IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

EIG ENERGY FUND XIV, L.P.,     :
EIG ENERGY FUND XIV-A, L.P.,    :
EIG ENERGY FUND XIV-B, L.P.,    :
EIG ENERGY FUND XIV (CAYMAN), L.P., :
EIG ENERGY FUND XV, L.P.,     :
EIG ENERGY FUND XV-A, L.P.,     :
EIG ENERGY FUND XV-B, L.P., and    : Case No. 18-cv-01047-PGG
EIG ENERGY FUND XV (CAYMAN), L.P.,  :
              :
      Plaintiffs,    : **FIRST AMENDED COMPLAINT**
              :
   - against -      :
              : **DEMAND FOR JURY TRIAL**
KEPPEL OFFSHORE & MARINE LTD.,  :
              :
      Defendant.   :
              :

Plaintiffs EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG

Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P.,

EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P. and EIG Energy Fund XV

(Cayman), L.P., by their attorneys Kramer Levin Naftalis & Frankel LLP, for their complaint

against defendant Keppel Offshore & Marine Ltd. ("**Keppel**" or "**defendant**"), allege as follows:

**Nature of the Action**

1.   This case arises from Keppel's wrongful participation in a highly

organized RICO conspiracy that conspired to, and in fact, committed the RICO predicate acts of

Travel Act violations, money laundering and wire fraud in the United States in violation of the

Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. § 1962(d).  This

conspiracy and its underlying RICO predicate acts caused plaintiffs to lose the entirety of their

$221 million investment in Sete Brasil Participações, S.A. ("**Sete**").

2.      On December 22, 2017, pursuant to a deferred prosecution agreement that Keppel reached with the U.S. Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of New York (the "**DPA**"), Keppel admitted that it "did knowingly and willfully conspire" to violate the Foreign Corrupt Practices Act (the "**FCPA**") through Keppel's participation in a long running bribery and kickback scheme.  In the DPA, Keppel and its wholly-owned U.S. subsidiary agreed to pay a criminal penalty in the amount of US $422,216,980.  Keppel's admission in the DPA that it committed violations of the FCPA constitute an admission that it conspired to commit and did commit the RICO predicate acts of Travel Act violations and money laundering.

3.      Keppel is a Singapore-based corporation that, among other things, builds offshore drillships and operates a shipyard in Brazil through wholly-owned intermediate entities. Keppel was a member of a RICO conspiracy with Petróleo Brasileiro S.A. ("**Petrobras**"), the Workers' Party of Brazil (the "**Workers' Party**"), Sete and others.  Petrobras is a Brazilian state-controlled oil company that operates to refine, produce, and distribute oil and oil products. At all relevant times, the Workers' Party was the governing political party in Brazil and effectively controlled Petrobras as its majority shareholder.

4.      Sete was created in 2011 by Petrobras for the sole purpose of raising outside capital on an "off balance sheet" basis, to fund the construction of twenty-eight offshore drillships at a cost of over US $700 million per drillship.  The drillships were to be chartered by Sete to Petrobras for ten to twenty years, and the revenue from this chartering would be Sete's sole source of income.  Keppel, through subsidiaries, contracted with Sete to build six of the proposed drillships.  The RICO conspiracy utilized Sete as a vehicle to expand an already existing massive bribery and kickback scheme.  Keppel authorized and paid over US $14 million of bribes in the form of kickbacks to enrich senior executives at Petrobras, Sete and the Workers'

Party in return for being awarded six lucrative drillship contracts with Sete.

5.      As Keppel well knew, in order for the bribery scheme to work, a critical
and necessary component of the scheme was that Petrobras and Sete would fraudulently raise
from third parties billions of dollars of capital for Sete, including from U.S. investors such as
plaintiffs, without disclosing that the investors' capital would actually finance millions of dollars
of bribes and kickbacks.  Without funding from outside investors, Sete could not pay Keppel for
the construction of drillships and Keppel could not kick back a percentage of those payments as
bribes.

6.      Keppel facilitated Petrobras' and Sete's fraudulent fund raising activities.
Before plaintiffs invested in Sete, plaintiffs' investment adviser, EIG Management Company,
LLC ("**EIG**") and its agents met on at least two occasions with Keppel regarding Sete, and
Keppel was fully aware that EIG-managed investment funds (with scores of US-based investors)
were potential investors in Sete.  EIG met again with Keppel after plaintiffs began to fund their
investment in Sete.  At the times that Keppel met with EIG as representative of plaintiffs, Keppel
had already agreed to pay millions of dollars in bribes and kickbacks to secure Sete drillship
contracts.  Keppel, in furtherance of the RICO conspiracy, did not at any time disclose to EIG or
plaintiffs that Keppel secretly planned to and did pay millions of dollars of bribes and kickbacks
relating to the Sete drillship contracts.

7.      Keppel also facilitated the fraud through its money laundering activities
and Travel Act violations.  These activities helped conceal and prolong the overall bribery and
kickback scheme, which caused the plaintiffs to make continued investments in Sete.

8.      As a result of multiple RICO predicate acts committed by the RICO
conspirators, from 2012 to early 2015, plaintiffs invested on a rolling basis over US $221 million
in Sete by wires emanating from banks in California and New York City.  These investments

were used to fund payments due under the corruptly obtained drillship contracts, a percentage of which was kicked back by Keppel in the form of bribes to senior executives of Petrobras and Sete and to the Workers Party.   During such time, Keppel transmitted wires and/or caused the transmission of wires in furtherance of the scheme to defraud potential Sete investors.  In violation of the Travel Act and federal money laundering laws, Keppel also used multiple instrumentalities of interstate commerce, including emails, to discuss, negotiate, plan and authorize the payment and concealment of bribes to the corrupt foreign officials, and made at least ten separate bribery payments related to Sete by wiring millions of dollars from at least two different accounts that Keppel and its agent controlled at banks in New York City.

9.       When Brazilian federal police and prosecutors uncovered and revealed this drillship bribery scheme – which has become part of the largest public scandal in the history of Brazil – Sete's drillship construction lenders promptly cut off further critical construction funding for Sete, thereby causing the company to default on its drillship construction contracts. Without such financing, and with the company then deeply mired in the bribery scandal, Sete quickly collapsed, and it filed in April 2016 for the Brazilian equivalent of bankruptcy proceedings.  Plaintiffs' over US $221 million investment in Sete is now worthless.

10.       Brazilian prosecutors discovered the RICO conspiracy through an ongoing investigation dubbed Operação Lava Jato ("**Operation Car Wash**"), which was publicly disclosed in 2015.  In connection with Operation Car Wash, authorities in Brazil have entered into plea agreements with, among others, João Carlos de Medeiros Ferraz ("**Ferraz**"), Pedro José Barusco Filho ("**Barusco**") and Eduardo Costa Vaz Musa ("**Musa**"), three former senior Petrobras executives whom Petrobras installed as Sete's most senior executives, and Zwi Skornicki ("**Skornicki**"), Keppel's Brazilian agent.

11.     As part of his plea agreement, Barusco made signed and recorded statements to the Brazilian federal police, and gave sworn testimony before the Brazilian congress, court and prosecutors describing in detail the criminal conspiracy involving Keppel entities.  Barusco admitted, among other things, that Renato Duque ("**Duque**") and Roberto Gonçalves ("**Gonçalves**") of Petrobras, João Vaccari Neto ("**Vaccari**") of the Workers' Party, and Sete executives Barusco, Ferraz and Musa, accepted bribes from Keppel in the amount of approximately 1 percent of the value of Keppel's drillship construction contracts with Sete. Ferraz, Barusco and Musa have subsequently agreed to disgorge close to US $100 million of the bribes they received, much or all of which they had secreted into Swiss bank accounts opened in the names of phantom entities.

12.     Skornicki's testimony revealed that Keppel had as early as February of 2011 directly authorized him to pay the bribes and kickbacks for Sete drillship construction contracts.  In finding that Skornicki was an "active" and "important" member of the illegal scheme, the 13th Federal Court of Curitiba in Brazil (the "**Brazilian Court**") convicted Skornicki of bribery, money laundering and participation in a "criminal organization."

13.     In the DPA, Keppel admitted to knowingly and willfully conspiring to pay and paying bribes from 2001 to 2014 in connection with thirteen projects in Brazil tendered by Petrobras and Sete.  The total bribes paid by Keppel over this time period amounted to approximately US $55 million, and were paid to Petrobras and Sete employees and the Workers' Party.  The bribes relating to Sete contracts totaled approximately US $14.4 million.  Keppel further admitted that it and its subsidiaries earned profits totaling approximately US $351.8 million from the business Keppel obtained through its participation in the illicit scheme.

