UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EIG ENERGY FUND XIV, L.P., EIG ENERGY FUND XIV-A, L.P., EIG ENERGY FUND XIV-B, L.P., EIG ENERGY FUND XIV (CAYMAN), L.P., EIG ENERGY FUND XV, L.P., EIG ENERGY FUND XV-A, L.P., EIG ENERGY FUND XV-B, L.P., and EIG ENERGY FUND XV (CAYMAN), L.P. | **MEMORANDUM OPINION & ORDER** <br><br> 18 Civ. 1047 (PGG) |

Plaintiffs,

- against -

KEPPEL OFFSHORE & MARINE LTD.,

Defendant.

PAUL G. GARDEPHE, U.S.D.J.:

This action arises from a bribery and kickback scheme involving Defendant Keppel Offshore & Marine Ltd. and entities in the Brazilian government and oil industry. The Amended Complaint alleges that Plaintiffs – unaware of the scheme – invested $221 million in Sete Brasil Participações, S.A. ("Sete"), a Brazilian company that used Plaintiffs' investment to fund the bribes and kickbacks. After the scheme was uncovered by Brazilian law enforcement authorities, Sete went bankrupt and Plaintiffs lost their investment.

The Amended Complaint alleges a conspiracy claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and an aiding and abetting fraud claim. (Am. Cmplt. (Dkt. No. 17)) Defendant has moved to dismiss pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). (Dkt. No. 35) For the reasons stated below, Defendant's motion to dismiss will granted in part and denied in part.

## BACKGROUND

### I.    FACTS

Plaintiffs are eight investment funds, all managed by EIG Management Company, LLC ("EIG"). (Am. Cmplt. (Dkt. No. 17) ¶¶ 6, 15-22) Each fund is a limited partnership organized under either the laws of Delaware or the Cayman Islands. (Id. ¶¶ 15-22) EIG's offices are located in Washington, D.C. (Id.)

Defendant Keppel Offshore & Marine Ltd. ("Keppel") is a corporation organized under the laws of Singapore. (Id. ¶ 23) Keppel's business "consists primarily of building mobile offshore drilling rigs and handling repairs, conversions, and upgrades of shipping vessels." (Id.) Keppel is the sole shareholder of Keppel Fels Brasil, S.A. ("Keppel Brazil"), which in turn is the sole shareholder of Estalerio BrasFELS Ltda., which owns and operates a shipyard in Brazil (the "Keppel Shipyard"). (Id. ¶ 24) Keppel is also the sole shareholder of Keppel Offshore & Marine USA, Inc. ("Keppel USA"), which is incorporated in Delaware and headquartered in Houston, Texas. (Id. ¶ 25)

The Amended Complaint alleges that Keppel; Petróleo Brasileiro S.A. ("Petrobras"), a Brazilian state-controlled oil company; the Workers' Party of Brazil, the governing political party in Brazil at all relevant times and the majority shareholder of Petrobras; and Sete, a Brazilian company that developed and chartered mobile offshore drilling rigs to Petrobras, were all members of a RICO conspiracy that engaged in bribery and kickbacks. (Id. ¶¶ 3-4, 54) Between 2001 and 2015 – when Brazilian law enforcement uncovered the conspiracy – Keppel systematically paid bribes and kickbacks to Petrobras and the Worker's Party in exchange for contracts with Petrobras. (Id. ¶ 32) According to Pedro José Barusco Filho, the Executive Manager of Engineering at Petrobras, "corruption within Petrobras was 'endemic and institutionalized' . . . . Bribery and kickbacks were 'built in' to contracts and were

'understood to be part of the relationship' between Petrobras and most persons and entities with whom Petrobras had business dealings, including its longstanding partner in crime, Keppel entities." (Id. ¶ 94)

      **A.**    **Keppel's Early Involvement in the Bribery Scheme**

Between 2001 and 2011, Keppel entered into at least seven contracts with Petrobras worth $4 billion.  In exchange for the contracts, Keppel paid $40 million in bribes to Petrobras and the Worker's Party.  (Id. ¶ 32)  The Amended Complaint includes excerpts from several e-mails in which Keppel officials discuss the bribes.  (Id. ¶¶ 33-36, 41-43)  Barusco – Petrobras' Executive Manager of Engineering – testified that Keppel made these bribes knowing that they "were intended for Petrobras employees and Workers' Party officials."  (Id. ¶ 96)  Zwi Skornicki – Keppel's agent in Brazil – testified that he "'made it clear to Keppel' that he was paying 'a bribe . . . to Petrobras officials . . . and it was accepted [by Keppel][,]' . . . [and 'Keppel] authorized' him to pay bribes."  (Id. ¶ 97)  Skornicki further testified that when Petrobras requested a bribe, he "reported that to [Keppel officials in] Singapore directly," including to "Tay Kim Hock, . . . [the] CEO [of Keppel Brazil], . . . [Chow Yew Yuen], [the] CEO of Keppel[,] . . . Sib Shoo, [the] former CEO [of Keppel], and . . . [Tong Chong Heong, Senior Executive Director of Keppel Corporation Ltd.]"  (Id.)

