UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

EIG ENERGY FUND XIV, L.P.,                          :
EIG ENERGY FUND XIV-A, L.P.,                        :
EIG ENERGY FUND XIV-B, L.P.,                        :
EIG ENERGY FUND XIV (CAYMAN), L.P.,   :
EIG ENERGY FUND XV, L.P.,                           :
EIG ENERGY FUND XV-A, L.P.,                         :
EIG ENERGY FUND XV-B, L.P., and               :      Case No. 18-cv-01047-PGG
EIG ENERGY FUND XV (CAYMAN), L.P.,     :
                                                                      :
                         Plaintiffs,                           :
                                                                      :
          - against -                                          :
                                                                      :
KEPPEL OFFSHORE & MARINE LTD.,             :
                                                                      :
                         Defendant.                          :
                                                                      :
——————————————————————x

## PLAINTIFFS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

I.   KEPPEL WAS A KEY PLAYER IN A MASSIVE KICKBACK AND BRIBERY SCHEME INVOLVING PETROBRAS AND SETE........................................................ 1

II.  KEPPEL WAS A KEY PARTICIPANT IN THE SETE PROJECT AND SCHEME FROM ITS INCEPTION AND LONG BEFORE EIG'S FIRST INVESTMENT IN AUGUST 2012.................................................................... 7

    A.   In 2010, Keppel Submitted Bids for Drilling Rigs Later Transferred to Sete With the Understanding It Would Pay Kickbacks If Awarded Contracts ....................................................................................................... 7

    B.   By January 2011, Keppel Knew That Sete Would Be Managed by Barusco and Planned to Raise Equity From Private Investors and Debt Financing From BNDES..................................................................................... 8

    C.   In June 2011, Sete Invited Keppel to Bid for EPC Contracts and Discussed a Potential Joint Venture With Keppel ................................................. 11

    D.   By the Third Quarter of 2011, Keppel Agreed to Pay Skornicki 2% of the EPC Contracts in Order to Conceal the Payment of Bribes and Kickbacks......... 13

    E.   In August 2011, Keppel Learned That EIG Was a Potential Sete Investor and Helped Sete Ease Any EIG Concerns About the Risk of the Project ........... 14

        1.   Keppel provided a tour and presentation of its Brazil shipyard to potential Sete investors, including EIG .................................................. 14

        2.   Keppel authorized access to its BrasFELS shipyard for EIG to create a film for its 2011 investor conference........................................... 16

    F.   Later in 2011, Keppel Received Additional Key Sete Offering Documents........ 17

        1.   Keppel received a misleading Petrobras presentation that EIG relied upon in approving a potential Sete investment............................... 17

        2.   As part of its due diligence for a potential joint venture with Sete, Keppel received Sete's financial model and a misleading presentation substantially identical to one received by EIG ..................... 18

    G.   Keppel Submitted Its Bid for Nearly $5 Billion of Semisubmersible Rigs and Proposed Investing up to $40 Million in a Joint Venture with Sete .............. 20

    H.   In December 2011, Keppel and Sete Entered the First EPC Contract and Made Representations That Were False Because of the Corruption Scheme....... 20

    I.   By Early 2012, Keppel Knew That Sete Planned to Raise a New Round of Equity and Again Gave EIG a Tour and Presentation of Its Brazil Shipyard....... 22

III.    PRIOR TO THE EXECUTION OF THE EPC CONTRACTS AND EIG'S FIRST
        INVESTMENT, KEPPEL'S HEAD OF LEGAL CREATED FALSE
        DOCUMENTS TO FACILITATE THE PAYMENT OF KICKBACKS ...................... 25

        A.    Jeffery Chow Created a Payment Structure and False Documents to
              Facilitate and Conceal the Payment of Bribes and/or Kickbacks by
              Skornicki ............................................................................................................ 25

        B.    Jeffery Chow Personally Signed Keppel's Fraudulent Agreements on
              Behalf of Keppel's Fernvale Subsidiary After Its Director Declined to
              Sign ....................................................................................................................... 28

        C.    The Agreements Between Keppel and Skornicki Were Created to Conceal
              and Facilitate the Corruption Scheme and Were Fundamentally False ............... 29

IV.     KEPPEL CONTINUED TO PARTICIPATE IN, CONCEAL, AND COVER UP
        THE SETE SCHEME ................................................................................................. 35

        A.    Keppel Signed Five More EPC Contracts, Entering a Total of Nearly $5
              Billion of Contracts With Sete .............................................................................. 35

        B.    Between 2012 and 2014, Keppel Paid More Than $20 Million to
              Skornicki's Offshore Shell Company to Facilitate the Payment of Bribes
              and Kickbacks ....................................................................................................... 36

        C.    Keppel Gave More Presentations to EIG and Other Sete Investors and
              Lenders to Reassure Them That the Project Was On Track .................................. 37

        D.    Keppel Sent False Anticorruption Letters to Sete to Help It Obtain
              BNDES Financing to Pay Keppel Under the EPC Contracts ............................... 39

        E.    Keppel Made False Public Statements to Conceal Its Role in the Scheme .......... 41

V.      EIG RELIED ON SETE AND PETROBRAS'S MATERIAL
        MISREPRESENTATIONS AND OMISSIONS PRIOR TO FUNDING ITS
        INVESTMENT .......................................................................................................... 42

        A.    Petrobras's Material Misrepresentations and Omissions ..................................... 43

              1.    The Petrobras Drilling Presentation ........................................................... 43

              2.    The Pre-Salt Oil Rigs Project Presentation ................................................ 44

              3.    Data Room Materials .................................................................................. 45

                    (a)    The Petrobras CIM ......................................................................... 45

                    (b)    The Caixa Memorandum ................................................................ 47

                    (c)    The Draft EPC Contract ................................................................. 49

        B.    Sete's Material Misrepresentations and Omissions ............................................. 49

              1.    Sete's Promotional Materials ..................................................................... 49

      2.     Shipyard Visits .......................................................................... 51

VI.    PRIOR TO FUNDING ITS INVESTMENT, EIG CONDUCTED EXTENSIVE
DUE DILIGENCE AND WOULD NOT HAVE INVESTED IF IT KNEW OF
THE CORRUPTION SCHEME ...................................................................... 51

    A.     EIG's Financial Modeling ................................................................ 51

    B.     EIG's Compliance Due Diligence ....................................................... 51

    C.     The Deal Team's Analysis and Resulting Investment Recommendations ........... 53

    D.     The Investment Committee Approves Investments in Sete by Funds XIV
and XV ..................................................................................... 55

    E.     EIG Would Never Have Invested in Sete Had it Known of the Corruption
Scheme ..................................................................................... 56

VII.   AFTER CAREFUL DUE DILIGENCE, EIG DOCUMENTED ITS
INVESTMENT AND INVESTED OVER $220 MILLION IN SETE ........................... 58

    A.     The Relevant Agreements, Including EIG's Agreements ..................................... 58

    B.     EIG's Investments in Sete ................................................................ 60

VIII.  SETE'S PROGRESS FROM 2013 UNTIL THE REVELATIONS IN
OPERATION CAR WASH .......................................................................... 62

    A.     Construction Delays ...................................................................... 63

    B.     Progress Regarding Obtaining Financing ............................................. 64

    C.     Impact on the IRR ......................................................................... 64

IX.    THE IMPACT OF OPERATION CAR WASH ................................................... 65

    A.     BNDES Financing, Which Was Critical to Sete, Was Expected by
February 6, 2015 .......................................................................... 65

    B.     The Impact of Operation Car Wash After Sete Was Officially Implicated ........... 67

X.     EIG'S INVESTMENT IN SETE IS WORTHLESS ............................................ 71

TABLE OF DEFINITIONS ................................................................................ 73

KL3 3355429.1

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York and Your Honor's Order dated August 23, 2021, Dkt. No. 89, Plaintiffs EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P. and EIG Energy Fund XV (Cayman), L.P. (together, "**EIG**" or "**Plaintiffs**") respectfully submit this statement of undisputed facts in support of their motion for summary judgment against Defendant Keppel Offshore & Marine Ltd. ("**Keppel**" or "**KOM**" or "**Defendant**").  For the convenience of the Court, a list of definitions used herein can be found in the Table of Definitions below.

## I.   Keppel Was a Key Player in a Massive Kickback and Bribery Scheme Involving Petrobras and Sete

1.      Keppel is a "Singapore-based corporation [that] operated shipyards in Asia, the Americas and Europe."  Exh. 105 at A-1 ¶ 2.

2.      Keppel's "business consist[s] primarily of building mobile offshore drilling rigs and handling repairs, conversions and upgrades of shipping vessels."  Exh. 105 at A-1 ¶ 2.

3.      Petróleo Brasileiro S.A. ("**Petrobras**") is a "Brazilian state-controlled oil company headquartered in Rio de Janeiro, Brazil, that operate[s] to refine, produce and distribute oil, oil products, gas, biofuels and energy."  Exh. 105 at A-1-2 ¶ 4.

4.      Sete Brasil Participações S.A. ("**Sete**" or "**Sete Brasil**") was a privately held corporation headquartered in Rio de Janeiro, Brazil.  Exh. 105 at A-2 ¶ 5.

5.      From in or around 2003 to April 2012, Renato Duque ("**Duque**") – referred to as "Brazilian Official 2" in the December 22, 2017 deferred prosecution agreement that Keppel entered into with the Fraud Section of the U.S. Department of Justice and the U.S. Attorney's Office for the Eastern District of New York (the "**DPA**") – was "an employee of Petrobras with

1

responsibility over the bidding process of certain projects." Exh. 105 at A-4 ¶ 16; Exh. 114 at 2, Interrogatory 1.a.

6.      From in or around 2003 to April 2011, Pedro José Barusco Filho ("**Barusco**") – referred to as "Brazilian Official 1" in the DPA – was an Executive Manager of Engineering in Petrobras's Services division with "responsibility for, among other things, the bidding process organized by a division of Petrobras." Exh. 30 at EIG_KEP_00048967; Exh. 105 at A-3-4 ¶ 15; Exh. 114 at 2, Interrogatory 1.a.

7.      After leaving Petrobras in or about April 2011, Barusco became the Chief Operating Officer of Sete "with responsibility for overseeing operations." Exh. 30 at EIG_KEP_00048967; Exh. 105 at A-3-4 ¶ 15.

8.      "For a number of years, executives and employees of Petrobras with responsibility over the bidding of certain large projects, including Brazilian Official 1 [Barusco] ("**Brazilian Official 1**") and Brazilian Official 2 [Duque] ("**Brazilian Official 2**"), and politicians and political parties in Brazil, including the Workers' Party, administered a scheme to secure corrupt payments equal to a percentage of a contract's value from the companies awarded those projects." Exh. 105 at A-4 ¶ 18; Exh. 114 at 2, Interrogatory 1.a.

9.      "In or around 2011, this scheme was extended to projects awarded by Sete Brasil, which commissioned a large fleet of rigs for Petrobras's end use" (the "**Corruption Scheme**"). Exh. 105 at A-4 ¶ 18.

10.     "In or about and between 2001 and 2014, [Keppel], together with others, including executives of [Keppel Offshore & Marine USA], knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil." Exh. 105 at A-5 ¶ 19.

2

11.      Keppel paid bribes equal to a percentage of the value of the contracts that it secured with Sete and Petrobras.  Exh. 133 at 61:21-25.

12.      With respect to Sete, Keppel negotiated bribes with Barusco equal to 0.9 to one percent of the value of Keppel's contracts with Sete.  Exh. 105 at A-14 ¶ 71.

13.      "Two thirds of the payments were designated to the Workers' Party and one third was to be divided equally between the relevant Petrobras and Sete executives."  Exh. 105 at A-14 ¶ 7.

14.      The split described in the above paragraph was agreed and administered by Barusco, Duque, and an official of the Partido dos Trabalhadores, a political party in Brazil that formed part of the federal government of Brazil, which directly owned more than 50 percent of Petrobras's common shares with voting rights, between 2003 and 2016 ("**Workers' Party**"). Exh. 105 at A-2 ¶¶ 4-6, A-14 ¶ 71; Exh. 114 at 2, Interrogatory 1.a.

15.      Zwi Skornicki ("**Skornicki**" or "**Consultant**") was an agent of Keppel in or about between 2000 and 2016.  Exh. 105 at A-2 ¶ 7; Exh. 114 at 2, Interrogatory 1.a.

16.      Skornicki facilitated bribe payments from Keppel to public officials of Brazil and the Workers' Party.  Exh. 105 at A-2 ¶ 7.

17.      In or about 2011, Chong Heong Tong ("**Tong**"), Yew Yuen Chow ("**YY Chow**"), and Kai Choong Kwok ("**Kwok**") authorized Skornicki during several telephone calls to pay one percent of the contract value as bribes in response to the demand of Barusco.  Exh. 105 at A-2 ¶¶  8, 10, A-15 ¶ 72; Exh. 114 at 2-3, Interrogatory 1.a, 1.b.

18.      Between 2009 and early 2014, Tong – who is "KOM Executive 1" in the DPA – was the Chief Executive Officer of Keppel.  Exh. 77 at 13, 202; Exh. 105 at A-2 ¶ 8; Exh. 114 at 2, Interrogatory 1.a.

19.     YY Chow – who is "KOM Executive 3" in the DPA – was President of Keppel Offshore & Marine U.S.A., Inc. ("**KOM USA**") prior to June 2011, and later became Managing Director at Keppel in June 2011, Chief Operating Officer of Keppel in 2012, and Chief Executive Officer in 2014.  Exh. 77 at 13, 203; Exh. 105 at A-2-3 ¶ 10; Exh. 114 at 2, Interrogatory 1.a.

20.     YY Chow reported to Tong.  Exh. 121 at 85:4-9.

21.     In 2011, Tong and YY Chow were also on the board of directors of Keppel FELS Brasil S.A. ("**Keppel Brasil**"), a subsidiary of Keppel.  Exh. 133 at 83:4-19, 113:21-114:5.

22.     Keppel Brasil, through its subsidiaries, owned and operated Keppel's BrasFELS shipyard in Angra dos Reis, Brazil ("**BrasFELS**").  Exh. 77 at 35, 43.

23.     Between 2009 and 2016, Kwok was the Chief Executive Officer and President of Keppel Brasil, and included in Keppel's organizational charts.  Exh. 102 at KEPPEL00000153-160.

24.     During his employment with Keppel, Jeffery Chow was Keppel's most senior in-house legal officer.  Exh. 121 at 12:25-13:2.

25.     Jeffery Chow testified that "[b]y no later than 2008" he "realized that Keppel was overpaying the agent [Skornicki], sometimes by millions of dollars, so that the agent could pay bribes to individuals who could help Keppel Offshore Marine do[] business with Petrobras."  Exh. 121 at 26:7-27:19.

26.     Between 2001 and 2011, Keppel "executives created and executed agreements on behalf of [Keppel] with consulting companies controlled by Consultant [Skornicki] that were intended to facilitate bribe payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose."  Exh. 105 at A-5 ¶ 21; Exh. 114 at 2, Interrogatory 1.a.

27.     Jeffery Chow admitted that he "created and executed false agreements" on behalf of KOM with companies controlled, in whole or in part, by Skornicki to "facilitate the payment of those bribes and conceal the true nature and purpose of the payments."  Exh. 121 at 40:22-41:15, 109:3-17; *see also* Exh. 103 at 4 ¶ 13.

28.     Between 2004 and 2014, "under the guise of these consulting agreements, [Keppel] effectuated bribes by making payments to bank accounts in the United States and elsewhere in the names of shell companies controlled by" Skornicki.  Exh. 105 at A-5 ¶ 22; Exh. 114 at 2, Interrogatory 1.a.

29.     Skornicki then transferred money from those bank accounts in the United States to bank accounts outside the United States controlled by or for the benefit of Duque, Barusco, and members of the Workers' Party to further the Corruption Scheme.  Exh. 105 at A-5 ¶ 22; Exh. 114 at 2, Interrogatory 1.a.

30.     Between 2001 and 2014, the bribes paid by KOM "amounted to approximately $55 million paid corruptly for the benefit of foreign officials, including Brazilian Official 1 [Barusco], Brazilian Official 2 [Duque], and the Workers' Party to secure improper advantages and to influence those foreign officials and the Workers' Party to obtain and retain business in Brazil."  Exh. 105 at A-5 ¶¶ 19-20; Exh. 114 at 2, Interrogatory 1.a.

31.     With respect to Sete, Skornicki "paid approximately $14.4 million in bribes to Brazilian Official 1 [Barusco], Brazilian Official 2 [Duque], and the Workers' Party" in connection with Keppel's Sete Engineering, Procurement and Construction ("**EPC**") contracts.  Exh. 105 at A-15 ¶ 72; Exh. 113 at 22-23, RFAs 22-23; Exh. 114 at 2, Interrogatory 1.a.

32.     In or about September 2013 to November 2014, at the instruction of a Workers' Party official, Skornicki made nine payments of $500,000 to a bank account in Switzerland to

settle payments owed to the Workers' Party as bribes for the Sete Brasil project and potentially others.  Exh. 105 at A-16 ¶ 78.

33.     "KOM and its related entities, including KOM USA, earned profits totaling approximately $351.8 million from business in Brazil obtained through the bribery scheme." Exh. 105 at A-5 ¶ 20.

34.     In the DPA, Keppel "admit[ed], accept[ed], and acknowledge[d] that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts [attached to the DPA], and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate."  Exh. 105 at 2 ¶ 2.

35.     Keppel "stipulate[d] to the admissibility of the Statement of Facts in any proceeding by the [Department of Justice] Fraud Section …, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding."  Exh. 105 at 2 ¶ 2.

36.     In August 2017, Jeffery Chow pled guilty to conspiring to violate the Foreign Corrupt Practices Act in connection with his role in the Corruption Scheme.  Exh. 121 at 16:23-18:19; Exh. 104 at 26:5-29:3.

37.     On September 26, 2018, Petrobras entered into a Non-Prosecution Agreement with the U.S. Department of Justice and the U.S. Attorney's Office for the Eastern District of Virginia (the "**NPA**") in connection with the Corruption Scheme.  Exh. 106 at 1.

