UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EIG ENERGY FUND XIV, L.P.,<br>EIG ENERGY FUND XIV-A, L.P.,<br>EIG ENERGY FUND XIV-B, L.P.,<br>EIG ENERGY FUND XIV (CAYMAN), L.P.,<br>EIG ENERGY FUND XV, L.P.,<br>EIG ENERGY FUND XV-A, L.P.,<br>EIG ENERGY FUND XV-B, L.P., and<br>EIG ENERGY FUND XV (CAYMAN), L.P.,<br><br>Plaintiffs,<br><br>- against -<br><br>KEPPEL OFFSHORE & MARINE LTD.,<br><br>Defendant. | Case No. 18-cv-01047-PGG |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT**
**<u>AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS</u>**

# TABLE OF CONTENTS

**Page**

RESPONSES TO KEPPEL'S STATEMENT OF UNDISPUTED FACTS .......... 1
A. EIG and Keppel .......... 1
B. Creation of Sete .......... 2
C. EIG's Experience in Brazil. .......... 4
D. EIG's Pursuit of the Sete Investment Opportunity. .......... 5
E. Alleged Misrepresentations in the Complaint .......... 7
F. EIG's Decision to Invest in Sete in June 2011. .......... 16
G. EIG's First Visit to the BrasFELS Shipyard in August 2011. .......... 20
H. EIG's Decision to Increase Its Equity Commitment in September 2011. .......... 26
I. Keppel's First Contract from Sete in December 2011. .......... 28
J. EIG's Second Visit to the BrasFELS Shipyard in March 2012. .......... 28
K. Keppel's Five Additional Contracts from Sete in August 2012. .......... 32
L. EIG's Disbursement of Funds in August 2012. .......... 33
M. Financial and Operational Documents Concerning Sete. .......... 34
N. News Reports Concerning Sete. .......... 37
O. EIG's Third Visit to the BrasFELS Shipyard in June 2013. .......... 40
P. Operation Car Wash. .......... 42
Q. Keppel's Deferred Prosecution Agreement. .......... 43
PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS .......... 48
I. The DPA/Charges Against Keppel .......... 48
II. The Consulting Agreements .......... 48
III. The January 2011 Petrobras Presentation .......... 49
IV. EIG's Visits to the Keppel Shipyard .......... 49
V. The Drilling Presentation and Management Presentation .......... 49
VI. Keppel's Knowledge That Sete Would Raise Additional Capital .......... 50
VII. The EPC Contracts .......... 51
VIII. Keppel's Contracts with Petrobras and Sete .......... 51

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York and Rule V(B) of this Court's Individual Rules of Practice in Civil Cases, Plaintiffs EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P. and EIG Energy Fund XV (Cayman), L.P. (together, "**EIG**" or "**Plaintiffs**") respectfully submit the following response to the Local Civil Rule 56.1 Statement of Defendant Keppel Offshore & Marine Ltd. ("**Keppel**" or "**Defendant**") in Support of Its Motion for Summary Judgment.[1]

## RESPONSES TO KEPPEL'S STATEMENT OF UNDISPUTED FACTS

### A. EIG and Keppel.

1. EIG is a "global alternative asset manager investing in the energy sector", based in Washington, D.C. (Ex. 62, EIG_KEP_00289876 at 882.)

**EIG's Response:** Admitted.

2. Keppel is a company based in Singapore that specializes in offshore rig design, construction and shipbuilding. (Ex. 3, DPA at A-1, ¶ 2.)

**EIG's Response:** Admitted.

[1] References to "EIG SOF" are to Plaintiffs' Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment, dated September 20, 2021, which is incorporated by reference herein. Unless otherwise defined, capitalized terms herein have the same meaning as set forth in the Table of Definitions beginning on page 73 of the EIG SOF. References to "EIG Additional Facts" are to Plaintiff's Statement of Additional Undisputed Material Facts, beginning on page 48 herein. References to "EIG Exh." are to the exhibits (also incorporated by reference herein) attached to either the EIG SOF (EIG Exhs. 1-136) or this response (EIG Exhs. 137-146). References to "Ex." are to the exhibits attached to Local Rule 56.1 Statement of Defendant Keppel Offshore & Marine Ltd. in Support of its Motion for Summary Judgment.

3.      The BrasFELS Shipyard is a subsidiary of Keppel located in the Angra dos Reis region of Brazil.  (Ex. 75, KEPPEL00444138-140 at 139.)

**EIG's Response:**  Admitted.

4.      There is no evidence EIG and Keppel discussed corruption or bribery in connection with Sete.

**EIG's Response:**  Admitted.

5.      There is no evidence Keppel provided inaccurate information to EIG in connection with Sete.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 5, there is no genuine dispute of material fact that Keppel provided inaccurate or misleading information to EIG (i) on tours and presentations at the BrasFELS Shipyard that did not disclose the existence of the bribery scheme (*see infra* ¶¶ 94, 134, 176); (ii) by executing EPC contracts with Sete, drafts of which EIG reviewed, that contained false representations regarding compliance with applicable laws and good industry practices (EIG SOF ¶¶ 149-52, 340; Ex. 37 at KEPPEL00610507-08; Ex. 38 at KEPPEL00610413-14; Ex. 39 at KEPPEL00610695-96; Ex. 40 at KEPPEL00555589-90; Ex. 41 at KEPPEL00555304-05; Ex. 43 at KEPPEL00490726-27); and (iii) making statements for Sete's lenders and to the public and Keppel's customers denying that it paid bribes and/or kickbacks in connection with the Sete EPC contracts (EIG SOF ¶¶ 272, 275-76, 282-89).

**B.      Creation of Sete.**

6.      Petrobras is an oil company controlled by the Brazilian government.  (Ex. 3, DPA at A-1 to A-2, ¶ 4.)

**EIG's Response:**  Admitted.

7.    Sete was a "partnership established by Petrobras, private investors and public pension funds to build ultra-deepwater drillships and charter them under long term contract to Petrobras."  (Ex. 19, DX039 at 792.)

**EIG's Response:**  Admitted that Keppel Statement No. 7 accurately describes one purpose for the creation of Sete.  EIG clarifies that Sete also was formed by Petrobras as an extension of a longstanding bribery scheme at Petrobras.  *See infra* ¶¶ 48, 182-83.

8.    Sete was created to finance the construction of 28 drillships for charter to Petrobras to extract oil from the pre-salt reserves off Brazil's coast.  (Ex. 21, DX062 at 012.)

**EIG's Response:**  Admitted that Keppel Statement No. 8 accurately describes one purpose for the creation of Sete.  EIG clarifies that Sete also was formed by Petrobras as an extension of a longstanding bribery scheme at Petrobras.  *See infra* ¶¶ 48, 182-83.

9.    Sete "was incorporated in December 2010."  (Ex. 21, DX062 at 030.)

**EIG's Response:**  Admitted.

10.    Prior to Sete's incorporation in December 2010, the project was described by Petrobras as "The Drilling Rigs Project".  (Ex. 53, EIG_KEP_00075177-213 at 178.)

**EIG's Response:**  Admitted.

11.    Petrobras installed former Petrobras employees as "Sete's most senior executives", including João Ferraz as Sete's CEO.  (Ex. 1, Compl. ¶ 10.)

**EIG's Response:**  Admitted.

12.    There is no evidence Keppel was involved in the creation of Sete.

**<u>EIG's Response:</u>** Admitted that there is no evidence that Keppel was involved in the decision or process by Petrobras to create Sete, and otherwise denied. Contrary to Keppel Statement No. 12, there is no genuine dispute of material fact that Keppel was involved in the bribery scheme that Sete was a continuation of, and Keppel was contemporaneously aware of Sete's creation by Petrobras. *See infra* ¶¶ 181-86; EIG SOF ¶ 48; EIG Exh. 4 at KEPPEL00619705-06.

**C. EIG's Experience in Brazil.**

13. EIG "was a sophisticated institutional investor when it made its investments in Sete". (Ex. 4, EIG Response to RFA 55.)

**<u>EIG's Response:</u>** Admitted.

14. EIG began investing in Brazil on or around 2000. (Ex. 25, DX083 at 523.)

**<u>EIG's Response:</u>** Admitted.

15. Kevin Corrigan was a Senior Vice President at EIG and "the lead member of EIG's team in connection with the Sete investment". (Ex. 10, Corrigan Tr. 57:02-05.)

**<u>EIG's Response:</u>** Admitted.

16. Kevin Corrigan opened EIG's office in Rio de Janeiro in 2012. (Ex. 16, Corrigan D.C. Tr. 17:08-13.)

**<u>EIG's Response:</u>** Admitted.

17. EIG's 2014 White Paper describes "recurrent concerns about transparency and corruption" in Brazil. (Ex. 25, DX083 at 524.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 17, there is no genuine dispute of material fact that, although the phrase "recurrent concerns about transparency and corruption" appears in EIG's 2014 White Paper, the White Paper *does not* "describe[]" any such "concerns."  Ex. 25 at EIG_KEP_00258524.

18.     EIG's CEO Blair Thomas testified that "to be precise, if the question is did I know that Brazilian construction firms had a checkered history on corruption, the answer is yes." (Ex. 15, Thomas Tr. 73:14-17.)

**EIG's Response:**  Admitted.

19.     In June 2011, during its due diligence of Sete, EIG discovered bribery and corruption charges against the part-owner of the EAS Shipyard.  (Ex. 61, EIG_KEP_00258104 at 105; Ex. 16, Corrigan D.C. Tr. 204:19-217:16; Ex. 10, Corrigan Tr. 51:07-23.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 19, there is no genuine dispute of material fact that EIG discovered prior corruption charges from 2009 against then-employees of Camargo Correa, a noncontrolling shareholder of the EAS Shipyard, but the corruption charges against the then-employees of Camargo Correa *were not* related in any way to the EAS Shipyard, and were not against Camargo Correa itself.  Ex. 61 at EIG_KEP_00258104-05.

