UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

EIG ENERGY FUND XIV, L.P.,          :
EIG ENERGY FUND XIV-A, L.P.,     :
EIG ENERGY FUND XIV-B, L.P.,     :
EIG ENERGY FUND XIV (CAYMAN), L.P.,  :
EIG ENERGY FUND XV, L.P.,          :
EIG ENERGY FUND XV-A, L.P.,      :
EIG ENERGY FUND XV-B, L.P., and    :    Case No. 18-cv-01047-PGG
EIG ENERGY FUND XV (CAYMAN), L.P.,  :
                            :
               Plaintiffs,    :
                            :
         - against -      :
                            :
KEPPEL OFFSHORE & MARINE LTD.,    :
                            :
              Defendant.    :
                            :

————————————————————————x

## PLAINTIFFS' REPLY TO
## DEFENDANT'S LOCAL RULE 56.1 COUNTERSTATEMENT

# TABLE OF CONTENTS

**Page**

RESPONSES TO KEPPEL'S COUNTERSTATEMENT OF ADDITIONAL FACTS ............... 1

A.  EIG Was a Sophisticated Investor with Experience in Brazil. ................................. 1

B.  EIG's Pursuit of the Sete Investment Opportunity. ................................................. 2

C.  Alleged Misrepresentations and Omissions .............................................................. 4

D.  EIG's Due Diligence ................................................................................................. 17

E.  EIG Made a Binding Commitment to Invest in Sete in June 2011 ....................... 27

F.  EIG's First Visit to the BrasFELS Shipyard in August 2011. ............................... 33

G.  Agreements with Zwi Skornicki. ............................................................................. 42

H.  EPC Contracts. .......................................................................................................... 44

I.  Keppel's Lack of Knowledge of Sete's Use of Funds. ........................................... 45

J.  EIG's Second Visit to the BrasFELS Shipyard in March 2012 ............................ 48

K.  EIG's Third Visit to the BrasFELS Shipyard in June 2013 .................................. 51

L.  Sete Had Difficulty Obtaining Financing Prior to the Disclosure of the Bribery
    Scheme. ...................................................................................................................... 54

M.  By June 2014, Sete Was on the Brink of Collapse Due to Steep Declines in the Price
    of Oil and the Value of the Brazilian Currency. .................................................... 57

N.  By November 2014, Sete Had Stopped Paying the Shipyards. ............................. 62

O.  Operation Car Wash ................................................................................................. 64

P.  EIG Continued to Invest in and Work with Sete After the Bribery Scheme Had Been
    Disclosed .................................................................................................................... 68

Q.  Anti-Corruption Letters ............................................................................................ 73

R.  BNDES Continued to Negotiate with Sete for Months after February 2015. ...... 74

S.  Sete Declared Bankruptcy in April 2016. ............................................................... 75

T.  The Deferred Prosecution Agreement. .................................................................... 83

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York and Rule V(B) of this Court's Individual Rules of Practice in Civil Cases, Plaintiffs EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P. and EIG Energy Fund XV (Cayman), L.P. (together, "**EIG**" or "**Plaintiffs**") respectfully submit the following response to Defendant Keppel Offshore & Marine Ltd.'s ("**Keppel**" or "**Defendant**") Local Rule 56.1 Counterstatement in Opposition to Plaintiffs' Motion for Summary Judgment ("**Reply SOF**").[1]

**RESPONSES TO KEPPEL'S COUNTERSTATEMENT OF ADDITIONAL FACTS**

**A.    EIG Was a Sophisticated Investor with Experience in Brazil.**

491.    EIG "was a sophisticated institutional investor when it made its investments in Sete". (Keppel Opp'n Exh. 2, EIG Response to RFA 55.)

**EIG's Response:** Admitted.

492.    EIG began investing in Brazil in or around 2000. (Keppel Opp'n Exh. 73, DX083 at 523.)

---

[1] References to "EIG SOF" are to Plaintiffs' Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment, dated September 20, 2021, which is incorporated by reference herein. References to "EIG Resp. SOF" are to Plaintiffs' Response to Defendant's Rule 56.1 Statement and Statement of Additional Undisputed Material Facts, dated October 19, 2021, which is incorporated by reference herein. Unless otherwise defined, capitalized terms herein have the same meaning as set forth in the Table of Definitions beginning on page 73 of the EIG SOF. References to "EIG Exh." are to the exhibits (also incorporated by reference herein) attached to either the EIG SOF (EIG Exhs. 1-136), EIG Resp. SOF (EIG Exhs. 137-146), or Reply SOF (EIG Exhs. 147-159). References to "Keppel Moving Exh." are to the exhibits attached to Local Rule 56.1 Statement of Defendant Keppel Offshore & Marine Ltd. in Support of Its Motion for Summary Judgment, dated September 20, 2021. References to "Keppel Opp'n Exh." are to the exhibits attached to Defendant's Local Rule 56.1 Response and Counterstatement in Opposition to Plaintiffs' Motion for Summary Judgment, dated October 19, 2021.

KL3 3360926.1

**EIG's Response:**  Admitted.

493.    Kevin Corrigan opened EIG's office in Rio de Janeiro in 2012.  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 17:08-13.)

**EIG's Response:**  Admitted.

494.    EIG's 2014 White Paper describes "recurrent concerns about transparency and corruption" in Brazil.  (Keppel Opp'n Exh. 73, DX083 at 524.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 494, there is no genuine dispute of material fact that, although the phrase "recurrent concerns about transparency and corruption" appears in EIG's 2014 White Paper, the White Paper *does not* "describe[]" any such "concerns."  Keppel Opp'n Exh. 73 at EIG_KEP_00258524.

495.    EIG's CEO Blair Thomas testified that "to be precise, if the question is did I know that Brazilian construction firms had a checkered history on corruption, the answer is yes." (Keppel Opp'n Exh. 54, Thomas Tr. 73:14-17.)

**EIG's Response:**  Admitted.

**B.    EIG's Pursuit of the Sete Investment Opportunity.**

496.    EIG first learned about the Sete investment opportunity in September of 2010 when Kevin Corrigan attended a meeting at Banco Santander with his former colleague.  (Keppel Opp'n Exh. 45, Corrigan Tr. 57:13-58:16.)

**EIG's Response:**  Admitted.

KL3 3360926.1

497.    After Kevin Corrigan's meeting at Banco Santander in September 2010, Mr. Corrigan "spoke to a friend" at the French Bank, Société Générale, about the Sete investment opportunity.  (Keppel Opp'n Exh. 45, Corrigan Tr. 58:17-59:08.)

**EIG's Response:**  Admitted.

498.    On September 30, 2010, Kevin Corrigan sent João Ferraz at Petrobras an email introducing himself and requesting a meeting during his trip to Rio de Janeiro, Brazil.  (Keppel Opp'n Exh. 120, EIG_KEP_00257850-852 at 852.)

**EIG's Response:**  Admitted.

499.    When EIG reached out to Petrobras to pitch itself as a potential investor in September 2010, it knew that Petrobras did not want international investors to become part of Sete.  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 82:18-83:12.)

**EIG's Response:**  Denied.  In September 2010, Mr. Corrigan mistakenly believed that Petrobras was not specifically targeting international investors for the Sete deal, but that understanding (i) was based on inadmissible hearsay and (ii) was incorrect because Petrobras was indeed targeting U.S. and other non-Brazilian investors.  *See* Keppel Opp'n Exh. 57 at 82:18-83:3 (Corrigan testified that his understanding that Petrobras did not initially want "international investors" in Sete "did not come from [João] Ferraz," a Petrobras employee whom Corrigan met, but from Petrobras's "financial advisors [Santander] who were telling me that."); EIG SOF ¶¶ 298-300, 306-11; EIG Exh. 1 at EIG00091851/EIG_KEP_00166334, p. 59 (noting that "[t]he choice of the FIP as [the] investment vehicle is due to," among other things, "[t]ax exemption for non-resident foreign investors"); EIG Exh. 37 at KEPPEL00040805 (noting that the Petrobras presentation titled "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" was "given at the Marine Money sponsored Latin American Ship and Offshore

Forum in Rio" on "16-17 September" ("Marine Money Conference"); EIG Exh. 148 (agenda for the Marine Money Conference showing participation of Jefferies and other international investors).

500.    Kevin Corrigan traveled to Brazil to meet with João Ferraz on or around October 19, 2010 "to learn more about Sondas and see if EIG could participate." (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 80:10-81:15.)

**EIG's Response:**  Admitted.

501.    "Sondas" refers to FIP Sondas, the Brazilian investment fund through which EIG and other equity investors made their investments in Sete.  (Keppel Opp'n Exh. 69, DX062 at 056-57.)

**EIG's Response:**  Admitted.

**C.    Alleged Misrepresentations and Omissions**

   i.    <u>September 2010 Drilling Presentation.</u>

502.    On September 27, 2010, Kevin Corrigan received the Drilling Presentation from a "friend" of his at Société Générale.  (Keppel Opp'n Exh. 104, EIG_KEP_00075177-213; Keppel Opp'n Exh. 45, Corrigan Tr. 58:17-24.)

**EIG's Response:**  Admitted.

503.    There is no evidence that Kevin Corrigan's "friend" at Société Générale was acting as an agent of Petrobras when he sent the Drilling Presentation to EIG on September 27, 2010.  (Keppel Opp'n Exh. 45, Corrigan Tr. 58:17-25.)

**EIG's Response:**  Admit that there is no *evidence* Société Générale was *acting as an agent* of Petrobras when the Drilling Presentation was sent to Corrigan on September 27, 2010.

EIG clarifies that there *is evidence* that the Drilling Presentation was prepared by Petrobras.  The last slide of the Drilling Presentation has the contact information for "João Carlos M. Ferraz," the "PETROBRAS – Finance&Treasury General Manager."  EIG Exh. 2 at EIG_KEP_00075213.  Additionally, the file name of the Drilling Presentation was "Joao Carlos Ferraz.pdf."  EIG Exh. 2 at EIG00025561/EIG_KEP_00075177.

504.    There is no evidence that anyone at Keppel was involved in preparing or disseminating the Drilling Presentation to any potential or actual investor.

**EIG's Response:**  Admitted that there is no evidence that Keppel was involved in *preparing* the Drilling Presentation, and otherwise denied.  Contrary to Keppel Statement No. 504, there is no genuine dispute of material fact that Keppel *was involved in disseminating* the Drilling Presentation to potential or actual investors.  Indeed, the Drilling Presentation was disseminated among employees of Keppel entities who were potential investors in Sete or its affiliates.  *See* Reply SOF *infra* ¶¶ 505-07; EIG SOF ¶¶ 73, 80-81, 161-62.

505.    On September 27, 2011, an independent member of Keppel Corp.'s Board of Directors emailed the Drilling Presentation and another presentation unrelated to Sete to four executives of Keppel entities.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 804.)

**EIG's Response:**  Whether Stephen Pan ("**Pan**") was an "independent" member of a Board of Directors is improper as it calls for a legal conclusion.  Subject to this objection, denied, except admitted that Pan emailed the Drilling Presentation to senior Keppel executives and Chiau Beng Choo, the Chairman of Keppel's Board of Directors and Chief Executive Officer of Keppel's parent, Keppel Corp. ("**Choo**").  Keppel Opp'n Exh. 137 at KEPPEL00040804; EIG SOF ¶ 55.  Contrary to Keppel Statement No. 505, there is no genuine

dispute of material fact that Pan was *not* a director of Keppel Corp., but rather a director of Keppel.  *See* EIG Resp. SOF ¶ 501.

506.    The Board member told the executives that he had obtained "some of the presentations given at" an offshore oil and gas industry forum in Rio de Janeiro, and asked whether anyone at the Keppel entities had seen the presentations.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 805.)

**EIG's Response:**  Admitted.

507.    Keppel Corp.'s CEO responded that he had not seen the presentation and the Board member sent two presentations.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 805.)

**EIG's Response:**  Admitted.  EIG clarifies that, to the extent that Keppel Statement No. 507 implies that Pan only sent the presentation to Choo, the presentation went to others at Keppel.  Specifically, (i) Pan told Choo he would "send on to KOM board" if Keppel had not received the presentation, (ii) Choo specifically instructed him to "[p]lease send," and (iii) Pan sent the presentation to Choo, Keppel Chief Executive Officer Tong, Keppel Managing Director YY Chow, and Keppel Chief Financial Officer Ngiam Jih Wong, and potentially the Keppel board per Choo's instructions.  Keppel Opp'n Exh. 137 at KEPPEL00040804-05; EIG SOF ¶ 19.

508.    There is no evidence anyone responded to the Board member's September 27, 2011 email attaching the Drilling Presentation.

**EIG's Response:**  Admitted.

509.    The Drilling Presentation does not mention EIG.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 827-862 ].)

6

**EIG's Response:**  Admitted.

510.    There is no evidence anyone at Keppel or anyone on EIG's investment committee opened or read the Drilling Presentation.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 510, there is no genuine dispute of material fact that Keppel Opp'n Exh. 137 is evidence that Keppel officers and directors read the Drilling Presentation.  The Drilling Presentation was sent by Pan, a Keppel director, who must have opened and read the presentation in order to know its contents.  *See* EIG Resp. SOF ¶¶ 31-33; Keppel Opp'n Exh. 137 at KEPPEL00040805.  Pan asked Choo and Tong "if someone from KOM attended [the presentations] and you have all the papers.  If not I will send on to KOM board."  Keppel Opp'n Exh. 137 at KEPPEL00040805.  Choo, emailing Pan and Tong and cc'ing YY Chow and Keppel's CFO, wrote that he "ha[d] not seen them" and directed Pan to "[p]lease send."  Keppel Opp'n Exh. 137 at KEPPEL00040805.  That the Drilling Presentation was specifically requested by Choo from a Keppel board member is evidence that he would have "opened or read" it upon receiving it.  And this email correspondence is evidence suggesting that the Keppel executives reporting to Choo who were working on the Sete deal—Tong and YY Chow (EIG SOF ¶ 79)—would have also opened and read the presentation.

EIG admits that nobody on EIG's Investment Committee opened or read the Drilling Presentation, which was in Portuguese, but denies the Statement to the extent it suggest that members of EIG's Investment Committee did not receive information contained in that and other Petrobras presentations, which they did.  First, it is clear that information from the Drilling Presentation was incorporated into internal EIG memos circulated to members of the Investment Committee.  For example:

| Drilling Presentation | EIG Internal Memo To Investment Committee Members |
|---|---|
| Slide 15: "Considering only Pre-Salt South Cluster (Santos Basin) 15 wells have been drilled with a 100% success rate." EIG Exh. 2 at EIG_KEP_00075193 (emphasis omitted). | June 2011 Investment Recommendation: "In the Santos Basin the pre-salt success rate is 100%." Keppel Opp'n Exh. 66 at EIG_KEP_00077822. |
| Slides 20-21: Providing list of risks and mitigants. EIG Exh. 2 at EIG_KEP_00075198-99. | February 7, 2011 Posting Memo: Noting that "a series of risk mitigants [] have been put in place." Keppel Opp'n Exh. 62 at, EIG_KEP_00075097. |
| Slides 20-21: Listing risks, including "Credit Risk," "Charter Daily Rates," "Non acceptance upon delivery from shipyard," "Delay in delivery," "Cost Overrun," "Operator Low Performance" and "Financing." EIG Exh. 2 at EIG_KEP_00075198-99. | March 2, 2011 Diligence Memo: Listing risks, including "Construction Risk," "Cost Overruns," "Delays in Start-up of Operations," Performance Risk" and "Financing Risk." EIG Exh. 150 at EIG_KEP_00075068-69.<br><br>June 2011 Investment Recommendation: Listing risks, including, among others, "Construction"—which includes "Delays" and "Cost over-runs" —"Operations;" and "Financing." Keppel Opp'n Exh. 66 at EIG_KEP_00077805-07. |
| Slide 21: Stating that "*PB permanent supervision of shipyard's works* and *enforcing a high standard* and experienced contractor association" was mitigating factor to risk of "Non acceptance upon delivery from shipyard." EIG Exh. 2 at EIG_KEP_00075199 (emphasis added). | February 7, 2010 Posting Memo: "However, with oil exploration increasingly heading to deeper waters, it is expected that these rigs, to be built to *Petrobras' exacting specifications, and supervised by their engineers*, will retain high market values after the expiration of the charters, in the unlikely event that they are not accepted or renewed by Petrobras." Keppel Opp'n Exh. 32 at EIG_KEP_00075097-98 (emphasis added). |
| Slide 21: Listing "FGCN" as an additional mitigant for both "Delay in delivery" and "Cost Overrun." EIG Exh. 2 at EIG_KEP_00075199.<br>Slide 26: "FGCN will reduce the construction risks perception and may enhance a higher interest from other potential financing entities, including ECAs." EIG Exh. 2 at EIG_KEP_00075204. | June 2011 Investment Recommendation: "The FGCN is available to reimburse the senior lenders in case of delays or cost overruns during construction." Keppel Opp'n Exh. 66 at EIG_KEP_00077793. |

KL3 3360926.1

| Drilling Presentation | EIG Internal Memo To Investment Committee Members |
|---|---|
| Slide 26: "BNDES will have an important and leading role for financing rigs construction, taking most of the long term debt; FGCN will reduce the construction risks perception and may enhance a higher interest from other potential financing entities, including ECAS; PRE SALT is attracting global recognition and calling attention from local and international financial investors and debt providers." EIG Exh. 2 at EIG_KEP_00075204. | February 7, 2011 Posting Memo:  "Providers of senior debt are expected to be a combination of BNDES, Brazil's state-owned development bank, ECA's of countries where rig components are purchased, commercial banks, and capital markets, if appropriate." Keppel Opp'n Exh. 62 at EIG_KEP_00075098. |

EIG Exh. 2; EIG Exh. 150 (Mar. 2 Diligence Memo sent to Thomas); Keppel Opp'n Exh. 62

(Feb. 7 Posting Memo sent to Blair Thomas); EIG SOF ¶ 384 (Investment Committee reviewed

June 2011 Investment Recommendation).  Second, the February 7, 2011 Posting Memo

circulated to Thomas and Talbot, both members of the Investment Committee, attached a copy of

a Pre-Salt Presentation that was similar in many respects to the Drilling Presentation.  EIG Exh.

