UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EIG Energy Fund XIV, L.P.,
EIG Energy Fund XIV-A, L.P.,
EIG Energy Fund XIV-B, L.P.,
EIG Energy Fund XIV (Cayman), L.P.,
EIG Energy Fund XV, L.P.,
EIG Energy Fund XV-A, L.P.,
EIG Energy Fund XV-B, L.P., and
EIG Energy Fund XV (Cayman), L.P.

                Plaintiffs,

-against-

Keppel Offshore & Marine Ltd.,

                Defendant.

No. 18-CV-01047 (PGG)

UNREDACTED VERSION

---

## DEFENDANT'S LOCAL RULE 56.1 RESPONSE AND COUNTERSTATEMENT IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant Keppel Offshore & Marine Ltd.*

October 19, 2021

CONTAINS CONFIDENTIAL INFORMATION

**TABLE OF CONTENTS**

**Page**

I.  RESPONSES TO PLAINTIFFS' STATEMENT OF FACTS. .......................................... 1

II. COUNTERSTATEMENT OF ADDITIONAL FACTS THAT PRECLUDE
    ENTRY OF SUMMARY JUDGMENT FOR PLAINTIFFS. ........................................ 141

    A.  EIG Was a Sophisticated Investor with Experience in Brazil. .......................... 141

    B.  EIG's Pursuit of the Sete Investment Opportunity. ............................................ 141

    C.  Alleged Misrepresentations and Omissions ........................................................ 142

    D.  EIG's Due Diligence. ........................................................................................... 146

    E.  EIG Made a Binding Commitment to Invest in Sete in June 2011 .................... 150

    F.  EIG's First Visit to the BrasFELS Shipyard in August 2011. ........................... 153

    G.  Agreements with Zwi Skornicki. ......................................................................... 157

    H.  EPC Contracts. ..................................................................................................... 158

    I.  Keppel's Lack of Knowledge of Sete's Use of Funds. ....................................... 158

    J.  EIG's Second Visit to the BrasFELS Shipyard in March 2012. ........................ 159

    K.  EIG's Third Visit to the BrasFELS Shipyard in June 2013. .............................. 160

    L.  Sete Had Difficulty Obtaining Financing Prior to the Disclosure of the
        Bribery Scheme. .................................................................................................... 162

    M.  By June 2014, Sete Was on the Brink of Collapse Due to Steep Declines
        in the Price of Oil and the Value of the Brazilian Currency. ............................. 163

    N.  By November 2014, Sete Had Stopped Paying the Shipyards. .......................... 165

    O.  Operation Car Wash. ............................................................................................ 166

    P.  EIG Continued to Invest in and Work with Sete After the Bribery Scheme
        Had Been Disclosed. ............................................................................................. 168

    Q.  Anti-Corruption Letters ........................................................................................ 170

    R.  BNDES Continued to Negotiate with Sete for Months after February
        2015. ...................................................................................................................... 170

CONTAINS CONFIDENTIAL INFORMATION

S.      Sete Declared Bankruptcy in April 2016. ............................................................ 170

T.      The Deferred Prosecution Agreement. ............................................................... 173

CONTAINS CONFIDENTIAL INFORMATION

## CITATION AND ABBREVIATION CONVENTIONS

**Exhibits Submitted in Connection with Plaintiffs' Motion for Summary Judgment**

- "EIG Exh.":   Exhibits to Plaintiffs' Rule 56.1 Statement of Facts

- "Keppel Opp'n Exh.":  Exhibits to Defendant Keppel Offshore & Marine Ltd.'s Response and Counterstatement to the Plaintiffs' Rule 56.1 Statement of Facts, served and filed concurrently herewith.

**Parties**

- "EIG":  EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P., and EIG Energy Fund XV (Cayman), L.P., the plaintiffs in this action, together with EIG Management Company, LLC and EIG Global Energy Partners.

- "Keppel":  Keppel Offshore & Marine Ltd., the defendant in this action.

**Other Relevant Entities**

- "ADICO":  Abu Dhabi Investment Council.

- "Barusco":  Pedro José Barusco Filho

- "Barrington":  Barrington Media, Inc.

- "BrasFELS Shipyard":  Estaleiro BrasFELS Ltda.

- "Keppel FELS Brasil":  Keppel FELS Brasil Ltda.

- "CIC":  China Investment Corporation.

- "EAS Shipyard":  Estaleiro Atlantico Sul.

- "Fernvale":  Fernvale Pte. Ltd.

- "FIP Sondas":  Fundo de Investimento em Participações Sondas.

- "João Ferraz":  João Carlos de Medeiros Ferraz.

- "Lakeshore":  Lakeshore Financial Partners Participações Ltda.

- "Keppel Corp.":  Keppel Corporation Limited.

CONTAINS CONFIDENTIAL INFORMATION

- "Santander":  Banco Santander S.A.

- "Sete":  Sete Brasil Participações, S.A.

**Pleadings**

- "Complaint":  EIG's First Amended Complaint against Defendant, filed April 30, 2018 (Dkt. 17).  (Keppel Opp'n Exh. 1.)

**Deferred Prosecution Agreement**

- "DPA":  Deferred Prosecution Agreement dated December 22, 2017, United States of America v. Keppel Offshore & Marine Ltd., Case No. 17-cr-697 in the United States District Court for the Eastern District of New York (Dkt. 24-1).  (Keppel Opp'n Exh. 3.)

**Deposition Exhibits**

- "DX":  Deposition exhibits introduced by Keppel in this action, numbered continuously across all depositions conducted by Keppel.

- "PX":  Deposition exhibits introduced by EIG in this action, numbered continuously across all depositions conducted by EIG.

**Litigations**

- "Action":  The present matter captioned <u>EIG Energy Fund XIV, L.P. et al v. Keppel Offshore & Marine Ltd.</u>, Case No. 1:18-cv-01047 (PGG) in the United States District Court for the Southern District of New York.

- "Petrobras Action":  The matter captioned <u>EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.</u>, Case No. 1:16-cv-333 (APM) in the United States District Court for the District of Columbia.

**Depositions Taken in this Action**

- "Albe Tr.":  Transcript of the August 5, 2021 Deposition of Alvin Albe, Jr.  (Keppel Opp'n Exh. 42.)

- "Anderson Tr.":  Transcript of July 22, 2021 Deposition of Jeffrey Anderson.  (Keppel Opp'n Exh. 43.)

- "Chow Tr.":  Transcript of June 24, 2021 Deposition of Jeffrey Chow.  (Keppel Opp'n Exh. 44.)

- "Corrigan Tr.":  Transcript of July 20, 2021 Deposition of Kevin Corrigan and Rule 30(b)(6) Deposition of EIG.  (Keppel Opp'n Exh. 45.)

CONTAINS CONFIDENTIAL INFORMATION

- "Hayden Tr.":  Transcript of May 27, 2021 Deposition of Simon Hayden.  (Keppel Opp'n Exh. 46.)

- "Hua Tr.":  Transcript of July 9, 2021 Deposition of Loh Chin Hua.  (Keppel Opp'n Exh. 47.)

- "Lowder Tr.":  Transcript of the June 4, 2021 Deposition of Kevin Lee Lowder.  (Keppel Opp'n Exh. 48.)

- "Merchant Tr.":  Transcript of July 2, 2021 Deposition of Aziz Merchant.  (Keppel Opp'n Exh. 49.)

- "Patel Tr.":  Transcript of May 14, 2021 Deposition of Hoshrav Patel.  (Keppel Opp'n Exh. 50.)

- "Talbot Tr.":  Transcript of June 17, 2021 Deposition of Kurt Talbot.  (Keppel Opp'n Exh. 51.)

- "Tan Tr.":  Transcript of July 15-16, 2021 Deposition of Leong Peng Tan and Rule 30(b)(6) Deposition of Keppel.  (Keppel Opp'n Exh. 52-53.)

- "Thomas Tr.":  Transcript of July 30, 2021 Deposition of Blair Thomas and Rule 30(b)(6) Deposition of EIG.  (Keppel Opp'n Exh. 54.)

- "Wade Tr.":  Transcript of June 11, 2021 Deposition of Randall Wade.  (Keppel Opp'n Exh. 55.)

**Depositions Taken in the Petrobras Action**

- "Bernardes D.C. Tr.":  Transcript of the January 27, 2021 Deposition of Jose Bernardes.  (Keppel Opp'n Exh. 56.)

- "Corrigan D.C. Tr.":  Transcript of the October 16, 2020 Deposition of Kevin Corrigan and Rule 30(b)(6) Deposition of EIG.  (Keppel Opp'n Exh. 57.)

- "Hayden D.C. Tr.":  Transcript of October 29, 2020 Deposition of Simon Hayden.  (Keppel Opp'n Exh. 58.)

- "Lowder D.C. Tr.":  Transcript of December 10, 2020 Deposition of Kevin Lowder.  (Keppel Opp'n Exh. 59.)

- "Thomas D.C. Tr.":  Transcript of December 16, 2020 Deposition of Blair Thomas and Rule 30(b)(6) Deposition of EIG.  (Keppel Opp'n Exh. 60.)

CONTAINS CONFIDENTIAL INFORMATION

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York and Your Honor's Individual Practice Rules, Defendant Keppel Offshore & Marine Ltd. ("Keppel") respectfully submits this Response and Counterstatement to Plaintiffs' Rule 56.1 Statement.  **Section I** provides Keppel's responses to each allegation in Plaintiffs' Rule 56.1 Statement with numbered paragraphs tracking the paragraphs in Plaintiffs' Rule 56.1 Statement.  (See infra ¶¶ 1-490.)  **Section II** provides additional facts that warrant the denial of Plaintiffs' motion for summary judgment in paragraphs numbered consecutively to those in Plaintiffs' Rule 56.1 Statement.  (See infra ¶¶ 491-742.)  All record authority has been served and filed concurrently with an Appendix, along with the accompanying Exhibits referenced herein.

## I.     RESPONSES TO PLAINTIFFS' STATEMENT OF FACTS.[1]

The disputes described below should not distract from the separate, undisputed facts described in Keppel's cross-motion for summary judgment, which establishes that summary judgment should be entered for Keppel.[2]

1.     **EIG ¶ 1**:  Keppel is a "Singapore-based corporation [that] operated shipyards in Asia, the Americas and Europe."  Exh. 105 at A-1 ¶ 2.

**Keppel Response**:  Undisputed, except to clarify that Defendant Keppel Offshore & Marine Ltd. ("Keppel") operated shipyards through its legally distinct subsidiaries.  (Keppel Opp'n Exh. 101, EIG_KEP_00026002 at 033.)

---

[1] The headings and definitions used in EIG's Rule 56.1 Statement are not assertions of fact supported by citations to the record.  To the extent such headings and definitions warrant a response, Keppel disputes each heading and definition.

[2] Nothing herein is intended, nor shall it be interpreted, to contradict the acceptance of responsibility by Keppel set forth in the Deferred Prosecution Agreement ("DPA") that Keppel entered into with the U.S. Department of Justice, dated December 22, 2017.

CONTAINS CONFIDENTIAL INFORMATION

2.      **EIG ¶ 2**:  Keppel's "business consist[s] primarily of building mobile offshore

drilling rigs and handling repairs, conversions and upgrades of shipping vessels."  Exh. 105 at A-

1 ¶ 2.

   **Keppel Response**:  Undisputed, except to clarify that Keppel's various

subsidiaries are responsible for each aspect of its business.  (Keppel Opp'n Exh. 16, at 191,

Keppel Corp. Report to Shareholders 2012.)

3.      **EIG ¶ 3**:  Petróleo Brasileiro S.A. ("**Petrobras**") is a "Brazilian state-controlled

oil company headquartered in Rio de Janeiro, Brazil, that operate[s] to refine, produce and

distribute oil, oil products, gas, biofuels and energy."  Exh. 105 at A-1-2 ¶ 4.

   **Keppel Response**:  Undisputed.

4.      **EIG ¶ 4**:  Sete Brasil Participações S.A. ("**Sete**" or "**Sete Brasil**") was a privately

held corporation headquartered in Rio de Janeiro, Brazil.  Exh. 105 at A-2 ¶ 5.

   **Keppel Response**:  Undisputed.

5.      **EIG ¶ 5**:  From in or around 2003 to April 2012, Renato Duque ("**Duque**") –

referred to as "Brazilian Official 2" in the December 22, 2017 deferred prosecution agreement

that Keppel entered into with the Fraud Section of the U.S. Department of Justice and the U.S.

Attorney's Office for the Eastern District of New York (the "**DPA**") – was "an employee of

Petrobras with responsibility over the bidding process of certain projects."  Exh. 105 at A-4 ¶ 16;

Exh. 114 at 2, Interrogatory 1.a.

   **Keppel Response**:  Undisputed.

6.      **EIG ¶ 6**:  From in or around 2003 to April 2011, Pedro José Barusco Filho

("**Barusco**") – referred to as "Brazilian Official 1" in the DPA – was an Executive Manager of

Engineering in Petrobras's Services division with "responsibility for, among other things, the

CONTAINS CONFIDENTIAL INFORMATION

bidding process organized by a division of Petrobras."  Exh. 30 at EIG_KEP_00048967; Exh. 105 at A-3-4 ¶ 15; Exh. 114 at 2, Interrogatory 1.a.

> **Keppel Response**:  Undisputed.

7.     **EIG ¶ 7**:  After leaving Petrobras in or about April 2011, Barusco became the Chief Operating Officer of Sete "with responsibility for overseeing operations."  Exh. 30 at EIG_KEP_00048967; Exh. 105 at A-3-4 ¶ 15.

> **Keppel Response**:  Undisputed.

8.     **EIG ¶ 8**:  "For a number of years, executives and employees of Petrobras with responsibility over the bidding of certain large projects, including Brazilian Official 1 [Barusco] ("**Brazilian Official 1**") and Brazilian Official 2 [Duque] ("**Brazilian Official 2**"), and politicians and political parties in Brazil, including the Workers' Party, administered a scheme to secure corrupt payments equal to a percentage of a contract's value from the companies awarded those projects."  Exh. 105 at A-4 ¶ 18; Exh. 114 at 2, Interrogatory 1.a.

> **Keppel Response**:  Undisputed.

9.     **EIG ¶ 9**:  "In or around 2011, this scheme was extended to projects awarded by Sete Brasil, which commissioned a large fleet of rigs for Petrobras's end use" (the "**Corruption Scheme**").  Exh. 105 at A-4 ¶ 18.

> **Keppel Response**:  Undisputed, except to clarify that (i) the "scheme" referred to in Paragraph 9 concerns only the scheme described in the DPA, namely the "scheme to secure corrupt payments equal to a percentage of a contract's value from the companies awarded those projects" and that (ii) the earliest evidence of any Keppel entity's involvement in the scheme relating to Sete is from September 2011.  (Keppel Opp'n Exh. 139, KEPPEL00280920; Keppel Opp'n Exh. 138, KEPPEL00045696.)

CONTAINS CONFIDENTIAL INFORMATION

10.    **EIG ¶ 10**:  "In or about and between 2001 and 2014, [Keppel], together with others, including executives of [Keppel Offshore & Marine USA], knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil."  Exh. 105 at A-5 ¶ 19.

**Keppel Response**:  Undisputed.

11.    **EIG ¶ 11**:  Keppel paid bribes equal to a percentage of the value of the contracts that it secured with Sete and Petrobras.  Exh. 133 at 61:21-25.

**Keppel Response**:  Disputed to the extent Plaintiffs refer to anything beyond the admissions included in the DPA, which sets forth the extent of Keppel's involvement in the bribery scheme revealed by Operation Car Wash.  (Keppel Opp'n Exh. 152.)  Otherwise, undisputed.

12.    **EIG ¶ 12**:  With respect to Sete, Keppel negotiated bribes with Barusco equal to 0.9 to one percent of the value of Keppel's contracts with Sete.  Exh. 105 at A-14 ¶ 71.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that Keppel negotiated with Barusco directly or knew at the time how any corrupt payments would be distributed to third parties after they were disbursed to Zwi Skornicki's companies.  (See infra CSOF ¶ 637.) There is no evidence that anyone at Keppel negotiated directly with Barusco, rather than through Zwi Skornicki.  Otherwise, undisputed.

13.    **EIG ¶ 13**:  "Two thirds of the payments were designated to the Workers' Party and one third was to be divided equally between the relevant Petrobras and Sete executives."  Exh. 105 at A-14 ¶ 7.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that Keppel knew at the time how any corrupt payments were being divided among third parties.  (See infra CSOF ¶ 637.)  Otherwise, undisputed.

CONTAINS CONFIDENTIAL INFORMATION

14.     **EIG ¶ 14**:  The split described in the above paragraph was agreed and administered by Barusco, Duque, and an official of the Partido dos Trabalhadores, a political party in Brazil that formed part of the federal government of Brazil, which directly owned more than 50 percent of Petrobras's common shares with voting rights, between 2003 and 2016 ("**Workers' Party**").  Exh. 105 at A-2 ¶¶ 4-6, A-14 ¶ 71; Exh. 114 at 2, Interrogatory 1.a.

**Keppel Response**:  Disputed to the extent that Paragraph 14 (i) refers to anything beyond the admissions included in the DPA and (ii) implies that Keppel knew at the time how any corrupt payments were being divided among third parties.  (See infra CSOF ¶ 637; Keppel Opp'n Exh. 152.)  Otherwise, undisputed.

15.     **EIG ¶ 15**:  Zwi Skornicki ("**Skornicki**" or "**Consultant**") was an agent of Keppel in or about between 2000 and 2016.  Exh. 105 at A-2 ¶ 7; Exh. 114 at 2, Interrogatory 1.a.

**Keppel Response**:  Undisputed, except to clarify that Skornicki had different agency relationships with different Keppel entities throughout the period.  (Keppel Opp'n Exh. 44, Chow Tr.  51:22-52:23.)

16.     **EIG ¶ 16**:  Skornicki facilitated bribe payments from Keppel to public officials of Brazil and the Workers' Party.  Exh. 105 at A-2 ¶ 7.

**Keppel Response**:  Disputed to the extent Paragraph 16 refers to anything beyond the admissions included in the DPA.  Otherwise, undisputed.

17.     **EIG ¶ 17**:  In or about 2011, Chong Heong Tong ("**Tong**"), Yew Yuen Chow ("**YY Chow**"), and Kai Choong Kwok ("**Kwok**") authorized Skornicki during several telephone calls to pay one percent of the contract value as bribes in response to the demand of Barusco.  Exh. 105 at A-2 ¶¶  8, 10, A-15 ¶ 72; Exh. 114 at 2-3, Interrogatory 1.a, 1.b.

**Keppel Response**:  Disputed to the extent Paragraph 17 refers to anything beyond the admissions included in the DPA and to the extent it implies that (i) Keppel knew about such

CONTAINS CONFIDENTIAL INFORMATION

conversations at the time or (ii) such conversations occurred prior to September 2011.  (See infra

CSOF ¶ 636 (citing Keppel Opp'n Exh. 139, KEPPEL00280920; Keppel Opp'n Exh. 138,

KEPPEL00045696).)  Otherwise, undisputed.

> 18.    **EIG ¶ 18**:  Between 2009 and early 2014, Tong – who is "KOM Executive 1" in

the DPA – was the Chief Executive Officer of Keppel.  Exh. 77 at 13, 202; Exh. 105 at A-2 ¶ 8;

Exh. 114 at 2, Interrogatory 1.a.

> **Keppel Response**:  Undisputed, except to clarify that Tong was Chief Executive

Officer of Keppel until February 1, 2014.  (Keppel Opp'n Exh. 17,  Keppel Corp. Report to

Shareholders 2013 at 202.)

> 19.    **EIG ¶ 19**:  YY Chow – who is "KOM Executive 3" in the DPA – was President

of Keppel Offshore & Marine U.S.A., Inc. ("**KOM USA**") prior to June 2011, and later became

Managing Director at Keppel in June 2011, Chief Operating Officer of Keppel in 2012, and

Chief Executive Officer in 2014.  Exh. 77 at 13, 203; Exh. 105 at A-2-3 ¶ 10; Exh. 114 at 2,

Interrogatory 1.a.

> **Keppel Response**:  Undisputed that YY Chow became Chief Operating Officer

of Keppel in 2012.  Disputed to the extent Plaintiffs imply that YY Chow was no longer

President of Keppel's subsidiary, KOM USA, as of June 2011.  YY Chow did not transition out

of his role as President of KOM USA until 2012.  Keppel Corp.'s 2011 Report to Shareholders

states that while "Mr Chow Yew Yuen was appointed MD of Keppel O&M. . . [h]e remains the

President of Americas."  (Keppel Opp'n Exh. 15, Keppel Corp. Report to Shareholders 2011 at

54.)  Emails sent to YY Chow in August 2011 were sent to his KOM USA email address, as

opposed to a Keppel email address.  (Keppel Opp'n Exh. 136, KEPPEL00030275.)  As Jeffrey

Chow testified, the email address can be used to determine the role that YY Chow had at the

relevant time.  (Keppel Opp'n Exh. 44, Chow Tr. 63:23-64:02.) ("From the e-mail, he was

CONTAINS CONFIDENTIAL INFORMATION

president of Keppel Offshore Marine USA in Houston.").  Leong Peng Tan further testified that

YY Chow was the President of KOM USA, as opposed to an executive at Keppel, in 2011.

(Keppel Opp'n Exh. 53, Tan Tr. 329:23-330:04, 331:05-10.)  Otherwise, undisputed.

20.     **EIG ¶ 20**:  YY Chow reported to Tong.  Exh. 121 at 85:4-9.

    **Keppel Response**:  Undisputed that Jeffrey Chow testified that "in the hierarchy

[Tong] was YY [Chow]'s boss."  (EIG Exh. 121 at 85:04-09.)

21.     **EIG ¶ 21**:  In 2011, Tong and YY Chow were also on the board of directors of

Keppel FELS Brasil S.A. ("**Keppel Brasil**"), a subsidiary of Keppel.  Exh. 133 at 83:4-19,

113:21-114:5.

    **Keppel Response**:  Disputed that the cited evidence establishes that Tong and YY

Chow were on the board of directors of Keppel FELS Brasil in 2011.  The cited evidence merely

states that (i) YY Chow was on the board of directors of Keppel FELS in 2014 and (ii) Tong did

not hold any board position on any Keppel entity after his tenure as the CEO of Keppel.  (EIG

Exh. 133 at 83:4-19, 113:21-114:05.)

22.     **EIG ¶ 22**:  Keppel Brasil, through its subsidiaries, owned and operated Keppel's

BrasFELS shipyard in Angra dos Reis, Brazil ("**BrasFELS**").  Exh. 77 at 35, 43.

    **Keppel Response**:  Undisputed that the BrasFELS Shipyard in Angra Dos Reis

was a wholly owned subsidiary of Keppel FELS Brasil.  Otherwise disputed as vague with

respect to the reference to "subsidiaries" apart from the BrasFELS Shipyard.

23.     **EIG ¶ 23**:  Between 2009 and 2016, Kwok was the Chief Executive Officer and

President of Keppel Brasil, and included in Keppel's organizational charts.  Exh. 102 at

KEPPEL00000153-160.

    **Keppel Response**:  Disputed to the extent that Plaintiffs ask the Court to infer

from Kwok's inclusion on organizational charts that he was an employee of Keppel.  Kwok was

CONTAINS CONFIDENTIAL INFORMATION

not an employee of Keppel, but rather the President of Keppel FELS Brasil.  Kwok was not

included on the lists of Keppel's directors and key executives in Keppel Corp.'s annual reports to

shareholders from 2009 to 2016.  (Keppel Opp'n Exh. 13, Keppel Corp. Report to Shareholders

2009, at 30; Keppel Opp'n Exh. 14, Keppel Corp. Report to Shareholders 2010, at 32; Keppel

Opp'n Exh. 15, Keppel Corp. Report to Shareholders 2011, at 26; Keppel Opp'n Exh. 16, Keppel

Corp. Report to Shareholders 2012, at 26; Keppel Opp'n Exh. 17, Keppel Corp. Report to

Shareholders 2013, at 26; Keppel Opp'n Exh. 18, Keppel Corp. Report to Shareholders 2014, at

26; Keppel Opp'n Exh. 19, Keppel Corp. Report to Shareholders 2015, at 32; Keppel Opp'n Exh.

20, Keppel Corp. Report to Shareholders 2016, at 32.)  Otherwise, undisputed.

24.     **EIG ¶ 24**:  During his employment with Keppel, Jeffery Chow was Keppel's

most senior in-house legal officer.  Exh. 121 at 12:25-13:2.

**Keppel Response**:  Disputed that Jeffrey Chow worked as the most senior in-

house legal officer throughout his time at Keppel.  Jeffrey Chow "started out as an admin

manager in a new engineering group".  He subsequently worked as "the legal manager", later

held a role as the "general manager of legal", and eventually worked as the "director of legal".

(EIG Exh. 121 at 12:10-21.)

25.     **EIG ¶ 25**:  Jeffery Chow testified that "[b]y no later than 2008" he "realized that

Keppel was overpaying the agent [Skornicki], sometimes by millions of dollars, so that the agent

could pay bribes to individuals who could help Keppel Offshore Marine do[] business with

Petrobras."  Exh. 121 at 26:7-27:19.

**Keppel Response**:  Undisputed.

26.     **EIG ¶ 26**:  Between 2001 and 2011, Keppel "executives created and executed

agreements on behalf of [Keppel] with consulting companies controlled by Consultant

[Skornicki] that were intended to facilitate bribe payment to obtain business from Petrobras and

CONTAINS CONFIDENTIAL INFORMATION

Sete Brasil and to conceal their purpose."  Exh. 105 at A-5 ¶ 21; Exh. 114 at 2, Interrogatory 1.a.

**Keppel Response**:  Undisputed, except to the extent it implies that Keppel or

anyone other than the individuals in the DPA knew at the time about the purpose of the

agreements described in Paragraph 26.  Further disputed to the extent Plaintiffs imply that the

agreements were intended to conceal anything from anyone outside of the Keppel group.  (EIG

Exh. 105 at A-2 to A-3,  ¶¶ 8-14; see infra CSOF ¶¶ 629-31 (citing Keppel Opp'n Exh. 9, Chow

Tr. 26:25-27:03, 90:14-91:05, 107:25-108:07-12, 142:04-07).)

27.    **EIG ¶ 27**:  Jeffery Chow admitted that he "created and executed false

agreements" on behalf of KOM with companies controlled, in whole or in part, by Skornicki to

"facilitate the payment of those bribes and conceal the true nature and purpose of the payments."

Exh. 121 at 40:22-41:15, 109:3-17; *see also* Exh. 103 at 4 ¶ 13.

**Keppel Response**:  Disputed as incomplete, since Paragraph 27 omits the passage

in the middle of the cited testimony in EIG Exh. 121, which stated that the agreements were

executed "in accordance with established practices" that pre-dated Sete.  (EIG Exh. 121 at 40:25-

41:02.)  Further disputed to the extent Plaintiffs imply that the agreements were intended to

conceal anything from anyone outside of the Keppel group.  (See infra CSOF ¶¶ 629-31 (citing

Keppel Opp'n Exh. 9, Chow Tr. 26:25-27:03; Keppel Opp'n Exh. 9, Chow Tr. 107:25-108:07-

12; Keppel Opp'n Exh. 9, Chow Tr. 90:14-91:05; Keppel Opp'n Exh. 9, Chow Tr. 142:04-07).)

28.    **EIG ¶ 28**:  Between 2004 and 2014, "under the guise of these consulting

agreements, [Keppel] effectuated bribes by making payments to bank accounts in the United

States and elsewhere in the names of shell companies controlled by" Skornicki.  Exh. 105 at A-5

¶ 22; Exh. 114 at 2, Interrogatory 1.a.

**Keppel Response**:  Undisputed.

9

CONTAINS CONFIDENTIAL INFORMATION

29.     **EIG ¶ 29**:  Skornicki then transferred money from those bank accounts in the United States to bank accounts outside the United States controlled by or for the benefit of Duque, Barusco, and members of the Workers' Party to further the Corruption Scheme.  Exh. 105 at A-5 ¶ 22; Exh. 114 at 2, Interrogatory 1.a.

        **Keppel Response**:  Disputed to the extent Plaintiffs imply Keppel knew at the time the details of Skornicki's payments to third parties, such as the bank accounts to which such payments were made or the owners or beneficiaries of such bank accounts.  Otherwise, undisputed.

30.     **EIG ¶ 30**:  Between 2001 and 2014, the bribes paid by KOM "amounted to approximately $55 million paid corruptly for the benefit of foreign officials, including Brazilian Official 1 [Barusco], Brazilian Official 2 [Duque], and the Workers' Party to secure improper advantages and to influence those foreign officials and the Workers' Party to obtain and retain business in Brazil."  Exh. 105 at A-5 ¶¶ 19-20; Exh. 114 at 2, Interrogatory 1.a.

        **Keppel Response**:  Disputed to the extent Paragraph 30 implies Keppel knew at the time the details of Skornicki's payments to third parties.  (See infra CSOF ¶ 637.)  Otherwise undisputed.

31.     **EIG ¶ 31**:  With respect to Sete, Skornicki "paid approximately $14.4 million in bribes to Brazilian Official 1 [Barusco], Brazilian Official 2 [Duque], and the Workers' Party" in connection with Keppel's Sete Engineering, Procurement and Construction ("**EPC**") contracts. Exh. 105 at A-15 ¶ 72; Exh. 113 at 22-23, RFAs 22-23; Exh. 114 at 2, Interrogatory 1.a.

        **Keppel Response**:  Disputed to the extent Paragraph 31 goes beyond the admissions in the DPA and cited evidence, which states that it "is not clear that all nine bribe payments related to the Sete Brasil projects".  (EIG Exh. 105.)  Further disputed to the extent Paragraph 31 implies Keppel knew at the time the details of Skornicki's payments to particular

third parties.  Further disputed on the basis that Keppel's subsidiary, Fernvale, entered the six

EPC contracts with Sete's subsidiary.  (Keppel Opp'n Exh. 87, PX51; Keppel Opp'n Exh. 88,

PX 52; Keppel Opp'n Exh. 89, PX53; Keppel Opp'n Exh. 90; PX54; Keppel Opp'n Exh.

91Keppel Opp'n Exh. PX55; Keppel Opp'n Exh. 93, PX70.)

32.     **EIG ¶ 32**:  In or about September 2013 to November 2014, at the instruction of a

Workers' Party official, Skornicki made nine payments of $500,000 to a bank account in

Switzerland to settle payments owed to the Workers' Party as bribes for the Sete Brasil project

and potentially others.  Exh. 105 at A-16 ¶ 78.

**Keppel Response**:  Disputed to the extent Paragraph 32 goes beyond the

admissions in the DPA and cited evidence.  Further disputed to the extent Paragraph 32 implies

Keppel knew at the time the details of Skornicki's payments to third parties.  (See infra CSOF

¶ 637.)

33.     **EIG ¶ 33**:  "KOM and its related entities, including KOM USA, earned profits

totaling approximately $351.8 million from business in Brazil obtained through the bribery

scheme."  Exh. 105 at A-5 ¶ 20.

**Keppel Response**:  Disputed to the extent Paragraph 33 implies that such profits

concern business from Sete, as opposed to the earlier projects in Brazil described in the DPA.

(EIG Exh. 105 at A-5 to A-14  ¶¶ 23-69.)

34.     **EIG ¶ 34**:  In the DPA, Keppel "admit[ed], accept[ed], and acknowledge[d] that

it is responsible under United States law for the acts of its officers, directors, employees, and

agents as charged in the Information, and as set forth in the Statement of Facts [attached to the

DPA], and that the allegations described in the Information and the facts described in the

Statement of Facts are true and accurate."  Exh. 105 at 2 ¶ 2.

**Keppel Response**:  Undisputed, except to the extent Plaintiffs imply that the DPA

11

CONTAINS CONFIDENTIAL INFORMATION

is relevant to Plaintiffs' claim for aiding and abetting investment fraud.  The DPA does not charge Keppel with defrauding Sete's investors, or with conspiring to defraud EIG or any other investors.  (EIG Exh. 105.)

35.     **EIG ¶ 35**:  Keppel "stipulate[d] to the admissibility of the Statement of Facts in any proceeding by the [Department of Justice] Fraud Section …, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding."  Exh. 105 at 2 ¶ 2.

        **Keppel Response**:  Undisputed, except to the extent Plaintiffs imply that the DPA is relevant to Plaintiffs' claim for aiding and abetting investment fraud.  The DPA does not charge Keppel with defrauding Sete's investors, or with conspiring to defraud EIG or any other investors.  (EIG Exh. 105.)

36.     **EIG ¶ 36**:  In August 2017, Jeffery Chow pled guilty to conspiring to violate the Foreign Corrupt Practices Act in connection with his role in the Corruption Scheme.  Exh. 121 at 16:23-18:19; Exh. 104 at 26:5-29:3.

        **Keppel Response**:  Undisputed that Jeffrey Chow pled guilty to one count of conspiring to violate the Foreign Corrupt Practices Act.  Keppel disputes Plaintiffs' definition of "Corruption Scheme" as vague and refers the Court to the DPA for its contents.  (Keppel Opp'n Exh. 152, DPA.)

37.     **EIG ¶ 37**:  On September 26, 2018, Petrobras entered into a Non-Prosecution Agreement with the U.S. Department of Justice and the U.S. Attorney's Office for the Eastern District of Virginia (the "**NPA**") in connection with the Corruption Scheme.  Exh. 106 at 1.

        **Keppel Response**:  Undisputed, except Keppel disputes Plaintiffs' definition of "Corruption Scheme" as vague, and refers to Petrobras's NPA for its contents.  (EIG Exh. 106.)

CONTAINS CONFIDENTIAL INFORMATION

38.     **EIG ¶ 38**:  In the NPA, Petrobras admitted that between at least 2004 and 2012, it was engaged in "massive bid-rigging and bribery schemes" involving the payment of bribes and kickbacks by Petrobras contractors to Petrobras personnel, political parties and public officials in exchange for various Petrobras contracts.  Exh. 106 at A-4-5 ¶¶ 14-16.

           **Keppel Response**:  Undisputed, except Keppel refers to Petrobras's NPA for its contents.  (EIG Exh. 106.)

39.     **EIG ¶ 39**:  In the NPA, Petrobras admitted that its kickback and corruption scheme involved many of Petrobras's other contractors and suppliers, including ship-operating companies and shipyards.  Exh. 106 at A-4 ¶ 14, A-8-10 ¶¶ 33-42.

           **Keppel Response**:  Undisputed, except Keppel refers to Petrobras's NPA for its contents.  (EIG Exh. 106.)

40.     **EIG ¶ 40**:  In the NPA, Petrobras "admit[ed], accept[ed], and acknowledge[d] that it is responsible under United States law for the acts of its officers, directors, employees, and agents as set forth in the [] Statement of Facts [attached to the NPA], and that the facts described therein are true and accurate."  Exh. 106 at 3.

           **Keppel Response**:  Undisputed, except to the extent Plaintiffs imply that Petrobras's NPA is relevant to Plaintiffs' claim for aiding and abetting investment fraud.  (EIG Exh. 106.)

41.     **EIG ¶ 41**:  On September 27, 2018, the U.S. Securities and Exchange Commission charged Petrobras "with misleading U.S. investors by filing false financial statements that concealed a massive bribery and bid-rigging scheme at the company," and issued a release stating that: "Petrobras fraudulently raised billions of dollars from U.S. investors while its senior executives operated a massive, undisclosed bribery and corruption scheme … [i]f an

13

international company sells securities in the United States, it must provide truthful information about its business operations."  Exh. 107 at 1.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the SEC's settlement with Petrobras was related in any way to Sete.  Further disputed to the extent it implies that Plaintiffs are among the investors referenced in the press release.  Further disputed to the extent it implies that Petrobras's settlement with the SEC concerning alleged misrepresentations and omissions in Petrobras's public stock offerings is relevant to Plaintiffs' claim concerning its private investment in Sete.  Further disputed to the extent Paragraph 41 implies that Plaintiffs have alleged that they relied on any of the purported misrepresentations and omissions at issue in the SEC's investigation of Petrobras (they have not).  Further disputed as inadmissible to the extent Plaintiffs rely on the cited evidence to prove the truth of its contents.

42.    **EIG ¶ 42**:  In 2019, Skornicki pled guilty in the United States District Court for the Eastern District of New York to conspiring to violate the Foreign Corrupt Practices Act in connection with his role in the Corruption Scheme.  Exh. 110 at 25:23-31:17.

**Keppel Response**:  Undisputed that Skornicki pled guilty to one count of conspiring to violate the Foreign Corrupt Practices Act, except Keppel disputes Plaintiffs' definition of "Corruption Scheme" as vague and refers the Court to the DPA for its contents. (Keppel Opp'n Exh. 152, DPA.)

43.    **EIG ¶ 43**:  In or about 2009, Keppel learned of Petrobras's need for drilling rig units to operate in deep and ultra-deep waters to explore the new oil reserves discovered by Petrobras off the coast of Brazil (the "**Rigs Project**" or the "**Drilling Rigs Project**").  Exh. 133 at 90:7-21.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed on the basis that Tan Leong Peng testified that "I think it's 2009" when asked when Keppel first heard Petrobras's announcement of the need for drilling rigs for offshore exploration, and further testified the he did not know if Keppel received any information "outside of the announcement" by Petrobras.  (EIG Exh. 133 at 90:07:91:04.)

44.     **EIG ¶ 44**:  In June 2010, Keppel submitted bids to Petrobras Netherlands B.V. ("**PNBV**"), a subsidiary of Petrobras, for the construction of drillings rigs for the Rigs Project. Exh. 133 at 91:6-17; Exh. 6 at EIG00091705/EIG_KEP_00164923.

**Keppel Response**:  Disputed to the extent Plaintiffs contend that Keppel, as opposed to Keppel FELS Brasil or the BrasFELS Shipyard, submitted bids on or around June 2010.  (EIG Exh. 133 at 92:12-14 and 93:12-17.)

45.     **EIG ¶ 45**:  The bids were made, through the Brazilian subsidiary owning the BrasFELS shipyard, for two semisubmersible drilling rigs and for seven drillships.  Exh. 133 at 91:18-93:7.

**Keppel Response**:  Disputed that the cited evidence establishes the assertion made in Paragraph 45.  Leong Peng Tan merely testified that BrasFELS was the entity that submitted an initial drilling rig bid.  (EIG Exh. 133 at 92:12-14.)

46.     **EIG ¶ 46**:  Keppel understood that it would be paying bribes and/or kickbacks on any contracts awarded to it or its subsidiaries by PNBV in connection with those bids.  Exh. 133 at 99:21-100:4.

**Keppel Response**:  Disputed.  There is no evidence of any discussions involving any Keppel entity concerning the bribery scheme relating to Sete until September 2011, as further evidenced by DPA.  (Keppel Opp'n Exh. 152, DPA.)  Leong Peng Tan referred Plaintiffs to the DPA for questions concerning the bribery scheme as the DPA reflects the scope of

CONTAINS CONFIDENTIAL INFORMATION

Keppel's knowledge of the bribery scheme.  (EIG Exh. 133 at 100:03-4; Keppel Opp'n

Exh.  152, A-15 at ¶¶ 73-74.)

47.    **EIG ¶ 47**:  Seven of the rigs that Keppel bid for were awarded by Petrobras to the

shipyard Estaleiro Atlântico Sul ("**EAS**"), and transferred by Petrobras to Sete after its

formation.  Exh. 9 at KEPPEL00007701.

