UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EIG Energy Fund XIV, L.P.,
EIG Energy Fund XIV-A, L.P.,
EIG Energy Fund XIV-B, L.P.,
EIG Energy Fund XIV (Cayman), L.P.,
EIG Energy Fund XV, L.P.,
EIG Energy Fund XV-A, L.P.,
EIG Energy Fund XV-B, L.P., and
EIG Energy Fund XV (Cayman), L.P.

                              Plaintiffs,

          -against-

Keppel Offshore & Marine Ltd.,

                              Defendant.

No. 18-CV-01047 (PGG)

ORAL ARGUMENT
REQUESTED

UNREDACTED VERSION

**DEFENDANT KEPPEL'S REPLY 56.1 STATEMENT IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT AND RESPONSE
TO EIG'S STATEMENT OF ADDITIONAL FACTS**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant Keppel Offshore &
Marine Ltd.*

November 2, 2021

CONTAINS CONFIDENTIAL INFORMATION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CITATION AND ABBREVIATION CONVENTIONS..................................................................ii

KEPPEL'S RULE 56.1 REPLY ........................................................................................................1

A.     EIG and Keppel..............................................................................................................1

B.     Creation of Sete.............................................................................................................3

C.     EIG's Experience in Brazil. ..........................................................................................5

D.     EIG's Pursuit of the Sete Investment Opportunity. ......................................................7

E.     Alleged Misrepresentations in the Complaint...............................................................9

F.     EIG's Decision to Invest in Sete in June 2011. ..........................................................20

G.     EIG's First Visit to the BrasFELS Shipyard in August 2011. ....................................26

H.     EIG's Decision to Increase Its Equity Commitment in September 2011. ....................35

I.     Keppel's First Contract from Sete in December 2011..................................................37

J.     EIG's Second Visit to the BrasFELS Shipyard in March 2012....................................37

K.     Keppel's Five Additional Contracts from Sete in August 2012. .................................42

L.     EIG's Disbursement of Funds in August 2012. ..........................................................44

M.     Financial and Operational Documents Concerning Sete. ............................................45

N.     News Reports Concerning Sete. ..................................................................................49

O.     EIG's Third Visit to the BrasFELS Shipyard in June 2013.........................................53

P.     Operation Car Wash.....................................................................................................56

Q.     Keppel's Deferred Prosecution Agreement. ...............................................................57

KEPPEL'S RESPONSE TO EIG'S STATEMENT OF ADDITIONAL FACTS........................64

I.     The DPA/Charges Against Keppel ..............................................................................64

II.     The Consulting Agreements ........................................................................................65

III.     The January 2011 Petrobras Presentation ...................................................................65

IV.     EIG's Visits to the Keppel Shipyard...........................................................................67

V.     The Drilling Presentation and Management Presentation ...........................................68

VI.     Keppel's Knowledge That Sete Would Raise Additional Capital ...............................69

VII.     The EPC Contracts.......................................................................................................70

VIII.     Keppel's Contracts with Petrobras and Sete ...............................................................71

CONTAINS CONFIDENTIAL INFORMATION

## CITATION AND ABBREVIATION CONVENTIONS

**Exhibits Submitted in Connection with Keppel's Motion for Summary Judgment**

- "Ex.":  Keppel's exhibits served in connection with its Motion for Summary Judgment on September 20, 2021, which are identified in Keppel's September 20 Appendix.

- "EIG Exh.":  Exhibits served with EIG's Motion for Summary Judgment on September 20, 2021 or EIG's Opposition to Keppel's Motion for Summary Judgment on October 19, 2021.

**Exhibits Submitted in Connection with EIG's Motion for Summary Judgment**

- "EIG Exh.":  Exhibits served with EIG's Motion for Summary Judgment on September 20, 2021 or EIG's Opposition to Keppel's Motion for Summary Judgment on October 19, 2021.

- "Keppel Opp'n Exh.":  Keppel's exhibits served in opposition to EIG's Motion for Summary Judgment on October 19, 2021, which are identified in Keppel's October 19 Appendix.

**Briefs Submitted in Connection with Keppel's Motion for Summary Judgment**

- "Keppel Br.":  Memorandum of Law in Support of Defendant Keppel Offshore & Marine Ltd.'s  Motion for Summary Judgment, served on September 20, 2021.

- "EIG Opp'n Br.":  Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, served on October 19, 2021.

- "Keppel Reply Br.":  Reply Memorandum of Law in Further Support of Defendant Keppel Offshore & Marine Ltd.'s Motion for Summary Judgment, served on November 2, 2021.

**Briefs Submitted in Connection with EIG's Motion for Summary Judgment**

- "EIG Br.":  Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment, served on September 20, 2021.

- "Keppel Opp'n Br.":  Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, served on October 19, 2021.

**Parties**

- "EIG":  EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P., and EIG Energy Fund XV (Cayman), L.P., the plaintiffs in this action, together with EIG Management Company, LLC and EIG Global Energy Partners.

CONTAINS CONFIDENTIAL INFORMATION

- "Keppel":  Keppel Offshore & Marine Ltd., the defendant in this action.

**Other Relevant Entities**

- "ADICO":  Abu Dhabi Investment Council.

- "Barrington":  Barrington Media, Inc.

- "BrasFELS Shipyard":  Estaleiro BrasFELS Ltda.

- "CIC":  China Investment Corporation.

- "EAS Shipyard":  Estaleiro Atlantico Sul.

- "Fernvale":  Fernvale Pte. Ltd.

- "FIP Sondas":  Fundo de Investimento em Participações Sondas.

- "João Ferraz":  João Carlos de Medeiros Ferraz.

- "Lakeshore":  Lakeshore Financial Partners Participações Ltda.

- "Keppel Corp.":  Keppel Corporation Limited.

- "Santander":  Banco Santander S.A.

- "Sete":  Sete Brasil Participações, S.A.

**Pleadings**

- "Complaint":  EIG's First Amended Complaint against Defendant, filed April 30, 2018 (Dkt. 17.)  (Ex. 1.)

**Deferred Prosecution Agreement**

- "DPA":  Deferred Prosecution Agreement dated December 22, 2017, <u>United States of America v. Keppel Offshore & Marine Ltd.</u>, Case No. 17-cr-697 in the United States District Court for the Eastern District of New York (Dkt. 24-1).  (Ex. 3.)

CONTAINS CONFIDENTIAL INFORMATION

**Discovery Responses Served in This Action**

- "EIG Response to RFA":  Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission, dated June 4, 2021.  (Ex. 4.)

- "Keppel Response to RFA":  Responses and Objections of Defendant Keppel Offshore & Marine Ltd. to Plaintiff's First Set of Requests for Admission, dated June 4, 2021.  (Ex. 5.)

**Deposition Exhibits**

- "DX":  Deposition exhibits introduced by Keppel in this action, numbered continuously across all depositions conducted by Keppel.

- "PX":  Deposition exhibits introduced by EIG in this action, numbered continuously across all depositions conducted by EIG.

**Litigations**

- "Action":  The present matter captioned <u>EIG Energy Fund XIV, L.P. et al v. Keppel Offshore & Marine Ltd.</u>, Case No. 1:18-cv-01047 (PGG) in the United States District Court for the Southern District of New York.

- "Petrobras Action":  The matter captioned <u>EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.</u>, Case No. 1:16-cv-333 (APM) in the United States District Court for the District of Columbia.

**Depositions Taken in this Action**

- "Chow Tr.":  Transcript of June 24, 2021 Deposition of Jeffrey Chow.  (Ex. 9.)

- "Corrigan Tr.":  Transcript of July 20, 2021 Deposition of Kevin Corrigan and Rule 30(b)(6) Deposition of EIG.  (Ex. 10.)

- "Hayden Tr.":  Transcript of May 27, 2021 Deposition of Simon Hayden.  (Ex. 11.)

- "Merchant Tr.": Transcript of July 2, 2021 Deposition of Aziz Merchant. (Keppel Opp'n Exh. 49.)

- "Patel Tr.":  Transcript of May 14, 2021 Deposition of Hoshrav Patel.  (Ex. 12.)

- "Tan I. Tr.":  Transcript of July 15, 2021 Deposition of Leong Peng Tan and Rule 30(b)(6) Deposition of Keppel.  (Ex. 13.)

- "Tan II. Tr.":  Transcript of July 16, 2021 Deposition of Leong Peng Tan and Rule 30(b)(6) Deposition of Keppel.  (Ex. 14.)

CONTAINS CONFIDENTIAL INFORMATION

- "Thomas Tr.":  Transcript of July 30, 2021 Deposition of Blair Thomas and Rule 30(b)(6) Deposition of EIG.  (Ex. 15.)

**Depositions Taken in the Petrobras Action**

- "Corrigan D.C. Tr.":  Transcript of October 16, 2020 Deposition of Kevin Corrigan and Rule 30(b)(6) Deposition of EIG.  (Ex. 16.)

- "Hayden D.C. Tr.":  Transcript of October 29, 2020 Deposition of Simon Hayden.  (Ex. 17.)

- "Thomas D.C. Tr.":  Transcript of December 16, 2020 Deposition of Blair Thomas and Rule 30(b)(6) Deposition of EIG.  (Ex. 18.)

**Documents Produced in the Action**

- "Drilling Presentation":  A document entitled, "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation", dated September 2011.  (Ex. 53.)

- "EPC Contract":  Agreements entitled, "Engineering, Procurement and Construction Contract".  (Exs. 37, 38, 39, 40, 41, 43.)

- "June 2011 Investment Recommendation":  A document entitled "Energy Fund XIV Investment Recommendation Sete Brasil Participações S.A. R$250,000 Common Equity", dated June 27, 2011.  (Ex. 19.)

- "Private Placement Memo":  A document entitled "Private Placement Confidential Information Memorandum", dated September 2011.  (Ex. 21.)

- "September 2011 Investment Recommendation":  A document entitled "Energy Fund XV Investment Recommendation Sete Brasil Participações S.A. R$250,000 Common Equity", dated September 16, 2011.  (Ex. 23.)

- "White Paper":  A document entitled "Brazil's Energy and Infrastructure Landscape – A White Paper", dated April 2014.  (Ex. 25.)

CONTAINS CONFIDENTIAL INFORMATION

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York and Your Honor's Individual Practice Rules, Defendant Keppel Offshore & Marine Ltd. ("Keppel") respectfully submits this Reply Rule 56.1 Statement and Response to EIG's Statement of Additional Facts in further support of Keppel's motion for summary judgment.[1]  EIG has failed to raise a genuine dispute of material fact relating to Keppel's motion for summary judgment.  To the extent any of EIG's additional factual assertions are disputed, such disputes are irrelevant to Keppel's motion.

## KEPPEL'S RULE 56.1 REPLY

On September 20, 2021, Keppel served its Rule 56.1 statement in support of its motion for summary judgment.  On October 19, 2021, EIG served its responsive Rule 56.1 statement in opposition to Keppel's motion.  For convenience, Keppel sets forth below the comprehensive universe of Keppel's Statement of Facts, EIG's Responses and Keppel's Replies.  (See infra ¶¶ 1-198.)

**A.    EIG and Keppel.**

1.       EIG is a "global alternative asset manager investing in the energy sector", based in Washington, D.C.  (Ex. 62, EIG_KEP_00289876 at 882.)

**EIG's Response:  Admitted.**

**Keppel's Reply:  No dispute.**

2.       Keppel is a company based in Singapore that specializes in offshore rig design, construction and shipbuilding.  (Ex. 3, DPA at A-1, ¶ 2.)[2]

---

[1] Nothing herein is intended, nor shall it be interpreted, to contradict the acceptance of responsibility by Keppel set forth in the Deferred Prosecution Agreement ("DPA") that Keppel entered into with the U.S. Department of Justice, dated December 22, 2017.

[2] Keppel's motion for summary judgment does not rely on the legal distinctions between Keppel and its affiliates; therefore, Keppel's motion and this reply do not distinguish between

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

3.      The BrasFELS Shipyard is a subsidiary of Keppel located in the Angra dos Reis region of Brazil.  (Ex. 75, KEPPEL00444138-140 at 139.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

4.      There is no evidence EIG and Keppel discussed corruption or bribery in connection with Sete.

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

5.      There is no evidence Keppel provided inaccurate information to EIG in connection with Sete.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 5, there is no genuine dispute of material fact that Keppel provided inaccurate or misleading information to EIG (i) on tours and presentations at the BrasFELS Shipyard that did not disclose the existence of the bribery scheme (*see infra* ¶¶ 94, 134, 176); (ii) by executing EPC contracts with Sete, drafts of which EIG reviewed, that contained false representations regarding compliance with applicable laws and good industry practices (EIG SOF ¶¶ 149-52, 340; Ex. 37 at KEPPEL00610507-08; Ex. 38 at KEPPEL00610413-14; Ex. 39 at KEPPEL00610695-96; Ex. 40 at KEPPEL00555589-90; Ex. 41 at KEPPEL00555304-05; Ex. 43 at KEPPEL00490726-27); and (iii) making statements

---

employees of Keppel and employees of Keppel's affiliated entities.  Keppel addresses the legal significance of the entity distinctions in its opposition brief to EIG's motion for summary judgment.  (Keppel Opp'n Br. at 28-35.)

for Sete's lenders and to the public and Keppel's customers denying that it paid bribes and/or kickbacks in connection with the Sete EPC contracts (EIG SOF ¶¶ 272, 275-76, 282-89).

**Keppel's Reply:  No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 5.  None of the cited evidence refers to inaccurate or misleading information provided to EIG.

First, EIG's assertions related to the yard visits are based on EIG's false claim that Keppel had a duty to disclose the bribery scheme to EIG, which it did not.  (Keppel Reply Br. 5-6.)

Second, EIG has admitted that it was not a party to the EPC contracts and did not rely on the EPC contracts.  (See infra ¶ 121; see also EIG Opp'n Br. 42.)  There is no evidence EIG reviewed Keppel's EPC contracts and the "drafts" that EIG references were not drafts of Keppel's EPC contracts.  (EIG Exh. 115 at 208; EIG Exh. 116 ; see also EIG Br. 10-11)

Third, there is no dispute that the anti-corruption declarations were addressed to Sete and its lenders, not EIG.  (EIG Exh. 85 at KEPPEL00635164, KEPPEL00635167.)  There is no allegation (let alone evidence) that EIG ever received, or was ever aware of, the declarations. The letters are irrelevant for the additional reason that they were issued after EIG's final investment in Sete on January 5, 2015.  (EIG Exh. 85 at KEPPEL00635164, KEPPEL00635167.) The first public statement by Keppel relating to Operation Car Wash was made to the public, not to EIG.  (EIG Exh. 93.)  The statement is irrelevant for the additional reason that it was released on February 9, 2015, after EIG made its final investment in Sete.  (EIG Exh. 93.)

