# EXHIBIT 1

**DIVERGENT**
LANGUAGE SOLUTIONS

STATE OF NEW YORK        )
                         )
                         )
COUNTY OF NEW YORK       )        ss

## CERTIFICATION

This is to certify that the attached translation is to the best of my knowledge and belief a true and accurate translation from Portuguese into English of the attached document with Bates number range EIG00091793 through EIG00091877.

_____
Matthew Garrison
Divergent Language Solutions, LLC

State of New York
County of New York
Subscribed to and sworn before me this 29th day of November, 20 20,
by Matthew Garrison.

_____
Notary Public

MATTHEW C. ZELAK
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ZE6350239
Qualified in Kings County
Commission Expires  November 7, 2024



183 Madison Avenue, Suite 416 | New York, NY 10016 | p 917.979.4513 | f 415.525.4313
600 California Street, 11th Floor | San Francisco, CA 94108 | p 415.400.4538 | f 415.525.4313
divergent@divergentls.com | www.divergentls.com

# Confidential Information Memorandum:

# *Pre-Salt Drilling Rigs Project*

## Revision #1



*Global Banking & Markets – Project Finance*
*January, 2010*

*Caution*

This material was prepared by Petrobras Netherlands B.V. ("PNBV") and by Petroleo Brasileiro S.A. ("Petrobras"), using the advisory services of Banco Santander Brasil S.A. ("Santander") and the Law Firm, Souza, Cescon, Barrieu & Flesh ("SCBF") together (the "Advisors").

Santander was hired as the Company's exclusive financial advisor during the structuring and potential capitalization process of the Special Purpose Entity ("SPE") to be established in order to hold and manage oil exploration assets ("Operation") and is authorized to disclose this material for potential investors. This material contains summary information not intended to be complete. The company provides no representation, express or implied, nor provides assurance as to the accuracy, adequacy or completeness of such information. We also clarify that neither the Company, Santander or its affiliates, subsidiaries or parents will possess, at any time, shareholder control of the SPE or be co-bound in any manner with respect to any obligations that may be assumed by SPE, or with respect to the financial results of the Operation.

This presentation contains certain forecast statements and information relating to the Project that reflect the current views and/or expectations of the Company and its management with respect to performance and future events related to the Operation. These projections are subject to risks, uncertainties and future events. We warn potential investors that a number of important factors could cause actual results to differ materially from the plans, objectives, expectations, projections and intentions expressed in this presentation. Under no circumstances shall the Company, Santander, its subsidiaries and respective affiliates, or their respective advisors, directors, agents or employees be liable to any third party (including investors) for any investment decision that may be taken based on the information and statements in this presentation or for any damages resulting thereof.

This presentation does not constitute an offer, invitation or solicitation of subscription or purchase of any securities. Moreover, neither this presentation nor its contents form the basis of any contract or commitment whatsoever.

**Market estimates**

The information and statistical data relating to the relevant market for the Operation were obtained from reports by independent consulting firms, government agencies and publications in general. The Company and Santander believe in the credibility of such sources of information.

This presentation and its contents are proprietary information of the Company and may not be reproduced or circulated, partially or totally, without the prior written consent of the Company. The terms and conditions of this material are preliminary and subject to additions, amendments and corrections.

## *Contact Information*

| PETROBRAS CONTACTS | TELEPHONE | EMAIL |
|---|---|---|
| João Carlos M. Ferraz | Esc: +55 21 3224 2881 | Email: jferraz@petrobras.com.br |
| Renato Marques Corrêa da Silva | Esc: +55 21 3224 5902 | Email: rsilva@petrobras.com.br |
| Deborah Hadid | Esc: +55 21 3224 9224 | Email: deborah.hadid@petrobras.com.br |
| Gustavo Dias Gomes Tauhata | Esc: +55 21 3224 9004 | Email: gustavot@petrobras.com.br |

| SANTANDER CONTACTS | TELEPHONE | EMAIL |
|---|---|---|
| Luiz Reis | Esc: +55 11 3553 0803 | Email: luiz.reis@santander.com.br |
| Patric Lange | Esc: +55 21 2526 9847 | Email: patric.lange@santander.com.br |
| Ivan Horig | Esc: +55 11 3012 7196 | Email: ihong@santander.com.br |
| Ricardo Szlejf | Esc: +55 11 3012 7261 | Email: rszlejf@santander.com.br |
| Albert Munck | Esc: +55 11 3012 5685 | Email: avmunck@santander.com.br |
| Leonardo Eder | Esc: +55 21 2526 9795 | Email: leonardo.eder@santander.com.br |

## *Index*

1.  **Executive Summary**                                                      **7**

    1.1.  Introduction to Pre-Salt                                         7
    1.2.  Pre-Salt Development and Exploration                             8
    1.3.  Market for Deep-Water Drilling Rigs                              9
    1.4.  The Pre-Salt Drilling Rig Project                                9
    1.5.  Investment Issue                                                 11
    1.6.  Project Structure                                                12
    1.7.  Attractiveness for Interested Parties                           14
    1.8.  Job Creation                                                    15

2.  **General View of the Sector**                                            **16**

    2.1.  World-Wide Energy Consumption                                   16
    2.2.  Fuel Production                                                 17
    2.3.  E&P Trends in Deep Waters                                       20
    2.4.  Offshore Activity in Brazil                                     20
    2.5.  Supply and Demand for Deepwater Platforms                       22
    2.6.  Re-Implementation Perspective                                   24
    2.7.  Charter Rate Project                                            25
    2.8.  Market Prices and Technological Risk                            26
    2.9.  Evolution of Drilling Rigs                                      26

3.  **Project Structure and Phases**                                          **29**

    3.1.  Introduction                                                   29
    3.2.  Phase 1                                                         29
    3.3.  Phase 2                                                         30
    3.4.  Phase 3                                                         31
    3.5.  Phase 4                                                         31
    3.6.  Operational Phase                                               33
    3.7.  Administration and Organizational Structure                     35
    3.8.  Portfolio Finance Concept                                      37
    3.9.   Credit Enhancements                                           39

4.  **Tax Structure**                                                         **42**

    4.1.  General Structure                                               42
    4.2.  Location of Entities                                            42
    4.3.  Brazil/Austria Double Taxation Treaty                           43
    4.4.  REPETRO Program                                                 43

5.  **Shipbuilding Guarantee Fund (*FGCN*)**                                  **45**

    5.1.  Introduction                                                   45
    5.2.  The FGCN                                                        45

| | | |
|---|---|---|
| | 5.2.1. Activation and Execution of the Guarantees | 48 |
| **6.** | **Main Contracts** | **50** |
| | 6.1.  Main Contractual Relationships | 50 |
| | 6.2.  Construction Contract | 50 |
| | 6.3.  Charter Contract | 52 |
| | 6.4.  Service Contract (Operations & Maintenance) | 55 |
| | 6.5.  Work Management and Inspection Contract | 57 |
| **7.** | **Corporate Governance Rules** | **58** |
| | 7.1.  SETE Brazil- Local Holding Company | 58 |
| | 7.2.  SETE International- Foreign Holding Company | 59 |
| | 7.3.  FIP- Private Equity Funds | 59 |
| | 7.4.  Petrobras Participation | 60 |
| | 7.5.  Equity Offering- Initial Public Offering (IPO) | 62 |
| **8.** | **Capital Structure and Financing Plan** | **63** |
| | 8.1.  Main Considerations | 63 |
| | 8.2.  Financing Plan | 64 |
| | 8.2.1. BNDES [Brazilian National Development Bank] | 65 |
| | 8.2.2. ECAs [Export Credit Agencies] | 67 |
| | 8.2.3. Commercial Banks-Syndicated Loans | 68 |
| | 8.3.   Preliminary Term Sheet | 68 |
| | 8.4.  Main Covenants and Obligations | 68 |
| | 8.5.  Guarantee Package | 69 |
| **9.** | **Economic-Financial Model and Analysis** | **70** |
| | 9.1.  Introduction | 70 |
| | 9.2.  Main Assumptions | 70 |
| | 9.3.  Important Dates | 70 |
| | 9.4.  Construction Schedule | 71 |
| | 9.5.  Main Macroeconomic Assumptions | 72 |
| | 9.6.  Operations Assumptions | 72 |
| | 9.7.  Tax Assumptions | 73 |
| | 9.8.  Financing Terms | 74 |
| | 9.9.  Consolidated Table of Sources and Uses of Financing | 75 |
| | 9.10. Reserve Account | 75 |
| | 9.11. Debt Service Coverage Ratio | 76 |
| **10.** | **Risks and Mitigating Factors** | **77** |
| | 10.1. Construction Risk | 77 |
| | 10.2. Risk of Cost Overruns | 78 |
| | 10.3. Risk of Delay in Beginning Operation | 80 |
| | 10.4. Performance Risk | 81 |

**Santander**

GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

v

EIG00091797

10.5. Refinancing Risk                                                             82
10.6. Risk of Ending of Austria/Brazil Double Taxation Treaty                      82
10.7. Social/Environmental Risk                                                    83

**11. Contracting Insurance                                                        84**

11.1. Third-Party Liability Insurance                                              84
11.2. Hull & Machinery                                                             84
11.3. Business Interruption or Loss of Hire                                        84

# 1. EXECUTIVE SUMMARY

## 1.1.    Introduction to Pre-Salt

*Pre-Salt is considered to be one of the most significant discoveries in the global petroleum industry within the last 30 years*

The Brazilian Pre-Salt oil province is considered to be one of the most significant discoveries in the global petroleum industry in the last 30 years.  These reservoirs are highly promising, and are considered to be the new frontier for development in the global petroleum industry.  The development of the Pre-Salt reserves will establish a new technological paradigm for the exploration of hydrocarbons in deep waters.

As a comparison, the Campos Basin (largest oil province in Brazil), responsible for almost 85% of total domestic oil production in the country, is 28,600 square kilometers area containing more than 600 drilled and completed wells.  On the other hand, the 7 blocks already conceded to Pre-Salt by ANP (National Agency for Petroleum, Natural Gas, and Biofuels) represent an area of 41,800 square kilometers, corresponding to only 28% of the Pre-Salt area, but it is 50% larger than the whole Campos Basin.  Up until March 31, 2010, there were only 15 wells drilled, 13 of which were from Petrobras[1].

*Figure 1:  Pre-Salt Map*



---

[1] Source: Petrobras

Petrobras is a concessionaire and exclusive operator of blocks conceded by the government in the Pre-Salt area. The exploration of these blocks will demand a significant increase in the capacity for drilling exploratory and production wells in deep water, which opens an unprecedented window of opportunity for the development of infrastructure related to this sector.

The strategic importance for Petrobras in the development of the Pre-Salt petroleum fields lies not only in the maintenance of its high index of reserve repositioning, but also to guarantee a long-term position among the large players in global petroleum production.

## 1.2.      Pre-Salt Development and Exploration

*There are not enough drilling rigs in the current international market with the characteristics required for the well-drilling project*

The characteristics of the reserves, the depth of the wells (more than 7000 meters) and the depth of the sea (up to 3000 meters) demand the use of special drilling rigs and cutting-edge technology.  Currently there are not enough drilling rigs in the international market with the characteristics required for the well-drilling project. Therefore, a substantial volume of new equipment will be required for Pre-Salt exploration.

As exclusive operator of the blocks under its concession, Petrobras will need to hire the chartering and operation of 40 drilling rigs (drilling vessels or semi-submersible platforms) until 2019 for the blocks already conceded.  To meet this demand, in 2008 Petrobras launched a bid for the chartering of an initial package of 12 new drilling rigs that are being constructed in shipyards abroad with an expected delivery date between 2011 and 2012.

*Table 1: Drilling Rigs Contracted through International Bid in 2008*

| Drilling Rig | Operator | Shipyard | Expected Delivery |
|---|---|---|---|
| Delba VI | Delba | N.A. | 2012 |
| Delba VI | Delba | N.A. | 2012 |
| Delba VII | Delba | DSME – South Korea | 2011 |
| Delba VIII | Delba | DSME - South Korea | 2011 |
| Norbe VIII | Odebrecht | DSME - South Korea | 2011 |
| Norbe IX | Odebrecht | DSME - South Korea | 2011 |
| TBN 1 | Schahin | Samsung - South Korea | 2011 |
| TBN II | Schahin | Samsung - South Korea | 2011 |
| Alpha Star | Queiroz Galvão, Scorpion | Keppel Fels - Singapore | 2012 |
| Carolina | Petroserv | DSME - South Korea | 2011 |
| Etesco VIII | Etesco | Samsung - South Korea | 2011 |
| Sevan Brasil | Sevan | Cosco/Qidong - China | 2012 |

*Source: E&P Petrobras*

_____

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

8

EIG00091800

*28 of the 40 drilling rigs required for the first phase of Pre-Salt exploration will be built in Brazil.*

For the other 28 drilling rigs, the government, conceding the blocks, raised the minimum index for national content, and, as a result, they will be built in Brazilian shipyards and will count on the massive participation of national companies to supply assets and services.  This scenario will create economic development conditions for the industry's entire supply chain, and can promote the specialization and competitiveness of this niche in the country.

*Table 2: Drilling Rig Units in Use by Petrobras Worldwide (Exploration & Production)*

|  | Leasing | Petrobras | Total |
|---|---|---|---|
| Onshore | 31 | 13 | 44 |
| Offshore | 36 | 9 | 45 |
| Jack-up | 2 | 5 | 7 |
| 500 to 1.000 metros | 9 | 2 | 11 |
| 1.000 to 1.500 metros | 12 | 1 | 12 |
| 1.500 to 2.000 metros | 8 | 1 | 9 |
| 2.000 to 2.500 metros | 4 | 0 | 4 |
| 2.500 to 3.000 metros | 1 | 0 | 1 |

*Source:  Petrobras Form 20-F 2009*

### 1.3.        Market for Deep-Water Drilling Rigs[2]

*Petrobras is by far the largest player in the deep and ultra-deep waters segment*

The global supply of deep-water drilling rigs is reasonably fragmented, with a total of 40 companies involved in the ownership and management of the fleet, and being that the five largest companies hold approximately half of the entire availability of drilling rigs with these characteristics.

In respect to the contractors in this market (petroleum operators), Petrobras is by far the largest player, responsible for more than one fourth of the deep-water drilling rigs (33 drilling rigs) contracted. Regarding drilling rigs for ultra-deep waters[3], Petrobras has 11 contracted drilling rigs, twice as many as number 2 on the list of operators using this type of equipment.

### 1.4.        The Pre-Salt Drilling Rig Project

The Pre-Salt Drilling Rig Project (the "Project") involves the creation of a company, Sete Brasil Participações ("Sete Brasil") which will be the holder of seven drilling rigs ("First System"), all through Charter Contracts with Petrobras.  The total investment for the First System is approximately USD 5.5 billion (value in December 2010).  These latest-generation drilling rigs will be built in Brazil and will operate in the Brazilian Pre-Salt

---

[2] Source: ODS-Petrodata, May 2010
[3] Drilling rigs with drilling capacity of more than 7500 feet

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

9

EIG00091801

area. The first drilling rig is estimated to enter into operation in 2015, and the last in 2019.

The primary objective of the Project is to supply Petrobras with drilling rigs that are built in Brazil, that are latest-generation, high-quality, with competitive costs, and with the capacity for full operation in the Brazilian Pre-Salt area. A flexible financing structure and rapid implementation will permit construction of the rigs in Brazil and result in a charter rate for Petrobras at levels practiced in the international market, for the same conditions and characteristics. The financial solution should consider an off-balance sheet structure without recourse for Petrobras (without recourse against Petrobras and without the consolidated debt on its balance sheet).

To promote the economic development of a national shipbuilding and drilling rig operation on a large scale, including the entire production chain, the Project counts on strong support from the federal government, including financial support, through the creation of a guarantee fund intended to mitigate the risk of building drilling rigs in the country (Reserve Fund for Naval Construction, or "FGCN").

*Table 3: Project Objectives and Rationale*

| Objectives | Rationale |
|---|---|
| Local construction of the drilling rigs with government incentives | Develop infrastructure and shipbuilding in Brazil, through the installation of four world-class shipyards |
| Off-balance sheet financial structure for Petrobras in accordance with IFRS | Avoid impact on Petrobras ratings, leverage and financial statements |
| Flexible financial structure in order to accommodate different types of financing | Ensure availability of necessary resources optimally, extending deadlines and minimizing costs |
| Stimulate competition between suppliers | To reduce construction costs |
| Manage risk efficiently | To reduce construction period and minimize delays |
| Low maintenance cost and simple structure | Reduced operating time |
| Structure implementation quick and easy | Reduce time to go to market |
| Insert liquidity throughout the production chain, including shipyards | Allow the development of the entire production chain linked to this industry |
| Eliminate any right of recourse of any participant in the financial structuring against Petrobras | Petrobras' commitments in the project will be limited only to payments of charter rates for the provision of the drilling rigs if and when they become available for operation and in proportion to the rate of operational |

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

10

EIG00091802

| Objectives | Rational |
|---|---|
| | (up time) |

## 1.5.   Investment Issue

*Partnership with Petrobras - leader in exploration in deep water and sole Pre-Salt operator*

Petrobras is the fourth largest energy company in the world[4], measured by petroleum production and is the second largest company in terms of market value.  In terms of deep-water petroleum production, Petrobras is the absolute leader, with approximately 23% of market share.

Today Petrobras has 61 drilling rigs (46 semi-submersible and 15 drilling vessels) in operation or contracted, of which 11 are for ultra-deep waters and 5 are operating in Pre-Salt[5].

Petrobras's participation will increase in comparison to the current situation where it is only acting as a drilling rig contractor.  Concerning the Project, Petrobras will contribute in the following manner: (i) as a contractor of drilling rig charter, (ii) as a manager and supervisor of the works, (iii) as a shareholder of the Brazilian holding company (Sete Brasil), which will consolidate all of the Project's financial investors, participating with a minimum of 5% and maximum of 10% of their share capital, and (iv) as operator of 2 of the 7 drilling rigs making up the First System to be allocated to the project, all with a 20-year charter contract.  The Project's other drilling rigs, 5 in total, will be operated by third parties and will have 10-year charter contracts.

*Long-term contracts with high levels of cash-flow predictability*

The 10-year contracts (5 drilling rigs) and 20-year contracts (2 drilling rigs) are much longer than the average 1-5 year contracts generally practiced in the market. In any case, payment of the charter contracts is directly linked to operator performance, measured by drilling rig availability ("uptime") and is independent of the drilling success, level of production or price of oil.  If the uptime is greater than 94%, the charter contracts foresee a bonus payment that is proportional and growing and that could reach up to 10% of the daily cost of the charter.

*Market with strong potential for growth and consolidation*

The Pre-Salt Drilling Rig Project has led to the rise of one of the largest deep-water drilling rig companies in the world, surpassed in this segment only by *Transocean* and *Seadrill*.  Since its creation, this new company has already been contracted to charter drilling rigs to one of the largest energy companies in the world - Petrobras.

---

[4] Source: PFC Energy 2009 – ref. January 2010
[5] Source: ODS- Petrodata, May 2010



*State-of-the-art drilling rigs with a high market value after 10 years*

According to projections by ODS-Petrodata[6], the demand for deep-water drilling rigs will remain high in the future.  ODS-Petrodata estimates that in the year 2025, drilling rigs similar to those built in Brazil will have a market value of USD 475-850 million[7] (an average of USD 662 million).

In addition, the risk of technological obsolescence is considered to be low during the first 25 years of the drilling rig's lifespan, and, looking at all of the drilling rigs worldwide, today's average lifespan is 22 years.  Such a condition gives the project an excellent perspective, and these drilling rigs will generate a sustainable and increasing cash flow through new charter contracts throughout their lifetime, with Petrobras or with another petroleum operator.

## 1.6.      Project Structure

*Introduction*

The 28 units will be built by Brazilian shipyards and will be contracted by Petrobras in lots that are identical to each other.  Due to the long period of time between the start of construction of the first (2011) and last (2019) drilling rigs, the Project's 28 units will be divided up into 4 "systems".

*First System of seven drilling rigs*

In function of the medium-term needs of Petrobras, it was decided that the First System would feature 7 drilling rigs, which will be built by a shipyard.  The selected shipyard should build the 7 perfectly identical, vessel-type drilling rigs using a design that is dominant and widely-accepted by the industry.

According to the Petrobras time schedule for the First System, the estimated start of construction for the first drilling rig is 2011.

*Preemptive rights for the next systems*

The other 3 systems will include the remaining drilling rigs, and the exact number of units for each of these additional systems has not yet been defined by Petrobras.

Petrobras will grant Sete Brasil priority in developing new drilling rigs, identical or similar to those in the first lot, and with the same conditions concerning price, deadline and physical characteristics.

The preemptive right shall be exercised for 21 new drilling rigs, in addition to the first 7, for 12 months from the date of the approval of the contract for the First System, the original document having a deadline of 6 months, renewable for an equal period, if necessary.

---

[6] ODS-Petrodata is an international consulting firm specializing in the production of consolidated reports related to the offshore oil industry.  The estimates related to this number consider known data until May 2010.
[7] This variation is due to different scenarios of international oil prices, in accordance with the model created by ODS-Petrodata.



For 2 years starting from the signature of the construction contract for the first lot, Petrobras and its subsidiaries are prohibited from constructing parallel vehicles with characteristics similar to those used in the Project and that are to be used to charter drilling rigs to Petrobras, until the 28 drilling rigs under the Project are constructed as per contract.

The financial structure designed by Petrobras can be divided into 4 phases:

*Phase I*
A Special Purpose Entity (SPE) will be created for each drilling rig, and these will contract the construction of the 7 drilling rigs and will be owners of the assets (one drilling rig per SPE). Sete Brasil Participações ("Sete Brasil" or "Local Holding Company") and Sete International GMbH ("Sete International" or "Foreign Holding Company") will also be created, and the latter will be a wholly-owned subsidiary of the former, and will hold an 85% stake in each of the SPEs.

At the end of the first phase, the drilling rig construction contracts will be signed with the shipyards and the charter and service contracts will be signed with Petrobras.

*Phase 2*
The financial investors (Pension Funds and Private Equity firms, for example) will be incorporated into the Project[8] through an exclusive drilling rig private equity fund which will have as its sole asset 90% of the share capital of Sete Brasil (with the remaining 10% held directly by Petrobras). However, Sete Brasil will be the sole holding company (holding 100% of the shares) of Sete International, specifically intended to participate in the share capital of each SPE. To regulate this participation, the SPEs will have 2 types of shares (Class A and Class B). The Class A shareholder for all SPEs will be Sete International and the Class B shareholders will be companies that specialize in drilling rig operations; each SPE will have only 1 Class B shareholder during the life of the project. Initially, during Phase 2, Petrobras will be the sole Class B shareholder ("Strategic Shareholder", or "Specialized Operator") of all SPEs, however, Petrobras will later select 5 of the SPEs from the First System to transfer all of their Class B shares in the SPEs to another company that specializes in drilling rig operations. The details of each type of shares are described in Chapter 3.

*Phase 3*
The search for senior debt that the project requires will occur during Phase 3. For this phase, Petrobras and Sete Brasil will retain a bank ("Financial Advisor") to be responsible for structuring the debt and raising the financial resources required by the project, in addition to all funds raised up until this phase. The financing is expected to rely on the massive participation of BNDES and export credit agencies (ECAs), commercial banks, and other financial institutions.

---

[8] After selection and contracting of the shipyards and signing of the charter contracts with Petrobras (consequently, after definition of the charter daily rates).

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

13

EIG00091805

*Phase 4*

Before the physical completion of the five drilling rigs in the First System, Petrobras will begin the process of selling the Class B shares of these 5 SPEs to strategic shareholders (specialized operators). This sale will be done through a selective process together with pre-qualified companies that are included on a short list. It is worth noting that the new specialized operator's step-in (full exercise of the transfer of Class B shares and effective start of its strategic shareholder status) should occur only (i) after the acceptance tests are performed by Petrobras, the future operator and other required specialists (Independent Engineer, classification society, governmental agents, etc.), (ii) satisfactory completion of all obligations assumed by the Specialized Operator in the Asset Purchase and Sale Commitment Agreement and (iii) the absence of any Material Adverse Effect situation in relation to the future operator, its parent company or subsidiaries.

### 1.7.    Attractiveness for Interested Parties

*Financial Investors*

- The fall in Brazilian interest rates over the last few years will motivate national institutional investors to look for new types of investments;
- Investors will have the opportunity to participate in a project with long-term contracts with a high probability of cash flows;
- Explore "new frontiers" together with Petrobras;
- Opportunity to participate in projects with the potential for an attractive return
- Opportunities for long-term upsides that are very advantageous.

*Operators*

- Establishment and broadening of the Oil Services industry in Brazil;
- Increase in market share, with less investments and without recourse;
- Leverage internal rates of return (IRR) in relation to similar projects;
- Interest already shown by the activity/business (business risks are already accepted by the market players);
- Limitation on the ability to develop a large number of simultaneous projects (mainly national operators);
- A unique opportunity to participate in multiple projects;
- Potential to purchase drilling rigs at the end of the initial charter contract, even for the current market price (without any bargaining conditions);
- Facilitates the entrance of national operators who are trustworthy and have experience.

*Funders*

- BNDES will have a key role in leading the financing package for the vessels;
- The FGCN reduces the perception of risk and will leverage the best interests of the funders;
- Pre-Salt has become a global issue and has attracted the attention of local and international funders;
- Funders are greatly attracted: opportunity to participate in the new Pre-Salt industry together with Petrobras.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

14

EIG00091806

*Federal Government*
- The Federal Government is faced with a unique opportunity to establish Brazil as a new, modern and competitive structuring industry, without the need for direct investment;
- To directly and actively participate in the development of the Brazilian Pre-Salt industry, modernizing and preparing the entire Brazilian production chain to meet the needs of the country's naval industry so that it can count on orders for decades to come, no longer requiring development banks or government funds;
- To create investment and re-investment opportunities in the country to apply the resources that will be generated by Pre-Salt exploration, diminishing risks of an emergence in Brazil of Dutch Disease (mismatch between large export surplus and domestic structural growth).

*Petrobras*
- Have at its disposition, through long-term contracts, the drilling rigs required to implements its program for Pre-Salt drilling wells, within the required technical specifications, and meeting the level of local content demanded by the government and with competitive prices for daily chartering;
- Avoid recourse against the company by Project participants (funders, suppliers, investors, etc.);
- Preserve the active participation in deep-water drilling rig operations by traditional and trustworthy operators;
- Avoid having the Project's consolidated assets and liabilities on its balance sheet.

### 1.8. Job Creation

*The Drilling Rig Project is extremely important for the Brazilian economy, with the ability to create more than 40 thousand jobs in Brazil for each lot of seven drilling rigs.*

It is estimated that more than 37,000 jobs will be generated by the construction of each System of 7 drilling rigs:

- Direct: 9300
- Indirect: 27,900

In addition, it is estimated that approximately 6000 jobs will be created by the construction of new shipyards:

- Direct: 1500
- Indirect: 4500

Therefore, approximately 54,000 direct and indirect jobs will be created by the 7 drilling rigs in the First System.

---

[14] That which was allowed by Law 12,024, of August 27, 2009, for which implementing regulations are currently being prepared by the Executive branch.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

15

EIG00091807

## 2. GENERAL VIEW OF THE SECTOR

### 2.1.     World-Wide Energy Consumption

According to International Energy Outlook 2009 (IEO2009), worldwide energy consumption should increase by approximately 44% between 2006 and 2030, from 472 quadrillion British Thermal Units (Btu) in 2006 to 552 quadrillion Btu in 2015 and 678 quadrillion Btu in 2030.

The current global economic crisis weakened the energy demand growth rate in the short term with even a short drop in consumption in 2009 (the first consumer drop observed since 1981), yet the economic recovery predicted beginning in 2010 should again increase demand and the production of goods and services, to again raise energy consumption to positive growth rates, returning to the long-term trend line.

The increase in energy consumption foreseen for the period between 2006 and 2030 should come mainly from the countries that are not part of the Organization for Economic Cooperation and Development (OECD).  The higher expected economic growth for emerging countries and non-OECD countries should generate an energy demand growth rate of 73% for this group between 2006 and 2030, against 15% for OECD members during this same period.

*Figure 2: Worldwide Energy Consumption*



*Source: IEO 2009*

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

16

EIG00091808

## 2.2.        Fuel Production

To meet the increase in energy demand, IEO2009 projections indicate a production increase for all types of fuel, especially fossil fuels (derived from oil, natural gas, and coal), which should continue to provide most of the world's energy consumption. In this group, liquid fuels are the most present with growth projections from approximately 85 million barrels of oil equivalent (BOE) per day in 2006 to 91 million BOE per day in 2019 and 107 million BOA per day in 2030.

*Figure 3: Main Energy Sources*



*Source: IEO 2009*

The increase of 22 million BOE per day in the production of liquid fuels between 2006-2030 should come both from countries that are members of the Organization of Petroleum-Exporting Countries (OPEC), with a total estimated production of 44 million BOE in 2030, as well as from countries that are not members of OPEC, with a production of 63 million BOE.

Part of this growth, approximately 10 million BOE per day, will come from non-conventional sources (biofuels, bituminous sands, Coal-to-Liquids (CTL) and Gas-to-Liquids (GTL)) and approximately 12 million BOE per day will come from conventional sources (oil, condensates and LPG).

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

17

EIG00091809

*Figure 4:  Liquid Fuels Production- By Region*



*Source:  IEO 2009*

Non-OPEC-member countries should be responsible for almost all of the production growth of non-conventional fuels (approximately 10 million BOE per day).

OPEC-member countries should be responsible for a large part of the production growth of conventional fuels (approximately 8 million BOE per day).

*Figure 5: Production of Conventional Liquid Fuels: OPEC-Member Countries*

*Source: IEO 2009*

For the period under analysis, the non-OPEC-member countries which will contribute the most towards the production of traditional (and non-traditional) liquid fuels are the USA and Brazil.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

18

EIG00091810

*Figure 6: Production of Conventional Liquid Fuels:  Non-OPEC-Member Countries*



*Source:   IEO 2009*

It should be mentioned that the increases in production are based on volumes produced in 2008.  Thus the effective growth of liquid fuel production must take into account the natural production declines from existing fields.

In this scenario, it is estimated that in 2030 the production from existing fields will decline by approximately 1/3 of the 2008 volume, therefore increasing the need for new discoveries capable of covering a potential production deficit of 60 million BOE in 2030.

*Figure 7: Liquid Fuel Production by Source in 2030*



*Source: IEO 2009*

2.3.        E&P Trends in Deep Water

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

19

EIG00091811

Within this context, the exploration and development of hydrocarbon reservoirs, especially in non-OPEC-member countries, located in sedimentary basins off the ocean coasts of Brazil, the Gulf of Mexico and Africa (known as the "Golden Triangle") is gaining importance.

Recently, special attention has been given to the exploration of potential basins located in deep and ultra-deep (a layer of 3000+ meters) waters that differ from deposits located in shallow water by the fact that they have the potential for large reserves of hydrocarbons (over 1 billion barrels).

Another feature inherent in the development of sedimentary basins located in deep and ultra-deep waters is the fact that few companies master the "know how" necessary for the effective exploitation of these potential hydrocarbon reserves. Petrobras is clearly an exception.

## 2.4.     Offshore Activity in Brazil

The Golden Triangle area should focus most of its exploratory efforts in deep water, despite some activity of this kind being developed in northwest Europe, the Mediterranean Sea, the Indian Ocean, Southeast Asia and Australia.

Petrobras has pioneered the development of deep-water offshore activities and was responsible for the discovery and development of the vast majority of hydrocarbon deposits off the Brazilian coast. Over time, these discoveries have allowed the country to pass from being an importer of oil to an exporter.

*Figure 8: Discovery per Year- Offshore Brazil*



*Source: ODSP Discoveries Database*

The reduction in the number of new reserve discoveries is mainly due to a very successful Petrobras effort to put already-identified fields into production. However,

the main discoveries of recent years were in deep or ultra-deep waters (a layer of 2000 meters or more of water).

*Figure 9: Discoveries per Year – Brazil, Offshore*



*Source:  ODSP Discoveries Database*

A good example of offshore discoveries in Brazil is the giant Tupi field which is expected to keep producing for more than a decade. Petrobras planned a long-term test starting in 2009 and, after that, the operator estimated 6-10 full phases, with at least 10 wells during each phase, in order to fully utilize this Pre-Salt formation. The recoverable reserves are estimated at between five billion to eight billion barrels of oil and, in comparison, the largest North Sea field had one billion recoverable barrels and Thunder Horse, part of the largest field in the Gulf of Mexico, also had one billion barrels.

It is true that the flow of large projects will sustain a high demand for drilling rigs in the region, and, as a result of discoveries made during the last two years (Tupi, Jupiter, Carioca and other fields), the future demand for Petrobras deep-water drilling rig platforms will be by far the greatest among all the operators and, given its dominant market position, this is not expected to change under these terms in the medium term.

The following chart shows an estimate by ODS-Petrodata of Petrobras' future demand for deep-water drilling rigs, demonstrating expectations of strong growth.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

21

EIG00091813

*Figure 10:  Petrobras Demand for Platforms- Estimate (Rigs rate >3000 feet):*



*Source: ODSP Discoveries Database*

## 2.5.    Supply and Demand for Deepwater Platforms

In 1990 the segment of deep-water drilling rigs represented a small share of the world's fleet of drilling rigs (only 20 drilling rigs). During the 1990s there was a construction period for new, deep-water rigs and an upgrade in existing equipment. In 2002, deep-water rigs numbered more than 80. In 2007, work began on a new wave of sixth-generation rigs. Currently, there are over 140 rigs in operation and 60 under construction.

The supply side of the deep-water drilling rigs market is fairly fragmented, with a total of 40 companies involved in owning and managing the fleet. Transocean holds approximately 25% of the market, and the five largest owners (Transocean, Diamond, Noble, Pride and Seadrill) hold only a little more than half of this fleet.

*Figure 11: Deep-Water Fleet (including Equipment under Construction)*



*Source:  ODS-Petrodata*

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

22

EIG00091814

Concerning the operators (Oil & Gas companies), Petrobras is the most important by far.  This company is currently responsible for 33 of 118 rigs under contract (including those under construction).  In the market for ultra-deep water drilling rigs, Petrobras is even more dominant, with 11 drilling rigs, more than twice as many as the second operator (Anadarko and Chevron, with 5 each).

*Figure 12: Worldwide Fleet of Deep-Water Drilling Rigs - By Operator*



*Source: ODS Petrobras*

*Figure 13: Worldwide Fleet of Ultra-Deep-Water Drilling Rigs - By Operator*



*Source:  ODS- Petrodata*

The following chart shows ODS-Petrodata's estimated supply and demand for deep-water drilling rigs for three oil price scenarios (high, mid and low case). It is worth noting that, according to the ODS-Petrodata forecast, the number of deep-water drilling rigs will nearly double in the next 15 years. In addition, the ODS-Petrodata estimate finds little imbalance between supply and demand, i.e., new shipyard orders

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

23

EIG00091815

are based on existing charter contracts and few platforms are built for speculation purposes.

*Figure 14: Market Equilibrium of Deep-Water Drilling Rigs*



*Source: ODS-Petrodata*

2.6.        Re-Implementation Perspective

The following graph shows the demand by region for platforms with a deep-water drilling capacity of a layer of water greater than 7500 deep. The Project's drilling rigs will be equipment of the latest generation and will therefore be suitable for the large majority of deep- and ultra-deep-water exploration areas, for example the Golden Triangle, or the Gulf of Mexico, Brazil and West Africa, as well as other areas under development (Southwest Asia, Indian Ocean and Oceania).

There are therefore many opportunities to re-deploy drilling rigs, even in a scenario of non-renewal of charter contracts.

*Figure 15: Demand for Deep-Water Drilling Rigs by Region (mid-case scenario)*

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

24
EIG00091816

*Source: ODS-Petrodata*

2.7.     Charter Rate Projection

The figure below shows expected charter rates until 2025 for vessel-type and semi-submersible drilling rigs.  As shown, the price cycles capture periods where rig offer and demand are not exactly balanced. However, it is estimated that these imbalances are small and their volatility to charter rates is limited.

*Figure 16: Historical Daily and Projected Rates for Deep-Water Platforms*



*Source: ODS-Petrodata*

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

25

EIG00091817

## 2.8.    Market Prices and Technological Risk

The oil industry is typically conservative, and the deep-water exploration industry is not an exception. The main equipment (jack-ups, vessel drilling rigs, and semi-submersible drilling rigs) were developed in the 1950's and 1960's.  Additionally, the drilling rigs are demonstrating an impressive life expectancy, with many rigs over 30 years old operating with excellent availability levels.  The current international fleet is more than 22 years old, on average.

*Figure 17: Average Age of Deep-Water Platforms*



*Source:  ODS-Petrodata*

The figure below shows ODS-Petrobras' estimation of market values. In 2013, some of the Project's rigs will be approximately 15 years old, which corresponds to probably ½ of their useful life, however their market value will be significant.

*Figure 18:  Estimated Future Market Values of Deep-Water Platforms*

| Rig Values - USD Million (2010 dollars) | | |
|---|---|---|
| | *Semi-submersibles* | *Drillships* |
| *2015* | *USD 550 to USD 650* | *USD 560 to USD 660* |
| *2020* | *USD 525 to USD 750* | *USD 525 to USD 750* |
| *2025* | *USD 475 to USD 850* | *USD 450 to USD 825* |
| *2030* | *USD 425 to USD 900* | *USD 400 to USD 900* |

*Source: ODS-Petrodata*

## 2.9.    Evolution of Drilling Rigs

The figure below graphically pictures the evolution of rig types, from conventional land rigs to semi-submersible drilling rigs and latest-generation shipping vessel drilling rigs.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

26

EIG00091818

*Figure 19: Evolution of Types of Drilling Rigs*



*Source: Petrobras*

*Table 4:  Summary of Drilling Rig Types*

| Type | Brief Description |
| --- | --- |
| Fixed Platform | These were the first units used.  They have been the preferred units for water layers of up to 300 meters.   Usually fixed platforms are comprised of modular steel structures installed at the operation site with piles driven into the seabed. Fixed platforms are designed to receive all drilling equipment, store materials, and accommodate staff as well as all necessary facilities for the production of the wells. |
| Auto-Elevated Platform | These basically consist of a ferry equipped with a support structure, or legs, which, when driven mechanically or hydraulically, move down until they reach the seabed. Then the platform is raised high above the water level, to a secure height which is above the swell of the waves.  These platforms are mobile, being transported by tug boats or self-propelled. They are intended for exploratory drilling on the continental shelf, in water depths ranging from 5 to 130 meters. |
| Semi-submersible Platforms | These are composed of a structure of one or more decks supported by columns on a semi-submerged pontoon. A floating unit suffers from movements due to the action of waves, currents and winds, with the possibility of damaging the equipment to be lowered into the well. Therefore, it is necessary that it is positioned on the surface of the sea, inside a circle with a tolerance radius dictated by subsurface equipment.  The operation is carried out in a layer of water. Two types of system are responsible for the positioning of the floating unit: the anchoring system and the dynamic-positioning system (DPS). <br> The anchoring system consists of 8 to 12 anchors and cables and/or chains acting as springs that produce efforts able to restore the floating position when it is modified by the action of waves, wind and currents. <br> With the dynamic positioning system, there is no physical connection of the platform to the seabed, except the drilling equipment. Acoustic sensors determine the drift, and computer-powered propellers in the hull restore the platform position. |

🔥 Santander

GLOBAL BANKING & MARKETS

Confidential

SOUZA, CESCON, BARRIEU & FLESCH

ADVOGADOS

27

EIG00091819

| Type | Brief Description |
|------|------------------|
| | The semi-submersible platforms may or may not be self-propelled. In any case, they are highly mobile, and are the preferred drilling rig for exploratory wells. |
| Drillships | Drillships are vessels designed to drill subsea wells. The drilling derrick is located in the center of the vessel, where an opening in the hull allows passage of the drill string. The drillship's dynamic positioning system, consisting of acoustic sensors, propellers and computers, cancels the effects of wind, waves and currents that tend to move the ship from its position. |

*Source: Petrobras*

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

28

EIG00091820

## 3. PROJECT STRUCTURE AND PHASES

### 3.1.        Introduction

The financial structure conceived by Petrobras and its Advisors includes 4 phases, from the contracting of the shipyards by the SPEs to the sales of Class B shares to operators.

*Table 5: Summary of Project Phases*

| Phase | Brief Description |
|---|---|
| Phase 1 | Formation of SPEs and Holding Companies |
|  | SPEs contract shipyards |
|  | Charter Contracts signed with each SPE |
|  | Service Contracts signed |
| Phase 2 | Fundraising with financial and institutional investors |
| Phase 3 | Senior debt with BNDES, commercial banks, ECAs and others |
| Phase 4 | Sale and transfer of Class B shares to strategic shareholders (operators) |

*Source: Petrobras*

### 3.2.        Phase 1

**Time Period**

May 2010 – February 2011

**Activity**

The SPEs contract the construction of the First System of drilling rigs (seven drilling rigs) to be built in Brazil by a shipyard.

The SPEs, Sete Brasil Participações S/A (holding company located in Brazil) and Sete International GmbH (holding company located in Austria) will also be formed during Phase 1. Sete International was already formed.

After the formation of the SPEs and the hiring of the shipyard for the First System, Petrobras will sign a Charter Contract with each SPE. The daily rate (charter rate) will be determined by Petrobras as a function of the investment of each drilling rig, the capital structure of each SPE, shareholder remuneration and other operational, administrative, tax and financing costs associated with the Project.

Parallel to the Charter Agreement, Petrobras will sign the seven Service Contracts, initially contracted using a subsidiary of Petrobras itself.

Also during Phase 1, each SPE will be responsible for the direct contracting of credit guarantees from FGCN.

**Bidding Process**

Traditionally, the Petrobras drilling rig bidding process is based on the lowest Charter Rate, where the operator is responsible for the construction and operation of the drilling rig within the timeframe stipulated by Petrobras.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

29
EIG00091821

However, for this operation Petrobras held a bidding process for the construction of rigs in Brazil based on the lowest construction cost. A bidding process is being conducted for the supply of seven vessel-type drilling rigs for the First System.

The technical and commercial proposals of the shipyards were delivered to Petrobras in late May 2010. In November 2010, the Atlântico Sul Shipyard ("EAS" in Portuguese) (whose shareholders are Grupo Camargo Corrêa, Queiroz Galvão, Samsung Heavy Industries, and the company PJMR) presented the lowest proposal for the construction of a batch of seven drilling rigs: USD 4.650 billion for seven rigs, or USD 664.2 million per drilling rig.

EAS is located at the Port Industrial Complex of Suape, in the city of Ipojuca, in Pernambuco.  EAS will be the shipyard for the First System.

*Figure 20:  Diagram of the Shipyard Contracting Process*



*Source:  Santander and Petrobras*

### 3.3.        Phase 2

*Time Period*        May 2010 – April 2011

*Activity*        Search for financial investors, formation of the Private Equity Fund, first injection of capital and creation of other investment vehicles required by the Project during this phase.

The SPEs will offer two types of shares (Class A and Class B), with equal economic rights, but with differences in shareholder profile and qualifications.  The Class A shareholder is a company located in Austria (Seven International) that will act as a holding company owning 85% of the share capital of each of the SPEs. Sete International, in turn, is a wholly-owned subsidiary of a holding company located in Brazil (Sete Brazil) which will be held by Petrobras (10% share) and financial and institutional investors gathered in a sole Private Equity Fund (90% share).

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

30

EIG00091822

The Private Equity Fund will provide simple and direct access for national pension funds (and other financial investors) to contribute resources to the project.

While the Class A shareholders will be the same for the entire system, each SPE has only one Class B shareholder during the life of the Project. Initially, during Phase 2, Petrobras will be the sole Class B shareholder of all SPEs, responsible for managing the construction and, where appropriate, responsible for the operation of the drilling rigs. During a second period, Petrobras will select new, Specialized Operators that will acquire the Class B shares that were issued by the respective SPEs, and until then held by Petrobras.

*Subordinated Debt*

In order to enjoy the tax advantages of the Brazil-Austria Double Taxation Treaty, Petrobras and Santander are considering having part of the shareholders' Class A investment be held in the form of subordinated debt (respecting the preference of senior BNDES financing, ECAs and commercial banks). Alternatively, the possibility is also being studied for having investors other than the Private Equity Fund shareholders participate in the Project's subordinated debt.

### 3.4.      Phase 3

*Time Period*

January 2011 until the Financial Closing

*Activities*

The main activity of Phase 3 will be to search for the Project's senior financing at the SPE level.

For this phase, Petrobras and Sete Brasil will hire a Financial Advisor to be responsible for the structuring of debt and raising of financial resources required by the project, as a complement to all funds raised up until this stage.

These resources should include the participation of the following financial agents: BNDES, ECAs, commercial banks and others.

The main objectives of Petrobras and the Financial Advisor during this phase are:
* Maximize the financing terms
* Search for lowest "all-in cost" (or lowest financing costs)
* Limit the number of sources of funding

Petrobras currently is in advanced talks with all of these agents, especially with BNDES, which also issued a letter of commitment to ensure their active participation in the Project debt.

In addition to the long-term sources, the Project may also rely on a bridge loan for the financing of the first disbursement and for the down payment for suppliers, up until the Financial Closing and first disbursement of senior debt.

### 3.5.      Phase 4

*Time period*

Begins in 2011 (forecast), continuing until the delivery of the last drilling rig in the First System.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

31

EIG00091823

*Activity*      Petrobras will begin the sale of the Class B shares from five of the seven SPEs to Strategic Shareholders (Specialized Operators), who are yet to be identified and selected. This may occur at any time after the signing of the contracts for the chartering, operation and construction of the drilling rigs, and should be completed before delivery of the drilling rig by the manufacturer and final acceptance by the SPE and Petrobras.

The sale will be conducted using a short list of previously-approved companies. It is worth noting that the selected operator's "step-in" (full exercise of the Class B share transfer and effective beginning of the company's shareholder status) should occur only after: (i) acceptance testing of each drilling rig by Petrobras, the future operator and other required specialists (Independent Engineer, classification agency, government officials, etc.), that is, when each drilling rig is completely finished, (ii) fulfillment of all obligations of the Specialized Operator according to the Asset Purchase and Sale Commitment Agreement and (iii) the absence of any Material Adverse Effect situation in relation to the future operator, its parent company or subsidiaries.

In addition to the shares of the aforementioned SPEs sold by Petrobras, the new Class B shareholders will also be entitled to the Service Agreement previously entered into by a Petrobras subsidiary and the SPE.

*Figure 21: Diagram of the Shareholder Structure for each System*



Source: *Petrobras and Santander*

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

32

EIG00091824

## 3.6.    Operational Phase

The First System will be formed by Sete Brasil (local holding company), Sete International (foreign holding company) and seven SPEs (each one responsible for its respective drilling rig).

*Figure 22:  Diagram of the Operational Phase*



*Source:  Petrobras and Santander*

Petrobras will remain a Class B shareholder for two SPEs (the drilling rigs of which will be chartered for 20 years). The 20-year-rigs are Rigs 1 and 2. Within the Financing Portfolio structure, these rigs with longer contracts lend assurance to the financing of the rigs with 10-year charter contracts, with a funding term that exceeds the charter term.

*Income & Expenses*

The SPEs have only one source of revenue, the charter fee, which should serve to cover the debt and administrative expenses, and to remunerate shareholders.

The charter daily rate will also have a component to meet the need for drilling rig maintenance and insurance.

The Operator will receive a Service Fee (via a Service Agreement with Petrobras, directly linked to the Charter Agreement for the same drilling rig) and will have primary responsibility for rig operations. The Operator will also be responsible for maintenance; however, since the portion relating to the maintenance costs will be included in the charter rate, payment for maintenance expenses will be made directly by the SPE to the Operator.

The Service Fee together with the Charter Rate make up what is called the Daily Rate.

The Service Fee will consist of two parts: (a) onshore portion, and (b) offshore portion

Santander
GLOBAL BANKING & MARKETS
Confidential

Souza, Cescon, Barrieu & Flesch
ADVOGADOS

33

EIG00091825

The daily rate total proposed by Petrobras, on a monthly basis, is USD 448,000, made up of a Charter Fee of USD 298,000 and a Service Fee of USD 150 000 (of which USD 35,000 will be paid to the SPEs and by the SPEs to the Operator).

Insurance for the operational phase will be negotiated by Sete International, seeking to explore the benefit of having a portfolio of 7 rigs, generating economies of scale while diluting risk. Obtaining such insurance, however, will be done by the SPEs.

During the operational phase, Sete Brasil will serve as a communication link between the SPEs, establishing a portfolio finance structure.

After the beginning of the operational phase, each SPE will be responsible for three sources of reserve funds, through the capitalization of extraordinary dividends re-passed to Sete International: a Performance Fund, a Renewal Fund and a Contingencies Reserve Account.

In addition to the goal of creating a self-insurance mechanism to cover a non-renewal situation and equipment performance issues, these backup mechanisms are expected to generate a more appropriate sphere for obtaining credit from the financial agents. The additional cost generated by the establishment of these funds will be greatly offset by funding structures and less costly and more flexible loans that are more appropriate for the Project. The Performance Fund, Renewal Fund and Contingencies Reserve Account will be discussed in more detail in Chapter 10 ("Risks and mitigation").

These funds will be formed at Sete International, and will be capitalized through extraordinary dividends generated and paid for by each of the SPEs, as well as by the centralization of the diverse sources available to each individual SPE at the beginning of the operations.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

34

EIG00091826

### 3.7.    Administration and Organizational Structure

Sete Brasil will be a company with professional management, with selected executive board members and managers who are approved and contracted by the company's Board of Directors, or by the competent authority designated for this purpose, as defined in its Statute, and its own administrative structure, and may outsource some of its functions that are not directly related to its main activity and strategies. The Executive Board will be composed of three members: One Chief Executive Officer, one Chief Financial Officer, and a Chief Operating Director.

*Figure 23: Organizational Structure*



*Source: Petrobras*

In order to facilitate the process of identifying its top executives for selecting the Board of Directors, the shareholders will assist the company by drawing up a list of at least three (3) candidates for each executive function. The Private Equity Fund should draw up a list of three names to recommend for CFO and Petrobras should provide three names to recommend for Chief Operating Officer. The Board of Directors may select one name from each list or reject all the nominees, and in this case, it is up to Petrobras and/or the shareholders of the Private Equity Fund, as appropriate, to develop a new list for the Board. The Chief Executive Officer will be a member of the Board of Directors.

The Board of Directors shall consist of nine (9) members, selected as follows:
- six (6) members appointed individually by each of the shareholders of the Private Equity Fund;
- one (1) member recommended by the Private Equity Fund Manager or by FI-FGTS manager if it will become shareholder of the Private Equity Fund or a debenture holder of the Company;
- one (1) member appointed by Petrobras, as minority shareholder; and

**Santander**
GLOBAL BANKING & MARKETS
Confidential

Souza, Cescon, Barrieu & Flesch
ADVOGADOS

35

EIG00091827

• one (1) member selected by the shareholders from one list containing three (3) recommendations to be made by Petrobras; said director will be the company's Chief Executive Officer.

In the case of a company IPO, the Board of Directors will be composed of at least 20% (twenty percent) of independent directors, as follows:

• two (2) independent directors; and
• seven (7) members shall be appointed by the Company's shareholders.

In any case, whether in the pre- or post-IPO stage, all of the Board of Directors of the Company will be elected at the General Meeting of Shareholders for a mandate of 2 (two) years and may be dismissed at any time.

In order to allow the Private Equity Fund quotaholders to play a more active role in the strategic decisions of Sete Brasil, a sole decision-making forum will be created in relation to important material ("Preliminary Meeting") to be decided upon by the quotaholders of the Private Equity Fund and Petrobras ("Investors"). Preliminary Meetings will be held prior to the holding of a General Shareholders' Meeting.

The level of representation of each investor at the Preliminary Meeting will be determined by Petrobras' direct participation and each quotaholder's indirect participation in the share capital of Sete Brazil.

The Preliminary Meeting will be convened in advance of any Sete Brasil General Meeting of Shareholders. The approval of the matters listed below will require an affirmative vote by investors who, directly or indirectly, represent 80% of the Company's capital:

(i)  Amendments to the Company's Bylaws;

(ii)  Approval and/or any changes in the Company's Strategic Planning Guidelines;

(iii) Establishment and modification of the powers and duties of the Board of Directors in addition to those established by law;

(iv) Any increase or decrease to the Company's share capital; and

(v)  Any transformation, merger, spin-off or other form of corporate reorganization involving the Company and its subsidiaries, whether directly or indirectly, in accordance with applicable law.

Decisions made by the Investors at the Preliminary Meeting will link (i) the vote of the Quotaholders at the Private Equity Fund Quotaholders' General Meeting and, consequently, (ii) the vote of the Private Equity Fund at the Sete Brasil General Assembly; in addition to the Petrobras vote also at the Sete Brasil General Assembly.

In the event of not achieving quorum to approve the subject matter on the agenda at the Preliminary Meeting, the quotaholders and the Private Equity Fund, where

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

36

EIG00091828

appropriate, will be required to vote against approval of the matters submitted for deliberation at the respective quotaholder and stockholder meetings.

The possible exercise of voting rights by any of the Investors at the Sete Brasil General Meeting or by the Private Equity Fund quotaholders at the Private Equity Fund Shareholders' General Meeting that disagree with the decisions adopted at the Preliminary Meeting shall void any vote cast in disagreement with the decisions adopted.

## 3.8.      Portfolio Finance Concept

The concept of Portfolio Finance was successfully implemented for the first time in Brazil by Petrobras itself in 2006, during a Petrobras project - Small Hydro Plants - under the PROINFA program, "Incentives for Alternative Sources of Energy".  This Portfolio Finance concept provides reassurance to shareholders and project lenders. The structure applied to these projects relies on two basic assumptions:

- Dilution of construction risk: different watersheds, therefore different geological risks, and different engineering, procurement & construction (EPC) contractors at different small hydro plants

- Dilution of repayment and operating risks: although each small hydro plant relies on its own SPE, and funding has been granted directly to each of these SPEs, a communication system was set up between the SPEs by forming a holding company. Through this holding, any excess cash from the small power plants that are performing within (or above) the projections can be sent to the holding (via dividends and interest on equity) that, in turn, can pass on these resources to the small hydro plants that are performing below forecast.

Using the same portfolio finance concepts that were successfully applied during the Brazil Small Hydro Plant project, the structure for the Pre-Salt Drilling Rigs Project could count on Portfolio Finance benefits that would be applied in the following manner:

- Dilution of Operating Risk: The only source of income for all drilling rigs will be through the Charter Agreement with Petrobras, and all operating expenses will be covered through the Service Agreement (together with Class B shareholders). Despite the contractual simplicity, there is a risk of a drilling rig operating below expectations at some point, thereby reducing debt repayment capacity, and reducing ability to cover other expenses. The portfolio financing structure provides important risk mitigation: the consolidation of dividend flows from all drilling rigs in the system to a foreign holding company which can transfer the excess cash to SPEs that are underperforming. In addition, the financial structuring of the project proposes the creation of two additional risk mitigations: (i) Performance Fund (capitalized by all drilling rigs in the system) for creating a reserve account for immediate coverage of any qualifying expenditure which cannot be settled due to eventual short falls in SPE revenue. In the form proposed, this Performance Fund will act like a car insurance policy (business interruption, etc.) for all SPEs in the system; and

(ii) the Contingencies Reserve Account established in the form of a common SPE "pool", centered at Sete International, the purpose of which is to mitigate the risk of SPE cash shortfalls.  The SPEs can draw from this pool to cover expenses and/or extraordinary costs incurred by the SPEs in the operation of the Project. This fund will be formed by the centralization of the diverse sources available to each individual SPE at its start of operations, including initial amounts payable by Petrobras at the beginning of the operational phase of the Charter and Service Agreement for each drilling rig (Mobilization, Commissioning and Pre-Operation rates), duly deducted from the payment of its own costs and obligations, including the capitalization of the Performance Fund until the Contingencies Reserve Account reaches its predetermined amount when the contributions cease.

- Dilution of Refinancing Risk: because of the economic assumption for Petrobras in relation to the drilling rig charter rates, a maturity mismatch occurs between the charter contracts (10 years) and financing (18 years). Such a condition incorporates an additional risk related to the refinancing of debt after the end of the first term of the charter contracts. This risk can also be contemplated and covered by portfolio financing mechanisms by consolidating dividend flows from all drilling rigs to the foreign holding company, which can transfer excess cash to the SPEs so they can honor their financial commitments after the initial term (10 years) of their charter contracts with Petrobras, if they will not be renewed or if there are market difficulties hampering the signing of new contracts with other oil operators. Similar to the previous item proposing the Performance Fund and the Contingencies Reserve Account, the present financial structure provides for the creation of additional mitigation against the risk of non-renewal: the creation of a Renewal Fund, also capitalized by all drilling rigs in the system (including drilling rigs with a charter term of 20 years). In this case, the Renewal Fund is intended to create a reserve to cover qualified obligations of SPEs that do not enter into new charter agreements after the first term of their contracts with Petrobras, or that do not sell their assets to liquidate any outstanding debt balance after this date. In the same way as proposed for the Performance Fund and the Contingencies Reserve Account, the Renewal Fund will function like auto insurance for all SPEs in the system. The rational for the creation of the three reserve accounts (Renewal Fund, Performance Fund and Contingencies Reserve Account) arises from any perception by potential Project funders of a possible difficulty in the direct and immediate application of the communication link concepts by the foreign holding company due to the fact that the SPEs have different corporate structures (depending on the different Class B shareholders). Through the aforementioned instruments, the foreign holding company can count on availabilities for immediate use, where appropriate, to support their subsidiary SPEs by granting inter-company loans, subordinated to senior creditors, without altering the corporate or contractual structures of the Project (including Negative

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

38

EIG00091830

*Performance Fund*

Pledges). Subsequently, these instruments may have their amounts replenished by the foreign holding company in the form of revenues from its interests in the SPEs.

### 3.9.    Credit Enhancements

The proposed structure, plus the comfort of portfolio financing, has three important mechanisms designed to strengthen the Project credit conditions:

*Reserve Fund for Naval Construction (FGCN)*

- <u>Objective</u>: mitigate risk of delays in the building of the drilling rigs

- <u>Formation</u>: a private Capital Guarantee Fund that is already established and capitalized

- <u>Use</u>: The FGCN offers two types of coverage in a First-Loss basis: (i) guarantee against credit risk (in favor of the lenders), a mandatory contract for the parties that order the vessels (SPE); and (ii) Performance Warranty against risk (in favor of the construction contractor) to be contracted optionally by the shipyard (or alternatively the equivalent insurance available in the market)

- <u>Amount</u>: Total capital of BRL 5 billion, with BRL 4 billion exclusively for the construction of drilling rigs in Brazilian shipyards

*Performance Fund*

- <u>Objective</u>: mitigate the risk of operator performance and drilling rig downtime, and, consequently, SPE revenue. If any drilling rig shows a reduction in its availability rate to the point that it threatens its ability to repay its respective indebtedness, or other qualified obligations, the fund will be used to pay debt installments and maturing qualified bonds.

- <u>Formation</u>: Will be formed during the first year of operation of each drilling rig by paying extraordinary dividends to Sete International, using all initial revenues available, including those concerning mobilization, commissioning and pre-operation rates, thus creating a special fund to be managed by an account management agent and with a maximum limit estimated during the fulfillment of his mandate. When the idealized value is reached, contributions will cease. If the fund is used and has its value reduced below the agreed minimum amount, contributions will again be made by SPEs through their available cash flow, before distributing dividends to Sete International.

- <u>Use</u>: the fund's resources should be used to pay SPE debt and other qualifying obligations in the eventuality of a possible lack of resources resulting from problems in the operation of the drilling rigs and therefore low availability. Unused resources may be reversed in free availabilities to Sete International, that may return them to its parent company (Sete Brazil) in the form of dividend distribution. In the event of continued unsatisfactory performance by the operator, the Operator may be reduced in terms of capital for the SPE in difficulty (as a Class B stockholder). In the case of constant operation problems, slow

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

39

EIG00091831

performance, and the consequent dilution of his stake in the SPE, the operator will be replaced.

- <u>Amount</u>: The project provides for the creation of a Performance Fund amounting to USD 56 (fifty-six) million for the First System. In contrast to the re-composition of the Performance Fund Sete International, this may trigger fine mechanisms for SPEs and gradual dilution mechanisms of Class B shareholder stocks for the SPEs not operated by Petrobras.

*Renewal Fund*

- <u>Objective</u>: To mitigate the risk of senior debt payments (or refinancing) that mature after the first term of the charter contracts for the drilling rigs not operated by Petrobras (contracts with 10-year terms).

- <u>Formation</u>: They will be sized to cover 6 (six) months of debt payments for all drilling rigs with a contract term of 10 years, and capitalized through dividends paid between the eighth and tenth year of commercial operation of each SPE (including drilling rigs with Charter Agreements of 20 (twenty) years), thus creating a special fund to be managed by an independent body.

- <u>Use</u>: This fund's resources should only be used for debt payments and SPE operating costs solely in the event of non-renewal of the charter contracts after the first term of the contracts that have maturities of 10 (ten) years and, if no renewal of that contract occurs or no new Charter Contract is signed, thus damaging the SPE's ability to honor its senior debt commitments, limited to an amount equal to 6 (six) months of senior debt installments by SPE until full utilization of the remaining Renewal Fund. The financing agreements will provide that, in the event of non-renewal of the charter contracts, the senior lenders will be prevented from declaring a SPE default of SPEs as their debt payments are being paid on time, through use of existing deposits in the Renewal Fund.

- <u>Amount</u>: The project provides for the creation of a Renewal Fund amounting to USD 117 (one hundred and seventeen) million for the First System.

*Contingencies Reserve Account*

- <u>Objective</u>: To mitigate the risk of insufficient cash by the SPEs to cover expenses and/or material extraordinary costs incurred during the pre-operational phase of each drilling rig.

- <u>Formation</u>: The Project provides for the creation of a Contingencies Reserve Account, established in the form of a common "pool" for all SPEs and based at Sete International. This fund will be formed by the centralization of diverse sources available to each individual SPE at the onset of the operational phase, including initial amounts payable by Petrobras at the beginning of the operational phase of the Charter and Service Agreement for each drilling rig (Mobilization, Commissioning and Pre-Operation rate), duly deducted from the payment of its own costs and obligations, including the capitalization of the Performance Fund until the Contingencies Reserve Account reaches its predetermined amount, at which point the contributions will cease.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

40

EIG00091832

- <u>Use</u>: The resources of the Contingencies Reserve Account are exclusively for the SPEs' cash flow insufficiencies to cover their expenses and/or material extra costs incurred by the SPEs in the pre-operational phase of each drilling rig and will be limited to a maximum amount deposited in this account and there is no replacement obligation for amounts drawn on it, either partially or totally. Unused resources deposited in the Contingencies Reserve Account may only be withdrawn and used by Sete International after the renewal of the last drilling rig of the First System.

- <u>Amount</u>: indicatively, the value will be R$ 150 million.

Despite any direct additional costs incurred by these funds, more favorable financing conditions due to the additional reassurance that lenders will have concerning the structure (more elastic terms and lower costs) will compensate for these costs while maintaining or even reducing the global cost ("all-in cost") of the Project.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

41

EIG00091833

# 4. TAX STRUCTURE

## 4.1.    General Structure

*Objectives*

From a tax and fiscal point of view, the proposed structure must have the following as additional objectives (in addition to the principal objectives described in the Executive Summary):

- Maximizing tax efficiency, reducing payments of unnecessary taxes in accordance with current laws and regulations applicable to each of the countries involved;
- Reducing foreign exchange variation risk in all cross-border or multi-currency transactions;
- Avoiding any domicile for SPEs in jurisdictions considered "tax havens."

*Advantages*

The principal advantages of the tax structure of the Project are:

- Avoiding taxing dividends of SPEs for the holding company, Sete International, increasing the return for shareholders and allowing the Foreign Holding Company to be used as a communicating vehicle for the portfolio structure.
- Using tax sparing credits in the SPEs (located in the Netherlands) to reduce or eliminate the incidence of income tax.
- Allowing thin capitalization and thus making the subordinated debt structure viable.
- Avoiding possible taxation of capital gains on sales of Petrobras Class B shares for operators.
- Eliminating the need to tax profits obtained abroad.

## 4.2.    Location of Entities

As a result of the tax objectives described above, the vehicles to be used in the Project must be located according to the following assumptions and considerations.

*Sete Brasil -*
*Local holding company*

Sete Brasil, in view of the profile of its investors, must be established in Brazil. Investments in foreign holdings require prior authorization to be obtained from the Secretary of Supplemental Pensions ("SPC") and, if necessary, the National Monetary Board; this situation may result in restrictions on pension fund shares, and the option of establishing the company in Brazil.

*Sete International -*
*Foreign holding company*

Sete International, in view of the purpose of mitigating financial risk by means of portfolio financing, must be located abroad to avoid cross-border risk. For tax reasons, the company will be located in Austria, which has a double taxation treaty with

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

42

EIG00091834

Brazil and, since it is a European Union member, avoids withholding tax on the distribution of dividends of the SPEs.

*SPEs*

The SPEs must be foreign entities in order to obtain benefits under the Repetro program. On the other hand, these SPEs should not be located in jurisdictions considered as "tax havens" for purposes of Brazilian legislation, avoiding tax payment at the source for remitting payments of charter fees by Petrobras. After assessing the various alternatives, it was decided to establish each of the SPEs in the Netherlands, since its legislation allows the use of the U.S. dollar as a functional currency, as well as the use of tax credits.

In turn, the operator of each unit must be a local entity (Brazilian) contracted by Petrobras by means of a service contract (rig operation) related to the Charter Contract. Payments related to this contract will be in local currency (*Reais*) insofar as payments related to the Charter Contract may be in U.S. dollars (possibly 80%) as well as *Reais* (possibly 20%), in whole or in part[14].

## 4.3.    Brazil/Austria Double Taxation Treaty

According to current Brazilian legislation, Brazilian companies that hold investments in subsidiaries and affiliates abroad are required to pay tax on the profits of these companies at the end of each fiscal year, regardless of whether these profits were made available in Brazil[15].

Nevertheless, according to the double taxation treaty signed between Brazil and Austria[16] ("Treaty"), the profits obtained by the Foreign Holding Company should not be taxed in Brazil, whether they are profits attributed to the Local Holding Company[17] (they are only taxed in Austria), or profits actually distributed in the form of dividends (dividends received by a Brazilian company from its subsidiary in Austria are exempt, if the Brazilian company owns more than 25% of the Austrian company).

## 4.4    REPETRO Program

In general, all commercial transactions are subject to taxation by Brazilian authorities and specifically for imports, the following taxes are assessed: import tax, IPI [tax on industrialized products], PIS [social integration program] and COFINS [contribution for social security financing], and ICMS [value added sales tax].

Even taking into consideration the use of certain tax credits by the SPEs and Petrobras, the impact of all of these taxes would be substantial for any financial structure that does not take into consideration the benefits of the Special Customs System for Imports and

---

[15] Article 74 of Provisional Measure No. 2158-35/01 – "MP 2158-35/01"
[16] Decree no. 78.107/76
[17] By virtue of article 74 of MP 2158-35/01 (estimated profits or dividends)

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

43

EIG00091835

Exports of goods intended for oil and natural gas exploration and production ("REPETRO") implemented in 1999[18]. Thus, it is essential for the financial structure to allow the SPEs and Petrobras to fully benefit from REPETRO, which, according to the terms currently in effect, would exempt these commercial transactions from all federal taxes and, depending on the situation and the specific inquiry, also from ICMS.

Under the REPETRO system:

- Goods may be imported as raw materials, without withholding or payment of taxes provided that they are used in producing assets eligible for subsequent export;
- The sale of certain eligible assets by a Brazilian producer to a foreign entity may be considered as an export transaction provided that these assets are not physically left in Brazil; and
- The import of certain eligible assets may be considered as a temporary admission of said assets into Brazil and therefore may be exempt from federal taxes assessed on imports.

The structure of the Project allows the SPEs and Petrobras to fully benefit from REPETRO. In particular, we must highlight the following issues:

- The SPEs, which are foreign entities, will own the platforms.
- All resources required by the SPEs to perform and complete the construction of platforms will be supplied to the offshore SPE;
- All payments to EPC contractors/shipyards will be made by the SPEs in a freely convertible currency
- All foreign content will be imported by EPC contractors/shipyards under a drawback system.
- Local content incorporated in the foreign content will be subject to formal export.
- Rigs will ultimately be imported by Petrobras, pursuant to the Charter under a temporary system (temporary admission system).

---

[18] REPETRO is currently regulated by Decree no. 6759 dated February 5, 2009 and by standards issued by the Secretary of Federal Revenue.

 Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

44

EIG00091836

# 5.   SHIPBUILDING GUARANTEE FUND

## 5.1.   Introduction

*Shipbuilding Guarantee Fund*

The national shipbuilding industry has experienced a period of strong growth, primarily driven by demand from the oil and gas industry, especially due to orders for stationary production units by Petrobras and oil tankers by Transpetro.

Despite the recent development of this industry in Brazil, the construction of rigs to meet Pre-Salt demand presents a series of challenges in relation to the lack of experience of local shipyards in constructing similar equipment and the need to be highly competitive in relation to shipyards that are specialized in this niche market, especially some shipyards located in South Korea and China. That being said, because of pioneering this activity in Brazil and the ongoing reference to more competitive shipyards (Korean and Chinese), contracting rig construction with Brazilian shipyards is associated with greater risks of (i) delays, (ii) cost overruns, (iii) engineering and (iv) design, among others, in relation to other specialized foreign shipyards.

In order to provide incentives for national shipbuilding and reduce the risks associated with contracting rigs with high domestic content, the Government issued MP 429, converted into Law 11.786/08, authorizing the creation of the Shipbuilding Guarantee Fund (FGCN).

## 5.2. The FGCN

*The main purpose of the FGCN is to guarantee the credit risk of financing operations*

The main purpose of the FGCN is to guarantee the credit risk of operations to finance the construction or production of ships and the risk derived from the performance of Brazilian shipyards.

The FGCN is a private fund, initially funded by the Federal Government with R$ 5 billion, of which 80% of the resources (or R$ 4 billion) will be allocated exclusively to guarantee credit and performance risks related to the construction or production, in a Brazilian shipyard, of Pre-Salt drilling rigs. The FGCN is administered, managed and held in custody by the *Caixa Econômica Federal* [a government-run financial institution].

The Federal government is the initial sole shareholder of the FGCN, although other shareholders will be included later, either on a voluntary or mandatory basis, which, in this case, are those that contract guarantees to be covered by the FGCN. The Government shares may be contributed in the form of cash, federal public debt instruments, listed stock and other securities traded on an organized market. Nevertheless, the Fund will not have any type of public sector guarantee or backing, and the FGCN will be liable for its obligations with the assets and rights comprising its equity, up to the limit thereof.

🔥 Santander

GLOBAL BANKING & MARKETS

Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

45

EIG00091837

Shares by other shareholders may only be contributed in cash. IN addition, shareholders will not be liable for fund obligations, but only for subscribing shares.

The guarantees to be provided by the FGCN are restricted to vessels constructed or produced in the Brazilian naval market, and will be valid throughout the period of construction of the vessel until acceptance by the Construction Contractor or up to 24 months after delivery of the vessel by the builder, whichever occurs first.

The FGCN may offer:

- Credit Risk Guarantee: in relation to the financing granted to the SPEs for the construction of the respective rig. Each SPE must sign a Guarantee Agreement ("CPG") with the Shipbuilding Guarantee Fund ("FGCN"), in relation to providing a credit risk guarantee related to the construction of rigs in a Brazilian shipyard. The beneficiaries of this CPG will be all SPE lenders.
- Performance Risk Guarantee: in relation to the risks inherent to constructing rigs by the shipyards. In this case, the guarantee applicants will be the shipyards, and the beneficiaries will be the SPEs.

The credit risk guarantee will be due when a contractual breach of the SPE is determined to have occurred or upon early termination of the financing agreement, derived from the failure to deliver and/or non-acceptance of the financed vessel, on the date indicated in the construction contract, taken into consideration by the lender to determine the initial financing repayment term.

The performance risk guarantee will be due in situations derived from the liability of the Brazilian shipyard, with the possibility of damages derived from breach caused by failure to perform the obligation stated in the construction contract and/or by inadequate quality of construction.

The guarantees issued by the FGCN will be structured in the form of a completion guarantee (and not a refund guarantee), which may be used for all lenders, including junior lenders. The types of default covered by the FGCN include:

- Bankruptcy of the shipyard;
- Delays in the physical work schedule (due to any reason not attributable to the contractor);
- Economic/financial difficulty of the shipyard that entails losses of liquidity and failure to pay its obligations (taxes, suppliers, employees, etc.) resulting in a delay in delivery of the rigs.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

46

EIG00091838

- Technical difficulty (technological capability, industrial processes used, stable delivery flow of inputs, etc.) that may entail delays in the delivery of the rigs;
- Operational problems of any type that may impede or make acceptance of the units by the contractor difficult in the unit delivery phase.

The FGCN, in turn, in granting the credit and/or performance risk guarantee, will receive counter-guarantees from the SPE, backed exclusively by assigning rights to the guarantees offered by the shipyard it contracted, and the shipyards themselves that were assigned construction of the respective rig, such as:

- Pledging all shares issued by the construction shipyard;
- Fiduciary transfer or mortgage of the vessel financed;
- Bond of shareholders that control the construction shipyard;
- Entering into a gratuitous bailment agreement for the industrial facilities where the vessel will be constructed, as well as for the machinery and equipment necessary for construction;
- Guarantee insurance with minimum coverage of 3% of the value of the loan granted.

If all shares issued by the construction shipyard were already pledged in guarantee, the promise to pledge all shares issued by the Brazilian shipyard may be accepted.

In providing the guarantee, the FGCN will receive a monetary commission that will be due: (i) by the Brazilian Shipyard, when it involves a guarantee to ensure the performance risk; and (ii) by the SPE, when it involves a guarantee to insure the credit risk. If the term of the guarantee is extended, a supplemental Monetary Commission will be collected for the additional term. The premium to be collected by the FGCN for this commission will be variable, in relation to the risk analysis to be performed by the Fund Administrator, for each situation, in relation to the risks perceived when the guarantees are granted.

The Brazilian shipyard will be required to acquire FGCN shares in two situations, each of them in an amount equal to 0.25% of the guaranteed amount: (i) upon contracting the Performance Risk guarantee by the shipyard itself; and (ii) in contracting the Credit Risk Guarantee, even if already contracted by the SPE. The shares must be acquired in a lump sum, in advance.

In addition to paying the monetary commission to be collected by the FGCN Administrator upon granting the credit risk guarantees for operations of Brazilian shipyards, the SPE will also be required to acquire FGCN shares, in an amount equal to 1% (one percent) of the guaranteed amount, upon contracting said guarantees, to be acquired in a lump sum, in advance, and will remain unavailable for a (minimum) term of five years.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

47

EIG00091839

In granting the guarantees, the FGCN must observe the following limitations:

- The performance risk guarantee may not exceed 10% of the cost of construction of each rig;
- The credit risk guarantee may not exceed 50% (fifty percent) of the unpaid balance of each financing operation (noting that this limit may be increased, depending upon the risk of each transaction, as determined by the Shareholder's Meeting);
- In financing operations with an FGCN guarantee, the amount financed by lending agents may correspond to up to 90% (ninety percent) of the total project amount;
- The FGCN exposure limit in relation to each SPE (or each Guaranteed Entity) will be 25% of its equity.

The FGCN will provide a guarantee, in the form of a bond or similar instrument, without the guarantor's benefit of exhausting all remedies first against the principal debtor.

In relation to each project with an FGCN guarantee, an agreement may be entered into, when applicable, with the other creditors of the project in question, governing the form and procedure for excluding secured loans provided by the covered Brazilian shipyard.

### 5.2.1.   Activation and Execution of Guarantees

If it becomes necessary to execute the credit risk guarantee, the FGCN will pay the full amount of the portion of the loan agreement that is due, up to the limit of the credit risk guarantee contracted with the FGCN (maximum of 50% of the unpaid balance).

In the event of early termination of the loan agreement covered by the credit risk guarantee, the FGCN will honor the unpaid balance on the early termination date, derived from the amounts disbursed by the lenders, up to the limit of the guarantee granted.

The guarantees that are common to the FGCN and the lenders may be executed by the FGCN, and the amounts derived from such execution will be used first to pay the remaining unpaid balance of the financing.

The settlement of each tranche of the financing by the FGCN will entail a proportional release of the guarantee.

The credit risk guarantee agreements must provide, in the event of early termination of the loan agreement, for the possibility of payment at sight or by reinstating the flow of payment funds specified in the loan agreement for the vessel, at the discretion of the FGCN.

For payment of the credit risk guarantee, the lender must contact the FGCN within no more than 90 (ninety) days from the date of the event triggering activation of the

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

48

EIG00091840

guarantee, by means of a formal notice with acknowledgement of receipt (AR), substantiating its request.

The lender must opt to receive payment in one of the following forms:

- Assets comprising the affected equity covered by the guarantee by means of a transfer of title on the date of payment of the guarantee;
- National legal tender, by means of a deposit to the current account in the name of the lender.

In the event that affected equity covered by the guarantee is not established, the lender may also opt to receive payment in assets constituting FGCN equity, by means of a transfer of title on the date of payment of the guarantee, with the consent of the FGCN.

The FGCN must notify, by means of a formal notice with acknowledgement of receipt (AR), the SPE and the lender, accordingly, of the request for payment of the guarantee, and the Brazilian Shipyard, establishing a term for acknowledgement and settlement.

The FGCN will perform the formalities, within 30 calendar days from receipt of the formal notice sent by the lender requesting payment of the guarantee, in order to verify the lender's request, in accordance with the clauses of the loan agreement or construction contract, accordingly.

The FGCN will honor the guarantee within 10 business days from the end of the term for said formalities.

**≛ Santander**
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

49
EIG00091841

## 6.    MAIN CONTRACTS

### 6.1.    Main Contractual Relationships

The following diagram illustrates the main contractual relationships of the Project:

*Figure 24: Main Contractual Relationships*



Source: Santander and Petrobras

### 6.2.    Construction Contract

The Construction Contracts, scheduled to be signed in February 2010 between each SPE and the shipyards, will have the following characteristics:

*Main characteristics of construction contracts*

- <u>Conditions</u>: lump-sum turnkey, with fixed price and date

- <u>Principal terms</u>: For the First System, the Construction Contract with EAS has construction terms as indicated below (as of the date of signing the Construction Contract): Rig 1: 1,440 days (2015); Rig 2: 1,740 days (2015); Rig 3: 1,980 days (2016); Rig 4: 2,220 days (2017); Rig 5: 2,460 days (2017); Rig 6: 2,700 days (2018), and Rig 7: 2,940 days (2019).

- <u>General Characteristics</u>: the EPC Contract signed with the shipyard will encompass the design, engineering, supply, construction, commissioning, startup, testing and completion of the Units, along with any other specification contained in the draft of the contracts. The EPC Contractor must perform the work (i) according to the scope of work and the terms and conditions of the EPC Contract, (ii) in accordance with and with the consent of applicable legislation, (iii) according to best practices of the industry, and (iv) within the term indicated in the contract for each Unit. The obligations of the EPC Contractor are: (i) the purchase, supply, transportation,

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

50

EIG00091842

handling, proper storage and preservation of the equipment, including equipment *received* from the SPE; (ii) assume liability for the design and engineering according to contractual specifications; (iii) provide the construction, manage the construction, including the supply of all management and labor supervision, workplace, equipment, tools, field material, storage and facilities necessary for the manufacture of each Unit; (iv) comply with applicable legislation and make the export of each Unit viable, which will be physically delivered to the SPE in sheltered waters in the Bay of Guanabara; (v) negotiate the guarantees, insurance, delivery schedule, performance requirements with all subcontractors; (vi) ensure that the work complies with the physical schedule; (vii) conduct and manage the performance tests; (viii) obtain licenses, permits, and authorizations required for performing the work; (ix) obtain any certificate as required by applicable legislation for conducting performance, demonstration and operations tests; (x) provide information and documents required by the SPE that are necessary in order to inspect the work; (xi) provide training to the SPE regarding the operation and maintenance of the equipment provided by the EPC Contractor; (xii) replace any subcontractor that is not performing the work according to the terms of the EPC Contract; (xiii) lead with all customs issues and assume liability for all tariffs related to the imported equipment; (xiv) at the request of the SPE, cooperate and respond to questions from any creditor related to the work and other activities to be performed within the scope of the contract; (xv) comply with BNDES financing requirements which, in the case of Brazil, is that the local content must be financed by said institution; (xvi) assume liability for all payments and withholding taxes related to the work; and (xvii) pay subcontractors within the terms set forth in the subcontracts. According to the Local Content rules, the Shipyard/ECP Contractor must perform, in Brazil, the construction, erection, pre-operation, startup and assisted operation related to the work, including the construction of the hull and all steel work until integrated with the drilling rig. The Builder must comply with Brazilian local content requirements, calculated according to ANP methods and criteria. For the first two rigs to be constructed, a minimum of 55% of the human resources and total weight of structural parts, panels and block manufacturing, as well as the erection, erection of blocks, all subsequent work for completion of the hull on the dock side, integration of the drilling plan and other activities must be performed in Brazil. The nationalization indices of the remaining rigs will increase to 65% for the last two units of the initial package of 7 rigs. If the EPC Contractor demonstrates that it would not be viable to perform steel work or manufacture parts/supply components in Brazil due to technological issues, these parts may be imported provided that they comply with the following percentages: 60% of management, propulsion and dynamic positioning systems, 50% of the drilling package and 65% overall.

- <u>Indexing</u>: By means of delivery of each rig, and determining the final price of construction, exclusively as a result of the construction price adjustment formula,

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Santander
GLOBAL BANKING & MARKETS
Confidential

51

EIG00091843

as established in the Construction Contract between the shipyard and the Company, the original amount of the daily rate of the Charter Contract may be adjusted upwards or downwards so as to incorporate said construction price variations (in the proportion of 1:1), in order to maintain the same anticipated profitability for the Project Base Case. This adjustment, as a direct function of the final construction price of each rig, does not apply to the price of the Service Contract.

- <u>Construction Contract Penalties</u>: The Construction Contract also provides for payment of a penalty by the shipyard to the SPE in the event of a delay in the term established in the contract (limited to 10% (ten percent) of the total estimated contract amount). In the event of a delay, the resources from the Construction Contract penalties will be used for payment of Charter Contract penalties. The credit rights of the Construction Contract will be pledged to guarantee the Senior Loan. Nevertheless, since the FGCN insurance covers payment of debt service in the event of a delay, the resources from Construction Contract penalties must be transferred to the SPEs.

## 6.3.    Charter Contract

The Charter Contract with Petrobras provides for payment of a Daily Rate established in the contract. The payment of the Daily Rate is in relation to the availability of the equipment (rig) and is not related to production.

*Characteristic assumptions:*
- <u>Offtaker</u>: Petrobras

- <u>Term</u>: 10 (ten) years or 20 (twenty) years (the latter exclusively for rigs operated by Petrobras). For the other Systems, the division between 10 (ten)-year and 20 (twenty)-year contracts will continue with the same proportion applied to the First System. The Charter Contract term will begin when the rig is inspected and approved by Petrobras.

- <u>Order of the Charter Contracts</u>: The rigs of the First system, with a charter term of 20 (twenty) years, will be the first two by order of start of construction and start of operation. For the other Systems that may be contracted by Petrobras, the definition of which rigs will have an initial contract term of 20 (twenty) or 10 (ten) years will comply with the same proportions and formation rule as applied to the First System.

- <u>Currency</u>: The Charter Rate may be paid partially in *Reais* (possibly 20%) and partially in dollars (possibly 80%). This opening will be defined immediately prior to the start of operations of each Rig and must reflect the capital structure of the Project.

- <u>Payment Frequency</u>: monthly

- <u>Index During Construction</u>: The daily rate will be adjusted upwards or downwards according to the Final Rig Construction contract Amount, using the parameterized formula and criteria previously defined in the charter contract, so that any rig

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

52

EIG00091844

construction price variations do not generate either a capital gain or  loss for the Company shareholders.

- <u>Index During Operation</u>: As of the start of the Charter Contract term, the contractual prices (adjusted to the Final Rig Amount) must be adjusted annually, in *Reais* or U.S. dollars. (i) the portion in *Reais* will be indexed at 100% of the Brazilian National Broad Consumer Price Index ("IPCA"); and (ii) the portion in U.S. dollars will be adjusted at 20% (twenty percent) of the Consumer Price Index ("CPI").

- <u>Payment</u>:      offshore: for the portion in USD
                       onshore (to be regulated by the SRF[19]): for the portion in R$

- <u>Mobilization, Commissioning and Pre-Operation Fee (or "Mobilization Fee")</u>: As set forth in the Charter Contract, by means of delivery and acceptance of each Rig, Petrobras agrees to make payment, in a lump sum, of a fee intended to cover the Company's expenses related to the commissioning, pre-operation and mobilization activities for each rig. This fee will be limited to the amount corresponding to USD 30 (thirty) million for each SPE, which will commit to apply these resources according to predetermined rules and criteria; it will be prohibited to use said resources to distribute dividends to shareholders before certain conditions precedent have been fully satisfied.

- <u>Early Bonus</u>: currently, the structure does not consider a bonus for early start of operation, but in the event that the rig is delivered before the established term, Petrobras will initiate payment of the Daily Rate as of the entry into operation, however early it is.

- <u>Delay</u>: the Charter Contract provides for a late penalty in the event that the term established in the contract is breached (limited to 10% (ten percent) of the total estimated contract amount). Any penalties that the SPE may incur will be deducted from the first payment and subsequent payments to which the SPE is entitled after applying sanctions by Petrobras. Discounts will be limited to 30% (thirty percent) of the corresponding monthly payment amount, until the penalty is fully paid. The Construction Contract also provides for payment of a penalty by the shipyard to the SPE in the event of delay in the term established in the contract (limited to 10% (ten percent) of the total estimated contract amount). In the event of delay, the resources from Construction Contract penalties will be used to pay Charter Contract penalties. The Construction Contract credit rights will be pledged to guarantee the Senior Loan. Nevertheless, since the FGCN insurance covers payment of debt service in the event of a delay, the proceeds from Construction Contract penalties must be transferred to the SPEs.

- <u>Termination of the Charter Contract</u>: A delay in the start of performance of the Charter Contract of more than 2 (two) years from the established term.

---

[19] Secretary of Federal Revenue

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

53

EIG00091845

| | |
|---|---|
| *Availability Bonus* | The Charter Contract provides for a performance bonus, the primary purpose of which is to provide an incentive for the Operator to obtain a high index of rig availability. The determination of payment of this bonus considers the monthly measurement period of the contract, and the availability index considered is the monthly average determined in each period. For modeling purposes, the Base Case considered an availability rate of 97%, as of the second year of the charter contract[20]. The following table illustrates the bonus levels associated with rig availability. |

*Table 6: Availability Bonus*

| Availability | Applicable Bonus |
|---|---|
| Below 94% | 0.0% |
| 95% | 2.5% |
| 96% | 5.0% |
| 97% | 7.5% |
| 98% | 10.0% |
| 99% | 10.0% |
| 100% | 10.0% |

*Source: Petrobras*

| | |
|---|---|
| *Contract Renewal* | The Charter Contract may be renewed for a term equal to the original term by means of an agreement between Petrobras and the SPE. In order to preserve its Preferential Right to Renewal, the SPE and/or Petrobras, within 12 (twelve) months before expiration of the term in question, must notify the other party, informing it of its intent to renew the Charter Contract and the conditions of the agreement under which it will do so. After this notification, the parties will enter into direct negotiations in order to determine the conditions for signing a new charter and service contract for another period equal to the originally contracted term. For purposes of the renewal process, while complying with the terms for the parties to indicate their interest, Petrobras may consider, as a priority, renewal of the Charter Contracts with the SPEs, provided that, at the time of renewal: (i) the demand conditions exist that justify the need to renew; and (ii) the prices and conditions that may result from negotiations are reasonable in view of market prices and conditions at that time, and (iii) performance histories are presented for the Rig being renewed that may be deemed satisfactory at the exclusive discretion of Petrobras. |
| | It must be emphasized that in order to prevent consolidation of assets on Petrobras' balance sheet, the Charter Contract will not take into consideration any clauses entailing |

---

[20] The financial model assumes 95% availability in the first year and 97% thereafter. Nevertheless, it does not assume a performance bonus.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

54

EIG00091846

automatic buyback or renewal or prices below market, or any conditions for guarantees or unilaterally exercising rights (put and call).

### 6.4. Service Contract (Operations and Maintenance)

As already explained, the Charter Contract is linked to an Operations and Maintenance Service Contract for the rigs. At the start of structuring and during practically the entire rig construction phase, the contractor responsible for operation will be Petrobras, in its capacity as Class B shareholder of all SPEs of the first system. However, before the rigs are placed into operation, Petrobras intends to sells its Class B shares in five of the seven SPEs of the First System to interested strategic shareholders (operators). In order to do so, Petrobras will transfer to the buyer of its Class B shares in each of these SPEs all of the rights and obligations in all contractual instruments it signed, including the Service Contracts related to each of these SPEs. It is important to note that each SPE will only have one Class B shareholder, i.e., only one party responsible for operation of the rig owned by said SPE.

For the other rigs comprising the first system (a total of two), Petrobras will maintain its investment as a Class B shareholder in the respective SPEs and the sole party responsible for operation thereof. For these rigs exclusively, the charter and service contracts will be added with the contractual terms extended to 20 years ("Petrobras Rigs").

*Main Assumptions*
- <u>Operator</u>: the final operator will be determined after the process of selling the Class B shares
- <u>Term</u>: 10 years or 20 years (in which case, exclusively for Petrobras Rigs)
- <u>Currency</u>: the rate will be determined in USD and converted to R$ by the exchange rate on the contract base date, and will remain in R$ until the end of the service contract
- <u>Service Fee</u>: initially estimated (Base Case of preliminary financial model) at USD 115,000[21]
- <u>Payment frequency</u>: monthly
- <u>Index</u>: parametric formula (including indexing using the Brazilian National Consumer Price Index (INPC), Wholesale Price Index and exchange rate)
- <u>Payment</u>: onshore. Petrobras pays the Operator (or the subsidiary established by the Operator) in Brazil directly
- <u>Other Costs</u>: other operating costs, such as insurance expenses and spare parts expenses (totaling approximately USD 35,000) will be added to the Charter Rate and therefore will be paid by the SPE
- <u>General Characteristics</u>: The Service Contract will always be performed simultaneously with the Charter Contract, signed on the same date. The contractor is responsible for: (i) maintaining, throughout the term of performing the contract,

---

[21] Estimated amount, which may be changed by Petrobras. Other operating costs such as insurance expenses and spare parts expenses will be paid by the SPE, and therefore will be included in the Charter Rate.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

55

EIG00091847

all eligibility conditions assumed in the bidding process; (ii) respecting and complying with administrative rules in effect at Petrobras; (iii) facilitating inspection actions, providing information or access to documentation and services being performed and promptly responding to observations and requirements presented by inspectors; (iv) repairing, at its expense, within the established term, any and all services considered unacceptable; assuming liability for any damage or loss caused to Petrobras or third parties, arising out of performing the services set forth in the Service Contract; (v) obtaining licenses related to its activities; (vi) assuming liability for the operation, supervision, technical and administrative management and labor necessary; (vii) the composition of the labor provided (staff) will consist of a minimum domestic component between 66% (1st contract year) and 85% (as of the 6th contract year); (viii) testing the Unit equipment within 72 hours after releasing it to sail to the first location; (ix) performing the services according to international labor safety standards; (x) maintaining complete confidentiality regarding all information and data provided by Petrobras; (xi) planning and performing the operations intended to prevent and control oil and gas blowouts, fires and other accidents; (xii) assume liability and charges for removing any equipment or material that falls into the ocean due to its fault; (xiii) properly arranging for the Unit, equipment and materials to enter and remain in the country and, at its expense, arranging for releases, inspections, registration and temporary admission; and (xiv) carrying insurance related to its activities, and subsequently renewing the insurance throughout the term of the contract. The obligations of Petrobras are: (i) making payments due to the contractor for services actually performed, measured and invoiced; (ii) providing the schedule of operations and locations sufficiently in advance; (iii) measuring the services performed and issuing the measurement report; (iv) providing transportation for personnel, materials and equipment to the Unit; (v) providing, on its own behalf, all fuel and water necessary to perform the services pursuant to the contract; (vi) maintaining control of the drilling and completion fluid; and (vii) providing, at its expense and under its responsibility, the auxiliary services related to: directional drilling, cementing, formation testing, electrical logging, flexitube operations, nitrogen operations, electrical cabling operations and wiring operations, when they are derived from Petrobras' own schedule. Petrobras may rescind the Service Contract in the following situations: (i) breach or irregular compliance with contractual clauses, specifications, operations or terms; (ii) delay in compliance, compelling Petrobras to presume that it is impossible to complete the services within the specified terms; (iii) unjustified delay in beginning services; (iv) shutdown of services without just cause and prior notification; (v) cessation or subcontracting of any or all of the purpose thereof without the prior express consent of Petrobras, as well as the association, merger, spinoff or incorporation of the contractor without notifying Petrobras in advance; (vi) failure to heed regular determinations indicated in the inspection; (vii) after the voluntary reorganization plan is approved or the court-ordered reorganization plan is granted, if the contractor does not post a sufficient bond to guarantee performance of its contractual obligations, at the discretion of Petrobras; (viii) suspension of services as determined by the appropriate authorities, attributable to the contractor; (ix) failure to present proof of satisfaction of labor obligations;

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

56
EIG00091848

(x) delay in beginning to perform the contract for more than 365 days; (xi) termination of the Charter Contract, regardless of the cause; and (xii) interruption of operations for more than 60 days for reasons attributable to the contractor, except for a shutdown due to an act of God or force majeure. The contractor may terminate the contract in the following situations: (i) suspension of performance by order of Petrobras, for a term exceeding 120 days; (ii) delay exceeding 90 days in making payments due; (iii) failure by Petrobras to release the location for performing services; and (iv) termination of the Charter Contract, regardless of the reason. As in the Charter Contract, in the Service Contract, the contractor is prohibited from assigning or pledging for any reason, in whole or in part, credits of any type derived from or arising out of said contract, without the prior authorization of Petrobras.

## 6.5.    Work Management and Inspection Contract

Each SPE will contract Petrobras to manage the work. The purpose of this management is to provide the SPEs with specialized technical services in the areas of work inspection, contract management assistance, technical assistance for the project, control of financial resources and preparation of technical reports. This activity optimizes costs and controls the quality and terms set forth for construction.

*Characteristics*

- <u>Contractor</u>: Petrobras
- <u>Term</u>: approximately four years (construction period up to acceptance)
- <u>Amount</u>: USD 8.35 million per unit throughout the construction
- <u>Currency</u>: USD or *Reais*, converted by the USD equivalent
- <u>Payments: monthly</u>

The main duties of Petrobras and the rig construction work manager in Brazil are:

- To develop and monitor the physical/financial planning of the work
- To monitor and inspect the performance of work with quality control
- To analyze and release monthly measurements, verifying compliance with the schedule, avoiding early disbursement of services not completed
- To monitor work performance in order to minimize possible claims by shipyards

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

57

EIG00091849

# 7.   CORPORATE GOVERNANCE RULES

## 7.1.   Sete Brasil – Local Holding Company

*Sete Brasil will follow the corporate governance standards in the New Market segment*

Sete Brasil will be the primary vehicle for bringing in equity. This company, established in Brazil according to the corporate governance standards in the New Market segment of BOVESPA [São Paulo stock exchange], uses the following assumptions as principal corporate guidelines:

- The company must exclusively issue common shares, with all shareholders having voting rights.
- In the event that a controlling interest in the capital stock is sold, the buyer will extend the offer to buy to all other shareholders, ensuring the same treatment given to the controlling seller (tag-along right).
- The Board of Directors of the company must consist of a minimum of five members, with a unified term of office of up to two years, with an independent director (only after the IPO).
- The company may not have founders' shares

*Shareholders' agreement*

As previously indicated, the investment in Sete Brasil will be performed by means of an FIP [private equity fund]. Petrobras will directly hold a minimum of 5% of the shares of Sete Brasil and a maximum of 10% (initially, Petrobras will hold 10% of the Sete Brasil capital), without the need to buy FIP shares. Therefore, a Shareholders' Agreement must be entered into, to govern matters such as, among others, how resolutions are passed by shareholders and business requiring a qualified quorum, the appointment of directors and managers, etc.

The Shareholders' Agreement will govern, among others, the following matters:

- Shareholder resolutions and business subject to a qualified quorum
- Preemptive and tag-along rights
- Appointment of directors and managers
- Right to compel the equity offering and initial public offering of the company

*Business Plan*

A Business Plan will be part of Sete Brasil's bylaws and will define its principal strategies, corporate and tax structure, financing plan, capital structure, plans for establishing its assets (related to rig construction), among others. Any changes not originally anticipated in the Business Plan will be subject to approval by the Board of Directors, according to rules to be established in Sete Brasil's corporate documents.

---

**Santander**
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

58

EIG00091850

## 7.2.    Sete International – Foreign Holding Company

Sete International will be a wholly-owned subsidiary of Sete Brasil and only a vehicle for establishing allocations for cash flows, an essential element in portfolio financing structure.

## 7.3.    FIP [Private Equity Fund]

The FIP allows, in the simplest and most direct manner, Brazilian pension funds and other investors to contribute funds to the Project. The choice of FIP as an investment vehicle is due to:

- Deferral of gains earned
- Applicable regulation of pension funds
- Tax exemption for non-resident foreign investors
- Simplification of the corporate structure of Sete Brasil

With regard to the admission of investors, the FIP will also be established and the agents responsible for operating activities (administrator, manager and custodian) will already have been selected and hired.

Upon investing in the FIP, the Pension Funds (and other investors) must sign a Shareholders' Agreement related to the following points, among others:

- Shareholder resolutions on matters requiring qualified quorum
- Shareholder resolutions to govern the exercise of voting rights of the FIP in Sete Brasil
- Preemptive and tag-along rights in stock transfers
- Replacement of Manager/Administrator and Custodian
- Appointment of Investment Committee members

The principal characteristics are:

- FIP Manager and Administrator: Caixa Econômica Federal (CEF)
- Custodian: Banco Bradesco S.A. (Bradesco)
- FIP Legal Counsel: Tauil & Chequer Advogados, affiliated with Mayer Brown LLP
- FIP Auditor: PriceWaterhouseCoopers
- Duration of the FIP: up to 20 (twenty) years from initial paying in of shares or at the time of an IPO, whichever occurs first
- FIP Investment Period: up to 10 (ten) years from the initial paying in of shares
- FIP Divestiture Period: up to 10 (ten) years
- Administration fee: 0.20% p.a. of equity
- Custody fee: 0.02%

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

59

EIG00091851

<u>Payment of FIP Dividends:</u> The proceeds from distributing dividends or interest on equity by Sete Brasil to which the FIP shareholder is entitled, when it exists, will be used entirely to amortize FIP-issued shares, unless the Administrator, with justification, deems it necessary to withhold any or all of the funds obtained from divestiture for paying fund payables, observing the maximum limit of 0.5% (one half percent) of its net equity.

<u>Allowed Investments:</u> The cash balance of the Rig FIP, not invested in Company shares, must be held in one of the following assets, up to the limit of 10% (ten percent) of Net Equity: (i) national legal tender; (ii) Federal Treasury bonds; (iii) repo transactions backed by the securities indicated in item (ii) above, with first class financial institutions; (iv) investment fund shares or mutual fund shares, with daily liquidity, the investment policy of which allows resources to be allocated exclusively in the assets identified in items (ii) and (iii) above, and whose investment policy allows derivative transactions, provided that they protect spot positions, up to the limit thereof; and (v) fixed income securities issued by first class financial institutions.

### 7.4.   Petrobras Investment

*Petrobras participation as Class A and Class B shareholder*

In addition to financial investors, from the start of structuring, Petrobras will hold 10% of the Class A capital stock of the Local Holding Company (Sete Brasil). In addition, during the rig construction phase, only Petrobras (directly or through one of its vehicles) will also invest as a Class B shareholder. Despite the minority shareholding of the SPEs, Petrobras, as a qualified shareholder experienced in the drilling rig construction and operation business, will contribute to the company by providing inspection services for rig construction and erection. However, this condition will not give Petrobras any preference or priority over the other shareholders in each SPE, in Sete International or Sete Brasil, where all decisions will be made strictly by a majority vote of the shareholders, according to the Shareholders' Agreement and bylaws.

*Sale of Class B shares*

As previously indicated, during the rig construction phase, Petrobras will sell strategic shareholders its Class B shares in five of the seven SPEs of the first system. This sale will be made by means of a selective process with pre-qualified companies included on a short list. Before admitting each financial investor in the Project FIP, this short list will be submitted to it for evaluation and approval. After completing this procedure, there will no longer be a need to obtain approvals for Petrobras to exercise its right to transfer Class B shares to the new strategic shareholder it selected. This procedure (prior approval through the short list) will be identical with the other Project participants (junior lenders, senior lenders, etc.).

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

60

EIG00091852

In addition, the Class B investor (except Petrobras, when it transfers its Class B shares to pre-selected strategic investors) may only sell its holdings in the SPEs with the prior approval of the Class A shareholder.

The Strategic Investor selection process may take place at any time after signing the Charter and Service Contracts, and this process must be completed before the date of delivery of the Rig by the Builder and final acceptance by the SPE and Petrobras. Nevertheless, full step-in exercise of the Class B stock transfer by PNBV to the new strategic shareholder will occur after the rig acceptance tests by Petrobras, performing the obligations assumed by the new strategic shareholder and the absence of any situation of Material Adverse Effect. PNBV, after selecting the new strategic shareholder, must enter into a stock purchase and sale agreement with it.

*Mechanism for dilution and early exit of Class B shareholder*

On the other hand, in order to preserve the financial shareholders and the anticipated results of this Project, a mechanism is provided for dilution and early exit of the Class B shareholder that does not present the previously required minimum operational performance. In this situation, if there is a need to replace a low-performing operator, a transitional period is planned using a Contingent Operator, which will assume all operational liability for the rig experiencing difficulties until a new strategic shareholder is selected by the Class A shareholder, to which the original Class B shares will be transferred, together with all rights and liability corresponding to this class of shares.

*Potential Strategic Investors*

The following tables present the definitive short list, containing the pre-qualified companies, for purposes of selling the Class B shares held by Petrobras.

- Atwood Oceanics, Inc.;
- Odebrecht Óleo & Gas Ltda.;
- Brasdril Sociedade de Perfurações Ltda.;
- Dolphin Drilling Ltd.;
- Ensco International Inc.;
- Etesco Construções e Comércio Ltda.;
- Frontier Drilling do Brasil Ltda.;
- Maersk Brasil Brasmar Ltda.;
- Noble do Brasil SIC Ltda.;
- Ocean Rig ASA;
- Odfjell Drilling AS;
- Pacific Drilling;
- Petroserv S.A;
- Pride do Brasil Serviços de Petróleo Ltda;
- Queiroz Galvão Óleo e Gás S.A.;
- Saipem do Brasil Ltda.;
- Seadrill Ltd.;
- Sevan Marine do Brasil Ltda.
- Transocean Brasil Ltda.;

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

61

EIG00091853

- Vantage Drilling Co.; and
- Grupo R.

## 7.5.    Equity Offering – IPO

In the event that Sete Brasil and its Board of Directors believe that there is a market opportunity and interest by investors, Sete Brasil may make a public offering of stock on the market through an IPO.

Once the community of market investors has an actual perception that the "Long-Term Pre-Salt Rig Chartering Business" is a robust, structured niche with principal variables calculated and risks mitigated, there is a real possibility to attract new investors through an IPO.

The IPO will consist of a primary and possibly a secondary offering:

- <u>Primary</u>: The investors subscribe to a capital increase in order to finance the remaining project needs, both for completing the investments required for the first rig system and possibly for implementing a second or even a third system (adding 7 new rigs for each new system included in the Project, if Sete Brasil has the preferential right).
- <u>Second</u>: Private investors [owning shares of Sete] will have an opportunity to monetize their investments in the capital increase by selling a (predetermined) percentage of their shares on the stock exchange.

For this purpose, all of the loan agreements must be initially negotiated and performed so as to allow the IPO of Class A shares, during the rig construction period as well as the operation period.

In order to maintain the initial risk profile of the Project (in contracting loans and financing) and in order to reduce uncertainties of a possible IPO, the proposed structure considers the need to use an internationally renowned operator as the operator of "last recourse" (Contingent Operator described in the "*Mechanism for dilution and early exit of Class B shareholder*"), or in the composition of a list or pre-approved operators, for the same purpose.

If the IPO does not occur by the eighth year after acquisition of Sete International GmbH by Sete Brasil, Sete Brasil may offer its shares publicly. The FIP quotaholders will be free to terminate [the FIP] and become direct shareholders of Sete Brasil.

If the shareholders approve the IPO, Sete Brasil will make a capital call up to the limit of the total capital committed by the FIP shareholders and Petrobras, in accordance with the Investment Commitment.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

62

EIG00091854

# 8.   CAPITAL STRUCTURE AND FINANCING PLAN

## 8.1.   Main Considerations

*Maximizing loan terms*

One of the main objectives of the Project is generating Charter Fees to be paid by Petrobras in line with the current market fees, for rigs with the same characteristics and similar contractual conditions. In this respect, the financing term to be used for the proposed structure is configured as one of the most important variables in determining a competitive Charter Fee. Therefore, it will be necessary to seek advantageous conditions, primarily in relation to term, for tranches of the Commercial Banks, ECAs, but primarily BNDES.

Thus, in order to generate competitive charter fees, one of the principal goals of the Project is to construct a medium-term financing package for repayment of debts exceeding the charter term (10 years). In order to do so, the structure provides a set of mechanisms to mitigate risks, the primary objective being to reassure lenders so they agree to dissociate repayment terms from the initial terms of the charter contracts.

In other words, the structure developed considers the risk of reallocation of rigs, which will be mitigated primarily by:

- Renewal Fund, which will be established by the Foreign Holding Company and capitalized by special dividends of the SPEs
- Portfolio finance structure with complementary SPE cash flows through the Foreign Holding Company
- Rigs with 20-year charters (two rigs in the first system) that have no risk of renewal
- Residual value of assets

*Limit the number of sources of financing*

In relation to the complexity and amount of financing of the Project, the funding strategy is focused on sources of financing with the greatest underwriting potential. The credit approval work for each source of financing is extensive (due diligence, contracts, negotiations, etc.) and the cost is significant. Based upon this strategy, the Project is seeking only a few sources of financing, primarily focused on BNDES.

*Involvement of BNDES since the inception of the Project*

Development of the Project and the "Value Chain" of the supply of domestic goods and services for rig construction in the country is of essential importance for Brazil. Therefore, great interest and participation by BNDES is anticipated.

The BNDES financing package must be very competitive in relation to term, cost and volume, but the value of its involvement is much greater. BNDES participation will be an important anchor for the other creditors, besides demonstrating the government's political support. It is believed that the bidding notice for selecting Brazilian shipyards

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

63

EIG00091855

to build the rigs contains an increasing index of Brazilian content in the Project (55% to 65%), so BNDES participation may be rather significant.

*IPO*

Although the financing plan does not provide for capital market resources, the proposed solution must consider a structure anticipating flexibility for accessing the stock market, creating mechanisms for bringing in additional funds required by the project and liquidity mechanisms for shareholders in the contractual structure.

## 8.2.    Financing Plan

The principal financing sources for the Project are:

*Bridge loan:*
- Use of funds: initial disbursements and down payments
- Participation: only short-term resources during construction
- Currency: USD or *Reais*
- Comments: Revolving loan

*BNDES:*
- Use of funds: local goods and services
- Participation: 40% to 50%
- Currency: USD
- Comments: principal source of project financing

*ECAs:*
- Use of funds: imported goods and services
- Participation: 20%
- Currency: USD
- Comments: probable ECAs should be U.S. EXIM and GIEK, among others

*Commercial banks:*
- Use of funds: costs not eligible for BNDES and ECAs
- Participation: 10% to 20%
- Currency: USD or *Reais*
- Comments: flexibility of disbursement and repayment

*Equity:*
- Use of funds: financing of goods and services not eligible for other sources of financing
- Participation: 20% to 25%
- Currency: *Reais*
- Comments: in order to take advantage of tax benefits under the Brazil-Austria Double Taxation Treaty (withholding tax does not apply to payment of interest between Brazil and Austria), Petrobras and Santander are analyzing the option of part of the Class A investors' investment being made in the form of junior debt (respecting the preferential senior loan of the BNDES, ECAs and Commercial Banks). Alternatively, the possibility of other investors, other than FTP shareholders, participating in the Project junior loan is also being studied.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

64

EIG00091856

In this way, the equity of the Rig Project is estimated at USD 1,108,963,000 and the total debt is USD 4,435,852,000, according to the following composition:

| Capital Structure | USD – in thousands | % |
|---|---|---|
| Debt | 4,435,852 | 80.0 |
|     BNDES | 2,495,167 | 45.0 |
|     ECAs | 1,108,963 | 20.0 |
|     Commercial Banks | 831,722 | 15.0 |
|   Equity | 1,108,963 | 20.0 |
|     Class A | 942,619 | 17.0 |
|       Petrobras | 91,262 | 1.7 |
|       Rig FIP | 848,357 | 15.3 |
|     Class B | 166,344 | 3.0 |
|   Total | 5,544,815 | 100.0 |

## 8.2.1. BNDES [Brazilian National Development Bank]

The BNDES is the largest source of long-term financing in Brazil and already formally indicated its commitment to participate in the Project's financing by means of a letter sent with the express authorization of its Executive Board.

The amount of BNDES financing is limited to the volume of local content of the Project (55% to 65%).

Since the loan applicants, the SPEs, will be located in the Netherlands and in view of the REPETRO characteristics, the only BNDES product available for this project is BNDES EXIM, in which funds may be disbursed directly to local suppliers in *reais* and reported as debt of the SPEs in U.S. dollars, converted on the date of disbursement.

The following financing conditions for the Project were approved unanimously by the Executive Board of the BNDES:

- Form of support: Direct

- Cost of financing: LIBOR + 2.25% p.a., for a total term of 18 years, with 3 years as a grace period and 15 years for repayment

- Repayment system: Price table

Santander
GLOBAL BANKING & MARKETS
Confidential

Souza, Cescon, Barrieu & Flesch
ADVOGADOS

65

EIG00091857

CONFIDENTIAL INFORMATION MEMORANDUM

- Risk compensation: defined by the BNDES credit policy, according to the risk classification of the Project; and

- Level of participation: 100% of domestic machinery and equipment and 80% of other items that may be financed.

The approval granted by the BNDES Board of Directors, however, is contingent upon meeting the following requirements, as well as others that may be included during the loan analysis:

- The EPC Contract must be entered into with an ECP Contractor, the credit rating of which is acceptable to the BNDES;

- The daily rate must be sufficient to at least: (i) cover the cost of rig operation and maintenance; (ii) ensure that the senior debt coverage ratio is equal to or greater than 1.2X; (iii) ensure that the total debt coverage ratio is equal to or greater than 1.00X; (iv) establish the funds and reserves to be pledged; and (iv [sic]) ensure that the flow of Sete International receivables is sufficient to cover 120% of any cash shortage of the SPEs, especially debt service of the SPEs that do not have their contracts renewed after the tenth year of operation.

- In the pre-operational phase, the following guarantees must be provided, including those that may be negotiated in the operations analysis phase, also considering that the rules applied to the guarantees to be established abroad will be determined at the discretion of the BNDES: (i) fiduciary assignment of credit rights to the EPC Contract; (ii) pledge or fiduciary assignment of credit rights to Sete International accounts; (iii) pledge or fiduciary assignment of credit rights to SPE accounts; (iv) pledge of SPE shares; (v) performance guarantee insurance; (vi) fiduciary ownership of the rigs; (vii) contingency reserve account; and (viii) FGCN credit guarantee for 50% of the financing.

- In the operational phase, the following guarantees must be provided, including those that may be negotiated in the operations analysis phase, also considering that the rules applied to the guarantees to be established abroad will be determined at the discretion of the BNDES: (i) pledge or fiduciary assignment of Sete International accounts receivable; (ii) pledge or fiduciary assignment of SPE accounts receivable; (iii) pledge of SPE shares; (iv) pledge or fiduciary assignment of credit risks to SPE accounts (v) pledge or fiduciary assignment of credit rights to the Foreign Holding Company's accounts; (vi) reserve for at least 3 months of debt service; (vii) renewal fund for a minimum amount of USD 150 million; (viii) performance fund for a minimum amount of USD 70 million; and (ix) fiduciary ownership of the rigs.

- Availability of FGCN funds to grant the credit guarantee for the package of rigs to be contracted; Shareholder equity of 20% of the investment amount, consisting of 10% equity and 10% junior debt, provided that if the equity portion is increased,

_____

**Santander**
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

66

EIG00091858

it may be done by increasing the portion of junior debt in Project sources;

- Petrobras must hold at least 10% of the capital stock of Sete Brasil, notwithstanding the possibility of reducing this equity interest to a minimum of 5% in the event of a public offering;

- Petrobras PNBV must remain as Class B Shareholder of each of the SPEs that will have a 10-year charter contract until at least 12 months before delivery of the respective rig.

- The obligation must be established for PNBV to remain as Class B Shareholder of each of the SPEs that will have a 20-year charter contract until at least the end of the term for repaying the senior debt; and

- The commitment must be established for shareholders to contribute equity funds in the SPEs, by means of a capital contribution or junior debt to senior creditors, if it is necessary to supplement resources to complete construction of the rigs, provided that this cost increase is derived from a change order for the project made by the SPE and/or the price adjustment index of the EPC Contract.

### 8.2.2.   ECAs [Export Credit Agencies]

*USEximbank - United States*

Independent U.S. government agency, created in 1934, the purpose of which is to facilitate export financing of U.S. goods and services. Eximbank promotes U.S. exports by offering credit guarantees and insurance for buyers and suppliers.

The price is currently attractive due to the recent improvement in Brazil's risk rating by the OECD. It typically requires a minimum 15% down payment.

*GIEK – Norway*

The purpose of GIEK is to promote Norwegian exports by means of guarantees representing the Norwegian government. Since 1994, GIEK is organized as a public agency under the Ministry of Commerce.

GIEK support for businesses related to Norwegian exports has been the object of increasing attention in view of the international financial crisis.

In addition, considering that the niche of supplying goods and services for offshore drilling rig construction currently has a major presence in Norway, GIEK support for the Project may mean significant participation by said institution in the structure financing package.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

67

EIG00091859

### 8.2.3.  Commercial Banks – Syndicated Loans

Traditionally, the primary source of financing for rigs built outside of Brazil is Commercial Bank syndicated loans, since the BNDES does not finance foreign equipment and services.

Therefore, a syndicated loan transaction with Commercial Banks should complete the financing package and may be initiated quickly and gradually. One of the main advantages of this form is its flexibility to customize Project needs – far greater than that of the BNDES, ECAs (USExim, GIEK) – even in relation to the type of debt repayment and the variable schedule for funds disbursement, eliminating negative carry losses. Another important advantage is the banks' knowledge of the industry.

### 8.3.  Preliminary Term Sheet

The following table presents the principal assumptions used for the base case of the financial model.

*Table 7: Base Case of Financing*

|  | BNDES | ECAs | Commercial Banks |
|---|---|---|---|
| Uses (eligibility) | Local goods and services | Imported goods and services | Costs not eligible for BNDES and ECAs |
| Applicant | SPEs | SPEs | SPEs |
| Participation | 45% | 20% | 15% |
| Currency | USD | USD | USD |
| Grace period | 6 months | 6 months | 6 months |
| Disbursement | Up to 3 years | Up to 3 years | Flexible |
| Term (years) | 3+15 | 3+12 | 3+10 |
| Index | Libor | Libor | Libor |
| Spread | 2.75% | 3.00% | 3.00% |
| Upfront fee | N/A | N/A | 2.00% |
| Frequency | Quarterly | Quarterly | Quarterly |

*Source: Petrobras and Santander*

### 8.4.  Main Covenants and Obligations

Based upon experience and recent transactions in the industry and in preliminary discussions with the BNDES and commercial banks, the main obligations and covenants for the Project should be:

*Coverage Ratio for Servicing Senior Debt*

In relation to the charter contract, offtaker qualifications, operations and maintenance costs and consequently the ability to project cash flow, we believe that the minimum DSCR should be 1.20X.

*Debt Service Reserve Account ("DSRA")*

Typically Project Finance structures take into consideration a reserve account for 6 months of interest and principal. Nevertheless, in relation to the portfolio structure and Credit Enhancements, we believe that a 3-month reserve account should be sufficient.

*Renewal Fund*

Through a trustee, the Renewal Fund (to be established abroad by the Foreign Holding Company – Sete International) will be capitalized by extraordinary

Santander

GLOBAL BANKING & MARKETS

Confidential

SOUZA, CESCON, BARRIEU & FLESCH

ADVOGADOS

68

EIG00091860

|                              |                                                                                                                                                                                                                                                                                                      |
|------------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                              | dividends paid by the SPEs between the eighth and tenth year of their charter contracts.                                                                                                                                                                                                              |
| *Mobilization Fee*           | The Mobilization, Commissioning and Pre-Operation Fee (Mobilization Fee) to be paid by Petrobras to each SPE after acceptance of each rig (after delivery by the shipyards) will be divided into two parts, with one portion of USD 8 million to be deposited in the Renewal Fund, to accelerate establishment of the fund. |
| *Contingency Reserve Fund*   | It is planned to establish an account (Contingent Expense Account) intended to cover additional material expenses not originally projected in the economic models and business plan for the Project, such as operational, administrative, tax, legal, O&M, advisor, consultant and other expenses.     |

| *Other Obligations* | • Restriction on additional indebtedness |
|---------------------|-------------------------------------------|
|                     | • Negative pledge |
|                     | • Waterfall of priorities and cash flow payments |

## 8.5.   Guarantee Package

The insurance package that senior creditors will probably require must include the following guarantees:

| *Pre-completion guarantees* | • Pledge/Fiduciary Transfer of Construction Contract |
|------------------------------|------------------------------------------------------|
|                              | • Pledge/Fiduciary Transfer of Charter Contract |
|                              | • Pledge/Fiduciary Transfer of shares/quotas of specific SPEs |
|                              | • Pledge/Fiduciary Transfer of insurance package |
|                              | • Pledge/Fiduciary Transfer of Liquidated Damages of Construction Contract |

| *Post-completion guarantees* | • Pledge/Fiduciary Transfer of Charter Contract |
|-------------------------------|-------------------------------------------------|
|                               | • Pledge/Fiduciary Transfer of Service Contract (O&M) |
|                               | • Pledge/Fiduciary Transfer of shares/quotas in SPEs |
|                               | • Pledge/Fiduciary Transfer of Project assets |
|                               | • Pledge/Fiduciary Transfer of insurance package |
|                               | • Pledge/Fiduciary Transfer of Project Accounts (DSRA, Performance Fund, Renewal Fund) |

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

69
EIG00091861

# 9.    MODEL and ECONOMIC/FINANCIAL ANALYSIS

## 9.1.    Introduction

In order to evaluate the bankability and financial and economic viability of the Project, Petrobras, in conjunction with Santander, developed a financial model to represent all of the principal conditions applicable to the Project and the financial structuring being implemented. The financial model and outputs will be available through the Data Room.

## 9.2.    Main Assumptions

From a preliminary financial point of view, the model takes into consideration a senior debt/capital ratio of 80/20. A portion of the resources from financial investors (Class A principal) may be from a loan granted by the shareholders themselves, or third parties, and may be subordinated to the senior debt ("Junior Debt"). Using as a basis the eligible costs and capacity of the project to settle its debt, the capital structure anticipated for the project was estimated as follows:

*Table 8: Debt tranches*

| Tranche | Description | % of Total Financed |
|---|---|---|
| BNDES | Financing of local goods and services | 45.0% |
| ECAs | Covers the principal imported items | 20.0% |
| Commercial Banks | Will finance other items not covered by the BNDES and ECAs | 15.0% |
| **Total** | | **80.0%** |

*Source: Petrobras and Santander*

## 9.3.    Important Dates

The financial model allows a simulation of each individual rig, where each SPE may have different construction dates and charter terms. April 2011 is the start of the Project, when all SPEs will have their initial disbursements. The following table presents the key dates for each Rid:

*Table 9: Important Dates*

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

70

EIG00091862

| Rig | First Disbursement | Start of Operation | End of Operation |
|-----|-------------------|--------------------|------------------|
| Rig 1 | April 2011 | July 2015 | June 2035 |
| Rig 2 | April 2011 | July 2016 | June 2036 |
| Rig 3 | April 2011 | Jan. 2017 | Dec. 2026 |
| Rig 4 | April 2011 | Oct. 2017 | Sept. 2027 |
| Rig 5 | April 2011 | July 2018 | June 2028 |
| Rig 6 | April 2011 | Jan. 2019 | Dec. 2028 |
| Rig 7 | April 2011 | Oct. 2019 | Sept. 2029 |

*Source: Petrobras*
*Note: Rigs with a term of 20 years will be rigs 1 and 2*

### 9.4.   Construction Schedule

*Development costs*:   As previously explained, strictly for purposes of the preliminary financial model, the start of the project will be in October 2010, when construction begins on three rigs. The following figure illustrates the investment schedule for the seven rigs and the red line shows the overall progress of the seven rigs.

*Figure 25: Investment Schedule*



*Source: Petrobras*

### 9.5.    Main Macroeconomic Assumptions

The main macroeconomic assumptions[22] are presented below. It must be noted that these assumptions may be revised during development of the project.

*Table 10: Macroeconomic assumptions*

|                           | 2011   | 2012   | 2013   | 2014  | 2015  | 2016  | 2017  |
|---------------------------|--------|--------|--------|-------|-------|-------|-------|
| INPC                      | 4.78%  | 4.50%  | 4.42%  | 4.37% | 4.37% | 4.37% | 4.37% |
| IPCA                      | 4.46%  | 4.50%  | 4.50%  | 4.50% | 4.00% | 4.00% | 4.00% |
| Average CDI               | 8.67%  | 10.31% | 11.41% | 9.97% | 9.97% | 9.97% | 9.97% |
| Dollar/Euro exchange rate | 1.48   | 1.55   | 1.55   | 1.55  | 1.55  | 1.55  | 1.55  |
| Real/Euro exchange rate   | 2.96   | 3.26   | 3.30   | 3.35  | 3.40  | 3.44  | 3.49  |
| Libor (6 months)          | 2.92%  | 3.13%  | 3.35%  | 3.57% | 3.78% | 4.00% | 4.25% |
| U.S. CPI                  | 3.00%  | 3.00%  | 3.00%  | 3.00% | 3.00% | 3.00% | 3.00% |

*Source: Santander Economia – November 2010*

The following table summarizes the impact of each assumption on long-term projections:

*Table 11: Macroeconomic assumptions – Impact on Project*

| Assumption                | Description                                                            |
|---------------------------|-----------------------------------------------------------------------|
| INPC                      | Index of Capex domestic portion                                       |
| IPCA                      | Index of Junior Debt and part of Daily Rate                           |
| Average CDI               | Used to calculate financial revenue of cash accumulated at Sete Brasil |
| Dollar/Euro exchange rate | Used to transfer principal between Sete International and the SPEs     |
| Real/Euro exchange rate   | Used to transfer principal between Sete International and Sete Brasil  |
| Libor (6 months)          | Used as variable interest for BNDES (USD), ECAs and Commercial Banks   |
| U.S. CPI                  | Index for imported Capex portion and part of Daily Rate               |

*Source: Santander*

### 9.6.    Operations Assumptions

*Charter Fee*

The only source of income of each SPE will be the bare boat charter fee paid monthly by Petrobras, according to rig availability ("Up Time").

The Base Case of the financial model assumes that the average availability of the rigs will be 95% in the first year and 97% for the remainder of the operation, but does not take

---

[22] The macroeconomic assumptions are subject to change.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

72

EIG00091864

into consideration a performance bonus. These assumptions were based on data from ODS-Petrodata[23] and Petrobras' experience as a charter party.

*Cost of Insurance and Maintenance*

The Charter Fee must also cover USD 13,000/day for insurance expenses and USD 22,000/day for spare parts and docking charges, to be paid by the SPE[24].

*Service Fee*

The operating assumptions will be governed by the Service Contract to be signed with the operator. The financial model considers a service fee of USD 115,000/day[25], the entire amount intended for the rig operator to cover all of its operating expenses, charges and profit margin. As in other similar contracts, the costs for which Petrobras is liable (such as fuel, supply of water and support vessels, etc.) is not included in these amounts.

*Mobilization Fee*

A single payment will be made for each rig, after acceptance of the rig by Petrobras, for mobilization in the amount of USD 30 million, to be used to cover mobilization costs for starting operating activities, including any expenses not initially anticipated in the business plan. Any balances of the amount paid for the Mobilization Fee generated by failure to use it all for the intended purposes must be used exclusively for allowed investments, as set forth in the operating agreements.

*Administrative costs - Local Holding Company*

In addition to the income and expenses of each SPE, Sete Brasil will have administrative costs estimated at R$ 2,045,000 per month (including R$ 1,760,000 per month in salaries and benefits and R$ 285,000 per month for administrative expenses).

## 9.7.   Tax Assumptions

The financial model specifically uses the principal tax assumptions, and it is possible to make the effect of each of them sensitive to the project.

*Table 12: Summary of Taxes*

| Tax | Rate | Comment |
|---|---|---|
| **Local Holding Company** | | |
| IOF/Credit | 1.88% | Upon granting the loan |
| IOF/Foreign Exchange | 0.38% | Upon disbursement of loaned funds |
| IOF/Foreign Exchange | 0.38% | Upon disbursement of funds contributed as capital |
| IOF/Foreign Exchange | 0.38% | Upon input of funds for receipt of interest and/or repayment of principal |

*[IOF = Tax on Financial Operations]*

---

[23] Source: *Ultra-Deepwater Rigs for Brazil, A report for Banco Santander related lo Petrobras' Pre-salt Oil Rigs Project, May 2010*
[24] Source: Petrobras, referring to actual data reported by the company and other drilling rig operators consulted. This amount may be changed by Petrobras.
[25] Source: Petrobras, referring to actual data reported by the company and other drilling rig operators consulted. This amount may be changed by Petrobras.

**Santander**
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

73

EIG00091865

| Tax | Rate | Comment |
|---|---|---|
| IOF/Foreign Exchange | 0.38% | Upon input of funds for receipt of dividends |
| **Foreign Holding Company** | | |
| Withholding tax - dividends | 15.0% | |
| Withholding tax – interest | 0.0% | |
| Capital duty | 1.0% | On capital contribution of Sete Brasil to Sete International |
| Stamp duty | 0.8% | On amount of loan agreement (junior debt) of Sete Brasil to Sete International |
| **SPEs** | | |
| Income Tax | 25% | Credit of 20% on charter income |
| Withholding tax – dividends | 0.0% | Does not include withholding tax on dividends distributed in Euro zone |

*Source: Petrobras and SCBF*

### 9.8.    Financing Terms

The financing terms established in the financial model for the Pre-Salt Rig Project are in line with the conditions discussed on a preliminary basis with the BNDES, GIEK and Commercial Banks. Nevertheless, these conditions are not yet formally signed and therefore the conditions presented below are preliminary and subject to change.

*Table 13: Financing Terms and Conditions of ECAs (per rig)[26]*

| Item | BNDES | ECAs | Commercial Banks |
|---|---|---|---|
| **Total Term (Years)** | **18** | **15** | **13** |
| Months Grace after CoD | 6 | 6 | 6 |
| Total Months Grace | 36 | 36 | 36 |
| Repayment  (years) | 15 | 12 | 10 |
| Total Spread | 2.75% | 3.00% | 3.00% |
| Variable Interest | Libor | Libor | Libor |
| Type of disbursement | Prorated | Prorated | Prorated |
| Type of repayment | PRICE Table | SAC Table | Customized |
| Repayment Schedule | Quarterly | Quarterly | Quarterly |

---

[26] The amounts are indicative and represent the best estimates by Santander and Petrobras at this time.

**Santander**
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

74

EIG00091866

| Item | BNDES | ECAs | Commercial Banks |
|---|---|---|---|
| Months Reserve Account | 3 | 3 | 3 |
| Capitalize JDC? | Yes | Yes | Yes |

*Source: Petrobras and Santander*

### 9.9. Consolidated Table of Sources and Uses of Financing

Based upon estimated costs and the proposed capital structure, the Table of Sources and Uses of Financing for the Project is as follows:

*Table 14: Table of Sources and Uses of Financing for the First System – USD thousands[27]*

| Sources | USD 1,000 | Uses | USD 1,000 |
|---|---|---|---|
| **Debt** | **4,435,852** | Cost of Construction | **4,648,000** |
| BNDES | 2,495,167 | Construction Adjustment | 595,147 |
| ECAs | 1,108,963 | Startup Equipment | 105,000 |
| Commercial Banks | 831,722 | FGCN | 26,532 |
| | | Work Inspection | 58,450 |
| **Equity** | **1,108,963** | Insurance | 84,000 |
| Class A Equity Capital | 942,619 | Financial Costs | 27,686 |
| Class B Equity Capital | 166,344 | | |
| **Total** | **5,544,815** | | **5,544,815** |

*Source: Santander and Petrobras*

### 9.10 Reserve Account

The project provides for the creation, throughout the debt repayment term, of a Debt Service Reserve Account, or "DSRA." For all tranches with the exception of the junior debt, it is estimated that the DSRA will be equal to three months of debt service[28].

These reserve accounts will be created with cash from the project in the first months of operation and must be used if the project is not in a position to service the debt. In this case (using the reserve account), the account must be reinstated in the following period with the project cash flow. The financial model indicates that the average DSRA balance of the BNDES is estimated at USD 23 million.

---

[27] The amounts are indicative and represent the best estimates by Santander and Petrobras at this time.
[28] Includes interest and amortization of principal.



### 9.11.   Debt Service Coverage Ratio

In order to calculate the capacity to pay for the seven rigs, the consolidated Debt Service Coverage Ratio ("DSCR") was prepared, in which the available cash for the seven rigs is used to pay the entire debt service for the seven rigs, complying with the dates of each SPE. It is important to emphasize that calculation of the DSCR does not use junior debt service. The DSCR was calculated as follows:

$$\frac{\text{Available Cash}}{\text{Debt Service}}$$

The cash available for debt service is calculated as follows:
(+) EBITDA (earnings before interest, taxes, depreciation and amortization)
(-) Changes in Working Capital
(-) Investments in Fixed Assets
(-) Taxes (Income Tax and Social Contributions)
(+) Financial income for the period


The debt service is calculated as follows:
(+) Principal amount of financing
(+) Interest on financing

Following are the average coverage ratios projected for the seven rigs in the project:

*Table 15: Consolidated Coverage Ratio for the seven rigs*

| Year | DSCR | Year | DSCR |
|------|------|------|------|
| 2015 | 3.97x | 2021 | 1.77x |
| 2016 | 3.11x | 2022 | 1.79x |
| 2017 | 2.39x | 2023 | 1.82x |
| 2018 | 1.88x | 2024 | 1.85x |
| 2019 | 1..83x | 2025 | 3.60x |
| 2020 | 1.70x | 2026 | 5.38x |

*Source: Santander.*

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

76
EIG00091868

# 10.   RISKS AND MITIGATING FACTORS

## 10.1.   Construction Risk

*Description of Risk*       Risk related to an error in the project design and/or engineering defects.

*Consequence*       Errors and defects may result in the project not passing the Petrobras acceptance test or even make completion of the construction process impossible. Furthermore, it may result in operating levels below specifications.

*Traditional mitigating factors*
- Use of an existing design or a change of an existing design with a proven history of success (field-proof)
- Selection of a shipyard with experience or associated with another shipyard with a proven reputation in building similar ships
- Reduction of areas of interference between the ship design and the construction shipyard
- Monitoring the construction process by Petrobras and an Independent Engineer ("IE") put forth by the shareholders, lenders and other interested parties (including the FGCN)

Taking into account that the Project rigs must be constructed in Brazil and that currently the country does not have shipyards with proven experience to perform these projects, Petrobras must play an even more important role to mitigate this risk by means of:

*Additional mitigating factors*
- A rigorous technical selection process for shipyards
- Supervision of the construction process by means of a Work Management and Inspection Contract

In the proposed structure, Petrobras will be the minority Class A shareholder and, at least during the construction process for each rig, it will also be a Class B shareholder. In this situation, the rig construction process will remain at all times under the direct control of Petrobras, as representative of all shareholders of the construction contractors (the SPEs). Thus, the risk of Petrobras not accepting the units may be classified as low.

It is important to recall that approximately 40% of the drilling equipment and systems to be installed in the rigs will be imported. This equipment is the same as currently used on similar rigs under construction or already built in international shipyards. In other words, with regard to this equipment and the final rig performance, the construction location has little effect on the final result, since the installation, erection and integration of these systems is monitored and supervised by the manufacturers of the main equipment, as planned in this case.

In addition, the portfolio structure and contract strategy for the 7 rigs at the same shipyard should allow local shipyards to garner know how and experience during

**Santander**

GLOBAL BANKING & MARKETS

Confidential

SOUZA, CESCON, BARRIEU & FLESCH

ADVOGADOS

77

EIG00091869

construction of the first rigs, reducing the system construction risk as a whole.

Furthermore, the shipyard selection criteria must take into consideration the capacity of local shipyards to associate with foreign shipyards that are experienced in constructing fifth and sixth generation drilling rigs.

Lastly, the guarantees provided by the FGCN, to be contracted by the SPEs, will have a significant mitigating effect on construction risk.

## 10.2.    Risk of Cost Overruns

*Risk*

Risk of an unexpected increase in the project cost. Normally, it is due to the inexperience of the shipyard in building similar equipment, contracts without price adjustment clauses, or major interference with the project contractor due to Change Orders, in addition to accidents or events of force majeure.

*Consequence*

In addition to the total investment in the project, a cost overrun event may use up some of the available resources and result in project delays.

The traditional mitigating factors for this risk are:

*Traditional mitigating factors*
- Use of an existing design or a change of an existing design with a proven history of success (field-proof)
- Contracting for construction (shipyard and any equipment supplied by the owner) pursuant to a contract with a fixed price and date.
- Ongoing supervision of the construction process (ideally by means of an internationally renowned Independent Engineer).
- Contracting insurance (BAR – Builders All Risk, and DSU – Delay Start Up)

*Additional mitigating factors*
In view of the inexperience of local shipyards in building similar equipment (primarily in relation to the first units), in addition to care in regard to the items indicated above, other mitigating factors must be observed, such as:

- FGCN: despite the limitation on using the fund for this purpose, the FGCN helps put together a package of guarantees and instruments to provide additional mitigation for this risk.
- Guarantee insurance (performance) of up to 21% for the entire package of orders placed with the shipyard responsible for building the seven rigs (3% of the investment in each rig).
- Contingency Reserve Account: The Project provides for creating a Contingency Reserve Account, established in the form of a pool common for all SPEs and centralized at Sete International, the primary purpose of which is to mitigate the risk of the SPEs having insufficient cash flow to cover their obligations arising out of extraordinary material expenses and/or costs incurred by the SPEs in the pre-operational phase of each Rig.

**◆ Santander**
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

78

EIG00091870

- In the proposed structure, Petrobras will be faced with construction processes for all of the rigs, and therefore identify problems and challenges in advance, which may provide additional reassurance to investors, lenders and other interested parties.

In addition, in order to reduce the price guarantee risk over the long term, the use of a customized index is planned to align construction prices and costs, to be determined and announced by the FGV [*Getulio Vargas Foundation*], which will closely represent the rig construction cost structure. The determination and announcement of this index by such a well-reputed entity such as the FGV provides additional assurance for the Project in managing construction costs, thereby significantly reducing the risk of cost overruns. Variations, upward or downward, in construction contract prices derived from this index will be reflected directly in the charter contract prices.

Furthermore, the structure takes into consideration the use of economic/financial equilibrium clauses according to which cost overruns will be covered by the parties that cause them (if it is Petrobras, there will be an adjustment in the charter fee).

*Table 16: Risk of Cost Overruns – Possible Causes and Mitigating Factors*

| Causes | Mitigating Factors |
|---|---|
| Increase in Tax Liability | • The proposed financial structure allows the SPEs and Petrobras to fully benefit from REPETRO.<br>• ICMS and IPI: The sale of certain eligible assets by a Brazilian producer of a foreign entity may be considered as an export transaction, even if said assets do not physically leave Brazil. Therefore, under the REPETRO system, the shipyard is exempt from ICMS and IPI.<br>• Import tax: Goods may be imported as raw materials, without withholding or paying taxes, provided that they are used in the production of certain industrialized goods and the assets are eligible for subsequent export.<br>• New taxes and rates that may result in increased construction costs will entail a price revision of the construction contract and will be reflected in the charter contract. |
| Variation in Construction Contract Correction Indices | • Construction contract correction in line with the Charter Contract correction – based upon an index to be determined and announced by the FGV that will represent the rig construction cost structure<br>• The exchange variation during construction is mitigated by costs in USD being financed by sources of USD funds (initially 20% ECAs and 20% Commercial Banks) |
| Variation in the Price of Raw Materials, | • The Construction Contract will be fixed price and date (turnkey) |

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

79

EIG00091871

| Equipment, Inputs, Consumables and Labor | • The variation in construction costs related to inflation is mitigated by the Construction Contract correction. |
| | • The variation in construction costs over budget in the proposal prepared by the shipyard will be the shipyard's responsibility. |
| Change Orders, Design Changes (improvement of design, operation, technical specifications) | • At the request of the Charter Party (Petrobras): any change orders will entail a corresponding increase in the Charter Fee |
| | • Due to an error, inefficiency or negligence of the Shipyard: the Shipyard will be responsible. |

*Source: Santander, Petrobras and SCBF*

### 10.3.    Risk of Delay in Beginning Operations

*Risk*

Risk of delay is characterized by delivery of equipment on a date subsequent to the date previously agreed. Delays are normally due to inexperience of the shipyard in constructing similar equipment, change orders, procurement problems, accidents or events of force majeure.

*Consequence*

A delay in delivery of the rig entails a deferral of revenue from the Charter Contract and consequently impairs the project's capacity to service senior debt. A delay exceeding 24 months may entitle Petrobras to defer or even cancel the Charter Contract.

The traditional mitigating factors for this risk are:

*Traditional mitigating factors*
- Contracting the construction (shipyard and any equipment supplied by the owner) under contract with a fixed price and date.
- Use of an existing design or a change of an existing design with a proven history of success and performance
- Selection of a shipyard with proven experience in building similar vessels
- Ongoing supervision of the construction process (by means of an internationally renowned independent consultant).
- Contracting insurance (BAR – Builders All Risk, and DSU – Delay Start Up, Loss of Hire, etc.)

*Additional mitigating factors*
In relation to the inexperience of local shipyards in building similar equipment (primarily in relation to the first units), additional instruments must complete the traditional "package" in order to provide additional assurance, such as:

- Adjust the construction term with loan grace periods.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

80
EIG00091872

- Adjust the maximum terms for beginning operation in the charter contracts in order to provide a sufficient period of time for delivery of the equipment before Petrobras may cancel the contract.
- FGCN: each SPE must carry credit insurance with the FGCN to cover any delay in the work schedule, provided that it is caused by the Shipyard, up to a limit of 50% of the unpaid balance of all debts contracted by the insured to finance construction, with first loss for the FGCN. The FGCN funds may be used for the first financing repayment amounts in the event of delay, up to the limit (approximate) of delays corresponding to 50% of the average term for repaying the financing.
- Carrying Liquidated Damages insurance
- Garnering experience and productivity by the shipyards with the first rigs.
- The charter fee to be paid by Petrobras includes an additional price margin ("Margin") to offset delays of up to 12 (twelve) months for the first rig and up to 6 (six) months for the second rig to be built, both with charter contracts with terms of 20 (twenty) years, operated by Petrobras. In the event that any delays in these two rigs exceeds the established Margin, Petrobras will use its best efforts to adjust the original contract term upwards for the charter and services for two assets (20 years) in order to maintain the same expected profitability for the Project Base Case.

### 10.4.   Performance Risk

*Risk*                                   Risk of low performance by the operator.

*Consequence*                     Reduction of charter fee, which may cause the project to not generate sufficient funds to meet all of its commitments and, within limits, lose the contract with Petrobras.

The traditional mitigating factors for this risk are:

*Traditional mitigating factors*
- Contracting an operator with proven experience in operating drilling rigs in ultra-deep water.
- Possibility of replacing the operator in the event of low performance
- Establishing three-month reserve accounts for debt service
- Careful evaluation of the project, with an emphasis on the project producing robust debt coverage ratios (over 1.20X).
- Carrying insurance.

*Additional mitigating factors*   In addition to the traditional mitigating factors, the proposed structure provides for establishing a Performance Fund. This fund will be established for all rigs for an amount of approximately USD 56 mm, for the sole purpose of providing additional mitigating factors for performance risk.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

81
EIG00091873

Furthermore, the operator will be the Class B investor, but has the additional incentive to obtain high uptime levels, since it will benefit as a shareholder.

Another potential mitigating factor for this risk is the selection/indication of an operator of "last resort," an internationally renowned company that may replace the original operator in the event of continued low performance (which may or may not be evaluated by consecutive periods) or even a list of operators that are pre-approved for this purpose.

## 10.5.    Refinancing Risk

*Risk*

Since the loan repayment period and the term of the charter contract do not coincide (a mismatch in financing), there is a risk that, at the end of the original charter contract, the project may not generate sufficient cash to repay the debt in its entirety.

The traditional mitigating factors for this risk are:

*Traditional mitigating factors*
- Residual asset value and the existence of a secondary market for this type of equipment.
- Possibility of using equipment at practically any location worldwide
- Possibility of renewing the contract with Petrobras without having to begin a bidding procedure, just direct negotiation.

*Additional mitigating factors*
In addition to the traditional mitigating factors indicated above, the proposed structure provides for establishing a Renovation Fund. This fund will be established for all rigs in an amount of approximately USD 117 mm, for the sole purpose of providing additional mitigation for renovation risk and service the debt during the period without a Charter Contract.

## 10.6.    Risk of Termination of the Brazil /Austria Double Taxation Treaty

*Risk*

Risk related to the termination of the Brazil/Austria Double Taxation Treaty and consequently taxing Sete Brazil (19% on dividends received from Sete International located in Austria).

The mitigating factors for this risk are:

*Traditional mitigating factors*
- The Treaty was established in 1976[29] for the purpose of avoiding double taxation in relation to Brazil/Austria income and capital tax
- The treaty does not have a term of validity
- There is no recent history of disputing the treaty.

---

[29] Decree No. 78.107/1976



### 10.7.   Social/Environmental Risk

*Risk*

Risks related to accidents in operating the rigs that may entail environmental problems. It must be emphasized that the Project is not a production unit, but only an exploration unit, and therefore has a much lower exposure to environmental risks.

The mitigating factors for this risk are:

*Traditional mitigating factors*

- Design: the design of the rigs must consider the highest environmental and safety standards for this type of equipment. Furthermore, the rigs will use an existing design, with proven success and performance history.
- Operation: Operations may only be performed by means of an LO issued by the appropriate Brazilian authorities, with ongoing monitoring and supervision by Petrobras, by means of inspection on board each vessel. For this purpose, Petrobras requires all of its contractors to use standard procedures prepared by the company and ongoing training for all employees and outsourced personnel of its contractors.
- The operation must comply with IBAMA, CONAMA and MARPOL standards and policies.
- According to the Charter Contract, in the event of a spill of oil or other residue in the ocean, the operator (SPE) will be liable up to the limit of USD 1 million per event.

Lastly, the lenders (ECAs and Commercial Banks) will require that the Project comply with all social/environmental obligations to which it is subject according to current social/environmental legislation and with the standards defined by the Equator Principles.

Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

83

EIG00091875

# 11.   CONTRACTING INSURANCE

The insurance package will be defined later by hiring an independent insurance consultant. Following is the typical insurance for operations in the oil and gas industry.

## 11.1   Third Party Liability Insurance

| | |
|---|---|
| *Description* | Third party liability insurance will be required in the construction phase as well as the operations phase. It must be contracted before the financial closing and will be renewable annually during the term of the financing. |
| *Insured* | • SPE and/or Shipyard<br>• Lenders (or collateral agent) |
| *Coverage* | • Legal liability of any insured related to (a) death, injury, illness of any person (excluding executives), and (b) loss of or damage to any property (excluding the project) |

## 11.2   Hull & Machinery

| | |
|---|---|
| *Description* | Hull & Machinery insurance is property insurance. It begins approximately 12 months before commercial operations and must be renewable annually during the term of the financing. |
| *Insured* | • EPC Contractors and/or Shipyard<br>• Lenders (or collateral agent) |
| *Coverage* | • Amount of financing (including derivatives contracts) or estimated replacement amount of insured equipment (rig)<br>• Coverage includes hurricanes, robbery, fire, collision, sinking, etc.<br>• Sabotage, terrorism, nationalization or confiscation of property |

## 11.3   Business Interruption or Loss of Hire

| | |
|---|---|
| *Description* | Business Interruption insurance is coverage that protects against the risk of loss of income. It is typically contracted a few months before commercial operation and is renewable annually during the term of the financing. |
| *Insured* | • Lenders (or collateral agent) |
| *Coverage* | • Includes fixed costs, like debt service, operations and maintenance costs (among others) and penalties established in the Charter Contract |

🔥 Santander
GLOBAL BANKING & MARKETS
Confidential

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

84
EIG00091876

- There is typically a stand still period (TBD)
- It does not cover low operator performance

CONFIDENTIAL INFORMATION MEMORANDUM                    PROJETO SONDAS DO PRÉ-SAL

# Confidential Information Memorandum:

# *Projeto Sondas do Pré-Sal*

## Revisão #1



*Global Banking & Markets - Project Finance*

*Janeiro de 2010*



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential                                                      EIG00091793

EIG_KEP_00166276

### *Aviso*

Este material foi preparado pela Petrobras Netherlands B.V. ("PNBV") e pela Petróleo Brasileiro S.A.("Petrobras"), com a assessoria do Banco Santander Brasil S.A. ("Santander") e do Souza, Cescon, Barrieu & Flesh Advogados ("SCBF"), conjuntamente (os "Assessores").

O Santander foi contratado como assessor financeiro exclusivo da Companhia no processo estruturação e de potencial capitalização de sociedade de propósito específico ("SPE") a ser criada para deter e gerir ativos de exploração petrolífera ("Operação") e está autorizado a divulgar este material para potenciais investidores. Este material contém informações resumidas sem intenção de serem completas. Não fazemos nenhuma declaração, implícita ou explícita, e não prestamos garantia quanto à correção, adequação ou abrangência dessas informações. Esclarecemos, ainda que a Companhia, o Santander ou qualquer de suas empresas coligadas, controladas ou controladoras não deterão, a qualquer tempo, o controle acionário da SPE ou serão de qualquer forma co-obrigadas com relação à quaisquer obrigações que venham a ser assumidas pela SPE, ou ainda com relação ao resultado financeiro da Operação.

Esta apresentação contém certas declarações futuras e informações relacionadas ao Projeto que refletem as visões atuais e/ou expectativas da Companhia e de sua administração com respeito à performance e eventos futuros relacionados à Operação. Referidas projeções estão sujeitas a riscos, incertezas e eventos futuros. Advertimos os potenciais investidores que diversos fatores importantes poderão fazer com que os resultados efetivos diferenciem-se de modo relevante de tais planos, objetivos, expectativas, projeções e intenções expressadas nesta apresentação. Em nenhuma circunstância a Companhia, o Santander, suas respectivas controladas e coligadas, seus respectivos conselheiros, diretores, agentes ou empregados serão responsáveis perante terceiros (incluindo investidores) por qualquer decisão de investimento que venha a ser tomada com base nas informações e declarações presentes nesta apresentação, ou por qualquer dano dela resultante.

Esta apresentação não constitui oferta, convite ou solicitação de oferta de subscrição ou compra de quaisquer valores mobiliários. Além disso, nem esta apresentação, nem seu conteúdo constituem a base de qualquer contrato ou compromisso de qualquer espécie.

Estimativas de Mercado

As informações e dados estatísticos relativos ao mercado relevante para a Operação foram obtidos nos relatórios de consultorias independentes, órgãos governamentais e publicações em geral. A Companhia e o Santander acreditam na credibilidade de tais fontes de informação.

Esta apresentação e seu conteúdo são informações de propriedade da Companhia e não podem ser reproduzidas ou circuladas, parcial ou totalmente, sem o prévio consentimento por escrito da Companhia. Os termos e condições contidos neste material são preliminares e estão sujeitos a complementações, emendas e correções.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

II

EIG_KEP_00166277

## *Contatos*

| Contatos Petrobras | Telefone & E-mail |
|---|---|
| João Carlos M. Ferraz | Esc: +55 21 3224 2881<br>Email: jferraz@petrobras.com.br |
| Renato Marques Correa da Silva | Esc: +55 21 3224 5902<br>Email: rsilva@petrobras.com.br |
| Deborah Hadid | Esc: +55 21 3224 9224<br>Email: deborah.hadid@petrobras.com.br |
| Gustavo Dias Gomes Tauhata | Esc: +55 21 3224 9004<br>Email: gustavot@petrobras.com.br |

| Contatos Santander | Telefone & E-mail |
|---|---|
| Luiz Reis | Esc: +55 11 3553 0803<br>Email: luiz.reis@santander.com.br |
| Patric Lange | Esc: +55 21 2526 9847<br>Email: patric.lange@santander.com.br |
| Ivan Hong | Esc: +55 11 3012 7196<br>Email: ihong@santander.com.br |
| Ricardo Szlejf | Esc: +55 11 3012 7261<br>Email: rszlejf@santander.com.br |
| Albert Munck | Esc: +55 11 3012 5685<br>Email: avmunck@santander.com.br |
| Leonardo Eder | Esc: +55 21 2526 9795<br>Email: leonardo.eder@santander.com.br |

Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

iii

EIG00091795

EIG_KEP_00166278

## *Índice*

| **1** | **Sumário executivo** | **7** |
|---|---|---|
| 1.1 | Introdução ao Pré-Sal | 7 |
| 1.2 | Desenvolvimento e Exploração do Pré-Sal | 8 |
| 1.3 | Mercado de Sondas de Águas Profundas | 9 |
| 1.4 | O Projeto Sondas Pré-Sal | 9 |
| 1.5 | Tese de Investimento | 15 |
| 1.6 | Estrutura do Projeto | 15 |
| 1.7 | Atrativos para as Partes Interessadas | 15 |
| 1.8 | Geração de Empregos | 15 |

| **2** | **Visão Geral do Setor** | **16** |
|---|---|---|
| 2.1 | Consumo Mundial de Energia | 16 |
| 2.2 | Produção de Combustíveis | 17 |
| 2.3 | Tendências de E&P em Águas Profundas | 20 |
| 2.4 | Atividade Offshore no Brasil | 20 |
| 2.5 | Oferta e Demanda por Plataformas de Águas Profundas | 22 |
| 2.6 | Perspectiva de Reimplantação | 24 |
| 2.7 | Projeção de Taxas de Afretamento | 25 |
| 2.8 | Preços de Mercado e Risco Tecnológico | 26 |
| 2.9 | Evolução dos Tipos de Sondas | 26 |

| **3** | **Estrutura e Fases do Projeto** | **29** |
|---|---|---|
| 3.1 | Introdução | 29 |
| 3.2 | Fase 1 | 29 |
| 3.3 | Fase 2 | 30 |
| 3.4 | Fase 3 | 31 |
| 3.5 | Fase 4 | 31 |
| 3.6 | Fase Operacional | 33 |
| 3.7 | Administração e Estrutural Organizacional | 35 |
| 3.8 | Conceito de *"Portfolio Finance"* | 37 |
| 3.9 | Reforços de Créditos (*"Credit Enhancements"*) | 39 |

| **4** | **Estrutura Tributária** | **42** |
|---|---|---|
| 4.1 | Estrutura Geral | 42 |
| 4.2 | Localização das Entidades | 42 |
| 4.3 | Acordo de Bitributação Brasil-Áustria | 43 |
| 4.4 | Programa REPETRO | 43 |

| **5** | **Fundo de Garantia Para a Construção Naval** | **45** |
|---|---|---|
| 5.1 | Introdução | 45 |
| 5.2 | O FGCN | 45 |



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

|        | 5.2.1 | Acionamento e Execução das Garantias | 48 |
| --- | --- | --- | --- |
| **6** | | **Principais Contratos** | **50** |
| | 6.1 | Principais Relações Contratuais | 50 |
| | 6.2 | Contrato de Construção | 50 |
| | 6.3 | Contrato de Afretamento | 52 |
| | 6.4 | Contrato de Serviço (Operação & Manutenção) | 55 |
| | 6.5 | Contrato de Gerenciamento e Fiscalização das Obras | 57 |
| **7** | | **Regras de Governança Corporativa** | **58** |
| | 7.1 | Sete Brasil - Holding Local | 58 |
| | 7.2 | Sete International - Holding Externa | 59 |
| | 7.3 | FIP | 59 |
| | 7.4 | Participação da Petrobras | 60 |
| | 7.5 | Oferta Acionária - IPO | 62 |
| **8** | | **Estrutura de Capital e Plano de Financiamento** | **63** |
| | 8.1 | Principais Considerações | 63 |
| | 8.2 | Plano de Financiamento | 64 |
| | 8.2.1 | BNDES | 65 |
| | 8.2.2 | ECAs | 66 |
| | 8.2.3 | Bancos Comerciais - Sindicalização | 68 |
| | 8.3 | *Term Sheet* Premilinar | 68 |
| | 8.4 | Principais *Covenants* e Obrigações | 68 |
| | 8.5 | Pacote de Garantias | 69 |
| **9** | | **Modelo e Análise Econômico-Financeira** | **70** |
| | 9.1 | Introdução | 70 |
| | 9.2 | Principais Premissas | 70 |
| | 9.3 | Principais Datas | 70 |
| | 9.4 | Cronograma de Construção | 71 |
| | 9.5 | Principais Premissas Macroeconômicas | 72 |
| | 9.6 | Premissas Operacionais | 72 |
| | 9.7 | Premissas Tributárias | 73 |
| | 9.8 | Termos do Financiamento | 74 |
| | 9.9 | Quadro de Usos e Fontes Consolidado | 75 |
| | 9.10 | Conta Reserva | 75 |
| | 9.11 | Índice de Cobertura do Serviço da Dívida | 76 |
| **10** | | **Riscos e Mitigantes** | **77** |
| | 10.1 | Risco de Construção | 77 |
| | 10.2 | Risco de Sobre Custo | 78 |
| | 10.3 | Risco de Atraso da Entrada em Operação | 80 |
| | 10.4 | Risco de Performance | 81 |



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG00091797

EIG_KEP_00166280

| 10.5 | Risco de Refinanciamento | 82 |
| 10.6 | Risco do Término do Acordo Brasil-Áustria de Bitributação | 82 |
| 10.7 | Risco Sócio-Ambiental | 83 |

**11** | **Contratação de Seguros** | **84** |
| 11.1 | Third-Party Liability Insurance | 84 |
| 11.2 | Hull & Machinery | 84 |
| 11.3 | Business Interruption ou Loss of Hire | 84 |



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091798

EIG_KEP_00166281



CONFIDENTIAL INFORMATION MEMORANDUM

# 1   SUMÁRIO EXECUTIVO

## 1.1   Introdução ao Pré-Sal

*O Pré-Sal é considerado uma das descobertas mais relevantes da indústria global de petróleo nos últimos 30 anos*

A província petrolífera do Pré-Sal brasileiro é considerada uma das descobertas mais relevantes da indústria global de petróleo nos últimos 30 anos. São reservas altamente promissoras, consideradas a nova fronteira do desenvolvimento da indústria petrolífera mundial. O desenvolvimento das reservas do Pré-Sal estabelecerá um novo paradigma tecnológico para a exploração de hidrocarbonetos em águas profundas.

Apenas como comparação, a Bacia de Campos (maior província petrolífera brasileira), responsável hoje por quase 85% de toda a produção doméstica de petróleo no país, tem cerca de 28,6 mil km2 de área onde se localizam mais de 600 poços perfurados e completados. Por sua vez, a área correspondente aos sete blocos já concedidos pela ANP no Pré-Sal conta com 41,8 mil km2, que correspondem a apenas 28% da área do Pré-Sal, mas que é 50% maior que toda a área da Bacia de Campos. Ainda, até 31 de março de 2010, haviam apenas 15 poços perfurados, sendo que 13 são da Petrobras[1].

*Figura 1: Mapa do Pré-Sal*



---

[1] Fonte: Petrobras.

 Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS



CONFIDENTIAL INFORMATION MEMORANDUM

A Petrobras é concessionária (em parceria) e operadora exclusiva de blocos concedidos pela União na área do Pré-Sal. A exploração desses blocos demandará um aumento significativo na capacidade de perfuração de poços exploratórios e de produção em águas profundas, o que abre uma janela de oportunidade sem precedentes para o desenvolvimento da infraestrutura voltada para o setor.

A importância estratégica para a Petrobras no desenvolvimento dos campos petrolíferos do Pré-Sal decorre não somente da manutenção de seus altos índices de reposição de reservas, mas também para garantir seu posicionamento de longo prazo entre os grandes players mundiais em produção de petróleo.

## 1.2   Desenvolvimento e Exploração do Pré-Sal

*Não existem hoje no mercado mundial sondas suficientes com as características demandadas para atendimento ao programa de perfuração de poços*

As características dos reservatórios, a profundidade dos poços (mais de 7.000 metros) e a profundidade do mar (até 3.000 metros) exigem a utilização de sondas de perfuração especiais e com tecnologia de ponta. Atualmente, não existem sondas suficientes no mercado mundial com as características demandadas para atendimento de todo o programa de perfuração de poços. Portanto, a exploração do Pré-Sal exigirá um volume substancial de equipamentos novos.

Como operadora exclusiva dos blocos sob sua concessão, a Petrobras necessitará contratar o afretamento e operação de 40 sondas de perfuração (tipo navio-sonda ou plataformas semi-submersível) até 2019 para os blocos já concedidos. Para atendimento dessa demanda, em 2008, a Petrobras licitou o afretamento de um pacote inicial de 12 novas sondas de perfuração que estão sendo construídas em estaleiros no exterior com entrega prevista entre 2011 e 2012.

*Tabela 1: Sondas Contratadas Através de Licitação Internacional em 2008*

| Sonda | Operador | Estaleiro | Entrega Prevista |
|---|---|---|---|
| Delba VI | Delba | N.A. | 2012 |
| Delba VI | Delba | N.A. | 2012 |
| Delba VII | Delba | DSME - Coréia do Sul | 2011 |
| Delba VIII | Delba | DSME - Coréia do Sul | 2011 |
| Norbe VIII | Odebrecht | DSME - Coréia do Sul | 2011 |
| Norbe IX | Odebrecht | DSME - Coréia do Sul | 2011 |
| TBN I | Schahin | Samsung - Coréia do Sul | 2011 |
| TBN II | Schahin | Samsung - Coréia do Sul | 2011 |
| Alpha Star | Queiroz Galvão, Scorpion | Keppel Fels - Cingapura | 2012 |
| Carolina | Petroserv | DSME - Coréia do Sul | 2011 |
| Etesco VIII | Etesco | Samsung - Coréia do Sul | 2011 |
| Sevan Brasil | Sevan | Cosco/Qidong - China | 2012 |

*Fonte: E&P - Petrobras.*


Confidential

EIG00091800

EIG_KEP_00166283



*28 das 40 sondas necessárias para a primeira fase de exploração do Pré-Sal terão que ser construídas no Brasil*

Para as demais 28 sondas, a União, concedente dos blocos, elevou o índice mínimo de conteúdo nacional e, como conseqüência, elas terão que ser construídas em estaleiros brasileiros e contar com a maciça participação de empresas nacionais no fornecimento de bens e serviços. Esse cenário irá criar condições de desenvolvimento econômico para toda a cadeia de suprimento dessa indústria, podendo promover a especialização e a competitividade desse nicho no País.

*Tabela 2: Unidades de Perfuração em Uso pela Petrobras Mundialmente (Exploração e Produção)*

|  | Leasing | Petrobras | Total |
|---|---|---|---|
| Onshore | 31 | 13 | 44 |
| Offshore | 36 | 9 | 45 |
| Jack-up | 2 | 5 | 7 |
| 500 to 1.000 metros | 9 | 2 | 11 |
| 1.000 to 1.500 metros | 12 | 1 | 12 |
| 1.500 to 2.000 metros | 8 | 1 | 9 |
| 2.000 to 2.500 metros | 4 | 0 | 4 |
| 2.500 to 3.000 metros | 1 | 0 | 1 |

*Fonte: Petrobras - Form 20-F de 2009.*

### 1.3 Mercado de Sondas de Águas Profundas[2]

*A Petrobras é destacadamente o player de maior preponderância no segmento de águas profundas e ultra profundas*

A oferta global de sondas de perfuração de águas profundas é razoavelmente fragmentada, com um total de 40 empresas envolvidas na propriedade e gerenciamento da frota, sendo que os cinco maiores contratantes detém aproximadamente metade de toda a disponibilidade de sondas com essas características.

No que diz respeito aos contratantes deste mercado (operadores de petróleo), a Petrobras é destacadamente o *player* de maior preponderância, respondendo por mais de um quarto de todas as sondas de águas profundas (33 sondas) sob contrato. No que se refere a sondas para águas ultra profundas[3], a Petrobras possui 11 sondas contratadas, o dobro do segundo colocado no ranking de operadores usuários desse tipo de equipamento.

### 1.4 O Projeto Sondas Pré-Sal

O Projeto Sondas do Pré-Sal (o "Projeto") envolve a criação de uma empresa, a Sete Brasil participações S.A. ("Sete Brasil") que será detentora de sete sondas ("Primeiro Sistema"), todas com Contratos de Afretamento com a Petrobras. O investimento total previsto para o Primeiro Sistema é de aproximadamente US$ 5,5 bilhões (valor de Dezembro 2010). Estas

---

[2] Fonte: ODS-Petrodata, Maio 2010.

[3] Sondas com capacidade de perfuração de mais de 7.500 pés.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091801

EIG_KEP_00166284



CONFIDENTIAL INFORMATION MEMORANDUM

sondas, com última geração, serão construídas no Brasil e deverão operar na área do Pré-Sal brasileiro. A primeira sonda está prevista para entrar em operação em 2015, enquanto a última sonda em 2019.

O principal objetivo do Projeto é disponibilizar para a Petrobras sondas de perfuração construídas no Brasil, de última geração, alta qualidade, custo competitivo e com capacidade de operação plena na área do Pré-Sal brasileiro, através de uma estrutura financeira flexível e de rápida implementação, permita a construção das sondas no Brasil e resulte em uma taxa de afretamento para Petrobras a níveis das praticadas no mercado internacional, para as mesmas condições e características. A solução financeira também deve contemplar uma estrutura *off-balance* e sem direito de regresso para a Petrobras (sem recursos contra a Petrobras e sem a consolidação do endividamento no seu balanço).

Por promover de forma ampla o desenvolvimento econômico da indústria nacional de construção naval e operação de sondas, incluindo toda a sua cadeia produtiva, o Projeto conta com forte apoio do governo federal, incluindo apoio financeiro, através da criação de um fundo garantidor destinado a mitigar o risco de construção das sondas no país (Fundo Garantidor da Construção Naval, ou "FGCN").

*Tabela 3: Objetivos e Racional do Projeto*

| Objetivos | Racional |
|---|---|
| Construção local das sondas com incentivo governamental | Desenvolver a infra-estrutura e indústria naval no Brasil, através da instalação de quatro estaleiros de classe mundial |
| Estrutura financeira *off-balance* para a Petrobras de acordo com o IFRS | Evitar impacto no rating, alavancagem e demonstrativos da Petrobras |
| Estrutura financeira flexível de forma a acomodar distintos tipos de financiamentos | Garantir disponibilidade dos recursos necessários de forma ótima, alongando prazos e minimizando custos |
| Estimular competição entre fornecedores | Reduzir custos de construção |
| Gerenciar riscos eficientemente | Reduzir período de construção e minimizar atrasos |
| Custo baixo de manutenção e estrutura simples | Redução do tempo de operação |
| Estrutura de fácil e rápida implementação | Reduzir tempo para ir a mercado |
| Inserir liquidez em toda cadeia produtiva, inclusive estaleiros | Permitir o desenvolvimento de toda a cadeia produtiva ligada à esta indústria |
| Eliminar qualquer direito de regresso de qualquer participante da estruturação financeira contra a Petrobras | As obrigações da Petrobras no projeto estarão limitadas unicamente aos pagamentos das taxas de afretamento pela disponibilização das sondas, se e quando estas estiverem disponíveis para operação e de forma proporcional à taxa de performance operacional |



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091802

EIG_KEP_00166285



CONFIDENTIAL INFORMATION MEMORANDUM

| Objetivos | Racional |
|---|---|
| | ("*Up Time*") |

## 1.5 Tese de Investimento

*Parceria com a Petrobras - líder em exploração em águas profundas e operadora única do Pré-Sal*

A Petrobras é a quarta maior empresa de energia do mundo[4], medida por produção de petróleo e a segunda maior empresa do setor por valor de mercado. Em termos de produção de petróleo em águas profundas, a Petrobras é líder absoluta, com aproximadamente 23% de *market share*.

A Petrobras conta hoje com 61 sondas (46 semi-submersíveis e 15 navios-sonda) em operação ou contratadas, das quais 11 para águas ultra profundas sendo cinco delas operando no Pré-Sal[5].

A participação da Petrobras será ampliada comparativamente à situação atual onde ela atua apenas como contratante das sondas. No que se refere ao Projeto, a Petrobras participa da seguinte forma: (i) como contratante do afretamento das sondas, (ii) como gerente e fiscal das obras, (iii) como acionista da empresa holding brasileira (Sete Brasil), que irá agrupar todos os investidores financeiros do Projeto, com participação mínima de 5% e máxima de 10% do seu capital social e (iv) como operadora de duas das sete sondas componentes do primeiro sistema a ser alocado ao Projeto, todas elas com contrato de afretamento de 20 anos. As demais sondas do Projeto, no total de cinco, serão operadas por terceiros e terão contratos de afretamento de dez anos.

*Contratos de longo prazo com alta previsibilidade dos fluxos de caixa*

Contratos de 10 (5 sondas) e 20 anos (2 sondas), bem acima da média de 1 a 5 anos geralmente praticada no mercado. Em todos os casos, o pagamento dos contratos de afretamento é diretamente ligado à *performance* do operador, medida pela disponibilidade das sondas (*uptime*), e que independe dos resultados de sucesso da perfuração, do nível da produção ou do preço do óleo. Caso o *uptime* seja superior a 94%, os contratos de afretamento irão prever pagamentos de bônus proporcionais e crescentes, e que poderão atingir até 10% da taxa diária de afretamento.

*Mercado com alto potencial de crescimento e consolidação*

O Projeto Sondas do Pré-Sal proporciona o surgimento de uma das maiores companhias do mundo em sondas de águas profundas, atrás apenas de empresas como *Transocean* e *Seadrill*, nesse segmento da indústria. Desde a sua criação, essa nova companhia, estará afretando sondas já sob contrato com a maior empresa do Brasil e uma das maiores empresas do setor de energia do mundo - a Petrobras.

---

[4] Fonte: PFC Energy 2009 – ref. janeiro/2010

[5] Fonte: ODS-Petrodata, Maio 2010.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

11

Confidential

CONFIDENTIAL INFORMATION MEMORANDUM

*Sondas "State of the Art" com alto valor de mercado após 10 anos*

De acordo com projeções da ODS-Petrodata[6], a demanda por sondas de água ultra profundas deverá continuar forte no futuro. A ODS-Petrodata estima que, em 2025, sondas similares às que serão construídas no Brasil terão um valor de mercado variando entre US$ 475 milhões e US$ 850 milhões[7] (média de US$ 662 milhões).

Adicionalmente, o risco de obsolescência tecnológica durante os primeiros 25 anos de vida de uma sonda é considerado remoto, já que, se tomarmos o universo de todas as sondas em operação hoje no mundo, verificaremos que a média de tempo de vida ativa dessas sondas é de 22 anos. Tal condição confere ao Projeto uma excelente perspectiva dessas unidades gerarem fluxo de caixa sustentável e crescente, através de novos contratos de afretamento a serem celebrados ao longo de sua vida útil, com a própria Petrobras ou mesmo qualquer outro operadora de petróleo.

### 1.6   Estrutura do Projeto

*Introdução*

As 28 unidades (sondas) serão construídas por estaleiros no Brasil e serão contratadas pela Petrobras em lotes de unidades idênticas entre si. Em função do longo prazo transcorrido entre o início da construção da primeira (2011) e a última sonda (2019), as 28 unidades estão tratadas no Projeto de forma a dividi-las em até quatro "sistemas".

*O Primeiro Sistema de sete sondas*

Em função das necessidades de médio prazo da Petrobras, foi definido que o Primeiro Sistema contará com sete sondas, e que serão construídas por um estaleiro. O estaleiro selecionado deverá construir um lote de sete sondas do tipo navio, exatamente idênticas, utilizando para isso projeto dominado e largamente aceito pela indústria.

De acordo com o cronograma da Petrobras para o primeiro sistema, a previsão do início da construção da primeira sonda é em 2011.

*Direito de Preferência para os demais sistemas*

Os demais três sistemas incluirão as sondas restantes, sendo que o exato número de unidades em cada um desses sistemas adicionais ainda não foi definido pela Petrobras.

A Petrobras concederá à Sete Brasil o direito de preferência para desenvolver novas sondas, com configuração idêntica ou semelhante à do primeiro lote, em condições de preço, prazo e características físicas similares às contidas neste.

O direito de preferência deverá ser exercido até o limite de 21 novas sondas, adicionais às primeiras 7, no período de até 12 meses contados da data de aprovação da contratação do Primeiro Sistema, tendo o instrumento original o prazo de 6 meses, renovável por igual período, caso necessário.

---

[6] A ODS-Petrodata é uma empresa internacional de consultoria, especializada na produção de relatórios consolidados voltados para a indústria petrolífera offshore. As estimativas relacionadas a essa Nota consideram dados conhecidos até Maio de 2010.

[7] Essa variação é decorrente de diferentes cenários de preço internacional de petróleo, de acordo com modelo criado pela ODS-Petrodata.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

12



CONFIDENTIAL INFORMATION MEMORANDUM

Pelo prazo de 2 anos contados da assinatura do contrato de construção do primeiro lote, a Petrobras e suas subsidiárias estão impedidas de criar outros veículos paralelos, com características similares aos utilizados no Projeto, e que tenham o propósito de fretar sondas para a Petrobras - até que as 28 sondas previstas no Projeto tenham tido suas construções contratadas

A estrutura financeira concebida pela Petrobras pode ser dividida em quatro fases:

*Fase 1*   Serão constituídas as Sociedades de Propósito Específicas ("SPEs"), uma para cada sonda, que contratarão a construção das sete sondas e serão proprietárias dos ativos (uma sonda para cada SPE). Também serão constituídas a Sete Brasil Participações S/A ("Sete Brasil" ou "Holding Local") e a Sete International GmbH ("Sete International" ou "Holding Externa"), sendo que esta última será subsidiária integral da primeira, e terá participação de 85% no capital de cada uma das SPEs.

Ao final da primeira fase serão assinados os contratos de construção das sondas com os estaleiros e os contratos de afretamento e serviço com a Petrobras.

*Fase 2*   Os investidores financeiros (por exemplo, Fundos de Pensão e Private Equity, entre outros) serão incorporados ao Projeto[8] através de um Fundo de Investimento em Participações ("FIP" ou "FIP Sondas") exclusivo, que terá como único ativo a participação em 90% do capital acionário da Sete Brasil (os 10% restantes serão detidos diretamente pela Petrobras). Por sua vez, a Sete Brasil será a holding exclusiva (100% das ações) da Sete International, a qual se destina especificamente a participar do capital social de cada uma das SPEs. Para regular essa participação, as SPEs terão ações de dois tipos (Classe A e Classe B). O acionista Classe A de todas as SPEs será a Sete International e os seus acionistas Classe B serão empresas especializadas em operação de sondas, sendo que cada SPE terá apenas um acionista Classe B durante toda a vida do projeto. Inicialmente, durante a Fase 2, a Petrobras será o único acionista Classe B ("Acionista Estratégico", ou "Operador Especializado") de todas as SPEs, porém, mais adiante, a Petrobras irá selecionar cinco das SPEs do primeiro sistema para transferir a sua participação integral nas ações Classe B dessas SPEs para outra empresa especializada em operação de sondas. Os detalhes de cada tipo de ação estão descritas no Capítulo 3.

*Fase 3*   Durante a Fase 3 ocorrerá a busca pelo financiamento sênior ("Senior Debt") demandado pelo Projeto. Para esta fase, a Petrobras e a Sete Brasil contratarão um banco ("Assessor Financeiro") para atuar como responsável pela estruturação das dívidas e levantamento dos recursos financeiros requeridos pelo projeto, em complemento a todos os recursos levantados até esta fase. O financiamento deverá contar com a participação maciça do BNDES e, adicionalmente, de Agências de Crédito à Exportação ("ECAs"), Bancos Comerciais, além de outros agentes financeiros.

---

[8] Após a seleção e contratação dos estaleiros e celebração dos contratos de afretamento com a Petrobras (consequentemente, após a definição das taxas diárias de afretamento).



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

13

EIG00091805

EIG_KEP_00166288



*Fase 4*    Anteriormente ao *completion* físico de cinco das sondas do primeiro sistema, a Petrobras dará início ao processo de venda das suas ações Classe B dessas cinco SPEs para acionistas estratégicos (operadores especializados). Esta venda será realizada através de um processo seletivo junto a empresas pré-qualificadas incluídas em um "*Short List*". Vale notar que o *step-in* (exercício pleno da transferência das ações Classe B e início efetivo de sua condição de Acionista Estratégico) do novo Operador Especializado deverá ocorrer apenas após (i) os testes de aceitação de cada sonda pela Petrobras, pelo futuro operador e demais especialistas requeridos (*Independent Engineer*, Sociedade Classificadora, agentes governamentais, etc.), ou seja, após o *completion* físico de cada sonda, (ii) o cumprimento satisfatório de todas as obrigações assumidas pelo Operador Especializado no Contrato de Promessa de Compra e Venda do Ativo e (iii) a inexistência de qualquer situação de Material Adverse Effect em relação ao futuro Operador, suas controladoras ou controladas.

### 1.7    Atrativos para as Partes Interessadas

*Investidores Financeiros*
- Queda na taxa real de juros nos últimos anos no Brasil incentiva investidores institucionais nacionais a olhar para novos tipos de investimento
- Investidores terão a oportunidade de participar de um projeto com contratos de longo prazo com alta previsibilidade de fluxos de caixa
- Explorar "novas fronteiras" em conjunto com a Petrobras
- Oportunidade de participar de projetos com potencial de retorno atrativo
- Oportunidades de "up sides" de longo prazo bastante vantajosos

*Operadores*
- Estabelecimento e ampliação da indústria de *Oil Services* no Brasil
- Aumento de seu market share, com menores investimentos e sem direito de regresso
- Alavancagem de seus retornos ("IRRs") em relação a projetos semelhantes
- Interesse já demonstrado pela atividade / negócio (riscos do negócio já são aceitos pelos *players* do mercado)
- Limitação da capacidade para desenvolver grande número de projetos simultaneamente (principalmente operadores nacionais)
- Oportunidade única de participar em múltiplos projetos
- Potencial para adquirir as sondas ao término do contrato de afretamento inicial, mesmo que por preço de mercado então vigente (sem qualquer condição de barganha)
- Facilitar a entrada de operadores nacionais com boa experiência e confiabilidade

*Financiadores*
- O BNDES irá desenvolver papel chave na liderança do pacote de financiamento das embarcações
- O FGCN reduz a percepção de riscos e alavanca maior interesse dos financiadores
- O Pré-Sal se tornou um tema de alcance global e tem atraído a atenção de financiadores locais e internacionais
- Grande atrativo para os financiadores: participar da nova indústria do Pré-Sal junto com a Petrobras

**Confidential**

EIG00091806

**EIG_KEP_00166289**



CONFIDENTIAL INFORMATION MEMORANDUM

*Governo Federal*
- O Governo Federal tem diante de si uma oportunidade única de estabelecer no Brasil uma nova, moderna e competitiva indústria estruturante, sem a necessidade de realizar investimentos diretos
- Ajudar de forma direta e ativa no desenvolvimento do Pré-Sal brasileiro, modernizando e preparando toda a cadeia produtiva brasileira para atendimento da indústria naval do país de forma que esta possa contar com encomendas por décadas à frente, não necessitando mais de fomentos ou de recursos do próprio governo
- Criar oportunidades de investimentos e reinvestimentos no país para aplicação dos recursos que serão gerados pela própria exploração do Pré-Sal, diminuído os riscos de surgimento no Brasil do "Mal Holandês" (descasamento entre grandes excedentes de exportação e crescimento econômico estruturante interno)

*Petrobras*
- Ter à sua disposição, através de contratos de longo prazo, as sondas requeridas para implantação do programa de perfuração de poços no Pré-Sal, dentro das especificações técnicas requeridas, atendendo ao índice de conteúdo brasileiro demandado pela União e com preços competitivos para as taxas diárias de afretamento
- Evitar direitos de regresso contra a companhia por parte dos participantes do Projeto (financiadores, fornecedores, investidores, etc.)
- Preservar a participação ativa nas operações das sondas de perfuração em águas profundas por parte de operadores tradicionais e confiáveis
- Evitar que os ativos e passivos do Projeto sejam consolidados em seu balanço

## 1.8    Geração de Empregos

*O Projeto Sondas é de extrema importância para a economia brasileira, podendo gerar mais de 40 mil empregos no Brasil, para cada lote de sete sondas*

A estimativa de geração de empregos na construção de cada sistema de sete sondas é superior a 37 mil, sendo:

- Diretos: 9.300
- Indiretos: 27.900

Adicionalmente, a estimativa de geração de empregos na construção de novos estaleiros é de aproximadamente seis mil, sendo:

- Diretos: 1.500
- Indiretos: 4.500

Portanto, para o primeiro sistema de sete sondas, a geração de empregos deve ser de aproximadamente 54 mil empregos diretos e indiretos.

---

[14] O que foi permitido através da Lei 12.024, de 27 de agosto de 2009, a qual se encontra em processo de regulamentação pelo Executivo.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091807

EIG_KEP_00166290



## 2   VISÃO GERAL DO SETOR

### 2.1   Consumo Mundial de Energia

De acordo com as projeções do International Energy Outlook 2009 (IEO2009), o consumo de energia no mundo deve crescer cerca de 44% no período de 2006 e 2030, passando de 472 quadrilhões de British thermal units (Btu) em 2006 para 552 quadrilhões de Btu em 2015 e 678 quadrilhões de Btu em 2030.

A atual crise econômica mundial atenuou a taxa de crescimento da demanda de energia no curto prazo, inclusive com pequena queda no consumo em 2009 (primeira queda de consumo observada desde 1981) contudo, a recuperação econômica prevista a partir de 2010 deve pressionar a demanda e a produção de bens e serviços levando novamente o consumo de energia à taxas positivas de crescimento, retomando a curva de tendência de longo prazo.

O aumento no consumo de energia prevista para o período de 2006 a 2030 deve vir principalmente dos países que não fazem parte da "Organization for Economic Cooperation and Development" ("OECD"). O maior crescimento econômico esperado para os países emergentes, e dos países não OECD, deve gerar um crescimento na demanda por energia deste grupo de 73% entre 2006 e 2030 contra 15% no mesmo período para os países membros a OECD.

*Figura 2: Consumo Mundial de Energia*



*Fonte: IEO 2009.*



Confidential

EIG00091808

EIG_KEP_00166291



### 2.2   Produção de Combustíveis

Para fazer frente ao aumento na demanda por energia, as projeções do IEO2009 indicam um aumento na produção de todo tipo de combustível, com destaque para os combustíveis fósseis (derivado de petróleo, gás natural e carvão) que devem continuar a prover a maior parte da energia consumida no mundo. Neste grupo, os combustíveis líquidos apresentam participação mais relevante com projeções de elevação de consumo de cerca de 85 milhões de barris de óleo equivalente ("boe") por dia em 2006 para 91 milhões de boe por dia em 2015 e 107 milhões de boe por dia em 2030.

*Figura 3: Principais Fontes de Energia*



*Fonte: IEO 2009.*

O incremento de 22 milhões de boe por dia na produção de combustíveis líquidos no período de 2006 a 2030 deve vir tanto de países membros da OPEP, com uma produção total estimada de 44 milhões de boe por dia em 2030, como de países que não fazem parte da OPEP, com produção de 63 milhões de boe por dia.

Uma parte deste crescimento deverá vir de fontes não convencionais (bio-combustíveis, areias betuminosas, CTL e GTL) com cerca de 10 milhões de boe por dia, e de fontes convencionais (petróleo, condensados e GLP) com cerca de 12 milhões de boe por dia.

Santander
GLOBAL BANKING & MARKETS

Souza, Cescon, Barrieu & Flesch
ADVOGADOS

**Confidential**

EIG00091809

EIG_KEP_00166292

CONFIDENTIAL INFORMATION MEMORANDUM

*Figura 4: Produção de Combustíveis Líquidos - por Região*



*Fonte: IEO 2009.*

Os países não membros da OPEP deverão ser responsáveis por quase todo o crescimento da produção de combustíveis não convencionais (cerca de 10 milhões de boe por dia).

Os países membros da OPEP deverão ser responsáveis por grande parte do aumento da produção de combustíveis líquido convencional (cerca de 8 milhões de boe por dia).

*Figura 5: Produção de Combustíveis Líquidos Convencionais - Países Membros da OPEP*



*Fonte: IEO 2009.*

No período em análise, os países que não fazem parte da OPEP que irão contribuir com o maior incremento na produção de combustíveis líquidos tradicionais (e não tradicionais) são os Estados Unidos e o Brasil.

Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091810

EIG_KEP_00166293

CONFIDENTIAL INFORMATION MEMORANDUM

*Figura 6: Produção de Combustíveis Líquidos Convencionais - Países Não Membros da OPEP*



*Fonte: IEO 2009.*

Cabe ressaltar que os incrementos de produção têm como base os volumes produzidos em 2008. Assim sendo o crescimento efetivo da produção de líquidos deve levar em consideração a taxa de declínio natural na produção dos campos existentes.

Neste cenário, estima-se que até 2030 a produção dos campos existentes caia para cerca de um terço do volume produzido em 2008 tornando, portanto crítica a necessidade de novas descobertas capazes de cobrir um potencial déficit de produção de cerca de 60 mboe em 2030.

*Figura 7: Produção de Combustíveis Líquidos por fontes em 2030*



*Fonte: IEO 2009.*

Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential



CONFIDENTIAL INFORMATION MEMORANDUM

### 2.3 Tendências de E&P em Águas Profundas

Dentro deste contexto, a exploração e desenvolvimento dos reservatórios de hidrocarbonetos, principalmente em países que não são membros da OPEP, localizados nas bacias sedimentares nas costas oceânicas do Brasil, Golfo do México e África (conhecidas como *"Golden Triangle"*) passam a ganhar importância.

Recentemente, especial atenção tem sido dada na exploração das reservas potencias das bacias localizadas em águas profundas ou ultra profundas (três mil metros de lamina de água ou mais) que se distinguem dos depósitos localizados em água rasa pelo fato de possuirem potencial de grandes reservas de hidrocarbonetos (acima de 1 bilhão de barris).

Outra característica inerente ao desenvolvimento das bacias sedimentares localizadas em águas profundas ou ultra profundas é o fato que poucas empresas dominam o *"know how"* necessário para a efetiva exploração destes potenciais reservatórios de hidrocarbonetos. A Petrobras é uma clara exceção.

### 2.4 Atividade Offshore no Brasil

A região denominada *Golden Triangle* deve concentrar a maior parte dos esforços exploratórios em águas profundas apesar de alguma atividade desta natureza estar sendo desenvolvida no Noroeste da Europa, no Mediterrâneo, no oceano Índico, no sudeste da Ásia e na Austrália.

Petrobras foi pioneira no desenvolvimento de atividades offshore em águas profundas e foi responsável pelo descobrimento e desenvolvimento da grande maioria dos depósitos de hidrocarbonetos na costa brasileira. Estas descobertas permitiram ao longo do tempo que o país passasse de importador a exportador de óleo.

*Figura 8: Descoberta por ano - Offshore Brasil*



*Fonte: ODSP Discoveries database.*

A redução no número de descobertas de novos reservatórios se deve principalmente a um esforço bem sucedido da Petrobras de colocar em produção os campos já identificados.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091812

EIG_KEP_00166295



Entretanto, as principais descobertas nos últimos anos foram em águas profundas ou ultra profundas (2.000 de lamina de água ou mais).

*Figura 9: Descobertas por ano - Brasil, Offshore*



*Fonte: ODSP Discoveries database.*

Um bom exemplo de descobertas offshore no Brasil é o campo gigante de Tupi do qual se espera que o desenvolvimento dure mais de uma década. A Petrobras planejou um teste de longa duração com inicio em 2009 e, após isso, o operador estima de seis a dez fases completas, com no mínimo dez poços cada, para aproveitar plenamente esta formação no Pré-Sal. As reservas recuperáveis estão estimadas entre cinco e oito bilhões de barris de óleo e, em termos de comparação, o maior campo do Mar do Norte tinha um bilhão de barris recuperáveis e Thunderhose, também com um bilhão de barris, parte o maior campo na parte norte-americana do Golfo do México.

É certo que o fluxo de grandes projetos sustentará alta a demanda na região para plataformas de perfuração e, em consequência das descobertas feitas nos últimos dois anos, tais como o Tupi, o Jupiter, o Carioca e o outras, a demanda futura para estes equipamentos de águas profundas pela Petrobras será de longe a maior dentre todos os operadores e, dado sua posição dominante no mercado, não é esperada uma mudança neste sentido no médio prazo.

O gráfico seguinte apresenta uma estimativa da ODS-Petrodata de demanda futura da Petrobras por plataformas de perfuração de águas profundas, demonstrando uma expectativa de forte crescimento.

Confidential

EIG00091813

EIG_KEP_00166296

CONFIDENTIAL INFORMATION MEMORANDUM

*Figura 10: Demanda da Petrobras por plataformas - Estimada (Rigs rate >3,000 feet)*



*Fonte: ODSP Discoveries database.*

## 2.5    Oferta e Demanda por Plataformas de Águas Profundas

Em 1990 o segmento de sondas de águas profundas representava uma pequena parcela da frota de sondas mundial (apenas 20 sondas). Durante os anos 90 ocorreu um período de construção de novas sondas para águas profundas e o *upgrade* de equipamentos existentes. Em 2002, as sondas para águas profundas somavam mais de 80. Em 2007, iniciou-se uma nova onda de sondas de 6° geração. Atualmente, existem mais de 140 sondas em operação e 60 em construção.

O lado de oferta do mercado de plataformas de perfuração de águas profundas é razoavelmente fragmentado, com um total de 40 companhias envolvidas em possuir e gerenciar a frota. A Transocean detém aproximadamente 25% do mercado, e os 5 maiores proprietários (Transocean, Diamond, Noble, Pride and Seadrill) detém somente um pouco de mais do que a metade desta frota.

*Figura 11: Frota de Águas Profundas (incluindo equipamentos em construção)*



*Fonte: ODS-Petrodata.*

Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091814

EIG_KEP_00166297



CONFIDENTIAL INFORMATION MEMORANDUM

No que diz respeito aos operadores (empresas de óleo e gás), de longe, o mais importante é a Petrobras. Esta companhia atualmente responde por 33 de 118 sondas atualmente contratadas (incluindo as em construção). No mercado de sondas para águas ultra profundas, a Petrobras é ainda mais dominante, com 11 sondas, mais que o dobro do segundo operador (Anadarko e Chevron, com 5 cada).

*Figura 12: Frota Mundial de Sondas de Águas Profundas – Por Operador*



*Fonte: ODS-Petrodata.*

*Figura 13: Frota Mundial de Sondas de Águas Ultra Profundas – Por Operador*



*Fonte: ODS-Petrodata.*

O gráfico a seguir mostra a estimativa de oferta e demanda por plataformas de águas profundas da ODS-Petrodata para três cenários de preço do petróleo (*high, mid and low case*). Vale notar que, de acordo com a previsão da ODS-Petrodata, o número de sondas de águas profundas quase dobra nos próximos 15 anos. Adicionalmente, a estimativa da ODS-Petrodata considera pouco desequilíbrio entre oferta e demanda, ou seja, novos pedidos aos estaleiros

Santander
GLOBAL BANKING & MARKETS

Souza, Cescon, Barrieu & Flesch
ADVOGADOS

23



deverão estar baseados em contratos de afretamento existentes e poucas plataformas construídas para especulação.

*Figura 14: Equilíbrio do Mercado de Plataformas de Águas Profundas*



*Fonte: ODS-Petrodata.*

## 2.6    Perspectiva de Reimplantação

O gráfico a seguir mostra a demanda por plataformas com capacidade de profundidade de água superior a 7.500 metros de lâmina d'água por região. As sondas do Projeto serão equipamentos com design de 6° geração e, portanto apropriadas para a grande maioria das áreas de exploração em águas profundas e ultra profundas, por exemplo, o *Golden Triangle*, ou Golfo do México, Brasil e Oeste da África, assim como outras áreas em desenvolvimento (Sudoeste da Ásia, Oceano Índico e Oceania).

Portanto, em um cenário de não renovação dos Contratos de Afretamento, existem muitas oportunidades de reimplantação dessas sondas.

*Figura 15: Demanda de Plataformas de Águas Profundas por Região (mid case)*



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential



*Fonte: ODS-Petrodata.*

### 2.7   Projeção de Taxas de Afretamento

A figura a seguir apresenta as taxas de afretamento projetadas até 2025 para sondas do tipo navio sondas e semi-submersível. Como podem ser observados, os ciclos de preço capturam períodos aonde oferta e demanda por sondas não estarão exatamente equilibradas. Entretanto, estima-se que estes desequilíbrios serão pequenos e a volatilidade de taxas limitadas.

*Figura 16: Daily Rates Históricas e Projetadas para Plataformas de Águas Profundas*



*Fonte: ODS-Petrodata.*


**Confidential**

EIG00091817

**EIG_KEP_00166300**



CONFIDENTIAL INFORMATION MEMORANDUM

### 2.8    Preços de Mercado e Risco Tecnológico

A indústria de petróleo é tipicamente conservadora e a indústria de exploração de águas profundas não é exceção. Os principais equipamentos (jack-ups, navio-sondas e semi-submersíveis) foram desenvolvidos nos anos 50 e 60. Adicionalmente, as sondas vêm demonstrando uma impressionante longevidade, com muitas sondas com mais de 30 anos operando com excelentes níveis de disponibilidade. A idade média da frota internacional é superior a 22 anos.

*Figura 17: Idade Médias das Plataformas de Águas Profundas*



*Fonte: ODS-Petrodata.*

A figura abaixo apresenta a projeção de valores de mercado estimados pela ODS-Petrodata. Em 2030 algumas sondas do Projeto terão aproximadamente 15 anos, provavelmente metade da sua vida útil, portanto, seu valor de mercado será significativo.

*Figura 18: Estimativa de Valores futuros de Plataformas de Águas Profundas*

| Rig Values - USD Million (2010 dollars) | | |
|---|---|---|
| | Semisubmersibles | Drillships |
| 2015 | USD 550 to USD 650 | USD 560 to USD 660 |
| 2020 | USD 525 to USD 750 | USD 525 to USD 750 |
| 2025 | USD 475 to USD 850 | USD 450 to USD 825 |
| 2030 | USD 425 to USD 900 | USD 400 to USD 900 |

*Fonte: ODS-Petrodata.*

### 2.9    Evolução dos Tipos de Sondas

A figura abaixo apresenta graficamente a evolução dos tipos de sondas, desde sondas terrestres convencionais até sondas semi-submersíveis e navios sondas de última geração.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

26



*Figura 19: Evolução dos Tipos de Sondas*

*Fonte: Petrobras.*

*Tabela 4: Resumo das Fases do Projeto*

| Tipo | Breve Descrição |
|---|---|
| Plataformas Fixas | Foram as primeiras unidades utilizadas. Têm sido as preferidas nos campos localizados em lâminas d'água de até 300m. Geralmente as plataformas fixas são constituídas de estruturas modulares de aço, instaladas no local de operação com estacas cravadas no fundo do mar. As plataformas fixas são projetadas para receber todos os equipamentos de perfuração, estocagem de materiais, alojamento de pessoal, bem como todas as instalações necessárias para a produção dos poços. |
| Plataformas Auto-eleváveis | São constituídas, basicamente, de uma balsa equipada com estrutura de apoio, ou pernas, que, acionadas mecânica ou hidraulicamente, movimentam-se para baixo até atingirem o fundo do mar. Em seguida, inicia-se a elevação da plataforma acima do nível da água, a uma altura segura e fora da ação das ondas. Essas plataformas são móveis, sendo transportadas por rebocadores ou por propulsão própria. Destinam-se à perfuração de poços exploratórios na plataforma continental, em lâmina d'água que variam de 5 a 130m. |
| Plataformas Semi-submersíveis | São compostas de uma estrutura de um ou mais conveses, apoiada por colunas em flutuadores submersos. Uma unidade flutuante sofre movimentações devido à ação das ondas, correntes e ventos, com possibilidade de danificar os equipamentos a serem descidos no poço. Por isso, torna-se necessário que ela fique posicionada na superfície do mar, dentro de um círculo com raio de tolerância ditado pelos equipamentos de subsuperfície, operação esta a ser realizada em lamina d'água. Dois tipos de sistema são responsáveis pelo posicionamento da unidade flutuante: o sistema de ancoragem e o sistema de posicionamento dinâmico.<br><br>O sistema de ancoragem é constituído de 8 a 12 âncoras e cabos e/ou correntes, atuando como molas que produzem esforços capazes de restaurar a posição do flutuante quando é modificada pela ação das ondas, ventos e correntes.<br><br>No sistema de posicionamento dinâmico, não existe ligação física da plataforma com o fundo do mar, exceto a dos equipamentos de perfuração. Sensores acústicos determinam a deriva, e propulsores no casco acionados por computador restauram a posição da plataforma. |

CONFIDENTIAL INFORMATION MEMORANDUM

| Tipo | Breve Descrição |
|---|---|
| | As plataformas semi-submersíveis podem ou não ter propulsão própria. De qualquer forma, apresentam grande mobilidade, sendo as preferidas para a perfuração de poços exploratórios |
| Navio-sonda | Navio-sonda é um navio projetado para a perfuração de poços submarinos. Sua torre de perfuração localiza-se no centro do navio, onde uma abertura no casco permite a passagem da coluna de perfuração. O sistema de posicionamento do navio-sonda, composto por sensores acústicos, propulsores e computadores, anula os efeitos do vento, ondas e correntes que tendem a deslocar o navio de sua posição. |

*Fonte: Petrobras.*

Confidential

EIG00091820

EIG_KEP_00166303



## 3   ESTRUTURA E FASES DO PROJETO

### 3.1   Introdução

A estrutura financeira concebida pela Petrobras e seus Assessores inclui quatro fases, desde a contratação dos estaleiros pelas SPEs até a venda das ações Classe B para os operadores.

*Tabela 5: Resumo das Fases do Projeto*

| Fase | Breve Descrição |
|---|---|
| Fase 1 | Constituição das SPEs e Holdings |
| | Contratação dos estaleiros pelas SPEs |
| | Celebração dos Contratos de Afretamento com cada SPE |
| | Celebração dos Contratos de Serviço |
| Fase 2 | Captação de investidores financeiros e institucionais locais |
| Fase 3 | Estruturação da dívida sênior junto a BNDES, Bancos Comerciais ECAs entre outros |
| Fase 4 | Venda e transferência das ações Classe B para acionistas estratégicos (operadores) |

*Fonte: Petrobras e Santander.*

### 3.2   Fase 1

*Prazo:*    Maio de 2010 - Fevereiro de 2011.

*Atividade:*    As SPEs contratam a construção do primeiro sistema de sondas (sete sondas) a ser construído no Brasil por um estaleiro.

Durante a Fase 1, também serão constituídas as SPEs, a Sete Brasil Participações S/A (holding localizada no Brasil) e a Sete International GmbH (holding localizada na Áustria). A Sete International já foi constituída.

Após a constituição das SPEs e a contratação do estaleiro do primeiro sistema, a Petrobras celebra o Contrato de Afretamento com cada SPE. O *daily rate* (Taxa de Afretamento) será determinado, pela Petrobras, em função do investimento de cada sonda, da estrutura de capital de cada SPE, da remuneração dos acionistas e de outros custos operacionais, administrativos, fiscais e financeiros associados ao Projeto.

Paralelamente ao Contrato de Afretamento, a Petrobras celebra os sete Contratos de Serviço, inicialmente utilizando-se com contratada uma subsidiária da própria Petrobras.

Ainda na Fase 1 cada SPE será responsável pela contratação direta das garantias de crédito providas pelo FGCN.

*Licitação:*    Tradicionalmente o esquema de licitação de sondas da Petrobras é baseado na menor Taxa de Afretamento, onde o operador é responsável pela construção e operação da sonda dentro dos prazo estipulados pela Petrobras.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

29

EIG00091821

EIG_KEP_00166304



CONFIDENTIAL INFORMATION MEMORANDUM

Contudo, nesta operação a Petrobras realizou uma licitação para a construção das sondas no Brasil com base no menor custo de construção. Para o primeiro sistema está sendo conduzida uma licitação para fornecimento de sete sondas do tipo navio.

As propostas técnicas e comerciais dos estaleiros foram entregues à Petrobras no final maio de 2010. Em novembro de 2010 o Estaleiro Atlântico Sul ("EAS") (cujos acionistas são Grupo Camargo Corrêa, Queiroz Galvão, Samsung Heavy Industries e a empresa PJMR) apresentou a menor proposta para a construção de um lote de sete sondas: US$4.650 bilhões para sete sondas ou US$664,2 milhões por sonda.

O EAS está localizado no Complexo Industrial Portuário de Suape, município de Ipojuca, em Pernambuco. O EAS será estaleiro para o Primeiro Sistema.

*Figura 20: Diagrama da Contratação do Estaleiro*



*Fonte: Santander e Petrobras.*

### 3.3   Fase 2

*Prazo:*      Maio 2010 - Abril de 2011.

*Atividade:*   Busca de investidores financeiros, constituição do Fundo de Investimento em Participações, primeiro aporte de capital e criação de outros veículos demandados pelo Projeto nessa fase.

As SPEs terão ações de dois tipos (Classe A e Classe B), com iguais direitos econômicos, mas com diferenças na natureza e qualificação de seus detentores. O acionista Classe A será uma empresa localizada na Áustria (Sete International) e que atuará como holding detendo 85% do capital social de cada uma das SPEs. A Sete International, por sua vez, será subsidiária integral de uma holding localizada no Brasil (Sete Brasil) que terá como acionistas a Petrobras (10% de participação) e investidores financeiros e institucionais reunidos em um FIP exclusivo (90% de participação).

   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

30



**CONFIDENTIAL INFORMATION MEMORANDUM**

O FIP permitirá, de forma simples e direta, que fundos de pensão nacionais (e outros investidores financeiros) aportem recursos no projeto.

Enquanto os acionistas Classe A serão os mesmos para todo o sistema, cada SPE terá apenas um acionista Classe B durante toda a vida do Projeto. Inicialmente, durante a Fase 2, a Petrobras será o único acionista Classe B de todas as SPEs, responsável pelo gerenciamento da construção e, conforme o caso, pela operação das sondas. Em um segundo momento, serão selecionados novos Operadores Especializados pela Petrobras que, antes da entrada em operação da sonda, deverão adquirir as ações Classe B emitidas pela respectiva SPE e, até aquele momento, detidas pela Petrobras.

*Dívida Subordinada:*  De forma a aproveitar as vantagens tributárias do Acordo de Bitributação Brasil-Áustria, a Petrobras e o Santander estão analisando a opção de parte do investimento dos acionistas Classe A ser realizado na forma de dívida subordinada (respeitando a preferência do financiamento sênior do BNDES, ECAs e Bancos Comerciais). Alternativamente, estuda-se também a possibilidade de outros investidores, diferentes dos cotistas do FIP, participarem da dívida subordinada do Projeto.

### 3.4    Fase 3

*Prazo:*  Janeiro de 2011 até o *Financial Closing*.

*Atividades:*  A principal atividade da Fase 3 será a busca pelo financiamento sênior do Projeto ao nível das SPEs.

Para esta fase, a Petrobras e a Sete Brasil contratarão um Assessor Financeiro para atuar como responsável pela estruturação das dívidas e levantamento dos recursos financeiros requeridos pelo Projeto, em complemento a todos os recursos levantados até esta fase.

Tais recursos, devem incluir a participação dos seguintes agentes financeiros: BNDES, ECAs, Bancos Comerciais entre outros.

Os principais objetivos da Petrobras e do Assessor Financeiro durante esta fase serão:

- Maximizar os prazos de financiamento
- Buscar menor "*all-in cost*" (ou menor custo de financiamento)
- Limitar o número de fontes de financiamento

Atualmente a Petrobras está em conversas avançadas com todos esses agentes, em especial com o BNDES, que inclusive emitiu uma carta de compromisso para garantia de sua participação ativa na dívida do Projeto.

Além das fontes de longo prazo, o Projeto também poderá contar com um Empréstimo Ponte para o financiamento dos primeiros desembolsos e do *downpayment* de fornecedores, até o *Financial Closing* e primeiro desembolso da dívida sênior.

### 3.5    Fase 4

*Prazo:*  Início em 2011 (previsto), continuando até a entrega da última sonda do primeiro sistema.

---


Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

31



**CONFIDENTIAL INFORMATION MEMORANDUM**

*Atividade:*   Petrobras dará início ao processo de venda das ações Classe B em cinco das sete SPEs para Acionistas Estratégicos (Operadores Especializados) ainda a serem identificados e selecionados. Este processo poderá ocorrer a qualquer tempo, a partir da celebração dos contratos para afretamento, operação e construção das sondas, e deverá ser concluído antes da entrega da sonda pelo construtor e aceitação final pela SPE e pela Petrobras..

Esta venda será realizada junto a empresas pré-qualificadas incluídas em um "*Short List*". Vale notar que o *step-in* do operador selecionado (exercício pleno da transferência das ações Classe B e início efetivo de sua condição de acionista do negócio) deverá ocorrer apenas após (i) os testes de aceitação de cada sonda pela Petrobras, pelo futuro operador e demais especialistas requeridos (*Independent Engineer*, Sociedade Classificadora, agentes governamentais, etc.), ou seja, quando do *completion* físico de cada sonda, (ii) o cumprimento satisfatório de todas as obrigações assumidas pelo Operador Especializado no Contrato de Promessa de Compra e Venda do Ativo e (iii) a inexistência de qualquer situação de Material Adverse Effect em relação ao futuro Operador, suas controladoras ou controladas.

Além das ações das citadas SPEs vendidas pela Petrobras, o novo acionista Classe B também terá direito ao Contrato de Serviço previamente celebrado entre uma subsidiária da Petrobras e a SPE.

*Figura 21: Diagrama da Estrutura Acionária para cada Sistema*



*Fonte: Petrobras e Santander.*

 Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091824

EIG_KEP_00166307



CONFIDENTIAL INFORMATION MEMORANDUM

### 3.6    Fase Operacional

O primeiro sistema será formado pela Sete Brasil (a holding local), a Sete International (a holding externa) e sete SPEs (cada uma responsável por sua respectiva sonda).

*Figura 22: Diagrama da Fase Operacional*



*Fonte: Petrobras e Santander.*

A Petrobras permanecerá como acionista Classe B em duas SPEs (cujas sondas serão afretadas por 20 anos). As sondas de 20 anos serão as sondas 1 e 2. Dentro da estrutura de *Portfolio Financing*, estas sondas com contratos mais longos darão conforto para os financiamentos das sondas com contrato de afretamento de 10 anos, cujo prazo do financiamento deverá ser superior ao prazo do afretamento.

*Receitas e Despesas*    As SPEs terão apenas uma única fonte de receita, a Taxa de Afretamento, que deverá servir à dívida, cobrir despesas administrativas e por fim remunerar os acionistas.

A Taxa de Afretamento também terá um componente para fazer frente às necessidade de manutenção das sondas e de suas apólices de seguros.

O Operador receberá uma Taxa de Serviço (através de um Contrato de Serviço com a Petrobras, diretamente vinculado ao Contrato de Afretamento da mesma sonda) e terá como principal responsabilidade a operação da sonda. O Operador também será responsável pela manutenção, contudo, como a parcela referente aos custos de manutenção estará incluída na Taxa de Afretamento, o pagamento pelas despesas com manutenção será feito diretamente pela SPE ao Operador.

A Taxa de Serviço, em conjunto com a Taxa de Afretamento formam a chamada daily rate.

A Taxa de Serviço será composta por duas parcelas: (a) parcela onshore, e (b) parcela offshore.

Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091825

EIG_KEP_00166308



A daily rate total proposta pela Petrobras, em base mensal, é de US$ 448 mil, sendo US$ 298 mil de Taxa de Afretamento e US$ 150 mil de Taxa de Serviço (dos quais US$ 35 mil serão pagos para as SPEs e das SPEs para o Operador).

Os seguros da fase operacional serão negociados pela Sete International, procurando explorar o benefício do portfólio de sete sondas, gerando escala e ao mesmo tempo diluição dos riscos. A contratação desses seguros, contudo, será realizada pelas SPEs.

A Sete International, durante a fase operacional, terá a função de vaso comunicante entres as SPEs, estabelecendo uma estrutura de *portfolio finance*.

Após iniciada a fase de operação, cada SPE será responsável por constituir, através da capitalização de dividendos extraordinários repassados a Sete International, três fontes de reservas: o Fundo de Performance; o Fundo de Renovação e a Conta Reserva de Eventualidades.

Além do objetivo de criar um auto-seguro para a situação de não renovação e problemas de performance dos equipamentos, estes mecanismos de reserva devem gerar uma esfera mais adequada para obtenção de crédito junto aos agentes financiadores. Entendemos que o custo adicional gerado pela constituição desses fundos será em muito compensado por estruturas de financiamentos e empréstimos mais flexíveis, de menor custo e mais adequadas para o Projeto. O Fundo de Performance, Fundo de Renovação e Conta Reserva de Eventualidades serão discutidos em maiores detalhes no Capítulo 10 ("Riscos e mitigantes").

Estes fundos serão constituídos na Sete International, e serão capitalizados através de dividendos extraordinários gerados e pagos por cada uma das SPEs, assim como pela centralização das diversas fontes das disponibilidades individuais das SPEs no momento do seu início de operação.

Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091826

EIG_KEP_00166309



CONFIDENTIAL INFORMATION MEMORANDUM

### 3.7    Administração e Estrutural Organizacional

A Sete Brasil será uma empresa com administração profissional, contando com diretores e gerentes selecionados, aprovados e contratados pelo Conselho de Administração da Companhia, ou por autoridade competente por este designado, conforme definido em seu Estatuto, além de uma estrutura administrativa própria, podendo ainda terceirizar algumas funções não diretamente relacionadas às suas atividades principais e estratégicas. A Diretoria será composta por três diretores: um Diretor Presidente, um Diretor Financeiro e um Diretor de Operações.

*Figura 23: Estrutura Organizacional*



*Fonte: Petrobras.*

A fim de facilitar o processo de identificação de seus principais executivos para seleção do Conselho de Administração da Companhia, os acionistas irão contribuir para a sociedade elaborando uma lista com pelo menos 3 (três) candidatos para cada função executiva. O FIP deverá elaborar uma lista triplice para indicação do Diretor Financeiro e a Petrobras uma lista triplice para indicação do Diretor de Operações. O Conselho de Administração poderá selecionar um dos componentes das listas triplices ou ainda rejeitar todos os indicados, sendo que, neste caso, caberá à Petrobras e/ou cotistas do FIP, conforme o caso, elaborar nova lista para apreciação do Conselho. O Diretor-Presidente será um membro do Conselho de Administração indicado.

O Conselho de Administração será composto por 9 (nove) membros, escolhidos da seguinte forma:

- 6 (seis) conselheiros indicados individualmente por cada um dos cotistas do FIP;

- 1 (um) conselheiro indicado pelo gestor do FIP ou pelo gestor do FI-FGTS, caso este venha a tornar-se cotista do FIP ou debenturista da Companhia;

- 1 (um) conselheiro indicado pela Petrobras, como acionista minoritário; e


Confidential

EIG00091827

EIG_KEP_00166310



CONFIDENTIAL INFORMATION MEMORANDUM

- 1 (um) conselheiro selecionado pelos acionistas dentre um lista contendo 3 (três) indicações a serem feitas pela Petrobras, referido conselheiro será o Diretor-Presidente da Companhia.

Em caso de IPO da Companhia, o Conselho de Administração passará a ser composto por, no mínimo, 20% (vinte por cento) de conselheiros independentes, da seguinte forma:

- 2 (dois) conselheiros independentes; e

- 7 (sete) conselheiros serão indicados pelos acionistas da Companhia.

Em todos os casos, na fase pré ou pós IPO, todos os Conselheiros de Administração da Companhia serão eleitos pela Assembléia Geral para um mandato de 2 (dois) anos e por ela destituíveis a qualquer tempo.

De forma a possibilitar aos quotistas do FIP uma participação mais ativa nas decisões estratégicas da Sete Brasil, será criado um foro decisório único com relação às matérias relevantes ("Reunião Prévia") a serem decididas pelos quotistas do FIP e pela Petrobras ("Investidores"). As Reuniões Prévias serão realizadas anteriormente à realização de uma Assembléia Geral de Acionistas.

Para fins de determinação da representatividade de cada Investidor na Reunião Prévia, será considerada a participação direta da Petrobras e a participação indireta de cada um dos quotistas no capital social da Sete Brasil.

A Reunião Prévia será convocada com antecedência a qualquer Assembleia Geral da Sete Brasil. A aprovação das matérias relacionadas abaixo exigirá o voto afirmativo de investidores representando, direta ou indiretamente, 80% do capital social da Companhia:

(i) Alterações ao Estatuto Social da Companhia;

(ii) Aprovação e/ou quaisquer alterações do Plano de Diretrizes Estratégicas da Companhia;

(iii) Fixação e alteração dos poderes e atribuições dos membros do Conselho de Administração, além daqueles estabelecidos por lei;

(iv) Qualquer aumento ou redução do capital social da Companhia; e

(v) Qualquer transformação, fusão, incorporação, cisão ou outra forma de reorganização societária que envolva a Companhia e suas Controladas, direta ou indiretamente, na forma da legislação aplicável.

As decisões tomadas em Reunião Prévia pelos Investidores vincularão (i) o voto dos Quotistas na Assembléia Geral de Quotistas do FIP e, consequentemente, (ii) o voto do FIP na Assembléia Geral da Sete Brasil; bem como o voto da Petrobras também na Assembléia Geral da Sete Brasil.

Em caso de não ter sido alcançado o quorum para a aprovação da matéria objeto da ordem do dia na Reunião Prévia, os quotistas e o FIP, conforme o caso, ficarão obrigados a votar no


Confidential

EIG00091828

EIG_KEP_00166311



CONFIDENTIAL INFORMATION MEMORANDUM

sentido de não aprovar a matéria submetida à deliberação nas respectivas assembléias de quotistas e assembléias de acionistas.

O eventual exercício, por qualquer dos Investidores ou do FIP, do direito de voto em Assembléia Geral de Quotistas do FIP ou de Assembléia Geral acionistas da Sete Brasil, conforme o caso, em desacordo com as decisões aprovadas na Reunião Prévia, importará em nulidade do voto exercido em desacordo com as decisões aprovadas.

### 3.8    Conceito de *"Portfolio Finance"*

O conceito de *portfolio finance*, implementado com sucesso e de forma pioneira no Brasil no projeto Brasil PCH da própria Petrobras (2006) - projeto de Pequenas Centrais Hidrelétricas do Programa de Incentivo a Fontes Alternativas de Energia - PROINFA - permite dar conforto adicional para os acionistas e credores do projeto. A estrutura aplicada aos citados projetos conta com duas premissas básicas:

* Diluição dos riscos de construção: diferentes bacias hidrográficas, portanto diferentes riscos geológicos, e EPCistas diferentes nas diversas PCHs

* Diluição dos riscos de repagamento e operação: apesar de cada PCH contar com sua própria SPE e dos financiamentos terem sido concedidos diretamente a cada uma destas SPEs, foi elaborado um sistema de vasos comunicantes entres as SPEs mediante a constituição de uma holding. Através desta holding, o eventual excesso de caixa das PCHs que estiverem performando dentro (ou acima) das projeções pode ser enviado (via dividendos e juros sobre capital próprio) para a sua holding que, por sua vez, pode repassar tais recursos para as PCHs que eventualmente estejam performando abaixo do projetado

Utilizando-se os mesmos conceitos aplicados com sucesso em Brasil PCH, a estrutura proposta para o Projeto Sondas do Pré-Sal poderá contar com os benefícios de um *portfolio finance*, que serão aplicados da seguinte forma:

* <u>Diluição do risco de operação:</u> a única fonte de receita de todas as sondas será o Contrato de Afretamento com a Petrobras e todos os custos de operação serão cobertos através do Contrato de Serviço (junto ao acionista Classe B). Apesar da simplicidade contratual, existe o risco de alguma sonda operar abaixo do esperado, num determinado momento, e conseqüentemente reduzir a sua capacidade de repagamento do serviço da dívida, além da cobertura de outras despesas. A estrutura de financiamento de portfólio disponibiliza um importante mitigador de risco: a consolidação dos fluxos de dividendos de todas as sondas do sistema na Holding Externa, que pode utilizar o excesso de caixa para repassar recursos para as SPEs que estão performando abaixo do projetado. Além disso, a estrutura financeira do Projeto propõe a criação de dois mitigadores adicionais: (i) o Fundo de Performance (capitalizado por todas as sondas do sistema), destinado a criar uma reserva para cobertura imediata de qualquer despesa qualificada e que não possa ser quitada devido a eventuais déficits (*"short fall"*) nas receitas das SPEs. Na forma como proposto, esse Fundo de Performance irá funcionar como um auto seguro (*"business interruption"*, etc.) para todas as SPEs do sistema; e



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091829

EIG_KEP_00166312



(ii) a Conta Reserva de Eventualidades, estabelecida na forma de um "pool" comum a todas as SPEs e centralizado na Sete International, que tem como principal objetivo mitigar o risco de insuficiência de caixa nas SPEs para cobertura de suas obrigações oriundas de despesas e/ou custos extraordinários materiais incorridos pelas SPEs na operação do Projeto. Este fundo será formado pela centralização das diversas fontes das disponibilidades individuais das SPEs no momento do seu início de operação, incluindo os valores iniciais a serem pagos pela Petrobras no início da fase operacional do Contrato de Afretamento e Serviço de cada Sonda (Taxas de Mobilização, Comissionamento e Pré-operação), devidamente deduzidos dos pagamentos de suas respectivas despesas e obrigações, incluindo a capitalização do Fundo de Performance, até que a Conta Reserva de Eventualidades atinja o seu montante pré-determinado, quando as contribuições cessarão.

- Diluição do risco de refinanciamento: por conta da premissa de economicidade para a Petrobras em relação às taxas de afretamento das sondas, haverá a necessidade de descasamento de prazos entre os contratos de afretamento (10 anos) e financiamento (até 18 anos). Tal condição incorpora à estrutura um risco adicional relacionado ao refinanciamento das dívidas após o término do primeiro termo dos contratos de afretamento. Esse risco também poderá ser contemplado e coberto pelos mecanismos do financiamento de portfólio através da consolidação dos fluxos de dividendos de todas as sondas do sistema na Holding Externa, que poderá utilizar-se do seu excesso de caixa para repassar recursos para as SPEs honrarem seus compromissos financeiros após o término do termo inicial (10 anos) dos seus Contratos Afretamento com a Petrobras, caso estes não venham a ser renovados ou haja dificuldades de mercado para a celebração de novos contratos com outros operadores de petróleo. De forma semelhante ao item anterior, quando foi proposto o Fundo de Performance e a Conta Reserva de Eventualidades, a presente estrutura financeira prevê a criação de um mitigador adicional para o risco de não renovação: a criação do Fundo de Renovação, também capitalizado por todas as sondas do sistema (incluindo as sondas com prazo de afretamento de 20 anos). Neste caso, o Fundo de Renovação destina-se a criar uma reserva para cobertura de obrigações qualificadas das SPEs que não celebrarem novos contratos de afretamento após o término do primeiro termo de seus contratos com a Petrobras ou não venderem os seus ativos para liquidar antecipadamente os saldos dos financiamentos ainda em aberto após essa data. Da mesma forma como proposto para o Fundo de Performance e Conta reserva de Eventualidades, o Fundo de Renovação irá funcionar como um auto seguro para todas as SPEs do sistema. A justificativa para a criação dos três instrumentos de reserva ( fundo de renovação, fundo de performance e conta de reserva) decorre da eventual percepção dos potenciais financiadores do projeto sobre uma possível dificuldade na aplicação direta e imediata dos conceitos de vasos comunicantes pela Holding Externa, pelo fato das SPEs terem estruturas societárias distintas (em função dos diferentes acionistas Classe B). Através dos citados instrumentos, a Holding Externa contará com disponibilidades para uso imediato, e sempre que necessário, para suportar as suas afiliadas SPEs, através da concessão de empréstimos entre empresas ("inter company"), subordinados aos credores seniores, não alterando as estruturas societária e contratual do Projeto (inclusive os "*Negative*

Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS



CONFIDENTIAL INFORMATION MEMORANDUM

*Pledges*"). Posteriormente, esses instrumentos poderão ter seus montantes repostos pela Holding Externa através das receitas provenientes de suas participações nas SPEs.

### 3.9    Reforços de Créditos ("*Credit Enhancements*")

A estrutura proposta, além do conforto do financiamento de portfólio, apresenta três importantes mecanismos que se destinam a reforçar as condições de crédito do Projeto:

*FGCN (Fundo Garantidor da Construção Naval)*

- Objetivo: mitigar risco de atraso na construção das sondas
- Constituição: fundo de garantia de natureza privada já constituído e capitalizado
- Utilização: o FGCN oferecerá dois tipos de cobertura em base *First-Loss*: (i) Garantia contra Risco de Crédito (em favor dos financiadores) a ser contratada, obrigatoriamente, por quem encomendar a embarcação (SPE); e (ii) Garantia contra Risco de Performance (em favor do contratante da construção) a ser contratada opcionalmente pelo estaleiro (alternativamente aos seguros equivalentes disponíveis no mercado)
- Montante: patrimônio total de R$ 5 bilhões, sendo R$ 4 bilhões exclusivamente para construção das sondas de perfuração em estaleiros brasileiros

*Fundo de Performance*

- Objetivo: mitigar o risco de performance do operador e *downtime* das sondas, conseqüentemente, a geração de receita das SPEs. Caso alguma sonda apresente redução na sua taxa de disponibilidade a tal ponto que prejudique a sua capacidade para servir seu respectivo endividamento, ou a outras obrigações qualificadas, o fundo será utilizado para realizar os pagamentos das parcelas da dívida e obrigações qualificadas vincendas
- Constituição: será constituído durante o primeiro ano de operação de cada sonda através do pagamento de dividendos extraordinários para a Sete Internacional, utilizando-se para isso de todas as receitas iniciais disponíveis, inclusive aquelas referentes às taxas de mobilização, comissionamento e pré-operação, criando assim um fundo especial que será gerido por um agente administrador de contas e com limite máximo estimado durante a execução do seu mandato. Quando o valor idealizado for alcançado, as contribuições cessarão. Caso o fundo seja utilizado e tenha o seu valor reduzido abaixo do mínimo definido, as contribuições voltarão a ser realizadas pelas SPEs através da sua geração de caixa livre, antes da distribuição de dividendos para a Sete International
- Utilização: os recursos do fundo deverão ser utilizados para pagar o serviço da dívida e outras obrigações qualificadas das SPEs, na eventual falta de recursos oriundos de problemas na operação das sondas e conseqüentemente baixa disponibilidade. Os recursos não utilizados poderão ser revertidos em livres disponibilidades para a Sete International, podendo reverter a seus controladores (Sete Brasil) na forma de distribuição de dividendos. Na hipótese de performance insatisfatória continuada por parte do Operador, poderá haver a diluição do Operador no capital da SPE em dificuldades (como acionista Classe B). No caso de constantes problemas de operação e



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091831

EIG_KEP_00166314



CONFIDENTIAL INFORMATION MEMORANDUM

baixa performance, e conseqüente diluição da sua participação na SPE, o Operador será substituído

- <u>Montante:</u> O Projeto prevê a criação de um Fundo de Performance no valor de US$ 56 (cinquenta e seis) milhões, para o Primeiro Sistema. Em contrapartida à recomposição do fundo de performance pela Sete International, essa poderá acionar mecanismos de multas para as SPEs, bem como mecanismos de diluição gradual das ações do Acionista Classe B para as SPEs não operadas Petrobras.

*Fundo de Renovação*

- <u>Objetivo:</u> mitigar o risco de pagamento do serviço da dívida sênior (ou refinanciamento) após o término do primeiro termo dos contratos de afretamento das sondas não operadas pela Petrobras (contratos com prazos de 10 anos).
- <u>Constituição:</u> será dimensionado para cobrir 6 (seis) meses do serviço de dívida de todas as sondas com prazo de contrato de afretamento de 10 anos e capitalizado através de dividendos entre o oitavo e décimo ano de operação comercial de cada SPE (incluindo as Sondas com Contrato de Afretamento de 20 (vinte) anos), criando assim um fundo especial que será gerido por um órgão independente
- <u>Utilização:</u> Os recursos desse fundo deverão ser utilizados unicamente para o pagamento do serviço da dívida e custos operacionais das SPEs, exclusivamente na hipótese de não renovação dos Contratos de Afretamento, após o término do primeiro termo dos contratos que terão prazos de 10 (dez) anos e, caso não haja a renovação de referido contrato ou a celebração de novo Contrato de Afretamento, prejudicando a capacidade da SPE em honrar seus compromissos decorrentes da Dívida Sênior, limitado ao montante equivalente à 6 (seis) meses do serviço da Dívida Sênior por SPE até a utilização total do saldo do Fundo de Renovação. Os contratos de financiamento irão prever que, na hipótese de não renovação dos Contratos de Afretamento, os financiadores seniores estarão impedidos de declarar default das SPEs enquanto o serviço de suas dívidas estiver sendo pago em dia, mediante utilização das disponibilidades existentes no Fundo de Renovação.
- <u>Montante:</u> O Projeto prevê a criação de um Fundo de Renovação no valor de US$ 117 (cento e dezessete) milhões, para o Primeiro Sistema.

*Conta Reserva de Eventualidade (já mencionado anteriormente)*

- <u>Objetivo:</u> mitigar o risco de insuficiência de caixa nas SPEs para cobertura de suas obrigações oriundas de despesas e/ou custos extraordinários materiais incorridos pelas SPEs na fase pré-operacional de cada sonda.
- <u>Constituição:</u> o Projeto prevê a criação de uma Conta Reserva de Eventualidades, estabelecida na forma de um "pool" comum a todas as SPEs e centralizado na Sete International. Este fundo será formado pela centralização das diversas fontes das disponibilidades individuais das SPEs no momento do seu início de operação, incluindo os valores iniciais a serem pagos pela Petrobras no início da fase operacional do Contrato de Afretamento e Serviço de cada Sonda (Taxa de Mobilização, Comissionamento e Pré-operação), devidamente deduzidos dos pagamentos de suas respectivas despesas e obrigações, incluindo a capitalização do Fundo de Performance, até que a Conta Reserva de Eventualidades atinja o seu montante pré-determinado, quando as contribuições cessarão.


**Confidential**

EIG00091832

EIG_KEP_00166315



- ◆ <u>Utilização:</u> As disponibilidades da Conta Reserva de Eventualidades são exclusivamente para a insuficiência de caixa das SPEs para cobertura de suas obrigações oriundas de despesas e/ou custos extraordinários materiais incorridos pelas SPEs na fase pré-operacional de cada sonda e estarão limitadas ao valor máximo depositado nessa Conta, não havendo qualquer obrigação de reposição dos valores dela sacados, seja parcial ou totalmente. Os recursos não utilizados depositados na Conta Reserva de Eventualidades somente poderão ser sacados e utilizados pela Sete International após a renovação da última Sonda do Primeiro Sistema.
- ◆ <u>Montante:</u> indicativamente o valor será de R$ 150 milhões.

Apesar dos eventuais custos adicionais diretos que tais fundos trarão, as condições mais favoráveis de financiamento oriundas do conforto adicional que os credores terão na estrutura (prazo mais elástico e custo mais reduzido) irão compensar esse aparente aumento de custos, mantendo e até reduzindo o custo global ("all in cost") do Projeto.

Confidential

EIG00091833

EIG_KEP_00166316



## 4   ESTRUTURA TRIBUTÁRIA

### 4.1   Estrutura Geral

*Objetivos*   Sob o ponto de vista tributário e fiscal, a estrutura proposta deve ter como objetivos adicionais (aos seus objetivos principais descritos no Sumário Executivo), os seguintes:

- Maximizar a eficiência tributária, reduzindo, dentro das leis e regras vigentes, aplicáveis a cada um dos países envolvidos, pagamentos de impostos e tributos desnecessários
- Reduzir o risco de variação cambial em todas as transações *"cross border"* ou multi moedas
- Evitar qualquer domicílio para as SPEs em jurisdição considerada "paraíso fiscal"

*Vantagens*   As principais vantagens da estrutura tributária do Projeto são:

- Evita a tributação de dividendos das SPEs para a sua holding Sete International, aumentando o retorno para o acionista e permitindo utilizar a Holding Externa como vaso comunicante para a estrutura de portfólio
- Utiliza *tax sparing credits* nas SPEs (localizadas na Holanda) para reduzir ou eliminar a incidência de imposto de renda
- Permite alto nível de alavancagem do capital (*thin capitalization*) e, portanto viabiliza a estrutura de dívida subordinada
- Evita possível tributação sobre ganhos de capital na venda das Ações Classe B da Petrobras para operadores
- Afasta a necessidade de tributação dos lucros auferidos no exterior

### 4.2   Localização das Entidades

Em decorrência dos objetivos tributários descritos anteriormente, os veículos a serem utilizados no Projeto deverão estar localizados de acordo com as seguintes premissas e considerações.

*Sete Brasil -*
*Holding Local*   A Sete Brasil, dado o perfil dos seus investidores, deverá ser estabelecida no Brasil. Investimentos em participações no exterior exigem a obtenção de anuência prévia junto à Secretaria de Previdência Complementar ("SPC") e, eventualmente, ao Conselho Monetário Nacional, tal situação poderia gerar restrições na participação dos fundos de pensão, optando-se pela constituição da empresa no Brasil.

*Sete International -*
*Holding Externa*   A Sete International, dado o propósito de mitigar o risco financeiro através da solidariedade dos fluxos (*portfolio financing*), deverá ser localizada no exterior para evitar risco *cross-border*. Por razões tributárias, a empresa será localizada na Áustria, que possui acordo de



**Confidential**

EIG00091834

EIG_KEP_00166317



CONFIDENTIAL INFORMATION MEMORANDUM

bitributação com o Brasil, e, por fazer parte da União Européia, evita *withholding tax* sobre a distribuição de dividendos das SPEs.

*SPEs*    As SPEs devem ser entidades estrangeiras a fim de obter os benefícios do programa Repetro. Por outro lado, estas SPEs não devem estar localizadas em jurisdição considerada "paraíso fiscal" para fins da legislação brasileira, evitando o pagamento de impostos na fonte na remessa dos pagamentos das taxas de afretamento pela Petrobras. Após avaliação sobre diversas alternativas, optou-se por constituir cada uma das SPEs na Holanda, uma vez que sua legislação permite o uso do dólar norte americano como moeda funcional, bem como a utilização de *tax credits*.

Por sua vez, o operador de cada unidade deverá ser uma entidade local (brasileira), contratada pela Petrobras através de um contrato de serviços (operação das sondas), vinculado ao Contrato de Afretamento. Os pagamentos relacionados a esse contrato serão em moeda local (Reais) ao passo que os pagamentos relacionados ao Contrato de Afretamento poderão ser tanto em dólar norte americano (possivelmente 80%) quanto em Reais (possivelmente 20%), total ou parcialmente[14].

### 4.3    Acordo de Bitributação Brasil-Áustria

De acordo com a legislação brasileira em vigor, as empresas brasileiras que detenham investimentos em sociedades controladas e coligadas no exterior estão obrigadas a tributar os lucros dessas sociedades ao final de cada exercício, independentemente de haver disponibilização desses lucros no Brasil[15].

Contudo, conforme o acordo de bitributação firmado entre o Brasil e a Áustria[16] ("Acordo"), os lucros auferidos pela Holding Externa não deverão ser tributados no Brasil, sejam esses lucros atribuídos à Holding Local[17] (são somente tributados na Áustria), sejam lucros efetivamente distribuídos na forma de dividendos (são isentos os dividendos recebidos por uma empresa brasileira de sua subsidiária na Áustria, caso a participação da empresa brasileira na empresa austríaca seja superior a 25%).

### 4.4    Programa REPETRO

De uma forma geral, todas as transações comerciais são sujeitas a tributação por autoridades brasileiras e, especificamente na importação, há a incidência dos seguintes tributos: Imposto de Importação, IPI, PIS e COFINS e ICMS.

Mesmo levando em consideração a utilização de determinados créditos fiscais pelas SPEs e pela Petrobras, o impacto de todos esses impostos seria substancial em qualquer estrutura financeira que não considere os benefícios do Regime Aduaneiro Especial de Exportação e

---

[15] Artigo 74 da Medida Provisória nº 2.158-35/01 – "MP 2.158-35/01".

[16] Decreto nº 78.107/76.

[17] Por força do art. 74 da MP 2.158-35/01 (lucros ou dividendos fictos).

---



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

43

EIG00091835

EIG_KEP_00166318



**CONFIDENTIAL INFORMATION MEMORANDUM**

Importação de bens destinados à exploração e à produção de petróleo e gás natural ("REPETRO"), implantado em 1999[18]. Desta forma, é essencial que a estrutura financeira permita às SPEs e à Petrobras beneficiarem-se plenamente do REPETRO, que, nos termos atualmente em vigor, isentaria essas transações comerciais de todos os impostos federais e, a depender da situação e de consulta específica, também do ICMS.

Sob o regime do REPETRO:

• Os bens podem ser importados como matérias-primas, sem retenção ou pagamento de impostos desde que sejam utilizados na produção dos ativos elegíveis para posterior exportação;

• A venda de certos ativos elegíveis por um produtor brasileiro a uma entidade estrangeira pode ser considerada como operação de exportação, mesmo que esses ativos não deixem fisicamente o Brasil; e

• A importação de determinados ativos elegíveis pode ser considerada como uma admissão temporária de tais ativos no Brasil e, portanto, podem ser desoneradas dos tributos federais incidentes na importação.

A estrutura do Projeto permite que as SPEs e a Petrobras se beneficiem plenamente do REPETRO. Em particular, destacamos as seguintes questões:

• As SPEs, entidades estrangeiras, serão proprietárias das plataformas

• Todos os recursos exigidos pelas SPEs para realizar e concluir a construção das plataformas serão fornecidos à SPE offshore

• Todos os pagamentos aos EPCistas / Estaleiros vão ser feitos pelas SPEs em uma moeda livremente conversível

• Todo o conteúdo estrangeiro será importado pelos EPCistas / Estaleiros ao abrigo de um regime drawback

• Conteúdo local incorporado no conteúdo estrangeiro, estará sujeito à exportação formal

• As sondas serão importadas pela Petrobras, em última instância, ao abrigo do Afretamento sob regime temporário (regime de admissão temporária)

---

[18] O REPETRO está atualmente regulamentado pelo Decreto nº 6.759, de 05 de fevereiro de 2009 e pelas normas emitidas pela Secretaria da Receita Federal.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

44

**Confidential**



## 5   FUNDO DE GARANTIA PARA A CONSTRUÇÃO NAVAL

### 5.1   Introdução

*Fundo de Garantia para a Construção Naval*

A indústria de construção naval nacional tem passado por um período de forte crescimento, principalmente impulsionada por demandas do setor de óleo & gás, notadamente pelas encomendas de unidades estacionárias de produção, pela Petrobras, e de navios petroleiros, pela Transpetro.

Apesar do desenvolvimento recente dessa indústria no Brasil, a construção das sondas para atendimento das demandas do Pré-Sal apresenta uma série de desafios em função da pouca experiência dos estaleiros locais na construção de equipamentos semelhantes e da necessidade de elevada competitividade em relação a estaleiros especializados nesse nicho de mercado, notadamente alguns estaleiros localizados na Coréia do Sul e China. Assim sendo, por conta do pioneirismo dessa atividade no Brasil e da referência permanente junto a estaleiros mais competitivos (coreanos e chineses), a contratação da construção das sondas em estaleiros brasileiros está associada a maiores riscos de (i) atraso, (ii) sobre custo, (iii) engenharia e (iv) design, entre outros, em relação a outros estaleiros estrangeiros especializados.

De forma a incentivar a construção naval nacional e reduzir riscos associados à contratação de sondas com alto conteúdo nacional o Governo editou a MP 429, convertida na Lei 11.786/08, que autoriza a criação do Fundo Garantidor da Construção Naval (FGCN).

### 5.2   O FGCN

*A principal finalidade do FGCN é garantir o risco de crédito das operações de financiamento*

A principal finalidade do FGCN é garantir o risco de crédito das operações de financiamento à construção ou à produção de embarcações e o risco decorrente do desempenho de Estaleiro Brasileiro.

O FGCN é um fundo de natureza privada e capitalizado inicialmente pelo Governo Federal no montante de até R$ 5 bilhões, sendo que 80% dos recursos (ou R$ 4 bilhões) serão destinados exclusivamente para garantir os riscos de crédito e performance relacionados à construção ou à produção, em estaleiro brasileiro, das sondas de perfuração para o Pré-Sal. A Caixa Econômica Federal é o administrador, gestor e custodiante do FGCN.

A União Federal é o cotista inicial exclusivo do FGCN, porém, posteriormente, outros cotistas serão incorporados, seja de forma voluntária ou compulsória, neste caso, os contratantes das garantias a serem cobertas pelo FGCN. A integralização das cotas pela União poderá ser realizada em moeda corrente, títulos da dívida pública federal, ações listadas em bolsas de valores e outros ativos mobiliários negociados em mercado de balcão organizado. Contudo, o Fundo não contará com qualquer tipo de garantia ou aval por parte do setor público, e o FGCN responderá por suas obrigações com os bens e direitos integrantes de seu patrimônio, até o limite deste.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS



A integralização das cotas pelos demais cotistas somente poderá ser realizada em moeda corrente. Além disso, os cotistas não responderão pelas obrigações do fundo, apenas pela subscrição das cotas.

As garantias a serem providas pelo FGCN restringem-se às embarcações construídas ou produzidas no mercado naval brasileiro, e terão vigência durante o período de construção da embarcação, até a sua aceitação pelo Contratante da Construção ou até 24 meses após a entrega da embarcação pelo construtor, o que ocorrer antes.

O FGCN poderá oferecer:

- Garantia de Risco de Crédito: com relação ao financiamento concedido às SPEs para a construção da respectiva sonda. Cada SPE deverá assinar um Contrato de Prestação de Garantia ("CPG") com o Fundo Garantidor da Construção Naval ("FGCN"), contemplando o provimento de garantia de risco de crédito relacionado à construção das Sondas em estaleiro brasileiro. Os beneficiários desse CPG serão todos os financiadores das SPEs.

- Garantia de Risco de Performance: com relação aos riscos inerentes à construção das sondas pelos Estaleiros. Nesse caso, os tomadores da garantia serão os Estaleiros, e os beneficiários serão as SPEs

A garantia de risco de crédito será devida quando se caracterizar situação de inadimplemento contratual da SPE ou vencimento antecipado do contrato de financiamento, decorrentes da não entrega e/ou não aceitação da embarcação financiada, na data prevista no contrato de construção, considerada pelo financiador para determinar o termo inicial da amortização do financiamento.

Já a garantia de risco de performance será devida em situações decorrentes de responsabilidade do estaleiro brasileiro, com a possibilidade de prejuízo decorrente de inadimplemento gerado pelo não cumprimento de obrigação constante do contrato de construção e/ou pela inadequação da qualidade da construção.

As garantias concedidas pelo FGCN serão estruturadas na forma de uma "*completion guarantee*" (e não um "*refund guarantee*"), podendo servir a todos os emprestadores, inclusive os financiadores subordinados. Dentre os inadimplementos cobertos pelo FGCN incluem-se:

- Falência do estaleiro

- Atrasos no cronograma físico das obras (por qualquer motivo não imputável ao contratante)

- Dificuldade econômico-financeira do estaleiro que acarrete perdas de sua liquidez e não pagamento de suas obrigações (impostos, fornecedores, empregados, etc.), e que venha a significar um atraso na entrega das sondas



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

46

**Confidential**



- Dificuldade técnica (capacidade tecnológica, processos fabris empregados, fluxo de entrega de insumos estável, etc) que venha acarretar em atrasos na entrega das sondas

- Problemas operacionais de qualquer natureza que venham a impedir ou dificultar a aceitação das unidades pelo contratante na fase de entrega das unidades

O FGCN, por sua vez, na concessão da garantia de risco de crédito e/ou de performance, receberá contra-garantias da SPE que tenha sido afiançada, exclusivamente através da subrogação de direitos ("*assignment*") sobre as garantias oferecidas pelo estaleiro por ela contratado, e dos próprios estaleiros junto aos quais a construção da respectiva sonda tenha sido alocada, quais sejam:

- Penhor da totalidade das ações de emissão do estaleiro construtor

- Alienação fiduciária ou hipoteca da embarcação objeto do financiamento

- Fiança dos acionistas controladores do estaleiro construtor

- Celebração de contrato de comodato das instalações industriais em que a embarcação será construída, bem como das máquinas e equipamentos necessários para sua construção

- Seguro garantia com cobertura mínima de 3% do valor do crédito concedido

Caso o penhor da totalidade das ações de emissão do estaleiro já tiver sido dado em garantia, poderá ser aceita a promessa de penhor da totalidade das ações de emissão do Estaleiro Brasileiro.

Ao prestar garantia, o FGCN receberá comissão pecuniária que será devida: (i) pelo Estaleiro Brasileiro, quando se tratar de garantia para assegurar o risco de performance; e (ii) pela SPE, quando se tratar de garantia para assegurar o risco de crédito. No caso de extensão de prazo da garantia, será cobrada Comissão Pecuniária complementar relativa ao prazo adicionado. O prêmio a ser cobrado pelo FGCN referente a essa comissão será variável em função da análise de riscos a ser efetuada pelo Administrador do fundo, para cada situação, em função dos riscos percebidos na concessão das garantias.

O estaleiro brasileiro estará obrigado a adquirir cotas do FGCN, em duas situações, em cada uma delas no montante equivalente a 0,25% do valor garantido: (i) na contratação da Garantia de Risco de Performance pelo próprio estaleiro, e (ii) na contratação da Garantia de Risco de Crédito, ainda que tal contratação tenha sido feita pela SPE. As cotas deverão ser adquiridas em parcela única e antecipada.

Além do pagamento da comissão pecuniária a ser cobrada pelo Administrador do FGCN na concessão das garantias de crédito nas operações dos estaleiros brasileiros, a SPE também estará obrigada a adquirir cotas do FGCN, em montante equivalente a 1% (um por cento) do valor garantido, quando da contratação das citadas garantias, que serão adquiridas em parcela única e antecipada, e permanecerão indisponíveis pelo prazo (mínimo) de cinco anos.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

47

EIG00091839

EIG_KEP_00166322



Ao conceder garantias, o FGCN deverá observar as seguintes limitações:

- A garantia de performance não poderá ser em valor superior a 10% do valor do custo de construção de cada sonda;

- A garantia de risco de crédito não poderá ser em valor superior a 50% (cinquenta por cento) do saldo devedor de cada operação de financiamento (observado que este limite poderá ser aumentado a depender do risco de cada transação, caso assim determinado pela Assembléia de Cotistas)

- Nas operações de financiamento com garantia do FGCN, o valor financiado pelos agentes financeiros poderá corresponder a até 90% (noventa por cento) do valor total do projeto

- O limite de exposição do FGCN com relação a cada SPE (ou cada Entidade Garantida) será de 25% do seu patrimônio

O FGCN prestará garantia, na modalidade de fiança ou equivalente, sem benefício de ordem para o garantidor.

Com relação a cada projeto que conte com a garantia do FGCN, este poderá celebrar, quando aplicável, acordo com os demais credores do projeto em questão, que discipline a forma e procedimento para exclusão das garantias reais fornecidas pelo estaleiro brasileiro garantido.

### 5.2.1    Acionamento e Execução das Garantias

Caso venha a ser necessária a execução da garantia de crédito, o FGCN pagará o valor integral da parcela vencida no contrato de financiamento, até o limite da garantia de crédito contratada com o FGCN (máximo de 50% do saldo devedor).

Na hipótese de vencimento antecipado no contrato de financiamento objeto da garantia de risco de crédito, o FGCN irá honrar o saldo devedor na data do vencimento antecipado, decorrente dos valores desembolsados pelos financiadores, até o limite da garantia concedida.

As garantias comuns ao FGCN e aos financiadores poderão ser executadas pelo FGCN, e os valores decorrentes de tal execução serão utilizados primeiro para pagamento do saldo devedor remanescente do financiamento.

A quitação de cada parcela do financiamento pelo FGCN importará exoneração proporcional da garantia.

Os contratos de garantia de risco de crédito deverão prever, quando for o caso de vencimento antecipado do contrato de financiamento, a possibilidade de pagamento à vista ou através da reposição do fluxo de pagamento previsto no contrato do financiamento da embarcação, a critério do FGCN.

Para o pagamento da garantia de crédito, o financiador deverá acionar o FGCN, no prazo máximo de 90 (noventa) dias a contar do evento que deu causa ao acionamento da garantia,



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

48

Confidential

EIG00091840

EIG_KEP_00166323



por meio de comunicação formal com Aviso de Recebimento (AR), fundamentando a sua solicitação.

O financiador deverá optar por receber o pagamento em uma das seguintes formas:

- Ativos que compõem o patrimônio de afetação vinculado à garantia mediante transferência de titularidade no dia do pagamento da garantia.

- Moeda corrente nacional, mediante depósito em conta corrente de titularidade do financiador.

No caso em que não tenha sido constituído patrimônio de afetação vinculado à garantia, o financiador também poderá fazer opção por receber em pagamento ativos que constituem o patrimônio do FGCN, mediante transferência de titularidade no dia do pagamento da garantia, mediante concordância do FGCN.

O FGCN deverá comunicar, por meio de correspondência com Aviso de Recebimento (AR), a solicitação de pagamento da garantia à SPE e ao financiador, conforme o caso, e ao Estaleiro Brasileiro, estabelecendo prazo para sua manifestação e regularização.

O FGCN realizará diligências, no prazo de 30 dias úteis contados a partir do recebimento da comunicação formal enviada pelo financiador solicitando o pagamento da garantia, com o intuito de verificar a solicitação do financiador, consoante cláusulas previstas no contrato de financiamento ou contrato de construção, conforme o caso.

O FGCN honrará a garantia no prazo de 10 dias úteis, contados do termo final da referida diligência.



Confidential

EIG00091841

EIG_KEP_00166324



# 6   PRINCIPAIS CONTRATOS

## 6.1   Principais Relações Contratuais

A figura abaixo apresenta as principais relações contratuais do Projeto:

*Figura 24: Principais Relações Contratuais*



*Fonte: Santander e Petrobras.*

## 6.2   Contrato de Construção

Os Contratos de Construção, previstos para serem firmados em fevereiro de 2010 entre cada SPE e os estaleiros, terão as seguintes características:

*Principais Características dos Contratos de Construção*

- Modalidade: tipo "*lump-sum turnkey*", com preço fixo e data certa

- Principais Prazos: Para o Primeiro Sistema, o Contrato de Construção junto ao EAS tem prazos de construção conforme abaixo (contado a partir da assinatura do Contrato de Construção): Sonda 1: 1.440 dias (2015); Sonda 2: 1.740 dias (2015); Sonda 3: 1.980 dias (2016); Sonda 4: 2.220 dias (2017); Sonda 5: 2.460 dias (2017); Sonda 6: 2.700 dias (2018) e Sonda 7: 2.940 dias (2019).

- Características Gerais:  O Contrato de EPC assinado com o estaleiro englobará design, engenharia, fornecimento, construção, comissionamento, arranque, testes e conclusão das Unidades, juntamente com qualquer outra especificação que conste na minuta dos contratos.  O EPCista deverá executar as obras (i) de acordo com o escopo das obras e os termos e condições do Contrato de EPC, (ii) de acordo e com o consentimento da legislação aplicável, (iii) de acordo com a boa pratica industrial e, (iv) dentro do prazo estipulado no contrato para cada Unidade. São obrigações do EPCista: (i) Compra,


Confidential



CONFIDENTIAL INFORMATION MEMORANDUM

fornecimento, transporte, manipulação, estocagem correta e preservação dos equipamentos inclusive os recebidos da SPE; (ii) Responsabilizar-se pelo design e engenharia de acordo com as especificações contratuais, (iii) Proporcionar a construção, gerir a construção, incluindo fornecer toda a gestão e supervisão da mão-de-obra, local de trabalho, equipamentos, ferramentas, material de campo, armazenagem e instalações necessárias para fabricação de cada Unidade; (iv) Cumprir a legislação aplicável e viabilizar a exportação de cada Unidade, que serão fisicamente entregues a SPE em águas abrigadas na Baía de Guanabara; (v) Negociar as garantias, seguros, cronograma de entrega, requerimentos de performance com todos os subcontratados; (vi) Assegurar que as obras estão de acordo com o cronograma físico; (vii) Conduzir e gerenciar os testes de performance; (viii) Obter licenças, permissões, autorizações requeridas para execução das obras; (ix) Obter qualquer certificado como exigido pela legislação aplicável para a condução dos testes de performance, demonstração e operação; (x) Fornecer informações e documentos requeridos pela SPE, necessárias para a inspeção das obras; (xi) Fornecer treinamento para SPE referentes a operação e manutenção dos equipamentos fornecidos pelo EPCista; (xii) Substituir qualquer subcontratado que não estiver executando as obras de acordo com os termos do Contrato de EPC; (xiii) Lidar com todas as questões aduaneiras e ser responsável por todas as tarefas relacionadas com equipamentos importados; (xiv) A pedido da SPE, cooperar e responder às perguntas de qualquer credor relativa às obras e outras atividades a serem desenvolvidas no âmbito do contrato; (xv) Cumprir os requisitos de financiamento do BNDES, no caso brasileiro que o conteúdo local é financiado por esta instituição; (xvi) Responsabilizar-se por todos os pagamentos e retenção de impostos relativos às obras; e (xvii) Pagar os subcontratados dentro dos prazos estipulados nos subcontratos  De acordo com as regras de Conteúdo Local, o Estaleiro/ECPista deverá realizar, no Brasil,  construção, montagem, pré-operação, arranque e operação assistida relacionadas com as obras, incluindo a construção do casco, assim como todas as obras relacionadas com aço até a sua integração com a planta de perfuração. O Construtor deve cumprir as exigências de conteúdo local brasileiro, calculado em conformidade com os métodos e critérios da ANP. Para as duas primeiras sondas a serem construídas, no mínimo 55% dos recursos humanos e peso total de peças estruturais da peças estruturais, painéis e fabricação de blocos, bem como montagem, montagem de blocos, todos os trabalhos subseqüentes para a conclusão do casco ao lado do cais, a integração do plano de perfuração e demais atividades, deverão ser realizadas no Brasil. As demais sondas terão seus índices de nacionalização crescentes até chegar a 65% para as duas últimas unidades do pacote inicial de 7 sondas. Se o EPCista demonstrar que seria inviável a realização de obras com aço ou fabricação de peças/componentes de abastecimento, no Brasil devido à questões tecnológicas, tais peças poderão ser importadas desde que cumpra os seguintes percentuais: 60% dos sistemas de geração, propulsão e posicionamento dinâmico, 50% pacote de perfuração e 65% global.

• Indexação: Mediante entrega de cada sonda e apurado o preço final de sua construção, como resultado exclusivo da fórmula de reajustamento de preços da construção,



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091843

EIG_KEP_00166326



CONFIDENTIAL INFORMATION MEMORANDUM

conforme estabelecido no Contrato de Construção celebrado entre o estaleiro e a Companhia, o valor original do daily rate do Contrato de Afretamento poderá ser reajustado, para mais ou para menos, de modo a incorporar as citadas variações de preço de construção (na proporção de 1:1), de forma a manter a mesma rentabilidade esperada para o Caso Base do Projeto. Esse reajuste, como função direta do preço final da construção de cada sonda, não se aplica ao preço do Contrato de Serviços.

- Multas do Contrato de Construção: O Contrato de Construção também prevê o pagamento de multa do estaleiro para a SPE em casa de atraso do prazo previsto em contrato (limitado a 10% (dez por cento) do valor total estimado do contrato). Em caso de atraso, os recursos das multas do Contrato de Construção serão utilizados para o pagamento das multas do Contrato de Afretamento. Os direitos creditórios do Contrato de Construção serão dados em garantia ao Financiamento Sênior. Contudo, uma vez que o seguro do FGCN cobre o pagamento do serviço da dívida em caso de atraso, os recursos das multas do Contrato de Construção deverão ser transferidos para as SPEs.

### 6.3   Contrato de Afretamento

O Contrato de Afretamento com a Petrobras prevê pagamento de uma Taxa Diária (ou "*Daily Rate*"), estabelecida em contrato. O pagamento da Taxa Diária é função da disponibilidade do equipamento (sonda) e não está vinculada à produção.

*Premissas Características*

- Offtaker: Petrobras.

- Prazo: 10 (dez) anos ou 20 (vinte) anos (este último, exclusivamente para as sondas operadas pela Petrobras). Para os demais Sistemas, a divisão entre os contratos com 10 (dez) e 20 (vinte) anos seguirá a mesma proporção aplicada ao Primeiro Sistema. O início do prazo do Contrato de Afretamento ocorrerá quando a sonda for inspecionada e aprovada pela Petrobras.

- Ordem dos Contratos de Afretamento: As sondas do Primeiro Sistema com prazo de afretamento de 20 (vinte) anos, serão as duas primeiras por ordem de início da construção e entrada em operação. Para os demais Sistemas que vierem a ser contratados pela Petrobras a definição sobre quais sondas terão 20 (vinte) ou 10 (dez) anos de contrato inicial atenderá a mesma proporcionalidade e regra de formação aplicada ao Primeiro Sistema.

- Moeda: A Taxa de Afretamento poderá ser paga parcialmente em reais (possivelmente 20%) e parcialmente em dólares (possivelmente 80%). Essa abertura será definida imediatamente antes do início da Operação de cada Sonda e deverá refletir a estrutura de capital do Projeto.

- Frequência de Pagamentos: mensal

- Indexador Durante a Construção: O valor do daily rate será reajustado, para mais ou para menos, de acordo com o Valor Final do Contrato de Construção da Sonda utilizando-se, para isso, de fórmula parametrizada e critérios previamente definidos no contrato de afretamento, de forma que as eventuais variações do preço de construção



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

52

Confidential



**CONFIDENTIAL INFORMATION MEMORANDUM**

das sondas não venha a gerar nem perda e nem ganho de capital aos acionistas da Companhia.

- <u>Indexador Durante a Operação:</u> A contar do início do prazo do Contrato de Afretamento, os preços contratuais (ajustados para o Valor Final da Sonda) deverão ser reajustados anualmente, tanto em reais como em dólares norte-americanos. (i) A parcela em reais será indexada por 100% do Índice Nacional de Preços ao Consumidor Amplo ("IPCA"); e (ii) A parcela em dólares norte-americanos deverá ser reajustada por 20% (vinte) do índice Consumer Price Index ("CPI").

- <u>Pagamento:</u> *offshore* - para a parte em US$

  *onshore* (ainda a ser regulamentado pela SRF[19]) - para a parcela em R$

- <u>Taxa de Mobilização, Comissionamento e Pré-operação (ou "*Mobilization Fee*"):</u> Conforme previsto no Contrato de Afretamento, mediante entrega e aceitação de cada Sonda, a Petrobras se compromete a efetuar o pagamento, em parcela única, de uma taxa destinada a cobrir despesas da Companhia relacionadas às atividades de comissionamento, pré-operação e mobilização de cada sonda. Essa taxa estará limitada ao valor correspondente a US$ 30 (trinta) milhões para cada SPE, que irá se compromoter a aplicar tais recursos de acordo com regras e critérios previamente definidos, ficando vedado o uso de tais recursos para distribuição de dividendos a seus Acionistas antes que determinadas condições precedentes sejam plenamente satisfeitas.

- <u>Bônus de Antecipação:</u> atualmente a estrutura não contempla um bônus pela antecipação da entrada em operação, porém, na hipótese da sonda ser entregue antes do prazo estabelecido, a Petrobras inicia o pagamento da Taxa Diária desde o início de sua entrada em operação, com qualquer antecedência

- <u>Atraso:</u> o Contrato de Afretamento prevê multa por atraso no caso de não cumprimento do prazo previsto em contrato (limitado a 10% (dez por cento) do valor total estimado do contrato). As multas a que porventura a SPE der causa serão descontadas no primeiro pagamento e nos subsequentes, a que a SPE tenha direito, após a aplicação das sanções pela Petrobras. Os descontos estarão limitados a 30% (trinta por cento) do valor do pagamento mensal correspondente, até que a multa esteja integralmente quitada. O Contrato de Construção também prevê o pagamento de multa do estaleiro para a SPE em casa de atraso do prazo previsto em contrato (limitado a 10% (dez por cento) do valor total estimado do contrato). Em caso de atraso, os recursos das multas do Contrato de Construção serão utilizados para o pagamento das multas do Contrato de Afretamento. Os direitos creditórios do Contrato de Construção serão dados em garantia ao Financiamento Sênior. Contudo, uma vez que o seguro do FGCN cobre o pagamento do serviço da dívida em caso de atraso, os recursos das multas do Contrato de Construção deverão ser transferidos para as SPEs.

- <u>Rescisão do Contrato de Afretamento:</u> Atraso no início da execução do Contrato de Afretamento por mais de 2 (dois) anos, contados do prazo previsto.

---

[19] Secretaria da Receita Federal.

---


Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

53

*Bônus por Disponibilidade*    O Contrato de Afretamento prevê um bônus de performance, cujo principal objetivo é incentivar o Operador a obter um alto índice de disponibilidade da sonda. A apuração para pagamento deste bônus considera o período de medição mensal do contrato, e o índice de disponibilidade considerado é a média mensal apurada em cada período. Para efeito de modelagem, o Caso Base considerou uma taxa de disponibilidade de 97%, a partir do segundo ano do contrato de afretamento[20]. A tabela abaixo ilustra os níveis de bônus associados à disponibilidade da sonda.

*Tabela 6: Bônus por Disponibilidade*

| Disponibilidade | Bônus Aplicável |
|---|---|
| Abaixo de 94% | 0,0% |
| 95% | 2,5% |
| 96% | 5,0% |
| 97% | 7,5% |
| 98% | 10,0% |
| 99% | 10,0% |
| 100% | 10,0% |

*Fonte: Petrobras.*

*Renovação do Contrato*    O Contrato de Afretamento poderá ser renovado por prazo igual ao prazo original mediante acordo entre a Petrobras e a SPE. Para preservar seu Direito de Preferência na Renovação, a SPE e/ou a Petrobras deverão, até 12 (doze) meses antes do término do prazo previsto, enviar notificação à outra parte, informando a sua intenção de renovar o Contrato de Afretamento e as condições de acordo com as quais deverá fazê-lo. Após essa notificação as partes iniciarão negociações diretas entre si visando à definição de condições para celebração de um novo contrato de afretamento e serviços por um novo período igual ao prazo originalmente contratado. Para efeito do processo de renovação, respeitados os prazos para manifestação de interesse entre as partes, a Petrobras poderá prioritariamente considerar a renovação dos Contratos de Afretamento com as SPEs, desde que, na oportunidade da sua renovação: (i) existam condições de demanda que justifiquem a necessidade de renovação, e (ii) que os preços e condições que possam resultar das tratativas de negociação sejam razoáveis à vista dos preços e condições de mercado à época e, ainda; (iii) que se apresentem históricos de performance para a Sonda sob renovação que possam ser julgados satisfatórios ao arbítrio exclusivo da Petrobras.

Vale ressaltar que de forma a evitar a consolidação dos ativos no balanço da Petrobras, o Contrato de Afretamento não contemplará cláusulas de recompra ou renovação automática ou

---

[20] O modelo financeiro assume 95% de disponibilidade no primeiro ano e 97% em diante. Contudo, não assume bônus por performance.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

54

**Confidential**



CONFIDENTIAL INFORMATION MEMORANDUM

por preço abaixo de mercado, nem mesmo qualquer condição de garantia ou de exercício de direitos unilaterais (tipo "*Put and Call*").

### 6.4   Contrato de Serviço (Operação & Manutenção)

Como já explicado, o Contrato de Afretamento está vinculado a um Contrato de Serviços de Operação e Manutenção das sondas. No início da estruturação e durante praticamente toda a fase de construção das sondas, o contratado e responsável pela sua operação será a Petrobras, na qualidade de acionista Classe B de todas as SPEs do primeiro sistema. No entanto antes da entrada em operação das sondas, é intenção da Petrobras vender as suas ações Classe B em cinco das sete SPEs do Primeiro Sistema, para acionistas estratégicos (operadores) interessados. Ao fazer isso, a Petrobras estará repassando ao adquirente de suas ações Classe B, em cada uma dessas SPEs, todos os direitos e obrigações em todos os instrumentos contratuais celebrados, inclusive os Contratos de Serviço vinculados a cada uma dessas SPEs. É importante notar que cada SPE terá apenas um acionista Classe B, ou seja, apenas um responsável pela operação da sonda de propriedade dessa SPE.

Para as demais sondas componentes do primeiro sistema (no total de duas) a Petrobras manterá a sua participação como acionista Classe B das respectivas SPEs e responsável única pela sua operação. Para essas sondas, exclusivamente, os contratos de afretamento e de serviço serão aditados com a dilatação dos prazos contratuais para 20 anos ("Sondas Petrobras").

*Principais Premissas*

- <u>Operador:</u> operador final a ser definido após o processo de vendas das ações Classe B

- <u>Prazo:</u> 10 anos ou 20 anos (neste caso, exclusivamente para as Sondas Petrobras)

- <u>Moeda:</u> a tarifa será definida em US$ e convertida em R$ pela taxa de câmbio da data base do contrato, mantendo-se em R$ até o final do contrato de prestação de serviços

- <u>Taxa de Serviço:</u> estimada preliminarmente (Caso Base do modelo financeiro preliminar) em US$ 115 mil[21]

- <u>Freqüência de Pagamentos:</u> mensal

- <u>Indexador:</u> fórmula paramétrica (incluindo indexação pelo Índice do Índice Nacional de Preços ao Consumidor (INPC), Índice de Preços por Atacado e taxa de câmbio)

- <u>Pagamento:</u> onshore. Petrobras paga diretamente para o Operador (ou subsidiária constituída pelo Operador) no Brasil

- <u>Outros Custos:</u> outros custos operacionais, como despesas de seguros e despesas com peças sobressalentes (totalizando aproximadamente US$ 35 mil) serão adicionados na Taxa de Afretamento, portanto serão pagos pela SPE.

- <u>Características Gerais:</u> O Contrato de Serviços terá sempre execução simultânea com o de Afretamento, assinado na mesma data.  São obrigações da contratada: (i) Manter,

---

[21] Valor estimado e poderá ser alterado pela Petrobras. Outros custos operacionais como despesas de seguros e despesas com peças sobressalentes serão pagos pela SPE, portanto serão incluídos na Taxa de Afretamento.


Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

55



CONFIDENTIAL INFORMATION MEMORANDUM

durante toda execução do contrato, todas as condições de habilitação assumidas na licitação; (ii) Respeitar e cumprir as normas administrativas em vigor na Petrobras; (iii) Facilitar a ação da Fiscalização, fornecendo informações ou provendo acesso à documentação e aos serviços em execução e atendendo prontamente às observações e exigências por ela apresentada; (iv) Reparar, às suas expensas e nos prazos estipulados, todo e qualquer serviço considerado inaceitável; Responder por qualquer dano ou prejuízo causado à Petrobras ou a terceiros, em decorrência da execução de serviços previstos no Contrato de Serviços; (v) Obter licenças relativas à sua atividade; (vi) Responder pela operação, supervisão, direção técnica e administrativa e mão-de-obra necessária; (vii) A composição da mão-de-obra embarcada (efetiva) terá um percentual mínimo de mão-de-obra nacional variando entre 66% (1º ano de contrato) e 85% (a partir do 6º ano de contrato); (viii) Efetuar os testes nos equipamentos da Unidade em até 72 horas após a liberação para navegar para a primeira locação; (ix) Conduzir os serviços de acordo com os padrões internacionais de segurança do trabalho; (x) Manter completo sigilo sobre todas as informações e dados fornecidos pela Petrobras; (xi) Planejar e conduzir as operações destinadas a evitar e combater erupções de petróleo, gás, incêndios e outros acidentes; (xii) Responsabilizar-se e arcar com o ônus pela retirada de qualquer equipamento ou material deixado cair no fundo do mar, por sua culpa; (xiii) Regularizar a entrada e permanência da Unidade no país, bem como de materiais e equipamentos, providenciando, às suas expensas, liberações, vistorias, registros e admissão temporária; e (xiv) Contratação de seguros pertinentes a atividade, bem como renovações consecutivas durante a vigência do contrato. São obrigações da Petrobras: (i) Efetuar os pagamentos devidos à contratada pelos serviços efetivamente prestados medidos e faturados; (ii) Fornecer o programa das operações e locações com devida antecedência; (iii) Proceder a medição dos serviços executados e emitir o relatório de medição; (iv) Fornecer transporte de pessoal, material e equipamento até a Unidade; (v) Fornecer, por sua conta, todo o combustível e água necessários à realização dos serviços objeto do contrato; (vi) Manter o controle sobre o fluído de perfuração e completação; e (vii) Fornecer, às suas expensas e sua responsabilidade, os serviços auxiliares relativos à: perfuração direcional, cimentação, testes de formação, perfilagem elétrica, operações com flexitubo, operações com nitrogênio, operação a cabo elétrico, operação com arame, quando decorrentes da programação da própria Petrobras. A Petrobras poderá rescindir o Contrato de Serviços, nas seguintes situações: (i) Descumprimento ou cumprimento irregular de cláusulas contratuais, especificações, operações ou prazos; (ii) Lentidão no cumprimento levando a Petrobras a presumir a impossibilidade de conclusão dos serviços nos prazos estipulados;   (iii) Atraso injustificado no início dos serviços;   (iv) Paralisação dos serviços sem justa causa e prévia comunicação; (v) Cessão ou subcontratação total ou parcial do seu objeto sem a prévia e expressa anuência da Petrobras, bem como a associação, fusão, cisão ou incorporação da contratada sem a prévia comunicação à Petrobras; (vi) O desatendimento das determinações regulares indicadas na fiscalização; (vii) Homologado o plano de recuperação extrajudicial ou deferida a recuperação judicial, se a contratada não prestar caução suficiente para garantir o cumprimento das obrigações contratuais, a critério da Petrobras; (viii) Suspensão dos serviços por determinação de autoridade competente, motivada pela contratada;   (ix)   Deixar   de   apresentar



Confidential



comprovação de adimplemento com obrigações trabalhistas; (x) Atraso no início da execução do contrato por mais de 365 dias; (xi) Rescisão do Contrato de Afretamento, independente de causa; e (xii) Interrupção das operações por mais de 60 dias, por razões imputáveis à contratada, exceto por paralisação por caso fortuito ou força maior. A contratada poderá rescindir o contrato nas seguintes situações: (i) Suspensão de sua execução por ordem da Petrobras, por prazo superior a 120 dias; (ii) Atraso superior a 90 dias dos pagamentos devidos; (iii) Não liberação por parte da Petrobras da locação para execução dos serviços; e (iv) Rescisão do Contrato de Afretamento, independente da causa. Assim como no Contrato de Afretamento, no Contrato de Serviço a contratante é impedida de ceder ou dar em garantia, a qualquer título, no todo ou em parte, os créditos de qualquer natureza decorrentes ou oriundos do desse contrato, salvo com autorização prévia da Petrobras.

### 6.5   Contrato de Gerenciamento e Fiscalização das Obras

Cada SPE contratará a Petrobras para realizar o gerenciamento da obra. Este gerenciamento visa fornecer às SPEs, serviços técnicos especializados nas áreas de fiscalização de obras, assessoria na gestão de contratos, assessoria técnica às obras, controle de recursos financeiros e elaboração de relatórios técnicos. Essa atividade otimiza os custos e controla a qualidade e os prazos estipulados para a construção.

*Características*

- Contratado: Petrobras

- Prazo: aproximadamente quatro anos (período de construção até a aceitação)

- Valor: US$ 8,35 milhões por unidade para toda a construção

- Moeda: US$ ou Reais, convertidos pelo US$ equivalente

- Pagamentos: mensais

As principais funções da Petrobras como o gerenciador das obras de construção das sondas no Brasil são:

- Desenvolver e acompanhar o planejamento físico-financeiro das obras

- Acompanhar e fiscalizar a execução das obras com controle de qualidade

- Analisar e liberar as medições mensais verificando o cumprimento do cronograma, evitando o desembolso antecipado dos serviços não concluídos

- Acompanhar a execução da obra para minimizar possíveis *claims* por parte dos estaleiros


**Confidential**

EIG00091849

EIG_KEP_00166332



# 7   REGRAS DE GOVERNANÇA CORPORATIVA

## 7.1   Sete Brasil - Holding Local

*A Sete Brasil seguirá os padrões de governança corporativa do segmento Novo Mercado*

A Sete Brasil será o veículo primário para captação de *equity*. Essa empresa, estabelecida no Brasil de acordo com os padrões de governança corporativa do segmento Novo Mercado da Bovespa, tem como principais características societárias as seguintes premissas:

- A empresa deverá emitir exclusivamente ações ordinárias, tendo todos os acionistas o direito de voto

- Em caso de venda do controle acionário, o comprador estenderá a oferta de compra a todos os demais acionistas, assegurando-se o mesmo tratamento dado ao controlador vendedor ("*tag along*")

- Conselho de Administração da companhia deve ser composto por, no mínimo, cinco membros, com mandato unificado de, no máximo, dois anos, com a presença de conselheiro independente (somente após o IPO)

- A companhia não deve ter partes beneficiárias

*Acordo de Acionistas*

Conforme mencionado anteriormente, o investimento na Sete Brasil será realizado através de um FIP. A Petrobras será detentora diretamente de no mínimo 5% das ações da Sete Brasil e no máximo 10% (Inicialmente a Petrobras será detentora de 10% do capital da Sete Brasil), sem a necessidade de aquisição de cotas do FIP. Portanto, deverá ser celebrado um Acordo de Acionistas que disciplinará, dentre outras, matérias como forma de deliberações pelos acionistas e matérias sujeitas a quorum qualificado, nomeação de administradores e conselheiros, etc.

O Acordo de Acionistas disciplinará, dentre outras, as seguintes matérias:

- Deliberações pelos acionistas e matérias sujeitas a quorum qualificado

- Direito de preferência e tag along

- Nomeação de administradores e conselheiros

- Direito de exigir a abertura de capital da empresa e oferta pública de valores mobiliários

*Plano de Negócios*

Um Plano de Negócios fará parte do Estatuto Social da Sete Brasil e definirá as suas principais estratégias, bem como a sua estrutura societária e tributária, o seu plano de financiamento, a estrutura de capital, os seus planos para constituição de seus ativos (vinculados à construção das sondas), entre outros. Quaisquer mudanças não previstas originalmente no Plano de Negócios estarão sujeitas à aprovação do Conselho de Administração, de acordo com as regras a serem estabelecidas nos documentos societários da Sete Brasil.


**Confidential**

EIG00091850

EIG_KEP_00166333



### 7.2    Sete International – Holding Externa

A Sete International será uma subsidiária integral da Sete Brasil e apenas um veículo para o estabelecimento de vasos comunicantes dos fluxos financeiros, elemento essencial na estrutura de *portfolio financing*.

### 7.3    FIP

O FIP permite, de forma mais simples e direta, que fundos de pensão brasileiros e outros investidores financeiros aportem recursos ao Projeto. A escolha do FIP como veículo do investimento se deve a:

- Diferimento dos ganhos auferidos
- Regulação aplicável aos fundos de pensão
- Isenção de impostos para investidores estrangeiros não residentes
- Simplificação da estrutura societária da Sete Brasil

Quando da entrada dos investidores, o FIP também estará constituído e os agentes responsáveis pelas suas atividades operacionais (administrador, gestor e custodiante), já estarão selecionados e contratados.

Ao investirem no FIP, os Fundos de Pensão (e outros investidores) deverão celebrar um Acordo de Quotistas que trate, entre outros pontos, os seguintes:

- Deliberações pelos quotistas sobre matérias sujeitas a quorum qualificado
- Deliberação pelos quotistas para regular o exercício do direito de voto do FIP na Sete Brasil
- Direito de preferência e tag along na transferência de quotas
- Substituição do Gestor/Administrador e Custodiante
- Nomeação dos membros do Comitê de Investimento

As principais características são:

- Gestor e Administrador do FIP: Caixa Econômica Federal (CEF)

- Custodiante: Banco Bradesco S.A. (Bradesco)

- Assessor Legal do FIP: Tauil & Chequer Advogados, associado ao Mayer Brown LLP

- Auditor do FIP: PriceWaterhouseCoopers

- Prazo de Duração do FIP: Até 20 (vinte) anos contados da primeira integralização de Quotas, na ocorrência de uma Oferta Pública de Ações, o que ocorrer primeiro.

- Período de Investimento do FIP: Até 10 (dez) anos contado da primeira integralização de Quotas

- Período de Desinvestimento do FIP: Até 10 (dez) anos

- Taxa de Administração: 0,20% do Patrimônio a.a.

- Taxa de Custódia: 0,02%



Confidential

EIG00091851

EIG_KEP_00166334



CONFIDENTIAL INFORMATION MEMORANDUM

<u>Pagamento de Dividendos do FIP:</u> O produto oriundo de distribuição de dividendos ou juros sobre capital próprio pela Sete Brasil a que fizer jus o acionista FIP, enquanto este existir, será integralmente utilizado para amortização das quotas de emissão do FIP, salvo se a Administradora, de forma justificada, entender necessário reter parte ou a totalidade dos recursos obtidos com o desinvestimento para pagamento das exigibilidades do fundo, observado o limite máximo de 0,5% (meio por cento) do patrimônio líquido deste.

<u>Investimentos Permitidos:</u> O saldo de caixa do FIP Sondas, que não for investido em ações da Companhia, deverá ser mantido em um dos seguintes ativos, até o limite de 10% (dez por cento) do Patrimônio Líquido: (i) moeda corrente nacional; (ii) títulos de emissão do Tesouro Nacional; (iii) operações compromissadas lastreadas nos títulos mencionados no item (ii) acima, contratadas com instituições financeiras consideradas de primeira linha; (iv) quotas de fundo de investimento ou quotas de fundo de investimento em fundos de investimento, com liquidez diária, cuja política de investimento admita a alocação de recursos exclusivamente nos ativos identificados nos itens (ii) e (iii) acima, bem como cuja política de investimento admita a realização de operações com derivativos, desde que para proteção das posições detidas à vista, até o limite destas; e (v) títulos de renda fixa de emissão de instituições financeiras consideradas de primeira linha.

### 7.4    Participação da Petrobras

*Participação da Petrobras como acionista Classe A e Classe B*

Além de investidores financeiros, desde o início da estruturação, a Petrobras participará com 10% do capital acionário Classe A da Holding Local (Sete Brasil). Adicionalmente, durante a fase de construção das sondas, somente a Petrobras (diretamente ou através de algum de seus veículos) irá participar também como acionista Classe B. Apesar de minoritária na composição acionária das SPEs, a Petrobras, como acionista qualificado e experiente no segmento de negócios de construção e operação de sondas de perfuração, irá contribuir para a sociedade com a prestação de serviços de fiscalização das atividades de construção e montagem das sondas. No entanto, tal condição não irá conferir à Petrobras qualquer condição de preferência ou ascendência sobre os demais sócios em cada SPE, na Sete International ou na Sete Brasil, onde todas as decisões prevalecerão estritamente por maioria de votos entre os sócios e de acordo com o Acordo de Acionistas e Estatuto Social.

*Venda das Ações Classe B*

Como mencionado anteriormente, durante a fase de cosntrução das sondas, a Petrobras venderá para acionistas estratégicos as suas ações Classe B em cinco das sete SPEs do primeiro sistema. Esta venda será realizada através de um processo seletivo junto a empresas pré qualificadas incluídas em um *Short List*. Antes da entrada de cada investidor financeiro no FIP do Projeto, esse *Short List* será submetido ao mesmo para sua avaliação e aprovação. Concluído esse procedimento, não caberá mais qualquer necessidade de obtenção de aprovações para que a Petrobras exerça o seu direito de transferência das ações Classe B para o novo acionista estratégico por ela selecionado. Esse procedimento (aprovação prévia através do *Short List*) será idêntico junto aos demais participantes do Projeto (financiadores subordinados, *Senior Lenders*, etc.).



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

60

EIG00091852

EIG_KEP_00166335



CONFIDENTIAL INFORMATION MEMORANDUM

Adicionalmente, o investidor Classe B (exceto a própria Petrobras quando esta vier a transferir as suas ações Classe B para investidores estratégicos pré selecionados) somente poderá vender a sua participação nas SPEs mediante aprovação prévia do acionista Classe A.

O processo de seleção do Investidor Estratégico poderá ocorrer a qualquer tempo, a partir da celebração dos Contratos de Afretamento e Prestação Serviço, sendo que este processo deverá estar concluído antes da data da entrega da Sonda pelo seu Construtor e aceitação final pela SPE e pela Petrobras. No entanto, o exercício pleno "step-in" da transferência das ações Classe B pela PNBV para o novo acionista estratégico irá ocorrer após o atendimento dos testes de aceitação da Sonda pela Petrobras, o cumprimento das obrigações assumidas pelo novo acionista estratégico e a inexistência de qualquer situação de Material Adverse Effect. A PNBV, após selecionar o novo acionista estratégico, deverá celebrar com este um contrato de promessa de compra e venda de ações.

*Mecanismo de diluição e saída antecipada do acionista Classe B*

Por outro lado, a fim de preservar os acionistas financeiros e os resultados esperados do próprio Projeto, está previsto um mecanismo de diluição e saída antecipada do acionista Classe B que não apresente uma performance operacional mínima previamente requerida. Nessa situação, caso haja a necessidade de substituição do operador que apresente baixa performance, está previsto um período transitório de utilização de um Operador Contingente que assumirá todas as responsabilidades operacionais da sonda em dificuldades até que um novo acionista estratégico seja selecionado pelo acionista Classe A, a quem serão transferidas as ações Classe B originais, em conjunto com todos os direitos e responsabilidades cabíveis a essa classe de ações.

*Potenciais Investidores Estratégicos*

As tabelas a seguir apresenta o *Short List* definitivo, contendo as empresas pré qualificadas, para efeito da venda das ações Classe B em poder da Petrobras.

- Atwood Oceanics, Inc.;
- Odebrecht Óleo & Gas Ltda.;
- Brasdril Sociedade de Perfurações Ltda.;
- Dolphin Drilling Ltd.;
- Ensco International Inc.;
- Etesco Construções e Comércio Ltda.;
- Frontier Drilling do Brasil Ltda.;
- Maersk Brasil Brasmar Ltda.;
- Noble do Brasil S/C Ltda.;
- Ocean Rig ASA;
- Odfjell Drilling AS;
- Pacific Drilling;
- Petroserv S.A;
- Pride do Brasil Serviços de Petróleo Ltda;
- Queiroz Galvão Óleo e Gás S.A.;
- Saipem do Brasil Ltda.;
- Seadrill Ltd.;
- Sevan Marine do Brasil Ltda.
- Transocean Brasil Ltda.;



🔶 Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091853

EIG_KEP_00166336



- Vantage Drilling Co.; e
- Grupo R.

### 7.5  Oferta Acionária – IPO

Na hipótese da Sete Brasil e seu Conselho de Administração, considerarem que existe a oportunidade de mercado e interesse por parte de investidores, a Sete Brasil poderá efetuar uma oferta pública de ações para o mercado, através de um IPO.

A partir do momento que a comunidade de investidores do mercado tiver uma real percepção de que o "Negócio de Afretamento de Longo Prazo de Sondas para o Pré-Sal" constitui-se em um nicho robusto, estruturado, com suas principais variáveis equacionadas e riscos mitigados, cria-se uma real possibilidade para atração de novos investidores através do IPO.

O IPO será composto por uma oferta primária e possivelmente uma secundária:

- <u>Primária:</u> Os investidores subscrevem um aumento de capital, de forma a financiar as necessidades restantes do projeto, tanto para complemento dos investimentos demandados para o primeiro sistema de sondas, quanto, eventualmente, para implementação de um segundo ou mesmo terceiro sistemas (acrescentando-se 7 novas sondas para cada novo sistema incluído no Projeto, na hipótese da Sete Brasil ter o direito de preferência)

- <u>Secundária:</u> Os investidores privados terão uma oportunidade para monetizar seus investimentos no aumento de capital, vendendo uma porcentagem (pré-definida) das suas ações em bolsa de valores

Para este fim, todos os contratos de financiamento deverão ser preliminarmente negociados e executados de forma a permitir o IPO das ações Classe A, tanto durante o período de construção das sondas, como durante sua operação.

A fim de manter-se o perfil de risco inicial do Projeto (quando da contratação dos empréstimos e financiamentos) e ainda visando á redução de incertezas em um eventual IPO, a estrutura proposta contempla a necessidade de utilização de um operador de renome internacional, como operador de "última instância" (Operador Contingente descrito no Quadro "*Mecanismo de diluição e saída antecipada do acionista Classe B*"), ou da composição de uma lista com operadores pré-aprovados, para o mesmo fim.

Caso não tenha havido o IPO até o oitavo ano após a aquisição da Sete International GmbH pela Sete Brasil, a Sete Brasil pode abrir seu capital.  Os quotistas do FIP estarão livres para extingui-lo e passarem a ser acionistas diretos da Sete Brasil.

Em caso de aprovação pelos acionistas de Oferta Pública de Ações, a Sete Brasil realizará uma chamada de capital até o limite do total comprometido pelos Quotistas do FIP e Petrobras, nos termos do Compromisso de Investimento.


Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091854

EIG_KEP_00166337



## 8   ESTRUTURA DE CAPITAL E PLANO DE FINANCIAMENTO

### 8.1   Principais Considerações

*Maximização dos Prazos dos Financiamentos*

Um dos principais objetivos do Projeto é a geração de Taxas de Afretamento a serem pagas pela Petrobras em linha com as taxas de mercado vigentes, para sondas com as mesmas características e condições contratuais semelhantes. Nesse sentido, o prazo do financiamento a ser levantado para a estrutura proposta configura-se como uma das variáveis mais importantes na determinação de uma Taxa de Afretamento competitiva. Portanto, será necessário buscar condições vantajosas, principalmente em termos de prazo, para as tranches dos Bancos Comerciais, de ECAs, mas principalmente do BNDES.

Assim, visando esse objetivo de geração de taxas de afretamento competitivas, uma das principais metas do Projeto é construir o pacote de financiamento com prazo médio para repagamento das dívidas superior ao prazo do afretamento (10 anos). Para isso, a estrutura prevê um conjunto de mecanismos para mitigação de riscos cujo maior objetivo gerar conforto aos financiadores para que estes aceitem dissociar os prazos de repagamento dos termos iniciais dos contratos de afretamento.

Ou seja, a estrutura desenvolvida contempla o risco de realocação das sondas, que será mitigado principalmente por:

- Fundo de Renovação que será constituído pela Holding Externa e capitalizado por dividendos extraordinários das SPEs
- Estrutura de *portfolio finance* com complementariedade dos fluxos das SPEs através da Holding Externa
- Sondas com afretamento de 20 anos (duas sondas no primeiro sistema) que não possuem risco de renovação
- Valor residual dos ativos

*Limitar o número de fontes de financiamento*

Em função da complexidade e do montante de financiamento do Projeto, a estratégia de *funding* está focada em fontes de financiamento com maior potencial de *underwriting*. O trabalho de aprovação de crédito de cada fonte de financiamento é extenso (*due diligence*, contratos, negociações, etc.) e de custo considerável. Com base nessa estratégia, o Projeto está buscando apenas poucas fontes de financiamento, com foco principalmente no BNDES.

*Envolvimento do BNDES deste o início do Projeto*

O desenvolvimento do Projeto, e da "Cadeia de Valor" de fornecimento de bens e serviços nacionais para a construção das sondas no país, é de fundamental importância para o Brasil. Portanto, é esperado grande interesse e participação do BNDES.

O pacote de financiamento do BNDES necessita ser muito competitivo em termos de prazo, custo e volume, mas o valor do seu envolvimento é muito maior. A participação do BNDES será uma importante âncora para os demais credores além de demonstrar o apoio político do governo. E considerando que o edital da licitação para seleção dos estaleiros brasileiros que



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

63



CONFIDENTIAL INFORMATION MEMORANDUM

irão construir as sondas prevê um índice crescente de conteúdo brasileiro no Projeto (55% a 65%), a participação do BNDES poderá ser bastante significativa.

IPO    Apesar do plano de financiamento não prever recursos do mercado de capitais, a solução proposta deverá contemplar uma estrutura antecipando a flexibilidade de acessar o mercado acionário, criando mecanismos de captação para recursos adicionais demandados pelo projeto e mecanismos de liquidez para os acionistas na estrutura contratual.

Essa estrutura deverá incluir a abertura de capital da Holding Local (Sete Brasil) e uma oferta pública de ações.

### 8.2    Plano de Financiamento

As principais fontes de financiamento para o Projeto são:

Empréstimo Ponte
- Utilização de Recursos: primeiros desembolsos e "downpayments"
- Participação: apenas recurso de curto prazo durante a construção
- Moeda: USD ou Reais
- Comentário: Empréstimo tipo *revolver*

BNDES
- Utilização de Recursos: bens e serviços locais
- Participação: 40% a 50%
- Moeda: USD
- Comentário: principal fonte de financiamento do projeto

ECAs
- Utilização de Recursos: bens e serviços importados
- Participação: 20%
- Moeda: USD
- Comentário: as prováveis ECAs deverão ser US EXIM e GIEK, entre outras

Bancos Comerciais
- Utilização de Recursos: custos não elegíveis do BNDES e das ECAs
- Participação: 10% a 20%
- Moeda: USD ou Reais
- Comentário: flexibilidade de desembolso e amortização

Equity
- Utilização de Recursos: financiamento de bens e serviços não elegíveis às demais fontes de financiamento
- Participação: 20% a 25%
- Moeda: Reais
- Comentário: de forma a aproveitar as vantagens tributárias do Acordo de Bitributação Brasil-Áustria (não se aplica *withholding tax* no pagamento de juros entre Brasil e Áustria), a Petrobras e o Santander estão analisando a opção de parte do investimento dos investidores Classe A ser realizado na forma de dívida subordinada (respeitando a preferência do financiamento sênior do BNDES, ECAs e Bancos Comerciais). Alternativamente, estuda-se também a possibilidade de outros investidores, diferentes dos cotistas do FIP, participarem da dívida subordinada do Projeto.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

64

EIG00091856

EIG_KEP_00166339



CONFIDENTIAL INFORMATION MEMORANDUM

Desta forma, o equity do Projeto Sondas está estimado em US$ 1.108.963 milhares e o montante total da dívida em US$ 4.435.852 milhares, compostos conforme demonstrado no quadro abaixo.

| Estrutura de Capital | US$ - Em Milhares | % |
|---|---|---|
| Dívida | 4.435.852 | 80,0 |
| BNDES | 2.495.167 | 45,0 |
| ECA's | 1.108.963 | 20,0 |
| Bancos Comerciais | 831.722 | 15,0 |
| | | |
| Equity | 1.108.963 | 20,0 |
| Classe A | 942.619 | 17,0 |
| Petrobras | 91.262 | 1,7 |
| FIP Sondas | 848.357 | 15,3 |
| Classe B | 166.344 | 3,0 |
| | | |
| Total | 5.544.815 | 100,0 |

### 8.2.1   BNDES

O BNDES é a maior fonte de financiamento de longo prazo do Brasil e já manifestou formalmente seu compromisso de participar no financiamento do Projeto através de carta emitida com autorização expressa de sua diretoria.

O valor do financiamento do BNDES está limitado ao volume de conteúdo local no Projeto (55% a 65%).

Dado que os tomadores do empréstimo, as SPEs, estarão localizadas na Holanda e, em virtude das características do REPETRO, o único produto do BNDES disponível para este projeto é o BNDES EXIM, no qual os recursos podem ser desembolsados diretamente para os fornecedores locais em reais e contabilizados na dívidas das SPEs em dólares norte-americanos, convertidos na data do desembolso.

A seguintes condições de financiamento para o Projeto foram aprovadas por unanimidade pela diretoria do BNDES:

- Forma de Apoio: Direto;

- Custo Financeiro: LIBOR + 2,25% a.a., para um prazo total de 18 anos, sendo 3 anos de carência e 15 anos de amortização;

- Sistema de Amortização: Tabela Price;



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

65



CONFIDENTIAL INFORMATION MEMORANDUM

- Remuneração de Risco: definida pela política de crédito do BNDES, conforme a classificação de risco do Projeto; e

- Nível de Participação: 100% das máquinas e equipamentos nacionais e 80% de demais itens financiáveis.

A aprovação concedida pela diretoria do BNDES, no entanto, está condicionada ao atendimento dos requisitos descritos abaixo, bem como de outros que poderão ser incluídos durante a análise do financiamento:

- Que o Contrato de EPC seja celebrado com Epcista cuja qualidade de crédito seja aceitável para o BNDES;

- Que a daily rate seja suficiente para que no mínimo: (i) cubra os custos de operação e manutenção das sondas; (ii) o índice de cobertura da dívida sênior seja maior ou igual a 1,2x; (iii) o índice de cobertura da dívida total seja maior ou igual a 1,00x; (iv) a constituição de fundos e contas reservas a serem dados em garantia; e (iv) o fluxo de recebíveis da Sete International (tais como dividendos, juros e principal da dívida subordinada) seja suficiente para cobrir 120% de qualquer deficiência de caixa das SPEs, especialmente o serviço da dívida das SPEs que não tenham seus contrato renovados após o 10º ano de operação

- Que na fase pré-operacional sejam prestadas as seguintes garantias, entre outras que possam ser negociadas na fase de análise da operação, considerando, ainda, que as regras aplicadas às garantias a serem constituídas no exterior serão determinadas a critério do BNDES: (i) cessão fiduciária dos direitos creditórios do Contrato de EPC; (ii) penhor ou cessão fiduciária dos direitos creditórios das contas da Sete International; (iii)penhor ou cessão fiduciária dos direitos creditórios das contas das SPEs; (iv) penhor das ações das SPEs; (v) seguro garantia de performance; (vi) propriedade fiduciária das sondas; (vii) conta reserva de eventualidade; e (viii) garantia de crédito do FGCN no valor de 50% do financiamento

- Que na fase operacional sejam prestadas as seguintes garantias entre outras que possam ser negociadas na fase de análise da operação, considerando, ainda, que as regras aplicadas às garantias a serem constituídas no exterior serão determinadas a critério do BNDES: (i) penhor ou cessão fiduciária dos recebíveis da Sete International; (ii) penhor ou cessão fiduciária dos recebíveis das SPEs; (iii) penhor das ações das SPEs; (iv) penhor ou cessão fiduciária dos direitos creditórios das contas da SPEs; (v) penhor ou cessão fiduciária dos direitos creditórios das contas da Holding Externa; (vi) conta reserva de, no mínimo, 3 meses do serviço da dívida; (vii) fundo de renovação no valor mínimo de US$ 150 milhões; (viii) fundo de performance no valor mínimo de US$ 70 milhões; e (ix) propriedade fiduciária das sondas.

- Disponibilidade de recursos do FGCN para conceder garantia de crédito para o pacote de sondas a ser contratada; Capital próprio do acionista de 20% do valor do investimento, composto por 10% de capital próprio e 10% de dívida subordinada,



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

66

EIG00091858

EIG_KEP_00166341



CONFIDENTIAL INFORMATION MEMORANDUM

ressalvado que, caso haja elevação da parcela de recursos próprios, o mesmo poderá ocorrer pelo aumento da participação da dívida subordinada nas fontes do Projeto;

- Que a Petrobras detenha, no mínimo, 10% do capital social da Sete Brasil, ressalvada a possibilidade de redução dessa participação até o mínimo de 5% caso haja abertura do capital;

- Que a Petrobras PNBV permaneça como Acionista Classe B de cada uma das SPEs que possuirão contrato de afretamento de 10 anos até, no mínimo, 12 meses antes da entrega da respectiva sonda;

- Que seja estabelecida a obrigação de a PNBV permanecer como Acionista Classe B de cada uma das SPEs que possuirão contrato de afretamento de 20 anos até, no mínimo, o final do prazo de amortização da dívida sênior; e

- Que seja estabelecido o compromisso dos acionistas aportarem recursos próprios nas SPEs, mediante aporte de capital ou dívida subordinada aos credores seniores, caso haja necessidade de complementação de recursos para finalizar a construção das sondas, desde que tal aumento de custos seja decorrente de uma solicitação de alteração do projeto realizada pela SPE (Change Order) e/ou do índice de reajuste de preço do Contrato de EPC.

### 8.2.2   ECAs

*USEximbank -*
*Estados Unidos*

Agência independente do governo norte americano, criada em 1934, que tem como objetivo facilitar o financiamento à exportação de mercadorias e serviços norte americanos. O Eximbank promove a exportação norte americana oferecendo seguros e garantias ao crédito destinados a compradores e fornecedores.

Atualmente possui preço atrativo dado a recente melhoria na classificação do risco Brasil da OECD. Tipicamente exige uma entrada de no mínimo 15%.

*GIEK - Noruega*

O objetivo do GIEK é promover exportações norueguesas através de garantias representando o governo norueguês. Desde 1994 o GIEK está organizado como uma instituição pública dentro do Ministério do Comércio.

O apoio do GIEK aos negócios relacionados às exportações norueguesas tem sido objeto de foco crescente tendo em vista a crise financeira internacional.

Adicionalmente, considerando que o nicho de fornecimento de bens e serviços para a construção de sondas de perfuração marítimas tem hoje grande presença na Noruega, o apoio do GIEK ao Projeto poderá significar uma participação considerável daquela instituição no pacote de financiamento da estrutura.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

67

Confidential

EIG00091859

EIG_KEP_00166342



CONFIDENTIAL INFORMATION MEMORANDUM

### 8.2.3   Bancos Comerciais – Sindicalização

Tradicionalmente a principal fonte de financiamento de sondas construídas fora do Brasil são sindicatos de Bancos Comerciais, uma vez que o BNDES não financia equipamentos e serviços estrangeiros.

Portanto, uma operação sindicalizada de financiamento com Bancos Comerciais deverá completar o pacote de financiamento e poderá ser iniciada rapidamente e de forma gradual. Uma das principais vantagens desta modalidade é sua flexibilidade para customização às necessidades do Projeto - muito maior do que o BNDES, as ECAs (USExim, GIEK) - inclusive em relação ao tipo de amortização da dívida e cronograma variável para desembolso dos recursos, eliminando perdas com "*negative carry*". Outra importante vantagem é o conhecimento do setor por parte dos bancos.

### 8.3   *Term Sheet* Premilinar

A tabela abaixo apresenta as principais premissas utilizadas para o caso base do modelo financeiro.

*Tabela 7: Caso Base do Financiamento*

|  | BNDES | ECAs | Bancos Comerciais |
|---|---|---|---|
| Usos (elegibilidade) | Bens e serviços locais | Bens e serviços importados | Custos não elegíveis ao BNDES e as ECAs |
| Tomador | SPEs | SPEs | SPEs |
| Participação | 45% | 20% | 15% |
| Moeda | US$ | US$ | US$ |
| Carência | 6 meses | 6 meses | 6 meses |
| Desembolso | Até 3 anos | Até 3 anos | Flexível |
| Prazo (anos) | 3 + 15 | 3 +12 | 3 + 10 |
| Indexador | Libor | Libor | Libor |
| Spread | 2,75% | 3,00% | 3,00% |
| *Upfront Fee* | N.A. | N.A. | 2,00% |
| Periodicidade | Trimestral | Trimestral | Trimestral |

*Fonte: Petrobras e Santander.*

### 8.4   Principais *Covenants* e Obrigações

Baseado em experiências e transações recentes no setor e em conversas preliminares com BNDES e bancos comerciais, as principais obrigações e *covenants* previstas para o Projeto deverão ser:

*Índice de Cobertura do Serviço da Dívida Sênior*   Em função do contrato de afretamento, qualidade do *offtaker*, custos de operação & manutenção e conseqüentemente a previsibilidade do fluxo de caixa, entendemos que o ICSD Sênior mínimo deverá ser de 1,20x.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

68

**Confidential**

**CONFIDENTIAL INFORMATION MEMORANDUM**

| | |
|---|---|
| *Conta Reserva do Serviço da Dívida ("DSRA")* | Tipicamente estruturas de *Project Finance* contemplam seis meses de conta reserva de juros e principal. No entanto, em função da estrutura de portfólio e dos *Credit Enhancements* entendemos que três meses de conta reserva venham a ser suficientes. |
| *Fundo de Renovação* | Através de um *trustee*, o Fundo de Renovação (a ser constituído no exterior pela Holding Externa - Sete International) será capitalizado por dividendos extraordinários pagos pelas SPEs entre o oitavo e décimo ano de seus contratos de afretamento. |
| *Mobilization Fee* | A Taxa de Mobilização, Comisssionamento e Pré-operação (*Mobilization Fee*) a ser paga pela Petrobras a cada SPE após a aceitação de cada sonda (após entregue pelos estaleiros) será dividida em duas partes, sendo que uma parcela de US$ 8 milhões será depositada no Fundo de Renovação, para acelerar a sua composição. |
| *Conta Reserva de Eventualidades* | Está prevista a constituição de uma conta (Conta para Despesas Eventuais) destinada à cobertura de despesas adicionais e materiais não previstas originalmente nos modelos econômicos e plano de negócios do Projeto, tais como operacionais, administrativas, fiscais, legais, O&M, contratação de assessores, consultores, etc. |
| *Outras Obrigações* | • Restrição de endividamento adicional<br>• *Negative-pledge*<br>• *Waterfall* de prioridades e pagamentos do fluxo de caixa |

### 8.5  Pacote de Garantias

O pacote de seguros que os credores seniores provavelmente irão requisitar devem incluir as seguintes garantias:

| | |
|---|---|
| *Garantias Pre-Completion* | • Penhor/Alienação Fiduciária do Contrato de Construção<br>• Penhor/Alienação Fiduciária do Contrato de Afretamento<br>• Penhor/Alienação Fiduciária das ações/quotas das SPEs Específicas<br>• Penhor/Alienação Fiduciária do pacote de seguros<br>• Penhor/Alienação Fiduciária dos *Liquidated Damages* do Contrato de Construção |
| *Garantias Post-Completion* | • Penhor/Alienação Fiduciária do Contrato de Afretamento<br>• Penhor/Alienação Fiduciária do Contrato de Serviço (O&M)<br>• Penhor/Alienação Fiduciária das ações/quotas das SPEs<br>• Penhor/Alienação Fiduciária dos ativos do Projeto<br>• Penhor/Alienação Fiduciária do pacote de seguros<br>• Penhor/Alienação Fiduciária das *Project Accounts* (DSRA, Fundo de Performance, Fundo de Renovação) |

**Confidential**                                                                                                           **EIG00091861**

**EIG_KEP_00166344**



## 9   MODELO E ANÁLISE ECONÔMICO-FINANCEIRA

### 9.1   Introdução

De forma a avaliar a bancabilidade e a viabilidade financeira e econômica do Projeto, foi desenvolvido pela Petrobras, em conjunto com o Santander um modelo financeiro para representar todas as principais condições aplicáveis ao Projeto e à estruturação financeira em implementação. O modelo financeiro e seus outputs serão disponibilizados através do Dataroom.

### 9.2   Principais Premissas

No plano financeiro preliminar, o modelo contempla uma relação dívida sênior/capital de 80/20. Dos recursos de investidores financeiros (capital Classe A), uma parcela poderá ser através de um financiamento concedido pelos próprios acionistas, ou por terceiros, porém subordinado à dívida sênior (a "Dívida Subordinada"). Tendo como base os custos elegíveis e a capacidade do projeto de saldar sua dívida, a estrutura de capital vislumbrada para o projeto foi estimada da seguinte forma:

*Tabela 8: Tranches da dívida*

| Tranche | Descrição | % do Total Financiado |
|---|---|---|
| BNDES | Financiamento dos bens e serviços nacionais | 45,0% |
| ECAs | Cobre os principais itens importados | 20,0% |
| Bancos Comerciais | Financiará os demais itens não cobertos pelo BNDES e ECAs | 15,0% |
| **Total** | | **80,0%** |

*Fonte: Petrobras e Santander.*

### 9.3   Principais Datas

O modelo financeiro permite simular cada sonda individualmente, onde cada SPE poderá ter datas de construção e prazos de afretamento distintos. Abril de 2011 é o início do Projeto, onde todas as SPEs terão seus primeiros desembolsos. A tabela abaixo apresenta as principais datas de cada Sonda:

*Tabela 9: Principais Datas*



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091862

EIG_KEP_00166345



CONFIDENTIAL INFORMATION MEMORANDUM

| Sonda | Primeiro Desembolso | Entrada em Operação | Término da Operação |
|-------|---------------------|---------------------|---------------------|
| Sonda 1 | Abr'2011 | Jul'2015 | Jun'2035 |
| Sonda 2 | Abr'2011 | Jul'2016 | Jun'2036 |
| Sonda 3 | Abr'2011 | Jan'2017 | Dez'2026 |
| Sonda 4 | Abr'2011 | Out'2017 | Set'2027 |
| Sonda 5 | Abr'2011 | Jul'2018 | Jun'2028 |
| Sonda 6 | Abr'2011 | Jan'2019 | Dez'2028 |
| Sonda 7 | Abr'2011 | Out'2019 | Set'2029 |

*Fonte: Petrobras.*
*Nota: As sondas de 20 anos serão as sondas 1 e 2.*

### 9.4  Cronograma de Construção

*Custos de Desenvolvimento*

Como já explicitado anteriormente, e estritamente para efeito do modelo financeiro preliminar, o início do projeto se dará em Outubro de 2010, quando três sondas iniciarão a construção. A figura abaixo ilustra o cronograma de investimentos das sete sondas e linha vermelha indica o progresso consolidado das sete sondas.

*Figura 25: Cronograma de investimentos*



*Fonte: Petrobras.*



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

71



### 9.5  Principais Premissas Macroeconômicas

As principais premissas macroeconômicas[22] são apresentadas a seguir. Deve-se notar que estas premissas podem ser revistas durante o desenvolvimento do projeto.

*Tabela 10: Premissas Macroeconômicas*

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| INPC | 4,78% | 4,50% | 4,42% | 4,37% | 4,37% | 4,37% | 4,37% |
| IPCA | 4,46% | 4,50% | 4,50% | 4,50% | 4,00% | 4,00% | 4,00% |
| CDI Médio | 8,67% | 10,31% | 11,41% | 9,97% | 9,97% | 9,97% | 9,97% |
| Cambio Dólar/Euro | 1,48 | 1,55 | 1,55 | 1,55 | 1,55 | 1,55 | 1,55 |
| Cambio Real/Euro | 2,96 | 3,26 | 3,30 | 3,35 | 3,40 | 3,44 | 3,49 |
| Libor (6 meses) | 2,92% | 3,13% | 3,35% | 3,57% | 3,78% | 4,00% | 4,25% |
| US CPI | 3,00% | 3,00% | 3,00% | 3,00% | 3,00% | 3,00% | 3,00% |

*Fonte: Santander Economia – Novembro 2010.*

A tabela abaixo resume o impacto de cada premissa nas projeções de longo prazo:

*Tabela 11: Premissas Macroeconômicas - Impacto no projeto*

| Premissa | Descrição |
|---|---|
| INPC | Indexador da parcela nacional do Capex |
| IPCA | Indexador da Dívida Subordinada e de parte do Daily Rate |
| CDI Médio | Usado para calcular a receita financeira do caixa acumulado na Sete Brasil |
| Euro/Dólar | Usada para a transferência de capital entre a Sete International e as SPEs |
| Real/Euro | Usada para a transferência de capital entre a Sete International e a Sete Brasil |
| Libor (6 meses) | Usado como juros flutuante para as tranches do BNDES (USD), ECAs e Bancos Comerciais |
| US CPI | Indexador da parcela importada do Capex e de parte do Daily Rate |

*Fonte: Santander.*

### 9.6  Premissas Operacionais

*Taxa de Afretamento*   Cada SPE terá como única fonte de receita a taxa de afretamento *bare boat* paga pela Petrobras mensalmente, de acordo com a disponibilidade da sonda ("*Up Time*").

O Caso Base do modelo financeiro assume que as sondas terão uma disponibilidade média de 95% no primeiro ano e de 97% no restante da operação, contudo não considera bônus de

---

[22] As premissas macroeconômicas estão sujeitas a mudanças.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

72

EIG00091864

EIG_KEP_00166347

performance. Tais premissas foram baseadas de acordo com dados da ODS-Petrodata[23] e experiência da Petrobras como afretador .

*Custos de Seguros e Manutenção*

A Taxa de Afretamento também deverá cobrir US$ 13.000/dia para despesas de seguros e US$ 22.000/dia para custos com peças sobressalentes e docagem que serão pagos pela SPE[24].

*Taxa de Serviço*

As premissas de operação serão regidas de acordo com o Contrato de Serviço a ser firmado junto à empresa operadora. O modelo financeiro considera uma taxa de serviço de US$ 115.000/dia[25], receita integral destinada ao operador das sondas para cobertura de todos os seus custos de operação, encargos e margem de lucro. Como em outros contratos semelhantes, os custos pelos quais a Petrobras é responsável (como combustível, suprimento de água e navios de apoio, etc.) não estão incluídos nesses valores.

*Mobilization fee ou Taxa de Mobilização*

Cada sonda receberá um único pagamento, após a aceitação da sonda pela Petrobras, referente à mobilização no valor de US$ 30 milhões, que será usado para suportar custos de mobilização para dar início às atividades operacionais, inclusive cobrir despesas eventuais não previstas inicialmente no plano de negócios. Eventuais saldos do valor pago referente à Taxa de Mobilização, gerados pela não utilização integral para os fins previstos, deverão ser usados exclusivamente nos investimentos permitidos, conforme previsto nos contratos da operação.

*Custos administrativos - Holding Local*

Adicionalmente às receitas e despesas de cada SPE, a Sete Brasil terá custos administrativos estimados em R$ 2.045 mil por mês (inclui R$ 1.760 mil por mês de salários e encargos e R$ 285 mil por mês com despesas administrativas).

## 9.7  Premissas Tributárias

O modelo financeiro utiliza fielmente as principais premissas tributárias, sendo possível sensibilizar o efeito de cada uma para o projeto.

*Tabela 12: Resumo dos Impostos*

| Imposto | Tarifa | Comentário |
|---|---|---|
| **Holding Local** | | |
| IOF/Crédito | 1,88% | Na concessão de empréstimo |
| IOF/Câmbio | 0,38% | Na saída dos recursos emprestados |
| IOF/Câmbio | 0,38% | Na saída dos recursos aportados como capital |
| IOF/Câmbio | 0,38% | No ingresso de recursos referentes ao recebimento |

---

[23] Fonte: *Ultra-Deepwater Rigs for Brazil, A report for Banco Santander related to Petrobras' Pre-salt Oil Rigs Project*, May 2010.

[24] Fonte: Petrobras, referente a dados reais praticados pela empresa e outros operadores de sondas de perfuração consultados. Este valor poderá ser alterado pela Petrobras.

[25] Fonte: Petrobras, referente a dados reais praticados pela empresa e outros operadores de sondas de perfuração consultados. Este valor poderá ser alterado pela Petrobras.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091865

EIG_KEP_00166348



CONFIDENTIAL INFORMATION MEMORANDUM

| Imposto | Tarifa | Comentário |
|---|---|---|
| | | dos juros e/ou amortização do principal |
| IOF/Câmbio | 0,38% | No ingresso de recursos referentes ao recebimento dos dividendos |
| **Holding Externa** | | |
| *Withholding Tax* - Dividendos | 15,0% | |
| *Withholding Tax* - Juros | 0,0% | |
| *Capital Duty* | 1,0% | Sobre o aporte de capital da Sete Brasil para a Sete International |
| *Stamp Duty* | 0,8% | Sobre o valor do contrato de mútuo (dívida subordinada) da Sete Brasil para a Sete International |
| **SPEs** | | |
| Imposto de Renda | 25,5% | Crédito de 20% sobre a receita de afretamento |
| *Withholding Tax* - Dividendos | 0,0% | Não incide *withholding tax* sobre dividendos distribuídos na zona do Euro |

*Fonte: Petrobras e SCBF.*

### 9.8 Termos do Financiamento

Os termos de financiamento previstos no modelo financeiro para o Projeto Sondas do Pré-Sal estão em linha com as condições discutidas preliminarmente com o BNDES, GEIK e Bancos Comerciais. No entanto, tais condições ainda não foram formalmente firmadas e portanto as condições apresentadas a seguir são preliminares, e são passíveis de alteração.

*Tabela 13: Termos e Condições do Financiamento das ECAs (por sonda)*[26]

| Item | BNDES | ECAs | Bancos Comerciais |
|---|---|---|---|
| **Prazo Total (Anos)** | 18 | 15 | 13 |
| Meses de Carência após CoD | 6 | 6 | 6 |
| Meses de Carência Total | 36 | 36 | 36 |
| Amortização (anos) | 15 | 12 | 10 |
| *Spread* Total | 2,75% | 3,00% | 3,00% |
| Juros Flutuante | Libor | Libor | Libor |
| Estilo de Desembolso | Pro Rata | Pro Rata | Pro Rata |
| Estilo de Repagamento | Tabela PRICE | Tabela SAC | Customizado |
| Cronograma de Repagamento | Trimestral | Trimestral | Trimestral |

[26] Valores indicativos e representam as melhores estimativas do Santander e da Petrobras atualmente.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

74



CONFIDENTIAL INFORMATION MEMORANDUM

| Item | BNDES | ECAs | Bancos Comerciais |
|---|---|---|---|
| Meses de Conta Reserva | 3 | 3 | 3 |
| Capitalizar JDC? | Sim | Sim | Sim |

*Fonte: Petrobras e Santander.*

### 9.9  Quadro de Usos e Fontes Consolidado

Baseado na estimativa de custos e na estrutura de capital proposta, o Quadro de Fontes e Usos previsto para o Projeto é o seguinte:

*Tabela 14: Quadro de Usos e Fontes para o primeiro sistema – USD milhares[27]*

| Fontes | USD 000 | Usos | USD 000 |
|---|---|---|---|
| **Dívida** | **4.435.852** | Custo de Construção | **4.648.000** |
| BNDES | 2.495.167 | Correção da Construção | 595.147 |
| ECAs | 1.108.963 | Equipamentos de Startup | 105.000 |
| Bancos Comerciais | 831.722 | FGCN | 26.532 |
| | | Fiscalização da obra | 58.450 |
| **Equity** | **1.108.963** | Seguros | 84.000 |
| Capital Próprio Classe A | 942.619 | Custos Financeiros | 27.686 |
| Capital Próprio Classe B | 166.344 | | |
| **Total** | **5.544.815** | | **5.544.815** |

*Fonte: Santander e Petrobras.*

### 9.10  Conta Reserva

O projeto prevê a criação, durante todo o prazo de repagamento da dívida de uma Conta Reserva de Serviço da Dívida (*Debt Service Reserve Account* ou "DSRA"). Para todas as tranches com exceção da dívida subordinada, estima-se uma DSRA equivalente a três meses do serviço da dívida[28].

Estas contas reservas serão criadas com o caixa do projeto nos primeiros meses de operação e deverão ser utilizadas caso o projeto não tenha condições de pagar o serviço da dívida. Neste caso (havendo uso da conta reserva), a conta deve ser preenchida no período seguinte com o fluxo de caixa do projeto. O modelo financeiro indica que o saldo médio DSRA do BNDES é estimado em USD 23 milhões.

---

[27] Valores indicativos e representam as melhores estimativas do Santander e da Petrobras atualmente.

[28] Inclui jaros e amortização do principal.


Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

**Confidential**

EIG00091867

**EIG_KEP_00166350**



**9.11   Índice de Cobertura do Serviço da Dívida**

A fim de calcular a capacidade de pagamento das sete sondas junto foi elaborado o Índice de Cobertura do Serviço da Dívida ("ICSD") consolidado, onde o caixa disponível nas sete sondas é utilizado para pagar todo o serviço da dívida das sete sondas, respeitando-se as datas de cada SPE. É importante ressaltar que o calculo do ICSD não utiliza o serviço da dívida subordinada. ICSD foi calculado da seguinte forma:

$$\frac{Caixa\ Disponível}{Serviço\ da\ Dívida}$$

O Caixa disponível para o serviço da dívida é calculado da seguinte forma:

(+) EBITDA (Lucro operacional antes de impostos, juros, depreciação e amortização)
(-) Variações de Capital de Giro
(-) Investimentos em Ativo Fixo
(-) Impostos (IR e CS)
(+) Receita Financeira do período

O serviço da dívida é calculado como:
(+) Principal dos financiamentos
(+) Juros dos financiamentos

Segue abaixo os indices de cobertura médio projetados das sete sondas do projeto.

*Tabela 15: Índice de Cobertura Consolidado das sete sondas*

| Ano | ICSD | Ano | ICSD |
|------|------|------|------|
| 2015 | 3,97x | 2021 | 1,77x |
| 2016 | 3,11x | 2022 | 1,79x |
| 2017 | 2,39x | 2023 | 1,82x |
| 2018 | 1,88x | 2024 | 1,85x |
| 2019 | 1,83x | 2025 | 3,60x |
| 2020 | 1,70x | 2026 | 5,38x |

*Fonte: Santander.*



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091868

EIG_KEP_00166351



## 10  RISCOS E MITIGANTES

### 10.1  Risco de Construção

*Descrição do Risco*   Risco relacionado a erro no design do projeto e/ou falhas de engenharia.

*Conseqüência*   Erros e falhas podem levar o projeto a não passar pelo teste de aceitação da Petrobras ou até mesmo impossibilitar a conclusão do processo de construção. Adicionalmente, pode resultar em níveis de operação abaixo das especificações.

*Mitigantes Tradicionais*
- Utilização de um design existente, ou de uma evolução de um design existente, com comprovado histórico de sucesso (*field proof*)
- Seleção de um estaleiro com experiência ou associado a outro estaleiro com reputação comprovada na construção de embarcações semelhantes
- Redução de áreas de interferência entre o design da embarcação e o estaleiro construtor
- Acompanhamento do processo de construção pela Petrobras e por um Engenheiro Independente ("*Independent Engineer*" ou "IE") indicado pelos acionistas, financiadores e demais partes interessadas (inclusive o FGCN)

Tendo em vista que as sondas do Projetos deverão ser construídas no Brasil e que, atualmente, o país não dispõe de estaleiros com a experiência comprovada para executar tais projetos, a Petrobras passa a ter papel ainda mais importante para mitigar este risco através de:

*Mitigantes Adicionais*
- Rigoroso processo de seleção técnica dos estaleiros
- Supervisão do processo de construção, através de um Contrato de Gerenciamento e Fiscalização das Obras

Na estrutura proposta a Petrobras será acionista Classe A minoritária e, pelo menos durante o processo de construção de cada sonda, será também acionista Classe B. Nessa situação, o processo de construção das sondas permanecerá a todo o momento sob controle direto da Petrobras, como representante de todos os acionistas das empresas contratantes das construções (as SPEs). Desta forma, o risco de não aceitação das unidades por parte da Petrobras pode ser classificado como baixo.

Vale lembrar que aproximadamente 40% dos equipamentos e sistemas de perfuração a serem instalados nas sondas serão importados. Estes equipamentos são os mesmos atualmente utilizados em sondas similares em construção ou já construídas em estaleiros internacionais. Ou seja, no que se refere a esses equipamentos e ao desempenho final das sondas, o local de construção tem pouco efeito no resultado final, desde que a instalação, montagem e integração desses sistemas sejam acompanhados e supervisionados pelos próprios fabricantes dos principais equipamentos, o que está previsto no presente caso.

Adicionalmente, a estrutura de portfólio e a estratégia de contratação de 7 sondas junto ao mesmo estaleiro devem permitir aos estaleiros locais acumularem *know how* e experiência



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091869

EIG_KEP_00166352



**CONFIDENTIAL INFORMATION MEMORANDUM**

durante a construção das primeiras sondas, reduzindo o risco de construção do sistema como um todo.

Além disso, o critério de seleção dos estaleiros deverá contemplar a capacidade dos estaleiros locais de se associarem a estaleiros estrangeiros com experiência na construção de sondas de perfuração de quinta e sexta geração.

Por último, as garantias providas pelo FGCN, a serem contratadas pelas SPEs, produzirão um efeito mitigador importante para o risco de construção.

## 10.2   Risco de Sobre Custo

*Risco*

Risco de um aumento inesperado do custo do projeto. Normalmente advém da inexperiência do estaleiro na construção de equipamentos semelhantes, contratos sem cláusulas de reajuste de preços, grande interferência do contratante da obra, através de alterações de projeto ("Change Orders"), além de acidentes ou eventos de força maior.

*Conseqüência*

Além do aumento no investimento total do projeto, um evento de sobre custo pode consumir parte dos recursos disponíveis e gerar atrasos no projeto.

Os mitigantes tradicionais para este risco são:

*Mitigantes Tradicionais*

- Utilização de um design existente, ou de uma evolução de um design existente, com comprovado histórico de sucesso (*field proof*)

- Contratação da construção (estaleiro assim como eventuais equipamentos fornecidos pelo proprietário) sob contrato com preço fixo e data certa

- Constante supervisão do processo de construção (idealmente através de um Engenheiro Independente de renome internacional)

- Contratação de seguros (BAR - Builders All Risk e DSU - Delay Start Up)

*Mitigantes Adicionais*

Tendo em vista a inexperiência dos estaleiros locais na construção de equipamentos semelhantes (principalmente com relação às primeiras unidades), além do cuidado em relação aos itens acima mencionados, outros mitigantes deverão ser providenciados, tais como:

- FGCN: apesar da limitação da utilização do fundo para esta finalidade, o FGCN ajuda a compor um pacote de garantias e instrumentos para prover mitigação adicional a este risco

- Seguro-garantia (performance) de até 21% para todo o pacote de encomendas alocado ao estaleiro responsável pela construção de sete sondas (3% do investimento de cada sonda)

- Conta Reserva de Eventualidades: O Projeto prevê a criação de uma Conta Reserva de Eventualidades, estabelecida na forma de um "pool" comum a todas as SPEs e centralizado na Sete International, que tem como principal objetivo mitigar o risco de insuficiência de caixa nas SPEs para cobertura de suas obrigações oriundas de despesas e/ou custos extraordinários materiais incorridos pelas SPEs na fase pré-operacional de cada Sondas.



Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

**Confidential**

EIG00091870

**EIG_KEP_00166353**



CONFIDENTIAL INFORMATION MEMORANDUM

• Na estrutura proposta a Petrobras estará à frente dos processos de construção de todas as sondas, portanto identificando preventivamente problemas e desvios, o que pode prover um conforto adicional a investidores, financiadores e demais partes interessadas

Adicionalmente, visando à redução do risco de garantia de preço no longo prazo, está previsto ainda a utilização de um índice customizado para alinhamento de preços e custos de construção, a ser apurado e divulgado pela FGV, e que representará fielmente a estrutura de custos da construção de sondas. A apuração e divulgação desse índice por entidade de reputação ilibada como a FGV confere uma segurança adicional ao Projeto na gestão dos custos de construção, reduzindo significativamente o risco de sobre custo. Variações, para cima ou para baixo, nos preços dos contratos de construção oriundas desse índice terão reflexo direto nos preços dos contratos de afretamento.

Adicionalmente, a estrutura contempla a utilização de cláusulas de equilíbrio econômico-financeiro segundo os quais sobre custos serão cobertos pelas partes que lhes derem causa (se Petrobras, haverá reajuste na taxa de afretamento).

*Tabela 16: Risco de Sobre Custo - Possíveis Causas e Mitigantes*

| Causas | Mitigantes |
|---|---|
| Aumento na Carga Tributária | • A estrutura financeira proposta permite que as SPEs e a Petrobras beneficiem-se plenamente do REPETRO<br><br>• ICMS e IPI: A venda de certos ativos elegíveis por um produtor brasileiro de uma entidade estrangeira pode ser considerada como operação de exportação, mesmo que esses ativos não deixem fisicamente o Brasil. Portanto no regime do REPETRO, o estaleiro está isento de ICMS e IPI<br><br>• Imposto de Importação: Os bens podem ser importados como matérias-primas, sem retenção ou pagamento de impostos desde que sejam utilizados na produção de determinados bens industrializados e os ativos elegíveis para posterior exportação<br><br>• Novos impostos e alíquotas que eventualmente venham a resultar em maiores custos de construção irão provocar a revisão do preço do contrato de construção e deverão ser refletidos no contrato de afretamento |
| Variação dos Índices de Correção do Contrato de Construção | • Correção do Contrato de Construção alinhada com correção do Contrato de Afretamento - a partir de um índice a ser apurado e divulgado pela FGV que representará a estrutura de custos da construção de sondas<br><br>• A variação cambial durante a construção está mitigada em função dos custos em USD serem financiados por fontes de recursos em USD (preliminarmente 20% ECAs e 20% Bancos Comerciais) |
| Variação no Preço das Matérias Primas, | • O Contrato de Construção será na modalidade preço-fixo e data-certa ("turnkey") |



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

79

EIG00091871

EIG_KEP_00166354



CONFIDENTIAL INFORMATION MEMORANDUM

| Causas | Mitigantes |
|---|---|
| Equipamentos, Insumos, Consumíveis e Mão de Obra | • A variação dos custos de construção relacionados à inflação está mitigado pela correção do Contrato de Construção<br>• A variação dos custos de construção acima do projetado na composição da proposta pelo Estaleiro são de responsabilidade do Estaleiro |
| "Change Orders" Alterações de Projeto (melhoria de design, operação, especificações técnicas) | • Por solicitação do Afretador (Petrobras): eventuais *change orders* contarão com aumento correspondente na Taxa de Afretamento<br>• Por erro, ineficiência ou negligência do Estaleiro: responsabilidade do Estaleiro |

*Fonte: Santander, Petrobras e SCBF.*

### 10.3   Risco de Atraso da Entrada em Operação

*Risco*   Risco de atraso se caracteriza por uma entrega do equipamento em data posterior à que foi previamente acordada. Atrasos são normalmente decorrentes da inexperiência do estaleiro na construção de equipamentos semelhantes, de "change orders", problemas de "procurement", acidentes ou eventos de força maior.

*Consequência*   O atraso na entrega da sonda implica no adiamento das receitas do Contrato de Afretamento e consequentemente prejudica a capacidade do projeto servir à dívida sênior. Um atraso superior a 24 meses poderá dar à Petrobras o direito de aditar ou até mesmo cancelar o Contrato de Afretamento.

Os mitigantes tradicionais para este risco são:

*Mitigantes Tradicionais*   • Contratação da construção (estaleiro assim como eventuais equipamentos fornecidos pelo proprietário) sob contrato com preço fixo e data certa

• Utilização de um design existente, ou de uma evolução de um design existente, com comprovado histórico de sucesso e de performance

• Seleção de um estaleiro com experiência comprovada na construção de embarcações semelhantes

• Constante supervisão do processo de construção (através de consultor independente de renome internacional)

• Contratação de seguros (BAR - Builders All Risk, DSU - Delay Start Up, Loss of Hire...)

*Mitigantes Adicionais*   Em função da inexperiência dos estaleiros locais na construção de equipamentos semelhantes (principalmente com relação às primeiras unidades), instrumentos adicionais deverão completar o "pacote" tradicional a fim de prover conforto adicional, tais como:

• Adequar prazo de construção com os prazos de carência dos financiamentos

 Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

Confidential

EIG00091872

EIG_KEP_00166355



- Adequar os prazos máximos de início de operação nos contratos de afretamento de forma a prover um lapso de tempo suficiente à entrega do equipamento antes que a Petrobras possa cancelar o contrato

- FGCN: cada SPE deverá contratar um seguro de crédito junto ao FGCN que dará cobertura contra qualquer atraso no cronograma das obras, desde que causado pelo Estaleiro, até o limite de 50% do saldo devedor de todas as dívidas contratadas pelo segurado para financiamento da construção, com "*first loss*" para o FGCN. Os recursos do FGCN podem ser utilizados para servir às primeiras parcelas de repagamento do financiamento em caso de atraso, até o limite (aproximado) de atrasos correspondentes a 50% do prazo médio de repagamento do financiamento

- Contratação de seguros do tipo "Liquidated Damages"

- Ganho de experiência e de produtividade dos estaleiros com primeiras sondas

- A taxa de afretamento a ser paga pela Petrobras contempla uma margem de preço adicional ("Margem") para compensar atrasos de até 12 (doze) meses na primeira sonda e de até 6 (seis) meses na segunda sonda a serem construídas, ambas com contratos de afretamento com prazos de 20 (vinte) anos e operadas pela Petrobras. Caso eventuais atrasos nessas duas sondas ultrapassem a Margem estabelecida, a Petrobras irá utilizar seus melhores esforços para reajustar para cima o prazo originalmente contratado para o afretamento e serviços dos dois ativos (20 anos) a fim de manter a mesma rentabilidade esperada para o Caso Base do Projeto.

### 10.4   Risco de Performance

*Risco*            Risco de baixa performance por parte do operador.

*Consequência*     Redução da taxa de afretamento que pode levar o projeto a não gerar recursos suficientes para honrar todos os seus compromissos e, no limite, perder o contrato com a Petrobras.

Os mitigantes tradicionais para este risco são:

*Mitigantes Tradicionais*
- Contratação de operador com experiência comprovada na operação de sondas de perfuração em águas ultra profundas

- Possibilidade de substituição do operador em caso de baixa performance

- Constituição de três meses de contas reserva para serviço de dívida

- Avaliação criteriosa do projeto com ênfase na capacidade do projeto de produzir índices de cobertura de dívida robustos (acima de 1,20x)

- Contratação de seguros

*Mitigantes Adicionais*    Além dos mitigantes tradicionais, a estrutura proposta prevê a constituição do Fundo de Performance. Este fundo será constituído por todas as sondas no valor de aproximadamente US$56mm, com finalidade única de prover mitigação adicional ao risco de performance.


**Confidential**

EIG00091873

EIG_KEP_00166356



Adicionalmente, o operador será o investidor Classe B, portanto tem o incentivo adicional para obter altos níveis de *uptime*, pois irá se beneficiar como acionista.

Outro potencial mitigante para este risco é a seleção/indicação de um operador de "última instância", uma empresa de renome internacional que possa substituir o operador original em caso de baixa performance continuada (pode ser avaliado por períodos consecutivos ou não) ou ainda uma lista de operadores pré-aprovados para tal finalidade.

### 10.5   Risco de Refinanciamento

*Risco*  Como haverá descasamento entre o período de repagamento dos financiamentos e o contrato de afretamento (existência de descasamento no financiamento) existe o risco de que, ao término do contrato de afretamento original, o projeto não tenha gerado caixa suficiente para repagar totalmente o seu endividamento.

Os mitigantes tradicionais para este risco são:

*Mitigantes Tradicionais*
- Valor residual do ativo e existência de um mercado secundário para este tipo de equipamento
- Possibilidade de utilização do equipamento em praticamente qualquer lugar do mundo
- Possibilidade de renovação do contrato com a Petrobras sem a necessidade de abrir um processo de licitação, apenas negociação direta

*Mitigantes Adicionais*  Além dos mitigantes tradicionais listados acima, a estrutura proposta prevê a constituição do Fundo de Renovação. Este fundo será constituído por todas as sondas no valor de aproximadamente US$117mm, com a finalidade única de prover mitigação adicional ao risco de renovação e servir à dívida durante o período sem um Contrato de Afretamento.

### 10.6   Risco do Término do Acordo Brasil-Áustria de Bitributação

*Risco*  Risco relacionado com o fim do Acordo Brasil-Áustria de Bitributação e conseqüentemente tributação na Sete Brasil (19% sobre os dividendos recebidos da Sete International localizada na Áustria).

Os mitigantes para este risco são:

*Mitigantes Tradicionais*
- O Acordo de foi estabelecido em 1976[29] com o objetivo de Evitar a Dupla Tributação em Matéria de Impostos sobre a Renda e o Capital Brasil-Áustria
- O acordo não tem prazo de validade
- Não existe histórico recente de contestação do acordo

---

[29] Decreto nº 78.107/1976.

---

  Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

82

EIG00091874

EIG_KEP_00166357



CONFIDENTIAL INFORMATION MEMORANDUM

### 10.7   Risco Sócio-Ambiental

*Risco*   Os riscos relacionados a acidentes na operação das sondas que possam levar a problemas ambientais. Vale destacar que o Projeto não é uma unidade de produção, apenas de exploração, portanto tem uma exposição muito menor a riscos ambientais.

Os mitigantes para este risco são:

*Mitigantes Tradicionais*
- Design: o design das sondas deverá contemplar os mais altos padrões ambientais e de segurança para este tipo de equipamento. Adicionalmente, as sondas utilizarão um design existente, com comprovado histórico de sucesso e de performance

- Operação: As operações só poderão ser realizadas mediante LO emitida pelas autoridades brasileiras competentes e contarão com acompanhamento e supervisão permanente da Petrobras, através de fiscalização à bordo de cada embarcação. Para este fim, a Petrobras exige de todas as suas contratadas a utilização de procedimentos padrão elaborados pela companhia e permanente treinamento de todos os empregados e terceirizados de suas contratadas

- A operação deverá seguir as normas e políticas do IBAMA, CONAMA e MARPOL

- De acordo com o Contrato de Afretamento, na hipótese de vazamento de petróleo, óleo e outros resíduos no mar, a operadora (SPE) responderá até o limite de US$ 1 milhão por evento

Finalmente, os financiadores (ECAs e Banco Comerciais) vão exigir a conformidade do Projeto com todas as obrigações socioambientais a que está sujeita por força da legislação socioambiental vigente e com os padrões definidos pelos Princípios do Equador.

Confidential                                                                                                EIG00091875

EIG_KEP_00166358



## 11  CONTRATAÇÃO DE SEGUROS

O pacote de seguros será definido mais adiante com a contratação de um consultor de seguros independente. Abaixo apresentamos os seguros típicos para operações no setor de óleo & gás.

### 11.1  Third-Party Liability Insurance

*Descrição*   O seguro de terceiros será exigido tanto na fase de construção quanto na fase de operação. Deverá ser contratado antes do *financial closing* e será renovável anualmente durante o prazo do financiamento.

*Segurado*
- SPE e/ou Estaleiro
- Financiadores (ou *collateral agent*)

*Cobertura*
- Passivo legal de qualquer assegurado referente a (a) morte, ferimento, doença de qualquer pessoa (excluindo funcionários), e (b) perda ou dano a qualquer propriedade (excluindo o projeto)

### 11.2  Hull & Machinery

*Descrição*   O seguro *Hull & Machinery* é um seguro do ativo. Tem início aproximadamente 12 meses antes da operação comercial e deve ser renovado anualmente durante o prazo do financiamento.

*Segurado*
- EPCistas e/ou Estaleiro
- Financiadores (ou *collateral agent*)

*Cobertura*
- Valor do financiamento (incluindo os contratos de derivativos) ou o valor estimado de reposição do equipamento segurado (sonda)
- A cobertura inclui, furacões, roubo, fogo, colisão, afundamento etc.
- Sabotagem, terrorismo, nacionalização ou confisco do ativo

### 11.3  Business Interruption ou Loss of Hire

*Descrição*   O *Business Interruption* é um seguro que protege contra o risco de perda de receita. Tipicamente é contratado alguns meses antes da operação comercial e renovável anualmente durante o prazo do financiamento.

*Segurado*
- Financiadores (ou *collateral agent*)

*Cobertura*
- Inclui custos fixos, como serviço da dívida, custos de operação e manutenção (entre outros) e penalidades previstas no Contrato de Afretamento


Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

84

Confidential

EIG00091876

EIG_KEP_00166359



**CONFIDENTIAL INFORMATION MEMORANDUM**

- ◆ Tipicamente tem um período de stand still (TBD)
- ◆ Não cobre baixa performance do operador

Santander
GLOBAL BANKING & MARKETS

SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

85

EIG00091877

**EIG_KEP_00166360**