# EXHIBIT 6



STATE OF NEW YORK
                )
                )
                )
COUNTY OF NEW YORK     )    ss

### CERTIFICATION

This is to certify that the attached translation is to the best of my knowledge and belief a true and accurate translation from Portuguese into English of the attached document with Bates number range EIG00091664 to EIG00091777.

_____
Edward J. Jacob
Divergent Language Solutions, LLC

State of New York

County of New York

Subscribed to and sworn before me this 9ᵗʰ day of December , 2020 ,

by Edward J. Jacob.

_____
Notary Public

MATTHEW C. ZELAK
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ZE6350239
Qualified in Kings County
Commission Expires   November 7, 2024



183 Madison Avenue, Suite 416 | New York, NY 10016 | p 917.979.4513 | f 415.525.4313
600 California Street, 11ᵗʰ Floor | San Francisco, CA 94108 | p 415.400.4538 | f 415.525.4313
divergent@divergentls.com | www.divergentls.com

CAIXA

**Investment Memorandum**

**FIP SONDAS**

EIG00091664

Confidential


[logo:] CAIXA

DISCLAIMER

This Investment Memorandum, prepared and exclusively owned by Caixa Econômica Federal, as Manager of Fundo de Investimento em Participações Sondas ("FIP Sondas" or the "Fund"), was provided confidentially to a limited number of investors, with the intention of allowing them to make an informed decision about a potential investment. The information contained herein must not be reproduced or distributed, nor must its content be made public, without the Manager's prior written authorization.

The information contained in this Investment Memorandum may include statements and estimates that present the Manager's expectations about future results or events. However, the Manager cannot guarantee that these statements or estimates will come to fruition, since the investment involves risks or uncertainties, whether foreseen or not. Therefore, the future results of FIP Sondas operations may differ from the current expectations, and the reader must not base their decision exclusively on the information contained herein.

The figures and information about the rig market and Petrobras, as well as the financial projections analyzed in this material were provided to the Manager by Petróleo Brasileiro S.A. ("Petrobras"), Banco Santander do Brasil S.A. ("Santander"), and by Souza, Cescon, Barrleu & Flesch Advogados ("SCBF"), the latter two referred to jointly as the "Advisors" or "Petrobras' Advisors."

Although we believe that the projections contained in this memorandum are based on reasonable assumptions, investors must be aware that these projections are subject to various risks and uncertainties, and may differ substantially from the actual results.

The analyses performed in this Memorandum of Investment were done based on information and documents that were provided by Petrobras and by Petrobras' Advisors up to December 14, 2010, which may not entirely reflect the final structure of the investment.

Lastly, even though we have endeavored to provide precise and up-to-date information, there is no guarantee of its exact accuracy on the date it was received, nor that it will continue to be accurate in the future.




[logo:] CAIXA

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **1.** | **INTRODUCTION** | **5** |
| | | |
| **2.** | **OIL EXPLORATION AND DRILLING SECTOR** | **6** |
| | | |
| 2.1. | BRIEF HISTORY OF DISCOVERIES | 6 |
| 2.2. | THE PRE-SALT LAYER | 7 |
| 2.3. | EXPLORATION AND DEVELOPMENT | 8 |
| 2.4. | WORLD ENERGY MATRIX AND THE ROLE OF OIL | 10 |
| 2.5. | OIL SUPPLY AND DEMAND | 13 |
| 2.6. | SHIPBUILDING | 15 |
| 2.7. | DRILLING AND PRODUCTION RIGS AND PLATFORMS | 17 |
| 2.8. | E&P ACTIVITY IN DEEP AND ULTRA-DEEP WATERS | 23 |
| 2.8.1. | THE OFFSHORE SEGMENT IN BRAZIL | 23 |
| 2.8.2. | MARKET FOR DEEP AND ULTRA-DEEP WATERS | 25 |
| 2.8.3. | DEMAND FOR PLATFORMS | 26 |
| 2.9. | THE OFFTAKER – PETROBRAS | 29 |
| 2.9.1. | BACKGROUND | 31 |
| 2.9.2. | CORPORATE GOVERNANCE | 32 |
| 2.9.3. | FINANCIAL INFORMATION | 33 |
| 2.9.4. | 2009-2014 Investment Plan | 34 |
| 2.9.5. | PROCAP | 35 |
| 2.10. | REGULATORY ASPECTS | 35 |
| 2.10.1. | CONCESSION SCHEME | 36 |
| 2.10.2. | CONCESSION AGREEMENT | 38 |
| 2.10.3. | LOCAL CONTENT | 39 |
| | | |
| **3.** | **THE RIGS PROJECT** | **41** |
| | | |
| 3.1. | SALE OF CLASS B SHARES | 42 |
| 3.2. | TOTAL INVESTMENT | 43 |
| 3.3. | CAPITAL STRUCTURE | 44 |
| 3.4. | CONSTRUCTION OF RIGS | 44 |
| 3.4.1. | ATLÂNTICO SUL SHIPYARD | 45 |
| 3.5. | CHARTERING AND OPERATION OF RIGS | 46 |
| 3.5.1. | UNDERPERFORMANCE COMPENSATION | 50 |
| 3.6. | FINANCING | 50 |
| 3.6.1. | BNDES | 51 |
| 3.6.2. | EXPORT CREDIT AGENCIES | 53 |
| 3.6.3. | COMMERCIAL BANKS | 54 |
| 3.7. | PERFORMANCE FUND, RENEWAL, AND RESERVE ACCOUNT | 54 |
| 3.7.1. | RENEWAL FUND | 55 |
| 3.7.2. | PERFORMANCE FUND | 55 |
| 3.7.3. | CONTINGENCY RESERVE ACCOUNT | 56 |
| 3.8. | PREFERENTIAL RIGHT | 57 |
| | | |
| **4.** | **SHIPBUILDING GUARANTEE FUND (FGCN)** | **58** |
| | | |
| 4.1.1. | CHARACTERISTICS OF THE FGCN | 58 |
| 4.1.2. | PURPOSE OF THE FGCN | 60 |
| 4.1.3. | FGCN'S AQUISITION OF GUARANTEES | 62 |
| 4.1.4. | ACTIVATION AND PERFORMANCE OF THE GUARANTEES | 63 |
| | | |
| **5.** | **LEGAL ANALYSIS** | **64** |



**CAIXA** [logo:] CAIXA

5.1.     CONSTRUCTION CONTRACT ........................................................................65
5.2.     CHARTER CONTRACT .................................................................................67
5.3.     SERVICE CONTRACT ..................................................................................71
5.4.     WORK OVERSIGHT AND MANAGEMENT CONTRACT ...........................75
5.5.     ASSET MAINTENANCE CONTRACT............................................................76
5.6.     CORPORATE DOCUMENTS - SETE BRASIL ...........................................77
5.6.1.    SHAREHOLDERS' AGREEMENT and ARTICLES OF ASSOCIATION ............77
5.6.2.    STRATEGIC GUIDELINES PLAN OF SETE BRASIL PARTICIPAÇÕES............80
5.7.     CHARTER AND BYLAWS - FIP SONDAS ................................................81
5.7.1.    INVESTMENT AGREEMENT ...........................................................................81
5.7.2.    BYLAWS .............................................................................................................83
5.7.3.    SHAREHOLDERS' AGREEMENT ...................................................................85
5.8.     TAX ASPECTS ............................................................................................86
5.8.1.    BRAZIL-AUSTRIA DOUBLE TAXATION AGREEMENT .................................87
5.8.2.    NETHERLANDS .................................................................................................88
5.8.3.    REPETRO...........................................................................................................89

**6.     THE INVESTIMENT** .................................................................................**93**

6.1.     THE TRANSACTION ....................................................................................93
6.2.     ALLOCATION OF FUNDS ...........................................................................94
6.3.     CONTROL AND DECISION-MAKING PROCESS ......................................94
6.4.     TRANSACTION RATIONALE: MANAGER'S OBSERVATIONS ................95
6.5.     LEVERAGE PROCESS ................................................................................96
6.6.     SELECTION AND ROLE OF THE OPERATOR...........................................97
6.7.     POSSIBILITIES FOR EXIT AND DIVESTMENT ........................................98

**7.     RETURN SCENARIOS** .........................................................................**100**

**8.     RISKS** .....................................................................................................**105**

8.1.     FIP ...............................................................................................................105
8.2.     PROJECT .....................................................................................................107

**9.     MANAGER'S OPINION** ........................................................................**111**



 [logo:] CAIXA

## 1. INTRODUCTION

In Brazil, medium and long-term development of the oil industry refers to the development of the large reserves that were discovered in the Pre-Salt Basin. The exploration and development of these resources will have significant consequences all along the oil industry value chain[1], having a multiplying effect on the investments made, by generating jobs and consequently increasing consumption and economic activity.

However, the successful development of these reserves depends on making major investments in the sector, which must take into consideration the period from the construction of shipyards up to the expansion of oil refining and export capacity. Therefore, over the upcoming years, the sector must rely on the support of the federal government, through sector incentives, financial institutions with the ability to provide funds to finance various oil segments, and financial investors, who are interested in contributing to the development of the sector, and in participatng in the potential return offered by the investments.

*Partners of PETROBRAS in the exploration fo the Pre-Salt Basin*

Within this context, Fundo de Investimento em Participações Sondas ("FIP Sondas" or the "Fund"), was formed. Its objective is to invest in the construction of rigs with drilling capacity in ultra-deep waters, which will initially be chartered to Petrobras to explore the Brazilian Pre-Salt Basin ("Rigs Project" or "Project"), one of the biggest discoveries in the global oil industry in the last two decades.

FIP Sondas will invest in the Project by acquiring 90% of the shares of Sete Brasil Participações S.A., a national holding company that will have as its full wholly owned subsidiary an international holding comopany formed in Austria, Sete International GmbH, which in turn will hold seven (7) Special Purpose Entities ("SPEs") formed in the Netherlands, which will be the direct owners of the assets, and responsible for the construction and charter of the drilling rigs.

The return on investment in the Rigs Project, which is estimated at 15.40% per year (nominal, in dollars), will be directly related to the availability of the rigs chartered to explore the wells.

Therefore, the goal of this report is to present to the potential investors of FIP Sondas the features of the Fund and Project, their risks and mitigating factors, the analyses conducted, as well as our opinion with regard to the structure of the investment.

---

[1] According to 2010 information from the ANP [Brazilian National Agency of Petroleum, Natural Gas, and Biofuels], there are approximately 200 companies operating in Brazil in the area of oil and gas prospecting and exploration, including data acquisition companies, service providers, and operators.



 [logo:] CAIXA

## 2. OIL EXPLORATION AND DRILLING SECTOR

### 2.1. BRIEF HISTORY OF DISCOVERIES

*First wells drilled in 1850*

According to historical documents, the first oil wells for commercial exploration were drilled in the 1850s. The year 1858 was an important marker for the industry, with the discovery of wells in the United States, due to the use of modern techniques of oil exploration, production, transportation, and marketing. One of the major businesses of the modern world began as of that point.

*In 1939, the existence of oil on Brazilian territory was discovered*

In Brazil, the first reference to oil prospecting was between 1892 and 1896, in Bofete (SP). A rig was installed at an outcrop of bituminous rock. The borehole extended more than four hundred meters deep, but when the well was opened, no oil was found. More than forty years later, in January 1939, the existence of oil on Brazilian territory was discovered, at the Lobato (BA) well, which was drilled by the National Department of Mineral Production, a body of the federal government. The Lobato well produced more than 2,000 barrels of oil in 1940. Until then, geological studies, under the guidance of North American geologists, had pointed to the existence of hydrocarbons on Brazilian territory.

For decades, Petrobras has been studying techniques for offshore oil and natural gas exploration, as Brazil is the first region in the world to reach the pre-salt layer and to discover economically profitable reserves for exploration. Despite being a much talked about topic recently, the discussion about the potential of this region is not new. Since the 1970s, petroleum geologists have surmised there is abundant oil in that region, but did not have adequate technology to conduct more detailed research.

At the end of the decade, in 1979, Petrobras was able to drill rigs that reached the pre-salt layer in the Campos Basin, but the discoveries confirmed at the time were not significant and the matter was set aside.

*Brazil was the trailblazer in reaching the pre-salt layer*

Expectations of finding a quantity of oil after the salt layer that would justify exploration arose again more strongly in 2005, with the announcement of the discovery of the Tupi field, in the Santos Basin.

*Long-term tests have already produced oil from the Pre-Salt Basin*

Petrobras is now producing oil from the Pre-Salt Basin in the Tupi and Jubarte Fields[2]. In Jubarte, which is located at the northeast border of the Pre-Salt area, production began in September 2008, in Tupi, in May 2009. This production is part of the long-term tests in view of evaluating the behavior of the reservoirs.

ExxonMobil, Anadarko, and BG also announced discoveries of oil in the Pre-Salt Basin, but still without any conclusive estimates regarding recoverable oil. ExxonMobil's discovery

---

[2] The Jubarte well is located seventy kilometers from the coast of Espírito Santo, with oil being extracted at a total depth of 4,700 meters, which includes the height of the water depth (distance from the surface to the sea bottom), thereby surpassing the 200-meter salt layer.



 [logo:] CAIXA

was close to Tupi; Anadarko's was along the coast of Espírito Santo, and BG's was in the Santos Basin, in an area where Petrobras had not announced the presence of a reservoir beneath the salt layer to the market.

The initial exploration occurred at the Jubarte Field, through Plataform P-34, which was already producing oil since December 2006, although in a reservoir located above the salt layer ("Post-Salt"). Early production from the pre-salt layer in Espírito Santo was facilitated because the platform was located just 2.5 kilometers from the exploratory well, below the Jubarte Field, at a water depth of 1,375 meters.

Between 2006 and 2008, a series of oil discoveries substantially expanded the volume of potential oil and natural gas reserves in Brazil, primarily in fields associated with the Pre-Salt Basin.

## 2.2.    THE PRE-SALT LAYER

*Pre-salt is the oil layer that is located beneath the salt layer*

Pre-Salt is the name of the petroleum reserves for which the rocks-reservoirs are located below a deep salt layer of the subsoil of the sea, and for which the source rocks of the reserves were formed, in terms of geological age, prior to the formation of the salt layer. The reservoir rocks from this type of region are normally found in very deep regions, which are hard to locate, complex to interpret seismologically, and that have limited access. The majority of the pre-salt oil reserves that are currently known in the world are in deep and ultra-deep offshore areas. The first commercial oil reserve in a pre-salt area in the world was on the Brazilian coast, leading to the name Pre-Salt Oil.

This layer is a gigantic oil and natural gas reservoir, located in the Santos, Campos, and Espírito Santo Basins (coastal region located from the state of Santa Catarina up to Espírito Santo).

The pre-salt discoveries were possible based on new, high-resolution seismic surveys conducted by Petrobras, in addition to the development of specific technology, also developed and owned by the company, which allowed Brazilian engineers to visualize what was beneath the salt layer which, in many sections, may be more than two thousand meters thick.

*Approved Pre-Salt Area is 50% bigger than the entire area of the Campos Basin*

Just to get an idea of the capacity of this layer, the Campos Basin (the biggest Brazilian petroleum province), which is currently responsible for almost 85% of all domestic oil production in the country, has approximately 28.6 thousand $km^2$ of area, where more than six hundred wells have been drilled and completed. In turn, the area corresponding to the seven blocks that the ANP already authorized in the Pre-Salt Basin has 41.8 thousand $km^2$, which correspond to just 28% of the Pre-Salt area, but is 50% bigger than the entire Campos Basin area. According to data from Petrobras, to date, there are twenty-one wells drilled in the Pre-Salt area of the Santos Basin, with one from the ANP, incorporated by the Transfer of Rights Agreement.





The Brazilian Pre-Salt layer, whose potential exceeds any other discovery to date, represents approximately 2.3% of the total Brazilian sedimentary basins, which total 6.4 million km$^2$, in addition to the onshore and offshore basins.

The water depth along the rocks of the Pre-Salt region varies between 800 and 3,000 meters, which are classified as deep water or ultra-deep water. Under these conditions, aside from Petrobras, few companies in the world have the technology to perform exploration and production activities.

The main technical challenges that had to be overcome to optimize production in the Pre-Salt layers were:

♦ distance between the reserves discovered and the coastline (approximately 300 kilometers);

♦ water depth (1,500 to 3,000 meters);

♦ depth of reservoirs (5,000 to 7,000 meters); and

♦ thickness of pre-salt layer in certain areas (approximately 2,000 meters),

These challenges were to a large extent overcome by the existing technology, and do not currently prevent reserves from being developed, nor oil from consequently being produced.

## 2.3.    EXPLORATION AND DEVELOPMENT

The Pre-Salt province has 149,000 km$^2$. Of this area, 41,772 km$^2$ (28% of the total) were already authorized. The new legislation that was recently approved by the National Congress, which grants Petrobras exclusivity to act as operator and leader of exploratory consortia therefore covers, for the 107,228 km$^2$ (72% of the total) which had still not been bid on (excluding the areas covered by Petrobras' Transfer of Rights Agreement[3] , and by the recent capitalization of the company). For the areas that

*Figure 1 – Pre-Salt Region*



---

[3] Legal transaction through which the government transfers to Petrobras, for a fee, the exercise of the activities of prospecting and extraction of oil, natural gas, and other liquid hydrocarbons, pursuant to Law 12.276, of 2010.



 [logo:] CAIXA

*The Pre-Salt Region of the Santos Basin is one of the chief discoveries of the world*

had already been bid out, governed by the previous regulatory framework, under a concession scheme, Petrobras is participating in all of the blocks granted and is only not the operator of Block BMS-22, which is operated by Exxon.

The large blue area of the image above indicates the expected occurrence for the Pre-Salt area where oil is potentially present.

In areas the ANP already authorized in the Pre-Salt area of the Santos Basin, the following are the main discoveries in Brazil and worldwide in recent years, with the estimated recoverable oil:

♦  Tupi: 5 to 8 billion barrels;

♦  Iara: 3 to 4 billion barrels; and

♦  Guará: 1.1 to 2 billion barrels.

In the Santos Basin, the sixteen wells that were drilled by March 31, 2010 had a complete success rate, with oil being indicated as present in all sixteen wells. In the Jubarte field, Petrobras began, in September 2008, a long-term test on well 1-ESS-103A, which is already producing 15,000 barrels a day from a reservoir located below the salt layer.

The exploration of these blocks will require a significant increase in the drilling capacity of exploratory deep and ultra-deep water wells, which creates an opportunity to develop the infrastructure for the drilling rig construction sector.

In order to meet its general drilling needs, and that of the Pre-Salt layer in particular, Petrobras bid out an initial package of twelve rigs to the international market, to be delivered by 2012. According to information from the Advisor, with this first lot Petrobras intended to meet the short-term needs while the national industry prepared for the orders of the remaining twenty-eight rigs.

*A package of twelve rigs is already under construction in the international market.*

To do so, the government, which grants the blocks, raised the minimum national content rate to supply goods and services and, consequently, this lot of twenty-eight rigs would need to be built at Brazilian shipyards and have the massive participation of national companies in supplying the goods and services. This scenario would create economic development conditions for the entire supply chain of this industry, which could promote the specialization and competitiveness of this economic segment in the country. The construction and specialization features of these rigs created a market niche in certain international shipyards (South Korea, China, and Dubai) and national shipyards. Currently, there are shipyards in operation or under construction in Rio Grande/RS, Angra dos Reis/RJ, and Suape/PE with the ability to build these drilling rigs for deep and ultra-deep waters.



 [logo:] CAIXA

Figure 2 – Shipyards under Construction



*Brazilian shipyards are expanding into shipbuilding sectors in various regions*

On October 16, 2009, Petrobras began the bidding process to select shipyards to build the first system of twenty-eight rigs that would constitute the Rigs Project. Although the bidding process is underway, there are still pending determinations as to the number of systems and the number of rigs per system, seven or nine rigs for the First System. It is hoped that other lots will follow this first lot, until the total demand for developing and exploring the Pre-Salt Basin is reached, consisting of the twenty-eight rigs needed (which in addition to the other twelve ordered on the international market, will make up the forty drilling rigs for the Pre-Salt Basin exploration program.)

The orders from Petrobras and the guarantees provided by the Shipbuilding Guarantee Fund ("FGCN"), which will be discussed in Section 4 below, will be able to create adequate conditions for investments in the sector, and will be able to attract new participants in the formation of modern and competitive shipyards in Brazil, as well as promote the development of the associated supply chain.

## 2.4.    WORLD ENERGY MATRIX AND THE ROLE OF OIL

*According to the IEO 2009 projections, the global consumption of energy should grow by approximately 44% between 2006 and 2030*

According to the *International Energy Outlook 2009* ("IEO") projections, the consumption of energy worldwide should grow by approximately 44% during the 2006-2030 period, going from 472 quadrillion




[logo:] CAIXA

British Thermal Units ("BTU") in 2006 to 552 quadrillion BTs in 2015, and 678 quadrillion BTUs in 2030. This growth in demand will exert significant pressure on the oil market.

Despite the fact that the global crisis has weakened the demand for short-term energy, even resulting in a small drop in consumption in 2009 (first drop in consumption noted since 1981), the economic recovery planned as of 2010 must place pressure on the demand and production of goods and services, again raising the consumption of energy to positive rates of growth, restoring the trend of long-term consumer growth.

The growth in energy consumption is very closely linked to a country's growth in production of goods and services. Therefore, this growth in demand will have to primarily come from countries outside of the Organization for Economic Cooperation and Development ("OECD") zone, mainly from economies of "emerging countries," for which growth forecasts indicate an acceleration well beyond those of the OECD.

*A significant increase in the production of fuels by 2030 is needed*

The IE02009 projections indicate an increase in the production of all types of fuel, notably fossil fuels, because the world energy matrix is above all comprised of fossil fuels (oil derivatives, natural gas, and coal). This group includes liquid fuels, primarily oil, which have a more significant share with projections showing a rise in consumption of approximately 85 million barrels of oil equivalent ("BOE") per day in 2006, to 91 million BOE per day in 2015, and 106 million BOE per day in 2030.





 [logo:] CAIXA

The increase of 22 million BOE per day in the production of liquid fuels during the 2006 to 2030 period must come from both member countries of OPEP, with a total estimated production of 44 million BOE per day in 2030, and from countries that do not belong to OPEP, with production of 63 million BOE per day.

During the period under analysis, the countries that do not belong to OPEP that will contribute with the biggest increase in the production of traditional (and untraditional) liquid fuels are the United States and Brazil.



*The potential production deficit will only be offset by new discoveries*

Based on the IEO 2009 research, we can confirm the importance of Brazilian oil production in the global energy matrix, especially for the recent Brazilian discoveries, since the increases in production as demonstrated by the IEO are based on the volumes produced in 2008. Therefore, the recent discoveries in Brazil should in the future constitute the effective growth in the production of liquids, which may contribute to offsetting the natural decline in the production of the existing fields.

Taking the natural decline of oil fields into consideration, it is estimated that by 2030, the production of existing fields will drop by approximately one third of the volume that was produced in 2008, therefore making it crucial to have new discoveries that are capable of covering a potential production deficit of approximately 60 BOE in 2030.

This discrepancy between long-term supply and demand will exert direct pressure on the demand for oil, since no substitution for using fossil fuels has emerged from other power generators during the period analyzed.



**EIG00091675**

 [logo:] CAIXA

### 2.5.    OIL SUPPLY AND DEMAND

Oil is a unique resource. It is an important and efficient source of energy for humanity. The availability of existing oil in the current world is present in almost everything that society produces and uses, as it is an energy source that drives 90% of world transportation. Quantitative data for this natural resource is currently as follows:

- ◆   Reserves -1.1 trillion barrels;

- ◆   Global Production - 32 billion barrels/year.

International agencies (US Department of Energy- DOE) and IEA *(International Energy Agency)* consider that world oil consumption will increase from the current 85 million barrels/day to 106.6 million barrels/day by 2030.

*In Brazil, robust investments in equipment produced by shipyards will be needed.*

In order for the Brazilian exploration and production program to increase oil production by more than 4 million barrels/day, as projected by the international agencies, investments in equipment produced by Brazilian and international shipyards will be needed.

*Graph 1 – Behavior of Global Demand for Oil*




Source: IEA World Energy Outlook 2007, EIA International Energy Outlook 2007

The recent discoveries of oil in the pre-salt layer in Brazil redefined the importance of the oil and natural gas supply in Brazil. Although exploration and development of these new deposits should occur and yield more palpable results throughout this decade, the new potential is already having an effect on oil activity in the country.



 [logo:] CAIXA

Oil exploration and production projects are analyzed in light of the future projection of the price per barrel of oil. The technical parameters of the projects consider the projection of the price per barrel at the time when a certain area begins production.

Currently, the oil industry is working with future values of approximately forty dollars per barrel. Under this scenario, Petrobras considers the Pre-Salt Basin projects to be economically viable.

This decade is proving to be quite positive for the oil industry. After a significant drop in oil prices at the end of the last decade (which ended up lower than US$18/barrel), the price again rose significantly, especially as of mid-2002, until reaching its peak (close to US$150/barrel) in 2008. This period preceding the worsening of the international financial crisis was marked by rapidly increasing demand, especially in Asia and developing countries. This demand led to an enormous exploratory phase, making progress on unconventional reserves – ultra-deep waters, Arctic reserves, ultra-heavy oil, or bituminous sand.

The price of oil has been recovering since it reached the very low levels of December 2008-January 2009. In terms of history, we can say that prices are at high levels, as demonstrated in the graph below:

*Graph 2 – Change in Oil Price (2003-2010)*

*The boom in oil prices of the last decade led to strong demand for exploration and production structures*



Source: ICE/NYMEX

For the shipbuilding industry, the aforementioned boom in oil industry prices and projects led to increased demand for exploration and production structures. The number of floating platforms



 [logo:] CAIXA

installed has evolved significantly in recent years in various petroleum provinces, as we will demonstrate in the following sections.

*The shipbuilding production chain consists of shipbuilding, navigation, merchant navy, maritime and offshore support..*

## 2.6.    SHIPBUILDING

The geopolitical reality to be considered when analyzing the Brazilian shipbuilding industry is the world demand for oil, which is estimated to go from 85 to 106.6 million barrels/day[4] by 2030, in a market that is completely geared towards oil logistics (transportation, exploration, production and offshore services).

The shipbuilding production chain basically consists of the shipbuilding and nautical, merchant navy, maritime support, and offshore industries. This chain, through its set of production activities for supplies and ship parts, which are used in construction, repair, modernization and maintenance, both for the shipbuilding industry and for the nautical industry, is important for generating direct and indirect jobs.

The merchant navy (long-distance, cabotage[5], river and lake[6]) is an important driver of the national economy.

It is noted that, after a decades-long peak(seventies and eighties), during which Brazil was among the greatest shipbuilders in the world, this production chain declined and remained stagnant until the late nineties. It ressurged driven by the growing demand for offshore vessels, plataforms, and other offshore oil production units and, subsequently, for new tankers, leading to national development, but with considerable regional diversification, with the construction of new shipyards in the states of Rio Grande do Sul, Pernambuco, and Rio de Janeiro.

This new reality has revealed the following conclusions about the direction of this segment:

1)   Shipbuilding aimed at oil logistics is a necessity for Brazil, as a way of ensuring independent acess to oil production equipment;

2)   This equipment includes drilling rigs, drilling and production platforms, offshore support vessels, submarine systems, oil and gas tankers[7], which already comprise the majority of Brazilian shipyards' order portfolios;

*It will increase the presence of oil companies and investors in the exploration and production effort*

3)   Increased presence in Brazil of oil companies and investors in the exploration and production effort;

4)   The big "buyer" should continue to be Petrobras, and it is expected that its financial capacity (through additional capitalizations or debt) will be sized to serve its projects; and

---

[4] Source: Sinaval.
[5] This is the navigation between interior ports of the country via the coast or rivers. Cabotage is the opposite of long-distance navigation, i.e. the navigation completed between ports of different countries.
[6] Navigation on lakes.
[7] Vessels for transporting liquified gases.



EIG00091678

 [logo:] CAIXA

5)    The protection of fields of offshore producers will promote the expansion of the fleet of military vessels.

The volume of business of the shipbuilding industry has shown growing demand. In 2010, orders totaled 132 projects (between oil platforms, oil tankers, bulk carriers, and container ships, tugs, ferries, and pushers) by April. This number is much higher than the 2000-2009 period, when shipyards recorded 168 delivered orders. The Brazilian market already has the fifth biggest portfolio of orders in the world of tanker ships, and currently, has the biggest offshore investment program in the world.

Brazilian shipyards are building production capacity capable of meeting the current demand of twenty-eight drilling rigs, 150 oil tankers, 200 offshore support vessels, and 150 production platforms. Given this demand, there are plans to establish seventeen shipyards and expand another five[8].

*Growth of leasing contractors*

There are various factors that are contributing to the current expansion of the Brazilian shipbuilding industry including, primarily, Petrobras' Production Development Policy (PDP) which launched yet another stage of the Offshore Support Fleet Renovation Program ("Prorefam"), a program aiming to renovate the fleet and achieve increased production of oil and natural gas.

Another factor to boost the shipbuilding industry is the Oil Tanker Fleet Modernization Program ("Promef"), of Transpetro – a Petrobras subsidiary. This program began in 2005, with a bidding process for twenty-six vessels during the first phase, totalling US$2.5 billion in investments. During the second phase of Promef, which is underway, a system of twenty-three medium and large ships has been forecast, which should reach US$1.5 billion. On May 7, 2010, the first oil tanker set sail, with a total of forty-nine vessels ordered by Transpetro. Since Transpetro requires 70% national participation, there are a total of 300,000 workers in Brazil who are currently involved in the shipbuilding network.

The intensification of the oil exploration and production ("E&P") market may also be identified in the growth of the "leasing contractors," agents that lease their platforms for exploration through daily fees. The amounts of these daily fees, especially those of greater complexity and capacity, jumped from an average of US$120,000-140,000 per day during the first half of the current decade to approximately US$350,000/day at the start of 2009[9], with peak values in 2008, when the level of use of the fleet reached 100%, in large part from the petroleum provinces. This intensification was reflected in the broad demand for conversion and new constructions at shipyards. Despite a significant variation in options and prices, an order of a drillship[10] capable of exploring ultra-deep waters reached US$750 million[11], an amount that is well above that of a large tanker.

*More than 46,000 jobs generated in 2009, incentivized by the local content rule*

The total direct jobs generated, more than 46,000 in 2009, should increase to 60,000 in 2014. Indirect jobs will increase from more than 180,000 in 2009, to 240,000 in 2014, considering an average of four jobs in the supply industry for each job generated at a shipyard.

---

[8] Source: Sinaval.
[9] Source: Sector Monitoring Report - Sinaval.
[10] Vessel equipped with well drilling equipment.
[11] Source: Datamonitor, June 24, 2008.



 [logo:] CAIXA

The network of suppliers of products and services is growing with the local content rule, which is increasing supplies by companies established in the country from 55% to 65%.

## 2.7.    DRILLING AND PRODUCTION RIGS AND PLATFORMS

An oil rig or platform is a large structure used in deep-sea drilling, to protect workers and the machinery needed to drill wells in the ocean bed, in addition to extracting oil and/or natural gas, processing the fluids extracted and bringing the products from the vessel to shore. Depending on the circumstances, the platform may be attached to the ocean floor, forming an "artificial island," or it may float.

The figure below provides a graphic depiction of the evolution in the types of rigs, from conventional onshore rigs to semi-submersible rigs and next-generation drillships.

Figure 3 – Evolution of Types of Rigs



The term "generation" is applied to a certain type of rig. It was initially named according to the decade in which the rig had been built, so that the technological developments that occurred during this length of time helped differentiate the various assets. However, more recently, there has been industry consensus that this name became strictly commercial in nature, such that few technological innovations would have occured between a rig of the fourth generation and a rig of the fifth generation, for example. In turn, the sixth generation of rigs now present capacities that refer to the new current exploratory frontiers, having successfully obtained greater efficiency in environments that were previously not a main focus of the other generations, without this making it unviable to competitively explore the areas for which they were designed.

*The sixth generation of rigs presents capacities that refer to the new exploratory frontiers of the Pre-Salt Basin.*





[logo:] CAIXA

The type of platform is defined according to the purpose for which it is intended and the water depth at which it will operate.

Submarine Drilling Rigs or Platforms:

Self-Elevating Platforms (or Jackups): Basically consist of a type of raft or barge, where all of the operating and support facilities are located, such as drilling rig, lodging, dining areas, laboratories, control rooms, heliport, etc. They have three or four legs that, when mechanically and hydraulically activated, move down to reach the sea bottom. The platform is then elevated to above sea level, at a safe height and away from wave activity. These platforms are mobile, and may be transported by tugs or self-propelled. They are intended for drilling exploratory rigs in the continental platform, in waters that are considered shallow to the offshore industry, at a depth varying between five and two hundred meters. Once the drilling of a specific well has finished, the deck of the platform is lowered to sea level, its legs are raised and collected, and the unit may be towed to another location.

*A type of raft or barge with three or four legs that move up and down*

*Figure 4 – Self-Elevating Platforms (Jackups)*



*Structure of one or more decks, supported by a submergea floating footings*

Semi-Submersible Platforms: Semi-submersible platforms are comprised of a structure of one or more decks, supported by columns in submerged floating footings, which function like two keels on a catamaran. Since, unlike a jackup, this type of platform is not supported on the sea bottom, remaining floating, it moves due to the action of the waves, currents, and winds, and it is possible that the equipment to be descended into the well can be damaged. Therefore, when drilling operations are taking place, it is necessary for it to be positioned on the water surface as stably as possible. Two types of systems are responsible for stably positioning the floating unit: the anchoring system and the dynamic positioning system. The anchoring system consists of eight to twelve anchors and cables and/or chains, which operate as springs that produce



 [logo:] CAIXA

force capable of restoring the position of the floating platform when it is modified by the action of the waves, winds, and currents.

In the dynamic positioning system, there is no physical link from the platform to the sea level (anchoring), except for the drilling equipment that has to reach the seabed. Acoustic positioning sensors, referring to submerged points, and GPS, referring to satellites, determine the drift, and computer-activated propellers in the hull restore the platform's position.

Semi-submersible platforms may or may not have self-populsion. In any case, they provide significant mobility, and are frequently used to drill exploratory wells in deep and ultra-deep waters.

*Figure 5 - Semi-Submersible Platforms*



Drillship: A drillship is a ship designed to drill offshore wells. Its drilling tower is located in the center of the ship, where an opening in the hull allows the drilling string to pass through. The drillship's positioning system, comprised of acoustic sensors, GPS, propellers and computers, cancels out the effects of the wind, waves, and currents that tend to move the ship from its position. Drillships, as with the semi-submersible platform, are intended to drill in deep and ultra-deep waters, where jackups are not applicable.

*Ship designed to drill wells, with a tower at its center where the drilling string goes through*

*Figure 6 - Shipyard*



 



 [logo:] CAIXA

Production Platform:

*Platforms with fixed beams on the seafloor, intended for shallow waters*

Fixed Platforms – Intended for shallow waters (up to three hundred meters). They were the first production units used in the world, in fields located at water depths of up 400 meters. This is precisely because the first discoveries in the sea were at lower depths. Generally, fixed platforms consist of modular steel structures, which are installed at the operation location, with beams stuck into the sea bottom. The jacket is established first, which is the base of the platform, to be affixed to the ocean floor. It is built at shipyards in a horizontal position. Once construction has finished, the jacket is brought to its location on large barges and launched into the sea in the vertical position, at the point where it will operate. After being duly affixed to the sea bottom, the upper parts of the platform are added to the jacket, which consist of the production and processing equipment, utilities, stock of materials, staff lodging, as well as all facilities needed for well production. Production is removed directly through ducts or by vessels, since they do not have storage tanks. This type of platform is designed for a certain location where it remains until the deposit has been exhausted, because it cannot be transferred to another field. The average useful life of an oil reservoir is thirty years, depending on various factors, such as size of reservoir or porosity of the enclosing rock. Once deactivated, fixed platforms may be transformed into fish farms, functioning as artificial reefs.

*Figure 7 – Fixed Platform*



Semi-submersible platform – Basically they are structures that are identical to platforms of the same type for the drilling detailed above. Generally, they are built using old semi-submersible drilling platforms that have become obsolete and converted into production units. The difference is that, unlike a drilling rig, they have production processing equipment on the deck. As they do not have their own propeller, they are towed to the production locations. Unlike fixed platforms, semi-submersible platforms may be transferred to another location.

*Floating oil production units, similar to semi-submersibles*

Tension-Leg Platforms (TLPs) – These are floating units that are used to produce oil. Their structure is quite similar to that of a semi-submersible platform. However, their anchoring to the sea floor is different: TLPs are anchored by tubular structures,



 [logo:] CAIXA

with their legs attached to the sea bottom by beams and kept taught by the excess buoyancy of the platform, which significantly reduces its movements. Therefore, operations of these units are similar to that of fixed platforms.

*Ships with the capacity to process and store oil*

FPSO (Floating, Production, Storage and Offloading) Platforms are vessels with the capacity to process and store oil, and transfer oil and/or natural gas. On the deck of the ship a processing plant is installed to separate and process the fluids produced by the wells. After the water and gas have been separated, the oil is stored in tanks on the ship itself, and is then periodically transferred to a shuttle tanker. Their hulls may be designed and built specifically to operate as an FPSO (new build), but they are generally production units that have been converted from old tankers that are no longer efficient for transporting oil.

A shuttle tanker connects its oil receiving equipment to the pumping equipment of the FPSO, which is in general located at the stern of these units, in order to receive oil stored in its tanks and transport it to onshore terminals. The compressed gas is sent ashore through pipelines and/or reinjected into the reservoir. The biggest FPSOs operating in Brazil have a process capacity of approximately 200,000 barrels of oil per day, with associated gas production of approximately 3 million cubic meters per day.

When constructing a drilling rig, certain points must be taken into consideration in terms of equipment, always according to the environment in which the rig will operate.

*The water depth is the main limiting factor, depending on the environment in which the rig will operate*

Sector specialists responsible for entering drilling rig contracts (leases) use the following asset gradation as key elements when deciding on an asset.

<u>Water depth</u> – This is the main limiting factor, which depends on the environment in which the rig will operate. In short, this is reflected in the maximum operating capactiy of a structure due to the water depth in the region in question. It is basically the distance between the platform's rotary table and the ocean floor.

The only restriction in terms of water depth would be with respect to jackups and fixed platforms, which only operate in shallow water environments.

Drilling rigs designed to operate in deep and ultra-deep waters may, where necessary, operate in medium and shallow waters. Therefore, when deepwater market conditions are lagging (which would be the opposite of the current trend), it would be possible for next-generation rigs to be able to operate outside their natural niche, making use of their flexible scope. In theory, they could compete in a market that was previously limited to shallow water rigs, and potentially at lower charter rates than those of their original market. It should be noted that in these temporary, contingency situations, these rigs would have idle capacity, and a portion of their structures would be redundant when operating in shallow waters.

*Despite being more expensive, the dynamic positioning system is more suitable for ultra-deep water exploration*

The main focus of attention in the oil and gas exploration market is currently on deep and ultra-deep waters. With the sedimentary basins located in shallow and medium waters across the planet already having been explored or depleted, the new frontier and natural path for the development





[logo:] CAIXA

of the world oil industry is the areas with deep and ultra-deep water depths. Major investments are being made in two structures capable of exploring these environments, semi-submersibles and drillships. These rigs in turn differ in the competitive environment due to their characteristics:

Hook Load – Due to the simple form and the capacity of the rig to carry the casing to be used in the well walls, it is necessary to stabilize the drilling, avoiding collapse and creating the drill pipe. These pipes, which are stored onboard the units until they are installed in the wells, require significant storage capacity, due to their length and weight.

Dynamic Positioning – Perhaps one of the debates that most generates controversies among subject matter experts, particularly in a scenario of increasing water depth, refers to two main aspects: conventional anchoring systems and dynamic positioning systems.

Traditionally, anchoring restricted vessels to up to 1,500 meters deep, which to some extent discourages new builds from using this technology, leading them to opt for dynamic positioning, even though recent Petrobras ventures, in long-term tests at Tupi, do use vessels with anchoring in water depths that are considerably deeper than those cited.

It is now clear that there are significant variations in terms of cost of capital and operations (recurring), by which the two systems differ.

From the viewpoint of costs, anchorage has comparative advantages in shallower waters and in longer exploratory projects, including the development phase. Conversely, dynamic positioning would be more suitable for exploration in ultra-deep waters, such that it would be almost impossible, according to sector authorities, to drill in ultra-deep waters with another system.

The installation cost of a dynamic positioning system is more expensive than an anchorage system, due to the fact that there is a greater number of regulatory requirements to install the system, and more electronic equipment to install. The greater cost of the dynamic positioning system [is due to] the separate machine room, which is a regulatory requirement, which allows it to back up and maintain the vessel's position in the event of a fire or flood.

*A drillship is twice as fast as a semi-submersible*

Navigation Speed and Stability – In this aspect, drillships significantly differ from semi-submersible platforms, as the first is up to six times faster than the second. This becomes more important in larger fields, where the drilling phase involves various borings, increasing the general efficiency of the operation. Moreover, with the new exploratory trends, which involve a greater number of drillings at exploratory



 [logo:] CAIXA

sites within lesser reservoirs, and that keep greater distances between them, increases the need for nimbler movement between the exploratory sites.

## 2.8.    E&P ACTIVITY IN DEEP AND ULTRA-DEEP WATERS

### 2.8.1.   THE OFFSHORE SEGMENT IN BRAZIL

The Project Rigs will be allocated to develop oil wells in deep and ultra-deep waters. Petrobras is recognized by the industry as a global leader in the sector in this market niche, and it was the trailblazer responsible for discovering and developing the great majority of hydrocarbon deposits on the Brazilian coast.

 *Petrobras is a pioneer in offshore and deepwater activities*



Source: ODS-Petrodata

There is a natural trend towards exhausting existing fields that are easier to develop and explore. Therefore, the search for new areas is proceeding, and the prospecting and exploration of more distant fields that are harder to access is a normal consequence of this market. This statement may already be confirmed based on the main discoveries in recent years, which were already in deep or ultra-deep waters (water depth of 2,000 [meters] or more].



 [logo:] CAIXA

*Graph 3 – Discoveries per Year – Brazil*



Source: ODS-Petrodata

Petrobras, together with other major oil companies and specialized consultants, expects that the stream of major oil exploration projects, primarily in Brazil, the Gulf of Mexico, and the Pre-Salt Area of Africa, will support the demand for drilling platforms.

ODS-Petrodata, the source of reference for various studies on the sector, outlined three possible scenarios for the growth in demand for drilling platforms for deep waters by 2016. In the graph below, we can see that even in a more pesimistic scenario, demand shows a trend towards growth.

*The stream of exploration projects in these areas will support the demand for platforms*






[logo:] CAIXA

### 2.8.2. MARKET FOR DEEP AND ULTRA-DEEP WATERS

The development of an oil field involves various aspects of engineering, many of them intrinsically related to the location of the field, the drilling program, the sizing of the unit that will support production, and the determination of the oil and gas elevation methods. A fundamental component of the project is properly analyzing the characteristics of the producing reservoir in order to determine the hydrocarbon production program. Lastly, the results will determine how viable it is to develop an oil field. The preparation of a project to develop a field immediately aims to maximize oil recovery and miniminize operating and capital investment costs.

The bidding process that Petrobras is leading to acquire twenty-eight drilling platforms must introduce a new generation of rigs – at least that is the expectation of the company's engineers, who hope that technologies will be gained that will place the platforms at a more advanced level. The bidding documents allowed the companies to retain Huisman, which is developing a new concept for drilling systems, to build certain units. Although still not released, the design appealed to Petrobras because it made working at water depths of more than 3,000 meters possible. Furthermore, there is a new rig layout, with greater drafts and more space on deck, with more automated and faster operations, increasing the productivity of operations. The innovations include a new form of stacking and moving drilling strings – the design of the tower, pipe, and center have articulated arms that can turn 360° around, eliminating the need for a substructure and optimizing rig space. The center of gravity of the platform is located at a lower position, which increases its stability and versatility of movements.

The sixth generation of rigs began to leave shipyards six years ago. They all leave the factory now with the capacity to operate at water depths of 3,600 meters and provide dual activity, which allows work to be performed in parallel, reducing the well's time of operations by between 20% and 40%.

*Requirement for projects prepared in Brazil and rigs delivered as of 2014*

In Brazil, Seadrill has two rigs of this type  - West Eminence, in operation at BM-S-11, and West Polaris, at BMS- 9, in addition to West Taurus, also in operation at BM-S-11, where the Pre-Salt Area is located, in the Santos Basin. In Espírito Santo, Drillmax, from Stena, is drilling a well for Repsol in Block EM-S-737. In addition to having dynamic positioning, the level of automation of these sixth-generation rigs is also higher, eliminating manual operation from the lowering and removal of the string, casing assembly, and bottom-hole assembly – the part before the drilling string.

Exploration in deeper and more hostile environments, marked by high pressures and temperatures, also prompted the sizing of these platforms to be more robust, due to the need for operating a greater variety of drilling strings, which is asssociated with the management of hazardous areas. It is difficult to obtain daily fees for a rig operating at water depths of over 2,000 meters, drilling almost eight kilometers of rock, at below the $400,000/day to $500,000/day range – this represents more than a third of the total drilling costs.



EIG00091688

 [logo:] CAIXA

The three biggest offshore oilwell drilling companies, Transocean, Noble, and Pride, confirmed in their anual reports to shareholders an increase in sales and orders for drillships to international shipyards.

Sales in 2009:

| | |
|---|---|
| Transocean | US$11.5 billion |
| Noble | US$3.6 billion |
| Pride | US$1.6 billion |

Transocean is building seven drillships. One of its newest units, the "Petrobras 10,000," was built at the Samsung Heavy industries shipyard (South Korea), was delivered in late 2009, and has a ten-year service contract with Petrobras, with daily rates in the amount of US$410,000. More specifically, this drillship is owned by a company that was formed between Petrobras and the Japanese company Mitsui, and was sublet by Transocean.

Noble has three drillships and two drilling platforms that will begin five or six-year contracts with Petrobras (the daily rates received in 2008 were in the amount of US$300,000). The three drillships will be modernized at Brazilian shipyards with investments of US$90,000,000 during the reconstruction period. Noble is building a drillship budgeted at US$585 million, a fixed platform, and two semi-submersible drilling platforms.

The drillship will be built in two phases: first, the hull and the propulsion system will be built at the STX shipyard (South Korea) at its unit in Dalian, China; next, the drillship will continue it navigation using self-propulsion to the Netherlands, where drilling equipment will be installed, which has been designed and built by Huisman Equipment BV. The 2008 annual report from Noble indicates that the daily rates for recently built drillships are in the amount of US$515,000.

Pride is building five drillships at the Samsung shipyard. One of them already has a contract with Petrobras, and two have a contract with BP, with a daily rate of US$502,000. Pride currently has seven semi-submersible drillships under contract in Brazil.

### 2.8.3.   DEMAND FOR PLATFORMS

*Few companies have the know-how needed to effectively explore potential hydrocarbon reservoirs in deep and ultra-deep waters*

In light of the information presented in the previous sections, the exploration and development of hydrocarbon reservoirs located in the sedimentary basins along the ocean coasts of Brazil, the Gulf of Mexico, and Africa (known as the "Golden Triangle") are becoming quite important.

Recently, special attention has been given to the exploration of potential reserves in basins located in deep or ultra-deep waters (water depths of three thousand meters or more) which differ from the deposits located in shallow water due to the fact that they have the potential for major hydrocarbon reserves (more than 1 billion barrels).



EIG00091689

 [logo:] CAIXA

One important characteristic as concerns the development of the sedimentary basins located in deep or ultra-deep waters is the fact that few companies have the know-how needed to effectively explore these potential hydrocarbon reservoirs. This is the main challenge that was presented to Petrobras.

The region known as the Golden Triangle must concentrate the majority of its exploration efforts in deep waters, despite some activity of this kind being developed in Northeastern Europe, the Mediterranean, the Indian Ocean, Southeast Asia, and Australia.

In the deepwater niche, Petrobras is responsible for approximately 23% of all oil production and operates approximately 18% of all offshore installations available worldwide.

The demand for production platforms of various types is estimated to be approximately one hundred fifty units by 2020.

Petrobras' estimated demand is ninety-five units. Eight FPSOs were bid out and are under construction by Engevix, in a consortium with GVA at the Rio Grande (RS) shipyard.

*The deepwater drilling market is fragmented, with approximately forty companies involved in owning and managing the fleet*

The demand from private tanker companies is estimated to be fifty-five production platforms, with this total including approximately forty-eight units requested by OGX, to be built at its OSX Shipyard, which in early 2010 launched shares and was able to obtain R$2.4 billion on the market to invest in its facility. In order to meet this demand, priority financing plans were approved at Fundo da Marinha Mercante (FMM) to establish seventeen shipyards and expand another five shipyards.

The supply of deepwater and ultra-deepwater drilling platforms is concentrated among a few companies. Transocean holds an approximately 25% stake in the market, and the five biggest owners (Transocean, Diamond, Noble, Pride, and Seadrill) only possess a little more than half of this fleet.



**Deepwater Fleet (including equipment under construction)**



EIG00091690

 [logo:] CAIXA

As we can see in the graph below, Petrobras is resposible for thirty-three of the one hundred eighteen rigs currently under contract (including rigs under construction). In the ultra-deepwater rigs market, Petrobras holds eleven rigs, more than double that of the second operator (Anadarko and Chevron, with five each).

**World Fleet of Deepwater Rigs – By Operator**





**Confidential**

**EIG00091691**



[logo:] CAIXA

## 2.9.    THE OFFTAKER – PETROBRAS

Petrobras is a mixed-capital company formed in 1953, which is controlled by the government. It is currently present in twenty-seven countries. Headquartered in Rio de Janeiro, the company works in the energy industry, primarily in the sectors of exploration, production, refining, sales, and transportation of oil and its derivatives, in Brazil and abroad. Recently, the company also began operating in the renewable energy segment, and is one of the biggest actors in Brazil in the biofuel sectors (ethanol, biodiesel, etc.), electrical energy (thermoelectricity and hydroelectricity), as well as wind power.

Petrobras' capital structure in December 2010 was distributed as follows:

*Table One – Petrobras' Capital Structure*

| Distribution of Capital on December 16, 2010 | % Ordinary Shares | % Preferred Shares | TOTAL |
|---|---|---|---|
| Federal Government (National Treasury) | 53.6% | 1.2% | 31.1% |
| Bndespar - BNDES Participações SA | 2.3% | 23.9% | 11.6% |
| Ffie - Fundo Fiscal de Investimentos e Estabilização[Investment and Stabilization Tax Fund] | 4.6% | 2.9% | 3.9% |
| Blackrock, Inc | 0.0% | 5.0% | 2.1% |
| FPS Fundo de Participacao Social [Social Participation Fund] | 3.0% | 0.0% | 1.7% |
| Previ Cx Prev Funcs Bco Brasil | 0.0% | 0.0% | 0.0% |
| Other | 36.4% | 67.0% | 49.5% |
| **Total** | **100.0%** | **100.0%** | **100.0%** |

*Source: Economética*

In January 2010, the company was considered the fourth biggest in the world, in terms of market value, according to the consulting firm *PFC Energy*. Additionally, it is considered the second biggest company among those with publically-traded shares.

Petrobras is a world leader in the exploration and production of oil in deep and ultra-deep waters, and was responsible for approximately 20% of world production in deep and ultra-deep waters in 2009, according to data from *PFC Energy*.

It is the biggest holder of exploratory blocks in Brazil, according to ANP data, with two hundred and twenty-five concessions as of December 31, 2009.

It is a member of a consortium with other companies, working as a concessionnaire of oil and natural gas exploration, development and production rights. The company currently has 101 concessions in partnerships, with sixty-nine of these being operated by Petrobras.

The company's business includes the research, exploration, production, refining, logistics, sales, and transportation of oil and its derivatives, and natural gas, in addition to electrical energy,



 [logo:] CAIXA

biofuels, and other renewable energy sources. Petrobras' business is currently divided into:

♦   Exploration and Production (E&P): Main operating segment. Includes the exploration and production of oil and natural gas in Brazil for priority sale in its own refineries and exportation of surplus. According to ANP data, Petrobras is responsible for approximately 98.5% of the total refinery capacity in Brazil;

♦   Supply: Includes refining, logistics, transportation, and sale of oil, derivatives, and alcohols, as well as the production and exploration of shale and equity interests in companies of the petrochemical sector in Brazil. On June 30, 2010, the company operated 92% of the total refinery capacity in Brazil.

♦   Gas and energy: includes the transportation and sale of natural gas produced in Brazil or imported, the transportation and sale of LNG, the generation and sale of electrical energy, as well as equity interests in companies that transport and distribute natural gas, as well as in thermoelectric plants in Brazil, and the fertilizer business. The results from the fertilizer business began to be included in the gas and energy segment as of January 1, 2010.

♦   Distribution: Includes the distribution of derivatives of oil, alcohols, and compressed natural gas in Brazil through a network of posts and services of the subsidiary Petrobras Distribuidora. This is the biggest distributor of oil and derivatives in the country, with a market share of 38.6% in 2009 and 38.7% on June 30, 2010, according to ANP data.

♦   International: Includes activities conducted abroad, and encompasses the exploration, production, refining, transportation, sale, and distribution of oil and derivatives, as well as energy.

♦   Corporate: Includes activities not attributable to the other segments, in particular those connected to corporate financial management.

The company's current focus is the exploration and production of oil and natural gas in basins located along the Brazilian coast and in the State of Amazonas. Of these, the most important are those of the Campos, Santos, and Espírito Santo Basins, which also include the Pre-Salt reservoirs.

The table below presents information about the basins in which Petrobras operates:

| | | Company[1] | | | | |
| | | Exploratory Blocks[2] | | | Average Production | |
| Basin | Total Area[1] | Quantity | Area | Fields of Production | Oil | Natural Gas |
|---|---|---|---|---|---|---|
| | (km²) | | (km²) | | (mbbl/d) | (mm²/d) |
| Campos ...................... | 115,000 | 21 | 5,884 | 41 | 1,693.6 | 12.0 |
| Santos....................... | 348,900 | 49 | 28,384 | 2 | 14.4 | 0.7 |
| Espírito Santo .............. | 75,000 | 23 | 8,623 | 46 | 40.9 | 1.5 |
| Others ...................... | 3,047,100 | 132 | 94,226 | 229 | 221.9 | 6.4 |
| **Total ...........................** | **3,586,000** | **225** | **137,117** | **318** | **1,970.8** | **20.6** |

(1)   Base Date: December 31, 2009

(2)   Exploratory blocks where Petrobras has an exploration and production right



 [logo:] CAIXA

As approximately 90% of the proven oil reserves and 53% of the proven gas reserves in 2009 were located in the production fields of the Campos Basin, this allows the infrastructure needed to provide support to E&P activities to be geographically concentrated, thereby reducing costs.

### 2.9.1.   BACKGROUND

*Petrobras has been investing in E&P in offshore fields since 1968, and has been successful since 1974.*

In October 1953, with the publication of Law 2004, the formation of Petrobras was authorized with the goal of operating in the Brazilian oil sector on behalf of the government.

Petróleo Brasileiro S.A - Petrobras began its operations with assets from the National Petroleum Council [*Conselho Nacional do Petróleo (CNP)*], which maintained a supervisory function over the sector.

At the time of its formation, oil production in Brazil was 2,700 barrels per day, and did not reach 2% of domestic consumption. Oil refinery capacity was also limited in relation to domestic consumption of derivatives, at the time 137,000 barrels per day.

One of Petrobras' first objectives was to build a fleet of refineries to meet the domestic need for the consumption of oil derivatives, and to create a supply infrastructure (network of transportation and terminals). Petrobras' efforts began at onshore fields, initially focusing on the state of Bahia. During the sixties, Petrobras began offshore exploration activities. As of 1968, there has been an increased focus on this activity, with the discovery of the Guaricema field (SE).

The oil shocks of 1973 and 1979, which were caused by a global crisis arising from the embargo on the supply of oil to the United States and Europe by OPEP, caused countries like Brazil to have a deficit of almost US$40 billion, primarily in 1973. As a result of these shocks, Petrobras prioritized investments in E&P, moving to maintaining a rate of investments in refinery capacity that would guarantee Brazil self-sufficiency in derivatives, for which internal demand was significantly increasing, spurred by the "economic miracle" period of the early seventies.

The investment in E&P, which is focused on offshore fields, quickly produced results: in 1974, the Garoupa field was discovered on the coast of the State of Rio de Janeiro, unleashing a series of successes in the Campos Basin, which quickly became the biggest Brazilian production region.

Graph 5 – History of E&P at Petrobras



 [logo:] CAIXA



YEAR 1 -   — Petrobras Historical Total    — Historical – Campos Basin    ⋯⋯ Campos Gigantes BC    — Pre-Salt Basin Planning
[illegible]                        [illegible]                    [illegible]                       [illegible]

One technological challenge emerged, however; offshore E&P in deep waters. In order to overcome it, Petrobras made large investments in research and technology for exploration at increasingly greater depths, achieving solid exploratory success, as reflected in successive domestic production records.

It should be noted that, during the 1995 to 1997 period, other companies, in addition to Petrobras, were authorized to enter the market, working in the exploration, production, and refining of hydrocarbons.

By 2007, the oil and gas ("O&G") sector had generated approximately 46% of the energy consumed in the country[12], with oil representing a little more than 37% of the Brazilian energy matrix and natural gas representing 9% of the primary energy consumed.

*Petrobras works in the exploration of offshore fields in countries such as Colombia, Iran, Pakistan, and Portugal.*

Another aspect of Petrobras' competitive advantage is the drive given to the process of internationalizing its business,especially by using its offshore oil exploration technology to explore deposits in other regions of the world. The company began offshore oil exploration in other countries, such as Colombia, Angola, Iran, Pakistan, and Portugal.

### 2.9.2. CORPORATE GOVERNANCE

Petrobras adopts best practices of corporate governance. As it is a publicly held company, it is subject to the rules of the Brazilian Securities and Exchange Commission [*Comissão de Valores Mobiliários (CVM)*] and the Brazilian Stock Exchange [*Bolsa de Valores, Mercadorias e Futuros (BM&FBovespa)*]. Abroad, it complies with the rules of the Securities and Exchange Commission (SEC) and the New York Stock Exchange (NYSE) in the United States; of Labitex of the

---

[12] Source: Ministry of Mines and Energy, 2008.



 [logo:] CAIXA

Madrid Stock Exchange [*Bolsa de Madrid*] in Spain; of the Buenos Aires Commercial Exchange [*Bolsa do Comércio de Buenos Aires*]; and of the Argentinian National Securities Commission [*Comisión Nacional de Valores (CNV)*] in Argentina.

Among the tools Petrobras has adopted to **guarantee** proper corporate governance is the Code of Best Practices, which deals with policies, such as the disclosure of information on material facts or actions and the trading of securities, related to the use of privileged information and the conduct of management and employees from senior management.

### 2.9.3. FINANCIAL INFORMATION

The graphs below present the representativeness of each of Petrobras' business segments, in net operating revenue for 2009 and in the first half of 2010.



**Segment Share of Net Operating Revenue - 2009**

Distribution – 18.60%
International – 6.70%
E&P – 24.30%
Gas and Energy – 3.70%
Supply – 46.70%



**Segment Share of Net Operating Revenue – 1st Half 2010**

Distribution – 17.00%
International – 6.70%
E&P – 25.70%
Gas and Energy – 3.60%
Supply – 47.00%

| In billions of R$ | 2007 | 2008 | 2009 | Q1-2010 | Q2-2010 | Q3-2010 |
|---|---|---|---|---|---|---|
| **Net Operating Revenue** | R$170.58 | R$215.12 | R$182.71 | R$50.41 | R$53.63 | R$54.74 |
| **Operating Profit (Loss)** | R$35.98 | R$48.20 | R$43.21 | R$10.74 | R$11.44 | R$12.87 |
| **Net Profit** | R$21.51 | R$32.99 | R$28.98 | R$7.73 | R$8.29 | R$8.57 |

Source: Economática



 [logo:] CAIXA

The net half-year profit reached R$16,021,000,000 and was 11% higher than the same period in 2009, reflecting a 3% increase in total oil and natural gas production. The rise in export prices and the recovery in the volume of sales in the domestic market, according to data from Petrobras, grew 11%.

### 2.9.4.   2009-2014 Investment Plan

In the 2020 Strategic Plan, Petrobras provides for a total investment of US$224 billion from 2009 to 2014, making an average investment of US$44.8 billion per year.

The 2009-2014 Business Plan provides for investments of 95% (US$212.3 billion) applied in Brazil and 5% (US$11.7 billion) abroad, with significant investments in the domestic supplier market, with a local content rate totaling 67%, which reflects an annual procurement level in the country of approximately US$28.4 billion. These amounts include the funds needed to explore and develop the Pre-Salt Basin. The oil production target is 3.9 million barrels of oil equivalent per day (BOE) in 2014, with a projected 5.4 million BOE in 2020.



The projection shown in the figure above only considers current portfolio projects and does not consider potential production arising from the Transfer of Rights Agreement, nor other projects under the new regulatory framework.




[logo:] CAIXA

### 2.9.5.  PROCAP

*It was through PROCAP that Petrobras developed the offshore exploration capacity it has today*

More intense research targeted at offshore oil exploration occurred in 1973 when the Centro de Pesquisa e Desenvolvimento Leopoldo Américo Migues de Melo (CENPES) [Leopoldo Américo Migues de Melo Research and Development Center] began to adapt imported technology to the environment, deposits, geology, and market conditions. At the same time, the company executed licensing contracts with foreign companies experienced in this type of exploration, seeking to transfer technology that included engineers training abroad and the dissemination of knowledge through internal courses.

Petrobras thus absorbed knowledge available in the market in relation to offshore oil exploration, but it was insufficient make the majority of the oil deposits of the Brazilian ocean subsoil technically and economically viable. This prompted it to develop its own technology through the Deepwater Production System Technological Development Program [*Programa de Desenvolvimento Tecnológico de Sistema de Produção em Águas Profundas (PROCAP)*]. The first PROCAP began in 1986 with the goal of improving the company's technical expertise in the production of oil and natural gas in waters with a depth of up to 1,000 meters.

The second version was launched in 1993, called PROCAP-2000 (Technological Innovation Program for a Deepwater Exploration System [*Programa de Inovação Tecnológica para Sistema de Exploração em Águas Profundas*], the goal of which was to facilitate the exploration of new fields with a water depth of close to 2,000 meters. Lastly, as of 2000, Petrobras began working with PROCAP-3000 (Petrobras' Technology Program for Ultra-Deepwater Exploration Systems [*Programa Tecnológico da Petrobras em Sistemas de Exploração em Águas Ultraprofundas*], aimed at facilitating the exploration of deposits with water depths of more than 3,000 meters. According to Petrobras, PROCAP-3000's specific objectives are (i) to facilitate the production of ultra-deep waters, (ii) reduce the extraction costs of fields under production development at water depths of more than one thousand meters, and (iii) generally reduce the lifting cost in deep and ultra-deep waters. It is performed through three series of systemic projects: (i) the first is the "control of wells in ultra-deep waters," which aims to increase safety and reduce risks related to drilling very deep wells; (ii) the second is for smart "supplementation"[13] for ultra-deep waters," which consists of a smart system which allows the operator to monitor and control, in real time, on-site or from a remote base, the operation of the well, making it possible to improve management, and; (iii) lastly are the "lightweight fluids in deep and ultra-deep waters" which seek to neutralize the technological obstacles to exploring deposits that are more than 3,000 meters deep, the difficulties encountered in the extraction of hydrocarbons, and the development, acquisition, and use of the equipment needed, and the collection and processing of geological data from these deep and ultra-deep areas.

### 2.10.  REGULATORY ASPECTS

---

[13] Set of services carried out at the oil well. Supplementation consists of transforming the drilled well into a productive unit.



 [logo:] CAIXA

Given the recent actions underway in the National Congress on changes in the concession schemes of exploratory blocks of the Brazilian Pre-Salt Basin, it is appropriate here for us to provide a brief presentation of the regulatory aspects of E&P activities in Brazil, including the concession scheme and the concession contract giving Petrobras the right to explore the blocks of the Pre-Salt Basin that were already granted by the Federal Government under the current scheme.

The rise in the local content rate is also a point to be addressed, as it is a determining factor in preparing the Rigs Project.

### 2.10.1.  CONCESSION SCHEME

*The 2004 Law regulated the Brazilian E&P sector until 1995.*

The federal government's monopoly over the hydrocarbons sector has been established since 1953[14], when Law 2004 was executed. This law establishing the monopoly formed Petrobras, the state-owned, semi-public company, and granted it the right to exercise this monopoly in the name of the federal government. This regulatory framework was a parameter for the rules of the sector until 1995, when the National Congress approved Constitutional Amendment No. 9, which removed Petrobras' right to exercise the monopoly in the name of the government.

The 1988 Constitution, in Art. 176, made clear the choice between the ownership scheme and the administrative concession to explore mineral resources, to wit:

*Art. 176. "Deposits, whether or not they are being exploited, and other mineral resources or potential hydraulic energy constitute property that is distinct from ownership of the soil, for the purposes of exploration or exploitation, and they belong to the government, guaranteeing ownership of the exploited product to the concessionnaire."*

However, this article was conceived of to govern the exploration of hydraulic energy and its mineral resources, making an exception for those resources for which exploration falls within the scope of the government's monopoly, as was the case for oil and gas.

In order to govern the assets of the government monopoly, the 1988 Constitution established the special exploitation scheme under Art. 177, governing oil, natural gas, and nuclear minerals. Article 177 was later modified by Constitutional Amendment No. 9, dated November 9, 1995.

The original text of the 1988 Constitution prevented any assignment or concession from the government of any activity in the oil sector, with the exception of distribution activities. Therefore, it was possible for the government, through Petrobras, under Law No. 2004 dated October 3, 1953, to continue exercising the government oil monopoly.

---

[14] Only in 1963 was the monopoly extended to the import and export of crude oil and derivatives.



EIG00091699

 [logo:] CAIXA

However, in the nineties, there was a change in the constitutional text relating to the oil sector. The spirit of this change, which was reflected in the text of Constitutional Amendment No. 9, was a loosening of the oil monopoly. This amendment introduced the possibility of the government entering contracts with state-owned or private companies for the exploration and production of oil and natural gas.

As of the new rules under Art. 177 of the Federal Constitution, modified as a result of Constitutional Amendment No. 9, Law 9.478, dated August 6, 1997 was enacted, which is also known as the Petroleum Law.

The main goal of this new regulatory framework was to establish the general principles and objectives of the national energy policy, providing for the formation of the National Petroleum Agency [*Agência Nacional de Petróleo (ANP)*] and the National Energy Policy Council [*Conselho Nacional de Política Energética (CNPE)*][15]. The former is a state-owned body for regulating the sector and promoting the entry of national and international companies along the oil production chain, and the latter is linked to the Office of the President of the Republic.

*Law 9.478/97 established the current E&P rules on Brazilian territory..*

Art. 23 *"The activities of exploration, development, and production of oil and natural gas shall be exercised through a concession agreement, preceded by a bidding process, in the form established under this law."*

With the approval of Law 9.478/97, it was established that the exploration and production rights for oil and natural gas on Brazilian territory[16] would continue to belong to the Union, and that it was up to the ANP and its administration, through a system of air concessions, through public auctions, opened to public and private companies. In other words, as it is a natural resource of the subsoil of the national territory, ownership of oil and gas reserves belongs to the government. Once it has been brought to the surface, ownership is passed on to the party that extracted it, as Article 26 of Law 9.478/97 attests:

Art. 26 *"The concession implies, for the concessionnaire, the obligation to explore, on its own behalf and at its own risk and, should it be successful, to produce oil and natural gas in a specific block, granting it ownership of these assets, after they have been extracted, being responsible for the payment of applicable taxes and the corresponding legal or contractual stakes."*

It can thus be gathered that Law 9.478/97 allowed the government to extend the concessions to the exploration of oil and natural gas. Under the concession scheme, the government, in order to prospect for and exploit these natural resources, enters concession agreements, and the product of the exploitation becomes owned by the concessionnaire.

---

[15] Consulting body for the President of the Republic, which has the primary purpose of formulating national energy policies intended to promote the rational use of the country's energy resources.
[16] The concept of territory includes: land, territorial waters, the continental platform, and the exclusive economic zone belonging to the government.



 [logo:] CAIXA

Based on this sytem, the ANP conducted seven rounds of bidding between 1999 and 2005, which resulted in the granting of more than 500 exploration blocks to seventy-two national and international economic groups (oil companies). Of these economic groups, thirty-six are nationally owned (including Petrobras) and thirty-six are internationally owned.

The seventh (eighth) round, which was supposed to be completed in November 2006, was suspended by judicial decision before all of the planned blocks could be auctioned. On November 27th, ANP conducted the Ninth Round, in which exploration blocks in deep waters, shallow waters, and onshore were offered, in areas classified as having high-potential new frontiers and mature basins.

During this round, 271 blocks were offered for exploration, which were distributed among nine basins, for a total of nearly 73,000 km$^2$. The basins included in this round were: Campos, Santos, Espírito-Santo, Pará-Maranhão, Parnaíba, Pernambuco-Paraíba, Potiguar, Recôncavo, and Rio do Peixe.

However, one new fact changed the course of this auction. Petrobras announced a new discovery in the Santos Basin, in the Tupi area, of light oil, estimated at approximately 5 to 8 billion barrels of oil and natural gas, which could mean a 50% increase in the current Brazilian reserves. This announcement, right before the auction, caused ANP to announce that forty-one exploratory blocks close to the Tupi Field, located in the Pre-Salt layer along the cost of Espírito Santo up to Santa Catarina, would be excluded from the bidding process. Of the forty-one blocks, twenty-six were located in the Santos Basin, thirteen were in the Campos Basin, and two were in the Espírito Santos Basin.

Given this new reality, which was concurrent with the CNPE guidance, the Brazilian government announced that it intended to change the regulatory frameworks of the hydrocarbon sector.

According to ANP data, the concession scheme allowed the oil and gas segment to develop in Brazil. From the time the sector opened, the oil industry grew from a 2% to 10% share of GDP.

## 2.10.2. CONCESSION AGREEMENT

The Concession Agreement is the instrument through which the E&P concessionnaire acquires the right to explore and produce hydrocarbons on its own behalf and at its own risk. Additionally, the grantor's interest is preserved through a series of duties, obligations, and responsibilities assumed by the concessionnaire, as stipulated in the contract itself or in the applicable legislation, including mandatory investments, the payment of financial obligations, and other applicable taxes, environmental protection, incentives for growth, and specialization of local labor, among other things.

With the easing of the monopoly as a result of Constitutional Amendment 9/95 and subsequently the Petroleum Law, Petrobras became a concessionaire, subject to the ANP's oversight and regulations. Therefore, concession agreements were entered for the areas that Petrobras already had under production, with the entry of these concession agreements being exempt from the bidding process. For the areas under exploration



EIG00091701

 [logo:] CAIXA

by Petrobras, it would have a period of three years to proceed with the activities and, if marketable oil was found, Petrobras could acquire the concession of the respective areas[17].

In order to carry out E&P activities, Petrobras was authorized to form a consortium with national or foreign companies, participating in ANP bidding rounds. Furthermore, Petrobras was authorized to form subsidiaries, which could partner with other majority or minority companies.

*Petrobras' service procurement processes used a simplified bidding procedure.*

In providing for Petrobras' participation in a competitive form, using the same mechanisms as private companies, the Petroleum Law released it from the application of Law 8.666 dated June 21, 1973[18]. The procurement procedure for Petrobras' services began to be conducted through a simplified bidding process. In this procedure, Petrobras sends invitation letters to potential service providers and may conduct other forms of procurement and selection as provided for in Decree 2745, dated August 24, 1998.

### 2.10.3. LOCAL CONTENT

The Concession Agreements for Exploration and Production of Oil and Natural Gas, which were executed between the ANP and the companies that won the bidding rounds, include a Local Content clause. According to this clause, concessionaires must give preference to retaining suppliers located on Brazilian territory whenever their offers meet price, term, and quality conditions that are equivalent to those of foreign suppliers. This contractual provision aims to increase the share of the national industry of goods and services in competitive bases, for oil and gas production exploration and development projects. The result hoped for in applying the Local Content Clause is that it would spur technological development, human resources training, as well as generate jobs and income in this segment.

*The Concession Agreements include Local Content Clauses*

Recent years have been quite significant for the increase in national content [in] new contracts, especialy after the changes introduced in 2003 on the weight of Local Content in selecting proposals submitted in ANP bidding processes. This year also marks a change in direction of Petrobras' purchasing and an early consolidation of institutions supporting the competitive development of the national oil industry, such as the National Oil Industry Organization [*Organização Nacional da Indústria do Petróleo (ONIP)*], the Brazilian Oil Industry Mobilization Program [*Programa de Mobilização da Indústria de Petróleo Brasileira (PROMINP)*], in addition to the lines of credit of BNDES. The figure below shows the growth in the Local Content rule during the ANP Bidding Rounds.

---

[17] Brazil, Federal Law No. 9478 dated August 6, 1997. Official Federal Gazette [*D.O.U*] dated August 7, 1997, Articles 31-34
[18] Regulates Article 37 of the Federal Constitution, institutes rules for bidding processes and contracts of the Public Administration and establishes other measures.



EIG00091702

 [logo:] CAIXA



*The local content rate for the Project will be beween 55% and 65%.*

For the Rigs Project, the local content requirement will be between 55% and 65% national content, in a phased and increasing format, with the first two units to be built having a 55% rate, and the last two to be delivered being required to have a 65% share of goods and services produced in Brazil.



[logo:] CAIXA

### 3.    THE RIGS PROJECT

The characteristics of the oil reserves located in the Pre-Salt Basin, such as the depth of the wells and water depth, require the use of special, high-tech equipment for their exploration.

The number of rigs available on the market that meet the minimum characteristics required to drill wells in ultra-deep waters, however, is insufficient to meet the demand generated by these reserves.

Petrobras alone, which is the exclusive operator of the six blocks in the Pre-Salt Basin under its concession needs to charter, by 2019, forty drilling rigs to operate in the blocks already granted. Of this total, Petrobras bid out, in 2008, the charter of twelve new drilling rigs, which are being built abroad and are scheduled to be delivered between 2010 and 2012.

The remaining twenty-eight rigs, by virtue of the minimum local content rate required by the Federal Government, will have to be built in shipyards located in Brazil.

Within this context, keeping in mind the significant volume of investments needed to build the rigs, Petrobras, together with its consultants, developed the Rigs Project.

*The goal of the Project is to build drilling rigs to be subsequently chartered to Petrobrás.*

The Project targeted the construction of drilling rigs (drillships and/or semi-submersible platforms) with the capacity to operate in ultra-deep waters, to be subsequently chartered to Petrobras, initially planning for the construction and charter of seven rigs (First System).

The structure of the Project envisions forming companies in Brazil, Austria, and the Netherlands, and was planned with the purpose of meeting the local content requirements and minimizing the impact of taxes on the links and flows created by the Project, even using benefits arising from the Brazil-Austria Double Taxation Treaty and REPETRO for that purpose.

In Brazil, a national holding company, Sete Brasil Participações S.A. ("Sete Brasil" or the "Invested Company") will be formed, with the aim of building, operating, and chartering specialized drilling rigs for use in deep waters.

The shareholding structure of Sete Brasil will consist of Petrobras (10%) and investors joined under the structure of FIP Sondas (90%).

*Seven SPEs will be formed, one for each rig.*





 [logo:] CAIXA

In the Netherlands, seven (7) SPEs will be formed, each SPE owning one rig, with the exclusive goal of entering a contract for the construction of the rigs and chartering them to Petrobras.

The capital of the SPEs will be held by Class "A" and "B" shareholders, in the proportions of 85% e 15%, respectively. Class A shares will be held by a company located in Austria, Sete International, which will be a wholly owned subsidiary of Sete Brasil.

Initially, Petrobras, through its subsidiary located in the Netherlands, Petrobras Netherlands BV ("PNBV") will be the only Class B shareholder of all of the SPEs. However, prior to completing the construction of each rig, Petrobras will sell its share in five of the seven SPEs to one or more operators specialized in rigs.

Additionally, during the pre-operating phase, it is planned that each SPE will retain Petrobras, or one of its subsidiaries, to manage construction of the rigs.

The corporate structure of the Project is reflected in the diagram below



*The SPEs will have Class A Shares (85%) and Class B Shares (15%) with equal financial rights, but differing in the nature and qualification of their holders*

### 3.1.   SALE OF CLASS B SHARES

*The Specialized Operator must meet a series of conditions before the Class B shares are actually transferred*

As previously described, PNBV will sell all of the Class B shares in five of the seven SPEs of the Project to companies specialized in rig operations ("Specialized Operator"), who are prequalified and included in a list pre-approved by the other participants in the Project, including the shareholders of Sete Brasil and the quotahodlers of FIP Sondas ("Short List").



 [logo:] CAIXA

The process of selecting a Specialized Operator may occur at any time, from the execution of the contracts to the charter, operation, and construction of rigs, and must be concluded before the builder delivers the rig and before final acceptance by the SPE or by Petrobras, as charterer.

However, the step-in for the transfer of Class B shares by PNBV to the Specialized Operator, and the effective start of their rights and obligations in all contracts of the Project, may only occur after a series of conditions precedent have been met, including (i) satisfactory completion of rig acceptance tests by Petrobras, by the future operator, and other required specialists; (ii) satisfactory completion of all obligations assumed by the Specialized Operator in a pre-contract agreement for the purchase and sale of shares to be entered between the parties; and (iii) the nonexistence of any significant material event in relation to the operator, its parents, or subsidiaries.

The Short List consists of the following operators:

| Atwood Oceanics, Inc | Maersk Brasil Brasmar Ltda. | Queiroz Galvão Óleo e Gás SA |
|---|---|---|
| Odebrecht Óleo & Gas Ltda. | Noble do Brasil S/C Ltda. | Saipem do Brasil Ltda. |
| Brasdril Sociedade de Perfurações Ltda | Ocean Rig ASA | Seadrill Ltd. |
| Dolphin Drilling Ltd | Odfjell Drilling AS | Sevan Marine do Brasil Ltda. |
| Ensco International Inc | Pacific Drilling | Transocean Brasil Ltda. |
| Etesco Construções e Comércio Ltda | Petroserv SA | Vantage Drilling Co. |
| Frontier Drilling do Brasil Ltda | Pride do Brasil Serviços de Petróleo Ltda. | Grupo R. |

**3.2.   TOTAL INVESTMENT**

The total investment volume planned to develop the Rigs Project is US$5,544,815 thousand, comprised of the following items:

| ITEM | US$ - in thousands | % |
|---|---|---|
| EPC Contract[19] | 4,648,000 | 83.8 |
| Amendment of EPC | 595,147 | 10.7 |
| Start-up Equipment | 105,000 | 1.9 |
| FGCN Quota | 26,532 | 0.5 |
| CMS (Spare Parts) | 58,450 | 1.1 |
| Insurance | 84,000 | 1.5 |
| Financial Costs | 27,686 | 0.5 |
| TOTAL | 5,544,815 | 100.0 |

---

[19] An investment of US$664.2 million per rig was considered.



**Confidential**



[logo:] CAIXA

It is important to note, however, that the total investment volume may be reduced as a result of the negotiations of the EPC Contract between Petrobras and the building shipyard.

## 3.3.    CAPITAL STRUCTURE

*Planned contractual structure of 20/80, equity and third party capital*

The capital structure planned to establish the Project is comprised of approximately 20% equity and 80% third party capital, and part of the funds that will constitute the equity portion may come from a subordinate debt issued by Sete Brasil. The order of disbursements will give priority to the equity portion and, once this source has been completed, disbursements arising from senior debts (third party capital) will begin. In all cases, the flow will be *pari passu* to the actual needs of the company and the investments of the Project so as to avoid a negative carry.

Therefore, the equity for the Rigs Project is estimated at US$1,108,963 thousand and the total amount of the data at US$4,435,852 thousand, comprised as shown in the chart below:

| CAPITAL STRUCTURE | | US$ - in thousands | % |
|---|---|---|---|
| DEBT | | 4,435,852 | 80.0 |
| | BNDES | 2,495,167 | 45.0 |
| | ECAs | 1,108,963 | 20.0 |
| | COMMERCIAL BANKS | 831,722 | 15.0 |
| | | | |
| EQUITY | | 1,108,963 | 20.0 |
| | CLASS A | 942,619 | 17.0 |
| | PETROBRAS | 94,262 | 1.7 |
| | FIP SONDAS | 848,357 | 15.3 |
| | CLASS B | 166,344 | 3.0 |
| TOTAL | | 5,544,815 | 100.0 |

## 3.4.    CONSTRUCTION OF RIGS

Over the course of 2009 and 2010, Petrobras bid out the contracts for twenty-eight drilling rigs in ultra-deep waters to Brazilian shipyards. The bidding process was divided into four systems with seven rigs each.

*The Atlântico Sul shipyard presented the lowest proposal for construction of the First System].*

After the technical qualification process, which resulted in the disqualification of certain shipyards, Petrobras opened the envelopes with the commercial proposals in November 2010, which resulted in the lower amount proposed by the Atlântico Sul shipyard ("EAS"), offering the amount of US$664.2 million for each of the rigs of the seven-unit system.



**EIG00091707**

 [logo:] CAIXA

The contracts for building the rigs will be formalized through the execution of a turnkey, lump-sum Engineering, Procurement, and Construction Contract ("EPC Contract"). Each SPE will execute their respective EPC Contract and will be responsible for payments to EAS arising from this contract.

The first rig is scheduled to be delivered in 2015, and the last one will be due in 2019. The graph below shows the planned schedule for delivery of the seven rigs.



During the rig construction period, Petrobras will be retained by the SPEs to provide work oversight and management services, which will include developing and monitoring the physical-financial plan, oversight of the work performed, with quality control, and the analysis and release of monthly measurements.

Once construction and commissioning[20] of the rigs has been completed, they will go through a period of performance and acceptance tests, which will rely on the participation of Petrobras, the SPE and the rig operator. Once these periods have been finalized, a final rig acceptance agreement will be issued for all three parties.


### 3.4.1.   ATLÂNTICO SUL SHIPYARD


EAS was formed in November 2005, with the groups Camargo Corrêa and Queiroz Galvão, the South Korean Samsung Heavy Industries ("SHI"), and the company PJMR as partners.

---

[20] Commissioning is the process of ensuring that the systems and components have been planned, installed, tested, operated, and maintained according to the operating needs and requirements of the owners.



 [logo:] CAIXA

FIP SONDAS – CONFIDENTIAL INFORMATION – 1/6/2011
**46**

With an installed processing capacity on the order of 160,000 tons of steel/year, EAS is located in the Port Industrial Complex of Suape, municipality of Ipojuca, in Pernambuco, and produces deadweight cargo ships (up to 500,000 tons), and offshore platforms of various types.

EAS has 1,620,000 square meters of land, a covered industrial area of 130,000 square meters, and a dry dock that is 400 meters long, 73 meters wide, and 12 meters deep. Approximately 680 meters of pier are used to build offshore platforms.



Despite being created in 2005, construction of the industrial plant of the shipyard, which required investments of approximately R$1.8 billion, only began two years later, and its operations only began in 2008, after Samsung joined as a technological partner.

### 3.5.    CHARTERING AND OPERATION OF RIGS

*The Charter Rate is the only source of revenue from the Project (SPEs). While it is not tied to the success of the exploration of the oil wells, nor to the price of a barrel, it is connected to the access of the Rigs.*

After the rigs are built, the SPE will charter them to Petrobras for exploration of the blocks of the Pre-Salt layer, and Petrobras will pay the SPEs a fee ("Charter Fee") for access to the rigs, if and when they are available for operation. The SPEs are therefore not responsible for the success of the drilling or the production level.

The charter term will vary according to each SPE. In order for the SPEs holding the first two rigs to be built, for which Petrobras will be Class B shareholder throughout the entire term of the Rigs Project, the charter will be entered for an initial period of twenty (20) years. For the other SPEs, the charter term of the first contract will be ten (10) years. It is important to note that the charter terms proposed by Petrobras for the Project rigs are higher than those currently used by the market by an average of three to four years.





 [logo:] CAIXA

In parallel to the chartering of the rigs, Petrobras will retain a specialized operator to perform well drilling services, which will be Petrobras itself (or a subsidiary of it, or even a third party of its choosing) for the first two rigs, and the Class B shareholder for the next five rigs. Petrobras will pay this operator a monthly charge called a Service Fee, which together with the Charter Fee, comprises the so-called daily rate.



The Service Fee will consist of two portions: (a) the onshore portion, and (b) the offshore portion.

The total daily rate proposed by Petrobras, on a monthly basis, is US$448,000, with a Charter Fee of US$298,000, and a service fee of US$150,000.

The following graph shows the forecasts of ODS Petrodata, in different scenarios, for the daily rates used in the market and projected up to 2024 for drillship-type rigs and semi-submersibles (in amounts from Q1 2010). We can verify that despite a slight drop between 2008 and 2009, caused by the low consumption of energy due to the global crisis, the daily rate has been increasing since 2003, boosted by oil discoveries in deep and ultra-deep waters which occurred as of this year.

*Graph 6 – Historical and Projected Daily Rates for Deepwater Platforms*



 [logo:] CAIXA

Additionally, we can conclude that the daily rate proposed by Petrobras is in line with the average rates currently used by the market.

Despite the fact that the daily rate is a fixed rate, it may vary according to the availbility of the rigs during the period in which their use is required.

During periods when there is an interruption in operating activities due to rig maintenance and/or repairs of its equipment, or for those whose supply the SPE or operator is responsible, Petrobras will not owe it any fees. If the rig is still under repair for a period that is equal or greater than 30% (thirty percent) of the time, over a six-month period, Petrobras may rescind the charter and operating service agreements. It is worth noting that, to date, according to information from Petrobras, it has not rescinded any Charter or Service Contract for rigs that were operating directly for the company and under its direct oversight in Brazil.

An exception to the rule described above will be made when the rig is being drilled in a "cluster," without removing the BOP up to the surface for a period that is equal or greater than six months. In this case, the SPE and the operator will be given a forty-eight-hour exemption for every six months of operation to perform preventative maintenance on the BOP system.

At Petrobras' discretion, a twenty-four-hour exemption may also be granted to perform BOP maintenance during the period between its removal from operation and when it is moved to be dropped into another well.

If any one of the scenarios for an exception described above is verified, or in situations where a rig is stopped due to inclement weather or awaiting the arrival, maintenance, or availability of materials for which Petrobras is responsible, the SPE and the operator shall be entitled to receive 90% of the daily rate.

In situations where it is impossible for the rig to operate due to cases of force majeure, the Charter and Service Fees will be adjusted according to the time the rig was unavailable:

- For the first thirty days of stoppage, 80% of the daily rate will be owed;

- From the thirty-first to the sixtieth day of stoppage, 50% of the daily rate will be owed;

- As of the sixty-first day of stoppage, no fee will be owed by Petrobras, and the parties may rescind the contract.

During periods when the rig is moving due to the start or end of the contract, as well as when it is moving between two locations, Petrobras will owe payment of 90% of the daily rate.

During the mobilization period, a payment of $30 million per rig will be owed, which will be paid at the start of the Charter Contract. During periods where the rigs are not mobile, Petrobras will not owe payment of any fee. In the event there are performance incidents, Petrobras will be exempt from paying the fees provided for under the contract. Such incidents include but are not limited to:



 [logo:] CAIXA

- Interruption of charter due to the fault of the SPE and/or operator;

- Stoppage due to measures requested by insurers; and

- Ocurrence of blow-out due to the action or culpable omission of the SPE and/or operator.

When there is a blow-out due to the eruption and collapse of the well, Petrobras will be responsible for the cost of the well control operations.

The daily rate may further vary due to the low yield from the rig and/or the lack, total or partial failure, or poor functioning of any equipment stated in the technical specifications of the unit. In these cases, a reducer will be applied to the previously calculated taxes. In the case of low yield, the daily rate and fees calculated for periods of movement will be reduced by 20%. In other cases, the reducer will be applied to a daily rate of 1%, which is cumulative for equipment that has failed, functions poorly, or is missing.

For each year of the contract, a three-day exemption will be granted for moving and docking the rigs and a daily thirty minutes of lubrication. The exemption time, when used, will be paid at 90% of the daily rate.

Additionally, in each period measured, the SPE and the operator will be entitled to receive an availability bonus, which is calculated according to the time that the rig was available for operations ("uptime"):

Table 2 – Availability Bonus

| Availability | Applicable Bonus |
| --- | --- |
| Below 94% | 0.0% |
| 95% | 2.5% |
| 96% | 5.0% |
| 97% | 7.5% |
| 98% | 10.0% |
| 99% | 10.0% |
| 100% | 10.0% |

The availability bonus aims to incentivize the operator to maintain a high level of uptime, since the operator will earn doubly, both as operator and as a Class B Shareholder of the SPE.

Based on the studies conducted by ODS-Petrodata and on Petrobras' experience as a charterer, it was forecast that the average availability of the Project rigs would be 95% in the first year and 97% during the remainder of the operation. To be conservative, the Availability Bonuses presented in Table 2 were not considered for the financial model, projections, and calculations of return.



[logo:] CAIXA

### 3.5.1.   UNDERPERFORMANCE COMPENSATION

Low performance in operating a rig which results in a loss of revenue for the SPE will result in the payment by the Class B Shareholder to the Class A Shareholder of "underperformance compensation," which may even result in a dilution of the Class B shareholder's equity interest in the corresponding SPE.

The "underperformance compensation" due by PNBV, as Class B shareholder, will not result in the dilution of its equity interest in the SPEs, and is limited to monetary compensation due to the SPE, under the SPEs' Shareholder Agreement (fine).

The criteria and scenarios in which payment of underperformance compensation to the A Quotaholder is due will be regulated under the SPE shareholders' agreement, which have still not been provided by Petrobras' Consultants, due to the need to negotiate its final terms with the rig operators, which still need to be selected and retained.

### 3.6.   FINANCING

Depending on the complexity and the amount of financing planned for the Project in the capital structure, the funding strategy is focused on sources of financing with the greatest underwriting potential. The work of approving credit from each financing source is extensive (due diligence, contracts, negotiations, etc.) and has a considerable cost. Based on this strategy, the Project will need to look for a few sources of financing, and may therefore retain a financial advisor for this purpose.

The financing plan provides for including financing from BNDES and, additionally, the Credit Export Agencies ("ECAs"), Commercial Banks, and Capital Market Instruments. Since the daily rate is being determined prior to assuming debt for the Project, a fundamental item for ensuring its profitability, Petrobras will be responsible for ensuring the negotiations and assumption of debts, assuming the risks of its final terms. Therefore, the final results obtained may require adjustments, upwards or downwards, in the amount of the daily rate initially agreed to by Petrobras. In light of the above, the main sources of financing of the project used for projections are:

Table 3 – Financing Conditions Proposed

| SOURCE | BNDES | ECAs | COMMERCIAL BANKS | SUBORDINATE DEBT |
|---|---|---|---|---|
| Uses (elegibility) | Local goods and services | Imported goods and services | Costs not eligible for BNDES | |
| Borrower | SPEs | SPEs | SPEs | Local Holding |
| Equity Interest | 45% | 20% | 10% | 15% |
| Currency | US$ | US$ | US$ | R$ |
| Waiting Period | 6 months | 6 months | 6 months | 12 months |



**EIG00091713**

 [logo:] CAIXA

| Disbursement | Up to 3 years | Up to 3 years | Flexible | Flexible |
|---|---|---|---|---|
| Term (years) | 3 + 15 | 3 +12 | 3 + 10 | 4+20 |
| Index | Libor | Libor | Libor | IPCA |
| Spread | 2.75% | 3.00% | 3.00% | 6.00% |
| Upfront Fee | N.A. | N.A. | 2.00% | N.A. |
| Frequency | Quarterly | Quarterly | Quarterly | Quarterly |

Source: Petrobras and Santander[21].

### 3.6.1. BNDES

BNDES is the biggest source of long-term financing in Brazil and already formally declared its commitment to participate in financing the Project through a letter issued with express authorization from its board.

*BNDES is the main source of financing of the Project, having even issued a letter committing to lend up to 45% of the senior debt.*

The amount of financing from BNDES will be limited to the local content rate in the Project (55% to 65%).

Given that the borrowers, the SPEs, will be located in the Netherlands, and due to features of REPETRO, the only BNDES product available for this project is the BNDES EXIM[22], in which funds may be disbursed directly to local suppliers in reais and recorded under the debts of the SPEs in US dollars, converted on the disbursement date.

The following financing conditions for the Project were unanimously approved by BNDES' board:

♦ Form of Support: Direct;

♦ Cost of Financing: LIBOR + 2.25% per year, for a total of eighteen years, with a waiting period of three years, and fifteen-year amortization;

♦ Amortization System: Price Chart;

♦ Risk Remuneration: defined by BNDES' credit policy, according to the Project's risk classification; and

♦ Level of Participation: 100% of national machines and equipment, and 80% of the other fundable items.

The approval granted by the BNDES board, however, is contingent on meeting the requirements described below, as well as others which may be included during the financing analysis:

♦ that the EPC Contract be entered with an EPC contractor whose quality of credit is acceptable to BNDES;

♦ that the daily rate be sufficient to at least:

---

[21] In the basic case a subordinate debt scenario is not being considered

[22] Support from BNDES for exporting national goods and services may be applied both during the pre-shipment and post-shipment phases.



 [logo:] CAIXA

- cover the rig operating and maintenance costs;

- the coverage rate of the senior debt must be greater or equal to 1.2x;

- the total debt coverage rate must be greater or equal than 1.00x;

- the establishment of funds and reserve accounts must be provided as a guarantee; and

- the flow of receivables from Sete International (such as dividends, interest, and principal from subordinate debt) must be sufficient to cover 120% of any cash deficiency of the SPEs, especially for servicing the debt of the SPEs that do not have their contracts renewed after the tenth year of operation.

♦ during the preoperating phase, the following guarantees must be provided, among others that may be negotiated during the operation anaysis phase, moreover considering that the rules applied to the guarantees to be established abroad will be determined at BNDES' discretion:

- fiduciary assignment of credit rights of the EPC Contract;

- pledge or fiduciary assignment of credit rights of Sete International accounts;

- pledge or fiduciary assignment of credit rights of the SPEs;

- pledge of SPE shares;

- performance guarantee insurance;

- fiduciary ownership of rigs;

- contingency reserve account; and

- credit guarantee of FGCN in the amount of 50% of the financing.

♦ during the operating phase the following guarantees must be provided, among others that may be negotiated during the operation review phase, moreover considering that the rules applied to the guarantees to be established abroad will be determined at BNDES' discretion:

- pledge or fiduciary assignment of receivables from Sete International;

- pledge or fiduciary assignment of receivables from the SPEs;

- pledge of shares from the SPEs;

- pledge or fiduciary assignment of credit rights of the accounts of SPEs;

- pledge or fiduciary assignment of credit rights of accounts from the External Holding;

- reserve account of at least three months of debt servicing;

- renewal fund in the minimum amount of US$150 million;

- performance fund in the minimum amount of US$70 million; and

- fiduciary ownership of the rigs.

♦ availability of FGCN funds to provide a credit guarantee for the package of rigs to be procured;





♦ shareholders' equity of 20% of the investment amount, comprised of 10% equity and 10% subordinate debt, provided that, if there is an increase in the portion of equity, this may be done through an increase in the share of subordinated debt in the Project sources;

♦ that Petrobras hold at least 10% of the share capital of Sete Brasil, save for the possibility of reducing this interest to a minimum of 5% if there is a public listing;

♦ Petrobras PNBV must remain the Class B Shareholder of each of the SPEs that will have a ten-year charter contract until, at least, twelve months prior to delivery of the respective rig;

♦ that PNBV be obligated to remain a Class B Shareholder of each of the SPEs that will have a twenty-year charter contract, until at least the end of the amortization term of the senior debt; and

*The funds from the ECAs will finance the imported equipment.*

♦ that the shareholders must commit to contributing their own funds in the SPEs, through a contribution of capital or subordinate debt to senior creditors, if it is necssary to supplement funds to finalize rig construction, provided that this increase in costs is a result of a request to change the project carried out by the SPE (Change Order) and/or the price readjustment index of the EPC Contract.

### 3.6.2.  EXPORT CREDIT AGENCIES

The main goal of the ECAs (Export Credit Agencies) is to promote exports that would not be possible without the agency's support, and strengthen the companies in their country to compete internationally.

Currently almost all industrialized countries have export credit agencies. In the Project, it is possible to use the support of at least two of them, located in the United States and Norway, depending on the source of the equipment that will be imported such as, for example, the drilling system.

<u>U.S. Exim Bank – United States</u>

*The commercial bank syndicates will also be used to complete the financing package.*

An independent agency of the U.S. government, formed in 1934, which has the goal of facilitating financing for exporting U.S. goods and services. Exim Bank promotes U.S. exports, offering credit guarantees and insurance for buyers and suppliers.



 [logo:] CAIXA

In June 2010, Exim Bank and BNDES executed an agreement with the goal of together promoting investments and projects that are of interest to Brazilian and North American companies, as in the case of the Project.

<u>GIEK (Garanti-Instituttet for Eksportkreditt) - Norway</u>

A Norwegian government agency, whose goal is to promote Norwegian exports through the granting of financing and/or credit guarantees represented by the Norwegian government. Since 1994, GIEK has been organized as a public institution within the Norwegian Ministry of Trade.

GIEK's support to business related to Norwegian exports has been the subject of growing focus, in view of the international financial crisis.

Additionally, considering that the niche for supplying goods and services for building offshore drilling rigs now has a major presence in Norway, GIEK's support for the Project could mean the institution will have a considerable share of the financing package.

### 3.6.3. COMMERCIAL BANKS

Despite the fact that the financing structure provides for BNDES being a major source of financing for the Project, the funds from it may only be alloted for acquiring national goods and services.

However, in a project to build rigs, like the rigs of the Project, there are a high number of parts and equipment that need to be imported from other countries.

Traditionally, the main source of financing for rigs built outside Brazil are commercial bank syndicates, which must complete the financing package. One of the main advantages of commercial bank financing is the flexibility to customize the debt arising from the cash flow and needs of the Project.

### 3.7. PERFORMANCE FUND, RENEWAL, AND RESERVE ACCOUNT

After the operating phase begins, each SPE will be responsible for establishing, through the capitalization of extraordinary dividends transferred to Sete International, three sources of reserves: the Performance Fund, the Renewal Fund, and the Contingency Reserve Account.

In addition to the goal of creating self-protection in the event of non-renewal or problems with the performance of the equipment, these reserve mechanisms should generate a more adequate



**EIG00091717**



[logo:] CAIXA

scope for obtaining credit from financing agents. We believe that the additional cost generated by establishing these funds will be offset by more flexible loans and financing structures, which cost less and are more suitable for the Project.

Since Sete International is the conduit for the cashflows of the SPEs, the funds and reserve account will be established in it.

### 3.7.1.  RENEWAL FUND

As a result of the discrepancy between the financing term (eighteen years) and the term of the charter contracts for five of the seven rigs (ten years), as well as the risks these contracts will not be renewed, it is planned to form a "Renewal Fund" in the amount of US$117 million for the first system of seven rigs.

The fund will be established at Sete International and will consist of the dividends distributed by all the SPEs between the eighth and the tenth year of commercial operation of each SPE, including the SPEs whose rigs have a twenty-year charter contract.

The money from this fund must be used only to pay for servicing the debt and operating costs of the SPEs, and exclusively in the event that the charter contracts are not renewed, or if a new charter contract is entered, hurting the SPE's capacity to honor its commitments for the senior debt.

The money deposited in the Renewal Fund may only be withdrawn and used by Sete International after the charter contract ends for all SPEs with a ten-year contract, and its use will be limited to an amount that is equivalent to six months of servicing of the senior debt of each SPE, until the entire balance of the Renewal Fund is used.

The financing contracts must provide that, in the event the charter contracts are not renewed, senior lenders will be prevented from declaring the SPEs to be in default, insofar as their debts are being paid on time, through the use of the existing resources in the Renewal Fund, or even the flow generated by all of the SPEs, consolidated within Sete International.

Sete Brasil will be authorized to maintain the practice of using a Renewal Fund for other systems of rigs, under conditions similar to those previously described, while making every effort to provide greater optimization of the money to be applied to the aforementioned fund.

### 3.7.2.  PERFORMANCE FUND

By virtue of the operator's performance risk and the downtime of the rigs, the Project provides for creating a "Performance Fund" in the amount of US$56 million for the first system of rigs.




[logo:] CAIXA

The fund will be comprised of all the SPEs, through dividends or another form agreed to during the first year of operation, and will be restored to its ideal level through new extraordinary dividends to be paid by all SPEs and/or by other resources from Sete International.

The money from this fund must be used solely to supplement the resources of each SPE in situations where money is lacking to pay its debt or other operating costs.

After the complete settlement of the payment obligations for the senior debt of all SPEs of the first system, any remaining balances in the Performance Fund will revert to unrestricted funds for Sete International, and may be returned back to Sete Brasil in the form of a distribution of dividends, or in another form as agreed.

As consideration for Sete International restoring the performance fund, it may activate fines for the SPEs (financial compensation due to underperformance*), as well as mechanisms for the gradual dilution of shares of the Class B shareholder, exclusively for SPEs not operated [by] Petrobras.

Sete Brasil will be authorized to maintain the practice of using a Renewal Fund for other systems of rigs, under conditions similar to those previously described, albeit using best efforts to ensure greater optimization of the money to be applied to the aforementioned fund.

### 3.7.3.   CONTINGENCY RESERVE ACCOUNT

The Project provides for creating a "Contingency Reserve Account," established as a shared pool for all the SPEs and centralized within Sete International, for which the main objective is to mitigate the risk of insufficient cash in the SPEs to cover their obligations for material extraordinary expenses and/or costs the SPEs incur during the pre-operating phase of each rig.

This account will be formed by centralizing the various sources of individual funds of the SPEs when their operations begin, including the initial amounts to be paid by Petrobras at the start of the operating phase of each rig's charter and service contract (Mobilization, Commissioning, and Pre-Operating Fees), which are duly deducted from the payments of their respective expenses and obligations, as well as the capitalization of the Performance Fund until the Contingency Reserve Account reaches an amount that is equivalent to three months of debt servicing[23] (amount estimated at US$150 million or approximately US$22 million per SPE), when the contributions will end.

There will be no obligation to restore amounts withdrawn from this account, whether partially or fully. Unused funds not deposited in the Contingency Reserve Account may only

---

[23] Excluding the servicing of the subordinated debt, where applicable.



 [logo:] CAIXA

be withdrawn and used freely by Sete International after the last rig of the First System has been renewed.

### 3.8.    PREFERENTIAL RIGHT

Petrobras shall grant Sete Brasil preferential right to develop new rigs, with a configuration that is identical or similar to that of the first system, under similar conditions of price, term, and physical characteristics.

The preferential right shall be exercised for up to twenty-one new rigs in addition to the first seven, during a period of up to twelve months counted from the date of approval of the First System contracts, with the original instrument having a term of six months, renewable for equal periods as necessary.

For a period of two years counted from the execution of the first system construction contract, Petrobras and its subsidiaries may not form other parallel vehicles with characteristics similar to those used in the Project, and that have the purpose of chartering rigs for Petrobras. If within a period of two years, credits, goods, and resources are committed for making additional Systems, up to the limit of twenty-eight rigs provided for in the Project, the prohibition will last until construction of all of the additional systems have been placed under contract.





[logo:] CAIXA

### 4.    SHIPBUILDING GUARANTEE FUND (FGCN)

*The FGCN was formed with the purpose of reducing bottlenecks to retaining national shipyards to build rigs*

Considered a strategic sector of the national economy, shipbuilding is responsible for generating countless direct and indirect job positions, as well as for developing new technologies. The construction of vessels in the country also has the direct effect of reducing remittances abroad, due to both payment for ships built at foreign shipyards, and freight, and thus impacts the Brazilian trade balance.

As the Brazilian government is aware how important this segment is to the economy, it has always tried to develop mechanisms with the intention of promoting the national industry and to providing access to parties interested in building vessels in the country, for example through the Merchant Navy Fund [*Fundo da Marinha Mercante ("FMM")*], an important financing instrument for the sector.

Construction contracts in general, and especially contracts from the shipbuilding sector, are subject to specific risks, such as (a) risk of delay or non-completion of the project, whether due to economic-financial conditions of the builder, or due to a delay in supply or other reasons, (b) the risk of the project, (c) risk of the project not being completed in compliance with the approved design, and (d) risks involving natural conditions or that are beyond the control of the parties involved, known as "events of force majeure or acts of God."

*It was established by Law 11.786 dated September 25, 2008.*

Notwithstanding the contractual protections developed over years of commercial practice, which address some of these situations, certain risks are still considered bottlenecks to contracts, such as the amounts involved in shipbuilding operations and the impact that any party not performing a contract for such an amount for any reason can have on the financial health and commercial strategy of the performing party.

*80% of FGCN funds are allocated to guarantee risks related to construction or production at a Brazilian shipyard.*

Therefore, given what the sector is currently experiencing, and in order to allow there to be greater security in contracts, Provisional Measure No. 429 of May 12, 2008 was adopted, which was converted to Law No. 11.786 dated September 25, 2008, which authorizes the formation of the FGCN. Subsequently, the original characteristics, scope, and coverage of the FGCN were expanded specifically to meet the needs for construction of drilling rigs in Brazil, through proposals established in Provisional Measure No. 462 of May 14, 2009, which was converted to Law No. 12.058 dated October 12, 2009.

### 4.1.1.   CHARACTERISTICS OF THE FGCN

The FGCN is a private fund with its own assets, separate from those of its quotaholders, and is subject to its own rights and obligations.

The federal government is the exclusive initial quotaholder of the FGCN. However, subsequently, other quotaholders may be incorporated, whether voluntarily or mandatorily (as a condition to participating



 [logo:] CAIXA

in this guarantee system). In this latter case, participants would be contracting parties of guarantees to be covered by the FGCN.

The FGCN was initially capitalized by the Federal Government in the amount of up to R$5 billion, with 80% of the money (or R$4 billion) being exclusively allocated to guarantee credit and performance risks related to the construction or production, at a Brazilian shipyard, of drilling rigs for the Pre-Salt Basin. Caixa Econômica Federal is the administrator, manager, and custodian of the FGCN.

For the purpose of FGCN's bylaws, the terms below are defined as follows:

♦ Credit risk – uncertainty related to the timely receipt of the amount under contract, to be paid by the beneficiary of the loan, caused by the Brazilian shipyard's failure to comply with the construction timeline approved by the parties; and

♦ Performance Risk – uncertainty related to faithful performance of all obligations assumed under contract for construction by the builder and unsuitability of the quality of the construction, together or individually, with damage potentially arising from nonperformance.

As concerns the guarantees offered:

*The Credit Guarantee is provided to the lender and is limited to 50% of the outstanding balance guaranteed.*

Credit Guarantee – Given to the lender and offered on behalf of the party applying for the financing, which may be the contractor of the construction or the Brazilian shipyard.

The guarantee for credit risk will be owed when the guaranteed entity does not perform or in the event of the early maturity of the financing agreement, due to non-delivery and/or non-acceptance of the financed vessel, on the date provided in the construction contract, which the lender considers in order to determine the initial amortization term of the financing.

Each financing operation will have at most 50% of its outstanding balance guaranteed with the granting of funds from the FGCN, depending on the operating risk, except for situations that are deliberated on and approved by the meeting of quotaholders, in which this limit may be raised.

*The Performance Guarantee is provided by the Shipyard to the SPEs, and limited to 10% of the amount of the transaction.*

In relation to covering the Credit Risk, the main purpose of the FGCN is to assume the obligation to honor considerations owed by any party that obtains financing to cover costs related to the activities of shipbuilding, performed by the Brazilian shipyard, whenever this shipyard does not meet the obligations assumed in the construction contract, and such noncompliance impacts this party's ability to pay the aforementioned considerations.

Performance Guarantee – This is offered to the shipyard, in benefit of the construction contractors. It will be owed in situations arising from the Brazilian shipyard's liability, that have the potential for damage arising from a failure to perform the obligation under this construction contract and/or due to the inadequate quality of the construction.



 [logo:] CAIXA

Each vessel built with guarantees from the FGCN may count on at most 10% of the transaction amount to cover the performance risk of the Brazilian shipyard guaranteed.

*Figure 8 – Functioning of the FGCN*



### 4.1.2.   PURPOSE OF THE FGCN

*The purpose of the FGCN is to assume the obligation to honor the considerations owed by any party that gets financing to cover costs related to the activities of shipbuilding, performed by a Brazilian shipyard, in addition to the risk arising from performance.*



The FGCN shall have the purpose of guaranteeing the credit risk from operations for financing the construction or production of vessels, and the risk arising from the Brazilian shipyard's performance. The guarantees granted shall remain in effect throughout the entire construction period, up to Petrobras' acceptance of the unit, or up to twenty-four months after the shipyard delivers the vessel, whichever occurs first.

An extension of the FGCN guarantee term shall be allowed in the event of a construction contract involving an extension of the originally agreed term. In that case, a supplementary pecuniary commission relating to the additional term shall be charged.

The Fund is a mechanism that was created by the government to increase the credits made available by financial agents, reducing the interest rates that apply to the operations to finance the construction of drilling rigs.

Money from the FGCN will be granted to guarantee the credit risk of the financing operations carried out with the Brazilian shipyard, with the aim of guaranteeing the risks of:

♦   Shipyard bankruptcy;

♦   Delays in the construction schedule of the works (due to any reason not attributable to the contracting party);



[logo:] CAIXA

♦   Economic-financial difficulty of the shipyard that results in losses in its liquidity and failure to pay its obligations (taxes, suppliers, employees, etc.), and that leads to a delay in the delivery of the rigs;

♦   Technical difficulty (technological capacity, manufacturing processes used, flow of delivery of stable inputs, etc.) which ends up leading to delays in delivering the rigs; and

♦   Operating problems of any kind that end up preventing or making it difficult for the contracting party to accept the units during the unit delivery phase,

When granting the guarantee, the FGCN will receive counter-guarantees from the SPE that has been financed, exclusively through the subrogation of rights over the guarantees offered by the shipyard retained by it, and from the actual shipyards to which the construction of the respective rig has been allocated, i.e.:

♦   Pledge of all shares issued by the building shipyard;

♦    Alienation or mortgage of the financed vessel;

♦   Bond from controlling shareholders of the building shipyard;

♦   Execution of a loan for use agreement[24] for the industrial facilities where the vessel will be built, as well as for the machinery and equipment needed to build it; and

♦   Guarantee insurance with minimum coverage of 3% of the amount of credit granted.

*The FGCN will receive a pecuniary commission from the Shipyard for the Performance Guarantee and from the SPE for the Credit Guarantee*

Since the pledge of all shares issued by the shipyard shall be given as a guarantee of the debt that will be taken out with BNDES, a promissory pledge for all shares issued by the Brazilian shipyard may be accepted.

The pecuniary commission received by the FGCN shall be due: (i) for the Brazilian shipyard, when there is a guarantee to ensure the performance risk; and (ii) for the SPE, when there is a guarantee to ensure the credit risk. In the event that the guarantee term is extended, a supplementary pecuniary commission relating to the additional term shall be charged. The premium to be charged by the FGCN, which refers to this commission, will vary according to the risk analysis to be conducted by the FGCN administrator, for each situation, due to risks noted in the guarantees granted.

The Brazilian shipyard shall be obligated to acquire quotas from the FGCN, in two situations, each in an amount equivalent to 0.25%[25] of the amount guaranteed: (i) when the shipyard itself obtains the Performance Risk Guarantee, and (ii) when the Credit Risk Guarantee is obtained, even though this has already been done by the SPE. The quotas shall be acquired as a single, advance payment.

---

[24] Contract in which one party delivers to another a non-fungible thing to be used temporarily and then returned. It is a free loan, an assignment of use, by which only possession of the good is transferred; its ownership is not transferred.
[25] Percent subject to change after the capacity of the shipyard has been analyzed by the FGCN Manager.



EIG00091724

 [logo:] CAIXA

*The SPEs shall acquire quotas from FGCN, in the amount of 1% of the guaranteed value.*

In addition to the payment of the pecuniary commission to be collected by the administrator of the FGCN in granting credit guarantees in the operations of the Brazilian shipyard, the SPE shall also be obligated to acquire quotas from the FGCN, in an amount that is equivalent to 1% (one percent) of the guaranteed amount, at the time of obtaining the aforementioned guarantees, which shall be acquired in a single, advance payment, and shall remain unavailable for a (minimum) period of five years.

Upon granting the guarantees, the FGCN must comply with the following limitations:

♦    The performance guarantee may not be for an amount that is higher than 10% of the construction cost of each rig;

♦    The credit risk guarantee may not be in an amount that is higher than 50% (fifty percent) of the outstanding balance on each financing operation (noting that this limit may be increased depending on the risk of each transaction, if so determined by the Meeting of Quotaholders)

♦    In financing operations with an FGCN guarantee, the amount financed by financial agents may correspond to up to 90% (ninety percent) of the total project amount; and

♦    The FGCN's exposure limit in relation to each entity guaranteed shall be 25% of its assets.

The FGCN shall provide a guarantee, in the form of a bond or equivalent, without a benefit of privilege for the guarantor.

In relation to each project that has the FGCN's guarantee, it may enter, where applicable, an agreement with the other creditors of the project in question, which governs the form and procedure for enforcing real guarantees provided by the guaranteed Brazilian shipyard.

### 4.1.3.   FGCN'S AQUISITION OF GUARANTEES

Guarantees are obtained by first registering the shipyard by submitting documents establishing the company and documents from the representatives. After the Administrator verifies the validity of the documents, a Statement of Registration is issued. All of the shipyards participating in the bidding process for the construction of the rigs must first complete this registration.

The selected shipyard will go through a review of the solvency conditions of the company and its parent/group[26], if necessary, and the history and experience of the shipyard or parent. A Letter of Commitment for a Credit Risk Guarantee is only issued after this phase has been completed.

Along with the solvency review, a review of the counter-guarantees offered is completed, where the administrator will estimate the value of the guarantees to be granted by the FGCN, considering parameters and methods that are compatible to those used in the market. At the end of this phase,

---

[26] In case of a new shipyard or without proven experience in the sector.





[logo:] CAIXA

a Performance Guarantee Contract is executed between the shipyard and the FGCN, along with a Contract to Share Guarantees with Financing Agents.

The SPE acquires the quotas from the FGCN (1% of the amount of the guarantee granted) and the shipyards make payment of the pecuniary commission on the performance and credit guarantee.

The credit guarantee is granted through a letter of guarantee issued by the FGCN to each financing agent, up to the limit guaranteed (50% of the oustanding balance), for each amount of credit released for the payments related to the construction of the rigs. The letter of guarantee shall be supported by the counter-guarantees offered.

It should be noted that the analysis is only done for the shipyard and guarantees granted, given that the risks covered are allocated during the rig construction phase.

### 4.1.4.   ACTIVATION AND PERFORMANCE OF THE GUARANTEES



*Guarantees shared between the FGCN and financing agents will be performed by the FGCN in order to first cover the oustanding balance of the financing..*

If at any time over the course of the Project it is necessary to enforce a credit guarantee, the FGCN will pay the entire amount of the instalment due under the financing contract, up to the limit of the credit guarantee agreed to with the FGCN, in this case 50% of the outstanding balance of each operation.

In the event that the financing agreement for which the credit risk guarantee is obtained is ended early, the FGCN will honor the oustanding balance arising from the amounts disbursed by the lenders, for up to 50% of the remaining outstanding balance, on the early maturity date.

The settlement of debts by the FGCN will entail subrogating the creditor's rights over the guarantees offered to it, in the same proportion as the amounts honored by the Fund upon termination of the financing agreements.

The majority of the guarantees offered shall be shared between the FGCN and the financing agents. These guarantees, if there are any, which are enforced by the FGCN, and the amounts arising from this enforcement, shall first be used to pay the remaining outstanding balance of the financing.

In order to pay the credit guarantee, the financing party must activate the FGCN guarantee, within a maximum period of ninety (90) days from the event that caused the guarantee to be triggered, by providing written notice with request for Ackowledgment of Receipt (AR), supporting its request.

The lender must choose to receive payment in one of the following forms:

♦   Assets that comprise the allocated assets connected to the guarantee by transfer of ownership on the date of payment of the guarantee; or

♦   National currency, by a deposit in a checking account held by the lender.

In the event that assets have not been established in connection with the guarantee, the lender may also choose to receive as payment assets that constitute the FGCN's assets,



 [logo:] CAIXA

by a transfer of ownership on the date of payment of the guarantee, through an agreeement with the FGCN.

In the event that the FGCN fails to perform, its property and rights shall be pledged or disposed of to meet the guaranteed obligations, up to the limit of the guarantee provided.

**5.    LEGAL ANALYSIS**

The legal aspects of the Rigs Project and of FIP Sondas are being analyzed by the legal advisor retained, the firm Tauil & Chequer Advogados, which is associated with Mayer Brown LLP ("Legal Advisor").

The scope of work of the Legal Advisor includes:

♦    Reviewing the operating structure, including corporate and tax aspects, also keeping in mind the offshore structures formed to achieve the Fund's objective, including preparing a memorandum analyzing and indicating any contingencies, along with suggestions for their treatment in these operating documents, in order to protect the interests of FIP Sondas;

♦    Revision and/or negotiation, where applicable, of the following documents related to the Project:

- shareholders' agreement of Sete Brasil Participações S.A.;

- shareholders' agreement of the SPEs;

- EPC contract;

- charter agreement;

- contract for management of services and oversight; and

- operating contract.

♦    Review and/or negotiation, as applicable, of the following documents related to the Fund:

- bylaws;

- quotaholders' agreement; and

- investment commitment.

♦    Legal opinion regarding:

- regulatory issues pertinent to the project;

- corporate aspects;



**Confidential**

 [logo:] CAIXA

- tax aspects; and

- structure of the operation.

As concerns the various legal aspects of the Project that are currently under the analysis of the Legal Advisor, we will provide a brief description of the contracts and tax aspects of the Rigs Project throughout the next two sections.

However, we did not intend to provide a legal opinion about the aforementioned contracts, nor about the tax aspects of the Project, but rather to list the points that we believe will be most relevant for potential investors to make a decision.

We emphasize that the examination and review of all Project contracts, those included here and those that will be included through some negotiation that is still pending, as well as the tax aspects, form part of the scope of analysis and the opinion to be issued by the Legal Advisor.

## 5.1.   CONSTRUCTION CONTRACT

The version of the Construction Contract on which we are basing our outlining of the points below was provided by the Petrobras Advisor on December 13, 2010.

*"Construction will be governed by lump-sum turnkey EPC Contracts."*

With the aim of generating security during the rig construction period, as concerns meeting the terms and the occurrence of cost overruns, the construction contracts, scheduled to be executed in 2010 between each SPE and the Shipyards/EPC Contractors, will be signed as Engineering, Procurement and Construction Contracts ("EPC Contracts"). The EPC Contracts will be turnkey and lump sum, i.e. with a firm price and a date certain for delivering the object.

The EPC Contract executed with the shipyard shall encompass the design, engineering, supply, construction, commissioning, start-up, tests, and completion of the Units, along with any other specification noted in the draft contracts.

*The EPC Contractor is responsible for the design, engineering, and construction of the rigs.*

The EPC Contractor must complete the works (i) in accordance with the scope thereof and the terms and conditions of the EPC Contract, (ii) in accordance with and with the consent of the applicable legislation, (iii) according to best industry practices and, (iv) within the term stipulated in the contract for each Unit.

The following are the EPC Contractor's obligations:

♦ Purchase, supply, transport, handling, proper storage, and preservation of the equipment, including those received by the SPE;

♦ Being responsible for the design and engineering, in accordance with the contract specifications;



 [logo:] CAIXA

♦ Providing the construction, managing the construction, including supplying all of the management and oversight of the labor, work location, equipment, tools, field materials, storage, and facilities needed to manufacture each Unit;

♦ Complying with applicable legislation and facilitating the export of each Unit, which shall be physically delivered to the SPE in the protected waters of Guanabara Bay;

♦ Negotiating the guarantees, insurance, delivery schedule, and performance requirements with all subcontractors;

♦ Ensuring that the works comply with the construction schedule;

♦ Conducting and managing performance tests;

♦ Obtaining licenses, permits, and authorizations required to carry out the works;

♦ Obtaining any certificate as required by the applicable legislation to conduct performance, demonstration, and operating tests;

♦ Supplying information and documents required by the SPE, which are necessary to inspect the works;

♦ Providing training to the SPEs in reference to the operation and maintenance of equipment provided by the EPC Contractor;

♦ Substituting any subcontractor that is not performing the works in accordance with the terms of the EPC Contract;

♦ Dealing with all customs issues and handling all tasks related to imported equipment;

♦ At SPE's request, cooperating and responding to the questions of any creditor relating to the works and other activities to be performed under the scope of the contract;

♦ Complying with BNDES' financing requirements, if Brazilian local content is financed by this institution;

♦ Handling all payments and withholdings of taxes relating to the works; and

♦ Paying subcontractors within the terms stipulated in the subcontracts.

In accordance with the Local Content rules, the Shipyard/EPC Contractor must complete, in Brazil, the construction, assembly, pre-operation, start-up, and assisted operation related to the works, including the construction of the hull, as well as all works related to steel, up to its integration with the drilling plant.

The Builder must comply with the Brazilian local content requirements, which are calculated in conformity with the ANP's methods and criteria.



 [logo:] CAIXA

FIP SONDAS – CONFIDENTIAL INFORMATION – 1/6/2011

67

For the main systems, the EPC contracts provide for the following rule:

*Table 4 – Local Content Rate*

| System | Local Content (percentage of contract price per Unit) | | |
| --- | --- | --- | --- |
| | First and Second Unit | Third and Fourth Unit | Fifth, Sixth, and Seventh Unit |
| **Generation, Propulsion, Dynamic Positioning** | 40% | 50% | 60% |
| **Drilling Package** | 20% | 30% | 50% |
| **Overall** | **55%** | **60%** | **65%** |

At least 65% of the human resources and total weight of structural parts, panels, and manufacturing of blocks, as well as assembly, assembly of blocks, and all subsequent work to conclude the hull on the pier side, the integration of the drilling plan, and other activities, must be completed in Brazil.

The overall amounts of the EPC Contracts may be reviewed in the following situations:

♦ Creation, modification, or elimination of a tax or fee that alters the cost of the work;

♦ Elimination or interruption of tax incentives; and

♦ Change in the scope of the contract by the SPE.

The adjustment of the overall contract amount must be calculated by the contractor based on the pricing statement that the EPC Contractor presents during the bidding process.

On a monthly basis, the Builder will have to measure the construction progress of the builds and submit the report for the SPE's approval.

*The EPC Contractor will arrange for a minimum level of insurance.*

Both the SPE and the Shipyard/EPC Contractor will arrange for the minimum level of insurance required, to be described in the EPC Contract.

The term for the Builder's guarantee will be twelve months following the delivery of each Unit.

## 5.2.   CHARTER CONTRACT



[logo:] CAIXA

The draft Charter Contract from which we have taken the information below, was the version provided on November 22, 2010.

*The Charter Contract is the legal instrument that will govern the chartering of the rigs*

The purpose of the Charter Contract is the charter[27] to Petrobras, of the drillship ("Unit"), to be used in the drilling, evaluation, supplementation, and/or maintenance of oil and/or gas wells (vertical, directional, horizontal, and shared) in Brazilian waters delineated by the geographic coordinates, in accordance with the Concession Agreement executed by Petrobras and the ANP up to a maximum depth of 10,000 meters, in water depths of up to 3,000 meters.

*The Contract for five of the rigs will have an effective term of ten years, which may be renewed for another ten years at Petrobras' discretion.*

The SPE will be free to start the charter term after it has been proven that the equipment comprising the operating systems of each Unit is in proper condition, such as, but not limited to, the power distribution and generation system, anchoring system (if available), industrial safety, storage of liquids and bulk cargo, circulation and processing of fluids, safety and well head, elevation, rotation, and handling of strings, instruments, equipment for formation testing, and communication system.

If the tests continue for more than seventy-two hours, at Petrobras' exclusive fault, a wait fee of 90% of the Charter Fee will be charged until the rig is released.

Stoppage periods of the unit due to lack of essential equipment, scheduled maintenance, and other reasons attributable to Sete Brasil may be added to the initial term of the Contract.

The effective term of the Charter Contracts shall be ten (10) years for five (5) of the rigs and twenty (20) years for two (2) of the rigs. The contracts may be renewed for a period that is equal to the terms originally determined under the agreement between the parties. It is worth noting that, in situations of this type (first renewal, as long as provided under the contract), Petrobras is released from completing a new bidding process for the purposes of renewing Charter Contracts. Therefore, in case of a potential renewal of contract with Petrobras, it will have to be implemented through a direct negotiation process. However, as there are no predefined conditions, there is no guarantee that any of the parties will execute a new charter contract at the end of the first term. In order to preserve the SPE's preferential right to renew the contract, the SPE and/or Petrobras, up to twelve (12) months prior to the end of the term provided, will have to send notice to the other party, indicating its intention to renew the contract. After this notification, the parties will begin negotiations. For the purpose of the renewal process, respecting the terms to declare interest among the parties, Petrobras may on a priority basis consider renewing the Charter Contracts with the SPEs, provided that, at the time of their renewal:

- There are conditions of demand that justify the need for renewal;

- The prices and conditions that may result from the negotiation discussions are reasonable in view of the market conditions and prices at the time; and

---

[27] Contract whereby the charterer assigns rights over the usage of the vessel to the charterer for a certain period of time.



EIG00091731

 [logo:] CAIXA

- Present performance histories for the rig under renovation that may be deemed satisfactory in Petrobras' exclusive judgment.

Petrobras' obligations are as follows:

- Make payments due to the SPE

- Provide operations program, with due advance notice;

- Measure chartering that has occurred and issue the measurement report;

- Notify the SPE of the application of any fines and of the suspension of the charter; and

- Notify the SPE about defects and irregularities found in the charter.

The amount corresponding to the Charter Rate will be stated in the contract and may be paid in dollars and/or reais, or partially in dollars and partially in reais. The Charter Rate must include all fees specified, public prices, oversight, management, taxes, and all expenses that directly or indirectly impact the performance of the contract.

If during the effective term of the contract taxes are created, eliminated, or modified, there is a change in rates and/or changes to the calculation base that ends up demonstrably altering the costs of the SPE, the charter rate that was originally approved will be modified in the same proportion.

The fines will be applied to the SPE, by Petrobras, for the following impediments:

- Delay in SPE's performance to begin charter:

 (i) first 182 days, 5% daily Charter Fee;

 (ii) between 183 and 365 days, 10% of the daily Charter Fee;

 (iii) between 366 and 547 days, 15% of the Daily Charter Fee, and

 (iv) after 548 days, 20% of the daily Charter Fee.

- delay in performing the contractual requirement or request for oversight-fine corresponding to 20% per day of delay.

Any fines that the SPE may incur will be deducted from the first payment, and from subsequent payments to which the SPE is entitled, after Petrobras has applied the sanctions. The deductions will be limited to 30% (thirty percent) of the corresponding monthly payment amount, until the fine has been fully settled.

Additionally, the EPC Contract provides for the payment of a fee (Liquidated Damages) by the EPC Contractor in the event of a delay in the delivery of each rig, limited to 10% of the contract amount[28]. In the event of a delay, the funds from the Construction Contract fines will be used to pay the Charter Contract fines.

---

[28] Same fee percentage applied to the SPE for a delay in starting the charter.



EIG00091732

[logo:] CAIXA

Petrobras and the SPE's liability for damages shall be limited to direct damages, in accordance with the Brazilian Civil Code and applicable legislation, excluding loss of profit and indirect damage, with direct damage being limited to 5% of the total contract amount.

In the event of oil spills and other waste in the ocean, the SPE shall be liable for up to the limit of US$1,000,000.00 (one million U.S. dollars) per event and that event's consequences.

The SPE shall not be liable for losses, damage, damage to reservoirs, pollution coming from the well, and loss of profit caused to Petrobras, as a result of a "kick[29]," "blow-out[30]," flood, or formation testing.

The SPE may not assign or provide, partially or fully, credits of any kind arising from the Charter Contract as a guarantee, for any purpose, without Petrobras' prior express, written authorization. Petrobras may partially or fully assign the Charter Contract, with the contracting party's consent, which is waived in cases where the assignee is a company which Petrobras controls or in which it holds an equity stake.

*The SPE is liable for all customs obligations to comply with the purpose of the contract.*

The contractor must arrange to purchase, at its own expense, the insurance needed to perform the Charter Contract, in accordance with Brazilian laws, intended to cover the Unit and all of its assets, including for any and all transportation of materials and/or equipment, except when transported under the responsibility of Petrobras and/or third parties in service of Petrobras, as well as civil liability insurance for damages caused to third parties. The contractor must also maintain insurance coverage for the Unit and all of its appurtenances, according to the terms of the London Standard Drilling Barge Form - All Risk. The insurance policies must be consecutively renewed throughout the effective term of the Charter Contract.

The SPE must comply and assume full liability for any and all customs obligations or measures necessary to send, monitor, and approve requests for concession, removal, or modification, in addition to others that prove to be necessary, which relate to the materials, equipment, and any other property that is indispensable to performing the purpose of the Charter Contract. The contractor is responsible for requesting, in a timely manner, authorization of REPETRO benefits for the materials, equipment, and any other assets for which it is responsible for supplying.

The equipment and tools imported under the Temporary Admission Scheme described in Item 5.8.3 may definitively remain in the country, provided that the SPE bears all costs arising from nationalization.

Goods and equipment may be imported on behalf of Petrobras, but all costs incurred in the importation process, including transportation, insurance, and customs clearance, are the SPE's responsibility.

Petrobras may rescind the contract in the following situations:

- Failure to comply or irregular compliance with contractual provisions;

---

[29] This is the undesirable flow of formation fluid within the well, due to well pressure being greater than formation pressure.
[30] When control of the well is lost.



EIG00091733

 [logo:] CAIXA

- unjustified delay in starting charter;

- stoppage of charter without just cause;

- partial or total assignment or subcontracting of the subject of the contract;

- pledge or assignment;

- association, merger, split, or incorporation of the SPE, without giving prior notice to Petrobras;

- faults committed repeatedly while performing the subject of the contract;

- the SPE being declared bankrupt;

- suspension of charter by the competent authorities, motivated by the SPE;

- delay in starting the contract of a period of more than 730 days; and

- rescission of Service Contract.

The SPE may rescind the contract in the following situations:

- delay of more than ninety days in payments due for the charter of the rigs;

- Petrobras' failure to release location to perform charter; and

- rescission from Service Contract;

## 5.3.    SERVICE CONTRACT

*The Service Contract is bound to the Charter Contract, and governs the relations between the SPEs and the Operators.*

The version of the Service Contract which we used to outline the points below was provided by the Advisor in June 2010.

The goal of the Service Contract is for the operator to provide, under the unitary price scheme, drilling services, and the evaluation and/or completion and/or maintenance of oil and/or gas wells (vertical, directional, horizontal, and shared) in Brazilian waters delineated by the geographic coordinates in accordance with the Concession Agreement executed by Petrobras and the government.

The Charter Contract is bound to an Operating and Maintenance Service Contract for the rigs, to be executed between Petrobras and the Specialized Operator/Class B Shareholder. Initially, Petrobras, through a subsidiary that is being formed for this purpose, will execute the Service Contract as operator, and will remain in this position throughout practically every phase of rig construction, as a Class B shareholder of all SPEs of the First System. However, before construction ends for each rig, Petrobras intends to sell its Class B shares in five of the seven SPEs of the First System, to interrested strategic shareholders (operators). To do so, Petrobras will be transferring to the buyer of its Class B shares, for each one of thse SPEs, all rights and obligations in all contractual instruments executed, including the Service Contracts bound to each one of these SPEs, and the shareholders' agreement for the respective SPE.



EIG00091734

 [logo:] CAIXA

For the other two rigs of the First System, Petrobras will maintain its stake as Class B shareholder of the respective SPEs, and is the sole party responsible for their operation and maintenance. For these rigs exclusively, the charter and service contracts will be amended, extending the contractual terms to twenty (20) years.

The payment of the service fee will be monthly, denominated in US$ and converted to R$ by the exchange rate for the base date of the contract, remaining in R$ until the end of the service contract. The service fee will be paid by Petrobras directly to the operator in Brazil.

For the purposes of financial projections, the service fee was estimated at US$115,000[31]. The index used will also be a parametric formula (including indexing according the National Consumer Price Index (INPC), the Wholesale Price Index, and the exchange rate).

The service fee will include other operating costs such as: costs of insurance and spare parts (totaling US$35,000), which are included in the Charter Fee, which the SPE will pay with the amount reimbursed by Petrobras.

The obligations under this contract include the contractor completing any and all operation that is necessary to fully perform the subject of the Service Contract, such as, but not being limited to, the performance and oversight of the positioning, ballasting, and movement of the Unit.

Petrobras may decide that the contractor should reenter wells that have already been drilled, and may install production facilities and equipment in the Unit, within the Unit's capacity (load and hazardous areas). Nevertheless, no structural modification will be made at the Unit without the contractor's consent. All of Petrobras' installed equipment will continue to be owned by it, and will be removed by it at the end of the Service Contract. Petrobras will bear installation and removal costs.

The Service Contract will always be performed simultaneously with the Charter Contract, as they are executed on the same date.

The contractor's obligations are:

♦ To maintain, throughout the performance of the contract, all qualification conditions adopted in the bidding process;

♦ To respect and comply with the administrative standards in effect at Petrobras;

♦ To facilitate the Oversight process, providing information or access to the documentation and services being performed, and promptly addressing the observations and requirements presented;

♦ To repair, at its expense and within the stipulated periods, any and all service that is considered unacceptable;

♦ To be liable for any damage caused to Petrobras or third parties, as a result of performing the services provided for under the Service Contract;

---

[31] Estimated value that may be altered by Petrobras. Other operating costs such as: cost of insurance and costs of spare parts will be paid by the SPE, and will therefore be included in the Charter Fee.



 [logo:] CAIXA

♦   To obtain licenses relating to its activity;

♦   To be liable for the operation, oversight, technical and administrative management, and the necessary labor;

♦   The composition of on-board labor (staff) will have a minimum percent of national labor ranging from 66% (first year of contract) to 85% (as of sixth year of contract);

♦   To perform tests on Unit equipment within seventy-two hours after release for navigating to the first location;

♦   To conduct services according to international work safety standards;

♦   To keep all information and data provided by Petrobras fully confidential;

♦   To plan and conduct operations aimed at avoiding and combatting eruptions of oil, gas, fires, and other accidents;

♦   To take responsbility for and bear the burden of removal of any equipment or material allowed to fall to the ocean floor, due to its fault;

♦   To obtain formal aproval for the Unit's entry and stay in the country, as well as for materials and equipment, arranging for clearances, inspections, registrations, and termporary admission at its expense; and

♦   To purchase insurance for its activity, as well as consecutively renew it throughout the effective term of the contract.


Petrobras' obligations are:

♦   To make payments due to the contractor for the services effectively performed, measured, and billed;

♦   To provide a schedule of operations and locations with due advance notice;

♦   To measure the services performed, and issue the measurement report;

♦   To provide transportation of staff, material, and equipment to the Unit;

♦   To provide, at its own expense, all fuel and water needed to perform the services under contract;

♦   To mantain control over the drilling fluid and completion; and

♦   To provide, at its own expense and liability, auxiliary services relating to: directional drilling, cementing, formation testing, electrical profiling, flexible pipe operations, nitrogen operations, electrical cable operations, wire operations, when arising from Petrobras' own scheduling.

*The Operator will receive a Service Fee which may only be altered if the taxes pertinent to the performance of the service under contract are changed.*

The amounts to be paid by Petrobras to the contractor will result from the application of fees to be determined according to the amounts established in a unit price spreadsheet, for amounts of service that are effectively performed and accepted by oversight.



**EIG00091736**

 [logo:] CAIXA

The prices proposed to perform the services will not be subject to revision unless, during the effective term of the contract, some pertinent tax is created or there is a change in the rate of an existing tax.

The late fee for the contractor, in reference to the [delayed] start of the contract, performance of contractual requirements, or request for inspection, along with delays in preparing the Daily Certificate of Operation ("*ADO*"), will be limited to 10% (ten percent) of the equivalent for the total estimated value of the Service Contract.

Petrobras will perform inspections to verify that the contractor is faithfully performing their obligations, as well as (i) that they are not using equipment, materials, drilling string and/or production tools or components that have been prohibited or that are unsuitable, and (ii) that they are not using improper and/or inadequate techniques.

Petrobras may rescind the Service Contract in the following situations:

♦ Failure to comply or irregular compliance with contractual clauses, specifications, operations, or terms;

♦ Slow performance, leading Petrobras to presume it is impossible to conclude the services within the periods stipulated;

♦ Unjustified delay in starting services;

♦ Stoppage of services without just cause and without prior notice;

♦ Complete or partial assignment or subcontracting of its purpose without Petrobras' prior, express consent, as well as the association, merger, split, or incorporation of the contractor without giving prior notice to Petrobras;

♦ Failure to comply with the regular determinations stated in the inspection;

♦ Once the out-of-court reorganization plan has been approved, or if judicial reorganization has been deferred, if the contractor does not provide sufficient security to guarantee performance of the contractual obligations, at Petrobras' discretion;

♦ Suspension of services by determination of a competent authority, motivated by the contractor;

♦ Failure to present proof of compliance with labor obligations;

♦ Delay in starting performance of the contract of more than 365 days;

♦ Rescission of Charter Contract, independently of cause; and

*Throughout construction, Petrobras will inspect the works.*

♦ Interruption of operations for more than sixty days, for reasons attributable to the contractor, except due to a stoppage resulting from a case of force majeure or an act of God.

The contractor may rescind the contract in the following situations:

♦ If its performance is suspended by order of Petrobras, for a period of more than 120 days;




[logo:] CAIXA

♦   A delay of more than ninety days of the payments owed;

♦   Petrobras' failure to release the location where the services are to be performed; and

♦   Rescission of the Charter Contract, independently of the cause.

As with the Charter Contract, under the Service Contract, the contractor is prevented from assigning or providing as a guarantee, for any purpose, partially or fully, credits of any kind that arise from this contract, without Petrobras' prior authorization.

**5.4.    WORK OVERSIGHT AND MANAGEMENT CONTRACT**

Petrobras, or one of its subsidiaries, will be the party responsible for monitoring and managing the construction of each rig. Therefore, each SPE will execute a work oversight and management contract, in which it will retain Petrobras, or one of its subsidiaries, to manage the work.

This management aims to provide the SPEs with specialized technical services in the areas of work oversight, consulting for contract management, technical consulting for the works, control of financial resources, and the preparation of technical reports.

Under this contract, Petrobras may, on behalf of the SPEs, fully exercise all rights, responsibilities, and obligations related to the EPC Contract, except the obligation to pay the EPC Contractor and the negotiation of equipment design. In conformity with this appointment, Petrobras is granted full powers to act on behalf of the SPEs, albeit with their prior consent, on the following issues: negotiating agreements, deciding any disputes, conflicts, or claims, request for arbitration or judicial proceeding, and to make amendments to the EPC Contract.

Petrobras assumes the obligation of not taking any action that could result in the SPEs' additional liability or financial obligation, without their prior, written consent.

This contract provides that, as concerns the EPC Contract, the SPEs must not do any of the following without Petrobras' prior, express consent:

(i)   exercise any right or power, or grant any approval and/or authorization, pursuant to the EPC Contract, that could compromise, in accordance with Petrobras' criteria, its capacity to comply with its contractual obligations; and

(ii)   waive or be released from any right, obligation, or liability, if such waiver or release, according to Petrobras' criteria, hinders its ability to perform the contractual obligations.

The Management Contract shall remain in effect throughout the construction term of each rig, an average of four years, until final acceptance of the rig by Petrobras and independent engineers



 [logo:] CAIXA

to be retained by the SPEs or their lenders, and may be rescinded by any of the parties due to the specific situations provided for under the contract itself.

Petrobras will be entitled to the payment of US$8.35 million per year/per unit for the management and oversight service, in reference to the date of its execution. Its chief responsiblities shall be (i) developing and monitoring the construction and financial planning of the works, (ii) monitoring and inspecting performance of the works, conducting quality controls, (iii) analyzing and releasing the monthly measurements, verifying compliance with the schedule, and (iv) monitoring performance of the work.

## 5.5.    ASSET MAINTENANCE CONTRACT

The points discussed in this section were based on the draft Asset Maintenance Contract, which the Advisor provided on December 10, 2010.

The Asset Maintenance Contract will be executed between the operator of each rig and the respective SPE with the goal of establishing the obligations, duties, and resonsibilities of the SPE as rig owner and operator with regard to the operation, maintenance, and preservation of the rig, including actions related to the selection, hiring, and training of its crew, so that it is used to meet the obligations assumed under the Charter and Service Contracts.

Under this contract, the operator acknowledges that it meets the technical conditions to operate the equipment, and promises to participate in the testing and commissioning phase ("Transition Phase"), to certify that the rig meets the technical specifications and has all of the items and equipment needed to allow the operation and charter to occur within the contractual conditions.

The contract shall remain in effect solely during this Transition Phase until the operator enters as shareholder of the SPE. During this period, the operator must comply with all obligations under the Service Contract, and with the obligations of the Charter Contract for which the SPE would be responsible during this stage, which include:

- Monitoring, on behalf of the SPE, the charter measurements taken by Petrobras;

- On behalf of the SPE, complying with the legal determinations issued by the authorities established in relation to the charter;

- Presenting and performing the maintenance plan, and keeping it updated; and

- The Operator shall be fully liable for all cases where petroleum, oil, or waste is dumped into the ocean, or any other accident that could occur, provided that it is due to the aforementioned events. During the rig operating phase, its liability shall be limited to the amounts specified under the Service Contract;

The SPE may apply late fees and compensation to the operator that Petrobras has imputed to it, as provided under the Charter Contract, which were caused by the operator's failure to perform



 [logo:] CAIXA

any terms stated under the contract. None of the parties shall be liable for failing to comply with obligations or damage resulting from a case of force majeure or an act of God.

The SPE and Sete International shall be guaraneed right of recourse against the operator, in the event that the SPE or Sete International becomes obligated to repair any damage that is caused to third parties or to Petrobras.

**5.6.    CORPORATE DOCUMENTS - SETE BRASIL**

**5.6.1.   SHAREHOLDERS' AGREEMENT and ARTICLES OF ASSOCIATION**

FIP Sondas and Petrobras shall enter a Shareholders' Agreement and Articles of Association, in order to establish the rights and obligations of each of the parties in relation to administering and conducting the business of Sete Brasil, as well as to regulate its functioning. In this section, we describe certain points of the Shareholders' Agreement and Articles of Association of Sete Brasil, in the versions the Advisor provided on December 15, 2010.

The Company's Board of Directors will consist of nine members, one of whom will be its chairman, and another the vice chairman, who have been elected at a general meeting and may be removed by the same process at any time. Other participants that do not have voting rights may also be invited to its meetings, to provide clarifications of any kind[32].

The company's Executive Board will consist of three elected directors, who may or may not be shareholders, who may be removed at any time by the Board of Directors. They are elected for a three-year term, as follows: one CEO, one CFO, and a Director of Operations. FIP will propose the CFO, from a list of three names it has prepared, and Petrobras will propose the CEO and Director of Operations from lists of three names each. The names indicated for the three directorships must be selected and approved by Sete Brasil's Board of Directors, which may even reject all of the names proposed for all three positions, in which case new lists of three names will have to be proposed by the respective parties, to be newly assessed by the Board of Directors.

Deliberations on any modification to the Articles of Association of the Company, any amendment and/or approval of the Strategic Guidelines Plan, determining or modifying the powers and responsibilities of members of the Board of Directors, an increase or reduction in share capital, and any form of corporate reorganization invovling Sete or subsidiaries, will depend on the affirmative vote of shareholders representing 80% of the total shares.

Throughout the effective term of the Shareholders' Agreement, shareholders will have the right to elect or remove, at any time, the members of the Board of Directors. There will be nine members, one of whom is elected by exclusive nomination of Petrobras, six by exclusive nomination of the quotaholders of FIP, one by

---





[logo:] CAIXA

FIP SONDAS – CONFIDENTIAL INFORMATION – 1/6/2011

**78**

exclusive nomination of the Manager of FIP[33], and one will be selected by the shareholders from among a list of three names to be provided by Petrobras, with the aforementioned member being elected CEO of Sete. The members of the Board of Directors will have one-year terms, and relection is permitted.

At any meeting of the Board of Directors, board members will have complete freedom to question the board about any matter relating to Sete, its subsidiaries, and activities. The directors are obligated to provide an adequate response and to present, where applicable, documentation supporting and proving their statements.

The responsibilities of Sete Brasil's Board of Directors' include, by a decision made by a majority vote of the members present:

(i)        approving the formation or elimination of subsidiaries;

(ii)        deciding on the Board's statement of accounts;

(iii)        proposing a resolution of the general meeting on allocation of the remaining balance of profits for each fiscal year;

(iv)        overseeing the Board's management;

(v)        revising the Business Plan on an annual basis;

(vi)        approving the hiring or substitution of independent auditors;

(vii)        resolving on the granting of guarantees of any nature;

(viii)        resolving on the conducting of business of any kind between the Company and the controlling shareholder;

(ix)        providing for its work and establishing the standards governing its operations;

(x)        resolving on stock splits, grouping of shares, and redemption or purchase of shares to be canceled or maintained in the treasury;

(xi)        resolving on the granting of guarantees of any kind not provided for under the business plan.

(xii)        resolving on an increase in share capital;

(xiii)        approving any amendments to Project contracts;

(xiv)        approving annual budget;

(xv)        setting general criteria for compensation and benefits policies of directors;

---

[33] In the event that FI-FGTS joins as a quotaholder of FIP, it will nominate one of the members of the Board of Directors. Upon the effective entry of FI-FGTS, the Manager of FIP will attend meetings of the Board of Directors as a non-voting member.



 [logo:] CAIXA

(xvi)        resolving on the exercise of voting rights by Sete Brasil at general meetings and/or meetings of shareholders;

(xvii)        resolving on the acceptance or rejection of any offer to acquire class "A" shares of the SPEs;

(xviii)        approving contracts for the construction of new drillships by any of the subsidiaries, as well as the respective charter contracts, asset maintenance contract, and other contracts related to the operation;

(xix)        approving changes to the Charter and Asset Maintenance Contracts outside the normal course of business, or that represent a reduction in revenue or increase in costs that could impact the business plan; and

(xx)        approving any change that results in an increase in construction costs or a change in the rig specifications.

In the event of an Initial Public Offering ("IPO") from the Company, the Board of Directors will be comprised of at least 20% of independent members[34], who must be expressly declared as such at the general meeting electing them.

The Strategic Guidelines Plan that will be part of Sete Brasil's articles of association will determine its main strategies, as well as its corporate and tax structure, its financing plan, capital structure, its plans to establish its assets (bound to the construction of the rigs), among other things. Any changes that are not originally provided for under the business plan may be proposed by the Board of Directors and are subject to approval at the general meeting of shareholders, in accordance with the rules to be established within Sete Brasil's corporate documents.

Sete Brasil's Strategic Guidelines Plan shall consider the following information regarding the company and its subsidiaries:

(i)   the general direction of the business, containing guidelines, policy, and basic objectives for all areas of operation;

(ii)   investment strategy, financing plan, capital structure, plans for establishing assets, organizational structure, and projections of revenue and expenses;

(iii)   commercial and operational planning; and

(iv)   investment plan, strategic plans, and risk plans, as well as criteria to alter the aforementioned plans.

Petrobras may only reduce its stake to below 5%: (i) after the investment period has ended (planned to be concluded within seven to ten years), (ii) Sete Brasil registers as a publicy held company with the CVM or (iii) in the event that any investor ends up transferring its quotas in FIP in violation of the Permitted Conditions. FIP may not transfer its shares: (i) prior to the conclusion of the investment period or (ii) before Sete Brasil is registered as a publicly held company ("Lock-Up Period").

---

[34] People elected under the power provided under Article 141, Paragraphs 4 and 5, of the Corporations Law.



 [logo:] CAIXA

The agreement provides for a tag-along right ("Tag-Along"). However, if FIP has an offer for the purchase of shares representing 45% of the share capital, or a sufficient number wherein FIP no longer has control of Sete Brasil, Petrobras will have the right to require that FIP include all shares held by Petrobras in the disposal.

Lastly, no shareholder will be able to create any direct or indirect burden over all or part of the Sete Brasil shares it holds, without the prior, express authorization of the other shareholders, except in cases of (i) a burden on the shares created in guarantee of the contract, agreement, or transaction to which the Company and/or its direct or indirect subsidiaries are party; and (ii) burden on shares created in guarantee of a contract, agreement, or transactions exclusively entered between shareholders.

The Shareholders' Agreement provides for a potential Initial Public Offering ("IPO").

Sete Brasil has an open-ended term and will only be liquidated in the cases provided under law. The general meeting is the body that has authority to determine the form of liquidation.

## 5.6.2.   STRATEGIC GUIDELINES PLAN OF SETE BRASIL PARTICIPAÇÕES

As part of the Shareholders' Agreement, a Strategic Guidelines Plan will be created for Sete Brasil (the "Plan"), and this will state the structure of Sete Brasil and its subsidiaries, how the necessary funds will be raised for the Project, how management and governance will be carried out, the sale of the Class B shares of the SPEs, the Short List, the possibility of an IPO, and the operating plan. Below are certain observations which we deem most pertinent from the draft provided on December 15, 2010.

As concerns Sete Brasil's growth strategy, the Plan provides that it will only occur through commercial exploration via charter of assets similar to those provided for the First System, through the construction, operation, and charter of new rigs for deep waters for clients requesting these assets, or by the purchase of assets that are already established or under construction, which are similar to the rigs, or by the acquisition of companies that have similar assets (drilling rigs or shares of capital), provided that these acquisitions are duly approved by the Board of Directors.

Another important point addressed in the Plan is the preferential right that Sete Brasil will have, within a period of twelve (12) months counted from the date of approval of the First System contracts, for the construction of new systems up to the limit of twenty-one (21) rigs, provided they comply with conditions of price, term, and physical characteristics that are similar to that of the First System. If the development of new systems is successful, the final terms and conditions for all main contracts involved in the construction, operation, and charter of these new rigs for Petrobras, or




[logo:] CAIXA

a company designated by it, must be submitted by Sete Brasil's Executive Board for approval by the Board of Directors.

For two years from the execution of the EPC Contracts of the first system, Petrobras and its subsidiaries may not create parallel vehicles with characteristics similar to those of the Project as long as these vehicles have the purpose of chartering Rigs, until contracts for construction of the twenty-eight (28) rigs provided for under the Project have been awarded.

The draft Plan describes how the Class B shares of five of the seven SPEs will be sold to the Specialized Operator. Provided that the buyer of the Class B shares is any of the companies included in the Short List, and that no adverse material event has occured with the company selected at the time of transferring the shares, no prior approval from the other shareholders or senior lenders of the SPE will be required to complete the sale of the shares.

Petrobras is free to choose the operator at any time upon executing the Charter, Service, and EPC Contracts, until the date of delivery of the rig and final acceptance by SPE and Petrobras, provided that the operator selected is included in the Short List. The effective transfer of Class B shares to the operator/shareholder will only occur after a series of conditions has been met, including satisfactory completion of Rig acceptance tests by Petrobras and by the operator.

The shareholder/operator will be responsible for paying the Class A shareholder "underperformance compensation" due to low performance of the rig that results in a loss of revenue, according to the rules and targets stipulated in the Shareholders' Agreement of each SPE[35], which may even result in a dilution of the Class B shareholder's equity stake in the corresponding SPE.

In the two SPEs of which Petrobras remains operator, the "underperformance compensation" due from the Class B shareholder to the Class A shareholder shall not result in a dilution of the Class B shareholder's stake, being limited to monetary compensation (a fine, which funds will be received by the SPE).

The Plan already includes the scenario (if there is market opportunity and interest from investors), that Sete Brasil may make an initial public offering to the market. The IPO shall consist of a primary offer and, if there is interest from the shareholders of Sete Brasil and from the market, a secondary offering. Furthermore, in the case of an IPO, Sete Brasil will make a call for capital up to the total limit committed by the FIP quotaholders, If this does not occur, after the eighth year, Sete Brasil may go public.

## 5.7.    CHARTER AND BYLAWS - FIP SONDAS

### 5.7.1.    INVESTMENT AGREEMENT

---

[35] Document not available

 [logo:] CAIXA

An Investment Agreement will also be executed with the aim of regulating potential investment in the Rigs Project by investors, as quotaholders of FIP Sondas, together with Petrobras, as shareholder of Sete Brasil. The agreement draft on which we are basing this section was provided on December 15, 2010.

The Investment Agreement provides for, among other issues:

(i)    the obligation of quotaholders to fully pay up the quotas of FIP Sondas and each shareholder in order to fully pay up the capital subscribed for in Sete Brasil;

(ii)   the schedule of capital contributions;

(iii)  the details for potentially creating subordinate debt;

(iv)  capital contributions in Sete International and in the SPEs, by Sete Brasil;

(v)    exercise of the voting rights of quotaholders and by Petrobras in matters relevant to Sete Brasil;

(vi)  the creation of a Performance Fund, Renewal Fund, and Contingency Reserve Account; and

(vii) the public listing of Sete Brasil's capital.

Quotaholders will fully pay for the quotas subscribed by a capital call to be made by the administrator, up to the limit established in the agreement. Capital calls will be made as necessary by Sete Brasil to perform its Business Plan. At each capital call as established in the contribution schedule, shareholders will have five business days to pay the entirety of the amount.

If any shareholder fails to pay the amounts noted in the capital calls, all rights granted to them in the Articles of Association and Shareholders' Agreement of Sete Brasil will be suspended. They may even, if nonperformance continues for a period of more than five business days, be charged a fine equivalent to 10% of the amount due as stipulated in the capital call. In the event that nonperformance continues for a period of more than twenty business days, Sete Brasil may, by decision of a majority of the board of directors, sell the unpaid shares held by the nonperforming shareholder.

At the discretion of the investors and within the limits established in the Strategic Guidelines Plan of Sete Brasil, part of the funds needed to conclude the Project may be obtained through subordinated debt, i.e. debt issued by Sete Brasil, in the form of an issuance of debentures not convertible to shares.

The Board of Directors of Sete Brasil shall have the authority to decide on and approve the distribution of extraordinary dividends to establish the Performance Fund. Furthermore, between the eighth and tenth year of operation of each rig, part of the dividends paid by the SPEs to Sete International must be allocated to establishing the Renewal Fund, in the relevant amount.

The Investment Agreement also addresses the creation of the Reserve Account, held by Sete International, which must be established for all SPEs and which has the purpose of providing financial assistance to SPEs having difficulties. The Reserve Account shall initially be established using funds from the Mobilization Fee.



 [logo:] CAIXA

As the quotaholders will not directly be shareholders of Sete Brasil, an individual decision-making forum will be created in relation to relevant matters concerning the Company (those requiring a qualified quorum of 80%), which will take place through meetings called prior to holding a General Meeting of Sete Brasil ("Preliminary Meeting"). At the Preliminary Meetings, both quotaholders of FIP Sondas and Petrobras will vote, with the representation of each participant being determined based on their (direct and indirect) equity interest in Sete Brasil. Decisions made at a Preliminary Meeting will be binding for quotaholders' votes in the General Meetings of Quotaholders, and for votes of FIP Sondas and Petrobras in the Special Meetings of Shareholders of Sete Brasil.

The deliberations of the Preliminary Meeting will depend on a qualified forum representing 80% of the total direct or indirect equity interest in the share capital of Sete Brasil.

### 5.7.2.  BYLAWS

The draft of the FIP ("Fund") Bylaws on which we are basing this section was provided by the Advisor on December 13, 2010. Its provisions include the responsibilities, obligations, and compensation of the administrator, the duties of the Fund, and the responsibilities of the general meeting of quotaholders, which include resolving on:

- the issuance and distribution of new quotas of the Fund;

- changes in the criterion for calculating the management fee;

- changes in the terms of the Fund and strategies and guidelines for investment and divestment in Sete Brasil;

- changes to the Bylaws; and

- retaining service providers (attorneys, consultants, auditors, etc.).

FIP is an equity investment fund, established in the form of a closed-end fund, governed by its bylaws and by the legal provisions applicable thereto, especially CVM Instruction [ICVM] 391.

Pursuant to Article 109 of ICVM 409, the following are considered Qualified Investors:

- financial institutions;

- insurance companies and capitalization companies;

- public and private supplementary pension entities;

- individuals or legal entities that have financial investments of more than R$300,000.00 and that, additionally, attest in writing to their status as a qualified investor through their own records;

- investment funds exclusively intended for qualified investors;

- portfolio managers and securities advisors authorized by the CVM, in relation to their equity; and



 [logo:] CAIXA

♦ specific social security schemes established by the government, the states, the Federal District, or by municipalities.

The Fund was established by the Director on August 12, 2010, and its charter and bylaws were filed at the Second Civil Registry Office of the Capital of the State of São Paulo, on August 12, 2010, under No. 0000971314.

Its goal is the appreciation of capital invested through the purchase of shares issued by Sete Brasil ("Invested Company"), participating in the decision-making process of the invested company, having an effective influence on defining its strategic and management policy. Up to 100% of the FIP portfolio may be invested in Sete Brasil.

The Fund shall participate in the management process of the Invested Company: (i) by holding shares that comprise the controlling block; (ii) by entering a shareholders' agreement, or (iii) by making adjustments of a different nature or adopting a procedure that ensures the Fund will have influence on determining the strategic and management policy of Sete Brasil, preferably by nominating members of its Board of Directors.

The term will be twenty (20) years, counted from the date of payment of the quotas constituting the minimum initial assets, which may be extended by approval of the general meeting of quotaholders. The ten-year period, counted from the time of payment, will be the investment period. The ten-year period, after the investment period ends, will be allocated to divestment, and during the divestment period, the Fund's investments will be liquidated, in an orderly manner, and the resulting proceeds used to amortize the quotas.

The quotas will correspond to suitable fractions of the Fund's net assets, will become registered quotas, and will be kept in a deposit account in the name of their holders. Ownership of these registered quotas will be presumed from an extract from the quota deposit account, opened in the name of the quotaholder.

The minimum individual subscription amount is R$1,000,000.00 (one million reais). No quotaholder may individually or jointly hold more than 33% (thirty-three percent) of the outstanding Fund quotas. The quotas will not be traded on the stock exchange or in an organized over-the-counter market.

A quotaholder that wishes to assign or transfer their quotas to third parties, partially or fully, must first offer them to any other quotaholder. The preferential right over the number of quotas offered will be in proportion to the quotaholder's equity interest in the Fund's total quotas.

In a complete or partial liquidation of the FIP, as well as in a distribution of dividends or interest on capital by Sete Brasil, the amount will be fully used to amortize the quotas, unless the Administrator justifiably identifies the need to withold part or all of the amount obtained with the divestment for payment of some Fund obligation, limited to a determined percentage of the Fund's net assets.

There will be no redemption of quotas, unless it is due to the conclusion of the term or the liquidation of the Fund. Redemption events may not be conflated with amortization events.



**EIG00091747**

 [logo:] CAIXA

The Fund will enter into liquidation at the end of the term or its extension, where applicable, by resolution of the general meeting of quotaholders.

At the time of Fund liquidation, the Administrator must account for the assets comprising the Fund portfolio and the resulting proceeds, upon deducting the Fund's commitments, must be delivered to quotaholders as payment for the amortization of the quotas, in proportion to each holder's stake in the Fund's net assets.

### 5.7.3.   QUOTAHOLDERS' AGREEMENT

A draft FIP Quotaholder Agreement was provided by Petrobras' Advisors on December 13, 2010. Its goal is to govern, in addition to the terms of the FIP Bylaws, the relationship between the quotaholders and the Fund's activities. As in the Bylaws, the Quotaholders' Agreement discusses, among other things, issues concerning rights and voting at the general meeting, the transfer and negotiation of quotas, the term of the Fund, capital calls, and lock-up periods.

All quotaholders, the Administrator, and Sete Brasil promise throughout the effective twenty-year term to comply with any and all provisions of the Quotaholders' Agreement.

As of the eighth year of the Fund, any quotaholder may ask the Administrator to call a general meeting of quotaholders to deliberate on the liquidation of the Fund, which liquidation will only be approved with the favorable vote of all quotaholders. When liquidating the Fund, upon paying the costs and fees, the Administrator will distribute the instruments and securities issued by Sete Brasil and the other assets comprising the Fund portfolio to the quotaholders.

With the exception of a transfer of quotas between quotaholders and after the period of paying up the capital committed by the quotaholders, in any potential transfer of quotas from FIP to a third party, Petrobras will have thirty days, counted from the Administrator's receipt of notification to declare whether they will veto the entry of the potential buyer as a quotaholder of the Fund if:

- Petrobras agrees, at its exclusive discretion, with justification, that the potential buyer is not qualified;

- the potential buyer is involved in a dispute with Petrobras or with direct or indirect subsidiaries or affiliates;

- the potential buyer is a competitor of Petrobras; or

- the potential buyer is a company that directly or indirectly works in the charter and drilling rig operations market.

Petrobras' right of veto will only be applicable before the Sete Brasil IPO is completed.



EIG00091748

 [logo:] CAIXA

### 5.8.   TAX ASPECTS

*Tax structure is a determining factor in the structure of the Project.*

The Rigs Project was structured to make use of tax benefits for taxes paid in acquiring the equipment needed to produce and maintain rigs and distribute profits to Shareholders. Therefore, the tax aspects of the Rigs Project are a main factor in its structure, which justifies the entities being located in various countries.

The location of the entities is closely linked to the tax objectives outlined, which in short aim to avoid, within the legal limit permitted, the unnecessary taxation of SPE dividends for its holding company Sete International, allowing it to be used as a conduit for the portfolio structure, and tax sparing credits[36] to be used in the SPEs to employ applicable legislation aimed at reducing the incidence of taxes.

*Sete Brasil will be formed in Brazil to facilitate the entry of investors.*

*The purpose of Sete International is to be a conduit for the SPEs.*

Sete Brasil, given the profile of some of its investors[37], will be established in Brazil, as a holding company for vehicles located abroad in order to create means that facilitate pension funds' investment in its capital.

The selection of an offshore structure to to achieve a concentration of cash aims to avoid the need for exchange flows in Brazil, as well as to eliminate the risk of exchange losses or gains due to currency contraction in relation to the real. Within the possible jurisdictions, according to Petrobras' Advisors, the choice of Austria as a location to establish Sete International is due to the fact that the Brazil-Austria Agreement has greater benefits compared to other locations. Additionally, because Austria is part of the European Union, this avoids taxation on the distribution of dividends from the SPEs to Sete International.

*The SPEs will be foreign entities in order to obtain the benefits of REPETRO*

The SPEs must be foreign entities in order to obtain the benefits of the REPETRO program. Additionally, it was decided to not establish the SPEs and[sic] jurisdiction considered a "tax haven" for the purposes of Brazilian law, thereby avoiding the payment of taxes at the source when Petrobras remits payments of the Charter Fees.

In turn, the operator of each unit must be a Brazilian company, in order to perform its activities on Brazilian territory, and have been retained by Petrobras through a service contract, connected to a charter contract. The payments related to this contract will be in local currency (reais) while payments related to the charter contract may be either completely or partially in US dollars or reais.

We note that the tax and regulatory aspects of the operation fall within the scope of analysis to be conducted by the firm Tauil & Chequer Mayer Brown ("Fund Legal Advisor"). The Legal Advisor's opinion will include the legal opinion regarding the descriptions provided here.



[36] Ficititious credit consists of the country of residence granting credit, corresponding to the tax established by the internal legislation of the source country, but that was reduced or had a payment exempt due to a tax incentive.
[37] Supplementary Pension Funds.



**CAIXA** [logo:] CAIXA

### 5.8.1.   BRAZIL-AUSTRIA DOUBLE TAXATION AGREEMENT

Sete International is located in Austria, such that it benefits from the double taxation agreement executed between Brazil and Austria[38].

*This is the agreement that optimizes the results for FIP quotaholders, since according to it, dividends will be taxed (15%) a single time.*

Under the terms of the agreement, the profits obtained by Sete International will only be taxed in one of its jurisdictions, in this case, Austria. In other words, in accordance with Article 74 of Provisional Measure 2158/35, the profits calculated by Sete Brasil must not be taxed in Brazil, since they arise from the distribution of dividends by Sete International, which were already duly taxed in Austria.

The Brazil-Austria Treaty exempts Brazilian shareholders from taxation, in Brazil, on dividends received from an Austrian source, if the Brazilian equity stake is at least 25% of the registered capital of the Austrian company.

Additionally, the dividends paid by an Austrian company to its Brazilian shareholders are subject to taxation, in Austria, at the rate of 15% for IRRF[39].

Provisional Measure [*MP*] 2158/35 determines that for the purposes of determining the calculation base for income tax and CSLL, the profits obtained by the subsidiary or affiliate abroad will be provided for the parent or affiliate in Brazil on the balance sheet date when they were calculated, and thus 34% of the calculated profit is subject to taxation, unless the subsidiary or affiliate is located in countries where there is a Double Taxation Agreement with the Brazilian government.

Under the Austrian Participation Exemption, the dividends received by an Austrian holding from a foreign subsidiary are not subject to the payment of taxes in Austria, if four requirements are met:

- The Austrian company must have an at least 10% stake in the foreign subsidiary;

- The Austrian subsidiary must be comparable to a corporate entity. SPEs will be formed as Dutch BVs *(Besloten Vennootschap met beperkle aanspralelijkheid)*, recognized by the Austrian authority as corporate entities.

- The foreign company's stake must be held for at least one year;

- Specific "anti-abuse"[40] rules are not applicable.

Beyond tax benefts, we can list some relevant points in the Austrian legal scenario that make the Project structure more attractive.

- A member of the European Union: the European directives provide the members of the European Union with a certain degree of flexibility in transactions with other member countries, such as, for example, in international acquisitions;

---

[38] Decree No. 78.107/76 dated July 22, 1976.
[39] Art.10, Decree 78.107.
[40] According to the "anti-abuse" rule, the Austrian participation exemption does not apply if the foreign subsidiaries are: passive (with revenue generated outside of Austria, where the foreign subsidiary has an office and employees, and the charter is operational), and are located in a jurisdiction where the income tax is substantially lower than it would be in Austria.



 [logo:] CAIXA

- Flexibility for corporate law issues and debt instruments;

- Easy establishment of Austrian entities. The most common legal forms are: public and private companies (AG, GmbH), in addition to unlimited or limited liability companies (OG, KG);

- The minimum share capital for a GmbH is €35,000;

- Foreign companies may also operate through subsidiaries; and

- Easy access to work permits, both for the management level, and for other groups.

General observations regarding the tax situation:

- Income Tax on Legal Entities (IRPJ) at the rate of 25% (twenty-five percent) on profit calculated at the end of the period;

- Participation Exemption Scheme for dividends and capital gains, known as the International Participation Exemption,

- The European Directive provides for IRRF not applying to dividends, royalties, and interest, as well as for not taxing international acquisitions;

- Extensive network, with more than eighty International Treaties, including various Double Taxation Treaties (DTTs), which allow IRRF at a rate of 0% on dividends, as well as provide for Tax Sparing Credits[41] and matching credits;

- Flexibility in a capital reduction;

- No IRRF on interest; interest paid in the acquisition of a debt-financed share is deductible; and

- Possibility of tax rulings being issued by the Austrian Treasury.


### 5.8.2. NETHERLANDS

After two years following the publication of Law No. 11.727/2008[42], the Brazilian Federal Revenue Office ("RFB") issued, on June 7, 2010, Legislative Instruction No. 1.037, which: (a) listed the jurisdictions deemd "tax havens" and the "privileged tax schemes"; and (b) expressly revoked the list contained in Legislative Instruction 188/2002. The Netherlands is listed as a privileged tax scheme, offering no risk to SPEs located in areas considered "tax havens."

*RBF Instruction 1.037 included the Netherlands as a "privileged tax scheme."*

Pursuant to the Brazil-Netherlands Treaty, when a resident of the Netherlands receives revenue from Brazil, as in the case of the SPEs (charter revenue), the Netherlands will allow

---

[41] The resident country grants a deduction of the amount of tax that the source country could have paid according to its general legislation, or a deduction of the amount determined in the double taxation treaty.
[42] Which expanded the concept of "tax havens" and introduced the definition of a "privileged tax scheme."



 [logo:] CAIXA

a Dutch tax deduction calculated on the revenue, which corresponds to the amount of tax paid in Brazil.

The deduction will be calculated at the rate of 20% for revenue coming from Brazil and will be considered a matching credit.

The matching credit will be offset when the profit obtained by the SPE in the Netherlands is taxed. Currently, the rate impacting the profit of Dutch companies is 25.5% and, when offset with a matching credit, this tends to minimize the tax burden on these companies' profits.

The requirements to apply a matching credit, in conformity with the provisions of the Brazil-Netherlands Treaty, are as follows:

- payments must be made by a resident in Brazil to a resident in the Netherlands;

- charter revenue must be classified as royalties. The treaty defines royalties as payments of any kind made by the use and by the right to use industrial, commercial, or scientific equipment;

- the person receiving royalties must be the actual beneficairy of the revenue;

- payments cannot be made to a beneficiary that conducts business in Brazil through a permanent place of business; and

- payments must be taxable in Brazil.

Additionally, the Netherlands is a traditional supplier for the oil and gas industry and, considering the outlook for growth of the Brazilian market, it is even further mobilizing in order to replace export processes to Brazil, by producing equipment and providing services on national territory.

According to the 2009 Economist Intelligence Unit, the Netherlands is the eighth leading country in technological development on the planet. Therefore, the SPEs will be located in a market that is comprised of companies that are recognized worldwide for using cutting-edge technology in their activities.

### 5.8.3.   REPETRO

*REPETRO is a scheme for import and export of goods intended for the E&P industry.*

The Special Customs Scheme for the Oil Industry [*Regime Aduaneiro Especial para Indústria do Petróleo ("REPETRO")*] is the import and export scheme for goods intended for prospecting and development activities for onshore and offshore oil and natural gas deposits. It may be granted up to December 31, 2020, providing full suspension of payment of the applicable federal taxes.

REPETRO was created by the Federal Government to increase oil and natural gas exploration and production activities in the country. Provisional Measure No. 1916,



 [logo:] CAIXA

dated July 29, 1999, which was transformed into Law No. 9.826, dated August 23, 1999, regulated by Decree No. 3.161, dated September 2, 1999, established special treatment applicable to foreign goods used by the oil and gas industry, but also applied to illusively exported national equipment[43]. Through REPETRO, customs fees (II, IPI, and ICMS) are suspended while the concession agreement is in effect, provided that the good is returned to the country of origin at the end of the contract.

In order to benefit from REPETRO, it is mandatory for the candidate to be (i) a concessionaire authorized by the ANP to prospect for and explore oil and natural gas in Brazil, or (ii) a service provider retained by a concessionaire to provide services relating to this industry in the country. In the event that the provider is not based in Brazil, a company with headquarters in the country that is designated by it to import the goods may qualify for REPETRO.

"Fictitious export," drawback[44], and temporary admission[45] are accepted customs treatments, where applicable, under REPETRO, each having specific features that should be noted.

REPETRO applies to the following goods:

a) Vessels for prospecting and production activities for oil or natural gas deposits, for support and stowage in the aforementioned activities;

b) Machines, devices, instruments, tools, and equipment for prospecting and production of oil or natural gas deposits;

c) Drilling platforms for oil or natural gas production activities, as well as those intended for support in the aforementioned activities;

d) Vehicles equipped with machines, devices, instruments, tools, and equipment designed for prospecting and production activities for oil or natural gas deposits; and

e) Structures especially designed to support platforms.

The scheme may moreover be applied to machines, devices, instruments, tools, equipment, and other parts or pieces, including spare parts, for (i) guaranteeing the operation of goods accepted under REPETRO; (ii) safety, accident prevention, and fire-fighting; and (iii) environmental protection.

Goods imported under REPETRO have a limited time to remain within Brazilian territory. This period corresponds to the concession term (if the applicant of the aforementioned system is the concessionaire) or the effective term of the contract (if the applicant is a contractor of the concessionaire). As soon as the permitted time for remaining in the country has elapsed, the goods must be: (i) reexported; (ii) delivered to the National Treasury, free of any expenses, provided that the customs authority agrees to receive it; (iii) destroyed; (iv) transferred to another special customs scheme; or (v) dispatched for consumption.

*The SPEs are fully compatible with the REPETRO scheme on the grounds of "fictitious export" (drawback and temporary admission )*

---

[43] Although the good is not physically in the national territory, the product negotiated is paid for in foreign currency to the company headquartered abroad, and is therefore considered to be exported for tax purposes.
[44] Method of suspending payment of taxes, raw materials, semi-finished products, or finished products, and parts or pieces, for the production of goods to be exported.
[45] When there are foreign or denationalized goods that come directly from abroad and remain in the country for a certain amount of time.



EIG00091753

 [logo:] CAIXA

It should be noted that REPETRO suspends all federal taxes on imports, i.e.: (i) Import Tax; (ii) Tax on Industrialized Products; (iii) PIS-importation; (iv) COFINS-importation, and (v) Additional tax on Freight for Renovation of the Merchant Navy - AFRMM. However, in the event that any of the legal provisions referring to REPETRO are not respected, payment of the suspended taxes must be made. Furthermore, administrative sanctions will be applied, which range from a notice of suspension to cancellation of the authorization.

In addition to the federal taxes mentioned above, the ICMS applies to the import of goods, which is subject to state jurisdiction. The current Brazilian legislation determines that tax benefits within the state scope must be granted through agreements.

In relation to REPETRO, Agreement No. 130/07 authorized the Member States to grant an exemption or reduction in ICMS for equipment and spare parts to be used in oil and natural gas exploration activities, provided that they have been imported through REPETRO.

Furthermore, the aforementioned agreement allows for a reduction of ICMS on equipment related to the production phase at a rate of 3%, in the case of cumulative tax, and 7.5% in the case of non-cumulative tax, at the taxpayer's discretion.

All Brazilian states ratified, even if tacitly, the aforementioned Agreement No. 130/07. However, in order for the benefit to be used, it is necessary for the State of the importing legal entity to formally approve Agreement No. 130/07. The states of Rio de Janeiro, São Paulo, and Espírito Santo have already done so.

As concerns the Project, even taking into consideration the use of certain tax credits by the SPEs and by Petrobras, the impact of all of these taxes would be substantial in any financial structure that does not consider the REPETRO benefits. Therefore, it is essential that the financial structure allow the SPEs and Petrobras to fully benefit from REPETRO, which would exempt these commercial transactions from all federal taxes and, depending on the situation and specific consultation, from ICMS as well.

Under the REPETRO scheme:

♦ Goods may be imported as raw materials, without withholding or payment of taxes as long as they are used to produce assets that are eligible for subsequent export;

♦ The sale of certain eligible assets by a Brazilian producer to a foreign entity may be considered an export operation, even though these assets do not physically leave Brazil; and

♦ The importation of certain eligible assets may be considered a temporary admission of these assets in Brazil and, therefore, may be exempt from federal import taxes.

The structure of the Project allows the SPEs and Petrobras to fully benefit from REPETRO. In particular, we note the following issues:



EIG00091754

 [logo:] CAIXA

♦   The SPEs, which are foreign entities, will own the platforms;

♦   All resources required by the SPEs to carry out and complete the construction of the platforms will be provided to the offshore SPE;

♦   All payments to EPC Contractors/Shipyards will be made by the SPEs in a freely convertible currency;

♦   All foreign content will be imported by the EPC Contractors/Shipyards under a drawback scheme[46];

♦   Local content incorporated into the foreign content, which is subject to formal export;

♦   The rigs will ultimately be imported by Petrobras, via a charter under a temporary scheme (temporary admission scheme).

---

[46] Special customs scheme which consists of suspending or eliminating taxes on imported materials for use in exported products.



**EIG00091755**



[logo:] CAIXA

## 6.    THE INVESTIMENT

The allocation proposed in this Investment Memorandum consists of acquiring quotas in an Equity Investment Fund, with the objective of holding a majority equity stake in Sete Brasil. Therefore, the Fund does not have the purpose of investing in other companies or assets outside the sector.

The quotas of the Fund that will be distributed must be fully subscribed at the closing of the private offer discussed in this Memorandum. Nevertheless, the full payment of these quotas will be made over time and is directly associated with the need for equity of the Invested Company. The current draft bylaws provide that such full payment may occur within ten years, the same amount of time as the investment term of the Fund. However, we believe that the effective payment of all quotas of the Fund must occur within an estimated period of eighteen months, or be paid early depending on whether the Invested Company goes public.

The Fund was formed by the Administrator on August 12, 2010, and its charter and bylaws were filed with the Second Civil Registry Office of the Capital of the State of São Paulo, on August 12, 2010, under No. 0000971314. On November 27, we requested automatic registration of the Fund with the Comissão de Valores Mobiliários, under the terms of Normative Instruction No. 591, stipulating to a distribution under the restricted placement scheme, as Normative Instruction No. 476 provides.

The assets provided for in the Fund amount to R$2 billion, with an initial minimum of R$1.5 billion. This amount was determined considering certain assumptions, such as the number of rigs to be built, and the capital structure of the Invested Company. The term of the Fund is twenty years, with the first ten years corresponding to the Investment Period.

### 6.1.    THE TRANSACTION

Through the Fund, ordinary shares will be acquired which represent up to 90% of the share capital of the Invested Company. This transaction will be made through a primary capital increase. Therefore, there is no secondary transaction involved in this operation. There will not be any premium payment in the aforementioned capital increase either, unless this is necessary to establish Sete's reserve of capital.



 [logo:] CAIXA

The Fund's stake in Sete may not be less than 90%, but no higher than 95%. Petrobras, as the holder of the remaining stake, must initially have 10% of Sete Brasil, but may not have a stake less than 5%, unless there is an IPO or any of FIP Sondas' quotaholders transfer their FIP quotas in violation of the previously established terms.

Prior to the aforementioned transaction, the Manager must have analyzed and approved, with the consent of the investors as well, the main documents establishing the Company, such as the Shareholders' Agreement and the Articles of Association.

**6.2.     ALLOCATION OF FUNDS**

The funds paid into Sete Brasil by the Fund will be allotted to achieving its business plan which, in short, consists of contracting for the construction and subsequent charter of a set of seven drillships. The funds will also support its various operating expenses, retaining third parties needed to attain its objectives, and will contribute to the leverage process of the Company and its subsidiaries.

**6.3.     CONTROL AND DECISION-MAKING PROCESS**

In holding a majority stake in the Company, FIP will also have shareholding control. Nevertheless, Sete Brasil's Shareholders' Agreement, forwarded by Petrobras' Advisors, provides for qualified quorums (80% of Sete quotas) for certain subject matters, and for there to be a Preliminary Meeting. This meeting must occur prior to the General Meeting of Quotaholders of the Fund and will have the effect of binding the quotaholders' votes at its meetings to the resolutions made at the Preliminary Meeting.

The Preliminary Meeting between the Fund's quotaholders and Petrobras, in practical terms, creates a decision-making forum among the quotaholders themselves, which also has the qualified quorum.

For example: if the Fund has just four quotaholders, each of which holds 25% of its quotas, and if the Fund has 90% of Sete's shares, then each quotaholder will indirectly hold 22.5% of Sete's shares. If the quorum for approval at this meeting depends on the favorable vote of shareholders that directly or indirectly hold at least 80% of Sete's shares, then any deliberation will require a favorable vote from four shareholders. Put another way, in this hypothetical example, any one of the quotaholders may veto decisions that require a qualified quorum.



 [logo:] CAIXA

Therefore, the Invested Company's decision-making process will be directly linked to decisions made by the quotaholders at a preliminary meeting, which will also involve Petrobras, as a shareholder of Sete Brasil, binding it to the decisions of the Preliminary Meeting. The Manager, as proposed by the aforementioned term sheet, will act as an agent that will enforce the decisions made at this meeting at the Fund's General Meeting of Quotaholders.

## 6.4.    TRANSACTION RATIONALE: MANAGER'S OBSERVATIONS

This Fund was created and designed as a project of Petrobras and Petrobras' Advisors, who identified in this format a viable financial alternative for building and chartering drillships for Petrobras needed to explore the Pre-Salt Basin. Therefore, Petrobras has been leading the main initiatives, such as the formation of FGCN, the completion of the competitive process to build drillships, surveying and approaching financial agents, and the respective financing terms, arranging to negotiate charter contracts with terms greater than the market averages, the operation of two of the seven drillships belonging to Sete, etc. In short, it is clear to us that the success of establishing the Fund is, above all, the result of the concerted efforts of Petrobras and Petrobras' advisors.

Although the Fund's business is owning an equity stake, i.e. a variable income asset, there are certain elements that make the operation, in some aspects, similar to a fixed income investment. The investment amount needed to build seven drillships and subsequently charter them to Petrobras is, although subject to certain uncertainties, known. The fee to be received for the charter of the vessels is pre-set and, notwithstanding it being to some extent linked to the operator's performance, is independent of the success of the drilling. In this sense, and once the risks of construction, delay, cost of debt (for which there are some mitigating factors) have been overcome, the credit risk of the offtaker (Petrobras) may be considered a marginal component of the risk evaluation, notwithstanding the inability to adequately forecast the Company's credit capacity over the long term. However, we note that Petrobras currently has reduced leverage, as evidenced by the net debt to net capitalization ratio of just 18% (Q3 2010), and by its credit rating: Petrobras has a national rating of Aaa (Moody's) and AAA (Fitch), and a global rating in foreign currency of Baa1 (Moody's), BBB- (S&P), and BBB (Fitch), all of which are above investment grade level.

Therefore, it is important to note that, although the Invested Company is strictly a start-up company, two "fundamental prices" will already be either established or, at least, reasonably well-identified. They are:

♦    The construction value of the seven drillships: Petrobras is close to concluding the bidding process for procurement of the vessels, such that these values, which are the



 [logo:] CAIXA

main component of Sete's investment, are already known. The shipyard responsible for construction will execute, with the SPEs that are indirectly controlled by Sete, a turnkey, lump-sum "EPC" contract. There is therefore a known value for this investment, and certain mitigating factors for the risks of cost overrun and delay.

♦ Capital Structure and cost of debt: BNDES may be the creditor of a portion equivalent to 45% (forty-five percent) of the investment, representing more than half of the entire debt. The general lending conditions were already indicated by the bank and are supported by financial modeling. The cost of the remaining portion of debt was estimated based on the costs currently charged in the market for similar operations. Therefore, and despite the uncertainties, the debt profile has been identified. Furthermore, Petrobras also promises to revise the amount of charter fees originally assumed so that they fully reflect the costs that were effectively incurred for the debts.

In this simplified approach, the price element lacking is the amount of the daily charter fee and the mobilization fee. The prospective return on the Fund, disregarding alternative exit scenarios, tends to be greater the higher these fees are. The fee currently indicated by Petrobras, of approximately US$448,000/day, is in line with the fees charged in the international market, according to ODS-Petrodata.

Therefore, the expected return on the Fund is supported by known variables, whose behavior has a reasonable degree of foreseeability, such that the sensitivity analyses of the alternative scenarios become less subjective.

## 6.5. LEVERAGE PROCESS

The third party capital provided for in Sete's structure corresponds to approximately 80% of all investments to be made, which is approximately US$5.5 billion. The senior debts will be at the SPE level, in the Finance Project method, and under the Portfolio Financing scheme.

Therefore, there will only be one process for assuming debt, which involves a set of creditors that will share guarantees. Even though there is an active and consolidated market for operations of this nature, and FGCN is acting as a fundamental facilitator, the leverage process will be, in our understanding, one of the most sensitive processes, since it tends to require performance from the Invested Company's team of professionals. In other words, the Fund will have to devote special attention to how this risk factor evolves, keeping in mind that its speed and



 [logo:] CAIXA

conditions could significantly impact Sete Brasil's success. In order to mitigate the financing risk, Petrobras and Petrobras' Advisors already began negotiations on the terms and conditions for financing the Rigs Project. BNDES, a major lender for the Rigs Project, already declared its commitment to participate in financing the Project through a letter issued with express authorization from its Executive Board, if the conditions listed in the aforementioned letter are met.

As evidence of the market's appetite for financing the rigs, in November 2010, Odebrecht Oil & Gas made an issue of US$1.5 billion for the financing of two ultra-deep water rigs in the international market (equipment similar to that of the Rigs Project). The issue was declared investment grade (in international currency) and was more than 3.5x oversubscribed.

It is important to note that the financial modeling uses assumptions which in our opinion are feasible as concerns this process, since it considers the existence of a relatively broad period of time (eighteen months) between the expenditure of equity and the entry of third party capital. We emphasize that the process of obtaining financing with BNDES already began and, according to what Petrobras' Advisors have informed us, the negotiations with the ECAs are likewise underway.

## 6.6.    SELECTION AND ROLE OF THE OPERATOR

As Sete Brasil will not operate the drillships it will charter to Petrobras, companies authorized to provide this service will be retained. These companies, as already stated in this Memorandum, will have to also be shareholders of the SPEs, with a 15% stake in the share capital. The requirement that the Operator also be a shareholder, i.e. the owner of the vessel it operates, helps to adequately align interests. Of the seven vessels, two must be operated by Petrobras itself, and five vessels will be operated by other companies. The Operators will only be retained after the vessels have been built, when they must also acquire the equity stake.

Keeping in mind the importance of this Operator – since its performance could impact Sete Brasil's result, a short list was created, which has already been presented in this Memorandum, with a limited number of traditional market operators, companies whose technical expertise has already been tested and recognized by Petrobras.

Although the existence of this list and the requirement of the Operator/Partner to contribute may be considered positive, the direct relationship of dependence that Sete Brasil's results have to the good performance of this Operator, in our understanding, should lead to adopting mechanisms that





[logo:] CAIXA

allow there to be a more equitable distribution of risks. These mechanisms, as already previously mentioned, in truth concern the underperformance compensation that will be owed by the Operator and that may, except in SPEs where the Class B shareholder is Petrobras, involve a dilution in the Class B equity stake. However, we emphasize that the criteria and limits applicable to the underperformance compensation will be determined when the operator enters and, in our view, should be deliberated on by Sete Brasil's Board of Directors.

## 6.7.    POSSIBILITIES FOR EXIT AND DIVESTMENT

The most probable exit scenarios consist of Sete Brasil going public, a disposal of the drillships, a sale to one of the main players in the sector, or renewal of the charter contracts, after their first term, when the funds generated by the monetization of the new contract may be used to repay the capital invested. In our understanding, however, a public listing is the alternative that seems most appropriate and viable to us, given the arguments presented below.

♦    By virtue of the preferential right granted to Sete Brasil, which is valid for twelve (12) months, to build and charter other systems – another twenty-one rigs – and the possibility of this right being exercised, there may be a need for subsequent capital increases in the Invested Company, in order to face the new amount of capex. In this scenario, a public listing could combine a portion of the capital increase and a secondary sale of shares. We tend to believe that IPOs in this format (meaning, where there is only the secondary sale of shares) are usually better received by the target public.

♦    When Sete Brasil has progressed to certain stages of its Strategic Guidelines Plan, above all as concerns the assumption of senior debt for the SPEs and the actual start of construction of the vessels, which must occur between twelve and twenty-four months from its start, the prospective scenario for Sete's results will then be more predictable, which tends to favor the perceived value of the company.

♦    Scope of the Invested Company and Offer: Sete, when fully operational, and considering just the first seven drillships, will have a significant level of cash generation, thereby contributing to the size of the offer. We believe that, in this industry, bigger offers tend to be more attractive.



[logo:] CAIXA

♦ As evidence of investors' interest in the sector, it is worth noting that the recent investment of US$400 million made by the Singaporean Temasek Holdings in the capital of Odebrecht Óleo e Gás (OOG) made it the holder of 14% of the share capital of this company. The transaction evaluated OOG at approximately US$2.8 billion. The company's main assets are three next-generation semi-submersible drilling rigs, which should begin operations in 2011, two drillships that are under construction, and 50% of a FPSO.



 [logo:] CAIXA

7.    **RETURN SCENARIOS**

The financial model provided by Santander, Petrobrás' Advisor, was used as the base scenario for conducting certain sensitivity analyses for some of the main assumptions of the Project, in order to verify the impact on the Fund's return.

The financial model associated with this initial base scenario (scenario one) has the following assumptions:

♦    Seven drillships will be built, with a total usage value of US$5.5 billion;

♦    The equity to third party capital ratio is 20/80;

♦    The EPC contract value for each drillship is US$664.2[47] million;

♦    The seven charter contracts are renewed;

♦    The charter rate is US$448,000/day;

♦    Internal Rate of Return of 12.67% per year (BRL), in actual terms; and

♦    Internal Rate of Return of 17.5% per year (BRL), in nominal terms.

In addition to this scenario, scenario two was created in which, unlike in scenario one, the charter contract for five drillships is not renewed at the end of the ten years, but these vessels are sold.

For these two scenarios, certain assumptions were used in order to verify what the impacts on the Fund's Expected IRR would be. These assumptions are:

♦    Uptime

♦    Peformance bonus: not considered

♦    Cost of Senior Debt

♦    Amount from sale of five drillships in tenth year.

---

[47] Note: this amount is currently being negotiated by Petrobras.



[logo:] CAIXA

The IRR calculated in both scenarios, with the sensitivity of the aforementioned variables, only comes from the flow of dividends from the Invested Company, and therefore does not consider liquidity events at Sete Brasil.

***Uptime*— Availability of Rigs**

The variation in uptime assumptions, as we can see from the table below, caused fluctuations in the expected IRR of the Funds in scenarios one and two. These projections did not consider potential performance bonuses.

|  | % Uptime | Actual IRR in BRL Scenario One (Renewal) | Actual IRR in BRL Scenario Two (Sale of Rigs) |
|---|---|---|---|
| Santander Base Scenario | 98% | 13.20% | 9.90% |
|  | 97% | 12.90% | 9.60% |
|  | 95% | 12.50% | 9.10% |
|  | 92% | 11.80% | 8.30% |
|  | 90% | 11.30% | 7.80% |

Although the expected uptime in the base scenario is consistent with the one effectively observed in the industry for leading operators, we believe that the technical difficulties associated with operating these vessels – farther from the coast and intended for deeper drilling – could cause intermittent periods where the drillships have lower availability.

However, as may be seen above, the decrease in uptime, noted linearly to simplify its analsyis, tends to cause unproportional drops in the expected return. Therefore, a more pessimistic scenario of uptime, between 92% and 95%, should generate a drop of approximately 100 bps in the expected IRR.

**Cost of Senior Debt**

The base scenario noted provides for a ratio between third party capital and equity of 80/20. Debt, under this scenario, is divided between BNDES, ECAs, and Commercial Banks, and is entirely denominated in US dollars. As the conditions of this set of financing may not be fully known ahead of time and may thus oscillate depending on market conditions or according to the specific characteristics of the asset financed, alternative scenarios were simulated for the cost of debt.





To simplify things, fluctuations in other financing conditions such as term, grace period, amortization system, exchange rate effects, etc., were not simulated. Nevertheless, a general worsening of the financing conditions ultimately leads to a higher cost of debt, which is why we believe that the simulation with linear fluctuations in the entire amount of debt, although seemingly simplistic, adequately reflects a worsening of these conditions.

| | Spread Over Libor BNDES/ ECA/Coml Bank | Actual IRR in BRL Scenario One (Renewal) | Actual IRR in BRL Scenario Two (Sale of Rigs) |
|---|---|---|---|
| | 2.50% | **13.30%** | **10.20%** |
| Santander Base Scenario | **2.75%/3.00%/3.00%** | **12.90%** | **9.60%** |
| | 3.00% | **12.80%** | **9.40%** |
| | 3.50% | **12.20%** | **8.60%** |
| | 4.00% | **11.60%** | **7.80%** |

The table above shows how an increase of 50 bps in the cost of debt leads to a more than proportional drop in the IRR, with this ratio being greater the more expensive this financial charge is. Therefore, even though the cost levels noted here came from objective verifications (such as the indication BNDES already gave for the terms of its portion), the variable cost of financing has a significant weight on the expected return and, for this reason, must be understood as one of the most relevant explanatory variables.

The risk of the cost of debt being higher than planned is, to some extent, mitigated by the mechanism that Petrobras suggested, since through this mechanism the amount of the daily charter rate may be adjusted and thus reflect, in a proportion that preserves the return initially expected by the investors – a higher financial cost.

**Sale Value - Drillships**

In Scenario Two, where it is assumed that five out of the seven rigs will be sold at the end of the ten years, the sale price of the asset has a direct impact on the expected return, since it moves up the end of the period that dividends are received by the SPEs controlled by the Invested Company.

The sale price estimated by Santander, of US$310 million, comes from an evaluation that considers the market values for vessels with equivalent construction time. It therefore reflects the price dynamic of this type of vessel, where the time factor, although relevant, does not lead to an absolute eroding of value. This basic scenario assumes that the vessels will be worth, at the end of the ten years, the equivalent of approximately half of their original value.



 [logo:] CAIXA

|  | Sale Value | Actual IRR in BRL Scenario Two (for Sale of Non-PETRO Rigs) |
| --- | --- | --- |
| Santander Base Scenario | US$400 million | 10.40% |
|  | US$350 million | 10.00% |
|  | **US$310 million** | **9.60%** |
|  | US$250 million | 9.00% |
|  | US$200 million | 8.40% |

**Liquidity Events**

In addition to the return scenarios above, IRRs were also estimated for the Fund for scenarios of an initial public offering of Sete Brasil's shares, assuming, in this case, a completely secondary offer. In order to calculate the expected return, the following assumptions were selected:

\-      The prospective scenario for Sete Brasil, used to estimate its cash flow, is scenario one, i.e. the one where five rigs are sold after ten years. In it, we use the assumptions (uptime, cost of debt, and sale value of the rigs) from Santander's base scenario. We also did simulations for scenario two, in which the charter contracts are renewed.

\-      All of the subscribed share capital of the Invested Company is fully paid-up prior to the IPO;

\-      Sete Brasil did not procure any other systems beyond the initial system of seven rigs;

\-      Consequently, there is no primary increase in Sete's capital for an IPO.

For calculation purposes, it was considered that the IPO could take place between 2011 and 2017. In our opinion, Sete Brasil will attain the minimum conditions for a public listing as of mid-2021. This term seems feasible to us in view of the fact that, by this date, the risks of both the leverage processes and construction of the vessels should already have been very well estimated.

In order to estimate the company's value at the time of an IPO, since it is a Company that does not yet have operating revenue, the discounted cash flow method (CDF) was used.

In the figure below, we estimate the returns for scenario one, with the sale of between five and seven rigs in the tenth year. One of the assumptions used – concerning the total contribution of equity prior to the public listing – has a truly significant effect on return. However, the market conditions at the time of the IPO may allow for a different form of IPO, with part of the initial public offering being primary, and another part being secondary, i.e. decreasing the amount that the Fund effectively contributes, which would really benefit the return obtained.



 [logo:] CAIXA

FIP SONDAS – CONFIDENTIAL INFORMATION – 1/6/2011
**104**

**YEAR of EXIT for PUBLIC LISTING**

| IRR per year (SALE OF RIGS) | Jul-11 | Jul-12 | Jul-13 | Jul-14 | Jul-15 | Jul-16 | Jul-17 |
|---|---|---|---|---|---|---|---|
| 15.0% | - | - | 22.9% | 1.0% | 11.1% | 14.3% | 15.2% |
| 14.0% | - | -33.3% | -4.1% | 12.4% | 17.5% | 18.2% | 17.7% |
| 13.5% | - | -21.7% | 5.5% | 18.0% | 20.6% | 20.1% | 19.0% |
| 13.0% | 48.3% | -8.5% | 15.2% | 23.5% | 23.8% | 22.1% | 20.9% |
| 12.5% | -32.1% | 6.3% | 25.1% | 29.0% | 27.0% | 24.0% | 21.6% |
| 12.0% | -10.1% | 22.9% | 35.0% | 34.5% | 30.2% | 26.0% | 22.9% |
| 11.0% | 56.1% | 61.7% | 55.4% | 45.4% | 35.5% | 30.0% | 25.5% |

*Dividend Discount Rate* (row label, vertical)

In scenario two, provided for in the chart below, the returns jump a level as a result of the calculation, which now considers longer periods – we recall that in this scenario the charter contracts are renewed. As there are no examples of IPOs that are more similar to this case, there is no way to ensure that the Company's pricing process, when it goes public, will consider the renewal of the contracts. However, as in the drilling rig industry the idleness of vessels is usually low, we consider it more reasonable that the pricing will take into account the renewal of the charter contracts, as this assumption is to some extent counterbalanced by a greater discount rate.

**YEAR of EXIT for PUBLIC LISTING**

| IRR per year (RENEWAL) | Jul-11 | Jul-12 | Jul-13 | Jul-14 | Jul-15 | Jul-16 | Jul-17 |
|---|---|---|---|---|---|---|---|
| 15.0% | -29.3% | 15.0% | 35.0% | 37.3% | 33.8% | 29.9% | 26.7% |
| 14.0% | 28.3% | 55.3% | 57.0% | 49.0% | 40.7% | 34.3% | 29.8% |
| 13.5% | 73.7% | 79.0% | 68.3% | 55.0% | 44.2% | 36.6% | 31.3% |
| 13.0% | 135.8% | 105.3% | 79.8% | 61.0% | 47.8% | 38.8% | 32.9% |
| 12.5% | 221.2% | 134.3% | 91.5% | 67.0% | 51.3% | 41.1% | 34.5% |
| 12.0% | 338.9% | 166.3% | 103.5% | 73.0% | 54.9% | 43.5% | 36.1% |
| 11.0% | 727.5% | 240.1% | 128.3% | 85.3% | 62.2% | 48.3% | 39.4% |

*Dividend Discount Rate* (row label, vertical)



[logo:] CAIXA

## 8.    RISKS

Any business operation involves risk, whether mitigated or not, significant or irrelevant, some of which are pertinent to the specific business operation.

We will try here to describe the main risks that must be taken into consideration when investors make their decisions. The risks described below are those known to the Manager at the date of this Investment Memorandum. Additional risks, which are currently unknown or considered irrelevant, may also adversely impact the Project and, consequently, the Fund.

The Fund's applications will not have the guarantee of the Administrator, Manager, or other service providers of the Fund, or of any insurance mechanism or Credit Guarantor Fund [*Fundo Garantidor do Crédito – FGC*], and may be adversely and materially impacted by any of the risk factors indicated, which may even lead to the total loss of the Fund's assets and, consequently, of the capital invested by the quotaholders.

### 8.1.    FIP

Market Risk

*The Market Risk is primarily tied to the result of the Invested Company.*

The value of the assets that comprise or end up comprising the Fund's portfolio may increase or decrease according to the fluctuations of market listings and prices, interest rates, and results of the companies (Sete Brasil and subsidiaries) whose securities comprise the portfolio (and are issued by it). In the event of a drop in value of the assets comprising the portfolio, the Fund's net assets may be negatively impacted. A drop in the prices of the assets comprising the portfolio may be temporary, although there is no guarantee that they will not extend to long and/or intermediate lengths of time.

The financial assets comprising the portfolio may also be subject to the capacity of their issuer to honor commitments to pay interests and principal referring to these assets. Changes in the financial status of the issuer of the financial assets and/or the perception that investors have of these conditions, as well as changes in economic and political conditions that can compromise their capacity to pay, may result in significant impacts on prices and on the liquidity of the financial assets.

A failure by Sete Brasil or its subsidiary to comply with the obligations referring to the securities on the scheduled dates, may damage the ability to pay and the profitability of the Fund and quotaholders. The Fund may also incur additional costs, in an attempt at recovering past due credits.



**EIG00091768**

Credit Risk

*Quotas of closed-
end funds generally
do not present a
satisfactory degree
of liquidity.*

Consists of the risk that issuers of securities and fixed-income financial assets that comprise or end up comprising the portfolio, and/or other parties involved in operations performed by the Fund do not meet their obligations to pay both the principal and the respective interest for their debts with the Fund.

Liquidity Risk

The initial volume of the Fund's applications and the non-existence of a tradition in the Brazilian capital market of negotiations involving quotas of closed-end funds lead to the prediction that the quotas issued by the Fund will not present satisfactory liquidity.

If the Fund needs to divest all or part of the assets comprising the portfolio, especially in the case of securities issued by closed companies, or publicly held companies without or with little negotiation, there may not be demand for these assets, or there may only be demand at reduced prices, to the detriment of the Fund's assets and, consequently to the capital invested by the quotaholders.

Furthermore, as investments in the Fund will have to provide for its effective participation in the decision-making process of Sete Brasil, the Fund will be subject to insider trading rules imposed on parties with access to information about the invested company. Therefore, if the Fund has access to information from the invested company, it will not be able to trade in the securities issued by the respective company until this information has been disclosed.

Risk of Concentration

Consists of the Fund's risk applying 100% of the Fund's net assets in a single target company, Sete Brasil.

Other Risks

The Fund is also subject to other risks arising from reasons that are beyond or outside the control of the Administrator/Manager, and of the other service providers of the Fund, such as delays, changes in regulations and/or legislation, including tax-related rules, that apply to the equity investment fund, as well as changes imposed on the financial assets comprising the portfolio. These risks, if they materialize, could have an impact on the results of the positions assumed by the Fund and on its operating conditions, thereby adversely impacting the Fund's profitability and the value of the quotas.



EIG00091769

**CAIXA** [logo:] CAIXA

<u>Nonexistence of Profitability Guarantee</u>

*If resolved at a General Meeting, by a qualified quorum, the Fund may be liquidated.*

A verification of profitability made in any equity investment fund in the market or this specific Fund does not represent a guarantee of future profitability. Additionally, the application of the Fund's resources in a project that has risks related to the capacity to generate income and pay its obligations does not therefore allow any certain limit of profitability for the quotas to be determined.

<u>Discontinuance</u>

The Fund bylaws establish the possibility of liquidating the Fund if this is resolved at a general meeting. In these situations, the quotaholders will have the original investment term reduced and may not be able to reinvest the funds received with the same proportional remuneration, as neither the Fund, the Administrator, or the other Fund service providers owe any fine or penalty for any purpose as a result of this fact.

**8.2.   PROJECT**

The matrix below presents the main risks and mitigating factors of the Rigs Project.

| RISKS | MITIGATING FACTORS |
|---|---|
| **Construction Risks —design error, delay, and cost overruns in works and risks related to the shipyard** | - Turnkey, lump-sum contract. |
| | - Petrobras' management and oversight of the works |
| | - Use of existing design accepted by the drilling industry |
| | - Coverage of FGCN |
| | - Rigorous technical and financial selection process for shipyards |
| | - Insurance (builder's all risk, performance bond, etc.) |
| | - Transfer of penalties charged to the SPEs due to delay in starting the chartering, when it is the shipyard's fault |
| | - Correction of construction contract due to change in inflation |
| | - Monitoring of construction process by Petrobras |
| | - Change orders managed by Petrobras result in a review of charter rate |
| | - Contracting strategy for up to seven rigs with the same shipyard must allow local shipyards to amass know-how and experience during the construction of the first rigs |
| | - Contingency Reserve Account |
| | - Approximately 40% (first system average) of the drilling system equipment to be installed in the rigs will be imported. This equipment is the same equipment that is currently used in similar rigs under construction or that were already built at international shipyards. In other words, as concerns this equipment and the final performance of the rigs, the |



[logo:] CAIXA

| | |
|---|---|
| | construction location should have little effect on the final result |
| | - New taxes and rates that may potentially result in higher construction costs will end up causing the price of the construction contract to be revised and will have to be reflected in the charter contract |
| | - The construction terms of the rigs in the Construction Contracts with the Shipyard provide for a term that is longer than the one used by more experienced shipyards (abroad, similar rigs are built within a period of two years. The Rigs Project provides for a construction term of approximately four years) |
| | - Purchase of liquidated damages insurance, penalizing the shipyard for delays |
| **Risks of Petrobras Renewing Charter Contracts** | - current demand for rigs of Petrobras and other companies with a presence in Brazil. |
| | - Value of asset (rig) |
| | - Possibility of chartering the rig to other clients (oil operators) |
| | - Possibility of selling the rig to the operator |
| | - Renewal Fund |
| **Risk of not raising the funds needed – Fundraising Risk** | - Support from BNDES as the main financer of the Project, as evidenced by the Executive Board's approval for financing the Rigs Project |
| | - Petrobras assumes the risks of its final financing conditions, undertaking to use its expertise and best credit conditions with the market to negotiate all financing instruments for the operation. The final conditions obtained will be incorporated into the amounts of the charter fees that were originally procured, revising them upwards or downwards, so as to maintain the original profitability of the quotaholders |
| | - Capital market operation to finance two rigs from Odebrecht Oil & Gas was 3.5x oversubscribed |
| | - Other operations in the rig financing market demonstrate support from commercial banks and ECAs in sector financing |
| **Risk of operator's poor performance** | - Performance bonus structure to better incentivize uptime by Operators |
| | - Compensation for underperformance (fine or dilution) |
| | - Possibility of changing operator |
| | - Performance Fund- Retaining operator with proven experience in operating drilling rigs in ultra-deep waters |
| | - New rigs, with next-generation equipment |
| | - Creation of ranking of best operators |
| **Risk of elimination of tax benefits** | - The charter contract includes an economic-financial balance clause arising from the change in taxes in relation to the time it was entered, such that tax changes referring to the creation of new taxes or to the modification of rates may change, upwards or downwards, the amount of charter fees originally agreed to, in order to offset the tax change. Nevertheless, we believe that for this contractual provision to be considered fully effective as a mitigating factor of the risk mentioned here, it would be necessary to make an express provision in the contract as to its applicability in case tax incentives are eliminated. This is, however, with the understanding that it will be ratified or rectified |

| | |
|---|---|
| | by the Legal Advisor. |
| | - The Brazil-Austria Double Taxation Agreement was established in 1976, does not have a valid term, and does not have a recent history of the agreement being disputed |
| **Risks of elimination of REPETRO, for which the effective term expires on December 31, 2020.** | - As all assets will be fully established prior to the date scheduled to eliminate the benefits generated by REPETRO, there shall be no impact on the Company's investment phase |
| | - The charter contract includes an economic-financial balance clause arising from the change in taxes in relation to the time that it was entered, such that tax modifications referring to the creation of new taxes or to the modification of rates may change, upwards or downwards, the amount of the charter fees that were originally agreed to, in order to offset the tax change. Nevertheless, we believe that in order for this contractual provision to be considered fully effective as a mitigating factor of the risk mentioned here, it would be necessary to place an express provision in the contract as to its applicability in case the tax incentives are eliminated. However, this is with the understanding that it will be ratified or amended by the Legal Advisor. |
| **Mandatory nature of additional contributions at the request of BNDES, in case of insufficient funds to complete the construction of the rigs.** | - Contingency Reserve Account |
| | - In addition to the mechanisms described above, we do not identify additional mitigating factors for this risk. Additionally, FIP Sonda's capacity to contribute funds is limited to the Committed Capital and/or Net Assets. |
| **Discrepancy between the senior debt term and the term of the Charter Contracts (Five SPEs)** | - Existence of two SPEs with twenty-year contracts |
| | - Renewal Fund |
| | - Generation of cash in portfolio, consolidated at Sete International |
| | - Demand of Petrobras (and globally) for ultra-deep water rigs |
| | - Capacity of equipment (rigs) allows them to be used in the Gulf of Mexico and Africa |
| | - asset value (rig) |
| **Discrepancy between costs and general expenses effectively incurred and those provided for in the Project modeling** | - Contingency Reserve Account |
| | - The additional costs related to the indexing of the construction contract at the shipyard increase the charter rate (in the same proportion) and allow the Rigs Project to seek additional third party resources |
| **Social-Environmental Risk** | - rig design |
| | - operating license |
| | - oversight from Petrobras |
| | - in accordance with the Charter Contract, in case of spill of petroleum, oil, or other waste into the sea, the operator (SPE) will be liable for up to the limit of US$1 million per event |
| | - operation of agreement with the standards and policies of IBAMA, CONAMA, and MARPOL |
| | - Lastly, the lenders (ECAs and Commercial Bank) are going to demand the Project's compliance with all social and |



 [logo:] CAIXA

|  | environmental obligations to which it is subject by virtue of the current social and environment legislation and the standards defined by the Equator Principles |
|---|---|

 [logo:] CAIXA

9.    **MANAGER'S OPINION**

This Memorandum of Investment supplements a set of information that was already provided by Petrobras and by Petrobras' Advisors and aims, above all, to offer our point of view of the business operation and a series of aspects which investors must understand in order to make an appropriate decision.

The proposed objective of this document consists of creating a company that will be among the biggest in its sector, which can become a leader in the ultra-deep water rigs segment. The gradual expansion of the activities related to oil extraction in the Pre-Salt Basin will thus result in a significant amount of business and players for the Brazilian oil market. Therefore, the Fund represents a privileged opportunity for Brazilian institutional investors to enter this industry segment. We believe that this real possibility will only truly become a reality through the rig production local content requirement, which will be used in the Pre-Salt Basin, and through the novel form of partnership that Petrobrás is proposing be entered with the capital markets.

The preferential right to build and charter the other systems, i.e. another twenty-one (21) drillships, in practice serves as a purchase option that is granted to the fund, as shareholder of Sete Brasil, and will allow for the scope of the company to considerably expand (growth story).

Petrobrás' participation in various roles – as offtaker of the charter contracts, shareholder of Sete Brasil, operator of certain vessels and construction inspector, among other things, represents in our opinion a strong and healthy alignment of interests, even though it is not easy to reach a consensus on certain business aspects. Generally, situations where the Company profits are also profitable situations for Petrobrás, and vice versa. Therefore, having it as a partner in Sete Brasil is more a factor for the success of this operation than it is a risk. Nevertheless, we would like to emphasize that, as Managers, we are fully aware of the need to adequately address some of the existing risks, which due to their nature cannot be completely eliminated.

This Memorandum, although it contains a lot of information that is necessary for investors to make a decision, does not exhaustively address certain points, which should be done once the Legal Advisor's work has been completed, the Manager has made progress in establishing certain mitigators that are deemed necessary, and the bidding process for the drillships has been completed.

There are also certain issues that, although progress has been made, still require some work before they are concluded, such as defining the governance of the Fund and of the Invested Company, and the final terms of the charter contracts.



 [logo:] CAIXA

As concerns the risks inherent to establishing Sete Brasil, we are of the opinion that the majority of the critical points have been well identified and addressed. The existence of executed long-term charter contracts, for a term much higher than the average used by the industry, at the time the Fund enters the Company, in practice serves as a way of reducing risks, since it substantially diminishes the portion of market risk, which is always consistently present in start-ups.

It is undeniable that the Invested Company's success is closely related to the success of its leverage process, which is why the work Petrobrás is already doing with potential lenders may be considered quite valuable, and should certainly help with the timeliness and quality of this process. However, we are of the opinion that the key members of Sete Brasil's management should be executives with robust financial expertise, who have the ability to lead financing project operations with national and international creditors.

Therefore, the Company's Board of Directors will have an essential role in the Invested Company's business running smoothly. Even though there is a very clear Strategic Guidelines Plan, which will help guide Sete's Board, many strategic issues will arise as the rigs are being built, such as expanding business (procurement of other systems), liquidity events, partnerships, etc.

The actions of another two essential agents must also be taken into consideration: the building shipyard and the operator partner, since their operating performance could impact Sete Brasil's expected returns. In this sense, it is positive to determine a shortlist of potential operator partners and to identify the shipyard that will build the first system.

We believe that the prospective levels of return on the Fund, considering the scenarios used, are in line with the risks identified. The possibility of an IPO, which to us seems to be the most feasible divestment alternative, could raise the return to quite attractive levels; see recent success stories like OGX and HRT.

In light of the information presented throughout this Investment Memorandum, and noting the exceptions made, we consider investment in the oil and gas sector, especially in the Rigs Project, to be desirable, and we recommend an investment through the purchase of quotas in FIP Sondas. Notwithstanding our belief, as well as the information presented in this Memorandum, prior to potential investors making a decision to invest, they must be informed and have extensively reviewed the structure of the Fund and of the Rigs Project, as well as the risks related thereto. Additionally, we note that our opinion on the investment is



EIG00091775

 [logo:] CAIXA

contingent on the Legal Advisor issuing a favorable opinion, as well as on maintaining the characteristics presented herein regarding the Rigs Project.

Lastly, we believe that the actual role of the Manager in this Fund, which has specific features, already arising with the asset and the investment plan identified, is to promote the interest of investors in the Invested Company, always seeking in a diligent and technically informed manner to identify, propose, and implement decisions that best serve the course of business, thereby maximizing all factors that could serve the scope of the Fund's objectives.



EIG00091777



**CAIXA**
VITER – SUFES – GEFES

Vitor Hugo dos Santos Pinto
National Manager
GEFES – Gerência Nacional de Fundos Especiais
[National Management of Special Funds]
VITER – Vice-Presidência de Ativos de Terceiros
[Office of the Vice President of Third Party Assets]
CAIXA ECONÔMICA FEDERAL
Tel.: 55 11 3555-6381

Diogo Florêncio Martins
Analyst
GEFES – Gerência Nacional de Fundos Especiais
[National Management of Special Funds]
VITER – Vice-Presidência de Ativos de Terceiros
[Office of the Vice President of Third Party Assets]
CAIXA ECONÔMICA FEDERAL
Tel.: 55 11 2159-7233
Email: diogo.martins@caixa.gov.br

Raquel Cristina Tedesco
Executive Manager
GEFES – Gerência Nacional de Fundos Especiais
[National Management of Special Funds]
VITER – Vice-Presidência de Ativos de Terceiros
[Office of the Vice President of Third Party Assets]
CAIXA ECONÔMICA FEDERAL
Tel.: 55 11 3555-6425
Email: raquel.tedesco@caixa.gov.br

Laiza Fabíola Martins Santa Rosa
Analyst
GEFES – Gerência Nacional de Fundos Especiais
[National Management of Special Funds]
VITER – Vice-Presidência de Ativos de Terceiros
[Office of the Vice President of Third Party Assets]
CAIXA ECONÔMICA FEDERAL
Tel.: 55 11 2159-7217
Email: laiza.rosa@caixa.gov.br

Av. Paulista 2300, 11°andar, Cerqueira César, São Paulo – SP
Tel.: 55 11 3555-6350 - sufes@caixa.gov.br - gefes@caixa.gov.br

Confidential

EIG00091664
EIG_KEP_00164882

Confidential



DISCLAIMER

Este Memorando de Investimento, elaborado e de propriedade exclusiva da Caixa Econômica Federal, na qualidade de Gestora do Fundo de Investimento em Participações Sondas ("FIP Sondas" ou "Fundo"), foi fornecido confidencialmente para um número restrito de investidores, com a intenção de permitir que estes tomem uma decisão informada acerca de um potencial investimento. As informações aqui contidas não devem ser reproduzidas ou distribuídas, nem seu conteúdo tornado público, sem prévia autorização por escrito da Gestora.

As informações contidas neste Memorando de Investimento podem incluir declarações e estimativas que apresentem expectativas da Gestora sobre eventos ou resultados futuros. No entanto, a Gestora não pode garantir que tais declarações ou estimativas venham a ser concretizadas, haja vista que o investimento envolve riscos ou incertezas, previstos ou não. Porquanto, os resultados futuros das operações do FIP Sondas podem diferir das atuais expectativas, e o leitor não deve se basear exclusivamente nas informações aqui contidas.

Os números e informações sobre o mercado de sondas e a Petrobras, bem como as projeções financeiras analisadas neste material foram fornecidos à Gestora pela Petróleo Brasileiro S.A. ("Petrobras"), pelo Banco Santander do Brasil S.A. ("Santander") e pelo Souza, Cescon, Barrieu & Flesch Advogados ("SCBF"), estes dois últimos, conjuntamente, "Assessores" ou "Assessores da Petrobras".

Embora acreditemos que as projeções contidas neste memorando estejam baseadas em premissas razoáveis, os investidores devem estar cientes de que tais projeções estão sujeitas a diversos riscos e incertezas e podem ser substancialmente diferentes dos resultados efetivos.

As análises efetuadas neste Memorando de Investimento de Investimento foram realizadas com base nas informações e documentos disponibilizados pela Petrobras e pelos Assessores da Petrobras até o dia 14/12/2010, os quais podem não refletir, em sua totalidade, a estrutura final do investimento.

Por fim, ainda que tenhamos no entendido em prestar informações precisas e atualizadas, não há nenhuma garantia de sua exatidão na data em que forem recebidas nem de que tal exatidão permanecerá no futuro.

EIG00091665
EIG_KEP_00164883

CAIXA

FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6-1-2011 3

# ÍNDICE

| 1. | INTRODUÇÃO | 5 |
|---|---|---|
| **2.** | **SETOR DE PERFURAÇÃO E EXPLORAÇÃO DE PETRÓLEO** | **6** |
| 2.1. | BREVE HISTÓRICO DAS DESCOBERTAS | 6 |
| 2.2. | A CAMADA DE PRÉ-SAL | 7 |
| 2.3. | DESENVOLVIMENTO E EXPLORAÇÃO | 8 |
| 2.4. | MATRIZ ENERGÉTICA MUNDIAL E O PAPEL DO PETRÓLEO | 10 |
| 2.5. | OFERTA E DEMANDA DE PETRÓLEO | 13 |
| 2.6. | CONSTRUÇÃO NAVAL | 15 |
| 2.7. | PLATAFORMAS E SONDAS DE PERFURAÇÃO E PRODUÇÃO | 17 |
| 2.8. | ATIVIDADE DE E&P EM ÁGUAS PROFUNDAS E ULTRAPROFUNDAS | 23 |
| 2.8.1. | O SEGMENTO OFFSHORE NO BRASIL | 23 |
| 2.8.2. | MERCADO DE ÁGUAS PROFUNDAS E ULTRAPROFUNDAS | 25 |
| 2.8.3. | DEMANDA POR PLATAFORMAS | 26 |
| 2.9. | O OFFTAKER - PETROBRAS | 29 |
| 2.9.1. | HISTÓRICO | 31 |
| 2.9.2. | GOVERNANÇA CORPORATIVA | 32 |
| 2.9.3. | INFORMAÇÕES FINANCEIRAS | 33 |
| 2.9.4. | PLANO DE INVESTIMENTO 2009 – 2014 | 34 |
| 2.9.5. | PROCAP | 35 |
| 2.10. | ASPECTOS REGULATÓRIOS | 35 |
| 2.10.1. | DO REGIME DE CONCESSÃO | 36 |
| 2.10.2. | DO CONTRATO DE CONCESSÃO | 38 |
| 2.10.3. | DO CONTEÚDO LOCAL | 39 |
| **3.** | **O PROJETO SONDAS** | **41** |
| 3.1. | VENDA DE AÇÕES CLASSE B | 42 |
| 3.2. | INVESTIMENTO TOTAL | 43 |
| 3.3. | ESTRUTURA DE CAPITAL | 44 |
| 3.4. | CONSTRUÇÃO DAS SONDAS | 44 |
| 3.4.1. | ESTALEIRO ATLÂNTICO SUL | 45 |
| 3.5. | O AFRETAMENTO E A OPERAÇÃO DAS SONDAS | 46 |
| 3.5.1. | COMPENSAÇÃO PARA UNDERPERFORMANCE | 50 |
| 3.6. | FINANCIAMENTO | 50 |
| 3.6.1. | BNDES | 51 |
| 3.6.2. | EXPORT CREDIT AGENCIES | 53 |
| 3.6.3. | BANCOS COMERCIAIS | 54 |
| 3.7. | FUNDO DE PERFORMANCE, RENOVAÇÃO E CONTA RESERVA | 54 |
| 3.7.1. | FUNDO DE RENOVAÇÃO | 55 |
| 3.7.2. | FUNDO DE PERFORMANCE | 55 |
| 3.7.3. | CONTA RESERVA DE EVENTUALIDADES | 56 |
| 3.8. | DIREITO DE PREFERÊNCIA | 57 |
| **4.** | **FUNDO DE GARANTIA PARA A CONSTRUÇÃO NAVAL (FGCN)** | **58** |
| 4.1.1. | CARACTERÍSTICAS DO FGCN | 58 |
| 4.1.2. | FINALIDADE DO FGCN | 60 |
| 4.1.3. | CONTRATAÇÃO DO FGCN | 62 |
| 4.1.4. | ACIONAMENTO E EXECUÇÃO DAS GARANTIAS | 63 |
| **5.** | **ANÁLISE JURÍDICA** | **64** |

| | | |
|---|---|---|
| 5.1. | CONTRATO DE CONSTRUÇÃO | 65 |
| 5.2. | CONTRATO DE AFRETAMENTO | 67 |
| 5.3. | CONTRATO DE SERVIÇOS | 71 |
| 5.4. | CONTRATO DE GERENCIAMENTO E FISCALIZAÇÃO DAS OBRAS | 75 |
| 5.5. | CONTRATO DE MANUTENÇÃO DE ATIVO | 76 |
| 5.6. | DOCUMENTOS SOCIETÁRIOS - SETE BRASIL | 77 |
| 5.6.1. | ACORDO DE ACIONISTAS e ESTATUTO SOCIAL | 77 |
| 5.6.2. | PLANO DE DIRETRIZES ESTRATÉGICAS DA SETE BRASIL PARTICIPAÇÕES | 80 |
| 5.7. | DOCUMENTOS DE CONSTITUIÇÃO E RECULAMENTAÇÃO - FIP SONDAS | 81 |
| 5.7.1. | ACORDO DE INVESTIMENTO | 81 |
| 5.7.2. | REGULAMENTO | 83 |
| 5.7.3. | DO ACORDO DE COTISTAS | 85 |
| 5.8. | ASPECTOS TRIBUTÁRIOS | 86 |
| 5.8.1. | ACORDO DE BITRIBUTAÇÃO BRASIL-ÁUSTRIA | 87 |
| 5.8.2. | HOLANDA | 88 |
| 5.8.3. | REPETRO | 89 |
| | | |
| 6. | O INVESTIMENTO | 93 |
| | | |
| 6.1. | A TRANSAÇÃO | 93 |
| 6.2. | DESTINAÇÃO DOS RECURSOS | 94 |
| 6.3. | CONTROLE E PROCESSO DECISÓRIO | 94 |
| 6.4. | RACIONAL DA TRANSAÇÃO: OBSERVAÇÕES DO GESTOR | 95 |
| 6.5. | PROCESSO DE ALAVANCAGEM | 96 |
| 6.6. | SELEÇÃO E PAPEL DO OPERADOR | 97 |
| 6.7. | POSSIBILIDADES DE SAÍDA E DESINVESTIMENTO | 98 |
| | | |
| 7. | CENÁRIOS DE RETORNO | 100 |
| | | |
| 8. | RISCOS | 105 |
| | | |
| 8.1. | FIP | 105 |
| 8.2. | PROJETO | 107 |
| | | |
| 9. | PARECER DO GESTOR | 111 |

EIG00091667
EIG_KEP_00164885

   CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6-1-2011  **5**

## 1. INTRODUÇÃO

No Brasil, a evolução da indústria petrolífera a médio e longo prazo tem, por referência, o desenvolvimento das grandes reservas descobertas na camada de Pré-Sal. A exploração e desenvolvimento desses recursos terão consequências substanciais ao longo da cadeia de valor da indústria petrolífera[1] com efeito multiplicador dos investimentos realizados, por meio da geração de empregos e consequente aumento do consumo e da atividade econômica.

O sucesso no desenvolvimento dessas reservas, no entanto, depende da realização de intensos investimentos no setor, que devem contemplar desde a construção de estaleiros até a ampliação da capacidade de refino e exportação de petróleo. Para tanto, o setor deverá contar, ao longo dos próximos anos, com o apoio do governo federal, por meio de incentivos ao setor, de instituições financeiras com capacidade de prover recursos para o financiamento dos diversos segmentos de petróleo e de investidores financeiros, interessados em contribuir para o desenvolvimento do setor e em participar do potencial de retorno oferecido pelos investimentos.

Dentro deste contexto, foi constituído o Fundo de Investimento em Participações Sondas ("FIP Sondas" ou "Fundo"), cujo objetivo é o de investir na construção de sondas com capacidade de perfuração em águas ultraprofundas, as quais serão, em um primeiro instante, fretadas para Petrobras para exploração da camada de Pré-Sal brasileiro ("Projeto Sondas" ou "Projeto"), uma das maiores descobertas da indústria global de petróleo nas últimas duas décadas.

O investimento do FIP Sondas no Projeto se dará por meio da aquisição de 90% das ações da Sete Brasil Participações S.A., holding nacional que terá como subsidiária integral uma holding internacional constituída na Áustria, a Sete International Gmbh que, por sua vez, será a detentora de 7 (sete) Sociedades de Propósito Específico ("SPE") constituídas na Holanda, as quais serão as proprietárias diretas dos ativos e responsáveis pela construção e afretamento das sondas de perfuração.

O retorno do investimento no Projeto Sondas, estimado em 15,40% a.a (nominal, em dólares) estará diretamente relacionado à disponibilidade das sondas afretadas para exploração dos poços.

Desta forma, o presente relatório tem como objetivo apresentar aos potenciais investidores do FIP Sondas, as características do Fundo e do Projeto, seus riscos e mitigadores, as análises efetuadas, bem como nosso parecer a respeito da estrutura do investimento.

---

[1] Segundo dados, de 2010, da ANP existem cerca de 200 empresas atuando no Brasil em pesquisa e exploração de petróleo e gás, entre empresas de aquisição de dados, prestadoras de serviço e operadoras.

Confidential



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6-1-2011 /6

## 2. SETOR de PERFURAÇÃO E EXPLORAÇÃO DE PETRÓLEO

### 2.1. BREVE HISTÓRICO DAS DESCOBERTAS

De acordo com a historiografia, os primeiros poços de petróleo com exploração comercial foram perfurados na década de 1850. O ano de 1858 tema sido um marco para indústria, com a descoberta de poços nos Estados Unidos. Já com a utilização de modernas técnicas de exploração, produção, transporte e comercialização. Fundava-se, a partir de então, um dos maiores negócios do mundo moderno.

No Brasil, a primeira referência à pesquisa de petróleo ocorreu entre os anos de 1892 e 1896, em Bofete (SP). Foi instalada uma sonda junto ao afloramento de uma rocha betuminosa, o furo atingiu mais de 400 metros de profundidade, mas com a abertura do poço não se encontrou petróleo. Mais de 40 anos depois, em janeiro de 1939, se constatou a existência de petróleo no solo brasileiro, no poço de Lobato (BA), perfurado pelo Departamento Nacional de Produção Mineral, órgão do governo federal. O poço de Lobato produziu mais de 2.000 barris de óleo em 1940. Até então, os estudos geológicos, sob a orientação de geólogos norte-americanos, apontaram para existência de hidrocarbonetos em solo brasileiro.

Há décadas, a Petrobras estuda técnicas para a exploração de petróleo e gás natural no mar, sendo no Brasil a primeira região do mundo a atingir a camada Pré-Sal e encontrar reservas economicamente rentáveis para exploração. Apesar de ser um tema muito comentado ultimamente, a discussão sobre a potencialidade dessa região não é nova. Desde os anos 70 os geólogos da petrolífera apostam na existência de petróleo abundante naquela região, mas não dispunham de tecnologia adequada para pesquisas mais detalhadas.

No final da década, em 1979, a Petrobras conseguiu perfurar poços que alcançaram o Pré-Sal na Bacia de Campos, mas as descobertas confirmadas na época não foram significativas e o tema foi deixado de lado.

As expectativas de se encontrar uma quantidade de petróleo acima da camada de sal que justificasse a exploração ressurgiram com mais força em 2005, com o anúncio da descoberta do campo de Tupi, na Bacia de Santos.

A Petrobras já está produzindo petróleo do Pré-Sal nos Campos de Tupi e Jubarte[2]. Em Jubarte, localizado na fronteira nordeste da área do Pré-Sal, a produção teve início em setembro de 2008 e, em Tupi, em maio de 2009. Essa produção faz parte dos testes de longa duração com vistas à avaliação do comportamento dos reservatórios.

A ExxonMobil, a Anadarko e a BG também divulgaram descobertas de petróleo no Pré-Sal, mas ainda sem estimativas conclusivas a respeito de petróleo recuperável. A descoberta da

---
[2] O poço de Jubarte está localizado a 70 quilômetros da costa do Espírito Santo, com o óleo sendo extraído a 4.700 metros de profundidade local, incluindo a altura da lâmina d'água (distância da superfície até o fundo do mar), tendo, para isso, que ultrapassar uma camada de 200 metros de sal.

Confidential

EIG00091669
EIG_KEP_00164887

CAIXA

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4-9-2001 **7**

ExxonMobil foi próxima a Tupi; a Anadarko no litoral do Espírito Santo, e a da BG na Bacia de Santos, em uma área onde a Petrobras não tinha anunciado ao mercado a presença de reservatório abaixo da camada de sal.

A exploração inicial ocorre no Campo de Jubarte, através da Plataforma P-34, que já produzia petróleo desde dezembro de 2006, porém em reservatório localizado acima da camada de sal ("Pós-SAL"). A antecipação da produção da camada Pré-Sal no Espírito Santo foi facilitada porque a plataforma estava situada a apenas 2,5 quilômetros do poço exploratório, abaixo do Campo de Jubarte, em lâmina d'água de 1.375 metros.

Entre 2006 e 2008, uma sequência de descobertas de petróleo ampliou substancialmente o volume de reservas potenciais de petróleo e gás natural no Brasil, principalmente em campos associados ao Pré-sal.

## 2.2.   A CAMADA DE PRÉ-SAL



Pré-Sal é a denominação das reservas petrolíferas cujas rochas-reservatório são encontradas abaixo de uma profunda camada de sal no subsolo marítimo e cujas rochas geradoras das reservas foram formadas, em termos de idade geológica, antes da formação da camada de sal. As rochas reservatório desse tipo de região normalmente são encontradas em regiões muito profundas, de difícil localização, complexa interpretação sismológica e limitado acesso. A maior parte das reservas petrolíferas do Pré-Sal atualmente conhecidas no mundo estão em áreas marítimas profundas e ultraprofundas. A primeira reserva petrolífera comercial em área Pré-Sal no mundo ocorreu no litoral brasileiro, onde passaram a ser conhecidas como Petróleo do Pré-Sal.

Essa camada é um gigantesco reservatório de petróleo e gás natural, localizado nas Bacias de Santos, Campos e Espírito Santo (região litorânea localizada desde o estado de Santa Catarina até o Espírito Santo).

As descobertas do Pré-Sal foram possíveis com base em novos levantamentos sísmicos de alta resolução realizados pela Petrobras agregados ao desenvolvimento de tecnologia específica, também desenvolvida e de propriedade da empresa, que permitiu aos técnicos brasileiros visualizar o que havia abaixo da camada salina, que, em muitos trechos, pode alcançar mais de 2 mil metros de espessura.

Apenas para se ter noção da capacidade dessa camada, a Bacia de Campos (maior província petrolífera brasileira), responsável hoje por quase 85% de toda a produção doméstica de petróleo no país, tem cerca de 28,6 mil km² de área onde se localizam mais de 600 poços perfurados e completados. Por sua vez, a área correspondente aos seis blocos já concedidos pela ANP no Pré-Sal conta com 41,8 mil km², que corresponde a apenas 28% da área do Pré-Sal, mas que é 50% maior que toda a área da Bacia de Campos. Segundo informações da Petrobras, até o momento existem 21 poços perfurados na área do Pré-Sal da Bacia de Santos, sendo 1 da ANP, incorporado pela Cessão Onerosa.

A camada de Pré-Sal brasileira, cujo potencial excede qualquer outro descoberto até o momento, representa em torno de 2,3% do total das bacias sedimentares brasileiras, que totalizam 6,4 milhões de km², somando-se as bacias terrestres e marítimas.

A profundidade da lâmina d'água na região de ocorrência as rochas do Pré-Sal varia entre 800 e 3 mil metros, sendo classificadas como águas profundas ou ultraprofundas. Nestas condições, além da Petrobras, poucas empresas do mundo possuem tecnologia para executar as atividades de exploração e produção.

Os principais desafios técnicos que tiveram que ser vencidos para a otimização da produção das camadas do Pré-Sal foram:

- distância entre as reservas descobertas e a linha da costa (aproximadamente 300 km);
- espessura da lâmina d'água (1 a 3 mil metros);
- profundidade dos reservatórios (5 a 7 mil metros); e
- espessura da camada de sal em algumas áreas (aproximadamente 2 mil metros).

Tais desafios em grande medida já foram superados pela tecnologia existente e atualmente não impedem o desenvolvimento das reservas e a conseqüente produção petrolífera.

### 2.3. DESENVOLVIMENTO E EXPLORAÇÃO

A província do Pré-Sal tem 149 mil km². Destes, 41.772 km² (28% do total) já foram concedidos. A nova legislação recentemente aprovada pelo Congresso Nacional e que concede à Petrobras a exclusividade para atuar como operadora e líder de consórcios exploratórios abrange, portanto, para os 107.228 km² (72% do total) que ainda não haviam sido licitados (descontadas as áreas que vierem a ser objeto da cessão onerosa[1] da Petrobras, como na recente capitalização da companhia). Para as áreas que

*Figura 1 - Região do Pré-Sal*



---

[1] Negócio jurídico por meio do qual a União transmite, de modo oneroso, à Petrobras o exercício das atividades de pesquisa e lavra de petróleo, gás natural e de outros hidrocarbonetos fluidos, nos termos da Lei 12.276, de 2010.

Confidential



none
none

none
none

none
none

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6.1.2001 -9

já haviam sido licitadas, regidas pelo marco regulatório anterior, em regime de concessão, a Petrobras participa de todos os blocos concedidos e só não é operadora no bloco BMS-22, operado pela Exxon.

A grande área azul, da figura acima, indica a ocorrência prevista para o Pré-Sal, com potencial para presença de petróleo.

Em áreas já concedidas pela ANP no Pré-Sal da Bacia de Santos encontram-se as principais descobertas do Brasil e do mundo nos últimos anos, com estimativa de óleo recuperável de:

- Tupi: 5 a 8 bilhões de barris;
- Iara: 3 a 4 bilhões de barris; e
- Guará: 1,1 a 2 bilhões de barris.

Na Bacia de Santos, os 16 poços perfurados até 31 de março de 2010, obtiveram taxa de sucesso integral, com indicação da presença de óleo nos 16 poços. No Campo de Jubarte, a Petrobras iniciou, em setembro de 2008, um teste de longa duração no poço 1-ESS-103A, que já está produzindo 15 mil barris por dia a partir de um reservatório localizado abaixo da camada de sal.

A exploração desses blocos demandará um aumento significativo na capacidade de perfuração de poços exploratórios de águas profundas e ultraprofundas, o que cria a oportunidade para o desenvolvimento da infraestrutura voltada para o setor de construção de sondas de perfuração.

Para atender às suas necessidades de perfuração em geral, e no Pré-sal em particular, a Petrobras licitou no mercado internacional um pacote inicial de 12 sondas, a serem entregues até 2012. Segundo informações do Assessor, o intuito da Petrobras com esse primeiro lote é atender à necessidade de curto prazo enquanto a indústria nacional se prepara para as encomendas das 28 sondas restantes.

Para estas, a União, concedente dos blocos, elevou o índice mínimo de conteúdo nacional no fornecimento de bens e serviços e, como consequência, esse lote de 28 sondas terá que ser construído em estaleiros brasileiros e contar com a maoija participação de empresas nacionais no fornecimento de bens e serviços. Este cenário irá criar condições de desenvolvimento econômico para toda a cadeia de suprimento dessa indústria, podendo promover a especialização e a competitividade desse segmento econômico no País. As características construtivas e especialização dessas sondas criaram um nicho de mercado em determinados estaleiros internacionais (Coréia do Sul, China e Dubai) e nacionais. Hoje, existem estaleiros em operação ou em construção no Rio Grande/RS, em Angra dos Reis/RJ e em Suape/PE com capacidade para construir essas sondas de perfuração para águas profundas e ultraprofundas.

Confidential

EIG00091672
EIG_KEP_00164890

Figura 2 - Estaleiros em Construção



Em 16/10/2009, a Petrobras iniciou a licitação para a seleção dos estaleiros para construção do primeiro lote das 28 Sondas que comporão o Projeto Sondas – muito embora esteja em curso a licitação, encontram-se ainda pendentes definições quanto ao número de sistemas e ao número de sondas por sistema, 7 ou 9 sondas para o Primeiro Sistema. Espera-se que a nsse primeiro lote venham a se somar outros lotes, até que a demanda para o desenvolvimento e exploração da camada do Pré-Sal total seja atendida, compondo as 28 sondas necessárias (que somadas as 12 outras encomendadas ao mercado internacional, perfazerão as 40 sondas de perfuração para o programa de exploração do Pré-Sal).

As encomendas da Petrobras e as garantias providas pelo Fundo Garantidor da Construção Naval ("FGCN"), a ser tratado adiante no capítulo 4, poderão criar as condições adequadas para investimentos no setor e poderão atrair novos participantes na criação de modernos e competitivos estaleiros no Brasil, bem como promover o desenvolvimento da cadeia de suprimento associada.

**2.4.   MATRIZ ENERGÉTICA MUNDIAL E O PAPEL DO PETRÓLEO**

De acordo com as projeções do *International Energy Outlook 2009* ("IEO") o consumo de energia no mundo deve crescer cerca de 44% no período de 2006 e 2030, passando de 472 quadrilhões

Confidential

EIG00091673
EIG_KEP_00164891

CAIXA   CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4-1-2001 | |

de British Thermal Units ("Btu") em 2006 para 552 quadrilhões de Btu em 2015 e 678 quadrilhões de Btu em 2030. Esse crescimento da demanda exercerá forte pressão sobre o mercado petrolífero.

Apesar de a crise mundial ter enfraquecido a demanda de energia no curto prazo, inclusive com pequena queda no consumo em 2009 (primeira queda de consumo observada desde 1981), a recuperação econômica prevista a partir de 2010 deve pressionar a demanda e a produção de bens e serviços levando novamente o consumo de energia a taxas positivas de crescimento, retomando a tendência de crescimento do consumo no longo prazo.

O crescimento do consumo de energia está intimamente ligado ao crescimento da produção de bens e serviços de um país. Portanto, esse acréscimo de demanda deverá vir principalmente dos países fora da zona do *Organization for Economic Cooperation and Development* ("OECD"), principalmente a partir das economias dos "países emergentes", para cujo crescimento as previsões indicam uma aceleração bem maior do que daquelas que compõem o OECD.

As projeções do IEO2009 indicam um aumento na produção de todo tipo de combustível, com destaque para os combustíveis fósseis, porquanto a matriz energética mundial é formada, sobretudo por combustíveis fósseis (derivados de petróleo, gás natural e carvão). Nesse grupo, os combustíveis líquidos, principalmente o petróleo, apresentam participação mais relevante com projeções de elevação de consumo de cerca de 85 milhões de barris de óleo equivalente ("boe") por dia em 2006 para 91 milhões de boe por dia em 2015 e 106 milhões de boe por dia em 2030.



**Matriz Energética Mundial 2006**

Petróleo 34%
Carvão 26%
Outros Renováveis 1%
Biomassa 10%
Hidro 2%
Nuclear 6%
Gás 21%

**Matriz Energética Mundial 2030**

Petróleo 30%
Carvão 29%
Outros Renováveis 2%
Biomassa 10%
Hidro 2%
Nuclear 5%
Gás 22%

Confidential

O incremento de 22 milhões de boe por dia na produção de combustíveis líquidos no período de 2006 a 2030 deve vir tanto de países membros da OPEP, com uma produção total estimada de 44 milhões de boe por dia em 2030, como de países que não fazem parte da OPEP, com produção de 63 milhões de boe por dia.

No período em análise, os países que não fazem parte da OPEP (que irão contribuir com o maior incremento na produção de combustíveis líquidos tradicionais (e não tradicionais) são os Estados Unidos e o Brasil.



**Produção de Combustíveis Líquidos Convencionais - Países Não Membros da OPEP**

Com base nas pesquisas do IEO2009 podemos verificar a importância da produção brasileira de petróleo na matriz energética mundial, com destaque para as recentes descobertas brasileiras, já que os incrementos da produção conforme demonstrados pelo IEO têm como base os volumes produzidos em 2008. Assim as descobertas recentes do Brasil deverão futuramente compor o crescimento efetivo da produção de líquidos, podendo contribuir para compensar o declínio natural na produção dos campos existentes.

Levando-se em consideração o declínio natural dos campos de petróleo, estima-se que até 2030 a produção dos campos existentes caia para cerca de um terço do volume produzido em 2008 tornando, portanto, crucial a necessidade de novas descobertas capazes de cobrir um potencial déficit de produção de cerca de 60 boe em 2030.

Esse descasamento entre oferta e demanda no longo prazo exercerá pressão direta sobre a demanda por petróleo, já que não se vê a substituição da utilização de combustíveis fósseis por outros geradores de energia no período analisado.



Confidential

EIG00091675
EIG_KEP_00164893

CAIXA   CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2011 **13**

**2.5. OFERTA E DEMANDA DE PETRÓLEO**

O petróleo é um recurso único. Trata-se de uma importante e eficiente fonte de energia da humanidade. A disponibilidade de petróleo existente no mundo atual está presente em quase tudo o que a sociedade produz e utiliza, sendo uma a fonte de energia que move 90% do transporte mundial. Os quantitativos deste recurso natural atualmente se apresentam como segue:

- Reservas – 1,1 trilhão de barris;
- Produção Mundial – 32 bilhões barris/ano.

Agências internacionais *(US Departament of Energy* – DOE, e IEA *(International Energy Agency)* consideram que o consumo mundial de petróleo vai aumentar dos atuais 85 milhões de barris/dia para 106,6 milhões de barris/dia, em 2030.

Para o programa de exploração e produção brasileiro aumentar a produção de petróleo em mais de 4 milhões de barris/dia, conforme expectativa das agências internacionais, serão necessários investimentos em equipamentos produzidos pelos estaleiros brasileiros e internacionais.

*Gráfico 1 - Comportamento da Demanda Global de Petróleo*



Fonte: IEA World Energy Outlook 2007, EIA International Energy Outlook 2007

As recentes descobertas de petróleo na camada de Pré-Sal no Brasil redefiniram a importância da oferta de petróleo e gás natural no Brasil. Embora a exploração e o desenvolvimento dessas novas jazidas devam ocorrer e apresentar resultados mais palpáveis ao longo desta década, o novo potencial já exerce efeito sobre a atividade petrolífera do País.

Confidential

CAIXA

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6.1.2011

Projetos de exploração e produção petrolíferos são analisados à luz da projeção futura do preço do barril de petróleo. Os parâmetros técnicos dos projetos consideram a projeção do preço do barril à época em que uma determinada área comece a produzir.

Atualmente, a indústria petrolífera trabalha com valores futuros em torno de 40 dólares o barril. Nesse cenário, a Petrobras considera os projetos de Pré-sal viáveis economicamente.

Esta década mostra-se bastante positiva para indústria petrolífera. Após uma expressiva queda no preço do petróleo no final da década passada (que chegou a ficar abaixo de US$ 18/barril), o preço voltou a subir significativamente, especialmente a partir de meados de 2002, até atingir seu pico (próximo a US$ 150/barril) em 2008. Esse período que antecede o adiamento da crise financeira internacional se caracterizou por demanda em rápida progressão, especialmente na Ásia e em países em desenvolvimento. Essa demanda induziu uma campanha exploratória vultosa, com avanço sobre reservas não convencionais – águas ultraprofundas, reservas do Ártico, de petróleo ultra pesado ou areia betuminosa.

O preço do petróleo vem se recuperando desde que atingiram níveis muito baixos entre dezembro de 2008 e janeiro de 2009. Em termos históricos podemos dizer que os preços estão em patamares elevados, conforme demonstrado no gráfico a seguir:

*Gráfico 2 - Variação no Preço do Petróleo (2003 - 2010)*



Fonte: ICE/NYMEX

Para a indústria naval, o referido boom dos preços e dos projetos da indústria de petróleo trouxe uma aquecida demanda por estruturas para exploração e produção. O número de plataformas

Confidential

EIG00091677
EIG_KEP_00164895

flutuantes instaladas evoluiu significativamente ao longo dos últimos anos em diversas províncias petrolíferas, como demonstraremos nos capítulos seguintes.

## 2.6.   CONSTRUÇÃO NAVAL

A realidade geopolítica a ser considerada na análise sobre a indústria da construção naval brasileira é a demanda mundial de petróleo, que se estima ir de 85 para 106,6 milhões de barris/dia[1], em 2030, em um mercado que é voltado integralmente para logística do petróleo (transporte, exploração, produção e serviços offshore).

A cadeia produtiva naval é constituída basicamente pelas indústrias de construção naval e náutica, marinha mercante, apoio marítimo e offshore. Essa cadeia, no seu conjunto de atividades de produção de insumos e navipeças, utilizados na construção, reparação, modernização e manutenção, tanto para indústria naval quanto para indústria náutica, é importante geradora de empregos diretos e indiretos.

A marinha mercante (longo curso, cabotagem[2], fluvial e lacustre[3]) é importante movimentadora da economia nacional.

Salienta-se que, após décadas (70-80) de grande apogeu, onde o Brasil se localizava entre os maiores construtores navais do mundo, essa cadeia produtiva declinou e permaneceu estagnada até o final dos anos 90. Ressurgiu impulsionada pela crescente demanda por embarcações offshore, plataformas e outras unidades de produção marítima de petróleo e, posteriormente, por novos petroleiros, gerando desenvolvimento de caráter nacional, mas com interessante diversificação regional, com a construção de novos estaleiros nos estados do Rio Grande do Sul, Pernambuco e Rio de Janeiro.

Essa nova realidade torna viáveis as seguintes conclusões acerca dos rumos desse segmento:

1º A construção naval voltada para logística do petróleo é uma necessidade do Brasil como forma de assegurar o acesso independente a equipamentos de produção de petróleo;

2º Esses equipamentos são sondas de perfuração, plataformas de perfuração e produção, navios de apoio offshore, sistemas submarinos, navios petroleiros e gaseiros[4], que já compõem a maior parte da carteira de encomenda dos estaleiros brasileiros;

3º Aumento da presença no Brasil de empresas petroleiras e investidores no esforço de exploração e produção;

4º A grande "compradora" deve continuar a ser a Petrobras, e é esperado que sua capacidade financeira (por meio de capitalizações adicionais ou endividamento) seja dimensionada de forma a servir seus projetos; e

---
[1] Fonte Sinaval.
[2] É a navegação realizada entre portos interiores do país pelo litoral ou por vias fluviais. A cabotagem se contrapõe à navegação de longo curso, ou seja, aquela realizada entre portos de diferentes nações.
[3] Navegação em lagos.
[4] São navios destinados ao transporte de gases liquefeitos.

CAIXA

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6.1.2001  16

5° A proteção dos campos produtores offshore vai promover a ampliação da esquadra de navios militares.

O volume de negócios da indústria naval tem apresentado uma demanda em crescimento. Em 2010 as encomendas somaram 132 projetos (entre plataformas de petróleo, petroleiros, navios graneleiros e porta-contêiner, rebocadores, balsas e empurradores) até abril. Este número é bem superior ao período de 2000 a 2009, quando os estaleiros registraram 158 encomendas entregues. O mercado brasileiro já detém a quinte maior carteira de encomendas do mundo de navios petroleiros e, hoje, toca o maior programa de investimentos offshore do mundo.

Os estaleiros brasileiros estão construindo a capacidade produtiva capaz de atender a demanda atual de 28 sondas de perfuração, 150 navios petroleiros, 200 navios de apoio offshore e 150 plataformas de produção. Diante desta demanda, há projetos de implantação de 17 estaleiros e a expansão de outros 5[§].

São vários os fatores que contribuem para a atual expansão da indústria naval brasileira, entre os principais, primeiramente, está a Política de Desenvolvimento Produtivo (PDP) da Petrobras que lançou mais uma etapa do Programa de Renovação da Frota de Apoio Marítimo ("Prorefam"), um programa com o objetivo de renovar a frota e atender ao aumento da produção de petróleo e gás natural.

Outro fator para a retomada da indústria naval é o Programa de Modernização da Frota de Petroleiros ("Promef"), da Transpetro – subsidiária da Petrobras. Este programa foi iniciado em 2005, com a licitação de 26 embarcações na primeira fase, totalizando US$ 2,5 bilhões em investimentos. Na segunda fase do Promef, que está em andamento, há previsão de um lote de 23 navios de médio e grande porte com investimentos que devem chegar a US$ 1,5 bilhão. No dia 7 de maio de 2010, foi lançado no mar o primeiro petroleiro, de um total de 49 navios encomendados pela Transpetro. Como a Transpetro exige 70% de participação nacional, o total de trabalhadores, no Brasil, atualmente envolvidos na rede de construção naval é de 300 mil pessoas.

O aquecimento do mercado de exploração e produção de petróleo ("E&P") pode também ser identificado no crescimento do *leasing contractors*, agentes que alugam suas plataformas para exploração por tarifas diárias. Os valores destas diárias, especialmente os de maior complexidade e capacidade, saltaram em média de US$ 120 – 140 mil/dia na primeira metade da década atual para cerca de US$ 350 mil/dia no início de 2009[§], com picos de valor em 2008, quando o nível de utilização da frota atingiu 100% em boa parte das províncias petrolíferas. Esse aquecimento refletiu-se em ampla demanda por conversão e novas construções nos estaleiros. Apesar da grande variação de opções e preços, uma encomenda de *drillship*[10] apto a explorar águas ultraprofundas chegou a US$ 750 milhões[1], valor bem superior ao de um grande tanqueiro.

O total de empregos diretos gerados, superiores a 48 mil em 2009, deve aumentar para 60 mil, em 2014. Os empregos indiretos aumentando de mais de 180 mil, em 2009, para 240 mil, em 2014, considera-se a média de 4 empregos na indústria fornecedora para cada emprego gerado em estaleiro.

---

[§] Fonte Sinaval.
[§] Fonte: Relatório de Acompanhamento Setorial – Sinaval.
[10] Embarcação equipada com aparelhagem de perfuração de poços.
[1] Fonte Datamonitor, 24/06/2008.



Confidential

EIG00091679
EIG_KEP_00164897

A rede de fornecedores de produtos e serviços cresce com a regra do conteúdo local, que aumenta de 55% para 65% os fornecimentos pelas empresas instaladas no País.

### 2.7.   PLATAFORMAS E SONDAS DE PERFURAÇÃO E PRODUÇÃO

Uma plataforma petrolífera ou plataforma de petróleo é uma grande estrutura usada na perfuração em alto mar, para abrigar trabalhadores e as máquinas necessárias para a perfuração de poços no leito do oceano, além da extração de petróleo e/ou gás natural, processando os fluidos extraídos e levando os produtos, de navio, até a costa. Dependendo das circunstâncias  a plataforma pode ser fixada ao fundo do oceano, constituindo uma "ilha artificial" ou pode flutuar.

A figura abaixo apresenta graficamente a evolução dos tipos de sondas, desde sondas terrestres convencionais até sondas semi-submersíveis e navios sondas de última geração.

Figura  3 - Evolução dos Tipos de Sondas



O termo "geração", aplicado a um determinado tipo de sonda.  Inicialmente era denominado em função da década em que a sonda tinha sido construída, de forma que evoluções tecnológicas ocorridas durante esse espaço de tempo ajudavam a diferenciar os diferentes ativos.  Mais recentemente, porém, é consenso na indústria que esta denominação ganhou um caráter estritamente comercial, de modo que poucas inovações tecnológicas teriam ocorrido entre uma sonda de 4ª geração e uma sonda de 5ª geração, por exemplo. Por sua vez, na 6ª geração as sondas já apresentam capacidades referentes às novas fronteiras exploratórias vigentes, conseguindo obter maior eficiência em ambientes que antes não eram foco principal das outras gerações, sem que isso as inviabilize de explorarem competitivamente as áreas para as quais foram concebidas.



Confidential

EIG00091680
EIG_KEP_00164898

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 4/1/2001  18

O tipo da plataforma é definido de acordo com a finalidade a que se destina e a profundidade da lâmina d'água em que irá atuar.

### Plataformas ou Sondas de Perfuração Submarinas:

Plataformas Auto-Eleváveis (PAs ou *Jackups*): São constituídas basicamente de uma espécie de balsa ou pranchão, onde estão localizadas todas as facilidades de operação e de apoio, como sonda de perfuração, alojamento, refeitórios, laboratórios, salas de controle, heliporto, etc. Possuem três ou quatro pernas, que, adonadas mecânica e hidraulicamente, movimentam-se para baixo até atingirem o fundo do mar. Em seguida, inicia-se a elevação da plataforma acima do nível da *água*, a uma altura segura e fora da ação das ondas. Essas plataformas são móveis, sendo transportadas por rebocadores ou por propulsão própria. Destinam-se a perfuração de poços exploratórios na plataforma continental, em águas consideradas rasas para indústria offshore, em profundidade que varia de 5 a 200 m. Terminada perfuração de um determinado poço, o convés a plataforma desce até o nível do mar, suas pernas são levantadas e recolhidas e a unidade pode ser rebocada para outra locação.

*Figura 4 - Plataformas Auto-Eleváveis (Jackups)*



Plataformas Semi-Submersíveis: As plataformas semi-submersíveis são compostas de uma estrutura de um ou mais conveses, apoiada por colunas em flutuadores submersos, que funcionam como duas quilhas de um catamarã. Como, diferentemente de uma *Jackup*, esse tipo de plataforma não encontra-se apoiada no fundo do mar, permanecendo flutuante, ela sofre movimentações devido à ação das ondas, correntes e ventos, com possibilidade de danificar os equipamentos a serem descidos no poço. Por isso, quando em operações de perfuração, torna-se necessário que ela fique posicionada na superfície do mar de forma mais estável possível. Dois tipos de sistema são responsáveis pelo posicionamento estável da unidade flutuante: o sistema de ancoragem e o sistema de posicionamento dinâmico. O sistema de ancoragem é constituído de 8 a 12 âncoras e cabos e/ou correntes, atuando como molas que produzem



Confidential

**CAIXA**

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2001  **19**

esforços capazes de restaurar a posição do flutuante quando é modificada pela ação das ondas, ventos e correntes.

No sistema de posicionamento dinâmico, não existe ligação física da plataforma com o fundo do mar (ancoragem), exceto a dos equipamentos de perfuração que têm que atingir o leito marinho. Sensores acústicos de posicionamento, com referência em pontos subterreos, e de GPS, com referência em satélites, determinam a deriva, e propulsores no casco acionados por computador, restauram a posição da plataforme.

As plataformas semi-submersíveis podem ou não ter propulsão própria. De qualquer forma, apresentam grande mobilidade, sendo bastante utilizadas para a perfuração de poços exploratórios em águas profundas e ultraprofundas.

*Figura 5 - Plataformas Semi-Submersíveis*



Navios-sonda: Navio sonda é um navio projetado para a perfuração de poços submarinos. Sua torre de perfuração localiza-se no centro do navio, onde uma abertura no casco permite a passagem da coluna de perfuração. O sistema de posicionamento do navio sonda, composto por sensores acústicos, GPS, propulsores e computadores, anula os efeitos do vento, ondas e correntes que tendem a deslocar o navio de sua posição. Os navios-sonda assim como a plataforma semi-submersível, são destinados à perfuração em águas profundas e ultraprofundas, onde as Jackups não são aplicáveis.

*Figura 6 - Navio-Sonda*





Confidential

EIG00091682
EIG_KEP_00164900



CAIXA FEP SONDAS - INFORMAÇÃO CONFIDENCIAL - 4-1-2001 29

### Plataforma de Produção:

Plataformas fixas – Destinam-se às águas rasas (até 300 m). Foram as primeiras unidades de produção utilizadas no mundo, nos campos localizados em lâmina d'água de até 400 m. Exatamente porque as primeiras descobertas no mar foram em profundidades menores. Geralmente as plataformas fixas são construídas de estruturas modulares de aço, instaladas no local de operação, com estacas cravadas no fundo do mar. Primeiro é constituída a jaqueta, que é a base da plataforma, a ser fixada no fundo do mar. A construção da jaqueta é feita nos estaleiros na posição horizontal. Concluída a construção, a jaqueta é levada para sua locação em barcaças de grande porte e lançada ao mar na posição vertical, no ponto onde vai operar. Depois de devidamente fixada no fundo do mar, a jaqueta recebe as partes superiores da plataforma, que constituem os equipamentos de produção, processamento, utilidades, estocagem de materiais, alojamento de pessoal, bem como todas as instalações necessárias para a produção de poços. Escoam a produção diretamente por dutos ou por navios, uma vez que não possuem tanques de armazenamento. Este tipo de plataforma é projetado para uma determinada locação onde permanece até o esgotamento da jazida, porque não pode ser transferida para outro campo. A vida média útil de um reservatório de petróleo é de 30 anos, dependendo de diversos fatores, como tamanho do reservatório ou porosidade da rocha armazenadora. Quando desativadas, as plataformas fixas podem ser transformadas em viveiros de peixes, como arrecifes artificiais.

*Figura 7 - Plataforma Fixa*



Plataforma semi-submersível – Basicamente são estruturas idênticas às plataformas do mesmo tipo para perfuração acima detalhada. Em geral, são construídas a partir de antigas plataformas semi-submersíveis de perfuração que ficaram obsoletas e convertidas em unidades de produção. A diferença é que, ao invés de sonda de perfuração, têm, sobre o convés, equipamentos de processamento de produção. Como não tem propulsão própria, são rebocadas para as locações de produção. Ao contrário das fixas as semi-submersíveis podem ser transferidas para outra locação.

Plataforma de Pernas Atirantadas (*Tension-Leg Platform* – T.P) – São unidades flutuantes utilizadas para a produção de petróleo. Sua estrutura é bastante semelhante à da plataforma semi-submersível. Porém, sua ancoragem ao fundo do mar é diferente: as TLPs são ancoradas por estruturas



Confidential



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 4-9-2001  **21**

tubulares, com os tendões fixos ao fundo do mar por estacas e mantidos esticados pelo excesso de flutuação da plataforma, o que reduz severamente os movimentos da mesma. Desta forma, as operações nessas unidades são semelhantes às das plataformas fixas.

Plataformas tipo FPSO – Os FPSOs (*Floating, Production, Storage and Offloading*) são navios com capacidade para processar e armazenar o petróleo e prover a transferência do petróleo e/ou gás natural. No convés do navio, é instalada uma planta de processo para separar e tratar os fluidos produzidos pelos poços. Depois de separado da água e do gás, o petróleo é armazenado nos tanques do próprio navio, sendo transferido para um navio aliviador ou tempos em tempos. Podem ter seus cascos projetados e construídos especificamente para operar como FPSO (*new-building*), mas em geral são unidades de produção convertidas a partir de antigos navios petroleiros que deixaram de ser eficientes para transporte de petróleo.

O navio aliviador é um petroleiro que conecta seus equipamentos de recebimento de petróleo aos equipamentos de bombeio do FPSO, em geral localizados na popa dessas unidades, para receber petróleo que foi armazenado em seus tanques e transportá-lo para terminais terrestres. O gás comprimido é enviado para terra através de gasodutos e/ou re-injetado no reservatório. Os maiores FPSOs em operação no Brasil têm sua capacidade de processo em torno de 200 mil barris de petróleo por dia, com produção associada de gás de aproximadamente 3 milhões de metros cúbicos por dia.

Ao construir uma sonda de perfuração, alguns pontos devem ser levados em consideração em termos de equipamento, sempre de acordo com o ambiente em que a sonda irá operar. Especialistas do setor responsáveis pelo fechamento dos contratos de sondas (*leasing contract*) de perfuração têm como elementos chave para sua decisão a seguinte gradação de uma ativo:

Lâmina d'água – É o principal fator limitante dependendo do ambiente em que a sonda irá operar; resumidamente, transfigura-se na capacidade máxima de operação de uma estrutura em função da profundidade do mar na região em questão. É basicamente a distância entre a mesa rotativa da plataforma e o fundo do oceano.

A única restrição em termos de lâmina d'água seria com respeito aos *jackups* e plataformas fixas, que somente operam em ambientes de águas rasas.

As sondas de perfuração desenhadas para atuar em águas profundas e ultraprofundas podem, em caso de necessidade, operar em águas médias e rasas, de forma que com um cenário de mercado desaquecido em águas profundas – que seria o contrário da tendência atual – abriria a possibilidade de que as sondas de última geração pudessem vir a operar fora de seu nicho natural, valendo-se de sua flexibilidade de alcance, assim a princípio disputando um mercado que antes estava restrito as sondas de águas rasas e possivelmente a taxas de afretamento inferiores às praticadas em seu mercado de origem. Cabe colocar que em tais situações contingenciais e transitórias, essas sondas quando operando em águas rasas, teriam capacidade ociosa e parte de suas estruturas lhes seriam redundantes.

O principal foco de atenção no mercado de exploração de petróleo e gás atualmente é em águas profundas e ultraprofundas. Com as bacias sedimentares localizadas em águas rasas e médias em todo o planeta já exploradas ou esgotadas, a nova fronteira e caminho natural para o desenvolvimento

Confidential

EIG00091684
EIG_KEP_00164902



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2001 **22**

da indústria petrolífera no mundo são as áreas com lâmina d'água profundas e ultraprofundas. Grandes investimentos estão sendo feitos nas duas estruturas capazes de explorar nesses ambientes, as semi-submersíveis e os navios sondas. Estas sondas, por sua vez, se diferenciam no ambiente competitivo por várias de suas características:

_Descida de Revestimento (hook load)_ - De uma forma simples é a capacidade que uma sonda apresenta de carregar os revestimento que deverão ser empregados nas paredes dos poços, necessários para estabilizar a perfuração, evitando desmoronamento e criando o duto de perfuração. Estes tubos, estocados a bordo das unidades até que sejam instalados nos poços, requerem grande capacidade de armazenamento, por conta de seu longo comprimento e peso.

_Posicionamento Dinâmico_ - Talvez um dos debates que mais gera controvérsias entre os experts no assunto, especialmente em um cenário de crescente lâmina d'água, refere-se a duas vertentes principais: o convencional sistema de ancoragem e o sistema de posicionamento dinâmico.

Tradicionalmente, a ancoragem restringiu as embarcações à lâmina d'água de até 1500 metros de profundidade, o que de certa forma desencoraja os novos projetos ("newbuilds") de empregarem tal tecnologia e optarem pelo posicionamento dinâmico – embora recentes empreendimentos da Petrobras, nos testes de longa duração em Tupi, empreguem embarcações com ancoragem em lâminas d'água consideravelmente mais profundas que as citadas.

O que se evidencia atualmente é que existem variações importantes em termos de custo de capital e de operação (recorrentes) que diferenciam os dois sistemas.

Do ponto de vista de custos, a ancoragem possui vantagens comparativas em águas mais rasas e em projetos exploratórios mais longos, isto inclusive na fase de desenvolvimento. Em contrapartida, o posicionamento dinâmico estaria mais apto à exploração em águas profundas, de forma que seria quase impossível, segundo autoridades do setor, se perfurar em águas ultraprofundas com outro sistema.

O custo de instalação de um sistema de posicionamento dinâmico é mais caro que um sistema de ancoragem, devido ao fato de que existe um número maior de requerimentos regulatórios para instalação do sistema e mais equipamentos eletrônicos a implantar. O maior custo do sistema de posicionamento dinâmico é a sala de máquinas separada, o que é uma exigência regulatória, de forma a tornar possível um backup e manutenção da posição da embarcação em caso de incêndio e inundação.

_Velocidade e Navegação e Estabilidade_ - Este aspecto difere consideravelmente navios sonda de plataformas semi-submersíveis, sendo que o primeiro é até seis vezes mais rápido que a segunda. Isto ganha relevância em campos maiores, onde a campanha de perfuração envolve vários furos, aumentando a eficiência geral da operação. Ainda, com as novas tendências exploratórias, que envolvem maior número de perfurações em sítios exploratórios dentro de reservatórios menores e que guardam

Confidential

EIG00091685
EIG_KEP_00164903



maiores distâncias entre si, aumenta a necessidade de uma locomoção mais ágil entre os sítios exploratórios.

**2.8.    ATIVIDADE DE E&P EM ÁGUAS PROFUNDAS E ULTRAPROFUNDAS**

**2.8.1.   O SEGMENTO OFFSHORE NO BRASIL**

As Sondas do Projeto serão destinadas ao desenvolvimento de poços de petróleo em águas profundas e ultraprofundas. Neste nicho de mercado a Petrobras é reconhecida pela indústria como líder global no setor e foi pioneira e responsável pelo descobrimento e desenvolvimento da grande maioria dos depósitos de hidrocarbonetos na costa brasileira.



Descobertas por ano - Offshore Brasil



Existe uma tendência natural de esgotamento dos campos existentes e de mais fácil desenvolvimento e exploração, dessa forma a busca por novas áreas avança e a prospecção e exploração de campos mais distantes e de difícil acesso é uma consequência normal neste mercado. Essa afirmação já pode ser atestada com base nas principais descobertas nos últimos anos, que já foram em águas profundas ou ultraprofundas (2.000 de lâmina de água ou mais).

EIG00091686
EIG_KEP_00164904

CAIXA    CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6.1.2001  **24**

*Gráfico 3 - Descobertas por ano - Brasil*



Fonte: ODS-Petrodata

A Petrobras, em conjunto com outras grandes empresas petrolíferas e consultores especializados, tem a expectativa de que o fluxo de grandes projetos de exploração petrolífero, principalmente no Brasil, Golfo do México e o Pré-Sal da África, sustentarão a demanda por plataformas de perfuração.

A ODS-Petrodata, fonte de referência para diversos estudos sobre o setor, traçou três cenários possíveis para o crescimento da demanda por plataformas de perfuração para águas profundas até 2016. No gráfico abaixo podemos verificar que mesmo em um cenário mais pessimista a demanda apresenta tendência de crescimento.



EIG00091687
EIG_KEP_00164905


## 2.8.2. MERCADO DE ÁGUAS PROFUNDAS E ULTRAPROFUNDAS

O desenvolvimento de um campo de petróleo envolve vários aspectos da engenharia, muitos deles intrinsecamente relacionados à localização do campo, ao programa de perfuração, ao dimensionamento da unidade que suportará a produção e a definição dos métodos de elevação de óleo e gás. Constitui-se um item fundamental no projeto a correta análise das características do reservatório produtor para a definição do programa de produção do hidrocarboneto. Finalmente, os resultados definirão a viabilidade de desenvolvimento de um campo de petróleo. Já um projeto a ser elaborado para o desenvolvimento de um campo visa a maximização da recuperação de petróleo e um custo mínimo operacional e de investimento de capital.

A licitação que a Petrobras está conduzindo para adquirir 28 plataformas de perfuração deve inaugurar uma nova geração de sondas – pelo menos essa é a expectativa dos técnicos da companhia, que esperam ver capturadas as tecnologias que irão colocar as plataformas num patamar mais avançado. Os editais permitiram que para a construção de algumas unidades as empresas contratem a *Huisman*, que desenvolveu um novo conceito em sistemas de perfuração – embora ainda inédito, o *design* agradou a Petrobras por possibilitar trabalhos em lâminas d'água superiores a três mil metros, a par disso há um novo *layout* da sonda, com colados maiores e mais espaço no convés, com operações mais automatizadas e rápidas, aumentando-se a produtividade das operações. Entre as inovações constam a nova forma de estabilizar e movimentar as colunas de perfuração – a geometria da torre, tubular e central, possui braços articulados que possibilitam girar 360° ao seu redor, eliminando a necessidade de uma subestrutura e otimizando o espaço da sonda. O centro de gravidade da plataforma está localizado em uma posição inferior, o que aumenta a sua estabilidade e versatilidade de deslocamentos.

A sexta geração de sondas começou a sair dos estaleiros há seis anos. Todas já saem de fábrica com capacidade para operar em lâminas d'água de três mil a três mil e seiscentos metros e trazem torre dupla – *dual-activity* – que permite realizar trabalhos em paralelo, reduzindo entre 20% e 40% o tempo das operações de poço.

A Seadrill possui, no Brasil, duas sondas desse tipo – *West Eminence*, em operação no BM-S-11, e *West Polaris*, no BM-S- 9, além da *West Taurus* em operação também no BM-S-11, onde está localizada à área do Pré-Sal, da Bacia de Santos. No Espírito Santo, a Drillmax, da Stena, perfura um poço para a Repsol no bloco EM-S-737. Além de possuírem posicionamento dinâmico, o nível de automação dessas sondas de sexta geração também é mais elevado, retirando da atuação manual as operações de descida e retirada de coluna, montagem de revestimentos e *bottom-hole assembly* – a parte anterior a coluna de perfuração.

A exploração em horizontes mais profundos e hostis, caracterizados por altas pressões e temperaturas, também estimulou o dimensionamento dessas plataformas com maior robustez – pela necessidade de operar uma variedade maior de colunas de perfuração – associada ao gerenciamento de zonas perigosas. As taxas diárias de uma sonda que operam em lâminas d'água superiores a dois mil metros, perfurando quase oito quilômetros de rocha, dificilmente ficam hoje abaixo da faixa entre US$ 400 mil/dia e US$ 500 mil/dia – é algo que representa mais de um terço do total dos custos de perfuração.



Confidential

As três maiores empresas de perfuração de poços de petróleo offshore, Transocean, Noble e Pride, confirmaram em seus relatórios anuais aos acionistas, aumento no faturamento e encomendas de navios-sondas aos estaleiros internacionais.

Faturamento em 2009:

| | |
|---|---|
| Transocean | US$ 11,5 bilhões |
| Noble | US$ 3,6 bilhões |
| Pride | US$ 1,6 bilhões |

A Transocean está construindo sete navios-sonda. Uma de suas mais novas unidades, a "Petrobras 10.000", foi construída no estaleiro *Samsung Heavy Industries* (Coréia do Sul), foi entregue no final de 2009 e tem contrato de serviços por dez anos com a Petrobras, com diárias no valor de US$ 410 mil. Mais especificamente, esse navio sonda é de propriedade de uma sociedade constituída entre a própria Petrobras e a japonesa Mitsui, e foi subarrendado pela Transocean.

A Noble tem três navios-sondas e duas plataformas de perfuração que iniciarão contratos por cinco e seis anos com a Petrobras (as diárias recebidas em 2008 foram no valor de US$ 300 mil). Os três navios-sondas serão modernizados em estaleiros brasileiros com investimentos de US$ 90 milhões durante o período de reconstrução. A Noble está construindo um navio sonda orçado em US$ 585 milhões, uma plataforma fixa e duas plataformas de perfuração semi-submersíveis.

O navio sonda será construído em duas fases: primeiro, a construção do casco e do sistema de propulsão no estaleiro STX (Coréia do Sul) na sua unidade em Dalian, na China; em seguida, o navio sonda segue navegando com propulsão própria até a Holanda, onde serão instalados equipamentos de perfuração, projetados e construídos pela Huisman Equipment BV. O relatório anual de 2008 da Noble informa que as diárias para navios de perfuração recém-construídos são no valor de US$ 515 mil.

A Pride está construindo cinco navios sondas no estaleiro Samsung, sendo um deles já com contrato com a Petrobras e dois com contrato com a BP, com diária de US$ 502 mil. A Pride tem atualmente sete plataformas de perfuração semi-submersíveis sob contrato no Brasil.

### 2.8.3.   DEMANDA POR PLATAFORMAS

No contexto do exposto nos capítulos anteriores, a exploração e desenvolvimento dos reservatórios de hidrocarbonetos, localizados nas bacias sedimentares nas costas oceânicas do Brasil, Golfo do México e África (conhecidas como "*Golden Triangle*") passam a ganhar importância.

Recentemente, especial atenção tem sido dada na exploração das reservas potenciais das bacias localizadas em águas profundas ou ultraprofundas (três mil metros de lâmina de água ou mais) que se distinguem dos depósitos localizados em água rasa pelo fato de possuírem potencial de grandes reservas de hidrocarbonetos (acima de 1 bilhão de barris).



CAIXA

Uma característica importante no tocante ao desenvolvimento das bacias sedimentares localizadas em águas profundas ou ultraprofundas é o fato de que poucas empresas dominam o "*know how*" necessário para a efetiva exploração destes potenciais reservatórios de hidrocarbonetos. Este é o principal desafio apresentado à Petrobras.

A região denominada *Golden Triangle* deve concentrar a maior parte dos esforços exploratórios em águas profundas, apesar de alguma atividade desta natureza estar sendo desenvolvida no Noroeste da Europa, no Mediterrâneo, no oceano Índico, no sudeste da Ásia e na Austrália.

No nicho de águas profundas, a Petrobras é responsável por cerca de 23% de toda a produção de petróleo e opera cerca de 18% das todas as instalações offshore disponíveis no mundo.

A demanda por plataformas de produção de diversos tipos é estimada em cerca de 150 unidades até 2020.

A demanda estimada da Petrobras é de 95 unidades, sendo que 8 cascos de FPSO foram licitados e estão sendo construídos pela Engevix em consórcio com a GVA no estaleiro do Rio Grande (RS).

É estimada em 55 plataformas de produção a demanda das empresas petroleiras privadas, incluindo neste total cerca de 48 unidades demandas pela OGX, para a construção no seu Estaleiro OSX, que, no início de 2010, lançou ações e captou no mercado R$ 2,4 bilhões para investir na sua implantação. Para fazer frente a essa demanda, existem projetos com prioridade de financiamento aprovadas no Fundo da Marinha Mercante (FMM) para a implantação de 17 estaleiros e a expansão de outros cinco estaleiros.

A oferta de plataformas de perfuração de águas profundas e ultraprofundas está concentrada em poucas empresas. A Transocean detém aproximadamente 25% do mercado, e os 5 maiores proprietários (Transocean, Diamond, Noble, Pride and Seadrill) somente, detém pouco mais da metade desta frota.



Como podemos verificar no gráfico abaixo que a Petrobras responde por 33 de 118 sondas atualmente contratadas (incluindo sondas em construção). No mercado de sondas para águas ultraprofundas, a Petrobras detém 11 sondas, mais que o dobro do segundo operador (Anadarko e Chevron, com 5 cada).

**Frota Mundial de Sondas de Águas Profundas - Por Operador**



CAIXA

## 2.9.    O OFFTAKER - PETROBRAS

A Petrobras é uma sociedade de economia mista controlada pela União, fundada em 1953, está presente hoje em 27 países. Sediada no Rio de Janeiro, a empresa atua na indústria de energia, prioritariamente nos setores de exploração, produção, refino, comercialização e transporte de petróleo e seus derivados, no Brasil e no exterior. Recentemente, a companhia iniciou atuação também no segmento de energia renovável, sendo já um dos maiores players no Brasil nos setores de biocombustíveis (etanol, biodiesel, etc.), energia elétrica (termelétrica e hidroelétrica) e energia além de energia eólica.

A estrutura de capital da Petrobras em dezembro de 20:0estava disposta da seguinte maneira:

*Tabela I - Estrutura de Capital da Petrobras*

| Distribuição do Capital em 16/12/2010 | Ações ON % | Ações PN % | TOTAL |
|---|---|---|---|
| União Federal (Tesouro Nacional) | 53,6% | 1,2% | 31,1% |
| Bndespar - BNDES Participações SA | 2,3% | 23,9% | 11,6% |
| Fie - Fundo Fiscal de Investimentos e Estabilização | 4,6% | 2,9% | 3,9% |
| Blackrock, Inc | 0,0% | 5,0% | 2,1% |
| FPS Fundo de Participacao Social | 3,0% | 0,0% | 1,7% |
| Previ Cx Prev Funcs Bco Brasil | 0,0% | 0,0% | 0,0% |
| Outros | 36,4% | 67,0% | 49,5% |
| **Total** | **100,0%** | **100,0%** | **100,0%** |

*Fonte: Economatica*

Em janeiro de 2010, a empresa foi considerada a quarta maior do mundo, em termos de valor de mercado, de acordo com a consultoria *PFC Energy*. Adicionalmente, é considerada a segunda maior empresa entre as com ações negociadas em bolsa.

A Petrobras é líder mundial na exploração e produção de petróleo em águas profundas e ultraprofundas, respondendo por aproximadamente 20% da produção mundial em águas profundas e ultraprofundas em 2009, de acordo com os dados da *PFC Energy*.

É a maior detentora dos blocos exploratórios no Brasil, de acordo com dados da ANP, com 225 concessões em 31 de dezembro de 2009.

Atua como consorciada a outras empresas como concessionária de direitos de exploração, desenvolvimento e produção de petróleo e gás natural. Atualmente, a companhia mantém 101 concessões em parcerias, sendo 69 destas operadas pela Petrobras.

Os negócios da empresa compreendem a pesquisa, exploração, produção, refino, logística, comercialização e transporte de petróleo e seus derivados e de gás natural além de energia

Confidential

EIG00091692
EIG_KEP_00164910

elétrica, biocombustíveis e outras fontes renováveis de energia. Atualmente, os negócios da Petrobras estão divididos em:

- Exploração e Produção (E&P): Principal segmento de atuação. Inclui a exploração e produção de petróleo e gás natural no Brasil para a comercialização prioritária nas refinarias próprias e exportação do excedente. De acordo com dados da ANP, a Petrobras é responsável por aproximadamente 98,5% da capacidade de refino total do Brasil;

- Abastecimento: Inclui o refino, logística, transporte e comercialização do petróleo, derivados e álcoois, bem como a produção e exploração de xisto e a participação em sociedades do setor petroquímico no brasil. Em 30 de junho de 2010, a Companhia operava 92% da capacidade de refino total do Brasil.

- Gás e energia: inclui o transporte e a comercialização de gás natural produzindo no Brasil ou importado, o transporte e comercialização de GNL, a geração e comercialização de energia elétrica, bem como a participação em sociedades transportadoras e distribuidoras de gás natural e em termelétricas no Brasil, e o negócio de fertilizantes. Os resultados decorrentes do negócio de fertilizantes passaram a ser incluídos no segmento de gás e energia a partir de 1º de janeiro de 2010.

- Distribuição: Inclui a distribuição de derivados de petróleo, álcoois e gás natural veicular no Brasil por meio de rede de postos e serviços da subsidiária Petrobras Distribuidora. Esta é a maior distribuidora de petróleo e derivados do país, com participação de mercado de 38,6% em 2009 e 38,7% em 30 de junho de 2010, de acordo com dados da ANP.

- Internacional: Inclui as atividades conduzidas no exterior, e compreendem a exploração, produção, refino, transporte, comercialização e distribuição de petróleo e derivados e energia.

- Corporativo: Inclui as atividades não atribuíveis aos demais segmentos, notadamente aquelas vinculadas a gestão financeira corporativa.

Atualmente, o foco da companhia é a exploração e produção de petróleo e gás natural em bacias localizadas ao longo da costa brasileira e no Estado do Amazonas. Dessas, as mais relevantes são as Bacias de Campos, Santos e Espírito Santo, que também incluem os reservatórios do Pré-Sal. A tabela abaixo apresenta informações sobre as bacias quais a Petrobras opera:

| Bacia | Área Total[1] | Blocos Exploratórios[2] | | Campos de Produção | Produção Média | |
|---|---|---|---|---|---|---|
| | | Quantidade | Área | | Petróleo | Gás Natural |
| | *km²* | | *km²* | | *m.bbl/d* | *mmm3/d* |
| Campos | 115.500 | 21 | 5.494 | 41 | 1.496,6 | 12,0 |
| Santos | 348.900 | 24 | 28.734 | 2 | 14,4 | 0,7 |
| Espírito Santo | 75.500 | 24 | 8.613 | 46 | 40,9 | 1,5 |
| Outras | 1.949.100 | 132 | 94.726 | 279 | 373,9 | 6,4 |
| **Total** | **2.589.000** | **225** | **137.117** | **378** | **1.990,8** | **20,6** |

(1)   Data Base: 31 de dezembro de 2009

(2)   Blocos exploratórios que a Petrobras possui direito de exploração e produção

Confidential

EIG00091693
EIG_KEP_00164911



Como aproximadamente 90% das reservas provadas de petróleo e 53% das reservas provadas de gás natural em 2009 estão localizadas nos campos de produção da Bacia de Campos, isso permite concentrar geograficamente a infra-estrutura necessária para dar suporte às atividades de E&P e, dessa forma, reduzir custos.

### 2.9.1. HISTÓRICO

Em outubro de 1953, com a edição da Lei 2004, a construção da Petrobras foi autorizada com o objetivo de executar as atividades do setor petróleo no Brasil em nome da União.

A Petróleo Brasileiro S.A – Petrobras iniciou suas atividades com o acervo recebido do antigo Conselho Nacional do Petróleo (CNP), que manteve sua função fiscalizadora sobre o setor.

Quando da sua criação, a produção de petróleo no Brasil era de 2.700 barris por dia, e não atingia 2% do consumo doméstico. A capacidade de refino do petróleo também era restrita em relação ao consumo doméstico de derivados, à época de 137 mil barris por dia.

Os primeiros objetivos da Petrobras foram a construção de um parque de refinarias para atendimento doméstico do consumo de derivados de petróleo e a criação de uma infraestrutura de abastecimento (rede de transportes e terminais). Os esforços da Petrobras tiveram início em campos onshore, com foco inicial no estado da Bahia. Na década de 60, a Petrobras iniciou atividades de exploração offshore. A partir de 1968 há aumento no foco dessa atividade, com a descoberta do campo de Guaricema (SE).

Os choques de petróleo de 1973 e 1979, ocasionados por crise mundial decorrente do embargo ao fornecimento de petróleo aos Estados Unidos e à Europa pela OPEP, fizeram com que países como o Brasil apresentassem um déficit de quase US$ 40 bilhões principalmente em 1973. Em decorrência desses choques, a Petrobras priorizou os investimentos em E&P, passando a manter um ritmo de investimentos em capacidade de refino que garantisse a autosuficiência brasileira em derivados, cuja demanda interna aumentava significativamente, estimulada pelo período do "milagre econômico" no início da década de 70.

O investimento em E&P, focado em campos offshore, rendeu frutos rapidamente: em 1974, quando foi descoberto o campo de Garoupa, no litoral do Estado do Rio de Janeiro, estabelecendo o início de uma série de êxitos na Bacia de Campos, que rapidamente tornou-se a maior região produtora brasileira.

Gráfico 5 - Histórico de E&P da Petrobras



Confidential

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2001 **32**



Surgia, no entanto, um desafio tecnológico: a E&P offshore em águas profundas. Para vencê-lo, a Petrobras investiu fortemente em pesquisa e tecnologia de exploração em profundidades cada vez maiores, concretizando sólido sucesso exploratório traduzido em sucessivos recordes de produção doméstica.

Cabe ressaltar que, no período entre 1995 e 1997, outras empresas, além da Petrobras, foram autorizadas a entrar no mercado, atuando nos elos de exploração, produção e refino de hidrocarbonetos.

Já em 2007, o setor de petróleo e gás ("P&G") gerou em torno de 48% da energia consumida no país[2], com o petróleo representando pouco acima de 37% da matriz energética brasileira e o gás natural 9% da energia primária consumida.

Outro aspecto da vantagem competitiva da Petrobras é o impulso dado ao processo de internacionalização de suas atividades, especialmente usando sua tecnologia em exploração de petróleo offshore para explorar jazidas em outras regiões do mundo. A empresa passou a atuar na exploração de petróleo offshore em outros países, tais como Colômbia, Angola, Irã, Paquistão e Portugal.

**2.9.2.  GOVERNANÇA CORPORATIVA**

A Petrobras adota as melhores práticas de governança corporativa. Por ser uma companhia de capital aberto, está sujeita às regras da Comissão de Valores Mobiliários (CVM) e da Bolsa de Valores, Mercadorias e Futuros (BM&FBovespa). No exterior cumpre as normas da *Securities and Exchange Commission* (SEC) e da *New York Stock Exchange* (NYSE), nos Estados Unidos, do Latibex da

---

[2] Fonte: Ministério das Minas e Energia, 2008.

Confidential

EIG00091695
EIG_KEP_00164913

GAIXA                                    CAIXA FIP SONDAS · INFORMAÇÃO CONFIDENCIAL – 6 1 2001  **33**

Bolsa de Madri, na Espanha; da Bolsa do Comércio de Buenos Aires e da Comisión Nacional de Valores (CNV), na Argentina.

Dentre os instrumentos para garantir a boa governança corporativa, a Petrobras adota o Código de Boas Práticas, que trata de políticas, como a de divulgação de informações sobre o ato ou fato relevante e a de negociação com valores mobiliários, relacionados ao uso de informação privilegiada e à conduta dos administradores e dos funcionários da administração superior.

### 2.9.3. INFORMAÇÕES FINANCEIRAS

Os gráficos a seguir apresentam a representatividade de cada um dos segmentos de negócio da Petrobras, na receita operacional líquida de 2009 e no primeiro semestre de 2010.



Participação dos Segmentos da
Receita Operac Líquida - 2009



Participação dos Segmentos da
Receita Operac Líquida - 1S 10



| em bilhões de R$ | 2007 | 2008 | 2009 | 1T 2010 | 2T 2010 | 3T 2010 |
|---|---|---|---|---|---|---|
| Receita Operacional Líquida | R$ 170,58 | R$ 215,12 | R$ 182,71 | R$ 56,31 | R$ 53,47 | R$ 56,71 |
| Lucro (prejuízo) operacional | R$ 33,92 | R$ 40,39 | R$ 43,11 | R$ 15,77 | R$ 11,74 | R$ 12,97 |
| Lucro Líquido | R$ 24,51 | R$ 33,38 | R$ 38,30 | R$ 7,73 | R$ 9,39 | R$ 9,57 |
| Fonte: Formulário |  |  |  |  |  |  |

CAIXA

O lucro líquido do semestre atingiu R$ 16.021 milhões e foi 11% superior ao mesmo período em 2009, refletindo aumento de 3% na produção total de petróleo e gás natural. A elevação dos preços das exportações e a recuperação do volume das vendas no mercado interno, segundo dados da Petrobras, se elevou em 11%.

### 2.9.4.  PLANO DE INVESTIMENTO 2009 – 2014

No Plano Estratégico 2020, a Petrobras prevê um investimento total de US$ 224 bilhões entre 2009/2014, realizando em média US$ 44,8 bilhões por ano.

O Plano de Negócios 2009-2014 prevê investimentos de 95% (US$ 212,3 bilhões) aplicados no Brasil e 5% (US$ 11,7 bilhões) no exterior, com significativa colocação dos investimentos junto ao mercado fornecedor doméstico, com uma taxa de conteúdo local totalizando 67%, o que significa um nível de contratação anual no País de cerca de US$ 28,4 bilhões. Nesses valores estão incluídos os recursos necessários para a exploração e desenvolvimento do Pré-Sal. A meta da produção de petróleo é de 3,9 milhões de barris de óleo equivalente por dia (boe) em 2014 e projeção de 5,4 milhões de boe em 2020.



A projeção demonstrada na figura acima leva em consideração apenas os atuais projetos da carteira e não consideram o potencial de produção proveniente da cessão onerosa, nem outros projetos do novo marco regulatório.





CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6 1 2001 **35**

### 2.9.5. PROCAP

O início das pesquisas mais intensas voltadas para exploração de petróleo offshore se deram em 1973 quando o Centro de Pesquisa e Desenvolvimento Leopoldo Américo Miguez de Mello (CENPES) conseguiu a adaptar tecnologia importada ao ambiente, jazidas, geologia e condições de mercado. Em paralelo a empresa firmava contratos de licenciamento junto a empresas estrangeiras experientes nesse tipo de exploração, em busca de transferência de tecnologia que incluía estágio dos engenheiros no exterior e difusão dos conhecimentos através de cursos internos.

Dessa forma, a Petrobras absorveu o conhecimento disponível no mercado em relação à exploração de petróleo offshore, mas insuficientes para viabilizar técnica e economicamente a maioria das jazidas petrolíferas do subsolo marinho brasileiro. Isso a impulsionou a desenvolver sua própria tecnologia através do Programa de Desenvolvimento Tecnológico de Sistema de Produção em Águas Profundas (PROCAP). O primeiro PROCAP começou em 1986 com o objetivo de melhorar a competência técnica da empresa na produção de petróleo e gás natural em águas com profundidade de até mil metros.

A segunda versão foi lançada em 1993, denominada PROCAP-2000 (Programa de Inovação Tecnológica para Sistema de Exploração em Águas Profundas), cujo objetivo era viabilizar a exploração de novos campos com lâmina d'água de cerca de 2 mil metros. Finalmente, a partir do ano de 2000, a Petrobras passou a trabalhar com o PROCAP-3000 (Programa Tecnológico da Petrobras em Sistemas de Exploração em Águas Ultraprofundas), voltado para viabilizar a exploração de jazidas com lâminas d'água superiores a 3 mil metros. Segundo a Petrobras, são objetivos específicos do PROCAP-3000 (i) viabilizar a produção de águas ultraprofundas, (ii) reduzir os custos de extração dos campos em desenvolvimento de produção à profundidade de lâmina d'água acima de mil metros e (iii) genericamente reduzir o custo de extração (*lifting cost*) em águas profundas e ultraprofundas. Sua execução é realizada por meio de três gamas de projetos sistêmicos: (i) o primeiro é o "controle de poços em águas ultraprofundas" que visa elevar a segurança e reduzir riscos relacionados a perfuração de poços de grande profundidade; (ii) o segundo é a "complementação [13] inteligente para águas ultraprofundas" consiste no sistema inteligente que permite ao operador monitorar e controlar, em tempo real, no local ou em uma base remota, a operação do poço, possibilitando melhorar o gerenciamento e; (iii) por último são os "fluidos leves em águas profundas e ultraprofundas" que buscam neutralizar as entraves tecnológicas de exploração de jazidas acima de 3 mil metros de profundidade, dificuldades encontradas na extração do hidrocarboneto, no desenvolvimento, obtenção e emprego de equipamentos necessários e na coleta e processamento dos dados geológicos dessas áreas profundas e ultraprofundas.

### 2.10. ASPECTOS REGULATÓRIOS

---

[13] Conjunto de serviços efetuados no poço perfilhe-o. A complementação consiste em transformar o poço perfurado em uma unidade produtiva.

Confidential

Frente às recentes ações em curso no Congresso Nacional sobre alterações nos regimes de concessão dos blocos exploratórios do Pré-Sal brasileiro, cabe aqui, fazermos uma breve exposição sobre os aspectos regulatórios das atividades de E&P no Brasil, dentre os quais o regime de concessão e o contrato de concessão que dá a Petrobras o direito de explorar os blocos de Pré-Sal já concedidos pelo Governo Federal sob o regime vigente.

A elevação do índice de conteúdo local também é um ponto a ser tratado, por ser um fator determinante na elaboração do Projeto Sondas.

### 2.10.1. DO REGIME DE CONCESSÃO

O monopólio da União sobre o setor de hidrocarbonetos está estabelecido desde 1953[14], quando da assinatura da Lei 2004. A mesma lei que estabeleceu o monopólio criou e concedeu à Petrobras, empresa estatal de capital misto, e a ela concedeu o direito de exercer esse monopólio em nome da União. Este marco regulatório foi parâmetro para as regras do setor até que em 1995, o Congresso Nacional aprovou a Emenda Constitucional nº 9, que retirava da Petrobras o direito de exercer o monopólio em nome da União.

A Carta Magna de 1988, em seu art. 176, deixou clara a opção pelo regime dominial e pela concessão administrativa para exploração dos recursos minerais, in verbis:

*Art. 176: "As jazidas, em lavra ou não, e demais recursos minerais e os potenciais de energia hidráulica constituem propriedade distinta da do solo, para efeito de exploração ou aproveitamento, e pertencem à União, garantida ao concessionário a propriedade do produto da lavra."*

Contudo, esse artigo foi concebido para disciplinar a exploração de energia hidráulica e de seus recursos minerais, excetuando aqueles cuja exploração estivesse dentro do âmbito do monopólio da União, como era o caso do petróleo e gás.

Para a disciplina dos bens monopólio da União, os Constituintes de 1988 estabeleceram o regime especial de aproveitamento no art. 177, sob a disciplina desse estavam petróleo, o gás natural e dos minerais nucleares. O artigo 177 foi, mais tarde, alterado pela Emenda Constitucional nº 9, de 9 de novembro de 1995.

O texto original da Constituição de 1988 impedia qualquer cessão ou concessão por parte da União de qualquer atividade do setor petrolífero, à exceção das atividades de distribuição. Manteve-se, assim, a possibilidade de a União, por meio da Petrobras, nos termos da Lei nº 2004, de 3 de outubro de 1953, continuar exercendo monopólio estatal do petróleo.

A Lei 2004 instituiu o setor de E&P no Brasil em 1953.

[14] Apenas em 1963 o monopólio foi estendido para importação e exportação de petróleo bruto e derivados.

Confidential

EIG00091699
EIG_KEP_00164917

CAIXA

No entanto, na década de 90, houve uma alteração do texto constitucional relativo ao setor petrolífero. O espírito dessa mudança, materializado no texto da Emenda Constitucional nº 9, foi a flexibilização do monopólio do petróleo. Essa emenda introduziu a possibilidade da União contratar com empresas estatais ou privadas a exploração e a produção de petróleo e gás natural.

A partir dos novos ditames do art. 177 da Constituição Federal, alterado como resultado da Emenda Constitucional nº 9, promulgou-se a Lei 9.478, de 6 de agosto de 1997, também conhecida como a Lei do Petróleo.

Este novo marco regulatório teve como objeto principal o estabelecimento dos princípios e objetivos gerais da política energética nacional, prevendo a criação da Agência Nacional de Petróleo (ANP) e do Conselho Nacional de Política Energética (CNPE) [1]. O primeiro, um órgão estatal para regular o setor e promover a entrada de empresas nacionais e internacionais ao longo da cadeia produtiva do petróleo e o segundo, vinculado ao Gabinete da Presidência República.

*Art.23 "As atividades de exploração, desenvolvimento e produção de petróleo e de gás natural serão exercidas mediante contrato de concessão, precedidas de licitação, na forma estabelecida nesta lei."*

Com a aprovação da Lei 9.478/97, ficou estabelecido que os direitos de exploração e produção de petróleo e gás natural, no território brasileiro [19], continuaram pertencendo à União, cabendo à ANP a sua administração, mediante o sistema de concessões abreos, por meio de leilões públicos, abertos a empresas públicas e privadas. Em outras palavras, enquanto recurso natural do subsolo do território nacional, a titularidade das reservas de petróleo e gás é do Estado, uma vez trazido à superfície, a propriedade passa a ser de quem o extraia, como atesta o artigo 26 da Lei 9.478/97:

*Art. 26 "A concessão implica, para o concessionário, a obrigação de explorar, por sua conta e risco e, em caso de êxito, produzir petróleo e gás natural em determinado bloco, conferindo-lhe a propriedade desses bens, após extraído, com os encargos relativos ao pagamento de tributos incidentes e das participações legais ou contratuais correspondentes."*

Depreende-se, então, que a Lei 9.478/97 permitiu à União a extensão das concessões na exploração de petróleo e gás natural. Sob regime de concessão, a União, para pesquisar e lavrar esses recursos naturais, celebra contratos de concessão, e o produto da lavra passa a ser de propriedade do concessionário.

---

[18] Órgão de assessoramento ao Presidente da República, cuja função principal é formular políticas nacional de energia destinadas a promover o aproveitamento racional dos recursos energéticos no país.

[19] O conceito de território abrange: a parte terrestre, o mar territorial, a plataforma continental e a zona econômica exclusiva pertencente à União.

EIG00091700
EIG_KEP_00164918

Com base neste sistema, a ANP realizou, entre 1999 e 2005, sete rodadas de licitações, das quais foram concedidos mais de 500 blocos de exploração para 72 grupos econômicos (empresas petrolíferas) nacionais e internacionais. Destes grupos econômicos, 36 são de capital nacional (incluindo a Petrobras) e 36 são de capital internacional.

A rodada seguinte (oitava), que seria realizada em novembro de 2006, foi suspensa por decisão judicial antes que tivessem sido leiloados todos os blocos previstos. E, em 27 de novembro de 2007, a ANP realizou a 9ª Rodada, em que foram ofertados blocos de exploração em águas profundas, águas rasas e terra, em áreas classificadas como de elevado potencial, novas fronteiras e bacias maduras.

Nessa rodada, 271 blocos foram ofertados para exploração, os quais foram distribuídos entre nove bacias, totalizando quase 73.000 km². As bacias incluídas nessa rodada foram: Campos, Santos, Espírito-Santo, Pará-Maranhão, Pernaíba, Pernambuco-Paraíba, Potiguar, Recôncavo e Rio do Peixe.

No entanto, um fato novo mudou o rumo desse leilão. Foi anunciada pela Petrobras uma nova descoberta na Bacia de Santos, na área de Tupi, de petróleo tipo leve, estimado em cerca de 5 a 8 bilhões de barris de petróleo e gás natural, podendo significar um incremento de 50% nas atuais reservas brasileiras. Este anúncio, às vésperas do leilão, fez com que a ANP anunciasse que 41 blocos exploratórios próximos ao Campo de Tupi, localizado na camada do Pré-Sal ao longo da costa do Espírito Santo até Santa Catarina, seriam excluídos da licitação. Dos 41 blocos, 26 estavam localizados na Bacia de Santos, 13 na Bacia de Campos e 2 na Bacia do Espírito Santo.

Diante desta nova realidade, concomitante com a orientação do CNPE, o governo brasileiro anunciou a intenção de mudar os marcos de regulação do setor de hidrocarbonetos.

Conforme dados da ANP, o regime de concessões permitiu o desenvolvimento do segmento de petróleo e gás no Brasil. Desde a abertura do setor, a indústria do petróleo cresceu de 2% para 10% de participação no PIB.

## 2.10.2. DO CONTRATO DE CONCESSÃO

O Contrato de Concessão é o instrumento pelo qual a concessionária de E&P adquire o direito de explorar e produzir hidrocarbonetos por sua conta e risco. Adicionalmente, preserva-se o interesse do concedente por meio de uma série de deveres, obrigações e responsabilidades incorridos pela concessionária, conforme estipulado no próprio contrato ou na legislação aplicável, incluindo investimentos obrigatórios, pagamento de obrigações financeiras e outros tributos aplicáveis, proteção ambiental, incentivos ao crescimento e especialização da mão-de-obra local, entre outros.

Com a flexibilização do monopólio, decorrente da EC 9/95 e posteriormente a Lei do Petróleo, a Petrobras passou a ser concessionária, sujeita a regulação e fiscalização da ANP. Para tanto, foram celebrados contratos de concessão para as áreas que a Petrobras detinha já em fase de produção, sendo a celebração de tais contratos de concessão dispensadas de licitação. Para as áreas em fase de

Confidential

EIG00091701
EIG_KEP_00164919



exploração pela Petrobras, esta teria o prazo de três anos para prosseguir com as atividades, e, encontrando-se petróleo comercializável, a Petrobras poderia adquirir a concessão das respectivas áreas[17].

Para realizar atividades de E&P, a Petrobras foi autorizada a constituir consórcio com empresas nacionais ou estrangeiras, participando das rodadas de licitação da ANP. Além disso, a Petrobras ficou autorizada a constituir subsidiárias, estas podendo associar-se a outras empresas, majoritárias ou minoritárias.

Ao prever a participação da Petrobras de forma competitiva, com os mesmo mecanismos das empresas privadas, a Lei do Petróleo liberou-a da aplicação da Lei 8.666 de 21 de junho de 1973[18]. O procedimento de contratação dos serviços da Petrobras passou a ser conduzido por meio de procedimento licitatório simplificado. Neste procedimento, a Petrobras envia cartas-convite para potenciais prestadores de serviços e pode conduzir outras formas de contratação e seleção previstas no Decreto 2745, de 24 de agosto de 1998.

### 2.10.3. DO CONTEÚDO LOCAL

Os Contratos de Concessão para Exploração e Produção de Petróleo e Gás Natural, firmado entre a ANP e as empresas vencedoras nas rodadas de licitações, incluem uma cláusula de Conteúdo Local. De acordo com essa cláusula, as concessionárias devem assegurar preferência à contratação de fornecedores localizados em território brasileiro sempre que suas ofertas apresentem condições de preço, prazo e qualidade equivalentes às de fornecedores externos. Este dispositivo contratual tem o objetivo de incrementar a participação da indústria nacional de bens e serviços, em bases competitivas, nos projetos de exploração e desenvolvimento na produção de petróleo e gás. O resultado esperado da aplicação da Cláusula de Conteúdo Local é o impulso ao desenvolvimento tecnológico, a capacitação de recursos humanos e à geração de empregos e renda neste segmento.

Os últimos anos têm sido bastante significativos para o incremento do conteúdo nacional novos contratos, especialmente após as mudanças introduzidas em 2003 no peso do Conteúdo Local para seleção das propostas realizadas nas licitações da ANP. Esse ano marca também a mudança no direcionamento das compras da Petrobras e de uma embrionária consolidação de instituições de suporte ao desenvolvimento competitivo da indústria petrolífera nacional, como a Organização Nacional da Indústria do Petróleo (ONIP), o Programa de Mobilização da Indústria de Petróleo Brasileira (PROMINP), além das linhas de crédito do BNDES. A figura abaixo demonstra o crescimento da regra de Conteúdo Local nas Rodadas da ANP.

---

[17] Brasil. Lei Federal nº 9478 de 6 de agosto de 1997 D.O.U de 7 de agosto de 1997, Artigos 31-34
[18] Regulamenta o artigo 37 da Constituição Federal, institui normas para as licitações e contratos da Administração Pública e dá outras providências.

Confidential

EIG00091702
EIG_KEP_00164920





CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2001 (i)



Para o Projeto Sondas a exigência de conteúdo local será de 55% a 65% de conteúdo nacional, de forma escalonada e crescente, sendo que as duas primeiras unidades a serem construídas terão um índice de 55% e as duas últimas a serem entregues deverão ter uma participação de 65% de bens e serviços produzidos no Brasil.



EIG00091703
EIG_KEP_00164921

CAIXA

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2008   41

**3.    O PROJETO SONDAS**

As características das reservas de petróleo localizadas na camada do Pré Sal, tais como a profundidade dos poços e da lâmina d'água, requerem a utilização de equipamentos especiais e de alta tecnologia para sua exploração.

A quantidade de sondas disponíveis no mercado que reúnam as características mínimas exigidas para a perfuração de poços em águas ultraprofundas, no entanto, é insuficiente para atender a demanda gerada por estas reservas.

Somente a Petrobras, operadora exclusiva dos seis blocos do Pré-Sal sob sua concessão, necessita direitas, até 2019, 40 sondas de perfuração para operar nos blocos já concedidos. Deste total, a Petrobras licitou, em 2008, o afretamento de 12 novas sondas de perfuração, as quais estão sendo construídas no exterior e tem previsão de entrega ao longo dos anos de 2010 e 2012.

As 28 sondas restantes, em virtude do índice mínimo de conteúdo local exigido pelo Governo Federal, deverão ser construídas em estaleiros localizados no Brasil.

Dentro deste contexto e, tendo em vista o expressivo volume de investimentos necessários para a construção das sondas, a Petrobras, em conjunto com os Assessores da Petrobras, desenvolve o Projeto Sondas.

O Projeto objetiva a construção de sondas de perfuração (navio sonda e/ou plataforma semi-submersível) com capacidade para operar em águas ultraprofundas, para posterior fretamento à Petrobras sendo que, em um primeiro instante, está prevista a construção e afretamento de 7 sondas (Primeiro Sistema).

A estrutura do Projeto contempla a constituição de empresas no Brasil, na Áustria e na Holanda, e foi planejada com o propósito de cumprir com os requisitos de conteúdo local e minimizar a incidência de tributos nas relações e fluxos criados pelo Projeto, para tanto utilizando-se inclusive dos benefícios decorrentes do Acordo de Bitributação Brasil-Áustria e do REPETRO.

No Brasil, será constituída uma holding brasileira, a Sete Brasil Participações S.A. ("Sete Brasil" ou "Companhia Investida"), com o objetivo de construir, operar e fretar sondas de perfuração especializadas para utilização em águas profundas.

O quadro acionário da Sete Brasil será composto pela Petrobras (10%) e por investidores reunidos na estrutura do FIP Sondas (90%).



Confidential

EIG00091704
EIG_KEP_00164922

CAIXA

Na Holanda, serão constituídas 7 (sete) SPEs, cada SPE será proprietária de uma sonda, com o objetivo exclusivo de contratarem a construção das sondas e as fretearem para Petrobras.

O capital das SPEs será detido por acionistas Classe "A" e Classe "B", na proporção de 85% e 15%, respectivamente. As ações Classe A serão detidas por uma empresa localizada na Áustria, a Sete International, que será subsidiária integral da Sete Brasil.

Inicialmente, a Petrobras, por meio de sua subsidiária localizada na Holanda, a Petrobras Netherlands BV ("PNBV") será o único acionista Classe B de todas as SPEs, no entanto, anteriormente a conclusão da construção de cada sonda, a Petrobras venderá sua participação em 5 das 7 SPEs para um ou mais operadores especializados de sondas.

Adicionalmente, durante a fase pré-operacional, está previsto que cada SPE irá contratar a Petrobras, ou uma de suas subsidiárias para realizar o gerenciamento da construção da sonda.

A estrutura societária do Projeto está refletida no desenho esquemático abaixo



**3.1.   VENDA DE AÇÕES CLASSE B**

Conforme descrito anteriormente, a PNBV venderá a totalidade das ações Classe B em 5 das 7 SPEs do Projeto para empresas especializadas em operação de sondas ("Operador Especializado"), pré-qualificadas e incluídas em uma lista pré-aprovada pelos demais participantes do Projeto, inclusive pelos acionistas da Sete Brasil e os cotistas do FIP Sondas ("Short List").

O processo de seleção do Operador Especializado poderá ocorrer a qualquer tempo, a partir da celebração dos contratos para afretamento, operação e construção das sondas, e deverá ser concluído antes da entrega da sonda pelo Construtor e aceitação final pela SPE e pela Petrobras, na qualidade de afretadora.

No entanto, o exercício pleno ("step-in") da transferência das ações Classe B pela PNBV para o Operador Especializado, e início efetivo de seus direitos e obrigações em todos os contratos do Projeto, somente irá ocorrer após o atendimento de uma série de condições precedentes, inclusive (i) o cumprimento satisfatório dos testes de aceitação da sonda pela Petrobras, pelo futuro operador e demais especialistas requeridos; (ii) o cumprimento satisfatório de todas as obrigações assumidas pelo Operador Especializado em contrato de promessa de compra e venda de ações a ser celebrado entre as partes; e (iii) a inexistência de qualquer evento material relevante em relação ao operador, suas controladoras ou controladas.

A *Short List* é composta pelos seguintes operadores:

| | | |
|---|---|---|
| Atwood Oceanics, Inc | Maersk Brasil Brasmar Ltda | Queiroz Galvão Óleo e Gás SA |
| Odebrecht Óleo & Gás Lda. | Noble do Brasil S/C Ltda | Sapem do Brasil Ltda. |
| Brasoil   Sociedade   de Perfurações Ltda | Ocean Rig ASA | Seadrill Ltd. |
| Dolphin Drilling Ltd | Odfjell Drilling AS | Sevan Marine do Brasil Ltda |
| Ensco International Inc | Pacific Drilling | Transocean Brasil Ltda |
| Ebesco   Construções   e Comércio Lda | Petroserv SA | Vantage Drilling Co |
| Frontier  Drilling  do  Brasil Ltda | Pride do Brasil Serviços de Petróleo Ltda | Grupo R. |

### 3.2.   INVESTIMENTO TOTAL

O volume total de investimentos previsto para o desenvolvimento do Projeto Sondas é de US$ 5.544.815 milhares, composto pelos seguintes itens:

| ITEM | US$ - em milhares | % |
|---|---|---|
| Contrato de EPC[1] | 4.648.000 | 83,8 |
| Correção do EPC | 595.147 | 10,7 |
| Equipamentos Startup | 105.000 | 1,9 |
| Cota FGCN | 26.532 | 0,5 |
| EMS (Partes Sobressalentes) | 58.450 | 1,1 |
| Seguros | 84.000 | 1,5 |
| Custos Financeiros | 27.686 | 0,5 |
| TOTAL | 5.544.815 | 100,0 |

[1] Por conta (iena) o investimento de US$ 664,2 milhões por sonda.

CAIXA

É importante destacar, no entanto, que o volume total de investimentos poderá ser reduzido em decorrência das negociações do Contrato de EPC entre a Petrobras e o estaleiro construtor.

### 3.3. ESTRUTURA DE CAPITAL

A estrutura de capital prevista para implantação do Projeto é composta de aproximadamente 20% de capital próprio e 80% de capital terceiros, sendo que parte dos recursos que comporão a parcela de capital próprio poderá advir de uma dívida subordinada emitida pela Sete Brasil. A ordem dos desembolsos dará prioridade à parcela de capital próprio e, concluída essa frente, terá início os desembolsos oriundos das dívidas sênior (capital de terceiros). Em todos os casos, o fluxo será *pari passu* as necessidades reais da empresa e dos investimentos do Projeto de forma a evitar *negative carry*.

Desta forma, o *equity* do Projeto Sondas está estimado em US$ 1.108.963 milhares e o montante total da dívida em US$ 4.435.852 milhares, compostos conforme demonstrado no quadro abaixo:

| ESTRUTURA DE CAPITAL | US$ - em milhares | % |
|---|---|---|
| DÍVIDA | 4.435.852 | 80,0 |
| BNDES | 2.495.167 | 45,0 |
| ECA´S | 1.108.963 | 20,0 |
| BANCOS COMERCIAIS | 831.722 | 15,0 |
| | | |
| EQUITY | 1.108.963 | 20,0 |
| CLASSE A | 942.619 | 17,0 |
| PETROBRAS | 94.262 | 1,7 |
| FIP SONDAS | 848.357 | 15,3 |
| CLASSE B | 166.344 | 3,0 |
| TOTAL | 5.544.815 | 100,0 |

### 3.4. CONSTRUÇÃO DAS SONDAS

No decorrer de 2009 e 2010, a Petrobras licitou a contratação, junto a estaleiros brasileiros, de 28 sondas de perfuração em águas ultraprofundas. A licitação foi dividida em quatro lotes com sete sondas cada um.

Após o processo de qualificação técnica, que resultou na desclassificação de alguns estaleiros, a Petrobras abriu, em novembro de 2010, os envelopes com as propostas comerciais, que resultou no menor valor proposto pelo Estaleiro Atlântico Sul ("EAS"), oferecendo o valor de US$ 664,2 milhões por cada uma das sondas para o lote de sete unidades.

EIG00091707
EIG_KEP_00164925

A contratação para construção das sondas será formalizada por meio da assinatura de um Contrato de *Engineering Procurement and Construction* ("Contrato de EPC"), na modalidade *turn key lump sum*. Cada SPE firmará seu respectivo Contrato de EPC e será responsável pelos pagamentos decorrentes deste contrato do EAS.

A primeira sonda está prevista para ser entregue no ano ce 2015 e, a última, no ano de 2019.  O gráfico abaixo demonstra o cronograma previsto para entrega das 7 sondas.



Curvas de Construção por SPE
(prazo máximo estipulado – 4 anos)

Durante o período de construção das sondas, a Petrobras será contratada pelas SPEs para prestação de serviços de gerenciamento e fiscalização das obras, que compreenderão o desenvolvimento e acompanhamento do planejamento físico-financeiro, a fiscalização da execução das obras com controle de qualidade e a análise e liberação das medições mensais.

Finalizada a construção e o comissionamento[25] das sondas, estas passarão por um período de testes de performance e aceitação, os quais contarão com a participação da Petrobras, da SPE e do operador das sondas. Finalizados tais períodos, será emitido, pelas três partes, um termo de aceitação final das sondas.

### 3.4.1.   ESTALEIRO ATLÂNTICO SUL

O EAS foi criado em novembro de 2005, tendo como sócios os grupos Camargo Corrêa e Queiroz Galvão, a sul-coreana Samsung Heavy Industries ("SHI") e a empresa PJMR.

---

[25] Comissionamento é o processo de assegurar que os sistemas e componentes tenham sido projetados, instalados, testados, operados e mantidos de acordo com as necessidades e requisitos operacionais do proprietário.

Com capacidade instalada de processamento da ordem de 160 mil toneladas de aço/ano, o EAS está localizado no Complexo Industrial Portuário de Suape, município de Ipojuca, em Pernambuco, e produz navios cargeiros de porte bruto (até 500 mil toneladas) e plataformas offshore de vários tipos.

O EAS tem 1 milhão e 620 mil metros quadrados de terreno, área industrial coberta de 130 mil metros quadrados, dique seco de 400 metros de extensão, 73 metros de largura e 12 metros de profundidade. Cerca de 680 metros de cais são utilizados para a construção de plataformas offshore.



Apesar da criação em 2005, a planta industrial do estaleiro, que demandou investimentos da ordem de R$ 1,8 bilhão, somente começou a ser construída dois anos depois e suas as operações foram iniciadas somente 2008, após a entrada da Samsung como parceira tecnológica.

### 3.5.   O AFRETAMENTO E A OPERAÇÃO DAS SONDAS

Após a construção das sondas, a SPE irá afretá-las para a Petrobras para exploração dos blocos da camada de Pré-Sal e a Petrobras pagará às SPES uma taxa ("Taxa de Afretamento") pela disponibilização das sondas, se e quando estiverem disponíveis para operação, não sendo as SPEs, portanto, responsáveis pelo sucesso da perfuração e do nível de produção.

O prazo do afretamento irá variar de acordo com cada SPE. Para as SPES detentoras das duas primeiras sondas a serem construídas, que terão a Petrobras como acionista Classe B durante todo o prazo do Projeto Sondas, o afretamento será contratado para o período inicial de 20 (vinte) anos. Para as demais SPEs, o prazo de afretamento do primeiro contrato será de 10 (dez) anos. É importante destacar que, os prazos de afretamento propostos pela Petrobras para as sondas do Projeto são superiores aos praticados atualmente pelo mercado, na média, de três a quatro anos.

CAIXA FIP SONDAS · INFORMAÇÃO CONFIDENCIAL · 6-1-2011 **47**

Paralelamente ao afretamento das sondas, a Petrobras contratará um operador especializado para realizar os serviços de perfuração dos poços, que será a própria Petrobras (ou uma subsidiária desta ou ainda um terceiro à sua escolha) para as duas primeiras sondas e o acionista Classe B para as cinco sondas subsequentes. A Petrobras pagará a esse operador uma taxa mensal denominada Taxa de Serviço que somada à Taxa de Afretamento, perfaz a chamada *daily rate*.



A Taxa de Serviço será composta por duas parcelas: (a) parcela *onshore*, e (b) parcela *offshore*.

A *daily rate* total proposta pela Petrobras, em base mensal, é de US$ 448 mil, sendo US$ 298 mil de Taxa de Afretamento e US$ 150 mil de Taxa de Serviço.

O gráfico a seguir demonstra as expectativas da ODS Petrodata, em diferentes cenários, para as *daily rate* praticadas no mercado e projetadas até 2024 para sondas do tipo navio sonda e semi-submersível (em valores de 1T2010). Podemos verificar que apesar de uma leve queda entre 2008 e 2009, motivada pelo menor consumo de energia em virtude da crise mundial, a *daily rate* vem crescendo desde 2003, puxada pelas descobertas de petróleo em águas profundas e ultraprofundas ocorridas a partir deste ano.

Gráfico n · Daily Rates Históricas e Projetadas para Plataformas de Águas Profundas





Confidential

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4 1 2008   48

Adicionalmente, podemos concluir que a *daily rate* proposta pela Petrobras está linha com as taxas médias praticadas pelo mercado atualmente.

Em que pese a *daily rate* ser uma taxa fixa, ela poderá variar de acordo com a disponibilidade das sondas durante o período em que seja requerida a sua utilização.

Nos períodos em que houver interrupção das atividades de operação devido à manutenção da sonda e/ou reparos em seus equipamentos ou naqueles cujo fornecimento seja de responsabilidade da SPE ou do operador, não será devido a este quaisquer pagamentos de taxa pela Petrobras. Caso a sonda permaneça em reparo por período igual ou superior a 30% (trinta por cento) do tempo, em um período de seis meses, a Petrobras poderá rescindir os contratos de afretamento e de prestação de serviços de operação. Vale dizer que, até hoje, segundo informações da Petrobras, esta não rescindiu nenhum Contrato de Afretamento e Serviço de sondas que estivessem operando diretamente para a empresa e sob a sua fiscalização direta no Brasil.

Exceção à regra descrita acima será realizada quando a sonda estiver perfurando em "cluster", sem retirar o BOP até a superfície por período igual ou superior a seis meses. Nesta hipótese, será concedida à SPE e ao operador uma franquia de 48 horas a cada seis meses de operação para manutenção preventiva no sistema de BOP.

A critério de Petrobras, poderá ser concedida também uma franquia de 24 horas para manutenção do BOP no período compreendido entre a sua retirada operacional e o momento da sua reoxigenação para descida em outro poço.

Em sendo verificada alguma das hipóteses de exceção descritas acima ou nas situações em que sonda estiver parada devido ao mau tempo ou por estar aguardando a chegada, manutenção ou disponibilidade de materiais de responsabilidade da Petrobras, a SPE e o operador farão jus ao recebimento de 90% da *daily rate*.

Nas situações em que a sonda estiver impossibilitada de operar devido a eventos de força maior, as Taxas de Afretamento e de Serviços serão afetadas em função do tempo de indisponibilidade da sonda:

- Para os primeiros 30 dias de paralisação, serão devidos 80% da *daily rate*;

- A partir do 31º e até o 60º dia de paralisação, serão devidos 50% da *daily rate*;

- A partir do 61º dia de paralisação, nenhuma taxa será devida pela Petrobras, e as partes poderão rescindir o contrato.

Nos períodos em que a sonda estiver em movimentação devido ao início ou término do contrato, bem como entre duas locações, será devido pela Petrobras o pagamento de 90% da *daily rate*

No período de mobilização será devido o pagamento de US$ 30 milhões por sonda, que serão pagos no início do Contrato de Afretamento. Nos período de desmobilização das sondas, não está previsto o pagamento de taxa pela Petrobrás Na ocorrência de incidentes na execução, a Petrobras estará isenta do pagamento das taxas previstas no contrato. Tais incidentes incluem, mas não se limitam a:

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6 1 2011 49

- Interrupção do afretamento por culpa da SPE e/ou do operador;

- paralização devido a providências solicitadas pelos seguradores; e

- ocorrência de "*blow out*" por ação ou omissão culposa da SPE e/ou do operador.

Na ocorrência de "*blow out*" devido à erupção e desmoronamento do poço, a Petrobras será responsável pelo custo das operações de controle do poço.

O *daily rate* poderá variar ainda em função do baixo rendimento de sonda e/ou da ausência, inoperância total ou parcial ou mau funcionamento de qualquer equipamento constante das especificações técnicas da unidade. Nestes casos, será aplicado um redutor sobre as taxas anteriormente calculadas. No caso de baixo rendimento, a *daily rate* e as taxas calculadas para o períodos de movimentação sofrerão uma redução de 20%. Nos demais casos, será aplicado o redutor sobre a *daily rate* de 1%, cumulativo por equipamento que estiver inoperante, em mau funcionamento ou ausente.

Será concedida, a cada ano contratual, uma franquia de 3 dias para mobilizações e docagem de sondas e, diariamente, 30 minutos para lubrificação. O tempo de franquia, quando utilizado, será remunerado à 90% da *daily rate*.

Adicionalmente, em cada período de medição, a SPE e o operador farão jus ao recebimento de um bônus por disponibilidade, calculado em função do tempo em que a sonda ficou disponível para as atividades ("uptime"):

Tabela 2 – Bônus por Disponibilidade

| Disponibilidade | Bônus Aplicável |
|---|---|
| Abaixo de 94% | 0,0% |
| 95% | 2,5% |
| 96% | 5,0% |
| 97% | 7,5% |
| 98% | 10,0% |
| 99% | 10,0% |
| 100% | 10,0% |

O bônus por disponibilidade visa incentivar o operador a manter um alto nível de uptime, haja vista que, neste ponto, o operador terá um duplo ganho, como operador e como Acionista Classe B da SPE.

Com base nos estudos efetuados pela OOS-Petrodata e na experiência da Petrobras como afretador, foi gerada a expectativa quanto à disponibilidade média das sondas do Projeto, de 95% no primeiro ano e 97% no restante da operação. Conservadoramente, para o modelo financeiro, projeções e cálculos de retorno, não foram considerados os Bônus de Disponibilidade apresentados na Tabela 2.

Confidential

EIG00091712
EIG_KEP_00164930

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 61 2001 **51)**

### 3.5.1. COMPENSAÇÃO PARA UNDERPERFORMANCE

A baixa performance na operação da sonda que acarrete em perda de receita pela SPE, implicará no pagamento, pelo Acionista Classe B ao Acionista Classe A, de uma "compensação para *underperformance*", podendo resultar, inclusive, em diluição na participação do acionista Classe B na SPE correspondente.

A "compensação para *underperformance*" devida pelo PMBV, enquanto acionista Classe B, não implicará em diluição de sua participação na SPEs, limitando-se a uma compensação monetária devida a SPE, conforme o Acordo de Acionista das SPEs (multa).

Os critérios e as hipóteses em que será devido o pagamento de compensação para *underperformance* ao Cotista A estarão regulados no acordo de acionistas da SPE, ainda não disponibilizados pelos Assessores Petrobras, devido à necessidade de negociação de seus termos finais com os operadores das sondas, ainda a serem selecionados e contratados.

### 3.6.  FINANCIAMENTO

Em função da complexidade e do montante de financiamento previsto para o Projeto na estrutura de capital, a estratégia de *funding* está focada em fontes de financiamento com maior potencial de *underwriting*. O trabalho de aprovação de crédito de cada fonte de financiamento é extenso (*due diligence*, contratos, negociações, etc.) e possui custo considerável. Com base nessa estratégia, o Projeto deverá buscar poucas fontes de financiamento, e poderá contratar, para tanto, um assessor financeiro.

O plano de financiamento está previsto para incluir a participação do BNDES e, adicionalmente, Agências de Crédito à Exportação ("ECAs"), Bancos Comerciais e Instrumentos de Mercado de Capitais. Como a taxa diária está sendo definida antes da contratação da dívida do Projeto, peça fundamental para garantir a sua rentabilidade, a Petrobras ficará responsável por garantir as negociações e contratações das dívidas, assumindo os riscos de suas condições finais. Desta forma, os resultados finais obtidos poderão requerer ajustes, para mais ou para menos, no valor do *daily rate* inicialmente contratado pela Petrobras.  De acordo com o exposto, as principais fontes de financiamento do projeto utilizadas para projeções são:

Tabela 3 - Condições do Financiamento Propostas

| FONTE | BNDES | ECAs | BANCOS COMERCIAIS | DÍVIDA SUBORDINADA |
|---|---|---|---|---|
| Usos (elegibilidade) | Bens e serviços locais | Bens e serviços importados | Custos não elegíveis ao BNDES | |
| Tomador | SPEs | SPEs | SPEs | Holding Local |
| Participação | 45% | 20% | 19% | 15% |
| Moeda | US$ | US$ | US$ | R$ |
| Carência | 6 meses | 6 meses | 6 meses | 12 meses |

Confidential

EIG00091713
EIG_KEP_00164931



| Desembolso | Até 3 anos | Até 3 anos | Flexível | Flexível |
|---|---|---|---|---|
| Prazo (anos) | 3 + 15 | 3 +12 | 3 + 16 | 4+20 |
| Indexador | Libor | Libor | Libor | IPCA |
| Spread | 2,75% | 3,00% | 3,00% | 6,00% |
| Upfront Fee | N.A. | N.A. | 2,00% | N.A. |
| Periodicidade | Trimestral | Trimestral | Trimestral | Trimestral |

Fonte: Petrobras e Santander[21].

### 3.6.1.  BNDES

O BNDES é a maior fonte de financiamento de longo prazo do Brasil e já manifestou formalmente seu compromisso de participar no financiamento do Projeto através de carta emitida com autorização expressa de sua diretoria.

O valor do financiamento do BNDES estará limitado ao volume de conteúdo local no Projeto (55% a 65%).

Dado que os tomadores do empréstimo, as SPEs, estarão localizados na Holanda e, em virtude das características do REPETRO, o único produto do BNDES disponível para este projeto é o BNDES EXIM[22], no qual os recursos podem ser desembolsados diretamente para os fornecedores locais em reais e contabilizados nas dívidas das SPEs em dólares norte-americanos, convertidos na data do desembolso.

As seguintes condições de financiamento para o Projeto foram aprovadas por unanimidade pela diretoria do BNDES:

- Forma de Apoio: Direto;

- Custo Financeiro: LIBOR + 2,25% a.a., para um prazo total de 18 anos, sendo 3 anos de carência e 15 anos de amortização;

- Sistema de Amortização: Tabela Price;

- Remuneração de Risco: definida pela política de crédito do BNDES, conforme a classificação de risco do Projeto; e

- Nível de Participação: 100% das máquinas e equipamentos nacionais e 80% de demais itens financiáveis

A aprovação concedida pela diretoria do BNDES, no entanto, está condicionada ao atendimento dos requisitos descritos abaixo, bem como de outros que poderão ser incluídos durante a análise do financiamento:

- que o Contrato de EPC seja celebrado com Eposta cuja qualidade de crédito seja aceitável para o BNDES;

- que a *daily rate* seja suficiente para que no mínimo:

---

[21] No caso base, não está sendo considerada um cenário de dívida subordinada.

[22] Apoio do BNDES destinado à exportação de bens e serviços nacionais pode ser aplicado tanto na fase de pré-embarque como na fase pós-embarque.

EIG00091714
EIG_KEP_00164932



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6-1-2011 **52**

- cubra os custos de operação e manutenção das sondas;

- o índice de cobertura da dívida sênior seja maior ou igual a 1,2x;

- o índice de cobertura da dívida total seja maior ou igual a 1,0x;

- a constituição de fundos e contas reservas a serem dados em garantia; e

- o fluxo de recebíveis da Sete International (tais como dividendos, juros e principal da dívida subordinada) seja suficiente para cobrir 1/0% de qualquer deficiência de caixa das SPEs, especialmente o serviço da dívida das SPEs que não tenham seus contrato renovados após o 10º ano de operação.

- que na fase pré-operacional sejam prestadas as seguintes garantias, entre outras que possam ser negociadas na fase de análise da operação, considerando, ainda, que as regras aplicadas às garantias a serem constituídas no exterior serão determinadas a critério do BNDES:

    - cessão fiduciária dos direitos creditórios do Contrato de EPC;

    - penhor ou cessão fiduciária dos direitos creditórios das contas da Sete International;

    - penhor ou cessão fiduciária dos direitos creditórios das contas das SPEs;

    - penhor das ações das SPEs;

    - seguro garantia de performance;

    - propriedade fiduciária das sondas;

    - conta reserva de eventualidade; e

    - garantia de crédito do FGCN no valor de 50% do financiamento.

- que na fase operacional sejam prestadas as seguintes garantias entre outras que possam ser negociadas na fase de análise da operação, considerando, ainda, que as regras aplicadas às garantias a serem constituídas no exterior serão determinadas a critério do BNDES:

    - penhor ou cessão fiduciária dos recebíveis da Sete International;

    - penhor ou cessão fiduciária dos recebíveis das SPEs;

    - penhor das ações das SPEs;

    - penhor ou cessão fiduciária dos direitos creditórios das contas da SPEs;

    - penhor ou cessão fiduciária dos direitos creditórios das contas da Holding Externa;

    - conta reserva de, no mínimo, 3 meses do serviço da dívida;

    - fundo de renovação no valor mínimo de US$ 150 milhões;

    - fundo de performance no valor mínimo de US$ 70 milhões; e

    - propriedade fiduciária das sondas.

- disponibilidade de recursos do FGCN para conceder garantia de crédito para o pacote de sondas a ser contratada;

Confidential

EIG00091715
EIG_KEP_00164933



- capital próprio do acionista de 20% do valor do investimento, composto por 10% de capital próprio e 10% de dívida subordinada, ressalvado que, caso haja elevação da parcela de recursos próprios, o mesmo poderá ocorrer pelo aumento da participação da dívida subordinada nas fontes do Projeto;

- que a Petrobras detenha, no mínimo, 10% do capital social da Sete Brasil, ressalvada a possibilidade de redução dessa participação até o mínimo de 5% caso haja abertura do capital;

- que a Petrobras PNBV permaneça como Acionista Classe B de cada uma das SPEs que possuirão contrato de afretamento de 10 anos até, no mínimo, 12 meses antes da entrega da respectiva sonda;

- que seja estabelecida a obrigação de a PNBV permanecer como Acionista Classe B de cada uma das SPEs que possuirão contrato de afretamento de 20 anos até, no mínimo, o final do prazo de amortização da dívida sênior; e

- que seja estabelecido o compromisso dos acionistas aportarem recursos próprios nas SPEs, mediante aporte de capital ou dívida subordinada aos credores seniores, caso haja necessidade de complementação de recursos para finalizar a construção das sondas, desde que tal aumento de custos seja decorrente de uma solicitação de alteração do projeto realizada pela SPE (*Change Order*) e/ou do índice de reajuste de preço do Contrato de EPC.

### 3.6.2.  EXPORT CREDIT AGENCIES

Os ECAs (Export Credit Agencies) são agência de crédito à exportação, cujo objetivo principal é o de promover as exportações que não seriam possíveis sem o apoio da agência e fortalecer as empresas de seu país para competir internacionalmente.

Atualmente quase todos os países industrializados contam com agências de crédito à exportação. No Projeto, existe a possibilidade de usar o apoio de pelo menos duas, localizadas nos Estados Unidos e Noruega, a depender da origem dos equipamentos que serão importados como, por exemplo, o sistema de perfuração.

<u>USAExim Bank – Estados Unidos</u>

Agência independente do governo norte americano, criada em 1934, que tem como objetivo facilitar o financiamento à exportação de mercadorias e serviços norte americanos. O Exim Bank promove a exportação norte-americana oferecendo seguros e garantias ao crédito, destinados a compradores e fornecedores.

Confidential

Em junho de 2010, o Exim Bank e o BNDES celebraram um acordo com o objetivo de promover, em conjunto, investimentos e projetos de interesse de empresas brasileiras e norte-americanas, como no caso do Projeto.

### GIEK (Garanti-Instituttet for Eksportkreditt) – Noruega

Agência do governo norueguês, cujo objetivo é o de promover exportações norueguesas por meio da concessão de financiamento e/ou de garantias de crédito representadas pelo governo norueguês. Desde 1994, o GIEK está organizado como uma instituição pública dentro do Ministério do Comércio de seu país.

O apoio do GIEK aos negócios relacionados às exportações norueguesas tem sido objeto de foco crescente tendo em vista a crise financeira internacional.

Adicionalmente, considerando que o nicho de fornecimento de bens e serviços para a construção de sondas de perfuração marítimas tem hoje grande presença na Noruega, o apoio do GIEK ao Projeto poderá significar uma participação considerável da instituição no pacote de financiamento.

### 3.6.3. BANCOS COMERCIAIS

Apesar de a estrutura de financiamento prever a participação do BNDES como a maior fonte de financiamento do Projeto, os recursos oriundos deste financiamento somente poderão ser destinados para aquisição de bens e serviços nacionais.

Ocorre que, dentro de um projeto de construção de sondas, como as do Projeto, existe um alto grau de peças e equipamentos que precisam ser importados de outros países.

Tradicionalmente, a principal fonte de financiamento de sondas construídas fora do Brasil são os sindicatos de bancos comerciais, que deverão completar o pacote de financiamento. Uma das principais vantagens dos financiamentos dos bancos comerciais é a flexibilidade para customização da dívida em decorrência do fluxo de caixa e das necessidades do Projeto.

### 3.7. FUNDO DE PERFORMANCE, RENOVAÇÃO E CONTA RESERVA

Após iniciada a fase de operação, cada SPE será responsável por constituir, através da capitalização de dividendos extraordinários repassados a Sete International, três fontes de reservas: o Fundo de Performance; o Fundo de Renovação e a Conta Reserva de Eventualidades.

Além do objetivo de criar um auto-seguro para a situação de não renovação e problemas de performance dos equipamentos, estes mecanismos de reserva devem gerar uma esfera mais adequada



Confidential

para obtenção de crédito junto aos agentes financiadores. Entendemos que o custo adicional gerado pela constituição desses fundos será compensado por estruturas de financiamentos e empréstimos mais flexíveis, de menor custo e mais adequadas para o Projeto.

Como o vaso comunicante dos fluxos de caixa das SPEs é a Sete International, é nela que serão constituídos os fundos e a conte reserva.

### 3.7.1. FUNDO DE RENOVAÇÃO

Em decorrência do descasamento entre o prazo do financiamento (15 anos) e o prazo dos contratos de afretamento de 5 das 7 sondas (10 anos), bem como do risco de não renovação destes contratos, está prevista a criação de um "Fundo de Renovação" no valor de US$ 11/ milhões para o primeiro lote de 7 sondas.

O fundo será constituído na Sete International e será composto pelos dividendos distribuídos por todas as SPEs entre o oitavo e o décimo ano de operação comercial de cada SPE, incluindo as SPEs cuja sondas possuam contrato de afretamento de 20 anos.

Os recursos desse fundo deverão ser utilizados unicamente para o pagamento do serviço da dívida e custos operacionais das SPEs, exclusivamente na hipótese de não renovação dos contratos de afretamento ou a celebração de novo contrato de afretamento, prejudicando a capacidade da SPE em honrar seus compromissos decorrentes da dívida sênior.

Os recursos depositados no Fundo de Renovação somente poderão ser sacados e utilizados pela Sete International após o término do contrato de afretamento de todas SPEs com contrato de 10 ano e sua utilização estará limitada ao montante equivalente a 6 meses do serviço da dívida sênior de cada SPE, até a utilização total do saldo do Fundo de Renovação.

Os contratos de financiamento deverão prever que, na hipótese de não renovação dos contratos de afretamento, os financiadores seniores estarão impedidos de declarar default das SPCs enquanto o serviço de suas dívidas estiver sendo pago em dia, mediante utilização das disponibilidades existentes no Fundo de Renovação ou mesmo do fluxo gerado por todas as SPEs, consolidado na Sete International.

A Sete Brasil estará autorizada a manter a filosofia de utilização de um Fundo de Renovação para outros lotes de sondas, em condições semelhantes às descritas anteriormente, entretanto envidando esforços no sentido de prover maior otimização dos recursos requeridos para aplicação no referido fundo.

### 3.7.2. FUNDO DE PERFORMANCE

Em virtude do risco de performance do operador e *downtime* das sondas, o Projeto prevê a criação de um "Fundo de Performance" no valor de US$ 56 milhões para o primeiro lote de sondas.

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4-1-2011 **56**

O fundo será composto por todas as SPEs através de dividendos ou outra forma que venha a ser convencionada durante o primeiro ano de operação, sendo e será reposto ao seu nível ideal através de novos dividendos extraordinários a serem pagos por todas as SPEs e/ou por outras disponibilidades da Sete International.

Os recursos desse fundo deverão ser utilizados unicamente para complementar as disponibilidades de cada SPE nas situações de falta de recursos para o pagamento do serviço de sua dívida e outros custos operacionais.

Após a liquidação completa das obrigações de pagamento da dívida sênior de todas as SPEs do primeiro lote, os eventuais saldos remanescentes no Fundo de Performance reverterão em livres disponibilidades para a Sete International, podendo reverter para a Sete Brasil na forma de distribuição de dividendos, ou outra forma que venha a ser convencionada.

Em contrapartida à recomposição do fundo de performance pela Sete International, essa poderá acionar mecanismos de multas para as SPEs (compensação financeira por *underperformance*), bem como mecanismos de diluição gradual das ações do acionista Classe B, exclusivamente para as SPEs não operadas Petrobras.

A Sete Brasil estará autorizada a manter a filosofia de utilização de um Fundo de Renovação para outros lotes de sondas, em condições semelhantes às descritas anteriormente, entretanto enviando esforços no sentido de prover maior otimização dos recursos requeridos para aplicação no referido fundo.

### 3.7.3. CONTA RESERVA DE EVENTUALIDADES

O Projeto prevê a criação de uma "Conta Reserva de Eventualidades" estabelecida na forma de um "pool" comum a todas as SPEs e centralizado na Sete International, que tem como principal objetivo mitigar o risco de insuficiência de caixa nas SPEs para cobertura de suas obrigações oriundas de despesas e/ou custos extraordinários materiais incorridos pelas SPEs na fase pré-operacional de cada Sonda.

Esta conta será formada pela centralização das diversas fontes das disponibilidades individuais das SPEs no momento do seu início de operação, incluindo os valores iniciais a serem pagos pela Petrobras no início da fase operacional do contrato de afretamento e serviço de cada sonda (taxa de Mobilização, Comissionamento e Pré-operação), devidamente deduzidos dos pagamentos de suas respectivas despesas e obrigações, assim como a capitalização do Fundo de Performance até que a Conta Reserva de Eventualidades atinja o valor equivalente a três meses do serviço da dívida[23] (valor estimado em US$ 150 milhões ou aproximadamente US$ 22 milhões por SPE), quando as contribuições cessarão.

Não haverá obrigação de reposição dos valores sacados desta conta, seja parcial ou totalmente. Os recursos não utilizados depositados na Conta Reserva de Eventualidades somente poderão

---

[23] Excluindo o serviço de dívida subordinada, se for o caso.

Confidential



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2011 **57**

ser sacados e utilizados livremente pela Sete International após a renovação da última Sonda do Primeiro Sistema.

**3.8.    DIREITO DE PREFERÊNCIA**

A Petrobras concederá à Sete Brasil o direito de preferência para desenvolver novas sondas, com configuração idêntica ou semelhante à do primeiro lote, em condições de preço, prazo e características físicas similares às contidas neste.

O direito de preferência deverá ser exercido até o limite de 21 novas sondas, adicionais às primeiras 7, no período de até 12 meses contados da data de aprovação da contratação do Primeiro Sistema, tendo o instrumento original o prazo de 6 meses, renovável por igual período, caso necessário.

Pelo prazo de 2 anos contados da assinatura do contrato de construção do primeiro lote, a Petrobras e suas subsidiárias estarão impedidas de criar outros veículos paralelos, com características similares aos utilizados no Projeto, e que tenham o propósito de fretar sondas para a Petrobras – se dentro do prazo de 2 anos forem comprometidos créditos, bens e recursos para a realização de Sistemas adicionais, até o limite de 28 sondas previstas no Projeto, a proibição perdurará até que todas as sondas dos sistemas adicionais tenham tido suas construções contratadas.

Confidential

EIG00091720
EIG_KEP_00164938



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 4-3-2011 **58**

## 4. FUNDO DE GARANTIA PARA A CONSTRUÇÃO NAVAL (FGCN)

Considerado um setor estratégico da economia nacional, a construção naval é responsável pela geração de inúmeros postos de trabalho, diretos e indiretos, e pelo desenvolvimento de novas tecnologias. A construção de embarcações no país tem também como efeito direto, a redução das remessas de recursos ao exterior, tanto para o pagamento da construção de navios em estaleiros estrangeiros quanto para o pagamento do frete, tendo assim, impacto na balança comercial brasileira.

Ciente da importância desse segmento para a economia, o governo brasileiro sempre tentou desenvolver mecanismos com a intenção de fomentar a indústria nacional e possibilitar o acesso dos interessados à construção de embarcações no país, a exemplo do Fundo da Marinha Mercante ("FMM"), um importante instrumento de financiamento para o setor.

Contratos de construção em geral, e em especial contratos do setor de construção naval, estão sujeitos a riscos específicos, tais como (a) risco de atraso ou não finalização da obra, seja por condições econômico-financeiras do construtor, seja pelo atraso de fornecimento ou outros motivos, (b) o risco do projeto, (c) risco de execução do projeto em desacordo com o design acordado e (d) riscos envolvendo condições naturais ou fora do controle das partes envolvidas, chamado de "eventos de força maior ou caso fortuito".

Não obstante as proteções contratuais desenvolvidas ao longo dos anos de prática comercial e enfrentamento de algumas dessas situações, alguns riscos ainda são considerados como gargalos para as contratações, tais como os montantes envolvidos em operações de construção naval e o impacto que o não cumprimento de um contrato de tal monta, por qualquer das partes e por qualquer motivo, pode ter na saúde financeira e estratégia comercial da parte adimplente.

Assim dado o momento que o setor atravessa e de forma a permitir uma maior segurança na contratação, foi adotada a Medida Provisória n.º 429 de 12 de maio de 2008, convertida na Lei n.º 11.786 de 25 de setembro de 2008, a qual autoriza a criação do FGCN. Posteriormente, as características, abrangências e coberturas originais do FGCN foram expandidas especificamente para atender as necessidades da construção de sondas de perfuração no Brasil através das proposições estabelecidas na Medida Provisória n.º 460 de 14 de maio de 2009, convertida na Lei n.º 12.058 de 17 de outubro de 2009.

### 4.1.1. CARACTERÍSTICAS DO FGCN

O FGCN é um fundo de natureza privada e patrimônio próprio, separado do patrimônio de seus cotistas, e sujeito a direitos e obrigações próprias.

A União Federal é o cotista inicial exclusivo do FGCN, porém, posteriormente, outros cotistas poderão ser incorporados, seja de forma voluntária ou compulsória (como condição à participação

Confidential

CAIXA

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6-1-2011  **59**

nesse sistema de garantia), neste último caso, os participantes seriam os contratantes das garantias a serem cobertas pelo FGCN.

O FGCN foi capitalizado inicialmente pelo Governo Federal no montante de até R$ 5 bilhões, sendo que 80% dos recursos (ou R$ 4 bilhões) são destinados exclusivamente para garantir os riscos de crédito e performance relacionados à construção ou à produção, em estaleiro brasileiro, das sondas de perfuração para o Pré-Sal. A Caixa Econômica Federal é o administrador, gestor e custodiante do FGCN.

Para efeitos do estatuto do FGCN entende-se por:

•   Risco de crédito – incerteza relacionada ao recebimento tempestivo de valor contratado, a ser pago pelo beneficiário do financiamento, causada pelo não cumprimento pelo estaleiro brasileiro do cronograma de construção aprovado pelas partes; e

•   Risco de performance – incerteza relacionada ao fiel cumprimento de todas as obrigações contraídas em contrato para a construção pelo construtor e a inadequação da qualidade da construção, em conjunto ou isoladamente, com a possibilidade de prejuízo decorrente de inadimplemento.

No tocante as garantias oferecidas:

A Garantia de Crédito é dada ao financiador e a contratante a 50% do saldo devedor garantido.

**Garantia de Crédito** - É dada em benefício do financiador e é oferecida em favor do solicitante do financiamento, que pode ser o contratante da construção ou estaleiro brasileiro.

A garantia de risco de crédito será devida quando houver inadimplência da entidade garantida ou vencimento antecipado do contrato de financiamento, decorrentes da não entrega e/ou não aceitação da embarcação financiada, na data prevista no contrato de construção, considerada pelo financiador para determinar o termo inicial da amortização do financiamento.

Cada operação de financiamento terá, no máximo, 50% do seu saldo devedor garantido com o provimento de recursos do FGCN, a depender do risco da operação, salvo situações deliberadas e aprovadas pela assembleia de cotistas, nas quais este limite poderá ser elevado.

A Garantia de Performance é oferecida em favor do estaleiro, limitada a 20% do valor do contrato de construção.

Em relação à cobertura de Risco de Crédito, a principal finalidade do FGCN é assumir a obrigação de honrar as contra-prestações devidas por qualquer parte que levantar financiamento para cobrir custos relacionados às atividades de construção naval, executados por estaleiro brasileiro, sempre que tal estaleiro não cumprir as obrigações assumidas no contrato de construção, e tal descumprimento afetar a habilidade desta parte em pagar as contra-prestações mencionadas.

**Garantia de Performance** – É oferecida em favor do estaleiro, em benefício do contratante da construção. Será devida em situações decorrentes de responsabilidade do estaleiro brasileiro, com a possibilidade de prejuízo decorrente do não cumprimento de obrigação presente no contrato de construção e/ou pela inadequação da qualidade da construção.



EIG00091722
EIG_KEP_00164940

Cada embarcação construída com garantia do FGCN poderá contar com, no máximo, 10% do valor da operação para a cobertura do risco de performance do estaleiro brasileiro garantido.

*Figura 4 - Funcionamento do FGCN*



### 4.1.2. FINALIDADE DO FGCN

O FGCN terá a finalidade de garantir o risco de crédito das operações de financiamento à construção ou produção de embarcações e o risco decorrente de performance do estaleiro brasileiro. As garantias concedidas permanecerão vigentes durante todo o período da construção, até a aceitação da unidade pela Petrobras ou até 24 meses após a entrega da embarcação pelo estaleiro, o que ocorrer primeiro.

Será admitida a extensão do prazo de garantia do FGCN em caso de renegociação do contrato de construção que implique em dilatação do prazo originalmente pactuado. Neste caso, será cobrada comissão pecuniária complementar relativa ao prazo adicionado.

O Fundo é um mecanismo criado pelo governo para aumentar os créditos disponibilizados pelos agentes financeiros com redução das taxas de juros aplicáveis às operações de financiamento à construção de sondas de perfuração.

Os recursos do FGCN serão concedidos para garantir o risco de crédito das operações de financiamento realizadas com estaleiro brasileiro, com o intuito de garantir os riscos de:

- Falência do estaleiro;

- Atrasos no cronograma físico das obras (por qualquer motivo não imputável ao contratante);

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6-1-2011  61

- Dificuldade econômico-financeira do estaleiro que acarrete perdas de sua liquidez e não pagamento de suas obrigações (impostos, fornecedores, empregados, etc.), e que venha a significar um atraso na entrega das sondas;

- Dificuldade técnica (capacidade tecnológica, processos fabris empregados, fluxo de entrega de insumos estável, etc.) que venha acarretar em atrasos na entrega das sondas; e

- Problemas operacionais de qualquer natureza que venham a impedir ou dificultar a aceitação das unidades pelo contratante na fase de entrega das unidades.

Na concessão da garantia o FGCN receberá contra-garantias da SPE que tenha sido afiançada, exclusivamente através da subrogação de direitos sobre as garantias oferecidas pelo estaleiro por ela contratado, e dos próprios estaleiros junto aos quais a construção da respectiva sonda tenha sido alocada, quais sejam:

- Penhor da totalidade das ações de emissão do estaleiro construtor;

- Alienação fiduciária ou hipoteca da embarcação objeto do financiamento;

- Fiança dos acionistas controladores do estaleiro construtor;

- Celebração de contrato de comodato[24] das instalações industriais em que a embarcação será construída, bem como das máquinas e equipamentos necessários para sua construção; e

- Seguro garantia com cobertura mínima de 3% do valor do crédito concedido.

Como o penhor da totalidade das ações de emissão do estaleiro será dado em garantia da dívida que será tomada com o BNDES, poderá ser aceita a promessa de penhor da totalidade das ações de emissão do estaleiro brasileiro.

A comissão pecuniária recebida pelo FGCN será devida: (i) pelo estaleiro brasileiro, quando se tratar de garantia para assegurar o risco de performance; e (ii) pela SPE, quando se tratar de garantia para assegurar o risco de crédito. No caso de extensão de prazo da garantia, será cobrada comissão pecuniária complementar relativa ao prazo adicionado. O prêmio a ser cobrado pelo FGCN, referente a essa comissão, será variável em função da análise de riscos a ser efetuada pelo administrador do FGCN, para cada situação, em função dos riscos percebidos na concessão das garantias.

O estaleiro brasileiro estará obrigado a adquirir cotas do FGCN, em duas situações, em cada uma delas no montante equivalente a 0,25%[25] do valor garantido: (i) na contratação da Garantia de Risco de Performance pelo próprio estaleiro, e (ii) na contratação da Garantia de Risco de Crédito, ainda que tal contratação tenha sido feita pela SPE. As cotas deverão ser adquiridas em parcela única e antecipada.

---

[24] Contratos em que uma parte entrega a outra coisa não fungível para ser usada temporariamente e depois restituída. É um empréstimo gratuito, uma cessão de uso, pelo qual se transfere apenas a posse do bem, não se transmite seu domínio.

[25] Percentual passível de alteração após análise da capacidade do estaleiro efetuada pelo Gestor do FGCN.

Confidential

EIG00091724
EIG_KEP_00164942

CAIXA FIP SONDAS · INFORMAÇÃO CONFIDENCIAL · 4-1-2011 **62**

Além do pagamento da comissão pecuniária a ser cobrada pelo administrador do FGCN na concessão das garantias de crédito nas operações dos estaleiros brasileiros, a SPE também estará obrigada a adquirir quotas do FGCN, em montante equivalente a 1% (um por cento) do valor garantido, quando da contratação das citadas garantias, que serão adquiridas em parcela única e antecipada, e permanecerão indisponíveis pelo prazo (mínimo) de cinco anos.

Ao conceder garantias, o FGCN deverá observar as seguintes limitações:

• A garantia de performance não poderá ser em valor superior a 10% do valor do custo de construção de cada sonda;

• A garantia de risco de crédito não poderá ser em valor superior a 50% (cinquenta por cento) do saldo devedor de cada operação de financiamento (observado que este limite poderá ser aumentado a depender do risco de cada transação, caso assim determinado pela Assembléia de Cotistas)

• Nas operações de financiamento com garantia do FGCN, o valor financiado pelos agentes financeiros poderá corresponder a até 90% (noventa por cento) do valor total do projeto; e

• O limite de exposição do FGCN com relação a cada entidade garantida será de 25% do seu patrimônio.

O FGCN prestará garantia, na modalidade de fiança ou equivalente, sem benefício de ordem para o garantidor.

Com relação a cada projeto que conte com a garantia do FGCN, este poderá celebrar, quando aplicável, acordo com os demais credores do projeto em questão, que discipline a forma e procedimento para execução das garantias reais fornecidas pelo estaleiro brasileiro garantido.

### 4.1.3.  CONTRATAÇÃO DO FGCN

A contratação das garantias inicia-se com o cadastramento do estaleiro através da entrega dos documentos de constituição da empresa e documentos dos representantes. Após a verificação da validade dos documentos pelo Administrador, é emitida uma Declaração de Cadastramento. Todos os estaleiros que participam da licitação para construção das sondas têm que primeiramente efetuar este cadastramento.

O estaleiro escolhido passará pela análise das condições de solvência da empresa e de seus controladores/grupo[15], se necessário, o histórico e a experiência do estaleiro ou do controlador. Somente após o término desta fase é emitida a uma Carta de Compromisso de Garantia de Risco de Crédito.

É efetuada justamente com a análise de solvência, a análise das contra garantias oferecidas, onde o administrador estimará o valor das garantias a serem outorgadas pelo FGCN, considerando parâmetros e metodologias compatíveis as utilizadas no mercado. Ao término desta fase é

_____

[15] Em caso de estaleiro novo ou sem experiência comprovada no ramo.



CAIXA FIP SONDAS · INFORMAÇÃO CONFIDENCIAL · 6·1·2011 63

assinado o Contrato de Garantia de Performance entre o estaleiro e o FGCN e o Contrato de Compartilhamento de Garantias com os Agentes Financiadores.

A SPE adquire as cotas do FGCN (1% do montante da garantia concedida) e os estaleiros efetuam o pagamento da comissão pecuniária sobre a garantia de crédito e de performance.

A garantia de crédito é concedida através de uma carta de fiança emitida pelo FGCN para cada agente financiador, até o limite garantido (50% do saldo devedor), a cada montante de crédito liberado destinado aos pagamentos relacionados à construção das sondas. A carta de fiança estará lastreada nas contra garantias oferecidas.

Cabe ressaltar, que a análise é feita somente sobre o estaleiro e as garantias concedidas, haja vista que os riscos cobertos estão alocados na fase de construção das sondas.

### 4.1.4. ACIONAMENTO E EXECUÇÃO DAS GARANTIAS

Se a qualquer momento, ao longo do Projeto for necessário a execução da garantia de crédito, o FGCN pagará o valor integral da parcela vencida no contrato de financiamento, até o limite da garantia de crédito contratada com o FGCN, nesse caso 50% do saldo devedor de cada operação.

Em caso de vencimento antecipado no contrato de financiamento objeto da garantia de risco de crédito, o FGCN irá honrar o saldo devedor na data do vencimento antecipado, decorrente dos valores desembolsados pelos financiadores, até 50% o saldo devedor remanescente.

A quitação dos débitos pelo FGCN importará a sub-rogação nos direitos do credor sobre as garantias a ele oferecidas, na mesma proporção dos valores honrados pelo Fundo ao término dos contratos de financiamento.

A maioria das garantias oferecidas será comum entre o FGCN e os agentes financiadores. Estas, se porventura forem, executadas pelo FGCN, e os valores decorrentes de tal execução serão utilizados primeiro para pagamento do saldo devedor remanescente do financiamento.

Para o pagamento da garantia de crédito, o financiador deverá acionar o FGCN, no prazo máximo de 90 (noventa) dias a contar do evento que deu causa ao acionamento da garantia, por meio de comunicação formal com Aviso de Recebimento (AR), fundamentando a sua solicitação.

O financiador deverá optar por receber o pagamento em uma das seguintes formas:

• Ativos que compõem o patrimônio de afetação vinculado à garantia mediante transferência de titularidade no dia do pagamento da garantia; ou

• Moeda corrente nacional, mediante depósito em conta corrente de titularidade do financiador.

No caso em que não tenha sido constituído patrimônio de afetação vinculado à garantia, o financiador também poderá fazer opção por receber em pagamento ativos que constituem o patrimônio





CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6·1·2011 64

do FGCN, mediante transferência de titularidade no dia do pagamento da garantia, mediante concordância do FGCN.

Em caso de inadimplência por parte do FGCN, seus bens e direitos serão objeto de penhora ou alienação para satisfazer as obrigações garantidas, no limite da garantia prestada.

**5.     ANÁLISE JURÍDICA**

Os aspectos jurídicos do Projeto Sondas e do FIP Sondas estão sendo analisados pelo assessor legal contratado, o escritório Tauil & Chequer Advogados, associado ao Mayer Brown LLP ("Assessor Legal").

O escopo dos trabalhos do Assessor Legal compreende:

● Revisão da estrutura da operação, compreendendo os aspectos societários e tributários, tendo em vista ainda as estruturas offshore constituídas para consecução do objetivo do Fundo, incluindo a elaboração de memorando com a análise e indicação de eventuais contingências, bem como sugestões de tratamento destas nos documentos da operação, a fim de proteger os interesses do FIP Sondas;

● Revisão e/ou negociação, conforme o caso, dos seguintes documentos relacionados ao Projeto:

  - acordo de acionistas da Sete Brasil Participações S.A.;

  - acordo de acionistas das SPEs;

  - contrato de EPC;

  - contrato de afretamento;

  - contrato de gestão de serviços e fiscalização; e

  - contrato de operação.

● Revisão e/ou negociação, conforme o caso, dos seguintes documentos relacionados ao Fundo:

  - regulamento;

  - acordo de cotistas; e

  - compromisso de investimento.

● Opinião legal a respeito:

  - questões regulatórias pertinentes ao projeto;

  - aspectos societários;

Confidential

EIG00091727
EIG_KEP_00164945



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6-1-2011 68

- aspectos tributários; e

- estrutura da operação.

Em que pese os diversos aspectos jurídicos do Projeto estarem, neste momento, sob análise do Assessor Legal, efetuamos ao longo dos próximos dois capítulos uma breve descrição dos contratos e dos aspectos tributários do Projeto Sondas.

Não tivemos, entretanto, a pretensão de prestar uma opinião jurídica acerca dos referidos contratos, bem dos aspectos tributários do Projeto, mas sim de elencar os pontos que acreditamos serem mais relevantes para tomada de decisão por parte dos possíveis investidores.

Salientamos que o exame e revisão de todos os contratos do Projeto, os que aqui estiverem e os que vierem a ser incluídos por alguma negociação ainda em andamento, bem como os aspectos tributários, são parte do escopo da análise e do parecer a ser emitido pelo Assessor Legal.

### 5.1.   CONTRATO DE CONSTRUÇÃO

A versão do Contrato de Construção a qual nos baseamos para traçar os pontos abaixo foi a disponibilizada pelo Assessor da Petrobras em 13 de dezembro de 2010.

Com o propósito de gerar segurança no período de construção das sondas, quanto ao cumprimento dos prazos e ocorrências de sobre custo, os contratos de construção, previstos para serem firmados em 2010 entre cada SPE e os Estaleiros/EPCistas, serão firmados na modalidade *Engineering, Procurement and Construction* ("Contrato de EPC"). O Contrato de EPC será *turn key lump-sum*, ou seja, a preço fechado e data certa para entrega do objeto.

O Contrato de EPC assinado com o estaleiro englobará *design*, engenharia, fornecimento, construção, comissionamento, *erranque*, testes e conclusão das Unidades, juntamente com qualquer outra especificação que correta na minuta dos contratos.

O EPCista deverá executar as obras (i) de acordo com o escopo das obras e os termos e condições do Contrato de EPC, (ii) de acordo e com o consentimento da legislação aplicável, (iii) de acordo com a boa prática industrial e, (iv) dentro do prazo estipulado no contrato para cada Unidade.

São obrigações do EPCista:

- Compra, fornecimento, transporte, manipulação, estocagem correta e preservação dos equipamentos inclusive os recebidos da SPE;

- Responsabilizar-se pelo design e engenharia de acordo com as especificações contratuais;



EIG00091728
EIG_KEP_00164946

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6.1.2001   66

- Proporcionar a construção, gerir a construção, incluindo fornecer toda a gestão e supervisão da mão-de-obra, local de trabalho, equipamentos, ferramentas, material de campo, armazenagem e instalações necessárias para fabricação de cada Unidade;

- Cumprir a legislação aplicável e viabilizar a exportação de cada Unidade, que serão fisicamente entregues a SPE em águas abrigadas na Baía de Guanabara;

- Negociar as garantias, seguros, cronograma de entrega, requerimentos de performance com todos os subcontratados;

- Assegurar que as obras estão de acordo com o cronograma físico;

- Conduzir e gerenciar os testes de performance;

- Obter licenças, permissões, autorizações requeridas para execução das obras;

- Obter qualquer certificado como exigido pela legislação aplicável para a condução dos testes de performance, demonstração e operação;

- Fornecer informações e documentos requeridos pela SPE, necessárias para a inspeção das obras;

- Fornecer treinamento para SPE referentes a operação e manutenção dos equipamentos fornecidos pelo EPCista;

- Substituir qualquer subcontratado que não estiver executando as obras de acordo com os termos do Contrato de EPC;

- Lidar com todas as questões aduaneiras e ser responsável por todas as tarefas relacionadas com equipamentos importados;

- A pedido da SPE, cooperar e responder às perguntas de qualquer credor relativa as obras e outras atividades a serem desenvolvidas no âmbito do contrato;

- Cumprir os requisitos de financiamento do BNDES, no caso brasileiro que o conteúdo local é financiado por esta instituição;

- Responsabilizar-se por todos os pagamentos e retenção de impostos relativos às obras; e

- Pagar os subcontratados dentro dos prazos estipulados nos subcontratos.

De acordo com as regras de Conteúdo Local, o Estaleiro/EPCista deverá realizar, no Brasil, construção, montagem, pré-operação, arranque e operação assistida relacionadas com as obras, incluindo a construção do casco, assim como todas as obras relacionadas com aço até a sua operação com a planta de perfuração.

O Construtor deve cumprir as exigências de conteúdo local brasileiro, calculado em conformidade com os métodos e critérios da ANP.



EIG00091729
EIG_KEP_00164947

CAIXA

Para os principais sistemas, os contratos de EPC preveêm a seguinte regra:

*Tabela 4 - Índice de Conteúdo Local*

| Sistema | Conteúdo Local (percentual do preço do contrato por Unidade) | | |
|---|---|---|---|
| | 1ª e 2ª Unid | 3ª e 4ª Unid | 5ª, 6ª e 7ª Unid |
| Geração, Propulsão, Posicionamento Dinâmico | 40% | 50% | 60% |
| Pacote de Perfuração | 20% | 30% | 50% |
| Global | 55% | 60% | 65% |

No mínimo 65% dos recursos humanos e peso total de peças estruturais, painéis e fabricação de blocos, bem como montagem, montagem de blocos e todos os trabalhos subsequentes para a conclusão do casco ao lado do cais, a integração do plano de perfuração e demais atividades, deverão ser realizadas no Brasil.

Os valores globais dos Contratos de EPC poderão ser revistos nas seguintes situações:

• Criação, alteração ou extinção de um imposto ou taxa que altere o custo da obra;

• Extinção ou descontinuidade de incentivos fiscais; e

• Alteração no escopo do contrato por parte da SPE.

O ajuste no valor global do contrato deve ser calculado pelo empreiteiro com base na declaração de formação de preços, apresentada, pelo EPCista, na licitação.

Mensalmente o Construtor deverá efetuar a medição do avanço físico das construções e submeter o relatório de medição à aprovação da SPE.

Tanto a SPE quanto o Estaleiro/EPCista providenciarão seguros mínimos exigidos a serem descritos no Contrato de EPC.

O período de garantia por parte do Construtor será de 12 meses após a entrega de cada Unidade.

**5.2.    CONTRATO DE AFRETAMENTO**





A minuta do Contrato de Afretamento a qual retiramos as informações abaixo, foi a versão disponibilizada em 22 de novembro de 2010.

O objeto do Contrato de Afretamento é o afretamento[17] à Petrobras, do navio sonda ("Unidade"), a fim de ser utilizada na perfuração, avaliação, completação e/ou manutenção de poços de petróleo e/ou gás (verticais, direcionais, horizontais e partilhados), em águas brasileiras delimitadas pelas coordenadas geográficas de acordo com o Contrato de Concessão assinado pela Petrobras e a ANP até a profundidade máxima de até 10.000 metros, em lâmina d'água de até 3.000 metros.

A SPE ficará liberada para iniciar o período de afretamento depois de comprovadas as boais condições dos equipamentos que constituem os sistemas operacionais de cada Unidade, tais como, mas não se limitando a, sistema de geração e distribuição de energia, sistema de ancoragem (se disponível), segurança industrial, estocagem de líquidos e granéis, circulação e processamento de fluidos, segurança e cabeça de poço, elevação, rotação e manuseio de colunas, instrumentação, equipamentos para teste de formação e sistema de comunicação.

Caso os testes perdurem por período superior a 72 horas, por culpa exclusiva da Petrobras, será devida uma taxa de espera equivalente à 90% da Taxa de Afretamento até a liberação da sonda.

Poderão ser acrescidos ao prazo de início do Contrato, a critério da Petrobras, os períodos de paralisação da unidade em decorrência de falta de equipamentos essenciais, de manutenção programada e outras razões atribuíveis à Sete Brasil.

A vigência dos Contratos de Afretamento será de 10 (dez) anos para 5 (cinco) das sondas e de 20 (vinte) anos para 2 (dois) das sondas. Os contratos poderão ser renovados por igual período aos seus prazos originalmente contratados mediante acordo entre as partes. Vale notar que, em situações desse tipo (primeira renovação, desde que prevista em contrato), a Petrobras está desobrigada de realizar um novo processo de licitação para fins de renovação de Contratos de Afretamento. Desta forma, no cenário de uma eventual renovação de contrato com a Petrobras, este deverá ser implementado através de um processo de negociação direta. No entanto, como não há condições predefinidas, não existe garantia de renhumna das partes em firmar um novo contrato de afretamento ao término do primeiro termo. Para preservar o direito de preferência da SPE na renovação do contrato, a SPE e/ou a Petrobras deverão, até 12 (doze) meses antes do término do prazo previsto, enviar notificação à outra parte, informando a sua intenção de renovar o contrato. Após essa notificação as partes iniciarão negociações. Para efeito do processo de renovação, respeitados os prazos para manifestação de interesse entre as partes, a Petrobras poderá prioritariamente considerar a renovação dos Contratos de Afretamento com as SPEs, desde que, na oportunidade da sua renovação:

- existam condições de demanda que justifiquem a necessidade de renovação;

- os preços e condições que possam resultar das tratativas de negociação forem razoáveis à vista dos preços e condições de mercado à época; e

---

[17] Contrato por meio do qual o fretador cede ao afretador, por certo período, direitos sobre o emprego da embarcação.

Confidential

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6 1 2001 /69

- apresentem históricos de performance para sonda sob renovação, que possam ser julgados satisfatórios ao arbítrio exclusivo da Petrobras.

São obrigações da Petrobras:

- Efetuar os pagamentos devidos à SPE

- Fornecer o programa de operações, com devida antecedência;

- Proceder à medição do afretamento ocorrido e emitir o relatório de medição;

- Notificar à SPE da aplicação de eventuais multas e da suspensão do afretamento; e

- Notificar à SPE sobre defeitos e irregularidades encontradas no afretamento.

O valor correspondente a Taxa de Afretamento constará no contrato e poderá ser paga em dólar e/ou real, ou parte em dólar e parte em real. A Taxa de Afretamento deverá compreender todas a tarifas especificadas, preços públicos, supervisão, administração, tributos e todas as despesas que incidam direta ou indiretamente na execução do contrato.

Se durante o prazo de vigência do contrato ocorrer à criação, extinção ou modificação de tributos, alteração de alíquotas e/ou alterações de base de cálculo que venha a alterar, comprovadamente, os custos da SPE, a taxa de afretamento originalmente acordada será modificada na mesma proporção.

As multas serão aplicada à SPE, pela Petrobras, pelos seguintes embaves:

- atraso no cumprimento por parte da SPE para início do afretamento:

(i) primeiros 182 dias, 5% da Taxa de Afretamento diária;

(ii) entre 183 e 365 dias, 10% da Taxa de Afretamento diária.;

(iii) entre 366 e 547 dias, 15% da Taxa de Afretamento diária e

(iv) após 548 dias, 20% da Taxa de Afretamento diária.

- atraso no cumprimento de exigência contratual ou de solicitação da fiscalização - multa correspondente a 20% por dia de atraso.

As multas a cue porventura a SPE der causa serão descontadas no primeiro pagamento e nos subseqüentes, a que a SPE tenha direito, após a aplicação das sanções pela Petrobras. Os descontos estarão limitados a 30% (trinta por cento) do valor do pagamento mensal correspondente, até que a multa esteja integralmente quitada.

Adicionalmente, o Contrato de EPC prevê o pagamento de multa (*Liquidated Damages*) pelo EPCista em caso de atraso do prazo de entrega de cada sonda, limitado a 10% do valor do contrato[20]. Em caso de atraso, os recursos das multas do Contrato de Construção serão utilizados para o pagamento das multas do Contrato de Afretamento.

---

[20] Mesmo percentual de multa aplicado à SPE por atraso no início do afretamento.

EIG00091732
EIG_KEP_00164950

A responsabilidade da Petrobras e da SPE por perdas e danos será limitada aos danos diretos, de acordo com o Código Civil Brasileiro e legislação aplicável, excluídos os lucros cessantes e danos indiretos, ficando os danos diretos limitados a 5% do valor total contratual.

Nos casos de vazamento de petróleo e outros resíduos no mar, a SPE responderá até o limite de US$ 1.000.000,00 (um milhão de dólares norte-americanos) por evento e seus desdobramentos.

A SPE não será responsabilizada por perdas, danos, prejuízos, danos a reservatórios, poluição advinda do poço e lucros cessantes causados à Petrobras, resultante de "kick[20]", "blow-out[21]", surgência e testes de formação.

A SPE não poderá ceder ou dar em garantia, a qualquer título, no todo ou em parte, os créditos de qualquer natureza decorrentes do Contrato de Afretamento, salvo com autorização prévia e por escrito da Petrobras. Já a Petrobras, poderá ceder o Contrato de Afretamento, total ou parcialmente, mediante anuência da contratada, dispensada esta nos casos em que a cessionária seja empresa sob controle ou com participação acionária da Petrobras.

A contratada deverá providenciar a contratação, às suas expensas, dos seguros necessários ao cumprimento do Contrato de Afretamento e de acordo com a legislação brasileira, destinados a cobertura da Unidade e todos os seus bens, inclusive para todo e qualquer transporte de materiais e/ou equipamentos, exceto quando transportados sob responsabilidade da Petrobras e/ou terceiros a serviço da Petrobras, bem como dos seguros de responsabilidade civil por danos a prejuízos causados a terceiros. A contratada deverá manter, também, cobertura de seguro para a Unidade e todos os seus perienos, segundo as condições de *London Standard Drilling Barge Form – All Risk*. As apólices de seguro deverão ser renovadas consecutivamente durante a vigência do Contrato de Afretamento.

A SPE deverá cumprir e assumir total responsabilidade por toda e qualquer obrigação aduaneira ou medida necessária ao encaminhamento, acompanhamento e deferimento dos pleitos de concessão, baixa ou alteração, além de outras de se mostrem necessárias, relativas aos materiais, equipamentos e quaisquer outros bens indispensáveis à realização do objeto do Contrato de Afretamento. Cabe a contratada requerer, em tempo hábil, a concessão dos benefícios do REPETRO para os materiais, equipamentos e quaisquer outros bens, cujo fornecimento seja de sua responsabilidade.

Os equipamentos e ferramentas importados sob o Regime de Admissão Temporária, descrito no item 5.8.3 poderão permanecer de forma definitiva no país desde que a SPE arque com todos os custos decorrentes da nacionalização.

Os bens e equipamentos poderão ser importados em nome da Petrobras, porém todos os custos incorridos no processo de importação incluindo transporte, seguros e despacho aduaneiros de responsabilidade da SPE.

A Petrobras poderá rescindir o contrato nas seguintes situações:

- descumprimento ou cumprimento irregular de disposições contratuais;

---

[20] É o fluxo indesejável de fluido da formação para interior do poço, devido à pressão no poço ser maior que a da formação.
[21] Quando se perde o controle do poço.



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2011  **71**

- atraso injustificado no início do afretamento;

- paralisação do afretamento sem justa causa;

- cessão ou subcontratação total ou parcial de seu objeto;

- cessão ou dação em garantia;

- associação, fusão, cisão ou incorporação da SPE, sem prévia comunicação à Petrobras;

- o cometimento reiterado de falhas na execução do objeto do contrato;

- a decretação de falência da SPE;

- suspensão do afretamento por autoridades competentes, motivada pela SPE;

- atraso no início da execução do contrato por prazo superior a 730 dias; e

- rescisão do Contrato de Serviços.

A SPE poderá rescindir o contrato nas seguintes situações:

- atraso superior a 90 dias nos pagamentos devidos pelo afretamento das sondas;

- não liberação pela Petrobras de locação para execução do afretamento; e

- rescisão do Contrato de Serviços;

**5.3.    CONTRATO DE SERVIÇOS**

A versão do Contrato de Serviços a qual nos basearmos para traçar os pontos abaixo foi a disponibilizada pelo Assessor em junho de 2010.

O objetivo do Contrato de Serviços é a prestação, pelo operador, sob o regime de preço unitário, dos serviços de perfuração e avaliação e/ou completação e/ou manutenção de poços de petróleo e/ou gás (verticais, direcionais, horizontais e partilhados), em águas brasileiras delimitadas pelas coordenadas geográficas de acordo com o Contrato de Concessão assinado pela Petrobras e a União.

O Contrato de Afretamento está vinculado a um Contrato de Serviços de Operação e Manutenção das sondas, a ser assinado entre a Petrobras e o Operador (especializado/Acionista Classe B. Inicialmente a Petrobras, através de uma subsidiária que está sendo criada para este fim, assinará o Contrato de Serviços como operador e permanecerá nesta posição durante praticamente toda a fase de construção das sondas, na qualidade de acionista Classe B de todas as SPEs do Primeiro Sistema. No entanto, antes do término da construção de cada sonda, é intenção da Petrobras vender as suas ações Classe B em cinco das sete SPEs do Primeiro Sistema, para acionistas estratégicos (operadores) interessados. Ao fazer isso, a Petrobras estará repassando ao adquirente de suas ações Classe B, em cada uma dessas SPEs, todos os direitos e obrigações em todos os instrumentos contratuais celebrados, inclusive os Contratos de Serviço vinculados a cada uma dessas SPEs e o acordo de acionistas da respectiva SPE.



Confidential

EIG00091734
EIG_KEP_00164952

Para as demais duas sondas componentes do Primeiro Sistema, a Petrobras manterá a sua participação como acionista Classe B das respectivas SPEs e única responsável pela sua operação e manutenção. Para essas sondas, exclusivamente, os contratos de afretamento e de serviço serão aditados com a dilação dos prazos contratuais para 20 (vinte) anos.

O pagamento da taxa de serviço será mensal, definida em US$ e convertida em R$ pela taxa de câmbio da data base do contrato, mantendo-se em R$ até o final do contrato de prestação de serviços. A taxa de serviço será paga pela Petrobras diretamente ao operador no Brasil.

Para fins de projeções financeiras a taxa de serviços foi estimada em US$ 115 mil[31]. O indexador utilizado será também uma fórmula paramétrica (incluindo indexação pelo Índice do Índice Nacional de Preços ao Consumidor (INPC), Índice de Preços por Atacado e taxa de câmbio).

Farão parte do valor da taxa de serviço outros custos operacionais como: despesas de seguros e despesas com peças sobressalentes (totalizando US$ 35 mil), incluídos na Taxa de Afretamento, quando serão pagos pela SPE através de valor reembolsado pela Petrobras.

Inclui-se como obrigação nesse contrato a execução, pela contratada, de toda e qualquer operação necessária ao perfeito cumprimento do objeto do Contrato de Serviços, tais como, porém não se limitando, a execução e supervisão do posicionamento, lastreamento e movimentação da Unidade.

A Petrobras poderá determinar que a contratada efetue a reentrada em poços já perfurados e poderá instalar na Unidade equipamentos e facilidades de produção, dentro da capacidade da Unidade (carga e áreas perigosas). Entretanto, nenhuma alteração estrutural será efetuada na Unidade sem o consentimento da contratada. E todo equipamento da Petrobras instalado continuará sendo de sua propriedade, e será por ela retirado antes do término do Contrato de Serviços. As despesas de instalação e remoção correrão por conta da Petrobras.

O Contrato de Serviços terá sempre execução simultânea com o de Afretamento, assinado na mesma data.

São obrigações da contratada:

- Manter, durante toda execução do contrato, todas as condições de habilitação assumidas na licitação;

- Respeitar e cumprir as normas administrativas em vigor na Petrobras;

- Facilitar a ação da Fiscalização, fornecendo informações ou provendo acesso à documentação e aos serviços em execução e atendendo prontamente às observações e exigências por ela apresentada;

- Reparar, às suas expensas e nos prazos estipulados, todo e qualquer serviço considerado inaceitável;

- Responder por qualquer dano ou prejuízo causado à Petrobras ou a terceiros, em decorrência da execução de serviços previstos no Contrato de Serviços;

---

[31]     Valor estimado e poderá ser alterado pela Petrobras. Outros custos operacionais como: despesas de seguros e despesas com peças sobressalentes serão pagas pela SPE, portanto serão incluídos na Taxa de Afretamento.

Confidential

EIG00091735
EIG_KEP_00164953



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 4.1.2001 **73**

- Obter licenças relativas à sua atividade;

- Responder pela operação, supervisão, direção técnica e administrativa e mão-de-obra necessária;

- A composição da mão-de-obra embarcada (efetiva) terá um percentual mínimo de mão-de-obra nacional variando entre 66% (1º ano de contrato) e 85% (a partir do 6º ano de contrato);

- Efetuar os testes nos equipamentos da Unidade em até 72 horas após a liberação para navegar para a primeira locação;

- Conduzir os serviços de acordo com os padrões internacionais de segurança do trabalho;

- Manter completo sigilo sobre todas as informações e dados fornecidos pela Petrobras;

- Planejar e conduzir as operações destinadas a evitar e combater erupções de petróleo, gás, incêndios e outros acidentes;

- Responsabilizar-se e arcar com o ônus pela retirada de qualquer equipamento ou material deixado cair no fundo do mar, por sua culpa;

- Regularizar a entrada e permanência da Unidade no país, bem como de materiais e equipamentos, providenciando, às suas expensas, liberações, vistorias, registros e admissão temporária; e

- Contratação de seguros pertinentes a atividade, bem como renovações consecutivas durante a vigência do contrato.

São obrigações da Petrobras:

- Efetuar os pagamentos devidos à contratada pelos serviços efetivamente prestados medidos e faturados;

- Fornecer o programa das operações e locações com devida antecedência;

- Proceder a medição dos serviços executados e emitir o relatório de medição;

- Fornecer transporte de pessoal, material e equipamento até a Unidade;

- Fornecer, por sua conta, todo o combustível e água necessários à realização dos serviços objeto do contrato.

- Manter o controle sobre o fluido de perfuração e completação; e

- Fornecer, às suas expensas e sua responsabilidade, os serviços auxiliares relativos à: perfuração direcional, cimentação, testes de formação, perfilagem elétrica, operações com flexitubo, operações com nitrogênio, operação a cabo elétrico, operação com arame, quando decorrentes da programação da própria Petrobras.

Os valores a serem pagos pela Petrobras à contratada serão resultantes da aplicação das taxas a serem definidas e de acordo com os valores estabelecidos em uma planilha de preços unitários, sobre as quantidades de serviços que forem efetivamente executados e aceitos pela fiscalização.

Confidential

EIG00091736
EIG_KEP_00164954

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 44 2001 74

Os preços propostos para execução dos serviços não serão passíveis de revisão exceto se, durante a vigência do contrato, ocorrer a criação e/ou alteração na alíquota de algum tributo pertinente.

A multa moratória por atrasos, por parte da contratada, referente ao início do contrato, cumprimento de exigências contratuais ou de solicitação de fiscalização e atrasos na elaboração do Atestado Diário de Operação ("ADO"), estarão limitadas a 10% (dez por cento) do equivalente ao valor total estimado do Contrato de Serviços.

A fiscalização será exercida pela Petrobras, a fim de se verificar o fiel cumprimento das obrigações da contratada, bem como (i) o emprego de equipamentos, materiais, ferramentas e componentes de coluna de perfuração e ou produção, condenados ou impróprios e (ii) o emprego de técnicas impróprias e/ou inadequadas.

A Petrobras poderá rescindir o Contrato de Serviços, nas seguintes situações:

• Descumprimento ou cumprimento irregular de cláusulas contratuais, especificações, operações ou prazos;

• Lentidão no cumprimento levando a Petrobras a presumir a impossibilidade de conclusão dos serviços nos prazos estipulados;

• Atraso injustificado no início dos serviços;

• Paralisação dos serviços sem justa causa e prévia comunicação;

• Cessão ou subcontratação total ou parcial do seu objeto sem a prévia e expressa anuência da Petrobras, bem como a associação, fusão, cisão ou incorporação da contratada sem a prévia comunicação à Petrobras;

• O desatendimento das determinações regulares indicadas na fiscalização;

• Homologado o plano de recuperação extrajudicial ou deferida a recuperação judicial, se a contratada não preste caução suficiente para garantir o cumprimento das obrigações contratuais, a critério da Petrobras;

• Suspensão dos serviços por determinação de autoridade competente, motivada pela contratada;

• Deixar de apresentar comprovação de adimplemento com obrigações trabalhistas;

• Atraso no início de execução do contrato por mais de 365 dias;

• Rescisão do Contrato de Afretamento, independente de causa; e

• Interrupção das operações por mais de 60 dias, por razões imputáveis à contratada, exceto por paralisação por caso fortuito ou força maior.

A contratada poderá rescindir o contrato nas seguintes situações:

• Suspensão de sua execução por ordem da Petrobras, por prazo superior a 120 dias;

Confidential

EIG00091737
EIG_KEP_00164955

CAIXA

- Atraso superior a 90 dias dos pagamentos devidos;
- Não liberação por parte da Petrobras da locação para execução dos serviços; e
- Rescisão do Contrato de Afretamento, independente da causa.

Assim como no Contrato de Afretamento, no Contrato de Serviço a contratante é impedida de ceder ou dar em garantia, a qualquer título, no todo ou em parte, os créditos de qualquer natureza decorrentes ou oriundos do desse contrato, salvo com autorização prévia da Petrobras.

**5.4.   CONTRATO DE GERENCIAMENTO E FISCALIZAÇÃO DAS OBRAS**

A Petrobras, ou uma de suas subsidiárias, será a responsável pelo acompanhamento e gerenciamento da construção de cada sonda. Para tanto, cada SPE assinará um contrato de gerenciamento e fiscalização da obra, no qual contratará a Petrobras, ou uma de suas subsidiárias, para realizar o gerenciamento da obra.

Este gerenciamento visa fornecer às SPEs, serviços técnicos especializados nas áreas de fiscalização de obras, assessoria na gestão de contratos, assessoria técnica às obras, controle de recursos financeiros e elaboração de relatórios técnicos.

Neste contrato a Petrobras poderá, em nome das SPEs, exercer plenamente todos os direitos, responsabilidades e obrigações relacionadas ao Contrato de EPC, exceto a obrigação de pagar o EPCista e a negociação de alteração do design do equipamento. Em conformidade com essa nomeação, são concedidos à Petrobras plenos poderes para agir em nome das SPEs, porém com seu prévio consentimento quanto às seguintes questões: negociar acordos, decidir quaisquer litígios, controvérsias ou reivindicações, pedido de arbitragem ou processo judicial e efetuar modificações no Contrato de EPC.

A Petrobras assume a obrigação de não tomar nenhuma ação que possa resultar em responsabilidade adicional ou obrigação financeira às SPEs, sem o consentimento prévio e por escrito destas.

Neste contrato está disposto que as SPEs não devem, no tocante ao Contrato de EPC, sem prévio e expresso consentimento da Petrobras:

(i) exercer qualquer direito ou poder ou conceder qualquer aprovação e/ou autorização, nos termos do Contrato de EPC, que possa comprometer, de acordo com o critério da Petrobras, a capacidade desta de cumprir com suas obrigações contratuais; e

(ii) renunciar ou liberar-se de qualquer direito, obrigação ou responsabilidade, se tal renúncia ou liberação prejudicar, de acordo com critérios da Petrobras, a capacidade desta de cumprir as obrigações contratuais.

O Contrato de Gerenciamento ficará em vigor durante o período de construção de cada sonda, em média 4 anos, até a aceitação definitiva da sonda pela Petrobras e engenheiros independentes

Confidential

EIG00091738
EIG_KEP_00164956

a serem contratados pelas SPEs ou seus financiadores, podendo ser rescindido por qualquer uma das partes mediante determinadas situações previstas no próprio contrato.

Pelo serviço de gerenciamento e fiscalização a Petrobras fará jus ao pagamento de US$ 8,35 milhões ano/por unidade, com referência na data de sua assinatura. E terá como responsabilidades principais (i) desenvolver e acompanhar o planejamento físico-financeiro das obras, (ii) acompanhar e fiscalizar a execução das obras com controle de qualidade, (iii) analisar e liberar as medições mensais verificando o cumprimento do cronograma e (iv) acompanhar a execução da obra.

**5.5.   CONTRATO DE MANUTENÇÃO DE ATIVO**

Os apontamentos discorridos neste capítulo foram baseados na minuta contratual do Contrato de Manutenção de Ativo, disponibilizada pelo Assessor em 10 de dezembro de 2010.

O Contrato de Manutenção de Ativo será assinado entre o operador de cada sonda e a respectiva SPE com o objetivo de estabelecer obrigações, deveres e responsabilidades da SPE na qualidade de proprietária da sonda e do operador quanto à operação, manutenção e conservação da sonda, inclusive as ações relacionadas à seleção, contratação e treinamento de sua tripulação, a fim de que esta seja utilizada para cumprir as obrigações assumidas nos Contratos de Afretamento e Contrato de Serviços.

Neste contrato o operador reconhece que tem condições técnicas de operar o equipamento e se compromete a participar da fase de testes e comissionamento ("Fase de Transição"), a fim de certificar que a sonda está em conformidade com as especificações técnicas e contem todos os itens e equipamentos necessários para permitir a operação e o afretamento dentro das condições contratuais.

O contrato permanecerá vigente apenas durante essa Fase de Transição até a entrada do operador como acionista da SPE, e neste período o operador deverá cumprir todas as obrigações do Contrato de Serviços e as obrigações do Contrato de Afretamento que caberiam à SPE durante esta etapa, dentre as quais:

· Acompanhar, em nome da SPE, as medições do afretamento procedidas pela Petrobras;

· Obedecer, em nome da SPE, às determinações legais emanadas das autoridades constituídas em relação ao afretamento;

· Apresentar, executar e manter permanentemente em dia o plano de manutenção; e

· O Operador será responsável integralmente por todos os casos de despejo de petróleo, óleo ou resíduos no mar, ou qualquer outro acidente que possa ocorrer, desde que tenha dado causa aos referidos eventos, sendo que, durante a fase operacional da sonda, sua responsabilidade estará limitada aos valores especificados no Contrato de Serviços;

A SPE poderá aplicar ao operador as multas moratórias e compensatórias previstas no Contrato de Afretamento que lhe forem imputadas pela Petrobras, ocasionadas pelo não cumprimento pelo



EIG00091739
EIG_KEP_00164957

operador de quaisquer termos constantes do contrato. Nenhuma das partes responderá pelo descumprimento das obrigações ou prejuízos resultantes de caso fortuito ou força maior.

Será garantido à SPE e à Sete International o direito de regresso em face do operador, no caso da SPE ou da Sete International, vier a ser obrigado a reparar, eventual dano causado à terceiros ou à Petrobras.

**5.6.    DOCUMENTOS SOCIETÁRIOS - SETE BRASIL**

**5.6.1.   ACORDO DE ACIONISTAS e ESTATUTO SOCIAL**

Será celebrado entre o FIP Sondas e a Petrobras um Acordo de Acionistas e o Estatuto Social, a fim de estabelecer os direitos e obrigações de cada uma das partes em relação à administração e condução dos negócios de Sete Brasil, bem como regulamentar o seu funcionamento. Descrevemos neste item alguns pontos do Acordo de Acionistas e o Estatuto Social da Sete Brasil, em suas versões disponibilizadas pelo Assessor em 15 de dezembro de 2010.

O conselho de administração da Companhia será composto por 9 membros, dos quais um será o seu presidente e outro o vice-presidente, eleitos em assembleia geral e por ela destituíveis a qualquer tempo. Poderá, ainda, convidar, em suas reuniões, outros participantes sem direito a voto, com a finalidade de prestar esclarecimentos de qualquer natureza[1].

A diretoria da companhia será composta por três diretores, acionistas ou não, eleitos e destituíveis, a qualquer tempo, pelo conselho de administração, eleitos para mandato de 3 anos, sendo: um diretor presidente, um diretor financeiro e um diretor de operações. O FIP proporá o diretor financeiro, a partir de uma lista tríplice por este elaborada, e a Petrobras proporá o diretor presidente e o diretor de operações a partir de listas tríplices. Os nomes indicados para as três diretorias deverão ser escolhidos e aprovados pelo Conselho de Administração da Sete Brasil, que terá liberdade inclusive para rejeitar todos os nomes propostos, nos três casos, caso em que novas listas tríplices deverão ser propostas pelas respectivas partes, para nova apreciação do Conselho de Administração.

As deliberações a respeito de qualquer alteração no Estatuto Social da Companhia, qualquer alteração e/ou aprovação do Plano de Diretrizes Estratégicas, fixação e alteração dos poderes e atribuições dos membros do conselho de administração, aumento ou redução no capital social e qualquer forma de reorganização societária que envolva a Sete ou controlas, dependerão de voto afirmativo dos acionistas representando 80% do total das ações.

Durante a vigência do Acordo de Acionistas os acionistas terão o direito de eleger e destituir, a qualquer tempo, os membros do conselho de administração. Serão nove membros, sendo um deles eleito por indicação exclusiva da Petrobras, seis por indicação exclusiva dos cotistas do FIP, um por

EIG00091740
EIG_KEP_00164958

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2011  78

indicação exclusiva da Gestora do FIP[1], e um será selecionado pelos acionistas dentre uma lista contendo três indicações a serem feitas pela Petrobras, sendo que o referido membro será eleito Diretor Presidente da Sete. Os mandatos dos membros do Conselho de Administração serão de um ano, sendo permitida a reeleição.

Em qualquer reunião do Conselho de Administração os conselheiros terão toda a liberdade para questionar a diretoria sobre qualquer matéria relativa à Sete, às controladas e às atividades destas, sendo os diretores obrigados a responder adequadamente e apresentar, se for o caso, documentação que fundamente e comprove as afirmações.

Cabe ao Conselho de Administração da Sete Brasil, por decisão tomada por maioria dos votos dos membros presentes, dentre outros:

(i)      aprovar a criação ou extinção de sociedades controladas;

(ii)     manifestar-se sobre o relatório de contas da Diretoria;

(iii)    propor a deliberação da assembleia geral a destinação a ser dada ao saldo remanescente dos lucros de cada exercício;

(iv)    fiscalizar a gestão da Diretoria;

(v)     revisar anualmente o Plano de Negócios;

(vi)    aprovar a contratação ou substituição de auditores independentes;

(vii)   deliberar a concessão de garantias de qualquer natureza;

(viii)  deliberar sobre a realização de negócios de qualquer natureza entre a Companhia e acionista controlador;

(ix)    dispor a respeito de seus trabalhos e estabelecer as normas regimentais de seu funcionamento;

(x)     deliberar sobre o desdobramento de ações, grupamento de ações, resgate ou compra de ações para cancelamento ou manutenção em tesouraria;

(xi)    deliberar sobre a concessão de garantias de qualquer natureza não previstas no plano de negócios.

(xii)   deliberar sobre o aumento do capital social;

(xiii)  aprovar qualquer alterações nos contratos do Projeto;

(xiv)   aprovar orçamento anual;

(xv)    fixar critérios gerais de remuneração e das políticas de benefícios dos administradores;

[1] Na hipótese de entrada do FI-FGTS como cotista do FIP, este indicará um dos membros do Conselho de Administração. Com a efetiva entrada do FI-FGTS o Gestor do FIP atenderá às reuniões do Conselho de Administração como membro não votante.



Confidential

EIG00091741
EIG_KEP_00164959



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4 1 2011 **79**

(xvi)    deliberar sobre o exercício dos direitos de voto pela Sete Brasil nas assembleias gerais e/ou reunião de sócios;

(xvii)   deliberar sobre a aceitação e rejeição de qualquer oferta de aquisição das ações classe "A" das SPEs;

(xviii)  aprovar a contratação da construção de novos navios sondas por quaisquer das controladas, bem como os respectivos contratos de afretamento, contrato de manutenção de ativos e demais contratos relacionados a operação;

(xix)    aprovar alterações nos Contratos de Afretamento e Contrato de Manutenção de Ativos fora do curso normal dos negócios ou que representem redução de receita ou aumento de custos que possam impactar no plano de negócios; e

(xx)     aprovar qualquer alteração que acarrete aumento dos custos de construção ou alteração nas especificações das sondas.

Em caso de Oferta Pública Inicial de Ações ("IPO") da Companhia, o Conselho de Administração passará a ser composto por, no mínimo, 20% de conselheiros independentes[14], os quais devem ser expressamente declarados como tais na assembleia geral que os eleger.

O Plano de Diretrizes Estratégicas da Sete Brasil definirá as suas principais estratégias, bem como a sua estrutura societária e tributária, seu plano de financiamento, estrutura de capital, seus planos para constituição de seus ativos (vinculados à construção das sondas), entre outros. Quaisquer mudanças não previstas originalmente no plano de negócios poderão ser propostas pelo conselho de administração e estão sujeitas à aprovação em assembleia geral de acionistas, de acordo com as regras a serem estabelecidas nos documentos societários da Sete Brasil.

O Plano de Diretrizes Estratégicas da Sete Brasil deverá contemplar as seguintes informações sobre a companhia e as controladas:

(i)   a orientação geral dos negócios, contendo diretrizes, política e objetivos básicos para todas as áreas de atuação;

(ii)  estratégia de investimentos, plano de financiamento, estrutura de capital, planos de constituição de ativos, a estrutura organizacional e as projeções de receita e despesas;

(iii) planejamento comercial e operacional, e

(iv)  plano de investimento, planos estratégicos e planos de risco, bem como critérios para alteração de referidos planos.

A Petrobras só poderá reduzir sua participação abaixo de 5%: (i) após o encerramento do período de investimento (previsto para estar concluído entre 7 e 10 anos), (ii) a obtenção, pela Sete Brasil, de registro de companhia aberta na CVM ou (iii) para o caso de qualquer investidor venha a transferir suas quotas do FIP em desacordo com as Condições Permitidas. O FIP não poderá transferir suas ações: (i) antes do encerramento do prazo do período de investimento ou (ii) antes que a Sete Brasil obtenha registro de companhia aberta ("Período de *Lock-up*").

---

[14] Aqueles eleitos mediante faculdade prevista no Artigo 141, Parágrafo 4º e 5º, da Lei das Sociedades por Ações.

Confidential

EIG00091742
EIG_KEP_00164960

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6.1.2011 80

O acordo prevê o direito de venda conjunta ("*Tag Along*"), porém caso o FIP tenha uma oferta pela aquisição de ações representativas de 45% do capital social ou de um número suficiente para que o FIP não mais detenha o controle da Sete Brasil, a Petrobras terá direito de exigir que o FIP inclua na alienação a totalidade das ações detidas pelas Petrobras.

Por último, nenhum acionista poderá criar quaisquer ônus, de forma direta ou indireta, sobre parte ou totalidade das ações da Sete Brasil por ele detidas, sem prévia e expressa autorização dos demais acionistas, salvo nas hipóteses de (i) ônus sobre as ações unidas em garantia de contrato, acordo ou transação da qual a Companhia e/ou suas subsidiárias diretas ou indiretas sejam parte; e (ii) ônus sobre as ações criadas em garantia de contrato, acordo ou transações celebradas exclusivamente entre acionistas.

O Acordo de Acionistas prevê a possibilidade de uma Oferta Pública Inicial de Ações ("IPO")

A Sete Brasil tem prazo de duração indeterminado e somente será liquidada nos casos previstos em lei, sendo a assembléia geral o órgão competente para determinar competente para determinar a forma de liquidação.

## 5.6.2.  PLANO DE DIRETRIZES ESTRATÉGICAS DA SETE BRASIL PARTICIPAÇÕES

Como parte do Acordo de Acionista será criado um Plano de Diretrizes Estratégicas para a Sete Brasil ("Plano"), e neste constará como será a estrutura da Sete Brasil e controladas, como se dará o levantamento dos recursos necessários para o Projeto, como se dará a administração e governança, a venda das ações Classe B das SPEs, a *Short List*, a possibilidade de IPO e o plano operacional. Segue alguns apontamentos que julgamos mais relevantes da minuta disponibilizada em 15 de dezembro de 2010.

No tocante à estratégia de crescimento da Sete Brasil, o Plano dispõe que será unicamente através da exploração comercial via afretamento de ativos semelhantes aos previstos para o Primeiro Sistema, através da construção, operação e fretamento de novas sondas para águas profundas para clientes que demandem a disponibilização de tais ativos ou ainda pela compra de ativos já constituídos ou em construção, semelhantes às sondas, ou pela aquisição de empresas que possuam ativos semelhantes (sondas de perfuração ou de quotas de capital), desde que tais aquisições sejam devidamente aprovadas pelo conselho de administração.

Outro ponto importante tratado no Plano é o direito de preferência que a Sete Brasil terá, dentro do prazo de até 12 (doze) meses contatos da data da aprovação da contratação do Primeiro Sistema, para a construção dos novos sistemas até o limite de 21 (vinte e uma) sondas, desde que em condições de preço, prazo e características físicas semelhantes a do Primeiro Sistema. Caso o desenvolvimento dos novos sistemas tenha êxito, os termos e condições finais para todos os principais contratos envolvidos na construção, operação e fretamento dessas novas sondas para a Petrobras, ou



Confidential

EIG00091743
EIG_KEP_00164961

empresa por ela indicada, deverão ser submetidos pela diretoria da Sete Brasil para aprovação pelo conselho de administração.

Por dois anos a contar do prazo da assinatura dos Contratos de EPC do primeiro sistema, a Petrobras, e suas subsidiárias, não poderão criar veículos paralelos com características similares ao do Projeto desde que tais veículos tenham a finalidade de afretamento das Sondas, até que o limite de 28 (vinte e oito) sondas previstas para o Projeto venha a ter sua construção contratada.

A minuta do Plano descreve como se dará a venda das ações classe B de cinco das sete SPEs para o Operador Especializado. Desde que o comprador das ações classe B seja qualquer das empresas incluídas no *Short List* e desde que não tenha ocorrido qualquer fato material adverso com a empresa selecionada no momento da transferência das ações não haverá a necessidade de qualquer aprovação prévia por parte dos demais acionistas ou dos financiadores sênior da SPE, para a efetivação da venda das ações.

A Petrobras é livre para efetuar a escolha do operador a qualquer tempo e a partir da celebração dos Contratos de Afretamento, Serviços e EPC até a data de entrega da sonda e aceitação final por parte SPE e da Petrobras, desde que o operador selecionado esteja incluído na *Short List*. A efetiva transferência efetiva das ações classe B para o operador/acionista só ocorrerá após o atendimento de uma série de condições, dentre estas o de cumprimento satisfatório dos testes de aceitação da Sonda pela Petrobras e pelo operador.

Caberá ao acionista/operador o pagamento ao acionista Classe A de uma "compensação para *underperformance*" em decorrência da baixa performance da sonda que resulte em uma perda de receita de acordo com regras e metas estipuladas no Acordo de Acionistas de cada SPE[27], podendo resultar, inclusive, em diluição na participação do acionista Classe B na SPE correspondente.

Nas duas SPEs que a Petrobras permanecer como operador, a "compensação de *underperformance*" devida pelo acionista classe B ao acionista classe A, não implicará em diluição na participação do acionista classe B, limitando-se à compensação monetária (multa, cujos recursos serão recebidos pela SPE).

O Plano já inclui a hipótese, caso exista a oportunidade de mercado e interesse de investidores, a Sete Brasil poderá elevar uma oferta pública de ações para o mercado. O IPO será composto por uma oferta primária e, caso exista interesse por parte dos acionistas da Sete Brasil e do mercado, uma oferta secundária. Ainda, em ocorrência do IPO, a Sete Brasil realizará uma chamada de capital até o limite total comprometido pelos cotistas do FIP. Caso este não ocorra, após o oitavo ano a Sete Brasil poderá abrir seu capital

**5.7.   DOCUMENTOS DE CONSTITUIÇÃO E RECULAMENTAÇÃO - FIP SONDAS**

**5.7.1.   ACORDO DE INVESTIMENTO**

---

[27] Documento não disponibilizado

Confidential

EIG00091744
EIG_KEP_00164962

Será assinado, também, um Acordo de Investimento com o objetivo de regular o potencial investimento no Projeto Sondas pelos investidores, na qualidade de cotistas do FIP Sondas, juntamente com a Petrobras, na qualidade de acionista da Sete Brasil. A minuta contratual na qual nos baseamos foi disponibilizada em 15 de dezembro de 2010.

O Acordo de Investimento dispõe, dentre os assuntos, sobre:

(i) a obrigação dos cotistas quanto à integralização das quotas do FIP Sondas e de cada acionista quanto a integralização do capital subscrito na Sete Brasil;

(ii) o cronograma de aportes de capital;

(iii) as características da possível criação de dívida subordinada;

(iv) dos aportes de capital na Sete International e nas SPEs, pela Sete Brasil;

(v) o exercício do direito de voto dos cotistas e da Petrobras em matérias relevantes à Sete Brasil;

(vi) a criação do Fundo de Performance, do Fundo de Renovação e da Conta Reserva de Eventualidade; e

(vii) a abertura do capital da Sete Brasil.

Os cotistas integralizarão as quotas subscritas mediante chamada de capital a ser efetuada pelo administrador, até o limite estabelecido no acordo. As chamadas de capital ocorrerão quando da necessidade de Sete Brasil para o cumprimento de seu Plano de Negócios. A cada chamada de capital conforme estabelecido no cronograma de aportes, os acionistas terão cinco dias úteis para integralização do valor.

Caso algum acionista deixe de integralizar os montantes mencionados das chamadas de capital, todos os direitos a ele conferidos no Estatuto Social e no Acordo de Acionistas da Sete Brasil serão suspensos. Podendo, inclusive, caso o inadimplemento permaneça por prazo superior a cinco dias úteis ser imputada multa equivalente a 10% da quantia devida estipulada na chamada de capital. Na hipótese de inadimplência perdurar por período superior a 20 dias úteis a Sete Brasil poderá, por decisão da maioria do conselho de administração, vender as ações não integralizadas devidas pelo acionista inadimplente.

A critério dos investidores e dentro dos limites estabelecidos no Plano de Diretrizes Estratégicas da Sete Brasil, parte dos recursos necessários para a conclusão do Projeto poderão ser obtidos por meio de dívida subordinada, isto é, dívida emitida pela Sete Brasil, na forma de emissão de debêntures não conversíveis em ações.

O conselho de administração da Sete Brasil terá competência de decidir e aprovar a distribuição de dividendos extraordinários para a formação do Fundo de Performance. E, entre o 8º e o 10º ano de operação de cada sonda, parte dos dividendos pagos pelas SPEs para a Sete International deverá ser destinado a formação do Fundo de Renovação, no montante de recursos.

O Acordo de Investimento trata também da criação da Conta Reserva, de titularidade da Sete International, que deverá ser constituída com recurso de todas as SPEs e tem a finalidade de prestação de auxílio financeiro para SPE com dificuldades. A Conta Reserva será constituída utilizando-se dos recursos do *Mobilization Fee*.



Como os cotistas não serão diretamente acionistas da Sete Brasil, será criado um foro decisório único com relação às matérias relevantes concernentes a Companhia (aquelas que exigem quórum qualificado de 80%), que se dará através de reuniões prévias convocadas antes da realização de uma Assembleia Geral da Sete Brasil ("Reunião Prévia"). Nas Reuniões Prévias, votarão tanto os quotistas do FIP Sondas como a Petrobras, sendo que a representatividade de casa participante será determinada com base na sua participação (direta e indireta) na Sete Brasil. As decisões tomadas em Reunião Prévia vincularão os votos dos quotistas nas AGQ e os votos do FIP Sondas e da Petrobras nas AGE da Sete Brasil.

As deliberações da Reunião Prévia dependerão de quórum qualificado representando 80% do total da participação direta ou indireta no capital social da Sete Brasil.

### 5.7.2. REGULAMENTO

A minuta do Regulamento do FIP ("Fundo") a cual nos baseamos foi disponibilizada pelo Assessor em 13 de dezembro de 2010. Neste estão dispostos, dentre outras, as responsabilidades, obrigações e a remuneração do administrador, os encargos do Fundo e as competências da assembleia geral de cotistas, dentre os quais, deliberar sobre:

- a emissão e distribuição de novas quotas do Fundo;
- alterações do critério de cálculo da taxa de administração;
- alterações nos prazos do Fundo e estratégias e diretrizes de investimento e desinvestimento na Sete Brasil;
- alterações no Regulamento; e
- contratação de prestadores de serviço (advogados, consultores, auditores etc.).

O FIP é um fundo de investimento em participações, constituído sobre a forma de condomínio fechado, regido por seu regulamento e pelas disposições legais que lhe forem aplicáveis, especialmente a Instrução CVM 391.

Nos termos do artigo 109 da ICVM 409, são considerados Investidores Qualificados:

- instituições financeiras;
- companhias seguradoras e sociedades de capitalização;
- entidades abertas e fechadas de previdência complementar;
- pessoas físicas ou jurídicas que possuam investimentos financeiros em valor superior a R$ 300.000,00 e que, adicionalmente, atestem por escrito sua condição de investidor qualificado mediante termos próprios;
- fundos de investimentos destinados exclusivamente a investidores qualificados;
- administradores de carteiras e consultores de valores mobiliários autorizados pela CVM, em relação a seus recursos próprios; e

CAIXA

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6.1.2011 **84**

• regimes próprios de previdência social instituídos pela União, pelos Estados, pelo Distrito Federal ou por Municípios.

O Fundo foi constituído pelo Administrador em 12 de agosto de 2010, e seus atos constitutivos e regulamento foram arquivados no Cartório 2º Oficial de Registros e Documentos e Civil de Pessoa Jurídica da Capital do Estado de São Paulo, em 12 de agosto de 2010, sob o nº 0000971314.

Tem como objetivo a valorização do capital investido por meio da aquisição de ações de emissão da Sete Brasil ("Companhia Investida"), participando do processo decisório da companhia investida, com efetiva influência na definição de sua política estratégica e de gestão. Até 100% da carteira do FIP poderá ser investido na Sete Brasil.

O Fundo deverá participar do processo de administração da Companhia Investida: (i) pela detenção das ações que integram o bloco de controle; (ii) pela celebração de acordo de acionistas ou (iii) pela celebração de ajustes de natureza diversa ou adoção de procedimento que assegure ao Fundo efetiva influência na definição da política estratégica e na gestão da Sete Brasil, preferencialmente através da indicação de membros do conselho de administração da mesma.

O prazo de duração será de 20 (vinte) anos, contados da data da integralização das quotas constitutivas do patrimônio inicial mínimo, prorrogável mediante aprovação da assembleia geral dos cotistas. O período de 10 anos, contados da integralização será o período de investimento. O período de 10 anos, após o término do período de investimento, será destinado ao desinvestimento, sendo que, durante o período de desinvestimento, os investimentos no Fundo serão liquidados, de forma ordenada e o produto resultante será utilizado para amortização das quotas.

As quotas corresponderão a frações ideais do patrimônio líquido do fundo, assumirão a forma nominativa e serão mantidas em conta de depósito em nome de seus titulares. A propriedade das quotas nominativas presumir-se-á por extrato de conta de depósitos das quotas, aberta em nome do cotista.

O valor mínimo individual de subscrição é de R$ 1.000.000,00 (um milhão de reais). Nenhum cotista poderá isoladamente ou em conjunto deter mais de 33% (trinta e três por cento) das quotas do Fundo em circulação. As quotas não serão negociadas em bolsa de valores ou em mercado de balcão organizado.

O cotista que desejar ceder ou transferir suas quotas a terceiros, no todo ou em parte, deverá primeiramente ofertá-las a outro cotista qualquer. O direito de preferência sobre o número de quotas ofertadas será proporcional à participação do cotista sobre o total de quotas do Fundo.

Na liquidação total ou parcial do FIP, bem como na distribuição de dividendos ou juros sobre o capital pela Sete Brasil, o valor será integralmente utilizado para amortização das quotas, salvo se o Administrador, de forma justificada, identificar a necessidade de reter parte ou a totalidade do montante obtido como o desinvestimento para pagamento de alguma obrigação do Fundo, limitado a um percentual, em definição, do patrimônio líquido do Fundo.

Não haverá resgate de quotas, e não ser pelo término do prazo de duração ou pela liquidação do Fundo, não se confundindo os eventos de resgate com os eventos de amortização.

Confidential

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6-1-2011 **85**

O Fundo entrará em liquidação ao final do prazo de duração ou de sua prorrogação, se for o caso, por deliberação da assembléia geral de cotista.

Por ocasião da liquidação do Fundo, o Administrador deverá promover a realização dos ativos integrantes da carteira do Fundo e o produto resultante, deduzidos os compromissos do Fundo, deverá ser entregue aos cotistas como forma de pagamento pela amortização das quotas, na proporção de cada um no patrimônio líquido do Fundo.

### 5.7.3.   DO ACORDO DE COTISTAS

Foi disponibilizada pelo Assessores da Petrobras, em 13 de dezembro de 2010, uma minuta de Acordo de Cotistas do FIP, o qual tem o objetivo de disciplinar, supletivamente ao disposto no Regulamento do FIP quanto a relação entres os cotistas e a condução das atividades do Fundo. Assim como no Regulamento, o Acordo de Cotistas trata, dentre outras, das questões de direito e exercício do voto em assembléia geral, a transferência e negociação das quotas, prazo de duração do Fundo, chamadas de capital e os períodos de *Lock-Up*.

Todos os cotistas, o Administrador e a Sete Brasil se obrigam durante o período de vigência, de 20 anos, a cumprir toda e qualquer disposição do Acordo de Cotistas.

A partir do oitavo ano do Fundo, qualquer cotista, poderá solicitar ao Administrador que convoque uma assembléia geral de cotistas para deliberar sobre a liquidação do Fundo, sendo que esta somente será aprovada se tiver o voto favorável da totalidade dos cotistas. Na liquidação do Fundo, após o pagamento das despesas e encargos, o Administrador, distribuirá aos cotistas, na proporção de suas participações, os títulos e valores mobiliários de emissão da Sete Brasil e demais ativos integrantes da carteira do Fundo.

Com exceção da transferência de cotas entre cotistas e após o período de integralização do capital comprometido pelos cotistas, em toda potencial transferência de cotas do FIP a um terceiro a Petrobras terá trinta dias, contado do recebimento da notificação pelo Administrador, para se manifestar se vetará o ingresso do potencial comprador como cotista do Fundo caso:

- a Petrobras entenda, a seu exclusivo critério, de forma justificada, que o potencial comprador não esteja qualificado;

- o potencial comprador esteja em litígio com a Petrobras ou com controladas ou coligadas diretas ou indiretas;

- o potencial comprador seja um concorrente da Petrobras; e

- o potencial comprador seja uma sociedade que atue direta ou indiretamente no mercado de afretamento e operação de sondas de perfuração.

O direito de veto da Petrobras será aplicável somente antes da realização do IPO da Sete Brasil.



EIG00091748
EIG_KEP_00164966



## 5.8.    ASPECTOS TRIBUTÁRIOS

O Projeto Sondas foi estruturado a fim de fazer uso de benefícios tributários no tocante aos tributos pagos na aquisição de equipamentos necessários à produção e manutenção das sondas e a distribuição de lucros para os Acionistas. Desta forma, os aspectos tributários do Projeto Sondas compõem fator principal para sua estrutura, justificando a localização das entidades em diferentes países.

A localização das entidades está intrinsecamente ligada aos aspectos tributários traçados, que resumidamente visam evitar, no limite legal permitido, a tributação desnecessária de dividendos das SPEs para a sua holding Sete International, permitindo utilizá-la como vaso comunicante para a estrutura de portfólio e a utilização de *tax sparing credits*[34] nas SPEs para uso da legislação aplicável visando reduzir a incidência de impostos.

A Sete Brasil, dado o perfil de alguns de seus investidores[35], será estabelecida no Brasil, como holding dos veículos localizados no exterior de forma a criar meios facilitadores para a participação dos fundos de pensão em seu capital.

A escolha de uma estrutura offshore para realizar a concentração de caixa visa evitar a necessidade de fluxos cambiais no Brasil, bem como eliminar o risco de ganhos ou perdas cambiais em função da contração da moeda frente ao Real. Dentre as jurisdições possíveis, segundo os Assessores da Petrobras, a escolha da Áustria como local de constituição da Sete International se deve pelo fato de o Acordo Brasil-Áustria ser mais benéfico quando comparado a outras localidades. Adicionalmente, pela Áustria fazer parte da União Européia, evita-se a tributação sobre a distribuição de dividendos das SPEs para a Sete International.

As SPEs devem ser entidades estrangeiras a fim de obter os benefícios do programa REPETRO. Por outro lado, optou-se por não constituir as SPES e, jurisdição considerada "paraíso fiscal" para fins da legislação brasileira, evitando o pagamento de impostos na fonte na remessa dos pagamentos das Taxas de Afretamento pela Petrobras.

Por sua vez, o operador de cada unidade deverá ser uma empresa brasileira, para exercer suas atividades em território brasileiro, e contratada pela Petrobras através de um contrato de serviços, vinculado ao contrato de afretamento. Os pagamentos relacionados a esse contrato serão em moeda local (Reais) ao passo que os pagamentos relacionados ao contrato de afretamento poderão ser tanto em dólar norte americano quanto em Reais, total ou parcialmente.

Salientamos que os aspectos tributários e regulatórios da operação estão no escopo da análise que será feita pelo escritório Tauil & Chequer Mayer Brown ("Assessor Legal do Fundo"). Dentro do parecer do Assessor Legal constará a opinião legal acerca das descrições aqui efetuadas.

---

[34] Crédito fictício consiste na outorga de crédito, pelo Estado de residência, correspondente ao imposto estabelecido pela legislação interna do Estado da fonte, mas que foi reduzido ou teve pagamento dispensado com consequência de programa de incentivos fiscais.

[35] Fundos de Previdência Complementar



Confidential

CAIXA
CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6 3 2011 **87**

### 5.8.1. ACORDO DE BITRIBUTAÇÃO BRASIL-ÁUSTRIA

A Sete International está localizada na Áustria, a fim de se beneficiar do acordo de bitributação firmado entre Brasil e Áustria[38].

Nos termos do acordo, os lucros auferidos pela Sete International somente serão tributados em uma das suas jurisdições, no caso a Áustria. Ou seja, de acordo com artigo 74º da Medida Provisória 2158/35, os lucros apurados pela Sete Brasil não deverão ser tributados no Brasil, já que são decorrentes da distribuição de dividendos pela Sete International, já devidamente tributados na Áustria.

O tratado Brasil-Áustria isenta os acionistas brasileiros de tributação, no Brasil, dos dividendos recebidos de origem austríaca, se a participação do acionista brasileiro for de, pelo menos, 25% do capital registrado da empresa austríaca.

Por outro lado, os dividendos pagos por uma companhia austríaca aos seus acionistas brasileiros estão sujeitos a tributação, na Áustria, à alíquota de 15% a título de IRRF[39].

A MP 2158/35 determina que para fins de determinação da base de cálculo do imposto de renda e da CSLL, os lucros auferidos por controlada ou coligada no exterior serão considerados disponibilizados para controladora ou coligada no Brasil na data do balanço no qual tiverem sido apurados, ficando então suscetível de ser tributado em até 34% do lucro apurado, a menos que a controlada ou coligada estejam localizadas em países que tenham acordos de bitributação com o governo brasileiro.

De acordo com o *Austrian Participation Exemption*, os dividendos recebidos por uma holding austríaca de uma subsidiária estrangeira não estão sujeitos ao pagamento de tributos na Áustria, caso seja atendido quatro requisitos:

- a empresa austríaca deve ter no mínimo 10% de participação na subsidiária estrangeira;

- a subsidiária austríaca deve ser comparável a uma entidade societária. As SPEs serão constituídas como BV (*Besloten Vennootschap met beperkte aansprakelijkheid*) holandesas, reconhecidas pela autoridade austríaca como entidades societárias.

- a participação da empresa estrangeira deve ser detida a pelo menos um ano;

- regras "anti-abuso"[40] específicas não são aplicáveis.

Além dos benefícios tributários, podemos elencar alguns pontos relevantes no cenário legal austríaco que tornam estrutura do Projeto mais atrativa.

- Membro da União Européia: as diretivas européias proporcionam aos membros da União Européia certa flexibilidade em transações com outros países membros, como por exemplo, em incorporações internacionais;

[38] Decreto nº 78.107/76 de 22 de julho de 1976.
[39] Art. 10 do Decreto 78.607.
[40] De acordo com a regra "anti-abuso", o Austrian participation exemption não se aplica caso as subsidiárias estrangeiras sejam: passivas (com receita gerada fora da Áustria, que a subsidiária estrangeira tenha acordao e favorecidos e o afrouxamento seja operacional), e estejam localizadas em uma jurisdição onde o imposto de renda é substancialmente menor do que seria na Áustria.

Confidential

EIG00091750
EIG_KEP_00164968

CAIXA CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 1 2003 88

- Flexibilidade referente às questões de direito societário e aos instrumentos de dívida;

- Fácil constituição de entidades austríacas. As formas jurídicas mais comuns são: empresas públicas e privadas (AG, GmbH), além de sociedades com responsabilidade ilimitada ou limitada (OG, KG);

- O capital social mínimo para uma GmbH é de 35,000 Euros;

- Empresas estrangeiras também podem operar através de filiais; e

- Fácil acesso a permissões de trabalho (work permits), tanto para o nível gerencial, quanto para outros grupos.

Observações gerais do cenário tributário:

- Imposto de Renda de Pessoa Jurídica (IRPJ) à alíquota de 25% (vinte e cinco por cento) sobre o lucro apurado ao final do período;

- Regime de isenção de participação para dividendos e ganhos de capital, denominado International Participation Exemption;

- A Diretiva Européia proporciona a não incidência do IRRF sobre dividendos, royalties, e juros, assim como a não tributação para incorporações internacionais.

- Extensa rede, com mais de 80 Tratados Internacionais, incluindo diversos Tratados para evitar a Dupla Tributação (DTT's), que permitem a incidência do IRRF à alíquota de 0% sobre dividendos, assim como dispõem sobre o tax Sparing Credit [1] (crédito fictício) e o matching credit (crédito presumido);

- Flexibilidade numa redução de capital;

- Não incidência de IRRF sobre juros; juros pagos na aquisição de uma participação societária financiada com dívida (debt financed shares) são dedutíveis; e

- Possibilidade de emissão de acordos fiscais pelo fisco austríaco (Tax Rulings).

**5.8.2.  HOLANDA**

Após dois anos de edição da Lei nº 11.727/2008 [2], a Receita Federal do Brasil ("RFB") emitiu, em 07 de junho de 2010, a Instrução Normativa nº 1.037, em que: (a) listou as jurisdições consideradas como "paraísos fiscais" e os "regimes fiscais privilegiados"; e (b) expressamente revogou a lista contida na Instrução Normativa nº 188/2002. A Holanda está elencada como regime fiscal privilegiado, não oferecendo risco às SPCs de estarem localizadas nos considerados "paraísos fiscais".

Nos termos do Tratado Brasil-Holanda, quando um residente na Holanda receber rendimentos provenientes do Brasil, como no caso das SPEs (recota do afretamento), a Holanda permitirá

[1] O Estado de residência concede a dedução da quantia do imposto que o Estado da fonte poderia ter cobrado de acordo com a sua legislação geral, ou a dedução da quantia determinada no tratado da dupla tributação.

[2] Que emoldura o conceito de "paraísos fiscais" e introduziu a definição de "regime fiscal privilegiado".

Confidential

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6-1-2011 89

uma dedução do imposto holandês calculado sobre os rendimentos, correspondente ao valor do imposto pago no Brasil.

A dedução será calculada à alíquota de 20% sobre a receita proveniente do Brasil e será considerada como crédito presumido.

O crédito presumido será compensado quando da incidência de imposto sobre o lucro auferido pela SPE na Holanda. Atualmente, a alíquota incidente sobre o lucro das empresas holandesas é de 25,5%, e, quando compensada com o crédito presumido, tende a minimizar a carga tributária sobre o lucro destas companhias.

Os requisitos para a aplicação do crédito presumido, conforme as disposições do Tratado Brasil-Holanda são os seguintes:

- os pagamentos devem ser efetuados por um residente no Brasil a um residente na Holanda;

- a receita do oferecimento deve ser qualificada como royalties. O tratado define royalties como sendo os pagamentos de qualquer natureza efetuados pelo uso ou pelo direito ao uso de equipamento industrial, comercial ou científico;

- a pessoa que receber royalties deve ser o beneficiário efetivo do rendimento;

- os pagamentos não podem ser efetuados a um beneficiário que realize negócios no Brasil por meio de um estabelecimento permanente; e

- os pagamentos devem estar sujeitos à tributação no Brasil.

Adicionalmente, a Holanda é um tradicional fornecedor para indústria de petróleo e gás e, considerando as perspectivas de crescimento do mercado brasileiro, está se mobilizando ainda mais para substituir processos de exportação para o Brasil, por produção de equipamentos e prestação de serviços em solo nacional.

Segundo a *Economist Intelligence Unit 2009*, a Holanda é o oitavo país que mais desenvolve inovação tecnológica no planeta. Desta forma, as SPEs estarão localizadas em um mercado formado pelas empresas que são reconhecidas em todo o mundo por utilizar tecnologia de ponta em suas atividades.

### 5.8.3.  REPETRO

O Regime Aduaneiro Especial para Indústria do Petróleo ("REPETRO") é o regime de exportação e importação de bens destinados às atividades de pesquisa e de desenvolvimento das jazidas de petróleo e de gás natural, onshore e offshore. Pode ser concedido até 31 de dezembro de 2020, com suspensão total do pagamento dos tributos federais incidentes.

O REPETRO foi criado pelo Governo Federal para incrementar as atividades de exploração e de produção de petróleo e de gás natural no país. A Medida Provisória nº 1916, de

29/07/1999, transformada em Lei nº 9.825, de 23/08/1999, regulamentada pelo Decreto nº 3.161, de 02/09/1999, instituiu um tratamento especial aplicável aos bens de origem estrangeira utilizados pela indústria do petróleo e gás, mas também aplicado aos equipamentos nacionais fictamente exportados[43]. Através do REPETRO os direitos aduaneiros (II, IPI e ICMS) ficam suspensos enquanto vigorar o contrato de concessão, condicionado o retorno do bem ao país de origem ao final do contrato.

A fim de beneficiar-se do REPETRO, é obrigatório que a candidata seja (i) um concessionário autorizado pela ANP para pesquisar e explorar petróleo e gás natural no Brasil, ou (ii) um prestador de serviço contratado por uma concessionária para prestar serviços relativos a essa indústria no país. Na hipótese do prestador de serviço não ser sediado no Brasil, poderá ser habilitado ao REPETRO a empresa com sede no país por ele designada para promover a importação dos bens.

A exportação ficta, o drawback[44] e a admissão temporária[45] são os tratamentos aduaneiros admitidos, conforme o caso, no REPETRO, cada qual com especificidades a serem observadas.

Aplicam-se ao REPETRO os seguintes bens:

a) Embarcações destinadas às atividades de pesquisa e produção de jazidas de petróleo ou gás natural e as destinadas ao apoio e estocagem nas referidas atividades;

b) Máquinas, aparelhos, instrumentos, ferramentas e equipamentos destinados às atividades de pesquisa e produção de jazidas de petróleo ou gás natural;

c) Plataformas de perfuração destinadas às atividades de produção de petróleo ou gás natural, bem como as destinadas ao apoio nas referidas atividades;

d) Veículos automotores montados com máquinas, aparelhos, instrumentos, ferramentas e equipamentos destinados as atividades de pesquisa e produção das jazidas de petróleo ou gás natural; e

e) Estruturas especialmente concebidas para suportar plataformas.

O regime poderá ser aplicado, ainda, a máquinas, aparelhos, instrumentos, ferramentas, equipamentos e outras partes ou peças, incluindo os sobressalentes, destinados a (i) garantir a operacionalidade dos bens admitidos no REPETRO; (ii) salvamento, prevenção de acidentes e combate a incêndios; e (iii) proteção do meio-ambiente.

Os bens importados pelo REPETRO têm um tempo limitado para permanecer dentro do território brasileiro. Esse período corresponde ao prazo de concessão (no caso em que o requerente do regime em comento é o concessionário) ou a vigência do contrato (na hipótese de o requerente ser um contratante do concessionário). Assim que o tempo de permissão de permanência no país tenha decorrido, os bens devem: (i) ser reexportados; (ii) entregues à Fazenda Nacional, livres de qualquer despesas, desde que a autoridade aduaneira concorde em recebê-los; (iii) destruídos; (iv) transferidos para outro regime aduaneiro especial; ou (v) despachados para consumo.

[43] Embora o bem não seja fisicamente do território nacional, o produto negociado é pago em moeda estrangeira à empresa com sede no exterior, sendo desta forma, considerado exportado para os fins fiscais.
[44] Modalidade de suspensão do pagamento dos tributos, matérias-primas, produtos semi-elaborados ou acabados e outras ou peças, para a produção de bens a serem exportados.
[45] Quando se trata de bens estrangeiros ou desnacionalizados que procedam diretamente do exterior e permaneçam no país por prazo determinado.

Confidential

Cabe ressaltar que o REPETRO suspende todos os tributos federais incidentes na importação, quais sejam: (i) Imposto de Importação; (ii) Imposto sobre Produto Industrializado; (iii) PIS-importação, (iv) COFINS-importação e (v) Adicional ao Frete para Renovação da Marinha Mercante – AFRMM. No entanto, caso algum dos dispositivos legais referentes ao REPETRO não sejam observados, o pagamento dos impostos suspensos deverá ser efetuado. Além disso, haverá aplicação de sanções administrativas, variando de advertência à suspensão e cancelamento da habilitação.

Além dos tributos federais mencionados acima, incide sobre a importação de bens o ICMS, que é de competência estadual. Determina a legislação brasileira em vigor que os benefícios fiscais concedidos em âmbito estadual devem ocorrer através de convênios.

Com relação ao REPETRO o Convênio nº 130/07 autorizou os Estados-membros a concederem a isenção ou redução de ICMS sobre equipamentos e peças sobressalentes para serem utilizados em atividades de exploração de petróleo e gás natural, desde que estes tenham sido importados pelo REPETRO

Além disso, o referido convênio permite a redução do ICMS sobre os equipamentos relacionados à fase de produção à uma alíquota de 3%, no caso de cumulatividade do imposto e 7.5% no caso de não-cumulatividade, a critério do contribuinte.

Todos os estados brasileiros ratificaram, ainda que tacitamente, o referido Convênio nº 130/07. No entanto, para que o benefício passe a ser utilizado é necessário que o Estado em que se encontra a pessoa jurídica importadora regulamente o Convênio nº 130/07. Os Estados do Rio de Janeiro, São Paulo e Espírito Santo já o fizeram.

No tocante ao Projeto, mesmo levando em consideração a utilização de determinados créditos fiscais pelas SPEs e pela Petrobras, o impacto de todos esses impostos seria substancial em qualquer estrutura financeira que não considere os benefícios REPETRO. Desta forma, é essencial que a estrutura financeira permita às SPEs e à Petrobras beneficiarem-se plenamente do REPETRO, que, isentaria essas transações comerciais de todos os impostos federais e, a depender da situação e de consulta específica, também do ICMS.

Sob o regime do REPETRO:

• Os bens podem ser importados como matérias-primas, sem retenção ou pagamento de impostos desde que sejam utilizados na produção dos ativos elegíveis para posterior exportação;

• A venda de certos ativos elegíveis por um produtor brasileiro a uma entidade estrangeira pode ser considerada como operação de exportação, mesmo que esses ativos não deixem fisicamente o Brasil; e

• A importação de determinados ativos elegíveis pode ser considerada como uma admissão temporária de tais ativos no Brasil e, portanto, podem ser desonerados dos tributos federais incidentes na importação.

A estrutura do Projeto permite que as SPEs e a Petrobras se beneficiem plenamente do REPETRO. Em particular, destacamos as seguintes questões:



EIG00091754
EIG_KEP_00164972

- As SPEs, entidades estrangeiras, serão proprietárias das plataformas;

- Todos os recursos exigidos pelas SPEs para realizar e concluir a construção das plataformas serão fornecidos à SPE offshore;

- Todos os pagamentos aos EPCistas / Estaleiros vão ser feitos pelas SPEs em uma moeda livremente conversível;

- Todo o conteúdo estrangeiro sera importado pelos EPCistas / Estaleiros ao abrigo de um regime drawback[48];

- Conteúdo local incorporado no conteúdo estrangeiro, estando sujeito à exportação formal;

- As sondas serão importadas pela Petrobras, em última instância, ao abrigo do afretamento sob regime temporário (regime de admissão temporária).

---

[48] Regime aduaneiro especial que consiste na suspensão ou eliminação de tributos incidentes sobre insumos importados para utilização em produtos exportados.



### 6.    O INVESTIMENTO

A alocação proposta neste Memorando de Investimentos consiste na aquisição de cotas de um Fundo de Investimento em Participações, cujo objetivo será deter participação acionária majoritária na Sete Brasil. O Fundo, assim sendo, não tem o propósito de fazer investimento em outras empresas ou ativos, independentemente do setor.

As cotas do Fundo que vierem a ser distribuídas deverão ser totalmente subscritas por ocasião do encerramento da oferta privada de que trata este Memorando. Não obstante, a integralização destas cotas se dará ao longo do tempo e está diretamente associada à necessidade de capital próprio da Companhia Investida. A atual minuta do regulamento prevê que tal integralização poderá ocorrer em até 10 anos– mesmo tempo do período de investimento do Fundo. Entendemos, porém, que a efetiva integralização das cotas do Fundo deva ocorrer em um prazo estimado de 18 meses, ou ser antecipada em função da abertura de capital da Companhia Investida.

O Fundo foi constituído pelo Administrador em 12 de agosto de 2010, e seus atos constitutivos e regulamento foram arquivados no Cartório 2º Oficial de Registros e Documentos e Civil de Pessoa Jurídica da Capital do Estado de São Paulo, em 12 de agosto de 2010, sob o nº 0000921314. No dia 27 de novembro, solicitamos o registro automático do Fundo junto à Comissão de Valores Mobiliários, nos termos da instrução normativa nº 591, prevendo distribuição no regime de esforços restritos de colocação, conforme dispõe a instrução normativa nº 476.

O patrimônio previsto do Fundo é de R$ 2 bilhões, com um mínimo inicial de R$ 1,5 bilhão. Este valor foi dimensionado considerando-se algumas premissas tais como o número de Sondas que serão construídas e a estrutura de capital da Companhia Investida. O prazo de duração do Fundo é de 10 anos, sendo que os 10 primeiros anos corresponderão ao período de investimentos.

### 6.1.    A TRANSAÇÃO

Por meio do Fundo, serão adquiridas ações ordinárias representativas até 90% do capital social da Companhia Investida. Esta transação se dará via aumento primário de capital, não havendo, portanto, uma transação secundária envolvida nesta operação. Tampouco haverá pagamento de ágio no referido aumento de capital, salvo se necessário para a composição de reserva de capital da Sete.



EIG00091756
EIG_KEP_00164974

CAIXA · FIP SONDAS · INFORMAÇÃO CONFIDENCIAL – 6.1 2011 · 91

A participação do Fundo na Sete poderá ser inferior aos 90%, mas não superior a 95%. A Petrobras, como sócia detentora da participação restante, deverá ter inicialmente 10% da Sete Brasil, mas não poderá ter participação inferior a 5%, a menos que a EFO seja realizada ou que qualquer dos cotistas do FIP Sondas transfira suas quotas do FIP em desacordo com as condições previamente estabelecidas.

Previamente à referida transação, o Gestor deverá ter analisado e aprovado – com a anuência, também, dos investidores – os principais documentos constitutivos da Companhia, tais como o Acordo de Acionistas e o Estatuto Social.

**6.2. DESTINAÇÃO DOS RECURSOS**

Os recursos integralizados na Sete Brasil pelo Fundo serão destinados à consecução do seu plano de negócios, o qual, em termos sintéticos, consiste na contratação da construção, e posterior afretamento, de um conjunto de sete navios sonda. Os recursos suportarão ainda as suas diversas despesas operacionais, as contratações de terceiros necessários ao alcance de seus objetivos e contribuirão para o processo de alavancagem da Companhia e suas subsidiárias.

**6.3. CONTROLE E PROCESSO DECISÓRIO**

Por deter participação majoritária na Companhia, o FIP deterá, também, o seu controle acionário. Não obstante, o Acordo de Acionistas da Sete Brasil encaminhado pelos Assessores da Petrobras prevê quórum qualificado (de 80% das cotas da Sete) para algumas matérias e a existência de uma Reunião Prévia, reunião esta que deverá acontecer previamente às AGQ do Fundo e que terá o efeito de vincular os votos dos cotistas nas suas assembleias às deliberações ocorridas na Reunião Prévia.

A Reunião Prévia entre os cotistas do Fundo e a Petrobras faz com que, em termos práticos, exista um foro decisório, entre os próprios cotistas, com quórum também qualificado.

Exemplificado: se o Fundo contar com apenas 4 cotistas, cada qual possuidor de 25% de suas cotas, e se o Fundo possuir 90% das ações da Sete, então cada cotista deterá, indiretamente, 22,5% das ações da Sete. Se o quórum de aprovação nesta reunião depende do voto favorável de acionistas que, direta ou indiretamente, possuam ao menos 80% das ações da Sete, então qualquer deliberação necessitará do voto favorável dos 4 acionistas. Dito de outra forma, neste exemplo hipotético qualquer um dos cotistas poderá vetar decisões que necessitem de quórum qualificado.



Confidential

EIG00091757
EIG_KEP_00164975

**CAIXA**   CAIXA FIP SONDAS · INFORMAÇÃO CONFIDENCIAL · 6 1 2001 95

Assim sendo, o processo decisório da Companhia Investida estará diretamente ligado às decisões tomadas pelos cotistas em reunião prévia, que envolverá também a Petrobras, como acionista da Sete Brasil, vinculando-a às decisões da Reunião Prévia. O Gestor, no formato proposto pelo referido *termsheet*, atuará como um agente que fará valer, em AGO do Fundo, as decisões tomadas nesta reunião.

**6.4.    RACIONAL DA TRANSAÇÃO: OBSERVAÇÕES DO GESTOR**

Este Fundo nasce, e é concebido, como um projeto da Petrobras e dos Assessores da Petrobras, que identificaram neste formato uma alternativa financeira viável para a construção e afretamento de para a Petrobras navios sonda necessários à exploração do Pré-Sal. Assim sendo, a Petrobras vem capitaneando as principais iniciativas, tais como a constituição do FGCN, a realização do processo competitivo para a construção dos navios sonda, a sondagem e aproximação dos agente financiadores e as respectivas condições de financiamento, a disposição para negociar contratos de afretamento com prazos superiores às médias de mercado, a operação de dois dos sete navios sonda pertences à Sete, etc. Em suma, resta-nos claro que o êxito na constituição do Fundo é, antes de tudo, fruto de um conjunto de esforços concentrados da Petrobras e dos Assessores da Petrobras.

Embora o negócio do Fundo seja a propriedade de participação acionária, significando, portanto, um ativo de renda variável, há alguns elementos que tornam a operação, em alguns aspectos, similar a um investimento em renda fixa. O valor do investimento necessário à construção dos sete navios sonda e seu consequente afretamento à Petrobras é, ainda que sujeito a algumas incertezas, conhecido. A taxa a ser recebida pelo afretamento dos navios é pré-fixada e – não obstante estar em alguma medida vinculada à performance do operador – independe do sucesso das perfurações. Neste sentido, e vencidos os riscos de construção, performance, atraso, custo da dívida (para os quais há alguns mitigadores), o risco de crédito do *offtaker* (Petrobras) pode ser considerado um componente marginal de avaliação de risco, não obstante a capacidade de crédito da Companhia não poder ser adequadamente prevista no longo prazo. Destacamos, entretanto, que a Petrobras, atualmente, apresenta alavancagem reduzida, evidenciada pela relação endividamento líquido / capitalização líquida de somente 18% (3º Trimestre de 2010), e por seu rating de crédito: a Petrobras conta com rating nacional Aaa (Moody's) e AAA (Fitch), e rating global em moeda estrangeira Baa1 (Moody's), BBB- (S&P), e BBB (Fitch), todos acima do nível *investment grade*.

Assim, é importante destacar que, embora a Companhia Investida seja, a rigor, uma *Start Up Company*, dois "preços fundamentais" já estarão ou estabelecidos ou, ao menos, razoavelmente bem identificados. São eles:

◆    O valor de construção dos sete navios sonda: a Petrobras está próxima da conclusão do processo licitatório para a contratação dos barcos, de modo que estes valores, que são o

EIG00091758
EIG_KEP_00164976

CAIXA

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6.1.2011 96

principal item de investimento da Sete, já são conhecidos. O estaleiro responsável pela construção ferrará, com as SPEs controladas indiretamente pela Sete, um contrato de "EPC" na modalidade *turn key lump sum*. Há, portanto, um valor conhecido para este investimento e alguns mitigadores para o risco de sobre preço e atraso.

- Estrutura de Capital e custo da dívida: O BNDES poderá ser o credor de uma parcela equivalente a 45% (quarenta e cinco por cento) do investimento, representando mais de metade de toda a dívida. As condições gerais do financiamento já foram sinalizadas pelo banco e contam da modelagem financeira. O custo da parcela restante da dívida foi estimado com base nos custos praticados atualmente pelo mercado em operações similares. Deste modo, e a despeito das incertezas, o perfil do endividamento está identificado. Além disso, a Petrobras também se compromete a revisar o valor das taxas de afretamento originalmente contratadas para refletir integralmente os custos efetivamente contratados para as dívidas.

Nesta simplificação da abordagem, o elemento de preço ausente é o valor da taxa diária de afretamento e a taxa de mobilização. O retorno prospectivo do Fundo – desconsiderando cenários alternativos de saída – tende a ser tanto maior quanto mais altas forem estas taxas. A taxa sinalizada atualmente pela Petrobras, de aproximadamente US$ 440 mil/ dia, está em linha com as taxas praticadas no mercado internacional, segundo a ODS-Petrodata.

Deste modo, o retorno esperado do Fundo está amparado em variáveis conhecidas, cujos comportamentos têm razoável grau de previsibilidade, fazendo assim que os exercícios de sensibilidade dos cenários alternativos tornem-se menos subjetivos.

**6.5.   PROCESSO DE ALAVANCAGEM**

O capital de terceiros previsto na estrutura da Sete corresponde a cerca de 60% de todo o investimento a ser realizado, que é de aproximadamente US$ 5,5 bilhões. As dívidas sênior serão ao nível das SPEs, na modalidade Project Finance e no esquema de Financiamento de Portfólio (*Portfolio Financing*).

Portanto, haverá apenas um processo de obtenção de dívida envolvendo um conjunto de credores que irão compartilhar garantias. Ainda que exista um mercado atuante e consolidado para operações desta natureza, e que o FGCN atue como um facilitador fundamental, o processo de alavancagem será, em nosso entendimento, um dos aspectos mais sensíveis, pois é o que mais tende a exigir performance do time de profissionais da Companhia Investida. Dito de outro modo, o Fundo deverá dedicar especial atenção à evolução deste fator de risco, tendo em vista que sua velocidade e suas



EIG00091759
EIG_KEP_00164977


condições podem afetar significativamente o sucesso da Sete Brasil. De forma a mitigar o risco de financiamento, a Petrobras e os Assessores da Petrobras já iniciaram negociações sobre os termos e condições de financiamento para o Projeto Sondas. O BNDES, maior financiador do Projeto Sondas, inclusive, já manifestou formalmente seu compromisso de participar no financiamento do Projeto através de carta emitida com autorização expressa de sua diretoria, se atendidas às condicionantes elencadas na referida carta.

Como evidência do apetite do mercado para o financiamento de sondas, em Novembro de 2010, a Odebrecht Oil & Gas, realizou uma emissão de US$ 1,5 bilhões para o financiamento de duas sondas de águas ultraprofundas no mercado internacional (equipamentos similares ao do Projeto Sondas). A emissão recebeu *investment grade* (em moeda internacional) e foi mais de 3,5x *oversubscribed*.

A modelagem financeira da operação, é importante destacar, traz premissas, em nossa opinião, exequíveis no que se refere a este processo, já que considera a existência de um lapso de tempo relativamente folgado (18 meses) entre o gasto do capital próprio e a entrada do capital de terceiros. Ressaltamos que o processo de obtenção de financiamento com BNDES já foi iniciado e, segundo informamos do Assessores da Petrobras, as negociações com os ECAs estão, da mesma forma, em andamento.

### 6.6.    SELEÇÃO E PAPEL DO OPERADOR

Como a Sete Brasil não fará a operação dos navios sonda que irá fretar à Petrobras, serão contratadas empresas habilitadas para a prestação deste serviço. Estas empresas, conforme já colocado neste Memorando, deverão ser também acionistas das SPEs, com participação de 15% no capital social. A exigência de que o Operador seja também acionista, ou seja, dono do navio que opera, contribui no sentido de alinhar adequadamente os interesses. Dos sete navios, dois deverão ser operados pela própria Petrobras, e cinco navios operados por outras empresas. Os Operadores somente serão contratados ao final da construção dos navios, quando também deverão adquirir a participação acionária.

Tendo em vista a importância deste Operador – já que sua performance pode afetar o resultado da Sete Brasil –, foi criada uma lista prévia (*Short List*), já apresentada neste Memorando, com um número limitado de tradicionais empresas operadoras no mercado, cuja expertise técnica já tenha sido testada e reconhecida pela Petrobras.

Embora possa ser considerada positiva a existência desta lista e a exigência de aporte pelo Operador/Sócio, a relação direta de dependência que os resultados da Sete Brasil têm da boa performance deste Operador deve ensejar, em nosso entendimento, a *adoção de mecanismos que*



Confidential



CAIXA FIP SONDAS · INFORMAÇÃO CONFIDENCIAL · 4-1-2001 ·98

permitam uma distribuição mais equitativa dos riscos. Estes mecanismos, conforme já mencionado anteriormente, tratam-se, na verdade, da compensação de *underperformance* que será devida pelo Operador e que poderá, exceto nas SPEs em que o acionista Classe B for a Petrobras, implicar na diluição da participação do acionista Classe B. Ressaltamos, no entante, que os critérios e limites aplicáveis à compensação de *underperformance* somente serão definidos quando da entrada do operador e, em nosso entendimento, deverão ser objeto de deliberação do Conselho de Administração da Sete Brasil.

**6.7.  POSSIBILIDADES DE SAÍDA E DESINVESTIMENTO**

Os cenários de saída mais prováveis consistem na abertura de capital da Sete Brasil, na alienação dos navios sonda, na venda para algum dos grandes *players* do setor ou na renovação dos contratos de afretamento, após seu primeiro termo, quando os recursos gerados pela monetização do novo contrato poderão ser utilizados para repagamento do capital investido. Em nosso entendimento, contudo, a abertura de capital é a alternativa que nos parece mais oportuna e viável, tendo em vista os argumentos apresentados abaixo.

- Em virtude do direito de preferência válido por 12 (doze) meses conferido à Sete Brasil na construção e afretamento de outros sistemas – mais 21 sondas – e na possibilidade deste direito ser exercido, pode existir a necessidade de sucessivos aumentos de capital na Companhia Investida, para fazer frente ao novo montante de *capex*. Neste cenário, uma abertura de capital poderia combinar uma parcela de aumento de capital e uma venda secundária de ações. Tendemos a acreditar que IPOs neste formato (ou seja, onde não há apenas a venda secundária de ações) tendem a ser mais bem recebidos pelo público alvo da colocação.

- Quando a Sete Brasil tiver avançado em algumas etapas de seu Plano de Diretrizes Estratégicas, sobretudo no que tange à contratação das dívidas sênior para as SPEs e ao início efetivo da construção das embarcações, o que deve acontecer entre 12 e 24 meses a partir de seu início, o cenário prospectivo para os resultados da Sete estará, então, mais previsível, o que tende a favorecer a percepção do valor da empresa.

- Porte da Companhia Investida e da Oferta: A Sete, quando plenamente operacional, e considerando apenas os primeiros sete navios sonda, terá um nível de geração de caixa significativo, contribuindo assim para o tamanho da oferta. Entendemos que, nesta indústria, ofertas maiores tendem a ser mais atrativas.



EIG00091761
EIG_KEP_00164979



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 6 | 2001 :99

Como evidência do interesse de investidores pelo setor, vale ressaltar o recente investimento de US$400 milhões realizado pela cingapuriana Temasek Holdings no capital da Odebrecht Óleo e Gás (OOG), após o qual passou a deter 14% do capital acionário da companhia. A transação avaliou a OOG em aproximadamente US$2,8 bilhões. Os principais ativos da companhia são três sondas de perfuração semi-submersíveis de última geração, cuja operação deverá ter início em 2011, dois navios-sonda que estão em fase de construção, e 50% de uma FPSO.

Confidential

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4-1-2011  100

**7.   CENÁRIOS DE RETORNO**

O modelo financeiro fornecido pelo Santander, Assessor da Petrobrás, foi utilizado como
sendo o cenário base a partir do qual exercitamos alguns cenários de sensibilidade para algumas das
principais premissas do Projeto, a fim de verificar o impacto no retorno do Fundo.

O modelo financeiro associado a este cenário base (cenário 1) inicial tem os seguintes
pressupostos:

* Serão construídos sete navios sonda, sendo que o valor total dos Usos é de US$
  5,5 bilhões;
* A relação capital próprio versus capital de terceiros é 20/80;
* O valor do contrato de EPC de cada navio sonda é de US$ 664,2[x] milhões;
* Os 7 contratos de afretamento são renovados;
* A taxa de afretamento é de US$ 448 mil/ dia;
* Taxa Interna de Retorno de 12,67% a.a. (BRL), em termos reais; e
* Taxa Interna de Retorno de 17,5% a.a. (BRL), em termos nominais.

Em complemento a este cenário, foi criado o cenário 2, onde, diferentemente do cenário
1, não há renovação do contrato de afretamento de 5 cinco navios sonda ao final de 10 anos, mas sim a
venda destas embarcações.

Para estes dois cenários, foram exercitadas algumas premissas com o propósito de
verificar qual seriam os impactos na TIR esperada do Fundo. Estas premissas são:

* Uptime
* Bônus de peformance: não foi considerado
* Custo da Dívida Sênior
* Valor de venda de 5 navios sonda no 10° ano

---

[x] Nota: este valor está atualmente sendo negociado pela Petrobras.

EIG00091763
EIG_KEP_00164981

A TIR calculada em ambos os cenários, com a sensibilidade das variáveis citadas, é proveniente apenas do fluxo de dividendos da Companhia Investida, não se considerando, portanto, eventos de liquidez na Sete Brasil.

**Uptime – Disponibilidade das Sondas**

A variação das premissas de *uptime* gerou, conforme se pode verificar na tabela abaixo, oscilações na TIR esperada do Fundo nos cenários 1 e 2. Nestas projeções não foram considerados potenciais bônus de performance.



|  | | TIR Real BRL Cenário 1 (Renovação) | TIR Real BRL Cenário 2 (Venda de Sondas) |
|---|---|---|---|
|  | 98% | 13,20% | 9,90% |
| Cenário Base Santander | 97% | 12,90% | 9,60% |
|  | 96% | 12,50% | 9,10% |
|  | 92% | 11,80% | 8,30% |
|  | 90% | 11,30% | 7,80% |

Ainda que o *uptime* esperado no cenário base esteja em consonância com o efetivamente observado na indústria para operadores de primeira linha, entendemos que as dificuldades técnicas associadas à operação destas embarcações – mais distantes da costa e destinadas à perfurações mais profundas – poderão ocasionar períodos intermitentes com menor disponibilidade dos navios sonda.

Contudo, como pode ser observado acima, a diminuição do *uptime* sensibilizada de forma linear para fins de simplificação, tende a causar quedas não proporcionais no retorno esperado. Assim sendo, um cenário mais pessimista de *uptime*, entre 92% e 95%, deve gerar uma queda de aproximadamente 100 bps na TIR esperada.

**Custo da Dívida Sênior**

O cenário base fornecido prevê uma relação entre capital de terceiros e capital próprio de 80/20. A dívida, neste cenário, está dividida entre o BNDES, ECAs e Bancos Comerciais e está toda denominada em dólares americanos. Como as condições deste conjunto de financiamentos não podem ser inteiramente conhecidas *a priori* e podem, neste modelo, oscilar em função de condições de mercado ou em função das próprias características do ativo financiado, foram simulados cenários alternativos de custo da dívida.

Confidential



Para efeitos de simplificação, não foram simuladas oscilações em outras condições do financiamento tais como prazo, carência, sistema de amortização, efeitos cambiais, etc. Não obstante, uma piora geral das condições de financiamento leva, em última instância, a um custo mais elevado de dívida, razão pela qual cremos que a simulação com oscilações lineares de todo o montante da dívida, embora aparentemente simplista, reflete adequadamente um piora destas condições.

| Spread Over Libor (BNDES /JCN /Bond Mark) | | | TER Real BRL Cenário 1 (Renovação) | TER Real BRL Cenário 2 (Venda das Sondas) |
|---|---|---|---|---|
| | 2,50% | | 13,30% | 10,20% |
| Cenário Base Santander | 2,75% / 3,00% / 3,00% | | 12,90% | 9,60% |
| | 3,00% | | 12,80% | 9,40% |
| | 3,50% | | 12,20% | 8,60% |
| | 4,00% | | 11,60% | 7,80% |

Na tabela acima, constata-se que um acréscimo de 50 bps no custo da dívida leva a uma queda maior do que proporcional na TER, sendo que tal relação é tanto maior quanto mais caro fica este encargo financeiro. Portanto, ainda que os níveis de custo aqui apontados tenham partido de verificações objetivas (como a indicação que o BNDES já deu para as condições de sua parcela), a variável custo de financiamento tem peso relevante no retorno esperado e, por esta razão, deve ser entendida como uma das variáveis explicativas mais relevantes.

O risco de o custo de dívida ser superior ao previsto está, em alguma medida, mitigado pelo mecanismo sugerido pela Petrobrás, já que por meio deste mecanismo o valor da taxa diária de afretamento poderá ser ajustado e assim refletir – na proporção que preserve o retorno inicialmente esperado pelo investidor – um custo financeiro mais elevado.

**Valor de Venda – Navios Sonda**

No cenário 2, onde se pressupõe a venda de 5 das 7 sondas ao final de 10 anos, o preço de alienação do ativo tem impacto direto no retorno esperado, já que antecipa o final do período de recebimento de dividendos de parte das SPEs controladas pela Companhia Investco.

O preço de venda estimado pelo Santander, de US$ 310 milhões, parte de uma avaliação que considerada os valores de mercado para navios com tempo de construção equivalente. Reflete, portanto, a dinâmica de preços deste tipo de embarcação, onde o fator tempo, embora relevante, não implica em corrosão absoluta de valor. Este cenário base pressupõe que os navios valerão, ao final de 10 anos, o equivalente a, aproximadamente, metade de seu valor original.



Confidential

EIG00091765
EIG_KEP_00164983



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4-1-2011   **163**

| | | TIR Real BRL Cenário 2 (para Venda das Sondas não PETRO) |
|---|---|---|
| | US$ 400 mm | **10,40%** |
| | US$ 350 mm | **10,00%** |
| Cenário Base Santander | **US$ 310 mm** | **9,60%** |
| | US$ 250 mm | **9,00%** |
| | US$ 200 mm | **8,40%** |

**Eventos de Liquidez**

Em complemento aos cenários de retorno acima, foram também estimadas TIR para o Fundo em hipóteses de oferta pública inicial de ações da Sete Brasil, pressupondo-se, neste caso, uma oferta integralmente secundária.   Para o cálculo do retorno esperado, foram selecionadas as seguintes premissas:

· O cenário prospectivo para a Sete Brasil, utilizado para estimar seu fluxo de caixa, é o cenário 1, ou seja, aquele onde há a venda de 5 sondas ao final de 10 anos. Neste, utilizamos as premissas (uptime, custo de dívida e valor de venda das sondas) do cenário base do Santander. Também fizemos simulações para o cenário 2, onde há a renovação dos contratos de afretamento.

· Todo o capital social subscrito da Companhia Investida é integralizado previamente ao IPO;

· Não há a contratação, pela Sete Brasil, de outros sistemas além do inicial, de 7 sondas;

· Não há, consequentemente, por ocasião do IPO, aumento primário de capital na Sete.

Para efeitos de cálculo, foi considerado que o IPO poderá ocorrer entre 2011 e 2017. Em nossa opinião a Sete Brasil alcançará condições mínimas para uma abertura de capital a partir de meados de 2021. Tal prazo nos parece exequível tendo em vista que, nesta data, tanto os processos de alavancagem quanto as construções dos barcos já deverão ter seus riscos mais bem estimados.

Para se estimar o valor da companhia quando do IPO, foi utilizado, por ser esta uma Companhia ainda sem receita operacional, o método do fluxo de caixa descontado (DCF).

Na figura abaixo, estimamos os retornos para o cenário 1, com a venda de 5 das 7 sondas no IPO ano. Uma das premissas utilizadas – de todo aporte do *equity* previamente à abertura de capital – tem efeito deveras significativo sobre o retorno. Contudo, as condições de mercado à época do IPO poderão permitir um formato diferente de IPO – com parte da oferta pública inicial sendo primária e parte sendo secundária, ou seja, diminuindo o montante efetivamente aportado pelo Fundo –, o que beneficiaria em muito o retorno obtido.



Confidential

EIG00091766
EIG_KEP_00164984



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4-1-2001  181

### ANO de SAÍDA para ABERTURA de CAPITAL

| TIR a.a (VENDA SONDAS) | jul-11 | jul-12 | jul-13 | jul-14 | jul-15 | jul-16 | jul-17 |
|---|---|---|---|---|---|---|---|
| 15,0% | | 32,0% | 4,0% | 11,9% | 11,3% | | 16,5% |
| 14,0% | -33,5% | -4,1% | 12,4% | 17,5% | 18,3% | | 7,7% |
| 13,5% | -31,7% | 5,9% | 18,0% | 20,6% | 20,1% | | 10,5% |
| 13,0% | 8,8% | 15,3% | 23,6% | 23,6% | 23,6% | | 14,3% |
| 12,5% | 32,6% | 6,3% | 29,1% | 28,0% | 27,7% | 26,0% | 15,5% |
| 12,0% | 42,8% | 33,9% | 34,6% | 30,2% | 26,0% | | 29,5% |
| 11,0% | 56,4% | 41,7% | 35,6% | 34,5% | 30,8% | | |

No cenário 2, disposto no quadro abaixo, os retornos saltam de patamar como resultado
do cálculo, que passa a considerar períodos mais longos – lembramos que neste cenário há a renovação
dos contratos de afretamento. Como não há exemplos de IPOs que guardem similaridade mais próxima
com o presente case, não há como assegurar que o processo de precificação da Companhia, quando da
abertura de capital, considerará a renovação dos contratos. Entretanto, como na indústria de sondas de
perfuração a ociosidade de embarcações costuma ser baixa, consideramos mais razoável que a
precificação leve em conta a renovação dos contratos de afretamento, sendo tal assunção em alguma
medida contrabalanceada por uma taxa de desconto maior.

### ANO de SAÍDA para ABERTURA de CAPITAL

| TIR a.a (RENOVAÇÃO) | jul-11 | jul-12 | jul-13 | jul-14 | jul-15 | jul-16 | jul-17 |
|---|---|---|---|---|---|---|---|
| 15,0% | -30,3% | 46,0% | 36,0% | 37,3% | 33,6% | 50,0% | 36,7% |
| 14,0% | -28,3% | 55,3% | 57,0% | 49,0% | 40,7% | 34,3% | 38,0% |
| 13,5% | 73,2% | 79,0% | 68,3% | 55,0% | 44,2% | 36,6% | 31,3% |
| 13,0% | 130,8% | 105,3% | 79,8% | 61,0% | 47,0% | 38,8% | 32,5% |
| 12,5% | 221,2% | 134,3% | 91,5% | 67,6% | 51,7% | 41,4% | 34,5% |
| 12,0% | 336,8% | 166,3% | 103,5% | 73,0% | 54,9% | 43,5% | 36,1% |
| 11,0% | 727,5% | 246,1% | 128,0% | 85,1% | 62,4% | 48,3% | 38,4% |



EIG00091767
EIG_KEP_00164985



## 8. RISCOS

Qualquer negócio envolve risco, mitigados ou não, significativos ou irrelevantes, sendo alguns deles inerentes ao próprio negócio.

Tentaremos aqui descrever os principais riscos que devem ser levados em consideração na tomada de decisão do investidor. Os riscos descritos a seguir são aqueles de conhecimento do Gestor na data deste Memorando de Investimento. Riscos adicionais, atualmente desconhecidos ou considerados irrelevantes, também podem afetar o Projeto e, conseqüentemente, o Fundo de forma adversa.

As aplicações do Fundo não contarão com garantia do Administrador, Gestor e demais prestadores de serviço do Fundo ou de qualquer mecanismo de seguro ou de Fundo Garantidor do Crédito – FGC, e podem ser adversa e materialmente afetadas por quaisquer dos fatores de risco indicados, podendo ocorrer, inclusive, perda total do patrimônio do Fundo e, conseqüentemente, do capital investido pelos cotistas.

### 8.1. FIP

#### Risco de Mercado

O valor dos ativos que integram ou que vierem a integrar a carteira do Fundo podem aumentar ou diminuir de acordo com as flutuações de preços e cotações de mercado, as taxas de juros e os resultados das companhias (Sete Brasil e controladas) cujos valores mobiliários por ela emitidos compõem a carteira, sendo que em caso de queda do valor dos ativos que compõem a carteira, o patrimônio líquido do Fundo pode ser afetado negativamente. A queda dos preços dos ativos integrantes da carteira podem ser temporárias, não existindo, no entanto, garantia de que não se estendam por períodos longos e/ou intermediários.

Os ativos financeiros integrantes da carteira podem estar sujeito à capacidade de seu emissor em honrar os compromissos de pagamento de juros e principal referentes a tais ativos. Alterações na condição financeira do emissor dos ativos financeiros e/ou na percepção que os investidores têm sobre tais condições, bem como alterações nas condições econômicas e políticas que possam comprometer a sua capacidade de pagamento, podem trazer impactos significativos nos preços e na liquidez dos ativos financeiros.

O não cumprimento, nas datas previstas, das obrigações referentes aos valores mobiliários por parte da Sete Brasil e de sua controlada poderá prejudicar a capacidade de pagamento e rentabilidade do Fundo e dos cotistas, podendo ainda o Fundo incorrer em custos adicionais, na tentativa de recuperação dos créditos inadimplentes.



Confidential



### Risco de Crédito

Consiste no risco dos emissores de valores mobiliários e ativos financeiros de renda fixa que integrem ou que venham a integrar a carteira e/ou outras partes envolvidas em operações realizadas pelo Fundo não cumprirem suas obrigações de pagar tanto o principal como os respectivos juros de suas dívidas para com o Fundo.

### Risco de Liquidez

O volume inicial de aplicações no Fundo e a inexistência de tradição no mercado de capitais brasileiro de negociações envolvendo quotas de fundos fechados fazem prever que as quotas de emissão do Fundo não apresentarão liquidez satisfatória.

Caso o Fundo precise se desfazer de parte ou da totalidade dos ativos integrantes da carteira, especialmente no caso de títulos e valores mobiliários de emissão de companhia fechadas, ou de companhias abertas sem ou com pouca negociação, poderá não haver demanda por esses ativos ou somente haver demanda a preços reduzidos, em prejuízo do patrimônio do Fundo e, conseqüentemente, do capital investido pelos cotistas.

Além disso, como os investimentos do Fundo deverão propiciar-lhe a sua efetiva participação no processo decisório da Sete Brasil, o Fundo estará sujeito às normas sobre votação à negociação de valores mobiliários impostas às pessoas que têm acesso a informações sobre a companhia investida. Assim, caso o Fundo tenha acesso às informações da companhia investida, não poderá negociar os valores mobiliários de emissão da respectiva companhia até tais informações serem divulgadas.

### Risco de Concentração

Consiste no risco do Fundo aplicar 100% do patrimônio líquido do Fundo em uma mesma companhia alvo, a Sete Brasil.

### Outros Riscos

O Fundo também está sujeito a outros riscos advindos de motivos alheios ou exógenos ao controle do Administrador/Gestor e dos demais prestadores de serviço do Fundo, tais como moratória, alterações na regulamentação e/ou na legislação, inclusive tributária, aplicáveis a fundo de investimento em participações, bem como mudanças impostas aos ativos financeiros integrantes da carteira. Tais riscos, caso materializados podem ter impacto nos resultados das posições assumidas pelo Fundo e nas condições de operação deste, afetando, portanto, adversamente a rentabilidade do Fundo e o valor das quotas.



Confidential



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6/1 2001  **107**

_Não existência de Garantia de Rentabilidade_

A verificação da rentabilidade passada em qualquer fundo de investimento em participações no mercado ou no próprio Fundo não representa garantia de rentabilidade futura. Adicionalmente, a aplicação dos recursos do Fundo em um projeto que possui riscos relacionados à capacidade de geração de receita e pagamento de suas obrigações não permite, portanto, determinar qualquer parâmetro de rentabilidade seguro as quotas.

_Descontinuidade_

O Regulamento do Fundo estabelece a possibilidade de liquidação do Fundo caso assim seja deliberado em assembléia geral. Nessas situações, os cotistas terão o prazo original de investimento reduzido e poderão não conseguir reinvestir os recursos recebidos com a mesma remuneração proporcional pelo Fundo, não sendo devida pelo Fundo, pelo Administrador ou pelos demais prestadores de serviços do Fundo, nenhuma multa ou penalidade, a qualquer título, em decorrência desse fato.

**8.2.   PROJETO**

A matriz abaixo apresenta os principais riscos e mitigantes do Projeto Sondas.

| RISCOS | MITIGANTES |
|---|---|
| | - Contrato na modalidade _turn key lump sum_ |
| | - Gerenciamento e fiscalização das obras pela Petrobras |
| | - Utilização de _design_ existente e aceito pela indústria de perfuração |
| | - Coberturas do FGCN |
| | - Rigoroso processo de seleção técnica e financeira dos estaleiros |
| Riscos de Construção – erro no design, atraso e sobrecustos nas obras e riscos relacionados ao estaleiro | - Seguros (builder's all risk, performance Bond, etc.) |
| | - Repasse de penalidades imputadas às SPEs por atraso no início do afretamento, quando por culpa do estaleiro |
| | - Correção de contrato de construção em função da variação da inflação |
| | - Acompanhamento do processo de construção pela Petrobras |
| | - _Change orders_ gerados pela Petrobras proporcionam revisão na taxa de afretamento. |
| | - Estratégia de contratação de até 7 sondas junto ao mesmo estaleiro devem permitir aos estaleiros locais acumularem |



EIG00091770
EIG_KEP_00164988

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL – 4-1-2011 **108**

| | |
|---|---|
| | *know how* e experiência durante a construção das primeiras sondas |
| | - Conta Reserva de Eventualidades |
| | - Aproximadamente 40% (na média do primeiro sistema) dos equipamentos e sistemas de perfuração a serem instalados nas sondas serão importados. Estes equipamentos são os mesmos atualmente utilizados em sondas similares em construção ou já construídas e m estaleiros internacionais. Ou seja, no que se refere a esses equipamentos e ao desempenho final das sondas, o local de construção deve ter pouco efeito no resultado final |
| | - Novos impostos e alíquotas que eventualmente venham a resultar em maiores custos de construção não provocar a revisão do preço do contrato de construção e deverão ser refletidos no contrato de afretamento |
| | - Os prazos de construção das sondas nos Contrato de Construção com o Estaleiro prevê um prazo maior do que o praticado por estaleiros mais experientes (no exterior, sondas similares são construídas em um prazo de dois anos. o Projeto Sondas prevê um prazo construção de aproximadamente quatro anos) |
| | - Contratação de seguros do tipo "*Liquidated Damages*", penalizando o Estaleiro por atrasos |
| **Riscos de renovação dos Contratos de Afretamento pela Petrobras** | - atual demanda por sondas pela Petrobras e por outras empresas com presença no Brasil. |
| | - Valor do ativo (sonda) |
| | - Possibilidade de fretar a sonda para outros clientes (operadoras de petróleo) |
| | - Possibilidade de venda da sonda para o operador |
| | - Fundo de Renovação |
| **Risco de não captação dos recursos financeiros necessários – Risco de Captação** | - Apoio do BNDES como principal financiador do Projeto, evidenciado pela aprovação de diretoria para o financiamento do Projeto Sondas |
| | - A Petrobras assume o risco das suas condições finais do financiamento, se encarregando de usar seu *expertise* e melhores condições de crédito junto ao mercado para negociar todos os instrumentos de financiamento da operação. As condições finais obtidas serão incorporadas aos valores das taxas de afretamento originalmente contratadas, para mais ou para menos, de forma a manter a rentabilidade original dos cotistas |
| | - Operação de mercado de capitais para o financiamento de 2 sondas da Odebrecht Oil & Gas foi 3,5x *oversubscribed* |
| | - Outras operações no mercado de financiamento de sondas demonstram o apoio de bancos comerciais e ECAs no financiamento do setor |
| **Risco de baixa performance do operador** | - Estrutura de bônus de performance para incentivar melhor *uptime* por parte dos Operadores |
| | - Compensação por *underperformance* (multa ou diluição) |

Confidential

**CAIXA**

| | |
|---|---|
| | · Possibilidade de troca do operador |
| | · Fundo de Performance- Contratação de operador com excelência comprovada na operação de sondas de perfuração em águas ultraprofundas. |
| | · Sondas novas, com equipamento de última geração |
| | · Criação de ranking dos melhores operadores |
| **Risco de extinção de benefícios tributários** | · O contrato de afretamento inclui cláusula de equilíbrio econômico-financeiro decorrente de variação de tributos em relação ao momento em que o mesmo for celebrado, de tal forma que, alterações tributárias referentes à criação de novos impostos ou à alteração de alíquotas poderão modificar, para mais ou para menos, o valor das taxas de afretamento originalmente contratadas, de forma a compensar a variação tributária. Não obstante, entendemos que para que tal dispositivo contratual seja considerado plenamente efetivo como mitigante do risco acul mencionado, seria necessária previsão expressa em contrato quanto a sua aplicabilidade em caso de extinção de incentivos fiscais. No entendimento, no entanto, será ratificado ou retificado pelo Assessor Legal. |
| | · O Acordo de Tributação Brasil-Áustria foi estabelecido em 1976, não tem prazo de validade e não existe histórico recente de contestação do acordo. |
| | · Como todos os ativos serão constituídos integralmente antes da data prevista para extinção dos benefícios gerados pelo REPETRO, não deverá haver impacto para a fase de investimentos da Companhia |
| **Riscos de extinção do REPETRO, cuja vigência expira em 31/12/2020.** | · O contrato de afretamento inclui cláusula de equilíbrio econômico-financeiro decorrente de variação de tributos em relação ao momento em que o mesmo for celebrado, de tal forma que, alterações tributárias referentes à criação de novos impostos ou à alteração de alíquotas poderão modificar, para mais ou para menos, o valor das taxas de afretamento originalmente contratadas, de forma a compensar a variação tributária. Não obstante, entendemos que para que tal dispositivo contratual seja considerado plenamente efetivo como mitigante do risco acul mencionado, seria necessária previsão expressa em contrato quanto a sua aplicabilidade em caso de extinção de incentivos fiscais. No entendimento, no entanto, será ratificado ou retificado pelo Assessor Legal. |
| **Obrigatoriedade de aportes adicionais por solicitação do BNDES, em caso de insuficiência de recursos para término da construção das sondas.** | · Conta Reserva de Eventualidades |
| | · Além dos mecanismos descritos acima, não identificamos mitigantes adicionais para este risco. Adicionalmente, a capacidade de aporte de recursos pelo FIP Sondas é limitada ao Capital Comprometido e/ou Patrimônio Líquido. |
| **Descasamento de prazo da dívida sênior e do prazo dos Contratos de Afretamento (5 SPEs)** | · Existência de 2 SPEs com contratos de 20 anos |
| | · Fundo de Renovação |
| | · Geração de caixa em portfolio, consolidada na Sete International |
| | · Demanda da Petrobras (e mundial) por sondas de águas ultraprofundas |

Confidential

EIG00091772
EIG_KEP_00164990

CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6/1/2011  110



| | - Capacidade do equipamento (sondas) permite sua utilização no Golfe do México e África |
|---|---|
| | - valor do ativo (sonda) |
| **Descasamento entre os custos e despesas gerais efetivamente realizados e os previstos na modelagem do Projeto** | - Conta Reserva de Eventualidades |
| | - Custos adicionais relacionados a indexação do contrato de construção junto a estaleiro aumentam a taxa de afretamento (na mesma proporção) e permite o Projeto Sondas buscar recursos de terceiros adicionais |
| **Risco Sócio-Ambiental** | - design da sonda |
| | - licença de operação |
| | - supervisão da Petrobras |
| | - de acordo com o Contrato de Afretamento, na hipótese de vazamento de petróleo, óleo e outros resíduos no mar, a operadora (SPE) responderá até o limite de US$ 1 milhão por evento |
| | - operação de acordo com as normas e políticas do IBAMA, CONAMA E MARPOL |
| | - Finalmente, os financiadores (ECAs e Banco Comerciais) vão exigir a conformidade do Projeto com todas as obrigações socioambientais a que está sujeita por força da legislação socioambiental vigente e com os padrões definidos pelos Princípios do Equador |

EIG00091773
EIG_KEP_00164991



CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6 4 2011   111

**9.   PARECER DO GESTOR**

Este Memorando de Investimento complementa um conjunto de informações já fornecidas pela Petrobras e pelos Assessores da Petrobras e visa, sobretudo, oferecer nosso ponto de vista sobre o negócio e uma série de aspectos cuja compreensão se faz necessária para a adequada tomada de decisão pelo investidor.

A proposta objetivo deste documento consiste na criação da uma empresa que já nascerá entre as maiores do seu ramo, podendo tornar-se líder no segmento de sondas para águas ultraprofundas. A progressiva expansão das atividades relacionadas à extração de óleo do Pré-Sal, neste sentido, trará uma quantidade significativa de negócios e atores para o mercado petrolífero brasileiro. Assim, o Fundo representa uma privilegiada oportunidade de ingresso neste segmento da indústria para investidores institucionais brasileiros. Esta real possibilidade, acreditamos, só ganha concretude em função, sobretudo, da exigência de conteúdo nacional na produção das sondas que serão utilizadas no Pré-Sal e no formato inédito de parceria que a Petrobrás está se propondo a fazer com o mercado de capitais.

O direito de preferência na construção e afretamento dos demais sistemas, ou seja, mais 21 (vinte e um) navios sonda, serve, na prática, como uma opção de compra que é conferida ao Fundo, como acionista da Sete Brasil, e permitirá uma ampliação significativa do porte da empresa(*growth story*).

A participação da Petrobrás em variados papéis – *offtaker* dos contratos de afretamento, acionista da Sete Brasil, operadora de algumas embarcações e fiscalizadora da construção, entre outros – representa em nossa opinião um forte e saudável alinhamento de interesses, ainda que o consenso em alguns aspectos negociais não seja de fácil alcance.  De um modo geral, situações de ganho para a Companhia representam situações de ganho para a Petrobrás, assim como o seu oposto.  Deste modo, tê-la como sócia na Sete Brasil é antes um fator de sucesso para a presente operação do que de risco. Não obstante, queremos destacar que, como Gestores, estamos plenamente conscientes da necessidade de se buscar um endereçamento adequado de alguns dos riscos existentes, os quais não poderão ser, por sua natureza, absolutamente eliminados.

Este Memorando, ainda que contenha muitas das informações necessárias à tomada de decisão pelo investidor, não exaure o entendimento de alguns pontos, o que deverá acontecer com a conclusão do trabalho do Assessor Legal, com o avanço do próprio Gestor na construção de alguns mitigadores entendidos como necessários e com a conclusão do processo licitatório dos navios sonda.

Há também algumas questões que, embora avançadas, ainda exigirão algum esforço antes de estarem concluídas, tais como a definição da governança do Fundo e da Companhia Investida e os termos finais dos contratos de afretamento.

Confidential

EIG00091774
EIG_KEP_00164992

 CAIXA FIP SONDAS - INFORMAÇÃO CONFIDENCIAL - 6/1/2011  112

Com relação aos riscos inerentes ao estabelecimento da Sete Brasil, somos da opinião de que a maior parte dos pontos críticos está bem identificada e endereçada. A existência de contratos de afretamento de longo prazo assinados – em prazo muito superior à média praticada pela indústria – quando da entrada do Fundo na Companhia funciona, na prática, como um vetor na redução dos riscos, já que diminui substancialmente a parcela de risco de mercado, sempre muito presente em *StartUps*.

É inegável que o sucesso da Companhia Investida está intimamente associado ao sucesso do seu processo de alavancagem, razão pela qual pode ser considerado de grande valia o trabalho que a Petrobras já vem fazendo com os potenciais agentes financiadores e que deve certamente contribuir para a celeridade e a qualidade deste processo. Entretanto, somos da opinião de que os principais membros do *management* da Sete Brasil deverão ser quadros com robusto *expertise* financeiro, com capacidade de conduzir operações de *Project Finance*, com credores nacionais e internacionais.

O conselho de administração da Companhia, assim sendo, terá papel fundamental no bom andamento dos negócios da Companhia Investida. Ainda que haja um Plano de Diretrizes Estratégicas muito claro, e que servirá de norte para a diretoria da Sete, muitas questões estratégicas deverão se apresentar ao longo do prazo de construção das sondas, tais como a possibilidade de ampliação dos negócios (contratação de outros sistemas), eventos de liquidez, associações, etc.

Também deve ser levada em consideração a atuação de dois outros agentes essenciais: o estaleiro construtor e o sócio operador, já que a performance operacional destes pode vir a afetar os retornos esperados da Sete Brasil. Neste sentido, é positiva a definição de uma lista prévia de potenciais sócios operadores e a identificação do estaleiro construtor do primeiro sistema.

Os níveis prospectivos de retorno do Fundo, considerando-se os cenários exercitados, estão em linha, em nosso entendimento, com riscos os identificados. A possibilidade de IPO, que nos parece a alternativa mais factível de desinvestimento, pode levar o retorno a níveis bastante atraentes; vide os casos de sucesso recentes como OGX e HRT.

Diante do exposto ao longo do presente Memorando de Investimento e observadas as ressalvas elencadas, consideramos atrativo o investimento no setor de petróleo e gás, especificamente no Projeto Sondas, e recomendamos o investimento por meio da aquisição de cotas do FIP Sondas. Não obstante nosso entendimento, bem como as informações apresentadas neste Memorando, previamente à tomada de decisão de investimento pelos potenciais investidores, estes deverão ter conhecido e estudado profundamente a estrutura do Fundo e do Projeto Sondas, bem como os riscos a eles relacionados. Adicionalmente, destacamos que a nossa opinião sobre o investimento está condicionada à emissão de



EIG00091775
EIG_KEP_00164993



parecer favorável pelo Assessor Legal, bem como à manutenção das características aqui apresentadas acerca do Projeto Sondas.

Por fim, entendemos que o efetivo papel do Gestor neste Fundo de características específicas – que já nasce com o ativo e o plano de investimentos identificado – é promover o interesse dos investidores na Companhia Investida, buscando sempre e de forma diligente e tecnicamente embasada, identificar, propor e implementar decisões que sirvam ao melhor andamento do negócio, maximizando assim todos os fatores que possam servir ao alcance dos objetivos do Fundo.



Confidential

EIG00091776
EIG_KEP_00164994

**CAIXA**

**Vitor Hugo dos Santos Pinto**
Gerente Nacional
GEFES - Gerência Nacional de Fundos Especiais
VITER - Vice-Presidência de Ativos de Terceiros
CAIXA ECONÔMICA FEDERAL
Tel.: (61) 3206-8191
E-mail: vitor.pinto@caixa.gov.br

**Diogo Florêncio Martins**
Analista
GEFES - Gerência Nacional de Fundos Especiais
VITER - Vice-Presidência de Ativos de Terceiros
CAIXA ECONÔMICA FEDERAL
Tel.: (61) 3206-7713
E-mail: diogo.martins@caixa.gov.br

**Raquel Cristina Todasco**
Gerente Executivo
GEFES - Gerência Nacional de Fundos Especiais
VITER - Vice-Presidência de Ativos de Terceiros
CAIXA ECONÔMICA FEDERAL
Tel.: (11) 3555-6420
E-mail: raquel.todasco@caixa.gov.br

**Laiza Fabíola Martins Santa Rosa**
Analista
GEFES - Gerência Nacional de Fundos Especiais
VITER - Vice-Presidência de Ativos de Terceiros
CAIXA ECONÔMICA FEDERAL
Tel.: (11) 3555-7714
E-mail: laiza.rosa@caixa.gov.br

Av. Paulista 2300, 10 andar, Cerqueira César, São Paulo - SP
Tel.: 55 11 3555-6550 - gefes@caixa.gov.br - gefes@caixa.gov.br

Confidential

EIG00091777
EIG_KEP_00164995