# EXHIBIT 63



STATE OF NEW YORK

                                )
                                )
                                )
COUNTY OF NEW YORK              )          ss


**CERTIFICATION**


This is to certify that the attached translation is to the best of my knowledge and belief a true and accurate

translation from Portuguese into English of the attached document with Bates number range EIG_KEP_00211771 to

EIG_KEP_00211828.




Edward J. Jacob
Divergent Language Solutions, LLC



State of New York

County of New York

Subscribed to and sworn before me this 23ᵈ day of June , 20 21 ,

by Edward J. Jacob.



Notary Public

MATTHEW C. ZELAK
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ZE6350239
Qualified in Kings County
Commission Expires   November 7, 2024

183 Madison Avenue, Suite 416 | New York, NY 10016 | p 917.979.4513 | f 415.525.4313
600 California Street, 11ᵗʰ Floor | San Francisco, CA 94108 | p 415.400.4538 | f 415.525.4313
divergent@divergentls.com | www.divergentls.com

FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES SONDAS QUOTAHOLDERS' AGREEMENT, AS
AMENDED AND CONSOLIDATED ON JULY 31, 2012

By means of this instrument,

a)      **Fundação Petrobras de Seguridade Social (PETROS)**, a privately held pension fund, domiciled at Rua do Ouvidor, n° 98, Centro, CEP 20040-030, in the City and State of Rio de Janeiro, registered with the CNPJ/MF [Brazilian Ministry of Finance Corporate Tax Roll] under No. 34.053.942/0001-50, herein represented in accordance with its bylaws, hereinafter referred to simply as "Petros";

b)      **Fundação dos Economiários Federais (FUNCEF)**, a privately held pension fund with private legal capacity, domiciled at Setor Comercial Norte Quadra 02, Bloco "A," Ed. Corporate Financial Center, 12º e 13º andares, City of Brasília, Federal District, CEP 70712-900, registered with the CNPJ/MF under No. 00.426.923/0001-90, herein represented in accordance with its bylaws, hereinafter referred to simply as "Funcef";

c)      **Caixa de Previdência dos Funcionários do Banco do Brasil (Previ)**, with registered office at Praia de Botafogo, 501, 3º e 4º andares, district of Botafogo, City of Rio de Janeiro, State of Rio de Janeiro, CEP 22.250-040, registered with the CNPJ/MF under No. 33.754.482/0001-24, herein represented by its legal representatives, as provided for in its charter documents, hereinafter referred to simply as "Previ";

d)      **Fundação Vale do Rio Doce de Seguridade Social (Valia)**, a privately held pension fund with registered office at Av. das Américas, nº. 4430, 3º andar, Barra da Tijuca, City of Rio de Janeiro, State of Rio de Janeiro, CEP 22640-102, registered with the CNPJ/MF under No. 42.271.429/0001-63, herein represented by its legal representatives in accordance with its charter documents, hereinafter referred to simply as "Valia";

e)      **Santander Participações S.A.** (subrogated in the rights of Banco Santander (Brasil), a corporation with registered office at Avenida Presidente Juscelino Kubitschek, nº. 2041 e 2235 – Bloco A (parte), 16º andar, CEP 04543-011, City and State of São Paulo, registered with the CNPJ under No. 04.270.778/0001-71, herein represented by its legal representatives in accordance with its charter documents, hereinafter referred to simply as "Santander";

1

EIG00102271
EIG_KEP_00211771

f)      **Strong Fundo de Investimento em Cotas de Fundos de Investimento Multimercado**, an investment fund investing in quotas of investment funds, organized in accordance with the rules of CVM [Brazilian Securities Commission] Instruction No. 409/04, as amended, registered under No. 248.818 on 03/18/2011 with the 2nd Official RTD of Osasco - SP, registered with the CNPJ/MF under No. 12.287.654/0001-27, represented through its Manager, BANCO BRADESCO BBI S.A., with registered office in the administrative center known as Cidade de Deus, Prédio Prata, 4º andar, Vial Yara, City of Osasco, State of São Paulo, registered with the CNPJ under No. 06.271.464/0001-19, authorized by the CVM to administer investment securities portfolios pursuant to CVM Declaratory Instrument No. 9.692 of 01/21/2008, hereinafter referred to simply as "Fundo Strong";

g)      **Banco BTG Pactual S.A.**, a financial institution with registered office in the City of Rio de Janeiro, [State of] Rio de Janeiro, at Praia de Botafogo, 501, Torre Corcovado, 5º andar, CEP 22250-040, registered with the CNPJ/MF under No. 30.306.294/0001-45, herein represented in accordance with its charter documents, hereinafter referred to simply as "BTG Pactual";

h)      **Petróleo Brasileiro S.A. (Petrobras)**, a corporation of mixed public/private ownership, with registered office at Av. República do Chile, 65, CEP 20031-912, City of Rio de Janeiro, State of Rio de Janeiro, registered with the CNPJ/MF under No. 33.000.167/0001-01, herein represented in accordance with its bylaws, hereinafter referred to simply as "Petrobras";

i)      **Lakeshore Financial Partners Participações Ltda.**, a Brazilian limited liability corporation [*sociedade limitada*] domiciled at Rua São Tomé, 86, 19º andar, Cj. 191, Sala B, Vila Olímpia, CEP 04.551-080, City and State of São Paulo, registered with the CNPJ/MF under No. 13.040.317/0001-01, herein represented in accordance with its articles of association, hereinafter referred to simply as "Lakeshore";

j)      **Luce Venture Capital – Drilling Series**, a company with registered office at 500 Stanton Christina Road, Newark, Delaware, 19713-2107, United States of America, herein represented in accordance with its articles of association, hereinafter referred to simply as "Luce Drilling";

k)      **EIG Sete Holdings SàRL**, a company with registered office at 2, boulevard Konrad Adenauer, L-1115, Luxembourg, herein represented in accordance with its articles of association, hereinafter referred to simply as "EIG";

2

EIG00102272
EIG_KEP_00211772

Petros, Funcef, Previ, Valia, Santander, Fundo Strong, BTG Pactual, Petrobras, Lakeshore, Luce Drilling, and EIG are hereinafter referred to separately as "Quotaholder" or "Party," and jointly as "Quotaholders" or "Parties."

and in the capacity of consenting participants:

l)      **Caixa Econômica Federal**, a financial institution in the form of a public enterprise, governed by the bylaws approved by Decree No. 6,473 of June 5, 2008, authorized by the Brazilian Securities Commission ("CVM") to administer investment funds and securities portfolios, with registered office in Brasília, Federal District, at Setor Bancário Sul, Quadra 4, Lotes 3 e 4, 21º andar, Asa Sul, through the Office of its Vice President for Third-Party Asset Management, located in the City of São Paulo, State of São Paulo at Avenida Paulista, No. 2300, 11º andar, CEP 01310-300 registered with the CNPJ/MF under No. 00.360.305/0001-04, in the capacity of administrator of FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES SONDAS, a private equity fund registered with the Securities Commission ("CVM") under No. 431-6, registered with the Ministry of Finance National Corporate Tax Roll ("CNPJ/MF") under No. 12.396.426/0001-95 ("Administrator"); and

m)     **Sete Brasil Participações S.A.**, a Brazilian joint-stock corporation [*sociedade por ações*] with registered office in the City of Rio de Janeiro, State of Rio de Janeiro, at Rua Humaitá 275, sala 1302, Humaitá, CEP 22261-005, registered with the CNPJ/MF under No. 13.127.015/0001-67, herein represented in accordance with its charter documents ("Company" and, together with the Administrator, "Consenting Participants").

WHEREAS:

(i)     as of this date, the Quotaholders are joint holders of all issued quotas of FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES SONDAS, an investment fund organized in the form of a Brazilian privately-traded, closed-end fund [*condomínio fechado*], pursuant to Securities Commission Instruction No. 391 dated July 16, 2003, as amended, registered with the CNPJ/MF under No. 12.396.426/0001-95 ("Fund"), with its charter documents and bylaws duly filed with the 2nd Official Registrations and Documents Office and Corporate Civil Registry of Brasília, Federal District, under No. 0000971314 on August 12, 2010 ("Bylaws");

3

EIG00102273
EIG_KEP_00211773

(ii)      pursuant to Article 13 of the Bylaws, the Fund's specific purpose is to invest in securities issued by the Company;

(iii)     in turn, the corporate purpose of the Company is to hold stakes in other companies, domestic or foreign, as shareholder, partner or quotaholder, joint ventures, partnerships and/or consortia, with a view to acquiring, disposing, building, operating and/or chartering: (i) drilling rigs and other assets and vessels for the exploration and production of oil and gas; (ii) maritime support vessels and other equipment used in support of oil and gas exploration and production activities; and (iii) shipyards and other industrial assets and quotas related to the naval industry;

(iv)      the Company is currently implementing a project to render viable the availability of 28 (twenty-eight) drilling rigs, with full operating capacity, primarily in the Brazilian Pre-Salt Basin ("Project");

(v)       the Company currently holds 100% (one hundred percent) of the outstanding shares of *Sete International GmbH*, located in Vienna, Austria, with address at Schwarzenbergstrasse, 1-3/14a, 1010, registered with the Commercial Registry of the Vienna Trade Court under No. FN 348664 t ("Sete International"), holding an indirect stake in special-purpose enterprises located in The Netherlands, organized exclusively to contract the construction of and to own and charter each Project rig;

(vi)      as of this date, the Fund and Petrobras are joint holders of all shares representing the Company's total voting share capital;

(vii)     the Fund and Petrobras are parties to a shareholders agreement ("Shareholders Agreement") that regulates, among other matters, voting rights in the Company's corporate resolutions, the distribution of earnings, subscription rights to additional shares and the rules for the transfer of Company shares;

(viii)    on May 13, 2011, the Quotaholders entered into the Quotaholders' Agreement for Fundo de Investimento em Participações, regulating its respective rights and obligations as quotaholders of the Fund and regulating, among other matters, (a) exercise of the right to vote at General Meetings of Fund Quotaholders; (b) the functioning and competency of its deliberative bodies; (c) rules for the transfer and trading of the Quotas; and (d) rules and guidelines for the Fund's investment policy,

4

among other matters, which was amended on March 29, 2012 ("Original Quotaholders' Agreement");

(ix)    on March 29, 2012, the second issuance of Fund quotas was approved, which were subscribed by the original Quotaholders and by new investors; and

(x)    The Quotaholders wish to amend and consolidate the Original Quotaholders' Agreement to adapt it to the current stage of the Company.

The Parties RESOLVE, by mutual accord, to enter into this Second Addendum to the Fundo de Investimento em Participações Sondas Quotaholders' Agreement ("Agreement"), opting to amend and consolidate the Agreement, the terms, and conditions of which, stipulated below, they promise to faithfully apply.

DEFINITIONS

Definitions. For purposes of this Agreement, the terms stipulated below in upper-case letters, in the plural or singular form, will have the meanings attributed to them below:

| | |
|---|---|
| Agreement | means this Fund Quotaholders' Agreement, as amended and consolidated, pursuant to the terms of the preamble. |
| Shareholders Agreement | means the Company Shareholders Agreement, entered into between the Fund and Petrobras. |
| Investment Agreement | means the Investment Agreement and Other Addenda entered into between the Quotaholders, with the Company and the Administrator as Consenting Participants. |
| Original Quotaholders Agreement | has the meaning set forth in the preamble to this Agreement. |
| Agreement for the Execution of Financial Transactions | means the Agreement for the Execution of Financial Transactions and Other Addenda, entered into between the Quotaholders and the Company. |
| Permitted Parallel Agreements | has the meaning set forth in Clause 9.12 below. |

Confidential

EIG00102275
EIG_KEP_00211775

| | |
|---|---|
| <u>Administrator</u> | means Caixa Econômica Federal, identified in the preamble to this Agreement, in the capacity of Fund administrator and manager. |
| <u>Affiliate</u> | means, with respect to any party, any other party directly or indirectly Controlled by, under joint Control with or Controlling the former. For purposes of this Agreement, the terms "Control," "Controlled" or "Controlling" shall have the meanings attributed thereto by Article 116 of the Brazilian Joint-Stock Companies Act [*Lei das Sociedades por Ações*]. |
| <u>Appendix – Investments Approved in the Business Plan</u> | means the appendix to the Company Business Plan, containing the matters listed in Clause 9.1 of the Company Shareholders Agreement. |
| <u>Company General Meeting of Shareholders</u> | means any general meeting of Company shareholders. |
| <u>General Quotaholders Meeting</u> | means any general meeting of Fund Quotaholders. |
| <u>Subscription Form</u> | means the subscription form signed by the Quotaholder upon first investing in the Fund, or upon the subscription of new quotas, the model for which is attached to the Investment Commitment. |
| <u>Chamber</u> | has the meaning set forth in Clause 9.3 below. |
| <u>CANN</u> | means the New Business Advisory Committee [*Comitê de Assessoramento para Novos Negócios*], approved at the Board of Directors meeting of January 27, 2012 and governed in accordance with its regulation. |
| <u>Committed Share Capital</u> | means the amount corresponding to the total quantity of Quotas which the Fund Quotaholders commit to subscribe and pay-in, as set forth in the respective Investment Commitment(s). |
| <u>Remaining Committed Capital Not Paid-In</u> | means the Committed Share Capital which, up to the date of the procedure stipulated in Clause 6.4 for purposes of an Initial Public Offering, has not yet been paid in. |

6

EIG00102276
EIG_KEP_00211776

| | |
|---|---|
| Investment Committee | means the Fund Investment Committee, regulated pursuant to Chapter VII of the Regulation and Clause 4.4 to 4.12 of this Agreement. |
| Investment Commitment | means the Specific Investment Commitment Instrument(s), entered into by each Quotaholder and the Administrator, pursuant to which each Quotaholder undertook to subscribe and to pay-in a specified number of Fund Quotas and, where applicable, the Entry Fee. |
| Conflict | has the meaning set forth in Clause 9.3 below. |
| Board of Directors | means the Company Board of Directors. |
| Charter Contract | means any drilling rig charter contracts entered into by the Company's Subsidiaries. |
| EPC Contract | means any contracts for the construction of drilling rigs, entered into between the SPE and shipyards selected by the Company. |
| Asset Maintenance Contract | Means any maintenance contracts for drilling rigs, their equipment, and accessories, entered into by the Company's Subsidiaries. |
| Service Provision Contract | means any contracts for the provision of rig operation services to be entered into between Petrobras and the operator of each drilling rig. |
| Operational Contracts | means the Charter Contracts, EPC Contracts, Service Provision Contracts and Asset Maintenance Contracts. |
| Subsidiary | means any corporation, joint venture, consortium or other form of corporate organization the Company holds or Controls, individually or |

7

EIG00102277
EIG_KEP_00211777

shared with third parties, including but not limited to Sete International and any special-purpose enterprises, located in The Netherlands, organized solely to engage in construction, own, and charter drilling rigs for Petrobras or its Affiliates (the "SPEs"), with the term "Control" having the meaning attributed thereto by Article 116 of the Joint-Stock Companies Act.

| | |
|---|---|
| CVM | means the Brazilian Securities Commission. |

Custodian    means Banco Bradesco S.A., a financial institution with registered office at Cidade de Deus, Vila Yara, s/n, City of Osasco, State of São Paulo, registered with the CNPJ/MF under No. 60.746.948/0001-12, in the capacity of Fund custodian.

Corporate Resolution  means any resolution passed in the General Quotaholders Meeting or the Company's General Meeting of Shareholders.

Administrative Resolutions means any resolution passed by the Board of Directors or by the Investment Committee, as well as in any deliberative administrative entity of the Fund or of the Company, as applicable.

Business Day    means any day other than a Saturday or Sunday or any other day when banks are authorized to close in the city of Rio de Janeiro, RJ and in the city of São Paulo, SP.

Right of First Refusal  means the right of Quotaholders to acquire Quotas, when offered by other Quotaholders, or to subscribe, upon Additional Issuances of Quotas, with priority over third parties that are not Fund quotaholders. Right of first refusal shall be exercised by means of written communication sent to the Administrator, indicating the amount it intends to acquire/subscribe, noting in all cases the Participation Limit, and the other terms stipulated in this Regulation and in this Agreement.

Right of First Refusal over has the meaning set forth in Clause 5.4.2. below.
Excess Quotas

8

EIG00102278
EIG_KEP_00211778

| | |
|---|---|
| <u>Right of Exchange for Shares</u> | has the meaning set forth in Clause 6.3.4. below. |
| <u>Right of Joint Sale</u> | has the meaning set forth in Clause 7.9. below. |
| <u>EFPC</u> | means any privately held pension fund, the principal purpose of which is to establish and execute retirement-related benefits plans in the form of Supplemental Law No. 109/01 and Supplemental Law No. 108/2001, and which is a Fund Quotaholder. |
| <u>Additional Issuances of Quotas</u> | means any issuance and distribution of new Fund Quotas, subsequent to the First Issuance of Quotas, as defined below. |
| <u>Fund</u> | has the meaning set forth in the preamble to this Agreement. |
| <u>Economic Group</u> | means the group of companies directly or indirectly under the same shareholder control, including parent companies (or members of the parent group), subsidiaries and related entities. Also considered as belonging to the economic group of a specified Quotaholder are investment funds managed in discretionary fashion by said Quotaholder, or by any Affiliate of the aforementioned Quotaholder. EFPCs and their respective sponsoring entities shall not be considered as forming part of the same economic group. |
| <u>ICVM No. 391</u> | means CVM Instruction No. 391 of July 16, 2003, as amended. |
| <u>IPCA</u> | means the Broad National Consumer Price Index or any other index that might replace it. |
| <u>Confidential Information</u> | has the meaning set forth in Clause 8.4 below. |

9

| | |
|---|---|
| <u>Participation Limit</u> | has the meaning set forth in Clause 7.3 below. |
| <u>List of Pre-Selected Companies</u> | means the list of the following companies or their Affiliates: 1. Atwood Oceanics, Inc.; 2. Odebrecht Óleo & Gas Ltda.; 3. Brasdril Sociedade de Perfurações Ltda.; 4. Dolphin Drilling Ltd.; 5. Ensco International Inc.; 6. Etesco Construções e Comércio Ltda.; 7. Frontier Drilling do Brasil Ltda.; 8. Maersk Brasil Brasmar Ltda.; 9. Noble do Brasil S/C Ltda.; 10. Ocean Rig ASA; 11. Odfjell Drilling S.A.; 12. Pacific Drilling; 13. Petroserv S.A.; 14. Pride do Brasil Serviços de Petróleo Ltda.; 15. Queiroz Galvão Óleo e Gás S.A.; 16. Saipem do Brasil Ltda.; 17. Seadrill Ltd.; 18. Sevan Marine do Brasil Ltda.; 19. Transocean Brasil Ltda.; and 20. Vantage Drilling Co. |
| <u>New Investments</u> | has the meaning set forth in Clause 5.5. below. |
| <u>New Quotaholders</u> | means any that in the future might become Fund Quotaholders, whether by means of subscription or acquisition of Quotas. |
| <u>Offering Notification</u> | has the meaning set forth in Clause 7.8.1. below. |
| <u>Offering</u> | has the meaning set forth in Clause 7.8.1. below. |
| <u>Initial Public Offering</u> | has the meaning set forth in Clause 6.2. below. |
| <u>Secondary Public Offering</u> | has the meaning set forth in Clause 8.2. below. |
| <u>Encumbrance</u> | means any and all encumbrances, rights of real guarantee, restrictions, right of first refusal for acquisition or subscription, options, charges, restrictions to full and free use, enjoyment, or benefit of any asset or right (or of any of the attributes inherent or relative to said asset or right), whether as a result of law, contract or claims of any other kind. |
| <u>Administrative Entities</u> | means the Company's Board of Directors and any deliberative administrative entity of the Fund or the Company, as applicable. |
| <u>Related Party</u> | means (i) with respect to a legal entity, any of its Affiliates or their |

10

EIG00102280
EIG_KEP_00211780

respective shareholders/quotaholders, employees, agents, representatives, commission agents [*comissários*], partners and/or administrators, and (ii) with respect to an individual, (a) his or her ascendants and descendants in a direct line, spouse and/or relatives from the 1st to 4th degrees, or (b) any Affiliates or Affiliated Parties of the persons identified in letter "(a)" above and the respective shareholders/quotaholders, employees, agents, representatives, commission agents, partners and/or administrators of all said Affiliates.

| | |
|---|---|
| <u>Parties Involved</u> | has the meaning attributed thereto in Clause 9.3. |
| <u>Fund Net Equity</u> | has the meaning attributed to the term "Net Equity" in the Fund Regulation. |
| <u>Divestment Period</u> | means ten (10) years following the Investment Period. |
| <u>Investment Period</u> | means the ten (10)-year period counting from the date of the first paying-in of quotas issued by the Fund, during which Quotaholders must undertake the paying-in of the subscribed Quotas and the Fund must effect investments in the Company, consistent with the Investment Agreement. |
| <u>Lock-Up Period</u> | has the meaning set forth in Clause 7.5. below. |
| <u>Distribution Plan</u> | means the conditions to be defined and approved in the General Meeting of Quotaholders for the allocation of excess Quotas, within the scope of an Additional Issuance of Quotas, after exercise of the Right of First Refusal and the Right of First Refusal over Excess Quotas. |
| <u>Business Plan</u> | has the meaning attributed [to it] in the Company Shareholder Agreement. |
| <u>Potential Purchaser</u> | has the meaning set forth in Clause 7.8.1. below. |
| <u>Potential Entering Entity</u> | means a potential new Fund Quotaholder, as set forth in Clause 7.6. below. |

11

EIG00102281
EIG_KEP_00211781

| | |
|---|---|
| First Issuance of Quotas | means the first issuance of Fund Quotas, as described in Article 40 *caput* of the Regulation. |
| First System | means the first seven (7) rigs of the Sondas Project held by the following SPEs: (i) Arpoador Drilling B.V.; (ii) Copacabana Drilling B.V.; (iii) Grumari Drilling B.V.; (iv) Ipanema Drilling B.V.; (v) Leblon Drilling B.V.; (vi) Leme Drilling B.V.; and (vii) Marambaia Drilling B.V. |
| Project | has the meaning set forth in the preamble of this Agreement. |
| Quotas | has the meaning set forth in Clause 2.1. below. |
| Quotaholders | means, in addition to the Parties identified in the preamble to this Agreement, any quotaholder that invests in the Fund through the acquisition and/or subscription of Quotas. |
| Disposing Quotaholder | has the meaning set forth in Clause 7.8 below. |
| Quotaholder Registry | represents the registry of Fund Quotaholders. |
| Bylaws | has the meaning set forth in the preamble to this Agreement. |
| Arbitration Regulations | has the meaning attributed to it in Clause 9.3.1. |
| Committee Meeting | means any meeting of the Investment Committee held pursuant to this Agreement. |
| SG&A | means the share of the Company's annual budget allocated to its general and administrative expenses. |
| SPE | means the special-purpose enterprises located in The Netherlands, organized exclusively to contract to build, own, and charter drilling rigs for Petrobras or its Affiliates. |

12

EIG00102282
EIG_KEP_00211782

| | |
|---|---|
| <u>Entry Fee</u> | has the meaning set forth in the Bylaws. |
| <u>Minimum Fee</u> | has the meaning set forth in Clause 5.3.1. below. |
| <u>Transfer of Quotas</u> | means the sale, commitment to sell, disposal, encumbrance, assignment, right of possession, granting of a purchase or sale option, trade, contribution to the share capital of another company, transfer or any other form of encumbrance or loss of ownership, directly or indirectly, including but not limited to through corporate reorganizations of any of the Quotas held directly or indirectly, on any occasion, by the Quotaholders, as well as the rights attributed to said Quotas. |
| <u>Permitted Transfer</u> | has the meaning set forth in Clause 7.2. below. |
| <u>Arbitral Tribunal</u> | has the meaning set forth in Clause 9.3.2. below. |

## CHAPTER I – PURPOSE

1.1.    <u>Purpose</u>. The purpose of this Agreement, as a supplement to the provisions of the Bylaws, is to govern relations between Quotaholders in conducting the Fund's activities, with regard to exercise of the right to vote at General Meetings of Quotaholders and at meetings of the Fund Investment Committee, the transfer and trading of Quotas, and other matters discussed herein.

## CHAPTER II – LINKS TO THE AGREEMENT

2.1.    <u>Linked Quotas</u>. This Agreement links all Quotas issued by the Fund and owned by the Quotaholders on this date and any that may be subscribed or acquired by any of the Quotaholders after this date, whether by subscription, purchase, bonus or any other form, and any rights to subscribe for Quotas or rights convertible to Quotas of the Fund that may be granted, at any time, to the Quotaholders, as well as all rights and prerogatives inherent to them ("Quotas"). The Fund's Net Assets are currently divided among 7,174,146,529 (seven billion, one hundred and seventy-four million, one hundred and forty-six thousand, five hundred and twenty-nine) Quotas, distributed among the Quotaholders as follows:

13

| Quotaholder | No. of Quotas | Stake in Net Assets |
|---|---|---|
| Petros | 870,179,318 | 19.2085% |
| Funcef | 870,179,318 | 19.2085% |
| Previ | 180,000,000 | 3.9734% |
| Valia | 200,000,000 | 4.4148% |
| Santander | 498,015,873 | 10.9933% |
| Fundo Strong | 250,000,000 | 5.5186% |
| BTG Pactual | 656,207,552 | 14.4853% |
| Petrobras | 226,508,683 | 5% |
| Lakeshore | 4,000,000 | 0.0883% |
| Luce Drilling | 278,048,780 | 6.1377% |
| EIG | 497,034,137 | 10.9716% |
| Total | 4,530,173,661 | 100% |

2.1.1    Each Quotaholder's stake in the Fund's Net Assets shall be adjusted, after the second subscription for quotas and the close of the second Additional Issuance of Quotas of the Fund, as provided in the minutes of the 19th Special Meeting of Quotaholders of the Fund, held on July 31, 2012, with the Parties committing to enter an addendum to this Agreement to reflect the aforementioned adjustments.

2.2.    <u>Representations by Quotaholders</u>. Each Quotaholder hereby represents to the other Quotaholder[s] that (i) it is the legitimate owner of its Quotas, which are duly registered, free and unburdened by any and all Encumbrances, except those created by means of this instrument; (ii) the provisions set forth in this Agreement constitute a legal, valid and binding obligation, enforceable against each Quotaholder, consistent with their terms; (iii) it is not party to nor is bound by any agreement relative to the ownership of its Quotas or that has as its purpose any Transfer of Quotas, except as provided for herein; (iv) it is not party to nor is bound by any other contract or instrument that violates the provisions of this Agreement or restricts its fulfillment; (v) there are no legal or administrative proceedings in progress that might, in any way, even indirectly, affect or restrict the entering into of this Agreement, free exercise of the rights and prerogatives inherent to the Quotas, or the Transfer of Quotas; and (vi) it has signed the Statement of Compliance with the Participation Limit, pursuant to "Appendix 2.2" of this Agreement, indicating under penalty of the law whether, directly or indirectly, it holds quotas individually or jointly with other

14

EIG00102284
EIG_KEP_00211784

Quotaholders forming part of the same Economic Group, or exercises jointly with other Quotaholders the political rights related to the quotas, that represent a percentage over the Participation Limit.

2.3.   <u>Admissibility</u>. In order to be admitted as Fund quotaholders, whether through the subscription of new Quotas or the acquisition of existing Quotas, under this Agreement any new Quotaholders must sign (i) the joinder to this Agreement; (ii) the joinder to the Fund Regulation; (iii) the joinder to the Investment Agreement; (iv) the joinder to the Agreement for the Execution of Financial Trading, and (v) any other instruments and representations required within the scope of the aforementioned Additional Issuance of Quotas.

2.4.   <u>Prohibition on Encumbrance</u>. The Quotaholders hereby undertake not to establish an Encumbrance on any portion of their Quotas without the prior written consent of all other Quotaholders.

## CHAPTER III - FULFILLMENT OF THE AGREEMENT

3.1.   <u>Fulfillment of the Agreement</u>. Each Quotaholder and the Administrator undertake to fulfill each and every provision of this Agreement during its entire validity period. Quotaholders and Consenting Participants shall not proffer, register, consent to or ratify any vote or approval in any deliberations taken within the scope of the Fund or the Company, or execute or fail to execute any action that violates or is incompatible with the provisions of this Agreement.

3.2.   The Company enters into this Agreement in the capacity of consenting participant, representing that it is aware of and in agreement with all the terms and conditions set forth herein.

## CHAPTER IV – VOTING RIGHTS

4.1.   <u>Exercise of Right to Vote</u>. The right to vote in Corporate Resolutions, exercised (i) by Quotaholders and by the Fund, as applicable, and (ii) by members of the Administrative Entities representing the Quotaholders and the Fund in Administrative Resolutions, must be consistent with the provisions of this Agreement.

4.2.   <u>Conflicting Vote</u>. The chair of the session in any Corporate Resolution or Administrative Resolution must not calculate votes cast in conflict with the provisions of this Agreement. In the event of

15

EIG00102285
EIG_KEP_00211785

non-appearance or abstention from voting in Corporate Resolutions or Administrative Resolutions, the harmed Party shall be assured the right to exercise the vote that would fall to the Party that is absent, excused or abstaining from voting, in cases where there is a voting agreement.

4.2.1.    Any casting of a vote in conflict with the provisions set forth in this Agreement shall result in invalidity of the vote and annulment of the resolution if so passed, without prejudice to the right of the harmed Party to promote the exercise of specific performance of the obligation in violation and to file claim for losses and damages.

4.3.    <u>General Meeting</u>. The General Meeting of Quotaholders has sole authority to deliberate on the matters listed in the Regulation, as well as those defined in ICVM No. 391.

