# EXHIBIT 106

**The following pages are a PDF printout of a document found at**
**https://www.justice.gov/opa/pr/petr-leo-brasileiro-sa-petrobras-agrees-pay-more-850-million-fcpa-violations**
**(under the Attachment(s) section, under the title**
**"Download Non-Prosecution Agreement and Statement of Facts")**


**The document is directly accessible at:**
**https://www.justice.gov/opa/press-release/file/1096706/download**



U.S. Department of Justice

Criminal Division

September 26, 2018

F. Joseph Warin
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

      Re:   Petróleo Brasileiro S.A. – Petrobras

Dear Counsel:

      The United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of Virginia (the "Fraud Section and the Office"), and Petróleo Brasileiro S.A. – Petrobras ("Petrobras" or the "Company") pursuant to authority granted by the Company's Board of Directors, enter into this Non-Prosecution Agreement ("Agreement"). On the understandings specified below, the Fraud Section and the Office will not bring any criminal or civil case against the Company (except for criminal tax violations, as to which the Fraud Section and the Office do not make any agreement) relating to any of the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts"). To the extent there is conduct disclosed by the Company that does not relate to any of the conduct described in the attached Statement of Facts, such conduct will not be exempt from prosecution and is not within the scope of or relevant to this Agreement. The Company, pursuant to authority granted by the Company's Board of Directors, also agrees to certain terms and obligations of the Agreement as described below.

      The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

      (a)    The Company did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section and the Office the conduct described in the Statement of Facts. However, after learning of the allegations of misconduct by Petrobras officials, the Company retained external law firms to conduct an independent investigation, and notified the Fraud Section and the Office of its investigation and intent to fully cooperate;

      (b)    the Company received full credit for its cooperation with the Fraud Section and the Office' investigation, including conducting a thorough internal investigation, proactively sharing in real-time facts discovered during the internal investigation and sharing information that would not have been otherwise available to the Fraud Section and the Office, making regular factual presentations to the Fraud Section and the Office, facilitating interviews of and information from foreign witnesses, and voluntarily collecting, analyzing, and organizing voluminous evidence and

1

information for the Fraud Section and the Office in response to requests, including translating key documents;

(c)     by the conclusion of the investigation, the Company provided to the Fraud Section and the Office all relevant facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Fraud Section prior to the Agreement;

(d)     the Company no longer employs or is affiliated with any of the individuals known to the Company to be implicated in the conduct at issue in the case as of the date of this Agreement, and the Company engaged in extensive remedial measures, including: replacing the Board of Directors and the Executive Board (the Company's high-level managers) and implementing governance reforms, such as expanding the scope of decisions requiring Board of Director approval; elevating and revamping the Company's compliance function, including creating and staffing the Division of Governance and Compliance ("DGC"), and mandating that the Officer of DGC cannot be terminated without the affirmative vote of a Board member representing minority shareholders; limiting individual decision-making authority by implementing a "four eyes" approval policy that requires a second review by supervisors from different reporting lines for substantive decisions; creating new corporate investment policies and procedures, including a new Approval Authority Matrix, mandatory collective decision-making, and participation of the Division of DGC in investment committees; enhancing the Company's policies and procedures related to confidential reporting and investigations, including restructuring the Office of the Ombudsman, implementing a confidential reporting hotline, and enhancing the procedures related to the Company's Internal Commissions of Inquiry; updating policies and procedures related to compliance; implementing measures to ensure the Company's operations are insulated from improper political interference, including new hiring and promotion procedures, a comprehensive government relations policy, and uniquely protecting the Officer of DGC within the organization; enhancing anti-corruption training by requiring all employees to complete compliance training, providing specialized training to employees engaged in the procurement of goods and services, and providing anti-corruption training to the Board of Directors and Executive Board; creating an Ethics Committee responsible for guiding, disseminating, and promoting compliance with ethical principles and conduct obligations; creating a committee within the Company's compliance function to discipline employees and ensure that discipline is meted out consistently; disciplining employees known to have violated Company policies and procedures, including suspending employees, removing their managerial functions, and terminating their employment; and enhancing controls related to procurement and contracting, including centralizing the procurement function, segregating procurement duties, and implementing a risk-based integrity due diligence program for prospective contractors;

(e)     the Company has committed to continue to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment B to this Agreement (Corporate Compliance Program);

(f)     the nature and seriousness of the offense conduct;

(g)     the Company has no prior criminal history;



2

(h)      the Company has agreed to continue to cooperate with the Fraud Section and the Office in any ongoing investigation of the conduct of the Company, its subsidiaries and affiliates and its officers, directors, employees, agents, business partners, distributors, and consultants relating to violations of the Foreign Corrupt Practices Act ("FCPA");

