# EXHIBIT 116

# ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT

**Dated as of** _____

**By and between**

**[SPC]**

**and**

**CONTRACTOR**

**DRILLING RIG UNIT**

**Confidential**

**EIG00026163**

**EIG_KEP_00166643**

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND INTERPRETATION

    1.1      Definitions.

    1.2      Section and Exhibit References.

    1.3      Interpretation.

ARTICLE 2 RELATIONSHIPS AND ACKNOWLEDGEMENTS

    2.1      Subject Matter of this Agreement.

    2.2      Status of Contractor.

    2.3      Acknowledgement of Contractor.

ARTICLE 3 OBLIGATIONS OF CONTRACTOR

    3.1      Scope of Work – General Scope.

    3.2      Specific Obligations.

    3.3      Contractor's Obligations Regarding the Performance of the Works.

    3.4      Spare Parts.

    3.5      Standard of Performance.

    3.6      Contractor's Tools and Equipment.

    3.7      Employment of Personnel.

    3.8      Key Personnel.

    3.9      Operations Personnel and Assisted Operation.

    3.10    Emergencies.

    3.11    Approvals, Certificates, Permits and Licenses.

    3.12    Books, Records and Audits.

    3.13    Tax Accounting.

    3.14    Temporary Facilities.

    3.15    No Liens.

    3.16    Quality Assurance.

    3.17    Plan & Reports.

    3.18    Payment.

    3.19    Progress Meetings.

    3.20    Site Security.

    3.21    Access to Documents.

    3.22    Environmental Compliance.

Confidential

EIG00026164

EIG_KEP_00166644

3.23    Transportation.

3.24    Not applicable.

3.25    Export of DRU.

ARTICLE 4 LOCAL CONTENT REQUIREMENTS

4.1    Local Operations in Brazil.

4.2    Brazilian Local Content.

4.3    Monthly Report.

4.4    Liquidated Damages.

ARTICLE 5 OBLIGATIONS OF [SPC]

5.1    Payment.

5.2    Permits.

5.3    Temporary Asset Transfers.

ARTICLE 6 REPRESENTATIONS OF THE PARTIES

6.1    Representations and Warranties of [SPC].

6.2    Representations and Warranties of Contractor.

ARTICLE 7 TAXES

7.1    General provision.

7.2    Modification of the Tax Burden.

7.3    Indemnification.

7.4    Not applicable.

ARTICLE 8 MEASUREMENT

8.1    Calculation of the Works Progress.

8.2    Measurement of the Works.

ARTICLE 9 CONTRACT PRICE

9.1    Contract Price.

9.2    Payment Limit.

9.3    No Other Modification.

ARTICLE 10 PAYMENTS TO CONTRACTOR

10.1    Payments.

10.2    Invoicing.

10.3    Invoicing Documents.

10.4    Representation.

10.5    Review and Approval.

10.6    Payments.

10.7    Payments Not Acceptance of Work.

Confidential

EIG00026165

EIG_KEP_00166645

10.8    Payments Withheld and Deducted.

10.9    Interest on Late Payments.

10.10   Payments During Default.

10.11   Offset.

10.12   Payment Error.

10.13   Adjustments.

10.14   Final Completion

ARTICLE 11 COMMENCEMENT OF WORK:  PROJECT SCHEDULE

11.1    Commencement of Work.

11.2    Limited Notice to Proceed.

11.3    Project Schedule.

11.4    Project Schedule Baseline.

ARTICLE 12 CHANGE ORDERS

12.1    Change.

12.2    Imputed Change.

12.3    Changes Caused by [SPC] Delays.

12.4    Procedures for Negotiation of Change Orders.

12.5    Unsuccessful Negotiation of Change Orders.

12.6    Not applicable.

12.7    [SPC] 's Written Consent.

ARTICLE 13 TITLE AND RISK OF LOSS

13.1    Title.

13.2    Contractor Waiver.

13.3    Risk of Loss.

ARTICLE 14 INSURANCE

14.1    Provision of Insurance.

14.2    Lenders as Additional Insured.

14.3    Subrogation Waivers.

14.4    New Technology.

14.5    No Cancellation.

14.6    Obligations Not Relieved.

14.7    Failure to Provide Required Insurance.

ARTICLE 15 DOCUMENTATION

15.1    Delivery of Record As-Built Drawings.

15.2    Purchasing and Subcontractor Supplied Information.

Confidential

EIG00026166

EIG_KEP_00166646

15.3   Construction Drawings and Manuals.

15.4   Other Information.

ARTICLE 16 COMPLETION

16.1   Mechanical Completion.

16.2   Substantial Completion.

16.3   [SPC] Acceptance of Substantial Completion.

16.4   Substantial Completion Punch-list.

16.5   Handover.

16.6   Handover Certificate.

16.7   Not Applicable.

16.8   Final Completion.

16.9   Long-Term Obligations.

ARTICLE 17 INSPECTION AND WARRANTY

17.1   Scope of Warranty.

17.2   [SPC] Right to Inspect.

17.3   Warranty of Defects and Services.

17.4   Warranty Exclusions.

ARTICLE 18 ASSIGNMENT AND GUARANTEE

18.1   Assignment.

18.2   Guarantee.

18.3   Contractor not to be Released.

18.4   Assignment by [SPC].

18.5   Right of Termination.

ARTICLE 19 SUBCONTRACTING

19.1   Subcontractors.

19.2   Subcontractors Qualification.

19.3   Proposed Subcontractors.

19.4   Subcontracts.

ARTICLE 20 GUARANTEE OF TIMELY COMPLETION

20.1   Guarantee of Timely Completion.

20.2   Liquidated Damages for Delay.

20.3   Liquidated Damages Are Not a Penalty.

20.4   Sole Remedy for Delay.

20.5   No Challenge.

20.6   Performance Security.

Confidential

EIG00026167

EIG_KEP_00166647

ARTICLE 21 DEFAULT, TERMINATION AND SUSPENSION

    21.1   Default by Contractor.

    21.2   Termination for Convenience by [SPC].

    21.3   Suspension of Work by [SPC].

    21.4   Termination by Contractor.

    21.5   Suspension of Work by Contractor.

ARTICLE 22 INDEMNITIES; LIMITATIONS OF LIABILITY

    22.1   Contractor's Indemnification Obligation.

    22.2   [SPC]'s Indemnification Obligation.

    22.3   Patent Indemnification.

    22.4   Notice.

    22.5   Survival and Duration.

    22.6   Limitation of Liability.

    22.7   Not applicable.

    22.8   Consequential Damages.

ARTICLE 23 FORCE MAJEURE

    23.1   No Liability.

    23.2   Prevention and Reduction.

    23.3   Mutual Consultation.

    23.4   Definition.

    23.5   Termination for Force Majeure.

ARTICLE 24 DISPUTE RESOLUTION

    24.1   Amicable Resolution.

    24.2   Disputes of Technical Nature.

    24.3   Binding Arbitration.

ARTICLE 25 MISCELLANEOUS PROVISIONS

    25.1   Entire Agreement.

    25.2   Opportunity to Review.

    25.3   Amendments.

    25.4   Captions.

    25.5   Notice.

    25.6   Severability.

    25.7   No Waiver.

    25.8   Governing Law.

    25.9   Successors and Assigns.

Confidential

EIG00026168

EIG_KEP_00166648

25.10  Exhibits.

25.11  Limitations on Third Party Beneficiaries; No Joint Venture.

25.12  Further Assurances.

25.13  Restrictions on Public Announcements.

25.14  Confidentiality.

25.15  Survival.

25.16  Negotiation.

ARTICLE 26  ADDITIONAL CONSIDERATIONS

26.1  Duty to Perform.

26.2  Right to Negotiate.

Confidential

EIG00026169

EIG_KEP_00166649

**LIST OF EXHIBITS**

EXHIBIT I          SCOPE OF WORK

EXHIBIT II         GENERAL TECHNICAL DESCRIPTION

EXHIBIT III        DIRECTIVES FOR ENGINEERING SERVICES

EXHIBIT IV         DIRECTIVES FOR CONSTRUCTION AND ASSEMBLY

EXHIBIT V          DIRECTIVES FOR PROCUREMENT

EXHIBIT VI         DIRECTIVES FOR PLANNING AND CONTROL

EXHIBIT VII        DIRECTIVES FOR QUALITY ASSURANCE SYSTEM

EXHIBIT VIII       DIRECTIVES FOR COMMISSIONING

EXHIBIT IX         DIRECTIVES FOR HEALTH, SAFETY AND ENVIRONMENT

EXHIBIT X          NOT APPLICABLE

EXHIBIT XI         FACILITIES FOR [SPC]'S REPRESENTATIVES

EXHIBIT XII        NOT APPLICABLE

EXHIBIT XIII       CONTRACTOR CONSENTS AND PERMITS

EXHIBIT XIV        [SPC] CONSENTS AND PERMITS

EXHIBIT XV         NOT APPLICABLE

EXHIBIT XVI        BRAZILIAN LOCAL CONTENT REQUIREMENTS

EXHIBIT XVII       NOT APPLICABLE

EXHIBIT XVIII      PRICE SCHEDULE

EXHIBIT XIX        LUMP SUM PRICE DISTRIBUTION AND MEASUREMENT
                   CRITERIA

Confidential

EIG00026170

EIG_KEP_00166650

EXHIBIT XX          PROJECT SCHEDULE

EXHIBIT XXI         FORM OF CHANGE ORDER

EXHIBIT XXII        NOT APPLICABLE

EXHIBIT XXIII       INSURANCE REQUIREMENTS

EXHIBIT XXIV        NOT APPLICABLE

EXHIBIT XXV         FORM OF HANDOVER CERTIFICATE

EXHIBIT XXVI        FORM OF FINAL LIEN WAIVER

EXHIBIT XXVII       PERFORMANCE SECURITY

EXHIBIT XXVIII      FORM OF SUBSTANTIAL COMPLETION CERTIFICATE

EXHIBIT XXIX        FORM OF FINAL COMPLETION CERTIFICATE

EXHIBIT XXX         FORM OF PERFORMANCE ACCEPTANCE CERTIFICATE

EXHIBIT XXXI        ADDENDA ISSUED BY [SPC] UP TO THE BIDDING DUE DATE

EXHIBIT XXXII       CORRESPONDENCE AND MINUTES OF MEETING AFTER THE
                    BIDDING DUE DATE

EXHIBIT XXXIII      TECHNICAL PROPOSAL

EXHIBIT XXXIV       COMMERCIAL PROPOSAL

EXHIBIT XXXV        REQUEST FOR PROPOSAL # 0003554.09.8

Confidential

EIG00026171

EIG_KEP_00166651

## ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT

THIS ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT (this "Agreement"), is made and entered into as of this _____ day of _____ , 2010, by and between [SPC], a private limited liability company organized and existing under the laws of The Netherlands, having its main offices in the [●], Rotterdam, The Netherlands ("[SPC]"), and _____ , a _____ , having its principal place of business at _____ (the "Contractor" and together with [SPC], the "Parties," and each a "Party").

## RECITALS

**WHEREAS** Sete International GmbH, [a private limited liability company] organized and existing under the laws of Austria, having its main offices in the [●] ("Sete International") has been assigned with all rights and obligations related to a certain bidding process to select the best proposals to perform all work related to the construction of seven (7) Drilling Rig Unities ("DRU"), drill ship type (the "Bidding Process");

**WHEREAS**, under the assignment's terms and conditions, Sete International should sign or indicate a third party to sign with the winning bidder one or more EPC Contracts;

**WHEREAS** Contractor has been awarded as winning bidder under the Bidding Process and Sete International has appointed [SPC], a subsidiary company of Sete International, to sign with Contractor one (1) EPC Contract;

**WHEREAS** [SPC] desires to engage Contractor to supply one (1) DRU, designing, engineering, procuring, supplying, constructing, commissioning, and completing such DRU, all as further described herein;

**WHEREAS** [SPC] desires that Contractor provide the foregoing engineering, procurement, and construction services on a lump sum price basis; and

**WHEREAS** Contractor has expertise and experience in carrying out the Works as defined herein and its other obligations under the Agreement, in accordance with the schedule set forth in this Agreement and in a suitable and efficient manner.

**NOW THEREFORE,** in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

**Confidential**

EIG00026172

EIG_KEP_00166652

# ARTICLE 1

## DEFINITIONS AND INTERPRETATION

1.1.   Definitions. In addition to other defined terms used throughout this Agreement, the following terms shall have the meanings specified below in this Article 1.

"Affiliate" shall mean (i) any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a Party, or (ii) any Person that, directly or indirectly, is the beneficial owner of 50% (fifty percent) or more of any class of equity securities of, or other ownership interests in, a Party or of which a Party is directly or indirectly the owner of 50% (fifty percent) or more of any class of equity securities or other ownership interests.

"Agreement" or "EPC Contract" shall mean this Engineering, Procurement and Construction Contract, including all Exhibits attached hereto, and including all Bid Documents, and all of their respective amendments from time to time by the Parties.

"ANP" shall mean the Brazilian National Agency for Petroleum, Natural Gas and Biofuels (*Agência Nacional do Petróleo, Gas Natural e Biocombustíveis*).

"Applicable Codes and Standards" shall mean the codes, standards or requirements, effective on the Proposal Submission Date, set forth herein or in any Applicable Law, which codes and standards include those listed in the Exhibits hereto and shall govern Contractor's performance of the Work. In the event of an inconsistency or conflict between any of the Applicable Codes and Standards, the highest performance standard shall govern Contractor's performance under this Agreement.

"Applicable Law" shall mean any treaty, law, statute, code, ordinance, decree, injunction, judgment, order, license, permit, Consent (as defined herein), rule or regulation (including those relating to taxes), policies having the force of law, collective labor agreement, promulgated, entered into, or endorsed by any Governmental Authority having jurisdiction over the matter in question, of any Governmental Authority, including any requirements and rules of a relevant flag authority (such as the Marshall Islands Flag Authority) and the Environmental Laws and the permits, approvals and licenses described in Section 3.2(j) and Section 5.2 herein, which relates to the performance of the Works or the interpretation or application of this Agreement, as such laws, statutes, codes, ordinances, decrees, injunctions, judgments, orders, licenses, permits, Consents, rules and regulations may be amended, modified or supplemented from time to time. The conduct adjustment commitment (*Termo de Ajustamento de Conduta*, "TAC"), issued, amended, modified or supplemented from time to time, shall also be considered Applicable Law.

"Bid Documents" shall mean those documents specified in the schedules attached hereto as Exhibits XXXI through XXXV.

"BNDES" shall mean the Brazilian Bank for Social and Economic Development. (*Banco Nacional de Desenvolvimento Econômico e Social*).

"Brazilian Local Content" shall have the meaning set forth in Section 4.2.

"Business Day" shall mean every day other than a Saturday, Sunday or a day that is an official

Confidential

holiday in the City of Rio de Janeiro, Brazil, in Rotterdam, the Netherlands or in New York City, United States of America. [Include the place of the Contractor]

"CEI" shall have the meaning set forth in Section 3.7.5.2.

"Centre" shall have the meaning set forth in Section 24.2(b).

"Change" shall have the meaning set forth in Section 12.1.

"Change Order" shall mean a written, signed order from [SPC] to Contractor in accordance with Article 12 hereof and in the form set forth in Exhibit XXI, which authorizes an addition to, deletion from, or revision of, the Scope of Work of this Agreement.

"Classification Society" shall mean the classification society indicated in Exhibit I.

"Confidential Information" means any proprietary information, technical data, trade secrets or know-how, data, reports or records, or other information marked as confidential by the disclosing Party, including without limitation research, product ideas, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, hardware configuration information, marketing, finances or other business information disclosed by a Party to the other Party directly or indirectly either orally, in writing or by drawings or inspection of parts or equipment. Confidential Information does not include information which (x) is known to the non-disclosing Party at the time of disclosure by the disclosing Party as evidenced by written records of the non-disclosing Party, (y) has become publicly known and made generally available through no wrongful act or inaction of the non-disclosing Party, or (z) has been rightfully received by the non-disclosing Party from a third party who is authorized to make such disclosure.

"Consent" shall mean any approval, consent, authorization or other requirement that is required from any Governmental Authority under Applicable Law with respect to the prosecution of the Works or of the activities related thereto.

"Contractor" shall have the meaning set forth in the preamble hereto.

"Contractor Group" shall mean Contractor, its Affiliates, successors, permitted assigns, officers, directors, employees and agents (including Subcontractors).

"Contractor Project Manager" shall mean that Person designated by Contractor in a written notice to [SPC] who shall have complete authority to act on behalf of Contractor on all matters pertaining to this Agreement or to the performance of the Works, including giving instructions, and making changes previously approved by [SPC] in the Works.

"Contract Price" shall mean the amount to be paid by [SPC] to Contractor for the performance of the Works, as calculated and adjusted only in accordance with the terms of this Agreement.

"Court" shall have the meaning set forth in Section 24.3(d).

"Day" or "day" shall mean a calendar day.

"Decision" shall have the meaning set forth in Section 24.2(c).

"Default" shall have the meaning set forth in Section 21.1 (a).

Confidential

"Defect" shall mean any design, plan, specification, engineering, Equipment, material, tool, supply, test, procedure, component, part or assembly which does not materially conform to the Scope of Work or the Applicable Codes and Standards, including any improper or inferior workmanship that is inconsistent with the Scope of Work or Good Industry Practices, and "Defective" shall have a correlative meaning.

"Defective Work" shall mean any Works that are Defective as determined pursuant to the terms of this Agreement.

"Delay Damages" shall have the meaning set forth in Section 20.2.5.

"Demonstration Tests" shall have the meaning set forth in Exhibit VIII.

"Dispute" shall have the meaning set forth in Section 24.1(a).

"Dissatisfaction Notice" shall have the meaning set forth in Section 24.2(d).

"DRU" shall mean a fully operational, complete drilling rig unit, as more specifically described in Exhibit II, including Equipment incorporated or to be incorporated therein (irrespective of when such Equipment has been or is to be incorporated), to be designed, engineered, procured, supplied, constructed, commissioned and completed pursuant to this Agreement.

"Environmental Law" shall mean any Applicable Law relating in any way to the environment, preservation or reclamation of natural resources, to the management, Release or the threatened Release of any Hazardous Materials, or to the health and safety matters attending to the personnel working at the Site, to the extent applicable to the Works and/or the Site, as amended, from time to time.

"Equipment" shall mean all equipment, materials, supplies, apparatus, machinery, parts, tools (including special tools), components, instruments, appliances, spare parts and appurtenances thereto (including those set forth and described as part of the Scope of Work in Exhibit I) that are required for the full and timely completion of the Works.

"Expert" shall have the meaning set forth in Section 24.2(b).

"FGTS" shall have the meaning set forth in Section 3.7.5.1.

"Final Completion" shall mean the full and complete performance of all Works in accordance with the terms of this Agreement, including: (i) the successful achievement of Mechanical Completion and Substantial Completion of the DRU; (ii) the completion of all Substantial Completion Punch-list items with respect to the DRU; (iii) the Handover Certificate in respect of the DRU has been accepted by [SPC]; (iv) all DRU systems are fully functional and operable; (v) receipt by [SPC] of a final Lien waiver in accordance with Exhibit XXVI; (vi) the transfer from Contractor to [SPC] of all final documentation, records, as-built drawings and test reports required by this Agreement; (vii) the removal of all of Contractor's and Subcontractor's personnel, supplies, waste, materials, rubbish, and temporary facilities from [SPC]'s property; and (viii) the receipt by [SPC] of any and all classification certificates from the relevant Classification Society.

"Final Completion Certificate" shall mean the certificate described in Section 16.8.

"Force Majeure" shall have the meaning set forth in Section 23.4.

PRO-FORMA CONTRACT

Confidential

EIG00026175

EIG_KEP_00166655

"GFIP" shall have the meaning set forth in Section 3.7.5.1.

"Good Industry Practices" shall mean the highest internationally accepted professional practices, methods, techniques and standards observed by the petroleum construction and production industries in countries such as the United States and the United Kingdom for operations in areas such as the Gulf of Mexico, or the offshore waters of Brazil for the design, engineering, construction, commissioning, testing, and operation of major drilling rig unities, that, in the exercise of good judgment by skilled and experienced construction contractors would have been expected to accomplish the desired result in a manner consistent with Applicable Laws, Applicable Codes and Standards, safety, reliability, environmental protection, local conditions, economy and efficiency.

"Governmental Authority" shall mean any national, regional or other government of any state, province, county, municipality, or other political subdivision thereof, any governmental body, agency, authority, division, department, board or commission, or any instrumentality, officer or official of any of the foregoing, including any court, tribunal or committee, and having administrative and regulatory power over a Party, the Site or any portion of the Works.

"GPS" shall have the meaning set forth in Section 3.7.5.2.

"Handover" shall have the meaning set forth in Section 16.5.

"Handover Certificate" shall mean the document issued by Contractor and accepted by [SPC] pursuant to Section 16.6.

"Handover Date" shall have the meaning set forth in Section 11.4.5.

"Hazardous Materials" shall mean any hazardous, toxic, or polluting substance, material, waste or contaminant as defined or regulated pursuant to Environmental Laws, or Applicable Laws, in general, including asbestos or asbestos containing material, and polychlorinated biphenyls.

"ICC Rules" shall have the meaning set forth in Section 24.3(a).

"Invoice" shall mean a request for a payment issued by Contractor in accordance with Section 10.2.

"INSS" shall have the meaning set forth in Section 3.7.5.1.

"Lender" shall mean any entity or entities providing temporary or permanent financing for the DRU and any agent or trustee of such parties.

"Lien" shall mean any encumbrance of any kind, mortgage, lien, pledge, charge, security interest, deed of trust, claim, or any charge on property for payment of some debt, obligation or duty.

"Limited Notice to Proceed" shall have the meaning set forth in Section 11.1.

"Major Subcontract" shall mean any agreement between Contractor and a Subcontractor as defined herein, having an aggregate value in excess of [US$ 30,000,000 (thirty million United States Dollars)] for performance of any part of the Works.

"Major Subcontractor" shall mean the Subcontractors listed in Exhibit XII and, in addition, any approved Subcontractor with whom Contractor enters, or intends to enter, into a Major

Confidential

EIG00026176

EIG_KEP_00166656

Subcontract.

"Measurement Report" or "MR" shall have the meaning set forth in Section 8.2.

"Mechanical Completion" shall mean, with respect to the DRU, the completion of the procurement, fabrication, installation, and pre-commissioning of all systems of such DRU, except for those items which do not affect the operation, safety, and mechanical and electrical integrity of such DRU, including all operating, protection, fire, safety, and other related systems required prior to start-up.

"Monthly Progress Report" shall have the meaning set forth in Section 3.17(d).

"Notice to Proceed" shall have the meaning set forth in Section 11.1.

"Operational Tests" shall have the meaning set forth in Exhibit VIII.

"Owner" shall have the meaning set forth in Section 18.4.

"Party" or "Parties" shall mean [SPC] and/or Contractor and their permitted successors and assigns.

"Performance Security" shall mean the performance security, furnished by Contractor to [SPC] in accordance with Exhibit XXXV, and any and all performance securities issued subsequently by Contractor to [SPC] to supplement or replace such original performance security.

"Performance Tests" shall mean, with respect to the DRU, those tests performed to ensure that such DRU meets the performance and operational criteria set forth in Exhibit I, which tests shall be set forth in Exhibit VIII.

"Person" shall mean any natural or legal person or entity.

"[SPC]" shall mean [SPC's corporate name].

"[SPC] Delay" shall mean events of interference in the progress of the Works, delay or failure of performance caused by [SPC], the [SPC] Project Manager, or their respective employees or agents and/or their subcontractors and suppliers that affects the critical path of the Project Schedule.

"[SPC] Group" shall mean [SPC], its Affiliates, related parties, successors, assigns, officers, directors, employees, agents and any other Person legally authorized to act in name of [SPC].

