# EXHIBIT 121

Page 1

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  ----------------------------x

4  EIG ENERGY FUND XIV, L.P.,

   EIG ENERGY FUND XIV-A, L.P.,

5  et al.

6          Plaintiffs,

7          vs.

8  KEPPEL OFFSHORE & MARINE LTD.,

9          Defendant.

10

   18 Civ. 1047 (PGG)

11

   ----------------------------x

12

13

14          C O N F I D E N T I A L

15

16    VIDEOTAPED DEPOSITION OF JEFFREY CHOW

17          Thursday, June 24, 2021

18             Conducted Remotely

19

20

21

22

23  REPORTED BY:

24  Christina Diaz, CRC, CRR, RMR, CSR, CLR

25  Job Number:  4626891

Page 12

1              J. Chow - Confidential

2     Marine Limited.

3           Q.     When did that corporate

4     transaction occur?

5           A.     I am not really sure.

6           Q.     So how long were you at the

7     company that became Keppel Offshore &

8     Marine Company?

9           A.     Ever since 1990.  Up until 2017.

10          Q.     And if you could just tell us the

11    different positions you had at Keppel

12    Offshore Marine from 1990 through 2017.

13          A.     I started out as an admin manager

14    in a new engineering group that was started

15    when I started.  I had that title for quite

16    a few years.  I am not sure when, but they

17    then designated me as the legal manager.  I

18    was legal manager for quite some time.

19    Then I became a general manager of legal up

20    until, I think, 2016.  Then I became the

21    director of legal until I resigned in 2017.

22          Q.     Was there a time period in which

23    you were the most senior in-house legal

24    officer at Keppel Offshore Marine?

25          A.     I was always the senior legal

```
                                    Page 13
 1              J. Chow - Confidential
 2    from the time I started.  There was no
 3    in-house legal at Far East-Levingston.
 4         Q.    So did you then, when Far
 5    East-Levingston merged into and became
 6    Keppel Offshore Marine, and in 2017 you are
 7    testifying that you were always the most
 8    senior legal manager at that company?
 9         A.    Well, technically when I started
10    I wasn't their legal person.  Legal was
11    centralized at Keppel Corporation.  It was
12    just after quite a few years then I was
13    designated as legal manager.
14         Q.    All right.  In 2010 say were you
15    a legal manager at Keppel Offshore Marine?
16         A.    I was the legal manager, general
17    manager of legal.
18         Q.    And you mentioned a company
19    called Keppel Corp.  Was Keppel Corp. the
20    parent corporation for Keppel Offshore
21    Marine?
22         A.    Yes.
23         Q.    Did Keppel Corp. own 100 percent
24    of Keppel Offshore Marine?
25         A.    I believe so.
```

```
 1              J. Chow - Confidential
 2        A.    Correct.
 3        Q.    What about YY Chow, what was his
 4   position at that time period?
 5        A.    Again, the exact timing of when
 6   he held the positions, I can't be certain
 7   without looking at the chart.  But he was
 8   president of the US operations, Keppel
 9   Offshore Marine USA.  Then he was called
10   back to Singapore to become COO of Keppel
11   Offshore Marine Limited.  And then at some
12   point in time he succeeded Mr. Tong to
13   become CEO.
14        Q.    Could you just tell us generally
15   what your duties and responsibilities were
16   as a legal manager at Keppel Offshore
17   Marine?
18        A.    Generally responsible for the
19   contracts, contracting, negotiation,
20   drafting, dealing with legal problems,
21   lawsuits for the 17 locations around the
22   world.
23        Q.    Mr. Chow, in 2017 did you plead
24   guilty to a federal crime?
25        A.    Yes.
```

Page 17

1              J. Chow - Confidential

2       Q.      To what crime did you plead

3   guilty?

4       A.      FCPA.

5       Q.      What is the FCPA?

6       A.      Foreign Corrupt Practice Act.

7       Q.      What does that act prohibit?

8       A.      Specifically -- I couldn't tell

9   you offhand.  It had to do with bribing of

10  public officials.

11      Q.      What were the acts that you

12  committed that led you to plead guilty to

13  violating the Foreign Corrupt Practices

14  Act?

15      A.      I should have known that there

16  was something going on that was against

17  what the act stood for or required and I

18  didn't do anything about it.  So I took

19  responsibility for not doing anything

20  further than being worried about it.

21      Q.      When you say you should have

22  known something was going on, what did you

23  mean by "something was going on"?

