# EXHIBIT 122

CONFIDENTIAL

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 18-cv-01047 (PGG)

5    - - - - - - - - - - - - - - - - - - - -x

6   EIG ENERGY FUND XIV, L.P.,

    EIG ENERGY FUND XIV-A, L.P.,

7   EIG ENERGY FUND XIV-B, L.P.,

    EIG ENERGY FUND XIV (CAYMAN), L.P.,

8   EIG ENERGY FUND XV, L.P.,

    EIG ENERGY FUND XV-A, L.P.

9   EIG ENERGY FUND XV-B, L.P.

    EIG ENERGY FUND XV (CAYMAN), L.P.

10                    Plaintiffs,

            -against-

11  KEPPEL OFFSHORE & MARINE LTD.,

                    Defendant.

12   - - - - - - - - - - - - - - - - - - - -x

13                Virtual Zoom Deposition

14

                    July 20, 2021

15                    10:00 a.m.

16      CONFIDENTIAL VIRTUAL VIDEO DEPOSITION

17  of KEVIN CORRIGAN, in the above-entitled

18  action, held at the above time and place,

19  taken before Jeremy Richman, a Shorthand

20  Reporter and Notary Public of the State of

21  New York, pursuant to the Federal Rules of

22  Civil Procedure, and stipulations between

23  Counsel.

24

25              *      *      *

CONFIDENTIAL

Page 34

```
 1              CONFIDENTIAL - CORRIGAN
 2     memo, who is advocating to, or who has
 3     sufficient interest in a transaction to
 4     present it to management and say, Hey,
 5     this is something we should look at
 6     more deeply.
 7          Q.    So we -- during this process
 8     we have a posting memo, and then we
 9     have a recommendation.  Those are two
10     separate points in time, correct?
11          A.    Correct.
12          Q.    Other than creating the
13     posting memo and creating the
14     recommendation document, is the due
15     diligence process documented in any
16     other way?
17          A.    We had periodic, I want to
18     say weekly, but it may have been every
19     other week, meetings with our chief
20     investment officer where all the
21     transactions we were working on as a
22     group were discussed, and people would
23     say, you know, We got the model and we
24     like it, or we don't like it, or we've
25     done it.  It's a very iterative process
```

CONFIDENTIAL

Page 35

```
 1              CONFIDENTIAL - CORRIGAN
 2      where certainly our chief investment
 3      officer would sort of follow the
 4      progress of transactions.
 5           Q.    In terms of documents created
 6      related to the due diligence process,
 7      is it just the posting memo and the
 8      investment recommendation, or are there
 9      other documents or work product that
10      are created to show what happened
11      during the due diligence process?
12           A.    Well, there was a shared
13      drive at EIG where a lot of the due
14      diligence documents that we were
15      working on were posted, so that people
16      could have access to it, and then of
17      course there were periodic memos in the
18      interim, if you, you know, you ran into
19      something that you wanted some guidance
20      on, you would probably write a memo to
21      the chief investment officer and/or the
22      CEO.
23           Q.    And then the investment
24      recommendation document essentially
25      summarizes that entire process and
```

CONFIDENTIAL

Page 36

1         CONFIDENTIAL - CORRIGAN
2   presents it to the investment
3   committee?
4        A.   Yes.  By the time we are
5   writing an investment recommendation,
6   the tires have been thoroughly kicked,
7   and we're ready to propose an
8   investment.
9        Q.   So the investment
10  recommendation sort of brings together
11  the entire due diligence process for
12  the investment committee?
13       A.   Yes.
14            MS. LAW:  Objection to form.
15       You can answer.
16       Q.   So what was the investment
17  decision-making body for EIG Energy
18  Fund XIV?
19            MS. LAW:  Objection to form.
20            MR. BARBUR:  I can rephrase,
21       if it will help.
22            MS. LAW:  I don't know what
23       you mean by "investment
24       decision-making body."
25       Q.   Who, what person or group of

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN

2          Q.     And in fact, EAS got one of

3     the very first contracts to build one

4     of the ships, right?

5          A.     Yes, seven of them, I

6     believe.

7          Q.     Given the past history of

8     corruption in Brazil and several

9     concerns about corruption in Brazil,

10    did you consider the possibility that

11    any of the entities involved in the

12    Sete project were involved in bribery

13    when you were doing your due diligence?

14               MS. LAW:  Objection to form,

15         you can answer.

16         A.     My concern with corruption in

17    Brazil was to avoid working with

18    government directly or indirectly.  So

19    when we embarked on our due diligence

20    of Sete, we looked at the players, all

21    our counterparties, the investors,

22    Petrobras, the shipbuilders and their

23    owners, and we took a view that it was

24    all on the up-and-up.  We never saw any

25    sign that there was anything going on

1          CONFIDENTIAL - CORRIGAN
2    untoward in the structure of the
3    transaction.  And had we known there
4    was, the deal would have died on the
5    spot, but we were never informed, and I
6    was never able to discern that this
7    type of activity was going on.
8          Q.    Just so we're clear,
9    Petrobras is a state-owned company, is
10   it not?
11         A.    Yes, but it's publicly
12   traded.  It trades on the New York
13   Stock Exchange, it files reports with
14   the SEC, I mean, it's a world-class
15   company.  I didn't view them as a den
16   of corruption.
17         Q.    So beyond running CompliNet
18   searches, what else did you do as part
19   of the due diligence process to look
20   into the possibility of corruption?
21         A.    It's what I said earlier.  I
22   took a view that the counterparts we
23   were dealing with were companies and
24   entities that we wanted to be
25   associated with.  They were the A group

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2          Q.     You were the lead member of

3     EIG's team in connection with the Sete

4     investment, correct?

