# EXHIBIT 123



Deposition of:

# Kevin Corrigan

*October 16, 2020*

In the Matter of:

# EIG v. Petrobras

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com  |

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3

4    EIG ENERGY FUND XIV.L.P., et al.,  )

                                        ) Civil Action No.

5           Plaintiffs,                 ) 1:16-cv-333-APM

                                        )

6         v.                            )

                                        )

7    PETROLEO BRASILEIRO S.A., et al.,  )

                                        )

8           Defendants.                 )

     -----------------------------------)

9

10                        - - -

11                 FRIDAY, OCTOBER 16, 2020

12                        - - -

13         30(B)(6) REMOTE ZOOM Deposition of EIG Energy

14    Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG

15    Energy Fund XIV-B, L.P., EIG Energy Fund XIV

16    (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy

17    Fund XV-A, L.P., EIG Energy Fund XV-B, L.P., and EIG

18    Energy Fund XV (Cayman), L.P. (the Funds) by and

19    through its designee KEVIN CORRIGAN, beginning at

20    9:14 a.m., before Nancy J. Martin, a Registered Merit

21    Reporter, Certified Shorthand Reporter.  All parties

22    appeared remotely.

Page 14

1      Q.  Okay.  So let me ask you that.  Are you

2  currently employed?

3      A.  No.

4      Q.  Okay.  And who was your last employer?

5      A.  EIG.

6      Q.  And when did your employment with them end?

7      A.  June 30, 2014.

8      Q.  And at that point, you retired?

9      A.  Correct.

10     Q.  Okay.  Have you done any consulting or other

11  paid work since June 30, 2014?

12     A.  I did one approximately three-week assignment

13  for EIG on a solar power project that they were

14  developing in Chile.  That was back about 2017, but

15  that's the only paid work I've done.

16     Q.  Okay.  And in terms of your employment by

17  EIG, can you tell me the years that you were employed

18  by EIG?

19     A.  February of 2005 until June 30, 2014.

20     Q.  And during that period of time, where were

21  you physically located?  Where were your offices?

22     A.  Well, when I was first hired, we had an

Page 15

1    office in Tysons Corner, Virginia.  You know,

2    Washington D.C., basically.  And in mid-2006 that

3    office was closed down.  It was part of TCW.  I

4    should -- are you aware that, you know, EIG was an

5    offshoot of TCW that occurred in 2010?

6           So I say EIG for the 10 years, but it was

7    really TCW and then EIG.

8        Q.  So let's clear that up.  So TCW is the Trust

9    Company of the West?

10       A.  Correct.  Yes, based in Los Angeles.

11       Q.  So you were first employed by TCW in February

12   of 2005?

13       A.  That's correct.  And EIG was the -- were the

14   initials for the Energy and Infrastructure Group

15   within TCW.

16       Q.  And that group was spun off into a separate

17   company or series of companies in 2010?

18       A.  Approximately 2010, yeah.

19       Q.  Okay.  Did that change your employment in any

20   way?

21       A.  Really, for me, it was completely seamless.

22   I was doing the same thing.  I was working with the

```
 1    have had individual personal offices, but there wasn't

 2    a separation between the companies in terms of

 3    physical barriers?

 4         A.  I believe there was a wall --

 5              MS. LAW:  Kevin, could you please just give

 6    me a chance to put objections in.

 7              THE WITNESS:  Oh.  Sorry.

 8              MS. LAW:  There was an objection to form on

 9    that.

10    BY MR. WOLINSKY:

11         Q.  Go ahead.

12         A.  There was a barrier of sorts that separated

13    Sete from these outsiders, if you will.

14         Q.  And was that barrier a wall --

15    floor-to-ceiling wall?

16         A.  Yes, that's my recollection.

17         Q.  Okay.  But you and Lakeshore shared office

18    space without such a barrier?

19         A.  Correct.

20         Q.  And the principal at Lakeshore was a

21    gentleman named Luiz Reis; is that right?

22         A.  Reis, yes.
```

Page 23

1    Hanover Trust Company.  And from 1992 -- early '92 to

2    mid '94 with a joint venture that Chemical Bank had

3    there.  By then Manufacturers Hanover and Chemical had

4    merged.

5         Q.  So when you returned to live in Brazil in

6    2012, you had not lived there since 1994?

7         A.  That is correct.

8         Q.  Okay.  Do you speak Portuguese fluently?

9         A.  Reasonably fluently.

10        Q.  Okay.  Where do you live today?

11        A.  Hedgesville, West Virginia.

12        Q.  Okay.  That sounds nice.

13             In terms of Lakeshore, what is your

14   understanding of Lakeshore's business?

15        A.  They're a financial advisory firm.

16        Q.  Okay.  And do you know whether or not they

17   had a business relation- -- you mentioned they had a

18   business relationship with Sete.  Can you tell me what

19   your understanding was of the business relationship

20   between Lakeshore and Sete?

21        A.  I believe they were hired to assist Sete in

22   fund-raising primarily.

1      Q.  Okay.  And so tell me when did you first --

2   when did you first become aware of Project Sondas?

3      A.  Right around this time.  Clay and I had gone

4   to Brazil on a sort of marketing trip, if you will.

5   In the course of that, we met with Denis and several

6   other, you know, market players and potential clients,

7   et cetera.

8      Q.  Okay.  So do you remember what months you

9   went to Brazil with Mr. Taylor?

10      A.  I think it was August.  So maybe a couple

11   weeks before this E-mail.

12      Q.  Okay.  When you went to Brazil in August of

13   2010, did you meet with anybody specifically about the

14   Sete project?

15      A.  Well, that's when I became aware of Sete, and

16   the first time I learned about it was when I visited

17   Banco Santander, and I visited an ex-colleague of mine

18   from a prior job.  He and I worked together, and he

19   was on Santander's equity investment side.  His name

20   is Luiz Cantidio.  And he said, "Hey, this is

21   something you should take a look at.  We're working on

22   this transaction with this new company that Petrobras

Page 53

1    is setting up," et cetera et cetera.  "By the way,

2    across the Chinese wall is our advisory group who have

3    been hired by Petrobras to advise them on this whole

4    transaction," and that's when he introduced me to Luiz

5    Reis.

6         Q.   Okay.  So in August 2010, you went to Brazil

7    and you met with Banco Santander; right?

