# EXHIBIT 2

# Kramer Levin



Daniel B. Goldman
Partner
T  212.715.9162
F  212.715.8128
dgoldman@kramerlevin.com

1177 Avenue of the Americas
New York, NY 10036
T  212.715.9100
F  212.715.8000

July 22, 2021

**VIA ECF**

The Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:   *EIG Energy Fund XIV, L.P., et al. v. Keppel Offshore & Marine Ltd.,*
      No. 18-cv-01047 (PGG)

Dear Judge Gardephe:

      We represent Plaintiffs EIG Energy Fund XIV, L.P., *et al.* (the "Funds" or "EIG") in the above-referenced matter.  In accordance with Rule IV(A) of Your Honor's Individual Rules of Practice and this Court's May 6, 2021 Order (Dkt. 71), we respectfully request a pre-motion conference to seek permission to file a motion for summary judgment against defendant Keppel Offshore & Marine Ltd. ("Keppel") in advance of completing expert discovery.

      There is no genuine dispute as to any fact material to EIG's sole claim for aiding and abetting fraud, and expert discovery is unnecessary for the Court to issue judgment as a matter of law in EIG's favor.  Keppel admitted in a 2017 deferred prosecution agreement with the Fraud Section of the U.S. Department of Justice and the U.S. Attorneys' Office for the Eastern District of New York (the "DPA") that it participated in, facilitated, and concealed a bribery and fraud scheme perpetrated by employees of Sete Brasil Participações, S.A. ("Sete") and Petróleo Brasileiro S.A. ("Petrobras"), and members of the Workers' Party of Brazil.  Keppel does not dispute the facts of the scheme set forth in the DPA.  Documents produced and testimony elicited during discovery in this case confirm that Keppel knew that Petrobras and Sete defrauded EIG and other equity investors by making material misrepresentations and omissions in marketing materials for the Sete project, none of which disclosed the bribery and kickback scheme.  Keppel provided substantial assistance to this corrupt scheme through intentional acts of concealment and affirmative misrepresentations in critical deal documents.  When Brazilian prosecutors uncovered this scheme, the banks immediately pulled back on their financing commitments, and Sete tumbled into bankruptcy.  As a result, EIG lost the entire value of its $221 million equity investment.  No amount of expert testimony can alter these undeniable facts.  There is no need to wait for expert discovery.  A motion for summary judgment is appropriate at the conclusion of fact discovery.

The Honorable Paul G. Gardephe
July 22, 2021



### A. Sete and Petrobras defrauded the Funds

"Aiding and abetting fraud has three elements: '(1) that an independent wrong exists; (2) that the aider and abettor knows of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong.'" Mem. Op. & Order (the "MTD Opinion") at 18, May 11, 2020, Dkt. 45 (quoting *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 312 (S.D.N.Y. 2009)). The elements of fraud under New York law are: "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury." *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 444 (S.D.N.Y. 2012) (quoting *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009)).

There is no genuine dispute as to any material fact regarding the underlying fraud committed by Petrobras and Sete against EIG. Indeed, Keppel has never contested, nor could it, that EIG was defrauded in making its investment in Sete. As set forth in voluminous testimony in Brazilian criminal proceedings, Petrobras executives and members of the Workers' Party of Brazil extended to Sete a decade-long bribery and kickback scheme at Petrobras. They did so at the very inception of Sete. The scheme was to procure bribes and kickbacks from shipbuilders, including Keppel, in the amount of one percent of the total construction value of twenty-eight deep water drill rigs, each of which cost roughly $750 million to build. These bribes were paid to senior executives of Petrobras and Sete, including former Sete and Petrobras executive Pedro José Barusco Filho, and to the Workers' Party of Brazil, the ruling political party in Brazil. Petrobras was and continues to be controlled by Brazil. In a variety of pitch materials and other materials put in the deal data room, Petrobras and Sete never disclosed the existence of this bribery/kickback scheme to EIG, and Petrobras and Sete made affirmative misrepresentations and misleading statements to EIG and investors including, among other things, that the shipbuilders, including Keppel, would enter contracts requiring them to comply with all applicable laws. EIG executives testified at their depositions that they relied on these misrepresentations and omissions in determining to invest in Sete, and that EIG would never have invested in Sete if it had known of the bribery scheme.

