**EXHIBIT 9**

Page 1

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------x

4   EIG ENERGY FUND XIV, L.P.,

    EIG ENERGY FUND XIV-A, L.P.,

5   et al.

6           Plaintiffs,

7           vs.

8   KEPPEL OFFSHORE & MARINE LTD.,

9           Defendant.

10

    18 Civ. 1047 (PGG)

11

    ------------------------------x

12

13

14           C O N F I D E N T I A L

15

16     VIDEOTAPED DEPOSITION OF JEFFREY CHOW

17           Thursday, June 24, 2021

18              Conducted Remotely

19

20

21

22

23   REPORTED BY:

24   Christina Diaz, CRC, CRR, RMR, CSR, CLR

25   Job Number:  4626891

Page 25

```
 1              J. Chow - Confidential
 2        is your plea to the charge contained in
 3        information 17-cr-466, guilty or not
 4        guilty?"
 5              And you answered, "Guilty, Your
 6        Honor."
 7              Do you see that?
 8        A.    Yes.
 9        Q.    And then if you look down on line
10   19, the court said, "I read the charge to
11   you a few minutes ago.  I want you to tell
12   me in your own words what exactly you did
13   in connection with the conspiracy that's
14   charged in the information."
15              Do you see that?
16        A.    Yes.
17        Q.    And then starting at lines 23 on
18   page 26 and going over to page 28, line 2,
19   you made a statement that day.
20              Do you see that?
21        A.    Yes.
22        Q.    And could you read into the
23   record your statement starting at page 26,
24   line 23, and going over to page 28, line 2.
25        A.    "I worked in the legal department
```

Page 26

1              J. Chow - Confidential

2    at Keppel Offshore Marine for over 25

3    years, and among my duties and

4    responsibilities were to draft and prepare

5    contracts with the company's agents and one

6    of those was an agent in Brazil.

7              "By no later than 2008, I

8    realized that Keppel was overpaying the

9    agent, sometimes by millions of dollars, so

10   that the agent could pay bribes to

11   individuals who could help Keppel Offshore

12   Marine doing business with Petrobras.

13             "Petrobras was a Brazilian

14   state-owned and controlled oil company.

15   Although no one ever named the bribe

16   recipients to me, I knew that they were

17   government officials and ruling political

18   party.

19             "I should have refused to draft

20   the contract that were used for paying

21   bribes and I should have resigned from

22   Keppel.  Instead I discussed the economic

23   terms of the contract with my seniors at

24   Keppel, and acting in agreement with my

25   seniors and others at Keppel, I drafted the

Page 27

```
 1              J. Chow - Confidential
 2    contract and made sure that they were
 3    executed.
 4              "In at least one case it was in
 5    the US that I sent the executed copies of
 6    the contract from Houston, Texas to the
 7    agent to confirm that my seniors at Keppel
 8    had signed the contract.
 9              "While I didn't negotiate the
10    contracts or make the decisions to pay the
11    bribes, I knew that the contracts existed
12    to make payments legitimate and that they
13    were an important part of the bribery
14    scheme.
15              "I am deeply sorry for my
16    conduct."
17        Q.    That statement was true at the
18    time you made it, right, sir?
19        A.    Yes.
20        Q.    Now I would like to ask you a few
21    questions about that statement.
22              On page -- the top of page 27,
23    you refer to an agent in Brazil.
24              Was that Mr. Zwi Skornicki?
25        A.    Yes, it is.
```

