**EXHIBIT 10**

CONFIDENTIAL

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Case No. 18-cv-01047 (PGG)
 5    - - - - - - - - - - - - - - - - - - -x
 6   EIG ENERGY FUND XIV, L.P.,
     EIG ENERGY FUND XIV-A, L.P.,
 7   EIG ENERGY FUND XIV-B, L.P.,
     EIG ENERGY FUND XIV (CAYMAN), L.P.,
 8   EIG ENERGY FUND XV, L.P.,
     EIG ENERGY FUND XV-A, L.P.
 9   EIG ENERGY FUND XV-B, L.P.
     EIG ENERGY FUND XV (CAYMAN), L.P.
10                    Plaintiffs,
            -against-
11   KEPPEL OFFSHORE & MARINE LTD.,
                      Defendant.
12    - - - - - - - - - - - - - - - - - - -x
13               Virtual Zoom Deposition
14
                 July 20, 2021
15               10:00 a.m.
16      CONFIDENTIAL VIRTUAL VIDEO DEPOSITION
17   of KEVIN CORRIGAN, in the above-entitled
18   action, held at the above time and place,
19   taken before Jeremy Richman, a Shorthand
20   Reporter and Notary Public of the State of
21   New York, pursuant to the Federal Rules of
22   Civil Procedure, and stipulations between
23   Counsel.
24
25            *      *      *
```

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN
2          Q.     Do you recall that there was
3     a President Collor of Brazil in 1992
4     who resigned?
5          A.     Yes, I do remember that.
6          Q.     And do you recall the
7     circumstances that led to his
8     resignation?
9          A.     I believe he stole a lot of
10     money from the treasury.
11          Q.     And he was accused and
12     impeached for accepting millions of
13     dollars in bribes, wasn't he?
14          A.     It was corruption.  I don't
15     remember the details of the nature of
16     the corruption.
17          Q.     And in 2007, are you familiar
18     with the charges brought against a
19     Brazilian construction company named
20     Gautama?
21          A.     No, I don't recall that one.
22          Q.     Do you recall that the
23     Brazilian construction company Camargo
24     Corrêa was hit with corruption charges
25     in 2007?

CONFIDENTIAL

Page 51

```
 1           CONFIDENTIAL - CORRIGAN
 2              MS. LAW:  Objection to form.
 3       You can answer.
 4       A.     Well, I think there was a
 5   CompliNet that was part of that
 6   finding.  Is it the same thing?
 7       Q.     I believe so.  Just for
 8   context, describe what a CompliNet is?
 9       A.     Well, that was part of our
10   due diligence that, where we subscribed
11   to a service which, where you would
12   input names of companies and
13   individuals, and they would search
14   publicly available data and give you
15   feedback on any negative behavior or
16   corrupt behavior involving those
17   individuals or companies.  And I do
18   remember that Camargo Corrêa had, I
19   think, four employees that were accused
20   of that.
21       Q.     And that was, again, a
22   bribery scandal in Brazil, correct?
23       A.     Yes.
24       Q.     And it involved a company
25   that was an investor in EAS, which was
```

CONFIDENTIAL

Page 52

```
 1              CONFIDENTIAL - CORRIGAN
 2   one of the shipbuilders for the Sete
 3   projects, correct?
 4              MS. LAW:  Objection to form,
 5      you can answer.
 6      A.    The company was an EAS
 7   shareholder, yes, Camargo Corrêa.  I
 8   don't believe these individuals had any
 9   role in that.
10      Q.    But just so the record is
11   clear, in -- the individuals at Camargo
12   Corrêa were exposed as having been
13   involved in a bribery scandal in 2007,
14   correct?
15      A.    That's my recollection, yes.
16      Q.    And as part of your CompliNet
17   searches relating to the Sete
18   investment, you turned that up because
19   Camargo Corrêa was one of the investors
20   in EAS, correct?
21      A.    Correct.
22      Q.    And EAS was one of the
23   shipbuilders fr the Sete project,
24   correct?
25      A.    That's right.
```

CONFIDENTIAL

1                CONFIDENTIAL - CORRIGAN

2      bribes?

3           A.    No.

4           Q.    Did you speak to anyone in

5      connection with the due diligence

6      process and ask questions relating to

7      the possibility of corruption?

8           A.    No.

9           Q.    So beyond the CompliNet

10     searches and just generally thinking

11     that Petrobras was on the up-and-up,

12     what else did EIG do with respect to

13     corruption due diligence?

14              MS. LAW:  Objection to form.

15        You can answer.

16          A.    As I mentioned a second ago,

17     we had the info memo and various other

18     documents that indicated that they were

19     following the law.  Sete itself had a

20     person on staff who was a compliance

21     person, they practice -- they had best

22     practices on corruption and code of

23     conduct and all that, so to me it

24     looked like it was all being done very

25     professionally.

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN
2          Q.     You were the lead member of
3     EIG's team in connection with the Sete
4     investment, correct?
5          A.     Yes, I would say so.
6          Q.     Did you speak to any members
7     of the Sete deal team to prepare for
8     your testimony, other members of the
9     Sete deal team?
10               MS. LAW:  Within EIG?
11         Q.     Within EIG.
12         A.     Oh, no.
13         Q.     When did you first learn
14    about the Sete investment opportunity?
15         A.     I think it was September of
16    2010.  I was visiting Brazil with Clay
17    Taylor from our Houston office.
18         Q.     And how did you learn about
19    the possibility of the Sete investment
20    at that time?
21         A.     I had made an appointment at
22    Banco Santander with a guy I used to
23    work with at Norchem, which is the
24    chemical operation that I referred to
25    earlier, when I lived there from '92 to

Page 58

