**EXHIBIT 16**



Deposition of:
# Kevin Corrigan

*October 16, 2020*

In the Matter of:

# EIG v. Petrobras

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

1    same people, and we just left Los Angeles and went

2    back to Washington, D.C.

3        Q.   So was there a time where you were located in

4    Los Angeles?

5        A.   Yes.  I started to say that.  So the first --

6    so when I was hired until the middle of 2006, we were

7    in Tysons Corner.  Then we -- TCW asked us to close

8    that office, and we all went out to Los Angeles.

9    There were about four or five of us in that office,

10   and we all moved to Los Angeles.  And I lived there

11   for four years until we went back to Washington, D.C.

12   with EIG.

13       There was a transition period where EIG and

14   TCW were still sort of co-existing, and I think -- my

15   recollection is that they were completely independent

16   as of January of 2011.

17       Q.   2011, you said?

18       A.   Yeah.

19       Q.   Okay.  And so when did you move back to

20   Washington, D.C.?

21       A.   Around July of 2010.

22       Q.   Okay.  So you were in Washington, D.C. from

Confidential

EIG_KEP_00257423

Page 17

1    July of 2010 through when?

2         A.   June of 2012, when I went to Brazil.

3         Q.   Okay.  And so where did you live in Brazil?

4         A.   Rio.

5         Q.   And how long were you there?

6         A.   Two years.  From 2012 to mid-2014.  I retired

7    from Rio.

8         Q.   And why did you go to Rio de Janeiro -- why

9    did you relocate to Rio de Janeiro in 2012?

10        A.   Well, EIG was expanding at the time, and we

11   wanted to have a presence in Brazil.  We were

12   committed to that market, and so I opened an office

13   for EIG in Rio.

14        Q.   Okay.  How many people were in that office

15   besides you, if any?

16        A.   Let's see.  The first hire was sort of a side

17   kick for me named Marcel Abe, and then we had an

18   administrative assistant, and that was it.  Of course

19   we served as a place for people to hang their hats

20   when they came on visits.  We had a fair number of

21   visitors coming and going from EIG.

22        Q.   Go ahead, please.

Confidential                                          EIG_KEP_00257424

Page 18

1          A.   I'm sorry.   That office was shared with

2     Lakeshore Partners, the financial advisors.

3          Q.   So was it one office that both companies were

4     in?

5          A.   Well, originally, we actually shared offices

6     in Sete Brasil's headquarters in Humaita.   And we,

7     "we," meaning Lakeshore and us, got our own office in

8     Ipanema for several months.   I don't remember how

9     many.   And then we moved to more permanent

10    headquarters in Botafogo.

11             And that's correct.   We each paid sort of

12    50-50, and, you know, we had our own communication

13    systems and what not, but we shared space essentially.

14         Q.   Okay.   So just -- I don't need to know the

15    exact dates, but I'm just trying to get my head around

16    this.   So starting in June 2012, you relocated to

17    Rio de Janeiro, and EIG shared office space with Sate

18    Brasil and Lakeshore or just Sete Brasil?

19         A.   No, and Lakeshore.

20         Q.   Okay.   And when you say, "shared office

21    space," it wasn't like you each had full run of the

22    building.   You all were in a shared space.   You might

Confidential                                         EIG_KEP_00257425

Page 79

1       A.  That's correct.

2       Q.  And your request to him does not mention Sete

3   Brasil; correct?

4       A.  Correct.

5       Q.  It doesn't mention Project Sondas either.

6       A.  No.

7       Q.  In fact, it asks for time for you to make a

8   presentation to him; correct?

9       A.  Yes.

10      Q.  Okay.  And Mr. Ferraz writes back and says,

11  "I am available for a brief conversation on the 19th

12  afternoon."  Do you see that?

13      A.  Uh-huh.

14      Q.  And you write back to that on the first page,

15  and you say, "Thank you much for your reply; this will

16  work for us.  Surely, we will not take more than

17  thirty minutes of your time for our presentation";

18  correct?

