3.14.   Temporary Facilities.  Contractor shall provide Owner, in accordance with Exhibit XI, with sufficient office space at the time of Site mobilization to accommodate Owner's Site representative(s) and support staff (as well as any Lender representatives), without cost to Owner.  Contractor shall provide for Owner and its representatives any other temporary facilities required for the execution of the Works, whenever reasonably requested by Owner, without cost to Owner.

3.15.   No Liens.

(a)   Property To Be Kept Lien Free.  Contractor shall keep the DRU, the Site and all Equipment (other than Equipment owned or leased by or procured for Contractor and used in the performance of the Works) free and clear of any and all Liens, claims and encumbrances (including any that arise from the performance of the Works or any reason related thereto or due to Contractor's other transactions, unrelated to the Works).

(b)   Notice of Filing of Lien.  Contractor agrees to notify Owner immediately of the filing of any Liens, or possible filing of Liens, upon the DRU, the Site, any Equipment (other than Equipment owned or leased by or procured for Contractor and used in the performance of the Works), or any moneys due to Contractor by Owner under this Agreement.  If any such Liens are filed, Contractor shall arrange for the removal of such Lien not later than thirty (30) days after such filing.  In the event that Contractor fails or refuses to remove such Lien within thirty (30) Days, then Owner shall have the right (but not the obligation) to pay any sums necessary to obtain prompt release of such Lien.  In this case, Contractor shall reimburse Owner for any sums so paid within thirty (30) Days of a demand therefor, or Owner shall have the right to set off such amounts against payments owed to Contractor by Owner hereunder in accordance with Section 10.8(f).

(c)   Liens to the Benefit of Sureties or Creditors.  Notwithstanding the provisions under Section 3.15(a) and Section 3.15(b) above, upon prior written approval of Owner (or its successor or assignee), Contractor and/or the Major Subcontractor listed in item 1.2 of Exhibit XII hereto shall be permitted to create Liens on the Site to secure sureties or financing raised with the specific purpose of developing the Site to allow for the construction of the DRU and other Liens that may be required by Contractor and/or the Major Subcontractor listed in item 1.2 of Exhibit XII hereto to be created in favor of the "Fundo de Garantia da Construção Naval – FGCN".

3.16.   Quality Assurance.  No later than the date indicated in Exhibit VI, Contractor shall submit to Owner for its approval: (i) a Quality Assurance Plan in the form set forth in Exhibits VI and VII; and (ii) a detailed inspection plan, and Contractor shall provide for the Site a quality assurance manager to supervise the implementation of the quality assurance plan, the inspection plan, and the inspection procedures, at the Site; and any other required documentation pursuant to Exhibits VI and VII.

Confidential

KEPPEL00610402

3.17.   Plan & Reports.  Contractor shall provide to Owner all Plan & Documents specified in Exhibit VI on the dates therein indicated, with progress reports and such other information as reasonably requested by Owner, including the following:

(a)     Minutes for all status and other project meetings within seven (7) Days following any such meeting;

(b)     Weekly progress reports, in form and substance reasonably acceptable to Owner, of the progress of the Works during the preceding work week and on all matters deemed significant by Owner or Contractor.  Contractor shall, as may be requested from time to time by Owner, deliver to Owner, on a daily basis, a written report, in form and substance reasonably acceptable to Owner of the Works during the preceding day and on all matters deemed significant by Owner or Contractor.

(c)     Safety incident reports according to Exhibit IX;

(d)     Monthly progress reports, in form and substance reasonably acceptable to Owner, containing the following information (each, a "Monthly Progress Report"):

   (i)     an executive summary with a description of overall progress of the Works compared to the Project Schedule;

   (ii)     a description, compared against the Project Schedule, of engineering status including actual percentage completed, document status, significant activities accomplished in the previous month and significant activities planned for the current month and next month;

   (iii)     a description, compared against the Project Schedule, of procurement activities including actual percentage completed, manufacturing and delivery status, significant activities accomplished in the previous month and significant activities planned for the current month;

   (iv)     a description, compared against the Project Schedule, of construction activities, including actual percentage completed, progress summary, numbers of skilled, unskilled, and supervisory staff on Site, as compared to planned levels, significant activities accomplished in the previous month and significant activities planned for the current month;

   (v)     a description, compared against the Project Schedule, of start-up activities, including actual percentage completed, progress summary, significant activities accomplished in the previous month and significant activities planned for the current month;

95-40522876

Confidential

KEPPEL00610403

(vi)     a description of critical items, including evaluation of problems and, to the extent applicable, of strategies to accelerate the performance of the Works in order to comply with the Project Schedule;

(vii)    a description of all permitting and environmental issues and its current status;

(viii)   a description of all safety and security issues;

(ix)     a description of quality assurance activities; and

(x)      any other information reasonably requested by Owner, including any material information of which Contractor is aware that could reasonably be foreseen to adversely affect the performance of the Works.

(e)     Contractor shall provide the Monthly Progress Report on or before the tenth (10th) Day of each month.  Monthly Progress Report shall cover activities up to the end of the previous month.  Contractor shall provide copies of the Monthly Progress Reports to any other Persons as Owner may reasonably request.

(f)     Reports of any event of Force Majeure duly notified pursuant to Article 23 and Section 25.5 hereof, in a form reasonably acceptable to Owner, detailing the status and developments of such event which occurs or may be anticipated, and any emergency or other unanticipated event, which might adversely affect Contractor's ability to perform its obligations hereunder.  The report shall detail all available information and steps being taken to correct or address such Force Majeure, as well as the estimated time for Contractor to resume the part of the Works affected by an event of Force Majeure and in each case shall be submitted by Contractor as soon as practicable.  Owner may at any time request a report on any event, which Owner reasonably regards as significant.

(g)     Reports on damage if any portion of the DRU is materially damaged or is destroyed, as soon as practicable after the occurrence of such damage or destruction, detailing such occurrence, any required repairs or replacement and the estimated duration of such repairs or replacement, including any estimate impact on the Project Schedule.  Without limiting the foregoing, such damage report shall be in a form acceptable to any insurance company against which a claim is made for coverage of such damage.

(h)     Written notice to Owner of any unanticipated significant changes or developments in the Works.  Contractor shall make available, and upon Owner's request shall furnish, to Owner such documents as may be necessary in Owner's sole discretion for Owner to inspect, evaluate or review the performance of the Works.

(i)     Copies of technical correspondence between Contractor and its Subcontractors of any tier, or their respective suppliers, upon request of Owner, including all notes,

- 33 -

95-40522876

Confidential                                                                                                      KEPPEL00610404

designs, drawings, specifications and other technical data pertaining to the technical aspects of the Works; provided that receipt by Owner of such technical correspondence shall not be deemed a consent to or approval by Owner of such technical correspondence and shall not limit any of the obligations of Contractor to perform under this Agreement.

(j)     Reports in form and substance reasonably satisfactory to Owner informing compliance by Contractor and its Subcontractors with health, safety and environmental standards and procedures required pursuant to this Agreement and by Applicable Law.

3.18.   Payment.   Contractor shall timely make all payments required to be paid to Owner pursuant to the terms of this Agreement.

3.19.   Progress Meetings.   During performance of the Works, periodic progress meetings shall be held at such place mutually agreeable to the Parties.   Such meetings shall be at least weekly or as otherwise agreed.   All matters bearing on the progress and performance of the Works and the Project Schedule since the preceding progress meeting shall be discussed and resolved, including any previously unresolved matters, deficiencies in the Works or the methods being employed for the Works, and problems, difficulties, or delays which may be encountered.   Contractor shall provide Owner with minutes of all progress meetings.   All decisions taken at such progress meetings shall be recorded in the minutes.   Owner shall initial and sign the minutes, noting any disagreements.   The minutes shall be considered the definitive record of what occurred and what was decided at the meetings.

