**KOM Opening Exhibit No. 43**

Urca Drilling B.V.

# ENGINEERING, PROCUREMENT AND

# CONSTRUCTION CONTRACT

### Dated as of December 16, 2011

### By and between

## URCA DRILLING B.V.

### and

## FERNVALE PTE. LTD.

### Drilling Rig Unit

**Exhibit**

**PL 0070**

Confidential

KEPPEL00490690

Urca Drilling B.V.                    CONTRACT SETE-Urca Drilling B.V.-001/2011

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND INTERPRETATION

    1.1    Definitions.

    1.2    Section and Exhibit References.

    1.3    Interpretation.

ARTICLE 2 RELATIONSHIPS AND ACKNOWLEDGEMENTS

    2.1    Subject Matter of this Agreement.

    2.2    Status of Contractor.

    2.3    Acknowledgement of Contractor.

ARTICLE 3 OBLIGATIONS OF CONTRACTOR

    3.1    Scope of Work – General Scope.

    3.2    Specific Obligations.

    3.3    Contractor's Obligations Regarding the Performance of the Works.

    3.4    Spare Parts.

    3.5    Standard of Performance.

    3.6    Contractor's Tools and Equipment.

    3.7    Employment of Personnel.

    3.8    Key Personnel.

    3.9    Operations Personnel and Assisted Operation.

    3.10    Emergencies.

    3.11    Approvals, Certificates, Permits and Licenses.

    3.12    Books, Records and Audits.

    3.13    Tax Accounting.

    3.14    Temporary Facilities.

Confidential                                                      KEPPEL00490691

Urca Drilling B.V.                                          CONTRACT SETE-Urca Drilling B.V.-001/2011

3.15    No Liens.

3.16    Quality Assurance.

3.17    Plan & Reports.

3.18    Payment.

3.19    Progress Meetings.

3.20    Site Security.

3.21    Access to Documents.

3.22    Environmental Compliance.

3.23    Transportation.

3.24    Export of DRU.

ARTICLE 4 LOCAL CONTENT REQUIREMENTS

4.1    Local Operations in Brazil.

4.2    Brazilian Local Content.

4.3    Brazilian Local Content Report.

4.4    Liquidated Damages.

ARTICLE 5 OBLIGATIONS OF OWNER

5.1    Payment.

5.2    Permits.

5.3    Temporary Asset Transfers.

5.4    Good Industry Practices

ARTICLE 6 REPRESENTATIONS OF THE PARTIES

6.1    Representations and Warranties of Owner.

6.2    Representations and Warranties of Contractor.

ARTICLE 7 TAXES

7.1    General provision.

Confidential                                                          KEPPEL00490692

7.2     Modification of the Tax Burden.

7.3     Indemnification.

7.4     REPETRO Regime

ARTICLE 8 MILESTONES PAYMENT

8.1     Milestones Payment

8.2     Milestones Payment Event

8.3     Milestones Payment Documents

ARTICLE 9 CONTRACT PRICE

9.1     Contract Price.

9.2     Price

9.3     Payment Limit.

9.4     Incentive Amount.

ARTICLE 10 PAYMENTS TO CONTRACTOR

10.1    Payments.

10.2    Invoicing.

10.3    Invoicing Documents.

10.4    Representation.

10.5    Review and Approval.

10.6    Payments.

10.7    Payments Not Acceptance of Work.

10.8    Payments Withheld and Deducted.

10.9    Interest on Late Payments.

10.10   Payments During Default.

10.11   Offset.

10.12   Payment Error.



Confidential                                                                        KEPPEL00490693

Urca Drilling B.V.                                    CONTRACT SETE-Urca Drilling B.V.-001/2011

