**OFGMEo**: Definitive value of the Price Index corresponding to *"Oil and Gas Field Machinery and Equipment (code PCU333132333132)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month of the Proposal Submission Date.

**ECI**: Definitive value of the Price Index corresponding to *"Employment Cost Index, Total Compensation, Private Industry, Not Seasonally Adjusted (code CIU2010000000001)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the trimester immediately preceding the trimester to which the adjustment is due.

**ECIo**: Definitive value of the Price Index corresponding to *"Employment Cost Index, Total Compensation, Private Industry, Not Seasonally Adjusted (code CIU2010000000001)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the trimester immediately preceding the trimester of the Proposal Submission Date.

10.13.3.2   Prices in Euros. The following formula shall apply to portions of Contract Price in Euros:

$$PM = PO \times Fy$$

Where:

**PM** = Adjusted Foreign Content Amount in Euros.

**PO** = Portion of Contract Price corresponding to the Foreign Content in Euros included in the Milestone Payment Event

**Fy** = Yearly adjustment factor determined by the following parametric formula, calculated every twelve months, and counted from the Proposal Submission Date:

$$Fy = 0{,}95 \times \frac{MME}{MME_0} + 0{,}05 \times \frac{MO_{EUR}}{MO_{EURO}}$$

Where:

**MME**: Definitive value of the Price Index corresponding to *"Manufacture of Machinery and Equipment (code C28)"* published by *"Eurostat"*, for the month immediately preceding the month to which the adjustment is due.

**MMEo**: Definitive value of the Price Index corresponding to *"Manufacture of Machinery and Equipment (code C28)"* published by *"Eurostat"*, for the month immediately preceding the month of the Proposal Submission Date.

**MO$_{EUR}$**: Definitive value of the Price Index corresponding to *"Labour Cost Index – Quarterly data (Nace R2) - Industry (except construction), code B-E – Data adjusted by working day – Wages and Salaries"* published by *"Eurostat"*, for the

Page 48 of 79

Confidential
KEPPEL00490737

trimester immediately preceding the trimester of the Proposal Submission Date.

**MO₍ₙₐcₑ₎**: Definitive value of the Price Index corresponding to *"Labour Cost Index – Quarterly data (Nace R2) – Industry (except construction), code B-E – Data adjusted by working day – Wages and Salaries"* published by *"Eurostat"*, for the trimester immediately preceding the trimester in which Contractor's Commercial Proposal was submitted.

10.13.4   Where the formula provided in Section 10.13.1 is not capable of being ascertained by reason that any one or more of the variables states therein is not established, then the formula which is applicable shall be the following: -

**Brazilian Reais Portion:**

The amount related to the Brazilian Reais amount shall be subjected to the following formula:

$$PM = PO \times Fy$$

Where:

**PM** : Adjusted Milestone Payment Event Amount in BRL.

**PO** : Portion of Contract Price corresponding to the Milestone Payment Event in BRL.

**Fy** : Yearly adjustment factor determined by the following parametric formula, calculated every twelve months counted from the Proposal Submission Date, to express the escalation costs related to the Brazilian Local Content:

$$Fy = 0{,}70 \times \frac{MOn}{MOo} + 0{,}30 \times \frac{FAn}{FAo}$$

Where:

**MOn** : Definitive value of the Price Index corresponding to *"Custo de construção - Mão-de-obra – Município do Rio de Janeiro – Coluna 10 - FGV (código A0159401)"* representing the cost of man power, referred to the month preceding the one to which the adjustment is due.

**MOo** : Definitive value of the Price Index corresponding to *"Custo de Construção - Mão-de-obra - Município do Rio de Janeiro - Coluna 10 – FGV (código A0159401)"* representing the cost of man power, referred to the month preceding the one of the Proposal Submission Date.

**FAn** : Definitive value of the Price Index corresponding to *"Indústria de Transformação – Metalurgia Básica - Coluna 30 - FGV (código 1006823)"*, representing the cost of raw materials in the price composition, referred to the month preceding the one to which the adjustment is due.

**FAo** : Definitive value of the Price Index corresponding to *"Indústria de Transformação – Metalurgia Básica – Coluna 30 - FGV (código 1006823)"*, representing the cost of raw materials in the price composition, referred to the month preceding the one of the Proposal Submission Date.

