**KEPPEL OPP'N EXH.  23**

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2011

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ＿ to ＿

Commission file number: 000-53604

# NOBLE CORPORATION
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Switzerland** | **98-0619597** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. employer identification number)* |

**Dorfstrasse 19A, Baar, Switzerland 6340**
*(Address of principal executive offices) (Zip Code)*

Registrant's Telephone Number, Including Area Code: 41 (41) 761-65-55

Securities registered pursuant to Section 12(b) of the Act:

| *Title of each class* | *Name of each exchange on which registered* |
|---|---|
| **Shares, Par Value 3.28 CHF Per Share** | **New York Stock Exchange** |

Commission file number: 001-31306

# NOBLE CORPORATION
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Cayman Islands** | **98-0366361** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. employer identification number)* |

**Suite 3D Landmark Square, 64 Earth Close, P.O. Box 31327**
**George Town, Grand Cayman, Cayman Islands KY1-1206**
*(Address of principal executive offices) (Zip Code)*

Registrant's Telephone Number, Including Area Code: **(345) 938-0293**

Securities registered pursuant to Sections 12(b) and 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Noble-Swiss: Large accelerated filer ☑     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐

Noble-Cayman: Large accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer ☑     Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

As of June 30, 2011, the aggregate market value of the registered shares of Noble Corporation (Switzerland) held by non-affiliates of the registrant was $9.8 billion based on the closing sale price as reported on the New York Stock Exchange.

Number of shares outstanding and trading at February 13, 2012: Noble Corporation (Switzerland) — 252,170,859

Number of shares outstanding: Noble Corporation (Cayman Islands) — 261,245,693

## DOCUMENTS INCORPORATED BY REFERENCE

The proxy statement for the 2012 annual general meeting of the shareholders of Noble Corporation (Switzerland) will be incorporated by reference into Part III of this Form 10-K.

**This Form 10-K is a combined annual report being filed separately by two registrants: Noble Corporation, a Swiss corporation ("Noble-Swiss"), and its wholly-owned subsidiary Noble Corporation, a Cayman Islands company ("Noble-Cayman"). Noble-Cayman meets the conditions set forth in General Instructions I (1) of Form 10-K and is therefore filing this Form 10-K with the reduced disclosure format contemplated by paragraphs (a) and (c) of General Instruction I(2) of Form 10-K.**

**TABLE OF CONTENTS**

|  | PAGE |
|---|---|
| **PART I** | |
| Item 1. Business | 2 |
| Item 1A. Risk Factors | 9 |
| Item 1B. Unresolved Staff Comments | 18 |
| Item 2. Properties | 18 |
| Item 3. Legal Proceedings | 22 |
| &bbsp; | |
| Item 4. Mine Safety Disclosures | 22 |
| **PART II** | |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 22 |
| Item 6. Selected Financial Data | 26 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 46 |
| Item 8. Financial Statements and Supplementary Data | 49 |
| Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 106 |
| Item 9A. Controls and Procedures | 106 |
| Item 9B. Other Information | 107 |
| **PART III** | |
| Item 10. Directors, Executive Officers and Corporate Governance | 107 |
| Item 11. Executive Compensation | 108 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 109 |
| Item 13. Certain Relationships and Related Transactions and Director Independence | 109 |
| Item 14. Principal Accounting Fees and Services | 109 |
| **PART IV** | |
| Item 15. Exhibits, Financial Statement Schedules | 109 |
| **SIGNATURES** | 110 |
| Exhibit 3.1 | |
| Exhibit 21.1 | |
| Exhibit 23.1 | |
| Exhibit 23.2 | |
| Exhibit 31.1 | |
| Exhibit 31.2 | |
| Exhibit 31.3 | |
| Exhibit 32.1 | |
| Exhibit 32.2 | |
| Exhibit 32.3 | |
| EX-101 INSTANCE DOCUMENT | |
| EX-101 SCHEMA DOCUMENT | |
| EX-101 CALCULATION LINKBASE DOCUMENT | |
| EX-101 LABELS LINKBASE DOCUMENT | |
| EX-101 PRESENTATION LINKBASE DOCUMENT | |
| EX-101 DEFINITION LINKBASE DOCUMENT | |

This combined Annual Report on Form 10-K is separately filed by Noble Corporation, a Swiss corporation ("Noble-Swiss"), and Noble Corporation, a Cayman Islands company ("Noble-Cayman"). Information in this filing relating to Noble-Cayman is filed by Noble-Swiss and separately by Noble-Cayman on its own behalf. Noble-Cayman makes no representation as to information relating to Noble-Swiss (except as it may relate to Noble-Cayman) or any other affiliate or subsidiary of Noble-Swiss.

This report should be read in its entirety as it pertains to each Registrant. Except where indicated, the Consolidated Financial Statements and the Notes to the Consolidated Financial Statements are combined. References in this Annual Report on Form 10-K to "Noble," the "Company," "we," "us," "our" and words of similar meaning refer collectively to Noble-Swiss and its consolidated subsidiaries, including Noble-Cayman, after March 26, 2009 and to Noble-Cayman and its consolidated subsidiaries for periods through March 26, 2009. Noble-Swiss became a successor registrant to Noble-Cayman under the Securities Exchange Act of 1934, as amended (the "Exchange Act") pursuant to Rule 12g-3 of the Exchange Act as a result of consummation of the 2009 migration transactions described in Item 1 of Part I of this Annual Report on Form 10-K.

Table of Contents

**PART I**

**Item 1.    Business.**

**General**

Noble Corporation, a Swiss corporation, is a leading offshore drilling contractor for the oil and gas industry. We perform contract drilling services with our fleet of 79 mobile offshore drilling units and one floating production storage and offloading unit ("FPSO") located worldwide. Our fleet consists of 14 semisubmersibles, 14 drillships, 49 jackups and two submersibles. Our fleet includes 11 units under construction as follows:

- five dynamically positioned, ultra-deepwater, harsh environment drillships, and

- six high-specification heavy-duty, harsh environment jackup rigs.

For additional information on the specifications of the fleet, see "Item 2. Properties. - Drilling Fleet." As of February 15, 2012, approximately 84 percent of our fleet was located outside the United States in the following areas: Mexico, Brazil, the North Sea, the Mediterranean, West Africa, the Middle East, India and the Asian Pacific. Noble and its predecessors have been engaged in the contract drilling of oil and gas wells since 1921.

**Business Strategy**

Our goal is to be the preferred offshore drilling contractor for the oil and gas industry based upon the following overriding principles:

- operate in a manner that provides a safe working environment for our employees while protecting the environment and our assets;

- provide an attractive investment vehicle for our shareholders; and

- deliver exceptional customer service through a large, diverse and technically advanced fleet operated by competent personnel.

We have actively expanded our offshore drilling and deepwater capabilities in recent years through the construction and acquisition of rigs. As part of this technical and operational enhancement, we plan to continue pursuing opportunities to upgrade our fleet to achieve greater technological capability and increase our operational efficiencies.

Our business strategy also focuses on the active expansion of our worldwide deepwater capabilities through upgrades and modifications, acquisitions and divestitures of drilling units, as well as the deployment of our drilling assets in important oil and gas producing areas.

During 2011, we continued our newbuild program with the following projects:

- we completed construction on the *Noble Bully I*, a dynamically positioned, ultra-deepwater, harsh environment drillship, owned through a joint venture with a subsidiary of Royal Dutch Shell plc. ("Shell") that left the shipyard during the third quarter of 2011 and is scheduled to complete acceptance testing and begin operations under a long-term contract in the U.S. Gulf of Mexico during the first quarter of 2012;

- we completed construction on the *Noble Bully II*, a dynamically positioned, ultra-deepwater, harsh environment drillship, owned through a joint venture with a subsidiary of Shell, that left the shipyard during the fourth quarter of 2011 and is scheduled to complete acceptance testing and begin operations under a long-term contract in Brazil during the first quarter of 2012;

- we completed construction on one dynamically positioned, ultra-deepwater, harsh environment *Globetrotter*-class drillship that left the shipyard during the fourth quarter of 2011 and is scheduled to complete acceptance testing and begin operations under a long-term contract in the U.S. Gulf of Mexico in the second quarter of 2012;

- we continued construction on a second dynamically positioned, ultra-deepwater, harsh environment *Globetrotter*-class drillship, which is scheduled to be delivered to our customer in the fourth quarter of 2013;

Table of Contents

- we began construction on four dynamically positioned, ultra-deepwater, harsh environment drillships at Hyundai Heavy Industries Co. Ltd. ("HHI"), which are estimated to be delivered from the shipyard to begin acceptance testing beginning in the second quarter of 2013; and

- we began construction on six high-specification heavy duty, harsh environment jackup rigs, which are estimated to be delivered from the shipyard to begin acceptance testing beginning in the first quarter of 2013.

Capital expenditures, including expenditures related to items noted above, totaled $2.6 billion during 2011.

In addition, as part of our business strategy, we continue to review our fleet and the strategic benefits of each of our units. As part of this process, we may dispose of some or all of our lower specification units and related assets and operations in one or more transactions. These dispositions may include sales of assets to third parties, a spin-off or other distribution or separation of assets. In analyzing any disposition, we will consider the strategic benefit to us of the potential transaction while seeking to secure what we consider appropriate value. To date, no potential disposition has provided the results we seek. The drilling market for lower specification units has recently improved, and we have experienced increased utilization and dayrates for these assets in certain areas. Thus, while we continue to evaluate disposition options, we believe these units should provide a positive contribution to our overall results under current market conditions. We can provide no assurance as to whether any disposition transaction will occur or what form it may take.

Demand for our services is a function of the worldwide supply of mobile offshore drilling units. Industry analysts widely acknowledge that a significant expansion of industry supply of both jackups and ultra-deepwater units has commenced, the majority of which currently have no contract. The introduction of non-contracted rigs into the marketplace will increase the supply of rigs which compete for drilling service contracts, which could negatively impact the dayrates we are able to achieve. Our strategy on newbuild construction has generally been to expand our drilling fleet in connection with a long-term drilling contract that covers a substantial portion of our capital investment and provides an acceptable return on our capital employed. However, in response to the addition of a significant number of new, technologically advanced units in the global fleet and changes in customer requirements and preferences, we believe that in order to maintain long-term competitiveness, it has become both necessary and desirable for us to engage in building speculative highly advanced jackups and floating units. Of the units we currently have under construction, three of the ultra-deepwater drillships and all six of the heavy-duty, harsh environment jackups are being constructed without customer contracts. We will attempt to secure contracts for these units prior to their completion. We may continue speculative building, even in the absence of contracts for our units already under construction.

As part of our strategy, we intend to participate in the consolidation of the offshore drilling industry where we believe we can create shareholder value. From time to time, we evaluate individual rig transactions and business combinations with other parties, and we will continue to consider business opportunities that promote our growth strategy and optimize shareholder value.

In previous years, the drilling industry has experienced significant increases in dayrates for drilling services in most markets, higher demand for drilling equipment, and shortages of personnel. This environment drove operating costs higher and magnified the importance of recruiting, training and retaining skilled personnel. While the recent global financial turmoil and governmental actions following the events of the *Deepwater Horizon* in April 2010 created uncertainty in our industry, we believe the current market offers limited supply and high demand for drilling units and qualified labor.

In recognition of the importance of our offshore operations personnel in achieving a safety record that has historically outperformed the offshore drilling industry sector and to retain such personnel, we have implemented a number of key operations personnel retention programs. We believe these programs are necessary to complement our other short and long-term incentive programs to attract and retain the skilled personnel we need to maintain safe and efficient operations.

3

Table of Contents

**Drilling Contracts**

We typically employ each drilling unit under an individual contract. Although the final terms of the contracts result from negotiations with our customers, many contracts are awarded based upon a competitive bidding process. Our drilling contracts generally contain the following terms:

- contract duration extending over a specific period of time or a period necessary to drill a defined number wells;

- provisions permitting early termination of the contract by the customer (i) if the unit is lost or destroyed or (ii) if operations are suspended for a specified period of time due to breakdown of equipment;

- provisions allowing the impacted party to terminate the contract if specified "force majeure" events beyond the contracting parties' control occur for a defined period of time;

- payment of compensation to us (generally in U.S. Dollars although some customers, typically national oil companies, require a part of the compensation to be paid in local currency) on a "daywork" basis, so that we receive a fixed amount for each day ("dayrate") that the drilling unit is operating under contract (a lower rate or no compensation is payable during periods of equipment breakdown and repair or adverse weather or in the event operations are interrupted by other conditions, some of which may be beyond our control);

- payment by us of the operating expenses of the drilling unit, including labor costs and the cost of incidental supplies; and

- provisions that allow us to recover certain cost increases from certain of our customers.

The terms of some of our drilling contracts permit early termination of the contract by the customer, without cause, generally exercisable upon advance notice to us and in some cases without requiring an early termination payment to us. Our drilling contracts with Petróleos Mexicanos ("Pemex") in Mexico, for example, allow early cancellation with 30 days or less notice to us without Pemex making an early termination payment.

Generally, our contracts allow us to recover our mobilization and demobilization costs associated with moving a drilling unit from one regional location to another. When market conditions require us to assume these costs, our operating margins are reduced accordingly. We cannot predict our ability to recover these costs in the future. For shorter moves, such as "field moves," our customers have generally agreed to assume the costs of moving the unit by paying us a reduced dayrate or "move rate" while the unit is being moved.

For a discussion of our backlog of commitments for contract drilling services, please read "Management's Discussion and Analysis of Financial Condition and Results of Operations — Contract Drilling Services Backlog."

**Acquisition of Frontier Holdings Limited**

On July 28, 2010, Noble-Swiss and Noble AM Merger Co., a Cayman Islands company and indirect wholly-owned subsidiary of Noble-Swiss ("Merger Sub"), completed the acquisition of FDR Holdings Limited, a Cayman Islands company ("Frontier"). The Frontier acquisition was for a purchase price of approximately $1.7 billion in cash plus liabilities assumed and strategically expanded and enhanced our global fleet. Frontier's results of operations were included in our results beginning July 28, 2010.

**Consummation of 2009 Migration**

On March 26, 2009, we completed a series of transactions that effectively changed the place of incorporation of our parent holding company from the Cayman Islands to Switzerland. As a result of these transactions, Noble-Cayman, our former publicly-traded parent company, became a direct, wholly-owned subsidiary of Noble-Swiss, our current publicly-traded parent company. Noble-Swiss' principal asset is all of the shares of Noble-Cayman. Noble-Cayman has no public equity outstanding after March 26, 2009. The consolidated financial statements of Noble-Swiss include the accounts of Noble-Cayman, and Noble-Swiss conducts substantially all of its business through Noble-Cayman and its subsidiaries.

4

Table of Contents

*Offshore Drilling Operations*

**Contract Drilling Services**

We conduct offshore contract drilling operations, which accounted for over 98 percent of our operating revenues for the years ended December 31, 2011, 2010 and 2009. We conduct our contract drilling operations principally in the U.S. Gulf of Mexico, Mexico, Brazil, the North Sea, the Mediterranean, West Africa, the Middle East, India and the Asian Pacific. Revenues from Shell and its affiliates accounted for approximately 24 percent of our total operating revenues in 2011 and 12 percent of our total operating revenues in each of 2010 and 2009. Revenues from Petróleo Brasileiro S.A. ("Petrobras") accounted for approximately 18 percent and 19 percent of our total operating revenues in 2011 and 2010, respectively. Petrobras did not account for more than 10 percent of our total operating revenues in 2009. Revenues from Pemex accounted for approximately 15 percent, 20 percent and 23 percent of our total operating revenues in 2011, 2010 and 2009, respectively. No other single customer accounted for more than 10 percent of our total operating revenues in 2011, 2010 or 2009.

**Labor Contracts**

We perform services for drilling and workover activities covering two rigs off the east coast of Canada, which extends through January 2013. We do not own or lease these rigs. Under our labor contracts, we provide the personnel necessary to manage and perform the drilling operations from a drilling platform owned by the operator.

During 2011, we commenced a refurbishment project with our customer, Shell, for one of its rigs. Under the contract, we provide the management and oversight of the project, as well as the personnel necessary to complete the refurbishment. Upon completion of the project, we anticipate operating the rig under a management agreement.

**Competition**

The offshore contract drilling industry is a highly competitive and cyclical business characterized by high capital and maintenance costs. Some of our competitors may have access to greater financial resources than we do.

In the provision of contract drilling services, competition involves numerous factors, including price, rig availability and suitability, experience of the workforce, efficiency, safety performance record, condition and age of equipment, operating integrity, reputation, industry standing and client relations. We believe that we compete favorably with respect to all of these factors. We follow a policy of keeping our equipment well maintained and technologically competitive. However, our equipment could be made obsolete by the development of new techniques and equipment, regulations or customer preferences.

We compete on a worldwide basis, but competition may vary by region at any particular time. Demand for offshore drilling equipment also depends on the exploration and development programs of oil and gas producers, which in turn are influenced by the financial condition of such producers, by general economic conditions and prices of oil and gas and by political considerations and policies.

In addition, industry-wide shortages of supplies, services, skilled personnel and equipment necessary to conduct our business can occur. We cannot assure that any such shortages experienced in the past will not happen again in the future.

**Governmental Regulations and Environmental Matters**

Political developments and numerous governmental regulations, which may relate directly or indirectly to the contract drilling industry, affect many aspects of our operations. Our contract drilling operations are subject to various laws and regulations in countries in which we operate, including laws and regulations relating to the equipping and operation of drilling units, the reduction of greenhouse gas emissions to address climate change, currency conversions and repatriation, oil and gas exploration and development, taxation of offshore earnings and earnings of expatriate personnel and use of local employees and suppliers by foreign contractors. A number of countries actively regulate and control the ownership of concessions and companies holding concessions, the exportation of oil and gas and other aspects of the oil and gas industries in their countries. In addition, government action, including initiatives by the Organization of Petroleum Exporting Countries ("OPEC"), may continue to contribute to oil price volatility. In some areas of the world, this governmental activity has adversely affected the amount of exploration and development work done by oil and gas companies and their need for drilling services and likely will continue to do so.

5

Table of Contents

The regulations applicable to our operations include provisions that regulate the discharge of materials into the environment or require remediation of contamination under certain circumstances. Many of the countries in whose waters we operate from time to time regulate the discharge of oil and other contaminants in connection with drilling operations. Failure to comply with these laws and regulations, or failure to obtain or comply with permits, may result in the assessment of administrative, civil and criminal penalties, imposition of remedial requirements and the imposition of injunctions to force future compliance. We have made, and will continue to make, expenditures to comply with environmental requirements. To date we have not expended material amounts in order to comply, and we do not believe that our compliance with such requirements will have a material adverse effect upon our results of operations or competitive position or materially increase our capital expenditures. Although these requirements impact the energy and energy services industries, generally they do not appear to affect us in any material respect that is different, or to any materially greater or lesser extent, than other companies in the energy services industry. However, our business and prospects could be adversely affected by regulatory activity that prohibits or restricts our customers' exploration and production activities, results in reduced demand for our services or imposes environmental protection requirements that result in increased costs to us, our customers or the oil and natural gas industry in general.

The following is a summary of some of the existing laws and regulations which apply to our operations in the U.S. Gulf of Mexico to serve as an example of the various laws and regulations to which we are subject. While laws vary widely in each jurisdiction, each of the laws and regulations below address environmental issues similar to those in most of the other jurisdictions in which we operate.

*Spills and Releases.* The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and similar state laws and regulations, impose joint and several liabilities, without regard to fault or the legality of the original act, on certain classes of persons that contributed to the release of a "hazardous substance" into the environment. These persons include the "owner" and "operator" of the site where the release occurred, past owners and operators of the site, and companies that disposed or arranged for the disposal of the hazardous substances found at the site. Responsible parties under CERCLA may be liable for the costs of cleaning up hazardous substances that have been released into the environment and for damages to natural resources. In the course of our ordinary operations, we may generate waste that may fall within CERCLA's definition of a "hazardous substance." However, we have to date not received any notification that we are, or may be, potentially responsible for cleanup costs under CERCLA.

In addition, the U.S. government has indicated that before any recipient of a deepwater drilling permit may resume drilling, (i) the operator must demonstrate that containment resources are available promptly in the event of a deepwater blowout, (ii) the chief executive officer of the operator seeking to perform deepwater drilling must certify that the operator has complied with all applicable regulations and (iii) the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE") will conduct inspections of such deepwater drilling operation for compliance with the applicable regulations. We cannot predict when the applicable government agency will determine that our deepwater driller is in compliance with the new regulations. Further, the BSEE and its predecessor agency have issued regulations on the design and operation of well control and other equipment at offshore production sites, implementation of safety and environmental management systems, and mandatory third-party compliance audits. BSEE's predecessor agency also proposed to further strengthen these regulations in September 2011.

*The Oil Pollution Act.* The U.S. Oil Pollution Act of 1990 ("OPA") and similar regulations impose certain operational requirements on offshore rigs operating in the U.S. Gulf of Mexico and govern liability for leaks, spills and blowouts involving pollutants. The OPA imposes strict, joint and several liabilities on "responsible parties" for damages, including natural resource damages, resulting from oil spills into or upon navigable waters, adjoining shorelines or in the exclusive economic zone of the United States. A "responsible party" includes the owner or operator of an onshore facility and the lessee or permittee of the area in which an offshore facility is located. The OPA establishes a liability limit for onshore facilities of $350 million, while the liability limit for offshore facilities is equal to all removal costs plus up to $75 million in other damages. These liability limits may not apply if a spill is caused by a party's gross negligence or willful misconduct, if the spill resulted from violation of a federal safety, construction or operating regulation, or if a party fails to report a spill or to cooperate fully in a clean-up.

6

Table of Contents

Regulations under the OPA require owners and operators of rigs in United States waters to maintain certain levels of financial responsibility. The failure to comply with the OPA's requirements may subject a responsible party to civil, criminal, or administrative enforcement actions. We are not aware of any action or event that would subject us to liability under the OPA, and we believe that compliance with the OPA's financial assurance and other operating requirements will not have a material impact on our operations or financial condition.

*Waste Handling.* The U.S. Resource Conservation and Recovery Act ("RCRA"), and similar state and local laws and regulations govern the management of wastes, including the treatment, storage and disposal of hazardous wastes. RCRA imposes stringent operating requirements, and liability for failure to meet such requirements, on a person who is either a "generator" or "transporter" of hazardous waste or an "owner" or "operator" of a hazardous waste treatment, storage or disposal facility. RCRA specifically excludes from the definition of hazardous waste drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil and natural gas. A similar exemption is contained in many of the state counterparts to RCRA. As a result, we are not required to comply with a substantial portion of RCRA's requirements as our operations generate minimal quantities of hazardous wastes. However, these wastes may be regulated by the United States Environmental Protection Agency ("EPA") or state agencies as solid waste. In addition, ordinary industrial wastes, such as paint wastes, waste solvents, laboratory wastes, and waste compressor oils may be regulated under RCRA as hazardous waste. We do not believe the current costs of managing our wastes, as they are presently classified, to be significant. However, a petition is currently before the EPA to revoke the oil and natural gas exploration and production exemption. Any repeal or modification of this or similar exemption in similar state statutes, would increase the volume of hazardous waste we are required to manage and dispose of, and would cause us, as well as our competitors, to incur increased operating expenses with respect to our U.S. operations.

*Water Discharges.* The U.S. Federal Water Pollution Control Act of 1972, as amended, also known as the "Clean Water Act," and similar state laws and regulations impose restrictions and controls on the discharge of pollutants into federal and state waters. These laws also regulate the discharge of storm water in process areas. Pursuant to these laws and regulations, we are required to obtain and maintain approvals or permits for the discharge of wastewater and storm water. We do not anticipate that compliance with these laws will cause a material impact on our operations or financial condition.

*Air Emissions.* The U.S. Federal Clean Air Act and associated state laws and regulations restrict the emission of air pollutants from many sources, including oil and natural gas operations. New facilities may be required to obtain permits before operations can commence, and existing facilities may be required to obtain additional permits, and incur capital costs, in order to remain in compliance. Federal and state regulatory agencies can impose administrative, civil and criminal penalties for non-compliance with air permits or other requirements of the Clean Air Act and associated state laws and regulations. In general, we believe that compliance with the Clean Air Act and similar state laws and regulations will not have a material impact on our operations or financial condition.

*Climate Change.* There is increasing attention concerning the issue of climate change and the effect of greenhouse gas ("GHG") emissions. On September 22, 2009, the EPA issued a "Mandatory Reporting of Greenhouse Gases" final rule ("Reporting Rule"). The Reporting Rule establishes a comprehensive plan requiring operators of stationary sources emitting more than established annual thresholds of carbon dioxide-equivalent GHG's to inventory and report their GHG emissions annually on a facility-by-facility basis. In addition, on December 15, 2009, the EPA published a final rule finding that current and projected concentrations of six key GHG's in the atmosphere threaten public health and welfare. The EPA and the National Highway Traffic Safety Administration subsequently developed GHG standards for motor vehicles, the effect of which could reduce demand for motor fuels refined from crude oil. Finally, the EPA and most states have begun to regulate GHG emissions under the Clean Air Act Prevention of Significant Deterioration ("PSD") program, which requires the use of "best available control technology" for GHG emissions from new and modified major stationary sources, which can sometimes include drillships. EPA regulations known as the "Tailoring Rule" also require the PSD program to address GHG emissions from relatively smaller stationary sources in the future.

7

Table of Contents

Further, proposed legislation has been introduced in Congress that would establish an economy-wide cap on emissions of GHG's in the United States and would require most sources of GHG emissions to obtain GHG emission "allowances" corresponding to their annual emissions of GHG's. Moreover, in 2005, the Kyoto Protocol to the 1992 United Nations Framework Convention on Climate Change, which establishes a binding set of emission targets for greenhouse gases, became binding on all countries that had ratified it. International discussions have been underway to develop a treaty to replace the Kyoto Protocol after its expiration in 2012. While it is not possible at this time to predict how new treaties and legislation that may be enacted to address GHG emissions would impact our business, the modification of existing laws or regulations or the adoption of new laws or regulations curtailing exploratory or developmental drilling for oil and gas could materially and adversely affect our operations by limiting drilling opportunities or imposing materially increased costs. Moreover, incentives to conserve energy or use alternative energy sources could have a negative impact on our business if such incentives reduce the worldwide demand for oil and gas.

*Safety.* The U.S. Occupational Safety and Health Act ("OSHA") and other similar laws and regulations govern the protection of the health and safety of employees. The OSHA hazard communication standard, EPA community right-to-know regulations under Title III of CERCLA and similar state statutes require that information be maintained about hazardous materials used or produced in our operations and that this information be provided to employees, state and local governments and citizens. We believe that we are in substantial compliance with these requirements and with other applicable OSHA requirements.

**Insurance and Indemnification Matters**

Our operations are subject to many hazards inherent in the drilling business, including blowouts, fires and collisions or groundings of offshore equipment, and damage or loss from adverse weather and sea conditions. These hazards could cause personal injury or loss of life, loss of revenues, pollution and other environmental damage, damage to or destruction of property and equipment and oil and natural gas producing formations, and could result in claims by employees, customers or third parties.

Our drilling contracts provide for varying levels of indemnification from our customers and in most cases also require us to indemnify our customers for certain losses. Under our drilling contracts, liability with respect to personnel and property is typically assigned on a "knock-for-knock" basis, which means that we and our customers assume liability for our respective personnel and property, irrespective of the fault or negligence of the party indemnified. In addition, our customers may indemnify us in certain instances for damage to our down-hole equipment and, in some cases, our subsea equipment.

Our customers typically assume responsibility for and indemnify us from loss or liability resulting from pollution or contamination, including third-party damages and clean-up and removal, arising from operations under the contract and originating below the surface of the water. We are generally responsible for pollution originating above the surface of the water and emanating from our drilling units. Additionally, our customers typically indemnify us for liabilities incurred as a result of a blow-out or cratering of the well and underground reservoir loss or damage.

In addition to the contractual indemnities described above, we also carry protection and indemnity ("P&I") insurance, which is a comprehensive general liability insurance program covering liability resulting from offshore operations. Our P&I insurance includes coverage for liability resulting from personal injury or death of third parties and our offshore employees, third party property damage, pollution, spill clean-up and containment and removal of wrecks or debris. Our insurance policy does not exclude losses resulting from our gross negligence or willful misconduct. Our P&I insurance program is renewed annually and currently has a standard deductible of $10 million per occurrence, with maximum liability coverage of $750 million.

Our insurance policies and contractual rights to indemnity may not adequately cover our losses and liabilities in all cases. For additional information, please read "We may have difficulty obtaining or maintaining insurance in the future and our insurance coverage and contractual indemnity rights may not protect us against all of the risks and hazards we face" included in Item 1A of this Annual Report on Form 10-K.

The above description of our insurance program and the indemnification provisions of our drilling contracts is only a summary as of the time of preparation of this report and is general in nature. Our insurance program and the terms of our drilling contracts may change in the future. In addition, the indemnification provisions of our drilling contracts may be subject to differing interpretations, and enforcement of those provisions may be limited by public policy and other considerations.

8

Table of Contents

**Employees**

At December 31, 2011, we had approximately 5,300 employees, excluding approximately 2,000 persons engaged through labor contractors or agencies. Approximately 77 percent of our employees were engaged in operations outside of the U.S. We are not a party to any collective bargaining agreements that are material, and we consider our employee relations to be satisfactory.

**Financial Information About Segments and Geographic Areas**

Information regarding our revenues from external customers, segment profit or loss and total assets attributable to each segment for the last three fiscal years is presented in "Part II Item 8. Financial Statements and Supplementary Data, Note 17 — Segment and Related Information."

Information regarding our operating revenues and identifiable assets attributable to each of our geographic areas of operations for the last three fiscal years is presented in "Part II Item 8. Financial Statements and Supplementary Data, Note 17 — Segment and Related Information."

**Available Information**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the U.S. Securities Exchange Act of 1934 are available free of charge at our website at http://www.noblecorp.com. These filings are also available to the public at the U.S. Securities and Exchange Commission's ("SEC") Public Reference Room at 100 F Street, NE, Room 1580, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Electronic filings with the SEC are also available on the SEC's website at http://www.sec.gov.

You may also find information related to our corporate governance, board committees and company code of ethics (and any amendments or waivers of compliance) at our website. Among the documents you can find there are the following:

- Corporate Governance Guidelines;

- Audit Committee Charter;

- Nominating and Corporate Governance Committee Charter;

- Compensation Committee Charter; and

- Code of Business Conduct and Ethics.

**Item 1A.   Risk Factors.**

You should carefully consider the following risk factors in addition to the other information included in this Annual Report on Form 10-K. Each of these risk factors could affect our business, operating results and financial condition, as well as affect an investment in our shares.

**Risk Factors Relating to Our Business**

***Our business depends on the level of activity in the oil and gas industry, which is significantly affected by volatile oil and gas prices.***

Demand for drilling services depends on a variety of economic and political factors and the level of activity in offshore oil and gas exploration and development and production markets worldwide. Commodity prices, and market expectations of potential changes in these prices, may significantly affect this level of activity. However, higher prices do not necessarily translate into increased drilling activity since our clients' expectations of future commodity prices typically drive demand for our rigs. Oil and gas prices are extremely volatile and are affected by numerous factors beyond our control, including:

- laws and regulations related to environmental or energy security matters, including those addressing alternative energy sources and the risks of global climate change;

9

**Table of Contents**

- the political environment of oil-producing regions, including uncertainty or instability resulting from civil disorder, an outbreak or escalation of armed hostilities or acts of war or terrorism;

- worldwide demand for oil and gas, which is impacted by changes in the rate of economic growth in the global economy;

- the ability of OPEC to set and maintain production levels and pricing;

- the level of production in non-OPEC countries;

- the laws and regulations of governments regarding exploration and development of their oil and gas reserves or speculation regarding future laws or regulations;

- the cost of exploring for, developing, producing and delivering oil and gas;

- the discovery rate of new oil and gas reserves;

- the rate of decline of existing and new oil and gas reserves;

- available pipeline and other oil and gas transportation capacity;

- the ability of oil and gas companies to raise capital;

- adverse weather conditions (such as hurricanes and monsoons) and seas;

- the development and exploitation of alternative fuels;

- tax laws, regulations and policies;

- advances in exploration, development and production technology; and

- the availability of, and access to, suitable locations from which our customers can produce hydrocarbons.

*Demand for our drilling services may decrease due to events beyond our control and some of our customers could seek to cancel, terminate or renegotiate their contracts.*

Our business could be impacted by events beyond our control including changes in our customers' drilling programs or budgets or their liquidity (including access to capital), changes in, or prolonged reductions of, prices for oil and gas, or shifts in the relative strength of various geographic drilling markets brought on by economic slowdown, or regional or worldwide recession, any of which could result in deterioration in demand for our drilling services. In addition, our customers may cancel drilling contracts or letter agreements or letters of intent for drilling contracts, or exercise early termination rights found in some of our drilling contracts or available under local law, for a variety of reasons, many of which are beyond our control. Depending upon market conditions, our customers may also seek renegotiation of firm drilling contracts to reduce their obligations. If the level of demand for our drilling services or conditions in the offshore contract drilling industry decline, our financial position, results of operations and cash flows could be adversely affected.

*We may not be able to renew or replace expiring contracts.*

We have a number of contracts that will expire in 2012 and 2013. Our ability to renew these contracts or obtain new contracts and the terms of any such contracts will depend on market conditions and our customers. We may be unable to renew our expiring contracts or obtain new contracts for the rigs under contracts that have expired or been terminated, and the dayrates under any new contracts may be below, perhaps substantially below, the existing dayrates, which could have a material adverse effect on our results of operations and cash flows.

*Our global operations involve additional risks.*

We operate in various regions throughout the world that may expose us to political and other uncertainties, including risks of:

- terrorist acts, war, revolution and civil disturbances;

- seizure, nationalization or expropriation of property or equipment;

- monetary policies, government debt downgrades and potential defaults, and foreign currency fluctuations and devaluations;

- the inability to repatriate income or capital;

- complications associated with repairing and replacing equipment in remote locations;

- piracy;

- import-export quotas, wage and price controls, imposition of trade barriers and other forms of government regulation and economic conditions that are beyond our control;

- regulatory or financial requirements to comply with foreign bureaucratic actions; and

- changing taxation policies.

Table of Contents

Our operations are subject to various laws and regulations in countries in which we operate, including laws and regulations relating to:

- the importing, exporting, equipping and operation of drilling units;

- repatriation of foreign earnings;

- currency exchange controls;

- oil and gas exploration and development;

- taxation of offshore earnings and earnings of expatriate personnel; and

- use and compensation of local employees and suppliers by foreign contractors.

Our ability to do business in a number of jurisdictions is subject to maintaining required licenses and permits and complying with applicable laws and regulations. For example, as of December 31, 2011, all three of our rigs operating in Nigeria were operating under temporary import permits and the Department of Petroleum Resources had not yet issued our Nigerian subsidiary a permit to operate as an oil industry service company or licenses to operate the three rigs for year 2012. It is customary in Nigeria that permits and licenses are issued well into the year to which they pertain and, to date, we have been successful in obtaining new, or extending existing, temporary import permits and other permits and licenses. However, there can be no assurance that we will be able to obtain new permits or further extensions of permits necessary to continue the operation of our rigs in Nigeria. If we cannot obtain a new permit or an extension necessary to continue operations of any rig, we may need to cease operations under the drilling contract for such rig and relocate such rig from Nigerian waters. We cannot predict what impact these events may have on any such contract or our business in Nigeria, and we could face additional fines and sanctions in Nigeria. Furthermore, we cannot predict what changes, if any, relating to temporary import permit policies and procedures may be established or implemented in Nigeria in the future, or how any such changes may impact our business there. For additional information regarding our completed internal investigation of our Nigerian operations and the status of our temporary import permits in Nigeria, see "Part II Item 8. Financial Statements and Supplementary Data, Note 16 — Commitments and Contingencies." Changes in, compliance with, or our failure to comply with the laws and regulations of the countries where we operate, including Nigeria, may negatively impact our operations in those countries and could have a material adverse effect on our results of operations.

In April 2010, the Nigerian Oil and Gas Industry Content Development Bill was signed into law. The law is designed to create Nigerian content in operations and transactions within the Nigerian oil and gas industry. The law sets forth certain requirements for asset ownership and the utilization of Nigerian human resources and goods and services in oil and gas projects and creates a Nigerian Content Development and Monitoring Board to implement and monitor the law and develop regulations pursuant to the law. The Nigerian Content Development and Monitoring Board has indicated that it will require all non-Nigerian offshore drilling companies to reorganize their local operations to include Nigerian indigenous minority interests in the operating assets and to obtain the approval of the Nigerian Content Development and Monitoring Board for future work in Nigeria. The law also establishes a Nigerian Content Development Fund to fund the implementation of the law, and requires that one percent of the value of every contract awarded in the Nigerian oil and gas industry be paid into the fund. We are monitoring closely the implementation of the law and are reviewing our structural and strategic alternatives and the associated cost. We cannot predict what impact the new law will have on the drilling industry and our existing or future operations in Nigeria, but the effect on our operations and profitability in the region could be material.

The Nigerian Maritime Administration and Safety Agency ("NIMASA") is seeking to collect a two percent surcharge on contract amounts under contracts performed by "vessels", within the meaning of Nigeria's cabotage laws, engaged in the Nigerian coastal shipping trade. Although we do not believe that these laws apply to our ownership of drilling units, NIMASA is seeking to apply a provision of the Nigerian cabotage laws to our offshore drilling units by considering these units to be "vessels". Following a series of suits, the Federal High Court of Lagos, Nigeria has issued a favorable ruling in response to our originating summons stating that our drilling operations do not fall within the cabotage laws and that our drilling rigs are not "vessels" for purposes of those laws. The court also issued an injunction against NIMASA prohibiting their interference with our drilling rigs or drilling operations. NIMASA has appealed the court's ruling. We intend to take all further appropriate legal action to resist the application of Nigeria's cabotage laws to our drilling units. The outcome of any such legal action and the extent to which we may ultimately be responsible for the surcharge is uncertain. If it is ultimately determined that offshore drilling units constitute "vessels" within the meaning of the Nigerian cabotage laws, we may be required to pay the surcharge and comply with other aspects of the Nigerian cabotage laws, which could adversely affect our operations in Nigerian waters and require us to incur additional costs of compliance. For additional information regarding these actions relating to the application of the cabotage laws, see "Part II, Item 8. Financial Statements and Supplementary Data, Note 16— Commitments and Contingencies."

11

Table of Contents

NIMASA had previously informed the Nigerian Content Division of its position that we were not in compliance with the cabotage laws. The Nigerian Content Division makes determinations of companies' compliance with applicable local content regulations for purposes of government contracting, including contracting for services in connection with oil and gas concessions where the Nigerian national oil company is a partner. The Nigerian Content Division had previously barred us from participating in tenders for new projects as a result of NIMASA's allegations, but we are currently able to participate based on the court's ruling in our favor. However, no assurance can be given with respect to our ability to bid for future work in Nigeria until our dispute with NIMASA is resolved.

In addition, other governmental actions, including initiatives by OPEC, may continue to cause oil price volatility. In some areas of the world, this governmental activity has adversely affected the amount of exploration and development work done by major oil companies, which may continue. In addition, some governments favor or effectively require the awarding of drilling contracts to local contractors, require use of a local agent or require foreign contractors to employ citizens of, or purchase supplies from, a particular jurisdiction. These practices may adversely affect our ability to compete and our results of operations.

***The U.S. government's regulations and permitting process could continue to have a prolonged and material adverse impact on our U.S. Gulf of Mexico operations.***

Subsequent to the April 2010 fire and explosion on the *Deepwater Horizon*, a competitor's drilling rig in the U.S. Gulf of Mexico, U.S. governmental authorities implemented a moratorium on and suspension of specified types of drilling activities in the U.S. Gulf of Mexico. In October 2010, the U.S. government lifted the moratorium following adoption of new regulations including a drilling safety rule and a workplace safety rule, each of which imposed multiple obligations relating to offshore drilling operations. These obligations relate to, among other things; additional certifications and verifications relating to compliance with applicable regulations, compatibility of blowout preventers with drilling rigs and well design, third-party inspections and design review of blowout preventers, testing of casing installations, minimum requirements for personnel operating blowout preventers and training in deepwater well control. BSEE's predecessor agency also proposed to further strengthen these regulations in September 2011. Although the BOEM and the BSEE (and their predecessor agency) began issuing new deepwater drilling well permits in mid-2011, there has been a delay in receiving permits and the new regulatory requirements have resulted in delays in the resumption of drilling-related activities, and we anticipate that there will continue to be such delays as these various requirements are fully implemented. Such delays could be exacerbated by potential third party environmental lawsuits targeting the permitting process and the new drilling regulations.

The U.S. government has mandated that before beginning a well in the U.S. Gulf of Mexico an operator must: (i) demonstrate that containment resources are available promptly in the event of a deepwater blowout, (ii) have the chief executive officer of the operator seeking to perform deepwater drilling certify that the operator has complied with all applicable regulations and (iii) allow BSEE to conduct inspections of such deepwater drilling operation for compliance with the applicable regulations. During the first half of 2011, our customers and other operators struggled to implement these new regulations, which resulted in increased downtime and decreased rates for a number of our contracted units. While it appears that operators have become accustomed to these new regulations, we cannot predict whether the permitting will continue at the current rate in the future.

Our existing U.S. Gulf of Mexico operations have been negatively impacted by the events, governmental actions and the related industry response described above. U.S. governmental restrictions and regulations have, and may continue to result in, increased expense and downtime of our operations in the U.S. Gulf of Mexico as additional maintenance and redundancy measures are required. Additionally, increased costs for our customers' operations, along with permitting delays, could negatively affect the economics of currently planned or future exploration and development activity, and result in a reduction in demand for our services.

***Governmental laws and regulations, including environmental laws and regulations, may add to our costs or limit our drilling activity.***

Our business is affected by public policy and laws and regulations relating to the energy industry and the environment in the geographic areas where we operate.

The drilling industry is dependent on demand for services from the oil and gas exploration and production industry, and accordingly, we are directly affected by the adoption of laws and regulations that for economic, environmental or other policy reasons curtail exploration and development drilling for oil and gas. We may be required to make significant capital expenditures to comply with governmental laws and regulations. It is also possible that these laws and regulations may in the future add significantly to our operating costs or significantly limit drilling activity. Governments in some foreign countries are increasingly active in regulating and controlling the ownership of concessions, the exploration for oil and gas, and other aspects of the oil and gas industries.

Additionally, there is increasing attention in the United States and worldwide concerning the issue of climate change and the effect of greenhouse gases. For further discussion, see "Part I, Item 1. Business — Governmental Regulations and Environmental Matters." The modification of existing laws or regulations or the adoption of new laws or regulations that result in the curtailment of exploratory or developmental drilling for oil and gas could materially and adversely affect our operations by limiting drilling opportunities or imposing materially increased costs.

Our operations are also subject to numerous laws and regulations controlling the discharge of materials into the environment or otherwise relating to the protection of the environment. As a result, the application of these laws could have a material adverse effect on our results of operations by increasing our cost of doing business, discouraging our customers from drilling for hydrocarbons or subjecting us to liability. For example, we, as an operator of mobile offshore drilling units in navigable U.S. waters and certain offshore areas, including the U.S. Outer Continental Shelf, are liable for damages and for the cost of removing oil spills for which we may be held responsible, subject to certain limitations. Our operations may involve the use or handling of materials that are classified as environmentally hazardous. Laws and regulations protecting the environment have generally become more stringent and in certain circumstances impose "strict liability", rendering a person liable for environmental damage without regard to negligence or fault. Environmental laws and regulations may expose us to liability for the conduct of or conditions caused by others or for acts that were in compliance with all applicable laws at the time they were performed.

***Worldwide instability in the financial and credit sectors and economic recession could have a material adverse effect on our financial position, results of operations and cash flows.***

Worldwide instability in the financial and credit sectors could reduce the availability of liquidity and credit to fund the continuation and expansion of industrial business operations worldwide. The shortage of liquidity and credit combined with substantial losses in worldwide equity markets could lead to another global economic recession. A slowdown in economic activity caused by a worldwide recession, combined with lower prices for oil and gas, would reduce worldwide demand for energy and demand for drilling services. If demand for drilling services declines again, we could experience a decline in dayrates for new

12

**Table of Contents**

contracts and a slowing in the pace of new contract activity. Demand for our services depends on oil and natural gas industry activity and expenditure levels that are directly affected by trends in oil and natural gas prices. Demand for our services is particularly sensitive to the level of exploration, development, and production activity of, and the corresponding capital spending by, oil and natural gas companies. Any prolonged reduction in oil and natural gas prices or material impairment of our customers' cash flow or liquidity, including their access to capital, could result in lower levels of exploration, development and production activity. Lower levels of exploration activity could result in a corresponding decline in the demand for our drilling services, which could have a material adverse effect on our financial position, results of operations and cash flows. The financial situation may also adversely affect the ability of shipyards to meet scheduled deliveries of our newbuilds and our ability to renew our fleet through new vessel construction projects and conversion projects.

> ***We are substantially dependent on several of our customers including Shell, Petrobras and Pemex, and the loss of these customers could have a material adverse effect on our financial condition and results of operations.***

We estimate Shell, Petrobras and Pemex represented approximately 63 percent, 20 percent and 5 percent, respectively, of our backlog at December 31, 2011 and revenues from Shell, Petrobras and Pemex accounted for approximately 24 percent, 18 percent and 15 percent of our total operating revenue for the year ended December 31, 2011. This concentration of customers increases the risks associated with any possible termination or nonperformance of contracts in addition to our exposure to credit risk. If any of these customers were to terminate or fail to perform their obligations under their contracts and we were not able to find other customers for the affected drilling units promptly, our financial condition and results of operations could be materially adversely affected.

> ***Construction, conversion or upgrades of rigs are subject to risks, including delays and cost overruns, which could have an adverse impact on our available cash resources and results of operations.***

We currently have multiple new construction projects and conversion projects underway and we may undertake additional projects in the future. In addition, we make significant upgrade, refurbishment and repair expenditures to our fleet from time to time, particularly as our rigs become older. Some of these expenditures are unplanned. These projects and other efforts of this type are subject to risks of cost overruns or delays inherent in any large construction project as a result of numerous factors, including the following:

- shortages of equipment, materials or skilled labor;
- work stoppages and labor disputes;
- unscheduled delays in the delivery of ordered materials and equipment;
- local customs strikes or related work slowdowns that could delay importation of equipment or materials;
- weather interferences;
- difficulties in obtaining necessary permits or approvals or in meeting permit or approval conditions;
- design and engineering problems;
- latent damages or deterioration to hull, equipment and machinery in excess of engineering estimates and assumptions;
- unforeseen increases in the cost of equipment, labor and raw materials, particularly steel;
- unanticipated actual or purported change orders;
- client acceptance delays;
- disputes with shipyards and suppliers;
- delays in, or inability to obtain, access to funding;
- shipyard availability, failures and difficulties, including as a result of financial problems of shipyards or their subcontractors; and
- failure or delay of third-party equipment vendors or service providers.

The failure to complete a rig upgrade or new construction on time, or the inability to complete a rig conversion or new construction in accordance with its design specifications, may, in some circumstances, result in loss of revenues, penalties, or delay, renegotiation or cancellation of a drilling contract or the recognition of an asset impairment. Additionally, capital expenditures for rig upgrade, refurbishment and construction projects could materially exceed our planned capital expenditures. Moreover, our rigs undergoing upgrade, refurbishment and repair may not earn a dayrate during the period they are out of service.

13

Table of Contents

### *We could be adversely affected by violations of applicable anti-corruption laws and our failure to comply with the terms of our settlement agreements with the DOJ and SEC.*

We operate in a number of countries throughout the world, including countries known to have a reputation for corruption. We are committed to doing business in accordance with applicable anti-corruption laws and our code of business conduct and ethics. We are subject, however, to the risk that we, our affiliated entities or their respective officers, directors, employees and agents may take action determined to be in violation of such anti-corruption laws, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA") and similar laws in other countries. Any violation of the FCPA or other applicable anti-corruption laws could result in substantial fines, sanctions, civil and/or criminal penalties and curtailment of operations in certain jurisdictions and might adversely affect our business, results of operations or financial condition. In addition, actual or alleged violations could damage our reputation and ability to do business. Further, detecting, investigating, and resolving actual or alleged violations is expensive and can consume significant time and attention of our senior management.

In 2007, we began an internal investigation of the legality under the FCPA of certain activities in Nigeria. In November 2010, we finalized settlements of this matter with each of the SEC and the DOJ. Under the settlements with the DOJ and SEC, we agreed to, among other things, pay certain fines and interest and disgorge certain profits, cooperate with the DOJ, comply with the FCPA, comply with certain self-reporting and annual reporting obligations and comply with an injunction restraining us from violating the anti-bribery, books and records and internal controls provisions of the FCPA. Our ability to comply with the terms of the settlements is dependent on the success of our ongoing compliance program, including our ability to continue to manage our agents and supervise, train and retain competent employees, and the efforts of our employees to comply with applicable law and our code of business conduct and ethics.

Also, in January 2011, the Nigerian Economic and Financial Crimes Commission and the Nigerian Attorney General Office initiated an investigation into these same activities. A subsidiary of Noble-Swiss resolved this matter through the execution of a non-prosecution agreement dated January 28, 2011. Pursuant to this agreement, the subsidiary paid $2.5 million to resolve all charges and claims of the Nigerian government.

Any additional investigation by these or other agencies could damage our reputation and result in substantial fines, sanctions, civil and/or criminal penalties and curtailment of operations in certain jurisdictions and might adversely affect our business, results of operations or financial condition. Further, resolving any additional investigations could be expensive and consume significant time and attention of our senior management. For instance, in February 2012, the SEC charged one current and two former employees of ours with violating the FCPA in connection with the events that were the subject of the internal investigations we began in 2007, as described above. We do not believe that the SEC pleadings against these individuals introduce material facts that were not addressed in our internal investigation, which we resolved with the SEC and the DOJ in November 2010. We are not a party to the SEC proceedings against these individuals, and we do not believe the charges against the individuals will result in fines, sanctions or civil or criminal penalties against us. However, these actions may consume the attention of management and damage our reputation.

### *Possible changes in tax laws could affect us and our shareholders.*

We are a Swiss company and operate through various subsidiaries in numerous countries throughout the world. Consequently, we are subject to changes in tax laws, treaties or regulations or the interpretation or enforcement thereof in Switzerland, the U.S. or jurisdictions in which we or any of our subsidiaries operate or are incorporated.

Tax laws and regulations are highly complex and subject to interpretation. Consequently, we are subject to changing tax laws, treaties and regulations in and between countries in which we operate. Our income tax expense is based upon our interpretation of the tax laws in effect in various countries at the time that the expense was incurred. If these laws, treaties or regulations change or other taxing authorities do not agree with our assessment of the effects of such laws, treaties and regulations, this could have a material adverse effect on us, including the imposition of a higher effective tax rate on our worldwide earnings or a reclassification of the tax impact of our significant corporate restructuring transactions.

In addition, the manner in which our shareholders are taxed on distributions on, and dispositions of, our shares could be affected by changes in tax laws, treaties or regulations or the interpretation or enforcement thereof in Switzerland, the U.S. or other jurisdictions in which our shareholders are resident. Any such changes could result in increased taxes for our shareholders and affect the trading price of our shares.

14

**Table of Contents**

*Our business involves numerous operating hazards.*

Our operations are subject to many hazards inherent in the drilling business, including blowouts, fires and collisions or groundings of offshore equipment, and damage or loss from adverse weather and seas. These hazards could cause personal injury or loss of life, suspend drilling operations or seriously damage or destroy the property and equipment involved, result in claims by employees, customers or third parties and, in addition to causing environmental damage, could cause substantial damage to oil and natural gas producing formations or facilities. Operations also may be suspended because of machinery breakdowns, abnormal drilling conditions, and failure of subcontractors to perform or supply goods or services, or personnel shortages. Damage to the environment could also result from our operations, particularly through oil spillage or extensive uncontrolled fires. We may also be subject to damage claims by oil and gas companies.

*The contract drilling industry is a highly competitive and cyclical business with intense price competition. If we are not able to compete successfully, our profitability may be reduced.*

The offshore contract drilling industry is a highly competitive and cyclical business characterized by high capital and maintenance costs. Drilling contracts are traditionally awarded on a competitive bid basis. Intense price competition, rig availability, location and suitability, experience of the workforce, efficiency, safety performance record, technical capability and condition of equipment, operating integrity, reputation, industry standing and client relations are all factors in determining which contractor is awarded a job. Mergers among oil and natural gas exploration and production companies from time to time may reduce the number of available clients, resulting in increased price competition.

Our industry has historically been cyclical. There have been periods of high demand, short rig supply and high dayrates, followed by periods of lower demand, excess rig supply and low dayrates. Periods of excess rig supply intensify the competition in the industry and may result in some of our rigs being idle for long periods of time. Prolonged periods of low utilization and low dayrates could result in the recognition of impairment charges on certain of our drilling rigs if future cash flow estimates, based upon information available to management at the time, indicate that the carrying value of these rigs may not be recoverable.

The increase in supply created by the number of rigs being built, as well as changes in our competitors' drilling rig fleets, could intensify price competition and require higher capital investment to keep our rigs competitive. In addition, the supply attributable to newbuild rigs, especially those being built on speculation, could cause a reduction in future dayrates. We are experiencing competition from newbuild jackups that are scheduled to enter the market in 2012 and beyond. The entry of these newbuild jackups into the market may result in lower dayrates for jackups than currently expected. Similarly, there are a number of deepwater newbuilds that are scheduled to enter the market over the next several years, which could also adversely affect the dayrates for these units.

*As a result of our significant cash flow needs, we may be required to incur additional indebtedness, or delay or cancel discretionary capital expenditures.*

Our currently anticipated cash flow needs may include the following:

- committed capital expenditures, including expenditures for newbuild projects currently underway;
- normal recurring operating expenses;
- discretionary capital expenditures, including various capital upgrades;
- potential newbuild projects and acquisitions; and
- payments of dividends.

In order to fund our capital expenditures, we may need funding beyond the amount available to us from cash generated by our operations, cash on hand and borrowings under our existing bank credit facilities. We may raise such additional capital in a number of ways, including accessing capital markets, obtaining additional lines of credit or disposing of assets. However, we can provide no assurance that any of these options will be available to us on terms acceptable to us or at all.

Our ability to obtain financing or to access the capital markets may be limited by our financial condition at the time of any such financing and the covenants in our existing debt agreements, as well as by adverse market conditions resulting from, among other things, general economic conditions and uncertainties that are beyond our control. Even if we are successful in obtaining additional capital through debt financings, incurring additional indebtedness may significantly increase our interest expense and may reduce our flexibility to respond to changing business and economic conditions or to fund working capital needs, because we will require additional funds to service our outstanding indebtedness.

15

Table of Contents

We may delay or cancel discretionary capital expenditures, which could have certain adverse consequences including delaying upgrades or equipment purchases that could make the affected rigs less competitive, adversely affect customer relationships and negatively impact our ability to contract such rigs.

***We may have difficulty obtaining or maintaining insurance in the future and our insurance coverage and contractual indemnity rights may not protect us against all of the risks and hazards we face.***

We generally identify the operational hazards for which we will procure insurance coverage based on the likelihood of loss, the potential magnitude of loss, the cost of coverage, the requirements of our customer contracts and applicable legal requirements. We do not procure insurance coverage for all of the potential risks and hazards we may face. Furthermore, no assurance can be given that we will be able to obtain insurance against all of the risks and hazards we face or that we will be able to obtain or maintain adequate insurance at rates and with deductibles or retention amounts that we consider commercially reasonable.

Although we maintain what we believe to be an appropriate level of insurance covering hazards and risks we currently encounter during our operations, we do not insure against all possible hazards and risks. Furthermore, our insurance carriers may interpret our insurance policies such that they do not cover losses for which we make claims. Our insurance policies may also have exclusions of coverage for some losses. Uninsured exposures may include expatriate activities prohibited by U.S. laws, radiation hazards, certain loss or damage to property onboard our rigs and losses relating to shore-based terrorist acts or strikes.

In addition, the damage sustained to offshore oil and gas assets as a result of hurricanes in recent years caused the insurance market for U.S. named windstorm perils to deteriorate significantly. Consequently, we currently self-insure U.S. named windstorm coverage for our units deployed in the U.S. Gulf of Mexico. If one or more future significant weather-related events occur in the Gulf of Mexico, or in any other geographic area in which we operate, we may experience increases in insurance costs, additional coverage restrictions or unavailability of certain insurance products.

Under our drilling contracts, liability with respect to personnel and property is customarily assigned on a "knock-for-knock" basis, which means that we and our customers assume liability for our respective personnel and property, irrespective of the fault or negligence of the party indemnified. Although our drilling contracts generally provide for indemnification from our customers for certain liabilities, including liabilities resulting from pollution or contamination originating below the surface of the water, enforcement of these contractual rights to indemnity may be limited by public policy and other considerations and, in any event, may not adequately cover our losses from such incidents. There can also be no assurance that those parties with contractual obligations to indemnify us will necessarily be in a financial position to do so.

Although we maintain insurance in the geographic areas in which we operate, pollution, reservoir damage and environmental risks generally are not fully insurable. Our insurance policies may not adequately cover our losses or may have exclusions of coverage for some losses. We do not have insurance coverage or rights to indemnity for all risks, including loss of hire insurance on most of the rigs in our fleet. Uninsured exposures may include expatriate activities prohibited by U.S. laws and regulations, radiation hazards, certain loss or damage to property onboard our rigs and losses relating to shore-based terrorist acts or strikes. If a significant accident or other event occurs and is not fully covered by insurance or contractual indemnity, it could adversely affect our financial position, results of operations or cash flows.

16

Table of Contents

*Failure to attract and retain highly skilled personnel or an increase in personnel costs could hurt our operations.*

We require highly skilled personnel to operate and provide technical services and support for our drilling units. As the demand for drilling services and the size of the worldwide industry fleet increases, shortages of qualified personnel have occurred from time to time. These shortages could result in our loss of qualified personnel to competitors, impair our ability to attract and retain qualified personnel for our new or existing drilling units, impair the timeliness and quality of our work and create upward pressure on personnel costs, any of which could adversely affect our operations.

*Fluctuations in exchange rates and nonconvertibility of currencies could result in losses to us.*

We may experience currency exchange losses where revenues are received or expenses are paid in nonconvertible currencies or where we do not hedge an exposure to a foreign currency. We may also incur losses as a result of an inability to collect revenues because of a shortage of convertible currency available to the country of operation, controls over currency exchange or controls over the repatriation of income or capital.

*We are subject to litigation that could have an adverse effect on us.*

We are, from time to time, involved in various litigation matters. These matters may include, among other things, contract disputes, personal injury claims, asbestos and other toxic tort claims, environmental claims or proceedings, employment matters, governmental claims for taxes or duties, and other litigation that arises in the ordinary course of our business. Although we intend to defend these matters vigorously, we cannot predict with certainty the outcome or effect of any claim or other litigation matter, and there can be no assurance as to the ultimate outcome of any litigation. Litigation may have an adverse effect on us because of potential negative outcomes, costs of attorneys, the allocation of management's time and attention, and other factors.

**Forward-Looking Statements**

This report on Form 10-K includes "forward-looking statements" within the meaning of Section 27A of the U.S. Securities Act of 1933, as amended, and Section 21E of the U.S. Securities Exchange Act of 1934, as amended. All statements other than statements of historical facts included in this report regarding the Frontier transaction and integration, contract backlog, fleet status, our financial position, business strategy, timing or results of acquisitions or dispositions, backlog, completion and acceptance of our newbuild rigs, contract commitments, dayrates, contract commencements, extension or renewals, contract tenders, the outcome of any dispute, litigation or investigation, plans and objectives of management for future operations, foreign currency requirements, results of

17

Table of Contents

joint ventures, indemnity and other contract claims, construction of rigs, industry conditions including the effect of disruptions of drilling in the U.S. Gulf of Mexico, access to financing, impact of competition, governmental regulations and permitting, availability of labor, worldwide economic conditions, taxes and tax rates, indebtedness covenant compliance, and timing for compliance with any new regulations are forward-looking statements. When used in this report, the words "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "project," "should" and similar expressions are intended to be among the statements that identify forward-looking statements. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we cannot assure you that such expectations will prove to be correct. These factors include those described in "Risk Factors" above, or in our other SEC filings, among others. Such risks and uncertainties are beyond our ability to control, and in many cases, we cannot predict the risks and uncertainties that could cause our actual results to differ materially from those indicated by the forward-looking statements. You should consider these risks when you are evaluating us.

**Item 1B.   Unresolved Staff Comments.**

　　　　None.

**Item 2.   Properties.**

**Drilling Fleet**

　　　　Our drilling fleet is composed of the following types of units: semisubmersibles, drillships, jackups and submersibles. Each type of drilling rig is described further below. We also own one FPSO. Several factors determine the type of unit most suitable for a particular job, the most significant of which include the water depth and ocean floor conditions at the proposed drilling location, whether the drilling is being done over a platform or other structure, and the intended well depth.

**Semisubmersibles**

　　　　Semisubmersibles are floating platforms which, by means of a water ballasting system, can be submerged to a predetermined depth so that a substantial portion of the hull is below the water surface during drilling operations. These units maintain their position over the well through the use of either a fixed mooring system or a computer controlled dynamic positioning system and can drill in many areas where jackups cannot drill. However, semisubmersibles normally require water depth of at least 200 feet in order to conduct operations. Certain of our semisubmersibles are capable of drilling in water depths of up to 12,000 feet. Semisubmersibles are more expensive to construct and operate than jackups.

　　　　The semisubmersible fleet consists of 14 units, including:

- five Noble EVA-4000™ semisubmersibles;

- three Friede & Goldman 9500 Enhanced Pacesetter semisubmersibles;

- two Pentagone 85 semisubmersibles;

- two Bingo 9000 design unit submersibles;

- one Aker H-3 Twin Hull S1289 Column semisubmersible; and

- one Offshore Co. SCP III Mark 2 semisubmersible.

**Drillships**

　　　　Our drillships are self-propelled vessels. These units maintain their position over the well through the use of either a fixed mooring system or a computer controlled dynamic positioning system. Our drillships are capable of drilling in water depths from 1,000 to 12,000 feet. The maximum drilling depth of our drillships ranges from 20,000 feet to 40,000 feet. Like semisubmersibles, drillships are more expensive to construct and operate than jackups.

　　　　The drillship fleet consists of 14 units, including:

- four dynamically positioned, harsh environment drillships currently under construction with Hyundai Heavy Industries Co. Ltd. ("HHI"), which are estimated to be delivered from the shipyard to begin acceptance testing beginning in the second quarter of 2013;

- three dynamically positioned Gusto Engineering Pelican Class drillships;

- two dynamically positioned *Bully*-class drillships to be operated by us through a 50 percent joint venture with a subsidiary of Shell;

18

**Table of Contents**

- one dynamically positioned *Globetrotter*-class drillship that left the shipyard during the fourth quarter of 2011;

- one dynamically positioned *Globetrotter*-class drillship currently under construction, which is scheduled to be delivered to our customer in the fourth quarter of 2013;

- one conventionally moored Sonat Discoverer Class drillship capable of drilling in Arctic environments;

- one dynamically positioned NAM Nedlloyd-C drillship; and

- one conventionally moored conversion class drillship.

**Jackups**

We currently have 49 jackups in our fleet, including six high-specification heavy duty, harsh environment jackups currently under construction. Jackups are mobile, self-elevating drilling platforms equipped with legs that can be lowered to the ocean floor until a foundation is established for support. The rig hull includes the drilling rig, jacking system, crew quarters, loading and unloading facilities, storage areas for bulk and liquid materials, helicopter landing deck and other related equipment. All of our jackups are independent leg (i.e., the legs can be raised or lowered independently of each other) and cantilevered. A cantilevered jackup has a feature that permits the drilling platform to be extended out from the hull, allowing it to perform drilling or workover operations over pre-existing platforms or structures. Moving a rig to the drill site involves jacking up its legs until the hull is floating on the surface of the water. The hull is then towed to the drill site by tugs and the legs are jacked down to the ocean floor. The jacking operation continues until the hull is raised out of the water, and drilling operations are conducted with the hull in its raised position. Our jackups are capable of drilling to a maximum depth of 30,000 feet in water depths up to 400 feet.

**Submersibles**

We have two submersibles in the fleet which are currently cold-stacked. Submersibles are mobile drilling platforms that are towed to the drill site and submerged to drilling position by flooding the lower hull until it rests on the sea floor, with the upper deck above the water surface. Our submersibles are capable of drilling to a maximum depth of 25,000 feet in water depths up to 70 feet.

19

Table of Contents

## Drilling Fleet Table

The following table sets forth certain information concerning our offshore fleet at February 15, 2012. The table does not include any units owned by operators for which we had labor contracts. We operate and own all of the units included in the table.

| Name | Make | Year Built or Rebuilt (1) | Water Depth Rating (feet) | Drilling Depth Capacity (feet) | Location | Status (2) |
|---|---|---|---|---|---|---|
| **Semisubmersibles - 14** | | | | | | |
| Noble Amos Runner | Noble EVA-4000™ | 1999 R/2008 M | 8,000 | 32,500 | U.S. Gulf of Mexico | Active |
| Noble Clyde Boudreaux | F&G 9500 Enhanced Pacesetter | 2007 R/M | 10,000 | 35,000 | Brazil | Active |
| Noble Danny Adkins | Bingo 9000 - DP | 2009 R | 12,000 | 35,000 | U.S. Gulf of Mexico | Active |
| Noble Dave Beard | F&G 9500 Enhanced Pacesetter - DP | 2008 R | 10,000 | 35,000 | Brazil | Active |
| Noble Driller | Aker H-3 Twin Hull S1289 Column | 2007 R | 5,000 | 30,000 | U.S. Gulf of Mexico | Active |
| Noble Homer Ferrington | F&G 9500 Enhanced Pacesetter | 2004 R | 7,200 | 30,000 | Israel | Active |
| Noble Jim Day | Bingo 9000 - DP | 2010 R | 12,000 | 35,000 | U.S. Gulf of Mexico | Active |
| Noble Jim Thompson | Noble EVA-4000™ | 1999 R/2006 M | 6,000 | 32,500 | U.S. Gulf of Mexico | Active |
| Noble Lorris Bouzigard | Pentagone 85 | 2003 R | 4,000 | 25,000 | U.S. Gulf of Mexico | Active |
| Noble Max Smith | Noble EVA-4000™ | 1999 R | 7,000 | 30,000 | U.S. Gulf of Mexico | Active |
| Noble Paul Romano | Noble EVA-4000™ | 1998 R/2007 M | 6,000 | 32,500 | Egypt | Active |
| Noble Paul Wolff | Noble EVA-4000™ - DP | 2006 R | 9,200 | 30,000 | Brazil | Active |
| Noble Therald Martin | Pentagone 85 | 2004 R | 4,000 | 25,000 | Brazil | Active |
| Noble Ton van Langeveld (3) | Offshore Co. SCP III Mark 2 | 2000 R | 1,500 | 25,000 | U.K. | Active |
| **Drillships - 14** | | | | | | |
| Noble Bully I (3)(5)(6) | GustoMSC Bully PRD 12000 | 2011 N | 8,200 | 40,000 | U.S. Gulf of Mexico | Pre-Contract |
| Noble Bully II (3)(5)(6) | GustoMSC Bully PRD 12000 | 2011 N | 8,200 | 40,000 | Brazil | Pre-Contract |
| Noble Discoverer (3) | Sonat Discoverer Class | 2009 R | 1,000 | 20,000 | New Zealand | Active |
| Noble Duchess | Conversion | 1975 | 1,500 | 25,000 | Singapore | Active |
| Noble Globetrotter I (3)(5) | Globetrotter Class | 2011 N | 10,000 | 30,000 | U.S. Gulf of Mexico | Pre-Contract |
| Noble Globetrotter II (3) | Globetrotter Class | 2013 N | 10,000 | 30,000 | China | Shipyard |
| Noble Leo Segerius | Gusto Engineering Pelican Class | 2002 R | 5,600 | 20,000 | Brazil | Active |
| Noble Muravlenko | Gusto Engineering Pelican Class | 1997 R | 4,900 | 20,000 | Brazil | Active |
| Noble Phoenix | Gusto Engineering Pelican Class | 2009 R | 5,000 | 25,000 | Brazil | Active |
| Noble Roger Eason | NAM Nedlloyd - C | 2005 R | 7,200 | 25,000 | Brazil | Active |
| Noble Newbuild Drillship #1 (3) | Hyundai Gusto P 10000 | 2013 N | 12,000 | 40,000 | South Korea | Shipyard |
| Noble Newbuild Drillship #2 (3) | Hyundai Gusto P 10000 | 2013 N | 12,000 | 40,000 | South Korea | Shipyard |
| Noble Newbuild Drillship #3 (3) | Hyundai Gusto P 10000 | 2014 N | 12,000 | 40,000 | South Korea | Shipyard |
| Noble Newbuild Drillship #4 (3) | Hyundai Gusto P 10000 | 2014 N | 12,000 | 40,000 | South Korea | Shipyard |
| **Independent Leg Cantilevered Jackups - 49 (Continued to next page)** | | | | | | |
| Dhabi II | Baker Marine BMC 150 | 2006 R | 150 | 20,000 | U.A.E. | Active |
| Noble Al White (3) | CFEM T-2005-C | 2005 R | 360 | 30,000 | The Netherlands | Active |
| Noble Alan Hay | Levingston Class 111-C | 2005 R | 300 | 25,000 | U.A.E. | Active |
| Noble Bill Jennings | MLT Class 84 - E.R.C. | 1997 R | 390 | 25,000 | Mexico | Active |
| Noble Byron Welliver (3) | CFEM T-2005-C | 1982 | 300 | 30,000 | The Netherlands | Active |
| Noble Carl Norberg | MLT Class 82-C | 2003 R | 250 | 20,000 | Mexico | Active |
| Noble Charles Copeland | MLT Class 82-SD-C | 2001 R | 280 | 20,000 | U.A.E | Active |
| Noble Charlie Yester | MLT Class 116-C | 1980 | 300 | 25,000 | India | Active |
| Noble Chuck Syring | MLT Class 82-C | 1996 R | 250 | 20,000 | U.A.E. | Active |
| Noble David Tinsley | Modec 300C-38 | 2010 R | 300 | 25,000 | U.A.E. | Active |
| Noble Dick Favor | Baker Marine BMC 150 | 2004 R | 150 | 20,000 | Bahrain | Active |
| Noble Don Walker | Baker Marine BMC 150-SD | 1992 R | 150 | 20,000 | Cameroon | Stacked |
| Noble Earl Frederickson | MLT Class 82-SD-C | 1999 R | 250 | 20,000 | Mexico | Active |
| Noble Ed Holt | Levingston Class 111-C | 2003 R | 300 | 25,000 | India | Active |
| Noble Ed Noble | MLT Class 82-SD-C | 2003 R | 250 | 20,000 | Nigeria | Active |
| Noble Eddie Paul | MLT Class 84 - E.R.C. | 1995 R | 390 | 25,000 | Mexico | Active |
| Noble Gene House | Modec 300C-38 | 1998 R | 300 | 25,000 | Saudi Arabia | Active |
| Noble Gene Rosser | Levingston Class 111-C | 1996 R | 300 | 25,000 | Mexico | Active |
| Noble George McLeod | F&G L-780 MOD II | 1995 R | 300 | 25,000 | India | Active |
| Noble George Sauvageau (3) | NAM Nedlloyd-C | 1981 | 250 | 25,000 | Germany | Active |
| Noble Gus Androes | Levingston Class 111-C | 2004 R | 300 | 30,000 | U.A.E. | Active |

*See footnotes on the following page.*

Table of Contents

| Name | Make | Year Built or Rebuilt (1) | Water Depth Rating (feet) | Drilling Depth Capacity (feet) | Location | Status (2) |
|---|---|---|---|---|---|---|
| **Independent Leg Cantilevered Jackups - 49 (Continued from previous page)** | | | | | | |
| Noble Hans Deul (3) | F&G JU-2000E | 2009 N | 400 | 30,000 | U.K. | Active |
| Noble Harvey Duhaney | Levingston Class 111-C | 2001 R | 300 | 25,000 | U.A.E. | Active |
| Noble Jimmy Puckett | F&G L-780 MOD II | 2002 R | 300 | 25,000 | Qatar | Active |
| Noble Joe Beall | Modec 300C-38 | 2004 R | 300 | 25,000 | Saudi Arabia | Active |
| Noble John Sandifer | Levingston Class 111-C | 1995 R | 300 | 25,000 | Mexico | Active |
| Noble Johnnie Hoffman | Baker Marine BMC 300 | 1993 R | 300 | 25,000 | Mexico | Active |
| Noble Julie Robertson (3) (4) | BMC 300 Harsh Weather Class | 2001 R | 390 | 25,000 | U.K. | Active |
| Noble Kenneth Delaney | F&G L-780 MOD II | 1998 R | 300 | 25,000 | India | Active |
| Noble Leonard Jones | MLT Class 53 - E.R.C. | 1998 R | 390 | 25,000 | Mexico | Active |
| Noble Lewis Dugger | Levingston Class 111-C | 1997 R | 300 | 25,000 | Mexico | Active |
| Noble Lloyd Noble | MLT Class 82-SD-C | 1990 R | 250 | 20,000 | Nigeria | Active |
| Noble Lynda Bossler (3) | MSC/CJ-46 | 1982 | 250 | 25,000 | The Netherlands | Active |
| Noble Percy Johns | F&G L-780 MOD II | 1995 R | 300 | 25,000 | Nigeria | Active |
| Noble Piet van Ede (3) | MSC/CJ-46 | 1982 | 250 | 25,000 | The Netherlands | Active |
| Noble Roger Lewis (3) | F&G JU-2000E | 2007 | 400 | 30,000 | Saudi Arabia | Active |
| Noble Ronald Hoope (3) | MSC/CJ-46 | 1982 | 250 | 25,000 | The Netherlands | Active |
| Noble Roy Butler | F&G L-780 MOD II | 1998 R | 300 | 25,000 | Mexico | Active |
| Noble Roy Rhodes | MLT Class 116-C | 2009 R | 300 | 25,000 | Oman | Active |
| Noble Sam Noble | Levingston Class 111-C | 1982 | 300 | 25,000 | Mexico | Active |
| Noble Scott Marks (3) | F&G JU-2000E | 2009 N | 400 | 30,000 | Saudi Arabia | Active |
| Noble Tom Jobe | MLT Class 82-SD-C | 1982 | 250 | 25,000 | Mexico | Active |
| Noble Tommy Craighead | F&G L-780 MOD II | 2003 R | 300 | 25,000 | Nigeria | Active |
| Noble Jackup I- Newbuild (3) | F&G JU-3000N | 2012 N | 400 | 30,000 | Singapore | Shipyard |
| Noble Jackup II- Newbuild (3) | F&G JU-3000N | 2013 N | 400 | 30,000 | Singapore | Shipyard |
| Noble Jackup III- Newbuild (3) | F&G JU-3000N | 2013 N | 400 | 30,000 | Singapore | Shipyard |
| Noble Jackup IV- Newbuild (3) | F&G JU-3000N | 2014 N | 400 | 30,000 | Singapore | Shipyard |
| Noble Jackup V- Newbuild (3) | F&G JU-3000N | 2014 N | 400 | 30,000 | Singapore | Shipyard |
| Noble Jackup VI- Newbuild (3) | F&G JU-3000N | 2014 N | 400 | 30,000 | Singapore | Shipyard |
| | | | | | | |
| **Submersibles - 2** | | | | | | |
| Noble Joe Alford | Pace Marine 85G | 2006 R | 70 | 25,000 | U.S. Gulf of Mexico | Stacked |
| Noble Lester Pettus | Pace Marine 85G | 2007 R | 70 | 25,000 | U.S. Gulf of Mexico | Stacked |
| | | | | | | |
| **FPSO- 1** | | | | | | |
| Seillean | Harland & Wolf Shipbuilding | 2008 R | N/A | N/A | U.S. Gulf of Mexico | Stacked |

**Footnotes to Drilling Fleet Table**

1. Rigs designated with an "R" were modified, refurbished or otherwise upgraded in the year indicated by capital expenditures in an amount deemed material by management. Rigs designated with an "N" are newbuilds. Rigs designated with an "M" have been upgraded to the Noble NC-5SM mooring standard.

2. Rigs listed as "active" are either operating under contract or were actively seeking contracts; rigs listed as "shipyard" are in a shipyard for construction, repair, refurbishment or upgrade; rigs listed as "stacked" are idle without a contract and are not actively marketed in present market conditions.

3. Harsh environment capability.

4. Although designed for a water depth rating of 390 feet of water in a non-harsh environment, the rig is currently equipped with legs adequate to drill in approximately 200 feet of water in a harsh environment. We own the additional leg sections required to extend the drilling depth capability to 390 feet of water.

5. Rigs listed as "pre-contract" have been accepted by Noble from the shipyard, but have not completed their mobilization and customer acceptance procedures.

6. We operate the *Noble Bully I* and *Noble Bully II* through joint ventures with a subsidiary of Shell.

21

Table of Contents

**Facilities**

Our corporate office is located in Baar, Switzerland, and we maintain offices for executive officers and selected personnel in Geneva, Switzerland. We also maintain office space in Sugar Land, Texas, where significant worldwide global support activity occurs. We own and lease administrative and marketing offices, and sites used primarily for storage, maintenance and repairs, and research and development for drilling rigs and equipment in various locations worldwide.

**Item 3.    Legal Proceedings.**

Information regarding legal proceedings is set forth in Note 16 to our consolidated financial statements included in Item 8 of this Annual Report on Form 10-K.

**Item 4.    Mine Safety Disclosures.**

Not applicable.

**PART II**

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

*Market for Shares and Related Shareholder Information*

Noble-Swiss shares are listed and traded on the New York Stock Exchange under the symbol "NE". The following table sets forth for the periods indicated the high and low sales prices and dividends or returns of capital declared and paid in U.S. Dollars per share:

|  | High | | Low | | Dividends Declared and Paid | |
|---|---|---|---|---|---|---|
| **2011** | | | | | | |
| Fourth quarter | $ | 38.42 | $ | 28.58 | $ | 0.14 |
| Third quarter | | 39.70 | | 27.68 | | 0.17 |
| Second quarter | | 46.10 | | 37.51 | | 0.15 |
| First quarter | | 46.12 | | 35.64 | | 0.14 |
| | | | | | | |
| **2010** | | | | | | |
| Fourth quarter | $ | 38.00 | $ | 33.14 | $ | 0.13 |
| Third quarter | | 35.95 | | 30.36 | | 0.66 |
| Second quarter | | 43.63 | | 27.04 | | 0.04 |
| First quarter | | 44.87 | | 38.94 | | 0.05 |

The declaration and payment of dividends or distributions and returns of capital in the future by Noble-Swiss and the making of distributions of capital, including returns of capital in the form of par value reductions, require authorization of the shareholders of Noble-Swiss. The amount of such dividends, distributions and returns of capital will depend on our results of operations, financial condition, cash requirements, future business prospects, contractual restrictions and other factors deemed relevant by our Board of Directors and our shareholders.

On February 13, 2012, there were 252,170,859 shares outstanding held by 849 shareholder accounts of record.

*Swiss Tax Consequences to Shareholders of Noble*

The tax consequences discussed below are not a complete analysis or listing of all the possible tax consequences that may be relevant to shareholders of Noble. Shareholders should consult their own tax advisors in respect of the tax consequences related to receipt, ownership, purchase or sale or other disposition of our shares and the procedures for claiming a refund of withholding tax.

22

Table of Contents

*Swiss Income Tax on Dividends and Similar Distributions*

A non-Swiss holder will not be subject to Swiss income taxes on dividend income and similar distributions in respect of our shares, unless the shares are attributable to a permanent establishment or a fixed place of business maintained in Switzerland by such non-Swiss holder. However, dividends and similar distributions are subject to Swiss withholding tax. See "—Swiss Withholding Tax—Dividends to Shareholders."

*Swiss Wealth Tax*

A non-Swiss holder will not be subject to Swiss wealth taxes unless the holder's shares are attributable to a permanent establishment or a fixed place of business maintained in Switzerland by such non-Swiss holder.

*Swiss Capital Gains Tax upon Disposal of Shares*

A non-Swiss holder will not be subject to Swiss income taxes for capital gains unless the holder's shares are attributable to a permanent establishment or a fixed place of business maintained in Switzerland by such non-Swiss holder. In such case, the non-Swiss holder is required to recognize capital gains or losses on the sale of such shares, which will be subject to cantonal, communal and federal income tax.

*Swiss Withholding Tax—Dividends to Shareholders*

A Swiss withholding tax of 35 percent is due on dividends to our shareholders from us, regardless of the place of residency of the shareholder (subject to the exceptions discussed under "—Exemption from Swiss Withholding Tax—Distributions to Shareholders" below). We will be required to withhold at such rate and remit on a net basis any payments made to a holder of our shares and pay such withheld amounts to the Swiss federal tax authorities. Please see "—Refund of Swiss Withholding Tax on Dividends and Other Distributions."

*Exemption from Swiss Withholding Tax—Distributions to Shareholders*

Under present Swiss tax law, distributions to shareholders in relation to a reduction of par value are exempt from Swiss withholding tax. Since January 1, 2011, distributions to shareholders out of qualifying additional paid-in capital for Swiss statutory purposes are exempt from the Swiss withholding tax. Consequently, we expect that a substantial amount of any potential future distributions, whether distributed as a reduction of par value or directly out of qualifying additional paid-in capital may be exempt from Swiss withholding tax.

*Repurchases of Shares*

Under present Swiss tax law, repurchases of shares for the purposes of capital reduction are treated as a partial liquidation subject to the 35 percent Swiss withholding tax. However, for shares repurchased for capital reduction, the portion of the repurchase price attributable to the par value of the shares repurchased will not be subject to the Swiss withholding tax. Since January 1, 2011, the portion of the repurchase price attributable to the qualifying additional paid-in capital for Swiss statutory reporting purposes of the shares repurchased will also not be subject to the Swiss withholding tax. We would be required to withhold at such rate the tax from the difference between the repurchase price and the related amount of par value and the related amount of qualifying additional paid-in capital. We would be required to remit on a net basis the purchase price with the Swiss withholding tax deducted to a holder of our shares and pay the withholding tax to the Swiss federal tax authorities.

With respect to the refund of Swiss withholding tax from the repurchase of shares, see "—Refund of Swiss Withholding Tax on Dividends and Other Distributions."

In most instances, Swiss companies listed on the SIX Swiss Exchange ("SIX"), carry out share repurchase programs through a "second trading line" on the SIX. Swiss institutional investors typically purchase shares from shareholders on the open market and then sell the shares on the second trading line back to the company. The Swiss institutional investors are generally able to receive a full refund of the withholding tax. Due to, among other things, the time delay between the sale to the company and the institutional investors' receipt of the refund, the price companies pay to repurchase their shares has historically been slightly higher (but less than one percent) than the price of such companies' shares in ordinary trading on the SIX first trading line.

23

Table of Contents

We do not expect to be able to use the SIX second trading line process to repurchase our shares because we do not currently intend to list our shares on the SIX. However, we have in the past and intend to continue to follow an alternative process whereby we expect to be able to repurchase our shares in a manner that should allow Swiss institutional market participants selling the shares to us to receive a refund of the Swiss withholding tax and, therefore, accomplish the same purpose as share repurchases on the second trading line at substantially the same cost to us and such market participants as share repurchases on a second trading line.

The repurchase of shares for purposes other than capital reduction, such as to retain as treasury shares for use in connection with stock incentive plans, convertible debt or other instruments within certain periods, will generally not be subject to Swiss withholding tax.

### Refund of Swiss Withholding Tax on Dividends and Other Distributions

*Swiss holders* — A Swiss tax resident, corporate or individual, can recover the withholding tax in full if such resident is the beneficial owner of our shares at the time the dividend or other distribution becomes due and provided that such resident reports the gross distribution received on such resident's income tax return, or in the case of an entity, includes the taxable income in such resident's income statement.

*Non-Swiss holders* — If the shareholder that receives a distribution from us is not a Swiss tax resident, does not hold our shares in connection with a permanent establishment or a fixed place of business maintained in Switzerland, and resides in a country that has concluded a treaty for the avoidance of double taxation with Switzerland for which the conditions for the application and protection of and by the treaty are met, then the shareholder may be entitled to a full or partial refund of the withholding tax described above. The procedures for claiming treaty refunds (and the time frame required for obtaining a refund) may differ from country to country.

Switzerland has entered into bilateral treaties for the avoidance of double taxation with respect to income taxes with numerous countries, including the U.S., whereby under certain circumstances all or part of the withholding tax may be refunded.

*U.S. residents* — The Swiss-U.S. tax treaty provides that U.S. residents eligible for benefits under the treaty can seek a refund of the Swiss withholding tax on dividends for the portion exceeding 15 percent (leading to a refund of 20 percent) or a full refund in the case of qualified pension funds.

As a general rule, the refund will be granted under the treaty if the U.S. resident can show evidence of:

- beneficial ownership,
- U.S. residency, and
- meeting the U.S.-Swiss tax treaty's limitation on benefits requirements.

The claim for refund must be filed with the Swiss federal tax authorities (Eigerstrasse 65, 3003 Berne, Switzerland), no later than December 31 of the third year following the year in which the dividend payments became due. The relevant Swiss tax form is Form 82C for companies, 82E for other entities and 82I for individuals. These forms can be obtained from any Swiss Consulate General in the U.S. or from the Swiss federal tax authorities at the address mentioned above or at www.estv.admin.ch (English, Anticipatory Tax, Services, Domicile abroad). Each form needs to be filled out in triplicate, with each copy duly completed and signed before a notary public in the U.S. Evidence that the withholding tax was withheld at the source must also be included.

*Stamp duties in relation to the transfer of shares* — The purchase or sale of our shares may be subject to Swiss federal stamp taxes on the transfer of securities irrespective of the place of residency of the purchaser or seller if the transaction takes place through or with a Swiss bank or other Swiss securities dealer, as those terms are defined in the Swiss Federal Stamp Tax Act and no exemption applies in the specific case. If a purchase or sale is not entered into through or with a Swiss bank or other Swiss securities dealer, then no stamp tax will be due. The applicable stamp tax rate is 0.075 percent for each of the two parties to a transaction and is calculated based on the purchase price or sale proceeds. If the transaction does not involve cash consideration, the transfer stamp duty is computed on the basis of the market value of the consideration.

24

Table of Contents

*Purchases of Shares*

The following table sets forth for the periods indicated certain information with respect to repurchases by Noble-Swiss of its shares:

| Period | Total Number of Shares Purchased (2) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs (1) |
|---|---|---|---|---|
| October 2011 | 183 | $ 37.55 | — | 6,769,891 |
| November 2011 | 1,046 | $ 37.15 | — | 6,769,891 |
| December 2011 | 4,607 | $ 31.33 | — | 6,769,891 |

(1)  All share purchases made in the open market and were pursuant to the share repurchase program which our Board of Directors authorized and adopted and our shareholders approved. Our repurchase program has no date of expiration.

(2)  Amounts represent shares surrendered by employees for withholding taxes payable upon the vesting of restricted stock or exercise of stock options.

*Stock Performance Graph*

This graph shows the cumulative total shareholder return of our shares over the five-year period from January 1, 2007 to December 31, 2011. The graph also shows the cumulative total returns for the same five-year period of the S&P 500 Index and the Dow Jones U.S. Oil Equipment & Services Index. The graph assumes that $100 was invested in our shares and the two indices on January 1, 2007 and that all dividends or distributions and returns of capital were reinvested on the date of payment.



| Company Name / Index | INDEXED RETURNS Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 |
| Noble Corporation | $ 148.80 | $ 59.16 | $ 109.61 | $ 99.03 | $ 85.00 |
| S&P 500 Index | 105.49 | 66.46 | 84.05 | 96.71 | 98.76 |
| Dow Jones U.S. Oil Equipment & Services | 144.95 | 59.00 | 97.43 | 124.07 | 108.65 |

25

Table of Contents

Investors are cautioned against drawing any conclusions from the data contained in the graph, as past results are not necessarily indicative of future performance.

The above graph and related information shall not be deemed "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933 or Securities Exchange Act of 1934, each as amended, except to the extent that we specifically incorporate it by reference into such filing.

**Item 6.    Selected Financial Data.**

The following table sets forth selected financial data of us and our consolidated subsidiaries over the five-year period ended December 31, 2011, which information is derived from our audited financial statements. This information should be read in connection with, and is qualified in its entirety by, the more detailed information in our financial statements included in Item 8 of this Annual Report on Form 10-K.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2010** | **2009** | **2008** | **2007** |
| | (In thousands, except per share amounts) | | | | |
| **Statement of Income Data** | | | | | |
| Operating revenues | $ 2,695,832 | $ 2,807,176 | $ 3,640,784 | $ 3,446,501 | $ 2,995,311 |
| Net income attributable to Noble Corporation | 370,898 | 773,429 | 1,678,642 | 1,560,995 | 1,206,011 |
| Net income per share: | | | | | |
|    Basic | 1.46 | 3.03 | 6.44 | 5.85 | 4.49 |
|    Diluted | 1.46 | 3.02 | 6.42 | 5.81 | 4.45 |
| | | | | | |
| **Balance Sheet Data (at end of period)** | | | | | |
| Cash and marketable securities | $ 239,196 | $ 337,871 | $ 735,493 | $ 513,311 | $ 161,058 |
| Property and equipment, net | 11,897,467 | 10,048,087 | 6,634,452 | 5,647,017 | 4,795,916 |
| Total assets | 13,495,159 | 11,302,387 | 8,396,896 | 7,106,799 | 5,876,006 |
| Long-term debt | 4,071,964 | 2,686,484 | 750,946 | 750,789 | 774,182 |
| Total debt (1) | 4,071,964 | 2,766,697 | 750,946 | 923,487 | 784,516 |
| Total equity | 8,097,852 | 7,287,634 | 6,788,432 | 5,290,715 | 4,308,322 |
| | | | | | |
| **Other Data** | | | | | |
| Net cash from operating activities | $ 758,984 | $ 1,654,376 | $ 2,136,716 | $ 1,888,192 | $ 1,414,373 |
| Net cash from investing activities | (2,540,290) | (2,913,943) | (1,495,059) | (1,129,293) | (1,223,873) |
| Net cash from financing activities | 1,682,631 | 861,945 | (419,475) | (406,646) | (91,152) |
| Capital expenditures | 2,639,979 | 1,423,484 | 1,431,498 | 1,231,321 | 1,287,043 |
| Working capital | 232,432 | 110,347 | 1,049,243 | 561,348 | 367,419 |
| Cash dividends/par value reduction declared per share (2) (3) | 0.60 | 0.88 | 0.18 | 0.91 | 0.12 |

_____

(1)    Consists of Long-Term Debt and Current Maturities of Long-Term Debt.

(2)    Since the third quarter of 2009, we have paid a return on capital in the form of par value reductions, in lieu of dividends, based upon an amount in Swiss Francs. Amounts listed are in U.S. Dollars at the exchange rate that the dividend was paid.

(3)    The par value reductions or cash dividends declared in 2010 and 2008 includes a special dividend of approximately $0.56 and $0.75 per share, respectively.

26

Table of Contents

Item 7.   **Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The following discussion is intended to assist you in understanding our financial position at December 31, 2011 and 2010, and our results of operations for each of the years in the three-year period ended December 31, 2011. You should read the accompanying consolidated financial statements and related notes in conjunction with this discussion.

**Executive Overview**

Our 2011 financial and operating results include:

- operating revenues totaling $2.7 billion;

- net income of $371 million or $1.46 per diluted share;

- net cash from operating activities totaling $759 million; and

- an increase in debt to 33.5 percent of total capitalization at the end of 2011, up from 27.5 percent at the end of 2010 due to the issuance of $1.1 billion in senior notes and $935 million additional debt being drawn on our credit facilities.

During 2011, we began to see some stability in the offshore drilling market after a period of volatility which occurred following the *Deepwater Horizon* incident in 2010 and the U.S. governmental response to the incident. In the U.S. Gulf of Mexico, the granting of permits and publication of new safety rules has led to more stable activity levels within the industry, especially as it relates to the deepwater markets. This resumption of activity has led to greater investment within the U.S. Gulf of Mexico and is contributing to an improvement in dayrates for deepwater and ultra-deepwater rigs worldwide. While there are still risks, including potential third party environmental lawsuits targeting the permitting process, possible new drilling regulations, a failure of the Bureau of Ocean Energy Management Regulation and Enforcement ("BOEMRE") to issue permits in a timely manner and the adoption by individual operators of new drilling or equipment standards exceeding those required by regulatory bodies, we believe those risks will be reduced as long as rigs continue to work without incident in the U.S. Gulf of Mexico.

The offshore drilling market displayed indications of improvement during 2011 even though there continues to be uncertainty regarding the sustainability of the global economic recovery, which is proceeding unevenly in different geographic regions. In addition to the political instability in certain oil producing nations in the Middle East and North Africa, there is also uncertainty regarding recovery in the credit markets, particularly in Europe and North America. During 2011, oil prices fluctuated as a result of supply side concerns in response to political unrest in the Middle East and North Africa. Natural gas prices in the United States fluctuated during the year, and ended the year at historical lows. We believe there continues to be competing factors which could impact the volatility in the offshore drilling market and the prices of oil and gas commodities for the foreseeable future.

Despite the instability in the global economy noted above, we saw an increase in demand for offshore drilling services in 2011. We believe both the short-term and long-term outlook for the deepwater market continues to strengthen. Market dayrates for new ultra-deepwater units remain generally above $500,000, which is lower than the peak rates achieved in 2007 and 2008, but higher than rates seen in 2010. Short-term fixtures for very high specification units have exceeded $550,000, and we believe this is an indication of where the market could be going should there continue to be a strong demand for ultra-deepwater drilling units. Although demand for jackup units decreased slightly during 2010, utilization rates for such units stabilized in 2011, especially for those units equipped with standard drilling features. We continue to see differentiation in the jackup market with newer units having utilization rates and dayrates exceeding those units that entered service before 2000, as customers display a preference for technologically advanced and efficient drilling alternatives.

Demand for our drilling services generally depends on a variety of economic and political factors, including worldwide demand for oil and gas, the ability of the Organization of Petroleum Exporting Countries ("OPEC") to set and maintain production levels and pricing, the level of production of non-OPEC countries and the policies of various governments regarding access to their oil and gas reserves. Our results of operations depend on offshore drilling activity worldwide. Historically, oil and gas prices and market expectations of potential changes in these prices have significantly affected that level of activity. Generally, higher oil and natural gas prices, or our customers' expectations of higher prices, result in greater demand for our services and lower oil and gas prices result in reduced demand for our services. Demand for our services is also a function of the worldwide supply of mobile offshore drilling units. Industry analysts widely report that a significant expansion of industry supply of both jackups and ultra-deepwater units is underway. The introduction of additional non-contracted rigs into the marketplace could have an adverse effect on demand for our services or the dayrates we are able to achieve.

27

Table of Contents

As a result of exploration discoveries offshore Brazil, Petroleo Brasileiro S.A. ("Petrobras"), the Brazilian national oil company, recently announced that it had approved contracts with two contractors to lease a total of 26 drilling rigs, which are expected to be delivered in the next 48 to 90 months. The potential increase in supply from the Petrobras newbuilds could adversely impact overall industry dayrates and economics.

As of February 15, 2012, we have 10 rigs under contract in Mexico with Pemex Exploracion y Produccion ("Pemex"), and three of these rigs have contracts scheduled to expire in 2012. Pemex continues to tender for additional jackup rigs as it attempts to increase the number of working rigs. Some previous tenders published by Pemex contained a requirement that certain units must have entered service since the year 2000. While Pemex did not succeed in securing a significant number of newer rigs from those published tenders, we cannot predict whether this age requirement will be present in future Pemex tenders. If this requirement is present in future tenders, it could require us to seek work for our rigs in other locations, as the ages of a majority of our rigs currently operating in Mexico do not meet this requirement. If such work is not available, it could lead to additional idle time on some of our rigs. We cannot predict how many rigs might be affected or how long they could remain idle. We remain optimistic that many, if not all, of our rigs currently operating in Mexico will be able to continue to secure long-term work with Pemex.

In January 2011, we announced the signing of a Memorandum of Understanding ("MOU") with Petrobras regarding operations in Brazil. Under the terms of the MOU, we agreed to substitute the *Noble Phoenix*, then under contract with Shell in Southeast Asia, for the *Noble Muravlenko*. In connection with the cancellation of the contract on the *Noble Phoenix*, we recognized a non-cash gain of approximately $52.5 million during the first quarter of 2011, which represents the unamortized fair value of the in-place contract assumed in connection with the Frontier acquisition. As a result of the substitution, we reached a decision not to proceed with the previously announced reliability upgrade on the *Noble Muravlenko* that was scheduled to take place in 2013. As a result, we incurred a non-cash charge of approximately $32.6 million related to the termination of outstanding shipyard contracts. We expect the actual substitution to take place in the second quarter of 2012 after the *Noble Phoenix* completes its shipyard work.

In connection with our existing drilling contracts with Petrobras for two of our drillships operating in Brazil, we approved certain shipyard reliability upgrade projects for these drillships, the *Noble Leo Segerius* and the *Noble Roger Eason*. These upgrade projects, planned through 2012, are designed to enhance the reliability and operational performance of these drillships. During the first quarter of 2012, the *Noble Leo Segerius* completed the shipyard portion of its reliability upgrade and departed the shipyard in Brazil for seatrials, final commissioning and customer acceptance activities. The *Noble Leo Segerius* is currently scheduled to return to work in the first quarter of 2012. The *Noble Roger Eason* is expected to enter the shipyard for its reliability upgrade in the second quarter of 2012, which is expected to take approximately 270 days to complete. There are a number of risks associated with shipyard projects of this nature, particularly in Brazil, including potential project delays and cost overruns because of labor, customs, local shipyard, local content and other issues. In addition, the drilling contracts for these vessels provide Petrobras with certain rights of termination in the event of excessive downtime, and it is possible that Petrobras could exercise this right in the future with respect to one or both of these drillships. We intend to continue to closely monitor and discuss with Petrobras the status of these projects and plan to take appropriate steps to mitigate identified risks, which depending upon the circumstances, could involve a variety of options.

While we cannot predict the future level of demand or dayrates for our drilling services or future conditions in the offshore contract drilling industry, we continue to believe we are well positioned within the industry and believe our acquisition of Frontier and recent newbuild activity further strengthens our position, especially in deepwater drilling.

Our business strategy focuses on the active expansion of our worldwide deepwater capabilities through construction, upgrades and modifications, acquisitions and divestitures of drilling units, as well as the deployment of our drilling assets in important oil and gas producing areas.

We have actively expanded our offshore drilling and deepwater capabilities in recent years through the construction and acquisition of new rigs. As part of this technical and operational enhancement, we plan to continue pursuing opportunities to upgrade our fleet to achieve greater technological capability, which should increase our operational efficiencies.

28

Table of Contents

As part of this process, we may dispose of some or all of our lower specification units and related assets and operations in one or more transactions. These dispositions may include sales of assets to third parties, a spin-off or other distribution or separation of assets. In analyzing any disposition, we will consider the strategic benefit to us of the potential transaction while seeking to secure what we consider appropriate value. To date, no potential disposition has provided the results we seek. The drilling market for lower specification units has recently improved, and we have experienced increased utilization and dayrates for these assets in certain areas. Thus, while we continue to evaluate disposition options, we believe these units should provide a positive contribution to our overall results under current market conditions. We can provide no assurance as to whether any disposition transaction will occur or what form it may take.

During 2011, we continued our newbuild program as indicated by the following activities:

- we completed construction on the *Noble Bully I*, a dynamically positioned, ultra-deepwater, harsh environment drillship, owned through a joint venture with a subsidiary of Shell, that left the shipyard during the third quarter of 2011 and is scheduled to complete acceptance testing and begin operations under a long-term contract in the U.S. Gulf of Mexico during the first quarter of 2012;

- we completed construction on the *Noble Bully II*, a dynamically positioned, ultra-deepwater, harsh environment drillship, owned through a joint venture with a subsidiary of Shell, that left the shipyard during the fourth quarter of 2011 and is scheduled to complete acceptance testing and begin operations under a long-term contract in Brazil during the first quarter of 2012;

- we completed construction on one dynamically positioned, ultra-deepwater, harsh environment *Globetrotter*-class drillship that left the shipyard during the fourth quarter of 2011 and is scheduled to complete acceptance testing and begin operations under a long-term contract in the U.S. Gulf of Mexico in the second quarter of 2012;

- we continued construction on a second dynamically positioned, ultra-deepwater, harsh environment *Globetrotter*-class drillship, which is scheduled to be delivered to our customer in the fourth quarter of 2013;

- we began construction on four dynamically positioned, ultra-deepwater, harsh environment drillships at Hyundai Heavy Industries Co. Ltd. ("HHI"), which are estimated to be delivered from the shipyard to begin acceptance testing beginning in the second quarter of 2013; and

- we began construction on six high-specification heavy duty, harsh environment jackup rigs, which are estimated to be delivered from the shipyard to begin acceptance testing beginning in the first quarter of 2013.

Capital expenditures, including expenditures related to items noted above, totaled $2.6 billion during 2011.

29

Table of Contents

### Contract Drilling Services Backlog

We maintain a backlog (as defined below) of commitments for contract drilling services. The following table sets forth as of December 31, 2011 the amount of our contract drilling services backlog and the percent of available operating days committed for the periods indicated:

| | Total | | Year Ending December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2012 | 2013 | 2014 | 2015 | 2016-2023 |
| | | | (In millions) | | | | |
| **Contract Drilling Services Backlog** | | | | | | | |
| Semisubmersibles/Drillships (1) (4) (5) | $ 11,679 | | $ 2,079 | $ 2,006 | $ 2,038 | $ 1,276 | $ 4,280 |
| Jackups | 2,004 | | 1,071 | 570 | 309 | 47 | 7 |
| Total (2) | $ 13,683 | | $ 3,150 | $ 2,576 | $ 2,347 | $ 1,323 | $ 4,287 |
| | | | | | | | |
| Percent of Available Operating Days | | | | | | | |
| Committed (3) | | | 68% | 44% | 31% | 12% | 5% |

(1) Our drilling contracts with Petrobras provide an opportunity for us to earn performance bonuses based on downtime experienced for our rigs operating offshore Brazil. With respect to our semisubmersibles operating offshore Brazil for Petrobras, we have included in our backlog an amount equal to 75 percent of potential performance bonuses for such semisubmersibles, which amount is based on and generally consistent with our historical earnings of performance bonuses for these rigs. With respect to our drillships presently operating offshore Brazil for Petrobras, we (a) have not included in our backlog any performance bonuses for periods prior to certain upgrade projects scheduled for completion in 2012 and 2013, which projects are designed to enhance the reliability and operational performance of these drillships, and (b) have included in our backlog an amount equal to 75 percent of potential performance bonuses for periods after the estimated completion of such upgrade projects. Our backlog for semisubmersibles/drillships includes approximately $250 million attributable to these performance bonuses.

The drilling contracts with Shell for the *Noble Globetrotter I, Noble Globetrotter II, Noble Jim Thompson, Noble Jim Day* and *Noble Clyde Boudreaux*, as well as the letter of intent for the *HHI Drillship I*, provide opportunities for us to earn performance bonuses based on key performance indicators as defined by Shell. With respect to these contracts, we have included in our backlog an amount equal to 75 percent of the potential performance bonuses for these rigs, except for the *Noble Clyde Boudreaux* while working in Brazil, where limited bonus is expected. Our backlog for these rigs includes approximately $520 million attributable to these performance bonuses.

(2) Pemex has the ability to cancel its drilling contracts on 30 days or less notice without Pemex's making an early termination payment. At December 31, 2011 we had 10 rigs contracted to Pemex in Mexico and our backlog includes approximately $687 million related to such contracts. Also, our drilling contracts generally provide the customer an early termination right in the event we fail to meet certain performance standards, including downtime thresholds. For example, Petrobras has the right to terminate its contract in the event of excessive downtime. While we have recently exceeded downtime thresholds on the *Noble Dave Beard* and *Noble Paul Wolff*, we have not received any notification concerning contract cancellations nor do we anticipate receiving any such notifications.

(3) Percentages take into account additional capacity from the estimated dates of deployment of our newbuild rigs that are scheduled to commence operations during 2012 through 2015.

(4) It is not possible to accurately determine the impact to our revenues or backlog resulting from efforts by operators to cancel or modify drilling contracts due to U.S. government imposed restrictions and the delay in the issuance of new drilling permits, and other consequences of actions by the U.S. government. At December 31, 2011, backlog related to our U.S. Gulf of Mexico deepwater rigs totaled $5.4 billion, $865 million of which represents backlog for the year ending December 31, 2012.

We entered into an agreement with Shell, effective June 27, 2010, which provides that Shell may suspend the contracts on three of our units operating in the U.S. Gulf of Mexico during any period of regulatory restriction by paying reduced suspension dayrates in lieu of the normal operating dayrates. The term of the initial contract is also extended by the suspension period. The impact of this agreement is to shift backlog among periods with an immaterial increase to total backlog because of the reduced suspension rates.

(5) Noble and a subsidiary of Shell are involved in joint ventures to build, operate, and own both the *Noble Bully I* and the *Noble Bully II*. Under the terms of the joint venture agreements, each party has an equal 50 percent share in both vessels. As of December 31, 2011, the combined amount of backlog for these rigs totals $2.5 billion, all of which is included in backlog. Noble's 50 percent interest in the backlog for these rigs totals $1.3 billion.

30

Table of Contents

Our contract drilling services backlog reported above reflects estimated future revenues attributable to both signed drilling contracts and letters of intent that we expect to become firm. A letter of intent is generally subject to customary conditions, including the execution of a definitive drilling contract. It is possible that some customers that have entered into letters of intent will not enter into signed drilling contracts. We calculate backlog for any given unit and period by multiplying the full contractual operating dayrate for such unit by the number of days remaining in the period. The reported contract drilling services backlog does not include amounts representing revenues for mobilization, demobilization and contract preparation, which are not expected to be significant to our contract drilling services revenues, amounts constituting reimbursables from customers or amounts attributable to uncommitted option periods under drilling contracts or letters of intent.

The amount of actual revenues earned and the actual periods during which revenues are earned may be different than the backlog amounts and backlog periods set forth in the table above due to various factors, including, but not limited to, shipyard and maintenance projects, unplanned downtime, weather conditions and other factors that result in applicable dayrates lower than the full contractual operating dayrate. In addition, amounts included in the backlog may change because drilling contracts may be varied or modified by mutual consent or customers may exercise early termination rights contained in some of our drilling contracts or decline to enter into a drilling contract after executing a letter of intent. As a result, our backlog as of any particular date may not be indicative of our actual operating results for the periods for which the backlog is calculated.

**Nigerian Operations**

In 2007, we began and voluntarily contacted the SEC and the U.S. Department of Justice ("DOJ") to advise them of an internal investigation of the legality under the United States Foreign Corrupt Practices Act ("FCPA") and local laws of certain reimbursement payments made by our Nigerian affiliate to our customs agents in Nigeria. In 2010, we finalized settlements of this matter with each of the SEC and the DOJ. Pursuant to these settlements, we agreed to pay fines and penalties to the DOJ and the SEC and to certain undertakings, including refraining from violating the FCPA and other anti-corruption laws, self-reporting any violations of the FCPA or such laws to the DOJ and reporting to the DOJ on an annual basis our progress on anti-corruption compliance matters. Our ability to comply with the terms of the settlements is dependent on the success of our ongoing compliance program, including our ability to continue to manage our agents and supervise, train and retain competent employees, and the efforts of our employees to comply with applicable law and our code of business conduct and ethics.

In January 2011, the Nigerian Economic and Financial Crimes Commission and the Nigerian Attorney General Office initiated an investigation into these same activities. A subsidiary of Noble-Swiss resolved this matter through the execution of a non-prosecution agreement dated January 28, 2011. Pursuant to this agreement, the subsidiary paid $2.5 million to resolve all charges and claims of the Nigerian government.

Any additional investigation by these or other agencies could damage our reputation and result in substantial fines, sanctions, civil and/or criminal penalties and curtailment of operations in certain jurisdictions and might adversely affect our business, results of operations or financial condition. Further, resolving any additional investigations could be expensive and consume significant time and attention of our senior management.

All of our rigs operating in Nigeria are operating under temporary import permits. To date, we have been successful in obtaining new, or extending existing, temporary import permits. However, there can be no assurance that we will be able to obtain new permits or further extensions of permits necessary to continue the operation of our rigs in Nigeria. If we cannot obtain a new permit or an extension necessary to continue operations of any rig, we may need to cease operations under the drilling contract for such rig and relocate such rig from Nigerian waters. We cannot predict what impact these events may have on any such contract or our business in Nigeria, and we could face additional fines and sanctions in Nigeria. Furthermore, we cannot predict what changes, if any, relating to temporary import permit policies and procedures may be established or implemented in Nigeria in the future, or how any such changes may impact our business there.

In April 2010, the Nigerian Oil and Gas Industry Content Development Bill was signed into law. The law is designed to create Nigerian content in operations and transactions within the Nigerian oil and gas industry. The law sets forth certain requirements for the utilization of Nigerian human resources and goods and services in oil and gas projects and creates a Nigerian Content Development and Monitoring Board to implement and monitor the law and develop regulations pursuant to the law. The Nigerian Content Development and Monitoring Board has indicated that it will require all non-Nigerian offshore drilling companies to reorganize their local operations to include Nigerian indigenous minority interests in the operating assets and to obtain the approval of the Nigerian Content Development and Monitoring Board for future work in Nigeria. The law also establishes a Nigerian Content Development Fund to fund the implementation of the law, and requires that one percent of the value of every contract awarded in the Nigerian oil and gas industry be paid into the fund. We cannot predict what impact the new law may have on our existing or future operations in Nigeria, but the effect on our operations there could be significant.

31

Table of Contents

**Acquisition of Frontier Holdings Limited**

On July 28, 2010, Noble-Swiss and Noble AM Merger Co., a Cayman Islands company and indirect wholly-owned subsidiary of Noble-Swiss ("Merger Sub"), completed the acquisition of FDR Holdings Limited, a Cayman Islands company ("Frontier"). Under the terms of the Agreement and Plan of Merger with Frontier and certain of Frontier's shareholders, Merger Sub merged with and into Frontier, with Frontier surviving as an indirect wholly-owned subsidiary of Noble-Swiss and a wholly-owned subsidiary of Noble-Cayman. The Frontier acquisition was for a purchase price of approximately $1.7 billion in cash plus liabilities assumed and strategically expanded and enhanced our global fleet. Frontier's results of operations were included in our results beginning July 28, 2010. We funded the cash consideration paid at closing of approximately $1.7 billion using proceeds from our July 2010 offering of senior notes and existing cash on hand.

**Consummation of Migration and Internal Restructuring**

On March 26, 2009, we completed a series of transactions that effectively changed the place of incorporation of our parent holding company from the Cayman Islands to Switzerland. As a result of these transactions, Noble-Cayman, our former publicly-traded parent company, became a direct, wholly-owned subsidiary of Noble-Swiss, our current publicly-traded parent company. Noble-Swiss' principal asset is all of the shares of Noble-Cayman. Noble-Cayman has no public equity outstanding after March 26, 2009. The consolidated financial statements of Noble-Swiss include the accounts of Noble-Cayman, and Noble-Swiss conducts substantially all of its business through Noble-Cayman and its subsidiaries.

**RESULTS OF OPERATIONS**

**2011 Compared to 2010**

*General*

Net income attributable to Noble Corporation for 2011 was $371 million, or $1.46 per diluted share, on operating revenues of $2.7 billion, compared to net income for 2010 of $773 million, or $3.02 per diluted share, on operating revenues of $2.8 billion.

The consolidated financial statements of Noble-Swiss include the accounts of Noble-Cayman, and Noble-Swiss conducts substantially all of its business through Noble-Cayman and its subsidiaries. As a result, the financial position and results of operations for Noble-Cayman, and the reasons for material changes in the amount of revenue and expense items between 2011 and 2010, would be the same as the information presented below regarding Noble-Swiss in all material respects, except operating income for Noble-Cayman for the year ended December 31, 2011 was $49 million higher than operating income for Noble-Swiss for the same period, primarily as a result of costs directly attributable to Noble-Swiss for operations support and stewardship related services.

32

Table of Contents

*Rig Utilization, Operating Days and Average Dayrates*

Operating revenues and operating costs and expenses for our contract drilling services segment are dependent on three primary metrics: rig utilization, operating days and dayrates. The following table sets forth the average rig utilization, operating days and average dayrates for our rig fleet for 2011 and 2010 (dollars in thousands):

| | Average Rig Utilization (1) | | Operating Days (2) | | | Average Dayrates | | |
|---|---|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 | % Change | 2011 | 2010 | % Change |
| Jackups | 75% | 79% | 11,794 | 12,376 | -5% | $ 85,510 | $ 96,935 | -12% |
| Semisubmersibles | 82% | 86% | 4,176 | 3,837 | 9% | 296,331 | 288,163 | 3% |
| Drillships | 59% | 89% | 1,284 | 1,392 | -8% | 242,019 | 256,067 | -5% |
| Other | 0% | 11% | — | 95 | -100% | — | 355,986 | -100% |
| **Total** | **72%** | **78%** | **17,254** | **17,700** | **-3%** | **$148,185** | **$152,292** | **-3%** |

(1)  Information reflects our policy of reporting on the basis of the number of actively marketed rigs in our fleet excluding newbuild rigs under construction.

(2)  Information reflects the number of days that our rigs were operating under contract.

*Contract Drilling Services*

The following table sets forth the operating revenues and the operating costs and expenses for our contract drilling services segment for 2011 and 2010 (dollars in thousands):

| | | 2011 | 2010 | Change $ | % |
|---|---|---|---|---|---|
| **Operating revenues:** | | | | | |
| Contract drilling services | $ | 2,556,758 | $ 2,695,493 | $ (138,735) | -5% |
| Reimbursables (1) | | 77,278 | 73,959 | 3,319 | 4% |
| Other | | 875 | 2,332 | (1,457) | -62% |
| | $ | 2,634,911 | $ 2,771,784 | $ (136,873) | -5% |
| **Operating costs and expenses:** | | | | | |
| Contract drilling services | $ | 1,384,200 | $ 1,177,800 | $ 206,400 | 18% |
| Reimbursables (1) | | 56,589 | 56,674 | (85) | 0% |
| Depreciation and amortization | | 647,142 | 528,011 | 119,131 | 23% |
| Selling, general and administrative | | 90,262 | 91,094 | (832) | -1% |
| Gain on contract extinguishments, net | | (21,202) | — | (21,202) | ** |
| | | 2,156,991 | 1,853,579 | 303,412 | 16% |
| **Operating income** | $ | 477,920 | $ 918,205 | $ (440,285) | -48% |

(1)  We record reimbursements from customers for out-of-pocket expenses as operating revenues and the related direct costs as operating expenses. Changes in the amount of these reimbursables generally do not have a material effect on our financial position, results of operations or cash flows.

**  Not a meaningful percentage.

*Operating Revenues.* Decreased contract drilling services revenues for the current year as compared to the prior year was driven by reductions in both average dayrates and operating days. The three percent decrease in average dayrates reduced revenues by approximately $71 million, and the three percent decrease in operating days decreased revenues by an additional $68 million.

The decrease in contract drilling services revenues primarily relates to our jackups, drillships and FPSO, which generated approximately $191 million, $46 million and $34 million less revenue, respectively, in 2011.

The decrease in jackup average dayrates of 12 percent resulted in a $135 million decrease in revenues from the prior year. The reduction in average dayrates was primarily from the contractual repricing of rigs in the Middle East, the North Sea, and Mexico for changes in market conditions in the global shallow water market. The five percent decline in jackup operating days resulted in a $56 million decline in revenues. The decrease in utilization primarily related to rigs coming off contract in Mexico and the Middle East during 2011, the majority of which did not return to work until the latter part of the year.

Table of Contents

The decrease in drillship revenue was primarily driven by reduced dayrates of five percent and an eight percent decrease in operating days, which resulted in decreased revenues of $18 million and $28 million, respectively, from the prior year. The decrease in drillship revenue is primarily the result of increased downtime in Brazil, as rigs entered the shipyard for upgrades and repairs.

Revenue from our FPSO, the *Noble Seillean*, decreased $34 million as it was not under contract in 2011.

The decreases in revenue for the above rig classes were partially offset by an increase in revenue of $132 million from our semisubmersibles. The increase was primarily attributable to a nine percent increase in operating days and three percent increase in average dayrates, which contributed additional revenue in 2011 of $98 million and $34 million, respectively. The increase is primarily attributable to operations from the newbuilds, *Noble Dave Beard* and *Noble Jim Day*, which were added to the fleet in March 2010 and January 2011, respectively. Additionally, the *Noble Driller* was added to the fleet in July 2010 as part of the Frontier acquisition.

***Operating Costs and Expenses.*** Contract drilling services operating costs and expenses increased $206 million for the current year as compared to the prior year. The rigs added to the fleet as part of the Frontier acquisition and the *Noble Dave Beard* and the *Noble Jim Day* added approximately $120 million of operating costs in the current year. Excluding the additional expenses related to these rigs, our contract drilling costs increased $86 million in the current year from the prior year. This increase was primarily driven by a $22 million increase in maintenance and rig-related expenses, $20 million increase in mobilization costs, $18 million increase in labor costs, and an $11 million increase in safety and training costs. These cost increases were primarily for our rigs returning, or preparing to return, to work in Brazil and Mexico. Additionally, rotation costs and operations support costs increased $10 million and $5 million, respectively.

Depreciation and amortization increased $119 million in 2011 over 2010 as a result of depreciation on newbuilds placed into service, rigs added to the fleet as part of the Frontier acquisition and additional depreciation related to other capital expenditures on our fleet since the beginning of 2010.

*Other*

The following table sets forth the operating revenues and the operating costs and expenses for our other services for 2011 and 2010 (dollars in thousands):

| | 2011 | 2010 | Change $ | Change % |
|---|---|---|---|---|
| **Operating revenues:** | | | | |
| Labor contract drilling services | $ 59,004 | $ 32,520 | $ 26,484 | 81% |
| Reimbursables (1) | 1,917 | 2,872 | (955) | -33% |
| | $ 60,921 | $ 35,392 | $ 25,529 | 72% |
| **Operating costs and expenses:** | | | | |
| Labor contract drilling services | $ 33,885 | $ 22,056 | $ 11,829 | 54% |
| Reimbursables (1) | 1,850 | 2,740 | (890) | -32% |
| Depreciation and amortization | 11,498 | 11,818 | (320) | -3% |
| Selling, general and administrative | 1,115 | 903 | 212 | 23% |
| | 48,348 | 37,517 | 10,831 | 29% |
| **Operating income** | $ 12,573 | $ (2,125) | $ 14,698 | -692% |

(1)   We record reimbursements from customers for out-of-pocket expenses as operating revenues and the related direct costs as operating expenses. Changes in the amount of these reimbursables generally do not have a material effect on our financial position, results of operations or cash flows.

34

Table of Contents

*Operating Revenues and Costs and Expenses.* The increase in both revenue and expense primarily relates to the commencement of a refurbishment project with our customer, Shell, for one of its rigs to be operated under a labor contract in Alaska, combined with operational increases and foreign currency fluctuations in our Canadian operations.

### Other Income and Expenses

*Selling, general and administrative expenses.* Overall selling, general and administrative expenses were consistent with 2010 as a $6 million increase primarily related to ongoing legal and tax expenses in the current year was offset by a $6 million decrease resulting from the absence of costs related to our completed FCPA investigation in the prior year.

*Interest Expense, net of amount capitalized.* Interest expense, net of amount capitalized, increased $46 million in 2011 from 2010. The increase is a result of $1.25 billion of debt issued in July 2010, which was used to partially fund the Frontier acquisition, $1.1 billion of debt issued in February 2011, which was primarily used to repay the outstanding balance on our revolving credit facility and to repay our portion of outstanding debt under the joint venture credit facilities, and current year drawdowns on the credit facilities.

*Income Tax Provision.* Our income tax provision decreased $70 million in 2011 compared to 2010 primarily due to a reduction in pre-tax earnings, which was partially offset by a higher effective tax rate. Pre-tax earnings decreased approximately 52 percent in 2011 compared to 2010 resulting in a reduction of approximately $75 million in income tax expense. The higher effective tax rate, which was 16.7 percent in 2011 compared to 15.6 percent in 2010, increased income tax expense by approximately $5 million. The increase in the effective tax rate was a result of a change in our geographic revenue mix primarily resulting from drilling restrictions in the U.S. Gulf of Mexico, partially offset by the resolution of discrete tax items.

### 2010 Compared to 2009

### General

Net income attributable to Noble Corporation for 2010 was $773 million, or $3.02 per diluted share, on operating revenues of $2.8 billion, compared to net income for 2009 of $1.7 billion, or $6.42 per diluted share, on operating revenues of $3.6 billion.

The consolidated financial statements of Noble-Swiss include the accounts of Noble-Cayman, and Noble-Swiss conducts substantially all of its business through Noble-Cayman and its subsidiaries. As a result, the financial position and results of operations for Noble-Cayman, and the reasons for material changes in the amount of revenue and expense items between 2010 and 2009, would be the same as the information presented below regarding Noble-Swiss in all material respects, except operating income for Noble-Cayman for the year ended December 31, 2010 was $42 million higher than operating income for Noble-Swiss for the same period, primarily as a result of costs directly attributable to Noble-Swiss for stewardship related services.

35

Table of Contents

*Rig Utilization, Operating Days and Average Dayrates*

Operating revenues and operating costs and expenses for our contract drilling services segment are dependent on three primary metrics: rig utilization, operating days and dayrates. The following table sets forth the average rig utilization, operating days and average dayrates for our rig fleet for 2010 and 2009 (dollars in thousands):

| | Average Rig Utilization (1) | | Operating Days (2) | | | Average Dayrates | | |
|---|---|---|---|---|---|---|---|---|
| | **2010** | **2009** | **2010** | **2009** | **% Change** | **2010** | **2009** | **% Change** |
| Jackups | 79% | 82% | 12,376 | 12,719 | -3% | $ 96,935 | $ 147,701 | -34% |
| Semisubmersibles | 86% | 100% | 3,837 | 3,673 | 4% | 288,163 | 368,398 | -22% |
| Drillships | 89% | 91% | 1,392 | 993 | 40% | 256,067 | 254,084 | 1% |
| FPSO/Submersibles (3) | 11% | 51% | 95 | 418 | -77% | 355,986 | 61,711 | 477% |
| **Total** | **78%** | **84%** | **17,700** | **17,803** | **-1%** | **$152,292** | **$197,144** | **-23%** |

(1) Information reflects our policy of reporting on the basis of the number of actively marketed rigs in our fleet excluding newbuild rigs under construction.

(2) Information reflects the number of days that our rigs were operating under contract.

(3) Effective March 31, 2009, the *Noble Fri Rodli,* which had been cold stacked since October 2007, was removed from our rig fleet.

*Contract Drilling Services*

The following table sets forth the operating revenues and the operating costs and expenses for our contract drilling services segment for 2010 and 2009 (dollars in thousands):

| | | | | | Change | |
|---|---|---|---|---|---|---|
| | **2010** | | **2009** | | **$** | **%** |
| **Operating revenues:** | | | | | | |
| Contract drilling services | $ | 2,695,493 | $ | 3,509,755 | $ (814,262) | -23% |
| Reimbursables (1) | | 73,959 | | 96,161 | (22,202) | -23% |
| Other | | 2,332 | | 1,302 | 1,030 | 79% |
| | $ | 2,771,784 | $ | 3,607,218 | $ (835,434) | -23% |
| **Operating costs and expenses:** | | | | | | |
| Contract drilling services | $ | 1,177,800 | $ | 1,006,764 | $ 171,036 | 17% |
| Reimbursables (1) | | 56,674 | | 82,122 | (25,448) | -31% |
| Depreciation and amortization | | 528,011 | | 398,572 | 129,439 | 32% |
| Selling, general and administrative | | 91,094 | | 80,004 | 11,090 | 14% |
| (Gain)/Loss on asset disposal/involuntary conversion, net | | — | | 31,053 | (31,053) | ** |
| | | 1,853,579 | | 1,598,515 | 255,064 | 16% |
| **Operating income** | $ | 918,205 | $ | 2,008,703 | $ (1,090,498) | -54% |

(1) We record reimbursements from customers for out-of-pocket expenses as revenues and the related direct costs as operating expenses. Changes in the amount of these reimbursables do not have a material effect on our financial position, results of operations or cash flows.

** Not a meaningful percentage.

*Operating Revenues.* The decrease in contract drilling services revenue for 2010 as compared to the prior year was primarily driven by reductions in both average dayrates and utilization. Lower dayrates decreased revenues approximately $798 million, while fewer operating days decreased revenues by approximately $16 million. The reduction in utilization was partially offset by the acquisition of Frontier and the addition of newbuilds.

The decrease in contract drilling services revenue related primarily to our jackups and semisubmersibles, which generated approximately $679 million and $248 million less revenue in 2010 as compared to the prior year, respectively. The decrease in jackup revenue was from a 34 percent decline in dayrates primarily from the contractual re-pricing of rigs in the Middle East, the North Sea, and Mexico resulting from changes in market conditions in the global shallow water market. Reductions in average dayrates by 22 percent contributed to the decline in semisubmersible revenue. These reductions resulted from the drilling restrictions in the U.S. Gulf of Mexico where lower standby rates replaced the standard operating dayrates for a majority of our customers, lower utilization from the termination of certain contracts and a dispute with a customer regarding the *Noble Homer Ferrington* contract.

Table of Contents

The decreases in revenue for the above rig classes were partially offset by higher revenues from our drillships and other rigs, which increased $113 million in 2010 as compared to the prior year. The increase was primarily due to the addition of the drillships and FPSO added to the fleet as part of the Frontier acquisition of $143 million, partially offset by a decrease in revenues from our drillships operating in Brazil.

***Operating Costs and Expenses.*** Contract drilling services operating costs and expenses increased $171 million in 2010 as compared to the prior year. Our newbuild rigs, the *Noble Scott Marks*, *Noble Danny Adkins* and *Noble Dave Beard*, which were added to the fleet in June 2009, October 2009 and March 2010, respectively, added approximately $109 million of operating costs in 2010. The acquisition of the Frontier rigs added an additional $55 million of operating costs. Excluding the additional expenses related to these newbuild and Frontier rigs, our contract drilling costs increased $7 million in 2010 as compared to 2009. This change was principally due to acquisition costs of $19 million coupled with increases in safety costs of $4 million, partially offset by a decrease in maintenance expenses of $9 million and a decrease in transportation and other expenses of $7 million.

Depreciation and amortization increased $129 million in 2010 over 2009 as a result of depreciation on newbuilds placed into service, and additional depreciation related to other capital expenditures on our fleet since the beginning of 2009. Also, the acquisition of Frontier added approximately $39 million in depreciation during 2010.

Loss on asset disposal/involuntary conversion in 2009 primarily consists of a charge of $17 million for our jackup, the *Noble David Tinsley*, which experienced a "punch-through" while being positioned on location offshore Qatar. The $17 million charge includes approximately $9 million for the write-off of the damaged legs and $8 million for non-reimbursable expenses. Also during 2009, we recorded an impairment charge of $12 million for the *Noble Fri Rodli* as a result of a decision to evaluate disposition alternatives for this submersible drilling unit.

***Other***

The following table sets forth the operating revenues and the operating costs and expenses for our other services for 2010 and 2009 (dollars in thousands):

|  | 2010 | 2009 | Change $ | Change % |
|---|---|---|---|---|
| **Operating revenues:** | | | | |
| Labor contract drilling services | $ 32,520 | $ 30,298 | $ 2,222 | 7% |
| Reimbursables (1) | 2,872 | 3,040 | (168) | -6% |
| Other | — | 228 | (228) | -100% |
|  | $ 35,392 | $ 33,566 | $ 1,826 | 5% |
| **Operating costs and expenses:** | | | | |
| Labor contract drilling services | $ 22,056 | $ 18,827 | $ 3,229 | 17% |
| Reimbursables (1) | 2,740 | 2,913 | (173) | -6% |
| Depreciation and amortization | 11,818 | 9,741 | 2,077 | 21% |
| Selling, general and administrative | 903 | 258 | 645 | 250% |
| (Gain)/Loss on asset disposal, net | — | (214) | 214 | ** |
|  | 37,517 | 31,525 | 5,992 | 19% |
| **Operating income** | $ (2,125) | $ 2,041 | $ (4,166) | -204% |

(1)   We record reimbursements from customers for out-of-pocket expenses as operating revenues and the related direct costs as operating expenses. Changes in the amount of these reimbursables generally do not have a material effect on our financial position, results of operations or cash flows.

**   Not a meaningful percentage.

Table of Contents

*Operating Revenues and Costs and Expenses.* Revenues and expenses associated with our Canadian labor contract drilling services increased in 2010 primarily for fluctuations in foreign currency exchange rates coupled with increased labor and contract drilling services costs. The increase in depreciation results from fixed asset additions in conjunction with the relocation of our corporate offices to Switzerland.

*Other Income and Expenses*

*Selling, general and administrative expenses.* Overall selling, general and administrative expenses increased $12 million in 2010 from 2009 primarily as a result of the FCPA settlement of $8 million, along with increases in employee related costs of $2 million, increases in consulting fees of $2 million and Swiss VAT taxes of $2 million, partially offset by the worldwide asset consolidation project and migration costs and other expenses in 2009 of $2 million.

*Interest Expense, net of amount capitalized.* Interest expense, net of amount capitalized increased $8 million in 2010 primarily for the addition of $1.25 billion of debt issued in July 2010 to partially fund the Frontier acquisition.

*Income Tax Provision.* Our income tax provision decreased $194 million in 2010 compared to 2009 primarily due to a reduction in pre-tax earnings combined with a lower effective tax rate. Pre-tax earnings decreased approximately 55 percent in 2010 compared to 2009 resulting in a reduction of approximately $184 million in income tax expense. The lower effective tax rate, which was 15.6 percent in 2010 compared to 16.7 percent in 2009, reduced income tax expense by approximately $10 million.

## LIQUIDITY AND CAPITAL RESOURCES

*Overview*

Net cash from operating activities in 2011 was $759 million, which compared to $1.7 billion and $2.1 billion in 2010 and 2009, respectively. The decrease in net cash from operating activities in 2011 compared to 2010 was primarily attributable to a significant decline in net income coupled with an increase in customer receivables. The increase in customer receivables is primarily related to the increased fleet activity in 2011, delays in customer payments and certain disputed amounts, which we believe will ultimately be collected. During 2011, we entered into an additional $600 million revolving credit facility, and at December 31, 2011 we had $225 million available under our credit facilities. We had working capital of $232 million and $110 million at December 31, 2011 and 2010, respectively. Primarily as a result of our $1.1 billion senior notes offering in February 2011 and a $935 million increase in net borrowings on our credit facilities during the year, total debt as a percentage of total debt plus equity increased to 33.5 percent at December 31, 2011 from 27.5 percent at December 31, 2010.

Additionally, at December 31, 2011, we had a total contract drilling services backlog of approximately $13.7 billion. Our backlog as of December 31, 2011 reflects a commitment of 68 percent of operating days for 2012. See "Contract Drilling Services Backlog" for additional information regarding our backlog.

Our principal capital resources in 2011 were cash generated from our $1.1 billion senior notes offering in February 2011, net borrowings under our bank credit facilities of $935 million and net cash from operating activities of $759 million.

In February 2012, we completed, through our indirect wholly-owned subsidiary, Noble Holding International Limited ("NHIL"), a debt offering of $1.2 billion aggregate principal amount of senior notes in three separate tranches, with $300 million of 2.50% Senior Notes due 2017, $400 million of 3.95% Senior Notes due 2022, and $500 million of 5.25% Senior Notes due 2042. The weighted average coupon of all three tranches was 4.13%. The net proceeds of approximately $1.19 billion, after expenses, were primarily used to repay the outstanding balance on our credit facilities.

Our currently anticipated cash flow needs may include the following:

• committed capital expenditures, including expenditures for newbuild projects currently underway;

• normal recurring operating expenses;

• discretionary capital expenditures, including various capital upgrades;

• potential newbuild projects and acquisitions; and

• payments of dividends.

Table of Contents

We currently expect to fund these cash flow needs with cash generated by our operations, cash on hand, proceeds from our 2012 senior notes offering discussed below and borrowings under our existing credit facilities. However, to adequately cover our expected cash flow needs, we may require capital in excess of the amount provided through these sources, and we may delay or cancel certain discretionary capital expenditures as necessary.

*Capital Expenditures*

Our primary liquidity requirement in 2012 will be for capital expenditures. Capital expenditures, including capitalized interest, totaled $2.6 billion, $1.4 billion and $1.4 billion for 2011, 2010 and 2009, respectively. Capital expenditures for 2010 do not include the fair value of assets acquired as part of the Frontier acquisition.

At December 31, 2011, we had 11 rigs under construction, and capital expenditures, excluding capitalized interest, for new construction during 2011 totaled $1.7 billion, as follows (in millions):

| Rig type/name | | Capital Expenditures During 2011 |
|---|---|---|
| **Drillships** | | |
| Globetrotter class | | |
| *Noble Globetrotter I* | $ | 221.7 |
| *Noble Globetrotter II* | | 141.5 |
| | | |
| Gusto P10,000 | | |
| *HHI Drillship I* | | 163.3 |
| *HHI Drillship II* | | 163.1 |
| *HHI Drillship III* | | 160.0 |
| *HHI Drillship IV* | | 159.0 |
| | | |
| **Joint venture owned drillships** | | |
| GustoMSC Bully PRD 12,000 | | |
| *Noble Bully I* | | 161.5 |
| *Noble Bully II* | | 185.2 |
| | | |
| **Jackups** | | |
| F&G JU-3000N | | |
| *Noble Jackup I* | | 45.1 |
| *Noble Jackup II* | | 43.6 |
| *Noble Jackup III* | | 88.4 |
| *Noble Jackup IV* | | 45.0 |
| *Noble Jackup V* | | 44.7 |
| *Noble Jackup VI* | | 44.7 |
| | | |
| Other | | 4.3 |
| **Total Newbuild Capital Expenditures** | $ | 1,671.1 |

In addition to the newbuild expenditures noted above, capital expenditures during 2011 consisted of:

- $636 million for major projects, including $149 million to upgrade two drillships currently operating in Brazil;

- $211 million for other capitalized expenditures, including major maintenance and regulatory expenditures which generally have useful lives ranging from 3 to 5 years; and

- $122 million in capitalized interest.

Table of Contents

Our total capital expenditures budget for 2012 is approximately $1.9 billion, which is currently anticipated to be spent as follows:

- approximately $750 million in newbuild expenditures;

- approximately $800 million in major projects, including subsea related expenditures and contract specific projects; and

- approximately $275 million in sustaining capitalized expenditures.

In addition to the amounts noted above, we anticipate additional charges related to capitalized interest, which may fluctuate as a result of the timing of completion of ongoing projects. In connection with our capital expenditure program, we have entered into certain commitments, including shipyard and purchase commitments, for approximately $3.0 billion at December 31, 2011, of which we expect to spend approximately $1.0 billion in 2012.

From time to time we consider possible projects that would require capital expenditures or other cash expenditures that are not included in our capital budget, and such unbudgeted capital or cash expenditures could be significant. In addition, we will continue to evaluate acquisitions of drilling units from time to time. Other factors that could cause actual capital expenditures to materially exceed planned capital expenditures include delays and cost overruns in shipyards (including costs attributable to labor shortages), shortages of equipment, latent damage or deterioration to hull, equipment and machinery in excess of engineering estimates and assumptions, and changes in design criteria or specifications during repair or construction.

### *Share Repurchases, Distributions of Capital and Dividends*

Our Board of Directors and shareholders have authorized and adopted a share repurchase program. At December 31, 2011, 6.8 million shares remained available under this authorization. Future repurchases will be subject to the requirements of Swiss law, including the requirement that we and our subsidiaries may only repurchase shares if and to the extent that sufficient freely distributable reserves are available. Also, the aggregate par value of all registered shares held by us and our subsidiaries, including treasury shares, may not exceed 10 percent of our registered share capital without shareholder approval. Our existing share repurchase program received the required shareholder approval prior to completion of our 2009 Swiss migration transaction. Share repurchases for each of the three years ended December 31, 2011 were as follows:

| Year Ended December 31, | Total Number of Shares Purchased | Total Cost (in thousands) | Average Price Paid per Share |
|---|---|---|---|
| 2011 | 261,721 | $ 10,233 | $ 39.10 |
| 2010 | 6,390,488 | 230,936 | 36.14 |
| 2009 | 5,470,000 | 186,506 | 34.10 |

Our most recent quarterly payment to shareholders, in the form of a capital reduction, which was declared on February 3, 2012 and is to be paid on February 23, 2012 to holders of record on February 13, 2012, was 0.13 CHF per share, or an aggregate of approximately $36 million. The declaration and payment of dividends in the future by Noble-Swiss and the making of distributions of capital, including returns of capital in the form of par value reductions, require authorization of the shareholders of Noble-Swiss. The amount of such dividends, distributions and returns of capital will depend on our results of operations, financial condition, cash requirements, future business prospects, contractual restrictions and other factors deemed relevant by our Board of Directors and shareholders.

Recently, our Board of Directors approved, subject to shareholder authorization at our upcoming annual general meeting scheduled for April 27, 2012, the payment of a dividend funded from capital contribution reserve in a total amount equal to $0.52 per share to be paid in four equal installments scheduled for August 2012, November 2012, February 2013 and May 2013. If approved by our shareholders, the dividend will require us to make total cash payments of approximately $66 million in 2012, based on the number of shares currently outstanding.

Table of Contents

### *Contributions to Pension Plans*

In August 2006, the Pension Protection Act of 2006 ("PPA") was signed into law in the U.S. The PPA requires that pension plans fund towards a target of at least 100 percent with a transition through 2011 and increases the amount we are allowed to contribute to our U.S. pension plans in the near term. During 2011, 2010 and 2009, we made contributions to our non-U.S. and U.S. pension plans totaling $11 million, $16 million and $18 million, respectively. We expect the minimum aggregate contributions to our non-U.S. and U.S. plans in 2012, subject to applicable law, to be $19 million. We continue to monitor and evaluate funding options based upon market conditions and may increase contributions at our discretion.

### *Credit Facilities and Long-Term Debt*

#### *Noble Credit Facilities and Long-Term Debt*

We have two separate revolving credit facilities in place which provide us with a total borrowing capacity of $1.2 billion. One credit facility, which has a capacity of $600 million, matures in 2013, and during the first quarter of 2011, we entered into an additional $600 million revolving credit facility which matures in 2015 (together referred to as the "Credit Facilities"). The covenants and events of default under the Credit Facilities are substantially similar, and each facility contains a covenant that limits our ratio of debt to total tangible capitalization, as defined in the Credit Facilities, to 0.60. At December 31, 2011, our ratio of debt to total tangible capitalization was 0.35 for the credit facility maturing in 2013 and 0.33 for the credit facility maturing in 2015. We were in compliance with all covenants under the Credit Facilities as of December 31, 2011.

In March 2012, availability under our credit facility maturing in 2013 reduces by $25 million. As discussed above, we used the proceeds from our February 2012 senior notes offering to repay the outstanding balance on our Credit Facilities. As such, we have classified the entire balance as "Long-term debt" on our Consolidated Balance Sheet at December 31, 2011.

The Credit Facilities provide us with the ability to issue up to $300 million in letters of credit in the aggregate. While the issuance of letters of credit does not increase our borrowings outstanding under the Credit Facilities, it does reduce the amount available. At December 31, 2011, we had borrowings of $975 million outstanding and no letters of credit issued under the Credit Facilities. We believe that we maintain good relationships with our lenders under the Credit Facilities, and we believe that our lenders have the liquidity and capability to perform should the need arise for us to draw on the Credit Facilities.

The indentures governing our outstanding senior unsecured notes contain covenants that place restrictions on certain merger and consolidation transactions, unless we are the surviving entity or the other party assumes the obligations under the indenture, and on the ability to sell or transfer all or substantially all of our assets. In addition, there are restrictions on incurring or assuming certain liens and sale and lease-back transactions. At December 31, 2011, we were in compliance with all our debt covenants. We continually monitor compliance with the covenants under our notes and, based on our expectations for 2012, expect to remain in compliance during the year.

At December 31, 2011, we had letters of credit of $65 million and performance and tax assessment bonds totaling $242 million supported by surety bonds outstanding. Of the letters of credit outstanding, $32 million were issued to support bank bonds in connection with our drilling units in Nigeria. Additionally, certain of our subsidiaries issue, from time to time, guarantees to the temporary import status of rigs or equipment imported into certain countries in which we operate. These guarantees are issued in lieu of payment of custom, value added or similar taxes in those countries.

Our total debt was $4.1 billion at December 31, 2011 as compared to $2.8 billion at December 31, 2010. The increase in debt is a result of the issuance of $1.1 billion aggregate principal amount of senior notes in February 2011 and $935 million of additional net borrowings on our Credit Facilities, partially offset by the repayment of $693 million in joint venture credit facilities. For additional information on our long-term debt, see Note 7 to our Consolidated Financial Statements.

In February 2011, we issued, through NHIL, $1.1 billion aggregate principal amount of senior notes in three separate tranches, comprising $300 million of 3.05% Senior Notes due 2016, $400 million of 4.625% Senior Notes due 2021, and $400 million of 6.05% Senior Notes due 2041. The weighted average coupon of all three tranches is 4.71%. A portion of the net proceeds of approximately $1.09 billion, after expenses, was used to repay the outstanding balance on our revolving credit facility and to repay our portion of outstanding debt under the joint venture credit facilities discussed below.

In the first quarter of 2011, the joint venture credit facilities, which had a combined outstanding balance of $693 million, were repaid in full through contributions to the joint ventures from Noble and Shell. Shell contributed $361 million in equity to fund their portion of the repayment of joint venture credit facilities and related interest rate swaps, which were settled concurrently with the repayment and termination of the joint venture credit facilities.

Table of Contents

In January 2011, the Bully joint ventures issued notes to the joint venture partners totaling $70 million. The interest rate on these notes was 10%, payable semi-annually in arrears and in kind on June 30 and December 31 commencing in June 2011. The purpose of these notes was to provide additional liquidity to the joint ventures in connection with the shipyard construction of the *Bully* vessels.

In April 2011, the Bully joint venture partners entered into a subscription agreement, pursuant to which each partner was issued equity in each of the Bully joint ventures in exchange for the cancellation of all outstanding joint venture partner notes. The subscription agreement has the effect of converting all joint venture partner notes, including the contribution noted above, into equity of the respective joint venture. The total capital contributed as a result of these agreements was $146 million, which included $142 million in outstanding notes, plus accrued interest. Our portion of the capital contribution, totaling $73 million, was eliminated in consolidation.

### *Summary of Contractual Cash Obligations and Commitments*

The following table summarizes our contractual cash obligations and commitments at December 31, 2011 (in thousands):

| | Total | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter | Other |
|---|---|---|---|---|---|---|---|---|
| **Contractual Cash Obligations** | | | | | | | | |
| Long-term debt obligations (1) | $4,071,964 | $ 25,000 | $ 874,949 | $ 249,647 | $725,000 | $299,938 | $ 1,897,430 | $ — |
| Interest payments | 2,128,719 | 173,993 | 162,477 | 143,741 | 129,638 | 111,702 | 1,407,168 | — |
| Operating leases | 71,682 | 19,721 | 18,550 | 12,481 | 4,654 | 3,020 | 13,256 | — |
| Pension plan contributions | 104,544 | 6,848 | 6,272 | 6,855 | 7,585 | 9,557 | 67,427 | — |
| Purchase commitments (2) | 3,031,792 | 955,029 | 1,047,817 | 1,028,946 | — | — | — | — |
| Tax reserves (3) | 118,111 | — | — | — | — | — | — | 118,111 |
| Total contractual cash obligations | $9,526,812 | $1,180,591 | $2,110,065 | $1,441,670 | $866,877 | $424,217 | $ 3,385,281 | $118,111 |

(1) In March 2012, availability under our credit facility maturing in 2013 reduces by $25 million. We used the proceeds from our February 2012 senior notes offering to repay the outstanding balance on our Credit Facilities; therefore, we have shown the entire balance as long-term on our December 31, 2011 Consolidated Balance Sheet.

(2) Purchase commitments consist of obligations outstanding to external vendors primarily related to future capital purchases.

(3) Tax reserves are included in "Other" due to the difficulty in making reasonably reliable estimates of the timing of cash settlements to taxing authorities. See Note 12 to our accompanying consolidated financial statements.

At December 31, 2011, we had other commitments that we are contractually obligated to fulfill with cash if the obligations are called. These obligations include letters of credit and surety bonds that guarantee our performance as it relates to our drilling contracts, tax and other obligations in various jurisdictions. These letters of credit and surety bond obligations are not normally called, as we typically comply with the underlying performance requirement.

The following table summarizes our other commercial commitments at December 31, 2011 (in thousands):

| | Total | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter |
|---|---|---|---|---|---|---|---|
| **Contractual Cash Obligations** | | | | | | | |
| Letters of Credit | $ 64,874 | $ 64,874 | $ — | $ — | $ — | $ — | $ — |
| Surety bonds | 241,810 | 205,858 | 15,892 | 4,199 | 15,861 | — | — |
| Total commercial commitments | $ 306,684 | $ 270,732 | $ 15,892 | $ 4,199 | $ 15,861 | $ — | $ — |

42

Table of Contents

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Our consolidated financial statements are impacted by the accounting policies used and the estimates and assumptions made by management during their preparation. Critical accounting policies and estimates that most significantly impact our consolidated financial statements are described below.

### *Principles of Consolidation*

The consolidated financial statements include our accounts, those of our wholly-owned subsidiaries and entities in which we hold a controlling financial interest. Our 2011 and 2010 consolidated financial statements include the accounts of two joint ventures, in each of which we own a 50 percent interest. Our ownership interest meets the definition of variable interest under Financial Accounting Standards Board ("FASB") codification and we have determined that we are the primary beneficiary. Intercompany balances and transactions have been eliminated in consolidation.

The combined joint venture carrying amount of the *Bully*-class drillships at December 31, 2011 totaled $1.3 billion, which was primarily funded through partner equity contributions.

### *Property and Equipment*

Property and equipment is stated at cost, reduced by provisions to recognize economic impairment in value whenever events or changes in circumstances indicate an asset's carrying value may not be recoverable. At December 31, 2011 and 2010, we had $4.4 billion and $3.2 billion of construction-in-progress, respectively. Such amounts are included in "Drilling equipment and facilities" in the accompanying Consolidated Balance Sheets. Major replacements and improvements are capitalized. When assets are sold, retired or otherwise disposed of, the cost and related accumulated depreciation are eliminated from the accounts and the gain or loss is recognized. Drilling equipment and facilities are depreciated using the straight-line method over their estimated useful lives as of the date placed in service or date of major refurbishment. Estimated useful lives of our drilling equipment range from three to thirty years. Other property and equipment is depreciated using the straight-line method over useful lives ranging from two to thirty years.

Interest is capitalized on construction-in-progress at the interest rate on debt incurred for construction or at the weighted average cost of debt outstanding during the period of construction. Capitalized interest for the years ended December 31, 2011, 2010 and 2009 was $122 million, $83 million and $55 million, respectively.

Overhauls and scheduled maintenance of equipment are performed based on the number of hours operated in accordance with our preventative maintenance program. Routine repair and maintenance costs are charged to expense as incurred; however, the costs of the overhauls and scheduled major maintenance projects that benefit future periods and which typically occur every three to five years are deferred when incurred and amortized over an equivalent period. The deferred portion of these major maintenance projects is included in "Other Assets" in the Consolidated Balance Sheets. Such amounts totaled $261 million and $183 million at December 31, 2011 and 2010, respectively.

Amortization of deferred costs for major maintenance projects is reflected in "Depreciation and amortization" in the accompanying Consolidated Statements of Income. The amount of such amortization was $111 million, $107 million and $102 million for the years ended December 31, 2011, 2010 and 2009, respectively. Total repair and maintenance expense for the years ended December 31, 2011, 2010 and 2009, exclusive of amortization of deferred costs for major maintenance projects, was $242 million, $186 million and $175 million, respectively.

We evaluate the realization of property and equipment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss on our property and equipment exists when the estimated undiscounted cash flows expected to result from the use of the asset and its eventual disposition are less than its carrying amount. Any impairment loss recognized represents the excess of the asset's carrying value over the estimated fair value.

43

Table of Contents

In January 2011, we announced the signing of a MOU with Petrobras regarding operations in Brazil. Under the terms of the MOU, we agreed to substitute the *Noble Phoenix*, then under contract with Shell in Southeast Asia, for the *Noble Muravlenko*. In connection with the cancellation of the contract on the *Noble Phoenix*, we recognized a non-cash gain of approximately $52.5 million during the first quarter of 2011, which represents the unamortized fair value of the in-place contract assumed in connection with the Frontier acquisition. As a result of the substitution, we reached a decision not to proceed with the previously announced reliability upgrade to the *Noble Muravlenko* that was scheduled to take place in 2013. As a result, we incurred a non-cash charge of approximately $32.6 million related to the termination of outstanding shipyard contracts. We expect the actual substitution to take place in the second quarter of 2012 after the *Noble Phoenix* completes its shipyard work.

In May 2009, our jackup the *Noble David Tinsley* experienced a "punch-through" while the rig was being positioned on location offshore Qatar. The incident involved the sudden penetration of all three legs through the sea bottom, which resulted in severe damage to the legs and the rig. We recorded a charge of $17 million during 2009 related to this involuntary conversion, which includes approximately $9 million for the write-off of the damaged legs.

During the first quarter of 2009, we recognized a charge of $12 million related to the *Noble Fri Rodli*, a submersible that had been cold stacked since October 2007. We recorded the charge as a result of a decision to evaluate disposition alternatives for this rig.

### Insurance Reserves

We maintain various levels of self-insured retention for certain losses including property damage, loss of hire, employment practices liability, employers' liability, and general liability, among others. We accrue for property damage and loss of hire charges on a per event basis.

Employment practices liability claims are accrued based on actual claims during the year. Maritime employer's liability claims are generally estimated using actuarial determinations. General liability claims are estimated by our internal claims department by evaluating the facts and circumstances of each claim (including incurred but not reported claims) and making estimates based upon historical experience with similar claims. At both December 31, 2011 and 2010, loss reserves for personal injury and protection claims totaled $21 million, and such amounts are included in "Other current liabilities" in the accompanying Consolidated Balance Sheets.

### Revenue Recognition

Revenues generated from our dayrate-basis drilling contracts and labor contracts are recognized as services are performed.

We may receive lump-sum fees for the mobilization of equipment and personnel. Mobilization fees received and costs incurred to mobilize a drilling unit from one market to another are recognized over the term of the related drilling contract. Absent a contract, the initial mobilization costs of newbuild rigs from the shipyard are deferred and amortized over the life of the rig. Subsequent costs incurred to relocate drilling units to more promising geographic areas in which a contract has not been secured are expensed as incurred. Lump-sum payments received from customers relating to specific contracts, including equipment modifications, are deferred and amortized to income over the term of the drilling contract. Deferred revenues under drilling contracts totaled $139 million and $104 million at December 31, 2011 and 2010, respectively. Such amounts are included in either "Other Current Liabilities" or "Other Liabilities" in our Consolidated Balance Sheets, based upon our expected time of recognition.

We record reimbursements from customers for "out-of-pocket" expenses as revenues and the related direct cost as operating expenses.

### Income Taxes

We operate through various subsidiaries in numerous countries throughout the world including the United States. Income taxes have been provided based on the laws and rates in effect in the countries in which operations are conducted or in which we or our subsidiaries are considered resident for income tax purposes. The income and withholding tax rates and methods of computing taxable income vary significantly for each jurisdiction. Consequently, we are subject to changes in tax laws, treaties or regulations or the interpretation or enforcement thereof in the U.S., Switzerland or jurisdictions in which we or any of our subsidiaries operate or is resident. Our income tax expense is based upon our interpretation of the tax laws in effect in various countries at the time that the expense was incurred. If the U.S. Internal Revenue Service or other taxing authorities do not agree with our assessment of the effects of such laws, treaties and regulations, this could have a material adverse effect on us, including the imposition of a higher effective tax rate on our worldwide earnings or a reclassification of the tax impact of our significant corporate restructuring transactions. Our income tax expense is expected to fluctuate from year to year as our operations and income fluctuates in the different taxing jurisdictions.

44

Table of Contents

We operate in a number of countries throughout the world and our income tax returns filed in those jurisdictions are subject to review and examination by tax authorities within those jurisdictions. The U.S. Internal Revenue Service ("IRS") has completed its examination of our 2008 U.S. tax return. The examination team has proposed adjustments and deficiencies with respect to certain items that were reported by us for the 2008 tax year. We believe that we have accurately reported all amounts included in our 2008 tax return, and have filed protests with the IRS Office of Appeals contesting the examination team's proposed adjustments. We intend to vigorously defend our reported positions. In addition, a U.S. subsidiary of Frontier is also under audit for its 2007 and 2008 tax returns. Furthermore, we are currently contesting several non-U.S. tax assessments and may contest future assessments when we believe the assessments are in error. We believe the ultimate resolution of the outstanding assessments, for which we have not made any accrual, will not have a material adverse effect on our consolidated financial statements. We recognize uncertain tax positions that we believe have a greater than 50 percent likelihood of being sustained. We cannot predict or provide assurance as to the ultimate outcome of the existing or future assessments.

Certain of our non-U.S. income tax returns have been examined for the 2002 through 2008 periods and audit claims have been assessed for approximately $262 million (including interest and penalties), primarily in Mexico. In Mexico, these assessments total approximately $249 million. We recently received from the Regional Chamber of the Federal Tax Court adverse decisions with respect to approximately $5 million in assessments related to depreciation deductions, which we are appealing. We are also contesting all other assessments in Mexico. However, we expect increased audit activity in Mexico and anticipate the tax authorities will issue additional assessments and continue to pursue legal actions for all audit claims.

Additional audit claims of approximately $92 million attributable to customs and other business taxes have been assessed against us in other jurisdictions. We have contested, or intend to contest, these assessments, including through litigation if necessary, and we believe the ultimate resolution, for which we have not made any accrual, will not have a material adverse effect on our consolidated financial statements.

Applicable income and withholding taxes have not been provided on undistributed earnings of our subsidiaries. We do not intend to repatriate such undistributed earnings except for distributions upon which incremental income and withholding taxes would not be material.

In certain jurisdictions we have recognized deferred tax assets and liabilities. Judgment and assumptions are required in determining whether deferred tax assets will be fully or partially utilized. When we estimate that all or some portion of certain deferred tax assets such as net operating loss carryforwards will not be utilized, we establish a valuation allowance for the amount ascertained to be unrealizable. We continually evaluate strategies that could allow for future utilization of our deferred assets. Any change in the ability to utilize such deferred assets will be accounted for in the period of the event affecting the valuation allowance. If facts and circumstances cause us to change our expectations regarding future tax consequences, the resulting adjustments could have a material effect on our financial results or cash flow.

In certain circumstances, we expect that, due to changing demands of the offshore drilling markets and the ability to redeploy our offshore drilling units, certain units will not reside in a location long enough to give rise to future tax consequences. As a result, no deferred tax asset or liability has been recognized in these circumstances. Should our expectations change regarding the length of time an offshore drilling unit will be used in a given location, we will adjust deferred taxes accordingly.

*Certain Significant Estimates and Contingent Liabilities*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Certain accounting policies involve judgments and uncertainties to such an extent that there is reasonable likelihood that materially different amounts could have been reported under different conditions, or if different assumptions had been used. We evaluate our estimates and assumptions on a regular basis. We base our estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates and assumptions used in preparation of our consolidated financial statements. In addition, we are involved in several litigation matters, some of which could lead to potential liability to us. We follow FASB standards regarding contingent liabilities which are discussed in "Part II Item 8. Financial Statements and Supplementary Data, Note 16- Commitments and Contingencies" of our annual report on form 10-K.

45

Table of Contents

*New Accounting Pronouncements*

In January 2010, the FASB issued Accounting Standards Update ("ASU") No. 2010-06, which amends FASB Accounting Standards Codification ("ASC") Topic 820, "Fair Value Measurements and Disclosures" relating to the disclosure of the fair value of assets. This guidance calls for additional information to be given regarding the transfer of items in and out of respective categories. In addition, it requires additional disclosures regarding purchases, sales, issuances, and settlements of assets that are classified as level three within the FASB fair value hierarchy. This guidance is generally effective for annual and interim periods ending after December 15, 2009. However, the disclosures about purchases, sales, issuances and settlements in the roll-forward activity in level three fair value measurements is deferred until fiscal years beginning after December 15, 2010. These additional disclosures did not have and are not expected to have a material impact on our financial condition, results of operations, cash flows or financial disclosures.

In December 2010, the FASB issued ASU No. 2010-29, which amends ASC Topic 805, "Business Combinations." This guidance requires a public entity to disclose pro forma information for business combinations that occurred in the current reporting period. The disclosures include pro forma revenue and earnings of the combined entity for the current reporting period as though the acquisition date for all business combinations that occurred during the year had been as of the beginning of the annual reporting period. If comparative financial statements are presented, the pro forma revenue and earnings of the combined entity for the comparable prior reporting period should be reported as though the acquisition date for all business combinations that occurred during the current year had been as of the beginning of the comparable prior annual reporting period. The guidance is effective for annual reporting periods beginning on or after December 15, 2010. Our adoption of this guidance did not have a material impact on our financial condition, results of operations, cash flows or financial disclosures.

In May 2011, the FASB issued ASU No. 2011-04, which amends ASC Topic 820, "Fair Value Measurements and Disclosures." This amended guidance clarifies the wording used to describe many of the requirements in accounting literature for measuring fair value and for disclosing information about fair value measurements. The goal of the amendment is to create consistency between the United States and international accounting standards. The guidance is effective for annual and interim reporting periods beginning on or after December 15, 2011. While we are still evaluating this guidance, the adoption of this guidance should not have a material impact on our financial condition, results of operations, cash flows or financial disclosures.

In June 2011, the FASB issued ASU No. 2011-05, which amends ASC Topic 220, "Comprehensive Income." This ASU allows an entity to present the total of comprehensive income, the components of net income, and the components of other comprehensive income either in a single continuous statement of comprehensive income or in two separate but consecutive statements. The amendment no longer allows an entity to show changes to other comprehensive income solely through the statement of equity. For publicly traded entities, the guidance is effective for annual and interim reporting periods beginning on or after December 15, 2011. While we are still evaluating this guidance, the adoption of this guidance will not have a material impact on our financial condition, results of operations, cash flows or financial disclosures.

**Item 7A.   Quantitative and Qualitative Disclosures About Market Risk.**

Market risk is the potential for loss due to a change in the value of a financial instrument as a result of fluctuations in interest rates, currency exchange rates or equity prices, as further described below.

*Interest Rate Risk*

We are subject to market risk exposure related to changes in interest rates on borrowings under the Credit Facilities. Interest on borrowings under the Credit Facilities is at an agreed upon percentage point spread over LIBOR, or a base rate stated in the agreement. At December 31, 2011, we had $975 million in borrowings outstanding under the Credit Facilities. Assuming our current level of debt, a change in LIBOR rates of one percent would increase our interest charges by approximately $10 million per year.

We maintain certain debt instruments at a fixed rate whose fair value will fluctuate based on changes in interest rates and market perceptions of our credit risk. The fair value of our total debt was $3.4 billion and $2.9 billion at December 31, 2011 and 2010, respectively. The increase was primarily a result of our issuance of $1.1 billion in debt in February 2011 and $935 million of additional borrowings under our revolving credit facilities, partially offset by the repayment of $693 million in joint venture credit facilities coupled with changes in fair value related to changes in interest rates and market perceptions of our credit risk.

Table of Contents

*Foreign Currency Risk*

Although we are a Swiss corporation, we define foreign currency as any non-U.S. denominated currency. Our functional currency is primarily the U.S. Dollar, which is consistent with the oil and gas industry. However, outside the United States, some of our expenses are incurred in local currencies. Therefore, when the U.S. Dollar weakens (strengthens) in relation to the currencies of the countries in which we operate, our expenses reported in U.S. Dollars will increase (decrease).

We are exposed to risks on future cash flows to the extent that local currency expenses exceed revenues denominated in local currency that are other than the functional currency. To help manage this potential risk, we periodically enter into derivative instruments to manage our exposure to fluctuations in currency exchange rates, and we may conduct hedging activities in future periods to mitigate such exposure. These contracts are primarily accounted for as cash flow hedges, with the effective portion of changes in the fair value of the hedge recorded on the Consolidated Balance Sheet and in "Accumulated other comprehensive loss". Amounts recorded in "Accumulated other comprehensive loss" are reclassified into earnings in the same period or periods that the hedged item is recognized in earnings. The ineffective portion of changes in the fair value of the hedged item is recorded directly to earnings. We have documented policies and procedures to monitor and control the use of derivative instruments. We do not engage in derivative transactions for speculative or trading purposes, nor are we a party to leveraged derivatives; however, we do maintain certain derivatives which were not designated for hedge accounting under FASB standards.

Our North Sea and Brazil operations have a significant amount of their cash operating expenses payable in local currencies. To limit the potential risk of currency fluctuations, we typically maintain short-term forward contracts settling monthly in their respective local currencies to mitigate exchange exposure. The forward contract settlements in 2012 represent approximately 23 percent of these forecasted local currency requirements. The notional amount of the forward contracts outstanding, expressed in U.S. Dollars, was approximately $42 million at December 31, 2011. Total unrealized loss related to these forward contracts was $3 million as of December 31, 2011 compared to a $2 million gain as of December 31, 2010. These items are recorded as part of "Accumulated other comprehensive loss" in our Consolidated Balance Sheets. A ten percent change in the exchange rate for the local currencies would change the fair value of these forward contracts by approximately $4 million.

We entered into a firm commitment for the construction of our *Noble Globetrotter I* drillship. The drillship was constructed in two phases, with the second phase being installation and commissioning of the topside equipment. Our payment obligation for this second phase of construction was denominated in Euros, and in order to mitigate the risk of fluctuations in foreign currency exchange rates, we entered into forward contracts to purchase Euros. As of December 31, 2011, all amounts related to the forward contracts have settled. We accounted for these forward contracts as fair value hedges, and their fair market value was included in "Other current assets/liabilities" in our Consolidated Balance Sheets. No gain or loss from these fair value hedges was recognized in earnings for the years ended December 31, 2011 or 2010.

*Market Risk*

We sponsor the Noble Drilling Corporation 401(k) Savings Restoration Plan ("Restoration Plan"). The Restoration Plan is a nonqualified, unfunded employee benefit plan under which certain highly compensated employees may elect to defer compensation in excess of amounts deferrable under our 401(k) savings plan. The Restoration Plan has no assets, and amounts withheld for the Restoration Plan are kept by us for general corporate purposes. The investments selected by employees and the associated returns are tracked on a phantom basis. Accordingly, we have a liability to employees for amounts originally withheld plus phantom investment income or less phantom investment losses. We are at risk for phantom investment income and, conversely, benefit should phantom investment losses occur. At December 31, 2011, our liability under the Restoration Plan totaled $6 million. We have purchased investments that closely correlate to the investment elections made by participants in the Restoration Plan in order to mitigate the impact of the phantom investment income and losses on our consolidated financial statements. The value of these investments held for our benefit totaled $5 million at December 31, 2011. A ten percent change in the fair value of the phantom investments would change our liability by approximately $0.5 million. Any change in the fair value of the phantom investments would be mitigated by a change in the investments held for our benefit.

47

Table of Contents

We also have a U.S. noncontributory defined benefit pension plan that covers certain salaried employees and a U.S. noncontributory defined benefit pension plan that covers certain hourly employees, whose initial date of employment is prior to August 1, 2004 (collectively referred to as our "qualified U.S. plans"). These plans are governed by the Noble Drilling Corporation Retirement Trust (the "Trust"). The benefits from these plans are based primarily on years of service and, for the salaried plan, employees' compensation near retirement. These plans are designed to qualify under the Employee Retirement Income Security Act of 1974 ("ERISA"), and our funding policy is consistent with funding requirements of ERISA and other applicable laws and regulations. We make cash contributions, or utilize credits available to us, for the qualified U.S. plans when required. The benefit amount that can be covered by the qualified U.S. plans is limited under ERISA and the Internal Revenue Code ("IRC") of 1986. Therefore, we maintain an unfunded, nonqualified excess benefit plan designed to maintain benefits for all employees at the formula level in the qualified U.S. plans. We refer to the qualified U.S. plans and the excess benefit plan collectively as the "U.S. plans".

In addition to the U.S. plans, each of Noble Drilling (Land Support) Limited, Noble Enterprises Limited and Noble Drilling (Nederland) B.V., all indirect, wholly-owned subsidiaries of Noble-Swiss, maintains a pension plan that covers all of its salaried, non-union employees (collectively referred to as our "non-U.S. plans"). Benefits are based on credited service and employees' compensation near retirement, as defined by the plans.

Changes in market asset value related to the pension plans noted above could have a material impact upon our Consolidated Statements of Comprehensive Income and could result in material cash expenditures in future periods.

48

Table of Contents

**Item 8.     Financial Statements and Supplementary Data.**

The following financial statements are filed in this Item 8:

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (Noble-Swiss) | 50 |
| Noble Corporation (Noble-Swiss) and Subsidiaries Consolidated Balance Sheet as of December 31, 2011 and 2010 | 51 |
| Noble Corporation (Noble-Swiss) and Subsidiaries Consolidated Statements of Income for the Years Ended December 31, 2011, 2010 and 2009 | 52 |
| Noble Corporation (Noble-Swiss) and Subsidiaries Consolidated Statements of Cash Flows for the Years Ended December 31, 2011, 2010 and 2009 | 53 |
| Noble Corporation (Noble-Swiss) and Subsidiaries Consolidated Statements of Equity for the Years Ended December 31, 2011, 2010 and 2009 | 54 |
| Noble Corporation (Noble-Swiss) and Subsidiaries Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2011, 2010 and 2009 | 55 |
| Report of Independent Registered Public Accounting Firm (Noble-Cayman) | 56 |
| Noble Corporation (Noble-Cayman) and Subsidiaries Consolidated Balance Sheet as of December 31, 2011 and 2010 | 57 |
| Noble Corporation (Noble-Cayman) and Subsidiaries Consolidated Statements of Income for the Years Ended December 31, 2011, 2010 and 2009 | 58 |
| Noble Corporation (Noble-Cayman) and Subsidiaries Consolidated Statements of Cash Flows for the Years Ended December 31, 2011, 2010 and 2009 | 59 |
| Noble Corporation (Noble-Cayman) and Subsidiaries Consolidated Statements of Equity for the Years Ended December 31, 2011, 2010 and 2009 | 60 |
| Noble Corporation (Noble-Cayman) and Subsidiaries Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2011, 2010 and 2009 | 61 |
| Notes to Consolidated Financial Statements | 62 |

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and
Shareholders of Noble Corporation, a Swiss Corporation ("Noble-Swiss")

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, comprehensive income, equity and cash flows present fairly, in all material respects, the financial position of Noble-Swiss and its subsidiaries at December 31, 2011 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2011 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, Noble-Swiss maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Noble-Swiss' management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on these financial statements and on Noble-Swiss' internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Houston, Texas
February 27, 2012

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET
(In thousands)

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 239,196 | $ 337,871 |
| Accounts receivable | 587,163 | 387,414 |
| Taxes receivable | 75,284 | 81,066 |
| Prepaid expenses | 57,254 | 35,502 |
| Other current assets | 100,715 | 69,941 |
| Total current assets | 1,059,612 | 911,794 |
| | | |
| Property and equipment | | |
| Drilling equipment and facilities | 14,839,627 | 12,471,283 |
| Other | 197,485 | 172,583 |
| | 15,037,112 | 12,643,866 |
| Accumulated depreciation | (3,139,645) | (2,595,779) |
| | 11,897,467 | 10,048,087 |
| | | |
| Other assets | 538,080 | 342,506 |
| **Total assets** | $ 13,495,159 | $ 11,302,387 |
| | | |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities | | |
| Current maturities of long-term debt | $ — | $ 80,213 |
| Accounts payable | 436,006 | 374,814 |
| Accrued payroll and related costs | 117,907 | 125,663 |
| Taxes payable | 94,920 | 96,448 |
| Interest payable | 54,419 | 40,260 |
| Other current liabilities | 123,928 | 84,049 |
| Total current liabilities | 827,180 | 801,447 |
| | | |
| Long-term debt | 4,071,964 | 2,686,484 |
| Deferred income taxes | 242,791 | 258,822 |
| Other liabilities | 255,372 | 268,000 |
| **Total liabilities** | 5,397,307 | 4,014,753 |
| | | |
| Commitments and contingencies | | |
| | | |
| Equity | | |
| Shares; 252,639 shares and 262,415 shares outstanding | 766,595 | 917,684 |
| Treasury shares, at cost; 287 shares and 10,140 shares | (10,553) | (373,967) |
| Additional paid-in capital | 48,356 | 39,006 |
| Retained earnings | 6,676,444 | 6,630,500 |
| Accumulated other comprehensive loss | (74,321) | (50,220) |
| **Total shareholders' equity** | 7,406,521 | 7,163,003 |
| | | |
| Noncontrolling interests | 691,331 | 124,631 |
| | | |
| **Total equity** | 8,097,852 | 7,287,634 |
| | | |
| **Total liabilities and equity** | $ 13,495,159 | $ 11,302,387 |

See accompanying notes to the consolidated financial statements

Table of Contents

**NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
(In thousands, except per share amounts)

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| **Operating revenues** | | | |
| Contract drilling services | $ 2,556,758 | $ 2,695,493 | $ 3,509,755 |
| Reimbursables | 79,195 | 76,831 | 99,201 |
| Labor contract drilling services | 59,004 | 32,520 | 30,298 |
| Other | 875 | 2,332 | 1,530 |
| | 2,695,832 | 2,807,176 | 3,640,784 |
| **Operating costs and expenses** | | | |
| Contract drilling services | 1,384,200 | 1,177,800 | 1,006,764 |
| Reimbursables | 58,439 | 59,414 | 85,035 |
| Labor contract drilling services | 33,885 | 22,056 | 18,827 |
| Depreciation and amortization | 658,640 | 539,829 | 408,313 |
| Selling, general and administrative | 91,377 | 91,997 | 80,262 |
| Gain on contract extinguishments, net | (21,202) | — | — |
| Loss on asset disposal/involuntary conversion, net | — | — | 30,839 |
| | 2,205,339 | 1,891,096 | 1,630,040 |
| **Operating income** | 490,493 | 916,080 | 2,010,744 |
| **Other income (expense)** | | | |
| Interest expense, net of amount capitalized | (55,727) | (9,457) | (1,685) |
| Interest income and other, net | 1,484 | 9,886 | 6,843 |
| **Income before income taxes** | 436,250 | 916,509 | 2,015,902 |
| Income tax provision | (72,625) | (143,077) | (337,260) |
| **Net income** | 363,625 | 773,432 | 1,678,642 |
| Income attributable to noncontrolling interests | 7,273 | (3) | — |
| **Net income attributable to Noble Corporation** | $ 370,898 | $ 773,429 | $ 1,678,642 |
| **Net income per share attributable to Noble Corporation** | | | |
| Basic | $ 1.46 | $ 3.03 | $ 6.44 |
| Diluted | 1.46 | 3.02 | 6.42 |
| **Weighted-Average Shares Outstanding:** | | | |
| Basic | 251,405 | 253,123 | 258,035 |
| Diluted | 251,989 | 253,936 | 258,891 |

See accompanying notes to the consolidated financial statements.

52

Table of Contents

**NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| **Cash flows from operating activities** | | | |
| Net income | $ 363,625 | $ 773,432 | $ 1,678,642 |
| Adjustments to reconcile net income to net cash from operating activities: | | | |
| Depreciation and amortization | 658,640 | 539,829 | 408,313 |
| Gain on contract extinguishments, net | (21,202) | — | — |
| Loss on asset disposal/involuntary conversion, net | — | — | 30,839 |
| Deferred income tax provision | (82,325) | (41,409) | 36,866 |
| Share-based compensation | 31,904 | 34,930 | 37,995 |
| Net change in other assets and liabilities | (191,658) | 347,594 | (55,939) |
| Net cash from operating activities | 758,984 | 1,654,376 | 2,136,716 |
| | | | |
| **Cash flows from investing activities** | | | |
| Capital expenditures | (2,639,979) | (1,423,484) | (1,431,498) |
| Change in accrued capital expenditures | 81,047 | 139,185 | (63,561) |
| Refund from contract extinguishments | 18,642 | | |
| Acquisition of FDR Holdings, Ltd., net of cash acquired | — | (1,629,644) | — |
| Net cash from investing activities | (2,540,290) | (2,913,943) | (1,495,059) |
| | | | |
| **Cash flows from financing activities** | | | |
| Increase in bank credit facilities, net | 935,000 | 40,000 | — |
| Proceeds from issuance of senior notes, net of debt issuance costs | 1,087,833 | 1,238,074 | — |
| Contributions from joint venture partners | 536,000 | 35,000 | — |
| Payments of other long-term debt | — | — | (172,700) |
| Payments of joint venture debt | (693,494) | — | — |
| Settlement of interest rate swap | (29,032) | (6,186) | — |
| Financing costs on credit facilities | (2,835) | — | |
| Proceeds from employee stock transactions | 9,924 | 11,828 | 12,168 |
| Repurchases of employee shares | (10,233) | (10,116) | (7,106) |
| Dividends/par value reduction payments paid | (150,532) | (227,325) | (47,939) |
| Repurchases of shares | — | (219,330) | (203,898) |
| Net cash from financing activities | 1,682,631 | 861,945 | (419,475) |
| Net (decrease) increase in cash and cash equivalents | (98,675) | (397,622) | 222,182 |
| **Cash and cash equivalents, beginning of period** | 337,871 | 735,493 | 513,311 |
| **Cash and cash equivalents, end of period** | $ 239,196 | $ 337,871 | $ 735,493 |

See accompanying notes to the consolidated financial statements.

53

Table of Contents

**NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF EQUITY**
(In thousands)

| | Shares | | Capital in Excess of Par Value | Retained Earnings | Treasury Shares | Noncontrolling Interests | Accumulated Other Comprehensive Loss | Total Equity |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Balance | Par Value | | | | | | |
| **Balance at January 1, 2009** | **261,899** | **$ 26,190** | **$ 402,115** | **$4,919,667** | **$ —** | **$ —** | **$ (57,257)** | **$5,290,715** |
| Employee related equity activity | | | | | | | | |
| Share-based compensation | 1,472 | 766 | 8,255 | 28,974 | — | — | — | 37,995 |
| Contribution to employee benefit plans | 17 | 49 | 152 | 339 | — | — | — | 540 |
| Exercise of stock options | 720 | 3,098 | 162 | 8,908 | — | — | — | 12,168 |
| Tax benefit of stock options exercised | — | — | (1,597) | 9,144 | — | — | — | 7,547 |
| Restricted shares forfeited or repurchased for taxes | (413) | (597) | (5,527) | (982) | — | — | — | (7,106) |
| Repurchases of ordinary shares | (1,720) | (172) | (43,303) | — | (143,031) | — | — | (186,506) |
| Cancellation of shares in Transaction | (261,246) | (26,125) | 26,125 | (775,950) | — | — | — | (775,950) |
| Issuance of shares in Transaction | 261,246 | 1,162,332 | (386,382) | — | — | — | — | 775,950 |
| Net income | — | — | — | 1,678,642 | — | — | — | 1,678,642 |
| Dividends/par value reduction payments paid | — | (34,934) | — | (13,005) | — | — | — | (47,939) |
| Other comprehensive income, net | — | — | — | — | — | — | 2,376 | 2,376 |
| **Balance at December 31, 2009** | **261,975** | **$1,130,607** | **$ —** | **$5,855,737** | **$(143,031)** | **$ —** | **$ (54,881)** | **$6,788,432** |
| Employee related equity activity | | | | | | | | |
| Share-based compensation | 78 | 313 | 34,617 | — | — | — | — | 34,930 |
| Contribution to employee benefit plans | 8 | 30 | 196 | — | — | — | — | 226 |
| Exercise of stock options | 538 | 2,119 | 9,483 | — | — | — | — | 11,602 |
| Tax benefit of stock options exercised | — | — | 6,494 | — | — | — | — | 6,494 |
| Restricted shares forfeited or repurchased for taxes | (184) | (809) | 965 | 1,334 | (11,606) | — | — | (10,116) |
| Repurchases of shares | — | — | — | — | (219,330) | — | — | (219,330) |
| Net income | — | — | — | 773,429 | — | 3 | — | 773,432 |
| Dividends/par value reduction payments paid | — | (214,576) | (12,749) | — | — | — | — | (227,325) |
| Noncontrolling interests from FDR Holdings, Ltd. acquisition | — | — | — | — | — | 124,628 | — | 124,628 |
| Other comprehensive income, net | — | — | — | — | — | — | 4,661 | 4,661 |
| **Balance at December 31, 2010** | **262,415** | **$ 917,684** | **$ 39,006** | **$6,630,500** | **$(373,967)** | **$ 124,631** | **$ (50,220)** | **$7,287,634** |
| Employee related equity activity | | | | | | | | |
| Share-based compensation | 252 | 848 | 31,066 | — | — | — | — | 31,914 |
| Exercise of stock options | 501 | 1,661 | 7,303 | — | — | — | — | 8,964 |
| Tax benefit of stock options exercised | — | — | 950 | — | — | — | — | 950 |
| Restricted shares | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| forfeited or repurchased for taxes | (413) | (1,401) | 1,401 | — | (10,233) | — | — | (10,233) |
| Retirement of treasury shares | (10,116) | (33,035) | — | (340,612) | 373,647 | — | — | — |
| Settlement of FIN 48 provision | — | — | — | 15,658 | — | — | — | 15,658 |
| Net income | — | — | — | 370,898 | — | (7,273) | — | 363,625 |
| Equity contribution by joint venture partner | — | — | — | — | — | 573,973 | — | 573,973 |
| Dividends/par value reduction payments paid | — | (119,162) | (31,370) | — | — | — | — | (150,532) |
| Other comprehensive loss, net | — | — | — | — | — | — | (24,101) | (24,101) |
| **Balance at December 31, 2011** | 252,639 | $ 766,595 | $ 48,356 | $6,676,444 | $ (10,553) | $ 691,331 | $ (74,321) | $8,097,852 |

See accompanying notes to the consolidated financial statements.

Table of Contents

**NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
(In thousands)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2011** | **2010** | **2009** |
| Net income | $ 363,625 | $ 773,432 | $ 1,678,642 |
| | | | |
| **Other comprehensive income (loss), net of tax** | | | |
| Foreign currency translation adjustments | (2,566) | 2,456 | 277 |
| Gain (loss) on foreign currency forward contracts | (4,665) | 1,187 | 417 |
| Gain (loss) on interest rate swaps | (366) | 366 | — |
| Net pension plan loss (net of a tax benefit of $12,845 in 2011, $2,888 in 2010 and $1,635 in 2009) | (18,551) | (1,898) | (1,424) |
| Amortization of deferred pension plan amounts (net of tax provision of $1,146 in 2011, $1,286 in 2010 and $653 in 2009) | 2,047 | 2,550 | 3,106 |
| Other comprehensive income (loss), net | (24,101) | 4,661 | 2,376 |
| | | | |
| Total comprehensive income | 339,524 | 778,093 | 1,681,018 |
| | | | |
| Less: Income attributable to noncontrolling interests | 7,273 | (3) | — |
| | | | |
| Less: Noncontrolling portion of gain (loss) on interest rate swaps | 183 | (183) | — |
| | | | |
| **Comprehensive income attributable to Noble Corporation** | $ 346,980 | $ 777,907 | $ 1,681,018 |

See accompanying notes to the consolidated financial statements

55

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and
Shareholder of Noble Corporation, a Cayman Islands Company ("Noble-Cayman")

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, comprehensive income, equity and cash flows present fairly, in all material respects, the financial position of Noble-Cayman and its subsidiaries at December 31, 2011 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2011 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, Noble-Cayman maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Noble-Cayman's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on these financial statements and on Noble-Cayman's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Houston, Texas
February 27, 2012

56

Table of Contents

NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET
(In thousands)

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 235,056 | $ 333,399 |
| Accounts receivable | 587,163 | 387,414 |
| Taxes receivable | 75,284 | 81,066 |
| Prepaid expenses | 54,563 | 33,232 |
| Other current assets | 98,651 | 69,821 |
| Total current assets | 1,050,717 | 904,932 |
| | | |
| Property and equipment | | |
| Drilling equipment and facilities | 14,839,627 | 12,471,283 |
| Other | 163,301 | 143,691 |
| | 15,002,928 | 12,614,974 |
| Accumulated depreciation | (3,134,401) | (2,594,954) |
| | 11,868,527 | 10,020,020 |
| | | |
| Other assets | 538,161 | 342,592 |
| **Total assets** | $ 13,457,405 | $ 11,267,544 |
| | | |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities | | |
| Current maturities of long-term debt | $ — | $ 80,213 |
| Accounts payable | 435,729 | 374,559 |
| Accrued payroll and related costs | 108,908 | 120,634 |
| Taxes payable | 91,190 | 94,132 |
| Interest payable | 54,419 | 40,260 |
| Other current liabilities | 123,399 | 83,759 |
| Total current liabilities | 813,645 | 793,557 |
| | | |
| Long-term debt | 4,071,964 | 2,686,484 |
| Deferred income taxes | 242,791 | 258,822 |
| Other liabilities | 255,372 | 268,026 |
| **Total liabilities** | 5,383,772 | 4,006,889 |
| | | |
| Commitments and contingencies | | |
| | | |
| Equity | | |
| Ordinary shares; 261,246 shares outstanding | 26,125 | 26,125 |
| Capital in excess of par value | 450,616 | 416,232 |
| Retained earnings | 6,979,882 | 6,743,887 |
| Accumulated other comprehensive loss | (74,321) | (50,220) |
| **Total shareholder equity** | 7,382,302 | 7,136,024 |
| | | |
| Noncontrolling interests | 691,331 | 124,631 |
| | | |
| **Total equity** | 8,073,633 | 7,260,655 |
| | | |
| **Total liabilities and equity** | $ 13,457,405 | $ 11,267,544 |

See accompanying notes to the consolidated financial statements.

57

Table of Contents

NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF INCOME
(In thousands, except per share amounts)

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2011** | **2010** | **2009** |
| **Operating revenues** | | | |
| Contract drilling services | $ 2,556,758 | $ 2,695,493 | $ 3,509,755 |
| Reimbursables | 79,195 | 76,831 | 99,201 |
| Labor contract drilling services | 59,004 | 32,520 | 30,298 |
| Other | 875 | 2,332 | 1,157 |
| | 2,695,832 | 2,807,176 | 3,640,411 |
| **Operating costs and expenses** | | | |
| Contract drilling services | 1,371,415 | 1,172,801 | 1,006,764 |
| Reimbursables | 58,439 | 59,414 | 85,035 |
| Labor contract drilling services | 33,885 | 22,056 | 18,827 |
| Depreciation and amortization | 657,205 | 539,004 | 408,313 |
| Selling, general and administrative | 56,787 | 55,568 | 58,543 |
| Gain on contract extinguishments, net | (21,202) | — | — |
| Loss on asset disposal/involuntary conversion, net | — | — | 30,839 |
| | 2,156,529 | 1,848,843 | 1,608,321 |
| **Operating income** | 539,303 | 958,333 | 2,032,090 |
| **Other income (expense)** | | | |
| Interest expense, net of amount capitalized | (55,727) | (9,457) | (1,685) |
| Interest income and other, net | 2,480 | 8,527 | 6,810 |
| **Income before income taxes** | 486,056 | 957,403 | 2,037,215 |
| Income tax provision | (71,286) | (141,866) | (336,834) |
| **Net income** | 414,770 | 815,537 | 1,700,381 |
| Income attributable to noncontrolling interests | 7,273 | (3) | — |
| **Net income attributable to Noble Corporation** | $ 422,043 | $ 815,534 | $ 1,700,381 |

See accompanying notes to the consolidated financial statements.

58

Table of Contents

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| **Cash flows from operating activities** | | | |
| Net income | $ 414,770 | $ 815,537 | $ 1,700,381 |
| Adjustments to reconcile net income to net cash from operating activities: | | | |
| Depreciation and amortization | 657,205 | 539,004 | 408,313 |
| Gain on contract extinguishments, net | (21,202) | — | — |
| Loss on asset disposal/involuntary conversion, net | — | — | 30,839 |
| Deferred income tax provision | (82,325) | (41,409) | 36,866 |
| Share-based compensation | — | — | 8,399 |
| Capital contribution by parent — share-based compensation | 18,726 | 20,604 | 27,254 |
| Net change in other assets and liabilities | (197,943) | 342,631 | (63,417) |
| Net cash from operating activities | 789,231 | 1,676,367 | 2,148,635 |
| | | | |
| **Cash flows from investing activities** | | | |
| Capital expenditures | (2,634,687) | (1,422,655) | (1,403,435) |
| Change in accrued capital expenditures | 81,047 | 139,185 | (63,561) |
| Refund from contract extinguishments | 18,642 | — | — |
| Acquisition of FDR Holdings, Ltd., net of cash acquired | — | (1,629,644) | — |
| Net cash from investing activities | (2,534,998) | (2,913,114) | (1,466,996) |
| | | | |
| **Cash flows from financing activities** | | | |
| Increase in bank credit facilities, net | 935,000 | 40,000 | — |
| Proceeds from issuance of senior notes, net of debt issuance costs | 1,087,833 | 1,238,074 | — |
| Contributions from joint venture partner | 536,000 | 35,000 | — |
| Payments of other long-term debt | — | — | (172,700) |
| Payments of joint venture debt | (693,494) | — | — |
| Settlement of interest rate swaps | (29,032) | (6,186) | — |
| Financing costs on credit facilities | (2,835) | — | — |
| Distributions to parent company, net | (186,048) | (462,967) | (218,258) |
| Proceeds from employee stock transactions | — | — | (6,430) |
| Dividends paid | — | — | (10,470) |
| Repurchases of ordinary shares | — | — | (60,867) |
| Net cash from financing activities | 1,647,424 | 843,921 | (468,725) |
| Net (decrease) increase in cash and cash equivalents | (98,343) | (392,826) | 212,914 |
| **Cash and cash equivalents, beginning of period** | 333,399 | 726,225 | 513,311 |
| **Cash and cash equivalents, end of period** | $ 235,056 | $ 333,399 | $ 726,225 |

See accompanying notes to the consolidated financial statements.

59

[Table of Contents]

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF EQUITY**
(In thousands)

| | Shares Balance | Par Value | Capital in Excess of Par Value | Retained Earnings | Noncontrolling Interests | Accumulated Other Comprehensive Loss | Total Equity |
|---|---|---|---|---|---|---|---|
| **Balance at January 1, 2009** | 261,899 | $ 26,190 | $ 402,115 | $4,919,667 | $ — | $ (57,257) | $5,290,715 |
| Share-based compensation | | | | | | | |
| Share-based compensation | 1,331 | 133 | 8,266 | — | — | — | 8,399 |
| Contribution to employee benefit plans | 6 | 1 | 152 | — | — | — | 153 |
| Exercise of stock options | 15 | 2 | 145 | — | — | — | 147 |
| Tax benefit of stock options exercised | — | — | 6,533 | — | — | — | 6,533 |
| Restricted shares forfeited or repurchased for taxes | (285) | (29) | (5,534) | — | — | — | (5,563) |
| Repurchases of ordinary shares | (1,720) | (172) | (43,303) | — | — | — | (43,475) |
| Net income | — | — | — | 1,700,381 | — | — | 1,700,381 |
| Dividends/par value reduction payments paid | — | — | — | (10,470) | — | — | (10,470) |
| Capital contributions by parent- | | | | | | | |
| Share-based compensation | — | — | 27,254 | — | — | — | 27,254 |
| Distributions to parent | — | — | — | (218,258) | — | — | (218,258) |
| Other comprehensive income, net | — | — | — | — | — | 2,376 | 2,376 |
| **Balance at December 31, 2009** | 261,246 | $ 26,125 | $ 395,628 | $6,391,320 | $ — | $ (54,881) | $6,758,192 |
| Distributions to parent | — | — | — | (462,967) | — | — | (462,967) |
| Capital contributions by parent- | | | | | | | |
| Share-based compensation | — | — | 20,604 | — | — | — | 20,604 |
| Net income | — | — | — | 815,534 | 3 | — | 815,537 |
| Noncontrolling interests from FDR Holdings, Ltd. acquisition | — | — | — | — | 124,628 | — | 124,628 |
| Other comprehensive income, net | — | — | — | — | — | 4,661 | 4,661 |
| **Balance at December 31, 2010** | 261,246 | $ 26,125 | $ 416,232 | $6,743,887 | $ 124,631 | $ (50,220) | $7,260,655 |
| Distributions to parent | — | — | — | (186,048) | — | — | (186,048) |
| Capital contributions by parent- | | | | | | | |
| Share-based compensation | — | — | 18,726 | — | — | — | 18,726 |
| Net income | — | — | — | 422,043 | (7,273) | — | 414,770 |
| Settlement of FIN 48 provision | — | — | 15,658 | — | — | — | 15,658 |
| Noncontrolling interest contributions | — | — | — | — | 573,973 | — | 573,973 |
| Other comprehensive loss, net | — | — | — | — | — | (24,101) | (24,101) |
| **Balance at December 31, 2011** | 261,246 | $ 26,125 | $ 450,616 | $6,979,882 | $ 691,331 | $ (74,321) | $8,073,633 |

See accompanying notes to the consolidated financial statements.

Table of Contents

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
(In thousands)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2009 |
| Net income | $ 414,770 | $ 815,537 | $ 1,700,381 |
| | | | |
| Other comprehensive income (loss), net of tax | | | |
| Foreign currency translation adjustments | (2,566) | 2,456 | 277 |
| Gain (loss) on foreign currency forward contracts | (4,665) | 1,187 | 417 |
| Gain (loss) on interest rate swaps | (366) | 366 | — |
| Net pension plan loss (net of a tax benefit of $12,845 in 2011, $2,888 in 2010 and $1,635 in 2009) | (18,551) | (1,898) | (1,424) |
| Amortization of deferred pension plan amounts (net of tax provision of $1,146 in 2011, $1,286 in 2010 and $653 in 2009) | 2,047 | 2,550 | 3,106 |
| Other comprehensive income (loss), net | (24,101) | 4,661 | 2,376 |
| | | | |
| Total comprehensive income | 390,669 | 820,198 | 1,702,757 |
| | | | |
| Less: Income attributable to noncontrolling interests | 7,273 | (3) | — |
| | | | |
| Less: Noncontrolling portion of gain (loss) on interest rate swaps | 183 | (183) | — |
| | | | |
| Comprehensive income attributable to Noble Corporation | $ 398,125 | $ 820,012 | $ 1,702,757 |

See accompanying notes to the consolidated financial statements.

61

Table of Contents

**NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES**
**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 1 — Organization and Significant Accounting Policies**

*Organization and Business*

Noble Corporation, a Swiss corporation, is a leading offshore drilling contractor for the oil and gas industry. We perform contract drilling services with our fleet of 79 mobile offshore drilling units and one floating production storage and offloading unit ("FPSO") located worldwide. Our fleet consists of 14 semisubmersibles, 14 drillships, 49 jackups and two submersibles. Our fleet includes 11 units under construction:

- five dynamically positioned, ultra-deepwater, harsh environment drillships and

- six high-specification heavy-duty, harsh environment jackup rigs.

As of February 15, 2012, approximately 84 percent of our fleet was located outside the United States in the following areas: Mexico, Brazil, the North Sea, the Mediterranean, West Africa, the Middle East, India and the Asian Pacific. Noble and its predecessors have been engaged in the contract drilling of oil and gas wells since 1921.

*Consummation of Migration and Worldwide Internal Restructuring*

On March 26, 2009, we completed a series of transactions that effectively changed the place of incorporation of our parent holding company from the Cayman Islands to Switzerland. As a result of these transactions, Noble-Cayman, our former publicly-traded parent company, became a direct, wholly-owned subsidiary of Noble-Swiss, our current publicly-traded parent company. Noble-Swiss' principal asset is all of the shares of Noble-Cayman. Noble-Cayman has no public equity outstanding after March 26, 2009. The consolidated financial statements of Noble-Swiss include the accounts of Noble-Cayman, and Noble-Swiss conducts substantially all of its business through Noble-Cayman and its subsidiaries.

*Principles of Consolidation*

The consolidated financial statements include our accounts, those of our wholly-owned subsidiaries and entities in which we hold a controlling financial interest. Our 2011 and 2010 consolidated financial statements include the accounts of two joint ventures, in each of which we own a 50 percent interest. Our ownership interest meets the definition of variable interest under Financial Accounting Standards Board ("FASB") codification and we have determined that we are the primary beneficiary. Intercompany balances and transactions have been eliminated in consolidation.

*Foreign Currency Translation*

Although we are a Swiss corporation, we define foreign currency as any non-U.S. denominated currency. In non-U.S. locations where the U.S. Dollar has been designated as the functional currency (based on an evaluation of such factors as the markets in which the subsidiary operates, inflation, generation of cash flow, financing activities and intercompany arrangements), local currency transaction gains and losses are included in net income. In non-U.S. locations where the local currency is the functional currency, assets and liabilities are translated at the rates of exchange on the balance sheet date, while income and expense items are translated at average rates of exchange during the year. The resulting gains or losses arising from the translation of accounts from the functional currency to the U.S. Dollar are included in "Accumulated other comprehensive loss" in the Consolidated Balance Sheets. We did not recognize any material gains or losses on foreign currency transactions or translations during the years ended December 31, 2011, 2010 and 2009.

*Cash and Cash Equivalents*

Cash and cash equivalents include cash on hand, demand deposits with banks and all highly liquid investments with original maturities of three months or less. Our cash, cash equivalents and short-term investments are subject to potential credit risk, and certain of our cash accounts carry balances greater than the federally insured limits. Cash and cash equivalents are held by major banks or investment firms. Our cash management and investment policies restrict investments to lower risk, highly liquid securities and we perform periodic evaluations of the relative credit standing of the financial institutions with which we conduct business.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

Cash flows from our labor contract drilling services in Canada are calculated based on the Canadian Dollar. As a result, amounts related to assets and liabilities reported on the Consolidated Statements of Cash Flows will not necessarily agree with changes in the corresponding balances on the Consolidated Balance Sheets. The effect of exchange rate changes on cash balances held in foreign currencies was not material in 2011, 2010 or 2009.

*Investments in Marketable Securities*

Investments in marketable securities are classified as trading securities and carried at fair value in "Other Current Assets" with the unrealized gain or loss included in "Other Income" in the accompanying Consolidated Statements of Income.

*Property and Equipment*

Property and equipment is stated at cost, reduced by provisions to recognize economic impairment in value whenever events or changes in circumstances indicate an asset's carrying value may not be recoverable. At December 31, 2011 and 2010, there was $4.4 billion and $3.2 billion of construction-in-progress, respectively. Such amounts are included in "Drilling equipment and facilities" in the accompanying Consolidated Balance Sheets. Major replacements and improvements are capitalized. When assets are sold, retired or otherwise disposed of, the cost and related accumulated depreciation are eliminated from the accounts and the gain or loss is recognized. Drilling equipment and facilities are depreciated using the straight-line method over their estimated useful lives as of the date placed in service or date of major refurbishment. Estimated useful lives of our drilling equipment range from three to thirty years. Other property and equipment is depreciated using the straight-line method over useful lives ranging from two to twenty-five years. Included in accounts payable was $210 million and $161 million of capital accruals as of December 31, 2011 and 2010, respectively.

Interest is capitalized on construction-in-progress at the interest rate on debt incurred for construction or at the weighted average cost of debt outstanding during the period of construction. Capitalized interest for the years ended December 31, 2011, 2010 and 2009 was $122 million, $83 million and $55 million, respectively.

Overhauls and scheduled maintenance of equipment are performed based on the number of hours operated in accordance with our preventative maintenance program. Routine repair and maintenance costs are charged to expense as incurred; however, the costs of the overhauls and scheduled major maintenance projects that benefit future periods and which typically occur every three to five years are deferred when incurred and amortized over an equivalent period. The deferred portion of these major maintenance projects is included in "Other Assets" in the Consolidated Balance Sheets. Such amounts totaled $261 million and $183 million at December 31, 2011 and 2010, respectively.

Amortization of deferred costs for major maintenance projects is reflected in "Depreciation and amortization" in the accompanying Consolidated Statements of Income. The amount of such amortization was $111 million, $107 million and $102 million for the years ended December 31, 2011, 2010 and 2009, respectively. Total repair and maintenance expense for the years ended December 31, 2011, 2010 and 2009, exclusive of amortization of deferred costs for major maintenance projects, was $242 million, $186 million and $175 million, respectively.

We evaluate the realization of property and equipment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss on our property and equipment exists when the estimated undiscounted cash flows expected to result from the use of the asset and its eventual disposition are less than its carrying amount. Any impairment loss recognized represents the excess of the asset's carrying value over the estimated fair value.

In January 2011, we announced the signing of a Memorandum of Understanding ("MOU") with Petroleo Brasileiro S.A. ("Petrobras") regarding operations in Brazil. Under the terms of the MOU, we agreed to substitute the *Noble Phoenix*, then under contract with Royal Dutch Shell, PLC ("Shell") in Southeast Asia, for the *Noble Muravlenko*. In connection with the cancellation of the contract on the *Noble Phoenix*, we recognized a non-cash gain of approximately $52.5 million during the first quarter of 2011, which represents the unamortized fair value of the in-place contract assumed in connection with the Frontier acquisition. As a result of the substitution, we reached a decision not to proceed with the previously announced reliability upgrade to the *Noble Muravlenko* that was scheduled to take place in 2013. As a result, we incurred a non-cash charge of approximately $32.6 million related to the termination of outstanding shipyard contracts. We expect the actual substitution to take place in the second quarter of 2012 after the *Noble Phoenix* completes its shipyard work.

63

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

In May 2009, our jackup, the *Noble David Tinsley*, experienced a "punch-through" while the rig was being positioned on location offshore Qatar. The incident involved the sudden penetration of all three legs through the sea bottom, which resulted in severe damage to the legs and the rig. We recorded a charge of $17 million during 2009 related to this involuntary conversion, which includes approximately $9 million for the write-off of the damaged legs.

During the first quarter of 2009, we recognized a charge of $12 million related to the *Noble Fri Rodli*, a submersible that had been cold stacked since October 2007. We recorded the charge as a result of a decision to evaluate disposition alternatives for this rig.

*Deferred Costs*

Deferred debt issuance costs are being amortized over the life of the debt securities. The amortization of debt issuance costs is included in interest expense.

*Insurance Reserves*

We maintain various levels of self-insured retention for certain losses including property damage, loss of hire, employment practices liability, employers' liability, and general liability, among others. We accrue for property damage and loss of hire charges on a per event basis.

Employment practices liability claims are accrued based on actual claims during the year. Maritime employer's liability claims are generally estimated using actuarial determinations. General liability claims are estimated by our internal claims department by evaluating the facts and circumstances of each claim (including incurred but not reported claims) and making estimates based upon historical experience with similar claims. At both December 31, 2011 and 2010, loss reserves for personal injury and protection claims totaled $21 million, and such amounts are included in "Other current liabilities" in the accompanying Consolidated Balance Sheets.

*Revenue Recognition*

Revenues generated from our dayrate-basis drilling contracts and labor contracts are recognized as services are performed.

We may receive lump-sum fees for the mobilization of equipment and personnel. Mobilization fees received and costs incurred to mobilize a drilling unit from one market to another are recognized over the term of the related drilling contract. Absent a contract, the initial mobilization costs of newbuild rigs from the shipyard are deferred and amortized over the life of the rig. Subsequent costs incurred to relocate drilling units to more promising geographic areas in which a contract has not been secured are expensed as incurred. Lump-sum payments received from customers relating to specific contracts, including equipment modifications, are deferred and amortized to income over the term of the drilling contract. Deferred revenues under drilling contracts totaled $139 million at December 31, 2011 as compared to $104 million at December 31, 2010, including $65 million in fair value contract adjustments in connection with our acquisition of FDR Holdings Ltd. discussed in Note 2. Such amounts are included in either "Other Current Liabilities" or "Other Liabilities" in our Consolidated Balance Sheets, based upon our expected time of recognition. As discussed in Note 10- "Gain on contract extinguishments, net," in connection with the cancelation of the contract on the *Noble Phoenix*, we recognized a non-cash gain of approximately $52.5 million in the first quarter of 2011, which represented the unamortized balance of the contract's fair value adjustment.

We record reimbursements from customers for "out-of-pocket" expenses as revenues and the related direct cost as operating expenses.

64

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

*Income Taxes*

Income taxes are based on the laws and rates in effect in the countries in which operations are conducted or in which we or our subsidiaries are considered resident for income tax purposes. Applicable income and withholding taxes have not been provided on undistributed earnings of our subsidiaries. We do not intend to repatriate such undistributed earnings except for distributions upon which incremental income and withholding taxes would not be material. In certain circumstances, we expect that, due to changing demands of the offshore drilling markets and the ability to redeploy our offshore drilling units, certain of such units will not reside in a location long enough to give rise to future tax consequences. As a result, no deferred tax asset or liability has been recognized in these circumstances. Should our expectations change regarding the length of time an offshore drilling unit will be used in a given location, we will adjust deferred taxes accordingly.

We operate through various subsidiaries in numerous countries throughout the world including the United States. Consequently, we are subject to changes in tax laws, treaties or regulations or the interpretation or enforcement thereof in the U.S., Switzerland or jurisdictions in which we or any of our subsidiaries operate or is resident. Our income tax expense is based upon our interpretation of the tax laws in effect in various countries at the time that the expense was incurred. If the U.S. Internal Revenue Service or other taxing authorities do not agree with our assessment of the effects of such laws, treaties and regulations, this could have a material adverse effect on us including the imposition of a higher effective tax rate on our worldwide earnings or a reclassification of the tax impact of our significant corporate restructuring transactions.

*Net Income per Share*

Our unvested share-based payment awards, which contain non-forfeitable rights to dividends, are participating securities and are included in the computation of earnings per share pursuant to the "two-class" method. The "two-class" method allocates undistributed earnings between common shares and participating securities. The diluted earnings per share calculation under the "two-class" method also includes the dilutive effect of potential registered shares issued in connection with stock options. The dilutive effect of stock options is determined using the treasury stock method.

*Share-Based Compensation Plans*

We record the grant date fair value of share-based compensation arrangements as compensation cost using a straight-line method over the service period. Share-based compensation is expensed or capitalized based on the nature of the employee's activities.

*Certain Significant Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Certain accounting policies involve judgments and uncertainties to such an extent that there is reasonable likelihood that materially different amounts could have been reported under different conditions, or if different assumptions had been used. We evaluate our estimates and assumptions on a regular basis. We base our estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates and assumptions used in preparation of our consolidated financial statements.

*Reclassifications*

Taxes payable in the December 31, 2010 Consolidated Balance Sheets was reported net of approximately $81 million in taxes receivable. During the second quarter of 2011, we determined that a right of offset in certain taxable jurisdictions did not exist for these receivables, and they are now being disclosed separately as a current asset. For the December 31, 2010 Consolidated Balance Sheets presented herein, these amounts have been reclassified to conform to the current year presentation. We believe that this reclassification is immaterial, as it did not have a material impact on our financial position, working capital, results of operations or cash flows from operations.

65

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

Certain other reclassifications have been made to amounts in prior period financial statements to conform to current period presentations. We believe these reclassifications are immaterial as they do not have a material impact on our financial position, results of operations or cash flows.

*Accounting Pronouncements*

In January 2010, the FASB issued Accounting Standards Update ("ASU") No. 2010-06, which amends FASB Accounting Standards Codification ("ASC") Topic 820, "Fair Value Measurements and Disclosures" relating to the disclosure of the fair value of assets. This guidance calls for additional information to be given regarding the transfer of items in and out of respective categories. In addition, it requires additional disclosures regarding purchases, sales, issuances, and settlements of assets that are classified as level three within the FASB fair value hierarchy. This guidance is generally effective for annual and interim periods ending after December 15, 2009. However, the disclosures about purchases, sales, issuances and settlements in the roll-forward activity in level three fair value measurements is deferred until fiscal years beginning after December 15, 2010. These additional disclosures did not have and are not expected to have a material impact on our financial condition, results of operations, cash flows or financial disclosures.

In December 2010, the FASB issued ASU No. 2010-29, which amends ASC Topic 805, "Business Combinations." This guidance requires a public entity to disclose pro forma information for business combinations that occurred in the current reporting period. The disclosures include pro forma revenue and earnings of the combined entity for the current reporting period as though the acquisition date for all business combinations that occurred during the year had been as of the beginning of the annual reporting period. If comparative financial statements are presented, the pro forma revenue and earnings of the combined entity for the comparable prior reporting period should be reported as though the acquisition date for all business combinations that occurred during the current year had been as of the beginning of the comparable prior annual reporting period. The guidance is effective for annual reporting periods beginning on or after December 15, 2010. Our adoption of this guidance did not have a material impact on our financial condition, results of operations, cash flows or financial disclosures.

In May 2011, the FASB issued ASU No. 2011-04, which amends ASC Topic 820, "Fair Value Measurements and Disclosures." This amended guidance clarifies the wording used to describe many of the requirements in accounting literature for measuring fair value and for disclosing information about fair value measurements. The goal of the amendment is to create consistency between the United States and international accounting standards. The guidance is effective for annual and interim reporting periods beginning on or after December 15, 2011. While we are still evaluating this guidance, the adoption of this guidance should not have a material impact on our financial condition, results of operations, cash flows or financial disclosures.

In June 2011, the FASB issued ASU No. 2011-05, which amends ASC Topic 220, "Comprehensive Income." This ASU allows an entity to present the total of comprehensive income, the components of net income, and the components of other comprehensive income either in a single continuous statement of comprehensive income or in two separate but consecutive statements. The amendment no longer allows an entity to show changes to other comprehensive income solely through the statement of equity. For publicly traded entities, the guidance is effective for annual and interim reporting periods beginning on or after December 15, 2011. While we are still evaluating this guidance, the adoption of this guidance will not have a material impact on our financial condition, results of operations, cash flows or financial disclosures.

## Note 2 — Acquisition of FDR Holdings Limited

On July 28, 2010, Noble-Swiss and Noble AM Merger Co., a Cayman Islands company and indirect wholly-owned subsidiary of Noble-Swiss ("Merger Sub"), completed the acquisition of FDR Holdings Limited, a Cayman Islands company ("Frontier"). Under the terms of the Agreement and Plan of Merger with Frontier and certain of Frontier's shareholders, Merger Sub merged with and into Frontier, with Frontier surviving as an indirect wholly-owned subsidiary of Noble-Swiss and a wholly-owned subsidiary of Noble-Cayman. The Frontier acquisition was for a purchase price of approximately $1.7 billion in cash plus liabilities assumed and strategically expanded and enhanced our global fleet. Frontier's results of operations were included in our results beginning July 28, 2010. We funded the cash consideration paid at closing of approximately $1.7 billion using proceeds from our July 2010 offering of senior notes and existing cash on hand.

66

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

The following unaudited pro forma financial information for the years ended December 31, 2010 and 2009, gives effect to the Frontier acquisition as if it had occurred January 1, 2009. The pro forma financial information for the year ended December 31, 2010 includes pro forma results for the period prior to the closing date of July 28, 2010 and actual results for the period from July 28, 2010 through December 31, 2010. The pro forma results are based on historical data and are not intended to be indicative of the results of future operations.

|  | 2010 | 2009 |
|---|---|---|
| Total operating revenues | $ 2,985,439 | $ 3,965,457 |
| Net income to Noble Corporation | 716,875 | 1,674,722 |
| Net income per share (Diluted) | $ 2.80 | $ 6.40 |

Revenues and operating expenses from the Frontier rigs totaled $147 million and $98 million, respectively, from the closing date of July 28, 2010 through December 31, 2010.

*Consolidated joint ventures*

In connection with the Frontier acquisition, we acquired Frontier's 50 percent interest in two joint ventures, each with a subsidiary of Shell, for the construction and operation of the two *Bully*-class drillships. Since these entities' equity at risk is insufficient to permit them to carry on their activities without additional financial support, they each meet the criteria for a variable interest entity. We have determined that we are the primary beneficiary. Accordingly, we consolidate the entities in our consolidated financial statements after eliminating intercompany transactions. Shell's equity interests are presented as noncontrolling interests on our Consolidated Balance Sheets.

In the first quarter of 2011, the joint venture credit facilities, which had a combined outstanding balance of $693 million, were repaid in full through contributions to the joint ventures from Noble and Shell. Shell contributed $361 million in equity to fund their portion of the repayment of joint venture credit facilities and related interest rate swaps, which were settled concurrently with the repayment and termination of the joint venture credit facilities.

In January 2011, the Bully joint ventures issued notes to the joint venture partners totaling $70 million. The interest rate on these notes was 10%, payable semi-annually in arrears and in kind on June 30 and December 31 commencing in June 2011. The purpose of these notes was to provide additional liquidity to the joint ventures in connection with the shipyard construction of the *Bully* vessels.

In April 2011, the Bully joint venture partners entered into a subscription agreement, pursuant to which each partner was issued equity in each of the Bully joint ventures in exchange for the cancellation of all outstanding joint venture partner notes. The subscription agreement converted all joint venture partner notes into equity of the respective joint venture. The total capital contributed as a result of these agreements was $146 million, which included $142 million in outstanding notes, plus accrued interest. Our portion of the capital contribution, totaling $73 million, was eliminated in consolidation.

In April 2011, the Bully joint venture partners also entered into capital contribution agreements whereby capital calls up to a total of $360 million can be made for funds needed to complete the projects. As of December 31, 2011, the total capital contributed under these agreements was $280 million. Subsequent to December 31, 2011, the remaining $80 million was contributed.

The combined carrying amount of the *Bully*-class drillships at December 31, 2011 totaled $1.3 billion, which was primarily funded through partner equity contributions.

67

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 3- Earnings per Share**

The following table sets forth the computation of basic and diluted net income per share for Noble-Swiss:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2011 | 2010 | 2009 |
| **Allocation of income from continuing operations** | | | |
| **Basic** | | | |
| Net income attributable to Noble Corporation | $ 370,898 | $ 773,429 | $ 1,678,642 |
| Earnings allocated to unvested share-based payment awards | (3,727) | (7,497) | (16,811) |
| Net income to common shareholders — basic | $ 367,171 | $ 765,932 | $ 1,661,831 |
| | | | |
| **Diluted** | | | |
| Net income attributable to Noble Corporation | $ 370,898 | $ 773,429 | $ 1,678,642 |
| Earnings allocated to unvested share-based payment awards | (3,719) | (7,481) | (16,758) |
| Net income to common shareholders — diluted | $ 367,179 | $ 765,948 | $ 1,661,884 |
| | | | |
| Weighted average shares outstanding — basic | 251,405 | 253,123 | 258,035 |
| Incremental shares issuable from assumed exercise of stock options | 584 | 813 | 856 |
| Weighted average shares outstanding — diluted | 251,989 | 253,936 | 258,891 |
| | | | |
| Weighted average unvested share-based payment awards | 2,552 | 2,438 | 2,611 |
| | | | |
| **Earnings per share** | | | |
| Basic | $ 1.46 | $ 3.03 | $ 6.44 |
| Diluted | $ 1.46 | $ 3.02 | $ 6.42 |

Only those items having a dilutive impact on our basic net income per share are included in diluted net income per share. For the years ended December 31, 2011, 2010 and 2009, stock options totaling 1.1 million, 0.8 million and 0.1 million, respectively, were excluded from the diluted net income per share calculation as they were not dilutive.

**Note 4- Marketable Securities**

*Marketable Equity Securities*

We have investments that closely correlate to the investment elections made by participants in the Noble Drilling Corporation 401(k) Savings Restoration Plan ("Restoration Plan") in order to mitigate the impact of the investment income and losses from the Restoration Plan on our consolidated financial statements. The value of these investments held for our benefit totaled $5 million and $7 million at December 31, 2011 and 2010, respectively. These assets were classified as trading securities and carried at fair value in "Other current assets" with the realized and unrealized gain or loss included in "Other income" in the accompanying Consolidated Statements of Income. We recognized a loss of $0.4 million during 2011, a gain of $0.7 million during 2010 and a loss of $2 million on these investments in 2009.

**Note 5- Receivables from Customers**

As discussed in Note 16, in May 2010 Anadarko Petroleum Corporation ("Anadarko") sent a letter asserting that the initial attempted deepwater drilling moratorium in the U.S. Gulf of Mexico was an event of force majeure under the drilling contract for the *Noble Amos Runner*. In June 2010, Anadarko filed a declaratory judgment action in Federal District Court in Houston, Texas seeking to have the court declare that a force majeure condition had occurred and that the drilling contract was terminated by virtue of the initial proclaimed moratorium. We disagree that a force majeure event occurred and that Anadarko had the right to terminate the contract. In August 2010, we filed a counterclaim seeking damages from Anadarko for breach of contract. We currently expect this matter to be set for trial during the second quarter of 2012. Anadarko has also attempted to offset revenue that we had billed for services performed prior to their termination of the contract against other amounts it claims are owed relating to costs Anadarko incurred after Hurrican Ike, and that are the subject of a separate dispute. At December 31, 2011, we had accounts receivable of approximately $14 million related to this attempted offset. We do not believe Anadarko has a basis to offset these invoiced amounts. While we will continue to litigate the matter to full resolution, we can make no assurances as to the collection of these amounts or the outcome of this dispute.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

In June 2010, a subsidiary of Frontier entered into a charter contract with a subsidiary of BP PLC ("BP") for the *Seillean* with a term of a minimum of 100 days. The unit went on hire on July 23, 2010. In October 2010, BP initiated an arbitration proceeding against us claiming the contract was *void ab initio*, or never existed, due to a fundamental breach and has made other claims and is demanding that we reimburse the amounts already paid to us under the charter. We believe BP owes us the amounts due under the charter. The charter contains a "hell or high water" provision requiring payment, and we believe we have satisfied our obligations under the charter. Outstanding receivables related to this charter totaled $35 million as of December 31, 2011. These receivables have been classified as long-term and are included in "Other assets" on our Consolidated Balance Sheet at December 31, 2011. We believe that if BP were to be successful in claiming the contract *void ab initio*, we would have an indemnity claim against the former shareholders of Frontier. We have put the former owners of Frontier on notice of this potential claim. We can make no assurances as to the outcome of this dispute.

At December 31, 2011, we had receivables of approximately $14 million related to the *Noble Max Smith*, which are being disputed by our customer, Pemex Exploracion y Produccion ("Pemex"). These receivables have been classified as long-term and are included in "Other assets" on our Consolidated Balance Sheet at December 31, 2011. The disputed amount relates to lost revenues due from Pemex for downtime that occurred after our rig was damaged when one of Pemex's supply boats collided with our rig. In January 2012, we filed a lawsuit against Pemex in Mexican court seeking recovery of these amounts. While we believe we are entitled to the disputed amounts, we can make no assurances as to the outcome of this dispute.

**Note 6- Property and Equipment**

Property and equipment, at cost, as of December 31, 2011 and 2010, consisted of the following:

| | 2011 | 2010 |
|---|---|---|
| Drilling equipment and facilities | $ 10,471,877 | $ 9,274,968 |
| Construction in progress | 4,367,750 | 3,196,315 |
| Other | 197,485 | 172,583 |
| | $ 15,037,112 | $ 12,643,866 |

Capital expenditures, including capitalized interest, totaled $2.6 billion and $1.4 billion for the years ended December 31, 2011 and 2010, respectively. Capital expenditures for 2010 do not include the fair value of assets acquired as part of the Frontier acquisition. Capital expenditures for 2011 consisted of the following:

- $1.7 billion for newbuild construction;

- $636 million for major projects, including $149 million to upgrade two drillships currently operating in Brazil;

- $211 million for other capitalized expenditures, including major maintenance and regulatory expenditures which generally have useful lives ranging from 3 to 5 years; and

- $122 million in capitalized interest.

Interest is capitalized on construction-in-progress at the weighted average cost of debt outstanding during the period of construction. Capitalized interest was $122 million and $83 million for the years ended December 31, 2011 and 2010, respectively.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 7– Debt**

Long-term debt consists of the following at December 31, 2011 and 2010:

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| **Wholly-owned debt instruments:** | | |
| 5.875% Senior Notes due 2013 | $ 299,949 | $ 299,911 |
| 7.375% Senior Notes due 2014 | 249,647 | 249,506 |
| 3.45% Senior Notes due 2015 | 350,000 | 350,000 |
| 3.05% Senior Notes due 2016 | 299,938 | — |
| 7.50% Senior Notes due 2019 | 201,695 | 201,695 |
| 4.90% Senior Notes due 2020 | 498,783 | 498,672 |
| 4.625% Senior Notes due 2021 | 399,480 | — |
| 6.20% Senior Notes due 2040 | 399,890 | 399,889 |
| 6.05% Senior Notes due 2041 | 397,582 | — |
| Credit Facilities | 975,000 | 40,000 |
| | | |
| **Consolidated joint venture debt instruments:** | | |
| Joint venture credit facilities | $ — | $ 691,052 |
| Joint venture partner notes | — | 35,972 |
| Total Debt | 4,071,964 | 2,766,697 |
| | | |
| Less: Current Maturities | — | (80,213) |
| Long-term Debt | $ 4,071,964 | $ 2,686,484 |

We have two separate revolving credit facilities in place which provide us with a total borrowing capacity of $1.2 billion. One credit facility, which has a capacity of $600 million, matures in 2013, and during the first quarter of 2011, we entered into an additional $600 million revolving credit facility which matures in 2015 (together referred to as the "Credit Facilities"). The new facility is guaranteed by our indirect wholly-owned subsidiaries, Noble Holding International Limited ("NHIL") and Noble Drilling Corporation ("NDC"). The covenants and events of default under the Credit Facilities are substantially similar, and each facility contains a covenant that limits our ratio of debt to total tangible capitalization, as defined in the Credit Facilities, to 0.60. At December 31, 2011, our ratio of debt to total tangible capitalization was 0.35 for the credit facility maturing in 2013 and 0.33 for the credit facility maturing in 2015. We were in compliance with all covenants under the Credit Facilities as of December 31, 2011.

In March 2012, availability under our credit facility maturing in 2013 reduces by $25 million. As discussed below, we used the proceeds from our February 2012 senior notes offering to repay the outstanding balance on our Credit Facilities. As such, we have classified the entire balance as "Long-term debt" on our Consolidated Balance Sheet at December 31, 2011.

The Credit Facilities provide us with the ability to issue up to $300 million in letters of credit in the aggregate. While the issuance of letters of credit does not increase our borrowings outstanding under the Credit Facilities, it does reduce the amount available. At December 31, 2011, we had borrowings of $975 million outstanding under the Credit Facilities.

At December 31, 2011, we had letters of credit of $65 million and performance and tax assessment bonds totaling $242 million supported by surety bonds outstanding. Of the letters of credit outstanding, $32 million were issued to support bank bonds in connection with our drilling units in Nigeria. Additionally, certain of our subsidiaries issue, from time to time, guarantees of the temporary import status of rigs or equipment imported into certain countries in which we operate. These guarantees are issued in lieu of payment of custom, value added or similar taxes in those countries.

On July 26, 2010, we issued, through NHIL, $1.25 billion aggregate principal amount of senior notes in three separate tranches, comprising $350 million of 3.45% Senior Notes due 2015, $500 million of 4.90% Senior Notes due 2020, and $400 million of 6.20% Senior Notes due 2040. Proceeds, net of discount and issuance costs, totaled $1.24 billion and were used to finance a portion of the cash consideration for the Frontier acquisition. Noble-Cayman fully and unconditionally guaranteed the notes on a senior unsecured basis. Interest on all three series of these senior notes is payable semi-annually, in arrears, on February 1 and August 1 of each year.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

In February 2011, we issued, through NHIL, $1.1 billion aggregate principal amount of senior notes in three separate tranches, comprising $300 million of 3.05% Senior Notes due 2016, $400 million of 4.625% Senior Notes due 2021, and $400 million of 6.05% Senior Notes due 2041. The weighted average coupon of all three tranches is 4.71%. A portion of the net proceeds of approximately $1.09 billion, after expenses, was used to repay the outstanding balance on our revolving credit facility and to repay our portion of outstanding debt under the joint venture credit facilities discussed below.

In the first quarter of 2011, the joint venture credit facilities, which had a combined outstanding balance of $693 million, were repaid in full through contributions to the joint ventures from Noble and Shell. Shell contributed $361 million in equity to fund their portion of the repayment of joint venture credit facilities and related interest rate swaps, which were settled concurrently with the repayment and termination of the joint venture credit facilities.

In January 2011, the Bully joint ventures issued notes to the joint venture partners totaling $70 million. The interest rate on these notes was 10%, payable semi-annually in arrears, and in kind, on June 30 and December 31 commencing in June 2011. The purpose of these notes was to provide additional liquidity to the joint ventures in connection with the shipyard construction of the *Bully* vessels.

In April 2011, the Bully joint venture partners entered into a subscription agreement, pursuant to which each partner was issued equity in each of the Bully joint ventures in exchange for the cancellation of all outstanding joint venture partner notes. The subscription agreement has the effect of converting all joint venture partner notes into equity of the respective joint venture. The total capital contributed as a result of these agreements was $146 million, which included $142 million in outstanding notes, plus accrued interest. Our portion of the capital contribution, totaling $73 million, was eliminated in consolidation.

In February 2012, we completed, through NHIL, a debt offering of $1.2 billion aggregate principal amount of senior notes in three separate tranches, with $300 million of 2.50% Senior Notes due 2017, $400 million of 3.95% Senior Notes due 2022, and $500 million of 5.25% Senior Notes due 2042. The weighted average coupon of all three tranches is 4.13%. The net proceeds of approximately $1.19 billion, after expenses, were primarily used to repay the outstanding balance on our credit facilities.

Aggregate principal repayments of total debt for the next five years and thereafter are as follows:

| | Total | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter |
|---|---|---|---|---|---|---|---|
| 5.875% Senior Notes due 2013 | $ 299,949 | $ — | $ 299,949 | $ — | $ — | $ — | $ — |
| 7.375% Senior Notes due 2014 | 249,647 | — | — | 249,647 | — | — | — |
| 3.45% Senior Notes due 2015 | 350,000 | — | — | — | 350,000 | — | — |
| 3.05% Senior Notes due 2016 | 299,938 | — | — | — | — | 299,938 | — |
| 7.50% Senior Notes due 2019 | 201,695 | — | — | — | — | — | 201,695 |
| 4.90% Senior Notes due 2020 | 498,783 | — | — | — | — | — | 498,783 |
| 4.625% Senior Notes due 2021 | 399,480 | — | — | — | — | — | 399,480 |
| 6.20% Senior Notes due 2040 | 399,890 | — | — | — | — | — | 399,890 |
| 6.05% Senior Notes due 2041 | 397,582 | — | — | — | — | — | 397,582 |
| Credit Facilities (1) | 975,000 | 25,000 | 575,000 | | 375,000 | | |
| Total | $4,071,964 | $ 25,000 | $ 874,949 | $ 249,647 | $ 725,000 | $ 299,938 | $ 1,897,430 |

(1)   In March 2012, availability under our credit facility maturing in 2013 reduces by $25 million. We used the proceeds from our February 2012 senior notes offering to repay the outstanding balance on our Credit Facilities; therefore, we have shown the entire balance as long-term on our December 31, 2011 Consolidated Balance Sheet.

71

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

*Fair Value of Financial Instruments*

The fair value of our senior notes was based on the quoted market prices for similar issues or on the current rates offered to us for debt of similar remaining maturities. The following table presents the estimated fair value of our long-term debt as of December 31, 2011 and 2010.

| | December 31, 2011 | | December 31, 2010 | |
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
|---|---|---|---|---|
| **Wholly-owned debt instruments** | | | | |
| 5.875% Senior Notes due 2013 | $ 299,949 | $ 317,586 | $ 299,911 | $ 324,281 |
| 7.375% Senior Notes due 2014 | 249,647 | 278,966 | 249,506 | 282,078 |
| 3.45% Senior Notes due 2015 | 350,000 | 363,571 | 350,000 | 357,292 |
| 3.05% Senior Notes due 2016 | 299,938 | 306,057 | — | — |
| 7.50% Senior Notes due 2019 | 201,695 | 248,623 | 201,695 | 242,464 |
| 4.90% Senior Notes due 2020 | 498,783 | 531,437 | 498,672 | 516,192 |
| 4.625% Senior Notes due 2021 | 399,480 | 416,847 | — | — |
| 6.20% Senior Notes due 2040 | 399,890 | 450,017 | 399,889 | 423,345 |
| 6.05% Senior Notes due 2041 | 397,582 | 443,308 | — | — |
| Credit facilities | 975,000 | 975,000 | 40,000 | 40,000 |
| **Consolidated joint venture debt instruments** | | | | |
| Joint venture credit facilities | — | — | 691,052 | 691,052 |
| Joint venture partner notes | — | — | 35,972 | 35,972 |

**Note 8- Equity**

*Share Capital*

The following table provides a detail of Noble-Swiss' share capital as of December 31, 2011 and 2010:

| | December 31, | |
| | 2011 | 2010 |
|---|---|---|
| **Shares outstanding and trading** | **252,352** | **252,275** |
| Treasury shares | 287 | 10,140 |
| **Total shares outstanding** | **252,639** | **262,415** |
| | | |
| Treasury shares held for share-based compensation plans | 13,511 | 13,851 |
| **Total shares authorized for issuance** | **266,150** | **276,266** |
| | | |
| Par value (in Swiss Francs) | 3.41 | 3.93 |

Shares authorized for issuance by Noble-Swiss at December 31, 2011 totaled 266.2 million shares and include 0.3 million shares held in treasury by Noble-Swiss and 13.5 million treasury shares held by a wholly-owned subsidiary. Repurchased treasury shares are recorded at cost, and include shares repurchased pursuant to our approved share repurchase program discussed below and shares surrendered by employees for taxes payable upon the vesting of restricted stock.

Share repurchases are made pursuant to the share repurchase program that our Board of Directors authorized and adopted, and are discussed further in *"Share Repurchases"* below.

During July 2011, after making the required filings with the Swiss Commercial Register, 10.1 million repurchased shares held in treasury were cancelled and the total number of shares authorized for issuance was reduced to 266.2 million shares.

Our Board of Directors may further increase Noble-Swiss' share capital through the issuance of up to 133.1 million conditionally authorized registered shares without obtaining shareholder approval. The issuance of these conditionally authorized registered shares is subject to certain conditions regarding their use.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

*Share Repurchases*

      Share repurchases made in the open market were made pursuant to the share repurchase program, which our Board of Directors authorized and adopted. At December 31, 2011, 6.8 million shares remained available under this authorization. Future repurchases will be subject to the requirements of Swiss law, including the requirement that we and our subsidiaries may only repurchase shares if and to the extent that sufficient freely distributable reserves are available. Also, the aggregate par value of all registered shares held by us and our subsidiaries, including treasury shares, may not exceed 10 percent of our registered share capital without shareholder approval. Our existing share repurchase program received the required shareholder approval prior to completion of our 2009 Swiss migration transaction. Share repurchases for each of the three years ended December 31, 2011 are as follows:

| Year Ended December 31, | Total Number of Shares Purchased (1) | Total Cost | Average Price Paid per Share |
|---|---|---|---|
| 2011 | 261,721 | $ 10,233 | $ 39.10 |
| 2010 | 6,390,488 | 230,936 | 36.14 |
| 2009 | 5,470,000 | 186,506 | 34.10 |

(1)   Includes shares surrendered by employees for taxes payable upon the vesting of restricted stock.

*Share-Based Compensation Plans*

*Stock Plans*

      The Noble Corporation 1991 Stock Option and Restricted Stock Plan, as amended (the "1991 Plan"), provides for the granting of options to purchase our shares, with or without stock appreciation rights, and the awarding of restricted shares or units to selected employees. In general, all options granted under the 1991 Plan have a term of 10 years, an exercise price equal to the fair market value of a share on the date of grant and generally vest over a three-year period. The 1991 Plan limits the total number of shares issuable under the plan to 45.1 million. As of December 31, 2011, we had 3.6 million shares remaining available for grants to employees under the 1991 Plan.

      Prior to October 25, 2007, the Noble Corporation 1992 Nonqualified Stock Option and Share Plan for Non-Employee Directors (the "1992 Plan") provided for the granting of nonqualified stock options to our non-employee directors. We granted options at fair market value on the grant date. The options are exercisable from time to time over a period commencing one year from the grant date and ending on the expiration of 10 years from the grant date, unless terminated sooner as described in the 1992 Plan. On October 25, 2007, the 1992 Plan was amended and restated to, among other things, eliminate grants of stock options to non-employee directors and modify the annual award of restricted shares from a fixed number of restricted shares to an annually-determined variable number of restricted or unrestricted shares. The 1992 Plan limits the total number of shares issuable under the plan to 1.6 million. As of December 31, 2011, we had 0.6 million shares remaining available for award to non-employee directors under the 1992 Plan.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

*Stock Options*

A summary of the status of stock options granted under both the 1991 Plan and 1992 Plan as of December 31, 2011, 2010 and 2009 and the changes during the year ended on those dates is presented below:

| | 2011 | | 2010 | | 2009 | |
|---|---|---|---|---|---|---|
| | Number of Shares Underlying Options | Weighted Average Exercise Price | Number of Shares Underlying Options | Weighted Average Exercise Price | Number of Shares Underlying Options | Weighted Average Exercise Price |
| Outstanding at beginning of year | 2,767,486 | $ 26.22 | 3,121,317 | $ 24.39 | 3,553,999 | $ 22.84 |
| Granted | 322,567 | 37.71 | 212,730 | 39.46 | 302,815 | 24.63 |
| Exercised (1) | (506,149) | 17.89 | (549,405) | 21.12 | (718,283) | 16.94 |
| Forfeited | (85,242) | 31.33 | (17,156) | 20.78 | (17,214) | 19.52 |
| Outstanding at end of year (2) | 2,498,662 | 29.22 | 2,767,486 | 26.22 | 3,121,317 | 24.39 |
| Exercisable at end of year (2) | 2,004,370 | $ 27.55 | 2,310,614 | $ 24.79 | 2,688,179 | $ 23.52 |

_____

(1)   The intrinsic value of options exercised during the year ended December 31, 2011 was $9 million.

(2)   The aggregate intrinsic value of options outstanding and exercisable at December 31, 2011 was $10 million.

The following table summarizes additional information about stock options outstanding at December 31, 2011:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Number of Shares Underlying Options | Weighted Average Remaining Life (Years) | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $15.55 to $24.65 | 637,051 | 1.12 | $ 17.00 | 634,370 | $ 16.97 |
| $24.66 to $34.67 | 790,089 | 4.78 | 26.50 | 710,936 | 26.70 |
| $34.68 to $43.01 | 1,071,522 | 6.64 | 38.50 | 659,064 | 38.66 |
| Total | 2,498,662 | 4.64 | $ 29.22 | 2,004,370 | $ 27.55 |

Fair value information and related valuation assumptions for stock options granted are as follows:

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Weighted average fair value per option granted | $ 13.20 | $ 16.14 | $ 8.64 |
| | | | |
| Valuation assumptions: | | | |
| Expected option term (years) | 6 | 6 | 5 |
| Expected volatility | 38.6% | 44.6% | 38.5% |
| Expected dividend yield | 1.5% | 1.2% | 0.7% |
| Risk-free interest rate | 2.6% | 2.6% | 2.1% |

The fair value of each option is estimated on the date of grant using a Black-Scholes pricing model. Assumptions used in the valuation are shown in the table above. The expected term of options granted represents the period of time that the options are expected to be outstanding and is derived from historical exercise behavior, current trends and values derived from lattice-based models. Expected volatilities are based on implied volatilities of traded options on our shares, historical volatility of our shares, and other factors. The expected dividend yield is based on historical yields on the date of grant. The risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant.

74

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

A summary of the status of our non-vested stock options at December 31, 2011, and changes during the year ended December 31, 2011, is presented below:

|  | Shares Under Outstanding Options | | Weighted-Average Grant-Date Fair Value |
| --- | --- | --- | --- |
| Non-Vested Options at January 1, 2011 | 456,872 | $ | 12.91 |
| Granted | 322,567 | | 13.20 |
| Vested | (250,431) | | 12.69 |
| Forfeited | (68,174) | | 12.86 |
| Non-Vested Options at December 31, 2011 | 460,834 | $ | 13.24 |

At December 31, 2011, there was $4 million of total unrecognized compensation cost remaining for option grants awarded under the 1991 Plan. We attribute the service period to the vesting period and the unrecognized compensation is expected to be recognized over a weighted-average period of 1.6 years. Compensation cost recognized during the years ended December 31, 2011, 2010 and 2009 related to stock options totaled $3 million, $3 million and $2 million, respectively.

We issue new shares to meet the share requirements upon exercise of stock options. We have historically repurchased shares in the open market from time to time which minimizes the dilutive effect of share-based compensation.

*Restricted Stock*

We have awarded both time-vested restricted stock and market based performance-vested restricted stock under the 1991 Plan. The time-vested restricted stock awards generally vest over a three year period. The number of performance-vested restricted shares which vest will depend on the degree of achievement of specified corporate performance criteria over a three-year performance period. These criteria are strictly market based criteria as defined by FASB standards.

The time-vested restricted stock is valued on the date of award at our underlying share price. The total compensation for shares that ultimately vest is recognized over the service period. The shares and related par value are recorded when the restricted stock vests and additional paid-in capital is adjusted as the share-based compensation cost is recognized for financial reporting purposes.

The market based performance-vested restricted stock is valued on the date of grant based on the estimated fair value. Estimated fair value is determined based on numerous assumptions, including an estimate of the likelihood that our stock price performance will achieve the targeted thresholds and the expected forfeiture rate. The fair value is calculated using a Monte Carlo Simulation Model. The assumptions used to value the performance-vested restricted stock awards include historical volatility, risk-free interest rates, and expected dividends over a time period commensurate with the remaining term prior to vesting, as follows:

|  | 2011 | 2010 | 2009 |
| --- | --- | --- | --- |
| Valuation assumptions: | | | |
| Expected volatility | 57.7% | 57.2% | 47.6% |
| Expected dividend yield | 0.6% | 0.5% | 0.5% |
| Risk-free interest rate | 1.3% | 1.3% | 2.1% |

Additionally, similar assumptions were made for each of the companies included in the defined index and the peer group of companies in order to simulate the future outcome using the Monte Carlo Simulation Model.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

A summary of the restricted share awards for each of the years in the period ended December 31 is as follows:

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Time-vested restricted shares: | | | |
| Shares awarded (maximum available) | 660,124 | 537,269 | 820,523 |
| Weighted-average share price at award date | $ 37.68 | $ 39.69 | $ 26.99 |
| Weighted-average vesting period (years) | 3.0 | 3.0 | 3.0 |
| | | | |
| Performance-vested restricted shares: | | | |
| Shares awarded (maximum available) | 508,206 | 349,784 | 579,160 |
| Weighted-average share price at award date | $ 37.60 | $ 39.73 | $ 24.46 |
| Three-year performance period ended December 31 | 2013 | 2012 | 2011 |
| Weighted-average award-date fair value | $ 16.77 | $ 17.76 | $ 13.55 |

We award both time-vested restricted stock and unrestricted shares under the 1992 Plan. The time-vested restricted stock awards generally vest over a three-year period. During the years ended December 31, 2011, 2010 and 2009, we awarded 69,711, 78,714 and 67,280 unrestricted shares to non-employee directors, resulting in related compensation cost of $3 million, $3 million and $2 million, respectively. We did not award any time-vested restricted stock under the 1992 Plan during the year ended December 31, 2011.

A summary of the status of non-vested restricted shares at December 31, 2011 and changes during the year ended December 31, 2011 is presented below:

| | Time-Vested Restricted Shares Outstanding | Weighted Average Award-Date Fair Value | Performance-Vested Restricted Shares Outstanding (1) | Weighted Average Award-Date Fair Value |
|---|---|---|---|---|
| Non-vested restricted shares at January 1, 2011 | 1,199,551 | $ 35.13 | 1,225,869 | $ 17.01 |
| Awarded | 660,124 | 37.68 | 508,206 | 16.77 |
| Vested | (613,451) | 35.75 | — | — |
| Forfeited | (115,787) | 35.90 | (491,870) | 20.88 |
| Non-vested restricted shares at December 31, 2011 | 1,130,437 | $ 36.20 | 1,242,205 | $ 15.79 |

(1)   The number of performance-vested restricted shares shown equals the shares that would vest if the "maximum" level of performance is achieved. The minimum number of shares is zero and the "target" level of performance is 67 percent of the amounts shown.

At December 31, 2011 there was $24 million of total unrecognized compensation cost related to the time-vested restricted shares which is expected to be recognized over a remaining weighted-average period of 1.5 years. The total award-date fair value of time-vested restricted shares vested during the year ended December 31, 2011 was $22 million.

At December 31, 2011, there was $7 million of total unrecognized compensation cost related to the performance-vested restricted shares which is expected to be recognized over a remaining weighted-average period of 1.6 years. The total potential compensation for performance-vested restricted stock is recognized over the service period regardless of whether the performance thresholds are ultimately achieved. During the year ended December 31, 2011, 305,335 performance-vested shares for the 2008-2010 performance period were forfeited. On January 1, 2012, 101,745 shares of the performance-vested shares for the 2009-2011 performance period vested and, in February 2012, 374,864 shares for the same performance period were forfeited.

Compensation expense recognized during the years ended December 31, 2011, 2010 and 2009 related to all restricted stock totaled $32 million ($28 million net of income tax), $35 million ($30 million net of income tax) and $32 million ($27 million net of income tax), respectively. Capitalized compensation costs totaled approximately $1 million for each year in 2011, 2010, and 2009, respectively.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 9- Accumulated Comprehensive Loss**

The following table sets forth the components of "Accumulated other comprehensive loss," net of deferred taxes:

|  | December 31, | |
|---|---|---|
|  | 2011 | 2010 |
| Foreign currency translation adjustments | $ (12,302) | $ (9,736) |
| Gain (loss) on foreign currency forward contracts | (3,061) | 1,604 |
| Gain on interest rate swaps | — | 366 |
| Deferred pension amounts | (58,958) | (42,454) |
| Accumulated Other comprehensive loss, net | (74,321) | (50,220) |
| Less: Noncontrolling interest portion of gain (loss) on interest rate swaps | 183 | (183) |
| Other comprehensive loss, net attributable to Noble Corporation | $ (74,138) | $ (50,403) |

**Note 10- Gain on Contract Extinguishments, Net**

In January 2011, we announced the signing of a MOU with Petrobras regarding operations in Brazil. Under the terms of the MOU, we agreed to substitute the *Noble Phoenix*, then under contract with Shell in Southeast Asia, for the *Noble Muravlenko*. In connection with the cancellation of the contract on the *Noble Phoenix*, we recognized a non-cash gain of approximately $52.5 million during the first quarter of 2011, which represents the unamortized fair value of the in-place contract assumed in connection with the Frontier acquisition. As a result of the substitution, we reached a decision not to proceed with the previously announced reliability upgrade to the *Noble Muravlenko* that was scheduled to take place in 2013. As a result, we incurred a non-cash charge of approximately $32.6 million related to the termination of outstanding shipyard contracts. We expect the actual substitution to take place in the second quarter of 2012 after the *Noble Phoenix* completes its shipyard work.

In February 2011, the outstanding balances of the Bully joint venture credit facilities, which totaled $693 million, were repaid in full and the credit facilities terminated using a portion of the proceeds from our February 2011 debt offering and equity contributions from our joint venture partner. In addition, the related interest rate swaps were settled and terminated concurrent with the repayment and termination of the credit facilities. As a result of these transactions, we recognized a gain of approximately $1.3 million during the first quarter of 2011.

**Note 11- Loss on Asset Disposal/Involuntary Conversion, Net**

In May 2009, our jackup, the *Noble David Tinsley*, experienced a "punch-through" while the rig was being positioned on location offshore Qatar. The incident involved the sudden penetration of all three legs through the sea bottom, which resulted in severe damage to the legs and the rig. We recorded a charge of $17 million during 2009 related to this involuntary conversion, which includes approximately $9 million for the write-off of the damaged legs.

In March 2009, we recognized a charge of $12 million related to the *Noble Fri Rodli*, a submersible that had been cold stacked since October 2007. We recorded the charge as a result of a decision to evaluate disposition alternatives for this rig.

**Note 12- Income Taxes**

Noble-Swiss is exempt from Swiss cantonal and communal income tax on its worldwide income, and is also granted participation relief from Swiss federal tax for qualifying dividend income and capital gains related to the sale of qualifying participations. It is expected that the participation relief will result in a full exemption of participation income from Swiss federal income tax.

Table of Contents

**NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES**
**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

We operate through various subsidiaries in numerous countries throughout the world, including the United States. Consequently, income taxes have been provided based on the laws and rates in effect in the countries in which operations are conducted, or in which we or our subsidiaries are considered resident for income tax purposes.

In certain circumstances, management expects that, due to changing demands of the offshore drilling markets and the ability to re-deploy our drilling units, certain units will not reside in a location long enough to give rise to future tax consequences. As a result, no deferred tax asset or liability is recognized in these circumstances. If management's expectations change regarding the length of time a drilling unit will be used in a given location, we will adjust deferred taxes accordingly. The components of the net deferred taxes are as follows:

| | 2011 | | 2010 | |
|---|---:|---|---:|---|
| **Deferred tax assets** | | | | |
| United States | | | | |
| Net operating loss carry forwards | $ | — | $ | 7,256 |
| Deferred pension plan amounts | | 17,768 | | 4,288 |
| Accrued expenses not currently deductible | | 33,145 | | 37,258 |
| Other | | 343 | | 1,124 |
| Non-U.S. | | | | |
| Net operating loss carry forwards | | 62,351 | | 71,160 |
| Deferred pension plan amounts | | 4,104 | | 4,018 |
| Other | | 139 | | 130 |
| Deferred tax assets | | 117,850 | | 125,234 |
| Less: valuation allowance | | — | | (6,000) |
| Net deferred tax assets | $ | 117,850 | $ | 119,234 |
| | | | | |
| **Deferred tax liabilities** | | | | |
| United States | | | | |
| Excess of net book basis over remaining tax basis | $ | (290,074) | $ | (297,284) |
| Other | | (5,499) | | (3,019) |
| Non-U.S. | | | | |
| Excess of net book basis over remaining tax basis | | (52,117) | | (67,087) |
| Deferred tax liabilities | $ | (347,690) | $ | (367,390) |
| | | | | |
| Net deferred tax liabilities | $ | (229,840) | $ | (248,156) |

Income before income taxes consists of the following:

| | Year Ended December 31, | | | | | |
|---|---:|---|---:|---|---:|---|
| | 2011 | | 2010 | | 2009 | |
| United States | $ | 142,922 | $ | 132,326 | $ | 738,130 |
| Non-U.S. | | 293,328 | | 784,183 | | 1,277,772 |
| Total | $ | 436,250 | $ | 916,509 | $ | 2,015,902 |

The income tax provision consists of the following:

| | Year Ended December 31, | | | | | |
|---|---:|---|---:|---|---:|---|
| | 2011 | | 2010 | | 2009 | |
| Current- United States | $ | 68,254 | $ | 80,895 | $ | 240,188 |
| Current- Non-U.S. | | 86,696 | | 101,192 | | 64,210 |
| Deferred- United States | | (39,167) | | (36,403) | | 33,530 |
| Deferred- Non-U.S. | | (43,158) | | (2,607) | | (668) |
| Total | $ | 72,625 | $ | 143,077 | $ | 337,260 |

78

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

The following is a reconciliation of our reserve for uncertain tax positions, excluding interest and penalties:

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Gross balance at January 1, | $ 128,581 | $ 87,668 | $ 84,942 |
| Additions based on tax positions related to current year | 5,130 | 6,942 | 9,087 |
| Additions for tax positions of prior years | 5,718 | 40,264 | 29,024 |
| Reductions for tax positions of prior years | (2,354) | — | (21,659) |
| Expiration of statutes (1) | (28,846) | (6,293) | (9,487) |
| Tax settlements | (193) | — | (4,239) |
| Gross balance at December 31, | 108,036 | 128,581 | 87,668 |
| Related tax benefits | (8,127) | (7,693) | (6,883) |
| Net reserve at December 31, | $ 99,909 | $ 120,888 | $ 80,785 |

_____

(1)   $(15.7) million and $(4.9) million relate to transactions recorded directly to equity for the years ended December 31, 2011 and December 31, 2010, respectively.

The liabilities related to our reserve for uncertain tax positions are comprised of the following:

|  | 2011 | 2010 |
|---|---|---|
| Reserve for uncertain tax positions, excluding interest and penalties | $ 99,909 | $ 120,888 |
| Interest and penalties included in "Other liabilities" | 18,202 | 23,649 |
| Reserve for uncertain tax positions, including interest and penalties | $ 118,111 | $ 144,537 |

If these reserves of $118 million are not realized, the provision for income taxes will be reduced by $118 million.

We include, as a component of our "Income tax provision", potential interest and penalties related to recognized tax contingencies within our global operations. Interest and penalties resulted in an income tax benefit of $5 million in 2011 and an income tax expense of $6 million and $5 million in 2010 and 2009, respectively.

It is reasonably possible that our existing liabilities related to our reserve for uncertain tax positions may increase or decrease in the next twelve months primarily due to the completion of open audits or the expiration of statutes of limitation. However, we cannot reasonably estimate a range of changes in our existing liabilities due to various uncertainties, such as the unresolved nature of various audits.

We conduct business globally and, as a result, we file numerous income tax returns in the U.S. and non-U.S. jurisdictions. In the normal course of business we are subject to examination by taxing authorities throughout the world, including major jurisdictions such as Brazil, India, Mexico, Nigeria, Norway, Qatar, Saudi Arabia, Switzerland, the United Kingdom and the United States. We are no longer subject to U.S. Federal income tax examinations for years before 2007 and non-U.S. income tax examinations for years before 2001.

Noble-Swiss conducts substantially all of its business through Noble-Cayman and its subsidiaries. Earnings are taxable in Switzerland at the Swiss statutory rate of 8.5%. This statutory rate is not material due to our participation exemption, and the Cayman Islands does not impose a corporate income tax. A reconciliation of tax rates outside of Switzerland and the Cayman Islands to our Noble-Swiss effective rate is shown below:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2011 | 2010 | 2009 |
| Effect of: |  |  |  |
| Tax rates which are different than the Swiss and Cayman Island rates | 18.9% | 14.6% | 17.3% |
| Reserve for (resolution of) tax authority audits | -2.2% | 1.0% | -0.6% |
| Total | 16.7% | 15.6% | 16.7% |

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

In 2011, we generated and fully utilized $21 million of U.S. foreign tax credits. In 2010 and 2009, we fully utilized our foreign tax credits of $17 million and $71 million, respectively.

Deferred income taxes and the related dividend withholding taxes have not been provided on approximately $1.8 billion of undistributed earnings of our U.S. subsidiaries. We consider such earnings to be permanently reinvested in the U.S. It is not practicable to estimate the amount of deferred income taxes associated with these unremitted earnings. If such earnings were to be distributed, we would be subject to U.S. taxes, which would have a material impact on our results of operations.

### Note 13– Employee Benefit Plans

#### *Defined Benefit Plans*

We have two U.S. noncontributory defined benefit pension plans: one which covers certain salaried employees and one which covers certain hourly employees, whose initial date of employment is prior to August 1, 2004 (collectively referred to as our "qualified U.S. plans"). These plans are governed by the Noble Drilling Corporation Retirement Trust (the "Trust"). The benefits from these plans are based primarily on years of service and, for the salaried plan, employees' compensation near retirement. These plans qualify under the Employee Retirement Income Security Act of 1974 ("ERISA"), and our funding policy is consistent with funding requirements of ERISA and other applicable laws and regulations. We make cash contributions, or utilize credit balances available to us under the plan, for the qualified U.S. plans when required. The benefit amount that can be covered by the qualified U.S. plans is limited under ERISA and the Internal Revenue Code ("IRC") of 1986. Therefore, we maintain an unfunded, nonqualified excess benefit plan designed to maintain benefits for all employees at the formula level in the qualified U.S. plans. We refer to the qualified U.S. plans and the excess benefit plan collectively as the "U.S. plans".

Each of Noble Drilling (Land Support) Limited, Noble Enterprises Limited and Noble Drilling (Nederland) B.V., all indirect, wholly-owned subsidiaries of Noble, maintains a pension plan which covers all of its salaried, non-union employees (collectively referred to as our "non-U.S. plans"). Benefits are based on credited service and employees' compensation near retirement, as defined by the plans.

A reconciliation of the changes in projected benefit obligations ("PBO") for our non-U.S. and U.S. plans is as follows:

| | Year Ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2011 | | | | 2010 | | | |
| | Non-U.S. | | U.S. | | Non-U.S. | | U.S. | |
| Benefit obligation at beginning of year | $ | 101,133 | $ | 157,903 | $ | 94,988 | $ | 132,517 |
| Service cost | | 4,545 | | 8,608 | | 4,260 | | 7,648 |
| Interest cost | | 5,586 | | 8,570 | | 4,926 | | 7,829 |
| Actuarial loss | | 3,202 | | 20,643 | | 3,837 | | 13,012 |
| Benefits paid | | (2,810) | | (3,682) | | (2,438) | | (3,103) |
| Plan participants' contributions | | 781 | | — | | 669 | | — |
| Foreign exchange rate changes | | (1,273) | | — | | (5,109) | | — |
| Benefit obligation at end of year | $ | 111,164 | $ | 192,042 | $ | 101,133 | $ | 157,903 |

80

Table of Contents

**NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES**
**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

A reconciliation of the changes in fair value of plan assets is as follows:

| | Year Ended December 31, | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | | 2010 | | | |
| | Non-U.S. | | U.S. | | Non-U.S. | | U.S. | |
| Fair value of plan assets at beginning of year | $ | 128,695 | $ | 144,542 | $ | 117,340 | $ | 124,874 |
| Actual return on plan assets | | 13,228 | | (5,063) | | 13,434 | | 12,522 |
| Employer contributions | | 5,543 | | 5,031 | | 6,202 | | 10,250 |
| Benefits and expenses paid | | (2,394) | | (3,682) | | (2,075) | | (3,104) |
| Plan participants' contributions | | 781 | | — | | 669 | | — |
| Expenses paid | | (416) | | — | | (364) | | — |
| Foreign exchange rate changes | | (2,327) | | — | | (6,511) | | — |
| Fair value of plan assets at end of year | $ | 143,110 | $ | 140,828 | $ | 128,695 | $ | 144,542 |

The funded status of the plans is as follows:

| | Year Ended December 31, | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | | 2010 | | | |
| | Non-U.S. | | U.S. | | Non-U.S. | | U.S. | |
| Funded status | $ | 31,946 | $ | (51,214) | $ | 27,562 | $ | (13,361) |

Amounts recognized in the Consolidated Balance Sheets consist of:

| | 2011 | | | | 2010 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Non-U.S. | | U.S. | | Non-U.S. | | U.S. | |
| Other assets (noncurrent) | $ | 31,946 | $ | 596 | $ | 28,240 | &bbsp;$ | 6,594 |
| Other liabilities (current) | | — | | (1,630) | | — | | (1,353) |
| Other liabilities (noncurrent) | | — | | (50,180) | | (678) | | (18,602) |
| Net amount recognized | $ | 31,946 | $ | (51,214) | $ | 27,562 | $ | (13,361) |

Amounts recognized in the "Accumulated other comprehensive loss" consist of:

| | Year Ended December 31, | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | | 2010 | | | |
| | Non-U.S. | | U.S. | | Non-U.S. | | U.S. | |
| Net actuarial loss | $ | 6,691 | $ | 85,366 | $ | 11,591 | $ | 51,966 |
| Prior service cost | | — | | 1,359 | | — | | 1,586 |
| Transition obligation | | — | | — | | 70 | | — |
| Deferred income tax asset | | (4,104) | | (30,354) | | (4,017) | | (18,742) |
| Accumulated other comprehensive loss | $ | 2,587 | $ | 56,371 | $ | 7,644 | $ | 34,810 |

81

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

Pension cost includes the following components:

| | Year Ended December 31, | | | | | |
| | 2011 | | 2010 | | 2009 | |
| | Non-U.S. | U.S. | Non-U.S. | U.S. | Non-U.S. | U.S. |
|---|---|---|---|---|---|---|
| Service Cost | $ 4,545 | $ 8,608 | $ 4,260 | $ 7,648 | $ 3,674 | $ 7,213 |
| Interest Cost | 5,586 | 8,570 | 4,926 | 7,829 | 4,279 | 6,854 |
| Return on plan assets | (5,647) | (11,072) | (5,321) | (9,568) | (5,377) | (7,143) |
| Pension obligation settlement | — | — | 718 | 227 | — | — |
| Amortization of prior service cost | 483 | 227 | 70 | — | 249 | 294 |
| Amortization of transition obligation | 74 | — | — | — | 73 | — |
| Recognized net actuarial loss | — | 3,374 | — | 2,821 | — | 4,124 |
| Net pension expense | $ 5,041 | $ 9,707 | $ 4,653 | $ 8,957 | $ 2,898 | $ 11,342 |

*Defined Benefit Plans — Disaggregated Plan Information*

Disaggregated information regarding our non-U.S. and U.S. plans is summarized below:

| | Year Ended December 31, | | | |
| | 2011 | | 2010 | |
| | Non-U.S. | U.S. | Non-U.S. | U.S. |
|---|---|---|---|---|
| Projected benefit obligation | $ 111,164 | $ 192,042 | $ 101,133 | $ 157,903 |
| Accumulated benefit obligation | 107,832 | 155,484 | 97,913 | 122,475 |
| Fair value of plan assets | 143,110 | 140,828 | 128,695 | 144,542 |

The following table provides information related to those plans in which the PBO exceeded the fair value of the plan assets at December 31, 2011 and 2010. The PBO is the actuarially computed present value of earned benefits based on service to date and includes the estimated effect of any future salary increases.

| | Year Ended December 31, | | | |
| | 2011 | | 2010 | |
| | Non-U.S. | U.S. | Non-U.S. | U.S. |
|---|---|---|---|---|
| Projected benefit obligation | $ — | $ 169,733 | $ 4,906 | $ 140,320 |
| Fair value of plan assets | — | 117,924 | 4,228 | 120,365 |

The PBO for the unfunded excess benefit plan was $13 million at both December 31, 2011 and 2010, and is included under "U.S." in the above tables.

The following table provides information related to those plans in which the accumulated benefit obligation ("ABO") exceeded the fair value of plan assets at December 31, 2011 and 2010. The ABO is the actuarially computed present value of earned benefits based on service to date, but differs from the PBO in that it is based on current salary levels.

| | Year Ended December 31, | | | |
| | 2011 | | 2010 | |
| | Non-U.S. | U.S. | Non-U.S. | U.S. |
|---|---|---|---|---|
| Accumulated benefit obligation | $ — | $ 133,175 | $ 4,588 | $ 7,943 |
| Fair value of plan assets | — | 117,924 | 4,228 | — |

The ABO for the unfunded excess benefit plan was $10 million at December 31, 2011 as compared to $8 million in 2010, and is included under "U.S." in the above tables.

82

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

*Defined Benefit Plans — Key Assumptions*

The key assumptions for the plans are summarized below:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2011 | | 2010 | |
| | Non-U.S. | U.S. | Non-U.S. | U.S. |
| **Weighted-average assumptions used to determine benefit obligations:** | | | | |
| Discount Rate | 4.7%-5.0% | 4.3%-4.7% | 5.3%-5.4% | 5.0%-5.8% |
| Rate of compensation increase | 3.9%-4.0% | 5.0% | 3.9%-4.6% | 5.0% |

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | 2010 | | 2009 | |
| | Non-U.S. | U.S. | Non-U.S. | U.S. | Non-U.S. | U.S. |
| **Weighted-average assumptions used to determine periodic benefit cost:** | | | | | | |
| Discount Rate | 5.3%-5.4% | 5.0%-5.8% | 5.3%-5.4% | 5.8%-6.0% | 5.3%-5.7% | 5.8%-6.0% |
| Expected long-term return on assets | 2.2%-6.3% | 7.8% | 3.0%-6.5% | 7.8% | 3.0%-6.5% | 7.8% |
| Rate of compensation increase | 3.9%-4.6% | 5.0% | 3.9%-4.0% | 5.0% | 3.9%-4.4% | 5.0% |

The discount rate used to calculate the net present value of future benefit obligations for our U.S. plan is based on the average of current rates earned on long-term bonds that receive a Moody's rating of "Aa" or better. We have determined that the timing and amount of expected cash outflows on our plan assets reasonably match this index. For non-U.S. plans, the discount rates used to calculate the net present value of future benefit obligations are determined by using a yield curve of high quality bond portfolios with an average maturity approximating that of the liabilities.

We employ third-party consultants for our U.S. and non-U.S. plans that use a portfolio return model to assess the initial reasonableness of the expected long-term rate of return on plan assets. To develop the expected long-term rate of return on assets, we considered the current level of expected returns on risk free investments (primarily government bonds), the historical level of risk premium associated with the other asset classes in which the portfolio is invested and the expectations for future returns of each asset class. The expected return for each asset class was then weighted based on the target asset allocation to develop the expected long-term rate of return on assets for the portfolio.

*Defined Benefit Plans — Plan Assets*

*Non-U.S. Plans*

Both the Noble Enterprises Limited and Noble Drilling (Nederland) B.V. pension plans have a targeted asset allocation of 100 percent debt securities. The investment objective for the Noble Enterprises Limited U.S. Dollar plan assets is to earn a favorable return against the Citigroup World Governmental Bond Index for all maturities greater than one year. The investment objective for both the Noble Enterprises Limited and the Noble Drilling (Nederland) B.V. Euro plan assets is to earn a favorable return against the Barclays Capital Euro Aggregate Unhedged index and the Customized Benchmark for Long Duration Fund for all maturities greater than one year. We evaluate the performance of these plans on an annual basis.

There is no target asset allocation for the Noble Drilling (Land Support) Limited pension plan. However, the investment objective of the plan, as adopted by the plan's trustees, is to achieve a favorable return against a benchmark of blended United Kingdom market indices. By achieving this objective, the trustees believe the plan will be able to avoid significant volatility in the contribution rate and provide sufficient plan assets to cover the plan's benefit obligations were the plan to be liquidated. To achieve these objectives, the trustees have given the plan's investment managers full discretion in the day-to-day management of the plan's assets. The plan's assets are invested with two investment managers. The performance objective communicated to one of these investment managers is to exceed a blend of FTSE A Over 15 Year Gilts index and iBoxx Sterling Non Gilts index by 1.25 percent per annum. The performance objective communicated to the other investment manager is to exceed a blend of FTSE's All Share index, North America index, Europe index and Pacific Basin index by 1.00 to 2.00 percent per annum. This investment manager is prohibited by the trustees from investing in real estate. The trustees meet with the investment managers periodically to review and discuss their investment performance.

83

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

The actual fair values of Non-U.S. pension plans are as follows:

| | | December 31, 2011 | | | December 31, 2010 | |
| | | Estimated Fair Value Measurements | | | | |
| | Carrying Amount | Quoted Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Carrying Amount | Estimated Fair Value |
|---|---|---|---|---|---|---|
| **Cash** | $ 50 | $ 50 | $ — | $ — | $ 12 | $ 12 |
| **Equity securities:** | | | | | | |
| International companies | $ 38,842 | $ 38,842 | $ — | $ — | $ 42,698 | $ 42,698 |
| | | | | | &sbsp; | |
| **Fixed income securities:** | | | | | | |
| Corporate bonds | $ 104,218 | $ 20,196 | $ 84,022 | $ — | $ 85,985 | $ 85,985 |
| **Total** | $ 143,110 | $ 59,088 | $ 84,022 | $ — | $ 128,695 | $ 128,695 |

*U.S. Plans*

The Trust invests in equity securities, fixed income debt securities, and cash equivalents and other short-term investments. The Trust may invest in these investments directly or through pooled vehicles, including mutual funds.

The Company's overall investment strategy, or target range, is to achieve a mix of approximately 65 percent in equity securities, 32 percent in debt securities and 3 percent in cash holdings. Actual results may deviate from the target range, however any deviation from the target range of asset allocations must be approved by the Trust's governing committee.

The performance objective of the Trust is to outperform the return of the Total Index Composite as constructed to reflect the target allocation weightings for each asset class. This objective should be met over a market cycle, which is defined as a period not less than three years or more than five years. U.S. equity securities (common stock, convertible preferred stock and convertible bonds) should achieve a total return (after fees) that exceeds the total return of an appropriate market index over a full market cycle of three to five years. Non-U.S. equity securities (common stock, convertible preferred stock and convertible bonds), either from developed or emerging markets, should achieve a total return (after fees) that exceeds the total return of an appropriate market index over a full market cycle of three to five years. Fixed income debt securities should achieve a total return (after fees) that exceeds the total return of an appropriate market index over a full market cycle of three to five years. Cash equivalent and short-term investments should achieve relative performance better than the 90-day Treasury bills. When mutual funds are used by the Trust, those mutual funds should achieve a total return that equals or exceeds the total return of each fund's appropriate Lipper or Morningstar peer category over a full market cycle of three to five years. Lipper and Morningstar are independent mutual fund rating and information services.

For investments in equity securities, no individual options or financial futures contracts are purchased unless approved in writing by the Trust's governing committee. In addition, no private placements or purchases of venture capital are allowed. The maximum commitment to a particular industry, as defined by Standard & Poor's, may not exceed 20 percent. The Trust's equity managers vote all proxies in the best interest of the Trust without regards to social issues. The Trust's governing committee reserves the right to comment on and exercise control over the response to any individual proxy solicitation.

For fixed income debt securities, corporate bonds purchased are primarily limited to investment grade securities as established by Moody's or Standard & Poor's. At no time shall the lowest investment grade make up more than 20 percent of the total market value of the Trust's fixed income holdings. The total fixed income exposure from any single non-government or government agency issuer shall not exceed 10 percent of the Trust's fixed income holdings. The average duration of the total portfolio shall not exceed seven years. All interest and principal receipts are swept, as received, into an alternative cash management vehicle until reallocated in accordance with the Trust's core allocation.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

For investments in mutual funds, the assets of the Trust are subject to the guidelines and limits imposed by such mutual fund's prospectus and the other governing documentation at the fund level.

For investments in cash equivalent and short-term investments, the Trust utilizes a money market mutual fund which invests in U.S. government and agency obligations, repurchase agreements collateralized by U.S. government or agency securities, commercial paper, bankers' acceptances, certificate of deposits, delayed delivery transactions, reverse repurchase agreements, time deposits and Euro obligations. Bankers' acceptances shall be made in larger banks (ranked by assets) rated "Aa" or better by Moody's and in conformance with all FDIC regulations concerning capital requirements.

Equity securities include our shares in the amounts of $3 million (2.4 percent of total U.S. plan assets) and $4 million (2.7 percent of total U.S. plan assets) at December 31, 2011 and 2010, respectively.

The actual fair values of U.S. plan assets are as follows:

| | December 31, 2011 | | | | December 31, 2010 | |
| | | Estimated Fair Value Measurements | | | | |
| | Carrying Amount | Quoted Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Carrying Amount | Estimated Fair Value |
|---|---|---|---|---|---|---|
| Cash | $ 1,345 | $ 1,345 | $ — | $ — | $ 2,823 | $ 2,823 |
| **Equity securities:** | | | | | | |
| U.S. Companies | $ 95,931 | $ 95,931 | $ — | $ — | $ 100,409 | $ 100,409 |
| **Fixed income securities:** | | | | | | |
| Corporate bonds | $ 43,552 | $ 43,552 | $ — | $ — | $ 41,310 | $ 41,310 |
| **Total** | $ 140,828 | $ 140,828 | $ — | $ — | $ 144,542 | $ 144,542 |

As of December 31, 2011, no single security made up more than 10 percent of total assets of either the U.S. or the Non-U.S. plans.

*Defined Benefit Plans — Cash Flows*

In 2011, we made total contributions of $6 million and $5 million to our non-U.S. and U.S. pension plans, respectively. In 2010, we made total contributions of $6 million and $10 million to our non-U.S. and U.S. pension plans, respectively. In 2009, we made total contributions of $6 million to each of our non-U.S. and U.S. pension plans. We expect our aggregate minimum contributions to our non-U.S. and U.S. plans in 2012, subject to applicable law, to be $7 million and $12 million, respectively. We continue to monitor and evaluate funding options based upon market conditions and may increase contributions at our discretion.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

In August 2006, the Pension Protection Act of 2006 ("PPA") was signed into law in the U.S. The PPA requires that pension plans become fully funded over a seven-year period beginning in 2008 and increases the amount we are allowed to contribute to our U.S. pension plans in the near term.

The following table summarizes our estimated benefit payments at December 31, 2011:

| | Total | Payments by Period | | | | | |
| | | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter |
|---|---|---|---|---|---|---|---|
| **Estimated benefit payments** | | | | | | | |
| Non U.S. plan | $ 23,071 | $ 1,544 | $ 1,702 | $ 1,803 | $ 1,941 | $ 2,071 | $ 14,010 |
| U.S. plan | 81,473 | 5,304 | 4,570 | 5,052 | 5,644 | 7,486 | 53,417 |
| Total estimated benefit payments | $ 104,544 | $ 6,848 | $ 6,272 | $ 6,855 | $ 7,585 | $ 9,557 | $ 67,427 |

*Other Benefit Plans*

We sponsor the Restoration Plan, which is a nonqualified, unfunded employee benefit plan under which certain highly compensated employees may elect to defer compensation in excess of amounts deferrable under our 401(k) savings plan. The Restoration Plan has no assets, and amounts withheld for the Restoration Plan are kept by us for general corporate purposes. The investments selected by employees and associated returns are tracked on a phantom basis. Accordingly, we have a liability to the employee for amounts originally withheld plus phantom investment income or less phantom investment losses. We are at risk for phantom investment income and, conversely, benefit should phantom investment losses occur. At December 31, 2011 and 2010, our liability for the Restoration Plan was $6 million and $7 million, respectively, and is included in "Accrued payroll and related costs."

In 2005 we enacted a profit sharing plan, the Noble Drilling Corporation Profit Sharing Plan, which covers eligible employees, as defined. Participants in the plan become fully vested in the plan after five years of service, or three years beginning in 2007. Profit sharing contributions are discretionary, require Board of Directors approval and are made in the form of cash. Contributions recorded related to this plan totaled $2 million, $2 million and $1 million in 2011, 2010 and 2009, respectively.

We sponsor a 401(k) savings plan, a medical plan and other plans for the benefit of our employees. The cost of maintaining these plans aggregated $61 million, $45 million and $36 million in 2011, 2010 and 2009, respectively. We do not provide post-retirement benefits (other than pensions) or any post-employment benefits to our employees.

**Note 14– Derivative Instruments and Hedging Activities**

We periodically enter into derivative instruments to manage our exposure to fluctuations in interest rates and foreign currency exchange rates. We have documented policies and procedures to monitor and control the use of derivative instruments. We do not engage in derivative transactions for speculative or trading purposes, nor were we a party to leveraged derivatives. During the period, we maintained certain foreign currency forward contracts that do not qualify under the FASB standards for hedge accounting treatment and therefore, changes in fair values are recognized as either income or loss in our consolidated income statement.

For foreign currency forward contracts, hedge effectiveness is evaluated at inception based on the matching of critical terms between derivative contracts and the hedged item. For interest rate swaps, we evaluate all material terms between the swap and the underlying debt obligation, known in FASB standards as the "long-haul method". Any change in fair value resulting from ineffectiveness is recognized immediately in earnings. We recognized a loss of $1.2 million and $0.3 million in other income due to interest rate swap hedge ineffectiveness during the year ended December 31, 2011 and 2010, respectively. No income or loss was recognized during 2009 due to hedge ineffectiveness.

86

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

### Cash Flow Hedges

Our North Sea and Brazil operations have a significant amount of their cash operating expenses payable in local currencies. To limit the potential risk of currency fluctuations, we typically maintain short-term forward contracts settling monthly in their respective local currencies to mitigate exchange exposure. The forward contract settlements in 2012 represent approximately 23 percent of these forecasted local currency requirements. The notional amount of the forward contracts outstanding, expressed in U.S. Dollars, was approximately $42 million at December 31, 2011. Total unrealized loss related to these forward contracts was $3 million as of December 31, 2011 compared to a $2 million gain as of December 31, 2010, and were recorded as part of "Accumulated other comprehensive loss" in the Consolidated Balance Sheets.

Our two joint ventures had maintained interest rate swaps which were classified as cash flow hedges. The purpose of these hedges was to satisfy bank covenants of the then outstanding credit facilities and to limit exposure to changes in interest rates. In February 2011, the outstanding balances of the joint venture credit facilities and the related interest rate swaps were settled and terminated. As a result of these transactions, we recognized a gain of $1 million during the year ended December 31, 2011.

The balance of the net unrealized gain/(loss) related to our cash flow hedges included in AOCL in the Consolidated Balance Sheets and related activity is as follows:

| | 2011 | 2010 | 2009 |
|---|---|---|---|
| Net unrealized gain at beginning of period | $ 1,970 | $ 417 | $ — |
| Activity during period: | | | |
| Settlement of foreign currency forward contracts during the period | (1,604) | (417) | — |
| Settlement of interest rate swaps during the period | (366) | — | — |
| Net unrealized gain/(loss) on outstanding foreign currency forward contracts | (3,061) | 1,604 | 417 |
| Net unrealized gain on outstanding interest rate swaps | — | 366 | — |
| Net unrealized gain/(loss) at end of period | $ (3,061) | $ 1,970 | $ 417 |

### Fair Value Hedges

During 2008, we entered into a firm commitment for the construction of the *Noble Globetrotter I* drillship. The drillship was constructed in two phases, with the second phase being installation and commissioning of the topside equipment. The contract for this second phase of construction was denominated in Euros, and in order to mitigate the risk of fluctuations in foreign currency exchange rates, we entered into forward contracts to purchase Euros. As of December 31, 2011, all amounts related to the forward contracts have settled. We accounted for these forward contracts as fair value hedges, and their fair market value was included in "Other current assets/liabilities" in the Consolidated Balance Sheets. Gains and losses from these fair value hedges would be recognized in earnings currently along with the change in fair value of the hedged item attributable to the risk being hedged, if any portion was found to be ineffective. No gains or losses related to fair value hedges were recognized in the income statement for the years ended December 31, 2011, 2010 and 2009.

### Foreign Currency Forward Contracts

The Bully 2 joint venture maintained foreign currency forward contracts to help mitigate the risk of currency fluctuation of the Singapore Dollar for the construction of the *Noble Bully II* drillship. These contracts were not designated for hedge accounting treatment under FASB standards, and therefore, changes in fair values were recognized as either income or loss in our Consolidated Income Statement. These contracts are referred to as non-designated derivatives in the tables to follow, and all were settled during the first quarter of 2011. For the year ended December 31, 2011, we recognized a loss of $0.5 million related to these foreign currency forward contracts.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

*Financial Statement Presentation*

The following tables, together with Note 15, summarize the financial statement presentation and fair value of our derivative positions as of December 31:

| | Balance sheet classification | Estimated fair value | |
|---|---|---|---|
| | | 2011 | 2010 |
| **Asset derivatives** | | | |
| Cash flow hedges | | | |
| Short-term foreign currency forward contracts | Other current assets | $ — | $ 2,015 |
| | | | |
| Non-designated derivatives | | | |
| Short-term foreign currency forward contracts | Other current assets | — | 2,603 |
| | | | |
| **Liability derivatives** | | | |
| Fair value hedges | | | |
| Short-term foreign currency forward contracts | Other current liabilities | $ — | $ 3,306 |
| | | | |
| Cash flow hedges | | | |
| Short-term foreign currency forward contracts | Other current liabilities | 3,061 | 412 |
| Short-term interest rate swaps | Other current liabilities | — | 15,697 |
| Long-term interest rate swaps | Other liabilities | — | 10,893 |

To supplement the fair value disclosures in Note 15, the following summarizes the recognized gains and losses of cash flow hedges and non-designated derivatives through AOCL or through "other income" for the years ended December 31, 2011 and 2010:

| | Gain/(loss) recognized through AOCL | | Gain reclassified from AOCL to "other income" | | Gain/(loss) recognized through "other income" | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 |
| **Cash flow hedge** | | | | | | |
| Foreign currency forward contracts | $ (3,061) | $ 1,187 | $ 1,604 | $ — | $ — | $ — |
| Interest rate swaps | — | 366 | 366 | — | — | (96) |
| | | | | | | |
| **Non-designated derivatives** | | | | | | |
| Foreign currency forward contracts | $ — | $ — | $ — | $ — | $ (546) | $ 2,253 |

During the year ended December 31, 2011, in connection with the settlement of our interest rate swaps, $1 million was reclassified from AOCL to "gain on contract extinguishments, net".

For cash flow presentation purposes, cash outflows of $29 million were recognized in the financing activities section related to the settlement of interest rate swaps. All other amounts are recognized through changes in operating activities and are recognized through changes in other assets and liabilities.

88

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 15- Financial Instruments and Credit Risk**

The following table presents the carrying amount and estimated fair value of our financial instruments recognized at fair value on a recurring basis:

| | | December 31, 2011 | | | December 31, 2010 | |
| | | Estimated Fair Value Measurements | | | | |
| | Carrying Amount | Quoted Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Carrying Amount | Estimated Fair Value |
|---|---|---|---|---|---|---|
| **Assets -** | | | | | | |
| Marketable securities | $ 4,701 | $ 4,701 | $ — | $ — | $ 6,854 | $ 6,854 |
| Foreign currency forward contracts | — | — | — | — | 4,618 | 4,618 |
| Firm commitment | — | — | — | — | 3,306 | 3,306 |
| **Liabilities -** | | | | | | |
| Interest rate swaps | $ — | $ — | $ — | $ — | $ 26,590 | $ 26,590 |
| Foreign currency forward contracts | 3,061 | — | 3,061 | — | 3,718 | 3,718 |

The derivative instruments have been valued using actively quoted prices and quotes obtained from the counterparties to the derivative agreements. Our cash and cash equivalents, accounts receivable and accounts payable are by their nature short-term. As a result, the carrying values included in the accompanying Consolidated Balance Sheets approximate fair value.

*Concentration of Credit Risk*

The market for our services is the offshore oil and gas industry, and our customers consist primarily of government-owned oil companies, major integrated oil companies and independent oil and gas producers. We perform ongoing credit evaluations of our customers and generally do not require material collateral. We maintain reserves for potential credit losses when necessary. Our results of operations and financial condition should be considered in light of the fluctuations in demand experienced by drilling contractors as changes in oil and gas producers' expenditures and budgets occur. These fluctuations can impact our results of operations and financial condition as supply and demand factors directly affect utilization and dayrates, which are the primary determinants of our net cash provided by operating activities.

In 2011, three customers combined for approximately 57 percent of our consolidated operating revenues. In 2010, three customers accounted for approximately 50 percent of consolidated operating revenues. In 2009, two customers accounted for approximately 35 percent of consolidated operating revenues. No other customer accounted for more than 10 percent of consolidated operating revenues in 2011, 2010 or 2009.

**Note 16- Commitments and Contingencies**

As discussed in Note 5, in May 2010 Anadarko sent a letter asserting that the initial attempted deepwater drilling moratorium in the U.S. Gulf of Mexico was an event of force majeure under the drilling contract for the *Noble Amos Runner*. In June 2010, Anadarko filed a declaratory judgment action in Federal District Court in Houston, Texas seeking to have the court declare that a force majeure condition had occurred and that the drilling contract was terminated by virtue of the initial proclaimed moratorium. We disagree that a force majeure event occurred and that Anadarko had the right to terminate the contract. In August 2010, we filed a counterclaim seeking damages from Anadarko for breach of contract. We currently expect this matter to be set for trial during the second quarter of 2012. Anadarko has also attempted to offset approximately $14 million that we had billed for services performed prior to their termination of the contract against other amounts it claims are owed relating to costs Anadarko incurred after Hurricane Ike, and that are the subject of a separate dispute. We do not believe Anadarko has a basis to offset these invoiced amounts. As a result of the uncertainties noted above, we have not recognized any revenue under the portion of this contract relating to the period after termination and the matter could have a material positive effect on our results of operations or cash flows for the period in which the matter is resolved should the court ultimately rule in our favor.

The other dispute with Anadarko relating to Hurricane Ike costs is the subject of a lawsuit (the "Hurricane Ike Case") brought by Anadarko after the initiation of the force majeure action described above. In the Hurricane Ike Case, which was filed in August 2010, Anadarko is seeking to recover various costs and damages including damages to recover two of our rigs under contract to Anadarko, costs that it may incur in the future to recover mooring components from the sea floor and costs Anadarko claims were incurred for a mooring upgrade of the two rigs. The Hurricane Ike Case has been consolidated in the Federal District Court in Houston, Texas with an action we initiated in September 2009 against a manufacturer of wire ropes, Bridon-American Corp. and Bridon International, Ltd (collectively, "Bridon"), and their distributor, Certex USA Inc., for damages we sustained after Bridon wire ropes parted on several of our drilling rigs during Hurricane Ike. We do not believe Anadarko's claims in the Hurricane Ike Case are meritorious and believe the likelihood of success by Anadarko is remote for the vast majority of damages it seeks in that case. We

expect the consolidated Bridon/Certex and Hurricane Ike case to go to trial in the second quarter of 2012 if not settled prior to trial. While we do not believe Anadarko's claims in this case are meritorious, we can make no assurances as to the outcome of this dispute.

89

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

The *Noble Homer Ferrington* is under contract with a subsidiary of ExxonMobil Corporation ("ExxonMobil"), who entered into an assignment agreement with BP for a two well farmout of the rig in Libya after successfully drilling two wells with the rig for ExxonMobil. In August 2010, BP attempted to terminate the assignment agreement claiming that the rig was not in the required condition. ExxonMobil has informed us that we must look to BP for payment of the dayrate during the assignment period. In August 2010, we initiated arbitration proceedings under the drilling contract against both BP and ExxonMobil. We do not believe BP had the right to terminate the assignment agreement and believe the rig continues to be fully ready to operate under the drilling contract. The rig has been operating under farm-out arrangements since March 2011. We believe we are owed dayrate by either or both of these clients. The operating dayrate was approximately $538,000 per day for the work in Libya. We are proceeding with the arbitration process and intend to vigorously pursue these claims. As a result of the uncertainties noted above, we have not recognized any revenue during the assignment period and the matter could have a material positive effect on our results of operations or cash flows in the period the matter is resolved should the arbitration panel ultimately rule in our favor.

In August 2007, we entered into a drilling contract with Marathon Oil Company ("Marathon") for the *Noble Jim Day* to operate in the U.S. Gulf of Mexico. On January 1, 2011, Marathon provided notice that it was terminating the contract. Marathon's stated reason for the termination was that the rig had not been accepted by Marathon by December 31, 2010, and Marathon also maintained that a force majeure condition existed under the contract. The contract contained a provision allowing Marathon to terminate if the rig had not commenced operations by December 31, 2010. We believe the rig was ready to commence operations and should have been accepted by Marathon. The contract term was for four years and represented approximately $752 million in contract backlog at the time of termination. No revenue has been recognized under this contract. In March 2011, we filed suit in Texas State District Court against Marathon seeking damages for its actions, and the suit is proceeding. We cannot provide assurance as to the outcome of this lawsuit.

We are from time to time a party to various lawsuits that are incidental to our operations in which the claimants seek an unspecified amount of monetary damages for personal injury, including injuries purportedly resulting from exposure to asbestos on drilling rigs and associated facilities. At December 31, 2011, there were approximately 23 of these lawsuits in which we are one of many defendants. These lawsuits have been filed in the United States in the states of Louisiana, Mississippi and Texas. We intend to defend vigorously against the litigation. We do not believe the ultimate resolution of these matters will have a material adverse effect on our financial position, results of operations or cash flows.

We are a defendant in certain claims and litigation arising out of operations in the ordinary course of business, including certain disputes with customers over receivables discussed in Note 5, the resolution of which, in the opinion of management, will not be material to our financial position, results of operations or cash flows. There is inherent risk in any litigation or dispute and no assurance can be given as to the outcome of these claims.

During the fourth quarter of 2007, our Nigerian subsidiary received letters from the Nigerian Maritime Administration and Safety Agency ("NIMASA") seeking to collect a two percent surcharge on contract amounts under contracts performed by "vessels," within the meaning of Nigeria's cabotage laws, engaged in the Nigerian coastal shipping trade. Although we do not believe that these laws apply to our ownership of drilling units, NIMASA is seeking to apply a provision of the Nigerian cabotage laws (which became effective on May 1, 2004) to our offshore drilling units by considering these units to be "vessels" within the meaning of those laws and therefore subject to the surcharge, which is imposed only upon "vessels." Our offshore drilling units are not engaged in the Nigerian coastal shipping trade and are not in our view "vessels" within the meaning of Nigeria's cabotage laws. In January 2008, we filed an originating summons against NIMASA and the Minister of Transportation in the Federal High Court of Lagos, Nigeria seeking, among other things, a declaration that our drilling operations do not constitute "coastal trade" or "cabotage" within the meaning of Nigeria's cabotage laws and that our offshore drilling units are not "vessels" within the meaning of those laws. In February 2009, NIMASA filed suit against us in the Federal High Court of Nigeria seeking collection of the cabotage surcharge. In August 2009, the court issued a favorable ruling in response to our originating summons stating that drilling operations do not fall within the cabotage laws and that drilling rigs are not vessels for purposes of those laws. The court also issued an injunction against the defendants prohibiting their interference with our drilling rigs or drilling operations. NIMASA has appealed the court's ruling, although the court dismissed NIMASA's lawsuit filed against us in February 2009. We intend to take all further appropriate legal action to resist the application of Nigeria's cabotage laws to our drilling units. The outcome of any such legal action and the extent to which we may ultimately be responsible for the surcharge is uncertain. If it is ultimately determined that offshore drilling units constitute vessels within the meaning of the Nigerian cabotage laws, we may be required to pay the surcharge and comply with other aspects of the Nigerian cabotage laws, which could adversely affect our operations in Nigerian waters and require us to incur additional costs of compliance.

90

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

NIMASA had previously informed the Nigerian Content Division of its position that we were not in compliance with the cabotage laws. The Nigerian Content Division makes determinations of companies' compliance with applicable local content regulations for purposes of government contracting, including contracting for services in connection with oil and gas concessions where the Nigerian national oil company is a partner. The Nigerian Content Division had previously barred us from participating in new tenders as a result of NIMASA's allegations, although the Division reversed its actions based on the favorable Federal High Court ruling. However, no assurance can be given with respect to our ability to bid for future work in Nigeria until our dispute with NIMASA is resolved.

We operate in a number of countries throughout the world and our income tax returns filed in those jurisdictions are subject to review and examination by tax authorities within those jurisdictions. The U.S. Internal Revenue Service ("IRS") has completed its examination of our 2008 U.S. tax return. The examination team has proposed adjustments and deficiencies with respect to certain items that were reported by us for the 2008 tax year. We believe that we have accurately reported all amounts included in our 2008 tax return, and have filed protests with the IRS Office of Appeals contesting the examination team's proposed adjustments. We intend to vigorously defend our reported positions. In addition, a U.S. subsidiary of Frontier is also under audit for its 2007 and 2008 tax returns. Furthermore, we are currently contesting several non-U.S. tax assessments and may contest future assessments when we believe the assessments are in error. We believe the ultimate resolution of the outstanding assessments, for which we have not made any accrual, will not have a material adverse effect on our consolidated financial statements. We recognize uncertain tax positions that we believe have a greater than 50 percent likelihood of being sustained. We cannot predict or provide assurance as to the ultimate outcome of the existing or future assessments.

Certain of our non-U.S. income tax returns have been examined for the 2002 through 2008 periods and audit claims have been assessed for approximately $262 million (including interest and penalties), primarily in Mexico. In Mexico, these assessments total approximately $249 million. We recently received from the Regional Chamber of the Federal Tax Court adverse decisions with respect to approximately $5 million in assessments related to depreciation deductions, which we are appealing. We are also contesting all other assessments in Mexico. However, we expect increased audit activity in Mexico and anticipate the tax authorities will issue additional assessments and continue to pursue legal actions for all audit claims.

Additional audit claims of approximately $92 million attributable to customs and other business taxes have been assessed against us in other jurisdictions. We have contested, or intend to contest, these assessments, including through litigation if necessary, and we believe the ultimate resolution, for which we have not made any accrual, will not have a material adverse effect on our consolidated financial statements.

We maintain certain insurance coverage against specified marine perils, including liability for physical damage to our drilling rigs, and loss of hire on certain of our rigs. The damage caused in 2005 and 2008 by Hurricanes Katrina, Rita and Ike negatively impacted the energy insurance market, resulting in more restrictive and expensive coverage for U.S. named windstorm perils. Accordingly, effective March 2009, we elected to self-insure this exposure to our units in the U.S. portion of the Gulf of Mexico. Our rigs located in the Mexican portion of the Gulf of Mexico remain covered by commercial insurance for windstorm damage. In addition, we maintain physical damage deductibles of $25 million per occurrence for rigs located in the U.S., Mexico, Brazil, Southeast Asia, the North Sea, New Zealand and Australia and $15 million per occurrence for rigs operating in West Africa, the Middle East, India, and the Mediterranean Sea. The loss of hire coverage applies only to our rigs operating under contract with a dayrate equal to or greater than $200,000 a day and is subject to a 45-day waiting period for each unit and each occurrence.

Although we maintain insurance in the geographic areas in which we operate, pollution, reservoir damage and environmental risks generally are not fully insurable. Our insurance policies and contractual rights to indemnity may not adequately cover our losses or may have exclusions of coverage for some losses. We do not have insurance coverage or rights to indemnity for all risks, including loss of hire insurance on most of the rigs in our fleet. Uninsured exposures may include expatriate activities prohibited by U.S. laws and regulations, radiation hazards, certain loss or damage to property onboard our rigs and losses relating to shore-based terrorist acts or strikes. If a significant accident or other event occurs and is not fully covered by insurance or contractual indemnity, it could adversely affect our financial position, results of operations or cash flows. Additionally, there can be no assurance that those parties with contractual obligations to indemnify us will necessarily be financially able to indemnify us against all these risks.

91

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

In October 2011, we were assessed a fine by the Brazilian government in the amount of R$238,000 (approximately $135,000) in connection with the inadvertent discharge of approximately 200 barrels of drilling fluid from one of our vessels offshore Brazil in November 2010. We plan on appealing this judgment to the full extent permissible by law.

We carry protection and indemnity insurance covering marine third party liability exposures, which also includes coverage for employer's liability resulting from personal injury to our offshore drilling crews. Our protection and indemnity policy currently has a standard deductible of $10 million per occurrence, with maximum liability coverage of $750 million.

In connection with our capital expenditure program, we had outstanding commitments, including shipyard and purchase commitments of approximately $3.0 billion at December 31, 2011.

We have entered into agreements with certain of our executive officers, as well as certain other employees. These agreements become effective upon a change of control of Noble-Swiss (within the meaning set forth in the agreements) or a termination of employment in connection with or in anticipation of a change of control, and remain effective for three years thereafter. These agreements provide for compensation and certain other benefits under such circumstances.

*Nigerian Operations*

In 2007, we began, and voluntarily contacted the SEC and the U.S. Department of Justice ("DOJ") to advise them of an internal investigation of the legality under the United States Foreign Corrupt Practices Act ("FCPA") and local laws of certain reimbursement payments made by our Nigerian affiliate to our customs agents in Nigeria. In 2010, we finalized settlements of this matter with each of the SEC and the DOJ. Pursuant to these settlements, we agreed to pay fines and penalties to the DOJ and the SEC and to certain undertakings, including refraining from violating the FCPA and other anti-corruption laws, self-reporting any violations of the FCPA or such laws to the DOJ and reporting to the DOJ on an annual basis our progress on anti-corruption compliance matters. Our ability to comply with the terms of the settlements is dependent on the success of our ongoing compliance program, including our ability to continue to manage our agents and supervise, train and retain competent employees, and the efforts of our employees to comply with applicable law and our code of business conduct and ethics.

In January 2011, the Nigerian Economic and Financial Crimes Commission and the Nigerian Attorney General Office initiated an investigation into these same activities. A subsidiary of Noble-Swiss resolved this matter through the execution of a non-prosecution agreement dated January 28, 2011. Pursuant to this agreement, the subsidiary paid $2.5 million to resolve all charges and claims of the Nigerian government.

Any additional investigation by these or other agencies could damage our reputation and result in substantial fines, sanctions, civil and/or criminal penalties and curtailment of operations in certain jurisdictions and might adversely affect our business, results of operations or financial condition. Further, resolving any additional investigations could be expensive and consume significant time and attention of our senior management.

As of December 31, 2011, all three of our rigs operating in Nigeria were operating under temporary import permits. To date, we have been successful in obtaining new, or extending existing, temporary import permits. However, there can be no assurance that we will be able to obtain new permits or further extensions of permits necessary to continue the operation of our rigs in Nigeria. If we cannot obtain a new permit or an extension necessary to continue operations of any rig, we may need to cease operations under the drilling contract for such rig and relocate such rig from Nigerian waters. We cannot predict what impact these events may have on any such contract or our business in Nigeria, and we could face additional fines and sanctions in Nigeria. Furthermore, we cannot predict what changes, if any, relating to temporary import permit policies and procedures may be established or implemented in Nigeria in the future, or how any such changes may impact our business there.

92

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 17- Segment and Related Information**

We report our contract drilling operations as a single reportable segment: Contract Drilling Services. The consolidation of our contract drilling operations into one reportable segment is attributable to how we manage our business, and the fact that all of our drilling fleet is dependent upon the worldwide oil industry. The mobile offshore drilling units comprising our offshore rig fleet operate in a single, global market for contract drilling services and are often redeployed globally due to changing demands of our customers, which consist largely of major non-U.S. and government owned/controlled oil and gas companies throughout the world. Our contract drilling services segment conducts contract drilling operations in the Middle East, India, U.S. Gulf of Mexico, Mexico, the Mediterranean, the North Sea, Brazil, West Africa and the Asian Pacific.

The accounting policies of our reportable segment are the same as those described in the summary of significant accounting policies (see Note 1). We evaluate the performance of our operating segment based on revenues from external customers and segment profit. Summarized financial information of our reportable segment for the years ended December 31, 2011, 2010 and 2009 is shown in the following table. The "Other" column includes results of labor contract drilling services, other insignificant operations and corporate related items.

| | Contract Drilling Services | Other | Total |
|---|---|---|---|
| **2011** | | | |
| Revenues from external customers | $ 2,634,911 | $ 60,921 | $ 2,695,832 |
| Depreciation and amortization | 647,142 | 11,498 | 658,640 |
| Segment operating income | 477,920 | 12,573 | 490,493 |
| Interest expense, net of amount capitalized | (1,959) | (53,768) | (55,727) |
| Income tax (provision)/ benefit | (80,317) | 7,692 | (72,625) |
| Segment profit/ (loss) | 406,112 | (35,214) | 370,898 |
| Total assets (at end of period) | 13,028,751 | 466,408 | 13,495,159 |
| Capital expenditures | 2,624,178 | 15,801 | 2,639,979 |
| | | | |
| **2010** | | | |
| Revenues from external customers | $ 2,771,784 | $ 35,392 | $ 2,807,176 |
| Depreciation and amortization | 528,011 | 11,818 | 539,829 |
| Segment operating income/ (loss) | 918,205 | (2,125) | 916,080 |
| Interest expense, net of amount capitalized | (1,123) | (8,334) | (9,457) |
| Income tax (provision)/ benefit | (144,220) | 1,143 | (143,077) |
| Segment profit/ (loss) | 779,609 | (6,180) | 773,429 |
| Total assets (at end of period) | 11,148,426 | 153,961 | 11,302,387 |
| Capital expenditures | 1,416,841 | 6,643 | 1,423,484 |
| | | | |
| **2009** | | | |
| Revenues from external customers | $ 3,607,219 | $ 33,565 | $ 3,640,784 |
| Depreciation and amortization | 398,573 | 9,740 | 408,313 |
| Segment operating income | 2,008,704 | 2,040 | 2,010,744 |
| Interest expense, net of amount capitalized | (664) | (1,021) | (1,685) |
| Income tax (provision)/ benefit | (337,470) | 210 | (337,260) |
| Segment profit | 1,671,942 | 6,700 | 1,678,642 |
| Capital expenditures | 1,367,096 | 64,402 | 1,431,498 |

Table of Contents

**NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES**
**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

The following table presents revenues and identifiable assets by country based on the location of the service provided:

| | Revenues Year Ended December 31, | | | Identifiable Assets As of December 31, | |
| | 2011 | 2010 | 2009 | 2011 | 2010 |
|---|---|---|---|---|---|
| United States | $ 524,750 | $ 550,683 | $ 811,538 | $ 5,205,343 | $ 4,070,858 |
| Bahrain | 4,252 | — | — | 20,282 | — |
| Benin | — | — | 11,976 | — | — |
| Brunei | 35,574 | 49,487 | — | — | 568,392 |
| Brazil | 572,015 | 527,678 | 372,750 | 3,785,412 | 1,824,190 |
| Cameroon | 17,029 | 21,991 | — | 62,465 | 51,098 |
| Canada | 39,186 | 35,292 | 33,338 | 12,398 | 15,333 |
| China (1) | — | — | — | 321,352 | 570,985 |
| Cyprus | 32,713 | — | — | — | — |
| Denmark | — | — | 127,149 | — | — |
| Egypt | 11,261 | — | — | 180,570 | — |
| India | 102,432 | 108,190 | 121,604 | 111,103 | 123,271 |
| Israel | 25,566 | — | — | 229,725 | — |
| Ivory Coast | — | — | 49,135 | — | — |
| Libya | 4,378 | 75,390 | 132,572 | — | — |
| Malta | 44,713 | — | — | — | 205,483 |
| Mexico | 402,129 | 553,209 | 839,312 | 746,592 | 710,090 |
| Morocco | 43,228 | — | — | — | — |
| New Zealand | 68,153 | — | — | — | — |
| Nigeria | 58,501 | 135,096 | 153,948 | 77,442 | 162,014 |
| Oman | 4,607 | — | — | 84,726 | — |
| Philippines | 6,472 | — | — | — | — |
| Qatar | 132,917 | 158,107 | 348,028 | 136,136 | 364,739 |
| Saudi Arabia | 96,655 | — | — | 659,634 | — |
| Singapore (1) | — | 32,212 | — | 494,578 | 1,283,071 |
| South Korea (1) | — | — | — | 651,266 | — |
| Switzerland (2) | — | — | — | 35,839 | 35,687 |
| The Netherlands | 220,489 | 317,530 | 333,440 | 159,053 | 629,859 |
| United Arab Emirates | 84,253 | 56,388 | 68,348 | 156,953 | 361,626 |
| United Kingdom | 164,559 | 185,821 | 237,418 | 364,290 | 325,691 |
| Other | — | 102 | 228 | — | — |
| Total | $ 2,695,832 | $ 2,807,176 | $ 3,640,784 | $ 13,495,159 | $ 11,302,387 |

(1)   China, Singapore and South Korea consist primarily of asset values for newbuild rigs under construction in shipyards.

(2)   Switzerland assets consist of general corporate assets, which generate no external revenue for the Company.

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 18 — Supplemental Cash Flow Information (Noble-Swiss)**

The net effect of changes in other assets and liabilities on cash flows from operating activities is as follows:

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2011** | | **2010** | | **2009** | |
| Accounts receivable | $ | (283,268) | $ | 343,844 | $ | (48,839) |
| Other current assets | | (51,409) | | (77,090) | | (17,723) |
| Other assets | | (5,077) | | (293) | | (14,050) |
| Accounts payable | | (12,502) | | (43,938) | | 11,646 |
| Other current liabilities | | 72,861 | | 97,041 | | (1,979) |
| Other liabilities | | 87,737 | | 28,030 | | 15,006 |
| | $ | (191,658) | $ | 347,594 | $ | (55,939) |

Additional cash flow information is as follows:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2011** | | **2010** | | **2009** | |
| Cash paid during the period for: | | | | | | |
| Interest, net of amounts capitalized | $ | 46,180 | $ | 4,044 | $ | 1,618 |
| Income taxes (net of refunds) | $ | 128,162 | $ | 194,423 | $ | 332,287 |

**Note 19 — Supplemental Cash Flow Information (Noble-Cayman)**

The net effect of changes in other assets and liabilities on cash flows from operating activities is as follows:

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2011** | | **2010** | | **2009** | |
| Accounts receivable | $ | (283,268) | $ | 343,844 | $ | (48,839) |
| Other current assets | | (49,044) | | (75,737) | | (16,686) |
| Other assets | | (8,056) | | (493) | | (13,935) |
| Accounts payable | | (12,524) | | (44,105) | | 11,558 |
| Other current liabilities | | 67,238 | | 90,864 | | (10,318) |
| Other liabilities | | 87,711 | | 28,258 | | 14,803 |
| | $ | (197,943) | $ | 342,631 | $ | (63,417) |

Additional cash flow information is as follows:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2011** | | **2010** | | **2009** | |
| Cash paid during the period for: | | | | | | |
| Interest, net of amounts capitalized | $ | 46,180 | $ | 4,044 | $ | 1,618 |
| Income taxes (net of refunds) | $ | 128,162 | $ | 194,423 | $ | 332,287 |

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 20- Other Financial Information**

The following are Swiss statutory disclosure requirements:

*(i) Expenses*

Total personnel expenses amounted to $746 million, $649 million and $564 million for the years ended December 31, 2011, 2010 and 2009, respectively.

*(ii) Fire Insurance*

Total fire insurance values of property and equipment amounted to $12.2 billion and $8.3 billion at December 31, 2011 and 2010, respectively.

*(iii) Risk assessment and Management*

The Board of Directors, together with the management of Noble, is responsible for assessing risks related to the financial reporting process and for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed by, or under the supervision of the Chief Executive Officer and Chief Financial Officer to provide reasonable assurance regarding the reliability of financial reporting and the preparation of Noble's consolidated financial statements for external purposes in accordance with GAAP.

The Board, operating through its Audit Committee composed entirely of directors who are not officers or employees of the Company, is responsible for oversight of the financial reporting process and safeguarding of assets against unauthorized acquisition, use, or disposition. The Audit Committee meets with management, the independent registered public accountants and the internal auditor; approves the overall scope of audit work and related fee arrangements; and reviews audit reports and findings. In addition, the independent registered public accountants and the internal auditor meet separately with the Audit Committee, without management representatives present, to discuss the results of their audits; the adequacy of the Company's internal control; the quality of its financial reporting; and the safeguarding of assets against unauthorized acquisition, use, or disposition.

**Note 21- Information about Noble-Cayman**

*Guarantees of Registered Securities*

Noble-Cayman and Noble Holding (U.S.) Corporation ("NHC"), a wholly-owned subsidiary of Noble-Cayman, are full and unconditional guarantors of NDC's 7.50% Senior Notes due 2019 which had an outstanding principal balance at December 31, 2011 of $202 million. NDC is a direct, wholly-owned subsidiary of NHC. Noble Drilling Holding LLC ("NDH"), a wholly-owned subsidiary of Noble-Cayman, is also a co-obligor on (and effectively a guarantor of) the 7.50% Senior Notes. Noble Drilling Services 6 LLC ("NDS6"), also a wholly-owned subsidiary of Noble-Cayman, is a co-issuer of the 7.50% Senior Notes.

NDC and NHIL are full and unconditional guarantors of Noble-Cayman's 5.875% Senior Notes due 2013, which had an outstanding principal balance of $300 million at December 31, 2011. The indenture governing the Senior Notes due 2013 provides that each guarantee may be released in connection with certain events, including upon a merger, consolidation or transfer of all of the assets of Noble Cayman or the guarantor with or to another person in compliance with the indenture (provided the acquiror assumes the guarantee), upon a liquidation of the guarantor in compliance with the indenture (provided any acquiror assumes the guarantee), or upon the guarantor's ceasing to be a wholly-owned subsidiary of Noble-Cayman.

Noble-Cayman is a full and unconditional guarantor of NHIL's 7.375% Senior Notes due 2014, which had an outstanding principal balance of $250 million at December 31, 2011.

Noble-Cayman is a full and unconditional guarantor of NHIL's 3.45% Senior Notes due 2015, 4.90% Senior Notes due 2020 and 6.20% Senior Notes due 2040. The aggregate principal balance of these three tranches of senior notes at December 31, 2011 was $1.25 billion.

Noble-Cayman is a full and unconditional guarantor of NHIL's 3.05% Senior Notes due 2016, 4.625% Senior Notes due 2021 and 6.05% Senior Notes due 2041. The aggregate principal balance of these three tranches of senior notes at December 31, 2011 was $1.1 billion.

The following consolidating financial statements of Noble-Cayman, NHC and NDH combined, NDC, NHIL, NDS6 and all other subsidiaries present investments in both consolidated and unconsolidated affiliates using the equity method of accounting.

Table of Contents

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONDENSED CONSOLIDATING BALANCE SHEET**
**December 31, 2011**
**(in thousands)**

| | Noble-Cayman | NHC and NDH Combined | NDC | NHIL | NDS6 | Subsidiaries of Noble | Consolidating Adjustments | Total |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| Current assets | | | | | | | | |
| Cash and cash equivalents | $ 146 | $ 385 | $ — | $ — | $ — | $ 234,525 | $ — | $ 235,056 |
| Accounts receivable | — | 10,810 | 3,371 | — | — | 572,982 | — | 587,163 |
| Taxes receivable | — | 4,566 | — | — | — | 70,718 | — | 75,284 |
| Prepaid expenses | — | 453 | 19 | — | — | 54,091 | — | 54,563 |
| Short-term notes receivable from affiliates | — | 119,476 | — | — | — | 122,298 | (241,774) | — |
| Accounts receivable from affiliates | 1,683,740 | 99,202 | 879,581 | 159,132 | 33,905 | 6,372,657 | (9,228,217) | — |
| Other current assets | — | 643 | 196 | 93 | — | 97,719 | — | 98,651 |
| Total current assets | 1,683,886 | 235,535 | 883,167 | 159,225 | 33,905 | 7,524,990 | (9,469,991) | 1,050,717 |
| Property and equipment | | | | | | | | |
| Drilling equipment, facilities and other | — | 2,718,186 | 71,381 | — | — | 12,213,361 | — | 15,002,928 |
| Accumulated depreciation | — | (220,662) | (53,037) | — | — | (2,860,702) | — | (3,134,401) |
| Total property and equipment, net | — | 2,497,524 | 18,344 | — | — | 9,352,659 | — | 11,868,527 |
| Notes receivable from affiliates | 3,842,062 | 675,000 | — | 2,336,527 | 572,107 | 2,678,192 | (10,103,888) | — |
| Investments in affiliates | 6,969,201 | 9,101,938 | 3,450,212 | 6,605,771 | 2,141,450 | — | (28,268,572) | — |
| Other assets | 3,230 | 8,092 | 2,541 | 18,548 | 880 | 504,870 | — | 538,161 |
| **Total assets** | $12,498,379 | $ 12,518,089 | $4,354,264 | $9,120,071 | $2,748,342 | $ 20,060,711 | $ (47,842,451) | $13,457,405 |
| **LIABILITIES AND EQUITY** | | | | | | | | |
| Current liabilities | | | | | | | | |
| Short-term notes payables from affiliates | $ 72,298 | $ 50,000 | $ — | $ — | $ — | $ 119,476 | $ (241,774) | $ — |
| Accounts payable and accrued liabilities | — | 8,474 | 7,503 | — | — | 528,660 | — | 544,637 |
| Accounts payable to affiliates | 2,079,719 | 4,166,021 | 27,341 | 112,953 | 34,107 | 2,808,076 | (9,228,217) | — |
| Interest payable | 1,891 | — | — | 48,116 | 4,412 | — | — | 54,419 |
| Taxes payable | — | 10,032 | — | — | — | 81,158 | — | 91,190 |
| Other current liabilities | — | — | 240 | — | — | 123,159 | — | 123,399 |
| Total current liabilities | 2,153,908 | 4,234,527 | 35,084 | 161,069 | 38,519 | 3,660,529 | (9,469,991) | 813,645 |
| Long-term debt | 1,274,949 | — | — | 2,595,320 | 201,695 | — | — | 4,071,964 |
| Notes payable to affiliates | 1,667,291 | 1,147,500 | 85,000 | 975,000 | 811,000 | 5,418,097 | (10,103,888) | — |
| Deferred income taxes | — | — | 15,731 | — | — | 227,060 | — | 242,791 |
| Other liabilities | 19,929 | 24,878 | — | — | — | 210,565 | — | 255,372 |
| Total liabilities | 5,116,077 | 5,406,905 | 135,815 | 3,731,389 | 1,051,214 | 9,516,251 | (19,573,879) | 5,383,772 |
| Commitments and contingencies | | | | | | | | |
| Equity | 7,382,302 | 7,111,184 | 4,218,449 | 5,388,682 | 1,697,128 | 10,544,460 | (28,268,572) | 8,073,633 |
| **Total liabilities and equity** | $12,498,379 | $ 12,518,089 | $4,354,264 | $9,120,071 | $2,748,342 | $ 20,060,711 | $ (47,842,451) | $13,457,405 |

97

Table of Contents

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONDENSED CONSOLIDATING BALANCE SHEET**
**December 31, 2010**
(in thousands)

| | Noble-Cayman | NHC and NDH Combined | NDC | NHIL | NDS6 | Other Non-guarantor Subsidiaries of Noble | Consolidating Adjustments | Total |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| Current assets | | | | | | | | |
| Cash and cash equivalents | $ 42 | $ 146 | $ — | $ — | $ — | $ 333,211 | $ — | $ 333,399 |
| Accounts receivable | — | 6,984 | 1,795 | — | — | 378,635 | — | 387,414 |
| Taxes receivable | — | 12,947 | — | — | — | 68,119 | — | 81,066 |
| Prepaid expenses | — | 310 | — | — | — | 32,922 | — | 33,232 |
| Short-term notes receivable from affiliates | — | 119,476 | — | — | — | 75,000 | (194,476) | — |
| Accounts receivable from affiliates | 614,264 | 73,001 | 751,623 | 219,215 | 11,374 | 3,801,852 | (5,471,329) | — |
| Other current assets | — | 3,788 | 240 | — | — | 65,793 | — | 69,821 |
| Total current assets | 614,306 | 216,652 | 753,658 | 219,215 | 11,374 | 4,755,532 | (5,665,805) | 904,932 |
| Property and equipment | | | | | | | | |
| Drilling equipment, facilities and other | — | 1,254,482 | 70,945 | — | — | 11,289,547 | — | 12,614,974 |
| Accumulated depreciation | — | (153,638) | (50,250) | — | — | (2,391,066) | — | (2,594,954) |
| Total property and equipment, net | — | 1,100,844 | 20,695 | — | — | 8,898,481 | — | 10,020,020 |
| Notes receivable from affiliates | 3,507,062 | 675,000 | — | 1,239,600 | 479,107 | 2,492,900 | (8,393,669) | — |
| Investments in affiliates | 6,835,466 | 9,150,129 | 3,561,451 | 5,618,248 | 1,879,831 | — | (27,045,125) | — |
| Other assets | 1,872 | 7,700 | 2,451 | 11,336 | 1,001 | 318,232 | — | 342,592 |
| **Total assets** | $10,958,706 | $ 11,150,325 | $4,338,255 | $7,088,399 | $2,371,313 | $ 16,465,145 | $ (41,104,599) | $11,267,544 |
| **LIABILITIES AND EQUITY** | | | | | | | | |
| Current liabilities | | | | | | | | |
| Short-term notes payables from affiliates | $ 25,000 | $ 50,000 | $ — | $ — | $ — | $ 119,476 | $ (194,476) | $ — |
| Current maturities of long-term debt | — | — | — | — | — | 80,213 | — | 80,213 |
| Accounts payable and accrued liabilities | — | 9,024 | 8,539 | — | — | 477,630 | — | 495,193 |
| Accounts payable to affiliates | 1,601,869 | 2,708,598 | 30,095 | 64,192 | 7,134 | 1,059,441 | (5,471,329) | — |
| Interest payable | 1,473 | — | — | 31,973 | 4,413 | 2,401 | — | 40,260 |
| Taxes payable | — | 6,887 | — | — | — | 87,245 | — | 94,132 |
| Other current liabilities | — | 3,307 | 240 | — | — | 80,212 | — | 83,759 |
| Total current liabilities | 1,628,342 | 2,777,816 | 38,874 | 96,165 | 11,547 | 1,906,618 | (5,665,805) | 793,557 |
| Long-term debt | 339,911 | — | — | 1,498,066 | 201,695 | 646,812 | — | 2,686,484 |
| Notes payable to affiliates | 1,834,500 | 1,092,000 | 120,000 | 550,000 | 811,000 | 3,986,169 | (8,393,669) | — |
| Deferred income taxes | — | — | 15,731 | — | — | 243,091 | — | 258,822 |
| Other liabilities | 19,929 | 48,595 | 9,754 | — | — | 189,748 | — | 268,026 |
| Total liabilities | 3,822,682 | 3,918,411 | 184,359 | 2,144,231 | 1,024,242 | 6,972,438 | (14,059,474) | 4,006,889 |
| Commitments and contingencies | | | | | | | | |
| **Equity** | 7,136,024 | 7,231,914 | 4,153,896 | 4,944,168 | 1,347,071 | 9,492,707 | (27,045,125) | 7,260,655 |

| Total liabilities and equity | $10,958,706 | $ 11,150,325 | $4,338,255 | $7,088,399 | $2,371,313 | $ 16,465,145 | $ (41,104,599) | $11,267,544 |
|---|---|---|---|---|---|---|---|---|

Table of Contents

NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
CONDENSED CONSOLIDATING STATEMENT OF INCOME
Year Ended December 31, 2011
(in thousands)

| | Noble-Cayman | NHC and NDH Combined | NDC | NHIL | NDS6 | Other Non-guarantor Subsidiaries of Noble | Consolidating Adjustments | Total |
|---|---|---|---|---|---|---|---|---|
| **Operating revenues** | | | | | | | | |
| Contract drilling services | $ — | $ 134,602 | $19,913 | $ — | $ — | $ 2,466,701 | $ (64,458) | $2,556,758 |
| Reimbursables | — | 4,351 | 12 | — | — | 74,832 | — | 79,195 |
| Labor contract drilling services | — | 4 | — | — | — | 59,000 | — | 59,004 |
| Other | — | — | — | — | — | 875 | — | 875 |
| Total operating revenues | — | 138,957 | 19,925 | — | — | 2,601,408 | (64,458) | 2,695,832 |
| | | | | | | | | |
| **Operating costs and expenses** | | | | | | | | |
| Contract drilling services | 3,038 | 46,305 | 7,478 | 59,865 | — | 1,319,187 | (64,458) | 1,371,415 |
| Reimbursables | — | 4,125 | — | — | — | 54,314 | — | 58,439 |
| Labor contract drilling services | — | — | — | — | — | 33,885 | — | 33,885 |
| Depreciation and amortization | — | 50,462 | 3,767 | — | —  | 602,976 | — | 657,205 |
| Selling, general and administrative | 1,242 | 5,025 | 1 | 33,355 | 1 | 17,163 | — | 56,787 |
| Gain on contract extinguishments, net | — | — | — | — | — | (21,202) | — | (21,202) |
| Total operating costs and expenses | 4,280 | 105,917 | 11,246 | 93,220 | 1 | 2,006,323 | (64,458) | 2,156,529 |
| | | | | | | | | |
| **Operating income (loss)** | (4,280) | 33,040 | 8,679 | (93,220) | (1) | 595,085 | — | 539,303 |
| **Other income (expense)** | | | | | | | | |
| Equity earnings in affiliates, net of tax | 488,735 | 296,751 | 64,626 | 579,730 | 328,443 | — | (1,758,285) | — |
| Interest expense, net of amounts capitalized | (69,180) | (61,271) | (6,110) | (88,396) | (29,050) | (38,778) | 237,058 | (55,727) |
| Interest income and other, net | 6,768 | 26,291 | (11) | 63,607 | 8,709 | 134,174 | (237,058) | 2,480 |
| | | | | | | | | |
| **Income before income taxes** | 422,043 | 294,811 | 67,184 | 461,721 | 308,101 | 690,481 | (1,758,285) | 486,056 |
| Income tax provision | — | (14,933) | — | — | — | (56,353) | — | (71,286) |
| Net Income | 422,043 | 279,878 | 67,184 | 461,721 | 308,101 | 634,128 | (1,758,285) | 414,770 |
| | | | | | | | | |
| Net loss attributable to noncontrolling interests | — | — | — | — | — | 7,273 | — | 7,273 |
| | | | | | | | | |
| **Net income attributable to Noble Corporation** | $422,043 | $ 279,878 | $67,184 | $461,721 | $308,101 | $ 641,401 | $ (1,758,285) | $ 422,043 |

Table of Contents

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONDENSED CONSOLIDATING STATEMENT OF INCOME**
**Year Ended December 31, 2010**
(in thousands)

| | Noble-Cayman | NHC and NDH Combined | NDC | NHIL | NDS6 | Other Non-guarantor Subsidiaries of Noble | Consolidating Adjustments | Total |
|---|---|---|---|---|---|---|---|---|
| **Operating revenues** | | | | | | | | |
| Contract drilling services | $ — | $ 94,027 | $ 17,942 | $ — | $ — | $ 2,621,424 | $ (37,900) | $2,695,493 |
| Reimbursables | — | 1,483 | 71 | — | — | 75,277 | — | 76,831 |
| Labor contract drilling services | — | — | — | — | — | 32,520 | — | 32,520 |
| Other | — | 78 | &1151; | — | — | 2,254 | — | 2,332 |
| Total operating revenues | — | 95,588 | 18,013 | — | — | 2,731,475 | (37,900) | 2,807,176 |
| **Operating costs and expenses** | | | | | | | | |
| Contract drilling services | 24,103 | 40,994 | 6,363 | 42,932 | — | 1,096,309 | (37,900) | 1,172,801 |
| Reimbursables | — | 1,641 | 66 | — | — | 57,707 | — | 59,414 |
| Labor contract drilling services | — | — | — | — | — | 22,056 | — | 22,056 |
| Depreciation and amortization | — | 37,324 | 3,449 | — | — | 498,231 | — | 539,004 |
| Selling, general and administrative | 7,979 | 4,674 | 2 | 30,210 | 1 | 12,702 | — | 55,568 |
| Total operating costs and expenses | 32,082 | 84,633 | 9,880 | 73,142 | 1 | 1,687,005 | (37,900) | 1,848,843 |
| **Operating income (loss)** | (32,082) | 10,955 | 8,133 | (73,142) | (1) | 1,044,470 | — | 958,333 |
| **Other income (expense)** | | | | | | | | |
| Equity earnings in affiliates, net of tax | 870,322 | 620,747 | 24,898 | 1,040,110 | 407,435 | — | (2,963,512) | — |
| Interest expense, net of amounts capitalized | (29,459) | (65,056) | (7,375) | (43,988) | (7,956) | (1,888) | 146,265 | (9,457) |
| Interest income and other, net | 6,753 | 28,452 | 3 | 19,980 | 9,416 | 90,188 | (146,265) | 8,527 |
| **Income before income taxes** | 815,534 | 595,098 | 25,659 | 942,960 | 408,894 | 1,132,770 | (2,963,512) | 957,403 |
| Income tax provision | — | (32,878) | — | — | — | (108,988) | — | (141,866) |
| **Net Income** | 815,534 | 562,220 | 25,659 | 942,960 | 408,894 | 1,023,782 | (2,963,512) | 815,537 |
| Net loss attributable to noncontrolling interests | — | — | — | — | — | (3) | — | (3) |
| **Net Income attributable to Noble Corporation** | $815,534 | $ 562,220 | $ 25,659 | $ 942,960 | $408,894 | $ 1,023,779 | $ (2,963,512) | $ 815,534 |

Table of Contents

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONDENSED CONSOLIDATING STATEMENT OF INCOME**
**Year Ended December 31, 2009**
(in thousands)

| | Noble-Cayman | NHC and NDH Combined | NDC | NHIL | NDS6 | Other Non-guarantor Subsidiaries of Noble | Consolidating Adjustments | Total |
|---|---|---|---|---|---|---|---|---|
| **Operating revenues** | | | | | | | | |
| Contract drilling services | $ — | $ 145,687 | $ 40,366 | $ — | $ — | $ 3,386,684 | $ (62,982) | $3,509,755 |
| Reimbursables | — | 1,904 | — | — | — | 97,297 | — | 99,201 |
| Labor contract drilling services | — | — | — | — | — | 30,298 | — | 30,298 |
| Other | — | 57 | 2 | — | — | 1,098 | — | 1,157 |
| Total operating revenues | — | 147,648 | 40,368 | — | — | 3,515,377 | (62,982) | 3,640,411 |
| | | | | | | | | |
| **Operating costs and expenses** | | | | | | | | |
| Contract drilling services | 956 | 33,587 | 7,070 | 53 | — | 1,028,080 | (62,982) | 1,006,764 |
| Reimbursables | — | 1,070 | — | — | — | 83,965 | — | 85,035 |
| Labor contract drilling services | — | — | — | — | — | 18,827 | — | 18,827 |
| Depreciation and amortization | — | 32,158 | 8,535 | — | — | 367,620 | — | 408,313 |
| Selling, general and administrative | 19,394 | 2,595 | 436 | — | — | 36,118 | — | 58,543 |
| Loss on asset disposal/involuntary conversion, net | — | — | — | — | — | 30,839 | — | 30,839 |
| Total operating costs and expenses | 20,350 | 69,410 | 16,041 | 53 | — | 1,565,449 | (62,982) | 1,608,321 |
| | | | | | | | | |
| **Operating income (loss)** | (20,350) | 78,238 | 24,327 | (53) | — | 1,949,928 | — | 2,032,090 |
| | | | | | | | | |
| **Other income (expense)** | | | | | | | | |
| Equity earnings in affiliates, net of tax | 1,724,115 | 1,438,451 | 488,802 | 1,300,141 | 224,535 | — | (5,176,044) | — |
| Interest expense, net of amounts capitalized | (5,080) | (63,316) | (15,106) | (25,143) | — | 5,289 | 101,671 | (1,685) |
| Interest income and other, net | 1,313 | (459) | 2 | — | — | 107,625 | (101,671) | 6,810 |
| | | | | | | | | |
| **Income before income taxes** | 1,699,998 | 1,452,914 | 498,025 | 1,274,945 | 224,535 | 2,062,842 | (5,176,044) | 2,037,215 |
| Income tax provision | 383 | (7,082) | — | — | — | (330,135) | — | (336,834) |
| **Net Income** | 1,700,381 | 1,445,832 | 498,025 | 1,274,945 | 224,535 | 1,732,707 | (5,176,044) | 1,700,381 |
| | | | | | | | | |
| Net loss attributable to noncontrolling interests | — | — | — | — | — | — | — | — |
| | | | | | | | | |
| **Net income attributable to Noble Corporation** | $1,700,381 | $ 1,445,832 | $498,025 | $1,274,945 | $224,535 | $ 1,732,707 | $ (5,176,044) | $1,700,381 |

101

Table of Contents

NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS
Year Ended December 31, 2011
(in thousands)

| | Noble-Cayman | NHC and NDH Combined | NDC | NHIL | NDS6 | Other Non-guarantor Subsidiaries of Noble | Consolidating Adjustments | Total |
|---|---|---|---|---|---|---|---|---|
| **Cash flows from operating activities** | | | | | | | | |
| Net cash from operating activities | $ (48,906) | $ 16,325 | $ (6,106) | $ (109,171) | $(20,222) | $ 957,311 | $ — | $ 789,231 |
| **Cash flows from investing activities** | | | | | | | | |
| New construction and capital expenditures | — | (1,490,696) | — | — | — | (1,062,944) | — | (2,553,640) |
| Notes receivable from affiliates | 20,000 | — | — | (1,096,927) | — | 172,302 | 904,625 | — |
| Refund from contract extinguishments | — | — | — | — | — | 18,642 | — | 18,642 |
| Net cash from investing activities | 20,000 | (1,490,696) | — | (1,096,927) | — | (872,000) | 904,625 | (2,534,998) |
| **Cash flows from financing activities** | | | | | | | | |
| Increase in bank credit facilities, net | 935,000 | — | — | — | — | — | — | 935,000 |
| Proceeds from issuance of senior notes, net | — | — | — | 1,087,833 | — | — | — | 1,087,833 |
| Contributions from joint venture partners | — | — | — | — | — | 536,000 | — | 536,000 |
| Payments of joint venture debt | — | — | — | — | — | (693,494) | — | (693,494) |
| Settlement of interest rate swaps | — | — | — | — | — | (29,032) | — | (29,032) |
| Financing cost on credit facilities | (2,835) | — | — | — | — | — | — | (2,835) |
| Distributions to parent | (186,048) | — | — | — | — | — | — | (186,048) |
| Advances (to) from affiliates | (597,305) | 1,492,110 | 41,106 | 118,265 | 20,222 | (1,074,398) | — | — |
| Notes payable to affiliates | (119,802) | (17,500) | (35,000) | — | — | 1,076,927 | (904,625) | — |
| Net cash from financing activities | 29,010 | 1,474,610 | 6,106 | 1,206,098 | 20,222 | (183,997) | (904,625) | 1,647,424 |
| Net change in cash and cash equivalents | 104 | 239 | — | — | — | (98,686) | — | (98,343) |
| Cash and cash equivalents, beginning of period | 42 | 146 | — | — | — | 333,211 | — | 333,399 |
| Cash and cash equivalents, end of period | $ 146 | $ 385 | $ — | $ — | $ — | $ 234,525 | $ — | $ 235,056 |

102

Table of Contents

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS**
**Year Ended December 31, 2010**
(in thousands)

| | Noble-Cayman | NHC and NDH Combined | NDC | NHIL | NDS6 | Other Non-guarantor Subsidiaries of Noble | Consolidating Adjustments | Total |
|---|---|---|---|---|---|---|---|---|
| **Cash flows from operating activities** | | | | | | | | |
| Net cash from operating activities | $ (33,316) | $ 4,469 | $ 1,810 | $ (80,151) | $ 1,581 | $ 1,781,974 | $ — | $ 1,676,367 |
| **Cash flows from investing activities** | | | | | | | | |
| New construction and capital expenditures | — | (563,095) | — | — | — | (720,375) | — | (1,283,470) |
| Notes receivable from affiliates | — | — | — | (1,239,600) | — | (490,000) | 1,729,600 | — |
| Acquisition of FDR Holdings, Ltd., net of cash acquired | (1,629,644) | — | — | — | — | — | — | (1,629,644) |
| Net cash from investing activities | (1,629,644) | (563,095) | — | (1,239,600) | — | (1,210,375) | 1,729,600 | (2,913,114) |
| **Cash flows from financing activities** | | | | | | | | |
| Increase in bank credit facilities, net | 40,000 | — | — | — | — | — | — | 40,000 |
| Proceeds from issuance of senior notes, net | — | — | — | 1,238,074 | — | — | — | 1,238,074 |
| Contributions from joint venture partners | — | — | — | — | — | 35,000 | — | 35,000 |
| Settlement of interest rate swaps | — | — | — | — | — | (6,186) | — | (6,186) |
| Distributions to parent | (462,967) | — | — | — | — | — | — | (462,967) |
| Advances (to) from affiliates | 356,366 | 558,504 | (1,810) | 81,677 | (1,581) | (993,156) | — | — |
| Notes payable to affiliates | 1,729,600 | — | — | — | — | — | (1,729,600) | — |
| Net cash from financing activities | 1,662,999 | 558,504 | (1,810) | 1,319,751 | (1,581) | (964,342) | (1,729,600) | 843,921 |
| Net change in cash and cash equivalents | 39 | (122) | — | — | — | (392,743) | — | (392,826) |
| Cash and cash equivalents, beginning of period | 3 | 268 | — | — | — | 725,954 | — | 726,225 |
| Cash and cash equivalents, end of period | $ 42 | $ 146 | $ — | $ — | $ — | $ 333,211 | $ — | $ 333,399 |

Table of Contents

**NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES**
**CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS**
**Year Ended December 31, 2009**
(in thousands)

| | Noble-Cayman | NHC and NDH Combined | NDC | NHIL | NDS6 | Other Non-guarantor Subsidiaries of Noble | Consolidating Adjustments | Total |
|---|---|---|---|---|---|---|---|---|
| **Cash flows from operating activities** | | | | | | | | |
| Net cash from operating activities | $ 11,850 | $ 47,633 | $ 31,136 | $ 3,526 | $ 3,290 | $ 2,051,200 | $ — | $ 2,148,635 |
| **Cash flows from investing activities** | | | | | | | | |
| New construction and capital expenditures | — | (717,148) | (16,037) | — | — | (733,811) | — | (1,466,996) |
| Repayments of notes from affiliates | — | — | — | — | — | — | 45,600 | 45,600 |
| Notes receivable from affiliates | (45,600) | 20,963 | 44,159 | — | — | 342,500 | (407,622) | (45,600) |
| Acquisition of FDR Holdings, Ltd., net of cash acquired | — | — | — | — | — | — | — | — |
| Net cash from investing activities | (45,600) | (696,185) | 28,122 | — | — | (391,311) | (362,022) | (1,466,996) |
| **Cash flows from financing activities** | | | | | | | | |
| Payments of other long-term debt | — | — | (150,000) | — | — | (22,700) | — | (172,700) |
| Contributions from joint venture partners | — | — | — | — | — | — | — | — |
| Settlement of interest rate swaps | — | — | — | — | — | — | — | — |
| Distributions to parent | (218,258) | — | — | — | — | — | — | (218,258) |
| Advances (to) from affiliates | 629,117 | 690,875 | 90,716 | (3,526) | (3,290) | (1,403,892) | — | — |
| Repayments of notes to affiliates | (300,000) | (42,500) | — | — | — | (19,522) | 362,022 | — |
| Repurchases of ordinary shares | (60,867) | — | — | — | — | — | — | (60,867) |
| Other | (16,900) | — | — | — | — | — | — | (16,900) |
| Net cash from financing activities | 33,092 | 648,375 | (59,284) | (3,526) | (3,290) | (1,446,114) | 362,022 | (468,725) |
| Net change in cash and cash equivalents | (658) | (177) | (26) | — | — | 213,775 | — | 212,914 |
| Cash and cash equivalents, beginning of period | 661 | 445 | 26 | — | — | 512,179 | — | 513,311 |
| Cash and cash equivalents, end of period | $ 3 | $ 268 | $ — | $ — | $ — | 725,954 | $ — | $ 726,225 |

Table of Contents

NOBLE CORPORATION (NOBLE-SWISS) AND SUBSIDIARIES
NOBLE CORPORATION (NOBLE-CAYMAN) AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unless otherwise indicated, dollar amounts in tables are in thousands, except per share data)

**Note 22 — Subsequent Event**

In February 2012, we completed, through our indirect wholly-owned subsidiary, NHIL, a debt offering of $1.2 billion aggregate principal amount of senior notes in three separate tranches, with $300 million of 2.50% Senior Notes due 2017, $400 million of 3.95% Senior Notes due 2022, and $500 million of 5.25% Senior Notes due 2042. The weighted average coupon of all three tranches is 4.13%. The net proceeds of approximately $1.19 billion, after expenses, were primarily used to repay the outstanding balance on our credit facilities.

**Note 23 — Unaudited Interim Financial Data**

Unaudited interim consolidated financial information for the years ended December 31, 2011 and 2010 is as follows:

| | Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | Mar. 31 | Jun. 30 | Sep. 30 | Dec. 31 |
| **2011** | | | | |
| Operating revenues | $ 578,888 | $ 627,997 | $ 737,902 | $ 751,045 |
| Operating income | 86,264 | 79,045 | 163,582 | 161,602 |
| Net Income attributable to Noble Corporation | 54,495 | 54,083 | 135,317 | 127,003 |
| Net income per share attributable to Noble Corporation (1) | | | | |
| Basic | 0.22 | 0.21 | 0.53 | 0.50 |
| Diluted | 0.21 | 0.21 | 0.53 | 0.50 |

| | Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | Mar. 31 | Jun. 30 | Sep. 30 | Dec. 31 |
| **2010** | | | | |
| Operating revenues | $ 840,851 | $ 709,922 | $ 612,618 | $ 643,785 |
| Operating income | 422,961 | 268,547 | 108,357 | 116,215 |
| Net Income attributable to Noble Corporation | 370,726 | 217,925 | 86,020 | 98,758 |
| Net income per share attributable to Noble Corporation (1) | | | | |
| Basic | 1.44 | 0.85 | 0.34 | 0.39 |
| Diluted | 1.43 | 0.85 | 0.34 | 0.39 |

---

(1)   Net income per share is computed independently for each of the quarters presented. Therefore, the sum of the quarters' net income per share may not equal the total computed for the year.

105

Table of Contents

**Item 9.     Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.     Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

David W. Williams, Chairman, President and Chief Executive Officer of Noble Corporation, a Swiss corporation ("Noble-Swiss"), and James A. MacLennan, Senior Vice President, Chief Financial Officer and Controller of Noble-Swiss have evaluated the disclosure controls and procedures of Noble-Swiss as of the end of the period covered by this report. On the basis of this evaluation, Mr. Williams and Mr. MacLennan have concluded that Noble-Swiss' disclosure controls and procedures were effective as of December 31, 2011. Noble-Swiss' disclosure controls and procedures are designed to ensure that information required to be disclosed by Noble-Swiss in the reports that it files with or submits to the SEC are recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

David W. Williams, President and Chief Executive Officer of Noble Corporation, a Cayman Islands company ("Noble-Cayman"), and Dennis J. Lubojacky, Vice President and Chief Financial Officer of Noble-Cayman, have evaluated the disclosure controls and procedures of Noble-Cayman as of the end of the period covered by this report. On the basis of this evaluation, Mr. Williams and Mr. Lubojacky have concluded that Noble-Cayman's disclosure controls and procedures were effective as of December 31, 2011. Noble-Cayman's disclosure controls and procedures are designed to ensure that information required to be disclosed by Noble-Cayman in the reports that it files with or submits to the SEC are recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

There was no change in either Noble-Swiss' or Noble-Cayman's internal control over financial reporting that occurred during the quarter ended December 31, 2011 that has materially affected, or is reasonably likely to materially affect, the internal control over financial reporting of each of Noble-Swiss or Noble-Cayman.

**Management's Annual Report on Internal Control Over Financial Reporting**

The management of Noble-Swiss and Noble-Cayman is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) promulgated under the U.S. Securities Exchange Act of 1934, as amended.

Internal control over financial reporting includes the controls themselves, monitoring (including internal auditing practices), and actions taken to correct deficiencies as identified. There are inherent limitations to the effectiveness of internal control over financial reporting, however well designed, including the possibility of human error and the possible circumvention or overriding of controls. The design of an internal control system is also based in part upon assumptions and judgments made by management about the likelihood of future events, and there can be no assurance that an internal control will be effective under all potential future conditions. As a result, even an effective system of internal controls can provide no more than reasonable assurance with respect to the fair presentation of financial statements and the processes under which they were prepared.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the management of Noble-Swiss and Noble-Cayman assessment, both Noble-Swiss and Noble-Cayman maintained effective internal control over financial reporting as of December 31, 2011.

PricewaterhouseCoopers LLP, the independent registered public accounting firm that audited our financial statements included in this Annual Report on Form 10-K, has audited the effectiveness of internal control over financial reporting as of December 31, 2011 as stated in their report, which is provided in this Annual Report on Form 10-K.

Table of Contents

**Item 9B.   Other Information.**

None.

**PART III**

**Item 10.   Directors, Executive Officers and Corporate Governance.**

The sections entitled "Election of Directors", "Additional Information Regarding the Board of Directors", "Section 16(a) Beneficial Ownership Reporting Compliance", and "Other Matters" appearing in the proxy statement for the 2012 annual general meeting of shareholders (the "2012 Proxy Statement"), will set forth certain information with respect to directors, certain corporate governance matters and reporting under Section 16(a) of the Securities Exchange Act of 1934, and are incorporated in this report by reference.

**Executive Officers of the Registrant**

The following table sets forth certain information as of February 27, 2012 with respect to our executive officers:

| Name | Age | Position |
|---|---|---|
| David W. Williams | 54 | Chairman, President and Chief Executive Officer |
| Julie J. Robertson | 56 | Executive Vice President and Corporate Secretary |
| James A. MacLennan | 52 | Senior Vice President, Chief Financial Officer and Controller |
| William E. Turcotte | 48 | Senior Vice President and General Counsel |
| Roger B. Hunt | 62 | Senior Vice President — Marketing and Contracts |
| Lee M. Ahlstrom | 44 | Senior Vice President — Strategic Development |
| Scott W. Marks | 52 | Senior Vice President — Engineering |
| Bernie G. Wolford | 52 | Senior Vice President — Operations |

David W. Williams was named Chairman, President and Chief Executive Officer effective January 2, 2008. Mr. Williams served as Senior Vice President — Business Development of Noble Drilling Services Inc. from September 2006 to January 2007, as Senior Vice President — Operations of Noble Drilling Services Inc. from January to April 2007, and as Senior Vice President and Chief Operating Officer of Noble from April 2007 to January 2, 2008. Prior to September 2006, Mr. Williams served for more than five years as Executive Vice President of Diamond Offshore Drilling, Inc., an offshore oil and gas drilling contractor.

Julie J. Robertson was named Executive Vice President effective February 10, 2006. Ms. Robertson served as Senior Vice President — Administration from July 2001 to February 10, 2006. Ms. Robertson has served continuously as Corporate Secretary since December 1993. Ms. Robertson served as Vice President — Administration of Noble Drilling from 1996 to July 2001. In 1994, Ms. Robertson became Vice President — Administration of Noble Drilling Services Inc. From 1989 to 1994, Ms. Robertson served consecutively as Manager of Benefits and Director of Human Resources for Noble Drilling Services Inc. Prior to 1989, Ms. Robertson served consecutively in the positions of Risk and Benefits Manager and Marketing Services Coordinator for a predecessor subsidiary of Noble, beginning in 1979.

James A. MacLennan was named Senior Vice President, Chief Financial Officer and Controller effective January 9, 2012. Prior to joining Noble, Mr. MacLennan served as Chief Financial Officer and Corporate Secretary of Ennis Traffic Safety Solutions, a leading producer of pavement marking materials, from January 2011 to December 2011. From June 2010 to January 2011, Mr. MacLennan did not hold a principal employment. Mr. MacLennan served as Executive Vice President and Chief Financial Officer

Table of Contents

of Lodgian, Inc., a publicly-traded independent owner and operator of hotels in the United States from March 2006 until Lodgian was acquired by and merged into Lone Star Funds in May 2010. Prior to joining Lodgian, Mr. MacLennan was Chief Financial Officer and Treasurer of Theragenics Corporation, a New York Stock Exchange-listed company that manufactures medical devices. Previously, Mr. MacLennan was Executive Vice President and Chief Financial Officer of Lanier Worldwide, Inc., a publicly-traded technical products company. Mr. MacLennan spent much of his early career in financial positions of increasing responsibility in the oil and gas industry, most notably with Exxon Corporation and later with Noble Corporation. Mr. MacLennan is a Chartered Accountant.

William E. Turcotte was named Senior Vice President and General Counsel effective December 16, 2008. Prior to joining Noble, Mr. Turcotte served as Senior Vice President, General Counsel and Corporate Secretary of Cornell Companies, Inc., a private corrections company, since March 2007. He served as Vice President, Associate General Counsel and Assistant Secretary of Transocean, Inc., an offshore oil and gas drilling contractor, from October 2005 to March 2007 and as Associate General Counsel and Assistant Secretary from January 2000 to October 2005. From 1992 to 2000, Mr. Turcotte served in various legal positions with Schlumberger Limited in Houston, Caracas and Paris. Mr. Turcotte was in private practice prior to joining Schlumberger.

Roger B. Hunt was named Senior Vice President — Marketing and Contracts effective July 20, 2009. Prior to joining Noble, Mr. Hunt served as Senior Vice President — Marketing at GlobalSantaFe Corporation, an offshore oil and gas drilling contractor, from 1997 to 2007. In that capacity, Mr. Hunt was responsible for marketing and pricing strategy, sales and contract activities for the company's fleet of 57 offshore drilling units. Mr. Hunt did not hold a principal employment from December 2007 to July 2009.

Lee M. Ahlstrom was named Senior Vice President — Strategic Development effective May 5, 2011. Mr. Ahlstrom served as Vice President of Investor Relations and Planning from May 2006 to May 2011. Prior to joining Noble, Mr. Ahlstrom served as Director of Investor Relations at Burlington Resources, held various management positions at UNOCAL Corporation and served as an Engagement Manager with McKinsey & Company.

Scott W. Marks was named Senior Vice President — Engineering effective January 2007. Mr. Marks served as Vice President — Project Management and Construction from August 2006 to January 2007, as Vice President — Support Engineering from September 2005 to August 2006 and as Director of Engineering from January 2003 to September 2005. Mr. Marks has been with Noble since 1991, serving as a Project Manager and as a Drilling Superintendent prior to 2003.

Bernie G. Wolford was named Senior Vice President — Operations effective February 6, 2012. Mr. Wolford served as Vice President — Operational Excellence from March 2010 to February 2012. From January 2003 until March 2010, Mr. Wolford was self-employed. During that time, he provided consulting services to Noble as a contractor on the construction of the *Noble Dave Beard* from March 2009 to December 2009. He also supported the operations of Mass Technology Corp., an independent downstream refining and storage company, as a significant shareholder of that company, from February 2007 to February 2009. Mr. Wolford began his career in the offshore drilling industry with Transworld Drilling in 1981, which was acquired by Noble in 1991. From 1981 through December 2002, he served in various roles in engineering, project management and operations with Transworld and Noble.

We have adopted a Code of Business Conduct and Ethics that applies to directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Our Code of Business Conduct and Ethics is posted on our website at http://www.noblecorp.com in the "Governance" area. Changes to and waivers granted with respect to our Code of Business Conduct and Ethics related to the officers identified above, and our other executive officers and directors, that we are required to disclose pursuant to applicable rules and regulations of the SEC will also be posted on our website.

**Item 11.   Executive Compensation.**

The sections entitled "Executive Compensation" and "Compensation Committee Report" appearing in the 2012 Proxy Statement set forth certain information with respect to the compensation of our management and our compensation committee report, and are incorporated in this report by reference.

Table of Contents

**Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The sections entitled "Equity Compensation Plan Information", "Security Ownership of Certain Beneficial Owners" and "Security Ownership of Management" appearing in the 2012 Proxy Statement set forth certain information with respect to securities authorized for issuance under equity compensation plans and the ownership of our voting securities and equity securities, and are incorporated in this report by reference.

**Item 13.   Certain Relationships and Related Transactions and Director Independence.**

The sections entitled "Additional Information Regarding the Board of Directors — Board Independence" and "Policies and Procedures Relating to Transactions with Related Persons" appearing in the 2012 Proxy Statement set forth certain information with respect to director independence and transactions with related persons, and are incorporated in this report by reference.

**Item 14.   Principal Accounting Fees and Services.**

The section entitled "Auditors" appearing in the 2012 Proxy Statement sets forth certain information with respect to accounting fees and services, and is incorporated in this report by reference.

**PART IV**

**ITEM 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

(a)   The following documents are filed as part of this report:

(1)   A list of the financial statements filed as a part of this report is set forth in Item 8 on page 49 and is incorporated herein by reference.

(2)   Financial Statement Schedules:

All schedules are omitted because they are either not applicable or required information is shown in the financial statements or notes thereto.

(3)   Exhibits:

The information required by this Item 15(a)(3) is set forth in the Index to Exhibits accompanying this Annual Report on Form 10-K and is incorporated herein by reference.

109

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**NOBLE CORPORATION, a Swiss Corporation**

Date: February 27, 2012

By:/s/ DAVID W. WILLIAMS
David W. Williams, Chairman,
President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Capacity In Which Signed | Date |
|---|---|---|
| /s/ DAVID W. WILLIAMS<br>David W. Williams | Chairman, President and Chief Executive Officer (Principal Executive Officer) | February 27, 2012 |
| /s/ JAMES A. MACLENNAN<br>James A. MacLennan | Senior Vice President, Chief Financial Officer and Controller (Principal Financial Officer and Principal Accounting Officer) | February 27, 2012 |
| /s/ MICHAEL A. CAWLEY<br>Michael A. Cawley | Director | February 27, 2012 |
| /s/ LAWRENCE J. CHAZEN<br>Lawrence J. Chazen | Director | February 27, 2012 |
| /s/ JULIE H. EDWARDS<br>Julie H. Edwards | Director | February 27, 2012 |
| /s/ GORDON T. HALL<br>Gordon T. Hall | Director | February 27, 2012 |
| /s/ MARC E. LELAND<br>Marc E. Leland | Director | February 27, 2012 |
| /s/ JACK E. LITTLE<br>Jack E. Little | Director | February 27, 2012 |
| /s/ JON A. MARSHALL<br>Jon A. Marshall | Director | February 27, 2012 |
| /s/ MARY P. RICCIARDELLO<br>Mary P. Ricciardello | Director | February 27, 2012 |

110

Table of Contents

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

| | |
|---|---|
| | **NOBLE CORPORATION, a Cayman Islands company** |
| Date: February 27, 2012 | By:/s/ DAVID W. WILLIAMS |
| | David W. Williams, |
| | President, Chief Executive Officer and Director |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Capacity In Which Signed | Date |
|---|---|---|
| /s/ DAVID W. WILLIAMS<br>David W. Williams | President, Chief Executive Officer and Director (Principal Executive Officer) | February 27, 2012 |
| /s/ DENNIS J. LUBOJACKY<br>Dennis J. Lubojacky | Vice President and Chief Financial Officer and Director (Principal Financial Officer and Principal Accounting Officer) | February 27, 2012 |
| /s/ ALAN P. DUNCAN<br>Alan P. Duncan | Director | February 27, 2012 |
| /s/ DAVID M.J. DUJACQUIER<br>David M.J. Dujacquier | Director | February 27, 2012 |
| /s/ ALAN R. HAY<br>Alan R. Hay | Director | February 27, 2012 |

111

Table of Contents

**INDEX TO EXHIBITS**

| Exhibit Number | Exhibit |
|---|---|
| 2.1 | Agreement and Plan of Merger, Reorganization and Consolidation, dated as of December 19, 2008, among Noble Corporation, a Swiss corporation ("Noble-Swiss"), Noble Corporation, a Cayman Islands company ("Noble-Cayman"), and Noble Cayman Acquisition Ltd. (filed as Exhibit 1.1 to Noble-Cayman's Current Report on Form 8-K filed on December 22, 2008 and incorporated herein by reference). |
| 2.2 | Amendment No. 1 to Agreement and Plan of Merger, Reorganization and Consolidation, dated as of February 4, 2009, among Noble-Swiss, Noble-Cayman and Noble Cayman Acquisition Ltd. (filed as Exhibit 2.2 to Noble-Cayman's Current Report on Form 8-K filed on February 4, 2009 and incorporated herein by reference). |
| 3.1 | Articles of Association of Noble-Swiss. |
| 3.2 | By-laws of Noble-Swiss (filed as Exhibit 3.2 to Noble-Swiss' Current Report on Form 8-K filed on March 27, 2009 and incorporated herein by reference). |
| 3.3 | Memorandum and Articles of Association of Noble-Cayman (filed as Exhibit 3.1 to Noble-Cayman's Current Report on Form 8-K filed on March 30, 2009 and incorporated herein by reference). |
| 4.1 | Indenture dated as of March 1, 1999, between Noble Drilling Corporation and JP Morgan Chase Bank, National Association (formerly Chase Bank of Texas, National Association), as trustee (filed as Exhibit 4.1 to the Form 8-K of Noble Drilling Corporation filed on March 23, 1999 and incorporated herein by reference). |
| 4.2 | Supplemental Indenture dated as of March 16, 1999, between Noble Drilling Corporation and JP Morgan Chase Bank, National Association (formerly Chase Bank of Texas, National Association), relating to 7.50% senior notes due 2019 of Noble Drilling Corporation (filed as Exhibit 4.2 to Noble Drilling Corporation's Form 8-K filed on March 23, 1999 and incorporated herein by reference). |
| 4.3 | Second Supplemental Indenture, dated as of April 30, 2002, between Noble Drilling Corporation, Noble Holding (U.S.) Corporation and Noble Corporation, and JP Morgan Chase Bank, National Association, as trustee, relating to 7.50% senior notes due 2019 of Noble Drilling Corporation (filed as Exhibit 4.6 to the Noble-Cayman Quarterly Report on Form 10-Q for the three-month period ended March 31, 2002 and incorporated herein by reference). |
| 4.4 | Third Supplemental Indenture, dated as of December 20, 2005, between Noble Drilling Corporation, Noble Drilling Holding LLC, Noble Holding (U.S.) Corporation and Noble Corporation and JP Morgan Chase Bank, National Association, as trustee, relating to 7.50% senior notes due 2019 of Noble Drilling Corporation (filed as Exhibit 4.14 to Noble-Cayman's Registration Statement on Form S-3 (No. 333-131885) and incorporated herein by reference). |
| 4.5 | Fourth Supplemental Indenture, dated as of September 25, 2009, among Noble Drilling Corporation, as Issuer, Noble Drilling Holding LLC, as Co-Issuer, Noble Drilling Services 1 LLC, as Co-Issuer, Noble Holding (U.S.) Corporation, as Guarantor, Noble-Cayman, as Guarantor, and The Bank of New York Mellon Trust Company, N.A., as Trustee (relating to Noble Drilling Corporation 7.50% Senior Notes due 2019) (filed as Exhibit 4.1 to Noble-Swiss' Form 8-K filed on October 1, 2009 and incorporated herein by reference). |
| 4.6 | Fifth Supplemental Indenture, dated as of October 1, 2009, among Noble Drilling Corporation, as Issuer, Noble Drilling Holding LLC, as Co-Issuer, Noble Drilling Services 6 LLC, as Co-Issuer, Noble Holding (U.S.) Corporation, as Guarantor, Noble-Cayman, as Guarantor, and The Bank of New York Mellon Trust Company, N.A., as Trustee (relating to Noble Drilling Corporation 7.50% Senior Notes due 2019) (filed as Exhibit 4.2 to Noble-Swiss' Form 8-K filed on October 1, 2009 and incorporated herein by reference). |

Table of Contents

| Exhibit Number | Exhibit |
|---|---|
| 4.7 | Indenture, dated as of May 26, 2006, between Noble Corporation, as Issuer, and JPMorgan Chase Bank, National Association, as trustee (filed as Exhibit 4.1 to Noble-Cayman's Current Report on Form 8-K filed on May 26, 2006 and incorporated herein by reference). |
| 4.8 | First Supplemental Indenture, dated as of May 26, 2006, between Noble Corporation, as Issuer, Noble Drilling Corporation, as Guarantor, and JP Morgan Chase Bank, National Association, as trustee, relating to 5.875% senior notes due 2013 of Noble Corporation (filed as Exhibit 4.2 to the Noble-Cayman's Current Report on Form 8-K filed on May 26, 2006 and incorporated herein by reference). |
| 4.9 | Second Supplemental Indenture, dated as of October 1, 2009, among Noble-Cayman, as Issuer, Noble Drilling Corporation, as Guarantor, Noble Holding International Limited, as Guarantor, and The Bank of New York Mellon Trust Company, N.A., as Trustee (relating to Noble-Cayman's 5.875% Senior Notes due 2013) (filed as Exhibit 4.3 to Noble-Swiss' Form 8-K filed on October 1, 2009 and incorporated herein by reference). |
| 4.10 | Revolving Credit Agreement, dated as of March 15, 2007, among Noble Corporation; the Lenders from time to time parties thereto; Citibank, N.A., as Administrative Agent, Swingline Lender and an Issuing Bank; SunTrust Bank, as Syndication Agent; The Bank of Tokyo-Mitsubishi UFJ, Ltd., Houston Agency, Fortis Capital Corp., and Wells Fargo Bank, N.A., as Co-Documentation Agents; and Citigroup Global Markets Inc., and SunTrust Robinson Humphrey, a division of SunTrust Capital Markets, Inc., as Co-Lead Arrangers and Co-Book Running Managers (filed as Exhibit 4.1 to Noble-Cayman's Current Report on Form 8-K filed on March 20, 2007 and incorporated herein by reference). |
| 4.11 | Subsidiary Guaranty Agreement, dated as of October 1, 2009, among Noble Holding International Limited, Noble-Cayman and Citibank, N.A., as Administrative Agent (relating to Noble-Cayman revolving credit agreement) (filed as Exhibit 4.4 to Noble-Swiss' Form 8-K filed on October 1, 2009 and incorporated herein by reference). |
| 4.12 | Revolving Credit Agreement dated as of February 11, 2011 among Noble Corporation, a Cayman Islands company; the Lenders from time to time parties thereto; Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and an Issuing Bank; Barclays Capital, a division of Barclays Bank PLC, and HSBC Securities (USA) Inc., as Co-Syndication Agents; and Wells Fargo Securities, LLC, Barclays Capital, a division of Barclays Bank PLC, and HSBC Securities (USA) Inc., as Joint Lead Arrangers and Joint Lead Bookrunners (filed as Exhibit 4.1 to Noble-Cayman's Current Report on Form 8-K filed on February 17, 2011 and incorporated by reference herein). |
| 4.13 | First Amendment to Revolving Credit Agreement dated as of March 11, 2011 among Noble Corporation, a Cayman Islands company; the Lenders from time to time parties thereto; Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and an Issuing Bank; Barclays Capital, a division of Barclays Bank PLC and HSBC Securities (USA) Inc., as Co-Syndication Agents; and Wells Fargo Securities, LLC, Barclays Capital, a division of Barclays Bank PLC, and HSBC Securities (USA) Inc., as Joint Lead Arrangers and Joint Lead Bookrunners (filed as Exhibit 4.2 to Noble-Swiss' Quarterly Report on Form 10-Q filed on May 6, 2011 and incorporated by reference herein). |
| 4.14 | Indenture, dated as of November 21, 2008, between Noble Holding International Limited, as Issuer, and The Bank of New York Mellon Trust Company, N.A., as Trustee (filed as Exhibit 4.1 to Noble-Cayman's Current Report on Form 8-K filed on November 21, 2008 and incorporated herein by reference). |

Table of Contents

| Exhibit Number | Exhibit |
|---|---|
| 4.15 | First Supplemental Indenture, dated as of November 21, 2008, among Noble Holding International Limited, as Issuer, Noble Corporation, as Guarantor, and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 7.375% senior notes due 2014 of Noble Holding International Limited (filed as Exhibit 4.2 to Noble-Cayman's Current Report on Form 8-K filed on November 21, 2008 and incorporated herein by reference). |
| 4.16 | Second Supplemental Indenture, dated as of July 26, 2010, among Noble Holding International Limited, as Issuer, Noble Corporation, as Guarantor, and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 3.45% senior notes due 2015 of Noble Holding International Limited, 4.90% senior notes due 2020 of Noble Holding International Limited, and 6.20% senior notes due 2040 of Noble Holding International Limited (filed as Exhibit 4.2 to Noble-Cayman's Current Report on Form 8-K filed on July 26, 2010 and incorporated herein by reference). |
| 4.17 | Third Supplemental Indenture, dated as of February 3, 2011, among Noble Holding International Limited, as Issuer, Noble Corporation, as Guarantor, and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 3.05% senior notes due 2016 of Noble Holding International Limited, 4.625% senior notes due 2021 of Noble Holding International Limited, and 6.05% senior notes due 2041 of Noble Holding International Limited (filed as Exhibit 4.1 to Noble-Cayman's Current Report on Form 8-K filed on February 3, 2011 and incorporated herein by reference). |
| 4.18 | Fourth Supplemental Indenture, dated as of February 10, 2012, among Noble Holding International Limited, as Issuer, Noble Corporation, as Guarantor, and The Bank of New York Mellon Trust Company, N.A., as Trustee, relating to 2.5% senior notes due 2017 of Noble Holding International Limited, 3.95% senior notes due 2022 of Noble Holding International Limited, and 5.25% senior notes due 2042 of Noble Holding International Limited (filed as Exhibit 4.2 to Noble-Cayman's Current Report on Form 8-K filed on February 13, 2012 and incorporated herein by reference). |
| 10.1* | Noble Drilling Corporation Equity Compensation Plan for Non-Employee Directors (filed as Exhibit 4.1 to Noble Drilling Corporation's Registration Statement on Form S-8 (No. 333-17407) dated December 6, 1996 and incorporated herein by reference). |
| 10.2* | Amendment, effective as of May 1, 2002, to the Noble Drilling Corporation Equity Compensation Plan for Non-Employee Directors (filed as Exhibit 10.1 to Post-Effective Amendment No. 1 to Noble-Cayman's Registration Statement on Form S-8 (No. 333-17407) and incorporated herein by reference). |
| 10.3* | Amendment No. 2 to the Noble Corporation Equity Compensation Plan for Non-Employee Directors dated February 4, 2005 (filed as Exhibit 10.20 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2004 and incorporated herein by reference). |
| 10.4* | Amendment to the Noble Corporation Equity Compensation Plan for Non-Employee Directors dated December 31, 2008 (filed as Exhibit 10.29 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2008 and incorporated herein by reference). |
| 10.5* | Amended and Restated Noble Corporation Equity Compensation Plan for Non-Employee Directors effective March 27, 2009 (filed as Exhibit 10.5 to Noble-Swiss' Annual Report on Form 10-K for the year ended December 31, 2010 and incorporated herein by reference). |
| 10.6* | Noble Drilling Corporation 401(k) Savings Restoration Plan (filed as Exhibit 10.1 to Noble Drilling Corporation's Registration Statement on Form S-8 dated January 18, 2001 (No. 333-53912) and incorporated herein by reference). |
| 10.7* | Amendment No. 1 to the Noble Drilling Corporation 401(k) Savings Restoration Plan (filed as Exhibit 10.1 to Post-Effective Amendment No. 1 to Noble-Cayman's Registration Statement on Form S-8 (No. 333-53912) and incorporated herein by reference). |

114

Table of Contents

| Exhibit Number | Exhibit |
|---|---|
| 10.8* | Amendment No. 2 to the Noble Drilling Corporation 401(k) Savings Restoration Plan dated February 25, 2003 (filed as Exhibit 10.30 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2005 and incorporated herein by reference). |
| 10.9* | Amendment No. 3 to the Noble Drilling Corporation 401(k) Savings Restoration Plan dated March 9, 2005 (filed as Exhibit 10.31 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2005 and incorporated herein by reference). |
| 10.10* | Amendment No. 4 to the Noble Drilling Corporation 401(k) Savings Restoration Plan dated March 30, 2007 (filed as Exhibit 10.41 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2007 and incorporated herein by reference). |
| 10.11* | Amendment No. 5 to the Noble Drilling Corporation 401(k) Savings Restoration Plan effective May 1, 2010 (filed as Exhibit 10.11 to Noble-Swiss' Annual Report on Form 10-K for the year ended December 31, 2010 and incorporated herein by reference). |
| 10.12* | Noble Drilling Corporation Retirement Restoration Plan dated April 27, 1995 (filed as Exhibit 10.2 to Noble Drilling Corporation's Quarterly Report on Form 10-Q for the three-month period ended March 31, 1995 and incorporated herein by reference). |
| 10.13* | Amendment No. 1 to the Noble Drilling Corporation Retirement Restoration Plan dated January 29, 1998 (filed as Exhibit 10.18 to Noble Drilling Corporation's Annual Report on Form 10-K for the year ended December 31, 1997 and incorporated herein by reference). |
| 10.14* | Amendment No. 2 to the Noble Drilling Corporation Retirement Restoration Plan dated June 28, 2004, effective as of July 1, 2004 (filed as Exhibit 10.32 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2005 and incorporated herein by reference). |
| 10.15* | Noble Drilling Corporation Retirement Restoration Plan dated December 29, 2008, effective January 1, 2009 (filed as Exhibit 10.32 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2008 and incorporated herein by reference). |
| 10.16* | Amendment No. 1 to Noble Drilling Corporation Retirement Restoration Plan dated July 10, 2009 (filed as Exhibit 10.16 to Noble-Swiss' Annual Report on Form 10-K for the year ended December 31, 2010 and incorporated herein by reference). |
| 10.17* | Amended and Restated Noble Corporation 1992 Nonqualified Stock Option and Restricted Share Plan for Non-Employee Directors dated February 4, 2005 (filed as Exhibit 10.21 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2004 and incorporated herein by reference). |
| 10.18* | Second Amended and Restated Noble Corporation 1992 Nonqualified Stock Option and Share Plan for Non-Employee Directors (filed as Exhibit 10.2 to Noble-Cayman's Quarterly Report on Form 10-Q for the three-month period ended September 25, 2007 and incorporated herein by reference). |
| 10.19* | Amendment to the Second Amended and Restated Noble Corporation 1992 Nonqualified Stock Option and Share Plan for Non-Employee Directors dated December 31, 2008 (filed as Exhibit 10.28 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2008 and incorporated herein by reference). |
| 10.20* | Third Amendment to Second Amended and Restated Noble Corporation 1992 Nonqualified Stock Option and Share Plan for Non-Employee Directors effective March 27, 2009 (filed as Exhibit 10.20 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2010 and incorporated herein by reference). |
| 10.21* | Composite copy of the Noble Corporation 1991 Stock Option and Restricted Stock Plan dated as of February 6, 2010 (filed as Exhibit 10.18 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2009 and incorporated herein by reference). |

Table of Contents

| Exhibit Number | Exhibit |
|---|---|
| 10.22* | Third Amendment to the Noble Corporation 1991 Stock Option and Restricted Stock Plan, effective as of February 3, 2012 (filed as Exhibit 10.2 to Noble-Cayman's Current Report on Form 8-K filed on February 7, 2012 and incorporated herein by reference). |
| 10.23* | Noble Drilling Corporation 2009 401(k) Savings Restoration Plan effective January 1, 2009 (filed as Exhibit 10.31 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2008 and incorporated herein by reference). |
| 10.24* | Amendment No. 1 to the Noble Drilling Corporation 2009 401(k) Savings Restoration Plan effective May 1, 2010 (filed as Exhibit 10.23 to Noble-Swiss' Annual Report on Form 10-K for the year ended December 31, 2010 and incorporated herein by reference). |
| 10.25* | Noble Corporation Summary of Directors' Compensation. (filed as Exhibit 10.24 to Noble-Swiss' Annual Report on Form 10-K for the year ended December 31, 2010 and incorporated herein by reference) |
| 10.26* | Form of Noble Corporation Performance-Vested Restricted Stock Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.34 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2008 and incorporated herein by reference). |
| 10.27* | Form of Noble Corporation Time-Vested Restricted Stock Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.35 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2008 and incorporated herein by reference). |
| 10.28* | Form of Noble Corporation Nonqualified Stock Option Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.36 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2008 and incorporated herein by reference). |
| 10.29* | Form of Noble Corporation Restricted Stock Agreement under the Amended and Restated Noble Corporation 1992 Nonqualified Stock Option and Share Plan for Non-Employee Directors (filed as Exhibit 10.37 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2008 and incorporated herein by reference). |
| 10.30* | Form of Noble Corporation Performance-Vested Restricted Stock Unit Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.1 to Noble-Cayman's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010 and incorporated herein by reference). |
| 10.31* | Form of Noble Corporation Time-Vested Restricted Stock Unit Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.2 to Noble-Cayman's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010 and incorporated herein by reference). |
| 10.32* | Form of Noble Corporation Nonqualified Stock Option Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.3 to Noble-Cayman's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010 and incorporated herein by reference). |
| 10.33* | Form of Noble Corporation Performance-Vested Restricted Stock Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.2 to Noble-Cayman's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 and incorporated herein by reference). |
| 10.34* | Form of Noble Corporation Time-Vested Restricted Stock Unit Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.2 to Noble-Cayman's Current Report on Form 8-K filed on January 13, 2012 and incorporated herein by reference). |

116

Table of Contents

| Exhibit Number | Exhibit |
|---|---|
| 10.35* | Form of Noble Corporation Nonqualified Stock Option Agreement under the Noble Corporation 1991 Stock Option and Restricted Stock Plan (filed as Exhibit 10.3 to Noble-Cayman's Current Report on Form 8-K filed on January 13, 2012 and incorporated herein by reference). |
| 10.36* | Noble Corporation 2011 Short Term Incentive Plan (filed as Exhibit 10.32 to Noble-Cayman's Annual Report on Form 10-K for the year ended December 31, 2011 and incorporated herein by reference). |
| 10.37* | Form of Employment Agreement and Guaranty Agreement (filed as Exhibit 10.1 to Noble-Swiss' Current Report on Form 8-K filed on December 4, 2009 and incorporated herein by reference). |
| 10.38* | Form of Employment Agreement and Guaranty Agreement (filed as Exhibit 10.1 to Noble-Cayman's Current Report on Form 8-K filed on January 13, 2012 and incorporated herein by reference). |
| 10.39* | Form of Employment Agreement and Guaranty Agreement (filed as Exhibit 10.1 to Noble-Cayman's Current Report on Form 8-K filed on February 7, 2012 and incorporated herein by reference). |
| 21.1 | Subsidiaries of Noble-Swiss and Noble-Cayman. |
| 23.1 | Consent of PricewaterhouseCoopers LLP. |
| 23.2 | Consent of PricewaterhouseCoopers LLP. |
| 31.1 | Certification of David W. Williams pursuant to SEC Rule 13a-14(a) or Rule 15d-14(a). |
| 31.2 | Certification of James A. MacLennan pursuant to SEC Rule 13a-14(a) or Rule 15d-14(a). |
| 31.3 | Certification of Dennis J. Lubojacky pursuant to SEC Rule 13a-14(a) or Rule 15d-14(a). |
| 32.1+ | Certification of David W. Williams pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2+ | Certification of James A. MacLennan pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.3+ | Certification of Dennis J. Lubojacky pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101+ | Interactive data files |

---

\*    Management contract or compensatory plan or arrangement.

+    Furnished in accordance with Item 601(b)(32)(ii) of Regulation S-K.

Exhibit 21.1

**NOBLE CORPORATION SUBSIDIARIES (as of December 31, 2011)**

| Subsidiary Name | Incorporated or Organized In |
|---|---|
| Bully 1 (US) Corporation | Delaware |
| Noble Contracting II S.á r.l. | Switzerland |
| Noble Contracting S.á r.l. | Switzerland |
| Noble Drilling (TVL) Ltd. | Cayman Islands |
| Noble Enterprises Limited | Cayman Islands |
| Noble Holding International S.á r.l. | Luxembourg |
| Noble Leasing III (Switzerland) GmbH | Switzerland |
| Noble Leasing IV (Switzerland) GmbH | Switzerland |
| Noble Rochford Drilling (North Sea) Ltd. | Cayman Islands |
| Arktik Drilling Limited, Inc. | Bahamas |
| Bully 1 (Switzerland) GmbH | Switzerland |
| Bully 2, Ltd. | Cayman Islands |
| Bully Drilling, Ltd. | Cayman Islands |
| FD Frontier Drilling (Cyprus) Limited | Cyprus |
| FDR Holdings Limited | Cayman Islands |
| Frontier Deepwater (B) Sdn. Bhd. | Brunei |
| Frontier Discoverer Kft. | Hungary |
| Frontier Driller Asset Management Limited Liability Company Luxembourg Branch | Luxembourg |
| Frontier Driller Cayman, Ltd. | Cayman Islands |
| Frontier Driller Kft. | Hungary |
| Frontier Driller, Inc. | Delaware |
| Frontier Driller, Ltd. | Cayman Islands |
| Frontier Drilling (Aust) Pty Ltd. | Western Australia |
| Frontier Drilling (Labuan) Pte. Ltd. | Labuan, Malaysia |
| Frontier Drilling (Malaysia) Sdn. Bhd. | Malaysia |
| Frontier Drilling AS | Norway |
| Frontier Drilling do Brasil Ltda. | Brazil |
| Frontier Drilling Nigeria Limited | Nigeria |
| Frontier Drilling Services Ltda. | Brazil |
| Frontier Drilling USA, Inc. | Delaware |
| Frontier Drillships 2, Ltd. | Cayman Islands |
| Frontier Drillships Cyprus Limited | Cyprus |
| Frontier Drillships, Ltd. | Cayman Islands |
| Frontier Offshore (Luxembourg) S.á r.l. | Luxembourg |
| Frontier Offshore AS | Norway |
| Frontier Seillean AS | Norway |
| International Directional Services Ltd. | Bermuda |
| KS Frontier Seillean | Norway |
| Kulluk Arctic Services ULC | Alberta, Canada |
| Noble (Gulf of Mexico) Inc. | Delaware |
| Noble (Middle East) Limited | Cayman Islands |
| Noble Asset (U.K.) Limited | Cayman Islands |
| Noble Asset Company Limited | Cayman Islands |
| Noble Asset Mexico LLC | Delaware |
| Noble Aviation LLC | Switzerland |
| Noble Bill Jennings LLC | Delaware |
| Noble Brasil Investimentos E Participacoes Ltda. | Brazil |
| Noble Campeche Limited | Cayman Islands |
| Noble Carl Norberg S.á r.l | Luxembourg |
| Noble Cayman Properties Limited | Cayman Islands |
| Noble Corporation (Cayman) | Cayman Islands |
| Noble Dave Beard Limited | Cayman Islands |
| Noble do Brasil Ltda. | Brazil |
| Noble Downhole Technology Ltd. | Cayman Islands |
| Noble Drilling (Asia) Pte Ltd. | Singapore |
| Noble Drilling (Canada) Ltd. | Alberta, Canada |
| Noble Drilling (Carmen) Limited | Cayman Islands |
| Noble Drilling (Cyprus) Limited | Cyprus |
| Noble Drilling (Deutschland) GmbH | Germany |
| Noble Drilling (Jim Thompson) LLC | Delaware |
| Noble Drilling (Land Support) Limited | Scotland |
| Noble Drilling (Luxembourg) S.à r.l | Luxembourg |
| Noble Drilling (Malaysia) Sdn. Bhd. | Malaysia |
| Noble Drilling (N.S.) Limited | Scotland |
| Noble Drilling (Nederland) B.V. | The Netherlands |
| Noble Drilling (Norway) AS | Norway |

**NOBLE CORPORATION SUBSIDIARIES (as of December 31, 2011)**

| Subsidiary Name | Incorporated or Organized In |
| --- | --- |
| Noble Drilling (Paul Wolff) Ltd. | Cayman Islands |
| Noble Drilling (U.S.) LLC | Delaware |
| Noble Drilling Arabia Limited | Saudi Arabia |
| Noble Drilling Asset (M.E.) Ltd. | Cayman Islands |
| Noble Drilling Corporation | Delaware |
| Noble Drilling de Venezuela C.A. | Venezuela |
| Noble Drilling Holding GmbH | Switzerland |
| Noble Drilling Holding LLC | Delaware |
| Noble Drilling Holdings (Cyprus) Limited | Cyprus |
| Noble Drilling International GmbH | Switzerland |
| Noble Drilling International Inc. | Delaware |
| Noble Drilling International Ltd. | Bermuda |
| Noble Drilling International Services Pte. Ltd. | Singapore |
| Noble Drilling Leasing S.à r.l | Luxembourg |
| Noble Drilling Nigeria Limited | Nigeria |
| Noble Drilling Services 2 LLC | Delaware |
| Noble Drilling Services 3 LLC | Delaware |
| Noble Drilling Services 6 LLC | Delaware |
| Noble Drilling Services 7 LLC | Delaware |
| Noble Drilling Services Inc. | Delaware |
| Noble Duchess Ltd. | Cayman Islands |
| Noble Earl Frederickson LLC | Delaware |
| Noble Engineering & Development de Venezuela C.A. | Venezuela |
| Noble Gene Rosser Limited | Cayman Islands |
| Noble Holding (U.S.) Corporation | Delaware |
| Noble Holding Europe S.à r.l | Luxembourg |
| Noble Holding International (Luxembourg NHIL) S.à r.l | Luxembourg |
| Noble Holding International (Luxembourg) S.à r.l | Luxembourg |
| Noble Holding International Limited | Cayman Islands |
| Noble Holding S.C.S. | Luxembourg |
| Noble International Finance Company | Cayman Islands |
| Noble International Limited | Cayman Islands |
| Noble John Sandifer LLC | Delaware |
| Noble Johnnie Hoffman LLC | Delaware |
| Noble Leasing (Switzerland) GmbH | Switzerland |
| Noble Leasing II (Switzerland) GmbH | Switzerland |
| Noble Leonard Jones LLC | Delaware |
| Noble Management Services S. de R.L. de C.V. | Mexico |
| Noble Mexico Limited | Cayman Islands |
| Noble Mexico Services Limited | Cayman Islands |
| Noble NDC Holding (Cyprus) Limited | Cyprus |
| Noble North Africa Limited | Cayman Islands |
| Noble Offshore Contracting Limited | Cayman Islands |
| Noble Offshore de Venezuela C.A. | Venezuela |
| Noble Offshore Mexico Limited | Cayman Islands |
| Noble Services (Switzerland) LLC | Switzerland |
| Noble Technology (Canada) Ltd. | Alberta, Canada |
| Noble-Neddrill International Limited | Cayman Islands |
| Resolute Insurance Group Ltd. | Bermuda |
| Triton Engineering Services Company | Delaware |