**KEPPEL OPP'N EXH.  35**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 6-K

**REPORT OF FOREIGN PRIVATE ISSUER**
**PURSUANT TO RULE 13a-16 OR 15d-16**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934**

For the month of February 2021

Commission File Number 333-224459

# Seadrill Limited
(Exact name of Registrant as specified in its Charter)

**Par-la-Ville Place, 4th Floor**
**14 Par-la-Ville Road**
**Hamilton HM 08 Bermuda**
(Address of principal executive office)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1).

Yes ☐ No ☒

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7).

Yes ☐ No ☒

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

**SDRL - Seadrill Announces Expiry of Forbearance Agreements**

**Hamilton, Bermuda, 29 January 2021** – Reference is made to the announcements by Seadrill Limited ("Seadrill" or the "Company") (OSE:SDRL, OTCQX:SDRLF) on 30 December 2020 regarding forbearance agreements entered into by the Company with certain creditors in respect of the group's senior secured credit facility agreements.

The term of the forbearance agreements expired on 29 January 2021, and, accordingly, the creditors with whom forbearance agreements were entered into are no longer prevented from taking actions in respect of events of default that may arise under the senior secured credit facility agreements as a result of the group not making interest payments under the group's senior secured credit agreements.

The Company continues to maintain its readiness to carry out a comprehensive restructuring of its balance sheet. Such a restructuring may involve the use of a court-supervised process. The Company continues to engage in constructive discussions in relation to potential further forbearances and to finalise the heads of terms of a comprehensive restructuring of its balance sheet; whilst no agreement has been reached at this point it is expected that potential solutions will lead to significant equitization of debt which is likely to result in minimal or no recovery for current shareholders.

FORWARD LOOKING STATEMENTS

This report on Form 6-K includes forward looking statements. Such statements are generally not historical in nature, and specifically include statements about the Company's plans, strategies, business prospects, changes and trends in its business, the markets in which it operates and its restructuring efforts. These statements are made based upon management's current plans, expectations, assumptions and beliefs concerning future events impacting the Company and therefore involve a number of risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed or implied in the forward-looking statements, which speak only as of the date of this report on Form 6-K. Consequently, no forward-looking statement can be guaranteed. When considering these forward-looking statements, you should keep in mind the risks described from time to time in the Company's regulatory filings and periodical reporting. The Company undertakes no obligation to update any forward looking statements to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for the Company to predict all of these factors. Further, the Company cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to be materially different from those contained in any forward looking statement.

This information is subject to the disclosure requirements pursuant to section 5-12 of the Norwegian Securities Trading Act.

**For further information, please contact:**
Media questions should be directed to:
Iain Cracknell
Director of Communications
+44 (0)7765 221 812

Analyst questions should be directed to:
Hawthorn Advisors
seadrill@hawthornadvisors.com
+44 (0)203 7454960

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SEADRILL LIMITED**

Date: February 1, 2021

By: /s/ Stuart Jackson

Name: Stuart Jackson
Title: Chief Executive Officer of Seadrill Management Ltd.
(Principal Executive Officer of Seadrill Limited)

3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 6-K

**REPORT OF FOREIGN PRIVATE ISSUER**
**PURSUANT TO RULE 13a-16 OR 15d-16**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**For the month of February 2021**

**Commission File Number 333-224459**

# Seadrill Limited
#### (Exact name of Registrant as specified in its Charter)

**Par-la-Ville Place, 4th Floor**
**14 Par-la-Ville Road**
**Hamilton HM 08 Bermuda**
**(Address of principal executive office)**

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.
Form 20-F ☒   Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1).
Yes ☐   No ☒

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7).
Yes ☐   No ☒

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

**SDRL - Seadrill Announces Forbearance Agreement**

**Hamilton, Bermuda, 3 February 2021** – Seadrill Limited ("Seadrill" or the "Company") (OSE:SDRL, OTCQX:SDRLF) announces that it has entered into a forbearance agreement with certain creditors in respect of nine out of the group's twelve senior secured credit facility agreements.

The purpose of the forbearance agreement is to allow the Company and its stakeholders more time to finalise negotiations on the head terms of a comprehensive restructuring of its balance sheet. Such a restructuring may involve the use of a court-supervised process. The Company continues to evaluate capital structure proposals from its financial stakeholders; whilst no agreement has been reached at this point it is expected that potential solutions will lead to significant equitization of debt which is likely to result in minimal or no recovery for current shareholders.

Pursuant to the forbearance agreement, the consenting creditors have agreed not to exercise any voting rights to, or otherwise take actions, in respect of certain events of default that may arise under those senior secured credit facility agreements as a result of the group not making certain interest payments, until and including the earlier of 15 February 2021 and any termination of the forbearance agreement.

Forbearance has not yet been agreed with respect to certain events of default or termination events that may arise under the three remaining senior secured credit agreements, the Company's New Secured Notes, leasing arrangements for the West Hercules, West Linus and West Taurus and a bilateral guarantee facility with Danske Bank. Without a forbearance in respect of these arrangements, a non-payment of interest or other amounts due under the senior secured credit agreements, the Company's New Secured Notes and/or the leasing arrangements could result in the creditors under these arrangements having the right to accelerate or otherwise enforce their rights under them.

FORWARD LOOKING STATEMENTS

This report on Form 6-K includes forward looking statements. Such statements are generally not historical in nature, and specifically include statements about the Company's plans, strategies, business prospects, changes and trends in its business, the markets in which it operates and its restructuring efforts. These statements are made based upon management's current plans, expectations, assumptions and beliefs concerning future events impacting the Company and therefore involve a number of risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed or implied in the forward-looking statements, which speak only as of the date of this report on Form 6-K. Consequently, no forward-looking statement can be guaranteed. When considering these forward-looking statements, you should keep in mind the risks described from time to time in the Company's regulatory filings and periodical reporting. The Company undertakes no obligation to update any forward looking statements to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for the Company to predict all of these factors. Further, the Company cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to be materially different from those contained in any forward looking statement.

This information is subject to the disclosure requirements pursuant to section 5-12 of the Norwegian Securities Trading Act.

**For further information, please contact:**
Media questions should be directed to:
Iain Cracknell
Director of Communications
+44 (0)7765 221 812

Analyst questions should be directed to:
Hawthorn Advisors
seadrill@hawthornadvisors.com
+44 (0)203 7454960

2

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SEADRILL LIMITED**

Date: February 3, 2021

By:  /s/ Stuart Jackson

Name: Stuart Jackson
Title: Chief Executive Officer of Seadrill Management Ltd.
(Principal Executive Officer of Seadrill Limited)

3

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 6-K

**REPORT OF FOREIGN PRIVATE ISSUER
PURSUANT TO RULE 13a-16 OR 15d-16
UNDER THE SECURITIES EXCHANGE ACT OF 1934**

For the month of February 2021

Commission File Number 333–224459

# Seadrill Limited
(Exact name of Registrant as specified in its Charter)

**Par-la-Ville Place, 4th Floor
14 Par-la-Ville Road
Hamilton HM 08 Bermuda
(Address of principal executive office)**

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1).

Yes ☐ No ☒

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7).

Yes ☐ No ☒

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

Attached hereto as Exhibit 99.1 is a copy of a press release of Seadrill Limited ("Seadrill"), dated February 7, 2021, announcing that Chapter 11 cases have been filed in the Southern District of Texas in respect of Seadrill's wholly-owned subsidiaries Seadrill GCC Operations Ltd, Asia Offshore Drilling Limited, Asia Offshore Rig 1 Limited, Asia Offshore Rig 2 Limited and Asia Offshore Rig 3 Limited.

**EXHIBITS**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press release dated February 7, 2021. |

2

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 8, 2021

**SEADRILL LIMITED**

By:   /s/ Stuart Jackson
  Name: Stuart Jackson
  Title: Chief Executive Officer of Seadrill Management Ltd.
  (Principal Executive Officer of Seadrill Limited)

3

**Exhibit 99.1**



**Seadrill Limited (SDRL): Asia Offshore Drilling Chapter 11 Filing**

**Hamilton, Bermuda, February 7, 2021** – The Board of Seadrill Limited ("Seadrill" or the "Company") (OSE: SDRL, OTCQX:SDRLF) today announces that Chapter 11 cases have been filed in the Southern District of Texas in respect of Seadrill's wholly-owned subsidiaries Seadrill GCC Operations Ltd, Asia Offshore Drilling Limited, Asia Offshore Rig 1 Limited, Asia Offshore Rig 2 Limited and Asia Offshore Rig 3 Limited (jointly, the "AOD Companies").

The Chapter 11 cases were filed as a protective measure to support Seadrill's broader comprehensive financial restructuring and will in no way affect the safe and efficient operation of the AOD offshore drilling units. The Company will request authority to pay its key trade creditors and employee wages and benefits without change or interruption and expects it will pay all suppliers and vendors in full under normal terms for goods and services provided during the Chapter 11 cases.

As a consequence of the Chapter 11 filings, the forbearance agreement announced by the Company on 3 February 2021 in respect of nine out of the group's twelve senior secured credit facility agreements has terminated.

This press release is not intended to be, and should not in any way be construed as, a solicitation of votes of stakeholders regarding the Chapter 11 proceedings in respect of the AOD Companies.

Further information about the Chapter 11 filing will be available at www.seadrill.com/restructuring.

FORWARD LOOKING STATEMENTS

This news release includes forward looking statements. Such statements are generally not historical in nature, and specifically include statements about the Company's plans, strategies, business prospects, changes and trends in its business, the markets in which it operates and its restructuring efforts. These statements are made based upon management's current plans, expectations, assumptions and beliefs concerning future events impacting the Company and therefore involve a number of risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed or implied in the forward-looking statements, which speak only as of the date of this news release. Consequently, no forward-looking statement can be guaranteed. When considering these forward-looking statements, you should keep in mind the risks described from time to time in the Company's regulatory filings and periodical reporting. The Company undertakes no obligation to update any forward looking statements to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for the Company to predict all of these factors. Further, the Company cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to be materially different from those contained in any forward looking statement.

This information is subject to the disclosure requirements pursuant to section 5-12 of the Norwegian Securities Trading Act.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 6-K

### REPORT OF FOREIGN PRIVATE ISSUER
### PURSUANT TO RULE 13a-16 OR 15d-16
### UNDER THE SECURITIES EXCHANGE ACT OF 1934

**For the month of February 2021**

**Commission File Number 333-224459**

# Seadrill Limited
**(Exact name of Registrant as specified in its Charter)**

**Par-la-Ville Place, 4th Floor**
**14 Par-la-Ville Road**
**Hamilton HM 08 Bermuda**
**(Address of principal executive office)**

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1).

Yes ☐ No ☒

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7).

Yes ☐ No ☒

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

Attached hereto as Exhibit 99.1 is a copy of a press release of Seadrill Limited ("Seadrill"), dated February 10, 2021, announcing that Chapter 11 cases have been filed in the Southern District of Texas in respect of Seadrill and certain of its consolidated subsidiaries.

**EXHIBITS**

| Exhibit Number | Description |
| --- | --- |
| 99.1 | Press release dated February 10, 2021. |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 10, 2021

**SEADRILL LIMITED**

By: /s/ Stuart Jackson

Name: Stuart Jackson

Title: Chief Executive Officer of Seadrill Management Ltd.

(Principal Executive Officer of Seadrill Limited)

3

**Exhibit 99.1**



**Seadrill Limited (SDRL): Filing of Chapter 11 Cases for Seadrill**

**Hamilton, Bermuda, February 10, 2021** – The Board of Seadrill Limited ("Seadrill" or the "Company") (OSE: SDRL, OTCQX:SDRLF) today announces that Chapter 11 cases have been filed in the Southern District of Texas in respect of Seadrill and its consolidated subsidiaries (the "Seadrill Group") with the exceptions set out below.

These filings are made in addition to the Chapter 11 cases filed separately for Seadrill GCC Operations Ltd, Asia Offshore Limited, Asia Offshore Rig 1 Limited, Asia Offshore Rig 2 Limited and Asia Offshore Rig 3 Limited, as announced by the Company on February 7, 2021. The Chapter 11 filings do not include Seadrill New Finance Limited and its subsidiaries; Seabras Servicos de Petroleo SA, Seadrill JU Newco Bermuda Limited, Seadrill Member LLC, Seadrill Mobile Units UK Limited, Seadrill Partners LLC Holdco Limited, Seadrill Seabras SP UK Limited, Seadrill Seabras UK Limited, Seadrill Seadragon UK Limited, Seadrill SeaMex 2 de Mexico S de RL de CV, Seadrill SeaMex SC Holdco Limited, Seadrill SKR Holdco Limited, Sevan Drilling Rig VI AS, and Sevan Drilling Rig VI Pte Ltd.

As part of the Chapter 11 cases, Seadrill filed "first day" motions that, when granted, will enable day-to-day operations of the Seadrill Group to continue as usual. Specifically, Seadrill has requested the authority to pay key trade creditors and employee wages and benefits without change or interruption and expects it will pay all suppliers and vendors in full under normal terms for goods and services provided during the Chapter 11 cases. At the point of filing, Seadrill has approximately $650m in cash and does not require debtor-in-possession financing.

The Chapter 11 cases are opened to facilitate a balance sheet restructuring which will enable Seadrill to continue to operate its modern fleet of drilling units. It is expected that this will lead to significant equitization of debt which is likely to result in minimal or no recovery for current shareholders. As a consequence of the Chapter 11 cases, Seadrill will submit an application to the Bermuda Supreme Court for the appointment of Joint Provisional Liquidators under Bermuda law to oversee the Chapter 11 cases in conjunction with the Board of Directors of the Company.

Commenting today, Stuart Jackson, CEO of Seadrill, said:

"This announcement marks the start of the court supervised process that will create a company that is financially sustainable for the long term. We are working closely with our stakeholders to ensure we achieve an outcome that gives us the flexibility to weather the low points in our industry cycles, whilst positioning us well for market recovery.

I would like to thank all our stakeholders for their continued support as we move through this legal process, in particular, our customers, vendors and employees, all of whom demonstrate continued support of our safe and efficient operational delivery."

This press release is not intended to be, and should not in any way be construed as, a solicitation of votes of stakeholders regarding the Chapter 11 proceedings.

The Company has engaged Kirkland & Ellis LLP as legal counsel, Houlihan Lokey, Inc. as financial advisor, and Alvarez & Marsal as restructuring advisor. Slaughter and May has been engaged as corporate counsel. Advokatfirmaet Thommessen AS is serving as Norwegian counsel. Conyers Dill & Pearman is serving as Bermuda counsel.

Further information about the Chapter 11 filing will be available at www.seadrill.com/restructuring.


FORWARD LOOKING STATEMENTS

This news release includes forward looking statements. Such statements are generally not historical in nature, and specifically include statements about the Company's plans, strategies, business prospects, changes and trends in its business, the markets in which it operates and its restructuring efforts. These statements are made based upon

management's current plans, expectations, assumptions and beliefs concerning future events impacting the Company and therefore involve a number of risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed or implied in the forward-looking statements, which speak only as of the date of this news release. Consequently, no forward-looking statement can be guaranteed. When considering these forward-looking statements, you should keep in mind the risks described from time to time in the Company's regulatory filings and periodical reporting. The Company undertakes no obligation to update any forward looking statements to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for the Company to predict all of these factors. Further, the Company cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to be materially different from those contained in any forward looking statement.

This information is subject to the disclosure requirements pursuant to section 5-12 of the Norwegian Securities Trading Act.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 6-K

**REPORT OF FOREIGN PRIVATE ISSUER
PURSUANT TO RULE 13a-16 OR 15d-16
UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**For the month of February 2021**

**Commission File Number 333-224459**

# Seadrill Limited
**(Exact name of Registrant as specified in its Charter)**

**Par-la-Ville Place, 4th Floor
14 Par-la-Ville Road
Hamilton HM 08 Bermuda
(Address of principal executive office)**

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.
Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1).
Yes ☐ No ☒

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7).
Yes ☐ No ☒

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

**SDRL – Seadrill New Finance Limited Announces Forbearance Agreement**

**Hamilton, Bermuda, February 11, 2021** – Seadrill Limited ("Seadrill" or the "Company") (OSE:SDRL, OTCQX:SDRLF) announces that Seadrill New Finance Limited (the "Issuer"), a subsidiary of the Company incorporated in Bermuda in 2018 and issuer of the 12.0% senior secured notes due 2025 (the "Notes"), has entered into a forbearance agreement with certain holders of the Notes.

Pursuant to the forbearance agreement, the consenting creditors have agreed not to exercise any enforcement rights with respect to the Issuer and any subsidiary of the Issuer which is an obligor under the Notes to, or otherwise take actions in respect of, certain events of default that may arise under the Notes as a result of, amongst other things, the Issuer not making the semi-annual 4% cash interest payment due to the senior secured noteholders on 15 January 2021 in respect of their Notes and the filing of Chapter 11 cases in the Southern District of Texas by the Company and certain of its consolidated subsidiaries (excluding the Issuer and its consolidated subsidiaries), until and including the earlier of 24 February 2021 and any termination of the forbearance agreement.

The purpose of the forbearance agreement is to allow the Company, the Issuer and its stakeholders (including the forbearing holders) time to seek to agree the terms of a restructuring of the Notes in parallel with the commencement by the Company and certain of its consolidated subsidiaries of their Chapter 11 cases. Such a restructuring may involve the use of a court-supervised process.

FORWARD LOOKING STATEMENTS

This report on Form 6-K includes forward looking statements. Such statements are generally not historical in nature, and specifically include statements about the Company's plans, strategies, business prospects, changes and trends in its business, the markets in which it operates and its restructuring efforts. These statements are made based upon management's current plans, expectations, assumptions and beliefs concerning future events impacting the Company and therefore involve a number of risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed or implied in the forward-looking statements, which speak only as of the date of this report on Form 6-K. Consequently, no forward-looking statement can be guaranteed. When considering these forward-looking statements, you should keep in mind the risks described from time to time in the Company's regulatory filings and periodical reporting. The Company undertakes no obligation to update any forward looking statements to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for the Company to predict all of these factors. Further, the Company cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to be materially different from those contained in any forward looking statement.

This information is subject to the disclosure requirements pursuant to section 5-12 of the Norwegian Securities Trading Act.

**For further information, please contact:**

Media questions should be directed to:
Iain Cracknell
Director of Communications
+44 (0)7765 221 812

Analyst questions should be directed to:
Hawthorn Advisors
seadrill@hawthornadvisors.com
+44 (0)203 7454960

2

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SEADRILL LIMITED**

Date: February 11, 2021

By:   /s/ Stuart Jackson

Name: Stuart Jackson

Title: Chief Executive Officer of Seadrill Management Ltd. (Principal Executive Officer of Seadrill Limited)

3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 6-K

**REPORT OF FOREIGN PRIVATE ISSUER**
**PURSUANT TO RULE 13a-16 OR 15d-16**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**For the month of February 2021**
**Commission File Number 001-35704**

# Seadrill Partners LLC
### (Exact name of Registrant as specified in its Charter)

**2nd Floor, Building 11**
**Chiswick Business Park**
**566 Chiswick High Road**
**London, W4 5YS**
**United Kingdom**
**(Address of principal executive office)**

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101 (b)(1).

Yes ☐ No ☒

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101 (b)(7).

Yes ☐ No ☒

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

**Entry Into Plan Support Agreement**

On February 12, 2021, Seadrill Partners LLC (the "Company") and certain of its affiliates (together with the Company, collectively, the "Debtors") entered into a plan support agreement (the "Plan Support Agreement") with the lenders under the Company's prepetition term loan B credit facility (the "TLB Lenders"). The Plan Support Agreement contemplates a series of transformative restructuring transactions that will, among other things:

- equitize approximately $2.7 billion in secured term loan obligations; and
- select go-forward service providers for the Debtors' fleet.

**Terms of the Plan of Reorganization**

The Company has further documented the terms of the restructuring contemplated by the Plan Support Agreement in the chapter 11 plan of reorganization (the "Plan") that was filed on February 13, 2021 with an accompanying disclosure statement ("Disclosure Statement"). The Plan provides for, among other things:

- the TLB Lenders to receive 100% of the new common stock issued under the Plan in exchange for the discharge of approximately $2.7 billion in secured term loan claims;
- general unsecured creditors to receive a treatment to be determined consistent with the Plan Support Agreement;
- existing interests in the Company to be extinguished;
- customary releases among the Company, the TLB Lenders, and their respective related parties of potential claims and causes of action; and
- the retention by the Company of claims it may have against Seadrill Limited.

The transactions contemplated by the Plan Support Agreement and the Plan are subject to court approval and other terms and conditions, and the foregoing descriptions of the Plan Support Agreement and Plan do not purport to be complete and are qualified in their entirety by reference to the Plan Support Agreement, the Plan and the Disclosure Statement, which are filed as Exhibit 99.1, Exhibit 99.2 and Exhibit 99.3, respectively, to this Form 6-K and are incorporated herein by reference.

**Other Information Regarding the Chapter 11 Cases**

Court filings and other information related to the chapter 11 cases are available at the website administered by the Company's claims and noticing agent, Prime Clerk LLC, at http://cases.primeclerk.com/seadrillpartners or via the information call center at 877-329-1894 (U.S. and Canada toll free) or 347-919-5756 (International). Such information is not incorporated by reference into this report.

**EXHIBITS**

The following exhibits are filed as part of this report:

| <u>Number</u> | <u>Exhibit:</u> |
|---|---|
| 99.1 | Plan Support Agreement |
| 99.2 | Chapter 11 Plan |
| 99.3 | Disclosure Statement |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SEADRILL PARTNERS LLC**

Date: February 19, 2021

By:  /s/ *John T. Roche*

Name:   John T. Roche
Title:    Authorized Signatory

Exhibit 99.1

*Execution Version*

THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of February 12, 2021 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) and (ii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Seadrill Partners LLC, a company incorporated under the Laws of the Republic of the Marshall Islands ("**SDLP**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting TLB Lenders (the Entities in this clause (i), collectively, the "**Company Parties**"); and

    ii.    the undersigned holders of Super Senior Term Loan Claims and TLB Secured Claims that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties (together with their respective successors and permitted assigns, collectively, the "**Consenting TLB Lenders**").[2]

## RECITALS

**WHEREAS**, the Company Parties and the Consenting TLB Lenders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Chapter 11 Plan (such transactions as described in this Agreement, the "**Restructuring Transactions**");

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the proposed chapter 11 plan of reorganization attached hereto as **Exhibit B** (the "**Chapter 11 Plan**").

[2]    For the avoidance of doubt, Consenting TLB Lenders shall include any person that either (i) is the sole legal and beneficial owner of a Super Senior Term Loan Claim and/or a TLB Secured Claim, (ii) has investment or voting discretion or control with respect to discretionary accounts for holders or beneficial owners of a Super Senior Term Loan Claim and/or a TLB Secured Claim, (iii) holds an undivided 100% beneficial interest or other participation interest in and to a Super Senior Term Loan Claim and/or a TLB Secured Claim, or (iv) any Consenting TLB Lender that has a contractual obligation to purchase and acquire (net of any obligation to sell any Super Senior Term Loan Claim and/or a TLB Secured Claim) a Super Senior Term Loan Claim and/or a TLB Secured Claim ("**Trades**"), which Trades, as of the date hereof, remain an outstanding obligation to purchase and acquire a Super Senior Term Loan Claim and/or a TLB Secured Claim, and such Consenting TLB Lender has not yet settled the Trades as an assignment, participation, or other transfer of such Super Senior Term Loan Claim and/or TLB Secured Claim.

WHEREAS, the Parties have agreed to support the Chapter 11 Plan and Restructuring Transactions contemplated by the Chapter 11 Plan, including the conversion of all TLB Secured Claims into equity securities in New HoldCo, in full and final satisfaction of such TLB Secured Claims;

WHEREAS, the Company Parties intend to implement the Restructuring Transactions through confirmation of the Chapter 11 Plan in connection with the voluntary cases under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court by all or a subset of the Company Parties (the "**Chapter 11 Cases**") and, if contemplated under the Description of Transaction Steps or otherwise determined necessary or appropriate by any of the Company Parties' managers, directors, or similar governing body, in consultation with the Required Consenting TLB Lenders, by commencing ancillary proceedings to Chapter 11 Cases or other proceedings seeking recognition of aspects of the Chapter 11 Cases, including proceedings under Chapter 15 of the Bankruptcy Code, the appointment of administrators or equivalent officeholders (howsoever described) under applicable law, dissolution proceedings under applicable law, and joint provisional liquidations under the Laws of any other relevant jurisdiction (collectively, the "**Ancillary Proceedings**") (collectively, the "**Implementation Mechanisms**"); and

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Chapter 11 Plan.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

### *AGREEMENT*

**Section 1. *Definitions and Interpretation.***

1.01. Definitions. The following terms shall have the following definitions:

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.02 (including the Chapter 11 Plan).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Ancillary Proceedings**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Super Senior Term Loan Claims, the Secured TLB Claims, and the Affiliate Unsecured Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Consenting TLB Lenders**" has the meaning set forth in the recitals to this Agreement.