14.     By this action, the plaintiffs seek redress for the injuries they have suffered due to the RICO conspiracy's illegal activities, which Keppel facilitated and aided and

for which Keppel is liable, including plaintiffs' lost investment of an excess of US $221,000,000, trebled under RICO to US $663,000,000, and mandatory attorneys' fees under RICO.

**Plaintiffs**

15.     Plaintiff EIG Energy Fund XIV, L.P. is a limited partnership organized and existing under the laws of the State of Delaware and is managed by EIG from its offices located in Washington, D.C.

16.     Plaintiff EIG Energy Fund XIV-A, L.P. is a limited partnership organized and existing under the laws of the State of Delaware and is managed by EIG from its offices located in Washington, D.C.

17.     Plaintiff EIG Energy Fund XIV-B, L.P. is a limited partnership organized and existing under the laws of the State of Delaware and is managed by EIG from its offices located in Washington, D.C.

18.     Plaintiff EIG Energy Fund XIV (Cayman), L.P. is a limited partnership organized and existing under the laws of the Cayman Islands and is managed by EIG from its offices located in Washington, D.C.

19.     Plaintiff EIG Energy Fund XV, L.P. is a limited partnership organized and existing under the laws of the State of Delaware and is managed by EIG from its offices located in Washington, D.C.

20.     Plaintiff EIG Energy Fund XV-A, L.P. is a limited partnership organized and existing under the laws of the State of Delaware and is managed by EIG from its offices located in Washington, D.C.

21.     Plaintiff EIG Energy Fund XV-B, L.P. is a limited partnership organized and existing under the laws of the State of Delaware and is managed by EIG from its offices located in Washington, D.C.

22.     Plaintiff EIG Energy Fund XV (Cayman), L.P. is a limited partnership organized and existing under the laws of the Cayman Islands and is managed by EIG from its offices located in Washington, D.C.

## Defendant

23.     Keppel is a corporation organized and existing under the laws of Singapore, operating globally, with its principal place of business at 50 Gul Road, 629351, Singapore.  Keppel's business consists primarily of building mobile offshore drilling rigs and handling repairs, conversions, and upgrades of shipping vessels.

24.     Keppel owns 100% of the stock of Keppel Fels Brasil, S.A. ("**Keppel Brazil**").  Keppel Brazil owns 100% of the stock of Estaleiro BrasFELS Ltda., which owns and operates a shipyard in the Angra dos Reis region of Brazil (the "**Keppel Shipyard**").  At all relevant times, Keppel has maintained control over and has had knowledge of the activities of Keppel Brazil and the Keppel Shipyard.

25.     Keppel, through intermediate entities, is also the parent company and one hundred percent shareholder of Keppel Offshore & Marine USA, Inc. ("**Keppel USA**"), which is based in Houston, Texas and incorporated in Delaware and whose executives supervised operations in, among other locations, Brazil.  Keppel has also maintained control over and knowledge of the activities of Keppel USA.

26.     The acts charged in this Complaint to have been done by Keppel were authorized, ordered or done by its officers, directors, employees, or agents, while actively engaged in the management of Keppel's affairs, and the acts taken by the other members of the RICO conspiracy in furtherance of the bribery and kickback scheme are imputed to each and every member of the conspiracy including Keppel.

**Jurisdiction and Venue**

27.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers jurisdiction upon this Court for actions arising under the laws of the United States, and 18 U.S.C. § 1964, which confers jurisdiction upon this Court to prevent and restrain violations of section 1962 of Chapter 96 of Title 18, RICO.

28.     This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367, as the state law claim arises from the same common nucleus of operative facts as the federal claim.

29.     This Court has personal jurisdiction over Keppel pursuant to N.Y. C.P.L.R. § 302(a) because Keppel conducted or caused to be conducted business in the Southern District of New York and committed acts in furtherance of the RICO conspiracy and the underlying fraud scheme in the Southern District of New York.  Assertion of personal jurisdiction over Keppel is consistent with the U.S. Constitution because of Keppel's and/or its agent's contacts with the Southern District of New York, which includes violations of the Travel Act, money laundering, and wire fraud in furtherance of the RICO conspiracy and the underlying fraud scheme.

30.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims asserted herein occurred in this district and pursuant to 18 U.S.C. § 1965(a) because Keppel transacted affairs in this district.

## Statement of Facts

Keppel's Long-Running
Involvement in
Bribery and Kickbacks

31.    High level executives from Keppel participated in a long-running bribery
and kickback scheme with Petrobras and the Workers' Party from as early as 2001.  This scheme
would have continued indefinitely but for its discovery by Brazilian prosecutors.

32.    From 2001 to 2011, Keppel entered into at least seven contracts with
Petrobras, and systematically paid bribes and kickbacks to Petrobras and Workers' Party officials
in exchange for each of these contracts.  The original value of these seven contracts totaled
approximately US $4 billion and the value of the bribes Keppel authorized in exchange totaled
approximately US $40 million, representing approximately 1% of each contract price.  Keppel
routinely used instrumentalities of interstate commerce, including emails and telephone lines, to
negotiate, authorize, and coordinate the concealment of and the execution of each bribe.

33.    For example, in or about 2001, Keppel won a subcontract to convert a
floating platform for Petrobras (the "**P-48 Project**").  Keppel executives provided instructions
and authorization for the payment of bribes totaling approximately US $300,000 to foreign
officials in connection with the P-48 Project.  On or about June 7, 2001, in relation to the P-48
Project, a Keppel executive sent the following email to the financial controller of a Keppel
subsidiary:

> [T]here is a commitment to pay US$300k for some governmental
> guy(s) to help us put pressure for the [P-48 project] to be carried
> out in Brazil.  [Another executive from a Keppel subsidiary] and
> myself have discussed this and decided to keep to the commitment.
> Pls make arrangement for the first US$50k to be paid accordingly
> . . . .

34.    On or about August 3, 2001, a Keppel executive again authorized the financial controller by email to make a bribe "payment for US$100k asap . . . ." On or about October 18, 2001, a Keppel executive sent another email to the financial controller regarding the P-48 Project in which he stated: "[t]ime has come for making another 2 payment for friends . . . similar to previous 3 payments. Pls proceed to make payment for US$100k . . . . After this we will have only one payment of US$50k left." On or about April 4, 2002, Keppel instructed the financial controller to make the final bribe payment of $50,000, to which the financial controller responded affirmatively.

35.    In or about 2003, Keppel again authorized the payment of bribes totaling approximately US $13.3 million in connection with two projects for construction services for Petrobras (the "**P-51 Project**" and the "**P-52 Project**"). Skornicki – defendant's agent in Brazil – testified that he arranged the bribe through Raul Schmidt of Petrobras and "took that to Keppel" and "made clear" to the "managers" of Keppel that the bribes would be for Petrobras employees. The bribes were transferred from a "pass-through" offshore company that Skornicki created by the name of Lynmar Assets Corporation f/k/a Faercon and held in Switzerland at Pictet bank. The payments were transmitted to separate accounts also in the names of foreign offshore companies intended for Petrobras employees and/or the Workers' Party.

36.    On or about October 3, 2003, Keppel executives discussed by email an upcoming meeting between Keppel and Petrobras officials to negotiate the kickback fee for the P-52 Project. The project was soon after awarded to Keppel. On or about February 12, 2004, Skornicki sent an email to Keppel affiliates, advising them that a Petrobras official had informed him that Keppel would need to alter its bid in order to ensure it won the contract for the P-51 Project. Skornicki stated that Keppel should, in part:

> Drop our today price in US$ 2 Million . . . with help again to
> compensate during the term of the contract.
>
> Reduce our delivery time in 2 months . . . and looking in my face,
> he promised me the two months will be give us back before the
> first year of the contract (we need to believe in him). This
> agreement will be straight with him, jointly with [Petrobras
> officials], but we cannot ask them officially, please believe him
> and me.

Skornicki also explained in the same email, "[i]f we go in the above line and provide them with

above conditions, he will be able to convince [others], to stop all negotiations and award the

contract to us." The P-51 Project was soon after awarded to Keppel.