Keppel's bribe and kickback payments were routed through offshore accounts. (Id. ¶¶ 35, 37, 44)  For example, on one occasion, bribe payments were transmitted from a Swiss account under the name of a "pass-through" company created by Skornicki to accounts in the name of "foreign offshore companies."  (Id. ¶ 35)  On another occasion, bribe payments were "disguised as registered election donations."  (Id. ¶ 37)  And at least once during the relevant time period, bribe payments were wired through U.S. bank accounts.  (Id. ¶ 44)

The Amended Complaint alleges that "[b]y 2011, Keppel was a long-standing and important player in the overall bribery and kickback scheme involving Petrobras projects."  (Id. ¶ 45)

**B.    Creation of Sete**

In 2006, Petrobras announced the discovery of the Pre-Salt Reserves, an oil field off the coast of Brazil believed to contain 50 billion barrels of oil.  (Id. ¶ 46)  "Senior executives of Petrobras conceived of the idea to perpetuate and expand their long-standing criminal scheme through the creation of Sete, an off-balance sheet vehicle formed by Petrobras to raise from third-party financiers in the United States and elsewhere the enormous amount of capital necessary to build drillships for purposes of extracting the Pre-Salt Reserves."  (Id. ¶ 47)

> Barusco testified in Brazilian proceedings that the "idea of the kickbacks" and Sete were "born together."  According to Barusco, "the practice of a 1% kickback in construction contracts came from Petrobras and migrated to Sete Brasil.  There were the same suppliers and it continued at Sete."  One of those key suppliers was Keppel.

(Id. ¶ 48)

Sete was formed by 2011.  (Id. ¶ 51)  Barusco and João Carlos de Medeiros Ferraz – senior Petrobras employees – took "the initiative to create Sete," and became Sete executives.  (Id. ¶¶ 47, 52)  According to Brazilian law enforcement authorities, "it was Petrobras that effectively exercised top management and ran [Sete]."  (Id. ¶ 52)

Petrobras contracted with Sete to build twenty-eight mobile offshore drilling rigs, or "drillships."  (Id. ¶ 52)  By April 2011, representatives of Petrobras, Sete, and Keppel had agreed to "produce a bid through Sete that would be favored in the bidding process by Petrobras and that would include Keppel as one of the shipyards."  (Id. ¶ 52)  Petrobras and Sete opened Swiss bank accounts in the name of "phantom, offshore companies," which were used to launder Sete-related bribes – including those paid by Keppel.  (Id. ¶ 53)

C.    **Sete Raises Capital**

Petrobras and Ferraz began raising capital for Sete in 2010.  (Id. ¶¶ 54-55)  In doing so, they prepared marketing materials and solicitations for potential investors "that they knew contained material omissions and purposely misleading information."  (Id. ¶ 54)  In particular, the marketing materials did not disclose the bribery and kickback scheme.  (Id. ¶¶ 58-66)  EIG received three such solicitations between September 2010 and September 2011.  (Id. ¶¶ 55-62)  Petrobras and Ferraz knew that the wires would be used to transmit marketing materials to potential investors in the United States, and that U.S. investors would use the wires to transmit investment funds to Sete.  (Id. ¶ 54)

Ferraz – the Sete and Petrobras executive – communicated with EIG about initial and continuing investment in Sete via e-mail and in person.  (Id. ¶¶ 64-69)  For example, Ferraz met with EIG representatives in Houston in the spring of 2013, and in Washington, D.C. in September 2013.  (Id. ¶¶ 68-69)  Ferraz did not disclose the bribery and kickback scheme to EIG.  (Id. ¶¶ 64-69)  To the contrary, "Ferraz's oral statements perpetuated the pattern of deception and lies promulgated in the various marketing materials previously provided by Petrobras and Sete to EIG and plaintiffs."  (Id. ¶ 69)

The Amended Complaint alleges that Petrobras and Sete targeted potential investors in the United States, including EIG.  (Id. ¶¶ 54, 57)  Ferraz testified before the Brazilian Congress that

> "there was great market interest [about Sete], particularly among US private equity groups."  Sete was focused, in particular, in procuring investment from EIG and [P]laintiffs, as Ferraz believed that such investment would be a "stamp of approval" for future international investors.  According to Ferraz, an investment by EIG's investment funds – the [P]laintiffs – in Sete would show, "we [Sete] are efficient, that we are capable to mitigate risk, and that we are a good investment."

(Id. ¶ 57)

The Amended Complaint further alleges that Keppel "conspired to and committed multiple acts of wire fraud in furtherance of the RICO conspiracy,[] it affirmatively assisted Petrobras and Sete's fraudulent fund raising activities[,] . . . [and] Keppel did its part in knowingly concealing the illicit bribery and kickback scheme from EIG in order to induce EIG and plaintiffs to invest in Sete."  (Id. ¶ 70)  According to Plaintiffs, Keppel knew that Sete "would be utilized to fund Keppel's bribes and kickbacks," and it knew that EIG was a Sete investor.  (Id.)