38.     In the NPA, Petrobras admitted that between at least 2004 and 2012, it was engaged in "massive bid-rigging and bribery schemes" involving the payment of bribes and kickbacks by Petrobras contractors to Petrobras personnel, political parties and public officials in exchange for various Petrobras contracts.  Exh. 106 at A-4-5 ¶¶ 14-16.

39.     In the NPA, Petrobras admitted that its kickback and corruption scheme involved many of Petrobras's other contractors and suppliers, including ship-operating companies and shipyards.  Exh. 106 at A-4 ¶ 14, A-8-10 ¶¶ 33-42.

40.     In the NPA, Petrobras "admit[ed], accept[ed], and acknowledge[d] that it is responsible under United States law for the acts of its officers, directors, employees, and agents as set forth in the [] Statement of Facts [attached to the NPA], and that the facts described therein are true and accurate."  Exh. 106 at 3.

41.     On September 27, 2018, the U.S. Securities and Exchange Commission charged Petrobras "with misleading U.S. investors by filing false financial statements that concealed a massive bribery and bid-rigging scheme at the company," and issued a release stating that: "Petrobras fraudulently raised billions of dollars from U.S. investors while its senior executives operated a massive, undisclosed bribery and corruption scheme … [i]f an international company sells securities in the United States, it must provide truthful information about its business operations."  Exh. 107 at 1.

42.     In 2019, Skornicki pled guilty in the United States District Court for the Eastern District of New York to conspiring to violate the Foreign Corrupt Practices Act in connection with his role in the Corruption Scheme.  Exh. 110 at 25:23-31:17.

## II.     Keppel Was a Key Participant in the Sete Project and Scheme From Its Inception and Long Before EIG's First Investment in August 2012

### A.     In 2010, Keppel Submitted Bids for Drilling Rigs Later Transferred to Sete With the Understanding It Would Pay Kickbacks If Awarded Contracts

43.     In or about 2009, Keppel learned of Petrobras's need for drilling rig units to operate in deep and ultra-deep waters to explore the new oil reserves discovered by Petrobras off the coast of Brazil (the "**Rigs Project**" or the "**Drilling Rigs Project**").  Exh. 133 at 90:7-21.

44.     In June 2010, Keppel submitted bids to Petrobras Netherlands B.V. ("**PNBV**"), a subsidiary of Petrobras, for the construction of drillings rigs for the Rigs Project.  Exh. 133 at 91:6-17; Exh. 6 at EIG00091705/EIG_KEP_00164923.

45.     The bids were made, through the Brazilian subsidiary owning the BrasFELS shipyard, for two semisubmersible drilling rigs and for seven drillships.  Exh. 133 at 91:18-93:7.

46.     Keppel understood that it would be paying bribes and/or kickbacks on any contracts awarded to it or its subsidiaries by PNBV in connection with those bids.  Exh. 133 at 99:21-100:4.

47.     Seven of the rigs that Keppel bid for were awarded by Petrobras to the shipyard Estaleiro Atlântico Sul ("**EAS**"), and transferred by Petrobras to Sete after its formation.  Exh. 9 at KEPPEL00007701.

**B.     By January 2011, Keppel Knew That Sete Would Be Managed by Barusco and Planned to Raise Equity From Private Investors and Debt Financing From BNDES**

48.     No later than December 4, 2010, employees at Keppel, including Tong, YY Chow, Kwok, Tommy Sam, and others learned from Skornicki "after his discussion with Barusco and Duque" that Petrobras would negotiate the first seven drill ships with EAS and "award them the bid," and that Petrobras would set up a new company – Sete – that would "conduct direct negotiation[s] with the other bidders" for the remaining 21 drilling rig units, including Keppel.  Exh. 4 at KEPPEL00619705-06.

49.     No later than December 4, 2010, Keppel knew that Barusco would be a senior executive of Sete.  Exh. 4 at KEPPEL00619705-06.

50.     By December 2010, Keppel knew that Petrobras would own 10% of Sete and the rest would be owned by "funds."  Exh. 4 at KEPPEL00619705-06.

51.     As of December 2010, Keppel expected to be awarded at least four semisubmersible drilling rigs by Sete at a cost of at least $700 million per rig.  Exh. 4 at KEPPEL00619705-06.

52.     By January 10, 2011, Keppel understood that Petrobras would "assign to SETE the "7 drillships award[ed] to EAS and the remaining 21 units of Drilling units," and that each drilling rig constructed by Sete would be financed by 20% equity and 80% debt.  Exh. 7 at KEPPEL00036104.

53.     Also by January 10, 2011, Keppel knew that Sete would invite "both international and domestic" drilling contractors to bid for contracts and the "[d]rilling contractor for each unit will have to provide as equity 3% (i.e. 15% of 20%) of the total project cost."  Exh. 7 at KEPPEL00036104.

54.     As of January 2011, Keppel knew that Sete would be funded at least in part by private entities.  Exh. 133 at 135:4-9.

55.     Between 2009 and early 2014, Chiau Beng Choo ("**Choo**") was the Chief Executive Officer of Keppel Corporation Ltd. ("**Keppel Corp.**") and Chairman of Keppel's board of directors.  Exh. 77 at 13, 202.

56.     After learning of Petrobras's plan for Sete, Keppel Corp. Chairman Boon Yang Lee wrote to Choo to ask "[w]ho actually owns SETE Enterprise. Petrobra[s] only own 5 to 10%. Who are the other private entities that will own the rest of the company. Has KOM done business with people in Sete before. Do we have any traction with Barusco who is going to head Sete." Exh. 7 at KEPPEL00036103-05.

57.     Choo replied, cc'ing Tong, YY Chow, and others, that "we have to be prepared and also find out more. … Barusco is currently GM Engineering of Petrobras and he knows us well." Exh. 7 at KEPPEL00036103.

9

58.     On January 14, 2011, Skornicki sent YY Chow an email attaching a January 12, 2011 Petrobras presentation titled Drilling Rigs in Brazil Project: Presentation to Drilling Operators (the "**January 2011 Petrobras Presentation**").  Exh. 8 at KEPPEL00049887-88.

59.     The January 2011 Petrobras Presentation contained a "Cautionary Statement for US investors."  Exh. 8 at KEPPEL00049889.

60.     The January 2011 Petrobras Presentation identified the "Main Challenges and Risks" of the Rigs Project.  Exh. 8 at KEPPEL00049899.

61.     The January 2011 Petrobras Presentation did not identify among the Main Challenges and Risks or anywhere else the existence of the Corruption Scheme.  Exh. 8 at KEPPEL00049888-924.

62.     The January 2011 Petrobras Presentation stated that "BNDES will play a key role by leading the financing package."  Exh. 8 at KEPPEL00049901 (emphasis in original).

63.     The January 2011 Petrobras Presentation further reflected that 20% of the financing for each rig would be equity, and that 85% of the equity would be held by "Finance Shareholders," including "Equity Investment Funds" and "Other Institutional Investors."  Exh. 8 at KEPPEL00049902.

64.     On February 12, 2011, Kwok forwarded a Petrobras press release to Keppel executives, which stated that "[t]he financial funds required by Sete BR will come from equity sources and long-term financing provided by the BNDES (Brazilian Development Bank), which will finance up to 100% of the Brazilian content of goods and services in the construction of each drilling rig."  Exh. 9 at KEPPEL00007701.

65.     In April 2011, Choo reported to Tong, YY Chow, Kwok, and others about drinks he had with Barusco, during which he and Barusco discussed the capital structure of the "New

10

Company" – Sete – as well as which entities would own its equity.  Exh. 11 at KEPPEL00010390.

66.     Keppel is a wholly-owned subsidiary and business unit of Keppel Corp.  Exh. 120 at 25:11-14.

67.     Choo later left Keppel because of his involvement in the Corruption Scheme.  Exh. 133 at 105:11-15.

68.     At that meeting, Barusco told Choo that Sete wanted to award semisubmersible rigs to Keppel.  Exh. 11 at KEPPEL00010390.

69.     In or about April 2011, Keppel received a report in which João Carlos de Medeiros Ferraz ("**Ferraz**") confirmed that "[n]ew investors are lining up" to invest in Sete, including private equity funds from the United States and Europe.  Exh. 12 at KEPPEL00037968.

70.     Ferraz was a Petrobras employee from 1980 until 2011, when he left Petrobras to become the Chief Executive Officer of Sete.  Exh. 30 at EIG_KEP_00048967.

71.     Ferraz entered a plea agreement and admitted to his participation in the Corruption Scheme as Chief Executive Officer of Sete.  Exh. 100 at 1-3.

**C.     In June 2011, Sete Invited Keppel to Bid for EPC Contracts and Discussed a Potential Joint Venture With Keppel**

72.     On or about June 14, 2011, YY Chow and Skornicki received an invitation from Barusco for Keppel to bid to construct drilling rigs for Sete.  Exh. 15 at KEPPEL00441474-75.

73.     In July 2011, Barusco requested, through Skornicki, that Keppel submit a proposal to Sete to construct a semisubmersible rig as part of a joint venture in which Keppel would take a 20% equity stake.  Exh. 21 at KEPPEL00269514-15; Exh. 133 at 179:13-25.

74.     At that time, Keppel understood that Sete required additional equity financing. Exh. 133 at 131:8-15.

75.     On or about July 15, 2011, Keppel sent a proposal to Sete for a semisubmersible rig at a price of $798 million USD.  Exh. 22 at KEPPEL00619599.

76.     The proposal stated, "The proposed Joint Venture (JV) shall be Keppel FELS Ltd (10-20%), Queiroz Galvão Óleo e Gás S.A. (20%) and Sete Brasil (60-70%)."  Exh. 22 at KEPPEL00619600.

77.     It stated, "The proposed financing model for this project shall be 20% equity and 80% financing to be secured by Sete Brasil."  Exh. 22 at KEPPEL00619600.

78.     The July 15, 2011 proposal was signed by "Chow Yew Yuen" as the "Managing Director" of "Keppel Offshore and Marine."  Exh. 22 at KEPPEL00619601.

79.     On July 20, 2011, YY Chow submitted an "Early Warning Paper" to the Keppel Corp.'s board of directors regarding the "Proposed JV with Sete Brasil for Newbuild DSS38E Semisubmersible Rig[,]" which stated it was "supported by" Tong (the "**Early Warning Paper**").  Exh. 41 at KEPPEL00427325.

80.     The Early Warning Paper stated that "[f]or Petrobras, Sete Brasil is an off-balance-sheet entity, in which it would retain a minority (15%) stake while the finance shareholders (Brazilian pension funds, equity investment funds and other institutional funds) hold the remaining 85% stake.  The plan is to eventually float Sete Brasil in the equity markets and seek established drillers to join the entity."  Exh. 41 at KEPPEL00427325.

81.     The Early Warning Paper described the proposed joint venture's capital structure, which would include 20% equity and a 20% equity stake by Keppel estimated at US$32 million. Exh. 41 at KEPPEL00427326.

82.     The Early Warning Paper further stated that "the proposed JV is expected to face minimal financing risk, given the fact that project financing will be secured by Sete Brasil (with BNDES backing)."  Exh. 41 at KEPPEL00427327.

83.     On July 21, 2011, Keppel Corp.'s board of directors authorized Keppel to "proceed with further discussions with the Sete Brasil and QGOG on the Proposed Joint Venture."  Exh. 29 at KEPPEL00440969.

**D.     By the Third Quarter of 2011, Keppel Agreed to Pay Skornicki 2% of the EPC Contracts in Order to Conceal the Payment of Bribes and Kickbacks**

84.     Skornicki was Keppel's agent with respect to its bids for the EPC contracts with Sete.  Exh. 133 at 188:4-8.

85.     Keppel agreed to pay Skornicki 2% of the contract value of the EPC contracts in the "third quarter of 2011."  Exh. 133 at 71:11-72:10.

86.     On July 5, 2011, Tan instructed a Keppel employee to adjust a cost estimate for a DSS38E semisubmersible rig for Sete to include a 2% commission for Skornicki.  Exh. 133 at 166:8-167:15.

87.     YY Chow was part of the bidding team that decided to increase the commission for Skornicki in Keppel's cost estimates to 2%.  Exh. 133 at 170:25-171:6.

88.     On September 19, 2011, Jeffery Chow wrote an email to Keppel employee Nora Marsuki ("**Marsuki**") regarding a "Commission Agreement with Eagle do Brasil" for her to "[p]ut this in a plain paper and pass to CHT [Chong Heong Tong]/YY [YY Chow], then delete email."  Exh. 35 at KEPPEL00045696.

89.     Jeffery Chow told Marsuki to put the message on a piece of paper and delete his email to conceal the fact that the commission agreement between Keppel and Skornicki was going to be, or needed to be, executed.  Exh. 121 at 86:4-10.

13

90.     In that message, Jeffery Chow also wrote:  "[N]eed to execute the standard Commission Agreement with Eagle do Brasil, with the 1.5%, as a copy of this will be showed up the line to convey that this is all.  Nothing more.  We've signed before for other jobs and have seen other agreements with Eagle for even larger amounts.  Would prefer not to, but the Comm. Agreement, may be the only thing that will satisfy people."  Exh. 35 at KEPPEL00045696.

91.     Eagle do Brasil Ltda. ("**Eagle**") was an entity owned and controlled by Skornicki, his wife, and his son.  Exh. 55 at KEPPEL00280913.

92.     On September 19, 2011, Jeffery Chow messaged Marsuki and asked her to type the message to YY Chow that "[w]ill need to prepare Commission Agreement with Eag[l]e for the 1.5%.  Is this okay, as he will have to show that this is all he is getting?"  Exh. 36 at KEPPEL00280920.

93.     Marsuki asked if she should "text" the message to YY Chow, and Jeffery Chow responded: "No. Type on paper and see how to get [it] to him."  Exh. 36 at KEPPEL00280920.

**E.     In August 2011, Keppel Learned That EIG Was a Potential Sete Investor and Helped Sete Ease Any EIG Concerns About the Risk of the Project**

**1.     Keppel provided a tour and presentation of its Brazil shipyard to potential Sete investors, including EIG**

94.     On or about July 29, 2011, Barusco called Skornicki and asked if a group of Sete investors could visit the BrasFELS shipyard on August 4, 2011.  Exh. 23 at KEPPEL00010310.

95.     Ordinarily, a yard tour at BrasFELS would need to be authorized by Kwok, the President of Keppel Brasil, and would include a presentation.  Exh. 133 at 273:10-17, 274:11-18.

96.     On July 29, 2011, Skornicki emailed Kwok and YY Chow and asked whether "some investors in Sete" could visit BrasFELS, explaining that Barusco was waiting for his response.  Exh. 23 at KEPPEL00010310.

97.     On July 30, 2011, in reply to Skornicki's question about the visit, Kwok directed Keppel Brasil employee Edmundo Santos ("**Santos"**), cc'ing Skornicki and YY Chow, to "liaise with Zwi and organize accordingly." Exh. 23 at KEPPEL00010310.

98.     On August 3, 2011, Skornicki forwarded Santos, Kwok, and YY Chow a list from Sete of visitors for the upcoming August 4 visit to BrasFELS. Exh. 24 at KEPPEL00010458.

99.     On the list of visitors were (i) Kevin Corrigan ("**Corrigan**") of EIG, (ii) two representatives of China Investment Corp ("**CIC**"), and (iii) Fabio Cunha and Ivan Hong, who had written next to their names "Sete Brasil." Exh. 24 at KEPPEL00010458.

100.    In August 2011, Corrigan visited the BrasFELS shipyard alongside CIC. Exh. 122 at 130:9-131:5.

101.    CIC was another international investor interested in a potential equity investment in Sete. Exh. 122 at 131:6-132:6.

102.    During this visit, Keppel provided Corrigan a presentation "touting [Keppel's] skills," and gave him a tour of the shipyard. Exh. 122 at 133:15-134:9, 141:4-11.

103.    Keppel did not reveal the Corruption Scheme to EIG during the August 2011 visit to BrasFELS. Exh. 122 at 136:3-13.

104.    On August 8, 2011, Fabio Cunha of Sete wrote in an email received by Santos and later Kwok that the August 4 visit "was very fruitful and our investors and employees learned a lot about the construction of platforms/vessels. The overall impression was good and reached the expected reduction in the risk perception of the project." Exh. 25 at KEPPEL00011126.

105.    Shortly after EIG's visit, on August 16, 2011, Tommy Sam ("**Sam**") received a news report that included the headline "Sete Brasil receives contribution from EIG Fund." Exh. 26 at KEPPEL00020438.

106.     Sam is "KOM Executive 5" described in the DPA.  Exh. 105 at A-3 ¶ 12; Exh. 114 at 2, Interrogatory 1.a.

107.     Between 2009 and 2017, Sam held executive positions at Keppel Brasil, including Chief Financial Officer and Vice President.  Exh. 133 at 86:13-24.

108.     Between 2012 and 2017, Sam also held "an executive position at KOM [Keppel] and at KOM USA."  Exh. 105 at A-3 ¶ 12.

109.     The email linked to an August 15, 2011 article in Valor Econômico titled "Sete Brasil Receives Contribution from EIG Fund," which stated that EIG had allocated R$250 million to Sete and would be the first foreign investor in Sete.  Exh. 26 at KEPPEL00020438.

### 2.     Keppel authorized access to its BrasFELS shipyard for EIG to create a film for its 2011 investor conference

110.     On August 15, 2011, YY Chow approved a request from Barusco, communicated through Skornicki, for a "Sete film" to be shot at the BrasFELS shipyard on August 24, 2011. Exh. 27 at KEPPEL00030275.

111.     YY Chow approved the "Sete film," stating: "Go ahead but our people must be involved.  We must approve the final version before release."  Exh. 27 at KEPPEL00030275.

112.     The "Sete film" that YY Chow authorized on August 15, 2011 was produced for EIG's 2011 investors conference by Barrington Media, which filmed the BrasFELS shipyard on August 24, 2011.  Exh. 28 at KEPPEL00020435.