**D.     EIG's Pursuit of the Sete Investment Opportunity.**

20.     EIG first learned about the Sete investment opportunity in September of 2010 when Kevin Corrigan attended a meeting at Banco Santander with his former colleague.  (Ex. 10, Corrigan Tr. 57:13-58:16.)

**EIG's Response:**  Admitted.

21.     After Kevin Corrigan's meeting at Banco Santander in September 2010, Mr. Corrigan "spoke to a friend" at the French Bank, Société Générale, about the Sete investment opportunity.  (Ex. 10, Corrigan Tr. 58:17-59:08.)

**EIG's Response:**  Admitted.

22.     On September 30, 2010, Kevin Corrigan sent João Ferraz at Petrobras an email introducing himself and requesting a meeting during his trip to Rio de Janeiro, Brazil.  (Ex. 59, EIG_KEP_00257850-852 at 852.)

**EIG's Response:**  Admitted.

23.     Kevin Corrigan traveled to Brazil to meet with João Ferraz on or around October 19, 2010 "to learn more about Sondas and see if EIG could participate."  (Ex. 16, Corrigan D.C. Tr. 80:10-81:15.)

**EIG's Response:**  Admitted.

24.     "Sondas" refers to FIP Sondas, the Brazilian investment fund through which EIG and other equity investors made their investments in Sete.  (Ex. 21, DX062 at 056-57.)

**EIG's Response:**  Admitted.

25.     There is no evidence anyone at Keppel was involved in or aware of any of EIG's discussions in 2010 concerning the Drilling Rigs Project, Sete or FIP Sondas.

**EIG's Response:**  Admitted.

**E. Alleged Misrepresentations in the Complaint.**

i. September 2010 Drilling Presentation.

26. The Drilling Presentation described in paragraph 55 of the Complaint is Exhibit 53. (Ex. 53, EIG_KEP_00075177-213; Ex. 1, Compl. ¶ 55.)

**EIG's Response:** Admitted.

27. The Drilling Presentation described the Drilling Rigs Project that would later become Sete. (Ex. 1, Compl. ¶ 56.)

**EIG's Response:** Admitted.

28. On September 27, 2010, Kevin Corrigan received the Drilling Presentation from a "friend" of his at Société Générale. (Ex. 53, EIG_KEP_00075177-213; Ex. 10, Corrigan Tr. 58:17-24.)

**EIG's Response:** Admitted.

29. There is no evidence that Kevin Corrigan's "friend" at Société Générale was acting as an agent of Petrobras when he sent the Drilling Presentation to EIG on September 27, 2010. (Ex. 10, Corrigan Tr. 58:17-25.)

**EIG's Response:** Admit that there is no *evidence* Société Générale was *acting as an agent* of Petrobras when the Drilling Presentation was sent to Corrigan on September 27, 2010. EIG clarifies that there *is evidence* that the Drilling Presentation was prepared by Petrobras. The last slide of the Drilling Presentation has the contact information for "João Carlos M. Ferraz," the "PETROBRAS – Finance&Treasury General Manager." Ex. 53 at EIG_KEP_00075213. Additionally, the file name of the Drilling Presentation was "Joao Carlos Ferraz.pdf." Ex. 53 at EIG_KEP_00075177.

30.     There is no evidence that anyone at Keppel was involved in preparing or disseminating the Drilling Presentation to any potential or actual investor.

**EIG's Response:**  Admitted that there is no evidence that Keppel was involved in *preparing* the Drilling Presentation, and otherwise denied.  Contrary to Keppel Statement No. 30, there is no genuine dispute of material fact that Keppel *was involved in disseminating* the Drilling Presentation to potential or actual investors.  Indeed, the Drilling Presentation was disseminated among employees of Keppel entities who were potential investors in Sete or its affiliates.  *See infra* ¶¶ 31-33; EIG SOF ¶¶ 73, 80-81, 161-62.

31.     On September 27, 2011, an independent member of Keppel Corp.'s Board of Directors emailed the Drilling Presentation and another presentation unrelated to Sete to four executives of Keppel entities.  (Ex. 71, KEPPEL00040804-862 at 804.)

**EIG's Response:**  Whether Pan was an "independent" member of a Board of Directors is improper as it calls for a legal conclusion.  Subject to this objection, denied, except admitted that Stephen Pan ("**Pan**") emailed the Drilling Presentation to senior Keppel executives and Chiau Beng Choo, the Chairman of its Board of Directors and Chief Executive Officer of its parent Keppel Corp. ("**Choo**").  Ex. 71 at KEPPEL00040804; EIG SOF ¶ 55.  Contrary to Keppel Statement No. 31, there is no genuine dispute of material fact that Pan was *not* a director of Keppel Corp., but rather a director of Keppel.  *See infra* EIG Additional Facts ¶ 501.

32.     The Board member told the executives that he had obtained "some of the presentations given at" an offshore oil and gas industry forum in Rio de Janeiro, and asked whether anyone at Keppel had seen the presentations.  (Ex. 71, KEPPEL00040804-862 at 805.)

**EIG's Response:**  Admitted.

33.     Keppel Corp.'s CEO responded that he had not seen the presentation and the Board member sent two presentations.  (Ex. 71, KEPPEL00040804-862 at 805.)

**EIG's Response:**  Admitted.  EIG clarifies that, to the extent that Keppel Statement No. 33 implies that Pan only sent the presentation to Choo, the presentation went to others at Keppel. Specifically, (i) Pan told Choo he would "send on to KOM board" if Keppel had not received the presentation, (ii) Choo specifically instructed him to "[p]lease send," and (iii) Pan sent the presentation to Choo, Keppel Chief Executive Officer Tong, Keppel Managing Director YY Chow, and Keppel Chief Financial Officer Ngiam Jih Wong, and potentially the Keppel board per Choo's instructions.  Ex. 71 at KEPPEL00040804-05; EIG SOF ¶ 19.

34.     There is no evidence anyone responded to the Board member's September 27, 2011 email attaching the Drilling Presentation.

**EIG's Response:**  Admitted.

35.     The Drilling Presentation does not mention EIG.  (Ex. 71, KEPPEL00040804-862 at 827-862.)

**EIG's Response:**  Admitted.

36.     There is no evidence anyone at Keppel opened or read the Drilling Presentation.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 36, there is no genuine issue of material fact that Exhibit 71 is evidence that Keppel officers and directors read the Drilling Presentation.  The Drilling Presentation was sent by Pan, a Keppel director, who must have opened and read the presentation in order to know its contents.  *See infra* ¶¶ 31-33; Ex. 71 at KEPPEL00040805.  Pan asked Choo and Tong "if someone from KOM attended [the presentations] and you have all the papers.  If not I will send on to KOM board."  Ex. 71 at

KEPPEL00040805.  Choo, emailing Pan and Tong and cc'ing YY Chow and Keppel's CFO, wrote that he "ha[d] not seen them" and directed Pan to "[p]lease send."  Ex. 71 at KEPPEL00040805.  That the Drilling Presentation was specifically requested by Choo from a Keppel board member is evidence that he would have "opened or read" it upon receiving it.  And this email correspondence is evidence suggesting that the Keppel executives reporting to Choo who were working on the Sete deal—Tong and YY Chow (EIG SOF ¶ 79)—would have also opened and read the presentation.

37.     There is no evidence anyone at Keppel commented on or discussed the Drilling Presentation.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 37, there is no genuine issue of material fact that Exhibit 71 is evidence that Keppel officers and directors commented on or discussed the Drilling Presentation.  Indeed, as discussed above, Choo and Pan were Keppel directors, and commented on and discussed the Drilling Presentation.  *See supra* ¶¶ 31, 36.

38.     Slide 20 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 58 of the Complaint.  (Ex. 71, KEPPEL00040804-862 at 847; Ex. 1, Compl. ¶ 58.)

**EIG's Response:**  Admitted.

39.     Slide 25 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 59 of the Complaint.  (Ex. 71, KEPPEL00040804-862 at 852; Ex. 1, Compl. ¶ 59.)

**EIG's Response:**  Admitted.

40. Slide 27 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 60 of the Complaint. (Ex. 71, KEPPEL00040804-862 at 854; Ex. 1, Compl. ¶ 60.)

**<u>EIG's Response:</u>** Admitted.

41. There is no evidence anyone at Keppel detected the alleged misrepresentations on slides 20, 25 or 27 of the Drilling Presentation. (Ex. 71, KEPPEL00040804-862 at 847, 852 and 854.)

**<u>EIG's Response:</u>** Denied. Contrary to Keppel Statement No. 41, there is no genuine issue of material fact that Exhibit 71 is evidence that Keppel detected the alleged misrepresentations on slides 20, 25 and 27 of the Drilling Presentation. Choo, Tong, and YY Chow each, on Choo's direction, received the Drilling Presentation. *See supra* ¶¶ 33, 36. Each of Choo, Tong, and YY Chow were aware of the bribery scheme at Petrobras (EIG SOF ¶¶ 67, 116), and that therefore the representations in the Drilling Presentation were false.

42. There is no evidence anyone at Keppel knew the Drilling Presentation was shared with EIG.

**<u>EIG's Response:</u>** Denied. Contrary to Keppel Statement No. 42, there is no genuine issue of material fact that Keppel knew that the Drilling Presentation, which contains a "Cautionary Statement for US investors," was directed at potential Sete investors, including U.S. investors. Ex. 71 at KEPPEL00040828. Keppel also knew that EIG was a U.S. investor and a potential investor in Sete. EIG SOF ¶¶ 94, 96, 98-100, 102, 104-05, 109, 110-113.

ii.     October 2010 Pre-Salt Oil Rigs Project Document

43.     The "Pre-Salt Oil Rigs Project" document described in paragraph 61 of the Complaint is DX061.  (Ex. 20, DX061; Ex. 1, Compl. ¶ 61.)