149 at EIG_KEP_00075096-111; *compare* EIG Exh. 149 at EIG_KEP_00075100-11 *with* EIG

Exh. 2.  For example, like the Drilling Presentation, the Pre-Salt Presentation referred to risks,

including "Credit Risk" and "Performance Risk," and described how FGCN served to mitigate

risks.  EIG Exh. 149 at Slide 11, EIG_KEP_00075111.  That Posting Memo with attachments

was circulated within EIG, particularly to senior members of the firm.  EIG Exh. 149 at

EIG_KEP_00075096, 97; EIG Exh. 158 at 100:9-13.  Posting memos were also discussed at

meetings of EIG's investment committee on a weekly basis.  EIG Exh. 158 at 100:17-18.

511.    There is no evidence anyone at Keppel commented on or discussed the Drilling

Presentation.

**EIG's Response:**  Denied.  *See* Reply SOF *supra* ¶¶ 504-07, 510.

512.    Slide 20 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 58 of the Complaint.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 847; Keppel Opp'n Exh. 1, Compl. ¶ 58.)

**EIG's Response:**  Admitted.

513.    Slide 25 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 59 of the Complaint.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 852; Keppel Opp'n Exh. 1, Compl. ¶ 59.)

**EIG's Response:**  Admitted.

514.    Slide 27 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 60 of the Complaint.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 854; Keppel Opp'n Exh. 1, Compl. ¶ 60.)

**EIG's Response:**  Admitted.

515.    There is no evidence anyone at Keppel detected the alleged misrepresentations on slides 20, 25 or 27 of the Drilling Presentation or that anyone on EIG's investment committee relied on the alleged misrepresentations on slides 20, 25 or 27 of the Drilling Presentation. (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 847, 852 and 854.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 515, there is no genuine dispute of material fact that Keppel Opp'n Exh. 137 is evidence that Keppel detected the alleged misrepresentations on slides 20, 25 and 27 of the Drilling Presentation.  Choo, Tong, and YY Chow each, on Choo's direction, received the Drilling Presentation.  *See* Reply SOF *supra* ¶¶ 507, 510.  Each of Choo, Tong, and YY Chow were aware of the bribery scheme at Petrobras

(EIG SOF ¶¶ 67, 116), and that therefore the representations in the Drilling Presentation were false.  In addition, the EIG Investment Committee reviewed the final Investment Recommendation for Fund XIV, which summarized the diligence work and analysis on the Sete investment, and relied upon the fact that the Drilling Presentation did not reveal the corruption scheme.  EIG SOF ¶¶ 375, 384.  Thomas, an Investment Committee member, testified that if they had believed Petrobras or any counterparty was engaged in corruption, EIG "would immediately terminate any involvement in a potential transaction.  So it's, you know, a complete full stop if you believe that there are participants in corruption.  So, yes, there is no chance we would have proceeded."  EIG Exh. 134 at 90:21-91:5.  Talbot, another Investment Committee member, testified that if EIG knew about corruption at Sete, "it would have never made it to [the Investment] [C]ommittee."  EIG Exh. 132 at 281:4-14.  Jeff Anderson, an Investment Committee member, testified that if "someone had raised concerns about bribery," he would not have voted to approve the investment in Sete.  EIG Exh. 119 at 54:12-15,  Alvin Albe, another Investment Committee member, testified that if he had "known that Sete was involved in a bribery and kickback scheme back in 2011," he would not have voted to approve the Sete investment.  *See also* Reply SOF *supra* ¶ 510.

516.    There is no evidence anyone at Keppel knew the Drilling Presentation was shared with EIG.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 516, there is no genuine dispute of material fact that Keppel knew that the Drilling Presentation, which contains a "Cautionary Statement for US investors," was directed at potential Sete investors, including U.S. investors.  Keppel Opp'n Exh. 137 at KEPPEL00040828.  Keppel also knew that EIG was a U.S. investor and a potential investor in Sete.  EIG SOF ¶¶ 94, 96, 98-100, 102, 104-05, 109, 110-113.

ii.     October 2010 Pre-Salt Oil Rigs Project Document.

517.    The "Pre-Salt Oil Rigs Project" document described in paragraph 61 of the Complaint is DX061.  (Keppel Opp'n Exh. 68, DX061; Keppel Opp'n Exh. 1, Compl. ¶ 61.)

**EIG's Response:**  Admitted.

518.    There is no evidence that anyone at Keppel was involved in preparing or disseminating the Pre-Salt Oil Rigs Project document to any potential or actual investor.

**EIG's Response:**  Admitted.

519.    The Pre-Salt Oil Rigs Project document does not mention EIG.

**EIG's Response:**  Admitted.

520.    There is no evidence anyone at Keppel received the Pre-Salt Oil Rigs Project document.

**EIG's Response:**  Admitted.

521.    There is no evidence anyone at Keppel knew about the Pre-Salt Oil Rigs Project document.

**EIG's Response:**  Admitted.

522.    There is no evidence anyone at Keppel knew the Pre-Salt Oil Rigs Project document was shared with EIG.

**EIG's Response:**  Admitted.

iii.    September 2011 Private Placement Memo.

523.    The September 2011 Private Placement Memo described in paragraph 62 of the Complaint is DX062.  (Keppel Opp'n Exh. 69, DX062; Keppel Opp'n Exh. 1, Compl. ¶ 62.)

**EIG's Response:**  Admitted.

524.    There is no evidence that anyone at Keppel was involved in preparing or disseminating the Private Placement Memo to any potential or actual investor.

**EIG's Response:**  Admitted.

525.    The September 2011 Private Placement Memo does not mention EIG.

**EIG's Response:**  Admitted.

526.    There is no evidence anyone at Keppel received the Private Placement Memo.

**EIG's Response:**  Admitted.

527.    There is no evidence anyone at Keppel knew about the Private Placement Memo.

**EIG's Response:**  Admitted.

528.    There is no evidence anyone at Keppel knew the Private Placement Memo was shared with EIG.

**EIG's Response:**  Admitted.

d.    January 2011 Presentation

529.    On January 14, 2011, Zwi Skornicki forwarded Yew Yuen Chow a document entitled, "Drilling Rigs In Brazil Project".  (Keppel Opp'n Exh. 94, PX086 at 887.)

**EIG's Response:**  Admitted.

530.    The cover of the Drilling Rigs in Brazil Project document states that it is a "Presentation to Drilling Operators".  (Keppel Opp'n Exh. 95, PX087 at 888.)

**EIG's Response:**  Admitted.

531.    The Drilling Rigs in Brazil Project document does not mention EIG.  (Keppel Opp'n Exh. 95, PX087.)

**EIG's Response:**  Admitted.

532.    There is no evidence anyone at Keppel opened or read the Drilling Rigs in Brazil Project document.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 532, there is no genuine dispute of material fact that Keppel Opp'n Exh. 94 is evidence that Skornicki, in his capacity as Keppel's agent, read the Drilling Rigs in Brazil Project document.  Additionally, Skornicki sent the presentation to YY Chow multiple times on January 14, 2011.  At 11:42 a.m., YY Chow received the presentation from Skornicki.  *See* EIG Resp. SOF ¶ 496.  At 3:16 p.m., Skornicki sent the presentation to YY Chow again, requesting that YY Chow "[p]lease try to open." Keppel Opp'n Exh. 94 at KEPPEL00049887.  Skornicki clearly resent the presentation either because YY Chow tried to read it and was unable to do so, or because he thought it was so important for YY Chow to read the presentation that he resent it again hours later.  Furthermore, four days before January 14, Choo directed Tong and Chow that "we have to be prepared and also find out more" about Sete (EIG SOF ¶ 57; EIG Exh. 7 at KEPPEL00036103), reflecting that YY Chow likely either requested Skornicki to send the presentation or would have reviewed it upon receiving it.

533.    There is no evidence anyone at Keppel ever commented on or discussed the Drilling Rigs in Brazil Project document.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 533, there is no genuine dispute of material fact that Skornicki, in his capacity as Keppel's agent, commented on the

Drilling Rigs in Brazil Project that YY Chow should "[p]lease try to open."  Keppel Opp'n Exh. 94 at KEPPEL00049887.

534.    There is no evidence anyone at Keppel knew which other entities, if any, received the Drilling Rigs in Brazil Project document.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 534, there is no genuine dispute of material fact that the Drilling Rigs in Brazil Project presentation states it is "to Drilling Operators" and has a "Cautionary Statement for US investors."  Keppel Opp'n Exh. 94 at KEPPEL00049888-89.  The presentation itself is evidence that it was sent to U.S. investors, including U.S.-listed drilling rig operators that would potentially bid for projects with Sete.  In addition, four days before receiving the Drilling Rigs in Brazil Project presentation, YY Chow reported that "SETE Enterprise will also be inviting Drilling contractors, both international and domestic, to bid for these 28 DRUs [drilling rig units] … Successful bidders are required to take a 15% stake in the equity of the unit.  The financial structure for each DRU is 20% equity and 80% debt financing.  This will mean that the successful Drilling contractor for each unit will have to provide as equity 3% (ie. 15% of 20%) of the total project cost."  EIG Exh. 7 at KEPPEL00036103-04.

a.    October 2011 Presentation and Financial Model

535.    On October 30, 2011, Keppel employees were sent a document entitled, "Sete Brasil Participações S/A Management Presentation" and a financial model entitled "Modelo Financeiro Sete Brasil".  (Keppel Opp'n Exh. 84, PX014 at 554, 560; Keppel Opp'n Exh. 86, PX038.)

**EIG's Response:**  Admitted.

536.    There is no mention of EIG in the "Sete Brasil Participações S/A Management Presentation".  (Keppel Opp'n Exh. 84, PX014.)

**EIG's Response:**  Admitted.

537.    There is no mention of EIG in the financial model entitled "Modelo Financeiro Sete Brasil".  (Keppel Opp'n Exh. 86, PX038.)

**EIG's Response:**  Admitted.

538.    There is no evidence anyone at Keppel knew which other entities, if any, received the "Sete Brasil Participações S/A Management Presentation".

**EIG's Response:**  Admitted.

539.    There is no evidence anyone at Keppel knew which other entities, if any, received the financial model entitled "Modelo Financeiro Sete Brasil".

**EIG's Response:**  Admitted.

540.    Keppel's Rule 30(b)(6) deposition witness, Tan Leong Peng, testified that all projects require financing and Sete was no different.  (Keppel Opp'n Exh. 52, Tan I Tr. 130:09-131:07.)

**EIG's Response:**  Admitted that Tan testified that all projects require financing, and denied that Tan testified that "Sete was no different."  Keppel Moving Exh. 13 at 130:18-19. Tan testified that Keppel specifically understood that Sete would require equity financing by the time Keppel had discussions with Sete regarding a joint venture in 2011 (EIG SOF ¶¶ 73-74; EIG Exh. 133 at 131:8-15), and that Keppel also understood in 2011 that the majority of senior debt for each rig would be financed by BNDES (EIG SOF ¶ 138; EIG Exh. 133 at 256:4-9, 264:10-18).  While not material to its response, EIG notes that the citation supporting Keppel

16

Statement No. 540 (Keppel Opp'n Exh. 52) does not include the referenced testimony.  For the Court's convenience, that testimony can be found at Keppel Moving Exh. 13.

**D.**     **EIG's Due Diligence.**

541.     Petrobras had no contractual obligations to protect Sete.  (Keppel Opp'n Exh. 51, Talbot Tr. 106:19-23.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 541, there is no genuine dispute of material fact that Petrobras "in addition to its ownership in Sete, provid[ed] contractual protections to the expected returns of Sete shareholders.  These include 10 to 20-year charter contracts for drillships and various mechanisms to reset the charter payments such that equity holders maintain their returns . . . While the transaction is not without its risks, Petrobrás and the Brazilian government have gone to great lengths to create a structure that provides some assurances of a minimum return to Sete's equity owners."  Keppel Opp'n Ex. 66 at EIG_KEP_00077793.  In addition, Petrobras entered into a Cooperation Agreement to provide a mechanism to maintain a pre-agreed return to Sete investors if financing terms differed from the original assumptions.  As explained in the Investment Recommendation:

> FIP Sondas has entered into a Cooperation Contract with Petrobrás that establishes a mechanism to maintain a pre-agreed return to FIP Sondas shareholders which is equal to Brazil IPCA inflation rate + 13.6%. Essentially, if the realized financing terms differ from those envisaged in the original Base Case (i.e. leverage is lower or higher than anticipated or financing costs obtained from BNDES, the ECAs or the commercial banks are higher or lower than anticipated), then Sete Brasil and Petrobrás will sit down in good faith and renegotiate the charter day rate to achieve the desired return. This practice will work in both directions, i.e. the charter day rate will increase if financing terms are worse than anticipated and decrease if financing terms are better than anticipated.

Keppel Opp'n Exh. 66 at EIG_KEP_00077799.

17

542.    The Brazilian government had no formal obligation to protect Sete.  (Keppel Opp'n Exh. 54, Thomas Tr. 57:5-23.)

**EIG's Response:**  Denied.  As an example, the Brazilian government created and funded the Fund to Guarantee Naval Construction, which was available to reimburse the senior lenders in case of delays or cost overruns during construction.  Keppel Opp'n Exh. 66 at EIG_KEP_00077793.  *See also* Reply SOF *supra* ¶ 541.

543.    EIG's CEO, Blair Thomas, testified: "In my eyes this transaction was all about Petrobras, that Sete is just – was just an alter ego of Petrobras, that -- and that every aspect of this transaction was controlled by and dependent upon Petrobras.  To be honest, I thought that was very attractive.  I thought that's what made this interesting was that this was Petrobras." (Keppel Opp'n Exh. 60, Thomas D.C. Tr. 103:15-22.)

**EIG's Response:**  Admitted.

544.    EIG's CEO, Blair Thomas, explained EIG's view of Sete as follows: "[A]ll roads in this transaction – everything revolved around Petrobras. . . . Sete was just a securitization vehicle, that's all it was.  It wasn't a real company and what mattered is what Petrobras thought." (Keppel Opp'n Exh. 60, Thomas D.C. Tr. 228:11-20.)

**EIG's Response:**  Admitted.

545.    Kevin Corrigan testified that "the reason we wanted to go into the [Sete] transaction and that we did go into the transaction were for those reasons, that this had -- this was a AAA credit with the top notch company in Brazil, the largest private investment bank, the largest foreign bank, the most prestigious pension funds.  This was a club we wanted to enter, but Petrobras ran this show." (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 95:20-96:02.)

**EIG's Response:**  Admitted.

546.    There is no evidence that EIG analyzed the potential impact that oil price fluctuations could have on the viability of Sete.  None of EIG's due diligence memoranda or financial models identified oil prices as a risk factor or analyzed the potential impact that oil fluctuations could have on Sete.  (Keppel Opp'n Exh. 62, DX032; Keppel Opp'n Exh. 63, DX034; Keppel Opp'n Exh. 64, DX036; Keppel Opp'n Exh. 65, DX037; Keppel Opp'n Exh. 66, DX039; Keppel Opp'n Exh. 71, DX075; Keppel Opp'n Exh. 61, DX010).

**EIG's Response:**  Admitted that EIG did not specifically analyze the impact of oil fluctuations on Sete and otherwise denied.  Contrary to Keppel Statement No. 546, there is no genuine dispute of material fact that EIG considered the structure of the deal when considering the viability of Sete.  Because Petrobras was locked into long-term charter agreements with Sete regardless of market conditions in the oil market, EIG viewed the investment as being insulated from the price of oil and focused its analysis on the charter contracts and potential impacts on day rates.  EIG SOF ¶¶ 371-374; Keppel Opp'n Exh. 66 at EIG_KEP_00077795-796, 803, 805-809.

547.    Blair Thomas testified that oil prices were a "nonissue" for EIG and Simon Hayden, the analyst responsible for EIG's financial modelling, testified that oil prices "may not have been an issue [EIG] looked at in detail".  (Keppel Opp'n Exh. 54, Thomas Tr. 132:13-17; Keppel Opp'n Exh. 46, Hayden Tr. 53-23-24.)

**EIG's Response:**  Admitted.  EIG clarifies that Thomas testified that oil prices were "a nonissue" for EIG with respect to Sete, because "Sete didn't own any oil, Sete didn't sell any oil, the contract wasn't tied to oil, Sete had a take or pay contract, and so the risk on oil prices was a Petrobras risk, not a Sete risk, not an EIG risk, and so we weren't tracking oil prices

and worried about whether it was up or down at any point in time." Keppel Opp'n Exh. 54 at 132:13-25.  Hayden testified because the Sete investment involved long-term, fixed price charter agreements with Petrobras, EIG viewed the investment as protected from oil price risk.  Keppel Opp'n Ex. 46 at 53:5-25

548.     There is no evidence that EIG considered during its due diligence whether Sete's debt-financing would be sufficient to cover the costs of Sete's shipbuilding agreements in the event that the Brazilian currency depreciated in a significant way.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 548, there is no genuine dispute of material fact that EIG carefully considered issues surrounding debt-financing and matters concerning Brazilian currency.  In addition, there is no genuine dispute of material fact that most of Sete's debt-financing was to be denominated in *U.S. dollars, not Brazilian currency.* The Investment Recommendation analyzed foreign exchange risk and explained that "the transaction is heavily dollarized with the EPC Contract, senior debt and at least 50% of charter revenues being dollar denominated."  Keppel Opp'n Exh. 66 at EIG_KEP_0077807-808, 819; EIG Exh. 151 at EIG_KEP_00073915, 948-952; *see* Reply SOF *infra* ¶ 676.