**Keppel Response**:  Undisputed that seven rigs were awarded to the EAS

Shipyard.  Disputed to the extent that Paragraph 47 states that Keppel, rather than BrasFELS, bid

for any drilling rigs.  (Keppel Opp'n Exh. 52, Tan Tr. at 92:12-14.)

48.    **EIG ¶ 48**:  No later than December 4, 2010, employees at Keppel, including

Tong, YY Chow, Kwok, Tommy Sam, and others learned from Skornicki "after his discussion

with Barusco and Duque" that Petrobras would negotiate the first seven drill ships with EAS and

"award them the bid," and that Petrobras would set up a new company – Sete – that would

"conduct direct negotiation[s] with the other bidders" for the remaining 21 drilling rig units,

including Keppel.  Exh. 4 at KEPPEL00619705-06.

**Keppel Response**:  Disputed that YY Chow was an employee of Keppel.  YY

Chow was President of Keppel's subsidiary, KOM USA, and did not become a Managing

Director at Keppel until the summer of 2011.  (Keppel Opp'n Exh. 14, Keppel Corp. report to

Shareholders 2010, at 36.)  Disputed that Tommy Sam was an employee of Keppel.  Sam was an

employee of Keppel FELS Brasil  (Keppel Opp'n Exh. 149 KEPPEL_00000153-160 at 158.)

Disputed that Kwok was a Keppel employee.  Kwok was President and CEO of Keppel FELS

Brasil.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 158, 160.)  Otherwise, undisputed.

49.    **EIG ¶ 49**:  No later than December 4, 2010, Keppel knew that Barusco would be

a senior executive of Sete.  Exh. 4 at KEPPEL00619705-06.

**Keppel Response**:  Disputed.  The cited evidence does not establish that Keppel

CONTAINS CONFIDENTIAL INFORMATION

knew Barusco would be a senior executive of Sete by December 4, 2010.  The cited evidence

merely shows that Tommy Sam, an employee of Keppel FELS Brasil, sent an email stating that

"[t]he following is an update from Zwi after his discussion with Barusco and Duque in separate

meetings. . . Barusco will retired soon to become the President of this new company, Sete

Enterprise."  (EIG Exh. 4 at 705; Keppel Opp'n Exh. 149 KEPPEL_00000153-160 at 158.)  One

email from a subsidiary employee does not establish what Keppel knew as of December 4, 2010.

50.      **EIG ¶ 50**:  By December 2010, Keppel knew that Petrobras would own 10% of

Sete and the rest would be owned by "funds."  Exh. 4 at KEPPEL00619705-06.

**Keppel Response**:  Disputed.  The cited evidence does not establish the

assertions in Paragraph 50.  The cited evidence merely shows that Tommy Sam, an employee of

Keppel FELS Brasil, sent an email stating that "[a] new company will be set up by Petrobras

called Sete Enterprise with 10% owned by Petrobras and 90% to be owned by some funds".

(EIG Exh. 4 at 705; Keppel Opp'n Exh. 149 KEPPEL_00000153-160 at 158.)  One email from a

subsidiary employee does not establish what Keppel knew as of December 2010.

51.      **EIG ¶ 51**:  As of December 2010, Keppel expected to be awarded at least four

semisubmersible drilling rigs by Sete at a cost of at least $700 million per rig.  Exh. 4 at

KEPPEL00619705-06.

**Keppel Response**:  Disputed.  The cited evidence does not establish that as of

December 2010, Keppel expected to be awarded at least four semisubmersible drilling rigs by

Sete at a cost of at least $700 million per rig.  The cited evidence is an email from Tommy Sam,

a Keppel FELS Brasil employee, as opposed to a Keppel employee.  (Keppel Opp'n Exh. 149

KEPPEL_00000153-160 at 158)  The cited document describes one conversation where it was

discussed that Keppel's subsidiary's bid would be "given 4 drilling rig semi's."  (EIG Exh. 4 at

705.)

CONTAINS CONFIDENTIAL INFORMATION

52.    **EIG ¶ 52**:  By January 10, 2011, Keppel understood that Petrobras would "assign to SETE" the "7 drillships award[ed] to EAS and the remaining 21 units of Drilling units," and that each drilling rig constructed by Sete would be financed by 20% equity and 80% debt.  Exh. 7 at KEPPEL00036104.

**Keppel Response**:  Disputed that the cited evidence establishes the assertion in Paragraph 52.  The cited evidence does not establish what Keppel understood as of January 10, 2011.  The cited evidence merely shows that Yew Yuen Chow, an employee of Keppel's subsidiary, KOM USA, sent an email containing the language quoted.  (EIG Exh. 7 at 103-104.)

53.    **EIG ¶ 53**:  Also by January 10, 2011, Keppel knew that Sete would invite "both international and domestic" drilling contractors to bid for contracts and the "[d]rilling contractor for each unit will have to provide as equity 3% (i.e. 15% of 20%) of the total project cost."  Exh. 7 at KEPPEL00036104.

**Keppel Response**:  Disputed that the cited evidence establishes the assertions in Paragraph 53.  The cited evidence does not establish what Keppel knew as of January 10, 2011, rather, the cited evidence merely reflects that YY Chow, an employee of Keppel's subsidiary, KOM USA, sent an email containing the language quoted.  (EIG Exh. 7 at 103-104.)

54.    **EIG ¶ 54**:  As of January 2011, Keppel knew that Sete would be funded at least in part by private entities.  Exh. 133 at 135:4-9.

**Keppel Response**:  Disputed that the cited evidence establishes the assertion in Paragraph 54.  The document discussed in the cited testimony is an email that merely shows that YY Chow, an employee of Keppel's subsidiary, KOM USA, sent an email stating that private entities would have a stake in Sete.  (Keppel Opp'n Exh. 83, at PX006 at 339.)

18

CONTAINS CONFIDENTIAL INFORMATION

55.    **EIG ¶ 55**:  Between 2009 and early 2014, Chiau Beng Choo ("**Choo**") was the Chief Executive Officer of Keppel Corporation Ltd. ("**Keppel Corp.**") and Chairman of Keppel's board of directors.  Exh. 77 at 13, 202.

       **Keppel Response**:  Undisputed, except to clarify that Choo was replaced as CEO and Chairman on January 1, 2014.  (Keppel Opp'n Exh. 17, Keppel's Annual Report to Shareholders 2013, at 33, 93.)

56.    **EIG ¶ 56**:  After learning of Petrobras's plan for Sete, Keppel Corp. Chairman Boon Yang Lee wrote to Choo to ask "[w]ho actually owns SETE Enterprise. Petrobra[s] only own 5 to 10%. Who are the other private entities that will own the rest of the company. Has KOM done business with people in Sete before. Do we have any traction with Barusco who is going to head Sete."  Exh. 7 at KEPPEL00036103-05.

       **Keppel Response**:  Undisputed that the cited evidence contains the quoted language.  Disputed to the extent Plaintiffs' reference to "plan" implies anything beyond what is reflected in the cited email.  (EIG Exh. 7.)

57.    **EIG ¶ 57**:  Choo replied, cc'ing Tong, YY Chow, and others, that "we have to be prepared and also find out more. … Barusco is currently GM Engineering of Petrobras and he knows us well."  Exh. 7 at KEPPEL00036103.

       **Keppel Response**:  Undisputed that the cited evidence contains the quoted language.

58.    **EIG ¶ 58**:  On January 14, 2011, Skornicki sent YY Chow an email attaching a January 12, 2011 Petrobras presentation titled Drilling Rigs in Brazil Project: Presentation to Drilling Operators (the "**January 2011 Petrobras Presentation**").  Exh. 8 at KEPPEL00049887-88.

       **Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

59. **EIG ¶ 59**: The January 2011 Petrobras Presentation contained a "Cautionary Statement for US investors." Exh. 8 at KEPPEL00049889.

**Keppel Response**: Undisputed that the Presentation contained boilerplate language under the heading "Cautionary Statement for US investors". (EIG Exh. 8 at KEPPEL00049889.) Disputed to the extent Plaintiffs imply that the "Cautionary Statement" was directed at EIG, particularly given that the Presentation was "to Drilling Operators" and that the statement merely offers a clarification that the terminology and figures used in the Presentation may not align with the terminology and figures used by Petrobras in its SEC filings. (EIG Exh. 8.) Disputed further to the extent Plaintiffs imply the Cautionary Statement was directed at investors based in the U.S., as opposed to investors in U.S. securities based anywhere in the world.

60. **EIG ¶ 60**: The January 2011 Petrobras Presentation identified the "Main Challenges and Risks" of the Rigs Project. Exh. 8 at KEPPEL00049899.

**Keppel Response**: Undisputed that the Presentation included the quoted language.

61. **EIG ¶ 61**: The January 2011 Petrobras Presentation did not identify among the Main Challenges and Risks or anywhere else the existence of the Corruption Scheme. Exh. 8 at KEPPEL00049888-924.

**Keppel Response**: Undisputed that the Presentation did not address corruption risks.

62. **EIG ¶ 62**: The January 2011 Petrobras Presentation stated that "BNDES will play a key role by leading the financing package." Exh. 8 at KEPPEL00049901 (emphasis in original).

**Keppel Response**: Undisputed that the Presentation included the cited language.

CONTAINS CONFIDENTIAL INFORMATION

63.     **EIG ¶ 63**:  The January 2011 Petrobras Presentation further reflected that 20% of the financing for each rig would be equity, and that 85% of the equity would be held by "Finance Shareholders," including "Equity Investment Funds" and "Other Institutional Investors."  Exh. 8 at KEPPEL00049902.

>    **Keppel Response**:  Undisputed.

64.     **EIG ¶ 64**:  On February 12, 2011, Kwok forwarded a Petrobras press release to Keppel executives, which stated that "[t]he financial funds required by Sete BR will come from equity sources and long-term financing provided by the BNDES (Brazilian Development Bank), which will finance up to 100% of the Brazilian content of goods and services in the construction of each drilling rig."  Exh. 9 at KEPPEL00007701.

>    **Keppel Response**:  Disputed to the extent Plaintiffs imply that YY Chow was a Keppel executive as of February 12, 2011.  YY Chow was not appointed Managing Director of Keppel Offshore & Marine until the summer of 2011 and remained President of KOM USA until 2012.  (Keppel Opp'n Exh. 15 at 54.)  Otherwise, undisputed.

65.     **EIG ¶ 65**:  In April 2011, Choo reported to Tong, YY Chow, Kwok, and others about drinks he had with Barusco, during which he and Barusco discussed the capital structure of the "New Company" – Sete – as well as which entities would own its equity.  Exh. 11 at KEPPEL00010390.

>    **Keppel Response**:  Disputed to the extent Plaintiffs imply that the cited email reflects a discussion of Sete's "capital structure" beyond the following:  "[Barusco] said Petrobras has between 5 to 10 pc of this New Company, Four Bank Funds, and Employees Guarantee Fund and BNDES have the rest."  (EIG Exh. 11 at KEPPEL00010390.)  Further disputed to the extent Plaintiffs imply the cited email reflects a discussion relevant in any way to EIG or international investors, which are not referenced in the email.  (EIG Exh. 11.)

66.   **EIG ¶ 66**:  Keppel is a wholly-owned subsidiary and business unit of Keppel Corp.  Exh. 120 at 25:11-14.

   **Keppel Response**:  Undisputed that Keppel is a wholly-owned subsidiary of Keppel Corp.  Disputed as to the meaning of "business unit" which is vague.

67.   **EIG ¶ 67**:  Choo later left Keppel because of his involvement in the Corruption Scheme.  Exh. 133 at 105:11-15.

   **Keppel Response**:  Disputed that the cited evidence establishes that Choo "left Keppel because of his involvement in the Corruption Scheme".  The cited testimony reflects, at most, that Leong Peng Tan "guess[ed]" about the reasons for Choo's departure.  (EIG Exh. 133 at 105:11-15.)

68.   **EIG ¶ 68**:  At that meeting, Barusco told Choo that Sete wanted to award semisubmersible rigs to Keppel.  Exh. 11 at KEPPEL00010390.

   **Keppel Response**:  Disputed to the extent it goes beyond the cited email, which states that "they want to award the Semis to Brasfels but EP is not agreeable".  (EIG Exh. 11 at KEPPEL00010390.)

69.   **EIG ¶ 69**:  In or about April 2011, Keppel received a report in which João Carlos de Medeiros Ferraz ("**Ferraz**") confirmed that "[n]ew investors are lining up" to invest in Sete, including private equity funds from the United States and Europe.  Exh. 12 at KEPPEL00037968.

   **Keppel Response**:  Disputed that the cited document shows when, or if, anyone at Keppel may have received the news article.  The report is dated April 15, 2011, but the cited exhibit does not show when, or if, anyone at Keppel received it, let alone reviewed it.  (EIG Exh. 12 at KEPPEL00037968.)  Disputed that the article reported that Ferraz had confirmed that "'[n]ew investors are lining up' to invest in Sete".  The cited report states that Ferraz confirmed

CONTAINS CONFIDENTIAL INFORMATION

that "the next round of procurement would not be long coming" and does not attribute the other statement about "funds from Brazil, the US and Europe" to anyone.  (EIG Exh. 12 at KEPPEL00037968.)

70.     **EIG ¶ 70**:  Ferraz was a Petrobras employee from 1980 until 2011, when he left Petrobras to become the Chief Executive Officer of Sete.  Exh. 30 at EIG_KEP_00048967.

        **Keppel Response**:  Undisputed.

71.     **EIG ¶ 71**:  Ferraz entered a plea agreement and admitted to his participation in the Corruption Scheme as Chief Executive Officer of Sete.  Exh. 100 at 1-3.

        **Keppel Response**:  Undisputed that Ferraz entered a plea agreement in connection with Operation Car Wash and his role as CEO of Sete.

72.     **EIG ¶ 72**:  On or about June 14, 2011, YY Chow and Skornicki received an invitation from Barusco for Keppel to bid to construct drilling rigs for Sete.  Exh. 15 at KEPPEL00441474-75.

        **Keppel Response**:  Disputed that the invitation was for Keppel to bid to construct drilling rigs for Sete.  The invitation is addressed to "Keppel Fels".  (Exh. 15 at KEPPEL00441475.)  Otherwise, undisputed.

73.     **EIG ¶ 73**:  In July 2011, Barusco requested, through Skornicki, that Keppel submit a proposal to Sete to construct a semisubmersible rig as part of a joint venture in which Keppel would take a 20% equity stake.  Exh. 21 at KEPPEL00269514-15; Exh. 133 at 179:13-25.

        **Keppel Response**:  Disputed that the request was for Keppel to submit a proposal.  The draft proposals in the cited document are entitled "KFELS Proposal"  (EIG Exh. 21 at KEPPEL00269513).  Otherwise, undisputed.

CONTAINS CONFIDENTIAL INFORMATION

74.   **EIG ¶ 74**: At that time, Keppel understood that Sete required additional equity financing.  Exh. 133 at 131:8-15.

**Keppel Response**:  Disputed.  The cited testimony does not establish the assertions in Paragraph 73.  In response to a question about when Keppel "first learn[ed] that Sete would require equity financing", Leong Peng testified that "I think it's time when I think we believe we have spoken about potentially having a joint venture for one of the units".  (EIG Exh. 133 at 131:13-15.)  The discussions concerning the financing needed to fund the joint venture for the first rig occurred around October 2011.  (EIG Exh. 39.)

75.   **EIG ¶ 75**: On or about July 15, 2011, Keppel sent a proposal to Sete for a semisubmersible rig at a price of $798 million USD.  Exh. 22 at KEPPEL00619599.

**Keppel Response**:  Disputed that Keppel sent a proposal to Sete.  The proposal was sent by Keppel's subsidiary, Keppel FELS, as shown by the letterhead.  (Exh. 22 at KEPPEL00619599.)  Otherwise, undisputed.

76.   **EIG ¶ 76**: The proposal stated, "The proposed Joint Venture (JV) shall be Keppel FELS Ltd (10-20%), Queiroz Galvão Óleo e Gás S.A. (20%) and Sete Brasil (60-70%)."  Exh. 22 at KEPPEL00619600.

**Keppel Response**:  Undisputed.

77.   **EIG ¶ 77**: It stated, "The proposed financing model for this project shall be 20% equity and 80% financing to be secured by Sete Brasil."  Exh. 22 at KEPPEL00619600.

**Keppel Response**:  Undisputed.

78.   **EIG ¶ 78**: The July 15, 2011 proposal was signed by "Chow Yew Yuen" as the "Managing Director" of "Keppel Offshore and Marine."  Exh. 22 at KEPPEL00619601.

**Keppel Response**:  Disputed.  Paragraph 78 is incomplete to the extent that it omits that the letter is signed "Yours faithfully, Keppel FELS Ltd".  (EIG Exh. 22 at 601.)

CONTAINS CONFIDENTIAL INFORMATION

Moreover, while YY Chow had been appointed Managing Director of Keppel Offshore and Marine by the date the proposal was signed, he continued to serve as the President of Keppel's subsidiary, KOM USA, which was a unit of Keppel FELS.  (Keppel Opp'n Exh. 15, Keppel Corp. Report to Shareholders 2011, at 54.)

79.     **EIG ¶ 79**:  On July 20, 2011, YY Chow submitted an "Early Warning Paper" to the Keppel Corp.'s board of directors regarding the "Proposed JV with Sete Brasil for Newbuild DSS38E Semisubmersible Rig[,]" which stated it was "supported by" Tong (the "**Early Warning Paper**").  Exh. 41 at KEPPEL00427325.

**Keppel Response**:  Undisputed.

80.     **EIG ¶ 80**:  The Early Warning Paper stated that "[f]or Petrobras, Sete Brasil is an off-balance-sheet entity, in which it would <u>retain a minority (15%) stake</u> while the finance shareholders (Brazilian pension funds, equity investment funds and other institutional funds) hold the remaining 85% stake.  The plan is to eventually float Sete Brasil in the equity markets and seek established drillers to join the entity."  Exh. 41 at KEPPEL00427325.

**Keppel Response**:  Undisputed.

81.     **EIG ¶ 81**:  The Early Warning Paper described the proposed joint venture's capital structure, which would include 20% equity and a 20% equity stake by Keppel estimated at US$32 million.   Exh. 41 at KEPPEL00427326.

**Keppel Response**:  Undisputed.

82.     **EIG ¶ 82**:  The Early Warning Paper further stated that "the proposed JV is expected to face minimal financing risk, given the fact that project financing will be secured by Sete Brasil (with BNDES backing)."  Exh. 41 at KEPPEL00427327.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

83.  **EIG ¶ 83**:  On July 21, 2011, Keppel Corp.'s board of directors authorized Keppel to "proceed with further discussions with the Sete Brasil and QGOG on the Proposed Joint Venture."  Exh. 29 at KEPPEL00440969.

**Keppel Response**:  Undisputed.

84.  **EIG ¶ 84**:  Skornicki was Keppel's agent with respect to its bids for the EPC contracts with Sete.  Exh. 133 at 188:4-8.

**Keppel Response**:  Disputed to the extent Plaintiffs contend that Keppel, as opposed to Keppel FELS Brasil, submitted bids for EPC contracts with Sete.  (Keppel Opp'n Exh. 150, KEPPEL00414911 at 911.)  Otherwise, undisputed.

85.  **EIG ¶ 85**:  Keppel agreed to pay Skornicki 2% of the contract value of the EPC contracts in the "third quarter of 2011."  Exh. 133 at 71:11-72:10.

**Keppel Response**:  Undisputed.

86.  **EIG ¶ 86**:  On July 5, 2011, Tan instructed a Keppel employee to adjust a cost estimate for a DSS38E semisubmersible rig for Sete to include a 2% commission for Skornicki. Exh. 133 at 166:8-167:15.

**Keppel Response**:  Undisputed, except to clarify that Chin Wong Tey, the employee Tan emailed, was employed by Keppel's subsidiary, Keppel FELS Brasil, as shown by his email address.  (Keppel Opp'n Exh. 96, PX090 at 030.)

87.  **EIG ¶ 87**:  YY Chow was part of the bidding team that decided to increase the commission for Skornicki in Keppel's cost estimates to 2%.  Exh. 133 at 170:25-171:6.

**Keppel Response**:  Disputed that the cited evidence establishes the assertion made in Paragraph 87.  Leong Peng Tan testified that he "really can't recall, to be very frank" whether YY Chow was involved in Skornicki's commission.  (EIG Exh. 133 at 171:11-12.)

CONTAINS CONFIDENTIAL INFORMATION

88.    **EIG ¶ 88**:  On September 19, 2011, Jeffery Chow wrote an email to Keppel employee Nora Marsuki ("**Marsuki**") regarding a "Commission Agreement with Eagle do Brasil" for her to "[p]ut this in a plain paper and pass to CHT [Chong Heong Tong]/YY [YY Chow], then delete email."  Exh. 35 at KEPPEL00045696.

    **Keppel Response**:  Undisputed.

89.    **EIG ¶ 89**:  Jeffery Chow told Marsuki to put the message on a piece of paper and delete his email to conceal the fact that the commission agreement between Keppel and Skornicki was going to be, or needed to be, executed.  Exh. 121 at 86:4-10.

    **Keppel Response**:  Disputed on the basis that the cited evidence does not establish the assertions in Paragraph 88.  As Jeffrey Chow testified, "[t]he intention wasn't to conceal any bribe payments.  The intention was to capture in writing the agreement between the company and Mr. Skornicki, that he would be paid a certain commission fee for his assistance under certain contracts."  (See infra CSOF ¶¶ 629-31 (citing Keppel Opp'n Exh. 9, Chow Tr. 26:25-27:03, 90:14-91:05, 107:25-108:07-12, 142:04-07).)

90.    **EIG ¶ 90**:  In that message, Jeffery Chow also wrote:  "[N]eed to execute the standard Commission Agreement with Eagle do Brasil, with the 1.5%, as a copy of this will be showed up the line to convey that this is all.  Nothing more.  We've signed before for other jobs and have seen other agreements with Eagle for even larger amounts.  Would prefer not to, but the Comm. Agreement, may be the only thing that will satisfy people."  Exh. 35 at KEPPEL00045696.

    **Keppel Response**:  Undisputed.

91.    **EIG ¶ 91**:  Eagle do Brasil Ltda. ("**Eagle**") was an entity owned and controlled by Skornicki, his wife, and his son.  Exh. 55 at KEPPEL00280913.

    **Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

92.     **EIG ¶ 92**:  On September 19, 2011, Jeffery Chow messaged Marsuki and asked her to type the message to YY Chow that "[w]ill need to prepare Commission Agreement with Eag[l]e for the 1.5%.  Is this okay, as he will have to show that this is all he is getting?"  Exh. 36 at KEPPEL00280920.

        **Keppel Response**:  Undisputed.

93.     **EIG ¶ 93**:  Marsuki asked if she should "text" the message to YY Chow, and Jeffery Chow responded: "No. Type on paper and see how to get [it] to him."  Exh. 36 at KEPPEL00280920.

        **Keppel Response**:  Undisputed.

94.     **EIG ¶ 94**:  On or about July 29, 2011, Barusco called Skornicki and asked if a group of Sete investors could visit the BrasFELS shipyard on August 4, 2011.  Exh. 23 at KEPPEL00010310.

        **Keppel Response**:  Undisputed.

95.     **EIG ¶ 95**:  Ordinarily, a yard tour at BrasFELS would need to be authorized by Kwok, the President of Keppel Brasil, and would include a presentation.  Exh. 133 at 273:10-17, 274:11-18.

        **Keppel Response**:  Undisputed, except disputed to the extent Paragraph 95 implies that Keppel had any involvement in any yard visit by EIG.

96.     **EIG ¶ 96**:  On July 29, 2011, Skornicki emailed Kwok and YY Chow and asked whether "some investors in Sete" could visit BrasFELS, explaining that Barusco was waiting for his response.  Exh. 23 at KEPPEL00010310.

        **Keppel Response**:  Undisputed, except to state that there is no evidence that YY Chow read or responded to the email described in Paragraph 96.  (EIG Exh. 23.)

28

CONTAINS CONFIDENTIAL INFORMATION

97.     **EIG ¶ 97**:  On July 30, 2011, in reply to Skornicki's question about the visit, Kwok directed Keppel Brasil employee Edmundo Santos ("**Santos**"), cc'ing Skornicki and YY Chow, to "liaise with Zwi and organize accordingly."  Exh. 23 at KEPPEL00010310.

**Keppel Response**:  Undisputed.

98.     **EIG ¶ 98**:  On August 3, 2011, Skornicki forwarded Santos, Kwok, and YY Chow a list from Sete of visitors for the upcoming August 4 visit to BrasFELS.  Exh. 24 at KEPPEL00010458.

**Keppel Response**:   Undisputed.

99.     **EIG ¶ 99**:  On the list of visitors were (i) Kevin Corrigan ("**Corrigan**") of EIG, (ii) two representatives of China Investment Corp ("**CIC**"), and (iii) Fabio Cunha and Ivan Hong, who had written next to their names "Sete Brasil."  Exh. 24 at KEPPEL00010458.

**Keppel Response**:  Undisputed.

100.    **EIG ¶ 100**:  In August 2011, Corrigan visited the BrasFELS shipyard alongside CIC.  Exh. 122 at 130:9-131:5.

**Keppel Response**:  Undisputed.

101.    **EIG ¶ 101**:  CIC was another international investor interested in a potential equity investment in Sete.  Exh. 122 at 131:6-132:6.

**Keppel Response**:  Undisputed, except to state, as Kevin Corrigan testified, that CIC was "an investor in EIG funds" and that EIG "set [the August 2011 BrasFELS yard tour] up to help CIC in their due diligence".  (Keppel Opp'n Exh. 45, Corrigan Tr. at 131:06-132:06.) Further undisputed to the extent Paragraph 101 implies that EIG had not already entered a binding agreement to invest in Sete.

102.    **EIG ¶ 102**:  During this visit, Keppel provided Corrigan a presentation "touting [Keppel's] skills," and gave him a tour of the shipyard.  Exh. 122 at 133:15-134:9, 141:4-11.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed to the extent that Paragrpah 102 implies that Keppel, as opposed to BrasFELS employees, provided any presentation during Corrigan's visit to the BrasFELS Shipyard in August 2011.  Corrigan's deposition included the following:  "Q. There were discussions with representatives of Brasfels on this trip; is that correct?  A. Yes, they, I recall they greeted us, they gave a presentation and then we walked around the shipyard, which is quite large."  (Keppel Opp'n Exh.  45, Corrigan Tr. 133:15-21) (emphasis added).  Disputed to the extent that Plaintiffs imply that the presentation Corrigan was shown focused on anything other than "shipbuilding capacity".  (See infra CSOF ¶ 599 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 143:07-09).)  Undisputed that Corrigan testified that during his visit to the BrasFELS Shipyard, he was shown a presentation by representatives of BrasFELS that "would have been an overview of their operations, and I'm sure it was touting their skills, etcetera".  (Keppel Opp'n Exh. 45, Corrigan Tr. 133:15-134:05.)

103.   **EIG ¶ 103**:  Keppel did not reveal the Corruption Scheme to EIG during the August 2011 visit to BrasFELS.  Exh. 122 at 136:3-13.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that Keppel had an opportunity (let alone duty) to disclose the bribery scheme during EIG's August 2011 visit to the BrasFELS Shipyard.  The evidence shows only that EIG communicated with BrasFELS representatives, as opposed to Keppel representatives, during the August 2011 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh.  45, Corrigan Tr. 133:15-21; 135:22-136:13.)  Disputed to the extent that Plaintiffs imply that anyone who attended the August 2011 BrasFELS yard tour was aware of the bribery scheme.  There is no evidence that anyone from BrasFELS who attended the yard tour knew about the corruption scheme.  Furthermore, the subjects of corruption and bribery were not raised by anyone who attended the August 2011 BrasFELS yard

tour.  (See infra CSOF ¶ 602 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 136:14-17, 143:03-06).)

104.    **EIG ¶ 10**:  On August 8, 2011, Fabio Cunha of Sete wrote in an email received by Santos and later Kwok that the August 4 visit "was very fruitful and our investors and employees learned a lot about the construction of platforms/vessels.  The overall impression was good and reached the expected reduction in the risk perception of the project."  Exh. 25 at KEPPEL00011126.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the visit to the BrasFELS Shipyard that occurred on or around August 4, 2011 covered anything beyond "the construction of platforms/vessels" or reduced "the risk perception of the project" with respect to risks associated with anything other than "the construction of platforms/vessels".  (EIG Exh. 25 at 126.)  Undisputed that on August 8, 2011, Fabio Cunha of Sete sent an email to Edmundo Santos containing the language quoted, and that this email was later forwarded to Kai Choong Kwok by Carla Shimabukuro, all of whom were employees of Keppel FELS Brasil.  (EIG Exh. 25 at 126.)

105.    **EIG ¶ 105**:  Shortly after EIG's visit, on August 16, 2011, Tommy Sam ("**Sam**") received a news report that included the headline "Sete Brasil receives contribution from EIG Fund."  Exh. 26 at KEPPEL00020438.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that anyone at any Keppel entity read the news report with the headline "Sete Brasil receives contribution from EIG fund", which was one of nine other headlines in the news report.  (EIG Exh. 26.)  There is no evidence that anyone at Keppel read the news report.  Further disputed on the basis that the article was in Portuguese and there is no evidence proving Sam could read Portuguese. (EIG Exh. 26.)

CONTAINS CONFIDENTIAL INFORMATION

106.  **EIG ¶ 106**: Sam is "KOM Executive 5" described in the DPA.  Exh. 105 at A-3 ¶ 12; Exh. 114 at 2, Interrogatory 1.a.

**Keppel Response**:  Undisputed, except to clarify that Sam held positions at KOM subsidiaries rather than KOM.  (EIG Exh. 105 at A-3 ¶ 12; EIG Exh. 114 at 2, Interrogatory 1.a; Keppel Opp'n Exh. 149, KEPPEL_00000153-160.)

107.  **EIG ¶ 107**:  Between 2009 and 2017, Sam held executive positions at Keppel Brasil, including Chief Financial Officer and Vice President.  Exh. 133 at 86:13-24.

**Keppel Response**:  Undisputed that Sam was Vice President of Keppel FELS Brasil in 2011.  Disputed that Sam was Chief Financial Officer of Keppel Brasil.  In 2009 and 2010, Sam did not hold an executive-level position at Keppel FELS Brasil.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 159-160.)  In 2012 and 2013, Sam was the President and CEO of subsidiary Bennett Offshore.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 156-157.)  From 2014 to 2016, Sam was Chief Financial Officer of KOM USA.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 153-155.)

108.  **EIG ¶ 108**:  Between 2012 and 2017, Sam also held "an executive position at KOM [Keppel] and at KOM USA."  Exh. 105 at A-3 ¶ 12.

**Keppel Response**:  Disputed that Sam held executive positions at Keppel between 2012 and 2017.  Evidence shows that Sam held positions at Keppel's subsidiaries, rather than Keppel, from at least 2011 to 2016.  In 2011, Sam was Vice President of Keppel FELS Brasil.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 158.)  From 2012 to 2015, Sam was President & CEO of Bennett Offshore.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 154-157.)  Bennett Offshore is a KOM subsidiary.  (Keppel Opp'n Exh. 152, DPA at A-3 ¶ 12.)  In 2016, Sam was Chief Financial Officer of KOM USA.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 153.)

CONTAINS CONFIDENTIAL INFORMATION

109.   **EIG ¶ 109**:  The email linked to an August 15, 2011 article in Valor Econômico titled "Sete Brasil Receives Contribution from EIG Fund," which stated that EIG had allocated R$250 million to Sete and would be the first foreign investor in Sete.  Exh. 26 at KEPPEL00020438.

   **Keppel Response**:  Disputed to the extent Plaintiffs imply that anyone at any Keppel entity read this article, which was in Portuguese.  (Exh. 26 at KEPPEL00020438.)

110.   **EIG ¶ 110**:  On August 15, 2011, YY Chow approved a request from Barusco, communicated through Skornicki, for a "Sete film" to be shot at the BrasFELS shipyard on August 24, 2011.  Exh. 27 at KEPPEL00030275.

   **Keppel Response**:  Disputed to the extent Paragraph 110 implies that YY Chow approved the contents of the "Sete film".  (EIG Exh. 27 at 275.)  Further disputed to the extent Paragraph 110 implies that YY Chow understood that there was any connection between the "Sete film" and EIG.  There is no mention of EIG in the cited evidence.  (EIG Exh. 27 at 275.)

111.   **EIG ¶ 111**:  YY Chow approved the "Sete film," stating: "Go ahead but our people must be involved.  We must approve the final version before release."  Exh. 27 at KEPPEL00030275.

   **Keppel Response**:  Disputed that YY Chow approved the "Sete film".  The cited document establishes only that YY Chow approved a request for the Sete film to be shot at the BrasFELS Shipyard.  (EIG Exh. 27 at 275.)  Undisputed that the cited evidence contains the language quoted.

112.   **EIG ¶ 112**:  The "Sete film" that YY Chow authorized on August 15, 2011 was produced for EIG's 2011 investors conference by Barrington Media, which filmed the BrasFELS shipyard on August 24, 2011.  Exh. 28 at KEPPEL00020435.

   **Keppel Response**:  Undisputed that Barrington Media videotaped general

CONTAINS CONFIDENTIAL INFORMATION

shipbuilding activity at the BrasFELS Shipyard on or around August 24, 2011.  Disputed that

YY Chow authorized the "Sete film".  The evidence merely shows that YY Chow authorized a

videoshoot at the BrasFELS Shipyard.  (See infra CSOF ¶ 613 (citing Keppel Opp'n Exh. 136,

KEPPEL00030275-276 at 275).)  Further disputed to the extent Plaintiffs imply that YY Chow

or anyone else at BrasFELS was responsible for the planning of the "Sete film" that was shown

at EIG's 2011 investors conference or that anyone at Keppel was aware of EIG's purported

purposes for the video.  (See infra CSOF ¶¶ 609-11 (citing Keppel Opp'n Exh. 77, DX092 at

596; Keppel Opp'n Exh. 78, DX093 at 446-47; Exh. 99, BARRINGTON_ET_00000486-0495 at

494).)  Barrington Media reached out to Sete on EIG's behalf to arrange the August 2011 video

shoot.  (Keppel Opp'n Exh. 78, DX093 at 447.)   EIG failed to produce any version of the video

purportedly shown at its conference.

113.    **EIG ¶ 113**:  In August 2011, Kwok and Sam were copied on emails to and from

Barbara Olsen ("**Olsen**") of Barrington Media, on which Corrigan was also copied, about the

upcoming August 24, 2011 film shoot at the BrasFELS shipyard.  Exh. 28 at KEPPEL00020435.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that there was any

direct communication between anyone at EIG, including Kevin Corrigan, and anyone at any

Keppel entity in connection with the Barrington video shoot at the BrasFELS Shipyard.  There is

no evidence of such communications, as the only communications show Barbara Olsen at

Barrington communicating with Keppel FELS Brasil administrative assistant, Adriana Farah.

(See infra CSOF ¶ 612 (citing Keppel Opp'n Exh. 100, BARRINGTON_ET_00000651-0654 at

652-654).)

114.    **EIG ¶ 114**:  EIG showed the video about its potential investment in Sete, which

included footage of the BrasFELS shipyard, at its 2011 investors conference in fall 2011.  Exh.

134 at 104:14-107:12.

**Keppel Response**:  Disputed on the basis that EIG failed to produce any version of the video purportedly shown in fall 2011.  Further disputed to the extent Plaintiffs imply that the footage of the BrasFELS shipyard included footage of any ships built for Sete.  Further disputed on the basis that there is no evidence the final version of the video mentioned any Keppel entity.

115.    **EIG ¶ 115**:  On September 27, 2011, Keppel board member Stephen Pan ("**Pan**") sent a presentation titled "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" (the "**September 2011 Petrobras Presentation**") to Choo, Tong, YY Chow, and Keppel Chief Financial Officer Ngiam Jih Wong.  Exh. 37 at KEPPEL00040804, KEPPEL00040827.

**Keppel Response**:  Disputed to the extent Paragraph 115 implies that the cited evidence establishes that anyone who received the September 27, 2011 email from Stephen Pan read the email or reviewed the presentation.  There is no evidence that anyone from Keppel opened any attachments to Stephen Pan's September 27, 2011 email described in Paragraph 115.

116.    **EIG ¶ 116**:  Tong and YY Chow knew of the existence of the Corruption Scheme.  Exh. 105 at A-15 ¶ 72; Exh. 114 at 2, Interrogatory 1.a.

**Keppel Response**:  Disputed on the basis that there is no evidence directly from Tong or YY Chow to establish their knowledge and Paragraph 116 does not specify the date of their purported knowledge, but undisputed that Tong and YY Chow were eventually discovered to have been involved in certain conduct related to the bribery scheme, as described in the DPA.

117.    **EIG ¶ 117**:  The September 2011 Petrobras Presentation is identical to the Petrobras Drilling Presentation received by EIG in September 2010.  *Compare* Exh. 37 at KEPPEL00040827 *with* Exh. 2 at EIG_KEP_00075178.

**Keppel Response**:  Undisputed that the Drilling Presentation sent by Stephen Pan

CONTAINS CONFIDENTIAL INFORMATION

in September 2011 appears to be substantially the same as the Drilling Presentation that EIG received in September 2010.  Disputed to the extent Paragraph 117 implies that the cited evidence suggests that anyone at Keppel had any awareness that EIG had ever received the Drilling Presentation.  (EIG Exh. 37; EIG Exh. 2.)

118.   **EIG ¶ 118**:  The September 2011 Petrobras Presentation contained a "Cautionary Statement for US investors."  Exh. 37 at KEPPEL00040828.

**Keppel Response**:  Undisputed that the Drilling Presentation contained boilerplate language under the heading "Cautionary Statement for US investors" followed by a disclaimer that the Drilling Presentation "shall not be used for any decision for an investment". (EIG Exh. 37 at KEPPEL00040828.)  Disputed to the extent Plaintiffs imply that the "Cautionary Statement" was directed at EIG, particularly given that the statement merely offers a clarification that the terminology and figures used in the Drilling Presentation may not align with the terminology and figures used by Petrobras in its SEC filings.  (EIG Exh. 37.)  Disputed further to the extent Plaintiffs imply the Cautionary Statement was directed at investors based in the U.S., as opposed to investors in U.S. securities anywhere in the world.  (EIG Exh. 37.)

119.   **EIG ¶ 119**:  The September 2011 Petrobras Presentation identified the Main Risks and Challenges to the project.  Exh. 37 at KEPPEL00040847.

**Keppel Response**:  Disputed to the extent that Paragraph 119 implies that the cited evidence establishes that anyone at Keppel reviewed the September 2011 Petrobras Presentation or the slide describing main risks and challenges to the project.  Otherwise, undisputed.

120.   **EIG ¶ 120**:  The Main Challenges and Risks listed in the September 2011 Petrobras Presentation are identical to the Main Challenges and Risks listed in the Petrobras

CONTAINS CONFIDENTIAL INFORMATION

Drilling Presentation received by EIG in September 2010.  *Compare* Exh. 8 at

KEPPEL00049899 *with* Exh. 2 at EIG00025582/EIG_KEP_00075198.

> **Keppel Response**:  Undisputed.

121.    **EIG ¶ 121**:  The September 2011 Petrobras Presentation stated that "BNDES will

have an important and leading role for financing rigs construction, taking most of the long term

debt."  Exh. 37 at KEPPEL00040853.