**B.    Creation of Sete.**

6.    Petrobras is an oil company controlled by the Brazilian government. (Ex. 3, DPA at A-1 to A-2, ¶ 4.)

**EIG's Response:**  Admitted.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply:  No dispute.**

7.      Sete was a "partnership established by Petrobras, private investors and public pension funds to build ultra-deepwater drillships and charter them under long term contract to Petrobras." (Ex. 19, DX039 at 792.)

**EIG's Response:**  Admitted that Keppel Statement No. 7 accurately describes one purpose for the creation of Sete.  EIG clarifies that Sete also was formed by Petrobras as an extension of a longstanding bribery scheme at Petrobras.  *See infra* ¶¶ 48, 182-83.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 7. EIG's additional commentary does not controvert the assertion in Paragraph 7 and is non-responsive.

8.      Sete was created to finance the construction of 28 drillships for charter to Petrobras to extract oil from the pre-salt reserves off Brazil's coast. (Ex. 21, DX062 at 012.)

**EIG's Response:**  Admitted that Keppel Statement No. 8 accurately describes one purpose for the creation of Sete.  EIG clarifies that Sete also was formed by Petrobras as an extension of a longstanding bribery scheme at Petrobras.  *See infra* ¶¶ 48, 182-83.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 8. EIG's additional commentary does not controvert the assertion in Paragraph 8 and is non-responsive.

9.      Sete "was incorporated in December 2010." (Ex. 21, DX062 at 030.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute**.

10.      Prior to Sete's incorporation in December 2010, the project was described by Petrobras as "The Drilling Rigs Project". (Ex. 53, EIG_KEP_00075177-213 at 178.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

11.     Petrobras installed former Petrobras employees as "Sete's most senior executives", including João Ferraz as Sete's CEO. (Ex. 1, Compl. ¶ 10.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

12.     There is no evidence Keppel was involved in the creation of Sete.

**EIG's Response:**  Admitted that there is no evidence that Keppel was involved in the decision or process by Petrobras to create Sete, and otherwise denied.  Contrary to Keppel Statement No. 12, there is no genuine dispute of material fact that Keppel was involved in the bribery scheme that Sete was a continuation of, and Keppel was contemporaneously aware of Sete's creation by Petrobras.  *See infra* ¶¶ 181-86; EIG SOF ¶ 48; EIG Exh. 4 at KEPPEL00619705-06.

**Keppel's Reply:**  **No genuine dispute.**  EIG has admitted the assertion in Paragraph 12. EIG's additional commentary does not controvert the assertion in Paragraph 12 and is non-responsive.

**C.     EIG's Experience in Brazil.**

13.     EIG "was a sophisticated institutional investor when it made its investments in Sete". (Ex. 4, EIG Response to RFA 55.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

14.     EIG began investing in Brazil on or around 2000. (Ex. 25, DX083 at 523.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

CONTAINS CONFIDENTIAL INFORMATION

15.      Kevin Corrigan was a Senior Vice President at EIG and "the lead member of EIG's team in connection with the Sete investment". (Ex. 10, Corrigan Tr. 57:02-05.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

16.      Kevin Corrigan opened EIG's office in Rio de Janeiro in 2012. (Ex. 16, Corrigan D.C. Tr. 17:08-13.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

17.      EIG's 2014 White Paper describes "recurrent concerns about transparency and corruption" in Brazil. (Ex. 25, DX083 at 524.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 17, there is no genuine dispute of material fact that, although the phrase "recurrent concerns about transparency and corruption" appears in EIG's 2014 White Paper, the White Paper *does not* "describe[]" any such "concerns."  Ex. 25 at EIG_KEP_00258524.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the point of the assertion in Paragraph 17—i.e., that EIG's 2014 White Paper acknowledges "recurrent concerns about transparency and corruption" in Brazil.  (Ex. 25, DX083 at 524.)

18.      EIG's CEO Blair Thomas testified that "to be precise, if the question is did I know that Brazilian construction firms had a checkered history on corruption, the answer is yes." (Ex. 15, Thomas Tr. 73:14-17.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

CONTAINS CONFIDENTIAL INFORMATION

19.     In June 2011, during its due diligence of Sete, EIG discovered bribery and corruption charges against the part-owner of the EAS Shipyard. (Ex. 61, EIG_KEP_00258104 at 105; Ex. 16, Corrigan D.C. Tr. 204:19-217:16; Ex. 10, Corrigan Tr. 51:07-23.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 19, there is no genuine dispute of material fact that EIG discovered prior corruption charges from 2009 against then-employees of Camargo Correa, a noncontrolling shareholder of the EAS Shipyard, but the corruption charges against the then-employees of Camargo Correa *were not* related in any way to the EAS Shipyard, and were not against Camargo Correa itself.  Ex. 61 at EIG_KEP_00258104-05.

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the point of the assertion in Paragraph 19—i.e., that "EIG discovered prior corruption charges from 2009 against then-employees of Camargo Correa, a noncontrolling shareholder of the EAS Shipyard".  EIG does not provide any evidence to dispute that the corruption charges related to bribery, which were "the same or similar to the conduct involved in Operation Lava Jato" .  (Ex. 16, Corrigan D.C. Tr. 215:08-216:01.)  EIG's additional commentary does not controvert the assertion in Paragraph 19 and is non-responsive.

**D.     EIG's Pursuit of the Sete Investment Opportunity.**

20.     EIG first learned about the Sete investment opportunity in September of 2010 when Kevin Corrigan attended a meeting at Banco Santander with his former colleague. (Ex. 10, Corrigan Tr. 57:13-58:16.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

CONTAINS CONFIDENTIAL INFORMATION

21.     After Kevin Corrigan's meeting at Banco Santander in September 2010, Mr.

Corrigan "spoke to a friend" at the French Bank, Société Générale, about the Sete investment

opportunity. (Ex. 10, Corrigan Tr. 58:17-59:08.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  No dispute.

22.     On September 30, 2010, Kevin Corrigan sent João Ferraz at Petrobras an email

introducing himself and requesting a meeting during his trip to Rio de Janeiro, Brazil. (Ex. 59,

EIG_KEP_00257850-852 at 852.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  No dispute.

23.     Kevin Corrigan traveled to Brazil to meet with João Ferraz on or around October

19, 2010 "to learn more about Sondas and see if EIG could participate." (Ex. 16, Corrigan D.C.

Tr. 80:10-81:15.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  No dispute.

24.     "Sondas" refers to FIP Sondas, the Brazilian investment fund through which EIG

and other equity investors made their investments in Sete. (Ex. 21, DX062 at 056-57.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  No dispute.

25.     There is no evidence anyone at Keppel was involved in or aware of any of EIG's

discussions in 2010 concerning the Drilling Rigs Project, Sete or FIP Sondas.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  No dispute.

CONTAINS CONFIDENTIAL INFORMATION

**E.      Alleged Misrepresentations in the Complaint.**

        i.      <u>September 2010 Drilling Presentation.</u>

        26.      The Drilling Presentation described in paragraph 55 of the Complaint is Exhibit

53. (Ex. 53, EIG_KEP_00075177-213; Ex. 1, Compl. ¶ 55.)

        **EIG's Response:**  Admitted.

        **Keppel's Reply:**  No dispute.

        27.      The Drilling Presentation described the Drilling Rigs Project that would later

become Sete. (Ex. 1, Compl. ¶ 56.)

        **EIG's Response:**  Admitted.

        **Keppel's Reply:**  No dispute.

        28.      On September 27, 2010, Kevin Corrigan received the Drilling Presentation from a

"friend" of his at Société Générale. (Ex. 53, EIG_KEP_00075177-213; Ex. 10, Corrigan Tr.

58:17-24.)

        **EIG's Response:**  Admitted.

        **Keppel's Reply:**  No dispute.

        29.      There is no evidence that Kevin Corrigan's "friend" at Société Générale was

acting as an agent of Petrobras when he sent the Drilling Presentation to EIG on September 27,

2010. (Ex. 10, Corrigan Tr. 58:17-25.)

        **EIG's Response:**  Admit that there is no *evidence* Société Générale was *acting as an

agent* of Petrobras when the Drilling Presentation was sent to Corrigan on September 27, 2010.

EIG clarifies that there *is evidence* that the Drilling Presentation was prepared by Petrobras.  The

last slide of the Drilling Presentation has the contact information for "João Carlos M. Ferraz,"

the "PETROBRAS – Finance&Treasury General Manager."  Ex. 53 at EIG_KEP_00075213.

- 9 -

CONTAINS CONFIDENTIAL INFORMATION

Additionally, the file name of the Drilling Presentation was "Joao Carlos Ferraz.pdf."  Ex. 53 at

EIG_KEP_00075177.

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the assertion in Paragraph 29.

EIG's additional commentary does not controvert the assertion in Paragraph 29 and is non-

responsive.

30.    There is no evidence that anyone at Keppel was involved in preparing or

disseminating the Drilling Presentation to any potential or actual investor.

**EIG's Response:**  Admitted that there is no evidence that Keppel was involved in

*preparing* the Drilling Presentation, and otherwise denied.  Contrary to Keppel Statement No.

30, there is no genuine dispute of material fact that Keppel *was involved in disseminating* the

Drilling Presentation to potential or actual investors.  Indeed, the Drilling Presentation was

disseminated among employees of Keppel entities who were potential investors in Sete or its

affiliates.  *See infra* ¶¶ 31-33; EIG SOF ¶¶ 73, 80-81, 161-62.

**Keppel's Reply:**  **No genuine dispute.**  EIG does not dispute the point of the assertion in

Paragraph 30—i.e., that Keppel was not involved in preparing the Drilling Presentation or in

disseminating the Drilling Presentation to any potential or actual investor in Sete.  EIG's

assertion that Keppel "was involved in disseminating" the Drilling Presentation is false and

unsupported by the cited evidence.

31.    On September 27, 2011, an independent member of Keppel Corp.'s Board of

Directors emailed the Drilling Presentation and another presentation unrelated to Sete to four

executives of Keppel entities. (Ex. 71, KEPPEL00040804-862 at 804.)

**EIG's Response:**  Whether Pan was an "independent" member of a Board of Directors is

improper as it calls for a legal conclusion.  Subject to this objection, denied, except admitted that

- 10 -

CONTAINS CONFIDENTIAL INFORMATION

Stephen Pan ("**Pan**") emailed the Drilling Presentation to senior Keppel executives and Chiau Beng Choo, the Chairman of its Board of Directors and Chief Executive Officer of its parent Keppel Corp. ("**Choo**").  Ex. 71 at KEPPEL00040804; EIG SOF ¶ 55.  Contrary to Keppel Statement No. 31, there is no genuine dispute of material fact that Pan was *not* a director of Keppel Corp., but rather a director of Keppel.  *See infra* EIG Additional Facts ¶ 501.

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the point of the assertion in Paragraph 31—i.e., that a member of the board of directors of a Keppel entity emailed the Drilling Presentation and another presentation unrelated to Sete to executives of Keppel entities. As EIG states, Pan was a director of Keppel.

32.     The Board member told the executives that he had obtained "some of the presentations given at" an offshore oil and gas industry forum in Rio de Janeiro, and asked whether anyone at Keppel had seen the presentations. (Ex. 71, KEPPEL00040804-862 at 805.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

33.     Keppel Corp.'s CEO responded that he had not seen the presentation and the Board member sent two presentations. (Ex. 71, KEPPEL00040804-862 at 805.)

**EIG's Response:**  Admitted.  EIG clarifies that, to the extent that Keppel Statement No. 33 implies that Pan only sent the presentation to Choo, the presentation went to others at Keppel. Specifically, (i) Pan told Choo he would "send on to KOM board" if Keppel had not received the presentation, (ii) Choo specifically instructed him to "[p]lease send," and (iii) Pan sent the presentation to Choo, Keppel Chief Executive Officer Tong, Keppel Managing Director YY Chow, and Keppel Chief Financial Officer Ngiam Jih Wong, and potentially the Keppel board per Choo's instructions.  Ex. 71 at KEPPEL00040804-05; EIG SOF ¶ 19.

- 11 -

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the assertion in Paragraph 33.

EIG's additional commentary does not controvert the assertion in Paragraph 33 and is non-

responsive.

34.     There is no evidence anyone responded to the Board member's September 27,

2011 email attaching the Drilling Presentation.

**EIG's Response**:  Admitted.

**Keppel's Reply**:  **No dispute.**

35.     The Drilling Presentation does not mention EIG. (Ex. 71, KEPPEL00040804-862

at 827-862.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

36.     There is no evidence anyone at Keppel opened or read the Drilling Presentation.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 36, there is no genuine

issue of material fact that Exhibit 71 is evidence that Keppel officers and directors read the

Drilling Presentation.  The Drilling Presentation was sent by Pan, a Keppel director, who must

have opened and read the presentation in order to know its contents.  *See infra* ¶¶ 31-33; Ex. 71

at KEPPEL00040805.  Pan asked Choo and Tong "if someone from KOM attended [the

presentations] and you have all the papers.  If not I will send on to KOM board."  Ex. 71 at

KEPPEL00040805.  Choo, emailing Pan and Tong and cc'ing YY Chow and Keppel's CFO,

wrote that he "ha[d] not seen them" and directed Pan to "[p]lease send."  Ex. 71 at

KEPPEL00040805.  That the Drilling Presentation was specifically requested by Choo from a

Keppel board member is evidence that he would have "opened or read" it upon receiving it.  And

this email correspondence is evidence suggesting that the Keppel executives reporting to Choo

CONTAINS CONFIDENTIAL INFORMATION

who were working on the Sete deal—Tong and YY Chow (EIG SOF ¶ 79)—would have also opened and read the presentation.

**Keppel Reply:  No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 36.  The cited evidence merely reflects that a Keppel director sent an email to executives of Keppel entities attaching the Drilling Presentation.  EIG has not cited any evidence showing that anyone read or opened the Drilling Presentation.  It is nevertheless immaterial whether it was opened or read, because what matters for purposes of Keppel's motion is that there is no evidence anyone at any Keppel entity knew the Drilling Presentation had ever been shared with EIG.  (See infra ¶ 42; see also Keppel Reply Br. 14.)