4.3.1.    General Meetings of the Fund's Quotaholders shall be convened and called to order in the form set forth in the Bylaws. Resolutions at the aforementioned meetings shall at all times be passed by favorable vote of Quotaholders representing a majority of Quotas issued, except in accordance with any other form set forth in the Bylaws. In the aforementioned resolutions, the provisions of this Agreement shall be followed at all times. The Fund's General Meetings shall at all times be held on Business Days, at the Company's registered office.

4.3.2. <u>Additional Issuances of Quotas</u>. Resolutions concerning any Additional Issuance of Quotas shall be approved as follows:

(i) if the issuance price of the new Fund Quotas, added to the respective Entry Fee, is less than that applied in the immediately preceding issuance, the Additional Issuance of Quotas, and the definition of the value of the applicable Entry Fees, shall only be approved by favorable vote of Quotaholders representing a minimum of 85% (eighty-five percent) of the Quotas issued by the Fund; and

(ii) if the issuance price of the new Fund Quotas, added to the respective Entry Fee, is equal to or greater than that applied in the immediately preceding issuance, the Additional Issuance of Quotas, and the definition of the value of the applicable Entry Fees, shall only be approved by favorable vote of Quotaholders representing a minimum of 65% (sixty-five percent) of the Quotas issued by the Fund.

4.4.    <u>Investment Committee</u>. The Fund shall have an Investment Committee, non-remunerated, consisting of members, individuals, or legal entities, appointed at the first General

16

Meeting of Quotaholders to be held after the signing of this Agreement, or after adherence thereto by the New Quotaholders, with one (1) member and the respective alternate nominated by each Quotaholder signatory of this Agreement and one (1) member and the respective alternate nominated by the Administrator.

4.4.1.   The members of the Investment Committee shall have terms of office of an indefinite period, and may be replaced at any time by request of the Quotaholders that nominated them, with the replacement to be ratified by the General Meeting of Quotaholders. In the case of a member nominated by the Administrator, the replacement will occur as from disclosure of the replacement to the Quotaholders, to be ratified at the next General Meeting of Quotaholders.

4.4.2.   The representativeness of the Quotaholders on the Investment Committee shall be confirmed by the respective nominated member, and each representative shall be entitled to as many votes on the Investment Committee as the number of quotas held by the Quotaholder representing them.

4.4.3.   The member nominated by the Administrator may speak at meetings of the Investment Committee, but shall not have the right to vote.

4.4.4.   Acting members of the Investment Committee may be replaced by their respective alternates at any time, provided that the Administrator is so informed in advance.

4.5.   The Investment Committee shall be competent to assess, discuss and deliberate on matters falling to the competency of the Company's General Meeting of Shareholders.

4.5.1.   Decisions made by the Investment Committee shall bind the Fund's vote at the Company's General Meeting of Shareholders.

4.5.2.   Decisions made by the Investment Committee referring to the matters stipulated in Item "ii," Clause 4.11. of this Agreement shall bind the vote of the Board of Directors members nominated by the Fund.

4.5.3.   The Administrator shall send to the Company a certified copy of the minutes of the Investment Committee Meeting corresponding to the respective Company General Meeting of Shareholders and/or Board of Directors meeting, as the case may be.

17

EIG00102287
EIG_KEP_00211787

4.5.4.   The chairman of the Company's General Meeting of Shareholders, as well as the Board of Directors Chairman, must take all necessary measures to file the Minutes of the Committee Meeting at the Company's registered office.

4.6.   Meetings of the Investment Committee shall be convened by the Administrator or by any of its members at least 10 (ten) Business Days before holding any Company General Meeting of Shareholders and/or four (4) Business Days before holding the meeting of the Company's Board of Directors. Meetings of the Investment Committee must be held at least one (1) day before holding the Company's General Meeting of Shareholders to which they refer. The Investment Committee must also meet whenever the Company's interests so require, by a call notice from any of its members, and in this case meetings shall be convened ten (10) Business Days in advance.

4.6.1.   The call notice to the Investment Committee shall be dispensed with when all its members are in attendance.

4.6.2.   Together with the call notice, which must be issued by means of correspondence with acknowledgement of receipt or email, indicating the date, time and place the meeting is to be held and the matters to be discussed and voted on thereat, all documents, studies, proposals, and analyses related to the resolution to be adopted must be forwarded to the members of the Investment Committee.

4.6.3.   The Investment Committee may be convened by the Administrator, at the request of any of the Quotaholders or the Company's executive board, for bimonthly meetings that are non-deliberative in nature, preferably to be held on the last business Thursday of each bimonthly period, with the presence of Company executive(s), with a view to updating the members on matters of general interest to the Company and to provide any clarifications ("Information Meeting"). Information Meetings shall be convened at least five (5) Business Days prior to the date they are held, and shall be called to order with the presence of any member of the Investment Committee.

4.7.   Quorum for Resolution of the Investment Committee. The Investment Committee shall deliberate on matters falling to its competency by means of votes of members of the Investment Committee representing the majority of Quotas issued by the Fund, except with

18

respect to matters with special resolution *quora*, as stipulated in <u>Items 4.8. to 4.12.</u> below.

4.8.   The following matters, corresponding to the Company, may only be approved by favorable vote of members of the Investment Committee representing a minimum of 94% (ninety-four) percent of the Quotas issued by the Fund:

(i)     entering into Company shareholder agreements and approval of any amendments to the aforementioned agreements, by the Administrator on behalf of the Fund; and

(ii)    any amendments to the Charter documents.

4.9.   The following matters may only be approved by favorable vote of members of the Investment Committee representing a minimum of 85% (eighty-five percent) of the Quotas issued by the Fund:

(i)     approval of the total or partial sale of instruments and securities issued by the Company forming part of the Fund portfolio, except as set forth in Clause <u>8.1</u>;

(ii)    any reduction in the Company's share capital;

(iii)   any conversion, merger, incorporation, split or other form of corporate reorganization involving the Company and/or its Subsidiaries, directly or indirectly, pursuant to applicable law;

(iv)    dismissal, at any time, of the members of the Board of Directors and Fiscal Council, pursuant to <u>Clause 4.14.</u> below;

(v)     board authorization to declare bankruptcy or to file a request for judicial or extra-judicial recovery of the Company and/or its Subsidiaries, pursuant to applicable law;

(vi)    liquidation and dissolution of the Company and/or its Subsidiaries, as well as appointment of the receiver;

(vii)   approval of extinction of the Company's Subsidiaries, direct or indirect, domestic, or foreign, or termination of partnerships, joint ventures or consortia;

Confidential

EIG00102289
EIG_KEP_00211789

(viii)   resolution, at the proposal of the Board of Directors, of the assignment, transfer, disposal and/or encumbrance, of any kind or form, by the Company and/or its Subsidiaries, of corporate interests and investment securities issued by other companies, domestically or abroad, or taking of a stake by the Company and/or its Subsidiaries in any consortium, partnership, or joint venture, unless stipulated otherwise in the Shareholders Agreement;

(ix)   completion, modification, and/or cancellation of transactions and deals of any kind between the Company and any of its Related Parties, or between a Subsidiary and a Related Party, unless the performance of said transaction or deal specifically with said Related Party is expressly provided for in the Appendix on Investments Approved by the Business Plan. To this end, the following situations do not constitute conflict of interest although they are not subject to the situation referenced in the *caput*:

(a) the provision of services involving financial advising, capital markets, treasury, the provision of banking services and financing provided by the Quotaholder or companies of its Economic Group to the Fund, the Company and/or Subsidiaries;

(b) the Company's relationship with sponsors of the EFPCs; and

(c) the relationship between the EFPCs and their respective sponsors;

(x)   completion, modification, and/or cancellation of transactions and deals of any kind by the Company and/or its Subsidiaries that individually or jointly, performed in the same fiscal year, are for amounts greater than 2% (two percent) of the total SG&A value of the Company's annual budget, or 5% (five percent) per specific annual budget item;

(xi)   resolution as to any offer to acquire the Class A shares of any company in which the Company holds a direct or indirect interest, unless otherwise provided for in the shareholders' agreements of the aforementioned companies;

(xii)   approval of the entry of a new shareholder other than a Quotaholder into the Company's share capital by means of subscription of new shares to increase the share capital, consistent with the provisions of Clause 10 and 11 of the Shareholders' Agreement as to the rights of shareholders in the transfer of subscription rights;

Confidential

(xiii)   resolution on any amendment to the EPC Contracts, Charter Contracts, Service Provision Contracts and Asset Maintenance Contracts that result in changes to the price, term, guarantees, penalties, and conditions that might adversely affect the acceptance of any rig by Petrobras, as well as cancellation of the aforementioned contract;

(xiv)   resolution on entering into, amending and/or cancelling the shareholder agreements of entities controlled directly or indirectly by the Company;

(xv)   resolution on the sale of the Class B shares of the SPEs to a company not included on the List of Pre-Selected Companies;

(xvi)   resolution on the trading of capital and/or initial public offering of shares issued by the Subsidiaries;

(xvii)   approval of the issuance of any instruments or investment securities convertible to shares by the Company and/or its Subsidiaries;

4.10.   The following matters may only be approved by favorable vote of members of the Investment Committee representing a minimum of 75% (seventy-five percent) of the Quotas issued by the Fund:

(i)   Approval and amendment of the Business Plan and its appendices; and

(ii)   approval of the entering into of any loan and/or financing agreements, or the contracting of other forms of debt, by the Company or by its Subsidiaries, not provided for or provided for under terms other than those stipulated in the Appendix – Investments Approved in the Business Plan.

4.11.   The following matters may only be approved by the favorable vote of members of the Investment Committee representing a minimum of 65% (sixty-five) percent of the Quotas issued by the Fund:

(i)   resolution on the opening of the share capital for trading and/or the Company's Initial Public Offering, consistent with the provisions of Clauses 8.1. and 8.2. of this Agreement;

21

(ii)     election, reelection, dismissal, and replacement of the Directors. On an extraordinary basis, said resolution shall be considered guidance for a vote binding on the members of the Company Board of Directors nominated by the Fund.

(iii)    approval of the sale, acquisition, lease, assignment, and Transfer of the assets of the Company or of any Subsidiary, in a single transaction or accumulated totals of multiple transactions, up to a value above USD 15,000,000.00 (fifteen million U.S. dollars) in a single fiscal year.

4.12.   The following matters may only be approved by favorable vote of members of the Investment Committee representing the majority of Quotas issued by the Fund:

(i)      approval of the annual budget of the Company and its Subsidiaries;

(ii)     resolution on the financial statements presented by the Company's Board of Directors, as well as the financial statements of its Subsidiaries;

(iii)    resolution on the allocation of net earnings for the fiscal year and the distribution of dividends;

(iv)     resolution on the granting of avals, bonds, or guarantees of any kind by the Company and its Subsidiaries, in conflict with the Appendix – Investments Approved by the Business Plan, which individually or jointly, when executed in a single fiscal year, are valued at over R$ 10,000,000.00 (ten million reais);

(v)      resolution on the splitting, consolidation, redemption, or purchase of shares for cancellation or for holding in treasury.

(vi)     resolution on the approval, amendment, and/or elimination of the stock   option plan intended for senior executives, directors and other administrators of the Company and/or its Subsidiaries, noting that the stock options to be granted by the Company will correspond

22

to a maximum of 5% (five percent) of the total shares issue by the Company, as approved by the Company's General Meeting of Shareholders;

(vii)     resolution on the annual compensation of the directors;

(viii)    resolution on the voting instruction corresponding to exercise of the right of first refusal, and the assignment, transfer or disposal of the Class B shares of any company in which the Company holds a direct or indirect ownership position, unless stipulated otherwise in the shareholder agreements of the aforementioned companies or in the Appendix – Investments Approved by the Business Plan; and

(ix)      election, at any time, of the members of the Board of Directors and Fiscal Council, pursuant to <u>Clause 4.14.</u> below;

4.12.1.  Any votes declared by the Fund, at the Company's General Meetings, in conflict with the resolution passed by the Quotaholders of the Investment Committee, shall be considered void by the Company, for all purposes.

4.12.2.  The direction of the vote of the Investment Committee must be followed by the members of the Company Board of Directors nominated by the Fund, which in resolutions concerning matters under their competency, must vote in such a way as to not directly or indirectly conflict with the decisions, votes, or guidelines of the Investment Committee.

4.13.    <u>Conflict of Interest</u>. In any resolution involving matters in which any Quotaholder raises the possibility of the existence of a conflict of interest between one or more Quotaholders and the Fund, the Company and/or its Subsidiaries, the examination of the conflict of interest shall be submitted, in advance, for resolution of the General Meeting of Quotaholders or the Investment Committee, as the case may be, considering the competency of each entity for resolving on the matter that gave rise to the conflict. In that case, the Quotaholders not in conflict, or their respective representatives on the Investment Committee, may, by simple majority of those present, resolve as to the possibility of the conflicted Quotaholder's participating in the resolution.

4.13.1. For the purposes set forth herein, conflict of interest is understood as being the existence of any interest by the Administrator, its respective shareholders or partners, administrators or employees of the Administrator, Fund Quotaholders, members of the Investment Committee, or

EIG00102293
EIG_KEP_00211793

their respective spouses, companions or the relatives to the second degree of any of the aforementioned persons, which might directly or indirectly, from any standpoint, be contrary to the interests of the Fund, the Company or its Controlled Companies.

4.13.2.  The following situations do not constitute conflict of interest although they are not subject to the situation referenced in the *caput*: (i) the provision of services involving financial advising, capital markets, treasury, the provision of banking services and financing provided by the Quotaholder or companies of its Economic Group to the Fund, the Company and/or its subsidiaries and controlled entities; (ii) the relationship between the Fund, the Company and/or its subsidiaries and controlled entities, with the EFPC sponsors; and (c) the relationship between the EFPCs and their respective sponsors.

4.14.  <u>Nomination of Members of the Company's Board of Directors</u>. The Company's Board of Directors shall consist of up to seventeen (17) effective members and an equal number of alternates, one of which shall be its chair and another its vice chair, elected by the General Meeting and subject to dismissal thereby at any time, with (i) one (1) effective member and the respective alternate on the Board of Directors to be elected solely at the nomination of Petrobras; (ii) one (1) effective member and the respective alternate to be selected by Company shareholders from a list containing three (3) suggestions to be made by Petrobras, with the referenced effective member to be elected company Director and Chair, in addition to a member of the Board of Directors; and (iii) the other effective members and their respective alternates to be elected at the sole nomination of the Fund, consistent with the provisions of this Agreement.

4.14.1.  With respect to the fifteen (15) effective members of the Company's Board of Directors and their respective alternates to be appointed by the Fund, until the holding of the Company's Initial Public Offering:

(i)      one (1) of them shall be nominated by the Administrator, or by the manager of FI-FGTS, if this party should become a Quotaholder of the Fund (noting that, in this second case, the Fund manager may nominate a representative to participate in the meetings of the Board of Directors as a non-voting member);

(ii) one (1) effective member and the respective alternate shall be nominated by Petros,

EIG00102294
EIG_KEP_00211794

(iii) one (1) effective member and the respective alternate shall be nominated by Funcef,

(iv) one (1) effective member and the respective alternate shall be nominated by Previ,

(v) one (1) effective member and the respective alternate shall be nominated by BTG Pactual,

(vi) one (1) effective member and the respective alternate shall be nominated by Santander,

(vii) one (1) effective member and the respective alternate shall be nominated by Fundo Strong,

(viii) one (1) effective member and the respective alternate shall be nominated by Valia,

(ix) one (1) effective member and the respective alternate shall be nominated by Luce Drilling, and

(x) one (1) effective member and the respective alternate shall be nominated by EIG.

4.14.2.        In addition to the members referenced above, Quotaholders who possess more than 15% of the Quotas issued by the Fund shall be entitled to nominate one additional member and the respective alternate to the Board of Directors, at all times in compliance with the maximum limit of up to fifteen effective members and their respective alternates to be nominated, in aggregate, by the Fund. For clarification purposes, the Quotaholders Petros, Funcef and BTG Pactual shall be entitled to elect a second effective member and respective alternate so long as they hold a stake greater than 15% of the Quotas issued by the Fund. In the event that their stakes are reduced to 15% or less of the Quotas issued by the Fund, the aforementioned Quotaholders shall lose their right to elect the second effective member and respective alternate.

4.14.3. No Quotaholder may appoint more than two (2) effective members and more than two (2) alternate members.

4.15.   New Business Advisory Committee. The CANN is a non-deliberative body, associated with the Board of Directors, that seeks to anticipate the analysis and discussion of potential opportunities for equity investments and divestments, lending greater efficiency and speed to the Company's deals, and shall be regulated by its regulation.

4.15.1. The CANN shall consist of the Director/Chairman or the Company Director of Investments [*Director de Participação*], one (1) representative from the Board of Directors, one (1) representative of

EIG00102295
EIG_KEP_00211795

the Fund Administrator and one (1) representative of each Quotaholder, who must be approved by the Board of Directors.

4.16.   Nomination of Members of the Company Fiscal Council. The Company's Fiscal Council shall be permanent in nature and shall consist of five (5) members, nominated by the Fund, which shall consider the nomination of the Quotaholders as follows: (i) Valia, Petros and Funcef shall nominate one (1) member each; and (ii) BTG Pactual, Fundo Strong and Santander shall nominate two (2) members jointly.

4.16.1. The Company shareholders shall necessarily maintain the criteria for composition of the Fiscal Council in the form specified in this clause for the first six (6) years after May 13, 2011, the date of signing of the first Fund Quotaholders' Agreement.

## CHAPTER V – CAPITAL CALLS; PAYING-IN OF QUOTAS

5.1.   Paying-In. The Quotaholders shall incorporate the respective Quotas and shall pay the Entry Fee, where applicable, through capital calls to be made by the Administrator to Quotaholders, pursuant to and up to the limit set forth in the respective Investment Commitments.

5.1.1.   The Administrator may only request capital calls to: (i) fulfill the plan set forth in the Appendix – Investments Approved by the Business Plan, consistent with the provision of the Company's Shareholders' Agreement, and/or (ii) payment of Fund expenses and charges and/or (iii) fulfillment of resolutions passed by Investment Committee.

5.1.2.   Capital Calls shall observe the Company's corresponding needs for net equity, as stipulated in the Appendix – Investments Approved by the Business Plan, which must provide the schedule of contributions needed for fulfillment of the obligations assumed by the Company for implementation of the project.

5.1.3.   Except to the extent needed for paying Fund charges, pursuant to Clause 5.1.4. below, the funds originating from the capital contributions made by the Quotaholders, as a result of capital calls, must be used for the Fund to pay-in shares and investment securities issued by the Company,

Confidential

within a period of up to three (3) business days of the date they are contributed to the Fund.

5.1.4.   A portion of the funds contributed by the Quotaholders may be retained by the Administrator to address the Fund's expenses and charges, limited in all cases to the amount corresponding to (i) 0.5% (five-tenths of one percent) of the Fund's Committed Share Capital, or (ii) the Fund's provision for expenses for the next six (6) months, whichever of the two is less.

5.1.5.   Notwithstanding the above provisions, Quotaholders shall be permitted to complete the paying-in of their Quotas by means of shares and investment securities issued by the Company, provided they are consistent with the Fund's investment policy, as provided for in the Bylaws, and as expressly stipulated in its respective Investment Commitment.

5.2.   After execution of an Additional Issuance of Quotas, any new paying-in of capital subscribed by the Fund and/or the execution of capital increases in the Company, pursuant to the Company's Shareholders' Agreement, must be covered by the Fund, on a priority basis, through the contribution of funds from the New Quotaholders or from Quotaholders who have increased their stakes, through the paying-in of Quotas, plus the respective Entry Fee, until the ratio between subscribed capital and paid-in capital of each Quotaholder is equivalent.

5.2.1.   For the purposes stipulated in Item 5.2. above, until all Fund Quotaholders have attained the same ratio between subscribed and paid-in capital, the Administrator must make capital calls solely to Quotaholders that, proportionally, hold a smaller stake in the paid-in share capital.

5.2.1.1. Equalization of the ratio between subscribed and paid-in share capital must be attained by the Quotaholders for each set of Quotas subscribed thereby that have the same issuance price and Entry Fee. After equalization of the ratio between subscribed and paid-in capital of all Quotaholders, they must again pay-in in proportion to each Quotaholder's stake in the Fund, and the average Entry Fee, calculated in consideration of the Total Entry Fee to be paid over the total Quotas to be paid-in pursuant to the Subscription Forms signed by the Quotaholder, shall be paid as they pay-in the Committed Share Capital.

27

EIG00102297
EIG_KEP_00211797

5.3.   <u>Subscription of New Quotas</u>. Excepting the case of the entry of a new shareholder directly into the Company, whenever a Company capital increase is approved, there shall be deliberation of an Additional Issuance of new Fund Quotas which, if approved, shall at all times have the same par value. Capital increases shall be carried out, on a priority basis, through the Fund, except pursuant to Clause 5.7 below.

5.3.1.   For the purposes set forth in Clauses 5.5. and 5.6. below, whenever there is an Additional Issuance of new Fund Quotas, the Administrator shall make its best efforts to obtain an Entry Fee at least equal to the subscription price of the Company's shares issued in the first paying-in of the Fund into the Company, corrected by a fixed nominal rate of 13% (thirteen percent) per year, *pro rata temporis*, weighted for the factor of paid-in capital over Committed Capital ("<u>Minimum Fee</u>").

5.3.2. The Entry Fee shall be expressed in reais per quota, and shall be paid upon each paying-in of the Quotas to which it corresponds, and its nominal value shall be determined by application of the following formula:

$$TI = \sum \{[(T_{Nom}+1)^{(1/252)}]^d - 1\} \times [(K_i/K_c)]$$

Where,

| TI | Entry Fee |
|---|---|
| $T_{Nom}$ | Nominal fee per year, *pro rata temporis*, to be defined by the General Meeting of Quotaholders that approve the Additional Issuance of Quotas. |
| d | Number of business days counting as from each paying-in of Company shares by the Fund, up to the date of Additional Issuance of Quotas. |
| $K_i$ | Paid-in share capital at each call for capital |
| $K_c$ | Share capital committed on the date of the Additional Issuance of Quotas. |

5.3.3. The Entry Fee shall be owed by all Quotaholders that subscribe for Quotas of the respective Additional Issuance of Quotas, including those that had exercised their Right of First Refusal and/or Right of First Refusal and/or Right of First Refusal over Excess Quotas, and shall be paid by the Quotaholders as they pay-in the amounts of the Committed Share Capital, as stipulated in the

28

EIG00102298
EIG_KEP_00211798

respective Investment Commitments and in the Payment Notification forwarded by the Administrator.

5.3.4.    Additional Issuances of Quotas, as well as the nominal $T_{Nom}$ rate that determines the Entry Fee, shall be delivered in a General Meeting of Quotaholders which shall conform to the quorums set forth in Clause 4.3.2. of this Agreement.

5.3.5.    Any Additional Issuances of Quotas necessary to address the increase in the Company's share capital may only be made provided they are consistent with the provisions of the Appendix – Investments Approved by the Business Plan.

5.4.    <u>Right of First Refusal to Subscribe for New Quotas</u>. In any Additional Issuance of Quotas, Quotaholders shall be entitled to Right of First Refusal and to Right of First Refusal over Excess Quotas for the subscription of new Fund Quotas, consistent with the Participation Limit.

5.4.1.    Exercise of the right of first refusal for the subscription of new Quotas by Quotaholders (including the Right of First Refusal over Excess Quotas) must be expressed by means of written notification sent to the Administrator, by registered letter with acknowledgement of receipt, within 30 (thirty) days of the decision of the General  Meeting of Quotaholders that approved the Additional Issuance of Quotas, indicating the amount they wish to subscribe, consistent with the Participation Limit.

5.4.2    Consistent with Clause 5.4.1. above, the Administrator shall allocate the new quotas to Quotaholders that exercise their Rights of First Refusal, first, in proportion to the stake of the referenced Quotaholders in the Committed Share Capital on the date of the Additional Issuance of Quotas. In the event that any Quotaholder has failed to totally or partially exercise its respective Rights of First Refusal in the subscription of new Fund Quotas, resulting in excess Quotas, these shall be distributed among the Quotaholders that, pursuant to Clause 5.4.1. above, have already expressed their interest in subscribing for any excess Quotas, consistent with the Participation Limit ("<u>Right of First Refusal over Excess Quotas</u>"). In the event that more than one Quotaholder wishes to exercise its Right of First Refusal over Excess Quotas, such that the number of Quotas necessary in order for said Quotaholders to have their claims met entirely exceeds the number of remaining Quotas, they shall be distributed in proportion to the stake of said Quotaholders in the Committed Capital of the Fund on the date of the General Meeting of Quotaholders to approve the respective Additional Issuance of Quotas, disregarding the stakes of the Quotaholders that do not express their Right of First Refusal over Excess Quotas.

Confidential

5.4.3.    The General Meeting of Quotaholders shall establish the Distribution Plan for the new issuance, with a view to defining the allocation of any excess Quotas, after exercise of the Right of First Refusal over Excess Quotas, and it may also provide for the right of first refusal for interested third parties, consistent at all times with the Participation Limit.

5.4.4.    The General Meeting of Quotaholders that approves the Additional Issuance of Quotas may also provide for a scaled Entry Fee per phase of the Distribution Plan, provided it is applied uniformly and isonomically to the participants in the respective phase.

5.4.5.    Failure to exercise the Right of First Refusal in a specified Additional Issuance of Quotas, via formal refusal in this regard or absence of communication of interest to the Administrator within the deadline and in the form mentioned in the above Clauses or in the Distribution Plan, shall be understood as an exclusive waiver of the rights of subscription and first refusal corresponding to said issuance.

5.5.    <u>New Investments</u>. Without prejudice to the provisions of Chapter IV, the approval of new investments to be made by the Company ("<u>New Investments</u>"), and the respective change in the Appendix – Investments Approved in the Business Plan, must conform to the following rules:

5.5.1.    In the event the New Investment includes activities already provided for in the Company's corporate purpose, the New Investment will only be approved by the Investment Committee with the favorable vote of members representing a minimum of 75% (seventy-five percent) of the Quotas issued by the Fund.

5.5.2.    In the event the New Investment includes activities not provided for in the Company's corporate purpose, the New Investment will only be approved by the Investment Committee with the favorable vote of members representing a minimum of 94% (ninety-four percent) of the Quotas issued by the Fund. altering the Company's corporate purpose to include the new activity.

5.6.    <u>Mismatch</u> [*Desenquadramento*]. To avoid any case of mismatching of the EFPCs upon the occurrence of any Capital Call, Quotaholders that are of the nature of EFPCs must pay-in their respective amounts  one (1) day in advance to the Quotaholders that are of the nature of EFPCs, pursuant to the Investment Commitment.

5.6.1. The Administrator may request that the paying-in of capital of the non-EFPC Quotaholders be done by 11:00 a.m. on the deadline for the paying-in of the funds, and of the EFPC Quotaholders by 1:00 p.m. on that deadline.

5.7.   Default: In the event of failure to settle the Payment Notifications, the penalties set forth in the Fund Bylaws shall apply.


## CHAPTER VI – TERM

6.1.   Original Term. As set forth in the Bylaws, the Fund shall have a term of twenty (20) years, counting from the date of the first paying-in of Quotas from the First Issuance of Fund Quotas, the first ten (10) years of which shall correspond to the Investment Period, and the following ten (10) years to the Divestment Period.

6.2.   Early Fund Liquidation. Notwithstanding the provisions set forth in the Bylaws, in the event that the Fund and Petrobras, as sole shareholders of the Company, at any time during the duration of the Fund approve an initial public offering of the Company's shares ("Initial Public Offering"), pursuant to Law No. 6,385 of December 7, 1976, and CVM Instruction No. 400 of December 29, 2003, as amended, the Fund shall be automatically liquidated on the date of publication of the announcement of the start of the Initial Public Offering through delivery of the instruments and investment securities issued by the Company to the Quotaholders.

6.2.1.   For the purposes stipulated in Item 6.2. above, early liquidation of the Fund shall be promoted directly by the Administrator, and it shall not be necessary to convene a General Meeting of Quotaholders to approve the matter.

6.2.2.   The Administrator must immediately take all necessary measures to redeem Fund investments in liquid assets, except shares and investment securities issued by the Company, pay all Fund expenses and charges, and initiate any other procedures for redemption of the Quotas and liquidation of the Fund.

6.2.3.   After payment of the Fund's expenses and charges, the Administrator shall distribute to the Quotaholders the instruments and investment securities issued by the Company and other assets

31

EIG00102301
EIG_KEP_00211801

comprising the Fund portfolio, in proportion to each Quotaholder's stake in the Fund's Net Equity.

6.2.4.    In the event the Fund's investments, redeemed pursuant to Clause 6.2.2, are not sufficient as to pay off all the Fund's expenses and charges, the Administrator shall send a Payment Notification to all Quotaholders which, together, are sufficient as to discharge all the obligations, without any excess funding.

6.3.    <u>Split of the Fund</u>. After the three (3)-year period, counting from the date of the first paying-in of share capital by the Fund in the Company, without the occurrence of an Initial Public Offering of the Company, and provided there is no mismatch of EFPC participation in the Fund, as defined in CMN Resolution No. 3792 of September 24, 2009 and subsequent amendments, any Quotaholder may, at its sole discretion, notify the Administrator, for it to communicate to the other Quotaholders, its total or partial intention to directly hold shares representing the Company's share capital.

6.3.1.    In that case, within three (3) Business Days, the Administrator must forward the notification received pursuant to Item 6.3. above to the other Fund Quotaholders, which shall have fifteen (15) days to express their respective intentions to directly hold instruments and investment securities issued by the Company.