(i)      the Company resolved with the U.S. Securities and Exchange Commission ("SEC") through a cease-and-desist proceeding that will be filed on September 27, 2018, relating to the conduct described in the Statement of Facts;

(j)      the Company settled a private class action shareholders' suit, In re Petrobras Securities Litigation, No. 14-cv-9662 (S.D.N.Y.), relating to conduct described in the Statement of Facts, pursuant to which it has agreed to pay the settlement class $2.95 billion;

(k)      the mitigating factors present in this case, including that, in addition to the misconduct described in the Statement of Facts, a number of executives of the Company engaged in an embezzlement scheme that victimized the Company and its shareholders; and that the Company is a Brazilian-owned company that will separately be entering into a resolution with Brazilian authorities;

(l)      accordingly, after considering (a) through (k) above, the Fraud Section and the Office believe that the appropriate resolution of this case is a non-prosecution agreement with the Company, and a criminal penalty with an aggregate discount of 25% off of the bottom of the U.S. Sentencing Guidelines fine range; that the Fraud Section and the Office will credit 80% of the criminal penalty against the amount the Company pays to Brazilian authorities, pursuant to their resolution, and 10% of the criminal penalty against the civil penalty imposed by the SEC. Based on the Company's remediation and the state of its compliance program, the Company's agreement to report to the Fraud Section and the Office as set forth in Attachment C to this Agreement (Corporate Compliance Reporting), and the fact that the Company is based in Brazil and will separately be entering into a resolution with Brazil and will be subject to oversight by Brazilian authorities, including Brazil's Tribunal de Contas da União and Comissão de Valores Mobiliários, the Fraud Section and the Office determined that an independent compliance monitor was unnecessary.

The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as set forth in the attached Statement of Facts, and that the facts described therein are true and accurate. The Company also admits, accepts, and acknowledges that the facts described in the attached Statement of Facts constitute a violation of law, specifically the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78m. The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility for criminal violations of the FCPA by the Company set forth above or the facts described in the attached Statement of Facts. The Company agrees that if it or any of its direct or indirect subsidiaries or affiliates that the Company majority-owns or otherwise controls issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult the Fraud Section and the Office to determine (a) whether the text of

3

the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Office and the Company; and (b) whether the Fraud Section and the Office have any objection to the release. This paragraph does not apply to any statement or testimony by any officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case against such individual, unless such individual is speaking in a representative and authorized capacity on behalf of the Company.

The Company's obligations under this Agreement shall have a term of 3 years from the date on which the Agreement is executed (the "Term"). The Company agrees, however, that, in the event the Fraud Section and the Office determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and the Office, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section and the Office's right to proceed as provided in the breach provisions of this Agreement below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment C, for an equivalent period. Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment C, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

The Company shall cooperate fully with the Fraud Section and the Office subject to applicable law and regulations, in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct related to possible corrupt payments, or related violations of the books and records or internal controls provisions of the FCPA under investigation by the Fraud Section and the Office until the later of the date upon which all investigations and prosecutions arising out of the conduct are concluded, or the Term. At the request of the Fraud Section and the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its subsidiaries or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and Attachment A to this Agreement (Statement of Facts) and other conduct related to corrupt payments, false books and records, failure to implement adequate internal accounting controls, and circumvention of internal controls under investigation by the Fraud Section and the Office except as otherwise prohibited by law. The Company agrees that its cooperation shall include, but not be limited to, the following:

a.     The Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine or similar protection under foreign law with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section and

4

the Office, upon request, any document, record, or other tangible evidence about which the Fraud Section and the Office may inquire of the Company.

     b.     Upon request of the Fraud Section and the Office, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section and the Office the information and materials described above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

     c.     The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents, and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

     d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as MDBs, of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

     In addition, during the Term, should the Company learn of evidence or allegations of actual or potentially corrupt payments or actual or potential violations of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegations to the Fraud Section and the Office. On the date the Term expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Fraud Section and the Office that the Company has met its disclosure obligations pursuant to this Agreement.  Such certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001 and 18 U.S.C. § 1519.

     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign and domestic officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment B (Corporate Compliance Program), which is incorporated by reference into this Agreement.  In addition, the Company agrees that it will report to the Fraud Section and the Office once annually during each year of the Term of the Agreement regarding remediation and implementation of the compliance measures described in Attachment B.  These reports will be prepared in accordance with Attachment C (Corporate Compliance Reporting).

     In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the

future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment B.