"[SPC] Policies" shall mean the safety rules and regulations of [SPC] set forth in Exhibit IX.

"[SPC] Project Manager" shall mean the Person indicated by [SPC] in a written notice to Contractor, from time to time, to act on behalf of [SPC] in all matters relating to the Works.

"Project Schedule" shall have the meaning set forth in Section 11.3(a).

"Proposal Submission Date" shall have the meaning set forth in Section 3.1.1.1 of the Instructions to Bidders, included under Exhibit XXXV.

"Quality Assurance System" shall mean the quality assurance system developed by Contractor in accordance with Exhibit VII.

Confidential

"Record As-Built Drawings" shall mean, with respect to the DRU, record drawings (but not field mark-ups) of such DRU showing current and accurate "as-built" conditions.

"Release" shall mean any release, spill, emission, leaking, pumping, injection, pouring, emptying, deposit, disposal, discharge, dispersal, dumping, escaping, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Reliability Tests" shall mean, with respect to the DRU, those tests performed to ensure that such DRU can be reliably and safely operated as guaranteed, which tests shall be as set forth in Exhibit VIII.

"Request" shall have the meaning set forth in Section 24.3(d).

"Required Final Completion Date" shall have the meaning set forth in Section 11.3(b).

"Scope of Work" shall mean the description of the Works to be performed by Contractor as set forth herein and as detailed in Exhibit I, which may include mandatory designs and specifications, and which may be adjusted pursuant to this Agreement.

"SISCOMEX" shall mean the Brazilian electronic foreign trade information system (*Sistema Integrado de Comércio Exterior*), jointly operated by the Brazilian Central Bank, the Brazilian Federal Tax Revenue Agency and the Brazilian Foreign Trade Agency.

"Site" shall mean the parcel(s) of real property on which the Works are performed by Contractor or its Subcontractors.

"Subcontract" shall mean any agreement between Contractor and a Subcontractor for the performance of any portion of the Works.

"Subcontractor" shall mean any Person (other than Contractor)  with whom Contractor has entered into any subcontract, purchase order or other agreement for such Person to perform any part of the Works, or to provide any materials, Equipment or supplies, including any Person at any tier with whom any Subcontractor has further subcontracted any part of the Works.

"Substantial Completion" shall mean, with respect to the DRU, that the following have occurred for such DRU: (i) Mechanical Completion has been achieved; (ii) Performance Tests, Reliability Tests and Demonstration Tests have been successfully completed, (iii) the Works have been completed (including training, manuals and the delivery of all documentation required for operation) except for Works on the Substantial Completion Punch-list; (iv) Contractor has delivered to [SPC] the Substantial Completion Certificate and [SPC] has reviewed and approved such certificate pursuant to Section 16.3; (v) such DRU is available for full commercial operation and is capable of being safely and reliably operated in accordance with the specifications contained in this Agreement and without damage to such DRU or any other property and without injury to any Person; (vi) all TTAS-1 have been signed by [SPC], according to Exhibit VIII; and (vii) any other requirement set forth under Exhibit VIII has been duly complied with.

"Substantial Completion Certificate" shall have the meaning set forth in Section 16.2.

"Substantial Completion Punch-list" shall mean, with respect to the DRU, a list of minor items required to complete the Works for such DRU which remain to be completed or corrected by Contractor after Substantial Completion but which shall not interrupt, disrupt or interfere with

Confidential

the safe and reliable operation of such DRU or any other completed DRU as contemplated by this Agreement, as more fully described in Section 16.4 of this Agreement.

"Technical Dispute" shall have the meaning set forth in Section 24.2(a).

"Tribunal" shall have the meaning set forth in Section 24.3(e).

"TTAS-1" shall mean the document issued by Contractor and signed by Contractor and [SPC] upon successful accomplishment of a Performance Acceptance Test phase 1 (TAP-1) that formalizes the transfer of the custody (with Assisted Operation by Contractor) and care of that specific system/subsystem equipment, parts and components from Contractor to [SPC].  No outstanding items type A, as defined in Exhibit VIII, shall remain for the issuance of TTAS-1.

"TTAS-2" shall mean the document issued by Contractor and signed by Contractor and [SPC] upon successful accomplishment of a Performance Acceptance Test phase 2 (TAP- 2) that formalizes the transfer of the custody and care of that specific system/subsystem equipment, parts and components of the DRU from Contractor to [SPC].

"Unit Contract Price" shall mean, with respect to the DRU, the amount to be paid by [SPC] to Contractor for the performance of the Works related to such DRU, as calculated and adjusted only in accordance with the terms of this Agreement.

"Warranty Period" shall have the meaning set forth in Section 17.3 (a).

"Works" shall mean all work, goods and services to be provided, and all acts or actions required or necessary for the design, engineering, supply, procurement, construction, commissioning, completion guaranteeing the performance and warranty of one (1) DRU described in Exhibit I, complete in every detail, whether at the Site or elsewhere, until Final Completion and satisfaction of Contractor's warranties, all in accordance with Good Industry Practices and the Applicable Codes and Standards, and all other works and services necessary to provide [SPC] with one (1) fully operating DRU satisfying the conditions of this Agreement.

"Work Authorization Initial Date" shall mean the initial date of the Works according to Article 11 and as more fully described in Exhibit I.

1.2.   Section and Exhibit References□ Any reference to a particular Article, Section, subsection, paragraph, subparagraph, Exhibit, schedule, if any, shall be a reference to such Article, Section, subsection, paragraph, subparagraph, Exhibit, or schedule in and to this Agreement.

1.3.   Interpretation.

   (a) Terms in the singular shall include the plural and vice versa.

   (b) Any reference to any agreement, document or drawing defined or referred to in this Agreement shall include each amendment, modification and supplement thereto and waiver thereof as may become effective from time to time in accordance with the terms thereof, except where otherwise indicated.

   (c) Any term defined by reference to any other agreement or document shall have such meaning whether or not such agreement or document remains in effect.

   (d) The words "include" and "including" shall be construed to include the phrase "not

PRO-FORMA CONTRACT

Confidential

limited to". The terms "hereof" or "thereof", "herein" or "therein", "hereunder" or "thereunder," and comparable terms refer to the entire Agreement with respect to which such terms are used and not to any particular Article, Section or other subdivision thereof.

(e) A reference to any Governmental Authority includes any Governmental Authority succeeding to such agency's or authority's functions and capabilities. Any reference to a Person shall include that Person's successors and permitted assigns or to any Person succeeding to that Person's functions.

(f) If any provision of this Agreement contemplates that the Parties shall negotiate or agree to any matter after the date that this Agreement is effective, such provision shall be construed to include an obligation of the Parties to negotiate or reach an agreement in good faith within the spirit and intent of this Agreement.

(g) Except as otherwise expressly indicated herein, any reference in this Agreement to any Applicable Law shall be considered as including a reference to any amendment or complementation then in force, as well as a reference to all norms or regulations then in force and enacted in connection with the relevant Applicable Law and whose validity derives there from.

(h) All schedules, Exhibits or attachments to this Agreement shall be read in conjunction with the body of the Agreement, and such schedules, Exhibits or attachments shall be interpreted so as to give effect to the intent of the Parties as evidenced by their terms when taken as a whole; provided however, that in the event of an express and irreconcilable conflict between the terms of any schedules, Exhibits or attachments and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control. **Contractor** acknowledges that it has reviewed this Agreement and all of the Exhibits to this Agreement and to the best of its knowledge, there are no conflicts between this Agreement and the Exhibits or among the Exhibits.

(i) The irreconcilable conflict between or among provisions of Sections of this Agreement and the Exhibits and/or attachments shall be controlled as follows:

(A) In all cases the Sections of this Agreement shall prevail upon any Exhibit or attachment of this Agreement

(B) In all cases the terms and provisions of Exhibit I (Scope of Work) shall prevail upon any other Exhibit and/or attachment of this Agreement.

(C) The Letters issued by [SPC] related to clarifications and answers made during the Bid process and attached in Exhibit XXXI (Addenda Issued By [SPC] Up To The Bidding Due Date), shall have priority over the terms and provisions of the documents specifically modified by the Circular Letter. However, the priority of the modified document is not changed.

Notwithstanding the above, the provisions of this Agreement, including all Exhibits, shall be wherever possible construed as complementary rather than conflicting.

PRO-FORMA CONTRACT                                    Page 18 of 85

EIG00026180
EIG_KEP_00166660

## ARTICLE 2

## RELATIONSHIPS AND ACKNOWLEDGEMENTS

2.1.   <u>Subject Matter of this Agreement</u>□ The subject matter of this Agreement is the design, engineering, supply, construction, commissioning, start-up, testing, completion and procurement of one (1) DRU, together with all other services and supplies required under this Agreement.   Contractor shall perform and prosecute the Works (i) in accordance with the Scope of Work and terms and conditions of this Agreement, (ii) in compliance with all Consents and Applicable Laws, and (iii) consistent with Good Industry Practices.

2.2.   <u>Status of Contractor</u>□ The relationship between Contractor and [SPC] shall be that of an independent contractor and nothing contained herein shall be construed as constituting any relationship between the Parties other than that at arms-length of owner and independent contractor.  Any provisions of this Agreement which may appear to give [SPC] or the [SPC] Project Manager the right to direct or control Contractor as to details of performing the Works, or to exercise any measure of control over the Works, shall be deemed to mean that Contractor shall follow the desires of [SPC] or the [SPC] Project Manager in the results of the Works only, and not in the means by which the Works are to be accomplished.  Nothing herein shall be interpreted to create a master-servant or principal-agent relationship between Contractor or any of its Subcontractors and [SPC].   Nevertheless, Contractor shall strictly comply with all provisions, terms and conditions of this Agreement, and the fact that Contractor is an independent contractor does not relieve it from its responsibility to fully, completely, timely and safely perform the Works in strict compliance with this Agreement and be responsible for all Subcontractors' performance and supply.

2.3.   <u>Acknowledgement of Contractor</u>□ Contractor hereby acknowledges and agrees that the percentage of Brazilian Local Content, established in <u>Section 4.2</u>, may be financed by BNDES, and that in such event Contractor will be required to comply with the requirements of BNDES.   Contractor further acknowledges and agrees that it may have to execute, as an intervening party, a BNDES financing agreement, to be entered into between [SPC] and BNDES. If BNDES's requirements represent any additional requirements (other than established in this Agreement), Parties shall negotiate a Change Order.

## ARTICLE 3

## OBLIGATIONS OF CONTRACTOR

3.1.   <u>Scope of Work – General Scope.</u>□Contractor has determined to its satisfaction that the requirements of the Scope of Work are consistent with Good Industry Practices and its obligations under <u>Section 2.1</u> above, and are capable of supporting the timely completion of the DRU and fulfillment of Contractor's obligations hereunder. It is understood and agreed that the Works shall include any incidental work that can reasonably be inferred as required and necessary to complete the DRU in accordance with Good Industry Practices, Applicable Laws, Applicable Codes and Standards and all other terms and provisions of this Agreement, excluding only those items which [SPC] has specifically agreed to provide under the terms of

Confidential

this Agreement. The Works are more specifically described in Exhibit I hereto.

3.2.   Specific Obligations. ☐Without limiting the generality of Section 3.1 or the requirements of any other provision of this Agreement, as part of the Works Contractor shall:

(a) Procure, supply, transport, handle, and properly store and preserve the Equipment (other than Equipment supplied by [SPC]), and receive, store, and preserve the Equipment supplied by [SPC];

(b) Be responsible for the engineering design in accordance with the specifications provided in this Agreement;

(c) Provide construction, construction management, including furnishing all management, labor, all Site supervision and craft labor, Equipment, tools, field supplies, warehousing and facilities necessary for such fabrication, all necessary power (electrical or otherwise), and all inspection (excluding inspections performed by [SPC] hereunder) and quality control services required to ensure that the Works are performed in accordance herewith.

(d) Take into consideration and comply with all Applicable Laws in order to make feasible the exportation of the DRU, which shall be physically delivered to [SPC] at sheltered waters in Guanabara Bay, not cleared for import.

(e) Negotiate all guarantees, warranties, delivery schedules, insurance requirements and performance requirements with all Subcontractors so that all Subcontracts are consistent with this Agreement;

(f) Perform shop and other inspections of the work of Subcontractors to ensure that such work meets all of the requirements of this Agreement;

(g) Contract the Classification Society and provide the DRU classification, as indicated in this Agreement, especially in Exhibits I and III;

(h) Ensure that the Works are performed in accordance with the Project Schedule;

(i) Conduct and manage all pre-commissioning, start-up operations, commissioning and performance testing.

(j) Obtain all Consents listed in Exhibit XIII, and any other Consents, permits, approvals or licenses required for performance of the Works for which [SPC] has not assumed responsibility under Exhibit XIV;

(k) Obtain any and all certificates, permits, and authorizations, including completion certificates, and operating permits as required by Applicable Laws to conduct the Performance Tests, Demonstration Tests, or Operational Tests.

(l) Provide information, assistance and documentation to [SPC] as reasonably requested in connection with the permits and consents to be obtained by [SPC] hereunder as listed on Exhibit XIV;

Confidential

(m) Provide training for [SPC]'s operating and maintenance personnel in accordance with <u>Exhibit V</u>, for the Equipment supplied by Contractor.

(n) Replace any Subcontractor(s) that fails to perform its Subcontract obligations;

(o) Handle all customs issues and be responsible for all duties related to imported Equipment;

(p) At the request of [SPC], cooperate with and respond to inquiries from any Lender relating to the Works and any other activities being undertaken under the Agreement;

(q) Comply with the BNDES financing requirements, in the event that the Brazilian Local Content is financed by the BNDES;

(r) Be responsible for and pay any and all withholding taxes related to the Works; and

(s) Pay Subcontractors in a timely fashion.

3.3. <u>Contractor's Obligations Regarding the Performance of the Works</u>. Without limiting the generality of <u>Section 3.1</u> or the requirements of any other provision of this Agreement, as part of the Works Contractor shall further:

3.3.1 Perform the Works in due time and in compliance with the provisions of this Agreement, the Project Schedule, the detailed work schedule, the Environment Laws and in strict compliance with any other Applicable Law.

3.3.2 Perform the pre-commissioning and commissioning of the DRU, as well as render assistance to [SPC]'s operations personnel during the technical assistance period, as set forth in <u>Exhibits I</u> and <u>VIII</u>.

3.3.3 Supply to [SPC] all documents and information necessary for the inspection of the Works (including the exercise by [SPC] of its powers as contemplated in <u>Section 17.2</u>), granting access to the Site where any portion of the Works is being carried out, as well as to promptly complying with [SPC]'s remarks and contractual requirements regarding the Works.

3.3.4 Remake or repair, at its own expense and within a schedule mutually agreed between [SPC] and Contractor, any irregularities or Defects in any portion of the Works that may have been rejected by [SPC] or that have been carried out without due regard to the terms of this Agreement.

3.3.5 For the whole period of the Agreement in its dealings with [SPC] in regard to the performance of the Works, Contractor shall be represented by a qualified professional, duly certified and in good standing at the relevant professional organization. The name of such professional accompanied by the relevant curriculum vitae shall be submitted to [SPC] for prior approval (the "<u>Contractor Project Manager</u>"). Any substitution, provisional or permanent, of Contractor Project Manager, shall be submitted to [SPC] for [SPC]'s prior approval.

Confidential

3.3.6   Correct any errors, discrepancies or omissions in any documents prepared by Contractor in accordance with this Agreement.

3.3.7   Not applicable.

3.3.8   Prepare and maintain, at the Site, a Work Report (RDO) for each phase of the Works, as described in Exhibit I, prepared in accordance with format provided by [SPC], containing records on the service orders, remarks on irregularities found and other events concerning the performance of this Agreement. The RDO shall be issued and delivered to [SPC] on a daily basis, or other period agreed between the Parties, in two counterparts (the first one to [SPC] and the second to Contractor), duly executed by Contractor Project Manager and by [SPC].

3.3.9   Defend, indemnify and hold each member of the [SPC] Group free and harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of the [SPC] Group and related attorneys' fees) suffered or incurred by any member of the [SPC] Group or third parties as a result of the failure by any member of Contractor Group to observe any Applicable Laws , subject to the limitations of liabilities under Article 22 as well as the exclusions therefrom.

3.3.10  Not applicable.

3.3.11  Obtain all Consents listed in Exhibit XIII, and any other permits, approvals or licenses required for performance of the Works for which [SPC] has not assumed responsibility under Exhibit XIV. Notwithstanding the generality of the foregoing, Contractor shall, in a manner to enable the performance of the Works to comply with the Project Schedule, obtain and maintain all Consents required for the performance of the Works, including all licenses for river crossings, road, railway and transmission line crossings, as well as licenses for disposal and storage of materials and/or all other special services required for the construction or assembly of the Works.

    3.3.11.1    Maintain the validity and compliance with all Consents or environmental licenses issued by the respective Governmental Authority and comply with any term of commitment and behavior adjustment" (*Termo de Ajustamento de Conduta*, "TAC") during the entire execution of this Agreement, referring to the Site where the Works shall be performed, and provide copies thereof to the Lenders, whenever requested.

3.3.12  Not applicable.

3.3.13  Carry out the quality control of the Works in accordance with the provisions of the Quality Assurance System to be implemented and maintained by Contractor at its expense, as described in Exhibit VII

3.3.14  Submit for [SPC]'s review, on the dates indicated in Exhibit VI, the documents concerning the Quality Assurance System.

Confidential

3.3.15 Supply all materials, tools, Equipment and appliances necessary for the quality assurance activities, which shall include any such materials, tools, Equipment and appliances used in qualification tests of its own staff and the qualification of its employees and procedures.

3.3.16 Not applicable.

3.3.17 Implement and maintain, at its own expenses, during the entire term of this Agreement, a Quality Assurance System as per Exhibit VII, as well as:

(a) Carry out all required qualifications of specialized workers and the assembly and welding procedures pursuant to the guidelines prescribed by the applicable norms and issue the relevant certificates required by the Quality Assurance System, bearing all the qualifications costs (including traveling, materials and equipment expenses used in the centralized qualification of workers and procedures);

(b) Carry out all additional experiments and tests that [SPC] may deem necessary to evidence the compliance with the quality levels required for the Works, in accordance with the Quality Assurance System.  If such additional experiments and tests do not demonstrate the non-compliance with the quality levels required for the Works, in accordance with the Quality Assurance System, [SPC] shall reimburse such costs and allow reasonable extension of time to Contractor.

3.3.18 Subject to the provisions of Article 7, pay and bear all taxes and expenses, including import duties, payable as a consequence of the performance of the Works in accordance with the terms of this Agreement to all local, state or federal governmental authorities, as the case may be, both in Brazil and abroad.

3.3.19 Provide the insurances set forth in Article 14 and bear all expenses related to any insurance contracted in accordance with Article 14.

3.4.  Spare Parts.  Contractor shall provide to [SPC] a list of factory recommended operating spare parts for the DRU for a two (2) year period of operations, with sufficient lead time to permit the review and  procurement of long lead-time items by [SPC] so that they may be delivered to the Site at or before the date of Substantial Completion. Contractor shall receive, store, and preserve such spare parts.

3.5.  Standard of Performance.  Contractor shall perform the Works in a good and workmanlike manner, in accordance with the terms and conditions of this Agreement, and shall cause all Subcontractors of any tier to perform all elements of the Works to be performed by them, in compliance with all Applicable Laws and in accordance with Good Industry Practices.  Notwithstanding the generality of the foregoing, in all activities related to the performance of the Works, Contractor shall refrain from using the work of minors and shall ensure that the same requirement is adopted in the agreements executed with its Subcontractors and suppliers.

3.6.  Contractor's Tools and Equipment. Contractor shall furnish all tools and Equipment necessary and appropriate for the timely and safe completion of the Works in strict

Confidential

compliance with this Agreement. Contractor shall be responsible for damage to or destruction or loss of, from any cause whatsoever (other than the acts of [SPC]), all construction tools and Equipment owned, rented or leased by Contractor for use in accomplishing the Works, and shall not be entitled to reimbursement therefor under this Agreement.

3.6.1   Contractor shall ensure that all Equipment for the DRU, including Equipment supplied by [SPC], is stored, protected and preserved in accordance with the manufacturer's written instructions and so as to maintain intact all warranties related thereto.

3.7.   Employment of Personnel□   Contractor shall not employ, in connection with its performance under this Agreement any unfit person or anyone not skilled in the work assigned to such person. Contractor agrees to promptly remove (or to require any Subcontractor to remove) from the Site in connection with the Works any employee who does not meet the foregoing requirements or if contracted, any person who obstructs or causes difficulties to his supervision action, or whose presence at the Site, under justified reason, is deemed inconvenient, without costs for [SPC]. In addition, Contractor agrees that in a timely fashion after receipt of written notice from [SPC], it will promptly investigate any employee or agent of Contractor or of Contractor's Subcontractors, who is interrupting, interfering or impeding the timely and proper completion of the Works. If it is the case, Contractor will remove such employee from the Works. [SPC] shall have no liability and Contractor agrees to defend, indemnify and hold each member of [SPC] Group free and harmless from and against any claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against a member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group resulting from Contractor's or any Subcontractor's termination of the employment of any such employee who fails to meet the foregoing requirements following a request by [SPC] to have such employee removed from the Works.

3.7.1   Contractor shall, with respect to its employees and its Subcontractors' employees:

3.7.1.1   Be solely responsible for the supervision, technical and administrative guidance and labor required for the performance of the Works.

3.7.1.2   Refrain from using, in all activities related to the performance of this Agreement, forced labor and work of minors, and cause the above-mentioned requirement to be included in each Subcontract.

3.7.1.3   Whenever required by [SPC], Contractor undertakes to issue a written statement representing that it has complied or is complying with the requirement contained in Section 3.7.1.2.

3.7.1.4   Submit for approval by [SPC] the curriculum vitae of the key personnel that will carry out the Works from time to time as well as inform, in writing, any proposed changes in such key personnel

3.7.1.5   Submit for approval by [SPC], before the commencement of the Works, a forecast for mobilization and demobilization of its key personnel, including those in charge of supervision and inspection, based on the Project Schedule.

3.7.1.6   Submit for approval by [SPC], the documents indicated in Exhibit VI, on the dates therein established.

PRO-FORMA CONTRACT

Page 24 of 85

3.7.1.7   Entrust the Works to reputable professionals qualified to carry out the Works in accordance with Good Industry Practices.  [SPC] may request evidence of any such professional's technical qualification.

3.7.2   Contractor shall cause its employees and its Subcontractors' employees, as well as their respective contractors, when working at any [SPC] facility, to use identification badges furnished by [SPC], which must be returned to [SPC] after termination of the Agreement or upon termination of the employee or contractor from the activities related to this Agreement.

3.7.3   Not applicable.

3.7.4   Contractor shall comply, in a timely manner, with all labor and social security regulations related to tax obligations, submitting, whenever requested by [SPC], the documentation evidencing such compliance with regard to its employees and Subcontractors, as applicable.

3.7.4.1 Pay and bear all charges and expenses deriving from lodging, boarding, transportation, medical assistance and emergency medical assistance to its employees.

3.7.5   For the Works carried out in Brazil, Contractor shall provide, or cause to be provided to [SPC], as a condition precedent for the issuance by [SPC] of a Measurement Report referred to in <u>Section 8.1</u>, and in accordance with Brazilian law:

3.7.5.1   Together with the calculations contemplated by <u>Section 8.1</u>, a certified copy of the relevant social security collection form (*Guia de Recolhimento do Fundo de Garantia por Tempo de Serviço e Informações à Previdência Social*)("<u>GFIP</u>") of the employee severance fund (*Fundo de Garantia por Tempo de Serviço*)("<u>FGTS</u>") and information to the social security administration (*Instituto Nacional do Seguro Social*)("<u>INSS</u>") for the month immediately preceding the month to which such Measurement Report refers, duly completed and paid, together with the relevant proof of receipt.