24      A.      That there was monies flowing

25  from our company to an agent, to people in

```
                                      Page 18
 1              J. Chow - Confidential
 2   public offices, to people in -- that work
 3   for our clients.  One in particular,
 4   Petrobras, their employees are considered
 5   public officers so they were owned by the
 6   government.
 7        Q.    When you say money was flowing
 8   from our company to agents -- to public
 9   agents, are you referring to bribes and
10   kickbacks?
11        A.    Yes.
12        Q.    Are you familiar with a company
13   called Sete Brasil?
14        A.    Yes.
15        Q.    Did some of the acts that you
16   committed that led you to plead guilty to
17   violating the Foreign Corrupt Practices Act
18   relate to Sete Brasil?
19        A.    Yes.
20        Q.    What acts that you committed
21   related to Sete Brasil?
22        A.    Same as the others.  I didn't do
23   anything to question it further or stop it
24   and assisted to create -- or drafting
25   agency agreements that were part of it.
```

```
                                        Page 25
 1            J. Chow - Confidential
 2       is your plea to the charge contained in
 3       information 17-cr-466, guilty or not
 4       guilty?"
 5            And you answered, "Guilty, Your
 6       Honor."
 7            Do you see that?
 8       A.    Yes.
 9       Q.    And then if you look down on line
10  19, the court said, "I read the charge to
11  you a few minutes ago.  I want you to tell
12  me in your own words what exactly you did
13  in connection with the conspiracy that's
14  charged in the information."
15            Do you see that?
16       A.    Yes.
17       Q.    And then starting at lines 23 on
18  page 26 and going over to page 28, line 2,
19  you made a statement that day.
20            Do you see that?
21       A.    Yes.
22       Q.    And could you read into the
23  record your statement starting at page 26,
24  line 23, and going over to page 28, line 2.
25       A.    "I worked in the legal department
```