5          A.     Yes, I would say so.

6          Q.     Did you speak to any members

7     of the Sete deal team to prepare for

8     your testimony, other members of the

9     Sete deal team?

10              MS. LAW:   Within EIG?

11         Q.     Within EIG.

12         A.     Oh, no.

13         Q.     When did you first learn

14    about the Sete investment opportunity?

15         A.     I think it was September of

16    2010.  I was visiting Brazil with Clay

17    Taylor from our Houston office.

18         Q.     And how did you learn about

19    the possibility of the Sete investment

20    at that time?

21         A.     I had made an appointment at

22    Banco Santander with a guy I used to

23    work with at Norchem, which is the

24    chemical operation that I referred to

25    earlier, when I lived there from '92 to

```
 1              CONFIDENTIAL - CORRIGAN
 2     '94.  His name is Luis Cantidio,
 3     C-A-N-T-I-D-I-O.  And I didn't have any
 4     particular agenda except to say hello,
 5     we're interested in doing business in
 6     Brazil, and what does he got, and does
 7     he have any ideas, etcetera.  And he
 8     says, It turns out I'm looking at this
 9     opportunity called Sete Brasil.  And
10     across the Chinese wall over there, is,
11     our bank is also the financial advisor
12     to Petrobras, and if you would like,
13     I'll introduce you to the guy who is
14     leading that effort, and his name was
15     Luiz Reis, R-E-I-S, and that's the
16     first time I learned about Sete Brasil.
17          Q.    What was the next step in the
18     process that ultimately led to the
19     investment in Sete Brasil?
20          A.    Well, I believe it was after
21     that I spoke to a friend of mine at
22     Société Générale, and he said, I have a
23     presentation on Sete, and he sent it to
24     me.  And I know that's among the
25     documents you have.  And so that was
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    the first, that's what would have
 3    prompted me to write a memo about this
 4    opportunity, whether we should look at
 5    it, etcetera.
 6              And then later we got access
 7    to the data room and, you know, then we
 8    really jumped in.
 9         Q.    Why did EIG want to pursue
10    this opportunity to invest in Sete?
11         A.    Well, it was the hottest deal
12    in the market in 2010.  Everybody
13    wanted to be in it, and I thought, as I
14    said earlier, we were dealing with the
15    A team, the largest corporation in
16    South America, the largest pension
17    funds, as co-investors.  Very large
18    construction groups involved in the
19    shipbuilding.  Petrobras is the
20    off-taker, Petrobras is the appointor
21    of senior management, BNDES support, I
22    mean, you couldn't get a better list of
23    entities in Brazil to work with on a
24    transaction, even though it had a lot
25    of inherent risk.
```

CONFIDENTIAL

```
1              CONFIDENTIAL - CORRIGAN
2       be there.  And again, it's in
3       numerical order.
4           A.    Thirty-nine, right?
5           Q.    Yes.
6                 (Exhibit 39, previously
7       marked, was shown to the witness,
8       EIG_KEP_00077790.)
9           A.    Okay, investment rec.
10          Q.    And do you recognize this
11     document we marked as Exhibit 39?
12          A.    Yes, I do.
13          Q.    And describe what it is?
14          A.    It's an investment
15     recommendation to invest 250 million
16     reals in Sete Brasil.
17          Q.    And this is the kind of
18     investment recommendation you talked
19     about earlier, correct?
20          A.    Correct.
21          Q.    And this is the one for the
22     investment by Fund XIV in the Sete
23     project, correct?
24          A.    That's right.
25          Q.    And this, then, sort of is
```

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2    the culmination of the due diligence

3    process and a recommendation to make

4    the investment, correct?

5         A.    Yes.

6         Q.    And this was presented to the

7    investment committee on June 27, 2011?

8         A.    It appears that way, yes.

9         Q.    And at that meeting, the

10   investment committee approved the

11   investment, correct?

12        A.    Correct.

13        Q.    How did you decide which

14   details relating to this possible

15   investment to put in this investment

16   recommendation?

17        A.    I'm not sure I understand the

18   question.

19        Q.    Well, you had learned a lot

20   about the Sete investment up to this

21   point in time, correct?

22        A.    Yes.

23        Q.    And you had to make some

24   decisions about what to put in here and

25   what not to put in here, correct?

CONFIDENTIAL

Page 71

1              CONFIDENTIAL - CORRIGAN

2         A.     Yes.

3         Q.     So just describe, generally,

4    the process of deciding what to put in

5    here and what not to put in here.

6         A.     Well, it's a fairly long

7    document to begin with, but the idea is

8    to present the transaction as

9    completely as possible with the terms

10   and conditions under which you're going

11   to invest, with the risks and mitigants

12   that you've identified for the

13   investment, and then there's, you know,

14   the projected returns and stress tests

15   on the returns.  I would say those are

16   the main themes that you want to

17   present to your investment committee.