8         A.   Correct.

9         Q.   And you met with an ex-colleague on the

10   equity -- on the equity side there named Luiz Cantio?

11        A.   C-a-n-t-i-d-i-o.

12        Q.   Got it.  Is that correct?

13        A.   Correct.

14        Q.   And he made you aware of the Sete project; is

15   that right?

16        A.   Right.

17        Q.   Okay.  But he wasn't personally working on

18   soliciting investors for that project; right?

19        A.   No.  Correct.

20        Q.   Okay.  In fact, you mentioned a Chinese wall.

21   People at Santander that were working on soliciting

22   investors for the project were walled off from your

Page 54

```
 1    ex-colleague right?
 2         A.   Correct.
 3         Q.   Did he actually physically introduce you to
 4    Mr. Reis during the visit in August of 2010?
 5         A.   I think so.  I mean it might have been later
 6    that day or the next day, but yes.
 7         Q.   Okay.  Was it -- and did you meet with him
 8    and discuss Sete at that point?
 9              MS. LAW:  When you say, "him" --
10              MR. WOLINSKY:  Mr. Reis.
11              THE WITNESS:  Yes.
12    BY MR. WOLINSKY:
13         Q.   Where -- were you in Santander's offices or
14    somewhere else?
15         A.   Santander's offices.
16         Q.   How long did you spend meeting with Mr. Reis
17    at that point?
18         A.   The first meeting?  Maybe 30 minutes.
19         Q.   Okay.  Was anybody else in the room besides
20    and you Mr. Reis?
21         A.   And Clay.
22         Q.   Anyone else besides the three of you?
```

Page 55

```
 1          A.  I don't think so.

 2          Q.  Did Mr. Reis give you any documents at that

 3     time?

 4          A.  No.

 5          Q.  Okay.  All right.  When you were in Brazil in

 6     August of 2010, you said you also -- did you meet with

 7     any -- did you discuss Sete Brasil with anybody else?

 8          A.  I don't believe so, no.

 9          Q.  Okay.  Did you meet with anyone from

10     Petrobras?

11          A.  No.

12          Q.  Okay.  You said you also met with your

13     colleague, Denis De Castro; is that correct?

14          A.  Yeah.  I don't know if I met with him that

15     trip, but I was in contact with Denis, yes.

16          Q.  Okay.  You then go on and say -- you tell

17     Mr. Taylor to "check out the websites to Petrobras,

18     Queiroz Galvao Oleo e Gas, and Odebrecht."

19               Do you see that?

20          A.  Yes.

21          Q.  Do you know why you were telling him to do

22     that?
```

Page 58

```
 1        Q.   Okay.  Are you familiar with a January 2010

 2   memorandum as described here?

 3        A.   Was this Lakeshore or Santander on it?  There

 4   was also one from that Kaisha prepared, and I'm

 5   getting a little confused between those two.

 6        Q.   Well, to be honest with you, I'm not sure

 7   what this refers to, and that's what I'm trying to

 8   understand from you.  It says, "Petrobras sent EIG a

 9   'Confidential Information Memorandum' dated January

10   2010."  Now, we just talked about how you didn't

11   become focused on this transaction -- the existence of

12   the transaction until August or September, 2010.

13        So do you remember actually receiving a

14   confidential information memorandum dated January

15   2010?

16        A.   I don't remember receiving it, but we had it

17   and we relied on it.

18        Q.   Do you know how you received it?

19        A.   My recollection -- we were getting most

20   things from Santander, and then later Lakeshore, in

21   their capacity as financial advisors to these two

22   companies.
```

1        Q.  And so you don't know -- sitting here today,

2    speaking on behalf of EIG, you can't tell me when EIG

3    received the January 2010 confidential information

4    memorandum referenced in Paragraph 36?

5            MS. LAW:  Objection to form.

6            THE WITNESS:  I don't remember the date, no.

7    BY MR. WOLINSKY:

8        Q.  And sitting here today, speaking on behalf of

9    EIG, you can't tell me how EIG -- from whom EIG

10   received the confidential information memorandum dated

11   January 2010; is that correct?

12           MS. LAW:  Objection.

13           THE WITNESS:  Yes.

14   BY MR. WOLINSKY:

15       Q.  Okay.  And you said but you relied on it.  In

16   what way did you rely on it?

17       A.  Well, we should really be talking about when

18   we got access to the data room because that's when we

19   had a lot of information on the transaction.  By then,

20   we spent some time and decided that this was something

21   we wanted to pursue.

22               And so in that data room there was a ton of

Page 60

```
1    information, and we relied on all of that for our

2    analysis and eventual approval of the investment.

3         Q.  Okay.  So do you know when you received

4    access to the data room?

5         A.  I don't remember dates and times.  So no.  It

6    was shortly -- I guess in September or October of

7    2010.

8         Q.  Okay.  And is that -- who would have given

9    you access to the data room?

10        A.  The financial advisors.

11        Q.  Who from EIG would have been responsible for

12   reviewing documents in the data room?

13        A.  Well, we had a team.  Myself, Kevin Lowder,

14   Clay Taylor.  We would have been the three primary

15   analysts.

16        Q.  Is it right --

17        A.  I'm sorry.  We also hired external counsel to

18   help us review the contractual arrangement.

19        Q.  Okay.  And sitting here today, speaking on

20   behalf of EIG, can you tell me in what month you

21   received -- what month and year you received access to

22   the data room?
```

Page 62

1     how to do that.

2              You may continue your deposition now.

3              MR. WOLINSKY:  I would ask that you do that

4     rather than guiding the witness, Ms. Law.  Thank you.

5              MS. LAW:  I was not guiding the witness.

6              MR. WOLINSKY:  You certainly were.

7         Q.  Mr. Corrigan, I'm going to repeat the

8     question.

9              Sitting here, speaking on behalf of EIG, can

10    you tell me the year in which EIG received access to

11    the data room?

12             MS. LAW:  Objection.  Same objection.

13             THE WITNESS:  I believe it was, you know,

14    towards the end of 2010.

15    BY MR. WOLINSKY:

16        Q.  Okay.  And it's the case -- isn't it the case

17    that the information in the data room changed and was

18    updated over time?

19        A.  Yes.  Usually things are added, models are

20    updated.