### B. Keppel had actual knowledge of the fraud

There is no genuine dispute as to any material fact establishing that Keppel had actual knowledge of the underlying fraud. Keppel admitted in the DPA that the decade-long bribery scheme involving projects awarded by Petrobras "was extended to projects awarded by Sete Brasil" in 2011. Keppel also admitted that it "knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil." There is no question that Keppel also knew that an essential part of the bribery and fraud scheme was that Petrobras and Sete had to raise billions of dollars of capital without disclosing the existence of the bribery and kickback scheme to investors. That capital was, of course, critical to fund the

The Honorable Paul G. Gardephe
July 22, 2021



construction of twenty-eight drill rigs and it was ultimately used by Keppel to kickback its bribes. To wit:

- In January 2011, Keppel's former executive and CEO, who was a participant in the bribery scheme, received a presentation prepared by Petrobras that included a cautionary statement for U.S. investors, described the project that would become Sete, and detailed Petrobras's plan to raise capital from investors, including equity. The presentation listed several risks associated with the project, but did not disclose the bribery and kickback scheme.

- In August 2011, KOM's subsidiary authorized and facilitated a visit by potential investors of Sete to Keppel's Brazilian shipyard, the BrasFELS shipyard, which included a representative from EIG. That same month, Keppel's former executive and CEO, who was a participant in the bribery scheme, authorized a visit to BrasFELS, by EIG's agent, to create a film about Sete.

- Between August 2011 and March 2012, Keppel executives who were participants in the bribery scheme received news reports that Sete planned to raise a second round of equity to finance the construction of drill rigs by Keppel and others, and these reports identified EIG as a potential investor in Sete.

- In September 2011, Keppel's former senior executives who were participants in the bribery scheme received an investor presentation prepared by Petrobras, which included a cautionary statement for U.S. investors, detailed Sete's capital structure, and provided associated risks with such project, but made no mention of the bribery scheme. EIG reviewed and relied on this exact presentation during its own due diligence of Sete.

- In October 2011, Keppel's former and current employees, including participants in the bribery scheme, received a financial model and an investor presentation prepared by Sete, which provided a detailed summary of the Sete investment, including related risks, but did not disclose the bribery scheme.

- In March 2012, Keppel's subsidiary authorized and facilitated another visit by potential investors of Sete to its BrasFELS shipyard, which included representatives from EIG.

    C.    **Keppel substantially assisted the fraud**

There is no genuine dispute as to any material fact establishing that Keppel substantially assisted Sete and Petrobras in defrauding EIG. Substantial assistance exists where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." MTD Opinion at 19 (quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005)). Substantial assistance "'can take many forms,' such as 'executing transactions' or helping a firm to present an 'enhanced financial picture to others.'" *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) (quoting *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 806 (S.D. Tex. 2005)). "Executing transactions, even ordinary course transactions, can constitute substantial assistance

The Honorable Paul G. Gardephe
July 22, 2021



... where there is an extraordinary economic motivation to aid in the fraud." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011)).

Keppel directly assisted Sete and Petrobras by (i) facilitating tours of its shipyard in Brazil by investors and potential investors of Sete, including potential lenders, providing comfort to such visitors regarding the progress of construction and/or the capabilities of its shipyard; and (ii) concealing from such visitors the fact that Petrobras, Sete, Keppel, and others, were involved in the bribery scheme. Prior to EIG's investment in Sete, EIG or its agent visited Keppel's shipyard at least three times, in August 2011 and March 2012. In one of the August 2011 visits, at the request of Mr. Barusco, Keppel's subsidiary coordinated and facilitated a visit to Keppel's shipyard by EIG—a fact that was made known to Keppel's former executive and CEO who was a participant in the bribery scheme. Following this visit, a Sete executive thanked Keppel for its attention to this visit, describing the visit as productive since it had reduced the risk of the project perceived by Sete's investors.