Page 28

```
 1            J. Chow - Confidential
 2       Q.    And then you say, "By no later
 3   than 2008, I realized that Keppel was
 4   overpaying the agent, sometimes by millions
 5   of dollars so that the agent could pay
 6   bribes to individuals who could help Keppel
 7   Offshore Marine doing business with
 8   Petrobras."
 9            How did you realize that Keppel
10   was overpaying the agent, sometimes by
11   millions of dollars, so the agent could pay
12   bribes to individuals who could help Keppel
13   Offshore Marine doing business with
14   Petrobras?
15       A.    It was a mix of things that
16   culminated by that time to lead me to
17   believe that bribes were being paid.  The
18   amount of money that was involved in these
19   contracts was very high.  Although some may
20   argue that a 2 percent fee for these type
21   of agreements is normal, when you are
22   talking about project values exceeding a
23   few hundred million dollars, that 2 percent
24   becomes a very sizeable amount of money.
25            The amount of work that goes in
```

```
                                      Page 87
 1              J. Chow - Confidential
 2   Mr. Tong and YY?
 3        A.    Either one or the other or both.
 4   I really don't remember.
 5        Q.    You say "made the suggestion to
 6   have one of us go to explain the
 7   situation."
 8              What did that mean?
 9        A.    I don't remember the substance of
10   this, other than what I am reading now.
11        Q.    And then it goes on to say,
12   "However, the problem is that we will not
13   be brought to all involved to explain."
14              What does that mean?
15        A.    Again, I don't know.
16        Q.    And it says, "As such, need to
17   execute the standard commission agreement
18   with Eagle do Brasil with the 1.5 percent
19   as a copy of this will be showed up the
20   line to convey that this is all.  Nothing
21   more.  We have signed before for other jobs
22   and have seen other agreements with Eagle
23   for even larger amounts."
24              Do you see that?
25        A.    Yes.
```

```
 1              J. Chow - Confidential
 2      Q.    And this standard commission
 3  agreement would be an agreement between
 4  Keppel Offshore Marine or a subsidiary or
 5  an affiliate and with Eagle do Brasil which
 6  was Mr. Skornicki's company, right?
 7      A.    I am sorry.  The question was?
 8      Q.    The standard commission agreement
 9  that's referred to in this document which
10  is Plaintiffs' Exhibit 12, refers to a
11  commission agreement that would be executed
12  between Keppel and Mr. Skornicki's company,
13  Eagle do Brasil, right?
14      A.    I am only speculating at the
15  time.  The standard commission agreement
16  uses the standard format that we would be
17  using to sign with Eagle do Brasil or with
18  any companies.
19      Q.    And the 1.5 percent referred to
20  the commission with Eagle do Brasil, right?
21      A.    1.5 percent would be what should
22  be in the commission agreement.
23      Q.    And then you say "as a copy of
24  this will be showed up the line."
25            What does that mean, showed up
```

Page 89

```
1              J. Chow - Confidential
2      the line?
3           A.    As I said, I don't remember this
4      so I don't know what I really meant by
5      that.
6           Q.    And it says, "We have signed
7      before for other jobs and have seen
8      agreements with Eagle for even larger
9      amounts."
10               Does that refer to larger
11     commission percentages?
12          A.    I am not remembering specifically
13     what this is.  We have signed with these
14     companies for 2 percent.  So that's larger
15     than the 1 1/2 percent.  But what I was
16     referring to on this particular e-mail, I
17     couldn't tell you for certain.
18          Q.    And you say "would prefer not to
19     but the commission agreement may be the
20     only thing that will satisfy people."
21               So are you saying here that you
22     prefer not to have Keppel sign a commission
23     agreement with Mr. Skornicki's company?
24          A.    Again, I don't remember, but it's
25     not for me to say whether it's to sign or
```

Page 90

```
 1              J. Chow - Confidential
 2   not with TB's company.
 3        Q.    You say "other than reverting to
 4   original plan where proof would not be
 5   required then."
 6              What was the original plan?
 7        A.    I don't remember.
 8        Q.    Do you recall discussing a plan
 9   whereby Mr. Skornicki would be paid
10   commissions but there would be no
11   commission agreement?
12        A.    I don't remember the details of
13   this, but I wouldn't be suggesting that
14   there would be payment.  Because payment
15   wouldn't be able to go through the company
16   without a contract or agreement that
17   supports it.  There needs to be some
18   documentation.
19        Q.    Why would there need to be some
20   documentation?
21        A.    To make payments.  In order to
22   make payment out of the company, you need
23   to have all the required documents there to
24   -- for the accounting people to sign off
25   and say, okay, payment is being made.  The
```