```
 1            CONFIDENTIAL - CORRIGAN
 2     '94.  His name is Luis Cantidio,
 3     C-A-N-T-I-D-I-O.  And I didn't have any
 4     particular agenda except to say hello,
 5     we're interested in doing business in
 6     Brazil, and what does he got, and does
 7     he have any ideas, etcetera.  And he
 8     says, It turns out I'm looking at this
 9     opportunity called Sete Brasil.  And
10     across the Chinese wall over there, is,
11     our bank is also the financial advisor
12     to Petrobras, and if you would like,
13     I'll introduce you to the guy who is
14     leading that effort, and his name was
15     Luiz Reis, R-E-I-S, and that's the
16     first time I learned about Sete Brasil.
17          Q.    What was the next step in the
18     process that ultimately led to the
19     investment in Sete Brasil?
20          A.    Well, I believe it was after
21     that I spoke to a friend of mine at
22     Société Générale, and he said, I have a
23     presentation on Sete, and he sent it to
24     me.  And I know that's among the
25     documents you have.  And so that was
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    the first, that's what would have
 3    prompted me to write a memo about this
 4    opportunity, whether we should look at
 5    it, etcetera.
 6              And then later we got access
 7    to the data room and, you know, then we
 8    really jumped in.
 9         Q.    Why did EIG want to pursue
10    this opportunity to invest in Sete?
11         A.    Well, it was the hottest deal
12    in the market in 2010.  Everybody
13    wanted to be in it, and I thought, as I
14    said earlier, we were dealing with the
15    A team, the largest corporation in
16    South America, the largest pension
17    funds, as co-investors.  Very large
18    construction groups involved in the
19    shipbuilding.  Petrobras is the
20    off-taker, Petrobras is the appointor
21    of senior management, BNDES support, I
22    mean, you couldn't get a better list of
23    entities in Brazil to work with on a
24    transaction, even though it had a lot
25    of inherent risk.
```

CONFIDENTIAL

Page 60

1          CONFIDENTIAL - CORRIGAN

2          Q.    What was the first step in

3    EIG's due diligence process with

4    respect to investing in Sete?

5          A.    Well, I always took the

6    approach that you want to understand

7    the story, does the story hold

8    together.  And if the story holds

9    together, and you think you can

10   mitigate the risk that you identified

11   to the point where you're not taking

12   undue risk, then you move forward.  And

13   the next step is to look at the model

14   to ascertain what your projected

15   returns might be.  But the story has to

16   hold together.  That's really step

17   number one.

18         Q.    And what did you do to make

19   sure that the story held together?

20         A.    Well, we sort of skirted it,

21   but it's again, you know, it was an

22   objective of the -- a national

23   objective of the government, to

24   revitalize the Brazilian shipbuilding

25   industry.  A desire on them to, you

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2   spend much time on this one.  So do you
 3   have 38 in front of you, Mr. Corrigan?
 4        A.    Yes, sir, I do.
 5        Q.    Do you recognize this
 6   document?
 7        A.    Yes, it's a, you know,
 8   calling an investment committee meeting
 9   by Blair's secretary, Iris.
10        Q.    And this is the investment
11   committee meeting on June 27, 2011,
12   when the decision to invest -- to have
13   Fund XIV invest in Sete was made; is
14   that correct?
15        A.    I believe it is.  Is there an
16   agenda?
17        Q.    No, but there are materials
18   attached, and if you go back to Exhibit
19   Share and pull up Exhibit 39.
20        A.    Okay, it had the investment
21   rec?
22        Q.    Yes.
23        A.    Okay, so yeah, I'll do that.
24   39.  I always have to refresh, don't I?
25              MS. LAW:  Yes, and it should
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2        be there.  And again, it's in
 3        numerical order.
 4           A.     Thirty-nine, right?
 5           Q.     Yes.
 6                  (Exhibit 39, previously
 7        marked, was shown to the witness,
 8        EIG_KEP_00077790.)
 9           A.     Okay, investment rec.
10           Q.     And do you recognize this
11    document we marked as Exhibit 39?
12           A.     Yes, I do.
13           Q.     And describe what it is?
14           A.     It's an investment
15    recommendation to invest 250 million
16    reals in Sete Brasil.
17           Q.     And this is the kind of
18    investment recommendation you talked
19    about earlier, correct?
20           A.     Correct.
21           Q.     And this is the one for the
22    investment by Fund XIV in the Sete
23    project, correct?
24           A.     That's right.
25           Q.     And this, then, sort of is
```

CONFIDENTIAL

1           CONFIDENTIAL - CORRIGAN
2       the culmination of the due diligence
3       process and a recommendation to make
4       the investment, correct?
5           A.    Yes.
6           Q.    And this was presented to the
7       investment committee on June 27, 2011?
8           A.    It appears that way, yes.
9           Q.    And at that meeting, the
10      investment committee approved the
11      investment, correct?
12          A.    Correct.
13          Q.    How did you decide which
14      details relating to this possible
15      investment to put in this investment
16      recommendation?
17          A.    I'm not sure I understand the
18      question.
19          Q.    Well, you had learned a lot
20      about the Sete investment up to this
21      point in time, correct?
22          A.    Yes.
23          Q.    And you had to make some
24      decisions about what to put in here and
25      what not to put in here, correct?

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2         A.    Yes.

3         Q.    So just describe, generally,

4    the process of deciding what to put in

5    here and what not to put in here.

6         A.    Well, it's a fairly long

7    document to begin with, but the idea is

8    to present the transaction as

9    completely as possible with the terms

10   and conditions under which you're going

11   to invest, with the risks and mitigants

12   that you've identified for the

13   investment, and then there's, you know,

14   the projected returns and stress tests

15   on the returns.  I would say those are

16   the main themes that you want to

17   present to your investment committee.

18        Q.    And is this the most

19   comprehensive document that summarizes

20   the due diligence process relating to

21   this investment?

22              MS. LAW:  Objection to form.

23        A.    This is the only document

24   that exists that was used to approve

25   the transaction inside EIG.

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN

 2    recommendation?

 3         A.    Well, the independent

 4    directors, no, they get it and they

 5    read it, and then they attend the

 6    meeting.  Obviously, Kurt Talbot and

 7    Blair Thomas, who were on the

 8    committee, were quite familiar with the

 9    transaction by the time they got this

10    document.

11         Q.    How many members are there of

12    the investment committee?

13         A.    I believe there were five at

14    the time, so it was Randy, Blair and

15    Kurt, and then the two independent

16    directors from TCW.

17         Q.    Turn to page 12 of the IR,

18    which has, begins in production number

19    2482.  Do you have that page in front

20    of you?