19      A.  Correct.

20      Q.  Did you, in fact, make a presentation to

21  Mr. Ferraz on October 19, 2010?

22      A.  I'm sure I did.  We typically would bring a

Confidential

Page 80

1    little marketing pamphlet, if you will, and show

2    people.

3         Q.  Okay.  Was there anybody -- who was at the

4    meeting you had with Mr. Ferraz, to the extent you

5    remember?

6         A.  Yeah, I'm having -- well, because earlier, I

7    said that I thought it was just me, but I'm talking

8    about here me and a colleague.  But I thought I went

9    by myself to visit Ferraz.

10        Q.  So it was you, potentially an EIG colleague,

11   and Mr. Ferraz in the meeting?

12        A.  Yes.

13        Q.  Was there anybody else there that you

14   remember?

15        A.  No.

16        Q.  Okay.  Did Mr. Ferraz make any sort of

17   presentation to you at that meeting?

18        A.  No.

19        Q.  Did he present a slide show?

20        A.  No.

21        Q.  Did he give you any documents?

22        A.  I don't believe so, no.

Confidential                                                    EIG_KEP_00257487

1          Q.   Is it fair to describe this meeting as a kind

2     of meet and greet or getting to know you type meeting?

3          A.   Yes.   It was definitely an introductory

4     meeting between EIG and Petrobras.

5          Q.   Okay.   And it wasn't focused on any

6     particular transaction; correct?

7          A.   No.   But we -- I'm sure we talked about

8     Project Sondas.

9          Q.   Okay.   Do you recall talking about anything

10    else -- actually, let me ask you this:   Do you

11    specifically remember talking about Project Sondas?

12         A.   Well, I don't remember the details of the

13    meeting, but I was going there to meet him and to

14    learn more about Sondas and see if EIG could

15    participate.

16         Q.   Okay.   Was that the -- were there any other

17    projects or opportunities discussed at that meeting,

18    to your knowledge?

19         A.   I don't believe so.

20         Q.   Okay.

21         A.   Although, I'm sure I would have made a

22    general request that if there's anything we can do for

Confidential                                          EIG_KEP_00257488

Page 82

1    Petrobras, we would be happy to look at it.

2        Q.  Okay.  And at that point, did EIG already

3    have an investment with the Bolivia Brazil pipeline?

4        A.  I don't think so.  I think that came later.

5        Q.  Okay.

6        A.  I'm sorry I don't remember the time.

7        Q.  That's okay.  It's a decade ago.  If you

8    remembered every detail, it would be remarkable.

9            So -- and you said you discussed Project

10   Sondas with Mr. Ferraz.  Did you discuss specifically

11   Sete Brasil?

12       A.  Well, Sete Brasil was the vehicle through

13   which Sondas was going to be developed.  So yeah, they

14   kind of go hand-in-hand.

15       Q.  Okay.  And you expressed interest to

16   Mr. Ferraz in becoming an investor in Sete Brasil?

17       A.  I'm sure I would have.

18       Q.  And at that point in time, your understanding

19   was that there was a desire -- there wasn't a desire

20   to have international investors in Sete Brasil, I

21   believe is what you said before?

22           MS. LAW:  Objection.  Form.

Confidential                                    EIG_KEP_00257489

Page 100

1    its Complaint.  Are you -- is EIG aware of any time

2    when Lakeshore was financial advisor to Petrobras?

3         A.  No.

4              MR. WOLINSKY:  Okay.  Let me get another

5    document for you.

6              (A discussion was held off the record.)

7              (Deposition Exhibit 10 was marked for

8              identification.)

9    BY MR. WOLINSKY:

10        Q.  Okay.  This is an E-mail exchange.  Take your

11   time to look at it.  It's from -- the bottom E-mail is

12   from August 16, 2011.  Do you see that E-mail?

13        A.  Yes.

14        Q.  That's an E-mail written by someone from CIC,

15   China Investment Company --

16        A.  Corporation, yes.

17        Q.  Corporation.  Sorry.  You accompanied them on

18   a trip to Brazil in August of 2011; correct?