3.20.   Site Security.   The following shall apply to the Site:

(a)     Contractor shall be responsible for all security matters at the Site during all times prior to Substantial Completion, which shall include measures reasonably required to prevent vandalism, sabotage, loss, theft and danger or any other changes to the Site, any Equipment and personnel.

(b)     Contractor shall coordinate entrance and exit from the Site so as to minimize disruption to the Works.

(c)     Contractor shall review all injuries to persons and damage to property arising during the performance of the Works to determine whether any unsafe conditions that exist at the Site contributed to such injuries or damage, and shall be solely responsible for the correction of any such conditions.

(d)     Contractor shall cooperate with Owner on all security matters and shall promptly comply with any reasonable security requirements for the DRU, the Site or the Works requested by Owner.   Such compliance shall not relieve Contractor of its responsibility for maintaining proper security for the above noted items, nor shall it be construed as limiting in any manner Contractor's obligation to comply with

Confidential                                                                                        KEPPEL00610405

Applicable Laws and to undertake reasonable action to establish and maintain secure conditions at the Site.

(e)     Contractor shall not be entitled to any extension of time or compensation on account of Contractor's failure to exercise reasonable care to protect the Site and all Equipment as described herein.

(f)     Contractor shall, and shall cause its Subcontractors to, comply with all Owner Policies when performing any Works at the Site.

(g)     Health and Safety. Contractor recognizes and agrees that safety is of paramount importance in the performance of the Works and that Contractor is responsible for performing (and causing the performance of) the Works in a safe manner. Contractor agrees to implement a safety program that is to be submitted to Owner for its approval prior to the commencement of the Works. Contractor shall perform the Works in such a manner as to minimize impact upon human health, safety and the natural environment. In carrying out the foregoing, Contractor shall comply with Good Industry Practices, Owner Policies, Applicable Laws and Contractor's Safety Program, as approved by Owner, which approval shall not be unreasonably withheld, and Owner's standards as set forth herein and in Exhibit IX. Such submission shall not be construed as limiting in any manner Contractor's obligation to undertake all reasonable actions toward maintaining safe working conditions at the Site, nor as imposing upon Owner responsibility to review, or for the adequacy of, the environment, health and safety program at the Site. Contractor shall assume all costs associated with compliance therewith. Contractor further agrees to provide necessary training to its employees and Subcontractors to ensure their compliance with the foregoing safety and health rules and standards. Should Owner at any time observe Contractor, or any of its Subcontractors, performing the Works in an unsafe manner, or in a manner that may, if continued, become unsafe, then Owner shall notify Contractor of the unsafe or potentially unsafe condition. Owner's notification shall establish a deadline for Contractor to remedy or rectify such condition. If Contractor fails to remedy the unsafe or potentially unsafe condition in such time, Owner shall have the right (but not the obligation) to require Contractor to stop the Works until such time as the manner of performing the Works have been brought into conformity with the requirements of this Agreement; provided, however, that at no time shall Contractor be entitled to an adjustment of the Contract Price or the Project Schedule based on such work stoppage. Nothing in this Section 3.20 shall affect Contractor's status as an independent contractor.

(h)     Conditions of the Site. Contractor represents and warrants that it knows and has carefully reviewed and taken account of all matters concerning the performance of the Works fully and completely, and in accordance with the Project Schedule. Contractor has had the opportunity to investigate and has carefully reviewed and taken account of all matters concerning the Site, including, the topography and weather patterns at the Site and surrounding area, the management and storage of

Confidential                                                                        KEPPEL00610406

materials, the availability of labor, construction water, construction electricity, and construction communications, the access routes to the Site (including the suitability of those routes, with such modifications or reinforcements as Contractor has identified as part of the Works, for delivery of Equipment) and soil and subsoil conditions and characteristics and accepts them for such performance. Contractor's failure to acquaint itself with such general or local conditions or circumstances affecting the Works existing as of the effective date of this Agreement shall neither relieve it from the responsibility for successfully performing this Agreement nor entitle Contractor to a Change Order. Contractor is responsible for the pertinence, sufficiency and accuracy of all information used in the performance of the Works. Contractor acknowledges that all appropriate allowances for these conditions have been taken into account in the Contract Price and in determining the Project Schedule. No discrepancy between the actual conditions encountered by Contractor and the conditions that Contractor anticipated or allowed for shall excuse Contractor from any failure to perform the Works in accordance with the Project Schedule. In addition, no claim shall be considered for any increase in the Contract Price or for any extension of the Project Schedule, or any other claim, relief or remedy whatsoever, based in whole or in part upon any such discrepancy.

(i)   No Hazardous Materials To Be Brought on Site.  Contractor shall not, nor shall it permit or allow any Subcontractor to, transport any Hazardous Materials to the Site, except to the extent necessary for the performance of the Works. Contractor shall remove, transport and dispose of, in accordance with any Applicable Law and Consents, any Hazardous Materials transported onto the Site or generated in the performance of the Works and so long as the same is done in compliance with Applicable Laws and Contractor shall remain responsible and strictly liable for all such Hazardous Materials. Subject to the other provisions of this Agreement, Contractor, on behalf of itself and of Contractor Group, agrees to defend, indemnify and hold each member of Owner Group free and harmless from and against any and all claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Owner Group and related attorneys' fees) suffered or incurred by any member of Owner Group that arise from or out of Contractor's use, handling, or disposal of Hazardous Materials on the Site, provided that such claims, losses and/or liabilities do not result in any way whatsoever from the gross negligence or willful misconduct of any member of Owner Group.

(j)   Clean-up.  Contractor shall at all times keep the Site free from waste materials or rubbish caused by its activities. As soon as practicable, after the completion of all Substantial Completion Punch-list items, Contractor shall remove, at its own cost, all of its equipment and materials not constituting part or otherwise embodied in the DRU, and remove all waste material and rubbish from the Site so as to bring the Site into full compliance with Applicable Laws, Consents and this Agreement.

Confidential                                                                                                          KEPPEL00610407

Contractor shall be responsible for all costs associated with removal of any waste materials and garbage from the Site, including, but not limited to, costs associated with permitting and transportation.

(k)    Non-Interference.  During the period from Substantial Completion of the DRU until completion of the Substantial Completion Punch-list for such DRU, Contractor shall ensure that the performance of the Works does not unreasonably interfere with the operation of such DRU or any other DRU.  In the event Contractor's performance of the Works interferes with the operation of such DRU, any other DRU and/or any adjoining facility, notwithstanding anything to the contrary in this Agreement, Contractor shall be liable for and shall defend, indemnify and hold each member of Owner Group free and harmless from and against any claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Owner Group and related attorneys' fees) suffered or incurred by any member of Owner Group resulting from such interference.  At no time may Contractor utilize any Owner systems or assets unless specifically authorized by the Scope of Work or as approved by Owner in writing.

(l)    Access to Site.  Contractor shall make the Site available to Owner, or to any Person at the request of Owner, including Owner's personnel, its agents, representatives and subcontractors, for the purpose of carrying out Owner's obligations under this Agreement or for the purpose of monitoring the performance of the Works.