                                                                                    DRU # 1

10.13   Adjustments.

10.14   Final Completion

ARTICLE 11 COMMENCEMENT OF WORK:  PROJECT SCHEDULE

11.1    Commencement of Work.

11.2    Limited Notice to Proceed.

11.3    Project Schedule.

11.4    Project Schedule Baseline.

ARTICLE 12 CHANGE ORDERS

12.1    Change.

12.2    Imputed Change.

12.3    Changes Caused by Owner Delays.

12.4    Procedures for Negotiation of Change Orders.

12.5    Unsuccessful Negotiation of Change Orders.

12.6    Rules.

12.7    Owner's Written Consent.

ARTICLE 13 TITLE AND RISK OF LOSS

13.1    Title.

13.2    Contractor Waiver.

13.3    Risk of Loss.

ARTICLE 14 INSURANCE

14.1    Provision of Insurance.

14.2    Lenders as Additional Insureds.

14.3    Subrogation Waivers.

14.4    New Technology.

14.5    No Cancellation.

Confidential                                                      KEPPEL00490694

Urca Drilling B.V.                    CONTRACT SETE-Urca Drilling B.V.-001/2011

DRU # 1

14.6    Obligations Not Relieved.

14.7    Failure to Provide Required Insurance.

ARTICLE 15 DOCUMENTATION

15.1    Delivery of Record As-Built Drawings.

15.2    Purchasing and Subcontractor Supplied Information.

15.3    Construction Drawings and Manuals.

15.4    Other Information.

ARTICLE 16 COMPLETION

16.1    Mechanical Completion.

16.2    Substantial Completion.

16.3    Owner Acceptance of Substantial Completion.

16.4    Substantial Completion Punch-list.

16.5    Handover.

16.6    Handover Certificate.

16.7    Performance Acceptance

16.8    Final Completion.

16.9    Long-Term Obligations.

ARTICLE 17 INSPECTION AND WARRANTY

17.1    Scope of Warranty.

17.2    Owner Right to Inspect.

17.3    Warranty of Defects and Services.

17.4    Warranty Exclusions.

ARTICLE 18 ASSIGNMENT AND GUARANTEE

18.1    Assignment.

18.2    Guarantee.



Confidential                                                    KEPPEL00490695

Urca Drilling B.V.                                    CONTRACT SETE-Urca Drilling B.V.-001/2011

                                                                            DRU # 1

18.3    Contractor not to be Released.

18.4    Assignment by Owner.

18.5    Right of Termination.

ARTICLE 19 SUBCONTRACTING

19.1    Subcontractors.

19.2    Subcontractors Qualification.

19.3    Proposed Subcontractors.

19.4    Subcontracts.

ARTICLE 20 GUARANTEE OF TIMELY COMPLETION

20.1    Guarantee of Timely Completion.

20.2    Liquidated Damages for Delay.

20.3    Liquidated Damages Are Not a Penalty.

20.4    Sole Remedy for Delay.

20.5    No Challenge.

20.6    Performance Guarantee.

ARTICLE 21 DEFAULT, TERMINATION AND SUSPENSION

21.1    Default by Contractor.

21.2    Termination for Convenience by Owner.

21.3    Suspension of Work by Owner.

21.4    Termination by Contractor.

21.5    Suspension of Work by Contractor.

ARTICLE 22 INDEMNITIES; LIMITATIONS OF LIABILITY

22.1    Contractor's Indemnification Obligation.

22.2    Owner's Indemnification Obligation.

22.3    Patent Indemnification.

Confidential

KEPPEL00490696

22.4    Notice.

22.5    Survival and Duration.

22.6    Limitation of Liability.

22.7    Consequential Damages.

ARTICLE 23 FORCE MAJEURE

23.1    No Liability.

23.2    Prevention and Reduction.

23.3    Mutual Consultation.

23.4    Definition.

23.5    Termination for Force Majeure.

ARTICLE 24 DISPUTE RESOLUTION

24.1    Amicable Resolution.

24.2    Disputes of Technical Nature.

24.3    Binding Arbitration.

ARTICLE 25 MISCELLANEOUS PROVISIONS

25.1    Entire Agreement.

25.2    Opportunity to Review.

25.3    Amendments.

25.4    Captions.

25.5    Notice.

25.6    Severability.

25.7    No Waiver.

25.8    Governing Law.

25.9    Successors and Assigns.

25.10   Exhibits.



Confidential                                                                 KEPPEL00490697

Urca Drilling B.V.                    CONTRACT SETE-Urca Drilling B.V.-001/2011

DRU # 1

25.11   Limitations on Third Party Beneficiaries; No Joint Venture.

25.12   Further Assurances.

25.13   Restrictions on Public Announcements.

25.14   Confidentiality.

25.15   Survival.

25.16   Negotiation.

ARTICLE 26 ADDITIONAL CONSIDERATIONS

26.1    Duty to Perform.

26.2    Right to Negotiate.

Confidential

KEPPEL00490698

Urca Drilling B.V.                                    CONTRACT SETE-Urca Drilling B.V.-001/2011