**US Dollar Portion**

$$PM = PO \times Fy$$

Where:

Confidential                                                                                                                                    KEPPEL00490738

**PM**: Adjusted Milestone Payment Event Amount in U.S. Dollars.

**PO**: Portion of Contract Price corresponding to the Milestone Payment Event in USD.

**Fy**: Yearly adjustment factor determined by the following parametric formula, calculated every twelve months, and counted from July, 2011 (Proposal Submission Date):

$$Fy = 0.95 \times \frac{OFGME}{OFGME_o} + 0.05 \times \frac{ECI}{ECI_o}$$

Where:
**OFGME**: Definitive value of the Price Index corresponding to *"Oil and Gas Field Machinery and Equipment (code PCU333132333132)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month to which the adjustment is due (i.e., each twelve (12) month anniversary of July 2011 (Proposal Submission Date).

**OFGME$_o$**: Definitive value of the Price Index corresponding to *"Oil and Gas Field Machinery and Equipment (code PCU333132333132)"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding July, 2011 (Proposal Submission Date

**ECI**: Definitive value of the Price Index corresponding to *"Employment Cost Index, Total Compensation, Private Industry"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding the month to which the adjustment is due (i.e. each twelve (12) month anniversary of July 2011 (Proposal Submission Date).

**ECI$_o$**: Definitive value of the Price Index corresponding to *"Employment Cost Index, Total Compensation, Private Industry"* published by *"United States Bureau of Labor Statistics Data – BLS"*, for the month immediately preceding July, 2011 (Proposal Submission Date).

    10.13.4.1 The Owner and the Contractor shall be entitled to compensate any amounts related to the application of the formula set forth in Section 10.13.4 once the variables necessary for the calculations mentioned in Sections 10.13.1 are available.

10.14. <u>Final Completion.</u> Upon Final Completion, Contractor shall submit a statement summarizing and reconciling all previous Invoices, payments received and Change Orders together with an affidavit affirming that all payrolls, taxes, Liens, charges, claims, demands, judgments, security interests, bills, Equipment, and any and all indebtedness connected with the Works have been paid or otherwise satisfied and discharged, and a final Lien waiver in the form specified in <u>Exhibit XXII.</u>

### ARTICLE 11    COMMENCEMENT OF WORK: PROJECT SCHEDULE

11.1. <u>Commencement of Work.</u> Contractor agrees to commence the Works upon the receipt from Owner of a notice to proceed ("<u>Notice to Proceed</u>") with the Work. The Work Authorization Initial Date of this Agreement is considered the date Contractor receives the Notice to Proceed in compliance with the Project Schedule.

11.2. [Not applicable].

11.3. <u>Project Schedule.</u>
    (a) <u>Critical Path Schedule.</u> Contractor shall perform the Works in accordance with the schedule and management plan agreed upon between the Parties and set forth in <u>Exhibit XVIII</u> (the "<u>Project Schedule</u>"). After signature of this Agreement, Contractor shall submit for Owner's review and approval, the detailed Project Schedule, in accordance with the Project requirements defined

Confidential    KEPPEL00490739

in this Agreement, mainly in Exhibit VI and Section 11.4. The Project Schedule shall include a Precedence Diagram, showing the critical path of the Project, indicating the execution time for all activities of the Works detailed in the Works Breakdown Schedule – WBS, and the logical interrelationship of such activities, (Project Precedence Diagram with Critical Path), complying with the dates indicated in Exhibit VI and Section 11.4. The Project Schedule will be the baseline of the Project and, once expressly approved by Owner, will be revised only as required under Sections 12.1, 12.2, 12.3, 12.4, 12.5 and 21.3.

(b) Final Completion. Final Completion shall occur no later than the date (such date, the "Required Final Completion Date") falling one thousand and eight hundred and forty (1,840) Days from the date of issuance of the Notice to Proceed. The Required Final Completion Date shall be adjusted only as provided in this Agreement.

(c) Acceleration. If at any time the progress of the Works is delayed by more than sixty (60) Days from the Project Schedule due to Contractor's fault, Owner shall notify Contractor thereof, then Contractor shall within thirty (30) Days present an acceleration plan to Owner, for its approval, specifically identifying the steps to be taken and the resources to be committed to accelerate the progress of the Works in order to bring the Works back into compliance with the Project Schedule ("Acceleration Plan"). All additional costs related to the implementation of any such Acceleration Plan shall be borne by Contractor.

(d) Failure to comply with the Acceleration Plan. In case the Contractor fails to prosecute the Work in accordance with the Acceleration Plan and there is a resulting additional delay of thirty (30) Days, the Contractor shall be in Default under this Agreement, pursuant to Section 21.1.

11.4. Project Schedule Baseline. The Works shall be performed in accordance with the milestones and other interim deadlines described below, which shall be included in the Project Schedule to be submitted by Contractor in accordance with Section 11.3(a):

11.4.1 Plans, procedures and documentation. Complete issuance of plans, procedures and documentation shall occur no later than the dates indicated on Exhibit VI.