"**Consenting TLB Lender Termination Event**" has the meaning set forth in Section 11.01.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, units, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, units, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Financing Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of consensual use of cash collateral and/or debtor in possession financing, and any documentation related thereto.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

3

"**Implementation Mechanisms**" has the meaning set forth in the recitals to this Agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestone**" has the meaning set forth in Section 6.01(j).

"**Outside Date**" has the meaning set forth in Section 11.05.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each Transfer of Company Claims/Interests which meets the requirements of Section 8.01.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting TLB Lenders**" means: (i) for so long as the Ad Hoc Committee holds at least 66.67% of the aggregate outstanding principal amount of TLB Claims as of the relevant date, Consenting TLB Lenders that are members of the Ad Hoc Committee that hold at least 50.01% of the aggregate outstanding principal amount of TLB Claims that are held by the Ad Hoc Committee as of the relevant date; or (ii) to the extent that the Ad Hoc Committee does not hold at least 66.67% of the aggregate outstanding principal amount of TLB Claims as of the relevant date, Consenting TLB Lenders holding at least 50.01% of the aggregate outstanding principal amount of TLB Claims that are held by Consenting TLB Lenders as of the relevant date.

"**Restructuring Effective Date**" means the occurrence of the effective date of the Chapter 11 Plan according to its terms.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**SDLP**" has the meaning set forth in the preamble to this Agreement.

"**SEC**" has the meaning set forth in Section 13.20.

4

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.04, 11.05, or 11.06.

"**TLB Agent**" means Alter Domus (US) LLC, and any successor thereto, solely in its capacity as administrative agent, collateral agent, and security trustee under the TLB Credit Agreement.

"**TLB Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

1.02. Interpretation. For purposes of this Agreement:

(a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e) unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f) the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i) the use of "include" or "including" is without limitation, whether stated or not; and

(j) the phrase "counsel to the Consenting TLB Lenders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.** *Effectiveness of this Agreement*. This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a) each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; and

(b) the following shall have executed and delivered counterpart signature pages of this Agreement:

(i) holders of at least two-thirds of the aggregate outstanding principal amount of Super Senior Term Loan Claims; and

(ii) holders of at least two-thirds of the aggregate outstanding principal amount of TLB Secured Claims.

**Section 3.** *Definitive Documents*.

3.01. The Definitive Documents governing the Restructuring Transactions shall consist of the following:

(a) the Description of Transaction Steps;

(b) any organizational documents of the Reorganized Debtors;

(c) any and all documentation required to implement, issue, and distribute the New Common Stock;

(d) the New Management Services Agreements;

(e) any motion seeking to reject the Seadrill MSAs;

(f) the Chapter 11 Plan, including, for the avoidance of doubt, the Cash Cap, Cash Out Amount, and the treatment of Holders of Claims in Class 3, Class 4, and Class 5, as may be modified pursuant to this Agreement, and any alternative plan of reorganization filed by the Debtors, and any amendments thereto as may be reasonably requested by the Ad Hoc Committee;

(g) the Confirmation Order;

(h) the Disclosure Statement;

(i) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials;

6

(j) the Financing Orders;

(k) the First Day Pleadings and all orders sought pursuant thereto;

(l) the Plan Supplement and all documents contained therein;

(m) to the extent applicable and not otherwise noted in this Section 3.01, the motions seeking approval of any of the foregoing;

(n) any other material pleadings or material motions the Company Parties plan to file in connection with the Chapter 11 Cases and all orders sought pursuant thereto; and

(o) any amendment to any of the foregoing.

3.02. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting TLB Lenders.

**Section 4.** ***Commitments of the Consenting TLB Lenders***.

4.01. General Commitments.

(a) During the Agreement Effective Period, each Consenting TLB Lender agrees, in respect of all of its Company Claims/Interests, to:

(i) support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, including, without limitation, the Chapter 11 Plan;

(ii) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii) use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 4.01(b);

(iv) give any notice, order, instruction, or direction to the TLB Agent necessary to give effect to the Restructuring Transactions; and

7

(v) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b) During the Agreement Effective Period, each Consenting TLB Lender agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii) propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Chapter 11 Plan;

(iv) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, the Ancillary Proceedings, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v) exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties; or

(vi) object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

4.02. Reserved.

4.03. Commitments with Respect to Chapter 11 Cases.

(a) During the Agreement Effective Period, each Consenting TLB Lender that is entitled to vote to accept or reject the Chapter 11 Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting TLB Lender of the Solicitation Materials:

(i) vote each of its Company Claims/Interests to accept the Chapter 11 Plan by delivering its duly executed and completed ballot accepting the Chapter 11 Plan on a timely basis following the commencement of the solicitation of the Chapter 11 Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii) to the extent it is permitted to elect whether to opt out of the releases set forth in the Chapter 11 Plan, elect not to opt out of the releases set forth in the Chapter 11 Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

8

(iii) not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (a)(ii) above.

(b) During the Agreement Effective Period, each Consenting TLB Lender, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 5. *Additional Provisions Regarding the Consenting TLB Lenders' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting TLB Lender to consult with any other Consenting TLB Lender, any TLB Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting TLB Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) be construed to prohibit any Consenting TLB Lender from appearing as a party-in-interest in a Chapter 11 Case, so long as such appearance and any positions advocated in connection therewith are not inconsistent with this Agreement; or (d) be construed to prohibit any Consenting TLB Lender from asserting, whether any matter, factor, or thing is a breach of, or is materially inconsistent with, this Agreement.

**Section 6. *Commitments of the Company Parties*.**

6.01. Affirmative Commitments. Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a) support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d) negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f) use commercially reasonable efforts to oppose any party or person seeking to object to, impede, or take any other action to interfere with the acceptance, implementation, and consummation of the Restructuring Transactions;

(g) [Reserved];

9

(h) (1) provide counsel for the Consenting TLB Lenders a reasonable opportunity to review draft copies of all material pleadings, and (2) to the extent reasonably practicable, provide a reasonable opportunity to counsel to the Consenting TLB Lenders to review draft copies of other documents that the Company Parties intend to file with the Bankruptcy Court, as applicable;

(i) on the Agreement Effective Date, the Debtors shall file this Agreement with the Bankruptcy Court, other than the signature pages of the Consenting TLB Lenders, as set forth in Section 13.20; and

(j) implement the Restructuring Transactions on the following timeline (each deadline, a "**Milestone**"), unless any such Milestone is extended or waived in writing (which may be by email between applicable counsel) by the Company Parties and the Required Consenting TLB Lenders:

(i) not later than 73 calendar days after the Petition Date, the Debtors shall have filed the Chapter 11 Plan and the Disclosure Statement;

(ii) not later than 73 calendar days after the Petition Date, the Debtors shall have executed the New Management Services Agreements (which such agreement or agreements shall be approved by the Bankruptcy Court within 94 days of the Petition Date);

(iii) not later than 77 calendar days after the Petition Date, the Debtors shall have delivered to the Consenting TLB Lenders a draft schedule of executory contracts to be assumed or rejected by the Debtors;

(iv) not later than 87 calendar days after the Petition Date, the Debtors shall have filed all exhibits and schedules to the Disclosure Statement;

(v) not later than 87 calendar days after the Petition Date, the Debtors and the Required Consenting TLB Lenders shall have agreed on a schedule of executory contracts to be assumed or rejected by the Debtors and, within 30 days thereafter, the Bankruptcy Court shall have approved the rejection or assumption of such executory contracts effective as of such date(s) to be agreed by the Debtors and the Required Consenting TLB Lenders, which such dates shall be prior to or contemporaneous with the confirmation of the Chapter 11 Plan;

(vi) not later than 109 calendar days after the Petition Date, all matters relating to onboarding the counterparties to the New Management Services Agreements shall be substantially complete; *provided*, that, to the extent any necessary regulatory approvals remain pending at that time, this date may be extended with the consent of the Required Consenting TLB Lenders to the date that is five (5) Business Days after obtaining such approvals, which such consent must be conveyed in writing (with email being sufficient);

(vii) not later than 119 calendar days after the Petition Date, the effective date(s) of the New Management Services Agreements shall have occurred; *provided*, that, to the extent any necessary regulatory approvals remain pending at that time, this date may be extended with the consent of the Required Consenting TLB Lenders to the date that is five (5) Business Days after obtaining such approvals, which such consent must be conveyed in writing (with email being sufficient); and

(viii) not later than 149 days after the Petition Date, the effective date of the Chapter 11 Plan shall have occurred; *provided*, that, to the extent any necessary regulatory approvals remain pending at that time, this date may be extended with the consent of the Required Consenting TLB Lenders to the date that is five (5) Business Days after obtaining such approvals, which such consent must be conveyed in writing (with email being sufficient).

6.02. Negative Commitments. Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b) take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Chapter 11 Plan; or

(c) file any motion or pleading with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement, the Chapter 11 Plan, or any Definitive Document.

**Section 7.** *Additional Provisions Regarding Company Parties' Commitments.*

7.01. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the Conflicts Committee of the Board of Directors of Seadrill Partners LLC (the "Conflicts Committee"), after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.

7.02. Notwithstanding anything to the contrary in this Agreement, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) solicit, encourage, consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting TLB Lender), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided, however*, that if any Company Party receives a proposal or expression of interest (orally or in writing) from a third party regarding an Alternative Restructuring Proposal that the Conflicts Committee determines in good faith and following consultation with counsel is a bona fide committed proposal that represents higher or otherwise better economic recovery to the Company Parties' stakeholders than the Restructuring

11

Transactions taken as a whole, such Company Party shall (x) provide counsel to the Consenting TLB Lenders with a copy of such Alternative Restructuring Proposal (or a description of the terms thereof, if such proposal was conveyed orally) within two (2) Business Days of the Company Party's receipt thereof, (y) provide information reasonably necessary to counsel to the Consenting TLB Lenders regarding such Alternative Restructuring Proposal to keep the Consenting TLB Lenders reasonably informed as to the status and substance of such proposal (including, but not limited to, the identity of the party or parties making such proposal or expression of interest except to the extent such Company Party is precluded from doing so pursuant to any applicable confidentiality agreement), and (z) use commercially reasonable efforts to respond promptly to information requests and questions from counsel to the Consenting TLB Lenders relating to such Alternative Restructuring Proposal.

7.03. Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8. *Transfer of Interests and Securities*.**

8.01. During the Agreement Effective Period, no Consenting TLB Lender shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a) in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an accredited investor (as defined in the Rules), or (iv) a Consenting TLB Lender; and

(b) either (i) the transferee executes and delivers to counsel to the Company Parties, within five (5) Business Days of the Transfer, a Transfer Agreement or (ii) the transferee is a Consenting TLB Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties within five (5) Business Days of the Transfer; *provided* that if any Consenting TLB Lender is party to a Transfer pending on the Agreement Effective Date pursuant to which such Consenting TLB Lender is selling Company Claims/Interests to a third party (whether or not such third party is a Consenting TLB Lender), such Consenting TLB Lender shall not be required to deliver a Transfer Agreement in connection with such Transfer and need not comply with subclause (ii) above.

8.02. Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. With respect to Company Claims/Interests held by the relevant transferee upon consummation of a Transfer, such transferee (other than any transferee to a Transfer pending on the Agreement Effective Date that is not otherwise party to this Agreement or not required to deliver a Transfer Agreement pursuant to Section 8.01(b)) is deemed to make all of the representations and warranties of a Consenting TLB Lender and undertake all obligations relevant to such transferor (including, for the avoidance of doubt, the commitments made in Section 4) set forth in this Agreement. Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03. This Agreement shall in no way be construed to preclude the Consenting TLB Lenders from acquiring additional Company Claims/Interests; *provided*, *however*, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting TLB Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting TLB Lenders) and (b) such Consenting TLB Lender must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04. This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting TLB Lender to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05. Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a Permitted Transfer under Section 8.01. To the extent that a Consenting TLB Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting TLB Lender without the requirement that the transferee be a Permitted Transferee.

8.06. Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9. *Representations and Warranties of Consenting TLB Lenders*.** Each Consenting TLB Lender severally, and not jointly, represents and warrants that, as of the date such Consenting TLB Lender executes and delivers this Agreement, on the Restructuring Effective Date:

13

(a) it is the beneficial or record owner of the face principal amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting TLB Lender's signature page to this Agreement or a Joinder or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8), other than in connection with a Super Senior Term Loan Claim and/or a TLB Secured Claim subject to a pending Trade;

(b) it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests, other than in connection with a Super Senior Term Loan Claim and/or a TLB Secured Claim subject to a pending Trade;

(c) other than as permitted by Section 8.06, such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting TLB Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d) it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law, other than in connection with a Super Senior Term Loan Claim and/or a TLB Secured Claim subject to a pending Trade; and

(e) solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting TLB Lender in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10. *Mutual Representations, Warranties, and Covenants*.** Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, that:

(a) it is validly existing and in good standing under the Laws of the state or country of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b) except as expressly provided in this Agreement, the Chapter 11 Plan, and the Bankruptcy Code or as expressly contemplated by the Implementation Mechanisms, no consent or approval is required by any other person or entity (other than in connection with a Super Senior Term Loan Claim and/or a TLB Secured Claim subject to a pending Trade) in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c) the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

14

(d) except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions (other than in connection with a pending Transfer to a Consenting TLB Lender) contemplated by, and perform its respective obligations under, this Agreement; and

(e) except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements relating to the Chapter 11 Cases with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11. *Termination Events*.**

11.01. <u>Consenting TLB Lender Termination Events</u>. This Agreement may be terminated with respect to the Consenting TLB Lenders, by the Required Consenting TLB Lenders, by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of the following events (each, a "**<u>Consenting TLB Lender Termination Event</u>**"):

(a) the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting TLB Lenders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting TLB Lenders transmit a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b) the failure of any Company Party to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting TLB Lender in violation of its obligations under this Agreement;

(c) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction (including the Bankruptcy Court), of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting TLB Lenders transmit a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d) the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan;

(e) the board of directors, board of managers, or other such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; or

15

(f) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting TLB Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement.

11.02. Company Party Termination Events. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a) the breach in any material respect by one or more of the Consenting TLB Lenders of any provision set forth in this Agreement that (i) is adverse to the Company Party seeking termination pursuant to this provision and (ii) remains uncured for a period of five (5) Business Days after such terminating Company Parties transmit a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b) the Conflicts Committee determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party if any Company Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d) the Bankruptcy Court enters an order denying confirmation of the Chapter 11 Plan.

11.03. Reserved.

11.04. Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting TLB Lenders; and (b) each Company Party.

11.05. Individual Consenting TLB Lender Termination. Any Consenting TLB Lender may, in its sole discretion, terminate its obligations under this Agreement if the Restructuring Effective Date shall not have occurred by the date that is 180 days after the Petition Date (the "**Outside Date**"); *provided* that (a) the Company Parties and (b) the Required Consenting TLB Lenders may agree to an extension of the Outside Date through and including the date that is 195 days after the Petition Date, but any extension of the Outside Date beyond such date shall require the consent of each Consenting TLB Lender; *provided further* that, notwithstanding the foregoing, to the extent any necessary regulatory approvals remain pending as of the Outside Date, this date may be extended with the consent of the Required Consenting TLB Lenders to the date that is five (5) Business Days after obtaining such approvals.

16

11.06. <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately after the Restructuring Effective Date.

11.07. <u>Effect of Termination</u>. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided, however,* that any Consenting TLB Lender withdrawing or changing its vote pursuant to this Section 11.07 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting TLB Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting TLB Lender, and (b) any right of any Consenting TLB Lender, or the ability of any Consenting TLB Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting TLB Lender. No purported termination of this Agreement shall be effective under this Section 11.07 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d). Nothing in this Section 11.07 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.** *Amendments and Waivers.*

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b) This Agreement, and all Definitive Documents, may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived only with the consent of (i) each Company Party and (ii) the Required Consenting TLB Lenders; *provided* that (x) any extension of the Outside Date beyond the date that is 195 days after the Petition Date shall

17

require the consent of each Consenting TLB Lender, (y) any amendment or modification of, or supplement to, this Agreement or any Definitive Document that materially adversely and disproportionately affects any Consenting TLB Lender when comparing (a) the treatment set forth in any Plan filed prior to the hearing on conditional approval of the Disclosure Statement and (b) the treatment set forth in any Plan filed thereafter shall require the written consent of such materially adversely and disproportionately affected Consenting TLB Lender and (z) any amendment to this Section 12 shall require the consent of each Consenting TLB Lender.

(c) Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13. *Miscellaneous*.**

13.01. <u>Acknowledgement</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02. <u>Exhibits Incorporated by Reference; Conflicts</u>. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.03. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.04. <u>Complete Agreement</u>. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

18

13.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06. <u>TRIAL BY JURY WAIVER</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting TLB Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting TLB Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.10. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a) if to a Company Party, to:

       Seadrill Partners LLC
       2nd Floor, Building 11, Chiswick Business Park
       566 Chiswick High Road

19

London, W4 5YS, U.K.
Attention: John T. Roche, Chief Executive Officer
E-mail address: John.Roche@seadrill.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attention: Brian E. Schartz, P.C.
E-mail address: brian.schartz@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Anup Sathy, P.C., Chad J. Husnick, P.C., and Gregory F. Pesce
E-mail addresses: anup.sathy@kirkland.com; chad.husnick@kirkland.com;
gregory.pesce@kirkland.com

and

Sheppard, Mullin, Richter & Hampton LLP
Three First National Plaza
70 West Madison Street, 48th Floor
Chicago, IL 60602
Attention: Justin R. Bernbrock, Robert B. McLellarn, Lawrence A. Larose, and Jennifer L. Nassiri
Email address: jbernbrock@sheppardmullin.com;
rmclellarn@sheppardmullin.com; llarose@sheppardmullin.com;
jnassiri@sheppardmullin.com

(b) if to a Consenting TLB Lender, to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention: Gerard Uzzi, Abhilash M. Raval, Nelly C. Almeida, and Evan Maass
E-mail addresses: GUzzi@milbank.com; ARaval@milbank.com;
NAlmeida@milbank.com; EMaass@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

20

13.11. <u>Independent Due Diligence and Decision Making</u>. Each Consenting TLB Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12. <u>Enforceability of Agreement</u>. Each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement.

13.13. <u>Waiver</u>. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18. <u>Capacities of Consenting TLB Lenders</u>. Each Consenting TLB Lender has entered into this agreement on account of all Company Claims/Interests that it holds or on account of which it is the beneficial owner (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19. <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting TLB Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.20. <u>Disclosure</u>. On the Agreement Effective Date, the Debtors shall file this Agreement with the Bankruptcy Court, other than the signature pages of the Consenting TLB Lenders. No Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party) the holdings information of any Consenting TLB Lender without such Consenting TLB Lender's prior written consent; *provided, however*, that signature pages executed by Consenting TLB Lenders shall be delivered to (a) all Consenting TLB Lenders in redacted form that removes the details of such Consenting TLB Lenders holdings of Company Claims/Interests listed thereon and (b) the Debtors in unredacted form (to be held by the Debtors on a professionals' eyes only-basis). Any public filing of this Agreement with the U.S. Securities and Exchange Commission (the "**SEC**") shall not contain signature pages. Other than as may be required by applicable law and regulation or by any governmental or regulatory authority, the Debtors shall not issue any press release, make any filing with the SEC, or make any other public announcement regarding this Agreement without the written consent of the Debtors and the Ad Hoc Committee (with email from counsel to the Ad Hoc Committee being sufficient), and each Party shall coordinate with the other Parties regarding any public statements made, including any communications with the press, public filings, or filings with the SEC with respect to this Agreement. For the avoidance of doubt, each Party shall have the right, without any obligation to any other Party, to decline to comment to the press with respect to this Agreement.

IN WITNESS WHEREOF, the undersigned Parties hereto have executed this Agreement on the day and year first above written.

22

Company Parties' Signature Page to
the Plan Support Agreement

**SEADRILL PARTNERS LLC**
**SEADRILL TEXAS LLC**
**SEADRILL HUNGARY KFT.**
**SEADRILL DEEPWATER DRILLSHIP LTD.**
**SEABRAS RIG HOLDCO KFT.**
**SEADRILL PARTNERS OPERATING LLC**
**SEADRILL GHANA OPERATIONS LTD.**
**SEADRILL PARTNERS MALAYSIA SDN BHD.**
**SEADRILL AURIGA HUNGARY KFT.**
**SEADRILL POLARIS LTD.**
**SEADRILL GULF OPERATIONS AURIGA LLC**
**SEADRILL CANADA LTD.**
**SEADRILL PARTNERS FINCO LLC**
**SEADRILL T-15 LTD.**
**SEADRILL GULF OPERATIONS SIRIUS LLC**
**SEADRILL PARTNERS B.V.**
**SEADRILL T-16 LTD.**
**SEADRILL CAPRICORN HOLDINGS LLC**
**SEADRILL GULF OPERATIONS VELA LLC**
**SEADRILL OPERATING LP**
**SEADRILL US GULF LLC**
**SEADRILL CHINA OPERATIONS LTD.**
**SEADRILL OPERATING GP LLC**
**SEADRILL INTERNATIONAL LTD.**
**SEADRILL VELA HUNGARY KFT.**
**SEADRILL OPCO SUB LLC**
**SEADRILL LEO LTD.**
**SEADRILL VENCEDOR LTD.**
**SEADRILL MOBILE UNITS (NIGERIA) LTD.**
By:  /s/ Mohsin Y. Meghji
Name:    Mohsin Y. Meghji
Title:    Authorized Signatory

Exhibit 99.2

> THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEADRILL PARTNERS LLC, *et al.*,[1] | ) | Case No. 20-35740 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF SEADRILL PARTNERS LLC AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
J. Machir Stull (TX Bar No. 24070697)
Genevieve Graham (TX Bar No. 24085340)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
mstull@jw.com
ggraham@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: brian.schartz@kirkland.com

-and-

Anup Sathy, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: anup.sathy@kirkland.com
chad.husnick@kirkland.com
gregory.pesce@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

-and-

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/seadrillpartners. The location of Debtor Seadrill Partners LLC's principal place of business and the Debtors' service address in these chapter 11 cases is Seadrill Partners LLC, 2nd Floor, Building 11, Chiswick Business Park, 566 Chiswick High Road, London W4 5YS, United Kingdom.