37.    In or about 2007, Keppel again authorized the payment of bribes totaling

approximately US $14.2 million in connection with a Petrobras contract for construction services

for platform P-56 (the "**P-56 Project**"). Skornicki presented the offer to Barusco at Petrobras,

and agreed that the bribes would also benefit the Workers' Party. He testified that the

"management of Keppel" authorized the bribe, noting that he, as a representative, did not have

authority to agree to the bribe himself. The bribe represented 1% of the contract price, with 50%

of the bribe designated for Petrobras and the remaining 50% for the Workers' Party. Skornicki

transferred the bribe to Petrobras using pass-through offshore accounts and to accounts

belonging to Vaccari of the Workers' Party and others, disguised as registered election

donations.

38.    A series of emails reveal that Keppel understood the arrangement would

be a "clone" of the P-51 Project, and that the bribe would be disguised as a "donation to [the

Workers' Party]." On or about September 19, 2007, Keppel executives discussed the deal by

email, stating:

> Petrobras . . . found a loop-hole in the Brazilian Law that they
> could invite [a Keppel joint venture] for direct negotiation if it
> were to be a "clone" of an existing unit. . . . [T]he Project

> Manager . . . met [the joint venture partner] and me on 20 March
> on her action plan to launch direct negotiation with [the Keppel
> joint venture] for the P-56, as a "clone" of P-51. She told us that
> her budget was US $950 m.

Shortly thereafter, in or about October 2007, Petrobras awarded the P-56 project to the Keppel joint venture.

39.     On or about May 11, 2010, a Keppel employee sent an email to an employee in the financial and accounting office of the Keppel joint venture, stating, "remember there was a donation to [the Workers' Party] as part of election in 2008 of R$1,942k and R$483k[.]" On or about May 12, 2010, a Keppel executive instructed others in an email chain discussing the bribe payments to "not communica[te] such confidential thing over email."

40.     In or about 2005, and in or about 2009, Keppel authorized the payment of bribes totaling approximately US $4.4 million in connection with portions of two floating platform conversion projects for Petrobras (the "**P-53 Project**" and the "**P-58 Project**"). Skornicki testified that he was directly authorized by then-CEO of Keppel, Mr. Nelson Yeo, as well as a sales director of Keppel, who was aware that the bribe would be divided evenly between Petrobras and the Workers' Party. Again, Keppel authorized Skornicki to transfer the bribes using offshore accounts, and the bribe payments were discussed in a series of emails.

41.     In or about 2009, Keppel authorized the payment of bribes totaling approximately US $8.8 million to secure a large platform construction contract from Petrobras (the "**P-61 Project**"). Keppel was aware the payment would be distributed evenly between Petrobras executives and the Workers' Party.

42.     On or about November 25, 2008, Skornicki sent an email to Keppel executives, seeking confirmation that, "based on our telecom, some days ago," that for his work on the P-61 Project, Skornicki would be paid his regular commission, referred to as "rates

actually used in the existing contract," plus an additional two percent comprised of 0.5 percent for "the party," 0.5 percent for "Group A" and one percent for "Group B."  "The party" referred to the Workers' Party, "Group A" referred to Petrobras officials and affiliated persons, and "Group B" referred to Skornicki himself.

43.    On or about November 30, 2008, in anticipation of the P-61 Project, Keppel executives exchanged an email stating, "[Skornicki] also mentioned that [the joint venture] was originally not invited for this project until much lobbying with his friends help. And the fees were told to us sometime ago.  If they perceive us as not honoring our commitment, it may be bad for future business."  In 2009, Skornicki received authorization from Keppel executives to pay the bribe.

44.    On or about November 1, 2009, a Keppel subsidiary entered into a Marketing and Sales Representation Agreement with Skornicki (the "**November 2009 contract**") in connection with the contemplated P-61 project.  While knowing that Skornicki would pay bribes on behalf of Keppel from commissions paid to him under the November 2009 contract, Keppel executives signed and witnessed the agreement in Houston, Texas.  Shortly thereafter in 2010, Petrobras awarded the P-61 contract to the Keppel joint venture.  The bribe payments issued pursuant to the November 2009 contract were wired through U.S. bank accounts.

45.    By 2011, Keppel was a long-standing and important player in the overall bribery and kickback scheme involving Petrobras projects.  When that scheme was expanded to include Sete, a new opportunity arose for greed, fraud, corruption and self-enrichment.  Keppel's continued participation was automatic.

The Creation of
A New Vehicle for
Corruption Through Sete

46.     In or about 2006, RICO co-conspirator Petrobras announced one of the most significant discoveries of new oil reserves in the preceding 30 years:  the Pre-Salt Reserves located in the Campos and Santos Basins off the coast of Brazil (the "**Pre-Salt Reserves**").  The basins were believed to contain up to 50 billion barrels of oil, which led to a massive capital expenditure program to extract the oil.

47.     Senior executives of Petrobras conceived of the idea to perpetuate and expand their long-standing criminal scheme through the creation of Sete, an off-balance sheet vehicle formed by Petrobras to raise from third-party financiers in the United States and elsewhere the enormous amount of capital necessary to build drillships for purposes of extracting the Pre-Salt Reserves.  According to Barusco's testimony before the Brazilian Congress, "the initiative to create Sete Brasil" was taken by Barusco and Ferraz in early 2008, while they were senior employees of Petrobras.  At such time, Ferraz had worked at Petrobras for thirty years and had the position of General Manager, Finance Treasury.  Barusco had worked at Petrobras for thirty-one years and was Executive Manager, Engineering.

48.     Sete was a deliberate continuation of the corruption that had infiltrated Petrobras.  Barusco testified in Brazilian proceedings that the "idea of the kickbacks" and Sete were "born together."  According to Barusco, "the practice of a 1% kickback in construction contracts came from Petrobras and migrated to Sete Brasil.  There were the same suppliers and it continued at Sete."  One of those key suppliers was Keppel.

49.     According to an information memorandum that Petrobras and Sete prepared and provided to plaintiffs as potential investors, the plan was for Sete – through contracts with companies like Keppel that own shipyards – to build and own up to twenty-eight

- 14 -

deep-water drillships, and charter them to Petrobras.  The information memorandum further stated that Sete would have a competitive advantage over other potential drillship providers because it would construct its drillships using shipyards and labor in Brazil, and thus comply with "local content" rules that the Brazilian government imposed.  Moreover, according to the information memorandum, Sete had "strong support from the Brazilian Federal Government, including financial support" because it was to be the bedrock of a program to revitalize the Brazilian shipbuilding industry, an important political goal of the Brazilian government.

50.    The information memorandum further stated that Sete planned to rely heavily on borrowed money to build the drillships and to otherwise conduct its operations, with equity investments making up the remainder of Sete's overall capital structure.  Thus, according to the memorandum, Sete's "funding strategy [would be] focused on financing sources with large underwriting potential."  And consistent with representations that Sete enjoyed "strong support from the Brazilian Federal Government," the information memorandum informed plaintiffs (and other prospective investors) that Sete would benefit by a "special focus" on debt financing from Banco Nacional de Desenvolvimento Econômico e Social ("**BNDES**"), the Brazilian state-owned development bank.  Indeed, the information memorandum stated that Sete expected the single largest element of its overall capitalization to come in the form of loans from BNDES.  Stated differently, the information memorandum emphasized to potential investors – including the plaintiffs – that their equity investments (amounting to hundreds of millions of dollars) would be prudent because, although massive amounts of debt capital would also be necessary for Sete's success, such debt capital would be readily available to Sete because of Sete's preferential relationship with the Brazilian government and financial institutions under the effective control of the Brazilian government.

51.     By 2011, Sete was formed.  At such time, according to Barusco, Sete had already been folded into the longstanding criminal scheme, which included Keppel entities.

52.     In furtherance of the RICO conspiracy, Petrobras installed Ferraz as the Chief Executive Officer of Sete and Barusco as the Chief Operating Officer of Sete.  Petrobras also inserted Musa as Sete's Chief of Engineering.  Because Petrobras controlled Ferraz, Barusco and Musa, Petrobras controlled and dominated Sete.  As the Brazilian Office of the Federal Prosecutor stated in its indictment of Ferraz, Barusco, Duque, and others, "it was Petrobras that effectively exercised top management and ran [Sete]."  Indeed, Duque, who remained at Petrobras, used his position within Petrobras to cause Petrobras to contract with Sete for the 28 drilling rigs and to include Keppel – as a participant in the illicit scheme – in that bid.  The indictment states that at least as of April 2011, Duque had already agreed with Ferraz and Barusco of Sete, Skornicki (as Keppel's representative), and others, to produce a bid through Sete that would be favored in the bidding process by Petrobras and that would include Keppel as one of the shipyards.  The Workers Party also continued to use its influence and political power to ensure that the corrupt executives involved in the bribery and kickback scheme were appointed to and remained in strategic and high ranking positions within Petrobras and Sete.