The Amended Complaint alleges that in August 2011 senior Keppel Brazil executives met with a senior EIG executive at the Keppel Shipyard.  (Id. ¶ 71)  Keppel Brazil knew that EIG was a potential investor in Sete.  (Id. ¶ 70)  "During this meeting, executives of Keppel Brazil made a power point presentation about Keppel's shipbuilding business, and they gave [the EIG executive] . . . a tour of the Keppel Shipyard."  (Id. ¶ 71)  A few weeks later, Sete and Keppel Brazil representatives arranged for Barrington Media – a media company retained by EIG – to film the Keppel Shipyards.  (Id. ¶ 72)  The purpose of this trip was to make "an informational video for EIG's investors concerning the investment in Sete," and Keppel knew that "the videos shot by Barrington would be used to induce [P]laintiffs' investment in Sete." (Id. ¶¶ 72, 74)  "Investment into Sete was critical, as Keppel knew, to the success of the bribery and kickback scheme and its receipt of lucrative drilling contracts."  (Id. ¶ 74)

### D.    EIG's Investment

"Based on the wrongful conduct of the RICO conspiracy, the plaintiffs began to invest in Sete in August 2012 and continued to make investments into early 2015."  (Id. ¶ 76) Plaintiffs' investments – totaling $221 million – were made through thirteen wire transfers from EIG-controlled bank accounts in New York and California.  (Id.)

"In early August of 2013, [an EIG executive] again visited the Keppel Shipyard, on behalf of plaintiffs, and met with senior Keppel Brazil employees." (<u>Id.</u> ¶ 79)  At that meeting, Keppel Brazil did not disclose the bribery and kickback scheme to EIG.  (<u>Id.</u>)

> **E.**     **<u>Keppel Pays Bribes to Obtain Sete Contracts</u>**

On August 7, 2012 – four days after Plaintiffs funded their first investment in Sete – Keppel issued a press release stating that a Keppel subsidiary had "'firmed up contracts" with Sete for the design and construction of five drillships, at a cost of $4.1 billion.  (<u>Id.</u> ¶ 78)  The press release states that Sete is "a Brazilian company established in December 2010 and formed by Brazilian and <u>International finance investors,</u> including banks and the four biggest Brazilian pension funds, besides Petrobras."  (<u>Id.</u> (emphasis in original))  "Keppel's reference to 'International finance investors' was a direct reference to EIG and the plaintiffs, which, as Keppel knew, had just become investors in Sete."  (<u>Id.</u>)  The drillships were scheduled for delivery between fourth quarter 2016 and third quarter 2019.  "Given that Keppel's bribes and kickbacks were funded by Sete's construction payments, Keppel would be paying bribes and kickbacks through at least 2019."  (<u>Id.</u>)

According to Barusco, "Keppel entities received six Sete contracts in exchange for [Keppel's] continued participation in the bribery and kickback scheme[,] and negotiated a bribe fee of .9% of the price of each Sete contract . . . ."  (<u>Id.</u> ¶ 96)

The Amended Complaint alleges that Keppel paid $14.4 million in bribes for the Sete drillship contracts.  (<u>Id.</u> ¶ 80)  "Keppel used multiple instrumentalities of interstate commerce, including emails and telephone lines, to negotiate, authorize, and coordinate the concealment of and the execution of these bribes."  (<u>Id.</u>)  Keppel made payments to Skornicki that were purportedly a commission for his consulting services, but portions of those payments

were used to pay the Sete-related bribes.  (Id. ¶ 81)  Keppel's payments were coordinated by

email.  (Id. ¶¶ 81-85)

> Skornicki then laundered the bribe payments
>
> by wiring money from an account maintained at Delta National Bank in New York City in the name of Deep Sea Oil Company, to an account at Citibank North America in New York City and, from there, to an account in the name of Shellbill Finance S/A and held at Heritage [B]ank in Switzerland.

(Id. ¶ 86; see also id. ¶¶ 87-88)

The Amended Complaint alleges that "Keppel's Travel Act violations and money laundering activities were essential to facilitating the ongoing concealment of the bribery and kickback scheme, which caused [P]laintiffs to make additional investments into Sete."  (Id. ¶ 89)

### F.   Criminal Proceedings

In 2015, law enforcement authorities in Brazil disclosed their investigation into the bribery and kickback scheme.  (Id. ¶ 91)  The Amended Complaint alleges that, were it not for this investigation, the scheme would have continued at least until 2019.  (Id. ¶ 90)

A number of individuals involved in this scheme – including Barusco, Ferraz, and Skornicki – pleaded guilty and entered into cooperation agreements with Brazilian prosecutors. (Id. ¶¶ 92, 98)  Barusco, testifying before the Brazilian Congress, described the Sete bribery and kickback scheme as "a continu[ation] of what happened [at Petrobras]."  Barusco testified that he and Ferraz intended for Sete to "perpetuate and expand the existing bribery and kickback scheme involving the same participants – including Keppel entities."  (Id. ¶ 93)

Skornicki was convicted in Brazil on five counts of bribery, eleven counts of money laundering, and one count of belonging to a criminal organization.  (Id. ¶ 100)  The Brazilian court concluded that it had been "proven beyond any reasonable doubt [that Skornicki] represent[ed] the interests" of a Keppel entity in paying bribes to Sete.  (Id. ¶ 99)

In April 2016 – as a result of the Brazilian prosecutors' investigation – Sete filed for "the equivalent of bankruptcy in Brazil."  (Id. ¶¶ 101-02)  "As a result, [P]laintiffs' investment in Sete is now worthless."  (Id. ¶ 103)

On December 22, 2017, Keppel entered into a deferred prosecution agreement (the "DPA") with the United States Attorney's Office for the Eastern District of New York, in which it admitted that it had violated the Foreign Corrupt Practices Act (the "FCPA").  (Id. ¶ 104)  The Amended Complaint alleges that:

> Under the DPA, Keppel agreed to pay a criminal penalty in the amount of [] $422,216,980, of which Keppel USA will pay US $4,725,000.  Keppel will pay [] $105,554,245 of its criminal penalty to the U.S. Treasury.  It will pay the remainder of the penalty to Brazil and Singapore.
>
> Keppel further admitted in the DPA that it paid approximately [] $55 million in bribes to employees of Petrobras and Sete and members of the Workers' Party to secure improper advantages in its business dealings over the course of a decade, of which approximately [] $14.4 million represented bribes Keppel made in connection with drillship projects awarded by Sete.
>
> Keppel also admitted in the DPA that from approximately 2001 to 2014, it entered into contracts for at least seven projects with Petrobras and six projects with Sete and that it negotiated, coordinated, authorized, and paid bribes in connection with each of these projects.  Keppel admitted that it drafted and executed agreements with consulting companies controlled by its agent (Skornicki) that were intended to facilitate the bribe payments and conceal their purpose.  Under the guise of these agreements and instructions provided by Keppel, Keppel's agent Skornicki made payments to bank accounts in the U.S. and elsewhere in the name of shell companies controlled by Skornicki.  Skornicki then wired the money from those bank accounts in the U.S. to bank accounts outside of the U.S. that were controlled by or for the benefit of executives at Petrobras, Sete, and members of the Workers' Party.

(Id. ¶¶ 106-108)

On August 29, 2017, Jeffrey Chow – the Director of Keppel's legal department – pled guilty to violating and conspiring to violate the FCPA's anti-bribery provisions.  (Id. ¶ 110)

> Chow admitted that, pursuant to "established practices" at Keppel, he and others at Keppel facilitated the payment of bribes and the concealment of the true nature and purpose of those payments by creating and executing false agreements on

behalf of Keppel with consulting companies controlled by Skornicki. . . . Chow
admitted that Keppel executives directed him and other Keppel employees to
execute those agreements and authorized the payments to Skornicki, knowing that
a portion of those payments would be used to pay bribes to Petrobras and Sete
employees, and the Workers' Party.  Chow further admitted that the bribe
payments were made to bank accounts located in the United States and elsewhere,
which were subsequently wired to bank accounts outside the United States
controlled by Petrobras and Sete employees and the Workers' Party.

(Id.)

On December 22, 2017, Keppel USA pled guilty to violating the FCPA's anti-

bribery provisions.  (Id. ¶ 111)

Among other things, Keppel USA admitted that "[i]n or about and between 2007
and 2014, [Keppel USA], together with others, including [defendant Keppel],
knowingly and willfully conspired to pay approximately $8.8 million corruptly
for the benefit of foreign officials, including [Petrobras employees, one of whom
migrated to Sete in 2011], and the Workers' Party to secure improper advantages
and to influence those foreign officials and the Workers' Party to obtain and
retain business in Brazil."

(Id. (alteration in original))

## II.   **PROCEDURAL HISTORY**

In 2016, Plaintiffs brought claims for fraud, aiding and abetting fraud, and

conspiracy to defraud against several defendants – including Keppel and Petrobras – in the

United States District Court for the District of Columbia (the "D.C. Action").  See EIG Energy

Fund XIV, L.P. v. Petroleo Brasileiro S.A., 246 F. Supp. 3d 52, 61 (D.D.C. 2017), aff'd, 894

F.3d 339 (D.C. Cir. 2018), cert. denied sub nom. Petróleo Brasileiro S.A. v. EIG Energy Fund

XIV, L.P., No. 18-716, 2019 WL 1231775 (U.S. Mar. 18, 2019).  On March 30, 2017, the district

court granted Keppel's motion to dismiss for lack of personal jurisdiction.[1]  Id. at 91.

---

[1]  Keppel contends that the dismissal of the D.C. Action demonstrates that Plaintiffs' allegations
in the instant case are without merit.  (Def. Br. (Dkt. No. 24) at 16, 25, 27)  Given that Keppel
was dismissed from the D.C. Action for lack of personal jurisdiction, this argument is not
persuasive.

On February 6, 2018, Plaintiffs filed the Complaint in the instant action.  (Dkt. No. 1)  The Amended Complaint – filed on April 30, 2018 – asserts claims for RICO conspiracy and aiding and abetting fraud.  (Dkt. No. 17)  Defendant moved to dismiss pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  (Dkt. No. 23)  On March 31, 2019, this Court denied the motion without prejudice and directed the parties to provide supplemental briefing as to whether (1) the wire fraud predicate acts for Plaintiffs' RICO conspiracy claim amount to securities fraud claims, such that the wire fraud allegations cannot be used as predicate acts for purposes of Plaintiffs' RICO conspiracy claim; and (2) the alleged Travel Act predicate acts entail an extraterritorial application of the Travel Act.  (March 31, 2019 Order (Dkt. No. 34))  Defendant renewed its motion to dismiss on April 12, 2019 (Dkt. No. 35), and both sides filed supplemental briefing as directed by the Court.  (Dkt. Nos. 36, 40, 44)

## DISCUSSION

## I.   MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . .  the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507

F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

      Fed. R. Civ. P. 9(b) sets standards for pleading fraud claims, and requires that

"[i]n alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake."  Fed. R. Civ. P. 9(b); see also In re Pfizer Inc. Sec. Litig., 584 F.

Supp. 2d 621, 632-33 (S.D.N.Y. 2008).  Rule 9(b) requires a plaintiff to "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent."

Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting Stevelman v.

Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation

omitted)).

## II.    RICO CONSPIRACY CLAIM

###     A.    Applicable Law

      To sustain a private cause of action under RICO, a plaintiff must allege:  "(1) the

defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property,

and (3) causation of the injury by the defendant's violation."  Lerner v. Fleet Bank, N.A., 459

F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and alteration omitted); see also 18

U.S.C. § 1964(c) (providing a cause of action for "[a]ny person injured in his business or

property by reason of a violation" of Section 1962).  18 U.S.C. § 1962(d) prohibits any person

from conspiring to violate any of the substantive provisions set forth in 18 U.S.C. § 1962(a)-(c).

      A substantive violation of the RICO statute occurs when "any person employed

by or associated with any enterprise engaged in, or the activities of which affect, interstate or

foreign commerce, . . . conduct[s] or participate[s], directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity. . . ."  18 U.S.C. § 1962(c).

Accordingly, to establish a substantive RICO violation, a plaintiff must allege:  "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce," in addition to injury and causation.  Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983).

   To establish a RICO conspiracy claim, a plaintiff must plead factual allegations demonstrating that a defendant agreed to participate "'in a charged enterprise's affairs' through a pattern of racketeering, 'not a conspiracy to commit predicate acts.'"  United States v. Pizzonia, 577 F.3d 455, 463 (2d Cir. 2009) (quoting United States v. Persico, 832 F.2d 705, 713 (2d Cir. 1987)).  "Assuming that a RICO enterprise exists, [plaintiff] must prove only that the defendants know the general nature of the conspiracy and that the conspiracy extends beyond their individual roles."  United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000) (citations, quotation marks, and alterations omitted); see also Salinas v. United States, 522 U.S. 52, 64 (1997) ("A person . . . may be liable for [RICO] conspiracy even though he was incapable of committing the substantive offense."); United States v. Yannotti, 541 F.3d 112, 122 (2d Cir. 2008) ("[D]efendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme.").

   The Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, however, "bars civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant."  MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277 (2d Cir. 2011).  Accordingly, "if any one of the predicate acts involves the purchase or sale of securities, the entire claim is

foreclosed by the securities fraud bar codified in the RICO statute." Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, 286 F. Supp. 3d 634, 638 (S.D.N.Y. 2017). The PSLRA provides an exception for "an action against any person that is criminally convicted in connection with the fraud . . . ." 18 U.S.C. § 1964(c).

      **B.**    <u>**Analysis**</u>

           Defendant argues that the alleged conduct falls within the PSLRA's bar on predicate acts involving securities fraud. (Def. Br. (Dkt. No. 26) at 24) This Court ordered supplemental briefing on the issue of "whether Plaintiff's wire fraud claim amounts to an actionable securities fraud claim such that the wire fraud claim cannot be used as a predicate act for purposes of the RICO conspiracy claim." (March 31, 2019 Order (Dkt. No. 34))

           Plaintiffs contend that acts of wire fraud may be used as predicate acts here because Keppel entered into a deferred prosecution agreement with the Government regarding the alleged bribery and kickback scheme. According to Plaintiffs, Defendant's entry into the DPA "constitutes a 'criminal conviction' for . . . purposes of the exception to the PSLRA bar." (Pltf. Supp. Br. (Dkt. No. 40) at 5 (citing Deferred Prosecution Agreement (Dkt. No. 24-1), Ex. 2)) Plaintiffs note that the DPA includes Defendant's "admi[ssion] that it 'did knowingly and willfully conspire to violate' the [Foreign Corrupt Practices Act], and [that Defendant] agreed to pay a criminal penalty of over $400 million." (Id.)

           Defendant argues, however, that the DPA "is not a 'criminal conviction' for purposes of the PSLRA bar." (Def. Supp. Reply Br. (Dkt. No. 44) at 5)

           A party that enters into a deferred prosecution agreement has not been convicted of a crime. Indeed, the obvious purpose of entering into a deferred prosecution agreement is to avoid a criminal conviction. See United States v. Stein, 435 F. Supp. 2d 330, 349 (S.D.N.Y. 2006), aff'd, 541 F.3d 130 (2d Cir. 2008) ("[The corporation] and the government entered into a

Deferred Prosecution Agreement . . . [in which] [t]he government agreed that it will seek dismissal of the information if [the corporation] complies with its obligations.  In a nutshell, [the corporation] stands to avoid a criminal conviction if it lives up to its part of the bargain.").

The DPA at issue here states that "any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term."  (Deferred Prosecution Agreement (Dkt. No. 24), Ex. 2 ¶ 12)  The deferral term is three years.  (Id. ¶ 3)  In the DPA, the Government agrees that – if Keppel meets its obligations under the DPA – when the deferral term expires, the Government "shall seek dismissal with prejudice of the Information filed against [Keppel]. . . ."  (Id. ¶ 13)  In sum, if Keppel meets its obligations under the DPA, the charges against it will be dismissed.  (Id.)

In arguing that the DPA constitutes a conviction, Plaintiffs cite to McKinney v. Moore, No. 04 Civ. 07926, 2007 WL 1149253, at *3 (S.D.N.Y. Apr. 16, 2007).  See Pltf. Supp. Br. (Dkt. No. 44) at 6.  McKinney is not on point, however.  That case does not involve the PSLRA bar.  The issue instead was whether the plaintiff was precluded "from suing either as trustee of the Pension Fund or otherwise on behalf of the Pension Fund" in light of a prohibition in 29 U.S.C. § 1111(a), which is part of the Employee Retirement Income Security Act ("ERISA").  McKinney, 2007 WL 1149253, at *3.  McKinney is not persuasive here.