113.     In August 2011, Kwok and Sam were copied on emails to and from Barbara Olsen ("**Olsen**") of Barrington Media, on which Corrigan was also copied, about the upcoming August 24, 2011 film shoot at the BrasFELS shipyard.  Exh. 28 at KEPPEL00020435.

114.   EIG showed the video about its potential investment in Sete, which included footage of the BrasFELS shipyard, at its 2011 investors conference in fall 2011.  Exh. 134 at 104:14-107:12.

**F.     Later in 2011, Keppel Received Additional Key Sete Offering Documents**

**1.     Keppel received a misleading Petrobras presentation that EIG relied upon in approving a potential Sete investment**

115.   On September 27, 2011, Keppel board member Stephen Pan ("**Pan**") sent a presentation titled "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" (the "**September 2011 Petrobras Presentation**") to Choo, Tong, YY Chow, and Keppel Chief Financial Officer Ngiam Jih Wong.  Exh. 37 at KEPPEL00040804, KEPPEL00040827.

116.   Tong and YY Chow knew of the existence of the Corruption Scheme.  Exh. 105 at A-15 ¶ 72; Exh. 114 at 2, Interrogatory 1.a.

117.   The September 2011 Petrobras Presentation is identical to the Petrobras Drilling Presentation received by EIG in September 2010.  *Compare* Exh. 37 at KEPPEL00040827 *with* Exh. 2 at EIG_KEP_00075178.

118.   The September 2011 Petrobras Presentation contained a "Cautionary Statement for US investors."  Exh. 37 at KEPPEL00040828.

119.   The September 2011 Petrobras Presentation identified the Main Risks and Challenges to the project.  Exh. 37 at KEPPEL00040847.

120.   The Main Challenges and Risks listed in the September 2011 Petrobras Presentation are identical to the Main Challenges and Risks listed in the Petrobras Drilling Presentation received by EIG in September 2010.  *Compare* Exh. 8 at KEPPEL00049899  *with* Exh. 2 at EIG00025582/EIG_KEP_00075198.

121.     The September 2011 Petrobras Presentation stated that "BNDES will have an important and leading role for financing rigs construction, taking most of the long term debt." Exh. 37 at KEPPEL00040853.

122.     The September 2011 Petrobras Presentation did not identify among the Main Challenges and Risks or anywhere else the existence of the Corruption Scheme.  Exh. 37 at KEPPEL00040827-62.

>    **2.**     **As part of its due diligence for a potential joint venture with Sete, Keppel received Sete's financial model and a misleading presentation substantially identical to one received by EIG**

123.     In the fourth quarter of 2011, Keppel conducted due diligence on Sete in anticipation of investing in a joint venture in connection with the first semisubmersible rig it proposed to build for Sete.  Exh. 133 at 245:8-16.

124.     As part of Keppel's due diligence on Sete, it examined the equity structure of Sete.  Exh. 133 at 246:19-247:5.

125.     In October 2011, Sam sent an email to Sete "request[ing] Sete Brasil's Business plan that contains . . . its structure and terms, ROI, equity investment and etc which a company would normally have to seek its own board or investors approval for any investment."  Exh. 39 at KEPPEL00556337-38.

126.     On October 30, 2011, Sam received a presentation (the "**Sete Management Presentation**") and financial model (the "**Sete Financial Model**") from Sete.  Exh. 39 at KEPPEL00556336.

127.     Sam sent the presentation and financial model he received on October 30, 2011 to Leong Peng Tan ("**Tan**"), Kwok, YY Chow, Jeffery Chow, and other Keppel executives that same day, writing that they should "review and see what other info we need."  Exh. 39 at KEPPEL00556336.

18

128.    Between 2012 and 2015, Tan was the Deputy Project Manager of Fernvale Pte Ltd. ("**Fernvale**").  Exh. 133 at 16:13-23.

129.    Tan was asked to join Fernvale by YY Chow.  Exh. 133 at 371:3-5.

130.    Tan has been employed by Keppel since 2002.  Exh. 133 at 11:4-13.

131.    Between 2011 and 2012, Tan reported to Aziz Amirali Hasham Merchant ("**Merchant**").  Exh. 130 at 18:25-19:6**.**

132.    Kenneth Chong ("**Chong**") was the Assistant General Manager of Legal at Keppel between 2010 and June 2015, the Company Secretary of Keppel, and he reported to Jeffery Chow.  Exh. 120 at 19:2-21, 20:22-21:5.

133.    The Sete Management Presentation had a section describing the Sete investment to prospective investors as "a unique opportunity aligning attractive returns, strong creditworthiness of counterparties in a sector with enormous potential."  Exh. 39 at KEPPEL00556412.

134.    The Sete Management Presentation described the capital structure of Sete.  Exh. 39 at KEPPEL00556415-16, KEPPEL00556419-20.

135.    In its Summary of Key Assumptions, the Sete Management Presentation included the assumption that 45% of the total financing, including both debt and equity, would come from BNDES (i.e., the Banco Nacional de Desenvolvimento Econômico e Social).  Exh. 39 at KEPPEL00556425.

136.    The Sete Management Presentation is substantially identical to a presentation provided to EIG by Sete's financial advisors in August 2011.  *Compare* Exh. 39 *with* Exh. 30.

137.    The Sete Management Presentation did not disclose the existence of the Corruption Scheme involving Sete, Petrobras, and Keppel.  Exh. 39.

KL3 3355429.1

138.     Keppel understood at that time that the majority of senior debt for each rig would be financed by BNDES.  Exh. 133 at 256:4-9, 264:10-18.

139.     Keppel considered Sete's ability to secure long-term financing to be necessary in order to complete construction of the 28 drilling rigs.  Exh. 133 at 327:11-328:16.

### G.     Keppel Submitted Its Bid for Nearly $5 Billion of Semisubmersible Rigs and Proposed Investing up to $40 Million in a Joint Venture with Sete

140.     On September 27, 2011, Keppel, through its Brazilian subsidiary that owned the BrasFELS shipyard, sent its proposal to construct six semisubmersible rigs.  Exh. 38 at KEPPEL00459977.

141.     The total price in the proposal was $4,858,800,000 for six semisubmersible rigs.  Exh. 38 at KEPPEL00459978.

142.     On November 29, 2011, Keppel executives requested approval from Keppel Corp.'s Investment and Major Project Action Committee (IMPAC) for the prospective joint venture with Sete, including an equity contribution by Keppel of up to US$40 million.  Exh. 41 at KEPPEL00427320, KEPPEL00427322.

143.     On December 10, 2011, Sam wrote to YY Chow and Kwok regarding "Cancellation of JV," writing that the potential joint venture between Keppel and Sete was cancelled by "the decision of the shareholders" of Sete.  Exh. 42 at KEPPEL00008389.

### H.     In December 2011, Keppel and Sete Entered the First EPC Contract and Made Representations That Were False Because of the Corruption Scheme

144.     On December 16, 2011, Fernvale executed the first EPC Contract with Urca Drilling B.V.  Exh. 44.

145.     Fernvale was a wholly-owned subsidiary of Keppel.  Exh. 120 at 27:10-12.

146.     Fernvale was formed by Keppel as a special purpose entity for the Sete EPC contracts.  Exh. 121 at 105:6-14.

20

147.    Urca Drilling B.V. was a special purpose entity affiliated with Sete.  Exh. 133 at 195:18-25.

148.    Section 2.1 of the EPC Contract between Fernvale and Urca Drilling required that Fernvale shall act "in compliance with all Consents and Applicable Laws" and "consistent with Good Industry Practices."  Exh. 44 at KEPPEL00490708, § 2.1.

149.    Section 6.2 set forth representations and warranties of Fernvale, including that Fernvale "is not in violation of any Applicable Law" which would "materially and adversely affect its performance" under the contract; "shall diligently perform… in a competent and professional manner, utilizing sound project management procedures and supervisory procedures, all in accordance with this Agreement, including Good Industry Practices and Applicable Codes and Standards"; and "has knowledge of or has investigated to its satisfaction all of the legal requirements and business practices that must be followed in performing" under the contract and its work "will be in conformity with such requirements and practices and in compliance with all Applicable Laws and Consents."  Exh. 44 at KEPPEL00490726-27, § 6.2.

150.    Section 6.2 represented that "[n]either the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, or compliance with the terms and provisions hereof, will conflict with, or result in a breach of . . . any Applicable Law or regulation."  Exh. 44 at KEPPEL00490726, § 6.2(d).

151.    Section 6.2 represented that Fernvale's "Works" would be "in compliance with all Applicable Laws," and "[t]he DRU c[ould] be constructed, complete in every detail under current Applicable Laws."  Exh. 44 at KEPPEL00490727, § 6.2(i).

152.    Keppel's representation through Fernvale in Section 6.2 of the EPC contracts were intentionally false because Keppel had agreed to pay bribes and/or kickbacks in connection with those Contracts.  Exh. 130 at 135:7-17; Exh. 121 at 113:10-24, 115:4-24.

153.    Jeffery Chow reviewed and approved comments on the EPC contracts, including regarding provisions relating to compliance with Applicable Law.  Exh. 121 at 74:16-77:4.

154.    Good industry practices, as defined in the EPC contracts, did not include the payment of bribes and kickbacks in violation of the Foreign Corrupt Practices Act.  Exh. 121 at 115:4-13; Exh. 130 at 127:20-22, 128:7-11.

155.    Fernvale would not be able to perform the EPC contracts with Sete in compliance with applicable laws.  Exh. 121 at 115:14-24.

156.    Shortly before the Urca EPC Contract was executed, on December 13, 2011, Skornicki told Jeffery Chow that he is "receiving pressure from my people about my agreement with Keppel."  Exh. 43 at KEPPEL00435116.

157.    On December 14, 2011, Jeffery Chow asked Nicholas Choo to prepare an agency agreement for Skornicki related to the "Sete Project" with a "2%" commission rate.  Exh. 43 at KEPPEL00435116.

I.    **By Early 2012, Keppel Knew That Sete Planned to Raise a New Round of Equity and Again Gave EIG a Tour and Presentation of Its Brazil Shipyard**

158.    On February 13, 2012, Keppel executives including YY Chow and Tong received a news report with the headline "Oil-Rig Co Sete Brasil May Seek New Investors," which stated that "Sete Brasil is now looking to bring on two to three new investors" and that "[i]nternational energy investor EIG Global Energy Partners is also an investor in the company."  Exh. 46 at KEPPEL00422871-74, KEPPEL00422881-82.

159.    On or about February 8, 2012, BrasFELS hosted a Sete-related "due diligence trip" for a representative from the CIC.  Exh. 45 at KEPPEL00080277.

22

NAVIGATION

160.    On March 6, 2012, Credit Suisse asked Keppel whether it had interest in an equity investment in Sete Brasil, which was "looking for an equity investment USD500 mm to USD1 bn[.]"  Exh. 47 at KEPPEL00460746.

161.    On March 7, 2012, a Keppel executive forwarded this solicitation to Choo, Tong, YY Chow, and others, stating that "Sete Brasil is looking to raise up to US$1b to fund the construction of 21 drilling rigs for Petrobras."  Exh. 47 at KEPPEL00460745.

162.    Choo responded that Keppel "should find out as much as possible!"  Exh. 47 at KEPPEL00460745.

163.    On March 9, 2012, Keppel executives including YY Chow and Tong received a news report with the headline "Sete Brasil will increase capital to R$7 billions," which stated that Sete planned to "increase its capital in more than three times, from 1,9 billion to R$ 7 billions" with "the entrance of new partners," including "Energy Investment Group (EIG), American institutional investor of the energy area, and Lucce Drilling, company created by the investor Aldo Floris, may become shareholders of the company."  Exh. 48 at KEPPEL00278825, KEPPEL00278826.

164.    Keppel understood that Sete was raising additional funds in early 2012 to finance the construction of 28 drilling rigs.  Exh. 133 at 297:4-9.

165.    Keppel understood that any funding that Sete raised from equity investors would help Sete pay Keppel and other shipyards for the construction of drilling rigs.  Exh. 133 at 304:22-305:16.

166.    On March 16, 2012, a Sete employee told Skornicki that Sete would "like to bring one of our potential investors to the BrasFels shipyard" on "March 27 or 28" and asked if Sete could "count on your usual assistance?"  Exh. 49 at KEPPEL00020565.

167.     Skornicki relayed the request to Kwok and Sam, and Kwok authorized the visit, writing "[s]ure, we will accommodate," and instructing "Gilberto [Israel] and Edmundo [Santos]" to "organize" the visit.  Exh. 49 at KEPPEL00020565.

168.     On March 20, 2012, Sete provided Skornicki with a list of the Sete investors who would be visiting the BrasFELS shipyard for the authorized visit.  Exh. 50 at KEPPEL00012940.

169.     The list included Corrigan, Simon Hayden ("**Hayden**"), and Hoshrav Patel ("**Patel**"), each of whom were employees of EIG.  Exh. 50 at KEPPEL00012940.

170.     Corrigan, Hayden, and Patel were visiting Brazil on a due diligence trip with the Abu Dhabi Investment Council ("**ADIC**"), which was another potential foreign investor in Sete. Exh. 122 at 160:4:22.

171.     Skornicki forwarded the list of attendees to Kwok and Sam in advance of the visit.  Exh. 50 at KEPPEL00012940.

172.     On March 28, 2012, Keppel gave Corrigan and Hayden a tour of the BrasFELS shipyard as part of a Sete due diligence trip.  Exh. 124 at 78:15-18, 83:11-87:25; Exh. 122 at 160:4-162:19, 166:23-167:7.

173.     Keppel employees also had a meeting with representatives of EIG during the shipyard visit during which Keppel provided a presentation focusing on the shipyard's ability to produce drillships.  Exh. 124 at 82:14-20, 84:8-25; Exh. 122 at 166:6-18.

174.     The purpose of the visit was "to give [potential Sete investors] comfort that these ships could be built in Brazil."  Exh. 124 at 84:11-14.

175.     Neither Keppel nor any of the representatives from Petrobras or Sete or their agents revealed the Corruption Scheme during this trip.  Exh. 122 at 167:17-168:4.

176.     On or about May 17, 2012, BrasFELS hosted a visit from BNDES "to conduct due diligence of the shipyard," after which Sete reported it had "very good feed-back from visit

of BNDES to BRASFELS," and thanked Sam for "the special care on preparation and conducting such visit."  Exh. 58 at KEPPEL00074639-42.

### III.    Prior to the Execution of the EPC Contracts and EIG's First Investment, Keppel's Head of Legal Created False Documents to Facilitate the Payment of Kickbacks

#### A.    Jeffery Chow Created a Payment Structure and False Documents to Facilitate and Conceal the Payment of Bribes and/or Kickbacks by Skornicki

177.    On March 22, 2012, Sete and Keppel Brasil executed a letter of intent for five additional semisubmersible rigs.  Exh. 53 at KEPPEL00572590-92.

178.    Soon after the letter of intent was signed, on March 30, 2012, Skornicki wrote to Jeffery Chow that he was "having pressure from my partners about my contract, the first payment for the 5 units will be pay soon."  Exh. 51 at KEPPEL00046214.

179.    Jeffery Chow wrote back that he was "working on it and will quietly try to have it ready over the weekend[.]"  Exh. 51 at KEPPEL00046214.

180.    On April 3, 2012, Jeffery Chow told Skornicki that he was "headed to Singapore to close on the 'agreemen[ts],'" and that he is "proposing one in Brazil like the old ones from BrasFELS. 0.5%. Others outside from Fernvale."  Exh. 52 at KEPPEL00490240.

181.    Jeffery Chow asked Skornicki if Skornicki had other companies he could use for payments to Skornicki related to Sete.  Exh. 52 at KEPPEL00490240.

182.    On April 9, 2012, Jeffery Chow asked Skornicki to "advise on Company for outside Agreement between that Company and Fernvale."  Exh. 54 at KEPPEL00046493.

183.    Jeffery Chow told Skornicki that he "suggested and agreement is reached" to have part of the payments to Skornicki related to Sete be paid "via normal channels to Eagle in Brazil, with balance to be with Fernvale outside."  Exh. 54 at KEPPEL00046493.

25

184. Jeffery Chow warned Tommy Sam and Jerald Lee Quan Ti that if Fernvale paid two different Skornicki entities for the Sete deal it "will get queried by audit of why two different representatives[.]" Exh. 54 at KEPPEL00046491-92.

185. Sam opined to Jeffery Chow that the "value" Keppel planned to pay to Skornicki was "very huge to justify." Exh. 54 at KEPPEL00046491.

186. Jeffery Chow wrote to Sam that "having two reps sign and paid by one party looks even more odd??  Just trying to reduce questions as much as possible." Exh. 54 at KEPPEL00046491.

187. Sam commented that the amounts Keppel planned to pay Skornicki were "always questionable" and that BrasFELS "cannot justify 0.5%" on the full contract value "between Fernvale and Urca when its part is only a portion..sure can change the contract..but doesn't that attract more questions[.]" Exh. 54 at KEPPEL00046491.

188. Jeffery Chow explained to Sam that Keppel "[c]annot pay 2% via Fernvale" and "[c]annot pay to two different Reps for same deal." Exh. 54 at KEPPEL00046490.

189. Jerald Lee Quan Ti warned that all transactions in and out of Fernvale's Brazilian Real account "must be declared in a standard form." Exh. 54 at KEPPEL00046490.

190. On or about April 19, 2012, Skornicki forwarded an email from Paulo Lerner of Delta Bank to Jeffery Chow with the incorporation documents for Deep Sea Oil Corp. ("**Deep Sea Oil**"), asking if this was "OK" or if Chow wanted "something else." Exh. 56 at KEPPEL00546088.

191. Deep Sea Oil was a British Virgin Islands entity incorporated on April 11, 2012, controlled by Skornicki. Exh. 56 at KEPPEL00546090, KEPPEL00546112.

192.    On April 20, 2012, Jeffery Chow stated that he could "close both" agreements with Skornicki if "Elois[a] [Skornicki] (under her maiden name) is a director" of Eagle.  Exh. 55 at KEPPEL00280913.