**EIG's Response:**  Admitted.

44.     There is no evidence that anyone at Keppel was involved in preparing or disseminating the Pre-Salt Oil Rigs Project document to any potential or actual investor.

**EIG's Response:**  Admitted.

45.     There is no evidence anyone at Keppel received the Pre-Salt Oil Rigs Project document.

**EIG's Response:**  Admitted.

46.     There is no evidence anyone at Keppel knew about the Pre-Salt Oil Rigs Project document.

**EIG's Response:**  Admitted.

47.     There is no evidence anyone at Keppel knew the Pre-Salt Oil Rigs Project document was shared with EIG.

**EIG's Response:**  Admitted.

iii.    September 2011 Private Placement Memo

48.     The September 2011 Private Placement Memo described in paragraph 62 of the Complaint is DX062.  (Ex. 21, DX062; Ex. 1, Compl. ¶ 62.)

**EIG's Response:**  Admitted.

49. There is no evidence that anyone at Keppel was involved in preparing or disseminating the Private Placement Memo to any potential or actual investor.

**EIG's Response:** Admitted.

50. There is no evidence anyone at Keppel received the Private Placement Memo.

**EIG's Response:** Admitted.

51. There is no evidence anyone at Keppel knew about the Private Placement Memo.

**EIG's Response:** Admitted.

52. There is no evidence anyone at Keppel knew the Private Placement Memo was shared with EIG.

**EIG's Response:** Admitted.

iv. October 2011 Email

53. The October 5, 2011 email described in paragraph 65 of the Complaint is DX063. (Ex 49, DX063; Ex. 1, Compl. ¶ 65.)

**EIG's Response:** Admitted.

54. There is no evidence anyone at Keppel was involved in preparing or disseminating the October 5, 2011 email.

**EIG's Response:** Admitted.

55. There is no evidence anyone at Keppel received the October 5, 2011 email.

**EIG's Response:** Admitted.

56. There is no evidence anyone at Keppel knew about the October 5, 2011 email.

**EIG's Response:** Admitted.

57. There is no evidence anyone at Keppel knew the October 5, 2011 email was shared with EIG.

**EIG's Response:** Admitted.

v. December 2011 Email

58. The December 23, 2011 email described in paragraph 66 of the Complaint is DX064. (Ex. 50, DX064; Ex. 1, Compl. ¶ 66.)

**EIG's Response:** Admitted.

59. There is no evidence anyone at Keppel was involved in preparing or disseminating the December 23, 2011 email.

**EIG's Response:** Admitted.

60. There is no evidence anyone at Keppel received the December 23, 2011 email.

**EIG's Response:** Admitted.

61. There is no evidence anyone at Keppel knew about the December 23, 2011 email.

**EIG's Response:** Admitted.

62. There is no evidence anyone at Keppel knew the December 23, 2011 email was shared with EIG.

**EIG's Response:** Admitted.

vi. <u>August 2012 Email</u>

63. The August 8, 2012 email described in paragraph 67 of the Complaint is Exhibit 51. (Ex. 51, EIG_KEP_00000128; Ex. 1, Compl. ¶ 67.)

**<u>EIG's Response:</u>** Admitted.

64. There is no evidence anyone at Keppel was involved in preparing or disseminating the August 8, 2012 email.

**<u>EIG's Response:</u>** Admitted.

65. There is no evidence anyone at Keppel received the August 8, 2012 email.

**<u>EIG's Response:</u>** Admitted.

66. There is no evidence anyone at Keppel knew about the August 8, 2012 email.

**<u>EIG's Response:</u>** Admitted.

67. There is no evidence anyone at Keppel knew the August 8, 2012 email was shared with EIG.

**<u>EIG's Response:</u>** Admitted.

vii. <u>2013 Meetings</u>

68. There is no evidence that anyone at Keppel was involved in or aware of the meeting described in paragraph 68 of the Complaint.

**<u>EIG's Response:</u>** Admitted.

69. There is no evidence that anyone at Keppel was involved in or aware of the conference described in paragraph 69 of the Complaint.

**<u>EIG's Response:</u>** Admitted.

**F.    EIG's Decision to Invest in Sete in June 2011.**

70.    On June 3, 2011, Kevin Corrigan sent Luiz Reis, a Lakeshore representative, an email stating that "the decision to invest in Sete Brasil has been made internally".  (Ex. 60, EIG_KEP_00257969-971 at 969.)

**EIG's Response:**  Admitted that Corrigan wrote in a June 3, 2011 email to Luiz Reis that "the decision to invest in Sete Brasil has been made internally."  Denied that EIG had decided to invest in Sete as of June 3, 2011.  EIG's investment committee had not approved any investment in Sete prior to June 27, 2011 (*see infra* ¶¶ 75-76), EIG had not entered into any binding contracts in connection with an investment in Sete until July 31, 2012 (EIG SOF ¶¶ 400-17), and EIG had not invested in Sete equity prior to August 3, 2012 (*see infra* ¶ 145).

71.    EIG's due diligence of Sete "culminated" in the preparation of the 43-page June 2011 Investment Recommendation.  (Ex. 22, DX074; Ex. 10, Corrigan Tr. 69:25-70:05; Ex. 16, Corrigan D.C. Tr. 156:08-14; Ex. 18, Thomas D.C. Tr. 115:09-116:13.)

**EIG's Response:**  Admitted.  EIG clarifies that Corrigan was asked at his deposition whether the June 2011 Investment Recommendation to EIG's investment committee "sort of is the culmination of the due diligence process and a recommendation to make the investment."  Ex. 10 at 69:25-70:5.  While Corrigan agreed, in fact, EIG continued its due diligence of Sete at least until its first investment was funded in August 2012.  EIG SOF ¶¶ 170, 172, 385, 419.

72.    On June 27, 2011, EIG's Kevin Corrigan and Simon Hayden presented the June 2011 Investment Recommendation to EIG's investment committee.  (Ex. 22, DX074 at 322.)

**EIG's Response:**  Admitted.

73.     The June 2011 Investment Recommendation included a total of five bullet points concerning any Keppel entity in its Appendix describing "potential" shipyards.  (Ex. 19, DX039 at 831.)

**EIG's Response:**  Admitted.

74.     Kevin Corrigan testified that the five bullets on BrasFELS were the "sum total of information that was presented to the investment committee regarding Brasfels".  (Ex. 10, Corrigan Tr. 77:09-25.)

**EIG's Response:**  Admitted that Corrigan testified that the five bullets on BrasFELS were the "sum total of information … regarding Brasfels" in the Sete investment recommendation provided to EIG's investment committee for the June 27, 2011 meeting.

75.     On June 27, 2011, EIG's investment committee approved an investment in Sete of up to 250 million Brazilian Reals ("BRL").  (Ex. 22, DX074 at 322.)

**EIG's Response:**  Admitted.

76.     The decision to invest in Sete was made by EIG's investment committee. (Thomas D.C. Tr. 117:11-14.)

**EIG's Response:**  Admitted.

77.     As of June 27, 2011, the EAS Shipyard was the only shipyard that had signed a shipbuilding contract with Sete.  (Ex. 19, DX039 at 802.)

**EIG's Response:**  Admitted.

78.     It was publicly reported by February 2011 that the EAS Shipyard had obtained the first seven drillship contracts from Sete.  (Ex. 42, PX062 at 007.)

**EIG's Response:**  Admitted.


79.     Blair Thomas, EIG's CEO, testified that at the time of the June 27, 2011 investment committee meeting, he did not know whether Keppel would ever get a shipbuilding contract from Sete.  (Ex. 15, Thomas Tr. 96:22-25.)

**EIG's Response:**  Admitted.


80.     Kevin Corrigan testified that at the time of the June 27, 2011 investment committee meeting, he did not know exactly which shipbuilders would ultimately end up building ships for Sete.  (Ex. 10, Corrigan Tr. 74:11-75:09.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 80, there is no genuine dispute of material fact that Corrigan testified that EIG "had a list of the shipyards that had been identified," and "had studied the six shipyards to get comfortable with their ability to produce future contracts granted to them."  Ex. 10 at 74:11-75:09.  Additionally, Corrigan testified that of those six potential shipyards, EIG was "comfortable" with Keppel and viewed it as the "star" shipyard in Brazil because of its "long history of operating in Brazil."  *Id.* at 110:8-16, 129:23-25.


81.     On June 29, 2011, Kevin Corrigan sent an email to other EIG employees stating that "[t]his week we are signing a binding agreement to make the investment when they fulfill two requirements:  get the boat contract from Petrobras, and existing investors fail to exercise all their pre-emptive rights."  (Ex. 26, DX086 at 755.)

**EIG's Response:**   Admitted that the quotation in Keppel Statement No. 81 was written by Corrigan in a June 29, 2011 email.  Denied that the "agreement" Corrigan referred to was "binding" and that the requirements under that agreement were those described by Corrigan. EIG SOF ¶¶ 400-17; *see infra* ¶ 82.

82.     On June 30, 2011, Sete, Lakeshore and EIG executed an investment agreement, under which EIG "irrevocably and irreversibly agree[d] to invest up to of R$250,000,000 (two hundred and fifty million Brazilian reais) ('Equity Commitment')".  (Ex. 27, DX087 at 153, 160; Ex. 26, DX086 at 755.)