549.     The AML/OFAC review was a matter of "checking all the boxes before [EIG] disburse[d] funds".  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 226:18.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 549, there is no genuine dispute of material fact that EIG engaged in an expansive due diligence review of matters that impacted on AML/OFAC, including, but not limited to, the use of a system called Complinet to search for indications of money laundering and corruption.  *See* EIG SOF ¶¶ 360-68.

550.    In June 2011, EIG ran a Complinet search of the entities involved in Sete at the time.  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105.)

**EIG's Response:**  Admitted.

551.    As of June 27, 2011, the EAS Shipyard was the only shipyard that had signed a shipbuilding contract with Sete.  (Keppel Opp'n Exh. 66, DX039 at 802.)

**EIG's Response:**  Admitted.

552.    It was publicly reported by February 2011 that the EAS Shipyard had obtained the first seven drillship contracts from Sete.  (Keppel Opp'n Exh. 92, PX062 at 007.)

**EIG's Response:**  Admitted.

553.    Camargo Correa owned 40% of the EAS Shipyard.  (Keppel Opp'n Exh. 66, DX039 at 829.)

**EIG's Response:**  Admitted.

554.    In June 2011, EIG learned that ten "employees of Camargo Correa were arrested in connection with a year-long corruption probe".  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105.)

**EIG's Response:**  Admitted.  EIG clarifies that the corruption probe was not related to Sete, that it occurred in 2009, that "no subsequent findings were identified in [EIG's] searches," and that there was "no information regarding resolution of the charges . . . on either Complinet or through independent searches."  Keppel Opp'n Ex. 122 at EIG_KEP_00258104-105.

555.    The ten employees of the EAS Shipyard, which included executives, "were alleged to have used a network of fake companies and illegal currency traders to transfer millions

of dollars abroad as part of a kickback scheme".  (Keppel Opp'n Exh. 122,

EIG_KEP_00258104-106 at 105.)

**EIG's Response:**  Admitted.  *See* Reply SOF *supra* ¶ 554.

556.    As Kevin Corrigan, EIG's Rule 30(b)(6) witness, testified, the allegations against

the owner of the EAS Shipyard were the "same or similar" types of allegations ultimately

revealed by Operation Car Wash.  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 215:18-216:1.)

**EIG's Response:**  Denied, as this quotation is taken out of context.  As Corrigan

testified, when asked whether he "consider[ed] the possibility that any of the entities involved in

the Sete project were involved in bribery when [he was] doing [his] due diligence," "we looked

at . . . all our counterparties, the investors, Petrobras, the shipbuilders and their owners, and we

took a view that it was all on the up-and-up.  We never saw any sign that there was anything

going on untoward in the structure of the transaction.  And had we known there was, the deal

would have died on the spot, but we were never informed, and I was never able to discern that

this type of activity was going on."  EIG Exh. 122 at 53:7-54: 7.  Moreover, Corrigan testified

that EIG was comforted by the fact that "Sete itself had a person on staff who was a compliance

person . . . [who] had best practices on corruption and code of conduct and all that, so to me it

looked like it was all being done very professionally."  Keppel Opp'n Exh. 56 at 56:19-25.

557.    EIG's June 2011 Complinet search also returned a red flag on Funcef related to

"funneling funds to politicians through private banks".  (Keppel Opp'n Exh. 122,

EIG_KEP_00258104-106 at 105.)

**EIG's Response:**  Denied.  The Complinet search revealed that in 2006, a congressional

inquiry asked prosecutors to bring charges against directors from 10 pension funds, including

Mr. Marques, who was an investment director at FUNCEF.  The *directors* were accused of

funneling funds to politicians through private banks.  The information uncovered about Mr.

Marques never indicated that he was arrested or penalized for corruption, and indicated that he

continued to serve as a director at FUNCEF and other companies.  Keppel Opp'n Exh. 122 at

EIG_KEP_00258105-106 .  EIG found no "further information regarding the allegations."

Keppel Opp'n Exh. 122 at EIG_KEP_00258105-06.   Corrigan and Vogel both found that this

Complinet result was not problematic. Keppel Opp'n Exh. 122 at EIG_KEP_00258104.  In

addition, FUNCEF was an equity investor in the deal; the result found was irrelevant to the Sete

deal.

558.    Funcef was a Brazilian pension fund and Sete investor at that time.  (Keppel

Opp'n Exh. 122, EIG_KEP_00258104-106 at 105.)

**EIG's Response:**   Admitted that FUNCEF was a Brazilian pension funds and an

investor in Sete and denied to the extent Keppel Statement No. 558 suggests that "at that time"

refers to the time of any red flags concerning FUNCEF.  *See* Reply SOF *supra* ¶ 557.

559.    With respect to the entities that faced corruption allegations, Simon Hayden

testified that he would have expected EIG, at minimum, to speak to the entities directly to "get to

the bottom of it."  (Keppel Opp'n Exh. 46, Hayden Tr. 139:11-12.)

**EIG's Response:**   Denied.  Contrary to Keppel Statement No. 559, there is no genuine

dispute of material fact that when Mr. Hayden was asked what he would have done "[i]f EIG had

uncovered allegations of bribery against entities involved in Sete before deciding to invest in

Sete," he understood that the question was talking about a "bribery scheme like that . . . Lavo-

Jato corruption."  Keppel Opp'n Exh. 46 at 138:14-23.  Mr. Hayden described a list of things he

would have considered doing in this hypothetical situation, including "ask them directly" if they

had access to them and that he "may take legal advice."  Keppel Opp'n Exh. 46 at 138:14-

140:19.  As part of this testimony, Mr. Hayden stated:  "I wasn't involved in Sete when all this broke."  Keppel Opp'n Exh. 46 at 140:13-14.

560.    In June 2011, Kevin Corrigan dismissed the corruption allegations against the EAS Shipyard and Funcef as irrelevant.  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 104.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 560, there is no genuine dispute of material fact that Corrigan did not simply dismiss the allegations.  Rather, Corrigan considered the results, spoke to others at EIG and found that the two Complinet results flagged were not problematic.  Keppel Opp'n Exh. 122 at EIG_KEP_00258104-105.  Corrigan noted that Camargo Corrêa was not a significant party to the transaction, explaining "the more I think of it, the less significant is the role of a 40% owner of the first systems' EPC contractor."  Keppel Opp'n Exh. 122 at EIG_KEP_00258104.  Corrigan noted that Marques was "one of twenty-two board members . . . with whom we will be sharing a board seat."  Keppel Opp'n Exh. 122 at EIG_KEP_00258105.

561.    Kevin Corrigan did not believe that the results of the June 2011 Complinet search warranted escalation to the investment committee.  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 104.)

**EIG's Response:**  Admitted.

562.    Carla Vogel decided that "the information [was] of 'low risk'" and did not believe that it rose "to the level of escalation to Blair [Thomas] nor disclosure on the Investment Rec[ommendation]".  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 104.)

**EIG's Response:**  Admitted.  EIG clarifies that Vogel reviewed the memo summarizing the Complinet results, and agreed that the articles represented "'low risk,'" noting that the allegations were "several years old," and "no subsequent findings were identified in [EIG's] searches."  Keppel Opp'n Exh. 122 at EIG_KEP_00258104-106.

563.    Thomas was not informed of the Complinet results.  (Keppel Opp'n Exh. 54, Thomas Tr. 72:8-15.)

**EIG's Response:**  Admitted.

564.    The June and September 2011 Investment Recommendations stated: "An AML/OFAC review was conducted using the *Complinet* system (an online global screening application) on controlling entities and individuals including key management personnel.  No material issues were identified and the transaction has been categorized low risk from a compliance perspective." (Keppel Opp'n Exh. 66, DX039 at 820; Keppel Opp'n Exh. 71, DX075 at 420.)

**EIG's Response:**  Admitted.

565.    In January 2012, EIG ran another Complinet search of the entities involved in Sete at the time, including Queiroz Galvao.  (Keppel Opp'n Exh. 123, EIG_KEP_00258109-112 at 110.)

**EIG's Response:**  Admitted.

566.    Queiroz Galvao owned approximately 40% of the EAS Shipyard as of January 2012.  (Keppel Opp'n Exh. 66, DX039 at 829.)

**EIG's Response:**  Admitted.

567.    The Complinet search revealed that Queiroz Galvao paid protection money to "drug lords in Rio" and that its employees were in Libya during the recent civil war negotiating with the provisional government.  (Keppel Opp'n Exh. 123, EIG_KEP_00258109-112 at 110.)

**EIG's Response:**  Admitted.

568.    EIG did not run a Complinet search on Keppel or any of its subsidiaries at any time.  (Keppel Opp'n Exh. 45, Corrigan Tr. 92:4-10.)

**EIG's Response:**  EIG is unable to respond with either "admitted" or "denied" to this Statement based on information that it knows or can readily obtain.  In addition, the cited evidence does not support this Statement:  Corrigan testified that he did not recall "one way or the other" if he "ran any [Complinet] searches related to any Keppel entities."  Keppel Opp'n Exh. 45 at 92:4-10.

569.    There is no evidence that EIG took steps other than its Complinet searches to assess corruption risks associated with its investment in Sete.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 569, EIG engaged in numerous steps to access corruption risks.  Corrigan testified that when EIG "embarked on our due diligence of Sete, we looked at the players, all our counterparties, the investors, Petrobras, the shipbuilders and their owners, and we took a view that it was all on the up-and-up.  We never saw any sign that there was anything going on untoward in the structure of the transaction."  EIG Exh. 122 at 53:18-54:3.  Indeed, EIG took a number of steps with respect to diligence on corruption: "we engaged counsel, both local and international; we canvassed our network of contacts in the market; and … we were very careful about who we chose as counterparties."  EIG Exh. 134 at 66:2-11.  *See also* EIG SOF ¶¶ 360-68.

26

**E.**     **EIG Made a Binding Commitment to Invest in Sete in June 2011.**

570.     On June 3, 2011, Kevin Corrigan sent Luiz Reis, a Lakeshore representative, an email stating that "the decision to invest in Sete Brasil has been made internally".  (Keppel Opp'n Exh. 121, EIG_KEP_00257969-971 at 969.)

**EIG's Response:**  Admitted that Corrigan wrote in a June 3, 2011 email to Luiz Reis that "the decision to invest in Sete Brasil has been made internally."  Denied that EIG had decided to invest in Sete as of June 3, 2011.  EIG's Investment Committee had not approved any investment in Sete prior to June 27, 2011 (*see* Reply SOF *infra* ¶¶ 578-79), EIG had not entered into a binding investment contract in connection with an investment in Sete until July 31, 2012 (EIG SOF ¶¶ 400-17), and EIG had not invested in Sete equity prior to August 3, 2012 (*see* EIG SOF ¶ 419).

571.     EIG's due diligence of Sete "culminated" in the preparation of the 43-page June 2011 Investment Recommendation.  (Keppel Opp'n Exh. 70, DX074; Keppel Opp'n Exh. 45, Corrigan Tr. 69:25-70:05; Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 156:08-14; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 115:09-116:13.)

**EIG's Response:**  Admitted.  EIG clarifies that Corrigan was asked at his deposition whether the June 2011 Investment Recommendation to EIG's investment committee "sort of is the culmination of the due diligence process and a recommendation to make the investment."  Keppel Opp'n Exh. 45 at 69:25-70:5.  While Corrigan agreed with that statement, in fact, EIG continued its due diligence of Sete through the funding in August 2012 and thereafter.  EIG SOF ¶¶ 170, 172, 385, 419; EIG Resp. SOF ¶ 128.

572.     On June 27, 2011, EIG's Kevin Corrigan and Simon Hayden presented the June 2011 Investment Recommendation to EIG's investment committee.  (Keppel Opp'n Exh. 70, DX074 at 322.)

**EIG's Response:**  Admitted.

573.     The June 2011 Investment Recommendation included a total of five bullet points concerning any Keppel entity in its Appendix describing "potential" shipyards.  (Keppel Opp'n Exh. 66, DX039 at 831.)

**EIG's Response:**  Admitted.

574.     Kevin Corrigan testified that the five bullets on the BrasFELS Shipyard were the "sum total of information that was presented to the investment committee regarding Brasfels".  (Keppel Opp'n Exh. 45, Corrigan Tr. 77:09-25.)

**EIG's Response:**  Admitted that Corrigan testified that the five bullets on BrasFELS were the "sum total of information … regarding Brasfels" in the Sete investment recommendation provided to EIG's investment committee for the June 27, 2011 meeting.

575.     The June 2011 Investment Recommendation listed the following risks associated with the Sete investment: construction, operations, financing, foreign exchange, future Sete investment programs and funding, change of law and environmental.  (Keppel Opp'n Exh. 66, DX039 at 805-810.)

**EIG's Response:**  Admitted.

576.     Next to all of these risks listed in the June 2011 Investment Recommendation, the support of Petrobras and/or a Brazilian government entity was listed as a mitigating factor.  (Keppel Opp'n Exh. 66, DX039 at 805-810.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 576, there is no genuine dispute of material fact that none of the mitigants refer to "the support of Petrobras and/or a Brazilian government entity."  Keppel Opp'n Exh. 66 at EIG_KEP_00077805-810.  That said, many of the risks had mitigants in the form of actions required by Petrobras or the Brazilian government.  For example, a mitigant for construction risk was the fact that "Petrobras will closely monitor construction through the Construction Management Agreement, thus reducing the likelihood of errors in construction and non-acceptance of the ship by Petrobras."  Keppel Opp'n Exh. 66 at EIG_KEP_00077805.  EIG also admits that while the support of Petrobras and the Brazilian government were not listed as mitigants to every risk in the Investment Recommendation, they were risk mitigants of the deal generally.

577.    The June 2011 Investment Recommendation did not discuss oil prices.  (Keppel Opp'n Exh. 66, DX039.)

**EIG's Response:**  Admitted.  Because Petrobras was locked into long-term charter agreements with Sete regardless of market conditions in the oil market, EIG viewed the investment as being insulated from the price of oil and focused its analysis on the charter contracts and potential impacts on day rates.  EIG SOF ¶¶ 371-374; Keppel Opp'n Exh. 66 at EIG_KEP_00077795-796, 803, 805-809.

578.    On June 27, 2011, EIG's investment committee approved an investment in Sete of up to 250 million Brazilian Reals ("BRL").  (Keppel Opp'n Exh. 70, DX074 at 322.)

**EIG's Response:**  Admitted.

579.    The decision to invest in Sete was made by EIG's investment committee.  (Keppel Opp'n Exh. 60, Thomas D.C. Tr. 117:11-14.)

29

**EIG's Response:**  Admitted.

580.    EIG's witnesses, including members of the investment committee, did not recall any discussions about corruption risk at the June 2011 meeting when EIG approved the investment.  (Keppel Opp'n Exh. 45, Corrigan Tr. 93:13-18, 111:8-13; Keppel Opp'n Exh. 54, Thomas Tr. 102:14-17; Keppel Opp'n Exh. 43, Anderson Tr. 29:11-25; Keppel Opp'n Exh. 48, Lowder Tr. 117:3-8; Keppel Opp'n Exh. 42, Albe Tr. 24:11-14.)

**EIG's Response:**  Admitted.  EIG clarifies that "[the Sete deal] would have never made it to [the Investment] [C]ommittee" if EIG knew that corruption was a risk after it conducted its diligence.  EIG Exh. 132 at 281:1-14.  Leading up to the EIG Investment Committee meeting, EIG had a "very iterative process" in which the deal team would have weekly or bi-weekly meetings with the chief investment officer as its due diligence progressed.  EIG Exh. 122 at 34:12-35:4, 72:5-18.

581.    Blair Thomas testified that at the time of the June 27, 2011 investment committee meeting, he did not know whether Keppel would ever get a shipbuilding contract from Sete. (Keppel Opp'n Exh. 54, Thomas Tr. 96:22-25.)

**EIG's Response:**  Admitted.

582.    Kevin Corrigan testified that at the time of the June 27, 2011 investment committee meeting, he did not know exactly which shipbuilders would ultimately end up building ships for Sete.  (Keppel Opp'n Exh. 45, Corrigan Tr. 74:11-75:09.)

583.    **EIG's Response:**  Admitted.  EIG clarifies that Corrigan testified that in "June of 2011, we had a list of shipyards that had been identified . . . [W]e had studied the six shipyards to get comfortable with their ability to produce future contracts granted to them."  Keppel Opp'n

30

Exh. 45 at 74:11-75:09.   As of June 27, 2011, the EAS Shipyard was the only shipyard that had

signed an EPC contract with Sete.  Keppel Opp'n Exh. 66 at EIG_KEP_00077802.

584.    The only other EPC contracts available to EIG as of June 27, 2011 were draft

EPC agreement in Sete's data room.  (Keppel Opp'n Exh. 114, EIG_KEP_00166208 at 208.)