> **Keppel Response**:  Undisputed.

122.    **EIG ¶ 122**:  The September 2011 Petrobras Presentation did not identify among

the Main Challenges and Risks or anywhere else the existence of the Corruption Scheme.  Exh.

37 at KEPPEL00040827-62.

> **Keppel Response**:  Undisputed that the Presentation did not address corruption

risks.

123.    **EIG ¶ 123**:  In the fourth quarter of 2011, Keppel conducted due diligence on

Sete in anticipation of investing in a joint venture in connection with the first semisubmersible

rig it proposed to build for Sete.  Exh. 133 at 245:8-16.

> **Keppel Response**:  Undisputed that Keppel considered participating in a joint

venture in connection with the first rig in late 2011.  Disputed that the cited evidence establishes

that Keppel conducted due diligence on Sete in the fourth quarter of 2011.  (EIG Exh. 133 at

245:8-16.)

124.    **EIG ¶ 124**:  As part of Keppel's due diligence on Sete, it examined the equity

structure of Sete.  Exh. 133 at 246:19-247:5.

> **Keppel Response**:  Disputed as incomplete and to the extent that Plaintiffs imply

that the cited evidence establishes the assertion in Paragraph 124.  The cited evidence merely

establishes that Tan testified that he was "personally not involved in the due diligence" but that

37

CONTAINS CONFIDENTIAL INFORMATION

he understood based on a document he saw that "they have gone through and look at the equity structure".  (EIG Exh. 133 at 246:19-247:05.)

125.     **EIG ¶ 125**:  In October 2011, Sam sent an email to Sete "request[ing] Sete Brasil's Business plan that contains . . . its structure and terms, ROI, equity investment and etc which a company would normally have to seek its own board or investors approval for any investment."  Exh. 39 at KEPPEL00556337-38.

**Keppel Response**:  Undisputed.

126.     **EIG ¶ 126**:  On October 30, 2011, Sam received a presentation (the "**Sete Management Presentation**") and financial model (the "**Sete Financial Model**") from Sete. Exh. 39 at KEPPEL00556336.

**Keppel Response**:  Undisputed.

127.     **EIG ¶ 127**:  Sam sent the presentation and financial model he received on October 30, 2011 to Leong Peng Tan ("**Tan**"), Kwok, YY Chow, Jeffery Chow, and other Keppel executives that same day, writing that they should "review and see what other info we need."  Exh. 39 at KEPPEL00556336.

**Keppel Response**:  Disputed.  Leong Peng Tan was an employee of a Keppel subsidiary rather than Keppel, as shown by his email address.  (EIG Exh. 39 at 336.)  YY Chow received the email in his capacity as an employee of KOM USA, as shown by his email address. (EIG Exh. 39 at 336.)  Disputed that the cited evidence establishes that the recipients of the email reviewed the attachments.  The cited evidence merely establishes that Tommy Sam sent an email stating, "Let's review and see what other info we need."  (EIG Exh. 39 at 336.)  Further disputed to the extent Plaintiffs imply that any materials mentioned EIG.

128.     **EIG ¶ 128**:  Between 2012 and 2015, Tan was the Deputy Project Manager of Fernvale Pte Ltd. ("**Fernvale**").  Exh. 133 at 16:13-23.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed that Tan was the Deputy Manager of Fernvale Pte Ltd. between 2012 and 2015.  The cited evidence merely establishes that Tan was the deputy project director at Fernvale in 2012.  (Keppel Opp'n Exh. 52, Tan Tr. 60:13-23.)  In 2014 and 2015, Tan was the General Manager of Engineering at Keppel FELS Brasil.  (Keppel Opp'n Exh. 149, KEPPEL_00000153 at 154-155.)

129.   **EIG ¶ 129**:  Tan was asked to join Fernvale by YY Chow.  Exh. 133 at 371:3-5.

**Keppel Response**:  Undisputed.

130.   **EIG ¶ 130**:  Tan has been employed by Keppel since 2002.  Exh. 133 at 11:4-13.

**Keppel Response**:  Undisputed that Tan was employed by Keppel entities since 2002.

131.   **EIG ¶ 131**:  Between 2011 and 2012, Tan reported to Aziz Amirali Hasham Merchant ("**Merchant**").  Exh. 130 at 18:25-19:6.

**Keppel Response**:  Undisputed.

132.   **EIG ¶ 132**:  Kenneth Chong ("**Chong**") was the Assistant General Manager of Legal at Keppel between 2010 and June 2015, the Company Secretary of Keppel, and he reported to Jeffery Chow.  Exh. 120 at 19:2-21, 20:22-21:5.

**Keppel Response**:  Undisputed.

133.   **EIG ¶ 133**:  The Sete Management Presentation had a section describing the Sete investment to prospective investors as "a unique opportunity aligning attractive returns, strong creditworthiness of counterparties in a sector with enormous potential."  Exh. 39 at KEPPEL00556412.

**Keppel Response**:  Undisputed that the Presentation included the quoted language, but disputed that the document specifies the intended audience.

CONTAINS CONFIDENTIAL INFORMATION

134.   **EIG ¶ 134**:  The Sete Management Presentation described the capital structure of Sete.  Exh. 39 at KEPPEL00556415-16, KEPPEL00556419-20.

**Keppel Response**:  Undisputed that the Presentation included information concerning Sete's financing.

135.   **EIG ¶ 135**:  In its Summary of Key Assumptions, the Sete Management Presentation included the assumption that 45% of the total financing, including both debt and equity, would come from BNDES (i.e., the Banco Nacional de Desenvolvimento Econômico e Social).  Exh. 39 at KEPPEL00556425.

**Keppel Response**:  Undisputed.

136.   **EIG ¶ 136**:  The Sete Management Presentation is substantially identical to a presentation provided to EIG by Sete's financial advisors in August 2011.  *Compare* Exh. 39 *with* Exh. 30.

**Keppel Response**: Disputed to the extent that Paragraph 136 implies that anyone at Keppel knew that Sete's financial investors provided EIG with any particular information. (EIG Exh. 39; EIG Exh. 30.)  Further disputed on the basis that EIG did not plead that it relied on any version of the Sete Management Presentation in its Complaint.

137.   **EIG ¶ 137**:  The Sete Management Presentation did not disclose the existence of the Corruption Scheme involving Sete, Petrobras, and Keppel.  Exh. 39.

**Keppel Response**:  Undisputed that the Presentation did not address corruption risks.

138.   **EIG ¶ 138**:  Keppel understood at that time that the majority of senior debt for each rig would be financed by BNDES.  Exh. 133 at 256:4-9, 264:10-18.

**Keppel Response**:  Disputed.  The cited evidence shows that Leong Peng Tan

CONTAINS CONFIDENTIAL INFORMATION

testified that "the slide" he was shown in his deposition stated that BNDES was expected to provide the majority of senior debt for each rig. (EIG Exh. 133 at 256:04-09.)

139.   **EIG ¶ 139**:  Keppel considered Sete's ability to secure long-term financing to be necessary in order to complete construction of the 28 drilling rigs.  Exh. 133 at 327:11-328:16.

**Keppel Response**:  Disputed on the basis that the paragraph does not specify a time.  Undisputed that Leong Peng Tan testified that "drilling rig program would need financing to be complete" as is the case with any project.  (EIG Exh. 133 at 327:20-328:02.)

140.   **EIG ¶ 140**:  On September 27, 2011, Keppel, through its Brazilian subsidiary that owned the BrasFELS shipyard, sent its proposal to construct six semisubmersible rigs.  Exh. 38 at KEPPEL00459977.

**Keppel Response**:  Undisputed that Keppel's subsidiary sent a proposal on September 27, 2011.  (EIG Exh. 38 at 977.)

141.   **EIG ¶ 141**:  The total price in the proposal was $4,858,800,000 for six semisubmersible rigs.  Exh. 38 at KEPPEL00459978.

**Keppel Response**:  Undisputed.

142.   **EIG ¶ 142**:  On November 29, 2011, Keppel executives requested approval from Keppel Corp.'s Investment and Major Project Action Committee (IMPAC) for the prospective joint venture with Sete, including an equity contribution by Keppel of up to US$40 million.  Exh. 41 at KEPPEL00427320, KEPPEL00427322.

**Keppel Response**:  Undisputed.

143.   **EIG ¶ 143**:  On December 10, 2011, Sam wrote to YY Chow and Kwok regarding "Cancellation of JV," writing that the potential joint venture between Keppel and Sete was cancelled by "the decision of the shareholders" of Sete.  Exh. 42 at KEPPEL00008389.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

144.   **EIG ¶ 144**:  On December 16, 2011, Fernvale executed the first EPC Contract with Urca Drilling B.V.  Exh. 44.

    **Keppel Response**:  Undisputed.

145.   **EIG ¶ 145**:  Fernvale was a wholly-owned subsidiary of Keppel.  Exh. 120 at 27:10-12.

    **Keppel Response**:  Undisputed.

146.   **EIG ¶ 146**:  Fernvale was formed by Keppel as a special purpose entity for the Sete EPC contracts.  Exh. 121 at 105:6-14.

    **Keppel Response**:  Disputed that the cited evidence does not establish the assertions in Paragraph 146.  The cited evidence merely reflects that Jeffrey Chow testified that if he "remember[ed] properly, [Fernvale] was the special purpose company that was going to execute one or more of the Sete projects."  (EIG Exh. 121 at 105:06-10.)

147.   **EIG ¶ 147**:  Urca Drilling B.V. was a special purpose entity affiliated with Sete. Exh. 133 at 195:18-25.

    **Keppel Response**:  Undisputed.

148.   **EIG ¶ 148**:  Section 2.1 of the EPC Contract between Fernvale and Urca Drilling required that Fernvale shall act "in compliance with all Consents and Applicable Laws" and "consistent with Good Industry Practices."  Exh. 44 at KEPPEL00490708, § 2.1.

    **Keppel Response**:  Undisputed.

149.   **EIG ¶ 149**:  Section 6.2 set forth representations and warranties of Fernvale, including that Fernvale "is not in violation of any Applicable Law" which would "materially and adversely affect its performance" under the contract; "shall diligently perform… in a competent and professional manner, utilizing sound project management procedures and supervisory procedures, all in accordance with this Agreement, including Good Industry Practices and

42

CONTAINS CONFIDENTIAL INFORMATION

Applicable Codes and Standards"; and "has knowledge of or has investigated to its satisfaction

all of the legal requirements and business practices that must be followed in performing" under

the contract and its work "will be in conformity with such requirements and practices and in

compliance with all Applicable Laws and Consents."  Exh. 44 at KEPPEL00490726-27, § 6.2.

> **Keppel Response**:  Undisputed.

150.    **EIG ¶ 150**:  Section 6.2 represented that "[n]either the execution and delivery of

this Agreement, nor the consummation of the transactions herein contemplated, or compliance

with the terms and provisions hereof, will conflict with, or result in a breach of . . . any

Applicable Law or regulation."  Exh. 44 at KEPPEL00490726, § 6.2(d).

> **Keppel Response**:  Undisputed.

151.    **EIG ¶ 151**:  Section 6.2 represented that Fernvale's "Works" would be "in

compliance with all Applicable Laws," and "[t]he DRU c[ould] be constructed, complete in

every detail under current Applicable Laws."  Exh. 44 at KEPPEL00490727, § 6.2(i).

> **Keppel Response**:  Undisputed.

152.    **EIG ¶ 152**:  Keppel's representation through Fernvale in Section 6.2 of the EPC

contracts were intentionally false because Keppel had agreed to pay bribes and/or kickbacks in

connection with those Contracts.  Exh. 130 at 135:7-17; Exh. 121 at 113:10-24, 115:4-24.

> **Keppel Response**:  Disputed that Keppel, as opposed to its subsidiaries, made
> representations in the EPC contracts.  (Keppel Opp'n Exh. 93, PX070; Keppel Opp'n Exh. 87,
> PX051; Keppel Opp'n Exh. 88, PX052; Keppel Opp'n Exh. 89, PX053; Keppel Opp'n Exh. 90,
> PX054; Keppel Opp'n Exh. 91, PX055.)  Disputed that the cited evidence establishes that
> Keppel's representations through Fernvale in Section 6.2 of the EPC contracts were intentionally
> false.  The cited evidence merely reflects (i) Aziz Merchant's testimony that he would not have
> signed the exhibit shown if he knew Fernvale or other Keppel entities were paying bribes and (ii)

CONTAINS CONFIDENTIAL INFORMATION

Jeffrey Chow's testimony regarding what he thought was true as of December 2011 and what he thought constituted good industry practice based on his years in the petroleum construction industry.  (EIG Exh. 130 at 135:07-17 and EIG Exh. 121 at 113:10-24; 115:4-13.)  Further disputed on the basis that EIG never pleaded reliance on the EPC contracts in its Complaint and there is no evidence EIG relied on the representations in any of Fernvale's EPC contracts.

153.   **EIG ¶ 153**:  Jeffery Chow reviewed and approved comments on the EPC contracts, including regarding provisions relating to compliance with Applicable Law.  Exh. 121 at 74:16-77:4.

**Keppel Response**:  Undisputed, except disputed to the extent Paragraph 153 implies there is evidence of any comments or discussions relating to the compliance with applicable laws provisions.

154.   **EIG ¶ 154**:  Good industry practices, as defined in the EPC contracts, did not include the payment of bribes and kickbacks in violation of the Foreign Corrupt Practices Act. Exh. 121 at 115:4-13; Exh. 130 at 127:20-22, 128:7-11.

**Keppel Response**:  Undisputed.

155.   **EIG ¶ 155**:  Fernvale would not be able to perform the EPC contracts with Sete in compliance with applicable laws.  Exh. 121 at 115:14-24.

**Keppel Response**:  Disputed to the extent Paragraph 155 implies that the cited evidence establishes anything beyond Jeffrey Chow's testimony regarding his own conclusions.  (EIG Exh. 121 at 115:14-24.)

156.   **EIG ¶ 156**:  Shortly before the Urca EPC Contract was executed, on December 13, 2011, Skornicki told Jeffery Chow that he is "receiving pressure from my people about my agreement with Keppel."  Exh. 43 at KEPPEL00435116.

**Keppel Response**:  Disputed to the extent Paragraph 156 implies that the cited

44

CONTAINS CONFIDENTIAL INFORMATION

evidence refers to any agreements other than agency agreements with Zwi Skornicki.  (EIG Exh. 43 at 116.)  Disputed to the extent Paragraph 156 implies that the consulting agreements discussed in the cited evidence refer to agreements signed by Zwi Skornicki and Keppel, as opposed to Zwi Skornicki and Keppel's subsidiary, Fernvale.  (Keppel Opp'n Exh. 85, PX025 at 252 and 267.)

157.   **EIG ¶ 157**:  On December 14, 2011, Jeffery Chow asked Nicholas Choo to prepare an agency agreement for Skornicki related to the "Sete Project" with a "2%" commission rate.  Exh. 43 at KEPPEL00435116.

**Keppel Response**:  Undisputed.

158.   **EIG ¶ 158**:  On February 13, 2012, Keppel executives including YY Chow and Tong received a news report with the headline "Oil-Rig Co Sete Brasil May Seek New Investors," which stated that "Sete Brasil is now looking to bring on two to three new investors" and that "[i]nternational energy investor EIG Global Energy Partners is also an investor in the company."  Exh. 46 at KEPPEL00422871-74, KEPPEL00422881-82.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that YY Chow or Tong read the article.  There is no evidence that that they read the article.  (EIG Exh. 46 at KEPPEL00422871-74, KEPPEL00422881-82.)

159.   **EIG ¶ 159**:  On or about February 8, 2012, BrasFELS hosted a Sete-related "due diligence trip" for a representative from the CIC.  Exh. 45 at KEPPEL00080277.

**Keppel Response**:  Undisputed.

160.   **EIG ¶ 160**:  On March 6, 2012, Credit Suisse asked Keppel whether it had interest in an equity investment in Sete Brasil, which was "looking for an equity investment USD500 mm to USD1 bn[.]"  Exh. 47 at KEPPEL00460746.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed that a Credit Suisse employee sent an email noting that Sete was "looking for an equity investment USD500 mn to USDl bn (current shareholders include pension funds, commercial banks, Petrobras) so let us know if this is of interest?".  (EIG Exh. 47 at KEPPEL00460746.)

161.    **EIG ¶ 161**:  On March 7, 2012, a Keppel executive forwarded this solicitation to Choo, Tong, YY Chow, and others, stating that "Sete Brasil is looking to raise up to US$1b to fund the construction of 21 drilling rigs for Petrobras."  Exh. 47 at KEPPEL00460745.

**Keppel Response**:  Undisputed that the email was forwarded, but disputed that the email represented a "solicitation".

162.     **EIG ¶ 162**:  Choo responded that Keppel "should find out as much as possible!"  Exh. 47 at KEPPEL00460745.

**Keppel Response**:  Undisputed.

163.    **EIG ¶ 163**:  On March 9, 2012, Keppel executives including YY Chow and Tong received a news report with the headline "Sete Brasil will increase capital to R$7 billions," which stated that Sete planned to "increase its capital in more than three times, from 1,9 billion to R$ 7 billions" with "the entrance of new partners," including "Energy Investment Group (EIG), American institutional investor of the energy area, and Lucce Drilling, company created by the investor Aldo Floris, may become shareholders of the company."  Exh. 48 at KEPPEL00278825, KEPPEL00278826.

**Keppel Response**:  Undisputed that YY Chow and Tong were sent a news report with the headline "Sete Brasil will increase capital to R$7 billions" on or around March 9, 2012. Disputed to the extent Plaintiffs imply that YY Chow or Tong read the news report with the headline "Sete Brasil will increase capital to R$7 billions".  There is no evidence that YY Chow or Tong read the news report.  (EIG Exh. 48 at KEPPEL00278825, KEPPEL00278826.)

CONTAINS CONFIDENTIAL INFORMATION

164.   **EIG ¶ 164**:  Keppel understood that Sete was raising additional funds in early 2012 to finance the construction of 28 drilling rigs.  Exh. 133 at 297:4-9.

**Keppel Response**:  Disputed.  The cited testimony shows that Leong Peng Tan merely testified that Keppel had an "understanding the 28 drill rigs needed financing".   Tan was then asked:  "And Sete was raising funds in order to finance a second round of bids for the 21 remaining drill rig units, correct?"  Tan responded "I don't know."  (EIG Exh. 133 at 297:4-21.)

165.   **EIG ¶ 165**:  Keppel understood that any funding that Sete raised from equity investors would help Sete pay Keppel and other shipyards for the construction of drilling rigs. Exh. 133 at 304:22-305:16.

**Keppel Response**:  Disputed.  Tan merely testified that "[t]he projects all require financing."  (EIG Exh. 133 at 305:09-16.)

166.   **EIG ¶ 166**:  On March 16, 2012, a Sete employee told Skornicki that Sete would "like to bring one of our potential investors to the BrasFels shipyard" on "March 27 or 28" and asked if Sete could "count on your usual assistance?"  Exh. 49 at KEPPEL00020565.

**Keppel Response**:  Undisputed.

167.   **EIG ¶ 167**:  Skornicki relayed the request to Kwok and Sam, and Kwok authorized the visit, writing "[s]ure, we will accommodate," and instructing "Gilberto [Israel] and Edmundo [Santos]" to "organize" the visit.  Exh. 49 at KEPPEL00020565.

**Keppel Response**:  Undisputed, except to clarify that the individuals were Keppel FELS Brasil employees, as opposed to Keppel employees.  (Keppel Opp'n Exh. 149 KEPPEL_00000153-160 at 157; EIG Exh. 49 at 565.)

168.   **EIG ¶ 168**:  On March 20, 2012, Sete provided Skornicki with a list of the Sete investors who would be visiting the BrasFELS shipyard for the authorized visit.  Exh. 50 at KEPPEL00012940.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed.

169.   **EIG ¶ 169**:  The list included Corrigan, Simon Hayden ("**Hayden**"), and Hoshrav

Patel ("**Patel**"), each of whom were employees of EIG.  Exh. 50 at KEPPEL00012940.

**Keppel Response**:  Undisputed.

170.   **EIG ¶ 170**:  Corrigan, Hayden, and Patel were visiting Brazil on a due diligence

trip with the Abu Dhabi Investment Council ("**ADIC**"), which was another potential foreign

investor in Sete.  Exh. 122 at 160:4:22.

**Keppel Response**:  Disputed to the extent Paragraph 170 implies that the visit

was part of EIG's due diligence, as opposed to ADIC's due diligence.  (See infra CSOF ¶ 643

(citing Keppel Opp'n Exh. 45, Corrigan Tr. 160:17-22; Keppel Opp'n Exh. 58, Hayden D.C. Tr.

304:21-305:01; Keppel Opp'n Exh. 118, EIG_KEP_00251502-508 at 505).)

171.   **EIG ¶ 171**:  Skornicki forwarded the list of attendees to Kwok and Sam in

advance of the visit.  Exh. 50 at KEPPEL00012940.

**Keppel Response**:  Undisputed.

172.   **EIG ¶ 172**:  On March 28, 2012, Keppel gave Corrigan and Hayden a tour of the

BrasFELS shipyard as part of a Sete due diligence trip.  Exh. 124 at 78:15-18, 83:11-87:25; Exh.

122 at 160:4-162:19, 166:23-167:7.

**Keppel Response**:  Disputed that Keppel, as opposed to BrasFELS

representatives, gave Corrigan and Hayden a tour of the BrasFELS Shipyard as part of a Sete due

diligence trip.  There is no evidence that anyone from Keppel attended the March 28, 2012 yard

tour.  (See infra CSOF ¶ 654.)  Kevin Corrigan could not recall anyone beyond the people at

BrasFELS attending the March 28, 2012 yard tour other than Ivan Hong, who might have

attended as Sete's advisor at Lakeshore.  (See infra CSOF ¶ 653 (citing Keppel Opp'n Exh. 45,

Corrigan Tr. 165:12-166:02).)

173.   **EIG ¶ 173**:  Keppel employees also had a meeting with representatives of EIG during the shipyard visit during which Keppel provided a presentation focusing on the shipyard's ability to produce drillships.  Exh. 124 at 82:14-20, 84:8-25; Exh. 122 at 166:6-18.

**Keppel Response**:  Disputed that Keppel employees, as opposed to BrasFELS representatives, had a meeting with EIG during the shipyard visit.  Disputed that Keppel, as opposed to BrasFELS provided a presentation focusing on the shipyard's ability to produce drillships.  Kevin Corrigan could not recall anyone beyond the people at BrasFELS attending the March 28, 2012 yard tour other than Ivan Hong, who might have attended as Sete's advisor at Lakeshore.  (See infra CSOF ¶ 653 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 165:12-166:02).)  Undisputed that the presentation at the March 28, 2012 BrasFELS Shipyard visit focused on the shipyard's shipbuilding capacity.

174.   **EIG ¶ 174**:  The purpose of the visit was "to give [potential Sete investors] comfort that these ships could be built in Brazil."  Exh. 124 at 84:11-14.

**Keppel Response**:  Disputed to the extent Plaintiffs imply Hayden was referring to EIG as opposed to ADICO.  (See infra CSOF ¶ 643 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 160:17-22; Keppel Opp'n Exh. 58, Hayden D.C. Tr. 304:21-305:01; Keppel Opp'n Exh. 118, EIG_KEP_00251502-508 at 505).)

175.   **EIG ¶ 175**:  Neither Keppel nor any of the representatives from Petrobras or Sete or their agents revealed the Corruption Scheme during this trip.  Exh. 122 at 167:17-168:4.

**Keppel Response**:  Disputed as misleading to the extent that Plaintiffs imply that Keppel had an opportunity or duty to disclose the bribery scheme.  There is no evidence that anyone was present beyond BrasFELS employees.  (See infra CSOF ¶¶ 653-54 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 165:12-166:02).)  There is no evidence that anyone from BrasFELS who attended the yard tour knew about the bribery scheme.  Furthermore, the subjects of

CONTAINS CONFIDENTIAL INFORMATION

corruption and bribery were not raised by anyone who attended the March 2012 BrasFELS yard

tour.  (See infra CSOF ¶¶ 647, 648 citing Keppel Opp'n Exh. 45, Corrigan Tr. 167:08-16).)

176.    **EIG ¶ 176**:  On or about May 17, 2012, BrasFELS hosted a visit from BNDES

"to conduct due diligence of the shipyard," after which Sete reported it had "very good feed-back

from visit of BNDES to BRASFELS," and thanked Sam for "the special care on preparation and

conducting such visit."  Exh. 58 at KEPPEL00074639-42.

**Keppel Response**:  Undisputed that the cited evidence contains the quoted

language.  Disputed to the extent Plaintiffs imply that they had any awareness or involvement in

that visit, or that any due diligence concerned corruption or bribery risks associated with Sete.

177.    **EIG ¶ 177**:  On March 22, 2012, Sete and Keppel Brasil executed a letter of

intent for five additional semisubmersible rigs.  Exh. 53 at KEPPEL00572590-92.

**Keppel Response**:  Undisputed.

178.    **EIG ¶ 178**:  Soon after the letter of intent was signed, on March 30, 2012,

Skornicki wrote to Jeffery Chow that he was "having pressure from my partners about my

contract, the first payment for the 5 units will be pay soon."  Exh. 51 at KEPPEL00046214.

**Keppel Response**:  Undisputed.

179.    **EIG ¶ 179**:  Jeffery Chow wrote back that he was "working on it and will quietly

try to have it ready over the weekend[.]"  Exh. 51 at KEPPEL00046214.

**Keppel Response**:  Undisputed.

180.    **EIG ¶ 180**:  On April 3, 2012, Jeffery Chow told Skornicki that he was "headed

to Singapore to close on the 'agreemen[ts],'" and that he is "proposing one in Brazil like the old

ones from BrasFELS. 0.5%. Others outside from Fernvale."  Exh. 52 at KEPPEL00490240.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

181.   **EIG ¶ 181**:  Jeffery Chow asked Skornicki if Skornicki had other companies he could use for payments to Skornicki related to Sete.  Exh. 52 at KEPPEL00490240.

   **Keppel Response**:  Undisputed.

182.   **EIG ¶ 182**:  On April 9, 2012, Jeffery Chow asked Skornicki to "advise on Company for outside Agreement between that Company and Fernvale."  Exh. 54 at KEPPEL00046493.

   **Keppel Response**:  Undisputed.

183.   **EIG ¶ 183**:  Jeffery Chow told Skornicki that he "suggested and agreement is reached" to have part of the payments to Skornicki related to Sete be paid "via normal channels to Eagle in Brazil, with balance to be with Fernvale outside."  Exh. 54 at KEPPEL00046493.

   **Keppel Response**:  Undisputed.

184.   **EIG ¶ 184**:  Jeffery Chow warned Tommy Sam and Jerald Lee Quan Ti that if Fernvale paid two different Skornicki entities for the Sete deal it "will get queried by audit of why two different representatives[.]"  Exh. 54 at KEPPEL00046491-92.

   **Keppel Response**:  Disputed that Jeffrey Chow "warned" Tommy Sam and Jerald Lee Quan Ti.  The cited document states:  "And Fernvale paying for both Eagle and Other Company (will get queried by audit of why two different representatives)?"  (EIG Exh. 54 at KEPPEL00046492.)

185.   **EIG ¶ 185**:  Sam opined to Jeffery Chow that the "value" Keppel planned to pay to Skornicki was "very huge to justify."  Exh. 54 at KEPPEL00046491.

   **Keppel Response**:  Undisputed that the cited email includes the quoted language.

186.   **EIG ¶ 186**:  Jeffery Chow wrote to Sam that "having two reps sign and paid by one party looks even more odd??  Just trying to reduce questions as much as possible."  Exh. 54 at KEPPEL00046491.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed.

187.    **EIG ¶ 187**:  Sam commented that the amounts Keppel planned to pay Skornicki were "always questionable" and that BrasFELS "cannot justify 0.5%" on the full contract value "between Fernvale and Urca when its part is only a portion..sure can change the contract..but doesn't that attract more questions[.]"  Exh. 54 at KEPPEL00046491.

**Keppel Response**:  Undisputed.

188.    **EIG ¶ 188**:  Jeffery Chow explained to Sam that Keppel "[c]annot pay 2% via Fernvale" and "[c]annot pay to two different Reps for same deal."  Exh. 54 at KEPPEL00046490.

**Keppel Response**:  Undisputed.

189.    **EIG ¶ 189**:  Jerald Lee Quan Ti warned that all transactions in and out of Fernvale's Brazilian Real account "must be declared in a standard form."  Exh. 54 at KEPPEL00046490.

**Keppel Response**:  Undisputed that the cited evidence states that "[a]ll transactions both in and out must be declared in a standard form."  (EIG Exh. 54 at 490.)

190.    **EIG ¶ 190**:  On or about April 19, 2012, Skornicki forwarded an email from Paulo Lerner of Delta Bank to Jeffery Chow with the incorporation documents for Deep Sea Oil Corp. ("**Deep Sea Oil**"), asking if this was "OK" or if Chow wanted "something else."  Exh. 56 at KEPPEL00546088.

**Keppel Response**:  Undisputed.

191.    **EIG ¶ 191**:  Deep Sea Oil was a British Virgin Islands entity incorporated on April 11, 2012, controlled by Skornicki.  Exh. 56 at KEPPEL00546090, KEPPEL00546112.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

192.    **EIG ¶ 192**:  On April 20, 2012, Jeffery Chow stated that he could "close both" agreements with Skornicki if "Elois[a] [Skornicki] (under her maiden name) is a director" of Eagle.  Exh. 55 at KEPPEL00280913.

       **Keppel Response**:  Undisputed.

193.    **EIG ¶ 193**:  Jeffery Chow further asked, "is Eagle owned by Elois[a] in any way, and is she a director (using her maiden name)? The reason I am asking, is that it will look strange to have [Skornicki] as rep for both contracts? I hope you understand what I'm trying to achieve?" Exh. 55 at KEPPEL00280913.

       **Keppel Response**:  Undisputed.

194.    **EIG ¶ 194**:  Jeffery Chow understood that Eloisa Skornicki was Skornicki's second wife.  Exh. 121 at 132:25-133:3.

       **Keppel Response**:  Undisputed.

195.    **EIG ¶ 195**:  Skornicki used Eloisa Skornicki's email to send invoices to Keppel. Exh. 76 at KEPPEL00023181.

       **Keppel Response**:  Undisputed that certain invoices were sent to Tan Leong Peng from Eloisa Skornicki's email address.  (EIG Exh. 76 at 181.)

196.    **EIG ¶ 196**:  On May 8, 2012, Jeffery Chow forwarded the Deep Sea Oil incorporation documents to Chong, telling him that "[t]he rep contract between FERNVALE and Deep Sea Oil will be for 1.5%."  Exh. 56 at KEPPEL00546088.

       **Keppel Response**:  Undisputed.

197.    **EIG ¶ 197**:  On May 15, 2012, Jeffery Chow sent Marsuki, Chong, Tan, and Nicholas Choo "final formats" of the Skornicki agreements for their "file and reference."  Exh. 57 at KEPPEL00546194.

       **Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

198.    **EIG ¶ 198**:  The draft agreement between Deep Sea Oil and Fernvale was dated December 14, 2011.  Exh. 57 at KEPPEL00546201.

**Keppel Response**:  Undisputed.

199.    **EIG ¶ 199**:  Deep Sea Oil did not exist on December 14, 2011.  Exh. 56 at KEPPEL00546090.

**Keppel Response**:  Disputed on the basis that the cited evidence does not establish the assertion in Paragraph 199.  The cited evidence merely states that Deep Sea Oil was incorporated on April 11, 2012.  (EIG Exh. 56 at 090.)

200.    **EIG ¶ 200**:  On July 17, 2012, Jeffery Chow wrote to Marsuki and Chong that "Agency/Commission agreements signed by" Skornicki were on his desk, but "need Aziz's signature."  Exh. 60 at KEPPEL00541293.

**Keppel Response**:  Undisputed.

201.    **EIG ¶ 201**:  The individual named "Aziz" that Jeffery Chow was referring to was Merchant.  Exh. 130 at 165:17-21.

**Keppel Response**:  Undisputed.

202.    **EIG ¶ 202**:  In 2012, Merchant was the Executive Director of Engineering at Keppel.  Exh. 130 at 14:13-17.

**Keppel Response**:  Disputed that Merchant was the Executive Director of Engineering at Keppel as opposed to Keppel FELS.  (Keppel Opp'n Exh. 49, Merchant Tr. 13:03-14:17.)

203.    Merchant has also been a director of Fernvale since 2011.  Exh. 130 at 59:8-10, 121:23-122:7; Exh. 120 at 182:5-10.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

204.   **EIG ¶ 204**:  Jeffery Chow testified that the normal procedure at Keppel was for the director of a special purpose entity to sign on its behalf.  Exh. 121 at 136:9-17.

**Keppel Response**:  Disputed.  Jeffrey Chow did not specify that it was the normal procedure at Keppel, rather, he testified that "the normal procedure is the director of the company would be signing".  (EIG Exh. 121 at 136:12-17.)

205.   **EIG ¶ 205**:  On July 19, 2012, Jeffery Chow wrote to YY Chow that he needed Merchant to sign commission agreements for Fernvale, and asked YY Chow to verbally confirm to Merchant the amount agreed to be paid to Skornicki so that Marsuki could "hand walk the docs" to Merchant for signing.  Exh. 59 at KEPPEL00281196.

**Keppel Response**:  Undisputed except to clarify that the email is dated July 18, 2012.  (EIG Exh. 59 at KEPPEL00281196.)

206.   **EIG ¶ 206**:  YY Chow asked why there were two agreements with Skornicki, and Jeffery Chow explained that there was "[o]ne for 0.5% and one for 1.5% for different parties, totaling the 2%."  Exh. 59 at KEPPEL00281196; Exh. 105 at A-15-16 ¶ 77.

**Keppel Response**:  Undisputed.

207.   **EIG ¶ 207**:  On July 24, 2012, Marsuki informed Jeffery Chow that she passed Skornicki's agreements to Merchant "but he has some queries on the percentage."  Exh. 60 at KEPPEL00541292.

**Keppel Response**:  Undisputed.

208.   **EIG ¶ 208**:  Jeffery Chow subsequently signed an agreement with Eagle dated November 30, 2011 (the "**Eagle Agency Agreement**") and an agreement with Deep Sea Oil dated December 1, 2011 (the "**Deep Sea Services Agreement**") on behalf of Fernvale.  Exh. 66 at KEPPEL00045257; Exh. 65 at KEPPEL00000240.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

209.   **EIG ¶ 209**:  The Eagle Agency Agreement and Deep Sea Services Agreement (collectively, the "**Consulting Agreements**") were backdated and executed by Jeffery Chow and Skornicki on or about August 7, 2012.  Exh. 67 at KEPPEL00555190.

**Keppel Response**:  Disputed that the cited evidence establishes that the Eagle Agency Agreement and Deep Sea Services Agreement were backdated and executed on or about August 7, 2012.  The cited evidence merely states, "Zwi may try to come by to sign on the documents on the right side of my desk on the Fernvale documents."  (EIG Exh. 67 at 190.) Undisputed that the contracts agreements were backdated and executed by Jeffrey Chow and Skornicki.

210.   **EIG ¶ 210**:  Keppel entered agreements with Eagle and Deep Sea to facilitate and conceal the payment of bribes relating to Sete.  Exh. 133 at 64:4-9.

**Keppel Response**:  Disputed on the grounds that Fernvale entered agreements with Eagle and Deep Sea.  (Keppel Opp'n Exh. 85, PX025 at 253-54, 276-78.)  Further disputed to the extent Plaintiffs imply the agreements were intended to conceal anything from investors of Sete.  (See infra CSOF ¶¶ 629-31 (citing Keppel Opp'n Exh. 9, Chow Tr. 26:25-27:03; 107:25-108:07-12, 90:14-91:05, 142:04-07).)

211.   **EIG ¶ 211**:  The Eagle Agency Agreement was one of the false agreements drafted by Jeffery Chow and other Keppel employees to facilitate the payment of bribes and to conceal the true nature and purpose of the payments.  Exh. 66; Exh. 121 at 150:13-151:17.

**Keppel Response**:  Disputed to the extent Plaintiffs imply the agreement was intended to conceal anything from investors of Sete.  (See infra CSOF ¶¶ 629-31 (citing Keppel Opp'n Exh. 9, Chow Tr. 26:25-27:03; 107:25-108:07-12, 90:14-91:05, 142:04-07).)

CONTAINS CONFIDENTIAL INFORMATION

212.  **EIG ¶ 212**:  Under the Eagle Agency Agreement, Fernvale agreed to pay Eagle "0.5% of the contract price paid to [Fernvale] under the EPC Contract[s]" with Sete.  Exh. 66 at KEPPEL00045253.

**Keppel Response**:  Undisputed.

213.  **EIG ¶ 213**:  The Deep Sea Services Agreement was one of the false agreements drafted by Jeffery Chow and other Keppel employees to facilitate the payment of bribes and to conceal the true nature and purpose of the payments.  Exh. 65; Exh. 121 at 156:11-17.

**Keppel Response**:  Disputed to the extent Plaintiffs imply the agreement was intended to conceal anything from investors of Sete.  (See infra CSOF ¶¶ 629-31 (citing Keppel Opp'n Exh. 9, Chow Tr. 26:25-27:03; 107:25-108:07-12, 90:14-91:05, 142:04-07).)

214.  **EIG ¶ 214**:  Under the Deep Sea Services Agreement, Fernvale agreed to pay Deep Sea Oil for each EPC contract "1.5% (one and half a percent) of the Contract Price (in US$) actually paid to and received by [Fernvale]."  Exh. 65 at KEPPEL00000219.

**Keppel Response**:  Undisputed.

215.  **EIG ¶ 215**:  The Consulting Agreements were an "important part of the bribery scheme."  Exh. 121 at 27:9-19, 151:12-17, 156:11-17.

**Keppel Response**:  Undisputed that Chow testified that the agreements were an "important part of the bribery scheme" in connection with his guilty plea.

216.  **EIG ¶ 216**:  The Consulting Agreements existed to make payments to Skornicki seem legitimate.  Exh. 133 at 65:18-23.

**Keppel Response**:  Undisputed, except to the extent Plaintiffs imply that the agreements existed to make payments to Skornicki seem legitimate to anyone outside of Keppel. (See infra CSOF ¶¶ 629-31 (citing Keppel Opp'n Exh. 9, Chow Tr. 26:25-27:03; 107:25-108:07-12, 90:14-91:05, 142:04-07).)

CONTAINS CONFIDENTIAL INFORMATION

217.   **EIG ¶ 217**:  The Consulting Agreements "falsely represented that payments were being made" to Skornicki "for his assistance and support in discussions and negotiations with prospective customers when, in fact, portions of these payments were being paid as bribes." Exh. 121 at 41:16-42:6, 146:13-20.

      **Keppel Response**:  Disputed that the cited evidence supports the assertions in Paragraph 217.  Undisputed that corrupt payments were made in connection with Skornicki's agreements.

218.   **EIG ¶ 218**:  Keppel knew that a portion of payments made to Deep Sea Oil in connection with the Consulting Agreements was intended to effectuate bribery payments to Brazilian officials.  Exh. 113 at 7-14, RFA 1-10.

      **Keppel Response**:  Disputed that Keppel knew of bribery payments at the time, but undisputed that certain individuals were involved in the bribery scheme, as described in the DPA.  (Keppel Opp'n Exh. 152, DPA.)