37.     There is no evidence anyone at Keppel commented on or discussed the Drilling Presentation.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 37, there is no genuine issue of material fact that Exhibit 71 is evidence that Keppel officers and directors commented on or discussed the Drilling Presentation.  Indeed, as discussed above, Choo and Pan were Keppel directors, and commented on and discussed the Drilling Presentation.  *See supra* ¶¶ 31, 36.

**Keppel's Reply:  No genuine dispute.**  EIG's cited evidence does not controvert the point of the assertion in Paragraph 36—i.e., that there is no evidence that anyone at Keppel commented on or discussed the substance of the Drilling Presentation.  The cited evidence does not reflect any discussion of the contents or substance of the Drilling Presentation.  The cited evidence reflects only communications regarding whether Stephen Pan would send the Drilling Presentation as an attachment to an email.

CONTAINS CONFIDENTIAL INFORMATION

38.     Slide 20 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 58 of the Complaint. (Ex. 71, KEPPEL00040804-862 at 847; Ex. 1, Compl. ¶ 58.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

39.     Slide 25 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 59 of the Complaint. (Ex. 71, KEPPEL00040804-862 at 852; Ex. 1, Compl. ¶ 59.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

40.     Slide 27 of the Drilling Presentation contains the alleged misrepresentation described in paragraph 60 of the Complaint. (Ex. 71, KEPPEL00040804-862 at 854; Ex. 1, Compl. ¶ 60.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

41.     There is no evidence anyone at Keppel detected the alleged misrepresentations on slides 20, 25 or 27 of the Drilling Presentation. (Ex. 71, KEPPEL00040804-862 at 847, 852 and 854.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 41, there is no genuine issue of material fact that Exhibit 71 is evidence that Keppel detected the alleged misrepresentations on slides 20, 25 and 27 of the Drilling Presentation.  Choo, Tong, and YY Chow each, on Choo's direction, received the Drilling Presentation.  *See supra* ¶¶ 33, 36.  Each

CONTAINS CONFIDENTIAL INFORMATION

of Choo, Tong, and YY Chow were aware of the bribery scheme at Petrobras (EIG SOF ¶¶ 67, 116), and that therefore the representations in the Drilling Presentation were false.

**Keppel's Reply**:  **No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 41.  The cited evidence shows only that Choo, Tong and YY Chow received the Drilling Presentation and were later implicated in a bribery scheme involving Petrobras.  EIG has not provided any evidence that any of the executives of Keppel entities who received the email with the Drilling Presentation attached read or reviewed the Drilling Presentation, or that the executives detected any of the alleged misrepresentations.  EIG's commentary is nevertheless immaterial because what matters for purposes of Keppel's motion is that there is no evidence that anyone at any Keppel entity knew the Drilling Presentation had ever been shared with EIG.  (See infra ¶ 42; see also Keppel Reply Br. 14.)

42.     There is no evidence anyone at Keppel knew the Drilling Presentation was shared with EIG.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 42, there is no genuine issue of material fact that Keppel knew that the Drilling Presentation, which contains a "Cautionary Statement for US investors," was directed at potential Sete investors, including U.S. investors.  Ex. 71 at KEPPEL00040828.  Keppel also knew that EIG was a U.S. investor and a potential investor in Sete.  EIG SOF ¶¶ 94, 96, 98-100, 102, 104-05, 109, 110-113.

**Keppel's Reply:**  **No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 42 and says nothing about whether Keppel knew that EIG had also received the Drilling Presentation.  EIG's additional commentary is non-responsive.  EIG's response reflects an effort to argue that the Cautionary Statement should have put Keppel on notice of the alleged fraud.  EIG's response also misrepresents the slide containing the

CONTAINS CONFIDENTIAL INFORMATION

"Cautionary Statement for US investors," which is a boilerplate statement that offers a clarification that the terminology and figures used in the presentation may not align with the terminology and figures used by Petrobras in its SEC filings.  (Ex 71 at 828; see also Keppel Br. 37-40.)  In other words, even if the intended audience of that Cautionary Statement were relevant to Keppel's motion (and it is not), it appears to be directed at investors anywhere in the world who may have reviewed Petrobras's SEC filings.

      ii.     October 2010 Pre-Salt Oil Rigs Project Document

43.     The "Pre-Salt Oil Rigs Project" document described in paragraph 61 of the Complaint is DX061. (Ex. 20, DX061; Ex. 1, Compl. ¶ 61.)

     **EIG's Response:**  Admitted.

     **Keppel's Reply**:  **No dispute.**

44.     There is no evidence that anyone at Keppel was involved in preparing or disseminating the Pre-Salt Oil Rigs Project document to any potential or actual investor.

     **EIG's Response:**  Admitted.

     **Keppel's Reply**:  **No dispute.**

45.     There is no evidence anyone at Keppel received the Pre-Salt Oil Rigs Project document.

     **EIG's Response:**  Admitted.

     **Keppel's Reply**:  **No dispute.**

46.     There is no evidence anyone at Keppel knew about the Pre-Salt Oil Rigs Project document.

     **EIG's Response:**  Admitted.

     **Keppel's Reply**:  **No dispute.**

CONTAINS CONFIDENTIAL INFORMATION

47.     There is no evidence anyone at Keppel knew the Pre-Salt Oil Rigs Project document was shared with EIG.

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

iii.     September 2011 Private Placement Memo

48.     The September 2011 Private Placement Memo described in paragraph 62 of the Complaint is DX062. (Ex. 21, DX062; Ex. 1, Compl. ¶ 62.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

49.     There is no evidence that anyone at Keppel was involved in preparing or disseminating the Private Placement Memo to any potential or actual investor.

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

50.     There is no evidence anyone at Keppel received the Private Placement Memo.

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

51.     There is no evidence anyone at Keppel knew about the Private Placement Memo.

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

52.     There is no evidence anyone at Keppel knew the Private Placement Memo was shared with EIG.

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

CONTAINS CONFIDENTIAL INFORMATION

    iv.    <u>October 2011 Email</u>

53.    The October 5, 2011 email described in paragraph 65 of the Complaint is DX063.

(Ex 49, DX063; Ex. 1, Compl. ¶ 65.)

    **<u>EIG's Response:</u>**  Admitted.

    **<u>Keppel's Reply</u>:**  No dispute.

54.    There is no evidence anyone at Keppel was involved in preparing or

disseminating the October 5, 2011 email.

    **<u>EIG's Response:</u>**  Admitted.

    **<u>Keppel's Reply</u>:**  No dispute.

55.    There is no evidence anyone at Keppel received the October 5, 2011 email.

    **<u>EIG's Response:</u>**  Admitted.

    **<u>Keppel's Reply</u>:**  No dispute.

56.    There is no evidence anyone at Keppel knew about the October 5, 2011 email.

    **<u>EIG's Response:</u>**  Admitted.

    **<u>Keppel's Reply</u>:**  No dispute.

57.    There is no evidence anyone at Keppel knew the October 5, 2011 email was

shared with EIG.

    **<u>EIG's Response:</u>**  Admitted.

    **<u>Keppel's Reply</u>:**  No dispute.

    v.    <u>December 2011 Email</u>

58.    The December 23, 2011 email described in paragraph 66 of the Complaint is

DX064. (Ex. 50, DX064; Ex. 1, Compl. ¶ 66.)

    **<u>EIG's Response:</u>**  Admitted.

    **<u>Keppel's Reply</u>:**  No dispute.

CONTAINS CONFIDENTIAL INFORMATION

59.     There is no evidence anyone at Keppel was involved in preparing or disseminating the December 23, 2011 email.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

60.     There is no evidence anyone at Keppel received the December 23, 2011 email.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

61.     There is no evidence anyone at Keppel knew about the December 23, 2011 email.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

62.     There is no evidence anyone at Keppel knew the December 23, 2011 email was shared with EIG.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

vi.     <u>August 2012 Email</u>

63.     The August 8, 2012 email described in paragraph 67 of the Complaint is Exhibit 51. (Ex. 51, EIG_KEP_00000128; Ex. 1, Compl. ¶ 67.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

64.     There is no evidence anyone at Keppel was involved in preparing or disseminating the August 8, 2012 email.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

65.     There is no evidence anyone at Keppel received the August 8, 2012 email.

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

66.     There is no evidence anyone at Keppel knew about the August 8, 2012 email.

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

67.     There is no evidence anyone at Keppel knew the August 8, 2012 email was shared with EIG.

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

vii.     2013 Meetings

68.     There is no evidence that anyone at Keppel was involved in or aware of the meeting described in paragraph 68 of the Complaint.

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

69.     There is no evidence that anyone at Keppel was involved in or aware of the conference described in paragraph 69 of the Complaint.

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

**F.     EIG's Decision to Invest in Sete in June 2011.**

70.     On June 3, 2011, Kevin Corrigan sent Luiz Reis, a Lakeshore representative, an email stating that "the decision to invest in Sete Brasil has been made internally". (Ex. 60, EIG_KEP_00257969-971 at 969.)

**EIG's Response:**  Admitted that Corrigan wrote in a June 3, 2011 email to Luiz Reis that "the decision to invest in Sete Brasil has been made internally."  Denied that EIG had decided to

CONTAINS CONFIDENTIAL INFORMATION

invest in Sete as of June 3, 2011.  EIG's investment committee had not approved any investment in Sete prior to June 27, 2011 (*see infra* ¶¶ 75-76), EIG had not entered into any binding contracts in connection with an investment in Sete until July 31, 2012 (EIG SOF ¶¶ 400-17), and EIG had not invested in Sete equity prior to August 3, 2012 (*see infra* ¶ 145).

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 70. EIG's additional commentary does not controvert the assertion in Paragraph 70 and is non-responsive.

71.    EIG's due diligence of Sete "culminated" in the preparation of the 43-page June 2011 Investment Recommendation. (Ex. 22, DX074; Ex. 10, Corrigan Tr. 69:25-70:05; Ex. 16, Corrigan D.C. Tr. 156:08-14; Ex. 18, Thomas D.C. Tr. 115:09-116:13.)

**EIG's Response:**  Admitted.  EIG clarifies that Corrigan was asked at his deposition whether the June 2011 Investment Recommendation to EIG's investment committee "sort of is the culmination of the due diligence process and a recommendation to make the investment." Ex. 10 at 69:25-70:5.  While Corrigan agreed, in fact, EIG continued its due diligence of Sete at least until its first investment was funded in August 2012.  EIG SOF ¶¶ 170, 172, 385, 419.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 71. EIG's additional commentary does not controvert the assertion in Paragraph 71 and is non-responsive.  Testimony from EIG's CEO, Blair Thomas, further confirms that the investment recommendation was the culmination of the due diligence process.  Thomas testified that EIG's "ultimate decision" to make its investments "rests with" its investment committee and that the Investment Recommendation is the document that contains the factors EIG considered when making its decision to invest in Sete.  (Ex. 18, Thomas D.C. Tr. 116:19-117:14.)

72.     On June 27, 2011, EIG's Kevin Corrigan and Simon Hayden presented the June 2011 Investment Recommendation to EIG's investment committee. (Ex. 22, DX074 at 322.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

73.     The June 2011 Investment Recommendation included a total of five bullet points concerning any Keppel entity in its Appendix describing "potential" shipyards. (Ex. 19, DX039 at 831.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

74.     Kevin Corrigan testified that the five bullets on BrasFELS were the "sum total of information that was presented to the investment committee regarding Brasfels". (Ex. 10, Corrigan Tr. 77:09-25.)

**EIG's Response:**  Admitted that Corrigan testified that the five bullets on BrasFELS were the "sum total of information … regarding Brasfels" in the Sete investment recommendation provided to EIG's investment committee for the June 27, 2011 meeting.

**Keppel's Reply:  No dispute.**  EIG has admitted the assertion in Paragraph 74.

75.     On June 27, 2011, EIG's investment committee approved an investment in Sete of up to 250 million Brazilian Reals ("BRL").  (Ex. 22, DX074 at 322.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

76.     The decision to invest in Sete was made by EIG's investment committee. (Thomas D.C. Tr. 117:11-14.)

**EIG's Response:**  Admitted.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply:  No dispute.**

77.     As of June 27, 2011, the EAS Shipyard was the only shipyard that had signed a shipbuilding contract with Sete. (Ex. 19, DX039 at 802.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

78.     It was publicly reported by February 2011 that the EAS Shipyard had obtained the first seven drillship contracts from Sete. (Ex. 42, PX062 at 007.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

79.     Blair Thomas, EIG's CEO, testified that at the time of the June 27, 2011 investment committee meeting, he did not know whether Keppel would ever get a shipbuilding contract from Sete. (Ex. 15, Thomas Tr. 96:22-25.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

80.     Kevin Corrigan testified that at the time of the June 27, 2011 investment committee meeting, he did not know exactly which shipbuilders would ultimately end up building ships for Sete. (Ex. 10, Corrigan Tr. 74:11-75:09.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 80, there is no genuine dispute of material fact that Corrigan testified that EIG "had a list of the shipyards that had been identified," and "had studied the six shipyards to get comfortable with their ability to produce future contracts granted to them."  Ex. 10 at 74:11-75:09.  Additionally, Corrigan testified that of those six potential shipyards, EIG was "comfortable" with Keppel and viewed it as the "star"

CONTAINS CONFIDENTIAL INFORMATION

shipyard in Brazil because of its "long history of operating in Brazil." *Id.* at 110:8-16, 129:23-25.

**Keppel's Reply:  No genuine dispute.**  EIG has not provided any evidence to controvert the assertion in Paragraph 80.  The cited evidence reflects that, at the time of the June 27, 2011 investment committee meeting, EIG had a list of "potential" shipyards that might get shipbuilding contracts with Sete.  Kevin Corrigan testified that at the time of the June 27, 2011 investment committee meeting, EIG did not know which shipbuilders would ultimately end up building ships for Sete because "EAS was the only shipyard that actually had an agreement to build ships for Sete".  (Ex. 10 at 76:05-09.)

81.     On June 29, 2011, Kevin Corrigan sent an email to other EIG employees stating that "[t]his week we are signing a binding agreement to make the investment when they fulfill two requirements: get the boat contract from Petrobras, and existing investors fail to exercise all their pre-emptive rights." (Ex. 26, DX086 at 755.)