6.3.2.    If, by virtue of the limit on the matching [*enquadramento*] of EFPC participation as noted above, it is not possible for the interested Quotaholder(s) to withdraw from their entire stake, then their withdrawal shall be permitted only in a proportion that takes into account the withdrawal intent expressed by each Quotaholder and the maximum withdrawal limit that does not result in a mismatching of the participation of the EFPCs that will remain as Fund quotaholders.

6.3.3.    In that case, the Quotaholders undertake to approve the split and conversion of the Fund into two different FIPs, one for those Quotaholders that wish to maintain their indirect investments in the Company (FIP 1) and the other for those Quotaholders that wish to have their quotas converted to shares issued by the Company (FIP 2).

32

EIG00102302
EIG_KEP_00211802

6.3.4.    The FIP 2 quotaholders shall resolve to liquidate the FIP 2 by means of an exchange of their quotas for shares issued by the Company in such a way that they hold a direct corporate stake in the Company equal to their interest held indirectly through the Fund and, subsequently, the FIP 2 ("Right of Exchange for Shares").

6.3.5.    Through exercise of the Right of Exchange for Shares, the rights of the new Company shareholders shall be kept in proportion to their stake in the Fund.

6.3.6.    In the event that Fund liquidation occurs as a function of the split described in this item, prior to the split, the Quotaholders undertake to approve Charter documents of the Company to include rules of governance consistent with those contained in the Shareholders' Agreement and this Quotaholders' Agreement, to proportionally maintain the rights of the Quotaholders who come to hold shares issued by the Company as a result of the Fund's split.

6.3.7.    The process of splitting the Fund may be carried out as many times as necessary in order for Quotaholders to completely implement their intent to directly hold instruments and investment securities issued by the Company, consistent with the minimum frequency of three (3) months.

6.3.8.    In the event of split of the Fund, the indirect stake held by the remaining Quotaholders through the Fund, subsequently the FIP 1, in the Company, must be maintained.

6.4. Early Paying-In for purposes of an Initial Public Offering. In the event that the Fund and Petrobras, in their capacity as sole shareholders of the Company, at any time during the lifetime of the Fund approve the completion of an Initial Public Offering for Company Shares, consistent with the provisions of Clause 8.1. below, the Company may require part or all of the funding committed by the Quotaholders in advance, notwithstanding the provisions set forth in the Business Plan. In that case, within fifteen (15) Business Days counting from the date of the corporate resolution approving completion of the Initial Public Offering, the Quotaholders hereby undertake to take the necessary measures as for the Administrator to issue a capital call pursuant to Article 41 of the Regulation, in the amount needed to supply the Company with the funding it requires, up to the maximum amount committed by the Quotaholders, and in proportion to their respective stakes in the Fund, pursuant to the Investment Commitment.

33

EIG00102303
EIG_KEP_00211803

6.4.1.    After executing the Initial Public Offering for the Company's Shares, the Quotaholders shall be automatically relieved of the obligation to make any further contribution of funding to the Fund, regardless of whether or not the Committed Share Capital for each Quotaholder, in addition to the respective Entry Fees, has been completely contributed to the Fund, pursuant to the respective Investment Commitment.

6.4.2.    In the case of Clause 6.4., the Quotaholders must request that the Administrator convene a General Quotaholders' Meeting, pursuant to the Bylaws, to resolve as to the early closing of the Fund's Investment Period, with the Quotaholders hereby undertaking to vote at the aforementioned meeting to approve the early closing of the Investment Period.

6.4.3.    In the event that during the Initial Public Offering, the Company's Board indicates that there is a possibility of cancellation of a portion of the Remaining Committed Share Capital Not Paid-In, even after any completion of the contributions provided for in Clause 6.4. above, the Quotaholders may individually opt to: (i) cancel all or part of their respective Remaining Committed Share Capital Not Paid-In, or (ii) anticipate all or part of the contribution of their respective Remaining Committed Share Capital Not Paid-In.

6.4.4.    The decision of the Quotaholder with respect to the provisions of Item 6.4.3. above shall prevail provided that (i) it is duly ratified at a Meeting of the Investment Committee and, to that end, all Quotaholders henceforth undertake to ensure that their nominated members of the Investment Committee vote in favor of ratification to fulfill each Quotaholder's individual option, and for purposes of a quorum for resolution of the aforementioned Committee, no potential vote shall be considered that disregards and/or ignores each Quotaholder's individual option, as mentioned in Clause 6.4.3. above; and (ii) consistent with the matching limits set forth in CMN Resolution 3,792/09, and subsequent amendments. The decision of the Quotaholders must be communicated directly to the Administrator within a maximum of five (5) business days from the date of receipt of the communication from the Company's Board pursuant to Clause 6.4.3., and the meeting of the Investment Committee must be held within one (1) business day after expiration of the deadline for the Quotaholders to express their decision.

34

EIG00102304
EIG_KEP_00211804

6.4.5.    In the event that, as a result of the provisions of Item 6.4.3., any Quotaholder sees a dilution of its stake in the Fund, it shall have an opportunity to revise its decision, and to that end, within two (2) days after the date of communication of the dilution of its stake, it must express its intent to advance or cancel its contributions in order to maintain its stake in the Fund.

6.4.6.    Notwithstanding the above, Quotaholders undertake to consider, in their decision as to the cancellation or advancing of the contribution of the Remaining Committed Share Capital Not Paid-In, market factors and conditions raised by the Company and by its financial advisors, in order not to render unviable or damage the completion of the Initial Public Offering. In the event of a discrepancy of interests and conflict of understanding between Quotaholders as to the potential harm to the Initial Public Offering, they undertake to meet prior to the act of exercising the right to pay-in the Remaining Committed Share Capital Not Paid-In, and to discuss in good faith possible alternatives and solutions, guaranteeing that the IPO will occur, as stipulated by the Company.


### CHAPTER VII – TRANSFER OF QUOTAS


7.1.    <u>Transfer of Quotas</u>. Quotaholders undertake not to sell, assign, transfer, establish encumbrance on and/or dispose of, in any fashion or by any means, in whole or in part, directly or indirectly, the Quotas, the Right of First Refusal or the Right of First Refusal over Excess Quotas, except as stipulated in this Agreement.

7.1.1.    Any trading or Transfer of Quotas or exercise of Right of First Refusal or Right of First Refusal over Excess Quotas, as well as the creation of any Encumbrance on the Quotas in violation of the provisions of this Agreement, including but not limited to the Participation Limit, shall be considered null and void, and therefore the following is prohibited: (i) their registration by the Administrator and by the recording agent in the Registry of Quotaholders; and (ii) exercise by the assignee of the corresponding right to vote or any other right guaranteed by the Quotas.

7.2.    <u>Permitted Transfers</u>. Restrictions as to the Transfer of Quotas as set forth in this chapter shall not apply (i) to Transfers of Quotas between Quotaholders, and (ii) to Transfers undertaken between investment companies or vehicles belonging to the same Economic Group as the disposing Quotaholder, provided they comply with the Participation Limit set forth in Clause 7.3. below.

7.3.    <u>Participation Limit</u>. No Quotaholder may directly or indirectly hold quotas, individually or jointly with other Quotaholders forming part of the same Economic Group, or exercise jointly with other Quotaholders, the political rights related to quotas, representing a percentage of greater than 30% (thirty percent) of the Fund's Committed Share Capital ("<u>Participation Limit</u>"). For purposes of calculating the Participation Limit, the stakes must be added that are held by Quotaholders that (i) belong to the same Economic Group; and/or (ii) are party to or have entered into, in any way, a voting agreement and/or other political rights in relation to their respective stakes in the Fund and/or in the Company.

7.3.1.    Each Quotaholder expressly undertakes not to acquire Fund Quotas, in any form, and hereby waives the Right of First Refusal and the Right of First Refusal over Excess Quotas in the subscription and/or acquisition of Fund Quotas, when the exercise of said right results in a direct or indirect stake above the Participation Limit. The Administrator shall take measures to certify that no purchase, sale, or subscription transaction involving Fund quotas in violation of the provisions of this Clause is entered into in any way and under any circumstances. Any Transfer of Quotas or exercise of the Right of First Refusal in the subscription of Fund Quotas that results in a violation of the provisions of this Clause 7.3.1. shall be subject to the provisions of Clause 7.1.1. above.

7.3.2.    In the event that any Quotaholder's stake exceeds the Participation Limit, the aforementioned Quotaholder (i) shall not exercise the respective voting rights corresponding to the quotas that exceed the Participation Limit; and (ii) undertakes to dispose of quotas that exceed the Participation Limit within 90 (ninety) days, consistent with the Right of First Refusal.

7.3.3.    In the case mentioned in Clause 7.3.2. (ii) above, in the event the Quotas exceeding the Participation Limit have not been disposed after expiration of the ninety (90)-day period, a General Quotaholders Meeting shall be convened within thirty (30) days, to deliberate on alternatives for the Quotaholder's re-matching to the Participation Limit, noting that, in the event that disposal of the excess quotas is not possible, the Quotaholder that exceeds the Participation Limit shall be prevented from exercising its voting rights with respect to the aforementioned excess Quotas, until such time as said situation is corrected.

36

EIG00102306
EIG_KEP_00211806

7.4.    For purposes of fulfilling the provisions of Clause 7.3. above, upon each Additional Issuance of Quotas, all Quotaholders shall sign a Statement, consistent with Appendix 1 of this Agreement, reporting whether, jointly with any other Quotaholder, they exceed the Participation Limit.

7.5.    <u>Lock-Up Period for Fund Quotaholders</u>. Except in the case of a Permitted Transfer, Quotaholders may not, under any circumstances, transfer their respective Quotas corresponding to the Committed Share Capital, from this date until the occurrence of the earliest of the following events ("<u>Lock-Up Period</u>"): (i) completion of an Initial Public Offering of the Company; or (ii) period of three (3) years from the date of the first paying-in of Quotas by each Quotaholder in the Fund, pursuant to Item 7.5.1.

7.5.1.    The Lock-Up Period for Fund Quotaholders who contribute capital as part of the Additional Issuances of Quotas shall be the following: (i) period of three (3) years from the subscription of shares by each Fund Quotaholder, noting that with respect to the initial Quotaholders that have contributed share capital in any Additional Issuance of Quotas, the new Lock-Up period stipulated in this Clause shall be applicable only to the newly issued Quotas; or (iii) publication of the Initial Public Offering.

7.5.2.    After the Lock-Up period of the Fund Quotaholders and the conclusion of all investments stipulated in the Business Plan, Quotaholders may Transfer their Quotas to third parties, consistent with the Right of First Refusal.

[initials]

7.6.    <u>Final Petrobras Lock-Up Period</u>. The Lock-Up Period for Petrobras, in its capacity as Fund Quotaholder, shall expire in the event of the entry of a potential new Fund Quotaholder with the characteristics of Clause 7.6.1., if there has been (i) a prior and contrary statement in writing by Petrobras with respect to the entry of said Potential Entering Party; and (ii) a statement by Petrobras of its intent to dispose of its quotas to the Potential Entering Party. In the event that said disposal fails to occur within the periods specified in this Agreement, the Lock-Up Period for Petrobras shall remain in force.

7.6.1.    A statement by Petrobras contrary to the entry of a Potential Entering Party must be justified in at least one of the following cases:

(i) in the event the Potential Entering Party is a competitor of Petrobras itself;

37

EIG00102307
EIG_KEP_00211807

(ii) in the event the Potential Entering Party is a company that is directly or indirectly active in the market for the chartering of drilling rigs and/or drilling rig operations;

(iii) in the event the Potential Entering Party is in litigation with Petrobras or its directly or indirectly controlled or related entities; and/or

(iv) in the event that Petrobras believes that the Potential Entering Party is not qualified to be a Company shareholder, and is likely to tarnish the image and reputation of the latter or its direct or indirect shareholders.

7.6.2.    Petrobras must make a statement as to the entry of the Potential Entering Party fifteen (15) days prior to expiration of the period for exercising Right of First Refusal, justifying any decision contrary to the entry of a Potential Entering Party.

7.6.3.    In the case stipulated in Clause 7.6., in the event the other Quotaholders fail to exercise their Right of First Refusal with respect to the offered Quotas, the Potential Entering Party must make an offer to acquire all the Quotas held by Petrobras and the other Quotaholders, noting that the price to be paid for the quotas may not be less than the price stipulated in Clause 7.9.1.

7.7.    Transfer of Non-Paid-In Quotas. Quotas may only be transferred to third parties if said Quotas have been completely paid-in or, in the event they have not been so, if the assignee assumes, in writing, jointly and severally with the Disposing Quotaholder, all obligations of the latter vis-à-vis the Fund and the other Quotaholders with regard to their paying-in.

7.8.    Right of First Refusal. After the lapse of the Lock-Up Period, a Quotaholder that wishes to transfer its Quotas to an interested third party, in whole or in part ("Disposing Quotaholder"), must offer them to the other Quotaholders, which shall have right of first refusal to acquire them under the exact terms as offered by the interested third party, consistent with the provisions of the Bylaws and of this Agreement, specifically the provisions of this Clause 7.8. and of Clause 7.9 below.

7.8.1.    Through receipt of an offer ("Offer") from a potential buyer ("Potential Buyer"), the Disposing Quotaholder must send a written notification to the Administrator, by means of a registered letter with return receipt requested describing the conditions of the Offer ("Notification of Offer"). For purposes of this Agreement, conditions of the Offer are understood as being (i) the

EIG00102308
EIG_KEP_00211808

quantity of Quotas the Disposing Quotaholder wishes to assign and transfer, (ii) the price per Quota offered by the Potential Buyer for acquisition of the quotas, (iii) the conditions, terms and guarantees of payment, (iv) other proposed conditions of the sale or transfer, and (v) the name, qualification, and complete identification of the Potential Buyer.

7.8.2.    The Notification of Offer shall be binding, irrevocable and irreversible, requiring the Disposing Quotaholder to dispose of its offered Quotas in accordance with the exact terms of the Offer Notification. Within a maximum of five (5) Business Days of the date of receipt of the Notification of Offer, the Administrator must send it to all other Fund Quotaholders, with a copy to Petrobras, pursuant to the Bylaws.

7.8.3.    The Quotaholders must state, via written notification sent to the Administrator, by means of a registered letter with acknowledgement of receipt, within a maximum of thirty (30) days counting from receipt of the Offer Notification, (i) whether they will exercise their respective Rights of First Refusal; or (ii) whether they will exercise their Joint Right of Sale, as applicable, in accordance with the rules of this Agreement.

7.8.4.    The Right of First Refusal may only be exercised in its entirety by Quotaholders interested in exercising the aforementioned right, individually or jointly, in proportion to their respective stake in the Fund's Committed Share Capital, considering only quotas already paid-in and disregarding the interests of the Disposing Quotaholder and the Quotaholders that do not exercise their Right of First Refusal, with no possibility of excess Quotas. The quantity of Quotas of the Disposing Quotaholder that may be effectively acquired by the interested Quotaholder, combined with the stake that the interested Quotaholder holds in the Fund, may not (i) exceed the Participation Limit, nor (ii) render it impossible for the Disposing Quotaholder to dispose of all the Quotas offered within the scope of the respective Offering.

7.8.5.    Through exercise of the Right of First Refusal by the Quotaholders, the offered Quotas must be transferred to the respective acquirers within a maximum of ten (10) days, from the end of the thirty (30)-day period to which Clause 7.8.3. above refers.

7.8.6.    In the event that the Quotaholders fail to exercise their Right of First Refusal, in the form of this Clause 7.8., and Petrobras fails to dispute the entry of the Potential Entering Party, pursuant to Clause 7.6., the Disposing Quotaholder shall be free to dispose of its Quotas to the Potential Buyer, within ninety (90) days from the end of the period set forth in Clause 7.8.3., under the same

EIG00102309
EIG_KEP_00211809

terms and conditions as set forth in the Notification of Offer. In the event that, for any reason, it fails to complete the assignment and transfer of the Quotas to the Potential Buyer within that period, the Disposing Quotaholder must reinitiate the procedure set forth in this Clause 7.8. and Clause 7.9. below before being able to dispose of its Quotas.

7.8.7.   In its capacity as Fund quotaholder, Petrobras shall waive exercise of the right of first refusal to acquire new quotas, and its Right of First Refusal over Excess Quotas, whenever said exercise might result in an increase of its stake in the Fund to over 6% (six percent) of the Quotas issued by the Fund.

7.9.   <u>Right of Joint Sale (Complete Tag-Along)</u>. In cases of the lapse of the Petrobras Lock-Up period, as provided for in Clause 7.6. above, in their capacity as Fund Quotaholders, each Quotaholder individually shall have the opportunity, at the end of the thirty (30)-day period stipulated in Clause 7.8.3., to state its intentions to dispose of all of its respective Quotas to the Potential Entering Party.

7.9.1.   In the case of the exercise of the Complete Tag-Along, the purchase price of the Quotas may not be less than the higher of the prices determined in accordance with the following criteria: (i) price of issuance of the Company shares subscribed by the Fund, corrected by the IPCA plus 15% (fifteen percent) per year; or (ii) average price of the shares issued by the Company subscribed by the Fund, as determined by three (3) financial institutions nominated by the Quotaholders that have exercised the Complete Tag-Along.

## CHAPTER VIII – OTHER QUOTAHOLDER COMMITMENTS

8.1.   <u>Initial Public Offering ("IPO")</u>. In the event that the Company Board of Directors believes there is a market opportunity and investor interest, the Company may undertake an Initial Public Offering for the market, consistent with the *quora* stipulated in this =Agreement and in the Bylaws, where applicable, as well as in the Company's Charter documents and Shareholders Agreement. The Initial Public Offering shall consist, preferentially, of a primary offering and may include a secondary tranche, if there is interest on the part of the Company shareholders and it is considered appropriate by the financial advisors who will be engaged by the Company, taking into consideration the marketing conditions at the time of the offering and other corporate, financial, and administrative instruments of the Company. In that case, the Company Board

40

EIG00102310
EIG_KEP_00211810

of Directors shall present the shareholders with a report from the Company's financial advisors containing the estimated terms and conditions for completing an Initial Public Offering, as provided for in the Shareholders Agreement.

8.1.1.   The Company's Initial Public Offering, pursuant to Item 8.1. above, shall be approved by the Investment Committees unless the members of the Investment Committee representing 85% (eighty-five percent) of the Quotas issued by the Fund are opposed. In that case, the Quotaholders must take every necessary measure, sign all documents, and record all corporate instruments that might be necessary to complete the Initial Public Offering.

8.1.2.   In the event the Initial Public Offering considers a secondary offering of shares and the shareholders' placement intentions exceed the recommended quantity for the secondary offering, shareholders shall have their placement intentions covered in proportion to the number of shares that said shareholders are seeking to place, over the total number of shares that the shareholders as a whole have the intention of placing in the secondary offering.

8.2.   <u>Public Trading of Company Stock and Secondary Public Offering</u>. Notwithstanding the possibility of the Initial Public Offering stipulated in Item 8.1. above, any Quotaholder or group of Quotaholders that directly or indirectly holds a minimum of 10% (ten percent) of the Company's total share capital may, at any time after the lapse of a period of five (5) years counting from the first paying-in of the Fund's share capital in the Company, regardless of any restrictions on any of the Quotaholders, request that the Administrator take the necessary measures, together with the Company's management, for the latter to convene a Company General Meeting with a view to approving (i) the Company's formalization of the request for registration with the CVM as a publicly traded company, pursuant to CVM Instruction No. 480 of December 7, 2009; and (ii) the completion of a Secondary Public Offering of the Company's shares for total or partial sale of the stake of the aforementioned Quotaholder in the Company ("<u>Secondary Public Offering</u>"). In that case, and pursuant to this Clause, the Company, its shareholders, the Fund and its Quotaholders undertake to take all necessary measures as to complete the Secondary Public Offering.

8.2.1.   Upon receipt of the aforementioned request, the Administrator must take measures jointly with the Company's management and complete the necessary steps to convene the aforementioned meeting.

41

8.2.2.    The Quotaholders hereby undertake to vote in accordance with their Quotas at a meeting of the Fund Investment Committee prior to the holding of the Company's General Meeting, to instruct the Administrator to favorably rule on the Company's acquisition of registration as a publicly traded company on the CVM and to hold the Secondary Public Offering, as decided by the Company's management, which shall immediately take all necessary measures.

8.3.    <u>Pledge of Quotas</u>. In the case of the pledge of Quotas held by one of the Quotaholders, the latter shall communicate said fact to the Administrator within forty-eight (48) hours after the date it is informed of the pledge order, setting forth that the third-party creditor in the aforementioned process shall not be permitted entry into the Fund. In that case, the Quotaholder that has pledged its Quotas shall have seventy-two (72) hours  from the notification to the Administrator, to replace said encumbrance and/or to deposit the required amount. After the lapse of that period, the other Quotaholders, in their capacity as interested third parties, shall be entitled to: (i) redemption, subrogating themselves in the rights of the creditor; or (ii) to exercise their right of first refusal to acquire the pledged Quotas, applying the rules of judicial disposal stipulated in Articles 1,113 to 1,119 and by analogy the pledge of company quotas stipulated in §4, Article 685-A of the Brazilian Civil Procedure Code [*Código de Processo Civil*].

8.3.1.    If the other Quotaholders elect redemption, subrogating themselves in the rights of the creditor, the Quotas in question shall be pledged  by the Quotaholder that is in debt to the others, as guarantee of payment by that Quotaholder owing debt to the other Quotaholders, and all returns owed to that Quotaholder during the period when said Quotas were pledged shall be paid until complete discharge of the debt.

8.3.2.    A Quotaholder that has pledged its Quotas hereby consents to and does not object to the other Quotaholders' being able to elect redemption and subrogate themselves in the rights of the creditor.

8.4.    <u>Confidentiality</u>. The Quotaholders must keep confidential any information received from the Fund and the other Quotaholders, including but not limited to all data and information obtained by the Quotaholders in accordance with this Agreement and any operations stipulated herein that are not of public knowledge, such as operations, strategies, products, services, expenses, revenue, profitability, prices, internal processes, and customer lists, with the exception of contracts entered into with Related Parties, agreements, and options programs for the acquisition of shares or other instruments or investment securities issued by the Company ("<u>Confidential Information</u>").

42

8.4.1.   Validity of the Confidentiality Obligation. The obligation to maintain secrecy of the Confidential Information shall be binding for the entire lifetime of this Agreement. A Quotaholder that withdraws and liquidates its stake in the Fund must maintain secrecy of the Confidential Information for five (5) additional years from the date of its withdrawal from the Fund, or the holding of the Initial Public Offering, whichever occurs first, noting that with respect to the Operational Contracts of the Company and its Subsidiaries, the secrecy of the Confidential Information must be maintained for a period of ten (10) years, counted in the same form as indicated in this Clause or for the period set forth in the aforementioned Contracts, whichever is greater.

8.4.2.   Information that (a) is developed independently by the Parties or not subject to confidentiality and received legally from another source that has the right to provide it; (b) becomes available to the public without violation of this Agreement by the Parties; (c) on the date of disclosure to a Party, was known by the aforementioned Party as not being subject to confidentiality, as confirmed by documentation in its possession; (d) the Fund agrees, in writing, is free of said restrictions; or (e) must, currently or in the future, be disclosed as required by law, regulation or applicable government standards (of which fact the informed Party shall immediately notify the informing Party, affording it the opportunity to try to restrict disclosure) or by force of judicial or administrative decision, shall not be considered confidential information for purposes of this Agreement.

8.4.3.   No Party shall give access, without the Fund's prior consent, and the Fund shall not be required to give access, to the confidential information to any Person who fails to commit in writing, prior to obtaining said access, to keep the confidential nature thereof, including but not limited to advisors, directors, employees, representatives, and agents of the Party in question.

## CHAPTER IX – FINAL PROVISIONS

9.1.   Validity. This Agreement shall begin to be in force as from its signing and shall remain in force until the occurrence of the first of the following events: (i) a period of twenty (20) years from the date of the first paying-in of Quotas issued by the Fund, which may be renewed for an equal period of time, in the

Confidential

event there is no statement by any of the Quotaholders 180 (one hundred eighty) days in advance with respect to termination of the validity period; or (ii) completion of the Company's Initial Public Offering.

9.2.    Amicable Resolution. In the event of any Conflict (as described below), the Quotaholders must make their best efforts to resolve it amicably. To that end, any Quotaholder may notify the other of its intent to file the proceeding described in this Clause, through which the Quotaholders must meet to seek to resolve said Conflict by means of amicable and good-faith discussions.

9.2.1.   In the event that the Quotaholders fail to arrive at a consensus within thirty (30) days from the receipt of notification of any Quotaholder, then the Conflict must be resolved by arbitration, as described in Clause 9.3. below.

9.3.    Arbitration. Any controversies, litigation, doubts, disputes, conflicts, questions, or discrepancies of any kind originating from or related to this Agreement ("Conflict"), involving any of the Quotaholders ("Parties Involved"), shall be resolved by means of arbitration, to be conducted before and administered by the Brazil-Canada Chamber of Commerce Arbitration and Mediation Center ("Chamber").

9.3.1.   The arbitration shall be carried out in accordance with the procedural standards of the Chamber current at the time of the arbitration ("Arbitration Regulations").

9.3.2.   The arbitration shall fall to an arbitral tribunal consisting of three arbiters, preferably registered with the Brazil Bar Association ("Arbitral Tribunal").

9.3.3.   Each Involved Party shall nominate one arbiter. In the event of more than one claimant, all of them shall nominate by mutual accord a single arbiter; in the event of more than one respondent, all of them shall nominate by mutual accord a single arbiter. The third arbiter, who shall preside over the Arbitral Tribunal, shall be chosen by mutual accord of the arbiters nominated by the Involved Parties.

(a)     Any omissions, recusals, litigation, doubts, and lack of agreement as to the nomination of the arbiters by the Involved Parties or the selection of the third arbiter shall be settled by the Chamber.

(b)     The procedures stipulated in this clause shall also apply to cases of replacement of arbiter.

44

EIG00102314
EIG_KEP_00211814

9.3.4.   The arbitration shall be carried out in the City of Rio de Janeiro, State of Rio de Janeiro, and the Arbitral Tribunal, with just cause, may provide for the performance of specific actions in other locations.

9.3.5.   The arbitration shall be carried out in the Portuguese language.

9.3.6.   The arbitration shall be as a full matter of law, applying the rules and principles of the legal system of the Federative Republic of Brazil.

9.3.7.   The arbitration shall be concluded within six (6) months from the date of signing of the arbitration instrument, which may be extended for just cause by the Arbitral Tribunal.

9.3.8.   The arbitration shall be confidential.

9.3.9.   The Arbitral Tribunal shall allocate among the parties, consistent with the criteria of the burden of payment of the prevailing party's legal fees and costs in litigation, reasonableness and proportionality, the payment and reimbursement (i) of the fees and other amounts owed, paid or reimbursed to the Chamber, (ii) of the fees and other amounts owed, paid or reimbursed to the arbiters, (iii) of the fees and other amounts owed, paid or reimbursed to the experts, translators, interpreters, stenographers and other assisting staff as might be appointed by the Arbitral Tribunal, (iv) of the prevailing party's legal fees and costs in litigation as set by the Arbitral Tribunal, and (v) any indemnification for litigation in bad faith. The Arbitral Tribunal shall not sentence any of the Involved Parties to pay or reimburse (i) contractual fees or any other amount owed, paid, or reimbursed by the adversary party to its attorneys, technical assistants, translators, interpreters, and other assisting staff, and (ii) any other amount owed, paid, or reimbursed by the adversary party with respect to the arbitration, e.g., expenses relating to photocopies, notarizations, consularizations and travel.

9.3.10.   Arbitration decisions shall be final and binding, not requiring judicial approval nor subject to any appeal against them, with the exception of requests for correction and clarification to the Arbitral Tribunal pursuant to Art. 30 of Law No. 9,307/96 and any cancellation action based on Art. 32 of Law No. 9,307/96.

9.3.11.   Prior to installation of the Arbitral Tribunal, any of the Involved Parties may request of the Judicial Authority emergency measures, with the certainty that no request for an emergency measure to the Judicial Authority shall affect the existence, validity, and efficacy of the arbitration

45

EIG00102315
EIG_KEP_00211815

agreement, nor shall represent an exception with respect to the need to submit the Conflict to arbitration. After installation of the Arbitral Tribunal, requests for emergency measures must be addressed to the Arbitral Tribunal, after its establishment. Emergency measures granted by the Judicial Authority may be reviewed by the Arbitral Tribunal after its establishment.

9.3.12. For (i) emergency measures prior to the establishment of the Arbitral Tribunal, (ii) execution of the decisions of the Arbitral Tribunal, including the final ruling and any partial ruling, (iii) any cancellation action based on Art. 32 of Law No. 9,307/96 and (iv) Conflicts which by force of Brazilian law are unable to be submitted to arbitration, the Forum of the Court District of Rio de Janeiro, State of Rio de Janeiro is elected as solely competent, waiving all others, as special or privileged as they might be.

9.4.    Specific Execution. The Quotaholders agree that the allocation of losses and damages, even if due and determined in accordance with the law, shall not constitute appropriate and sufficient compensation for breach of the obligations set forth in this Agreement. After having obtained recognition of the breach and of the right to specific execution through an arbitral procedure, any Quotaholder may claim in court specific execution of the obligation not fulfilled through judicial order, in accordance with the terms of Articles 461, 466-A, 466-B, 466-C and 632 and thereafter of the Code of Civil Procedure.