The Fraud Section, the Office, and the Company agree, based on the application of the United States Sentencing Guidelines, that the appropriate total criminal penalty is $853,200,000 ("Total Criminal Penalty"). This reflects a 25 percent discount off of the bottom of the applicable United States Sentencing Guidelines fine range for the Company's full cooperation and remediation. The Fraud Section, the Office, and the Company further agree that the Company will pay the United States $85,320,000, equal to 10 percent of the Total Criminal Penalty. The Company agrees to pay $85,320,000 to the United States Treasury no later than five business days after the Agreement is fully executed. The Fraud Section and the Office agree to credit the remaining amount of the Total Criminal Penalty against the amount the Company pays to Brazil, up to 80 percent of the Total Criminal Penalty, equal to $682,560,000, and the amount the Company pays to the SEC as a civil penalty, up to 10 percent of the Total Criminal Penalty, equal to $85,320,000. The Company's payment obligations to the United States will be complete upon the Company's payment of $85,320,000, equal to 10 percent of the Total Criminal Penalty, so long as the Company pays the remaining amounts to Brazil and the SEC pursuant to their respective agreements. In the event that the Company does not pay to Brazil any part of the $682,560,000 in the timeframe specified in the agreement between Brazilian authorities and the Company, the Company will be required to pay that amount to the United States Treasury, except that the Fraud Section and the Office will credit up to 50% of that amount paid to the SEC. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts. This Agreement does not bar the Company from seeking recovery under Brazilian law, in proceedings unrelated to the penalty imposed here, from those who have inflicted harm on the Company. The Company further acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty.

The Fraud Section and the Office agree, except as provided herein, that it will not bring any criminal or civil case (except for criminal tax violations, as to which the Fraud Section and the Office does not make any agreement) against the Company relating to any of the conduct described in the attached Statement of Facts. To the extent there is conduct disclosed by the Company that does not relate to any of the conduct described in the attached Statement of Facts, such conduct will not be exempt from prosecution and is not within the scope of or relevant to this Agreement. The Fraud Section and the Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury

or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by the Company or any of its present or former parents or subsidiaries. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company or any of its present or former parents or subsidiaries.

If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in this Agreement; (d) fails to implement a compliance program as set forth in this Agreement and Attachment B; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section and the Office becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office has knowledge, including, but not limited to, the conduct described in the attached Statement of Facts, which may be pursued by the Fraud Section and the Office in the U.S. District Court for the Eastern District of Virginia or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Fraud Section and the Office's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of U.S. federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

In the event the Fraud Section and the Office determine that the Company has breached this Agreement, the Fraud Section and the Office agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days (30) of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Company.

7

In the event that the Fraud Section and the Office determine that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Fraud Section and the Office, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any material change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such change is structured as a sale, asset sale, merger, transfer, or other material change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section and the Office's ability to determine whether there has been a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include this Agreement's breach provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Fraud Section and the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section and the Office shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section and the Office may deem it a breach of this Agreement pursuant to the breach provisions of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

By entering into this Agreement, notwithstanding anything contained herein, the Company does not prospectively waive any arguments that, as an instrumentality of the Republic of Brazil, it is protected by sovereign immunity from criminal prosecution in the United States, and it

8

reserves the right to assert this argument in any future prosecution or civil action by the United States.

This Agreement is binding on the Company and the Fraud Section and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section and the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

It is further understood that the Company and the Fraud Section and the Office may disclose this Agreement to the public.

This Agreement sets forth all the terms of the agreement between the Company and the Fraud Section and the Office. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section and the Office, the attorneys for the Company, and a duly authorized representative of the Company.

Sincerely,

SANDRA MOSER
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: September 26, 2018    BY:

Christopher Cestaro
Lorinda Laryea
Assistant Chiefs, FCPA Unit
Derek Ettinger
Trial Attorney

G. ZACHARY TERWILLIGER
United States Attorney
Eastern District of Virginia

Date: September 26, 2018    BY:

Grace L. Hill
Assistant United States Attorney

9

AGREED AND CONSENTED TO:

Petróleo Brasileiro S.A. – Petrobras

Date: September 26th, 2018   BY: _____

Taisa Maciel
General Counsel
Petróleo Brasileiro S.A. – Petrobras

Date: September 26, 2018   BY: _____

F. Joseph Warin
Gibson, Dunn & Crutcher LLP
*Counsel for Petróleo Brasileiro S.A. –
Petrobras*

DISTRICT OF COLUMBIA:  SS

**Subscribed and sworn to before me by Taisa Maciel,** General Counsel, Petroleo Brasileiro S.A. – Petrobras and **F. Joseph Warin,** Esquire, of Gibson, Dunn & Crutcher LLP, Counsel for Petroleo Brasileiro S.A. – Petrobras this 26th day of September, 2018