3.7.5.2   Together with the calculations contemplated by <u>Section 8.1</u>, a certified copy of the social security collection form (*Guia da Previdência Social*)("<u>GPS</u>") for the month immediately preceding the month to which such Measurement Report refers, containing the amount indicated in the report of the relevant GFIP, duly completed and paid,  and containing the enrollment of the work (*Cadastro Específico do INSS*)("<u>CEI</u>").

3.7.5.3   Together with the calculations contemplated by <u>Section 8.1</u>, a statement, issued on a yearly basis, executed by Contractor Project Manager and its accountant, certifying the regularity of Contractor's bookkeeping.

3.7.5.4   No later than thirty (30) Business Days after the period prescribed by Brazilian law for the authentication of the Ledger *(Livro Diário)* at the commercial board, a certified copy of the balance sheet extracted from the Ledger and certified at the Commercial Board, reflecting the previous fiscal year.

3.7.5.5   Subject to the provisions of <u>Exhibit XIII</u>, annually, during the period of validity of this Agreement, a certified copy of the following documents, duly filed at

Confidential

with the relevant authorities: (i) environmental risk prevention program (*Programa de Prevenção de Riscos Ambientais*), (ii) working conditions technical report (*Laudo Técnico de Condições Ambientais de Trabalho*), (iii) construction industry working conditions and environment program (*Programa de Condições e Meio Ambiente do Trabalho na Indústria de Construção*) and (iv) medical control and occupational health program (*Programa de Controle Médico e da Saúde Ocupacional)*.

3.7.5.6    No later than thirty (30) Business Days after the date of execution of this Agreement, the enrollment of the Works at the CEI.

3.7.5.7    In case of suspension of the Works, a copy of the GFIP containing a code reflecting the cause of the suspension, with the relevant proof of delivery within the maximum term of five (5) Business Days after the date of delivery of the relevant GFIP to the competent Governmental Authority.

3.7.5.8   For the final Measurement Report, in addition to the documents indicated in the previous items of this Section 3.7.5, the documents referring to the month of the final Measurement Report must also be delivered, no later than three (3) Business Days prior to the due date of the collection document, as well as the evidence of termination of the Works at the CEI and the relevant government debt clearance certificate (*Certidão Negativa de Débitos*).

In case of subcontracting services in Brazil, according to Article 19, in addition to the documents indicated above, Contractor shall also provide the following documents related to the Subcontracts:

(a)   Copies of Subcontractors' invoices and/or receipts, related to the services provided by the Subcontractors, showing clearly the connection of such services with the Works and the amount related to INSS taxes withheld by Contractor, according to Applicable Law.

(b)   Copies of collection documents, related to the amount withheld by Contractor according to paragraph (a) above, showing the evidence of payment of such amount to the INSS according to Brazilian law.

(c)   A certified copy of the relevant GFIP of the FGTS and information submitted to the INSS for the month immediately preceding the month to which the Measurement Report refers, issued by the Subcontractor, duly completed and paid, together with the relevant proof of receipt.

3.7.6   Contractor shall undertake any and all civil, labor, social security, tax and FGTS obligations deriving from the performance of the Works, together with any costs and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group.  Contractor also undertakes to assume, either in or out of court, any and all the liabilities related to any occasional claims that may arise, including by requesting the exclusion of any member of [SPC] Group from such procedures, at the request of [SPC], and by offering all guarantees or bonds required to release any member of [SPC] Group, and also bearing all costs and expenses incurred from such procedures.

3.7.6.1   If a claim referred to in Section 3.7.6 is made against [SPC], [SPC] shall

Confidential

immediately give notice to Contractor and Contractor shall be entitled to contest any such claim in good faith by appropriate judicial or administrative procedures. If [SPC] is found liable to any claim listed in <u>Section 3.7.6</u>, and the court, arbitration panel or any other competent Governmental Authority determines such claim resulted solely from Contractor's acts or omissions, Contractor shall pay to [SPC], as the case may be, the [SPC]'s liability amount in the decision rendered by the court, arbitration panel or any other competent Governmental Authority that Contractor's action or omission led to the filing of such claim. This indemnity is subject to the limitation of liabilities under Article 22 as well as the exclusions therefrom.

3.7.7   Contractor shall arrange for the technical responsibility annotation (*Anotação de Responsabilidade Técnica*) concerning this Agreement to be obtained at the appropriate engineering, architecture and agronomy regional council (*Conselho Regional de Engenharia, Arquitetura e Agronomia*), forwarding a copy thereof to [SPC] before the commencement of the Works, as well as demonstrate its compliance with any other such requirements before [SPC] whenever any amendments are introduced in the Agreement or in any of the cases provided for in the Resolutions of the engineering, architecture and agronomy federal council (*Conselho Federal de Engenharia Arquitetura e Agronomia*).

3.7.8   Contractor shall deliver to [SPC]: (i) a letter by the nuclear energy national commission (*Comissão Nacional de Energia Nuclear*), approving the physical control system and the contingency plan adopted by Contractor, (ii) industrial safety prescriptions adopted by it in accordance with Applicable Law, (iii) instructions furnished to its employees, agents, representatives and Subcontractors regarding the risks and precautions to be observed, and (iv) affidavits reflecting the verification and assessment of monitoring and measurement equipment, all in accordance with Brazilian law (including nuclear energy national commission norms), in any event prior to the performance of any portion of the Works involving any industrial X-ray and/or gamma-ray service.

3.7.8.1   Contractor shall have a X-Ray and/or gamma-ray Protection Superintendent, whose name and resume shall be submitted to [SPC] together with the names and resumes of its agents and representatives at the time of the submission of the documents listed in <u>Section 3.7.8.</u> Such X-ray and/or gamma-ray Protection Superintendent shall be responsible for ensuring, especially in emergency cases, the safety of all persons who, given the place and conditions of the activity performed by them, may be exposed to the radiation emitted in connection thereof.

3.7.9   Contractor shall arrange and maintain in effect all the documentation related to any expatriate employees that take part in the performance of any portion of the Works, including the necessary work visas, according to Applicable Law.

3.7.10   Contractor's Additional Obligations.

3.7.10.1   Furnish monthly, or whenever requested by [SPC] in accordance with the terms and conditions of this Agreement, reports in writing, on the development of the several stages of the Works, as well as of the elements required to the fitness adequacy thereof and preparation of information of a statistic nature, in accordance with the

PRO-FORMA CONTRACT                    Page 27 of 85

[SPC]'s requirements.

3.7.10.2  Assist [SPC] with the issuance of Measurement Reports in accordance with Exhibit XIX.

3.7.10.3  Not applicable.

3.7.10.4 Correct, immediately and at its own expense, any and all portion of the Works, Equipment or engineering documents that are not in accordance with this Agreement and/or remake the part of the Works that have been rejected by [SPC] as they have not been carried out in accordance with the requirements contained in this Agreement for engineering documents, specifications, rules and applicable standards or with the Applicable Codes and Standards, including repairs in welding and the relevant X-ray and/or gamma-ray inspection.

3.8.  Key Personnel. Exhibit XXXIII sets forth Contractor's organizational chart to be implemented for the Works.  Contractor shall promptly advise [SPC] of any reassignment of its personnel assigned to perform the Works.

3.9.  Operation Personnel and Assisted Operation. Contractor shall provide [SPC] with such orientation and training concerning the operation and maintenance of the DRU that may be necessary for [SPC]'s designated personnel or representatives to operate and maintain the DRU in accordance with Good Industry Practices. The training shall be performed in accordance with a training plan submitted to [SPC] for approval not less than three (3) months prior to the anticipated date of Mechanical Completion. Contractor shall provide such training or orientation to all qualified individuals identified in the list provided by [SPC], according to the Exhibit V requirements.  Notwithstanding the foregoing, neither the removal nor the replacement of the individuals designated by [SPC] for training shall result in additional training obligations on the part of Contractor with respect to the individuals substituted for those removed or replaced.

3.10. Emergencies.□In the event of any emergency endangering life or property during the performance of Works, Contractor shall take such action as may be reasonable and necessary to prevent, avoid or mitigate injury, damage, or loss and shall, as soon as possible, report any such incidents, including Contractor's response thereto, to [SPC].  If Contractor has not taken reasonable precautions for the safety of the public or the protection of the Works, and such failure creates an emergency requiring immediate action, then [SPC], with or without notice to Contractor may, but shall be under no obligation to, provide reasonable protection as required to control such emergency.  The taking of any such action by [SPC], or [SPC]'s failure to take any action, shall not limit Contractor's liability.  Contractor shall reimburse [SPC] for the performance of any such Works or the furnishing of any such Equipment in connection with any emergency in an amount equal to the reasonable costs incurred by [SPC] in such performance of Works or furnishing of Equipment.  The taking by Contractor or [SPC] of any actions pursuant to this Section 3.10 to prevent, avoid or mitigate injury, damage, or loss as a result of an emergency shall in no way alter or excuse any of Contractor's obligations under this Agreement.

3.11. Approvals, Certificates, Permits and Licenses□ Other than those permits and consents listed in Exhibit XIV, which shall be responsibility of [SPC], Contractor shall obtain all Consents, approvals, certificates, permits and licenses required to perform the Works, including the Consents listed on Exhibit XIII. Contractor shall provide [SPC] with copies of such permits and Consents as soon as they are obtained.  Contractor shall provide information,

Confidential

EIG00026190

EIG_KEP_00166670

assistance and documentation to [SPC] as reasonably requested in connection with the permits and Consents to be obtained by [SPC] hereunder as listed on Exhibit XIV.

3.12. <u>Books, Records and Audits.</u>

    (a)    Contractor shall keep such full and detailed books, construction logs, records, daily reports, accounts, payroll records and other pertinent documents as may be necessary for proper financial management under this Agreement and as required under Applicable Law.  Contractor shall maintain all such books and records in accordance with applicable generally accepted accounting principles, or otherwise in the ordinary course of business, and shall retain all such books and records for a minimum period of ten (10) years following issuance of the Notice to Proceed, or such greater period of time as may be required under Applicable Law.

    (b)    Upon request by [SPC], Contractor shall provide [SPC] or its agents or representatives with any appropriate information, documents or reports that may be necessary to determine Contractor's compliance with Brazilian Local Content requirements hereunder.

3.13. <u>Tax Accounting</u>  Within a reasonable period of time following [SPC]'s request, Contractor shall provide [SPC] with any information regarding the quantities, descriptions and costs of any Equipment installed in or incorporated into the DRU as [SPC] may deem reasonably necessary in connection with its tax planning or the preparation of its tax returns.

3.14. <u>Temporary Facilities</u>  Contractor shall provide [SPC], in accordance with Exhibit XI, with sufficient office space at the time of Site mobilization to accommodate [SPC]'s Site representative(s) and support staff (as well as any Lender representatives), without cost to [SPC].   Contractor shall provide for [SPC] and its representatives any other temporary facilities required for the execution of the Works, whenever reasonably requested by [SPC], without cost to [SPC]

3.15. <u>No Liens.</u>

    (a)    <u>Property To Be Kept Lien Free</u>. Contractor shall keep the DRU, the Site and all Equipment (other than Equipment owned or leased by or procured for Contractor and used in the performance of the Works) free and clear of any and all Liens, claims and encumbrances (including any that arise from the performance of the Works or any reason related thereto or due to Contractor's other transactions, unrelated to the Works).

    (b)    <u>Notice of Filing of Lien.</u> Contractor agrees to notify [SPC] immediately of the filing of any Liens, or possible filing of Liens, upon the DRU, the Site, any Equipment (other than Equipment owned or leased by or procured for Contractor and used in the performance of the Works), or any moneys due to Contractor by [SPC] under this Agreement.  If any such Liens are filed, Contractor shall arrange for the removal of such Lien not later than thirty (30) days after such filing.  In the event that Contractor fails or refuses to remove such Lien within thirty (30) Days, then [SPC] shall have the right (but not the obligation) to pay any sums necessary to obtain prompt release of such Lien. In this case, Contractor shall reimburse [SPC] for any sums so paid within thirty (30) Days of

PRO-FORMA CONTRACT                    Page 29 of 85

**Confidential**

a demand therefor, or [SPC] shall have the right to set off such amounts against payments owed to Contractor by [SPC] hereunder in accordance with Section 10.8 (f)..

(c)   Liens to the Benefit of Sureties or Creditors. Notwithstanding the provisions under Section 3.15(a) and Section 3.15(b) above, upon approval of [SPC] (or its successor or assignee), Contractor shall be permitted to create Liens (i) on the Site to secure sureties or financing raised with the specific purpose of developing the Site to allow for the construction of the DRU and (ii) on the Site and the DRU with respect to any Liens that may be required to be created in favor of the "Fundo de Garantia da Construção Naval – FGCN".

3.16. Quality Assurance. No later than the date indicated in Exhibit VI, Contractor shall submit to [SPC] for its approval:  (i) a Quality Assurance Plan in the form set forth in Exhibits VI and VII; and (ii) a detailed inspection plan, and Contractor shall provide for the Site a quality assurance manager to supervise the implementation of the quality assurance plan, the inspection plan, and the inspection procedures, at the Site; and any other required documentation pursuant to Exhibits VI and VII.

3.17. Plan & Reports. Contractor shall provide to [SPC] all Plan & Documents specified in Exhibit VI  on the dates therein indicated, with progress reports and such other information as reasonably requested by [SPC], including the following:

(a)   Minutes for all status and other project meetings within seven (7) Days following any such meeting;

(b)   Weekly progress reports, in form and substance reasonably acceptable to [SPC], of the progress of the Works during the preceding work week and on all matters deemed significant by [SPC] or Contractor.   Contractor shall, as may be requested from time to time by [SPC], deliver to [SPC], on a daily basis, a written report, in form and substance reasonably acceptable to [SPC] of the Works during the preceding day and on all matters deemed significant by [SPC] or Contractor.

(c)   Safety incident reports according to Exhibit IX;

(d)   Monthly Progress Reports, in form and substance reasonably acceptable to [SPC], containing the following information (each, a "Monthly Progress Report"):

(i)      an executive summary with a description of overall progress of the Works compared to the Project Schedule;

(ii)     a description, compared against the Project Schedule, of engineering status including actual percentage completed, document status, significant activities accomplished in the previous month and significant activities planned for the current month and next month;

Confidential

(iii)    a description, compared against the Project Schedule, of procurement activities including actual percentage completed, manufacturing and delivery status, significant activities accomplished in the previous month and significant activities planned for the current month;

(iv)    a description, compared against the Project Schedule, of construction activities, including actual percentage completed, progress summary, numbers of skilled, unskilled, and supervisory staff on Site, as compared to planned levels, significant activities accomplished in the previous month and significant activities planned for the current month;

(v)    a description, compared against the Project Schedule, of start-up activities, including actual percentage completed, progress summary, significant activities accomplished in the previous month and significant activities planned for the current month;

(vi)    a description of critical items, including evaluation of problems and, to the extent applicable, of strategies to accelerate the performance of the Works in order to comply with the Project Schedule;

(vii)    a description of all permitting and environmental issues and its current status;

(viii)    a description of all safety and security issues;

(ix)    a description of quality assurance activities; and

(x)    any other information reasonably requested by [SPC], including any material information of which Contractor is aware that could reasonably be foreseen to adversely affect the performance of the Works.

(e)    Contractor shall provide the Monthly Progress Report on or before the tenth (10th) Day of each month.  Monthly Progress Report shall cover activities up to the end of the previous month.  Contractor shall provide copies of the Monthly Progress Reports to any other Persons as [SPC] may reasonably request.

(f)    Reports of any event of Force Majeure duly notified pursuant to Article 23 and Section 25.5 hereof, in a form reasonably acceptable to [SPC], detailing the status and developments of any significant problem, strike, injury, work stoppage, legal problem which occurs or may be anticipated, and any emergency or other unanticipated event, which might adversely affect Contractor's ability to perform its obligations hereunder.   The report shall detail all available information and steps being taken to correct or address such Force Majeure, significant problem, strike, injury, work stoppage, legal problem, emergency or other unanticipated event, and in each case shall be submitted by Contractor as soon as practicable. [SPC] may at any time request a report on any event, which [SPC] reasonably regards as significant.

(g)    Reports on damage if any portion of the DRU is materially damaged or is destroyed, as soon as practicable after the occurrence of such damage or

PRO-FORMA CONTRACT                    Page 31 of 85

EIG00026193

EIG_KEP_00166673

destruction, detailing such occurrence, any required repairs or replacement and the estimated duration of such repairs or replacement, including any estimate impact on the Project Schedule.  Without limiting the foregoing, such damage report shall be in a form acceptable to any insurance company against which a claim is made for coverage of such damage.

(h)   Written notice to [SPC] of any unanticipated significant changes or developments in the Works. Contractor shall make available, and upon [SPC]'s request shall furnish, to [SPC] such documents as may be necessary in [SPC]'s sole discretion for [SPC] to inspect, evaluate or review the performance of the Works.

(i)   Copies of technical correspondence between Contractor and its Subcontractors of any tier, or their respective suppliers, upon request of [SPC], including all notes, designs, drawings, specifications and other technical data pertaining to the technical aspects of the Works; provided that receipt by [SPC] of such technical correspondence shall not be deemed a consent to or approval by [SPC] of such technical correspondence and shall not limit any of the obligations of Contractor to perform under this Agreement.

(j)   Reports in form and substance reasonably satisfactory to [SPC] discussing compliance by Contractor and its Subcontractors with health, safety and environmental standards and procedures required pursuant to this Agreement and by Applicable Law.

3.18.  Payment.  Contractor shall timely make all payments required to be paid to [SPC] pursuant to the terms of this Agreement.

3.19.  Progress Meetings.  During performance of the Works, periodic progress meetings shall be held at such place mutually agreeable to the Parties.  Such meetings shall be at least weekly or as otherwise agreed.  All matters bearing on the progress and performance of the Works and the Project Schedule since the preceding progress meeting shall be discussed and resolved, including any previously unresolved matters, deficiencies in the Works or the methods being employed for the Works, and problems, difficulties, or delays which may be encountered. Contractor shall provide [SPC] with minutes of all progress meetings.  All decisions taken at such progress meetings shall be recorded in the minutes.  [SPC] shall initial and sign the minutes, noting any disagreements.  The minutes shall be considered the definitive record of what occurred and what was decided at the meetings.

3.20.  Site Security.  The following shall apply to the Site:

(a)   Contractor shall be responsible for all security matters at the Site during all times prior to Substantial Completion, which shall include measures reasonably required to prevent vandalism, sabotage, loss, theft and danger or any other changes to the Site, any Equipment and personnel.

(b)   Contractor shall coordinate entrance and exit from the Site so as to minimize

Confidential

EIG00026194

EIG_KEP_00166674

disruption to the Works.

(c)   Contractor shall review all injuries to persons and damage to property arising during the performance of the Works to determine whether any unsafe conditions that exist at the Site contributed to such injuries or damage, and shall be solely responsible for the correction of any such conditions.

(d)   Contractor shall cooperate with [SPC] on all security matters and shall promptly comply with any reasonable security requirements for the DRU, the Site or the Works requested by [SPC].  Such compliance shall not relieve Contractor of its responsibility for maintaining proper security for the above noted items, nor shall it be construed as limiting in any manner Contractor's obligation to comply with Applicable Laws and to undertake reasonable action to establish and maintain secure conditions at the Site.

(e)   Contractor shall not be entitled to any extension of time or compensation on account of Contractor's failure to exercise reasonable care to protect the Site and all Equipment as described herein.

(f)   Contractor shall, and shall cause its Subcontractors to, comply with all [SPC] Policies when performing any Works at the Site.

(g)   Health and Safety. Contractor recognizes and agrees that safety is of paramount importance in the performance of the Works and that Contractor is responsible for performing (and causing the performance of) the Works in a safe manner. Contractor agrees to implement a safety program that is to be submitted to [SPC] for its approval prior to the commencement of the Works.  Contractor shall perform the Works in such a manner as to minimize impact upon human health, safety and the natural environment.  In carrying out the foregoing, Contractor shall comply with Good Industry Practices, [SPC] Policies, Applicable Laws and Contractor's Safety Program, as approved by [SPC], which approval shall not be unreasonably withheld, and [SPC]'s standards as set forth herein and in Exhibit IX.   Such submission shall not be construed as limiting in any manner Contractor's obligation to undertake all reasonable actions toward maintaining safe working conditions at the Site, nor as imposing upon [SPC] responsibility to review, or for the adequacy of, the environment, health and safety program at the Site.   Contractor shall assume all costs associated with compliance therewith. Contractor further agrees to provide necessary training to its employees and Subcontractors to ensure their compliance with the foregoing safety and health rules and standards. Should [SPC] at any time observe Contractor, or any of its Subcontractors, performing the Works in an unsafe manner, or in a manner that may, if continued, become unsafe, then [SPC] shall notify Contractor of the unsafe or potentially unsafe condition. [SPC]'s notification shall establish a deadline for Contractor to remedy or rectify such condition. If Contractor fails to remedy the unsafe or potentially unsafe condition in such time, [SPC] shall have the right (but not the obligation) to require Contractor to stop the Works until such time as the manner of performing the Works have been brought into

PRO-FORMA CONTRACT                    Page 33 of 85

conformity with the requirements of this Agreement; provided, however, that at no time shall Contractor be entitled to an adjustment of the Contract Price or the Project Schedule based on such work stoppage. Nothing in this Section 3.20 shall affect Contractor's status as an independent contractor.

(h)   <u>Conditions of the Site</u>.  Contractor represents and warrants that it knows and has carefully reviewed and taken account of all matters concerning the performance of the Works fully and completely, and in accordance with the Project Schedule. Contractor has had the opportunity to investigate and has carefully reviewed and taken account of all matters concerning the Site, including, the topography and weather patterns at the Site and surrounding area, the management and storage of materials, the availability of labor, construction water, construction electricity, and construction communications, the access routes to the Site (including the suitability of those routes, with such modifications or reinforcements as Contractor has identified as part of the Works, for delivery of Equipment) and soil and subsoil conditions and characteristics and accepts them for such performance. Contractor's failure to acquaint itself with such general or local conditions or circumstances affecting the Works existing as of the effective date of this Agreement shall neither relieve it from the responsibility for successfully performing this Agreement nor entitle Contractor to a Change Order.  Contractor is responsible for the pertinence, sufficiency and accuracy of all information used in the performance of the Works.  Contractor acknowledges that all appropriate allowances for these conditions have been taken into account in the Contract Price and in determining the Project Schedule. No discrepancy between the actual conditions encountered by Contractor and the conditions that Contractor anticipated or allowed for shall excuse Contractor from any failure to perform the Works in accordance with the Project Schedule. In addition, no claim shall be considered for any increase in the Contract Price or for any extension of the Project Schedule, or any other claim, relief or remedy whatsoever, based in whole or in part upon any such discrepancy.

(i)   <u>No Hazardous Materials To Be Brought on Site</u>. Contractor shall not, nor shall it permit or allow any Subcontractor to, transport any Hazardous Materials to the Site, except to the extent necessary for the performance of the Works. Contractor shall remove, transport and dispose of, in accordance with any Applicable Law and Consents, any Hazardous Materials transported onto the Site or generated in the performance of the Works and so long as the same is done in compliance with Applicable Laws and Contractor shall remain responsible and strictly liable for all such Hazardous Materials. Subject to the other provisions of this Agreement, Contractor, on behalf of itself and of Contractor Group, agrees to defend, indemnify and hold each member of [SPC] Group free and harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group that arise from or out of Contractor's use, handling, or disposal of Hazardous Materials on the Site, provided that such claims, losses and/or liabilities do not result in any way

PRO-FORMA CONTRACT

Confidential

whatsoever from the gross negligence or willful misconduct of any member of [SPC] Group.