Page 26

```
 1            J. Chow - Confidential
 2    at Keppel Offshore Marine for over 25
 3    years, and among my duties and
 4    responsibilities were to draft and prepare
 5    contracts with the company's agents and one
 6    of those was an agent in Brazil.
 7            "By no later than 2008, I
 8    realized that Keppel was overpaying the
 9    agent, sometimes by millions of dollars, so
10    that the agent could pay bribes to
11    individuals who could help Keppel Offshore
12    Marine doing business with Petrobras.
13            "Petrobras was a Brazilian
14    state-owned and controlled oil company.
15    Although no one ever named the bribe
16    recipients to me, I knew that they were
17    government officials and ruling political
18    party.
19            "I should have refused to draft
20    the contract that were used for paying
21    bribes and I should have resigned from
22    Keppel.  Instead I discussed the economic
23    terms of the contract with my seniors at
24    Keppel, and acting in agreement with my
25    seniors and others at Keppel, I drafted the
```

```
                                      Page 27
 1            J. Chow - Confidential
 2   contract and made sure that they were
 3   executed.
 4            "In at least one case it was in
 5   the US that I sent the executed copies of
 6   the contract from Houston, Texas to the
 7   agent to confirm that my seniors at Keppel
 8   had signed the contract.
 9            "While I didn't negotiate the
10   contracts or make the decisions to pay the
11   bribes, I knew that the contracts existed
12   to make payments legitimate and that they
13   were an important part of the bribery
14   scheme.
15            "I am deeply sorry for my
16   conduct."
17       Q.    That statement was true at the
18   time you made it, right, sir?
19       A.    Yes.
20       Q.    Now I would like to ask you a few
21   questions about that statement.
22            On page -- the top of page 27,
23   you refer to an agent in Brazil.
24            Was that Mr. Zwi Skornicki?
25       A.    Yes, it is.
```

```
 1                J. Chow - Confidential
 2   right, sir?
 3        A.    Yes.
 4        Q.    And then it goes on to state in
 5   paragraph 12, "In order to win the TLWP
 6   project and the Sete Brasil project, among
 7   other projects for Petrobras, between 2000
 8   and 2016, Rig Construction Company," or
 9   Keppel Offshore Marine "paid bribes through
10   Rig Construction Company Agent to
11   government officials, including foreign
12   official one and foreign official two and
13   the political party."
14                Do you see that?
15        A.    Yes.
16        Q.    And those were true statements as
17   well, right, sir?
18        A.    Yes.
19        Q.    Rig Construction Company Agent
20   was Zwi Skornicki, right?
21        A.    Correct.
22        Q.    And paragraph 13, this states,
23   "To facilitate the payment of those bribes
24   and to conceal the true nature and purpose
25   of the payments, in accordance with
```

```
                                            Page 41
 1              J. Chow - Confidential
 2    established practices at Rig Construction
 3    Company," or Keppel Offshore Marine, "the
 4    defendant Jeffrey Chow and other employees
 5    at Rig Construction Company created and
 6    executed false agreements on behalf of Rig
 7    Construction Company with consulting
 8    companies controlled, in whole or in part,
 9    by Rig Construction Company Agent."
10              And again the Rig Construction
11    Company Agent is Zwi Skornicki, right, sir?
12        A.    Yes.
13        Q.    And those statements I just read
14    in paragraph 13 were true, right?
15        A.    Yes.
16        Q.    And it goes on to state, "These
17    agreements falsely represented that
18    payments were made to Rig Construction
19    Company Agent for his assistance and
20    support in discussions and negotiations
21    with prospective customers when in fact
22    portions of those payments were being paid
23    as bribes.  Certain of these agreements
24    also falsely represented that Rig
25    Construction Company Agent was abiding by
```

```
                                        Page 42
 1              J. Chow - Confidential
 2   antibribery laws and was not making
 3   improper payments."
 4              Those statements were also true,
 5   right, sir?
 6        A.    Yes.
 7        Q.    And it goes on to say,
 8   "Executives at Rig Construction Company,"
 9   or Keppel Offshore Marine, "directed the
10   defendant Jeffrey Chow and other employees
11   at Rig Construction Company to execute
12   those agreements and then authorize
13   payments to Rig Construction Company Agent
14   pursuant to those agreements knowing that a
15   portion of those payments would be used to
16   pay bribes to officials at Petrobras and to
17   the political party."
18              Those were all true, right, sir?
19        A.    Yes.
20        Q.    And the political party referred
21   to the Workers Party of Brazil, right, sir?
22        A.    Correct.
23        Q.    And it goes on in paragraph 15 to
24   state, "Payments from Rig Construction
25   Company to the consulting companies
```

```
                                              Page 49
 1              J. Chow - Confidential
 2       Q.    I would like you to look at page
 3   19 if you would.
 4       A.    Yes.
 5       Q.    And this document is executed by
 6   someone named Nicholas Choo Kwan Hui.  I am
 7   not sure if I'm pronouncing that correctly
 8   from Keppel Offshore Marine on December 22,
 9   2017.
10              Do you know what his position was
11   at Keppel Offshore Marine?
12       A.    Specifically at that time, I am
13   not certain but he should be assistant
14   general manager of legal.
15       Q.    Did he report to you when you
16   were at Keppel Offshore Marine?
17       A.    He did and then he left for two,
18   2 1/2 years and I asked him to come back.
19       Q.    When did he come back?
20       A.    I am not really sure of the
21   specific time but definitely before this
22   document.
23       Q.    All right.  Do you see that --
24   look at page A-1 of this document at the
25   top it says Attachment A, Statement of
```

```
 1              J. Chow - Confidential
 2       Q.     Okay.   Then it goes on.   It
 3   states, number six, "Brief discussion on
 4   the EPC changes/clarifications with the
 5   understanding that Luciana and Jeff will
 6   present to Sete's Isabela the written list
 7   of changes/clarifications that we are
 8   suggesting to the EPC draft, for review and
 9   decision (so as not to take everyone's time
10   on legal language)."
11              Luciana was who?
12       A.     She was a junior legal officer in
13   Keppel sales Brazil.
14       Q.     By whom was she employed?
15       A.     Keppel sales Brazil.
16       Q.     So at this time you were
17   reviewing a draft EPC contract and you were
18   going to give comments, sir?
19       A.     Correct.
20              MR. GOLDMAN:   All right.   I am
21       going to mark another exhibit.
22              (Plaintiffs' Exhibit 9, e-mail
23       dated 6/25/11 bearing Production Nos.
24       KEPPEL 429516 through 20, was marked
25       for identification)
```

Page 75

1              J. Chow - Confidential
2    BY MR. GOLDMAN:
3         Q.     All right.  I have introduced
4    Plaintiff's Exhibit 9.  Do you have it,
5    sir?
6         A.     Yes, I do.
7         Q.     This is an e-mail with an
8    attachment Bates stamped KEPPEL 429516
9    through 20.  It's a -- appears to be, on
10   the first page an e-mail from you,
11   Mr. Chow, dated August 25, 2011, subject
12   "Sete Brasil:  Comments to Draft EPC
13   Contract for Semi-Submersibles," to a
14   number of people at Sete and cc'ing folks
15   at Keppel.
16             Do you see that?
17        A.     Yes.  I do.
18        Q.     And you say, "Isabela, please
19   find attached our comments to the draft EPC
20   contract."
21             Do you see that?
22        A.     Yes.
23        Q.     And if you look at the page that
24   starts with KEPPEL 429517, these were the
25   comments that you sent Isabela at Sete,