18        Q.     And is this the most

19   comprehensive document that summarizes

20   the due diligence process relating to

21   this investment?

22             MS. LAW:  Objection to form.

23        A.     This is the only document

24   that exists that was used to approve

25   the transaction inside EIG.

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN

2          Q.    And if I want --

3          A.    I'm not sure what you mean by

4      "most comprehensive."

5          Q.    If I wanted to understand

6      everything that happened during the due

7      diligence process, is there any better

8      document to look at than this one?

9               MS. LAW:  Objection to form.

10         A.    Well, again, there were --

11     this was an iterative process where, as

12     I mentioned earlier, we had periodic

13     discussions with Kurt about the

14     progress of the deal.  So there --

15     again, I don't remember specifically,

16     but there would have been issues that

17     came up, and we would have discussed

18     them and dealt with them.  Whether all

19     of that appeared in the final

20     investment recommendation, I don't

21     know.

22         Q.    The members of the investment

23     committee, did they get information

24     related to this potential investment

25     other than what's in this investment

CONFIDENTIAL

```
 1            CONFIDENTIAL - CORRIGAN
 2     underway was not of the drill ships for
 3     Sete, we established, right?
 4          A.    No, that's right, they were
 5     clearing land and setting up, what are
 6     the words in English?  I can't
 7     remember, anyway.
 8          Q.    What sorts of questions did
 9     you ask during your visit to the EAS
10     shipyard?
11          A.    I'm not -- I don't remember
12     conversations I had 11 years ago, or
13     10 years ago.
14          Q.    Did you ask anyone at EAS
15     about possible corruption or bribery
16     when you were on this tour?
17          A.    No.
18          Q.    Did you expect the employees
19     of EAS to address the subject matter of
20     corruption or bribery on this tour?
21          A.    Well, had it occurred to me
22     that it was part of the structure of
23     the deal, that would have been nice for
24     somebody so tell us, yes.
25          Q.    But did you expect them to
```

CONFIDENTIAL

Page 83

CONFIDENTIAL - CORRIGAN

1  address that subject matter at all

2  during this tour when you took the

3  tour?

4           MS. LAW:  Objection, asked

5     and answered.

6     Q.    You can answer.

7           MS. LAW:  You can answer it

8     again.

9     A.    Well, it's what I just said.

10 I would have expected, if this was

11 known to people that we were meeting

12 with, that they would have told us.  I

13 did not have an expectation, as I

14 earlier mentioned, that there was a

15 huge corruption scheme involved in this

16 transaction.

17    Q.    Why didn't you ask anyone at

18 EAS on this tour questions relating to

19 corruption and bribery?

20    A.    Well, I didn't think this was

21 an issue that I had to worry about.

22    Q.    Did EAS provide any

23 misleading or inaccurate information to

24 EIG during this yard tour?

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2                   THE WITNESS:  You'll tell me

3         when it's up --

4                   MS. LAW:  It's up now,

5         Defendant's Exhibit 84.

6                   (Exhibit 84, marked for

7         identification, Bates stamped

8         EIG_KEP_000735367.)

9         Q.    And this is an email you sent

10   to Simon Hayden; is that correct?

11        A.    Yes.

12        Q.    And could you just describe

13   generally what you're telling

14   Mr. Hayden in this email?

15        A.    I mean, I forwarded to him

16   the most recent EPC construction

17   management agreement and the charter

18   contract and services agreement, so he

19   would be able to look them over and

20   incorporate them into the investment

21   recs we were probably scrambling to

22   finish at that point.

23        Q.    Okay.  And let's look at the

24   next exhibit, which would be number 85.

25   Hopefully that's up by now.  Or it will

Page 89

                CONFIDENTIAL - CORRIGAN

1
2   be shortly.
3              MS. LAW:  It should be there.
4              (Exhibit 85, marked for
5        identification, Bates stamped
6        EIG_KEP_00073537.)
7        A.    Okay, I see it.  85, I'll
8   open it up.  EPC?
9        Q.    Right.  And this appears to
10  be the attachment to the prior exhibit?
11       A.    Right.
12       Q.    Is that the way it looks to
13  you?
14       A.    It does, yes.
15              MS. LAW:  It's one of the
16       attachments, right, not all of
17       them?
18              MR. BARBUR:  Yes, that's
19       correct.
20       Q.    And this is the EPC contract
21  that was reviewed by the due diligence
22  team and summarized in the investment
23  recommendation, correct?
24              MS. LAW:  Objection to form.
25       A.    It should be, yes.  This

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2      looks like a final.  We looked at
 3      drafts earlier on, I remember.
 4           Q.    Okay.  But you got this
 5      before the date of the investment
 6      committee meeting, right?
 7           A.    Right.
 8           Q.    If you turn to page 41 of
 9      this document.
10                 MS. LAW:  You're referring to
11           the page numbers at the bottom of
12           the document.
13                 MR. BARBUR:  Correct.
14           A.    38, 39, here we go, 41, okay,
15      I'm here.
16           Q.    And you see that there are
17      representations and warranties by the
18      contractor --
19           A.    Mm-hmm, yes.
20           Q.    -- in 6.2?
21           A.    Yes.
22           Q.    Did EIG consider these
23      representations and warranties here to
24      be material to its investment decision?
25                 MS. LAW:  Objection to form.
```

Page 91

1              CONFIDENTIAL - CORRIGAN
2        You can answer.
3        A.    Yes, this is an important
4   part of the contract.
5        Q.    And one of the
6   representations and warranties is the
7   contractor is not in violation of any
8   applicable law.  Do you see that?
9        A.    Yes.
10       Q.    And other than simply reading
11  this on this page, did you do anything
12  to verify whether that representation
13  and warranty was correct?
14       A.    No, we took it at face value.
15       Q.    And we talked earlier about
16  the CompliNet searches you ran as part
17  of the due diligence process.  Do you
18  recall that?
19       A.    Yes, sir.
20       Q.    And you said you ran some
21  CompliNet searches related to Keppel,
22  correct?
23            MS. LAW:  Objection,
24       mischaracterizes his prior
25       testimony.

CONFIDENTIAL

Page 98