21        Q.  Okay.  And did EIG download the information

22    in the data room or look at it on-line or some other

1    way?

2         A.  Well, we would have downloaded all of that

3    into our own system.

4         Q.  Okay.  Who would have been responsible for

5    that?

6         A.  Probably Kevin Lowder or Clay Taylor.  I'm

7    not sure who.  But we had a shared drive within EIG

8    that everybody had access to and was working on deals.

9              MR. WOLINSKY:  Okay.  I'm just looking for

10   one more document.  Bear with me.

11             (Pause in proceedings.)

12             MR. WOLINSKY:  Okay.  I'm going to introduce

13   Exhibit 5.  Tell me when it shows up for you.

14             (Deposition Exhibit 5 was marked for

15             identification.)

16   BY MR. WOLINSKY:

17        Q.  Okay.  Can you now see the document?

18        A.  Yes, I'm trying to read it.

19        Q.  Okay.  Tell me when you're ready.

20             (The witness reviewed Exhibit 5.)

21             THE WITNESS:  Okay.

22   BY MR. WOLINSKY:

Page 65

```
 1          Q.   Well, he says, "It's all in Portuguese."

 2          Do you see that?

 3          A.   Okay.

 4          Q.   Yes?  Okay.  And so did Mr. Lowder speak

 5     Portuguese?

 6          A.   No.

 7          Q.   Did Mr. Hayden speak Portuguese?

 8          A.   No.  No.  I was the only Portuguese speaker

 9     in the group.

10          Q.   Okay.  Did you review all 30 folders worth of

11     data room material provided by Sete Brasil?

12          A.   I don't recall, but I reviewed a lot of

13     information at the time.

14          Q.   Okay.  And did you take notes as to which

15     documents you reviewed?

16          A.   No.  I don't remember these things.

17          Q.   Okay.  Is there any record -- did you review

18     every document that was in the data room?

19          A.   I don't recall.  I would have reviewed the

20     great preponderance of it.  I don't know if I reviewed

21     every single one.

22          Q.   Is there anybody else besides you that would
```

1    have reviewed Portuguese language documents from the

2    data room?

3        A.  Just the lawyers regarding the contractual

4    arrangements.

5        Q.  Okay.  And would -- in sitting here today, is

6    there any way for you to tell me whether -- which

7    documents you did review and which you didn't review

8    from the data room?

9        A.  No.  I can't tell you.

10       Q.  All right.  With respect -- going back to

11   Exhibit 3, Paragraph 36.  In the January 2010

12   memorandum, can you tell me whether EIG reviewed that

13   document in the data room?

14           MS. LAW:  Objection to form.

15           He can answer.

16           THE WITNESS:  Well, as I said earlier, I

17   remember two big info memos.  One prepared by

18   Petrobras and one prepared by Kaisha, and I certainly

19   read those through, too, thoroughly.

20   BY MR. WOLINSKY:

21       Q.  Do you know what either of those, the January

22   2010 Petrobras memorandum referred to in Paragraph 36?

```
 1     referring to a different document.

 2               MR. WOLINSKY:  Okay.  I'm going to pull up

 3     another document.

 4               (Deposition Exhibit 6 was marked for

 5               identification.)

 6               THE WITNESS:  Are we looking at Exhibit 6?

 7               MR. WOLINSKY:  I'm about to give you another

 8     exhibit.

 9               (Pause in proceedings.)

10     BY MR. WOLINSKY:

11         Q.  Have you seen this document before?

12         A.  Yes.

13         Q.  Okay.  Do you know when you first saw this

14     document?

15         A.  I don't.

16               MR. WOLINSKY:  Okay.  Let me show you another

17     document.

18               (Deposition Exhibit 7 was marked for

19               identification.)

20     BY MR. WOLINSKY:

21         Q.  Okay.  I'm going to show you Exhibit 7.

22         A.  Is this a new exhibit?
```

Page 69

1        Q.   Exhibit 7.  Can you open that one and look at

2    it?

3        A.   Yes.

4            MS. LAW:  Robert, again, this exhibit appears

5    to have an attachment that's reflected on it.  Do you

6    have the attachment to the E-mail?

7            MR. WOLINSKY:  Yes.  It's Exhibit 6.

8            MS. LAW:  Thank you.

9            THE WITNESS:  Okay.  This is October 2010.

10   BY MR. WOLINSKY:

11       Q.   Do you see, it says, "Dear Kevin and Clay,

12           "Please find attached a couple slides with a

13   brief summary of Petrobras' Pre-salt Oil Rigs.

14           "Kind regards,

15           "Ivan Hong."

16       A.   Correct.

17       Q.   Okay.  And then he attached what's Exhibit 6,

18   which is a slide show that we reviewed a moment ago.

19       A.   Right.

20       Q.   Does this refresh your recollection as to

21   when you first saw Exhibit 6?

22       A.   Yes, this would have been the first time.

Page 70

```
 1        Q.   Okay.  Do you know why Mr. Hong sent you

 2   these slides at this time?

 3        A.   Again, we were in contact with the advisor of

 4   Petrobras and trying to get our arms around this

 5   transaction in October of 2010.

 6        Q.   What does it mean to get your arms around it?

 7        A.   At that point we hadn't decided -- well,

 8   there were two things.  1, were we able to get into

 9   the transaction, and 2, did we want to get into the

10   transaction.  You had to deal with those issues.

11        So this is very much an exploratory thing

12   where we're just getting our arms around the deal.

13        Q.   Okay.  And did you ask Mr. Hong to send this

14   information?

15        A.   I probably would have.  In the course of

16   discussions about the transaction, he probably said,

17   "Hey, here's something that I can send you that will

18   give you a little summary."

19        And we said, "Thank you."

20        Q.   Okay.  And was it enough information for you

21   to make an investment decision?  Enough information to

22   make an investment decision?
```

1        A.   Oh, no.   No.   This would be scratching the

2    surface.

3        Q.   Okay.   If you look at -- and that's because

4    you would need to know -- you would need to do a

5    formal due diligence, including looking in the data

6    room and doing your own research and analysis; is that

7    correct?

8             MS. LAW:   Objection to form.

9             THE WITNESS:   That's correct.

10   BY MR. WOLINSKY:

11       Q.   Now, if you look at Paragraph 45 of the

12   Complaint, which is Exhibit 3.   Tell me when you're

13   there?