Keppel also made express representations in its construction contracts with Sete that it was not in violation of any applicable law, and would perform its work in compliance with applicable laws and good industry practices. Those representations were false. Keppel knew, when it negotiated the terms of and executed such contracts that it had already agreed to pay a percentage of the value of those contracts as bribes. The agreements, the first of which Keppel signed more than half-a-year before EIG made its first investment in Sete, were reviewed by EIG, which was unaware that those same contracts were in fact secured by Keppel's promise of kickbacks.

Finally, by its own admission in the DPA and the admission of Jeffery Chow, Keppel's former head legal officer who pled guilty to conspiring to violate the Foreign Corrupt Practices Act, Keppel created and executed false agreements with Mr. Skornicki "[t]o facilitate the payment of [] bribes and to conceal the true nature and purpose of the payments." As with all of its other efforts to conceal the bribery scheme, the manner in which Keppel structured its agreements with Mr. Skornicki enabled the bribery and fraud scheme to exist and continue. Mr. Chow explained at his deposition that Keppel could not have wired money to Mr. Skornicki to pay bribes without this false documentation because Keppel's internal controls required a contract to wire money outside of the company. Mr. Chow drafted these agreements to include false representations by Mr. Skornicki, whereby he expressly agreed to abide by anticorruption and antibribery laws. Mr. Chow executed these agreements knowing they would conceal bribe payments on behalf of Keppel to executives at Sete, Petrobras, and the Workers' Party. Mr. Chow further instructed Keppel employees to delete emails and avoid email or text when discussing details concerning the bribery scheme. Additionally, Mr. Chow requested that Mr. Skornicki use an offshore shell company, preferably in his wife's maiden name. Mr. Skornicki created a British Virgin Islands entity called Deep Sea Oil Corp. ("Deep Sea Oil"). Keppel transferred a portion of the payments it received from Sete to a Deep Sea Oil account in the United States, and Mr. Skornicki transferred funds from that account to accounts held by Mr. Barusco and other bribe recipients in Switzerland.

The Honorable Paul G. Gardephe
July 22, 2021



### D. Following the public revelation of the bribery scheme, Sete collapsed

There is also no question that the bribery and kickback scheme, of which Keppel aided and abetted, *caused* the loss of EIG's $221 million investment in Sete. Contemporaneous documents from EIG, Sete, and Keppel confirm that an essential part of the Sete project was to obtain over $10 billion of long-term financing from the Banco Nacional de Desenvolvimento Econômico e Social ("BNDES"). On February 6, 2015, BNDES was scheduled to execute an agreement to provide Sete approximately $3.5 billion dollars of long-term financing for the first eight of Sete's drill rigs. A day prior to that scheduled meeting, statements made in plea agreements by Mr. Barusco to the Brazilian police were made public. Those statements centered on details linking Sete (and Keppel) to a massive bribery and kickback scheme involving Sete's construction contracts. The public disclosure of Mr. Barusco's statements caused BNDES to cancel its financing commitments to Sete, resulting in Sete's collapse into bankruptcy. Ultimately, the entirety of Sete's equity, including EIG's investment, was sold to a Dutch entity for less than one U.S. dollar. Any expert testimony offered by Keppel cannot change these facts.

### E. The computation of EIG's damages does not require expert testimony

Finally, EIG seeks $221 million in out-of-pocket losses from its investment in Sete, prejudgment interest, and punitive damages. *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) (under New York's "'out-of-pocket' rule," plaintiffs' "loss is computed by ascertaining the 'difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain'") (quoting *Sager v. Friedman*, 270 N.Y. 472, 481 (1936)). There is no dispute that EIG invested $221 million and recovered nothing. No valuation analysis is required or relevant.

We respectfully request that the Court schedule a pre-motion conference concerning the Funds' forthcoming motion for summary judgment.

Respectfully submitted,

/s/ *Daniel B. Goldman*
Daniel B. Goldman

CC: All Counsel of Record (via ECF and email)