Page 91

```
 1              J. Chow - Confidential
 2   contract that supports it, the invoice, the
 3   bank details.  You just can't move money
 4   out of the company without a contract to
 5   support why you are moving money.
 6        Q.    I would like you to look back at
 7   -- I will tell you what exhibit it is --
 8   Plaintiffs' Exhibit 3, if you would.
 9        A.    I have it.
10        Q.    All right.  I would like to go to
11   page A-15 starting at paragraph 73.
12              Are you there, sir?
13        A.    Not yet.  Page A-15?
14        Q.    A-15, paragraph 73?
15        A.    Yes, I have it now.
16        Q.    All right.  And do you see there,
17   this is the statement of facts that was
18   part of the Keppel Offshore Marine deferred
19   prosecution agreement and in paragraph 73
20   and 74 they are talking about a check that
21   you sent in September 2011 that I showed
22   you as Plaintiffs' Exhibit 11 and this
23   e-mail that we just spent time on was
24   referred to in paragraph 74 there dated
25   September 19, 2011.  Take your time and
```

```
                                            Page 92
 1              J. Chow - Confidential
 2    read those two paragraphs.
 3         A.    (Witness reviewing document).
 4              Yes.
 5         Q.    Now, seeing those paragraphs in
 6    this deferred prosecution agreement, is
 7    there any doubt in your mind that what I
 8    showed you in this deposition as
 9    Plaintiffs' Exhibit 11 and 12 relate to
10    drafting a commission agreement with
11    Mr. Skornicki for the purposes of paying
12    bribes relating to the Sete project?
13              MS. SKAISTIS:  Objection.
14              MR. MEISTER:  Can you just state
15         that question.
16              MR. GOLDMAN:  Could we have the
17         court reporter read it back.
18              (Question read)
19         A.    From reading the paragraphs and
20    the earlier documents that you had
21    questioned me about, it refers to a
22    commission agreement with Mr. Skornicki,
23    that we were looking to have someone
24    prepare it and okay it.
25              That's only from reading what you
```

```
                                            Page 106
 1              J. Chow - Confidential
 2       Q.     And it appears to be a draft of a
 3   marketing consulting and services agreement
 4   between Fernvale and Eagle do Brasil.
 5              Do you see that?
 6       A.     Yes.
 7       Q.     And Eagle do Brasil was
 8   Mr. Skornicki's company, right?
 9       A.     Yes.
10       Q.     Then if you look at page KEPPEL
11   435132, section 9.0, Business Ethics, do
12   you see that, sir?
13       A.     Yes.  I have it now.
14       Q.     And this section -- and you can
15   tell me if I am wrong, this draft provides
16   that Mr. Skornicki is going to comply with
17   anticorruption laws and not pay bribes and
18   kickbacks to, among others, including
19   Petrobras, right?
20       A.     Correct.
21       Q.     Why was this in this agreement?
22       A.     We would update our format from
23   time to time and inclusion of these
24   provisions was recommended to me by some
25   friends or business acquaintances.  So we
```

1            J. Chow - Confidential

2    incorporated different things from time to

3    time, and for this one, it's a clause that

4    other companies have used and in particular

5    Zwi had signed with another company having

6    similar provisions.

7        Q.    But you knew, sir, that he was

8    not going to be able to comply with what

9    was set forth in section 9.0, right?

10        A.    Well, it was up to him to agree

11    or not agree to it and up to him to comply

12    or not comply.

13        Q.    I got that, sir.  But you knew

14    that Mr. Skornicki was not going to be able

15    to comply with anticorruption laws because

16    he was going to be paying bribes to

17    Petrobras, right?

18        A.    I had come to the conclusion that

19    he was.

20        Q.    And wasn't the purpose of this

21    section, one of the purposes was to conceal

22    the fact that he would be paying bribes?