21         A.    Yes, sir.

22         Q.    It refers to EPC contractors.

23    Do you see that?

24         A.    Mm-hmm.

25         Q.    You need to say yes or no.
```

CONFIDENTIAL

1           CONFIDENTIAL - CORRIGAN

2           A.      Yes, sorry.

3           Q.      Could you describe what EPC

4      contractor means in this document?

5           A.      Well, EPC stands for

6      engineering, procurement and -- anyway,

7      it means in this case the six shipyards

8      that were building the, either

9      semi-submersibles or ultra deepwater

10     drill ships.

11          Q.      At this time, did you know

12     exactly which shipbuilders would

13     ultimately end up building which ships?

14          A.      In June of 2011, we had a

15     list of the shipyards that had been

16     identified, yes.  And I think EAS had

17     already been granted their --

18          Q.      You had EAS that you knew was

19     going to be building one of the ships,

20     right?

21          A.      Right.

22          Q.      And there was a list of other

23     potential shipyards, but none of them

24     had actually had any contracts with

25     Sete, correct?

CONFIDENTIAL

                        CONFIDENTIAL - CORRIGAN
1
2          A.      In June of 2011, yeah, I
3    don't remember exactly when the other
4    contracts were given, but I think it
5    was after that.  You're right.  But we
6    had studied the six shipyards to get
7    comfortable with their ability to
8    produce future contracts granted to
9    them.
10         Q.      And EAS, as we discussed
11   previously, that's a company that one
12   of the owners of is Camargo Corrêa that
13   was involved in the corruption scandal,
14   right?
15               MS. LAW:  Objection to form.
16         Q.      I'm sorry, I didn't hear your
17   answer, Mr. Corrigan.
18         A.      Yes, correct.
19         Q.      And with respect to EAS, if
20   we look at page 15 of the -- 15 and 16
21   of the investment recommendation, this
22   just discusses certain risks, including
23   shipyard bankruptcy.  Do you see that?
24         A.      Yes.
25         Q.      And the only shipyard that's

Page 76

1              CONFIDENTIAL - CORRIGAN
2       discussed under shipyard bankruptcy is
3       EAS, correct?
4              A.    Yes.
5              Q.    And that's because EAS was
6       the only shipyard that actually had an
7       agreement to build ships for Sete,
8       correct?
9              A.    At that point, yes.
10             Q.    And then if we turn to,
11      there's an appendix to this document.
12      It's the second to the last page,
13      appendix 6, page 41 of the document.
14             A.    Okay.  Yes.
15             Q.    And this is the suggestion
16      about other potential shipyard
17      contractors, correct?
18             A.    Correct.
19             Q.    We have Jurong, Brasfels and
20      three others, correct?
21             A.    Mm-hmm.
22             Q.    Please answer yes or no.
23             MS. LAW:  Objection to form.
24             A.    Yes, I'm sorry, yes.
25      Paraguaçu is misspelled, I just

CONFIDENTIAL

1           CONFIDENTIAL - CORRIGAN
2     realized it, anyway.
3           Q.     And where did this investment
4     recommendation come from with respect
5     to these shipyards?
6           A.     It was in the data room, we
7     had -- it was identified in various
8     info memos that we reviewed.
9           Q.     And in fact, you simply
10    copied these bullet points from a
11    bank -- Banco Santander presentation,
12    correct?
13          A.     Right, I do remember saying,
14    just use that info.  It provided a
15    summary of who these folks were.
16          Q.     With respect to Brasfels,
17    which is the Keppel entity, this is the
18    sum total of information that was
19    presented to the investment committee
20    regarding Brasfels, correct?
21          A.     That's correct.
22          Q.     And this information came
23    from Banco Santander?
24          A.     Right, as Petrobras's
25    financial advisor.

CONFIDENTIAL

1        CONFIDENTIAL - CORRIGAN

2        Q.    And did you do any

3    independent due diligence beyond

4    Santander to verify that what was said

5    about Brasfels here was correct?

6        A.    We went on websites and

7    talked to people.  We, of course,

8    visited both EAS and Brasfels.  So no,

9    we did do additional due diligence

10   along with all the other factors we

11   were looking at.  We were trying to get

12   comfortable that they would be able to

13   build these ships.

14       Q.    Prior to the time that this

15   investment recommendation was created,

16   you had not visited Brasfels, correct?

17       A.    Prior to June of 2011?

18       Q.    Correct.

19       A.    I believe that was

20   afterwards, yes.  I think we had

21   visited EAS at that point.

22       Q.    I think you said in your

23   Petrobras deposition, it was post EAS

24   and Jurong, correct?

25       A.    I don't remember visiting

CONFIDENTIAL

Page 108

1          CONFIDENTIAL - CORRIGAN

2          A.     That's correct, yes.

3          Q.     And in fact, this document is

4     almost identical to the investment

5     recommendation made for Fund XIV,

6     correct?

7          A.     I would think so, although I

8     would have to read them both.  But I

9     agree, there would have been

10    significant changes between June and

11    September.

12         Q.     Would additional due

13    diligence have been done between June

14    and September?

15         A.     Well I think, no, not per se.

16    We were still there monitoring what was

17    going on and the progress of the

18    contracts with Petrobras for the

19    additional drill ships, and all I can

20    say is if we had gotten a whiff of

21    anything untoward during that time, we

22    clearly would have pulled the deal.

23    But I don't remember that we made more

24    trips specifically for this purpose.

25         Q.     What we've marked as

CONFIDENTIAL

Page 109

1               CONFIDENTIAL - CORRIGAN
2       Exhibit 75, this was sent to the
3       investment committee, correct?
4               A.    It would have been the same
5       procedure as the previous one, yes.
6               Q.    Ultimately, this investment
7       was approved in September of 2011,
8       correct?
9               A.    Correct.
10              Q.    And if you look at page 41 of
11      this document, it's the second to the
12      last page, it refers again to potential
13      system to EPC contractors, do you see
14      that?
15              A.    Yes, hold on.  Yes, I see,
16      I'm here.
17              Q.    And this is identical to the
18      same page in the prior investment
19      recommendation for Fund XIV, correct?
20              A.    Appendix 5 seems to be a
21      little more fleshed out.  Appendix 6,
22      yes, that's the same.
23              Q.    And this is the part that
24      deals with Brasfels, which is the
25      Keppel entity, correct?

CONFIDENTIAL

Page 110

1              CONFIDENTIAL - CORRIGAN

2         A.    Correct.

3         Q.    What this says about Brasfels

4    is exactly what was said about Brasfels

5    in the investment recommendation for

6    Fund XIV, correct?

7         A.    It looks like it, yes.

8         Q.    Had any additional due

9    diligence been done relating to

10   Brasfels or Keppel between June and

11   September?

12        A.    I don't believe so, no.  We

13   were comfortable with them because they

14   were, you know, they were an operating

15   entity, they had a track record in

16   Brazil.  The others did not.

17        Q.    And then you would have

18   presented this investment

19   recommendation to the investment

20   committee at a meeting in September of

21   2011, correct?

22        A.    Yes.

23        Q.    And was the presentation

24   essentially the same as the

25   presentation for the Fund XIV

CONFIDENTIAL

Page 111