19        A.  Correct.

20        Q.  Okay.  What was the purpose of that trip?

21        A.  Well, among the -- in addition to considering

22   us to come in as an investor, the financial advisers

Confidential

EIG_KEP_00257507

Page 101

1     and Sete discussed the possibility of maybe having

2     more than one, and could EIG help them with this.  And

3     so not me, but I think Blair reached out to CIC,

4     because they were one of our important clients, you

5     know, on the funding side in China, and they obviously

6     expressed enough interest to at least explore it so

7     that they -- we arranged this trip for them, which I

8     then accompanied these two individuals on.  And it was

9     for the sole purpose of gauging their interest in

10    investing in Sete Brasil.

11         Q.  So you as EIG were facilitating an

12    introduction to CIC to Sete and Lakeshore; is that

13    right?

14         A.  Correct.

15         Q.  And you accompanied them on a trip in August

16    of 2011 to do due diligence, I guess?

17             MS. LAW:  Objection to form.

18             THE WITNESS:  To do their preliminary due

19    diligence, yes.

20    BY MR. WOLINSKY:

21         Q.  Do you remember who you met with during that

22    trip?

Confidential                                              EIG_KEP_00257508

Page 102

1      A.  Well, we certainly met with Ferraz.  We

2   met -- we visited one of the shipyards.  I want to say

3   it was Keppel Fels, but I'm not 100 percent sure.  We

4   met with one of the other investors, and I think we

5   met with a couple of the other pension fund investors

6   in Sete because they wanted to ask, you know, "What

7   attracts you to this transaction.  So we would listen

8   to what they had to say.

9      Q.  So looking at the E-mails here, they don't

10  identify anyone from Petrobras on them.  Is that

11  because -- well, is that correct?  No Petrobras

12  people -- I don't see any.  Do you?

13     A.  I'm not sure I understand the question,

14  Robert.  This is sort of like internal communications

15  between EIG and CIC and Lakeshore to set up some

16  meetings in Brazil.  Isn't that what this is?

17     Q.  I guess so.  You tell me what it is.

18     A.  That's how I'm reading it.

19     Q.  Okay.  So communications -- so it does

20  include Sete.  So if you look at the bottom E-mail

21  that Mr. Yangyang sent --

22     A.  That's a woman.

Confidential

EIG_KEP_00257509

Page 155

1    I don't know if it had already happened.  They were

2    investing in EIG.  They were an extremely important

3    client, and we had approached them about an interest

4    in basically co-investing with us.  So we would have

5    been very open with our information with that.

6         Q.  Okay.  And who would have directed you to

7    send this to them?

8         A.  I don't remember getting permission, but --

9              MS. LAW:  Objection to form.

10             THE WITNESS:  I'm sorry.

11             MS. LAW:  I just wanted to make sure the

12    objection was noted on the record.

13             THE WITNESS:  Robert, I don't know the answer

14    to that.

15             MR. WOLINSKY:  Okay.  Fair enough.

16             Okay.  Let me get the next document up.

17             (Deposition Exhibit 21 was marked for

18             identification.)

19             MR. WOLINSKY:  Exhibit 21.

20        Q.  This is the "Energy FUND XIV Investment

21    Recommendation" for 250 million reais of common

22    equity.  It's dated June 27, 2011.

Confidential                                                        EIG_KEP_00257562

Page 156

1          Have you seen this document before?

2      A.   Yes.  I had a big part in preparing it.

3      Q.   Would you say that you were the lead person

4  in preparing it?

5      A.   Yes.  I was viewed as the lead within EIG.

6      Q.   Okay.  Can you tell me what the purpose of

7  this document is?

8      A.   The purpose of the document is to bring

9  together the months of due diligence we've done and

10  the thousands of pages of documents we've sifted

11  through and models we've analyzed and try to summarize

12  it into a presentable document that is sent to our

13  investment committee, and they then read it and vote

14  to approve this -- the investment.

15      Q.   So is it fair to think that you read and

16  approved of every word in this before it was

17  finalized?