3.21.   Access to Documents.  Owner, its Owner Project Manager or any person authorized in writing by Owner shall have access, at all reasonable times, to inspect and make copies of all notes, designs, drawings, specifications and other technical data pertaining to the technical aspects of the Works, Equipment specifications, performance guarantee data, warranties, shop and field performance test and field representative reports; provided that Contractor shall not be obligated to provide access to proprietary technical data regarding Equipment manufactured by or for Contractor and not provided by Contractor to other Persons so long as Contractor provides the non-proprietary portion of such technical data and the non-proprietary data provided by Contractor shall be of such type and detail as is customarily provided by vendors and provides Owner with a reasonable basis for technical review of the design of the DRU.  Drawings representing the latest modifications to or the current as-built status of the DRU required pursuant to Exhibit III shall be available for Owner's inspection at the Site at all times during any working day.

3.22.   Environmental Compliance.  Contractor shall perform the Works in such a manner as to minimize impact upon human health, safety and the natural environment.  In carrying out the foregoing, Contractor shall comply with Good Industry Practices, Owner Policies, Applicable Laws, Applicable Codes and Standards and Contractor's Safety Program.  Contractor shall dispose of any waste buildup in the water or wastewater treatment systems included in the Site and waste from the sanitary sewer or any other source included in the Site resulting from

Confidential                                                            KEPPEL00610408

Contractor's performance of the Works.  Contractor shall dispose of all non-hazardous wastes and Hazardous Materials generated or encountered during performance of the Works only at disposal facilities approved and permitted to receive such wastes and Hazardous Materials.

3.23.   Transportation.  Contractor shall be responsible for the transportation to, from and among any of the Sites of all Equipment, Subcontractors and personnel used to perform any Works.

3.24.   Export of DRU.  Contractor shall take all necessary steps and shall obtain all necessary authorizations for the timely exportation of the DRU, including the registration of such DRU in all the relevant registries, such as the Registro de Operações de Crédito and the Registro de Exportação with SISCOMEX.  Contractor, on behalf of itself and its Affiliates, agrees to defend, indemnify and hold each member of Owner Group free and harmless from and against claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Owner Group and related attorneys' fees) suffered or incurred by any member of Owner Group resulting from the failure of any member of Contractor Group to obtain any permit or Consent from any applicable registry, including the registries described in the preceding sentence.

## ARTICLE 4   LOCAL CONTENT REQUIREMENTS

4.1.   Local Operations in Brazil.   Contractor shall perform, in Brazil, construction and assembly, commissioning, pre-operation, start-up, and assisted operation related to the Works, including the hull construction, as well as all related steel works, its integration with the drilling plant, and all related activities.

4.1.1   The hull construction, as well as all related steel works, its integration with the drilling plant, and all related activities, shall be performed at a single Site, located in Brazil.

4.1.1.1 If the yard is incapable of supporting the whole production needed for the performance of all of the Works, Contractor may adopt an alternate and complimentary strategy to complete the Works at one or more alternate sites.  Notwithstanding the foregoing, Contractor shall meet at least 60% (sixty percent) of the Global Brazilian Local Content as stipulated in Section 4.2 below, that includes, but is not limited to, both manpower and aggregate weight of structural parts, panels and blocks fabrication, as well as assembly, block erection, all subsequent works for completion of the hull at quay side, integration of the drilling plan and remaining activities, all of which shall take place at the Site specified under Section 4.1.1.

4.1.1.2 Any alternative site utilized by Contractor pursuant to Section 4.1.1.1 shall be located in Brazil.

4.1.1.3 If Contractor demonstrates that it would be unfeasible to perform steel works or component part fabrication/supply in Brazil, then subject to obtaining Owner's prior written consent (which consent may be withheld in Owner's sole discretion), such parts/components may be supplied and/or fabricated from sources and/or sites outside

Confidential

KEPPEL00610409

Brazil.  The proposition set forth herein does not relieve Contractor of its obligations under Section 4.2.  In addition, within two (2) months prior to the beginning of the steel works to be performed or fabrication/supply of component part under this section, the Contractor shall promptly provide the Owner, whenever required, with (i) any and all documentation required by Owner to obtain the necessary visa to travel abroad to inspect the Works, as well as (ii) office accommodation in the yard where the works will be performed/supplied for at least ten (10) persons to be indicated by the Owner, in accordance with Exhibit XI.

>    4.1.1.3.1        In relation to works performed pursuant to Section 4.1.1.3 above, the Contractor shall bear the costs of transporting (including insurance) the works performed pursuant to Section 4.1.1.3 until the same arrives at the Contractor's Site in Brazil

4.2.    Brazilian Local Content.  Contractor shall comply with the following Brazilian Local Content requirements, calculated in accordance with the ANP's criteria, methods and procedures indicated in Exhibit XV ("Brazilian Local Content"):

4.2.1    The local content indexes (*Índice de Nacionalização*) for the Works shall be at least as per the table below:

| System | Local Content (percentage of the Contract Price) |
|---|---|
| Generation, Propulsion, and Dynamically Positioning Systems | 50% (fifty percent) |
| Drilling Package | 30% (thirty percent) |
| Global | 60% (sixty percent) |

4.2.2    The definitions of the scope of the generation, propulsion, and dynamically positioning systems, as well as the drilling package, for local content calculation purposes, are set forth under Section 3 and Section 4 of Exhibit XV.

4.3.    Brazilian Local Content Report.  Contractor shall provide during each month of the term of this Agreement, a Brazilian Local Content report, as defined in Exhibit XV, together with supporting documentary evidence, demonstrating Contractor's compliance with the Brazilian Local Content requirements at the end of this Agreement.

4.3.1    Contractor shall, within sixty (60) Days from the date of execution of this Agreement, submit for Owner's approval, the method by which Contractor intends to evidence compliance with the provisions of Section 4.2.

4.3.2    The procedure and criteria for the calculation of Brazilian Local Content, shall comply with ANP requirements, as per Exhibit XV.

Confidential                                                                                    KEPPEL00610410

4.3.3   The calculation of the Brazilian Local Content indicated in the Brazilian Local Content Monthly Report, may be audited by an entity contracted by Owner.

4.3.4   Contractor shall make available to the above mentioned entity all documents and information required for the auditing of the Brazilian Local Content, in accordance with Exhibit XV.

4.4.   Liquidated Damages.  In the event Contractor fails to comply with the Brazilian Local Content requirements for the DRU, as defined in Section 4.2, Contractor shall pay to Owner liquidated damages for such non-compliance as follows:

4.4.1   If Contractor does not comply with the Brazilian Local Content indexes (*Índice de Nacionalização*) for (i) Generation, Propulsion and Dynamically Positioning Systems and/or Drilling Package, then Contractor shall pay to Owner an amount equal to twenty percent (20%) of the difference between the applicable required local content percentage of the system price and the actual local content percentage of such system price or (ii) Global, as specified in Section 4.2.1, then Contractor shall pay to Owner an amount equal to twenty percent (20%) of the difference between the applicable required local content percentage of the Contract Price and the actual local content percentage of the Contract Price;

4.4.2   The liquidated damages payable pursuant to Section 4.4.1 above for the DRU may be assessed in respect of clauses (i) and (ii) of Section 4.4.1 and are, in respect of clauses (i) and (ii) of Section 4.4.1, cumulative, but the total amount of liquidated damages assessed for the DRU for non compliance with the Brazilian Local Content requirements for such DRU will be limited to the greater of:

(a)   the aggregate liquidated damages assessed for non compliance with the Global Brazilian Local Content requirements for such DRU; and

(b)   the sum of the aggregate liquidated damages for non compliance with the Brazilian Local Content requirements related to the Drilling Package and to the Generation, Propulsion, and Dynamically Positioning Systems for such DRU.