DRU # 1

## LIST OF EXHIBITS

| | |
|---|---|
| EXHIBIT I | SCOPE OF WORK |
| EXHIBIT II | GENERAL TECHNICAL DESCRIPTION |
| EXHIBIT III | DIRECTIVES FOR ENGINEERING SERVICES |
| EXHIBIT IV | DIRECTIVES FOR CONSTRUCTION AND ASSEMBLY |
| EXHIBIT V | DIRECTIVES FOR PROCUREMENT |
| EXHIBIT VI | DIRECTIVES FOR PLANNING AND CONTROL |
| EXHIBIT VII | DIRECTIVES FOR QUALITY ASSURANCE SYSTEM |
| EXHIBIT VIII | DIRECTIVES FOR COMMISSIONING |
| EXHIBIT IX | DIRECTIVES FOR HEALTH, SAFETY AND ENVIRONMENT |
| EXHIBIT X | GENERAL FUNCTIONAL DESCRIPTION |
| EXHIBIT XI | FACILITIES FOR OWNER'S REPRESENTATIVES |
| EXHIBIT XII | LIST OF SUBCONTRACTORS |
| EXHIBIT XIII | CONTRACTOR CONSENTS AND PERMITS |
| EXHIBIT XIV | OWNER CONSENTS AND PERMITS |
| EXHIBIT XV | BRAZILIAN LOCAL CONTENT REQUIREMENTS |
| EXHIBIT XVI | PRICE SCHEDULE |
| EXHIBIT XVII | MILESTONES PAYMENTS |
| EXHIBIT XVIII | PROJECT SCHEDULE |
| EXHIBIT XIX | FORM OF CHANGE ORDER |
| EXHIBIT XX | INSURANCE REQUIREMENTS |
| EXHIBIT XXI | FORM OF HANDOVER CERTIFICATE |
| EXHIBIT XXII | FORM OF FINAL LIEN WAIVER |
| EXHIBIT XXIII | PERFORMANCE SECURITY |
| EXHIBIT XXIV | FORM OF SUBSTANTIAL COMPLETION CERTIFICATE |

Confidential

KEPPEL00490699

EXHIBIT XXV        FORM OF FINAL COMPLETION CERTIFICATE

EXHIBIT XXVI       FORM OF PERFORMANCE ACCEPTANCE CERTIFICATE

EXHIBIT XXVII      INTERNATIONAL INVITATION  NR. 0966646118

EXHIBIT XXVIII     CONTRACTOR DOCUMENTATION



Confidential

KEPPEL00490700

## ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT

THIS ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT (this "**Agreement**"), is made and entered into as of this 16 day of December, 2011, by and between URCA DRILLING B.V., a limited liability company organized and existing under the laws of The Netherlands, having its main office at De Entree 99 -197, 1101HE Amsterdam, The Netherlands ("**Owner**"), and FERNVALE PTE. LTD., a private company limited by shares (Company Registration No.201132918E) organized and existing under the laws of the Republic of Singapore, having its main office at 50 Gul Road Singapore 629351 (the "**Contractor**" and together with Owner, the "**Parties**," and each a "**Party**").

### RECITALS

**WHEREAS**, Owner desires to engage Contractor to supply one (1) DRILLING RIG UNIT, semi-submersible type, designing, engineering, procuring, supplying, constructing, commissioning, and completing such DRU, in accordance with the requirements and technical specification set out in the Invitation applicable to a semi-submersible rigs, as further described herein;

**WHEREAS**, Owner desires that Contractor provide the foregoing engineering, procurement, and construction services on a lump sum price basis; and

**WHEREAS**, Contractor is a wholly-owned subsidiary of FELS Offshore Pte Ltd and an affiliate of Keppel FELS Brasil S.A. and has expertise and experience in carrying out the Works as defined herein and its other obligations under the Agreement, in accordance with the schedule set forth in this Agreement and in a suitable and efficient manner;

**NOW THEREFORE**, in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

### ARTICLE 1      DEFINITIONS AND INTERPRETATION

1.1.   Definitions. In addition to other defined terms used throughout this Agreement, the following terms shall have the meanings specified below in this Article 1.

"Affiliate" shall mean (i) any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a Party, or (ii) any Person that, directly or indirectly, is the beneficial owner of 50% (fifty percent) or more of any class of equity securities of, or other ownership interests in, a Party or of which a Party is directly or indirectly the owner of 50% (fifty percent) or more of any class of equity securities or other ownership interests.

"Agreement" or "EPC Contract" shall mean this Engineering, Procurement and Construction Contract, including all Exhibits attached hereto, and including all Bid Documents, and all of their respective amendments from time to time by the Parties.

"ANP" shall mean the Brazilian National Agency for Petroleum, Natural Gas and Biofuels (*Agência Nacional do Petróleo, Gas Natural e Biocombustíveis*).

"Applicable Codes and Standards" shall mean the codes, standards or requirements, effective on the Proposal Submission Date, set forth herein or in any Applicable Law, as amended from time to

Confidential

KEPPEL00490701

time, which codes and standards include, but are not limited to, those listed in the Exhibits hereto and shall govern Contractor's performance of the Work. In the event of an inconsistency or conflict between any of the Applicable Codes and Standards, the highest performance standard shall govern Contractor's performance under this Agreement.