11.4.2 Purchase Orders. Complete the issuance of Purchase Orders for critical Equipment and materials, which shall be clearly identified as such by Contractor in its Procurement Management Plan, no later than ninety (90) Days from the issuance of the Notice to Proceed.

11.4.3 Start fabrication. Commence fabrication of the first DRU no later than three hundred and sixty five (365) Days from the issuance of the Notice to Proceed.

11.4.4 Start of the DRU Erection. Commence erection of the first DRU no later than six hundred and ten (610) Days from the issuance of the Notice to Proceed.

11.4.5 Handover. The Handover of the DRU shall occur on the date no later than 1,460 (one thousand, four hundred and sixty) Days from the issuance of the Notice to Proceed (such date, the "Handover Date").

11.4.6 Final Completion. Final Completion shall occur no later than the Required Final Completion Date.

11.4.7 [Not applicable].

Confidential
KEPPEL00490740

11.4.8 <u>Contractor's technical assistance</u>. Contractor shall provide offshore technical assistance to the Owner during a period of twelve (12) months after the actual date of Handover for the DRU.

## ARTICLE 12      CHANGE ORDERS

12.1. <u>Change</u>. Owner shall have the right to make, from time to time, any change, modification, addition/reduction or deletion to, in or from the Scope of Work, and/or to adjust the Project Schedule for performance thereof (a "<u>Change</u>").

12.1.1 As soon as possible, and in any event no later than fourteen (14) Days, extendable upon mutual agreement, Contractor shall prepare and furnish to Owner a written statement specifying the consequences of such Change on the Contract Price and on the Project Schedule, setting out in full details an estimate of the resulting cost or savings from such Change in the DRU, and proposed modification, as the case may be, in the schedule or in the estimated value of this Agreement. The mentioned written statement shall contemplate any requisite adjustment to the time for completion, any proposed modifications to this Agreement and/or any effect that such Change would imply to the DRU, the Works and/or on any other provisions of this Agreement. The Change shall be mutually agreed to by the Parties and set out in a Change Order in accordance with the following:

12.1.1.1. The adjustment to the Contract Price for any Change shall be calculated by Contractor based on cost plus fee (overhead, profit, insurance) in accordance with the Statement of Price Formation as presented in Contractor's original bid proposal. In case of new equipment, not referred to in the Statement of Price Formation, Contractor shall present three price quotations for Owner's analysis and decision. Each Change Order shall present a complete breakdown showing in details quantities, unit prices and taxes, taking into consideration any savings or costs not incurred by Contractor due to such Change, and shall be based on a lump sum fixed price.

12.1.1.2 The Project Schedule will only be adjusted in any Change Order to the extent that Contractor can demonstrate that the Change has affected the Project Schedule. If it is possible to maintain the Project Schedule by accelerating the performance of the Works, then Contractor shall propose such acceleration as an option for Owner, and give Owner the cost impact of performing the Works on an accelerated basis as opposed to the cost impact without acceleration. Contractor shall use its best efforts to minimize the impact of any Change on the Project Schedule.

12.1.2 If Owner and Contractor reach agreement on all matters identified in the written statement furnished by Contractor under the terms of <u>Section 12.1.1</u> above, then Owner shall approve a Change Order giving effect thereto. Such Change Order shall contain full particulars of the modifications, any adjustments of the Contract Price and/or the Project Schedule and all other modifications to this Agreement, and shall be signed by Owner and by Contractor. The Change identified in such Change Order shall thereupon be deemed to form part of the Works and to be an amendment to this Agreement, and shall be subject to all of Contractor's obligations under this Agreement. Upon receipt of a Change Order, Contractor shall be obligated to perform the Works as changed by Owner without deficiency or delay. Any Change shall only be executed after approval of the Change Order by Owner.

12.1.3 Owner will have fourteen (14) Days to approve a Change Order submitted to it by Contractor. If Owner does not so approve within such fourteen (14) Day period, Owner shall be deemed to have rejected such Change Order, and the Change Order shall not be implemented.

Confidential      KEPPEL00490741

12.2 **Imputed Change.** If Contractor reasonably believes that any action, directive, order, or other communication of or from Owner constitutes a Change but is not formally identified as such, Contractor shall so inform Owner in writing as soon as possible and not later than fifteen (15) Days after receipt of such action, directive, order or other communication, and prior to performing the corresponding tasks. After such notice, within fifteen (15) Days or other period of time to be agreed between the Parties, Contractor shall provide Owner with a detailed estimated cost and other consequences of the alleged Change, in accordance with the requirements of Sections 12.1.1.1 and 12.1.1.2.