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Justin R. Bernbrock, Esq. (admitted *pro hac vice*)
Robert B. McLellarn, Esq. (admitted *pro hac vice*)
Three First National Plaza 70 West Madison Street, 48th Floor
Chicago, IL 60602
Telephone: (312) 499-6321
Facsimile: (312) 499-4741
Email: jbernbrock@sheppardmullin.com
rmclellarn@sheppardmullin.com

-and-

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Lawrence A. Larose, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, New York 10122
Telephone: (212) 896-0627
Facsimile: (917) 438-6197
Email: llarose@sheppardmullin.com

-and-

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Jennifer L. Nassiri, Esq. (admitted *pro hac vice*)
333 South Hope Street, 43rd Floor
Los Angeles, California 90071
Telephone: (213) 617-4106
Facsimile: (213) 443-2739
Email: jnassiri@sheppardmullin.com

*Proposed Conflicts Counsel for the Debtors
and Debtors in Possession*

ii

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **INTRODUCTION** | | **1** |
| **ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES** | | **1** |
| A. | Defined Terms | 1 |
| B. | Rules of Interpretation | 12 |
| C. | Computation of Time | 12 |
| D. | Governing Law | 12 |
| E. | Reference to Monetary Figures | 12 |
| F. | Reference to the Debtors or the Reorganized Debtors | 12 |
| G. | Controlling Document | 12 |
| H. | Plan Support Agreement | 13 |
| **ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS** | | **13** |
| A. | Administrative Claims | 13 |
| B. | Professional Fee Claims | 14 |
| C. | Priority Tax Claims | 14 |
| **ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS** | | **15** |
| A. | Classification of Claims and Interests | 15 |
| B. | Treatment of Classes of Claims and Interests | 15 |
| C. | Special Provision Governing Unimpaired Claims | 19 |
| D. | Elimination of Vacant Classes | 19 |
| E. | Voting Classes; Presumed Acceptance by Non-Voting Classes | 19 |
| F. | Subordinated Claims | 19 |
| G. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 19 |
| H. | Payments Pursuant to Cash Collateral Order | 19 |
| **ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN** | | **20** |
| A. | General Settlement of Claims and Interests | 20 |
| B. | Restructuring Transactions | 20 |
| C. | New Management Services Agreements | 21 |
| D. | Issuance and Distribution of New Common Stock | 21 |
| E. | Corporate Action | 21 |
| F. | Corporate Existence | 22 |
| G. | Vesting of Assets in the Reorganized Debtors | 22 |
| H. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 22 |
| I. | New Organizational Documents | 22 |
| J. | Effectuating Documents; Further Transactions | 23 |
| K. | Certain Securities Law Matters | 23 |
| L. | Section 1146(a) Exemption | 23 |
| M. | Employee Matters | 24 |
| N. | Preservation of Rights of Action | 24 |
| **ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | | **25** |
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 25 |
| B. | Indemnification Obligations | 25 |
| C. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 26 |
| D. | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed | 26 |
| E. | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases | 26 |
| F. | Insurance Policies | 26 |
| G. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 27 |
| H. | Reservation of Rights | 27 |

|   | I. | Nonoccurrence of Effective Date | 27 |
|---|----|--------------------------------|----|
|   | J. | Contracts and Leases Entered into after the Petition Date | 27 |
| **ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** | | | **27** |
|   | A. | Distributions on Account of Claims and Interests Allowed as of the Effective Date | 27 |
|   | B. | Rights and Powers of Distribution Agent | 28 |
|   | C. | Special Rules for Distributions to Holders of Disputed Claims and Interests | 28 |
|   | D. | Delivery of Distributions | 28 |
|   | E. | Claims Paid or Payable by Third Parties | 30 |
|   | F. | Setoffs | 30 |
|   | G. | Allocation between Principal and Accrued Interest | 31 |
|   | H. | Minimum Distributions | 31 |
| **ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS** | | | **31** |
|   | A. | Disputed Claims Process | 31 |
|   | B. | Disputed and Contingent Claims Reserve | 31 |
|   | C. | Claims Administration Responsibilities | 31 |
|   | D. | Estimation of Claims | 32 |
|   | E. | Time to File Objections to Claims | 32 |
|   | F. | Adjustment to Claims without Objection | 32 |
|   | G. | No Interest | 32 |
|   | H. | Disallowance of Claims and Interests | 32 |
|   | I. | Single Satisfaction Rule | 33 |
| **ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN** | | | **33** |
|   | A. | Discharge of Claims and Termination of Interests | 33 |
|   | B. | Releases by the Debtors | 33 |
|   | C. | Releases by Holders of Claims and Interests | 34 |
|   | D. | Exculpation | 34 |
|   | E. | Injunction | 34 |
|   | F. | Protection against Discriminatory Treatment | 35 |
|   | G. | Recoupment | 35 |
|   | H. | Document Retention | 35 |
|   | I. | Reimbursement or Contribution | 35 |
|   | J. | Release of Liens | 35 |
| **ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** | | | **36** |
|   | A. | Conditions Precedent to the Effective Date | 36 |
|   | B. | Waiver of Conditions Precedent | 37 |
|   | C. | Effect of Non-Occurrence of Conditions to Consummation | 37 |
| **ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** | | | **37** |
|   | A. | Modification of Plan | 37 |
|   | B. | Effect of Confirmation on Modifications | 37 |
|   | C. | Withdrawal of Plan | 37 |
| **ARTICLE XI RETENTION OF JURISDICTION** | | | **38** |
| **ARTICLE XII MISCELLANEOUS PROVISIONS** | | | **39** |
|   | A. | Immediate Binding Effect | 39 |
|   | B. | Additional Documents | 39 |
|   | C. | Payment of Statutory Fees | 39 |
|   | D. | Reservation of Rights | 40 |
|   | E. | Successors and Assigns | 40 |
|   | F. | Service of Documents | 40 |
|   | G. | Term of Injunctions or Stays | 41 |
|   | H. | Entire Agreement | 41 |
|   | I. | Plan Supplement | 41 |

| | | |
|---|---|---|
| J. | Non-Severability | 41 |
| K. | Votes Solicited in Good Faith | 42 |
| L. | Closing of Chapter 11 Cases | 42 |
| M. | Waiver or Estoppel | 42 |
| N. | Creditor Default | 42 |

iii

**INTRODUCTION**

Seadrill Partners LLC and its affiliated Debtors in the above-captioned chapter 11 cases (each, a "Debtor" and, collectively, the "Debtors") jointly propose this Plan. Capitalized terms used in the Plan shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions on the Effective Date of the Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, the Restructuring Transactions, and certain related matters.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

**A. Defined Terms**

As used in this Plan, the following terms shall have the meanings set forth below.

1. "*Ad Hoc Committee*" means an ad hoc committee comprised of: (a) Avenue Capital Group, (b) Canyon Capital Advisors LLC, (c) Elliott Advisors (UK) Limited, (d) GoldenTree Asset Management, (e) Invesco Senior Secured Management, and (f) Sculptor Capital Management, as Holders of TLB Claims represented by Milbank LLP and Cole Schotz P.C., each as legal counsel, Rothschild & Co. US Inc. and Intrepid Partners, LLC, each as financial advisor, and Steven Newman, as technical advisor.

2. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) Restructuring Expenses; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

3. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

4. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

5. "*Agent*" means Alter Domus (US) LLC, or any successor thereto, solely in its capacities as administrative agent, collateral agent, and security trustee under the TLB Credit Agreement.

6. "*Allowed*" means, with respect to any (a) Claim or portion thereof (i) that is (1) evidenced by a Proof of Claim or a request for payment of an Administrative Claim Filed by the Claims Bar Date or the Administrative Claims Bar Date, as applicable, in each case in accordance with the Bar Date Order or Confirmation Order, as applicable, and (2) for which no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (ii) that is listed in the Schedules as not contingent, not unliquidated, and not disputed (to the extent it has been listed), and for which no

contrary or superseding Proof of Claim, as applicable, has been timely Filed, or (iii) that is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, any Final Order, or stipulation that is approved by a Final Order, except, in each case, a Claim paid in full prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court or (b) Interest (or portion thereof) that is reflected as outstanding in the stock transfer ledger or similar register of the applicable Debtor as of the Effective Date. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed and for which no contrary or superseding Proof of Claim is or has been timely Filed or that is not or has not been Allowed by a Final Order is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, if a Proof of Claim is Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed is made after the Administrative Claims Bar Date, as applicable, the Holder of such Claims shall be barred from asserting such Claim or requesting such payment against the Debtors, as set forth in the Bar Date Order. "Allow" and "Allowing" shall have correlative meanings.

7. "*Assumed Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases that will be assumed by the Reorganized Debtors pursuant to the Plan, which list shall be included in the Plan Supplement.

8. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

9. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases.

10. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

11. "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 124] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

12. "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

13. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

14. "*Cash Cap*" means an amount to be determined consistent with the Plan Support Agreement, which such amount shall be reflected in an amended version of the Plan.

15. "*Cash Collateral Order*" means the *Interim Order (I) Authorizing Postpetition Use of Cash and Cash Collateral, (II) Granting Adequate Protection to the TLB Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 77] and, if entered, the *Final Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the TLB Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief.*

16. "*Cash Out Amount*" means an amount to be determined consistent with the Plan Support Agreement.

17. "*Causes of Action*" means any action, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-

2

contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "*Causes of Action*" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

18. "*Certificate*" means any instrument evidencing a Claim or an Interest.

19. "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court pursuant to the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 46].

20. "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code.

21. "*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by the Bar Date Order or the Confirmation Order.

22. "*Claims Register*" means the official register of Claims against the Debtors maintained by the Clerk of the Bankruptcy Court or the Notice and Claims Agent.

23. "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

24. "*Committee*" means any statutory committee appointed in the Chapter 11 Cases.

25. "*Compensation and Benefits Programs*" means those employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs and payments, life and accidental death and dismemberment insurance plans, and programs of the Debtors listed in the Plan Supplement, and all amendments and modifications thereto listed in the Plan Supplement, applicable to the Debtors' and their Affiliates' employees, former employees, retirees, and non-employee directors and the employees, former employees, and retirees of their subsidiaries.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

29. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

30. "*Consenting TLB Lenders*" means the TLB Lenders (or investment advisors or collateral managers to any TLB Lender) that are or become parties to the Plan Support Agreement.

31. "*Consummation*" means the occurrence of the Effective Date.

32. "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

33. "*Debtors*" means, collectively, Seadrill Partners LLC, Seadrill Texas LLC, Seadrill Hungary Kft., Seadrill Deepwater Drillship Ltd., Seabras Rig Holdco Kft., Seadrill Partners Operating LLC, Seadrill Ghana Operations Ltd., Seadrill Partners Malaysia Sdn Bhd., Seadrill Auriga Hungary Kft., Seadrill Polaris Ltd., Seadrill Gulf Operations Auriga LLC, Seadrill Canada Ltd., Seadrill Partners Finco LLC, Seadrill T-15 Ltd., Seadrill Gulf Operations Sirius LLC, Seadrill Partners B.V., Seadrill T-16 Ltd., Seadrill Capricorn Holdings LLC, Seadrill Gulf Operations Vela LLC, Seadrill Operating LP, Seadrill US Gulf LLC, Seadrill China Operations Ltd., Seadrill Operating GP LLC, Seadrill International Ltd., Seadrill Vela Hungary Kft., Seadrill OPCO Sub LLC, Seadrill Leo Ltd., Seadrill Vencedor Ltd., and Seadrill Mobile Units (Nigeria) Ltd.

34. "*Definitive Documentation*" means the definitive documents and agreements governing the Restructuring Transactions (including any related orders, agreements, instruments, schedules, exhibits, or documents) that are contemplated by and referenced in the Plan (as amended, modified, or supplemented from time to time), including: (a) the Plan (and all exhibits and other documents and instruments related thereto); (b) the Plan Support Agreement (including the "Definitive Documents" as defined therein); (c) the New Management Services Agreements; (d) the Plan Supplement; (e) the Disclosure Statement; (f) the Solicitation Materials; (g) the Disclosure Statement Order; and (h) the Confirmation Order.

35. "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement as determined by the Debtors and the Required Consenting Lenders.

36. "*Disclosure Statement*" means the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization*, dated as of February 12, 2021, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

37. "*Disclosure Statement Order*" means, once entered, the order (and all exhibits thereto) of the Bankruptcy Court conditionally approving the Disclosure Statement and Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

38. "*Disputed*" means a Claim or an Interest or any portion thereof: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

39. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan. For the avoidance of doubt, the Agent shall not act as the Distribution Agent with respect to the distribution of New Common Stock pursuant to the Plan.

40. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

41. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan or such other date as may be agreed between the Debtors and the Required Consenting Lenders.

4

42. "*Employee Incentive Plan*" means a post-Effective Date employee incentive plan, which may be implemented by the Reorganized Debtors and that may (a) reserve a portion of the New Common Stock, in an amount to be determined by the New HoldCo Board, on a fully diluted, fully distributed basis, for grants that may be made from time to time to directors and employees of the Reorganized Debtors, solely as determined by the New HoldCo Board; and (b) otherwise contain terms and conditions (including with respect to participants, allocation, structure, and timing of issuance) determined at the discretion of the New HoldCo Board.

43. "*Energy Drilling*" means Energy Drilling Management Pte. Ltd.

44. "*Energy Drilling MSA*" means that certain Management Agreement dated as of January 20, 2021 by and between Seadrill Partners LLC and Energy Drilling, as the manager thereunder, for the management and operation of the Debtors' tender rig vessels.

45. "*Energy Drilling Order*" means the *Order Approving Debtors' Emergency Motion for an Order (A) Authorizing the Debtors to Enter Into a New Management Agreement with Energy Drilling Management Pte Ltd for the Debtors' Tender Rigs, and (B) Granting Related Relief* [Docket No. 248].

46. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

47. "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

48. "*Exculpated Party*" means each of, and in each case, in its capacity as such: (a) the Debtors; (b) the Agent; (c) Deutsche Bank AG New York Branch, as the prior administrative and collateral agent under the TLB Credit Agreement; (d) the Consenting TLB Lenders; (e) the Ad Hoc Committee and each member thereof; and (f) with respect to each of the foregoing Entities in clause (a) through (e), such Entity's Related Parties. For the avoidance of doubt, no Seadrill Party and no current or former director, officer, designee, shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party (each, solely in their capacity as such) shall be an Exculpated Party.

49. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

50. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent or the Bankruptcy Court.

51. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

52. "*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified or amended, that is not stayed, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

53. "*General Unsecured Claim*" means any Claim that is not a Secured Claim and is not: (a) an Administrative Claim; (b) an Intercompany Claim; (c) a Section 510(b) Claim; (d) an Other Priority Claim; or (e) a Priority Tax Claim. For the avoidance of doubt, any TLB Deficiency Claim, Rejection Damages Claim, and, solely with respect to voting to accept or reject the Plan, Specified SDLP Claim, is a General Unsecured Claim.

54. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

55. "*Holder*" means any Entity that is the legal and/or beneficial owner of a Claim or Interest as of the applicable date of determination. For the avoidance of doubt, if a Claim is subject to an unsettled trade as of the Voting Deadline, the Holder shall be deemed to be the Entity that will be the legal and/or beneficial owner of such claim after such trade has settled, consistent with the Disclosure Statement Order.

5

56. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

57. "*Indemnification Provisions*" means each of the Debtors' indemnification provisions listed in the Plan Supplement in place as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current directors and officers and current and former [employees, professionals, and agents] of the Debtors, and their respective Affiliates.

58. "*Intercompany Claim*" means any Claim against a Debtor held by a Debtor or by the SDLP Non-Debtors; *provided* that, solely for purposes of voting to accept or reject the Plan, the Specified SDLP Claims shall be classified in Class 5; *provided, further,* that, for the avoidance of doubt, Intercompany Claims shall not include any Claims against a Debtor held by any Seadrill Parties or their non-Debtor Affiliates.

59. "*Intercompany Interest*" means an Interest held by another Debtor.

60. "*Interest*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, including, without limitation, options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

61. "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 125] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

62. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

63. "*MSA Stipulation*" means the *Stipulation and Order Authorizing the Debtors to Provide Adequate Assurance of Payment* [Docket No. 106] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

64. "*New Common Stock*" means the equity securities of New HoldCo to be issued on the Effective Date.

65. "*New HoldCo*" the Entity that will be the ultimate parent of the Reorganized Debtors and the issuer of the New Common Stock, which Entity shall be (a) (i) Seadrill Partners LLC or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise or (ii) a newly-formed corporation, limited liability company, partnership, or other entity that may be formed to, among other things, directly or indirectly acquire all of the assets and/or stock of the Debtors, in each case, in accordance with the Description of Transaction Steps and (b) selected by the Required Consenting Lenders in consultation with the Debtors.

66. "*New HoldCo Board*" means the Board of Directors of New HoldCo established in accordance with the New Organizational Documents. The New HoldCo Board will consist of (i) the Reorganized Debtors' chief executive officer and (ii) the other directors selected by the Required Consenting Lenders. To the extent known with respect to such directors, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code shall be disclosed in the Plan Supplement.

67. "*New Management Services Agreements*" means, together, the Energy Drilling MSA and the Vantage Drilling MSA.

68. "*New MSA Providers*" means Energy Drilling, Vantage Drilling, and any other non-Debtor counterparties to the New Management Services Agreements.

6

69. "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, consistent with the Plan Support Agreement and section 1123(a)(6) of the Bankruptcy Code (as applicable).

70. "*Notice and Claims Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases.

71. "*Ordinary Course Professional*" means an Entity (other than a Professional) retained and compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

72. "*Ordinary Course Professionals Order*" means the *Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 163] (as amended, modified or supplemented from time to time in accordance with the terms thereof).

73. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

74. "*Other Secured Claim*" means any Secured Claim, other than a Super Senior Term Loan Claim and TLB Secured Claim, including any Secured Tax Claim.

75. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

76. "*Petition Date*" means December 1, 2020, the date on which the Chapter 11 Cases were commenced.

77. "*Plan*" means this Chapter 11 plan, as altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Plan Support Agreement, including the Plan Supplement and all exhibits, supplements, appendices, and schedules thereto.

78. "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, each of which shall be in form and substance reasonably acceptable to the Agent with respect to any provisions relating to the Agent, which shall be Filed by the Debtors, to the extent reasonably practicable, on or before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Confirmation Order, and the Plan Support Agreement, and, with respect to any provisions relating to the Agent, shall be otherwise in form and substance reasonably acceptable to the Agent.

79. "*Plan Support Agreement*" means that certain Plan Support Agreement, dated as of February 12, 2021, by and among the Debtors and the Plan Support Parties, including all exhibits and attachments thereto, as such agreement may be amended from time to time in accordance with its terms, a copy of which is attached to the Disclosure Statement as Exhibit B.

80. "*Plan Support Parties*" means, collectively, the signatories to the Plan Support Agreement and the other parties who executed and delivered signature pages thereto.

81. "*Plan Value*" has the meaning set forth in the Plan Supplement.

82. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

83. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

84. "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code.

85. "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

86. "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount.

87. "*Professional Fee Escrow Amount*" means the aggregate amount of unpaid fees and expenses the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and including the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in as set forth in Article II.B of the Plan.

88. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

89. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

90. "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, which list shall be included in the Plan Supplement.

91. "*Rejection Damages Claim*" mean any Claim arising from the rejection of an Executory Contract and Unexpired Lease pursuant to (a) the Plan or (b) any Bankruptcy Court order.

92. "*Related Party*" means each of, solely in their capacity as such, current directors and officers and current and former [affiliated investment funds or investment vehicles, investment advisors, collateral managers, predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals]; *provided, however*, that notwithstanding anything herein to the contrary, no current or former shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party shall be a Related Party.

93. "*Released Party*" means each of, and in each case, in its capacity as such: (a) the Agent; (b) the Consenting TLB Lenders; (c) the Ad Hoc Committee and each of its members; (d) all Releasing Parties; (e) each Related Party of each Entity in clauses (a) through (c); and (f) each Related Party of each Debtor; *provided, however*, that notwithstanding anything herein to the contrary, no current or former director, officer, designee, shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party (each, solely in their capacity as such) shall be a Released Party.

94. "*Releasing Party*" means each of, and in each case, in its capacity as such: (a) the Agent; (b) each Consenting TLB Lender; (c) all Holders of Claims or Interests, solely in their capacities as such, that (i) are presumed to accept the Plan *and* who do not opt out of the releases in the Plan, (ii) vote to accept the Plan *and* who do not opt out of the releases in the Plan, (iii) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (iv) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (v) are deemed to reject the Plan *and* who do not opt out of the releases in the Plan; and (d) each Related Party of each Entity in clause (a) through (c); *provided, however,* that no Seadrill Party shall be a Releasing Party.

8

95. "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, amalgamation, consolidation, or otherwise, on and after the Effective Date, including New HoldCo.

96. "*Required Consenting Lenders*" means: (i) for so long as the Ad Hoc Committee holds at least 66.67% of the aggregate outstanding principal amount of TLB Claims as of the relevant date, Consenting TLB Lenders that are members of the Ad Hoc Committee that hold at least 50.01% of the aggregate outstanding principal amount of TLB Claims that are held by the Ad Hoc Committee as of the relevant date; or (ii) to the extent that the Ad Hoc Committee does not hold at least 66.67% of the aggregate outstanding principal amount of TLB Claims as of the relevant date, Consenting TLB Lenders holding at least 50.01% of the aggregate outstanding principal amount of TLB Claims that are held by Consenting TLB Lenders as of the relevant date.

97. "*Restructuring Expenses*" means the reasonable and documented fees and expenses incurred by each of the Agent, Deutsche Bank AG New York Branch, as the prior administrative and collateral agent under the TLB Credit Agreement, and the Ad Hoc Committee in connection with the restructuring, including, but not limited to, the fees and expenses of their respective legal and financial advisors) and any indemnity claims whether incurred prior to or after the Petition Date, without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Cases, which in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction, or credit of any kind whatsoever.

98. "*Restructuring Transactions*" means the transactions described in Article IV.B.

99. "*SDLP*" means Seadrill Partners LLC, a company incorporated under the Laws of the Republic of the Marshall Islands.

100. "*SDLP Non-Debtors*" means, collectively, (a) Seadrill Auriga UK Ltd., (b) Seadrill Capricorn Ltd., (c) Seadrill Ireland Ltd., (d) Seadrill Partners Contracting Ltd., (e) Seadrill Partners Deepwater Services Ltd., (f) Seadrill Partners Labuan Ltd., (g) Seadrill Sirius UK Ltd., (h) Seadrill Vela UK Ltd., and (i) Seadrill Partners Servicos de Perfuracao Ltda.

101. "*SDLP OpCo Parties*" means, collectively, Seadrill Capricorn Holdings LLC, Seadrill Deepwater Drillship Ltd., Seadrill Mobile Units (Nigeria) Ltd., and Seadrill Operating LP.

102. "*Seadrill MSAs*" means, collectively, the Amended and Restated Management and Administrative Services Agreement, dated as of September 11, 2017, and any related agreements between any of the Debtors and Seadrill Management Ltd., a company organized under the Laws of England and Wales, or such other entity that may be designated as manager from time to time, including but not limited to all Subsidiary MSAs.

103. "*Seadrill Parties*" means (a) Seadrill Limited, a company incorporated under the Laws of Bermuda, (b) Seadrill Member LLC, a limited liability company organized under the Laws of the Republic of the Marshall Islands, (c) Seadrill Partners LLC Holdco Limited, a company incorporated under the Laws of Bermuda, (d) Seadrill New Finance Limited, a company incorporated under the Laws of Bermuda, (e) Seadrill Capricorn HoldCo Limited, a company incorporated under the Laws of Bermuda, (f) Seadrill Management Ltd., a company incorporated under the Laws of England and Wales, and (g) each of the other Entities listed on Schedule 1 hereto.

104. "*Section 510(b) Claim*" means any Claim arising from rescission of a purchase or sale of an equity security of the Debtors or an Affiliate of the Debtors for damages arising from the purchase or sale of such an equity security or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

105. "*Secured Claim*" means any Claim that is: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

106. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

107. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time, or any similar federal, state, or local law.

108. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

109. "*Solicitation Materials*" means the solicitation materials with respect to the Plan.

110. "*Specified SDLP Claims*" means the Claims of certain Debtors other than SDLP, each as lender, against SDLP, as borrower. For purposes of Plan voting, the amount of the Specified SDLP Claims, in the aggregate, shall be not less than $[209,762,245].

111. "*Subsidiary MSAs*" means, collectively, (a) the Amended and Restated Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Partners LLC, (b) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Vencedor Ltd., (c) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill US Gulf LLC., (d) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill T-16 Ltd., (e) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill T-15 Ltd., (f) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Polaris Ltd., (g) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Leo Ltd., (h) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill International Limited, (i) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Hungary Kft., (j) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Gulf Operations Vela LLC., (k) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Gulf Operations Auriga LLC., (l) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Ghana Operations Ltd., (m) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Far East Ltd., (n) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Deepwater Drillship Ltd., (o) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill China Operations Ltd S.a.r.l., (p) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Canada Ltd., (q) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seadrill Auriga Hungary Kft., and (r) the Management and Administrative Services Agreement, dated as of September 11, 2017, by and between Seadrill Management Ltd. and Seabras Rig Holdco Kft.

112. "*Super Senior Term Loan Claims*" means any Claim constituting "Revolving Loans" as defined in the TLB Credit Agreement and arising under or in connection with the making of such Revolving Loans by the holder of such Claim pursuant to (a) the Consent and Amendment No. 3, dated as of July 30, 2020, to the TLB Credit Agreement or (b) the Consent and Amendment No. 4, dated as of October 30, 2020, to the TLB Credit Agreement.

113. "*TLB Claim*" means any Claim arising under or in connection with the TLB Credit Agreement or the TLB Finance Documents, including Claims based on a Debtor's guarantee of obligations thereunder and Claims arising under any hedging agreement.

114. "*TLB Credit Agreement*" means that certain Credit Agreement, dated as of February 21, 2014, as amended by (a) the Amendment and Restatement Agreement, dated as of June 26, 2014, (b) the Amendment No. 1, dated as of February 12, 2018, (c) the Amendment No. 2, dated as of March 12, 2018, (d) the Consent and Amendment No. 3, dated as of July 30, 2020, and (e) the Consent and Amendment No. 4, dated as of October 30, 2020 (as further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), among Seadrill Operating LP, SDLP, Finco LLC, and Seadrill Capricorn Holdings LLC as borrowers, the guarantors party thereto, the Agent, and the TLB Lenders.

115. "*TLB Deficiency Claim*" means any TLB Claim that is not a Secured Claim.

116. "*TLB Finance Documents*" means, collectively, all related agreements, indentures, documents (including security, collateral or pledge agreements, or documents), mortgages, or instruments executed or delivered in connection with the TLB Credit Agreement.

117. "*TLB Lenders*" means the lenders under the TLB Credit Agreement from time to time.

118. "*TLB Secured Claim*" means any TLB Claim that is a Secured Claim, excluding the Super Senior Term Loan Claims.