53.     In connection with the anticipated expansion of the bribery scheme through Sete, in or about October 2011, Barusco traveled to Milan, Italy with Duque and Ferraz to meet with representatives of Banque Cramer, a bank based in Switzerland.  Barusco testified that he, Duque, and Ferraz opened accounts at Banque Cramer, in the names of phantom, offshore companies, for the purpose of laundering the Sete-related bribes.  The accounts were then actually used to receive Sete-related bribes, including from Keppel.

The RICO conspiracy Commits
Multiple Acts of Wire Fraud
<u>Targeted at U.S. Investors</u>

54.     RICO co-conspirators Petrobras and Sete were primarily responsible for raising the capital for Sete.  In doing so, they targeted U.S. investors, including plaintiffs. Petrobras and Sete committed wire fraud on numerous occasions by fraudulently preparing documents that they knew contained material omissions and purposely misleading information, and with knowledge that in order to reach potential investors, particularly U.S. investors, wires into the U.S. would be and were used to transmit the fraudulent information and wires from the U.S. would be and were used to transmit investment funds to Sete.

55.     In September of 2010, Societe General used international wires to email to EIG in Washington D.C. a multi-page presentation compiled by Petrobras entitled, "The Drilling Rigs Project:  Petrobras' Strategy for its Successful Implementation" (the "**Drilling Presentation**").  Petrobras provided Societe General with the Drilling Presentation.  Petrobras knew or reasonably knew that the Drilling Presentation would be sent through international wires to potential investors of Sete, including U.S. investors.

56.     Ferraz was referenced in the Drilling Presentation as "Petrobras-Finance Treasury, General Manager," and is the apparent author of the document.  The Drilling Presentation discussed the long term strategic and financing goals for an off-balance sheet "finance structure" to develop and to charter drillships to Petrobras so that Petrobras could extract oil and gas from the Pre-Salt Reserves.  Such "finance structure" became Sete.

57.     Petrobras, in its dissemination of the Drilling Presentation, specifically targeted U.S. investors.  Indeed, the Drilling Presentation contained a section titled "Cautionary Statement for US Investors," which read:

> The United States Securities and Exchange Commission permits oil and gas companies, in their filings with the SEC, to disclose only proved reserves that a company has demonstrated by actual production or conclusive formation tests to be economically and legally producible under existing economic and operating conditions.  We use certain terms in this presentation, such as oil and gas resources, that the SEC's guidelines strictly prohibit us from including in filings with the SEC.

Ferraz's subsequent testimony before the Brazilian Congress after the public revelation of Operation Car Wash confirmed that Petrobras targeted U.S. companies to invest in Sete.  According to Ferraz, "there was great market interest [about Sete], particularly among US private equity groups."  Sete was focused, in particular, in procuring investment from EIG and plaintiffs, as Ferraz believed that such investment would be a "stamp of approval" for future international investors.  According to Ferraz, an investment by EIG's investment funds - the plaintiffs - in Sete would show, "we [Sete] are efficient, that we are capable to mitigate risk, and that we are a good investment."

58.     The Drilling Presentation contained a number of fraudulent misrepresentations.  The Drilling Presentation identified six potential risks under the heading "Main Risks and Challenges," including "Credit Risk," "Short Fall of Revenues," "Charter Daily Rates," "Guarantees," "Technological Risk" and "Delay and Cost Overrun."  The listing of only six "Main Risks and Challenges" was materially false and/or materially misleading, because there was a seventh, enormous "main risk" with the investment – that Petrobras and Keppel and others had been engaged for years in a corruption scheme, and that they intended to expand and perpetuate that scheme through Sete.

59.     The Drilling Presentation also contained misrepresentations on a slide entitled, the "Main Players Objectives – Petrobras and Brazilian Government."  According to Petrobras, its "Main Objectives" were "[t]o ensure the availability of its demand for drilling rigs

for Pre Salt application, minimizing charter costs and associated risks." That representation was materially false because one of the main objectives with Sete was to perpetuate and expand the longstanding corruption scheme.

60. The Drilling Presentation also included a flow chart that purported to describe "The Basic Structure for Each Drilling Unit." That flow chart was materially false, as it did not reflect a key element of the basic structure in that Keppel would be paying bribes to executives of Petrobras, Sete and the Workers' Party with respect to each drillship.

61. In October of 2010, Bank Santander, Petrobras' financial advisor and agent, used international wires to email to EIG in Washington, D.C. a document prepared by Petrobras entitled, "Pre-Salt Oil Rigs Project." This document also discussed the Sete investment premise and touted that Sete would have "management with extensive experience in the market." This document did not disclose, however, that such management, which included Ferraz, would be utilizing Sete to perpetuate and expand the bribery and kickback scheme or that the investors' capital would be used to fund the bribes and the kickbacks.

62. In September of 2011, Lakeshore Financial Partners Participações Ltda. ("**Lakeshore**"), Petrobras and/or Sete's financial advisor and agent, used international wires to email to EIG in Washington D.C. a "Private Placement Confidential Information Memorandum" (the "**Private Placement Memo**"). In the Private Placement Memo, Sete described the Sete "investment opportunity." It did not disclose, however, that any investment in Sete would be utilized to fund the massive bribery and kickback scheme. The Private Placement Memo also delineated eight "risks and mitigating factors" including (1) "Design and Engineering," (2) "Cost Overrun," (3) "Delay" (4) "Performance," (5) "Charter Agreement Renewal," (6) "Termination of Brazil-Austria Agreement," (7) "Environmental and Social," and (8) "Total or Partial Loss." That Sete listed only these eight risk factors with a Sete investment was a material

misrepresentation and/or materially misleading because Sete knew that there was a ninth and enormous undisclosed risk factor:  that Keppel and others would utilize Sete to further perpetuate their bribery and kickback scheme.

63.     In the Private Placement Memo, Sete stated that companies building drillships were contractually bound to comply with "applicable law."  That statement was materially misleading as Sete knew that the opposite was true, and that Keppel and others had already agreed to violate the law by paying bribes and kickbacks in exchange for Sete contracts.

64.     Throughout the periods referenced above, Ferraz also transmitted through international wires numerous emails concerning Sete to EIG in Washington D.C., and none of these emails disclosed that Sete was a corruption conduit.

65.     For example, on October 5, 2011, Ferraz used international wires to communicate by email with EIG at EIG's offices in Washington, D.C.  In that email, Ferraz reported on Sete's progress in bidding for drillship charter agreements with Petrobras, and touted Sete's ability "to achiev[e] conditions that are both doable for Sete and its shareholders and practically unbeatable by [Sete's] competitor."  What Ferraz did not disclose to EIG, however, was that one of the reasons that Sete could achieve "conditions" that were "practically unbeatable" was that Petrobras, Sete, Keppel, the Workers' Party and others had organized a criminal scheme whereby the executives of Petrobras and Sete and the Workers' Party would be receiving millions of dollars of bribes and kickbacks from Keppel on the Sete drillship contracts.

66.     On December 23, 2011, Ferraz used international wires to communicate by email with EIG at EIG's offices in Washington, D.C. to report on the progress of the bidding process with Petrobras.  Ferraz stated that he had "high hopes" that by the end of January 2012, Sete would be allocated "the entire lot of the new drilling rigs" and that he was "very familiar" with all "5 members" of the Petrobras negotiating group.  Ferraz failed to disclose to EIG,

however, that his high hopes were based largely on the existence of the secret bribery and kickback scheme.

67.     On August 8, 2012, Ferraz again emailed EIG at EIG's offices in Washington, D.C.  Ferraz discussed the need for a capital call from Sete's shareholders and emphasized that, "we cannot shut our eyes to Sete Brasil's main focus today:  building its drilling rigs on time and on budget, to meet the goals for return on investment of all Sete Brasil shareholders."  Ferraz did not disclose to EIG, however, that one of Sete's main but secret goals was to enrich the senior executives of Petrobras, Sete and the Workers' Party with bribes and kickbacks and to secure lucrative contracts for Keppel and other shipbuilders.

68.     In addition to causing the transmission of fraudulent materials by email to the United States, members of the RICO conspiracy, including Keppel, carried out other substantial and illegal activities in the United States.  For example, Ferraz traveled to the United States several times to meet with EIG for the purpose of promoting both initial and continued investments in Sete.  One such meeting took place in Houston, Texas during the spring of 2013.  At that meeting, Ferraz did not disclose to EIG the massive bribery and corruption scheme in which he was participating personally.