Plaintiffs citation to Harmon v. Teamsters, Chauffeurs & Helpers Local Union 371, 832 F.2d 976, 978 (7th Cir. 1987), is likewise unavailing.  See Pltf. Supp. Br. (Dkt. No. 44) at 6.  In Harmon, the Seventh Circuit considered whether an Iowa deferred judgment constituted a conviction for purposes of the federal Labor-Management Reporting and Disclosure Act, which forbids those who have been convicted of certain crimes from serving as a union officer. Harmon, 832 F.2d at 976-77.  Even if this Iowa statute were analogous to the PSLRA bar –

which it is not – the Iowa deferred judgment procedure involves a "guilty plea followed by a sentence of probation but no judgment of conviction" (see id.), whereas a DPA involves no guilty plea and no sentence of any sort.  Id.

Plaintiffs also cite to Kaplan v. S.A.C. Capital Advisors, L.P., 104 F. Supp. 3d 384, 389 (S.D.N.Y. 2015).  See Pltf. Supp. Br. (Dkt. No. 44) at 6.  In Kaplan, the court analyzed a guilty plea allocution to determine whether it covered the conduct underlying plaintiff's RICO claim, and ultimately determined that it did not.  Kaplan, 104 F. Supp. 3d at 391.  In any event, Kaplan provides no support to Plaintiffs here, because that case involves an actual guilty plea, sentence, and conviction (see id. at 389), whereas the instant case does not.

It is, of course, completely illogical to contend that an agreement expected to lead to dismissal of criminal charges actually constitutes a conviction.  Moreover, case law interpreting the PSLRA's criminal conviction exception confirms that it would be improper to treat a deferred prosecution agreement as a conviction.  Courts have found that the PSLRA's "criminal conviction exception must be construed as narrowly as possible," and that "the exception is 'only available [as] to . . . a defendant [that] has specifically been convicted of criminal fraud.'"  Kaplan, 104 F. Supp. 3d at 389 (quoting Krear v. Malek, 961 F.Supp. 1065 (E.D. Mich. 1997).  Furthermore, it is the "[p]lea [a]llocution, not the [i]ndictment, [that] determines the scope of the conduct to which the [defendant] pleaded guilty."  Id. at 389-90.  In sum, the scope of the criminal conviction exception is narrow, and applying the exception to cover a deferred prosecution agreement – which is not a conviction – is inconsistent with the statutory scheme.  Accordingly, the Court concludes that the PSLRA's criminal conviction exception is not applicable.

Plaintiffs do not contest that the Amended Complaint's wire fraud allegations amount to an actionable securities fraud claim.  (Pltf. Supp. Br. (Dkt. No. 40))  The Amended Complaint alleges a "scheme behind the conspiracy[,] . . . [a] necessary component of [which] was that Sete, a start-up, would fraudulently raise billions of dollars of capital" (Am. Cmplt. (Dkt. No. 17) ¶ 117); that such investments were solicited through a "Private Placement Confidential Information Memorandum" prepared by Sete (id. ¶ 62); that Defendant "did its part in knowingly concealing the illicit bribery and kickback scheme from EIG in order to induce EIG and plaintiffs to invest in Sete," and that because of Defendant's deceptive conduct, "the plaintiffs began to invest in Sete in August 2012 and continued to make investments into early 2015. . . . through a series of wires" (id. ¶¶ 70, 76); and that "conspirators conspired to and committed overt, RICO predicate acts . . . of wire fraud . . . violating the Travel Act . . . [and] of money laundering . . . ."  (Id. ¶ 120)

The Court concludes that the PSLRA bar applies to the predicate acts of wire fraud alleged in the Amended Complaint.  Moreover, because the wire fraud, Travel Act, and money laundering predicate acts are all part of the same claim, the entire RICO conspiracy claim is barred.  See Zohar, 286 F. Supp. 3d. at 638 ("if any one of the predicate acts involves the purchase or sale of securities, the entire claim is foreclosed by the securities fraud bar codified in the RICO statute"); Awad v. Omar, No. 18 CIV. 10810 (NRB), 2019 WL 5727327, at *5 (S.D.N.Y. Nov. 5, 2019) ("The [PSLRA bar] bars plaintiffs' RICO claim, and does so regardless of whether the other predicate acts that plaintiffs allege are based on conduct that is not actionable as securities fraud."); In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F.Supp. 2d 666, 730 (S.D.N.Y. 2013), vacated on other grounds sub nom. Gelboim v. Bank of America Corp., 823 F.3d 759 (2d Cir. 2016) ("[W]here plaintiffs allege a single scheme, courts

have held that if any predicate act is barred by the PSLRA it is fatal to the entire RICO claim.") (internal quotation marks and citation omitted).