193.     Jeffery Chow further asked, "is Eagle owned by Elois[a] in any way, and is she a director (using her maiden name)? The reason I am asking, is that it will look strange to have [Skornicki] as rep for both contracts? I hope you understand what I'm trying to achieve?"  Exh. 55 at KEPPEL00280913.

194.    Jeffery Chow understood that Eloisa Skornicki was Skornicki's second wife. Exh. 121 at 132:25-133:3.

195.    Skornicki used Eloisa Skornicki's email to send invoices to Keppel.  Exh. 76 at KEPPEL00023181.

196.    On May 8, 2012, Jeffery Chow forwarded the Deep Sea Oil incorporation documents to Chong, telling him that "[t]he rep contract between FERNVALE and Deep Sea Oil will be for 1.5%."  Exh. 56 at KEPPEL00546088.

197.    On May 15, 2012, Jeffery Chow sent Marsuki, Chong, Tan, and Nicholas Choo "final formats" of the Skornicki agreements for their "file and reference."  Exh. 57 at KEPPEL00546194.

198.    The draft agreement between Deep Sea Oil and Fernvale was dated December 14, 2011.  Exh. 57 at KEPPEL00546201.

199.    Deep Sea Oil did not exist on December 14, 2011.  Exh. 56 at KEPPEL00546090.

**B.     Jeffery Chow Personally Signed Keppel's Fraudulent Agreements on Behalf of Keppel's Fernvale Subsidiary After Its Director Declined to Sign**

200.    On July 17, 2012, Jeffery Chow wrote to Marsuki and Chong that "Agency/Commission agreements signed by" Skornicki were on his desk, but "need Aziz's signature." Exh. 60 at KEPPEL00541293.

201.    The individual named "Aziz" that Jeffery Chow was referring to was Merchant. Exh. 130 at 165:17-21.

202.    In 2012, Merchant was the Executive Director of Engineering at Keppel.  Exh. 130 at 14:13-17.

203.    Merchant has also been a director of Fernvale since 2011.  Exh. 130 at 59:8-10, 121:23-122:7; Exh. 120 at 182:5-10.

204.    Jeffery Chow testified that the normal procedure at Keppel was for the director of a special purpose entity to sign on its behalf.  Exh. 121 at 136:9-17.

205.    On July 19, 2012, Jeffery Chow wrote to YY Chow that he needed Merchant to sign commission agreements for Fernvale, and asked YY Chow to verbally confirm to Merchant the amount agreed to be paid to Skornicki so that Marsuki could "hand walk the docs" to Merchant for signing.  Exh. 59 at KEPPEL00281196.

206.    YY Chow asked why there were two agreements with Skornicki, and Jeffery Chow explained that there was "[o]ne for 0.5% and one for 1.5% for different parties, totaling the 2%."  Exh. 59 at KEPPEL00281196; Exh. 105 at A-15-16 ¶ 77.

207.    On July 24, 2012, Marsuki informed Jeffery Chow that she passed Skornicki's agreements to Merchant "but he has some queries on the percentage."  Exh. 60 at KEPPEL00541292.

208.    Jeffery Chow subsequently signed an agreement with Eagle dated November 30, 2011 (the "**Eagle Agency Agreement**") and an agreement with Deep Sea Oil dated December 1, 2011 (the "**Deep Sea Services Agreement**") on behalf of Fernvale.  Exh. 66 at KEPPEL00045257; Exh. 65 at KEPPEL00000240.

209.    The Eagle Agency Agreement and Deep Sea Services Agreement (collectively, the "**Consulting Agreements**") were backdated and executed by Jeffery Chow and Skornicki on or about August 7, 2012.  Exh. 67 at KEPPEL00555190.

### C.    The Agreements Between Keppel and Skornicki Were Created to Conceal and Facilitate the Corruption Scheme and Were Fundamentally False

210.    Keppel entered agreements with Eagle and Deep Sea to facilitate and conceal the payment of bribes relating to Sete.  Exh. 133 at 64:4-9.

211.    The Eagle Agency Agreement was one of the false agreements drafted by Jeffery Chow and other Keppel employees to facilitate the payment of bribes and to conceal the true nature and purpose of the payments.  Exh. 66; Exh. 121 at 150:13-151:17.

212.    Under the Eagle Agency Agreement, Fernvale agreed to pay Eagle "0.5% of the contract price paid to [Fernvale] under the EPC Contract[s]" with Sete.  Exh. 66 at KEPPEL00045253.

213.    The Deep Sea Services Agreement was one of the false agreements drafted by Jeffery Chow and other Keppel employees to facilitate the payment of bribes and to conceal the true nature and purpose of the payments.  Exh. 65; Exh. 121 at 156:11-17.

214.    Under the Deep Sea Services Agreement, Fernvale agreed to pay Deep Sea Oil for each EPC contract "1.5% (one and half a percent) of the Contract Price (in US$) actually paid to and received by [Fernvale]."  Exh. 65 at KEPPEL00000219.

215.    The Consulting Agreements were an "important part of the bribery scheme." Exh. 121 at 27:9-19, 151:12-17, 156:11-17.

216.    The Consulting Agreements existed to make payments to Skornicki seem legitimate.  Exh. 133 at 65:18-23.

217.    The Consulting Agreements "falsely represented that payments were being made" to Skornicki "for his assistance and support in discussions and negotiations with prospective customers when, in fact, portions of these payments were being paid as bribes."  Exh. 121 at 41:16-42:6, 146:13-20.

218.    Keppel knew that a portion of payments made to Deep Sea Oil in connection with the Consulting Agreements was intended to effectuate bribery payments to Brazilian officials. Exh. 113 at 7-14, RFA 1-10.

219.    The Consulting Agreements also "falsely represented that [Skornicki] was abiding by antibribery laws and was not making improper payments."  Exh. 121 at 41:23-42:6, 109:18-110:3.

220.    The Eagle Agency Agreement contained an "ANTI-BRIBERY & CORRUPTION" section whereby Eagle "represents warrants and agrees that it has not made and shall not make, either directly or indirectly, any improper payment of money or anything of value to an Official in connection with the EPC Contract, whether before or after the signing of the EPC Contract."  Exh. 66 at KEPPEL00045255-56.

221.    The Eagle Agency Agreement defined "Official" for purposes of the "ANTI-BRIBERY & CORRUPTION" clause as "(a) any officer or employee of any government or any department, agency or instrumentality thereof, or any person acting in an official capacity on behalf of any such government, department, agency or instrumentality; (b) any political party; (c) any official of a political party; (d) any candidate for political office; or (e) any officer or

employee of a public international organization such as the United Nations." Exh. 66 at KEPPEL00045255.

222.    In the "ANTI-BRIBERY & CORRUPTION" section, the Eagle Agency Agreement also stated that "in recognition of the principles of the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions which entered into force on February 15, 1999, the United States Foreign Corrupt Practices Act, the United Kingdom Bribery Act 2010, the Singapore Prevention of Corruption Act 2010 . . . and any other applicable laws, regulations, codes and sanctions relating to anti-bribery or anti-corruption, similar international conventions and national laws, the Agent warrants that it will not, directly or indirectly, in connection with the EPC Contract and the matters resulting therefrom, offer, pay, promise to pay or authorize the giving of money or anything of value to an Official, or to any other person, while knowing or being aware that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to an Official, for the purpose of improperly influence the act, decision or omission of such Official to obtain or retain business related to this Agreement, to direct business related to the EPC contract to any person, or to obtain any improper advantage or benefit." Exh. 66 at KEPPEL00045255.

223.    The "ANTI-BRIBERY & CORRUPTION" section of the Eagle Agency Agreement further directed that Eagle shall not "give to or receive from" Fernvale "any commission, fee…in connection with this Agreement or the EPC Contract, or enter into any business arrangement" with "any director, employee, representative or agent" of Fernvale, Sete, or their affiliates "without prior written consent." Exh. 66 at KEPPEL00045256.

224.    When Jeffery Chow drafted and signed the Eagle Agency Agreement, he understood that Skornicki would pay bribes and/or kickbacks in connection with the EPC

contracts and violate the "ANTI-BRIBERY & CORRUPTION" of the Eagle Agency Agreement, as well as the laws referred to therein.  Exh. 121 at 107:13-19.

225.    The Deep Sea Services Agreement contained a "BUSINESS ETHICS" section whereby Deep Sea Oil "agrees to strictly adhere to" the "Keppel Code of Business Conduct Policy" and "represents and warrants" that "it will not cause or aid [Fernvale] or any of its officers or employees to be in violation of said Policies."  Exh. 65 at KEPPEL00000222.

226.    Pursuant to the Deep Sea Services Agreement, Deep Sea Oil "agrees, represents and warrants that [it] has read, understands and will abide by the United States Foreign Corrupt Practices Act ('FCPA'), the United Kingdom Bribery Act 2010, the Singapore Prevention of Corruption Act 2010 and the anti-corruption and bribery laws of Brasil" and will "comply with the provisions of all applicable federal, state, country, or municipal laws, regulations or ordinances[.]"  Exh. 65 at KEPPEL00000223, KEPPEL00000227.

227.    Pursuant to the Deep Sea Services Agreement, Deep Sea Oil "agrees, represents and warrants" that it and its "affiliates … and its and their respective directors, officers, employees, agents, or representatives" shall "abide by the prohibitions of the Anti-Corruption Laws" and represent that they "have not and shall not pay, give, offer, promise to pay, or authorize the payment or giving of any money or anything of value" to any government official, including Petrobras, to influence such an official's "acts or decisions or induce such Government Official to use his or her influence to affect the official decision or actions of others in order to obtain, retain or direct business or to obtain any other improper advantage for" Fernvale or Deep Sea Oil, or make such payments to any other person "in furtherance of any prohibited act covered by the Anti-Corruption Laws" or if "there is a high probability" that the third party will make a prohibited payment to a government official, including Petrobras.  Exh. 65 at KEPPEL00000223-0224.

32

228.    The Deep Sea Services Agreement defined "Government Official" to "include[]
any appointed, elected, or honorary official, or officer or any employee of any government,
government ministry or department, agency or instrumentality thereof, or any company or
corporation that is owned or controlled by a government or any public international organization
or any person acting in an official capacity for or on behalf of any such government, ministry or
department, agency, company or corporation, instrumentality or public international
organization, including without limitation PETROBRAS."  Exh. 65 at KEPPEL00000223.

229.    The Deep Sea Services Provision contained a "Certification" stating that "[i]t is
the intention of the parties to that Marketing Consulting and Services Agreement dated
December 14, 2011 shall comply with the Foreign Corrupt Practices Act of the United States of
America, the United Kingdom Bribery Act 2010, the Singapore Prevention of Corruption Act
2010 and the anti-corruption and bribery laws of Brasil, and all applicable anti-corruption laws
… [a]ccordingly, and without prejudice to the generality of the foregoing, herewith
CONSULTANT undertakes and agrees that it has not and shall not directly or indirectly to offer,
pay, promise to pay or authorize the payment or giving of any money, or anything of value to
any official of any government or any instrumentality thereof (for purposes hereof, an employee
of PETROBRAS is deemed to be an official of a government or instrumentality thereof), to any
political party or candidate for political office, or to any person, while knowing that all or a
portion of such money or thing of value will be offered, given, or promised, directly or
indirectly, to any official of any government or any instrumentality thereof, for the purposes of:
a. Influencing any act or decision of such in his official capacity, including a decision to fail to
perform his official functions; or b. Inducing such official to use his influence with any
governmental or any instrumentality thereof to affect or influence any act or decision of such

government or instrumentality, in order to obtain or retain business for or with, or direct business to, any person."  Exh. 65 at KEPPEL00000234.

230.    Pursuant to the Deep Sea Services Agreement, Deep Sea Oil "agrees" to "immediately advise" Fernvale of any development that "in any way makes inaccurate or incomplete the representations, warrants and certifications" in the Deep Sea Services Agreement."  Exh. 65 at KEPPEL00000226.

231.    The business ethics and anti-bribery representations constituted a "material provision" of the Deep Sea Services Agreement.  Exh. 65 at KEPPEL00000227.

232.    When Jeffery Chow drafted and signed the Deep Sea Services Agreement, he understood that Skornicki would pay bribes and/or kickbacks in connection with the EPC contracts and that the representations by Deep Sea Oil and/or Skornicki in the Agreement and attached Certification were false.  Exh. 121 at 107:13-19.

233.    The 2% commission payments Fernvale made under the Consulting Agreements were intended to conceal the fact that a portion of the payments were intended to be a bribe payment.  Exh. 133 at 65:18-23.

234.    At the time that Jeffery Chow executed the Consulting Agreements, Tong and YY Chow had already authorized Skornicki to pay bribes and/or kickbacks relating to the EPC contracts.  *See supra* ¶ 17.

235.    Keppel Corp.'s Code of Conduct (the "**Code of Conduct**") issued on December 1, 2001 and revised on November 11, 2011 was applicable to Keppel.  Exh. 40 at KEPPEL00267958.

236.    The Code of Conduct stated that "Keppel's policy is to conduct business with integrity, fairly, impartially, in an ethical and proper manner, and in compliance with all applicable laws and regulations."  Exh. 40 at KEPPEL00267960; *see also* Exh. 130 at 92:4-6.

34

237.    The Code of Conduct's Section 3.2.2 on "Anti-Corruption" mandated that "Employees must under no circumstances offer, promise, give or authorise the giving, directly or through third parties, of any bribe, kickback, illicit payment, benefit in kind or any other advantage to a public official, private sector customer, supplier, contractor, or any other person or entity, as an inducement or reward for an improper performance or non-performance of a function or activity."  Exh. 40 at KEPPEL00267961.

## IV.    Keppel Continued to Participate in, Conceal, and Cover Up the Sete Scheme

### A.    Keppel Signed Five More EPC Contracts, Entering a Total of Nearly $5 Billion of Contracts With Sete

238.    On August 2, 2012, Fernvale entered five additional EPC contracts with affiliates of Sete.  Exh. 120 at 141:17-20, 191:16-25.

239.    Those five EPC contracts contained the same representations in Section 2.1 and 6.2 as the Urca EPC contract concerning violations of law.  Exh. 120 at 191:12-202:21.

240.    Keppel's Sete EPC contracts were collectively "the biggest contract that Keppel had ever entered into in its history."  Exh. 133 at 381:14-23.

241.    On August 7, 2012, Keppel issued a press release that it had signed five additional EPC contracts with Sete, describing Sete as a company with "[i]nternational finance investors."  Exh. 64 at 2.

242.    Keppel's internal third quarter 2012 update regarding the first rig for Sete reflected that Sete had "[t]wo new investors join[] the latest round: U.S. private-equity firm EIG Global Energy Partners invested BRL500 million while a wealthy Brazilian family also invested."  Exh. 68 at KEPPEL00441072.

**B.      Between 2012 and 2014, Keppel Paid More Than $20 Million to Skornicki's Offshore Shell Company to Facilitate the Payment of Bribes and Kickbacks**

243.     On or about August 30, 2012, Fernvale wired approximated $1,152,661 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 7-8, RFA 1.

244.     On or about November 5, 2012, Fernvale wired approximated $3,626,162 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 8, RFA 2.

245.     On or about March 15, 2013, Fernvale wired approximated $1,382,161 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 9, RFA 3.

246.     On or about October 18, 2013, Fernvale wired approximated $1,139,160 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 9-10, RFA 4.

247.     On or about November 1, 2013, Fernvale wired approximated $6,535,939 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 10, RFA 5.

248.     On or about February 12, 2014, Fernvale wired approximated $3,439,148 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 11, RFA 6.

249.     On or about April 21, 2014, Fernvale wired approximated $574,593 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 12, RFA 7.

250.     On or about June 4, 2014, Fernvale wired approximated $1,150,752 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 12-13, RFA 8.

251.     On or about July 9, 2014, Fernvale wired approximated $625,795 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 13, RFA 9.

252.     On or about October 31, 2014, Fernvale wired approximated $1,343,565 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 14, RFA 10.

253.     In total, Fernvale wired approximately $20.97 million to Delta Bank for the benefit of Deep Sea Oil.  *See supra* ¶¶ 243-52.

254.    The $20.97 million that Fernvale wired to Deep Sea Oil at Delta Bank originated directly from payments made by Sete under its EPC contracts with Fernvale, and the amounts wired to Deep Sea Oil were determined from the amounts that Fernvale received from Sete. Exh. 133 at 396:4-8; Exh. 121 at 139:15-21.

255.    Each of the payments by Fernvale to Deep Sea Oil were approved by Tong.  Exh. 133 at 391:22-392:7, 407:2-14.

256.    Keppel employees understood that a portion of the $20.97 million wired by Fernvale to Deep Sea Oil was intended to effectuate bribe payments to Brazilian officials.  Exh. 113 at 7-14, RFA 1-10.

### C.    Keppel Gave More Presentations to EIG and Other Sete Investors and Lenders to Reassure Them That the Project Was On Track

257.    On January 17, 2013, Ferraz and "a delegation of senior management" from export agencies DNB, GIEK, and Eksportkreditt visited the BrasFELS shipyard and received a tour of the shipyard and a presentation about the Sete project.  Exh. 69 at KEPPEL00011057.

258.    After the visit, Kwok emailed Tong and YY Chow to summarize the visit, stating that the export agencies were "involved with financing SETE / Petrobras on the [drilling rig] program," were "on a verification tour," and "left the yard fully satisfied with what they saw." Exh. 69 at KEPPEL00011057.

259.    On or about February 27, 2013, a representative from United Kingdom Export Finance ("**UKEF**") was authorized to visit the BrasFELS shipyard in connection with financing for Sete, with a presentation to be made.  Exh. 70 at KEPPEL00007815.

260.    On or about June 6, 2013, "representative[s] from Sete Brasil [i]nvestors," including Kevin Corrigan of EIG, visited the BrasFELS shipyard and were given a tour and

presentations about the shipyard and Sete project.  Exh. 71 at KEPPEL00457153-54,

KEPPEL00457157; Exh. 122 at 172:17-173:20.