**EIG's Response:**   Admitted that Sete, Lakeshore and EIG executed an investment agreement on June 30, 2011, which contained the language quoted in Keppel Statement No. 82. Denied that EIG "irrevocably and irreversibly agree[d]" to invest in Sete.  The June 2011 Investment Agreement provided that the Potential Investor, EIG, would invest up to $250 million Reais "provided that (i) the Proposal is entirely or partially awarded as the Tender's winning bid regarding one or more Rigs, and (ii) in connection with the aforementioned award SETE BRASIL requires additional equity investment in addition to the pre-emptive rights of the Original Investors in order to pay for the investments and expenses related to the implementation of the new rigs[.]"  EIG Exh. 19 at EIG_KEP_00049153, § 2.1.  Article 2.1(i)(a) stated that EIG would need to "execute an Investment Commitment Agreement" if the conditions precedent were satisfied.  EIG Exh. 19 at EIG_KEP_00049153, § 2.1(i)(a).  EIG executed definitive transaction documents, including the Investment Commitment Agreement that set forth the terms and conditions for the investment on July 31, 2012.  EIG SOF ¶ 410.  Article 2.7 also referred to conditions precedent in the June 2011 Investment Agreement.  Exh. 19 at EIG_KEP_00049154, § 2.7.

**G. EIG's First Visit to the BrasFELS Shipyard in August 2011.**

i. August 2011 Yard Visit.

83. EIG initiated and planned the August 2011 visit to the BrasFELS Shipyard. (Ex. 10, Corrigan Tr. 131:13-24, 132:22-133:03, 135:09-21.)

**EIG's Response:** Admitted that EIG sought to visit the BrasFELS Shipyard in August 2011 as part of a potential co-investment by CIC and its own ongoing due diligence, and denied that EIG "planned" the visit. Ex. 10 at 131:13-132:6. Contrary to Keppel Statement No. 83, there is no genuine dispute of material fact that Keppel hosted the visit on the request of Barusco of Sete, initially made on or about July 29, 2011. EIG SOF ¶¶ 94, 96. Keppel planned the tour and presentation that it gave EIG and CIC as part of that visit. EIG SOF ¶¶ 97, 100, 102; EIG Exh. 23 at KEPPEL00010310; EIG Exh. 122 at 133:15-134:9, 141:4-11.

84. Kevin Corrigan asked Sete to arrange the August 2011 visit to the BrasFELS Shipyard. (Ex. 10, Corrigan Tr. 135:12-18.)

**EIG's Response:** Admitted.

85. Kevin Corrigan set up the August 2011 visit "to help CIC in their due diligence" because "CIC was . . . beginning to kick the tires, as we had the previous year". (Ex. 10, Corrigan Tr. 131:23-24, 132:22-24, 135:09-21; Ex. 52, EIG_KEP_00049095-096.)

**EIG's Response:** Admitted.

86. CIC was an "important investor in EIG" funds. (Ex. 10, Corrigan Tr. 134:10-15, 131:06-12.)

**EIG's Response:** Admitted.

87.     Kevin Corrigan testified that the "sole purpose" of the August 2011 visit was "gauging [CIC's] interest in investing in Sete Brasil". (Ex. 16, Corrigan D.C. Tr. 101:02-10.)

**EIG's Response:** Admitted that Corrigan testified that CIC's interest in investing in Sete was the sole reason he visited the BrasFELS shipyard on August 4, 2011 specifically. EIG clarifies that Corrigan also testified that EIG "would have eventually wanted to visit" the BrasFELS shipyard even absent CIC's potential investment, and that on the August 4, 2011 trip he "would have been interested to see what was going on in connection with our own investment." Ex. 10 at 131:18-132:14.

88.     On or around August 2, 2011, Keppel received a request from Sete to host the August 2011 yard visit. (Ex. 68, KEPPEL00010460-0462 at 460.)

**EIG's Response:** Denied. Contrary to Keppel Statement No. 83, there is no genuine dispute of material fact that Skornicki received the request from Sete for Keppel to host "some investors in Sete" on or about July 29, 2011, and relayed the request on July 29 to YY Chow and Kwok. EIG SOF ¶¶ 94, 96; EIG Exh. 23 at KEPPEL00010310.

89.     There is no evidence of any communications between EIG and Keppel concerning the planning of the August 2011 yard visit.

**EIG's Response:** Admitted.

90.     On or around August 4, 2011, Kevin Corrigan visited the BrasFELS Shipyard with representatives of CIC, which is the visit described in paragraph 71 of the Complaint. (Ex. 4, EIG Response to RFA 32; Ex. 1, Compl. ¶ 71.)

**EIG's Response:** Admitted.

91.     There is no evidence of any contact between EIG and Keppel concerning Sete prior to the August 4, 2011 yard visit.

**EIG's Response:**  Admitted.

92.     The "focus" of EIG's August 2011 yard visit "was on the shipbuilding capacity of Brasfels".  (Ex. 10, Corrigan Tr. 143:07-09.)

**EIG's Response:**  Admitted.

93.     Nobody who attended the August 2011 visit raised questions relating to bribery or corruption.  (Ex. 10, Corrigan Tr. 136:14-17, 143:03-06.)

**EIG's Response:**  Admitted.

94.     Kevin Corrigan testified that during the August 2011 yard visit "everything they said was truthful", although "you know, they didn't bring up the corruption scheme that already existed".  (Ex. 10, Corrigan Tr. 136:03-13.)

**EIG's Response:**  Admitted.  EIG clarifies that the presentation and tour during the August 2011 shipyard visit were misleading because Keppel did not disclose the bribery scheme to the attendees.

95.     On August 8, 2011, Sete emailed Keppel about the August 2011 visit to the BrasFELS Shipyard, stating that "[t]he visit was very productive and our investors and associates learned a lot about the construction of the semi-subs.  The overall impression was great and achieved the intended result- a lower perceived risk of the project."  (Ex. 45, PX095 at -1126.)

**EIG's Response:**  Admitted.

96. EIG's August 2011 yard visit occurred after EIG made its initial decision to invest in Sete. (Ex. 10, Corrigan Tr. 130:09-131:17.)

**EIG's Response:** Admitted that the August 4, 2011 visit by EIG to the BrasFELS Shipyard occurred after the Fund XIV investment committee approved a potential investment in Sete (*see supra* ¶ 75), and denied that the August 4, 2011 visit was after "EIG made its initial decision to invest in Sete." Contrary to Keppel Statement No. 96, there is no genuine dispute of material fact that, as of August 2011, the Fund XV investment committee had not yet approved a potential investment in Sete, and the potential investment in Sete by Fund XIV was subject to the satisfaction in the future of certain conditions and final definitive documentation. *See supra* ¶¶ 81-82; EIG SOF ¶ 383.

97. Yard tours at the BrasFELS Shipyard were common and routine occurrences. (Ex. 14, Tan II Tr. 287:12-22, 276:24-279:19; see, e.g., Ex. 67, KEPPEL00009411; Ex. 70, KEPPEL00330052; Ex. 64, KEPPEL00006070; Ex. 66, KEPPEL00009237; Ex. 65, KEPPEL00076345.)

**EIG's Response:** Denied. Contrary to Keppel Statement No. 97, there is no genuine dispute of material fact that yard tours at the BrasFELS Shipyard, especially by Sete's investors or lenders, were not routine but required the approval of Kai Choong Kwok, the Chief Executive Officer and President of the Keppel Brasil. EIG SOF ¶¶ 23, 95; EIG Exh. 102 at KEPPEL00000153-160; EIG Exh. 133 at 273:10-17, 274:11-18.

ii. August 2011 Video Shoot.

98. EIG initiated the August 2011 video shoot of the BrasFELS Shipyard. (Ex. 29, DX092 at 596; Ex. 30, DX093 at 447.)

**EIG's Response:** Admitted.

99.     Barrington planned the August 2011 video shoot of the BrasFELS Shipyard.  (Ex. 29, DX092 at 596; Ex. 30, DX093 at 446-47; Ex. 47, BARRINGTON_ET_00000486-0495 at 494.)

**EIG's Response:**  Admitted.

100.    Barrington, on EIG's behalf, reached out to Sete to arrange the August 2011 video shoot as part of a presentation for EIG's annual investors conference.  (Ex. 47, DX093 at -0447.)

**EIG's Response:**  Admitted.

101.    Barrington originally planned to record video at the EAS Shipyard, not the BrasFELS Shipyard.  (Ex. 29, DX092 at 596; Ex. 30, DX093 at 447; Ex. 47, BARRINGTON_ET_00000486-495 at 491.)

**EIG's Response:**  Admitted.

102.    Kevin Corrigan testified that Barrington recorded video at the BrasFELS Shipyard instead of the EAS Shipyard because "from a logistical standpoint it was obviously easier to go to BrasFELS".  (Ex. 10, Corrigan Tr. 148:12-149:07.)

**EIG's Response:**  Admitted that Corrigan testified that "from a logistical standpoint, it was obviously easier to go to BrasFELS."  EIG clarifies that Corrigan's full testimony included his testimony that he "imagine[s]" that "the reason the switch was made from EAS to BrasFELS" was logistics, but he is "not a hundred percent sure" because it "was Sete's initiative, you know, they were helping us set all this stuff up."  Ex. 10 at 149:8-15.

103.    There is no evidence of any direct communications between EIG and Keppel about the planning of the Barrington video shoot.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 103, there is no genuine dispute of material fact that Barrington, acting on behalf of EIG, communicated with Keppel about the Barrington video shoot, and Kevin Corrigan of EIG was part of those communications. EIG SOF ¶¶ 112-13; EIG Exh. 28 at KEPPEL00020435.

104.    On or around August 24, 2011, Barrington's Barbara Olsen visited the BrasFELS shipyard to record video of "general shipyard activity", which is the video shoot described in paragraph 72 to 75 of the Complaint.  (Ex. 1, Compl. ¶¶ 72-75; Ex. 30, DX093 at 447; Ex. 48, BARRINGTON_ET_00000651 at 653; Ex. 10, Corrigan Tr. 154:25-155:10.)