**EIG's Response:**  Admitted.

585.    On June 29, 2011, Kevin Corrigan sent an email to other EIG employees stating

that "[t]his week we are signing a binding agreement to make the investment when they fulfill

two requirements: get the boat contract from Petrobras, and existing investors fail to exercise all

their pre-emptive rights." (Keppel Opp'n Exh. 74, DX086 at 755.)  EIG's witnesses testified that

the agreement was binding "if [certain] conditions [were] met" and that those conditions were

met.  (Keppel Opp'n Exh. 45, Corrigan Tr. 96:8-24; Keppel Opp'n Exh. 60, Thomas D.C. Tr.

160:6-15.)

**EIG's Response:**  Admitted, except denied that this was the totality of the testimony on

this subject.  The June 2011 Investment Agreement provided that "the POTENTIAL

INVESTOR," EIG, would invest up to $250 million Reais "provided that (i) the Proposal  is

entirely  or partially awarded as the Tender's winning bid regarding one or more Rigs, and (ii) in

connection with the aforementioned award SETE BRASIL requires additional equity investment

in addition to the pre-emptive rights of the Original Investors in order to pay for the investments

and expenses related to the implementation of the new rigs[.]"  EIG Exh. 19 at

EIG_KEP_0049153, § 2.1.  Article 2.1(i)(a) of that June 2011 Investment Agreement stated that

EIG also would need to execute final transaction documents in the form of an Investment

Commitment Agreement if the conditions precedent were satisfied.  EIG Exh. 19 at

EIG_KEP_0049153, § 2.1(i)(a).  As Thomas explained, as of June 2011 EIG "had not signed

31

transaction documents," and only did so in July 2012.  EIG Exh. 134 at 96:22-97:15, 102:24-103:13.  It was not until July 31, 2012 that EIG entered into an Investment Commitment Agreement, whereby it committed "to subscribe and pay for the quotas issued by the [FIP Sondas]" up to the limit of EIG's committed capital of R$509,459,990 (the "**Investment Commitment Agreement**").  EIG Exh. 62 at EIG_KEP_00044774-775, ¶ 1.1.  In addition, as Mr. Corrigan testified, "at this point in time [June 2011], we still didn't know if we had a deal," because there were certain conditions before the investment would close, including a question of how many drillships Sete would secure, and it was possible that other investors in Sete would exercise their preemptive rights.  EIG Exh. 122 at 114:8-18, 117:3-17.  While EIG "wanted to invest," they "didn't feel we were binded or bound by this.  If something had come up, we would have pulled out."  EIG Exh. 122 at 117:3-8.  Indeed, "[i]f somebody had called us [EIG] and said, Hey, did you know Ferraz is getting a 1 percent kickback from the shipyard, we would have pulled out."  EIG Exh. 122 at 199:9-199:13.

586.    On June 30, 2011, Sete, Lakeshore and EIG executed an investment agreement, under which EIG "irrevocably and irreversibly agree[d] to invest up to of R$250,000,000 (two hundred and fifty million Brazilian reais) ('Equity Commitment')".  (Keppel Opp'n Exh. 75, DX087 at 153, 160; Keppel Opp'n Exh. 74, DX086 at 755.) EIG increased its investment on September 8, 2011 by executing the First Amendment and Restatement Agreement.  (Keppel Opp'n Exh. 76, DX089.)

**EIG's Response:**  Admitted that Sete, Lakeshore and EIG executed an investment agreement on June 30, 2011, which contained the language quoted in Keppel Statement No. 586. Denied that EIG "irrevocably and irreversibly agree[d]" to invest in Sete.  The June 2011 Investment Agreement provided that "the POTENTIAL INVESTOR," EIG, would invest up to

32

$250 million Reais "provided that (i) the Proposal is entirely or partially awarded as the Tender's winning bid regarding one or more Rigs, and (ii) in connection with the aforementioned award SETE BRASIL requires additional equity investment in addition to the pre-emptive rights of the Original Investors in order to pay for the investments and expenses related to the implementation of the new rigs[.]"  EIG Exh. 19 at EIG_KEP_00049153, § 2.1.  Article 2.1(i)(a) stated that EIG would need to "execute an Investment Commitment Agreement" if the conditions precedent were satisfied.  EIG Exh. 19 at EIG_KEP_00049153, § 2.1(i)(a).  EIG executed definitive transaction documents, including the Investment Commitment Agreement that set forth the terms and conditions for the investment, on July 31, 2012.  EIG SOF ¶ 410.  Article 2.7 also referred to conditions precedent in the June 2011 Investment Agreement.  EIG Exh. 19 at EIG_KEP_00049154, § 2.7.  *See also* Reply SOF *supra* ¶ 585.

**F.    EIG's First Visit to the BrasFELS Shipyard in August 2011.**

   i.    <u>August 2011 Yard Visit.</u>

587.    The first visit to the BrasFELS Shipyard took place on or around August 4, 2011. (Keppel Opp'n Exh. 45, Corrigan Tr. 130:09-25.)

   **EIG's Response:**  Admitted that the first visit by EIG to the BrasFELS Shipyard in connection with the SETE investment took place on or around August 4, 2011.

588.    EIG initiated and planned the August 2011 visit to the BrasFELS Shipyard. (Keppel Opp'n Exh. 45, Corrigan Tr. 131:13-24, 132:22-133:03, 135:09-21.)

   **EIG's Response:**  Admitted that EIG sought to visit the BrasFELS Shipyard in August 2011 as part of a potential co-investment by CIC and its own ongoing due diligence, and denied that EIG "planned" the visit.  Keppel Opp'n Exh. 45 at 131:13-132:6.  Contrary to Keppel Statement No. 588, there is no genuine dispute of material fact that Keppel hosted the visit on the

request of Barusco of Sete, initially made on or about July 29, 2011.  EIG SOF ¶¶ 94, 96.

Keppel planned the tour and presentation that it gave EIG and CIC as part of that visit.  EIG SOF

¶¶ 97, 100, 102; EIG Exh. 23 at KEPPEL00010310; EIG Exh. 122 at 133:15-134:9, 141:4-11.

589.    Kevin Corrigan asked Sete to arrange the August 2011 visit to the BrasFELS

Shipyard.  (Keppel Opp'n Exh. 45, Corrigan Tr. 135:12-18.)

**EIG's Response:**  Admitted.

590.    Kevin Corrigan set up the August 2011 visit "to help CIC in their due diligence"

because "CIC was . . . beginning to kick the tires, as we had the previous year".  (Keppel Opp'n

Exh. 45, Corrigan Tr. 131:23-24, 132:22-24, 135:09-21.)

**EIG's Response:**  Admitted.

591.    CIC was an "important investor in EIG" funds.  (Keppel Opp'n Exh. 45, Corrigan

Tr. 134:10-15, 131:06-12.)

**EIG's Response:**  Admitted.

592.    Kevin Corrigan testified that the "sole purpose" of the August 2011 visit was

"gauging [CIC's] interest in investing in Sete Brasil".  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr.

101:02-10.)

**EIG's Response:**  Admitted that Corrigan testified that CIC's interest in investing in Sete

was the sole reason he visited the BrasFELS shipyard on August 4, 2011 specifically.  EIG

clarifies that Corrigan also testified that EIG "would have eventually wanted to visit" the

BrasFELS shipyard even absent CIC's potential investment, and that on the August 4, 2011 trip

he "would have been interested to see what was going on in connection with our own

investment."  Keppel Opp'n Exh. 45 at 131:18-132:14.

34

593.    There is no evidence of any communications between EIG and Keppel concerning the planning of the August 2011 yard visit.

**EIG's Response:**  Admitted.

594.    Zwi Skornicki emailed Kai Choong Kwok and Yew Yuen Chow at his KOM USA email address regarding the August 2011 BrasFELS Shipyard visit.  (Keppel Opp'n Exh. 134, KEPPEL00010310.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 594, there is no genuine dispute of material fact that Skornicki emailed Kai Choong Kwok at his Keppel FELS email address (kaichoong.kwok@keppelfels.com) and YY Chow at his KOM USA email address (yewyuen.chow@keppelom-usa.com) regarding the August 2011 BrasFELS visit.

595.    There is no evidence that Yew Yuen Chow read Zwi Skornicki's July 29, 2011 email or otherwise acknowledged EIG's visit.

**EIG's Response:**  Denied.  YY Chow was President of Keppel Offshore & Marine U.S.A., Inc. ("**KOM USA**") prior to June 2011, and later became Managing Director at Keppel in June 2011, Chief Operating Officer of Keppel in 2012, and Chief Executive Officer in 2014. EIG Exh. 77 at 13, 203; Keppel Opp'n Exh. 152 at A-2-3 ¶ 10; EIG Exh. 114 at 2, Interrogatory 1.a.  In 2011, YY Chow was also on the board of directors of Keppel Brasil.  EIG SOF ¶ 21. There is no evidence that Mr. Chow did not read his emails, and presumably a person of his importance within the organization *did* read emails.  In addition, on August 3, 2011, Skornicki forwarded Edmundo Santos, Kwok, and YY Chow a list from Sete of visitors for the upcoming August 4 visit to BrasFELS.  EIG Exh. 24 at KEPPEL00010458.  On the list of visitors were (i) Kevin Corrigan of EIG, (ii) two representatives of China Investment Corp, and (iii) Fabio Cunha

and Ivan Hong, who had written next to their names "Sete Brasil."  EIG Exh. 24 at
KEPPEL00010458.  YY Chow did not protest this visit.

596.    During the summer of 2011, Yew Yuen Chow was transitioning into a role as
Managing Director of Keppel.  (Keppel Opp'n Exh. 15, at 54,
https://www.kepcorp.com/en/file/investors/annual-reports/2011/2011-kcl.pdf.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 596, there is no genuine
dispute of material fact that YY Chow became Managing Director at Keppel in June 2011.  EIG
Exh. 77 at 13, 203; Keppel Opp'n Exh. 152 at A-2-3 ¶ 10; EIG Exh. 114 at 2, Interrogatory 1.a.

597.    When Yew Yuen Chow was transitioning into a role as Managing Director of
Keppel in August 2011, he was still serving as the President of Keppel's subsidiary, KOM USA,
which oversaw operations in North and South America.  (Keppel Opp'n Exh. 15, at 54,
https://www.kepcorp.com/en/file/investors/annual-reports/2011/2011-kcl.pdf.)

**EIG's Response:**  Denied.  The DPA makes clear that YY Chow was President of KOM
USA prior to June 2011, and later became Managing Director at Keppel in June 2011, Chief
Operating Officer of Keppel in 2012, and Chief Executive Officer in 2014.  EIG Exh. 77 at 13,
203; Keppel Opp'n Exh. 152 at A-2-3 ¶ 10; EIG Exh. 114 at 2, Interrogatory 1.a.  YY Chow
continued to oversee Keppel's operations in North and South America in his capacity as a
Keppel officer.  EIG Exh. 102 at KEPPEL00000158.

598.    There is no evidence of any contact between EIG and Keppel concerning Sete
prior to the August 2011 yard visit.

**EIG's Response:**  Admitted.

599.    The "focus" of EIG's August 2011 yard visit "was on the shipbuilding capacity of Brasfels".  (Keppel Opp'n Exh. 45, Corrigan Tr. 143:07-09.)

**EIG's Response:**  Admitted.

600.    Kevin Corrigan testified that representatives of BrasFELS "greeted [EIG]" and "gave a presentation" during the August 4, 2011 yard visit.  (Keppel Opp'n Exh. 45, Corrigan Tr. 133:15-21.)

**EIG's Response:**  Admitted.

601.    Kevin Corrigan testified that the presentation that was shown during the August 4, 2011 visit to the BrasFELS Shipyard "would have been an overview of their operations, and I'm sure it was touting their skills, etcetera".  (Keppel Opp'n Exh. 45, Corrigan Tr. 133:15-134:05.)

**EIG's Response:**  Admitted.

602.    Nobody who attended the August 2011 visit raised questions relating to bribery or corruption.  (Keppel Opp'n Exh. 45, Corrigan Tr. 136:14-17, 143:03-06.)

**EIG's Response:**  Admitted.

603.    There is no evidence that anyone made any false statements to EIG during the August 4, 2011 visit to the BrasFELS Shipyard.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 603, there is no genuine dispute of material fact that nobody at Keppel mentioned the "corruption scheme that already existed."  Keppel Opp'n Exh. 45 at 136:9-13.

604.   Kevin Corrigan testified that during the August 2011 yard visit "everything they said was truthful", although "you know, they didn't bring up the corruption scheme that already existed". (Keppel Opp'n Exh. 45, Corrigan Tr. 136:03-13.)

**EIG's Response:** Admitted. EIG clarifies that the presentation and tour during the August 2011 shipyard visit were misleading because Keppel did not disclose the bribery scheme to the attendees.

605.   There is no evidence that anyone from Keppel attended EIG's August 4, 2011 visit to the BrasFELS Shipyard.

**EIG's Response:** Denied.  Contrary to Keppel Statement No. 605, there is no genuine dispute of material fact that Keppel employees attended the August 4, 2011 shipyard visit. Keppel Opp'n Exh. 45 at 129:06-10.

606.   There is no evidence that anyone who attended EIG's August 4, 2011 visit to the BrasFELS Shipyard was aware of the bribery scheme.

**EIG's Response:** Admitted.  EIG clarifies that Skornicki, Kwok and YY Chow were aware of the visit and the bribery scheme.  EIG SOF ¶¶ 16-17, 96-99, 104.

607.   On August 8, 2011, Fabio Cunha, a Sete representative, emailed Edmundo Santos, a Keppel FELS Brasil employee, about the August 2011 visit to the BrasFELS Shipyard, stating that "[t]he visit was very productive and our investors and associates learned a lot about the construction of the semi-subs.  The overall impression was great and achieved the intended result- a lower perceived risk of the project." (Keppel Opp'n Exh. 97, PX095 at 126.)

**EIG's Response:** Admitted.

608.     EIG's August 2011 yard visit occurred after EIG made its binding decision to

invest in Sete.  (Keppel Opp'n Exh. 45, Corrigan Tr. 130:09-131:17.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 608, there is no genuine

dispute of material fact that, as of August 2011, the Fund XV investment committee had not yet

approved a definitive investment in Sete, and the potential investment in Sete by Fund XIV was

subject to the satisfaction in the future of certain conditions and final definitive documentation.

*See* Reply SOF *supra* ¶¶ 585-86; EIG SOF ¶ 383.


ii.     <u>August 2011 Video Shoot.</u>

609.     EIG initiated the August 2011 video shoot of the BrasFELS Shipyard.  (Keppel

Opp'n Exh. 77, DX092 at 596; Keppel Opp'n Exh. 78, DX093 at 447.)

**EIG's Response:**  Admitted.


610.     Barrington planned the August 2011 video shoot of the BrasFELS Shipyard.

(Keppel Opp'n Exh. 77, DX092 at 596; Keppel Opp'n Exh. 78, DX093 at 446-47; Keppel Opp'n

Exh. 99, BARRINGTON_ET_00000486-0495 at 494.)

**EIG's Response:**  Admitted.


611.     Barrington, on EIG's behalf, reached out to Sete to arrange the August 2011 video

shoot as part of a presentation for EIG's annual investors conference.  (Keppel Opp'n Exh. 78,

DX093 at 447.)

**EIG's Response:**  Admitted.


612.     There is no evidence of any direct communications between EIG and Keppel

about the planning of the Barrington video shoot, as the only communications show Barbara

Olsen at Barrington communicating with Keppel FELS Brasil administrative assistant, Adriana

Farah.  (Keppel Opp'n Exh. 100, BARRINGTON_ET_00000651-0654 at 652-654.)

    **EIG's Response:**  Denied.  Contrary to Keppel Statement No. 612, there is no genuine

dispute of material fact that Barrington, acting on behalf of EIG, communicated with Keppel

about the Barrington video shoot, and Kevin Corrigan of EIG was part of those communications.

EIG SOF ¶¶ 112-13; EIG Exh. 28 at KEPPEL00020435.

    613.    Yew Yuen Chow approved a request for the Sete video to be shot at the

BrasFELS Shipyard.  (Keppel Opp'n Exh. 136, KEPPEL00030275-276 at 275.)

    **EIG's Response:**  Admitted.

    614.    Yew Yuen Chow responded to the request for the Sete video to be shot at the

BrasFELS Shipyard from his KOM email address.  (Keppel Opp'n Exh. 136,

KEPPEL00030275-276 at 275.)

    **EIG's Response:**  Admitted.

    615.    As of August 2011, Yew Yuen Chow was still serving as the President of

Keppel's subsidiary, KOM USA.  (Keppel Opp'n Exh. 15, at 54,

https://www.kepcorp.com/en/file/investors/annual-reports/2011/2011-kcl.pdf.)

    **EIG's Response:**  Denied.  Per the Keppel DPA, YY Chow was President of Keppel

Offshore & Marine U.S.A., Inc. prior to June 2011, and became Managing Director at Keppel in

June 2011, Chief Operating Officer of Keppel in 2012, and Chief Executive Officer in 2014.

EIG Exh. 77 at 13, 203; Keppel Opp'n Exh. 152 at A-2-3 ¶ 10; EIG Exh. 114 at 2, Interrogatory

1.a.

616.    There is no evidence that Yew Yuen Chow took any actions with respect to the Barrington video shoot beyond approving the request or that he attended the video shoot. (Keppel Opp'n Exh. 136, KEPPEL00030275-276 at 275.)

**EIG's Response:**  Admitted.

617.    On or around August 24, 2011, Barrington's Barbara Olsen visited the BrasFELS Shipyard to record video of "general shipyard activity", which is the video shoot described in paragraphs 72 to 75 of the Complaint.  (Keppel Opp'n Exh. 1, Compl. ¶¶ 72-75; Keppel Opp'n Exh. 78, DX093 at 447; Keppel Opp'n Exh. 100, BARRINGTON_ET_00000651 at 653; Keppel Opp'n Exh. 45, Corrigan Tr. 154:25-155:10.)