219.   **EIG ¶ 219**:  The Consulting Agreements also "falsely represented that [Skornicki] was abiding by antibribery laws and was not making improper payments."  Exh. 121 at 41:23-42:6, 109:18-110:3.

      **Keppel Response**:  Undisputed that the agreements included representations concerning anti-bribery laws, but disputed to the extent Plaintiffs imply the representations were made to anyone other than the parties of the agreements.  (EIG Exh. 65; EIG Exh. 66.)

220.   **EIG ¶ 220**:  The Eagle Agency Agreement contained an "ANTI-BRIBERY & CORRUPTION" section whereby Eagle "represents warrants and agrees that it has not made and shall not make, either directly or indirectly, any improper payment of money or anything of value to an Official in connection with the EPC Contract, whether before or after the signing of the EPC Contract."  Exh. 66 at KEPPEL00045255-56.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed.

221.    **EIG ¶ 221**:  The Eagle Agency Agreement defined "Official" for purposes of the "ANTI-BRIBERY & CORRUPTION" clause as "(a) any officer or employee of any government or any department, agency or instrumentality thereof, or any person acting in an official capacity on behalf of any such government, department, agency or instrumentality; (b) any political party; (c) any official of a political party; (d) any candidate for political office; or (e) any officer or employee of a public international organization such as the United Nations."  Exh. 66 at KEPPEL00045255.

**Keppel Response**:  Undisputed.

222.    **EIG ¶ 222**:  In the "ANTI-BRIBERY & CORRUPTION" section, the Eagle Agency Agreement also stated that "in recognition of the principles of the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions which entered into force on February 15, 1999, the United States Foreign Corrupt Practices Act, the United Kingdom Bribery Act 2010, the Singapore Prevention of Corruption Act 2010  . . . and any other applicable laws, regulations, codes and sanctions relating to anti-bribery or anti-corruption, similar international conventions and national laws, the Agent warrants that it will not, directly or indirectly, in connection with the EPC Contract and the matters resulting therefrom, offer, pay, promise to pay or authorize the giving of money or anything of value to an Official, or to any other person, while knowing or being aware that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to an Official, for the purpose of improperly influence the act, decision or omission of such Official to obtain or retain business related to this Agreement, to direct business related to the EPC contract to any person, or to obtain any improper advantage or benefit."  Exh. 66 at KEPPEL00045255.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

223.   **EIG ¶ 223**:  The "ANTI-BRIBERY & CORRUPTION" section of the Eagle Agency Agreement further directed that Eagle shall not "give to or receive from" Fernvale "any commission, fee…in connection with this Agreement or the EPC Contract, or enter into any business arrangement" with "any director, employee, representative or agent" of Fernvale, Sete, or their affiliates "without prior written consent."  Exh. 66 at KEPPEL00045256.

      **Keppel Response**:  Undisputed.

224.   **EIG ¶ 224**:  When Jeffery Chow drafted and signed the Eagle Agency Agreement, he understood that Skornicki would pay bribes and/or kickbacks in connection with the EPC contracts and violate the "ANTI-BRIBERY & CORRUPTION" of the Eagle Agency Agreement, as well as the laws referred to therein.  Exh. 121 at 107:13-19.

      **Keppel Response**:  Disputed to the extent that Paragraph 224 goes beyond Jeffrey Chow's testimony.  Jeffrey Chow testified that he "had come to the conclusion that [Skornicki] was going to be paying bribes to Petrobras".  (EIG Exh. 121 at 107:13-19.)

225.   **EIG ¶ 225**:  The Deep Sea Services Agreement contained a "BUSINESS ETHICS" section whereby Deep Sea Oil "agrees to strictly adhere to" the "Keppel Code of Business Conduct Policy" and "represents and warrants" that "it will not cause or aid [Fernvale] or any of its officers or employees to be in violation of said Policies."  Exh. 65 at KEPPEL00000222.

      **Keppel Response**:  Undisputed.

226.   **EIG ¶ 226**:  Pursuant to the Deep Sea Services Agreement, Deep Sea Oil "agrees, represents and warrants that [it] has read, understands and will abide by the United States Foreign Corrupt Practices Act ('FCPA'), the United Kingdom Bribery Act 2010, the Singapore Prevention of Corruption Act 2010 and the anti-corruption and bribery laws of Brasil" and will

CONTAINS CONFIDENTIAL INFORMATION

"comply with the provisions of all applicable federal, state, country, or municipal laws, regulations or ordinances[.]"  Exh. 65 at KEPPEL00000223, KEPPEL00000227.

**Keppel Response**:  Undisputed.

227.   **EIG ¶ 227**:  Pursuant to the Deep Sea Services Agreement, Deep Sea Oil "agrees, represents and warrants" that it and its "affiliates … and its and their respective directors, officers, employees, agents, or representatives" shall "abide by the prohibitions of the Anti-Corruption Laws" and represent that they "have not and shall not pay, give, offer, promise to pay, or authorize the payment or giving of any money or anything of value" to any government official, including Petrobras, to influence such an official's "acts or decisions or induce such Government Official to use his or her influence to affect the official decision or actions of others in order to obtain, retain or direct business or to obtain any other improper advantage for" Fernvale or Deep Sea Oil, or make such payments to any other person "in furtherance of any prohibited act covered by the Anti-Corruption Laws" or if "there is a high probability" that the third party will make a prohibited payment to a government official, including Petrobras.  Exh. 65 at KEPPEL00000223-0224.

**Keppel Response**:  Undisputed.

228.   **EIG ¶ 228**:  The Deep Sea Services Agreement defined "Government Official" to "include[] any appointed, elected, or honorary official, or officer or any employee of any government, government ministry or department, agency or instrumentality thereof, or any company or corporation that is owned or controlled by a government or any public international organization or any person acting in an official capacity for or on behalf of any such government, ministry or department, agency, company or corporation, instrumentality or public international organization, including without limitation PETROBRAS."  Exh. 65 at KEPPEL00000223.

**Keppel Response**:  Undisputed.

229.   **EIG ¶ 229**:  The Deep Sea Services Provision contained a "Certification" stating that "[i]t is the intention of the parties to that Marketing Consulting and Services Agreement dated December 14, 2011 shall comply with the Foreign Corrupt Practices Act of the United States of America, the United Kingdom Bribery Act 2010, the Singapore Prevention of Corruption Act 2010 and the anti-corruption and bribery laws of Brasil, and all applicable anti-corruption laws … [a]ccordingly, and without prejudice to the generality of the foregoing, herewith CONSULTANT undertakes and agrees that it has not and shall not directly or indirectly to offer, pay, promise to pay or authorize the payment or giving of any money, or anything of value to any official of any government or any instrumentality thereof (for purposes hereof, an employee of PETROBRAS is deemed to be an official of a government or instrumentality thereof), to any political party or candidate for political office, or to any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any official of any government or any instrumentality thereof, for the purposes of: a. Influencing any act or decision of such in his official capacity, including a decision to fail to perform his official functions; or b. Inducing such official to use his influence with any governmental or any instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to obtain or retain business for or with, or direct business to, any person."  Exh. 65 at KEPPEL00000234.

      **Keppel Response**:  Undisputed.

230.   **EIG ¶ 230**:  Pursuant to the Deep Sea Services Agreement, Deep Sea Oil "agrees" to "immediately advise" Fernvale of any development that "in any way makes inaccurate or incomplete the representations, warrants and certifications" in the Deep Sea Services Agreement."  Exh. 65 at KEPPEL00000226.

      **Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

231.   **EIG ¶ 231**:  The business ethics and anti-bribery representations constituted a "material provision" of the Deep Sea Services Agreement.  Exh. 65 at KEPPEL00000227.

  **Keppel Response**:  Undisputed that the cited evidence contains the language quoted, but disputed to the extent Plaintiffs imply the provisions were described as "material" to any entity apart from the parties to the contract.

232.   **EIG ¶ 232**:  When Jeffery Chow drafted and signed the Deep Sea Services Agreement, he understood that Skornicki would pay bribes and/or kickbacks in connection with the EPC contracts and that the representations by Deep Sea Oil and/or Skornicki in the Agreement and attached Certification were false.  Exh. 121 at 107:13-19.

  **Keppel Response**:  Disputed to the extent that Paragraph 232 goes beyond Jeffrey Chow's testimony.  Jeffrey Chow testified that he "had come to the conclusion that [Skornicki] was going to be paying bribes to Petrobras".  (EIG Exh. 121 at 107:13-19.)

233.   **EIG ¶ 233**:  The 2% commission payments Fernvale made under the Consulting Agreements were intended to conceal the fact that a portion of the payments were intended to be a bribe payment.  Exh. 133 at 65:18-23.

  **Keppel Response**:  Disputed to the extent it is inconsistent with Jeffrey Chow's testimony.  As Jeffrey Chow testified, "[t]he intention wasn't to conceal any bribe payments. The intention was to capture in writing the agreement between the company and Mr. Skornicki, that he would be paid a certain commission fee for his assistance under certain contracts." (Keppel Opp'n Exh. 44, Chow Tr. 107:25-108:12.)

234.   **EIG ¶ 234**:  At the time that Jeffery Chow executed the Consulting Agreements, Tong and YY Chow had already authorized Skornicki to pay bribes and/or kickbacks relating to the EPC contracts.  *See supra* ¶ 17.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**: Disputed on the basis that the evidence does not show precisely when Skornicki obtained such authorization. (Keppel Opp'n Exh. 152, DPA at A-14 to A-15 ¶¶ 71-72.)

235. **EIG ¶ 235**: Keppel Corp.'s Code of Conduct (the "**Code of Conduct**") issued on December 1, 2001 and revised on November 11, 2011 was applicable to Keppel. Exh. 40 at KEPPEL00267958.

**Keppel Response**: Disputed that Keppel Corp.'s Code of Conduct was issued on December 1, 2001; it was issued on December 1, 2004. (EIG Exh. 40 at 958.) Otherwise, undisputed.

236. **EIG ¶ 236**: The Code of Conduct stated that "Keppel's policy is to conduct business with integrity, fairly, impartially, in an ethical and proper manner, and in compliance with all applicable laws and regulations." Exh. 40 at KEPPEL00267960; *see also* Exh. 130 at 92:4-6.

**Keppel Response**: Undisputed.

237. **EIG ¶ 237**: The Code of Conduct's Section 3.2.2 on "Anti-Corruption" mandated that "Employees must under no circumstances offer, promise, give or authorise the giving, directly or through third parties, of any bribe, kickback, illicit payment, benefit in kind or any other advantage to a public official, private sector customer, supplier, contractor, or any other person or entity, as an inducement or reward for an improper performance or non-performance of a function or activity." Exh. 40 at KEPPEL00267961.

**Keppel Response**: Undisputed.

238. **EIG ¶ 238**: On August 2, 2012, Fernvale entered five additional EPC contracts with affiliates of Sete. Exh. 120 at 141:17-20, 191:16-25.

**Keppel Response**: Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

239.   **EIG ¶ 239**:  Those five EPC contracts contained the same representations in Section 2.1 and 6.2 as the Urca EPC contract concerning violations of law.  Exh. 120 at 191:12-202:21.

**Keppel Response**:  Undisputed.

240.   **EIG ¶ 240**:  Keppel's Sete EPC contracts were collectively "the biggest contract that Keppel had ever entered into in its history."  Exh. 133 at 381:14-23.

**Keppel Response**:  Disputed that the cited evidence establishes the assertion made in Paragraph 240.  The cited evidence merely shows that Leong Peng Tan believed that to be the case.  (EIG Exh. 133 at 381:14-23.)

241.   **EIG ¶ 241**:  On August 7, 2012, Keppel issued a press release that it had signed five additional EPC contracts with Sete, describing Sete as a company with "[i]nternational finance investors."  Exh. 64 at 2.

**Keppel Response**:  Disputed that the pres release states that Keppel, as opposed to Fernvale, signed five additional EPC contracts with Sete.  (EIG Exh. 64 at 1.)  Disputed to the extent Plaintiffs imply that Keppel, rather than Sete, drafted the August 7, 2012 press release to include the phrase "[i]nternational finance investors".  Sete made "three minor changes" to the press release regarding the five EPC contracts.  (Keppel Opp'n Exh. 140, KEPPEL00429725-729 at 725-27.)  One of these changes was to add the words "and International" to the sentence "Sete Brasil is a Brazilian company established in December 2010 and formed by Brazilian and International finance investors, including banks and the four biggest Brazilian pension funds, besides Petrobras".  (Keppel Opp'n Exh. 140, KEPPEL00429725-729 at 725-27.)

242.   **EIG ¶ 242**:  Keppel's internal third quarter 2012 update regarding the first rig for Sete reflected that Sete had "[t]wo new investors join[] the latest round: U.S. private-equity firm

CONTAINS CONFIDENTIAL INFORMATION

EIG Global Energy Partners invested BRL500 million while a wealthy Brazilian family also invested."  Exh. 68 at KEPPEL00441072.

**Keppel Response**:  Undisputed that the cited document included the quoted language.

243.   **EIG ¶ 243**:  On or about August 30, 2012, Fernvale wired approximated $1,152,661 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 7-8, RFA 1.

**Keppel Response**:  Undisputed.

244.   **EIG ¶ 244**:  On or about November 5, 2012, Fernvale wired approximated $3,626,162 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 8, RFA 2.

**Keppel Response**:  Undisputed.

245.   **EIG ¶ 245**:  On or about March 15, 2013, Fernvale wired approximated $1,382,161 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 9, RFA 3.

**Keppel Response**:  Undisputed.

246.   **EIG ¶ 246**:  On or about October 18, 2013, Fernvale wired approximated $1,139,160 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 9-10, RFA 4.

**Keppel Response**:  Undisputed.

247.   **EIG ¶ 247**:  On or about November 1, 2013, Fernvale wired approximated $6,535,939 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 10, RFA 5.

**Keppel Response**:  Undisputed.

248.   **EIG ¶ 248**:  On or about February 12, 2014, Fernvale wired approximated $3,439,148 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 11, RFA 6.

**Keppel Response**:  Undisputed.

249.   **EIG ¶ 249**:  On or about April 21, 2014, Fernvale wired approximated $574,593 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 12, RFA 7.

CONTAINS CONFIDENTIAL INFORMATION

> **Keppel Response**:  Undisputed.

250.    **EIG ¶ 250**:  On or about June 4, 2014, Fernvale wired approximated $1,150,752 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 12-13, RFA 8.

> **Keppel Response**:  Undisputed.

251.    **EIG ¶ 251**:  On or about July 9, 2014, Fernvale wired approximated $625,795 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 13, RFA 9.

> **Keppel Response**:  Undisputed.

252.    **EIG ¶ 252**:  On or about October 31, 2014, Fernvale wired approximated $1,343,565 to Delta Bank for the benefit of Deep Sea Oil.  Exh. 113 at 14, RFA 10.

> **Keppel Response**:  Undisputed.

253.    **EIG ¶ 253**:  In total, Fernvale wired approximately $20.97 million to Delta Bank for the benefit of Deep Sea Oil.  *See supra* ¶¶ 243-52.

> **Keppel Response**:  Undisputed.

254.    **EIG ¶ 254**:  The $20.97 million that Fernvale wired to Deep Sea Oil at Delta Bank originated directly from payments made by Sete under its EPC contracts with Fernvale, and the amounts wired to Deep Sea Oil were determined from the amounts that Fernvale received from Sete.  Exh. 133 at 396:4-8; Exh. 121 at 139:15-21.

> **Keppel Response**:  Undisputed that payments to Deep Sea Oil were equal to a percentage of payments received from Sete.  Disputed on the basis that it is unclear what is meant by "originated directly".

255.    **EIG ¶ 255**:  Each of the payments by Fernvale to Deep Sea Oil were approved by Tong.  Exh. 133 at 391:22-392:7, 407:2-14.

> **Keppel Response**:   Disputed that the cited evidence establishes the assertion in paragraph 256.  Leong Peng Tan merely testified that he "believe[d]" that Tong "authorize[d]

CONTAINS CONFIDENTIAL INFORMATION

every payment that was made to Mr. Skornicki pursuant to Fernvale's contract with Eagle or Deepsea Oil."  (EIG Exh. 133 at 407:02-06.)

256.   **EIG ¶ 256**:  Keppel employees understood that a portion of the $20.97 million wired by Fernvale to Deep Sea Oil was intended to effectuate bribe payments to Brazilian officials.  Exh. 113 at 7-14, RFA 1-10.

**Keppel Response**:  Undisputed that certain individuals understood the purpose of certain payments made to Zwi Skornicki's companies, as described in the DPA.  (Keppel Opp'n Exh. 152, DPA.)

257.   **EIG ¶ 257**:  On January 17, 2013, Ferraz and "a delegation of senior management" from export agencies DNB, GIEK, and Eksportkreditt visited the BrasFELS shipyard and received a tour of the shipyard and a presentation about the Sete project.  Exh. 69 at KEPPEL00011057.

**Keppel Response**:  Undisputed.

258.   **EIG ¶ 258**:  After the visit, Kwok emailed Tong and YY Chow to summarize the visit, stating that the export agencies were "involved with financing SETE / Petrobras on the [drilling rig] program," were "on a verification tour," and "left the yard fully satisfied with what they saw."  Exh. 69 at KEPPEL00011057.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.   Disputed to the extent Plaintiffs imply that the visit to the BrasFELS Shipyard addressed any topics beyond shipbuilding capacity.  (Keppel Opp'n Exh. 135, KEPPEL00011057.)

259.   **EIG ¶ 259**:  On or about February 27, 2013, a representative from United Kingdom Export Finance ("**UKEF**") was authorized to visit the BrasFELS shipyard in

CONTAINS CONFIDENTIAL INFORMATION

connection with financing for Sete, with a presentation to be made.  Exh. 70 at KEPPEL00007815.

> **Keppel Response**:  Disputed to the extent Plaintiffs imply that the visit concerned any topics beyond shipbuilding capacit.  Sete's email states: "The Topics to be discussed will be Brasfells plan to build the drilling rigs in Brazil and how to achieve the time schedule."  (Keppel Opp'n Exh. 133, KEPPEL00007815-816 at 815.)

260.    **EIG ¶ 260**:  On or about June 6, 2013, "representative[s] from Sete Brasil [i]nvestors," including Kevin Corrigan of EIG, visited the BrasFELS shipyard and were given a tour and presentations about the shipyard and Sete project.  Exh. 71 at KEPPEL00457153-54, KEPPEL00457157; Exh. 122 at 172:17-173:20.

> **Keppel Response**:  Disputed to the extent that Plaintiffs imply that anything other than the "[y]ard track record and construction methodology" was presented by BrasFELS employees.  (Keppel Opp'n Exh. 141, KEPPEL00457152-156 at 152.)  Disputed to the extent that Plaintiffs imply that Keppel representatives were present at this yard visit.  (See infra CSOF ¶ 663.)

261.    **EIG ¶ 261**:  After the visit, Bruno Ng, a Keppel Brasil employee, sent an email to Kwok and others stating that the visit "was successfully conducted with no major issue or concern" and that "the visitors left in awe after the insightful yard tour at the [drilling rig] construction sites."  Exh. 71 at KEPPEL00457152.

> **Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

262.    **EIG ¶ 262**:  Corrigan left this third visit to the BrasFELS shipyard "feeling good about the progress at Brasfels, that they were a professional company that was doing a good job."

CONTAINS CONFIDENTIAL INFORMATION

Exh. 122 at 175:14-24.

**Keppel Response**:  Undisputed that Corrigan provided the quoted testimony.

263.   **EIG ¶ 263**:  On June 5, 2013, Sete wrote to Petrobras regarding an "All Lenders Meeting," writing that the "most important of all is to relay the message to the shipyards that: THIS IS THE MOST IMPORTANT MEETING OF THE FINANCING PROCESS!! The creditors need to leave this meeting convinced that everything is under control (shipyard construction and rig construction). Their comfort has a direct connection to their efficiency and willingness to finance. So the focus is on commitment to the Project, including its risks!!!"  Exh. 72 at KEPPEL00589220 (emphasis in original).

**Keppel Response**:  Undisputed that a Sete employee sent the email quoted in Paragraph 263 to a Petrobras employee, except to clarify that the email was in Portuguese.

264.   **EIG ¶ 264**:  Later that day, Petrobras forwarded the message to Kwok, Skornicki, Tan, and others, writing that Sete and the rig operators "will have meetings with all lenders," that "[i]t is a very important process," and "Keppel has been helping us on this process and as already discussed with Zwi [Skornicki], next Tuesday (11/06) Keppel shall make a presentation about the Drillship project and the shipyards. I request you to make the presentation."  Exh. 72 at KEPPEL00589220.

**Keppel Response**:  Undisputed that the email cited contains the language quoted.

265.   **EIG ¶ 265**:  On June 11, 2013, Keppel and/or its subsidiary made a presentation to Sete's lenders at "SETE's All Lenders' presentation meeting . . . where all the Yards were asked to present the respective Yard's capability / capacity and DRU progress status."  Exh. 73 at KEPPEL00008303.

**Keppel Response**:  Disputed to the extent Plaintiffs contend that Keppel, rather than its subsidiary, made a presentation to Sete's lenders.  The presentation was made by

CONTAINS CONFIDENTIAL INFORMATION

BrasFELS.  (See infra CSOF ¶¶ 658-660 (citing Keppel Opp'n Exh. 146, KEPPEL00589219-229 at 220.)  Otherwise, undisputed that the evidence cited contains the language quoted.

266.    **EIG ¶ 266**:  After arriving back from the meeting, Kwok reported to YY Chow that "[o]ur presentation went well and post meeting feedback is that all the Lenders have complete confidence in BrasFELS."  Exh. 73 at KEPPEL00008303.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.  Disputed to the extent Plaintiffs imply that the presentation reflected anything other than the "Yard's capability/capacity and DRU progress status."  (EIG Exh. 73, at KEPPEL00008303-304 at KEPPEL00008303.)

267.    **EIG ¶ 267**:  Through 2014, Keppel never disclosed the Corruption Scheme to Sete's investors or lenders.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that Keppel had a duty to disclose the bribery scheme to Sete's investors or lenders.

268.    **EIG ¶ 268**:  Keppel understood from Sete that the first batch of long-term financing from BNDES was scheduled to be signed on February 6, 2015.  Exh. 87 at KEPPEL00641137.

**Keppel Response**:  Undisputed that Kwok Kai Choong sent an email to individuals associated with various Keppel entities that "the Long Term Loan agreement signing [was] on Fri 6/2".  (EIG Exh. 87 at KEPPEL006411370).  Disputed to the extent Plaintiffs imply this was the first time BNDES had scheduled and then postponed a signing.

269.    **EIG ¶ 269**:  That first batch was "specific project based," and Keppel expected BNDES to "pay the progress claims directly to the shipyards," including Keppel for the Urca and Frade rigs.  Exh. 87 at KEPPEL00641137.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed to the extent that Plaintiffs contend that Keppel expected BNDES to pay progress claims directly to Keppel as opposed to its subsidiary, the BrasFELS Shipyard.  The cited evidence states that "progress claims" will be "directly to the shipyards."  (Keppel Opp'n Exh. 148, KEPPEL00641136-138 at 137.)  Undisputed that the evidence cited contains the language quoted.

270.   **EIG ¶ 270**:  The first batch of BNDES financing was "subject to Keppel submitting its anti corruption declaration letter addressed to the lenders."  Exh. 87 at KEPPEL00641137.

**Keppel Response**:  Disputed that BNDES financing was contingent on anti-corruption declarations.  BNDES had previously postponed financing irrespective of any such declarations.  (See infra CSOF ¶¶ 665, 669, 672, 686, 699 (citing Keppel Opp'n Exh. 27, Keppel Opp'n Exh. 128, EIG_KEP_00260601 at 635, Keppel Opp'n Exh. 126, EIG_KEP_00259344 at 345).)  Undispited that after Operation Car Wash was disclosed, Sete's representatives told Keppel employees that lenders had requested anti-corruption declarations.

271.   **EIG ¶ 271**:  BNDES financing was "quite critical in order for Sete to continue funding the milestone payments to the shipyards."  Exh. 126 at 18:23-19:3.

**Keppel Response**:  Undisputed that Sete needed financing to pay the shipyards.  Disputed to the extent Plaintiffs imply that BNDES was the only lender available to Sete.  It was not.  (See infra CSOF ¶¶ 664, 666 (citing Keppel Opp'n Exh. 66, DX039 at 811, Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 636).)  Further disputed to the extent Plaintiffs imply that Sete's failure to secure financing from BNDES was due to the disclosure of the bribery scheme.  Sete had been trying unsuccessfully to secure financing for years before Operation Car Wash was disclosed.  (See infra CSOF ¶¶ 665, 668-670, 673-681 (citing Keppel Opp'n Exh. 27, Keppel Opp'n Exh. 105, EIG_KEP_00094179-182 at 180; Keppel Opp'n Exh. 128,

CONTAINS CONFIDENTIAL INFORMATION

EIG_KEP_00260601-651 at 635; Keppel Opp'n Exh. 126, EIG_KEP_00259344-345 at 345;

Keppel Opp'n Exh. 131, EIG_KEP_00266976-981 at 977; Keppel Opp'n Exh. 127,

EIG_KEP_00260519-533 at 521; Keppel Opp'n Exh. 80, DX096 at 151).)

272.   **EIG ¶ 272**:  In December 2014, Jeffery Chow approved Anticorruption Letters to

be sent from Fernvale to Sete, which Sete "stressed" to Keppel were an "essential document for

BNDES" financing.  Exh. 83 at KEPPEL00634954.

   **Keppel Response**:  Disputed as incomplete, given the cited email states that the

letters were "still one essential document for BNDES loan, [Antonio from Sete] stressed".

273.   **EIG ¶ 273**:  On January 9, 2015, Jeffery Chow requested that Sam advise Keppel

Brasil employees that "things too dicey to be sending too much through Internet."  Exh. 84 at

KEPPEL00485414.

   **Keppel Response**:  Undisputed that the evidence cited contains the language

quoted.

274.   **EIG ¶ 274**:  Also on January 9, 2015, Jeffery Chow told Sam to contact Fernvale

Project Director Yan Naing Myint and tell him to keep the conversation regarding the

Anticorruption Letters "off emails" because Keppel didn't "want to be seen to colluding" which

it had "already."  Exh. 83 at KEPPEL00634953.

   **Keppel Response**:  Disputed as incomplete.  Chow stated:  "Can you contact Yan

and tell him to keep this off emails, as we don't want to be seen to colluding with others (as

we've been doing it already since the drafts submitted - Fernando used our arguments and drafts,

to the most extent)?"  (EIG Exh. 83 at KEPPEL00634953.)  Further disputed to the extent

Plaintiffs imply the reference to "colluding" was about the bribery scheme.  Chow testified that

he did not want to be seen colluding with other shipyards in the negotiations with Sete.  (Keppel

Opp'n Exh. 44, Chow Tr. 160:05-18.)

CONTAINS CONFIDENTIAL INFORMATION

275.   **EIG ¶ 275**:  On or about January 16, 2015, Fernvale signed anticorruption letters in which it "represent[ed] and warrant[ed]" that none of its "directors, officers, employees, or, to the best of its knowledge after due enquiry, agents and no other person acting on behalf of it, made or received any corrupt payments to obtain or retain business or improperly secure a business advantage" in connection with the EPC contracts.  Exh. 85 at KEPPEL00635164, KEPPEL00635167.

   **Keppel Response**:  Undisputed.

276.   **EIG ¶ 276**:  The Anticorruption Letters were false.  Exh. 121 at 167:13-168:22.

   **Keppel Response**:  Undisputed that Operation Car Wash revealed that certain employees had been involved in making corrupt payments.  In any event, the letters are irrelevant because they were issued after EIG's final investment in Sete (for which it seeks damages from Keppel) on January 5, 2015 and never seen by EIG.  (See infra CSOF ¶¶ 719-720.)

277.   **EIG ¶ 277**:  Jeffery Chow advised Keppel to not make anticorruption representations directly to lenders because if "for any reason there is a default of such terms on anti-corruption … a court may impose punitive [damages]" against Keppel which under U.S. law could "be astronomical."  Exh. 87 at KEPPEL00641136.

   **Keppel Response**:  Undisputed that the cited evidence contains the language quoted.  The letters are irrelevant because they were issued after EIG's final investment in Sete (for which it seeks damages from Keppel) on January 5, 2015 and never seen by EIG.  (See infra CSOF ¶¶ 719-720.)

278.   **EIG ¶ 278**:  On February 5, 2015, the contents of Barusco's plea agreement and testimony were made public and implicated Sete in the Corruption Scheme.  Exh. 89 at KEPPEL00440537-40; Exh. 91 at EIG_KEP_00284098.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed to the extent Plaintiffs imply that February 5, 2015 was the first time that Sete was implicated in the bribery scheme.  In November 2014, it was publicly reported that Mr. Barusco, the former COO of Sete, had confessed to Brazilian prosecutors that he took bribes from construction companies and that the CEOs of Camargo Corrêa and Queiroz Galvão, the construction companies that owned the majority of EAS, the shipyard building the first seven rigs for Sete, had been arrested.  (Keppel Opp'n Exh. 153, EIG_KEP_00134494 at 3.)  In November 2014, EIG answered written inquiries from its own investors about the impact of the bribery scheme on its investment in Sete.  (Keppel Opp'n Exh. 82, EIG_KEP_00263664 at 4.)  Moreover, EIG has asserted repeatedly that it viewed Sete as Petrobras's "alter ego", and thus from EIG's perspective, EIG would have known that Sete was involved when it learned that Petrobras was implicated and certainly when it learned that Barusco was implicated.  (See infra CSOF ¶¶ 543-544 (citing Keppel Opp'n Exh. 60, Thomas D.C. Tr. 103:15-22; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 228:11-20).)

279.   **EIG ¶ 279**:  The signing of contracts between Sete and BNDES for long-term financing that were scheduled for on or about February 6, 2015 was suspended due to the public disclosure of Barusco's Collaboration Agreements made as part of his plea agreement.  Exh. 133 at 342:16-22; Exh. 88 at EIG_KEP_00235093; Exh. 89 at KEPPEL00440536-37.

**Keppel Response**:  Undisputed that BNDES continued its pattern of postponing financing commitments in early February 2015.

280.   **EIG ¶ 280**:  Executives at Keppel were concerned about Sete's ability to secure long-term financing with BNDES after the Barusco collaboration agreements were disclosed.  Exh. 133 at 340:5-13.

**Keppel Response**:  Undisputed that Keppel employees expressed concern about the possible impact of Barusco's plea on Sete's ability to secure financing.  Disputed to the

extent Plaintiffs imply Keppel was monitoring the financing for any reason other than the fact

that Sete had already stopped paying the shipyards by November 2014.  (See infra CSOF ¶¶ 688-

689 (citing Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 868; Keppel Opp'n Exh. 145,

KEPPEL00567865-866 at 865; Keppel Opp'n Exh. 47; Hua Tr. 18:6-11; Keppel Opp'n Exh. 53,

Tan Tr. 343:10-14).)

281.    **EIG ¶ 281**:  YY Chow and Jeffery Chow were part of Keppel's task force that

responded to allegations made by Barusco.  Exh. 126 at 38:18-39:2.

**Keppel Response**:  Undisputed that they were initially assigned to a task force to

address the allegations.

282.    **EIG ¶ 282**:  On February 9, 2015, Keppel Corp. issued a statement to "refute

allegations made in media reports on Keppel FELS' involvement in the scandal surrounding

Petrobras."  Exh. 93.

**Keppel Response**:  Undisputed.

283.    **EIG ¶ 283**:  In the statement, Keppel Corp. "emphasise[d] that Keppel Group has

a Code of Conduct which prohibits, among others, bribery and corruption.  Our employees are

required to conduct themselves with integrity, in an ethical and proper manner, and in

compliance with the applicable laws and regulations of the countries in which we operate,

including anti-bribery laws."  Exh. 93 at KEPPEL00553544.

**Keppel Response**:  Undisputed.

284.    **EIG ¶ 284**:  In the statement, Keppel Corp. "point[ed] out . . . [that] the Agency

Agreement with Eagle do Brasil categorically states that Eagle do Brasil and Zwi Skornicki

'shall not make, either directly or indirectly, any improper payment of money or anything of

value to an Official in connection with the Contract'."  Exh. 93 at KEPPEL00553544.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

285.   **EIG ¶ 285**:  Keppel's February 9, 2015 press release did not disclose that Keppel executives had authorized Skornicki to pay bribes.  Exh. 93 at KEPPEL00553544.

**Keppel Response**:  Disputed to the extent Paragraph 285 implies anyone other than the individuals described in the DPA were aware of the bribery scheme at the time. Disputed that the February 9, 2015 press release was issued by Keppel, as opposed to Keppel Corp.  (EIG Exh. 93.)

286.   **EIG ¶ 286**:  On or about February 9, 2015, Jeffery Chow drafted a letter from Keppel to its customers, telling them to "rest assured" that allegations of Keppel's involvement in the bribery scandal involving Petrobras were "false and without merit."  Exh. 92 at KEPPEL00641233.

**Keppel Response**:  Undisputed that Chow drafted a letter with the language quoted.

287.   **EIG ¶ 287**:  The February 9, 2015 letter from Keppel to its customers was false. Exh. 121 at 174:20-175:20.

**Keppel Response**:  Undisputed that it was later revealed that individuals at Keppel, including Chow, had been involved in the bribery scheme, as described in the DPA.

288.   **EIG ¶ 288**:  On August 3, 2016, Keppel Corp. issued a statement "strongly den[ying] the allegations reportedly made that Keppel executives authorized Mr Skornicki to pay bribes on its behalf," representing that "[n]one of the individuals … including the current CEO of Keppel Offshore and Marine Mr Chow Yew Yuen, have ever authorized Mr Skornicki to make any payments as bribes."  Exh. 93 at 1.

**Keppel Response**:  Disputed that the cited evidence contains the language quoted.

289.   **EIG ¶ 289**:  That August 3, 2016 statement was false.  Exh. 105 at A-15 ¶ 72.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed that it was later revealed that individuals at Keppel had been involved in the bribery scheme, as described in the DPA.

290.  **EIG ¶ 290**:  Corrigan, who is fluent in Portuguese, was employed by EIG from its inception until he retired on June 30, 2014.  Exh. 123 at 14:16-15:18, 23:8-9.

**Keppel Response**:  Undisputed.

291.  **EIG ¶ 291**:  Corrigan was the senior-most member on the EIG team that was evaluating a potential investment in the Drilling Rigs/Sete project (the "**Sete Deal Team**").  Exh. 122 at 57:2-5; Exh. 123 at 155:20-156:5; 165:14-21; Exh. 125 at 295:7-10.

**Keppel Response**:  Undisputed.

292.  **EIG ¶ 292**:  Kevin Lowder ("**Lowder**"), Clay Taylor ("**Taylor**"), and Hayden were EIG employees who served at times on the Sete Deal Team.  Exh. 123 at 60:3-16; Exh. 125 at 33:8-17; Exh. 127 at 74:12-75:6.

**Keppel Response**:  Undisputed.

293.  **EIG ¶ 293**:  The Sete Deal Team worked with Brazilian outside counsel at Machado Meyer, who reviewed the Sete transaction and "put together a risk matrix" of the deal for EIG ("**Machado Meyer**").  Exh. 123 at 60:17-18; 172:8-16.

**Keppel Response**:  Undisputed.

294.  **EIG ¶ 294**:  The Sete Deal Team received information from Banco Santander Brasil S.A ("**Santander**") while considering an investment in Sete.  Exh. 123 at 54:7-55:1, 58:18-22; *see*, *e.g.*, Exh. 10 at EIG_KEP_00075067.

**Keppel Response**:  Undisputed.

295.  **EIG ¶ 295**:  The Sete Deal Team understood that the team at Santander was acting as a financial advisor for Petrobras for the Sete transaction.  Exh. 123 at 52:12-53:5.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed on the basis that the cited evidence does not support the assertion in Paragraph 295, except undisputed that Kevin Corrigan testified that someone at Santander told him a team at Santander had been "hired by Petrobras to advise them."

296.   **EIG ¶ 296**:  Luiz Reis ("**Reis**") originally worked with Santander, who was advising Petrobras on the Rigs Project, but he left to be a founder of Lakeshore Financial Partners Participações ("**Lakeshore**").  Exh. 128 at 37:4-12; Exh. 122 at 165:18-166:2; Exh. 123 at 19:20-22, 52:12-53:5.

**Keppel Response**:  Disputed on the basis that the cited evidence reflects EIG's uncertainty over the roles played by Lakeshore and Santander with respect to Petrobras and Sete..

297.   **EIG ¶ 297**:  Lakeshore assumed Santander's role as Sete's financial advisor.  Exh. 20 at EIG_KEP_00076504; Exh. 128 at 36:6-38:9; Exh. 122 at 165:18-166:2.

**Keppel Response**:  Disputed on the basis that the cited evidence reflects uncertainty over the roles played by Lakeshore and Santander with respect to Petrobras and Sete.

298.   **EIG ¶ 298**:  On September 27, 2010, Corrigan received via e-mail from Société Générale a multi-page English-language presentation titled, "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" (the "**Petrobras Drilling Presentation**").  Exh. 2 at EIG00025561/EIG_KEP_00075177.

**Keppel Response**:  Undisputed.

299.   **EIG ¶ 299**:  This Petrobras Drilling Presentation is identical to the September 2011 Petrobras Presentation that Keppel received.  *See supra* ¶ 120.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that anyone at Keppel knew that EIG had ever received a version of the Drilling Presentation and to the extent Plaintiffs imply that anyone at Keppel ever read the Drilling Presentation.  (See infra CSOF ¶¶ 511, 516.)

CONTAINS CONFIDENTIAL INFORMATION

300.   **EIG ¶ 300**:  The Petrobras Drilling Presentation contained a section titled "Cautionary Statement for US investors." Exh. 2 at EIG_KEP_00075179.

**Keppel Response**:  Undisputed that the Drilling Presentation contained boilerplate language under the heading "Cautionary Statement for US investors" followed by a disclaimer that the Drilling Presentation "shall not be used for any decision for an investment". Disputed to the extent Plaintiffs imply that the "Cautionary Statement" was directed at EIG, particularly given that the statement merely offers a clarification that the terminology and figures used in the Drilling Presentation may not align with the terminology and figures used by Petrobras in its SEC filings.  Disputed further to the extent Plaintiffs imply the Cautionary Statement was directed at investors based in the US, as opposed to investors in US securities anywhere in the world.

301.   **EIG ¶ 301**:  The Petrobras Drilling Presentation discussed the long-term strategic and financing goals for an "off balance sheet" "finance structure" to develop and to charter drilling rigs to Petrobras so that Petrobras could extract oil and gas from the Santos and Campos Basins.  Exh. 2 at EIG_KEP_00075194-96, EIG_KEP_00075201-02.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that they relied on the Drilling Presentation when deciding to invest in Sete.

302.   **EIG ¶ 302**:  The Petrobras Drilling Presentation included a slide that stated that the "Main Objectives" were "[t]o ensure the availability of its demand for drilling rigs for Pre Salt application, minimizing charter costs and associated risks."  Exh. 2 at EIG_KEP_00075203.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted, but disputed to the extent Plaintiffs imply that they relied on the Drilling Presentation when deciding to invest in Sete.