**EIG's Response:**  Admitted that the quotation in Keppel Statement No. 81 was written by Corrigan in a June 29, 2011 email.  Denied that the "agreement" Corrigan referred to was "binding" and that the requirements under that agreement were those described by Corrigan. EIG SOF ¶¶ 400-17; *see infra* ¶ 82.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 81. EIG's additional commentary does not controvert the assertion in Paragraph 81 and is non-responsive.

82.     On June 30, 2011, Sete, Lakeshore and EIG executed an investment agreement, under which EIG "irrevocably and irreversibly agree[d] to invest up to of R$250,000,000 (two

- 24 -

CONTAINS CONFIDENTIAL INFORMATION

hundred and fifty million Brazilian reais) ('Equity Commitment')". (Ex. 27, DX087 at 153, 160;

Ex. 26, DX086 at 755.)

**EIG's Response:**  Admitted that Sete, Lakeshore and EIG executed an investment

agreement on June 30, 2011, which contained the language quoted in Keppel Statement No. 82.

Denied that EIG "irrevocably and irreversibly agree[d]" to invest in Sete.  The June 2011

Investment Agreement provided that the Potential Investor, EIG, would invest up to $250 million

Reais "provided that (i) the Proposal is entirely or partially awarded as the Tender's winning bid

regarding one or more Rigs, and (ii) in connection with the aforementioned award SETE

BRASIL requires additional equity investment in addition to the pre-emptive rights of the

Original Investors in order to pay for the investments and expenses related to the implementation

of the new rigs[.]" EIG Exh. 19 at EIG_KEP_00049153, § 2.1.  Article 2.1(i)(a) stated that EIG

would need to "execute an Investment Commitment Agreement" if the conditions precedent

were satisfied.  EIG Exh. 19 at EIG_KEP_00049153, § 2.1(i)(a).  EIG executed definitive

transaction documents, including the Investment Commitment Agreement that set forth the terms

and conditions for the investment on July 31, 2012.  EIG SOF ¶ 410.  Article 2.7 also referred to

conditions precedent in the June 2011 Investment Agreement.  Exh. 19 at EIG_KEP_00049154,

§ 2.7.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 82.

EIG's additional commentary does not controvert the assertion in Paragraph 82 and is non-

responsive.  Keppel's motion does not depend on the timing of EIG's due diligence or decision

to invest, but the evidence cited by EIG does not support EIG's effort to dispute that it entered a

"binding agreement" to invest in Sete on June 30, 2011.  On June 29, 2011, Kevin Corrigan sent

an email to other EIG employees stating that "[t]his week we are signing a binding agreement to

CONTAINS CONFIDENTIAL INFORMATION

make the investment". (Ex. 26, DX086 at 755.) On June 30, 2011, Sete, Lakeshore and EIG executed that "binding agreement", under which EIG "irrevocably and irreversibly agree[d] to invest up to of R$250,000,000 (two hundred and fifty million Brazilian reais) ('Equity Commitment')". (Ex. 27, DX087 at 153, 160.)

**G.      EIG's First Visit to the BrasFELS Shipyard in August 2011.**

  i.      <u>August 2011 Yard Visit.</u>

  83.      EIG initiated and planned the August 2011 visit to the BrasFELS Shipyard. (Ex. 10, Corrigan Tr. 131:13-24, 132:22-133:03, 135:09-21.)

  **EIG's Response:**  Admitted that EIG sought to visit the BrasFELS Shipyard in August 2011 as part of a potential co-investment by CIC and its own ongoing due diligence, and denied that EIG "planned" the visit.  Ex. 10 at 131:13-132:6.  Contrary to Keppel Statement No. 83, there is no genuine dispute of material fact that Keppel hosted the visit on the request of Barusco of Sete, initially made on or about July 29, 2011.  EIG SOF ¶¶ 94, 96.  Keppel planned the tour and presentation that it gave EIG and CIC as part of that visit.  EIG SOF ¶¶ 97, 100, 102; EIG Exh. 23 at KEPPEL00010310; EIG Exh. 122 at 133:15-134:9, 141:4-11.

  **Keppel's Reply:  No genuine dispute.**  EIG does not dispute that EIG initiated the visit to the BrasFELS Shipyard in August 2011.  EIG's cited evidence does not controvert that EIG planned the August 2011 visit to the BrasFELS Shipyard, because EIG does not refute that EIG "set up" the August 2011 visit to the BrasFELS Shipyard "to help CIC in their due diligence" (Ex. 10, Corrigan Tr. 131:18-132:17.).  EIG's additional commentary does not controvert the assertion in Paragraph 83 and is non-responsive and immaterial because Keppel's motion does not depend on the timing of EIG's due diligence or decision to invest.  In any event, EIG's additional commentary that the August 2011 yard visit was part of EIG's due diligence is controverted by the undisputed fact that EIG's 30(b)(6) witness, Kevin Corrigan, testified that

the "sole purpose" of the August 2011 visit was "gauging [CIC's] interest in investing in Sete Brasil".  (Ex. 16, Corrigan D.C. Tr. 101:02-10.)

84.    Kevin Corrigan asked Sete to arrange the August 2011 visit to the BrasFELS Shipyard. (Ex. 10, Corrigan Tr. 135:12-18.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

85.    Kevin Corrigan set up the August 2011 visit "to help CIC in their due diligence" because "CIC was . . . beginning to kick the tires, as we had the previous year". (Ex. 10, Corrigan Tr. 131:23-24, 132:22-24, 135:09-21; Ex. 52, EIG_KEP_00049095-096.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

86.    CIC was an "important investor in EIG" funds. (Ex. 10, Corrigan Tr. 134:10-15, 131:06-12.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

87.    Kevin Corrigan testified that the "sole purpose" of the August 2011 visit was "gauging [CIC's] interest in investing in Sete Brasil". (Ex. 16, Corrigan D.C. Tr. 101:02-10.)

**EIG's Response:**  Admitted that Corrigan testified that CIC's interest in investing in Sete was the sole reason he visited the BrasFELS shipyard on August 4, 2011 specifically.  EIG clarifies that Corrigan also testified that EIG "would have eventually wanted to visit" the BrasFELS shipyard even absent CIC's potential investment, and that on the August 4, 2011 trip he "would have been interested to see what was going on in connection with our own investment."  Ex. 10 at 131:18-132:14.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the assertion in Paragraph 87. EIG's additional commentary does not controvert the assertion in Paragraph 87 and is non-responsive, speculative and irrelevant.

88.     On or around August 2, 2011, Keppel received a request from Sete to host the August 2011 yard visit. (Ex. 68, KEPPEL00010460-0462 at 460.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 83, there is no genuine dispute of material fact that Skornicki received the request from Sete for Keppel to host "some investors in Sete" on or about July 29, 2011, and relayed the request on July 29 to YY Chow and Kwok.  EIG SOF ¶¶ 94, 96; EIG Exh. 23 at KEPPEL00010310.

**Keppel's Reply:**  **No genuine dispute.**  The cited evidence does not controvert the assertion in Paragraph 88 – that "[o]n or around August 2, 2011", Keppel received a request from Sete to host the August 2011 yard visit.  EIG's additional commentary that the request Skornicki received was to host "some investors in Sete" does not controvert the assertion in Paragraph 88 and is non-responsive.

89.     There is no evidence of any communications between EIG and Keppel concerning the planning of the August 2011 yard visit.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

90.     On or around August 4, 2011, Kevin Corrigan visited the BrasFELS Shipyard with representatives of CIC, which is the visit described in paragraph 71 of the Complaint. (Ex. 4, EIG Response to RFA 32; Ex. 1, Compl. ¶ 71.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

CONTAINS CONFIDENTIAL INFORMATION

91.     There is no evidence of any contact between EIG and Keppel concerning Sete prior to the August 4, 2011 yard visit.

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

92.     The "focus" of EIG's August 2011 yard visit "was on the shipbuilding capacity of Brasfels". (Ex. 10, Corrigan Tr. 143:07-09.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

93.     Nobody who attended the August 2011 visit raised questions relating to bribery or corruption. (Ex. 10, Corrigan Tr. 136:14-17, 143:03-06.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

94.     Kevin Corrigan testified that during the August 2011 yard visit "everything they said was truthful", although "you know, they didn't bring up the corruption scheme that already existed". (Ex. 10, Corrigan Tr. 136:03-13.)

**EIG's Response:**  Admitted.  EIG clarifies that the presentation and tour during the August 2011 shipyard visit were misleading because Keppel did not disclose the bribery scheme to the attendees.

**Keppel's Reply:**  **No genuine dispute.**  EIG has admitted the assertion in Paragraph 94. EIG's additional commentary does not controvert Paragraph 94 and is non-responsive and irrelevant to the extent it implies Keppel or its subsidiaries had a duty to disclose the bribery scheme.

CONTAINS CONFIDENTIAL INFORMATION

95.     On August 8, 2011, Sete emailed Keppel about the August 2011 visit to the

BrasFELS Shipyard, stating that "[t]he visit was very productive and our investors and associates

learned a lot about the construction of the semi-subs.  The overall impression was great and

achieved the intended result- a lower perceived risk of the project." (Ex. 45, PX095 at -1126.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

96.     EIG's August 2011 yard visit occurred after EIG made its initial decision to invest

in Sete.  (Ex. 10, Corrigan Tr. 130:09-131:17.)

**EIG's Response:**  Admitted that the August 4, 2011 visit by EIG to the BrasFELS

Shipyard occurred after the Fund XIV investment committee approved a potential investment in

Sete (*see supra* ¶ 75), and denied that the August 4, 2011 visit was after "EIG made its initial

decision to invest in Sete."  Contrary to Keppel Statement No. 96, there is no genuine dispute of

material fact that, as of August 2011, the Fund XV investment committee had not yet approved a

potential investment in Sete, and the potential investment in Sete by Fund XIV was subject to the

satisfaction in the future of certain conditions and final definitive documentation.  *See supra* ¶¶

81-82; EIG SOF ¶ 383.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 96.

It is undisputed that EIG's investment committee approved an investment in Sete on June 27,

2011. (Ex. 22, DX074 at 322.)  Keppel's motion does not depend on the timing of EIG's due

diligence or decision to invest, but the evidence cited by EIG does not support EIG's effort to

dispute that it entered a "binding agreement" to invest in Sete on June 30, 2011.  On June 29,

2011, Kevin Corrigan sent an email to other EIG employees stating that "[t]his week we are

signing a binding agreement to make the investment".  (Ex. 26, DX086 at 755.)  On June 30,

CONTAINS CONFIDENTIAL INFORMATION

2011, Sete, Lakeshore and EIG executed an investment agreement, under which EIG

"irrevocably and irreversibly agree[d] to invest up to of R$250,000,000 (two hundred and fifty

million Brazilian reais) ('Equity Commitment')".  (Ex. 27, DX087 at 153, 160.)

97.     Yard tours at the BrasFELS Shipyard were common and routine occurrences. (Ex.

14, Tan II Tr. 287:12-22, 276:24-279:19; see, e.g., Ex. 67, KEPPEL00009411; Ex. 70,

KEPPEL00330052; Ex. 64, KEPPEL00006070; Ex. 66, KEPPEL00009237; Ex. 65,

KEPPEL00076345.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 97, there is no genuine

dispute of material fact that yard tours at the BrasFELS Shipyard, especially by Sete's investors

or lenders, were not routine but required the approval of Kai Choong Kwok, the Chief Executive

Officer and President of the Keppel Brasil.  EIG SOF ¶¶ 23, 95; EIG Exh. 102 at

KEPPEL00000153-160; EIG Exh. 133 at 273:10-17, 274:11-18.

**Keppel's Reply:  No genuine dispute.**  EIG's cited evidence does not controvert the

assertion in Paragraph 97.  The cited evidence shows that Kai Choong Kwok approved the yard

tours at the BrasFELS Shipyard.  It is undisputed that "[n]ormally [for] any yard visit, the

authorization would be by the president of the yard".  (EIG Exh. 133, Tan Tr. 274:11-15.)  It is

undisputed that in August 2011, Kwok was the President of the BrasFELS Shipyard.  (EIG Exh.

133, Tan Tr. 274:16-18.)  The evidence shows that yard tours were common and routine at the

BrasFELS Shipyard.  Leong Peng Tan, Keppel's 30(b)(6) witness, testified: "[Y]ard tour to us is

very common.  Every year we host numerous yard tour from various client, education institute,

ministry.  So just business as usual kind of yard visit." (Ex. 14, Tan II Tr. 287:12-22.)

ii.     August 2011 Video Shoot.

98.     EIG initiated the August 2011 video shoot of the BrasFELS Shipyard. (Ex. 29,

DX092 at 596; Ex. 30, DX093 at 447.)

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

99.      Barrington planned the August 2011 video shoot of the BrasFELS Shipyard. (Ex. 29, DX092 at 596; Ex. 30, DX093 at 446-47; Ex. 47, BARRINGTON_ET_00000486-0495 at 494.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

100.      Barrington, on EIG's behalf, reached out to Sete to arrange the August 2011 video shoot as part of a presentation for EIG's annual investors conference. (Ex. 47, DX093 at -0447.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

101.      Barrington originally planned to record video at the EAS Shipyard, not the BrasFELS Shipyard. (Ex. 29, DX092 at 596; Ex. 30, DX093 at 447; Ex. 47, BARRINGTON_ET_00000486-495 at 491.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

102.      Kevin Corrigan testified that Barrington recorded video at the BrasFELS Shipyard instead of the EAS Shipyard because "from a logistical standpoint it was obviously easier to go to BrasFELS". (Ex. 10, Corrigan Tr. 148:12-149:07.)

**EIG's Response:**  Admitted that Corrigan testified that "from a logistical standpoint, it was obviously easier to go to BrasFELS."  EIG clarifies that Corrigan's full testimony included his testimony that he "imagine[s]" that "the reason the switch was made from EAS to

BrasFELS" was logistics, but he is "not a hundred percent sure" because it "was Sete's initiative, you know, they were helping us set all this stuff up."  Ex. 10 at 149:8-15.

**Keppel's Reply**:  **No dispute.**  EIG has admitted the assertion in Paragraph 102.  EIG's additional commentary does not controvert the assertion in Paragraph 102 and reinforces the undisputed fact that Keppel played no role in initiating or setting up the video shoot.