9.5.    Notifications. All notifications, consents, requests, and other communications provided for in this Agreement shall be made in writing and hand-delivered, sent by registered letter (with acknowledgement of receipt) or by fax or recognized courier service, to the addresses and the responsible individuals identified below:

(i)     If for Petros:

Rua do Ouvidor, n° 98, Centro, Rio de Janeiro, RJ

CEP: 20040-030

Tel.: (21) 2506-0514

Attn.: Manuela Marçal, *Gerente Executiva de Participações Mobiliárias* [Executive Manager, Investment Securities]

Email: manuelam@petros.com.br

(ii)    If for Funcef:

Setor Comercial Norte Quadra 02, Bloco "A," Ed. Corporate Financial Center, 12º e 13º andares

Brasília, DF

46

CEP: 70712-900

Tel.: (61) 3532-1772

Fax: (61) 3532-1767

Attn.: Investments Department

Email: dipar@funcef.com.br; humberto@funcef.com.br

(iii)     If for Previ:

Praia de Botafogo, 501 - 3º e 4º andares - Botafogo

Rio de Janeiro – RJ

CEP: 22.250-040

Fax: (21) 3870-1652

Attn.: *Director de Investimentos* [Investments Director]

Email: dirin@previ.com.br and gerin@previ.com.br

(iv)     If for Valia:

Av. das Américas, No. 4430, 3º andar, Barra da Tijuca

Rio de Janeiro – RJ

CEP: 22640-102

Fax: (21) 3385 2227

Attn.: Mr. Eustáquio Coelho Lott

Email: eustaquio.lott@vale.com

(v)     If for Santander:

Av. Presidente Juscelino Kubitschek, 2.041/2.235, Bloco A (parte), 16º andar

São Paulo – SP

CEP: 04543-011

Fax: (11) 3553-2999

Attn.: Marcelo Hudik Furtado de Albuquerque

Email: mhalbuquerque@santander.com.br

(vi)     If for Fundo Strong:

Avenida Paulista, 1450, 12º andar

São Paulo, SP, 01310-100

Attn.: Mr. Fernando Jorge Buso Gomes

Telephone: +55 (11) 2178-5593/+55 (11) 2178-4510

Fax: +55 (11) 2178-5793

Email: fernando@bradescobbi.com.br

47

Confidential

EIG00102317
EIG_KEP_00211817

(vii)    If for BTG Pactual:

Praia de Botafogo, 501, Torre Corcovado, 5º andar

Rio de Janeiro – RJ

CEP 22250-040

*Departamento Jurídico* [Legal Department]

Tel.: (11) 3383-2000

Fax: (11) 3383-2001

Attn.: Mr. Bruno Duque, Mr. Oderval Duarte and Mr. Lucas Martinelli

Email: bruno.duque@btgpacual.com; oderval.duarte@btgpactual.com; and lucas.martinelli@btgpactual.com

(viii)    If for Petrobras:

Av. República do Chile, 65/1004

Rio de Janeiro – RJ

CEP 20031-912

Attn.: Fábio Barreto Lourenço

Tel.: (21) 3224-3067

Fax: (21) 3224-0860

Email: fabiolourenco@petrobras.com.br

(ix)    If for Lakeshore:

Rua São Tomé, 86, 19º andar, Cj. 191, Sala B

Vila Olímpia

04551-080 – São Paulo, SP

Tel.: (21) 8151-6309

Attn.: Luiz Fontoura de Oliveira Reis Filho

Email: luizreis@globo.com.br

(x)    If for Luce Drilling

Praia de Botafogo, 228, Ala A - sala 601, Botafogo

Rio de Janeiro, 22250-040

Fax: +55 21 25541071

Telephone: +55 21 2553-4303

Attn.: (Mr. Aldo Floris)

Email: aldofloris@flbinv.com.br

Confidential

EIG00102318
EIG_KEP_00211818

(xi)    If for EIG

1700 Pennsylvania Ave., NW

Washington, D.C. 20006, USA

Telephone: (202) 600-3306

Fax: (202) 600-3406

Email: kevin.corrigan@eigpartners.com; blair.thomas@eigpartners.com

(xii)   If for the Administrator

Av. Paulista, 2300 – 11º andar, Cerqueira Cesar

São Paulo, SP

CEP 01310-300

Fax: (11) 3555-6378
Attn.: *Gerência Nacional de Desenvolvimento de Fundos Estruturados* [National Structured

Funds Development Office]

Email: gedef@caixa.gov.br

(xiii)  If for the Company

Rua Humaitá 275, sala 1302, Humaitá

Rio de Janeiro, RJ

CEP 22261-005

Tel.: (21) 2528-0080

Fax: (21) 2528-0080

Email: joao.ferraz@setebr.com

9.5.1.   Notifications delivered in accordance with Clause 9.5 shall be considered as given: (i) at the time they were delivered, if delivered personally; (ii) at the time they were received, if sent by mail or courier service or by means of email with confirmation of receipt; and (iii) if by fax, on the date set forth in the confirmation of receipt of the transmission issued by the respective receiving fax device.

9.5.2.   Any Party may change the address to which the notification must be sent by written notification to the other Parties and to the Administrator in accordance with this clause, and with respect to this provision, the notification shall be considered as received only upon recognition of

Confidential

said receipt by each of the other Parties.

9.5.3.   Copies of notifications related to the Company and/or its subsidiary or controlled companies, received by the Administrator, must be forwarded to the Quotaholders, at the addresses noted in Clause 9.5. above, within three (3) Business Days.

9.6.    <u>Financial Transactions</u>. With respect to the contracting of the financial institutions provided for in this Agreement, the Quotaholders, Administrator and Investment Committee must observe the provisions of the Agreement in the performance of Financial Transactions.

9.7.    <u>Binding Effect</u>. Pursuant to Clause 9.9., this Agreement is entered into irrevocably and irreversibly, binding the Fund and its Quotaholders, on their behalf and on that of their respective successors and authorized assigns. New Quotaholders, by virtue of the subscription of new Quotas or the Transfer of Quotas, must adhere to the terms and conditions of this Agreement, as if they had been an original party thereto, subrogating themselves (in the case of Transfer) completely in the rights and obligations of the assignor, and noting that any such subscription or Transfer shall only be valid pursuant to said complete adherence.

9.8.    <u>Invalidity, Inefficacy and Unenforceability</u>. If, for any reason, any provision of this Agreement comes to be considered invalid, ineffective, or unenforceable, said provision shall be limited to the amount possible for it to produce its effects, and the validity, effectiveness, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or harmed.

9.9.    <u>Changes</u>. This Agreement may not be changed without the express written consent of all Quotaholders and Consenting Participants.

9.10.   <u>Updating of Amounts</u>. All absolute amounts provided for in this Agreement shall be adjusted annually according to the IPCA, with no need to enter into an amendment of this Agreement.

9.11.   <u>Waiver, Recission, or Discharge</u>. No waiver, rescission, or discharge of this Agreement, or of any of its terms or provisions, shall be binding on any of the Parties unless confirmed in writing. No waiver by any of the Parties of any term or provision of this Agreement or any breach under this instrument shall constitute a novation, nor shall prejudice or restrict said Party's rights, nor shall exempt the other Parties

50

EIG00102320
EIG_KEP_00211820

from complete fulfillment of their obligations herein stipulated, nor shall affect the rights of said Party, as of that point, to perform said term or provision, or to exercise any legal right or remedy in the event of any other violation, whether similar or otherwise.

9.12.   <u>Entirety of the Agreement; New Agreements</u>. This Agreement replaces the Fund Quotaholders' Agreement entered into on May 13, 2011 and its subsequent amendments. This Agreement, as of this date, constitutes the entirety of the agreement and the understanding of the Fund with respect to the matters covered herein, and expressly cancels and replaces any other prior accords, verbal or written. The provisions of this Clause 9.12 shall not prevent the Parties from entering into, among themselves, other Quotaholder agreements or any other document binding the Quotas, provided that (i) the existence of said agreement and the matters contained therein is expressly communicated to the Administrator, and a copy of said agreement is archived at the Administrator's registered office; (ii) said agreement is not in conflict or inconsistent with or contrary to the provisions of this Agreement; and (iii) the direct and/or indirect stake of the Quotaholders signatory to said agreement, in the Fund's Committed Share Capital, when added together, is less than the Participation Limit ("<u>Permitted Parallel Agreements</u>"). None of the Parties may enter into other documents or agreements of any kind that directly or indirectly result in the exercise, by any Quotaholder, of political rights over Fund Quotas representing more than 30% (thirty percent) of the Quotas representing the Fund's Committed Share Capital such that, in the event that a Permitted Parallel Agreement ends up binding a volume of Quotas greater than the Participation Limit, it shall be automatically suspended for all legal purposes until the signatory Quotaholders of said Permitted Parallel Agreement come to hold, jointly, a stake less than the Participation Limit. In the event of conflict, inconsistency or contrariety between this Agreement and the Fund's Bylaws, the provisions contained in this Agreement shall prevail.

9.13.   <u>Power and Authorization</u>. The Quotaholders and Consenting Participants have all power and authority necessary as to enter into this Agreement, fulfill its respective obligations and consummate the transactions stipulated herein. The entering into and delivery of this instrument by the Quotaholders and the Consenting Participants and the fulfillment of their obligations as provided for herein were duly authorized by all necessary corporate instruments. No other instrument is needed to authorize the entering into, delivery and fulfillment of this Agreement by the Parties.

9.14.   <u>Absence of Violation, and Consents</u>. Neither the entering into and delivery of this Agreement by the Quotaholders and the Consenting Participants, nor the fulfillment by the Quotaholders and the Consenting Participants of all their obligations provided for herein:

51

EIG00102321
EIG_KEP_00211821

(a)      shall violate or conflict with any provision of their founding documents;

(b)      shall violate, cause breach or in any other way constitute or give rise to a breach with respect to any contract, commitment, or other relevant obligation to which the Quotaholders and the Consenting Participants are party or by which they are bound;

(c)      shall violate or conflict with any regulation, order, law, instruction, regulation, standard, administrative or judicial decision of any court or other governmental or regulatory authority to which the Quotaholders and Consenting Participants are subject; nor

(d)      shall require any consent, approval or authorization, notification, archiving or registration vis-à-vis any person, entity, tribunal or governmental or regulatory agency.

9.15.   <u>Absence of Defects</u>. The services assumed are recognized by the Quotaholders as being manifestly proportional, and the Quotaholders are aware of all circumstances and rules guiding this legal transaction, and are experienced in the obligations corresponding thereto by reason of this instrument.

9.16.   <u>Capacity</u>. The legal representatives signing below are fully authorized to represent the Quotaholders and the Consenting Participants vis-à-vis third parties and to assume the obligations stipulated herein.

9.17.   <u>Titles</u>. The titles of the clauses of this Agreement are used only for reference purposes and shall not in any way affect the meaning or interpretation of this Agreement.

9.18.   <u>Registration and Publicity</u>. The Administrator must (i) maintain the registry of this Agreement together with the registry of Quotaholders; (ii) file the Agreement at its registered office; and (iii) inform the registering agent and the Custodian of Quotas as to the existence of the Agreement and its subsequent amendments, ensuring that they record the existence of the Agreement in the documentary registry of Quotas, in order to provide for publishing of the existence of the Agreement to third parties.

9.19.   <u>Applicable Law</u>. This Agreement shall be governed and interpreted in accordance with the laws of the Federative Republic of Brasil.

*[page left intentionally blank]*

52

EIG00102322
EIG_KEP_00211822

*(Page 1 of signatures of the Fund Quotaholders' Agreement, entered into on July 31, 2012)*

And, thus being duly contracted, the Parties hereby sign this Agreement in thirteen (13) copies of identical content and form, with the two (2) witnesses below, all present.

Rio de Janeiro, July 31, 2012.

**STRONG FUNDO DE INVESTIMENTO EM COTAS DE FUNDOS DE INVESTIMENTO MULTIMERCADO**

By : [signature]_____          By: [signature]_____

Name:                                    Name

Title:                                   Title:

**BANCO BTG PACTUAL S.A.**

By : [signature]_____          By: [signature]_____

Name:   [stamp:] CAMILLA BARROS DONATI     Name: [stamp:] FERNANDA GAMA MOREIRA
                ATTORNEY                          JORGE - ATTORNEY
Title:                                   Title:

**SANTANDER PARTICIPAÇÕES S.A.**

By : [signature]_____          By: [signature]_____

Name:                                    Name:

Title:                                   Title:

**FUNCEF - FUNDAÇÃO DOS ECONOMIÁRIOS FEDERAIS**

By : [signature]_____          By:_____

Name:   [stamp:] Carlos Alberto Caser      Name:
                Director - Chairman
Title:                 FUNCEF            Title:

*[Signature page follows]*

[stamp:] [initials]
CAIXA/GEJUR
OAB/SP
155619
Lucia Elena A. Bastos

[stamp:] [initials]
Felipe de Abreu
Cáceras
PREVI
ASJUR
Attorney

[initials]
[stamp:]
GEJUR
[initials]
FUNCEF

[stamp:] BANCO SANTANDER
(BRASIL) S/A
[initials]
Cecilia Pizzutti
LEGAL DEPARTMENT

[stamp:]
[initials]
VALIA – ASLIS
LEGAL CONSULTING -
INVESTMENTS

[stamp:]
VIEIRA REZENDE BARBOSA E
GUERREIRO
Advogados
[initials]

[stamp:] [initials]
**PETROS
LEGAL/CS
Maria Cortezzi**

[initals]
[stamp:]
Sete Brasil
[initials]
LEGAL

[stamp:]
REVIEWED
[initials]
LEGAL

53

Confidential

EIG00102323
EIG_KEP_00211823

*(Page 2 of signatures of the Fund Quotaholders' Agreement, entered into on July 31, 2012)*

**FUNDAÇÃO PETROBRAS DE SEGURIDADE SOCIAL – PETROS**

By : ____[signature]_____         By: _____

Name:                                             Name:

Title:                                            Title:

**CAIXA DE PREVIDÊNCIA DOS FUNCIONÁRIOS DO BANCO DO BRASIL – PREVI**

By : [signature]_____              By: _____

Name:   [stamp:] René Sanda                        Name:
              Director of Investments
Title:                                            Title:

**FUNDAÇÃO VALE DO RIO DOCE DE SEGURIDADE SOCIAL – VALIA**

By : [signature]_____              By: [signature]_____

Name:                                             Name:

Title:                                            Title:

**PETRÓLEO BRASILEIRO S.A.**

By : [signature]_____              By: _____

Name:                                             Name:

Title:                                            Title:

**LAKESHORE FINANCIAL PARTNERS PARTICIPAÇÕES LTDA.**

By : [signature]_____              By: _____

Name:                                             Name:

Title:                                            Title:

[stamp:] [initials]
CAIXA/GEAJU
OAB/SP
155619
Lucia Elena A. Bastos

[stamp:] [initials]
Felipe de Abreu
Cáceras
PREVI
ASJUR
Attorney

[stamp:]
[initials]
VALIA – ASLIS
LEGAL CONSULTING -
INVESTMENTS

[stamp:]
VIEIRA REZENDE BARBOSA E
GUERREIRO
Advogados
[initials]

[stamp:] [initials]
**PETROS
LEGAL/CS
Maria Cortezzi**

[initals]
[stamp:]
Sete Brasil
[initials]
LEGAL

[stamp:]
REVIEWED
[initials]
LEGAL

[initials]
[stamp:]
GEJUR
[initials]
FUNCEF

[stamp:] BANCO SANTANDER
(BRASIL) S/A
[initials]
Cecilia Pizzutti
LEGAL DEPARTMENT

54

Confidential

EIG00102324
EIG_KEP_00211824

*(Page 3 of signatures of the Fund Quotaholders' Agreement, entered into on July 31, 2012)*

## LUCE VENTURE CAPITAL – DRILLING SERIES

By : [signature] _____     By: _____

Name:     Name:

Title:     Title:

## EIG SETE HOLDINGS SÀRL

By : [signature] _____     By: [signature] _____

Name:   *Maria Virginia Nabuco do Amaral Mesquita*     Name: *Maria Virginia Nabuco do Amaral Mesquita*

Title:   *Attorney*     Title: *Attorney*

Consenting Participants:

## CAIXA ECONÔMICA FEDERAL

By : [signature] _____     By: [signature] _____

Name:     Name:

Title:     Title:

## SETE BRASIL PARTICIPAÇÕES S.A.

By : [signature] _____     By: [signature] _____

Name:   [stamp:] REBECA CORREA BALIAN     Name:   [stamp:] YOSHIO MARCOS HASHIMOTO
          EXECUTIVE MANAGER              National Manager
Title:    REG. 067 287-0               Title:   Reg. 028.253-0
          GEDEF/MZ/SP                           National Manager - Structured Funds Development
          CAIXA ECONÔMICA FEDERAL               CAIXA ECONÔMICA FEDERAL



[stamp:] [initials]
CAIXA/GEAJU
OAB/SP
155619
Lucia Elena A. Bastos

[stamp:] [initials]
Felipe de Abreu
Cáceras
PREVI
ASJUR
Attorney

[stamp:]
[initials]
VALIA – ASLIS
LEGAL CONSULTING -
INVESTMENTS

[stamp:]
VIEIRA REZENDE BARBOSA E
GUERREIRO
Advogados
[initials]

[stamp:] [initials]
**PETROS
LEGAL/CS
Maria Cortezzi**

[initals]
[stamp:]
Sete Brasil
[initials]
LEGAL

[stamp:]
REVIEWED
[initials]
LEGAL

[initials]
[stamp:]
GEJUR
[initials]
FUNCEF

[stamp:] BANCO SANTANDER
(BRASIL) S/A
[initials]
Cecilia Pizzutti
LEGAL DEPARTMENT

55

Confidential

EIG00102325
EIG_KEP_00211825

*(Page 4 of signatures of the Fund Quotaholders' Agreement, entered into on July 31, 2012)*

Witnesses:

1. _____ [signature] _____         2. _____ [signature] _____

Name:                                         Name:

RG:         [stamp:] Maria Celina Missias      RG:        [stamp:] Andréa Ribeiro
                    da Cruz                                 Reg. 23.126.528-1 SSP/SP
               Reg. 18.373.229-7                              CPF: 149.218.078-50
               CPF: 053.709.608-60

[stamp:] [initials]
CAIXA/GEAJU
OAB/SP
155619
Lucia Elena A. Bastos

[stamp:] [initials]
Felipe de Abreu
Cáceras
PREVI
ASJUR
Attorney

[initials]
[stamp:]
GEJUR
[initials]
FUNCEF

[stamp:] BANCO SANTANDER
(BRASIL) S/A
[initials]
Cecilia Pizzutti
LEGAL DEPARTMENT

[stamp:]
[initials]
VALIA – ASLIS
LEGAL CONSULTING -
INVESTMENTS

**Confidential**

[stamp:]
VIEIRA REZENDE BARBOSA E
GUERREIRO
Advogados
[initials]

[stamp:] [initials]
**PETROS
LEGAL/CS
Maria Cortezzi**

[initals]
[stamp:]
Sete Brasil
[initials]
LEGAL

[stamp:]
REVIEWED
[initials]
LEGAL

56

**APPENDIX 2.2**


*Draft Statement of Compliance with Participation Limit*


\* \* \* \* \*


São Paulo, [==] [==] 2012


TO

**CAIXA ECONÔMICA FEDERAL**

Av. Paulista, 2300 – 11º andar, Cerqueira Cesar, São Paulo, SP

CEP 01310-300

Attn.: GEDEF - National Structured Funds Development Office

As Administrator of Fundo de Investimento em Participações Sondas ("FIP Sondas")


Re:      *FIP Sondas – Participation Limit – Economic Group*


*Dear Sirs,*


1.      (Quotaholder name), registered with the CNPJ/MF under No. (CNPJ No.), duly qualified in the Fundo de Investimento em Participações Sondas ("Fund") Quotaholders' Agreement, entered into between Banco BTG Pactual S.A., Santander Participações S.A., Caixa de Previdência dos Funcionários do Banco do Brasil – Previ, Fundação dos Economiários Federais – Funcef, Fundação Petrobras de Seguridade Social – Petros, Fundação Vale do Rio Doce de Seguridade Social – Valia, Lakeshore Financial Partners Participações Ltda., Strong Fundo de Investimento em Cotas de Fundos de Investimento Multimercado, Petróleo Brasileiro S.A. – Petrobras, and New Quotaholders (jointly, the "Quotaholders"), Sete Brasil Participações S.A. ("Sete Brasil") and Caixa Econômica Federal (the "Administrator"), as amended and current as of this date (the "Quotaholders' Agreement"), hereby presents, through its legal representatives, this statement of compliance with the Participation Limit (as defined in the Quotaholders'

57

EIG00102327
EIG_KEP_00211827

Agreement and Fund Bylaws), consistent with the terms below.

2.      Pursuant to Item "vi," Clause 2.2 of the Quotaholders' Agreement, the purpose of this instrument is to declare, under penalty of the law and for all legal purposes, that as of this date, the signatory [does not form part of the Economic Group, consistent with the definition set forth in the Quotaholders' Agreement and Fund Bylaws, and no other Quotaholder or New Quotaholder of FIP Sondas exercises, jointly with another Quotaholder or New Quotaholder of FIP Sondas, political rights related to quotas that represent a percentage greater than the Participation Limit] OR [is a member of the same Economic Group, consistent with the definition set forth in the Quotaholders' Agreement and Fund Bylaws, of the [Quotaholder/New Quotaholder [==]], to which end it requests that its respective interests in the Fund's Committed Share Capital be accounted in consolidated form for purposes of calculating the Participation Limit] OR [exercises, jointly with the Quotaholder/New Quotaholder [==], political rights related to quotas representing a percentage greater than the Participation Limit].

3.      Terms used in upper case and not expressly defined in this correspondence shall have the meaning attributed to them in the Quotaholders' Agreement.

4.      We are hereby at your complete disposal to provide any additional clarifications that might be necessary with respect to this correspondence.


                        Sincerely,



                        **[QUOTAHOLDER]**




Name:                                           Name:

Title:                                          Title:

[stamp:] [initials]
CAIXA/GEAJU
OAB/SP
155619
Lucia Elena A. Bastos

[stamp:] [initials]
Felipe de Abreu
Cáceras
PREVI
ASJUR
Attorney

[stamp:]
[initials]
VALIA – ASLIS
LEGAL CONSULTING -
INVESTMENTS

[stamp:]
VIEIRA REZENDE BARBOSA E
GUERREIRO
Advogados
[initials]

[stamp:] [initials]
**PETROS
LEGAL/CS
Maria Cortezzi**

[initials]
[stamp:]
Sete Brasil
[initials]
LEGAL

[stamp:]
REVIEWED
[initials]
LEGAL

[initials]
[stamp:]
GEJUR
[initials]
FUNCEF

[stamp:] BANCO SANTANDER
(BRASIL) S/A
[initials]
Cecilia Pizzutti
LEGAL DEPARTMENT

58

Confidential

<u>ACORDO DE QUOTISTAS DO FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES
SONDAS, CONFORME ADITADO E CONSOLIDADO EM 31 DE JULHO DE 2012</u>

Pelo presente instrumento,

a)     **Fundação Petrobras de Seguridade Social - PETROS**, entidade fechada de previdência complementar, domiciliada na Rua do Ouvidor, nº 98, Centro, CEP 20040-030, na Cidade e Estado do Rio de Janeiro, inscrita no CNPJ/MF sob o nº 34.053.942/0001-50, neste ato representada em conformidade com seu estatuto, doravante denominada simplesmente "<u>Petros</u>";

b)     **Fundação dos Economiários Federais - FUNCEF**, entidade fechada de previdência complementar com personalidade jurídica de direito privado domiciliada no Setor Comercial Norte Quadra 02, Bloco "A", Ed. Corporate Financial Center, 12º e 13º andares, na Cidade de Brasília, Distrito Federal, CEP 70712-900, inscrita no CNPJ/MF sob o nº 00.436.923/0001-90, neste ato representada em conformidade com seu estatuto, doravante denominada simplesmente "<u>Funcef</u>";

c)     **Caixa de Previdência dos Funcionários do Banco do Brasil – Previ**,entidade fechada de previdência complementar com sede na Praia de Botafogo, 501, 3º e 4º andares, no bairro de Botafogo, na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, CEP 22.250-040, inscrita n o CNPJ/MF sob o nº 33.754.482/0001-24, neste ato representada por seus representantes legais na forma prevista em seus atos constitutivos, doravante denominada simplesmente "<u>Previ</u>";

d)     **Fundação Vale do Rio Doce de Seguridade Social – Valia**, entidade fechada de previdência complementar, com sede na Av. das Américas, nº 4430, 3º andar, Barra da Tijuca, Cidade do Rio de Janeiro, Estado do Rio de Janeiro, CEP 22640-102, inscrita no CNPJ/MF sob o nº 42.271.429/0001-63, neste ato representada por seus representantes legais na forma prevista em seus atos constitutivos, doravante denominada simplesmente "<u>Valia</u>";

e)     **Santander Participações S.A.** (sub-rogado nos direitos do Banco Santander (Brasil) S.A.), sociedade anônima com sede na Avenida Presidente Juscelino Kubitschek, nº 2041 e 2235 – Bloco A (parte), 16º andar, CEP 04543-011, Cidade e Estado de São Paulo, inscrita no CNPJ sob o nº 04.270.778/0001-71, neste ato representada por seus representantes legais na forma prevista em seus atos constitutivos, doravante denominada simplesmente "<u>Santander</u>";






EIG00102271
EIG_KEP_00211771

f)     **Strong Fundo de Investimento em Cotas de Fundos de Investimento Multimercado**, fundo de investimento em cotas de fundos de investimento, constituído de acordo com as regras da Instrução CVM n° 409/04, conforme alterada, registrado sob o n.° 248.818 em 18.03.2011 no 2° Oficial RTD de Osasco - SP, inscrito no CNPJ/MF sob o n° 12.287.654/0001-27, representado por meio de seu Gestor o BANCO BRADESCO BBI S.A., com sede social no núcleo administrativo denominado Cidade de Deus, Prédio Prata, 4° andar, Vila Yara, Cidade de Osasco, Estado de São Paulo, inscrito no CNPJ sob n.° 06.271.464/0001-19, autorizado pela CVM a administrar carteiras de valores mobiliários pelo Ato Declaratório CVM n.° 9.692, de 21.01.2008, doravante denominado simplesmente "Fundo Strong";

g)     **Banco BTG Pactual S.A.**, instituição financeira, com sede na Cidade do Rio de Janeiro, Rio de Janeiro, na Praia de Botafogo, 501, Torre Corcovado, 5° andar, CEP 22250-040, inscrita no CNPJ/MF sob o n° 30.306.294/0001-45, neste ato representada em conformidade com seu estatuto social, doravante denominada simplesmente "BTG Pactual";

h)     **Petróleo Brasileiro S.A. – Petrobras**, sociedade de economia mista, com sede na Av. República do Chile, 65, CEP 20031-912, Cidade do Rio de Janeiro, Estado do Rio de Janeiro, inscrita no CNPJ/MF sob o n° 33.000.167/0001-01, neste ato representada em conformidade com seu estatuto, doravante denominada simplesmente "Petrobras";

i)     **Lakeshore Financial Partners Participações Ltda.**, sociedade limitada domiciliada na Rua São Tomé, 86, 19° andar, Cj. 191, Sala B, Vila Olímpia, CEP: 04.551-080, na Cidade e Estado de São Paulo, inscrita no CNPJ/MF sob o n° 13.040.317/0001-01, neste ato representada em conformidade com seu contrato social, doravante denominada simplesmente "Lakeshore";

j)     **Luce Venture Capital – Drilling Series**, empresa com sede em 500 Stanton Christina Road, Newark, Delaware, 19713-2107, Estados Unidos da América, neste ato representada em conformidade com seu contrato social, doravante denominada simplesmente "LuceDrilling";

k)     **EIG Sete Holdings SàRL**, sociedade com sede em 2, boulevard Konrad Adenauer, L-1115, Luxemburgo, neste ato representada em conformidade com seu contrato social, doravante denominada simplesmente "EIG";





Petros, Funcef, Previ, Valia, Santander, Fundo Strong, BTG Pactual, Petrobras, Lakeshore, Luce Drilling e EIG são designados isoladamente como "Quotista" ou "Parte" e, em conjunto, como "Quotistas" ou "Partes".

e, na qualidade de intervenientes-anuentes:

l)      **Caixa Econômica Federal**, instituição financeira sob a forma de empresa pública, regendo-se pelo estatuto aprovado pelo Decreto n.º 6.473, de 5 de junho de 2008, autorizada pela Comissão de Valores Mobiliários ("CVM") a administrar fundos de investimento e carteiras de valores mobiliários, com sede em Brasília, Distrito Federal, no Setor Bancário Sul, Quadra 4, Lotes 3 e 4, 21º andar, Asa Sul, por meio de sua Vice-Presidência de Gestão de Ativos de Terceiros, situada na Cidade de São Paulo, Estado de São Paulo, na Avenida Paulista, n.º 2300, 11º andar, CEP 01310-300, inscrita no CNPJ/MF sob o n.º 00.360.305/0001-04, na qualidade de administradora do FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES SONDAS, fundo de investimento em participações, com registro na Comissão de Valores Mobiliários ("CVM") sob nº 431-6, inscrito no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ/MF") sob o nº 12.396.426/0001-95 ("Administradora"); e

m)      **Sete Brasil Participações S.A.**, sociedade por ações, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Rua Humaitá 275, sala 1302, Humaitá, CEP 22261-005, inscrita no CNPJ/MF sob o nº 13.127.015/0001-67, neste ato representada em conformidade com seu estatuto social ("Companhia" e, em conjunto com a Administradora, "Intervenientes Anuentes").