_____

Doris L. Stanley, Notary Public in and for the District of Columbia

DORIS L. STANLEY
Notary Public of District of Columbia
My Commission Expires August 31, 2021

10

ATTACHMENT A

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the non-prosecution agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Eastern District of Virginia, and Petróleo Brasileiro S.A. - Petrobras ("Petrobras"). Petrobras hereby agrees and stipulates that the following information is true and accurate. Petrobras admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as set forth below:

**Relevant Entities and Individuals**

1.    Petrobras was a Brazilian state-owned-and-controlled oil and gas company headquartered in Rio de Janeiro, Brazil, and operating in 18 other countries, including the United States. The vast majority of the Company's shares traded either on the New York Stock Exchange in the form of American Depository Shares, on the São Paulo Stock Exchange, with the Brazilian government directly owning approximately 50.26 percent of Petrobras's common shares with voting rights, and an additional 9.87 percent of its common shares controlled by the Brazilian Economic and Social Development Bank as of February 28, 2018. Petrobras's common and preferred stock was registered with the United States Securities and Exchange Commission ("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934 as amended and currently trades on the New York Stock Exchange.

2.    Petrobras was an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1 and 78m(b).

A-1

3.    Executive 1, a resident and citizen of Brazil whose identity is known to the United States and Petrobras, was the head of a Petrobras division from approximately 2004 to 2012. Executive 1 was appointed to his position under the influence of a political party.

4.    Executive 2, a resident and citizen of Brazil whose identity is known to the United States and Petrobras, was the head of a Petrobras division from approximately 2004 to 2012. Executive 2 was appointed to his position under the influence of a political party.

5.    Executive 3, a resident and citizen of Brazil whose identity is known to the United States and Petrobras, was the head of a Petrobras division from approximately 2003 to 2008 and the Chief Financial Officer of one of Petrobras's largest subsidiaries from in or about 2008 to 2014. Executive 3 was appointed to his position under the influence of a political party.

6.    Executive 4, a resident and citizen of Brazil whose identity is known to the United States and Petrobras, was the head of a Petrobras division from approximately 2008 to 2012. Executive 4 was appointed to his position under the influence of a political party.

7.    Manager 1, a resident and citizen of Brazil whose identity is known to the United States and Petrobras, was a high-ranking manager in a Petrobras division.  From approximately 2004 to 2011, he reported to Executive 2.

8.    Intermediary 1, a resident and citizen of Brazil whose identity is known to the United States and Petrobras, was an intermediary responsible for transferring bribe payments from bribe-paying contractors to Executive 1, Brazilian politicians, and Brazilian political parties.

### *The Board of Executive Officers*

9.    Executive 1 (2004 to 2012), Executive 2 (2004 to 2012), Executive 3 (2003 to 2008), and Executive 4 (2008 to 2012) were each members of the Petrobras Board of Executive Officers ("Executive Board").   The Executive Board was the highest level of Company

A-2

management and was responsible for managing the Company's business, pursuant to the mission, goals, strategies, and guidelines established by the Board of Directors. During the relevant time period the Executive Board was comprised of the Chief Executive Officer, the Chief Financial Officer, and the heads of the Company's operating and support divisions, these included: Exploration and Production, International, Gas & Energy, Downstream, and Services. The Officers on the Executive Board sat at the top of the Petrobras hierarchy, just below the Board of Directors. Beneath them were Executive Managers, General Managers, Managers, Sector Managers, Coordinators, and regular employees.

10.     Executive 1, Executive 2, Executive 3, Executive 4, and Manager 1 have all been convicted in Brazil of crimes related to their participation in the corruption at Petrobras that is described below. Executive 1, Executive 2, Executive 3, and Manager 1, have each admitted that they participated in the corruption at Petrobras, and Executive 2 and Executive 4 are currently serving prison sentences after being convicted at trial in Brazil for their roles in the corrupt schemes that were in place at the Company.

11.     In addition to receiving bribes, these executives also facilitated and directed millions of dollar in corrupt payments to politicians and political parties in Brazil, including, in one instance, directing the payment of illicit funds to stop a Parliamentary Inquiry into Petrobras contracts.

12.     In association with the corrupt schemes, each of these executives, and certain others who did not receive kickbacks, among other things, knowingly and willfully failed to implement internal controls, and Executive 1, Executive 2, and Executive 4 each falsified the Company's books and records by, among other things, signing, and causing to be signed, sub-certifications attesting to the accuracy and completeness of Petrobras's disclosures to the SEC that were

A-3

knowingly and willfully false.   Similarly, Executive 3 knowingly and willfully signed a management representation letter falsely stating that he was unaware of any fraud affecting the Company's subsidiary for which he served as CFO or that would significantly affect that subsidiary's financial statements.