(j) <u>Clean-up</u>. Contractor shall at all times keep the Site free from waste materials or rubbish caused by its activities. As soon as practicable, after the completion of all Substantial Completion Punch-list items, Contractor shall remove, at its own cost, all of its equipment and materials not constituting part or otherwise embodied in the DRU, and remove all waste material and rubbish from the Site so as to bring the Site into full compliance with Applicable Laws, Consents and this Agreement.  Contractor shall be responsible for all costs associated with removal of any waste materials and garbage from the Site, including costs associated with permitting and transportation.

(k) <u>Non-Interference</u>. During the period from Substantial Completion of the DRU until completion of the Substantial Completion Punch-list for such DRU, Contractor shall ensure that the performance of the Works does not unreasonably interfere with the operation of such DRU or any other DRU. In the event Contractor's performance of the Works interferes with the operation of such DRU, any other DRU and/or any adjoining facility, notwithstanding anything to the contrary in this Agreement, Contractor shall be liable for and shall defend, indemnify and hold each member of [SPC] Group free and harmless from and against any claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group resulting from such interference. At no time may Contractor utilize any [SPC] systems or assets unless specifically authorized by the Scope of Work or as approved by [SPC] in writing.

(l) Access to Site. Contractor shall make the Site available to [SPC], or to any Person at the request of [SPC], including [SPC]'s personnel, its agents, representatives and subcontractors, for the purpose of carrying out [SPC]'s obligations under this Agreement or for the purpose of monitoring the performance of the Works.

3.21. <u>Access to Documents.</u>☐[SPC], its [SPC] Project Manager or any person authorized in writing by [SPC] shall have access, at all reasonable times, to inspect and make copies of all notes, designs, drawings, specifications and other technical data pertaining to the technical aspects of the Works, Equipment specifications, performance guarantee data, warranties, shop and field performance test and field representative reports; <u>provided</u> that Contractor shall not be obligated to provide access to proprietary technical data regarding Equipment manufactured by or for Contractor and not provided by Contractor to other Persons so long as Contractor provides the non-proprietary portion of such technical data and the non-proprietary data provided by Contractor shall be of such type and detail as is customarily provided by vendors and provides [SPC] with a reasonable basis for technical review of the design of the DRU.  Drawings representing the latest modifications to or the current as-built status of the DRU required pursuant to Exhibit III shall be available for [SPC]'s inspection at the Site at all

PRO-FORMA CONTRACT

Confidential

times during any working day.

3.22.  Environmental Compliance. Contractor shall perform the Works in such a manner as to minimize impact upon human health, safety and the natural environment.  In carrying out the foregoing, Contractor shall comply with Good Industry Practices, [SPC] Policies, Applicable Laws, Applicable Codes and Standards and Contractor's Safety Program.  Contractor shall dispose of any waste buildup in the water or wastewater treatment systems included in the Site and waste from the sanitary sewer or any other source included in the Site resulting from Contractor's performance of the Works.  Contractor shall dispose of all non-hazardous wastes and Hazardous Materials generated or encountered during performance of the Works only at disposal facilities approved and permitted to receive such wastes and Hazardous Materials.

3.23. Transportation. Contractor shall be responsible for the transportation to, from and among any of the Sites of all Equipment, Subcontractors and personnel used to perform any Works.

3.24.  Not applicable.

3.25.  Export of DRU. Contractor shall take all necessary steps and shall obtain all necessary authorizations for the timely exportation of the DRU, including the registration of such DRU in all the relevant registries, such as the Registro de Operações de Crédito and the Registro de Exportação with SISCOMEX.  Contractor, on behalf of itself and its Affiliates, agrees to defend, indemnify and hold each member of [SPC] Group free and harmless from and against claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group resulting from the failure of any member of Contractor Group to obtain any permit or Consent from any applicable registry, including the registries described in the preceding sentence.

## ARTICLE 4
## LOCAL CONTENT REQUIREMENTS

4.1.  Local Operations in Brazil. Contractor shall perform, in Brazil, construction and assembly, commissioning, pre-operation, start-up, and assisted operation related to the Works, including the hull construction, as well as all related steel works, its integration with the drilling plant, and all related activities.

4.1.1  The hull construction, as well as all related steel works, its integration with the drilling plant, and all related activities, shall be performed at a single Site, located in Brazil.

4.1.1.1  If the yard is incapable of supporting the whole production needed for the performance of all of the Works, Bidder may adopt an alternate and complimentary strategy to complete the Works at one or more alternate sites. Notwithstanding the foregoing, at least 65% (sixty-five percent) of both manpower and aggregate weight of structural parts, panels and blocks fabrication, as well as assembly, block erection, all subsequent works for completion of the hull at quay side, integration of the drilling

Confidential

plan and remaining activities, shall take place at the Site specified under Section 4.1.1.

4.1.1.2    Any alternative site utilized by Contractor pursuant to Section 4.1.1.1 shall be located in Brazil.

4.1.1.3    If Contractor demonstrates that it would be unfeasible to perform steel works or component part fabrication/supply in Brazil, due to technological issues, then subject to obtaining [SPC]'s prior written consent (which consent may be withheld in [SPC]'s sole discretion), such parts/components may be supplied from sources outside Brazil. The proposition set forth herein does not relieve Contractor of its obligations under Section 4.2.

4.2.    Brazilian Local Content. Contractor shall comply with the following Brazilian Local Content requirements, calculated in accordance with the ANP's criteria, methods and procedures indicated in Exhibit XVI ("Brazilian Local Content"):

4.2.1.    The local content indices (Índice de Nacionalização) for the Works shall be at least as per the table below:

| System | Local Content (percentage of the Unit Contract Price) |
|---|---|
| Generation, Propulsion, and Dynamically Positioning Systems | 40% |
| Drilling Package | 20% |
| Global | 55% |

4.2.2.    The definitions of the scope of the generation, propulsion, and dynamically positioning systems, as well as the drilling package, for local content calculation purposes, are set forth under Section 3 and Section 4 of Exhibit XVI.

4.3.    Monthly Report. Contractor shall provide during each month of the term of this Agreement, a Brazilian Local Content report, as defined in Exhibit XVI, together with supporting documentary evidence, demonstrating Contractor's compliance with the Brazilian Local Content requirements at the end of this Agreement

4.3.1    Contractor shall, within sixty (60) Days from the date of execution of this Agreement, submit for [SPC]'s approval, the method by which Contractor intends to evidence compliance with the provisions of Section 4.2.

4.3.2    The procedure and criteria for the calculation of Brazilian Local Content, shall comply with ANP requirements, as per Exhibit XVI.

4.3.3    The calculation of the Brazilian Local Content indicated in the Brazilian Local Content Monthly Report, may be audited by an entity contracted by [SPC].

PRO-FORMA CONTRACT                              Page 37 of 85

4.3.4   Contractor shall make available to the above mentioned entity all documents and information required for the auditing of the Brazilian Local Content, in accordance with Exhibit XVI.

4.4.   Liquidated Damages. In the event Contractor fails to comply with the Brazilian Local Content requirements for the DRU, as defined in Section 4.2, Contractor shall pay to [SPC] liquidated damages for such non-compliance as follows:

4.4.1   If Contractor does not comply with the Brazilian Local Content indexes (*Índice de Nacionalização*) for (i) Generation, Propulsion and Dynamically Positioning Systems, and/or Drilling Package, then Contractor shall pay to [SPC] an amount equal to twenty percent (20%) of the difference between the applicable required local content percentage of the system price and the actual local content percentage of such system price  or (ii) Global, as specified in Section 4.2.1, then Contractor shall pay to [SPC] an amount equal to twenty percent (20%) of the difference between the applicable required local content percentage of the Unit Contract Price and the actual local content percentage of the Unit Contract Price;

4.4.2   The liquidated damages payable pursuant to Section 4.4.1 above for the DRU may be assessed in respect of clauses (i) and (ii) of Section 4.4.1 and are, in respect of clauses (i) and (ii) of Section 4.4.1, cumulative, but the total amount of liquidated damages assessed for the DRU for non compliance with the Brazilian Local Content requirements for such DRU will be limited to the greater of:

   (a)   the aggregate liquidated damages assessed for non compliance with the Global Brazilian Local Content requirements for the DRU; and

   (b)   the sum of the aggregate liquidated damages for non compliance with the Brazilian Local Content requirements related to the Drilling Package and to the Generation, Propulsion, and Dynamically Positioning Systems for the DRU.


## ARTICLE 5

## OBLIGATIONS OF [SPC]

[SPC] shall comply with the following provisions in a timely manner:

5.1.   Payment. [SPC] shall timely pay the Contract Price and all other sums, if any, required to be paid by [SPC] to Contractor pursuant to the terms of this Agreement, and in accordance with the provisions of Article 9 and 10 hereof.

5.2.   Permits. [SPC] shall be responsible for obtaining the permits and consents listed in Exhibit XIV in accordance with the schedule contained therein. [SPC] shall provide Contractor with copies of such permits and consents. [SPC] shall provide information, assistance and documentation to Contractor as reasonably requested in connection with the permits and Consents to be obtained by Contractor hereunder.

**Confidential**

5.3.   Temporary Asset Transfers. [SPC] may transfer to Contractor custody of certain assets owned or leased by [SPC] and required by Contractor to complete the Works.  Such transfer shall not be construed as a transfer of [SPC]'s ownership, title or other interest in or to the relevant asset. Contractor shall return promptly each such asset to [SPC] upon the completion of the portion of the Works for which the custody of such asset was required by Contractor. Contractor shall be liable for any damage to the asset occurring during the time the asset is in Contractor's custody, provided such damage was directly caused by Contractor. Prior to any transfer, Contractor shall demonstrate to [SPC]'s satisfaction that it possesses sufficient insurance to cover any damage or risk of loss to the asset.

5.4.   [SPC] shall carry out their duties hereunder in accordance with Good Industry Practices and in such a way as to avoid any unnecessary increase in costs to the Contractor or delay in Project Schedule.

## ARTICLE 6

## REPRESENTATIONS OF THE PARTIES

6.1.   Representations and Warranties of [SPC].  [SPC] represents and warrants to Contractor that, as of the date hereof:

   (a)   Due Organization. It is a private limited liability company duly organized and validly existing under the laws of The Netherlands, and is authorized and qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure so to qualify would have a material adverse effect on its financial condition, operations, or business.

   (b)   No Violation of Law; Litigation. It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or taken together, would materially and adversely affect its performance of any obligations under this Agreement.  There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to the best of its knowledge) threatened against it that, if adversely determined, could reasonably be expected to have a material adverse effect on its financial condition, operations, prospects or business, as a whole, or their ability to perform under this Agreement.

   (c)   Licenses. It is the holder of all consents, licenses, permits, or other authorizations required to permit it to operate or conduct its business now and as contemplated by this Agreement and carry out the provisions of this Agreement.

   (d)   No Conflict. Neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, or compliance with the terms and provisions hereof, will conflict with, or result in a breach of, or require any consent under, the charter or by-laws  of either Party, or any Applicable Law or regulation or any order writ, injunction or decree of any court, or any agreement or instrument to which  it is a party or is bound or to

PRO-FORMA CONTRACT                          Page 39 of 85

which it is subject, or constitute a default under any such agreement or instrument.

(e) <u>Corporate Action.</u> It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by [SPC] of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms.

(f) <u>Financial Solvency</u>. It is financially solvent, able to pay all debts as they mature and possesses sufficient working capital to perform its obligations hereunder.

6.2.   Representations and Warranties of Contractor.  Contractor represents and warrants to [SPC] that, as of the date hereof:

(a) <u>Due Organization</u>. It is a [corporation] duly organized, validly existing and in good standing under the laws of _____, and is authorized and qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure so to qualify would have a material adverse effect on its financial condition, operations or business.

(b) <u>No Violation of Law; Litigation</u>. It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or taken together, would materially and adversely affect its performance of any obligations under this Agreement.  There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to the best of its knowledge) threatened against it that, if adversely determined, could reasonably be expected to have a material adverse effect on its financial condition, operations, prospects or business, as a whole, or its ability to perform under this Agreement.

(c) <u>Licenses</u>. It is the holder of all Consents, licenses, permits, or other authorizations required to permit it to operate or conduct its business now and as contemplated by this Agreement and to carry out the provisions of this Agreement.

(d) <u>No Conflict</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, or compliance with the terms and provisions hereof, will conflict with, or result in a breach of, or require any consent under, the charter or by-laws of Contractor, or any Applicable Law or regulation or any order writ, injunction or decree of any court or any agreement or instrument to which  it is a party or is bound or to which it is subject, or constitute a default under any such agreement or instrument.

(e) <u>Corporate Action.</u> It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and

Confidential

performance by Contractor of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by Contractor and constitutes its legal, valid and binding obligation enforceable in accordance with its terms.

(f)     <u>Financial Solvency</u>. It is financially solvent, able to pay all debts as they mature and possesses sufficient working capital to complete the Works and perform its obligations hereunder.     Any guarantor guaranteeing the obligations of Contractor is financially solvent, able to pay all debts as they mature and possesses sufficient working capital to perform its obligations under such guarantee.

(g)     <u>Professional Skills</u>. Contractor has substantial experience and all the required skills and capacity necessary for the procurement and construction of Equipment used in the DRU, and is fully qualified to procure and construct the Works and deliver the DRU and otherwise perform the Works in accordance with this Agreement. Contractor shall diligently perform the Works in a competent and professional manner, utilizing sound project management procedures and supervisory procedures, all in accordance with this Agreement, including Good Industry Practices and Applicable Codes and Standards.

(h)     <u>[SPC] Information</u>. Contractor understands that as background information and as an accommodation to Contractor, [SPC] may provide or may have provided Contractor with copies of certain studies, reports or other information. Contractor further understands that [SPC] makes no representations or warranties with respect to the accuracy of such documents or the information or opinions therein contained or expressed unless expressly stated in this Agreement.

(i)     <u>Legal Requirements</u>. Contractor has knowledge of or has investigated to its satisfaction all of the legal requirements and business practices that must be followed in performing the Works and the Works will be in conformity with such requirements and practices and in compliance with all Applicable Laws and Consents.  The DRU can be constructed, complete in every detail under current Applicable Laws in accordance with the terms hereof for the Contract Price.

(j)     <u>Status</u>. Contractor satisfies the definition of an "Estaleiro Brasileiro" (Brazilian Shipyard) according to article 4 of Brazilian Law n. 11.786/08, in all respects.


## ARTICLE 7

## TAXES

7.1.   <u>General provision.</u> Except as provided herein, taxes arising out of the performance of

PRO-FORMA CONTRACT

Confidential

this Agreement, whether directly or indirectly, shall be the exclusive responsibility of the taxpayer of record that bears the tax burden before the relevant Governmental Authority, without Contractor being entitled to reimbursement as a consequence of any tax levied on the amounts received by it under this Agreement or the performance of its contractual obligations. Notwithstanding the foregoing, as to tax assessments levied in Brazil, Contractor shall be contractually responsible for the payment of the following taxes and mandatory contributions, independent of whether Contractor is the taxpayer of any tax arising out of the exportation/importation/admission into the custom regime of any equipment, materials or other goods related to the construction (construction equipment), including any sales taxes, importation duties or importation taxes. [SPC], when the withholding source, shall discount and pay over, within the legal deadlines, from payments effected, such taxes as it is required to withhold and pay under Applicable Law, and Contractor acknowledges that no amount payable by [SPC] to Contractor hereunder shall be increased as a result of such withholding or any other withholding that may be required under Applicable Law, and all payments shall be made net of any such withholdings.

7.1.1   Contractor declares that it has taken into consideration in the Contract Price the taxes applicable to the performance of the Works and supplies of Equipment and all equipment, materials or other goods related to the construction (construction equipment) provided in connection therewith (including (i) any sales and services tax (for example, *Imposto Sobre Circulação de Mercadorias e Serviços)* that may be due in connection with any payments under this Agreement, and (ii) any taxes due in connection with the importation of Equipment ). Contractor shall not be entitled to any remedy or claim against any member of [SPC] Group in relation such taxes,  including any revision in the Contract Price or for reimbursement for such taxes .

7.1.2   If, as a result of the performance of this Agreement, and within the time period required by Applicable Laws for the fulfillment of tax obligations, any type of taxes for which Contractor is liable or taxes which are to be borne by Contractor pursuant to this Article 7 are assessed by the taxing authorities against any member of [SPC] Group, Contractor shall pay such taxes or oppose such taxes in good faith through administrative or judicial proceedings under its exclusive responsibility. Contractor shall defend, indemnify and hold each member of [SPC] Group free and harmless from and against claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group arising out of any payment of such taxes, if assessed against any member of [SPC] Group, and [SPC] may set off any such amounts duly paid by it against any payments that [SPC] may owe to Contractor under this Agreement.

7.2.   Modification of the Tax Burden. If during the period between the Proposal Submission Date and the earlier of (i) the date on which this Agreement is terminated and (ii) the date of the Final Completion Acceptance, any of the following events as per (i), (ii), (iii), (iv) below occur (in Brazil or other country as a result of the performance of this Agreement), then, the price may be revised such that any increase or decrease in Contractor's cost:

PRO-FORMA CONTRACT                    Page 42 of 85

(i)     new taxes or fiscal assessments (which are not corporate or similar taxes) are created;

(ii)    existing taxes or fiscal assessments (which are not corporate or similar taxes) are revoked;

(iii)   tax calculation basis, rates of taxes or fiscal assessments (which are not corporate or similar taxes) are modified;

(iv)   enactment or discontinuance of taxes or fiscal assessments incentives of any kind and/or exemption or reduction of Brazilian federal, state or municipal taxes or fiscal assessments (other than corporate or similar taxes) that actually increase or reduce the burden of taxes or fiscal assessments (other than corporate or similar taxes)..

7.3.   Indemnification. □Contractor shall defend, indemnify and hold each member of [SPC] Group free and harmless from and against any claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group as a result of any failure by any member of Contractor Group to pay any taxes when due. Upon payment of any such taxes by such member of [SPC] Group then, [SPC] or such member of [SPC] Group, as the case may be, shall be entitled immediately to recover from Contractor the amount thereof together with all direct expenses incurred by [SPC] or such member of [SPC] Group, as the case may be, in connection therewith or to set off all such amounts against any sums owed to Contractor by [SPC]. As a result, each member of [SPC] Group shall be duly compensated by Contractor for the amounts paid by it (whether directly or indirectly) as taxes in Brazil (deducted by any costs and expenses incurred by Contractor to secure such favorable outcome).

7.4    Not applicable.

## ARTICLE 8

## MEASUREMENT

8.1.   Calculation of the Works Progress□Contractor shall submit, no later than the twenty-eighth (28th) day of each month, the detailed calculations reflecting the Works carried out in the applicable period. Failure to meet such term shall cause proportional delay in the corresponding payments.

8.1.1   The calculation of the Works progress shall:

(a)   be based in the planning and control systems developed according to the requirements of Exhibit VI;

(b)   otherwise comply with the progress measurement criteria established in

Confidential

this Agreement.

8.2.  Measurement of the Works. □With the assistance and cooperation of Contractor, [SPC] shall verify the calculation of the Works progress and measure the portion of Works performed and of the events completed and accepted during the period between the 26th Day of the prior month and the 25th Day of the month of reference. The results of such verification shall be specified in a measurement document (the "Measurement Report"), pursuant to the provisions of this Article. On the first Business Day of the month following the month of reference, provided that contractor has complied with requirements of Section 8.1 above, [SPC] shall deliver to Contractor the Measurement Report ("MR") indicating the Work performed during the pertinent period.  Such MR shall be the basis of Contractor's Invoice for the relevant period.

8.2.1  The measurement of the Works in relation to a certain period shall:

(a)  take into consideration the requirements indicated in Exhibit XIX  and Exhibit VI; and

(b)  specify the Works to be measured and paid in each specific currency, assigning the correspondent amount of such currency, which shall be subject to the provisions established under Section 10.1.

8.2.2  The Works recorded in the Measurement Report as having been performed shall be deemed provisionally accepted, and acknowledged to be invoiced by Contractor; provided, however, that [SPC] will be entitled to reject such recorded Works at a subsequent time if any failure, discrepancy, fault or Defect is later ascertained, in which case Contractor shall be required to remake or correct such failure, discrepancy, fault or Defect at its exclusive expense in accordance with this Agreement.

8.2.3  Contractor may provide feedback to the inspection carried out by [SPC] by submitting within five (5) Business Days after its receipt of the MR, setting forth any claims, comments or considerations that Contractor may deem convenient for [SPC]'s appreciation and judgment.

8.2.4  The execution of the Measurement Report by [SPC] Project Manager will imply acknowledgement of the accuracy thereof.


**ARTICLE 9**

**CONTRACT PRICE**


9.1.  Contract Price. □The Contract Price is determined on a lump sum, fixed price basis and is equal to the sum of the component prices for the Works amounting to $_____ as set forth in Exhibit XVIII. The Contract Price is inclusive of all the necessary overhead, personnel (supervision, direction, administration, labor), Equipment,

**Confidential**

taxes due to labor and social security obligations, costs, supplies, tools, expenses, taxes, licenses, insurance and other legal obligations, including profit, required for the performance of Contractor's entire contractual obligations until termination of this Agreement.  Each Change Order authorizing the payment of money to Contractor or credit of amounts from Contractor to [SPC] shall be deemed to increase or decrease the Contract Price accordingly for all purposes hereof.

9.2.   Price. The Contract Price comprises:

9.2.1   The lump sum price of US$ _____, including the amount of € _____ (_____ Euros), converted into United States Dollars at an exchange rate of US$_____/1€ for the purpose of calculating the lump sum price, and the amount of R$ _____ (_____Reais), converted into United States Dollars at an exchange rate of US$ ____/1R$ for the purpose of calculating the lump sum price, as set forth in Price Schedule A of Exhibit XVIII, corresponding to all services and work required to deliver the DRU, as described herein, fully functional, operable and delivered definitively to [SPC] at the final location, comprising, among others, engineering design, procurement, construction, erection and assembly, Pre-Commissioning, Tests, Trials, Certification and assisted operation of the DRU, and excluding the items to be specifically provided by [SPC], as indicated in Exhibits I and II.

9.3.   Payment Limit. Notwithstanding the provisions under Section 9.1, when the sums of payments made by [SPC] reaches the total amount specified in Section 9.1, [SPC]'s payment responsibilities shall cease except as otherwise provided in this Agreement. Notwithstanding the foregoing, Contractor shall be responsible to carry out the Works and its obligations and responsibilities under this Agreement to Final Completion.

## ARTICLE 10

## PAYMENTS TO CONTRACTOR

10.1.   Payments. Payments shall be made by [SPC] to Contractor in accordance with Article 9, Exhibit XVIII and Exhibit XIX, and shall comply with all other terms of this Agreement. Payments shall be made to one or more accounts designated by Contractor and shall be made in the currency (Brazilian Reais, United States Dollars, or Euros) in which the corresponding portion of the Contract Price is denominated in Exhibit XVIII.

10.1.1 In case Contractor chooses to receive the Payments in more than one currency, as per Section 10.1 above, the total amount of each currency shall be equal to the correspondent total amount payable by [SPC] specifically defined for that currency, under Exhibit XVIII.

10.2.   Invoicing. No later than the fourth (4th) Business Day of the month immediately following the month to which the Invoice pertains, Contractor shall submit to [SPC], with a copy to [SPC] Project Manager, its Invoice for such month accompanied by any necessary

Confidential

supporting documents described in Sections 10.3 through 10.5, in a form reasonably acceptable to [SPC] and previously approved by the Contractor Project Manager.

10.2.1 In the event invoicing occurs on a later date than that set forth in Section 10.2, the due date for payment of the invoice shall be postponed by as many days as the number of days of delay in the delivery of the invoice and/or of any required supporting documents in accordance with Sections 10.3 and 10.5.

10.2.2 In case the issuance of the Measurement Report is delayed for any reason attributable to [SPC], the respective payment shall not be delayed as a consequence of such delay.