Page 76

```
 1              J. Chow - Confidential
 2  right?
 3       A.    I believe they are, yes.
 4       Q.    Would you have drafted this
 5  document?  Was that your practice?  When I
 6  say "this document," I mean the comments
 7  here starting at 429517.
 8       A.    As a matter of practice, it would
 9  be usually a team effort that people would
10  provide me with the comments and I would
11  consolidate it.
12             On this one, I couldn't really
13  say for sure who consolidated it but that's
14  my normal style of listing out number by
15  number what -- either changes or
16  clarifications we were seeking.
17       Q.    You would have approved these
18  comments before you sent them out though,
19  right, sir?
20       A.    Yes.
21       Q.    And if you look at number three
22  on the comments, definitions, it states,
23  "Applicable law should be noted as in the
24  applicable codes and standards to be those
25  having force of law effective on the
```

```
                                        Page 77
 1              J. Chow - Confidential
 2  proposal submission date for consistency."
 3              What did you mean by that?
 4       A.    I don't really remember.
 5              (Plaintiffs' Exhibit 10, e-mail
 6       string beginning with e-mail dated
 7       6/9/11 bearing Production Nos. KEPPEL
 8       546493, was marked for identification)
 9  BY MR. GOLDMAN:
10       Q.    I have marked as Exhibit 10 an
11  e-mail.
12              Do you have that yet, sir?
13       A.    Not yet.  Okay.
14       Q.    All right.  So this is a single
15  page with the Bates stamp KEPPEL 546493 and
16  it has a number -- a couple e-mails.  The
17  top one is from you to Mr. Tan cc'ing
18  Mr. Choo dated July 2011, subject, "Sete
19  Brasil:  Cash flow expanded per unit."
20              Do you see that?
21       A.    Yes.
22       Q.    And you wrote, "Heard that
23  Barusco was headed for Italy tomorrow with
24  Duque."
25              Do you see that?
```

                                                      Page 85

1               J. Chow - Confidential

2                First of all, who was CHT?

3       A.     CH Tong.

4       Q.     At this point, was he the

5    president of Keppel Offshore Marine or was

6    YY the president of Keppel Offshore Marine?

7       A.     At that particular time, I

8    couldn't be certain but in the hierarchy he

9    was YY's boss and YY was my boss, so...

10      Q.     You said, "Put this in plain

11   paper."  What did you mean any that?

12      A.     I am just going from what I wrote

13   because I don't remember that it's hard to

14   get these people, especially if I am not in

15   the office, and if I am overseas and the

16   timing is different as to when I am working

17   and when they are at the office, I am not

18   about to call them late night.  So it's,

19   again, get a message to them and make sure

20   they get the message.  For this specific

21   one, I really don't remember.

22      Q.     Then you wrote, "Then delete

23   e-mail."

24                Why were you instructing your

25   assistant to delete the e-mail?

```
                                            Page 86
 1              J. Chow - Confidential
 2         A.    I really don't remember.  It just
 3    seemed sensitive.
 4         Q.    Well, I mean, isn't it true, sir,
 5    that you were trying to conceal the fact
 6    that this commission agreement was going to
 7    be or needed to be executed so you told her
 8    to put it on a piece of paper and then
 9    delete this particular e-mail, right, sir?
10         A.    That's what it reads, yes.
11         Q.    And what you told her to put on
12    plain paper and pass to Mr. Tong and YY was
13    the following:  "Further to our t/c, made
14    the suggestion to have one of us go to
15    explain the situation.  However the problem
16    is that we will not be brought to all
17    involved to explain."
18              Do you see that?
19         A.    Yes.
20         Q.    "T/C," does that refer to a
21    telephone call?
22         A.    T/C is my way of putting
23    telephone call, if it's a telephone call,
24    yes.
25         Q.    This was a telephone call with
```

```
 1            J. Chow - Confidential
 2   Choo and you cc Miss Marsuki, "Can you
 3   prepare agency agreement for Zwi on the
 4   Sete project?  Follow earlier formats or
 5   check with Nora on the format for the one
 6   he did with ENSCO.  I got copies from him
 7   and passed them to file," and then you
 8   wrote 2 percent.
 9            First of all who is Mr. Choo?
10      A.    He is one of my juniors.
11      Q.    Had you discussed with him or
12   Mr. Chong or anybody else who was working
13   with you about your conclusions that Keppel
14   Offshore Marine was paying bribes and
15   kickbacks relating to Brazilian projects?
16      A.    No.
17      Q.    And the 2 percent that you refer
18   to there, that was the commission rate that
19   was going to be paid to Mr. Skornicki?
20      A.    Correct.
21      Q.    Mr. Choo writes back to you,
22   December 1, 2011, "Jeff, working on the
23   Marketing Consulting and Services Agreement
24   for Zwi (Eagle).  Is this to be signed by
25   Keppel FELS Brasil or Sete?  2 percent
```

```
                                        Page 105
 1              J. Chow - Confidential
 2    based on receipt by Keppel FELS Brasil?"
 3    And then you respond on December 15th in
 4    the e-mail above that to Mr. Choo cc'ing
 5    Miss Marsuki, "Fernvale."
 6                What is Fernvale?
 7         A.    If I remember properly, it was
 8    the special purpose company that was going
 9    to execute on one or more of the Sete
10    projects.
11         Q.    And that was a special purpose
12    company that was formed and owned by Keppel
13    Offshore Marine?
14         A.    Yes.
15         Q.    And then Mr. Choo writes, "Dear
16    Jeff.  Please find attached draft for
17    Eagle.  Kindly note the highlighted
18    clauses.  Not sure if you want them in or
19    amended."
20                Do you see that?
21         A.    Yes.
22         Q.    And then if you turn back on this
23    document to the Bates stamp KEPPEL 435122.
24                Are you there?
25         A.    Yes, I see it.
```