```
 1              CONFIDENTIAL - CORRIGAN
 2    for a legal opinion.  You're not a
 3    lawyer, I'm not asking you for a legal
 4    opinion.  But when you wrote, binding
 5    commitment and binding agreement, did
 6    you mean what you said?
 7              MS. LAW:  Objection, form.
 8         A.    I have to go back and look at
 9    what we had signed.  I'm sure we had
10    signed something with Kaisha, and I
11    probably was using terms that they were
12    using.  I don't remember.  That's why I
13    used that word.  But clearly, we had an
14    expectation of investing, but I don't
15    feel we were committed at this point.
16         Q.    And you were not committed
17    because you thought there were certain
18    conditions, is that your testimony?
19         A.    Yes.
20         Q.    And those conditions related
21    to allocations and other things, and
22    they were met, those conditions?
23         A.    Eventually, yes.
24         Q.    Let's mark another exhibit,
25    tab 12.
```

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2    mentioned, but that would have been --

3    we were using EIG as investment

4    manager.

5         Q.    This is the agreement that

6    you referred to as a binding agreement

7    in the prior document we looked at,

8    correct?

9              MS. LAW:  Objection to form.

10        A.    I believe so.

11        Q.    And if you look on the second

12   to the last page, it ends in production

13   number 476.  Is that your signature?

14        A.    Yes.

15        Q.    And also there's the

16   signature of Mr. Thomas there?

17        A.    Yes.

18        Q.    What did you understand you

19   were agreeing to when you signed this?

20        A.    Well, I -- it was an

21   indication that we were prepared to

22   invest in Sete Brasil, but we're still

23   referred to as a potential investor, so

24   there doesn't seem to be any commitment

25   on their side.

CONFIDENTIAL

1           CONFIDENTIAL - CORRIGAN

2        A.     That's correct, yes.

3        Q.     And in fact, this document is

4    almost identical to the investment

5    recommendation made for Fund XIV,

6    correct?

7        A.     I would think so, although I

8    would have to read them both.  But I

9    agree, there would have been

10   significant changes between June and

11   September.

12       Q.     Would additional due

13   diligence have been done between June

14   and September?

15       A.     Well I think, no, not per se.

16   We were still there monitoring what was

17   going on and the progress of the

18   contracts with Petrobras for the

19   additional drill ships, and all I can

20   say is if we had gotten a whiff of

21   anything untoward during that time, we

22   clearly would have pulled the deal.

23   But I don't remember that we made more

24   trips specifically for this purpose.

25       Q.     What we've marked as

CONFIDENTIAL

Page 110

1          CONFIDENTIAL - CORRIGAN

2          A.     Correct.

3          Q.     What this says about Brasfels

4     is exactly what was said about Brasfels

5     in the investment recommendation for

6     Fund XIV, correct?

7          A.     It looks like it, yes.

8          Q.     Had any additional due

9     diligence been done relating to

10    Brasfels or Keppel between June and

11    September?

12         A.     I don't believe so, no.  We

13    were comfortable with them because they

14    were, you know, they were an operating

15    entity, they had a track record in

16    Brazil.  The others did not.

17         Q.     And then you would have

18    presented this investment

19    recommendation to the investment

20    committee at a meeting in September of

21    2011, correct?

22         A.     Yes.

23         Q.     And was the presentation

24    essentially the same as the

25    presentation for the Fund XIV

CONFIDENTIAL

CONFIDENTIAL - CORRIGAN

1

2    there would have been much change in

3    that.  They were preparing for a bigger

4    fundraising, because they were going to

5    grow from seven to 28 ships, and so

6    they did need a lot of capital, and

7    that's what was the genesis of our

8    increased investment.  But at this

9    point in time, we still didn't know if

10   we had a deal.  That's my main

11   recollection of this time frame.

12        Q.    And again, that's because

13   there were certain conditions before

14   the investment would close, correct?

15        A.    Well, and it wasn't clear

16   that the other investors wanted us in

17   there.  They were going to exercise

18   their preemptive rights.

19        Q.    So what you're saying is this

20   was a commitment by EIG to invest, but

21   not a commitment by Sete to accept the

22   investment?

23            MS. LAW:  Objection to form,

24       mischaracterizes the testimony.

25        A.    Yeah, I don't know if, I