14            MS. LAW:   Robert, I don't know if the

15   background noise that you hear is yours, and if it is,

16   that's fine.   If it's not, I would just ask everyone

17   else who is participating to mute themselves.

18            MR. WOLINSKY:   I think, unfortunately, it's

19   mine.

20            MS. LAW:   Okay.   We get it.

21            (The witness reviewed the document.)

22   BY MR. WOLINSKY:

1      A.  We do have that process as part of our due

2   diligence, yes.

3      Q.  Are you responsible for that part of the due

4   diligence?

5      A.  Well, ultimately, I was responsible for the

6   deal.  I had help, and we have a compliance officer

7   who actually would review it and make sure it was

8   okay.

9      Q.  Okay.  Who was that compliance officer?

10      A.  Carla.

11      Q.  Vogel.

12      A.  Vogel.  Thank you.

13      Q.  Okay.

14          MS. LAW:  If you're about to start a new

15   topic, do you mind if we take a quick bathroom break?

16          MR. WOLINSKY:  Sure.

17          MS. LAW:  11:15?

18          THE VIDEOGRAPHER:  The time is 11:03 a.m.

19   This ends Unit No. 1.  Off the record.

20          (A recess was taken from 11:03 a.m.

21          to 11:17 a.m.)

22          THE VIDEOGRAPHER:  The time is 11:17 a.m.

Page 96

1      pension funds.  This was a club we wanted to enter,

2      but Petrobras ran this show.

3           Q.  When you say, "this is a club we wanted to

4      enter," what "club" are you referring to?

5           A.  That if you're going to do business in

6      Brazil, you could not have a better group of

7      counterparts than the ones that existed in Sete

8      Brasil.

9           Q.  Okay.  Are you familiar, on behalf of EIG, of

10     the ownership structure of Sete Brasil?

11          A.  I mean I knew those numbers off the top of my

12     head a while back.  I remember we owned 6.3 percent.

13          Q.  Okay.

14          A.  I remember BTG Pactual was the largest

15     shareholder.  Petrobras, I think, had 10 percent,

16     et cetera.

17          Q.  So Petrobras was not even the largest

18     shareholder in Sete Brasil; correct?

19          A.  Yes.  Robert, we've already established that,

20     but there's a lot more to it than that.

21          Q.  Okay.  And --

22          A.  If you want to beat down on 10 percent and

Page 104

1          A.   No.   Ferraz, of course, but --

2          Q.   And then -- well, Mr. Ferraz worked for Sete

3     Brasil; correct?

4          A.   That's correct.

5          Q.   And if you look at the first page of

6     Exhibit 10 the second E-mail, the middle E-mail from

7     Mr. Hong at Lakeshore says, "Dear CIC Team,

8               "Please find attached Sete Brasil's updated

9     infomemo in English.   It was also updated to the

10    dataroom."   Do you see that?

11         A.   Yeah.

12         Q.   Okay.   And then you turn around and send it

13    to Mr. Lowder and Mr. Hayden.   Do you see that on the

14    top E-mail?

15         A.   Yes.

16         Q.   Okay.   What were Mr. Lowder and Mr. Hayden's

17    roles at EIG with respect to the Sete investment?

18         A.   Well, Kevin became very involved in it as the

19    transaction went along and became the primary, let's

20    say, numbers guy, if you will.   And Simon, who was in

21    London, was brought in to assist us because it was a

22    very massive project.   There was a lot of information.

1       Q.  Okay.  What kind of due diligence did you do

2   on the shipyard sponsors?

3       A.  Well, we would have obviously taken the

4   information that was in the infomemo on who they are,

5   and then we would have looked at the individual

6   shareholders of each of these shipyards.  A couple of

7   them were already operating, so it was a little

8   easier, and then the others you had to take a view

9   that these are big companies that know what they're

10  doing and they're going to be able to build these

11  shipyards and fulfill the contracts that they were

12  entering into with Sete.

13      Q.  And in terms of your diligence on them, why

14  were you doing diligence on the shipyard sponsors?

15      A.  Well, I mean that was one of the risks that

16  we had identified, which is delays of construction and

17  cost overruns.  So we wanted to get a sense that we

18  were dealing with counterparts who would not have too

19  many issues in that area.

20          Now, of course, this is a rather subjective

21  analysis because you never know until you're actually

22  building these very sophisticated machines.

1      A.  Yes.

2      Q.  Okay.  Why were you sending this information

3  to the China Investment Corporation?

4      A.  Well, it goes back to the earlier discussion

5  we had on how Sete was thinking of asking for

6  additional overseas investors, and we were continuing

7  the dialogue that we already started with CIC.

8      Q.  Okay.  And, you know, at least the investment

9  recommendation and some of the Brazilian counsel notes

10  are, you know, internal documents.  Why was EIG

11  willing to share those internal documents with CIC?

12          MS. LAW:  Objection to form.

13  BY MR. WOLINSKY:

14      Q.  To the extent you know, why was EIG willing

15  to share these documents with CIC?

16          MS. LAW:  Same objection.

17          THE WITNESS:  I don't know.  You'd have to

18  ask my superiors at EIG at the time.

19  BY MR. WOLINSKY:

20      Q.  So you sent these documents to CIC at someone

21  else's direction?

22      A.  Yes.  I can say that CIC at that point was --

Page 155

1     I don't know if it had already happened.  They were

2     investing in EIG.  They were an extremely important

3     client, and we had approached them about an interest

4     in basically co-investing with us.  So we would have

5     been very open with our information with that.

6          Q.  Okay.  And who would have directed you to

7     send this to them?

8          A.  I don't remember getting permission, but --

9               MS. LAW:  Objection to form.

10              THE WITNESS:  I'm sorry.

11              MS. LAW:  I just wanted to make sure the

12    objection was noted on the record.

13              THE WITNESS:  Robert, I don't know the answer

14    to that.

15              MR. WOLINSKY:  Okay.  Fair enough.

16              Okay.  Let me get the next document up.

17              (Deposition Exhibit 21 was marked for

18              identification.)

19              MR. WOLINSKY:  Exhibit 21.

20         Q.  This is the "Energy FUND XIV Investment

21    Recommendation" for 250 million reais of common

22    equity.  It's dated June 27, 2011.