23        A.    Not to conceal it, no.  It was

24    more for protection internally.

25        Q.    Well, sir, I mean, one of the

Page 108

```
 1          J. Chow - Confidential
 2    reasons why you executed these types of
 3    agreements with Mr. Skornicki in these
 4    projects with Petrobras was to conceal the
 5    true nature and purpose of the bribe
 6    payments, right, sir?
 7         A.    The intention wasn't to conceal
 8    any bribe payments.  The intention was to
 9    capture in writing the agreement between
10    the company and Mr. Skornicki, that he
11    would be paid a certain commission fee for
12    his assistance under certain contracts.
13         Q.    Okay.  Sir, well, let's go back
14    to Exhibit 2 then.  These are the charges
15    to which you plead guilty.
16              Are you there, sir?
17         A.    Yes.  Sorry.
18              MS. SKAISTIS:  We are just
19         pulling up Exhibit 2.
20    BY MR. GOLDMAN:
21         Q.    Paragraph 13, are you there?
22         A.    Now I am.
23         Q.    And you agreed earlier at this
24    deposition that the statements in paragraph
25    13 were true, right, sir?
```

Page 109

1              J. Chow - Confidential

2       A.      Correct.

3       Q.      And according to paragraph 13,

4    "To facilitate the payment of those bribes

5    and conceal the true nature and purpose of

6    the payments, in accordance with

7    established practices and Rig Construction

8    Company, the defendant, Jeffrey Chow, and

9    other employees at Rig Construction Company

10   created and executed false agreements on

11   behalf of Rig Construction Company with

12   consulting companies controlled in whole or

13   in part by Rig Construction Company Agent."

14           Do you see that?

15      A.      Yes.

16      Q.      And that was true, right?

17      A.      Yes.  Yes.

18      Q.      And you see the last sentence

19   says, "Certain of these agreements also

20   falsely represented that Rig Construction

21   Company Agent was abiding by antibribery

22   law and was not making improper payments."

23           Do you see that?

24      A.      Yes.

25      Q.      And that was also true, right,

Page 116

```
 1              J. Chow - Confidential
 2         introduce another exhibit.
 3              (Plaintiffs' Exhibit 18, e-mail
 4         dated 2/13/12 with attachment bearing
 5         Production Nos. KEPPEL 422871 through
 6         74 and 879 through 882, was marked for
 7         identification)
 8              THE WITNESS:  18, I have it.
 9    BY MR. GOLDMAN:
10         Q.    Okay.  So this is a multi-page
11    document with attachments Bates stamped
12    KEPPEL 422871 through 882.  Actually, I
13    take that back.  It's KEPPEL 422871 through
14    74.  There is an attachment that begins at
15    879 and goes through 882.
16              So this is an e-mail to a lot of
17    people dated February 13, 2012 and it's
18    from Serene Lee.
19              Do you know who Serene Lee was?
20         A.    No.
21         Q.    If you look at the second page
22    with the Bates stamp 422872, the second
23    line, do you see that you were a recipient
24    of this e-mail?
25              MR. MEISTER:  We will take your
```

Page 117

```
 1            J. Chow - Confidential
 2       representation that he is.
 3                MR. GOLDMAN:  The second line,
 4       page 422872.
 5       A.    Yes.  I see my name.
 6  BY MR. GOLDMAN:
 7       Q.    The e-mail says, "Good morning.
 8  Please find press clippings attached."
 9            Do you recall that around this
10  time period that there would be press
11  clippings sent around to employees of
12  Keppel?
13       A.    I don't remember this in
14  particular.
15       Q.    I appreciate that but do you
16  remember that you would get periodically
17  press clippings sent around to you?
18       A.    As part of the group, I would get
19  press clippings from group corporate
20  communications at various times.
21       Q.    Did you ever learn prior to this
22  lawsuit that my client EIG was an investor
23  in Sete?
24       A.    I don't remember them being, no.
25  I don't remember being aware of it.
```