```
 1              CONFIDENTIAL - CORRIGAN
 2     investment?
 3          A.    I'm guessing this would have
 4     been a quick approval.
 5          Q.    Do you recall anyone asking
 6     questions at that meeting?
 7          A.    I don't recall, no.
 8          Q.    Do you recall that, the
 9     subject of bribery or corruption risk,
10     coming up at that September meeting?
11          A.    No, it never came up
12     internally, or we wouldn't have gotten
13     to this point in the transaction.
14          Q.    Were any of EIG's visits to
15     any of the shipyards discussed at the
16     meeting?
17          A.    I don't recall.
18          Q.    Was any Keppel entity
19     discussed at the September 11th
20     investment committee meeting?
21          A.    I don't recall.
22          Q.    Let's mark another exhibit.
23     It's tab 19.
24               (Exhibit 89, marked for
25         identification, Bates stamped
```

1              CONFIDENTIAL - CORRIGAN

2                   MR. BARBUR:  Okay.

3                   MS. LAW:  My technology

4        skills have improved over the last

5        year, so we're good now?

6                   THE WITNESS:  Yeah.

7                   MS. LAW:  Yes?

8                   THE WITNESS:  I don't need to

9        see myself, but that's fine.

10                   MS. LAW:  Sorry, Peter.

11                   MR. BARBUR:  No worries.

12        A.     I'm on 40.

13        Q.     This is an email you sent to

14     Simon Hayden on or around, the top

15     email is January 6, 2012.

16        A.     Correct.

17        Q.     And if you scroll down the

18     page, there's a predecessor email from

19     Simon to you dated January 4th.

20                   Do you see that?

21        A.     Yes.

22        Q.     And he's referring to the

23     fact that it was reported on

24     December 27th of 2011 that Sete had

25     awarded a contract to Keppel.

CONFIDENTIAL

Page 124

1          CONFIDENTIAL - CORRIGAN
2              Do you see that?
3       A.    I see that, yes.
4       Q.    That's the first information
5    EIG had that any contract had been
6    awarded to Keppel, correct?
7              MS. LAW:  Objection to form,
8        you can answer.
9       A.    I'm not sure, because again,
10   this was something being sent to me
11   from a colleague in London, and I was
12   in pretty frequent contact with Luiz
13   Reis and other people in Brazil, so I
14   don't remember the exact date that the
15   award was granted, or that Keppel won
16   the award.  But it was around this
17   time, it was towards the end of the
18   year in 2011.
19       Q.    Let me put it this way:  You
20   learned the first time that Keppel had
21   been awarded a contract after the
22   September investment committee meeting,
23   correct?
24       A.    That's right, because I don't
25   believe it had been awarded until

CONFIDENTIAL

Page 125

1           CONFIDENTIAL - CORRIGAN
2    later.
3         Q.    And up at the top you say, I
4    had to check on this, because I wasn't
5    sure.  Amazingly, it is the first of
6    the 21 new ships to be built for Sete
7    Brasil in Brazil.
8              Do you see that?
9         A.    Yes.
10        Q.    What do you mean by,
11   amazingly?
12        A.    I'm not sure.  I think it has
13   to do with the fact until then I think
14   a lot of these semi-submersibles had
15   been built in Singapore by Keppel, but
16   I don't know.
17             MR. KUMAGAI:  Let's also mark
18        another exhibit, tab 21, David.
19             MS. LAW:  Kevin, I'll let you
20        know when it's up.  It should be up
21        as Defendant's Exhibit 90.
22             (Exhibit 90, marked for
23        identification, Bates stamped
24        EIG_KEP_00047981.)
25         Q.    It begins with a

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2       certification from a translator that

3       because the email in the exhibit was in

4       Portuguese, and therefore, if you turn

5       to page 2 of the exhibit, it's the

6       English translation of the Portuguese

7       email exchange.

8              A.    Right.

9              Q.    If you want to see, the

10      original Portuguese is also attached at

11      the end of this exhibit.

12             A.    Right, okay, I'm looking at

13      that.

14             Q.    So tell me when you're done

15      reviewing it, and I just have a couple

16      of brief questions.

17             A.    Okay, so I see this on

18      January 5, 2012.

19             Q.    And you were communicating

20      with Luiz Reis.  Do you see that?

21             A.    Yes.

22             Q.    Who is he?

23             A.    He was the Lakeshore guy, and

24      Sete's financial advisor.

25             Q.    And in the email from you to

Page 129

1              CONFIDENTIAL - CORRIGAN
2      of the due diligence process?
3           A.    Well, because we now know
4      that Keppel, among others, was part of
5      the Lava Jato bribery scheme.
6           Q.    Did you have any connections
7      with Keppel during the due diligence
8      process?
9           A.    Just the visits that we
10     talked about before.
11          Q.    The visits were after the
12     first investment decision was made,
13     right?
14          A.    That's correct.
15          Q.    So they were not part of the
16     due diligence process to make the
17     investment, were they?
18               MS. LAW:   Objection to form.
19        You can answer.
20          A.    Right, we had visited EAS,
21     and we had looked at the other
22     shipyards, and as I had said earlier,
23     for us, Keppel was the star because it
24     had a long history of operating in
25     Brazil.

CONFIDENTIAL

Page 130

1          CONFIDENTIAL - CORRIGAN
2          Q.     Well, did you have any
3    conversations with anyone at Keppel
4    where you would have thought they
5    should have disclosed the bribes, and
6    they failed to do so?
7          A.     Not prior to the investment
8    recommendation, no.
9          Q.     At some point you made some
10   visits to the Keppel -- the Brasfels
11   shipyard in Brazil, correct?
12         A.     Yes.
13         Q.     And the first one of those
14   visits was in August of 2011, as you
15   testified in your Petrobras deposition,
16   right?
17         A.     I'm going to refer to the
18   binder, since we had agreed earlier
19   that I could do that.
20         Q.     Absolutely, help yourself.
21         A.     And that has on tab, towards
22   the end, it has correspondence about
23   that visit, I believe.  Okay, I think
24   it's tab 21, talks about your trip in
25   August of 2011.

CONFIDENTIAL

1            CONFIDENTIAL - CORRIGAN

2        Q.    Correct.  And this was a trip

3    in conjunction with an entity called

4    CIC, correct?

5        A.    That is correct.

6        Q.    What is CIC?

7        A.    China Investment Corporation.

8    It's a customer of EIG's.

9        Q.    You mean, when you say

10   customer --

11       A.    I'm sorry, yeah, I -- an

12   investor in EIG funds.

13       Q.    And this tour in August of

14   2011 occurred after EIG had already

15   made its decision, initial decision to

16   invest in Sete, correct?

17       A.    Correct.

18       Q.    And this tour concerned CIC's

19   potential investment in Sete rather

20   than EIG's, correct?

21            MS. LAW:  Objection, you can

22       answer.

23       A.    Yeah, we set it up to help

24   CIC in their due diligence, but I

25   wouldn't say that we were -- you know,

CONFIDENTIAL

```
 1            CONFIDENTIAL - CORRIGAN
 2   we would do nothing in our own case.
 3   It was the first time we'd been to
 4   Keppel, so we would have been
 5   interested to see what was going on in
 6   connection with our own investment.
 7        Q.    Would you have set up this
 8   trip, but for CIC?
 9            MS. LAW:  Objection to form,
10      you can answer.
11        A.    I don't know how to answer
12   that.  Probably not at this time, but
13   we would have eventually wanted to
14   visit.  Keppel had the benefit of being
15   the closest physically to Rio, and it
16   was easier to get to the other ones
17   where you had to get on a plane.
18        Q.    And what was the purpose of
19   visiting the yard?  Setting aside the
20   role of CIC, for either CIC or EIG,
21   what was the purpose?
22        A.    Well, CIC was, you know,
23   beginning to kick the tires, as we had
24   the previous year, and they just wanted
25   to see one of the shipyards to see
```

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN
2      what -- to gain impressions on their
3      ability to fulfill contracts.
4           Q.     Is it fair to say the focus
5      was the technical ability of the
6      shipyard to construct the drill ships?
7                  MS. LAW:   Objection to form.
8          You can answer.
9           A.     Yeah, I think that would --
10     well, again, I don't know exactly what
11     Yangyang and Dr. Xu wanted to
12     accomplish on that trip, but I think
13     what you've said is a reasonable
14     assumption.
15          Q.     There were discussions with
16     representatives of Brasfels on this
17     trip; is that correct?
18          A.     Yes, they, I recall they
19     greeted us, they gave a presentation
20     and then we walked around the shipyard,
21     which is quite large.
22          Q.     And the presentation focused
23     on their ability to construct the drill
24     ships, correct?
25          A.     I don't remember the exact