18      A.   Yes.

19      Q.   And is there a template or a specific set of

20  requirements for investment recommendation to an EIG

21  fund?

22      A.   Yes.  I mean there's some ability to tailor

Confidential

EIG_KEP_00257563

1      to specific circumstances, but there are certain

2      information that needs to be included.

3           Q.   Okay.  If you look at Page 15, it starts

4      "Risks and Mitigants."  Do you see that?

5           A.   On 15, yes.  "Risks and Mitigants."

6           Q.   It goes on to 18, 19, 20.

7           A.   Right.

8           Q.   Okay.  Did you draft that?

9                MS. LAW:  Objection to form.

10               MR. WOLINSKY:  What's the objection?

11               MS. LAW:  I don't know, are you talking about

12     the section?  Are you talking about the pages that you

13     just responded to?

14               MR. WOLINSKY:  Yes.  They're the same thing.

15     Risks and mitigants go from Page 15 to 20 with a

16     section and those pages, and I want to know whether

17     this witness drafted those pages, which was a

18     collective section.

19               THE WITNESS:  I believe I did, but I can't

20     tell you I remember writing all of these, but that

21     would have normally been my job.

22     BY MR. WOLINSKY:

Confidential                                    EIG_KEP_00257564

Page 203

1    so he would have been probably having a lot of

2    discussions with Ivan Hong and his counterpart at Sete

3    Brasil, whose name I can't remember.

4        Q.  Does that mean -- I'm sorry.  I apologize.

5        A.  I'm just going to say, as I've said earlier,

6    financial models are very dynamic instruments that

7    change all the time based on assumptions.  So we

8    were -- like in the previous memo we looked at

9    regarding IRRs, we were trying to make sure we had the

10   right assumptions, input that also got us to our

11   desired returns.

12       Q.  This was six months after your second

13   investment approval.  What was the purpose -- what was

14   the purpose of working through issues after the

15   investment had already been approved?

16       A.  Well, the model would have been updated every

17   time there was a new contract or a slowdown in

18   construction.  These all affect the financial models.

19   So I'm guessing this is what was going on, but I

20   personally did not work on this.  So I don't know

21   exactly what issues we were trying to work through.

22       Q.  So if there was a negative change to a

Confidential

EIG_KEP_00257610

Page 204

1    financial model, would EIG have reconsidered its

2    decision to invest?

3         A.   It wouldn't be that -- I mean if something

4    really drastic happened, yes.  But then I'd have to

5    look at the investment agreement and see, you know, if

6    that was an eligible cancellation event.

7              MR. WOLINSKY:  Okay.  Let me give you the

8    next document.

9              (Deposition Exhibit 28 was marked for

10             identification.)

11             MR. WOLINSKY:  I'm sending you Exhibit 28.

12             THE WITNESS:  6-23-2011?

13   BY MR. WOLINSKY:

14        Q.   Yes.

15        A.   "Sete compliance"?

16        Q.   Yes.  Okay.  So tell me when you're ready.

17        A.   Well, do you want to ask the question, or do

18   you want me to read --

19        Q.   Let me start by directing your attention to

20   the bottom E-mail.

21        A.   Okay.

22        Q.   And there's an E-mail from someone named

Confidential                                              EIG_KEP_00257611

Page 205

1    Patrick Songsanand --

2         A.   Songsanand, yes.

3         Q.   -- to you on June 22, 2011 at 10:30 p.m.   Who

4    is Mr. Songsanand?

5         A.   He's an analyst in the D.C. office who helped

6    me with this aspect of the preparation of the

7    investment recommendation.

8         Q.   And what is this aspect of the investment

9    recommendation?

10        A.   Compliance.

11        Q.   Compliance with the law?

12        A.   Compliance with our internal policies and

13   procedures and code of conduct.

14        Q.   Which would include compliance with the law?

15        A.   Yes.

16        Q.   Okay.  And it mentions speaking to Carla.

17   That's Carla Vogel?

18        A.   Yes.

19        Q.   She is or was the EIG's head of compliance at

20   the time?