## ARTICLE 5  OBLIGATIONS OF OWNER

Owner shall comply with the following provisions in a timely manner:

5.1.   Payment.  Owner shall timely pay the Contract Price and all other sums, if any, required to be paid by Owner to Contractor pursuant to the terms of this Agreement, and in accordance with the provisions of Article 9 and Article 10 hereof.

5.2.   Permits.  Owner shall be responsible for obtaining the permits and consents listed in Exhibit XIV in accordance with the schedule contained therein.  Owner shall provide Contractor with copies of such permits and consents.  Owner shall provide information, assistance and

Confidential                                                                                                   KEPPEL00610411

documentation to Contractor as reasonably requested in connection with the permits and Consents to be obtained by Contractor hereunder.

5.3.   <u>Temporary Asset Transfers</u>. Owner may transfer to Contractor custody of certain assets owned or leased by Owner and required by Contractor to complete the Works. Such transfer shall not be construed as a transfer of Owner's ownership, title or other interest in or to the relevant asset. Contractor shall return promptly each such asset to Owner upon the completion of the portion of the Works for which the custody of such asset was required by Contractor. Contractor shall be liable for any damage to the asset occurring during the time the asset is in Contractor's custody. Prior to any transfer, Contractor shall demonstrate to Owner's satisfaction that it possesses sufficient insurance to cover any damage or risk of loss to the asset.

5.4.   <u>Good Industry Practices</u>. Owner shall carry out its duties hereunder in accordance with Good Industry Practices and in such a way as to avoid any unnecessary increase in costs to the Contractor or delay in Project Schedule.

## ARTICLE 6  REPRESENTATIONS OF THE PARTIES

6.1.   <u>Representations and Warranties of Owner</u>. Owner represents and warrants to Contractor that, as of the date hereof:

(a)   <u>Due Organization</u>. It is a private limited liability company duly organized and validly existing under the laws of The Netherlands, and is authorized and qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure so to qualify would have a material adverse effect on its financial condition, operations, or business.

(b)   <u>No Violation of Law; Litigation</u>. It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or taken together, would materially and adversely affect its performance of any obligations under this Agreement. There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to the best of its knowledge) threatened against it that, if adversely determined, could reasonably be expected to have a material adverse effect on its financial condition, operations, prospects or business, as a whole, or its ability to perform under this Agreement.

(c)   <u>Licenses</u>. It is the holder of all consents, licenses, permits, or other authorizations required to permit it to operate or conduct its business now and as contemplated by this Agreement and carry out the provisions of this Agreement.

(d)   <u>No Conflict</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, or compliance with the terms and provisions hereof, will conflict with, or result in a breach of, or require any consent under, the charter or by-laws of the Owner, or any Applicable Law or

Confidential                                                                                          KEPPEL00610412

regulation or any order writ, injunction or decree of any court, or any agreement or instrument to which it is a party or is bound or to which it is subject, or constitute a default under any such agreement or instrument.

(e)    Corporate Action.  It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by Owner of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms.

(f)    Financial Solvency.  It is financially solvent, able to pay all debts as they mature and possesses sufficient working capital to perform its obligations hereunder.

6.2.    Representations and Warranties of Contractor.  Contractor represents and warrants to Owner that, as of the date hereof:

(a)    Due Organization.  It is a corporation duly organized, validly existing and in good standing under the laws of the Republic of Singapore, and is authorized and qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure to do so would have a material adverse effect on its financial condition, operations or business.

(b)    No Violation of Law; Litigation.  It is not in violation of any Applicable Law or judgment entered by any Governmental Authority, which violations, individually or taken together, would materially and adversely affect its performance of any obligations under this Agreement.  There are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to the best of its knowledge) threatened against it that, if adversely determined, could reasonably be expected to have a material adverse effect on its financial condition, operations, prospects or business, as a whole, or its ability to perform under this Agreement.

(c)    Licenses.  It is the holder of all Consents, licenses, permits, or other authorizations required to permit it to operate or conduct its business now and as contemplated by this Agreement and to carry out the provisions of this Agreement.

(d)    No Conflict.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, or compliance with the terms and provisions hereof, will conflict with, or result in a breach of, or require any consent under, the charter or by-laws of Contractor, or any Applicable Law or regulation or any order writ, injunction or decree of any court or any agreement or instrument to which it is a party or is bound or to which it is subject, or constitute a default under any such agreement or instrument.

Confidential                                                                                    KEPPEL00610413

(e)   Corporate Action. It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by Contractor of this Agreement has been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by Contractor and constitutes its legal, valid and binding obligation enforceable in accordance with its terms.

(f)   Financial Solvency. It is financially solvent, able to pay all debts as they mature and possesses sufficient working capital to complete the Works and perform its obligations hereunder. Any guarantor guaranteeing the obligations of Contractor is financially solvent, able to pay all debts as they mature and possesses sufficient working capital to perform its obligations under such guarantee.

(g)   Professional Skills. Contractor has substantial experience and all the required skills and capacity necessary for the procurement and construction of Equipment used in the DRU, and is fully qualified to procure and construct the Works and deliver the DRU and otherwise perform the Works in accordance with this Agreement. Contractor shall diligently perform the Works in a competent and professional manner, utilizing sound project management procedures and supervisory procedures, all in accordance with this Agreement, including Good Industry Practices and Applicable Codes and Standards.

(h)   Owner Information. Contractor understands that as background information and as an accommodation to Contractor, Owner may provide or may have provided Contractor with copies of certain studies, reports or other information. Contractor further understands that Owner makes no representations or warranties with respect to the accuracy of such documents or the information or opinions therein contained or expressed unless expressly stated in this Agreement.

(i)   Legal Requirements. Contractor has knowledge of or has investigated to its satisfaction all of the legal requirements and business practices that must be followed in performing the Works and the Works will be in conformity with such requirements and practices and in compliance with all Applicable Laws and Consents. The DRU can be constructed, complete in every detail under current Applicable Laws in accordance with the terms hereof for the Contract Price.

(j)   Status. The Major Subcontractor listed in item 1.2 of Exhibit XII hereto satisfies the definition of an "Estaleiro Brasileiro" (Brazilian Shipyard) according to article 2°-A of Brazilian Law n. 11.786/08, in all respects.

## ARTICLE 7  TAXES

7.1.   General provision. Except as provided herein, taxes arising out of the performance of this Agreement, whether directly or indirectly, shall be the exclusive responsibility of the taxpayer of record that bears the tax burden before the relevant Governmental Authority, without Contractor being entitled to reimbursement as a consequence of any tax levied on the amounts

Confidential                                                                                    KEPPEL00610414

received by it under this Agreement or the performance of its contractual obligations. Notwithstanding the foregoing, as to tax assessments levied in Brazil, Contractor shall be contractually responsible for the payment of the following taxes and mandatory contributions, independent of whether Contractor is the taxpayer of any tax arising out of the exportation/importation/admission into the custom regime of any equipment, materials or other goods related to the construction (construction equipment), including any sales taxes, importation duties or importation taxes. Owner, when the withholding source, shall discount and pay over, within the legal deadlines, from payments effected, such taxes as it is required to withhold and pay under Applicable Law, and Contractor acknowledges that no amount payable by Owner to Contractor hereunder shall be increased as a result of such withholding or any other withholding that may be required under Applicable Law, and all payments shall be made net of any such withholdings.