"Applicable Law" shall mean any treaty, law, statute, code, ordinance, decree, injunction, judgment, order, license, permit, Consent (as defined herein), rule or regulation (including those relating to taxes), policies having the force of law, collective labor agreement, promulgated, entered into, or endorsed by any Governmental Authority having jurisdiction over the matter in question, of any Governmental Authority, including any requirements and rules of a relevant flag authority and the Environmental Laws and the permits, approvals and licenses described in Section 3.2(j) and Section 5.2 herein, which relates to the performance of the Works or the interpretation or application of this Agreement, as such laws, statutes, codes, ordinances, decrees, injunctions, judgments, orders, licenses, permits, Consents, rules and regulations may be amended, modified or supplemented from time to time. The conduct adjustment commitment (*Termo de Ajustamento de Conduta*, "TAC"), issued, amended, modified or supplemented from time to time, shall also be considered Applicable Law.

"Bid Circulars" shall mean those documents specified in the schedules attached hereto as Exhibit XXVII, Appendix 2.

"Bid Documents" shall mean those documents specified in the schedules attached hereto as Exhibit XXVII, Appendix 1.

"BNDES" shall mean the Brazilian Bank for Social and Economic Development (*Banco Nacional de Desenvolvimento Econômico e Social*).

"Brazilian Local Content" shall have the meaning set forth in Section 4.2.

"Business Day" shall mean every day other than a Saturday, Sunday or a day that is an official holiday in the City of Rio de Janeiro, Brazil, in Amsterdam, Netherlands, Singapore or in New York City, United States of America.

"CEI" shall have the meaning set forth in Section 3.7.4.2.

"Centre" shall have the meaning set forth in Section 24.2(b).

"Change" shall have the meaning set forth in Section 12.1.

"Change Order" shall mean a written, signed order from Owner to Contractor in accordance with Article 12 hereof and in the form set forth in Exhibit XIX, which authorizes an addition to, deletion from, or revision of, the Scope of Work of this Agreement and/or an adjustment to the Project Schedule.

"Classification Society" shall mean the classification society indicated in Exhibit I.

"Confidential Information" means any proprietary information, technical data, trade secrets or know-how, data, reports or records, or other information marked as confidential by the disclosing Party, including without limitation research, product ideas, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, hardware configuration information, marketing, finances or other business information disclosed by a Party to the other Party directly or indirectly either orally, in writing or by drawings or inspection of parts or equipment. Confidential Information does not include information which (x) is known to the non-disclosing Party at the time of disclosure by the disclosing Party as evidenced by written records of the non-disclosing Party, (y) has become publicly known and made generally available through no wrongful act or inaction of the non-disclosing Party, or (z) has been rightfully received by the non-disclosing Party from a third party who is authorized to make such disclosure.

"Consent" shall mean any approval, consent, authorization or other requirement that is required from any Governmental Authority under Applicable Law with respect to the prosecution of the

Confidential

KEPPEL00490702

Works or of the activities related thereto.

"Contractor" shall have the meaning set forth in the preamble hereto.

"Contractor Group" shall mean Contractor, its Affiliates, successors, permitted assigns, officers, directors, employees and agents (including Subcontractors).

"Contractor Project Manager" shall mean that Person designated by Contractor in a written notice to Owner who shall have complete authority to act on behalf of Contractor on all matters pertaining to this Agreement or to the performance of the Works, including giving instructions, and making changes previously approved by Owner in the Works.

"Contract Price" shall mean the amount to be paid by Owner to Contractor for the performance of the Works, as calculated and adjusted only in accordance with the terms of this Agreement.

"Day" or "day" shall mean a calendar day.

"Decision" shall have the meaning set forth in Section 24.2(c).

"Default" shall have the meaning set forth in Section 21.1 (a).

"Defect" shall mean any design, plan, specification, engineering, Equipment, material, tool, supply, test, procedure, component, part or assembly which does not materially conform to the Scope of Work or the Applicable Codes and Standards, including any improper or inferior workmanship that is inconsistent with the Scope of Work or Good Industry Practices, and "Defective" shall have a correlative meaning.

"Defective Work" shall mean any Works that are Defective as determined pursuant to the terms of this Agreement.

"Delay Damages" shall have the meaning set forth in Section 20.2.3.

"Demonstration Tests" shall have the meaning set forth in Exhibit VIII.

"Dispute" shall have the meaning set forth in Section 24.1(a).

"Dissatisfaction Notice" shall have the meaning set forth in Section 24.2(d).