12.3 **Changes Caused by Owner Delays.** As soon as possible, and in any event no later than ten (10) Days after the occurrence of the applicable event, Contractor shall give notice to Owner of any Owner Delay which may impact on the Contract Price or the Project Schedule. Such notice shall specify the estimated effect on the Contract Price and/or Project Schedule and include the other details required pursuant to Section 12.1.1.1 and Section 12.1.1.2. In the event that it is impossible to estimate the impact on the Contract Price or the Project Schedule at the time such notice is delivered, Contractor shall provide Owner with periodic supplemental notices during the period over which the event continues. Such supplemental notices shall be intended to keep Owner informed of any change, development, progress or other relevant information concerning the event of which Contractor is aware.

12.4 **Procedures for Negotiation of Change Orders.** If either Party believes it is entitled to an adjustment in the Contract Price and/or the Project Schedule as a result of a Change or a Owner Delay, then Owner and Contractor shall use reasonable efforts to negotiate the terms of the Change Order, and if requested by either Party in writing, the Parties shall meet to determine whether a Change Order is appropriate or the extent of the adjustment.

12.5 **Unsuccessful Negotiation of Change Orders.** If the Parties are unable to agree on the terms of a Change Order, then Owner may elect in writing to have the Change performed on a time and materials basis in accordance with Section 12.5.1 and Section 12.5.2 with the consequences on the Project Schedule and Contract Price to be determined prior to Substantial Completion. In such case, the Parties shall enter into a Change Order, which states that any modification in the Contract Price and/or Project Schedule will be determined after completion of the Works as changed. If the Parties cannot agree on the amount of any adjustment after application of the procedures contained in this Article 12, then the issue shall be resolved under the procedures set forth in Article 24. Pending resolution of the dispute, Contractor shall perform the Works as directed by Owner on a time and material basis as set out in the Statement of Price Formation. Failure to so perform the Works shall constitute a Default.

12.5.1 If a Change Order is performed on a time and materials basis pursuant to Section 12.5, then the Contract Price shall be adjusted by an amount equal to the increase or decrease in Contractor's cost of performing the Works that was affected by the Change or Owner Delay, as provided in Section 12.5.2, on an open book basis. Contractor shall use its best efforts to minimize such costs, and shall provide Owner with options whenever possible for reducing costs. Contractor shall maintain proper and detailed documentation of all such costs and shall provide such documentation and other information reasonably requested by Owner to substantiate any adjustment. Documentation shall include invoices and timesheets, which specifically identify that such amounts relate to changed Works or Owner Delay. To the extent that Contractor has not properly documented such costs, such costs shall not be recoverable from Owner hereunder.

12.5.2 For any adjustments to the Project Schedule or the Contract Price, the requirements of the Sections 12.1.1.1 and 12.1.1.2 shall be considered.

12.6 **Rules.** If Contractor reasonably believes that a change in the rules set by a relevant coastal or

Confidential
KEPPEL00490742

flag authority or in the applicable codes and standards specifically related to the technical rules applicable to the construction of the DRU has occurred after the Proposal Submission Date, Contractor shall provide Owner with a detailed estimated cost and other consequences of the alleged change, prior to performing the corresponding tasks. Upon mutual agreement between the Parties the change shall be set out in a Change Order accordingly.

12.7 Owner's Written Consent. Notwithstanding any provisions to the contrary in this Agreement, no variations to the Works, drawings, schedules, prices, delivery or any other data and information provided by Owner will be allowed without the prior written consent of Owner, unless in case of emergency that puts at risk the safety of the DRU and persons. In such cases Contractor shall submit a report with all necessary evidence to Owner according to Section 3.17 and the Parties will discuss the pertinent matters in good faith. If the Parties can not agree on the variation or the existence of the "emergency" giving arise to any such variation, the Contractor shall be obligated to comply with original obligations, and Owner shall not bear any costs in connection therewith.

### ARTICLE 13   TITLE AND RISK OF LOSS

13.1. Title.

   (a) Clear Title. Contractor warrants and guarantees that Owner's legal title to, and ownership of, the Works and the DRU shall at all times be free and clear of any and all Liens, claims, security interests or other encumbrances, whenever the title thereto passes to Owner, except as expressed otherwise under Section 3.15 (c).

   (b) Title to Works. Title to the Works in respect of the DRU shall pass to Owner upon the earlier of (i) payment by Owner; or (ii) incorporation into such DRU, amounting to delivery of such DRU in sheltered waters in accordance with this Agreement.