119. "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions); *provided, however*, that holding Certificates in an account with a broker-dealer where the broker-dealer holds a security interest or other encumbrance over property in the account generally, which security interest or other encumbrance is released upon transfer of such securities, shall not constitute a "*Transfer*" under the Plan.

120. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

121. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

122. "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

123. "*Vantage Drilling*" means Vantage Drilling International.

124. "*Vantage Drilling MSA*" means, collectively, that certain Framework Agreement dated as of February 9, 2021 by and among the Debtors and Vantage Drilling, as the manager thereunder, and the contemplated form marketing agreements and form management agreements under the Framework Agreement between the applicable Debtors or their affiliates and Vantage Drilling or the applicable Vantage Drilling affiliated entity.

125. "*Vantage Drilling MSA Motion*" means the *Debtors' Emergency Motion for an Order (A) Authorizing the Debtors to Enter Into a New Framework Agreement with Vantage Drilling International for the Debtors' Fleet Vessels, and (B) Granting Related Relief* [Docket No. 266].

126. "*Vantage Drilling Order*" means a final, non-appealable order entered by the Bankruptcy Court approving the Debtors entry into the Vantage Drilling MSA pursuant to the Vantage Drilling MSA Motion.

127. "*Voting Deadline*" means April 1, 2021 at 11:59 p.m. prevailing Central Time.

## B. Rules of Interpretation

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (k) any immaterial effectuating provisions may be interpreted by the Debtors, with the consent of the Required Consenting Lenders, or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## C. Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

## E. Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## F. Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors to the extent the context requires.

## G. Controlling Document

In the event of an inconsistency between the Plan and the Plan Support Agreement, the terms of the Plan shall control in all respects, except as set forth in Article I.H below. In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the applicable Plan Supplement document shall control. In the event of any inconsistency between the Confirmation Order and of the Plan, the Disclosure Statement, the Plan Support Agreement, and the Plan Supplement, the Confirmation Order shall control.

### H. Plan Support Agreement

Notwithstanding anything to the contrary in this Plan, the Plan Supplement, or the Disclosure Statement, the Plan Support Agreement, including all consent rights therein, with respect to the form and substance of the Plan, the Plan Supplement, and any other documents relating to the Restructuring Transactions, including any amendments, restatements, supplements, or other modifications to such documents and any consents, waivers, or other deviations under or from any such documents, shall be incorporated by reference herein and fully enforceable as if stated in full herein. Solely with respect to any consent or consultation rights in this Plan, in the event of an inconsistency between the Plan, the Plan Supplement, the Disclosure Statement, and the Plan Support Agreement, the terms of the Plan Support Agreement shall control.

**ARTICLE II**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

### A. Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code), and Restructuring Expenses will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court. For the avoidance of doubt, the amount and validity of any Administrative Claim arising under or in connection with the Seadrill MSAs or any transition services arrangement shall be determined in the manner set forth in the MSA Stipulation, and the amount of any Administrative Claim asserted by any Seadrill Party shall be determined in a manner consistent with Section 503(b)(1) of the Bankruptcy Code.

Except as otherwise provided in this Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than 60 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

Notwithstanding anything to the contrary contained herein, any unpaid Restructuring Expenses shall constitute an Allowed Administrative Claim and shall be paid in accordance with the Plan Support Agreement in full in Cash on the Effective Date or as soon as practicable thereafter. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be

13

considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Reorganized Debtors; *provided* that, to the extent any invoices for any unpaid Restructuring Expenses are delivered to the Reorganized Debtors after the Effective Date, such invoices shall be paid in full in Cash as soon as reasonably practicable after the Effective Date.

## B. Professional Fee Claims

### 1. Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 45 days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

### 2. Professional Fee Escrow Amount

As soon as possible after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors.

### 3. Allocation and Estimation of Professional Fees and Expenses

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Confirmation Date, and shall deliver such estimate to the Debtors by the earlier of (a) five Business Days after the Confirmation Date and (b) two Business Days prior to the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.

### 4. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Reorganized Debtors. Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## C. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

14

**ARTICLE III**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

**A. Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Super Senior Term Loan Claims | Impaired | Entitled to Vote |
| 4 | TLB Secured Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 8 | Interests in SDLP | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Interests in SDLP OpCo Parties | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B. Treatment of Classes of Claims and Interests**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

15

**1. Class 1 — Other Secured Claims**

    (a)   *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

    (b)   *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, as determined by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld):

        (i)   payment in full in Cash of its Allowed Other Secured Claim;

        (ii)   the collateral securing its Allowed Other Secured Claim;

        (iii)   Reinstatement of its Allowed Other Secured Claim; or

        (iv)   such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)   *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**2. Class 2 — Other Priority Claims**

    (a)   *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

    (b)   *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim, or such other treatment as may be agreed among the Holder of such Other Priority Claim, the Debtors, and the Required Consenting Lenders.

    (c)   *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**3. Class 3 — Super Senior Term Loan Claims**

    (a)   *Classification*: Class 3 consists of all Super Senior Term Loan Claims.

    (b)   *Treatment*: On the Effective Date, each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the New Common Stock (subject to dilution by any future issuances of New Common Stock or any New Common Stock that may be issued pursuant to the Employee Incentive Plan, if any) in an amount to be determined consistent with the Plan Support Agreement.

    (c)   *Voting*: Class 3 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

**4. Class 4 — TLB Secured Claims**

    (a)    *Classification*: Class 4 consists of all TLB Secured Claims.

    (b)    *Treatment*: On the Effective Date, each Holder of an Allowed Class 4 Claim shall receive its Pro Rata share of the New Common Stock (subject to dilution by any future issuances of New Common Stock or any New Common Stock that may be issued pursuant to the Employee Incentive Plan, if any) in an amount to be determined consistent with the Plan Support Agreement, unless such Holder elects to receive the Cash Out Amount per $1,000 of Allowed Class 4 Claims in Cash, subject to the Cash Cap (the "<u>Class 4 Cash Election</u>"). If the total Class 4 Cash Elections would result in distributions of Cash to Holders of Allowed Class 4 Claims in excess of the Cash Cap, then each Holder of an Allowed Class 4 Claim that elected to receive Cash shall receive its Pro Rata share of: (i) the Cash Cap amount in Cash and (ii) New Common Stock of the value equal to the balance of the recovery such Holder would have received in the absence of the Cash Cap.

        For the avoidance of doubt, any TLB Deficiency Claim shall be classified as a Class 5 General Unsecured Claim; *provided, however*, that if (i) Class 4 votes to accept the Plan and (ii) Holders of Class 5 Claims vote to accept the Plan, the TLB Deficiency Claims shall not be entitled to any distribution under the Plan and shall be deemed canceled, released, and extinguished.

    (c)    *Voting*: Class 4 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

**5. Class 5 — General Unsecured Claims**

    (a)    *Classification*: Class 5 consists of all General Unsecured Claims.

    (b)    *Treatment*: As of the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of an amount of Cash to be determined consistent with the Plan Support Agreement.[2]

    (c)    *Voting*: Class 5 is Impaired under the Plan. Therefore, Holders of Allowed Claims in Class 5 are entitled to vote to accept or reject the Plan.

**6. Class 6 — Intercompany Claims**

    (a)    *Classification*: Class 6 consists of all Intercompany Claims against the Debtors.

    (b)    *Treatment*: On the Effective Date, Intercompany Claims shall, at the election of the applicable Debtor with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld), be (i) Reinstated, (ii) converted to equity, or (iii) otherwise extinguished, compromised, addressed, canceled and released, or settled, in each case, in accordance with the Description of Transaction Steps.

    (c)    *Voting*: Class 6 is either Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and not receiving any distribution under the Plan, in which case the Holders of such Allowed Intercompany Claims in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Allowed Intercompany Claim in Class 6 will not be entitled to vote to accept or reject the Plan.

---

2    For the avoidance of any doubt, this treatment is without prejudice to the Debtors' right to pay any ordinary course prepetition trade vendor claims pursuant to any first day orders, subject to the terms thereof.

**7. Class 7 — Intercompany Interests**

    (a)   *Classification*: Class 7 consists of Intercompany Interests.

    (b)   *Treatment*: As of the Effective Date, each Intercompany Interest shall either be (i) Reinstated or (ii) merged, contributed, addressed, or canceled and released, at the option of the Debtors with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld), in each case, in accordance with the Description of Transaction Steps.

    (c)   *Voting*: Holders of Allowed Intercompany Interests are either (i) Unimpaired and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or (ii) Impaired and such Holders of Allowed Class 7 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

**8. Class 8 — Interests in SDLP**

    (a)   *Classification*: Class 8 consists of Interests in SDLP.

    (b)   *Treatment*: On the Effective Date, Holders of Interests in SDLP will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished and will be of no further force or effect.

    (c)   *Voting*: Class 8 is Impaired and not receiving any distribution under the Plan. Therefore, Holders of Allowed Interests in SDLP in Class 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**9. Class 9 — Interests in SDLP OpCo Parties Other than Intercompany Interests3**

    (a)   *Classification*: Class 9 consists of all Interests (excluding, for the avoidance of doubt, Intercompany Interests) in SDLP OpCo Parties.

    (b)   *Treatment*: As of the Effective Date, Interests in SDLP OpCo Parties will be canceled, released, and extinguished and will be of no further force and effect, and Holders of Interests in SDLP OpCo Parties shall not receive any distribution on account of such Interests.

    (c)   *Voting*: Class 9 is Impaired and not receiving any distribution under the Plan. Therefore, Holders of Allowed Interests in Class 9 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

---

3    For the avoidance of doubt, Intercompany Interests and the treatment thereof are not affected in any manner by the treatment of Interests in SDLP OpCo Parties. Interests in SDLP OpCo Parties held by the Debtors are included in Intercompany Interests and, therefore, not affected by the treatment of Class 9.

18

10. **Class 10 — Section 510(b) Claims**

    (a)   *Classification*: Class 10 consists of all Section 510(b) Claims.

    (b)   *Treatment*: As of the Effective Date, Section 510(b) Claims will be canceled, released, and extinguished and will be of no further force and effect, and Holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims.

    (c)   *Voting*: Class 10 is Impaired and not receiving any distribution under the Plan. Therefore, Holders of Allowed Claims in Class 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

### C. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### D. Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### E. Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

### F. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### G. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### H. Payments Pursuant to Cash Collateral Order

Pursuant to the critical and integrated global compromise on the Debtors' consensual use of cash collateral, a result of good-faith, arm's-length negotiations, nothing in this Plan shall affect the payment of postpetition interest or adequate protection payments made pursuant to the Cash Collateral Order and any outstanding interest or other payments owed under the Cash Collateral Order, including any outstanding professional fees payable thereunder, as of the Effective Date shall be paid on the Effective Date.

**ARTICLE IV**
**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

**A. General Settlement of Claims and Interests**

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including resolution of intercompany liabilities, allocation of value among the Debtors, and treatment of Holders of General Unsecured Claims against each of the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**B. Restructuring Transactions**

On or before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall take all actions set forth in the Description of Transaction Steps and shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, as applicable, establishing New HoldCo, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided herein, the Description of Transaction Steps, or in the Definitive Documentation. The actions to implement the Restructuring Transactions may include, as applicable: (a) the execution and delivery of appropriate agreements, including any Definitive Documentation, or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities, including the Debtors and the Consenting TLB Lenders, may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable law; (d) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by New HoldCo, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (e) the filing of a Form 15 with the Securities and Exchange Commission to deregister the Interests in SDLP under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder; and (f) all other actions that the applicable Reorganized Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors, with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld) and otherwise consistent with the Description of Transaction Steps, may (1) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved, or otherwise consolidated, (2) cause the transfer of assets between or among the Reorganized Debtors, (3) use Cash on hand to pay all Restructuring Expenses, (4) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (5) engage in any other transaction in furtherance of the Plan, including for tax efficiency reasons; *provided* that such transactions are not inconsistent with the Restructuring Transactions or the other terms of the Plan. Subject to the prior written consent of the Required Consenting Lenders, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors.

The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

20

## C. New Management Services Agreements

On January 20, 2021, the Debtors entered into the Energy Drilling MSA with Energy Drilling for the management and operation of the Debtors' tender rig vessels. The Energy Drilling MSA was the result of an extensive marketing process conducted by the Debtors, Evercore Group L.L.C. ("Evercore"), and Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin"), as conflicts counsel. The Debtors, through Evercore, reached out to numerous potential counterparties, received and evaluated several bids in consultation with Sheppard Mullin, and in the Debtors' business judgment, decided to enter into the Energy Drilling MSA. On February 2, 2021, the Bankruptcy Court entered the Energy Drilling Order, approving the Debtors' entry into the Energy Drilling MSA.

On February 9, 2021, the Debtors entered into the Vantage Drilling MSA with Vantage Drilling for the management and operation of the Debtors' fleet vessels. The Vantage Drilling MSA was the result of an extensive marketing process conducted by the Debtors, Evercore, and Sheppard Mullin, as conflicts counsel. The Debtors, through Evercore, reached out to numerous potential counterparties, received and evaluated several bids in consultation with Sheppard Mullin, and in the Debtors' business judgment, decided to enter into the Vantage Drilling MSA. On February 9, 2021, the Debtors filed the Vantage Drilling MSA Motion seeking Bankruptcy Court approval of their entry into the Vantage Drilling MSA.

## D. Issuance and Distribution of New Common Stock

On the Effective Date, pursuant to the Description of Transaction Steps, applicable Holders of Claims shall receive the New Common Stock issued by New HoldCo in exchange for their respective Claims as set forth in Article III.B hereof. The issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by the Holders of any Claims or Interests. All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, each Entity's acceptance of New Common Stock shall be deemed as its agreement to the terms of the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

## E. Corporate Action

On or before the Effective Date, as applicable, all actions contemplated under the Plan and consistent with the Plan Support Agreement and the Description of Transaction Steps shall be deemed authorized and approved in all respects, including, without limitation: (1) selection of the directors and officers by the Required Consenting Lenders for the Reorganized Debtors; (2) the distribution of the New Common Stock; (3) implementation of the Restructuring Transactions; (4) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (5) adoption of the New Organizational Documents; (6) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (7) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.E shall be effective notwithstanding any requirements under non-bankruptcy law.

**F. Corporate Existence**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law). For the avoidance of doubt, after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

New HoldCo will be the issuer of the New Common Stock.

**G. Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action of the Debtors, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**H. Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, as applicable, shall be cancelled and all obligations related to or arising out of the same of the Debtors or the Reorganized Debtors, as applicable, thereunder, or in any way related thereto shall be discharged; *provided, however*, that, notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, any credit document or agreement and any other instrument, Certificate, agreement, or other document that governs the rights, claims, or remedies of the Holder of a Claim shall continue in full force and effect solely for purposes of (a) allowing Holders of Allowed Claims to receive distributions under the Plan and/or allowing and preserving the rights of the Agent to make distributions to the TLB Lenders as provided herein and to take any actions to perform its obligations (if any) under the Plan and Confirmation Order and to enforce their rights and the rights of the holders of Claims or beneficial Holders under the applicable instruments, documents and agreements; (b) preserving all rights, remedies, indemnities, powers, and protections of the Agent as against any Person or Entity other that the Debtors, and any money or property distributable to the Holder of Claims or beneficial Holders under the relevant instrument (including any rights to priority of payment) and any exculpation of the Agent (which rights, remedies, indemnities, powers, and protections against all persons and entities other than the Debtors and against such distributable money or property and which exculpations shall survive and remain in full force and effect, and not be released, discharged or affected in any way by the terms of the Plan or the Confirmation Order); (c) allowing the Agent (including its advisors and agents) to appear and be heard in the Chapter 11 Cases, or in any proceeding in the Bankruptcy Court or any other court; and (d) permitting the Agent to enforce any obligation owed to it under the Plan.

**I. New Organizational Documents**

To the extent required under the Plan or applicable non-bankruptcy law, on or as soon as reasonably practicable after the Effective Date, except as otherwise provided in the Plan or the Description of the Transaction Steps, the Reorganized Debtors may file the New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the applicable corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the

Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

### J. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Support Agreement, the Description of Transaction Steps, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### K. Certain Securities Law Matters

The offering, issuance, and distribution of the New Common Stock, as contemplated by Article III.B hereof, shall be exempt, without further act or actions by any Entity, from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable securities laws requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Any such New Common Stock issued in reliance on section 1145 of the Bankruptcy Code will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

To the extent that section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, exchange, or distribution of any Securities pursuant to the Plan is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act, pursuant to section 4(a)(2) of the Securities Act and/or the regulations (including Regulation D) promulgated thereunder or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, any other available exemption from registration under the Securities Act. Any such Securities issued in reliance on section 4(a)(2) of the Securities Act, including in compliance with Rule 506 of Regulation D, and/or Regulation S will be considered "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to an effective registration statement, or an applicable exemption from the registration requirements under the Securities Act and other applicable law, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

Any equity and equity-linked interests associated with the Employee Incentive Plan, if any, will be issued pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 4(a)(2) of the Securities Act and, accordingly, such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

### L. Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any

transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### M. Employee Matters

All Compensation and Benefits Programs listed in the Plan Supplement in place as of the Effective Date, if any, will be included in the Assumed Executory Contract and Unexpired Lease List and shall be assumed by the Reorganized Debtors and remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. [Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.]

### N. Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action of the Debtors against it. Except as specifically released under the Plan or pursuant to a Final Order, the Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Reorganized Debtors expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action of the Debtors notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

24

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed rejected as of the Effective Date, except for any Executory Contract and Unexpired Lease that (1) is listed on the Assumed Executory Contract and Unexpired Lease List, (2) is the subject of a separate motion to assume or assume and assign pending as of the Effective Date, or (3) previously expired or terminated pursuant to its terms. In addition, pursuant to the Confirmation Order, the Debtors shall be authorized to enter into and perform their obligations under the Plan Support Agreement, the provisions of which are incorporated herein. The Executory Contracts and Unexpired Leases listed on the Assumed Executory Contract and Unexpired Lease List shall be assumed by the applicable Reorganized Debtor and/or assumed and assigned to a third party; *provided* that, pending such action, such Executory Contracts and Unexpired Leases shall be fully enforceable by the applicable Reorganized Debtor. To the extent that each of the Seadrill MSAs is not rejected prior to the date the Confirmation Order is entered, the Confirmation Order shall provide for the rejection of any Seadrill MSA not previously rejected and/or terminated as of the Effective Date. Entry of the Confirmation Order shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the rejection of the Executory Contracts and Unexpired Leases as set forth in this paragraph.

Entry of the Confirmation Order shall also constitute approval of the Bankruptcy Court of the assumption and assumption and assignment of the Executory Contracts and Unexpired Leases as set forth in the Plan and the Assumed Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the prior written consent of the Required Consenting Lenders (which consent shall not be unreasonably withheld), reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List or Assumed Executory Contract and Unexpired Lease List identified in this Article V.A and in the Plan Supplement at any time through and including 45 days after the Effective Date.

To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan and in the Description of Transaction Steps shall not entitle the Executory Contract or Unexpired Lease counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### B. Indemnification Obligations

All Indemnification Provisions listed in the Plan Supplement, if any, for the current directors and officers and current and former [employees and agents] of the Debtors, as applicable, shall, to the greatest extent permitted by applicable law, be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current directors and officers and current and former [employees and agents] of the Debtors than the Indemnification Provisions in place prior to the Effective Date; *provided* that the Reorganized Debtors shall not indemnify the Debtors' directors for any claims or causes of action for which indemnification is barred under applicable law, the Debtors' organizational documents, or applicable agreements governing the Debtors' indemnification obligations, or for any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence; *provided, further*, that the Reorganized Debtors shall not indemnify any directors, officers, managers, employees, agents of the Debtors for any Causes of Action that are not indemnified by such Indemnification Provisions.

### C. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Rejection Damages Claims, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Rejection Damages Claims not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their respective properties without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any such Rejection Damages Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Rejection Damages Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III hereof.

### D. Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree (subject to the consent of the Required Consenting Lenders, not to be unreasonably withheld). Any dispute regarding (1) the amount of any payments to Cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be resolved by entry of a Final Order. At least twenty-one days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption, proposed Cure amounts, and of the procedures for objecting thereto and resolution of disputes by the Bankruptcy Court to be sent to the applicable counterparties. Any objection by a counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or related Cure amount must be Filed, served, and actually received by the Debtors at least seven days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed automatically disallowed and expunged upon assumption, without further notice to or action, order, or approval of the Bankruptcy Court.**

### E. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

### F. Insurance Policies

Each of the Debtors' insurance policies listed in the Plan Supplement, if any, and any agreements, documents, or instruments relating thereto listed in the Plan Supplement, if any, shall be assumed by the Debtors pursuant to the Plan as of the Effective Date. All other insurance policies and any agreements, documents, or instruments relating thereto are treated as Executory Contracts under the Plan and shall be treated in a manner consistent with Article V.A hereof.

26

**G. Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**H. Reservation of Rights**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contract and Unexpired Leases nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, subject to any consent rights of the Required Consenting Lenders (which consent shall not be unreasonably withheld) or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

**I. Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**J. Contracts and Leases Entered into after the Petition Date**

Notwithstanding anything contained herein (including any release, discharge, exculpation or injunction provisions) or the Confirmation Order, contracts, agreements, instruments, Certificates, leases and other documents entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts, agreements, instruments, Certificates, leases and other documents (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by the Plan (including the release, discharge, exculpation and injunction provisions), the entry of the Confirmation Order and any other Definitive Documentation.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A. Distributions on Account of Claims and Interests Allowed as of the Effective Date**

Except as (i) otherwise provided herein, (ii) upon a Final Order, or (iii) as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the Effective Date or as reasonably practicable thereafter, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims and Interests; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C of the Plan.

## B. Rights and Powers of Distribution Agent

### 1. Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

### 2. Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

## C. Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, unless as otherwise agreed to by the Debtors or set forth in an order of the Bankruptcy Court: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; *provided, however,* that if a portion of a Claim is not Disputed, the Distribution Agent may make a partial distribution based on such portion of such Claim that is not Disputed; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

## D. Delivery of Distributions

The Distribution Agent shall make all distributions required under the Plan. Except as otherwise provided herein (including, for the avoidance of doubt, as set forth in the foregoing paragraph with respect to distributions to Holders of Super Senior Term Loan Claims, and TLB Secured Claims), and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record as of the Effective Date by the Distribution Agent: (1) to the address of such Holder as set forth in the books and records of the applicable Debtor (or if the Debtors have been notified in writing, on or before the date that is 10 days before the Effective Date, of a change of address, to the changed address) or, with respect to distributions on account of TLB Claims, to the addresses reflected on the books and records of the Agent; (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtors books and records, no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of address or change of address on or before the date that is 10 days before the Effective Date; or (3) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Notwithstanding anything to the contrary in the Plan, including this Article VI.D of the Plan, the Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

28

1. **Accrual of Dividends and Other Rights**

For purposes of determining the accrual of distributions or other rights after the Effective Date, the New Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed; *provided, however*, the Reorganized Debtors shall not pay any such distributions or distribute such other rights, if any, until after distributions of the New Common Stock actually take place.

2. **Compliance Matters**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

3. **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

4. **Fractional, Undeliverable, and Unclaimed Distributions**

    (a)  *Fractional Distributions*. Whenever any distribution of fractional shares of the New Common Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest share (up or down), with half shares or less being rounded down.

    (b)  *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim or Interest is returned to the Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Article VI.D.(c) of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

    (c)  *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor and, to the extent such Unclaimed Distribution is New Common Stock, shall be deemed cancelled. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

**5. Surrender of Cancelled Instruments or Securities**

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent. Such Certificate shall be cancelled solely with respect to the Debtors (other than any Certificate that survives and is not cancelled pursuant to the Plan, including Article IV.H), and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing paragraph, this Article VI shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

**E. Claims Paid or Payable by Third Parties**

**1. Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim from the Debtors and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan; *provided* that the foregoing shall not prejudice such third party's rights (including, for the avoidance of doubt, subrogation rights) with respect to the Debtors and the Reorganized Debtors.

**2. Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Notice and Claims Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**3. Applicability of Insurance Policies**

Except as otherwise provided herein, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**F. Setoffs**

Except as otherwise expressly provided for herein, each Reorganized Debtor with the consent of Required Consenting Lenders (such consent not to be unreasonably withheld), pursuant to the Bankruptcy Code (including sections 553 and 558 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Claim and/or the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim (other than any Professional Fee Claims), to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder; *provided, further,* that such Holder may contest any such set off by a Reorganized Debtor in the Bankruptcy Court. For the avoidance of doubt, any such right of set off may be preserved by Filing a Proof of Claim related to such right of set off prior to the Claims Bar Date.

30

#### G. Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Effective Date.

#### H. Minimum Distributions

Holders of Allowed Claims entitled to distributions of $50 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of the Plan and its Holder shall be forever barred pursuant to Article VIII of the Plan from asserting that Claim against the Reorganized Debtors or their property.