69.     In September 2013, Ferraz attended in Washington, D.C. an annual conference EIG holds for its investors, involving approximately 300 attendees and including representatives of numerous U.S. state municipal pension plans, U.S. insurance companies and individual U.S. investors, many of whom had invested in plaintiffs.  The purpose of the conference was to review current investments, and prospective investment opportunities.  During the conference, Ferraz touted to EIG and EIG's fund investors that Sete expected drillship charter revenue "of almost US $90 billion [in] the next 20 years."  Ferraz also reported that Sete was "ahead of schedule," and was "not facing any problem to raise" the necessary debt financing

called for in its business plan.  Ferraz assured EIG and EIG's fund investors that by 2019, Sete

would "have 90 percent of all rigs already in operation," and that its "EBITDA [would] be US

$4.6 billion per year."  Finally, Ferraz told EIG and EIG's fund investors that Sete was

"performing as planned," and that he "[didn't] see any reason why [Sete] should deviate from

that."  Ferraz's oral statements perpetuated the pattern of deception and lies promulgated in the

various marketing materials previously provided by Petrobras and Sete to EIG and plaintiffs.

Ferraz must have known he was doing so, given that, by September 2013, he had been

participating personally and directly for several years in the corruption scheme with Keppel and

others, and he had projected that over the life of Sete, he would receive approximately US $20

million in illicit bribes.

       70.    Keppel also conspired to and committed multiple acts of wire fraud in

furtherance of the RICO conspiracy, and it affirmatively assisted Petrobras and Sete's fraudulent

fund raising activities.  Keppel was fully aware that Sete was a start-up company formed by

Petrobras that needed to raise capital, which would be utilized to fund Keppel's bribes and

kickbacks.  Keppel was also aware of the identity of Sete's investors, including of EIG.  And

Keppel did its part in knowingly concealing the illicit bribery and kickback scheme from EIG in

order to induce EIG and plaintiffs to invest in Sete.

       71.    No later than in August of 2011, Keppel learned that EIG was a potential

U.S. investor in Sete.  In early August of 2011, Kevin Corrigan ("**Corrigan**"), a senior executive

of EIG and one of the point persons at EIG on the Sete investment, traveled to the Keppel

Shipyard in Brazil and met with senior Keppel Brazil executives regarding Sete.  Also present at

that meeting were representatives from a sovereign wealth fund, which was considering an

investment in Sete, and Lakeshore.  During this meeting, executives of Keppel Brazil made a

power point presentation about Keppel's shipbuilding business, and they gave Corrigan and the other attendees a tour of the Keppel Shipyard.

72.     A few weeks later, Barusco contacted Keppel Brazil and requested that EIG's agent, Barrington Media, a media company residing in the United States ("**Barrington**"), be allowed to visit the Keppel Shipyard.  EIG had retained Barrington to film the Keppel Shipyard for an informational video for EIG's investors concerning the investment in Sete. Barrington and Sete employees exchanged multiple emails coordinating the schedule and details of the video shoot.  Barusco obtained approval from Keppel Brazil for Barrington's trip to the Keppel Shipyard.  On August 19, 2011, a Sete employee sent an email to Barrington in the U.S. providing Barrington with both the phone number and email address of a Keppel Brazil employee who would escort the Barrington team.  In response, on the same day, Barrington emailed Adrianna Farah, an employee at Keppel Brazil, confirming the visit and details of the visit and shoots.  Farah responded on the same day to Barrington by email, copying Corrigan of EIG and Kai Choong Kwok, the CEO of Keppel Brazil, confirming the details of the visit. Kwok, along with other high level executives at Keppel, was fully aware of Keppel's participation and role in the bribery and kickback scheme.  Indeed, Keppel's agent Skornicki named Kwok as a major participant in the scheme during his criminal proceedings before the Brazilian Court.

73.     In late August 2011, Barrington flew from the United States to Brazil to visit the Keppel Shipyard, where it was accompanied by Keppel Brazil and Keppel Shipyard personnel.  During the visit, Barrington spent a number of hours filming various areas of the Keppel Shipyard, for later use at EIG's investors conference.

74.     The emails exchanged between Keppel Brazil and Barrington were in furtherance of the bribery and kickback scheme, including the scheme to defraud Sete's potential

investors.  As Keppel knew, the videos shot by Barrington would be used to induce plaintiffs' investment in Sete.  Investment into Sete was critical, as Keppel knew, to the success of the bribery and kickback scheme and its receipt of lucrative drilling contracts.

75.    By August of 2011, Keppel had already agreed to pay bribes and kickbacks in return for Sete drillship contracts.  Indeed, Petrobras had carefully selected Keppel as a Sete supplier, given that Petrobras knew Keppel would continue to be an-only-too willing participant in the bribery scheme.  Keppel did not, however, at any time disclose to EIG or plaintiffs the existence of that scheme and/or that Keppel, in furtherance of the RICO conspiracy, had agreed to pay such bribes and kickbacks.  Nor did Keppel disclose to EIG or plaintiffs that a principal reason for its selection as a contractor was its very willingness to participate in that bribery scheme.

76.    Based on the wrongful conduct of the RICO conspiracy, the plaintiffs began to invest in Sete in August 2012 and continued to make investments into early 2015. Plaintiffs made their investments in Sete through a series of wires originating from bank accounts controlled by EIG in California and in New York City.  The RICO conspiracy, through its fraudulent misrepresentations and omissions directed at EIG, caused EIG, on behalf of plaintiffs, to initiate all such wires.  That EIG would make wire transfers from the U.S. for the purpose of investing in Sete was reasonably foreseeable to the members of the RICO conspiracy. The wire transfers sent by EIG, all of which were caused by the RICO conspiracy and its underlying RICO predicate acts, originated from the United States, as illustrated in the below table:

| Originating US Bank | Date of Wire | Amount (USD) |
|---|---|---|
| Union Bank CA | 8/3/2012 | 50,049,309.66 |
| Union Bank CA | 8/9/2012 | 25,020,988.03 |
| Union Bank CA | 5/7/2013 | 2,391,661.00 |
| Union Bank CA | 10/1/2013 | 214,717.89 |
| CitiBank NY | 4/11/2013 | 14,132,504.22 |
| CitiBank NY | 5/7/2014 | 22,022,539.75 |
| CitiBank NY | 6/4/2014 | 10,856,257.43 |
| CitiBank NY | 8/12/2014 | 8,058,966.64 |
| CitiBank NY | 8/25/2014 | 12,354,944.74 |
| CitiBank NY | 10/15/2014 | 9,488,769.37 |
| CitiBank NY | 11/10/2014 | 8,863,942.25 |
| CitiBank NY | 12/8/2014 | 15,088,880.87 |
| CitiBank NY | 1/5/2015 | 42,567,695.54 |

Had EIG known the truth about the bribery and kickback scheme, EIG would never have invested plaintiffs' funds in Sete.

77.    In April 2012, Keppel issued a press release in which it stated that it, through its subsidiaries, had signed a letter of intent for the design and construction of six drillships.  Keppel acknowledged in that press release that "Sete Brasil is a Brazilian company established in December 2010 formed by seven Brazilian finance investors, including banks and the four biggest Brazilian pension funds, besides Petrobras."

78.    On August 7, 2012 – four days after plaintiffs funded their first investment in Sete – Keppel issued another press release in which it stated that, "Sete Brasil is a Brazilian

- 25 -

company established in December 2010 and formed by Brazilian and *International finance investors*, including banks and the four biggest Brazilian pension funds, besides Petrobras" (emphasis added).  Keppel's reference to "International finance investors" was a direct reference to EIG and the plaintiffs, which, as Keppel knew, had just become investors in Sete.  The press release further stated that Keppel had, through a subsidiary, "firmed up contracts" with Sete for the design and construction of five drillships for "approximately US $4.1 billion."  According to that press release, the drillships were scheduled for delivery in "4Q 2016, 3Q 2017, 2Q 2018, 4Q 2018 and 3Q 2019 respectively."  Given that Keppel's bribes and kickbacks were funded by Sete's construction payments, Keppel would be paying bribes and kickbacks through at least 2019.

79.     In early August of 2013, EIG's Corrigan again visited the Keppel Shipyard, on behalf of plaintiffs, and met with senior Keppel Brazil employees.  Again, Keppel affirmatively assisted Petrobras and Sete's scheme to defraud investors by failing to disclose to plaintiffs' representative, Corrigan, that Keppel had agreed to and, in fact, was paying bribes and kickbacks to procure Sete contracts.