Accordingly, Defendant's motion to dismiss will be granted as to Plaintiff's RICO conspiracy claim.[2]

## III.   AIDING AND ABETTING FRAUD CLAIM

### A.   Applicable Law

Aiding and abetting fraud has three elements:   "'(1) that an independent wrong exist[s]; (2) that the aider and abettor know[s] of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong.'"   Adelphia Recovery Trust v. Bank of Am., N.A., 624 F. Supp. 2d 292, 312 (S.D.N.Y. 2009) (quoting Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 162-163 (3d Cir. 1973)).[3]   To meet Rule 9(b) pleading requirements, "'a claim for aiding and abetting fraud requires plaintiff to plead facts showing[] the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission.'"   Id. at 312 (quoting Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000)).

To survive a motion to dismiss, a complaint must allege "actual knowledge of fraud with the particularity necessary to survive the heightened pleading requirements of Federal

---

[2]  Because Plaintiffs' RICO conspiracy claim is barred by the PSLRA, this Court does not reach Defendant's arguments concerning extraterritoriality.  See Def. Br. (Dkt. No. 24) at 24.

[3]  Both sides rely on New York law.  (See Def. Br. (Dkt. No. 24) at 20 n.9; Pltf. Opp. Br. (Dkt. No. 26) at 26 (citing Fertitta v. Knoedler Gallery, LLC, No. 14-CV-2259, 2015 WL 374968, at *7 (S.D.N.Y. Jan. 29, 2015), in which New York law is applied))  Accordingly, they have implicitly agreed to the application of New York law.  See Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 514 n.4 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law."); Corbett v. Firstline Sec., Inc., 687 F. Supp. 2d 124, 128 (E.D.N.Y. 2009) (applying New York law where "both parties cite exclusively to New York [] law in their argument").

Rule of Civil Procedure 9(b)."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292-93 (2d Cir. 2006);

see also Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014) ("[U]nder New York law, a complaint

adequately alleges the knowledge element of an aiding and abetting claim when it pleads 'not . . .

constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding

circumstances.'") (quoting Oster v. Kirschner, 77 A.D.3d 51, 56 (1st Dep't 2010)).

              As to the "substantial assistance" element, "'[a] defendant provides substantial

assistance only if [it] affirmatively assists, helps conceal, or by virtue of failing to act when

required to do so enables [the fraud] to proceed.'"[4]  JP Morgan Chase Bank v. Winnick, 406 F.

Supp. 2d 247, 256 (S.D.N.Y. 2005) (quoting Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,

No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)).  "Whether the

assistance is substantial or not is measured, in turn, by whether 'the action of the aider and

abettor proximately caused the harm on which the primary liability is predicated.'"  Id. (quoting

In re WorldCom, Inc. Sec. Litig., 382 F. Supp. 2d 549, 560-61 (S.D.N.Y. 2005)).  In other

words, plaintiffs "must allege also that their injury was 'a direct or reasonably foreseeable result

of the [aider and abettor's] conduct.'"  Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,

479 F. Supp. 2d 349, 371 (S.D.N.Y. 2007) (quoting Pension Comm. of Univ. of Montreal

Pension Plan, 446 F. Supp. 2d at 202).

---

[4]  "'Absent a confidential or fiduciary relationship between the plaintiff and the aider and abettor,
the inaction of the latter does not constitute substantial assistance warranting aider and abettor
liability.'"  Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F.
Supp. 2d 163, 203 (S.D.N.Y. 2006) (quoting Ryan v. Hunton & Williams, No. 99 Civ. 5938
(JG), 2000 WL 1375265, at *10 (E.D.N.Y. Sept. 20, 2000)).

B.   **Analysis**

Defendant contends that the Amended Complaint does not allege Keppel's actual knowledge or substantial assistance in the scheme to defraud Sete investors.  (Def. Br. (Dkt. No. 24) at 26-27)  Defendant does not contest that an independent wrong exists.  (Id.)

1.   **Actual Knowledge**

The Amended Complaint alleges that Keppel agreed to perpetrate the bribery and kickback scheme in exchange for six Sete contracts.  (Am. Cmplt. (Dkt. No. 17) ¶ 96)  This allegation is premised on, inter alia, testimony from Barusco and Keppel's Brazilian agent Zwi Skornicki, in which both men testified that Keppel entities had agreed to pay a bribe of .9% of the price of each Sete contract.  Skornicki testified that Keppel executives in Singapore – including Keppel's chief executive officer and former chief executive officer – had "'authorized' him[] to pay bribes" to Petrobas officials.  (Id. ¶¶ 96-97)  These allegations are sufficient to plead actual knowledge of the underlying bribery scheme, because "[fraudulent] intent may be inferred from [these] circumstances."  Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs. LLC, No. 12-cv-3723, 2016 WL 5719749, at *5 (S.D.N.Y. Sept. 29, 2016) (first alteration in original).

As to Keppel's knowledge that Sete was defrauding its investors, the Amended Complaint alleges that Keppel understood that capital raised for Sete would be used to fund the bribes and kickbacks.  (Am. Cmplt. (Dkt. No. 17) ¶¶ 5, 117, 128)

Keppel also facilitated the fraud scheme by giving an EIG senior executive tours of the Keppel shipyard in August 2011 and August 2013, and by assisting a media company hired by EIG "in [the August 2011] filming [of] various areas of the Keppel Shipyard, for later use at EIG's investors conference."  (Id. ¶¶ 70-79)

Although Defendant argues that "Plaintiffs do not allege when Keppel supposedly learned that Plaintiffs had in fact decided to invest in Sete" (Def. Br. (Dkt. No. 24) at 26), the

Amended Complaint asserts that by the time of an August 7, 2012 press release, Keppel knew that EIG and Plaintiffs "had just become investors in Sete."  (Am. Cmplt. (Dkt. No. 17) ¶ 78)  Given Keppel's involvement in EIG's due diligence efforts, and Keppel's reference to "International finance investors" in the August 7, 2012 press release, this is a fair inference.  The Court concludes that the Amended Complaint adequately pleads actual knowledge.