261.    After the visit, Bruno Ng, a Keppel Brasil employee, sent an email to Kwok and

others stating that the visit "was successfully conducted with no major issue or concern" and that

"the visitors left in awe after the insightful yard tour at the [drilling rig] construction sites."  Exh.

71 at KEPPEL00457152.

262.    Corrigan left this third visit to the BrasFELS shipyard "feeling good about the

progress at Brasfels, that they were a professional company that was doing a good job."  Exh.

122 at 175:14-24.

263.    On June 5, 2013, Sete wrote to Petrobras regarding an "All Lenders Meeting,"

writing that the "most important of all is to relay the message to the shipyards that: THIS IS THE

MOST IMPORTANT MEETING OF THE FINANCING PROCESS!! The creditors need to

leave this meeting convinced that everything is under control (shipyard construction and rig

construction). Their comfort has a direct connection to their efficiency and willingness to

finance. So the focus is on commitment to the Project, including its risks!!!"  Exh. 72 at

KEPPEL00589220 (emphasis in original).

264.    Later that day, Petrobras forwarded the message to Kwok, Skornicki, Tan, and

others, writing that Sete and the rig operators "will have meetings with all lenders," that "[i]t is a

very important process," and "Keppel has been helping us on this process and as already

discussed with Zwi [Skornicki], next Tuesday (11/06) Keppel shall make a presentation about

the Drillship project and the shipyards. I request you to make the presentation."  Exh. 72 at

KEPPEL00589220.

265.    On June 11, 2013, Keppel and/or its subsidiary made a presentation to Sete's

lenders at "SETE's All Lenders' presentation meeting . . . where all the Yards were asked to

present the respective Yard's capability / capacity and DRU progress status."  Exh. 73 at KEPPEL00008303.

266.    After arriving back from the meeting, Kwok reported to YY Chow that "[o]ur presentation went well and post meeting feedback is that all the Lenders have complete confidence in BrasFELS."  Exh. 73 at KEPPEL00008303.

267.    Through 2014, Keppel never disclosed the Corruption Scheme to Sete's investors or lenders.

### D.    Keppel Sent False Anticorruption Letters to Sete to Help It Obtain BNDES Financing to Pay Keppel Under the EPC Contracts

268.    Keppel understood from Sete that the first batch of long-term financing from BNDES was scheduled to be signed on February 6, 2015.  Exh. 87 at KEPPEL00641137.

269.    That first batch was "specific project based," and Keppel expected BNDES to "pay the progress claims directly to the shipyards," including Keppel for the Urca and Frade rigs.  Exh. 87 at KEPPEL00641137.

270.    The first batch of BNDES financing was "subject to Keppel submitting its anti corruption declaration letter addressed to the lenders."  Exh. 87 at KEPPEL00641137.

271.    BNDES financing was "quite critical in order for Sete to continue funding the milestone payments to the shipyards."  Exh. 126 at 18:23-19:3.

272.    In December 2014, Jeffery Chow approved Anticorruption Letters to be sent from Fernvale to Sete, which Sete "stressed" to Keppel were an "essential document for BNDES" financing.  Exh. 83 at KEPPEL00634954.

273.    On January 9, 2015, Jeffery Chow requested that Sam advise Keppel Brasil employees that "things too dicey to be sending too much through Internet."  Exh. 84 at KEPPEL00485414.

39

274.     Also on January 9, 2015, Jeffery Chow told Sam to contact Fernvale Project Director Yan Naing Myint and tell him to keep the conversation regarding the Anticorruption Letters "off emails" because Keppel didn't "want to be seen to colluding" which it had "already."  Exh. 83 at KEPPEL00634953.

275.     On or about January 16, 2015, Fernvale signed anticorruption letters in which it "represent[ed] and warrant[ed]" that none of its "directors, officers, employees, or, to the best of its knowledge after due enquiry, agents and no other person acting on behalf of it, made or received any corrupt payments to obtain or retain business or improperly secure a business advantage" in connection with the EPC contracts.  Exh. 85 at KEPPEL00635164, KEPPEL00635167.

276.     The Anticorruption Letters were false.  Exh. 121 at 167:13-168:22.

277.     Jeffery Chow advised Keppel to not make anticorruption representations directly to lenders because if "for any reason there is a default of such terms on anti-corruption … a court may impose punitive [damages]" against Keppel which under U.S. law could "be astronomical." Exh. 87 at KEPPEL00641136.

278.     On February 5, 2015, the contents of Barusco's plea agreement and testimony were made public and implicated Sete in the Corruption Scheme.  Exh. 89 at KEPPEL00440537-40; Exh. 91 at EIG_KEP_00284098.

279.     The signing of contracts between Sete and BNDES for long-term financing that were scheduled for on or about February 6, 2015 was suspended due to the public disclosure of Barusco's Collaboration Agreements made as part of his plea agreement.  Exh. 133 at 342:16-22; Exh. 88 at EIG_KEP_00235093; Exh. 89 at KEPPEL00440536-37.

280.    Executives at Keppel were concerned about Sete's ability to secure long-term financing with BNDES after the Barusco collaboration agreements were disclosed.  Exh. 133 at 340:5-13.

**E.    Keppel Made False Public Statements to Conceal Its Role in the Scheme**

281.    YY Chow and Jeffery Chow were part of Keppel's task force that responded to allegations made by Barusco.  Exh. 126 at 38:18-39:2.

282.    On February 9, 2015, Keppel Corp. issued a statement to "refute allegations made in media reports on Keppel FELS' involvement in the scandal surrounding Petrobras."  Exh. 93.

283.    In the statement, Keppel Corp. "emphasise[d] that Keppel Group has a Code of Conduct which prohibits, among others, bribery and corruption.  Our employees are required to conduct themselves with integrity, in an ethical and proper manner, and in compliance with the applicable laws and regulations of the countries in which we operate, including anti-bribery laws."  Exh. 93 at KEPPEL00553544.

284.    In the statement, Keppel Corp. "point[ed] out . . . [that] the Agency Agreement with Eagle do Brasil categorically states that Eagle do Brasil and Zwi Skornicki 'shall not make, either directly or indirectly, any improper payment of money or anything of value to an Official in connection with the Contract'."  Exh. 93 at KEPPEL00553544.

285.    Keppel's February 9, 2015 press release did not disclose that Keppel executives had authorized Skornicki to pay bribes.  Exh. 93 at KEPPEL00553544.

286.    On or about February 9, 2015, Jeffery Chow drafted a letter from Keppel to its customers, telling them to "rest assured" that allegations of Keppel's involvement in the bribery scandal involving Petrobras were "false and without merit."  Exh. 92 at KEPPEL00641233.

287.    The February 9, 2015 letter from Keppel to its customers was false.  Exh. 121 at 174:20-175:20.

41

288.    On August 3, 2016, Keppel Corp. issued a statement "strongly den[ying] the allegations reportedly made that Keppel executives authorized Mr Skornicki to pay bribes on its behalf," representing that "[n]one of the individuals … including the current CEO of Keppel Offshore and Marine Mr Chow Yew Yuen, have ever authorized Mr Skornicki to make any payments as bribes."  Exh. 93 at 1.

289.    That August 3, 2016 statement was false.  Exh. 105 at A-15 ¶ 72.

V.    **EIG Relied on Sete and Petrobras's Material Misrepresentations and Omissions Prior to Funding Its Investment**

290.    Corrigan, who is fluent in Portuguese, was employed by EIG from its inception until he retired on June 30, 2014.  Exh. 123 at 14:16-15:18, 23:8-9.

291.    Corrigan was the senior-most member on the EIG team that was evaluating a potential investment in the Drilling Rigs/Sete project (the "**Sete Deal Team**").  Exh. 122 at 57:2-5; Exh. 123 at 155:20-156:5; 165:14-21; Exh. 125 at 295:7-10.

292.    Kevin Lowder ("**Lowder**"), Clay Taylor ("**Taylor**"), and Hayden were EIG employees who served at times on the Sete Deal Team.  Exh. 123 at 60:3-16; Exh. 125 at 33:8-17; Exh. 127 at 74:12-75:6.

293.    The Sete Deal Team worked with Brazilian outside counsel at Machado Meyer, who reviewed the Sete transaction and "put together a risk matrix" of the deal for EIG ("**Machado Meyer**").  Exh. 123 at 60:17-18; 172:8-16.

294.    The Sete Deal Team received information from Banco Santander Brasil S.A ("**Santander**") while considering an investment in Sete.  Exh. 123 at 54:7-55:1, 58:18-22; *see*, *e.g.*, Exh. 10 at EIG_KEP_00075067.

295.    The Sete Deal Team understood that the team at Santander was acting as a financial advisor for Petrobras for the Sete transaction.  Exh. 123 at 52:12-53:5.

296.     Luiz Reis ("**Reis**") originally worked with Santander, who was advising Petrobras on the Rigs Project, but he left to be a founder of Lakeshore Financial Partners Participações ("**Lakeshore**").  Exh. 128 at 37:4-12; Exh. 122 at 165:18-166:2; Exh. 123 at 19:20-22, 52:12-53:5.

297.     Lakeshore assumed Santander's role as Sete's financial advisor.  Exh. 20 at EIG_KEP_00076504; Exh. 128 at 36:6-38:9; Exh. 122 at 165:18-166:2.

### A.     Petrobras's Material Misrepresentations and Omissions

#### 1.     The Petrobras Drilling Presentation

298.     On September 27, 2010, Corrigan received via e-mail from Société Générale a multi-page English-language presentation titled, "The Drilling Rigs Project:  Petrobras' Strategy for its successful implementation" (the "**Petrobras Drilling Presentation**").  Exh. 2 at EIG00025561/EIG_KEP_00075177.

299.     This Petrobras Drilling Presentation is identical to the September 2011 Petrobras Presentation that Keppel received.  *See supra* ¶ 120.

300.     The Petrobras Drilling Presentation contained a section titled "Cautionary Statement for US investors." Exh. 2 at EIG_KEP_00075179.

301.     The Petrobras Drilling Presentation discussed the long-term strategic and financing goals for an "off balance sheet" "finance structure" to develop and to charter drilling rigs to Petrobras so that Petrobras could extract oil and gas from the Santos and Campos Basins. Exh. 2 at EIG_KEP_00075194-96, EIG_KEP_00075201-02.

302.     The Petrobras Drilling Presentation included a slide that stated that the "Main Objectives" were "[t]o ensure the availability of its demand for drilling rigs for Pre Salt application, minimizing charter costs and associated risks."  Exh. 2 at EIG_KEP_00075203.

303.    The Petrobras Drilling Presentation identified six potential risks under the heading "Main Risks and Challenges," including "Credit Risk," "Short Fall of Revenues," "Charter Daily Rates," "Guarantees," "Technological Risk" and "Delay and Cost Overrun."  Exh. 2 at EIG_KEP_00075198.

304.    The Petrobras Drilling Presentation also included a flow chart that purported to describe "The Basic Structure for Each Drilling Unit" and depicted the corporate structure and agreements governing the various parties. Exh. 2 at EIG_KEP_00075205.

305.    The Petrobras Drilling Presentation did not mention the Corruption Scheme.  Exh. 2.

## 2.    The Pre-Salt Oil Rigs Project Presentation

306.    On October 25, 2010, Santander e-mailed Corrigan and Taylor an English-language document entitled, "Pre-Salt Oil Rigs Project" ("**Petrobras Pre-Salt Presentation**"). Exh. 3 at EIG_KEP_00075164.

307.    Corrigan received the Petrobras Pre-Salt Presentation.  Exh. 123 at 68:11-12; 69:9-71:2.

308.    Lowder reviewed the Petrobras Pre-Salt Presentation.  Exh. 128 at 121:15-122:5.

309.    Information in the Petrobras Pre-Salt Presentation was incorporated into EIG's internal work product analyzing the project.  Exh. 128 at 121:15-122:5.

310.    This document discussed the Sete investment thesis and stated that Sete would have "[m]anagement with extensive experience in the market."  Exh. 3 at EIG_KEP_00075171.

311.     The document included a slide titled "Ownership Structure: Investors" which contained a box for "Local and International Investors" investing in the Fundo de Investimento em Participações Sondas ("**FIP Sondas**"), the investment fund that Petrobras created that was responsible for grouping together future investors of Sete.  Exh. 3 at EIG_KEP_00075173.

44

312.    The Petrobras Pre-Salt Presentation made no mention of the Corruption Scheme.
Exh. 3.

### 3.    Data Room Materials

313.    After approval by Petrobras, Santander provided EIG access to the data room for
the Sete transaction on or around December 29, 2010 ("**Data Room**"), which contained
documents uploaded by Petrobras and later Sete.  Exh. 5 at EIG00025391/EIG_KEP_00050772,
EIG00025396/EIG_KEP_00050777; Exh. 123 at 104:5-11, 305:15-20, 309:10-21.

314.    There was an index that listed many of the documents that were placed in the
Data Room.  Exh. 115.

315.    Santander recommended that EIG focus on the following documents in the Data
Room:  (i) an "[i]investment memorandum prepared by Caixa Econômica Federal", (ii) the
"Term Sheet," (iii) the "Return scenarios and main premises used," (iv) the "Strategic Guidelines
Plan," and (v) the "Schedule."   Exh. 5 at EIG00025390/EIG_KEP_00050771.

316.    In connection with his due diligence efforts in the Sete investment, Corrigan or
his colleagues read and reviewed documents in the Data Room.  Exh. 123 at 59:15-60:18; 62:16-
63:7; 65:10-21; 302:14-304:4; 309:2-4; 313:16-314:4; Exh. 122 at 59:6-8.

### (a)    The Petrobras CIM

317.    A document titled "Confidential Information Memorandum:  Pre-Salt Drilling
Rigs Project," that Petrobras and its advisors prepared, dated January 2010 (the "**CIM**") was in
the Data Room.  Exh. 115 at EIG_KEP_00166208; Exh. 123 at 58:13-17, 303:13-304:4.

318.    Corrigan reviewed the CIM and the Sete Deal team "thoroughly" relied on it
when evaluating the Project Sondas investment.  Exh. 123 at 58:13-17; 66:16-19, 158:1-7,
303:13-304:4.

319.    The CIM stated that an investment in Sete was attractive because the investors could "[e]xplore 'new frontiers' together with Petrobras," there would be "long-term contracts with a high probability of cash flows" and "[o]pportunities for long-term upsides that are very advantageous."   Exh. 1 at EIG00091806/EIG_KEP_00166289.

320.    Petrobras stated in the CIM that BNDES would finance 45% of the total capital of the project in the form of long-term debt.  Exh. 1 at EIG00091862/EIG_KEP_00166345.

321.    The CIM described Sete's 10-year and 20-year charter contracts as above average for the industry, and discussed the possibility of "a bonus payment that is proportional and growing and that could reach up to 10% of the daily cost of the charter."  Exh. 1 at EIG00091803/EIG_KEP_00166286.

322.    The CIM stated that the contractual terms of the Sete investment provided for payment of a Daily Rate "in relation to the availability of the equipment (rig) and is not related to production."  Exh. 1 EIG00091844/EIG_KEP_00166327.

323.    The CIM stated that Petrobras would contribute to the Project "as a contractor of drilling rig charter," as "a manager and supervisor of the works," "as a shareholder of the Brazilian holding company (Sete Brazil) . . . participating with a minimum of 5% and maximum of 10% of their share capital" and as an operator of at least two of the rigs.  Exh. 1 at EIG00091803/EIG_KEP_00166286.

324.    The CIM explained that "[t]o promote the economic development of a national shipbuilding and drilling rig operation on a large scale, including the entire production chain, the Project counts on strong support from the federal government, including financial support."  Exh. 1 at EIG00091802/EIG_KEP_00166285.

325.    The CIM stated that Sete would enter into drillship construction contracts with shipyards that would, among other things, oblige each shipyard to "perform the work . . . in

accordance with . . . applicable legislation [and] according to best practices of the industry."  Exh. 1 at EIG00091842/EIG_KEP_00166325.

326.     The CIM identified seven different "Risks and Mitigating Factors" associated with investing in Sete, including risks relating to project design and engineering defects, cost overruns, operational delay, performance risk, refinancing risk, taxes and social/environmental risks.  Exh. 1 at EIG00091869-75/EIG_KEP_00166352-58.

327.     Petrobras represented in the CIM that any risk of delay was mitigated by the "[s]election of a shipyard with proven experience in building similar vessels."  Exh. 1 at EIG00091872/EIG_KEP_00166355.

328.     The CIM did not mention the Corruption Scheme as a risk or otherwise.  Exh. 1.

**(b)     The Caixa Memorandum**

329.     A document titled "Investment Memorandum FIP Sondas," dated January 6, 2011 (the **"Caixa Memorandum"**), that was prepared by Caixa Econômica Federal (**"Caixa"**), was included in the Data Room.  Exh. 5 at EIG00025390/EIG_KEP_00050771; Exh. 123 at 303:13-304:4.

330.     The Caixa Memo was "prepared" by Caixa "as Manager of … FIP Sondas" using information provided to it by Petrobras and its agents.  Exh. 6 at EIG00091665/EIG_KEP_00164883.

331.     Corrigan reviewed the Caixa Memorandum and the Deal Team "thoroughly" relied on it when evaluating the Project Sondas investment.  Exh. 123 at 66:16-19; 158:1-7; 303:13-304:4.

332.     The Caixa Memorandum represented that:

> "Petrobras adopts best practices of corporate governance. As it is a publicly held company, it is subject to the rules of the Brazilian Securities and Exchange Commission [*Comissão de Valores*

> *Mobiliários (CVM)*] and the Brazilian Stock Exchange [*Bolsa de Valores, Mercadorias e Futuros (BM&FBovespa)*]. Abroad, it complies with the rules of the Securities and Exchange Commission (SEC) and the New York Stock Exchange (NYSE) in the United States; of Labitex of the Madrid Stock Exchange [*Bolsa de Madrid*] in Spain; of the Buenos Aires Commercial Exchange [*Bolsa do Comércio de Buenos Aires*]; and of the Argentinian National Securities Commission [*Comisión Nacional de Valores (CNV)*] in Argentina.
>
> Among the tools Petrobras has adopted to **guarantee** proper corporate governance is the Code of Best Practices, which deals with policies, such as the disclosure of information on material facts or actions and the trading of securities, related to the use of privileged information and the conduct of management and employees from senior management."

Exh. 6 at EIG00091695-96/EIG_KEP_00164913-14 (emphases and brackets in original).

333.    The Caixa Memorandum also stated that, based on a "version of the Construction Contract… provided by the Petrobras Advisor," the EPC Contractor was under the obligation of "[c]omplying with applicable legislation."  Exh. 6 at EIG00091728-29/EIG_KEP_00164946-47.

334.    The Caixa Memorandum listed "the main risks and mitigating factors of the Rigs Project," with the ten risks being "Construction Risks," "Risks of Petrobras Renewing Charter contracts," "Risk of not raising the funds needed," "Risk of operator's poor performance," "Risk of elimination of tax benefits," "Risks of elimination of REPETRO," "Mandatory nature of additional contributions at the request of BNDES, in case of insufficient funds to complete the construction of the rigs," "Discrepancy between the senior debt term and the term of the Charter Contracts," "Discrepancy between costs and general expenses effectively incurred and those provided for the in the Project modeling," and "Social-Environmental Risk."  Exh. 6 at EIG00091770-73/EIG_KEP_00164988-91.

335.    The Caixa Memorandum did not list the risk of the Corruption Scheme.  Exh. 6.

(c)      **The Draft EPC Contract**

336.    Draft EPC contracts, in English, were in the Data Room.  Exh. 115 at EIG000141814/EIG_KEP_00166208.

337.    The draft EPC contract contained a "Representation[] and Warrant[y] of the Contractor" that "[i]t is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or taken together, would materially and adversely affect its performance of any obligations under this Agreement."  Exh. 116 at EIG_KEP_00166682, Article 6.2(b).

338.    EIG considered "these representations and warranties … material to its investment decision," because this was "an important part of the contract."  Exh. 122 at 90:22-91:4.

339.    On June 16, 2011, Corrigan received a final draft of an EPC contract and forwarded it to Hayden "so he would be able to look [it] over and incorporate them into the investment recs."  Exh. 122 at 88:12-22, 89:20-90:7.

340.    EIG reviewed the EPC and other contracts and incorporated them into their own work product.  Exh. 127 at 67:19-68:18; Exh. 124 at 70:22-71:7.

**B.**    **Sete's Material Misrepresentations and Omissions**

**1.**    **Sete's Promotional Materials**

341.    On August 23, 2011, EIG received an English-language presentation titled "Sete Brasil Participações S/A Management Presentation" from Lakeshore (the **"Management Presentation"**).  Exh. 30 at EIG_KEP_00048952-53.

342.    The Management Presentation listed risks and mitigants.  Exh. 30 at EIG_KEP_00048987-88.

343.    It stated that while "[t]ypical charter contracts in the sector are short-term (1-3 years)," Sete had signed two 20-year contracts and five 10-year contracts with Petrobras, giving it "low exposure to volatility of the sector's supply and demand (both in terms of price and contract availability)."  Exh. 30 at EIG_KEP_00048960.

344.    It noted that financing risks were mitigated by the fact that the Pre-Salt was a "strategic priorit[y] to country development," and they could "count on full support and commitment from [the] Brazilian Government and BNDES."  Exh. 30 at EIG_KEP_00048988.

345.    The Management Presentation did not list the risk of the Corruption Scheme. Exh. 30.

346.    On or about September 14, 2011, Lakeshore sent to EIG another English-language confidential information memorandum, dated September 2011 (the "**Lakeshore Memorandum**").  Exh. 32.

347.    The Lakeshore Memorandum stated that "Sete Brasil has strong support from the Brazilian Federal Government."  Exh. 32 at EIG_KEP_00251585.

348.    The Lakeshore Memorandum also noted the "[s]trict technical selection of experienced shipyards or shipyards associated with another [] technical partner with proven reputation in the construction of similar vessels."  Exh. 32 at EIG_KEP_00251653.

349.    The Lakeshore Memorandum noted that EAS would execute its work "in accordance to and under consent of the applicable law."  Exh. 32 at EIG_KEP_00251621.

350.    The Lakeshore Memorandum also warned of a number of potential risks with Sete.  Exh. 32 at EIG_KEP_00251653-57.

351.    The Lakeshore Memorandum did not mention the Corruption Scheme as a potential risk or otherwise.  Exh. 32 at EIG_KEP_00251653-57.

50

### 2. Shipyard Visits

352.    In late May or early June 2011, Corrigan and Lowder visited Brazil and the EAS shipyard.  Exh. 14 at EIG_KEP_00073975.

353.    Corrigan and Lowder met with Barusco, Ferraz, and Ivan Hong and Reis of Santander during this visit.  Exh. 14 at EIG_KEP_00073975; Exh. 13 at EIG_KEP_00073982.

354.    No one in these meetings mentioned the Corruption Scheme.  Exh. 123 at 160:17-161:21, 189:12-190:6; Exh. 122 at 82:14-83:17, 118:5-9, 177:17-22; Exh. 134 at 90:11-14, 91:11-92:14.

355.    Corrigan also visited the Keppel Shipyard on multiple occasions.  *See supra* ¶¶ 100, 172, 260.

356.    The Corruption Scheme was not disclosed during any of Corrigan's visits to the Keppel Shipyard.  *See supra* ¶¶ 103, 175, 260, 267.

## VI. Prior to Funding Its Investment, EIG Conducted Extensive Due Diligence and Would Not Have Invested if It Knew of the Corruption Scheme

### A. EIG's Financial Modeling

357.    EIG reviewed financial materials and models provided by Santander and Lakeshore.  Exh. 128 at 36:9-13, 76:3-8; Exh. 123 at 60:8-10, 309:2-4, 309:9-21.

358.    EIG changed certain assumptions in the models. Exh. 125 at 150:18-21.

359.    A version of EIG's internal financial model was used as support for the Sete Investment Recommendations for Funds XIV and XV.  Exh. 17 at EIG_KEP_00070034-41; Exh. 33 at EIG_KEP_00069946, EIG_KEP_00069953; Exh. 128 at 92:6-8, 93:9-94:8,154:5-13.

### B. EIG's Compliance Due Diligence

360.    Corrigan testified that when EIG "embarked on our due diligence of Sete, we looked at the players, all our counterparties, the investors, Petrobras, the shipbuilders and their

owners, and we took a view that it was all on the up-and up.  We never saw any sign that there

was anything going on untoward in the structure of the transaction."  Exh. 122 at 53:18-54:3.

361.     EIG took a number of steps with respect to diligence on corruption: "we engaged

counsel, both local and international; we canvassed our network of contacts in the market; and …

we were very careful about who we chose as counterparties."  Exh. 134 at 66:2-11.

362.     The compliance department at EIG used a system called Complinet to search for

indications of money laundering and corruption.  Exh. 125 at 294:5-9.

363.     Corrigan devised the search terms for the Complinet searches, which contained

approximately thirty names related to the Sete transaction.  Exh. 16 at EIG_KEP_00203446.

364.     EIG also searched for the following in connection with Sete: the issuer of the

securities at issue, as well as all parties that had a significant relationship with the issuer,

including client and client contacts, beneficiaries, collateral owners, guarantors and cosigners,

controlling or significant shareholders, and sending and receiving parties.  Exh. 16 at

EIG_KEP_00203445-46.

365.     A memo summarizing the Complinet search identified "two noteworthy results"

concerning Carmargo Correa and Demosthense Marques.  Exh. 16 at EIG_KEP_00203446-47.

366.     That memorandum concluded that these flagged results should not prevent EIG

from proceeding with the Sete investment.  Exh. 16 at EIG_KEP_00203446-47.

367.     In June 2011, Carla Vogel ("**Vogel**") was Chief Compliance Officer at EIG.  Exh.

123 at 75:9-12.

368.     Vogel reviewed the memorandum and the articles found by the Complinet search,

and agreed that the articles represented "low risk," noting that the allegations were "several years

old," and "no subsequent findings were identified in [EIG's] searches."  Exh. 16 at

EIG_KEP_00203445.

C.      **The Deal Team's Analysis and Resulting Investment Recommendations**

369.    EIG spent months reviewing "the thousands of pages of documents" Petrobras,

Sete, and their agents provided it, and analyzing the Sete investment opportunity.  Exh. 123 at

59:17-60:2, 156:8-14, 300:13-16.

370.    EIG had a "very iterative process" in which the deal team would have weekly or

bi-weekly meetings with the chief investment officer as due diligence progressed.  Exh. 122 at

34:12-35:4, 72:5-18.

371.    Hayden testified that because the Sete investment involved long-term, fixed price

charter agreements with Petrobras, EIG viewed the investment as protected from oil price risk.

Exh. 124 at 53:5-25.

372.    R. Blair Thomas ("**Thomas**"), the Chief Executive Officer of EIG, testified that

oil prices were "a nonissue" for EIG with respect to Sete, because "Sete didn't own any oil, Sete

didn't sell any oil, the contract wasn't tied to oil, Sete had a take or pay contract, and so the risk

on oil prices was a Petrobras risk, not a Sete risk, not an EIG risk, and so we weren't tracking oil

prices and worried about whether it was up or down at any point in time."  Exh. 134 at 132:13-

25.

373.    Kurt Talbot ("**Talbot**"), EIG's Chief Investment Officer from its inception until

2014, testified that Sete's long term contracts with Petrobras meant that short term oil price

fluctuations would not "have had that big [of] an impact" on Sete.  Exh. 131 at 30:4-18, 125:24-

126:12.

374.    As Randall Wade ("**Wade**"), an EIG employee who served on the EIG

Investment Committee for Fund XV, explained, "Our investment in Sete wasn't tied to

commodity prices.  Our investment in Sete was supported by… a contractual revenue stream that

was unrelated to commodity prices.  And so if the contract had performed … the lower oil prices would not have had any impact on our investment."  Exh. 136 at 23:24-24:5, 77:13-23.

375.    The final Investment Recommendation for Fund XIV, dated June 27, 2011, was a 42-page document summarizing the diligence work and analysis on the Sete investment (the "**June 2011 Investment Recommendation**").  Exh. 17; Exh. 123 at 155:20-156:14; Exh. 122 at 35:5-36:13, 69:25-70:5, 71:3-17.

376.    The risks and mitigants identified in the June 2011 Investment Recommendation included several of those set out in the CIM.  *Compare* Exh. 1 at EIG00091869-75/EIG_KEP_00166352-58 *with* Exh. 17 at EIG_KEP_000720027-32.

377.    The June 2011 Investment Recommendation also described contractual protections to mitigate the risks of the investment:

> To mitigate the risks associated with this huge undertaking, Petrobrás is, in addition to its ownership in Sete, providing contractual protections to the expected returns of Sete shareholders.  These include 10 to 20-year charter contracts for drillships and various mechanisms to reset the charter payments such that equity holders maintain their returns . . . While the transaction is not without its risks, Petrobrás and the Brazilian government have gone to great lengths to create a structure that provides some assurances of a minimum return to Sete's equity owners.

Exh. 17 at EIG_KEP_00070015.

378.    The June 2011 Investment Recommendation recognized that BNDES would provide 55% of the senior debt and expressed interest in providing up to 45% of the total funding.  Exh. 17 at EIG_KEP_00070015, EIG_KEP_00070033.

379.    The June 2011 Investment Recommendation referred to key agreements, including the EPC contract, provided by Sete and Petrobras and reviewed by EIG as important

factors in reducing risk and ensuring stability from charter revenues.  Exh. 17 at EIG_KEP_00070015-16, EIG_KEP_00070021, EIG_KEP_00070025-26.

380.    A revised Investment Recommendation, dated September 16, 2011, was prepared for consideration of the investment by Fund XV (the "**September 2011 Investment Recommendation**") that was nearly identical to the June 2011 Investment Recommendation (collectively, the "**Sete Investment Recommendations**").  Exh. 33 at EIG_KEP_00069924; Exh. 123 at 174:9-13, 174:19-175:4.

### D.    The Investment Committee Approves Investments in Sete by Funds XIV and XV

381.    The EIG Investment Committee is comprised of the most senior people at EIG who each have decades of experience assessing investment opportunities (the "**EIG Investment Committee**"). Exh. 135 at 116:7-13.

382.    On June 27, 2011, EIG's Fund XIV approved "an investment of up to R$250,000,000 of common equity in FIP Sondas."  Exh. 18 at EIG_KEP_00127316.

383.    On September 16, 2011, EIG's Investment Committee approved "an investment of up to R$250,000,000 of common equity in FIP Sondas" through Fund XV.  Exh. 34 at EIG_KEP_00127312, EIG_KEP_00127314.

384.    The EIG Investment Committee for Funds XIV and XV conducted a thoughtful review of the analysis contained in the Sete Investment Recommendations. Exh. 135 at 146:15-148:16; Exh. 123 at 156:8-14.

385.    After the Investment Committee approves an investment, EIG has "a green light to proceed to… complete any remaining diligence," and EIG continued its due diligence until an investment is funded.  Exh. 124 at 56:6-57:12.

### E. EIG Would Never Have Invested in Sete Had it Known of the Corruption Scheme

386. EIG's leadership was unaware of the bribery and kickback Corruption Scheme involving Keppel, Petrobras, and Sete before the contents of Barusco's plea were made public in February 2015. Exh. 135 at 103:5-104:19; Exh. 123 at 159:6-10, 161:16-21, 189:12-190:20; Exh. 132 at 280:3-281:14; Exh. 122 at 82:14-83:17, 118:5-9, 177:17-22; Exh. 134 at 91:11-92:14.

387. EIG does not engage in or pursue transactions where there is a risk of corruption. Exh. 132 at 280:3-281:14; Exh. 123 at 160:17-161:15, 164:17-165:3, 167:17-168:14, 189:12-190:20.

388. Corrigan "wouldn't have even gone beyond Step 1" if he thought corruption was a risk. Exh. 123 at 160:21-161:15.

389. EIG "had a code of conduct where you're not supposed to engage in any unlawful activities, and by extension, bring any unlawful transactions into the company." Exh. 123 at 167:8-13.

390. EIG did not think corruption was an issue for the Sete deal because "we were teaming up … with the A team of Brazil. Petrobras, the largest pension fund, et cetera," and Petrobras had a strong credit and risk profile. Exh. 123 at 161:2-9.

391. Likewise, EIG took comfort that Sete was planning to partner with Keppel, which was the "star" shipyard in Brazil. Exh. 122 at 110:8-16, 129:20-25.

392. Thomas testified that if they had believed Petrobras or any counterparty was engaged in corruption, EIG "would immediately terminate any involvement in a potential transaction. So it's, you know, a complete full stop if you believe that there are participants in corruption. So, yes, there is no chance we would have proceeded." Exh. 134 at 90:21-91:5.

56

393.    Corrigan testified that if the results of the Complinet search indicated that Ferraz was taking bribes, "then the transaction would have died . . . . [W]e don't try to bring crooked transactions to our investment committee . . . . [W]e don't allow it.  We don't permit it.  We don't engage in it or pursue transactions that we think have a risk of having corrupt individuals behind it . . . ."  Exh. 123 at 168:4-14.

394.    As Corrigan testified that had EIG known there was corruption in the structure of Sete, "the deal would have died on the spot, but we were never informed, and I was never able to discern that this type of activity was going on."  Exh. 122 at 53:24-54:7.

395.    Corrigan testified, if EIG "had gotten a whiff of anything untoward during that time, we clearly would have pulled the deal," and "[if] something had come up, we would have pulled out."  Exh. 122 at 108:15-24, 117:6-8.

396.    Corrigan testified, "we would have pulled out had we known what was really going on, and we were never given that opportunity."  Exh. 122 at 117:22-118:4.

397.    Talbot testified that if EIG knew about corruption at Sete, "it would have never made it to [the Investment] [C]ommittee."  Exh. 132 at 281:4-14.

398.    Jeff Anderson, an Investment Committee member, testified that if "someone had raised concerns about bribery," he would not have voted to approve the investment in Sete.  Exh. 119 at 54:12-15.

399.    Similarly, Alvin Albe, another Investment Committee member, testified that if he had "known that Sete was involved in a bribery and kickback scheme back in 2011," he would not have voted to approve the Sete investment.  Exh. 118 at 38:8-23.

KL3 3355429.1

## VII.   After Careful Due Diligence, EIG Documented its Investment and Invested Over $220 Million in Sete

### A.   The Relevant Agreements, Including EIG's Agreements

400.   On June 30, 2011, EIG entered into an Investment Agreement with Sete and Lakeshore ("**June 2011 Investment Agreement**").  Exh. 19.

401.   As of this date, EIG "had an expectation of investing," but was not "committed at this point" given the existence of various preconditions in the June 30, 2011 Investment Agreement.  Exh. 122 at 98:13-23, 100:18-25.

402.   The June 2011 Investment Agreement provided that the Potential Investor, EIG, would invest up to $250 million Reais "provided that (i) the Proposal  is entirely  or partially awarded as the Tender's winning bid regarding one or more Rigs, and (ii) in connection with the aforementioned award SETE BRASIL requires additional equity investment in addition to the pre-emptive rights of the Original Investors in order to pay for the investments and expenses related to the implementation of the new rigs[.]"  Exh. 19 at EIG_KEP_0049153, § 2.1.

403.   Article 2.1(i)(a) stated that EIG would need to execute an Investment Commitment Agreement if the conditions precedent were satisfied.  Exh. 19 at EIG_KEP_0049153, § 2.1(i)(a).

404.   Article 2.7 also referred to conditions precedent in the June 2011 Investment Agreement.  Exh. 19 at EIG_KEP_0049154, § 2.7.

405.   On September 8, 2011, EIG entered into the First Amendment and Restatement Agreement ("**September 2011 Amended Investment Agreement**"), which amended the June 2011 Investment Agreement to reflect an increase in its equity investment from $250 million to $500 million reais.  Exh. 31 at EIG_KEP_00048628.

406.     The September 2011 Amended Investment Agreement contained the same conditions precedent as the June 2011 Investment Agreement.  Exh. 31 at EIG_KEP_00048629, § 2.1.

407.     As Mr. Corrigan testified, "at this point in time, we still didn't know if we had a deal," because there were certain conditions before the investment would close, including a question of how many drillships Sete would secure, and it was possible that other investors in Sete would exercise their preemptive rights.  Exh. 122 at 114:8-18, 117:3-17.

408.     While EIG "wanted to invest," they "didn't feel we were binded or bound by this.  If something had come up, we would have pulled out."  Exh. 122 at 117:3-8.

409.     Indeed, "[i]f somebody had called us [EIG] and said, Hey, did you know Ferraz is getting a 1 percent kickback from the shipyard, we would have pulled out."  Exh. 122 at 199:9-199:13.

410.     As Thomas explained, as of June 2011 EIG "had not signed transaction documents," and only did so in July 2012.  Exh. 134 at 96:22-97:15, 102:24-103:13.

411.     On March 29, 2012, the FIP Sondas quotaholders approved the issuance of new quotas of FIP Sondas.  Exh. 63 at EIG_KEP_00211775; Exh. 62 at EIG_KEP_00044772 at ¶ 1.1.

412.     On July 31, 2012, EIG entered into an Investment Commitment Agreement whereby it committed "to subscribe and pay for the quotas issued by the [FIP Sondas]" up to the limit of EIG's committed capital of R$509,459,990 (the "**Investment Commitment Agreement**").  Exh. 62 at EIG_KEP_00044774 ¶ 1.1.

413.     The Investment Commitment Agreement provided that "[t]he Committed Capital, including the applicable Entry Fees, must be paid up insofar as the Fund requires resources to

KL3 3355429.1

implement its objectives, through capital calls to be made by the Administrator, within the term of the Fund, as prescribed in the Bylaws." Exh. 62 at EIG_KEP_00044777 ¶ 2.1.

414.    The Investment Commitment Agreement established penalties for "any Investor [that] fails to partially or fully comply with the obligation to contribute capital to the Fund, pursuant to the Bylaws and th[e] Investment Commit[ment], by the date specified in each Payment Notification." Exh. 62 at EIG_KEP_00044780 ¶ 4.2.

415.    On July 31, 2012, the FIP Sondas' Quotaholders Agreement was amended to include new investors EIG and Luce Venture Capital – Drilling Series ("**Luce**") as quotaholders of the FIP Sondas. Exh. 63 at EIG_KEP_00211772.

416.    On July 31, 2012, the original Investment Agreement was amended to: (i) implement necessary changes to adapt the Investment Agreement as of May 2011 to the current stage of the Project and (ii) govern the terms and conditions for investments and capital contributions into Sete for the implementation of new investments (the "**Second Amendment to the Investment Agreement**"). Exh. 61 at EIG_KEP_00110498, (m).

417.    The Second Amendment to the Investment Agreement established that the "Quotaholder that fails to pay for [its shares] . . . shall automatically be considered to be in default . . ., being subject to the penalties noted in Article 45 of the [FIP Sondas] Bylaws." Exh. 61 at EIG_KEP_00110502 ¶ 3.6.

**B.    EIG's Investments in Sete**

418.    EIG used two Luxembourg entities, EIG Sete Parent S.à r.l. and EIG Sete Holdings S.à r.l. (the "**Luxembourg Entities**"), to invest in Sete. Exh. 117 at EIG_KEP_00130961.

419.    On August 3, 2012, EIG wired a total of $50,049,309.66 USD, which flowed through the Luxembourg Entities, converted to BRL 101,500,000.00 and, on August 7, 2012, funded FIP Sondas.  Exh. 117 at EIG_KEP_00130961-962.

420.    On August 9, 2012, EIG wired a total of $25,020,988.03 USD through the Luxembourg Entities, converted the funds to BRL 50,379,759.40 and, on August 13, 2012, funded to FIP Sondas.  Exh. 117 at EIG_KEP_00130739-40.

421.    On May 7, 2013, EIG wired a total of $2,391,661.00 USD through the Luxembourg Entities, converted the funds to BRL 4,813,217.77 and, on May 10, 2013, funded FIP Sondas.  Exh. 117 at EIG_KEP_00096904-05.

422.    On October 1, 2013, EIG wired a total of $214,717.89 USD through the Luxembourg Entities, converted the funds to BRL 473,989.73 and, on October 4, 2013, funded FIP Sondas.  Exh. 117 at EIG_KEP_00087376-77.

423.    On April 11, 2014, EIG wired a total of $14,132,504.22 USD through the Luxembourg Entities, converted the funds to BRL 31,148,039.28 and, on April 16, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00051566-67.

424.    On May 7, 2014, EIG wired a total of $22,022,539.74 USD through the Luxembourg Entities, converted the funds to BRL 49,011,162.20 and, on May 9, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00168123-25.

425.    On June 4, 2014, EIG wired a total of $10,856,257.42 USD through the Luxembourg Entities, converted the funds to BRL 24,692,557.50 and, on June 6, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00167806-08.

426.    On August 12, 2014, EIG wired a total of $8,058,966.67 USD through the Luxembourg Entities, converted the funds to BRL 18,318,031.25 and, on August 14, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00158294-96.

427.    On August 25, 2014, EIG wired a total of $12,354,944.76 USD through the Luxembourg Entities, converted the funds to BRL 28,187,806.48 and, on August 27, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00156962-64.

428.    On October 15, 2014, EIG wired a total of $9,488,769.34 USD through the Luxembourg Entities, converted the funds to BRL 23,105,153.33 and, on October 17, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00152226-29.

429.    On November 10, 2014, EIG wired a total of $8,863,942.29 USD through the Luxembourg Entities, converted the funds to BRL 22,492,253.56 and, on November 12, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00150332-34.

430.    On December 8, 2014, EIG wired a total of $15,088,880.88 USD through the Luxembourg Entities, converted the funds to BRL 39,223,545.84, and, on December 10, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00147399-401.

431.    On January 6, 2015, EIG wired a total of $42,567,695.54 through the Luxembourg Entities, converted the funds to BRL 115,677,712.63, and, on January 7, 2015, funded FIP Sondas.  Exh. 117 at EIG_KEP_00249992-93.

432.    Between August 2012 and January 2015, EIG invested a total of $221,111,177.44 USD in FIP Sondas.  *See supra* ¶¶ 419-31.

## VIII.   Sete's Progress From 2013 until the Revelations in Operation Car Wash

433.    In September 2013, EIG invited Ferraz to attend the annual conference EIG holds for its investors in in Washington, D.C.  Exh. 74 at EIG_KEP_00249871.

434.    During that conference, Ferraz told EIG and investors in EIG's Funds that Sete was "performing as planned," and that he "[didn't] see any reason why [Sete] should deviate from that."  Exh. 75 at lines 488-89.

435.    Ferraz reported that Sete was "ahead of schedule," and was "not facing any problem to raise" the necessary debt financing called for in its business plan.  Exh. 75 at 234, 389-91.

436.    Ferraz did not mention the Corruption Scheme at EIG's 2013 investor conference. Exh. 75.

**A.    Construction Delays**

437.    From the start, EIG understood that delays of construction and cost overruns were risks of the deal.  Exh. 123 at 119:1-22.

438.    Corrigan reported that at a Sete board meeting held in June 2014, Luiz Eduardo Guimarães Carneiro ("**Carneiro**"), Sete's new CEO, had said that "many of the drillships, particularly the early ones, now face some serious delays in delivery and commissioning on behalf of Petrobras. The average delay for all 29 drillships is 4.1 months, and due to the buffer between delivery and commissioning, the average delay on the latter falls to 1.7 months. More worrisome, the two drillships expected to be delivered in 2015 (Arpoador and Urca), are now expected to be delivered in February, 2016. The four drillships/semi-subs to be delivered in 2016 are now expected to suffer delays of between nine and ten months. The picture improves thereafter."  Exh. 78 at EIG_KEP_00142563.

439.    In an email summarizing the Sete board meeting, Corrigan explained that while "much of the above is true, and will be an ongoing challenge," Corrigan believed that Carneiro was "clearly . . . trying to paint the bleakest picture possible to lower all our expectations, and hopefully, be able to show some positive results going forward."  Exh. 78 at EIG_KEP_00142564.

440.    Corrigan testified: "I worked on many transactions over 37 years of finance, and while this may seem like it was complicated and difficult, which it was, to me it was not out of the ordinary, the issues we were encountering as this went along."  Exh. 123 at 257:1-6.

441.    While EIG understood that the construction delays continued as of December 2014, the "[m]ain bottlenecks" for construction delays were "expected to be surpassed in the first semester of 2015."  Exh. 81 at EIG_KEP_00209432.

442.    As of October 2014, Keppel was on track to deliver its first rig for Sete on time. Exh. 130 at 185:13-25.

### B.    Progress Regarding Obtaining Financing

443.    Prior to the Lava Jato revelations, in Thomas's view any difficulties Sete encountered to receive financing were not "out of the ordinary…. [t]he scale of the financing required was large, but the company had a lot of alternatives… and they had demonstrated an ability to raise significant amounts of capital."  Exh. 134 at 108:24-109:13.

444.    Sete had many discussions about optimizing financing and getting cheaper financing, but "it wasn't generally a question of if they could raise financing, it was at what cost."  Exh. 134 at 108:24-109:16.

### C.    Impact on the IRR

445.    By the end of 2014, EIG projected an IRR of 9.7%.  Exh. 81 at EIG_KEP_00209431.

446.    At all times in 2014 and prior, EIG projected a positive IRR.  *See supra* ¶ 445.

## IX.   The Impact of Operation Car Wash

### A.   BNDES Financing, Which Was Critical to Sete, Was Expected by February 6, 2015

447.   Chin Hua Loh ("**Loh**"), the Chief Executive Officer of Keppel Corp. and Chairman of Keppel's board of directors in 2014 and 2015, testified that BNDES financing was "quite critical in order for Sete to continue funding the milestone payments to the shipyards." Exh. 126 at 11:4-12:5, 18:23-19:3.

448.   Brazilian prosecutors discovered the Corruption Scheme in and after 2014 through an investigation dubbed Operação Lava Jato ("**Operation Car Wash**").  Exh. 98 at F-10.

449.   The Corruption Scheme went undetected for a decade before the Brazilian federal prosecutors and police even discovered it.  Exh. 98 at F-10.

450.   Although Paulo Roberto Costa ("**Costa**"), Petrobras' former Chief Downstream Officer, was arrested in March 2014, he only "publicly describ[ed] the payment scheme" at Petrobras in October 2014, when he testified in court.  Exh. 98 at F-10, F-11.

451.   In November 2014, news of a plea agreement by Barusco was made public, but there were no disclosures regarding Sete. Exh. 79 at EIG00064923-24/EIG_KEP00148015-16; Exh. 129 at 38:5-13; Exh. 82 at KEPPEL00495288.

452.   Although EIG was aware by sometime in mid- to late 2014 that the Operation Car Wash investigation had uncovered corruption at Petrobras, EIG did not know at that time that Sete would be implicated in Operation Car Wash.  Exh. 129 at 38:5-13; Exh. 135 at 283:20-284:1.

453.   As of December 2014, the total balance of the bridge loans outstanding at Sete was more than $4 billion.  Exh. 81 at EIG_KEP_00209436.

454.     On December 16, 2014, BNDES issued Executive Board Decision No.

1239/2014, which added new conditions to financing as a result of Operation Car Wash. Exh. 80

at EIG_KEP_00208070-71.

455.     Pursuant to Executive Board Decision No. 1239/2014, BNDES required

"declarations to be executed by the respective operators, EPC contractors, and by Petrobras

under terms that are satisfactory to BNDES, stating that there was no corruption in relation to the

Project." Exh. 80 at EIG_KEP_00208070, ¶ e.

456.     On December 30, 2014, Kai Choong Kwok stated in an internal update to others

at Keppel:

> As a result of the above scandals involving Petrobras, SETE Brazil
> had also started an internal investigation on its contracts previously
> signed by its COO, Pedro Barusco who is also involved in the
> Lava Jato scandal. The investigations are still in progress without
> any indications as of date of any anomalies.
>
> These developments have affected SETE Brasil's ability to obtain
> long term financing from lenders. As of date, major lenders led by
> BNDES has delayed signing of the loan agreement with SETE.
> SETE has been resorting to short term bridging loans from Banco
> do Brazil, etc but in recent weeks, hit obstacles and there has been
> no closure of further bridging loans.
>
> …
>
> It has also been reported that, in light of all the negative
> developments, Petrobras will be toning down on its investments
> and focusing on production. However, Head of Brazil's National
> Petroleum Agency (ANP), Mrs Magda Cambriard was reported to
> have declared in mid Dec that 'pre-salt oil is still profitable even
> with oil at US$60 per barrel'.

Exh. 82 at KEPPEL00495288-89.

457.     On January 31, 2015, an internal Keppel email discussing "[d]evelopments with

SETE Brasil regarding their financing conditions" stated, "SETE expect that, with the approval

from PB [Petrobras] to release the AMA [Asset Management Agreement between Petrobras and

Sete] and anti corruption declaration letter on 2/2, they should be able to sign the 1st batch loan agreement with BNDES on Friday [February 6]."  Exh. 86 at KEPPEL00089793.

458.    The batch of financing led by BNDES in February 2015 was expected to provide Sete in excess of $5 billion in financing.  Exh. 97 at EIG00156005/EIG_KEP_00203233; Exh. 89 at KEPPEL00440536.

**B.    The Impact of Operation Car Wash After Sete Was Officially Implicated**

459.    On February 5, 2015, the contents of Barusco's plea agreement and testimony were made public and implicated Sete and Keppel in the Corruption Scheme.  Exh. 89 at KEPPEL00440539-40.

460.    That same day, Sete Investor Relations emailed "Shareholders and Board Members," explaining that "the Company was planning to sign the initial financing contracts related to three PNBV rigs this Friday (02/06/2015)."  Exh. 88 at EIG_KEP_00235094.

461.    The anticorruption declarations and the AMA contracts were not considered at the Petrobras Board meeting scheduled for February 5, 2015.  Exh. 88 at EIG_KEP_00235094.

462.    By email on February 5, 2015, Petrobras stated that the "the main reason" why the anticorruption statements and AMA contracts were not submitted to the Petrobras Executive Board was "the disclosure today, by the press, of the Collaboration Agreement No. 3 provided by Pedro José Barusco Filho."  Exh. 88 at EIG_KEP_00235093.

463.    The information contained in Barusco's collaboration agreement "ma[de] it impossible" for the anticorruption statements "to be submitted for deliberation by the Petrobras Board."  Exh. 88 at 00235093.

464.    Tan testified that the signing of contracts between Sete and BNDES for long-term financing scheduled for on or about February 6, 2015 were suspended due to the public disclosure of the Barusco collaboration agreements.  Exh. 133 at 342:16-22.

465.    Executives at Keppel were concerned about Sete's ability to secure long-term financing with BNDES after the Barusco collaboration agreements were disclosed.  Exh. 133 at 340:5-13.

466.    On February 6, 2015, Wan Jun Lee forwarded an article from O Globo "focusing on Barusco's statements on Sete Brasil" to Loh and others.  Exh. 89 at EIG_KEP_00440537.

467.    Loh responded to Lee, "The concern is likely to move to whether this will stall Sete deal with BNDES and delay the financing and the funding to pay us."  Exh. 89 at KEPPEL00440537.

468.    YY Chow replied to Loh, "Agree. We will have to be prepared for further delay to the funding."  Exh. 89 at KEPPEL00440537.

469.    Hours later, a Keppel employee distributed an article to senior Keppel executives reporting the suspension of "the signing of the financing agreement of [BNDES], Caixa Econômica Federal, and UK Export Finance."  Exh. 89 at KEPPEL00440536.

470.    The employee informed the CEOs of Keppel Corp. and Keppel that "the signing of financing contracts, which was schedule to take place in Brazil today (6 Feb) has been suspended."  Exh. 89 at KEPPEL00440536.

471.    On February 7, 2015, in an internal Keppel email responding to a report that "BNDES will postpone credit to Sete Brasil … following press reports suggesting that rig-building entity Sete Brasil was involved in the corruption," Look Fung Wang wrote, "As expected, and not good for us…"  Exh. 90 at KEPPEL00440618.

472.    BTG Pactual was the largest investor in Sete.  Exh. 123 at 96:14-15.

473.     In a "Briefing Memo regarding SETE," dated February 9, 2015, BTG Pactual

outlined the difficulties Sete faced getting financing as a consequence of Operation Car Wash

and described the effects of the revelation of Barusco's statements as follows:

- "The scenario changed substantially in early October 2014 as a consequence of investigations carried out by the Federal Police and Public Ministries, nicknamed Operação Lava Jato. . . ."  Exh. 91 at EIG_KEP_00284098.

- "[Sete] immediately hired law firms to perform independent audits . . . Despite the positive result of those audits, negative impacts on SETE arose due to the overall situation. . . ."  *Id.*

- "BNDES and the other long term financiers of Batch 1 (first group of rigs to receive long term funding, of a total of three batches) added many new requirements – from SETE, Petrobras, the operators and the shipyards – to approve the signature of the contracts, which caused delays to the process. The Company managed to obtain three other bridge loans during this period, but conditions became increasingly difficult, to the point where no additional funding was available in late November 2014. Thus, SETE saw itself forced to stop payments to the shipyards in November 2014. Management made significant efforts to achieve the signatures of Batch 1 loan documentation, which, after clearing dozens of new conditions precedent, was scheduled to take place on Friday, February 6th 2015."  *Id.*

- "On February 5th 2015 however, Barusco's hearings became public and revealed that he also received bribes during his period as SETE's COO. . . ."  *Id.*

- "Barusco's testimony not only precluded the Company from achieving the last condition precedent required for the signature of the long-term funding (an anti-corruption representation from Petrobras) but also created the necessity of a complete reformulation of the project. Under the current scenario, no disbursement should be expected in the very short-term and the relationship with the shipyards, which were allegedly benefited through illicit practices, must be reviewed."  *Id*. at EIG_KEP_00284099.

474.     On February 12, 2015, Keppel board member Pan wrote to Loh and YY Chow,

"LOOKS LIKE SETE affair will be drawn out for a while. Seems funding for Sete is like

chicken and egg revolving around the politics of how to resolve the corruption scandal."  Exh. 94

at KEPPEL00439869.

475.    Loh responded:  "In the worst case painted below, PB [Petrobras] won't get their rigs. Shipyards will layoff tens of thousands of workers. Pension funds that invested in Sete Brasil will be left with a big hole and their beneficiaries will have a big problem."  Exh. 94 at KEPPEL00439869.

476.    On March 3, 2015, Peng Sang Sit ("**Sit**"), a director at Keppel, responded to an email from Wang Jun Lee circulating news blurbs concerning Lavo Jato:  "Looks bad ? Chances of Sete not getting the financing ?"  Exh. 95 at KEPPEL00485355.

477.    Sam responded to Sit, "Sete's ability to obtain Financing is very much tie to the scandals still looming over the country as the financing institutions want to play very safe and thus more conditions are imposed. The longer this drags on, Sete may even become insolvent which will be very bad for the country."  Exh. 95 at KEPPEL00485355.

478.    In an April 13, 2015 letter to Sete's shareholders, Sete's CEO stated that "the disclosure of the contents of the plea agreement entered by former director Pedro Barusco made it impossible to sign the long-term contracts scheduled for February 6, 2015, and [Sete] is currently uncertain about its ability to continue as a going concern."  Exh. 96 at EIG_KEP_00237890.

479.    On April 30, 2015, Sete issued an April 2015 Executive Report in which it stated that the process of obtaining US$4.6 billion in anticipated financing from FMM was "interrupted by the disclosure of Pedro Barusco's plea bargain."  Exh. 97 at EIG00156005/EIG_KEP_00203233.

480.    The Executive Report also stated that US$1.7 billion in funding from FINISA "was approved" and "ready for signature on February 6, 2015, together with BNDES and UKEF, but was interrupted by the disclosure of Pedro Barusco's plea bargain."  Exh. 97 at EIG00156005/EIG_KEP_00203233.

481.    The Executive Report noted that "US$213 million was approved by UKEF's board" and "was ready for signature on February 6, 2015, together with BNDES and FINISA, but was interrupted by the disclosure of Pedro Barusco's plea bargain."  Exh. 97 at EIG00156005/EIG_KEP_00203233.

482.    The Executive report further noted that "US$3.7 billion was approved by [BNDES'] board in December 2013" and "[d]ocumentation was ready for signature on February 6, 2015, but the process was interrupted by the disclosure of Pedro Barusco's plea bargain." Exh. 97 at EIG00156005/EIG_KEP_00203233.

483.    The Executive Report also stated that $5.6 billion in BNDES funding for "the second batch was structured but has been halted until the disbursement of the first batch." Exh. 97 at EIG00156005/EIG_KEP_00203233.

484.    The Executive Report noted that "BNDES indicated that it must no longer finance the project directly."  Exh. 99 at EIG00110475/EIG_KEP_00237594.

485.    On May 19, 2015 Sete explained that "based on the[] revelations" in connection with the disclosure of Barusco's plea agreement, "BNDES, the lead party financing the Project, halted final negotiations for granting direct, long-term financing."  Exh. 99 at EIG00110475/EIG_KEP_00237594.

## X.    EIG's Investment in Sete is Worthless

486.    On June 15, 2016, a Brazilian court approved Sete's request for reorganization. Exh. 109 at EIG00228049/EIG_KEP_00175810.

487.    In a December 6, 2018 letter to Sete shareholders signed by the company's CEO, Carneiro, Sete proposed transferring "all Sete Brasil shares held by FIP Sondas" to a "non-profit orphan entity" "for the symbolic value of one Brazilian *real*," in light of the fact that "the current shareholders' continuing control of the Company will not guarantee them any financial return on

71

the investment made" and "the current corporate structure, if maintained, only tends to represent liability risks to current shareholders."  Exh. 108 at 2018.12.06 EIG00228071/EIG_KEP_00176683.

488.    In a February 26, 2019 letter to Sete shareholders, Caixa stated that FIP Sondas' "total investment in [Sete] is posted at a book value of zero" and that in 2017, the net equity became "negative on account of the lack of funding to pay its operating expenses." Exh. 109 at EIG00228049/EIG_KEP_00175810.

489.    On November 1, 2019, the FIP Sondas investment committee approved the sale of all Sete shares "for the symbolic total value of R$ 1.00 (one real)."  Exh. 111 at EIG00228793-94/EIG_KEP_00249901-02.

490.    On January 27, 2020, Caixa announced that FIP Sondas sold its full interest in Sete "corresponding to 95% of the Company's share capital, in accordance with terms approved by the Fund's Investment Committee."  Exh. 112 at EIG00228764/EIG_KEP_00249872.

Dated:  New York, New York
   September 20, 2021

         Respectfully submitted,

         KRAMER LEVIN NAFTALIS &
         FRANKEL LLP

         By:    /s/ Daniel B. Goldman
           Daniel B. Goldman
           Kerri Ann Law
           Claudia Pak
           1177 Avenue of the Americas
           New York, New York 10036
           (212) 715-9100
           dgoldman@kramerlevin.com

         *Attorneys for Plaintiffs*

KL3 3355429.1

**TABLE OF DEFINITIONS**

| Term | Description | Source[1] |
|---|---|---|
| ADIC | Abu Dhabi Investment Council, a potential investor in Sete | 170 |
| Barusco | Pedro José Barusco Filho, an (i) executive manager at Petrobras from in or about 2003 to April 2011 with responsibility for the bidding process organized by a division of Petrobras; and (ii) Chief Operating Officer of Sete starting in or about April 2011 with responsibility for overseeing operations | 6-7 |
| BNDES | Banco Nacional de Desenvolvimento Econômico e Social, a Brazilian state-owned development bank that was expected to provide long-term financing to Sete to fund the Rigs Project | 64, 135 |
| BrasFELS | The shipyard owned and operated by Keppel Brasil in Angra dos Reis, Brazil | 22 |
| Brazilian Official 1 | Refers to Barusco in the Keppel DPA | 6 |
| Brazilian Official 2 | Refers to Duque in the Keppel DPA | 5 |
| Caixa | Caixa Econômica Federal, the Manager of FIP Sondas | 330 |
| Caixa Memorandum | A document titled "Investment Memorandum FIP Sondas," dated January 6, 2011, that was prepared by Caixa | 329 |
| Carneiro | Luiz Eduardo Guimarães Carneiro, the CEO of Sete as of June 30, 2014 | 438 |
| Choo | Chiau Beng Choo, the Chief Executive Officer of Keppel Corp. and Chairman of Keppel's board of directors between 2009 and early 2014 | 55 |
| Chong | Kenneth Chong, Assistant General Manager of Legal at Keppel between 2010 and June 2015, and Company Secretary of Keppel | 132 |
| CIC | China Investment Corp., a potential investor in Sete | 101 |
| CIM | A document titled "Confidential Information Memorandum:  Per-Salt Drilling Rigs Project," dated January 2010 | 317 |
| Code of Conduct | Keppel Corp.'s Code of Conduct, issued on December 1, 2001 and revised on November 11, 2011, applicable to Keppel | 235 |
| Consultant | Refers to Skornicki in the Keppel DPA | 15 |
| Consulting Agreements | Collectively, the Eagle Agency Agreement and the Deep Sea Services Agreement | 209 |

---

[1] Source refers to the paragraph in the SOF that contains citations for these definitions.

| Term | Description | Source[1] |
|------|-------------|-----------|
| Corrigan | Kevin Corrigan, an EIG employee who led the EIG deal team that was evaluating Sete | 291 |
| Corruption Scheme | The bribery and kickback scheme involving Keppel, Sete, Petrobras, and the Workers' Party, among others, that went undetected for a decade before Brazilian federal law enforcement discovered it | 8-9, 449, 459 |
| Costa | Paulo Roberto Costa, Petrobras' former Chief Downstream Officer, who was arrested in March 2014 | 450 |
| Data Room | A shared file site for the Sete transaction that Petrobras granted EIG access to | 313 |
| Deep Sea Oil | Deep Sea Oil Corporation, a company incorporated in the British Virgin Islands that was controlled by Skornicki | 191 |
| Deep Sea Services Agreement | The Marketing Consulting and Services Agreement between Fernvale and Deep Sea Oil used to facilitate and conceal bribes | 208, 213 |
| DPA | The Deferred Prosecution Agreement that Keppel entered into in December 2017 with the Fraud Section of the U.S. Department of Justice and the U.S. Attorney's Office for the Eastern District of New York concerning its participation in the Corruption Scheme | 5 |
| Drilling Rigs Project (also referred to as the "Rigs Project") | The project involving the construction of rigs in Brazil with drilling capacity in ultra-deep waters to be chartered to Petrobras to explore the Brazilian pre-salt basin | 43-44, 301 |
| Duque | Renato Duque, a Petrobras employee from in or around 2003 to April 2012 with responsibility over the bidding process of certain projects | 5 |
| Eagle | Eagle do Brasil Ltda., owned by Skornicki, his wife, and his son | 91 |
| Eagle Agency Agreement | The Agency Agreement between Fernvale and Eagle | 208 |
| Early Warning Paper | An "Early Warning Paper" submitted by YY Chow on July 20, 2011 to Keppel Corp.'s board of directors regarding the "Proposed JV with Sete Brasil for Newbuild DSS38E Semisubmersible Rig" | 79 |
| EAS | Estaleiro Atlântico Sul, a shipyard in Brazil | 47, 352 |
| EIG Investment Committee | EIG's investment committee that receives recommendations on investments for various EIG funds and decides whether or not to approve them | 381-85 |
| EIG | Plaintiffs EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy Fund XV-A, L.P., EIG | p. 1 |

74

| Term | Description | Source[1] |
|------|-------------|-----------|
| | Energy Fund XV-B, L.P. and EIG Energy Fund XV (Cayman), L.P., and EIG Management Company, LLC, collectively | |
| EPC contracts | Engineering, Procurement and Construction contracts | 31 |
| Fernvale | Fernvale Pte Ltd., a wholly-owned subsidiary of Keppel formed as a special purpose entity for the Sete EPC contracts | 128, 145-46 |
| Ferraz | João Carlos de Medeiros Ferraz, a Petrobras employee from 1980 until 2011, when he became Chief Executive Officer of Sete. | 69-70 |
| FIP Sondas | Fundo de Investimento em Participações Sondas, an investment fund created by Petrobras to invest in the Drilling Rigs Project | 311 |
| Hayden | Simon Hayden, an EIG employee who served at times on the Sete Deal Team | 169, 292 |
| Investment Commitment Agreement | A July 31, 2012 Investment Commitment Agreement whereby EIG committed "to subscribe and pay for the quotas issued by the [FIP Sondas]" up to the limit of EIG's committed capital of R$509,459.990" | 412 |
| Jeffery Chow | The most senior in-house legal officer at Keppel | 24 |
| June 2011 Investment Recommendation | The EIG Investment Recommendation, dated June 27, 2011, concerning Sete | 375 |
| January 2011 Petrobras Presentation | A January 12, 2011 Petrobras presentation titled Drilling Rigs in Brazil Project: Presentation to Drilling Operators | 58 |
| Keppel (also referred to as KOM) | Keppel Offshore & Marine Ltd., whose subsidiary, Keppel Brasil, owned and operated the BrasFELS shipyard in Brazil | p.1, 21-22 |
| Keppel Brasil | Keppel FELS Brasil S.A., a subsidiary of Keppel | 21 |
| Keppel Corp. | Keppel Corporation Ltd., who was an owner of Keppel. | 55, 56 |
| Kwok | Kai Choong Kwok, the Chief Executive Officer and President of Keppel Brazil between 2009 and 2016 | 23 |
| Lakeshore | Lakeshore Financial Partners Participações, Sete's financial advisor | 296-97 |
| Lakeshore Memorandum | An English-language confidential information memorandum, dated September 2011, promoting the investment in Sete that EIG received from Lakeshore | 346 |
| Loh | Chin Hua Loh, the Chief Executive Officer of Keppel Corp. and Chairman of Keppel's board of directors, including between 2014 and 2015 | 447 |
| Lowder | Kevin Lowder, a EIG employee who served at times on the Sete Deal Team | 292 |
| Luce | Luce Venture Capital – Drilling Series, an investor in Sete | 415 |

| Term | Description | Source[1] |
|---|---|---|
| Luxembourg Entities | EIG Sete Parent S.à r.l and EIG Sete Holdings S.à.r.l, two Luxembourg entities used by EIG to invest in Sete | 418 |
| Machado Meyer | EIG's Brazilian legal counsel | 293 |
| Management Presentation | A presentation titled "Sete Brasil Participações S/A Management Presentation" that EIG received from Lakeshore in August 2011 | 341 |
| Marsuki | Nora Marsuki, a Keppel employee | 88 |
| Merchant | Aziz Hashram Amirali Merchant, a director of Fernvale from 2011 to present and the Executive Director of Engineering at Keppel in 2012 | 202-03 |
| NPA | A Non-Prosecution Agreement that Petrobras entered into on September 26, 2018 with the U.S. Department of Justice and the U.S. Attorney's Office for the Eastern District of Virginia | 37 |
| Olsen | Barbara Olsen of Barrington Media | 113 |
| Operation Car Wash | An investigation dubbed Operação Lava Jato by Brazilian prosecutors through which they discovered the Petrobras Corruption Scheme in and after 2014 | 448 |
| Pan | Stephen Pan, a Keppel board member | 115 |
| Patel | Hoshrav Patel, an EIG employee who served at times on the Sete Deal Team | 169 |
| Petrobras | Petróleo Brasileiro S.A., a Brazilian state-owned company in the oil and gas industry controlled by the Brazilian government | 3, 14 |
| Petrobras Drilling Presentation | A multi-page English-language presentation titled, "The Drilling Rigs Project:  Petrobras' Strategy for its successful implementation" that EIG received in September 2010 | 298 |
| Petrobras Pre-Salt Presentation | An English-language document entitled, "Pre-Salt Oil Rigs Project" that EIG received in October 2010 | 306 |
| PNBV | Petrobras Netherlands B.V., a subsidiary of Petrobras incorporated in the Netherlands | 44 |
| Reis | Luiz Reis, who was employed by Santander and later by Lakeshore | 296 |
| Rigs Project (also referred to as the "Drilling Rigs Project") | Petrobras's plan to fulfill its need for 28 drilling rig units in Brazil with drilling capacity in ultra-deep waters to be chartered to Petrobras to explore the Brazilian pre-salt basin | 43-44, 301 |
| Sam | Tommy Sam, an executive at Keppel FELS Brasil between 2009 and 2017 | 105, 107 |
| Santander | Banco Santander Brasil S.A., Petrobras' financial advisor for the Rigs Project | 294-95 |
| Santos | Edmundo Santos, a Keppel Brasil employee | 97 |

| Term | Description | Source[1] |
|------|-------------|-----------|
| Second Amendment to the Investment Agreement | A July 31, 2012 amendment to the Investment Agreement as of May 2011 | 416 |
| September 2011 Amended Investment Agreement | The First Amendment and Restatement Agreement, dated September 8, 2011, which amended the June 2011 Investment Agreement to reflect an increase in EIG's equity investment in Sete from $250 million to $500 million reais | 405 |
| September 2011 Investment Recommendation | The Investment Recommendation, dated September 16, 2011, that was prepared for consideration of investment by EIG in Sete | 380 |
| September 2011 Petrobras Presentation | A presentation titled "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" | 115 |
| Sete or Sete Brasil | Sete Brasil Participações S.A., a Brazilian company formed by Petrobras | 4, 80 |
| Sete Deal Team | The EIG deal team that was evaluating a potential investment in the Drilling Rigs/Sete project | 291 |
| Sete Financial Model | A financial model that Keppel received from Sete on October 30, 2011 | 126 |
| Sete Investment Recommendations | Collectively, the June 2011 Investment Recommendation and the September 11 Investment Recommendation | 380 |
| Sete Management Presentation | A presentation that Keppel received from Sete on October 30, 2011 | 126 |
| Sit | Peng Sang Sit, a director at Keppel | 476 |
| Skornicki | Zwi Skornicki, Keppel's agent in Brazil | 15 |
| Talbot | Kurt Talbot, EIG's Chief Investment officer from shortly after EIG's inception until 2014 | 373 |
| Tan | Leong Peng Tan, a Keppel employee since 2002, including as the Deputy Project Manager of Fernvale between 2012 and 2015 | 127-28, 130 |
| Taylor | Clay Taylor, an EIG employee who served at times on the Sete Deal Team | 292 |
| Thomas | R. Blair Thomas, the Chief Executive Officer of EIG | 372 |
| Tong | Chong Heong Tong, the Chief Executive Officer of Keppel between 2009 and early 2014 | 17-18 |
| UKEF | United Kingdom Export Finance, which was expected to be one of the senior long-term lenders in Sete | 259, 481 |
| Vogel | Carla Vogel, EIG's Chief Compliance Officer during the compliance due diligence of the Sete transaction | 367 |
| Wade | Randall Wade, an EIG employee who served on the EIG Investment Committee for Fund XV | 374 |
| Workers' Party | Partido dos Trabalhadores, a political party in Brazil that formed part of the federal government, which directly owned more than 50 percent of Petrobras's | 14 |

| Term | Description | Source[1] |
|------|-------------|-----------|
| | common shares with voting rights, between 2003 and 2016 | |
| YY Chow | Yew Yuen Chow, who was President of Keppel Offshore & Marine U.S.A., Inc. prior to June 2011 and later became Managing Director at Keppel in June 2011, Chief Operating Officer of Keppel in 2012, and Chief Executive Officer in 2014 | 17, 19 |

KL3 3355429.1