**EIG's Response:**  Admitted.

105.    The Barrington video shoot was independent of EIG's due diligence for its Sete investment.  (Ex. 10, Corrigan Tr. 157:02-08.)

**EIG's Response:**  Admitted.

106.    Kevin Corrigan testified that the Barrington video shoot was "not an extension of [EIG's] due diligence" of the Sete investment.  (Ex. 10, Corrigan Tr. 157:02-08.)

**EIG's Response:**  Admitted.

107.    The August 2011 video shoot did not include footage of construction for Sete drillships because Keppel did not obtain its first contract until December 2011.  (Ex. 43, KEPPEL00490690-768.)

**EIG's Response:**  Admitted.

108.    There is no evidence that bribery or corruption risks were discussed during the planning or shooting of the Barrington video.

**EIG's Response:**  Admitted.

109.    There is no evidence that Keppel provided inaccurate information to Barrington or EIG in connection with the Barrington video.

**EIG's Response:**  Admitted.

110.    The approximately five-minute-long Barrington video was shown at EIG's daylong annual investors' conference.  (Ex. 10, Corrigan Tr. 157:23-158:24.)

**EIG's Response:**  Admitted.

111.    There is no evidence that the Barrington video mentioned Keppel.

**EIG's Response:**  Admitted that there is no evidence that the audio of the Barrington video used the phrase "Keppel."  EIG clarifies that the Barrington video showed pictures of the BrasFELS shipyard.

**H.    EIG's Decision to Increase Its Equity Commitment in September 2011.**

112.    On September 8, 2011, Sete, Lakeshore and EIG executed the "First Amendment and Restatement Agreement".  (Ex. 28, DX089.)

**EIG's Response:**  Admitted.

113.    The First Amendment and Restatement Agreement provided that the "[p]arties agree to increase the Original Equity Commitment from the current R$250,000,000 (two hundred and fifty million Brazilian reais) to the amount of R$500,000,000 (five hundred million Brazilian reais), an increase, therefore, of R$250,000,000 (two hundred and fifty million Brazilian reais)".  (Ex. 28, DX089 at 626, 635.)

**EIG's Response:** Admitted. EIG clarifies that the September 2011 Amended Investment Agreement contained the same conditions precedent as the June 2011 Investment Agreement. EIG Exh. 31 at EIG_KEP_00048629, § 2.1; *see supra* ¶ 82.

114. On September 16, 2011, Blair Thomas presented the September 2011 Investment Recommendation to EIG's investment committee. (Ex. 24, DX076 at 323.)

**EIG's Response:** Admitted.

115. The September 2011 Investment Recommendation included the same five bullets on the BrasFELS Shipyard as the June 2011 Investment Recommendation. (Ex. 23, DX075 at 431.)

**EIG's Response:** Admitted.

116. Kevin Corrigan testified that what was said in the June 2011 Investment Recommendation relating to BrasFELS is exactly what was said in the September 2011 Investment Recommendation relating to BrasFELS. (Ex. 10, Corrigan Tr. 110:03-07.)

**EIG's Response:** Admitted.

117. On September 16, 2011, EIG's investment committee approved the increase of EIG's equity commitment from 250 million BRL to 500 million BRL. (Ex. 10, Corrigan Tr. 109:06-09; Ex. 15, Thomas Tr. 99:15-21.)

**EIG's Response:** Admitted.

118.    As of September 16, 2011, the EAS Shipyard was the only shipyard that had been obtained an EPC Contract from Sete.  (Ex. 23, DX075 at 215; Ex. 10, Corrigan Tr. 124:19-125:02.)

**EIG's Response:**  Admitted.

**I.    Keppel's First Contract from Sete in December 2011.**

119.    On December 16, 2011, Sete and Keppel executed an EPC Contract to build one drillship for Sete via their subsidiaries, Fernvale and Urca Drilling B.V.  (Ex. 43, PX070.)

**EIG's Response:**  Admitted.

120.    The December 16, 2011 EPC Contract was Keppel's first shipbuilding contract in connection with Sete.  (Ex. 43, KEPPEL000490690-768.)

**EIG's Response:**  Admitted.

121.    EIG was not a party to the December 16, 2011 EPC Contract.  (Ex. 43, KEPPEL00490690-768 at 690.)

**EIG's Response:**  Admitted.

**J.    EIG's Second Visit to the BrasFELS Shipyard in March 2012.**

122.    EIG did not mention any 2012 visit to the BrasFELS Shipyard in the Complaint. (Ex. 1, Compl.).

**EIG's Response:**  Admitted.

123.    EIG initiated and planned the March 2012 visit to the BrasFELS Shipyard.  (Ex. 31, DX095 at 469; Ex. 58, EIG_KEP_00251523-529 at 528.).

**EIG's Response:**  Admitted that EIG requested the visit, through Sete and/or its financial advisors, as part of its due diligence and a potential co-investment by ADICO, and that EIG employees and/or Sete's financial advisors planned the logistics for the EIG employees to travel to the BrasFELS shipyard, and denied that EIG planned the March 2012 visit.  Ex. 31 at EIG_KEP_00121469; Ex. 58 at EIG_KEP_00251523-28; *see infra* ¶ 128  Contrary to Keppel Statement No. 123, there is no genuine issue of material fact that Keppel and/or its subsidiaries planned the visit, including a tour, presentation, lunch, and conversations with employees of Keppel and/or its subsidiaries.  EIG SOF ¶¶ 166-67, 172-73; EIG Exh. 49 at KEPPEL00020565; EIG Exh. 122 at 160:4-162:19, 166:6-18, 166:23-167:7; EIG Exh. 124 at 78:15-18, 82:14-20, 83:11-87:25.

124.    There is no evidence of any communications between EIG and Keppel concerning the planning of the March 2012 yard visit.

**EIG's Response:**  Admitted.

125.    On or around March 28, 2012, Kevin Corrigan, Simon Hayden and Hoshrav Patel of EIG visited the BrasFELS Shipyard with representatives of ADICO.  (Ex. 4, EIG Response to RFA 33; Ex. 10, Corrigan Tr. 162:11-19; Ex. 12 Patel Tr. 88:15-19.)

**EIG's Response:**  Admitted.

126.    The March 2012 visit to the BrasFELS Shipyard was part of ADICO's due diligence of Sete.  (Ex. 10, Corrigan Tr. 160:17-22; Ex. 17, Hayden D.C. Tr. 304:21-305:01; Ex. 57, EIG_KEP_00251502-508 at 505.)

**EIG's Response:**  Admitted.

127.    ADICO was an investor of EIG.  (Ex. 10, Corrigan Tr. 160:23-161:05.)

**EIG's Response:**  Admitted.

128.    Kevin Corrigan testified that the March 2012 visit "was a mirror of the CIC's visit a few months earlier", and that the purpose was to present to ADICO the possibility of investing in Sete.  (Ex. 10, Corrigan Tr. 160:12-22.)

**EIG's Response:**  Admitted that Corrigan testified that the March 2012 visit "was a mirror of the CIC's visit a few months earlier," and that *a* purpose of the visit was for ADICO to conduct due diligence for a potential investment in Sete.  EIG clarifies that the March 2012 visit also was part of EIG's due diligence of Sete, which continued until EIG funded its investment in Sete, after which EIG monitored its investment.  EIG SOF ¶ 385; EIG Exh. 124 56:21-25.

129.    The focus of the March 2012 visit to the BrasFELS Shipyard was the shipbuilding capacity at BrasFELS.  (Ex. 10, Corrigan Tr. 166:14-18; Ex. 11, Hayden Tr. 84:21-25.)

**EIG's Response:**  Admitted.

130.    There is no evidence that bribery or corruption were discussed during the March 2012 yard visit.

**EIG's Response:**  Admitted.

131.    Kevin Corrigan testified that he could not recall any discussions concerning corruption during the March 2012 visit to the BrasFELS Shipyard.  (Ex. 10, Corrigan Tr. 167:08-16.)

**EIG's Response:**  Admitted.

132.     Simon Hayden testified that he could not recall any specific questions during the March 2012 visit to the BrasFELS Shipyard.  (Ex. 17, Hayden D.C. Tr. 305:07-09; Ex. 11, Hayden Tr. 86:04-08.)

**EIG's Response:**  Admitted that Hayden could not remember the exact questions he asked during the March 2012 shipyard visit.  EIG clarifies that Hayden testified that he "would have" asked questions at the BrasFELS Shipyard, but just did not remember what questions he asked.  Ex. 11 at 86:04-08.

133.     Hoshrav Patel testified that he had no recollection of the March 2012 visit to the BrasFELS Shipyard.  (Ex. 12, Patel Tr. 84:14-88:14; Ex. 57, EIG_KEP_00251502-508 at 505.)

**EIG's Response:**  Admitted.

134.     There is no evidence Keppel provided any inaccurate information in connection with the March 2012 visit to the BrasFELS Shipyard.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 134, there is no genuine issue of material fact that Keppel met with, and made a presentation to, EIG and ADICO during the March 2012 visit.  EIG SOF ¶¶ 170, 173.  The presentation and information provided by Keppel was misleading in light of the fact that it did not disclose the bribery scheme.  *See supra* ¶ 130.

135.     Kevin Corrigan testified that there was no misleading information provided concerning the shipbuilding capacity of BrasFELS during the March 2012 visit to the BrasFELS Shipyard.  (Ex. 10, Corrigan Tr. 168:15-20.)

**EIG's Response:**  Admitted.  EIG clarifies that Corrigan's testimony was limited to misleading information provided by Keppel concerning its *shipbuilding capacity*, and that

Corrigan continued his answer by stating that there was misleading information "[c]oncerning the *overall transaction*."  Ex. 10 at 168:15-22 (emphasis added).

**K.      Keppel's Five Additional Contracts from Sete in August 2012.**

136.    On April 12, 2012, Keppel announced that it had entered a letter of intent with Sete to build an additional five drillships.  (Ex. 63, KEPPEL00005616-617.)

**EIG's Response:**  Admitted.

137.    On August 2, 2012, EPC Contracts for five drillships were executed between Keppel and Sete.  (Ex. 37, PX051; Ex. 38, PX052; Ex. 39, PX053; Ex. 40, PX054; Ex. 41, PX055.)

**EIG's Response:**  Admitted.

138.    EIG was not a party to the August 2, 2012 EPC Contracts.  (Ex. 37, PX051; Ex. 38, PX052; Ex. 39, PX053; Ex. 40, PX054; Ex. 41, PX055.)

**EIG's Response:**  Admitted.

139.    On August 7, 2012, Eva Ho of Keppel circulated the final draft of the press release and explained:  "Sete Brasil has approved our press release.  The approved version is below.  They have made only three minor changes as highlighted in yellow below."  (Ex. 74, KEPPEL00429725-729 at 725-27.)

**EIG's Response:**  Admitted.

140.    One of the three changes Sete made to Keppel's draft of the August 7, 2012 press release was the addition of the words "and International" to the sentence "Sete Brasil is a Brazilian company established in December 2010 and formed by Brazilian and International

finance investors, including banks and the four biggest Brazilian pension funds, besides Petrobras". (Ex. 74, KEPPEL00429725-729 at 725-27.)

**EIG's Response:** Admitted.

141. The August 7, 2012 press release entitled "Keppel signs contracts with Sete Brasil for five DSS 38E semis for US$4.1 billion" described in paragraph 78 of the Complaint is Ex. 75. (Ex. 75, KEPPEL00444138-140; Ex. 1, Compl. ¶ 78.)

**EIG's Response:** Admitted.

142. Sete added the word "International" to the description of Sete's investors in Keppel's August 7, 2012 press release. (Ex. 74, KEPPEL00429725-729 at 725.)

**EIG's Response:** Admitted.

143. There is no evidence Keppel discussed with Sete or anyone else the phrase "International finance investors" in the August 7, 2012 press release.

**EIG's Response:** Denied. Contrary to Keppel Statement No. 143, there is no genuine dispute of material fact that Exhibit 74 is evidence that Keppel discussed with Sete the phrase "International finance investors" that Sete specifically requested Keppel to add to its August 7, 2012 press release. *See infra* ¶¶ 139-40.

**L. EIG's Disbursement of Funds in August 2012.**

144. On or around July 31, 2012, upon the satisfaction of the conditions in EIG's June 30, 2011 investment agreement (as amended and restated in September 8, 2011), EIG executed shareholder agreements with Sete and its other equity investors. (Ex. 55, EIG_KEP_00110494-535; Ex. 56, EIG_KEP_00116690.)

**EIG's Response:** Admitted.

145. On or around August 3, 2012, EIG answered its first capital call by disbursing approximately $50 million to Sete. (Ex. 1, Compl. ¶ 76.)

**EIG's Response:** Admitted.

146. No further action or approval from EIG's investment committee was needed in July and August 2012 because the investment committee had already approved the investment in June and September 2011. (Ex. 15, Thomas Tr. 104:04-07; Ex. 18, Thomas D.C. Tr. 188:05-14, 195:08-196:04.)

**EIG's Response:** Admitted. EIG clarifies that no further action was required because the transaction was proceeding on terms previously approved by the committee. EIG SOF ¶¶ 392, 395-96, 408-09.

**M. Financial and Operational Documents Concerning Sete.**

147. On January 14, 2011, Zwi Skornicki forwarded Yew Yuen Chow a document entitled, "Drilling Rigs In Brazil Project". (Ex. 44, PX086 at 887.)

**EIG's Response:** Admitted.

148. The cover of the Drilling Rigs in Brazil Project document states that it is a "Presentation to Drilling Operators". (Ex. 44, PX087 at 888.)

**EIG's Response:** Admitted.

149. The Drilling Rigs in Brazil Project document does not mention EIG. (Ex. 44, PX087.)

**EIG's Response:** Admitted.

150.    There is no evidence anyone at Keppel opened or read the Drilling Rigs in Brazil Project document.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 150, there is no genuine dispute of material fact that Exhibit 44 is evidence that Skornicki, in his capacity as Keppel's agent, read the Drilling Rigs in Brazil Project document.  Additionally, Skornicki sent the presentation to YY Chow multiple times on January 14, 2011.  At 11:42 a.m., YY Chow received the presentation from Skornicki.  *See infra* EIG Additional Facts ¶ 496.  At 3:16 p.m., Skornicki sent the presentation to YY Chow again, requesting that YY Chow "[p]lease try to open."  Ex. 44 at KEPPEL00049887.  Skornicki clearly resent the presentation either because YY Chow tried to read it and was unable to do so, or because he thought it was so important for YY Chow to read the presentation that he resent it again hours later.  Furthermore, four days before January 14, Choo directed Tong and Chow that "we have to be prepared and also find out more" about Sete (EIG SOF ¶ 57; EIG Exh. 7 at KEPPEL00036103), reflecting that YY Chow likely either requested Skornicki to send the presentation or would have reviewed it upon receiving it.

151.    There is no evidence anyone at Keppel ever commented on or discussed the Drilling Rigs in Brazil Project document.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 151, there is no genuine dispute of material fact that Skornicki, in his capacity as Keppel's agent, commented on the Drilling Rigs in Brazil Project that YY Chow should "[p]lease try to open."  Ex. 44 at KEPPEL00049887.

152.    There is no evidence anyone at Keppel knew which other entities, if any, received the Drilling Rigs in Brazil Project document.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 152, there is no genuine dispute of material fact that the Drilling Rigs in Brazil Project presentation states it is "to Drilling Operators" and has a "Cautionary Statement for US investors."  Ex. 44 at KEPPEL00049888-89. The presentation itself is evidence that it was sent to U.S. investors, including U.S.-listed drilling rig operators that would potentially bid for projects with Sete.  In addition, four days before receiving the Drilling Rigs in Brazil Project presentation, YY Chow reported that "SETE Enterprise will also be inviting Drilling contractors, both international and domestic, to bid for these 28 DRUs [drilling rig units] … Successful bidders are required to take a 15% stake in the equity of the unit.  The financial structure for each DRU is 20% equity and 80% debt financing. This will mean that the successful Drilling contractor for each unit will have to provide as equity 3% (ie. 15% of 20%) of the total project cost."  EIG Exh. 7 at KEPPEL00036103-04.

153.    On October 30, 2011, Keppel employees were sent a document entitled, "Sete Brasil Participações S/A Management Presentation" and a financial model entitled "Modelo Financeiro Sete Brasil".  (Ex. 33, PX014 at 554, 560; Ex. 34, PX038.)

**EIG's Response:**  Admitted.

154.    There is no mention of EIG in the "Sete Brasil Participações S/A Management Presentation".  (Ex. 33, PX014.)

**EIG's Response:**  Admitted.

155.    There is no mention of EIG in the financial model entitled "Modelo Financeiro Sete Brasil".  (Ex. 34, PX038.)

**EIG's Response:**  Admitted.

156. There is no evidence anyone at Keppel knew which other entities, if any, received the "Sete Brasil Participações S/A Management Presentation".

**EIG's Response:** Admitted.

157. There is no evidence anyone at Keppel knew which other entities, if any, received the financial model entitled "Modelo Financeiro Sete Brasil".

**EIG's Response:** Admitted.

158. Keppel's Rule 30(b)(6) deposition witness, Tan Leong Peng, testified that all projects require financing and Sete was no different. (Tan I Tr. 130:09-131:07.)

**EIG's Response:** Admitted that Tan testified that all projects require financing, and denied that Tan testified that "Sete was no different." Ex. 13 at 130:18-19. Tan testified that Keppel specifically understood that Sete would require equity financing by the time Keppel had discussions with Sete regarding a joint venture in 2011 (EIG SOF ¶¶ 73-74; EIG Exh. 133 at 131:8-15), and that Keppel also understood in 2011 that the majority of senior debt for each rig would be financed by BNDES (EIG SOF ¶ 138; EIG Exh. 133 at 256:4-9, 264:10-18).

**N. News Reports Concerning Sete.**

159. On August 16, 2011, an email from Guia Oil & Gas Brasil was sent to Tommy Sam with links to 10 articles, including an article headlined "Sete Brasil receives funds from the EIG fund" (translated to English). (Ex. 69, KEPPEL00020438-440 at 438.)

**EIG's Response:** Admitted.

160. There is no evidence anyone at Keppel read the August 2011 news report.

**EIG's Response:** Denied. Contrary to Keppel Statement No. 160, there is no genuine dispute of material fact that Exhibit 69 is evidence that Tommy Sam read the August 2011 news

report. Tommy Sam was a recipient of the August 2011 news report, and was working at that time on a bid by Keppel to construct billions of dollars of drilling rigs for Sete and a joint venture in which Keppel would invest in an affiliate of Sete. EIG Exh. 38 at KEPPEL00459977-80; EIG Exh. 39 at KEPPEL00556336-40.

161. There is no evidence anyone at Keppel commented on or discussed the August 2011 news report.

**EIG's Response:** Admitted.

162. On February 13, 2012, Keppel employees were sent a press clipping that included an article with the headline "Oil-Rig Co Sete Brasil May Seek New Investors – Source". (Ex. 35, PX018 at 871, 881.)

**EIG's Response:** Admitted.

163. On February 13, 2012, Keppel employees were sent an email that included an article with the headline "Sete Brasil Charts Growth Path On Back Of Latest Rig Order". (Ex. 73, KEPPEL00049993 at 993.)

**EIG's Response:** Admitted.

164. There is no evidence anyone at Keppel read the February 2012 news reports.

**EIG's Response:** Denied. Contrary to Keppel Statement No. 164, there is no genuine dispute of material fact that the emails containing the news reports were sent and prepared by employees of Keppel, its parent or subsidiaries, who read the news reports before sending them. Exs. 35 at KEPPEL00422871-74, 73 at KEPPEL00049993. Indeed, one of the February 2012 news reports (Ex. 35 at KEPPEL00422871-72) was emailed to more than 100 employees of

Keppel, its parent and/or its subsidiaries, including Tong, YY Chow, Kwok, Sam, Jeffery Chow, and other Keppel executives who were working on the Sete deal during this period.

165.     There is no evidence anyone at Keppel commented on or discussed the February 2012 news reports.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 165, there is no genuine dispute of material fact that the emails containing the news reports were prepared and sent by employees of Keppel, its parent or subsidiaries, and those emails were commentary on which news reports senior executives of Keppel entities should read.  Ex. 35 at KEPPEL00422871-74; Ex. 73 at KEPPEL00049993-94.

166.     On March 9, 2012, Keppel employees were sent an email that included an article with the headline "Sete Brasil will increase capital to R$7 billion (Portos e Navios)".  (Ex. , 46, PX098 at 825.)

**EIG's Response:**  Admitted.

167.     There is no evidence anyone at Keppel read the March 2012 news report.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 167, there is no genuine dispute of material fact that the March 2012 news report was read, translated, and sent by employees of a Keppel subsidiary.  Ex. 46 at KEPPEL00278825; *see infra* EIG Additional Facts ¶ 508.

168.     There is no evidence anyone at Keppel commented on or discussed the March 2012 news report.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 168, there is no genuine dispute of material fact that the March 2012 news report was sent and translated by an employee

of Keppel, its parent, or subsidiaries, and that email was commentary on which news reports senior executives of Keppel entities should read. Ex. 46 at KEPPEL00278825-26; *see infra* EIG Additional Facts ¶ 508. Additionally, Exhibit 46 is evidence that other Keppel executives commented on or discussed the March 2012 news report. More than 20 employees of Keppel, its parent, and its subsidiary Keppel Brasil, including Tong, YY Chow, Kwok, and Tommy Sam—executives involved in the Sete deal and negotiating the letter of intent signed that month for five additional rigs—received the news report. Ex. 46 at KEPPEL00278825; EIG SOF ¶ 177; EIG Exh. 41 at KEPPEL00427320-24, KEPPEL00427328-30.

**O. EIG's Third Visit to the BrasFELS Shipyard in June 2013.**

169. According to an email dated May 28, 2013, Sete shareholders planned to visit the BrasFELS shipyard on June 6, 2013. (Ex. 54, EIG_KEP_00095123-129 at 124.)

**EIG's Response:** Admitted.

170. The June 2013 visit to the BrasFELS Shipyard was initiated by Sete shareholders. (Ex. 54, EIG_KEP_00095123-129 at 124, 128.)

**EIG's Response:** Denied. Contrary to Keppel Statement No. 170, there is no genuine dispute of material fact that Corrigan testified that the June 2013 visit was either "Ferraz's idea" or suggested by "one of the shareholders" at a Sete board meeting. Ex. 10 at 169:12-22.

171. Sete arranged the June 2013 visit to the BrasFELS Shipyard. (Ex. 54, EIG_KEP_00095123-128 at -128.)

**EIG's Response:** Admitted.

172. There is no evidence of any communications between EIG and Keppel concerning the planning of the June 2013 visit to the BrasFELS Shipyard.

**EIG's Response:**  Admitted.

173.    On or around June 6, 2013, Kevin Corrigan visited the BrasFELS Shipyard along with other representatives of Sete's shareholders.  (Ex. 10, Corrigan Tr. 173:02-06; Ex. 4, EIG Response to RFA 34.)

**EIG's Response:**  Admitted.

174.    Kevin Corrigan testified that the purpose of the June 2013 visit to the BrasFELS Shipyard was "to see the progress of the shipyards" and that the focus of the visit was the shipbuilding capacity of BrasFELS.  (Ex. 10, Corrigan Tr. 169:08-22, Corrigan Tr. 174:13-21.)

**EIG's Response:**  Admitted.

175.    Kevin Corrigan testified that he could not recall anyone raising the subject of corruption risks during the June 2013 visit to the BrasFELS Shipyard.  (Ex. 10, Corrigan Tr. 175:07-13.)

**EIG's Response:**  Admitted.

176.    There is no evidence Keppel provided any inaccurate information in connection with the June 2013 visit to the BrasFELS Shipyard.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 176, there is no genuine dispute of material fact that Keppel and/or its subsidiary gave a presentation and tour after which "the visitors left in awe" of Keppel's rig construction work.  EIG SOF ¶¶ 260-61; EIG Exh. 71 at KEPPEL00457152.  The presentation and tour were misleading because Keppel did not disclose the bribery scheme to the Sete investors.

177.    The Complaint refers to a visit by EIG to the BrasFELS Shipyard in August 2013, but there is no evidence of any such visit in August 2013.  (Ex. 1, Compl. ¶ 79.)

**EIG's Response:**  Admitted.  EIG clarifies that discovery has revealed that the visit of Corrigan to the BrasFELS Shipyard in 2013 referred to in paragraph 79 of First Amended Complaint took place in June, not August 2013.  EIG Exh. 71 at KEPPEL00457152, KEPPEL00457157.

**P.    Operation Car Wash.**

178.    Brazilian authorities began investigating corruption at Petrobras in a probe called "Operation Car Wash", which started as an investigation into "alleged money laundering" and grew into a larger corruption investigation involving bribery at Petrobras.  (Ex. 1, Compl. ¶ 91.)

**EIG's Response:**  Admitted.

179.    By the fall of 2014, there were news reports about Operation Car Wash and the bribery scheme at Petrobras.  (Ex. 6, Wall St. J., Oct. 9, 2014; Ex. 7, The Washington Post, Nov. 17, 2014; Ex. 8, Bloomberg, Dec. 3, 2014.)

**EIG's Response:**  Admitted.  EIG clarifies that in November 2014, news of a plea agreement by Barusco was made public, but there were no disclosures regarding Sete.  EIG Exh. 79 at EIG00064923-24/EIG_KEP_00148015-16; EIG Exh. 129 at 38:5-13; EIG Exh. 82 at KEPPEL00495288.

180.    On November 18, 2014, EIG received an inquiry from one of its investors about the potential impact of the bribery scandal on Sete.  (Ex. 32, DX109 at 926; Ex. 15, Thomas Tr. 137:02-139:03.)

**EIG's Response:**  Admitted.

**Q. Keppel's Deferred Prosecution Agreement.**

181. On December 22, 2017, Keppel entered the DPA to resolve "one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ('FCPA'), as amended, Title 15, United States Code, Sections 78dd-2 and 78dd-3." (Ex. 3, DPA at 1 ¶ 1.)

**EIG's Response:** Admitted.

182. The DPA states that "[f]or a number of years, executives and employees of Petrobras with responsibility over the bidding of certain large projects . . . administered a scheme to secure corrupt payments equal to a percentage of a contract's value from the companies awarded those projects." (Ex. 3, DPA at A-4 ¶ 18.)

**EIG's Response:** Admitted.

183. The bribery scheme involving Petrobras was extended to projects awarded by Sete in or around 2011. (Ex. 3, DPA at A-4 ¶ 18; Ex. 1, Compl. ¶ 45.)

**EIG's Response:** Admitted. EIG clarifies that the bribery scheme was formally extended to Sete when Sete was formed in or around 2011, but the participants in the long-running bribery scheme, including Keppel, intended to continue the scheme to projects awarded in connection with the Rigs Project before Sete was formed. *See* EIG SOF ¶¶ 26, 43-53.

184. The DPA states that "[i]n or about and between 2001 and 2014, KOM, together with others, including executives of KOM USA, knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil." (Ex. 3, DPA at A-5 ¶ 19.)

**EIG's Response:** Admitted.

185. The DPA states that "[i]n or about and between 2001 and 2011, KOM and KOM USA executives created and executed agreements on behalf of KOM with consulting companies controlled by [Zwi Skornicki] that were intended to facilitate bribe payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose". (Ex. 3, DPA at A-5 ¶ 21.)

**EIG's Response:** Admitted.

186. Commissions of one to three percent of a contract's value were standard each time. (Ex. 3, DPA at A-13 ¶ 63; DPA at A-15 ¶ 74; DPA at A-9 ¶ 42.)

**EIG's Response:** Admitted. EIG clarifies that the evidence reflects that, by July 2011, Keppel agreed to pay Skornicki 2% of the contract value of EPC contracts with Sete in order to facilitate the payment of bribes. EIG SOF ¶¶ 85-86.

187. Jeffrey Chow, Keppel's former legal director, drafted and signed the commission agreements related to Sete with Zwi Skornicki. (Ex. 9, Chow Tr. 26:25-27:03.)

**EIG's Response:** Admitted.

188. Jeffrey Chow testified that the "intention" of Zwi Skornicki's contracts "wasn't to conceal any bribe payments. The intention was to capture in writing the agreement between the company and [Mr. Skornicki], that he would be paid a certain commission fee for his assistance under certain contracts." (Ex. 9, Chow Tr. 107:25-108:07-12.)

**EIG's Response:** Admitted that paragraph 188 accurately quotes Jeffery Chow's testimony, and denied that the "intention" of Skornicki's contracts "wasn't to conceal any bribe payments." Contrary to Keppel Statement No. 188, there is no genuine dispute of material fact that Keppel admitted in the DPA that the contracts were "intended to facilitate bribe payment to

obtain business from Petrobras and Sete Brasil and to conceal their purpose." *See supra* ¶ 185. Jeffery Chow admitted that the contracts he drafted and signed with Skornicki related to Sete were backdated, falsely represented the purpose of Keppel's payments to him, falsely represented that he was complying with antibribery laws, and were intended to facilitate the payment of bribes and conceal the true nature and purpose of the payments. EIG SOF ¶¶ 27, 219; *see infra* EIG Additional Facts ¶¶ 493-94.

189. Jeffrey Chow testified that:

> "[P]ayment wouldn't be able to go through the company without a contract or agreement that supports it. There needs to be some documentation. . . . In order to make payment out of the company, you need to have all the required documents there to – for the accounting people to sign off and say, okay, payment is being made. The contract that supports it, the invoice, the bank details. You just can't move money out of the company without a contract to support why you are moving money." (Ex. 9, Chow Tr. 90:14-91:05.)

**EIG's Response:** Admitted.

190. Jeffrey Chow testified that "the contracts themselves were the documents necessary to process the agreement between Keppel and Zwi [Skornicki]". (Ex. 9, Chow Tr. 142:04-07.)

**EIG's Response:** Admitted.

191. Keppel executed two contracts, effective as of November 30, 2011 and December 1, 2011, with Zwi Skornicki's companies that provided for commission payments of 0.5% and 1.5% of the price of each drillship. (Ex. 3, DPA at A-15-16, ¶ 77; Ex. 36, PX025 at 253-54, 276-78.)

**<u>EIG's Response:</u>** Admitted that Keppel executed two contracts with companies controlled by Skornicki that provided for commission payments of 0.5% and 1.5% of the price of each drillship, and denied that the agreements were effective as of November 30, 2011 and December 1, 2011. Contrary to Keppel Statement No. 191, there is no genuine dispute of material fact that the agreements were signed on or about August 7, 2012 and backdated, and Skornicki's company that was a party to the December 1, 2011 agreement—Deep Sea Oil Corp.—did not exist until April 2012. EIG SOF ¶¶ 191, 209; *see infra* EIG Additional Facts ¶ 493.

192. Jeffrey Chow testified that payment method that was arranged with Zwi Skornicki in connection with Sete was "the normal process that [Chow] ha[d] been familiar dealing with Zwi in the past". Ex. 9, Chow Tr. 121:05-09.

**<u>EIG's Response:</u>** Admitted that Jeffery Chow testified that the payment method he devised for Skornicki in connection with Sete was "the normal process" in the context of Keppel's participation in the Petrobras bribery scheme that was extended to Sete. *See supra* ¶¶ 182-86.

193. Jeffrey Chow testified that "[t]he standard commission agreement uses the standard format that we would be using to sign with Eagle do Brasil or with any companies." (Ex. 9, Chow Tr. 88:15-18.)

**<u>EIG's Response:</u>** Admitted.

194. Jeffrey Chow testified that he had no knowledge or awareness of EIG prior to this lawsuit. (Ex. 9, Chow Tr. 117:21-25.)

**<u>EIG's Response:</u>** Admitted.

195.    In accordance with the agreements, when Keppel received milestone payments from Sete for the construction of its drillships, Keppel made commission payments to Zwi Skornicki's companies.  (Ex. 72, KEPPEL00045267 at 276-77; Ex. 5, Keppel Response to RFAs 1-10.)

**EIG's Response:**  Admitted.

196.    The DPA does not charge Keppel with defrauding Sete's investors, or with conspiring to defraud EIG or any other investors.  (Ex. 3, DPA.)

**EIG's Response:**  Keppel Statement No. 196 is improper because it calls for a legal conclusion.  Subject to its objection, admitted.

197.    Keppel did not make any admissions in the DPA concerning Sete's investors. (Ex. 3, DPA.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 197, there is no genuine dispute of material fact that Keppel admitted in the DPA that it "knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil."  *See supra* ¶ 184.  Keppel's payment of bribes was made using funds provided to Sete by its investors and lenders (*see supra* ¶ 195), and therefore concerned Sete's investors.  Furthermore, Keppel admitted in the DPA to entering agreements with Skornicki in connection with Sete "intended to facilitate bribe payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose."  *See supra* ¶ 185.  The facilitation and concealment of bribe payments using funds provided to Sete by investors and paid to Keppel—the revelation of which Keppel alleges prevented Sete from obtaining financing—concerns Sete's investors.

198. The DPA does not mention EIG or any other of Sete's investors (apart from Petrobras). (Ex. 3, DPA.)

**EIG's Response:** Admitted.

**PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

## I. The DPA/Charges Against Keppel

491. In the DPA, Keppel "expressly agree[d] that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for [Keppel] make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by [Keppel] set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution." Ex. 3 at 17 ¶ 20.

492. In announcing the charges against Keppel, the U.S. Attorney for the Eastern District of New York stated: "In an attempt to conceal their crimes, [Keppel] used the global financial system—including the United States banking system—to disguise the source and disbursement of the bribe payments by passing funds through a series of shell companies." EIG Exh. 145.

## II. The Consulting Agreements

493. Jeffery Chow admitted that the Consulting Agreements were backdated. EIG Exh. 146 at 152:5-19.

494. Jeffery Chow admitted that the Consulting Agreements "existed to make payments legitimate." EIG Exh. 121 at 27:9-19.

## III. The January 2011 Petrobras Presentation

495. On January 14, 2011, an employee of Petrobras sent Skornicki the January 2011 Petrobras Presentation (also referred to as the Drilling Rigs in Brazil Project presentation) by email, writing that, "It took some time but I finally got a copy of the presentation." Ex. 44 at KEPPEL00049887.

496. On January 14, 2011 at 11:42 a.m., Skornicki sent YY Chow the January 2011 Petrobras Presentation. EIG Exh. 137 at KEPPEL00281797.

497. At 3:16 p.m. on January 14, Skornicki sent the January 2011 Petrobras Presentation to YY Chow again, requesting that YY Chow "[p]lease try to open." Ex. 44 at KEPPEL00049887.

498. The "Main Challenges and Risks" described in the January 2011 Petrobras Presentation are substantially the same as those described in the Petrobras Drilling Presentation (also referred to as the Drilling Presentation). *Compare* Ex. 44 at KEPPEL00049899 *with* Ex. 53 at EIG_KEP_00075198.

## IV. EIG's Visits to the Keppel Shipyard

499. During his August 2011 visit to BrasFELS, Corrigan conducted due diligence "in connection with" EIG's potential investment in Sete. Ex. 10 at 131:13-132:6.

500. During EIG's March 28, 2012 visit to BrasFELS, Keppel presented regarding the "abilities of [BrasFELS] to produce these complex vessels" for the Sete project, and its employees had "a free-flowing conversation for the hour or more" of the tour and presentation regarding "how it all worked." EIG Exh. 124 at 82:14-86:3.

## V. The Drilling Presentation and Management Presentation

501. In 2011, Stephen Pan was a member of Keppel's board of directors. EIG Exh. 141 at 26.

502. On September 27, 2011, Pan emailed Choo and Tong to ask "if someone from KOM attended [the presentations given at an offshore oil and gas industry forum in Rio de Janeiro] and you have all the papers. If not I will send on to KOM board." Ex. 71 at KEPPEL00040805.

503. In response to Pan's email, Choo replied to Pan and Tong, cc'ing YY Chow and Keppel's CFO Ngiam Jih Wong, explaining that he "ha[d] not seen them" and directing Pan to "[p]lease send." Ex. 71 at KEPPEL00040805.

504. Sam forwarded the Management Presentation and accompanying financial model to Leong Peng Tan, Kwok, YY Chow, Jeffery Chow, and other Keppel executives on October 30, 2011, writing "[l]et's review and see what other info we need." Ex. 33 at KEPPEL00410554.

505. On October 31, 2011, LP Tan commented on the Management Presentation and financial model that "FYI. We cannot allow further reduction of our rig price as they had a huge project budget." Exh. 138 at KEPPEL00388231.

506. On November 16, 2011, a Keppel employee sent an email to YY Chow, Jeff Chow, and LP Tan in which he presented "[a] few findings from the financial model" and accompanying Management Presentation for their "consideration." Exh. 139 at KEPPEL00440820-21.

**VI. Keppel's Knowledge That Sete Would Raise Additional Capital**

507. On March 8, 2012, Sam informed Keppel's CEO Tong and COO YY Chow that he had "bumped into Ferraz (Sete's CEO) who told Zwi that Sete [wa]s very confident of raising the funds it needs from financial institutions and funds." EIG Exh. 142 at KEPPEL00570070.

508. The March 9, 2012 article (*see supra* ¶ 166) sent to Keppel executives regarding EIG's potential investment in a new round of capital raised by Sete was identified as "[w]orth

translating!" by a communications consultant, and translated and distributed by Keppel Brasil employees. EIG Exh. 143 at KEPPEL00274222.

## VII. The EPC Contracts

509. In an email dated November 19, 2011, LP Tan stated that "the total contract value for this [Sete] job" was worth at least "US$4.8 Billion …. The biggest contract in the whole history of Keppel." EIG Exh. 140 at KEPPEL00205263.

510. Between August 28 and August 30, 2012, Sete affiliates wired more than $65 million to Fernvale in connection with the EPC contracts. EIG Exh. 144 at KEPPEL00000266.

## VIII. Keppel's Contracts with Petrobras and Sete

511. Between in or about 2001 and 2010, Keppel "paid[d] bribes in connection with" and secured seven contracts or subcontracts for "projects tendered for Petrobras": the P-48, P-51, P-52, P-53, P-56, P-58, and P-61 projects. Ex. 105 at A-5-14 ¶¶ 19, 23-24, 31-32, 37, 41-43, 45, 50-51, 55-56, 68-69.

Dated: New York, New York
October 19, 2021

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/ Daniel B. Goldman
Daniel B. Goldman
Kerri Ann Law
Claudia Pak
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
dgoldman@kramerlevin.com

*Attorneys for Plaintiffs*