**EIG's Response:**  Admitted.

618.    The Barrington video shoot was independent of EIG's due diligence for its Sete investment.  (Keppel Opp'n Exh. 45, Corrigan Tr. 157:02-08.)

**EIG's Response:**  Admitted.

619.    Kevin Corrigan testified that the Barrington video shoot was "not an extension of [EIG's] due diligence" of the Sete investment.  (Keppel Opp'n Exh. 45, Corrigan Tr. 157:02-08.)

**EIG's Response:**  Admitted.

620.    The August 2011 video shoot did not include footage of construction for Sete drillships because Keppel's subsidiary did not execute its first contract with Sete's subsidiary until December 2011.  (Keppel Opp'n Exh. 142, KEPPEL00490690-768.)

**EIG's Response:**  Admitted.

KL3 3360926.1

621.     There is no evidence that bribery or corruption risks were discussed during the planning or shooting of the Barrington video.

**EIG's Response:**  Admitted.

622.     There is no evidence that anyone from Keppel attended the Barrington video shoot in August 2011.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 622, Barrington was accompanied by Keppel's Adriana Farah.  EIG Exh. 28 at KEPPEL00020435-36.  EIG further clarifies that Skornicki coordinated the visit by EIG's agent to film the Keppel shipyard, and "liaise[d]" with the shipyard "on the details" of the visit.  EIG Exh. 27 at KEPPEL00030275.

623.     There is no evidence that anyone from any Keppel entity provided inaccurate information to Barrington or EIG in connection with the Barrington video.

**EIG's Response:**  Admitted.

624.     There is no evidence that the Barrington video mentioned any Keppel entity.

**EIG's Response:**  Admitted that there is no evidence that the audio of the Barrington video used the phrase "Keppel."  EIG clarifies that the Barrington video showed pictures of the BrasFELS shipyard.

## G.     Agreements with Zwi Skornicki.

625.     There is no evidence prior to September 2011 of any discussions concerning Zwi Skornicki's agreements in connection with Sete.  (Keppel Opp'n Exh. 139, at KEPPEL00280920.)

**EIG's Response:**  Denied.  While it is unclear what Keppel is referring to as "agreements," there is no genuine dispute of material fact that Skornicki had agreed to assist

Keppel with the Drilling Rig project prior to September 2011.  EIG SOF ¶¶ 15, 17, 26, 48, 58,

72-73, 86.

626.    The Eagle Agency Agreement and Deep Sea Services Agreement were executed

by Jeffrey Chow and Zwi Skornicki on or about August 7, 2012.  (Keppel Opp'n Exh. 144, at

KEPPEL00555190.)

**EIG's Response:**  Admitted.

627.    There is no evidence that anyone at EIG reviewed or requested to review any

shipyard's consulting or agency agreements.

**EIG's Response:**  Admitted.

628.    Jeffrey Chow, Keppel's former legal director, drafted and signed the consulting

agreements related to Sete with Zwi Skornicki.  (Keppel Opp'n Exh. 9, Chow Tr. 26:25-27:03.)

**EIG's Response:**  Admitted.

629.    Jeffrey Chow testified that the "intention" of Zwi Skornicki's contracts "wasn't to

conceal any bribe payments.  The intention was to capture in writing the agreement between the

company and [Mr. Skornicki], that he would be paid a certain commission fee for his assistance

under certain contracts." (Keppel Opp'n Exh. 9, Chow Tr. 107:25-108:07-12.)

**EIG's Response:**  Admitted that Keppel Statement No. 629 accurately quotes Jeffery

Chow's testimony, and denied that the "intention" of Skornicki's contracts "wasn't to conceal

any bribe payments."  Contrary to Keppel Statement No. 629, there is no genuine dispute of

material fact that Keppel admitted in the DPA that the contracts were "intended to facilitate bribe

payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose."  Keppel

Opp'n Exh. 152 at A-5, ¶ 21.  Jeffery Chow admitted that the contracts he drafted and signed

with Skornicki related to Sete were backdated, falsely represented the purpose of Keppel's

payments to him, falsely represented that he was complying with anti-bribery laws, and were

intended to facilitate the payment of bribes and conceal the true nature and purpose of the

payments.  EIG SOF ¶¶ 27, 219; EIG Resp. SOF ¶¶ 493-94.

630.    Jeffrey Chow testified that:

> "[P]ayment wouldn't be able to go through the company without a contract or agreement that supports it.  There needs to be some documentation. . . . In order to make payment out of the company, you need to have all the required documents there to – for the accounting people to sign off and say, okay, payment is being made.  The contract that supports it, the invoice, the bank details.  You just can't move money out of the company without a contract to support why you are moving money." (Keppel Opp'n Exh. 9, Chow Tr. 90:14-91:05.)

**EIG's Response:**  Admitted.

631.    Jeffrey Chow testified that "the contracts themselves were the documents

necessary to process the agreement between Keppel and Zwi [Skornicki]".  (Keppel Opp'n Exh.

9, Chow Tr. 142:04-07.)

**EIG's Response:**  Admitted.

**H.    EPC Contracts.**

632.    On December 16, 2011, Keppel's subsidiary, Fernvale, executed its first EPC

contract with Sete's special purpose vehicle, Urca Drilling B.V.  (Keppel Opp'n Exh. 93,

PX070.)

**EIG's Response:**  Admitted.

633.    The December 16, 2011 EPC Contract was the first shipbuilding contract between

any Keppel entity and Sete.  (Keppel Opp'n Exh. 93, PX070.)

**EIG's Response:**  Admitted.

634.    EIG was not a party to the December 16, 2011 EPC Contract.  (Keppel Opp'n Exh. 93, PX070.)

**EIG's Response:**  Admitted.

## I.    Keppel's Lack of Knowledge of Sete's Use of Funds.

635.    A financial analysis prepared by Lakeshore in September 2011 states that EIG had committed to contribute 7.8% of Sete's equity funding.  (Keppel Opp'n Exh. 102, EIG_KEP_00048709-713 at 713.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 635, there is no genuine dispute of material fact that in September 2011, a representative from Lakeshore provided certain equity scenarios for another potential investor "in the case of 21 new drillships and 14 new drillships."  Keppel Opp'n Exh. 102 at EIG_KEP_00048710.  Based on a long list of assumptions, including estimated preemptive rights from existing shareholders, the analysis suggested that EIG would be a "second close investor" with a percentage of 7.8%.  Keppel Opp'n Exh. 102 at EIG_KEP_00048710-714.

636.    The September 19, 2011 exchanges between Jeffrey Chow and Nora Marsuki are the earliest communications concerning improper payments to Zwi Skornicki's companies in connection with Sete.  (Keppel Opp'n Exh. 139, KEPPEL00280920 and Keppel Opp'n Exh. 138, KEPPEL00045696.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 636, there is no genuine dispute of material fact that on July 5, 2011, Tan instructed a Keppel employee to adjust a cost estimate for a DSS38E semisubmersible rig for Sete to include a 2% commission for Skornicki.  EIG Exh. 133 at 166:8-167:15.  In addition, Skornicki had been an agent of Keppel since 2000.  Keppel Opp'n Exh. 152 at A-2 ¶ 7; EIG Exh. 114 at 2, Interrogatory 1.a.  Jeffery Chow testified

that "[b]y no later than 2008" he "realized that Keppel was overpaying the agent [Skornicki], sometimes by millions of dollars, so that the agent could pay bribes to individuals who could help Keppel Offshore Marine do[] business with Petrobras."  EIG Exh. 121 at 26:7-27:19.  In June 2010, Keppel submitted bids to PNBV to construct drilling rigs for the Rigs Project with the understanding that it would pay bribes and/or kickbacks on any contracts it won—undoubtedly through Skornicki like the other Petrobras deals—and those rigs were later transferred to Sete. EIG SOF ¶¶ 43-47.  No later than December 4, 2010, employees at Keppel, including Tong, YY Chow, Kwok, Tommy Sam, and others learned from Skornicki "after his discussion with Barusco and Duque" that Petrobras would negotiate the first seven drill ships with EAS and "award them the bid," and that Petrobras would set up a new company – Sete – that would "conduct direct negotiation[s] with the other bidders" for the remaining 21 drilling rig units, including Keppel.  EIG Exh. 4 at KEPPEL00619705-06.  Undoubtedly, there were conversations about payments to Skornicki in connection with Sete at the time Skornicki brought this project to Keppel's attention.

637.    There is no evidence that Keppel knew how any corrupt payments would be distributed to third parties after payments were disbursed to Zwi Skornicki's companies.

**EIG's Response:**  Denied.  Keppel employees understood that a portion of the $20.97 million wired by Fernvale to Deep Sea Oil was intended to effectuate bribe payments to Brazilian officials.  EIG Exh. 113 at 7-14, RFA 1-10.  Keppel also knew that one of the bribe recipients was Pedro Barusco, the COO of Sete, who made the bribe demand and negotiated the bribe amount with Keppel.  Keppel Opp'n Exh. 152 at A-14-15 ¶¶ 71-72; EIG Exh. 114 at 2, Interrogatory 1.a.

638.     There is no evidence that EIG's 7.8% share of Sete's equity funding was a necessary component of the bribery scheme.

**EIG's Response:**   Denied.  The $20.97 million that Fernvale wired to Deep Sea Oil at Delta Bank originated directly from payments made by Sete under its EPC contracts with Fernvale, and the amounts wired to Deep Sea Oil were determined from the amounts that Fernvale received from Sete.  EIG Exh. 133 at 396:4-8; EIG Exh. 121 at 139:15-21.  Each of the payments by Fernvale to Deep Sea Oil were approved by Tong.  EIG Exh. 133 at 391:22-392:7, 407:2-14.  Keppel employees understood that a portion of the $20.97 million wired by Fernvale to Deep Sea Oil was intended to effectuate bribe payments to Brazilian officials.  EIG Exh. 113 at 7-14, RFA 1-10.

639.     Keppel understood that "projects all require financing" and that Sete was no different.  (Keppel Opp'n Exh. 53, Tan Tr. 305:09-16.)

**EIG's Response:**   Admitted that Tan testified that all projects require financing, and denied that Tan testified that "Sete was no different."  Keppel Moving Exh. 13 at 130:18-19. Tan testified that Keppel specifically understood that Sete would require equity financing by the time Keppel had discussions with Sete regarding a joint venture in 2011 (EIG SOF ¶¶ 73-74; EIG Exh. 133 at 131:8-15), and that Keppel also understood in 2011 that the majority of senior debt for each rig would be financed by BNDES (EIG SOF ¶ 138; EIG Exh. 133 at 256:4-9, 264:10-18).

640.     There is no evidence Keppel knew which funds Sete used to pay the shipyards.

**EIG's Response:**   Denied.  *See* Reply SOF *supra* ¶¶ 637-38.

**J.      EIG's Second Visit to the BrasFELS Shipyard in March 2012.**

641.    EIG initiated and planned the March 2012 visit to the BrasFELS Shipyard. (Keppel Opp'n Exh. 79, DX095 at 469; Keppel Opp'n Exh. 119, EIG_KEP_00251523-529 at 528.)

**EIG's Response:**  Admitted that EIG requested the visit, through Sete and/or its financial advisors, as part of its due diligence and a potential co-investment by ADICO, and that EIG employees and/or Sete's financial advisors planned the logistics for the EIG employees to travel to the BrasFELS shipyard, and denied that EIG planned the March 2012 visit.  Keppel Opp'n Exh. 79 at EIG_KEP_00121469; Keppel Opp'n Exh. 119 at EIG_KEP_00251523-28; EIG Resp. SOF ¶ 128  Contrary to Keppel Statement No. 641, there is no genuine dispute of material fact that Keppel and/or its subsidiaries planned the visit, including a tour, presentation, lunch, and conversations with employees of Keppel and/or its subsidiaries.  EIG SOF ¶¶ 166-67, 172-73; EIG Exh. 49 at KEPPEL00020565; EIG Exh. 122 at 160:4-162:19, 166:6-18, 166:23-167:7; EIG Exh. 124 at 78:15-18, 82:14-20, 83:11-87:25.

642.    There is no evidence of any communications between EIG and Keppel concerning the planning of the March 2012 yard visit.

**EIG's Response:**  Admitted.

643.    The March 2012 visit to the BrasFELS Shipyard was part of ADICO's due diligence of Sete.  (Keppel Opp'n Exh. 45, Corrigan Tr. 160:17-22; Keppel Opp'n Exh. 58, Hayden D.C. Tr. 304:21-305:01; Keppel Opp'n Exh. 118, EIG_KEP_00251502-508 at 505)

**EIG's Response:**  Admitted.

644.    ADICO was an investor of EIG.  (Keppel Opp'n Exh. 45, Corrigan Tr. 160:23-161:05.)

**EIG's Response:**  Admitted.

645.    Kevin Corrigan testified that the March 2012 visit "was a mirror of the CIC's visit a few months earlier", and that the purpose was to present to ADICO the possibility of investing in Sete.  (Keppel Opp'n Exh. 45, Corrigan Tr. 160:12-22.)

**EIG's Response:**  Admitted that Corrigan testified that the March 2012 visit "was a mirror of the CIC's visit a few months earlier," and that *a* purpose of the visit was for ADICO to conduct due diligence for a potential investment in Sete.  EIG clarifies that the March 2012 visit also was part of EIG's due diligence of Sete, which continued until EIG funded its investment in Sete, after which EIG monitored its investment.  EIG SOF ¶ 385; EIG Exh. 124 56:21-25.

646.    The focus of the March 2012 visit to the BrasFELS Shipyard was the shipbuilding capacity at BrasFELS.  (Keppel Opp'n Exh. 45, Corrigan Tr. 166:14-18; Keppel Opp'n Exh. 46, Hayden Tr. 84:21-25.)

**EIG's Response:**  Admitted.

647.    There is no evidence that bribery or corruption were discussed during the March 2012 yard visit.

**EIG's Response:**  Admitted.

648.    Kevin Corrigan testified that he could not recall any discussions concerning corruption during the March 2012 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 45, Corrigan Tr. 167:08-16.)

**EIG's Response:**  Admitted.

649.     Simon Hayden testified that he could not recall any specific questions during the March 2012 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 58, Hayden D.C. Tr. 305:07-09; Keppel Opp'n Exh. 46, Hayden Tr. 86:04-08.)

**EIG's Response:**  Admitted that Hayden could not remember the exact questions he asked during the March 2012 shipyard visit.  EIG clarifies that Hayden testified that he "would have" asked questions at the BrasFELS Shipyard, but just did not remember what questions he asked.  Keppel Opp'n Exh. 46 at 86:04-08.

650.     Hoshrav Patel testified that he had no recollection of the March 2012 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 50, Patel Tr. 84:14-88:14; Keppel Opp'n Exh. 118, EIG_KEP_00251502-508 at 505.)

**EIG's Response:**  Admitted.

651.     There is no evidence that anyone from any Keppel entity provided any inaccurate information in connection with the March 2012 visit to the BrasFELS Shipyard.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 651, there is no genuine dispute of material fact that Keppel met with, and made a presentation to, EIG and ADICO during the March 2012 visit.  EIG SOF ¶¶ 170, 173.  The presentation and information provided by Keppel was misleading in light of the fact that it did not disclose the bribery scheme.  *See* Reply SOF *supra* ¶ 647.

652.     Kevin Corrigan testified that there was no misleading information provided concerning the shipbuilding capacity of BrasFELS during the March 2012 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 45, Corrigan Tr. 168:15-20.)

**EIG's Response:**  Admitted.  EIG clarifies that Corrigan's testimony was limited to misleading information provided by Keppel concerning its *shipbuilding capacity*, and that Corrigan continued his answer by stating that there was misleading information "[c]oncerning the *overall transaction*."  Keppel Opp'n Exh. 45 at 168:15-22 (emphasis added).

653.    Kevin Corrigan testified that he could not recall anyone else attending the yard tour in March 2012 beyond the people at BrasFELS other than Ivan Hong, who might have attended as Sete's advisor at Lakeshore.  (Keppel Opp'n Exh. 45, Corrigan Tr. 165:12-166:02.)

**EIG's Response:**  Admitted.  EIG clarifies that earlier in his testimony, Mr. Corrigan testified that other EIG personnel and a representative from ADICO attended the March 2012 shipyard visit.  Keppel Opp'n Exh. 45 at 162:11-19.

654.    There is no evidence that anyone from Keppel attended the March 2012 visit to the BrasFELS Shipyard or that anyone from Keppel delivered a presentation to EIG.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 654, there is no genuine dispute of material fact that Keppel met with, and made a presentation to, EIG and ADICO during the March 2012 visit.  EIG SOF ¶¶ 170, 173.  The presentation and information provided by Keppel was misleading in light of the fact that it did not disclose the bribery scheme.  *See* Reply SOF *supra* ¶ 647.

## K.    EIG's Third Visit to the BrasFELS Shipyard in June 2013.

655.    Sete arranged the June 2013 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 106, EIG_KEP_00095123-128 at 128.)

**EIG's Response:**  Admitted.

656.    There is no evidence of any communications between EIG and Keppel concerning the planning of the June 2013 visit to the BrasFELS Shipyard.

**EIG's Response:**  Admitted.

657.    Kevin Corrigan testified that the purpose of the June 2013 visit to the BrasFELS Shipyard was "to see the progress of the shipyards" and that the focus of the visit was the shipbuilding capacity of the BrasFELS Shipyard.  (Keppel Opp'n Exh. 45, Corrigan Tr. 169:08-22, Corrigan Tr. 174:13-21.)

**EIG's Response:**  Admitted.

658.    Sete stated that "[t]he shipyards should be represented by their presidents or directors" during the June 2013 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 146, KEPPEL00589219-229 at 220.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 658, Sete stated that "[t]he shipyards should be represented by their presidents or directors" during the lenders meeting in June 2013, not in connection with the June 2013 visit to the BrasFELS shipyard.  EIG Exh. 72 at KEPPEL00589220.

659.    Sete requested that Kai Choong Kwok, the President of the BrasFELS Shipyard, deliver a presentation.  (Keppel Opp'n Exh. 146, KEPPEL00589219-229 at 220.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 659, Petrobras (not Sete) requested that Kai Choong Kwok, the President of the BrasFELS Shipyard, deliver a presentation at the all lenders meeting in June 2013.  EIG Exh. 72 at KEPPEL00589220.

660.    Gilberto Israel and Bruno Ng Wei Ming, the people who prepared the presentation shown at the "Sete's All Lenders' presentation meeting" were associated with

52

Keppel's subsidiaries rather than Keppel.  (Keppel Opp'n Exh. 146, KEPPEL00589219-229 at 219.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 660, Kwok presented at the all lenders meeting, and also asked Gilberto Israel and Bruno Ng Wei Ming to "make" a presentation.  EIG Exh. 73 at KEPPEL00008303; EIG Exh. 72 at KEPPEL00589219.  Gilberto Israel was identified by Keppel in its annual reports as among its "Key Personnel," and Bruno Ng was part of the organization of Fernvale, Keppel's special purpose entity for the Sete project.  EIG Exh. 147; EIG Exh. 152 at KEPPEL00000001-04.

661.    Kevin Corrigan testified that he could not recall anyone raising the subject of corruption risks during the June 2013 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 45, Corrigan Tr. 175:07-13.)

**EIG's Response:**  Admitted.

662.    There is no evidence that anyone from any Keppel entity provided any inaccurate information in connection with the June 2013 visit to the BrasFELS Shipyard.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 662, there is no genuine dispute of material fact that Keppel and/or its subsidiary gave a presentation and tour after which "the visitors left in awe" of Keppel's rig construction work.  EIG SOF ¶¶ 260-61; EIG Exh. 71 at KEPPEL00457152.  The presentation and tour were misleading because Keppel did not disclose the bribery scheme to the Sete investors.

663.    There is no evidence that anyone from Keppel, as opposed to its subsidiaries, attended the June 2013 visit to the BrasFELS Shipyard.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 663, there is no genuine dispute of material fact that Bruno Ng attended EIG's June 2013 visit to BrasFELS, and that he was the deputy director of Keppel's special purpose entity Fernvale.  EIG Exh. 71 at KEPPEL00457152.

## L.    Sete Had Difficulty Obtaining Financing Prior to the Disclosure of the Bribery Scheme.

664.    In June 2011, Sete was expected to receive 45% of its long-term financing from BNDES, 20% from foreign export credit agencies, and 15% from commercial banks.  (Keppel Opp'n Exh. 66, DX039 at 811.)

**EIG's Response:**  Admitted.  EIG clarifies that, at this same time, it understood that the remaining 20% would be in the form of equity.  Keppel Opp'n Exh. 66 at EIG_KEP_00077811.

665.    On January 14, 2015, Bloomberg News reported: "BNDES postponed first the approval and then the disbursement [of a loan to Sete] several times since late 2012 because of a lack of guarantees, as well as setbacks on international financing and on Sete Brasil contracts with rig operators".  (Keppel Opp'n Exh. 27, "Petrobras Rig-Builder Said Close to Receiving Delayed BNDES Loan", Bloomberg, January 14, 2015.)

**EIG's Response:**  EIG responds that Keppel Statement No. 665 is inadmissible hearsay. Subject to its objection, EIG admits the quoted language is contained in the Bloomberg News Article.  That January 14, 2015 article also states:

> *Brazil's BNDES development bank is expected to authorize as soon as next week the first disbursement of a 10 billion-real ($3.8 billion) loan to Sete Brasil Participacoes SA*, ending a two-year delay that threatened to send the oil-rig supplier into default, two people with direct knowledge of the matter said.  *The BNDES probably will sign the contract to disburse the first tranche of 3.5 billion reais, with Sete Brasil receiving the cash in one or two months*, the people said, asking not to be named because the discussions are private. . . . . *BNDES insisted*

*that a "no-corruption clause" be included in the loan contracts* before agreeing to release the money, two people said, adding that the loan could be recalled early or canceled if any irregularities were found. Sete Brasil said in an emailed message to Bloomberg on December 1 that it opened an internal investigation on contracts with Petrobras.  The announcement came after a former director confessed he took bribes while working previously as an executive at Petrobras.  Petrobras is embroiled in a corruption scandal in which builders and contractors are accused of paying kickbacks in exchange for deals with the state-run oil producer.  *Sete Brasil has not been named in the investigation* led by federal police in Curitiba, Brazil.

Keppel Opp'n Exh. 27 (emphasis added).

666.     Lenders that extended bridge financing to Sete included Banco Itaú S.A., Banco Bradesco S.A., Banco Votorantim S.A., Banco do Brasil S.A., Banco Santander S.A., Sumitomo Mitsui Banking, The Bank of Nova Scotia, Standard Charter Bank, Bradesco BBI, Citibank and Caixa Economica Federal.  (Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 636.)

**EIG's Response:**  Admitted.  For the Court's clarity, the referenced document (Keppel Opp'n Exh. 128) does not support the full statement, but the Statement is nevertheless true.

667.     In January 2012, EIG provided a $100 million bridge loan to Sete.  (Keppel Opp'n Exh. 54, Thomas Tr. 109:21-111:03.)

**EIG's Response:**  Admitted.

668.     In June 2013, BNDES gave conditional approval for a 1.3 billion BRL loan for Sete, which was scheduled to close in September 2013.  (Keppel Opp'n Exh. 105, EIG_KEP_00094179-182 at 180.)

**EIG's Response:**  Denied.  In June 2013, BNDES's board of directors approved a 1.3 billion BRL convertible debenture ("**DCA**") from BNDESPAR, a subsidiary of BNDES, with "[d]isbursement expected by" September 2013.  The BNDESPAR DCA was unrelated to long-

55

term financing from BNDES and was categorized as equity, not debt financing. Keppel Opp'n Exh. 105 at EIG_KEP_0094180; Keppel Opp'n Exh. 81 at EIG_KEP_00258698.

669.    BNDES postponed its June 2013 commitment after the existing equity shareholders refused to agree to BNDES's demands that they invest additional capital to lower Sete's debt-to-equity ratio from around 80:20 to 75:25. (Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 635; Keppel Opp'n Exh. 126, EIG_KEP_00259344-345 at 345.)

**EIG's Response:** Denied. Keppel Statement No. 669 conflates financing from BNDESPAR with financing from BNDES. The "June 2013 commitment" that Keppel Statement No. 699 appears to refer to was a DCA from BNDESPAR, which was unrelated to long-term financing from BNDES. The BNDESPAR DCA was treated as equity, not debt financing. *See* Reply SOF *supra* ¶ 668.

670.    In September and October 2014, Sete's "difficult financial situation started to show up [i]n national newspapers". (Keppel Opp'n Exh. 131, EIG_KEP_00266976-981 at 977.)

**EIG's Response:** Denied to the extent that Keppel Statement No. 670 suggests that "difficult" was part of the quotation in the cited document. The cited document states under the heading "September – October 2014" that "Sete Brasil financial situation start to show up on national newspapers" [sic]. Keppel Opp'n Exh. 131 at EIG_KEP_00266977.

671.    On January 14, 2015, Bloomberg reported that "[Sete] is already late in paying shipyards its contracted to build oil rigs." (Keppel Opp'n Exh. 27, "Petrobras Rig-Builder Said Close to Receiving Delayed BNDES Loan", Bloomberg, January 5, 2015.)

**EIG's Response:**  EIG responds that Keppel Statement No. 671 is inadmissible hearsay. Subject to its objection, EIG admits the quoted language is contained in the Bloomberg News Article.  For context of the article, see Reply SOF *supra* ¶ 665.

672.    BNDES's February 2015 postponement of its financing commitment to Sete represented at least the fourth time BNDES had postponed its plans to finance Sete.  (Keppel Opp'n Exh. 54, Thomas Tr. 115:03-06; 124:16-125:9; 130:14-18; 157:24-159:22; Keppel Opp'n Exh. 81, at DX107 at 695; Keppel Opp'n Exh. 27, "Petrobras Rig-Builder Said Close to Receiving Delayed BNDES Loan," Bloomberg, January 14, 2015.)

**EIG's Response:**  EIG objects to Keppel Statement No. 672 on the ground that the phrase "plans to finance Sete" is vague and overbroad.  Subject to its objection, EIG denies this Statement to the extent the phrase refers to scheduled closing dates.  The only scheduled closing date was February 6, 2015.  EIG SOF ¶¶ 268, 457, 464, 473, 478.  EIG further notes that the referenced exhibits do not provide support for Keppel Statement No. 672.

## M.    By June 2014, Sete Was on the Brink of Collapse Due to Steep Declines in the Price of Oil and the Value of the Brazilian Currency.

673.    By February 2014, BNDES and other lenders had demanded that Sete raise another 2 billion BRL in equity before they were willing to provide long-term financing, due to the declining value of the BRL.  (Keppel Opp'n Exh. 127, EIG_KEP_00260519-533 at 521.)

**EIG's Response:**  Admitted in part and denied in part.  In or around February 2014, Sete requested another 2 billion BRL in equity in order to bring its debt-to-equity ratio in line with the 75% debt / 25% equity ratio potential lenders were requiring and to account for the devaluation of the Brazilian Real relative to the US Dollar over the previous eighteen months.  EIG further

clarifies that most of Sete's financing was denominated in U.S. dollars. Keppel Opp'n Exh. 127, EIG_KEP_00260519-533 at 521; Reply SOF *infra* ¶ 676.

674. On February 1, 2014, Kevin Corrigan sent an email to Blair Thomas stating that there had been a "devaluation" of Brazilian currency "over the past 18 months". (Keppel Opp'n Exh. 72, DX077 at 521.)

**EIG's Response:** Admitted.

675. The Brazilian currency had depreciated significantly from June 2011 when USD $100 could buy 159 BRL to January 2014 when USD $100 could buy 240 BRL. (Keppel Opp'n Exh. 11, Federal Reserve, "Foreign Exchange Rates"; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 238:11-21.) The devaluation of Brazilian currency harmed Sete. (Keppel Opp'n Exh. 66, DX058 at 076; Keppel Opp'n Exh. 60, Thomas Petrobras Tr. 241:06-19.)

**EIG's Response:** Admitted that the Brazilian currency had depreciated between June 2011 and June 2014, and denied that Sete was "harmed" by the devaluation of currency. Contrary to Keppel Statement No. 675, there is no genuine dispute of material fact that only a small percentage of the charter revenue was denominated in Reais (most was in U.S. dollars), and any foreign exchange impact was short-term. Keppel Opp'n Exh. 66 at EIG_KEP_0007808.

676. Sete's financing commitments were denominated in Brazilian currency. (Keppel Opp'n Exh. 66, DX058 at 076; Keppel Opp'n Exh. 66, DX039 at 800.)

**EIG's Response:** Denied. Contrary to Keppel Statement No. 676, there is no genuine dispute of material fact that 75-80% of Sete's financing was to be debt financing and that most of that financing, and most of the planned financing as a whole, was to be denominated in U.S. dollars. Sete was "heavily dollarized," with the "senior debt," including BNDES financing,

denominated in U.S. dollars.  EIG Exh. 1 at EIG00091856/EIG_KEP_00166339; EIG Exh. 80 at

EIG_KEP_00208071; Keppel Opp'n Exh. 66 at EIG_KEP_00077808.  The citations by Keppel

concern equity financing only.  Keppel Opp'n Exh. 66 at EIG_KEP_00077800 ("[e]quity

commitments are denominated in BRL"); Keppel Opp'n Exh. 67 at EIG_KEP_00290076

("equity commitments are denominated in Reais").

677.    Sete's construction contracts were in USD.  (Keppel Opp'n Exh. 63, DX034 at

361.)

**EIG's Response:**  Admitted.

678.    Because of the "mismatch" between the currencies used in Sete's financing and

construction contracts, "the contracts priced in dollars became more expensive" and the

anticipated debt was no longer sufficient to cover the USD cost of drillship construction.

(Keppel Opp'n Exh. 60, Thomas Petrobras Tr. 239:22-241:10.)

**EIG's Response:**  Admitted only to the extent that in the cited testimony, Thomas

testified that there was a "mismatch between their capital, which was a combination of dollars

and Reais, and their contracts and the -- the Reais portion of their contracts," and agreed that "the

contracts priced in dollars became more expensive" as BRL declined.  Otherwise denied, as

Thomas did not testify that "the anticipated debt was no longer sufficient to cover the USD cost

of drillship construction," and further denied to the extent that Keppel suggests that Sete's debt

was denominated in BRL, when there is no genuine dispute of material fact that Sete's debt was

largely denominated in U.S. dollars.  *See* Reply SOF *supra* ¶ 676.

679.    In February 2014, EIG's chief investor officer, Kurt Talbot, stated:  "If anything

our track record is overwhelmingly throwing good money after bad.  FX is overwhelming

everything here (that's why they are R$ 2 billion [BRL] short).  The fundamentals for Brazil are

going the wrong direction and all we should be concerned about is US$ returns. . . . FX is killing

us, and performance is less than certain.  This is a non-yielding, minority common equity

investment, not exactly the sweet spot for the fund." (Keppel Opp'n Exh. 127,

EIG_KEP_00260519-533 at 519.)

**EIG's Response:**  Admitted and clarifies that the complete quotation from the email

states:

> If anything our tract [sic] record is overwhelmingly throwing good money after
> bad. FX is overwhelming everything here (that's why they are R$ 2 billion short).
> The fundamentals for Brazil are going the wrong direction and all we should be
> concerned about is US$ returns.  Sub salt is going much slower and costing more.
> We don't know if Sete can deliver or not.  *I'm happy with what we have, but can't
> get excited about taking more.*

Keppel Opp'n Exh. 127 at EIG_KEP_00260519 (emphasis added).  EIG further clarifies that

Thomas responded to Talbot, "Completely disagree."  Keppel Opp'n Exh. 127 at

EIG_KEP_00260519.

680.    By June 2014, BNDES and Sete's other lenders' demands for additional equity

increased from 2 to 3 billion BRL.  (Keppel Opp'n Exh. 80, DX096 at 151.)

**EIG's Response:**  Admitted in part and denied in part.  In or about June 2014, Sete

indicated that it would begin looking for R$ 3 billion in new equity for the project.  Keppel

Opp'n Exh. 80, DX096 at EIG_KEP_00258151.

681.    EIG recognized in a June 24, 2014 email that Sete's situation was "dire" and that

"many of the drillships, particularly the early ones, now face some serious delays in delivery and

commissioning on behalf of Petrobras".  In the same email, EIG stated that "the company will

now begin looking for the R $ 3 billion of new equity needed to complete the project, and no one believes they will be able to go to market". (Keppel Opp'n Exh. 80, DX096 at 151.)

**EIG's Response:**  Admitted.  EIG clarifies that Corrigan also stated in the same email: "I can't blame Carneiro for doing this, and I would probably have done the same thing in his shoes:  my read is that much of the above is true, and will be an ongoing challenge, but clearly he's trying to pain the bleakest picture possible to lower all our expectations, and hopefully, be able to show some positive results going forward."  Keppel Opp'n Exh. 80, DX096 at EIG_KEP_00258151.

682.    It also emerged in June 2014 that one of the five shipyards building drillships for Sete was bankrupt, which EIG recognized "could seriously impact the delivery schedule on the three drillships under their responsibility".  (Keppel Opp'n Exh. 80, DX096 at 151.)

**EIG's Response:**  Admitted, except clarifies that the cited document states that a shipyard was "about to go bankrupt," not that it was bankrupt.  Keppel Opp'n Exh. 80, DX096 at EIG_KEP_00258151.

683.    Construction delays resulted in additional capital expenditure requirements of about $500 million (USD).  (Keppel Opp'n Exh. 80, DX096 at 150.)

**EIG's Response:**  Admitted.

684.    As Thomas testified, "[t]he overall oil and gas industry experienced significant volatility in 2014 and so the sentiment about the entire industry was down." (Keppel Opp'n Exh. 54, Thomas Tr. 59:18-21.)

**EIG's Response:**  Admitted.  EIG clarifies that Thomas also testified that oil prices were "a nonissue" for EIG with respect to Sete, because "Sete didn't own any oil, Sete didn't sell any

61

oil, the contract wasn't tied to oil, Sete had a take or pay contract, and so the risk on oil prices was a Petrobras risk, not a Sete risk, not an EIG risk, and so we weren't tracking oil prices and worried about whether it was up or down at any point in time."  EIG Exh. 134 at 132:13-25.

685.    It was reported that the decline in oil prices that began in the summer of 2014 resulted in large losses for "companies that operate offshore rigs on behalf of oil producers." (Keppel Opp'n Exh. 25, "Offshore rig operators reel from oil price rout," Financial Times, April 24, 2016.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because Petrobras was locked into long-term charter agreements with Sete regardless of market conditions in the oil market, and thus the average price of oil between 2006 and 2011 is irrelevant here.  Keppel Opp'n Exh. 66 at EIG_KEP_00077792; EIG Exh. 153 at EIG_KEP_00235015, EIG_KEP_00235020.  EIG further responds that the statement is inadmissible hearsay.  Subject to its objections, EIG admits that the quoted words are in the referenced article.  That article also states:  "Not every company is turning away from offshore oil and gas . . . Shell said the potential for growth in deep water off Brazil was a central reason for its £35bn takeover of BG Group."  Keppel Opp'n Exh. 25 at 5.

**N.    By November 2014, Sete Had Stopped Paying the Shipyards.**

686.    In September 2014, BNDES further delayed its financing until November 2014 resulting in Sete's inability to pay the shipyards building the drillships, including the BrasFELS Shipyard.  (Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 635.)

**EIG's Response:**  Admitted.

687.     To stay solvent, Sete issued an emergency capital call in September 2014, which EIG's investment committee approved.  (Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 637; Keppel Opp'n Exh. 54, Thomas Tr. 127:12-132:03; Keppel Opp'n Exh. 110, EIG_KEP_00135540-544 at 540.)

**EIG's Response:**  Admitted, except denied that the capital call was issued by Sete "to stay solvent."  Contrary to Keppel Statement No. 687, there is no genuine dispute of material fact that the capital call was made in accordance with the terms of the definitive transaction documentation to help the company with liquidity until the long-term financing was disbursed. Keppel Opp'n Exh. 128 at EIG_KEP_00260637; EIG SOF ¶¶ 413-14.

688.     In November 2014, Sete stopped paying the shipyards building the drillships. (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 868.)

**EIG's Response:**  Admitted.

689.     In November 2014, Sete also stopped paying the BrasFELS Shipyard and, therefore, Keppel was monitoring Sete's financing in 2014 and 2015.  (Keppel Opp'n Exh. 145, KEPPEL00567865-866 at 865; Keppel Opp'n Exh. 47; Hua Tr. 18:6-11; Keppel Opp'n Exh. 53, Tan Tr. 343:10-14.)

**EIG's Response:**  Admitted.

690.     In December 2014, BNDES "informed [Sete that] new deteriorated conditions will require $703M of additional equity, decreasing leverage to 63%." (Keppel Opp'n Exh. 111, EIG_KEP_00140086-088 at 086.)

**EIG's Response:**  Admitted.

691.    In its financial modeling as of March 2014, EIG reported an expected IRR of 12.9%.  (Keppel Opp'n Exh. 113, EIG_KEP_00156130 at tab "QR Front" cell E19.)

**EIG's Response:**  Admitted.

692.    As of September 2014, EIG reported an expected IRR of 10.6%.  (Keppel Opp'n Exh. 115, EIG_KEP_00210300 at tab "QR Front" cell E19.)

**EIG's Response:**  Admitted.

693.    As of December 2014, EIG reported an expected IRR of 1.1%.  (Keppel Opp'n Exh. 116, EIG_KEP_00210425 at tab "QR Front" cell E19.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 693, there is no genuine dispute of material fact that as of December 2014, EIG reported an expected IRR of 9.7%.  EIG Exh. 81 at EIG_KEP_00209431.  The document cited by Keppel as support for Keppel Statement No. 693 is from June 2015, after the public disclosure of Barusco's testimony.  The document contains the June 30, 2015 date in its file name, "SBR QR Model 20150630_vSENT.xlsx."  It simply carried over a prior date of December 2014 in cell E19, which is inaccurate.  Keppel Opp'n Exh. 116 at tab "QR Front."; Declaration of Daniel B. Goldman ¶ 2.

## O.    Operation Car Wash.

694.    Beginning on November 18, 2014 and through December 2014, it was widely reported that Pedro Barusco, Sete's former Chief Operating Officer, had signed a plea agreement with Brazilian prosecutors in connection with Operation Car Wash and confessed to accepting bribes from construction companies.  (Keppel Opp'n Exhs. 23, 9, 12, 28.)

**EIG's Response:**  Admitted that in November 2014, news of a plea agreement by Barusco was made public, but denies to the extent the statement implies there were disclosures regarding Sete. There was no connection to Sete at this time.  EIG Exh. 79 at EIG00064923-924/EIG_KEP00148015-016; EIG Exh. 129 at 38:5-13; EIG Exh. 82 at KEPPEL00495288.

695.   Derek Lemke was a Managing Director at EIG.  (Keppel Opp'n Exh. 103, EIG_KEP_00052509-551 at 550.)

**EIG's Response:**  Admitted.

696.   Jose Magela Bernardes was the Senior Executive Vice President at EIG.  (Keppel Opp'n Exh. 56, Bernardes D.C. Tr. 123:01-03.)

**EIG's Response:**  Admitted that from June 2014 through June 2016, Bernardes was a Senior VP at EIG.  EIG Exh. 159 at 12:20-13:3.

697.   On November 18, 2014, Derek Lemke sent an email to Jose Magela Bernardes stating: "I've had an inquiry from [an EIG investor] about the impact of the bribery scandal at Petrobras on our investments and portfolio companies. . . . Sete strikes me as the situation where we have the most exposure." (Keppel Opp'n Exh. 109 at 667.)

**EIG's Response:**  Admitted.  EIG clarifies that nobody had any information at the time of the inquiry that Sete was implicated in Lavo Jato.  EIG further clarifies that the quoted language is contained in Keppel Opp'n Exh. 82 at EIG_KEP_00263667, not in Keppel Opp'n Exh. 109 as cited in Keppel Statement No. 697.

698.   On November 18, 2014, Derek Lemke sent an email to Jose Magela Bernardes and others at EIG stating, "Just circling back one more time on this. . . . Have we seen anything in connection with the corruption investigations that MIGHT impact our investments or portfolio

65

companies? Is there any reason to think that there might have been illegal payments made in connection with the award of the Petrobras contracts to Sete? Is it likely that the circumstances around the contract award will be reviewed by governmental authorities?" (Keppel Opp'n Exh. 82 at 665.)

**EIG's Response:**  Admitted.

699.    Also in November 2014, BNDES had reportedly postponed its proposed funding of Sete in order to consider the implications of Mr. Barusco's arrest.  (Keppel Opp'n Exh. 143, KEPPEL00495287-291 at 288.)

**EIG's Response:**  Admitted that in or about November 2014, BNDES was considering the implications of Lavo Jato on its funding of Sete.

700.    Blair Thomas testified that he had no reason to doubt that EIG was aware that Petrobras had been implicated in the bribery scheme by November 2014.  (Keppel Opp'n Exh. 54, Thomas Tr. 138:22-25.)

**EIG's Response:**  Denied and responds that the statement mischaracterizes the testimony.  At his deposition, Mr. Thomas was asked questions about when EIG was aware of the bribery scheme at Petrobras.  He testified:  "I don't recall the exact time frame, but my recollection is that the Barusco testimony about Lavo Jato became public in late 2014 and the connection to Petrobras and Sete happened in early 2015, but I could be mistaken about that." Keppel Opp'n Exh. 54 at 136:17-25.  He was then shown an email chain and asked if it "refresh[ed] your recollection that EIG was aware of the bribery scandal at Petrobras in November of 2014."  *Id.* at 137:2-138:16.  Thomas testified:  "Well, I am not on these emails, so it doesn't refresh my recollection.  I agree that's what the email says."  *Id.* at 138:17-21.  Having failed to elicit a specific memory, counsel then asked Thomas:  "Do you have any reason to

66

doubt that EIG was aware of the bribery scandal involving Petrobras in November 2014." *Id.* at 138:22-24. He responded: "No I do not; as I said, I knew it all happened in the fourth quarter of 2014, when this started to come to light." *Id.* at 138:25-139:3.

701.    In December 2014, it was reported that Brazilian prosecutors "filed charges against 36 suspects in a corruption investigation alleging construction companies bribed public officials and overbilled [Petrobras] for contracts." (Keppel Opp'n Exh. 6, 39.)

**EIG's Response:**  EIG responds that Keppel Statement No. 701 is inadmissible hearsay. Subject to its objection, admitted that the Wall Street Journal reported the quoted language in Keppel Statement No. 701 in December 2014. *See also* Reply SOF *infra* ¶ 702.

702.    The charges announced in December 2014 included charges against entities involved in Sete, including employees of Petrobras and the part-owners of the EAS Shipyard. (Keppel Opp'n Exh. 6.)

**EIG's Response:**  EIG responds that Keppel Statement No. 702 is inadmissible hearsay. Subject to its objection, admitted except denied that there were any reports in December 2014 connecting the charges to Sete contracts. The reports were limited to corruption at Petrobras. *See, e.g.,* Keppel Opp'n Exh. 6.

703.    As Operation Car Wash revealed, dozens of individuals and entities in Brazil, including the President and almost every other construction firm in Brazil were alleged to have had knowledge of the bribery scheme.  (Keppel Opp'n Exh. 6.)

**EIG's Response:**  EIG responds that Keppel Statement No. 703 is inadmissible hearsay. Subject to its objection, denied.  To the extent Keppel Statement No. 703 implies that the bribery scheme was well known prior to being discovered through Lavo Jato, denied.  To the extent

Keppel Statement No. 703 implies that the construction firms, including Keppel, implicated in the bribery scheme knew that they had been improperly paying bribes, admitted.

704.   There is no evidence that Keppel knew what EIG did or did not know about the bribery scheme.

**EIG's Response:**  Denied.  Keppel knew that EIG was a potential investor in Sete, and that it never disclosed to EIG that Keppel, Petrobras and Sete were involved in a massive bribery scheme.  *See* EIG SOF ¶¶ 94-139, 158-76.

## P.   EIG Continued to Invest in and Work with Sete After the Bribery Scheme Had Been Disclosed.

705.   EIG wired approximately $15 million to Sete on December 8, 2014 and approximately $43 million on January 6, 2015.  (Keppel Opp'n Exh. 112, EIG_KEP_00147165; Keppel Opp'n Exh. 117, EIG_KEP_00249977.)

**EIG's Response:**  Admitted that EIG paid capital calls in December 2014 and January 2015 that were issued pursuant to the terms of the definitive transaction documents, but denies that such payments were made "after the bribery scheme had been disclosed" as suggested in the heading to this section.  EIG SOF ¶¶ 413-414.  EIG clarifies that on December 8, 2014, EIG wired a total of $15,088,880.88 USD through the Luxembourg Entities, converted the funds to BRL 39,223,545.85, and, on December 10, 2014, funded FIP Sondas.  EIG Exh. 117 at EIG_KEP_00147399-401.  On January 6, 2015, EIG wired a total of $42,567,695.54 through the Luxembourg Entities, converted the funds to BRL 115,677,712.63, and, on January 7, 2015, funded FIP Sondas.  EIG Exh. 117 at EIG_KEP_00249992-93.  At that time, Sete had not been implicated in Lavo Jato, and every Sete shareholder continued to comply with capital calls through at least January 2015.  EIG Exh. 154 at EIG00157932/EIG_KEP_00209424 (stating in a

March 2, 2015 Sete presentation that "shareholders <u>fully</u> complied with their commitment to the project, having contributed the entire amount of capital committed of R$8.3 billion.") (emphasis in original).  On February 5, 2015, the contents of Barusco's plea agreement and testimony were made public and implicated Sete and Keppel in the Corruption Scheme.  EIG Exh. 89 at KEPPEL00440539-40.

706.    EIG witnesses testified that despite the unfolding scandal it had not occurred to them to cut ties with Sete and Petrobras.  (Keppel Opp'n Exh. 45, Corrigan Tr. 195:17-21; Keppel Opp'n Exh. 54, Thomas Tr. 139:7-12.)

**EIG's Response:**  Admitted that in late 2014 and early 2015, EIG did not breach their investment agreements and cut ties with Sete and Petrobras based on news reports of corruption at Petrobras, without any link to corruption at Sete.  EIG clarifies that on July 31, 2012, EIG entered into an Investment Commitment Agreement concerning its investment in Sete, which had provisions that established penalties for "any Investor [that] fails to partially or fully comply with the obligation to contribute capital to the Fund, pursuant to the Bylaws and th[e] Investment Commit[ment], by the date specified in each Payment Notification.  EIG Exh. 62 at EIG_KEP_00044780 ¶ 4.2.  Indeed, as of March 2015, every shareholder had "<u>fully</u> complied with their commitment to the project, having contributed the entire amount of capital committed of R$8.3 billion."  EIG Exh. 154 at EIG00157932/EIG_KEP_00209424 (emphasis in original).

707.    EIG continued to approve Sete's capital calls until 2018.  (Keppel Opp'n Exh. 54, Thomas Tr. 145:7-13.)

**EIG's Response:**  Denied.  There is no evidence that EIG continued to approve Sete Capital Calls until 2018.  Keppel cites to Thomas's deposition testimony in which he stated that he "believe[d] there were one or two de minimis amounts that were funded after this time period

[January 2015] . . . associated with getting the company into judicial recovery" and that "[Sete] continued to make capital calls through I think 2018 or 2019, maybe 2018," not that EIG wired money in response to those capital calls into 2018.  Keppel Opp'n Ex. 54 at 144:22-145:19.

708.     On February 16, 2015, days after Mr. Barusco's plea agreement was released, EIG stated that its "expectation [was] that all 29 rigs will be delivered and used in the pre-salt program as the pre-salt programs are still economic, just not the huge cash cows there were at $100 oil." (Keppel Opp'n Exh. 108, EIG_KEP_00134490-493 at 491.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 708, there is no genuine dispute of material fact that the quoted language was *not* a statement by EIG.  On or about February 16, 2015, EIG was preparing a presentation deck for an investor, who had asked EIG certain specific questions.  The quoted language appears in an internal email providing a proposed draft response by Niranjan Ravindran to one of the pending question.  Mr. Ravindran was not a member of the Sete Deal Team and expressly stated that the quoted language was a draft of "[m]y answer" to the question posed.  Keppel Opp'n Ex. 108 at EIG_KEP_00134491. The final deck, as revised by Thomas, did not include the proposed language by Mr. Ravindran. *See* Keppel Opp'n Ex. 108 at EIG_KEP_00134498.

709.     In a February 2015 presentation, after Mr. Barusco's plea agreement was released, EIG stated that "Brazil Inc., meaning Petrobras, key pension plans and financial institutions and shipyards that currently employ 180,000 Brazilians" would protect Sete even though EIG recognized that "few parties in Brazil seem to have clean hands." (Keppel Opp'n Exh. 108, EIG_KEP_00134490-498 at 498.)

**EIG's Response:**  Admitted that the quotations appear in the cited document.  Denied to the extent that Keppel Statement No. 709 suggests the cited document states that these factors "would protect Sete."  The full quotation is:

> A key structural protection at the time of the investment was the involvement of "Brazil Inc.", meaning Petrobras, key pension plans and financial institutions and shipyards that currently employ 180,000 Brazilians. The current crisis will test whether this protection is adequate.

Keppel Opp'n Exh. 108 at EIG_KEP_00134498.

710.    In the same February 2015 presentation, after Mr. Barusco's plea agreement was released, EIG further explained that "it seems reasonable to assume that some form of political solution will be reached that frees Sete to complete it's [sic] mission." (Keppel Opp'n Exh. 108, EIG_KEP_00134490-498 at 498.)

**EIG's Response:**  Admitted.

711.    In the February 2015 presentation, after Mr. Barusco's plea agreement was released, EIG also maintained that "[t]he fundamental reason for the creation of Sete . . .  is as strong today as the day that Sete was formed." (Keppel Opp'n Exh. 108, EIG_KEP_00134490-498 at 498.)

**EIG's Response:**  Admitted

712.    In April 2015, EIG continued to express its "belie[f] that Brazil Inc. is likely to provide a solution" for Sete.  (Keppel Opp'n Exh. 132, EIG_KEP_00280676 at 676.)

**EIG's Response:**  Admitted.  EIG clarifies that the full sentence by Thomas in this email chain was:  "Sete is a challenge but I still believe that Brazil Inc. is likely to provide a solution." Keppel Opp'n Exh. 132 at EIG_KEP_00280676.

71

713.     By July 2015, Sete was working to secure financing from Banco do Brasil and Caixa, which were "fully engaged" in negotiations to restructure Sete, according to EIG. (Keppel Opp'n Exh. 130, EIG_KEP_00262889-891 at 890.)

**EIG's Response:**  Admitted that in an internal email on July 15, 2015, Bernardes reported "[l]atest news on SETE restructuring plan" and included a bullet that stated: "Banco do Brasil and Caixa are fully engaged."  Keppel Opp'n Exh. 130 at EIG_KEP_00262889-90.

714.     In a July 27, 2015 presentation, EIG expressed its willingness to invest additional funds into a restructured version of Sete.  (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 865.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 714, the cited document did not express EIG's willingness to invest additional funds into a restructured version of Sete. EIG prepared a document titled "Sete Brasil Discussion Materials" and dated July 27, 2015. That document discussed highlights of a restructuring plan and potential scenarios for Sete Brasil.  One of those potential scenarios indicated that it would require new equity and equity from current shareholders.  The Discussion Materials simply laid out options and scenarios, and did not indicate any willingness by EIG with respect to any specific scenario.  Keppel Opp'n Exh. 109 at EIG_KEP_00134861, EIG_KEP_00134865.

715.     As part of the July 2015 restructuring plan, EIG and Sete's other shareholders proposed that they contribute additional equity in order to avoid dilution.  (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 865.)

**EIG's Response:**  Denied.  *See* Reply SOF *infra* ¶ 714.

716.    The July 2015 restructuring plan also proposed that Sete continue to rely on the BrasFELS Shipyard for six drillships.  (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 862, 871.)

**EIG's Response:**  Admitted that the Discussion Materials proposed that BrasFELS would be involved in 6 DRUs.

717.    In the meantime, Sete was engaged in a "road show" for new potential investors in Asia.  (Keppel Opp'n Exh. 130, EIG_KEP_00262889-891 at 890.)

**EIG's Response:**  Admitted.

718.    EIG explained, as of late July 2015, that "restructuring discussions were still actively proceeding" and EIG's "hope at this point in time was to restructure Sete." (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 865.)

**EIG's Response:**  Admitted.  EIG clarifies that the quoted language comes from Thomas's deposition testimony, not the document cited by Keppel as support for this Statement. EIG further clarifies that while EIG was hopeful in the months after the February 5, 2015 disclosure of Barusco's plea agreement that there would be a political solution to save Sete, that did not happen and EIG had no such hopes once Sete declared bankruptcy in April 2016.  *See* Reply SOF *infra* ¶ 723.

## Q.    **Anti-Corruption Letters**

719.    Fernvale, a Keppel subsidiary, signed anti-corruption letters addressed to Urca Drilling B.V. and Frade Drilling B.V. on January 16, 2015.  (Ex 147, KEPPEL00635162-168 at 162, 164-65, 167-68.)

**EIG's Response:**  Admitted.

73

720.    There is no evidence that EIG ever received (or was ever aware of) the anti-corruption declarations from Fernvale.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 720, there is no genuine dispute of material fact that EIG knew that in December 2014 BNDES required "declarations to be executed by the respective operators, EPC contractors, and by Petrobras under terms that are satisfactory to BNDES, stating that there was no corruption in relation to the Project."  EIG SOF ¶ 455.  As of February 2, 2015, EIG was aware that Keppel had agreed to issue the anti-corruption declaration.  EIG Exh. 153 at EIG_KEP_00235012 (informing the members of the FIP Sondas Investment Committee, including EIG, that "Keppel already agreed to issue the letter, addressing it to the SPE, and the creditors are reviewing the issue").

**R.    BNDES Continued to Negotiate with Sete for Months after February 2015.**

721.    BNDES continued to engage in negotiations with Sete for months after February 2015.  (Keppel Opp'n Exh. 125, Keppel Opp'n Exh. 5.)

**EIG's Response:**  Denied.  On April 30, 2015, Sete issued an April 2015 Executive Report in which it stated that US $1.7 billion in funding from FINISA "was approved" and "ready for signature on February 6, 2015, together with BNDES and UKEF, but was interrupted by the disclosure of Pedro Barusco's plea bargain."  EIG Exh. 97 at EIG00156005/EIG_KEP_00203233.   The Executive Report noted that "BNDES indicated that it must no longer finance the project directly."  EIG Exh. 97 at EIG00156005/EIG_KEP_00203233.

722.    During the restructuring negotiations in 2015 and 2016, Sete pursued long-term financing from Banco do Brasil, Caixa, and the China Development Bank, among others.  (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 871.)

74

**EIG's Response:**  Admitted.

## S.      Sete Declared Bankruptcy in April 2016.

723.      After Sete became insolvent, EIG continued to believe that Petrobras and the Brazilian government—which EIG referred to internally as "Brazil Inc."—would find a "political solution" to save Sete.  (Keppel Opp'n Exh. 153, EIG_KEP_00134494-498 at 498.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 723, there is no genuine dispute of material fact that while EIG was hopeful in the months after the February 5, 2015 disclosure of Barusco's plea agreement that there would be a political solution to save Sete, that did not happen and EIG had no such hopes once Sete declared bankruptcy in April 2016.  Keppel Opp'n Exh. 153 at EIG_KEP_00134498, Keppel Opp'n Ex. 108 at EIG_KEP_00134490, 498.

724.      In 2014, when the price of oil exceeded $100 per barrel, drillships reportedly could be rented for as much as $680,000 a day.  (Keppel Opp'n Exh. 21, Allison McNeely, "Mass Offshore Oil-Servicer Busts Imperil $30 Billion of Debt," Bloomberg.com, August 19, 2020; Keppel Opp'n Exh. 22, David Wethe, "Mothballing the World's Fanciest Oil Rigs Is a Massive Gamble," Bloomberg.com, September 20, 2016.)

**EIG's Response:**  EIG responds that this is inadmissible hearsay.  EIG responds that this is not a *material fact* relevant to this action because (i) Sete was protected from fluctuation in leading edge day rates due to its long-term, fixed price contracts with Petrobras and (ii) what other drill rates commanded in terms of day rates in 2014 is irrelevant because the day rates were fixed by contract.  Keppel Opp'n Exh. 66 at EIG_KEP_00077792; EIG Exh. 153 at EIG_KEP_00235015, 020.  EIG further responds that the day rates in 2014 varied depending on source and location.  Subject to its objections, denied.  There is no evidence, including in the articles cited, that "drillships reportedly could be rented for as much as $680,000 a day."  One of

the articles cited references one totally irrelevant instance where one entity agreed to pay another $681,000 a day to lease a ship in one of the richest deals ever:  "In mid-2014, just as oil prices were peaking, Eni SpA agreed to pay Transocean $681,000 a day to lease the ship.  It was one of the richest drilling contracts ever, an amount that's about triple the rate a deal signed today would fetch."  Keppel Opp'n Exh. 22 at 5.

725.   In 2012, Sete's drillships were expected to be rented to Petrobras at over $500,000 per day.  (Keppel Opp'n Exh. 38, "The Sete Brasil Surprise?" Credit Suisse Equity Research, February 13, 2012.)

**EIG's Response:**  EIG responds that this is inadmissible hearsay.  Subject to its objection, denied.  Contrary to Keppel Statement No. 725, there is no genuine dispute of material fact that the total day rate including charter and service rates was (i) $458,000/day for the seven rigs of the First System, and (ii) a range of $525,000-541,000 for the twenty-one rigs of the Second System.  EIG Exh. 153 at EIG_KEP_00235020.

726.   By January 2015, day rates had fallen "well below the rate level at the Sete contracts." (Keppel Opp'n Exh. 129, EIG_KEP_00262886-747 at 746.)

**EIG's Response:**  EIG responds that this is inadmissible hearsay.  EIG also responds that this is not a *material fact* relevant to this action because (i) Sete was protected from fluctuation in leading edge day rates due to its long-term, fixed price contracts with Petrobras and (ii) what other drill rates commanded in terms of day rates in January 2015 is irrelevant because the day rates were fixed by contract.  Keppel Opp'n Exh. 66 at EIG_KEP_00077792; EIG Exh. 153 at EIG_KEP_00235015, 020.  This fact also depends on the source used.  Subject to its objections, EIG responds that in January 2015, an employee from DNB Bank ASA sent his views on the market and stated the language quoted in Keppel Statement No. 726.

727.    By January 19, 2015, analysts reported that it no longer made economic sense for Petrobras to participate in Sete's restructuring, because Petrobras could "charter rigs directly in the market themselves and benefit directly from low rates" rather than using drillships at "original SETE day-rates." (Keppel Opp'n Exh. 129, EIG_KEP_00262886-888 at 887.)

**EIG's Response:**  EIG responds that this is inadmissible hearsay.  EIG also responds that this is not a *material fact* relevant to this action because Sete was protected from fluctuation in leading edge day rates due to its long-term, fixed price contracts with Petrobras and the analyst view would require Petrobras to breach such contracts.  Keppel Opp'n Exh. 66 at EIG_KEP_00077792; EIG Exh. 153 at EIG_KEP_00235015, 020.  Subject to its objections, EIG responds that in January 2015, an employee from DNB Bank ASA sent his views on the market and stated the language quoted in Keppel Statement No. 727.

728.    It was reported on April 22, 2016 that "[s]hareholders in Sete Brasil voted . . . to allow the ailing rig lessor to seek bankruptcy protection after efforts to secure a long-term contract with state-controlled oil producer Petrobras failed." (Keppel Opp'n Exh. 37, Oil Daily, "Shareholders Approve Sete Brasil Bankruptcy", April 22, 2016.)

**EIG's Response:**  EIG responds that this is inadmissible hearsay.  Subject to its objections, admitted that Keppel Opp'n Exh. 37 includes the quoted language.  EIG clarifies that there is no genuine issue of material fact that Petrobras actually executed long-term charter contracts for Sete's planned 28 rigs by August 2012 (EIG Exh. 153 at EIG_KEP_00235015), and that Sete in fact collapsed because long-term financiers pulled financing after the contents of Barusco's plea agreement were made public.  EIG SOF ¶¶ 458-64, 473-86.

729.    It was also reported on April 22, 2016 that "[t]he fate of Sete Brasil . . . hinged on Petrobras' willingness to sign a long-term rent contract." (Keppel Opp'n Exh. 37, "Shareholders Approve Sete Brasil Bankruptcy", Oil Daily, April 22, 2016.)

**EIG's Response:**  EIG responds that this is inadmissible hearsay.  Subject to its objections, admitted that Keppel Opp'n Exh. 37 includes the quotes language.  EIG clarifies that there is no genuine issue of material fact that Petrobras actually executed long-term charter contracts for Sete's planned 28 rigs by August 2012 (EIG Exh. 153 at EIG_KEP_00235015), and that Sete in fact collapsed because long-term financiers pulled financing after the contents of Barusco's plea agreement were made public.  EIG SOF ¶¶ 458-64, 473-86.

730.    Seadrill Limited was "primarily engaged in offshore contract drilling for the oil and gas industry in benign and harsh environments worldwide, including ultra-deepwater environments".  (Keppel Opp'n Exh. 34, Seadrill Ltd. Form 10-K, December 31, 2011 at 2.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because the primary engagement of Seadrill Limited is irrelevant.  Each company operates in different geographies, with different counterparties, and different contractual and financing structures, among other things.  Subject to its objection, EIG responds that publicly available documents confirm Keppel Statement No. 730.

731.    Seadrill Limited filed for bankruptcy on September 12, 2017 and then again on February 7, 2021.  (Keppel Opp'n Exh. 36, Seadrill Ltd. Form 6-K, September 2017 at 2; Keppel Opp'n Exh. 32, "Seadrill files for Chapter 11 bankruptcy," Reuters, September 12, 2017; Keppel Opp'n Exh. 35 Seadrill Ltd. Form 6-K, February 2021; Keppel Opp'n Exh. 33, "Seadrill Limited: Seadrill Limited (SDRL): Asia Offshore Drilling Chapter 11 Filings," Dow Jones Institutional News, February 7, 2021.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because whether or not Seadrill Limited filed for bankruptcy in 2017 or 2021 is irrelevant. Subject to its objection, EIG responds that publicly available documents confirm Keppel Statement No. 731.

732.    Noble Corporation was "a leading offshore drilling contractor for the oil and gas industry".  (Keppel Opp'n Exh. 23, Noble Corporation plc Form 10-K, December 31, 2011 at 2.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because the business purpose of Noble Corporation is irrelevant.  Each company operates in different geographies, with different counterparties, and different contractual and financing structures, among other things.  Subject to its objection, EIG responds that publicly available documents confirm Keppel Statement No. 732.

733.    Noble Corporation filed for bankruptcy on July 31, 2020.  (Keppel Opp'n Exh. 24, Noble Corporation plc Form 8-K, July 2020 at 2; Keppel Opp'n Exh. 26, "Offshore-Rig Operator Noble Files for Bankruptcy; Struggling offshore oil-and-gas driller files for chapter 11 after striking a $3.4 billion debt-for-equity swap with bondholders," The Wall Street Journal, July 31, 2020.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because whether or not Noble Corporation filed for bankruptcy in 2020 is irrelevant.  Subject to its objection, EIG responds that publicly available documents confirm Keppel Statement No. 733.

KL3 3360926.1

734.    Diamond Offshore Drilling, Inc. was "a leading, global offshore oil and gas drilling contractor".  (Keppel Opp'n Exh. 8, Diamond Offshore Drilling Ltd. Form 10-K, December 31, 2011 at 3.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because the business purpose of Diamond Offshore Drilling, Inc. is irrelevant.  Each company operates in different geographies, with different counterparties, and different contractual and financing structures, among other things.  Subject to its objection, EIG responds that publicly available documents confirm Keppel Statement No. 734.

735.    Diamond Offshore Drilling, Inc. filed for bankruptcy on April 26, 2020.  (Keppel Opp'n Exh. 7, Diamond Offshore Drilling Inc. Form 8-K, April 2020 at 2; Keppel Opp'n Exh. 9, "Diamond Offshore files for bankruptcy, citing 'price war,' coronavirus," Reuters, April 27, 2020.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because whether or not Diamond Offshore Drilling, Inc. filed for bankruptcy in 2020 is irrelevant.  Subject to its objection, EIG responds that publicly available documents confirm Keppel Statement No. 735.

736.    Ensco was "one of the leading providers of offshore contract drilling services to the international oil and gas industry".  (Keppel Opp'n Exh. 10 Ensco plc Form 10-K, December 31, 2011 at p. 4.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because the business purpose of Ensco plc is irrelevant.  Each company operates in different geographies, with different counterparties, and different contractual and financing structures,

among other things.  Subject to its objection, EIG responds that publicly available documents confirm Keppel Statement No. 736.

737.    Rowan Companies Ltd. was "major provider of international and domestic offshore contract drilling services".  (Keppel Opp'n Exh. 31, Rowan Companies Form 10-K, December 31, 2011 at p. 3)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because the business purpose of Rowan Companies Ltd. is irrelevant.  Each company operates in different geographies, with different counterparties, and different contractual and financing structures, among other things.  Subject to its objection, EIG responds that publicly available documents confirm that the cited document contains the quotation in Keppel Statement No. 737, but as a description for Rowan Companies Inc. not Rowan Companies Ltd.

738.    Atwood Oceanics, Inc. was "an international offshore drilling contractor engaged in the drilling and completion of exploratory and developmental oil and gas wells".  (Keppel Opp'n Exh. 4, Atwood Oceanics Form 10-K, December 31, 2011 at p. 3)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because the business purpose of Atwood Oceanics, Inc. is irrelevant.  Each company operates in different geographies, with different counterparties, and different contractual and financing structures, among other things.  Subject to its objection, EIG responds that publicly available documents confirm Keppel Statement No. 738.

739.    Atwood Oceanics, Ensco and Rowan all merged and the company's name was changed to Valaris plc, which filed for bankruptcy on August 18, 2020.  (Keppel Opp'n Exh. 41,

Valaris plc Form 8-K, August 2020 at 2; Keppel Opp'n Exh. 40, "Valaris Declares Chapter 11 Bankruptcy, In Restructuring Agreement," Dow Jones Institutional News, August 19, 2020.)

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action because the corporate status and bankruptcy filing of Atwood Oceanics, Ensco and Rowan is irrelevant.  Subject to its objection, EIG responds that publicly available documents confirm that (i) Atwood Oceanics was acquired by Valaris, (ii) Ensco acquired Rowan, becoming Ensco Rowan PLC, (iii) Ensco Rowan changed its name to Valaris PLC, and (iv) on August 18, 2020, Valaris PLC entered into a Restructuring Support Agreement with certain noteholders and on August 19, 2020 filed a voluntary petition for reorganization in Bankruptcy Court.

740.    Seadrill Limited, Noble Corporation, Diamond Offshore Drilling, Ensco, Rowan Companies Ltd. and Atwood Oceanics, Inc. did not have corruption-related issues.

**EIG's Response:**  EIG responds that this is not a *material fact* relevant to this action and was not part of any discovery in this action.  EIG is not privy to the inner workings, including corruption issues, of any of the entities listed in Keppel Statement No. 740.  Nor has Keppel provided any source for its statement.  Based on news articles, EIG denies this statement.  The securities filings of these companies suggest that certain of them *did* have "corruption-related issues" and were implicated in the Operation Car Wash investigation.  Agents for Noble Corporation and Ensco and their subsidiaries each pled guilty in Brazil in connection with the Operation Car Wash investigation, and the companies were in contact with the DOJ and SEC regarding their investigations.  EIG Exh. 155; EIG Exh. 156 at 42-44, 130-31.   And last year, Seadrill disclosed that it was "served with a search and seizure warrant from the Federal Police in Rio de Janeiro, Brazil as part of the latest phase of Operation Car Wash."  EIG Exh. 157 at 2.

741.    On November 1, 2019, Sete's equity was sold for the "total symbolic amount of R$1.00 (one real)".  (Keppel Opp'n Exh. 98, EIG_KEP_00176682 at 2.)

**EIG's Response:**  Admitted that Sete's equity was sold for the "total symbolic amount of R$1.00 (one real)", except clarifies the timeline.  On November 1, 2019, the FIP Sondas investment committee approved the sale of all Sete shares "for the symbolic total value of R$ 1.00 (one real)."  EIG Exh. 111 at EIG00228793-94/EIG_KEP_00249901-02.  On January 27, 2020, Caixa announced that FIP Sondas sold its full interest in Sete "corresponding to 95% of the Company's share capital, in accordance with terms approved by the Fund's Investment Committee."  EIG Exh. 112 at EIG00228764/EIG_KEP_00249872.

## T.    The Deferred Prosecution Agreement.

742.    The Deferred Prosecution Agreement does not mention EIG or any of Sete's other investors.  (Keppel Opp'n Exh. 152, DPA.)

**EIG's Response:**  Admitted.

Dated:  New York, New York                     Respectfully submitted,
            November 2, 2021

                                                KRAMER LEVIN NAFTALIS &
                                                FRANKEL LLP

                                                By:    /s/ Daniel B. Goldman
                                                    Daniel B. Goldman
                                                    Kerri Ann Law
                                                    Claudia Pak
                                                    1177 Avenue of the Americas
                                                    New York, New York 10036
                                                    (212) 715-9100
                                                    dgoldman@kramerlevin.com

                                                *Attorneys for Plaintiffs*