CONTAINS CONFIDENTIAL INFORMATION

303.    **EIG ¶ 303**:  The Petrobras Drilling Presentation identified six potential risks under the heading "Main Risks and Challenges," including "Credit Risk," "Short Fall of Revenues," "Charter Daily Rates," "Guarantees," "Technological Risk" and "Delay and Cost Overrun."  Exh. 2 at EIG_KEP_00075198.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.  Disputed to the extent Plaintiffs imply that slide 20 of the Drilling Presentation purports to offer an exhaustive list of potential risks.  Further disputed to the extent Plaintiffs imply that they relied on the Drilling Presentation when deciding to invest in Sete.

304.    **EIG ¶ 304**:  The Petrobras Drilling Presentation also included a flow chart that purported to describe "The Basic Structure for Each Drilling Unit" and depicted the corporate structure and agreements governing the various parties. Exh. 2 at EIG_KEP_00075205.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted and a flow chart, but disputed to the extent Plaintiffs imply that they relied on the Drilling Presentation when deciding to invest in Sete..

305.    **EIG ¶ 305**:  The Petrobras Drilling Presentation did not mention the Corruption Scheme.  Exh. 2.

**Keppel Response**:  Undisputed that the Drilling Presentation does not discuss corruption risks, but disputed to the extent Plaintiffs imply that they relied on the Drilling Presentation when deciding to invest in Sete.

306.    **EIG ¶ 306**:  On October 25, 2010, Santander e-mailed Corrigan and Taylor an English-language document entitled, "Pre-Salt Oil Rigs Project" ("**Petrobras Pre-Salt Presentation**").  Exh. 3 at EIG_KEP_00075164.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

307.   **EIG ¶ 307**:  Corrigan received the Petrobras Pre-Salt Presentation.  Exh. 123 at 68:11-12; 69:9-71:2.

**Keppel Response**:  Undisputed that Corrigan testified that he received the Petrobras Pre-Salt Presentation.

308.   **EIG ¶ 308**:  Lowder reviewed the Petrobras Pre-Salt Presentation.  Exh. 128 at 121:15-122:5.

**Keppel Response**:  Disputed on the basis that it misstates the evidence cited.  Mr. Lowder testified:  "This is a long time ago. But yes, it looks familiar, and I believe I recall reviewing and, you know, incorporating some of this information into early memorandums and the like."

309.   **EIG ¶ 309**:  Information in the Petrobras Pre-Salt Presentation was incorporated into EIG's internal work product analyzing the project.  Exh. 128 at 121:15-122:5.

**Keppel Response**:  Disputed on the basis that it misstates the evidence cited.  Mr. Lowder testified:  "This is a long time ago. But yes, it looks familiar, and I believe I recall reviewing and, you know, incorporating some of this information into early memorandums and the like."

310.   **EIG ¶ 310**:  This document discussed the Sete investment thesis and stated that Sete would have "[m]anagement with extensive experience in the market."  Exh. 3 at EIG_KEP_00075171.

**Keppel Response**:  Undisputed that the document included the quoted language. Disputed on the basis that the document pre-dates Sete and further disputed to the extent Plaintiffs imply they relied on the quoted language when deciding to invest in Sete.

311.    **EIG ¶ 311**:  The document included a slide titled "Ownership Structure: Investors" which contained a box for "Local and International Investors" investing in the Fundo

de Investimento em Participações Sondas ("**FIP Sondas**"), the investment fund that Petrobras created that was responsible for grouping together future investors of Sete.  Exh. 3 at EIG_KEP_00075173.

> **Keppel Response:**  Disputed, except undisputed that the document included the quoted language.  Disputed on the basis that the document pre-dates Sete and further disputed to the extent Plaintiffs imply they relied on the quoted language when deciding to invest in Sete.

312.    **EIG ¶ 312**:  The Petrobras Pre-Salt Presentation made no mention of the Corruption Scheme.  Exh. 3.

> **Keppel Response**:  Undisputed that the document does not discuss corruption risks, but disputed to the extent Plaintiffs imply that they relied on the document when deciding to invest in Sete.

313.    **EIG ¶ 313**:  After approval by Petrobras, Santander provided EIG access to the data room for the Sete transaction on or around December 29, 2010 ("**Data Room**"), which contained documents uploaded by Petrobras and later Sete.  Exh. 5 at EIG00025391/EIG_KEP_00050772, EIG00025396/EIG_KEP_00050777; Exh. 123 at 104:5-11, 305:15-20, 309:10-21.

> **Keppel Response**:  Undisputed, except disputed on the basis that the evidence cited does not prove that the "data room" referenced "contained documents uploaded by Petrobras and later Sete".

314.    **EIG ¶ 314**:  There was an index that listed many of the documents that were placed in the Data Room.  Exh. 115.

> **Keppel Response**:  Disputed on the basis that there is no evidence indicating where the purported list in Exhibit 115 came from, the date it was created or any other

CONTAINS CONFIDENTIAL INFORMATION

information to support the assertion that Exhibit 115 did, in fact, list "many of the documents that were placed in the data room".

315.     **EIG ¶ 315**:  Santander recommended that EIG focus on the following documents in the Data Room:  (i) an "[i]nvestment memorandum prepared by Caixa Econômica Federal", (ii) the "Term Sheet," (iii) the "Return scenarios and main premises used," (iv) the "Strategic Guidelines Plan," and (v) the "Schedule."   Exh. 5 at EIG00025390/EIG_KEP_00050771.

     **Keppel Response**:  Undisputed.

316.     **EIG ¶ 316**:  In connection with his due diligence efforts in the Sete investment, Corrigan or his colleagues read and reviewed documents in the Data Room.  Exh. 123 at 59:15-60:18; 62:16-63:7; 65:10-21; 302:14-304:4; 309:2-4; 313:16-314:4; Exh. 122 at 59:6-8.

     **Keppel Response**:  Undisputed that Corrigan and others purport to have reviewed documents in the Data Room, but disputed to the extent Paragraph 316 implies that anyone other than Corrigan could review any of the documents in Portuguese.  (Keppel Opp'n Exh. 54, Thomas Tr. 118:25-119:08; Keppel Opp'n Exh. 50, Patel Tr. 45:08-16; Keppel Opp'n Exh. 43, Anderson Tr. 22:09-11; Keppel Opp'n Exh. 51, Talbot Tr. 57:22-58:13; Keppel Opp'n Exh. 55, Wade Tr. 27:14-23; Keppel Opp'n Exh. 46, Hayden Tr. 70:16-21; Keppel Opp'n Exh. 59, Lowder D.C. Tr. 23:01-08.)

317.     **EIG ¶ 317**:  A document titled "Confidential Information Memorandum:  Pre-Salt Drilling Rigs Project," that Petrobras and its advisors prepared, dated January 2010 (the "**CIM**") was in the Data Room.  Exh. 115 at EIG_KEP_00166208; Exh. 123 at 58:13-17, 303:13-304:4.

     **Keppel Response**:  Disputed that the cited evidence supports the assertion in Paragraph 317 given that there is no evidence showing what was or was not in the Data Room at any point in time.

CONTAINS CONFIDENTIAL INFORMATION

318.   **EIG ¶ 318**:  Corrigan reviewed the CIM and the Sete Deal team "thoroughly" relied on it when evaluating the Project Sondas investment.  Exh. 123 at 58:13-17; 66:16-19, 158:1-7, 303:13-304:4.

 **Keppel Response**:  Disputed that the Sete Deal Team "thoroughly" relied on the CIM.  The evidence cited only shows that Corrigan testified that they "relied on it" (EIG Exh. 123 at 58:13-17, 158:1-7, 304:2-4) and that he read it "thoroughly" (id. at 66:16-19).  Further disputed on the basis that everyone apart from Corrigan involved in Sete at EIG at that time testified that they could not read Portuguese.  (Keppel Opp'n Exh. 51, Talbot Tr. 57:22-58:13; Keppel Opp'n Exh. 46, Hayden Tr. 70:16-21; Keppel Opp'n Exh. 50, Patel Tr. 10-13; Keppel Opp'n Exh. 55, Wade Tr. 27:16-17; Keppel Opp'n Exh. 54, Thomas Tr. 119:03-13; Keppel Opp'n Exh. 43, Anderson Tr. 22:09-11; Keppel Opp'n Exh. 59, Lowder D.C. Tr. 23:01-08.)  Further disputed on the basis that the only version of the CIM pleaded in the Complaint was the September 2011 version that was in English and obtained by EIG after it had decided to invest in Sete.  (Keppel Opp'n Exh. 69, DX062; Keppel Opp'n Exh. 1, Compl. ¶ 62.)

319.   **EIG ¶ 319**:  The CIM stated that an investment in Sete was attractive because the investors could "[e]xplore 'new frontiers' together with Petrobras," there would be "long-term contracts with a high probability of cash flows" and "[o]pportunities for long-term upsides that are very advantageous."   Exh. 1 at EIG00091806/EIG_KEP_00166289.

 **Keppel Response**:  Undisputed that the evidence cited contains the language quoted, according to the certified translation.

320.   **EIG ¶ 320**:  Petrobras stated in the CIM that BNDES would finance 45% of the total capital of the project in the form of long-term debt.  Exh. 1 at EIG00091862/EIG_KEP_00166345.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed that the CIM states that BNDES would finance 45% of the total capital of the project in the form of long-term debt.  According to the certified translation of the CIM, the document only states that "the principal assumptions used for the base case of the financial model" include that BNDES's participation was projected to be 45%.  (EIG Exh. 1 at EIG00091862/EIG_KEP_00166345.)

321.   **EIG ¶ 321**:  The CIM described Sete's 10-year and 20-year charter contracts as above average for the industry, and discussed the possibility of "a bonus payment that is proportional and growing and that could reach up to 10% of the daily cost of the charter."  Exh. 1 at EIG00091803/EIG_KEP_00166286.

**Keppel Response**:  Disputed that the CIM described the charter contracts as "above average for the industry".  The certified translation of the CIM states that the contracts "are much longer than the average 1-5 year contracts generally practiced in the market".  (EIG Exh. 1 at EIG00091803/EIG_KEP_00166286.)  Undisputed that the CIM discussed the possibility of a "bonus payment" "if the uptime is greater than 94%".  (Id.)

322.   **EIG ¶ 322**:  The CIM stated that the contractual terms of the Sete investment provided for payment of a Daily Rate "in relation to the availability of the equipment (rig) and is not related to production."  Exh. 1 EIG00091844/EIG_KEP_00166327.

**Keppel Response**:  Undisputed that the certified translation of the CIM contains the language quoted.

323.   **EIG ¶ 323**:  The CIM stated that Petrobras would contribute to the Project "as a contractor of drilling rig charter," as "a manager and supervisor of the works," "as a shareholder of the Brazilian holding company (Sete Brazil) . . . participating with a minimum of 5% and maximum of 10% of their share capital" and as an operator of at least two of the rigs.  Exh. 1 at EIG00091803/EIG_KEP_00166286.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed that the CIM stated that Petrobras would be an operator of "at least" two of the rigs.  The certified translation of the CIM stated that Petrobras would be an operator "of 2 of the 7 drilling rigs making up the First System to be allocated to the project".  (EIG Exh. 1 at EIG00091803/EIG_KEP_00166286.)  Otherwise, undisputed that the evidence cited contains the language quoted.

324.  **EIG ¶ 324**:  The CIM explained that "[t]o promote the economic development of a national shipbuilding and drilling rig operation on a large scale, including the entire production chain, the Project counts on strong support from the federal government, including financial support.  Exh. 1 at EIG00091802/EIG_KEP_00166285.

**Keppel Response**:  Disputed as incomplete.  The full statement in the certified translation of the CIM is:  "To promote the economic development of a national shipbuilding and drilling rig operation on a large scale, including the entire production chain, the Project counts on strong support from the federal government, including financial support, through the creation of a guarantee fund intended to mitigate the risk of building drilling rigs in the country (Reserve Fund for Naval Construction, or 'FGCN')."  (EIG Exh. 1 at EIG00091802.)

325.  **EIG ¶ 325**:  The CIM stated that Sete would enter into drillship construction contracts with shipyards that would, among other things, oblige each shipyard to "perform the work . . . in accordance with . . . applicable legislation [and] according to best practices of the industry."  Exh. 1 at EIG00091842/EIG_KEP_00166325.

**Keppel Response**:  Disputed on the basis that the cited language from the CIM referred expressly to the EAS Shipyard's EPC contract, as opposed to any contract involving any Keppel entity.  The certified translation of the CIM stated:  "Principal terms: For the First System, the Construction Contract <u>with EAS</u> has construction terms as indicated below . . . .

CONTAINS CONFIDENTIAL INFORMATION

perform the work . . . in accordance with . . . applicable legislation [and] according to best practices of the industry."  (EIG Exh. 1 at EIG00091842 (emphasis added).)

326.  **EIG ¶ 326**:  The CIM identified seven different "Risks and Mitigating Factors" associated with investing in Sete, including risks relating to project design and engineering defects, cost overruns, operational delay, performance risk, refinancing risk, taxes and social/environmental risks.  Exh. 1 at EIG00091869-75/EIG_KEP_00166352-58.

**Keppel Response**:  Undisputed that the certified translation of the CIM contains the quoted language.

327.  **EIG ¶ 327**:  Petrobras represented in the CIM that any risk of delay was mitigated by the "[s]election of a shipyard with proven experience in building similar vessels."  Exh. 1 at EIG00091872/EIG_KEP_00166355.

**Keppel Response**:  Undisputed that the certified translation of the CIM contains the quoted language.

328.  **EIG ¶ 328**:  The CIM did not mention the Corruption Scheme as a risk or otherwise.  Exh. 1.

**Keppel Response**:  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme. [Keppel Opp'n Exh. 152, DPA].  Otherwise, undisputed.

329.  **EIG ¶ 329**:  A document titled "Investment Memorandum FIP Sondas," dated January 6, 2011 (the ""), that was prepared by Caixa Econômica Federal ("**Caixa**"), was included in the Data Room.  Exh. 5 at EIG00025390/EIG_KEP_00050771; Exh. 123 at 303:13-304:4.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed on the basis that there is no evidence showing what was or was not in the Data Room at any point in time.  Further disputed on the basis that the Caixa Memorandum was not pleaded in the Complaint.

330.   **EIG ¶ 330**:  The Caixa Memo was "prepared" by Caixa "as Manager of … FIP Sondas" using information provided to it by Petrobras and its agents.  Exh. 6 at EIG00091665/EIG_KEP_00164883.

**Keppel Response**:  Disputed as incomplete and further disputed to clarify that the document states that "[t]he analyses performed in this Memorandum of Investment were done based on information and documents that were provided by Petrobras and by Petrobras's Advisors up to December 14, 2010".  (EIG Exh. 6 at EIG00091665/EIG_KEP_00164883.)  Otherwise, undisputed.

331.   **EIG ¶ 331**:  Corrigan reviewed the Caixa Memorandum and the Deal Team "thoroughly" relied on it when evaluating the Project Sondas investment.  Exh. 123 at 66:16-19; 158:1-7; 303:13-304:4.

**Keppel Response**:  Disputed that the Deal Team "thoroughly" relied on the Caixa Memorandum when evaluating the Project Sondas investment.  The cited testimony establishes only that Corrigan testified that he "read [it] through . . . throroughly" (EIG Exh. 123 at 66:16-19, 303:22-304:1) and purportedly "relied" on it (EIG Exh. 123 at 158:1-7, 304:2-6).  Further disputed on the basis that everyone apart from Corrigan involved in Sete at EIG at that time testified that they could not read Portuguese.  (Keppel Opp'n Exh. 54, Thomas Tr. 118:25-119:08; Keppel Opp'n Exh. 50, Patel Tr. 45:08-16; Keppel Opp'n Exh. 43, Anderson Tr. 22:09-11; Keppel Opp'n Exh. 51, Talbot Tr. 57:22-58:13; Keppel Opp'n Exh. 55, Wade Tr. 27:14-23; Keppel Opp'n Exh. 46, Hayden Tr. 70:16-21; Keppel Opp'n Exh. 59, Lowder D.C. Tr. 23:01-08.)  Disputed to the extent Plaintiffs imply that they relied on the Caixa Memorandum.

CONTAINS CONFIDENTIAL INFORMATION

332.   **EIG ¶ 332**:  The Caixa Memorandum represented that:

"Petrobras adopts best practices of corporate governance. As it is a
publicly held company, it is subject to the rules of the Brazilian
Securities and Exchange Commission [*Comissão de Valores
Mobiliários (CVM)*] and the Brazilian Stock Exchange [*Bolsa de
Valores, Mercadorias e Futuros (BM&FBovespa)*]. Abroad, it
complies with the rules of the Securities and Exchange
Commission (SEC) and the New York Stock Exchange (NYSE) in
the United States; of Labitex of the Madrid Stock Exchange [*Bolsa
de Madrid*] in Spain; of the Buenos Aires Commercial Exchange
[*Bolsa do Comércio de Buenos Aires*]; and of the Argentinian
National Securities Commission [*Comisión Nacional de Valores
(CNV)*] in Argentina.

Among the tools Petrobras has adopted to **guarantee** proper
corporate governance is the Code of Best Practices, which deals
with policies, such as the disclosure of information on material
facts or actions and the trading of securities, related to the use of
privileged information and the conduct of management and
employees from senior management."

Exh. 6 at EIG00091695-96/EIG_KEP_00164913-14 (emphases and brackets in original).

   **Keppel Response**:  Undisputed that the certified translation of the Caixa
Memorandum contains the language quoted.

90

CONTAINS CONFIDENTIAL INFORMATION

333.    **EIG ¶ 333**:  The Caixa Memorandum also stated that, based on a "version of the Construction Contract… provided by the Petrobras Advisor," the EPC Contractor was under the obligation of "[c]omplying with applicable legislation."  Exh. 6 at EIG00091728-29/EIG_KEP_00164946-47.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the construction contract was a contract with Keppel or any of its subsidiaries.  Keppel's subsidiary did not execute its first EPC contract to build a drillship in connection with Sete until December 16, 2011.  (See infra CSOF ¶¶ 632-633.)  Further disputed on the basis that the certified translation of the Caixa Memorandum expressly refers only to the EAS Shipyard as the EPC Contractor, as opposed to any Keppel entity.  Otherwise, undisputed that the evidence contains the language quoted.

334.    **EIG ¶ 334**:  The Caixa Memorandum listed "the main risks and mitigating factors of the Rigs Project," with the ten risks being "Construction Risks," "Risks of Petrobras Renewing Charter contracts," "Risk of not raising the funds needed," "Risk of operator's poor performance," "Risk of elimination of tax benefits," "Risks of elimination of REPETRO," "Mandatory nature of additional contributions at the request of BNDES, in case of insufficient funds to complete the construction of the rigs," "Discrepancy between the senior debt term and the term of the Charter Contracts," "Discrepancy between costs and general expenses effectively incurred and those provided for the in the Project modeling," and "Social-Environmental Risk."  Exh. 6 at EIG00091770-73/EIG_KEP_00164988-91.

**Keppel Response**:  Undisputed that the certified translation of the Caixa Memorandum contains the language quoted.

335.    **EIG ¶ 335**:  The Caixa Memorandum did not list the risk of the Corruption Scheme.  Exh. 6.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme. (Keppel Opp'n Exh. 152, DPA.)  Otherwise, undisputed.

336.    **EIG ¶ 336**:  Draft EPC contracts, in English, were in the Data Room.  Exh. 115 at EIG000141814/EIG_KEP_00166208.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the two draft EPC contracts, only one of which was for the construction of drillships, purportedly in the Data Room were drafts of the contract with Keppel or any of its subsidiaries.  There was no mention of Keppel or its subsidiaries in the draft EPC drillship contract.  (EIG Exh. 116.)  EIG made its binding commitment to invest in Sete before Keppel's subsidiary, Fernvale, executed its first EPC contract with Sete in December 2011.  (See infra CSOF ¶¶ 632-633.)  Otherwise, undisputed.

337.    **EIG ¶ 337**:  The draft EPC contract contained a "Representation[] and Warrant[y] of the Contractor" that "[i]t is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or taken together, would materially and adversely affect its performance of any obligations under this Agreement."  Exh. 116 at EIG_KEP_00166682, Article 6.2(b).

**Keppel Response**:  Undisputed.

338.    **EIG ¶ 338**:  EIG considered "these representations and warranties … material to its investment decision," because this was "an important part of the contract."  Exh. 122 at 90:22-91:4.

**Keppel Response**:  Disputed on the basis that there is no contemporaneous evidence that EIG ever reviewed such representations or considered them "important".

CONTAINS CONFIDENTIAL INFORMATION

339.   **EIG ¶ 339**:  On June 16, 2011, Corrigan received a final draft of an EPC contract and forwarded it to Hayden "so he would be able to look [it] over and incorporate them into the investment recs."  Exh. 122 at 88:12-22, 89:20-90:7.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the EPC contract was related to any Keppel entity.  In June 2011, EAS Shipyard was the only shipyard that had signed an EPC contract with Sete.  (See infra CSOF ¶¶ 551-552.)  Keppel's subsidiary did not execute its first EPC contract to build a drillship in connection with Sete until December 16, 2011.  (See infra CSOF ¶¶ 632-633.)  Otherwise, undisputed that the evidence contains the language quoted.

340.   **EIG ¶ 340**:  EIG reviewed the EPC and other contracts and incorporated them into their own work product.  Exh. 127 at 67:19-68:18; Exh. 124 at 70:22-71:7.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that EIG reviewed and incorporated in its own work product any contract between any Keppel entity and and any Sete entity.  In June 2011, EAS Shipyard was the only shipyard that had signed an EPC contract with Sete.  (See infra CSOF ¶¶ 551, 583.)  Keppel's subsidiary did not execute its first EPC contract to build a drillship in connection with Sete until December 16, 2011.  (See infra CSOF ¶¶ 632-633.)  Otherwise, undisputed.

341.   **EIG ¶ 341**:  On August 23, 2011, EIG received an English-language presentation titled "Sete Brasil Participações S/A Management Presentation" from Lakeshore (the **"Management Presentation"**).  Exh. 30 at EIG_KEP_00048952-53.

**Keppel Response**:  Undisputed, except disputed on the basis that the Management Presentation was not pleaded in the Complaint.

342.   **EIG ¶ 342**:  The Management Presentation listed risks and mitigants.  Exh. 30 at EIG_KEP_00048987-88.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed.

343.    **EIG ¶ 343**:  It stated that while "[t]ypical charter contracts in the sector are short-term (1-3 years)," Sete had signed two 20-year contracts and five 10-year contracts with Petrobras, giving it "low exposure to volatility of the sector's supply and demand (both in terms of price and contract availability)."  Exh. 30 at EIG_KEP_00048960.

    **Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

344.    **EIG ¶ 344**:  It noted that financing risks were mitigated by the fact that the Pre-Salt was a "strategic priorit[y] to country development," and they could "count on full support and commitment from [the] Brazilian Government and BNDES."  Exh. 30 at EIG_KEP_00048988.

    **Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

345.    **EIG ¶ 345**:  The Management Presentation did not list the risk of the Corruption Scheme.  Exh. 30.

    **Keppel Response**:  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme. (Keppel Opp'n Exh. 152.)  Otherwise, undisputed.

346.    **EIG ¶ 346**:  On or about September 14, 2011, Lakeshore sent to EIG another English-language confidential information memorandum, dated September 2011 (the "**Lakeshore Memorandum**").  Exh. 32.

    **Keppel Response**:  Undisputed, except to the extent Plaintiffs seek to confuse the Court by obscuring the fact that this is the information memorandum pleaded in the Complaint. (Compl. ¶¶ 49-50, 62-63.)

94

CONTAINS CONFIDENTIAL INFORMATION

347.   **EIG ¶ 347**:  The Lakeshore Memorandum stated that "Sete Brasil has strong support from the Brazilian Federal Government."  Exh. 32 at EIG_KEP_00251585.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

348.   **EIG ¶ 348**:  The Lakeshore Memorandum also noted the "[s]trict technical selection of experienced shipyards or shipyards associated with another [] technical partner with proven reputation in the construction of similar vessels."  Exh. 32 at EIG_KEP_00251653.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

349.   **EIG ¶ 349**:  The Lakeshore Memorandum noted that EAS would execute its work "in accordance to and under consent of the applicable law."  Exh. 32 at EIG_KEP_00251621.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

350.   **EIG ¶ 350**:  The Lakeshore Memorandum also warned of a number of potential risks with Sete.  Exh. 32 at EIG_KEP_00251653-57.

**Keppel Response**:  Undisputed.

351.   **EIG ¶ 351**:  The Lakeshore Memorandum did not mention the Corruption Scheme as a potential risk or otherwise.  Exh. 32 at EIG_KEP_00251653-57.

**Keppel Response**:  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme. (Keppel Opp'n Exh. 152, DPA.)  Otherwise, undisputed.

352.    **EIG ¶ 352**:  In late May or early June 2011, Corrigan and Lowder visited Brazil and the EAS shipyard.  Exh. 14 at EIG_KEP_00073975.

       **Keppel Response**:  Undisputed.

353.    **EIG ¶ 353**:  Corrigan and Lowder met with Barusco, Ferraz, and Ivan Hong and Reis of Santander during this visit.  Exh. 14 at EIG_KEP_00073975; Exh. 13 at EIG_KEP_00073982.

       **Keppel Response**:  Undisputed.

354.    **EIG ¶ 354**:  No one in these meetings mentioned the Corruption Scheme.  Exh. 123 at 160:17-161:21, 189:12-190:6; Exh. 122 at 82:14-83:17, 118:5-9, 177:17-22; Exh. 134 at 90:11-14, 91:11-92:14.

       **Keppel Response**:  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme. (Keppel Opp'n Exh. 152, DPA.)  Further disputed to the extent Plaintiffs imply that the subjects of bribery or corruption risks were ever discussed.

355.    **EIG ¶ 355**:  Corrigan also visited the Keppel Shipyard on multiple occasions. *See supra* ¶¶ 100, 172, 260.

       **Keppel Response**:  Undisputed.

356.    **EIG ¶ 356**:  The Corruption Scheme was not disclosed during any of Corrigan's visits to the Keppel Shipyard.  *See supra* ¶¶ 103, 175, 260, 267.

       **Keppel Response**:  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme. (Keppel Opp'n Exh. 152, DPA.)  Disputed to the extent Plaintiffs imply that Keppel had a duty or opportunity to reveal the bribery scheme during any of Corrigan's visits to the BrasFELS Shipyard.  There is no evidence that anyone from Keppel, as opposed to its subsidiaries, was in

CONTAINS CONFIDENTIAL INFORMATION

attendance for any of Corrigan's visits to the BrasFELS Shipyard.  (See infra CSOF ¶¶ 605, 654,

663.)  Bribery and corruption were not discussed during any of Corrigan's visits to the BrasFELS

Shipyard.  (See infra CSOF ¶¶ 602 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 136:14-17,

143:03-06); CSOF ¶¶ 647-648 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 167:08-16 ); CSOF

¶¶ 661 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 175:07-13).)

357.    **EIG ¶ 357**:  EIG reviewed financial materials and models provided by Santander

and Lakeshore.  Exh. 128 at 36:9-13, 76:3-8; Exh. 123 at 60:8-10, 309:2-4, 309:9-21.

**Keppel Response**:  Undisputed that certain EIG witnesses purport to recall

reviewing financial materials and models.

358.    **EIG ¶ 358**:  EIG changed certain assumptions in the models. Exh. 125 at 150:18-

21.

**Keppel Response**:  Disputed that the cited evidence supports the assertion that

EIG changed certain assumptions in the models.  Hayden testified that "[EIG] could have been

changing assumptions or asking Lakeshore to do it for us."  (Keppel Opp'n Exh. 58, Hayden

D.C. Tr. 150:15-151:02.)

359.    **EIG ¶ 359**:  A version of EIG's internal financial model was used as support for

the Sete Investment Recommendations for Funds XIV and XV.  Exh. 17 at

EIG_KEP_00070034-41; Exh. 33 at EIG_KEP_00069946, EIG_KEP_00069953; Exh. 128 at

92:6-8, 93:9-94:8,154:5-13.

**Keppel Response**:  Undisputed.

360.    **EIG ¶ 360**:  Corrigan testified that when EIG "embarked on our due diligence of

Sete, we looked at the players, all our counterparties, the investors, Petrobras, the shipbuilders

and their owners, and we took a view that it was all on the up-and-up.  We never saw any sign

CONTAINS CONFIDENTIAL INFORMATION

that there was anything going on untoward in the structure of the transaction."  Exh. 122 at 53:18-54:3.

   **Keppel Response**:  Disputed to the extent Plaintiffs imply that EIG "never saw any sign that there was anything going on untoward in the structure of the transaction".  The evidence shows that during its due diligence, EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-563 (citing Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105; Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 215:18-216:1; Keppel Opp'n Exh. 45, Corrigan Tr. 92:4-10).)  Disputed to the extent Plaintiffs imply that EIG's due diligence "looked at the players", including the "shipbuilders and their owners".  The evidence shows that EIG's due diligence into the shipyards was minimal at best and that EIG did not even run a Complinet search on Keppel or its subsidiaries.  (See infra CSOF ¶¶ 568 (Keppel Opp'n Exh. 45, Corrigan Tr. 92:4-10).)  Otherwise, undisputed that the cited evidence contains the language quoted.

   361.   **EIG ¶ 361**:  EIG took a number of steps with respect to diligence on corruption: "we engaged counsel, both local and international; we canvassed our network of contacts in the market; and … we were very careful about who we chose as counterparties."  Exh. 134 at 66:2-11.

   **Keppel Response**:  Disputed that EIG was "very careful" about who they chose as counterparties and "took a number of steps with respect to diligence on corruption".  The evidence shows that during its due diligence, EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-563.)  Disputed that EIG took "a number of steps with respect to due diligence on

corruption".  The evidence shows that EIG's due diligence into corruption was minimal at best and that EIG did not even run a Complinet search on Keppel or its subsidiaries.  (See infra CSOF ¶¶ 568.)

362.  **EIG ¶ 362**:  The compliance department at EIG used a system called Complinet to search for indications of money laundering and corruption.  Exh. 125 at 294:5-9.

**Keppel Response**:  Undisputed.

363.  **EIG ¶ 363**:  Corrigan devised the search terms for the Complinet searches, which contained approximately thirty names related to the Sete transaction.  Exh. 16 at EIG_KEP_00203446.

**Keppel Response**:  Undisputed.

364.  **EIG ¶ 364**:  EIG also searched for the following in connection with Sete: the issuer of the securities at issue, as well as all parties that had a significant relationship with the issuer, including client and client contacts, beneficiaries, collateral owners, guarantors and cosigners, controlling or significant shareholders, and sending and receiving parties.  Exh. 16 at EIG_KEP_00203445-46.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the parties listed in Paragraph 364 were searched for in addition to the approximately 30 names provided by Corrigan.  The document does not state that these searches were run in addition to the 30 names Corrigan had already provided.  (EIG Exh. 16 at EIG_KEP_00203445-46.)  Otherwise, undisputed.

365.  **EIG ¶ 365**:  A memo summarizing the Complinet search identified "two noteworthy results" concerning Carmargo Correa and Demosthense Marques.  Exh. 16 at EIG_KEP_00203446-47.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

366.   **EIG ¶ 366**:  That memorandum concluded that these flagged results should not prevent EIG from proceeding with the Sete investment.  Exh. 16 at EIG_KEP_00203446-47.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the flagged results should not have prevented EIG from proceeding with the Sete investment.  EIG was aware that corruption was an issue in Brazil and, specifically, that Brazilian construction firms "had a checkered history on corruption".  (See infra CSOF ¶¶ 491-95 (citing Keppel Opp'n Exh. 54, Thomas Tr. 73:14-17.).)  The allegations uncovered by the Complinet search were of the same type uncovered by Operation Car Wash.  (See infra CSOF ¶¶ 550-58 (citing Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105; Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 215:18-216:1).)

367.   **EIG ¶ 367**:  In June 2011, Carla Vogel ("**Vogel**") was Chief Compliance Officer at EIG.  Exh. 123 at 75:9-12.

**Keppel Response**:  Undisputed.

368.   **EIG ¶ 368**:  Vogel reviewed the memorandum and the articles found by the Complinet search, and agreed that the articles represented "low risk," noting that the allegations were "several years old," and "no subsequent findings were identified in [EIG's] searches."  Exh. 16 at EIG_KEP_00203445.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the results of the Complinet search represented "low risk".  EIG was aware that corruption was an issue in Brazil and, specifically, that Brazilian construction firms "had a checkered history on corruption". (See infra CSOF ¶¶ 491-95 (citing Keppel Opp'n Exh. 54, Thomas Tr. 73:14-17).)  The allegations uncovered by the Complinet search were of the same type uncovered by Operation Car Wash. (See infra CSOF ¶¶ 550-58 (citing Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105; Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 215:18-216:1).)

369.   **EIG ¶ 369**:  EIG spent months reviewing "the thousands of pages of documents" Petrobras, Sete, and their agents provided it, and analyzing the Sete investment opportunity. Exh. 123 at 59:17-60:2, 156:8-14, 300:13-16.

**Keppel Response**:  Undisputed that Corrigan testified that EIG spent months reviewing "the thousands of pages of documents" Petrobras, Sete, and their agents provided it, and analyzing the Sete investment opportunity.

370.   **EIG ¶ 370**:  EIG had a "very iterative process" in which the deal team would have weekly or bi-weekly meetings with the chief investment officer as due diligence progressed.  Exh. 122 at 34:12-35:4, 72:5-18.

**Keppel Response**:  Undisputed that Corrigan testified that EIG had a "very iterative process" in which the deal team would have weekly or bi-weekly meetings with the chief investment officer as due diligence progressed.

371.   **EIG ¶ 371**:  Hayden testified that because the Sete investment involved long-term, fixed price charter agreements with Petrobras, EIG viewed the investment as protected from oil price risk.  Exh. 124 at 53:5-25.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that the Sete investment was protected from oil price risk.  The evidence shows it was not and that the global drop in oil prices in 2014 led to Sete's collapse.  (See infra CSOF ¶¶ 684-85, 724-27.)  Disputed to the extent Plaintiffs imply that they adequately analyzed the oil price risk associated with the Sete investment.  Hayden testified that oil price risk "may not have been an issue [EIG] looked at in detail."  (See infra CSOF ¶ 547 (citing Keppel Opp'n Exh. 54, Thomas Tr. 132:13-17;  Keppel Opp'n Exh. 46, Hayden Tr. 53-23-24).)   Otherwise, undisputed.

372.   **EIG ¶ 372**:  R. Blair Thomas ("**Thomas**"), the Chief Executive Officer of EIG, testified that oil prices were "a nonissue" for EIG with respect to Sete, because "Sete didn't own

any oil, Sete didn't sell any oil, the contract wasn't tied to oil, Sete had a take or pay contract, and so the risk on oil prices was a Petrobras risk, not a Sete risk, not an EIG risk, and so we weren't tracking oil prices and worried about whether it was up or down at any point in time." Exh. 134 at 132:13-25.

> **Keppel Response**:  Disputed to the extent Plaintiffs imply that oil prices were "a nonissue" for EIG or Sete.  The evidence shows it was an issue and that the global drop in oil prices in 2014 led to Sete's collapse, and EIG's investment losses.  (See infra CSOF ¶¶ 684-85, 724-27.)  Otherwise, undisputed that the evidence cited contains that language quoted.

373.   **EIG ¶ 373**:  Kurt Talbot ("**Talbot**"), EIG's Chief Investment Officer from its inception until 2014, testified that Sete's long term contracts with Petrobras meant that short term oil price fluctuations would not "have had that big [of] an impact" on Sete.  Exh. 131 at 30:4-18, 125:24-126:12.

> **Keppel Response**:  Disputed to the extent Plaintiffs imply that short term oil price fluctuations would not have "that big [of] an impact" on Sete.  The evidence shows that the global drop in oil prices in 2014 led to Sete's collapse.  (See infra CSOF ¶¶ 684-85, 724-27.) Otherwise, undisputed.

374.   **EIG ¶ 374**:  As Randall Wade ("**Wade**"), an EIG employee who served on the EIG Investment Committee for Fund XV, explained, "Our investment in Sete wasn't tied to commodity prices.  Our investment in Sete was supported by… a contractual revenue stream that was unrelated to commodity prices.  And so if the contract had performed … the lower oil prices would not have had any impact on our investment."  Exh. 136 at 23:24-24:5, 77:13-23.

> **Keppel Response**:  Disputed that EIG's investment in Sete wasn't tied to commodity prices and that "lower oil prices would not have had any impact" on EIG's investment in Sete.  The evidence shows that commodity prices did affect EIG's investment in

Sete; the global drop in oil prices in 2014 led to Sete's collapse, and therefore, EIG's investment losses.  (See infra CSOF ¶¶ 684-85, 724-27.)  Further, as Wade testified, "if oil prices changed the credit profile of Petrobras to such a sustained degree that they could no longer live up to the terms of their contract, then that could have had an impact on our investment".  (Keppel Opp'n Exh.  55, Wade Tr. 76:24-78:11.)  Otherwise, undisputed that the evidence cited contains that language quoted.

375.    **EIG ¶ 375**:  The final Investment Recommendation for Fund XIV, dated June 27, 2011, was a 42-page document summarizing the diligence work and analysis on the Sete investment (the "**June 2011 Investment Recommendation**").  Exh. 17; Exh. 123 at 155:20-156:14; Exh. 122 at 35:5-36:13, 69:25-70:5, 71:3-17.

    **Keppel Response**:  Undisputed.

376.    **EIG ¶ 376**:  The risks and mitigants identified in the June 2011 Investment Recommendation included several of those set out in the CIM.  *Compare* Exh. 1 at EIG00091869-75/EIG_KEP_00166352-58 *with* Exh. 17 at EIG_KEP_000720027-32.

    **Keppel Response**:  Disputed to the extent Plaintiffs purport to have relied on the January 2010 Portuguese version of the CIM, which was not pleaded in the Complaint. Undisputed that there are certain similar risks and mitigants appear in the CIM and the June 2011 Investment Recommendation.

377.    **EIG ¶ 377**:  The June 2011 Investment Recommendation also described contractual protections to mitigate the risks of the investment:

    To mitigate the risks associated with this huge undertaking,

    Petrobrás is, in addition to its ownership in Sete, providing

    contractual protections to the expected returns of Sete

    shareholders.  These include 10 to 20-year charter contracts for

CONTAINS CONFIDENTIAL INFORMATION

> drillships and various mechanisms to reset the charter payments
>
> such that equity holders maintain their returns . . . While the
>
> transaction is not without its risks, Petrobrás and the Brazilian
>
> government have gone to great lengths to create a structure that
>
> provides some assurances of a minimum return to Sete's equity
>
> owners.

Exh. 17 at EIG_KEP_00070015.

**Keppel Response**:  Disputed that Petrobras and/or the Brazilian government provided contractual protections to Sete or its investors.  The evidence shows that neither party provided enforceable guarantees to protect Sete or its investors from the risks of the investment. (See infra CSOF ¶¶ 541-42.)  Otherwise, undisputed that the cited evidence contains the language quoted.

378.   **EIG ¶ 378**:  The June 2011 Investment Recommendation recognized that BNDES would provide 55% of the senior debt and expressed interest in providing up to 45% of the total funding.  Exh. 17 at EIG_KEP_00070015, EIG_KEP_00070033.

**Keppel Response**:  Undisputed, except to clarify that the June 2011 Investment Recommendation states that BNDES "has issued a term sheet to provide 55% of the senior debt" and to the extent Plaintiffs imply that Sete ever secured the long-term financing envisioned. (EIG Exh. 17 at EIG_KEP_00070015; see infra CSOF ¶¶ 664-72.)

379.   **EIG ¶ 379**:  The June 2011 Investment Recommendation referred to key agreements, including the EPC contract, provided by Sete and Petrobras and reviewed by EIG as important factors in reducing risk and ensuring stability from charter revenues.  Exh. 17 at EIG_KEP_00070015-16, EIG_KEP_00070021, EIG_KEP_00070025-26.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed that the evidence proves that the EPC Contract was a "key agreement".  Further disputed to clarify that at the time of the June 2011 investment committee meeting, the EAS Shipyard was the only shipyard that had signed an EPC contract with Sete and the June 2011 Investment Recommendation refers to BrasFELS only once in the Appendix under the list of "Potential System 2 EPC Contractors".  (See infra CSOF ¶¶ 573-74, 583.)

380.   **EIG ¶ 380**:  A revised Investment Recommendation, dated September 16, 2011, was prepared for consideration of the investment by Fund XV (the "**September 2011 Investment Recommendation**") that was nearly identical to the June 2011 Investment Recommendation (collectively, the "**Sete Investment Recommendations**").  Exh. 33 at EIG_KEP_00069924; Exh. 123 at 174:9-13, 174:19-175:4.

**Keppel Response**:  Undisputed.

381.   **EIG ¶ 381**:  The EIG Investment Committee is comprised of the most senior people at EIG who each have decades of experience assessing investment opportunities (the "**EIG Investment Committee**").  Exh. 135 at 116:7-13.

**Keppel Response**:  Undisputed that Thomas testified that the EIG Investment Committee is comprised of the most senior people at EIG who each have decades of experience assessing investment opportunities.

382.   **EIG ¶ 382**:  On June 27, 2011, EIG's Fund XIV approved "an investment of up to R$250,000,000 of common equity in FIP Sondas."  Exh. 18 at EIG_KEP_00127316.

**Keppel Response**:  Undisputed.

383.   **EIG ¶ 383**:  On September 16, 2011, EIG's Investment Committee approved "an investment of up to R$250,000,000 of common equity in FIP Sondas" through Fund XV.  Exh. 34 at EIG_KEP_00127312, EIG_KEP_00127314.

**Keppel Response**:  Undisputed.

384.     **EIG ¶ 384**:  The EIG Investment Committee for Funds XIV and XV conducted a thoughtful review of the analysis contained in the Sete Investment Recommendations. Exh. 135 at 146:15-148:16; Exh. 123 at 156:8-14.

**Keppel Response**:  Disputed that the evidence cited proves that EIG's review of the analysis was "thoughtful", which is subjective.  Further disputed that the September 2011 meeting involved any substantive review given that EIG executed an agreement with Sete for the investment approved at the September 16 meeting more than one week earlier, on September 8, 2011.  (See infra CSOF ¶ 586; Keppel Opp'n Exh. 154, DX076 at 323; Keppel Opp'n Exh. 45, Corrigan Tr. 109:06-09; Keppel Opp'n Exh. 54, Thomas Tr. 99:15-21.)  Further disputed on the basis that EIG's witnesses testified that the September 2011 meeting would have been a "quick approval" that involved a short discussion..  (Keppel Opp'n Exh. 45, Corrigan Tr. at 110:23-111:07.)

385.     **EIG ¶ 385**:  After the Investment Committee approves an investment, EIG has "a green light to proceed to… complete any remaining diligence," and EIG continued its due diligence until an investment is funded.  Exh. 124 at 56:6-57:12.

**Keppel Response**:  Disputed that EIG continues its due diligence until an investment is funded.  Hayden testified that after the Investment Committee approves an investment, "if there are no material changes to what was expected Investment Committee, then that would be sufficient to, you know, to sign the deal."  (Keppel Opp'n Exh.  46, Hayden Tr. 56:05-12.)  Further disputed on the basis that EIG's Chief Operations Officer testified that due diligence occurs prior to approval, and Blair Thomas testified that the investment recommendation was the "culmination" of EIG's due diligence.  (Keppel Opp'n Exh.  55, Wade Tr. 41:16-42:02; Keppel Opp'n Exh.  60, Thomas D.C. Tr. 116:14-117:14; 148:07-129:02;

Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 156:06-14; Keppel Opp'n Exh. 45, Corrigan Tr. 35:23-36:13; see infra CSOF ¶ 571.)

386.  **EIG ¶ 386**: EIG's leadership was unaware of the bribery and kickback Corruption Scheme involving Keppel, Petrobras, and Sete before the contents of Barusco's plea were made public in February 2015.  Exh. 135 at 103:5-104:19; Exh. 123 at 159:6-10, 161:16-21, 189:12-190:20; Exh. 132 at 280:3-281:14; Exh. 122 at 82:14-83:17, 118:5-9, 177:17-22; Exh. 134 at 91:11-92:14.

**Keppel Response**: Disputed.  By November 2014, EIG, including its CEO Thomas, was aware of Operation Car Wash, and that Petrobras, Sete and the construction companies it worked with were implicated.  (See infra CSOF ¶¶ 694-700.)  In fact, EIG answered written inquiries from its own investors about the impact of Operation Car Wash on its investment in Sete in November 2014.  (See infra CSOF ¶¶ 695-98.)  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme.  (Keppel Opp'n Exh. 152, DPA.)

387.  **EIG ¶ 387**: EIG does not engage in or pursue transactions where there is a risk of corruption.  Exh. 132 at 280:3-281:14; Exh. 123 at 160:17-161:15, 164:17-165:3, 167:17-168:14, 189:12-190:20.

**Keppel Response**: Disputed.  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision and its assessment of corruption risk was a matter of "checking all the boxes".  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 226:13-227:01; see infra CSOF ¶ 559.)  EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas testified that he would not necessarily decline an opportunity to invest in Petrobras

because of Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG

continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF

¶¶ 705-07.)  EIG likewise remained committed to working with a restructured version of Sete

that included the BrasFELS Shipyard, despite acknowledging that "few parties in Brazil seem to

have clean hands".  (See infra CSOF ¶¶ 709, 714-15, 718; Keppel Opp'n Exh.  54, Thomas Tr.

158:21-159:22 153,.)

388.    **EIG ¶ 388**:  Corrigan "wouldn't have even gone beyond Step 1" if he thought

corruption was a risk.  Exh. 123 at 160:21-161:15.

**Keppel Response**:  Disputed.  The evidence shows that Corrigan was not

concerned with corruption risk when making its Sete investment decision.  Corrigan became

aware that senior employees of both Sete's institutional investors and the only shipyard that had

received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that

information.  (See infra CSOF ¶¶ 550-64.)

389.    **EIG ¶ 389**:  EIG "had a code of conduct where you're not supposed to engage in

any unlawful activities, and by extension, bring any unlawful transactions into the company."

Exh. 123 at 167:8-13.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that EIG adhered to

this "code of conduct" or otherwise relied on it when assessing Sete.  There is no evidence of

EIG mentioning the "code of conduct" during its due diligence and EIG did not produce any

code of conduct.  Moreover, EIG became aware that senior employees of both Sete's institutional

investors and the only shipyard that had received a contract from Sete at the time (EAS) had

been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas

testified that he would not necessarily decline an opportunity to invest in Petrobras because of

Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF ¶¶ 705-07.)

390.   **EIG ¶ 390**:  EIG did not think corruption was an issue for the Sete deal because "we were teaming up … with the A team of Brazil.  Petrobras, the largest pension fund, et cetera," and Petrobras had a strong credit and risk profile. Exh. 123 at 161:2-9.

**Keppel Response**:  Disputed.  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision, despite knowing that there were corruption risks involved with the Sete deal.  (See infra CSOF ¶¶ 550-64, 580.)

391.   **EIG ¶ 391**:  Likewise, EIG took comfort that Sete was planning to partner with Keppel, which was the "star" shipyard in Brazil. Exh. 122 at 110:8-16, 129:20-25.

**Keppel Response**:  Disputed.  There is no evidence that Keppel or its subsidiaries were factors in EIG's decision to invest in Sete.  Keppel's subsidiary had not even been awarded a contract by Sete's subsidiary until December 2011, several months after EIG had entered its binding agreement to invest in Sete.  (See infra CSOF ¶¶ 570-86, 632-33.)  At the time EIG made that commitment, EIG did not know whether Keppel or any of its subsidiaries would get a contract from Sete.  (See infra CSOF ¶¶ 581-83.)

392.   **EIG ¶ 392**:  Thomas testified that if they had believed Petrobras or any counterparty was engaged in corruption, EIG "would immediately terminate any involvement in a potential transaction.  So it's, you know, a complete full stop if you believe that there are participants in corruption.  So, yes, there is no chance we would have proceeded." Exh. 134 at 90:21-91:5.

**Keppel Response**:  Disputed.  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision.  EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a

CONTAINS CONFIDENTIAL INFORMATION

contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas testified that he would not necessarily decline an opportunity to invest in Petrobras because of Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF ¶¶ 705-07.)

393.    **EIG ¶ 393**:  Corrigan testified that if the results of the Complinet search indicated that Ferraz was taking bribes, "then the transaction would have died . . . . [W]e don't try to bring crooked transactions to our investment committee . . . . [W]e don't allow it.  We don't permit it.  We don't engage in it or pursue transactions that we think have a risk of having corrupt individuals behind it . . . ."  Exh. 123 at 168:4-14.

**Keppel Response**:  Disputed.  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision.  EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas testified that he would not necessarily decline an opportunity to invest in Petrobras because of Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF ¶¶ 705-07.)

394.    **EIG ¶ 394**:  As Corrigan testified that had EIG known there was corruption in the structure of Sete, "the deal would have died on the spot, but we were never informed, and I was never able to discern that this type of activity was going on."  Exh. 122 at 53:24-54:7.

**Keppel Response**:  Disputed.  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision.  EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a

CONTAINS CONFIDENTIAL INFORMATION

contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas testified that he would not necessarily decline an opportunity to invest in Petrobras because of Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF ¶¶ 705-07.)

395.  **EIG ¶ 395**:  Corrigan testified, if EIG "had gotten a whiff of anything untoward during that time, we clearly would have pulled the deal," and "[if] something had come up, we would have pulled out."  Exh. 122 at 108:15-24, 117:6-8.

      **Keppel Response**:  Disputed.  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision.  EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas testified that he would not necessarily decline an opportunity to invest in Petrobras because of Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF ¶¶ 705-07.)  Otherwise, undisputed that the evidence cited contains the language quoted.

396.  **EIG ¶ 396**:  Corrigan testified, "we would have pulled out had we known what was really going on, and we were never given that opportunity."  Exh. 122 at 117:22-118:4.

      **Keppel Response**:  Disputed.  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision.  EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas testified that he would not necessarily

CONTAINS CONFIDENTIAL INFORMATION

decline an opportunity to invest in Petrobras because of Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF ¶¶ 705-07.)

397.   **EIG ¶ 397**:  Talbot testified that if EIG knew about corruption at Sete, "it would have never made it to [the Investment] [C]ommittee."  Exh. 132 at 281:4-14.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that if EIG knew about corruption at Sete, "it would have never made it to [the Investment] [C]ommittee".  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision.  EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas testified that he would not necessarily decline an opportunity to invest in Petrobras because of Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF ¶¶ 705-07.)

398.   **EIG ¶ 398**:  Jeff Anderson, an Investment Committee member, testified that if "someone had raised concerns about bribery," he would not have voted to approve the investment in Sete.  Exh. 119 at 54:12-15.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that no one "had raised concerns about bribery" in connection with the Sete investment.  EIG's Complinet search did turn up corruption allegations of the same type as discovered during Operation Car Wash associated with individuals involved in Sete, which EIG disregarded.  (See infra CSOF ¶¶ 550-64.)

399.   **EIG ¶ 399**:  Similarly, Alvin Albe, another Investment Committee member, testified that if he had "known that Sete was involved in a bribery and kickback scheme back in 2011," he would not have voted to approve the Sete investment.  Exh. 118 at 38:8-23.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that EIG did not know "that Sete was involved in a bribery and kickback scheme back in 2011".  EIG's Complinet search did turn up corruption allegations of the same type as discovered during Operation Car Wash associated with individuals involved in Sete, which EIG disregarded.  (See infra CSOF ¶¶ 550-64.)

400.   **EIG ¶ 400**:  On June 30, 2011, EIG entered into an Investment Agreement with Sete and Lakeshore ("**June 2011 Investment Agreement**").  Exh. 19.

**Keppel Response**:  Undisputed.

401.   **EIG ¶ 401**:  As of this date, EIG "had an expectation of investing," but was not "committed at this point" given the existence of various preconditions in the June 30, 2011 Investment Agreement.  Exh. 122 at 98:13-23, 100:18-25.

**Keppel Response**:  Disputed.  EIG described the agreement as a "binding agreement" to invest on June 29, 2011.  (See infra CSOF ¶ 585 (citing Keppel Opp'n Exh. 74, DX086 at 755).)

402.   **EIG ¶ 402**:  The June 2011 Investment Agreement provided that the Potential Investor, EIG, would invest up to $250 million Reais "provided that (i) the Proposal  is entirely or partially awarded as the Tender's winning bid regarding one or more Rigs, and (ii) in connection with the aforementioned award SETE BRASIL requires additional equity investment in addition to the pre-emptive rights of the Original Investors in order to pay for the investments and expenses related to the implementation of the new rigs[.]"  Exh. 19 at EIG_KEP_0049153, § 2.1.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed to the extent that Plaintiffs imply that as of June 2011, EIG had not entered a binding agreement to invest in Sete.  When the two conditions were met, EIG disbursed the investment.  (See infra CSOF ¶ 585 (citing Keppel Opp'n Exh. 45, Corrigan Tr. 96:8-24; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 160:6-15).)  Otherwise, undisputed that the evidence cited contains the language quoted.

403.    **EIG ¶ 403**:  Article 2.1(i)(a) stated that EIG would need to execute an Investment Commitment Agreement if the conditions precedent were satisfied.  Exh. 19 at EIG_KEP_0049153, § 2.1(i)(a).

**Keppel Response**:  Disputed to the extent that Plaintiffs imply that as of June 2011, EIG had not entered a binding agreement to invest in Sete.  (See infra CSOF ¶¶ 570-86.)  Further disputed to the extent Plaintiffs try to portray the additional documents it was required to sign pursuant to the binding June 2011 investment agreement were optional, given the cited provision's repeated use of "shall".  (EIG Exh. 19 at EIG_KEP_0049153, § 2.1(i)(a).)

404.    **EIG ¶ 404**:  Article 2.7 also referred to conditions precedent in the June 2011 Investment Agreement.  Exh. 19 at EIG_KEP_0049154, § 2.7.

**Keppel Response**:  Disputed to the extent that Plaintiffs imply that as of June 2011, EIG had not entered a binding agreement to invest in Sete..  (See infra CSOF ¶¶ 570-86.)

405.    **EIG ¶ 405**:  On September 8, 2011, EIG entered into the First Amendment and Restatement Agreement ("**September 2011 Amended Investment Agreement**"), which amended the June 2011 Investment Agreement to reflect an increase in its equity investment from $250 million to $500 million reais.  Exh. 31 at EIG_KEP_00048628.

**Keppel Response**:  Undisputed.

114

CONTAINS CONFIDENTIAL INFORMATION

406.   **EIG ¶ 406**:  The September 2011 Amended Investment Agreement contained the same conditions precedent as the June 2011 Investment Agreement.  Exh. 31 at EIG_KEP_00048629, §  2.1.

**Keppel Response**:  Disputed to the extent that Plaintiffs imply that as of June 2011, EIG had not entered a binding agreement to invest in Sete.  (See infra CSOF ¶¶ 570-86.) Otherwise, undisputed.

407.   **EIG ¶ 407**:  As Mr. Corrigan testified, "at this point in time, we still didn't know if we had a deal," because there were certain conditions before the investment would close, including a question of how many drillships Sete would secure, and it was possible that other investors in Sete would exercise their preemptive rights.  Exh. 122 at 114:8-18, 117:3-17.

**Keppel Response**:  Disputed.  The overwhelming evidence shows EIG believed it had entered a "binding agreement" to invest as of June 2011, and there is no contemporaneous evidence supporting the self-serving assertions made by EIG's witnesses during depositions. (See infra CSOF ¶¶ 570-86.)

408.   **EIG ¶ 408**:  While EIG "wanted to invest," they "didn't feel we were binded or bound by this.  If something had come up, we would have pulled out."  Exh. 122 at 117:3-8.

**Keppel Response**:  Disputed.  The overwhelming evidence shows EIG believed it had entered a "binding agreement" to invest as of June 2011, and there is no contemporaneous evidence supporting the self-serving assertions made by EIG's witnesses during depositions. (See infra CSOF ¶¶ 570-86.)

409.   **EIG ¶ 409**:  Indeed, "[i]f somebody had called us [EIG] and said, Hey, did you know Ferraz is getting a 1 percent kickback from the shipyard, we would have pulled out."  Exh. 122 at 199:9-199:13.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Disputed.  The evidence shows that EIG was not concerned with corruption risk when making its Sete investment decision.  EIG became aware that senior employees of both Sete's institutional investors and the only shipyard that had received a contract from Sete at the time (EAS) had been accused of bribery, but disregarded that information.  (See infra CSOF ¶¶ 550-64.)  Thomas testified that he would not necessarily decline an opportunity to invest in Petrobras because of Lava Jato.  (Keppel Opp'n Exh.  54, Thomas Tr. 93:7-11.)  Furthermore, EIG continued to invest in Sete even after Operation Car Wash had been disclosed.  (See infra CSOF ¶¶ 705-07.)

410.   **EIG ¶ 410**:  As Thomas explained, as of June 2011 EIG "had not signed transaction documents," and only did so in July 2012.  Exh. 134 at 96:22-97:15, 102:24-103:13.

**Keppel Response**:  Disputed.  EIG entered a binding agreement to invest in Sete in June 2011, under which EIG was required to sign transaction documents upon the satisfaction by Sete of two conditions.  (See infra CSOF ¶¶ 570-86.)  When the conditions were satisfied, EIG signed the transaction documents and began disbursing funds, without seeking any further approval from the investment committee.  (Keppel Opp'n Exh.  54, Thomas Tr. 103:14-104:13; see infra CSOF ¶ 585.)  Further disputed to the extent EIG ignores the $100 million loan disbursed to Sete in January 2012.  (Keppel Opp'n Exh. 151, EIG_KEP_00132161-163; see infra CSOF ¶ 667.) 54,

411.   **EIG ¶ 411**:  On March 29, 2012, the FIP Sondas quotaholders approved the issuance of new quotas of FIP Sondas.  Exh. 63 at EIG_KEP_00211775; Exh. 62 at EIG_KEP_00044772 at ¶ 1.1.

**Keppel Response**:  Undisputed.

412.   **EIG ¶ 412**:  On July 31, 2012, EIG entered into an Investment Commitment Agreement whereby it committed "to subscribe and pay for the quotas issued by the [FIP

CONTAINS CONFIDENTIAL INFORMATION

Sondas]" up to the limit of EIG's committed capital of R$509,459,990 (the "**Investment Commitment Agreement**").  Exh. 62 at EIG_KEP_00044774 ¶ 1.1.

      **Keppel Response**:  Undisputed, except to the extent Plaintiffs imply that it was not already bound to sign the Investment Commitment Agreement in accordance with its June 2011 investment agreement, as amended in September 2011.  (See infra CSOF ¶¶ 570-86.)

413.    **EIG ¶ 413**:  The Investment Commitment Agreement provided that "[t]he Committed Capital, including the applicable Entry Fees, must be paid up insofar as the Fund requires resources to implement its objectives, through capital calls to be made by the Administrator, within the term of the Fund, as prescribed in the Bylaws."  Exh. 62 at EIG_KEP_00044777 ¶ 2.1.

      **Keppel Response**:  Undisputed.

414.    **EIG ¶ 414**:  The Investment Commitment Agreement established penalties for "any Investor [that] fails to partially or fully comply with the obligation to contribute capital to the Fund, pursuant to the Bylaws and th[e] Investment Commit[ment], by the date specified in each Payment Notification." Exh. 62 at EIG_KEP_00044780 ¶ 4.2.

      **Keppel Response**:  Undisputed.

415.    **EIG ¶ 415**:  On July 31, 2012, the FIP Sondas' Quotaholders Agreement was amended to include new investors EIG and Luce Venture Capital – Drilling Series ("**Luce**") as quotaholders of the FIP Sondas.  Exh. 63 at EIG_KEP_00211772.

      **Keppel Response**:  Undisputed.

416.    **EIG ¶ 416**:  On July 31, 2012, the original Investment Agreement was amended to: (i) implement necessary changes to adapt the Investment Agreement as of May 2011 to the current stage of the Project and (ii) govern the terms and conditions for investments and capital

contributions into Sete for the implementation of new investments (the "**Second Amendment to the Investment Agreement**").  Exh. 61 at EIG_KEP_00110498, (m).

**Keppel Response**:  Disputed to the extent Plaintiffs imply they had not entered a binding agreement to invest in Sete in June 2011.  (See infra CSOF ¶¶ 570-86.)

417.   **EIG ¶ 417**:  The Second Amendment to the Investment Agreement established that the "Quotaholder that fails to pay for [its shares] . . . shall automatically be considered to be in default . . ., being subject to the penalties noted in Article 45 of the [FIP Sondas] Bylaws." Exh. 61 at EIG_KEP_00110502 ¶ 3.6.

**Keppel Response**:  Undisputed.

418.   **EIG ¶ 418**:  EIG used two Luxembourg entities, EIG Sete Parent S.à r.l. and EIG Sete Holdings S.à r.l. (the "**Luxembourg Entities**"), to invest in Sete.  Exh. 117 at EIG_KEP_00130961.

**Keppel Response**:  Undisputed.

419.   **EIG ¶ 419**:  On August 3, 2012, EIG wired a total of $50,049,309.66 USD, which flowed through the Luxembourg Entities, converted to BRL 101,500,000.00 and, on August 7, 2012, funded FIP Sondas.  Exh. 117 at EIG_KEP_00130961-962.

**Keppel Response**:  Undisputed.

420.   **EIG ¶ 420**:  On August 9, 2012, EIG wired a total of $25,020,988.03 USD through the Luxembourg Entities, converted the funds to BRL 50,379,759.40 and, on August 13, 2012, funded to FIP Sondas.  Exh. 117 at EIG_KEP_00130739-40.

**Keppel Response**:  Undisputed.

421.   **EIG ¶ 421**:  On May 7, 2013, EIG wired a total of $2,391,661.00 USD through the Luxembourg Entities, converted the funds to BRL 4,813,217.77 and, on May 10, 2013, funded FIP Sondas.  Exh. 117 at EIG_KEP_00096904-05.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**: Undisputed.

422. **EIG ¶ 422**: On October 1, 2013, EIG wired a total of $214,717.89 USD through the Luxembourg Entities, converted the funds to BRL 473,989.73 and, on October 4, 2013, funded FIP Sondas. Exh. 117 at EIG_KEP_00087376-77.

**Keppel Response**: Undisputed.

423. **EIG ¶ 423**: On April 11, 2014, EIG wired a total of $14,132,504.22 USD through the Luxembourg Entities, converted the funds to BRL 31,148,039.28 and, on April 16, 2014, funded FIP Sondas. Exh. 117 at EIG_KEP_00051566-67.

**Keppel Response**: Undisputed.

424. **EIG ¶ 424**: On May 7, 2014, EIG wired a total of $22,022,539.74 USD through the Luxembourg Entities, converted the funds to BRL 49,011,162.20 and, on May 9, 2014, funded FIP Sondas. Exh. 117 at EIG_KEP_00168123-25.

**Keppel Response**: Undisputed.

425. **EIG ¶ 425**: On June 4, 2014, EIG wired a total of $10,856,257.42 USD through the Luxembourg Entities, converted the funds to BRL 24,692,557.50, and, on June 6, 2014, funded FIP Sondas. Exh. 117 at EIG_KEP_00167806-08.

**Keppel Response**: Undisputed.

426. **EIG ¶ 426**: On August 12, 2014, EIG wired a total of $8,058,966.67 USD through the Luxembourg Entities, converted the funds to BRL 18,318,031.25 and, on August 14, 2014, funded FIP Sondas. Exh. 117 at EIG_KEP_00158294-96.

**Keppel Response**: Undisputed.

427. **EIG ¶ 427**: On August 25, 2014, EIG wired a total of $12,354,944.76 USD through the Luxembourg Entities, converted the funds to BRL 28,187,806.48 and, on August 27, 2014, funded FIP Sondas. Exh. 117 at EIG_KEP_00156962-64.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed.

428.    **EIG ¶ 428**:  On October 15, 2014, EIG wired a total of $9,488,769.34 USD through the Luxembourg Entities, converted the funds to BRL 23,105,153.33 and, on October 17, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00152226-29.

**Keppel Response**:  Undisputed.

429.    **EIG ¶ 429**:  On November 10, 2014, EIG wired a total of $8,863,942.29 USD through the Luxembourg Entities, converted the funds to BRL 22,492,253.56 and, on November 12, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00150332-34.

**Keppel Response**:  Undisputed.

430.    **EIG ¶ 430**:  On December 8, 2014, EIG wired a total of $15,088,880.88 USD through the Luxembourg Entities, converted the funds to BRL 39,223,545.84, and, on December 10, 2014, funded FIP Sondas.  Exh. 117 at EIG_KEP_00147399-401.

**Keppel Response**:  Undisputed.

431.    **EIG ¶ 431**:  On January 6, 2015, EIG wired a total of $42,567,695.54 through the Luxembourg Entities, converted the funds to BRL 115,677,712.63, and, on January 7, 2015, funded FIP Sondas.  Exh. 117 at EIG_KEP_00249992-93.

**Keppel Response**:  Undisputed.

432.    **EIG ¶ 432**:  Between August 2012 and January 2015, EIG invested a total of $221,111,177.44 USD in FIP Sondas.  *See supra* ¶¶ 419-31.

**Keppel Response**:  Undisputed, except to clarify that EIG continued to answer capital calls through 2018 and also provided a $100 million loan to Sete in January 2012.  (See infra CSOF ¶¶ 667, 707 (citing Keppel Opp'n Exh.  54, Thomas Tr. 145:7-13, 109:21-111:03.)

433.    **EIG ¶ 433**:  In September 2013, EIG invited Ferraz to attend the annual conference EIG holds for its investors in in Washington, D.C.  Exh. 74 at EIG_KEP_00249871.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed.

434.    **EIG ¶ 434**:  During that conference, Ferraz told EIG and investors in EIG's

Funds that Sete was "performing as planned," and that he "[didn't] see any reason why [Sete]

should deviate from that."  Exh. 75 at lines 488-89.

**Keppel Response**:  Undisputed that the translated document purports to be a

transcript of an "EIG Conference Roundtable", but is not dated and has not been authenticated.

435.    **EIG ¶ 435**:  Ferraz reported that Sete was "ahead of schedule," and was "not

facing any problem to raise" the necessary debt financing called for in its business plan.  Exh. 75

at 234, 389-91.

**Keppel Response**:  Undisputed that the translated document purports to be a

transcript of an "EIG Conference Roundtable", but is not dated and has not been authenticated.

436.    **EIG ¶ 436**:  Ferraz did not mention the Corruption Scheme at EIG's 2013

investor conference.  Exh. 75.

**Keppel Response**:  Undisputed that the translated document purports to be a

transcript of an "EIG Conference Roundtable", but is not dated and has not been authenticated.

437.    **EIG ¶ 437**:  From the start, EIG understood that delays of construction and cost

overruns were risks of the deal.  Exh. 123 at 119:1-22.

**Keppel Response**:  Disputed to the extent Plaintiffs imply anything more than the

substance of the testimony cited.  The cited evidence only establishes that Corrigan testified that

"one of the risks that [EIG] had identified . . . is delays of construction and cost overruns".  (EIG

Exh. 123 at 119:15-17.)

438.    **EIG ¶ 438**:  Corrigan reported that at a Sete board meeting held in June 2014,

Luiz Eduardo Guimarães Carneiro ("**Carneiro**"), Sete's new CEO, had said that "many of the

drillships, particularly the early ones, now face some serious delays in delivery and

commissioning on behalf of Petrobras. The average delay for all 29 drillships is 4.1 months, and due to the buffer between delivery and commissioning, the average delay on the latter falls to 1.7 months. More worrisome, the two drillships expected to be delivered in 2015 (Arpoador and Urca), are now expected to be delivered in February, 2016. The four drillships/semi-subs to be delivered in 2016 are now expected to suffer delays of between nine and ten months. The picture improves thereafter." Exh. 78 at EIG_KEP_00142563.

 **Keppel Response**: Undisputed that the cited email includes the quoted language. The email also shows EIG's understanding of the "dire" financial state that Sete was in prior to the disclosure of Operation Car Wash.

 439. **EIG ¶ 439**: In an email summarizing the Sete board meeting, Corrigan explained that while "much of the above is true, and will be an ongoing challenge," Corrigan believed that Carneiro was "clearly . . . trying to paint the bleakest picture possible to lower all our expectations, and hopefully, be able to show some positive results going forward." Exh. 78 at EIG_KEP_00142564.

 **Keppel Response**: Undisputed that the evidence cited contains the language quoted.

 440. **EIG ¶ 440**: Corrigan testified: "I worked on many transactions over 37 years of finance, and while this may seem like it was complicated and difficult, which it was, to me it was not out of the ordinary, the issues we were encountering as this went along." Exh. 123 at 257:1-6.

 **Keppel Response**: Undisputed that the testimony cited contains the language quoted. Disputed to the extent Plaintiffs seek to portray Sete's financial state, as of June 2014, as "not out of the ordinary", particularly given EIG's June 2014 email shows that Sete was in immediate need of 3 billion in equity to continue operations. (See infra CSOF ¶ 680-83.)

CONTAINS CONFIDENTIAL INFORMATION

441.   **EIG ¶ 441**:  While EIG understood that the construction delays continued as of December 2014, the "[m]ain bottlenecks" for construction delays were "expected to be surpassed in the first semester of 2015."  Exh. 81 at EIG_KEP_00209432.

   **Keppel Response**:  Disputed.  By June 2014, Sete was on the brink of collapse and "no one believe[d] [Sete] will be able to go to market" to raise the funds needed, including EIG.  (See infra CSOF ¶¶ 675-85 80,.)  Throughout 2014, EIG's own internal projections reflected Sete's deteriorating condition.  (See infra CSOF ¶¶ 691-93.)  Further, in December 2014, BNDES "informed [Sete that] new deteriorated conditions will require $703M of additional equity, decreasing leverage to 63%."  (See infra CSOF ¶ 690.)   As of December 2014, EIG's projected internal rate of return on its Sete investment was 1.1%.  (See infra CSOF ¶ 693.)

442.   **EIG ¶ 442**:  As of October 2014, Keppel was on track to deliver its first rig for Sete on time.  Exh. 130 at 185:13-25.

   **Keppel Response**:  Undisputed.

443.   **EIG ¶ 443**:  Prior to the Lava Jato revelations, in Thomas's view any difficulties Sete encountered to receive financing were not "out of the ordinary…. [t]he scale of the financing required was large, but the company had a lot of alternatives… and they had demonstrated an ability to raise significant amounts of capital."  Exh. 134 at 108:24-109:13.

   **Keppel Response**:  Disputed to the extent Plaintiffs imply that that the issues Sete was experiencing prior to the public disclosure of Lava Jato were not "out of the ordinary".  The evidence shows that these caused Sete's collapse.  (See infra CSOF ¶¶ 664-90 (citing Keppel Opp'n Exh. 66, DX039 at 811; Keppel Opp'n Exh. 27; Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 636; Keppel Opp'n Exh.  54, Thomas Tr. 109:21-111:03; Keppel Opp'n Exh. 105, EIG_KEP_00094179-182 at 180; Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 635; Keppel Opp'n Exh. 126, EIG_KEP_00259344-345 at 345;

CONTAINS CONFIDENTIAL INFORMATION

Keppel Opp'n Exh. 131, EIG_KEP_00266976-981 at 977; Keppel Opp'n Exh. 54, Thomas Tr.

115:03-06; 124:16-125:9; 130:14-18; 157:24-159:22; Keppel Opp'n Exh. 81, at DX107 at 695;

Keppel Opp'n Exh. 127, EIG_KEP_00260519-533 at 521; Keppel Opp'n Exh. 72, DX077 at

521; Keppel Opp'n Exh. 1; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 238:11-21; Keppel Opp'n

Exh. 66, DX058 at 076; Keppel Opp'n Exh. 60, Thomas Petrobras Tr. 241:06-19; Keppel Opp'n

Exh. 66, DX058 at 076; Keppel Opp'n Exh. 66, DX039 at 800; Keppel Opp'n Exh. 63, DX034

at 361; Keppel Opp'n Exh. 60, Thomas Petrobras Tr. 239:22-241:10; Keppel Opp'n Exh. 127,

EIG_KEP_00260519-533 at 519; Keppel Opp'n Exh. 80, DX096 at 151;  ).)  Disputed to the

extent Plaintiffs imply that Sete "had demonstrated an ability to raise significant amounts of

capital".  By June 2014, Sete was on the brink of collapse and "no one believe[d] [Sete] will be

able to go to market" to raise the funds needed, including EIG.  (See infra CSOF ¶¶ 675-85

(citing Keppel Opp'n Exh. 11; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 238:11-21; Keppel

Opp'n Exh. 66, DX058 at 076; Keppel Opp'n Exh. 60, Thomas Petrobras Tr. 241:06-19; Keppel

Opp'n Exh. 66, DX039 at 800; Keppel Opp'n Exh. 63, DX034 at 361; Keppel Opp'n Exh. 60,

Thomas Petrobras Tr. 239:22-241:10; Keppel Opp'n Exh. 127, EIG_KEP_00260519-533 at 519;

Keppel Opp'n Exh. 80, DX096 at 150-51;  Keppel Opp'n Exh. 25).)  Otherwise, undisputed that

the evidence cited contains the language quoted.

444.   **EIG ¶ 444**:  Sete had many discussions about optimizing financing and getting

cheaper financing, but "it wasn't generally a question of if they could raise financing, it was at

what cost."  Exh. 134 at 108:24-109:16.

**Keppel Response**:  Undisputed that Sete's ability to obtain financing was a key

risk from its inception.  (See infra CSOF ¶¶ 664-72 (citing Keppel Opp'n Exh. 66, DX039 at

811; Keppel Opp'n Exh. 27; Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 636; Keppel

Opp'n Exh. 54, Thomas Tr. 109:21-111:03; Keppel Opp'n Exh. 105, EIG_KEP_00094179-182

at 180; Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 635; Keppel Opp'n Exh. 126,

EIG_KEP_00259344-345 at 345; Keppel Opp'n Exh. 131, EIG_KEP_00266976-981 at 977;

Keppel Opp'n Exh. 27; Keppel Opp'n Exh. 54, Thomas Tr. 115:03-06; 124:16-125:9; 130:14-18;

157:24-159:22; Keppel Opp'n Exh. 81, at DX107 at 695; Keppel Opp'n Exh. 27).)

445.    **EIG ¶ 445**:  By the end of 2014, EIG projected an IRR of 9.7%.  Exh. 81 at

EIG_KEP_00209431.

**Keppel Response**:  Disputed.  By December 2014, EIG was projecting an IRR

for its investment in Sete of 1.1%.  (See infra CSOF ¶ 693) (citing Keppel Opp'n Exh. 116,

EIG_KEP_00210425 at tab "QR Front" cell E19.)

446.    **EIG ¶ 446**:  At all times in 2014 and prior, EIG projected a positive IRR.  *See*

*supra* ¶ 445.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that EIG's projected

IRR did not decrease over that time period.  The evidence shows that EIG's quarterly models

showed a steady decrease in its expected returns from Sete.  The IRR resulting from EIG's

quarterly financial model for Sete was at 22% in June 2012, dropped to 12.9% in March 2014,

to 10.6% in September 2014 and to 1.1% in December 2014.  (Keppel Opp'n Exh.  107,

EIG_KEP_00098236 at tab "QR Front" cell E19; see infra CSOF ¶¶ 691-93 (citing Keppel

Opp'n Exh. 113, EIG_KEP_00156130 at tab "QR Front" cell E19; Keppel Opp'n Exh. 115,

EIG_KEP_00210300 at tab "QR Front" cell E19; Keppel Opp'n Exh. 116, EIG_KEP_00210425

at tab "QR Front" cell E19).)  Further disputed to the extent Plaintiffs imply that EIG's internal

forecasts accurately or reliably depicted Sete's financial state.

447.    **EIG ¶ 447**:  Chin Hua Loh ("**Loh**"), the Chief Executive Officer of Keppel Corp.

and Chairman of Keppel's board of directors in 2014 and 2015, testified that BNDES financing

CONTAINS CONFIDENTIAL INFORMATION

was "quite critical in order for Sete to continue funding the milestone payments to the shipyards." Exh. 126 at 11:4-12:5, 18:23-19:3.

      **Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

    448.   **EIG ¶ 448**:  Brazilian prosecutors discovered the Corruption Scheme in and after 2014 through an investigation dubbed Operação Lava Jato ("**Operation Car Wash**").  Exh. 98 at F-10.

      **Keppel Response**:  Disputed to the extent Plaintiffs imply that Operation Car Wash began in 2014; it began in 2009.  (EIG Exh. 98 at F-10.)  Disputed that Brazilian prosecutors discovered Petrobras's involvement in the conduct underlying Operation Car Wash after 2014; they discovered Petrobras's involvement "over the course of 2014".  (EIG Exh. 98 at F-10.)  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme.  (Keppel Opp'n Exh. 152, DPA.)

    449.   **EIG ¶ 449**:  The Corruption Scheme went undetected for a decade before the Brazilian federal prosecutors and police even discovered it.  Exh. 98 at F-10.

      **Keppel Response**:  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme.  (Keppel Opp'n Exh. 152, DPA.)  Further disputed on the basis that it is not known exactly when or how the scheme was detected, and Petrobras's financial statements are insufficient to prove the assertions in Paragraph 449.

    450.   **EIG ¶ 450**:  Although Paulo Roberto Costa ("**Costa**"), Petrobras' former Chief Downstream Officer, was arrested in March 2014, he only "publicly describ[ed] the payment scheme" at Petrobras in October 2014, when he testified in court.  Exh. 98 at F-10, F-11.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed.

451.   **EIG ¶ 451**:  In November 2014, news of a plea agreement by Barusco was made public, but there were no disclosures regarding Sete. Exh. 79 at EIG00064923-24/EIG_KEP00148015-16; Exh. 129 at 38:5-13; Exh. 82 at KEPPEL00495288.

   **Keppel Response**:  Disputed that there were no disclosures regarding Sete.  News of the former COO of Sete's arrest and confession to accepting bribes plainly implicated Sete, as reflected by the inquiries from EIG's own investors upon the November 2014 disclosure.  (See infra CSOF ¶¶ 694-700 (Keppel Opp'n Exh. 29; Keppel Opp'n Exh. 28; Opp'n Exh. 3; Keppel Opp'n Exh. 103, EIG_KEP_00052509-551 at 550; Keppel Opp'n Exh. 56, Bernardes D.C. Tr. 123:01-03; Keppel Opp'n Exh. 109 at 667; Keppel Opp'n Exh. 82 at 665; Keppel Opp'n Exh. 143, KEPPEL00495287-291 at 288; Keppel Opp'n Exh. 54, Thomas Tr. 138:22-25).)

452.   **EIG ¶ 452**:  Although EIG was aware by sometime in mid- to late 2014 that the Operation Car Wash investigation had uncovered corruption at Petrobras, EIG did not know at that time that Sete would be implicated in Operation Car Wash.  Exh. 129 at 38:5-13; Exh. 135 at 283:20-284:1.

   **Keppel Response**:  Disputed that EIG did not know in 2014 that Sete would be implicated in Operation Car Wash.  EIG knew by November 2014 that Sete was implicated in Operation Car Wash. *See infra* CSOF ¶¶ 694-700.  Further disputed in light of EIG's repeated assertions that it viewed Sete as Petrobras's "alter ego" and that "all roads led to Petrobras.  (See infra CSOF ¶¶ 543-45 (citing Keppel Opp'n Exh. 60, Thomas D.C. Tr. 103:15-22; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 228:11-20; Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 95:20-96:02).)

453.   **EIG ¶ 453**:  As of December 2014, the total balance of the bridge loans outstanding at Sete was more than $4 billion.  Exh. 81 at EIG_KEP_00209436.

   **Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

454.   **EIG ¶ 454**:  On December 16, 2014, BNDES issued Executive Board Decision No. 1239/2014, which added new conditions to financing as a result of Operation Car Wash. Exh. 80 at EIG_KEP_00208070-71.

**Keppel Response**:  Disputed to the extent Plaintiffs imply that this was the first time BNDES had changed its conditions to financing, given that BNDES had repeatedly postponed and changed its conditions to financing since 2012. (See infra CSOF ¶¶ 664-72 (citing Keppel Opp'n Exh. 66, DX039 at 811; Keppel Opp'n Exh. 27; Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 636; Keppel Opp'n Exh.  54, Thomas Tr. 109:21-111:03; Keppel Opp'n Exh. 105, EIG_KEP_00094179-182 at 180; Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 635; Keppel Opp'n Exh. 126, EIG_KEP_00259344-345 at 345; Keppel Opp'n Exh. 131, EIG_KEP_00266976-981 at 977; Keppel Opp'n Exh. 27; Keppel Opp'n Exh. 54, Thomas Tr. 115:03-06; 124:16-125:9; 130:14-18; 157:24-159:22; Keppel Opp'n Exh. 81, at DX107 at 695; Keppel Opp'n Exh. 27).)

Further disputed on the basis that the document makes no reference to Operation Car Wash.  (EIG Exh. 80.)  Otherwise, undisputed.

455.   **EIG ¶ 455**:  Pursuant to Executive Board Decision No. 1239/2014, BNDES required "declarations to be executed by the respective operators, EPC contractors, and by Petrobras under terms that are satisfactory to BNDES, stating that there was no corruption in relation to the Project."  Exh. 80 at EIG_KEP_00208070, ¶ e.

**Keppel Response**:  Undisputed.

456.   **EIG ¶ 456**:  On December 30, 2014, Kai Choong Kwok stated in an internal update to others at Keppel:

As a result of the above scandals involving Petrobras, SETE Brazil

had also started an internal investigation on its contracts previously

CONTAINS CONFIDENTIAL INFORMATION

signed by its COO, Pedro Barusco who is also involved in the Lava Jato scandal. The investigations are still in progress without any indications as of date of any anomalies.

These developments have affected SETE Brasil's ability to obtain long term financing from lenders. As of date, major lenders led by BNDES has delayed signing of the loan agreement with SETE. SETE has been resorting to short term bridging loans from Banco do Brazil, etc but in recent weeks, hit obstacles and there has been no closure of further bridging loans.

…

It has also been reported that, in light of all the negative developments, Petrobras will be toning down on its investments and focusing on production.  However, Head of Brazil's National Petroleum Agency (ANP), Mrs Magda Cambriard was reported to have declared in mid Dec that 'pre-salt oil is still profitable even with oil at US$60 per barrel'.

Exh. 82 at KEPPEL00495288-89.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

457.  **EIG ¶ 457**:  On January 31, 2015, an internal Keppel email discussing "[d]evelopments with SETE Brasil regarding their financing conditions" stated, "SETE expect that, with the approval from PB [Petrobras] to release the AMA [Asset Management Agreement

CONTAINS CONFIDENTIAL INFORMATION

between Petrobras and Sete] and anti corruption declaration letter on 2/2, they should be able to sign the 1st batch loan agreement with BNDES on Friday [February 6]."  Exh. 86 at KEPPEL00089793.

      **Keppel Response**:  Disputed to the extent Plaintiffs imply that Kwok Kai Choong was associated with Keppel.  He was associated with Keppel Fels Brasil.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 153.)  Otherwise, undisputed that the evidence cited contains the language quoted.

    458.  **EIG ¶ 458**:  The batch of financing led by BNDES in February 2015 was expected to provide Sete in excess of $5 billion in financing.  Exh. 97 at EIG00156005/EIG_KEP_00203233; Exh. 89 at KEPPEL00440536.

      **Keppel Response**:  Undisputed.

    459.  **EIG ¶ 459**:  On February 5, 2015, the contents of Barusco's plea agreement and testimony were made public and implicated Sete and Keppel in the Corruption Scheme.  Exh. 89 at KEPPEL00440539-40.

      **Keppel Response**:  Disputed to the extent Plaintiffs imply that February 5, 2015 was the first time that Sete was implicated in Operation Car Wash.  Sete was implicated in Operation Car Wash in November 2014 when its former COO was arrested and confessed to accepting bribes from construction companies.  (See infra CSOF ¶¶ 694 (citing Keppel Opp'n Exh. 29, Ex 28; Ex 12; Keppel Opp'n Exh. 3), CSOF ¶ 699 (citing Keppel Opp'n Exh. 143, KEPPEL00495287-291 at 288).)  Disputed as to Plaintiffs' definition of Corruption Scheme, which is vague; Defendant refers the Court to the DPA for the scope of the bribery scheme. (Keppel Opp'n Exh. 152, DPA.)  Otherwise, undisputed.

CONTAINS CONFIDENTIAL INFORMATION

460.   **EIG ¶ 460**:  That same day, Sete Investor Relations emailed "Shareholders and Board Members," explaining that "the Company was planning to sign the initial financing contracts related to three PNBV rigs this Friday (02/06/2015)."  Exh. 88 at EIG_KEP_00235094.

**Keppel Response**:  Undisputed.

461.   **EIG ¶ 461**:  The anticorruption declarations and the AMA contracts were not considered at the Petrobras Board meeting scheduled for February 5, 2015.  Exh. 88 at EIG_KEP_00235094.

**Keppel Response**:  Undisputed that the cited email purports to explain what occurred at the meeting scheduled for February 5, 2015.

462.   **EIG ¶ 462**:  By email on February 5, 2015, Petrobras stated that the "the main reason" why the anticorruption statements and AMA contracts were not submitted to the Petrobras Executive Board was "the disclosure today, by the press, of the Collaboration Agreement No. 3 provided by Pedro José Barusco Filho."  Exh. 88 at EIG_KEP_00235093.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

463.   **EIG ¶ 463**:  The information contained in Barusco's collaboration agreement "ma[de] it impossible" for the anticorruption statements "to be submitted for deliberation by the Petrobras Board."  Exh. 88 at 00235093.

**Keppel Response**:  Disputed as incomplete.  The evidence cited states that the information contained in Barusco's collaboration agreement "makes it impossible, at this time, for the Anticorruption Statement to be provided to the *lenders* to be submitted for deliberation by the Petrobras Board".  (EIG Exh. 88 at 00235093.)  Otherwise, undisputed that the cited evidence contains the language quoted.

131

CONTAINS CONFIDENTIAL INFORMATION

464.   **EIG ¶ 464**:  Tan testified that the signing of contracts between Sete and BNDES for long-term financing scheduled for on or about February 6, 2015 were suspended due to the public disclosure of the Barusco collaboration agreements.  Exh. 133 at 342:16-22.

**Keppel Response**:  Disputed.  Tan testified that "[t]he answer is that based on the newspaper article the financing to Sete Brasil is suspended due to Lava Jato."  (Keppel Opp'n Exh. 53, Tan Tr. 343:6-9.)

465.   **EIG ¶ 465**:  Executives at Keppel were concerned about Sete's ability to secure long-term financing with BNDES after the Barusco collaboration agreements were disclosed. Exh. 133 at 340:5-13.

**Keppel Response**:  Disputed to the extent Plaintiffs imply anything more than the substance of the cited evidence.  The cited evidence shows only that Tan agreed that "there were executives at KOM who expessed concern about Sete's ability to secure long-term financing with BNDES after Mr. Barusco's plea agreements were disclosed".  (EIG Exh. 133 at 340:6-11.) Otherwise, undisputed.

466.   **EIG ¶ 466**:  On February 6, 2015, Wan Jun Lee forwarded an article from O Globo "focusing on Barusco's statements on Sete Brasil" to Loh and others.  Exh. 89 at EIG_KEP_00440537.

**Keppel Response**:  Undisputed.

467.   **EIG ¶ 467**:  Loh responded to Lee, "The concern is likely to move to whether this will stall Sete deal with BNDES and delay the financing and the funding to pay us."  Exh. 89 at KEPPEL00440537.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

CONTAINS CONFIDENTIAL INFORMATION

468.   **EIG ¶ 468**:  YY Chow replied to Loh, "Agree. We will have to be prepared for further delay to the funding."  Exh. 89 at KEPPEL00440537.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted, except to clarify that YY Chow explicitly mentioned the "futher delay".

469.   **EIG ¶ 469**:  Hours later, a Keppel employee distributed an article to senior Keppel executives reporting the suspension of "the signing of the financing agreement of [BNDES], Caixa Econômica Federal, and UK Export Finance."  Exh. 89 at KEPPEL00440536.

**Keppel Response**:  Disputed that the sender of the email was a "Keppel employee".  The sender was associated with Keppel Corp, as indicated by his email address. (EIG Exh. 89 at KEPPEL00440536.)  Undisputed that the evidence cited contains the language quoted.

470.   **EIG ¶ 470**:  The employee informed the CEOs of Keppel Corp. and Keppel that "the signing of financing contracts, which was schedule to take place in Brazil today (6 Feb) has been suspended."  Exh. 89 at KEPPEL00440536.

**Keppel Response**:  Undisputed.

471.   **EIG ¶ 471**:  On February 7, 2015, in an internal Keppel email responding to a report that "BNDES will postpone credit to Sete Brasil … following press reports suggesting that rig-building entity Sete Brasil was involved in the corruption," Look Fung Wang wrote, "As expected, and not good for us…"  Exh. 90 at KEPPEL00440618.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

472.   **EIG ¶ 472**:  BTG Pactual was the largest investor in Sete.  Exh. 123 at 96:14-15.
**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

473.   **EIG ¶ 473**:  In a "Briefing Memo regarding SETE," dated February 9, 2015, BTG Pactual outlined the difficulties Sete faced getting financing as a consequence of Operation Car Wash and described the effects of the revelation of Barusco's statements as follows:

- "The scenario changed substantially in early October 2014 as a consequence of investigations carried out by the Federal Police and Public Ministries, nicknamed Operação Lava Jato. . . ."  Exh. 91 at EIG_KEP_00284098.

- "[Sete] immediately hired law firms to perform independent audits . . . Despite the positive result of those audits, negative impacts on SETE arose due to the overall situation. . . ."  *Id.*

- "BNDES and the other long term financiers of Batch 1 (first group of rigs to receive long term funding, of a total of three batches) added many new requirements – from SETE, Petrobras, the operators and the shipyards – to approve the signature of the contracts, which caused delays to the process. The Company managed to obtain three other bridge loans during this period, but conditions became increasingly difficult, to the point where no additional funding was available in late November 2014. Thus, SETE saw itself forced to stop payments to the shipyards in November 2014. Management made significant efforts to achieve the signatures of Batch 1 loan documentation, which, after clearing dozens of new conditions precedent, was scheduled to take place on Friday, February 6th 2015."  *Id.*

CONTAINS CONFIDENTIAL INFORMATION

- "On February 5th 2015 however, Barusco's hearings became public and revealed that he also received bribes during his period as SETE's COO. . . ." *Id.*

- "Barusco's testimony not only precluded the Company from achieving the last condition precedent required for the signature of the long-term funding (an anti-corruption representation from Petrobras) but also created the necessity of a complete reformulation of the project. Under the current scenario, no disbursement should be expected in the very short-term and the relationship with the shipyards, which were allegedly benefited through illicit practices, must be reviewed."  *Id*. at EIG_KEP_00284099.

> **Keppel Response**:  Disputed that the document attributed the "the negative impacts on SETE" to the revelation of Barusco's statements.  The document states only that "negative impacts on SETE arose due to the overall situation".  (EIG Exh. 91 at EIG_KEP_00284089.)  Otherwise, undisputed that the evidence cited contains the language quoted.

474.   **EIG ¶ 474**:  On February 12, 2015, Keppel board member Pan wrote to Loh and YY Chow, "LOOKS LIKE SETE affair will be drawn out for a while. Seems funding for Sete is like chicken and egg revolving around the politics of how to resolve the corruption scandal." Exh. 94 at KEPPEL00439869.

> **Keppel Response**:  Undisputed that the evidence cited contains the language quoted.

475.   **EIG ¶ 475**:  Loh responded:  "In the worst case painted below, PB [Petrobras] won't get their rigs. Shipyards will layoff tens of thousands of workers. Pension funds that

CONTAINS CONFIDENTIAL INFORMATION

invested in Sete Brasil will be left with a big hole and their beneficiaries will have a big

problem."  Exh. 94 at KEPPEL00439869.

> **Keppel Response**:  Undisputed that the evidence cited contains the language
quoted.

476.     **EIG ¶ 476**:  On March 3, 2015, Peng Sang Sit ("**Sit**"), a director at Keppel,

responded to an email from Wang Jun Lee circulating news blurbs concerning Lavo Jato:

"Looks bad ? Chances of Sete not getting the financing ?"  Exh. 95 at KEPPEL00485355.

> **Keppel Response**:  Undisputed that the evidence cited contains the language
quoted.

477.     **EIG ¶ 477**:  Sam responded to Sit, "Sete's ability to obtain Financing is very

much tie to the scandals still looming over the country as the financing institutions want to play

very safe and thus more conditions are imposed. The longer this drags on, Sete may even become

insolvent which will be very bad for the country."  Exh. 95 at KEPPEL00485355.

> **Keppel Response**:  Undisputed that the evidence cited contains the language
quoted.

478.     **EIG ¶ 478**:  In an April 13, 2015 letter to Sete's shareholders, Sete's CEO stated

that "the disclosure of the contents of the plea agreement entered by former director Pedro

Barusco made it impossible to sign the long-term contracts scheduled for February 6, 2015, and

[Sete] is currently uncertain about its ability to continue as a going concern."  Exh. 96 at

EIG_KEP_00237890.

> **Keppel Response**:  Undisputed that the evidence cited contains the language
quoted.

479.     **EIG ¶ 479**:  On April 30, 2015, Sete issued an April 2015 Executive Report in

which it stated that the process of obtaining US$4.6 billion in anticipated financing from FMM

CONTAINS CONFIDENTIAL INFORMATION

was "interrupted by the disclosure of Pedro Barusco's plea bargain." Exh. 97 at

EIG00156005/EIG_KEP_00203233.

**Keppel Response**: Undisputed that the cited evidence contains the language

quoted.

480.    **EIG ¶ 480**: The Executive Report also stated that US$1.7 billion in funding from

FINISA "was approved" and "ready for signature on February 6, 2015, together with BNDES

and UKEF, but was interrupted by the disclosure of Pedro Barusco's plea bargain." Exh. 97 at

EIG00156005/EIG_KEP_00203233.

**Keppel Response**: Undisputed that the cited evidence contains the language

quoted.

481.    **EIG ¶ 481**: The Executive Report noted that "US$213 million was approved by

UKEF's board" and "was ready for signature on February 6, 2015, together with BNDES and

FINISA, but was interrupted by the disclosure of Pedro Barusco's plea bargain." Exh. 97 at

EIG00156005/EIG_KEP_00203233.

**Keppel Response**: Undisputed that the evidence cited contains the language

quoted.

482.    **EIG ¶ 482**: The Executive report further noted that "US$3.7 billion was

approved by [BNDES'] board in December 2013" and "[d]ocumentation was ready for signature

on February 6, 2015, but the process was interrupted by the disclosure of Pedro Barusco's plea

bargain." Exh. 97 at EIG00156005/EIG_KEP_00203233.

**Keppel Response**: Undisputed that the evidence cited contains the language

quoted, but does not address the year gap between the approval by BNDES's board in December

2013 and February 2015.

137

CONTAINS CONFIDENTIAL INFORMATION

483.    **EIG ¶ 483**:  The Executive Report also stated that $5.6 billion in BNDES funding

for "the second batch was structured but has been halted until the disbursement of the first

batch." Exh. 97 at EIG00156005/EIG_KEP_00203233.

       **Keppel Response**:  Undisputed that the evidence cited contains the language

quoted.

484.    **EIG ¶ 484**:  The Executive Report noted that "BNDES indicated that it must no

longer finance the project directly."  Exh. 99 at EIG00110475/EIG_KEP_00237594.

       **Keppel Response**:  Disputed that the evidence cited contains the language

quoted.

485.    **EIG ¶ 485**:  On May 19, 2015 Sete explained that "based on the[] revelations" in

connection with the disclosure of Barusco's plea agreement, "BNDES, the lead party financing

the Project, halted final negotiations for granting direct, long-term financing."  Exh. 99 at

EIG00110475/EIG_KEP_00237594.

       **Keppel Response**:  Undisputed that the evidence cited contains the language

quoted.  Disputed to the extent Plaintiffs imply that the February 5, 2015 disclosure was the

reason BNDES did not provide financing.  (See infra CSOF ¶¶ 664-72 (citing Keppel Opp'n

Exh. 66, DX039 at 811; Keppel Opp'n Exh. 27; Keppel Opp'n Exh. 128, EIG_KEP_00260601-

651 at 636; Keppel Opp'n Exh.  54, Thomas Tr. 109:21-111:03; Keppel Opp'n Exh. 105,

EIG_KEP_00094179-182 at 180; Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 635;

Keppel Opp'n Exh. 126, EIG_KEP_00259344-345 at 345; Keppel Opp'n Exh. 131,

EIG_KEP_00266976-981 at 977; Keppel Opp'n Exh. 27; Keppel Opp'n Exh. 54, Thomas Tr.

115:03-06; 124:16-125:9; 130:14-18; 157:24-159:22; Keppel Opp'n Exh. 81, at DX107 at 695;

Keppel Opp'n Exh. 27).)

CONTAINS CONFIDENTIAL INFORMATION

486.   **EIG ¶ 486**:  On June 15, 2016, a Brazilian court approved Sete's request for reorganization.  Exh. 109 at EIG00228049/EIG_KEP_00175810.

   **Keppel Response**:  Undisputed.

487.   **EIG ¶ 487**:  In a December 6, 2018 letter to Sete shareholders signed by the company's CEO, Carneiro, Sete proposed transferring "all Sete Brasil shares held by FIP Sondas" to a "non-profit orphan entity" "for the symbolic value of one Brazilian *real*," in light of the fact that "the current shareholders' continuing control of the Company will not guarantee them any financial return on the investment made" and "the current corporate structure, if maintained, only tends to represent liability risks to current shareholders."  Exh. 108 at 2018.12.06 EIG00228071/EIG_KEP_00176683.

   **Keppel Response**:  Undisputed that the cited document contains the language quoted, but disputed to the extent Plaintiffs imply that the document explains what took place in the more than two years between Sete's filing for bankruptcy and the date of the letter.

488.   **EIG ¶ 488**:  In a February 26, 2019 letter to Sete shareholders, Caixa stated that FIP Sondas' "total investment in [Sete] is posted at a book value of zero" and that in 2017, the net equity became "negative on account of the lack of funding to pay its operating expenses."  Exh. 109 at EIG00228049/EIG_KEP_00175810.

   **Keppel Response**:  Disputed that the letter is dated February 26, 2019; the document is not dated.  (EIG Exh. 109.)  Otherwise, undisputed.

489.   **EIG ¶ 489**:  On November 1, 2019, the FIP Sondas investment committee approved the sale of all Sete shares "for the symbolic total value of R$ 1.00 (one real)."  Exh. 111 at EIG00228793-94/EIG_KEP_00249901-902.

   **Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

490.   **EIG ¶ 490**:  On January 27, 2020, Caixa announced that FIP Sondas sold its full interest in Sete "corresponding to 95% of the Company's share capital, in accordance with terms approved by the Fund's Investment Committee."  Exh. 112 at EIG00228764/EIG_KEP_00249872.

**Keppel Response**:  Undisputed.

CONTAINS CONFIDENTIAL INFORMATION

## II.    COUNTERSTATEMENT OF ADDITIONAL FACTS THAT PRECLUDE ENTRY OF SUMMARY JUDGMENT FOR PLAINTIFFS.

Pursuant to Local Civil Rule 56.1 of the of the United States District Court for the Southern District of New York and Your Honor's Individual Practice Rules, Keppel respectfully submits the following statement of additional facts that preclude entry of summary judgment for Plaintiffs and warrant the denial of Plaintifffs' motion.

**A.     EIG Was a Sophisticated Investor with Experience in Brazil.**

491.    EIG "was a sophisticated institutional investor when it made its investments in Sete".  (Keppel Opp'n Exh. 2, EIG Response to RFA 55.)

492.    EIG began investing in Brazil in or around 2000.  (Keppel Opp'n Exh. 73, DX083 at 523.)

493.    Kevin Corrigan opened EIG's office in Rio de Janeiro in 2012.  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 17:08-13.)

494.    EIG's 2014 White Paper describes "recurrent concerns about transparency and corruption" in Brazil.  (Keppel Opp'n Exh. 73, DX083 at 524.)

495.    EIG's CEO Blair Thomas testified that "to be precise, if the question is did I know that Brazilian construction firms had a checkered history on corruption, the answer is yes." (Keppel Opp'n Exh. 54, Thomas Tr. 73:14-17.)

**B.     EIG's Pursuit of the Sete Investment Opportunity.**

496.    EIG first learned about the Sete investment opportunity in September of 2010 when Kevin Corrigan attended a meeting at Banco Santander with his former colleague.  (Keppel Opp'n Exh. 45, Corrigan Tr. 57:13-58:16.)

CONTAINS CONFIDENTIAL INFORMATION

497.     After Kevin Corrigan's meeting at Banco Santander in September 2010, Mr.

Corrigan "spoke to a friend" at the French Bank, Société Générale, about the Sete investment

opportunity.  (Keppel Opp'n Exh. 45, Corrigan Tr. 58:17-59:08.)

498.     On September 30, 2010, Kevin Corrigan sent João Ferraz at Petrobras an email

introducing himself and requesting a meeting during his trip to Rio de Janeiro, Brazil.  (Keppel

Opp'n Exh. 120, EIG_KEP_00257850-852 at 852.)

499.     When EIG reached out to Petrobras to pitch itself as a potential investor in

September 2010, it knew that Petrobras did not want international investors to become part of

Sete.  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 82:18-83:12.)

500.     Kevin Corrigan traveled to Brazil to meet with João Ferraz on or around October

19, 2010 "to learn more about Sondas and see if EIG could participate."  (Keppel Opp'n Exh. 57,

Corrigan D.C. Tr. 80:10-81:15.)

501.     "Sondas" refers to FIP Sondas, the Brazilian investment fund through which EIG

and other equity investors made their investments in Sete.  (Keppel Opp'n Exh. 69, DX062 at

056-57.)

**C.     Alleged Misrepresentations and Omissions**

i.  <u>September 2010 Drilling Presentation</u>.

502.     On September 27, 2010, Kevin Corrigan received the Drilling Presentation from a

"friend" of his at Société Générale.  (Keppel Opp'n Exh. 104, EIG_KEP_00075177-213; Keppel

Opp'n Exh. 45, Corrigan Tr. 58:17-24.)

503.     There is no evidence that Kevin Corrigan's "friend" at Société Générale was

acting as an agent of Petrobras when he sent the Drilling Presentation to EIG on September 27,

2010.  (Keppel Opp'n Exh. 45, Corrigan Tr. 58:17-25.)

504.    There is no evidence that anyone at Keppel was involved in preparing or disseminating the Drilling Presentation to any potential or actual investor.

505.    On September 27, 2011, an independent member of Keppel Corp.'s Board of Directors emailed the Drilling Presentation and another presentation unrelated to Sete to four executives of Keppel entities.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 804.)

506.    The Board member told the executives that he had obtained "some of the presentations given at" an offshore oil and gas industry forum in Rio de Janeiro, and asked whether anyone at the Keppel entities had seen the presentations.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 805.)

507.    Keppel Corp.'s CEO responded that he had not seen the presentation and the Board member sent two presentations.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 805.)

508.    There is no evidence anyone responded to the Board member's September 27, 2011 email attaching the Drilling Presentation.

509.    The Drilling Presentation does not mention EIG.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 827-862 ].)

510.    There is no evidence anyone at Keppel or anyone on EIG's investment committee opened or read the Drilling Presentation.

511.    There is no evidence anyone at Keppel commented on or discussed the Drilling Presentation.

512.    Slide 20 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 58 of the Complaint.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 847; Keppel Opp'n Exh. 1, Compl. ¶ 58.)

CONTAINS CONFIDENTIAL INFORMATION

513.   Slide 25 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 59 of the Complaint.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 852; Keppel Opp'n Exh. 1, Compl. ¶ 59.)

514.   Slide 27 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 60 of the Complaint.  (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 854; Keppel Opp'n Exh. 1, Compl. ¶ 60.)

515.   There is no evidence anyone at Keppel detected the alleged misrepresentations on slides 20, 25 or 27 of the Drilling Presentation or that anyone on EIG's investment committee relied on the alleged misrepresentations on slides 20, 25 or 17 of the Drilling Presentation. (Keppel Opp'n Exh. 137, KEPPEL00040804-862 at 847, 852 and 854.)

516.   There is no evidence anyone at Keppel knew the Drilling Presentation was shared with EIG.

ii.   October 2010 Pre-Salt Oil Rigs Project Document.

517.   The "Pre-Salt Oil Rigs Project" document described in paragraph 61 of the Complaint is DX061.  (Keppel Opp'n Exh. 68, DX061; Keppel Opp'n Exh. 1, Compl. ¶ 61.)

518.   There is no evidence that anyone at Keppel was involved in preparing or disseminating the Pre-Salt Oil Rigs Project document to any potential or actual investor.

519.   The Pre-Salt Oil Rigs Project document does not mention EIG.

520.   There is no evidence anyone at Keppel received the Pre-Salt Oil Rigs Project document.

521.   There is no evidence anyone at Keppel knew about the Pre-Salt Oil Rigs Project document.

522.   There is no evidence anyone at Keppel knew the Pre-Salt Oil Rigs Project document was shared with EIG.

CONTAINS CONFIDENTIAL INFORMATION

     iii.   September 2011 Private Placement Memo.

523.    The September 2011 Private Placement Memo described in paragraph 62 of the

Complaint is DX062.  (Keppel Opp'n Exh. 69, DX062; Keppel Opp'n Exh. 1, Compl. ¶ 62.)

524.    There is no evidence that anyone at Keppel was involved in preparing or

disseminating the Private Placement Memo to any potential or actual investor.

525.    The September 2011 Private Placement Memo does not mention EIG.

526.    There is no evidence anyone at Keppel received the Private Placement Memo.

527.    There is no evidence anyone at Keppel knew about the Private Placement Memo.

528.    There is no evidence anyone at Keppel knew the Private Placement Memo was

shared with EIG.

     d.   January 2011 Presentation

529.    On January 14, 2011, Zwi Skornicki forwarded Yew Yuen Chow a document

entitled, "Drilling Rigs In Brazil Project".  (Keppel Opp'n Exh. 94, PX086 at 887.)

530.    The cover of the Drilling Rigs in Brazil Project document states that it is a

"Presentation to Drilling Operators".  (Keppel Opp'n Exh. 95, PX087 at 888.)

531.    The Drilling Rigs in Brazil Project document does not mention EIG.  (Keppel

Opp'n Exh. 95, PX087.)

532.    There is no evidence anyone at Keppel opened or read the Drilling Rigs in Brazil

Project document.

533.    There is no evidence anyone at Keppel ever commented on or discussed the

Drilling Rigs in Brazil Project document.

534.    There is no evidence anyone at Keppel knew which other entities, if any, received

the Drilling Rigs in Brazil Project document.

145

a. <u>October 2011 Presentation and Financial Model</u>

535.     On October 30, 2011, Keppel employees were sent a document entitled, "Sete Brasil Participações S/A Management Presentation" and a financial model entitled "Modelo Financeiro Sete Brasil". (Keppel Opp'n Exh. 84, PX014 at 554, 560; Keppel Opp'n Exh. 86, PX038.)

536.     There is no mention of EIG in the "Sete Brasil Participações S/A Management Presentation". (Keppel Opp'n Exh. 84, PX014.)

537.     There is no mention of EIG in the financial model entitled "Modelo Financeiro Sete Brasil". (Keppel Opp'n Exh. 86, PX038.)

538.     There is no evidence anyone at Keppel knew which other entities, if any, received the "Sete Brasil Participações S/A Management Presentation".

539.     There is no evidence anyone at Keppel knew which other entities, if any, received the financial model entitled "Modelo Financeiro Sete Brasil".

540.     Keppel's Rule 30(b)(6) deposition witness, Tan Leong Peng, testified that all projects require financing and Sete was no different. (Keppel Opp'n Exh. 52, Tan I Tr. 130:09-131:07.)

**D.     EIG's Due Diligence.**

541.     Petrobras had no contractual obligations to protect Sete. (Keppel Opp'n Exh. 51, Talbot Tr. 106:19-23.)

542.     The Brazilian government had no formal obligation to protect Sete. (Keppel Opp'n Exh. 54, Thomas Tr. 57:5-23.)

543.     EIG's CEO, Blair Thomas, testified: "In my eyes this transaction was all about Petrobras, that Sete is just – was just an alter ego of Petrobras, that -- and that every aspect of this transaction was controlled by and dependent upon Petrobras. To be honest, I thought that was

very attractive.  I thought that's what made this interesting was that this was Petrobras."  (Keppel Opp'n Exh. 60, Thomas D.C. Tr. 103:15-22.)

544.    EIG's CEO, Blair Thomas, explained EIG's view of Sete as follows:  "[A]ll roads in this transaction – everything revolved around Petrobras. . . . Sete was just a securitization vehicle, that's all it was.  It wasn't a real company and what mattered is what Petrobras thought." (Keppel Opp'n Exh. 60, Thomas D.C. Tr. 228:11-20.)

545.    Kevin Corrigan testified that "the reason we wanted to go into the [Sete] transaction and that we did go into the transaction were for those reasons, that this had -- this was a AAA credit with the top notch company in Brazil, the largest private investment bank, the largest foreign bank, the most prestigious pension funds.  This was a club we wanted to enter, but Petrobras ran this show."  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 95:20-96:02.)

546.    There is no evidence that EIG analyzed the potential impact that oil price fluctuations could have on the viability of Sete.  None of EIG's due diligence memoranda or financial models identified oil prices as a risk factor or analyzed the potential impact that oil fluctuations could have on Sete.  (Keppel Opp'n Exh. 62, DX032; Keppel Opp'n Exh. 63, DX034; Keppel Opp'n Exh. 64, DX036; Keppel Opp'n Exh. 65, DX037; Keppel Opp'n Exh. 66, DX039; Keppel Opp'n Exh. 71, DX075; Keppel Opp'n Exh. 61, DX010. )

547.    Blair Thomas testified that oil prices were a "nonissue"  for EIG and Simon Hayden, the analyst responsible for EIG's financial modelling, testified that oil prices "may not have been an issue [EIG] looked at in detail".  (Keppel Opp'n Exh. 54, Thomas Tr. 132:13-17; Keppel Opp'n Exh. 46, Hayden Tr. 53-23-24.)

548.    There is no evidence that EIG considered during its due diligence whether Sete's debt-financing would be sufficient to cover the costs of Sete's shipbuilding agreements in the event that the Brazilian currency depreciated in a significant way.

549.    The AML/OFAC review was a matter of "checking all the boxes before [EIG] disburse[d] funds".  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 226:18.)

550.    In June 2011, EIG ran a Complinet search of the entities involved in Sete at the time.  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105.)

551.    As of June 27, 2011, the EAS Shipyard was the only shipyard that had signed a shipbuilding contract with Sete.  (Keppel Opp'n Exh. 66, DX039 at 802.)

552.    It was publicly reported by February 2011 that the EAS Shipyard had obtained the first seven drillship contracts from Sete.  (Keppel Opp'n Exh. 92, PX062 at 007.)

553.    Camargo Correa owned 40% of the EAS Shipyard.  (Keppel Opp'n Exh. 66, DX039 at 829.)

554.    In June 2011, EIG learned that ten "employees of Camargo Correa were arrested in connection with a year-long corruption probe".  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105.)

555.    The ten employees of the EAS Shipyard, which included executives, "were alleged to have used a network of fake companies and illegal currency traders to transfer millions of dollars abroad as part of a kickback scheme".  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105.)

556.    As Kevin Corrigan, EIG's Rule 30(b)(6) witness, testified, the allegations against the owner of the EAS Shipyard were the "same or similar" types of allegations ultimately revealed by Operation Car Wash.  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 215:18-216:1.)

557.    EIG's June 2011 Complinet search also returned a red flag on Funcef related to "funneling funds to politicians through private banks".  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105.)

CONTAINS CONFIDENTIAL INFORMATION

558.    Funcef was a Brazilian pension fund and Sete investor at that time.  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 105.)

559.    With respect to the entities that faced corruption allegations, Simon Hayden testified that he would have expected EIG, at minimum, to speak to the entities directly to "get to the bottom of it".  (Keppel Opp'n Exh. 46, Hayden Tr. 139:11-12.)

560.    In June 2011, Kevin Corrrigan dismissed the corruption allegations against the EAS Shipyard and Funcef as irrelevant.  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 104.)

561.    Kevin Corrigan did not believe that the results of the June 2011 Complinet search warranted escalation to the investment committee.  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 104.)

562.    Carla Vogel decided that "the information [was] of 'low risk'" and did not believe that it rose "to the level of escalation to Blair [Thomas] nor disclosure on the Investment Rec[ommendation]".  (Keppel Opp'n Exh. 122, EIG_KEP_00258104-106 at 104.)

563.    Thomas was not informed of the Complinet results.  (Keppel Opp'n Exh. 54, Thomas Tr. 72:8-15.)

564.    The June and September 2011 Investment Recommendations stated:  "An AML/OFAC review was conducted using the *Complinet* system (an online global screening application) on controlling entities and individuals including key management personnel.  No material issues were identified and the transaction has been categorized low risk from a compliance perspective."  (Keppel Opp'n Exh. 66, DX039 at 820; Keppel Opp'n Exh. 71, DX075 at 420.)

CONTAINS CONFIDENTIAL INFORMATION

565.    In January 2012, EIG ran another Complinet search of the entities involved in Sete at the time, including Queiroz Galvao.  (Keppel Opp'n Exh. 123, EIG_KEP_00258109-112 at 110.)

566.    Queiroz Galvao owned approximately 40% of the EAS Shipyard as of January 2012.  (Keppel Opp'n Exh. 66, DX039 at 829.)

567.    The Complinet search revealed that Queiroz Galvao paid protection money to "drug lords in Rio" and that its employees were in Libya during the recent civil war negotiating with the provisional government.  (Keppel Opp'n Exh. 123, EIG_KEP_00258109-112 at 110.)

568.    EIG did not run a Complinet search on Keppel or any of its subsidiaries at any time.  (Keppel Opp'n Exh. 45, Corrigan Tr. 92:4-10.)

569.    There is no evidence that EIG took steps other than its Complinet searches to assess corruption risks associated with its investment in Sete.

**E.    EIG Made a Binding Commitment to Invest in Sete in June 2011.**

570.    On June 3, 2011, Kevin Corrigan sent Luiz Reis, a Lakeshore representative, an email stating that "the decision to invest in Sete Brasil has been made internally".  (Keppel Opp'n Exh. 121, EIG_KEP_00257969-971 at 969.)

571.    EIG's due diligence of Sete "culminated" in the preparation of the 43-page June 2011 Investment Recommendation.  (Keppel Opp'n Exh. 70, DX074; Keppel Opp'n Exh. 45, Corrigan Tr. 69:25-70:05; Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 156:08-14; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 115:09-116:13.)

572.    On June 27, 2011, EIG's Kevin Corrigan and Simon Hayden presented the June 2011 Investment Recommendation to EIG's investment committee.  (Keppel Opp'n Exh. 70, DX074 at 322.)

CONTAINS CONFIDENTIAL INFORMATION

573.    The June 2011 Investment Recommendation included a total of five bullet points concerning any Keppel entity in its Appendix describing "potential" shipyards.  (Keppel Opp'n Exh. 66, DX039 at 831.)

574.    Kevin Corrigan testified that the five bullets on the BrasFELS Shipyard were the "sum total of information that was presented to the investment committee regarding Brasfels". (Keppel Opp'n Exh. 45, Corrigan Tr. 77:09-25.)

575.    The June 2011 Investment Recommendation listed the following risks associated with the Sete investment:  construction, operations, financing, foreign exchange, future Sete investment programs and funding, change of law and environmental.  (Keppel Opp'n Exh. 66, DX039 at 805-810.)

576.    Next to all of these risks listed in the June 2011 Investment Recommendation, the support of Petrobras and/or a Brazilian government entity was listed as a mitigating factor. (Keppel Opp'n Exh. 66, DX039 at 805-810.)

577.    The June 2011 Investment Recommendation did not discuss oil prices.  (Keppel Opp'n Exh. 66, DX039.)

578.    On June 27, 2011, EIG's investment committee approved an investment in Sete of up to 250 million Brazilian Reals ("BRL").  (Keppel Opp'n Exh. 70, DX074 at 322.)

579.    The decision to invest in Sete was made by EIG's investment committee.  (Keppel Opp'n Exh. 60, Thomas D.C. Tr. 117:11-14.)

580.    EIG's witnesses, including members of the investment committee, did not recall any discussions about corruption risk at the June 2011 meeting when EIG approved the investment.  (Keppel Opp'n Exh. 45, Corrigan Tr. 93:13-18, 111:8-13; Keppel Opp'n Exh. 54, Thomas Tr. 102:14-17; Keppel Opp'n Exh. 43, Anderson Tr. 29:11-25; Keppel Opp'n Exh. 48, Lowder Tr. 117:3-8; Keppel Opp'n Exh. 42, Albe Tr. 24:11-14.)

CONTAINS CONFIDENTIAL INFORMATION

581.     Blair Thomas testified that at the time of the June 27, 2011 investment committee meeting, he did not know whether Keppel would ever get a shipbuilding contract from Sete. (Keppel Opp'n Exh. 54, Thomas Tr. 96:22-25.)

582.     Kevin Corrigan testified that at the time of the June 27, 2011 investment committee meeting, he did not know exactly which shipbuilders would ultimately end up building ships for Sete. (Keppel Opp'n Exh. 45, Corrigan Tr. 74:11-75:09.)

583.     As of June 27, 2011, the EAS Shipyard was the only shipyard that had signed an EPC contract with Sete. (Keppel Opp'n Exh. 66, DX039 at 802.)

584.     The only other EPC contracts available to EIG as of June 27, 2011 were draft EPC agreement in Sete's data room. (Keppel Opp'n Exh. 114, EIG_KEP_00166208 at 208.)

585.     On June 29, 2011, Kevin Corrigan sent an email to other EIG employees stating that "[t]his week we are signing a binding agreement to make the investment when they fulfill two requirements:  get the boat contract from Petrobras, and existing investors fail to exercise all their pre-emptive rights." (Keppel Opp'n Exh. 74, DX086 at 755.)  EIG's witnesses testified that the agreement was binding "if [certain] conditions [were] met" and that those conditions were met. (Keppel Opp'n Exh. 45, Corrigan Tr. 96:8-24; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 160:6-15.)

586.     On June 30, 2011, Sete, Lakeshore and EIG executed an investment agreement, under which EIG "irrevocably and irreversibly agree[d] to invest up to of R$250,000,000 (two hundred and fifty million Brazilian reais) ('Equity Commitment')". (Keppel Opp'n Exh. 75, DX087 at 153, 160; Keppel Opp'n Exh. 74, DX086 at 755.)  EIG increased its investment on September 8, 2011 by executing the First Amendment and Restatement Agreement. (Keppel Opp'n Exh. 76, DX089.)

CONTAINS CONFIDENTIAL INFORMATION

**F.     EIG's First Visit to the BrasFELS Shipyard in August 2011.**

            i.     <u>August 2011 Yard Visit.</u>

587.     The first visit to the BrasFELS Shipyard took place on or around August 4, 2011. (Keppel Opp'n Exh. 45, Corrigan Tr. 130:09-25.)

588.     EIG initiated and planned the August 2011 visit to the BrasFELS Shipyard. (Keppel Opp'n Exh. 45, Corrigan Tr. 131:13-24, 132:22-133:03, 135:09-21.)

589.     Kevin Corrigan asked Sete to arrange the August 2011 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 45, Corrigan Tr. 135:12-18.)

590.     Kevin Corrigan set up the August 2011 visit "to help CIC in their due diligence" because "CIC was . . . beginning to kick the tires, as we had the previous year".  (Keppel Opp'n Exh. 45, Corrigan Tr. 131:23-24, 132:22-24, 135:09-21.)

591.     CIC was an "important investor in EIG" funds.  (Keppel Opp'n Exh. 45, Corrigan Tr. 134:10-15, 131:06-12.)

592.     Kevin Corrigan testified that the "sole purpose" of the August 2011 visit was "gauging [CIC's] interest in investing in Sete Brasil".  (Keppel Opp'n Exh. 57, Corrigan D.C. Tr. 101:02-10.)

593.     There is no evidence of any communications between EIG and Keppel concerning the planning of the August 2011 yard visit.

594.     Zwi Skornicki emailed Kai Choong Kwok and Yew Yuen Chow at his KOM USA email address regarding the August 2011 BrasFELS Shipyard visit.  (Keppel Opp'n Exh. 134, KEPPEL00010310.)

595.     There is no evidence that Yew Yuen Chow read Zwi Skornicki's July 29, 2011 email or otherwise acknowledged EIG's visit.

CONTAINS CONFIDENTIAL INFORMATION

596.     During the summer of 2011, Yew Yuen Chow was transitioning into a role as Managing Director of Keppel.  (Keppel Opp'n Exh. 15, at 54, https://www.kepcorp.com/en/file/investors/annual-reports/2011/2011-kcl.pdf.)

597.     When Yew Yuen Chow was transitioning into a role as Managing Director of Keppel in August 2011, he was still serving as the President of Keppel's subsidiary, KOM USA, which oversaw operations in North and South America. (Keppel Opp'n Exh. 15, at 54, https://www.kepcorp.com/en/file/investors/annual-reports/2011/2011-kcl.pdf.)

598.     There is no evidence of any contact between EIG and Keppel concerning Sete prior to the August 2011 yard visit.

599.     The "focus" of EIG's August 2011 yard visit "was on the shipbuilding capacity of Brasfels".  (Keppel Opp'n Exh. 45, Corrigan Tr. 143:07-09.)

600.     Kevin Corrigan testified that representatives of BrasFELS "greeted [EIG]" and "gave a presentation" during the August 4, 2011 yard visit.  (Keppel Opp'n Exh. 45, Corrigan Tr. 133:15-21.)

601.     Kevin Corrigan testified that the presentation that was shown during the August 4, 2011 visit to the BrasFELS Shipyard "would have been an overview of their operations, and I'm sure it was touting their skills, etcetera".  (Keppel Opp'n Exh. 45, Corrigan Tr. 133:15-134:05.)

602.     Nobody who attended the August 2011 visit raised questions relating to bribery or corruption.  (Keppel Opp'n Exh. 45, Corrigan Tr. 136:14-17, 143:03-06.)

603.     There is no evidence that anyone made any false statements to EIG during the August 4, 2011 visit to the BrasFELS Shipyard.

604.     Kevin Corrigan testified that during the August 2011 yard visit "everything they said was truthful", although "you know, they didn't bring up the corruption scheme that already existed".  (Keppel Opp'n Exh. 45, Corrigan Tr. 136:03-13.)

CONTAINS CONFIDENTIAL INFORMATION

605.    There is no evidence that anyone from Keppel attended EIG's August 4, 2011 visit to the BrasFELS Shipyard.

606.    There is no evidence that anyone who attended EIG's August 4, 2011 visit to the BrasFELS Shipyard was aware of the bribery scheme.

607.    On August 8, 2011, Fabio Cunha, a Sete representative, emailed Edmundo Santos, a Keppel FELS Brasil employee, about the August 2011 visit to the BrasFELS Shipyard, stating that "[t]he visit was very productive and our investors and associates learned a lot about the construction of the semi-subs.  The overall impression was great and achieved the intended result- a lower perceived risk of the project."  (Keppel Opp'n Exh. 97, PX095 at 126.)

608.    EIG's August 2011 yard visit occurred after EIG made its binding decision to invest in Sete.  (Keppel Opp'n Exh. 45, Corrigan Tr. 130:09-131:17.)

         ii.    <u>August 2011 Video Shoot.</u>

609.    EIG initiated the August 2011 video shoot of the BrasFELS Shipyard.  (Keppel Opp'n Exh. 77, DX092 at 596; Keppel Opp'n Exh. 78, DX093 at 447.)

610.    Barrington planned the August 2011 video shoot of the BrasFELS Shipyard. (Keppel Opp'n Exh. 77, DX092 at 596; Keppel Opp'n Exh. 78, DX093 at 446-47; Keppel Opp'n Exh. 99, BARRINGTON_ET_00000486-0495 at 494.)

611.    Barrington, on EIG's behalf, reached out to Sete to arrange the August 2011 video shoot as part of a presentation for EIG's annual investors conference.  (Keppel Opp'n Exh. 78, DX093 at 447.)

612.    There is no evidence of any direct communications between EIG and Keppel about the planning of the Barrington video shoot, as the only communications show Barbara Olsen at Barrington communicating with Keppel FELS Brasil administrative assistant, Adriana Farah.  (Keppel Opp'n Exh. 100,  BARRINGTON_ET_00000651-0654 at 652-654.)

CONTAINS CONFIDENTIAL INFORMATION

613.   Yew Yuen Chow approved a request for the Sete video to be shot at the BrasFELS Shipyard.  (Keppel Opp'n Exh. 136, KEPPEL00030275-276 at 275.)

614.   Yew Yuen Chow responded to the request for the Sete video to be shot at the BrasFELS Shipyard from his KOM email address.  (Keppel Opp'n Exh. 136, KEPPEL00030275-276 at 275.)

615.    As of August 2011, Yew Yuen Chow was still serving as the President of Keppel's subsidiary, KOM USA.  (Keppel Opp'n Exh. 15, at 54, https://www.kepcorp.com/en/file/investors/annual-reports/2011/2011-kcl.pdf.)

616.   There is no evidence that Yew Yuen Chow took any actions with respect to the Barrington video shoot beyond approving the request or that he attended the video shoot.  (Keppel Opp'n Exh. 136, KEPPEL00030275-276 at 275.)

617.   On or around August 24, 2011, Barrington's Barbara Olsen visited the BrasFELS Shipyard to record video of "general shipyard activity", which is the video shoot described in paragraphs 72 to 75 of the Complaint.  (Keppel Opp'n Exh. 1, Compl. ¶¶ 72-75; Keppel Opp'n Exh. 78, DX093 at 447; Keppel Opp'n Exh. 100, BARRINGTON_ET_00000651 at 653; Keppel Opp'n Exh. 45, Corrigan Tr. 154:25-155:10.)

618.   The Barrington video shoot was independent of EIG's due diligence for its Sete investment.  (Keppel Opp'n Exh. 45, Corrigan Tr. 157:02-08.)

619.   Kevin Corrigan testified that the Barrington video shoot was "not an extension of [EIG's] due diligence" of the Sete investment.  (Keppel Opp'n Exh. 45, Corrigan Tr. 157:02-08.)

620.   The August 2011 video shoot did not include footage of construction for Sete drillships because Keppel's subsidiary did not execute its first contract with Sete's subsidiary until December 2011.  (Keppel Opp'n Exh. 142, KEPPEL00490690-768.)

CONTAINS CONFIDENTIAL INFORMATION

621.    There is no evidence that bribery or corruption risks were discussed during the planning or shooting of the Barrington video.

622.     There is no evidence that anyone from Keppel attended the Barrington video shoot in August 2011.

623.    There is no evidence that anyone from any Keppel entity provided inaccurate information to Barrington or EIG in connection with the Barrington video.

624.    There is no evidence that the Barrington video mentioned any Keppel entity.

**G.    Agreements with Zwi Skornicki.**

625.    There is no evidence prior to September 2011 of any discussions concerning Zwi Skornicki's agreements in connection with Sete.  (Keppel Opp'n Exh. 139, at KEPPEL00280920.)

626.    The Eagle Agency Agreement and Deep Sea Services Agreement were executed by Jeffrey Chow and Zwi Skornicki on or about August 7, 2012.  (Keppel Opp'n Exh. 144, at KEPPEL00555190.)

627.    There is no evidence that anyone at EIG reviewed or requested to review any shipyard's consulting or agency agreements.

628.    Jeffrey Chow, Keppel's former legal director, drafted and signed the consulting agreements related to Sete with Zwi Skornicki.  (Keppel Opp'n Exh. 9, Chow Tr. 26:25-27:03.)

629.    Jeffrey Chow testified that the "intention" of Zwi Skornicki's contracts "wasn't to conceal any bribe payments.  The intention was to capture in writing the agreement between the company and [Mr. Skornicki], that he would be paid a certain commission fee for his assistance under certain contracts."  (Keppel Opp'n Exh. 9, Chow Tr. 107:25-108:07-12.)

630.    Jeffrey Chow testified that:

CONTAINS CONFIDENTIAL INFORMATION

> "[P]ayment wouldn't be able to go through the company without a contract or agreement that supports it. There needs to be some documentation. . . . In order to make payment out of the company, you need to have all the required documents there to – for the accounting people to sign off and say, okay, payment is being made. The contract that supports it, the invoice, the bank details. You just can't move money out of the company without a contract to support why you are moving money." (Keppel Opp'n Exh. 9, Chow Tr. 90:14-91:05.)

631.    Jeffrey Chow testified that "the contracts themselves were the documents necessary to process the agreement between Keppel and Zwi [Skornicki]". (Keppel Opp'n Exh. 9, Chow Tr. 142:04-07.)

**H.    EPC Contracts.**

632.    On December 16, 2011, Keppel's subsidiary, Fernvale, executed its first EPC contract with Sete's special purpose vehicle, Urca Drilling B.V. (Keppel Opp'n Exh. 93, PX070.)

633.    The December 16, 2011 EPC Contract was the first shipbuilding contract between any Keppel entity and Sete. (Keppel Opp'n Exh. 93, PX070.)

634.    EIG was not a party to the December 16, 2011 EPC Contract. (Keppel Opp'n Exh. 93, PX070.)

**I.    Keppel's Lack of Knowledge of Sete's Use of Funds.**

635.    A financial analysis prepared by Lakeshore in September 2011 states that EIG had committed to contribute 7.8% of Sete's equity funding. (Keppel Opp'n Exh. 102, EIG_KEP_00048709-713 at 713.)

636.    The September 19, 2011 exchanges between Jeffrey Chow and Nora Marsuki are the earliest communications concerning improper payments to Zwi Skornicki's companies in connection with Sete. (Keppel Opp'n Exh. 139, KEPPEL00280920 and Keppel Opp'n Exh. 138, KEPPEL00045696.)

CONTAINS CONFIDENTIAL INFORMATION

637.   There is no evidence that Keppel knew how any corrupt payments would be distributed to third parties after payments were disbursed to Zwi Skornicki's companies.

638.   There is no evidence that EIG's 7.8% share of Sete's equity funding was a necessary component of the bribery scheme.

639.   Keppel understood that "projects all require financing" and that Sete was no different.  (Keppel Opp'n Exh. 53, Tan Tr. 305:09-16.)

640.   There is no evidence Keppel knew which funds Sete used to pay the shipyards.

**J.    EIG's Second Visit to the BrasFELS Shipyard in March 2012.**

641.   EIG initiated and planned the March 2012 visit to the BrasFELS Shipyard. (Keppel Opp'n Exh. 79, DX095 at 469; Keppel Opp'n Exh. 119, EIG_KEP_00251523-529 at 528.)

642.   There is no evidence of any communications between EIG and Keppel concerning the planning of the March 2012 yard visit.

643.   The March 2012 visit to the BrasFELS Shipyard was part of ADICO's due diligence of Sete.  (Keppel Opp'n Exh. 45, Corrigan Tr. 160:17-22; Keppel Opp'n Exh. 58, Hayden D.C. Tr. 304:21-305:01; Keppel Opp'n Exh. 118, EIG_KEP_00251502-508 at 505)

644.   ADICO was an investor of EIG.  (Keppel Opp'n Exh. 45, Corrigan Tr. 160:23-161:05.)

645.   Kevin Corrigan testified that the March 2012 visit "was a mirror of the CIC's visit a few months earlier", and that the purpose was to present to ADICO the possibility of investing in Sete.  (Keppel Opp'n Exh. 45, Corrigan Tr. 160:12-22.)

646.   The focus of the March 2012 visit to the BrasFELS Shipyard was the shipbuilding capacity at BrasFELS.  (Keppel Opp'n Exh. 45, Corrigan Tr. 166:14-18; Keppel Opp'n Exh. 46, Hayden Tr. 84:21-25.)

CONTAINS CONFIDENTIAL INFORMATION

647.    There is no evidence that bribery or corruption were discussed during the March 2012 yard visit.

648.    Kevin Corrigan testified that he could not recall any discussions concerning corruption during the March 2012 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 45, Corrigan Tr. 167:08-16.)

649.    Simon Hayden testified that he could not recall any specific questions during the March 2012 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 58, Hayden D.C. Tr. 305:07-09; Keppel Opp'n Exh. 46, Hayden Tr. 86:04-08.)

650.    Hoshrav Patel testified that he had no recollection of the March 2012 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 50, Patel Tr. 84:14-88:14; Keppel Opp'n Exh. 118, EIG_KEP_00251502-508 at 505.)

651.    There is no evidence that anyone from any Keppel entity provided any inaccurate information in connection with the March 2012 visit to the BrasFELS Shipyard.

652.    Kevin Corrigan testified that there was no misleading information provided concerning the shipbuilding capacity of BrasFELS during the March 2012 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 45, Corrigan Tr. 168:15-20.)

653.    Kevin Corrigan testified that he could not recall anyone else attending the yard tour in March 2012 beyond the people at BrasFELS other than Ivan Hong, who might have attended as Sete's advisor at Lakeshore.  (Keppel Opp'n Exh. 45, Corrigan Tr. 165:12-166:02.)

654.    There is no evidence that anyone from Keppel attended the March 2012 visit to the BrasFELS Shipyard or that anyone from Keppel delivered a presentation to EIG.

**K.     EIG's Third Visit to the BrasFELS Shipyard in June 2013.**

655.    Sete arranged the June 2013 visit to the BrasFELS Shipyard.  (Keppel Opp'n Exh. 106, EIG_KEP_00095123-128 at 128.)

CONTAINS CONFIDENTIAL INFORMATION

656.    There is no evidence of any communications between EIG and Keppel concerning the planning of the June 2013 visit to the BrasFELS Shipyard.

657.    Kevin Corrigan testified that the purpose of the June 2013 visit to the BrasFELS Shipyard was "to see the progress of the shipyards" and that the focus of the visit was the shipbuilding capacity of the BrasFELS Shipyard. (Keppel Opp'n Exh. 45, Corrigan Tr. 169:08-22, Corrigan Tr. 174:13-21.)

658.    Sete stated that "[t]he shipyards should be represented by their presidents or directors" during the June 2013 visit to the BrasFELS Shipyard. (Keppel Opp'n Exh. 146, KEPPEL00589219-229 at 220.)

659.    Sete requested that Kai Choong Kwok, the President of the BrasFELS Shipyard, deliver a presentation. (Keppel Opp'n Exh. 146, KEPPEL00589219-229 at 220.)

660.    Gilberto Israel and Bruno Ng Wei Ming, the people who prepared the presentation shown at the "Sete's All Lenders' presentation meeting" were associated with Keppel's subsidiaries rather than Keppel. (Keppel Opp'n Exh. 146, KEPPEL00589219-229 at 219.)

661.    Kevin Corrigan testified that he could not recall anyone raising the subject of corruption risks during the June 2013 visit to the BrasFELS Shipyard. (Keppel Opp'n Exh. 45, Corrigan Tr. 175:07-13.)

662.    There is no evidence that anyone from any Keppel entity provided any inaccurate information in connection with the June 2013 visit to the BrasFELS Shipyard.

663.    There is no evidence that anyone from Keppel, as opposed to its subsidiaries, attended the June 2013 visit to the BrasFELS Shipyard.

CONTAINS CONFIDENTIAL INFORMATION

**L.     Sete Had Difficulty Obtaining Financing Prior to the Disclosure of the Bribery Scheme.**

664.     In June 2011, Sete was expected to receive 45% of its long-term financing from BNDES, 20% from foreign export credit agencies, and 15% from commercial banks.  (Keppel Opp'n Exh. 66, DX039 at 811.)

665.     On January 14, 2015, Bloomberg News reported: "BNDES postponed first the approval and then the disbursement [of a loan to Sete] several times since late 2012 because of a lack of guarantees, as well as setbacks on international financing and on Sete Brasil contracts with rig operators".  (Keppel Opp'n Exh. 27, "Petrobras Rig-Builder Said Close to Receiving Delayed BNDES Loan", Bloomberg, January 14, 2015.)

666.     Lenders that extended bridge financing to Sete included Banco Itaú S.A., Banco Bradesco S.A., Banco Votorantim S.A., Banco do Brasil S.A., Banco Santander S.A., Sumitomo Mitsui Banking, The Bank of Nova Scotia, Standard Charter Bank, Bradesco BBI, Citibank and Caixa Economica Federal.  (Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 636.)

667.     In January 2012, EIG provided a $100 million bridge loan to Sete.  (Keppel Opp'n Exh.  54, Thomas Tr. 109:21-111:03.)

668.     In June 2013, BNDES gave conditional approval for a 1.3 billion BRL loan for Sete, which was scheduled to close in September 2013.  (Keppel Opp'n Exh. 105, EIG_KEP_00094179-182 at 180.)

669.     BNDES postponed its June 2013 commitment after the existing equity shareholders refused to agree to BNDES's demands that they invest additional capital to lower Sete's debt-to-equity ratio from around 80:20 to 75:25.  (Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 635; Keppel Opp'n Exh. 126, EIG_KEP_00259344-345 at 345.)

670.    In September and October 2014, Sete's "difficult financial situation started to show up [i]n national newspapers".  (Keppel Opp'n Exh. 131, EIG_KEP_00266976-981 at 977.)

671.    On January 14, 2015, Bloomberg reported that "[Sete] is already late in paying shipyards its contracted to build oil rigs."  (Keppel Opp'n Exh. 27, "Petrobras Rig-Builder Said Close to Receiving Delayed BNDES Loan", Bloomberg, January 5, 2015.)

672.    BNDES's February 2015 postponement of its financing commitment to Sete represented at least the fourth time BNDES had postponed its plans to finance Sete.  (Keppel Opp'n Exh. 54, Thomas Tr. 115:03-06; 124:16-125:9; 130:14-18; 157:24-159:22; Keppel Opp'n Exh. 81, at DX107 at 695; Keppel Opp'n Exh. 27, "Petrobras Rig-Builder Said Close to Receiving Delayed BNDES Loan," Bloomberg, January 14, 2015.)

## M.    By June 2014, Sete Was on the Brink of Collapse Due to Steep Declines in the Price of Oil and the Value of the Brazilian Currency.

673.    By February 2014, BNDES and other lenders had demanded that Sete raise another 2 billion BRL in equity before they were willing to provide long-term financing, due to the declining value of the BRL.  (Keppel Opp'n Exh. 127, EIG_KEP_00260519-533 at 521.)

674.    On February 1, 2014, Kevin Corrigan sent an email to Blair Thomas stating that there had been a "devaluation" of Brazilian currency "over the past 18 months".  (Keppel Opp'n Exh. 72, DX077 at 521.)

675.    The Brazilian currency had depreciated significantly from June 2011 when USD $100 could buy 159 BRL to January 2014 when USD $100 could buy 240 BRL.  (Keppel Opp'n Exh. 11, Federal Reserve, "Foreign Exchange Rates"; Keppel Opp'n Exh. 60, Thomas D.C. Tr. 238:11-21.)  The devaluation of Brazilian currency harmed Sete.  (Keppel Opp'n Exh. 66, DX058 at 076; Keppel Opp'n Exh. 60, Thomas Petrobras Tr. 241:06-19.)

CONTAINS CONFIDENTIAL INFORMATION

676.   Sete's financing commitments were denominated in Brazilian currency.  (Keppel Opp'n Exh. 66, DX058 at 076; Keppel Opp'n Exh. 66, DX039 at 800.)

677.   Sete's construction contracts were in USD.  (Keppel Opp'n Exh. 63, DX034 at 361.)

678.   Because of the "mismatch" between the currencies used in Sete's financing and construction contracts, "the contracts priced in dollars became more expensive" and the anticipated debt was no longer sufficient to cover the USD cost of drillship construction. (Keppel Opp'n Exh. 60, Thomas Petrobras Tr. 239:22-241:10.)

679.   In February 2014, EIG's chief investor officer, Kurt Talbot, stated:  "If anything our track record is overwhelmingly throwing good money after bad.  FX is overwhelming everything here (that's why they are R\$ 2 billion [BRL] short).  The fundamentals for Brazil are going the wrong direction and all we should be concerned about is US\$ returns. . . . FX is killing us, and performance is less than certain.  This is a non-yielding, minority common equity investment, not exactly the sweet spot for the fund."  (Keppel Opp'n Exh. 127, EIG_KEP_00260519-533 at 519.)

680.   By June 2014, BNDES and Sete's other lenders' demands for additional equity increased from 2 to 3 billion BRL.  (Keppel Opp'n Exh. 80, DX096 at 151.)

681.   EIG recognized in a June 24, 2014 email that Sete's situation was "dire" and that "many of the drillships, particularly the early ones, now face some serious delays in delivery and commissioning on behalf of Petrobras".  In the same email, EIG stated that "the company will now begin looking for the R \$ 3 billion of new equity needed to complete the project, and no one believes they will be able to go to market".  (Keppel Opp'n Exh. 80, DX096 at 151.)

CONTAINS CONFIDENTIAL INFORMATION

682.    It also emerged in June 2014 that one of the five shipyards building drillships for Sete was bankrupt, which EIG recognized "could seriously impact the delivery schedule on the three drillships under their responsibility".  (Keppel Opp'n Exh. 80, DX096 at 151.)

683.    Construction delays resulted in additional capital expenditure requirements of about $500 million (USD).  (Keppel Opp'n Exh. 80, DX096 at 150.)

684.    As Thomas testified, "[t]he overall oil and gas industry experienced significant volatility in 2014 and so the sentiment about the entire industry was down."  (Keppel Opp'n Exh. 54, Thomas Tr. 59:18-21.)

685.    It was reported that the decline in oil prices that began in the summer of 2014 resulted in large losses for "companies that operate offshore rigs on behalf of oil producers." (Keppel Opp'n Exh. 25, "Offshore rig operators reel from oil price rout," Financial Times, April 24, 2016.)

**N.    By November 2014, Sete Had Stopped Paying the Shipyards.**

686.    In September 2014, BNDES further delayed its financing until November 2014 resulting in Sete's inability to pay the shipyards building the drillships, including the BrasFELS Shipyard.  (Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 635.)

687.    To stay solvent, Sete issued an emergency capital call in September 2014, which EIG's investment committee approved.  (Keppel Opp'n Exh. 128, EIG_KEP_00260601-651 at 637; Keppel Opp'n Exh. 54, Thomas Tr. 127:12-132:03; Keppel Opp'n Exh. 110, EIG_KEP_00135540-544 at 540.)

688.    In November 2014, Sete stopped paying the shipyards building the drillships. (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 868.)

689.    In November 2014, Sete also stopped paying the BrasFELS Shipyard and, therefore, Keppel was monitoring Sete's financing in 2014 and 2015.  (Keppel Opp'n Exh. 145,

165

KEPPEL00567865-866 at 865; Keppel Opp'n Exh. 47; Hua Tr. 18:6-11; Keppel Opp'n Exh. 53, Tan Tr. 343:10-14.)

690.    In December 2014, BNDES "informed [Sete that] new deteriorated conditions will require $703M of additional equity, decreasing leverage to 63%."  (Keppel Opp'n Exh. 111, EIG_KEP_00140086-088 at 086.)

691.    In its financial modeling as of March 2014, EIG reported an expected IRR of 12.9%.  (Keppel Opp'n Exh. 113, EIG_KEP_00156130 at tab "QR Front" cell E19.)

692.    As of September 2014, EIG reported an expected IRR of 10.6%.  (Keppel Opp'n Exh. 115, EIG_KEP_00210300 at tab "QR Front" cell E19.)

693.    As of December 2014, EIG reported an expected IRR of 1.1%.  (Keppel Opp'n Exh. 116, EIG_KEP_00210425 at tab "QR Front" cell E19.)

**O.     Operation Car Wash.**

694.    Beginning on November 18, 2014 and through December 2014, it was widely reported that Pedro Barusco, Sete's former Chief Operating Officer, had signed a plea agreement with Brazilian prosecutors in connection with Operation Car Wash and confessed to accepting bribes from construction companies.  (Keppel Opp'n Exhs. 23, 9, 12, 28.)

695.    Derek Lemke was a Managing Director at EIG.  (Keppel Opp'n Exh. 103, EIG_KEP_00052509-551 at 550.)

696.    Jose Magela Bernardes was the Senior Executive Vice President at EIG.  (Keppel Opp'n Exh. 56, Bernardes D.C. Tr. 123:01-03.)

697.    On November 18, 2014, Derek Lemke sent an email to Jose Magela Bernardes stating:  "I've had an inquiry from [an EIG investor] about the impact of the bribery scandal at Petrobras on our investments and portfolio companies. . . . Sete strikes me as the situation where we have the most exposure."  (Keppel Opp'n Exh. 109 at 667.)

CONTAINS CONFIDENTIAL INFORMATION

698.    On November 18, 2014, Derek Lemke sent an email to Jose Magela Bernardes and others at EIG stating, "Just circling back one more time on this. . . . Have we seen anything in connection with the corruption investigations that MIGHT impact our investments or portfolio companies?  Is there any reason to think that there might have been illegal payments mad ein connection with the award of the Petrobras contracts to Sete?  Is it likely that the circumstances around the contract award will be reviewed by governmental authorities?"  (Keppel Opp'n Exh. 82 at 665.)

699.    Also in November 2014,  BNDES had reportedly postponed its proposed funding of Sete in order to consider the implications of Mr. Barusco's arrest.  (Keppel Opp'n Exh. 143, KEPPEL00495287-291 at 288.)

700.    Blair Thomas testified that he had no reason to doubt that EIG was aware that Petrobras had been implicated in the bribery scheme by November 2014.  (Keppel Opp'n Exh. 54, Thomas Tr. 138:22-25.)

701.    In December 2014, it was reported that Brazilian prosecutors "filed charges against 36 suspects in a corruption investigation alleging construction companies bribed public officials and overbilled [Petrobras] for contracts."  (Keppel Opp'n Exh. 6, 39.)

702.    The charges announced in December 2014 included charges against entities involved in Sete, including employees of Petrobras and the part-owners of the EAS Shipyard.  (Keppel Opp'n Exh. 6.)

703.    As Operation Car Wash revealed, dozens of individuals and entities in Brazil, including the President and almost every other construction firm in Brazil were alleged to have had knowledge of the bribery scheme.  (Keppel Opp'n Exh. 6.)

704.    There is no evidence that Keppel knew what EIG did or did not know about the bribery scheme.

CONTAINS CONFIDENTIAL INFORMATION

**P.      EIG Continued to Invest in and Work with Sete After the Bribery Scheme Had Been Disclosed.**

705.     EIG wired approximately $15 million to Sete on December 8, 2014 and approximately $43 million on January 6, 2015.  (Keppel Opp'n Exh. 112, EIG_KEP_00147165; Keppel Opp'n Exh. 117, EIG_KEP_00249977.)

706.     EIG witnesses testified that despite the unfolding scandal it had not occurred to them to cut ties with Sete and Petrobras.  (Keppel Opp'n Exh. 45, Corrigan Tr. 195:17-21; Keppel Opp'n Exh. 54, Thomas Tr. 139:7-12.)

707.     EIG continued to approve Sete's capital calls until 2018.  (Keppel Opp'n Exh. 54, Thomas Tr. 145:7-13.)

708.     On February 16, 2015, days after Mr. Barusco's plea agreement was released, EIG stated that its "expectation [was] that all 29 rigs will be delivered and used in the pre-salt program as the pre-salt programs are still economic, just not the huge cash cows there were at $100 oil."  (Keppel Opp'n Exh. 108, EIG_KEP_00134490-493 at 491.)

709.     In a February 2015 presentation, after Mr. Barusco's plea agreement was released, EIG stated that "Brazil Inc., meaning Petrobras, key pension plans and financial institutions and shipyards that currently employ 180,000 Brazilians" would protect Sete even though EIG recognized that "few parties in Brazil seem to have clean hands."  (Keppel Opp'n Exh. 108, EIG_KEP_00134490-498 at 498.)

710.     In the same February 2015 presentation, after Mr. Barusco's plea agreement was released, EIG further explained that "it seems reasonable to assume that some form of political solution will be reached that frees Sete to complete it's [sic] mission."  (Keppel Opp'n Exh. 108, EIG_KEP_00134490-498 at 498.)

CONTAINS CONFIDENTIAL INFORMATION

711.    In the February 2015 presentation, after Mr. Barusco's plea agreement was released, EIG also maintained that "[t]he fundamental reason for the creation of Sete … is as strong today as the day that Sete was formed."  (Keppel Opp'n Exh. 108, EIG_KEP_00134490-498 at 498.)

712.    In April 2015, EIG continued to express its "belie[f] that Brazil Inc. is likely to provide a solution" for Sete.  (Keppel Opp'n Exh. 132, EIG_KEP_00280676 at 676.)

713.    By July 2015, Sete was working to secure financing from Banco do Brasil and Caixa, which were "fully engaged" in negotiations to restructure Sete, according to EIG.  (Keppel Opp'n Exh. 130, EIG_KEP_00262889-891 at 890.)

714.    In a July 27, 2015 presentation, EIG expressed its willingness to invest additional funds into a restructured version of Sete.  (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 865.)

715.    As part of the July 2015 restructuring plan, EIG and Sete's other shareholders proposed that they contribute additional equity in order to avoid dilution.  (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 865.)

716.    The July 2015 restructuring plan also proposed that Sete continue to rely on the BrasFELS Shipyard for six drillships.  (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 862, 871.)

717.    In the meantime, Sete was engaged in a "road show" for new potential investors in Asia.  (Keppel Opp'n Exh. 130, EIG_KEP_00262889-891 at 890.)

718.    EIG explained, as of late July 2015, that "restructuring discussions were still actively proceeding" and EIG's "hope at this point in time was to restructure Sete."  (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 865.)

CONTAINS CONFIDENTIAL INFORMATION

**Q.     Anti-Corruption Letters**

719.    Fernvale, a Keppel subsidiary, signed anti-corruption letters addressed to Urca Drilling B.V. and Frade Drilling B.V. on January 16, 2015.  (Ex 147, KEPPEL00635162-168 at 162, 164-65, 167-68.)

720.    There is no evidence that EIG ever received (or was ever aware of) the anti-corruption declarations from Fernvale.

**R.     BNDES Continued to Negotiate with Sete for Months after February 2015.**

721.    BNDES continued to engage in negotiations with Sete for months after February 2015.  (Keppel Opp'n Exh. 125, Keppel Opp'n Exh. 5.)

722.    During the restructuring negotiations in 2015 and 2016, Sete pursued long-term financing from Banco do Brasil, Caixa, and the China Development Bank, among others. (Keppel Opp'n Exh. 109, EIG_KEP_00134861-871 at 871.)

**S.     Sete Declared Bankruptcy in April 2016.**

723.    After Sete became insolvent, EIG continued to believe that Petrobras and the Brazilian government—which EIG referred to internally as "Brazil Inc."—would find a "political solution" to save Sete.  (Keppel Opp'n Exh. 153, EIG_KEP_00134494-498 at 498.)

724.    In 2014, when the price of oil exceeded $100 per barrel, drillships reportedly could be rented for as much as $680,000 a day.  (Keppel Opp'n Exh. 21, Allison McNeely, "Mass Offshore Oil-Servicer Busts Imperil $30 Billion of Debt," Bloomberg.com, August 19, 2020; Keppel Opp'n Exh. 22, David Wethe, "Mothballing the World's Fanciest Oil Rigs Is a Massive Gamble," Bloomberg.com, September 20, 2016.)

725.    In 2012, Sete's drillships were expected to be rented to Petrobras at over $500,000 per day.  (Keppel Opp'n Exh. 38, "The Sete Brasil Surprise?" Credit Suisse Equity Research, February 13, 2012.)

CONTAINS CONFIDENTIAL INFORMATION

726.    By January 2015,  day rates had fallen "well below the rate level at the Sete contracts."  (Keppel Opp'n Exh. 129, EIG_KEP_00262886-747 at 746.)

727.    By January 19, 2015, analysts reported that it no longer made economic sense for Petrobras to participate in Sete's restructuring, because Petrobras could "charter rigs directly in the market themselves and benefit directly from low rates" rather than using drillships at "original SETE day-rates."  (Keppel Opp'n Exh. 129, EIG_KEP_00262886-888 at 887.)

728.    It was reported on April 22, 2016 that "[s]hareholders in Sete Brasil voted  . . . to allow the ailing rig lessor to seek bankruptcy protection after efforts to secure a long-term contract with state-controlled oil producer Petrobras failed."  (Keppel Opp'n Exh. 37, Oil Daily, "Shareholders Approve Sete Brasil Bankruptcy", April 22, 2016.)

729.    It was also reported on April 22, 2016 that "[t]he fate of Sete Brasil . . . hinged on Petrobras' willingness to sign a long-term rent contract."  (Keppel Opp'n Exh. 37, "Shareholders Approve Sete Brasil Bankruptcy", Oil Daily, April 22, 2016.)

730.    Seadrill Limited was "primarily engaged in offshore contract drilling for the oil and gas industry in benign and harsh environments worldwide, including ultra-deepwater environments".  (Keppel Opp'n Exh. 34, Seadrill Ltd. Form 10-K, December 31, 2011 at 2.)

731.    Seadrill Limited filed for bankruptcy on September 12, 2017 and then again on February 7, 2021.  (Keppel Opp'n Exh. 36, Seadrill Ltd. Form 6-K, September 2017 at 2; Keppel Opp'n Exh. 32, "Seadrill files for Chapter 11 bankruptcy," Reuters, September 12, 2017; Keppel Opp'n Exh. 35 Seadrill Ltd. Form 6-K, February 2021; Keppel Opp'n Exh. 33, "Seadrill Limited: Seadrill Limited (SDRL): Asia Offshore Drilling Chapter 11 Filings," Dow Jones Institutional News, February 7, 2021.)

732.    Noble Corporation was "a leading offshore drilling contractor for the oil and gas industry".  (Keppel Opp'n Exh. 23, Noble Corporation plc Form 10-K, December 31, 2011 at 2.)

CONTAINS CONFIDENTIAL INFORMATION

733.    Noble Corporation filed for bankruptcy on July 31, 2020.  (Keppel Opp'n Exh. 24, Noble Corporation plc Form 8-K, July 2020 at 2; Keppel Opp'n Exh. 26, "Offshore-Rig Operator Noble Files for Bankruptcy; Struggling offshore oil-and-gas driller files for chapter 11 after striking a $3.4 billion debt-for-equity swap with bondholders," The Wall Street Journal, July 31, 2020.)

734.    Diamond Offshore Drilling, Inc. was "a leading, global offshore oil and gas drilling contractor".  (Keppel Opp'n Exh. 8, Diamond Offshore Drilling Ltd. Form 10-K, December 31, 2011 at 3.)

735.    Diamond Offshore Drilling, Inc. filed for bankruptcy on April 26, 2020.  (Keppel Opp'n Exh. 7, Diamond Offshore Drilling Inc. Form 8-K, April 2020 at 2; Keppel Opp'n Exh. 9, "Diamond Offshore files for bankruptcy, citing 'price war,' coronavirus," Reuters, April 27, 2020.)

736.    Ensco was "one of the leading providers of offshore contract drilling services to the international oil and gas industry".  (Keppel Opp'n Exh. 10 Ensco plc Form 10-K, December 31, 2011 at p. 4.)

737.    Rowan Companies Ltd. was "major provider of international and domestic offshore contract drilling services". (Keppel Opp'n Exh. 31, Rowan Companies Form 10-K, December 31, 2011 at p. 3)

738.    Atwood Oceanics, Inc. was "an international offshore drilling contractor engaged in the drilling and completion of exploratory and developmental oil and gas wells". (Keppel Opp'n Exh. 4, Atwood Oceanics Form 10-K, December 31, 2011 at p. 3)

739.    Atwood Oceanics, Ensco and Rowan all merged and the company's name was changed to Valaris plc, which filed for bankruptcy on August 18, 2020.  (Keppel Opp'n Exh. 41,

CONTAINS CONFIDENTIAL INFORMATION

Valaris plc Form 8-K, August 2020 at 2; Keppel Opp'n Exh. 40, "Valaris Declares Chapter 11 Bankruptcy, In Restructuring Agreement," Dow Jones Institutional News, August 19, 2020.)

740.     Seadrill Limited, Noble Corporation, Diamond Offshore Drilling, Ensco, Rowan Companies Ltd. and Atwood Oceanics, Inc. did not have corruption-related issues.

741.     On November 1, 2019, Sete's equity was sold for the "total symbolic amount of R$1.00 (one real)".  (Keppel Opp'n Exh. 98, EIG_KEP_00176682 at 2.)

**T.     The Deferred Prosecution Agreement.**

742.     The Deferred Prosecution Agreement does not mention EIG or any of Sete's other investors.  (Keppel Opp'n Exh. 152, DPA.)