103.    There is no evidence of any direct communications between EIG and Keppel about the planning of the Barrington video shoot.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 103, there is no genuine dispute of material fact that Barrington, acting on behalf of EIG, communicated with Keppel about the Barrington video shoot, and Kevin Corrigan of EIG was part of those communications. EIG SOF ¶¶ 112-13; EIG Exh. 28 at KEPPEL00020435.

**Keppel's Reply**:  **No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 103.  The cited evidence reflects that Barbara Olsen, the Vice President of Barrington Media, communicated with Adriana Farah, an Administrative Supervisor at Keppel's subsidiary Keppel FELS Brasil.  (EIG Exh 28 at 435-436.)  The cited evidence does not show that anyone from EIG communicated with Keppel; the evidence cited by EIG includes emails where Kevin Corrigan is copied but no emails sent by Mr. Corrigan.  (EIG Exh 28 at 435-436.)

104.    On or around August 24, 2011, Barrington's Barbara Olsen visited the BrasFELS shipyard to record video of "general shipyard activity", which is the video shoot described in paragraph 72 to 75 of the Complaint. (Ex. 1, Compl. ¶¶ 72-75; Ex. 30, DX093 at 447; Ex. 48, BARRINGTON_ET_00000651 at 653; Ex. 10, Corrigan Tr. 154:25-155:10.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

- 33 -

105.    The Barrington video shoot was independent of EIG's due diligence for its Sete investment. (Ex. 10, Corrigan Tr. 157:02-08.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

106.    Kevin Corrigan testified that the Barrington video shoot was "not an extension of [EIG's] due diligence" of the Sete investment. (Ex. 10, Corrigan Tr. 157:02-08.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

107.    The August 2011 video shoot did not include footage of construction for Sete drillships because Keppel did not obtain its first contract until December 2011. (Ex. 43, KEPPEL00490690-768.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

108.    There is no evidence that bribery or corruption risks were discussed during the planning or shooting of the Barrington video.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

109.    There is no evidence that Keppel provided inaccurate information to Barrington or EIG in connection with the Barrington video.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

110.    The approximately five-minute-long Barrington video was shown at EIG's daylong annual investors' conference. (Ex. 10, Corrigan Tr. 157:23-158:24.)

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

111.    There is no evidence that the Barrington video mentioned Keppel.

**EIG's Response:**  Admitted that there is no evidence that the audio of the Barrington video used the phrase "Keppel."  EIG clarifies that the Barrington video showed pictures of the BrasFELS shipyard.

**Keppel's Reply:**  **No dispute.**  EIG has admitted the assertion in Paragraph 111.  EIG's additional commentary does not controvert the assertion in Paragraph 111 and is non-responsive and does not cite any evidence.

**H.    EIG's Decision to Increase Its Equity Commitment in September 2011.**

112.    On September 8, 2011, Sete, Lakeshore and EIG executed the "First Amendment and Restatement Agreement". (Ex. 28, DX089.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

113.    The First Amendment and Restatement Agreement provided that the "[p]arties agree to increase the Original Equity Commitment from the current R$250,000,000 (two hundred and fifty million Brazilian reais) to the amount of R$500,000,000 (five hundred million Brazilian reais), an increase, therefore, of R$250,000,000 (two hundred and fifty million Brazilian reais)". (Ex. 28, DX089 at 626, 635.)

**EIG's Response:**  Admitted.  EIG clarifies that the September 2011 Amended Investment Agreement contained the same conditions precedent as the June 2011 Investment Agreement.  EIG Exh. 31 at EIG_KEP_00048629, § 2.1; s*ee supra* ¶ 82.

**Keppel's Reply:**  **No dispute.**  EIG has admitted the assertion in Paragraph 113.  EIG's additional commentary does not controvert the assertion in Paragraph 113 and is non-responsive.

CONTAINS CONFIDENTIAL INFORMATION

114.    On September 16, 2011, Blair Thomas presented the September 2011 Investment Recommendation to EIG's investment committee. (Ex. 24, DX076 at 323.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

115.    The September 2011 Investment Recommendation included the same five bullets on the BrasFELS Shipyard as the June 2011 Investment Recommendation. (Ex. 23, DX075 at 431.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

116.    Kevin Corrigan testified that what was said in the June 2011 Investment Recommendation relating to BrasFELS is exactly what was said in the September 2011 Investment Recommendation relating to BrasFELS. (Ex. 10, Corrigan Tr. 110:03-07.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

117.    On September 16, 2011, EIG's investment committee approved the increase of EIG's equity commitment from 250 million BRL to 500 million BRL. (Ex. 10, Corrigan Tr. 109:06-09; Ex. 15, Thomas Tr. 99:15-21.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

118.    As of September 16, 2011, the EAS Shipyard was the only shipyard that had been obtained an EPC Contract from Sete. (Ex. 23, DX075 at 215; Ex. 10, Corrigan Tr. 124:19-125:02.)

**EIG's Response:**  Admitted.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply:**  **No dispute.**

I.    **Keppel's First Contract from Sete in December 2011.**

119.    On December 16, 2011, Sete and Keppel executed an EPC Contract to build one

drillship for Sete via their subsidiaries, Fernvale and Urca Drilling B.V.[3] (Ex. 43, PX070.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

120.    The December 16, 2011 EPC Contract was Keppel's first shipbuilding contract in

connection with Sete. (Ex. 43, KEPPEL000490690-768.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

121.    EIG was not a party to the December 16, 2011 EPC Contract. (Ex. 43,

KEPPEL00490690-768 at 690.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

J.    **EIG's Second Visit to the BrasFELS Shipyard in March 2012.**

122.    EIG did not mention any 2012 visit to the BrasFELS Shipyard in the Complaint.

(Ex. 1, Compl.).

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

123.    EIG initiated and planned the March 2012 visit to the BrasFELS Shipyard. (Ex.

31, DX095 at 469; Ex. 58, EIG_KEP_00251523-529 at 528.).

---

[3] Keppel built semi-submersible drilling units for Sete. For purposes of this motion, however,
Keppel adopts the "drillship" terminology used in the Complaint.

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Admitted that EIG requested the visit, through Sete and/or its financial advisors, as part of its due diligence and a potential co-investment by ADICO, and that EIG employees and/or Sete's financial advisors planned the logistics for the EIG employees to travel to the BrasFELS shipyard, and denied that EIG planned the March 2012 visit.  Ex. 31 at EIG_KEP_00121469; Ex. 58 at EIG_KEP_00251523-28; *see infra* ¶ 128 Contrary to Keppel Statement No. 123, there is no genuine issue of material fact that Keppel and/or its subsidiaries planned the visit, including a tour, presentation, lunch, and conversations with employees of Keppel and/or its subsidiaries.  EIG SOF ¶¶ 166-67, 172-73; EIG Exh. 49 at KEPPEL00020565; EIG Exh. 122 at 160:4-162:19, 166:6-18, 166:23-167:7; EIG Exh. 124 at 78:15-18, 82:14-20, 83:11-87:25.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the point of the assertion in Paragraph 123—i.e., that "EIG requested the [March 2012] visit" to the BrasFELS Shipyard and that  EIG "planned the logistics" related to the March 2012 visit to the BrasFELS Shipyard.  EIG's additional commentary does not controvert the assertion in Paragraph 123 and is non-responsive.  The cited evidence shows that EIG planned the visit.

124.    There is no evidence of any communications between EIG and Keppel concerning the planning of the March 2012 yard visit.

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

125.    On or around March 28, 2012, Kevin Corrigan, Simon Hayden and Hoshrav Patel of EIG visited the BrasFELS Shipyard with representatives of ADICO. (Ex. 4, EIG Response to RFA 33; Ex. 10, Corrigan Tr. 162:11-19; Ex. 12 Patel Tr. 88:15-19.)

**EIG's Response:**  Admitted.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply:  No dispute.**

126.    The March 2012 visit to the BrasFELS Shipyard was part of ADICO's due diligence of Sete. (Ex. 10, Corrigan Tr. 160:17-22; Ex. 17, Hayden D.C. Tr. 304:21-305:01; Ex. 57, EIG_KEP_00251502-508 at 505.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

127.    ADICO was an investor of EIG. (Ex. 10, Corrigan Tr. 160:23-161:05.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

128.    Kevin Corrigan testified that the March 2012 visit "was a mirror of the CIC's visit a few months earlier", and that the purpose was to present to ADICO the possibility of investing in Sete. (Ex. 10, Corrigan Tr. 160:12-22.)

**EIG's Response:**  Admitted that Corrigan testified that the March 2012 visit "was a mirror of the CIC's visit a few months earlier," and that *a* purpose of the visit was for ADICO to conduct due diligence for a potential investment in Sete.  EIG clarifies that the March 2012 visit also was part of EIG's due diligence of Sete, which continued until EIG funded its investment in Sete, after which EIG monitored its investment.  EIG SOF ¶ 385; EIG Exh. 124 56:21-25.

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 128—i.e., that Kevin Corrigan testified that the March 2012 visit to the BrasFELS Shipyard "was a mirror of the CIC's visit a few months earlier", and that "the visit was for ADICO to conduct due diligence for a potential investment in Sete".  EIG's additional commentary does not controvert the assertion in Paragraph 128 and is non-responsive.

CONTAINS CONFIDENTIAL INFORMATION

129.    The focus of the March 2012 visit to the BrasFELS Shipyard was the shipbuilding

capacity at BrasFELS. (Ex. 10, Corrigan Tr. 166:14-18; Ex. 11, Hayden Tr. 84:21-25.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

130.    There is no evidence that bribery or corruption were discussed during the March

2012 yard visit.

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

131.    Kevin Corrigan testified that he could not recall any discussions concerning

corruption during the March 2012 visit to the BrasFELS Shipyard. (Ex. 10, Corrigan Tr. 167:08-

16.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

132.    Simon Hayden testified that he could not recall any specific questions during the

March 2012 visit to the BrasFELS Shipyard. (Ex. 17, Hayden D.C. Tr. 305:07-09; Ex. 11,

Hayden Tr. 86:04-08.)

**EIG's Response:**  Admitted that Hayden could not remember the exact questions he

asked during the March 2012 shipyard visit.  EIG clarifies that Hayden testified that he "would

have" asked questions at the BrasFELS Shipyard, but just did not remember what questions he

asked.  Ex. 11 at 86:04-08.

**Keppel's Reply:  No dispute.**  EIG has admitted the assertion in Paragraph 132.  EIG's

additional commentary does not controvert Paragraph 132 and is non-responsive.

- 40 -

CONTAINS CONFIDENTIAL INFORMATION

133.    Hoshrav Patel testified that he had no recollection of the March 2012 visit to the BrasFELS Shipyard. (Ex. 12, Patel Tr. 84:14-88:14; Ex. 57, EIG_KEP_00251502-508 at 505.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

134.    There is no evidence Keppel provided any inaccurate information in connection with the March 2012 visit to the BrasFELS Shipyard.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 134, there is no genuine issue of material fact that Keppel met with, and made a presentation to, EIG and ADICO during the March 2012 visit.  EIG SOF ¶¶ 170, 173.  The presentation and information provided by Keppel was misleading in light of the fact that it did not disclose the bribery scheme.  *See supra* ¶ 130.

**Keppel's Reply:  No genuine dispute.**  EIG does not dispute that Keppel did not provide any "inaccurate information in connection with the March 2012 visit to the BrasFELS Shipyard". It is undisputed that Kevin Corrigan testified that there was no misleading information provided concerning the shipbuilding capacity of BrasFELS during the March 2012 visit to the BrasFELS Shipyard. (Ex. 10, Corrigan Tr. 168:15-20.)  It is also undisputed that bribery and corruption were not discussed on any of EIG's visits to the BrasFELS Shipyard.  (See supra ¶¶ 130-131.) EIG's commentary is non-responsive and irrelevant to the extent it implies Keppel or its subsidiaries had a duty to disclose the bribery scheme.

135.    Kevin Corrigan testified that there was no misleading information provided concerning the shipbuilding capacity of BrasFELS during the March 2012 visit to the BrasFELS Shipyard. (Ex. 10, Corrigan Tr. 168:15-20.)

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Admitted.  EIG clarifies that Corrigan's testimony was limited to misleading information provided by Keppel concerning its *shipbuilding capacity*, and that Corrigan continued his answer by stating that there was misleading information "[c]oncerning the *overall transaction*." Ex. 10 at 168:15-22 (emphasis added).

**Keppel's Reply:  No genuine dispute.**  EIG has admitted the assertion in Paragraph 135. EIG's additional commentary does not controvert Paragraph 135 and is non-responsive and irrelevant to the extent it implies Keppel or its subsidiaries had a duty to disclose the bribery scheme.

**K.    Keppel's Five Additional Contracts from Sete in August 2012.**

136.    On April 12, 2012, Keppel announced that it had entered a letter of intent with Sete to build an additional five drillships. (Ex. 63, KEPPEL00005616-617.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

137.    On August 2, 2012, EPC Contracts for five drillships were executed between Keppel and Sete. (Ex. 37, PX051; Ex. 38, PX052; Ex. 39, PX053; Ex. 40, PX054; Ex. 41, PX055.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

138.    EIG was not a party to the August 2, 2012 EPC Contracts. (Ex. 37, PX051; Ex. 38, PX052; Ex. 39, PX053; Ex. 40, PX054; Ex. 41, PX055.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

139.    On August 7, 2012, Eva Ho of Keppel circulated the final draft of the press release and explained: "Sete Brasil has approved our press release.  The approved version is

- 42 -

CONTAINS CONFIDENTIAL INFORMATION

below.  They have made only three minor changes as highlighted in yellow below." (Ex. 74,

KEPPEL00429725-729 at 725-27.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

140.    One of the three changes Sete made to Keppel's draft of the August 7, 2012 press

release was the addition of the words "and International" to the sentence "Sete Brasil is a

Brazilian company established in December 2010 and formed by Brazilian and International

finance investors, including banks and the four biggest Brazilian pension funds, besides

Petrobras". (Ex. 74, KEPPEL00429725-729 at 725-27.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

141.    The August 7, 2012 press release entitled "Keppel signs contracts with Sete Brasil

for five DSS 38E semis for US$4.1 billion" described in paragraph 78 of the Complaint is Ex.

75. (Ex. 75, KEPPEL00444138-140; Ex. 1, Compl. ¶ 78.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

142.    Sete added the word "International" to the description of Sete's investors in

Keppel's August 7, 2012 press release. (Ex. 74, KEPPEL00429725-729 at 725.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

143.    There is no evidence Keppel discussed with Sete or anyone else the phrase

"International finance investors" in the August 7, 2012 press release.

- 43 -

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 143, there is no genuine

dispute of material fact that Exhibit 74 is evidence that Keppel discussed with Sete the phrase

"International finance investors" that Sete specifically requested Keppel to add to its August 7,

2012 press release.  *See infra* ¶¶ 139-40.

**Keppel's Reply:**  **No genuine dispute.**  EIG's cited evidence does not controvert the

point of the assertion in Paragraph 143—i.e., that Sete and Keppel did not discuss the meaning of

the phrase "International finance investors" or the entities to which that phrase referred.  The

cited evidence merely shows that Keppel accepted the edits that Sete suggested, including the

insertion of the phrase "International finance investors."  There is no evidence of any discussion

of the edits Sete made to the press release, including the addition of the phrase "International

finance investors".

**L.     EIG's Disbursement of Funds in August 2012.**

144.     On or around July 31, 2012, upon the satisfaction of the conditions in EIG's June

30, 2011 investment agreement (as amended and restated in September 8, 2011), EIG executed

shareholder agreements with Sete and its other equity investors. (Ex. 55, EIG_KEP_00110494-

535; Ex. 56, EIG_KEP_00116690.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

145.     On or around August 3, 2012, EIG answered its first capital call by disbursing

approximately $50 million to Sete. (Ex. 1, Compl. ¶ 76.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

146.     No further action or approval from EIG's investment committee was needed in

July and August 2012 because the investment committee had already approved the investment in

June and September 2011. (Ex. 15, Thomas Tr. 104:04-07; Ex. 18, Thomas D.C. Tr. 188:05-14, 195:08-196:04.)

**EIG's Response:**  Admitted.  EIG clarifies that no further action was required because the transaction was proceeding on terms previously approved by the committee.  EIG SOF ¶¶ 392, 395-96, 408-09.

**Keppel's Reply:  No dispute.**  EIG has admitted the assertion in Paragraph 146.  EIG's additional commentary does not controvert the assertion in Paragraph 146 and only confirms the fact that EIG's decision to invest was made in June 2011.

**M.     Financial and Operational Documents Concerning Sete.**

147.     On January 14, 2011, Zwi Skornicki forwarded Yew Yuen Chow a document entitled, "Drilling Rigs In Brazil Project". (Ex. 44, PX086 at 887.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

148.     The cover of the Drilling Rigs in Brazil Project document states that it is a "Presentation to Drilling Operators". (Ex. 44, PX087 at 888.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

149.     The Drilling Rigs in Brazil Project document does not mention EIG. (Ex. 44, PX087.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

150.     There is no evidence anyone at Keppel opened or read the Drilling Rigs in Brazil Project document.

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 150, there is no genuine dispute of material fact that Exhibit 44 is evidence that Skornicki, in his capacity as Keppel's agent, read the Drilling Rigs in Brazil Project document.  Additionally, Skornicki sent the presentation to YY Chow multiple times on January 14, 2011.  At 11:42 a.m., YY Chow received the presentation from Skornicki.  *See infra* EIG Additional Facts ¶ 496.  At 3:16 p.m., Skornicki sent the presentation to YY Chow again, requesting that YY Chow "[p]lease try to open."  Ex. 44 at KEPPEL00049887.  Skornicki clearly resent the presentation either because YY Chow tried to read it and was unable to do so, or because he thought it was so important for YY Chow to read the presentation that he resent it again hours later.  Furthermore, four days before January 14, Choo directed Tong and Chow that "we have to be prepared and also find out more" about Sete (EIG SOF ¶ 57; EIG Exh. 7 at KEPPEL00036103), reflecting that YY Chow likely either requested Skornicki to send the presentation or would have reviewed it upon receiving it.

**Keppel's Reply:**  **No genuine dispute.**  EIG's cited evidence does not controvert Paragraph 150.  The cited evidence merely reflects that Skornicki sent an email to YY Chow attaching the Drilling Rigs in Brazil Project document.  EIG has not cited any evidence showing that YY Chow or Skornicki read or opened the Drilling Rigs in Brazil Project Document, and instead relies on irrelevant conjecture about what "clearly" happened, "likely" happened or "would have" happened.

151.    There is no evidence anyone at Keppel ever commented on or discussed the Drilling Rigs in Brazil Project document.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 151, there is no genuine dispute of material fact that Skornicki, in his capacity as Keppel's agent, commented on the

Drilling Rigs in Brazil Project that YY Chow should "[p]lease try to open."  Ex. 44 at KEPPEL00049887.

**Keppel's Reply**:  **No genuine dispute.**  EIG's cited evidence does not controvert the point of the assertion in Paragraph 151—i.e., that there is no evidence that anyone at Keppel commented on or discussed the substance of the Drilling Rigs in Brazil Project document.

152.    There is no evidence anyone at Keppel knew which other entities, if any, received the Drilling Rigs in Brazil Project document.

**EIG's Response**:  Denied.  Contrary to Keppel Statement No. 152, there is no genuine dispute of material fact that the Drilling Rigs in Brazil Project presentation states it is "to Drilling Operators" and has a "Cautionary Statement for US investors."  Ex. 44 at KEPPEL00049888-89. The presentation itself is evidence that it was sent to U.S. investors, including U.S.-listed drilling rig operators that would potentially bid for projects with Sete.  In addition, four days before receiving the Drilling Rigs in Brazil Project presentation, YY Chow reported that "SETE Enterprise will also be inviting Drilling contractors, both international and domestic, to bid for these 28 DRUs [drilling rig units] … Successful bidders are required to take a 15% stake in the equity of the unit.  The financial structure for each DRU is 20% equity and 80% debt financing. This will mean that the successful Drilling contractor for each unit will have to provide as equity 3% (ie. 15% of 20%) of the total project cost."  EIG Exh. 7 at KEPPEL00036103-04.

**Keppel's Reply**:  **No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 152.  EIG has not provided any evidence showing that Keppel knew which other entities, if any, actually received the Drilling Rigs in Brazil Project document.  The cited evidence merely reflects that the Drilling Rigs in Brazil Project document included a "Cautionary Statement for US investors" and that YY Chow reported that "SETE Enterprise will

also be inviting Drilling contractors, both international and domestic, to bid for these 28 DRUs".

EIG's additional commentary is non-responsive and reflects an effort to argue that the

Cautionary Statement should have put Keppel on notice of the alleged fraud.  EIG's response

also misrepresents the slide containing the "Cautionary Statement for US investors," which is a

boilerplate statement that offers a clarification that the terminology and figures used in the

presentation may not align with the terminology and figures used by Petrobras in its SEC filings.

(Ex. 44 at 889; see also Keppel Br. 37-40.)  In other words, even if the intended audience of that

Cautionary Statement were relevant to Keppel's motion (and it is not), it appears to be directed at

investors anywhere in the world who may have reviewed Petrobras's SEC filings.

153.    On October 30, 2011, Keppel employees were sent a document entitled, "Sete
Brasil Participações S/A Management Presentation" and a financial model entitled "Modelo
Financeiro Sete Brasil". (Ex. 33, PX014 at 554, 560; Ex. 34, PX038.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  No dispute.

154.    There is no mention of EIG in the "Sete Brasil Participações S/A Management
Presentation". (Ex. 33, PX014.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  No dispute.

155.    There is no mention of EIG in the financial model entitled "Modelo Financeiro
Sete Brasil". (Ex. 34, PX038.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  No dispute.

CONTAINS CONFIDENTIAL INFORMATION

156.    There is no evidence anyone at Keppel knew which other entities, if any, received the "Sete Brasil Participações S/A Management Presentation".

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

157.    There is no evidence anyone at Keppel knew which other entities, if any, received the financial model entitled "Modelo Financeiro Sete Brasil".

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

158.    Keppel's Rule 30(b)(6) deposition witness, Tan Leong Peng, testified that all projects require financing and Sete was no different. (Tan I Tr. 130:09-131:07.)

**EIG's Response:**  Admitted that Tan testified that all projects require financing, and denied that Tan testified that "Sete was no different."  Ex. 13 at 130:18-19.  Tan testified that Keppel specifically understood that Sete would require equity financing by the time Keppel had discussions with Sete regarding a joint venture in 2011 (EIG SOF ¶¶ 73-74; EIG Exh. 133 at 131:8-15), and that Keppel also understood in 2011 that the majority of senior debt for each rig would be financed by BNDES (EIG SOF ¶ 138; EIG Exh. 133 at 256:4-9, 264:10-18).

**Keppel's Reply:**  No dispute.  EIG has admitted the assertion in Paragraph 158.  EIG's additional commentary does not controvert the assertion in Paragraph 158 and is non-responsive.

N.    **News Reports Concerning Sete.**

159.    On August 16, 2011, an email from Guia Oil & Gas Brasil was sent to Tommy Sam with links to 10 articles, including an article headlined "Sete Brasil receives funds from the EIG fund" (translated to English). (Ex. 69, KEPPEL00020438-440 at 438.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

- 49 -

CONTAINS CONFIDENTIAL INFORMATION

160.    There is no evidence anyone at Keppel read the August 2011 news report.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 160, there is no genuine dispute of material fact that Exhibit 69 is evidence that Tommy Sam read the August 2011 news report.  Tommy Sam was a recipient of the August 2011 news report, and was working at that time on a bid by Keppel to construct billions of dollars of drilling rigs for Sete and a joint venture in which Keppel would invest in an affiliate of Sete.  EIG Exh. 38 at KEPPEL00459977-80; EIG Exh. 39 at KEPPEL00556336-40.

**Keppel's Reply:**  **No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 160.  EIG has not cited any evidence showing that Tommy Sam read the August 2011 news report, which is nevertheless irrelevant to Keppel's motion.

161.    There is no evidence anyone at Keppel commented on or discussed the August 2011 news report.

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

162.    On February 13, 2012, Keppel employees were sent a press clipping that included an article with the headline "Oil-Rig Co Sete Brasil May Seek New Investors – Source". (Ex. 35, PX018 at 871, 881.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

163.    On February 13, 2012, Keppel employees were sent an email that included an article with the headline "Sete Brasil Charts Growth Path On Back Of Latest Rig Order". (Ex. 73, KEPPEL00049993 at 993.)

**EIG's Response:**  Admitted.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply:  No dispute.**

164.    There is no evidence anyone at Keppel read the February 2012 news reports.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 164, there is no genuine dispute of material fact that the emails containing the news reports were sent and prepared by employees of Keppel, its parent or subsidiaries, who read the news reports before sending them. Exs. 35 at KEPPEL00422871-74, 73 at KEPPEL00049993.  Indeed, one of the February 2012 news reports (Ex. 35 at KEPPEL00422871-72) was emailed to more than 100 employees of Keppel, its parent and/or its subsidiaries, including Tong, YY Chow, Kwok, Sam, Jeffery Chow, and other Keppel executives who were working on the Sete deal during this period.

**Keppel's Reply:  No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 164.  EIG makes conclusory statements that "the emails containing the news reports were sent and prepared by employees of Keppel, its parents or subsidiaries, who read the news reports before sending them", however, the cited evidence does not support that assertion.  The cited evidence merely reflects that employees of Keppel entities sent emails containing daily press clippings and  does not establish who, if anyone, read the news reports.

165.    There is no evidence anyone at Keppel commented on or discussed the February 2012 news reports.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 165, there is no genuine dispute of material fact that the emails containing the news reports were prepared and sent by employees of Keppel, its parent or subsidiaries, and those emails were commentary on which news reports senior executives of Keppel entities should read.  Ex. 35 at KEPPEL00422871-74; Ex. 73 at KEPPEL00049993-94.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply:  No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 165.  The cited evidence does not establish that anyone at Keppel or its subsidiaries read or commented on the February 2012 news reports.   The cited evidence does not include any commentary on or discussion of the news reports.

166.    On March 9, 2012, Keppel employees were sent an email that included an article with the headline "Sete Brasil will increase capital to R$7 billion (Portos e Navios)". (Ex. , 46, PX098 at 825.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

167.    There is no evidence anyone at Keppel read the March 2012 news report.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 167, there is no genuine dispute of material fact that the March 2012 news report was read, translated, and sent by employees of a Keppel subsidiary.  Ex. 46 at KEPPEL00278825; *see infra* EIG Additional Facts ¶ 508.

**Keppel's Reply:  No genuine dispute.**  EIG's cited evidence does not controvert the assertion in Paragraph 167.  The cited evidence does not reflect that anyone at Keppel read, translated or sent the March 2012 news report, rather the cited evidence reflects that Monique Pereira, an employee of Keppel's subsidiary, Keppel FELS Brasil, sent an email containing the March 2012 news report.

168.    There is no evidence anyone at Keppel commented on or discussed the March 2012 news report.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 168, there is no genuine dispute of material fact that the March 2012 news report was sent and translated by an employee

CONTAINS CONFIDENTIAL INFORMATION

of Keppel, its parent, or subsidiaries, and that email was commentary on which news reports senior executives of Keppel entities should read. Ex. 46 at KEPPEL00278825-26; *see infra* EIG Additional Facts ¶ 508. Additionally, Exhibit 46 is evidence that other Keppel executives commented on or discussed the March 2012 news report. More than 20 employees of Keppel, its parent, and its subsidiary Keppel Brasil, including Tong, YY Chow, Kwok, and Tommy Sam—executives involved in the Sete deal and negotiating the letter of intent signed that month for five additional rigs—received the news report. Ex. 46 at KEPPEL00278825; EIG SOF ¶ 177; EIG Exh. 41 at KEPPEL00427320-24, KEPPEL00427328-30.

**Keppel's Reply:** **No genuine dispute.** EIG's cited evidence does not controvert the assertion in Paragraph 168. The cited evidence merely reflects that Monique Pereira, an employee of Keppel FELS Brasil, Keppel's subsidiary, sent a March 2012 news report via email. EIG has not provided any evidence that anyone at any Keppel entity read or translated the news articles included in the daily news report.

**O.    EIG's Third Visit to the BrasFELS Shipyard in June 2013.**

169.    According to an email dated May 28, 2013, Sete shareholders planned to visit the BrasFELS shipyard on June 6, 2013. (Ex. 54, EIG_KEP_00095123-129 at 124.)

**EIG's Response:** Admitted.

**Keppel's Reply:** **No dispute.**

170.    The June 2013 visit to the BrasFELS Shipyard was initiated by Sete shareholders. (Ex. 54, EIG_KEP_00095123-129 at 124, 128.)

**EIG's Response:** Denied. Contrary to Keppel Statement No. 170, there is no genuine dispute of material fact that Corrigan testified that the June 2013 visit was either "Ferraz's idea" or suggested by "one of the shareholders" at a Sete board meeting. Ex. 10 at 169:12-22.

- 53 -

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply**:  **No genuine dispute.**  EIG's cited evidence does not controvert the point of the assertion in Paragraph 170—i.e., that individuals associated with Sete (not Keppel) initiated the June 2013 visit to the BrasFELS Shipyard.  Moreover, the contemporaneous evidence clearly states:  "As requested by several shareholders, we are arranging to schedule a visit to the BrasFELS Shipyard, in Angra dos Reis."  (Ex. 54, EIG_KEP_00095123-129 at 128.)  The cited evidence reflects that the visit to the BrasFELS Shipyard, which was initially scheduled for May 23, 2013, was rescheduled for June 6, 2013.  (Ex. 54, EIG_KEP_00095123-129 at 127-128.)

171.    Sete arranged the June 2013 visit to the BrasFELS Shipyard.  (Ex. 54, EIG_KEP_00095123-129 at 124, 128.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

172.    There is no evidence of any communications between EIG and Keppel concerning the planning of the June 2013 visit to the BrasFELS Shipyard.

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

173.    On or around June 6, 2013, Kevin Corrigan visited the BrasFELS Shipyard along with other representatives of Sete's shareholders. (Ex. 10, Corrigan Tr. 173:02-06; Ex. 4, EIG Response to RFA 34.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

- 54 -

174.    Kevin Corrigan testified that the purpose of the June 2013 visit to the BrasFELS
Shipyard was "to see the progress of the shipyards" and that the focus of the visit was the
shipbuilding capacity of BrasFELS. (Ex. 10, Corrigan Tr. 169:08-22, Corrigan Tr. 174:13-21.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

175.    Kevin Corrigan testified that he could not recall anyone raising the subject of
corruption risks during the June 2013 visit to the BrasFELS Shipyard. (Ex. 10, Corrigan Tr.
175:07-13.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  **No dispute.**

176.    There is no evidence Keppel provided any inaccurate information in connection
with the June 2013 visit to the BrasFELS Shipyard.

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 176, there is no genuine
dispute of material fact that Keppel and/or its subsidiary gave a presentation and tour after which
"the visitors left in awe" of Keppel's rig construction work.  EIG SOF ¶¶ 260-61; EIG Exh. 71 at
KEPPEL00457152.  The presentation and tour were misleading because Keppel did not disclose
the bribery scheme to the Sete investors.

**Keppel's Reply:**  **No genuine dispute.**  EIG's cited evidence does not controvert the
assertion in Paragraph 176.  It is undisputed that bribery and corruption were not discussed
during the June 2013 visit to the BrasFELS Shipyard.  (Ex. 10, Corrigan Tr. 175:07-13.)  EIG's
additional commentary that after the presentation and tour, "the visitors left in awe" of Keppel's
rig construction work does not controvert the assertion in Paragraph 176 and is non-responsive.

EIG's additional commentary is irrelevant to the extent it implies Keppel or its subsidiaries had a duty to disclose the bribery scheme.

177.     The Complaint refers to a visit by EIG to the BrasFELS Shipyard in August 2013, but there is no evidence of any such visit in August 2013. (Ex. 1, Compl. ¶ 79.)

**EIG's Response:**  Admitted.  EIG clarifies that discovery has revealed that the visit of Corrigan to the BrasFELS Shipyard in 2013 referred to in paragraph 79 of First Amended Complaint took place in June, not August 2013.  EIG Exh. 71 at KEPPEL00457152, KEPPEL00457157.

**Keppel's Reply:**  No dispute.  EIG has admitted the assertion in Paragraph 177 and that it pleaded the wrong month of the 2013 yard visit.

**P.     Operation Car Wash.**

178.     Brazilian authorities began investigating corruption at Petrobras in a probe called "Operation Car Wash", which started as an investigation into "alleged money laundering" and grew into a larger corruption investigation involving bribery at Petrobras. (Ex. 1, Compl. ¶ 91.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

179.     By the fall of 2014, there were news reports about Operation Car Wash and the bribery scheme at Petrobras. (Ex. 6, Wall St. J., Oct. 9, 2014; Ex. 7, The Washington Post, Nov. 17, 2014; Ex. 8, Bloomberg, Dec. 3, 2014.)

**EIG's Response:**  Admitted.  EIG clarifies that in November 2014, news of a plea agreement by Barusco was made public, but there were no disclosures regarding Sete.  EIG Exh. 79 at EIG00064923-24/EIG_KEP_00148015-16; EIG Exh. 129 at 38:5-13; EIG Exh. 82 at KEPPEL00495288.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply**:  **No dispute.**  EIG has admitted the assertion in Paragraph 179.  EIG's

additional commentary does not controvert the assertion in Paragraph 179 and is non-responsive.

180.    On November 18, 2014, EIG received an inquiry from one of its investors about

the potential impact of the bribery scandal on Sete. (Ex. 32, DX109 at 926; Ex. 15, Thomas Tr.

137:02-139:03.)

**EIG's Response**:  Admitted.

**Keppel's Reply**:  **No dispute.**

**Q.    Keppel's Deferred Prosecution Agreement.**

181.    On December 22, 2017, Keppel entered the DPA to resolve "one count of

conspiracy to commit an offense against the United States, in violation of Title 18, United States

Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices

Act of 1977 ('FCPA'), as amended, Title 15, United States Code, Sections 78dd-2 and 78dd-3."

(Ex. 3, DPA at 1 ¶ 1.)

**EIG's Response**:  Admitted.

**Keppel's Reply**:  **No dispute.**

182.    The DPA states that "[f]or a number of years, executives and employees of

Petrobras with responsibility over the bidding of certain large projects . . . administered a scheme

to secure corrupt payments equal to a percentage of a contract's value from the companies

awarded those projects." (Ex. 3, DPA at A-4 ¶ 18.)

**EIG's Response**:  Admitted.

**Keppel's Reply**:  **No dispute.**

183.    The bribery scheme involving Petrobras was extended to projects awarded by

Sete in or around 2011. (Ex. 3, DPA at A-4 ¶ 18; Ex. 1, Compl. ¶ 45.)

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Admitted.  EIG clarifies that the bribery scheme was formally extended to Sete when Sete was formed in or around 2011, but the participants in the long-running bribery scheme, including Keppel, intended to continue the scheme to projects awarded in connection with the Rigs Project before Sete was formed.  *See* EIG SOF ¶¶ 26, 43-53.

**Keppel's Reply:**  No dispute.  EIG has admitted the assertion in Paragraph 183. Plaintiffs' additional commentary does not controvert the assertion in Paragraph 183 and is non-responsive and unsupported.

184.     The DPA states that "[i]n or about and between 2001 and 2014, KOM, together with others, including executives of KOM USA, knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil." (Ex. 3, DPA at A-5 ¶ 19.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

185.     The DPA states that "[i]n or about and between 2001 and 2011, KOM and KOM USA executives created and executed agreements on behalf of KOM with consulting companies controlled by [Zwi Skornicki] that were intended to facilitate bribe payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose". (Ex. 3, DPA at A-5 ¶ 21.)

**EIG's Response:**  Admitted.

**Keppel's Reply:**  No dispute.

186.     Commissions of one to three percent of a contract's value were standard each time. (Ex. 3, DPA at A-13 ¶ 63; DPA at A-15 ¶ 74; DPA at A-9 ¶ 42.)

CONTAINS CONFIDENTIAL INFORMATION

**EIG's Response:**  Admitted.  EIG clarifies that the evidence reflects that, by July 2011, Keppel agreed to pay Skornicki 2% of the contract value of EPC contracts with Sete in order to facilitate the payment of bribes.  EIG SOF ¶¶ 85-86.

**Keppel's Reply:  No dispute.**  EIG has admitted the assertion in Paragraph 186.  EIG's additional commentary does not controvert the assertion in Paragraph 186 and is non-responsive and unsupported by the cited evidence.

187.    Jeffrey Chow, Keppel's former legal director, drafted and signed the commission agreements related to Sete with Zwi Skornicki. (Ex. 9, Chow Tr. 26:25-27:03.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

188.    Jeffrey Chow testified that the "intention" of Zwi Skornicki's contracts "wasn't to conceal any bribe payments.  The intention was to capture in writing the agreement between the company and [Mr. Skornicki], that he would be paid a certain commission fee for his assistance under certain contracts." (Ex. 9, Chow Tr. 107:25-108:07-12.)

**EIG's Response:**  Admitted that paragraph 188 accurately quotes Jeffery Chow's testimony, and denied that the "intention" of Skornicki's contracts "wasn't to conceal any bribe payments."  Contrary to Keppel Statement No. 188, there is no genuine dispute of material fact that Keppel admitted in the DPA that the contracts were "intended to facilitate bribe payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose."  *See supra* ¶ 185. Jeffery Chow admitted that the contracts he drafted and signed with Skornicki related to Sete were backdated, falsely represented the purpose of Keppel's payments to him, falsely represented that he was complying with antibribery laws, and were intended to facilitate the

CONTAINS CONFIDENTIAL INFORMATION

payment of bribes and conceal the true nature and purpose of the payments.  EIG SOF ¶¶ 27,

219; *see infra* EIG Additional Facts ¶¶ 493-94.

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the assertion in Paragraph 188.

EIG's additional commentary does not controvert the assertion in Paragraph 188 and is non-

responsive, unsupported by the evidence and irrelevant because there is no evidence that

Skornicki's agreements were intended to conceal anything from EIG or investors in Sete.  There

is no evidence that Keppel entered its agreements with Zwi Skornicki to help to deceive EIG or

any other investor into an investment with Sete.  Nor is there any evidence that anyone at EIG

reviewed or requested to review any shipyard's consulting or agency agreements.

189.    Jeffrey Chow testified that:

> "[P]ayment wouldn't be able to go through the company without a
> contract or agreement that supports it.  There needs to be some
> documentation. . . .  In order to make payment out of the company,
> you need to have all the required documents there to – for the
> accounting people to sign off and say, okay, payment is being
> made.  The contract that supports it, the invoice, the bank details.
> You just can't move money out of the company without a contract
> to support why you are moving money." (Ex. 9, Chow Tr. 90:14-
> 91:05.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

190.    Jeffrey Chow testified that "the contracts themselves were the documents

necessary to process the agreement between Keppel and Zwi [Skornicki]". (Ex. 9, Chow Tr.

142:04-07.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

191.    Keppel executed two contracts, effective as of November 30, 2011 and December

1, 2011, with Zwi Skornicki's companies that provided for commission payments of 0.5% and

CONTAINS CONFIDENTIAL INFORMATION

1.5% of the price of each drillship. (Ex. 3, DPA at A-15-16, ¶ 77; Ex. 36, PX025 at 253-54, 276-78.)

**EIG's Response:**  Admitted that Keppel executed two contracts with companies controlled by Skornicki that provided for commission payments of 0.5% and 1.5% of the price of each drillship, and denied that the agreements were effective as of November 30, 2011 and December 1, 2011.  Contrary to Keppel Statement No. 191, there is no genuine dispute of material fact that the agreements were signed on or about August 7, 2012 and backdated, and Skornicki's company that was a party to the December 1, 2011 agreement—Deep Sea Oil Corp.—did not exist until April 2012.  EIG SOF ¶¶ 191, 209; *see infra* EIG Additional Facts ¶ 493.

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the point of the assertion in Paragraph 191—i.e., that Keppel executed two contracts with Zwi Skornicki's companies to provide commission payments.  EIG's additional commentary does not controvert the assertion in Paragraph 191 and is non-responsive and irrelevant.

192.    Jeffrey Chow testified that payment method that was arranged with Zwi Skornicki in connection with Sete was "the normal process that [Chow] ha[d] been familiar dealing with Zwi in the past".  Ex. 9, Chow Tr. 121:05-09.

**EIG's Response:**  Admitted that Jeffery Chow testified that the payment method he devised for Skornicki in connection with Sete was "the normal process" in the context of Keppel's participation in the Petrobras bribery scheme that was extended to Sete.  *See supra* ¶¶ 182-86.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the assertion in Paragraph 192. EIG's additional commentary does not controvert the assertion in Paragraph 192 and is non-responsive, unsupported by the evidence and irrelevant.

193.    Jeffrey Chow testified that "[t]he standard commission agreement uses the standard format that we would be using to sign with Eagle do Brasil or with any companies." (Ex. 9, Chow Tr. 88:15-18.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

194.    Jeffrey Chow testified that he had no knowledge or awareness of EIG prior to this lawsuit. (Ex. 9, Chow Tr. 117:21-25.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

195.    In accordance with the agreements, when Keppel received milestone payments from Sete for the construction of its drillships, Keppel made commission payments to Zwi Skornicki's companies. (Ex. 72, KEPPEL00045267 at 276-77; Ex. 5, Keppel Response to RFAs 1-10.)

**EIG's Response:**  Admitted.

**Keppel's Reply**:  **No dispute.**

196.    The DPA does not charge Keppel with defrauding Sete's investors, or with conspiring to defraud EIG or any other investors. (Ex. 3, DPA.)

**EIG's Response:**  Keppel Statement No. 196 is improper because it calls for a legal conclusion.  Subject to its objection, admitted.

**Keppel's Reply**:  **No genuine dispute.**  EIG has admitted the assertion in Paragraph 196.

CONTAINS CONFIDENTIAL INFORMATION

197.    Keppel did not make any admissions in the DPA concerning Sete's investors. (Ex. 3, DPA.)

**EIG's Response:**  Denied.  Contrary to Keppel Statement No. 197, there is no genuine dispute of material fact that Keppel admitted in the DPA that it "knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil."  *See supra* ¶ 184.  Keppel's payment of bribes was made using funds provided to Sete by its investors and lenders (*see supra* ¶ 195), and therefore concerned Sete's investors.  Furthermore, Keppel admitted in the DPA to entering agreements with Skornicki in connection with Sete "intended to facilitate bribe payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose."  *See supra* ¶ 185.  The facilitation and concealment of bribe payments using funds provided to Sete by investors and paid to Keppel—the revelation of which Keppel alleges prevented Sete from obtaining financing—concerns Sete's investors.

**Keppel's Reply:  No genuine dispute.**  EIG's commentary does not controvert the point of the assertion in Paragraph 197—i.e., that there are no admissions in the DPA relating to EIG or Sete's investors.   The DPA does not mention efforts to raise capital for Sete.  (Ex. 3, DPA.) EIG cites no evidence to support its conjecture concerning the DPA and its commentary is therefore irrelevant and non-responsive.

198.    The DPA does not mention EIG or any other of Sete's investors (apart from Petrobras). (Ex. 3, DPA.)

**EIG's Response:**  Admitted.

**Keppel's Reply:  No dispute.**

CONTAINS CONFIDENTIAL INFORMATION

**KEPPEL'S RESPONSE TO EIG'S STATEMENT OF ADDITIONAL FACTS**

Keppel sets forth below its Responses to EIG's Statement of Additional Facts. (See infra ¶¶ 491-511.)[4] EIG has failed to raise a genuine dispute of material fact capable of defeating Keppel's motion for summary judgment. To the extent any of EIG's additional facts are disputed, such disputes are irrelevant to Keppel's motion.

**I.     The DPA/Charges Against Keppel[5]**

491.    In the DPA, Keppel "expressly agree[d] that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for [Keppel] make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by [Keppel] set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution." Ex. 3 at 17 ¶ 20.

**Keppel Response**:   Undisputed that the quoted language appears in the DPA.

492.    In announcing the charges against Keppel, the U.S. Attorney for the Eastern District of New York stated: "In an attempt to conceal their crimes, [Keppel] used the global financial system—including the United States banking system—to disguise the source and

---

[4] EIG numbered the paragraphs in its responsive Rule 56.1 Statement of Additional Facts sequentially from the paragraphs in its Rule 56.1 Statement that it served in support of its own motion for summary judgment. EIG seeks improperly to "incorporate by reference" factual assertions made in connection with its own motion. (EIG's Oct. 19 Response at 1, n.1.) In any event, EIG's factual assertions made in connection with its own motion do not raise a genuine dispute of material fact sufficient to defeat Keppel's motion. The undisputed material facts on which Keppel's motion is based (including all of EIG's responses and Keppel's replies) are contained in the Reply section, above. (See supra ¶¶ 1-198.)

[5] The headings used in EIG's Statement of Additional Facts are not assertions of fact supported by citations to the record. To the extent such headings warrant a response, Keppel disputes each heading.

CONTAINS CONFIDENTIAL INFORMATION

disbursement of the bribe payments by passing funds through a series of shell companies." EIG Exh. 145.

**Keppel's Response**:  Undisputed that the cited document contains the quoted language. Disputed to the extent Plaintiffs imply that the cited document makes any connection to EIG or Sete's investors.  (EIG Exh. 145.)

## II.   The Consulting Agreements

493.   Jeffery Chow admitted that the Consulting Agreements were backdated.  EIG Exh. 146 at 152:5-19.

**Keppel's Response**:  Undisputed that the consulting agreements were backdated in order for "commissions to be paid" to Zwi Skornicki (EIG Exh. 146 at 152:11-15), but disputed that the cited evidence establishes that Jeffrey Chow admitted that both consulting agreements were backdated.  The cited evidence merely establishes that the agreement "between Fernvale and Eagle" was backdated.  (EIG Exh. 146 at 152:05-19.)

494.   Jeffery Chow admitted that the Consulting Agreements "existed to make payments legitimate."  EIG Exh. 121 at 27:9-19.

**Keppel Response**:  Undisputed, except to the extent Plaintiffs imply that the agreements existed to make payments to Skornicki seem legitimate to EIG or Sete's investors.  As Jeffrey Chow testified, "payment wouldn't be able to go through the company without a contract or agreement that supports it. There needs to be some documentation. . . . In order to make payment out of the company, you need to have all the required documents there to – for the accounting people to sign off and say, okay, payment is being made. The contract that supports it, the invoice, the bank details. You just can't move money out of the company without a contract to support why you are moving money." (Ex.. 9, Chow Tr. 90:14-91:05.)

## III.   The January 2011 Petrobras Presentation

CONTAINS CONFIDENTIAL INFORMATION

495.    On January 14, 2011, an employee of Petrobras sent Skornicki the January 2011 Petrobras Presentation (also referred to as the Drilling Rigs in Brazil Project presentation) by email, writing that, "It took some time but I finally got a copy of the presentation."  Ex. 44 at KEPPEL00049887.

**Keppel's Response**:  Undisputed that the cited evidence is a certified translation of an email that a Petrobras employee sent Skornicki, attaching a "Presentation to Drilling Operators." (Ex. 44 at 887-888.).  Disputed to the extent Plaintiffs imply that receipt of the Drilling Operators presentation should have put Keppel on notice of the alleged fraud.  (Keppel Reply Br. 14.)  The presentation does not mention EIG and states that it is for "Drilling Operators" rather than equity investors.  (Ex. 44 at 888.)  There is no allegation (let alone evidence) that EIG ever received the presentation.  Nor any evidence Keppel knew which other entities received the presentation.  (See supra ¶ 152.)

496.    On January 14, 2011 at 11:42 a.m., Skornicki sent YY Chow the January 2011 Petrobras Presentation.  EIG Exh. 137 at KEPPEL00281797.

**Keppel's Response**:  Undisputed, except to state that there is no genuine dispute that there is no evidence that anyone at any Keppel entity knew which other entities received the presentation and no evidence that EIG ever received the presentation, which was for "Drilling Operators".  (See supra ¶ 152; see also Keppel Br. 26.)

497.    At 3:16 p.m. on January 14, Skornicki sent the January 2011 Petrobras Presentation to YY Chow again, requesting that YY Chow "[p]lease try to open."  Ex. 44 at KEPPEL00049887.

**Keppel's Response**:  Undisputed, except to state that there is no genuine dispute that there is no evidence that anyone at any Keppel entity knew which other entities received the

presentation and no evidence that EIG ever received the presentation, which was for "Drilling Operators".  (See supra ¶ 152; see also Keppel Br. 26.)

498.    The "Main Challenges and Risks" described in the January 2011 Petrobras Presentation are substantially the same as those described in the Petrobras Drilling Presentation (also referred to as the Drilling Presentation).  *Compare* Ex. 44 at KEPPEL00049899 *with* Ex. 53 at EIG_KEP_00075198.

**Keppel Response**:  Undisputed.

## IV.    EIG's Visits to the Keppel Shipyard

499.    During his August 2011 visit to BrasFELS, Corrigan conducted due diligence "in connection with" EIG's potential investment in Sete.  Ex. 10 at 131:13-132:6.

**Keppel Response**:  Disputed, but immaterial to Keppel's motion for summary judgment. The August 2011 visit to the BrasFELS Shipyard was not conducted in connection with EIG's due diligence.  Kevin Corrigan admitted that the "sole purpose" of the August 2011 visit was "gauging [CIC's] interest in investing in Sete Brasil".  (Ex. 16, Corrigan D.C. Tr. 101:02-10.)  It is undisputed that Kevin Corrigan testified that the August 2011 visit to the BrasFELS Shipyard "concerned CIC's potential investment in Sete rather than EIG's".  (Ex. 10 at 131:13-132:06.)

500.    During EIG's March 28, 2012 visit to BrasFELS, Keppel presented regarding the "abilities of [BrasFELS] to produce these complex vessels" for the Sete project, and its employees had "a free-flowing conversation for the hour or more" of the tour and presentation regarding "how it all worked."  EIG Exh. 124 at 82:14-86:3.

**Keppel Response**:  Disputed to the extent that Plaintiffs imply that any presentation shown during the March 28, 2012 BrasFELS Shipyard visit related to anything other than the shipbuilding "capacity of the shipyard".  (EIG Exh. 124 at 84:21-25.)  Disputed to the extent that Plaintiffs imply that the "free-flowing conversation" related to anything other than the

shipbuilding process.  (EIG Exh. 124 at 85:15-86:03.)  In any event, such disputes are immaterial to Keppel's motion for summary judgment.

## V.    The Drilling Presentation and Management Presentation

501.    In 2011, Stephen Pan was a member of Keppel's board of directors.  EIG Exh. 141 at 26.

**Keppel Response**:  Undisputed.

502.    On September 27, 2011, Pan emailed Choo and Tong to ask "if someone from KOM attended [the presentations given at an offshore oil and gas industry forum in Rio de Janeiro] and you have all the papers.  If not I will send on to KOM board."  Ex. 71 at KEPPEL00040805.

**Keppel Response**:  Undisputed, except to the extent EIG implies there is any other evidence of the Drilling Presentation being circulated to anyone other than the individuals reflected in the cited evidence.  In any event, it is immaterial to Keppel's motion for summary judgment.

503.    In response to Pan's email, Choo replied to Pan and Tong, cc'ing YY Chow and Keppel's CFO Ngiam Jih Wong, explaining that he "ha[d] not seen them" and directing Pan to "[p]lease send."  Ex. 71 at KEPPEL00040805.

**Keppel Response**:  Undisputed.

504.    Sam forwarded the Management Presentation and accompanying financial model to Leong Peng Tan, Kwok, YY Chow, Jeffery Chow, and other Keppel executives on October 30, 2011, writing "[l]et's review and see what other info we need."  Ex. 33 at KEPPEL00410554.

**Keppel Response**:  Undisputed that the evidence cited contains the language quoted.  Disputed that Kwok was a Keppel executive.  Kwok was not a Keppel employee, but rather the

CONTAINS CONFIDENTIAL INFORMATION

President and CEO of Keppel FELS Brasil.  (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 158, 160.)   Leong Peng Tan was an employee of a Keppel subsidiary rather than Keppel, as shown by his email address.  (Ex. 33 at KEPPEL00410554.)  YY Chow received the email in his capacity as an employee of KOM USA, as shown by his email address.  (Ex. 33 at KEPPEL00410554.)  In any event, such disputes are immaterial to Keppel's motion for summary judgment.

505.    On October 31, 2011, LP Tan commented on the Management Presentation and financial model that "FYI.  We cannot allow further reduction of our rig price as they had a huge project budget."  Exh. 138 at KEPPEL00388231.

**Keppel Response**:  Disputed, but immaterial to Keppel's motion for summary judgment. The cited evidence does not establish that LP Tan was commenting on the Management Presentation or financial model.  LP Tan's email does not include any reference to the Management Presentation or financial model.  Moreover, there is nothing in the cited evidence to establish that LP Tan had reviewed or was commenting on these documents.  There is nothing in the cited evidence to establish that LP Tan knew which other entities had received the Management Presentation or financial model.

506.    On November 16, 2011, a Keppel employee sent an email to YY Chow, Jeff Chow, and LP Tan in which he presented "[a] few findings from the financial model" and accompanying Management Presentation for their "consideration."  Exh. 139 at KEPPEL00440820-21.

**Keppel Response**:  Undisputed.

**VI.    Keppel's Knowledge That Sete Would Raise Additional Capital**

- 69 -

CONTAINS CONFIDENTIAL INFORMATION

507.    On March 8, 2012, Sam informed Keppel's CEO Tong and COO YY Chow that he had "bumped into Ferraz (Sete's CEO) who told Zwi that Sete [wa]s very confident of raising the funds it needs from financial institutions and funds."  EIG Exh. 142 at KEPPEL00570070.

**Keppel Response**:  Undisputed that the cited evidence contains the language quoted. Disputed to the extent Plaintiffs imply that Tommy Sam was an employee of Keppel, rather than President and CEO of subsidiary Bennett Offshore. (Keppel Opp'n Exh. 149, KEPPEL_00000153-160 at 156-157.)  In any event, such disputes are immaterial to Keppel's motion for summary judgment.

508.    The March 9, 2012 article (*see supra* ¶ 166) sent to Keppel executives regarding EIG's potential investment in a new round of capital raised by Sete was identified as "[w]orth translating!" by a communications consultant, and translated and distributed by Keppel Brasil employees.  EIG Exh. 143 at KEPPEL00274222.

**Keppel Response**:  Undisputed.

## VII.    The EPC Contracts

509.    In an email dated November 19, 2011, LP Tan stated that "the total contract value for this [Sete] job" was worth at least "US$4.8 Billion ....  The biggest contract in the whole history of Keppel."  EIG Exh. 140 at KEPPEL00205263.

**Keppel Response**:  Undisputed that the cited email contains the quoted language. Although immaterial to Keppel's motion for summary judgment, Keppel clarifies that the cited evidence is a reference to the "total contract value" for all six contracts being the largest in aggregate.  (EIG Exh. 140 at 263.)

510.    Between August 28 and August 30, 2012, Sete affiliates wired more than $65 million to Fernvale in connection with the EPC contracts.  EIG Exh. 144 at KEPPEL00000266.

CONTAINS CONFIDENTIAL INFORMATION

**Keppel Response**:  Undisputed that the cited invoices show wire transfers of over $65 million in total from Sete affiliates, Bracuhy Drilling B.V., Frade Drilling B.V., Mangaratiba Drilling B.V., and Portogalo Drilling B.V., to Fernvale between August 28 and August 30, 2012.

**VIII.   Keppel's Contracts with Petrobras and Sete**

511.     Between in or about 2001 and 2010, Keppel "paid[d] bribes in connection with" and secured seven contracts or subcontracts for "projects tendered for Petrobras": the P-48, P-51, P-52, P-53, P-56, P-58, and P-61 projects.  Ex. 105 at A-5-14 ¶¶ 19, 23-24, 31-32, 37, 41-43, 45, 50-51, 55-56, 68-69.

**Keppel Response**:  Disputed as incomplete paraphrasing of the DPA, but immaterial to Keppel's motion for summary judgment.  Keppel refers to the DPA for its contents and does not dispute the admissions therein.

Dated:  November 2, 2021

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

By
          /s/ Peter T. Barbur
          Peter T. Barbur
          Rachel G. Skaistis
          Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
    pbarbur@cravath.com
    rskaistis@cravath.com

*Attorneys for Defendant Keppel Offshore & Marine Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that I caused a copy of the foregoing document to be

served via email on the attorneys of record in this action on November 2, 2021.


                    /s/     David Kumagai
                         David Kumagai