CONSIDERANDO QUE:



(i)     os Quotistas são, nesta data, titulares, em conjunto, da totalidade das quotas de emissão do FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES SONDAS, fundo de investimento constituído sob a forma de condomínio fechado, nos termos da Instrução nº 391, da Comissão de Valores Mobiliários, datada de 16 de julho de 2003, conforme alterada, inscrito no CNPJ/MF sob o nº 12.396.426/0001-95 ("Fundo"), com seus atos constitutivos e regulamento devidamente arquivados no 2º Cartório Oficial de Registros e Documentos e Civil de Pessoa Jurídica de Brasília, Distrito Federal, sob o nº 0000971314, em 12 de agosto de 2010 ("Regulamento");







Confidential

(ii) nos termos do Artigo 13 do Regulamento, o Fundo tem o objetivo específico de investir em títulos e valores mobiliários de emissão da Companhia;

(iii) a Companhia, por sua vez, tem por objeto social a participação em outras sociedades nacionais ou estrangeiras, na qualidade de acionista, sócia ou quotista, joint ventures, parcerias e/ou consórcios com objetivo de adquirir, alienar, construir, operar e/ou fretar: (i) sondas de perfuração e outros ativos e embarcações de exploração e produção de petróleo e gás; (ii) embarcações de apoio marítimo e outros equipamentos utilizados no apoio das atividades de exploração e produção de petróleo e gás; e (iii) estaleiros e outros ativos e unidades industriais relacionados à indústria naval;

(iv) a Companhia está, atualmente, implementando um projeto para viabilizar a disponibilização de 28 (vinte e oito) sondas de perfuração, com capacidade plena de operação principalmente na área do pré-sal brasileiro ("Projeto");

(v) a Companhia é detentora de 100% (cem por cento) das ações de emissão da *Sete International GmbH*, localizada em Viena, na Áustria,com endereço em Schwarzenbergstraße, 1-3/14a, 1010, registrada no Registro Comercial da Corte Comercial de Viena sob o no. FN 348664 t ("Sete International"), detendo participação indireta em sociedades de propósito específico, localizadas na Holanda, constituídas exclusivamente para contratar a construção, ser proprietárias e fretar cada uma das sondas do Projeto;

(vi) o Fundo e a Petrobras são, nesta data, detentores, em conjunto, da totalidade das ações representativas do capital social total e votante da Companhia;

(vii) o Fundo e a Petrobras são partes de um acordo de acionistas ("Acordo de Acionistas"), que regula, dentre outras matérias, os direitos de voto nas deliberações sociais da Companhia, a distribuição dos lucros, os direitos de subscrição de ações adicionais e as regras de transferência de ações da Companhia;

(viii) os Quotistas celebraram, em 13 de maio de 2011, o Acordo de Quotistas do Fundo de Investimento em Participações Sondas, regulando seus respectivos direitos e obrigações enquanto quotistas do Fundo e regulamentando, dentre outras matérias (a) o exercício do direito de voto nas Assembleias Gerais de Quotistas do Fundo; (b) o funcionamento e a competência de seus órgãos deliberativos; (c) as regras de transferência e negociação das Quotas; e (d) as regras e diretrizes da política de

4

EIG00102274

EIG_KEP_00211774

investimento do Fundo, entre outras matérias, o qual foi aditado em 29 de março de 2012 ("Acordo de Quotistas Original");

(ix)  foi aprovada, em 29 de março de 2012, a segunda emissão de quotas do Fundo, as quais foram subscritas pelos Quotistas originais e por novos investidores; e

(x)  os Quotistas pretendem aditar e consolidar o Acordo de Quotistas Original para adaptá-lo ao atual estágio da Companhia.

RESOLVEM as Partes, de comum acordo, celebrar o presente Segundo Aditamento ao Acordo de Quotistas do Fundo de Investimento em Participações Sondas ("Acordo"), optando por aditar e consolidar o Acordo, cujos termos e condições, abaixo estipulados, prometem bem e fielmente cumprir.

DEFINIÇÕES

**Definições.** Para os fins deste Acordo, os termos iniciados em letras maiúsculas, na sua forma plural ou singular, terão o significado a eles atribuído abaixo:

| | |
|---|---|
| Acordo | significa este Acordo de Quotistas do Fundo, conforme aditado e consolidado, nos termos do preâmbulo. |
| Acordo de Acionistas | significa o Acordo de Acionistas da Companhia, celebrado entre o Fundo e a Petrobras. |
| Acordo de Investimento | significa o Acordo de Investimento e Outras Avenças celebrado entre os Quotistas, tendo como intervenientes-anuentes a Companhia e a Administradora. |
| Acordo de Quotistas Original | tem o significado previsto no preâmbulo a este Acordo. |
| Acordo para Realização de Negócios Financeiros | significa o Acordo para Realização de Negócios Financeiros e Outras Avenças, celebrado entre os Quotistas e a Companhia. |
| Acordo(s) Paralelo(s) Permitido(s) | tem o significado previsto na Cláusula 9.12 abaixo. |





5



| | |
|---|---|
| Administradora | significa a Caixa Econômica Federal, qualificada no preâmbulo deste Acordo, na qualidade de administradora e gestora do Fundo. |
| Afiliada | significa, com relação a qualquer pessoa, qualquer outra pessoa direta ou indiretamente Controlada por, sob Controle comum com ou Controladora da primeira. Para fins deste Acordo, os termos "Controle", "Controlada" ou "Controladora" têm o significado que lhes é atribuído pelo artigo 116 da Lei das Sociedades por Ações. |
| Anexo – Investimentos Aprovados do Plano de Negócios | significa o anexo ao Plano de Negócios da Companhia, contendo as matérias arroladas na Cláusula 9.1 do Acordo de Acionistas da Companhia. |
| Assembleia Geral da Companhia | significa qualquer assembleia geral de acionistas da Companhia. |
| Assembleia Geral de Quotistas | significa qualquer assembleia geral de quotistas do Fundo. |
| Boletim de Subscrição | significa o boletim de subscrição firmado pelo Quotista quando do seu ingresso no Fundo, ou subscrição de novas quotas, cujo modelo se encontra anexo ao Compromisso de Investimento. |
| Câmara | tem o significado previsto na Cláusula 9.3 abaixo. |
| CANN | significa o Comitê de Assessoramento para Novos Negócios, aprovado na reunião do Conselho de Administração de 27 de janeiro de 2012 e regulado nos termos de seu regimento. |
| Capital Comprometido | significa o valor correspondente à quantidade total de Quotas às quais os Quotistas do Fundo se comprometeram a subscrever e integralizar, constante do(s) respectivo(s) Compromisso(s) de Investimento. |
| Capital Comprometido Não Integralizado | Significa o Capital Comprometido que, até a data do procedimento previsto na Cláusula 6.4 para fins de aferir a |

6

EIG00102276

EIG_KEP_00211776

| | |
|---|---|
| Remanescente | Pública de Ações, ainda não tenha sido integralizado. |
| Comitê de Investimento | significa o Comitê de Investimento do Fundo, regulado nos termos do Capítulo VII do Regulamento e Cláusulas 4.4 a 4.12 deste Acordo. |
| Compromisso de Investimento | significa o(s) Instrumento(s) Particular(es) de Compromisso de Investimento, celebrado(s) por cada um dos Quotistas e a Administradora, por meio do(s) qual(is) cada Quotista comprometeu-se a subscrever e integralizar um determinado montante de Quotas do Fundo e, quando aplicável, a Taxa de Ingresso. |
| Conflito | tem o significado previsto na Cláusula 9.3 abaixo. |
| Conselho de Administração | significa o conselho de administração da Companhia. |
| Contrato de Afretamento | significa quaisquer contratos de afretamento de sonda de perfuração celebrados pelas Controladas da Companhia. |
| Contrato de EPC | significa quaisquer contratos para construção de sondas, celebrados entre as SPEs e os estaleiros eleitos pela Companhia. |
| Contrato de Manutenção de Ativo | significa quaisquer contratos de manutenção de sondas de perfuração, seus equipamentos e acessórios, celebrados pelas Controladas da Companhia. |
| Contrato de Prestação de Serviços | significa quaisquer contratos para prestação de serviços de operação de sondas a ser celebrado entre Petrobras e o operador de cada sonda. |
| Contratos Operacionais | significam os Contratos de Afretamento, Contratos de EPC, Contratos de Prestação de Serviços e Contratos de Manutenção de Ativos. |
| Controlada | significa qualquer sociedade, *joint venture*, consórcio ou outra forma de organização societária na qual a Companhia detenha o |





EIG00102277
EIG_KEP_00211777

Controle, individual ou compartilhado com terceiros, incluindo, sem limitação, a Sete International e quaisquer sociedades de propósito específico, localizadas na Holanda, constituídas exclusivamente para contratar a construção, serem proprietárias e fretar sondas de perfuração para a Petrobras ou suas Afiliadas (as "<u>SPEs</u>"), tendo o termo "<u>Controle</u>" o significado que lhe é atribuído pelo artigo 116 da Lei das Sociedades por Ações.

| | |
|---|---|
| <u>CVM</u> | significa a Comissão de Valores Mobiliários. |

<u>Custodiante</u>　　　　significa o Banco Bradesco S.A., instituição financeira com sede na Cidade de Deus, Vila Yara, s/n, Cidade de Osasco, Estado de São Paulo, inscrito no CNPJ/MF sob o n.º 60.746.948/0001-12, na qualidade de custodiante do Fundo.

<u>Deliberação Social</u>　　significa qualquer deliberação tomada em Assembleia Geral de Quotistas ou em Assembleia Geral da Companhia.

<u>Deliberações Administrativas</u>　　significa qualquer deliberação tomada pelo Conselho de Administração ou pelo Comitê de Investimento ou, ainda, em qualquer outro órgão administrativo deliberativo do Fundo ou da Companhia, conforme aplicável.

<u>Dia Útil</u>　　　　significa qualquer dia que não seja sábado ou domingo ou outro dia em que os bancos estejam autorizados a fechar na cidade do Rio de Janeiro – RJ e na cidade de São Paulo – SP.



<u>Direito de Preferência</u>　　significa o direito dos Quotistas em adquirir, quando ofertadas Quotas por outros Quotistas, ou subscrever, quando das Emissões Adicionais de Quotas, com prioridade em relação a terceiros não quotistas do Fundo. O exercício do direito de preferência será feito por meio de comunicação escrita endereçada à Administradora, indicando o montante que pretende adquirir/subscrever, observando-se, em todo caso, o Limite de Participação, e os demais termos previstos no Regulamento e neste Acordo.



<u>Direito de Preferência</u>　　Tem o significado previsto na Cláusula 5.4.2. abaixo.



Confidential

sobre Sobras

Direito de Troca por Ações — tem o significado previsto na Cláusula 6.3.4. abaixo.

Direito de Venda Conjunta — tem o significado previsto na Cláusula 7.9 abaixo.

EFPC — significa qualquer entidade fechada de previdência complementar, as quais têm por objetivo principal instituir e executar planos de benefícios de caráter previdenciário, na forma da Lei Complementar n° 109/01 e da Lei Complementar n°. 108/2001, e que seja quotista do Fundo.

Emissão(ões) Adicional(is) de Quotas — significa qualquer emissão e distribuição de novas Quotas do Fundo, posteriores à Primeira Emissão de Quotas, conforme definida abaixo.

Fundo — tem o significado previsto no preâmbulo deste Acordo.

Grupo Econômico — Significa o grupo de sociedades que se encontram direta ou indiretamente sob o mesmo controle acionário incluindo sociedades controladoras (ou integrantes de grupo de controle), controladas e coligadas. Ainda, serão considerados como pertencentes ao grupo econômico de um determinado Quotista os fundos de investimento que sejam geridos de forma discricionária por tal Quotista, ou por qualquer Afiliada do referido Quotista. As EFPC e suas respectivas patrocinadoras não serão consideradas integrantes do mesmo grupo econômico.

ICVM n° 391 — significa a Instrução CVM n° 391, de 16 de julho de 2003, conforme alterada.

IPCA — significa o Índice Nacional de Preços ao Consumidor Amplo ou qualquer outro índice que venha a substituí-lo.

Informações Confidenciais — tem o significado previsto na Cláusula 8.4 abaixo.







EIG00102279

EIG_KEP_00211779

| | |
|---|---|
| Limite de Participação | tem o significado previsto na Cláusula 7.3 abaixo. |
| Lista de Empresas Pré-selecionadas | significa a lista das seguintes empresas ou suas Afiliadas: 1. Atwood Oceanics, Inc.; 2. Odebrecht Óleo & Gas Ltda.; 3. Brasdril Sociedade de Perfurações Ltda.; 4. Dolphin Drilling Ltd.;5. Ensco International Inc.; 6. Etesco Construções e Comércio Ltda.; 7. Frontier Drilling do Brasil Ltda.; 8. Maersk Brasil Brasmar Ltda.; 9. Noble do Brasil S/C Ltda.; 10. Ocean Rig ASA; 11. Odfjell Drilling S.A; 12. Pacific Drilling; 13. Petroserv S.A; 14. Pride do Brasil Serviços de Petróleo Ltda; 15. Queiroz Galvão Óleo e Gás S.A.; 16. Saipem do Brasil Ltda.; 17. Seadrill Ltd.; 18. Sevan Marine do Brasil Ltda.; 19. Transocean Brasil Ltda.; e 20. Vantage Drilling Co. |
| NovosInvestimentos | tem o significado previsto na Cláusula 5.5. abaixo. |
| Novos Quotistas | significa aquele que futuramente venha a se tornar um Quotista do Fundo, seja por meio de subscrição ou aquisição de Quotas. |
| Notificação de Oferta | tem o significado previsto na Cláusula 7.8.1 abaixo. |
| Oferta | tem o significado previsto na Cláusula 7.8.1 abaixo. |
| Oferta Pública de Ações | tem o significado previsto na Cláusula 6.2 abaixo. |
| Oferta Pública Secundária | tem o significado previsto na Cláusula 8.2 abaixo. |
| Ônus | significa todos e quaisquer gravames, direitos reais de garantia, restrições, direitos de preferência para aquisição ou subscrição, opções, encargos, limitações ao pleno e livre uso, gozo ou fruição de qualquer bem ou direito (ou de qualquer dos atributos inerentes ou relativos a tal bem ou direito), seja em decorrência de lei, contrato ou pretensões de qualquer outra natureza. |
| Órgãos Administrativos | significa o Conselho de Administração da Companhia e qualquer órgão administrativo deliberativo do Fundo ou da Companhia, conforme aplicável. |
| Parte Relacionada | significa (i) em relação a uma pessoa jurídica, qualquer de suas |



EIG00102280

EIG_KEP_00211780

Afiliadas ou seus respectivos acionistas/quotistas, empregados, agentes, representantes, comissários, parceiros e/ou administradores, e (ii) em relação a uma pessoa física, (a) seus ascendentes e descendentes em linha direta, cônjuge e/ou parentes de 1º a 4º graus, ou (b) qualquer de suas Afiliadas ou Afiliadas das pessoas indicadas na letra "(a)" acima e os respectivos acionistas/quotistas, empregados, agentes, representantes, comissários, parceiros e/ou administradores de todas estas Afiliadas.

| | |
|---|---|
| Partes Envolvidas | tem o significado que lhe é atribuído na Cláusula 9.3. |
| Patrimônio Líquido do Fundo | tem o significado atribuído ao termo "Patrimônio Líquido" no Regulamento do Fundo. |
| Período de Desinvestimento | significa os 10 (dez) anos seguintes ao Período de Investimento. |
| Período de Investimento | significa o período de 10 (dez) anos a contar da data da primeira integralização de quotas de emissão do Fundo, durante o qual os Quotistas deverão efetuar a integralização das Quotas subscritas e o Fundo deverá efetuar investimentos na Companhia, nos termos do Acordo de Investimento. |
| Período de *Lock-Up* | tem o significado previsto na Cláusula 7.5 abaixo. |
| Plano de Distribuição | Significa as condições a serem definidas e aprovadas em Assembleia Geral de Quotistas para alocação das sobras de Quotas, no âmbito de uma Emissão Adicional de Quotas, após o exercício do Direito de Preferência e do Direito de Preferência sobre Sobras. |
| Plano de Negócios | tem o significado atribuído no Acordo de Acionistas da Companhia. |
| Potencial Comprador | tem o significado previsto na Cláusula 7.8.1 abaixo. |
| Potencial Ingressante | significa potencial novo Quotista no Fundo, conforme previsto |



11

EIG00102281

EIG_KEP_00211781

na Cláusula 7.6 abaixo.

| | |
|---|---|
| Primeira Emissão de Quotas | significa a primeira emissão de Quotas do Fundo, conforme descrita no Artigo 40 caput do Regulamento. |
| Primeiro Sistema | significa as 7 (sete) primeiras sondas do Projeto Sondas detidas pelas seguintes SPEs: (i) Arpoador Drilling B.V.; (ii) Copacabana Drilling B.V.; (iii) Grumari Drilling B.V.; (iv) Ipanema Drilling B.V.; (v) Leblon Drilling B.V.; (vi) Leme Drilling B.V.; e (vii) Marambaia Drilling B.V.. |
| Projeto | tem o significado previsto no preâmbulo deste Acordo. |
| Quotas | tem o significado previsto na Cláusula 2.1 abaixo. |
| Quotistas | significa, além das Partes identificadas no preâmbulo deste Acordo, qualquer quotista que ingressar no Fundo em razão da aquisição e/ou subscrição de Quotas. |
| Quotista Alienante | tem o significado previsto na Cláusula 7.8 abaixo. |
| Registro de Quotistas | representa o registro de Quotistas do Fundo. |
| Regulamento | tem o significado previsto no preâmbulo deste Acordo. |
| Regulamento Arbitragem | tem o significado que lhe é atribuído na Cláusula 9.3.1. |
| Reunião do Comitê | significa qualquer reunião do Comitê de Investimento realizada nos termos deste Acordo. |
| SG&A | significa a parcela do orçamento anual da Companhia destinada às suas despesas gerais e administrativas. |
| SPE | significa as sociedades de propósito específico, localizadas na Holanda, constituídas exclusivamente para contratarem a construção, serem proprietárias e afretarem sondas de perfuração para a Petrobras ou suas Afiliadas. |

12

EIG00102282
EIG_KEP_00211782

| Taxa de Ingresso | tem o significado previsto no Regulamento. |
|---|---|
| Taxa Mínima | tem o significado previsto na Cláusula 5.3.1 abaixo. |
| Transferência de Quotas | significa a venda, compromisso de venda, alienação, gravame, cessão, direito de posse, concessão de opção de compra ou venda, troca, aporte ao capital social de outra companhia, transferência ou qualquer outra forma de oneração ou perda da propriedade, direta ou indiretamente, inclusive, sem limitação, por meio de reorganizações societárias, de qualquer uma das Quotas detidas, direta ou indiretamente, em qualquer ocasião, pelos Quotistas, bem como dos direitos atribuídos a tais Quotas. |
| Transferência Permitida | tem o significado previsto na Cláusula 7.2 abaixo. |
| Tribunal Arbitral | tem o significado previsto na Cláusula 9.3.2 abaixo. |

## CAPÍTULO I – OBJETIVO

1.1.    Objetivo. Este Acordo tem por objetivo disciplinar, supletivamente ao disposto no Regulamento, as relações entre os Quotistas na condução das atividades do Fundo, quanto ao exercício do direito de voto nas Assembleias Gerais de Quotistas e no Comitê de Investimento do Fundo, à transferência e negociação de Quotas e as demais matérias aqui tratadas.

## CAPÍTULO II – VINCULAÇÃO AO ACORDO

2.1.    Quotas Vinculadas. Este Acordo vincula a totalidade das Quotas de emissão do Fundo e de propriedade dos Quotistas nesta data e as que vierem a ser subscritas ou adquiridas por qualquer dos Quotistas após a presente data, seja mediante subscrição, compra, bonificação ou qualquer outra forma, e quaisquer direitos de subscrição de Quotas ou direitos conversíveis em Quotas do Fundo que venham a ser outorgados, a qualquer tempo, aos Quotistas, bem como todos os direitos e prerrogativas a essas inerentes ("Quotas"). O Patrimônio Líquido do Fundo é atualmente dividido em 7.174.146.529 (sete bilhões, cento e setenta e quatro milhões, cento e quarenta e seis mil, quinhentas e vinte e nove) Quotas, distribuídas entre os Quotistas da seguinte forma:

13

EIG00102283

EIG_KEP_00211783

| Quotista | Nº de Quotas | Participação no Patrimônio Líquido |
|---|---|---|
| Petros | 870.179.318 | 19,2085% |
| Funcef | 870.179.318 | 19,2085% |
| Previ | 180.000.000 | 3,9734% |
| Valia | 200.000.000 | 4,4148% |
| Santander | 498.015.873 | 10,9933% |
| Fundo Strong | 250.000.000 | 5,5186% |
| BTG Pactual | 656.207.552 | 14,4853% |
| Petrobras | 226.508.683 | 5% |
| Lakeshore | 4.000.000 | 0,0883% |
| Luce Drilling | 278.048.780 | 6,1377% |
| EIG | 497.034.137 | 10,9716% |
| Total | 4.530.173.661 | 100% |

2.1.1. A participação de cada um dos Quotistas no Patrimônio Líquido do Fundo será ajustada, após a 2ª subscrição de quotas e o encerramento da 2ª Emissão Adicional de Quotas do Fundo, conforme previsto na ata da 19ª Assembleia Geral Extraordinária de Quotistas do Fundo, realizada no dia 31 de julho de 2012, comprometendo-se as Partes a celebrar aditamento ao presente Acordo, para refletir referidos ajustes.

2.2.  Declarações dos Quotistas. Cada Quotista, pelo presente, declara ao outro Quotista que (i) é o legítimo proprietário de suas Quotas, que se encontram devidamente registradas, livres e desembaraçadas de todos e quaisquer Ônus, exceto por aqueles criados pelo presente instrumento; (ii) as disposições previstas neste Acordo constituem obrigação legal, válida e vinculante, exequível contra cada um dos Quotistas, de acordo com os seus termos; (iii) não é parte e não está vinculado por qualquer acordo relativo à propriedade de suas Quotas ou que tenha por objeto qualquer Transferência de Quotas, exceto conforme aqui previsto; (iv) não é parte e não está vinculado a qualquer outro contrato ou instrumento que viole as disposições deste Acordo ou restrinja o seu cumprimento; (v) não existe qualquer procedimento judicial ou administrativo que possa, de qualquer forma, ainda que indiretamente, afetar ou restringir a celebração deste Acordo, o livre exercício dos direitos e prerrogativas inerentes às Quotas, ou a Transferência de Quotas; e (vi) assinou Declaração de Observância do Limite de Participação, conforme "Anexo 2.2" deste Acordo, indicando sob as penas da lei se, direta ou indiretamente, detém quotas isoladamente ou em conjunto com outros Quotistas integrantes do mesmo Grupo Econômico, ou exerce conjuntamente com outros Quotistas os direitos








EIG00102284

EIG_KEP_00211784

políticos relacionados a quotas, que representem percentual superior ao Limite de Participação.

2.3.   Admissibilidade. Para que sejam admitidos como quotistas do Fundo, seja em virtude de subscrição de novas Quotas ou aquisição de Quotas existentes, nos termos deste Acordo, quaisquer Novos Quotistas deverão celebrar (i) termo de adesão ao presente Acordo; (ii) termo de adesão ao Regulamento do Fundo; (iii) termo de adesão ao Acordo de Investimentos; (iv) termo de adesão ao Acordo para Realização de Negócios Financeiros e (v) quaisquer outros instrumentos e declarações exigidas no âmbito da referida Emissão Adicional de Quotas.

2.4.   Proibição de Ônus. Os Quotistas por este ato obrigam-se a não constituir Ônus sobre qualquer parte das suas Quotas sem a prévia anuência por escrito de todos os demais Quotistas.

## CAPÍTULO III - CUMPRIMENTO DO ACORDO

3.1.   Cumprimento do Acordo. Cada um dos Quotistas e a Administradora obrigam-se a cumprir toda e qualquer disposição deste Acordo durante todo o período de sua vigência. Os Quotistas e os Intervenientes Anuentes não proferirão, registrarão, consentirão ou ratificarão qualquer voto ou aprovação em quaisquer deliberações tomadas no âmbito do Fundo ou da Companhia, ou realizarão ou deixarão de realizar qualquer ato, que viole ou que seja incompatível com as disposições do presente Acordo.

3.2.   A Companhia assina este Acordo na qualidade de interveniente anuente, declarando estar ciente e de acordo com todos os termos e condições aqui estabelecidos.

## CAPÍTULO IV – DIREITOS DE VOTO

4.1.   Exercício do Direito de Voto. O direito de voto exercido (i) pelos Quotistas e pelo Fundo, nas Deliberações Sociais, conforme aplicável e (ii) por membros dos Órgãos Administrativos que representam os Quotistas e o Fundo nas Deliberações Administrativas, deverá estar em consonância com as disposições deste Acordo.

4.2.   Voto em Desacordo. O presidente de mesa em qualquer Deliberação Social ou Deliberação Administrativa não deverá computar votos proferidos em desacordo






EIG00102285
EIG_KEP_00211785

disposições do presente Acordo. No caso de não comparecimento ou abstenção de voto em Deliberações Sociais ou Deliberações Administrativas, ficará assegurada à Parte prejudicada o direito de exercer o voto que caberia à Parte ausente, omissa, ou que se absteve de votar, nos casos em que houver acordo de voto.

4.2.1.   O eventual exercício de voto em desacordo com as disposições previstas neste Acordo importará em invalidade do voto e nulidade da deliberação que for assim tomada, sem prejuízo do direito de a Parte prejudicada promover a execução específica da obrigação descumprida e pleitear perdas e danos.

4.3.   <u>Assembleia Geral</u>. Compete privativamente à Assembleia Geral de Quotistas deliberar sobre as matérias elencadas no Regulamento, bem como sobre aquelas definidas na ICVM nº 391.

4.3.1.   As Assembleias Gerais de Quotistas do Fundo serão convocadas e instaladas na forma estabelecida no Regulamento. As deliberações nas referidas assembleias serão sempre tomadas pelo voto favorável dos Quotistas representando a maioria das Quotas emitidas, exceto conforme de outra forma estabelecido no Regulamento. Nas referidas deliberações será sempre observado o quantum estabelecido no presente Acordo. As Assembleias Gerais do Fundo serão realizadas sempre em Dias Úteis, na sede da Companhia.

4.3.2.   <u>Emissões Adicionais de Quotas</u>. As deliberações sobre quaisquer Emissões Adicionais de Quotas serão tomadas da seguinte forma:
(i) quando o preço de emissão das novas Quotas do Fundo, somado à respectiva Taxa de Ingresso, for inferior ao praticado na emissão imediatamente anterior, a Emissão Adicional de Quotas, e a definição do valor das Taxas de Ingresso aplicáveis, somente serão aprovadas pelo voto afirmativo de Quotistas que representem, no mínimo, 85% (oitenta e cinco) por cento das Quotas emitidas pelo Fundo; e
(ii) quando o preço de emissão das novas Quotas do Fundo, somado à respectiva Taxa de Ingresso, for igual ou superior ao praticado na emissão imediatamente anterior, a Emissão Adicional de Quotas, e a definição do valor das Taxas de Ingresso aplicáveis, somente serão aprovadas pelo voto afirmativo de Quotistas que representem, no mínimo, 65% (sessenta e cinco) por cento das Quotas emitidas pelo Fundo.

4.4.   <u>Comitê de Investimento</u>. O Fundo terá um Comitê de Investimento, não remunerado, composto por membros, pessoas físicas ou jurídicas, nomeados na primeira Assembleia









VIEIRA REZENDE BARBOSA E GUERREIRO
Advogados

Confidential

Geral de Quotistas a ser realizada após a assinatura deste Acordo, ou após adesão a este pelos Novos Quotistas, sendo 1 (um) membro titular e seu respectivo suplente indicados por cada um dos Quotistas signatários deste Acordo e 1 (um) membro titular e respectivo suplente indicados pela Administradora.

4.4.1. Os membros do Comitê de Investimento terão mandato por prazo indeterminado e poderão ser substituídos, a qualquer tempo, por solicitação dos Quotistas que os indicaram, sendo que a substituição deverá ser ratificada por Assembleia Geral de Quotistas. No caso de membro indicado pela Administradora, a substituição ocorrerá a partir da divulgação da substituição aos Quotistas, devendo ser ratificada na próxima Assembleia Geral de Quotistas.

4.4.2. A representatividade dos Quotistas no Comitê de Investimento dar-se-á pelo respectivo membro indicado, sendo certo que cada representante terá direito a tantos votos no Comitê de Investimentos quantas forem as quotas detidas pelo Quotista que representa.

4.4.3. O membro indicado pela Administradora poderá se manifestar nas reuniões do Comitê de Investimento, porém, não terá direito a voto.

4.4.4. Os membros titulares do Comitê de Investimento poderão ser substituídos por seus respectivos suplentes em qualquer ocasião, desde que informado previamente à Administradora.



4.5. O Comitê de Investimento será competente para apreciar, discutir e deliberar sobre as matérias de competência da Assembleia Geral da Companhia.

4.5.1. As decisões tomadas pelo Comitê de Investimento vincularão o voto do Fundo na Assembleia Geral da Companhia.



4.5.2. As decisões tomadas pelo Comitê de Investimento referentes à matéria prevista no item "ii" da Cláusula 4.11. deste Acordo vincularão o voto dos membros do Conselho de Administração indicados pelo Fundo.

4.5.3. A Administradora enviará à Companhia cópia autenticada da ata de Reunião do Comitê de Investimento que verse sobre a respectiva Assembleia Geral da Companhia e/ou reunião do Conselho de Administração, conforme o caso.







EIG00102287

EIG_KEP_00211787

4.5.4.   O presidente da Assembleia Geral da Companhia, assim como o Presidente do Conselho de Administração, deverá tomar todas as medidas necessárias para o arquivamento da Ata de Reunião do Comitê na sede social da Companhia.

4.6.   As reuniões do Comitê de Investimento serão convocadas pela Administradora, ou por qualquer de seus membros, com, ao menos, 10 (dez) Dias Úteis de antecedência à data de realização de qualquer Assembleia Geral da Companhia e/ou 04 (quatro) Dias Úteis de antecedência à data de realização de reunião do Conselho de Administração. As reuniões do Comitê de Investimento deverão ocorrer com, ao menos, 1 (um) dia de antecedência à data de realização da Assembleia Geral da Companhia a que se referem. O Comitê de Investimento deverá se reunir também sempre que os interesses da Companhia assim o exigirem, mediante convocação por qualquer de seus membros, sendo que neste caso as reuniões serão convocadas com 10 (dez) Dias Úteis de antecedência.

4.6.1.   Será dispensada a convocação do Comitê de Investimento quando reunidos a totalidade de seus membros.

4.6.2.   Juntamente com a convocação, que deverá ser feita por meio de correspondência com aviso de recebimento ou correio eletrônico, com indicação do dia, hora e local de realização da reunião e dos assuntos a serem discutidos e votados, devem ser encaminhados aos membros do Comitê de Investimento todos os documentos, estudos, propostas e análises que estejam relacionados à deliberação a ser adotada.

4.6.3.   O Comitê de Investimento poderá ser convocado pela Administradora, a pedido de qualquer dos Quotistas ou da diretoria da Companhia, para reuniõesbimestrais sem caráter deliberativo, a serem realizadas, preferencialmente, na última quinta-feira útil de cada bimestre, com a presença de executivo(s) da Companhia, com o propósito de atualizar os membros sobre matérias de interesse geral da Companhia e prestar eventuais esclarecimentos ("Reunião Informativa"). As Reuniões Informativasserão convocadas com ao menos 5 (cinco) Dias Úteis de antecedência à data de sua realização e instalar-se-ão com a presença de qualquer membro do Comitê de Investimento.




4.7.   Quorum de Deliberação do Comitê de Investimento. O Comitê de Investimento deliberará sobre as matérias de sua competência por meio de votos dos membros do Comitê de Investimento que representem a maioria das Quotas emitidas pelo Fundo, exceto com





relação às matérias com *quora* especial de deliberação, conforme previstas nos <u>itens 4.8 a 4.12</u> abaixo.

4.8.     As seguintes matérias, relativas à Companhia, somente poderão ser aprovadas pelovoto afirmativo de membros do Comitê de Investimento que representem, no mínimo, 94% (noventa e quatro por cento) das Quotas emitidas pelo Fundo:

    (i)      celebração, pela Administradora, em nome do Fundo, de acordos de acionistas na Companhia e aprovação de eventuais alterações aos aludidos acordos; e

    (ii)     quaisquer alterações ao Estatuto Social.

4.9.     As seguintes matérias somente poderão ser aprovadas pelo voto afirmativo de membros do Comitê de Investimento que representem, no mínimo, 85% (oitenta e cinco) por cento das Quotas emitidas pelo Fundo:

    (i)      aprovação sobre a venda, total ou parcial, de títulos e valores mobiliários de emissão da Companhia integrantes da carteira do Fundo, ressalvado o disposto na Cláusula 8.1;

    (ii)     qualquer redução do capital social da Companhia;

    (iii)    qualquer transformação, fusão, incorporação, cisão ou outra forma de reorganização societária que envolva a Companhia e/ou suas Controladas, direta ou indiretamente, na forma da legislação aplicável;

    (iv)     destituição, a qualquer tempo, dos membros do Conselho de Administração e do Conselho Fiscal, observado o disposto na <u>Cláusula 4.14</u> abaixo;

    (v)      autorização à diretoria para confessar falência, apresentar pedido de recuperação judicial ou extrajudicial da Companhia e/ou de suas Controladas, nos termos da legislação aplicável;

    (vi)     liquidação e dissolução da Companhia e/ou de suas Controladas, bem como a nomeação de liquidante;

    (vii)    aprovação da extinção de Controladas da Companhia, diretas ou indiretas, no país ou no exterior, ou término de parcerias ou *joint ventures* ou consórcios;







EIG00102289

EIG_KEP_00211789

(viii)  deliberação, por proposta da diretoria, sobre a cessão, transferência, alienação e/ou oneração, a qualquer título ou forma, pela Companhia e/ou suas Controladas, de participações societárias e valores mobiliários de emissão de outras sociedades, no país ou no exterior, ou participação da Companhia e/ou de suas Controladas em qualquer consórcio, parceria ou *joint ventures*, exceto se de outra forma estabelecido no Acordo de Acionistas;

(ix)  realização, alteração e/ou rescisão de operações e negócios de qualquer natureza entre a Companhia e qualquer Parte Relacionada sua ou entre uma Controlada e uma Parte Relacionada da Companhia, exceto se a realização dessa operação ou negócio especificamente com tal Parte Relacionada estiver prevista de forma expressa no Anexo – Investimentos Aprovados do Plano de Negócios. Não caracteriza conflito de interesse para este fim, não estando, portanto, sujeita ao quórum referido no *caput*, as seguintes situações:
(a) serviços de assessoria financeira, mercado de capitais, tesouraria, prestação de serviços bancários, seguros e financiamentos prestados por Quotistas ou empresas do seu Grupo Econômico ao Fundo, a Companhia e/ou Controladas;
(b) a relação da Companhia com as patrocinadoras das EFPC; e
(c) a relação entre as EFPC e suas respectivas patrocinadoras;

(x)  realização, alteração e/ou rescisão de operações e negócios de qualquer natureza pela Companhia e/ou suas Controladas que individualmente ou em conjunto, realizadas no mesmo exercício social, tenham valores superiores a 2% (dois por cento) do valor global de SG&A do orçamento anual da Companhia ou 5% (cinco por cento) por rubrica específica do orçamento anual;

(xi)  deliberação sobre qualquer oferta de aquisição das ações classe A de qualquer sociedade em que a Companhia detenha participação direta ou indireta, exceto se de outra forma previsto em acordos de acionistas das referidas sociedades;

(xii)  aprovação da entrada de novo acionista que não um Quotista no capital social da Companhia por meio de subscrição de novas ações em aumento do capital social, observado o disposto nas cláusulas 10 e 11 do Acordo de Acionistas quanto aos direitos dos acionistas na transferência de direitos de subscrição;









20

Confidential

(xiii)  deliberação sobre qualquer alteração aos Contratos de EPC, Contratos de Afretamento, Prestação de Serviços e aos Contratos de Manutenção de Ativo que impliquem em alteração do preço, prazo, garantias, penalidades, bem como de condições que possam afetar adversamente a aceitação de qualquer sonda pela Petrobras, bem como a rescisão dos referidos contratos;

(xiv)  deliberação sobre a celebração, alteração e/ou rescisão dos acordos de acionistas das Controladas, direta ou indiretamente, pela Companhia;

(xv)  deliberação sobre a venda das ações Classe B das SPEs para empresa não prevista na Lista de Empresas Pré-selecionadas;

(xvi)  deliberação sobre a abertura de capital e/ou oferta pública de ações de emissão das Controladas; e

(xvii)  aprovação da emissão de quaisquer títulos ou valores mobiliários conversíveis em ações pela Companhia e/ou suas Controladas.

4.10.  As seguintes matérias somente poderão ser aprovadas pelo voto afirmativo de membros do Comitê de Investimento que representem, no mínimo, 75% (setenta e cinco) por cento das Quotas emitidas pelo Fundo:

(i)  Aprovaçãoe alteração do Plano de Negócios e seus anexos;e

(ii)  aprovação da celebração de quaisquer contratos de empréstimo e/ou financiamentos, ou contratação de outras formas de endividamento, pela Companhia, ou por suas Controladas, não previstos, ou em termos diversos daqueles previstos no Anexo – Investimentos Aprovados do Plano de Negócios.

4.11.  As seguintes matérias somente poderão ser aprovadas pelo voto afirmativo de membros do Comitê de Investimento que representem, no mínimo, 65% (sessenta e cinco) por cento das Quotas emitidas pelo Fundo:

(i)  deliberação sobre a abertura de capital e/ou oferta pública de ações de emissão da Companhia, observadas as disposições das Cláusulas 8.1 e 8.2 deste Acordo;









21

EIG00102291

EIG_KEP_00211791

(ii)     eleição, reeleição, destituição e substituição dos Diretores da Companhia. Excepcionalmente, essa deliberação será considerada orientação de voto vinculante aos membros do Conselho de Administração da Companhia indicados pelo Fundo; e

(iii)    aprovar a venda, aquisição, locação, cessão e Transferência dos ativos da Companhia ou de qualquer Controlada, em uma única operação ou valores acumulados em mais operações, até um valor total acima de US$15.000.000,00 (quinze milhões de dólares americanos) em um mesmo exercício fiscal.

4.12.    As seguintes matérias somente poderão ser aprovadas pelo voto afirmativo de membros do Comitê de Investimento que representem a maioria das Quotas emitidas pelo Fundo:

(i)      aprovação do orçamento anual da Companhia e de suas Controladas;

(ii)     deliberação sobre as demonstrações financeiras apresentadas pelo Conselho de Administração da Companhia, bem como das demonstrações financeiras de suas Controladas;

(iii)    deliberação sobre a destinação do lucro líquido do exercício e a distribuição de dividendos;

(iv)     deliberação sobre a concessão de avais, fianças ou garantias de qualquer natureza pela Companhia e/ou por suas Controladas, em desacordo com o Anexo – Investimentos Aprovados do Plano de Negócios, que individualmente ou em conjunto, realizados em um mesmo exercício social, tenham valores superiores a R$ 10.000.000,00 (dez milhões de reais);

(v)      deliberação sobre o desdobramento de ações, grupamento de ações, resgate ou compra de ações para cancelamento ou manutenção em tesouraria;

(vi)     deliberação sobre a aprovação, alteração e/ou extinção de plano de opção de compra de ações destinado a executivos seniores, diretores e demais administradores da Companhia e/ou de suas Controladas, observado que as opções de compra de ações a serem outorgadas pela Companhia e/ou por suas Controladas obedecerão ao limite máximo de 5% (cinco por cento) do total de







22

EIG00102292

EIG_KEP_00211792

ações emitidas pela Companhia, conforme aprovado pela Assembleia Geral da Companhia;

(vii) deliberação sobre a remuneração anual dos administradores;

(viii) deliberação sobre a instrução de voto referente ao exercício do direito de preferência, a cessão, transferência ou alienação das ações Classe B, de qualquer sociedade em que a Companhia detenha participação direta ou indireta, exceto se de outra forma previsto em acordos de acionistas dasreferidas sociedades ou no Anexo – Investimentos Aprovados do Plano de Negócios; e

(ix) eleição, a qualquer tempo, dos membros do Conselho de Administração e do Conselho Fiscal, observado o disposto na <u>Cláusula 4.14</u> abaixo.

4.12.1. Quaisquer votos que sejam proferidos pelo Fundo, em Assembleias Gerais da Companhia, em desacordo com a deliberação tomada pelos Quotistas no Comitê de Investimento, serão considerados nulos pela Companhia, para todos os fins.

4.12.2. A orientação de voto do Comitê de Investimento deverá ser respeitada pelos membros do Conselho de Administração da Companhia indicados pelo Fundo, os quais, nas deliberações relativas às matérias de sua competência, deverão votar de forma a não contrariar, de forma direta ou indireta, decisões, votos ou orientações do Comitê de Investimento.




4.13. <u>Conflito de Interesse</u>. Em qualquer deliberação relativa a matérias em que qualquer Quotista suscite a possibilidade de existência de conflito de interesse entre um ou mais Quotistas e o Fundo, a Companhia e/ou suas controladas, o exame do conflito de interesse será submetido, em caráter prévio, à deliberação da Assembleia Geral de Quotistas ou do Comitê de Investimento, conforme o caso, considerando a competência de cada órgão para deliberação da matéria que tenha originado o conflito. Nessa hipótese, os Quotistas não conflitados, ou seus respectivos representantes no Comitê de Investimento, poderão, por maioria simples dos presentes, deliberar sobre a possibilidade do Quotista conflitado participar da deliberação.



4.13.1. Para os fins aqui previstos, entende-se por conflito de interesse a existência de qualquer interesse da Administradora, de seus respectivos acionistas ou sócios, de administradores ou empregados da Administradora, de Quotistas do Fundo,


VIEIRA REZENDE BARBOSA E GUERREIRO
Advogados




Confidential

membros do Comitê de Investimento, ou dos respectivos cônjuges, companheiros ou parentes até o segundo grau de quaisquer das referidas pessoas que, de forma direta ou indireta, possa, sob qualquer aspecto, ser contraposto aos interesses do Fundo, da Companhia ou de suas sociedades controladas, inclusive as Controladas.

4.13.2. Não caracteriza conflito de interesse, não estando, portanto, sujeita ao procedimento referido no *caput*, as seguintes situações: (i) prestação de serviços de assessoria financeira, mercado de capitais, tesouraria, prestação de serviços bancários, seguros e financiamentos prestados por Quotistas ou empresas do seu Grupo Econômico ao Fundo, à Companhia e/ou a suas subsidiárias e controladas; (ii) a relação entre o Fundo, a Companhia e/ou suas subsidiárias e controladas com as patrocinadoras das EFPC; e (iii) a relação entre as EFPC e suas respectivas patrocinadoras.

4.14.   Indicação dos Membros do Conselho de Administração. O Conselho de Administração será composto por até 17 (dezessete) membros efetivos e igual número de suplentes, dos quais um será o seu presidente e outro seu vice-presidente, eleitos pela Assembleia Geral da Companhia e por ela destituíveis a qualquer tempo, sendo (i) 1 (um) membro efetivo e respectivo suplente do Conselho de Administração eleitos por indicação exclusiva da Petrobras; (ii) 1 (um) membro efetivo e respectivo suplente selecionados pelos acionistas da Companhia dentre uma lista contendo 3 (três) sugestões a serem feitas pela Petrobras, sendo que referido membro efetivo será, além de membro do Conselho de Administração, eleito Diretor Presidente da Companhia; e (iii) os demais membros efetivos e respectivos suplentes eleitos por indicação exclusiva do Fundo, observado o disposto neste Acordo.



4.14.1. Com relação aos até 15 (quinze) membros efetivos do Conselho de Administração e seus respectivos suplentes a serem indicados pelo Fundo, até a realização de Oferta Pública de Ações da Companhia:




(i) 1 (um) deles será indicado pela Administradora, ou pelo gestor do FI-FGTS, caso este venha a tornar-se Quotista do Fundo (observado que, neste segundo caso, o gestor do Fundo poderá indicar um representante para participar das reuniões do Conselho de Administração como ouvinte, que poderá participar dos debates, mas sem direito a voto);

(ii) 1 (um) membro efetivo e seu respectivo suplente serão indicados pela Petros,







24

EIG00102294

EIG_KEP_00211794

(iii) 1 (um) membro efetivo e seu respectivo suplente serão indicados pela Funcef,

(iv) 1 (um) membro efetivo e seu respectivo suplente serão indicados pela Previ,

(v) 1 (um) membro efetivo e seu respectivo suplente serão indicados pelo BTG Pactual,

(vi) 1 (um) membro efetivo e seu respectivo suplente serão indicados pelo Santander,

(vii) 1 (um) membro efetivo e seu respectivo suplente serão indicados pelo Fundo Strong,

(viii) 1 (um) membro efetivo e seu respectivo suplente serão indicados pela Valia,

(ix) 1 (um) membro efetivo e seu respectivo suplente serão indicados pela Luce Drilling, e

(x) 1 (um) membro efetivo e seu respectivo suplente serão indicados pelo EIG.

4.14.2.　　　Adicionalmente aos membros previstos acima, os Quotistas que detenham mais de 15% das Quotas de emissão do Fundo terão direito a indicar mais um membro e respectivo suplente para o Conselho de Administração, sempre observado o limite máximo de até 15 membros efetivos e respectivos suplentes a serem indicados, em agregado, pelo Fundo. Para fins de esclarecimento, os Quotistas Petros, Funcef e BTG Pactual terão direito de eleger um segundo membro efetivo e respectivo suplente enquanto detiverem participação superior a 15% das Quotas de emissão do Fundo. Caso tenham suas participações reduzidas para 15% ou menos das Quotas de emissão do Fundo, referidos Quotistas perderão o direito de eleger o segundo membro efetivo e respectivo suplente.



4.14.3. Nenhum Quotista poderá indicar mais de 2 (dois) membros efetivos e mais que 2 (dois) membros suplentes.

4.15.　Comitê de Assessoramento para Novos Negócios. O CANN é um órgão não deliberativo, vinculado ao Conselho de Administração, que visa antecipar a análise e discussão das potenciais oportunidades de investimentos e desinvestimento em participações, dando mais eficiência e celeridade às decisões de negócios da Companhia, e será regulado pelo seu regimento.

4.15.1. O CANN será composto pelo Diretor Presidente ou Diretor de Participação da Companhia, 1 (um) representante do Conselho de Administração, 1 (um) representante da








25

EIG00102295

EIG_KEP_00211795

Administradora do Fundo e 1 (um) representante de cada Quotista, que deverão ser aprovados pelo Conselho de Administração.

4.16.   Indicação dos Membros do Conselho Fiscal da Companhia. O conselho fiscal da Companhia terá caráter permanente e será formado por 5 (cinco) membros, indicados pelo Fundo, o qual considerará a indicação dos Quotistas da seguinte forma: (i) Valia, Petros e Funcef indicarão 1 (um) membro cada; e (ii) BTG Pactual, Fundo Strong e Santander indicarão 2 (dois) membros em conjunto.

4.16.1. Os acionistas da Companhia manterão, necessariamente, o critério de composição do Conselho Fiscal na forma indicada nesta cláusula durante os 06 (seis) primeiros anos contados a partir do dia 13 de maio de 2011, data da assinatura do primeiro Acordo de Quotistas do Fundo.

## CAPÍTULO V – CHAMADAS DE CAPITAL E INTEGRALIZAÇÃO DE QUOTAS

5.1.   Integralização. Os Quotistas integralizarão as respectivas Quotas e pagarão a Taxa de Ingresso, quando aplicável, mediante chamadas de capital a serem realizadas pela Administradora aos Quotistas, nos termos e até o limite estabelecido nos respectivos Compromissos de Investimento.



5.1.1. A Administradora somente solicitará chamadas de capital para: (i) cumprimento ao previsto no Anexo – Investimentos Aprovados do Plano de Negócios, aprovado conforme o disposto no Acordo de Acionistas da Companhia, e/ou (ii) pagamento de despesas e encargos do Fundo, e/ou (iii) cumprimento de deliberações aprovadas pelo Comitê de Investimento.





5.1.2. As chamadas de capital observarão as necessidades de capital próprio da Companhia, de acordo com o Anexo – Investimentos Aprovados do Plano de Negócios, sendo que este deverá prever o cronograma de aportes necessário ao cumprimento das obrigações assumidas pela Companhia para implementação de seus negócios.

5.1.3. Salvo na medida do necessário para o pagamento dos encargos do Fundo, conforme disposto na Cláusula 5.1.4. abaixo, os recursos provenientes dos aportes de capital realizados pelos Quotistas, em decorrência das chamadas de capital, deverão ser utilizados para a integralização, pelo Fundo, de títulos e valores mobiliários de













26

Confidential

emissão da Companhia, no prazo de até 03 (três) dias úteis da data em que sejam aportados no Fundo.

5.1.4. Parte dos recursos aportados pelos Quotistas poderá ser retida pela Administradora para fazer frente às despesas e encargos do Fundo, limitada em todo caso ao montante correspondente a (i) 0,5% (cinco décimos por cento) do Capital Comprometido do Fundo ou (ii) à provisão de despesas do Fundo para os próximos 6 (seis) meses, dos dois o menor.

5.1.5. Não obstante as disposições acima, será permitido aos Quotistas efetuar a integralização de suas Quotas por meio de títulos e valores mobiliários emitidos pela Companhia, desde que estes se enquadrem na política de investimento do Fundo, conforme disposto no Regulamento, e conforme previsto de forma expressa em seu respectivo Compromisso de Investimento.

5.2. Após a realização de Emissão Adicional de Quotas, quaisquer novas integralizações de capital subscrito pelo Fundo e/ou realização de aumentos de capital na Companhia, nos termos previstos no Acordo de Acionistas, deverão ser atendidos pelo Fundo, prioritariamente, por meio do aporte de recursos dos Novos Quotistas ou dos Quotistas que tenham aumentado sua participação, mediante integralização de Quotas, acrescidas da respectiva Taxa de Ingresso, até que a relação entre capital subscrito e capital integralizado de todos os Quotistas seja equivalente.

5.2.1. Para os fins previstos no item 5.2. acima, até que todos os Quotistas do Fundo tenham atingido a mesma relação entre capital subscrito e capital integralizado, a Administradora deverá realizar chamadas de capital exclusivamente para os Quotistas que, proporcionalmente, detenham participação inferior de capital integralizado.

5.2.1.1. A equalização da relação entre capital subscrito e capital integralizado deverá ser atingida pelos Quotistas para cada conjunto de Quotas por eles subscritas que possuam mesmo preço de emissão e Taxa de Ingresso. Após a equalização da relação entre capital subscrito e capital integralizado de todos os Quotistas, as integralizações deverão novamente ser realizadas proporcionalmente à participação de cada Quotista no Fundo, devendo a Taxa de Ingresso média, calculada considerando o total de Taxa de Ingresso a pagar sobre o total de Quotas a integralizar nos termos dos Boletins de Subscrição assinados pelo Quotista, ser paga à medida que estes integralizarem os montantes do Capital Comprometido.








27

EIG00102297

EIG_KEP_00211797

5.3.   <u>Subscrição de Novas Quotas</u>. Excetuando a hipótese de entrada de um novo acionista diretamente na Companhia, sempre que for deliberado aumento do limite do capital autorizado da Companhia, haverá deliberação acerca da Emissão Adicional de Quotas do Fundo, as quais, caso aprovadas, terão sempre o mesmo valor nominal. Os aumentos de capital serão realizados, prioritariamente, por meio do Fundo, exceto conforme disposto na Cláusula 5.7 abaixo.

5.3.1.   Para os fins previstos nas Cláusulas 5.5. e 5.6. abaixo, sempre que houver Emissão Adicional de Quotas do Fundo, a Administradora envidará seus melhores esforços para obter Taxa de Ingresso que seja ao menos igual ao preço de subscrição das ações da Companhia emitidas na primeira integralização do Fundo na Companhia, corrigido por uma taxa nominal fixa de 13% (treze por cento) ao ano, *pro rata temporis* ponderada pelo fator do capital integralizado sobre o Capital Comprometido ("<u>Taxa Mínima</u>").

5.3.2.   A Taxa de Ingresso será expressa em reais por quota, será paga a cada integralização das Quotas a que se refira, e seu valor nominal será apurado pela aplicação da fórmula abaixo:



$$TI = \sum\{[(T_{Nom}+1)^{(1/252)}]^d -1\} \times [(K_i/K_c)]$$



Sendo,

| TI | Taxa de Ingresso |
|---|---|
| $T_{Nom}$ | Taxa nominal ao ano, *pro rata temporis*, a ser definida pela Assembleia Geral de Quotistas que aprovar a Emissão Adicional de Quotas. |
| d | Quantidade de dias úteis contados a partir de cada integralização de ações da Companhia pelo Fundo, até a data da Emissão Adicional de Quotas. |
| $K_i$ | Capital integralizado em cada chamada de capital. |
| $K_c$ | Capital comprometido na data da Emissão Adicional de Quotas. |

5.3.3.   A Taxa de Ingresso será devida por todos os Quotistas que subscreverem as Quotas da respectiva Emissão Adicional de Quotas, inclusive aqueles que tenham exercido seu Direito de Preferência e/ou Direito de Preferência sobre Sobras, e será paga pelos Quotistas à medida que estes integralizarem os montantes do Capital







28

EIG00102298
EIG_KEP_00211798

Comprometido, conforme previsto nos respectivos Compromissos de Investimento e na Notificação de Integralização encaminhada pela Administradora.

5.3.4. As Emissões Adicionais de Quotas, bem como a taxa nominal $T_{Nom}$ que determina o valor da Taxa de Ingresso, serão deliberadas em Assembleia Geral de Quotistas que obedecerão os *quora* estabelecidos na Cláusula 4.3.2 deste Acordo.

5.3.5. Quaisquer Emissões Adicionais de Quotas necessárias para atender o aumento do capital social da Companhia somente poderão ser realizadas desde que de acordo com o disposto no Anexo – Investimentos Aprovados do Plano de Negócios.

5.4. <u>Direito de Preferência na Subscrição de Novas Quotas</u>. Em qualquer Emissão Adicional de Quotas, os Quotistas terão Direito de Preferênciae Direito de Preferência sobre Sobras para a subscrição de novas Quotas do Fundo, observado o Limite de Participação.

5.4.1. O exercício do Direito de Preferência para subscrição de novas Quotas pelos Quotistas (incluindo o Direito de Preferência sobre Sobras) deverá ser manifestado mediante notificação por escrito enviada à Administradora, por meio de carta registrada com aviso de recebimento, no prazo de 30 (trinta) dias contados da decisão da Assembleia Geral de Quotistas que aprovar a respectiva Emissão Adicional de Quotas, indicando o montante que deseja subscrever, observado o Limite de Participação.

5.4.2. Observada a Cláusula 5.4.1. acima, a Administradora alocará as novas quotas aos Quotistas que exerceram seus Direitos de Preferência, primeiramente, na proporção da participação de referidos Quotistas no Capital Comprometido na data da Emissão Adicional de Quotas. Caso qualquer dos Quotistas tenha deixado de exercer, de forma total ou parcial, os seus respectivos Direitos de Preferência na subscrição de novas Quotas do Fundo, resultando em sobras de Quotas, estas serão distribuídas dentre os Quotistas que, nos termos da Cláusula 5.4.1. acima, já tenham manifestado seu interesse em subscrever eventuais sobras, obedecido o Limite de Participação ("<u>Direito de Preferência sobre Sobras</u>"). Caso mais de um Quotista deseje exercer seu Direito de Preferência sobre Sobras, de forma que o número de Quotas necessárias para que tais Quotistas tenham suas manifestações integralmente atendidas exceda o número de Quotas restantes, estas serão distribuídas proporcionalmente à participação de tais Quotistas no Capital Comprometido do Fundo na data da Assembleia Geral de Quotistas que aprovar a respectiva Emissão Adicional de Quotas, desconsiderando as participações dos Quotistas que não exercerem o Direito de Preferência sobre Sobras.









YHEIRA REZENDE PEDROSA E GUERREIRO
Advogados

29

5.4.3. A Assembleia Geral de Quotistas estabelecerá o Plano de Distribuição da nova emissão, com vistas à definição da alocação de eventuais sobras de Quotas, após o exercício do Direito de Preferência sobre Sobras, podendo prever, inclusive, preferência para terceiros interessados, sempre observado o Limite de Participação.

5.4.4. A Assembleia Geral de Quotistas que aprovar a Emissão Adicional de Quotas também poderá prever Taxa de Ingresso escalonada por fase do Plano de Distribuição, desde que aplicadas de modo uniforme e isonômico aos participantes da respectiva fase.

5.4.5. O não exercício do Direito de Preferência em uma determinada Emissão Adicional de Quotas, através de recusa formal neste sentido ou de ausência de comunicação de interesse à Administradora, no prazo e na forma mencionados nas Cláusulas acima e no Plano de Distribuição, será entendido como renúncia exclusivamente aos direitos de subscrição e preferência referentes a tal emissão.

5.5.    Novos Investimentos. Sem prejuízo do disposto no Capítulo IV, a aprovação de novos investimentos a serem feitos pela Companhia ("Novos Investimentos"), e a respectiva alteração do Anexo – Investimentos Aprovados do Plano de Negócios, deverão obedecer às seguintes regras:



5.5.1. Caso o Novo Investimento compreenda atividades já previstas no objeto social da Companhia, o Novo Investimento somente será aprovado pelo Comitê de Investimento mediante voto favorável de membros que representem, no mínimo, 75% (setenta e cinco por cento) das Quotas emitidas pelo Fundo.

5.5.2. Caso o Novo Investimento compreenda atividades não previstas no objeto social da Companhia, o Novo Investimento será aprovado pelo Comitê de Investimento mediante voto favorável de membros que representem, no mínimo, 94% (noventa e quatro por cento) das Quotas emitidas pelo Fundo, alterando-se o objeto social da Companhia para inclusão da nova atividade.



5.6.    Desenquadramento. A fim de evitar qualquer hipótese de desenquadramento das EFPC, quando da ocorrência de qualquer chamada de capital, os Quotistas que não tenham natureza de EFPC deverão integralizar seus respectivos montantes com 1 (um) dia de antecedência aos Quotistas com natureza de EFPC, nos termos do Compromisso de Investimento.





30

EIG00102300

EIG_KEP_00211800

5.6.1. A Administradora poderá solicitar que a integralização de capital dos Quotistas não EFPC, seja feita até às 11hs da data limite para integralização dos recursos, e dos Quotistas EFPC até às 13hs da data limite.

5.7.   Inadimplência. No caso de não quitação das Notificações de Integralização, serão aplicáveis as penalidades previstas no Regulamento do Fundo.

## CAPÍTULO VI – PRAZO DE DURAÇÃO

6.1.   Prazo de Duração Original. Conforme o estabelecido no Regulamento, o Fundo terá prazo de duração de 20 (vinte) anos, contados a partir da data da primeira integralização de Quotas da Primeira Emissão de Quotas do Fundo, sendo que os primeiros 10 (dez) anos corresponderão ao Período de Investimento, e os 10 (dez) anos seguintes ao Período de Desinvestimento.

6.2.   Liquidação Antecipada do Fundo. Não obstante o estabelecido no Regulamento, caso o Fundo e a Petrobras, na qualidade de únicos acionistas da Companhia, aprovem, a qualquer momento durante o prazo de duração do Fundo, a realização de uma oferta pública inicial das ações da Companhia ("Oferta Pública de Ações"), nos termos da Lei n° 6.385, de 7 de dezembro de 1976, e da Instrução n° 400, da CVM, datada de 29 de dezembro de 2003, conforme alterada, o Fundo será automaticamente liquidado na data de publicação do anúncio de início da Oferta Pública de Ações mediante entrega dos títulos e valores mobiliários de emissão da Companhia aos Quotistas.



6.2.1. Para os fins previstos no item 6.2. acima, a liquidação antecipada do Fundo será promovida diretamente pela Administradora, não sendo necessária a convocação de Assembleia Geral de Quotistas para deliberar a matéria.

6.2.2. A Administradora deverá prontamente tomar todas as medidas necessárias para resgatar as aplicações do Fundo em ativos líquidos, exceto títulos e valores mobiliários de emissão da Companhia, pagar todas as despesas e encargos do Fundo e iniciar todos os demais procedimentos para amortização das Quotas e liquidação do Fundo.






6.2.3. Após o pagamento das despesas e encargos do Fundo, a Administradora distribuirá aos Quotistas os títulos e valores mobiliários de emissão da Companhia e

31

demais ativos integrantes da carteira do Fundo, na proporção da participação de cada Quotista no Patrimônio Líquido do Fundo.

6.2.4.   Caso as aplicações do Fundo resgatadas nos termos da Cláusula 6.2.2., acima, não sejam suficientes para pagar todas as despesas e encargos do Fundo, a Administradora encaminhará Notificação de Integralização para todos os Quotistas que somadas, sejam suficientes para quitação de todas as obrigações, sem qualquer sobra de recursos.

6.3.   <u>Cisão do Fundo</u>. Após o período de 3 (três) anos, contados da data da primeira integralização de capital pelo Fundo na Companhia, sem que tenha ocorrido a Oferta Pública de Ações, e desde que não haja o desenquadramento da participação das EFPC no Fundo, conforme definido na Resolução CMN nº 3.792 de 24 de setembro de 2009 e alterações posteriores, qualquer Quotista poderá, a seu exclusivo critério, notificar a Administradora, por meio de correspondência escrita, para que esta comunique aos demais Quotistas, a sua intenção, total ou parcial, de deter diretamente ações que representem o capital social da Companhia.

6.3.1.   Nesse caso, a Administradora, no prazo de 3 (três) Dias Úteis, deverá encaminhar a notificação recebida nos termos do item 6.3. acima aos demais Quotistas do Fundo, os quais terão o prazo de 15 (quinze) dias para se manifestar sobre a sua respectiva intenção de deter diretamente títulos e valores mobiliários de emissão da Companhia.



6.3.2.   Se, em virtude do limite de enquadramento da participação das EFPC acima indicado, não for possível a saída da totalidade da participação do(s) Quotista(s) interessado(s), será permitida a saída destes apenas na proporção que leve em conta a intenção de saída manifestada por cada Quotista e o limite máximo de saída que não origine o desenquadramento da participação das EFPC que permanecerão como Quotistas do Fundo.



6.3.3.   Nessa hipótese, os Quotistas se comprometem a deliberar favoravelmente pela cisão do Fundo, o qual será cindido e transformado em dois FIP distintos, sendo um para aqueles Quotistas que desejarem permanecer com seus investimentos indiretos na Companhia (FIP 1) e o outro para aqueles Quotistas que desejarem ter suas quotas transformadas em ações de emissão da Companhia (FIP 2).






VIEIRA REZENDE BARBOSA E GUERREIRO
Advogados

32



6.3.4. Os quotistas do FIP 2 irão deliberar pela liquidação do FIP 2 mediante troca de suas quotas por ações de emissão da Companhia de forma que passem a deter uma participação societária direta na Companhia igual à sua participação detida indiretamente por meio do Fundo e, posteriormente, do FIP 2 ("Direito de Troca por Ações").

6.3.5. Mediante o exercício do Direito de Troca por Ações, os direitos dos novos acionistas da Companhia serão mantidos na proporção da participação destes no Fundo.

6.3.6. Caso a liquidação do Fundo ocorra em função da cisão descrita neste item, os Quotistas se obrigam a aprovar, antes da cisão, a alteração do Estatuto Social da Companhia para inclusão de regras de governança consistentes com as contidas no Acordo de Acionistas e neste Acordo de Quotistas, para manter de forma proporcional os direitos dos Quotistas que passarão a deter diretamente ações de emissão da Companhia, em decorrência da cisão do Fundo.

6.3.7. O processo de cisão do Fundo poderá ser realizado quantas vezes forem necessárias para que os Quotistas tenham realizado integralmente sua intenção de deter diretamente títulos e valores mobiliários de emissão da Companhia, respeitada a periodicidade mínima de 3 (três) meses.

6.3.8. Na hipótese de cisão do Fundo, deverá ser mantida a participação indireta detida pelos Quotistas remanescentes por meio do Fundo, posteriormente FIP 1, na Companhia.

6.4. <u>Integralização Antecipada para fins de Oferta Pública de Ações.</u> Caso o Fundo e a Petrobras, na qualidade de únicos acionistas da Companhia, aprovem, a qualquer momento durante o prazo de duração do Fundo, a realização de uma Oferta Pública de Ações da Companhia, observado o disposto na Cláusula 8.1. abaixo, a Companhia poderá necessitar antecipadamente de parte ou da totalidade dos recursos comprometidos pelos Quotistas, não obstante o estabelecido no Plano de Negócios. Nessa hipótese, os Quotistas desde já se comprometem a, no prazo de 15 (quinze) Dias Úteis contados da data da deliberação social que aprovar a realização da Oferta Pública de Ações, tomar as medidas necessárias para que a Administradora realize uma chamada de capital nos termos do Artigo 41 do Regulamento, no montante necessário para prover a Companhia com os recursos que essa necessitar, até o limite do total comprometido pelos Quotistas, e na proporção da sua respectiva participação no Fundo, nos termos do Compromisso de Investimento.



33

EIG00102303
EIG_KEP_00211803

6.4.1   Após a realização da Oferta Pública de Ações da Companhia, os Quotistas estarão automaticamente liberados da obrigação de realizar qualquer outro aporte de recursos no Fundo, independentemente de o Capital Comprometido por cada Quotista, adicionado das respectivas Taxas de Ingresso, ter sido ou não integralmente aportado no Fundo, nos termos do respectivo Compromisso de Investimento.

6.4.2   Na hipótese da Cláusula 6.4., os Quotistas deverão solicitar à Administradora que convoque uma Assembleia Geral de Quotistas, na forma do Regulamento, para deliberar sobre o encerramento antecipado do Período de Investimento do Fundo, sendo que os Quotistas desde já se comprometem a votar na referida assembleia de forma a aprovar o encerramento antecipado do Período de Investimento.

6.4.3.   Caso durante o processo da Oferta Pública de Ações, a Diretoria da Companhia indique que há possibilidade de cancelamento de parte do Capital Comprometido Não Integralizado Remanescente, mesmo após eventual realização dos aportes previstos na Cláusula 6.4 acima, poderão os Quotistas optar, individualmente, por: (i) cancelar, no todo ou em parte, o seu respectivo Capital Comprometido Não Integralizado Remanescente, ou (ii) antecipar o aporte, no todo ou em parte, do seu respectivo Capital Comprometido Não Integralizado Remanescente.

6.4.4.   A decisão do Quotista com relação ao previsto no item 6.4.3. acima prevalecerá desde que (i) devidamente ratificada em Reunião do Comitê de Investimento e, para tanto, todos os Quotistas desde já se comprometem a fazer com que os seus membros indicados para o Comitê de Investimentos votem favoravelmente à ratificação de forma a respeitar a opção individual de cada Quotista, não sendo considerado, para fins de quorum de deliberação do referido Comitê, eventual voto que desrespeite e/ou desconsidere a opção individual de cada Quotista/ conforme mencionado na Cláusula 6.4.3 acima; e (ii) observados os limites de enquadramento estabelecidos na Resolução CMN 3.792/09, e posteriores alterações. A decisão dos Quotistas deverá ser comunicada diretamente à Administradora, no prazo de até 5 (cinco) dias úteis contados da data do recebimento da comunicação da Diretoria da Companhia nos termos da Cláusula 6.4.3, sendo que a reunião do Comitê de Investimento deverá ser realizada no prazo de 01 (um) dia útil após o término do prazo para manifestação dos Quotistas.








34

EIG00102304

EIG_KEP_00211804

6.4.5   Caso, em decorrência do disposto no item 6.4.3, qualquer Quotista tenha sua participação no Fundo diluída, este terá oportunidade de rever sua decisão e, para tanto, deverá manifestar, no prazo de 2 (dois) dias contados da data de comunicação da diluição de sua participação, a sua intenção de antecipar ou cancelar seus aportes de forma a manter sua participação no Fundo.

6.4.6 Não obstante o quanto disposto acima, os Quotistas se comprometem a considerar, em sua decisão sobre cancelamento ou antecipação do aporte do Capital Comprometido Não Integralizado Remanescente, os elementos e condições de mercado levantados pela Companhia e por seus assessores financeiros, de forma a não inviabilizar ou prejudicar a realização da Oferta Pública de Ações. Caso haja divergência de interesses e conflito de entendimento entre os Quotistas sobre os potenciais danos à Oferta Pública de Ações, estes se comprometem a reunir-se previamente ao ato de exercer o direito de integralizar o Capital Comprometido Não Integralizado Remanescente e discutir de boa-fé as possíveis alternativas e soluções, garantindo que o IPO ocorra, conforme previsto pela Companhia.

## CAPÍTULO VII - TRANSFERÊNCIA DE QUOTAS

7.1.   Transferências de Quotas. Os Quotistas se comprometem a não vender, ceder, transferir, instituir Ônus e/ou alienar, a qualquer título ou por quaisquer meios, no todo ou em parte, direta ou indiretamente, as Quotas, o Direito de Preferência, ou o Direito de Preferência sobre Sobras, exceto conforme previsto neste Acordo.



7.1.1.   Qualquer negociação ou Transferência de Quotas ou exercício de Direito de Preferência ou de Direito de Preferência sobre Sobras, ou, ainda, a criação de qualquer Ônus sobre as Quotas em violação ao disposto neste Acordo, incluindo, sem limitação, o Limite de Participação, será considerada nula e sem efeito, sendo, portanto, proibido (i) o seu registro pela Administradora e pelo agente escriturador no Registro de Quotistas; e (ii) o exercício pelo cessionário do correspondente direito de voto ou qualquer outro direito garantido pelas Quotas.



Transferências Permitidas. As restrições à Transferência de Quotas estabelecidas no presente capítulo não se aplicarão (i) às Transferências de Quotas entre os Quotistas, e (ii) às Transferências realizadas entre sociedades ou veículos de investimento pertencentes ao mesmo Grupo Econômico do Quotista alienante, desde que respeitado o Limite de Participação, previsto na Cláusula 7.3 abaixo.





35

7.3.    <u>Limite de Participação</u>. Nenhum Quotista poderá, direta ou indiretamente, deter quotas, isoladamente ou em conjunto com outros Quotistas integrantes do mesmo Grupo Econômico, ou exercer conjuntamente com outros Quotistas os direitos políticos relacionados a quotas, que representem percentual superior a 30% (trinta por cento) do Capital Comprometido do Fundo ("<u>Limite de Participação</u>"). Para fins de cômputo do Limite de Participação deverão ser somadas as participações detidas por Quotistas que (i) pertençam a um mesmo Grupo Econômico; e/ou (ii) sejam partes ou tenham celebrado, sob qualquer forma, acordo de voto e/ou outros direitos políticos em relação às suas respectivas participações no Fundo e/ou na Companhia.

7.3.1.   Cada Quotista expressamente se obriga a não adquirir, sob qualquer forma, e desde já renuncia ao Direito de Preferência e ao Direito de Preferência sobre Sobras na subscrição e/ou aquisição de Quotas do Fundo, quando o exercício de tal direito resultar em uma participação, direta ou indireta, acima do Limite de Participação. A Administradora tomará providências para certificar-se de que nenhuma operação de compra, venda ou subscrição de quotas do Fundo em violação ao disposto nesta Cláusula seja concluída, sob qualquer forma e a qualquer título. Qualquer Transferência de Quotas ou exercício de Direito de Preferência na subscrição de Quotas do Fundo que resulte em violação às disposições desta Cláusula 7.3.1. estará sujeita ao disposto na Cláusula 7.1.1 acima.

7.3.2.   Na hipótese da participação de qualquer Quotista exceder o Limite de Participação, referido Quotista (i) não exercerá os respectivos direitos de voto relativos às quotas que excederem o Limite de Participação; e (ii) se compromete a alienar as quotas que excederem o Limite de Participação no prazo de até 90 (noventa) dias, observado o Direito de Preferência.



7.3.3.   Na hipótese mencionada na Cláusula 7.3.2 (ii) acima, caso as Quotas excedentes ao Limite de Participação não tenham sido alienadas após expirado o prazo de 90 (noventa) dias, será convocada, em até 30 (trinta) dias, Assembleia Geral de Quotistas para deliberação sobre as alternativas para reenquadramento do Quotista ao Limite de Participação, observado que, caso não seja possível a alienação do excedente, o Quotista que ultrapassar o Limite de Participação continuará impedido de exercer seus direitos de voto em relação à referidas Quotas excedentes, até que seja sanada tal situação.







36

7.4     Para fins de atendimento ao disposto na Cláusula 7.3 acima, a cada Emissão Adicional de Quotas, todos os Quotistas firmarão Declaração, nos termos do Anexo 1 deste Acordo, informando se conjuntamente com qualquer outro Quotista ultrapassa o Limite de Participação.

7.5.    Período de _Lock-Up_ dos Quotistas do Fundo. Exceto no caso de uma Transferência Permitida, os Quotistas não poderão, de nenhuma forma, transferir suas respectivas Quotas correspondentes ao Capital Comprometido, a partir da presente data até a ocorrência do primeiro dos seguintes eventos ("Período de _Lock-Up_"): (i) realização de Oferta Pública de Ações da Companhia; ou (ii) transcurso do prazo de 3 (três) anos contados da data da subscrição de Quotas por parte de cada Quotista no Fundo, observado o disposto no item 7.5.1.

7.5.1   O Período de _Lock-up_ dos Quotistas do Fundo que aportarem capital no âmbito de Emissões Adicionais de Quotas será o seguinte: (i) término do período de 3 (três) anos contados da subscrição de quotas por parte de cada Quotista do Fundo, observado que com relação aos Quotistas que tenham aportado capital em qualquer Emissão Adicional de Quotas, o novo período de _Lock-up_ previsto nesta Cláusula será aplicável somente às novas Quotas emitidas; ou (ii) publicação de início da Oferta Pública de Ações.

7.5.2.  Após o período de _Lock-Up_ dos Quotistas do Fundo e a realização de todos os investimentos previstos no Plano de Negócios, os Quotistas poderão Transferir suas Quotas a terceiros, observado o Direito de Preferência. 

7.6.    Final do Período de _Lock-Up_ da Petrobras. O Período de _Lock-Up_ da Petrobras, na qualidade do Quotista do Fundo, extinguir-se-á na hipótese de ingresso de potencial novo Quotista do Fundo com as características da Cláusula 7.6.1, quando tenha havido (i) manifestação prévia e contrária, por escrito, da Petrobras, com relação ao ingresso deste Potencial Ingressante; e (ii) manifestação da Petrobras da intenção de alienar suas quotas ao Potencial Ingressante. Se tal alienação não ocorrer nos prazos previstos neste Acordo, o Período de _Lock-Up_ da Petrobras permanecerá vigente. 

7.6.1.  A manifestação contrária da Petrobras ao ingresso de Potencial Ingressante deverá estar justificada em ao menos uma das seguintes hipóteses:

(i) caso o Potencial Ingressante seja um concorrente da própria Petrobras;



37

(ii) caso o Potencial Ingressante seja uma sociedade que atue direta ou indiretamente no mercado de afretamento de sondas de perfuração e/ou operações de sondas de perfuração;

(iii) caso o Potencial Ingressante esteja em litígio com a Petrobras ou com suas controladas, coligadas, diretas ou indiretas; e/ou

(iv) caso a Petrobras considere que o Potencial Ingressante não esteja qualificado para figurar como sócio da Companhia, podendo macular a imagem e reputação desta ou de seus acionistas, diretos ou indiretos.

7.6.2   A Petrobras deverá manifestar-se sobre o ingresso de Potencial Ingressante com 15 (quinze) dias de antecedência ao término do prazo para exercício de Direito de Preferência, justificando sua eventual decisão contrária ao ingresso do Potencial Ingressante.

7.6.3   Na hipótese prevista nesta Cláusula 7.6, caso os demais Quotistas não exerçam, seu Direito de Preferência em relação às Quotas ofertadas, o Potencial Ingressante deverá realizar uma oferta de aquisição da totalidade das Quotas de titularidade da Petrobras e dos demais Quotistas, observado que o preço a ser pago pelas Quotas não poderá ser inferior ao preço previsto na Cláusula 7.9.1.

7.7.   <u>Transferência de Quotas Não-Integralizadas</u>. As Transferências de Quotas a terceiros poderão ocorrer somente se tais Quotas tiverem sido totalmente integralizadas ou, caso não tenham sido, se o cessionário assumir, por escrito, solidariamente com o Quotista Alienante, todas as obrigações deste perante o Fundo e os demais Quotistas no tocante à sua integralização.

7.8.   <u>Direito de Preferência</u>. Após o término do Período de *Lock-Up*, o Quotista que desejar ceder e/ou transferir suas Quotas a terceiro interessado, no todo ou em parte ("<u>Quotista Alienante</u>"), deverá oferecê-las aos demais Quotistas, que terão Direito de Preferência para adquiri-las nos exatos termos propostos pelo terceiro interessado, observadas as disposições do Regulamento e deste Acordo, em especial as disposições desta Cláusula 7.8 e da Cláusula 7.9 abaixo.

7.8.1.   Mediante o recebimento de uma oferta ("<u>Oferta</u>") de um potencial comprador ("<u>Potencial Comprador</u>"), o Quotista Alienante deverá enviar uma notificação por escrito à Administradora, por meio de carta registrada com aviso de recebimento, descrevendo as condições da Oferta ("<u>Notificação de Oferta</u>"). Para os fins de






38

EIG00102308

EIG_KEP_00211808

presente Acordo são entendidas como condições da Oferta (i) a quantidade de Quotas que o Quotista Alienante pretende ceder e transferir, (ii) o preço por Quota oferecido pelo Potencial Comprador para aquisição das quotas, (iii) as condições, prazos e garantias de pagamento, (iv) outras condições da venda ou transferência propostas e (v) o nome, qualificação e identificação completa do Potencial Comprador.

7.8.2. A Notificação de Oferta será vinculante, irrevogável e irretratável, obrigando o Quotista Alienante a alienar suas Quotas ofertadas nos exatos termos da Notificação de Oferta. Em até 5 (cinco) Dias Úteis da data do recebimento da Notificação de Oferta, a Administradora deverá enviá-la a todos os demais Quotistas do Fundo, com cópia para a Petrobras, nos termos do Regulamento.

7.8.3. Os Quotistas deverão se manifestar, mediante notificação por escrito enviada à Administradora, por meio de carta registrada com aviso de recebimento, em até 30 (trinta) dias contados do recebimento da Notificação de Oferta, (i) se exercerão seus respectivos Direitos de Preferência; ou (ii) se exercerão o Direito de Venda Conjunta, conforme aplicáveis, respeitadas as regras do presente Acordo.

7.8.4. O Direito de Preferência somente poderá ser exercido de forma integral pelos Quotistas interessados em exercer o referido direito, individualmente ou em conjunto, de forma proporcional as suas respectivas participações no Capital Comprometido do Fundo, considerando somente as quotas emitidas e desconsiderando as participações do Quotista Alienante e dos Quotistas que não exercerem o Direito de Preferência, sem que possa haver sobras de Quotas. A quantidade de Quotas do Quotista Alienante que poderá ser efetivamente adquirida pelo Quotista interessado combinada com a participação que tal Quotista detém no Fundo não poderá (i) superar o Limite de Participação, nem (ii) resultar na impossibilidade de o Quotista Alienante alienar a totalidade das Quotas ofertadas no âmbito da respectiva Oferta.



7.8.5. Mediante o exercício do Direito de Preferência pelos Quotistas, as Quotas ofertadas deverão ser transferidas aos respectivos adquirentes no prazo de até 10 (dez) dias, contados do término do período de 30 (trinta) dias a que se refere cláusula 7.8.3 acima.

7.8.6. Caso os Quotistas não exerçam o seu Direito de Preferência, na forma desta Cláusula 7.8, e a Petrobras não se manifeste contrariamente ao ingresso do Potencial Ingressante, nos termos da Cláusula 7.6., o Quotista Alienante estará livre para alienar ao Potencial Comprador, no prazo de 90 (noventa) dias contados do termo do prazo






EIG00102309
EIG_KEP_00211809

estabelecido na Cláusula 7.8.3., suas Quotas, nos mesmos termos e condições estabelecidos na Notificação de Oferta. Caso não formalize, por qualquer motivo, a cessão e transferência das Quotas ao Potencial Comprador no prazo estabelecido, o Quotista Alienante deverá reiniciar o procedimento desta Cláusula 7.8 e Cláusula 7.9 abaixo antes que possa alienar suas Quotas.

7.8.7. A Petrobras, na qualidade de Quotista do Fundo, renunciará ao exercício do Direito de Preferência para aquisição de novas quotas e do Direito de Preferência sobre Sobras, sempre que tal exercício possa implicar em aumento de sua participação no Fundo para mais de 6% (seis por cento) das Quotas emitidas pelo Fundo.

7.9.   Direito de Venda Conjunta (*Tag Along* Integral). Nas hipóteses de término do Período de *Lock-Up* da Petrobras, conforme previsto na Cláusula 7.6 acima, na qualidade de Quotista do Fundo, cada Quotista, individualmente, terá a possibilidade de, ao final do prazo de 30 (trinta) dias previsto na Cláusula 7.8.3, manifestar sua intenção de alienar a totalidade de suas respectivas Quotas ao Potencial Ingressante.

7.9.1.   Na hipótese de exercício do *Tag Along* Integral, o preço de compra das Quotas não poderá ser inferior ao maior preço apurado de acordo com os seguintes critérios: (i) preço de emissão das ações da Companhia subscritas pelo Fundo, corrigido por IPCA acrescido de 15% (quinze por cento) ao ano; ou (ii) preço médio das ações de emissão da Companhia subscritas pelo Fundo, apurado por 3 (três) instituições financeiras indicadas pelos Quotistas que tenham exercido o *TagAlong* Integral.



## CAPÍTULO VIII – OUTROS COMPROMISSOS DOS QUOTISTAS

8.1.   Oferta Pública de Ações (IPO). Na hipótese da Diretoria da Companhia considerar que existe a oportunidade de mercado e interesse por parte de investidores, a Companhia, poderá efetuar a Oferta Pública de Ações para o mercado, observados os *quora* previstos neste Acordo e no Regulamento, quando aplicável, bem como no Estatuto Social da Companhia e no Acordo de Acionistas. A Oferta Pública de Ações será composta prioritariamente por uma oferta primária e poderá contemplar uma tranche secundária, caso exista interesse por parte dos acionistas da Companhia e seja considerado apropriado pelos assessores financeiros que serão contratados pela Companhia, levando em consideração as condições mercadológicas à época da oferta e demais instrumentos societários, financeiros e administrativos da Companhia. Nesse caso, a Diretoria da Companhia apresentará aos









EIG00102310

EIG_KEP_00211810

acionistas um relatório dos assessores financeiros da Companhia contendo os termos e condições estimados para a realização da Oferta Pública de Ações, conforme previsto no Acordo de Acionistas.

8.1.1.   A Oferta Pública de Ações, nos termos previstos no item 8.1. acima será aprovada pelo Comitê de Investimento, salvo se os membros do Comitê de Investimento representando 85% (oitenta e cinco por cento) das Quotas emitidas pelo Fundo se opuserem. Caso aprovada, os Quotistas deverão tomar todas as medidas necessárias, assinar todos os documentos e realizar todos os atos societários que forem necessários para a realização da Oferta Pública de Ações.

8.1.2.   Caso a Oferta Pública de Ações contemple uma oferta secundária de ações e as intenções de colocação dos acionistas superarem a quantidade recomendada para a oferta secundária, os acionistas terão suas intenções de colocação atendidas na proporção do número de ações que tais acionistas pretendam colocar sobre o total de ações que os acionistas como um todo tenham a intenção de colocar na oferta secundária.

8.2.   Abertura de Capital e Oferta Pública Secundária. Sem prejuízo da possibilidade de Oferta Pública de Ações prevista no item 8.1. acima, qualquer Quotista ou grupo de Quotistas que detiver, direta ou indiretamente, no mínimo, 10% (dez por cento) do capital social total da Companhia, poderá, a qualquer tempo após o decurso do prazo de 5 (cinco) anos contados da primeira integralização de capital do Fundo na Companhia, independentemente de quaisquer restrições de qualquer dos Quotistas, solicitar à Administradora que tome as providências necessárias em conjunto com à administração da Companhia, para que esta convoque uma Assembleia Geral da Companhia, com o objetivo de aprovar: (i) a formalização, pela Companhia, do pedido de registro de companhia aberta na CVM, nos termos da Instrução CVM nº 480, de 7 de dezembro de 2009; e (ii) a realização da Oferta Pública de Ações secundária da Companhia para venda, total ou parcial, da participação do referido Quotista na Companhia ("Oferta Pública Secundária"). Nesse caso, e conforme disposto nesta Cláusula, a Companhia, seus acionistas, o Fundo e seus Quotistas se obrigam a tomar todas as providências necessárias para realização da Oferta Pública Secundária.

8.2.1.   Mediante o recebimento da referida solicitação, a Administradora deverá diligenciar em conjunto com a administração da Companhia e realizar os atos necessários à realização da referida assembleia.





41

EIG00102311

EIG_KEP_00211811

8.2.2   Os Quotistas por este ato comprometem-se a votar com suas Quotas em reunião do Comitê de Investimento do Fundo que anteceda a realização da Assembleia Geral da Companhia, de forma a instruir a Administradora a manifestar-se favoravelmente à obtenção, pela Companhia, do registro de companhia aberta na CVM e à realização da Oferta Pública Secundária, determinando à administração da Companhia que prontamente tome todas as providências necessárias.

8.3.   Penhora de Quotas. No caso de penhora de Quotas detidas por um dos Quotistas, este comunicará tal fato à Administradora no prazo de até 48 (quarenta e oito) horas contado da data que tomar conhecimento da ordem de penhora, ficando estabelecido que não será permitido o ingresso no Fundo do terceiro credor na referida execução. Nesta hipótese, o Quotista que tiver suas Quotas penhoradas terá prazo de 72 (setenta e duas) horas, contadas da comunicação à Administradora, para substituir tal gravame e/ou para depositar o valor envolvido. Ultrapassado este prazo, será facultado aos demais Quotistas, na qualidade de terceiros interessados: (i) remir a execução, sub-rogando-se nos direitos do credor; ou (ii) exercer sua preferência na aquisição das Quotas penhoradas, aplicando-se as regras de alienação judicial estipuladas nos artigos 1.113 a 1.119 e, analogicamente o disposto de penhora de quotas de sociedades estipulado no §4° do artigo 685-A todos do Código de Processo Civil.

8.3.1.   Se os demais Quotistas optarem por remir a execução sub-rogando-se nos direitos do credor, as Quotas que seriam penhoradas serão empenhadas pelo Quotista devedor em favor dos demais, como garantia do pagamento pelo Quotista devedor de sua dívida com os demais Quotistas e a integralidade dos rendimentos devidos àquele Quotista durante o período em que essas Quotas estiverem empenhadas será paga aos demais Quotistas até a quitação total da dívida.

8.3.2.   O Quotista que tiver suas Quotas penhoradas desde já anui e não se opõe que os demais Quotistas possam remir a execução e subrogar-se nos direitos do credor.

8.4.   Confidencialidade. Os Quotistas deverão manter o caráter confidencial de quaisquer informações recebidas do Fundo e de outros Quotistas, inclusive, sem limitação, todos os dados e informações obtidos pelos Quotistas em conformidade com este Acordo e qualquer das operações aqui previstas, que não sejam de conhecimento público, tais como operações, estratégias, produtos, serviços, despesas, receitas, lucratividade, preços, processos internos e listas de clientes, com exceção de contratos celebrados com Partes Relacionadas, acordos e programas de opções de aquisição de ações ou de outros títulos ou valores mobiliários de emissão da Companhia ("Informações Confidenciais").






42

EIG00102312

EIG_KEP_00211812

8.4.1.  Vigência da Obrigação de Confidencialidade. A obrigação de manter em sigilo as Informações Confidenciais será vinculante durante todo o prazo de vigência deste Acordo. O Quotista que se retirar e liquidar sua participação no Fundo deverá manter em sigilo as Informações Confidenciais por 5 (cinco) anos adicionais contados da data de sua retirada do Fundo, ou da realização da Oferta Pública de Ações, o que ocorrer primeiro, observado que em relação aos Contratos Operacionais da Companhia e suas Controladas, o sigilo sobre as Informações Confidenciais deve ser mantido pelo prazo de 10 (dez) anos, contados da mesma forma indicada nesta Cláusula ou pelo prazo estabelecido em referidos contratos, o que for maior.

8.4.2.  As informações que (a) sejam desenvolvidas de forma independente pelas Partes ou não sujeitas à confidencialidade e recebidas legalmente de outra fonte que tenha o direito de fornecê-las; (b) se tornem disponíveis ao público sem violação do presente Acordo pelas Partes; (c) na data de divulgação a uma Parte eram conhecidas pela referida Parte como não estando sujeitas à confidencialidade, conforme comprovado por documentação em seu poder; (d) o Fundo concorde, por escrito, estarem livres de tais restrições; ou (e) devam, atualmente ou no futuro, ser divulgadas conforme prescrito pela lei, regulamentos ou normas governamentais aplicáveis (fato acerca do qual a Parte informada fornecerá imediatamente à Parte informante aviso, concedendo a oportunidade para tentar restringir a divulgação) ou por força de decisão judicial ou administrativa não serão consideradas informações confidenciais para fins do presente Acordo.

8.4.3.  Nenhuma Parte dará acesso, sem o consentimento prévio do Fundo, e o Fundo não ficará obrigado a dar acesso, às Informações Confidenciais a qualquer pessoa que não se obrigue por escrito, antes da obtenção de tal acesso, a manter o caráter confidencial destas, inclusive, sem limitação, conselheiros, diretores, empregados, representantes e agentes da Parte em questão.



## CAPÍTULO IX – DISPOSIÇÕES FINAIS

9.1.  Vigência. O presente Acordo começará a vigorar a partir de sua assinatura e permanecerá em vigor até a ocorrência do primeiro dos seguintes eventos: (i) o decurso do prazo de 20 (vinte) anos contados da data da primeira integralização de Quotas de emissão do Fundo, podendo ser renovado por igual período, caso não haja manifestação de qualquer dos









EIG00102313

EIG_KEP_00211813

Quotistas com 180 (cento e oitenta) dias de antecedência em relação ao término do prazo de vigência; ou (ii) realização da Oferta Pública de Ações.

9.2.    Resolução Amigável. Se houver qualquer Conflito, os Quotistas deverão enviar seus melhores esforços para solucioná-lo de forma amigável. Para tal fim, qualquer Quotista poderá notificar o outro de sua intenção de iniciar o procedimento descrito nesta Cláusula, pela qual os Quotistas deverão se reunir para tentar solucionar tal Conflito por meio de discussões amigáveis e de boa-fé.

9.2.1.    No caso de os Quotistas não chegarem a um consenso e no prazo de 30 (trinta) dias, contados a partir do recebimento da notificação de qualquer Quotista, então o Conflito deverá ser solucionado por arbitragem, como descrito na Cláusula 9.3 abaixo.

9.3.    Arbitragem. Quaisquer controvérsias, litígios, dúvidas, disputas, conflitos, questões ou discrepâncias de qualquer natureza oriundas ou relacionadas a este Acordo ("Conflito"), envolvendo qualquer dos Quotistas ("Partes Envolvidas"), será resolvido por meio de arbitragem, a ser conduzida perante e administrada pelo Centro de Arbitragem e Mediação da Câmara de Comércio Brasil-Canadá ("Câmara").

9.3.1.    A arbitragem será realizada de acordo com as normas procedimentais da Câmara em vigor no momento da arbitragem ("Regulamento Arbitragem").

9.3.2.    A arbitragem caberá a um tribunal arbitral composto por três árbitros, preferencialmente inscritos na Ordem dos Advogados do Brasil ("Tribunal Arbitral").

9.3.3.    Cada Parte Envolvida indicará um árbitro. Havendo mais de um reclamante, todos eles indicarão de comum acordo um único árbitro; havendo mais de um reclamado, todos eles indicarão de comum acordo um único árbitro. O terceiro árbitro, que presidirá o Tribunal Arbitral, será escolhido de comum acordo pelos árbitros indicados pelas Partes Envolvidas.

(a)    Quaisquer omissões, recusas, litígios, dúvidas e faltas de acordo quanto à indicação dos árbitros pelas Partes Envolvidas ou à escolha do terceiro árbitro serão dirimidos pela Câmara.

(b)    Os procedimentos previstos na presente cláusula também se aplicarão aos casos de substituição de árbitro.






44

EIG00102314

EIG_KEP_00211814

9.3.4.   A arbitragem será realizada no Município do Rio de Janeiro, Estado do Rio de Janeiro, podendo o Tribunal Arbitral, motivadamente, designar a realização de atos específicos em outras localidades.

9.3.5.   A arbitragem será realizada em língua portuguesa.

9.3.6.   A arbitragem será de direito, aplicando-se as regras e princípios do ordenamento jurídico da República Federativa do Brasil.

9.3.7.   A arbitragem será concluída no prazo de 6 (seis) meses, contados a partir da data de assinatura do termo de arbitragem, o qual poderá ser prorrogado motivadamente pelo Tribunal Arbitral.

9.3.8.   A arbitragem será sigilosa.

9.3.9.   O Tribunal Arbitral alocará entre as partes, conforme os critérios da sucumbência, razoabilidade e proporcionalidade, o pagamento e o reembolso (i) das taxas e demais valores devidos, pagos ou reembolsados à Câmara, (ii) dos honorários e demais valores devidos, pagos ou reembolsados aos árbitros, (iii) dos honorários e demais valores devidos, pagos ou reembolsados aos peritos, tradutores, intérpretes, estenotipistas e outros auxiliares eventualmente designados pelo Tribunal Arbitral, (iv) dos honorários advocatícios de sucumbência fixados pelo Tribunal Arbitral e (v) de eventual indenização por litigância de má-fé. O Tribunal Arbitral não condenará qualquer das Partes Envolvidas a pagar ou reembolsar (i) honorários contratuais ou qualquer outro valor devido, pago ou reembolsado pela parte contrária a seus advogados, assistentes técnicos, tradutores, intérpretes e outros auxiliares e (ii) qualquer outro valor devido, pago ou reembolsado pela parte contrária com relação à arbitragem, a exemplo de despesas com fotocópias, autenticações, consularizações e viagens.





9.3.10. As decisões da arbitragem serão finais e definitivas, não se exigindo homologação judicial nem cabendo qualquer recurso contra as mesmas, ressalvados os pedidos de correção e esclarecimentos ao Tribunal Arbitral previstos no art. 30 da Lei nº 9.307/96 e eventual ação anulatória fundada no art. 32 da Lei nº 9.307/96.

9.3.11. Antes da instalação do Tribunal Arbitral, qualquer das Partes Envolvidas poderá requerer ao Poder Judiciário medidas de urgência, sendo certo que e eventual requerimento de medida de urgência ao Poder Judiciário não afetará a existência,




45

EIG00102315
EIG_KEP_00211815

validade e eficácia da convenção de arbitragem, nem representará uma dispensa com relação à necessidade de submissão do Conflito à arbitragem. Após a instalação do Tribunal Arbitral, os requerimentos de medida de urgência deverão ser dirigidos ao Tribunal Arbitral, após a sua constituição. As medidas de urgência concedidas pelo Poder Judiciário poderão ser revistas pelo Tribunal Arbitral após a sua constituição.

9.3.12. Para (i) as medidas de urgência anteriores à constituição do Tribunal Arbitral, (ii) a execução das decisões do Tribunal Arbitral, inclusive da sentença final e eventual sentença parcial, (iii) eventual ação anulatória fundada no art. 32 da Lei nº 9.307/96 e (iv) os Conflitos que por força da legislação brasileira não puderem ser submetidas à arbitragem, fica eleito o Foro da Comarca do Rio de Janeiro, Estado do Rio de Janeiro, como o único competente, renunciando-se a todos os outros, por mais especiais ou privilegiados que sejam.

9.4.    Execução Específica. Os Quotistas concordam que a atribuição de perdas e danos, ainda que devidos e determinados de acordo com a lei, não constituirá uma compensação apropriada e suficiente pelo inadimplemento das obrigações estabelecidas neste Acordo. Após obtido o reconhecimento do inadimplemento e do direito à execução específica mediante procedimento arbitral, qualquer Quotista poderá reivindicar judicialmente a execução específica da obrigação não cumprida mediante ordem judicial, de acordo com os termos dos artigos 461, 466-A, 466-B, 466-C e 632 e seguintes do Código de Processo Civil.

9.5.    Notificações. Todas as notificações, consentimentos, solicitações e outras comunicações previstas neste Acordo serão realizadas por escrito e serão entregues em mãos, enviadas por meio de carta registrada (com aviso de recebimento), ou por fax ou serviço de *courier* reconhecido, no endereço e para os responsáveis abaixo indicados:



(i)    Se para a Petros:
       Rua do Ouvidor, nº 98, Centro, Rio de Janeiro, RJ
       CEP: 20040-030
       Tel.: (21) 2506-0514
       A/C: Manuela Marçal, Gerente Executiva de Participações Mobiliárias
       E-mail: manuelam@petros.com.br



(ii)   Se para a Funcef:
       Setor Comercial Norte Quadra 02, Bloco "A", Ed. Corporate Financial Center, 12º e 13º andares
       Brasília, DF









46

Confidential

CEP: 70712-900
Tel.: (61) 3532-1772
Fac-símile: (61) 3532-1767
A/C: Diretoria de Participações
E-mail: dipar@funcef.com.br; humberto@funcef.com.br

(iii)    Se para a Previ:
         Praia de Botafogo, 501- 3º e 4º andares - Botafogo
         Rio de Janeiro – RJ
         CEP: 22.250-040
         Fac-símile: (21) 3870-1652
         A/C: Diretor de Investimentos
         E-mail: dirin@previ.com.br e gerin@previ.com.br

(iv)     Se para a Valia:
         Av. das Américas, nº 4430, 3º andar, Barra da Tijuca
         Rio de Janeiro – RJ
         CEP: 22640-102
         Fac-símile: (21) 3385 2227
         A/C: Sr. Eustáquio Coelho Lott
         E-mail: eustaquio.lott@vale.com

(v)      Se para o Santander:
         Av. Presidente Juscelino Kubitschek, 2.041/2.235, Bloco A (parte), 16º andar
         São Paulo – SP
         CEP: 04543-011
         Fac-símile: (11) 3553-2999
         A/C: Marcelo Hudik Furtado de Albuquerque
         Email: mhalbuquerque@santander.com.br

(vi)     Se para o Fundo Strong:
         Avenida Paulista, 1450, 12º andar
         São Paulo, SP, 01310-100
         A/C: Sr. Fernando Jorge Buso Gomes
         Telefone: +55 (11) 2178-5593/+55(11) 2178-4510
         Fac-símile: +55 (11) 2178-5793
         E-mail: fernando@bradescobbi.com.br








47

(vii)   Se para o BTG Pactual:
        Praia de Botafogo, 501, Torre Corcovado, 5º andar
        Rio de Janeiro – RJ
        CEP 22250-040
        Departamento Jurídico
        Tel.: (11) 3383-2000
        Fac-símile: (11) 3383-2001
        A/C: Sr. Bruno Duque, Sr. Oderval Duarte e Sr. Lucas Martinelli
        E-mail: bruno.duque@btgpactual.com; oderval.duarte@btgpactual.com; e
        lucas.martinelli@btgpactual.com

(viii)  Se para a Petrobras:
        Av. República do Chile, 65/1004
        Rio de Janeiro – RJ
        CEP 20031-912
        A/c Fábio Barreto Lourenço
        Tel.: (21) 3224-3067
        Fac-símile: (21)3224-0860
        E-mail: fabiolourenco@petrobras.com.br

(ix)    Se para a Lakeshore:
        Rua São Tomé, 86, 19º andar, Cj. 191, Sala B
        Vila Olímpia
        04551-080 – São Paulo, SP
        Tel.: (21) 8151-6309
        A/C: Luiz Fontoura de Oliveira Reis Filho
        E-mail: luizreis@globo.com

(x)     Se para a Luce Drilling
        Praia de Botafogo, 228, Ala A - sala 601, Botafogo
        Rio de Janeiro, 22250-040
        Fac-símile: + 55 21 25541071
        Telefone: +55 21 2553-4303
        At.: (Sr. Aldo Floris)
        E-mail: aldofloris@flbinv.com.br









48

EIG00102318

EIG_KEP_00211818

(xi)    Se para o EIG
        1700 Pennsylvania Ave, NW
        Washington, DC 20006 USA
        Telefone: (202) 600-3306
        Fac-símile: (202) 600-3406
        E-mail: kevin.corrigan@eigpartners.com
            blair.thomas@ eigpartners.com

(xii)   Se para a Administradora
        Av. Paulista, 2300 – 11° andar, Cerqueira Cesar
        São Paulo, SP
        CEP 01310-300
        Fac-símile: (11) 3555-6378
        A/C: Gerência Nacional de Desenvolvimento de Fundos Estruturados
        E-mail: gedef@caixa.gov.br

(xiii)  Se para a Companhia
        Rua Humaitá 275, sala 1302, Humaitá
        Rio de Janeiro, RJ
        CEP 22261-005
        Tel.: (21) 2528-0080
        Fac-símile: (21) 2528-0080
        E-mail: joao.ferraz@setebr.com



9.5.1.  As notificações entregues de acordo com a cláusula 9.5 serão consideradas dadas: (i) na ocasião em que forem entregues, se entregues pessoalmente; (ii) na ocasião em que forem recebidas, se enviadas por correio ou por serviço de *courier* ou por meio de mensagem eletrônica com confirmação de recebimento; e (iii) se por fax, na data constante da confirmação de recebimento da transmissão emitida pelo respectivo aparelho de fax receptor.



9.5.2.  Qualquer Parte poderá mudar o endereço para o qual a notificação deverá ser enviada por notificação escrita às demais Partes e à Administradora de acordo com esta cláusula, sendo que, com relação a esta disposição, a notificação será considerada







49

EIG00102319
EIG_KEP_00211819

recebida apenas mediante reconhecimento de tal recebimento por cada uma das demais Partes.

9.5.3. Cópias das notificações relacionadas à Companhia e/ou suas sociedades subsidiárias ou controladas, recebidas pela Administradora, deverão ser encaminhadas aos Quotistas, nos endereços indicados na Cláusula 9.5. acima, no prazo de 03 (três) Dias Úteis.

9.6  Negócios Financeiros. Os Quotistas, a Administradora e o Comitê de Investimento deverão observar, em relação à contratação das instituições financeiras previstas neste Acordo, o disposto no Acordo para Realização de Negócios Financeiros.

9.7.  Efeito Vinculante. Observado o disposto na Cláusula 9.9, este Acordo é celebrado em caráter irrevogável e irretratável, vinculando o Fundo e seus Quotistas, por si e seus respectivos sucessores e cessionários autorizados. Novos Quotistas, em virtude da subscrição de novas Quotas ou da Transferência de Quotas, deverão aderir aos termos e condições deste Acordo, como se tivessem sido parte original deste, subrogando-se (no caso de Transferência) integralmente nos direitos e obrigações do cedente, sendo que as referidas subscrição ou Transferência somente serão válidas mediante tal adesão integral.

9.8.  Invalidade, Ineficácia e Inexequibilidade. Se, por qualquer razão, qualquer disposição deste Acordo vier a ser considerada inválida, ineficaz ou inexequível, essa disposição será limitada o quanto possível para que produza seus efeitos, e a validade, eficácia e exequibilidade das disposições remanescentes deste Acordo não serão por qualquer forma afetadas ou prejudicadas.



9.9.  Alterações. O presente Acordo não poderá ser alterado, exceto com a concordância expressa e por escrito de todos os Quotistas e dos Intervenientes Anuentes.

9.10.  Atualização de Valores. Todos os valores absolutos previstos neste Acordo serão anualmente corrigidos por IPCA, sem necessidade de celebração de aditamento ao presente Acordo.

9.11.  Renúncia, Rescisão ou Quitação. Nenhuma renúncia, rescisão ou quitação deste Acordo, ou de qualquer dos termos ou disposições deste, obrigará qualquer das Partes a menos que seja confirmada por escrito. Nenhuma renúncia por qualquer das Partes a qualquer termo ou disposição deste Acordo ou a qualquer inadimplemento sob este Instrumento constituirá novação, nem prejudicará ou restringirá os direitos de tal Parte, nem






50

EIG00102320

EIG_KEP_00211820

isentará as outras Partes do integral cumprimento de suas obrigações conforme aqui previstas, nem afetará os direitos de tal Parte, a partir de então, de executar tal termo ou disposição ou de exercer qualquer direito ou remédio jurídico na eventualidade de qualquer outro inadimplemento, quer similar ou não.

9.12.   Totalidade do Acordo e Novos Acordos. O presente Acordo substitui o Acordo de Quotistas do Fundo celebrado em 13 de maio de 2011 e seus aditamentos posteriores. Este Acordo constitui, nesta data, a totalidade do acordo e entendimento do Fundo em relação às matérias aqui contidas e cancela e substitui, expressamente, quaisquer outros acordos anteriores, verbais ou escritos. O disposto nesta Cláusula 9.12 não impede que as Partes celebrem entre si outros acordos de Quotistas ou qualquer outro documento que vincule as Quotas, desde que (i) a existência de tal acordo e as matérias ali contidas sejam expressamente comunicados à Administradora, e uma cópia de tal acordo seja arquivado na sede da Administradora; (ii) tal acordo não seja conflitante, inconsistente ou contrário com as disposições do presente Acordo; e (iii) a participação direta e/ou indireta dos Quotistas signatários de tal acordo no Capital Comprometido do Fundo, quando somadas, seja inferior ao Limite de Participação ("Acordos Paralelos Permitidos"). Nenhuma das Partes poderá celebrar quaisquer documentos ou acordos de qualquer natureza que resultem, de forma direta ou indireta, no exercício, por qualquer dos Quotistas, de direitos políticos sobre Quotas do Fundo que representem mais de 30% (trinta por cento) das Quotas representativas do Capital Comprometido do Fundo de modo que, na hipótese de que um Acordo Paralelo Permitido passe a vincular volume de Quotas superior ao Limite de Participação, este ficará automaticamente suspenso para todos os fins de direito até que os Quotistas signatários de tal Acordo Paralelo Permitido passem a deter, em conjunto, participação inferior ao Limite de Participação. Em caso de conflito, inconsistência ou contrariedade entre o presente Acordo e o Regulamento do Fundo, as disposições contidas neste Acordo prevalecerão.

9.13.   Poder e Autorização. Os Quotistas e os Intervenientes Anuentes têm todos os poderes e autoridade necessários para celebrar este Acordo, cumprir suas respectivas obrigações e consumar as operações aqui previstas. A celebração e entrega deste instrumento pelos Quotistas e os Intervenientes Anuentes e o cumprimento de suas obrigações conforme aqui previsto foram devidamente autorizadas por todos os atos societários necessários. Nenhum outro ato é necessário para autorizar a celebração, entrega e cumprimento deste Acordo pelas Partes.

9.14.   Ausência de Violação e Consentimentos.   Nem a celebração e entrega deste Acordo pelos Quotistas e pelos Intervenientes Anuentes, nem o cumprimento pelos Quotistas e pelos Intervenientes Anuentes de todas as suas obrigações aqui previstas,



VIEIRA REZENDE BARBOSA E GUERREIRO
Advogados

51

(a)     violarão ou conflitarão com qualquer disposição de seus documentos constitutivos;

(b)     violarão, causarão inadimplemento ou de outra forma constituirão ou darão origem a um inadimplemento com relação a qualquer contrato, compromisso ou outra obrigação relevante dos quais os Quotistas e os Intervenientes Anuentes sejam parte ou pelos quais estejam vinculadas;

(c)     violarão ou conflitarão com qualquer regulamento, ordem, lei, instrução, normativo, decisão administrativa ou judicial de qualquer tribunal ou outra autoridade governamental ou regulatória aos quais os Quotistas e os Intervenientes Anuentes estejam sujeitos; ou

(d)     requererão qualquer consentimento, aprovação ou autorização, notificação, arquivamento ou registro perante qualquer pessoa, entidade, tribunal ou autoridade governamental ou regulatória.

9.15.   <u>Inexistência de Vícios</u>. As prestações assumidas são reconhecidas pelos Quotistas como manifestamente proporcionais e os Quotistas estão cientes de todas as circunstâncias e regras que norteiam o presente negócio jurídico, e detêm experiência nas obrigações que lhe competem por força deste instrumento.

9.16.   <u>Capacidade</u>. Os representantes legais abaixo assinados estão plenamente capacitados para representar os Quotistas e os Intervenientes Anuentes perante terceiros e assumir as obrigações aqui estipuladas.

9.17.   <u>Títulos</u>. Os títulos das cláusulas deste Acordo servem apenas para fins de referência e não afetarão de nenhuma forma o significado ou interpretação deste Acordo.



9.18.   <u>Registro e Publicidade</u>. A Administradora deverá (i) manter o registro do presente Acordo juntamente com o registro dos Quotistas; (ii) arquivar o Acordo em sua sede social; e (iii) informar ao agente escriturador e ao Custodiante das Quotas acerca da existência do Acordo e de suas posteriores alterações, fazendo com que estes averbem a existência do Acordo no registro escritural das Quotas, de forma a dar publicidade acerca da existência do Acordo a terceiros.

9.19.   <u>Lei Aplicável</u>. O presente Acordo será regido e interpretado de acordo com as leis da República Federativa do Brasil.



*[página deixada em branco intencionalmente]*









52

EIG00102322

EIG_KEP_00211822

*(Página 01 de assinatura do Acordo de Quotistas do Fundo, celebrado em 31 de julho de 2012)*

E, por estarem assim justas e contratadas, as Partes assinam o presente Acordo em 13 (treze) vias de igual teor e forma, com as 2 (duas) testemunhas abaixo, a tudo presentes.

Rio de Janeiro, 31 de julho de 2012.

**STRONG FUNDO DE INVESTIMENTO EM COTAS DE FUNDOS DE INVESTIMENTO MULTIMERCADO**

Por: _____          Por: _____

Nome: _____          Nome: _____

Cargo: _____          Cargo: _____

**BANCO BTG PACTUAL S.A.**

Por: _____          Por: _____

Nome: CAMILLA BARROS DONATI          Nome: FERNANDA GAMA MOREIRA JORGE
PROCURADORA                                        PROCURADORA

Cargo: _____          Cargo: _____

**SANTANDER PARTICIPAÇÕES S.A.**

Por: _____          Por: _____

Nome: _____          Nome: _____

Cargo: _____          Cargo: _____

**FUNCEF – FUNDAÇÃO DOS ECONOMIÁRIOS FEDERAIS**

Por: _____          Por: _____

Nome: Carlos Alberto Caser          Nome: _____
Diretor-Presidente
FUNCEF

Cargo: _____          Cargo: _____

*[Segue continuação da página de assinaturas]*

VIEIRA REZENDE BARBOSA E GUERREIRO
Advogados



53

Confidential

*(Página 02 de assinatura do Acordo de Quotistas do Fundo, celebrado em 31 de julho de 2012)*

**FUNDAÇÃO PETROBRAS DE SEGURIDADE SOCIAL – PETROS**

Por: _____     Por: _____

Nome: _____     Nome: _____

Cargo: _____     Cargo: _____

**CAIXA DE PREVIDÊNCIA DOS FUNCIONÁRIOS DO BANCO DO BRASIL – PREVI**

Por: _____     Por: _____

Nome: Rene Sanda                        Nome: _____
Diretor de Investimentos

Cargo: _____     Cargo: _____

**FUNDAÇÃO VALE DO RIO DOCE DE SEGURIDADE SOCIAL – VALIA**

Por: _____     Por: _____

Nome: _____     Nome: _____

Cargo: _____     Cargo: _____

**PETRÓLEO BRASILEIRO S.A.**

Por: _____     Por: _____

Nome: _____     Nome: _____

Cargo: _____     Cargo: _____

**LAKESHORE FINANCIAL PARTNERS PARTICIPAÇÕES LTDA.**

Por: _____     Por: _____

Nome: _____     Nome: _____

Cargo: _____     Cargo: _____

VIEIRA REZENDE BARBOSA E GUERREIRO
Advogados

54

EIG00102324

EIG_KEP_00211824

*(Página 03 de assinatura do Acordo de Quotistas do Fundo, celebrado em 31 de julho de 2012)*

**LUCE VENTURE CAPITAL – DRILLING SERIES**

Por: _____     Por: _____

Nome: _____     Nome: _____

Cargo: _____     Cargo: _____

**EIG SETE HOLDINGS SÀRL**

Por: _____     Por: _____

Nome: Maria Virginia Nabuco do     Nome: Maria Virginia Nabuco do Amaral
Amaral Mesquita                     Mesquita

Cargo: Procuradora                  Cargo: Procuradora

Intervenientes-anuentes:

**CAIXA ECONÔMICA FEDERAL**

Por: _____     Por: _____

Nome: REBECA CORREA BALIAN          Nome: YOSHIU MARCOS HASHIMOTO
GERENTE EXECUTIVO                   Gerente Nacional
MATR. 067 287-0                     Matr. 028.253-0
GEDEF/MZ/SP                         GN Desenv. Fundos Estruturados
Cargo: CAIXA ECONÔMICA FEDERAL      Cargo: CAIXA ECONÔMICA FEDERAL

**SETE BRASIL PARTICIPAÇÕES S.A.**

Por: _____     Por: Eduardo _____

Nome: _____     Nome: _____

Cargo: _____     Cargo: _____

55

EIG00102325

EIG_KEP_00211825

*(Página 04 de assinatura do Acordo de Quotistas do Fundo, celebrado em 31 de julho de 2012)*

Testemunhas:

1. 

Nome:

RG:   *Maria Celina Missias da Cruz*
      *RG. 18.373.229-7*
      *CPF: 053.709.608-60*

Nome:   **Andréa Ribeiro**
RG:     RG. 23.126.528-1 SSP/SP
        CPF. 149.218.078-60







Confidential

<u>**ANEXO 2.2**</u>

*Modelo de Declaração de Observância do Limite de Participação*

\* \* \* \* \*

São Paulo, ▦ de ▦ de 2012

À

**CAIXA ECONÔMICA FEDERAL**

Av. Paulista, 2300 – 11º andar, Cerqueira Cesar, São Paulo, SP

CEP 01310-300

A/C: GEDEF - Gerência Nacional de Desenvolvimento de Fundos Estruturados

Na qualidade de Administradora do Fundo de Investimento em Participações Sondas (o "<u>FIP</u> <u>Sondas</u>")

Ref:    <u>*FIP Sondas – Limite de Participação – Grupo Econômico*</u>



Prezados Senhores,

1.      (nome do Quotista), portador do CNPJ/MF nº. (nº do CNPJ), devidamente qualificado no Acordo de Quotistas do Fundo de Investimento em Participações Sondas ("Fundo"), celebrado entre Banco BTG Pactual S.A., Santander Participações S.A., Caixa de Previdência dos Funcionários do Banco do Brasil – Previ, Fundação dos Economiários Federais – Funcef, Fundação Petrobras de Seguridade Social – Petros, Fundação Vale do Rio doce de Seguridade Social – Valia, Lakeshore Financial Partners Participações Ltda., Strong Fundo de Investimento em Cotas de Fundos de Investimento Multimercado, Petróleo Brasileiro S.A. – Petrobras, e Novos Quotistas (em conjunto, os "Quotistas"), a Sete Brasil Participações S.A. (a "<u>Sete Brasil</u>") e a Caixa Econômica Federal (a "<u>Administradora</u>"), conforme alterado e vigente nesta data (o "<u>Acordo de Quotistas</u>"), vem, por seus representantes legais, apresentar a presente declaração de observância do Limite de Participação



VIEIRA REZENDE BARROSA E GUERREIRO
Advogados



57

**Confidential**

(conforme definido no Acordo de Quotistas e Regulamento do Fundo), nos termos abaixo.

2.     Em atenção ao item "vi" da Cláusula 2.2. do Acordo de Quotistas, serve a presente para declarar, sob as penas da lei e para todos os fins de direito, que, na presente data, a signatária [não integra o Grupo Econômico, conforme definição constante do Acordo de Quotistas e Regulamento do Fundo, de nenhum outro Quotista ou Novo Quotista do FIP Sondas, nem exerce, conjuntamente com outro Quotista ou Novo Quotista do FIP Sondas, direitos políticos relacionados a quotas que representem percentual superior ao Limite de Participação] OU [integra o mesmo Grupo Econômico, conforme definição constante do Acordo de Quotistas e Regulamento do Fundo, do [Quotista/Novo Quotista ▓▓], pelo que solicita que suas respectivas participações no Capital Comprometido do Fundo sejam contabilizadas de forma consolidada para fins de cálculo do Limite de Participação] OU [exerce, conjuntamente com o Quotista/Novo Quotista ▓▓, direitos políticos relacionados a quotas que representam percentual superior ao Limite de Participação].

3.     Os termos em maiúscula utilizados e não expressamente definidos na presente correspondência, terão o significado que lhes foi atribuído no Acordo de Quotistas.

4.     Colocamo-nos desde já à inteira disposição de V. Sa. para a prestação de quaisquer esclarecimentos adicionais que se façam necessários com relação à presente correspondência.

Atenciosamente,

**[QUOTISTA]**

Nome: _____           Nome: _____
Cargo:                                                     Cargo:

EIG00102328
EIG_KEP_00211828