13.     At the time the corrupt schemes were in place, other individuals at the Company, including certain members of the Company's Board of Directors, were aware that Petrobras contractors were involved in corruption at the time those companies were contracting with Petrobras and yet they did nothing to stop those companies from doing business with Petrobras or to investigate the nature and scope of corruption within Petrobras.  Indeed, two members of the Company's Board of Directors were involved in facilitating bribes that a major Petrobras contractor was paying to Brazilian politicians.

### The Bribery and Embezzlement Schemes

14.     In or around and between at least 2004 and 2012, Petrobras executives and managers, including Executive 1, Executive 2, Executive 3, Executive 4, Manager 1, and others, and contractors and suppliers of the Company, facilitated massive bid-rigging and bribery schemes that, among other things, allowed contractors to obtain contracts from Petrobras through non-competitive means and caused Petrobras to remain in the favor of many of Brazil's politicians and political parties.

15.     The contractors that engaged in the corruption typically paid bribes totaling approximately one to three percent of the value of the contracts obtained from Petrobras, which were then typically split among certain Petrobras executives, Brazilian politicians, Brazilian political parties, and other individuals who helped facilitate the payment of the bribes.

16.     The Petrobras executives and managers, including Executive 1, Executive 2,

Executive 3, Executive 4, and Manager 1, participated in receiving bribes, and also participated in the facilitation and direction of portions of the corrupt payments to Brazilian politicians and Brazilian political parties, some of which could affect the Company, including because they had oversight over the location in which a Company project was being completed.

17.   The money to pay the bribes was often funneled through fictitious costs, including consultancy agreements, incurred by the contractors in association with Petrobras projects and other projects.  Petrobras executives, including Executive 1, Executive 2, Executive 3, Executive 4, and Manager 1, assisted the corrupt contractors by, among other things, creating conditions – in part through the failure to implement adequate internal controls – that allowed for the contractors to continue generating the funds needed to make the corrupt payments.  Though the precise number is unknown, more than U.S. $2 billion has been estimated to have been generated and used to make corrupt payments, more than approximately U.S. $1 billion of which was estimated to have been directed to politicians and political parties, some of which could affect the Company.

18.   The inflated amounts paid to the corrupt contractors were capitalized as legitimate costs and hidden as part of the particular contracts, which were recorded in the Company's books, falsely inflating the value of certain of the Company's assets.

19.   Examples of the corrupt schemes follow:

### The Abreu e Lima Refinery

20.   In or about 2005, Petrobras announced its intention to complete the Abreu e Lima Refinery ("RNEST") in the Northeast state of Pernambuco.  The RNEST project generated more than 300 contracts and more than 950 amendments.

21.   Petrobras executives named above conspired with contractors and suppliers of the Company to facilitate millions of dollars in payments to politicians from contractors that obtained

business from Petrobras in association with the RNEST project.

22.     For example, in or about 2008 or 2009, Petrobras issued tenders for two contracts related to services and supplies required for the installation of atmospheric distillation units (UDA) and hydrogen generation units (HDT) at RNEST.  These contracts were awarded in or about 2009, and together were worth over R$4.67 billion.

23.     Before the tenders for these contracts were announced, the then-general manager of RNEST, who has been criminally prosecuted in Brazil for his role in the scheme, passed information about the size and initial values of the UDA and HDT units to one of the potential contractors.  That contractor then took the information to a meeting with several other competitor contractors.

24.     At the meeting, the contractors decided which of them would have priority over the projects they had learned about.  It was agreed that two construction companies would form a consortium and submit the lowest tender for the UDA and HDT contracts. Other companies would have priority over other contracts.

25.     After winning the tender for the UDA and HDT contracts, Executive 1 told a member of the consortium to pay R$15 million to a Brazilian political party and R$15 million to Executive 1.  When a politician became angry because the amount was lower than he expected, Executive 1 assured him that there would not be a lack of opportunities to obtain additional money in the future.

26.     Executive 1 also directed Intermediary 1 to use bribe payments received from Petrobras contractors to corruptly pay R$20 million to the campaign of a Brazilian politician who had oversight over the location where the RNEST refinery was being built.  This corrupt payment to the campaign was made at the specific request of another Brazilian official who oversaw the

A-6

port which was meant to receive the oil that Petrobras would ultimately ship from the RNEST refinery.  The corrupt payment was made after Executive 1 had several meetings with these two officials to discuss issues related to RNEST.

27.     The consortium paid an additional R$30 million in bribes to Executive 2 and Manager 1 in exchange for, among other things, Manager 1 helping the consortium with any problems that might occur on the project.

### The Petrochemical Complex of Rio de Janeiro

28.     The Rio de Janeiro State Petrochemical Complex ("COMPERJ") project also involved massive corruption and bribery.  COMPERJ covered an area of 42 square kilometers and involved multiple large contracts over a period of more than ten years.

29.     In connection with the COMPERJ project, Executive 1 and the Petrobras contractors directed corrupt payments to a powerful Brazilian politician who had oversight over the location where COMPERJ was being built, and with whom Executive 1 had a close working relationship.

30.     Specifically, in or about the first half of 2010, Executive 1 was called to a meeting with the Brazilian politician and two other Brazilian officials who were members of his staff. During the meeting, the officials solicited Executive 1 for money for the politician's re-election campaign fund.

31.     Later in 2010, Executive 1 contacted at least six companies that had contracts with Petrobras for the COMPERJ project to attend a meeting with one of the officials at a hotel in Rio de Janeiro.  Ultimately, each of the companies that were at the meeting, as well as three large companies that were also working on COMPERJ but were not present at the meeting, paid a total of R$30 million to the Brazilian politician's campaign.  Executive 1 admitted to taking part in

getting the companies to agree to make the corrupt payments to the politician's campaign.

32.    Executive 1, Executive 2, and Manager 1 also each received millions of dollars in bribes from contractors that obtained business from Petrobras in association with the COMPERJ project.  In exchange, among other things, Manager 1 leaked confidential information regarding certain projects that was used to review bid proposals, and Executive 1 accelerated the schedule for completing COMPERJ, resulting in procurement commencing, in some cases, without sufficient technical designs, and providing the bribe-paying contractors with lucrative contracting opportunities.

*Drillships and Shipyards*

33.    During their respective tenures on the Petrobras executive board, both Executive 3 and Executive 4 conspired with contractors and suppliers of the Company to facilitate corrupt payments from Petrobras contractors to politicians and political parties, and also received bribes for themselves.

34.    For example, in or about 2007, Executive 3 received pressure from a government minister, whose responsibilities both directly and indirectly included oversight of Petrobras and its activities, to pay an approximately R$50 million campaign debt that was owed to a bank by the minister's political party.  Executive 3 asked another executive for assistance, and together the executives agreed that the Company would award business to a ship operating company that was affiliated with the bank in order to reimburse the bank for the debt owed by the political party.

35.    The ship operating company was not the most qualified company to operate the rig and it was not the top choice to provide the service.  In order to avoid another more qualified company from winning the business, the ship operating company was awarded the contract directly, without submitting to a competitive bidding process. Neither of the Petrobras executives

involved in this scheme received bribes in association with the contract awarded to the ship operating company.

36.     In addition, in or about and between approximately 2004 and 2012, Manager 1 cooperated in the payment of bribes from a Singaporean shipyard company to a political party on at least six Petrobras projects.  Executive 2 and Manager 1 also received bribes themselves on those projects, some of which they shared with Executive 4.

37.     For example, in or about 2008, a joint venture between an American engineering company and the shipyard company was invited to bid on a project to build a tension leg platform.

38.     In or about 2008, after the invitation to bid, a consultant working for the shipyard company met with Manager 1, who told the consultant that if his company wanted to win the contract, it would need to pay a percentage of the contract value in bribes to a Brazilian political party and to Manager 1.

39.     The Singaporean company authorized the consultant to pay the bribes and in or about 2010 the joint venture won the project.

40.     Using commissions he received under a consulting agreement, the consultant paid approximately U.S. $8.8 million in bribes to the Brazilian political party and to Manager 1 in connection with the project.  Manager 1 also shared some of the bribe money with Executive 2.

41.     In another example, in or around and between 2009 and 2010, bribes were paid to a political party, Executive 4, a former Petrobras manager who worked under Executive 4, and various intermediaries in order to assist a drillship company in winning a contract with Petrobras valued at U.S. $1.8 billion for the chartering of a drilling vessel.

42.     The owner of the vessel paid approximately U.S. $20.8 million under separate commission agreements with two different agents in connection with the contract. The two

A-9

agreements were signed on the same date, for the same amount, and with the same payment schedules. The agents then arranged separately, and through various means, to pay the political party, Executive 4, and the former Petrobras manager their share of the bribes.

### False Books and Records

43.     While the various bribery and bid rigging schemes were ongoing, Petrobras's American Depositary Shares were traded on the New York Stock Exchange, and Petrobras was an "issuer" within the meaning of 15 U.S.C. § 78dd-1. Accordingly, Petrobras was required to file an annual report, including financial statements, with the SEC. For each of the relevant years, Petrobras filed its annual report with the SEC using Form 20-F, which is the primary disclosure document used by foreign private issuers that have equity shares listed on exchanges in the United States.

44.     During the scheme, Petrobras failed to make and keep books, records, and accounts which accurately and fairly reflected the Company's capitalization of property, plant, and equipment ("PP&E"), which was overstated on the Form 20-F as a result of the bribes being generated by the Company's contractors with the cooperation of certain Petrobras executives.

45.     Moreover, Executive 1, Executive 2, and Executive 4, each signed Sarbanes-Oxley (SOX) 302 sub-certifications while they were involved in, and were aware that other executives at Petrobras were involved in, obtaining and facilitating the payment of millions of dollars in bribes to themselves, to Brazilian politicians, and to Brazilian political parties.

46.     The SOX 302 sub-certifications signed by the corrupt Petrobras executives required the executives to certify, in relevant part, that the Form 20-F the Company would be filing with the SEC did not contain materially false or misleading statements, and that the information contained therein was accurate. The executives who signed, or caused to be signed, the Form

20-Fs did not disclose to the market the massive bribery schemes that were ongoing at the company, and each of the corrupt Petrobras executives knew at the time they signed the SOX 302 sub-certification that the Form 20-F did not include that disclosure.

47.    Similarly, Executive 3, while Chief Financial Officer of a subsidiary of Petrobras, signed a management representation letter that was provided to external auditors of Petrobras stating, among other things, that he was unaware of any fraud affecting the subsidiary that involved employees who played a significant role in internal controls or of fraud that would significantly affect the subsidiary's financial statements.  Executive 3 knew at the time a bribery scheme was ongoing at Petrobras such that the appointed officers of certain divisions facilitated bribes to politicians and political parties and in fact received bribes themselves.  He also knew that there were bribes paid to him and to politicians and political parties in connection with multiple business ventures of the Petrobras subsidiary.

48.    In or around September 2010, Petrobras closed on a global public offering of equity securities raising nearly U.S. $70 billion in capital from the Brazilian, U.S., and international capital markets.  Of that total, approximately U.S. $10 billion was raised from American Depository Shares listed on the New York Stock exchange.  The primary goals of the 2010 Offering were to (1) finance the purchase of pre-salt exploration and production rights in the Brazilian pre-salt basin; and (2) finance a portion of Petrobras's planned investment program.

## Failure to Implement Adequate Internal Controls

49.    Petrobras officials described above involved in the scheme at the executive level of the company who were responsible, in part, for implementing the Company's internal financial and accounting controls, knowingly and willfully failed to do so in order to continue to facilitate bribe payments to Brazilian politicians and Brazilian political parties.

50.     The executives described above, among other things, failed to implement internal controls over the process of contracting for services relating to Petrobras's large investment projects in the E&P, Gas and Power, Refining, Transportation and Marketing ("RTM"), and International business segments.

51.     Throughout the relevant period, the Petrobras executives described above, and others, knowingly and willfully failed to implement a system of internal accounting controls designed to detect and prevent the facilitation of bribes to Brazilian politicians and political parties, and to Petrobras officials.  The following internal control deficiencies, among others, facilitated the ongoing corruption schemes: failure to implement appropriate due diligence procedures for the retention of third-party vendors; failure to implement sufficient oversight to prevent the revision of estimates at the conclusion of the bid phase to favor certain bidders; failure to implement sufficient safeguards to prevent the manipulation of bid participant lists or criteria for selecting bid invitees to permit the invitation of companies that were not qualified; failure to implement a selection process that would prevent projects from being improperly awarded through direct contracting instead of a tender process; and manipulation of bid evaluation criteria to favor bribe-paying companies.

### Petrobras's Acceptance of Responsibility

52.     Petrobras accepts responsibility under United States law for the wrongful acts set forth above taken by the Petrobras executives and officers, and admits that those acts meet the vicarious liability and respondeat superior standard for corporate criminal wrongdoing under United States law and as a result, Petrobras violated all of the elements of the books and records and internal controls provisions under Title 15, United States Code, Sections 78m, 78ff.

A-12

### ATTACHMENT B

### CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*, and other applicable anti-corruption laws, Petróleo Brasileiro S.A. - Petrobras (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts

B-1

(collectively, the "anti-corruption laws,"), which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

    a.      gifts;

    b.      hospitality, entertainment, and expenses;

    c.      customer travel;

    d.      political contributions;

    e.      charitable donations and sponsorships;

    f.      facilitation payments; and

    g.      solicitation and extortion.

4.      The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance

of fair and accurate books, records, and accounts.  This system should be designed to provide reasonable assurances that:

        a.      transactions are executed in accordance with management's general or specific authorization;

        b.      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

        c.      access to assets is permitted only in accordance with management's general or specific authorization; and

        d.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

        5.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

        6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.      The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

B-4

*Internal Reporting and Investigation*

10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees.   Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.   The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

B-5

*Third-Party Relationships*

14.   The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.   properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.   informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.   seeking a reciprocal commitment from agents and business partners.

15.   Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.   The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential

new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.    The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.    train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

b.    where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.    The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

B-7

## ATTACHMENT C

### CORPORATE COMPLIANCE REPORTING

Petróleo Brasileiro S.A. - Petrobras (the "Company") agrees that it will report to the Fraud Section and the United States Attorney's Office for the Eastern District of Virginia (the "Fraud Section and the Office") periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment B.  During this three-year period, the Company shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two (2) follow-up reviews and reports, as described below:

a.    By no later than one year from the date this Agreement is executed, the Company shall submit to the Fraud Section and the Office a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the Company's internal controls, policies, and procedures for ensuring compliance with the FCPA and other applicable anti-corruption laws, and the proposed scope of the subsequent reviews.  The report shall be transmitted to Deputy Chief - FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Bond Building, Eleventh Floor, Washington, DC 20530 and the Chief of the Criminal Division, United States Attorney's Office for the Eastern District of Virginia, Justin W. Williams United States Attorney's Building, 2100 Jamieson Ave, Alexandria, VA 22314.  The Company may extend the time period for issuance of the report with prior written approval of the Fraud Section and the Office.

b.    The Company shall undertake at least two follow-up reviews and reports incorporating the Fraud Section and the Office's views on the Company's prior reviews and reports, to further monitor and assess whether the Company's policies and procedures are

C-1

reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws.

c.      The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Fraud Section and the Office.  The second follow-up review and report shall be completed and delivered to the Fraud Section and the Office no later than thirty days before the end of the Term.

d.      The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section and the Office's discharge of their duties and responsibilities or is otherwise required by law.

e.      The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section and the Office.

## ATTACHMENT D

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, Petróleo Brasileiro S.A. - Petrobras (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of Virginia (the "Fraud Section and the Office") regarding issues arising in relation to the making and keeping of false books and records and the failure to implement adequate internal accounting controls; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section and the Office; and

WHEREAS, the Company's General Counsel, Taisa Maciel, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (a) enters into this non-prosecution agreement ("Agreement") with the Fraud Section and the Office; and (b) agrees to accept a total criminal penalty against the Company totaling $853,200,000, of which $85,320,000 will be paid to the United States Treasury, and to pay such penalty in accordance with terms set forth in the non-prosecution agreement and with respect to the conduct described in the Statement of Facts in Attachment A in the manner described in the Agreement;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with

D-1

respect to venue in the United States District Court for the Eastern District of Virginia; and (b) a

knowing waiver of any defenses based on the statute of limitations for any prosecution relating to

the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud

Section and the Office prior to the date on which this Agreement was signed that is not time-barred

by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The General Counsel of Company, Taisa Maciel, is hereby authorized, empowered

and directed, on behalf of the Company, to execute the Agreement substantially in such form as

reviewed by this Board of Directors at this meeting with such changes as the General Counsel of

Company, Taisa Maciel, may approve;

4.      The General Counsel of Company, Taisa Maciel, is hereby authorized, empowered

and directed to take any and all actions as may be necessary or appropriate and to approve the

forms, terms or provisions of any agreement or other documents as may be necessary or

appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the General Counsel of Company, Taisa Maciel, which actions

would have been authorized by the foregoing resolutions except that such actions were taken prior

to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted

as actions on behalf of the Company.

Date: _SEPTEMBER 26ᵗʰ 2018_   By: _____

**DISTRICT OF COLUMBIA:  SS**

João Gonçalves Gabriel
Corporate Secretary
Petróleo Brasileiro S.A. - Petrobras

**Subscribed and sworn to before me by**
**Joao Goncalves Gabriel, Corporate Secretary,**
Petroleo Brasileiro S.A. – Petrobras  this  _26_  day of September, 2018

_____
Doris L. Stanley, Notary Public in and for the District of Columbia

                                        D-2



DORIS L. STANLEY
Notary Public of District of Columbia
My Commission Expires August 31, 2021