10.3.  Invoicing Documents. Each Invoice issued by Contractor to [SPC] must contain at a minimum the following information:

  (i)  [SPC]'s address;

  (ii)  Reference to this Agreement with effective dates and any amendment or addendum pursuant to which Invoice is issued;

  (iii)  Reference to the Measurement Report to which the Invoice pertains and to the period of time covered by such Measurement Report, and any numbering system used to identify such Measurement Report;

  (iv)  Contractor's bank account information;

  (v)  Evidence of compliance by Contractor of its FGTS and INSS obligations required by the Applicable Law;

  (vi)  Any other data necessary for [SPC] to make payment thereof; and

  (vii)  The currency(ies) in which such Invoice shall be paid.

10.4.  Representation. Each Invoice shall constitute a representation by Contractor that:

  (i)  The quality of all Works described in the Invoice is in accordance with the terms of this Agreement;

  (ii)  Contractor is entitled to payment of the amount invoiced;

  (iii)  The Works (or any portion thereof) described in the Measurement Report accompanying the Invoice and all previous Invoices are free and clear of all Liens, security interests and encumbrances; and

  (iv)  All Subcontractors have been paid the monies due and payable to them for their work and supplies in connection with the Works (except for such amounts as may be disputed in good faith by Contractor).

The amount of the Invoice and the Works described therein shall correspond to the relevant Measurement Reports. A delay in the submission of the Invoice by Contractor

Confidential

to [SPC] (and any and all supporting documentation requested by [SPC] pursuant to Section 10.5 below) will result in the postponement of the payment date for a period equal to such delay. [SPC] may, at its sole discretion, request that any Invoice be accompanied by a Lien waiver corresponding to all Works performed during the month to which such Invoice pertains.

10.5. Review and Approval. Each Invoice shall be reviewed by [SPC] in order to be compared with the Measurement Report for the corresponding period. Upon [SPC]'s request, Contractor shall furnish additional supporting documentation, including certificates, and provide any further information as may be reasonably requested by [SPC] to verify such Invoice. Unless disputed pursuant to Article 24, the amount of each Invoice shall be due and payable within thirty (30) Days immediately following the final date of the measurement period (such payment due date to be adjusted pursuant to Section 10.2 above to reflect any delays in Contractor's Invoice issuance and delivery of requested documentation). If any amount described in any Invoice is disputed by [SPC], payment shall be made only with respect to its undisputed portion. Payment of disputed amounts shall be made as soon as the dispute is resolved.

10.6. Payments. The payment amount due to Contractor based on the Measurement Report shall be effected by [SPC] by means of a bank receipt document issued by a banking institution in the name of Contractor, payable on the thirtieth $(30^{th})$ day counting from the final date of the measurement period informed in the relevant Measurement Report, with due regard for the provisions of Section 10.2, or by wire transfer in favor of Contractor. Contractor hereby notifies [SPC] that payment shall be made to the following bank and account:

BANK : _____

BRANCH/ADDRESS: _____

ACCOUNT NR: _____

10.6.1 At Contractor's discretion it can elect to instruct [SPC] to make payments hereunder to more than one bank account.

10.6.2 If Contractor desires to receive payment at a bank account other than the account described above, it shall notify [SPC] in accordance with Section 25.5 indicating the new bank reference concurrent with an Invoice to [SPC].

10.6.3 If Contractor elects to receive payment hereunder at a bank account held in the name of its Affiliate, then as a condition of nominating such account Contractor shall irrevocably acknowledge and agree that any payments made to such account by [SPC] shall for all purposes hereunder be treated as a payment to Contractor.

10.6.4 If any amount hereunder is due on a day which is not a Business Day, such amount shall not be due and payable until the next following Business Day, and no interest shall accrue in respect of such delay.

10.7. Payments Not Acceptance of Work. No payment made hereunder shall be considered as an approval or acceptance of the Works or portions of the Works by [SPC], or a waiver of any claim or right that [SPC] may have hereunder. All payments shall be subject to correction and

Confidential

adjustment to be effected in subsequent payments.

10.8. <u>Payments Withheld and Deducted.</u> In addition to disputed amounts set forth in an Invoice, [SPC] may withhold or deduct payment of any amount described in an Invoice or portions thereof in an amount and to such extent as may be reasonably necessary to protect [SPC] due to:

(a)  Defective Works that have not been remedied as required under this Agreement and which [SPC] has incurred expenses for the correction of Defective Works, after Contractor having been duly notified and given a reasonable term for remedying any such faulty or Defective Works, and to the extent (i) any defective Works are due to the Contractor's or Subcontractors' sole fault; and (ii) such Defective Works have been or are being corrected by [SPC] or by any third parties appointed by [SPC];

(b)  Not applicable;

(c)  Amounts paid by [SPC] to Contractor, in the month immediately preceding, incorrectly, or for which there was insufficient or inaccurate supporting information;

(d)  Liquidated damages such as Delay Damages which Contractor owes;

(e)  Any other expenses, costs or liabilities, which [SPC] has incurred and for which Contractor is legally or contractually responsible, such as undisputed payment under any Subcontracts;

(f)  Amounts corresponding to the satisfaction of any judicial or administrative decision, encumbrances, liabilities to third parties for which Contractor is solely responsible, (whether directly or under any provision of this Agreement, including any provisions relating to Contractor's duty to indemnify any member of [SPC] Group), and brought against any member of [SPC] Group or, in the case of an encumbrance or lien, created on any property of any member of [SPC] Group; <u>provided</u> that the withholding of payments under this item (f) shall be limited to the value of the corresponding final judgment, or encumbrances;

(g)  Any undisputed amounts due and payable by Contractor to [SPC];

(h)  Any invoice that fails to substantially meet the requirements of this <u>Section 10.8</u>;

(i)  In case [SPC] has already paid to Contractor for Defective Work, [SPC] may deduct an amount equal to the amount paid to Contractor for the defective Works from any subsequent payments until such defective work has been corrected and ascertained by [SPC]; or

(j)  Contractor is in Default pursuant to <u>Section 21.1</u> and such Default has not been

PRO-FORMA CONTRACT                    Page 48 of 85

cured within the time set forth in Section 21.1,

and any amount withheld pursuant to this Section 10.8 shall not be due and payable hereunder for any purpose under this Agreement until the event or occurrence giving rise to [SPC]'s withholding of payment ceases to exist.

10.9. Interest on Late Payments. Any amounts due, but not paid hereunder, shall bear interest at a per annum rate equal to the 6-month London Interbank Offered Rate (LIBOR), as published by the Financial Times, London edition, on the relevant due date plus 2% (two percent) per annum. Any amounts withheld, as per Sections 10.8 and 10.12 of this Agreement shall not be considered due and payable and are not subject to the foregoing interest.

10.10. Payments During Default. [SPC] shall not be obligated to make any payments hereunder at any time in which a Default shall have occurred and be continuing, (except for all undisputed payments that are due and in respect of which the related Invoice(s) has been accepted by [SPC]) and Contractor shall have no right to exercise any remedy hereunder in respect of such payments if and for so long as such Default is continuing.

10.11. Offset. [SPC] may offset any amount due and payable from Contractor to [SPC] against any amount due and payable to Contractor hereunder, without prejudice to [SPC]'s other rights and remedies under this Agreement.

10.12. Payment Error. Payments made in error shall be immediately returned by the Party receiving the payment in error. Notwithstanding the generality of the foregoing, in the event [SPC] discovers that a milestone associated with a payment was not in fact achieved, [SPC] may set off the amount paid by it in respect of the achievement of such milestone against other payment obligations of [SPC] until such milestone is achieved, at which time the amount recovered by [SPC] through exercise of such rights of set off shall be due and payable by [SPC] to Contractor.

10.13. Adjustments. The Parties expressly understand and acknowledge that (i) the formulas set out below include the effects of price fluctuations that affect the Contract Price and (ii) Contractor has taken the effects of exchange rate fluctuations into account in proposing and agreeing to the Contract Price. [SPC] shall not be obligated to adjust the Contract Price or to pay any additional amounts in respect of the Contract Price for any reason related to fluctuations of exchange rates or price fluctuations not assessed by the price indices defined in Sections 10.13.1 and 10.13.4 below.

10.13.1    The Parties agree that the amount to be paid in respect of any component of the Contract Price that is denominated in Brazilian Reais, shall be subject to yearly adjustments determined by the following parametric formula, calculated once every twelve months, and counted from the Proposal Submission Date, to reflect the escalation of costs related to the drilling rig industry in the Brazilian market:

Confidential

EIG00026211

EIG_KEP_00166691

$$PM = \left( PO \times \left( \alpha 1 \times \left( \frac{ICSPn}{ICSPo} \right) + \alpha 2 \times \left( \frac{IGP - DIn}{IGP - DIo} \right) \right) \right)$$

Where:

**PM**: Monthly Amount in Brazilian currency Reais (R$).

**PO**: Portion of Contract Price subject to payments in Brazilian Reais (R$) and included in the Measurement Report.

**α1**: coefficient calculated by *Fundação Getulio Vargas – FGV*, representing the weight of production costs in the typical sales Price for the drilling rig industry in the Brazilian market (**α1=0,8).**

**α2**: coefficient calculated by *Fundação Getulio Vargas – FGV*, representing the weight of non production costs, including overhead, in the typical sales Price for the drilling rig industry in Brazilian market (**α2= 0,2).**

**ICSPn**: Definitive value of the Price Index corresponding to the Brazilian Drilling Rig Building for the month immediately preceding the month to which the adjustment is due (i.e., each twelve (12) month anniversary of the Proposal Submission Date), calculated by *Fundação Getulio Vargas - FGV*

**ICSPo**: Definite value of the Price Index corresponding to the Brazilian drilling rig industry for  the month immediately preceding the month in which the Contractor Commercial Proposal was submitted, calculated by *Fundação Getulio Vargas - FGV*

**IGP-DIn**: Definitive value of the *General Price Index on Internal Availability* ("Índice Geral de Preços – Disponibilidade Interna") for the month immediately preceding the month to which the adjustment is due (i.e., each twelve (12) month anniversary of the Proposal Submission Date), calculated by *Fundação Getulio Vargas - FGV*

**IGP-DIo**: *General Price Index on Internal Availability* (Índice Geral de Preços – Disponibilidade Interna") for  the month immediately preceding the month in which the Contractor Commercial Proposal was submitted, calculated by *Fundação Getulio Vargas - FGV*

10.13.2    Not applicable.

10.13.3    Not applicable.

10.13.4    The amount to be paid in respect of any component of the Contract Price that is denominated in United States Dollars (US$) or Euros (€) shall be subject to yearly adjustments, calculated once every twelve (12) months, according to the following formulas:

(a) Prices in US Dollars:

**PM =  PO   x   Fy**

**Confidential**

Where:

**PM**: Adjusted Foreign Content Amount in U.S. Dollars.

**PO**: Portion of Contract Price corresponding to the Foreign Content in US Dollars included in the Measurement Report.

**Fy**: Yearly adjustment factor determined by the following parametric formula, calculated every twelve months, and counted from the Proposal Submission Date:

$$\mathbf{Fy} = \mathbf{0,95} \ \mathbf{x} \ \frac{\mathbf{OFGME}}{\mathbf{OFGMEo}} + \mathbf{0,05} \ \mathbf{x} \ \frac{\mathbf{ECI}}{\mathbf{ECIo}}$$

Where:

**OFGME**: Definitive value of the Price Index corresponding to *"Oil and Gas Field Machinery and Equipment (code PCU333132333132)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month to which the adjustment is due (i.e., each twelve (12) month anniversary of the Proposal Submission Date).

**OFGMEo**: Definitive value of the Price Index corresponding to *"Oil and Gas Field Machinery and Equipment (code PCU333132333132)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month in which Contractor's Commercial Proposal was submitted.

**ECI**: Definitive value of the Price Index corresponding to *"Employment Cost Index, Total Compensation, Private Industry"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month to which the adjustment is due (i.e., each twelve (12) month anniversary of the Proposal Submission Date).

**ECIo**: Definitive value of the Price Index corresponding to *"Employment Cost Index, Total Compensation, Private Industry"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month in which Contractor's Commercial Proposal was submitted.

(b) Prices in Euros:

$$\mathbf{PM} = \mathbf{PO} \ \mathbf{x} \ \mathbf{Fy}$$

Where:

**PM** = Adjusted Foreign Content Amount in Euros.

**PO** = Portion of Contract Price corresponding to the Foreign Content in Euros included in the Measurement Report.

**Confidential**

**Fy** = Yearly adjustment factor determined by the following parametric formula, calculated every twelve months, and counted from the Proposal Submission Date:

$$\mathbf{Fy} = \mathbf{0,95} \times \frac{\mathbf{MME}}{\mathbf{MMEo}} + \mathbf{0,05} \times \frac{\mathbf{MO_{EUR}}}{\mathbf{MO_{EURO}}}$$

Where:

**MME:** Definitive value of the Price Index corresponding to *"Manufacture of Machinery and Equipment (code C28)"* published by *"Eurostat"*, for the month immediately preceding the month to which the adjustment is due (i.e., each twelve (12) month anniversary of the Proposal Submission Date).

**MMEo:** Definitive value of the Price Index corresponding to *"Manufacture of Machinery and Equipment (code C28)"* published by *"Eurostat",* for the month immediately preceding the month in which Contractor's Commercial Proposal was submitted.

**MO$_{EUR}$:** Definitive value of the Price Index corresponding to *"Labour Cost – Industry and Services (excluding public administration) – Wages and Salaries"* published by *"Eurostat"*, for the trimester immediately preceding the trimester to which the adjustment is due (i.e., each twelve (12) month anniversary of the Proposal Submission Date).

**MO$_{EURO}$:** Definitive value of the Price Index corresponding to *"Labour Cost – Industry and Services (excluding public administration) – Wages and Salaries"* published by *"Eurostat"*, for the trimester immediately preceding the trimester in which Contractor's Commercial Proposal was submitted.

10.14. <u>Final Completion.</u> Upon Final Completion, Contractor shall submit a statement summarizing and reconciling all previous Invoices, payments received and Change Orders together with an affidavit affirming that all payrolls, taxes, Liens, charges, claims, demands, judgments, security interests, bills, Equipment, and any and all indebtedness connected with the Works have been paid or otherwise satisfied and discharged, and a final Lien waiver in the form specified in <u>Exhibit XXVI.</u>

## ARTICLE 11

## COMMENCEMENT OF WORK: PROJECT SCHEDULE

11.1. <u>Commencement of Work.</u> Contractor agrees to commence the Works, or a portion of the Works pursuant to <u>Section 11.2</u>, as the case may be, upon the earlier of receipt from [SPC] of (i) a limited notice to proceed ("<u>Limited Notice to Proceed</u>"), or (ii) a notice to proceed ("<u>Notice to Proceed</u>"), with the Work. The Work Authorization Initial Date of this Agreement

**Confidential**

is considered the date Contractor receives the first of a Limited Notice to Proceed or a Notice to Proceed in compliance with the Project Schedule.

11.2. <u>Limited Notice to Proceed.</u> At any time prior to the date of issuance of the Notice to Proceed, [SPC] may issue one or more Limited Notice(s) to Proceed which shall authorize Contractor to commence and complete performance of a specified portion of the Works described in the Limited Notice to Proceed for a period of up to four (4) months. A Limited Notice to Proceed shall specify the maximum total cost of such specified Works, and Contractor shall be paid for such specified Works pursuant to the terms and conditions of this Agreement, with all such payments credited against the Contract Price and the first milestone payments to become due hereunder.

11.3. <u>Project Schedule.</u>

    (a)   <u>Critical Path Schedule</u>. Contractor shall perform the Works in accordance with the schedule and management plan agreed upon between the Parties and set forth in <u>Exhibit XX</u> (the "<u>Project Schedule</u>"). After signature of this Agreement, Contractor shall submit for [SPC]'s review and approval, the detailed Project Schedule, in accordance with the Project requirements defined in this Agreement, mainly in <u>Exhibit VI</u> and <u>Section 11.4</u>. The Project Schedule shall include a Precedence Diagram, showing the critical path of the Project, indicating the execution time for all activities of the Works detailed in the Works Breakdown Schedule - WBS, and the logical interrelationship of such activities, (Project Precedence Diagram with Critical Path), complying with the dates indicated in <u>Exhibit VI</u> and <u>Section 11.4</u>. The Project Schedule will be the baseline of the Project and, once approved by [SPC], will be revised only as required under <u>Sections 12.1</u>, <u>12.2</u>, <u>12.3</u> <u>12.4</u>, <u>12.5</u> and <u>21.3</u>.

    (b)   <u>Final Completion</u>. Final Completion shall occur no later than the date (such date, the "<u>Required Final Completion Date</u>") falling one thousand and eight hundred (1,800) Days from the date of issuance of the Notice to Proceed. The Required Final Completion Date shall be adjusted only as provided in this Agreement.

    (c)   <u>Acceleration</u>. If at any time the progress of the Works is delayed by more than [sixty (60) Days] from the Project Schedule, then Contractor shall promptly notify [SPC] of the delay and the event or events causing such delay, and shall present an acceleration plan to [SPC], for its approval, specifically identifying the steps to be taken and the resources to be committed to accelerate the progress of the Works in order to bring the Works back into compliance with the Project Schedule. All additional costs related to the implementation of any such acceleration plan shall be borne by Contractor, unless such delay results from a [SPC] Delay.

11.4. <u>Project Schedule Baseline.</u> The Works shall be performed in accordance with the milestones and other interim deadlines described below, which shall be included in the Project Schedule to be submitted by Contractor in accordance with <u>Section 11.3(a)</u>:

Confidential

11.4.1 <u>Plans, procedures and documentation.</u> Complete issuance of plans, procedures and documentation shall occur no later than the dates indicated on <u>Exhibit VI</u>.

11.4.2 <u>Purchase Orders.</u> Complete the issuance of Purchase Orders for critical equipment and materials, which shall be clearly identified as such by Contractor in its Procurement Management Plan, no later than <u>ninety (90)</u> Days from the issuance of the Notice to Proceed.

11.4.3 <u>Start fabrication.</u> Commence fabrication of the DRU no later than <u>three hundred and sixty five (365)</u> Days from the issuance of the Notice to Proceed.

11.4.4 <u>Start of the DRU Erection.</u> Commence erection of the DRU no later than <u>six hundred and ten (610)</u> Days from the issuance of the Notice to Proceed.

11.4.5 <u>Handover.</u> The Handover of the DRU shall occur within one thousand, four hundred and forty (1,440) Days from the issuance of the Notice to Proceed (such date, the "<u>Handover Date</u>").

11.4.6 <u>Final Completion.</u> Final Completion shall occur no later than the Required Final Completion Date.

11.4.7 <u>Training Programs.</u> The Training Programs, as indicated in <u>Exhibit V</u>, shall be provided by Contractor during the construction phase, and shall be completed no later than <u>one hundred and twenty (120)</u> Days before the actual date of Handover of each DRU.

11.4.8 <u>Contractor's technical assistance</u>. Contractor shall provide offshore technical assistance to the [SPC] during a period of three hundred and sixty (360) Days after the actual date of Handover for each DRU.

## ARTICLE 12

## CHANGE ORDERS

12.1. <u>Change</u> [SPC] shall have the right to make, from time to time, any change, modification, addition/reduction or deletion to, in or from the Scope of Work, or to adjust the Project Schedule for performance thereof (a "<u>Change</u>").

12.1.1 As soon as possible, and in any event not later that fourteen (14) Days, extendable upon mutual agreement, Contractor shall prepare and furnish to [SPC] a written statement specifying the consequences of such Change on the Contract Price and on the Project Schedule, setting out in full details an estimate of the resulting cost or savings from such Change in the Project, and proposed modification, as the case may

Confidential

be, in the schedule or in the estimated value of this Agreement. The mentioned written statement shall contemplate any requisite adjustment to the time for completion, any proposed modifications to this Agreement and/or any effect that such Change would imply to the Project, the Works and/or on any other provisions of this Agreement. The Change shall be mutually agreed to by the Parties and set out in a Change Order in accordance with the following:

12.1.1.1. The adjustment to the Contract Price for any Change shall be calculated by Contractor based on cost plus fee (overhead, profit, insurance) in accordance with the STATEMENT OF PRICE FORMATION as presented in Contractor's original bid proposal. In case of new equipment, not referred to in the STATEMENT OF PRICE FORMATION, Contractor shall present three price quotations for [SPC]'s analysis and decision. Each Change Order shall present a complete breakdown showing in details quantities, unit prices and taxes, taking into consideration any savings or costs not incurred by Contractor due to such Change, and shall be based on a lump sum fixed price.

12.1.1.2 The Project Schedule will only be adjusted in any Change Order to the extent that Contractor can demonstrate that the Change has affected the Project Schedule. If it is possible to maintain the Project Schedule by accelerating the performance of the Works, then Contractor shall propose such acceleration as an option for [SPC], and give [SPC] the cost impact of performing the Works on an accelerated basis as opposed to the cost impact without acceleration. Contractor shall use its best efforts to minimize the impact of any Change on the Project Schedule.

12.1.2 If [SPC] and Contractor reach agreement on all matters identified in the written statement furnished by Contractor under the terms of Section 12.1.1 above, then [SPC] shall approve a Change Order giving effect thereto . Such Change Order shall contain full particulars of the modifications, any adjustments of the Contract Price and/or the Project Schedule and all other modifications to this Agreement, and shall be signed by [SPC] and by Contractor. The Change identified in such Change Order shall thereupon be deemed to form part of the Works, and shall be subject to all of Contractor's obligations under this Agreement. Upon receipt of a Change Order, Contractor shall be obligated to perform the Works as changed by [SPC] without deficiency or delay. Any Change shall only be executed after approval of the Change Order by [SPC].

12.1.3 [SPC] will have fourteen (14) Days to approve a Change Order submitted to it by Contractor. If [SPC] does not so approve within such fourteen (14) Day period, [SPC] shall be deemed to have rejected such Change Order, and the Change Order shall not be implemented.

12.2   Imputed Change. If Contractor reasonably believes that any action, directive, order, or other communication of or from [SPC] constitutes a Change but is not formally identified as such, Contractor shall so inform [SPC] in writing as soon as possible and not later than fifteen (15) Days after receipt of such action, directive, order or other communication, and prior to performing the corresponding tasks. After such notice, within fifteen (15) Days or other period of time to be agreed between the Parties, Contractor shall provide [SPC] with a detailed estimated cost and other consequences of the alleged Change, in accordance with the requirements of Sections 12.1.1.1 and 12.1.1.2.

PRO-FORMA CONTRACT

Confidential

12.3   Changes Caused by [SPC] Delays. As soon as possible, and in any event not later than ten (10) Days after the occurrence of the applicable event, Contractor shall give notice to [SPC] of any [SPC] Delay which may impact on the Contract Price or the Project Schedule. Such notice shall specify the estimated effect on the Contract Price and/or Project Schedule and include the other details required pursuant to Section 12.1.1.1 and Section 12.1.1.2. In the event that it is impossible to estimate the impact on the Contract Price or the Project Schedule at the time such notice is delivered, Contractor shall provide [SPC] with periodic supplemental notices during the period over which the event continues. Such supplemental notices shall be intended to keep [SPC] informed of any change, development, progress or other relevant information concerning the event of which Contractor is aware.

12.4   Procedures for Negotiation of Change Orders. If either Party believes it is entitled to an adjustment in the Contract Price and/or the Project Schedule as a result of a Change or a [SPC] Delay, then [SPC] and Contractor shall use reasonable efforts to negotiate the terms of the Change Order, and if requested by either Party in writing, the Parties shall meet to determine whether a Change Order is appropriate or the extent of the adjustment.

12.5   Unsuccessful Negotiation of Change Orders. If the Parties are unable to agree on the terms of a Change Order, then [SPC] may elect in writing to have the Change performed on a time and materials basis in accordance with Section 12.5.1 and Section 12.5.2 with the consequences on the Project Schedule and Contract Price to be determined prior to Substantial Completion. In such case, the Parties shall enter into a Change Order, which states that any modification in the Contract Price and/or Project Schedule will be determined after completion of the Works as changed. If the Parties cannot agree on the amount of any adjustment after application of the procedures contained in this Article 12, then the issue shall be resolved under the procedures set forth in Article 24. Pending resolution of the dispute, Contractor shall perform the Works as directed by [SPC] on a time and material basis as set out in the Statement of Price Formation. Failure to so perform the Works shall constitute a Default.

12.5.1   If a Change Order is performed on a time and materials basis pursuant to Section 12.5, then the Contract Price shall be adjusted by an amount equal to the increase or decrease in Contractor's cost of performing the Works that was affected by the Change or [SPC] Delay, as provided in Section 12.5.2, on an open book basis. Contractor shall use its best efforts to minimize such costs, and shall provide [SPC] with options whenever possible for reducing costs. Contractor shall maintain proper and detailed documentation of all such costs and shall provide such documentation and other information reasonably requested by [SPC] to substantiate any adjustment. Documentation shall include invoices and timesheets, which specifically identify that such amounts relate to changed Works or [SPC] Delay. To the extent that Contractor has not properly documented such costs, such costs shall not be recoverable from [SPC] hereunder.

12.5.2   For any adjustments to the Project Schedule or the Contract Price, the requirements of the Sections 12.1.1.1 and 12.1.1.2 shall be considered.

12.6   Costal and Flag Authority rules. If Contractor reasonably believes that a change in the rules set by a relevant costal or flag authority has occurred after the Proposal Submission Date, Contractor shall provide [SPC] with a detailed estimated cost and other consequences of the alleged change, prior to performing the corresponding tasks.

Upon mutual agreement between the Parties the change shall be set out in a Change Order accordingly.

12.7    [SPC]'s Written Consent. Notwithstanding any provisions to the contrary in this Agreement, no variations to the Works, drawings, schedules, prices, delivery or any other data and information provided by [SPC] will be allowed without the prior written consent of [SPC], unless in case of emergency that puts at risk the safety of the DRU and persons. In such cases Contractor shall submit a report with all necessary evidence to [SPC] according to Section 3.17 and the Parties will discuss the pertinent matters in good faith. If the Parties can not agree on the variation or the existence of the "emergency" giving arise to any such variation, the Contractor shall be obligated to comply with original obligations, and [SPC] shall not bear any costs in connection therewith.


# ARTICLE 13
# TITLE AND RISK OF LOSS

13.1. Title.

   (a)   Clear Title. Contractor warrants and guarantees that [SPC]'s legal title to, and ownership of, the Works and the DRU shall at all times be free and clear of any and all Liens, claims, security interests or other encumbrances, whenever the title thereto passes to [SPC], except as expressed otherwise under Section 3.15 (c).

   (b)   Title to Works. Title to the Works in respect of the DRU shall pass to [SPC] upon the earlier of (i) payment by [SPC]; or (ii) incorporation into such DRU, amounting to delivery of such DRU in sheltered waters in accordance with this Agreement.

   (c)   Title to Drawings. Contractor retains all rights with respect to the specifications, plans and working drawings, technical descriptions, calculations, test results and other data information concerning the design and construction of the DRU and hereby grants to, or agrees to procure on behalf of, [SPC] an irrevocable, non-exclusive, royalty-free and perpetual license to use such specifications, plans and working drawings, technical descriptions, calculations, test results and other data information for operating and maintaining the DRU, and for training engineers and operators for that purpose.


13.2. Contractor Waiver. Contractor hereby irrevocably waives all rights of any kind and nature, in law or equity, to claim at any place and before any jurisdiction, any Lien or retention rights to any parts of the Works or to the DRU based on whatever reasons or allegations. Contractor shall also require from its Subcontractors, suppliers, agents or any other persons to equally waive any such rights in their respective agreements and contracts.

13.3. Risk of Loss. Contractor hereby agrees that Contractor shall bear all risks of any losses and damages caused by Contractor and/or Contractor Group relating to the performance of the Works until such date as Contractor has completed the entire services according to the

Confidential

provisions of Exhibit I and [SPC] has released a written Performance Acceptance Certificate of the Works performed by Contractor according to Exhibit XXX. In order to assist Contractor in mitigating such risks, [SPC] has agreed to procure insurance under a Builder's Risk Insurance policy as set forth in Exhibit XXIII. Without limiting the generality of Section 25.2, Contractor acknowledges that it has investigated to its satisfaction all of the terms and conditions of the proposed Builder's Risk Insurance policy as set forth in Exhibit XXIII and hereby waives any right to make any claim hereunder that the coverage provided under such Builder's Risk Insurance policy is inadequate to insure against such risks or that [SPC] has failed to disclose or provide adequate disclosure regarding the terms and conditions of such insurance coverage; provided that the insurance coverage provided by [SPC] in respect of such risks is equivalent or substantially similar in all material respects to the Builder's Risk Insurance policy described in Exhibit III.

## ARTICLE 14

## INSURANCE

14.1. Provision of Insurance. Contractor and [SPC] shall provide, at a minimum, the insurance specified in Exhibit XXIII on terms and conditions therein stated (which, in the case of Contractor, shall include [SPC] as the loss payee under the insurance policy, where applicable).

14.2. Lenders as Additional Insureds. The insurance provided by the Parties pursuant to Section 14.1 shall list any and all Lenders as additional insured, where applicable.

14.3. Subrogation Waivers. The Parties shall provide, whenever applicable, subrogation waivers from the insurers contracted pursuant to Section 14.1 in form and substance reasonably acceptable to the other Party.

14.4. New Technology. Notwithstanding Contractor's representation in Section 17.1 that it will not install unproven or prototype equipment, if the insurance provider characterizes certain technologies installed and which comprise the Works as being new technologies, and such insurance provider restricts, denies, limits, or is unwilling to provide insurance coverage in connection with such new technology, then the Party that is requiring the related new technologies shall secure such additional coverage and pay any additional or increased insurance premiums that may be charged by an insurance provider as a result of the use of new technology.

14.5 No Cancellation. All policies providing coverage hereunder shall contain a provision that no cancellation or material change to any policy shall become effective except upon thirty (30) Days advanced written notice thereof to the other Party, where applicable.

14.6. Obligations Not Relieved. Notwithstanding anything to the contrary, the occurrence of any of the following events shall not relieve a Party from any of its obligations under this Agreement: (i) failure by a Party to secure the required insurance coverage hereunder; (ii) failure by a Party to fully comply with any of the insurance requirements of this Agreement;

Confidential

(iii) failure by a Party to secure such endorsements on the policies as may be necessary to carry out this Agreement; (iv) the insolvency, bankruptcy or failure of any insurance company providing insurance to a Party; or (v) failure of any insurance company to pay any claim accruing under its policy.

14.7. Failure to Provide Required Insurance. In the event that coverage for any loss or damage is denied by the underwriter or underwriters due to, in whole or in part, the breach of the insurance policy terms and conditions by a Party, or for any other reason attributable to a Party, or in case the Party required to maintain the insurance fails to do so, then the defaulting Party shall defend, indemnify and hold the other Party harmless against all losses which would otherwise have been covered by said insurance.  In the event Contractor fails to maintain the required insurance, [SPC] may obtain the required insurance, and may demand reimbursement of such premiums and related expenses, together with interest in accordance with Section 10.9. [SPC] also reserves the right to set off any such amounts (including interest) in accordance with Section 10.8 hereof.

## ARTICLE 15

## DOCUMENTATION

15.1. Delivery of Record As-Built Drawings. Contractor shall deliver to [SPC] its "As-Built" Drawings in accordance with Exhibit III, promptly after Substantial Completion.

15.2 Purchasing and Subcontractor Supplied Information. As more fully set forth in Exhibit III and Exhibit V, Contractor shall deliver to [SPC] copies of all purchase documents, vendor operating and maintenance information manuals, material and fabrication certifications as applicable, installation instructions, and specific guarantee and warranty information documentation prior to Substantial Completion.

15.3. Construction Drawings and Manuals. Contractor shall provide [SPC] with construction and erection drawings specified in Exhibit III and Exhibit IV.

15.4. Other Information. Contractor shall provide all other information and documentation as may be reasonably requested by [SPC].

## ARTICLE 16

## COMPLETION

16.1 Mechanical Completion. Contractor shall give [SPC] not less than twenty (20) Days prior written notice of its intention to commence any pre-commissioning activities required for Mechanical Completion.  Prior to Mechanical Completion, all systems shall undergo all pre-commissioning checks and tests required to ensure that such systems were correctly installed and are capable of being operated safely and reliably within the specifications contained in this Agreement and in Exhibit VIII and according to Good Industry Practices and without damage to such DRU or any other property and without injury to any person, and documentation shall be provided to [SPC] which establishes and verifies that all such pre-commissioning activities

Confidential

have been performed.  Upon achievement of Mechanical Completion of the DRU, Contractor shall notify [SPC].  Contractor shall comply with all procedures and requirements for the achievement of Mechanical Completion set forth herein and in Exhibit VIII.

16.2. Substantial Completion. □Contractor shall comply with all requirements for Substantial Completion set forth herein and in Exhibit VIII.  To the extent not specified in Exhibit VIII, the Parties shall mutually agree upon procedures for the performance of the Performance Tests, Reliability Tests, and Demonstration Tests.  Contractor shall provide labor, equipment, supplies, and all other items necessary for the performance of the Performance Tests, Reliability Tests, and Demonstration Tests.  Contractor shall be responsible for analyzing the data obtained during the Performance Tests, Reliability Tests and Demonstration Tests, and for ensuring that such data reflects the performance standards required hereunder.  A complete copy of all raw performance data, and a detailed listing of all testing instrumentation utilized, shall be provided to [SPC] at the completion of the tests.  Upon Substantial Completion of the DRU, Contractor shall certify to [SPC] that all of the requirements for Substantial Completion for such DRU have occurred in the form specified in Exhibit XXVIII (the "Substantial Completion Certificate") and shall provide a performance test report and analysis to [SPC].  At a minimum, the test report shall include (i) the raw performance data; (ii) a description of the instrumentation utilized for the performance testing; (iii) the procedures utilized during the performance testing, together with all correction curves and formulas; (iv) a full explanation of all corrections and calculations required to correct the test data to site conditions; and (v) any other supporting information used to demonstrate that each system tested has met the performance standards required under the terms of this Agreement.  The Substantial Completion Certificate shall be accompanied by all other supporting documentation as may be required to establish that the requirements for Substantial Completion have been met.

16.3. [SPC] Acceptance of Substantial Completion. □[SPC] shall notify Contractor whether it accepts or rejects the Substantial Completion Certificate for the DRU no later than thirty (30) Days following receipt of the Substantial Completion Certificate.  Prior to the end of the thirty (30) Day review period, the Parties may agree in writing to extend the previously mentioned period as may be necessary according to the circumstances.  If [SPC] does not accept or reject the Substantial Completion Certificate within the term established or agreed by the Parties in this Section 16.3, Contractor may deem for all purposes that the Substantial Completion Certificate has been accepted.  If [SPC] does not agree that Substantial Completion has occurred, then [SPC] shall state the basis for its rejection in reasonable detail in a written notice provided promptly to Contractor.  The Parties shall thereupon promptly and in good faith confer and undertake all reasonable efforts to resolve any issues preventing the acceptance by [SPC] of the Substantial Completion Certificate.  In the event such issues are not resolved within twenty (20) Days of the delivery by [SPC] of its notice, or in the period of days agreed by the Parties to enable any correction in order to achieve Substantial Completion, [SPC] and Contractor shall resolve the dispute in accordance with the dispute resolution procedures provided for under Article 24.

16.4. Substantial Completion Punch-list□Prior to the issuance of the Substantial Completion Certificate for the DRU, [SPC] and Contractor shall inspect the whole DRU, to identify the pending items to be included in the Substantial Completion Punch-list.  As a result of such inspection, Contractor shall prepare the Substantial Completion Punch-list.  Contractor shall promptly provide the Substantial Completion Punch-list to [SPC] for the DRU, together with an estimation of the time and cost necessary to complete or correct each Substantial

Confidential

Completion Punch-list item.   [SPC] shall review the Substantial Completion Punch-list to ensure that it includes only items of a minor nature.   Contractor shall immediately initiate measures to complete or correct, as appropriate, any item [SPC] requires to be completed to ensure the proper operation of the DRU or protection of the Equipment or personnel safety. The failure to include any items on the Substantial Completion Punch-list shall not alter the responsibility of Contractor to complete all Works in accordance with the terms and provisions of this Agreement. All Works on the Substantial Completion Punch-list shall be completed no later than ninety (90) Days following the effective date of Substantial Completion, or other period of time previously agreed between the Parties. If Contractor fails to complete such Works during such period of time, [SPC] will have the right, but not the obligation, to complete such Substantial Completion Punch-list items at the expense of Contractor.

16.5. Handover☐The transfer of physical care and custody of the DRU ("Handover") shall only occur  once the following events are completed: (i) Substantial Completion of such DRU has been achieved; (ii) all Tests and Sea Trials, necessary to safely transport and operate the DRU at the drilling location, have been performed in accordance with Exhibit VIII; (iii) Contractor has delivered to [SPC] the Handover Certificate and its terms have been  reviewed and accepted by [SPC]; (iv) Contractor has taken all necessary steps, according this Agreement, customs requirements and Applicable Law, for the export of such DRU; and (v) such DRU is safely and properly transferred to [SPC] in sheltered waters of Guanabara Bay, Rio de Janeiro State, in Brazil.

16.6. Handover Certificate.☐The Handover conditions agreed between [SPC] and Contractor shall be fully described in the Handover Certificate as per Exhibit XXV.

16.7.  Performance Acceptance. Shall occur only after all TTAS-2 have been issued and approved by [SPC] and all Substantial Completion Punch-list Items have been completed.

16.8. Final Completion.☐The Works shall be finally complete when all requirements for Final Completion have been satisfied and Contractor has delivered a certificate in the form specified in Exhibit XXIX, and [SPC] has accepted such Final Completion Certificate, attesting that Final Completion of the Works has occurred. Acceptance by [SPC] of such Final Completion Certificate shall determine the expiration of this Agreement.

16.9.  Long-Term Obligations☐Final acceptance and payment shall not in any way release Contractor or any surety of Contractor from any unperformed obligations of this Agreement, including warranties, obligations, or any other liabilities for which insurance is required, or any other responsibility of Contractor, including the payment of any and all fines and penalties assessed as a result of Contractor's failure to comply with Applicable Law.   It is expressly understood and agreed to by the Parties that nothing in this Article 16 shall in any way modify or alter Contractor's obligations under Article 17 and Article 20 hereof.

Confidential

## ARTICLE 17

## INSPECTION AND WARRANTY

17.1.  Scope of Warranty.

(a)  General Standards. Contractor shall ensure that all Works performed hereunder, all Equipment supplied hereunder, and the DRU shall comply with all requirements set forth in this Agreement.  Without limiting the preceding sentence, Contractor warrants (i) that the Equipment and all other items furnished hereunder are new and unused, of internationally acceptable standards according to Good Industry Practices, and free from encumbrance, Liens or other security interest, and that only proven technology, in commercial operation at the time of execution of this Agreement, with conditions substantially similar to those contained herein, shall be used; (ii) that the Works and the Equipment shall be free from Defects in materials and/or workmanship and shall conform in all respects with the Scope of Work; and (iii) that the Works shall conform to Good Industry Practices and all Applicable Codes and Standards and Applicable Law.

(b)  Equipment Quality. Contractor shall furnish satisfactory evidence as to the kind, quality, and quantity of all Equipment.  Contractor shall not use any Equipment other than as specified in this Agreement except with prior written approval by [SPC] specifically waiving the pertinent requirements of this Agreement. If Contractor wishes to modify the requirements for any Equipment contained herein, then it shall make written application to [SPC] for [SPC]'s approval, in [SPC]'s sole discretion, prior to performing any such Works.  Such application shall (i) identify the requirements being modified, (ii) certify that the quality of the proposed substitute is equal to or better than that currently specified, and (iii) certify that the substitute is suited to the same use and capable of performing the same function as that specified.  If the preceding requirements are not followed, then any substitution shall constitute a Default by Contractor.  All Equipment and material shall be new and manufactured, built, applied, installed, connected, operated (during start-up and testing), cleaned and conditioned in accordance with the instructions and warranties of the applicable vendor, manufacturer, fabricator or processor.  Contractor shall obtain (or cause to be obtained) manufacturers' warranties for all Equipment, to be held by [SPC] in [SPC]'s name or assigned to [SPC] pursuant to Section 17.3(b).

(c)  Environmental Compliance. Contractor is fully responsible for ensuring that the Works are performed in an environmentally sound manner, in compliance with all provisions of this Agreement regarding the environment and is in compliance with all Environmental Laws.  In the event of any non-compliance by Contractor or any member of Contractor Group with Environmental Law, or the occurrence of any environmental condition (including any Release) caused by any member of Contractor Group, Contractor shall notify [SPC] thereof as soon as reasonably possible after having knowledge thereof, and in no event later than one (1) day after such occurrence.  Contractor shall, at its sole cost and expense, be

Confidential

responsible for all fines and penalties associated with such non-compliance, and remediate the Release of any substance or other event in violation of this Section 17.1(c) and shall repair any damage caused thereby. Contractor's obligations under this Section 17.1(c) shall not be subject to any limitation of liability contained in this Agreement, except for the provisions of Section 22.6.2, and shall survive termination of this Agreement.

(d)     Local Content Compliance. Contractor is fully responsible for ensuring that Brazilian Local Content requirements are met in accordance with the terms of this Agreement.

17.2. [SPC] Right to Inspect.

(a)     General Rights. All Works shall be subject to inspection by [SPC] at all times to determine whether the Works conform to the requirements of this Agreement, for which purpose [SPC], its officials or authorized representatives shall at all times have unrestricted right to access to all locations where the Works are in progress, whether on the Site or any other places, including Subcontractors' premises where any Works or parts thereof are being manufactured, stored or prepared for delivery to Contractor. Contractor shall furnish [SPC] with access to all locations where Works are in progress, including locations not on the Site. If, in the judgment of [SPC], any Works are Defective, then Contractor shall, at its own expense, promptly repair or replace the Defective Works. Subject to Contractor's right to pursue a dispute under Article 24, the decision of [SPC] shall be conclusive as to whether the Works are conforming or Defective, and Contractor shall comply with the instructions of [SPC] in all such matters while pursuing any such dispute. If it is later determined that the Works were not Defective, then [SPC] shall reimburse Contractor for all costs incurred in connection with such repair or replacement and a Change Order shall be issued for such amount and shall address any impact the repair or replacement may have had on the Project Schedule. If Contractor fails, after a reasonable period of time not to exceed seven (7) Days, to repair or replace any Defective Works, or to commence to repair or replace any Defective Works, then [SPC] may repair, replace or have the Defective Works repaired or replaced and the expenses thereof shall be reimbursed by Contractor, and Contractor shall not be entitled to any extension of the Project Schedule.

(b)     No Obligation to Inspect. [SPC]'s right to conduct inspections under Section 17.2(a) shall not obligate [SPC] to do so. Neither the exercise of [SPC] of any such right, nor any failure on the part of [SPC] to discover or reject Defective Works, shall be construed to imply an acceptance of such Defective Works or a waiver of such Defect.

(c)     Cost of Disassembling. The cost of disassembling or dismantling finished Works for the purposes of [SPC]'s control, and of reassembling such portions (together with any delay associated therewith) shall be borne by [SPC] if such Works are found to conform with the requirements of this Agreement, and by Contractor if such Works are found to be Defective.

Confidential

17.3.  <u>Warranty of Defects and Services.</u>

  (a)  <u>Warranty Period</u>. For the DRU Contractor shall promptly correct, repair or replace, and properly install, at no cost to [SPC], any Defective Works, and any part of the DRU or other property which is damaged or affected by Defective Works, if the Defect appears, is discovered or occurs during the 12 (twelve) month-period (the "<u>Warranty Period</u>") commencing on the actual date of Handover of such DRU. Any labor, services, Equipment and materials furnished by Contractor to correct any Defect shall be guaranteed for an additional 12 (twelve) month warranty period starting as of the date that the correction, repair or replacement work is completed.

  (b)  <u>Additional Warranties</u>. Without limiting Contractor's obligations hereunder to warrant the Works, Contractor shall assign to [SPC] all rights under any warranties it may receive or be entitled to from Subcontractors and suppliers. Contractor shall execute such additional documents as [SPC] may require evidencing that assignment to [SPC].

  (c)  <u>Remedy</u>. [SPC] shall provide notice to Contractor of the discovery of any Defective Works as soon as reasonably practicable after such discovery. Contractor shall correct, repair or replace such Defective Works, and any other portions of the Project damaged or affected by such Defective Works, immediately and on an expedited basis, at no cost to [SPC]. [SPC] shall provide Contractor with access to the relevant DRU sufficient to perform its warranty obligations under this Agreement, so long as such access does not unreasonably interfere with operation of such DRU or any other DRU, and subject to any reasonable security or safety requirements of [SPC]. Any change to parts or Equipment that would alter the requirements of this Agreement may be made only with prior written approval of [SPC] in accordance with the terms of <u>Section 17.1(b)</u> hereof.

  (d)  <u>Repair by [SPC]</u>. Should Contractor, after notification of a breach of a warranty under <u>Section 17.3(c)</u>, fail to commence remedial action within a reasonable period of time not to exceed seven (7) Days, or delay in continuing or completing such remedial action, [SPC] may, upon written notice to Contractor, correct or have such Defect(s) corrected in accordance with the provisions of this Agreement. In such case Contractor shall be liable for all costs, charges and expenses incurred by [SPC] in connection therewith, upon receipt of an invoice from [SPC] and provided that (i) such costs, charges and expenses shall be calculated on a time and material basis and (ii) the Statement of Price Formation presented in Contractor's original bid proposal shall be used as a reference; <u>provided</u> always that the Contractor's total and cumulative liabilities hereunder shall be subject to the limitation of liabilities under <u>Article 22</u>, as well as the exclusions therefrom, and further provided always that [SPC] shall give the Contractor free and unfettered access to the Works.

17.4.  <u>Warranty Exclusions</u>. Notwithstanding the foregoing, Contractor shall not in any event be responsible or liable for:

PRO-FORMA CONTRACT       Page 64 of 85

(i)   Repairing / dismantling / reassembling of objects / parts / equipment other than Contractor's own work as guaranteed herein;

(ii)  Costs of heavy lift operations offshore or organizing the same;

(iii) The costs of routine maintenance of the DRU;

(iv)  The costs of repairing damage to the DRU or of correcting any such defects which result from or are due to:

    a.    Normal fair wear and tear;

    b.    Incorrect operation of or failure to maintain the DRU by [SPC]; or

    c.    Actual operating conditions being different from those specified in this Agreement (including in Exhibit II) or any Change Orders;

(v)   Any materials or equipment supplied by [SPC] or for any damage caused by any defect in such materials or equipment not attributable to Contractor; and

(vi)  Any costs in addition to Contractor's guarantee pursuant to Section 17.3.

17.4.1 In addition to the above, if the remedial work requires Contractor to complete work offshore and/or such work requires work below the waterline and/or is required to be completed in dry dock, [SPC] shall make all necessary arrangements at its own cost to facilitate and ensure Contractor has the necessary access required in order to complete the remedial work.  In no event shall Contractor be responsible for any delay or time taken or lost for events arising out of this paragraph and Section 17.3(c).


# ARTICLE 18

## ASSIGNMENT AND GUARANTEE

18.1.  Assignment.☐ This Agreement shall not be assigned or transferred by Contractor in whole or in part without [SPC]'s prior written consent, which [SPC] may grant or withhold at its sole discretion.  Notwithstanding the provisions of any assignment, Contractor shall together with any assignee remain jointly and severally liable to [SPC] for the due performance of all Contractor's obligations under this Agreement.

18.2.  Guarantee.☐Contractor may not establish or authorize the establishment of any guarantee over this Agreement (including any credits arising hereunder), nor agree with legal acts to the same effect, at any title, fully or partially, unless upon prior written authorization by [SPC].

18.3.  Contractor not to be Released. ☐The assignment or establishment of guarantees permitted above does not release Contractor from any of its contractual obligations hereunder.  Should [SPC] agree and authorize a partial subcontracting of the Contractor's obligations, the Contractor will remain responsible to [SPC] for any actions or omissions by any Subcontractor.

18.4.  Assignment by [SPC].☐At its sole discretion and without any previous consent from Contractor, [SPC] may pledge or assign its rights and obligations in and to this Agreement in whole or in part to any entity in which [SPC] or an Affiliate of [SPC] has an equity interest ("Owner"), or to any Lender or creditor upon written and prior notice to Contractor.

Confidential

EIG00026227

EIG_KEP_00166707

Contractor also agrees and undertakes, if so requested by [SPC] or by such Owner, Lender or creditor, to execute a specific agreement or agreements with [SPC], Owner, Lender or creditor, under terms deemed satisfactory to Contractor and [SPC] or Owner or such Lender or creditor, including an amendment and/or replication of this Agreement to reflect such whole or partial assignment. Such specific agreement may also provide for Contractor's obligation to furnish financial and accounting information, as well as any other information of any nature relating to this Agreement and the performance of the Works. Such assignment shall not impose on Contractor any additional obligation or adversely affect any right or remedy available to Contractor hereunder.

18.5. <u>Right of Termination.</u>☐ When duly assigned in accordance with the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the assignee; any assignment not in accordance with the provisions of <u>Article 18</u> shall be void and without force or effect. Any attempt of Contractor to assign this Agreement in violation of this <u>Article 18</u> shall grant [SPC] the right, but not the obligation, to terminate this Agreement at its sole option pursuant to <u>Section 21.1(a)</u>.

## ARTICLE 19

## SUBCONTRACTING

19.1. <u>Subcontractors.</u>☐ [SPC] acknowledges and agrees that Contractor intends to have portions of the Works executed by Subcontractors pursuant to written Subcontracts between Contractor and certain Subcontractors previously approved by [SPC].

19.2. <u>Subcontractors Qualification.</u>☐All Subcontractors shall be reputable, qualified firms with an established record of successful performance in their respective trades performing identical or substantially similar work. All contracts with Subcontractors shall be consistent with the terms or provisions of this Agreement including in the case of Major Subcontracts as heretofore defined, that they contain provisions in the form and substance of <u>Section 22.1</u> and <u>Article 14</u>. No Subcontractor is intended to be or shall be deemed to be a third party beneficiary of this Agreement. Contractor shall be fully responsible to [SPC] for the acts and omissions of Subcontractors and of persons directly or indirectly employed by them, as it is for the acts or omissions of persons directly employed by Contractor. The work of any Subcontractor shall be subject to inspection by [SPC] to the same extent as the Works of Contractor. All Subcontractors and personnel of Subcontractors are to be instructed in the terms and requirements of [SPC]'s approved safety and environmental protection regulations, including the [SPC] Policies, and are expected to comply with such regulations. In the event Subcontractor's personnel does not adhere to such regulations, then they shall be removed by Contractor. In no event shall Contractor be entitled to any adjustment of the Contract Price or Project Schedule as a result of any increase in cost due to compliance with such regulations or due to the removal of personnel.

19.3. <u>Proposed Subcontractors.</u>☐In the event that Contractor is considering the selection of a Subcontractor for a Major Subcontract, Contractor shall notify [SPC] of its proposed Major Subcontractor as soon as possible during the selection process and furnish [SPC] all information reasonably requested by [SPC] with respect to Contractor's selection criteria (including copies of bid packages furnished to prospective Major Subcontractors and the qualifications of the proposed Major Subcontractors), or in no event less than thirty (30) Days

Confidential

prior to the execution of a Major Subcontract, whichever is earlier.  Contractor shall not enter into any Major Subcontract with a proposed Major Subcontractor rejected by [SPC] in accordance with the preceding sentence.  [SPC] shall undertake in good faith to review the information provided by Contractor pursuant to this Section 19.3 expeditiously and shall notify Contractor of its decision to accept or reject a proposed Major Subcontractor as soon as practicable after such decision is made.

19.3.1 The Subcontractors shall comply with and perform for the benefit of [SPC] all requirements and obligations of Contractor to [SPC] under this Agreement, as such requirements and obligations are applicable to the performance of the work under the Major Subcontract, including but not limited to an indemnity in substance the same as that included in Section 22.1 and the insurance requirements specified in Article 14.

19.4.  Subcontracts.

19.4.1 Major Subcontracts.  Notwithstanding the provisions under Section 19.3, Contractor shall furnish [SPC] with a copy of all Major Subcontracts within ten (10) Days after execution thereof. Without prejudice to other applicable provisions of this Agreement, each Major Subcontract will contain the following provisions:

> (a)   It is the responsibility of Contractor to fully disclose this Agreement and the contents thereof, except for commercial terms, to any Subcontractor. Contractor shall undertake all necessary action to prevent [SPC] from becoming liable directly to any claims by Subcontractors and shall defend, indemnify and hold each member of [SPC] **Group** free and harmless from and against any claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group as a result of any such claim by any Subcontractor.  Without limiting the generality of the foregoing, Contractor shall require that all Subcontractors release and waive any and all rights against [SPC] and the Lenders for recovery of payment of any moneys.

> (b)   No Subcontract, supply contract, purchase order or other agreement entered into by Contractor for the purposes of performing the Works shall bind or purport to bind [SPC].   Contractor shall ensure that each such Subcontract, supply contract, purchase order or other agreement contains a provision permitting assignment thereof to [SPC], in the event this Agreement is terminated by [SPC] pursuant to Section 21.1 or upon Contractor's written consent.    Subject to the following sentence, Contractor hereby assigns to [SPC] (and [SPC]'s assigns) all of its interest in any Subcontracts, purchase orders and warranties (or any portion thereof relating to the DRU if any such Subcontracts, purchase orders and warranties relate to other projects or Contractor) now existing or hereafter entered into or received by Contractor for performance of any part of the Works, which assignment will be effective upon acceptance by [SPC] in writing only as to those Subcontracts, purchase orders and warranties

**Confidential**

which [SPC] designates in such writing. [SPC] agrees not to exercise any right to assignment of any Subcontract, purchase order or warranty unless and until (i) any obligation by any Subcontractor thereunder extends beyond the expiration of this Agreement, including the last day of the Warranty Period, (ii) [SPC] terminates this Agreement in accordance with its terms or (iii) Contractor has failed to perform any of its obligations under this Agreement and [SPC] takes no action that would release or otherwise compromise any right or claim of Contractor against any Subcontractor under the applicable Subcontract or purchase order.

    (c)    All Subcontracts, supply contracts, purchase orders or other agreements shall provide for the right of unilateral termination by Contractor of all or a portion of such Subcontract, supply contract, purchase order or other agreement without any penalties to Contractor or to [SPC]. If so requested by [SPC], following any termination of this Agreement for convenience, or by reason of Default by Contractor, Contractor shall terminate any such agreements, Subcontracts, supply contract, purchase order or other agreement. Each Subcontract, supply contract, purchase order and other agreement shall also provide that, in the event of termination, title to Equipment or partially completed Works for which [SPC] has paid (whether directly or indirectly) shall pass to [SPC] and Contractor, at the direction of [SPC], will instruct the Subcontractor with respect to the disposition of such Equipment or Works.

19.4.2 Nothing contained herein or in any such Subcontract, supply contract, purchase order or other agreement shall (i) create or constitute any contractual relationship between [SPC] and any Subcontractor, (ii) create any obligation on the part of [SPC] to a Subcontractor or (iii) obligate [SPC] to pay any amount to any Subcontractor.


# ARTICLE 20

## GUARANTEE OF TIMELY COMPLETION

20.1. Guarantee of Timely Completion. Contractor acknowledges that time is of the essence in the performance of this Agreement, and agrees that it shall diligently pursue the Works, assigning to it a priority that will comply with the Project Schedule prepared according to the Project Schedule Baseline specified in Section 11.4, and cause (i) the DRU to satisfy and to achieve Handover on or before the relevant Handover Date and (ii) Final Completion to occur on or before the Required Final Completion Date.

20.2. Liquidated Damages for Delay. The events indicated in the Project Schedule Baseline, Section 11.4, shall be achieved by Contractor in sufficient time to permit Substantial Completion and Handover of the DRU on or prior to the relevant Handover Date.

20.2.1 If Handover of the DRU occurs after the applicable Handover Date, then Contractor shall pay to [SPC], as liquidated damages for such delay, the amount corresponding to the percentage of the Unit Contract Price of such DRU as per Schedule A of Exhibit

PRO-FORMA CONTRACT                    Page 68 of 85

XVIII, indicated below, for each full week of delay, until Handover occurs:

| 1st to 8th week | 0.02% of the Unit Contract Price of the DRU as per Schedule A |
|---|---|
| 9th to 16th week | 0.03% of the Unit Contract Price of the DRU as per Schedule A |
| 17th week onwards | 0.1% of the Unit Contract Price of the DRU as per Schedule A |

20.2.2  Not applicable.

20.2.3  Not applicable.

20.2.4  If Contractor fails to comply with any of its obligations under this Agreement, in a timely manner, Contractor shall pay to [SPC] an amount corresponding to 0.001% (one thousandth of one percent) of the Unit Contract Price of the DRU per day of delay for complying with the related obligation, after elapsed the time period set by the notification of irregularity issued by [SPC].

20.2.5  The maximum total amount of liquidated damages payable under Section 20.2 ("Delay Damages") in respect of the DRU shall be equal to ten percent (10%) of the Unit Contract Price of such DRU. Once this total amount is reached, [SPC] shall have the right, at its option, to terminate this Agreement in accordance with Article 21.

20.2.6  Liquidated damages payable pursuant to this Section 20.2 shall be paid by Contractor in arrears on the final Business Day of each month during which such liquidated damages are incurred. [SPC] will have the right to offset any liability of Contractor under this Article 20 against any amount due or to become due from [SPC] to Contractor under this Agreement.

20.3.  Liquidated Damages Are Not a Penalty. The Parties acknowledge and agree that because of the unique nature of the DRU, the unavailability of substitute facilities, and the effects of delay, it would be impracticable or extremely difficult to determine the actual damages resulting from Contractor's failure to achieve the Handover of the DRU. It is understood and agreed by the Parties that (i) [SPC] shall be damaged by failure of Contractor to meet such obligations, and such damages can and will include any losses incurred by [SPC] or any of its subsidiaries or Affiliates or Partners as end user of the DRU which may result from lost oil production, (ii) it would be impracticable or extremely difficult to fix the actual damages resulting there from, (iii) any sums that would be payable under this Article 20 are in the nature of liquidated damages, and are not a penalty or consequential damages, and (iv) such payment represents a reasonable and appropriate estimate of fair compensation for the losses that may reasonably be anticipated from such failure.

20.4.  Sole Remedy for Delay. Except as provided in Article 21, payment of the Delay Damages shall be [SPC]'s sole and exclusive remedy for Contractor's failure to achieve the Handover of the DRU on or before the applicable Handover Date. Contractor agrees, however, that Delay Damages are intended only to cover damages suffered by [SPC] as a result of delay. Delay Damages also are not be deemed to cover the cost of completion of the Works or other damages and [SPC] shall also be entitled to rely on its other remedies under this Agreement for all Defaults, further to those allowed in law or equity, should [SPC] opt to terminate the

Confidential

Agreement in accordance with Section 21.1. Notwithstanding anything to the contrary, this Agreement and all of its terms with the exception of those provisions identified in Section 25.15, shall expire automatically on the date indicated in Section 11.4.6. [SPC], at its sole option, may agree to extend the date set forth in this Section 20.4.

20.5. No Challenge. Each of the Parties agrees not to challenge the enforceability of the liquidated damages provisions contained herein. If the enforceability of the amount of liquidated damages under this Agreement is successfully challenged by Contractor, or by a third party acting in its place and stead, as being a penalty or unreasonable in amount, Contractor shall instead be liable to [SPC] for all direct and consequential damages, costs and losses incurred by [SPC] in connection with such breach, together with all costs incurred by [SPC] in proving or enforcing the same, without regard to any limitations whatsoever set forth in this Agreement, including waiver of consequential damages.

20.6. Performance Security. In addition to any other performance securities provided herein, Contractor shall furnish a Performance Security for the full and faithful performance of its obligations under this Agreement and any and all performance securities issued subsequently by Contractor to [SPC] to supplement or replace such original Performance Security, in accordance with Item 3.7 of the Instructions to Bidders released by [SPC]'s Affiliate, in connection with Request for Proposal [SPC] # 0003554.09.8, as set forth in Exhibit XXXV. This Performance Security shall be valid until the acceptance by [SPC] of the Performance Acceptance Certificate of the DRU.

## ARTICLE 21

### DEFAULT, TERMINATION AND SUSPENSION

21.1. Default by Contractor.

    (a)   Termination by [SPC] for Default. Contractor shall be in default of this Agreement in the event that any of the following events (each a "Default") occurs and is continuing: (i) Contractor fails to prosecute the Work in accordance with the Project Schedule, with a resulting delay of more than seven hundred and twenty (720) Days for the DRU; (ii) Contractor fails to pay its Subcontractors or to pay its debts as they become due in accordance with relevant contract, Subcontract or Subcontractor's undisputed invoice; (iii) Contractor becomes insolvent or has a receiver appointed, in which case the cure period described below shall not apply; (iv) Contractor violates the anti-assignment provisions of Section 18.5 or makes a general assignment for the benefit of its creditors, in which case the cure period described below shall not apply; (v) Contractor exceeds the maximum Delay Damages allowed in accordance with Section 20.2.5; (vi) Contractor modifies the ownership or composition of its Affiliate relationship with its Nominated Contractor without the prior written consent of [SPC] (subject to [SPC]'s sole and absolute discretion); (vii) Contractor abandons the Works (except due to a termination of the Works permitted by this Agreement); then, upon notice by [SPC] in accordance with Section 25.5 specifying the nature and origin of the alleged Default; and provided, however, Contractor shall not have taken adequate steps

PRO-FORMA CONTRACT            Page 70 of 85

to cure such condition within seven (7) Days counted from the notice by [SPC], or if the Default is impossible to be corrected within such seven (7) Days, and Contractor has commenced such corrective action within seven (7) Days and cures such condition within fourteen (14) Days, [SPC], at its option, without prejudice to the other rights it may have under this Agreement, and without further notice to any Party, may:

(i)   Take such steps as are necessary to overcome the condition, in which case Contractor shall be fully liable to [SPC] and shall pay for the cost thereof;

(ii)  Terminate this Agreement or Contractor's performance of all or any part of the Works, seeking any legal remedies as it may be entitled to under this Agreement; provided that in the event that any Default described in Sections 21.1(a)(vii) through (xii) has occurred and is continuing and has not been cured by Contractor, [SPC] shall not be permitted to terminate this Agreement unless and until Contractor exceeds the maximum Delay Damages allowed in accordance with Section 20.2.5; or

(iii) Seek interlocutory, equitable or injunctive relief requiring performance of Contractor's obligations, it being agreed by Contractor that such relief may be necessary to avoid irreparable harm to [SPC].

Under no circumstances shall [SPC] be responsible for any payments to Contractor hereunder during a Default by Contractor. Notwithstanding any of the foregoing, [SPC] shall not have any affirmative obligation to terminate this Agreement, in the event of a Default.

(b)  Additional Rights of [SPC] Upon Termination. In the event that [SPC] terminates this Agreement in whole or in part  by reason of Contractor's Default, [SPC] may, at its sole option, (i) enter onto the Site and take possession, at its sole discretion, for the purpose of completing the Works of all of the Equipment, materials, tools, supplies, documents, and information of Contractor, (ii) assume any or all of the Subcontracts, at its sole discretion, and (iii) either itself or through others, complete the Works in the most cost-efficient means reasonably practicable.  To the extent [SPC] exercises any of its additional rights upon termination, Contractor shall cooperate fully with, and provide all reasonable assistance to [SPC].  Contractor shall not be entitled to receive any further payment from [SPC] until the Works have been fully completed and accepted by [SPC], and any Disputes in connection with such completion are resolved.   [SPC]'s rights under this Section 21.1(b) are in addition to any other rights provided for under this Agreement.  [SPC] agrees to act reasonably and use its best efforts to mitigate any costs it might incur in connection with any termination for default by Contractor.

(c)   Not applicable.

21.2. Termination for Convenience by [SPC]. [SPC] shall have the right to terminate for convenience this Agreement or Contractor's performance of all or any part of the Works by providing Contractor with a written notice of termination, to be effective thirty (30) Days after the receipt by Contractor of such Notice.  Upon termination for convenience, Contractor shall

Confidential

(i) as soon as practicable discontinue the Works on the date and to the extent specified in such notice, (ii) place no further orders for Subcontracts, Equipment, or services except as may be necessary for completion of such portion of the Works currently being undertaken so as to avoid the impact of any remobilization, (iii) promptly make every reasonable effort to procure cancellation or transfer/assignment of the Subcontracts and rental agreements to [SPC], or to any of its appointees, upon terms satisfactory to [SPC] to the extent they relate to the performance of the Works then discontinued and to the extent requested by [SPC], (iv) cooperate with [SPC] for the efficient transition of the Works, and (v) thereafter execute only that portion of the Works as may be necessary to preserve and protect Works already in progress and to protect Equipment at the Site or in transit thereto, and to comply with any Applicable Law. Contractor shall be paid the value of the Works performed prior to termination plus its reasonable demobilization and dismantling costs and reasonable direct and associated close-out costs, but in no event shall Contractor be entitled to receive any amount for overhead or anticipatory profit.

21.3.   Suspension of Works by [SPC]. [SPC] may, for any reason, at any time and from time to time, by written notice to Contractor, suspend the carrying out of the Works or any part thereof, whereupon Contractor shall suspend the carrying out of the Works or any part thereof for such time or times and in such manner as [SPC] may require. During any such suspension, Contractor shall properly protect and secure the Works in such manner as [SPC] may reasonably require.  Unless otherwise instructed by [SPC], Contractor shall during any such suspension maintain its staff and labor on or near the Site and otherwise ready to proceed with the Works upon receipt of [SPC]'s further instructions. [SPC] and Contractor shall negotiate a Change Order to address the impact of such suspension on the Contract Price and on the Project Schedule. The Contract Price shall be adjusted for the reasonable costs (including actual overhead and reasonable profit) of such suspension, including demobilization and remobilization costs, if required, along with appropriate supporting documentation to evidence such costs, and the Project Schedule shall be equitably adjusted to reflect such suspension.

21.4.   Termination by Contractor.□Contractor may terminate this Agreement or suspend the execution of the Works in the following circumstances:

21.4.1 Any undisputed amount due and payable to Contractor by [SPC] is not paid within sixty (60) Business Days after Contractor's notice of non-payment to [SPC]; provided that Contractor has achieved the corresponding portion of the Works set forth in the Project Schedule.

21.4.2 [SPC], by written notice to Contractor, suspends the Works pursuant to Section 21.3 for more than 180 (one hundred and eighty) consecutive days.

21.4.3 If this Agreement is terminated by Contractor pursuant to the terms of this Section 21.4, [SPC] shall pay to Contractor, within sixty (60) Business Days after the date of the termination notice, the reasonable value of the Works performed prior to termination plus any reasonable mobilization costs plus reasonable direct close-out costs. In no event shall Contractor be entitled to receive any amount for overhead or anticipatory profit following such termination. However, if there is a dispute with respect to the amount owed, [SPC] shall pay all undisputed amounts on or before the due date hereof and the Parties may submit the dispute for resolution as set forth in

PRO-FORMA CONTRACT

Confidential

EIG00026234

EIG_KEP_00166714

Article 24.

21.5. <u>Suspension of Work by Contractor.</u> □Contractor may suspend its performance of the Works, in whole or in part, by sending a suspension notice to [SPC], at least 5 (five) Business Days in advance (which must contain the suspension start date and the reasons of such suspension), if any of the following events occurs and is continuing:

    (a)  [SPC] fails to supply materials or equipment that it is obligated hereunder to supply;

    (b)  Contractor is prevented from performing the Works due to any order or directive issued by any Government Authority; or

    (c)  [SPC] fails to pay Contractor any amount due and payable hereunder for a consecutive period of more than sixty (60) days.

If Contractor validly suspends the performance of the Works pursuant to this <u>Section 21.5</u>, the Parties shall negotiate a Change Order to address the impact of such suspension on the Contract Price and on the Project Schedule at such time as Contractor's performance of the Works resumes.


# ARTICLE 22

## INDEMNITIES; LIMITATIONS OF LIABILITY

22.1.  <u>Contractor's Indemnification Obligation.</u> Subject to the other provisions of this Agreement, Contractor agrees to defend, indemnify and hold each member of [SPC] Group free and harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group arising out of or resulting from the negligence or willful misconduct of, or the violation of any Applicable Law by, or the material breach of this Agreement by, any member of Contractor Group.  The amount of any loss or liability for which indemnification is provided under this Section 22.1 shall be reduced to take account of any insurance payment realized by [SPC] under the Builder's Risk policy.

22.2.  <u>[SPC]'s Indemnification Obligation</u>. Subject to the other provisions of this Agreement, [SPC] agrees to defend, indemnify and hold each member of Contractor Group  free and harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Contractor Group and related attorneys' fees) suffered or incurred by any member of Contractor Group arising out of or resulting from the negligence or willful misconduct of, or the violation of any Applicable Law by, or the material breach of this Agreement by, any member of [SPC] Group.

22.3. <u>Patent Indemnification</u>

PRO-FORMA CONTRACT                 Page 73 of 85

EIG00026235

EIG_KEP_00166715

22.3.1   Each member of Contractor Group shall defend, indemnify and hold each member of [SPC] Group free and harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of [SPC] Group and related attorneys' fees) suffered or incurred by any member of [SPC] Group arising out of any actual or alleged infringement of patents, trademarks, or other intellectual property rights, or the improper use of other proprietary rights that may occur in connection with any member of Contractor Group's performance of the Works or the ownership or use of the Equipment by any member of Contractor Group or any member of [SPC] Group.  Subject to Section 22.4, Contractor shall have sole authority for the control of the defense of any such claims.   Furthermore, should any such claim materially impair the performance of the Works by any member of Contractor Group or its continued operations, Contractor shall, at its own expense, promptly procure such intellectual property or other rights as may be necessary for such member of Contractor Group to continue its performance of the Works so as not to materially impair the Project Schedule or continuity of operation. Contractor's obligations under this Section 22.3.1 are subject to limitation of liability up to [US$ 100,000,000 (one hundred million American Dollars)], notwithstanding the provisions under Section 22.6.

22.3.2   Each member of [SPC] Group shall defend, indemnify and hold each member of Contractor Group free and harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Contractor Group and related attorneys' fees) suffered or incurred by any member of Contractor Group arising out of any actual or alleged infringement of patents, trademarks, or other intellectual property rights, or the improper use of other proprietary rights that may occur in connection with any member of [SPC] Group's performance of its obligations hereunder or use of the Equipment by any member of [SPC] Group.  Subject to Section 22.4, [SPC] shall have sole authority for the control of the defense of any such claims. Furthermore, should any such claim materially impair the performance by [SPC] of its obligations under this Agreement, [SPC] shall, at its own expense, promptly procure such intellectual property or other rights as may be necessary for it to continue its performance of its obligations hereunder so as not to materially impair the Project Schedule or continuity of operation.  [SPC]'s obligations under this Section 22.3.2 are not subject to or included in the calculation of any limitations of liability contained in this Agreement.

22.4. Notice.  The Parties shall give reasonably prompt written notice to the other of any and all injuries to Persons or damage to property (including any claim with respect thereto) of which such Party has notice or knowledge and which in any way arises from the performance of the Works or this Agreement. The indemnifying Party shall not settle any suit for which it is providing indemnity under this Article 22 without the prior written consent of indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed.

22.5. Survival and Duration  The indemnification provisions contained in this Agreement shall survive after Contractor's completion of the Works hereunder and the termination of this Agreement. Claims for indemnification may be made hereunder so long as any claim may be made in respect of such matters under any applicable statute of limitations; provided, however, that the foregoing shall not affect any claim made in good faith prior to the date of such

Confidential

expiration.

22.6. The liability of each Party hereunder shall  not exceed, in the aggregate, an amount equal to ten percent (10%) of the Contract Price.□

22.6.1 For the purpose of calculating whether this limitation of liability has been met, the following items shall be excluded and shall not be subject to any limitation of liability:

(a) losses and damages resulting from any member of Contractor Group's or any member of [SPC] Group's, as applicable, gross negligence, willful misconduct, fraud  related to this Agreement or any Subcontract;

(b) abandonment of the Works by Contractor, or deliberate and unjustified interruption of the Works by Contractor, except when directed by an existing provision of this Agreement or in case of an unjustified non-payment of amounts due by [SPC];

(c) losses and damages resulting from any member of Contractor Group's violation of any applicable Environmental Law or the occurrence of any environmental condition caused by any member of the Contractor Group;

(d) losses and damages resulting from any member of Contractor Group's non-observance of any aspect of the fiscal, labor and social security laws, or of any provisions in this Agreement related to the same matters;

(e) if [SPC] unjustifiably withholds payments due to Contractor;

(f) any third party liabilities arising as a result of any violation by any member of Contractor Group or any member of [SPC] Group, as applicable, of any right of third parties provided that in such case Contractor shall be liable up to the limit of [US$ 100,000,000 (one hundred million American Dollars)];

(g) termination for convenience by [SPC], as per Section 21.2 or suspension of Works by [SPC], as per Section 21.3; and

(h) in case [SPC] fails to provide and maintain the insurance under its responsibility, as per Section 14.1.

22.6.2 In case of oil spill and other wastes discharge at sea, due to any member of the Contractor Group, Contractor shall be liable up to the limit of [US$ 1,000,000 (One million United States Dollars)], per event and its consequences.

22.6.3 [SPC] shall be entitled to the right of recourse against Contractor in case it is obliged to pay for any losses and damages caused by Contractor to third parties.

22.6.4. The amount to be collected upon recourse shall include whatever third parties obtain in and off-court, plus all expenses (court and off-court fees, attorney's fees, among others).

22.7. Not applicable.

Confidential

22.8.   Consequential Damages.   Notwithstanding any other provision of this Agreement to the contrary, and except as otherwise set forth in Sections 20.5 and 22.3, in no event shall [SPC] or Contractor be liable to each other for any indirect, special, incidental or consequential loss or damage (other than such damages as may be included as a component of liquidated damages hereunder) including loss of profits or revenue, loss of opportunity or use incurred by either Party to the other, or like items of loss or damage, and each Party hereby releases the other Party therefrom.

## ARTICLE 23

## FORCE MAJEURE

23.1.  No Liability.☐ Notwithstanding anything to the contrary in this Agreement, neither Contractor nor [SPC] shall be liable to the other for any damages, claims or suits of any nature arising out of delays or noncompliance of its obligations under this Agreement in cases where such delay or noncompliance is due to Force Majeure.

23.1.1  The Party invoking Force Majeure shall give written notice to other Party pursuant to Section 25.5 immediately following the occurrence of the event of Force Majeure, which shall specify the details, and the anticipated duration of such event of Force Majeure. Once the affected Party is no longer prevented from performing its obligations under this Agreement as a result of an event of Force Majeure, it shall promptly notify the other Party of this fact. In the event that a Party fails to acknowledge the occurrence of an event of Force Majeure, the Party claiming Force Majeure shall bear the burden of proof.

23.1.2  A Force Majeure event shall be deemed to have commenced not earlier than seventy-two (72) hours prior to the giving of such notice. The affected Party shall, in such notice, indicate what actions it is taking to mitigate the effects of such Force Majeure event.   The affected Party shall further provide the other Party with (i) periodic supplemental written notices during the period of the Force Majeure event regarding any change, development, progress, or other relevant information concerning the Force Majeure event as per Section 3.17(f), and (ii) written notice promptly after the termination of the Force Majeure event.

23.2.  Prevention and Reduction.☐Both Parties shall: (i) make all reasonable efforts to prevent and reduce to a minimum and mitigate the effect of any delay or cost increase occasioned to the Works by any event of Force Majeure; and (ii) use their reasonable efforts to ensure resumption of normal performance of the Works promptly after the termination of any event of Force Majeure.

23.3.  Mutual Consultation.☐ If an event of Force Majeure has occurred, the Parties shall consult with one another as to the effect, if any, of such event of Force Majeure, and if such effect is to delay the completion of the Works.  In such a case, the Project Schedule shall be equitably adjusted to take into account the effect that the Party claiming an event of Force Majeure demonstrates is actually and necessarily attributable to such event of Force Majeure.

Confidential

Any such adjustment shall take into account rescheduling or other actions, as Contractor or [SPC] may reasonably be expected to undertake, in order to minimize the material adverse effect of such event of Force Majeure on the Project Schedule. Each Party shall bear its own increased costs arising from each event of Force Majeure.

23.4. Definition. For the purposes of this Agreement, "Force Majeure" will be considered as any act, event or condition that (i) renders it impossible for the affected Party to perform its obligations under this Agreement, (ii) to the extent that such events are beyond the reasonable control of the affected Party and not due to its fault or negligence, and (iii) could not have been prevented or avoided by the affected Party through the exercise of due diligence, including the expenditure of any reasonable sum taking into account the Contract Price. Force Majeure includes catastrophic storms or floods, lightning, earthquakes and other typical acts of God, wars, civil disturbances, revolts, insurrections, sabotage, commercial embargoes, fires, explosions, actions of a Governmental Authority that were not requested, promoted or caused by the affected Party, that prevent a Party from timely discharging its duties and obligations hereunder. Notwithstanding the foregoing, Force Majeure shall not include any of the following: (a) economic or financial hardship; (b) changes in market conditions; (c) late delivery or failure of Equipment, unless otherwise caused by Force Majeure hereunder; (d) strikes and other industrial disturbances caused exclusively by Contractor, its Subcontractors or their employees; (e) nonperformance or delay by Subcontractors, unless otherwise caused by Force Majeure hereunder; (f) weather conditions which could reasonably be anticipated by experienced contractors (and any Site conditions arising therefrom); or (g) robbery or theft experienced with warehoused, stored or in-transit Equipment, materials or any other effects under Contractor's responsibility, whether or not owned by Contractor.

23.5 Termination for Force Majeure. In the event a Force Majeure event makes the performance of the Works impossible for a continuous period of 90 (ninety) days or more, either Party may terminate this Agreement. In the event of such termination, neither Party shall have further obligation to the other hereunder and Contractor shall not be entitled to any portion of the Contract Price which has not been paid prior to the occurrence of the event of Force Majeure unless [SPC] accepts partially performed or partially completed Works, in which event Contractor shall be paid the reasonable value of said partially performed or completed Works.

## ARTICLE 24

## DISPUTE RESOLUTION

24.1. Amicable Resolution.

   (a)   In the event of any dispute, claim, or controversy arising out of, relating to, or in connection with this Agreement, including any dispute as to the breach, validity, or existence of this Agreement (a "Dispute"), the Parties agree in the first instance to submit the Dispute to a joint negotiation between two senior management officers, one from each Party. Each Party shall nominate its respective senior management officer within fifteen (15) Days from the earliest date on which a Party shall be deemed to have given notice, pursuant to Section

Confidential

25.5, of a Dispute (the "Dispute Notice"). The two senior management officers shall meet at a mutually agreeable time and location within thirty (30) Days after the Dispute Notice is given to try to resolve the Dispute in an equitable and good-faith manner.  If the Parties cannot agree on a time and location for the senior officers meeting, then they may proceed directly to proceedings under Sections 24.2 or 24.3, as applicable. The Parties expressly acknowledge and agree that [SPC]'s right to terminate this Agreement pursuant to Article 21 is not limited in any way by the Dispute resolution provisions of this Article 24.

(b) Notwithstanding anything in this Article 24, the Parties may at any time, without prejudice to any other proceedings, seek to settle any Dispute through mediation before one neutral mediator who shall be fluent in the English language and who shall be qualified by experience and education to mediate disputes concerning international commercial agreements.  If the Parties elect to settle a Dispute through mediation but cannot agree on a neutral mediator and a method to conduct the mediation, the Parties agree to submit the matter to mediation to be conducted in English under the ICC ADR Rules in force on the date of the dispute.  The Parties agree that the neutral mediator cannot serve as the Expert, as that term is defined in Section 24.2, or as an arbitrator under Section 24.3.

24.2.  Disputes of Technical Nature.

(a) Any Dispute that concerns a technical matter which can be reasonably settled by empirical studies and which relates primarily to technical issues, rather than commercial, economic, financial, or accounting issues, shall be deemed a "Technical Dispute".

(b) If a Technical Dispute exists and is not amicably resolved under Section 24.1, the Parties agree to submit the Technical Dispute to an independent petroleum industry engineering expert (the "Expert"), who shall be fluent in the English language. If the Parties cannot mutually agree on the Expert within fifteen (15) Days after the senior officers' meeting under Section 24.1, the Parties agree that the International Chamber of Commerce's Centre for Expertise (the "Centre") shall appoint the Expert in accordance with the Rules of Expertise of the International Chamber of Commerce that are in effect on the date of the dispute. The Parties request that the Centre shall endeavor to appoint the Expert within fifteen (15) Days following receipt of a request to appoint the Expert.

(c) Within fifteen (15) Days after the Expert is agreed to or appointed under Section 24.2(b), each Party shall provide the Expert and the other Party with a written notice in English detailing the issues in the Technical Dispute, along with copies of all supporting documentation on which the Party is relying to support its position. The Expert shall complete all proceedings regarding the Technical Dispute and issue a written decision (the "Decision") in English as soon as reasonably possible, but in no event later than thirty (30) Days after the Expert is agreed to or appointed under Section 24.2(b). If the Expert needs additional time to issue the Decision, the Expert shall notify the Parties in

Confidential

writing and shall be entitled to an additional period not to exceed fifteen (15) Days, unless the Parties agree otherwise.

(d)   The Decision shall be final and binding on the Parties, unless a Party provides the other Party and the Expert with written notice of dissatisfaction (the "Dissatisfaction Notice") with the Decision within fifteen (15) Days after the issuance of the Decision. If a Party provides Dissatisfaction Notice, the Technical Dispute shall be finally resolved through arbitration under Section 24.3.

24.3.  Binding Arbitration.

(a)   Subject to the requirements of Sections 24.1 and 24.2, the Parties agree that any Dispute shall be finally resolved by binding arbitration before three (3) arbitrators in New York City, New York, U.S.A., pursuant to the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") in force on the date of the Dispute, except as those rules may be modified by this Article 24.

(b)   Except as set forth in this Article 24, the Parties agree that Arbitration shall be the exclusive means of resolving the Dispute.  No Party shall refer or attempt to refer a Dispute to any court or other tribunal for resolution.

(c)   The Arbitration shall be conducted in the English language.  Unless agreed otherwise, all documents submitted in connection with the arbitration shall be in the English language or, if submitted in any other language, shall be accompanied by a certified English translation.

(d)   The Party filing the Request for Arbitration (the "Request") under the ICC Rules shall deliver a copy of the Request to the other Party at the same time and in the same manner as it delivers the Request to the Secretariat of the International Court of Arbitration (the "Court") of the International Chamber of Commerce. The Request shall be made within a reasonable time after the Dispute arises.

(e)   The arbitral tribunal (the "Tribunal") shall consist of three (3) arbitrators who shall be qualified by experience and education to arbitrate disputes concerning international commercial agreements and who shall be chosen as follows:

(i)   Each Party shall nominate one arbitrator within twenty (20) Days after the filing of the Request with the Secretariat of the Court. If a Party does not timely nominate an arbitrator, that Party's arbitrator shall be appointed by the Court pursuant to the ICC Rules; and

(ii)   Within twenty (20) Days after the latest date on which one of them has been confirmed or appointed by the Court, the two arbitrators selected under Section 24.3(e)(i) shall jointly nominate the third arbitrator, who shall act as chairman of the Tribunal after being confirmed by the Court. If the two arbitrators cannot agree on the

Confidential

third arbitrator, the Court shall appoint the third arbitrator pursuant to the ICC Rules.

(f)    The Tribunal's award shall be made and payable in U.S. Dollars after any tax or other deduction. The award shall include interest from the date of breach, if breach of this Agreement is found. The Tribunal shall also fix an appropriate rate of interest from the date of the award until the award is paid in full.

(g)    The Parties agree that judgment upon the Tribunal's award may be entered in any court having jurisdiction thereof, and may not be challenged in any court, either at the place of arbitration or elsewhere. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any such enforcement proceeding and to the proceeding being brought in an allegedly inconvenient forum. Each Party also hereby agrees to accept service of process in any such enforcement proceeding.

(h)    The Parties agree that each Party shall bear the fees and expenses of the arbitrator nominated by it (or on its behalf) and share of the ICC administrative expenses assessed by the Court.  The fees and expenses of the third arbitrator shall be borne by the Parties in equal parts.  Any other arbitration fees and expenses, including attorneys' and expert fees, shall be allocated by the Tribunal in its award.  The Parties agree to instruct the Tribunal to allocate such fees and expenses to the Parties in a proportion to reflect their relative success on the merits (including the successful assertion of any defense).

(i)    The Tribunal shall have the authority to enter interim, conservatory, injunctive, and declaratory relief, if appropriate under applicable substantive law. The Tribunal shall also have the power to determine whether a Dispute is arbitrable. The Tribunal shall not, however, have the power to award punitive or exemplary damages. Notwithstanding anything in this subsection (i), each Party retains the right to apply for injunctive relief in any court having jurisdiction thereof prior to or during the arbitration, and any such application shall not be deemed to be an infringement or waiver of the ability to arbitrate under this Section 24.3 and shall not affect the relevant powers reserved to the Tribunal.

(j)    In accordance with Section 25.8, the substantive law of the State of New York, without regard to its conflict-of-laws principles, shall apply to the arbitration. The Tribunal shall not have the power of an *amiable compositeur*.

(k)    Unless the Parties agree otherwise, the arbitration shall be completed within the shorter of (i) the time limit under the ICC Rules, or (ii) two hundred seventy (270) Days after the confirmation or appointment of the third arbitrator under Section 24.3(e)(ii).

(l)    Unless this Agreement is terminated in accordance with its terms, each Party shall continue to perform its obligations under this Agreement during the course of any of the dispute resolution procedures set forth in this Article 24.

Confidential

(m)   This <u>Article 24</u> shall survive termination of all or any part of this Agreement, as indicated in <u>Section 25.15</u>.


# ARTICLE 25

## MISCELLANEOUS PROVISIONS

25.1.  <u>Entire Agreement.</u>  This Agreement, together with all Exhibits, schedules, and attachments, contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes any and all prior agreements and commitments with respect thereto. There are no other oral understandings, terms or conditions, and neither Party has relied upon any representation, express or implied, which is not contained in this Agreement.

25.2.  <u>Opportunity to Review.</u>  Contractor agrees and acknowledges that it has had a full and complete opportunity to examine this Agreement and understands the obligations contained herein. Contractor represents that it has carefully examined the documents listed or referenced in the Scope of Works and all Exhibits attached hereto and has fully acquainted itself with the data and information contained therein (including any and all designs, specifications and estimates). Any failure of Contractor to review such information and data shall not release Contractor of its responsibilities under this Agreement nor shall it give rise to an increase in the Contract Price or an adjustment to the Project Schedule. Notwithstanding the foregoing, it shall be Contractor's responsibility to determine the accuracy, adequacy and completeness of such information and data as [SPC] makes no guaranty or warranty, express or implied, as to the accuracy, adequacy or completeness of such information or data.

25.3.  <u>Amendments.</u> No change, amendment or modification of this Agreement shall be valid or binding upon the Parties unless such change, amendment or modification is in writing and duly executed by both Parties.

25.4.  <u>Captions.</u>  The captions and section headings contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope of intent of this Agreement or the intent of any provision contained herein.

25.5.  <u>Notice.</u> Any notice, demand, offer, or other written instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving such notice and shall be hand delivered or sent by overnight courier, messenger, facsimile, e-mail or certified mail, return receipt requested, to the other Party at the address set forth below.

(a)   If delivered to [SPC] :

[SPC]

_____

or

E-mail: XXXXX

**Confidential**

EIG00026243

**EIG_KEP_00166723**

Attn: XXXXX

(b)   If delivered to Contractor:

_____

or

E-mail: XXXXX

Attn: XXXXX

Each Party shall have the right to change the place to which notice shall be sent or delivered by sending a similar notice to the other Party in like manner informing of such change. Notices shall be deemed to have been duly given on the date of delivery if (i) delivered personally, (ii) sent by facsimile or e-mail, if a confirming copy is sent the same day by mail, or (iii) sent by a recognized overnight delivery service to the Party to whom the notice is to be given. All other notices shall be deemed given when received.  Notwithstanding the foregoing, if a notice is delivered or sent after the close of regular business hours, it shall be deemed to have been given on the first  Business Day following receipt, unless if acknowledged on the same day.

25.5.1  All communications will be in the English language. Portuguese language may be used, as an alternative, when previously allowed by [SPC].

25.6.  Severability.  The invalidity of one or more phrases, sentences, clauses, sections or articles contained in this Agreement shall not affect the validity of the remaining portions of this Agreement so long as the material purposes of this Agreement can be determined and effectuated.

25.7.  No Waiver.  Any failure of either Party to enforce any of the provisions of this Agreement or to require compliance with any of its terms at any time during the term of this Agreement shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of such Party thereafter to enforce any and each such provisions.

25.8.   Governing Law.  This Agreement shall be governed, construed and enforced in accordance with the Laws of the State of New York, without giving effect to its conflicts of law rules.

25.9.  Successors and Assigns.  This Agreement shall be binding upon the Parties, their successors and permitted assigns.

25.10.  Exhibits.  All Exhibits, Schedules or other attachments referenced in this Agreement are incorporated into this Agreement by reference and shall be deemed an integral part of this Agreement.

25.11.  Limitations on Third Party Beneficiaries; No Joint Venture.  Except as provided in Article 22 and any other provision of this Agreement providing for the indemnification of a Person who is not a party to this Agreement, this Agreement is for the sole and exclusive benefit of the Parties and is not intended to stipulate any benefit in favor of any third party.

Confidential

EIG00026244

EIG_KEP_00166724

This Agreement establishes no joint venture or partnership between the Parties.

25.12.  Further Assurances. Contractor and [SPC] agree to provide such information, execute and deliver any such instruments and documents and to take such other actions as may be necessary or reasonably requested by the other Party that are not inconsistent with the provisions of this Agreement and that do not involve the assumptions of obligations other than those provided for in this Agreement, in order to give full effect to this Agreement and to carry out the intent of this Agreement.

25.13.  Restrictions on Public Announcements. Contractor shall not publicize, issue press releases, participate in interviews, print advertisements, publicity materials, prospectuses, financial documents or in any similar way mention or refer to the DRU or the Works without the prior written consent of [SPC], which consent shall not be unreasonably withheld.

25.14.  Confidentiality. Each Party shall keep all Confidential Information provided to it by the other Party strictly confidential and shall not disclose, permit to be disclosed, use, transfer or divulge any Confidential Information except as expressly permitted by the terms of this Agreement.

25.14.1  Each Party shall be permitted to disclose Confidential Information provided to it by the other Party with:

(a)     Its Affiliates and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and will agree to keep such Confidential Information confidential); provided that any Party that discloses the Confidential Information of the other Party shall remain liable for any breach of the terms hereof by such Person, as if itself had committed such breach;

(b)     Persons with whom such Party is contemplating the formation of a joint venture; provided that (A) the original disclosing Party is notified of the other Party's intention to so disclose such Confidential Information, and (B) such Party will cause any such Person to execute and deliver to the Parties a confidentiality agreement substantially in the form of this Section 25.14;

(c)     A Governmental Authority, to the extent compelled by any Governmental Authority having jurisdiction over it, and only as may be required by Applicable Law or by any subpoena or similar legal process; provided that if it shall be compelled by any such Governmental Authority to disclose Confidential Information, it shall provide the original disclosing Party with sufficient advance notice of such disclosure as would permit such Party to intervene in any such process, or to initiate process to prevent the disclosure of such Confidential Information.

25.14.2  None of the Parties shall use, or shall permit the use by its Affiliates, successors, assigns, directors, employees or agents of, any Confidential Information for any purpose whatsoever other than in connection with this Agreement.

25.14.3  All Confidential Information disclosed by a Party to the other Party shall remain the

Confidential

sole property of the disclosing Party. Each Party shall take any and all reasonable precautions to prevent any unauthorized disclosure of any Confidential Information to any other Person.

25.14.4 Upon the termination of this Agreement, or upon a Party's earlier request, the other Party shall, within fifteen (15) Business Days of such request: (i) return, or cause any Person to whom it disclosed Confidential Information to return, all Confidential Information in its possession or control, or (ii) destroy, or cause any Person to whom it has disclosed Confidential Information to destroy, all Confidential Information in its possession or control, and deliver a certificate signed by its legal representative, acceptable in substance and form to the original disclosing Party, certifying that all such Confidential Information has been so destroyed.

25.14.5 Contractor acknowledges that the business operations of [SPC] in the jurisdictions where this Agreement is to be performed are highly competitive, and that [SPC]'s strategies, methods, business relationships, and commercial contractual and financial information concerning such jurisdiction comprise Confidential Information and trade secrets of [SPC], which may enable [SPC] to obtain a competitive advantage over competitors which do not know or use such Confidential Information.  Contractor further acknowledges that protection of the Confidential Information and trade secrets against unauthorized disclosure and use is of critical importance to [SPC] in maintaining its competitive position.

25.14.6 Each Party shall be entitled to enforce the provisions of this section by appropriate judicial action, including orders for specific performance or injunctive relief compelling the other Party's compliance with these restrictions.

25.15.  Survival.

   The provisions of Sections 2.3, 3.2(l), 3.3.9, 3.12, 3.15, 3.20(i), 16.9, 17.1, 17.3, 18.1, 18.3, and 18.4, and Articles 1, 4, 6, 13, 15, 22, 24 and 25 shall survive the termination or expiration of this Agreement.

25.16.  Negotiation.  Each of the Parties acknowledges and agrees that they have had the opportunity to have their respective legal counsel review this Agreement and participate in the joint negotiation and documentation of this Agreement, and the Parties are fully familiar with each of the provisions of this Agreement and the effect thereof.

## ARTICLE 26

## ADDITIONAL CONSIDERATIONS

26.1 Duty to Perform.  Each Party agrees that it is bound to perform its contractual duties hereunder even if events arising on or after the Proposal Submission Date have rendered performance of this Agreement more onerous or less commercially or financially advantageous to it than could reasonably have been anticipated at the Proposal Submission Date.

26.1.1. Not applicable

Confidential

26.2 Right to Negotiate.    Notwithstanding Section 26.1, where a Party to this Agreement proves that:

(a) the continued performance of its contractual duties has become excessively onerous due to an event beyond its reasonable control arising on or after the Proposal Submission Date which it could not reasonably have been expected to have taken into account at the time of the conclusion of this Agreement; and that

(b) it could not reasonably have avoided or overcome the event or its consequences,

the Parties agree that they are bound, within a reasonable time of the invocation of this Section 26.2, to negotiate alternative contractual terms which reasonably allow for the consequences of the event.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

By [SPC] :                                     By Contractor :



Name:                                          Name:
Title:                                         Title:



Witnesses:



Name:                                          Name:
Identity:                                      Identity:



PRO-FORMA CONTRACT                    Page 85 of 85

Confidential