Page 106

1              J. Chow - Confidential
2       Q.    And it appears to be a draft of a
3    marketing consulting and services agreement
4    between Fernvale and Eagle do Brasil.
5              Do you see that?
6       A.    Yes.
7       Q.    And Eagle do Brasil was
8    Mr. Skornicki's company, right?
9       A.    Yes.
10      Q.    Then if you look at page KEPPEL
11   435132, section 9.0, Business Ethics, do
12   you see that, sir?
13      A.    Yes.  I have it now.
14      Q.    And this section -- and you can
15   tell me if I am wrong, this draft provides
16   that Mr. Skornicki is going to comply with
17   anticorruption laws and not pay bribes and
18   kickbacks to, among others, including
19   Petrobras, right?
20      A.    Correct.
21      Q.    Why was this in this agreement?
22      A.    We would update our format from
23   time to time and inclusion of these
24   provisions was recommended to me by some
25   friends or business acquaintances.  So we

1              J.  Chow - Confidential

2      incorporated different things from time to

3      time, and for this one, it's a clause that

4      other companies have used and in particular

5      Zwi had signed with another company having

6      similar provisions.

7           Q.    But you knew, sir, that he was

8      not going to be able to comply with what

9      was set forth in section 9.0, right?

10          A.    Well, it was up to him to agree

11     or not agree to it and up to him to comply

12     or not comply.

13          Q.    I got that, sir.  But you knew

14     that Mr. Skornicki was not going to be able

15     to comply with anticorruption laws because

16     he was going to be paying bribes to

17     Petrobras, right?

18          A.    I had come to the conclusion that

19     he was.

20          Q.    And wasn't the purpose of this

21     section, one of the purposes was to conceal

22     the fact that he would be paying bribes?

23          A.    Not to conceal it, no.  It was

24     more for protection internally.

25          Q.    Well, sir, I mean, one of the

```
                                    Page 109

  1              J. Chow - Confidential

  2       A.      Correct.

  3       Q.      And according to paragraph 13,

  4  "To facilitate the payment of those bribes

  5  and conceal the true nature and purpose of

  6  the payments, in accordance with

  7  established practices and Rig Construction

  8  Company, the defendant, Jeffrey Chow, and

  9  other employees at Rig Construction Company

 10  created and executed false agreements on

 11  behalf of Rig Construction Company with

 12  consulting companies controlled in whole or

 13  in part by Rig Construction Company Agent."

 14              Do you see that?

 15       A.      Yes.

 16       Q.      And that was true, right?

 17       A.      Yes.  Yes.

 18       Q.      And you see the last sentence

 19  says, "Certain of these agreements also

 20  falsely represented that Rig Construction

 21  Company Agent was abiding by antibribery

 22  law and was not making improper payments."

 23              Do you see that?

 24       A.      Yes.

 25       Q.      And that was also true, right,
```

Page 110

```
 1              J. Chow - Confidential
 2   sir?
 3        A.    Yes.
 4              MR. GOLDMAN:   I am going to mark
 5        another exhibit.
 6              (Plaintiffs' Exhibit 16, e-mail
 7        string beginning with e-mail dated
 8        12/17/11 bearing Production Nos. KEPPEL
 9        453940 through 41, was marked for
10        identification)
11   BY MR. GOLDMAN:
12        Q.    All right.  I have marked
13   Plaintiffs' Exhibit 16.
14              Do you see it, Mr. Chow?
15        A.    Yes.  Now I do.
16        Q.    This is a multi-page document
17   with -- I will tell you what the Bates
18   stamp is -- multi-page document with the
19   Bates stamp KEPPEL 453940 through 41.
20              And do you see that the bottom of
21   the page there is an e-mail from Mr. Chong
22   to a number of people and you are cc'd on
23   that e-mail dated December 17, 2011?
24        A.    Yes.
25        Q.    It says, "Dear All, FYI the
```

Page 113

```
 1              J. Chow - Confidential
 2   testing, completion and procurement of the
 3   DRU, together with all other services and
 4   supplies required under this agreement."
 5              Do you see that?
 6       A.   Yes.
 7       Q.   And DRU stands for drilling rig
 8   unit?
 9       A.   I believe so.
10       Q.   And it goes on to state,
11   "Contractor shall perform and prosecute the
12   Works (i) in accordance with the scope of
13   work and terms and conditions of this
14   agreement and (ii) in compliance with all
15   consents and applicable laws, and (iii)
16   consistent with good industry practices."
17              Do you see that?
18       A.   Yes.
19       Q.   And you thought as of this time,
20   this is December of 2011, that Keppel
21   Offshore Marine would be paying bribes
22   through Mr. Skornicki for the Sete project,
23   right, sir?
24       A.   Yes.
25       Q.   And if you look at the definition
```

```
 1              J. Chow - Confidential
 2              Do you see that?
 3       A.     Yes.
 4       Q.     Based on your many years of
 5  experience in the petroleum construction
 6  industry, do you think it's fair to say
 7  that good industry practices as defined
 8  here as the highest internationally
 9  accepted practices did not include paying
10  prescribes and kickbacks in violation of
11  United States Foreign Corrupt Practices
12  Act?
13       A.     That's fair to say, yes.
14       Q.     And so if you go back to Article
15  2, Section 2.1, Fernvale which was part of
16  Keppel Offshore Marine was not going to be
17  able to perform this contract consistent
18  with good industry practices, right, sir?
19       A.     I conclude that, yes.
20       Q.     It was also not going to be able
21  to perform the contract in compliance with
22  applicable laws, right, sir?
23              MS. SKAISTIS:  Objection.
24       A.     Correct.
25              MR. GOLDMAN:  I am going to
```

```
                                     Page 132
 1             J. Chow - Confidential
 2    am looking at the second one down.  It's
 3    from you to Eagle@globo.com, "Subject:
 4    Deepsea Oil Company," dated April 20, 2012.
 5             And it says, "Received, thank
 6    you.  As you are the sole shareholder of
 7    this company, is Eagle owned by Eloise in
 8    any way, and is she a director (using her
 9    maiden name)?  The reason I am asking is
10    that it will look strange to have you as a
11    rep for both contracts?  I hope you
12    understand what I am trying to achieve."
13             Do you see that?
14        A.    Yes.
15        Q.    What were you trying to achieve?
16        A.    I really don't know.
17        Q.    Why did you think it would be
18    strange to have him as the rep for both
19    contracts?
20        A.    I really don't know because we
21    have hired him as a rep in contracts where
22    there were two entities anyway.  So I have
23    no idea where that was coming from at the
24    time.
25        Q.    Eloise, is that the name of Zwi
```

```
                                        Page 133
 1              J. Chow - Confidential
 2    Skornicki's wife?
 3         A.    His second wife, yes.
 4              (Plaintiffs' Exhibit 23, e-mail
 5         string beginning with e-mail dated
 6         5/8/12 bearing Production Nos. KEPPEL
 7         546088 through 546110, was marked for
 8         identification)
 9    BY MR. GOLDMAN:
10         Q.    I marked Plaintiffs' Exhibit 23.
11         A.    I have it.
12         Q.    This is dated August 5, 2012.
13    It's from you to Mr. Chong, the subject,
14    "For Deepsea Oil Corp." with an attachment
15    and you wrote, "The rep contract between
16    Fernvale and Deepsea Oil will be for 1.5
17    percent."
18              First of all, Deepsea Oil
19    was a company owned by Mr. Skornicki,
20    right?
21              MR. MEISTER:  You said August
22         5th.
23              MR. GOLDMAN:  I am sorry.  You
24         know what, let me rephrase the
25         question.  You are correct.
```

```
 1              J. Chow - Confidential
 2       Q.    Why were you trying to get
 3  Mr. Aziz to sign the commission agreements
 4  with Mr. Skornicki?
 5              MR. MEISTER:  The last part of
 6       your question was garbled.  Can you
 7       repeat it.
 8  BY MR. GOLDMAN:
 9       Q.    Why were you trying to get
10  Mr. Aziz to sign the commission agreements
11  with Mr. Skornicki?
12       A.    I would have to check the
13  records, but the normal procedure is the
14  director of the company would be signing so
15  you don't need to do the power of attorney
16  and I believe Aziz was a director of
17  Fernvale at the time.
18       Q.    Okay.  Do you recall that
19  Mr. Aziz did not sign the commission
20  agreements with Mr. Skornicki?
21       A.    I recall that ultimately I signed
22  the agreement.
23       Q.    Do you know why Mr. Aziz did not
24  sign them?
25       A.    Specifically, no.
```

```
                                          Page 139
 1            J. Chow - Confidential
 2   this agreement, right, sir?
 3        A.    I need to get to page 6, sorry.
 4   That's my signature, yes.
 5        Q.    Sir, you signed as
 6   attorney-in-fact for Fernvale there, right?
 7        A.    Correct.
 8        Q.    And in this agreement, if you
 9   look at paragraph 3 on page 2, there was
10   going to be a commission of .5 percent of
11   the contract price paid to contractor under
12   the EPC contract.
13            Do you see that?
14        A.    Yes.
15        Q.    And the way it would work is that
16   when Keppel Offshore Marine got paid on its
17   EPC contract, then it would make payments
18   back to Mr. Skornicki for his commission,
19   is that correct?
20        A.    Normally it would be, but I would
21   have to look at the details.  I am sorry.
22        Q.    If you look at page 4, paragraph
23   8, there is a heading that says,
24   "Antibribery and Corruption"?
25        A.    Yes.
```

Page 146

```
 1              J. Chow - Confidential
 2   sir?
 3              MR. MEISTER:  Can you restate
 4        that.
 5              There were a couple of questions
 6        in there.  You used the word "falsely."
 7        I don't know if you meant to have
 8        falsely cover all of that.
 9              MR. GOLDMAN:  I am just reading
10        what you plead guilty to here, sir.
11        Let's look at it.
12   BY MR. GOLDMAN:
13        Q.   Paragraph 13, "These agreements
14   falsely represented that payments were
15   being made to Rig Construction Company
16   Agent for his assistance and support in
17   discussions and negotiations with
18   prospective customers when, in fact,
19   portions of these payments were being paid
20   as bribes."
21              Those were true statements,
22   right, sir?
23        A.   It's true that part of those seem
24   to have been used to pay bribes as it's
25   there.
```

```
 1              J. Chow - Confidential
 2        Q.     You knew that this agency
 3   agreement, which is part of Exhibit 25
 4   between Fernvale and Eagle do Brasil, had
 5   embedded in it commissions, some of which
 6   were going to be used by Skornicki to pay
 7   bribes and kickbacks, right, sir?
 8        A.     I felt that there was so much
 9   money there and the experience in Brazil in
10   all likelihood money would flow from those
11   payments to other people other than
12   Mr. Skornicki.
13        Q.     What I am just trying to get to
14   is that on paragraph 13 of the information,
15   you plead guilty to a sentence here that
16   said these agreements falsely represented
17   payments were being paid to Rig
18   Construction Company Agent for his
19   assistance and support in discussion and
20   negotiations with prospective customers
21   when in fact a portion of those payments
22   were being paid as bribes.
23              My simple question is the
24   agreement between Fernvale and Eagle do
25   Brasil which is part of Plaintiffs' Exhibit
```

Page 151

```
 1              J. Chow - Confidential
 2   25 is one of the agreements to which was
 3   referred in that sentence, right, sir?
 4              MR. MEISTER:  So, Dan, he didn't
 5         plead guilty to a sentence in a
 6         paragraph, so if you could restate
 7         that.  That's just not an accurate
 8         statement.
 9              MR. GOLDMAN:  I am not going to
10         restate it.
11   BY MR. GOLDMAN:
12      Q.    Answer the question, please.
13      A.    The agreements that you referred
14   to in Exhibit 25 are what is referred to as
15   agreements in paragraph 13 of Exhibit 2.
16              Is that what you are looking for?
17   That's what it is.
18              MR. GOLDMAN:  Thank you, sir.
19              MR. MEISTER:  Dan, it's 2:30.  Do
20         you want to take a little break?
21              MR. GOLDMAN:  That's fine.
22              THE VIDEOGRAPHER:  We are now
23         going off the record.  The time is
24         2:30.
25              (Recess)
```

Page 156

```
 1            J. Chow - Confidential
 2   paragraph 13 of Exhibit 1 which is the
 3   information to which you plead guilty,
 4   right, sir?
 5            MS. SKAISTIS:  I think you mean
 6        Exhibit 2.
 7            MR. GOLDMAN:  That's correct.
 8        Let me ask the question again.  I will
 9        get it right the third time.
10   BY MR. GOLDMAN:
11        Q.   This agreement, which is Exhibit
12   26, between Deepsea Oil Company and
13   Fernvale was also one of the agreements
14   that is encompassed in Exhibit 2, paragraph
15   13 which is the information to which you
16   plead guilty, right, sir?
17        A.   Yes, it is.
18            (Plaintiffs' Exhibit 27, e-mail
19        string beginning with e-mail dated
20        8/28/12 bearing Production Nos. KEPPEL
21        553114, was marked for identification).
22   BY MR. GOLDMAN:
23        Q.   I have marked Exhibit 27.  Let me
24   know when you get it.
25        A.   I have it.
```

Page 167

1            J. Chow - Confidential
2    page of this document, it's signed by
3    somebody who is an authorized signatory for
4    Fernvale.
5            Do you know whose signature that
6    is?
7        A.    It doesn't look familiar
8    unfortunately.
9        Q.    And Fernvale in this letter is
10   defined as "the EPC contractor," right, if
11   you look at the top?
12       A.    Yes.
13       Q.    And do you see it says there
14   that, "The EPC contractor hereby represents
15   and warrants as of the date of this letter,
16   considering its obligations under the EPC
17   contract to comply with all applicable laws
18   that," and goes on to state that "neither
19   in connection with the bidding procedure,"
20   and it has a number, "relating to the
21   project agreement, nor the construction,
22   testing and insulation of the unit
23   contemplated by the project agreement, has
24   it, or any of their directors, officers,
25   employees, or to the best of its knowledge

```
 1              J. Chow - Confidential
 2    after due inquiry, agents, and no other
 3    person acting on behalf of it, made or
 4    received any corrupt payments to obtain or
 5    retain business or improperly secure a
 6    business advantage, which would or might
 7    constitute bribery within the OECD
 8    Convention on Combatting Bribery of Foreign
 9    Public Officials in International Business
10    Transactions, the Foreign Corrupt Practices
11    Act, or the United Kingdom Bribery Act or
12    any of their corresponding regulations."
13    It goes on and says, "Including but not
14    limited to any offer, gift, payment,
15    promise to pay, commission, fee, loan,
16    rebate, facilitation, payment, kickback or
17    any other consideration or anything of
18    value."
19              Those statements when made on
20    January 16, 2015 by Fernvale were false,
21    right, sir?
22        A.    Yes.  May I add to it?
23              MR. GOLDMAN:  There is no
24        question pending, sir.
25              (Plaintiffs' Exhibit 31, e-mail
```

Page 174

```
 1            J. Chow - Confidential
 2              And then if you look at the page
 3    that has KEPPEL 641233, do you see that?
 4        A.    Yes.
 5        Q.    Did you draft that letter?
 6        A.    I don't believe I would have.  I
 7    don't remember drafting it.
 8        Q.    Do you know who did?
 9        A.    I don't know specifically who
10    did.
11        Q.    Do you know generally who has
12    responsibility for drafting these types of
13    releases?
14        A.    There is a department that's in
15    the group called Group Corporate
16    Communications.  You will see it as GCC in
17    some of the e-mails.  They would be the
18    ones that would be drafting and authorizing
19    for distribution.
20        Q.    It states, "It's come to our
21    attention that there are a number of media
22    reports floating about in Brazil which may
23    have also been picked up on various
24    international publications alleging Keppel
25    FELS' involvement in a bribery scandal
```

Page 175

```
 1              J. Chow - Confidential
 2   surrounding Petrobras.  Please rest assured
 3   that Keppel FELS finds these allegations to
 4   be false and without merit."
 5              Now that statement, "please rest
 6   assured that Keppel FELS finds these
 7   allegations to be false and without merit,"
 8   as of the date of this document, February
 9   9, 2015 was itself, false, right, sir?
10       A.    I didn't have evidence to say
11   that it wasn't, but I concluded through my
12   experience dealing with Petrobras and
13   Brazil that it was false.
14       Q.    But knowing what you know today,
15   you know that was false, right, sir?
16       A.    Knowing what I know today?
17       Q.    Correct.
18       A.    Based on the information that has
19   been put out there by Mr. Barusco and
20   Mr. Skornicki, I take it to be false.
21              (Plaintiffs' Exhibit 33, Letter
22         dated 2/9/15, one page, was marked for
23         identification)
24   BY MR. GOLDMAN:
25       Q.    I have marked Plaintiffs' Exhibit
```