```
 1           CONFIDENTIAL - CORRIGAN
 2       answer.
 3           A.    No.  Remember, our mindset at
 4   this point was hoping to invest.  We
 5   wanted to invest, but we didn't feel we
 6   were binded or bound by this.  If
 7   something had come up, we would have
 8   pulled out.  But at this point in time
 9   we viewed this as a, you know, our
10   intention is to invest, but we don't
11   know if they're going to get the 21
12   additional drill ships or the other
13   shareholders are going to not exercise
14   their preemptive rights, so there were
15   two big conditions there, which, as we
16   discussed earlier, were eventually
17   fulfilled.
18           Q.    Right.  So the conditions
19   that made your investment less than
20   certain were ultimately overcome or
21   fulfilled, right?
22           A.    Yes, but I'm saying, and I'm
23   not a lawyer, that, you know, BNDES
24   pulled out of the deal when things went
25   sour, and they had a commitment, so we
```

CONFIDENTIAL

1                CONFIDENTIAL - CORRIGAN

2     would have pulled out had we known what

3     was really going on, and we were never

4     given that opportunity.

5          Q.    Did you ever request the

6     opportunity to pull out?

7          A.    No, it never came up, because

8     we weren't aware there was a reason to

9     pull out.

10         Q.    When did EIG first become

11    aware that one of the shipbuilding

12    contracts for the Sete project was

13    awarded to Keppel?

14         A.    I think it was towards the

15    end of 2011.

16         Q.    Let's post what was

17    previously marked as Defendant's

18    Exhibit 40.

19              (Exhibit 40, previously

20         marked, was shown to the witness,

21         EIG_KEP_00286690.)

22         A.    Should I get out of this

23    document?

24         Q.    You can get out of that

25    document and go to what will hopefully

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2     of the due diligence process?
 3          A.    Well, because we now know
 4     that Keppel, among others, was part of
 5     the Lava Jato bribery scheme.
 6          Q.    Did you have any connections
 7     with Keppel during the due diligence
 8     process?
 9          A.    Just the visits that we
10     talked about before.
11          Q.    The visits were after the
12     first investment decision was made,
13     right?
14          A.    That's correct.
15          Q.    So they were not part of the
16     due diligence process to make the
17     investment, were they?
18               MS. LAW:  Objection to form.
19        You can answer.
20          A.    Right, we had visited EAS,
21     and we had looked at the other
22     shipyards, and as I had said earlier,
23     for us, Keppel was the star because it
24     had a long history of operating in
25     Brazil.
```

CONFIDENTIAL

1        CONFIDENTIAL - CORRIGAN
2        Q.    Well, did you have any
3    conversations with anyone at Keppel
4    where you would have thought they
5    should have disclosed the bribes, and
6    they failed to do so?
7        A.    Not prior to the investment
8    recommendation, no.
9        Q.    At some point you made some
10   visits to the Keppel -- the Brasfels
11   shipyard in Brazil, correct?
12       A.    Yes.
13       Q.    And the first one of those
14   visits was in August of 2011, as you
15   testified in your Petrobras deposition,
16   right?
17       A.    I'm going to refer to the
18   binder, since we had agreed earlier
19   that I could do that.
20       Q.    Absolutely, help yourself.
21       A.    And that has on tab, towards
22   the end, it has correspondence about
23   that visit, I believe.  Okay, I think
24   it's tab 21, talks about your trip in
25   August of 2011.

CONFIDENTIAL

Page 131

1          CONFIDENTIAL - CORRIGAN

2          Q.    Correct.  And this was a trip

3     in conjunction with an entity called

4     CIC, correct?

5          A.    That is correct.

6          Q.    What is CIC?

7          A.    China Investment Corporation.

8     It's a customer of EIG's.

9          Q.    You mean, when you say

10    customer --

11         A.    I'm sorry, yeah, I -- an

12    investor in EIG funds.

13         Q.    And this tour in August of

14    2011 occurred after EIG had already

15    made its decision, initial decision to

16    invest in Sete, correct?

17         A.    Correct.

18         Q.    And this tour concerned CIC's

19    potential investment in Sete rather

20    than EIG's, correct?

21              MS. LAW:  Objection, you can

22         answer.

23         A.    Yeah, we set it up to help

24    CIC in their due diligence, but I

25    wouldn't say that we were -- you know,

Page 132

1              CONFIDENTIAL - CORRIGAN

2    we would do nothing in our own case.

3    It was the first time we'd been to

4    Keppel, so we would have been

5    interested to see what was going on in

6    connection with our own investment.

7         Q.    Would you have set up this

8    trip, but for CIC?

9              MS. LAW:  Objection to form,

10       you can answer.

11        A.    I don't know how to answer

12   that.  Probably not at this time, but

13   we would have eventually wanted to

14   visit.  Keppel had the benefit of being

15   the closest physically to Rio, and it

16   was easier to get to the other ones

17   where you had to get on a plane.

18        Q.    And what was the purpose of

19   visiting the yard?  Setting aside the

20   role of CIC, for either CIC or EIG,

21   what was the purpose?

22        A.    Well, CIC was, you know,

23   beginning to kick the tires, as we had

24   the previous year, and they just wanted

25   to see one of the shipyards to see

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2    what -- to gain impressions on their

3    ability to fulfill contracts.

4         Q.    Is it fair to say the focus

5    was the technical ability of the

6    shipyard to construct the drill ships?

7              MS. LAW:  Objection to form.

8         You can answer.

9         A.    Yeah, I think that would --

10   well, again, I don't know exactly what

11   Yangyang and Dr. Xu wanted to

12   accomplish on that trip, but I think

13   what you've said is a reasonable

14   assumption.

15        Q.    There were discussions with

16   representatives of Brasfels on this

17   trip; is that correct?

18        A.    Yes, they, I recall they

19   greeted us, they gave a presentation

20   and then we walked around the shipyard,

21   which is quite large.

22        Q.    And the presentation focused

23   on their ability to construct the drill

24   ships, correct?

25        A.    I don't remember the exact

                    CONFIDENTIAL - CORRIGAN

1
2    nature of the presentation, but it

3    would have been an overview of their

4    operations, and I'm sure it was touting

5    their skills, etcetera.

6         Q.    When we talk about skills,

7    it's really their shipbuilding capacity

8    was the focus, right?

9         A.    Yes, that's correct.

10        Q.    What was EIG's relationship

11   with CIC?

12        A.    I would prefer that you ask

13   Blair that question, if you don't mind,

14   because I just know they were an

15   important investor in EIG.

16        Q.    Setting -- did you understand

17   that EIG had a preexisting relationship

18   with CIC prior to this yard tour?

19        A.    Just as an aside, in a fund

20   management company such as EIG, you

21   have the folks that deal with

22   investors, and then folks like me that

23   deal with the deployment of those

24   funds.  And the two don't really mix or

25   interact that much.

CONFIDENTIAL

```
1              CONFIDENTIAL - CORRIGAN
2    overview I gave you a minute ago.
3        Q.    Do you think that any
4    inaccurate or misleading information
5    was provided by Brasfels during this
6    tour?
7              MS. LAW:  Objection, you can
8        answer.
9        A.    Again, it's what I said
10   earlier.  No, at that time I thought
11   everything they said was truthful and,
12   you know, they didn't bring up the
13   corruption scheme that already existed.
14       Q.    Did you or did anyone else on
15   this tour raise questions relating to
16   bribery or corruption?
17       A.    No.
18       Q.    Do you recall that CIC
19   invited someone from Morgan Stanley to
20   this yard tour?
21       A.    My recollection, I think his
22   name was Kevin, poor guy, and he was
23   sort of an intern.  I don't think he
24   was wearing a Morgan Stanley hat, so he
25   was seconded or doing an internship of
```

CONFIDENTIAL

Page 141

1          CONFIDENTIAL - CORRIGAN

2              MS. LAW:  Objection to form.

3      A.    Several, five or six.

4      Q.    Five or six Brasfels people

5  participated in this yard tour?

6      A.    No, well, in the

7  presentation, I remember we went into a

8  conference room, and then we met

9  several people.  They gave a

10  presentation, and then I think the walk

11  itself was with just one individual.

12      Q.    And when you walked around,

13  what were you looking at?

14      A.    Where they store the steel,

15  where the dry dock is, these huge

16  cranes.  There was a semi-submersible

17  sitting in the water.  I mean, it's a

18  big operation.

19      Q.    And this yard tour occurred

20  before Brasfels actually had a contract

21  to build one of the rigs for Sete,

22  right?

23      A.    Yes, because we established

24  that was at the end of the year, and

25  this is August.

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2    shipyards?

3        A.    Yes.

4        Q.    Do you recall that there was

5    another visit to the Brasfels shipyard

6    in March of 2012?

7        A.    Yes, I'm going to refer again

8    to my binder on that.  Yeah, that's the

9    second one, with another investor.

10        Q.    And what do you recall about

11    the purpose of this yard tour?

12        A.    My recollection is that it

13    was a mirror of the CIC's visit a few

14    months earlier, except now with ADICO,

15    the sovereign wealth fund of Abu Dhabi,

16    as opposed to a Chinese entity.

17        Q.    So the purpose of this was to

18    present to ADICO the possibility of

19    investing in Sete?

20        A.    That is correct.  A-D-I-C-O.

21    It's Abu Dhabi Investment Company, I

22    believe it stands for.

23        Q.    Did EIG have a preexisting

24    relationship with ADICO?

25        A.    I go back to my response how

Page 161

1          CONFIDENTIAL - CORRIGAN

2    I answered you on CIC.  It was an

3    investor of ours, and beyond that I

4    don't know.  But clearly it was an

5    important investor.

6          Q.    Do you know whether ADICO was

7    an investor in either Fund XIV or Fund

8    XV?

9          A.    I don't recall.

10          Q.    But this tour was focused on

11    a potential separate investment by

12    ADICO in Sete; is that correct?

13              MS. LAW:  Objection to form.

14       You can answer.

15          A.    That -- yeah, that was an

16    evolution.  It didn't start out that

17    way.  It eventually became that, and at

18    this point in time I'm not sure whether

19    it's to co-invest with us, to come in

20    with us, or to do their own thing.

21          Q.    Did ADICO ultimately invest

22    in Sete separate from EIG?

23          A.    We understand that it came in

24    through BTG Bactual.

25          Q.    What was the last word you

CONFIDENTIAL

Page 162

1              CONFIDENTIAL - CORRIGAN

2    said?

3         A.    B-A-C-T-U-A-L.

4         Q.    And what is that?

5         A.    That's the investment bank

6    that had the single largest investment

7    in Sete, and a lot of that was, I don't

8    know how much, but they had, you know,

9    co-investors behind them, ADICO being

10   one of them.

11        Q.    Who was present for this

12   March 28th Brasfels yard tour from EIG,

13   if anyone?

14        A.    My recollection is it was

15   Simon Hayden from our London office,

16   myself, an analyst from London named

17   Hoshrav Patel, and then Jeppe from

18   ADICO.  He might have had somebody with

19   him, I can't remember.

20             MR. BARBUR:  Let's mark a

21      document, tab 23, David.

22             MS. LAW:  It should be in

23      your folder as Exhibit 95.

24             THE WITNESS:  Got it.

25        Q.    Do you recognize this email,

CONFIDENTIAL

1           CONFIDENTIAL - CORRIGAN

2        A.    He was an analyst in our

3    London office, yeah, he worked with

4    Simon Hayden.

5        Q.    And how many representatives

6    of ADICO were on this --

7        A.    As I said earlier, for sure

8    Jeppe, and I can't remember if he had

9    someone with him or not.  I think he

10   was by himself, but I wouldn't swear to

11   it.

12       Q.    Anyone else on the yard tour

13   beyond the people at Brasfels?

14       A.    I don't remember if somebody

15   from Lakeshore came with us.  Ivan Hong

16   might have been with us, but again, I

17   don't recall.

18       Q.    And Ivan Hong is with a Sete

19   entity called Lakeshore?

20       A.    No, Lakeshore is the

21   financial advisor that, let's say,

22   replaced Santander.  But, you know,

23   it's the same people.  They had been

24   employees of Santander, then they

25   formed their own advisory company and

CONFIDENTIAL

Page 166

1                  CONFIDENTIAL - CORRIGAN

2      became Sete's advisors.

3          Q.    Was anyone from Sete or

4      Petrobras on the yard tour?

5          A.    I don't believe so, no.

6          Q.    Do you recall meeting with

7      employees of the shipyard?

8          A.    My recollection is that it

9      was very similar to what we had done

10     with CIC, where they made a

11     presentation, and then we had a walk

12     around the shipyard, and I think we had

13     lunch in their staff dining hall.

14         Q.    And again, the focus of the

15     yard tour was the shipbuilding capacity

16     of Brasfels?

17              MS. LAW:  Objection to form.

18         A.    Yes.

19         Q.    Do you remember any specific

20     questions that were asked of Brasfels

21     on this tour?

22         A.    I don't.

23         Q.    You had a general tour of the

24     shipyard and looked at ships being

25     constructed; is that correct?

CONFIDENTIAL

Page 167

1                CONFIDENTIAL - CORRIGAN

2          A.     Well, semi-submersibles.  I

3     don't recall that there was one being

4     built, but they had one, I think,

5     floating nearby, and they had a dry

6     dock.  They were doing maintenance and

7     stuff like that.

8          Q.     Did the subject of corruption

9     or bribery come up at any time during

10    this yard tour?

11         A.     Not that I recall.

12         Q.     Do you recall -- did you or

13    anyone else from EIG ask any questions

14    relating to corruption or bribery?

15         A.     No, I don't recall, I believe

16    not.

17         Q.     Do you have any reason to

18    believe that Brasfels provided any

19    false or misleading information during

20    this tour?

21              MS. LAW:  Objection to form,

22       you can answer.

23         A.     Yeah, this is a similar

24    question.  The way I answered it is at

25    the time, no, we thought it was all on

```
 1              CONFIDENTIAL - CORRIGAN
 2   the up-and-up, and nobody told us that
 3   there was an underlying issue that we
 4   should have known about.
 5         Q.    The focus of the yard tours,
 6   we discussed, was the shipbuilding
 7   capacity of Brasfels, right?
 8              MS. LAW:  Objection.
 9         A.    Semi-submersibles that
10   Petrobras was contracting them for.
11         Q.    And was any misleading
12   information provided relating to that?
13              MS. LAW:  Objection, asked
14      and answered.
15         Q.    You can answer.  The question
16   is, was any misleading information
17   provided concerning the shipbuilding
18   capacity of Brasfels?
19         A.    No, not concerning
20   shipbuilding capacity.  Concerning the
21   overall transaction in retrospect, yes,
22   as we said before.
23         Q.    Did EIG rely on anything it
24   learned during this yard tour for any
25   purpose?
```

```
 1              CONFIDENTIAL - CORRIGAN
 2    watch, what was it, the 2014 Superbowl.
 3    He was a big New England Raiders fan.
 4         Q.    And --
 5         A.    Patriots, jeez, sorry.
 6         Q.    No, go ahead.
 7         A.    Sorry, New England Patriots.
 8         Q.    During any of your
 9    discussions with Mr. Ferraz, did the
10    subject of bribery or corruption ever
11    come up?
12         A.    Never.
13         Q.    Did you ever ask Mr. Ferraz
14    whether Sete was involved in any
15    bribery?
16         A.    I did not.
17         Q.    Do you recall who the
18    shareholders were that requested this
19    2013 yard tour?
20         A.    I don't, because as I said
21    earlier, I wasn't -- I'm not sure if
22    the genesis was one of the directors or
23    Ferraz.  But anyway, the idea was
24    broached, and it was enthusiastically
25    received, I remember that.
```

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN
2          Q.    And do you remember who the
3     attendees were for this yard tour?
4          A.    I can't, I couldn't.  But I
5     think pretty much every investor had
6     somebody there, including myself.
7          Q.    So approximately how many
8     people would that be?
9          A.    I think the board had 13
10    people and, you know, I guess there was
11    probably 20 of us showed up, roughly.
12         Q.    And to sort of cut to the
13    chase, did this yard tour proceed,
14    essentially, as the other ones had?
15         A.    Yes, very similar.
16         Q.    There was a presentation, and
17    then there was a walk-around tour of
18    the yard?
19         A.    That's correct, that's my
20    recollection.
21         Q.    And do you recall anything
22    specific that was discussed, either
23    during the presentation or the
24    walk-around tour?
25         A.    I do not.

CONFIDENTIAL

Page 175

                    CONFIDENTIAL - CORRIGAN

1

2        A.    That is correct.

3        Q.    Was the subject of corruption

4   or bribery ever discussed on this yard

5   tour?

6        A.    No.

7        Q.    Did you or anyone else from

8   EIG or any of the other investors ask

9   any questions of Brasfels relating to

10  corruption or bribery?

11       A.    I did not, and I don't recall

12  hearing anybody else bring up that

13  subject.

14       Q.    And did EIG rely on anything

15  that it learned on this yard tour for

16  any purpose?

17            MS. LAW:  Objection to form.

18       You can answer.

19       A.    Well, it provided, you know,

20  this was now several months after our

21  previous visit, and I remember feeling

22  good about the progress at Brasfels,

23  that they were a professional company

24  that was doing a good job.

25       Q.    And has your view on that

CONFIDENTIAL

Page 177

1              CONFIDENTIAL - CORRIGAN

2         A.    No, that I'm pretty confident

3    did not happen.

4         Q.    Do you know who Zwi Skornicki

5    is?

6         A.    Well, I didn't until Kerri

7    told me yesterday.

8         Q.    So you had never heard the

9    name Zwi Skornicki come up prior to

10   yesterday?

11        A.    That's correct.

12        Q.    I know this is after you

13   retired from EIG, but at some point

14   Operation Car Wash was widely

15   publicized in Brazil, right?

16        A.    That's correct.

17        Q.    Were you aware of that when

18   it happened?

19        A.    I mean, from press reports,

20   yeah, I think I found out about it the

21   way most people did.  I wasn't aware of

22   any buildup, if there was one.

23        Q.    And what did you understand

24   was revealed, generally, through

25   Operation Car Wash?

1              CONFIDENTIAL - CORRIGAN

2    transaction if you wanted to?

3              MS. LAW:  Objection to form,

4         asks for a legal conclusion.  You

5         can answer.

6         A.    I view that as a theoretical

7    question.  At this point we're at the

8    opposite mindset, hoping for an

9    allocation and wanting to get in.  If

10   somebody had called us and said, Hey,

11   did you know Ferraz is getting a

12   1 percent kickback from the shipyard,

13   we would have pulled out.  So we're

14   dealing in sort of hypothetical

15   situations here.

16        Q.    Did you have concerns about

17   Sete's management?

18        A.    No.

19             MR. BARBUR:  Let's look at

20        another document, tab 28.  We'll

21        mark that.

22             (Exhibit 98, marked for

23        identification, Bates stamped

24        EIG_KEP_00039525.)

25             MS. LAW:  Should be up now as

**ERRATA SHEET**
*EIG v. Keppel*
**Kevin Corrigan Transcript (#4693396)**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 27 | 3 | "$100,000" should be "$150,000" | Clarification |
| 27 | 3 | "$250,000" should be "$400,000" | Clarification |
| 38 | 24 | "investment?" should be "investment." | Transcription error |
| 51 | 5, 8 | "CompliNet" should be "Complinet" | Transcription error |
| 52 | 16 | "CompliNet" should be "Complinet" | Transcription error |
| 54 | 17 | "CompliNet" should be "Complinet" | Transcription error |
| 56 | 9 | "CompliNet" should be "Complinet" | Transcription error |
| 79 | 8 | "Kevin Lauder" should be "Kevin Lowder" | Transcription error |
| 80 | 6 | "Lauder" should be "Lowder" | Transcription error |
| 91 | 16, 21 | "CompliNet" should he "Complinet" | Transcription error |
| 92 | 5 | "CompliNet" should be "Complinet" | Transcription error |
| 98 | 10 | "Kaisha" should be "Caixa" | Transcription error |
| 102 | 5 | "Curt" should be "Kurt" | Transcription error |
| 103 | 2 | "Lauder" should be "Lowder" | Transcription error |
| 106 | 15 | "hiccough" should be "hiccup" | Transcription error |
| 108 | 9 | "would have been" should be "would not have been" | Clarification |
| 139 | 2 | "I did" should be "I did not" | Clarification |
| 161 | 24 | "BTG Bactual" should be "BTG Pactual" | Transcription error |
| 162 | 3 | "B-A-C-T-U-A-L." should be "P-A-C-T-U-A-L." | Transcription error |
| 170 | 17 | "suplante" should be "suplente" | Transcription error |
| 171 | 25 | "Lauder" should be "Lowder" | Transcription error |

1

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 178 | 13, 16 | "workers' party" should be "Workers' Party" | Transcription error |

Kevin Corrigan

Kevin Corrigan

8/16/21

Date

2