Page 156

1            Have you seen this document before?

2       A.   Yes.  I had a big part in preparing it.

3       Q.   Would you say that you were the lead person

4   in preparing it?

5       A.   Yes.  I was viewed as the lead within EIG.

6       Q.   Okay.  Can you tell me what the purpose of

7   this document is?

8       A.   The purpose of the document is to bring

9   together the months of due diligence we've done and

10   the thousands of pages of documents we've sifted

11   through and models we've analyzed and try to summarize

12   it into a presentable document that is sent to our

13   investment committee, and they then read it and vote

14   to approve this -- the investment.

15       Q.   So is it fair to think that you read and

16   approved of every word in this before it was

17   finalized?

18       A.   Yes.

19       Q.   And is there a template or a specific set of

20   requirements for investment recommendation to an EIG

21   fund?

22       A.   Yes.  I mean there's some ability to tailor

Page 158

1        Q.  Would you have relied on inputs from anyone

2    else to draft this section?

3            MS. LAW:  Objection to form.

4            THE WITNESS:  Well, only the information

5    memoranda given to us by Santander and Caixa Economica

6    Federal, which had their own discussions on risks and

7    mitigants.

8    BY MR. WOLINSKY:

9        Q.  So would you do your own independent analysis

10   of risks?

11           MS. LAW:  Objection to form.

12           THE WITNESS:  Yes.  We had done that as well,

13   but I'm saying the source of those documents were

14   those info memos.

15           MS. LAW:  Objection.

16   BY MR. WOLINSKY:

17       Q.  And would you also have relied on advice of

18   your own counsel in considering the risks and

19   mitigants?

20           MS. LAW:  Objection to form, and I instruct

21   the witness to the extent he is talking about

22   discussions with counsel, he can say "yes" or "no"

Page 159

1    without revealing the substance of any such

2    discussion.

3          THE WITNESS:  Yes.  Counsel was involved in

4    our analysis.

5    BY MR. WOLINSKY:

6        Q.  Okay.  Did you consider including in the

7    risks and mitigants section any risk of unlawful

8    conduct, corruption, or bribery?

9        A.  No, because I didn't think it existed in this

10   case.

11       Q.  Well, so those answers are contradictory.

12   Let's unpack it a little bit.

13          So you said you didn't consider it, and you

14   said -- but you then said you didn't know it existed.

15   So my question really is did you consider whether

16   there was a risk of corruption, bribery, kickbacks?

17          MS. LAW:  Objection to the question.

18   Objection to the mischaracterization.

19          MR. WOLINSKY:  The objection to the question

20   isn't a legitimate objection.  What's the objection,

21   Counsel?

22          MS. LAW:  You started with saying how the

Page 160

1      testimony was inconsistent with each other.  If you

2      want to ask a question, ask him a question but don't

3      characterize things.

4              MR. WOLINSKY:  Fine.  I'll let you lead him.

5      Go ahead.

6              MS. LAW:  Is there a question for him to

7      answer?

8              MR. WOLINSKY:  Yes.

9              MS. LAW:  I'm asking the witness if there's a

10     question he's answering.

11             MR. WOLINSKY:  Stop interrupting the witness

12     so that he can answer the question.

13             MS. LAW:  Kevin, do you know what question

14     you're answering?

15             THE WITNESS:  No, please repeat it.

16             MR. WOLINSKY:  Good job, Kerri.

17         Q.  So Mr. Corrigan, when you wrote this risks

18     and mitigants section did you consider whether there

19     was any need to address the risk of bribery,

20     corruption, or other unlawful conduct?

21         A.  The way I would answer that is we would have

22     considered corruption as a potential risk before we

Page 161

```
 1    even embarked on any transaction.
 2              The reason we didn't think this was an issue
 3    in this case is because we were teaming up, as I had
 4    indicated earlier, with the A team of Brazil.
 5    Petrobras, the largest pension fund, et cetera.  This,
 6    to us, was a AAA rated credit profile and risk
 7    profile, and I had worked personally for over 30 years
 8    with Petrobras and never had any whiff of corruption
 9    with any interactions I ever had with that company.
10              So we wouldn't have even gone beyond Step 1
11    if this was going to be a risk that I would have to
12    talk about.  So that's why it doesn't appear in our
13    risks and mitigants.  These are more
14    commercially-oriented risks.  The big picture risk is
15    dealt with right off the bat.
16         Q.  Other than what you just described, are there
17    any other reasons you did not believe that there was
18    any risk of corruption, unlawful conduct, bribery, or
19    kickbacks?
20         A.  No.  That pretty much summarizes why I
21    thought we were getting into a clean transaction.
22         Q.  Okay.  Does the EIG operating procedures for
```

1      A.   No.   There was a formal meeting and an oral

2   presentation.

3      Q.   Approximately how long did the presentation

4   last with respect to the investment recommendation for

5   Sete Brasil to Fund XIV?

6      A.   These typically lasted 45 minutes to an hour.

7           (Telephonic interruption.)

8           THE WITNESS:   Sorry about that.

9           45 minutes to an hour.

10  BY MR. WOLINSKY:

11     Q.   Okay.   Did -- to your memory, did anyone,

12  during the investment committee discussion, ask about

13  any risks of unlawful conduct including bribery,

14  corruption, or kickbacks?

15     A.   I don't recall that there was any such

16  discussion.

17     Q.   Okay.   Have you ever been involved in any

18  investment committee meeting at EIG where there was a

19  discussion of the risk of unlawful conduct of any

20  kind?

21     A.   No, because that transaction would never have

22  gotten that far.   If there was any real worry that we

1    were going to make an investment and then have it blow

2    up in our face over a corruption scandal, it just

3    doesn't get that far.

4         Q.  Would the decision as to the assessment of

5    the risk of unlawful conduct be yours to make with

6    respect to Sete Brasil, or would you have to pass it

7    up to other people more senior than you to make that

8    decision?

9              MS. LAW:  Objection to form.

10             Robert, you keep using "would."  Is that the

11   word you want to choose?

12             MR. WOLINSKY:  Let me look at my sentence.

13   Yeah.  It should have been was.

14        Q.  Was the decision, as to the risk of unlawful

15   conduct yours to make with respect to the Sete Brasil

16   investment recommendation?

17        A.  Well, I was the lead proponent of this

18   transaction.  So people would have looked at me to vet

19   those kinds of risks, and I felt confident that we

20   were getting into a transaction that was not going to

21   be subject to those kinds of risks.

22        Q.  Have you ever done -- have you ever raised --

1    thought could be subject to a scandal of that nature.

2    BY MR. WOLINSKY:

3         Q.  Does EIG have specific standards that it

4    applies when evaluating the risk of unlawful conduct,

5    including bribery and corruption, in evaluating

6    potential investments?

7              MS. LAW:  Objection to form.

8              THE WITNESS:  Well, we have the review that I

9    just mentioned a minute ago of companies and

10   individuals, but of course, you know, we had a code of

11   conduct where you're not supposed to engage in any

12   unlawful activities, and by extension, bring any

13   unlawful transactions into the company.  I mean it's a

14   bit of a legal question, and perhaps a lawyer should

15   respond to that.

16   BY MR. WOLINSKY:

17        Q.  I'm not asking it from a legal perspective.

18   I'm asking when you did the Complinet search and you

19   got the results, it doesn't come back and say, "Yeah,

20   this deal is going to have unlawful" -- it gives you

21   information.  So my question is what standard -- does

22   EIG have standards or rules that you are supposed to

Page 168

1    apply in evaluating that Complinet information?

2            MS. LAW:  Objection to form.

3            You can answer.

4            THE WITNESS:  Well, you look at the results

5    of the Complinet search, and if you saw something that

6    said, "Joao Ferraz was taking bribes," then the

7    transaction would have died, but it did not reveal

8    such standards or results.

9            So to answer your question, we don't try to

10   bring crooked transactions to our investment

11   committees.  There's no standard.  The standard is we

12   don't allow it.  We don't permit it.  We don't engage

13   in it or pursue transactions that we think have a risk

14   of having corrupt individuals behind it running it.

15   BY MR. WOLINSKY:

16       Q.  The question is how do you evaluate that

17   risk.  If Complinet doesn't say the lead player is a

18   crook, is that good enough?

19           MS. LAW:  Objection to form.

20           THE WITNESS:  That's the end process at the

21   very beginning, as I've indicated earlier.  You're

22   making an assessment of your counterparties, and I

1    document is slightly different.  It's more of a

2    landscape, as opposed to the portrait.  So I just want

3    to make sure you can see the entirety of the document.

4            THE WITNESS:  Yeah.  Well, I can see it was

5    prepared by Machado Meyer.

6            I'm sorry, Robert.  The question?

7    BY MR. WOLINSKY:

8        Q.  What is this document?

9        A.  Well, it looks like a preliminary analysis by

10   Machado Meyer of their review of this transaction in

11   June of 2012.

12       Q.  They would have done that for EIG?

13       A.  Yeah.  Machado Meyer were our attorneys.

14       Q.  Okay.  And so they were asked to put together

15   a risk matrix; is that correct?

16       A.  It looks like it.

17       Q.  Okay.  And you shared that risk matrix with

18   CIC; correct?

19       A.  This particular one?  I know we shared our

20   investment recommendation.  Was this part of what --

21       Q.  Yes.  There was attached.

22       A.  All right.  Okay.

Page 174

1           MR. WOLINSKY:  Let me ask you -- let me give

2     you the next one.  I've got a spinning circle.  I

3     don't know what to do about that.

4           (Pause in proceedings.)

5           MR. WOLINSKY:  You're about to see

6     Exhibit 24.

7           (Deposition Exhibit 24 was marked for

8           identification.)

9           MR. WOLINSKY:  This is the "Energy Fund XV

10    Investment Recommendation" for 250 million reais

11    common equity investment dated September 16, 2011.

12        Q.  Do you see that?

13        A.  Yes.

14        Q.  Were you also the principal author of this

15    document?

16        A.  Yes.

17        Q.  Okay.

18        A.  There was a lot of copy and paste.

19        Q.  That's what I was about to ask is are there

20    material differences between this document and the

21    investment recommendation that was done for Investment

22    Fund XIV?

1        A.  Well, not having read through both of them

2    now and having done this close to 10 years ago, I'm

3    saying no, there were not.  There would have been

4    tweaks.

5        Q.  What kind of tweaks would you make?

6        A.  Well, I don't think there have been any

7    tweaks in the --

8            MS. LAW:  Objection to form.

9            THE WITNESS:  I'm sorry, Kerri?

10           MS. LAW:  Objection to form.

11           You can continue.

12           THE WITNESS:  Okay.

13           I would have typically made updates on any

14   updated operational issues, like construction

15   progress, things of that nature, and there may have

16   been some adjustments to the model.  But in terms of

17   the description of the transaction, the risk and all

18   that, nothing had changed.

19   BY MR. WOLINSKY:

20       Q.  And this document as well does not, it's

21   silent with respect to the risk of unlawful conduct,

22   including corruption, bribery, and kickbacks; correct?

Page 189

1     Why did you choose that number?

2          A.  I don't remember how we went from 100- to our

3     final number.  That would have been an iterative

4     process based on, you know, ongoing negotiations.

5     This is still fairly early -- well, reasonably early

6     in the process.  So I think at that point that's

7     probably what we had been told by Lakeshore that we

8     should expect to be an investment amount.

9          Q.  Okay.  And then you list nine possible risks

10    and mitigants.  Do you see that?

11         A.  Yes.

12         Q.  And at this point in time, March 2, 2011, you

13    had not done anything to evaluate potential risk of

14    unlawful conduct, including bribery, corruption, or

15    kickbacks; correct?

16              MS. LAW:  Objection to form.

17              You can answer.

18              THE WITNESS:  Well, we have a disagreement on

19    that because this memo -- we wouldn't have even got

20    into this point if we had even a whiff of such a

21    preoccupation.  So we had already decided this was a

22    great investment and we wanted to do it, and you don't

Page 190

```
 1      go down that road if you think you're going into a

 2      corruption scheme.  It just wouldn't happen.

 3           So the fact that this doesn't address that

 4      risk is because it would have been discarded based,

 5      again, on the counterparties involved in this

 6      transaction.

 7      BY MR. WOLINSKY:

 8           Q.  Okay.  As of March 2, 2011, what affirmative

 9      steps, if any, had anyone at EIG taken to evaluate any

10      risk of unlawful conduct as it related to the Sete

11      investment?

12           A.  Robert, I think we discussed this earlier.

13      There would not have been a formal vetting of let's --

14      you know, if there are risks here.  We looked at the

15      transaction from a commercial standpoint.  We then

16      said, "Oh, look.  It's Petrobras all over.  We've got

17      these funds," big shipyards.  We would not have

18      pursued it beyond that very initial phase if we

19      thought there was going to be some huge payment scheme

20      involved.

21           Q.  Well, what --

22           A.  I mean I guess you could say I decided that.
```

1          MR. WOLINSKY:  Okay.  Well, so first of all,

2     Kerri Ann, we request the document that he indicated

3     would exist that would show the amounts and the timing

4     of the distributions of investments in Sete Brasil.

5          MS. LAW:  I don't think he said that a

6     document exists.  He thought there might be a document

7     that exists.  We'll endeavor to look for it, but you

8     have other documents that provide with you the same

9     information.  But you should put it in your letter,

10    and we'll respond accordingly.

11         MR. WOLINSKY:  What documents are you

12    referring to, Kerri Ann?

13         MS. LAW:  The wire transfers.

14         MR. WOLINSKY:  Okay.

15    Q.   And Mr. Corrigan, as of June 30, when you

16    left EIG, you were unaware of the conduct by any --

17    you were unaware of Operation Lava Jato; right?

18    A.   Correct.

19    Q.   Yet Sete Brasil was having significant

20    financial and operational problems.  Isn't that right?

21         MS. LAW:  Objection to form.

22         THE WITNESS:  I don't view the term

1      "significant" as adequate factual statement.  The -- I

2      worked on many transactions over 37 years of finance,

3      and while this may seem like it was complicated and

4      difficult, which it was, to me it was not out of the

5      ordinary, the issues we were encountering as this went

6      along.

7                  MR. WOLINSKY:  Okay.  Let's look -- let me

8      pull up the next document then.

9                  (Deposition Exhibit 36 was marked for

10                 identification.)

11                 MR. WOLINSKY:  All right.  You're about to

12     see Exhibit 36.

13                 THE WITNESS:  Okay.  I'm on it.

14     BY MR. WOLINSKY:

15          Q.  Are you familiar with this E-mail exchange?

16                 THE WITNESS:  Let me refresh my memory here.

17                 (The witness reviewed Exhibit 36.)

18                 THE WITNESS:  Yes, I painfully remember this.

19     BY MR. WOLINSKY:

20          Q.  You "painfully remember."  Is that what you

21     said?

22          A.  Yep.

Page 280

1        Q.  This has your E-mail summary of the board

2    meeting that we were just talking about, and then

3    Mr. Talbot forwards it on to Randall Wade.  Mr. Wade

4    was a COO of EIG; is that right?

5        A.  Yes.

6        Q.  Is there a reason why you didn't copy him

7    originally?

8        A.  I mean there's no particular reason, just

9    forgot.

10        Q.  And you just said, "FYI, quite a different

11    story than what we've been told heretofore."

12            Do you see that?

13        A.  Right.

14        Q.  Okay.  Do you agree with that statement?

15        A.  Well, again, he's the chief investment

16    officer.  I just sent some bad news, and it's almost

17    an I told you so, but...

18            MR. WOLINSKY:  Got it.  One more I want to

19    show you, and then we'll take a break.

20            (Pause in proceedings.)

21            MR. WOLINSKY:  Here's Exhibit 38.

22            (Deposition Exhibit 38 was marked for

Page 281

1          identification.)

2          THE WITNESS:  Robert, I think I -- this is

3     not important, but I think I said Magela had been at

4     BP, but I think it's BG.

5     BY MR. WOLINSKY:

6          Q.   Okay.

7          A.   Sorry.

8          Q.   That's fine.  So at the risk of getting

9     crosswise with Kerri, this has one line of Portuguese.

10         MS. LAW:  I think my Spanish helps me with

11    that one.

12    BY MR. WOLINSKY:

13         Q.   Well, let's do this.  Mr. Corrigan, what did

14    you say to Mr. Reis in the top E-mail.

15         A.   Hold on.  It's 38 we're looking at?

16         Q.   Yeah.

17         A.   Okay.  Here it is.  All right.

18              For your information and as discussed, hugs,

19    Kevin.

20         Q.   And why did you send -- and what you sent him

21    was your description of the last board meeting --

22         A.   Right.

Page 300

1          Q.   Looking at -- looking at Topic 17,

2     communications between EIG and Santander, BNDES,

3     et cetera, you mention you and Mr. Thomas had several

4     meetings with BNDES.  Other than those meetings, did

5     EIG have any direct communications with BNDES in

6     connection with making -- with its decision to make

7     the loan or invest in Sete?

8          A.   No.

9          Q.   Okay.  Who did EIG communicate with at

10    Santander about -- to receive information that it used

11    in deciding whether to make the loan or invest with

12    Sete?

13         A.   Well, Santander, its financial advisor gave

14    us access to the data room --

15         Q.   Okay.

16         A.   -- which obviously Petrobras authorized.

17         Q.   Okay.  Did you have -- has EIG had any

18    communications with any politician or government

19    employee relating to its decision to make the loan or

20    to invest in Sete?

21         A.   No.

22         Q.   Has EIG had any communications with any

Page 302

1          to 6:11 p.m.)

2          THE VIDEOGRAPHER:  The time is 6:11 p.m.

3     We're back on the record.

4

5                    EXAMINATION

6     BY MS. LAW:

7          Q.  Mr. Corrigan, this is Kerri Ann Law speaking.

8     I just have a few questions for you this evening.  I'm

9     going to ask Ms. Pak to put up the translation of a

10    document Bates stamped EIG00141814 through -15.

11          (Deposition Plaintiff Exhibit 1 was marked for

12          identification.)

13    BY MS. LAW:

14          Q.  And Mr. Corrigan, I'm going to ask you if you

15    can tell us what this document is.

16          MR. WOLINSKY:  Objection.  Foundation.

17    BY MS. LAW:

18          Q.  You can answer.

19          A.  That looks like the index to the data room

20    that we used for this transaction.

21          Q.  Okay.  And do you see that there are 18 items

22    listed on this document?

Page 303

1          A.   I do.

2          Q.   And did you review the 18 documents listed on

3     this document?

4          A.   Yes.   Or I had colleagues helping me do it,

5     but yes, EIG reviewed the whole shebang.

6          Q.   Okay.   And did you rely on the 18 documents

7     listed on this exhibit in making the decision to

8     invest in Sete?

9               MR. WOLINSKY:   Objection to the form.

10    BY MS. LAW:

11         Q.   You can answer.

12         A.   Yes we did.

13         Q.   Looking at this index, is there anything that

14    is not on this index that you recall being in the data

15    room?

16         A.   Well, under 11 it says information

17    memorandum, and we actually had two information

18    memorandum.   One prepared by Santander on behalf of

19    Petrobras, and one prepared by Caixa Economica Federal

20    and their role was FIP administrator, and we used both

21    of those documents.

22         Q.   Did you review both of those documents?

Page 304

 1        A.   Thoroughly.

 2        Q.   Did you rely on both of those documents in

 3   making the decision to invest in Sete?

 4        A.   Yes, we did.

 5            MS. LAW:   I have no further questions for

 6   this witness.

 7            MR. WOLINSKY:   I have redirect.

 8

 9                    FURTHER EXAMINATION

10   BY MR. WOLINSKY:

11        Q.   Mr. Corrigan, before today, have you seen the

12   documents on the screen currently?

13        A.   The index or each individual --

14        Q.   The index in paper form like it's appearing

15   on the screen?

16        A.   Yes.

17        Q.   Okay.  When?

18        A.   Either yesterday or the day before when we

19   were preparing.

20        Q.   So this was -- is that the first time you had

21   seen that document?

22        A.   Yes, because it was done in the context of

Page 305

1       the 30(b), whatever, preparation.

2              Q.  So just to be clear, the first time you saw

3       the Document Plaintiff's Exhibit 1 was in October of

4       2012; correct?

5              A.  In this form.

6              Q.  Okay.  Now, earlier today, you saw a document

7       that said that there were over 30 folders of

8       documents -- let me ask a slightly different question.

9              With respect to the document Plaintiff's

10      Exhibit 1, do you know what the date is of that

11      document?

12             A.  Of the document I'm looking at right now?

13             Q.  Yes.

14             A.  No, I don't know when they prepared it.

15             Q.  Okay.  The data room wasn't static, was it?

16             A.  Well, no.  That FIP administrator infomemo

17      was added after we first looked at it.

18             Q.  And lots of other things were added as well;

19      right?

20             A.  Yes.  That's correct.

21             Q.  In fact, we looked at a -- we looked at a

22      document earlier today where one of your colleagues

Page 308

1          Q.  It doesn't give a date for what document it's
2     referring to, does it?
3          A.  No.
4          Q.  Okay.  And it's only referring to one
5     document is your view?
6          A.  I believe No. 11, that's correct.
7          Q.  Okay.  So and is that true for all of these?
8          A.  I'm not sure.  I don't know.
9          Q.  Okay.  So, for example, No. 16 investment
10    agreement draft.  Is there one draft there, more than
11    one draft?
12         A.  Again, Robert, I'd have to go back and look
13    at the original.  This was just intended to show the
14    documents that we looked at and relied on when we made
15    the investment.
16         Q.  So other than your belief that you looked at
17    everything in the data room or relied on everything in
18    the data room, you can't know for sure which of the
19    documents listed on this exhibit you actually looked
20    at or relied on.  Isn't that correct?
21              MS. LAW:  Objection to form.
22              THE WITNESS:  Well, I didn't think this was a

1    memory test, and just because I'm not remembering

2    right now, but I can assure you we would have looked

3    at everything in the data room when we were given

4    access to it.

5    BY MR. WOLINSKY:

6         Q.   Okay.  So it's not usually a memory test, but

7    your memory was perfect when Ms. Law asked you

8    questions, and then it's failing when I do.

9              If you look at No. 8, 8A project Sete

10   financial model V-1.  How many project Sete financial

11   models were in the data room?

12             MS. LAW:  Objection to the form.

13             THE WITNESS:  Over time there were many

14   versions of the financial model.

15   BY MR. WOLINSKY:

16        Q.   Okay.  And No. 10, return on investment

17   scenarios.  How many return on investment scenarios

18   were in the data room?

19        A.   Well, again, over time, you know, you start

20   out with one, and then it's a moving document over

21   time.

22        Q.   But it's fair to say that looking at this

Page 313

```
 1              MS. LAW:  You may now continue.

 2              MR. WOLINSKY:  I don't agree to that.

 3              MS. LAW:  All right.

 4      BY MR. WOLINSKY:

 5          Q.  Mr. Corrigan, looking at this document and

 6      not telling me anything that your lawyers told you, do

 7      you have any information you can share about what date

 8      this document is from?

 9          A.  No, there's no date on it.

10              MR. WOLINSKY:  Okay.  I have nothing further.

11

12                       FURTHER EXAMINATION

13      BY MS. LAW:

14          Q.  Mr. Corrigan, did you are review the

15      documents -- withdrawn.

16              Mr. Corrigan, did you or someone per your

17      direction review the documents that were in the data

18      room concerning the Sete deal?

19          A.  Back in 2010, yes.

20          Q.  And did you rely on those documents that

21      were -- that you reviewed in connection with making

22      the investment decision?
```

Page 314

1            MR. WOLINSKY:  Objection to form.

2     BY MS. LAW:

3          Q.  You may answer.

4          A.  Yes.

5            MS. LAW:  I have no further questions.

6            MR. WOLINSKY:  Okay.

7            MS. LAW:  I guess we are done.

8            MR. WOLINSKY:  Yep.  Other than you have to

9     arrange to make this part of the record somehow, but

10    I'll leave that to you.

11            MS. LAW:  We will handle that.

12            MR. WOLINSKY:  Okay.  I'm still waiting for

13    deposition dates on a bunch of witnesses.

14            MS. LAW:  I think we can go off the record

15    now.

16            MR. WOLINSKY:  No.  No.  I want to finish on

17    the record.

18            I'm still waiting for a deposition dates for

19    a bunch of witnesses.  I hope to get those soon and

20    not one at a time.

21            MS. LAW:  We appreciate that we have given

22    you dates and you have taken a long time to get back