Page 118

                    J. Chow - Confidential
 1
 2        Q.     Were you aware at any time who
 3   the equity investors were in Sete?
 4        A.     No.  Not specific.  There was
 5   always information being sent about Sete
 6   but I never did take much notice of it.
 7             MR. GOLDMAN:  I am going to mark
 8         another exhibit.
 9             (Plaintiffs' Exhibit 19, e-mail
10         string beginning with e-mail dated
11         4/3/12 bearing Production Nos. KEPPEL
12         490240, was marked for identification)
13   BY MR. GOLDMAN:
14        Q.     Do you have Plaintiffs' Exhibit
15   19?
16        A.     Not yet.  I have it now.
17        Q.     All right.  This is an April 3,
18   2012 e-mail from you to Mr. Skornicki and
19   you forward it to Mr. Sam, Bates stamp
20   KEPPEL 490240 and you wrote on April 3,
21   2012, "Zwi, I am at the airport headed to
22   Singapore to close on the agreements.  I am
23   proposing one in Brazil elect the old ones
24   from BrasFELS .5 percent.  Others outside
25   from Fernvale.  You mentioned that you have

Page 120

```
 1           J. Chow - Confidential
 2    April 9, 2012 cc'ing Tommy Sam.
 3           Do you see that?
 4      A.    Yes.
 5      Q.    It says, "Need you to advise on
 6    company for outside agreement between that
 7    company and Fernvale.  I have suggested and
 8    agreement is reached to have one portion
 9    via normal channels to Eagle in Brazil,
10    with balance to be with Fernvale outside."
11           Why were you making this
12    suggestion?
13           MR. MEISTER:  Can you point me to
14      where you are in that document again.
15      Sorry about that.
16           MR. GOLDMAN:  I will ask the
17      question again.
18    BY MR. GOLDMAN:
19      Q.    Look at the page with KEPPEL
20    46493.  You wrote to Mr. Skornicki, "Need
21    you to advise a company for outside
22    agreement between that company and
23    Fernvale.  I have suggested and agreement
24    is reached to have one portion via normal
25    channels to Eagle in Brazil with balance to
```

Page 121

```
1              J. Chow - Confidential
2    be with Fernvale outside."
3              First of all, what do you mean by
4    that suggestion?
5         A.    It's the normal process that I
6    have been familiar dealing with Zwi in the
7    past.  He breaks it down into two portions,
8    local currency portion and a US dollar
9    portion outside.
10        Q.    When you say outside, what do you
11   mean by that?
12        A.    Outside of Brazil.
13        Q.    And then the next e-mail above
14   that is from Mr. Sam to Jerald Lee Quan Ti.
15             Who is that?
16        A.    I believe he was the CFO in
17   Brazil at the time.
18        Q.    Okay.  And you were cc'd and
19   Mr. Sam says, "Jerald, Zwi is requesting
20   that part in Brazil be paid in Reals from
21   Fernvale's nonresident account in Brazil.
22   If so, do we have to withhold taxes?
23   Kindly check."
24             Was that a concern that you would
25   have to withhold taxes?
```

Page 122

```
 1              J. Chow - Confidential
 2       A.    It wasn't a concern that I had.
 3  I didn't know about the tax issues.
 4       Q.    And then you wrote above that on
 5  April 9th, "So the contract would be
 6  between Fernvale and Eagle for both Reals
 7  and US dollar portions?  I was hoping to
 8  lay off .5 percent to BrasFELS, and rest
 9  Fernvale (so that Eagle helped BrasFELS get
10  it job, while XYZ company help Fernvale get
11  job)."
12              What did you mean by that?
13       A.    Fernvale shouldn't be bearing the
14  full brunt of the 2 percent and that the
15  company that was enjoying the benefit of
16  the contract should be bearing some of it,
17  that being BrasFELS.
18              So the normal procedure before in
19  dealing with these, it was always split up
20  into two portions, a local currency portion
21  and a portion outside with the special
22  project company.
23       Q.    And why was it split up in two
24  portions in that manner?
25       A.    In the past, Zwi had requested it
```

```
 1            J. Chow - Confidential
 2       created to make the payments seem
 3       legitimate.
 4            MR. GOLDMAN:  All right.
 5  BY MR. GOLDMAN:
 6       Q.   Look at line 23 of page 27, would
 7  you, sir.
 8            Are you there?
 9       A.   Yes.  Yes.
10       Q.   And you read this statement
11  earlier today, but you stated, "While I
12  didn't negotiate the contracts or make the
13  decisions to pay the bribes, I knew that
14  the contracts existed to make the payments
15  legitimate and that they were an important
16  part of the bribery scheme."
17            Do you see that?
18       A.   Yes.
19       Q.   And this contract which is marked
20  as Plaintiffs' Exhibit 25 is one of the
21  contracts to which you were referring in
22  that testimony when you were making your
23  guilty plea, correct?
24       A.   (Witness reviewing document).
25            In general, we needed an
```

Page 142

```
 1              J. Chow - Confidential
 2    agreement between the contracting entity
 3    and the company which Zwi had designated as
 4    the one to receive commissions.  So the
 5    contracts themselves were the documents
 6    necessary to process the agreement between
 7    Keppel and Zwi.
 8              So in order to make the payments
 9    legitimate in the sense that they were
10    supported by contracts, the contracts were
11    needed to, I guess, prove that there was a
12    commitment made.
13              Does that answer your question?
14        Q.    Let me ask this question.
15              This contract, which is
16    Plaintiffs' Exhibit 25, was an important
17    part of the bribery scheme, right, sir?
18              MR. MEISTER:  Can we just pull up
19        the Exhibit 25.  Okay.  We have it.
20        A.    Your question again, I am sorry.
21    BY MR. GOLDMAN:
22        Q.    This contract, Exhibit 25, which
23    is between Fernvale and Eagle do Brasil
24    dated as of November 30, 2011 relating to
25    Sete Brasil and commissions to be paid
```

```
 1              J. Chow - Confidential
 2   relating to that project, was an important
 3   part of the bribery scheme, right, sir?
 4        A.    It was needed to pay Zwi from our
 5   company.  Without those payments, I guess
 6   he couldn't take care of who he was
 7   supposed to take care of.
 8        Q.    Well, you testified earlier today
 9   and you stated in your guilty plea that, "I
10   knew the contracts existed to make the
11   payments legitimate and that they were an
12   important part of the bribery scheme."
13              So my question is:  This contract
14   that you executed on behalf of Fernvale
15   with Eagle do Brasil was an important part
16   of the bribery scheme, correct, sir?
17        A.    It documented the obligation to
18   pay Zwi which puts money in Zwi's hand for
19   him to take care of whoever he wanted to
20   take care of.  In that sense, yes.  Without
21   that agreement we couldn't pay him and he
22   couldn't do whatever he had to do with
23   those funds.
24        Q.    Including pay --
25        A.    Sorry.
```

Page 189

1

2                C E R T I F I C A T E

3    STATE OF NEW YORK )

4                     ) ss.:

5    COUNTY OF NEW YORK)

6        I, Christina Diaz, a Certified

7    Realtime Captioner, Registered Merit

8    Reporter and Certified Realtime Reporter and

9    Notary Public within and for the State of

10   New York, do hereby certify:

11       That JEFFREY CHOW, the witness whose

12   deposition is hereinbefore set forth, was

13   duly remotely sworn by me and that such

14   deposition is a true record of the testimony

15   given by such witness on June 24, 2021.

16       I further certify that I am not

17   related to any of the parties to this action

18   by blood or marriage and that I am in no way

19   interested in the outcome of this matter.

20   Dated:  June 25, 2021

21

22

         CHRISTINA DIAZ

23       NCRA Certified Realtime Captioner

         NCRA Certified Realtime Reporter

24       NCRA Registered Merit Reporter

         NYS Certified Shorthand Reporter

25