```
 1              CONFIDENTIAL - CORRIGAN
 2    nature of the presentation, but it
 3    would have been an overview of their
 4    operations, and I'm sure it was touting
 5    their skills, etcetera.
 6         Q.    When we talk about skills,
 7    it's really their shipbuilding capacity
 8    was the focus, right?
 9         A.    Yes, that's correct.
10         Q.    What was EIG's relationship
11    with CIC?
12         A.    I would prefer that you ask
13    Blair that question, if you don't mind,
14    because I just know they were an
15    important investor in EIG.
16         Q.    Setting -- did you understand
17    that EIG had a preexisting relationship
18    with CIC prior to this yard tour?
19         A.    Just as an aside, in a fund
20    management company such as EIG, you
21    have the folks that deal with
22    investors, and then folks like me that
23    deal with the deployment of those
24    funds.  And the two don't really mix or
25    interact that much.
```

CONFIDENTIAL

1            CONFIDENTIAL - CORRIGAN

2        Q.    Okay.

3        A.    Does that clarify anything,

4    or --

5        Q.    Well, sort of.  I mean, did

6    you deal with CIC prior to this yard

7    tour?

8        A.    No.

9        Q.    And was this set, this yard

10   tour, set up at the request of EIG or

11   CIC or Sete?

12       A.    No, I would have set up the

13   agenda in consultation with Yangyang,

14   and I would have asked Sete to arrange

15   it.  I didn't think I could call

16   Brasfels directly and get a visit, but

17   I knew that Sete would be able to

18   arrange a visit.

19       Q.    So you initiated this yard

20   tour?

21       A.    Correct.

22       Q.    Do you recall any specific

23   discussions with representatives of

24   Brasfels at this tour?

25       A.    I don't, besides the general

CONFIDENTIAL

1                CONFIDENTIAL - CORRIGAN

2       overview I gave you a minute ago.

3            Q.    Do you think that any

4       inaccurate or misleading information

5       was provided by Brasfels during this

6       tour?

7                  MS. LAW:  Objection, you can

8          answer.

9            A.    Again, it's what I said

10      earlier.  No, at that time I thought

11      everything they said was truthful and,

12      you know, they didn't bring up the

13      corruption scheme that already existed.

14           Q.    Did you or did anyone else on

15      this tour raise questions relating to

16      bribery or corruption?

17           A.    No.

18           Q.    Do you recall that CIC

19      invited someone from Morgan Stanley to

20      this yard tour?

21           A.    My recollection, I think his

22      name was Kevin, poor guy, and he was

23      sort of an intern.  I don't think he

24      was wearing a Morgan Stanley hat, so he

25      was seconded or doing an internship of

CONFIDENTIAL

Page 137

1          CONFIDENTIAL - CORRIGAN
2     sorts at CIC.  So I viewed him as a CIC
3     person, not a Morgan Stanley person.
4          Q.    Do you recall saying that you
5     were offended that he came on the yard
6     tour?
7          A.    No.
8          Q.    Why don't we mark another
9     document, it's tab 16.
10              MS. LAW:  I'll tell you when
11         it's there.  It should be there as
12         Defendant's Exhibit 91.
13              (Exhibit 91, marked for
14         identification, Bates stamped
15         EIG_KEP_00049094.)
16         A.    Hmm, yeah, I don't remember
17     this exchange.
18         Q.    You did write to Blair, I
19     just found out this guy is from Morgan
20     Stanley.  I think they should have
21     asked if it was okay, and I'm a bit
22     offended.
23              Do you see that?
24         A.    Yes.
25         Q.    As you sit here today, do you

CONFIDENTIAL

Page 142

1              CONFIDENTIAL - CORRIGAN

2         Q.     And you were not actually

3     looking at the construction of one of

4     the rigs for Sete?

5         A.     Correct.

6         Q.     And do you recall whether the

7     presentations were in English or in

8     Portuguese?

9         A.     I'm pretty sure they were in

10    English.

11        Q.     You recall a presentation,

12    was that like a slide deck

13    presentation?

14        A.     Yes.

15        Q.     Were any videos shown?

16        A.     I don't recall.

17        Q.     Do you have to wear safety

18    equipment, like a hardhat?

19        A.     When we were walking around,

20    absolutely, yes.  And I think we put on

21    safety vests, you know, the kind that

22    you can see.

23        Q.     And do you recall asking any

24    questions of anyone at Brasfels about

25    corruption or bribery issues?

```
 1              CONFIDENTIAL - CORRIGAN
 2        A.     No.
 3        Q.     Did the subject of corruption
 4   or bribery come up in any way?
 5        A.     I don't recall that it did,
 6   no.
 7        Q.     And again, the focus was on
 8   the shipbuilding capacity of Brasfels?
 9        A.     Yes.
10             MS. LAW:  Objection to form.
11        You can answer.  I think the answer
12        was yes.
13        A.     Yes, sorry.
14        Q.     Do you believe that any of
15   the information that was provided by
16   Brasfels during the yard tour was
17   inaccurate or misleading?
18             MS. LAW:  Objection, asked
19        and answered multiple times.
20        A.     Yeah, it's the same answer
21   that at the moment, at that time, no,
22   but in retrospect, yes.
23        Q.     Did EIG rely on anything it
24   learned in connection with this yard
25   tour as part of its decision to invest
```

Page 144

```
 1              CONFIDENTIAL - CORRIGAN
 2   in Sete?
 3              MS. LAW:  Objection to form,
 4       you can answer.
 5        A.    Well, at that time we had
 6   already made one approval, and I
 7   wouldn't say -- this would have been a
 8   negative event, if something had come
 9   to light that was negative, we wouldn't
10   have proceeded with the second
11   investment rec.  At that point our due
12   diligence we felt was pretty complete.
13        Q.    And you didn't add any
14   information concerning Brasfels to the
15   September investment recommendation as
16   a result of this yard tour, correct?
17        A.    That appears to be correct,
18   yes.
19        Q.    Are you aware of a video that
20   was made by Barrington Media?
21        A.    Yes, I recall it.
22        Q.    Describe generally what you
23   recall about that video.
24        A.    Well, Barrington worked with
25   TCW and EIG to prepare presentations
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2       you when it's there.  It's
 3       Defendant's Exhibit 92, Kevin, it
 4       should be in your folder.
 5                 THE WITNESS:  It's an email,
 6       I see.
 7         Q.    This is an email that you
 8    wrote to Barbara Olsen, correct?
 9                 (Exhibit 92, marked for
10       identification, Bates stamped
11       Barrington_ET_0000596.)
12         Q.    And Barbara Olsen is with
13    Barrington Media?
14         A.    Yes.
15         Q.    Whose idea was it to hire
16    Barrington Media for this purpose?
17         A.    Again, I'm, Barrington as a
18    company did a lot of stuff for TCW and
19    EIG in connection with these annual
20    investor conferences.  So that was sort
21    of a going relationship, if you will.
22    I'm guessing Blair decided what
23    transactions he wanted to highlight for
24    that year.
25         Q.    Okay.
```

CONFIDENTIAL

Page 148

CONFIDENTIAL - CORRIGAN

1

2        A.      And then Barrington was
3    brought in, along with others.  I mean,
4    there were several investments
5    highlighted that year.
6        Q.      And in your email to Barbara
7    Olsen you say, I wanted to let you know
8    that Sete Brasil is supposed to speak
9    with EAS (the ship builder) today.
10              Do you see that?
11       A.      Yes.
12       Q.      So was the original plan to
13   film at EAS, rather than Brasfels?
14       A.      It looks that way, because
15   they were the only ones that had
16   contracted at that point.  But from a
17   logistical standpoint, it was obviously
18   easier to go to Brasfels, and that's
19   where they ended up going.
20       Q.      Since I'm not familiar with
21   the geography of Brazil, where is
22   Recife, which is where EAS is, relative
23   to where Brasfels is?
24       A.      It's about, I would say a two
25   and a half-hour flight north, more or

Page 149

```
 1              CONFIDENTIAL - CORRIGAN
 2    less due north of Rio.
 3         Q.    So if you went to the EAS
 4    shipyard, you would have had to fly
 5    rather than drive?
 6         A.    Oh, absolutely, yeah.  It's a
 7    big country.
 8         Q.    So is it your understanding
 9    that the reason the switch was made
10    from EAS to Brasfels was simply the
11    logistics of getting there?
12         A.    I imagine so.  Again, I'm not
13    a hundred percent sure.  But I think it
14    was Sete's initiative, you know, they
15    were helping us set all this stuff up.
16              MR. BARBUR:  It's now 1:00,
17         and I guess we promised to break at
18         1:00.  I was about to mark another
19         document, so maybe we should stop
20         here.
21              THE WITNESS:  That's good.
22              MS. LAW:  That's fine.
23              MR. BARBUR:  We'll resume at
24         about 1:30, then.
25              THE WITNESS:  Thank you.
```

CONFIDENTIAL

1                CONFIDENTIAL - CORRIGAN

2                   THE VIDEOGRAPHER:   Going off

3          the record.   The time is 1:00 p.m.,

4          we're off the record.

5                   (Luncheon recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 153

```
 1              CONFIDENTIAL - CORRIGAN
 2   means Sete, correct?
 3        A.    Correct.
 4              MS. LAW:  Objection to form.
 5        Q.    And that was your
 6   understanding of the purpose of the
 7   videotape?
 8        A.    Yes.
 9        Q.    And she goes on to say, At
10   EAS, because they're still talking
11   about filming at EAS, I would like to
12   videotape general shipbuilding
13   activity.
14              Do you see that?
15        A.    Yes.
16        Q.    And was that your
17   understanding of what they wanted to
18   videotape, that is, general
19   shipbuilding activity?
20        A.    Yeah, I mean, this is the
21   only interaction I had on this subject,
22   so it's a pretty broad statement, but
23   that's what they wanted to do.
24              MR. BARBUR:  Let's mark
25     another exhibit.  It's tab 18,
```

CONFIDENTIAL

1            CONFIDENTIAL - CORRIGAN
2       Dave.
3               MS. LAW:  Kevin, it should be
4       there as Defendant's 94.
5       Q.    Do you have Exhibit 94 in
6   front of you, Mr. Corrigan?
7       A.    It just opened, yes.
8       Q.    Take a minute to familiarize
9   yourself and I'll ask a couple
10  questions.
11              (Exhibit 94, marked for
12      identification, Bates stamped
13      EIG_KEP_00048996.)
14      A.    Okay.
15      Q.    And again, what we've marked
16  as Exhibit 94, this is another email
17  chain involving you and Ms. Olsen
18  relating to the Barrington video,
19  correct?
20      A.    Correct.
21      Q.    And by this point in time, it
22  had obviously been determined to shoot
23  at Brasfels rather than EAS, correct?
24      A.    Yes.
25      Q.    And in particular, for

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2   August 24th, the entry says, Drive to
 3   Brasfels' shipyard, videotape general
 4   shipyard activity.
 5              Do you see that?
 6        A.    Yes.
 7        Q.    And that's consistent with
 8   what you understood Barrington Video
 9   would be doing at Brasfels, correct?
10        A.    Yes.
11        Q.    Did you have -- let me back
12   up.  Were you the primary person at EIG
13   who was tagged with logistics for this
14   video shoot?
15        A.    I think I just served to
16   introduce her to Sete, and then I
17   don't, I really wasn't involved after
18   that in the specifics, you know, the
19   exact dates and when she was meeting
20   with whom.  She pretty much, I think,
21   corresponded directly with Sete on
22   that, keeping me in the loop.  So I --
23   once we introduced her to the right
24   people, she pretty much set it up.
25        Q.    And so you and EIG didn't
```

CONFIDENTIAL

1                CONFIDENTIAL - CORRIGAN

2     have any direct contact with Brasfels

3     relating to this video shoot; it was

4     done through Barrington and Sete,

5     correct?

6          A.    That would be correct, yes.

7          Q.    Do you know whether

8     Barrington Media interviewed any

9     employees of Keppel or Brasfels for the

10    video?

11         A.    I don't know that.

12         Q.    Did you have any

13    understanding that the people from

14    Barrington on this video shoot would be

15    asking questions of Brasfels?

16         A.    I'm not sure I understand the

17    question, Peter.

18         Q.    Well, Barrington Media was

19    going to go to the shipyard to take

20    some video, correct?

21         A.    Yes.

22         Q.    Was it your understanding

23    they were going to be meeting with

24    people at Brasfels and asking them

25    questions about anything?

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN
2         A.    I don't really know what they
3    intended to do, but they were not an
4    extension of our due diligence, if
5    that's what you're asking.
6         Q.    So this was independent of
7    due diligence?
8         A.    Correct.
9         Q.    Do you know whether there was
10   any discussion of corruption or bribery
11   during the filming by Barrington at the
12   Brasfels shipyard?
13        A.    I'm sorry, I wasn't there,
14   and I don't know what was discussed.
15        Q.    Do you have any reason to
16   believe that any false or misleading
17   information was provided to Barrington
18   Media during this video shoot?
19        A.    I don't know.
20        Q.    What did EIG ultimately do
21   with the video that Barrington
22   produced?
23        A.    They made a little
24   five-minute or so presentation that was
25   shown at our annual meeting that year.

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN
2          Q.    Do you remember, like,
3     approximately how much of that video
4     was devoted to the shipyard?
5          A.    A relatively small portion,
6     10 to 15 percent, maybe.
7          Q.    And this would have been just
8     background shots of ships being built
9     at Brasfels?
10         A.    Yeah, no interviews at
11    Brasfels.
12         Q.    Was the -- never mind, I'll
13    move on.
14               This was then shown at an
15    investors' conference in
16    September 2011, correct?
17         A.    Yes, I thought it was in
18    October, but it must have been in
19    September that year.
20         Q.    Okay.  You were present?
21         A.    Yes.
22         Q.    Do you recall how long the
23    conference lasted?
24         A.    It was an all-day affair.
25         Q.    And the video all together

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN

2    was about five minutes of that?

3         A.    Approximately, around that.

4         Q.    Do you recall any discussion

5    relating to the video of the shipyards

6    at the investors' conference?

7         A.    No.

8         Q.    Do you recall any discussion

9    of corruption or bribery risk in Brazil

10   at the investors' conference?

11        A.    No, I don't recall.

12        Q.    Do you remember any

13   discussions about the identities of the

14   shipyards at the investors' conference?

15        A.    I don't remember, but I

16   believe Simon gave a presentation about

17   Sete at that conference.  In other

18   words, the video wouldn't have been

19   shown in isolation.  It would have

20   accompanied a presentation by an

21   investment officer of the transaction.

22        Q.    Is it fair to say that the

23   discussion at the investors' conference

24   relating to the Sete project focused on

25   Sete, as opposed to the individual

Page 160

1              CONFIDENTIAL - CORRIGAN
2     shipyards?
3          A.    Yes.
4          Q.    Do you recall that there was
5     another visit to the Brasfels shipyard
6     in March of 2012?
7          A.    Yes, I'm going to refer again
8     to my binder on that.  Yeah, that's the
9     second one, with another investor.
10         Q.    And what do you recall about
11    the purpose of this yard tour?
12         A.    My recollection is that it
13    was a mirror of the CIC's visit a few
14    months earlier, except now with ADICO,
15    the sovereign wealth fund of Abu Dhabi,
16    as opposed to a Chinese entity.
17         Q.    So the purpose of this was to
18    present to ADICO the possibility of
19    investing in Sete?
20         A.    That is correct.  A-D-I-C-O.
21    It's Abu Dhabi Investment Company, I
22    believe it stands for.
23         Q.    Did EIG have a preexisting
24    relationship with ADICO?
25         A.    I go back to my response how

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN

2    I answered you on CIC.  It was an

3    investor of ours, and beyond that I

4    don't know.  But clearly it was an

5    important investor.

6          Q.     Do you know whether ADICO was

7    an investor in either Fund XIV or Fund

8    XV?

9          A.     I don't recall.

10         Q.     But this tour was focused on

11   a potential separate investment by

12   ADICO in Sete; is that correct?

13              MS. LAW:  Objection to form.

14      You can answer.

15         A.     That -- yeah, that was an

16   evolution.  It didn't start out that

17   way.  It eventually became that, and at

18   this point in time I'm not sure whether

19   it's to co-invest with us, to come in

20   with us, or to do their own thing.

21         Q.     Did ADICO ultimately invest

22   in Sete separate from EIG?

23         A.     We understand that it came in

24   through BTG Bactual.

25         Q.     What was the last word you

```
 1              CONFIDENTIAL - CORRIGAN
 2    said?
 3         A.    B-A-C-T-U-A-L.
 4         Q.    And what is that?
 5         A.    That's the investment bank
 6    that had the single largest investment
 7    in Sete, and a lot of that was, I don't
 8    know how much, but they had, you know,
 9    co-investors behind them, ADICO being
10    one of them.
11         Q.    Who was present for this
12    March 28th Brasfels yard tour from EIG,
13    if anyone?
14         A.    My recollection is it was
15    Simon Hayden from our London office,
16    myself, an analyst from London named
17    Hoshrav Patel, and then Jeppe from
18    ADICO.  He might have had somebody with
19    him, I can't remember.
20              MR. BARBUR:  Let's mark a
21         document, tab 23, David.
22              MS. LAW:  It should be in
23         your folder as Exhibit 95.
24              THE WITNESS:  Got it.
25         Q.    Do you recognize this email,
```

CONFIDENTIAL

Page 163

1              CONFIDENTIAL - CORRIGAN

2    Mr. Corrigan?

3              (Exhibit 95, marked for

4         identification, Bates stamped

5         EIG_KEP_00121469.)

6         A.    Okay.

7         Q.    I'm sorry, the question was,

8    do you recognize this?

9         A.    Yes.

10        Q.    And do you recall this email

11   exchange in 2012?

12        A.    Vaguely.

13        Q.    You sent the email to someone

14   named Jeppe Starup, correct?

15        A.    Yes, that's the same

16   individual that had come -- or I don't

17   know if this is before or after, but

18   he's the one that visited Brasfels with

19   us.

20        Q.    And these are ADICO?

21        A.    He is the investment officer

22   that was looking at the transaction

23   from ADICO, yes.

24        Q.    And you were sending him an

25   article that, in fact, related about

CONFIDENTIAL

Page 165

1          CONFIDENTIAL - CORRIGAN

2          A.    He was an analyst in our

3     London office, yeah, he worked with

4     Simon Hayden.

5          Q.    And how many representatives

6     of ADICO were on this --

7          A.    As I said earlier, for sure

8     Jeppe, and I can't remember if he had

9     someone with him or not.  I think he

10    was by himself, but I wouldn't swear to

11    it.

12         Q.    Anyone else on the yard tour

13    beyond the people at Brasfels?

14         A.    I don't remember if somebody

15    from Lakeshore came with us.  Ivan Hong

16    might have been with us, but again, I

17    don't recall.

18         Q.    And Ivan Hong is with a Sete

19    entity called Lakeshore?

20         A.    No, Lakeshore is the

21    financial advisor that, let's say,

22    replaced Santander.  But, you know,

23    it's the same people.  They had been

24    employees of Santander, then they

25    formed their own advisory company and

CONFIDENTIAL

Page 166

```
 1            CONFIDENTIAL - CORRIGAN
 2    became Sete's advisors.
 3         Q.    Was anyone from Sete or
 4    Petrobras on the yard tour?
 5         A.    I don't believe so, no.
 6         Q.    Do you recall meeting with
 7    employees of the shipyard?
 8         A.    My recollection is that it
 9    was very similar to what we had done
10    with CIC, where they made a
11    presentation, and then we had a walk
12    around the shipyard, and I think we had
13    lunch in their staff dining hall.
14         Q.    And again, the focus of the
15    yard tour was the shipbuilding capacity
16    of Brasfels?
17              MS. LAW:  Objection to form.
18         A.    Yes.
19         Q.    Do you remember any specific
20    questions that were asked of Brasfels
21    on this tour?
22         A.    I don't.
23         Q.    You had a general tour of the
24    shipyard and looked at ships being
25    constructed; is that correct?
```

Page 167

1            CONFIDENTIAL - CORRIGAN

2       A.    Well, semi-submersibles.  I

3   don't recall that there was one being

4   built, but they had one, I think,

5   floating nearby, and they had a dry

6   dock.  They were doing maintenance and

7   stuff like that.

8       Q.    Did the subject of corruption

9   or bribery come up at any time during

10  this yard tour?

11      A.    Not that I recall.

12      Q.    Do you recall -- did you or

13  anyone else from EIG ask any questions

14  relating to corruption or bribery?

15      A.    No, I don't recall, I believe

16  not.

17      Q.    Do you have any reason to

18  believe that Brasfels provided any

19  false or misleading information during

20  this tour?

21          MS. LAW:  Objection to form,

22      you can answer.

23      A.    Yeah, this is a similar

24  question.  The way I answered it is at

25  the time, no, we thought it was all on

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN
2    the up-and-up, and nobody told us that
3    there was an underlying issue that we
4    should have known about.
5          Q.    The focus of the yard tours,
6    we discussed, was the shipbuilding
7    capacity of Brasfels, right?
8               MS. LAW:  Objection.
9          A.    Semi-submersibles that
10   Petrobras was contracting them for.
11         Q.    And was any misleading
12   information provided relating to that?
13              MS. LAW:  Objection, asked
14       and answered.
15         Q.    You can answer.  The question
16   is, was any misleading information
17   provided concerning the shipbuilding
18   capacity of Brasfels?
19         A.    No, not concerning
20   shipbuilding capacity.  Concerning the
21   overall transaction in retrospect, yes,
22   as we said before.
23         Q.    Did EIG rely on anything it
24   learned during this yard tour for any
25   purpose?

CONFIDENTIAL

Page 169

1              CONFIDENTIAL - CORRIGAN
2                  MS. LAW:  Objection to form.
3          You can answer.
4          A.    At this point we had approved
5      the transaction, so I wouldn't say we
6      added anything, but we didn't subtract
7      anything, either.
8          Q.    And there was another yard
9      tour at Brasfels in June of 2013,
10     correct?
11         A.    Yes.
12         Q.    And what is your recollection
13     about the purpose of that yard tour?
14         A.    That came up at a board
15     meeting, and I don't remember now if
16     one of the shareholders said, Hey, it
17     would be great to see the progress of
18     the shipyards, or if it was Ferraz's
19     idea, but anyway, the idea was floated
20     that it would be interesting for the
21     board to visit one of the shipyards,
22     and that was arranged at Brasfels.
23         Q.    And you're talking about the
24     board of Sete here?
25         A.    That's correct, yeah.

```
 1              CONFIDENTIAL - CORRIGAN
 2         Q.    And so there was a board
 3    meeting at Sete, and the idea of a yard
 4    tour came up?
 5         A.    That's correct.
 6         Q.    Were you at the board
 7    meeting?
 8         A.    Yes.
 9         Q.    You were a member of the
10    board of Sete?
11         A.    I was, yes.
12         Q.    For how long?
13         A.    Yeah, I should clarify.  The
14    board, the director assigned to the
15    board was Blair, but in Brazil it's
16    common that all directors have a
17    suplante, or a -- what would that be,
18    like a secondary, and that allows at
19    least one individual from each
20    organization to attend board meetings,
21    since Blair was living in Washington
22    and I was in Rio.
23         Q.    You were sort of Mr. Thomas'
24    proxy for these board meetings?
25              MS. LAW:  Objection to form.
```

CONFIDENTIAL

Page 172

```
              CONFIDENTIAL - CORRIGAN
 1
 2    watch, what was it, the 2014 Superbowl.
 3    He was a big New England Raiders fan.
 4          Q.    And --
 5          A.    Patriots, jeez, sorry.
 6          Q.    No, go ahead.
 7          A.    Sorry, New England Patriots.
 8          Q.    During any of your
 9    discussions with Mr. Ferraz, did the
10    subject of bribery or corruption ever
11    come up?
12          A.    Never.
13          Q.    Did you ever ask Mr. Ferraz
14    whether Sete was involved in any
15    bribery?
16          A.    I did not.
17          Q.    Do you recall who the
18    shareholders were that requested this
19    2013 yard tour?
20          A.    I don't, because as I said
21    earlier, I wasn't -- I'm not sure if
22    the genesis was one of the directors or
23    Ferraz.  But anyway, the idea was
24    broached, and it was enthusiastically
25    received, I remember that.
```

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN
2          Q.     And do you remember who the
3     attendees were for this yard tour?
4          A.     I can't, I couldn't.  But I
5     think pretty much every investor had
6     somebody there, including myself.
7          Q.     So approximately how many
8     people would that be?
9          A.     I think the board had 13
10    people and, you know, I guess there was
11    probably 20 of us showed up, roughly.
12         Q.     And to sort of cut to the
13    chase, did this yard tour proceed,
14    essentially, as the other ones had?
15         A.     Yes, very similar.
16         Q.     There was a presentation, and
17    then there was a walk-around tour of
18    the yard?
19         A.     That's correct, that's my
20    recollection.
21         Q.     And do you recall anything
22    specific that was discussed, either
23    during the presentation or the
24    walk-around tour?
25         A.     I do not.

Page 174

1          CONFIDENTIAL - CORRIGAN
2          Q.    Did you at that point in time
3    see any work that was actually being
4    done in connection with the Sete
5    projects?
6          A.    I think they showed us some
7    of the raw materials that were going to
8    be utilized in the construction.  I
9    remember big piles of steel and things
10   of that nature, but not the actual --
11   nothing floating in the water, if you
12   will.
13         Q.    And again, the focus of the
14   yard tour was the shipbuilding capacity
15   of Brasfels, right?
16              MS. LAW:  Objection to form,
17      you can answer.
18         A.    Yes, I would say as a board
19   of directors, we want to be sure that
20   our money was being well spent at
21   Brasfels.
22         Q.    And you wanted to make sure
23   that Brasfels had the ability to
24   deliver the ships on time and on
25   budget, right?

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN
2         A.    That is correct.
3         Q.    Was the subject of corruption
4    or bribery ever discussed on this yard
5    tour?
6         A.    No.
7         Q.    Did you or anyone else from
8    EIG or any of the other investors ask
9    any questions of Brasfels relating to
10   corruption or bribery?
11        A.    I did not, and I don't recall
12   hearing anybody else bring up that
13   subject.
14        Q.    And did EIG rely on anything
15   that it learned on this yard tour for
16   any purpose?
17             MS. LAW:  Objection to form.
18        You can answer.
19        A.    Well, it provided, you know,
20   this was now several months after our
21   previous visit, and I remember feeling
22   good about the progress at Brasfels,
23   that they were a professional company
24   that was doing a good job.
25        Q.    And has your view on that

CONFIDENTIAL

Page 176

```
 1              CONFIDENTIAL - CORRIGAN
 2    ever changed?
 3         A.    No.
 4         Q.    So moving beyond the three
 5    yard tours that we have discussed, did
 6    you or did anyone else from EIG have
 7    any direct contact with anyone at
 8    Keppel?
 9         A.    I don't believe so, no.  And
10    we're talking about Brasfels, the
11    Brazilian entity, right?
12         Q.    Correct, well --
13         A.    I don't know, we had offices
14    in Australia and Hong Kong.  I don't
15    know if they ever met Keppel in
16    Singapore.
17         Q.    And you were the lead person
18    for the Sete investments for EIG,
19    right?
20         A.    That's correct, but Brasfels
21    -- Keppel's a very large company.
22         Q.    And you're not aware of any
23    contact by anyone at EIG with anyone at
24    Keppel relating to the Sete project
25    beyond --
```

CONFIDENTIAL

Page 211

1

2                    **CERTIFICATION**

3

4

5      I, JEREMY RICHMAN, a Notary Public for

6   and within the State of New York, do

7   hereby certify:

8      That the witness whose testimony as

9   herein set forth, was duly sworn by me;

10  and that the within transcript is a true

11  record of the testimony given by said

12  witness.

13     I further certify that I am not

14  related to any of the parties to this

15  action by blood or marriage, and that I am

16  in no way interested in the outcome of

17  this matter.

18     IN WITNESS WHEREOF, I have hereunto

19  set my hand this 21st day of July, 2021.

20

21

22     JEREMY RICHMAN

23                 *      *      *

24

25

# ERRATA SHEET

*EIG v. Petrobras*

**Kevin Corrigan October 16, 2020 Transcript (#4298656)**

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 20 | 7 | "San Paulo" should be "Sao Paulo" | Transcription error |
| 27 | 1 | "Ewooma" should be "Eluma" | Transcription error |
| 36 | 13 | "Reyes" should be "Reis" | Transcription error |
| 44 | 3, 5 | "Barusca" should be "Barusco" | Transcription error |
| 45 | 5 | "Lovajato" should be "Lava Jato" | Transcription error |
| 45 | 14 | "Flores" should be "Floris" | Transcription error |
| 58 | 4 | "Kaisha" should be "Caixa" | Transcription error |
| 66 | 18 | "Kaisha" should be "Caixa" | Transcription error |
| 105 | 7 | "infomemo" should be "info memo" | Transcription error |
| 111 | 3 | "infomemos" should be "info memos" | Transcription error |
| 119 | 4 | "infomemo" should be "info memo" | Transcription error |
| 191 | 20, 22 | "BNDS" should be "BNDES" | Transcription error |
| 192 | 9, 13, 18, 19 | "BNDS" should be "BNDES" | Transcription error |
| 193 | 2, 11, 16, 20 | "BNDS" should be "BNDES" | Transcription error |
| 194 | 1, 4, 13 | "BNDS" should be "BNDES" | Transcription error |
| 195 | 2 | "175" should be "1.75" | Clarification |
| 198 | 2 | "BNDS" should be "BNDES" | Transcription error |
| 271 | 14 | "delay rate" should be "delay risk" | Clarification |
| 290 | 4 | "BNDS" should be "BNDES" | Transcription error |

1

| 292 | 11 | "Ms. Caixa" should be "Ms. Calca" | Clarification |
| 292 | 12 | "FIP Sandos" should be "FIP Sondas" | Transcription error |
| 305 | 16 | "infomemo" should be "info memo" | Transcription error |

_Kevin Corrigan_
Kevin Corrigan

_12/9/20_
Date

2

**Confidential**

**EIG_KEP_00257787**