21        A.   That's correct.

22        Q.   Okay.  And he mentions "Complinet searches."

Confidential                                    EIG_KEP_00257612

Page 206

1    Can you tell me your understanding of what Complinet

2    searches are?

3         A.   Yeah, I referenced it earlier.   I think it's

4    a subscription service where you input names of

5    companies and individuals, and it spits out publicly

6    available data on them from a misbehavior standpoint

7    if there's anything in there that draws your

8    attention.

9         Q.   And have you ever personally run Complinet

10   searches?

11        A.   I did not.   Patrick did.

12        Q.   Okay.   Did he provide you with the results

13   verbatim, or did he just provide you with a summary?

14        A.   He would have shown me these two instances

15   that popped up that, you know, had to be looked at.

16        Q.   But what I'm asking you is, you know, are

17   these the only two things that were mentioned in the

18   Complinet search, or were there others and these are

19   the two he brought to your attention?

20        A.   No.   These were the only two that came up.

21             MR. WOLINSKY:   Okay.

22             Counsel, to the extent that the actual

Confidential                                    EIG_KEP_00257613

Page 207

1   Complinet search still exists in the EIG's files, we'd

2   like that to be produced.

3          MS. LAW:  If you could just add it to your

4   letter, that would be great.

5          MR. WOLINSKY:  Sure.

6       Q.  So he's proposing a note to Carla Vogel.  Is

7   Carla still with EIG?  Do you know?

8       A.  No.

9       Q.  Okay.  Do you know where she is now?

10      A.  I think she moved back to New York, but I

11  don't know where she is.

12      Q.  Okay.  And it says, "As we discussed" --

13  well, actually, it says, "The memo is a follow up to

14  our conversation regarding the results of the

15  Complinet search."  Is that a conversation that

16  Patrick and Carla had, or were you part of that

17  conversation as well?

18         MS. LAW:  Objection to form.

19         THE WITNESS:  I remember speaking to Carla

20  about this issue in general.  I don't remember if I

21  was part of this, the discussion he's referencing.

22  BY MR. WOLINSKY:

Confidential                                          EIG_KEP_00257614

Page 208

1          Q.  Okay.  And then Mr. --

2          A.  I'm sorry.  I would have tended to

3     participate in these things because he was a

4     relatively junior person and Carla was a senior

5     person.

6          Q.  Okay.  And he goes on and says, "there were

7     two noteworthy results that were highlighted through

8     searches using the Complinet system," and then he

9     lists them.  Do you see the two?

10         A.  Right.  Camargo Correa?

11         Q.  Yeah.  He says, "Camargo Correa is a 45%

12    joint venture partner in the EPC contractor, Estaleiro

13    Atlantico Sul, ('EAS'), that will construct the

14    drillships finance by the Sete investment."  Now EAS

15    was building the first seven drillships; correct?

16         A.  Yes.

17         Q.  And you actually went and visited EAS;

18    correct?

19         A.  Correct.

20         Q.  And you had prior experience dealing with --

21    business dealings with Camargo Correa; right?

22         A.  Yes.

Confidential                                              EIG_KEP_00257615

Page 209

1      Q.  And it says, "Camargo Correa is one of the

2   largest private conglomerates in Brazil.  Complinet's

3   'Media Results' noted that in 2009, employees of

4   Camargo Correa were arrested in connection with a

5   year-long corruption probe.  Ten employees, including

6   four executives, were alleged to have used a network

7   of fake companies and illegal currency traders to

8   transfer millions of dollars abroad as part of a

9   kickback scheme."  Do you see that?

10     A.  Yes.

11     Q.  Prior to running these Complinet results,

12   were you aware of that conduct by the Camargo Correa

13   employees that were arrested?

14     A.  No.

15     Q.  "No information regarding resolution of the

16   charges was found on either Complinet or through

17   independent searches.  We take comfort from the

18   presence of two highly reputable partners in the EAS

19   joint venture:  Queiroz Galvao (45%), one of the

20   largest shipbuilders in Brazil, with whom EIG is

21   currently invested in the Atlantic Star investment;

22   and Samsung Heavy Industries (10%)."

Confidential

EIG_KEP_00257616

Page 210

1          Do you see that?

2      A.   Yes.

3      Q.   Okay.  So what research was done to find out

4   what the resolution was of the arrests of the Camargo

5   Correa employees and executives?

6          MS. LAW:  Objection to form.

7          You can answer.

8          THE WITNESS:  I don't think we took it beyond

9   this, is my recollection.

10  BY MR. WOLINSKY:

11     Q.   Okay.  It says, "No information regarding

12  resolution of the charges was found on either

13  Complinet or through independent searches."  What

14  independent searches?  What is that referencing?

15     A.   I don't know.  I'd have to ask Patrick.

16     Q.   And so sitting here today, you can't identify

17  any follow-up that EIG did when it learned that one of

18  the owners of EAS, who was building the first seven

19  drillships had 10 employees arrested for kickbacks?

20         MS. LAW:  Objection.

21         THE WITNESS:  Correct.  Well, it's an

22  allegation.  We don't know if they actually proved it.

Confidential                                          EIG_KEP_00257617

Page 211

```
 1    BY MR. WOLINSKY:

 2         Q.   Well, it says here that they were arrested

 3    for it.  That's what I just said in my question.

 4         A.   Right.

 5         Q.   Okay.  Sitting here today, you know, not

 6    limiting yourself to what you knew in June of 2011, do

 7    you know anything more about the resolution of that --

 8    those 10 Camargo Correa employees and their arrest for

 9    kickbacks?

10         A.   I do not.

11         Q.   Okay.  Was there ever any further effort to

12    find out or follow that case?

13              MS. LAW:  Objection to form.

14              THE WITNESS:  No, not that I'm aware of.

15    BY MR. WOLINSKY:

16         Q.   Okay.  It mentions that you take comfort from

17    the presence of two highly reputable partners in the

18    EAS joint venture Queiroz and Samsung Heavy.  Why do

19    you take comfort from that?

20         A.   Well, it was a joint venture between Queiroz

21    Galvao and Camargo Correa.  We knew Queiroz Galvao.

22    We viewed them as a very upstanding company.
```

Confidential                                                    EIG_KEP_00257618

Page 212

1          MS. LAW:  Robert, are you referring to Kevin

2     or are you referring to --

3          MR. WOLINSKY:  I'm talking about EIG.

4          MS. LAW:  Okay.

5     BY MR. WOLINSKY:

6          Q.  It says that Queiroz Galvao, you're currently

7     invested in the Atlantic Star investment with them.

8          A.  I draw a blank on that, sorry.

9          Q.  So you weren't involved in the Atlantic Star

10    investment?

11         A.  No.

12         Q.  I apologize.  Go ahead.

13         A.  I'm sorry.  No.  It's fine.

14         Q.  I was just going to say from your time at

15    EIG, are you aware of any investment EIG made that

16    Queiroz Galvao was involved in?

17         A.  No.

18         Q.  Okay.  And you don't -- and sitting here

19    today, you don't remember what the Atlantic Star

20    investment is?

21         A.  I believe in was a senior debt fund that

22    invested.  So this would have been a senior debt

Confidential                                              EIG_KEP_00257619

Page 213

1      investment in Queiroz Galvao, one of their ships.

2          Q.   Okay.   So it was an investment in the Queiroz

3      Galvao ship?

4          A.   Well, Queiroz Galvao, yes, asset, the oil and

5      gas-related asset.

6          Q.   And of course, you're aware that Camargo and

7      Queiroz Galvao and the EAS shipyard were all accused

8      in various ways of misconduct in Operation Lava Jato;

9      correct?

10         A.   Yes.

11         Q.   Do you still view Queiroz Galvao as a highly

12     reputable partner?

13         A.   Of course not.   I don't view any of these

14     counterparties as reputable anymore.

15         Q.   And when you did your investment in Atlantic

16     Star, what due diligence did EIG do on Queiroz Galvao

17     at that time?

18              MS. LAW:   Objection to form.

19              THE WITNESS:   I don't know.

20     BY MR. WOLINSKY:

21         Q.   Do you know if they did any due diligence on

22     Queiroz Galvao?

Confidential                                                    EIG_KEP_00257620

Page 214

1          A.   I don't know.   I mean our normal procedure is

2     to do due diligence and prepare investment

3     recommendations.   So there would have been due

4     diligence.   I did not prepare it.

5          Q.   Okay.   Does EIG consider the arrest of 10

6     employees, including 4 executives for an alleged

7     kickback scheme involving millions of dollars, to be a

8     serious issue?

9               MS. LAW:   Objection to form.

10               THE WITNESS:   Yes.

11     BY MR. WOLINSKY:

12          Q.   Okay.   If you look at No. 2, it says,

13     "Demosthenes Marques is [an investment director] at

14     FUNCEF, one of the largest Brazilian pension funds."

15     Do you see where I am?

16          A.   Yep.

17          Q.   "FUNCEF will be one of several investors,

18     including large Brazilian banks and [other

19     institutions], alongside EIG in the Sete transaction.

20     Complinet noted that in 2006, a congressional inquiry

21     asked prosecutors to bring charges against directors

22     from 10 pension funds, including Mr. Marques.   The

Confidential                                                          EIG_KEP_00257621

Page 215

1    directors were accused of funneling funds to

2    politicians through private banks.  Complinet did not

3    provide further information regarding the allegations.

4    Independent searches indicated that Mr. Marques has

5    continued serve as a director for several companies

6    from 2006 to the present."  Do you see that?

7         A.  Yes.

8         Q.  Did you do any further diligence with respect

9    to the allegation that Mr. Marques funneled funds to

10   politicians?

11           MS. LAW:  Objection to form.

12           THE WITNESS:  No.

13   BY MR. WOLINSKY:

14        Q.  You are aware that one of the alleged

15   conducts that is involved in Lava Jato is funneling

16   funds to politicians; correct?

17        A.  Yes.

18        Q.  Okay.  So is it fair to say that both of

19   these two items in Mr. Songsanand's E-mail involved

20   conduct that is the same or similar to the conduct

21   involved in Operation Lava Jato?

22           MS. LAW:  Objection to form.

Confidential                                    EIG_KEP_00257622

1           THE WITNESS:  Yes.

2   BY MR. WOLINSKY:

3       Q.  Let's go up to your response on June 23, 2011

4   at 8:10 a.m.  You write back to Mr. Songsanand, and

5   copying Carl Vogel, and you say, "Thanks, Patrick."

6           Do you see that?

7       A.  Yep.

8       Q.  You say, "I think it would be useful to have

9   some guidelines on how broad the checks we run should

10  be."  At that point in time, June 23, 2011, did you

11  have any guidelines at all on how broad the checks you

12  should run should be?

13      A.  No.  I think it was up to the individual

14  investment officer to pick who should be checked,

15  which normally would be, of course, your direct party,

16  Sete in this case.  And here, because the project

17  involved the construction of ships, we would have

18  looked at the underlying shipbuilders.

19      Q.  EAS was being awarded shipbuilding contracts

20  in excess of $4 billion; correct?

21      A.  Correct.

22      Q.  Then you said, "I gave you about thirty names

Confidential

EIG_KEP_00257623

Page 217

1    covering just about every entity in the transaction -

2    is that what we're after?"  Is that not something that

3    you knew the answer to yourself as part of your job

4    responsibilities at EIG?

5         A.  Yeah, I didn't, or I wouldn't have been

6    asking it.

7         Q.  Okay.  So whose job responsibility is it to

8    know the answer to that?

9         A.  Well, this is an interactive process with our

10   compliance officer, and she was brought into the

11   picture.  I don't remember the outcome of that

12   discussion, but there would have been a discussion

13   with Carla and we deemed that this, while significant,

14   did not reach the threshold of pulling out of the

15   transaction.  You know, in retrospect, I made the

16   wrong call.

17        Q.  So let me just see here.  The sticker is in

18   the way.  And Patrick Songsanand writes back and says,

19   "This is from Randy previously."  Who is "Randy"?

20        A.  The COO, Randy Wade.

21        Q.  Okay.  Does EIG have a written policy about

22   which parties to check as part of a client's due

Confidential                                                          EIG_KEP_00257624

Page 218

1    diligence?

2         A.   I think, as I said earlier, it would be up to

3    me to determine who the proper counterparties are in a

4    transaction you're considering, and then put those

5    folks on a list.  I think it's just a broad

6    categorization saying, you know, who you're going to

7    be working with.  And so for each transaction it would

8    be different because, in this case, you had shipyards,

9    the company itself, and other investors.  So those are

10   the people we checked out.

11        Q.   So in the second top E-mail, Ms. Vogel

12   responds on June 23.  Do you see that?

13        A.   Yes.

14        Q.   And she says, "I reviewed the articles with

15   Patrick last night, and I agree that based on the

16   information in these articles (which are several years

17   old), the fact that no subsequent findings were

18   identified in our searches and the role these subjects

19   have in our investment, the information is of 'low

20   risk'"?

21        A.   Right.

22        Q.   And then she goes on and says, "While we've

Confidential          EIG_KEP_00257625

Page 316

1                    C E R T I F I C A T E

2        I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.


14


15        _____

          Nancy J. Martin, RMR, CSR

16

17   Dated:   October 16, 2020

18

19   (The foregoing certification of this transcript does

20   not apply to any reproduction of the same by any

21   means, unless under the direct control and/or

22   supervision of the certifying shorthand reporter.)

Confidential                                    EIG_KEP_00257723

## ERRATA SHEET

*EIG v. Petrobras*

**Kevin Corrigan October 16, 2020 Transcript (#4298656)**

| Page | Line(s) | Change | Reason |
|---|---|---|---|
| 20 | 7 | "San Paulo" should be "Sao Paulo" | Transcription error |
| 27 | 1 | "Ewooma" should be "Eluma" | Transcription error |
| 36 | 13 | "Reyes" should be "Reis" | Transcription error |
| 44 | 3, 5 | "Barusca" should be "Barusco" | Transcription error |
| 45 | 5 | "Lovajato" should be "Lava Jato" | Transcription error |
| 45 | 14 | "Flores" should be "Floris" | Transcription error |
| 58 | 4 | "Kaisha" should be "Caixa" | Transcription error |
| 66 | 18 | "Kaisha" should be "Caixa" | Transcription error |
| 105 | 7 | "infomemo" should be "info memo" | Transcription error |
| 111 | 3 | "infomemos" should be "info memos" | Transcription error |
| 119 | 4 | "infomemo" should be "info memo" | Transcription error |
| 191 | 20, 22 | "BNDS" should be "BNDES" | Transcription error |
| 192 | 9, 13, 18, 19 | "BNDS" should be "BNDES" | Transcription error |
| 193 | 2, 11, 16, 20 | "BNDS" should be "BNDES" | Transcription error |
| 194 | 1, 4, 13 | "BNDS" should be "BNDES" | Transcription error |
| 195 | 2 | "175" should be "1.75" | Clarification |
| 198 | 2 | "BNDS" should be "BNDES" | Transcription error |
| 271 | 14 | "delay rate" should be "delay risk" | Clarification |
| 290 | 4 | "BNDS" should be "BNDES" | Transcription error |

1

Confidential

EIG_KEP_00257786

| 292 | 11 | "Ms. Caixa" should be "Ms. Calca" | Clarification |
| 292 | 12 | "FIP Sandos" should be "FIP Sondas" | Transcription error |
| 305 | 16 | "infomemo" should be "info memo" | Transcription error |

Kevin Corrigan

12/9/20
Date

2

**Confidential**

**EIG_KEP_00257787**