7.1.1   Contractor declares that it has taken into consideration in the Contract Price the taxes applicable to the performance of the Works and supplies of Equipment and all equipment, materials or other goods related to the construction (construction equipment) provided in connection therewith (including (i) any sales and services tax (for example, *Imposto Sobre Circulação de Mercadorias e Serviços*) that may be due in connection with any payments under this Agreement, and (ii) any taxes due in connection with the importation of Equipment). Contractor shall not be entitled to any remedy or claim against any member of Owner Group in relation to such taxes, including any revision in the Contract Price or for reimbursement for such taxes.

7.1.2   If, as a result of the performance of this Agreement, and within the time period required by Applicable Laws for the fulfillment of tax obligations, any type of taxes for which Contractor is liable or taxes which are to be borne by Contractor pursuant to this Article 7 are assessed by the taxing authorities against any member of Owner Group, Contractor shall pay such taxes or oppose such taxes in good faith through administrative or judicial proceedings under its exclusive responsibility. Contractor shall defend, indemnify and hold each member of Owner Group free and harmless from and against claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Owner Group and related attorneys' fees) suffered or incurred by any member of Owner Group arising out of any payment of such taxes, if assessed against any member of Owner Group, and Owner may set off any such amounts duly paid by it against any payments that Owner may owe to Contractor under this Agreement.

7.2.   Modification of the Tax Burden.   If during the period between the Proposal Submission Date and the earlier of (i) the date on which this Agreement is terminated and (ii) the date of the Final Completion Certificate, any of the following events as per (i), (ii), (iii), (iv) below occur (in Brazil or any other country as a result of the performance of this Agreement), then the price may be revised to reflect any increase or decrease in Contractor's cost:

(i)   new taxes or fiscal assessments (which are not corporate or similar taxes) are created;

Confidential                                                                        KEPPEL00610415

(ii)   existing taxes or fiscal assessments (which are not corporate or similar taxes) are revoked;

(iii)   tax calculation basis, rates of taxes or fiscal assessments (which are not corporate or similar taxes) are modified;

(iv)   enactment or discontinuance of tax or fiscal assessments incentives of any kind and/or exemption or reduction of Brazilian federal, state or municipal taxes or fiscal assessments (other than corporate or similar taxes) that actually increase or reduce the burden of taxes or fiscal assessments (other than corporate or similar taxes).

7.3.   Indemnification.   Contractor shall defend, indemnify and hold each member of Owner Group free and harmless from and against any claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Owner Group and related attorneys' fees) suffered or incurred by any member of Owner Group as a result of any failure by any member of Contractor Group to pay any taxes when due.  Upon payment of any such taxes by such member of Owner Group then, Owner or such member of Owner Group, as the case may be, shall be entitled immediately to recover from Contractor the amount thereof together with all direct expenses incurred by Owner or such member of Owner Group, as the case may be, in connection therewith or to off set all such amounts against any sums owed to Contractor by Owner.  As a result, each member of Owner Group shall be duly compensated by Contractor for the amounts paid by it (whether directly or indirectly) as taxes in Brazil (deducted by any costs and expenses incurred by Contractor to secure such favorable outcome).

7.4   REPETRO Regime.   Notwithstanding any other provision herein to the contrary (particularly, but without prejudice to the generality of the foregoing, Sections 3.2(d), 3.24, 3.3.13, 7.1 and 7.3), in case the Owner fails to perform the importation of the DRU to Brazil under the REPETRO Regime, the Owner shall indemnify and hold the Contractor harmless from any and all taxes levied on the exportation process of the DRU adversely affecting the basis of the Contract Price, as set forth in Section 9.1 below.

### ARTICLE 8  MILESTONES PAYMENTS.

8.1.   Milestones Payments.   Subject to the compliance with Exhibit XVII, Appendix 1 (Milestones Payment Schedule), the Contract Price shall be paid by the Owner to the Contractor in accordance with the Milestones Payment Events and the provisions of this Article.

8.2.   Milestone Payment Event.   A Milestone Payment Event when accomplished entitles the Contractor to invoice and receive payment for the portion of the Contract Price corresponding to such Milestone Payment in accordance with Exhibit XVII.

8.2.1   Upon 15 days of availability of the detailed Project Schedule (Exhibit XVIII), the Exhibit XVII - Appendix 1-Milestone Payment Schedule shall be revised and agreed by the parties in order to reflect the detailed construction progress achieved on each Milestone Payment Event accordingly.

95-40522876

Confidential

KEPPEL00610416

8.3.  Milestone Payment Documents.  The Contractor shall submit to the Owner on the Milestone date a statement showing: (i) the Milestone Payment Event achieved prior to the date of the statement to the extent not previously invoiced, (ii) the portion of the Contract Price corresponding to the Milestone Payment Event included in the relevant statement, (iii) any other amounts due and payable to the Contractor pursuant to this Contract and (iv) documentation supporting the foregoing.

8.3.1  No later than seven (7) days from the date of issuance of a statement by the Contractor pursuant to this Section, the Owner shall review such statement and, by notice to the Contractor substantiated in reasonable details, inform whether in its reasonable opinion the Milestones Payment reflected therein have been completed and/or the amounts included in the statement conform to the Milestones Payment Schedule or otherwise reject the statement.  The Owner's failure to issue the notice contemplated in this sub-clause within the required seven (7) day period shall constitute a deemed acceptance of the relevant statement.

8.3.2  From and after the date which is the earlier of (i) the date on which the Contractor received the notice contemplated in Section 8.3.1 above and (ii) seven (7) days after the issuance of the relevant statement, the Contractor shall be entitled to issue and deliver to the Owner the appropriate invoicing documentation.

8.3.3  The Milestone Payment Event – Downpayment is an exception to Section 8.3.1 and the related invoice shall be issued only after together with the receipt of the Performance Security, provided in accordance with Exhibit XXIII and issued by a bank or an insurance company previously approved by the Owner.

## ARTICLE 9  CONTRACT PRICE

9.1.  Contract Price.  The Contract Price is determined on a lump sum, fixed price basis and is equal to the sum of the component prices for the Works amounting to US$ 823,448,000.00 as set forth in Exhibit XVI; provided that, the Contract Price may be increased up to the amount of US$ 8,155,000.00 in accordance with the conditions set forth in Section 9.2.2. The Contract Price is inclusive of all the necessary overhead, personnel (supervision, direction, administration, labor), Equipment, taxes due to labor and social security obligations, costs, supplies, tools, expenses, taxes, the IN241/513 and the REPETRO Regime, licenses, insurance and other legal obligations, including profit, required for the performance of Contractor's entire contractual obligations until termination of this Agreement, including, but not limited to, its provisions relating to Contractor's performance (Article 3); Local Content (Article 4); Taxes (Article 7), Good Industry Practices, and all Applicable Laws.  Each Change Order authorizing the payment of money to Contractor or credit of amounts from Contractor to Owner shall be deemed to increase or decrease the Contract Price accordingly for all purposes hereof.

9.2.  Price.  The Contract Price comprises:

9.2.1  The lump sum price of US$ 823,448,000.00 including the amount of US$ 370,551,600.00 and the amount of R$ 706,518,384.00, converted into United States Dollars at an

Confidential

KEPPEL00610417

exchange rate of US$1.00/ R$1.56 for the purpose of calculating the lump sum price, as set forth in Price Schedule A of Exhibit XVI, corresponding to all services and work required to deliver the DRU, as described herein, fully functional, operable and delivered definitively to Owner at the final location, comprising, among others, engineering design, procurement, construction, erection and assembly, pre-commissioning, tests, trials, certification and assisted operation of the DRU, and excluding the items to be specifically provided by Owner, as indicated in Exhibits I, II and X.

9.2.2   An additional amount not to exceed US$ 8,155,000.00, corresponding to the additional works to be performed by Contractor upon receipt of a written notice that may be given by Owner within sixty (60) days after the date hereof, instructing Contractor to perform the additional works selected by Owner, at its own discretion, from any one or more of the work items listed in Appendix 9 of Exhibit XXVIII (without any adjustment to the Project Schedule). The Parties agree that the price of the additional works shall be the amount stated in the column next to each individual work item listed in Appendix 9 of Exhibit XXVIII. If Owner does not instruct in writing Contractor to perform any additional works in accordance with the provisions of this Section 9.2.2 within the sixty (60) day period, then there shall be no adjustment to the lump sum price mentioned in Section 9.1. If Owner provides a written instruction to Contractor within the sixty (60) day period, then (i) the lump sum price stated as the Contract Price in Section 9.1 shall be increased by the aggregate amount of the applicable price(s) listed in Appendix 9 of Exhibit XXVIII corresponding to each of the work item(s) selected by Owner (and such additional amount shall be divided in United States Dollars and Brazilian Reais following the same ratio of United States Dollars to Brazilian Reais applied in Section 9.2.1) (for the purpose of this Section, collectively the "Additional Works Price"); (ii) not later than thirty (30) days following the date of such instruction or receipt of an invoice in respect thereof from the Contractor, whichever is the later, Owner shall pay to Contractor an amount equal to a percentage of the Additional Works Price equal to the percentage of the Contract Price (excluding the Additional Work Price) paid and/or invoiced as Milestone Payments prior to the date of such instruction or invoice, as the case may be (and, for the avoidance of doubt, subsequent Milestone Payments shall be made by reference to the Contract Price including the Additional Works Price); and (iii) the selected work items shall become part of the Works required to be performed by Contractor under the Contract.

9.3.   Payment Limit. Notwithstanding the provisions under Section 9.1, when the sums of payments made by Owner reaches the total amount specified in Section 9.1, Owner's payment responsibilities shall cease except as otherwise provided in this Agreement. Notwithstanding the foregoing, Contractor shall be responsible to carry out the Works and its obligations and responsibilities under this Agreement to Final Completion.

9.4.   Incentive Amount. The Contractor shall be entitled to receive an incentive amount under this Agreement (i) if the Owner is awarded early operation bonus on start of operation for using the DRU regarding the operations of TBN-SSUB Nr. 16 awarded to Owner under International

Confidential                                                                          KEPPEL00610418

Invitation No.0966646118 or (ii) if the Handover occurs earlier than the Handover Date and the DRU is not used for the event mentioned in Section 9.4(i) above ("Incentive Amount").

9.4.1   The Incentive Amount shall be paid by the Owner to the Contractor, at the end of the relevant period, in the case of Section 9.4(i), to the extent that Owner is entitled to an early operation bonus under the relevant charter agreement executed in connection hereto ("Charter Agreement"), in accordance with the conditions set forth in Section 9.4(i).

9.4.1.1 Upon the occurrence of the events set out in Section 9.4(i) above, the Owner shall pay the Contractor an amount equal to one hundred percent (100%) of the daily early operation bonus under the Charter Agreement.

9.4.1.2 Upon the occurrence of the events set out in Section 9.4(ii) above, the Owner shall pay the Contractor an amount equal to US$50,000.00 (fifty thousand United States dollars) for each day of early Handover, subject to a limit of 365 days.

9.4.2   It is agreed by the Parties that notwithstanding the provisions of Section 20.2.1, the liquidated damages under the provisions of Section 20.2.1 shall apply only if no Incentive Amount is payable under Section 9.4(i) from the day following the date that no bonus or incentive payment is payable by Petrobras under the Charter Agreement.

## ARTICLE 10 PAYMENTS TO CONTRACTOR

10.1.   Payments.  Payments shall be made by Owner to Contractor in accordance with Article 9, Exhibit XVI and Exhibit XVII, and shall comply with all other terms of this Agreement. Payments shall be made to one or more accounts designated by Contractor and shall be made in Brazilian Reais and United States Dollars in which the corresponding portion of the Contract Price is denominated in Exhibit XVI.

10.1.1 The percentage of each currency to be paid in each Milestone Payment Event is set under Exhibit XVII.

10.2.   Invoicing.  Contractor shall submit to Owner, with a copy to Owner Project Manager, its Invoice according to Section 8.3.2 for such Milestone Payment Event accompanied by any necessary supporting documents described in Sections 10.3 through 10.5, in a form reasonably acceptable to Owner and previously approved by the Contractor Project Manager.

10.2.1 In the event invoicing occurs on a later date than that set forth in Section 10.2, the due date for payment of the invoice shall be postponed by as many days as the number of days of delay in the delivery of the invoice and/or of any required supporting documents in accordance with Sections 10.3 and 10.5.

10.3.   Invoicing Documents.  Each Invoice issued by Contractor to Owner must contain at a minimum the following information:

(i)      Owner's address;

Confidential                                                                                    KEPPEL00610419

(ii)    Reference to this Agreement with effective dates and any amendment or addendum pursuant to which such Invoice is issued;

(iii)    Reference to the Milestone Payment Event to which the Invoice pertains and to the period of time covered by such Milestone Payment Event, and any numbering system used to identify such Milestone Payment Event(s);

(iv)    Contractor's bank account information;

(v)    Evidence of compliance by Contractor of its FGTS and INSS obligations required by the Applicable Law;

(vi)    Any other data necessary for Owner to make payment thereof; and

(vii)    The currency(ies) in which such Invoice shall be paid according to Section 10.1.1.

10.4.    Representation. Each Invoice shall constitute a representation by Contractor that:

(i)    The quality of all Works described in the Invoice is in accordance with the terms of this Agreement;

(ii)    Contractor is entitled to payment of the amount invoiced;

(iii)    The Works described in the Milestone Payment Documents accompanying the Invoice and all previous Invoices are free and clear of all Liens, security interests and encumbrances; and

(iv)    All Subcontractors have been paid the monies due and payable to them for their work and supplies in connection with the Works (except for such amounts as may be disputed in good faith by Contractor).

The amount of the Invoice and the Works described therein shall correspond to the relevant Milestone Payment Event for the payment period covered by such Invoice. A delay in the submission of the Invoice by Contractor to Owner (and any and all supporting documentation requested by Owner pursuant to Section 10.5 below) will result in the postponement of the payment date for a period equal to such delay. Owner may, at its sole discretion, request that any Invoice be accompanied by a Lien waiver corresponding to all Works performed during the month to which such Invoice pertains.

10.5.    Review and Approval. Each Invoice shall be reviewed and approved by Owner. Upon Owner's request, Contractor shall furnish additional supporting documentation, including certificates, and provide any further information as may be reasonably requested by Owner to verify such Invoice. Unless disputed pursuant to Article 24, the amount of each Invoice shall be due and payable within thirty (30) Days immediately following the receipt of the Milestone Payment Documents as per Section 8.3 (such payment due date to be adjusted pursuant to Section 10.2 above to reflect any delays in Contractor's Invoice issuance and delivery of requested documentation). If any amount described in any Invoice is disputed by Owner,

Confidential                                                          KEPPEL00610420

payment shall be made only with respect to its undisputed portion. Payment of disputed amounts shall be made as soon as the dispute is resolved.

10.6.    _Payments._   The payment amount due to Contractor based on the Milestone Payment Event shall be effected by Owner by means of a bank receipt document issued by a banking institution in the name of Contractor, payable on the thirtieth (30th) day counting from the receipt of the Milestone Payment Documents as per Section 8.3 with due regard for the provisions of Section 10.2, or by wire transfer in favor of Contractor. Contractor hereby notifies Owner that payment shall be made to the following bank and account:

For payments in United States Dollars:

BANK: Citibank N.A.
Address: 8 Marina View, #21-01, Asia Square Tower 1, Singapore 018960
SWIFT: CITISGSG
Company Name: Fernvale Pte. Ltd.
USD ACCOUNT no. ███████████

For payments in Reais:

BANK: HSBC Bank Brasil S.A.
Branch No.: 0240
Account No.: █████████
SWIFT: BCBBBRPR
Beneficiary: Fernvale Pte. Ltd.

10.6.1   At Contractor's discretion it can elect to instruct Owner to make payments hereunder to more than one bank account.

10.6.2   If Contractor desires to receive payment at a bank account other than the account described above, it shall notify Owner in accordance with Section 25.5 indicating the new bank reference concurrent with an Invoice to Owner.

10.6.3   If Contractor elects to receive payment hereunder at a bank account held in the name of its Affiliate, then as a condition of nominating such account Contractor shall irrevocably acknowledge and agree that any payments made to such account by Owner shall for all purposes hereunder be treated as a payment to Contractor.

10.6.4   If any amount hereunder is due on a day which is not a Business Day, such amount shall not be due and payable until the next following Business Day, and no interest shall accrue in respect of such delay.

10.6.5   For the first Milestone Payment Event – Down payment, the amount due as Down Payment shall be paid by Owner in accordance with the date set forth in the applicable invoice after receipt of the Performance Security, provided in accordance with Exhibit XXIII and issued by a bank or an insurance company prior approved by the Owner.

Confidential                                                                          KEPPEL00610421

10.6.6 Upon any failure from Owner to comply with its payment obligations, which are due and payable, pursuant to Article 10 – Payments to Contractor, with respect to any undisputed and unconditionally amount due and payable to the Contractor, Contractor may, no later than 3 Business Days from the date in which such payment was due, send a notice to Sete International together with all Invoicing Documents ("Payment Notice") and Sete International shall procure that any such payment, up to the limit set forth below, is made in favor of the Contractor no later than ten (10) Business Days from receipt of the Payment Notice. The obligation of Sete International to procure that any payment is made pursuant to the terms and conditions set forth herein is limited to 85% (eighty-five percent) of the amount due and payable by the Owner.

10.7.  Payments Not Acceptance of Work. No payment made hereunder shall be considered as an approval or acceptance of the Works or portions of the Works by Owner, or a waiver of any claim or right that Owner may have hereunder. All payments shall be subject to correction and adjustment to be effected in subsequent payments.

10.8.  Payments Withheld and Deducted. In addition to disputed amounts set forth in an Invoice, Owner may withhold or deduct payment of any amount described in an Invoice or portions thereof in an amount and to such extent as may be reasonably necessary to protect Owner due to:

(a) Defective Works that have not been remedied as required under this Agreement and which Owner has incurred expenses for the correction of Defective Works, after Contractor having been duly notified and given a reasonable term for remedying any such faulty or Defective Works, and to the extent (i) any Defective Works are due to the Contractor's or Subcontractors' sole fault; and (ii) such Defective Works have been or are being corrected by Owner or by any third parties appointed by Owner;

(b) Amounts paid by Owner to Contractor, in the month immediately preceding, incorrectly, or for which there was insufficient or inaccurate supporting information;

(c) Liquidated damages such as Delay Damages which Contractor owes;

(d) Any undisputed expenses, costs or liabilities, which Owner has incurred and for which Contractor is legally or contractually responsible, such as undisputed payment under any Subcontracts;

(e) Amounts corresponding to the satisfaction of any judicial or administrative decision, encumbrances, liabilities to third parties for which Contractor is solely responsible, (whether directly or under any provision of this Agreement, including any provisions relating to Contractor's duty to indemnify any member of Owner Group), and brought against any member of Owner Group or, in the case of an encumbrance or lien, created on any property of any member of Owner Group; provided that the withholding of payments under this item (f) shall be limited to the value of the corresponding final judgment, or encumbrances;

(f) Any undisputed amounts due and payable by Contractor to Owner; or

(g) Contractor is in Default pursuant to Section 21.1 and such Default has not been cured within the time set forth in Section 21.1, and any amount withheld pursuant to this Section 10.8 shall not be due and payable hereunder for any purpose under this Agreement until the event or occurrence giving rise to Owner's withholding of payment ceases to exist.

Confidential                                                                     KEPPEL00610422

10.9. _Interest on Late Payments_. Any amounts due, but not paid hereunder, from one Party to the other, shall bear interest as follows: (i) if the amounts are denominated in United States Dollars, at a per annum rate equal to the 6-month London Interbank Offered Rate (LIBOR) for United States Dollars, as published by the Financial Times, London edition, on the relevant due date plus 2% (two percent) per annum; and (ii) if the amounts are denominated in Brazilian Reais, at a per annum rate equal to the SELIC rate, as published by the Central Bank of Brazil on the relevant due date plus 2% (two percent) per annum.  Any amounts withheld, as per Sections 10.8 and 10.12 of this Agreement shall not be considered due and payable and are not subject to the foregoing interest.

10.10. _Payments During Default_. Owner shall not be obligated to make any payments hereunder at any time in which a Default shall have occurred and be continuing, (except for all undisputed payments that are due and in respect of which the related Invoice(s) has been accepted by Owner) and Contractor shall have no right to exercise any remedy hereunder in respect of such payments if and for so long as such Default is continuing.

10.11. _Offset_. Owner may offset any amount due and payable from Contractor to Owner against any amount due and payable to Contractor hereunder, without prejudice to Owner's other rights and remedies under this Agreement.

10.12. _Payment Error_. Payments made in error shall be immediately returned by the Party receiving the payment in error. Notwithstanding the generality of the foregoing, in the event Owner discovers that a milestone associated with a payment was not in fact achieved, Owner may set off the amount paid by it in respect of the achievement of such milestone against other payment obligations of Owner until such milestone is achieved, at which time the amount recovered by Owner through exercise of such rights of set off shall be due and payable by Owner to Contractor.

10.13. _Adjustments_. The Parties expressly understand and acknowledge that (i) the formulas set out below include the effects of price fluctuations that affect the Contract Price and (ii) Contractor has taken the effects of exchange rate fluctuations into account in proposing and agreeing to the Contract Price. Owner shall not be obligated to adjust the Contract Price or to pay any additional amounts in respect of the Contract Price for any reason related to fluctuations of exchange rates or price fluctuations not assessed by the price indexes defined in Sections 10.13.1 and 10.13.3 below.

10.13.1 The Parties agree that the amount to be paid in respect of any component of the Contract Price that is denominated in Brazilian Reais, shall be subject to yearly adjustments determined by the following parametric formula, calculated once every twelve months, and counted from the Proposal Submission Date, to reflect the escalation of costs related to the drilling rig industry in the Brazilian market:

$$PM = \left( PO \times \left( \alpha 1 \times \left( \frac{ICSPn}{ICSPo} \right) + \alpha 2 \times \left( \frac{IGP - DIn}{IGP - DIo} \right) \right) \right)$$

Confidential

KEPPEL00610423

Where:

**PM**: Monthly Amount in Brazilian currency Reais (R$).

**PO**: Portion of Contract Price subject to payments in Brazilian Reais (R$) and included in the Milestone Payment Event.

**α1**: coefficient calculated by *Fundação Getulio Vargas – FGV*, representing the weight of production costs in the typical sales Price for the drilling rig industry in the Brazilian market **(α1=0,8)**.

**α2**: coefficient calculated by *Fundação Getulio Vargas – FGV*, representing the weight of non production costs, including overhead, in the typical sales Price for the drilling rig industry in Brazilian market **(α2= 0,2)**.

**ICSPn**: Definitive value of the Price Index corresponding to the Brazilian Drilling Rig Building for the month immediately preceding the month to which the adjustment is due, calculated by *Fundação Getulio Vargas - FGV*

**ICSPo**: Definite value of the Price Index corresponding to the Brazilian drilling rig industry for the month immediately preceding the month of the Proposal Submission Date, calculated by *Fundação Getulio Vargas - FGV*

**IGP-DIn**: Definitive value of *the General Price Index on Internal Availability* ("Índice Geral de Preços – Disponibilidade Interna") for the month immediately preceding the month to which the adjustment is due, calculated by *Fundação Getulio Vargas - FGV*

**IGP-DIo**: *General Price Index on Internal Availability* (Índice Geral de Preços – Disponibilidade Interna") for the month immediately preceding the month of the Proposal Submission Date, calculated by *Fundação Getulio Vargas - FGV*

10.13.2 The amount to be paid in respect of any component of the Contract Price that is denominated in United States Dollars (US$) or Euros (€) shall be subject to yearly adjustments, calculated once every twelve (12) months, according to the following formulas:

10.13.2.1      Prices in US Dollars. Except for the provisions of section 10.13.3.1, the following formula shall apply to portions of the Contract Price in United States Dollars:

$$PM = PO \times Fy$$

Where:

**PM**: Adjusted Foreign Content Amount in U.S. Dollars.

**PO**: Portion of Contract Price corresponding to the Foreign Content in US Dollars included in the Milestone Payment Event.

Confidential                                                                                    KEPPEL00610424

**Fy**: Yearly adjustment factor determined by the following parametric formula, calculated every twelve months, and counted from the Proposal Submission Date:

$$Fy = 0.95 \times \frac{OFGME}{OFGME_0} + 0.05 \times \frac{ECI}{ECI_0}$$

Where:

**OFGME**: Definitive value of the Price Index corresponding to *"Oil and Gas Field Machinery and Equipment (code PCU333132333132)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month to which the adjustment is due.

**OFGMEo**: Definitive value of the Price Index corresponding to *"Oil and Gas Field Machinery and Equipment (code PCU333132333132)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month of the Proposal Submission Date.

**ECI**: Definitive value of the Price Index corresponding to *"Employment Cost Index, Total Compensation, Private Industry, Not Seasonally Adjusted (code CIU2010000000000I)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the trimester immediately preceding the trimester to which the adjustment is due.

**ECIo**: Definitive value of the Price Index corresponding to *"Employment Cost Index, Total Compensation, Private Industry, Not Seasonally Adjusted (code CIU2010000000000I)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the trimester immediately preceding the trimester of the Proposal Submission Date.

10.13.2.2    Prices in Euros. The following formula shall apply to portions of the Contract Price in Euros:

$$PM = PO \times Fy$$

Where:

**PM** = Adjusted Foreign Content Amount in Euros.

**PO** = Portion of Contract Price corresponding to the Foreign Content in Euros included in the Milestone Payment Event

**Fy** = Yearly adjustment factor determined by the following parametric formula, calculated every twelve months, and counted from the Proposal Submission Date:

Confidential                                                          KEPPEL00610425

$$Fy = 0.95 \times \frac{MME}{MME_0} + 0.05 \times \frac{MO_{EUR}}{MO_{EURO}}$$

Where:

**MME**: Definitive value of the Price Index corresponding to "*Manufacture of Machinery and Equipment (code C28)*" published by "*Eurostat*", for the month immediately preceding the month to which the adjustment is due.

**MME₀**: Definitive value of the Price Index corresponding to "*Manufacture of Machinery and Equipment (code C28)*" published by "*Eurostat*", for the month immediately preceding the month of the Proposal Submission Date.

**MO$_{EUR}$**: Definitive value of the Price Index corresponding to "*Labour Cost Index – Quarterly data (Nace R2) - Industry (except construction), code B-E – Data adjusted by working day – Wages and Salaries*" published by "*Eurostat*", for the trimester immediately preceding the trimester of the Proposal Submission Date.

**MO$_{EURO}$**: Definitive value of the Price Index corresponding to "*Labour Cost Index – Quarterly data (Nace R2) - Industry (except construction), code B-E – Data adjusted by working day – Wages and Salaries*" published by "*Eurostat*", for the trimester immediately preceding the trimester in which Contractor's commercial proposal was submitted.

10.13.3 Where the formula provided in Section 10.13.1 is not capable of being ascertained by reason that any one or more of the variables states therein is not established, then the formula which is applicable shall be the following: -

**Brazilian Reais Portion:**

The amount related to the Brazilian Reais amount shall be subjected to the following formula:

$$PM = PO \times Fy$$

Where:

**PM**: Adjusted Milestone Payment Event Amount in BRL

**PO**: Portion of Contract Price corresponding to the Milestone Payment Event in BRL

**Fy**: Yearly adjustment factor determined by the following parametric formula, calculated every twelve months counted from the Proposal Submission Date, to express the escalation costs related to the Brazilian Local Content:

Confidential

KEPPEL00610426

Bracuhy Drilling B.V.

Bracuhy Drilling B.V.- 003/2012-FELS

DRU #3

$$Fy = 0{,}70 \times \frac{MOn}{MOo} + 0{,}30 \times \frac{FAn}{FAo}$$

Where,

**MOn**: Definitive value of the Price Index corresponding to "*Custo de construção - Mão-de-obra – Município do Rio de Janeiro – Coluna 10 - FGV (código A0159401)*" representing the cost of man power, referred to the month preceding the one to which the adjustment is due.

**MOo**: Definitive value of the Price Index corresponding to "*Custo de Construção - Mão-de-obra - Município do Rio de Janeiro - Coluna 10 – FGV (código A0159401)*" representing the cost of man power, referred to the month preceding the one of the Proposal Submission Date.

**FAn**: Definitive value of the Price Index corresponding to "*Indústria de Transformação – Metalurgia Básica - Coluna 30 - FGV (código 1006823)*", representing the cost of raw materials in the price composition, referred to the month preceding the one to which the adjustment is due.

**FAo**: Definitive value of the Price Index corresponding to "*Indústria de Transformação – Metalurgia Básica - Coluna 30 - FGV (código 1006823)*", representing the cost of raw materials in the price composition, referred to the month preceding the one of the Proposal Submission Date.

## US Dollar Portion

**PM = PO × Fy**

Where:

**PM**: Adjusted Milestone Payment Event Amount in U.S. Dollars.

**PO**: Portion of Contract Price corresponding to the Milestone Payment Event in USD.

**Fy**: Yearly adjustment factor determined by the following parametric formula, calculated every twelve months, and counted from July, 2011 (Proposal Submission Date):

$$Fy = 0.95 \times \frac{OFGME}{OFGMEo} + 0.05 \times \frac{ECI}{ECIo}$$

Where:

**OFGME**: Definitive value of the Price Index corresponding to "*Oil and Gas Field Machinery and Equipment (code PCU333132333132)*" published by "United States

SPAULO-I-37049-v3

- 56 -

95-40522876

KEPPEL00610427