"DRU" shall mean a fully operational, complete drilling rig unit, as more specifically described in Exhibit II and Exhibit X, including Equipment incorporated or to be incorporated therein (irrespective of when such Equipment has been or is to be incorporated), to be designed, engineered, procured, supplied, constructed, commissioned and completed pursuant to this Agreement.

"Environmental Law" shall mean any Applicable Law relating in any way to the environment, preservation or reclamation of natural resources, to the management, Release or the threatened Release of any Hazardous Materials, or to the health and safety matters attending to the personnel working at the Site, to the extent applicable to the Works and/or the Site, as amended, from time to time.

"Equipment" shall mean all equipment, materials, supplies, apparatus, machinery, parts, tools (including special tools), components, instruments, appliances, spare parts and appurtenances thereto (including those set forth and described as part of the Scope of Work in Exhibit I) that are required for the full and timely completion of the Works.

"Expert" shall have the meaning set forth in Section 24.2(b).

"FGTS" shall have the meaning set forth in Section 3.7.4.1.

"Final Completion" shall mean the full and complete performance of all Works in accordance with the terms of this Agreement, including without limitation: (i) the successful achievement of Mechanical Completion and Substantial Completion of the DRU; (ii) the completion of all Substantial Completion Punch-list items with respect to the DRU; (iii) the Handover Certificate in respect of the DRU has been accepted by Owner; (iv) all DRU systems are fully functional and

Confidential

KEPPEL00490703

operable; (v) receipt by Owner of a final Lien waiver in accordance with Exhibit XXII; (vi) the transfer from Contractor to Owner of all final documentation, records, as-built drawings and test reports required by this Agreement; (vii) the removal of all of Contractor's and Subcontractor's personnel, supplies, waste, materials, rubbish, and temporary facilities from Owner's property; and (viii) the receipt by Owner of any and all classification certificates from the relevant Classification Society.

"Final Completion Certificate" shall mean the certificate described in Section 16.7.

"Force Majeure" shall have the meaning set forth in Section 23.4.

"GFIP" shall have the meaning set forth in Section 3.7.4.1.

"Good Industry Practices" shall mean the highest internationally accepted professional practices, methods, techniques and standards observed by the petroleum construction and production industries in countries such as the United States and the United Kingdom for operations in areas such as the Gulf of Mexico, or the offshore waters of Brazil for the design, engineering, construction, commissioning, testing, and operation of major drilling rig unities, that, in the exercise of good judgment by skilled and experienced construction contractors would have been expected to accomplish the desired result in a manner consistent with Applicable Laws, Applicable Codes and Standards, safety, reliability, environmental protection, local conditions, economy and efficiency.

"Governmental Authority" shall mean any national, regional or other government of any state, province, county, municipality, or other political subdivision thereof, any governmental body, agency, authority, division, department, board or commission, or any instrumentality, officer or official of any of the foregoing, including any court, tribunal or committee, and having administrative and regulatory power over a Party, the Site or any portion of the Works.

"GPS" shall have the meaning set forth in Section 3.7.4.2.

"Handover" shall have the meaning set forth in Section 16.5.

"Handover Certificate" shall mean the document issued by Contractor and accepted by Owner pursuant to Section 16.6.

"Handover Date" shall have the meaning set forth in Section 11.4.5.

"Hazardous Materials" shall mean any hazardous, toxic, or polluting substance, material, waste or contaminant as defined or regulated pursuant to Environmental Laws, or Applicable Laws, in general, including, but not limited to asbestos or asbestos containing material, and polychlorinated biphenyls.

"ICC Rules" shall have the meaning set forth in Section 24.3(a).

"Incentive Amount" shall have the meaning set forth in Section 9.4.

"Invoice" shall mean a request for a payment issued by Contractor in accordance with Section 10.2.

"INSS" shall have the meaning set forth in Section 3.7.4.1.

"International Invitation No.0966646118 or "Invitation" shall have the meaning set forth in the Exhibit XXVII.

"Lender" shall mean any entity or entities providing temporary or permanent financing for the DRU and any agent or trustee of such parties.

"Lien" shall mean any encumbrance of any kind, mortgage, lien, pledge, charge, security interest, deed of trust, claim, or any charge on property for payment of some debt, obligation or duty.

"Major Subcontract" shall mean any agreement between Contractor and a Subcontractor as defined herein, having an aggregate value in excess of US$ 30,000,000 (thirty million United States Dollars) for performance of any part of the Works.

"Major Subcontractor" shall mean the Subcontractors listed in Exhibit XII and, in addition, any

Confidential

KEPPEL00490704