   (c) Title to Drawings. Contractor retains all rights with respect to the specifications, plans and working drawings, technical descriptions, calculations, test results and other data information concerning the design and construction of the DRU and hereby grants to, or agrees to procure on behalf of, Owner an irrevocable, non-exclusive, royalty-free and perpetual license to use such specifications, plans and working drawings, technical descriptions, calculations, test results and other data information for operating and maintaining the DRU, and for training engineers and operators for that purpose.

13.2. Contractor Waiver. Contractor hereby irrevocably waives all rights of any kind and nature, in law or equity, to claim at any place and before any jurisdiction, any Lien or retention rights to any parts of the Works or to the DRU based on whatever reasons or allegations. Contractor shall also require from its Subcontractors, suppliers, agents or any other persons to equally waive any such rights in their respective agreements and contracts.

13.3. Risk of Loss. Contractor hereby agrees that Contractor shall bear all risks of any losses and damages caused by Contractor and/or Contractor Group relating to the performance of the Works until Handover of the DRU to Owner whereupon Owner shall assume and bear all risks of loss of or damage to the DRU. In order to assist Contractor in mitigating such risks, Owner has agreed to procure insurance under a Builder's Risk Insurance policy as set forth in Exhibit XX. Without limiting the generality of Section 25.2, Contractor acknowledges that it has investigated to its satisfaction all of the terms and conditions of the proposed Builder's Risk Insurance policy as set forth in Exhibit XX and hereby waives any right to make any claim hereunder that the coverage provided under such Builder's Risk Insurance policy is inadequate to insure against such risks or that Owner has failed to disclose or provide adequate disclosure regarding the terms and conditions of such insurance coverage; provided that the insurance coverage provided by Owner in respect of

Confidential                                                                                                                         KEPPEL00490743

such risks is equivalent or substantially similar in all material respects to the Builder's Risk Insurance policy described in Exhibit III.

## ARTICLE 14             INSURANCE

14.1. Provision of Insurance. Contractor and Owner shall provide, at a minimum, the insurance specified in Exhibit XX on terms and conditions therein stated (which, in the case of Contractor, shall include Owner as the loss payee under the insurance policy, where applicable).

14.2. Lenders as Additional Insureds. The insurance provided by the Parties pursuant to Section 14.1 shall list any and all Lenders as additional insureds, where applicable.

14.3. Subrogation Waivers. The Parties shall provide, whenever applicable, subrogation waivers from the insurers contracted pursuant to Section 14.1 in form and substance reasonably acceptable to the other Party.

14.4. New Technology. Notwithstanding Contractor's representation in Section 17.1 that it will not install unproven or prototype equipment, if the insurance provider characterizes certain technologies installed and which comprise the Works as being new technologies, and such insurance provider restricts, denies, limits, or is unwilling to provide insurance coverage in connection with such new technology, then the Party that is requiring the related new technologies shall secure such additional coverage and pay any additional or increased insurance premiums that may be charged by an insurance provider as a result of the use of new technology.

14.5 No Cancellation. All policies providing coverage hereunder shall contain a provision that no cancellation or material change to any policy shall become effective except upon thirty (30) Days advanced written notice thereof to the other Party, where applicable.

14.6. Obligations Not Relieved. Notwithstanding anything to the contrary, the occurrence of any of the following events shall not relieve a Party from any of its obligations under this Agreement: (i) failure by a Party to secure the required insurance coverage hereunder; (ii) failure by a Party to fully comply with any of the insurance requirements of this Agreement; (iii) failure by a Party to secure such endorsements on the policies as may be necessary to carry out this Agreement; (iv) the insolvency, bankruptcy or failure of any insurance company providing insurance to a Party; or (v) failure of any insurance company to pay any claim accruing under its policy.

14.7. Failure to Provide Required Insurance. In the event that coverage for any loss or damage is denied by the underwriter or underwriters due to, in whole or in part, the breach of the insurance policy terms and conditions by a Party, or for any other reason attributable to a Party, or in case the Party required to procure and/or maintain the insurance fails to do so, then the defaulting Party shall defend, indemnify and hold the other Party harmless against all losses which would otherwise have been covered by said insurance. In the event Contractor fails to maintain the required insurance, Owner may obtain the required insurance, and may demand reimbursement of such premiums and related expenses, together with interest in accordance with Section 10.9. Owner also reserves the right to set off any such amounts (including interest) in accordance with Section 10.8 hereof. In the event that Contractor fails to keep the required insurance coverage in effect while performing the Works, such failure shall constitute a breach to this Agreement and Owner also shall have the right, in addition to any other rights it may have under this Agreement, to terminate this Agreement immediately without any further cost to Owner.

Confidential                                                                                                                                    KEPPEL00490744