**ARTICLE VII**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

#### A. Disputed Claims Process

Except as otherwise provided herein, if a party Files a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VII of the Plan. **Except as otherwise provided herein, all Proofs of Claim Filed after the Claims Bar Date and all requests for payment of any Administrative Claim Filed after the Administrative Claims Bar Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.**

#### B. Disputed and Contingent Claims Reserve

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, may with the prior written consent of the Required Consenting Lenders (such consent not to be unreasonably withheld) establish one or more reserves for alleged General Unsecured Claims that are contingent or have not yet been Allowed, in an estimated amount or amounts as reasonably determined by the applicable Debtors with the consent of the Consenting TLB Lenders (such consent not to be unreasonably withheld). Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. As such, such assets will be subject to entity-level taxation, and the Reorganized Debtors shall be required to comply with the relevant rules.

#### C. Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Article IV.N of the Plan.

### D. Estimation of Claims

Before or after the Effective Date, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### E. Time to File Objections to Claims.

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims set forth in this paragraph at any time, including before or after the expiration of 180 days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

### F. Adjustment to Claims without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### G. No Interest

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### H. Disallowance of Claims and Interests

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order

**I. Single Satisfaction Rule**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

**ARTICLE VIII**
**EFFECT OF CONFIRMATION OF THE PLAN**

**A. Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

**B. Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative Claims asserted or capable of being asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions among the Debtors, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan Support Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan Support Agreement, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Notwithstanding anything herein to the contrary, no Seadrill Party and no current or former director, officer, designee, shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party (each, solely in their capacity as such) shall be a Released Party.

33

#### C. Releases by Holders of Claims and Interests

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan Support Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan Support Agreement, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Notwithstanding anything herein to the contrary, no Seadrill Party and no current or former director, officer, designee, shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party (each, solely in their capacity as such) shall be a Released Party.

#### D. Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur and each Exculpated Party is released and exculpated from any liability arising from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything herein to the contrary, no Seadrill Party and no current or former director, officer, designee, shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party (each, solely in their capacity as such) shall be an Exculpated Party.

#### E. Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has Filed a motion

34

requesting the right to perform such setoff on or before the Effective Date and a Final Order authorizing the actions requested in such motion has been entered, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

**F. Protection against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**G. Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**H. Document Retention**

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

**I. Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J. Release of Liens**

Except (1) with respect to the Liens securing Other Secured Claims (depending on the treatment of such Claims) or (2) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, at the sole expense of the Debtors or Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

35

**ARTICLE IX**
**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A. **Conditions Precedent to the Effective Date**.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1. the Plan Support Agreement shall not have been terminated and shall remain in full force and effect, and the Debtors shall have been authorized to enter into the Plan Support Agreement and perform their obligations thereunder pursuant to the Confirmation Order;

2. the Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code and shall have approved of the Solicitation Materials;

3. the Cash Collateral Order shall remain in full force and effect;

4. entry of the Confirmation Order and no stay of the Confirmation Order, which shall be a Final Order, shall then be in effect;

5. the occurrence of the effective date of rejection or termination, as applicable, of the Seadrill MSA;

6. entry into the New Management Services Agreements and the Bankruptcy Court's entry of the Vantage Drilling Order and the Energy Drilling Order, which shall each be a Final Order;

7. the effective date of each of the New Management Services Agreements shall have occurred;

8. issuance of the New Common Stock (with all conditions precedent thereto having been satisfied or waived, other than the occurrence of the Effective Date);

9. the effectiveness of any other applicable Definitive Documentation, subject to the consent and approval rights set forth in the Plan Support Agreement;

10. the establishment and funding of the Professional Fee Escrow Account in an amount sufficient to pay all Allowed Professional Fee Claims;

11. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement;

12. the Restructuring Expenses incurred and invoiced as of the Effective Date shall have been satisfied in full, in Cash;

13. all requisite governmental authorities and third parties will have approved or consented to the Restructuring Transactions, to the extent required;

14. all conditions precedent to the issuance of the New Common Stock shall have been satisfied or duly waived;

15. all actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with the Plan Support Agreement and applicable law; and

36

16.     the Debtors and Reorganized Debtors, as applicable, shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Plan and the Plan Support Agreement.

## B. Waiver of Conditions Precedent

The Debtors, with the prior written consent of the Required Consenting Lenders, and with respect to Article IX.A.12, the Ad Hoc Committee and the Agent (such consent not to be unreasonably withheld), may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time or as otherwise provided in the Plan Support Agreement, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan. The failure of the Debtors or Reorganized Debtors, as applicable, or the Plan Support Parties, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## C. Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur on or before the termination of the Plan Support Agreement, then: (1) the Plan will be null and void in all respects; (2) nothing contained in the Plan, the Disclosure Statement, or the Plan Support Agreement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided, however,* that all provisions of the Plan Support Agreement that survive termination of those agreements (each, according to its terms) shall remain in effect in accordance with the terms thereof.

## ARTICLE X
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A. Modification of Plan

Subject to the limitations and terms contained in the Plan, the Plan Support Agreement, and the approval rights of the Required Consenting Lenders set forth therein, the Debtors reserve the right, with the consent of the Agent with respect to any provision relating to the Agent (such consent not to be unreasonably withheld) to (1) amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein, in accordance with the Plan Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld) may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and the Plan Support Agreement, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

## B. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## C. Withdrawal of Plan

The Debtors reserve the right, subject to the terms of the Plan Support Agreement and the approval rights of the Required Consenting Lenders set forth therein, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity; *provided, however,* that all provisions of the Plan Support Agreement that survive termination of those agreements (each, according to its terms) shall remain in effect in accordance with the terms thereof.

**ARTICLE XI**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. decide and resolve all matters related to the Plan Support Agreement;

4. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

5. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

6. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

38

12. decide and resolve all matters related to the issuance of the New Common Stock;

13. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

15. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17. enforce all orders previously entered by the Bankruptcy Court; and

18. hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code.

**ARTICLE XII**
**MISCELLANEOUS PROVISIONS**

**A. Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B. Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan; *provided* that such agreements and other documents shall be consistent in all material respects with the terms and conditions of the Plan Support Agreement. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C. Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

39

### D. Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### E. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

### F. Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Reorganized Debtors | Seadrill Partners LLC<br>(Corporate Headquarters)<br>2nd Floor, Building 11, Chiswick Business Park<br>566 Chiswick High Road<br>London, W4 5YS, United Kingdom<br>Attention: John T. Roche, Chief Executive Officer<br>E-mail: John.Roche@seadrill.com |
|---|---|
| Co-Counsel to Debtors | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>609 Main Street<br>Houston, Texas 77002<br>Attn.: Brian E. Schartz, P.C.<br>E-mail: brian.schartz@kirkland.com<br>**Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attn.: Anup Sathy, P.C.<br>Chad J. Husnick, P.C.<br>Gregory F. Pesce<br>E-mail: anup.sathy@kirkland.com<br>chad.husnick@kirkland.com<br>gregory.pesce@kirkland.com |

| | |
|---|---|
| **Conflicts Counsel for the Debtors** | **Sheppard, Mullin, Richter & Hampton LLP**<br>Three First National Plaza<br>70 West Madison Street, 48th Floor<br>Chicago, Illinois 60602<br>Attn.: Justin R. Bernbrock<br>Robert B. McLellarn<br>E-mail: jbernbrock@sheppardmullin.com<br>rmclellarn@sheppardmullin.com<br>-and-<br>**Sheppard, Mullin, Richter & Hampton LLP**<br>30 Rockefeller Plaza<br>New York, New York 10122<br>Attn.: Lawrence A. Larose<br>E-mail: llarose@sheppardmullin.com<br>-and-<br>**Sheppard, Mullin, Richter & Hampton LLP**<br>333 South Hope Street, 43rd Floor<br>Los Angeles, California 90071<br>Attn.: Jennifer L. Nassiri<br>E-mail: jnassiri@sheppardmullin.com |
| **United States Trustee** | **Office of The United States Trustee**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002,<br>Attn.: Hector Duran, Jr.<br>Stephen Statham<br>E-mail: hector.duran.jr@usdoj.gov<br>stephen.statham@usdoj.gov |

### G. Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### H. Entire Agreement

Except as otherwise indicated, and without limiting the effectiveness of the Plan Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### I. Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://cases.primeclerk.com/seadrillpartners or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

### J. Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation shall be consistent with the Plan Support Agreement. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by

41

such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) nonseverable and mutually dependent.

### K. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

### L. Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### M. Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Plan Support Agreement or papers Filed prior to the Confirmation Date.

### N. Creditor Default

An act or omission by a Holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated: February 12, 2021

SEADRILL PARTNERS LLC
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*
Mohsin Y. Meghji
Chief Restructuring Officer

**Schedule 1**

**Seadrill Parties**

Seadrill Limited
Seadrill Member LLC
Seadrill Partners LLC Holdco Limited
Seadrill New Finance Limited
Seadrill Capricorn HoldCo Limited
Seadrill Management Ltd.
Seadrill Americas, Inc.
Asia Offshore Rig 1 Limited
Asia Offshore Rig 2 Limited
Asia Offshore Rig 3 Limited
Eastern Drilling AS
North Atlantic Alpha Ltd.
North Atlantic Crewing Ltd.
North Atlantic Elara Ltd.
North Atlantic Epsilon Ltd.
North Atlantic Linus Charterer Ltd.
North Atlantic Navigator Ltd.
North Atlantic Phoenix Ltd.
North Atlantic Venture Ltd.
Scorpion Courageous Ltd.
Scorpion Deepwater B.V.
Scorpion Deepwater Ltd.
Scorpion Drilling Ltd.
Scorpion Freedom Ltd.
Scorpion International Ltd.
Scorpion Nederlandse B.V.
Scorpion Offshore Inc.
Scorpion Resolute Ltd.
Scorpion Rigs Ltd.
Scorpion USA Expats, Inc.
Scorpion Vigilant Ltd.
SDS Drilling Ltd.
Sea Dragon de Mexico S de R.L. de CV
Seabras Holdings GmbH
Seabras Rig Holdings GmbH
Seabras Servicos de Petroleo SA
Seadrill Abu Dhabi Operations Limited
Seadrill Angola LDA
Seadrill Ariel Ltd.
Seadrill Australia Pte Ltd.
Seadrill Brunei Ltd.
Seadrill Callisto Ltd.
Seadrill Carina Ltd.
Seadrill Castor Ltd.
Seadrill Castor Pte Ltd.
Seadrill Common Holdings Ltd.
Seadrill Cressida Ltd.
Seadrill Deepwater Charterer Ltd.
Seadrill Deepwater Contracting Ltd.
Seadrill Deepwater Crewing Ltd.
Seadrill Deepwater Holdings Ltd.
Seadrill Deepwater Units Pte Ltd.

Seadrill Eclipse Ltd.
Seadrill Eminence Ltd.
Seadrill Equatorial Guinea Ltd.
Seadrill Europe Management AS
Seadrill Far East Ltd.
Seadrill Freedom Ltd.
Seadrill GCC Operations Ltd.
Seadrill Gemini Ltd.
Seadrill Global Services Ltd.
Seadrill Gulf Operations Neptune LLC
Seadrill Holdings Singapore Pte Ltd.
Seadrill Indonesia Ltd.
Seadrill Insurance Ltd.
Seadrill International Resourcing DMCC
Seadrill Investimentos do Brasil Ltda
Seadrill Investment Holding Company Limited
Seadrill Jack Up Holding Ltd.
Seadrill Jack Up I BV
Seadrill Jack Up II BV

Seadrill Jack-Ups Contracting Ltd.
Seadrill Jupiter Ltd.
Seadrill Labuan Ltd.
Seadrill Management (S) Pte Ltd.
Seadrill Management AME Ltd.
Seadrill Mira Hungary Kft.
Seadrill Mira Ltd.
Seadrill Mobile Units UK Ltd.
Seadrill Neptune Hungary Kft.
Seadrill Newfoundland Operations Ltd.
Seadrill Nigeria Operations Ltd.
Seadrill North Atlantic Holdings Limited
Seadrill North Sea Crewing Ltd.
Seadrill Norway Crew AS
Seadrill Norway Operations Ltd.
Seadrill Offshore AS
Seadrill Offshore Nigeria Ltd.
Seadrill Operations de Mexico S de RL de CV
Seadrill Orion Ltd.
Seadrill Pegasus (S) Pte Ltd.
Seadrill Prospero Ltd.
Seadrill Rig Holding Company Limited
Seadrill Saturn Ltd.
Seadrill Saudi I BV
Seadrill Saudi II BV
Seadrill Seabras UK Ltd.
Seadrill Seabras SP UK Ltd.
Seadrill SeaMex 2 de Mexico S de RL de CV
Seadrill SeaMex SC HoldCo Ltd.
Seadrill Seadragon UK Ltd.
Seadrill Servicos de Petroleos Ltda.
Seadrill Sevan Holdings Limited
Seadrill Telesto Ltd.

Seadrill Tellus Ltd.
Seadrill Titania Sarl
Seadrill Treasury UK Limited
Seadrill Triton Ltd.
Seadrill Tucana Ltd.
Seadrill UK Ltd.
Seadrill UK Operations Ltd.
Seadrill UK Support Services Ltd.
Sevan Brasil Ltd.
Sevan Developer Ltd
Sevan Driller Ltd.
Sevan Drilling Limited
Sevan Drilling North America LLC
Sevan Drilling Pte Ltd.
Sevan Drilling Rig II AS
Sevan Drilling Rig II Pte Ltd.
Sevan Drilling Rig IX Pte Ltd.
Sevan Drilling Rig V Pte Ltd.
Sevan Drilling Rig VI AS
Sevan Louisiana Hungary Kft.
Sevan Marine Servicos de Perfuracao Ltda
Scorpion Servicos Offshore Ltda.
Seadrill Dione Ltd.
Seadrill Hyperion Ltd.
Seadrill Mimas Ltd.
Seadrill Offshore Malaysia Sdn. Bhd.
Seadrill Proteus Ltd.
Seadrill Rhea Ltd.
Seadrill Tethys Ltd.
Seadrill Titan Ltd.
Seadrill Umbriel Ltd.
Asia Offshore Drilling Limited

Exhibit 99.3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEADRILL PARTNERS LLC, *et al.*,[1] | ) | Case No. 20-35740 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT RELATING TO THE JOINT**
**CHAPTER 11 PLAN OF REORGANIZATION OF SEADRILL PARTNERS LLC**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR CONDITIONAL APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
J. Machir Stull (TX Bar No. 24070697)
Genevieve Graham (TX Bar No. 24085340)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     mcavenaugh@jw.com
             mstull@jw.com
             ggraham@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:     (713) 836-3601
Email:     brian.schartz@kirkland.com

-and-

Anup Sathy, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     anup.sathy@kirkland.com
             chad.husnick@kirkland.com
             gregory.pesce@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

---

1    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/seadrillpartners. The location of Debtor Seadrill Partners LLC's principal place of business and the Debtors' service address in these chapter 11 cases is Seadrill Partners LLC, 2nd Floor, Building 11, Chiswick Business Park, 566 Chiswick High Road, London W4 5YS, United Kingdom.

-and-

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Justin R. Bernbrock, Esq. (admitted *pro hac vice*)
Robert B. McLellarn, Esq. (admitted *pro hac vice*)
Three First National Plaza
70 West Madison Street, 48th Floor
Chicago, IL 60602
Telephone:       (312) 499-6321
Facsimile:        (312) 499-4741
Email:            jbernbrock@sheppardmullin.com
                      rmclellarn@sheppardmullin.com

-and-

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Lawrence A. Larose, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, New York 10122
Telephone:       (212) 896-0627
Facsimile:        (917) 438-6197
Email:            llarose@sheppardmullin.com

-and-

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Jennifer L. Nassiri, Esq. (admitted *pro hac vice*)
333 South Hope Street, 43rd Floor
Los Angeles, California 90071
Telephone:       (213) 617-4106
Facsimile:        (213) 443-2739
Email:            jnassiri@sheppardmullin.com

*Proposed Conflicts Counsel for the Debtors
and Debtors in Possession*

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF SEADRILL PARTNERS LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND THE CONSENTING TLB LENDERS THAT HAVE EXECUTED THE PLAN SUPPORT AGREEMENT. THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.

THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE PLAN SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," OF THIS DISCLOSURE STATEMENT, WHICH BEGINS ON PAGE 33, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN (BUT NOT ALL) OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;
- TECHNOLOGY;
- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;
- LIQUIDITY;
- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;
- OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;
- FUTURE DEMAND FOR OFFSHORE DRILLING SERVICES;
- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;
- AVAILABILITY AND TERMS OF CAPITAL;
- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;
- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;
- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;
- GENERAL ECONOMIC AND BUSINESS CONDITIONS;
- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;
- ENVIRONMENTAL LIABILITIES;
- COUNTERPARTY CREDIT RISK;
- THE OUTCOME OF PENDING AND FUTURE LITIGATION;
- GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;
- DEVELOPMENTS IN OIL-PRODUCING AND NATURAL GAS-PRODUCING COUNTRIES;
- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;
- PLANS, OBJECTIVES, AND EXPECTATIONS;
- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;
- RISKS IN CONNECTION WITH ACQUISITIONS;
- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND
- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; PANDEMICS (INCLUDING THE CONTINUING IMPACT OF COVID-19), GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **I.** | **INTRODUCTION** | **1** |
| **II.** | **PRELIMINARY STATEMENT** | **1** |
| **III.** | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** | **4** |
| | A.   What is chapter 11? | 4 |
| | B.   Why are the Debtors sending me this Disclosure Statement? | 5 |
| | C.   Am I entitled to vote on the Plan? | 5 |
| | D.   What will I receive from the Debtors if the Plan is consummated? | 6 |
| | E.   What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim? | 9 |
| | F.   Will my treatment change under the Plan? | 10 |
| | G.   Are any regulatory approvals required to consummate the Plan? | 10 |
| | H.   What happens to my recovery if the Plan is not confirmed or does not go effective? | 10 |
| | I.   If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" | 11 |
| | J.   Is there potential litigation related to the Plan? | 11 |
| | K.   How will the preservation of the Causes of Action impact my recovery under the Plan? | 11 |
| | L.   Will there be releases and exculpation granted to parties in interest as part of the Plan? | 12 |
| | M.   What is the deadline to vote on the Plan? | 15 |
| | N.   How do I vote for or against the Plan? | 15 |
| | O.   Why is the Bankruptcy Court holding a Confirmation Hearing? | 15 |
| | P.   When is the Confirmation Hearing set to occur? | 15 |
| | Q.   What is the purpose of the Confirmation Hearing? | 15 |
| | R.   What is the effect of the Plan on the Debtors' ongoing businesses? | 15 |
| | S.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 16 |
| | T.   Do the Debtors recommend voting in favor of the Plan? | 16 |
| | U.   Who is Committed by the Plan Support Agreement to Support the Plan? | 16 |
| **IV.** | **THE PLAN SUPPORT AGREEMENT AND PLAN** | **17** |
| | A.   Plan Support Agreement | 17 |
| | B.   The Plan | 19 |
| **V.** | **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** | **25** |
| | A.   SDLP's Corporate History | 25 |
| | B.   SDLP's Operations | 25 |
| | C.   The Debtors' Prepetition Capital Structure | 26 |
| **VI.** | **EVENTS LEADING TO THE CHAPTER 11 FILINGS** | **28** |
| | A.   Market Decline and Industry-Specific Challenges | 28 |
| | B.   Proactive Approach to Addressing Liquidity Constraints | 29 |
| | C.   Chapter 11 Filing | 30 |
| **VII.** | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** | **30** |
| | A.   Corporate Structure upon Emergence | 30 |
| | B.   Expected Timetable of the Chapter 11 Cases | 31 |

|   |   | |
|---|---|---|
| C. | First Day Relief | 31 |
| D. | Other Procedural and Administrative Motions | 31 |
| E. | Schedules and Statements | 32 |
| F. | Establishment of a Claims Bar Date | 32 |
| G. | Litigation Matters | 32 |

**VIII. RISK FACTORS** — **33**

| | | |
|---|---|---|
| A. | Bankruptcy Law Considerations | 33 |
| B. | Risks Related to Recoveries under the Plan | 37 |
| C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 39 |

**IX. SOLICITATION AND VOTING PROCEDURES** — **44**

| | | |
|---|---|---|
| A. | Holders of Claims Entitled to Vote on the Plan | 45 |
| B. | Voting Record Date | 45 |
| C. | Voting on the Plan | 45 |
| D. | Ballots Not Counted | 46 |

**X. CONFIRMATION OF THE PLAN** — **47**

| | | |
|---|---|---|
| A. | Requirements for Confirmation of the Plan | 47 |
| B. | Best Interests of Creditors/Liquidation Analysis | 47 |
| C. | Feasibility | 47 |
| D. | Acceptance by Impaired Classes | 48 |
| E. | Confirmation without Acceptance by All Impaired Classes | 48 |
| F. | Valuation of the Debtors | 49 |

**XI. CERTAIN SECURITIES LAW MATTERS** — **50**

| | | |
|---|---|---|
| A. | Issuance of Securities under the Plan | 50 |
| B. | Subsequent Transfers of Securities Issued under the Plan | 50 |
| C. | New Common Stock & Employee Incentive Plan | 51 |

**XII. CERTAIN UNITED STATES FEDERAL INCOME TAX, UNITED KINGDOM, AND MARSHALL ISLANDS TAX CONSEQUENCES OF THE PLAN** — **52**

**XIII. RECOMMENDATION** — **52**

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Plan of Reorganization |
| EXHIBIT B | Plan Support Agreement |
| EXHIBIT C | Corporate Organization Chart |
| EXHIBIT D | Disclosure Statement Order |
| EXHIBIT E | Liquidation Analysis |
| EXHIBIT F | Financial Projections |
| EXHIBIT G | Valuation Analysis |

## I.   INTRODUCTION

Seadrill Partners LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," and together with Seadrill Partners LLC's direct and indirect non-Debtor subsidiaries and affiliates, collectively, "SDLP"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of Seadrill Partners LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 12, 2021 (the "Plan").1 A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND THE CONSENTING TLB LENDERS THAT HAVE EXECUTED THE PLAN SUPPORT AGREEMENT SUPPORT CONFIRMATION OF THE PLAN, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THESE CHAPTER 11 CASES.**

## II.   PRELIMINARY STATEMENT

SDLP was formed in June 2012 by Seadrill Limited to own and acquire offshore drilling rigs. Historically, SDLP has operated as a subsidiary of Seadrill Limited, but with its own capital structure separate and apart from Seadrill Limited's. In addition, SDLP has historically relied on Seadrill Limited and certain of its affiliates to provide SDLP with essentially all services needed to run their businesses through a series of management and administrative services agreements (the "Seadrill MSAs"). The services provided under the Seadrill MSAs include employee and contractor staffing, corporate administration, treasury and finance, legal compliance, and other critical functions necessary to maintain SDLP's drilling rigs. As both SDLP and Seadrill Limited began exploring their own restructuring strategies over the course of the last year, the Conflicts Committee (as defined below) was expanded and tasked to focus on this issue.

SDLP's customers (typically referred to as "operators") include super-major and major oil and gas companies, state-owned national oil companies, and comparatively smaller, local independent offshore exploration and production companies. The Debtors' fleet consists of four semi-submersible rigs, four ultra-deepwater drillships, and three tender rigs. SDLP operates one of the most modern fleets of offshore drilling rigs in the market. In simple terms, the Debtors' business is to contract their 11 rigs for a specified period of time (often spanning several years) at a contracted-for daily rate or "dayrate."

As of the Petition Date, the Debtor Loan Parties (as defined below) had approximately $2.7 billion in aggregate funded-debt obligations. These obligations comprise two tranches of debt, under which the Debtor Loan Parties are either borrowers or guarantors. In addition, the Debtor Loan Parties have (a) interest rate swap liabilities in the amount of approximately $21 million; (b) approximately $25 million in third-party unsecured debt incurred in the normal course of business; and (c) up to approximately $85 million of taxes, and (d) approximately $64 million of net liabilities to related parties.

---

1   Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

For the last six years, oil and natural gas prices have been in a down cycle. Additionally, the recent disputes between the Organization of the Petroleum Exporting Countries and Russia, in addition to the worldwide outbreak of COVID-19, have resulted in a decline in demand of oil and natural gas. Recent changes to production and pricing policies of some of the world's largest oil and natural gas exporting countries have reduced export prices, creating a global excess in supply of oil and natural gas. Offshore drillers like SDLP depend on "upstream" capital expenditures to fuel continued growth and success. During this down cycle, a number of large upstream oil and natural gas exploration and production companies, servicing companies, and operators have been forced to seek chapter 11 protection. Even the super-major oil and gas companies that have avoided restructurings have aggressively scaled back exploration and production-related capital expenditures. As a result, the distress in the upstream sector has spread to service providers and other ancillary businesses that depend on upstream capital expenditures for their revenues, including offshore drilling companies like SDLP.

Oil prices peaked in mid-2014 at more than $115 per barrel before declining to less than $30 per barrel by early 2020. Since the beginning of the COVID-19 outbreak in early 2020, oil prices have recovered to $55 per barrel. However there remains a significant oversupply of drilling units relative to current and expected near term demand. During this same period, SDLP's common share trading price, now trading over the counter ("OTC"), fell to a fraction of its mid-2014 highs.

As an initial response to the prolonged downcycle and deteriorating market conditions, in February 2016, SDLP reduced its quarterly dividends to common shareholders and then again in February 2019 to one cent per common share. In February 2018, SDLP completed an amendment to the terms of that certain Credit Agreement (as amended, restated, amended and restated, supplemented or otherwise modified, the "Term Loan B Credit Agreement"), by and among Seadrill Operating LP ("Seadrill LP"), Seadrill Capricorn Holdings LLC ("Seadrill Capricorn"), and Seadrill Partners Finco LLC ("Seadrill Finco"), as borrowers, certain Debtors as guarantors (together with Seadrill LP, Seadrill Capricorn and Seadrill Finco, the "Debtor Loan Parties"), Deutsche Bank AG New York Branch ("DBNY"), as agent,[2] and the lender parties thereto (the "TLB Lenders"), under which the TLB Lenders agreed to waive a leverage covenant until maturity.

On July 30, 2020, following a consent solicitation available to each TLB Lender, the Debtor Loan Parties and TLB Lenders representing a majority of the TLB principal amount outstanding executed a third amendment to the Term Loan B Credit Agreement, which provided approximately $63.7 million in super senior revolving loans on a cashless basis in lieu of receipt of cash interest with respect to the interest payment due and payable on June 30, 2020. On October 30, 2020, following a consent solicitation available to each TLB Lender, the Debtor Loan Parties and TLB Lenders representing a majority of the TLB principal amount outstanding executed a fourth amendment to provide approximately $63.3 million in super senior revolving loans on a cashless basis in lieu of receipt of cash interest with respect to the interest payment due and payable on September 30, 2020. The Term Loan B Credit Agreement is subject to annual amortization payments of approximately $29.0 million, payable in quarterly installments, with the balance of the loan then coming due in February 2021.

On July 31, 2020, in connection with the July 30, 2020 Term Loan B Credit Agreement amendment, that certain Senior Secured Credit Facility Agreement, by and among Seadrill Vela Hungary Kft, as borrower, SDLP, as parent, and certain Debtors as guarantors, ING Bank N.V., as agent, and the lender parties thereto, was terminated. Additionally, in connection with the July 30, 2020 Term Loan B Credit Agreement amendment, that certain Term Loan and Revolving Credit Facilities Agreement, by and among Seadrill Polaris Ltd., as borrower, SDLP, as parent, and certain Debtors as guarantors, DNB Bank ASA, as agent, and the lender parties thereto, was terminated.

---

2     On October 16, 2020, DBNY, the Debtor Loan Parties, and Alter Domus (US) LLC ("Alter Domus" or the "Agent") executed an Agency Assignment Agreement wherein DBNY resigned as administrative agent, collateral agent and security trustee under the Term Loan B Credit Agreement and Alter Domus became successor administrative agent, collateral agent and security trustee under the Term Loan B Credit Agreement.

In connection with the Term Loan B Credit Agreement amendments, in or about July 2020, the four-member Conflicts Committee of its Board of Directors (the "Conflicts Committee") (together with Evercore, Group L.L.C. ("Evercore") and Sheppard Mullin Richter & Hamilton, LLP ("Sheppard Mullin"), SDLP's independent financial adviser and independent legal counsel, respectively) commenced a strategic process by which it solicited third party interest to (a) enter into a new management and administrative services agreement with the Debtors with respect to one or more of their vessels and/or (b) participate in a merger or acquisition transaction involving the Debtors (collectively, the "Strategic Process"). The goal of the Strategic Process is to maximize the value of the Debtors' estates for the benefit their stakeholders, with a view to facilitating further discussion and negotiation surrounding the Debtors' balance-sheet restructuring.

As of the date hereof, and as further described herein, the Strategic Process has resulted in the execution of a master services agreement with Energy Drilling Management Pte. Ltd. (the "Energy Drilling MSA") and the entry into the Vantage Drilling MSA with Vantage Drilling International (the "Vantage Drilling MSA"). Together, the Energy Drilling MSA and the Vantage Drilling MSA currently represent the management and operation of the Debtors' entire fleet, aside from two fleet vessels which are currently managed by Seadrill Limited and will transfer to management under Vantage Drilling upon the expiration of the applicable customer contracts.

The majority of the Debtor Loan Parties' debt arrangements have floating interest rates. As such, significant movements in interest rates could have an adverse effect on earnings and cash flow. To manage the Debtor Loan Parties' exposure to interest rate fluctuations, the Debtor Loan Parties use interest rate swaps to effectively fix a part of their floating rate debt obligations (collectively, the "Interest Rate Swaps").

On November 23, 2020, SDLP elected not to make a periodic payment due on the Interest Rate Swaps obligations in connection with its entry into a forbearance agreement with holders of a majority of the obligations under the Term Loan B Credit Agreement. Under that forbearance agreement, the parties agreed to forbear from enforcing any "claims, causes of action, rights, or remedies" with respect to any default that may occur under the Term Loan B Credit Agreement as a result of the swap obligations-related non-payment.

On November 25, 2020, Seadrill Limited—without prior notice to SDLP—exercised certain purported rights under their master services agreement to settle approximately $24 million in various purported claims, which was $19.4 million in excess of the $4.8 million expressly authorized by the Conflicts Committee. Thereafter, the Conflicts Committee assessed Seadrill Limited's actions and sought to chart a path forward to maximize the value of the Debtors in light of numerous considerations. Among other things, the Conflicts Committee: (a) conferred with the Debtors' management team and the Conflicts Committee's independent advisors; (b) engaged with the advisors to an ad hoc group of TLB Lenders (the "Ad Hoc Group")[3] regarding the situation; (c) considered the effect of Seadrill Limited's actions or potential future actions on its operations, customers, and employees; and (d) engaged with independent counsel regarding potential legal recourse.

---

[3]    The members of the Ad Hoc Group represent more than 50.1% of the outstanding amount of the term loan under the Term Loan B Credit Agreement. *See Verified Statement Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 69].

As a result, on December 1, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the Southern District of Texas. In the days leading up to the Petition Date, the Debtors and the Ad Hoc Group engaged in negotiations regarding the use of the Ad Hoc Group's cash collateral. These negotiations bore positive results, leading to an agreement for the interim use of the cash collateral to stabilize the Debtors' business operations, as embodied in the *Stipulation and Order Authorizing the Use, on an Emergency Basis Only, of Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2)(A)* [Docket No. 6] between the Debtors and Alter Domus (US) LLC, which Alter Domus executed at the direction of the Required Consenting Lenders, the *Interim Order (I) Authorizing Postpetition Use of Cash and Cash Collateral, (II) Granting Adequate Protection to the TLB Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 77] (the "Interim Cash Collateral Order"), the *Notice of (I) Extension of the Outside Date Under the Interim Cash Collateral Order and (II) Cancellation of December 21, 2020 Hearing Regarding Cash Collateral Motion* [Docket No. 102], submitted by the Debtors to the Bankruptcy Court with the consent of the Ad Hoc Group and Alter Domus (at the direction of the Required Consenting Lenders), and the *Notice of Extension of Outside Date Under the Interim Cash Collateral Order* [Docket No. 127] submitted by the Debtors to the Bankruptcy Court with the consent of the Ad Hoc Group and Alter Domus (at the direction of the Required Consenting Lenders).

Following the Petition Date, the Debtors, the Conflicts Committee, the Ad Hoc Group, and their respective advisors engaged in negotiations to reach a consensual resolution of these Chapter 11 Cases. These discussions have ultimately resulted in a Plan Support Agreement, a copy of which is attached hereto as **Exhibit B** and incorporated herein by reference, which contemplates a series of transformative restructuring transactions that will:

- equitize approximately $2.7 billion in secured term loan obligations; and
- select go-forward, value-maximizing service providers through the Strategic Process.

The formulation of the Plan Support Agreement and the Plan is a significant achievement for the Debtors in the face of historic commodity price declines and a depressed operating environment. The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time. Given the Debtors' core strengths, including their modern fleet, global reach, and successful operating and safety track record, the Debtors are confident they will emerge from these Chapter 11 Cases as a stronger enterprise going forward and can efficiently implement the restructuring set forth in the Plan Support Agreement to ensure their long-term viability and success. For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

**III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN**

**A.   What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold. Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

Several subsidiaries of SDLP hold Intercompany Claims against SDLP. Certain of these Intercompany Claims serve as collateral for the TLB Lenders under the Term Loan B Credit Agreement. Because the Debtors are in default under the Term Loan B Credit Agreement, the TLB Lenders allege that they are entitled to exercise their foreclosure rights against these Intercompany Claims in full or partial satisfaction of the Debtors' outstanding obligations under the Term Loan B Credit Agreement. To facilitate the swift resolution of these Chapter 11 Cases, the Debtors and the TLB Lenders have agreed, solely for purposes of voting on the Plan, to treat these intercompany claims as if the TLB Lenders have exercised their foreclosure rights. For that reason, the applicable Holders of TLB Secured Claims shall be entitled to vote their Pro Rata portion of the Specified SDLP Claims as Class 5 General Unsecured Claims, solely for purposes of determining votes to accept or reject the Plan.

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against each Debtor pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Super Senior Term Loan Claims | Impaired | Entitled to Vote |
| 4 | TLB Secured Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 8 | Interests in SDLP | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Interests in SDLP OpCo Parties | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

Holders of General Unsecured Claims in Class 5 will receive treatment to be determined consistent with the Plan Support Agreement.

The Debtors have not conducted a comprehensive intercompany claims analysis or an entity by entity valuation analysis. The Debtors, however, believe that the settlement of the recoveries allocable to Holders of General Unsecured Claims at each Debtor is fair and reasonable and satisfies the requirements for approval under Bankruptcy Rule 9019 and applicable confirmation standards under section 1129 of the Bankruptcy Code because (a) the treatments, as reflected in the Plan, were the subject of good faith settlement negotiations between the Debtors and the Consenting TLB Lenders parties, both pre and postpetition, (b) the settlement avoids the costs and expenses of conducting a full analysis of Intercompany Claims and (c) the settlement is otherwise supported by the facts and circumstances of these Chapter 11 Cases, including the consent of all of the Debtors' major creditor constituencies, including the parties to the Plan Support Agreement other than SDLP, who together hold the significant majority of claims against the Debtors.

4    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed (as defined in the Plan) as well as other factors related to the Debtors' business operations and general economic conditions.

6

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

### SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan[5] |
|---|---|---|---|---|
| | | *Claims Against Each Debtor* | | |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive as determined by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim, or such other treatment as may be agreed among the Holder of such Other Priority Claim, the Debtors, and the Required Consenting Lenders. | | |
| 3 | Super Senior Term Loan Claims | On the Effective Date, each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the New Common Stock (subject to dilution by any New Common Stock that may be issued pursuant to the Employee Incentive Plan, if any) in an amount to be determined consistent with the Plan Support Agreement. | | |

---

5   The low and high ranges included in projected recoveries correspond to the valuation range in the analysis performed by Evercore and attached hereto as **Exhibit G**.

7

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan5 |
|---|---|---|---|---|
| 4 | TLB Secured Claims | On the Effective Date, each Holder of an Allowed Class 4 Claim shall receive its Pro Rata share of the New Common Stock (subject to dilution by any New Common Stock that may be issued pursuant to the Employee Incentive Plan, if any) in an amount to be determined consistent with the Plan Support Agreement, unless such Holder elects to receive the Cash Out Amount per $1,000 of Allowed Class 4 Claims in Cash, subject to the Cash Cap (the "Class 4 Cash Election"). If the total Class 4 Cash Elections would result in distributions of Cash to Holders of Allowed Class 4 Claims in excess of the Cash Cap, then each Holder of an Allowed Class 4 Claim that elected to receive Cash shall receive its Pro Rata share of: (i) the Cash Cap amount in Cash and (ii) New Common Stock of the value equal to the balance of the recovery such Holder would have received in the absence of the Cash Cap. For the avoidance of doubt, any TLB Deficiency Claim shall be classified as a Class 5 General Unsecured Claim; *provided, however*, that if (i) Class 4 votes to accept the Plan and (ii) Holders of Class 5 Claims, vote to accept the Plan, the TLB Deficiency Claims shall not be entitled to any distribution under the Plan and shall be deemed canceled, released, and extinguished | | |
| 5 | General Unsecured Claims | As of the Effective Date, each Holder of an Allowed General Unsecured Claim against the Debtors shall receive treatment to be determined consistent with the Plan Support Agreement.6 | | |
| 6 | Intercompany Claims | On the Effective Date, Intercompany Claims shall, at the election of the applicable Debtor with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld), be (i) Reinstated, (ii) converted to equity, or (iii) otherwise extinguished, compromised, addressed, canceled and released, or settled, in each case, in accordance with the Description of Transaction Steps. | | |
| 7 | Intercompany Interests | As of the Effective Date, each Intercompany Interest shall either be (i) Reinstated or (ii) merged, contributed, addressed, or canceled and released, at the option of the Debtors with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld), in each case, in accordance with the Description of Transaction Steps. | | |
| 8 | Interests in SDLP | On the Effective Date, Holders of Interests in SDLP will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished and will be of no further force or effect. | | |

---

6    For the avoidance of any doubt, this treatment is without prejudice to the Debtors' right to pay any ordinary course prepetition trade vendor claims pursuant to any first day orders, subject to the terms thereof.

8

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan5 |
|---|---|---|---|---|
| 9 | Interests in SDLP OpCo Parties Other than Intercompany Interests | As of the Effective Date, Interests in SDLP OpCo Parties Other than Intercompany Interests will be canceled, released, and extinguished and will be of no further force and effect, and Holders of Interests in SDLP OpCo Parties Other than Intercompany Interests shall not receive any distribution on account of such Interests. | | |
| 10 | Section 510(b) Claims | As of the Effective Date, Section 510(b) Claims will be canceled, released, and extinguished and will be of no further force and effect, and Holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims. | | |

**E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

**1.     Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code), and Restructuring Expenses will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court. For the avoidance of doubt, the amount and validity of any Administrative Claim arising under or in connection with the Seadrill MSA or any transition services arrangements shall be determined in the manner set forth in the MSA Stipulation, and the amount of any Administrative Claim asserted by any Seadrill Party shall be determined in a manner consistent with Section 503(b)(1) of the Bankruptcy Code.

9

Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than 60 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

Notwithstanding anything to the contrary contained in the Plan, any unpaid Restructuring Expenses shall constitute an Allowed Administrative Claim and shall be paid in accordance with the Plan Support Agreement in full in Cash on the Effective Date or as soon as practicable thereafter. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Reorganized Debtors; *provided* that, to the extent any invoices for any unpaid Restructuring Expenses are delivered to the Reorganized Debtors after the Effective Date, such invoices shall be paid in full in Cash as soon as reasonably practicable after the Effective Date.

**F.   Will my treatment change under the Plan?**

As described herein, the Debtors have engaged in comprehensive settlement discussions with certain parties in interest. The Debtors are not aware of any actionable alternative or settlement proposal at this time that would result in greater recoveries to Holders of Claims and Interests than those described herein. Moreover, the Plan now embodies a global resolution supported by the Consenting TLB Lenders. The Debtors continue to believe that the Plan represents the most feasible, highest and otherwise best, value-maximizing alternative. For all of these reasons, the Debtors recommend that you vote to accept the Plan.

**G.   Are any regulatory approvals required to consummate the Plan?**

There are no known U.S. regulatory approvals that are required to consummate the Plan at this time. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**H.   What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 47, and the Liquidation Analysis attached hereto as **Exhibit E**.

10

**I.**   **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article XI of this Disclosure Statement, entitled "Confirmation of the Plan" which begins on page 47, for a discussion of the conditions precedent to consummation of the Plan.

**J.**   **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VIII.C.11 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 43.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan," which begins on page 34.

**K.**   **How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date. Seadrill Limited and the Seadrill Parties are not included as Released Parties or Exculpated Parties.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action of the Debtors against it. Except as specifically released under the Plan or pursuant to a Final Order, the Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Reorganized Debtors expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**L.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting TLB Lenders in obtaining their support for the Plan pursuant to the terms of the Plan Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to facilitate the marketing process and negotiate and implement the Plan, each of which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions. Seadrill Limited and the Seadrill Parties are not included as Released Parties or Exculpated Parties.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

Potential claims that will be released include claims against SDLP, its directors and officers, and other insiders relating to certain prepetition transactions. In the Debtors' view, and based on the independent investigation as described below, the terms of the Plan, including the releases and exculpation contained therein, are fair, equitable, reasonable, necessary to the reorganization, and in the best interests of the Debtors' estates. Therefore, the Debtors believe that the Plan is confirmable, which the Debtors intend to prove at the Confirmation Hearing.

**1.      Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative Claims asserted or capable of being asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in,**

a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions among the Debtors, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan Support Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan Support Agreement, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Notwithstanding anything in the Plan to the contrary, no Seadrill Party and no current or former director, officer, designee, shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party (each solely in their capacity as such) shall be a Released Party.

**2.    Releases by Holders of Claims and Interests.**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan Support Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan Support Agreement, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Notwithstanding anything in the Plan to the contrary, no Seadrill Party and no current or former director, officer, designee, shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party (each solely in their capacity as such) shall be a Released Party.

**3.    Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur and each Exculpated Party is released and exculpated from any liability arising from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11

Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything in the Plan to the contrary, no Seadrill Party and no current or former director, officer, designee, shareholder, partner, limited partner, general partner, affiliated investment fund, or investment vehicle of any Seadrill Party (each solely in their capacity as such) shall be an Exculpated Party.

4.    Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date and a Final Order authorizing the actions requested in such motion has been entered, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

5.    Release of Liens.

Except (1) with respect to the Liens securing Other Secured Claims (depending on the treatment of such Claims), or (2) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, at the sole expense of the Debtors or Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

14

**M.   What is the deadline to vote on the Plan?**

The Voting Deadline is April 1, 2021, at 11:59 p.m. (prevailing Central Time).

**N.   How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is **actually received** by the Debtors' solicitation agent, Prime Clerk LLC (the "Solicitation Agent") **on or before the Voting Deadline,** *i.e.* **April 1, 2021, at 11:59 p.m. prevailing Central Time.** *See* Article IX of this Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES," which begins on page 44 for more information.

**O.   Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**P.   When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for April 7, 2021, at 9:30 a.m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than April 1, 2021, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

**Q.   What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest Holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**R.   What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will not be forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date and unless otherwise provided in the Plan, the Reorganized Debtors may then operate their businesses and, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

15

**S.  Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Prime Clerk LLC, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Seadrill Partners LLC
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165

*By electronic mail at:*
seadrillpartnersinfo@primeclerk.com

*By telephone (toll free) at:*
877-329-1894 (U.S. and Canada Toll Free)
347-919-5756 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at http://cases.primeclerk.com/seadrillpartners (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee). Translated versions of the Notice of Confirmation and certain other notices filed in the Chapter 11 Cases are available free of charge from the website of the Solicitation Agent at http://cases.primeclerk.com/seadrillpartners.

**T.  Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**U.  Who is Committed by the Plan Support Agreement to Support the Plan?**

The Plan is supported by the Debtors and the Consenting TLB Lenders.

16

## IV.    THE PLAN SUPPORT AGREEMENT AND PLAN
### A.    Plan Support Agreement

On February 12, 2021, the Debtors and the Consenting TLB Lenders entered into the Plan Support Agreement. Since executing the Plan Support Agreement, the Debtors have further documented the terms of the restructuring contemplated thereby.7 The Restructuring Transactions contemplated by the Plan will (a) minimize overall leverage through equitizing the Super Senior Term Loan Claims and the TLB Secured Claims into New Common Stock in Reorganized SDLP and (b) put in place go-forward operators for the Debtors' assets. Each of the major Restructuring Transactions contemplated by the Plan Support Agreement is described in greater detail below. The Debtors believe that the transactions contemplated by the Plan Support Agreement are the best available restructuring terms and will allow SDLP to succeed as a restructured company after emergence from these Chapter 11 Cases and will afford meaningful runway to allow the market to recover.

*Strategic Process.*

In the months leading up to the Petition Date, the Conflicts Committee engaged Evercore and Sheppard Mullin to explore a potential restructuring and/or the replacement of the Seadrill MSAs that SDLP and certain other Debtors that are parties to with Seadrill Limited and certain of Seadrill Limited's affiliates. Pursuant to the Seadrill MSAs, Seadrill Limited's affiliates provide the Debtors with essentially all services needed to run their business, including employees and contractors, corporate administration, treasury and finance, legal compliance, and other critical functions. As part of the restructuring process, the Conflicts Committee, Evercore, certain Holders of the Term Loan B Credit Agreement (the "TLB Holders"), the Ad Hoc Group, and their advisors (the "TLB Advisors") evaluated various strategic alternatives for SDLP. This evaluation included an analysis of SDLP's cost structure, including the existing Seadrill MSAs. After considering the reasonably available possible courses of action, the Conflicts Committee, Evercore, Sheppard Mullin, the Ad Hoc Group, and the TLB Advisors determined that running a marketing process in which SDLP solicited third-parties with respect to (i) an M&A transaction with SDLP (an "M&A Transaction") and (ii) a new management service agreement with SDLP that would replace the Seadrill MSAs (an "MSA Transaction") was in the best interest of the Debtors and the their estates.

Evercore, along with the Conflicts Committee and the TLB Advisors, identified thirteen potential counterparties that they expected to have potential interest in either an M&A Transaction or MSA Transaction with SDLP. On July 30, 2020, Evercore reached out to the identified potential counterparties. If the potential counterparty was interested in pursuing either an M&A Transaction or MSA Transaction, Evercore provided the potential counterparty with a Non-Disclosure Agreement ("NDA") and a Phase 1 Request for Proposal Instructions Letter ("Phase 1 RFP"). Evercore requested responses to the Phase 1 RFP by August 27, 2020 with respect to potential MSA Transaction and by September 14, 2020 with respect to a potential M&A Transaction. Upon executing the NDA, potential counterparties were granted access to a Virtual Data Room ("VDR") which provided additional information about SDLP, its assets, and the services required by a new management service agreement counterparty. Potential counterparties were encouraged to submit a response to whichever type of transaction they preferred, including both an MSA Transaction and M&A Transaction.

Evercore initially received five responses to their Phase 1 RFP and two additional parties contacted Evercore. Evercore, the Conflicts Committee, and the TLB Advisors reviewed the Phase 1 RFP responses and conducted follow-up discussions with bidders to clarify various components of the proposals received. The Conflicts Committee, Evercore, the Ad Hoc Group, and the TLB Advisors collectively decided to provide each of the seven potential counterparties with a Phase 2 Request for Proposal Instructions Letter ("Phase 2 RFP") that provided additional guidance on the services requested to be provided in a new management service agreement as well as access to additional operational data in the VDR. Evercore provided the Phase 2 RFP to the seven potential counterparties on September 15, 2020 and requested responses by October 23, 2020. All seven potential counterparties submitted a response by October 30, 2020.

---

7    The key terms of the Plan are discussed in greater detail in Section V.B of this Disclosure Statement, entitled "The Plan," immediately following this section.

17

Upon receiving responses from potential counterparties, Evercore, along with the Conflicts Committee and the TLB Advisors, performed a diligent review of all proposals received. Potential counterparties that submitted proposals that were deemed less favorable for the Debtors were notified that their proposals would not be considered unless they were materially improved.

Kickoff meetings were conducted with counterparties that submitted favorable proposals, whereby such counterparties were invited to submit draft management services agreements memorializing their proposals. Negotiations proceeded with terms being reviewed collectively by the Conflicts Committee, Evercore, Sheppard Mullin, SDLP, and the TLB Advisors, with revised agreements being provided to potential counterparties. Due to the niche aspects of the tender rig business, most of the potential counterparties were not interested in submitting bids that contemplated the provision of services to the tender rigs. The Debtors therefore determined in the exercise of their reasonable business judgment that pursuing two separate management agreements, one for the tender rigs and one for the remaining vessels, would result in the optimal outcome for the Debtors and their estates. Seadrill Limited, aware of the above-mentioned marketing process since summer 2020, indicated their interest in participating in early December, and Evercore sent the Phase 1 and Phase 2 RFPs to Seadrill Limited on December 11, 2020. To date, Seadrill Limited has not submitted an actionable proposal.

Following the lengthy marketing process described above, and following extensive negotiations through December and early January, Energy Drilling Management Pte. Ltd. ("Energy Drilling") was chosen by the Debtors in their reasonable business judgment as the best option among the proposals received for the tender rigs. The Debtors determined that the Energy Drilling MSA contains daily rates and other terms which are favorable to the Debtors compared to the Seadrill MSAs and comparable market rates. The Energy Drilling MSA includes a favorable working capital structure as well as bonus/malus structures that incentivize costs being kept below budget. Additionally, Energy Drilling is incentivized to market and secure favorable contracts for the tender rigs. Energy Drilling's operations are exclusively focused on tender rigs and they have the experience and competence to provide high levels of service. Energy Drilling is also located in Singapore, which provides easy access to the tender rigs.

After further negotiations, on January 19, 2021, the Debtors' Board of Directors approved the execution of the Energy Drilling MSA and, on February 2, 2021, the Court entered the *Order Approving Debtors' Emergency Motion for an Order (A) Authorizing the Debtors to Enter into a New Management Agreement with Energy Drilling Management PTE LTD for the Debtors' Tender Rigs, and (B) Granting Related Relief* [Docket No. 248] (the "Energy Drilling Order").

Similarly, following the aforementioned lengthy marketing process, and following extensive negotiations, Vantage Drilling International ("Vantage Drilling") was chosen by the Debtors in their reasonable business judgment as the best option among the proposals received for operatorship of the fleet vessels. The Debtors determined in their reasonable business judgment that the Vantage Drilling MSA contains daily rates and other terms that are favorable to the Debtors compared to those of the SDRL MSAs and comparable market rates. The fee structure of the Vantage Drilling MSA includes fixed fee and variable fee components that are designed to align incentives between Vantage Drilling and the Debtors. For example, the fixed fee component is discounted as additional fleet vessels are "cold-stacked," incentivizing Vantage Drilling to keep fleet vessels operating on active contracts. The variable fee component includes gross margin incentives for operational fleet vessels and a cost bonus structure that incentivizes Vantage Drilling to market and win favorable contracts as well as keep costs below budget.

Since 2008, Vantage Drilling and its predecessor company has performed operational and management services to comparable offshore drilling rigs as to the fleet vessels, providing Vantage Drilling with unique experience and an ability to provide optimal levels of service. The Vantage Drilling management team has also shown a positive track record of delivering safety and operational performance, successfully marketing vessels similar to the fleet vessels to achieve profitable contract terms, and developing strong customer relationships.

18

The Vantage Drilling MSA contemplates a framework for the execution of separate management agreements between various Vantage Drilling entities and each owner of the fleet vessels for the management and operation of each respective fleet vessel pursuant to the form management agreements.

The Vantage Drilling MSA also contemplates the entry into certain marketing agreements between various Vantage Drilling entities and each owner of the fleet vessels for the marketing of the respective fleet vessel in order to obtain favorable contracts pursuant to the form marketing agreements.

After further negotiations, on February 8, 2021, the Debtors' Board of Directors approved the execution of the Vantage Drilling MSA and, on February 9, 2021, the Debtors filed the Vantage Drilling MSA Motion seeking Bankruptcy Court approval of their entry into the Vantage Drilling MSA. As a result of the Strategic Process and entry into the New Management Services Agreements, the Debtors intend to terminate certain of the Seadrill MSAs contemporaneously with the management transition to allow for a smooth process. The Debtors determined in their reasonable business judgment that such termination is in the best interests of the Debtors' estates given the Debtors' entry into the New Management Services Agreements on more favorable terms.

Related to the Energy Drilling MSA, on January 31, 2021, certain of the Debtors delivered a notice of termination to certain affiliates of Seadrill Limited for convenience under each of the Seadrill MSAs and related agreements applicable to the tender rigs covered by the Energy Drilling MSA (the "Notice of Termination" and such agreements, the "SDRL Tender Rig Agreements"[8]). Pursuant to the Notice of Termination and the provisions of the SDRL Tender Rig Agreements, the notice periods under each of the SDRL Tender Rig Agreements have now begun, the last of which will contractually terminate on May 1, 2021.

The entry of the Vantage Drilling Order and Energy Drilling Order as Final Orders (and the effectiveness of both the Energy Drilling MSA and Vantage Drilling MSA are conditions precedent to the Effective Date of the Plan.

***Equity Cancellation.*** On the Effective Date, the existing Interests in SDLP will be extinguished; a Holder of such Interests shall not receive or retain any distribution, property, or other value on account of its Interest.

**B.    The Plan**

The Plan contemplates the following key terms, among others described herein and therein:

**1.    General Settlement of Claims and Interests**

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including resolution of intercompany liabilities, allocation of value among the Debtors, and treatment of Holders of General Unsecured Claims against each of the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

---

[8]    The SDRL Tender Rig Agreements consist of the applicable Seadrill MSAs, the applicable Advisory, Technical and Administrative Services Agreements, the applicable Rig Rental Agreements, and the applicable Rig Management Agreements.

### 2.   Restructuring Transactions

On or before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall take all actions set forth in the Description of Transaction Steps and shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, as applicable, establishing New HoldCo, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided herein, the Description of Transaction Steps, or in the Definitive Documentation. The actions to implement the Restructuring Transactions may include, as applicable: (a) the execution and delivery of appropriate agreements, including any Definitive Documentation, or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities, including the Debtors and the Consenting TLB Lenders, may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable law; (d) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by New HoldCo, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (e) the filing of a Form 15 with the Securities and Exchange Commission to deregister the Interests in SDLP under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder; and (f) all other actions that the applicable Reorganized Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors, with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld) and otherwise consistent with the Description of Transaction Steps), may (1) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved, or otherwise consolidated, (2) cause the transfer of assets between or among the Reorganized Debtors, (3) use Cash on hand to pay all Restructuring Expenses, (4) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (5) engage in any other transaction in furtherance of the Plan, including for tax efficiency reasons; *provided* that such transactions are not inconsistent with the Restructuring Transactions or the other terms of the Plan. Subject to the prior written consent of the Required Consenting Lenders, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors.

The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### 3. New Management Services Agreements

On January 20, 2021, the Debtors entered into the Energy Drilling MSA with Energy Drilling for the management and operation of the Debtors' tender rig vessels. The Energy Drilling MSA was the result of an extensive marketing process conducted by the Debtors, Evercore Group, and Sheppard, Mullin, as conflicts counsel. The Debtors, through Evercore, reached out to numerous potential counterparties, received and evaluated several bids in consultation with Sheppard Mullin, and in the Debtors' business judgment, decided to enter into the Energy Drilling MSA. On February 2, 2021, the Bankruptcy Court entered the Energy Drilling Order, approving the Debtors' entry into the Energy Drilling MSA.

On February 9, 2021, the Debtors entered into the Vantage Drilling MSA with Vantage Drilling for the management and operation of the Debtors' fleet vessels. The Vantage Drilling MSA was the result of an extensive marketing process conducted by the Debtors, Evercore, and Sheppard Mullin, as conflicts counsel. The Debtors, through Evercore, reached out to numerous potential counterparties, received and evaluated several bids in consultation with Sheppard Mullin, and in the Debtors' business judgment, decided to enter into the Vantage Drilling MSA. On February 9, 2021, the Debtors filed the Vantage Drilling MSA Motion seeking Bankruptcy Court approval of their entry into the Vantage Drilling MSA.

### 4. Issuance and Distribution of the New Common Stock

On the Effective Date, pursuant to the Description of Transaction Steps, applicable Holders of Claims shall receive the New Common Stock issued by New HoldCo in exchange for their respective Claims as set forth in Article III.B of the Plan. The issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by the Holders of any Claims or Interests. All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, each Entity's acceptance of New Common Stock shall be deemed as its agreement to the terms of the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

### 5. Corporate Action

On or before the Effective Date, as applicable, all actions contemplated under the Plan and consistent with the Plan Support Agreement and the Description of Transaction Steps shall be deemed authorized and approved in all respects, including, without limitation: (1) selection of the directors and officers for the Reorganized Debtors; (2) the distribution of the New Common Stock; (3) implementation of the Restructuring Transactions; (4) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (5) adoption of the New Organizational Documents; (6) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (7) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.E of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

6. **Corporate Existence**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law). For the avoidance of doubt, after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

New HoldCo will be the issuer of the New Common Stock

7. **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action of the Debtors, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

8. **Cancellation of Notes, Instruments, Certificates and Other Documents**

On the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, as applicable, shall be cancelled and all obligations related to or arising out of the same of the Debtors or the Reorganized Debtors, as applicable, thereunder, or in any way related thereto shall be discharged; *provided, however*, that, notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, any credit document or agreement and any other instrument, Certificate, agreement, or other document that governs the rights, claims, or remedies of the Holder of a Claim shall continue in full force and effect solely for purposes of (a) allowing Holders of Allowed Claims to receive distributions under the Plan and/or allowing and preserving the rights of the Agent to make distributions to the TLB Lenders as provided herein and to take any actions to perform its obligations (if any) under the Plan and Confirmation Order and to enforce their rights and the rights of the holders of Claims or beneficial Holders under the applicable instruments, documents and agreements; (b) preserving all rights, remedies, indemnities, powers, and protections of the Agent as against any Person or Entity other that the Debtors, and any money or property distributable to the Holder of Claims or beneficial Holders under the relevant instrument (including any rights to priority of payment) and any exculpation of the Agent (which rights, remedies, indemnities, powers, and protections against all persons and entities other than the Debtors and against such distributable money or property and which exculpations shall survive and remain in full force and effect, and not be released, discharged or affected in any way by the terms of the Plan or the Confirmation Order); (c) allowing the Agent (including its advisors and agents) to appear and be heard in the Chapter 11 Cases, or in any proceeding in the Bankruptcy Court or any other court; and (d) permitting the Agent to enforce any obligation owed to it under the Plan.

### 9.    New Organizational Documents

To the extent required under the Plan or applicable non-bankruptcy law, on or as soon as reasonably practicable after the Effective Date, except as otherwise provided in the Plan or the Description of the Transaction Steps, the Reorganized Debtors may file the New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the applicable corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

### 10.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Support Agreement, the Description of Transaction Steps, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### 11.    Certain Securities Law Matters

The offering, issuance, and distribution of the New Common Stock, as contemplated by Article III.B of the Plan, shall be exempt, without further act or actions by any Entity, from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable securities laws requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Any such New Common Stock issued in reliance on section 1145 of the Bankruptcy Code will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

To the extent that section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, exchange, or distribution of any Securities pursuant to the Plan is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act, pursuant to section 4(a)(2) of the Securities Act and/or the regulations (including Regulation D) promulgated thereunder or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, any other available exemption from registration under the Securities Act. Any such Securities issued in reliance on section 4(a)(2) of the Securities Act, including in compliance with Rule 506 of Regulation D, and/or Regulation S will be considered "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to an effective registration statement, or an applicable exemption from the registration requirements under the Securities Act and other applicable law, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

Any equity and equity-linked interests associated with the Employee Incentive Plan, if any, will be issued pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 4(a)(2) of the Securities Act and, accordingly, such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

**12.   Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**13.   Employee Matters**

All Compensation and Benefits Programs listed in the Plan Supplement in place as of the Effective Date, if any, will be included in the Assumed Executory Contract and Unexpired Lease List and shall be assumed by the Reorganized Debtors and remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. [Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.]

**14.   Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

24

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action of the Debtors against it. Except as specifically released under the Plan or pursuant to a Final Order, the Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Reorganized Debtors expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action of the Debtors notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## V.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   SDLP's Corporate History

Seadrill Limited formed SDLP in the summer of 2012 with an initial fleet of 4 units on long term contracts. During the years following its formation, SDLP capitalized on strong demand for offshore drilling equipment and services, driven by a favorable oil pricing environment, and acquired an additional 7 units with long term contracts from Seadrill Limited, actively expanding its fleet geographic footprint, and contracted backlog.

From an organizational perspective, SDLP wholly-owns Seadrill Operating GP LLC, Seadrill Partners B.V. and Seadrill Partners Operating LLC, which wholly-owns two of the tender rigs (T-15 and T-16). SDLP owns a 58% interest in Seadrill Operating LP, which wholly owns the West Polaris drillship, West Vencedor tender rig, and West Leo and West Aquarius semi-submersible rigs. Seadrill Operating LP is also a majority owner of the West Capella drillship. Furthermore, SDLP is a majority owner in Seadrill Capricorn Holdings LLC, which wholly-owns the West Auriga and West Vela drillships, and West Sirius and West Capricorn semi-submersible rigs.

Seadrill's complete corporate organization chart is attached hereto as **Exhibit C**.

### B.   SDLP's Operations

As of the Petition Date, the Debtors and SDLP Non-Debtors' (the "SDLP Group") fleet consists of four (4) drillships, two (2) of which are on contract, four (4) semi-submersible rigs, and three (3) tender rigs. The fleet remains one of the youngest and most modern among major offshore drilling contractors, with an average fleet age of approximately 8.5 years, compared to up to 20 years in the case of its major competitors' rigs. The SDLP Group's rigs are located in Aruba, Canada, the U.S. Gulf of Mexico, Malaysia, Indonesia, Norway, Southern Asia, and Singapore. The SDLP Group contracts with vendors and customers across the globe to provide drilling services, in both benign and harsh operating environments from shallow to ultra-deepwater. The Debtors derive the majority of their revenues and cash flow from a small number of customers.

25

Certain Seadrill Limited subsidiaries provide managerial, administrative, financial, operational, and other support services and personnel to the SDLP Group through the Seadrill MSAs. Through these arrangements, hundreds of highly-skilled individuals located across three continents serve on the SDLP Group's offshore drilling units and onshore operations in technical, commercial, and administrative functions.

As of the Petition Date, the Debtors, directly and indirectly, staff a total workforce of at least 400 personnel, which consists of approximately 44 workers employed directly by the Debtors, (the "Direct Employees"), 115 seconded employees (the "Seconded Employees"), 197 employees of Seadrill Management operating the Debtors' rigs (the "Operating Employees," and together with the Direct Employees and the Seconded Employees, the "Employees"), and third-party contingent workers. While the Direct Employees and the Seconded Employees are paid through a payroll process operated by Seadrill Management, the funds used to compensate such employees come directly from the accounts of the Debtors.

**C.       The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors had approximately $2.7 billion in aggregate funded-debt obligations. These obligations comprise three tranches of debt, under which certain Debtors are either borrowers or guarantors (collectively, the "Debtor Loan Parties"). The table below summarizes the Debtor Loan Parties' prepetition capital structure.

| Debt *(in US$ millions)* | Approximate Principal Outstanding |
|---|---|
| Term Loan B – Super Senior Loan Due February 2021 | $        63.9 |
| Term Loan B – Super Senior Loan Due February 2021 | $        64.4 |
| Term Loan B Credit Facility Due February 2021 | $     2,585.5 |
| Swap Liability | $        20.8 |
| **Total Obligations Outstanding** | **$     2,734.6** |

***Term Loan B Credit Agreement and the Prior Vessel Facility Loans.***

The Term Loan B Credit Agreement was entered into on February 21, 2014, and it was amended by (i) the Amendment and Restatement Agreement, dated as of June 26, 2014, (i) the Amendment No. 1, dated as of February 12, 2018, (iii) the Amendment No. 2, dated as of March 12, 2018, (y) the Consent and Amendment No. 3, dated as of July 30, 2020, and (iv) the Consent and Amendment No. 4, dated as of October 30, 2020. The Term Loan B Credit Agreement is governed by New York law.

Pursuant to the terms of the Term Loan B Credit Agreement, the agent was granted, for the benefit of itself and the TLB Lenders, a first-priority security interest in and continuing lien on substantially all of the Debtor Loan Parties' assets and property.

On July 30, 2020, the parties executed an amendment to the Term Loan B Credit Agreement, which provided approximately $63.7 million in super senior revolving loans on a cashless basis in lieu of receipt of cash interest with respect to the interest payment due and payable on June 30, 2020. On October 30, 2020, the parties executed an amendment to provide approximately $63.3 million in super senior revolving loans on a cashless basis in lieu of receipt of cash interest with respect to the interest payment due and payable on September 30, 2020 (together with the July 30, 2020, super senior loans, the "Super Senior Term Loans"). The Term Loan B Credit Agreement is subject to annual amortization payments of approximately $29.0 million, payable in quarterly installments, with the balance of the loan then coming due in 2021. As of the Petition Date, the Debtor Loan Parties have approximately $2.7 billion outstanding under the Term Loan B Credit Agreement.

On July 31, 2020, in connection with the July 30, 2020 Term Loan B Credit Agreement amendment, that certain Senior Secured Credit Facility Agreement, by and among Seadrill Vela Hungary Kft, as borrower, SDLP, as parent, and certain Debtors as guarantors, ING Bank N.V., as agent, and the lender parties thereto was terminated.

On July 31, 2020, in connection with the July 30, 2020 Term Loan B Credit Agreement amendment, that certain Term Loan and Revolving Credit Facilities Agreement, by and among Seadrill Polaris Ltd., as borrower, SDLP, as parent, and certain Debtors as guarantors, DNB Bank ASA, as agent, and the lender parties thereto was terminated.

In 2019, the Ad Hoc Group retained Milbank LLP as counsel, Intrepid Financial Partners as operational adviser, and Rothschild and Co. as financial adviser to facilitate restructuring negotiations. The Ad Hoc Group's advisors entered into non-disclosure agreements with SDLP in November 2019.

On October 16, 2020, DBNY, the Debtor Loan Parties, and Alter Domus executed an Agency Assignment Agreement wherein DBNY resigned as administrative agent, collateral agent, and security trustee under the Term Loan B Credit Agreement and Alter Domus became successor administrative agent, collateral agent, and security trustee under the Term Loan B Credit Agreement.

***Swap Liabilities.*** The Debtor Loan Parties' debt arrangements have floating interest rates. As such, significant movements in interest rates could have an adverse effect on earnings and cash flow. To manage the Debtor Loan Parties' exposure to interest rate fluctuations, the Debtor Loan Parties use interest rate swaps to effectively fix a part of their floating rate debt obligations (collectively, the "Interest Rate Swaps"). As of the Petition Date, the Debtor Loan Parties had Interest Rate Swaps for a combined outstanding principal amount of approximately $2.7 billion. The fair value of the Interest Rate Swaps outstanding as of the Petition Date was a liability of approximately $20.8 million. The Interest Rate Swaps are junior in right of payment to the Super Senior Term Loans, but otherwise rank pari passu with the other obligations under the Term Loan B Credit Agreement.

On November 23, 2020, SDLP elected not to make a periodic payment due on the Interest Rate Swaps obligations in connection with its entry into a forbearance agreement with holders of a majority of the obligations under the Term Loan B Credit Agreement. Under that forbearance agreement, the parties agreed to forbear from enforcing any "claims, causes of action, rights, or remedies" with respect to any default that may occur under the Term Loan B Credit Agreement as a result of the swap obligations-related non-payment.

***Unsecured Indebtedness.*** In addition to its secured debt, SDLP has approximately $25 million in third-party unsecured debt incurred in the normal course of business. The Debtors also have approximately $64 million of net payables to related parties, including Seadrill Limited and its affiliates, approximately $85 million in taxes, and approximately $8 million related to a prior royalty settlement. Approximately $3 million of contract payables to related parties consists of an earn-out related to Seadrill Capricorn Holdings LLC's acquisition from Seadrill Limited of all of the ownership interests in the entities that own and operate the drillship West Vela.

*Publicly-Traded Common Units.* As a publicly-held Marshall Islands limited liability partnership, SDLP issues two classes of stock: "common units" and "subordinated units." On December 11, 2019, SDLP's common units were delisted and deregistered from the NYSE as a result of the Company's low-market capitalization. Subsequently, SDLP's common units traded on the OTCQB, an over-the-counter market significantly more limited than the NYSE, under the symbol "SDLPF." Since the Petition Date, SDLP's common units have traded on the OTC Pink Open Market under the symbol "SDLPQ." As of the Petition Date, Seadrill Limited owns 35 percent of the outstanding common units of SDLP and 100 percent of SDLP's subordinated units.[9]

## VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.   Market Decline and Industry-Specific Challenges

Approximately six years ago, the oil and gas industry entered what has become a sustained down cycle that was brought on by low commodities prices. Additionally, the recent worldwide outbreak of COVID-19 has resulted in an unprecedented decline in demand of oil and natural gas. Recent changes to production and pricing policies of some of the world's largest oil and natural gas exporting countries have reduced export prices, creating a global excess in supply of oil and natural gas. SDLP has not been immune to the effects of the market decline. Oil prices peaked in mid-2014 at more than $115 per barrel before declining to less than $30 per barrel by early 2020. Since the beginning of the COVID-19 outbreak in early 2020, oil prices have recovered to $55 per barrel. However there remains a significant oversupply of drilling units relative to current and expected near term demand. During this same period, SDLP's common share trading price, now trading OTC, fell to a fraction of its mid-2014 highs.

SDLP also faces a mix of offshore drilling industry-specific risks. In response to the recent market downturn, operators have significantly pared back new drilling activity. Even as the oil prices begin to improve, it is likely that the recovery for offshore drilling companies such as SDLP will lag behind the oil price increases due to the lead time required to plan new projects and oversupply of offshore drilling units.

Further, upstream capital expenditures, and especially the demand for offshore drilling services, are influenced as much by market expectations as actual market performance. Due to the size of the required capital investment and typical length of offshore drilling contracts, upstream capital expenditure levels are unlikely to improve if operators expect continued volatility in the commodities markets. As a result, on an industry-wide basis, average ultra-deepwater drillship dayrates have decreased by over $350,000 from mid-2014.

Finally, SDLP operates in a highly competitive sector. Even in good times, offshore drilling contractors compete vigorously for new engagements. This competition has only intensified due to the substantial industry-wide excess rig capacity. While operators may consider a range of factors in contracting for drilling services, they tend to focus more closely on price in a weak market. These conditions have put substantial downward pressure on the day rates offshore drillers are able to charge. Additionally, while SDLP's long-term contracts help to insulate it from market pressures, certain operators have aggressively pursued contract amendments in an attempt to extract favorable terms.

---

[9]   Seadrill Limited holds approximately 39 percent of the equity interests of Debtor Seadrill Deepwater Drillship Limited, a Cayman Islands company and obligor under the Term Loan B Credit Agreement. Additionally, Seadrill Limited holds indirect equity interests in three Debtors: (a) a 49 percent equity interest in Seadrill Mobile Units Ltd., a Nigerian entity; (b) a 49 percent equity interest in Seadrill Capricorn Holdings LLC, a Marshall Islands company and obligor under the Term Loan B Credit Agreement; and (c) a 42 percent equity interest in Seadrill Operating LP, a Marshall Islands limited partnership and obligor under the Term Loan B Credit Agreement.

Although the Debtors and other offshore oil companies have actively sought to delay (and in some cases cancel) deliveries of newly-constructed rigs, and have divested or scrapped older rigs, global utilization rates remain well below historical highs.

**B.      Proactive Approach to Addressing Liquidity Constraints**

Since 2017, the SDLP Group has faced an onslaught of negative macroeconomic trends, including reduced upstream capital expenditures, a surplus in supply, and increased price competition. In response, SDLP and its seven-member Board of Directors have proactively sought to address the SDLP Group's capital structure challenges. Additionally, SDLP, through the four-member Conflicts Committee of its Board of Directors (the "Conflicts Committee"), has focused on several key conflicts issues, including the potential to restructure and/or replace the management services agreements with Seadrill Limited to best maximize value. To that end, the Conflicts Committee retained Evercore as its independent financial adviser and Sheppard Mullin as its independent legal counsel.

Since the summer of 2020, the Debtors have preserved liquidity in anticipation of a holistic balance-sheet restructuring in conjunction with the Strategic Process (as defined below). For example, as described below, the Debtor Loan Parties executed two amendments to the Term Loan B Credit Agreement that preserved more than $100 million of cash-interest expense and, most recently, the Debtors elected not to make a periodic payment with respect to certain swap obligations.[10]

In connection with the Term Loan B Credit Agreement amendments, the Conflicts Committee (together with Evercore and Sheppard Mullin) commenced a strategic process by which it solicited third party interest to (a) enter into a new management and administrative services agreement with the Debtors with respect to one or more of their vessels and/or (b) participate in a merger or acquisition transaction involving the Debtors (collectively, the "Strategic Process"). The goal of the Strategic Process is to maximize the Debtors' value for the benefit their stakeholders, with a view to facilitating further discussion and negotiation surrounding the Debtors' balance-sheet restructuring.

The Debtors, led by the Conflicts Committee, sought to use the Strategic Process to forge consensus with the TLB Lenders regarding a balance-sheet restructuring that would equitize all of the TLB Lenders' claims through a scheme of arrangement or prearranged chapter 11 process. At the same time, the Conflicts Committee engaged with Seadrill Limited to investigate and review potential claims by the Debtors against Seadrill Limited.

On November 25, 2020, Seadrill Limited—without prior notice to SDLP—exercised certain purported rights under the MSA to settle approximately $24 million in purported various claims, which was $19.4 million in excess of the $4.8 million authorized by the Conflicts Committee (the "Cash Sweep"). Thereafter, the Conflicts Committee assessed Seadrill Limited's actions and sought to chart a path forward to maximize the value of the Debtors in light of numerous considerations. Among other things, the Conflicts Committee: (a) conferred with the Debtors' management team and the Conflicts Committee's independent advisors; (b) engaged with the advisors to the Ad Hoc Group regarding the situation; (c) considered the effect of Seadrill Limited's actions or potential actions on its operations, customers, and employees; and (d) engaged with independent counsel regarding potential legal recourse.

---

10    *See* SDLP – Announces Forbearance Agreement Relating to Swap Payments, November 25, 2020, https://seadrillpartners.com/investor-
relations/news-releases/detail/?id=3F0D58D3A9A90B17.

Following several days of review and numerous formal and informal meetings, both at the Conflicts Committee level and at the Board level, the Debtors determined that it was prudent to commence these cases to ensure that no additional unauthorized settlements like the Cash Sweep occurred by Seadrill Limited and to use the chapter 11 process to maximize the value of the Debtors' enterprise for the benefit of all stakeholders. In conjunction with their decision to commence these Chapter 11 Cases, the Debtors negotiated with the Ad Hoc Group for consensual use of cash collateral. As part of that agreement, the Debtors will complete the Strategic Process, the outcome of which the Debtors anticipate will serve as the foundation for a plan of reorganization that addresses the Debtors' over-leveraged balance sheet and an expeditious exit from chapter 11.

### C.   Chapter 11 Filing

After the unauthorized Cash Sweep, the Conflicts Committee assessed Seadrill Limited's actions and sought to chart a path forward to maximize the value of the Debtors in light of numerous considerations. Among other things, the Conflicts Committee: (a) conferred with the Debtors' management team and the Conflicts Committee's independent advisors; (b) engaged with the advisors to the Ad Hoc Group regarding the situation; (c) considered the effect of Seadrill Limited's actions or potential actions on its operations, customers, and employees; and (d) engaged with independent counsel regarding potential legal recourse. As a result, on the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the Southern District of Texas.

## VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   Corporate Structure upon Emergence

Except as otherwise provided in the Plan (including, for the avoidance of doubt, in the Description of Transaction Steps), each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

To implement the restructuring contemplated by the Plan, the Debtors intend to take a number of steps after confirmation of the plan (but prior to emergence from chapter 11) with regard to SDLP's capital structure. These steps include, but may not be limited to:

- • rationalizing intercompany and intergroup funding balances;
- • executing and taking all steps to satisfy the conditions precedent to the effectiveness of the re-profiled secured credit facilities; and
- • paying certain professional and other fees.

Subject to obtaining the necessary corporate consents, third party consents and governmental approvals and regulatory clearances (as referred to in Article III.G above), the Debtors anticipate that they will be able to execute all of the foregoing steps in a timely fashion on or prior to emergence from chapter 11.

**B.      Expected Timetable of the Chapter 11 Cases**

To ensure that the Debtors and their stakeholders will benefit from the Plan Support Agreement, the Debtors intend to move as quickly as practicable during these chapter 11 cases. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within 149 days after the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

**C.      First Day Relief**

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. At a hearing on December 4, 2020, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions on an interim or final basis.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://cases.primeclerk.com/seadrillpartners.

**D.      Other Procedural and Administrative Motions**

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On December 28, 2020, the Debtors filed the Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business [Docket No. 112] (the "OCP Motion"). The OCP Motion seeks to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On January 27, 2021, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 163].

- Retention Applications. Between December 24, 2020 and January 18, 2021, the Debtors and their professionals filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis, LLP and Jackson Walker L.L.P. as legal counsel, Sheppard, Mullin, Richter & Hampton LLP as legal counsel to the Conflicts Committee, Evercore Inc. as financial advisor, and M-III Advisory Partners, LP as restructuring advisor (collectively, the "Retention Applications"). Between January 15, 2021 and January 27, 2021, the Bankruptcy Court approved the retention applications of Kirkland & Ellis, LLP, Jackson Walker L.L.P., and Evercore Inc. On February [●], 2021 and February [●], 2021, the Bankruptcy Court approved the retention applications of Sheppard Mullin and M-III Advisory Partners, LP, respectively. The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

31

E.      **Schedules and Statements**

On January 29, 2021, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 180 to 237].

F.      **Establishment of a Claims Bar Date**

On January 12, 2021, the Bankruptcy Court entered an order (the "Bar Date Order") establishing February 15, 2021 as the general claims bar date and May 30, 2021 as the governmental claims bar date [Docket No. 124]. On or before January 17, 2021, the Debtors served notice of the bar dates in accordance with the Bar Date Order.11 On January 14, 2021, the Debtors published notice of the bar dates in accordance with the Bar Date Order. Any party required to file a proof of claim under the Bar Date Order which fails to do so before the applicable bar date will be forever barred, estopped, and enjoined from asserting such claim against the Debtors and the Debtors will be forever discharged from any indebtedness or liability relating to such claim. Such party will not be permitted to vote to accept or reject the Plan or receive any recovery under the Plan.

G.      **Litigation Matters**

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

Debtors Seadrill US Gulf LLC, Seadrill Gulf Operations Vela, LLC, and Seadrill Gulf Operations Auriga LLC (collectively, the "Arbitration Debtors") provide drilling rigs to BP Exploration & Production, Inc. ("BP") pursuant to certain long-term contracts. In 2019, the Arbitration Debtors commenced an arbitration against BP to recover approximately $50 million for BP's alleged breach of those contracts with regard to BP's refusal to fully compensate the Arbitration Debtors for their increase U.S. Federal income tax costs incurred pursuant to a 2017 enactment of a Base Anti-Abuse Tax. The arbitration, entitled *Seadrill US Gulf LLC, Seadrill Gulf Operations Vela LLC, and Seadrill Gulf Operations Auriga, LLC v. BP Exploration & Production*, Inc., ICDR Case No. 01-19-003-0191 (the "Arbitration"), is currently pending before a three-arbitrator tribunal appointed by the International Centre for Dispute Resolution (the "Tribunal"), an affiliate of the American Arbitration Association. The Debtors believe that the claims at issue in the Arbitration are valuable Estate assets.

Following the Petition Date, BP filed an application in the Arbitration requesting that the Tribunal order the Arbitration Debtors to provide security for BP's prepetition attorney's fees. On December 14, 2020, the Tribunal granted BP's application and ordered the Arbitration Debtors to provide security in the amount of $1,792,125 (the "Order Requiring Security"). The Arbitration Debtors believe that BP's application for attorney's fees and the Order Requiring Security are violations of section 362(a) of the Bankruptcy Code and, accordingly, filed the *Debtors' Emergency Motion for Order Pursuant to Section 362(a) and Granting Related Relief* [Docket No. 139] (the "Motion to Enforce the Stay").12

---

11      *See Affidavit of Service* [Docket No. 147-2].

12      The Debtors also believe that BP's application for attorney's fees and the Order Requiring Security violate the Order *(I) Restating and Enforcing The Worldwide Automatic Stay, Anti-Discrimination Provisions, And Ipso Facto Protections Of The Bankruptcy Code, (II) Permitting The Debtors To Modify The Automatic Stay In Their Sole Discretion To Proceed With Litigation Or Contested Matters Commenced Prepetition, (III) Approving The Form And Manner Of Notice, And (IV) Granting Related Relief* [Docket No. 79].

On January 28, 2021, the Bankruptcy Court held a hearing on the Motion to Enforce the Stay and orally ruled in favor the Debtors, overruling BP's objection to the Motion to Enforce the Stay completely. On February [●], 2021, the Bankruptcy Court entered the *Order Approving Debtors' Emergency Motion for Order Pursuant to Section 362(a) and Granting Related Relief* [Docket No. [●]] reflecting the Bankruptcy Court's oral ruling at hearing.

## VIII.  RISK FACTORS

Holders of Claims should carefully read and consider the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS BUSINESS MAY BE FOUND IN PUBLICLY AVAILABLE SECURITIES FILING INCLUDE SDLP'S MOST RECENTLY FILED FORM 20-F AND ANY FORM 20-F FILED AFTER THE DATE OF THIS DISCLOSURE STATEMENT.**

### A.  Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.  Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

33

**2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

**3.      The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

**4.      The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Plan Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

**5.      Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly"

34

and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

**6.     Continued Risk upon Confirmation**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil (and thus demand for the services the Debtors provide), and increasing expenses. See Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 39. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

**7.     The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**8.     The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

35

**9.      Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**10.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**11.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity by backstopping the rights offerings, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Plan Support Agreement and Plan and the significant deleveraging and financial benefits that they embody. Seadrill Limited and the Seadrill Parties are not included as Released Parties or Exculpated Parties.

**B.      Risks Related to Recoveries under the Plan**

**1.      The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results**

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

**2.      There Is No Established Market for the New Common Stock**

The New Common Stock will be new issuances of securities and there is no established trading market for those securities. The Debtors do not intend to apply for the New Common Stock to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system. New Common Stock may not be sold at any particular time or at favorable prices. As a result, the Debtors cannot assure the liquidity of any trading market for the New Common Stock. Accordingly, financial risk of ownership of the New Common Stock may be required to be born indefinitely. If a trading market were to develop, future trading prices of the New Common Stock may be volatile and will depend on many factors, including (a) the Debtors' operating performance and financial condition, (b) the interest of securities dealers in making a market for them, and (c) the market for similar securities.

**3.      The Trading Price for the Shares of New Common Stock May Be Depressed Following the Effective Date**

Assuming that the Effective Date occurs, shares of New Common Stock will be issued to Holders of certain Classes of Claims or Interests (as applicable). Following the Effective Date of the Plan, shares of New Common Stock may be sold to satisfy withholding tax requirements. In addition, Holders of Claims or Interests (as applicable) that receive New Common Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Common Stock available for trading could cause the trading price for the New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

**4.      Certain Holders of New Common Stock May Be Restricted in their Ability to Transfer or Sell their Securities**

To the extent that the New Common Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims or Interests (as applicable) who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Common Stock to freely resell the New Common Stock. The Debtors have agreed to take certain steps to register the resale of certain of the New Common Stock after the Effective Date. *See* Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 50.

**5.      Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies**

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. While the Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of the restricted securities will qualify for an exemption from registration under Rule 144. In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

Holders of New Common Stock who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 50.

**6.      Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 50, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims and Interests.

**7.      The Debtors May Not Be Able to Accurately Report Their Financial Results**

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

**C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

     **1.     The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control, including, without limitation, the continued impact of the outbreak of COVID-19. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness.

     **2.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

     **3.     Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

4.     **Financial Results May Be Volatile and May Not Reflect Historical Trends**

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations"), in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The financial projections contained in **Exhibit F** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

5.     **The Debtors' Substantial Liquidity Needs May Impact and Revenue**

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate

40

liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 6. Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on the willingness of their operator customer base to make operating and capital expenditures to explore and drill for, develop, and produce oil and natural gas. Operators' willingness to conduct such activities are in turn dependent on prevailing oil and natural gas prices. Further, since operators are reluctant to increase drilling activities in a high-volatility commodities pricing environment, demand for the Debtors' services is affected as much by oil and natural gas price expectations as actual pricing. In short, the Debtors face a high level of exposure to oil and natural gas price swings. Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends. Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The Debtors expect such volatility to continue in the future. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- worldwide production and demand for oil and gas and geographical dislocations in supply and demand;
- the cost of exploring for, developing, producing and delivering oil and gas;
- expectations regarding future energy prices and production;
- advances in exploration, development and production technology;
- the ability of the Organization of Petroleum Exporting Countries ("OPEC"), to set and maintain levels and pricing;
- the level of production in non-OPEC countries;
- international sanctions on oil-producing countries, or the lifting of such sanctions;
- government regulations, including restrictions on offshore transportation of oil and natural gas;
- local and international political, economic and weather conditions;
- domestic and foreign tax policies;
- the development and exploitation of alternative fuels and unconventional hydrocarbon production, including shale;

41

- worldwide economic and financial problems and the corresponding decline in the demand for oil and gas and, consequently, our services;
- the policies of various governments regarding exploration and development of their oil and gas reserves, accidents, severe weather;
- natural disasters and other similar incidents relating to the oil and gas industry;
- the worldwide political and military environment, including uncertainty or instability resulting from an escalation or additional outbreak of armed hostilities or other crises in the Middle East, eastern Europe or other geographic areas or further acts of terrorism in the United States, Europe or elsewhere; and
- the global COVID-19 pandemic's former, present, and future impact on the economy.

Continued volatility or weakness in oil and natural gas prices (or the perception that oil and natural gas prices will remain depressed) generally leads to decreased upstream spending, which in turn negatively affects demand to the Debtors' services. A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

7.     **The Offshore Drilling Industry is Influenced by Several Factors That Can Reduce the Demand for the Debtors' Services**

While the price of oil and gas has a significant impact on the offshore drilling industry, several other factors have the potential to reduce the demand for the Debtors' services and disrupt the Debtors' business, including:

- the availability of debt financing on reasonable terms;
- the level of costs for associated offshore oilfield and construction services;
- oil and gas transportation costs;
- the level of rig operating costs, including crew and maintenance;
- the discovery of new oil and gas reserves;
- the political and military environment of oil and gas reserve jurisdictions; and
- regulatory restrictions on offshore drilling.

8.     **The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are subject to extensive laws and regulations in a number of different countries across the globe, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and

subject the Debtors to administrative, civil and criminal penalties. The Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of oil, gas or other pollutants into the air or water. In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file claims for alternative water supplies, property damage or bodily injury. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

**9.      The Debtors' Operations are Subject to Hazards Inherent in the Energy Services Industry.**

Risks inherent in the offshore drilling industry, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment. These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages and could result in a variety of claims, losses and remedial obligations that could have an adverse effect on the Debtors' business and results of operations. The existence, frequency and severity of such incidents will affect operating costs, insurability and relationships with customers, employees and regulators. In particular, the Debtors' customers may elect not to purchase our services if they view our safety record as unacceptable, which could cause us to lose customers and substantial revenue.

**10.     The Debtors Operate in a Highly-Competitive Industry with Significant Potential for Excess Capacity.**

The offshore drilling industry is highly competitive and fragmented and includes several large companies that compete in many of the markets we serve, as well as numerous small companies that compete with us on a local basis. Offshore drilling contracts are generally awarded on a competitive bid basis or through privately negotiated transactions. In determining which qualified drilling contractor is awarded a contract, the key factors are pricing, rig availability, rig location, the condition and integrity of equipment, its record of operating efficiency, including high operating uptime, technical specifications, safety performance record, crew experience, reputation, industry standing and customer relations. Our operations may be adversely affected if our current competitors or new market entrants introduce new drilling rigs with better features, performance, prices or other characteristics compared to our drilling rigs, or expand into service areas where we operate.

Competitive pressures and other factors may result in significant price competition, particularly during industry downturns, which could have a material adverse effect on our results of operations and financial condition.

**11.     The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

43

### 12. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the offshore drilling industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 13. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

### 14. The Debtors May Not Be Able to Obtain All the Consents Required in Order to Implement the Transaction Steps

The Debtors have not, as of the date of this Disclosure Statement, obtained all corporate consents, consents from third parties and governmental approvals and regulatory clearances required in order to implement the Transaction Steps. While the Debtors are engaging actively in discussions with each of the entities that must provide these corporate consents and consents from third parties, and are actively seeking the governmental approvals and regulatory clearances required, there can be no assurances that the Debtors will obtain these corporate consents and consents from third parties, or obtain these governmental approvals and regulatory clearances. Failure to obtain these corporate consents or consents from third parties could result in an implementation of the corporate recapitalization that is not consistent with the Plan Support Agreement and/or could result in delays to the overall implementation of the Transaction Steps.

## IX. SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

**A.      Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all Holders of Claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" which begins on page 5, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims or Interests in Classes 3, 4, and 5 (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 6, 7, 8, 9, and 10. Additionally, the Disclosure Statement Order provides that certain holders of Claims or Interests in the Voting Classes, such as those Holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

To the extent necessary to ensure that the votes of Holders with pending trades can be counted, subject to submission of documentation satisfactory to the Debtors' counsel and counsel to the Ad Hoc Group evidencing such party's beneficial ownership, the Debtors will accept provisional Ballots from beneficial Holders of Claims or Interests in Voting Classes. To the extent any conflicting Ballots are submitted on behalf of both the beneficial and record Holder, the beneficial Holder's Ballot will supersede any Ballot submitted on behalf of such record Holder.

**B.      Voting Record Date**

**The Voting Record Date is February 26, 2021.** The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

**C.      Voting on the Plan**

**The Voting Deadline is April 1, 2021, at 11:59 p.m. (prevailing Central Time).** In order to be counted as votes to accept or reject the Plan, all ballots must be (a) electronically submitted utilizing the online balloting portal maintained by the Notice and Claims Agent on or before the Voting Deadline; or (b) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Notice and Claims Agent on or before the Voting Deadline at the following address:

45

<u>**DELIVERY OF BALLOTS**</u>

**SEADRILL PARTNERS LLC**
**C/O PRIME CLERK LLC**
**One Grand Central Place**
**60 East 42nd Street**
**Suite 1440**
**New York, NY 10165**

If you received an envelope addressed to your nominee, please return your ballot to your nominee,
allowing enough time for your nominee to cast your vote on a ballot before the Voting Deadline.

**PLEASE SELECT JUST ONE OPTION TO VOTE.**
**EITHER RETURN PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**
**OR**
**VOTE VIA ELECTRONIC MAIL TO seadrillpartnersballots@primeclerk.com**

Holders of Claims who cast a ballot via electronic mail to seadrillpartnersballots@primeclerk.com with "Seadrill Partners Vote" in the subject line should NOT also submit a paper Ballot.

FOR ANY BALLOT CAST VIA ELECTRONIC MAIL, A FORMAT OF THE ATTACHMENT MUST BE FOUND IN THE COMMON WORKPLACE AND INDUSTRY STANDARD FORMAT (*I.E.*, INDUSTRY-STANDARD PDF FILE) AND THE RECEIVED DATE AND TIME IN THE SOLICITATION AGENT'S INBOX WILL BE USED AS A TIMESTAMP FOR RECEIPT.

IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (877) 329-1894. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.

**D.      Ballots Not Counted**

<u>**No ballot will be counted toward Confirmation if, among other things**</u>: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the administrative agents under the Bank Facilities, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

46

## X.    CONFIRMATION OF THE PLAN
### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code. The Liquidation Analysis takes into account all intercompany liabilities on the Debtors' books and records and all claim holders' estimated recoveries therein reflect the collection on intercompany claims.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 33, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit F** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.   Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[13]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E.   Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

---

13   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.   No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### E.   Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit G** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going-concern value recoveries to creditors under the Plan are higher than the recoveries such creditors would receive in a hypothetical liquidation of SDLP under chapter 7 of the Bankruptcy Code, as illustrated in the Liquidation Analysis. Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

**XI.    CERTAIN SECURITIES LAW MATTERS**

The Debtors believe the New Common Stock to be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities laws.

**A.    Issuance of Securities under the Plan**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local laws requiring registration ("Blue Sky Laws") when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. Section 1145(a)(2) of the Bankruptcy Code exempts from registration under section 5 of the Securities Act and applicable Blue Sky Laws the offer of a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in section 1145(a)(1) of the Bankruptcy Code, or the sale of a security upon the exercise of such a warrant, option, right, or privilege. In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities. In reliance upon this exemption, the Debtors believe that the offer and sale under the Plan of New Common Stock will be exempt from registration under the Securities Act and state securities laws with respect to any such Holder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code. Accordingly, no registration statement will be filed under the Securities Act or any state Blue Sky Laws. Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Laws.

The New Common Stock will be issued without registration in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S. Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of a security in connection with transactions not involving any public offering. Rule 506 of Regulation D, provides non-exclusive safe harbor conditions with respect to the exemption provided by Section 4(a)(2) of the Securities Act. Regulation S provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of securities made outside of the United States to any non-U.S. Person (within the meaning of Regulation S). Any securities issued in reliance on Section 4(a)(2) of the Securities Act, including in compliance with Rule 506 of Regulation D, and/or Regulation S promulgated thereunder will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to an effective registration statement under the Securities Act, or an applicable exemption from registration under the Securities Act and other applicable law.

**B.    Subsequent Transfers of Securities Issued under the Plan**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;
- offers to sell securities offered under a plan of reorganization for the holders of those securities;
- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

Persons (i) who receive securities that are exempt under section 1145 of the Bankruptcy Code but who are deemed "underwriters" or (ii) who receive securities issued under the Plan that are "restricted securities" would, however, be permitted to sell such securities without registration if an available resale exemption exists, including the exemptions provided by Rule 144 or Rule 144A under the Securities Act to the extent available.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**C.    New Common Stock & Employee Incentive Plan.**

Any equity and equity-linked interests associated with the Employee Incentive Plan, if any, will be issued pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 4(a)(2) of the Securities Act and, accordingly, such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE**

51

**UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX, UNITED KINGDOM, AND MARSHALL ISLANDS TAX CONSEQUENCES OF THE PLAN**

This tax disclosure will be updated in advance of the hearing on conditional approval of the Disclosure Statement.

**XIII.   RECOMMENDATION**

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: February 12, 2021

SEADRILL PARTNERS LLC
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*
Mohsin Y. Meghji
Chief Restructuring Officer
Seadrill Partners LLC

52

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## Form 6-K

**REPORT OF FOREIGN PRIVATE ISSUER**
**PURSUANT TO RULE 13a-16 OR 15d-16**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934**

For the month of February 2021

Commission File Number 333-224459

# Seadrill Limited
(Exact name of Registrant as specified in its Charter)

Par-la-Ville Place, 4th Floor
14 Par-la-Ville Road
Hamilton HM 08 Bermuda
(Address of principal executive office)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.
Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1).
Yes ☐ No ☒

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7).
Yes ☐ No ☒

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

**Seadrill New Finance Limited Announces Extension of Forbearance Agreement**

**Hamilton, Bermuda, February 23, 2021** – Seadrill Limited ("Seadrill" or the "Company") (OSE:SDRL, OTCQX:SDRLF) announces that Seadrill New Finance Limited (the "Issuer"), a subsidiary of the Company, has agreed to extend the existing forbearance agreement announced on 11 February 2021 with respect to the 12.0% senior secured notes due 2025 (the "Notes") with certain holders of the Notes (the "Note Holders").

Pursuant to the forbearance agreement, as extended, the consenting Note Holders have agreed not to exercise any enforcement rights with respect to the Issuer and any subsidiary of the Issuer which is an obligor under the Notes to, or otherwise take actions in respect of, certain events of default that may arise under the Notes as a result of, amongst other things, the Issuer not making the semi-annual 4% cash interest payment due to the senior secured noteholders on 15 January 2021 in respect of their Notes and the filing of Chapter 11 cases in the Southern District of Texas by the Company and certain of its consolidated subsidiaries (excluding the Issuer and its consolidated subsidiaries) until and including the earlier of 10 March 2021 and any termination of the forbearance agreement.

The purpose of the forbearance agreement is to allow the Issuer and its stakeholders more time to negotiate on the heads of terms of a comprehensive restructuring of its balance sheet. Such a restructuring may involve the use of a court-supervised process.

FORWARD LOOKING STATEMENTS

This news release includes forward looking statements. Such statements are generally not historical in nature, and specifically include statements about the Company's plans, strategies, business prospects, changes and trends in its business, the markets in which it operates and its restructuring efforts. These statements are made based upon management's current plans, expectations, assumptions and beliefs concerning future events impacting the Company and therefore involve a number of risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed or implied in the forward-looking statements, which speak only as of the date of this news release. Consequently, no forward-looking statement can be guaranteed. When considering these forward-looking statements, you should keep in mind the risks described from time to time in the Company's regulatory filings and periodical reporting. The Company undertakes no obligation to update any forward looking statements to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for the Company to predict all of these factors. Further, the Company cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to be materially different from those contained in any forward looking statement.

This information is subject to the disclosure requirements pursuant to section 5-12 of the Norwegian Securities Trading Act.

**For further information, please contact:**

Media questions should be directed to:
Iain Cracknell
Director of Communications
+44 (0)7765 221 812

Analyst questions should be directed to:
Hawthorn Advisors
seadrill@hawthornadvisors.com
+44 (0)203 7454960

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SEADRILL LIMITED**

Date: February 24, 2021

By:   /s/ Stuart Jackson
Name: Stuart Jackson
Title: Chief Executive Officer of Seadrill Management Ltd. (Principal Executive Officer of Seadrill Limited)