> Keppel Pays Bribes On Sete
> Contracts in Violation of the Travel Act
> and Launders Sete Bribes
> Through New York City Banks

80.     In violation of the Travel Act, Keppel offered, promised, and did pay approximately US $14.4 million in bribes for the Sete drillship contracts.  Keppel used multiple instrumentalities of interstate commerce, including emails and telephone lines, to negotiate, authorize, and coordinate the concealment of and the execution of these bribes.  It negotiated and authorized bribes equal to 0.9% of each Sete contract price, with two thirds of the payment designated for the Workers' Party and one third to be divided equally between Petrobras and

Sete executives.  Keppel executives further authorized its agent, Skornicki, to pay an additional

kickback solely for Barusco in an amount equal to 0.1% of each Sete contract.

81.     On or about September 19, 2011, a Keppel executive sent a chat to his

secretary asking her to type a message to another Keppel executive explaining, "[w]ill need to

prepare Commission Agreement [with Skornicki's company] for the 1.5 [percent].  Is this okay,

as he will have to show that this is all he is getting?"  The "Commission Agreement" referred to

in the email falsely represented that a payment was being made to Skornicki's company for

"consulting" services, including his assistance and support in discussions and negotiations with

prospective customers when, in fact, a portion of that payment was being used to pay Sete-

related bribes.  Keppel directed its employees to execute these commission agreements and

authorized payments pursuant to those agreements, knowing that a portion of those payments

would be used to pay bribes to Petrobras, Sete, and the Workers' Party.

82.     On or about September 19, 2011, a Keppel executive sent an email to his

secretary in which he discussed the arrangement of and need to conceal the Sete-related bribes,

stating,

> Put this in a plain paper and pass to [certain other Keppel
> executives], then delete email:  Further to our t/c, made the
> suggestion to have one of us go to explain the situation.  However,
> the problem is that we will not be brought to all involved to
> explain.   As such, need to execute the standard Commission
> Agreement with [Skornicki's company], with the 1.5% as a copy
> of this will be showed up the line to convey that this is all. Nothing
> more.   We've signed before for other jobs and have seen other
> agreements with [Skornicki's company] for even larger amounts.
> Would prefer not to, but the Comm. Agreement, may be the only
> thing that will satisfy people.  Other than reverting to the original
> plan, wherein proof would not be required then.  At a loss as to
> alternatives.

83.     On or about March 30, 2012, Skornicki emailed a Keppel executive, copying another Keppel executive, stating that he was "having pressure from my partners about my contract . . . ."

84.     On or about April 12, 2012, a Keppel executive emailed another Keppel executive informing him that "[Skornicki] was asked by his 'friends' to call a [third Keppel executive] tonight about the contract.  Fyi."

85.     On or about July 18, 2012, a Keppel executive sent an email to another Keppel executive in which he mentioned dividing payments to Skornicki into two agreements. The Keppel executive who received the email responded the following day, "What do [you] mean by 2 agreements?", to which the first Keppel executive responded, "[o]ne for .5% and one for 1.5% for different parties, totaling 2%."

86.     Skornicki, acting on Keppel's authority and instructions, laundered Sete-related bribe and kickback payments by wiring money from an account maintained at Delta National Bank in New York City in the name of Deep Sea Oil Company, to an account at Citibank North America in New York City and, from there, to an account in the name of Shellbill Finance S/A and held at Heritage bank in Switzerland.

87.     Pursuant to such routing, Keppel, through its agent, Skornicki, laundered the following funds through New York City bank accounts through the use of wires emanating from the U.S.:

- US $500,000 on September 25, 2013;

- US $500,000 on November 15, 2013;

- US $500,000 on December 19, 2013;

- US $500,000 on February 6, 2014;

- US $500,000 on March 25, 2014;

- US $500,000 on April 28, 2014;

- US $500,000 on July 10, 2014;

- US $500,000 on September 8, 2014; and

- US $500,000 on November 4, 2014.

88.     In or about 2014, Skornicki again used the Deep Sea Oil Company account held at Delta National Bank in New York City to settle an outstanding bribe debt with Barusco for US $2 million, which Barusco believed concerned a Sete drillship contract. Skornicki also attempted to use the Deep Sea account to transfer a US $12 million bribe payment to Duque but when the transfer failed, he opened a new account, named York Town and held at Delta Bank in Switzerland, to complete the transaction.  Keppel paid Sete-related bribes and kickbacks from the construction payments that it received from Sete and which the RICO conspiracy fraudulently extracted from investors, including plaintiffs.

89.     Keppel's Travel Act violations and money laundering activities were essential to facilitating the ongoing concealment of the bribery and kickback scheme, which caused plaintiffs to make additional investments into Sete.

Brazilian Police and
Prosecutors Uncover the
Bribery and Kickback Scheme

90.     The bribery and kickback scheme as it related to Sete, along with Keppel's bribery and money laundering activities, would have continued at least through 2019 but for the Brazilian government's investigation.  If construction had been delayed, the scheme would have continued past 2019.

91.     In 2015, federal police and prosecutors in Brazil publicly disclosed Operation Car Wash.  Although the investigation initially concerned alleged money laundering

by a number of criminal organizations, it ultimately revealed the conspiracy and bribery and kickback scheme described herein.

92.     The police and prosecutors conducting Operation Car Wash arrested Barusco on suspicion that he had been involved in corruption during his tenure at Petrobras. Subsequently, Barusco, Ferraz, Musa, Keppel's agent Skornicki, and many others entered into plea arrangements with Brazilian prosecutors and police wherein they agreed to cooperate with the investigation in exchange for lighter sentences.

93.     Barusco provided extensive information to Brazilian police and prosecutors and to the Brazilian Congress, demonstrating the scope, duration and the development of the bribery and kickback scheme.  Tellingly, in his sworn testimony before the Brazilian Congress, Barusco stated that "[t]he issue of [Sete], about the establishment of bribe amounts, was a continuity of what happened in PETROBRAS."  In other words, the moment that Ferraz and Barusco – while they worked at Petrobras – came up with the idea to form Sete, they were well aware, and intended, that Sete would perpetuate and expand the existing bribery and kickback scheme involving the same participants—including Keppel entities.

94.     According to Barusco's plea statements, from at least as early as 2003, corruption within Petrobras was "endemic and institutionalized."  Bribery and kickbacks were "built in" to contracts and were "understood to be part of the relationship" between Petrobras and most persons and entities with whom Petrobras had business dealings, including its longstanding partner in crime, Keppel entities.  It was, to use Barusco's words, Petrobras's "*modus operandi*" to accept some form of bribe in its business dealings.  Bribes and kickbacks paid in connection with Petrobras contracts generally were split, with a portion going to Vaccari – the Secretary of Finance and Planning of the Workers' Party – and the balance going to "the House," which consisted of Duque, Barusco and, on occasion, other Petrobras executives.  The scope of this

corruption, both in terms of the number of people involved and the amount of bribes paid, was massive – between 2005 and 2010 alone, Barusco estimated that Duque and he received millions of dollars in bribes in connection with 60 separate contracts.

95.   According to Barusco, the decision to divide the Sete-related bribes between three groups (two-thirds to the Workers' Party and one-third to Petrobras and Sete) involved a two-year negotiation, which began in 2010. During this time, Barusco testified that there were a number of meetings between Barusco, Duque, and Vaccari and others concerning the division of the Sete-related bribes.

96.   In Barusco's plea-related statements and testimony, including Collaboration Agreement No. 1, dated March 3, 2014, between Barusco and, among others, the Brazilian Bureau for the Repression of Financial Crimes and Deviations of Public Resources, Barusco described the conspiracy and the involvement of the Keppel entities therein, including that:

- Keppel entities authorized the payment of bribes and kickbacks in connection with at least seven contracts it received from Petrobras that were worth approximately US $4 billion between 2001 and 2011, and knew that the payments were intended for Petrobras employees and Workers' Party officials;

- Keppel entities agreed that approximately 1 percent of the price of each contract would be paid as bribes;

- Keppel entities received six Sete contracts in exchange for its continued participation in the bribery and kickback scheme and negotiated a bribe fee of .9% of the price of each Sete contract; and

- Two-thirds of the bribes from Keppel's agent was designated for Vaccari of the Workers' Party and one-third was divided evenly between "House 1," which consisted of Petrobras executives Duque and Gonçalves, and "House 2," which consisted of Sete executives Barusco, Ferraz and Musa. Barusco negotiated for himself an additional payment from Keppel entities in the amount of 0.1% of the contract price.

97.     Skornicki, in his testimony before Brazilian prosecutors, corroborated most of Barusco's account.  Skornicki testified that he "made it clear to Keppel" that he was paying "a bribe . . . to Petrobras officials . . . and it was accepted [by Keppel]."  Skornicki also testified that when Barusco requested a bribe, Skornicki "reported that to Singapore directly," Skornicki "ended up going to Singapore five times a year," and "they authorized" him to pay bribes.  According to Skornicki:

> **[Skornicki]:** No, the only autonomy I had, which after agreeing on the bribe primarily with the Party, Keppel left to my discretion, knowing that it was Mr. Vaccari, to arrange with Mr. Vaccari as to whom I should pay, they didn't interfere in that.

> **Defense Counsel:** And who was it exactly at Keppel, did you mention some people?

> **[Skornicki]:** There were several, beginning with Tay Kim Hock, who was the first CEO [of Keppel Brazil], today it's "[Kai Choong Kwok]," also Mr. Yew Yuen Chow [Chow Yew Yuen], who is currently CEO of Keppel Offshore and Marine, which covers all the Keppel Fels companies, Mr. "Sib Shoo," who is former CEO [of defendant Keppel Offshore and Marine], and the Chairman, who is Mr. Tong [Tong Chong Heong, Senior Executive Director of Keppel Corporation Ltd.] there in Singapore.

98.     Brazilian prosecutors have charged and/or convicted various individuals for partaking in this criminal scheme, including Barusco, Duque, Vaccari, Musa and Skornicki. Barusco was originally sentenced to 18 years in prison in 2014 for, among other things, his involvement in the corruption scheme, but that sentence was later reduced to two years of alternative confinement in exchange for his full cooperation in the investigation.  In September 2015, Duque was convicted by the Brazilian Court for the crimes of bribery and money laundering related to his involvement in the bribery and kickback scheme, and is currently serving a prison sentence of more than 40 years for that and subsequent convictions.  Vaccari

was also convicted in September 2015 and received a 15 year prison sentence for, among other things, receiving bribes in connection with Sete contracts.

99.    Skornicki, Keppel's agent, was also convicted.  According to the Brazilian Court:

> Also proven beyond any reasonable doubt is that Zwi Skornicki, representing the interests of Keppel Fels Group, paid improper benefits in contracts entered into by the Group, specifically by the subsidiary Brasfels Shipyard, to Sete Brasil for the supply of six drilling rigs with Petrobras intended as their end customer.

100.    The Brazilian Court convicted Skornicki of "five counts of offering bribes . . . eleven counts of money laundering . . . [and] the charge of belonging to a criminal organization."

101.    The public revelation of the facts underlying the affairs of this "criminal organization" have had a devastating impact on Sete.  As a result of this revelation, Sete has had its bank financing lines cut off and the raising of further debt or equity rendered impossible; it has defaulted on its shipbuilding contracts for lack of money to pay necessary installments; and the lack of drillships has led to the cancellation (or an inability to timely perform) the Petrobras charter contracts that were to underpin its entire business plan.  Indeed, during Barusco's testimony before the Brazilian Congress on March 10, 2015, a legislator asked Barusco about the impact of the corruption scandal on Sete and its investors.  In response, Barusco testified:

> The [Sete] project is an intelligent project. It is a structuring that made things work. There was just one detail: it was obviously very dependent on financing from the BNDES – extremely dependent. And with the discovery of the information that there was payment of bribes on contracts with the shipyards, the financial agents backed away.  And if there is no contribution of the funds that are called for, that are in the Budget, are in the planning, Sete really can go bankrupt, it could end up unable to honor its commitments.

102.   This prediction, in fact, came to pass.  In April 2016, Sete filed for the equivalent of bankruptcy in Brazil.

103.   As a result, plaintiffs' investment in Sete is now worthless.

Keppel Admits its
Participation in the
Bribery and Kickback Scheme

104.   On December 22, 2017, Keppel entered into the DPA in which Keppel admitted that it:

> [T]ogether with others, did knowingly and willfully conspire to commit offenses against the United States, to wit:  being a person other than an issuer or domestic concern, through its employees and agents, while in the territory of the United States, corruptly to make use of the mails or any means or instrumentality of interstate commerce or to do any act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, a foreign political party, a foreign political party official, a foreign political candidate and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official, a foreign political party, a foreign political party official and a foreign political candidate for the purposes of: (a) influencing acts and decisions of such foreign official, foreign political party, foreign political party official and foreign political candidate in her or her official capacity; (b) inducing such foreign political party, foreign political party official and foreign political candidate to do and omit to do acts in violation of the lawful duty of such official; (c) securing any improper advantage; and (d) inducing such foreign official, foreign political party, foreign political party official and foreign political candidate to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist [Keppel] and its employees and agents in obtaining and retaining business for and with, and directing business to, [Keppel] and others, contrary to Title 15, United States Code, Section 78dd-3.

105.     Keppel further admitted in the DPA that, in furtherance of such conspiracy, Keppel committed and caused to be committed a series of overt acts within the Eastern District of New York and elsewhere.

106.     Under the DPA, Keppel agreed to pay a criminal penalty in the amount of US $422,216,980, of which Keppel USA will pay US $4,725,000.  Keppel will pay US $105,554,245 of its criminal penalty to the U.S. Treasury.  It will pay the remainder of the penalty to Brazil and Singapore.

107.     Keppel further admitted in the DPA that it paid approximately US $55 million in bribes to employees of Petrobras and Sete and members of the Workers' Party to secure improper advantages in its business dealings over the course of a decade, of which approximately US $14.4 million represented bribes Keppel made in connection with drillship projects awarded by Sete.

108.     Keppel also admitted in the DPA that from approximately 2001 to 2014, it entered into contracts for at least seven projects with Petrobras and six projects with Sete and that it negotiated, coordinated, authorized, and paid bribes in connection with each of these projects.  Keppel admitted that it drafted and executed agreements with consulting companies controlled by its agent (Skornicki) that were intended to facilitate the bribe payments and conceal their purpose.  Under the guise of these agreements and instructions provided by Keppel, Keppel's agent Skornicki made payments to bank accounts in the U.S. and elsewhere in the name of shell companies controlled by Skornicki.  Skornicki then wired the money from those bank accounts in the U.S. to bank accounts outside of the U.S. that were controlled by or for the benefit of executives at Petrobras, Sete, and members of the Workers' Party.

109.     The U.S. Department of Justice described Keppel's role in the criminal organization as "long-running," "serious[]," and involving "high level [Keppel] executives."

110.    Jeffery Chow ("**Chow**"), the Director of Keppel's legal department – a United States citizen – pled guilty on August 29, 2017 for conspiring to violate and violating the FCPA's anti-bribery provisions.  Chow admitted that, pursuant to "established practices" at Keppel, he and others at Keppel facilitated the payment of bribes and the concealment of the true nature and purpose of those payments by creating and executing false agreements on behalf of Keppel with consulting companies controlled by Skornicki.  These agreements falsely represented that payments were being made to Skornicki for support services when, in fact, portions of those payments were being paid as bribes.  Chow admitted that Keppel executives directed him and other Keppel employees to execute those agreements and authorized the payments to Skornicki, knowing that a portion of those payments would be used to pay bribes to Petrobras and Sete employees, and the Workers' Party.  Chow further admitted that the bribe payments were made to bank accounts located in the United States and elsewhere, which were subsequently wired to bank accounts outside the United States controlled by Petrobras and Sete employees and the Workers' Party.  Chow himself executed or was personally involved with helping to coordinate at least three such agreements during the Sete time period.

111.    On December 22, 2017, Keppel's U.S.-based, wholly-owned subsidiary, Keppel USA, also pled guilty to violating the FCPA's anti-bribery provisions in connection with its involvement in the bribery and kickback scheme alleged herein.  Among other things, Keppel USA admitted that "[i]n or about and between 2007 and 2014, [Keppel USA], together with others, including [defendant Keppel], knowingly and willfully conspired to pay approximately $8.8 million corruptly for the benefit of foreign officials, including [Petrobras employees, one of whom migrated to Sete in 2011], and the Workers' Party to secure improper advantages and to influence those foreign officials and the Workers' Party to obtain and retain business in Brazil."

## FIRST CAUSE OF ACTION:
## VIOLATION OF RICO, 18 U.S.C. § 1962(d)

112.    Plaintiffs repeat each and every prior allegation, as if fully set forth herein.

113.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs seek relief from the defendant for violating 18 U.S.C. §1962(d).

114.    At all relevant times, Keppel and each alleged co-conspirator was and is a "person" within the meaning of 18 U.S.C. § 1962(d) and 18 U.S.C. § 1961(3).

115.    In violation of 18 U.S.C. § 1962(d), Keppel, Petrobras, the Workers' Party, Sete and various other entities knowingly conspired with each other to conduct the affairs of an enterprise through a pattern of racketeering activity that affected interstate or foreign commerce in violation of 18 U.S.C. § 1962(c).

116.    Keppel, Petrobras, the Workers Party and Sete together constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

117.    The scheme behind the conspiracy included the use of Sete as a new vehicle to engage in, continue, and expand the massive bribery and kickback scheme that had already been in existence, to conceal that scheme, to fund the scheme by committing fraud on Sete's investors, including plaintiffs, and to enrich the conspirators by systematically and unlawfully securing lucrative Sete contracts for Keppel in exchange for bribe and kickback payments.  A necessary component of that scheme, which was known to all participants in the conspiracy including Keppel, was that Sete, a start-up, would fraudulently raise billions of dollars of capital, from among others, plaintiffs, which would be used to fund the bribes and the kickbacks in the form of construction payments to Keppel and other shipbuilders.

118.    Keppel's agreement with the members of the conspiracy, including Petrobras, Sete, and the Workers' Party, individually and through their agents, employees, and/or

representatives, to facilitate the ends of the conspiracy through a pattern of racketeering activity that affected interstate or foreign commerce can be reasonably inferred by (1) Keppel's financial gain resulting from the commission of overt RICO predicate acts; (2) Keppel's knowledge that Sete was a start-up company that needed to raise capital to fund Keppel's bribes and kickbacks; (3) Keppel's knowledge of the identity of Sete's potential investors, including EIG-managed investment funds; (4) Keppel's knowledge that a critical and essential goal of the conspiracy was to conceal the bribery and kickback scheme, including from potential investors; (5) Keppel's facilitation of Petrobras and Sete's fraudulent fundraising activities, including providing presentations to EIG, as plaintiffs' representative, and hosting potential investors and investor representatives at the Keppel Shipyard without ever disclosing to EIG or plaintiffs that Keppel had agreed to pay millions of dollars of Sete related bribes and kickbacks; (6) Keppel's commission of multiple acts of wire fraud, violations of the Travel Act and multiple acts of money laundering, through which it carried out and facilitated the concealment and execution of the bribery and kickback scheme, in furtherance of the RICO conspiracy; (7) the testimony of Skornicki that Keppel was aware of and authorized Keppel's Sete-related bribes and kickbacks; (8) the findings of the Brazilian authorities that Skornicki, as Keppel's agent, was guilty of money laundering, participating in a criminal organization and was an active and important participant in carrying out the bribery and kickback scheme; (9) Keppel's agreement to pay bribes on Sete contracts at least by early 2011 and Keppel's plan to pay bribes relating to Sete through at least 2019, if not later; and (10) Keppel's own admissions in the DPA that it violated the FCPA by conspiring and participating in an illegal bribery and kickback scheme concerning Sete as well as the admissions by Keppel USA and Keppel's former director of its legal department concerning the same.

119.    Defendant's agreement with the members of the conspiracy, including Petrobras, Sete, and the Workers' Party, individually and through their agents, employees, and/or representatives, to engage in a pattern of racketeering activity was further manifested by the number of racketeering offenses committed by them, individually and collectively, as alleged above.

120.    The conspirators conspired to and committed overt, RICO predicate acts to facilitate the purposes of the conspiracy.  Keppel conspired to and committed multiple predicate acts of wire fraud in violation of 18 U.S.C. § 1343, multiple predicate acts violating the Travel Act through its knowing violations of the FCPA under 18 U.S.C. § 1952, and multiple predicate acts of money laundering in violation of 18 U.S.C. § 1956, as alleged herein. Conspiracy members Petrobras and Sete also conspired to and committed multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as alleged herein.

121.    As a direct and proximate result of the conspiracy's RICO predicate acts, plaintiffs have suffered substantial damages in an amount to be proven at trial.

122.    As a RICO co-conspirator, Keppel is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy.

123.    Plaintiffs suffered domestic U.S. injuries.  In addition to the injuries already alleged, as a result of the material false statements and omissions made through use of wires by Petrobras and Sete, the wires transmitted by or caused to be transmitted by Keppel as part of the scheme to defraud potential investors, and the acts of concealment undertaken by Keppel and the other RICO conspiracy members, plaintiffs invested without knowledge of the almost certain risk that if the corruption scheme underlying the RICO conspiracy ever came to light, Sete's business would suffer irreparable, direct and immediate harm and the value of any investment in Sete would decline or be destroyed entirely.  Plaintiffs' injury occurred in the

- 39 -

United States, where the investment originated, from where plaintiffs wired funds to invest in Sete and where six of the plaintiffs reside.

124.    Accordingly, defendant is liable to the plaintiffs for treble damages, plus interest, costs and disbursements, and attorneys' fees under 18 U.S.C. §§ 1964(c) and (d).

125.    In addition, by reason of their injuries, plaintiffs are entitled to any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION:
## AIDING AND ABETTING FRAUD

126.    Plaintiffs repeat each and every prior allegation, as if fully set forth herein.

127.    Keppel aided and abetted the fraud committed by Petrobras and Sete against the plaintiffs, as alleged herein.

128.    Keppel knew of the fraud perpetrated by Petrobras and Sete against EIG and the plaintiffs.  Keppel was aware of the overall objective of the bribery and kickback scheme involving Sete and knew that a necessary component of that scheme was the solicitation of private investment funds through fraudulent means.  Keppel further knew that EIG and the plaintiffs were potential investors in Sete and that Petrobras and Sete were soliciting investments without disclosing the bribery and kickback scheme and Keppel's illicit role therein.  Keppel had a clear motive to assist in the fraud and colluded in the efforts to defraud the plaintiffs.

129.    Keppel provided substantial assistance to Petrobras and Sete in perpetrating that fraud by, among other things, facilitating their fraudulent fundraising activities. Knowing that plaintiffs were potential investors in Sete, Keppel Brazil executives met with plaintiffs' representative at least twice regarding Sete, made a power point presentation about Keppel's shipbuilding business, and provided the plaintiffs' representative with a tour of the Keppel Shipyard.  Keppel Brazil also exchanged emails with the plaintiffs' agent for the purpose

- 40 -

of allowing the agent to film the Keppel Shipyard.  Despite the fact that Keppel Brazil was fully aware of the Sete bribery and kickback scheme and was an active participant therein, neither Keppel Brazil nor Keppel ever disclosed to plaintiffs the existence of the bribery and kickback scheme.  Keppel, through Keppel Brazil, knowingly carried out the foregoing activities in furtherance of the scheme to induce fraudulently the plaintiffs' investment in Sete.

130.     Keppel also provided substantial assistance with the fraud by helping conceal and prolong the bribery and kickback scheme through its money laundering activities and Travel Act violations.  As Keppel well knew, the concealment of the bribery and kickback scheme was critical to the  ongoing success of the scheme, which required continued funding from investors, like plaintiffs.  Had plaintiffs learned of the bribery and kickback scheme, they would have ceased their rolling investments in Sete.

131.     As a direct and proximate result of Keppel's wrongful conduct, plaintiffs invested and continued to invest in Sete and suffered damages in an amount to be proven at trial, but in no event less than US $221,000,000.

132.     Keppel acted in willful disregard of the plaintiffs' rights, and of the wrongful nature of its course of deceitful conduct.  Accordingly, plaintiffs are entitled to recover punitive damages in an amount to be proven at trial.

WHEREFORE, plaintiffs respectfully request judgment against the defendant as follows:

(a) Awarding them treble damages pursuant to 18 U.S.C. § 1964(c) on their first cause of action, in an amount to be proved at trial, but in no event less than US $663,000,000;

(b) Awarding them damages pursuant to their second cause of action, in an amount to be proved at trial, but in no event less than US $221,000,000, plus punitive damages; and

(c) Awarding them interest and attorneys' fees, as well as their costs and disbursements incurred in connection with this action; and

(d) Awarding them such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  New York, New York
April 30, 2018

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:   /s/ Daniel B. Goldman
Daniel B. Goldman
Kerri Ann Law
Claudia Pak
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for Plaintiffs*