2.      **Substantial Assistance**

The Amended Complaint alleges that Defendant substantially assisted in the defrauding of Sete's investors by (1) facilitating EIG's due diligence through the two tours of the Keppel Shipyard; and (2) concealing the bribery and kickback scheme from EIG by laundering the bribes through shell companies.  (Am. Cmplt. (Dkt. No. 17) ¶¶ 70-79, 86-88, 130)

"Where the primary fraud claim is predicated on misrepresentations in documents, substantial assistance usually involves assistance in the preparation or dissemination of the documents."  Nathel v. Siegal, 592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008) (citing ABF Capital Mgmt. v. Askin Capital Mgmt., 957 F.Supp. 1308, 1328 (S.D.N.Y. 1997)).  However, "[w]here the fraud alleged involves a 'highly interdependent scheme in which both [the principal and aider and abettor] benefited'" – such as the instant scheme – "'allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient.'"  Nathel, 592 F. Supp. 2d at 470 (quoting ABF Capital Mgmt., 957 F.Supp. at 1328).

The Court concludes that the Amended Complaint adequately pleads substantial assistance.

Defendant's motion to dismiss Plaintiffs' aiding and abetting fraud claim will be denied.

IV.    **RES JUDICATA**

Defendant argues that this case is barred by res judicata as a result of the

dismissal in the D.C. Action.  (Def. Br. (Dkt. No. 24) at 28-29)

A.    **Applicable Law**

"'Res judicata' is used to refer both to the doctrine of claim preclusion alone and

to the doctrines of claim preclusion and issue preclusion (or collateral estoppel) collectively."

Mahmood v. Research in Motion Ltd., 905 F. Supp. 2d 498, 501 n.1 (S.D.N.Y. 2012), aff'd, 515

F. App'x 891 (Fed. Cir. 2013).

The doctrine of claim preclusion provides that

"a valid, final judgment, rendered on the merits, constitutes an absolute bar to a
subsequent action between the same parties, or those in privity with them, upon
the same claim or demand.  It operates to bind the parties both as to issues
actually litigated and determined in the first suit, and as to those grounds or issues
which might have been, but were not, actually raised and decided in that action.
The first judgment, when final and on the merits, thus puts an end to the whole
cause of action."

Epperson v. Entm't Express, Inc., 242 F.3d 100, 108-09 (2d Cir. 2001) (quoting Saylor v.

Lindsley, 391 F.2d 965, 968 (2d Cir. 1968) (citations omitted)).

Accordingly, "[t]o prove the affirmative defense [of claim preclusion,] a party

must show that (1) the previous action involved an adjudication on the merits; (2) the previous

action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the

subsequent action were, or could have been, raised in the prior action."  Monahan v. New York

City Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000) (citations omitted).

Issue preclusion "'applies when (1) the issues in both proceedings are identical,

(2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a]

full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated

was necessary to support a valid and final judgment on the merits.'"  Epperson, 242 F.3d at 108

(quoting <u>United States v. Hussein</u>, 178 F.3d 125, 129 (2d Cir.1999) (internal quotation marks and citation omitted)).

**B.**     **<u>Analysis</u>**

Defendant was dismissed from the D.C. Action for lack of personal jurisdiction. <u>EIG Energy Fund XIV, L.P.</u>, 246 F. Supp. 3d at 91 ("[T]he court finds that it lacks personal jurisdiction over [Keppel] under the D.C. long-arm statute . . . ."). "[A] dismissal for lack of personal jurisdiction is not a final judgment on the merits" for purposes of either <u>res judicata</u> or issue preclusion. <u>Barrett v. Tema Dev. (1988), Inc.</u>, 463 F. Supp. 2d 423, 427 (S.D.N.Y. 2006); <u>see also Arnold Graphics Indus., Inc. v. Indep. Agent Ctr. Inc.</u>, 775 F.2d 38, 41 (2d Cir. 1985); <u>Harte v. Iberia Airlines</u>, Case No. 02 Civ 3624, 2002 WL 1870251, at *2 (S.D.N.Y. Aug. 13, 2002). Accordingly, the instant action is not barred by either <u>res judicata</u> or collateral estoppel.

**<u>CONCLUSION</u>**

For the reasons stated above, Defendant's motion to dismiss is granted in part and denied in part. The parties' motions for oral argument are denied as moot. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 35, 37, 41).

The initial pretrial conference in this matter will take place on **June 25, 2020 at 11:00 a.m.** in Courtroom 705 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York.

Seven days before the conference, the parties will submit a joint letter addressing the following in separate paragraphs: (1) a brief description of the case, including the factual and legal bases for the claims and defenses; (2) any contemplated motions; and (3) the prospect for settlement. For the Court's convenience, the parties must set forth the conference's date and time in the joint letter's opening paragraph. In preparing their joint letter and proposed case

management plan, the parties will consult the Court's Individual Practices and model Case

Management Plan and Scheduling Order – both of which are available on this District's website.

Dated: New York, New York
        May 9, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge