**KEPPEL OPP'N EXH.  36**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

———————————

# Form 6-K

———————————

**REPORT OF FOREIGN PRIVATE ISSUER**
**PURSUANT TO RULE 13a-16 OR 15d-16**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**For the month of September 2017**

**Commission File Number 001-34667**

———————————

# Seadrill Limited
**(Exact name of Registrant as specified in its Charter)**

———————————

**Par-la-Ville Place, 4th Floor**
**14 Par-la-Ville Road**
**Hamilton HM 08 Bermuda**
**(Address of principal executive office)**

———————————

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F. Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101 (b)(1). Yes ☐ No ☒

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101 (b)(7). Yes ☐ No ☒

**Entry into Restructuring Support and Lock-Up Agreement and Commencement of Chapter 11 Cases**

On September 12, 2017, Seadrill Limited ("Seadrill" or the "Company") entered into a restructuring support and lock-up agreement (the "RSA") with a group of bank lenders, bondholders, certain other stakeholders, and new-money providers. Seadrill's consolidated subsidiaries North Atlantic Drilling Ltd. ("NADL") and Sevan Drilling Limited ("Sevan"), together with certain other of Seadrill's consolidated subsidiaries (collectively with Seadrill, the "Company Parties") entered into the RSA together with Seadrill. The parties to the RSA represent more than 97% of the loans under the Seadrill group's 12 credit facilities and approximately 40% of the Seadrill and NADL bonds. Ship Finance International Limited and three of its subsidiaries ("SFL"), which charter three drilling units to the Company Parties, also executed the RSA. In connection with the RSA, the Company Parties entered into an investment agreement (the "Investment Agreement") under which Hemen Investments Limited, an affiliate of Seadrill's largest shareholder Hemen Holding Ltd. and a consortium of investors, including the bondholder parties to the RSA, committed to provide $1.06 billion in new cash commitments.

On September 12, 2017, to implement the transactions contemplated by the RSA and Investment Agreement, the Company Parties' commenced prearranged reorganization proceedings under chapter 11 of title 11 of the United States Code in the Southern District of Texas. At the point of filing, Seadrill has over $1 billion in cash and does not require debtor-in-possession financing. As part of the chapter 11 cases, the Company Parties have filed "first day" motions that, when granted, will enable the Company Parties' day-to-day operations to continue as usual. Specifically, the Company Parties requested authority to pay trade creditors and employee wages and benefits without change or interruption. Additionally, the Company Parties will pay all suppliers and vendors in full under normal terms for goods and services provided during the chapter 11 cases.

**Overview of RSA and Investment Agreement**

The RSA contemplates that each of the Company Parties' credit facilities will be amended to provide, among other things:

- approximately 4 to 5.5 year maturity extensions;

- significant amortization relief with no amortization payments until 2020;

- no maintenance covenants except minimum liquidity until Q1 2021; and

- cross-collateralization of the existing credit facilities.

The RSA and Investment Agreement contemplate the formation of an intermediate holding company to issue the new secured notes. Rig-owning entities and certain other assets will be contributed to a subsidiary of that intermediate holding company, which will guarantee and facilitate cross-collateralization of the amended credit facilities. The RSA provides for amendments to SFL's charter agreements with the Company Parties on terms generally consistent with the credit facility amendments.

The Investment Agreement provides for the issuance of $860 million of new senior secured notes and $200 million of new Seadrill equity. The new secured notes will mature on the seventh anniversary of the closing and bear interest at a fixed rate of 12% annually consisting of 4% annually payable in cash and 8% annually payable in kind. The new secured notes will be secured by, among other things, first ranking security interests in unencumbered assets and $227.5 million in a cash escrow account, subject to reduction under certain circumstances, plus second ranking security over other assets.

The RSA and Investment Agreement both require the restructuring to close within 11 months, and both are subject to customary closing conditions and termination events. The Investment Agreement obligated Seadrill to pay cash commitment fees equal to 5% of the total debt and equity commitment at signing. The Investment Agreement also provides for an additional cash fee equal to 1% of the new senior secured notes, a primary structuring fee consisting of 5% of the new Seadrill equity (post-dilution), and an additional structuring fee consisting of 0.5% of the new Seadrill equity (pre-dilution), payable to certain parties to the Investment Agreement at closing.

**Terms of the Plan of Reorganization**

The chapter 11 plan of reorganization contemplated by the RSA provides the following distributions, assuming general unsecured creditors accept the plan:

- purchasers of the new secured notes will receive 57.5% of the new Seadrill equity, subject to dilution by the primary structuring fee and an employee incentive plan;

- purchasers of the new Seadrill equity will receive 25% of the new Seadrill equity, subject to dilution by the primary structuring fee and an employee incentive plan;

- general unsecured creditors of Seadrill, NADL, and Sevan, which includes Seadrill and NADL bondholders, will receive their pro rata share of 15% of the new Seadrill common stock, subject to dilution by the primary structuring fee and an employee incentive plan, plus certain eligible unsecured creditors will receive the right to participate pro rata in $85 million of the new secured notes and $25 million of the new equity, provided that general unsecured creditors vote to accept the plan; and

- holders of Seadrill common stock will receive 2% of the new Seadrill equity, subject to dilution by the primary structuring fee and an employee incentive plan, provided that general unsecured creditors vote to accept the plan.

Existing claims against and interests in Seadrill, including the economic interests in the existing Seadrill common shares, will be extinguished under the plan. If Seadrill general unsecured creditors do not accept the plan, they will receive the minimum consideration required under chapter 11, and holders of existing Seadrill common shares will receive no recovery. The RSA contemplates certain releases and exculpations and implementation of a customary equity-based employee incentive plan at closing. The transactions contemplated by the RSA are subject to court approval and other terms and conditions.

Seadrill's non-consolidated affiliates, including Seadrill Partners LLC, SeaMex Ltd., Archer Limited, and their respective subsidiaries, did not commence proceedings under chapter 11 and are not parties to the RSA or Investment Agreement. We expect their business operations to continue uninterrupted.

The foregoing description of the RSA, Investment Agreement and terms of the plan of reorganization does not purport to be complete and is qualified in its entirety by reference to the RSA and the Investment Agreement, which are filed as Exhibit 10.2 and Exhibit 10.3, respectively, to this Form 6-K and are incorporated herein by reference.

**Other Information Regarding Reorganization Proceedings**

The Company has engaged Kirkland & Ellis LLP as legal counsel, Houlihan Lokey, Inc. as financial advisor, and Alvarez & Marsal as restructuring advisor. Slaughter and May has been engaged as corporate counsel, and Morgan Stanley served as co-financial advisor during the negotiation of the restructuring agreement. Advokatfirmaet Thommessen AS is serving as Norwegian counsel. Conyers Dill & Pearman is serving as Bermuda counsel.

Together with the chapter 11 proceedings, Seadrill, NADL and Sevan are commencing liquidation proceedings in Bermuda to appoint joint provisional liquidators and facilitate recognition and implementation of the transactions contemplated by the RSA and Investment Agreement, and Simon Edel, Alan Bloom and Roy Bailey of Ernst & Young are to act as the joint and several provisional liquidators.

Court filings and other information related to the restructuring proceedings are available at a website administered by the Company's claims agent, Prime Clerk, at https://cases.primeclerk.com/seadrill or via the information call center at  844-858-8891 (US toll free) or the following international numbers:

Brazil Toll Free: 0-800-591-8054
Mexico Toll Free: 01-800-681-5354
Nigeria Toll Free: 070-80601847
Norway Toll Free: 800-25-030
Saudi Arabia Toll Free: 800-850-0029
Singapore Toll Free: 800-492-2272
Thailand Toll Free: 1-800-011-156
UAE Toll Free: 8000-3570-4559
UK Toll Free: 0-800-069-8580

The Company has also posted FAQs on its website at www.seadrill.com/restructuring.

**EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 10.1 | Presentation related to the Company's restructuring, dated September 12, 2017, to certain of its bondholders. |
| 10.2 | Restructuring Support and Lock-up Agreement, dated September 12, 2017, among the Company, certain of its wholly and partially owned subsidiaries, certain senior secured lenders, certain bondholders, and certain new money providers, and the exhibits thereto. |
| 10.3 | Investment Agreement, dated September 12, 2017, among the Company, certain of its wholly and partially owned subsidiaries, and certain new money providers, and the exhibits thereto. |
| 99.1 | Press release dated September 12, 2017. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SEADRILL LIMITED**

Date: September 13, 2017

By:  /s/ Mark Morris

Name:  Mark Morris
Title:   Chief Financial Officer

Exhibit 10.1



# Seadrill Limited
**Strictly Private & Confidential**

## Project Eagle: Cleansing Presentation

Original Date: 5 August 2017

Updated for Q2 2017: 12 September 2017

*Subject to the disclosures, assumptions and qualifications set out in this presentation including, without limitation, the disclaimer set forth on page 2*

# Disclaimer



We have prepared this document solely for informational purposes and it remains subject to Seadrill Limited Board review. You should not definitively rely upon it or use it to form the definitive basis for any decision, contract, commitment or action whatsoever, with respect to any proposed transaction or otherwise. You and your directors, officers, employees, agents and affiliates must hold this document and any oral information provided in connection with this document in strict confidence and may not communicate, reproduce, distribute or disclose it to any other person, or refer to it publicly, in whole or in part at any time except with our prior written consent. If you are not the intended recipient of this document, please delete and destroy all copies immediately. This document is protected by rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use of disclosure of confidential settlement discussions.

The information contained herein includes certain statements, estimates and projections with respect to our anticipated future performance and anticipated industry trends. Such statements, estimates and projections reflect various assumptions concerning anticipated results and industry trends, which assumptions may or may not prove to be correct. Actual results and trends may vary materially and adversely from the projections contained herein. We have prepared this document and the analyses contained in it based, in part, on certain assumptions and information obtained by us from the recipient, its directors, officers, employees, agents, affiliates and/or from other sources. Our use of such assumptions and information does not imply that we have independently verified or necessarily agree with any of such assumptions or information, and we have assumed and relied upon the accuracy and completeness of such assumptions and information for purposes of this document. Neither we nor any of our affiliates, or our or their respective officers, employees, advisors or agents, make any representation or warranty, express or implied, in relation to the accuracy or completeness of the information contained in this document or any oral information provided in connection herewith, or any data it generates and accept no responsibility, obligation or liability (whether direct or indirect, in contract, tort or otherwise) in relation to any of such information. We and our affiliates and our and their respective officers, employees, advisors and agents expressly disclaim any and all liability which may be based on this document and any errors therein or omissions therefrom. Neither we nor any of our affiliates, or our or their respective officers, employees, advisors or agents, make any representation or warranty, express or implied, that any transaction has been or may be effected on the terms or in the manner stated in this document, or as to the achievement or reasonableness of future projections, management targets, estimates, prospects or returns, if any. Any views or terms contained herein are preliminary only, and are based on financial, economic, market and other conditions prevailing as of the date of this document or as at the date stated in respect of that information and are therefore subject to change. We undertake no obligation or responsibility to update any of the information contained in this document. Past performance does not guarantee or predict future performance.

This document and the information contained herein do not constitute an offer to sell or the solicitation of an offer to buy any security, commodity or instrument or related derivative, nor do they constitute an offer or commitment to lend, syndicate or arrange a financing, underwrite or purchase or act as an agent or advisor or in any other capacity with respect to any transaction, or commit capital, or to participate in any trading strategies, and do not constitute legal, regulatory, accounting or tax advice to the recipient. We recommend that the recipient seek independent third party legal, regulatory, accounting and tax advice regarding the contents of this document. This document does not constitute and should not be considered as any form of financial opinion or recommendation by us or any of our affiliates. This document is not a research report and was not prepared by the research department of Seadrill Limited or any of its affiliates.

Neither you nor your directors, officers, employees, agents, advisors and affiliates may use the information contained in this document in any manner whatsoever, in whole or in part, other than in connection with evaluating the proposal contained herein. This document may contain material non-public information concerning Seadrill Limited and/or its affiliates and/or Seadrill Limited's and/or its affiliates' securities. You and your directors, officers, employees, agents, advisors and affiliates must only use such information in accordance with your compliance policies and procedures, contractual obligations and applicable laws and regulations. Some or all of the information contained herein is or may be price sensitive information and the use of such information may be regulated or prohibited by applicable legislation relating to insider dealing. You and your directors, officers, employees, agents, advisors and affiliates must not use any such information for any unlawful purpose.

2

## Table of Contents



1. **Introduction & Update**

2. **Market and Business Update**

3. **Business Plan**

4. **Recapitalisation Plan**

5. **Treatment of Stakeholders**

6. **Timing and Implementation**

Seadrill

# Introduction and Update

## Process Update and Investment Opportunity



- **Agreement has been reached on the key elements of Seadrill's restructuring plan**

  - ➤ $1.06 bn ($860mm New Secured Notes and $200mm of new equity) of new capital from Hemen and Centerbridge ("HCB"), ad hoc group ("AHG"), and certain other holders
  - ➤ Amendment & extension of bank facilities
  - ➤ Equitisation of more than $2.5bn of outstanding bonds and derivative exposure
  - ➤ Management of contingent liabilities

- **Agreement provides a comprehensive 5-year plan**

- **We expect to implement the proposed restructuring plan through pre-arranged Chapter 11 commencing on 12 September 2017**

# Investment Opportunity



| | |
|---|---|
| **Invest in Industry Leader** | • Seadrill has youngest fleet among the largest industry players<br>• Strong management team with deep industry relationships<br>• Supportive anchor shareholder with decades of experience in the maritime and drilling industry<br>• Significant scale and global reach provide strong commercial platform |
| **Invest at the Bottom of the Cycle** | • Offshore resources continue to be a significant portion of oil and gas reserves, and cost of supply is competitive on a full cycle basis<br>• Underinvestment during the down-cycle will require future investment at levels not seen in decades<br>• Dayrate and utilisation trends are following previous cycles: increased tender activity indicates industry improvement |
| **5-year Runway Until Industry Fully Recovers** | • No maturities until Mar-22[1]<br>• Significant amortisation reduction and flexibility through a deferral election<br>• Adequate forecasted liquidity under downside scenario<br>• No maintenance covenants except minimum liquidity until Q1 2021<br>• No cash settlement of non-consolidated guarantees<br>• At the end of 5 year period, leverage through New Secured Notes is refinance-able |
| **Collateral Coverage and Structural Downside Protection** | • 2nd ranking security over banks' cross-collateralised security at RigCo level<br>• Clean 1st ranking claim on cash collateral at NSNCo representing approximately 27% of NSN<br>• Clean 1st ranking security over IHCo and NSNCo shares and certain other assets provides additional protection<br>• Structural priority over claims at Seadrill Limited level |
| **Strong Return Profile** | • Fees and mid-teens coupon provides base return even in the event of a modest recovery<br>• Equity to new capital provides strong gearing to industry recovery<br>• Commitment Fees and Closing Fees |

1. Lenders will be asked to consent within 30 days of the Petition Date to extend maturities by a further three months so that they fall between June 2022 and December 2024

Seadrill

# Market and Business Update

## Market Conditions

## Leadership Succession Plan Implemented



### Anton Dibowitz



- CEO, appointed 1 July 2017
- Former Chief Commercial Officer and Executive Vice President
- Joined Seadrill in April 2007
- 20 years experience in the drilling industry

### Per Wullf



- Will continue as a Director
- Former CEO, President and Director
- Joined Seadrill in February 2009
- 30+ years experience in the drilling industry

## Offshore Has A Significant Role to Play



### Offshore is a Significant Portion of Oil Companies Reserves…



Source: Wood Mackenzie as of Jun-17

### Current Breakeven Oil Price By Resource Type and Production Volume



Source: Evercore ISI Energy Research as of Feb-17

9

# Offshore Will Be A Critical Source Of Future Supply   Seadrill

- Over half of production growth through 2020 expected to come from the offshore segment

**Global Liquid Production (mbbl/d)**



Source: Rystad Energy, Morgan Stanley Research estimates as of Jun-17



## Offshore Needed To Bridge Production Gap

### Estimated incremental demand
*In mbpd, cumulative to 2020*

### Sources of additional supply
*In mbpd, cumulative to 2020*

*Production needs from **offshore** and other sources*

*Shale (additional, at $80/b oil)*
*Shale (base, at $60/b oil)*

*Pipeline – upstream projects, 2017-2020*

IEA estimate that in order to compensate for three years of suppressed investment (2015-2017), ~21 billion barrels of new projects will need to be approved annually between 2018-2025 – levels not seen since the 1970s

Source: IEA, Fearnleys

## Increasing Tendering Activity

**Seadrill**

### Level of activity across tendering process
*In rig years*





- Day rates have stabilised, albeit at low levels
- Marketed utilisation has begun to increase and is expected to continue based on tendering activity

Source: Fearnley Securities - Drillers Weekly: Week 24 – June 13th 2017



# Market and Business Update

## Competitive Position And Recent Performance





## Competitive Position: Floaters

**Seadrill**

### Contract Coverage — Floaters



### Average Floater Age



*One of the largest and youngest floater fleet among major drillers*
*Best in class contract current contract coverage*

Source: IHS Petrodata, Seadrill analysis – June 2017
1. Seadrill Group includes consolidated Seadrill, SDLP and Seamex

## Competitive Position: Jack-ups

**Seadrill**

### Contract Coverage — Jack-ups



Number of Units (left axis) / (%) (right axis)

Legend: ■ 1. Contracted   ■ 2. Warm stacked   ■ 3. Cold stacked   — Utilization (%)

### Average Jack-ups Age

Av. Age (Years)

> Figures for Seadrill Group include West Mischief, but exclude West Triton and West Resolute



| Seadrill Group[1] | Diamond Offshore | Borr Drilling | Noble | Rowan | Ensco |
|---|---|---|---|---|---|
| 7 | 9 | 12 | 14 | 17 | 22 |

*One of the largest and youngest jack-up fleet among major drillers*
*High current contract coverage*

Source: IHS Petrodata, Seadrill analysis – June 2017
1. Seadrill Group includes consolidated Seadrill, SDLP and Seamex

16

# Industry leading backlog additions in 2016 and 2017   Seadrill

**Key contracts executed:**

- **2016**
  - ➢ West Eclipse – 2 year contract with Exxon Mobil in Angola
  - ➢ West Tellus – 18 month extension with Petrobras in Brazil
  - ➢ AOD I, II and III – 3 year extensions for each of 3 jack-ups with Saudi Aramco
  - ➢ West Castor – 1 year contract for jack-up with ENI in Mexico
  - ➢ West Phoenix – Contracts with Total and Nexen in UK covering the majority of 2017

- **2017**
  - ➢ 10 year contract for the West Elara and 10 year extension for the West Linus with Conoco Phillips in Norway – estimated $1.4bn in net backlog addition[1]
  - ➢ Seamex JV - 2.5 year contract extensions for each of 5 jack-ups with Pemex[2]
  - ➢ West Saturn – Contracts with Ophir (Ivory Coast) and Statoil (Brazil) utilising newly installed 2nd BOP and MPD (Managed Pressure Drilling) equipment
  - ➢ West Hercules – contract with Siccar Point in UK for cold stacked unit

(1)   Contracts subject to partners' approval. Backlog estimate assumptions set out in North Atlantic Drilling press release April 11, 2017
(2)   Seamex is a 50% owned joint venture not consolidated by Seadrill Limited

# Innovative Solutions To Serve Our Customers

**Seadrill**

**Integrated service offerings**



***West Aquarius / Statoil Canada***



***West Castor / ENI Mexico***

**Managed pressure drilling**



***West Tellus / Petrobras Libra Field Brazil***

**Market indexed rates**



***West Capricorn / BP US GoM***



***West Capella / Total Cyprus***



## Continued Focus On Cost Competitiveness



Opex per rig per day including overhead ($'000)

**Floaters**

-28%

202  171  146

**Jack-ups**

-24%

88  86  67

2014  2015  2016

19

## Outstanding Performance and Safety

**Seadrill**

### Economic utilisation



Our uptime has been at sustained record highs in 2016 and this year….

### Total Recordable Injury Frequency



…while we've managed to reduce injuries below industry benchmark

20

# Summary

Seadrill

- **Offshore has a role to play in providing the world's energy**

  - ➢ Production gap that requires offshore to plug
  - ➢ Dayrate and utilisation trend following patterns from previous cycles just before recovery
  - ➢ Increase in tendering activity a good leading indicator for the market

- **Results in the past two years demonstrate we can deliver, even in the toughest of times**

  - ➢ Substantial cost reductions
  - ➢ Record utilisation and improved HSE
  - ➢ Backlog additions in 2016 and 2017 ahead of peers

- **Seadrill has the right strategy and assets to succeed in the competitive drilling industry**

  - ➢ Right focus: operations, rigs, customers and people
  - ➢ Relatively high proportion of rigs on contracts
  - ➢ Modern, high specification fleet

Seadrill

# Business Plan

## Financial Model



- **We have prepared a Financing Case and Delayed Dayrate Case**
  - ➢ Difference relates to timing of a recovery in dayrates
- **Delayed Dayrate Case is being used for investment committee and Banks' credit approval process**
  - ➢ Conservative outlook for setting covenants and liquidity cushion
- **Please refer to 9 December 2016 presentation materials filed on 31 January 2017 and Appendix B and C for additional detail**

## Key Assumptions – Delayed Dayrate Case



- Contract dayrates where applicable

- Independent 3rd party dayrate and utilisation assumptions (Fearnley) thereafter

- Idle time between contract end to Fearnley

- Cold stacked rigs cost $10k/d and estimated reactivation fees of $30mm for floaters and $10mm for jack-ups

**Floaters**



**BE Jackups**



**HE Jackups**



24

# Main Developments and Changes Since December 

| Item | Update as of Q2-17 |
|------|--------------------|
| **Actuals update** | ▪ Actuals included through the end of Q2-17 |
| **Seadrill Limited backlog increased** | ▪ $1.4 bn<br>▪ 8 fixtures |
| **Sale of 3 Jack-ups** | ▪ $225 million gross proceeds received<br>  ➢ Of which $102 million used to repay bank debt associated with rigs sold |
| **West Mira Settlement** | ▪ $170 million received |

## Unlevered Free Cash Flow – Delayed Dayrate Case



**Unlevered Free Cash Flow**



- The business continues to generate cash throughout the period

- Business model not broken

**Revenue**



**EBITDA**



26

## Cashflow Sensitivity Analysis



### Delayed Dayrate Case UFCF: $3,989 million over forecast period (2018 – 2022)



**Analysis applies the reduction / increase over the entire forecast period**

27

# Cash Hazards and Opportunities



| | Hazards | Opportunities | Entity Affected / Beneficiary |
|---|---|---|---|
| Newbuilds guarantee settlement | TBD | - | RigCo |
| Working capital increase | - | +$50 million | RigCo |
| Support for JV's | -$40 million | - | RigCo |
| Credit charges for prospective interest rate hedging | TBD | - | RigCo |
| Seadrill Partners distributions[1] | -$40 million p.a. | - | IHCo |
| Sapura deferred consideration[2,3] | - | +$110 million | RigCo / NSNCo |
| Seabras Sapura J.V. dividends | - | +$40 million p.a. | NSNCo |

1. Includes distributions from subsidiaries of Seadrill Partners to Seadrill Partners that are then up-streamed and distributions from Seadrill Ltd's direct stake in the subsidiaries of Seadrill Partners
2. As of June 30, 2017
3. NSNCo benefits post-closing, subject to a minimum outstanding balance of $55m



# Recapitalisation Plan

## Overview

**Seadrill**

- **Objectives**
  - ➢ 5-year plan to bridge to a recovery
  - ➢ Attract new capital
  - ➢ Manage contingent liabilities
  - ➢ Remain competitive post refinancing

- **Scope**
  - ➢ Seadrill Limited (incl. NADL, Sevan and AOD)
  - ➢ All facilities that have Seadrill Limited covenants

- **Principles**
  - ➢ Consensual approach
  - ➢ Timely execution
  - ➢ Lowest execution risk



## Group Liabilities Addressed, as of Q2 2017

**Seadrill**

| Liabilities | Size ($mm) |
|---|---|
| **Secured Seadrill Limited Debt (incl. NADL, Sevan and AOD)** | **$5,953** |
| Ship Finance Loans | 835[1] |
| **Total Secured Debt** | **$6,788** |
| | |
| **Unsecured Bond Debt** | **$2,297** |
| | |
| **Seabras Sapura Guaranteed Debt** | **736** |
| **Archer[2]** | **296** |
| **SDLP Guaranteed Debt** | **583** |
| **Seadrill Limited Contingent Liabilities** | **$1,615** |
| | |
| **Seadrill Limited Guaranteed Newbuild Obligation** | **$1,830** |
| | |
| **Derivative Contracts** | **$280** |
| | |
| **Total Liabilities Addressed by Plan (as of Q2-17)** | **$12,810** |

1.  Represents SFL debt consolidated on Seadrill's balance sheet. Total lease liability $1,181mm
2.  Balance as of Q1 2017; the guarantees were managed prior to the end of Q2 2017

## Other Current Liabilities Already Addressed

**Seadrill**

| Entity | Liability (as of Q2-17) | Treatment | Credit Approval | Documentation |
|---|---|---|---|---|
| Archer[1] | $296 million | ▪ Remove guarantee of bank debt<br>▪ Remove event of default on sponsor default | ✓ | ✓ |
| Seamex | Zero as of Sept 2016 | ▪ Remove event of default on sponsor default | ✓ | ✓ |
| SDLP | $583 million | ▪ Structural separation of SDLP and Seadrill facilities including removal of Seadrill guarantees of SDLP bank debt | ✓ | ✓ |

1.   Balance as of Q1 2017; the guarantees were managed prior to the end of Q2 2017

Key Parts Of The Plan

Seadrill

Amendment and extension of Bank Facilities

New Capital

Restructuring of SFL bareboat charter payments

Supported by strong operational performance

Manage interest rate risk

Contingent liability insulation

Equitisation of bonds, existing derivatives and other unsecured claims

Manage newbuild risk

34



## Liquidity After Restructuring

### Liquidity After Restructuring – Delayed Dayrate Case [1]



1. Consolidated cash includes cash in RigCo, IHCo, NSNCo and Seadrill Ltd; 2022 bank maturities assumed to roll

## Leverage After Restructuring

**Seadrill**

### Leverage Trajectory



### Leverage Profile



## Projected Principal Payments After Restructuring[1]   Seadrill 

- Assumes 12-September Ch11 filing; bank facilities are fully repaid at maturity and lenders consent to extending bank maturities by a further three months



(1)  Under Delayed Dayrate case; assumes consent from lenders to provide additional 3-month maturity extension
(2)  Amortisation in 2020 reflects the true-up for amortisation paid from 1 August 2017 to filing

## Minimum Principal Payments



- Assumes 12-September Ch11 filing; bank facilities are fully repaid at maturity and lenders consent to extending bank maturities by a further three months



(1) Includes maturities for Amortisation Conversion Election tranches; assumes consent from lenders to provide additional 3-month maturity extension

38

# Illustrative Sources and Uses At Closing

**Seadrill**

*Assumes Filing Date of 12-Sep-17 and Emergence / Closing Date of 15-Apr-18*

| Sources | In $ millions | Usage | Uses | In $ millions |
|---|---|---|---|---|
| Illustrative Cash on B/S at Emergence | $826 | RigCo: All cash on B/S at transaction close | Cash at RigCo | $1,378 |
| New Equity | $200 | RigCo: $200 | Amendment Fees to Banks | 24 |
| New Secured Notes | $860 | RigCo: $523.9 | Closing Fees | 148 |
| | | IHCo: $100 | Cash at IHCo | 100 |
| | | NSNCo: $227.5 | Cash at NSNCo | 228 |
| | | NSN Closing Fee: 1% | NSN Closing Fee[1] | 9 |
| **Total Sources** | **$1,886** | | **Total Uses** | **$1,886** |

(1)  1% cash fee paid at closing

## Seadrill Equity Ownership After Restructuring

**Seadrill**

| Stakeholder | Ownership of Seadrill Limited[1] |
|---|---|
| **New Secured Notes** | • 57.5% pre dilution |
| **New Equity** | • 25% pre dilution |
| **Unsecured Claims** | • 15% pre dilution |
| **Existing Equity** | • 2% pre dilution |
| **Structuring Fee to Ad Hoc Group** | • 0.5% of equity pre dilution |
| **Structuring Fee to Hemen** | • 5% of equity post dilution |



**Fully Diluted[1][2]**

- 0.5% Structuring Fee (AHG)
- 5.0% Structuring Fee (Hemen)
- 1.9% Existing Equity
- 14.3% Unsecured Claims
- 23.8% New Equity
- 54.6% New Secured Notes

1. Equity split in a consensual deal
2. Fully diluted before management incentive plan



# Treatment of Stakeholders

Corporate Structure Post Restructuring

Seadrill

(1) Entities refer to New Seadrill, New Sevan, and New NADL with the current entities expected to be liquidated pursuant to Bermuda law

## Bank Debt Amendment and Extension 

| Key Amendments | <ul><li>Maturity Extension: c.4 to 6 years</li><li>Amortisation:<ul><li>2017 (post filing): none;</li><li>2018: none</li><li>2019: none</li><li>2020: $358 million[1]</li><li>Post 2020: $521 million p.a.</li></ul></li><li>Cash sweep beginning in Q2 2021</li><li>Financial Covenants:<ul><li>Minimum Liquidity: $650mm stepping down to $400mm</li><li>Leverage and DSCR: tested from Q1-2021</li></ul></li><li>Undrawn RCF: cancelled and replaced with $500mm ACE</li></ul> |
|---|---|

1.   Includes true-up mechanism for any amortisation paid from 1 August 2017 to filing

## Bank Debt Amendment and Extension (Cont.)



| Key Benefits To Banks | ■ Majority of cash at closing at RigCo |
| | ■ Cross-collateralisation |
| | ■ No principal impairment |
| | ■ Guarantee from RigCo and Seadrill Limited |
| | ■ Improved group-wide covenants |
| | ■ Upfront 50bps fee and 100bps increased margin |

## New Secured Notes



| | |
|---|---|
| **Amount** | ■ $860 million<br>   ➤ $462.4 million commitment by Hemen and Centerbridge<br>   ➤ $397.6 million commitment by the ad hoc group ($357.6 million) and certain other holders ($40 million)<br>■ $85 million Rights Offering to certain eligible holders of general unsecured claims, which reduces Hemen's, Centerbridge's and the ad hoc group's commitment |
| **Economics** | ■ 12% interest: 4% cash and 8% PIK<br>■ 57.5% of reorganised equity in Seadrill Limited (before Structuring Fee and management incentive plan dilution) |
| **Maturity** | ■ 7-years post closing (or if later, 6 months after the last Bank maturity)<br>■ Bullet repayment at maturity |
| **Security** | ■ Junior to Banks' cross-collateralisation at RigCo<br>■ First lien over unencumbered assets<br>■ $227.5 million cash collateral, subject to release mechanism |

## New Secured Notes

**Seadrill**

| | |
|---|---|
| **Commitment Fee** | ■ Fee of 5% payable in cash at RSA signing to initial NSN commitment parties in accordance with the Investment Agreement |
| **Closing Fee** | ■ Fee of 1% payable in cash at closing in accordance with the Investment Agreement |
| **Termination Fee** | ■ None |

# New Equity Placement

**Seadrill**

| Amount | ■ $200 million<br>➤ $150 million committed by Hemen and Centerbridge<br>➤ $50 million commitment by the ad hoc group<br>■ Up to $25 million of Hemen's allocation available as Rights Offering to general unsecured claims |
|---|---|
| Reorganised Equity | ■ 25% of new equity in Seadrill Limited (before Structuring Fee and management incentive plan dilution) |
| Use of Proceeds | ■ All proceeds moved to RigCo except $25 million retained at Seadrill Limited |
| Commitment Fee | ■ Fee of 5% payable in cash at RSA signing |
| Ticking Fee | ■ Ticking fee of $100,000 per day if the new equity is not available for trade on the Oslo Stock Exchange within 90 days of the Confirmation Order being entered; provided that no ticking fee will apply if the new equity is not available for trade due to events not reasonable within the control of the Company |
| Termination Fee | ■ None |

# Structuring Fees



| | |
|---|---|
| **Structuring Fee: Payable to AHG** | ■ 0.5% of reorganised equity in Seadrill Limited after equitisation of bond/swap claims and, if applicable, allocation to existing equity in consensual scenario (but before dilution due to Structuring Fee: Payable to Hemen) |
| **Structuring Fee: Payable to Hemen** | ■ 5% of fully diluted reorganised equity in Seadrill Limited after equitisation of bond/swap claims, Structuring Fee: Payable to AHG and, if applicable, allocation to existing equity in consensual scenario |

# Bonds

**Seadrill**

| Treatment of Bonds | ■ Bonds, derivatives and other unsecured claims to receive 15% of new equity in Seadrill Limited (before Structuring Fee and management incentive plan dilution) |
| --- | --- |

## Existing Shareholders



**Equity Ownership Post Reorganisation**

- Existing shareholders will only receive equity if unsecured classes at Seadrill Limited vote to accept the plan
- Current shareholders to receive 2% of reorganised equity in Seadrill Limited (before Structuring Fee and management incentive plan dilution)

## Newbuilds

**Seadrill**

**Guaranteed Newbuilds**

- Guarantees will be eliminated either through:
  - i.   Negotiated settlement, or
  - ii.  Rejection of contracts in Ch. 11

## NADL, Sevan Drilling and AOD Minority Equity



| **NADL and Sevan Drilling Minority Equity** | ■ To be eliminated<br>■ No cash payment |
| --- | --- |
| **AOD Minority Equity** | ■ Mermaid's stake (c.34% ownership) unchanged<br>■ AOD's contribution to RigCo cross-collateralisation modified to reflect Seadrill's c.66% stake<br>■ Discussions with Mermaid ongoing |

# Ship Finance Limited

**Seadrill** 

| **Bareboat Charter Amendments** | ■ 29% deferral of the SFL charters for the period 2018-2022 |
| | ■ After 2022, deferred amounts from period 5 years earlier added back to the charter rate (e.g., amounts deferred in 2018 are repaid in 2023) |
| | ■ Put/purchase obligations are adjusted such that the all-in IRR of each lease is reduced from implied contractual rate to 6.0%, with the West Linus put option further adjusted to $86 million |
| | ■ Call options adjusted by adding any deferred amounts to and subtracting any repaid amounts from the original call option prices |
| | ■ Charters hived down to RigCo group |
| | ■ Seadrill Limited guarantees to be retained |
| | ■ SFL does not participate in the banks' RigCo cash sweep |
| | ■ Third ranking RigCo guarantees (subordinated to first ranking guarantee in favour of Banks and second ranking guarantee in favour of New Secured Notes) |

## Seabras Sapura

**Seadrill** 

**Seabras Guarantees**

- Guarantees will be eliminated either through:
  i. Negotiated settlement that removes guarantee in return for certain commercial concessions, within Seabras (preferred approach), or
  ii. Equitisation of contingent unsecured claim in Ch. 11
- Approach to Esmeralda remains under consideration

## Derivatives

**Seadrill**

**Derivatives**

- All existing derivatives expected to be terminated upon filing for Ch. 11
- Derivatives counterparties receive an unsecured claim equal to crystallised derivatives' mark-to-market
- Unsecured claim to receive same treatment as Bonds
- Considering either the purchase of interest rate caps or entering into new swaps to replace the swaps expected to be terminated

## Rights Offering To Unsecured Claims in Ch.11 

**Rights Offering Recipients**

- As part of the transaction, rights offerings will be offered to holders of general unsecured claims ("**Rights Offering Recipients**")
- Amounts subscribed and funded by these Rights Offering Recipients shall result in a reduction to Hemen, Centerbridge and the ad hoc group's aggregate commitments as described in the Rights Offering Quota section below
- Commitment parties in the Investment Agreement will not be able to participate in the Rights Offerings with respect to their claim as of the Agreement Effective Date

**Rights Offering Quota**

- The aggregate available NSNs to Hemen, Centerbridge, and the ad hoc group may be reduced by up to $85 million
- The aggregate available New Equity to Hemen may be reduced by up to $25 million



# Timing and Implementation

## Chapter 11 Implementation Overview



- **We presently expect the Company to file a prearranged chapter 11**
  - ➤ Established forum for an enterprise of this size and complexity
  - ➤ Worldwide automatic stay protects contracts from termination
  - ➤ Ability to reject unfavorable contracts
  - ➤ Voting class majority required: 66.7% in amount and 50% in number
  - ➤ Ability to bind non-consenting classes of creditors / interests

- **Agreeing to a prearranged chapter 11 has a number of key benefits**
  - ➤ Less time in chapter 11
  - ➤ Less expensive
  - ➤ Less disruption to operations
  - ➤ Clear public deal terms from beginning provides more certainty to the market and customers on final outcome



# Chapter 11 Implementation Illustrative Timeline

Seadrill

1.Up to 60 days between Confirmation Hearing and Plan Effective Date to finalise documents

# Key Documents



| Document | Description | Parties |
|---|---|---|
| Investment Agreement | Reflects terms and conditions of new money commitments | Hemen, NSN commitment parties, and Seadrill parties |
| Restructuring Support and Lock-Up Agreement (RSA) | Reflects terms and conditions of commitments to support the restructuring transactions, including the Chapter 11 cases | Banks, Hemen, NSN commitment parties, Seadrill Parties, and other stakeholders |
| Restructuring Term Sheets | Reflects material terms of Chapter 11 plan and other restructuring terms | Attached to RSA |
| Commercial Term Sheets | Reflect terms of bank amendments, new secured notes, inter-creditor agreement, and cash pooling | Attached to RSA |
| Other Term Sheets | Reflect terms of cash collateral order, non-consolidated entity insulation, and swap matters | Attached to RSA |
| Definitive Documents | At closing an indenture, amended credit agreements and other definitive documents consistent with the term sheets will be negotiated and executed | Various |

Seadrill

# Appendix

## Appendix: Table of Contents

**Seadrill**

- **Appendix A: Key Modelling Assumptions**      **65**

- **Appendix B: Business Plan – Financing Case**      **69**

- **Appendix C: Business Plan – Delayed Dayrate Case**      **73**

- **Appendix D: Legal Structure Before and After Recapitalisation**      **77**

- **Appendix E: Term Sheets**
  - ➤ Summary of Terms for Secured Credit Facilities
  - ➤ Summary of Terms for New Secured Notes
  - ➤ Summary of Terms for Bonds
  - ➤ Summary of Terms for Non-Consolidated Entities and Financial Guarantees

       **81**

- **Appendix F: Cash Pool Mechanics**      **100**

- **Appendix G: Bank Debt Maturity and Amortisation Profile**      **107**

- **Appendix H: Forward LIBOR Curve**      **110**

Seadrill

# Appendix A
# Key Modelling Assumptions

## Opex



- Operating costs of contracted rigs assumed to increase at a rate of 3% p.a.
- Rigs rollover operating cost including G&A assumption for:

| | | |
|---|---|---|
| Floaters[1] | 2017 | $145k/d |
| | 2018 (+4%) | $150k/d |
| | 2019 (+4%) | $155k/d |
| | 2020 (+8%) | $166k/d |
| | 2021 (+4%) | $172k/d |
| | 2022 (+4%) | $178k/d |
| HE Jackups[1] | 2017-2022 | $150k/d |
| BE Jackups[1] | 2017-2022 | $70k/d |
| Idle Rigs[2] | 2017-2022 | $10k/d |

1. All daily opex numbers (other than idle rigs) include $20k/d of G&A
2. Excludes G&A costs

# Other Assumptions



| | |
|---|---|
| **Key Dates** | Filing Date: 12 September 2017<br>Effective Date: 15 April 2018 |
| **Treatment of Bonds** | No interest paid upon filing<br>Claims fully equitised upon emergence |
| **Premium Paid for Interest Rate Caps** | $75m spent to purchase interest rate caps in Q4 2017 assumed, if caps purchased in preference to swaps |
| **Non Working Fleet Assumption** | Cold stacked (FL $10k/d, JU $10k/d) with no capital expenditures (including Long-Term Maintenance) |
| **Reactivation Fees** | Estimated reactivation fees of $30mm for floaters and $10mm for jack-ups |
| **West Mira Cancellation Compensation** | $170mm received in Q1 2017 |
| **Working Capital Requirements** | $50mm WC increase in Q3 2017 |
| **Archer Guarantees Removal** | $28mm settlement in Q2 2017 |
| **SDLP Distributions to SDRL** | $10mm distributions quarterly |

# Refinancing Assumptions



## Filing Date: 12 September 2017; Effective Date: 15 April 2018

| **1** Bank Amendment and Extension | **Maturity Tenor** | Maturities extended by c. 4 to 6 years |
| --- | --- | --- |
| | **Amortisation** | Amortisation holiday from Filing Date through 2019<br>$358mm[1] amortisation in 2020<br>$521mm amortisation in 2021 and thereafter (as reduced to reflect maturities from March 2022)<br>$500mm Amortisation Conversion Election starting in Q1 2020 |
| | **Consent Economics** | 50bps consent fee, 50% credit for R1 extension fee payments<br>100 bps margin increase |
| **2** Equitise Bonds and Other Unsecured Claims | **Equitisation of Bonds** | Full equitisation of outstanding bond and other unsecured claims in exchange for 15% of the reorganised equity (before Structuring Fee dilution [2]) |
| | **Other Unsecured Claims** | Derivatives expected to be terminated upon filing, Company cash flows to remain unhedged<br>Derivatives to be crystallised and treated as part of general unsecured claims pool |

1. Includes true-up mechanism for any amortisation paid from 1 August 2017 to filing
2. Fully diluted before management incentive plan

# Refinancing Assumptions (cont.)



**Filing Date: 12 September 2017; Effective Date: 15 April 2018**



| 3 | | |
|---|---|---|
| **New Money Investment** | **New Secured Notes** | Amount: $860mm in cash<br>Maturity: Year 7 post-closing<br>Interest: 4% cash, 8% PIK<br>Fees: 5% commitment fee and 1% closing fee paid in cash |
| | **Equity Placement** | Amount: $200mm in cash<br>$150 mm committed by HCB, $50mm committed by AHG and<br>Up to $25 million of Hemen's allocation available as Rights Offering to Unsecured Creditors[1]<br>Equity: 25% of reorganised equity in Seadrill Limited (before Structuring Fee dilution [2])<br>Fees: 5% fee paid in cash |

1.  Commitment Parties have agreed to not participate in the Rights Offering on behalf of their Unsecured Claims
2.  Fully diluted before management incentive plan



# Appendix B
# Business Plan –
# Financing Case

## Business Plan Assumptions



- To assist us in preparing the Business Plan, we commissioned a report (the "Fearnley Report") on the offshore drilling market from Fearnley Offshore AS
  - ➢ We believe this forecast is conservative and realistic
- The Fearnley Report is the basis for the dayrate and utilisation assumptions
  - ➢ We manage our fleet as a portfolio and the assumptions are applied to the uncontracted fleet

| Financing Case | Based on Fearnley's low case assumptions around dayrate and utilisation of rigs for Seadrill | | | | | |
|---|---|---|---|---|---|---|
| | | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** |
| **Floaters** | Dayrates ($ k/d) | $180 | $268 | $363 | $420 | $435 | $435 |
| | Total Utilisation (%) | 51% | 77% | 87% | 89% | 91% | 91% |
| **Jackups (BE)** | Dayrates ($ k/d) | $84 | $95 | $99 | $112 | $118 | $125 |
| | Total Utilisation (%) | 65% | 85% | 89% | 90% | 89% | 88% |
| **Jackups (HE)** | Dayrates ($ k/d) | $133 | $141 | $175 | $215 | $243 | $243 |
| | Total Utilisation (%) | 67% | 67% | 90% | 90% | 90% | 90% |



## Key Financials – Financing Case



### Key Financials

| ($ in millions) | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| **Cash Flow Items** | | | | | | | | |
| EBITDA | $1,557 | $744 | $730 | $1,243 | $1,543 | $1,671 | $1,680 | $9,169 |
| Unlevered FCF | 1,359 | 597 | 182 | 636 | 982 | 1,262 | 1,326 | 6,345 |
| Cash Interest | (466) | (380) | (326) | (325) | (331) | (303) | (253) | (2,384) |
| **Levered FCF** | **$893** | **$217** | **($144)** | **$311** | **$651** | **$959** | **$1,073** | **$3,961** |
| Bank Amortisation | (923) | (679) | - | - | (358) | (521) | (521) | (3,004) |
| Cash Sweep | - | - | - | - | - | (760) | (490) | (1,250) |
| SFL Payments | (187) | (189) | (135) | (115) | (106) | (104) | (102) | (938) |
| New Capital / Other | 542 | 268 | 944 | 40 | 40 | 40 | 40 | 1,914 |
| **Net Cash Flow** | **$325** | **($383)** | **$665** | **$237** | **$226** | **($386)** | **($0)** | **$684** |
| **Balance Sheet Items** | | | | | | | | |
| Bank Debt | $6,450 | $5,662 | $5,662 | $5,662 | $5,304 | $4,022 | $3,010 | |
| New Secured Capital | - | - | 913 | 988 | 1,069 | 1,157 | 1,253 | |
| Bonds | 2,295 | 2,295 | - | - | - | - | - | |
| Sale Leaseback | 884 | 787 | 689 | 592 | 494 | 397 | 299 | |
| **Total Debt** | **$9,630** | **$8,744** | **$7,264** | **$7,242** | **$6,867** | **$5,576** | **$4,562** | |
| Cash | 1,369 | 986 | 1,651 | 1,887 | 2,114 | 1,728 | 1,728 | |
| **Net Debt** | **$8,261** | **$7,758** | **$5,613** | **$5,354** | **$4,753** | **$3,849** | **$2,835** | |
| **Credit Statistics** | | | | | | | | |
| Net Debt / EBITDA | 5.3x | 10.4x | 7.7x | 4.3x | 3.1x | 2.3x | 1.7x | |

1. Amortisation in 2020 is less than the term sheets' 2020 amortisation of $434mm, which reflects the true-up for amortisation paid after 1 August 2017

Seadrill

# Appendix C
# Business Plan –
# Delayed Dayrate Case

# Dayrate and Utilisation – Delayed Dayrate Case



- The Delayed Dayrate Case is framed as a six-month delay in the 2018 recovery of dayrates, returning to previously presented Financing Case assumptions by 2020
- The Delayed Dayrate Case is a more conservative case to ensure that the Company has the necessary liquidity and runway to reach an industry recovery

**Operating Assumptions: Floaters**

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Total Utilisation Rate** | | | | | | |
| Financing Case | 51% | 77% | 87% | 89% | 91% | 91% |
| Delayed Dayrate Case | 51% | 77% | 87% | 89% | 91% | 91% |
| **Annual Uncontracted Dayrate** | | | | | | |
| Financing Case | $180 | $268 | $363 | $420 | $435 | $435 |
| Delayed Dayrate Case | $180 | $224 | $315 | $420 | $435 | $435 |

**Operating Assumptions: HE Jack-ups**

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Total Utilisation Rate** | | | | | | |
| Financing Case | 67% | 67% | 90% | 90% | 90% | 90% |
| Delayed Dayrate Case | 67% | 67% | 90% | 90% | 90% | 90% |
| **Annual Uncontracted Dayrate** | | | | | | |
| Financing Case | $133 | $141 | $175 | $215 | $243 | $243 |
| Delayed Dayrate Case | $133 | $137 | $158 | $215 | $243 | $243 |

**Operating Assumptions: BE Jack-ups**

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Total Utilisation Rate** | | | | | | |
| Financing Case | 65% | 85% | 89% | 90% | 89% | 88% |
| Delayed Dayrate Case | 65% | 85% | 89% | 90% | 89% | 88% |
| **Annual Uncontracted Dayrate** | | | | | | |
| Financing Case | $84 | $95 | $99 | $112 | $118 | $125 |
| Delayed Dayrate Case | $84 | $90 | $97 | $112 | $118 | $125 |

**Legend**

- Recovery Delay
- Midpoint calculation for 6 month delay
- Denotes full recovery to current year Financing Case

## Delayed Dayrate Case – Variance Analysis



### Seadrill Consolidated

| ($ in Millions) | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| Financing Case | $2,867 | $1,865 | $1,991 | $2,647 | $2,980 | $3,149 | $3,196 | $18,621 |
| Delayed Dayrate Case | $2,867 | $1,865 | $1,814 | $2,399 | $2,980 | $3,149 | $3,196 | $18,196 |
| Delayed Dayrate Case Better / (Worse) than Financing Case | - | - | ($178) | ($248) | - | - | - | ($425) |
| | | | | | | | | |
| **EBITDA** | | | | | | | | |
| Financing Case | $1,557 | $744 | $730 | $1,243 | $1,543 | $1,671 | $1,680 | $9,156 |
| Delayed Dayrate Case | $1,557 | $744 | $552 | $995 | $1,543 | $1,671 | $1,680 | $8,730 |
| Delayed Dayrate Case Better / (Worse) than Financing Case | - | - | ($178) | ($248) | - | - | - | ($425) |
| | | | | | | | | |
| **Unlevered FCF** | | | | | | | | |
| Financing Case | $1,359 | $597 | $182 | $636 | $982 | $1,262 | $1,326 | $6,343 |
| Delayed Dayrate Case | $1,359 | $597 | $48 | $414 | $939 | $1,262 | $1,326 | $5,943 |
| Delayed Dayrate Case Better / (Worse) than Financing Case | - | - | ($135) | ($222) | ($43) | - | - | ($400) |

**Applying a one year delay to the Financing Case in dayrates would decrease EBITDA by a total $425mm over the projected period**

**Unlevered free cash flow decreases less than EBITDA due to working capital fluctuations, as well as lower projected capital expenditures and taxes**



# Key Financials – Delayed Dayrate Case



| Key Financials | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ($ in millions) | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
| **Cash Flow Items** | | | | | | | | |
| EBITDA | $1,557 | $744 | $552 | $995 | $1,543 | $1,671 | $1,680 | $8,743 |
| Unlevered FCF | 1,359 | 597 | 48 | 414 | 939 | 1,262 | 1,326 | 5,945 |
| Cash Interest | (466) | (380) | (326) | (325) | (331) | (314) | (276) | (2,417) |
| **Levered FCF** | **$893** | **$217** | **($278)** | **$89** | **$608** | **$949** | **$1,050** | **$3,528** |
| Bank Amortisation | (923) | (679) | - | - | (358) | (521) | (521) | (3,004) |
| Cash Sweep | - | - | - | - | - | (351) | (467) | (817) |
| SFL Payments | (187) | (189) | (135) | (115) | (106) | (104) | (102) | (938) |
| New Capital / Other | 542 | 268 | 944 | 40 | 40 | 40 | 40 | 1,914 |
| **Net Cash Flow** | **$325** | **($383)** | **$530** | **$15** | **$184** | **$13** | **($0)** | **$684** |
| **Balance Sheet Items** | | | | | | | | |
| Bank Debt | $6,450 | $5,662 | $5,662 | $5,662 | $5,304 | $4,432 | $3,443 | |
| New Secured Capital | - | - | 913 | 988 | 1,069 | 1,157 | 1,253 | |
| Bonds | 2,295 | 2,295 | - | - | - | - | - | |
| Sale Leaseback | 884 | 787 | 689 | 592 | 494 | 397 | 299 | |
| **Total Debt** | **$9,630** | **$8,744** | **$7,264** | **$7,242** | **$6,867** | **$5,986** | **$4,995** | |
| Cash | 1,369 | 986 | 1,516 | 1,531 | 1,714 | 1,728 | 1,728 | |
| **Net Debt** | **$8,261** | **$7,758** | **$5,748** | **$5,711** | **$5,153** | **$4,259** | **$3,268** | |
| **Credit Statistics** | | | | | | | | |
| Net Debt / EBITDA | 5.3x | 10.4x | 10.4x | 5.7x | 3.3x | 2.5x | 1.9x | |

1. Amortisation in 2020 is less than the term sheets' 2020 amortisation of $434mm, which reflects the true-up for amortisation paid after 1 August 2017

Seadrill

# Appendix D
# Legal Structure Before and After
# Recapitalisation Plan



## Current Group Structure and Liabilities

Seadrill

**Consolidated Entities**

**Legend**
- Parent
- Equity Interests
- Subsidiaries
- Consolidated Entities

**Seadrill Limited**
Secured Debt: $6.0bn
(o/w at Seadrill Limited: $3.9bn)
Unsecured Bonds:$2.3bn
(o/w at Seadrill Limited: $1.7bn)

**Guarantees and Contingent Liabilities**
- NADL: $950mm bank debt, $170mm NOK bond
- Sevan: $875mm
- AOD: $219mm
- SFL lease obligation: $835mm
- Derivative Contracts MtM: $280mm
- Seabras Sapura: $783mm
- Newbuilds: $1,830mm delivery payments with recourse to Seadrill Limited[5]

**Non-Consolidated Entities**

**15.7%**
Archer
Sec. Debt: $674mm

**50.0%**
Seabras Sapura
Secured Debt: $1.4bn

Other Non-Consolidated Entities

**46.6%**
Seadrill Partners LLC
Secured Debt : $3.0bn

**50.0%**[2]
SeaMex Ltd
Secured Debt: $582mm

**50.1%**[1]
Sevan Drilling Ltd.
Secured Debt: $875mm

**66.2%**[4]
Asia Offshore Drilling
Secured Debt: $219mm

**70.4%**[1][3]
North Atlantic Drilling, Ltd.
Secured Debt: $950mm
Uns. Bonds (Seadrill Ltd-guaranteed): NOK1,500mm ($170mm)
Uns. Bonds (not guaranteed): $413mm (not inclusive of $187mm owned by Seadrill Limited)

Source:  Company Q2 2017 filings

Note: Seadrill Partners is accounted through the equity method
1.   Remaining ownership held by public shareholders
2.   Joint-venture partner is an investment fund managed by Fintech Advisory Inc.
3.   Ship Finance rigs are already included in rig counts (two at Seadrill, one at NADL)
4.   Other major shareholder is Mermaid Maritime Public Company Limited
5.   Other $1,971mm of contingent payments for delivery of 8 jackup vessels ($1,471mm) and the Sevan Developer ($500mm) do not have recourse to Seadrill Limited







# Group Structure Before Restructuring

Seadrill

1. Certain shareholdings are indirectly held by Seadrill Limited
2. Shareholding indirectly held by Seadrill UK Ltd

# Group Structure Post Restructuring

Seadrill

1. $1.06Bn of new cash capital in the form of $200m new equity and $860m New Secured Notes
2. Bonds fully equitised, together with existing derivatives and other unsecured claims
3. Creation of NSNCo, a wholly owned subsidiary of IHCo, as issuer of NSNs
4. Seadrill Partners and other assets (including assets pledged to NSNs) hived down to NSNCo
5. $227.5m of proceeds kept as cash collateral for the NSNs, subject to release mechanism

1. 1st ranking guarantee to be granted in favour of the New Secured Noteholders
2. 2nd ranking guarantee to be granted in favour of the New Secured Noteholders

Seadrill

# Appendix E
# Summary Term Sheets

**The summary terms contained in this Appendix E are a high level, indicative only summary and subject to the detailed terms set out in the legal term sheets. To the extent there is any inconsistency with the summary terms in this Appendix E and the legal term sheets, the legal term sheets will prevail.**



# Summary of Terms for Secured Credit Facilities

## Secured Credit Facilities

**Seadrill**

| | Current Contractual Terms (Post R1) | Summary of Proposed Terms |
|---|---|---|
| **Tenor** | • December 2016 to August 2020 | • March 2022 to September 2024<br>• Banks requested to consent within 30 days of filing to extend the maturities by a further three months so that they fall between June 2022 and December 2024 |
| **Amortisation** | • Under R1 no change to number of existing scheduled amortisation payments | • 2017: Existing amortisation paid until filing, provided that to the extent amortisation payments made between 1 Aug 2017 and filing date, such amounts to be deducted from 2020 amortisation<br>• 2018: $0m<br>• 2019: $0m<br>• 2020: $358m[1]<br>• Post 2020: $521m (as reduced to reflect maturities from March 2022) |
| **Amortisation Conversion Election** | • N/A | • $500m total Amortisation Conversion Election subject to:<br>  ➤ Being available from first quarterly amortisation after 1 January 2020<br>  ➤ For first $250m of ACE 40c contribution from IHCo to RigCo for every dollar of ACE utilised, but if no cash at IHCo then ACE still available<br>  ➤ First $250m of ACE, LTM EBITDA less than projected EBITDA in the Delayed Dayrate Case (for election in 2020) or $1.55bn (for elections after 2020)<br>  ➤ Second $250m of ACE, LTM EBITDA less than 80% of projected EBITDA in the Delayed Dayrate (for election in 2020) or $1.25bn (for elections after 2020)<br>  ➤ Facility margin of L + 550bps<br>  ➤ Ability to fully redraw |
| **Amendment Fee** | • 10bps waiver consent fee<br>• Approximately 20-50bps maturity extension fee paid | • 50bps calculated on the funded amounts under the relevant Secured Credit Facilities on the refinancing closing date<br>• Subject to credit, in the case of any Facilities extended as part of Request 1, for 50% of the extension fees paid in respect of such Facility |
| **Margin** | • Original applicable margin will apply as increased by below margin grid<br><br>| Leverage Ratio | Margin |<br>\|---\|---\|<br>\| <4.5x \| 0 bps \|<br>\| 4.5x – 5.0x \| 12.5 bps \|<br>\| 5.0x – 5.5x \| 25 bps \|<br>\| 5.5x – 6.0x \| 75 bps \|<br>\| >6.0x \| 150 bps \| | • 100bps increase to post R1 applicable cash margin |
| **MVC Test** | • Suspended until testing date post 30 June 2017 | • Waived during the life of the Secured Credit Facilities |
| **IHCo Cash Sweep** | • N/A | • On each NSN cash interest payment date, where IHCo cash (excl. NSNCo cash and certain other cash amounts) exceeds $250m, excess cash will be swept from IHCo to RigCo |

1.   Includes true-up mechanism for any amortisation paid from 1 August 2017 to filing

82

# Secured Credit Facilities (cont.)

 Seadrill

| | Current Contractual Terms (Post R1) | Summary of Proposed Terms |
|---|---|---|
| **Mandatory RigCo cash sweep** | • N/A | • Semi-annual cash sweep beginning from 30 June 2021<br>• For each cash sweep date:<br>  ➢ 75% of RigCo Excess Cash swept to Banks<br>  ➢ 25% of RigCo Excess Cash swept to IHCo<br>• Excess cash defined as RigCo cash balance above $1.25bn<br>• No payments to IHCo to the extent IHCo cash balance greater than $250m – amounts then retained at RigCo |
| **Restricted Payments** | • Essentially no dividends or other restricted payments to be made by Seadrill Limited during the negotiation for the amendments to the Secured Credit Facilities | • No distributions out of RigCo except for certain Permitted Payments, which include payments permitted under group wide covenants<br>• Other IHCo Top-Up Payments only permitted under certain conditions:<br>  ➢ Commencing January 2020<br>  ➢ No existing or pro forma EoD<br>  ➢ Cash at IHCo (excluding certain excluded cash) does not exceed $250m pre or post payment<br>  ➢ Cash at RigCo equal to $250m above then applicable Minimum Liquidity Requirement pre and post payment<br>  ➢ For every dollar upstreamed, three dollars of secured credit facilities pre-paid<br>  ➢ No amounts outstanding under ACE |
| **Cross Default** | • Full cross-default to various wholly-owned and non-wholly owned subsidiaries and investments (e.g. NADL, Sevan, AOD and certain other non-consolidated entities) | • Full cross-default between Secured Credit Facilities (including AOD, NADL and Sevan) subject to harmonisation of certain covenants and events of default<br>• Acceleration of NSNs will also be an EoD<br>• No cross default in respect of debt of other non-100% owned subsidiaries of Seadrill Limited from time to time and their subsidiaries or non-consolidated investments of Seadrill Limited from time to time and their subsidiaries |
| **Seadrill Ltd Deficiency Claim** | • Each facility benefits from unsubordinated guarantee or direct borrowing claim from Seadrill Limited for any deficiency claim | • Each facility benefits from guarantee from Seadrill Limited (pari passu with guarantee in favour of NSNs) |
| **RCF Availability** | • RCFs blocked | • Cancellation and replacement of the RCFs with the $500 mm ACE construct |

# Secured Credit Facilities (cont.)


**Seadrill**

| | Current Contractual Terms (Post R1) | Summary of Proposed Terms |
|---|---|---|
| **Financial Covenants** | • Reset of the Leverage Ratio covenant in each Secured Credit Facility so that:<br>➢ 6.0x up to 31 December 2016<br>➢ 6.5x from 31 March 2017 to and including 30 June 2017<br>➢ 4.5x from 30 September 2017<br>• Equity Ratio covenant temporarily amended so that the market value adjustment to the Equity and Total Assets components of this financial covenant is deleted (subject to reinstatement on 30 June 2017) | • Minimum liquidity covenant to be satisfied at all times (subject to 5 Business Days grace period for intra-period variations of up to $50m) and to be tested quarterly from closing<br>• No other financial covenant testing until Q1 2021<br>• First 4 testing periods:<br>➢ RigCo DSCR (Adjusted EBITDA / Debt Service) at 0.8x<br>➢ RigCo Net Leverage (Net Funded Debt / Adjusted EBITDA) set at same implied headroom<br>➢ Any DSCR or Net Leverage covenant breach does not cause event of default: triggers margin increase of +25 bps PIK plus obligation on IHCo to fund RigCo in an amount to remedy breach (and therefore remove margin increase) to the extent it has cash to do so. Where margin increase occurs, banks have consultation rights<br>• After the first four testing periods, DSCR at 1.0x and Net Leverage set at same implied headroom<br>• After first 4 testing periods, EBITDA equity cure rights (limited to 4 total uses) through contributions to RigCo (equity or subordinated debt or cash at IHCo or Seadrill Limited level)<br>• Financial covenants to be a common term provision amendable by 66 2/3rds of all lenders (i.e. not per facility) |
| **Minimum Liquidity** | • $250mm | • At closing, $100m held at IHCo. Remaining cash (excluding NSNCo restricted cash and other restricted cash) held at RigCo (i.e. including $200m equity proceeds and $523.9m of the NSN proceeds) provided that $25m left at Seadrill Limited<br>• Minimum RigCo liquidity of:<br>➢ 2017: $650m<br>➢ 2018: $525m<br>➢ 2019 onward: $400m |
| **Asset Sales** | • Provisions dealing with disposals of rigs and entities holding rigs unclear both as to extent of consents needed and thresholds for these | • No consents required where allocated debt is prepaid in full with sale proceeds<br>• In addition, where sale proceeds are not less than 90% of amount required for prepayment of allocated debt, difference can be topped up from cashflow provided that no EoD and RigCo cash is not less than the RigCo minimum liquidity requirement + $250m (pre and post payment on a pro forma basis) |

# Secured Credit Facilities (cont.)



| | Current Contractual Terms (Post R1) | Summary of Proposed Terms |
|---|---|---|
| Excess Sales Proceeds | • N/A | • Excess sales proceeds will be paid into excess sales proceeds escrow account(s) that will be established at the RigCo group level<br>• Security will be granted over the RigCo excess sales proceeds escrow account(s) with Bank Finance Parties having a first priority claim and the New Secured Noteholders having a second priority claim subject to the Intercreditor Agreement<br>• Where no EoD, amounts in the excess sales proceeds escrow account(s) can be applied (i) in prepayment of ACE tranches, (ii) if there are no ACE tranches outstanding, towards upcoming amortisation and interest payments if RigCo group liquidity is less than $750m or (iii) to acquire new rigs within the RigCo group (subject to the consent of the Supra Majority Lenders) |
| Security | • Existing first ranking security on rig related collateral, including rigs, earnings accounts, insurances, earnings and shares | • Existing bank security package to remain in place<br>• Security to be granted in favour of lenders under the respective facilities over intercompany liabilities owed to RigCo by a subsidiary of RigCo which is subject to the existing security<br>• Cross collateralisation between outstanding facilities through first ranking security granted in favour of the Bank Finance Parties over::<br>➤ the shares in RigCo<br>➤ the RigCo bank account which is funded with contributions from IHCo<br>➤ the intercompany loans made by RigCo to IHCo and by IHCo to RigCo<br>➤ the RigCo excess sales proceeds escrow account(s)<br>➤ any subsidiary party to a guaranteed newbuild contract to the extent RigCo cash used to fund such newbuild<br>• 1st lien pari passu with NSN on IHCo cash (Banks' claim to have priority to enforcement proceeds up to difference between prevailing Minimum Liquidity level and RigCo group consolidated cash)<br>• Cash sweep from RigCo entities to RigCo periodically (on a basis to be agreed with the Company) and first ranking security over RigCo cash sweep accounts granted in favour of the Bank Finance Parties |
| Change of Control (Hemen) | • Change of Control mandatory prepayment triggered if Hemen ceases to own a minimum of 20% of voting rights or share capital of Seadrill Ltd or otherwise control the appointment of board of Seadrill Ltd | • Change of Control if:<br>➤ For the first 12 months after closing, Hemen owns less than 20% of voting shares and ceases to have the agreed director appointment rights<br>➤ Between 12 and 24 months after closing, Hemen owns less than 10% of the voting shares and ceases to have the agreed director appointment rights<br>➤ From 24 months after closing, Hemen owns less than 5% of the voting shares and ceases to have the agreed director appointment rights<br>• In the event of John Fredriksen's death or permanent disability, above provisions to fall away after 6 months<br>• In addition, Change of Control if a third party (i.e. a person who is not Hemen) acquires (i) 50.1% of the voting shares or (ii) the ability to appoint a majority of the board |

# Financial Covenants Summary

 Seadrill

| Financial covenants applicable from Refinancing Closing Date to Q1 2021 | | |
|---|---|---|
| **Covenants** | **Level** | **Calculation** |
| **Minimum Liquidity** | • 2017: $650m<br>• 2018: $525m<br>• 2019 onward: $400m | • Min. liquidity requirement of $650/525/400mm within RigCo and its Subsidiaries<br>• To be satisfied at all times (subject to 5 Business Days grace period for intra-period variations of up to $50m) and to be tested quarterly from closing |

| Financial covenants applicable from Q1 2021 onwards | | |
|---|---|---|
| **Covenants** | **Level** | **Calculation** |
| **Minimum Liquidity** | • $400mm | • Min. liquidity requirement of $400mm within RigCo and its Subsidiaries<br>• To be satisfied at all times (subject to 5 Business Days grace period for intra-period variations of up to $50m) and to be tested quarterly from closing |
| **RigCo Debt Service Coverage Ratio** | • Not tested prior to Q1 2021<br>• 0.8x from Q1 2021 to Q4 2021<br>• 1.0x from Q1 2022 onwards | • Calculated as Adjusted EBITDA / Debt Service<br>• At each quarterly test date, covenant level tested using RigCo EBITDA calculated over last 12 months<br>• Adjusted EBITDA to include all IHCo contributions made to RigCo after closing |
| **RigCo Net Leverage** | • Not tested prior to Q1 2021<br>• Set as same implied headroom as DSCR | • Calculated as Net Funded Debt / Adjusted EBITDA<br>• Net Funded Debt as at testing debt and Adjusted EBITDA calculated on immediately preceding 12 months<br>• Adjusted EBITDA to include all IHCo contributions made to RigCo after closing |
| **Minimum MVC** | • Minimum market value covenant and associated mandatory prepayment event to be waived during the life of the Secured Credit Facilities<br>• The Group will continue to provide market value of rigs semi-annually for information purposes only | |

# RigCo Financial Covenants – Delayed Dayrate Case  

- Financial covenants tested at RigCo level only and amended to navigate through industry downturn
- Holiday period post closing until Q1 2021 (except for minimum liquidity)
- Covenant breaches in 2021 lead to a margin increase of 25 bps PIK and Bank consultation rights; do not lead to an Event of Default
- Limited financial covenants thereafter with significant headroom against the Delayed Dayrate Case

### RigCo Financial Covenants

| ($ in millions) | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RigCo Financials [1]** | | | | | | | | | | | | | | | | | |
| LTM RigCo EBITDA | $537 | $616 | $708 | $844 | $982 | $1,105 | $1,237 | $1,374 | $1,528 | $1,566 | $1,618 | $1,640 | $1,671 | $1,670 | $1,666 | $1,681 | $1,680 |
| | | | | | | | | | | | | | | | | | |
| LTM Amortisation Payments | - | - | - | - | - | 63 | 137 | 248 | 358 | 425 | 482 | 502 | 521 | 521 | 521 | 521 | 521 |
| LTM Interest Expense | 300 | 280 | 283 | 285 | 287 | 290 | 291 | 292 | 290 | 288 | 284 | 277 | 269 | 259 | 249 | 239 | 228 |
| **LTM Debt Service Payments** | **$300** | **$280** | **$283** | **$285** | **$287** | **$353** | **$428** | **$539** | **$649** | **$713** | **$766** | **$779** | **$791** | **$781** | **$771** | **$760** | **$750** |
| | | | | | | | | | | | | | | | | | |
| Gross RigCo Debt | $5,662 | $5,662 | $5,662 | $5,662 | $5,662 | $5,599 | $5,525 | $5,414 | $5,304 | $5,173 | $4,859 | $4,729 | $4,432 | $4,302 | $3,977 | $3,846 | $3,443 |
| RigCo Cash | (1,154) | (1,018) | (1,036) | (1,106) | (1,153) | (1,134) | (1,131) | (1,205) | (1,322) | (1,401) | (1,250) | (1,330) | (1,250) | (1,355) | (1,250) | (1,386) | (1,250) |
| **Net RigCo Debt** | **$4,508** | **$4,644** | **$4,626** | **$4,556** | **$4,509** | **$4,465** | **$4,394** | **$4,209** | **$3,981** | **$3,773** | **$3,609** | **$3,399** | **$3,182** | **$2,947** | **$2,727** | **$2,460** | **$2,193** |
| | | | | | | | | | | | | | | | | | |
| **Selected RigCo Credit Metrics [1]** | | | | | | | | | | | | | | | | | |
| LTM Net Leverage | 8.40x | 7.54x | 6.54x | 5.40x | 4.59x | 4.04x | 3.55x | 3.06x | 2.60x | 2.41x | 2.23x | 2.07x | 1.90x | 1.76x | 1.64x | 1.46x | 1.31x |
| LTM DSCR | 1.79x | 2.20x | 2.50x | 2.96x | 3.42x | 3.13x | 2.89x | 2.55x | 2.36x | 2.20x | 2.11x | 2.11x | 2.11x | 2.14x | 2.16x | 2.21x | 2.24x |
| | | | | | | | | | | | | | | | | | |
| **Financial Covenants** | | | | | | | | | | | | | | | | | |
| Net Leverage | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | 6.61x | 5.89x | 5.46x | 5.03x | 3.77x | 3.54x | 3.24x | 2.93x |
| | | | | | | | | | | | | | | | | | |
| Debt Service Coverage Ratio | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | 0.80x | 0.80x | 0.80x | 0.80x | 1.00x | 1.00x | 1.00x | 1.00x |
| | | | | | | | | | | | | | | | | | |
| **Covenant Headroom** | | | | | | | | | | | | | | | | | |
| Net Leverage | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | 174% | 164% | 163% | 164% | 114% | 116% | 121% | 124% |
| | | | | | | | | | | | | | | | | | |
| Debt Service Coverage Ratio | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | 174% | 164% | 163% | 164% | 114% | 116% | 121% | 124% |
| | | | | | | | | | | | | | | | | | |
| **EBITDA Headroom** | | | | | | | | | | | | | | | | | |
| Net Leverage | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | 995 | 1,005 | 1,017 | 1,039 | 889 | 895 | 921 | 930 |
| Debt Service Coverage Ratio | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | n.a. | 995 | 1,005 | 1,017 | 1,039 | 889 | 895 | 921 | 930 |

1. Illustrative; subject to update for precise legal definitions of Net Leverage and DSCR
2. Amortisation reflects the true-up for amortisation paid from 1 August 2017 to filing

Seadrill

# Summary of Terms for New Secured Notes

# New Secured Notes  Seadrill

| Key Terms |
|---|
| **Issuer** <br> • NSNCo (a wholly-owned special purposes subsidiary of IHCo) |
| **Guarantor** <br> • Guarantee from Seadrill Limited (pari passu with banks) <br> • 1st ranking guarantee from IHCo <br> • 2nd ranking guarantee from RigCo <br> • 1st ranking guarantee from all other subsidiaries of Seadrill Ltd other than IHCo and its subsidiaries (and subject to certain exceptions to be agreed for immaterial and rig-owning subsidiaries) |
| **Amount** <br> • $860 million <br>    ➤ $462.4m commitment by Hemen and Centerbridge <br>    ➤ $357.6m commitment by the ad hoc group <br>    ➤ $40m commitment by other holders <br>    ➤ $85m available to certain eligible holders of general unsecured claims, which reduces Hemen's, Centerbridge's and the ad hoc group's commitment |
| **Redemption** <br> • 7NC3 structure <br> • Up to 50% equity claw (using proceeds of equity or subordinated debt issued by Seadrill Limited) at 106% or otherwise T+50 make whole prior to third anniversary of closing <br> • Voluntary redemption at 106% in year 4, 103% in year 5 and 100% thereafter <br> • Make whole and call premia equivalent to the above to apply in case of acceleration |
| **Use of Proceeds** <br> • Contribute $523.9m into RigCo Cash Pool <br> • Contribute $100m into IHCo Cash Pool <br> • Contribute $227.5m into an NSN Escrow Account <br> • NSN Closing Fee |
| **Amortisation** <br> • Bullet repayment at maturity |
| **Tenor** <br> • Year 7 post-closing (or if later, 6 months after latest maturing Secured Credit Facility) |
| **Economics** <br> • 4% cash interest and 8% PIK interest (paid with additional NSNs). Accrues from earlier of closing and 240 days after the petition date. Ability to cash pay PIK interest from, amongst other things, equity raise and subordinated debt proceeds, cashflows at the Seadrill Limited level and Net Realisation Proceeds (as specified below) <br> • 5% Commitment Fee and 1% Closing Fee paid in cash in accordance with the Investment Agreement <br> • 57.5% equity in Seadrill Limited (before Structuring Fee dilution) |

89

## New Secured Notes (cont.)



| | Key Terms |
|---|---|
| **Security and Ranking** | • 2nd ranking security over bank accounts at RigCo and RigCo shares<br>• 1st ranking security over the shares in IHCo and NSNCo, NSNCo cash and IHCo cash (pari passu with banks' claim)<br>• Security over any subsidiary of Seadrill Limited party to a newbuild contract (in the case of guaranteed newbuilds, second ranking to any first ranking security in favour of Banks)<br>• 1st ranking security (or alternative structure to give the NSNs the benefit of the relevant assets where required consents cannot be obtained) over all other material unencumbered assets and claims that are not to be contributed to RigCo (subject to exceptions to be agreed), including but not limited to:<br>  ➤ each NSN HoldCo (including NSN HoldCos which hold shares in Seadrill Partners LLC, Seadrill Operating LP and Seadrill Capricorn Holdings LLC and NSN HoldCos which are assigned the benefit of the SapuraKencana receivable and SeaMex Seller's Credit)<br>  ➤ Seadrill Member LLC<br>  ➤ Equity stake in any JV relating to West Rigel rig<br>  ➤ Seabras Sapura 50% equity stake<br>  ➤ SeaMex Ltd. 50% equity stake<br>  ➤ Seabras Servicos de Petroleo SA<br>  ➤ Seabras Sapura Participacoes Ltda 50% equity stake<br>  ➤ Archer Limited stake<br>• 1st ranking security (or alternative structure to give the NSNs the benefit of the relevant receivables where required consents cannot be obtained) over other unencumbered receivables (including receivables owed by SDLP, SeabrasSapura entities and Archer)<br>• Security over certain intercompany loan claims (first or second ranking depending on the specific claim)<br>• Cash income and dividends from, and proceeds of disposals of, assets subject to or held by an entity subject to first ranking NSN security, but excluding certain ordinary course dividends, earn-outs and receivables from SDLP and/or related entities, ("**Net Realisation Proceeds**") will be paid into a mandatory offer holding account for application in accordance with the "Asset Realisation Redemptions / Reinvestment" section below. The mandatory offer holding account will be secured on a first ranking basis in favour of the NSNs |
| **Asset Realisation Redemptions / Reinvestment** | • Asset realisations must be for fair market value and at least 75% of the consideration must be cash<br>• The Board will agree a plan for realisation of non-core assets<br>• Net Realisation Proceeds subject to mandatory offer to redeem NSNs at 103 and then voluntary prepayment right at 106 during non-call period (then call price) in respect of 50% of Net Realisation Proceeds<br>• Reinvestment right available for 360 days after the mandatory offer, on terms to be agreed, then if not used transferred to IHCo<br>• Net Realisation Proceeds remaining after mandatory offer may also be used to cash pay PIK interest on the NSNs, fund financial support to non-consolidated entities and repay certain RigCo cash used to fund financial support |
| **Change of Control Put** | • Put at 101%<br>• Change of Control definition to match the Secured Credit Facilities definition |
| **Amendments and Waivers** | • >50% consent; except certain economic and other customary entrenched amendments which require 90% consent |

# New Secured Notes and Banks Security Package



| Assets | New Secured Notes | | | RigCo Banks | | |
|---|---|---|---|---|---|---|
| | 1st Ranking | 2nd Ranking | Structural Priority | 1st Ranking | 2nd Ranking | Structural Priority |
| **SDRL Ltd level** | | | | | | |
| Newbuild Entities other than those party to a guaranteed newbuild contract (SDRL Ltd direct/indirect stakes) | ✓ | | | | | |
| Newbuild Entities party to a guaranteed newbuild contract | | ✓ | | ✓(4) | | |
| **IHCo level** | | | | | | |
| IHCo shares (100% stake) | ✓ | | | | | |
| IHCo cash (NSN and banks pari passu) | ✓ | | | ✓(1) | | |
| Seabras Sapura Holding GmbH shares (50% stake); Seabras Servicos de Petroleo SA shares (100% stake); Seabras Sapura Participacoes Ltda shares (50% stake) | ✓ | | | | | |
| Archer Limited shares (15.71% stake) | ✓ | | | | | |
| SeaMex Ltd (50% stake) | ✓ | | | | | |
| NSNCo shares (100% stake) and NSN HoldCos (100% stakes) | ✓ | | | | | |
| NSNCo cash | ✓ | | | | | |
| **NSNCo level** | | | | | | |
| Seadrill Partners LLC (units owned by SDRL Ltd); Seadrill Capricorn Holdings (47% stake); Seadrill Operating LP (42% stake) | | | ✓(3) | | | |
| Equity stake in West Rigel rig JV(5) | ✓ | | ✓ | | | |
| SapuraKencana receivable | | | ✓ | | | |
| SeaMex seller note | | | ✓ | | | |
| Other unencumbered receivables (including receivables owed by SeabrasSapura entities and Archer)(5) | ✓ | | ✓ | | | |
| **RigCo level** | | | | | | |
| Seadrill Management Ltd (100% stake) | | | | | | ✓ |
| Seadrill Global Services Ltd (100% stake) | | | | | | ✓ |
| RigCo shares (100% IHCo stake) | | ✓ | | ✓ | | |
| Existing rigs | | | | ✓(2) | | ✓ |
| Excess sales proceeds escrow account(s), Contribution Agreement account and cash sweep account(s) at the RigCo group level | | ✓ | | ✓ | | |
| Other cash at RigCo | | | | | | ✓ |
| Intercompany loan claims owed by RigCo to IHCo and upstream intercompany loans made by RigCo to IHCo | | ✓ | | ✓ | | |

1. Claim up to the difference between prevailing Minimum Liquidity level and RigCo group consolidated cash
2. Existing rigs will continue to be secured in favour of the lenders under the relevant Secured Credit Facilities
3. Held by a new wholly owned subsidiary of NSNCo (each a 'NSN HoldCo'). NSNs have 1st ranking security over the NSN HoldCos
4. To the extent RigCo cash used to fund such newbuild
5. If consent cannot be obtained to grant security, alternative form of priority or benefit will be given

# Intercreditor Principles

 Seadrill

| | Key Terms |
|---|---|
| **Voluntary Redemption of New Secured Notes** | • Permitted prior to discharge of Secured Credit Facilities where redemption is funded by the proceeds of:<br>➢ an equity issuance by Seadrill Limited<br>➢ debt issued by Seadrill Limited and/or its subsidiaries (excluding IHCo and RigCo and its subsidiaries) and which do not benefit from guarantees or security from IHCo or RigCo or its subsidiaries<br>➢ issuance of permitted refinancing debt (subject to specified parameters)<br>➢ sales or disposals of assets other than those subject to the banks' first ranking security which is not also secured in favour of the New Secured Notes |
| **Refinancing of Secured Credit Facilities** | • Permitted in whole or in part subject to certain permitted refinancing parameters, including with respect to maturity and amount of refinancing debt and a requirement that certain other provisions not be more onerous than the Secured Credit Facilities unless such terms are also offered to the other Bank Finance Parties. |
| **Enforcement Mechanism** | • Existing security under Secured Credit Facilities: through the relevant existing security agent in accordance with the terms of the relevant individual Secured Credit Facility (i.e. consent of 66.67% of the lenders under that Secured Credit Facility)<br>• Shared security between banks (on a first ranking basis) and New Secured Notes (on a second ranking basis):<br>➢ On behalf of Banks: Supra Majority Lenders (and banks to consult with New Secured Noteholders prior to taking enforcement action and keep New Secured Noteholders informed of processes and developments)<br>➢ New Secured Notes: No independent enforcement right without Supra Majority Lender Consent<br>• "Supra Majority Lenders" means two thirds majority of the lenders under the Secured Credit Facilities with reference to total outstanding commitments across the Secured Credit Facilities<br>• New Secured Notes first ranking security (not shared with banks): Simple majority of New Secured Noteholders. Banks to be notified and kept updated on progress of enforcement |

# Intercreditor Principles (cont.)



| | Key Terms |
|---|---|
| **Fair Value Protections** | ▪ No fair value protections (subject to customary affiliate transaction restrictions) in respect of existing security under Secured Credit Facilities or New Secured Notes first ranking security (not shared with banks)<br><br>▪ Shared security between banks (on a first ranking basis) and New Secured Notes (on a second ranking basis): Fair value protections on enforcement (including requirements for court supervision of sale process or otherwise a public auction or competitive bid process). Proceeds on enforcement to be received entirely in cash, subject to credit bidding by New Secured Noteholders |
| **Amendments** | ▪ Certain amendments to the Secured Credit Facilities to be subject to consent of New Secured Noteholders, including increase of senior debt above a 10% headroom and increases in the margin, commission or fees that would increase the total annual cash costs or PIK costs in each case by more than 10%<br><br>▪ Certain amendments to New Secured Notes to be subject to consent of Supra Majority Lenders, including increasing the cash pay element, increasing quantum of notes by more than a level to be agreed, or shortening the maturity to less than 6 months after the latest maturing Secured Credit Facility |
| **US-style Restructuring and Insolvency Related Provisions** | ▪ Market standard US-style restructuring and insolvency related provisions |
| **Subordination** | ▪ Subordination of certain RigCo group intra group debt<br><br>▪ Subordination of RigCo guarantees granted to SFL counterparties, to first ranking guarantee granted in favour of Bank Finance Parties and second ranking guarantee granted in favour of New Secured Notes |



# Summary Equity Placement and Structuring Fee to Hemen

# Equity Placement Term Sheet



| | Key Terms |
|---|---|
| **Issuer** | ▪ Seadrill Limited |
| **Amount** | ▪ $200 million<br>   ➢ $150 million committed by Hemen and Centerbridge<br>   ➢ $50 million committed by ad hoc group<br>   ➢ Up to $25 million of Hemen's allocation available as Rights Offering to Unsecured Creditors[1] |
| **Reorganised Equity** | ▪ 25% of reorganised equity in Seadrill Limited (after equitisation of bonds and derivatives but before Structuring Fee dilution) |
| **Use of Proceeds** | ▪ All proceeds (subject to up to $25m to remain at Seadrill Limited for liquidity purposes) to be moved down to RigCo |
| **Warranties and MAC** | ▪ Certain customary warranties to be given at signing and on the subscription date<br>▪ Business MAC |
| **Economics** | ▪ 5% fee paid in cash |

1. Commitment Parties have agreed to not participate in the Rights Offering on behalf of their Unsecured Claims

# Structuring Fee Term Sheet

**Seadrill**

| Structuring Fee: Payable to AHG | |
| --- | --- |
| Issuer | ▪ Seadrill Limited |
| Investors | ▪ To members of the Ad Hoc Group of bondholders |
| Reorganised Equity | ▪ 0.5% of reorganised equity in Seadrill Limited after equitisation of bond/swap claims |

| Structuring Fee: Payable to Hemen | |
| --- | --- |
| Issuer | ▪ Seadrill Limited |
| Investors | ▪ To Hemen and affiliates, for structuring the transaction and Hemen's commercial contributions and assistance in newbuild negotiations |
| Reorganised Equity | ▪ 5% of fully diluted reorganised equity in Seadrill Limited (after equitisation of bond/swap claims, Structuring Fee: Payable to AHG and, if applicable, allocation to existing equity in consensual scenario) |

Seadrill

# Summary of Other Liabilities

# Other Liabilities



| Stakeholder | Key Terms |
|---|---|
| **Bonds** | ▪ Bonds, derivatives and other unsecured claims to receive 15% of new equity in Seadrill Limited (before Structuring Fee dilution) |
| **Contingent Claims** | ▪ Interest rate and cross-currency derivatives expected to be terminated and crystallised mark-to-market settled with share of the pro-forma equity |
| **Newbuilds** | ▪ Guarantees will be eliminated either through:<br>  i.   Rejection of contracts in Ch. 11, or<br>  ii.  Negotiated settlement |
| **Existing Equity** | ▪ Existing shareholders will only receive equity if unsecured classes at Seadrill Limited vote to accept the plan<br>▪ Existing shareholders to receive 2% of reorganised equity in Seadrill Limited (before Structuring Fee dilution) |

Seadrill

# Appendix F
# Cash Pool Mechanics

**The summary terms contained in this Appendix F are a high level, indicative only summary and subject to the detailed terms set out in the legal term sheets. To the extent there is any inconsistency with the summary terms in this Appendix F and the legal term sheets, the legal term sheets will prevail.**

# Cash Pooling Mechanics After Recapitalisation



| Summary of Cash Movement Obligations and Restrictions |
|---|

**RigCo**

- RigCo Minimum Liquidity Requirement of:
  - ➢ $650mm for 2017
  - ➢ $525mm for 2018
  - ➢ $400mm thereafter

  Must be satisfied at all times and tested quarterly, subject to a cure period of 5 business days for intra period variations where cash within the RigCo group is no more than $50 million below the applicable RigCo Minimum Liquidity Requirement

- Whilst there is no event of default, no restrictions on cash movements within RigCo group (other than moneys held in the excess sales proceeds escrow account(s))

- Periodic cash sweep (subject to exceptions) of cash held by subsidiaries of RigCo to RigCo

- Cash upstream to IHCo subject to **RigCo Restricted Payments Membrane:**
  - ➢ **Junior Obligations Permitted Payments** permitted if no payment or insolvency event of default or no event of default arising out of a breach of the RigCo Minimum Liquidity Requirement is continuing and no IHCo breach of RigCo funding obligation under Contribution Agreement
  - ➢ **Structural Permitted Payments** will be permitted to be made at any time irrespective of whether any event of default is continuing
  - ➢ Other payments subject to certain conditions (**IHCo Top-up Payments**)

  See glossary on next page

**IHCo / Seadrill Limited**

- IHCo commits to provide necessary funds to RigCo on a quarterly basis to maintain RigCo Minimum Liquidity Requirement, subject to limitations

- IHCo cash increases through permitted payments from RigCo (incl. cash sweep), release of cash from NSNCo Escrow Account, certain earn-outs and dividends from SDLP and related entities, and any Net Realisation Proceeds not reinvested or used to redeem NSNs

- Cash held by IHCo capped at $250m (subject to certain exceptions, including the proceeds of an equity raise or debt raise at Seadrill Limited). Cash above this cap to be contributed to RigCo

- Cash upstreamed to Seadrill Limited not restricted, and movement of moneys held by Seadrill Limited and its subsidiaries (other than IHCo and its subsidiaries) not restricted, provided that cash held by Seadrill Limited and its subsidiaries (other than IHCo and its subsidiaries) will not be permitted to exceed $25mm, subject to certain exceptions (including cash flows from assets and investments held by such entities and the proceeds of an equity raise or debt raise at Seadrill Limited)

Note: Tax diligence regarding structure implementation and post-effective cash pool structure is ongoing

# RigCo Restricted Payments Membrane



- **Junior Obligations Permitted Payments** include:
  - ➢ Payments in respect of unsecured debt issued by Seadrill Limited
  - ➢ Payments in respect of the New Secured Notes, to the extent there is no cash at IHCo to make the payments
  - ➢ Hedging payments
  - ➢ Payments by way of financial support to non-consolidated entities, to the extent there is no cash at IHCo to make the payments
  - ➢ Certain payments in respect of newbuilds, to the extent there is no cash at IHCo to make the payments
  - ➢ Payments in respect of acquisitions and rig investments permitted under the Secured Credit Facilities' group-wide covenants, to the extent there is no cash at IHCo to make the payments
- **Structural Permitted Payments** include a variety of ordinary course of business payments such as corporate expenses, insurance costs, tax, payments for services or goods on an arm's length basis, etc, as well as payments under Seadrill Limited guarantees and payments in respect of transactions permitted under the Secured Credit Facilities' group-wide covenants
- **IHCo Top-up Payments –** from 1 January 2020 subject to certain conditions:
  - ➢ No continuing or pro forma event of default under the Secured Credit Facilities
  - ➢ Cash at IHCo does not exceed the $250m cap (subject to exceptions) at the time of and post payment
  - ➢ Cash at Seadrill Limited and its subsidiaries (excluding IHCo and its subsidiaries) does not exceed the $25m cap (subject to exceptions) at the time of and post payment
  - ➢ RigCo Minimum Liquidity Requirement plus US$250 million remains at the time of and post payment
  - ➢ The Amortisation Conversion Election has not been exercised or has been prepaid in full
  - ➢ For every dollar upstreamed from RigCo to IHCo, three dollars applied in prepayment of the Secured Credit Facilities

## Cashflow Projections – Financing Case



### RigCo

| ($ in millions) | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RigCo EBITDA | $205 | $190 | $166 | $153 | $307 | $299 | $316 | $308 | $370 | $372 | $390 | $398 | $407 | $423 | $412 | $429 | $406 | $419 | $428 | $428 |
| Change in WC | (99) | 9 | 19 | 7 | (110) | (11) | (2) | 12 | (45) | (20) | (6) | (4) | 4 | (29) | 16 | (16) | 23 | (26) | (3) | - |
| Capex | (31) | (63) | (75) | (115) | (75) | (78) | (51) | (77) | (96) | (141) | (56) | (25) | (61) | (29) | (81) | (29) | (62) | (39) | (30) | (30) |
| Reactivation Costs | (90) | - | - | - | (70) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes | (31) | (28) | (26) | (25) | (37) | (36) | (38) | (37) | (41) | (41) | (42) | (43) | (45) | (46) | (46) | (47) | (45) | (46) | (47) | (47) |
| **Unlevered FCF** | **($46)** | **$108** | **$85** | **$19** | **$16** | **$174** | **$226** | **$206** | **$188** | **$170** | **$285** | **$326** | **$305** | **$319** | **$302** | **$337** | **$321** | **$308** | **$347** | **$350** |
| Interest | ($90) | ($69) | ($70) | ($71) | ($71) | ($71) | ($72) | ($73) | ($73) | ($73) | ($72) | ($72) | ($71) | ($69) | ($60) | ($59) | ($55) | ($53) | ($49) | ($48) |
| IRS Hedges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Amortisation [1] | - | - | - | - | - | - | - | - | (63) | (73) | (111) | (111) | (130) | (130) | (130) | (130) | (130) | (130) | (130) | (130) |
| Amortisation Deferral | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Debt Balloon Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ship Finance Bareboat Payment | (33) | (34) | (34) | (34) | (32) | (30) | (27) | (27) | (26) | (26) | (27) | (27) | (26) | (26) | (26) | (26) | (26) | (25) | (25) | (25) |
| **Cash Balance BoP** | **$986** | **$1,388** | **$1,394** | **$1,374** | **$1,289** | **$1,203** | **$1,275** | **$1,403** | **$1,510** | **$1,534** | **$1,531** | **$1,605** | **$1,722** | **$1,800** | **$1,250** | **$1,335** | **$1,250** | **$1,360** | **$1,250** | **$1,392** |
| RigCo FCF | (169) | 5 | (19) | (86) | (86) | 73 | 127 | 107 | 24 | (3) | 74 | 117 | 78 | 94 | 85 | 121 | 110 | 99 | 142 | 147 |
| Incremental Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Balance BoP + RigCo FCF + Amort Deferral Impact | 817 | 1,394 | 1,374 | 1,289 | 1,203 | 1,275 | 1,403 | 1,510 | 1,534 | 1,531 | 1,605 | 1,722 | 1,800 | 1,894 | 1,335 | 1,456 | 1,360 | 1,459 | 1,392 | 1,539 |
| Specified Permitted Payments from RigCo to IHCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| New Investment | 733 | - | - | - | 7 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| R2 Amendment Fees | (33) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (148) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Items- Sevan and Archer | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Premium Paid on Interest Rate Hedging | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| IHCo 2Q17 CF (pre transaction) | 20 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inflow from IHCo to RigCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash flow Sweep | - | - | - | - | - | - | - | - | - | - | - | - | - | (644) | - | (206) | - | (209) | - | (289) |
| **Cash Balance EoP** | **$1,388** | **$1,394** | **$1,374** | **$1,289** | **$1,203** | **$1,275** | **$1,403** | **$1,510** | **$1,534** | **$1,531** | **$1,605** | **$1,722** | **$1,800** | **$1,250** | **$1,335** | **$1,250** | **$1,360** | **$1,250** | **$1,392** | **$1,250** |

1. Amortisation in 2020 reflects the true-up for amortisation paid from 1 August 2017 to filing

## Cashflow Projections – Financing Case (cont.)

**Seadrill**

### IHCo

| ($ in millions) | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unlevered FCF | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sevan Developer cancellation | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dividend In - SDLP | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Dividend In - Vela and Polaris | 6 | 3 | 4 | 4 | 2 | 4 | 4 | 4 | 4 | 4 | 4 | - | - | - | - | - | - | - | - | - |
| SDLP West Vencedor Loan receivable | 4 | 21 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NSN Cash Interest | - | (9) | (9) | (9) | (9) | (9) | (9) | (10) | (10) | (10) | (10) | (10) | (11) | (11) | (11) | (11) | (12) | (12) | (12) | (12) |
| NSN Balloon Repayment | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bond Cash Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bond Balloon Repayment (Holdouts) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Balance BoP** | - | $100 | $125 | $130 | $134 | $138 | $142 | $146 | $150 | $154 | $158 | $161 | $164 | $163 | $250 | $249 | $250 | $248 | $250 | $248 |
| IHCo FCF | - | 25 | 5 | 5 | 3 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | (1) | (1) | (1) | (1) | (2) | (2) | (2) | (2) |
| Outflow from IHCo to RigCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inflow from RigCo and NSNCo to IHCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| New Secured Notes | 100 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| New Equity | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Commitment Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Flow Sweep | - | - | - | - | - | - | - | - | - | - | - | - | - | 87 | - | 2 | - | 3 | - | 4 |
| IHCo Cash Flow Sweep to RigCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Balance EoP** | $100 | $125 | $130 | $134 | $138 | $142 | $146 | $150 | $154 | $158 | $161 | $164 | $163 | $250 | $249 | $250 | $248 | $250 | $248 | $250 |

### NSNCo

| ($ in millions) | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Balance BoP** | - | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 |
| Charged Account Holdings | 228 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Commitment Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Release of Cash | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Balance EoP** | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 |

# Cashflow Projections – Delayed Dayrate Case

 Seadrill

## RigCo

| ($ in millions) | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RigCo EBITDA | $167 | $148 | $117 | $105 | $246 | $240 | $252 | $243 | $370 | $372 | $390 | $398 | $407 | $423 | $412 | $429 | $406 | $419 | $428 | $428 |
| Change in WC | (74) | 13 | 23 | 6 | (103) | (10) | 1 | 14 | (89) | (20) | (6) | (4) | 4 | (29) | 16 | (16) | 23 | (26) | (3) | - |
| Capex | (31) | (63) | (75) | (115) | (75) | (78) | (51) | (77) | (96) | (141) | (56) | (25) | (61) | (29) | (81) | (29) | (62) | (39) | (30) | (30) |
| Reactivation Costs | (90) | - | - | - | (70) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes | (28) | (26) | (23) | (22) | (33) | (33) | (34) | (33) | (41) | (41) | (42) | (43) | (45) | (46) | (46) | (47) | (45) | (46) | (47) | (47) |
| **Unlevered FCF** | **($56)** | **$73** | **$42** | **($26)** | **($34)** | **$119** | **$169** | **$147** | **$144** | **$170** | **$285** | **$326** | **$305** | **$319** | **$302** | **$337** | **$321** | **$308** | **$347** | **$350** |
| Interest | ($90) | ($69) | ($70) | ($71) | ($71) | ($71) | ($72) | ($73) | ($73) | ($73) | ($72) | ($72) | ($71) | ($69) | ($65) | ($64) | ($61) | ($59) | ($55) | ($54) |
| IRS Hedges | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Amortisation[1] | - | - | - | - | - | - | - | - | (63) | (73) | (111) | (111) | (130) | (130) | (130) | (130) | (130) | (130) | (130) | (130) |
| Amortisation Deferral | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Debt Balloon Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ship Finance Bareboat Payment | (33) | (34) | (34) | (34) | (32) | (30) | (27) | (27) | (26) | (26) | (27) | (27) | (26) | (26) | (26) | (26) | (26) | (25) | (25) | (25) |
| **Cash Balance BoP** | | $986 | $1,378 | $1,347 | $1,285 | $1,154 | $1,018 | $1,036 | $1,106 | $1,153 | $1,134 | $1,131 | $1,205 | $1,322 | $1,401 | $1,250 | $1,330 | $1,250 | $1,355 | $1,250 | $1,386 |
| RigCo FCF | (180) | (30) | (62) | (131) | (136) | 18 | 70 | 48 | (19) | (3) | 74 | 117 | 78 | 94 | 80 | 116 | 105 | 93 | 136 | 141 |
| Incremental Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Balance BoP + RigCo FCF + Amort Deferral Impact | 806 | 1,347 | 1,285 | 1,154 | 1,018 | 1,036 | 1,106 | 1,153 | 1,134 | 1,131 | 1,205 | 1,322 | 1,401 | 1,494 | 1,330 | 1,446 | 1,355 | 1,448 | 1,386 | 1,527 |
| Specified Permitted Payments from RigCo to IHCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| New Investment | 733 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| R2 Amendment Fees & NSN Commitment Fee / Equity Fee | (33) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (148) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Items - Archer Guarantee and Working Capital and Actuals Adjustment | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Premium Paid on Interest Rate Hedging | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| IHCo 2Q17 CF (pre transaction) | 20 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inflow from IHCo to RigCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Flow Sweep | - | - | - | - | - | - | - | - | - | - | - | - | - | (244) | - | (196) | - | (198) | - | (277) |
| **Cash Balance EoP** | $1,378 | $1,347 | $1,285 | $1,154 | $1,018 | $1,036 | $1,106 | $1,153 | $1,134 | $1,131 | $1,205 | $1,322 | $1,401 | $1,250 | $1,330 | $1,250 | $1,355 | $1,250 | $1,386 | $1,250 |

1. Amortisation in 2020 reflects the true-up for amortisation paid from 1 August 2017 to filing

## Cashflow Projections – Delayed Dayrate Case (cont.)  Seadrill

### IHCo

| ($ in millions) | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unlevered FCF | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sevan Developer cancellation | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dividend In - SDLP | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Dividend In - Vela and Polaris | 6 | 3 | 4 | 4 | 2 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | - | - | - | - | - | - | - | - |
| SDLP West Vencedor Loan receivable | 4 | 21 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NSN Cash Interest | - | (9) | (9) | (9) | (9) | (9) | (9) | (10) | (10) | (10) | (10) | (10) | (11) | (11) | (11) | (11) | (12) | (12) | (12) | (12) |
| NSN Balloon Repayment | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bond Cash Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bond Balloon Repayment (Holdouts) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Balance BoP** | - | $100 | $125 | $130 | $134 | $138 | $142 | $146 | $150 | $154 | $158 | $161 | $164 | $163 | $224 | $222 | $250 | $248 | $250 | $248 |
| IHCo FCF | - | 25 | 5 | 5 | 3 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | (1) | (1) | (1) | (1) | (2) | (2) | (2) | (2) |
| Outflow from IHCo to RigCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inflow from RigCo and NSNCo to IHCo | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| New Secured Notes | 100 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| New Equity | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Commitment Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Flow Sweep | - | - | - | - | - | - | - | - | - | - | - | - | - | 61 | - | 29 | - | 3 | - | 4 |
| **Cash Balance EoP** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
|  | $100 | $125 | $130 | $134 | $138 | $142 | $146 | $150 | $154 | $158 | $161 | $164 | $163 | $224 | $222 | $250 | $248 | $250 | $248 | $250 |

### NSNCo

| ($ in millions) | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Balance BoP** | - | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 |
| Charged Account Holdings | 228 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Commitment Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Release of Cash | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Balance EoP** | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 | $228 |

Seadrill

# Appendix G
# Bank Debt Maturity and Amortisation Profile

# Bank Maturity Profile



| ($ in millions) | Today | | Amended Profile[1] | |
|---|---|---|---|---|
| Facility | Original Maturity | Outstanding Amount at 6/30/2017[2] | New Maturity | Maturity Extension (months) |
| $450mm Facility | 19-Jun-16 | 265 | 19-Mar-22 | 69.0 |
| $400mm Facility | 08-Dec-16 | 135 | 23-Jul-22 | 67.5 |
| $2,000mm Facility (NADL) | 15-Apr-17 | 950 | 25-Oct-22 | 66.3 |
| $440mm Facility | 19-Dec-17 | 173 | 30-Apr-23 | 64.4 |
| $1,450mm Facility[2] | 02-Apr-18 | 332 | 14-Jul-23 | 63.4 |
| $360mm Facility (AOD) | 15-Apr-18 | 219 | 24-Jul-23 | 63.3 |
| $300mm Facility | 23-Aug-18 | 150 | 27-Oct-23 | 62.1 |
| $1,750mm Facility (Sevan) | 30-Sep-18 | 875 | 24-Nov-23 | 61.8 |
| $1,500mm Facility[3] | 14-Aug-19 | 1,156 | 19-Jul-24 | 59.2 |
| $1,350mm Facility | 29-Aug-19 | 979 | 29-Jul-24 | 59.0 |
| $950mm Facility[3] | 29-Jan-20 | 586 | 29-Aug-24 | 55.0 |
| $450mm Facility (2015) | 26-Aug-20 | 133 | 28-Sep-24 | 49.1 |

1.  Lenders will be asked to consent within 30 days of the Petition Date to extend maturities by a further three months so that they fall between June 2022 and December 2024
2.  Adjusted for sale of three jack-ups in Q2-17
3.  ECA tranches mature concurrently with respective Commercial tranche if Commercial tranche is not refinanced

## Amortisation Profile



| ($ in millions) | Status Quo | | Amended Profile | |
|---|---|---|---|---|
| **Facility** | **Original Amortisation Tenor (Years)** | **Quarterly Amortisation** | **2020 Quarterly Amortisation[3]** | **2021 until Maturity Quarterly Amortisation** |
| $450mm Facility | 8.5 | $13.2 | $6.0 | $7.1 |
| $400mm Facility | 10 | 10.0 | 4.1 | 4.9 |
| $2,000mm Facility (NADL) | 12 | 41.7 | 20.0 | 23.5 |
| $440mm Facility[1] | 10 | 8.5 | 1.6 | 1.8 |
| $1,450mm Facility[2] | 12 | 10.1 | 5.8 | 6.7 |
| $360mm Facility (AOD) | 10 | 9.0 | 4.6 | 5.4 |
| $300mm Facility | 10 | 6.0 | 3.0 | 3.5 |
| $1,750mm Facility (Sevan) | 10 | 35.0 | 17.5 | 20.5 |
| $1,500mm Facility[1] | 12 | 31.3 | 17.9 | 21.0 |
| $1,350mm Facility | 10 | 33.8 | 17.8 | 20.9 |
| $950mm Facility[1] | 12 for Carina, 10 for Eclipse | 16.5 | 9.5 | 11.3 |
| $450mm Facility (2015) | 8.5 | 5.8 | 3.1 | 3.6 |
| **Quarterly Total** | | **$220.9** | **$110.8** | **$130.4** |
| **Annual Total** | | **$883.6** | **$443.4** | **$521.5[4]** |

1. Amortisation paid semi-annually, adjusted to quarterly for illustrative purposes in status quo
2. ECA tranches mature concurrently with respective Commercial tranche if Commercial tranche is not refinanced
3. 2020 Amortisation does not reflect the amortisation true up for amortisation paid from 1 August 2017 to filing
4. This total will reduce to reflect maturities from March 2022 or June 2022 if extended by a further three months

Seadrill

# Appendix H
# Forward LIBOR Curve

## Forward LIBOR Curve





Exhibit 10.2

*EXECUTION VERSION*

THIS RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT

This RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02, this "**Agreement**") is made and entered into as of September 12, 2017 (the "**Execution Date**"), by and among the following parties, each in the capacity set forth on its signature page to this Agreement (each of the following described in sub-clauses (i) through (viii) of this preamble, collectively, the "**Parties**"):1

  i.   Seadrill Limited, a company incorporated under the Laws of Bermuda with registration number 36832 ("**Seadrill**"); North Atlantic Drilling Limited, a company incorporated under the Laws of Bermuda with registration number 45094 ("**NADL**"); Sevan Drilling Limited, a company incorporated under the Laws of Bermuda with registration number 48546 ("**Sevan**"); and each of their respective direct and indirect subsidiaries that have executed and delivered counterpart signature pages to this Agreement or signature pages to a Joinder (as applicable) to counsel to the Consenting Stakeholders (the entities in this clause (i), collectively, the "**Company Parties**");

  ii.  the undersigned lenders that hold Credit Agreement Claims that have executed and delivered counterpart signature pages to this Agreement or signature pages to a Joinder or Transfer Agreement (as applicable) to counsel to the Company Parties (who shall promptly provide copies of such signature pages (with the Company Claims/Interests redacted) to counsel to the other Consenting Stakeholders) (the entities in this clause (ii), collectively, the "**Consenting Lenders**");

  iii. the undersigned holders or investment advisors, sub-advisors or managers of discretionary accounts that hold Unsecured Note Claims that have executed and delivered counterpart signature pages to this Agreement or signature pages to a Joinder or Transfer Agreement (as applicable) to counsel to the Company Parties (who shall promptly provide copies of such signature pages to counsel to the other

---

1   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

iv.   the holders of commitments under the Investment Agreement that have executed and delivered counterpart signature pages to this Agreement or signature pages to a Joinder (as applicable) to counsel to the Company Parties (who shall promptly provide copies of such signature pages to counsel to the other Consenting Stakeholders), including Hemen (the entities in this clause (iv), collectively, the "**Commitment Parties**");

v.    Ship Finance International Limited, a company incorporated under the Laws of Bermuda with registration number 34296, SFL Linus Ltd., SFL Hercules Ltd. and SFL Deepwater Ltd. (the entities in this clause (v), collectively, "**SFL**");

vi.   any Permitted Transferee in accordance with Section 9 of this Agreement (together with the entities in the foregoing clauses (ii) through (v), collectively, the "**Consenting Stakeholders**");

vii.  each applicable Agent and Trustee following the occurrence of the Agreement Effective Date and (a) the instructions set out in Section 2(b) having been provided by the Required Consenting Lenders to each applicable Agent under each of the Credit Facilities and (b) the instructions set out in Section 2(c) having been provided by the Required Consenting Noteholders to each applicable Trustee under each series of Unsecured Notes; and

viii. solely with respect to Sections 4.06, Section 4.07, Section 13, and Section 14, the Seadrill ECAs.

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheets collectively attached as **Exhibit A** hereto (the "**Term Sheets**" and, such transactions as described in this Agreement and the Term Sheets, irrespective of the Implementation Mechanism, the "**Restructuring Transactions**");

**WHEREAS**, the Term Sheets consist of:

i.    the term sheet setting forth the terms of a comprehensive restructuring of the Company Parties, including the terms of a joint chapter 11 plan of reorganization with respect to the Filing Entities (the "**Plan**"), attached hereto as **Annex 1** to **Exhibit A** (the "**Restructuring Term Sheet**");

ii.   the form of proposed order setting forth the terms of the consensual use of cash collateral in the Chapter 11 Cases attached hereto as **Annex 2** to **Exhibit A** (the "**Proposed Cash Collateral Order**");

2

iii.    the term sheet with respect to the proposed treatment and/or amendments or modifications of each of the Credit Facilities and each affected Finance Document attached hereto as **Annex 3** to **Exhibit A** (the "**Credit Facility Term Sheet**");

iv.    the term sheet with respect to the proposed issuance of the New Secured Notes and the Equity Securities attached hereto as **Annex 4** to **Exhibit A** (the "**New Secured Notes Term Sheet**");

v.    the term sheet with respect to certain proposed cash pooling mechanics which are intended to regulate arrangements for the Consolidated Group following the Restructuring Effective Date attached hereto as **Annex 5** to **Exhibit A** (the "**Cash Pooling Term Sheet**");

vi.    the term sheet setting forth intercreditor principles as between the amended Credit Agreement Claims and the New Secured Notes attached hereto as **Annex 6** to **Exhibit A** (the "**Intercreditor Term Sheet**");

vii.    the term sheet with respect to the treatment of the SFL Claims attached hereto as **Annex 7** to **Exhibit A** (the "**SFL Term Sheet**"); and

viii.    the term sheet with respect to insulation of Seabras from the Implementation Mechanisms and Restructuring Transactions, attached hereto as **Annex 8** to **Exhibit A** (the "**Seabras Term Sheet**").

**WHEREAS**, by the Agreement Effective Date, the Commitment Parties and certain of the Company Parties shall have executed the investment agreement with respect to the New Secured Notes and the Equity Placement, in the form attached hereto as **Exhibit B** (the "**Investment Agreement**");

**WHEREAS**, the Company Parties intend to market the transactions contemplated by the Investment Agreement pursuant to the procedures attached hereto as **Exhibit C** (as they may be modified from time to time by the Company Parties in their sole discretion (but in consultation with counsel to the CoCom and the Required Commitment Parties, which consultation shall not, for the avoidance of doubt, unless expressly agreed otherwise, require disclosure of the terms of any Alternative Restructuring Proposals or the identity of the Entities submitting them), the "**Marketing Procedures**"));

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions through one or more of the following implementation mechanisms, separately, successively, or in conjunction, as determined by the Company Parties in their sole discretion (but in consultation with counsel to the Consenting Stakeholders) (collectively, the "**Implementation Mechanisms**"):

i.    without the filing of any Chapter 11 Case or Scheme of Arrangement (an "**Out-of-Court Transaction**"), including by: (A) amending or otherwise modifying the Credit Agreements according to the terms thereof (the "**Credit Facility Amendments**"); (B) amending or otherwise modifying the NOK/SEK Bond Agreements according to the terms thereof, including by votes at bondholder meetings (the "**NOK/SEK Amendments**"); and (C) rights offerings to certain holders of Unsecured Notes, as set forth in the Term Sheets;

ii.   by commencing one or more creditor or member schemes of arrangement that conform to the Term Sheets under:

    a.   Part 26 of the Companies Act 2006 (United Kingdom);

    b.   Section 99 of the Companies Act 1981 (Bermuda); or

    c.   the Laws of any other relevant jurisdiction, as determined by the Company Parties in their sole discretion (but in consultation with counsel to the Consenting Stakeholders),

with respect to all or a subset of the Company Claims/Interests (the "**Schemes of Arrangement**");

iii.   by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on behalf of all or a subset of the Company Parties, as determined by any of the Company Parties' managers, officers, directors, or similar governing body, in their sole discretion (but in consultation with counsel to the Consenting Stakeholders) (the full list of such Company Parties, collectively, the "**Filing Entities**" being those entities set out in **Schedule 1** hereto and, the cases commenced on behalf of the Filing Entities, the "**Chapter 11 Cases**"); provided that **Schedule 1** hereto may be amended by the Company Parties in their sole discretion at any time (but in consultation with counsel to the Consenting Stakeholders); and

iv.   if determined necessary or appropriate by any of the Company Parties' managers, officers, directors, or similar governing body, in their sole discretion (but in consultation with counsel to the Consenting Stakeholders), by commencing proceedings ancillary to any Schemes of Arrangement or Chapter 11 Cases or other proceedings seeking recognition of aspects of the Schemes of Arrangement or Chapter 11 Cases, including proceedings under chapter 15 of the Bankruptcy Code, dissolution proceedings under applicable Law and joint provisional liquidations under Bermudan Law (collectively, the "**Ancillary Proceedings**");

**WHEREAS**, the effectiveness of the Non-Consolidated Entity Amendments shall be a condition to the occurrence of the Agreement Effective Date; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Term Sheets;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1. *Definitions and Interpretation.***

1.01. <u>Definitions</u>. The following terms shall have the following definitions:

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agent**" means any facility agent or collateral agent under any of the Credit Facilities, including any successors thereto.

"**Agents/Trustees**" means, collectively, all of the Agents and Trustees.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02 (including the Term Sheets and the Investment Agreement).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party (except where a provision of this Agreement survives the Termination Date according to Section 15.19, in which case such provision shall remain in effect to the extent set forth in Section 15.19).

"**All Party Matters**" means the definition of "Required Consenting Lenders," the definition of "Required Commitment Parties," Section 9, Section 13.01(g), Section 13.02, Section 13.05, Section 13.08, and Section 14.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, or discussion with respect to a new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Ancillary Proceedings**" has the meaning set forth in the recitals to this Agreement.

"**Applicable Credit Agreement Waiver Letters**" means the waiver letters dated 28 April 2016 in respect of each of the Credit Agreements, as the same may be amended or supplemented from time to time.

5

"**AOD**" means Asia Offshore Drilling Limited, a company incorporated under the Laws of Bermuda with registration number 44712.

"**Archer**" means Archer Limited, a company incorporated under the Laws of Bermuda, and its direct and indirect subsidiaries.

"**Archer Agreement**" means the US$601,750,000 facility agreement between, among others, Archer Limited, Archer Assets UK Limited, Limay Drilling Rigs Limited, Archer Well Company Inc., Archer Norge AS, Archer AS and Archer Oiltools AS, as borrowers, and the financial institutions listed therein as lenders.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, the Southern District of New York, or the Southern District of Texas, in the sole discretion of the Company Parties (but in consultation with counsel to the Required Consenting Lenders and the Required Commitment Parties).

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York, Oslo, or London.

"**Cash Collateral Order**" means any order entered in the Chapter 11 Cases authorizing the use of cash collateral (whether interim or final).

"**Cash Pooling Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Causes of Action**" means any action, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, Equity Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Centerbridge**" means Centerbridge Credit Partners, L.P. and certain Affiliates.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Documents**" means the Restructuring Term Sheet and Definitive Documents set forth in Section 3.01(c).

"**Chosen Court**" means the United States District Court for the Southern District of New York or any New York state court; <u>provided</u>, <u>however</u>, that if any of the Company Parties commence Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

"**Claim**" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured and calculated together with all applicable accrued interest, fees and commission due, owing or incurred from time to time by any Company Party or an applicable obligor or security provider under any applicable Finance Document or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. For the avoidance of doubt, the definition of claim as defined in this Agreement is no less broad than the definition of claim as defined in section 101(5) of the Bankruptcy Code.

"**CoCom**" means the members of the coordinating committee of the financial institutions appointed pursuant to the CoCom Appointment Letter that hold Credit Agreement Claims, which at the Execution Date is constituted by ABN AMRO Bank, Citibank Europe plc UK Branch, Danske Bank A/S, DNB Bank ASA, ING Bank N.V. Nordea Bank AB London Branch, Garantiinstituttet for Eksportkreditt, and Skandinaviska Enskilda Banken AB (publ).

"**CoCom Appointment Letter**" means the coordinator letter dated 20 April 2016 among Seadrill and each member of the CoCom (as amended, restated, supplemented or otherwise modified from time to time).

"**CoCom Extension Letter**" means the letter to be entered into by Seadrill and the members of the CoCom, in form and substance, and on terms reasonably acceptable to Seadrill and the CoCom in order to, among other things, amend and supplement the CoCom Appointment Letter and extend the CoCom appointment for such further period as is required in order to support and consummate the Restructuring Transactions.

"**Commitment Parties**" has the meaning set forth in the preamble to this Agreement. For the avoidance of doubt, the "Commitment Parties" include the Original Commitment Parties and the Select Commitment Parties.

"**Company Claims/Interests**" means, collectively, all Claims against, and Equity Interests in, a Company Party, including the Credit Agreement Claims, the SFL Claims, and the Unsecured Note Claims; provided, however, that when used in respect of an Entity that (i) holds Credit Agreement Claims as of the Execution Date (or a later date as agreed by the Company Parties with respect to a Permitted Transferee) or (ii) is a commercial bank that is a Permitted Transferee of a Consenting Lender, "Company Claims/Interests" shall refer exclusively to the Credit Agreement Claims, the SFL Claims, the Unsecured Note Claims, Guarantee Facility Claims (as defined in the Restructuring Term Sheet), and Equity Interests in a Company Party.

"**Company Party**" has the meaning set forth in the preamble to this Agreement. The "Company Parties" shall not include AOD and its wholly-owned subsidiaries unless and until they execute a signature page or Joinder to this Agreement; provided, however, that, during the Agreement Effective Period, AOD and its wholly-owned subsidiaries shall be "Company Parties" for the purposes of Section 4, the definition of "Company Claims/Interests," and for the purposes of any other definitions necessary to give meaning to such definition, including the definition of "Credit Agreement Claims" as used in the definition of "Company Claims/Interests."

7

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consolidated Group**" means Seadrill and each of its direct and indirect subsidiaries in which Seadrill has at least a simple majority ownership or voting stake.

"**Credit Agreement**" means each of the following, as amended, restated, supplemented or otherwise modified from time to time including by each Applicable Credit Agreement Waiver Letter (and each secured credit facility made available thereunder, a "**Credit Facility**"):

(a) the US$1,350,000,000 senior secured credit facility agreement originally dated 26 August 2014 between, amongst others, Seadrill as borrower and DNB Bank ASA as agent (the "**$1.35B Credit Facility**");

(b) the US$450,000,000 senior secured credit facility agreement originally dated 13 December 2013 between, amongst others, Seadrill Eminence Ltd. as borrower and Danske Bank A/S as agent (the "**$450M Credit Facility (Eminence)**");

(c) the US$360,000,000 senior secured credit facility agreement originally dated 9 April 2013 between, amongst others, Asia Offshore Rig 1 Limited, Asia Offshore Rig 2 Limited and Asia Offshore Rig 3 Limited as borrowers and ABN AMRO Bank N.V. as agent (the "**$360M Credit Facility**");

(d) the US$400,000,000 senior secured credit facility agreement originally dated 8 December 2011 between, amongst others, Seadrill as borrower and Nordea Bank AB (publ), filiali Norge as agent (the "**$400M Credit Facility**");

(e) the US$950,000,000 senior secured credit facility agreement originally dated 26 January 2015 between, amongst others, Seadrill as borrower and Nordea Bank AB, London Branch as agent (the "**$950M Credit Facility**");

(f) the US$300,000,000 senior secured credit facility agreement originally dated 16 July 2013 between, amongst others, Seadrill as borrower and DNB Bank ASA as agent (the "**$300M Credit Facility**");

8

(g) the US$1,500,000,000 senior secured credit facility agreement originally dated 30 July 2014 between, amongst others, Seadrill Neptune Hungary Kft, Seadrill Saturn Ltd. and Seadrill Jupiter Ltd. as borrowers and Nordea Bank AB, London Branch as agent (the "**$1.5B Credit Facility**");

(h) the US$450,000,000 senior secured credit facility agreement originally dated 26 August 2015 between, amongst others, Seadrill as borrower and Nordea Bank AB, London Branch as agent (the "**$450M Credit Facility (Nordea)**");

(i) the US$2,000,000,000 senior secured credit facility agreement originally dated 15 April 2011 between, amongst others, NADL as borrower and DNB Bank ASA as agent (the "**$2B Credit Facility**");

(j) the US$1,750,000,000 senior secured credit facility agreement originally dated 30 September 2013 between, amongst others, various subsidiaries of Sevan as borrowers and ING Bank N.V. as agent (the "**$1.75B Credit Facility**");

(k) the US$440,000,000 secured credit facility agreement, originally dated 4 December 2012 between, amongst others, Seadrill as borrower and Citibank Europe plc, UK Branch as agent (the "**$440M Credit Facility (Telesto)**"); and

(l) the US$1,450,000,000 senior secured credit facility agreement originally dated 20 March 2013 between, amongst others, Seadrill Tellus Ltd. as borrower and ING Bank N.V. as agent as set out in Schedule 2 (*Amended and Restated Tellus Facility Agreement*) of the Third Amendment and Restatement Agreement dated 16 August 2017 between, amongst others, Seadrill Tellus Ltd. and Seadrill Vela Hungary Kft as borrowers and ING Bank N.V. as agent (the "**$483M Credit Facility (Tellus)**").

"**Credit Agreement Claims**" means, collectively, Claims against any Company Party with respect to: (a) the Credit Agreements and (b) each Finance Document entered into pursuant to or in connection with each Credit Agreement, which for the avoidance of doubt excludes the Seabras Sapura Agreements.

"**Credit Agreement Finance Document**" means, in respect of any Credit Agreement, a "Finance Document" as defined in such Credit Agreement, with the exception of any agreements governing the Hedging Claims.

"**Definitive Documents**" means the documents set forth in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**ECA Covered Lender**" means each Consenting Lender that is a beneficiary of one or more Seadrill ECA Guarantees and, for the purposes of Sections 4.06 and 4.07 only, Eksportkreditt Norge AS or any of its nominees.

"**ECA Matters**" means any amendment to or waiver of any provision of this Agreement that has the effect of changing or which relates to (in each case relative to what was set out in the Credit Facility Term Sheet, the Cash Pooling Term Sheet, and the Intercreditor Term Sheet as at the Agreement Effective Date) any right or discretion granted to any Seadrill ECA under any Credit Agreement Finance Document or Seadrill ECA Guarantee, solely in its capacity as a Seadrill ECA, including but not limited to:

(a) repayment, prepayment and cancellation provisions in respect of any ECA tranche under the existing Credit Agreements (including with respect to break costs);

(b) amendment and waiver and consent provisions of any Credit Agreement which require Seadrill ECA consent or provide any Seadrill ECA with a decision making, voting or consultation right under any Credit Agreement or Seadrill ECA Guarantee;

(c) any Seadrill ECA recourse, subrogation or transfer right under any Credit Agreement;

(d) any provision conferring any obligation on any finance party (however defined under the relevant Credit Agreement Finance Document) towards a Seadrill ECA; and/or

(e) any reduction in the amount of or change of terms relating to any Seadrill ECA fees and premiums (including in relation to any fee or premium increase provisions) under any Credit Agreement or Seadrill ECA Guarantee.

"**Enforcement Action**" means any action of any kind to:

(a) declare prematurely due and payable or otherwise seek to accelerate payment of all or any part of any Company Claims/Interests;

(b) recover, or demand cash cover in respect of, all or any part of any Company Claims/Interests (including by exercising any set-off, save as required by law);

(c) exercise or enforce any right under any guarantee or any right in respect of any Lien (including, for the avoidance of doubt, any security interest granted under any of the Finance Documents), in each case granted in relation to (or given in support of) all or any part of any Company Claims/Interests;

(d) petition for (or take or support any other step which may lead to) any corporate action, legal process (including legal proceedings, execution, distress and diligence) or other procedure or step being taken in relation to any Company Party entering into Insolvency Proceedings; or

(e) sue, claim or institute or continue legal process (including legal proceedings, execution, distress and diligence) against any Company Party.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

10

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Equity Securities**" means the new equity in Seadrill or New Seadrill (as defined in the Restructuring Term Sheet) to be issued pursuant to the terms of the Investment Agreement (excluding the NSN Securities (as defined in the Restructuring Term Sheet)).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Filing Entities**" has the meaning set forth in the recitals to this Agreement.

"**Finance Documents**" means, collectively, (a) the Credit Agreements, the USD Indentures, the NOK/SEK Bond Agreements, and the SFL Documents and (b) all other documents entered into pursuant to or in connection with the foregoing documents in clause (a) of this definition, including each "Finance Document" as defined in each Credit Agreement (with the exception of any agreements governing the Hedging Claims), each USD Indenture, each NOK/SEK Bond Agreement, and each SFL Document.

"**First Day Pleadings**" means the first-day pleadings identified on **Schedule 2** attached hereto and any other customary first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Guaranteed Newbuild Contract**" means each of the following contracts (as amended, restated, supplemented or otherwise modified from time to time):

(a) Construction Contract between Seadrill Libra Ltd and Daewoo Shipbuilding & Marine Engineering Co., Ltd in relation to West Libra;

(b) Construction Contract between Seadrill Aquila Ltd and Daewoo Shipbuilding & Marine Engineering Co., Ltd in relation to West Aquila;

(c) Construction Contract between Seadrill Dorado Ltd and Samsung Heavy Industries Co., in relation to West Dorado; and

(d) Construction Contract between Seadrill Draco Ltd and Samsung Heavy Industries Co., in relation to West Draco.

"**Hemen**" means Hemen Investments Limited, a company incorporated under the Laws of Cyprus with organization number HE371665.

"**Hedging Claims**" means, collectively, Claims against a Company Party under International Swaps and Derivatives Association Master Agreements, or other documentation of interest rate swaps, currency swaps, or other hedging or derivative contract arrangements, entered into between a Company Party and another Entity and any document entered into in connection therewith including any guarantee thereof.

11

"**IHCo**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Implementation Mechanisms**" has the meaning set forth in the recitals to this Agreement.

"**Insolvency Proceeding**" means any corporate action, legal proceedings or other procedure or step taken in any jurisdiction in relation to:

(a) the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition or reorganisation (by way of voluntary arrangement, scheme or otherwise) of any member of the Consolidated Group, including under the Bankruptcy Code or a Scheme of Arrangement;

(b) a composition, conciliation, compromise or arrangement with the creditors generally of any member of the Consolidated Group or an assignment by any member of the Consolidated Group of its assets for the benefit of its creditors generally or any member of the Consolidated Group becoming subject to a distribution of its assets;

(c) the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any member of the Consolidated Group or any of its assets;

(d) enforcement of any security over any assets of any member of the Consolidated Group; or

(e) any procedure or step in any jurisdiction analogous to those set out in paragraphs (a) to (d) above.

"**Investment Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Investment Agreement Effective Date**" has the meaning ascribed to it in the Investment Agreement.

"**Intercreditor Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Joinder Party**" means a party that has executed and delivered a Joinder to counsel to the Company Parties or Consenting Stakeholders (as applicable).

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, or regulation, in each case, that is validly adopted, promulgated, or issued by a governmental authority of competent jurisdiction.

"**Lender Terms**" means those provisions of the Term Sheets set forth in **Schedule 3** hereto.

"**Lien**" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Marketing Procedures**" has the meaning set forth in the preamble to this Agreement.

"**Material Adverse Effect**" has the meaning ascribed to it in the Investment Agreement.

"**NADL**" has the meaning set forth in the preamble to this Agreement.

"**New Secured Notes**" means the new secured notes to be issued as a component of the Restructuring Transactions in accordance with the New Secured Notes Term Sheet.

"**New Secured Notes Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**NOK/SEK Amendments**" has the meaning set forth in the recitals to this Agreement.

"**Non-Consolidated Entities**" means, collectively, Archer, SDLP, Seabras, SeaMex, and SFL.

"**Non-Consolidated Entity Amendments**" means, the amendments, waivers, forbearances, and/or other modifications or documents necessary or appropriate to ensure that there are no defaults or events of default under the funded debt obligations of the Non-Consolidated Entities in connection with the Restructuring Transactions, substantially on the following terms:

(a) the release and extinguishment of the guarantees provided by Seadrill with respect to the Archer Agreement and the amendment and restatement of the Archer Agreement becoming effective according to its terms;

(b) execution of the Seamex Consent Letter by the required Seamex Lenders under the Seamex Agreement;

(c) execution of the Seabras Consent Letters by (or on behalf of) the required Seabras Sapura Lenders under the Seabras Sapura Agreements;

(d) execution of the SFL Consent Letter by the required SFL Lenders under each of the SFL Credit Agreements; and

(e) execution by the required SDLP Lenders under the SDLP Agreements of the SDLP Consent Letters.

"**NSNCo**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Original Commitment Parties**" means Hemen and Centerbridge.

"**Out-of-Court Transaction**" has the meaning set forth in the recitals to this Agreement.

"**Outside Date**" means the date that is eleven (11) months from (i) the Petition Date or (ii) if no Chapter 11 Cases have been filed, the Agreement Effective Date.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Filing Entities commences a Chapter 11 Case.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Plan B**" means an alternative plan solely as between the holders of Credit Agreement Claims and the Company Parties to be pursued in the event this Agreement terminates.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court.

"**Proposed Cash Collateral Order**" has the meaning set forth in the recitals to this Agreement.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Released Party**" means each Party, its Affiliates, and each Party's and its Affiliates' respective current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"**Reorganized Company Parties**" means, collectively, (a) each Company Party, as reorganized pursuant to and under the Out-of-Court Transactions, Schemes of Arrangement, or the Plan, and (b) any successor thereto.

14

"**Request 1**" means the waiver and extension approval letters dated 28 April 2016 related to the Credit Agreements (as amended, restated, supplemented, or otherwise modified from time to time).

"**Required Commitment Parties**" means Commitment Parties holding at least 50.1% in principal amount of the commitments to purchase the New Secured Notes held by all such Commitment Parties at such time; _provided_ that at all times, each of the Original Commitment Parties shall be part of the "Required Commitment Parties"; _provided_, _further_, that each Select Commitment Party shall be part of the "Required Commitment Parties" with respect to (i) material modifications to this Agreement, the Investment Agreement and the exhibits to each such document and the terms of any other Definitive Documents to the extent such modifications are adverse to such Select Commitment Party and (ii) any economic modifications to this Agreement, the Investment Agreement and the exhibits to each such document and the terms of any other Definitive Documents to the extent such economic modifications are adverse to such Select Commitment Party, without regard to materiality; _provided_, _however_, that notwithstanding the foregoing, in no event will any Commitment Party be a Required Commitment Party at any point in time that such Party is also in breach of this Agreement or the Investment Agreement.

"**Required Consenting Lenders**" means (i) with respect to any consent, amendment, waiver, or other modification to any Lender Terms, Consenting Lenders holding 100% of the aggregate outstanding principal amount of Credit Agreement Claims held by all Consenting Lenders at such time, (ii) with respect to any consent, amendment, waiver, or other modification to the Chapter 11 Documents, the CoCom, and (iii) for all other purposes under this Agreement, Consenting Lenders holding at least 66.67% of the aggregate outstanding principal amount of Credit Agreement Claims held by all Consenting Lenders at such time; _provided_, _however_, that, with respect to clauses (i) and (iii) above, if any Consenting Lender fails to respond to a request for a consent, waiver, amendment of or in relation to any of the terms of this Agreement within ten (10) Business Days of that request being made (unless Seadrill and the CoCom agree to a longer period in relation to any such request), the outstanding principal amount of such Consenting Lender's Credit Agreement Claims at such time shall not be included for the purpose of calculating the aggregate outstanding principal amount of Credit Agreement Claims held by all Consenting Lenders at such time when ascertaining whether any relevant percentage (including, for the avoidance of doubt, 100%) of the aggregate outstanding principal amount of Credit Agreement Claims held by all Consenting Lenders has been obtained to approve that request.

"**Required Consenting Noteholders**" means Consenting Stakeholders holding at least 50.1% of the aggregate outstanding principal amount of the Unsecured Note Claims held by all such Consenting Stakeholders at such time; _provided_ that, at all times, each of the Select Commitment Parties shall be part of the "Required Consenting Noteholders" with respect to (i) material modifications to this Agreement, the Investment Agreement and the exhibits to each such document and the terms of any other Definitive Documents to the extent such modifications are adverse to such Select Commitment Party and (ii) any economic modifications to this Agreement, the Investment Agreement and the exhibits to each such document and the terms of any other Definitive Documents to the extent such economic modifications are adverse to such

Select Commitment Party, without regard to materiality; provided, however, that notwithstanding the foregoing, in no event will any Consenting Noteholder be a Required Consenting Noteholder at any point in time that such Party is also in breach of this Agreement; provided, further, that if a matter is submitted for the consent of the Consenting Noteholders under this Agreement and any Consenting Noteholder fails to respond within five (5) Business Days, such Consenting Noteholder shall be deemed to have consented for the purpose of the threshold set forth in this definition. For the purpose of this definition, the principal amount of any Unsecured Note Claim not denominated in USD is to be converted to USD calculated in accordance with Section 15.22.

"**Restricted Period**" means the period commencing as of the date each Consenting Stakeholder, as applicable, executes this Agreement until the Termination Date, as to such Consenting Stakeholder.

"**Restructuring Effective Date**" means the latest to occur of:

(a) if an Out-of-Court Transaction has been selected by one or more Company Parties as an Implementation Mechanism, the latest of (i) the closing of the Credit Facility Amendments, (ii) the closing of the NOK/SEK Amendments, and (iii) the issuance of the New Secured Notes;

(b) if a Scheme of Arrangement has been selected by one or more Company Parties as an Implementation Mechanism, (i) a copy of the order of the relevant court sanctioning the Scheme of Arrangement under:

(A)     in the case of a Bermuda Scheme of Arrangement, section 99 of the Companies Act 1981 (Bermuda);

(B)     in the case of an United Kingdom Scheme of Arrangement, section 899 of the Companies Act 2006 (United Kingdom); or

(C)     in the case of any other Scheme of Arrangement, in accordance with local Laws together will all other actions required to give effect to a valid Scheme of Arrangement under local Law;

is filed with the relevant Registrar of Companies or other relevant person and (ii) the related Credit Facility Amendments have become effective according to their terms; or

(c) if the Chapter 11 Cases have been selected by one or more Filing Entities as an Implementation Mechanism, the occurrence of the effective date of the Plan according to its terms.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**RigCo**" has the meaning ascribed to it in the Restructuring Term Sheet.

16

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Schemes of Arrangement**" has the meaning set forth in the recitals to this Agreement.

"**Scheme Meeting**" means each meeting convened by the relevant Company Party of its Scheme Stakeholders in order to vote on the relevant Scheme of Arrangement, or in the event such meeting is adjourned, the date of such reconvened meeting.

"**Scheme Stakeholder**" means a Consenting Stakeholder, in its capacity as a creditor (whether actual or contingent) of the Company Party, who is entitled to consider and cast its vote in relation to a relevant Scheme of Arrangement.

"**SDLP**" means Seadrill Partners LLC, a company incorporated under the Laws of the Republic of the Marshall Islands, and its direct and indirect subsidiaries.

"**SDLP Consent Letters**" means the consent request letters submitted by SDLP on May 3, 2017 to the SDLP Lenders, and any amendments thereto, requesting certain amendments to the SDLP Agreements.

"**SDLP Agreements**" means the (a) US$1,450,000,000 senior secured credit facility agreement originally dated 20 March 2013 between, amongst others, Seadrill Vela Hungary Kft as borrower and ING Bank N.V. as agent as set out in Schedule 3 (*Amended and Restated Vela Facility Agreement*) of the Third Amendment and Restatement Agreement dated 16 August 2017 between, amongst others, Seadrill Tellus Ltd. and Seadrill Vela Hungary Kft as borrowers and ING Bank N.V. as agent (as amended, restated, supplemented or otherwise modified from time to time); (b) US$119,100,000 secured credit facility agreement originally dated 16 August 2017 (as amended, restated, supplemented or otherwise modified from time to time) between, amongst others, Seadrill T-15 Ltd. and Seadrill T-16 Ltd., as borrowers, and Citibank Europe plc, UK Branch as agent; and (c) US$420,000,000 term loan and revolving credit facilities agreement originally dated 28 December 2012 (as amended, restated, supplemented or otherwise modified from time to time) between, amongst others, Seadrill Polaris Ltd. (previously SFL West Polaris Limited) as borrower and DNB Bank ASA as agent.

"**SDLP Lenders**" means the beneficial holders or owners of, or holders or owners of the ultimate economic interest in, any exposure under any of the SDLP Agreements.

"**Seabras**" means Seabras Sapura Holding GmbH, a company incorporated under the Laws of the Republic of Austria, Seabras Sapura PLSV Holding GmbH, a company incorporated under the Laws of the Republic of Austria, Seabras Servicos de Petroleo SA, a company incorporated under the Laws of the Federative Republic of Brazil, and their direct and indirect subsidiaries.

"**Seabras Sapura Agreements**" means the (a) US $543,000,000 secured facilities agreement dated 31 December 2013 between, among others, Sapura Diamante GmbH, Sapura Topazio GmbH and ING Bank N.V., (b) US $780,000,000 secured facilities agreement dated 10 April 2015 between, among others, Sapura Onix GmbH, Sapura Jade GmbH, Sapura Rubi GmbH and ING Bank N.V., and (c) guarantees and undertakings granted by each of Seadrill and Sapura Energy Berhad (formerly SapuraKencana Petroleum Berhand) in connection with (a) and (b), in each case as amended, restated, supplemented or otherwise modified through the date hereof.

"**Seabras Sapura Lenders**" means the beneficial holders or owners of, or holders or owners of the ultimate economic interest in, any exposure under any of the Seabras Sapura Agreements.

"**Seabras Consent Letters**" means the waiver approval letters executed (or to be executed on or about the date of this Agreement) by, among others, Seabras and the agent under each of the Seabras Sapura Agreements (on behalf of certain of the Seabras Sapura Lenders) temporarily waiving events of default arising as a result of the commencement of the Chapter 11 Cases.

"**Seabras Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Seadrill**" has the meaning set forth in the preamble to this Agreement.

"**Seadrill ECA**" means each of:

(a)     Garantiinstituttet for eksportkreditt or any of its nominees;

(b)     Eksportkreditt Norge AS or any of its nominees;

(c)     the Export-Import Bank of Korea;

(d)     Korea Trade Insurance Corporation;

(e)     DNB Bank ASA; and

(f)     Standard Chartered Bank.

and any affiliate thereof, in each case in its capacity solely as a provider, or in respect of Eksportkreditt Norge AS or any of its nominees only as a recipient, of a Seadrill ECA Guarantee, (including, for the avoidance of doubt, in circumstances where the Credit Agreement Claims of one or more ECA Covered Lenders have been transferred to such provider in accordance with the terms of such Seadrill ECA Guarantee and this Agreement), provided that for the purposes of Sections 4.06 and 4.07 only, the term "Seadrill ECA" shall not include Eksportkreditt Norge AS or any of its nominees.

"**Seadrill ECA Guarantee**" means any guarantee granted or insurance policy issued by a Seadrill ECA under which such Seadrill ECA has agreed to provide cover to an ECA Covered Lender under and in connection with each relevant obligor's obligations under one or more Credit Agreements, in each case, in accordance with the general terms and conditions of that guarantee or insurance policy.

"**Seadrill Entity**" means, collectively, Seadrill and each of its direct and indirect wholly- and partially-owned subsidiaries.

18

"**SeaMex**" means SeaMex Ltd., a company incorporated under the Laws of Bermuda, and its direct and indirect subsidiaries.

"**SeaMex Agreement**" means the US$750,000,000 senior secured credit facility dated 20 March 2015 between, amongst others, Seamex Ltd. and ING Bank N.V.

"**SeaMex Consent Letter**" means the consent letter to be executed pursuant to "Request A" in the request letter issued by SeaMex to the SeaMex Lenders on 2 June 2017.

"**SeaMex Lenders**" means the beneficial holders or owners of, or holders or owners of the ultimate economic interest in, any exposure under the Seamex Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Select Commitment Parties**" means certain funds and/or accounts holding Unsecured Notes that are managed, advised or sub-advised by Aristeia Capital L.L.C., GLG Partners LP, Saba Capital Management LP and Whitebox Advisors LLC and their respective Affiliates.

"**Sevan**" has the meaning set forth in the preamble to this Agreement.

"**SFL**" has the meaning set forth in the preamble to this Agreement.

"**SFL Credit Agreements**" means each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a) the US$475,000,000 secured term loan and revolving credit facility agreement originally dated 17 October 2013 between, amongst others, SFL Linus Ltd. as borrower and Nordea Bank AB (publ), filial i Norge as agent;

(b) the US$390,000,000 secured term loan and revolving credit facility agreement originally dated 31 October 2013 between, amongst others, SFL Deepwater Ltd. as borrower and ABN Amro Bank N.V. as agent; and

(c) the US$375,000,000 secured term loan and revolving credit facility agreement originally dated 24 May 2013 between, amongst others, SFL Hercules Ltd. as borrower and Nordea Bank AB (publ), filial i Norge as agent.

"**SFL Charter Agreements**" means, collectively:

(a) the head-charter agreement originally dated 7 October 2008 (as amended, restated, supplemented or otherwise modified from time to time) made between SFL Hercules Ltd as owner, Seadrill Offshore AS as charterer and Seadrill as charter guarantor;

(b) the head-charter agreement originally dated 7 October 2008 (as amended, restated, supplemented, or otherwise modified from time to time) made between SFL Deepwater Ltd as owner, Seadrill Deepwater Charterer Ltd as charterer and Seadrill as charter guarantor;

(c) the head-charter agreement originally dated 30 June 2013 (as amended, restated, supplemented or otherwise modified from time to time) made between SFL Linus Ltd as owner, North Atlantic Linus Charterer Ltd as charterer and Seadrill as charter guarantor; and

(d) the sub-charter agreement originally dated 30 June 2013 (as amended, restated, supplemented or otherwise modified from time to time) made between North Atlantic Linus Charterer Ltd as owner, North Atlantic Norway Ltd. as charterer and Seadrill as charter guarantor.

"**SFL Claims**" means, collectively, each Claim against a Company Party under an SFL Charter Agreement.

"**SFL Consent Letter**" means, collectively, the consent letters, amendments, waivers, forbearances, or other documents reasonably necessary to avoid the occurrence or continuation of any defaults or events of default under the SFL Credit Agreements as a direct consequence of the Implementation Mechanisms and Restructuring Transactions, including the commencement of the Chapter 11 Cases.

"**SFL Documents**" means, collectively, the SFL Charter Agreements and all other documents entered into pursuant to or in connection therewith, including the applicable guarantee and collateral agreements for the same.

"**SFL Entity**" means Ship Finance International Limited, SFL Linus Ltd, SFL Hercules Ltd and SFL Deepwater Ltd.

"**SFL Lenders**" means the beneficial holders or owners of, or holders or owners of the ultimate economic interest in, any exposure under any of the SFL Credit Agreements.

"**SFL Schemes**" means any scheme(s) of arrangement under section 99 of the Companies Act 1981 (Bermuda) proposed by one or more of the SFL Entities in order to obtain, among other things, the requisite consent under the SFL Credit Agreements to amend the SFL Documents in accordance with the terms of the SFL Term Sheet.

"**SFL Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Solicitation Materials**" means solicitation materials with respect to the Plan together with the Disclosure Statement.

"**Structural Flex**" means the making of any amendment to this Agreement (including the exhibits, annexes and schedules hereto):

(a) that amends the proposed allocation of New Seadrill Common Shares (as defined in the Restructuring Term Sheet), New Secured Notes, or rights to purchase either, provided that any such amendment would not result in (a) a breach of the change of control provision set forth in the Credit Facility Term Sheet; or (b) the Equity Placement being for less than an amount equal to $200 million; and

(b) that increases the initial principal amount of the New Secured Notes from that contemplated by this Agreement (including the Term Sheets); provided, however, that (i) in no event shall the initial principal amount of the New Secured Notes exceed US $1,000,000,000 and (ii) the proceeds of any additional New Secured Notes, net of any additional NSN Escrow Amount (as defined in the New Secured Notes Term Sheet) at existing proportions, shall be funded into RigCo.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.03, 13.04, 13.05, 13.06, or 13.07.

"**Term Sheets**" has the meaning set forth in the recitals to this Agreement.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions); provided, however, that holding securities attesting ownership of Company Claims/Interests in an account with a broker-dealer where the broker-dealer holds a security interest or other encumbrance over property in the account generally, which security interest or other encumbrance is released upon transfer of such securities, shall not constitute a "Transfer" for purposes hereof.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under any series of the Unsecured Notes.

"**Unsecured Notes**" means, collectively, each of the following series:

(a) the following series of United States dollar-denominated notes (the indentures governing clauses (a)(i) through (iii) and the other Finance Documents entered into pursuant thereto, collectively, the "**USD Indentures**"):

(i) US$1,000,000,000 5 ⅝% Senior Notes issued by Seadrill due 2017 ("**Seadrill 2017 Notes**");

(ii) US$500,000,000 6 ⅛% Senior Notes issued by Seadrill due 2020 ("**Seadrill 2020 Notes**"); and

(iii) US$600,000,000 6.25% Senior Notes issued by NADL due 2019 ("**NADL 2019 Notes**"); and

(b) the following series of Norwegian or Swedish krone-denominated notes (the bond agreements governing clauses (b)(i) through (iii) and the other Finance Documents entered into pursuant thereto, each as amended, restated, supplemented or otherwise modified from time to time, the "**NOK/SEK Bond Agreements**"):

21

(i) the FRN Seadrill Senior Unsecured Bond Issue 2013/2018 dated 11 March 2013 (ISIN NO 001 067314.8) ("**Seadrill NOK Notes**");

(ii) the FRN Seadrill Senior Unsecured Bond Issue 2013/2019 dated 17 March 2014 (ISIN NO 001 070579.1) ("**Seadrill SEK Notes**"); and

(iii) the FRN North Atlantic Drilling Limited Bond Issue 2013/2018 dated 13 February 2015 (ISIN NO 001 069241.1), guaranteed by Seadrill. ("**NADL NOK Notes**").

"**Unsecured Note Claims**" means Claims under the Unsecured Notes.

1.02. Interpretation. For purposes of this Agreement:

(a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e) unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f) the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i) the use of "include" or "including" is without limitation, whether stated or not;

22

(j) the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 15.10 other than counsel to the Company Parties; and

(k) for the avoidance of doubt, the Consenting Lenders that are members of the CoCom act in their individual capacities and not as agent, trustee, or in any other fiduciary capacity with respect to any other Consenting Lender or any other Party.

**Section 2.** *Effectiveness of this Agreement.*

(a) This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(i) each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Stakeholders;

(ii) each of Seadrill, NADL, and Sevan shall have provided to counsel to each of the Consenting Stakeholders a copy of the resolutions, minutes, or written consents of its board of directors, board of managers, or such similar governing body (A) approving the terms of this Agreement and (B) authorizing a specified person or persons to execute this Agreement on its behalf;

(iii) the following parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Stakeholders and counsel to the Company Parties: (A) the Commitment Parties; (B) SFL; and (C) the Seadrill ECAs;

(iv) the CoCom Extension Letter shall have been executed and become effective according to its terms;

(v) the conditions to the occurrence of the Investment Agreement Effective Date shall have been satisfied (other than the occurrence of the Agreement Effective Date);

(vi) the Non-Consolidated Entity Amendments shall have occurred and become effective according to their terms;

(vii) holders of at least two thirds of the aggregate outstanding principal amount of Credit Agreement Claims under each individual Credit Facility shall have executed and delivered counterpart signature pages of this Agreement or signature pages to a Joinder (as applicable) to counsel to the Company Parties (who shall promptly provide copies of such signature pages (with the Company Claims/Interests redacted) to counsel to each of the Consenting Stakeholders; provided, however, that the requirement in this Section 2(a)(vii) may be waived by written agreement of the Company Parties, the Required Commitment Parties, and the CoCom;

23

(viii) holders of at least 40% of the aggregate outstanding principal amount of Unsecured Note Claims shall have executed and delivered counterpart signature pages of this Agreement or signature pages to a Joinder (as applicable) to counsel to the Company Parties and each of the other Consenting Stakeholders; provided, however, that the requirement in this Section 2(a)(viii) may be waived by written agreement of the Company Parties, the Required Commitment Parties, and the CoCom; and

(ix) counsel to Seadrill shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 15.10 hereof that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred.

(b) On the date upon which holders of at least two thirds of the outstanding principal amount of Credit Agreement Claims under a Credit Facility have executed and delivered counterpart signature pages of this Agreement or signature pages to a Joinder (as applicable) to counsel to the Company Parties, automatically and without the need for any further instruction under any applicable Finance Document, the Consenting Lenders under such Credit Facility hereby direct and authorize the applicable Agent to (A) promptly execute a Joinder to become a party to this Agreement and (B) perform its obligations under this Agreement and in all cases such actions and responsibilities of such Agent shall be subject to the protections applicable to such Agent under the applicable Credit Agreement and by entering into this Agreement, the Consenting Lenders party to such Credit Agreement acknowledge and confirm that such protections apply to any actions which such Agent may be required to take upon becoming a party to this Agreement.

(c) On the date upon which holders of at least two thirds of the outstanding principal amount of Unsecured Note Claims under the USD Indenture and/or the NOK/SEK Bond Agreement have executed and delivered counterpart signature pages to this Agreement or signature pages to a Joinder (as applicable) to counsel to the Company Parties, automatically and without the need for any further instruction under any applicable Finance Document, the applicable Consenting Noteholders under such USD Indenture or NOK/SEK Bond Agreement hereby direct and authorize the applicable Trustee to (A) promptly execute a Joinder to become a party to this Agreement and (B) perform its obligations under this Agreement in all cases the actions and responsibilities of such Trustee to be subject to the protections applicable to such Trustee under the USD Indentures or NOK/SEK Bond Agreement and by entering into this Agreement, the Consenting Noteholders party to such USD Indenture or NOK/SEK Bond Agreement acknowledge and confirm that such protections apply to any actions which such Trustee may be required to take upon becoming a party to this Agreement.

**Section 3. *Definitive Documents.***

3.01. The Definitive Documents governing the Restructuring Transactions shall consist of the following:

(a) irrespective of Implementation Mechanism:

(i) the Investment Agreement;

(ii) the Non-Consolidated Entity Amendments;

(iii) the following documents, in each case consistent with the Credit Facility Term Sheet: (A) amended, or amended and restated, Credit Agreements; (B) new, amended, or amended and restated guarantees and security documents and agreements; (C) amendments to the Credit Agreements and related documents effectuating the foregoing documents; and (D) all opinions, certificates, filings and other deliverables required to satisfy the conditions precedent to the effectiveness of the foregoing documents and agreements;

(iv) the indenture and first and second ranking guarantee and security documents to effectuate the issuance of the New Secured Notes, in each case, consistent with the New Secured Notes Term Sheet;

(v) an intercreditor agreement with respect to the amended Credit Facilities, the New Secured Notes and the amended SFL Charter Agreement consistent with the Intercreditor Term Sheet;

(vi) the Contribution Agreement (as defined in the Cash Pooling Term Sheet); and

(vii) any organizational documents of the Reorganized Company Parties;

(viii) the amended SFL Documents, consistent with the SFL Term Sheet, including any amendment to the SFL Charter Agreements necessary or desirable to implement the IHCo-RigCo-NSNCo structure as contemplated in Section G1 of the SFL Term Sheet (but irrespective of that section excluding any such amendments to the SFL Credit Agreements which shall be a matter solely for SFL and its lenders);

(b) if the Schemes of Arrangement are commenced and not discontinued;

(i) a practice statement letter (to the extent applicable) and an explanatory statement (including for the avoidance of doubt, the scheme document itself);

(ii) an order of the relevant court in which the Scheme of Arrangement has been filed, giving orders for directions with respect to, among other things, the convening of creditor and/or member meetings to vote on the Scheme of Arrangement;

(iii) an order of the relevant court in which the Scheme of Arrangement has been filed sanctioning the Scheme of Arrangement; and

(iv) any other document, deed, agreement, filing, notification, letter or instrument necessary or desirable (in the opinion of the proponent of the Scheme of Arrangement, acting reasonably) entered into by a Company Party or Consenting Stakeholder in connection with the relevant Scheme of Arrangement and referred to in the explanatory statement described in paragraph (b)(i) above (including, for the avoidance of doubt, documents referred to in the scheme of arrangement described in the explanatory statement); and

(c) if the Chapter 11 Cases are commenced:

(i) the following documents: (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the Solicitation Materials; and (E) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials (including the rights offering procedures attached thereto);

(ii) the Proposed Cash Collateral Order and any other Cash Collateral Order;

(iii) the First Day Pleadings and all orders sought pursuant thereto;

(iv) the registration statement in relation to the Equity Securities and the offering memorandum in connection with the issuance of the New Secured Notes; and

(v) the Plan Supplement.

3.02. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, including the Term Sheets, as they may be modified, amended, or supplemented in accordance with Section 14. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties, the Required Consenting Lenders, the Required Consenting Noteholders, and the Required Commitment Parties; provided, however, that, with respect to any Scheme of Arrangement, only the approval of the Required Consenting Lenders and Required Consenting Noteholders with Company Claims/Interests against the Company Parties subject to such Scheme of Arrangement is required.

3.03. The following Definitive Documents shall be consistent with the SFL Term Sheet and otherwise in form and substance reasonably acceptable to SFL: (a) the amended SFL Documents (including, for the avoidance of doubt, the amended guarantee and collateral documents entered into in connection with the amended SFL Charter Agreements) and (b) the other Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date to the extent they materially affect SFL.

**Section 4.** *Commitments of the Consenting Stakeholders.*

4.01. General Commitments, Forbearances, and Waivers.

(a) During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests pursuant to this Agreement to:

(i) support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

26

(ii) (with respect to Consenting Lenders, solely as to those that are members of the CoCom in their collective capacity therein) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii) give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions; and

(iv) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b) During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests pursuant to this Agreement that it shall not directly or indirectly:

(i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii) either itself or through any representatives or agents solicit, initiate, encourage (including by furnishing information), induce, negotiate, facilitate, continue or respond to Alternative Restructuring Proposals from or with any Entity or propose, file, support, consent to, seek formal or informal credit committee approval of, or vote for Alternative Restructuring Proposals (and shall immediately inform the other Consenting Stakeholders of any notification of an Alternative Restructuring Proposal); provided, further, that at the request of the Company Parties, the Consenting Lenders or their advisors may consult with the Company Parties at the time the Company Parties are making the determination whether to exercise their fiduciary duties to accept and enter into (or seek authorization from the Bankruptcy Court to enter into) a commitment supported by the board of directors, board of managers, or such similar governing body of any Company Party with respect to an Alternative Restructuring Proposal in respect of which the offeror has paid the Company Parties a refundable advance deposit, in the same form and aggregate amount and on equivalent terms as the deposit paid by the Commitment Parties under the Investment Agreement; provided, however, that this clause (ii) shall not apply to a Plan B;

(iii) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Schemes of Arrangement, the Chapter 11 Cases, this Agreement, the Ancillary Proceedings, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

27

(iv) (A) take (directly or indirectly) any Enforcement Actions; (B) direct or encourage any other person to take any Enforcement Action; or (C) vote or direct any proxy appointed by it to vote in favor of any Enforcement Action, in each case except as contemplated by this Agreement or the Definitive Documents or as otherwise agreed in writing to be necessary or desirable for the implementation of the Restructuring Transactions by the Company Parties, the Required Commitment Parties, and the CoCom; provided that nothing herein shall impact the automatic acceleration of a Filing Entity's indebtedness that may occur under the Finance Documents or Applicable Credit Agreement Waiver Letters, in each case due to the filing of the Chapter 11 Cases or Schemes of Arrangement; or

(v) directly or indirectly object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; provided, however, that nothing in this Agreement shall limit the right of any Party to exercise any right or remedy provided under the Cash Collateral Order, the Confirmation Order or any other Definitive Document.

(c) Each Consenting Stakeholder, during the Agreement Effective Period, hereby temporarily waives any breach by any Company Party of, and any default or event of default (howsoever described) under, any Finance Document which shall or may arise as a result of or is related to, directly or indirectly, the commencement of any Chapter 11 Cases, Schemes of Arrangement or other Implementation Mechanisms or any of the steps, actions or transactions required by, specified or contemplated in and/or implemented by or undertaken pursuant to this Agreement (but excluding, for the avoidance of doubt, any breach of this Agreement or any of the Definitive Documents), including:

(i) any of the Company Parties that are not Filing Entities failing to make any payment of principal, amortization, interest, or other amounts due under the Finance Documents to any Agent or Consenting Lender so long as the Company Parties make any such payments to the extent that would be required by the Cash Collateral Order if such Company Party were a Filing Entity (but excluding, for the avoidance of doubt, any breach of this Agreement (except any breach occurring solely as a result of a default or event of default under the Finance Documents) or any of the Definitive Documents); and

(ii) any of the Company Parties that are not Filing Entities failing to comply with any of the financial covenants under their respective Credit Agreements.

(d) (i) Upon the occurrence of the Restructuring Effective Date, without prejudice to any consents, waivers, releases or discharges contained in any Implementation Mechanism, each Consenting Stakeholder hereby permanently waives any default or event of default (howsoever described and howsoever occurring) by a Company Party under the Finance Documents to which it is a party (whether or not occurring as a result of the steps and actions contemplated by this Agreement or the Restructuring Transactions).

(ii) Nothing in this Agreement shall be construed as a waiver of any default or event of default (howsoever described and howsoever occurring) under any Definitive Document arising on or after the occurrence of the Restructuring Effective Date and nothing in this Agreement shall impair, restrict or reduce any right or remedy that any Party may have as a result of or related to any such default or event of default.

28

(e) Notwithstanding any provision of any document to the contrary, but subject to Section 15.26, no Party shall exercise any contractual right against any other Party under the terms of any agreement existing immediately prior to the Agreement Effective Date, where such right arises as a result of any action to be taken in accordance with the terms of this Agreement or any of the Definitive Documents (or as otherwise consented to by the Company Parties, the Required Commitment Parties and the CoCom to be necessary or desirable for the consummation or implementation of the Restructuring Transactions), unless such exercise of right is contemplated by the terms of this Agreement.

(f) On the date upon which holders of at least two thirds of the aggregate outstanding principal amount of Credit Agreement Claims under a Credit Facility have executed and delivered counterpart signature pages of this Agreement or signature pages to a Joinder (as applicable) to counsel to the Company Parties, then in each case automatically and without the need for any further request or instruction under any applicable Finance Document, the applicable Agent is hereby instructed by Consenting Lenders who comprise the requisite lenders under each Credit Agreement to acknowledge and otherwise comply with this Section 4.01, noting that nothing in this Section 4.01 shall operate to override the Agent's rights and obligations under the Credit Agreements solely in its role as Agent.

(g) On the date upon which holders of at least two thirds of the aggregate outstanding principal amount of Unsecured Note Claims under the USD Indenture and/or the NOK/SEK Bond Agreement have executed and delivered counterpart signature pages to this Agreement or signature pages to a Joinder (as applicable) to counsel to the Company Parties, then in each case automatically and without the need for any further request or instruction under any applicable Finance Document, the applicable Trustee is hereby directed to acknowledge and otherwise comply with this Section 4.01.

(h) The Consenting Lenders hereby agree to the maturity and amortization schedule set forth on Part I of Annex 2 to the Credit Facilities Term Sheet; provided, however, that the Consenting Lenders that are members of the CoCom agree to consent to an amendment to the Credit Facilities Term Sheet to reflect the maturity and amortization schedule set forth on Part II of Annex 2 to the Credit Facilities Term Sheet and to use commercially reasonable efforts to obtain the support of the Required Consenting Lenders to amend this Agreement to reflect such modified schedule within 30 days after the Petition Date.

4.02. Non-Consolidated Entity Amendments. During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of each of its Company Claims/Interests pursuant to this Agreement:

(a) to support, and not object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Non-Consolidated Entity Amendments; and

(b) to the extent it holds or beneficially owns Claims against a Non-Consolidated Entity that are subject to the Non-Consolidated Entity Amendments, to (i) consent to and execute all documentation necessary to effectuate the Non-Consolidated Entity Amendments; and (ii) take all actions necessary or reasonably requested by the Company Parties to authorize and direct a consent to or execute any document necessary to consent to and support the Non-Consolidated Entity Amendments,

provided that nothing in this Section 4.02 shall require any Consenting Stakeholder to take any action to effectuate a Non-Consolidated Entity Amendment in respect of the Seabras Sapura Agreements (and any actions, authorizations or other consents shall be separately procured by Seabras from the Seabras Sapura Lenders, which shall be in form and substance consistent with the Seabras Term Sheet).

4.03. Locked-Up Company Claim/Interest Confirmations. During the Agreement Effective Period, each Consenting Stakeholder must notify counsel to the Company Parties as soon as reasonably practicable of any change to that Consenting Stakeholder's Company Claims/Interests (which, for the avoidance of doubt, shall comply with Section 9).

4.04. Commitments with Respect to Schemes of Arrangement. During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of each of its Company Claims/Interests pursuant to this Agreement:

(a) to use commercially reasonable efforts to (i) take all necessary steps, and (ii) execute all necessary documents, in order to authorize and direct a vote on such Consenting Stakeholder's behalf in favor of the Schemes of Arrangement proposed by a Company Party in respect of each of its Company Claims/Interests against the Company Party that is subject to that Scheme of Arrangement pursuant to this Agreement;

(b) without limiting the binding nature of any Scheme of Arrangement, to comply with the terms of each Scheme of Arrangement that it is subject to and to take all commercially reasonable actions and steps (including executing any document) to give effect to the terms of each Scheme of Arrangement that it is subject to;

(c) to the extent a class of Company Claims/Interests is permitted to vote to accept or reject the Scheme of Arrangement, to attend (in person or by proxy) any relevant Scheme Meeting and vote (or cause the relevant person to vote, to the extent it is legally entitled to cause that person to vote) each of its Company Claims/Interests, in favor of any matter necessary to facilitate, implement and/or consummate the Scheme of Arrangement on terms consistent with the Term Sheets, including promptly instructing any relevant Agent/Trustee to take any step to facilitate, implement and/or consummate the Scheme of Arrangement and to vote with respect to any amendment or modification to the Scheme of Arrangement or adjournment to a Scheme Meeting in each case to the extent as contemplated by or which is required in accordance with the Term Sheets;

(d) to not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote referred to in clause (c) above; provided, however, that nothing in this Agreement shall prevent any Party from withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Scheme of Arrangement if this Agreement is terminated with respect to such Party; and

(e) to otherwise support and take all commercially reasonable actions necessary or reasonably requested by Seadrill or the relevant Company Party to give effect to the Scheme of Arrangement.

4.05. Commitments with Respect to Chapter 11 Cases.

(a) During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i) vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; provided that such Plan releases are materially consistent with those set forth in the Restructuring Term Sheet; and

(iii) not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above; provided, however, that nothing in this Agreement shall prevent any Party from changing, withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated with respect to such Party.

(b) During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Filing Entity in the Bankruptcy Court that is consistent with this Agreement; provided that no Consenting Stakeholder shall be required to take action in support of such pleading or document unless such motion or other pleading is shared, where reasonably practicable, with counsel to such Consenting Stakeholder with a sufficient opportunity to consult with the Consenting Stakeholder and the relevant Filing Entities regarding such motion or other pleading.

4.06. Seadrill ECA Confirmations. On and from the date it becomes party to this Agreement, and at all times during the Agreement Effective Period, each Seadrill ECA agrees for the benefit of each applicable ECA Covered Lender that:

(a) the applicable Seadrill ECA Guarantee shall remain in full force and effect, notwithstanding the entry into and performance of this Agreement by any Company Party or ECA Covered Lender, nor the fact that the Seadrill ECA Guarantee has not been called in accordance with its terms, nor the implementation of the Restructuring Transactions in accordance with the Term Sheets (including, without limitation, the execution of any amendments to and the granting of any consents and waivers in respect of any Credit Agreement contemplated by the Term Sheets);

(b) subject to each relevant ECA Covered Lender complying with the terms of this Agreement, each Seadrill ECA Guarantee that it has granted or issued as the case may be, shall, following the implementation of the Restructuring Transactions, remain enforceable by the relevant ECA Covered Lenders in accordance with the same terms and conditions of such Seadrill ECA Guarantee as of the Agreement Effective Date (save for any amendments to such Seadrill ECA Guarantee expressly agreed by the relevant ECA Covered Lenders, the relevant Seadrill ECA and Seadrill (if applicable) outside the terms of this Section 4.06 and Section 4.07); and

(c) automatically and without further need for any further instruction other than instructions required in accordance with Section 4.07, each applicable ECA Covered Lender is authorized and directed to comply with and perform its obligations under this Agreement as a Consenting Lender, including, without limitation, executing any amendments to and granting any consents and waivers in respect of any Credit Agreement and any Definitive Document contemplated by the Term Sheets.

4.07. Seadrill ECA Standstill .

(a) On and from the date it becomes party to this Agreement unless otherwise agreed by the relevant Seadrill ECA and the relevant ECA Covered Lenders from the Agreement Effective Date until the date that is eleven (11) months from the Petition Date, subject to Section 4.06, each ECA Covered Lender agrees not to make any claim under any Seadrill ECA Guarantee of which it is a beneficiary or exercise any other rights and remedies available to it under the terms thereof (unless otherwise separately agreed with the applicable Seadrill ECA).

(b) On and from the date it becomes party to this Agreement, and at all times during the Agreement Effective Period, subject to Section 4.06, each ECA Covered Lender agrees not to: (i) agree to or implement any amendment to any Definitive Document if such amendment would be inconsistent with this Agreement (including the Term Sheets) or any ECA Matter, (ii) grant any consent or waive of any term hereof or exercise any right, power or discretion in relation to this Agreement, or (iii) agree to the termination of this Agreement or any term hereof, without the prior written consent of each Seadrill ECA that has granted or issued the relevant Seadrill ECA Guarantee of which it is a beneficiary.

(c) Upon receipt of any request from a Company Party to amend or grant a consent or waiver of any term of this Agreement, each Seadrill ECA shall promptly notify the relevant ECA Covered Lender of its acceptance or refusal (as the case may be) of such request. No ECA Covered Lender shall be obliged to respond to any such request from a Company Party, or be in breach of this Agreement for failing to do so, unless and until the relevant ECA Covered Lender has received instructions in respect of such request from the relevant Seadrill ECA.

(d) Upon the termination of this Agreement in accordance with Section 13, any rights and remedies of the ECA Covered Lenders under any Seadrill ECA Guarantee shall be fully and freely exercisable by such ECA Covered Lenders.

**Section 5.** *Additional Provisions Regarding the Consenting Stakeholders' Commitments.* Notwithstanding anything contained in this Agreement, and notwithstanding any delivery of a consent or vote to accept the Schemes of Arrangement or Plan, as applicable, by any Consenting Stakeholder, or any acceptance of the Schemes of Arrangement or Plan, as applicable, by any class of creditors, but subject to Section 15.26 and 15.27, nothing in this Agreement shall:

(a) be construed to prohibit any Consenting Stakeholder from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(b) be construed to prohibit any Consenting Stakeholder from appearing as a party-in-interest in any matter to be adjudicated in a Chapter 11 Case or any Scheme of Arrangement, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of delaying, interfering with, impeding, or taking any other action to delay, interfere with or impede, directly or indirectly, the Restructuring Transactions;

(c) subject to the terms of Section 4.01(b)(ii), affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) or any Scheme of Arrangement;

(d) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(e) prevent any Consenting Stakeholder from enforcing this Agreement;

(f) require any Consenting Stakeholder to incur any material financial or other material liability other than as expressly described in this Agreement;

(g) obligate a Consenting Stakeholder to deliver a vote to support the Schemes of Arrangement or Plan, as applicable, or prohibit a Consenting Stakeholder from withdrawing such vote, in each case upon the Termination Date (other than as a result of the occurrence of the Restructuring Effective Date); provided that upon the withdrawal of any such vote on or after the Termination Date (other than as a result of the occurrence of the Restructuring Effective Date), such vote shall be deemed void *ab initio* and such Consenting Stakeholder shall have the opportunity to change its vote;

(h) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege;

(i) prevent any Consenting Stakeholder from taking any action which is required by applicable Law;

(j) prevent any Consenting Stakeholder by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like;

(k) subject to the terms of Section 4, prevent any Consenting Stakeholder from exercising any right under any Finance Document, nor shall anything contained in this Agreement be deemed to constitute a waiver or amendment of any provision of any Finance Document other than as expressly set forth herein;

(l) prevent any Consenting Stakeholder from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence or priority of its Company Claims/Interests in accordance with the terms of the relevant Finance Documents (including, without limitation, the filing of a proof of claim against any Filing Entity); provided that, for the avoidance of doubt, nothing in this Section 5(l) shall permit any Consenting Stakeholder to enforce any security interest, or exercise any foreclosure or other contractual or legal remedy, in respect of any asset of any Company Party that would otherwise not be permitted pursuant to Section 4; or

(m) prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement.

**Section 6. *Commitments of the Company Parties.***

6.01. Affirmative Commitments. Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a) support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including by complying with Section 4 and Section 5 to the extent they hold or otherwise control any Company Claims/Interests;

(b) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment;

(c) make commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d) make commercially reasonable efforts to actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the timely filing of objections or written responses in a Scheme of Arrangement or Chapter 11 Case) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(e) negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent and to the extent the Company Parties receive any Joinders, notify the Consenting Stakeholders of such Joinders;

(g) consult with the advisors to the Consenting Stakeholders regarding the implementation of the Restructuring Transactions, including with respect to:

(i) the Implementation Mechanisms to be used in order to implement and consummate the Restructuring Transactions, including whether to terminate or not initiate an Implementation Mechanism;

(ii) with respect to any Schemes of Arrangement of the Credit Agreement Claims, the jurisdiction and steps for the launch of each such Schemes of Arrangement;

(iii) the identity of the Filing Entities in any Chapter 11 Cases; and

(iv) whether it is necessary or desirable for the Company Parties to seek any Ancillary Proceedings;

(h) upon reasonable request of the Consenting Stakeholders, inform the advisors to the Consenting Stakeholders as to: (i) the material business and financial (including liquidity) performance of the Consolidated Group; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i) inform counsel to the Consenting Stakeholders as soon as reasonably practicable after becoming aware of: (i) any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so occur), that would permit any Party to terminate, or would result in the termination of, this Agreement; (ii) any matter or circumstance which they know, or suspect is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) any notice of any commencement of any material involuntary Insolvency Proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party; (iv) a breach of this Agreement (including a breach by any Company Party) and (v) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(j) comply with their obligations under the CoCom Appointment Letter, as amended by the CoCom Extension Letter, and not terminate it (or seek to reject it in any Chapter 11 Case) other than in accordance with its terms;

35

(k) participate in weekly (or as may otherwise be agreed to between the Company Parties and counsel to the CoCom) calls with the advisors to the CoCom regarding the status and progress of the implementation of the Restructuring Transactions, including the Chapter 11 Cases and the Company Parties' efforts with respect to confirmation of the Plan;

(l) make commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(m) make commercially reasonable efforts to operate their business in the ordinary course, taking into account the Restructuring Transactions;

(n) (i) provide counsel for the Consenting Lenders, Consenting Noteholders, and Commitment Parties a reasonable opportunity to review draft copies of all First Day Pleadings and, (ii) to the extent reasonably practicable, provide a reasonable opportunity to counsel to any Consenting Stakeholders materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with the court sanctioning the Schemes of Arrangement or the Bankruptcy Court, as applicable;

(o) comply in all respects with the provisions of Request 1 (including but not limited to, the provisions of Request 1 relating to equal treatment of the Lenders under (and as defined in) the Credit Agreements), other than any amendments, or derogations from, the terms of Request 1:

(i) necessary to implement the Non-Consolidated Entity Amendments;

(ii) necessary to comply with the Bankruptcy Code or implement any other arrangement described in this Agreement (including the exhibits, annexes, and schedules hereto) that is to become effective before the Restructuring Effective Date;

(iii) necessary to permit the making of Permitted Newbuild Contract Payments (as defined in Request 1) pursuant to any Guaranteed Newbuild Contract up to US$200,000,000 in the aggregate, only to the extent the payment is funded from cash flows of the Company Parties; or

(iv) which may otherwise be agreed in writing by the Required Lenders, Majority Lenders, or Required Majority (as the case may be) under (and as defined in) each Credit Agreement; and

(p) perform their obligations under the SFL Charter Agreements, including their timely payment of the respective charter hire in accordance with the terms thereof, until the Restructuring Effective Date.

6.02. Negative Commitments. Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a) (i) object to or otherwise commence any proceeding opposing any of the terms of this Agreement (including the Term Sheets) or (ii) commence any proceeding or prosecute, join in, or otherwise support any action to oppose, object to, or delay entry of the Confirmation Order or an order approving the Investment Agreement;

(b) take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement (including the Term Sheets) or the Plan;

(c) modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement (including the Term Sheets) in all material respects;

(d) file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including the Term Sheets) or the Plan; provided, however, that notwithstanding anything to the contrary in this Agreement, the filing by a Company Party of a motion or other pleading with the Bankruptcy Court or any other court to authorize or facilitate the acceptance or return of deposits in connection with Alternative Restructuring Proposals shall not constitute a breach of this Agreement; or

(e) initiate any Implementation Mechanism that does not comply with this Agreement (including with respect to the consultation rights of the Consenting Lenders and the Commitment Parties).

**Section 7.** *Additional Provisions Regarding Company Parties' Commitments.*

7.01. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to such exercise of fiduciary duties shall not be deemed to constitute a breach of this Agreement.

7.02. Notwithstanding anything to the contrary in this Agreement, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives:

(a) from the Execution Date until the entry of the Confirmation Order (but, for the avoidance of doubt, not thereafter):

(i) shall not solicit, initiate, encourage, or induce Alternative Restructuring Proposals except as set forth in the Investment Agreement or this Agreement; and

(ii) shall have the rights to (1) consider, respond to, and facilitate Alternative Restructuring Proposals; (2) provide access to non-public information concerning any Company Party to any Entity or enter into confidentiality agreements or nondisclosure agreements with any Entity; (3) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals, including those received pursuant to clause (b) of this Section 7.02;

37

(4) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (5) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party regarding the Restructuring Transactions or Alternative Restructuring Proposals from any Entity.

(b) from the Investment Agreement Effective Date until 90 days after the Petition Date, shall have the rights to solicit, initiate, encourage, or induce Alternative Restructuring Proposals from any Entity.

7.03. Nothing in this Agreement shall (a) be construed to prohibit any Company Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, (b) be construed to prohibit any Company Party from appearing as a party-in-interest in any matter to be adjudicated in a Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere or impede, directly or indirectly, with the Restructuring Transactions, (c) affect the ability of any Company Party to consult with any Consenting Stakeholder, (d) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions, (e) prevent any Company Party from enforcing this Agreement, (f) require any Company Party to incur any material financial or other material liability other than as expressly described in this Agreement, or (g) prohibit any Company Party from taking any action that is not inconsistent with this Agreement.

**Section 8.** *Limited Releases.*

8.01. For good and valuable consideration, effective upon the occurrence of the Agreement Effective Date, each Party hereby releases and discharges each Released Party from any and all Causes of Action, whether known or unknown, asserted on behalf of such releasing Party or that such releasing Party would have been legally entitled to assert (whether individually or collectively), arising on or before the Agreement Effective Date and arising from any Released Party's negotiation of and/or entry into this Agreement, the Investment Agreement, or the other Definitive Documents.

8.02. Notwithstanding anything to the contrary in Section 8.01, the releases set forth in Section 8.01 do not release: (a) any post-Agreement Effective Date obligations of any Party or Entity under this Agreement, the Investment Agreement, any Restructuring Transaction, or any other document, instrument, or agreement (including the Definitive Documents) executed to implement this Agreement or the Restructuring Transactions; (b) any Claims against the Company Parties for principal, interest, or other amounts owing under the Finance Documents or any Equity Interests; or (c) any Causes of Action (i) arising before the commencement of the negotiation of this Agreement and the Investment Agreement, (ii) unrelated to the negotiation of or entry into this Agreement, the Investment Agreement, or the other Definitive Documents, (iii) between one Company Party and another Company Party, (iv) between any Party and that Party's own Affiliates, or between any Party and/or that Party's Affiliates and their own respective current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries,

38

partners, limited partners, general partners, principals, members, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; or (v) solely to the extent any such Cause of Action, as determined by a final order of a court of competent jurisdiction, arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence. The releases in Section 8 are in addition to, and not in lieu of, the releases to be included in the Plan or other Definitive Documents.

**Section 9. *Transfer of Interests and Securities.***

9.01. During the Restricted Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a) in the case of any Company Claims/Interests other than Credit Agreement Claims, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b) either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder.

For the avoidance of doubt, the Company Parties acknowledge and agree that, to the extent a Seadrill ECA, by complying with this Section 9.01, becomes or agrees to become a Consenting Lender in respect of any Credit Agreement Claims that are the subject of such cover arrangements, no consent of any Company Party shall be required for such Seadrill ECA to become a Consenting Lender hereunder.

9.02. Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 9.01 shall be void *ab initio*. A Consenting Stakeholder that makes a Transfer pursuant to Section 9.01(b)(ii) shall provide notice of such Transfer to the Company Parties as soon as reasonably practicable after such Transfer.

9.03. This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; <u>provided</u>, <u>however</u>, that (a) any Consenting Stakeholder that acquires additional Company Claims/Interests must comply with Section 4.03 hereof and (b) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders).

9.04. This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05. Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 9.01; and (iii) the transfer otherwise is a permitted transfer under Section 9.01. To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.06. Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10. *Representations and Warranties of Consenting Stakeholders.*** Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement, on each date of a Scheme Meeting and on the Restructuring Effective Date:

(a) it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Joinder or a Transfer Agreement, as applicable (as may be updated pursuant to Section 4.03);

(b) it has the full power and authority to act on behalf of, vote and consent to matters concerning such Company Claims/Interests;

40

(c) such Company Claims/Interests are free and clear of any pledge, Lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d) it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to the terms and conditions of the Finance Documents and applicable Law;

(e) solely with respect to holders of Company Claims/Interests other than Credit Agreement Claims, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(f) except as contemplated by this Agreement, it is not party to any restructuring support or similar agreement in respect of the Seadrill Entities between (i) any of the Consenting Lenders or Consenting Noteholders and (ii) any of the Commitment Parties which has not been disclosed to the Company Parties.

**Section 11.** *Representations and Warranties of Company Parties.* Each Company Party severally, and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement, on each date of a Scheme Meeting and on the Restructuring Effective Date:

(a) to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of it or any other Company Party or other member of the Consolidated Group, and no analogous procedure has been commenced in any jurisdiction; *provided*, *however*, that this Section 11 does not apply to the commencement of any Implementation Mechanism; and

(b) it has not, and no member of the Consolidated Group has, entered into any arrangement in respect of any of the Finance Documents (including with any individual lender thereunder, irrespective of whether it is or is to become a Consenting Lender) on terms that are not reflected in the Term Sheets; *provided*, *however*, that this Section 11 does not apply to the previously sanctioned scheme of arrangement with respect to the $450M Credit Facility (Eminence) or any other previously sanctioned scheme of arrangement with respect to any Credit Facility.

**Section 12.** *Mutual Representations, Warranties, and Covenants.* Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on each date of a Scheme Meeting and on the Restructuring Effective Date:

41

(a) it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b) except as expressly provided in this Agreement (including the Term Sheets), the Plan and the Bankruptcy Code or as expressly contemplated by the Implementation Mechanisms, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c) the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d) except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e) except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 13. *Termination Events.***

13.01. <u>Consenting Stakeholder Termination Events</u>. This Agreement may be terminated (a) with respect to the Consenting Lenders by the Required Consenting Lenders, (b) with respect to the Consenting Noteholders by the Required Consenting Noteholders, (c) with respect to the Commitment Parties by the Required Commitment Parties, and (d) with respect to SFL (solely with respect to Sections 13.01(a), 13.01(c), 13.01(e), and 13.01(f) through 13.01(j)) by SFL, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 15.10 hereof upon the occurrence and continuation of any of the following events:

(a) the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured (to the extent curable) for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 hereof detailing any such breach;

(b) the economic substance or the legal rights, remedies, or benefits of the Restructuring Transactions is materially and adversely affected in a manner that (i) is a result of fraud, bad faith, or willful misconduct by any of the Company Parties or their applicable boards of directors or officers and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 hereof detailing any such occurrence;

42

(c) the Company Parties (i) withdraw the Plan or (ii) publicly announce their intention not to support the Restructuring Transactions;

(d) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e) the failure by the Company Parties to have commenced one or more of the Chapter 11 Cases or Schemes of Arrangement by 11:59 p.m. prevailing Eastern time on September 12, 2017;

(f) the Bankruptcy Court enters an order denying confirmation of the Plan;

(g) the Investment Agreement is terminated according to its terms (other than as a result of a breach by the Consenting Stakeholder seeking termination under this Agreement);

(h) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders and the Required Commitment Parties) (i) converting one or more of the Chapter 11 Cases of a Filing Entity that is obligated under the Finance Documents to a case under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases of a Filing Entity that is obligated under the Finance Documents, (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Filing Entity that is obligated under the Finance Documents, (iv) vacating the (interim or final, as applicable) Cash Collateral Order, or (v) rejecting this Agreement;

(i) a termination of the Filing Entities' right to consensually use cash collateral following the occurrence of a Termination Event as defined in the (interim or final, as applicable) Cash Collateral Order; or

(j) other than for the purpose of implementing the Restructuring Transactions in accordance with the terms of this Agreement, one or more Insolvency Proceedings are opened in respect of any Company Party that is an Obligor under (and as defined in) the Finance Documents that have not been dismissed within forty-five (45) days of the commencement thereof; provided that this termination right shall not apply to or be exercised by any Party that initiated or supported the initiation of the Insolvency Proceedings in question in contravention of any contrary obligation or restriction set out in this Agreement.

13.02. <u>Individual Consenting Lender's Termination Events</u>. Each Consenting Lender may terminate this Agreement, with respect to itself only, upon prior written notice to the other Parties delivered in accordance with Section 15.10 hereof, upon the occurrence and continuation of any of the following events:

(a) if any terms of the Investment Agreement are amended, waived or otherwise modified without the prior written consent of the Required Consenting Lenders, with the effect of decreasing the amount of the new money investment provided thereunder, or

(b) any Definitive Document being executed or filed by a Company Party that includes terms (by amendment or otherwise) that are inconsistent in any material respect with this Agreement (including the Term Sheets) in a manner adverse to such Consenting Lender, unless such inconsistency has been approved in writing by such Consenting Lender; <u>provided</u>, that this termination right shall only apply if such event remains uncured for fifteen (15) Business Days after such terminating Consenting Lender transmits a written notice in accordance with Section 15.10 hereof detailing any such inconsistent and adverse terms; <u>provided</u>, <u>further</u>, that this termination right shall not apply if such Definitive Document is executed or filed according to the terms of Section 3.02, as applicable, or is amended, modified, or supplemented according to Section 14 or the terms of the applicable Definitive Documents.

13.03. <u>Commitment Party Termination Events</u>. Upon the termination of the Investment Agreement, either (i) in relation to the Commitment Parties pursuant to section 8.1 or 8.3 of the Investment Agreement or (ii) in relation to a Commitment Party pursuant to section 8.2 of the Investment Agreement, this Agreement shall terminate as to such affected Commitment Party or the affected Commitment Parties as applicable, in all respects (other than any surviving provisions as set forth herein), without any further action or notice.

13.04. <u>Company Party Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 15.10 hereof upon the occurrence of any of the following events:

(a) the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b) the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c) the disinterested directors of any of the Company Parties conclude following their investigation that granting the releases set forth in the Restructuring Term Sheet on behalf of any of the Company Parties would be inconsistent with the exercise of their fiduciary duties or applicable Law;

44

(d) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.10 hereof detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(e) the Bankruptcy Court enters an order denying confirmation of the Plan.

13.05. <u>Scheme of Arrangement Termination</u>. The obligations set forth in Section 4.04 of this Agreement may be terminated (a) with respect to the Consenting Lenders by the Required Consenting Lenders, (b) with respect to the Consenting Noteholders by the Required Consenting Noteholders, (c) with respect to the Commitment Parties by the Required Commitment Parties, and (d) with respect to SFL, by SFL, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 15.10 hereof by, as applicable, the Required Consenting Lenders, the Required Consenting Noteholders, the Required Commitment Parties, or SFL (as applicable) upon the occurrence and continuation of a Material Adverse Effect.

13.06. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Lenders; (b) the Required Consenting Noteholders; (c) the Required Commitment Parties; and (d) each Company Party.

13.07. <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice on the earlier of (i) the Outside Date and (ii) the Restructuring Effective Date.

13.08. <u>Effect of Termination.</u> Except as set forth in Section 15.19, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action. To the extent that a grace period has expired in relation to any events of default (howsoever described) under the Finance Documents after the Agreement Effective Date, that grace period shall remain expired following a Termination Date except as otherwise set forth in this Agreement. Unless the Restructuring Effective Date has occurred, any grace period continuing on the Termination Date shall be treated as expired on the Termination Date except as otherwise set forth in this Agreement. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; <u>provided, however</u>, any Consenting Stakeholder

45

withdrawing or changing its vote pursuant to Section 5(h) shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder. No purported termination of this Agreement shall be effective under this Section 13.08 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 13.04(b) or Section 13.04(c). Nothing in this Section 13.08 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.04(b) or Section 13.04(c).

13.09. Notwithstanding Section 13.08, if this Agreement is terminated pursuant to Section 13.01(g) or is otherwise terminated by the Required Commitment Parties, for the period commencing on the Termination Date and ending on the earlier of (a) the Outside Date and (b) the ninetieth (90th) day following the Termination Date, the Consenting Lenders agree to not support any chapter 11 plan filed in the Chapter 11 Cases that is not proposed by Seadrill so long as (i) the Company Parties have, since the Agreement Effective Date, reasonably cooperated (and only if requested in writing) with the CoCom and its advisors regarding a Plan B, (ii) the Company Parties complied, and during such period continue to comply, with Section 6 and Section 7 of this Agreement, to the extent applicable, (iii) a written agreement in principal (which may be in the form of a term sheet) on an alternative reorganization plan that, among other things, restructures Credit Agreement Claims (and which may or may not involve an alternative source of new capital) is reached between the Consenting Lenders and the Company Parties within thirty (30) days after the Termination Date and (iv) a plan and disclosure statement in respect of such alternative plan is filed within forty-five (45) days after the Termination Date, it being understood that no Consenting Lender is under any obligation or commitment to agree to any alternative plan (or any related restructuring transaction), which shall in all cases be subject to all internal approvals regarding such alternative plan and restructuring transactions and all definitive documentation; provided that nothing in this Section 13.09 shall be construed as an extension of the Termination Date.

**Section 14. *Amendments and Waivers.***

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b) Other than the All Party Matters, the Lender Terms, the ECA Matters, and Section 13.03 of this Agreement, this Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (a) each Company Party and (b) the following Parties, solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of such Parties and unless otherwise specified in this Agreement: (i) the Required Consenting Lenders; (ii) the Required Consenting Noteholders (to the extent Section 2(a)(viii) is satisfied); (iii) the Required Commitment Parties; and (iv) SFL; provided, however, that if the proposed modification, amendment, waiver or supplement has a material, disproportionate (as compared to other Consenting Stakeholders holding claims within the same class as provided for in the Restructuring Term Sheet) and adverse effect on any of the Company Claims/Interests held by such Consenting Stakeholders (including, without limitation, any disparate treatment with respect to the releases set forth in Section 8.01), then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; provided, further, any exercise of the Structural Flex shall not require the consent of the Consenting Lenders or the Consenting Noteholders.

(c) The All Party Matters may not be modified, amended, waived or supplemented in any manner except in writing signed by: (i) each Consenting Lender; (ii) each Commitment Party; (iii) each Company Party; and (iv) SFL.

(d) The Lender Terms may not be modified, amended, waived or supplemented in any manner except in writing signed by: (i) each Company Party and (ii) each Consenting Lender.

(e) The ECA Matters may not be affected except where agreed by (i) each Company Party; (ii) the Required Consenting Lenders and (iii) each affected Seadrill ECA.

(f) Section 13.03 may not be modified, amended or supplemented in any manner except in a writing signed by each affected Commitment Party and each Company Party.

(g) Any proposed modification, amendment, waiver or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(h) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

47

(i) For the avoidance of doubt, Sections 4.06, 4.07, and 14.01(e) are solely for the benefit of each Seadrill ECA and each ECA Covered Lender that has executed and delivered a counterpart signature page to this Agreement or signature page to a Joinder or a Transfer Agreement (as applicable) to counsel to the Company Parties in its capacity as such. Notwithstanding any provision of this Agreement to the contrary, such sections may only be amended or waived with the consent of each Seadrill ECA and each ECA Covered Lender that has executed and delivered a counterpart signature page to this Agreement or a signature page to a Joinder or a Transfer Agreement (as applicable) to counsel to the Company Parties in its capacity as such.

**Section 15. *Miscellaneous.***

15.01. <u>Acknowledgement</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02. <u>Exhibits Incorporated by Reference; Conflicts</u>. Each of the exhibits, annexes, signatures pages and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits (other than Exhibit B, the Investment Agreement), annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern; provided, however, that, notwithstanding the foregoing, for the avoidance of doubt nothing herein is intended to, and nothing herein shall, affect or modify the rights and obligations of the relevant Company Parties and the Commitment Parties under the Investment Agreement. Further, each of the Commitment Parties' obligations to fund the Debt Commitment and/or Equity Commitment (as applicable, and as defined in the Investment Agreement) shall be subject solely to the terms and conditions of the Investment Agreement.

15.03. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04. <u>Complete Agreement</u>. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING

EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Chosen Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06. <u>TRIAL BY JURY WAIVER</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

15.10. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a) if a Company Party, to:

Seadrill Limited
Par-la-Ville Place
14 Par-la-Ville Road
Hamilton HM 08, Bermuda
Attention: Georgina Sousa

49

with copies for information only (which shall not constitute notice) to:

Seadrill Management Ltd.
(Corporate Headquarters)
2nd Floor
Building 11
Chiswick Business Park
566 Chiswick High Road
London W4 5YS
United Kingdom
Attention: Chris Edwards
E-mail addresses: Chris.Edwards@seadrill.com

and:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Anup Sathy and Ross Kwasteniet
E-mail address: asathy@kirkland.com, rkwasteniet@kirkland.com, and
KE_ProjectEagle@kirkland.com

and

Kirkland & Ellis LLP
609 Main Street
Houston, Texas 77006
Attention: Brian E. Schartz
E-mail addresses: bschartz@kirkland.com

and

Slaughter and May
One Bunhill Row
London EC1Y 8YY
United Kingdom
Attention: Philip Snell and Ian Johnson
E-mail addresses: philip.snell@slaughterandmay.com,
ian.johnson@slaughterandmay.com, and sm_eagle_2016@slaughterandmay.com

(b) if to a Consenting Lender, to the notice details identified on that Consenting Lender's signature page to this Agreement or its Joinder or its Transfer Agreement, with a copy (which shall not constitute notice unless otherwise specified herein) to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: Scott Greissman
E-mail addresses: sgreissman@whitecase.com and
WCProjectEagle@whitecase.com

and

White & Case LLP
5 Old Broad Street
London EC2N 1DW
United Kingdom
Attention: David Manson
E-mail addresses: dmanson@whitecase.com and
WCProjectEagle@whitecase.com

(c) if to a Commitment Party, to the notice details identified on the Commitment Party's signature page to this Agreement or its Joinder or its Transfer Agreement, with a copy (which shall not constitute notice unless otherwise specified herein) to:

(i) If an Original Commitment Party:

Cadwalader, Wickersham & Taft LLP
Dashwood House, 69 Old Broad Street,
London EC2M 1QS
United Kingdom
Attention: Gregory Petrick and Yushan Ng
E-mail addresses: Gregory.Petrick@cwt.com; Yushan.Ng@cwt.com;
projecteagle@cwt.com

and

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention: Brad E. Scheler and Jennifer L. Rodburg
Email: Brad.Scheler@friedfrank.com; Jennifer.Rodburg@friedfrank.com

51

(ii) If to a Select Commitment Party:

Akin Gump LLP
10 Bishops Square
Eighth Floor
London E1 6EG
United Kingdom
Attention: James Terry and Liz Osborne
Email: james.terry@akingump.com; liz.osborne@akingump.com;
SEADRILLAKIN@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention: Ira Dizengoff and Philip Dublin
Email: idizengoff@akingump.com; pdublin@akingump.com;
SEADRILLAKIN@akingump.com

(iii) If to ARCM Master Fund III, Ltd.:

ARCM Master Fund III, Ltd.,
c/o Asia Research & Capital Management Ltd
21/F, SCB Tower
12 Queens Road Central
Hong Kong

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 373-0524
Attention: Andrew Rosenberg, Elizabeth McColm, and Catherine Goodall
Email: arosenberg@paulweiss.com; emccolm@paulweiss.com;
cgoodall@paulweiss.com

(iv) If to Fintech Investments Ltd.:

Fintech Investments Ltd.
C/O KENDRIS Ltd.
Steinengraben 5
CH-4002 Basel
Switzerland

52

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 373-0524
Attention: Andrew Rosenberg, Elizabeth McColm, and Catherine Goodall
Email: arosenberg@paulweiss.com; emccolm@paulweiss.com;
cgoodall@paulweiss.com

(d) if to SFL, to:

Ship Finance International Limited
Par-la-Ville Place
14 Par-la-Ville Road
Hamilton HM 08, Bermuda
Attention: Georgina Sousa

with copies for information only (which shall not constitute notice) to:

Ship Finance Management AS
Bryggegata 3
P.O. Box 1327 Vika
N-0112 Oslo, Norway
Email: harald.gurvin@shipfinance.no

Any notice given by delivery, mail, or courier shall be effective when received.

15.11. <u>Independent Due Diligence and Decision Making</u>. Each Consenting Stakeholder hereby confirms that its decision to execute this agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

15.12. <u>Role of Agents/Trustees</u>. For the avoidance of doubt and on and from the date on which any Agent/Trustee executes a Joinder, the Parties acknowledge and agree that such Agent/Trustee is not and shall not be responsible for the adequacy, accuracy, or completeness of any statement or information (whether written or oral) made in or supplied in connection with this Agreement and such Agent/Trustee is not responsible for the legality, validity, effectiveness, adequacy, completeness or enforceability of this Agreement or any other document. No Party may take any proceedings against any officers, employees or agents of the Agent/Trustee in respect of any claim it might have against the Agent/Trustee or in respect of any act or omission of any kind by that officer, employee or agent in connection with this Agreement. Any officer, employee or agent of the Agent/Trustee may rely on this paragraph and enforce its terms. Nothing in this Agreement is intended to amend or modify any of the rights, powers, protections and discretions of the Agents/Trustees under the Finance Documents, which remain in full force and effect.

15.13. <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.14. <u>Waiver</u>. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.15. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.16. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.17. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.18. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.19. <u>Survival</u>. Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with Section 9 or (b) the termination of this Agreement in accordance with its terms:

(i) the agreements and obligations of the Parties in Section 8, Section 15 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof; and

(ii) Sections 4.01(b)(iv), 4.01(b)(v), 4.01(c), 4.01(d), and 4.01(e) shall survive such termination until thirty (30) days after the Termination Date solely to the extent consistent with the terms and conditions of the Cash Collateral Order and as limited by Section 5.

15.20. <u>Cash Collateral Order Notices</u>. The Consenting Lenders hereby grant the CoCom the authority to deliver notices under, and as set forth in, the Cash Collateral Order.

15.21. <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests. To the extent that a Party holds Credit Agreement Claims, Unsecured Note Claims, and/or commitments under the Investment Agreement (as indicated on its signature page to this Agreement, Joinder, or Transfer Agreement), it shall be considered a Consenting Lender, Consenting Noteholder, and/or Commitment Party, respectively, for the purposes of all rights and obligations of such Parties under this Agreement.

15.22. <u>Conversion of Currency</u>. For the purpose of converting NOK to USD or SEK to USD or any other currency that a Company Party owes a Consenting Stakeholder to USD, the applicable amount, in USD, will be the amount of USD obtained by converting such foreign currency involved in such computation into USD at the spot rate for the purchase of USD with the applicable foreign currency as published under "Currency Rates" in the section of the *Financial Times* entitled "Currencies, Bonds & Interest Rates" the date that is 2 Business Days prior to such determination.

15.23. <u>Seadrill As Company Parties' Agent</u>. Each Company Party by its execution of this Agreement hereby irrevocably authorizes Seadrill to give all notices and instructions and make such agreements (including, without limitation, in relation to Section 14) expressed to be capable of being given or made by Seadrill or that Company Party, notwithstanding that they may affect that Company Party, without further reference to or the consent of that Company Party and that Company Party shall, as regards the other Parties, be bound thereby as though that Company Party had agreed that change, given that notice or made that agreement.

15.24. <u>Consents and Acceptances</u>. Where a written consent, acceptance, or approval is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Company Parties, the Required Consenting Lenders, the Required Consenting Noteholders, or the Required Commitment Parties, such written consent, acceptance, or approval shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, or approval, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

Case 1:18-cv-01047-PGG-RWL   Document 156-39   Filed 09/12/23   Page 172 of 685

15.25. <u>Certain SFL Matters</u>. The representations and undertakings given by SFL under this Agreement related to the implementation of the terms of the SFL Term Sheet and entry into the applicable Definitive Documents are subject to the SFL Lenders consenting to the implementation of the terms of the SFL Term Sheet, or the sanctioning by the relevant court of the SFL Schemes or a combination of both. SFL agrees to use commercially reasonable efforts to obtain such agreement or sanctioning of the SFL Schemes. Notwithstanding anything to the contrary in this Agreement, (a) the Plan and Confirmation Order shall provide for the assumption of the SFL Charter Agreements as amended consistent with the SFL Term Sheet and for authorization and approval of the other amended SFL Documents to which one or more of the Company Parties will be party to or otherwise bound by and (b) any amendment, modification, or supplement to the SFL Term Sheet shall be in form and substance reasonably acceptable to SFL.

15.26. <u>Hedging Claims</u>. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement shall (i) apply to, affect, modify or limit in any way the rights of holders of Hedging Claims in respect of such Hedging Claims, including the rights of any holder of Hedging Claims who is a Consenting Stakeholder, or (ii) prohibit any holder of Hedging Claims, in respect of such Hedging Claims, from taking any action in or in connection with the Chapter 11 Cases, any Schemes of Arrangement, or otherwise, including without limitation exercising any right in respect of Hedging Claims, interposing any objection to the relief sought therein or voting against the Plan. Notwithstanding anything herein to the contrary in this Agreement, any amendment to the definition of "Hedging Claims" or the provisions that reference the Hedging Claims shall require the consent of the Consenting Stakeholders holding such Hedging Claims

15.27. <u>Seabras Claims</u>. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement shall (i) apply to, waive, release, affect, modify or limit in any way the rights, powers or remedies of the Seabras Sapura Lenders under or in respect of any of the Seabras Sapura Agreements, including the rights of any Consenting Stakeholder who is also a Seabras Sapura Lender, or (ii) prohibit any Seabras Sapura Lender, in respect of any Seabras Sapura Agreements, from taking any action in or in connection with the Chapter 11 Cases, any Schemes of Arrangement, or otherwise, including without limitation exercising any right in respect of the Seabras Sapura Agreements, interposing any objection to the relief sought therein or voting against the Plan.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

Company Parties' Signature Page to
the Restructuring Support and Lock-Up Agreement

**SEADRILL LIMITED**
EASTERN DRILLING AS
SCORPION COURAGEOUS LTD.
SCORPION DEEPWATER LTD.
SCORPION DRILLING LTD.
SCORPION FREEDOM LTD.
SCORPION INTERNATIONAL LTD.
SCORPION INTREPID LTD.
SCORPION OFFSHORE, INC.
SCORPION USA EXPATS INC.
SCORPION VIGILANT LTD.
SDS DRILLING LTD.
SEA DRAGON DE MEXICO S. DE R.L. DE C.V
SEABRAS RIG HOLDCO LTD.
SEADRILL ABU DHABI OPERATIONS LIMITED
SEADRILL AMA OPERATIONS LTD.
SEADRILL AMERICAS, INC.
SEADRILL AQUILA LTD.
SEADRILL ARIEL LTD.
SEADRILL AURIGA LTD.
SEADRILL BRUNEI LTD.
SEADRILL CALLISTO LTD.
SEADRILL CAPITAL SPARES POOL AS
SEADRILL CAPRICORN LTD.
SEADRILL CARINA LTD.
SEADRILL CASTOR PTE LTD.
SEADRILL COMMON HOLDINGS LTD.
SEADRILL CRESSIDA LTD.
SEADRILL DEEPWATER CHARTERER LTD.
SEADRILL DEEPWATER CONTRACTING LTD.
SEADRILL DEEPWATER CREWING LTD.
SEADRILL DEEPWATER HOLDINGS LTD.
SEADRILL DIONE LTD.
SEADRILL DORADO LTD.
SEADRILL DRACO LTD.
SEADRILL ECLIPSE LTD.
SEADRILL EGYPT OPERATIONS LTD.
SEADRILL EMINENCE LTD.
SEADRILL EQUATORIAL GUINEA LTD.
SEADRILL FREEDOM LTD.
SEADRILL GCC OPERATIONS LTD.
SEADRILL GEMINI LTD.
SEADRILL GLOBAL SERVICES LTD.

SEADRILL GULF OPERATIONS NEPTUNE LLC
SEADRILL HYPERION LTD.
SEADRILL INDONESIA LTD.
SEADRILL INSURANCE LTD.
SEADRILL INTERNATIONAL RESOURCING DMCC
SEADRILL INVEST I LTD.
SEADRILL IVORY COAST OPERATIONS LTD.
SEADRILL JACK UP HOLDING LTD.
SEADRILL JACK-UPS CONTRACTING LTD.
SEADRILL JANUS LTD.
SEADRILL JUPITER LTD.
SEADRILL JV GHANA LTD.
SEADRILL LABUAN LTD.
SEADRILL LIBRA LTD.
SEADRILL LIMITED
SEADRILL MANAGEMENT AME LTD.
SEADRILL MANAGEMENT AS
SEADRILL MANAGEMENT LTD.
SEADRILL MANAGEMENT SERVICES LTD.
SEADRILL MIMAS LTD.
SEADRILL MIRA LTD.
SEADRILL NEPTUNE LTD.
SEADRILL NEWFOUNDLAND OPERATIONS LIMITED
SEADRILL NIGERIA DEEPWATER CONTRACTING LTD.
SEADRILL OBERON LTD.
SEADRILL OFFSHORE AS
SEADRILL OFFSHORE MALAYSIA SDN. BHD
SEADRILL OPERATIONS DE MEXICO, S. DE R.L. DE C.V
SEADRILL ORION LTD.
SEADRILL PAYROLL LTD.
SEADRILL PROSPERO LTD.
SEADRILL PROTEUS LTD.
SEADRILL RHEA LTD.
SEADRILL SATURN LTD.
SEADRILL TELESTO LTD.
SEADRILL TELLUS LTD.
SEADRILL TETHYS LTD.
SEADRILL TITAN LTD.
SEADRILL TITANIA SARL
SEADRILL TUCANA LTD.
SEADRILL UK LTD.
SEADRILL UMBRIEL LTD.

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEADRILL VELA LIMITED
SEADRILL VIETNAM LTD.

By:      /s/ Georgina E. Sousa
Name:    Georgina E. Sousa
Title:   Authorized Signatory

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEADRILL NIGERIA OPERATIONS LTD.

By: /s/ Thompson Tatua
Name: Thompson Tatua
Title: Director

By: /s/ Grant Creed
Name: Grant Creed
Title: Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SOAS SERVICOS DE PETROLEO LTDA.

By: Eastern Drilling AS

Its: Shareholder

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

By: Seadrill Offshore AS

Its: Shareholder

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEADRILL SERVICOS DE PETROLEO LTDA.

By: Eastern Drilling AS

Its: Shareholder

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

By: Seadrill Offshore AS

Its: Shareholder

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEABRAS SERVICOS DE PETROLEO SA

By: Seadrill UK Ltd.
Its: Shareholder

By: /s/ David Sneddon
Name: David Sneddon
Title: Authorized Director

By: Seadrill Common Holdings Ltd.

Its: Shareholder

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SCORPION SERVICOS OFFSHORE LTDA.

By: Scorpion International Ltd.

Its: Shareholder

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEADRILL JACK UP I BV
SEADRILL SAUDI I BV
SEADRILL SAUDI II BV


By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Director


By: /s/ Ieva Zigmantaite
Name: Ieva Zigmantaite
Title: Director

**Company Parties' Signature Page to
the Restructuring Support and Lock-Up Agreement**

SEADRILL JACK UP II BV

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Director

By: /s/ Johannes Maria Anonius
Name: Johannes Maria Anonius
Title: Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SCORPION DEEPWATER BV
SCORPION NEDERLANDSE BV


By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEABRAS HOLDINGS GMBH

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Signatory

**Company Parties' Signature Page to
the Restructuring Support and Lock-Up Agreement**

SEABRAS RIG HOLDING GMBH

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Signatory

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEADRILL ANGOLA LTDA.

By: /s/ Roger Aserød
Name: Roger Aserød
Title: Director

By: /s/ Alok Jha
Name: Alok Jha
Title: Director

By: /s/ Renato Moure
Name: Renato Moure
Title: Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

GOLDEN DREAM SHIPPING COMPANY LIMITED
SEADRILL AUSTRALIA PTE LTD.
SEADRILL CASTOR LTD.
SEADRILL DEEPWATER UNITS PTE LTD.
SEADRILL FAR EAST LTD.
SEADRILL HOLDINGS SINGAPORE PTE LTD
SEADRILL JANUS LIMITED
SEADRILL MANAGEMENT (S) PTE LTD.
SEADRILL OFFSHORE SINGAPORE PTE LTD.
SEADRILL PEGASUS PTE. LTD.
SEADRILL LARISSA LIMITED

SEADRILL (DALIAN) CONSULTING LTD.

By: /s/ Lee Geok Hiang
Name: Lee Geok Hiang
Title: Authorized Director

**Company Parties' Signature Page to
the Restructuring Support and Lock-Up Agreement**

SUBSEA DRILLING (III) LIMITED

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

**Company Parties' Signature Page to
the Restructuring Support and Lock-Up Agreement**

SEADRILL MIRA HUNGARY KFT.
SEADRILL NEPTUNE HUNGARY KFT.


By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SUBSEA DRILLING (IV) LIMITED

By: /s/ Livar Voll
Name: Livar Voll
Title: Authorized Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEADRILL OFFSHORE NIGERIA LTD.

By: Seadrill UK Ltd.
Its: Shareholder


       By: /s/ David Sneddon
       Name: David Sneddon
       Title: Authorized Director

By: Seadrill Limited
Its: Shareholder


       By: /s/ Georgina E. Sousa
       Name: Georgina E. Sousa
       Title: Authorized Signatory

Company Parties' Signature Page to
the Restructuring Support and Lock-Up Agreement

**NORTH ATLANTIC DRILLING LTD.**

NORTH ATLANTIC ALPHA LTD.
NORTH ATLANTIC CREW AS
NORTH ATLANTIC CREWING LTD.
NORTH ATLANTIC DRILLING LTD.
NORTH ATLANTIC DRILLING UK LTD.
NORTH ATLANTIC ELARA LTD.
NORTH ATLANTIC EPSILON LTD.
NORTH ATLANTIC HELENE LTD.
NORTH ATLANTIC KARI LTD.
NORTH ATLANTIC LINUS CHARTERER LTD.
NORTH ATLANTIC MANAGEMENT AS
NORTH ATLANTIC NAVIGATOR LTD.
NORTH ATLANTIC NORWAY LTD.
NORTH ATLANTIC PHOENIX LTD.
NORTH ATLANTIC RIGEL LTD.
NORTH ATLANTIC SUPPORT SERVICES LTD.
NORTH ATLANTIC VENTURE LTD.


By: /s/ Georgina E. Sousa
Name: Georgina E. Sousa
Title: Authorized Signatory

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

NORTH ATLANTIC MANAGEMENT LLC

By: /s/ Alf Løvdal
Name: Alf Ragnar Løvdal
Title: Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

**SEVAN DRILLING LIMITED**

SEVAN BRASIL LTD.
SEVAN DEVELOPER LTD.
SEVAN DRILLER LTD.
SEVAN DRILLING ASA
SEVAN DRILLING LIMITED (UK)
SEVAN DRILLING LTD. (BERMUDA)
SEVAN DRILLING MANAGEMENT AS
SEVAN DRILLING NORTH AMERICA LLC
SEVAN DRILLING RIG II AS
SEVAN DRILLING RIG V AS
SEVAN DRILLING RIG VI AS


By: /s/ Georgina E. Sousa
Name: Georgina E. Sousa
Title: Authorized Signatory

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEVAN MARINE SERVICOS DE PERFURACAO LTDA

By: Sevan Drilling Rig IX Pte.

Its: Shareholder

By: Sevan Drilling Limited

Its: Shareholder

By: /s/ Georgina E. Sousa
Name: Georgina E. Sousa
Title: Authorized Signatory

By: Sevan Investimentos do Brasil Ltda

Its: Shareholder

By: Sevan Drilling Limited

Its: Shareholder

By: /s/ Georgina E. Sousa
Name: Georgina E. Sousa
Title: Authorized Signatory

By: Sevan Drilling Rig IX Pte.

Its: Shareholder

By: Sevan Drilling Limited

Its: Shareholder

By: /s/ Georgina E. Sousa
Name: Georgina E. Sousa
Title: Authorized Signatory

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEVAN INVESTIMENTOS DO BRASIL LTDA

By: Sevan Drilling Limited

Its: Shareholder

By:     /s/ Georgina E. Sousa
Name:   Georgina E. Sousa
Title:   Authorized Signatory

By: Sevan Drilling Rig IX Pte.

Its: Shareholder

By: Sevan Drilling Limited

Its: Shareholder

By:     /s/ Georgina E. Sousa
Name:   Georgina E. Sousa
Title:   Authorized Signatory

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEVAN LOUISIANA HUNGARY KFT.

By:      /s/ Scott Mcreaken
Name:    Scott Mcreaken
Title:   Director

**Company Parties' Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

SEVAN DRILLING PTE LTD.
SEVAN DRILLING RIG II PTE LTD.
SEVAN DRILLING RIG IX PTE LTD.
SEVAN DRILLING RIG V PTE LTD.
SEVAN DRILLING RIG VI PTE. LTD.

By:      /s/ Lee Geok Hiang
Name:    Lee Geok Hiang
Title:   Authorized Director

**Consenting Stakeholder Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

**[CONSENTING STAKEHOLDER]**

_____

Name:
Title:

Address:

E-mail address(es):

*Aggregate Amounts Beneficially Owned or Managed on Account of:*

| | |
|---|---|
| Credit Agreement Claims (principal amount) | |
| - $1.35B Credit Facility | US$ |
| - $450M Credit Facility (Eminence) | US$ |
| - $360M Credit Facility | US$ |
| - $400M Credit Facility | US$ |
| - $950M Credit Facility | US$ |
| - $300M Credit Facility | US$ |
| - $1.5B Credit Facility | US$ |
| - $450M Credit Facility (Nordea) | US$ |
| - $2B Credit Facility | US$ |
| - $1.75B Credit Facility | US$ |
| - $440M Credit Facility (Telesto) | US$ |
| - $483M Credit Facility (Tellus) | US$ |
| SFL Claims (principal amount) | US$ |
| Unsecured Note Claims (principal amount) | |
| - Seadrill 2017 Notes | US$ |
| - Seadrill 2020 Notes | US$ |
| - NADL 2019 Notes | US$ |
| - Seadrill NOK Notes | NOK |
| - Seadrill SEK Notes | SEK |
| - NADL NOK Notes | NOK |
| Commitment under the Investment Agreement | US$ |
| Equity Interests in Seadrill | |
| Equity Interests in NADL | |
| Equity Interests in any other Company Party other than Seadrill and NADL (please specify) | |

**Seadrill ECA Signature Page to**
**the Restructuring Support and Lock-Up Agreement**

**[SEADRILL ECA]**

_____

signing solely with respect to Section 4.06, Section 4.07, Section 13 and Section 14 of the Restructuring Support and Lock-Up Agreement

Name:
Title:

Address:

E-mail address(es):

**EXHIBIT A**

**Term Sheets**

**ANNEX 1 to EXHIBIT A**

**Restructuring Term Sheet**

**SEADRILL LIMITED**

**RESTRUCTURING TERM SHEET**[1]

**September 12, 2017**

THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THE RSA, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

This term sheet (this "**Restructuring Term Sheet**") describes certain restructuring and recapitalization transactions with respect to the Company Parties' capital structures (the "**Restructuring Transactions**") on the terms set forth in the restructuring support and lock-up agreement (the "**RSA**") to which this Restructuring Term Sheet is attached as **Annex 1** to **Exhibit A**.

**Summary of Restructuring Transactions**

| | |
|---|---|
| Organizational Restructuring | The Company Parties will undergo an organizational restructuring in accordance with the Description of Transaction Steps, the Credit Facility Term Sheet, the New Secured Notes Term Sheet, and the RSA and its other attachments, in which: |
| | • A new holding company ("**New Seadrill**") will be established for the purposes of carrying out the Restructuring Transactions; |
| | • New Seadrill will form a new wholly-owned intermediate holding company ("**IHCo**"); |
| | • IHCo will form a new wholly-owned intermediate holding company for the purpose of issuing the New Secured Notes ("**NSNCo**"); |
| | • NSNCo may form certain new wholly-owned intermediate holding companies for the purpose of owning Seadrill's prepetition Interests in certain of the Non-Consolidated Entities (each, an "**NSN HoldCo**"); and |
| | • IHCo will form a new wholly-owned intermediate holding company ("**RigCo**") for the purposes of (a) guaranteeing the Amended Credit Facilities (as defined below) and (b) owning Seadrill's prepetition Interests in NADL, Sevan, AOD, and Seadrill's direct or indirect wholly-owned rig-owning entities and intra-group charterers. |
| | The organizational restructuring will be described in greater detail in the Description of Transaction Steps to be included in the Plan Supplement. |

---

1  Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings given to such terms in the RSA or the Investment Agreement, as applicable.

| | |
|---|---|
| Credit Facility Amendments | The Credit Facilities will be amended substantially on the terms set forth in the Credit Facility Term Sheet. Each Credit Facility amended as such shall be referred to as an "**Amended Credit Facility**." |
| SFL Amendments | The charter agreements giving rise to the SFL Claims will be amended substantially on the terms set forth in the SFL Term Sheet (such prepetition charters, the "**SFL Charters**" and, such charters as amended, the "**Amended SFL Charters**"). On the Plan Effective Date, the Debtors shall enter into the Amended SFL Charters, which shall replace and supersede the SFL Charters, and shall be deemed assumed without cure under section 365 of the Bankruptcy Code. |
| New Secured Notes | NSNCo will issue $860 million in principal amount of New Secured Notes, substantially on the terms set forth in the New Secured Notes Term Sheet and the Investment Agreement. New Seadrill will issue 57.5% of the New Seadrill Common Shares, subject to dilution by the Employee Incentive Plan and the Primary Structuring Fee (such New Seadrill Common Shares, together with the New Secured Notes, the "**NSN Securities**"), on a pro rata basis to the purchasers of the New Secured Notes. Pursuant and subject to the Investment Agreement, the Commitment Parties shall commit to purchase the full amount of the NSN Securities for $860 million in cash, which shall be allocated as follows: (i) $462 million to the Original Commitment Parties; (ii) $358 million to the Select Commitment Parties; and (iii) $40 million to the other Commitment Parties. |
| Equity Placement | New Seadrill will issue 25% of the New Seadrill Common Stock, in exchange for $200 million in cash pursuant to the Investment Agreement, which shall be allocated as follows: (i) $150 million for 18.75% of the New Seadrill Common Shares (prior to accounting for any Excess New Seadrill Common Stock) to Hemen and Centerbridge (the "**HCB Equity Placement**"); and (ii) $50 million for 6.25% of the New Seadrill Common Shares (prior to accounting for any Excess New Seadrill Common Stock) to the Select Commitment Parties (the "**Select Commitment Parties Equity Placement,** and together with the HCB Equity Placement, the "**Equity Placement**"), in each case subject to dilution by the Employee Incentive Plan and the Primary Structuring Fee. |
| Rights Offerings | Subject to the acceptance of certain classes of Claims as set forth in this Restructuring Term Sheet and the Plan and pursuant to the Rights Offering Procedures, the opportunity to participate in the issuance of $85 million in principal amount of the New Secured Notes, including the corresponding New Seadrill Common Shares (the "**Note Rights**"), and $25 million of Hemen's portion of the HCB Equity Placement (the "**Equity Rights**") will be offered to certain eligible holders of allowed General Unsecured Claims against Seadrill, NADL, and Sevan; provided, however, that the Commitment Parties, and any Permitted Transferee of Company Claims/Interests held by a Commitment Party as of the Agreement Effective Date, have agreed not to receive the Note Rights and Equity Rights on account of their General Unsecured Claims against Seadrill, NADL, and Sevan as of the Agreement Effective Date. The NSN Securities and the New Seadrill Common Shares to be acquired by the Commitment Parties under the Investment Agreement will be reduced to the extent the Note Rights and Equity Rights are exercised as set forth in the Investment Agreement.<br><br>If Note Rights or Equity Rights are not offered to a class of Claims or Interests as set forth in this Restructuring Term Sheet because the applicable class does not vote to accept the Plan, the Note Rights and Equity Rights that were otherwise to be offered to that class will be canceled and the corresponding NSN Securities and Equity Securities will be acquired by the Commitment Parties as set forth in the Investment Agreement. |

| | |
|---|---|
| General Unsecured Claims | If Classes B3, D3, and F3 (General Unsecured Claims against Seadrill, NADL, and Sevan) vote to accept the Plan: |
| | • The holders of allowed General Unsecured Claims will receive in the aggregate 15% of the New Seadrill Common Shares, subject to dilution by the Employee Incentive Plan and the Primary Structuring Fee (the "**Unsecured Pool Equity**"), plus the Note Rights and Equity Rights, as set forth in the Investment Agreement. |
| | • Holders of allowed General Unsecured Claims against NADL and Sevan shall receive 70% of the recovery received by allowed General Unsecured Claims against or guaranteed by Seadrill. |
| | • General Unsecured Claims against AOD shall be Reinstated or repaid in full in cash. |
| | If Classes B3, D3, and F3 vote to reject the Plan: |
| | • holders of Claims in such Classes will receive the Liquidation Recovery, unless otherwise determined by the Bankruptcy Court; and |
| | • the Excess New Seadrill Common Stock will be distributed to the Equity Commitment Parties, pro rata, based on their respective allocations of the Equity Placement. |
| | For the avoidance of doubt, the forgoing describes the aggregate recovery if each of Classes B3, D3, and F3 vote to accept, or each votes to reject, the Plan. As more fully set forth below, the recoveries such classes receive will be on a class-by-class basis and will depend only on whether the applicable class votes to accept or reject the Plan. |
| | General Unsecured Claims against Other Seadrill Debtors, Other NADL Debtors, Other Sevan Debtors, and AOD Debtors shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in cash. |
| Interests in Seadrill | If Class B3 (General Unsecured Claims Against Seadrill) votes to accept the Plan, holders of Interests in Seadrill will receive their pro rata share of 2% of the New Seadrill Common Shares, subject to dilution by the Employee Incentive Plan and the Primary Structuring Fee (the "**Equity Recovery**"). |
| | If Class B3 votes to reject the Plan, holders of Interests in Seadrill will receive no recovery. |
| Non-Consolidated Entities | The Non-Consolidated Entity Amendments will be effectuated before the Petition Date to insulate the Non-Consolidated Entities from the Chapter 11 Cases and, where applicable, to effectuate certain other commercial amendments, substantially on the terms described in the RSA. The Non-Consolidated Entities will not commence Chapter 11 Cases. |
| Tax Matters | The Parties will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring Transactions in a tax efficient and cost-effective manner for the Company. |

| Class | Claim/Interest | Treatment | Status |
|-------|----------------|-----------|--------|
| | | **Treatment of Claims Against and Interests in the Debtors Under the Plan** | |

On the Plan Effective Date, each holder of an allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed Claim or Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such allowed Claim or Interest, as applicable.

The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor and the classifications set forth below shall be deemed to apply to each Debtor.

With respect to Entities that do not file Chapter 11 Cases, the treatment described below for allowed Claims or Interests, as applicable to each such Entity, shall be effectuated through other Implementation Mechanisms on the terms set forth in the Term Sheets.

### Unclassified Non-Voting Claims

| Class | Claim/Interest | Treatment | Status |
|-------|----------------|-----------|--------|
| N/A | **Administrative Claims** | On the Plan Effective Date, each holder of an allowed Administrative Claim shall receive payment in full in cash. | N/A |
| N/A | **Priority Tax Claims** | On the Plan Effective Date, each holder of an allowed Priority Tax Claim shall receive payments in cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |

### Other Claims

| Class | Claim/Interest | Treatment | Status |
|-------|----------------|-----------|--------|
| A1 | **Other Secured Claims** | On the Plan Effective Date, each holder of an allowed Other Secured Claim shall receive, at the election of the applicable Debtor: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim unimpaired. | Unimpaired; deemed to accept. |
| A2 | **Other Priority Claims** | On the Plan Effective Date, each holder of an allowed Other Priority Claim against a Debtor shall receive payment in full in cash or other treatment rendering such Claim unimpaired at the election of the Debtors. | Unimpaired; deemed to accept. |
| A3 | **Intercompany Claims** | On the Plan Effective Date, Claims between Debtors will be Reinstated or released at the election of the Debtors (other than NADL Revolving Loan Claim and the Sevan Second Lien Claim, which shall be treated as set forth in the applicable classes). | Impaired/ unimpaired; deemed to reject/accept. |

### Seadrill

| Class | Claim/Interest | Treatment | Status |
|-------|----------------|-----------|--------|
| B1 | **Credit Agreement Claims Against Seadrill** | On the Plan Effective Date, each holder of an allowed Credit Agreement Secured Claim against Seadrill shall receive its pro rata share of participation in the Amended Credit Facility that corresponds to the Credit Facility under which such Credit Agreement Claim arose, as set forth in the Credit Facility Term Sheet. | Impaired; entitled to vote. |
| B2 | **Guarantee Facility Claims** | On the Plan Effective Date, each holder of an allowed Guarantee Facility Claim against Seadrill shall receive its pro rata share of participation in the Amended Guarantee Facility. | Impaired; entitled to vote. |

| Class | Claim/Interest | Treatment | Status |
|---|---|---|---|
| B3 | General Unsecured Claims Against Seadrill | On the Plan Effective Date:<br><br>• **if Class B3 votes to accept the Plan**, each holder of an allowed General Unsecured Claim against Seadrill (including allowed Seadrill Unsecured Note Claims, Seadrill Interest Rate Swap Claims, Seadrill Currency Swap Claims, and NADL Guaranteed Unsecured Note Claims against Seadrill) shall receive 100% of its pro rata share (measured by reference to the Unsecured Pool Denominator) of (a) the Unsecured Pool Equity; (b) the Note Rights; and (c) the Equity Rights; provided, however, that the Commitment Parties, and any Permitted Transferee of Company Claims/Interests held by a Commitment Party as of the Agreement Effective Date, have agreed not to receive the Note Rights and Equity Rights on account of their General Unsecured Claims against Seadrill as of the Agreement Effective Date; and<br><br>• **if Class B3 votes to reject the Plan**, each holder of an allowed General Unsecured Claim against Seadrill shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court;<br><br>provided, however, that the holders of Credit Agreement Unsecured Claims have agreed to forgo their right to receive their pro rata share of any recovery on account of General Unsecured Claims against Seadrill under the Plan (but not, for the avoidance of doubt, under any other plan of reorganization or alternative restructuring); provided, further, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims shall be entitled to vote to accept or reject the Plan on account of such Claims. | Impaired; entitled to vote. |
| B4 | Seadrill 510(b) Claims | On the Plan Effective Date:<br><br>• **if Class B3 votes to accept the Plan**, each holder of an allowed Seadrill 510(b) Claim shall receive its pro rata share of the Equity Recovery; and<br><br>• **if Class B3 votes to reject the Plan**, each holder of an allowed Seadrill 510(b) Claim will be extinguished and shall not receive or retain any distribution, property, or other value on account of their Seadrill 510(b) Claims. | To be determined. |
| B5 | Interests in Seadrill | On the Plan Effective Date:<br><br>• **if Class B3 votes to accept the Plan**, each holder of an allowed Interest in Seadrill shall receive its pro rata share of the Equity Recovery; and<br><br>• **if Class B3 votes to reject the Plan**, each Interest in Seadrill will be extinguished in accordance with the Description of the Transaction Steps and the holder of such Interest in Seadrill shall not receive or retain any distribution, property, or other value on account of its Interest in Seadrill. | To be determined. |

| Class | Claim/Interest | Treatment | Status |
|---|---|---|---|
| | | ***Other Seadrill Debtors*** | |
| C1 | **Credit Agreement Claims Against Other Seadrill Debtors** | On the Plan Effective Date, each holder of an allowed Credit Agreement Claim against an Other Seadrill Debtor shall receive its pro rata share of participation in the Amended Credit Facility that corresponds to the Credit Facility under which such Credit Agreement Claim arose, as set forth in the Credit Facility Term Sheet. | Impaired; entitled to vote. |
| C2 | **General Unsecured Claims Against Other Seadrill Debtors** | On the Plan Effective Date, each holder of an allowed General Unsecured Claim against an Other Seadrill Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in cash. | Unimpaired; deemed to accept. |
| C3 | **Interests in Other Seadrill Debtors** | On the Plan Effective Date, each holder of an allowed Interest in an Other Seadrill Debtor shall be Reinstated. | Unimpaired; deemed to accept. |
| | | ***NADL*** | |
| D1 | **Credit Agreement Claims Against NADL** | On the Plan Effective Date, each holder of an allowed Credit Agreement Secured Claim against NADL shall receive its pro rata participation in the Amended NADL Credit Facility. | Impaired; entitled to vote. |
| D2 | **NADL Revolving Loan Claim** | On the Plan Effective Date, the holder of the NADL Revolving Loan Claim, at the election of the Debtors, shall be (a) Reinstated or (b) canceled and released without recovery. | Impaired; entitled to vote. |
| D3 | **General Unsecured Claims Against NADL** | On the Plan Effective Date:<br><br>• **if Class D3 votes to accept the Plan**, each holder of an allowed General Unsecured Claim against NADL (including NADL Guaranteed Unsecured Note Claims and NADL Non-Guaranteed Unsecured Note Claims) shall receive 70% of its pro rata share (measured by reference to the Unsecured Pool Denominator) of (a) the Unsecured Pool Equity; (b) the Note Rights; and (c) the Equity Rights; provided, however, that the Commitment Parties, and any Permitted Transferee of Company Claims/Interests held by a Commitment Party as of the Agreement Effective Date, have agreed not to receive the Note Rights and Equity Rights on account of their General Unsecured Claims against NADL as of the Agreement Effective Date; and<br><br>• **if Class D3 votes to reject the Plan**, each holder of an allowed General Unsecured Claim against NADL shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court; | Impaired; entitled to vote. |

| Class | Claim/Interest | Treatment | Status |
|---|---|---|---|
| | | provided, however, that the holders of Credit Agreement Unsecured Claims against NADL have agreed to forgo their right to receive their pro rata share of any recovery on account of General Unsecured Claims against NADL under the Plan (but not, for the avoidance of doubt, under any other plan of reorganization or alternative restructuring), provided, further, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims shall be entitled to vote to accept or reject the Plan on account of such Claims. | |
| D4 | NADL 510(b) Claims | On the Plan Effective Date, each holder of an allowed NADL 510(b) Claim will be extinguished and shall not receive or retain any distribution, property, or other value on account of their Seadrill 510(b) Claims. | Impaired; deemed to reject. |
| D5 | Interests in NADL | On the Plan Effective Date, each Interest in NADL will be extinguished in accordance with the Description of the Transaction Steps and the holder of such Interest in NADL shall not receive or retain any distribution, property, or other value on account of its Interest in NADL. | Impaired; deemed to reject. |
| | | ***Other NADL Debtors*** | |
| E1 | Credit Agreement Claims Against Other NADL Debtors | On the Plan Effective Date, each holder of an allowed Credit Agreement Claim against an Other NADL Debtor shall receive its pro rata participation in the Amended NADL Credit Facility. | Impaired; entitled to vote. |
| E2 | General Unsecured Claims Against Other NADL Debtors | On the Plan Effective Date, each holder of an allowed General Unsecured Claim against an Other NADL Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in cash. | Unimpaired; deemed to accept. |
| E3 | Interests in Other NADL Debtors | On the Plan Effective Date, each allowed Interest in an Other NADL Debtor shall be Reinstated. | Unimpaired; deemed to accept. |
| | | ***Sevan*** | |
| F1 | Credit Agreement Claims Against Sevan | On the Plan Effective Date, each holder of an allowed Credit Agreement Secured Claim against Sevan shall receive its pro rata participation in the Amended Sevan Credit Facility. | Impaired; entitled to vote. |
| F2 | Sevan Second Lien Claim | On the Plan Effective Date, the Sevan Second Lien Claim shall, at the election of the Debtors, be (a) Reinstated or (b) canceled and released without recovery. | Impaired; entitled to vote. |

7

| Class | Claim/Interest | Treatment | Status |
|-------|----------------|-----------|--------|
| F3 | General Unsecured Claims Against Sevan | On the Plan Effective Date,<br><br>• **if Class F3 votes to accept the Plan**, each holder of an allowed General Unsecured Claim against Sevan shall receive 70% of its pro rata share (measured by reference to the Unsecured Pool Denominator) of (a) the Unsecured Pool Equity; (b) the Note Rights; and (c) the Equity Rights; provided, however, that the Commitment Parties, and any Permitted Transferee of Company Claims/Interests held by a Commitment Party as of the Agreement Effective Date, have agreed not to receive the Note Rights and Equity Rights on account of their General Unsecured Claims against Sevan as of the Agreement Effective Date; and<br><br>• **if Class F3 votes to reject the Plan**, each holder of an allowed General Unsecured Claim against NADL shall receive the Liquidation Recovery, unless otherwise ordered by the Bankruptcy Court;<br><br>provided, however, that the holders of Credit Agreement Unsecured Claims against Sevan have agreed to forgo their right to receive their pro rata share of any recovery on account of General Unsecured Claims against Sevan under the Plan (but not, for the avoidance of doubt, under any other plan of reorganization or alternative restructuring); provided, further, that, for the avoidance of doubt, holders of Credit Agreement Unsecured Claims shall be entitled to vote to accept or reject the Plan on account of such Claims. | Impaired; entitled to vote. |
| F4 | Sevan 510(b) Claims | On the Plan Effective Date, each allowed Sevan 510(b) Claim will be extinguished and shall not receive or retain any distribution, property, or other value on account of their Seadrill 510(b) Claims. | Impaired; deemed to reject. |
| F5 | Interests in Sevan | On the Plan Effective Date, each Interest in Sevan will be extinguished in accordance with the Description of the Transaction Steps and the holder of such Interest in Sevan shall not receive or retain any distribution, property, or other value on account of its Interest in Sevan. | Impaired; deemed to reject. |
| | | *Other Sevan Debtors* | |
| G1 | Sevan Credit Agreement Subsidiary Claims | On the Plan Effective Date, each holder of an allowed Credit Agreement Claim against an Other Sevan Debtor shall receive its pro rata participation in the Amended Sevan Credit Facility. | Impaired; deemed to reject. |
| G2 | General Unsecured Claims Against Other Sevan Debtors | On the Plan Effective Date, each holder of an allowed General Unsecured Claim against an Other Sevan Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in cash. | Unimpaired; deemed to accept. |
| G3 | Interests in Other Sevan Debtors | On the Plan Effective Date, each allowed Interest in an Other Sevan Debtor shall be Reinstated. | Unimpaired; deemed to accept. |

8

| Class | Claim/Interest | Treatment | Status |
|---|---|---|---|
| | | *AOD Debtors* | |
| H1 | **AOD Credit Agreement Claims** | On the Plan Effective Date, each holder of an allowed Credit Agreement Claim against an AOD Debtor shall receive pro rata participation in the Amended AOD Credit Facility. | Impaired; entitled to vote. |
| H2 | **General Unsecured Claims Against AOD Debtors** | On the Plan Effective Date, each holder of an allowed General Unsecured Claim against an AOD Debtor shall, at the election of the applicable Debtor, be (a) Reinstated or (b) paid in full in cash. | Unimpaired; deemed to accept. |
| H3 | **Existing Interests in AOD** | On the Plan Effective Date, each Interest in AOD shall be Reinstated. | Unimpaired; deemed to accept. |

**Other Chapter 11 Provisions**

| | |
|---|---|
| Chapter 11 Debtors | The Chapter 11 Cases will be commenced on account of the Entities identified in **Schedule 1** to the RSA, subject to modification in accordance with the RSA. |
| | With respect to such entities that do not file Chapter 11 Cases on the Petition Date, the Restructuring Transactions would be implemented by: |
| | • execution of the Credit Facility Amendments by 100% of the lenders under the applicable Credit Facility; or |
| | • absent such execution, filing Chapter 11 Cases on account of such entities after the Petition Date, but before the Restructuring Effective Date. |
| | Foreign proceedings ancillary to the applicable Chapter 11 Case or other proceedings seeking recognition of aspects of the Chapter 11 Case, including dissolution proceedings under applicable law, may be commenced if determined necessary or appropriate by any of the Company Parties in their sole discretion (but in consultation with counsel to the Consenting Stakeholders). |
| New NADL and Sevan Common Shares | On the Plan Effective Date, 100% of the New NADL Common Shares and New Sevan Common Shares shall be issued to the Reorganized Debtors in accordance with the Description of Transaction Steps. For administrative convenience, the holders of Credit Agreement Claims against NADL and the Other NADL Debtors and Sevan and the Other Sevan Debtors have agreed to accept participation in the Amended NADL Credit Facility and Amended Sevan Credit Facility, as applicable, in lieu of any entitlement to receive the New NADL Common Shares and New Sevan Shares and consent to the issuance of such shares to the Reorganized Debtors in accordance with the Description of Transaction Steps. |
| Credit Agreement Claim Allowance | Each Credit Agreement Claim shall be deemed allowed by the Plan in amounts to be specified in the Plan. |
| NADL Guaranteed Unsecured Note Claims | For the avoidance of doubt, holders of NADL Guaranteed Unsecured Note Claims shall receive one recovery on account of their General Unsecured Claims against Seadrill and an additional recovery on account of their General Unsecured Claims against NADL. |

9

| | |
|---|---|
| Bermuda Dissolution Proceedings | On the Plan Effective Date, three new holding companies will be established for the purpose of carrying out certain transactions under the Plan with respect to each of Seadrill (such holding company, "**New Seadrill**"), NADL (such holding company, "**New NADL**"), and Sevan (such holding company, "**New Sevan**"). Substantially all the assets owned by Seadrill, NADL, and Sevan immediately before the Plan Effective Date and not transferred to IHCo, NSNCo, or RigCo shall be transferred to New Seadrill, New NADL, and New Sevan, respectively, on the Plan Effective Date.<br><br>Within a reasonable time after the Plan Effective Date, Reorganized Seadrill, Reorganized NADL, and Reorganized Sevan shall be dissolved through liquidation proceedings under Bermuda law, resulting in Interests in Reorganized Seadrill with no value (the "**Bermuda Dissolution Proceedings**"). Recognition of the Plan will be sought through the Bermuda Dissolution Proceedings and is a condition precedent to the occurrence of the Restructuring Effective Date, and an injunction, similar in scope to the releases and exculpations set forth in the Plan, will be sought through the Bermuda Dissolution Proceedings and is a condition precedent to the occurrence of the Restructuring Effective Date.<br><br>The Bermuda Dissolution Proceedings and the formation of New Seadrill, New NADL, and New Sevan will be described in greater detail in the Description of Transaction Steps to be included in the Plan Supplement. |
| Use of Cash Collateral | The Parties will support the Debtors' consensual use of cash collateral during the Chapter 11 Cases on the terms and conditions set forth in the Proposed Cash Collateral Order. |
| Customer Contracts and Performance Guarantees | The Debtors' drilling contracts and other agreements with customers, including guarantees by Debtors' of other Entities' performance under such contracts (the "**Customer Contracts**"), shall be assumed on or before the Restructuring Effective Date. |
| Rights Offerings | The offerings of the Notes Rights, if any, and Equity Rights, if any, shall be carried out in accordance with the rights offering procedures to be attached to the Investment Agreement (the "**Rights Offering Procedures**"). |
| Disputed Claims Reserve | On the Plan Effective Date, the Debtors may establish one or more reserves for alleged General Unsecured Claims that have not yet been allowed, in an estimated amount or amounts determined by the applicable Debtors, consisting of Unsecured Pool Equity, Notes Rights, Equity Rights, and/or Liquidation Recovery in the same proportions and amounts as provided for in the Plan. |
| Employee Matters | Pursuant to the RSA and this Restructuring Term Sheet, the Consenting Stakeholders consent to (i) the continuation of the Debtors' wages, compensation, and benefits programs according to existing terms and practices, including executive compensation programs, and (ii) any motions in the Bankruptcy Court for approval thereof.<br><br>On the Restructuring Effective Date, the Debtors shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees or (b) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee. |
| Employee Incentive Plan | On the Restructuring Effective Date, an employee incentive plan shall be implemented at the Reorganized Debtors (the "**Employee Incentive Plan**"), which will (a) reserve an aggregate of 10% of the New Seadrill Common Shares, on a fully diluted, fully distributed basis, for grants made from time to time to employees of the reorganized Debtors; and (b) otherwise contain terms and conditions (including with respect to participants, allocation, structure, and timing of issuance) generally consistent with those prevailing in the market at the discretion of the board of directors of New Seadrill. Unless otherwise agreed between the Debtors and the Required Commitment Parties, such terms and conditions shall be set forth in a term sheet for the Employee Incentive Plan, in form and substance reasonably satisfactory to the Debtors and the Required Commitment Parties, to be included in the Plan Supplement. |

| | |
|---|---|
| Indemnification Obligations | The Debtors' indemnification obligations in place as of the Petition Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the directors, officers, or employees that are currently employed by, or serving on the board of directors or like body of, any of the Company Parties, as of the Petition Date, shall be assumed pursuant to the Plan. |
| Debtor Releases, Third-Party Releases, and Exculpation | The exculpation provisions, the Debtor releases, and the "third-party" releases to be included in the Plan will be as set forth below in all material respects. The Consenting Stakeholders will, pursuant to the RSA, agree not to "opt out" of the consensual "third-party" releases, including those granted to the Debtors' current and former officers, directors, and employees. To the extent any Company Party is not a Debtor as of the Plan Effective Date, releases among the Parties and their Related Parties substantially consistent with the following shall be included in the Definitive Documents with respect to such Company Party. |

**Releases by the Debtors.** Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Investment Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Releases by Holders of Claims and Interests.** As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Entity from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Investment Agreement, the Plan, or any

11

Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Investment Agreement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Exculpation.** Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

| | |
|---|---|
| Conditions Precedent to Emergence | The occurrence of the Restructuring Effective Date will be subject to the following conditions precedent: |

• the RSA and Investment Agreement shall not have been terminated and shall remain in full force and effect;

• entry of the Confirmation Order and no stay of the Confirmation Order shall then be in effect;

• entry into the Amended Credit Facilities (with all conditions precedent thereto having been satisfied or waived);

• issuance of the New Secured Notes and the Equity Securities (with all conditions precedent thereto having been satisfied or waived);

• the effectiveness of all other applicable Definitive Documents, subject to the consent and approval rights set forth in the RSA;

• establishment of a professional fee escrow funded in the amount of estimated accrued but unpaid professional fees incurred by the Debtors during the Chapter 11 Cases;

• payment of the CoCom and Agents' reasonable and documented unpaid professional fees and expenses;

• payment of the Commitment Parties' reasonable and documented unpaid professional fees and expenses;

• all requisite governmental authorities and third parties will have approved or consented to the Restructuring Transactions, to the extent required;

• recognition of the Plan through the Bermuda Dissolution Proceedings; and

• granting of an injunction, similar in scope to the release and exculpations set forth in the Plan, under the Bermuda Dissolution Proceedings.

## Definitions

"**Administrative Claim**" means a Claim incurred by a Debtor on or after the Petition Date and before the Plan Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agreement Effective Date**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Amended AOD Credit Facility**" means the credit facility under the AOD Credit Agreement as amended substantially consistent with the Credit Facility Term Sheet.

"**Amended Credit Facility**" has the meaning set forth in this Restructuring Term Sheet.

"**Amended Guarantee Facility**" means the Guarantee Facility after the Restructuring Effective Date, as modified by (a) taking any steps or executing any documentation required to (i) release all non-cash collateral securing the Guarantee Facility, including pledges of shares in Archer and NADL held by Seadrill, and (ii) increase the existing cash collateral to meet the requirement for security valued at least 150% of the MOF+ Overdraft Limited, as set out in clause 7.2 of the Prepetition Cash Management Agreement; (b) making other amendments thereto that are (i) reasonably necessary to implement the Restructuring Transactions or (ii) otherwise agreed between New Seadrill and Danske Bank; and (c) continuing all issued guarantees, both bid and performance bonds, after the Plan Effective Date.

"**Amended NADL Credit Facility**" means the Credit Facility under the NADL Credit Agreement as amended substantially consistent with the Credit Facility Term Sheet.

"**Amended Sevan Credit Facility**" means the Credit Facility under the Sevan Credit Agreement as amended substantially consistent with the Credit Facility Term Sheet.

"**Amended SFL Charters**" has the meaning set forth in this Restructuring Term Sheet.

"**AOD Credit Agreement**" means the US$360,000,000 senior secured credit facility agreement originally dated 9 April 2013 between, amongst others, Asia Offshore Rig 1 Limited, Asia Offshore Rig 2 Limited and Asia Offshore Rig 3 Limited as borrowers and ABN AMRO Bank N.V. as agent.

"**AOD Debtors**" means, collectively, each Debtor that is AOD and its direct or indirect wholly-owned subsidiaries.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

"**Bermuda Dissolution Proceedings**" has the meaning set forth in this Restructuring Term Sheet.

"**Business Day**" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable,

13

directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"**Centerbridge**" has the meaning set forth in the Investment Agreement.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"**Commitment Party**" has the meaning set forth in the Investment Agreement.

"**Company Groups**" means each of the following groups of Company Parties, respectively: (a) Seadrill and its wholly-owned direct and indirect subsidiaries; (b) NADL and its wholly-owned direct and indirect subsidiaries; (c) Sevan and its wholly-owned direct and indirect subsidiaries; and (d) AOD and its wholly-owned direct and indirect subsidiaries.

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"**Consummation**" means the occurrence of the Plan Effective Date.

"**Credit Agreement Secured Claim**" means a Credit Agreement Claim that is Secured.

"**Credit Agreement Unsecured Claim**" means a Credit Agreement Claim that is not Secured.

"**Credit Facility Lenders**" means the lenders that hold Credit Agreement Claims.

"**Currency Swaps**" means the interest rate swaps entered into by a Company Party.

"**Currency Swap Claim**" means any Claim under or derived from a Currency Swap.

"**Customer Contracts**" has the meaning set forth in this Restructuring Term Sheet.

"**Debtor**" means "Filing Entity" as defined in the RSA.

"**Description of Transaction Steps**" means the description of the steps to be carried out to effectuate the Restructuring Transactions set forth in the Plan Supplement.

"**Employee Incentive Plan**" has the meaning set forth in this Term Sheet.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Commitment Parties**" means the parties to the Investment Agreement that committed to purchase the Equity Placement.

"**Equity Placement**" has the meaning set forth in this Restructuring Term Sheet.

"**Equity Recovery**" has the meaning set forth in this Restructuring Term Sheet.

"**Equity Security**" has the meaning set forth in section 101(16) of the Bankruptcy Code and includes, for the avoidance of doubt, membership interests.

"**Estate**" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

"**Excess New Seadrill Common Stock**" means an amount of New Seadrill Common Shares consisting of (a) the New Seadrill Common Shares that (i) constitute the Unsecured Pool Equity and the Equity Recovery and (ii) will not otherwise be distributed to holders of Claims and Interests under the Plan, less (b) the New Seadrill Common Shares that will otherwise be distributed to holders of Claims under the Plan on account of the Liquidation Recovery.

14

"**Exculpated Party**" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; and (c) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"**General Unsecured Claim**" means any Unsecured Claim against a Debtor that is not otherwise paid in full pursuant to an order of the Bankruptcy Court, including: (a) Unsecured Note Claims; (b) Currency Swap Claims; and (c) Interest Rate Swap Claims. For the avoidance of doubt, any Credit Agreement Unsecured Claim shall constitute a General Unsecured Claim.

"**Guarantee Facility**" means the $90 million guarantee facility under the Prepetition Cash Management Agreement.

"**Guarantee Facility Claim**" means any Claim against a Debtor under the Guarantee Facility.

"**HCB Equity Placement**" has the meaning set forth in this Restructuring Term Sheet.

"**Hemen**" has the meaning set forth in the Investment Agreement.

"**Interest**" means any Equity Security in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"**Interest Rate Swaps**" means the interest rate swaps entered into by a Company Party.

"**Interest Rate Swap Claim**" means any Claim under or derived from an Interest Rate Swap.

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Liquidation Recovery**" means an amount of New Seadrill Common Shares and/or other consideration (including new unsecured debt) equal in value (in the case of New Seadrill Common Shares, based on the valuation analysis attached to the Disclosure Statement) to the amount such Claim or Interest would so receive or retain if the applicable Debtor were liquidated under chapter 7 of the Bankruptcy Code as of the Plan Effective Date, as set forth in the liquidation analysis attached to the Disclosure Statement. The form and amount of consideration included in the Liquidation Recovery shall be specified in the solicitation version of the Plan and Disclosure Statement.

"**NADL 510(b) Claim**" means any Claim arising from rescission of a purchase or sale of an equity security of NADL or its wholly-owned direct or indirect Debtors for damages arising from the purchase or sale of such an equity security or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

"**NADL Currency Swap Claim**" means a Currency Swap Claim against NADL.

"**NADL Guaranteed Unsecured Note Claim**" means, collectively, any Claim arising under the NADL NOK Notes.

"**NADL Revolving Loan Claim**" means the Claims, held by Seadrill as of the Petition Date, under the revolving credit facility agreement, dated 30 January 2017, between North Atlantic Drilling Ltd., as borrower, and Seadrill Limited, as lender.

"**NADL Interest Rate Swap Claim**" means an Interest Rate Swap Claim against NADL.

"**NADL Non-Guaranteed Unsecured Note Claim**" means, collectively, any Claim arising under the NADL 2019 Notes.

"**New NADL**" has the meaning set forth in this Restructuring Term Sheet.

"**New NADL Common Shares**" means the new common shares in New NADL issued pursuant to the Plan on the Plan Effective Date.

"**New Seadrill**" has the meaning set forth in this Restructuring Term Sheet.

"**New Seadrill Common Shares**" means the new common shares in New Seadrill issued pursuant to the Plan on the Plan Effective Date.

"**New Sevan**" has the meaning set forth in this Restructuring Term Sheet.

"**New Sevan Common Shares**" means the new common shares in New Sevan issued pursuant to the Plan on the Plan Effective Date.

"**Notes Rights Offering**" means the rights offering for New Secured Notes of NSNCo, in an amount equal to the Notes Rights Offering Amount, backstopped by the Debt Commitment Parties as contemplated by the Investment Agreement and this Restructuring Term Sheet.

"**Notes Rights Offering Amount**" means the amount of the Notes Rights Offering, which shall be $85 million and shall be deposited in an escrow account prior to the Plan Effective Date, for New Secured Notes.

"**NSNCo**" has the meaning set forth in this Restructuring Term Sheet.

"**NSN HoldCo**" has the meaning set forth in this Restructuring Term Sheet.

"**Original Commitment Parties**" means Hemen and Centerbridge.

"**Other NADL Debtors**" means, collectively, each Debtor that is a direct or indirect wholly-owned subsidiary of NADL.

"**Other Priority Claim**" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"**Other Seadrill Debtors**" means, collectively, each Debtor that is a direct or indirect wholly-owned subsidiary of Seadrill.

"**Other Secured Claim**" means any Secured Claim against any of the Debtors, other than a Credit Agreement Claim, the NADL Revolving Loan Claim, or the Sevan Second Lien Claim.

"**Other Sevan Debtors**" means, collectively, each Debtor that is a direct or indirect wholly-owned subsidiary of Sevan.

"**Petition Date**" means the earliest date on which a Company Party files a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"**Plan Effective Date**" means, with respect to the Plan, the date selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in the Plan have been satisfied or waived; and (c) the Plan is declared effective.

"**Prepetition Cash Management Agreement**" means the Amended and Restated Group Cash Management Agreement, dated March 6, 2013, between Seadrill Limited, as customer, and Danske Bank, as bank.

"**Primary Structuring Fee**" means a fee equal to 5% of the New Seadrill Common Shares issued to Hemen on the Plan Effective Date pursuant to the Investment Agreement, subject to dilution by the Employee Incentive Plan.

"**Priority Tax Claim**" means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

"**Reinstated**" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"**Related Party**" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"**Released Party**" means, collectively, and in each case in its capacity as such: (a) each Company Party; (b) each Reorganized Company Party; (c) each Non-Consolidated Entity; (d) each Consenting Lender; (e) the CoCom and each member of the CoCom; (f) each Consenting Noteholder; (g) each Commitment Party; (h) Hemen; (i) SFL; (j) each current and former Affiliate of each Entity in clause (a) through (k); and (k) each Related Party of each Entity in clause (a) through (k).

16

"**Releasing Parties**" means, collectively, and in each case in its capacity as such: (a) each Company Party; (b) each Reorganized Company Party; (c) each Non-Consolidated Entity; (d) each Consenting Lender; (e) the CoCom and each member of the CoCom; (f) each Consenting Noteholder; (g) each Commitment Party; (h) Hemen; (i) SFL; (j) all holders of Claims; (k) all holders of Interests; (l) each current and former Affiliate of each Entity in clause (a) through (m); and (m) each Related Party of each Entity in clause (a) through (m).

"**Reorganized Debtor**" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date, including New Seadrill, New NADL, and New Sevan and, before their dissolution pursuant to the Bermuda Dissolution Proceedings, Reorganized Seadrill, Reorganized NADL, and Reorganized Sevan.

"**Reorganized NADL**" means NADL, or any successor or assign thereto, by merger, consolidation or otherwise on and after the Plan Effective Date, excluding New NADL, and before dissolution pursuant to the Bermuda Dissolution Proceedings.

"**Reorganized Seadrill**" means Seadrill, or any successor or assign thereto, by merger, consolidation or otherwise on and after the Plan Effective Date, excluding New Seadrill, and before dissolution pursuant to the Bermuda Dissolution Proceedings.

"**Reorganized Sevan**" means Sevan, or any successor or assign thereto, by merger, consolidation or otherwise on and after the Plan Effective Date, excluding New Sevan, and before dissolution pursuant to the Bermuda Dissolution Proceedings.

"**Required Commitment Parties**" has the meaning ascribed to it in the Investment Agreement.

"**Rights Offering Procedures**" has the meaning ascribed to it in this Restructuring Term Sheet.

"**Seadrill 510(b) Claim**" means any Claim, other than the NADL 510(b) Claims, the Sevan 510(b) Claims, and the AOD 510(b) Claims, arising from rescission of a purchase or sale of an equity security of the Debtors or an Affiliate of the Debtors for damages arising from the purchase or sale of such an equity security or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

"**Seadrill Currency Swap Claim**" means a Currency Swap Claim against Seadrill.

"**Seadrill Interest Rate Swap Claim**" means an Interest Rate Swap Claim against Seadrill.

"**Seadrill Unsecured Note Claim**" means, collectively, any Claim arising under the Seadrill 2017 Notes, Seadrill 2020 Notes, Seadrill NOK Notes, and Seadrill SEK Notes.

"**Secured**" means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a secured claim.

"**Select Commitment Equity Placement**" has the meaning set forth in this Restructuring Term Sheet.

"**Select Commitment Parties**" has the meaning set forth in the Investment Agreement.

"**Sevan 510(b) Claim**" means any Claim arising from rescission of a purchase or sale of an equity security of Sevan or its wholly-owned direct or indirect Debtors for damages arising from the purchase or sale of such an equity security or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

"**Sevan Credit Agreement**" means the US$1,750,000,000 senior secured credit facility agreement originally dated 30 September 2013 between, amongst others, various Subsidiaries of Sevan as borrowers and ING Bank N.V. as agent.

"**Sevan Second Lien Claim**" means the Claims, held by Seadrill as of the Petition Date, against the Sevan Debtors under the amended and restated subordinated revolving credit facility agreement, dated December 2014, between certain Sevan Debtors, as borrowers, and Seadrill, as lender.

"**Unsecured Claim**" means any Claim that is not a Secured Claim.

17

"**Unsecured Pool Denominator**" means an amount equal to the sum of:

(a)      100% of the aggregate allowed General Unsecured Claims against or guaranteed by Seadrill; and

(b)      70% of the aggregate allowed General Unsecured Claims not against or guaranteed by Seadrill (including the NADL Non-Guaranteed Unsecured Note Claims but excluding General Unsecured Claims against AOD).

"**Unsecured Pool Equity**" has the meaning set forth in this Restructuring Term Sheet.

<u>**ANNEX 2**</u> **to** <u>**EXHIBIT A**</u>

**Proposed Cash Collateral Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | |
| SEADRILL LIMITED, *et al.*,[1] | ) | Case No. 17-[_] (_) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | **Re: Docket No. _** |

**INTERIM ORDER (I) AUTHORIZING USE
OF CASH COLLATERAL, (II) GRANTING ADEQUATE
PROTECTION, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors (the "Debtors") for entry of interim and final orders seeking, among other things:

(i) authorization for the Debtors to use "cash collateral" as that term is defined in section 363 of title 11 of the United States Code (the "Bankruptcy Code") (which shall include, but not be limited to, all proceeds of the Prepetition Collateral and any and all cash of any kind, whether in reserved accounts, blocked accounts or otherwise, including, without limitation, any prepetition and postpetition cash and cash equivalents), in which the Prepetition Facility Secured Parties have Prepetition Liens or other interests (the "Cash Collateral"); *provided* that the cash held by Seadrill Limited in the Administrative Cash Account (as defined in the Cash

---

1    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/Seadrill. The location of Debtor Seadrill Americas Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 11025 Equity Drive, Suite 150, Houston, Texas 75201.

2    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in **Annex A** or **Annex B** hereto, as applicable.

1

Management Order (as defined below)) in the amount of approximately $300 million as of the Petition Date (such cash, the "<u>Administrative Cash</u>") has been agreed by the Debtors and the Prepetition Facility Secured Parties to not constitute Cash Collateral (including with respect to any setoff, offset or recoupment rights of the applicable depository related to prepetition obligations), solely for purposes of the consensual use of Cash Collateral (including the grant of adequate protection and other rights) in accordance with this Interim Order; <u>provided</u>, <u>further</u>, that (x) if this Interim Order or the Final Order (each as defined below) is terminated pursuant to paragraph 4 hereof or otherwise, the Prepetition Facility Secured Parties reserve the right to assert that the Administrative Cash constituted Cash Collateral (including for the purpose of calculating any Diminution in Value (as defined below)) and the Debtors reserve their rights to contest such assertion, in each case, on any basis and (y) the Prepetition Facility Secured Parties agree that, solely for the purposes of the consensual use of Cash Collateral in accordance with this Interim Order, Diminution in Value shall not include the use of the Administrative Cash from the Petition Date to the Termination Date (as defined below);

(ii) authorization for the Debtors to grant, as of the Petition Date, certain adequate protection to the Prepetition Facility Secured Parties which has been negotiated at arms' length as a critical and integrated global compromise on the consensual use of Cash Collateral, to protect against any aggregate diminution in the value of their respective interests in their collateral (including their Cash Collateral), as a result of, *inter alia*, the imposition of the automatic stay and the use of their Prepetition Collateral (including their Cash Collateral), as required by the Bankruptcy Code;

(iii) modification of the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to permit the Debtors and the Prepetition Facility Secured Parties to implement and effectuate the terms and provisions of this order (together with all annexes and exhibits hereto, this "Interim Order");

(iv) approval of certain stipulations by the Debtors as set forth in Annex B to this Interim Order with respect to the Prepetition Facilities, and the liens and security interests arising therefrom;

(v) subject to entry of the Final Order (as defined below), the waiver of any right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or other applicable law pursuant to the terms and subject to the conditions and limitations provided for herein and in the Final Order (as defined below);

(vi) the scheduling of a hearing (the "Final Hearing") to be held before this Court to consider entry of a final order in form and substance acceptable to the Prepetition Facility Secured Parties (the "Final Order") approving the use of the Cash Collateral, and the grant of adequate protection to the Prepetition Facility Secured Parties on a final basis;

(vii) the waiver of any applicable stay (including under Rule 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules")) and providing for immediate effectiveness of this Interim Order; and

(viii) authorization for Seadrill Limited, as of the Petition Date, to perform and comply with all obligations under that certain Equitable Mortgage Over Shares in Seadrill Deepwater Drillship Ltd. (the "Deepwater Share Pledge");

and due, proper and sufficient notice of the Motion and the hearing to approve this Interim Order (the "<u>Interim Hearing</u>") having been given under the circumstances and the opportunity for objection having been provided; and the Interim Hearing having been held before the Court on September 13, 2017; and it appearing that no other or further notice is necessary with respect to the Court's entry of this Interim Order; and upon the Mosley Declaration, the evidence submitted and the record of the Interim Hearing held on the Motion to approve this Interim Order; and any and all objections to the entry of this Interim Order having been withdrawn, overruled or otherwise resolved; and that this Court may enter this Interim Order consistent with Article III of the United States Constitution; and it appearing that the relief requested in the Motion and granted herein is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A. **Commencement of the Chapter 11 Cases**: On September 12, 2017 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>"), thereby commencing these chapter 11 cases (the "<u>Chapter 11 Cases</u>").

B. **Debtors in Possession; No Committee**: Since the Petition Date, the Debtors have been managing and operating their business and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no official committee of unsecured creditors (any such committee, the "<u>Committee</u>") has been appointed in the Chapter 11 Cases.

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. <u>See</u> Bankruptcy Rule 7052.

C. **Jurisdiction and Venue**: This Court has jurisdiction over these Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a) and 1334(b). Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. §157(b)(2). The predicates for relief sought herein are sections 105, 361, 362, 363, 507(b) and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure for the Southern District of Texas (the "Local Rules"). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Notice**. Notice of the hearing on this Interim Order and the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances. Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including (a) the Office of the U.S. Trustee for Southern District of Texas (the "U.S. Trustee"); (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents for each of the Debtors' secured credit facilities; (d) counsel to the CoCom (as defined below); (e) the indenture trustee for each of the Debtors' unsecured notes; (f) counsel to the Select Commitment Parties (as defined in the chapter 11 plan filed on the Petition Date); (g) counsel to Hemen Holding Ltd. and Centerbridge Credit Partners L.P.; (h) counsel to the counterparties to the Debtors' swap transactions and Seabras lenders; (i) the Office of the United States Attorney for the Southern District of Texas; (j) the state attorneys general for states in which Debtors conduct business; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

E. **Prepetition Facility Obligations**. Seadrill Limited and certain affiliated Debtors are party to thirteen separate secured credit facilities, each with a separate lender group and its own distinct collateral package (including certain collateral that is shared by multiple credit facilities). A detailed description of such Prepetition Facilities and Prepetition Collateral is set forth in **Annex A** hereto.

F. **Stipulations as to Prepetition Facility Obligations**. Without limiting the rights of any Committee or any other party-in-interest that has standing as, and solely to the extent set forth in paragraph 11 below, the Debtors permanently, immediately, and irrevocably acknowledge, represent, stipulate and agree to the statements set forth in **Annex B** hereto (the "Stipulations").

G. **Necessity of Relief Requested**. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Rules 4001-1, 4002-1, and 9013-1, and good cause has been shown for entry of this Interim Order. The Debtors would not have sufficient available sources of working capital to operate their business in the ordinary course or to maintain their property without the use of the Cash Collateral. Without access to, and the ability to use, the Prepetition Collateral, which includes the Rigs (as defined below) and the Cash Collateral, the Debtors' ability to manage, administer and preserve their estates would be immediately and irreparably harmed, thereby materially impairing their respective estates and creditors and the likelihood of a successful outcome in these Chapter 11 Cases. The terms of the use of Cash Collateral, including the grant of adequate protection and the other rights and

6

benefits of the parties set forth in this Interim Order, are fair and reasonable, and the product of arms' length negotiations, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Accordingly, entry of this Interim Order is in the best interests of the Debtors, their respective estates and their creditors and other parties-in-interest.

H. **Adequate Protection**. The Prepetition Facility Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, and as a condition for the use of their Prepetition Collateral, including the Cash Collateral, to the adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral. The Prepetition Facility Secured Parties have negotiated in good faith regarding the Debtors' use of the Cash Collateral to fund the administration of the Debtors' estates and continued operation of their business, in accordance with the terms hereof. The Prepetition Facility Secured Parties have agreed to permit the Debtors to use the Cash Collateral, in accordance with this Interim Order, including the Budget (as defined below) (subject to Permitted Variance (as defined below)), and subject to the other terms and conditions set forth herein, including the protections afforded parties in "good faith" under section 363(m) of the Bankruptcy Code. Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral, including the Cash Collateral, are fair and reasonable, reflect the Debtors' prudent business judgment, and constitute reasonably equivalent value and fair consideration for the Prepetition Facility Secured Parties' consent thereto.

Based upon the foregoing, and upon the record made before this Court with respect to the Motion, including the record made at the Interim Hearing, and good and sufficient cause appearing therefor,

**NOW THEREFORE, IT IS HEREBY ORDERED THAT**:

1. <u>Motion Granted</u>. The Motion is granted on an interim basis as herein provided and the use of Cash Collateral is authorized for each Debtor, subject and pursuant to the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not previously been withdrawn, waived or otherwise resolved are hereby denied and overruled.

2. <u>Authorization to Use Cash Collateral</u>. The Debtors are authorized to use Cash Collateral during the period beginning on the Petition Date until the occurrence of the Termination Date (as defined below), subject to the terms and conditions of this Interim Order and to the adequate protection granted to or for the benefit of the Prepetition Facility Secured Parties as set forth herein, and in accordance with the 13-week cash disbursements and receipts budget attached as **<u>Exhibit A</u>** to this Interim Order (as such budget may be modified from time to time by the Debtors with the prior written consent of the CoCom (as defined below), the "<u>Budget</u>"); <u>provided</u> that (i) beginning on the date the first updated 13-week cash flow forecast of the Debtors is issued pursuant to paragraph 5(j) hereof, there shall be a permitted percentage variance between the total operating cash flow set forth in the Budget and the actual total operating cash flow for the six-week period ended the last business day of the immediately preceding week (excluding, for purposes of determining Budget compliance and calculation of the Permitted Variance, (A) Professional Fees (as defined below), (B) Adequate Protection Payments (as defined below) and (C) up to $175,000,000 in the aggregate of "Other Non-Operating Activities" (as used in the Budget), consisting of up to $75,000,000 on account of

hedging arrangements (the "Hedging Basket") and up to $100,000,000 on account of agreements pursuant to which delivery of a newbuild is deferred (the "Newbuild Basket") (provided, for the avoidance of doubt, that the remaining $100,000,000 (or up to $150,000,000 to the extent applicable in accordance with clause (ii) below) of "Other Non-Operating Activities" amounts to be used by the Debtors for expenditures (the "Remaining Other Non-Operating Activities Basket") shall be included for purposes of determining Budget compliance and calculation of the Permitted Variance)), which shall not exceed the greater of (x) 20% of the total operating cash flow from the preceding six-week period and (y) $25,000,000 (the "Permitted Variance"), (ii) to the extent any portion of the Hedging Basket or the Newbuild Basket remains unused, such unused amount up to $25,000,000 for each of the Hedging Basket and the Newbuild Basket (for a potential aggregate amount of $50,000,000) may be applied to the Remaining Other Non-Operating Activities Basket and (iii) solely with respect to the Hedging Basket, the Newbuild Basket and the Remaining Other Non-Operating Activities Basket, any amounts or expenses listed in the line item in the Budget that are unused in the six-week period used to test the Permitted Variance may be carried over and used by the Debtors in any subsequent four-week period for such line item. For the avoidance of doubt, the Debtors shall first use Administrative Cash to pay the fees and expenses of Professional Persons (as defined below), any ordinary course professionals retained pursuant to Court order, and the Clerk and UST Fees (as defined below) and, to the extent the Administrative Cash is insufficient pay such fees and expenses, the Debtors may thereafter use Cash Collateral for purposes of satisfying such claims, in each case in accordance with the terms of this Interim Order.

9

3. <u>Termination</u>. The occurrence of any of the following events set forth in clauses (a) through (s) below shall constitute a "<u>Termination Event</u>," unless waived in writing by the CoCom:

(a) this Interim Order shall cease to be in full force and effect for any reason;

(b) any of these Chapter 11 Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, a chapter 11 trustee or examiner with expanded powers pursuant to section 1106(b) of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases or the Court shall abstain from hearing any of these Chapter 11 Cases, or any of the Debtors shall file a motion or other pleading with the Court seeking any of the foregoing relief;

(c) the Final Order shall not have been entered by this Court on or before 45 days following entry of this Interim Order, unless an extension is otherwise agreed to in writing by the CoCom;

(d) an order shall have been entered (or any of the Debtors shall seek an order) reversing, amending, supplementing, extending, staying, vacating, or otherwise modifying this Interim Order without the prior written consent of the CoCom;

(e) the Debtors shall file or the Court shall grant any application, motion or borrowing request seeking to: (i) incur indebtedness from any party secured by a lien on, or otherwise having a claim against or recourse to, as the case may be, the Debtors, the Prepetition Collateral or the Adequate Protection Collateral (as defined below), unless such liens or claims are junior and subordinated in all respects to the Prepetition Liens, the Prepetition Facility Obligations, the Adequate Protection Liens (as defined below) and the Adequate Protection Superpriority Claims (as defined below) without the consent the CoCom; or (ii) use Cash Collateral on a nonconsensual basis;

(f) the Court shall grant any application by any party seeking payment of any claim on a superpriority administrative claim basis pari passu, or senior, to the Adequate Protection Superpriority Claims without the consent of the CoCom;

(g) the entry of an order by this Court or any other court having jurisdiction to do so granting relief from or modifying the automatic stay applicable under section 362 of the Bankruptcy Code to allow a holder or holders of any lien or security interest to foreclose or otherwise realize upon their liens or security interests in respect of a Rig;

(h) the Debtors' exclusive right to file and solicit acceptance of a plan of reorganization is terminated or terminates, unless such exclusivity expires after the Debtors have filed a plan of reorganization with the Court that is in form and substance satisfactory to the Prepetition Facility Secured Parties (for the avoidance of doubt, the RSA Plan (as defined below) shall be considered in a form and substance satisfactory to the Prepetition Facility Secured Parties), and are proceeding in good faith toward confirmation and consummation of such plan;

(i) any Debtor breaches any material covenant or undertaking (after any applicable cure period) in any of the Prepetition Facility Documents relating to the insurance, operation, management and maintenance of any drilling rig that constitutes Prepetition Collateral (each, a "Rig"), including without limitation a breach in connection with expropriation, arrest, detention, capture, condemnation, confiscation, requisition, purchase, seizure, or forfeiture of, or any taking of title to, the applicable Rig;

11

(j) the entry of an order by this Court or any other court having jurisdiction to do so (i) authorizing the sale of all or substantially all of a Debtor's assets, or (ii) authorizing any other sale or disposition of any of the Prepetition Collateral outside the ordinary course of business without the prior written consent of the CoCom;

(k) any Debtor shall make any material payment (including "adequate protection" payments) on or in respect of any prepetition indebtedness other than in accordance with the Budget or otherwise pursuant to this Interim Order or any other interim or final order entered with respect to the Debtors' "first day" motions (so long as such motions and orders are in form and substance reasonably acceptable to the CoCom);

(l) subject to a five (5) day grace period, the Debtors shall fail to make any Adequate Protection Payment when due;

(m) the entry of an order of this Court avoiding, disgorging, or requiring repayment of any portion of the Adequate Protection Payments made by the Debtors hereunder;

(n) the entry of an order of this Court approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any Prepetition Collateral;

(o) the Adequate Protection Liens or the Adequate Protection Superpriority Claims granted to the Prepetition Facility Secured Parties shall cease to be valid, perfected and enforceable in all respects, or any Debtor shall assert the invalidity, non-perfection or unenforceability of any of the Adequate Protections Liens or the invalidity or unenforceability of the Adequate Protection Superpriority Claims;

(p) any Debtor shall seek, or shall support (in any such case by way of, *inter alia,* any motion or other pleading filed with this Court or any other writing to another party-in-interest executed by or on behalf of any Debtor) any other person's motion, to disallow or subordinate in whole or in part any Prepetition Facility Secured Party's claim in respect of Prepetition Facility Obligations or to challenge the validity, enforceability, perfection or priority of the liens in favor of any Prepetition Facility Secured Party (including, without limitation, any Prepetition Liens);

(q) the termination of the prepetition restructuring support agreement entered into by the Debtors and certain consenting creditors dated on or about [•], 2017 (as amended, restated, supplemented or otherwise modified in accordance with its terms, the "Restructuring Support Agreement"), subject to the tail period, if applicable, set forth in Section 13.09 of the Restructuring Support Agreement;

(r) the Debtors shall fail to adhere to the Budget (subject to the Permitted Variance); provided that it shall not constitute a Termination Event if the Debtors exceed the Permitted Variance by no more than $25,000,000 for a period of two weeks, so long as the Debtors are back in compliance with the Budget (subject to the Permitted Variance) within three weeks of the initial date of the noncompliance or

(s) the Debtors shall fail to comply with any other provision of this Interim Order in a material respect.

4. Remedies Upon the Termination Date.

(a) Notwithstanding anything contained herein, the Debtors' authorization to use Cash Collateral hereunder shall automatically terminate (except for payment of the Carve-Out, as provided in paragraph 7 below) on the date (such date, the "Termination Date"), which is the

earlier to occur of (x) June 12, 2018 and (y) seven (7) business days from the date (the "<u>Termination Notice Date</u>") on which written notice of the occurrence of a Termination Event is given (which may be done electronically) by the CoCom to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee appointed in the Chapter 11 Cases (the "<u>Termination Notice</u>," and such period commencing on the Termination Notice Date and ending seven (7) business days later, the "<u>Termination Notice Period</u>"); <u>provided</u> that, if a hearing to consider relief from the automatic stay, any other appropriate relief in connection with delivery of the Termination Notice, or continued use of Cash Collateral (as may be held on an expedited basis as set forth in paragraph 4(b) below) is requested to be heard within such seven (7) business day period but is scheduled for a later date by the Court, the Termination Notice Period shall be automatically extended to the date of such hearing.

(b) Upon and after the delivery of the Termination Notice, the Debtors and each of the Prepetition Facility Agents and the CoCom consent to a hearing on an expedited basis to consider whether the automatic stay may be lifted so that the Prepetition Facility Secured Parties may exercise any and all of their respective rights and remedies in respect of the Adequate Protection Collateral in accordance with this Interim Order, the applicable Prepetition Facility Documents, or applicable law, or to consider any other appropriate relief (including the Debtors' use of Cash Collateral on a nonconsensual basis); provided that the rights of the Debtors to oppose any relief requested by the Prepetition Facility Secured Parties and/or the CoCom (and the rights of any Prepetition Facility Secured Party or the CoCom to oppose any request for relief by the Debtors, including for the use of Cash Collateral on a nonconsensual basis) are, in each case, fully reserved.

14

(c) During the Termination Notice Period, the Debtors' right to use Cash Collateral pursuant to this Interim Order shall be limited to payment of: (x) any expenses set forth in the Budget that were incurred prior to, and remain unpaid as of, the Termination Notice Date and (y) solely as determined by the Debtors in their reasonable discretion and in good faith, any other critical business-related expenses necessary to operate the Debtors' business or preserve the Prepetition Collateral including payments in respect of health or human safety, in each case with prior notice to the CoCom (to the extent reasonably possible) and subject in all respects to the Budget. Following the Termination Date, the Debtors may use Cash Collateral to pay any remaining expenses set forth in the Budget that were incurred (in the ordinary course of business consistent with past practice) prior to, and remain unpaid as of, the Termination Date.

(d) The delay or failure to exercise rights and remedies under this Interim Order or any Prepetition Facility Document shall not constitute a waiver of the Prepetition Facility Secured Parties' rights hereunder, thereunder or otherwise. The occurrence of the Termination Date or a Termination Event shall not affect the validity, priority or enforceability of any and all rights, remedies, benefits and protections provided to the Prepetition Facility Secured Parties under this Interim Order, which rights, remedies, benefits and protections shall survive the Termination Date.

(e) The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims and to incur all liabilities and obligations to the Prepetition Facility Secured Parties under this Interim Order, and (ii) authorize the Prepetition Facility Secured Parties to retain and apply any applicable payments hereunder.

(f) Without limiting any obligations under the Restructuring Support Agreement (to the extent in effect at such time), nothing included herein shall prejudice, impair, or otherwise affect any Prepetition Facility Secured Party's rights to seek any other or supplemental relief in respect of the Debtors (including any other or additional adequate protection); provided that each Prepetition Facility Secured Party's right to seek any rights or adequate protection with respect to the Administrative Cash is subject to the express reservation set forth in clause (i) of the preamble of this Interim Order. The rights of the Debtors and all other parties in interest to oppose any such request on any grounds are fully reserved.

5. Adequate Protection. As adequate protection for the respective interests of the Prepetition Facility Secured Parties in the Prepetition Collateral (including the Cash Collateral), pursuant to sections 361 and 363(e) of the Bankruptcy Code, and as a condition for the use of their Prepetition Collateral, including any Cash Collateral, each of the Prepetition Facility Secured Parties are hereby granted the following (collectively, the "Adequate Protection"), effective from the Petition Date:

(a) Adequate Protection Liens. Solely to the extent of, and in an aggregate amount equal to, any diminution in value of any Prepetition Facility Secured Party's interests in its respective Prepetition Collateral, including on a dollar-for-dollar basis in respect of any Cash Collateral, from and after the Petition Date, arising from the imposition and enforcement of the automatic stay and the Debtors' use, sale or lease of such Prepetition Collateral, including any Cash Collateral (any such diminution, a "Diminution in Value"), and in each case subject and subordinate to the Carve-Out, each Prepetition Facility Secured Party (or the applicable Prepetition Facility Agent on its behalf) is hereby granted the following security interests and liens (collectively, the "Adequate Protection Liens"):

16

(i) pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority replacement liens on, and security interests in, the Adequate Protection Collateral of each borrower and obligor under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party that is not subject to (x) valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or (y) valid and non-avoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and

(ii) pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-avoidable senior priming replacement liens on, and security interest in, all other Adequate Protection Collateral of each borrower and obligor under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party, which replacement liens and security interests shall be (x) junior to the Prepetition Liens, and any (1) valid, perfected and non-avoidable liens in existence as of the Petition Date and (2) valid and non-avoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which in each case are senior in priority to the Prepetition Liens and are permitted by the terms of the Prepetition Facility Documents and (y) senior to all other liens on and security interests of any third parties that were junior to the Prepetition Liens as of the Petition Date.

17

(b) <u>Adequate Protection Collateral.</u> "<u>Adequate Protection Collateral</u>" shall mean, collectively, all of the Debtors' property and assets (whether now owned or after-acquired, and whether real or personal, tangible or intangible), including, without limitation, all Prepetition Collateral, Rigs, postpetition revenues, insurance, bank accounts and other security or deposit accounts of the Debtors (including, for the avoidance of doubt, any accounts opened prior to, on and/or after the Petition Date), all equity interests, all intercompany claims, accounts and receivables (and all rights associated therewith), and any and all proceeds, products, rents and profits of all of the foregoing; <u>provided</u> that Adequate Protection Collateral shall not include (i) the Administrative Cash (subject to the reservation in clause (i) of the preamble of this Interim Order), (ii) assets or property (other than the Prepetition Collateral, including Cash Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien as contemplated in this Interim Order, would constitute a default or event of default, under (a) that certain $1,450,000,000 senior secured credit facility agreement originally dated 20 March 2013 between, amongst others, Seadrill Vela Hungary Kft as borrower and ING Bank N.V. as agent as set out in Schedule 3 (*Amended and Restated Vela Facility Agreement*) of the Third Amendment and Restatement Agreement dated 16 August 2017 between, amongst others, Seadrill Tellus Ltd. and Seadrill Vela Hungary Kft as borrowers and ING Bank N.V. as agent (as amended, restated, supplemented or otherwise modified from time to time), (b) that certain $119,100,000 secured credit

18

facility agreement originally dated 16 August 2017 (as amended, restated, supplemented or otherwise modified from time to time) between, amongst others, Seadrill T-15 Ltd. and Seadrill T-16 Ltd., as borrowers, and Citibank Europe plc, UK Branch as agent, and (c) that certain $420,000,000 term loan and revolving credit facilities agreement originally dated 28 December 2012 (as amended, restated, supplemented or otherwise modified from time to time) between, amongst others, Seadrill Polaris Ltd. (previously SFL West Polaris Limited) as borrower and DNB Bank ASA as agent, (iii) any receivables, collateral, or other assets pledged, assigned, or otherwise granted by a Debtor to secure the Senior Secured Credit Facility Agreement, dated March 20, 2015, as amended from time to time, between SeaMex Ltd. and the other parties thereto, including under the Intra-Group Credit Assignment, dated March 20, 2015, as amended from time to time, between Seadrill Limited and the other parties thereto, (iv) the Mortgaged Shares (as defined under the Deepwater Share Pledge), or (v) any of the Debtors' claims and causes of action for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>"); and <u>provided</u>, <u>further</u>, that subject only to, and effective upon, entry of the Final Order, Adequate Protection Collateral shall include any and all proceeds or other property that is recovered or becomes unencumbered, whether by judgment, settlement, or otherwise, or is otherwise the subject of any successful Avoidance Actions.

(c) <u>Adequate Protection Superpriority Claims</u>. To the extent of, and in an aggregate amount equal to, any Diminution in Value in respect of the Prepetition Collateral securing its respective Prepetition Facility, and subject only to the Carve-Out, each Prepetition Facility Secured Party is hereby granted an allowed superpriority administrative expense claim against each borrower and obligor under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party (collectively, the "<u>Adequate Protection Superpriority Claims</u>"), which Adequate Protection Superpriority Claims shall, subject to the Carve-Out, have priority over any and all administrative expenses, adequate protection claims and other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

(d) <u>Scope of Adequate Protection Liens and Adequate Protection Superpriority Claims</u>. Notwithstanding anything to the contrary herein, solely prior to the entry of the Final Order, (i) the Adequate Protection Liens granted to each Prepetition Facility Secured Party hereunder shall be limited to (x) Adequate Protection Collateral consisting of such Prepetition Facility Secured Party's Prepetition Collateral and (y) any other Adequate Protection Collateral owned by a borrower or obligor under the applicable Prepetition Facility but only to the extent of the Diminution in Value of the collateral owned by such borrower or obligor; and (ii) the Adequate Protection Superpriority Claims granted to each Prepetition Facility Secured Party hereunder (x) shall be limited to claims against the borrowers and obligors under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party and (y) shall be limited to the extent of the Diminution in Value of the collateral owned by such borrower or obligor.

(e) <u>Status of the Adequate Protection Liens and Adequate Protection Superpriority Claims</u>. The Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any lien or security interest arising after the Petition Date, subject only to the Carve-Out, or (ii) except as expressly set forth in clauses (i) or (ii) of paragraph 5(a) above, subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise. The Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Facility Agents for the benefit of the Prepetition Facility Secured Parties and not in substitution therefor. Notwithstanding anything to the contrary in this Interim Order, (i) if the Plan (as defined in the Restructuring Support Agreement, the "<u>RSA Plan</u>") is confirmed in accordance with the terms of the Restructuring Support Agreement, any Adequate Protection Liens and Adequate Protection Superpriority Claims granted to any Prepetition Facility Secured Lender (or the applicable Prepetition Facility Agent on its behalf) will be deemed satisfied (including for purposes of satisfying section 1129(a)(9) of the Bankruptcy Code) by the treatment provided to such Prepetition Facility Secured Parties under the RSA Plan or (ii) in the case of any plan of reorganization or liquidation other than the RSA Plan (such plan, a "<u>Non-RSA Plan</u>"), the Adequate Protection Liens and Adequate Protection Superpriority Claims granted to any

Prepetition Facility Secured Lender (or the applicable Prepetition Facility Agent on its behalf) shall be, under such Non-RSA Plan, either (1) paid in full in cash or (2) provided with any other treatment that has been accepted by the Prepetition Facility Secured Parties holding claims under the applicable Prepetition Facility under which such Prepetition Facility Secured Lender is a party in numbers and amounts sufficient to satisfy the requirements of section 1126(c) of the Bankruptcy Code, so long as such treatment complies with the requirements of section 1129(b) of the Bankruptcy Code (it being agreed that, if all requirements of section 1129(b) are satisfied, then in such case the requirements of section 1129(a)(9) may be deemed satisfied by treatment other than payment in full in cash). Solely for purposes of the consensual use of Cash Collateral in accordance with this Interim Order and solely with respect to Adequate Protection Superpriority Claims and Adequate Protection Liens shall not include any expenditure or transfer of Cash Collateral consistent with the Budget and the Cash Management Order during the period from the Petition Date until the earlier of (x) the effective date of the RSA Plan and (y) the Termination Date. Notwithstanding anything to the contrary herein, each Prepetition Facility Secured Party is hereby granted and shall have replacement liens in all postpetition revenues deposited into Earnings Accounts (as defined in the Cash Management Order) owned by each borrower and obligor under the applicable Prepetition Facility under which such Prepetition Facility Secured Party is a party.

22

(f) <u>Adequate Protection Payments</u>. The Prepetition Facility Agents (on behalf of the respective Prepetition Facility Secured Parties) shall each receive from the Debtors (using reasonable efforts where practicable to pay the following payments from Earnings Accounts (as defined in the Cash Management Order)) (i) within five (5) business days following the entry of this Interim Order, cash payment of all accrued and unpaid interest (whether accrued prior to or after the Petition Date) on the applicable Prepetition Facility Obligations at the non-default rates provided for in the respective Prepetition Facility Documents (it being understood that interest shall accrue at the default rate to the fullest extent permitted under the Bankruptcy Code, with all rights to object thereto fully preserved), and all accrued and unpaid fees and costs (whether accrued prior to or after the Petition Date) owing to the Prepetition Facility Secured Parties under the respective Prepetition Facility Documents, and (ii) on the last business day of each month thereafter, cash payment of all accrued and unpaid interest, at the applicable non-default rates provided in the respective Prepetition Facility Documents (it being understood that interest shall accrue at the default rate to the fullest extent permitted under the Bankruptcy Code, with all rights to object thereto fully preserved; <u>provided</u>, that the difference between the applicable non-default and default interest rate shall be waived pursuant to, and on the effective date of, the RSA Plan), and any fees and costs due and payable under the respective Prepetition Facilities, including, without limitation, any accrued fees owing to the Prepetition Facility Secured Parties under the respective Prepetition Facility Documents; <u>provided</u> that, solely in the event that a Non-RSA Plan is confirmed under section 1129 of the Bankruptcy Code and there is a final determination that any Prepetition Facility Secured Parties were undersecured as of the Petition Date, payments received by such Prepetition Facility Secured Parties pursuant to this paragraph 5(f) may be recharacterized and applied as payments of principal attributable to the applicable Prepetition Facility.

23

(g) <u>ECA Payments</u>. The Debtors shall pay all interest, premiums and/or other fees (whether incurred prior to or after the Petition Date) due and payable to any Seadrill ECA (as defined in the Restructuring Support Agreement) under, and in accordance with, such Seadrill ECA's respective Seadrill ECA Guarantee (as defined in the Restructuring Support Agreement) and the Prepetition Facility Documents.

(h) <u>Fees and Expenses</u>. The Debtors shall pay in full, in cash and in immediately available funds all reasonable and documented fees, costs and expenses (whether incurred prior to, on or after the Petition Date), without duplication, of (i) the Prepetition Facility Agents and (ii) the Committee of Coordinators appointed under as and defined in that certain appointment letter dated April 20, 2016 among Seadrill Limited and each member thereof, as amended, restated, supplemented, or otherwise modified from time to time (the "<u>CoCom</u>"), on the terms set forth in each work fee letter entered into between any Debtor and each member of the CoCom (the "<u>CoCom Work Fee Letters</u>"), including all reasonable and documented professional and advisory fees, costs and expenses of their legal, financial and other professionals, including White & Case LLP, Advolatfirmaet BA-HR and Lazard Frères & Co. LLC (which, for the avoidance of doubt, includes the monthly fee, transaction (or similar back-ended) fee and any expenses owed to Lazard Frères & Co. LLC in accordance with the terms of its retention agreement), and including any other local, foreign or regulatory counsel as may at any time be necessary (collectively, the "<u>Prepetition Facility Professionals</u>"), (x) promptly

24

upon entry of this Interim Order in the full amounts set forth in any outstanding invoices from the Prepetition Facility Agents and Prepetition Facility Professionals received by the Debtors at least five (5) business days prior to the entry of this Interim Order and outstanding amounts owed to the CoCom outstanding under the CoCom Work Fee Letters (as invoiced to the Debtors) and (y) thereafter, within ten (10) business days after (A) the presentment of any such invoices to the Debtors and the U.S. Trustee (which shall include reasonable supporting detail in the form of standard detailed invoices, which may be redacted to protect privileged, confidential, or commercially or strategically sensitive information) or (B) in the case of the CoCom fees owed to the CoCom under the CoCom Work Fee Letters, such payments coming due pursuant to the terms of the CoCom Work Fee Letters, as invoiced to the Debtors (the payment obligations set forth in this paragraph 5(h), together with the payment obligations set forth in paragraphs 5(f) and 5(g) above, the "Adequate Protection Payments"). The Prepetition Facility Agents, the CoCom and the Prepetition Facility Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file any fee applications with the Court, but shall provide copies of their invoices as set forth above to the U.S. Trustee.

(i) Reservation of Rights. Nothing in this Interim Order shall be construed to limit the Prepetition Facility Agents' or the CoCom's respective rights and remedies under the Prepetition Facility Documents, the CoCom Work Fee Letters or applicable law regarding engagement and reimbursement of expenses of professionals and advisors.

(j) Reporting. The Debtors shall comply with the reporting requirements set forth in the Prepetition Facility Documents, and shall provide the following additional reporting to the Prepetition Facility Agents and the CoCom:

25

(i) No later than Friday of the fourth week covered by the then existing Budget, an updated 13-week cash flow forecast of the Debtors, substantially in the form of the Budget, which updated Budget shall be in form and substance satisfactory to the Prepetition Facility Agents and the CoCom (but shall not be required to be filed with the Court); provided, however, that if the Prepetition Facility Agents and the CoCom do not agree to an updated Budget, the Budget shall be the then existing Budget or such Budget as may be approved by the Court.

(ii) On Friday of each calendar week, commencing on Friday, September 29, 2017, a variance report comparing, on a line item basis, actual results for the previous individual week and cumulative weeks to the amounts set forth in the Budget for such previous week and since the Petition Date. Such variance report shall provide itemized detail on the utilization of the Hedging Basket, the Newbuild Basket, and the Remaining Other Non-Operating Activities Basket. Each material variance shall be accompanied by a qualitative explanation.

(iii) No later than the date that the monthly operating report is issued, a copy of the unaudited consolidated balance sheet of the Debtors as at the end of such month and the related statements of income and cash flows for such month and the portion of the fiscal year through the end of such month.

(iv) A monthly fleet status report on all drilling rigs.

26

(v) Written notice to the CoCom of any drilling contract early termination notices provided by the Debtors' customers pursuant to the relevant drilling contract.

(vi) The monthly information updates required to be delivered under paragraph 4(w) of each of the waiver and extension approval letters, dated 28 April 2016, related to the Prepetition Facility Loan Documents (as amended, restated, supplemented, or otherwise modified from time to time), to be provided as soon as available, but in any event within forty-five (45) calendar days after the last day of each month.

(vii) The Debtors shall promptly provide notice to each of the Prepetition Facility Agents and the CoCom (with a copy to their counsel), when any Debtor has any knowledge of the occurrence of any Termination Event.

(k) Access to Records. In addition to, and without limiting, any rights to access that the Prepetition Facility Secured Parties have under their respective Prepetition Facility Documents, upon reasonable notice and at reasonable times, the Debtors shall permit representatives, agents and employees of the Prepetition Facility Agents and the CoCom (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, and (iii) to discuss (no less than once per calendar month) the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors, including the status of any pending tax settlements or other contingent liabilities.

(l) <u>Modifications for Adverse Consequences of Granting Adequate Protection Liens or Adequate Protection Superpriority Claims</u>. If the Debtors determine in good faith (in consultation with any affected Prepetition Facility Agent and the CoCom) that the grant of any Adequate Protection Lien on any asset or Adequate Protection Superpriority Claim of any Debtor (or any direct or indirect non-Debtor subsidiary or affiliate of a Debtor) (i) results, or would result, in a material adverse tax consequence to any Debtor (or any direct or indirect non-Debtor subsidiary or affiliate of a Debtor), (ii) is otherwise prohibited or restricted by applicable law, or (iii) is determined by the Debtors, acting in good faith, to have a reasonable likelihood of giving rise to termination and/or acceleration of any material customer contract, then such Adequate Protection Lien shall not attach to any such asset or such Adequate Protection Superpriority Claim shall be reduced or limited or (solely in the case of clause (i) or (ii) above) *void ab initio*, as applicable (without further action of the Court, the Debtors, the Prepetition Facility Agents, or the CoCom), solely to the extent necessary to avoid such material adverse consequence, such prohibition, restriction, or such termination or acceleration; <u>provided</u>, <u>however</u>, that the Debtors shall use commercially reasonable efforts to minimize any such material adverse tax consequences, prohibitions, restrictions, terminations, or accelerations, as applicable, and to preserve, to the extent possible, the Adequate Protection Lien or Adequate Protection Superpriority Claim; and <u>provided</u>, <u>further</u>, that to the extent any such asset or claims is excluded pursuant to this paragraph 5(l), such asset or claim shall cease to be so excluded at the time that the condition causing such exclusion no longer exists and, to the extent severable, the Adequate Protection Lien shall attach immediately to such asset and such Adequate Protection Superpriority Claim shall be restored.

6. <u>Subordination of the Debtors' Intercompany, Affiliate Liens.</u> All intercompany or affiliate claims (and, to the extent secured, all such liens) of the Debtors (other than any liens granted to the Prepetition Facility Secured Parties), will be tracked and documented, and will be contractually subordinated to the Prepetition Facility Obligations, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the liens granted to the Prepetition Facility Secured Parties (but not, for the avoidance of doubt, any other liens or claims except as otherwise ordered by the Court), on terms that are satisfactory to the CoCom.

7. <u>Carve-Out.</u>

(a) <u>Carve-Out</u>. As used in this Interim Order, the "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below) (the "<u>Clerk and UST Fees</u>"); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the CoCom of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to

29

or after delivery of the Carve-Out Trigger Notice, subject (as applicable) to the Investigation Budget Cap; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000,000 incurred after the first business day following delivery by the CoCom of a Carve-Out Trigger Notice (provided that such amount may only be used to pay any Allowed Professional Fees that remain outstanding after first applying to such Allowed Professional Fees any Administrative Cash), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by e-mail (or other electronic means) by the CoCom to the Debtors' lead restructuring counsel, the U.S. Trustee, and counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of a Termination Event (and may be delivered together with, and as a part of, the Termination Notice), stating that the Post Carve-Out Trigger Notice Cap has been invoked.

(b) Carve Out Reserves. On the day on which a Carve Out Trigger Notice is given by the CoCom to the Debtors with a copy to counsel to the Committee (if any) (the "Termination Declaration Date"), the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. The Debtors shall also deposit and hold cash in an amount equal to the Post Carve-Out Trigger Notice Cap in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post Carve-Out

Trigger Notice Cap (the "<u>Post Carve-Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Facility Agents for the benefit of the Prepetition Facility Secured Parties, unless the Prepetition Facility Obligations (including, to the extent required pursuant to this Interim Order or the Final Order, any amounts owed on account of the adequate protection granted to the Prepetition Facility Secured Parties pursuant to this Interim Order and the Final Order) have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and priorities as of the Petition Date. All funds in the Post Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition Facility Agents for the benefit of the Prepetition Facility Secured Parties, unless the Prepetition Facility Secured Obligations (including, to the extent required pursuant to this Interim Order or the Final Order, any amounts owed on account of the adequate protection granted to the Prepetition Facility Secured Parties pursuant to this Interim Order and the Final Order) have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the Prepetition Facility

Documents, this Interim Order, or the Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 7, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 7, prior to making any payments to the Prepetition Facility Agents or any of the Debtors' creditors, as applicable. Notwithstanding anything to the contrary in the Prepetition Facility Documents, this Interim Order, or the Final Order, following delivery of a Carve Out Trigger Notice, the Prepetition Facility Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Prepetition Facility Agents for application in accordance with the Prepetition Facility Documents and this Interim Order or the Final Order. Further, notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall the Budget, Carve Out, Post Carve-Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Final Order, or in the Prepetition Facility Documents, the Carve Out shall be senior to all liens and claims securing the Prepetition Collateral, including the Cash Collateral, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and any liens or claims securing the Prepetition Facility Obligations.

32

(c) <u>No Cap; Priority</u>. Notwithstanding anything to the contrary in this Interim Order, in no way shall the Budget, the Carve-Out, the Post Carve-Out Trigger Notice Cap or the Carve-Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt, and notwithstanding anything to the contrary herein or in the Prepetition Facility Documents, the Carve-Out shall be senior to all liens and claims securing the Prepetition Collateral, including the Cash Collateral, the Adequate Protection Liens and the Adequate Protection Superpriority Claims.

(d) <u>Payment of Allowed Professional Fees Prior to the Carve-Out Trigger Notice Date</u>. Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(e) <u>Payment of Carve-Out On or After the Carve-Out Trigger Notice Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

8. <u>Reservation of Rights</u>. The Prepetition Facility Agents, the other Prepetition Facility Secured Parties and the CoCom reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Budget. The payment of any Allowed Professional Fees pursuant to the Carve-Out shall not, and shall not be deemed to (i) reduce any Debtor's obligations owed to any of the Prepetition Facility Secured Parties (whether under this Interim Order or otherwise) or (ii) modify, alter or otherwise affect any of the liens and security interests of such parties (whether granted under this Interim Order or otherwise) in the Prepetition Collateral or the Adequate Protection Collateral (or their

respective claims against the Debtors). The Prepetition Facility Secured Parties shall not be responsible for the direct payment or reimbursement of any Allowed Professional Fees, or any fees or expenses of the U.S. Trustee or Clerk of the Court (or of any other entity) incurred in connection with the Chapter 11 Cases or any successor case, and nothing in this Interim Order or otherwise shall be construed to obligate such parties in any way to pay such compensation or to reimburse such expenses; provided that, if any such party has received a payment or distribution in violation of this Interim Order at a time when the Carve-Out has not been fully honored or funded, any and all such payments or distributions received in violation of this Interim Order may be subject to disgorgement to the extent necessary to fund the Carve-Out.

9. Insurance on Assets. The Debtors shall provide continued maintenance of and appropriate insurance on the Debtors' assets (including the Rigs), in amounts consistent with the Debtors' prepetition practices and as set forth in the applicable Prepetition Facility Documents.

10. Effectiveness of Adequate Protection Liens. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, enforceability and priority of the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of liens, or other similar instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Adequate Protection Liens or to entitle the Adequate Protection Liens to the priorities granted herein. Notwithstanding the foregoing, any Prepetition Facility Agent may, in its sole discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of liens and other similar instruments or documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order

34

to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases. The Debtors shall execute and deliver to the Prepetition Facility Agents all such financing statements, mortgages, security agreements, notices and other documents as the Prepetition Facility Agents may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of the Adequate Protection Liens. Each Prepetition Facility Agent, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

11. Challenges and Claims. The stipulations, admissions, agreements, releases and waivers contained in this Interim Order, including the Stipulations in **Annex B** of this Interim Order, are and shall be binding upon the Debtors and any of the Debtors' successors, including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative and all parties-in-interest and all of their successors-in-interest and assigns, including, without limitation, any Committee, unless, and solely to the extent that, a party-in-interest with requisite standing (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) (i) has timely filed the proper pleadings, and timely commenced the appropriate proceedings under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in

35

paragraph 12 below), challenging the Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of any Prepetition Facility Agent or other Prepetition Facility Secured Party; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Facility Obligations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge"), by no later than sixty (60) calendar days from the date of entry of the Final Order (the "Challenge Period Termination Date"), as such date may be extended in the sole discretion of the applicable Prepetition Facility Agents and any applicable individual Prepetition Facility Secured Party that is the subject of a Challenge (as defined below) and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding, and any such judgment has become final and is not subject to any further review or appeal. To the extent the Stipulations (or any of them), in each case, as with respect to any Prepetition Facility, any Prepetition Facility Agent or any other Prepetition Facility Secured Party, are (x) not subject to a Challenge timely and properly commenced prior to the expiration of the Challenge Period Termination Date or (y) subject to a Challenge timely and properly commenced prior to the expiration of the Challenge Period Termination Date, to the extent any such Challenge does not result in a final and non-appealable judgment or order of the Court that is inconsistent with such Stipulations, then, in each case, without further notice, motion or application to, or order of, or hearing before, this Court and without the need or requirement to file any proof of claim: (a) any and all such Challenges by any party shall be deemed to be forever waived, released, and barred; and (b) all of the Stipulations and all other waivers, releases and affirmations set forth in this Interim Order (or any not properly and timely

36

challenged) shall be of full force and effect and shall be binding, conclusive and final on any person, entity or party-in-interest, including any Committee, in the Chapter 11 Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by the Committee or any other party-in-interest, including, without limitation, any trustee, responsible individual, examiner with expanded powers or other representative of the Debtors' estates. If any such Challenge is timely and properly filed, the stipulations and admissions contained in this Interim Order, including the Stipulations, shall nonetheless remain binding and preclusive on the Committee (if any) and any other person or entity except, and solely to the extent, that such stipulations and admissions were expressly challenged in such timely and properly filed Challenge and determined by final order of the Court to be disallowed. Notwithstanding anything to the contrary herein, the right to commence any Challenge under this Interim Order is only preserved as against any particular Prepetition Facility Obligation or Prepetition Collateral and/or against each particular Prepetition Facility Agent and each other Prepetition Facility Secured Party to the extent such Challenge is commenced timely and properly, prior to the Challenge Period Termination Date and in respect of such Prepetition Facility Obligations or Prepetition Collateral, such Prepetition Facility Agent, and/or such other Prepetition Facility Secured Party, and is otherwise waived as set forth in this paragraph 11. All remedies or defenses of any party with respect to any Challenge are hereby preserved. Nothing in this Interim Order vests or confers on any person, including the Committee (if any) appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Facility Obligations, and an order of the Court (or any

other court of competent jurisdiction) conferring such standing on a Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee or such other party-in-interest. To the extent any Challenge Proceeding is timely and properly commenced, the Prepetition Facility Secured Parties and the CoCom shall be entitled to reimbursement or payment of the related costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending themselves in any such proceeding, consistent with the terms of paragraph 5(h) above.

     12. <u>Limitations on Use of Cash Collateral</u>. Notwithstanding anything herein to the contrary, no portion of the proceeds of the Prepetition Collateral, including Cash Collateral, the Administrative Cash or the Carve-Out, and no disbursements set forth in the Budget, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (a) incurring indebtedness other than as expressly provided in this Interim Order, (b) preventing, hindering, impeding, or delaying any of the Prepetition Facility Agents' or any other Prepetition Facility Secured Parties' enforcement or realization upon, or exercise of rights in respect of, any of the Prepetition Collateral or Adequate Protection Collateral (except as provided in paragraph 4 above), (c) seeking to amend or modify any of the rights or interests granted to any Prepetition Facility Agent or any other Prepetition Facility Secured Party under this Interim Order or their respective Prepetition Facility Documents, including seeking to use Cash Collateral on a contested basis, (d) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any Challenge or any other actions under chapter 5 of the Bankruptcy Code (or any similar law), against any of the Prepetition First Lien Agents or any other Prepetition Facility Secured Party, or any of their

respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, or (e) asserting, joining, commencing, supporting, investigating, or prosecuting any Challenge, or any other action for any claim, counterclaim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the Prepetition Facility Secured Parties, arising out of, in connection with, or relating to the Prepetition Facility Documents, or the transactions contemplated thereunder, including, without limitation, (i) any action arising under the Bankruptcy Code, (ii) any so-called "lender liability" claims and causes of action, (iii) any action with respect to the validity and extent of the Prepetition Facility Obligations or the validity, extent, perfection and priority of the Prepetition Liens, (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the Prepetition Liens, in whole or in part, (v) appeal or otherwise challenge this Interim Order or the Final Order or (vi) any action that has the effect of preventing, hindering, impeding or delaying (whether directly or indirectly) the Prepetition Facility Agents or Prepetition Facility Secured Parties in respect of their Prepetition Liens, Prepetition Claims, Adequate Protection Liens or Adequate Protection Superpriority Claims or any of their rights, powers, or benefits hereunder or in the Prepetition Facility Documents anywhere in the world; provided that no more than $75,000 in the aggregate of the proceeds of the Prepetition Collateral, the Cash Collateral, the Administrative Cash and the Carve-Out may be used by any Committee to investigate (but not prosecute or Challenge) the Stipulations (the "Investigation Budget Cap").

13. Continuing Effect of Order. Any dismissal, conversion, or substantive consolidation of these Chapter 11 Cases shall not affect the rights of the Prepetition Facility Secured Parties or the CoCom under this Interim Order, and all of their rights and remedies hereunder shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated. Any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise shall provide or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Prepetition Liens, the Adequate Protection Superpriority Claims and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such Adequate Protection Superpriority Claims and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all persons), and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

14. Proofs of Claim. None of the Prepetition Facility Agents and the other Prepetition Facility Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases (as defined below) and the Debtors' Stipulations on **Annex B** hereto, together with **Annex A** hereto, shall be deemed to constitute a timely filed proof of claim against each of the applicable Debtors in the Chapter 11 Cases. Any order entered by the Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Chapter 11 Cases or Successor Cases shall not apply to the Prepetition Facility Agents or the other Prepetition Facility Secured Parties with respect to all claims and interest, including,

40

without limitation, claims arising under or related to the Prepetition Facilities. Notwithstanding the foregoing, or any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of the Prepetition Facility Agents (in respect of the applicable Prepetition Secured Facilities) on behalf of themselves and the applicable Prepetition Facility Secured Parties, respectively, is hereby authorized and entitled, in each case in its respective sole discretion, but not required, to file (and amend and/or supplement, as such respective Prepetition Facility Agents and Prepetition Facility Secured Parties see fit) a master proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or Successor Cases for any claim allowed herein. Any proof of claim filed by a Prepetition Facility Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Facility Secured Parties.

15. No Marshaling/Applications of Proceeds. The Prepetition Facility Agents and the other Prepetition Facility Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or Adequate Protection Collateral, as the case may be, and proceeds shall be received and applied in accordance with this Interim Order and the Prepetition Facility Documents notwithstanding any other agreement or provision to the contrary.

16. Section 552(b). The Prepetition Facility Agents and the other Prepetition Facility Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, including, for the avoidance of doubt, in respect of postpetition revenues and payments in connection with (and as proceeds of) any Prepetition Collateral, including postpetition payments under drilling contracts in effect on and after the Petition Date and, upon

41

entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Facility Agents or the Prepetition Facility Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

17. Section 507(b) Reservation. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Facility Agents or the Prepetition Facility Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral) during the Chapter 11 Cases or any successor cases to the Chapter 11 Cases including, but not limited to, any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the Chapter 11 Cases (collectively, "Successor Cases").

18. Section 506(c) Waiver. Subject to the entry of the Final Order, no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases or any Successor Cases at any time shall be charged against any Prepetition Facility Secured Party, any of their respective claims, any Prepetition Facility Obligations, any Adequate Protection Liens, any Adequate Protection Superiority Claims, any Prepetition Liens or any Prepetition Collateral, including any Cash Collateral, pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise, without the prior written consent of the affected Prepetition Facility Agent. Nothing contained in this Interim Order shall be deemed a consent by any Prepetition Facility Secured Party to any charge, lien, assessment or claim against, or in respect

of, the Prepetition Collateral, including Cash Collateral, under section 506(c) or 105(a) of the Bankruptcy Code, or otherwise. Notwithstanding anything to the contrary in this paragraph 18, if the Final Order is terminated pursuant to paragraph 4 above or otherwise, the Debtors reserve their rights under section 506(c) of the Bankruptcy Code solely with respect to costs and expenses incurred after the Termination Date, and the Prepetition Facility Secured Parties reserve their rights to contest any such assertion on any basis.

19. Credit Bid. Subject in all respects to the terms of the applicable Prepetition Facility, each Prepetition Facility Agent on behalf of and at the direction of the applicable Prepetition Facility Secured Parties shall have the right to credit bid under section 363(k) of the Bankruptcy Code, all of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a chapter 11 plan.

20. Cash Management. The Debtors shall maintain their cash management arrangement in a manner consistent with that described in the *Interim Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Dkt. No. ___] (the "Cash Management Order") and, for the avoidance of doubt, as provided in the Cash Management Order, the Debtors shall not transfer any funds (including, without limitation, any Cash Collateral) to any non-Debtor affiliates, including foreign affiliates, during the Chapter 11 Cases except in accordance with the Budget.

21. Collateral Accounts. None of the cash deposited in the Citibank Collateral Account or the Danske Collateral Account (each as defined in the Cash Management Order), shall constitute Cash Collateral or Administrative Cash for purposes of this Interim Order, and the Debtors are not authorized to use such cash pursuant to this Interim Order.

22.  <u>Administrative Cash Account</u>. The Administrative Cash Account (as defined in the Cash Management Order) shall be maintained at Danske, and, subject to clause (i) of the preamble hereof, Danske shall retain all rights that it had with respect to the Administrative Cash before it was transferred from other accounts maintained at Danske to the Administrative Cash Account, including any right to set off, offset or recoup such funds; <u>provided</u> that this paragraph 22 shall survive the Termination Date.

23.  <u>Good Faith</u>. Each of the Prepetition Facility Secured Parties have acted in good faith (including, without limitation, for the purposes of section 363(m) of the Bankruptcy Code) in connection with this Interim Order and their reliance on this Interim Order has been and is in good faith.

24.  <u>No Release of Guarantors</u>. Nothing contained in this Interim Order shall be deemed to terminate, modify or release any obligations of any non-Debtor guarantor to any Prepetition Facility Secured Party with respect to their respective obligations under any of the Prepetition Facilities.

25.  <u>No Waiver by Failure to Seek Relief; Right to Seek Additional Adequate Protection</u>. The failure of any Prepetition Facility Secured Party to seek relief or otherwise exercise its rights and remedies under this Interim Order, the applicable Prepetition Facility Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of any Prepetition Facility Secured Party. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Facility Secured Parties to request additional forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

26. <u>The Deepwater Share Pledge</u>. Seadrill Limited is hereby authorized, as of the Petition Date, to perform and comply with all obligations under the Deepwater Share Pledge.

27. <u>Danske Facility</u>. Beginning on the Petition Date, no additional extensions of credit shall be made under the existing Danske Facility. Any remaining availability under the Danske Facility shall be available to the Debtors on a postpetition basis subject to the terms and conditions of the Danske Cash Management Agreement and such postpetition obligations shall be administrative expense claims. Danske is hereby authorized to withdraw funds from the Danske Collateral Account upon a default of the Debtors' or their non-Debtors affiliates' obligations (including obligations to pay due and payable amounts) under the Danske Cash Management Agreement notwithstanding the automatic stay set forth in section 362 of the Bankruptcy Code. Further, the Debtors are hereby authorized and directed to reimburse amounts in the Danske Collateral Account as necessary to comply with the Danske Cash Management Agreement.

28. <u>Modification of Automatic Stay</u>. The automatic stay under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the Adequate Protection Liens and incur the Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as may be needed to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations under the terms of this Interim Order; (d) authorize the Debtors to pay, and the respective Prepetition Facility Agents to

45

retain and apply, any payments made in accordance with the terms of this Interim Order; (e) permit the Prepetition Facility Secured Parties, upon occurrence of the Termination Date, to terminate the use of Cash Collateral in accordance with this Interim Order; and (f) permit the Debtors to perform and comply with all obligations under the Deepwater Share Pledge.

29. No Third Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

30. Binding Effect of Interim Order. Immediately upon entry by the Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon the Debtors, the Prepetition Facility Secured Parties, all other creditors of any of the Debtors, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these Chapter 11 Cases, or upon dismissal of any of these Chapter 11 Cases.

31. Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a chapter 7 case, or (iii) dismissing any of the Chapter 11 Cases and, with respect to the entry of any order as set forth in clause (ii) or (iii) of this paragraph 31, the terms and provisions of this Interim Order as well as the Adequate Protection Liens and Adequate Protection Superpriority Claims shall continue in full force and effect notwithstanding the entry of any such order.

32. Effect of this Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable nunc pro tunc to the Petition Date immediately upon entry. To the extent that such findings may constitute conclusions, and vice versa, they hereby are deemed as such.

33. _Amendments_. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by, or on behalf of, the Debtors and the CoCom, and approved by the Court after notice to parties-in-interest.

34. _Actions Under Restructuring Support Agreement_. Actions required or contemplated to be taken by the CoCom, any member of the CoCom, or any of the CoCom's advisors under, or consistent with, the Restructuring Support Agreement (including, without limitation, coordinating with the broader group of Prepetition Facility Secured Parties, responding to inquiries from Prepetition Facility Secured Parties and collecting signature pages from Prepetition Facility Secured Parties) are hereby authorized as part of the consensual use of Cash Collateral and any such actions are hereby determined to not be a solicitation of acceptances of a chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code.

35. _Notice_. The Debtors shall, within three business days of entry of this Interim Order, mail copies of a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, facsimile, electronic mail or overnight mail upon the Notice Parties. In addition, all parties who have requested electronic notice of filings in these cases through the Court's ECF system will automatically receive notice of this Interim Order no later than the day after its entry on the docket. Moreover, a copy of this Interim Order will be made available on the Debtors' restructuring website located at http://cases.primeclerk.com/Seadrill. The notice of the entry of this Interim Order and the Final

Hearing shall state that the objections to the entry of the Final Order shall be filed with the Court, together with proof of service thereon, and served on the counsel for the Debtors and the Notice Parties with a copy to the Court's chambers so as to be actually received no later than 5:00 p.m. (prevailing eastern time) on [•], 2017.

36. Compliance with Local Bankruptcy Rule 9013-1(b). The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Motion.

37. Debtors' Authorization. The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Interim Order.

38. Retention of Jurisdiction. This Court hereby retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

39. Final Hearing. The Court shall hold the Final Hearing to consider the relief requested in the Motion, including any objection filed in accordance with this Interim Order, on [•], 2017 (prevailing Central Time).

40. Controlling Effect of Interim Order. To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion, the Cash Management Order, or any other order of this Court, the provisions of this Interim Order shall control to the extent of such conflict.

Victoria, Texas
Dated :_, 2017

_____
UNITED STATES BANKRUPTCY JUDGE

48

**Annex A**

**Prepetition Facilities**

1. **$1.350 Billion 4 UDW Senior Secured Facility**

Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$1.35 Billion 4 UDW Facility Lenders"), and DNB Bank ASA, as bookrunner, facility agent and security agent (the "$1.35 Billion 4 UDW Facility Agent", and together with the $1.35 Billion 4 UDW Facility Lenders, the "$1.35 Billion 4 UDW Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of August 26, 2014 (as amended, restated, supplemented and/or modified through the Petition Date, the "$1.35 Billion 4 UDW Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $1.35 Billion 4 UDW Facility Credit Agreement, the "$1.35 Billion 4 UDW Facility Loan Documents").

The $1.35 Billion 4 UDW Facility Credit Agreement provided for a $675 million Term Loan Facility and $675 million Revolving Facility (each as defined in the $1.35 Billion 4 UDW Facility Credit Agreement). Seadrill Offshore AS (Norway), Seadrill Pegasus (S) Pte. Ltd. (Singapore), Seadrill Gemini Ltd. (Bermuda), Seadrill Orion Ltd. (Bermuda), and Sea Dragon de Mexico S. de R.L. de C.V. (Mexico) have each provided, pursuant to clause 18 of the $1.35 Billion 4 UDW Facility Credit Agreement, an unconditional joint and several guaranty of the Guaranteed Obligations (as defined in the $1.35 Billion 4 UDW Facility Credit Agreement).

Pursuant to the $1.35 Billion 4 UDW Facility Credit Loan Documents, the $1.35 Billion 4 UDW Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Pegasus*, *West Gemini*, and *West Orion*, (b) assignments of earnings, earnings accounts, charterparties, and insurance policies with respect to *West Pegasus*, *West Gemini* and

*West Orion*, (c) floating liens over all rights and movable assets of Sea Dragon de Mexico S. de R.L. de C.V. (Mexico) and (d) share charges or equity interest pledges over the shares in each drilling unit owner and intra-group charterer (collectively, the "$1.35 Billion 4 UDW Facility Collateral").

2. **$440 Million China ECA Senior Secured Facility**

Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$440 Million China ECA Facility Lenders"), The Export-Import Bank of China and Citibank, N.A., London Branch, as bookrunners and mandated lead arrangers, Citibank Europe plc, UK Branch, as facility agent (the "$440 Million China ECA Facility Agent", and together with the $440 Million China ECA Facility Lenders, the "$440 Million China ECA Facility Secured Parties"), and Citibank N.A., London Branch, as security agent, are parties to that certain Secured Credit Facility Agreement, dated as of December 4, 2012 (as amended, restated, supplemented and/or modified through the Petition Date, the "$440 Million China ECA Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $440 Million China ECA Facility Credit Agreement, the "$440 Million China ECA Facility Loan Documents").

The $440 Million China ECA Facility Credit Agreement provided for a $308 million CEXIM Facility and $132 million Commercial Facility (each as defined in the $440 Million China ECA Facility Credit Agreement). Seadrill UK Ltd. (England) and Seadrill Telesto Ltd. (Bermuda) have each provided, pursuant to clause 18 of the $440 Million China ECA Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $440 Million China ECA Facility Credit Agreement).

2

Pursuant to the $440 Million China ECA Facility Loan Documents, the $440 Million China ECA Facility Secured Parties were granted (a) a first priority lien on, and security interest in, the Rig *West Telesto*, (b) assignments of earnings, earnings accounts, charterparties and insurance policies with respect to *West Telesto* and (c) and a share charge over the shares of the drilling unit owner. The $440 Million China ECA Facility Secured Parties also benefit from (a) second priority liens on and security interests in Rigs *T-15* and *T-16* and (b) assignment of earnings, earnings accounts, charterparties and insurance policies with respect to Rigs *T-15* and *T-16* (collectively, the "$440 Million China ECA Facility Collateral").

3. **$450 Million Eminence Senior Secured Facility**

Seadrill Eminence Ltd. (Bermuda), as borrower, the lenders party thereto from time to time (the "$450 Million Eminence Facility Lenders"), and Danske Bank A/S, as agent (the "$450 Million Eminence Facility Agent", and together with the $450 Million Eminence Facility Lenders, the "$450 Million Eminence Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of December 13, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "$450 Million Eminence Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $450 Million Eminence Facility Credit Agreement, the "$450 Million Eminence Facility Loan Documents").

The $450 Million Eminence Facility Credit Agreement provided for a $450 million Senior Secured Facility (as defined in the $450 Million Eminence Facility Credit Agreement). Seadrill Limited (Bermuda) and Seadrill Offshore AS (Norway) have each provided, pursuant to clause 18 of the $450 Million Eminence Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $450 Million Eminence Facility Credit Agreement).

3

Pursuant to the $450 Million Eminence Facility Loan Documents, the $450 Million Eminence Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rig *West Eminence*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *West Eminence* and (c) and a share charge over shares of Seadrill Eminence Ltd. (collectively, the "$450 Million Eminence Facility Collateral").

4. **$360 Million AOD Senior Secured Facility**

Asia Offshore Rig 1 Limited (Bermuda), Asia Offshore Rig 2 Limited (Bermuda) and Asia Offshore Rig 3 Limited (Bermuda), as borrowers, the lenders party thereto from time to time (the "$360 Million AOD Facility Lenders"), and ABN AMRO Bank, N.V., Oslo Branch, as agent, coordinating bank and bookrunner (the "$360 Million AOD Facility Agent" and, together with the $360 Million AOD Facility Lenders, the "$360 Million AOD Facility Secured Parties") are parties to that certain Senior Secured Credit Facility Agreement, dated as of April 9, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "$360 Million AOD Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $360 Million AOD Facility Credit Agreement, the "$360 Million AOD Facility Loan Documents").

The $360 Million AOD Facility Credit Agreement provided for three senior secured term loan tranches of up to $120 million each. Seadrill Limited (Bermuda), Seadrill GCC Operations Ltd. (Bermuda) and Asia Offshore Drilling Limited (Bermuda) have each provided, pursuant to clause 18 of the $360 Million AOD Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $360 Million AOD Facility Credit Agreement).

Pursuant to the $360 Million AOD Facility Loan Documents, the $360 Million AOD Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *AOD I, AOD II* and *AOD III*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *AOD I, AOD II* and *AOD III* and (c) share charges over shares of each borrower (collectively, the "$360 Million AOD Facility Collateral").

5. **$400 Million Nordea Senior Secured Facility**

Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$400 Million Nordea Facility Lenders"), and Nordea Bank Norge ASA, as agent (the "$400 Million Nordea Facility Agent" and, together with the $400 Million Nordea Facility Lenders, the "$400 Million Nordea Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of December 8, 2011 (as amended, restated, supplemented and/or modified through the Petition Date, the "$400 Million Nordea Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $400 Million Nordea Facility Credit Agreement, the "$400 Million Nordea Facility Loan Documents").

The $400 Million Nordea Facility Credit Agreement provided for a $200 Term Loan Facility and $200 million Revolving Facility (each as defined in the $400 Million Nordea Facility Credit Agreement). Seadrill GCC Operations Ltd. (Bermuda), Seadrill UK Ltd. (England), Seadrill Callisto Ltd. (Bermuda), Seadrill Indonesia Ltd. (Bermuda), Seadrill Triton Ltd. (Bermuda), Seadrill Cressida Ltd. (Bermuda), Seadrill Far East Limited (Hong Kong) have each provided, pursuant to clause 18 of the $400 Million Nordea Facility Credit Agreement, an unconditional joint and several guaranty of the of the obligations thereunder.

Pursuant to the $400 Million Nordea Facility Loan Documents, the $400 Million Nordea Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Leda*, *West Cressida*, *West Callisto* and *West Triton*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *West Leda*, *West Cressida*, *West Callisto* and *West Triton* and (c) share charges over shares of each drilling unit owner (collectively, the "$400 Million Nordea Facility Collateral").

6. **$950 Million Eclipse/Carina Senior Secured Facility**

Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$950 Million Eclipse/Carina Facility Lenders"), Eksportkreditt Norge ASA, as GIEK lender and Nordea Bank AB, London Branch, as bookrunner, coordinator, facility agent and security agent (the "$950 Million Eclipse/Carina Facility Agent" and, together with the $950 Million Eclipse/Carina Facility Lenders, the "$950 Million Eclipse/Carina Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of January 26, 2015 (as amended, restated, supplemented and/or modified through the Petition Date, the "$950 Million Eclipse/Carina Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $950 Million Eclipse/Carina Facility Credit Agreement, the "$950 Million Eclipse/Carina Facility Loan Documents").

6

The $950 Million Eclipse/Carina Facility Credit Agreement provided for the $190 million Carina ECA Facility, $60 million Carina Term Loan Facility, $250 million Carina Revolving Facility, $225 million Eclipse Term Loan Facility and $225 million Eclipse Revolving Facility (each as defined in the $950 Million Eclipse/Carina Facility Credit Agreement). Seadrill Offshore AS (Norway), Seadrill Carina Ltd. (Bermuda) and Seadrill Eclipse Ltd. (Bermuda) have each provided, pursuant to clause 18 of the $950 Million Eclipse/Carina Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $950 Million Eclipse/Carina Facility Credit Agreement).

Pursuant to the $950 Million Eclipse/Carina Facility Loan Documents, the $950 Million Eclipse/Carina Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Carina* and *West Eclipse*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *West Carina* and *West Eclipse* and (c) share charges over shares of each drilling unit owner (collectively, the "$950 Million Eclipse/Carina Facility Collateral").

7. **$300 Million DNB Senior Secured Facility**

Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$300 Million DNB Facility Lenders") and DNB Bank ASA, as agent (the "$300 Million DNB Facility Agent" and, together with the $300 Million DNB Facility Lenders, the "$300 Million DNB Facility Secured Parties"), are parties to that certain Senior Secured Credit Facility Agreement, dated as of July 16, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "$300 Million DNB Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $300 Million DNB Facility Credit Agreement, the "$300 Million DNB Facility Loan Documents").

The $300 Million DNB Facility Credit Agreement provided for the $60 million Eksportkreditt GIEK Facility, $90 million Eksportkreditt Commercial Facility, $90 million DNB Liv GIEK Facility and $60 million Contract Facility (each as defined in the $300 Million DNB Facility Credit Agreement). Seadrill UK Ltd. (England), Seadrill Castor Ltd. (Bermuda) and Seadrill Tucana Ltd. (Bermuda) have each provided, pursuant to clause 20 of the $300 Million DNB Facility Credit Agreement, an unconditional joint and several guaranty of the of the Guarantee Obligations (as defined in the $300 Million DNB Facility Credit Agreement).

Pursuant to the $300 Million DNB Facility Loan Documents, the $300 Million DNB Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Castor* and *West Tucana*, (b) assignments of earnings, earnings accounts, and insurance policies with respect to *West Castor* and *West Tucana* and (c) share charges over shares of each drilling unit owner (collectively, the "$300 Million DNB Facility Collateral").

8. **$1,450,000,000 Tellus Senior Secured Credit Facility**

Seadrill Tellus Ltd. (Bermuda), as borrower, the lenders party thereto from time to time (the "Tellus Credit Facility Lenders"), ING Bank N.V., as facility agent, security agent, documentation agent, commercial coordinator commercial and bookrunner (the "Tellus Credit Facility Agent", and together with the Tellus Credit Facility Lenders, the "Tellus Credit Facility Secured Parties") and HSBC Bank plc, as ECA Coordinator and ECA bookrunner are parties to that certain Senior Secured Credit Facility Agreement, dated as of March 20, 2013 as set out in Schedule 2 (Amended and Restated Tellus Facility Agreement) of the Third Amendment and Restated Agreement, dated 16 August 2017 between, amongst others, Seadrill Tellus Ltd. And Seadrill Vela Hungary Kft, as borrowers, and ING Bank N.V., as agent (as amended, restated, supplemented and/or modified through the Petition Date, the "Tellus Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the Tellus Credit Agreement, the "Tellus Facility Loan Documents").

The Tellus Credit Agreement provided for the $67,666,666.67 Commercial Facility, $191,666,666.67 GIEK Lender Facility, $112,000,000 KEXIM Facility and $112,000,000 K-sure Facility (each as defined in the Tellus Credit Agreement). Seadrill Limited (Bermuda), Seadrill Tellus Ltd. (Bermuda) and Seadrill Offshore AS have each provided, pursuant to clause 18 of the Tellus Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the Tellus Credit Agreement).

Pursuant to the Tellus Facility Loan Documents, the Tellus Credit Facility Secured Parties were granted (a) a first priority lien on, and security interest in, the Rig *West Tellus*, (b) assignment of earnings, earnings accounts, charterparties and insurance policies with respect to *West Tellus* and (c) a share charge over shares of the borrower (collectively, the "Tellus Credit Facility Collateral").

9. **$1.5 Billion ECA II Senior Secured Facility**

Seadrill Saturn Ltd. (Bermuda), Seadrill Neptune Hungary Kft (Hungary) and Seadrill Jupiter Ltd (Bermuda), as borrowers, the lenders party thereto from time to time (the "$1.50 Billion ECA II Facility Lenders"), DNB Bank ASA, HSBC Bank plc, ING Bank N.V. and Nordea Bank Norge ASA, as bookrunners, Nordea Bank Finland Plc, London Branch, as global coordinator, facility agent, security agent and ECA agent (the "$1.50 Billion ECA II Facility Agent" and, together with the $1.50 Billion ECA II Facility Lenders, the "$1.50 Billion ECA II Facility Secured Parties"), HSBC Bank plc and DNB Bank ASA, as ECA coordinators, and ING Bank N.V., as commercial lenders coordinator and documentation agent, are parties to that

9

certain Senior Secured Credit Facility Agreement, dated as of July 30, 2014 (as amended, restated, supplemented and/or modified through the Petition Date, the "$1.50 Billion ECA II Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $1.50 Billion ECA II Facility Credit Agreement, the "$1.50 Billion ECA II Facility Loan Documents").

The $1.50 Billion ECA II Facility Credit Agreement provided for the $400 million GIEK Facility, $220 million KEXIM Facility, $180 million KEXIM Guarantee Facility, $400 million K-Sure Facility and $300 million Commercial Facility (each as defined in the $1.50 Billion ECA II Facility Credit Agreement). Seadrill Limited (Bermuda), Seadrill Gulf Operations Neptune LLC (USA) (Delaware), Seadrill Nigeria Operations Limited (Nigeria) and Seadrill Offshore Nigeria Limited (Nigeria) have each provided, pursuant to clause 18 of the $1.50 Billion ECA II Facility Credit Agreement, an unconditional joint and several guaranty of the of the Guarantee Obligations (as defined in the $1.50 Billion ECA II Facility Credit Agreement).

Pursuant to the $1.50 Billion ECA II Facility Loan Documents, the $1.50 Billion ECA II Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Neptune*, *West Jupiter* and *West Saturn*, (b) assignments of earnings, earnings accounts, charterparties and insurance policies with respect to *West Neptune*, *West Jupiter* and *West Saturn* and (c) share charges over shares of each borrower and intra-group charterer (collectively, the "$1.50 Billion ECA II Facility Collateral").

10. **$2 Billion NADL Senior Secured Facility**

North Atlantic Drilling Ltd. (Bermuda), as borrower, the lenders party thereto from time to time (the "$2 Billion NADL Facility Lenders") and DNB Bank ASA, as agent (the "$2 Billion NADL Facility Agent" and, together with the $2 Billion NADL Facility Lenders, the "$2 Billion NADL Facility Secured Parties") are parties to that certain Senior Secured Credit Facility Agreement, dated as of April 15, 2011 (as amended, restated, supplemented and/or modified through the Petition Date, the "$2.0 Billion NADL Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $2 Billion NADL Facility Credit Agreement, the "$2.0 Billion NADL Facility Loan Documents").

The $2.0 Billion NADL Facility Credit Agreement provided for the $1 billion Term Loan Facility and $1 billion Revolving Facility (each as defined in the $2.0 Billion NADL Facility Credit Agreement). Seadrill Limited, North Atlantic Alpha Ltd. (Bermuda), North Atlantic Norway Ltd., Norwegian branch (Norway), North Atlantic Elara Ltd (Bermuda), North Atlantic Epsilon Ltd. (Bermuda), North Atlantic Navigator Ltd. (Bermuda), North Atlantic Venture Ltd. (Bermuda), North Atlantic Phoenix Ltd. (Bermuda) and North Atlantic Drilling UK Ltd (Scotland) have each provided, pursuant to clause 18 of the $2.0 Billion NADL Facility Credit Agreement, unconditional joint and several Guarantees (as defined in the $2.0 Billion NADL Facility Credit Agreement).

Pursuant to the $2.0 Billion NADL Facility Loan Documents, the $2.0 Billion NADL Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Alpha*, *West Elara*, *West Epsilon*, *West Navigator*, *West Phoenix* and *West Venture*, (b) assignments of earnings, earnings accounts, charterparties and insurance policies with respect to *West Alpha*, *West Elara*, *West Epsilon*, *West Navigator*, *West Phoenix* and *West Venture* and (c) share charges over shares of each drilling owner (collectively, the "$2.0 Billion NADL Facility Collateral").

11

11. **<u>$1.75 Billion Sevan Senior Secured Facility</u>**

Sevan Brasil Ltd. (Bermuda), Sevan Driller Ltd. (Bermuda), Sevan Drilling Rig VI Pte. Ltd. (Singapore) and Sevan Louisiana Hungary Kft (Hungary), as borrowers, the lenders party thereto from time to time (the "<u>$1.75 Billion Sevan Facility Lenders</u>") and ING Bank N.V., as agent, GIEK agent and coordinator (the "<u>$1.75 Billion Sevan Facility Agent</u>" and, together with the $1.75 Billion Sevan Facility Lenders, the "<u>$1.75 Billion Sevan Facility Secured Parties</u>") are parties to that certain Senior Secured Credit Facility Agreement, dated as of September 30, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "<u>$1.75 Billion Sevan Facility Credit Agreement</u>" and, together with each of the Finance Documents and Security Documents, each as defined in the $1.75 Billion Sevan Facility Credit Agreement, the "<u>$1.75 Billion Sevan Facility Loan Documents</u>").

The $1.75 Billion Sevan Facility Credit Agreement provided for Commercial Facilities and GIEK Facilities (each as defined in the $1.75 Billion Sevan Facility Credit Agreement). Seadrill Limited (Bermuda), Sevan Drilling Rig II AS (Norway), Sevan Drilling Limited (Scotland), Sevan Drilling North America LLC (Texas), Sevan Brasil Ltd. (Bermuda), Sevan Driller Ltd. (Bermuda) and Sevan Louisiana Hungary Kft. (Hungary) have each provided, pursuant to clause 18 of the $1.75 Billion Sevan Facility Credit Agreement, an unconditional joint and several guaranty of the Guarantee Obligations (as defined in the $1.75 Billion Sevan Facility Credit Agreement).

12

Pursuant to the $1.75 Billion Sevan Facility Loan Documents, the $1.75 Billion Sevan Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *Sevan Brazil, Sevan Driller, Sevan Louisiana and Sevan Developer*, (b) assignments of earnings, earnings accounts, charterparties and insurance policies with respect to *Sevan Brazil, Sevan Driller, Sevan Louisiana and Sevan Developer* and (c) share charges or equity interest pledges over the shares of the borrowers and intra-group charterers (collectively, the "$1.75 Billion Sevan Facility Collateral").

12. **$450 Million Jackup Senior Secured Facility**

Seadrill Limited (Bermuda), as borrower, the lenders party thereto from time to time (the "$450 Million Jackup Facility Lenders") and Nordea Bank AB, London Branch, as bookrunner and agent (the "$450 Million Jackup Facility Agent" and, together with the $450 Million Jackup Facility Lenders, the "$450 Million Jackup Facility Secured Parties") are parties to that certain Senior Secured Credit Facility Agreement, dated as of August 26, 2015 (as amended, restated, supplemented and/or modified through the Petition Date, the "$450 Million Jackup Facility Credit Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the $450 Million Jackup Facility Credit Agreement, the "$450 Million Jackup Facility Loan Documents").

The $450 Million Jackup Facility Credit Agreement provided for the $225 million Term Loan Facility and $225 million Revolving Facility (each as defined in the $450 Million Jackup Facility Credit Agreement). Seadrill Freedom Ltd. (Bermuda), Scorpion Rigs Ltd. (Bermuda), Scorpion Vigilant Ltd. (Bermuda), Scorpion Resolute Ltd. (Bermuda), Seadrill Prospero Ltd. (Bermuda), Seadrill Abu Dhabi Operations Ltd. (Bermuda), Seadrill Ariel Ltd. (Liberia), Seadrill Jack Up I BV (Netherlands), Seadrill Jack Up II BV, Seadrill Labuan Ltd. (Labuan) and Seadrill Offshore Malaysia Sdn. Bhd. have each provided, pursuant to clause 18 of the $450 Million Jackup Facility Credit Agreement, an unconditional joint and several guaranty of the of the Guarantee Obligations (as defined in the $450 Million Jackup Facility Credit Agreement).

13

Pursuant to the $450 Million Jackup Facility Loan Documents, the $450 Million Jackup Facility Secured Parties were granted (a) first priority liens on, and security interests in, the Rigs *West Freedom, West Ariel, West Prospero, West Mischief, West Vigilant* and *West Resolute*, (b) assignments of earnings, earnings accounts and insurance policies with respect to *West Freedom, West Ariel, West Prospero, West Mischief, West Vigilant* and *West Resolute* and (c) share charges or equity interest pledges over the shares of each drilling unit owner and intra-group charterer (collectively, the "$450 Million Jackup Facility Collateral").

13. **$90 Million Danske Facility**

Seadrill Limited (Bermuda), as customer, and Danske Bank, Norwegian branch, as bank ("Danske"), are parties to that certain Group Cash Management Agreement, dated as of March 6, 2013 (as amended, restated, supplemented and/or modified through the Petition Date, the "Danske Cash Management Agreement" and, together with each of the Finance Documents and Security Documents, each as defined in the Danske Cash Management Agreement, the "Danske Facility Loan Documents").

Pursuant to the Danske Facility Loan Documents, Danske was granted (a) a first priority pledge over Seadrill's shares in Archer Limited, Bermuda, with Bermuda registration number 40612, registered in a Norwegian securities account held with Danske and (b) a first priority security interest in the Danske Collateral Account (as defined in the Cash Management Order) (collectively, the "Danske Facility Collateral").

14

14. **Related Defined Terms**

(a) The $1.35 Billion 4 UDW Facility Agent, $440 Million China ECA Facility Agent, $450 Million Eminence Facility Agent, $360 Million AOD Facility Agent, $400 Million Nordea Facility Agent, $950 Million Eclipse/Carina Facility Agent, $300 Million DNB Facility Agent, Tellus Facility Agent, $1.50 Billion ECA II Facility Agent, $2 Billion NADL Facility Agent, $1.75 Billion Sevan Facility Agent and $450 Million Jackup Facility Agent are collectively referred to herein as the "Prepetition Facility Agents."

(b) The $1.35 Billion 4 UDW Facility Secured Parties, $440 Million China ECA Facility Secured Parties, $450 Million Eminence Facility Secured Parties, $360 Million AOD Facility Secured Parties, $400 Million Nordea Facility Secured Parties, $950 Million Eclipse/Carina Facility Secured Parties, $300 Million DNB Facility Secured Parties, Tellus Facility Secured Parties, $1.50 Billion ECA II Facility Secured Parties, $2 Billion NADL Facility Secured Parties, $1.75 Billion Sevan Facility Secured Parties, $450 Million Jackup Facility Secured Parties, and Danske, in its capacity as bank under the Danske Cash Management Agreement, are collectively referred to herein as the "Prepetition Facility Secured Parties."

(c) The $1.35 Billion 4 UDW Facility Loan Documents, $440 Million China ECA Facility Loan Documents, $450 Million Eminence Facility Loan Documents, $360 Million AOD Facility Loan Documents, $400 Million Nordea Facility Loan Documents, $950 Million Eclipse/Carina Facility Loan Documents, $300 Million DNB Facility Loan Documents, Tellus Facility Loan Documents, $1.50 Billion ECA II Facility Loan Documents, $2.0 Billion NADL Facility Loan Documents, $1.75 Billion Sevan Facility Loan Documents, $450 Million Jackup Facility Loan Documents, and Danske Facility Loan Documents are collectively referred to herein as the "Prepetition Facility Documents" and the facilities contemplated thereby, the "Prepetition Facilities."

15

(d) The $1.35 Billion 4 UDW Facility Collateral, $440 Million China ECA Facility Collateral, $450 Million Eminence Facility Collateral, $360 Million AOD Facility Collateral, $400 Million Nordea Facility Collateral, $950 Million Eclipse/Carina Facility Collateral, $300 Million DNB Facility Collateral, Tellus Facility Collateral, $1.50 Billion ECA II Facility Collateral, $2 Billion NADL Facility Collateral, $1.75 Billion Sevan Facility Collateral, $450 Million Jackup Facility Collateral, and Danske Facility Collateral are collectively referred to herein as the "Prepetition Collateral."

16

**Annex B**

**Stipulations**

As of the Petition Date, the Debtors permanently, immediately, and irrevocably acknowledge, represent stipulate and agree as follows, and make the releases and waivers set forth below:

1. **Secured Obligations**. As of the Petition Date, the Debtors were indebted and liable to the following parties, without objection, defense, counterclaim or offset of any kind:

(a) the $1.35 Billion 4 UDW Facility Secured Parties, in the aggregate principal amount of not less than $945,000,000, with respect to the $1.35 Billion 4 UDW Facility Loan Documents, plus accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $1.35 Billion 4 UDW Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $1.35 Billion 4 UDW Facility Loan Documents (collectively, the "$1.35 Billion 4 UDW Facility Obligations");

(b) the $440 Million China ECA Facility Secured Parties, in the aggregate principal amount of not less than $67,261,765, with respect to the $440 Million China ECA Facility Loan Documents, plus accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $440 Million China ECA Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $440 Million China ECA Facility Loan Documents (collectively, the "$440 Million China ECA Facility Obligations");

1

(c) the $450 Million Eminence Facility Secured Parties, in the aggregate principal amount of not less than $264,705,800, with respect to the $450 Million Eminence Facility Loan Documents, <u>plus</u> accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $450 Million Eminence Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $450 Million Eminence Facility Loan Documents (collectively, the "$450 Million Eminence Facility Obligations");

(d) the $360 Million AOD Facility Secured Parties, in the aggregate principal amount of not less than $210,000,004, with respect to the $360 Million AOD Facility Loan Documents, <u>plus</u> accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $360 Million AOD Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $360 Million AOD Facility Loan Documents (collectively, the "$360 Million AOD Facility Obligations");

(e) the $400 Million Nordea Facility Secured Parties, in the aggregate principal amount of not less than $135,107,913, with respect to the $400 Million Nordea Facility Loan Documents, <u>plus</u> accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $400 Million Nordea Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $400 Million Nordea Facility Loan Documents (collectively, the "$400 Million Nordea Facility Obligations");

2

(f) the $950 Million Eclipse/Carina Facility Secured Parties, in the aggregate principal amount of not less than $566,056,341, with respect to the $950 Million Eclipse/Carina Facility Loan Documents, plus accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $950 Million Eclipse/Carina Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $950 Million Eclipse/Carina Facility Loan Documents (collectively, the "$950 Million Eclipse/Carina Facility Obligations");

(g) the $300 Million DNB Facility Secured Parties, in the aggregate principal amount of not less than $288,000,000, with respect to the $300 Million DNB Facility Loan Documents, plus accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $300 Million DNB Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $300 Million DNB Facility Loan Documents (collectively, the "$300 Million DNB Facility Obligations");

(h) the Tellus Facility Secured Parties, in the aggregate principal amount of not less than $322,222,229, with respect to the Tellus Facility Loan Documents, plus accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the Tellus Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Tellus Facility Loan Documents (collectively, the "Tellus Facility Obligations");

3

(i) the $1.50 Billion ECA II Facility Secured Parties, in the aggregate principal amount of not less than $1,124,999,999, with respect to the $1.50 Billion ECA II Facility Loan Documents, <u>plus</u> accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $1.50 Billion ECA II Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $1.50 Billion ECA II Facility Loan Documents (collectively, the "<u>$1.50 Billion ECA II Facility Obligations</u>");

(j) the $2 Billion NADL Facility Secured Parties, in the aggregate principal amount of not less than $908,333,333, with respect to the $2.0 Billion NADL Facility Loan Documents, <u>plus</u> accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $2.0 Billion NADL Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $2 Billion NADL Facility Loan Documents (collectively, the "<u>$2.0 Billion NADL Facility Obligations</u>");

(k) the $1.75 Billion Sevan Facility Secured Parties, in the aggregate principal amount of not less than $874,999,999, with respect to the $1.75 Billion Sevan Facility Loan Documents, <u>plus</u> accrued (both before and after the Petition Date) and unpaid

interest thereon, and fees, expenses and all other obligations under the $1.75 Billion Sevan Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $1.75 Billion Sevan Facility Loan Documents (collectively, the "$1.75 Billion Sevan Facility Obligations");

(l) the $450 Million Jackup Facility Secured Parties, in the aggregate principal amount of not less than $106,409,004, with respect to the $450 Million Jackup Facility Loan Documents, plus accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the $450 Million Jackup Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the $450 Million Jackup Facility Loan Documents (collectively, the "$450 Million Jackup Facility Obligations");

(m) Danske, in the aggregate principal amount of not less than $54 million, with respect to the Danske Facility Loan Documents, plus accrued (both before and after the Petition Date) and unpaid interest thereon, and fees, expenses and all other obligations under the Danske Facility Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Danske Facility Loan Documents (collectively, the "Danske Facility Obligations"); and

(n) The $1.35 Billion 4 UDW Facility Obligations, $440 Million China ECA Facility Obligations, $450 Million Eminence Facility Obligations, $360 Million AOD Facility Obligations, $400 Million Nordea Facility Obligations, $950 Million Eclipse/Carina Facility Obligations, $300 Million DNB Facility Obligations, Tellus Facility Obligations, $1.50 Billion ECA II Facility Obligations, $2 Billion NADL Facility Obligations, $1.75 Billion Sevan Facility Obligations, $450 Million Jackup Facility Obligations, and Danske Facility Obligations are collectively referred to herein as the "Prepetition Facility Obligations."

2. **Enforceability, etc. of the Secured Facility Obligations**. The Prepetition Facility Documents and the Prepetition Facility Obligations are (a) legal, valid, binding, and enforceable against the applicable Debtors in accordance with the terms of the respective Prepetition Facility Documents, and are hereby deemed by the Debtors to be allowed claims of the applicable Prepetition Facility Secured Parties, and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance or other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

3. **Enforceability, etc. of Liens**. The liens and security interests (collectively, the "Prepetition Liens") granted by the Debtors under the Prepetition Facility Documents to or for the benefit of the Prepetition Facility Secured Parties as security for the Prepetition Facility Obligations are legal, valid, binding, enforceable, non-avoidable and properly perfected liens on and security interests in the Prepetition Collateral and are not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. As of the Petition Date, and without giving effect to this Interim Order, the Debtors are not aware of any liens or

6

security interests having priority over the Prepetition Liens. The Prepetition Liens were granted to or for the benefit of the Prepetition Facility Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.

4. **Indemnity**. The Prepetition Facility Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens and all documents related to and all transactions contemplated by the foregoing. Accordingly, the Prepetition Facility Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto; provided that no such parties will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. No exception or defense in contract, law or equity exists as to any obligation set forth in this paragraph [4] or in the Prepetition Facility Documents to indemnify and/or hold harmless the Prepetition Facility Secured Parties and any such defenses are hereby waived.

7

5. **No Liability to Third Parties**. Neither the CoCom nor any of the Prepetition Facility Secured Parties shall (i) have liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," "owner or operator," or "participant" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any other Federal, state, or applicable international statute or regulation) or (ii) owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall constitute or deemed to constitute a joint venture ore partnership with any of the Debtors.

6. **No Claims, Causes of Action**. As of the date hereof, there exist no claims or causes of action against the CoCom or any of the Prepetition Facility Secured Parties with respect to, in connection with, related to, or arising from the Prepetition Facility Documents that may be asserted by the Debtors or any other person or entity.

7. **Release**. The Debtors forever and irrevocably release, discharge, and acquit all former, current and future members of the CoCom, Prepetition Facility Agents and any other Prepetition Facility Secured Parties, and each of their respective former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to Prepetition Facility Documents and/or the

transactions contemplated hereunder or thereunder including, without limitation, (w) any so-called "lender liability" or equitable subordination claims or defenses, (x) any and all claims and causes of action arising under the Bankruptcy Code, (y) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Facility Secured Parties and (z) any and all claims and causes of action related to actions described in paragraph 34 of the Interim Order.

9

**ANNEX 3 to EXHIBIT A**

**Credit Facility Term Sheet**

**PROJECT EAGLE**

**SECURED CREDIT FACILITIES**

**RESTRUCTURING TERM SHEET**

**CONTENTS**

| | | **PAGE** |
|---|---|---|
| A. | STRUCTURE | 3 |
| B. | AMENDMENTS AND EXTENSION | 4 |
| C. | KEY TERMS | 7 |
| D. | CONDITIONS TO AMENDMENTS AND EXTENSION | 12 |
| E. | ECONOMICS | 16 |
| F. | COVENANTS | 17 |
| G. | OTHER PROVISIONS | 18 |
| ANNEX 1 DEFINITIONS | | 23 |
| ANNEX 2 AMORTISATION | | 27 |
| ANNEX 3 COMMON TERMS AND DEFINITIONS AND REGULARISING AMENDMENTS FOR SECURED FACILITY AGREEMENTS | | 74 |
| ANNEX 4 GROUP WIDE RESTRICTIVE COVENANTS | | 75 |
| ANNEX 5 FINANCIAL COVENANT DEFINITIONS | | 76 |

**PROPOSED CAPITAL STRUCTURE FOLLOWING IMPLEMENTATION OF RECAPITALISATION PLAN**



Note: Full summary of guarantees and security set out in the relevant term sheets.

2

**KEY COMMERCIAL TERMS FOR SECURED FACILITY AGREEMENTS AND STRUCTURE**

This document (together with its annexes, the "**Term Sheet**") sets out the terms and conditions for the amendment of the Secured Credit Facilities under the recapitalisation plan for Seadrill Ltd (the "**Company**") and its subsidiaries (the "**Group**") (the "**Recapitalisation Plan**") pursuant to the restructuring support and lock-up agreement (the "**RSA**") to which this Term Sheet is attached.

Further details relating to the intercreditor principles, cash pooling arrangements, the arrangements for the Existing Bonds and the amendments to the Ship Finance Agreements are set out in Exhibit A of the RSA.

Capitalised terms used in this Term Sheet and not otherwise defined herein or in Annex 1 (Definitions) have the meanings given to them in the relevant Secured Facility Agreement.

**A. STRUCTURE**

| | | |
|---|---|---|
| 1. | **IHCo** | A new intermediate holding company, IHCo, to be put in place as a direct wholly-owned subsidiary of the Company. |
| | | Please refer to the structure diagram on page 2 for further detail. |
| 2. | **NSNCo** | A second new intermediate holding company, NSNCo, to be put in place as a direct wholly-owned subsidiary of IHCo. |
| | | The Company's interests in SDLP, Seadrill Capricorn Holdings LLC and Seadrill Operating LP to be moved down to sit below new individual holding companies put in place as direct wholly-owned subsidiaries of NSNCo. Other assets to be moved under NSNCo as set out in the New Secured Notes Term Sheet set out in Annex 4 to Exhibit A of the RSA (the "**New Secured Notes Term Sheet**"). |
| | | Please refer to the structure diagram on page 2 for further detail. |
| 3. | **RigCo** | A third new intermediate holding company, RigCo, to be put in place as a direct wholly-owned subsidiary of IHCo. |
| | | Rig-owners and intra-group charterers to be moved down to sit below RigCo, together with the Group's interests in NADL, Sevan and AOD. |
| | | Seadrill Global Services Limited (owner of the Seadrill shared capital equipment pool) and Seadrill Management Ltd to be moved down to sit below RigCo. For the avoidance of doubt, Seadrill Global Services Limited and Seadrill Management Ltd shall not be subject to any new security arrangements and shall continue to operate on the basis on which they currently operate. |
| | | Please refer to the structure diagram on page 2 for further detail. |

3

**B. AMENDMENTS AND EXTENSION**

| | | |
|---|---|---|
| 1. | **Tenor Extension** | The tenor of each Secured Facility Agreement to be extended as further detailed in the amortisation schedule in Part I of Annex 2 (Amortisation), such extension to become effective on the Refinancing Closing Date. |

ECA tranches which already extend to or beyond the extended maturities will be excluded from the tenor extension. All ECA tranches will retain existing termination rights subject to paragraph G.16 (ECA related matters) below.

The Secured Credit Facilities maturities will commence from March 2022 and will have maturity priority over the New Secured Notes, provided that the last occurring maturity date in respect of the Secured Credit Facilities falls not less than 6 months prior to the maturity of the New Secured Notes and the maturity of the New Secured Notes does not extend beyond the seventh anniversary of the Refinancing Closing Date.

For the avoidance of doubt, maturities under the Secured Credit Facilities will be extended by approximately 9 months versus the maturities agreed with the Company in October. As a result, maturities will be between March 2022 and September 2024.

With effect from the Refinancing Closing Date:

• all drawn revolving loans under the Secured Facility Agreements will be termed out; and

• the final maturity dates of each of the Secured Facility Agreements will be extended as described in Annex 2 (Amortisation).

Lenders under the Secured Credit Facilities will be asked to consent within 30 days of the Petition Date (as defined in the RSA) to extend the maturities of the Secured Credit Facilities by a further three months so that they fall between June 2022 and December 2024 as set out in Part II of Annex 2 (Amortisation).

| | | |
|---|---|---|
| 2. | **Amortisation Amendment** | Amended amortisation payments to commence from 1 January 2020 and going out to the extended maturity dates as per the amortisation schedule for the relevant Secured Facility Agreement set out in Part I of Annex 2 (Amortisation). |

Quarterly amortisation and interest payment dates to be harmonised across all Secured Facility Agreements.

ECA tranches to be included in amortisation amendment.

Part I of Annex 2 (Amortisation) is prepared on the basis that amortisation payments are made up to an assumed filing date of 12 September 2017 and that the following aggregate annual amortisation payments are made thereafter (excluding final bullet payments on extended maturity dates):

<div align="center">4</div>

- 2017: US$0m, provided that where any amortisation payments are made in the period from 1 August 2017 to the filing date, the amount of amortisation in 2020 set out below shall be reduced to ensure there is a full recovery of any such amortisation payments (as reflected in Annex 2 (Amortisation))

- 2018: US$0m

- 2019: US$0m

- 2020: US$445m (less the amount of any amortisation payments made in the period from 1 August 2017 to the filing date)

- Post 2020: US$521m (as reduced to reflect maturities of the Secured Credit Facilities from March 2022)

Lenders under the Secured Credit Facilities will be asked to consent within 30 days of the Petition Date (as defined in the RSA) to adjust the amortisation payments profile so that it reflects Part II of Annex 2 (Amortisation).

| | | |
|---|---|---|
| 3. | **Amortisation Conversion Election** | Subject to the conditions described below, the Company may elect in respect of each quarter to convert a specified amount of scheduled principal amortisation into a new secured tranche under each of the Secured Facility Agreements, with 550bps cash margin over LIBOR and a bullet payment on the extended maturity date under each respective Secured Facility Agreement (the "**Amortisation Conversion Election**"). Where Senior Secured Lenders are backed by ECA or commercial lender guarantees, the ECAs, the covered lenders and the relevant commercial lenders in respect of each such Secured Credit Facility shall agree the allocation of the cash margin in respect of Amortisation Conversion Elections as between themselves. |

The initial conversion may occur at any time beginning with the first quarterly amortisation after 1 January 2020. For the avoidance of doubt, the first election notice may be delivered prior to this date (subject to compliance with the notice requirements set out below).

The Amortisation Conversion Election may be made on consecutive election dates. The Company may reborrow any part of the new secured tranche created as a result of the exercise of the Amortisation Conversion Election which has been repaid or prepaid. For the avoidance of doubt, IHCo shall not be required to contribute cash to RigCo in respect of any such reborrowing.

Notice of each Amortisation Conversion Election (including the intended quantum) must be made not less than 90 nor more than 120 days prior to the amortisation payment date on which the amortisation conversion is to take effect.

Each Amortisation Conversion Election must be for the lower of (i) the full amount of the amortisation due on the relevant amortisation payment date and (ii) the unutilised amount of the Maximum Conversion Amount (as defined below). If the Company makes an Amortisation Conversion Election for an amount which is less than the full amount of the amortisation due on the relevant payment date, scheduled amortisations on the relevant amortisation payment date reduce on a pro rata basis across all Secured Credit Facilities.

The Company may make Amortisation Conversion Elections from 1 January 2020 so long as (x) the total cumulative amortisation conversion amount does not exceed US$500 million at any time ("**Maximum Conversion Amount**") and (y) the following conditions are met:

(a) with respect to the first US$250m of the Amortisation Conversion Elections:

- if the election is exercised in 2020, LTM Consolidated EBITDA when tested at the most recent quarterly testing date is not more than projected consolidated EBITDA under the Delayed Day Rate Case on such date; and

- if the election is exercised after 2020, LTM Consolidated EBITDA when tested at the most recent quarterly testing date is less than US$1.55 billion on such quarter date; and

(b) with respect to the remaining US$250m of the Amortisation Conversion Elections:

- if the election is exercised in 2020, LTM Consolidated EBITDA when tested at the most recent quarterly testing date is less than 80% of projected consolidated EBITDA under the Delayed Day Rate Case on such date; and

- if the election is exercised after 2020, LTM Consolidated EBITDA when tested at the most recent quarterly testing date is less than US$1.25 billion on such quarter date.

With respect to the first US$250m of Amortisation Conversion Elections, there will be a mechanism whereby in the event of an Amortisation Conversion Election, IHCo will be required to contribute additional cash to RigCo equal to the lesser of:

- such amount that equates to a proportion of 40 cents for every dollar of Amortisation Conversion Elections; and

- the residual cash balance at IHCo excluding any IHCo Excluded Cash (as defined in the Cash Pooling Term Sheet set out at Annex 5 to Exhibit A of the RSA (the "**Cash Pooling Term Sheet**")).

For the avoidance of doubt, the Company shall be able to exercise Amortisation Conversion Elections notwithstanding the cash balance at IHCo being zero.

Mechanics of Amortisation Conversion Election to be introduced to each of the Secured Facility Agreements with effect from the Refinancing Closing Date.

Existing security documents to be re-confirmed / adjusted on local counsel advice in order to ensure that new secured tranches resulting from exercise of the Amortisation Conversion Election benefit from the same security as existing secured debt.

12 month cash forecasts are required as a condition precedent to exercise of the Amortisation Conversion Election mechanism, to be updated on a quarterly basis together with the option of a quarterly call with management for so long as any of the secured tranches created as a result of the exercise of the Amortisation Conversion Election remain outstanding. For the avoidance of doubt, the provision of cash forecasts and holding of calls with management shall not give rise to any consent/approval rights for the banks or be capable of triggering any defaults.

| | | |
|---|---|---|
| 4. | **Derivative Arrangements** | Approach to hedging to be discussed further within Chapter 11. |
| 5. | **Ship Finance** | See the term sheet at Annex 7 to Exhibit A of the RSA. |
| 6. | **Seabras Sapura** | See the term sheet at Annex 8 to Exhibit A of the RSA. |

**C. KEY TERMS**

| | | |
|---|---|---|
| 1. | **Financial Covenants** | All existing financial covenants in the Secured Credit Facilities will be deleted or waived permanently. |

The Secured Credit Facilities shall benefit from the following financial tests at the times and on the terms specified below:

*RigCo Minimum Liquidity Covenant*

- RigCo Group Minimum Liquidity of US$650 million to 31 December 2017, US$525 million from 1 January 2018 to 31 December 2018 and US$400 million thereafter. This must be satisfied at all times (subject to a cure period of not more than 5 Business Days between quarterly testing dates for intra period variations in the event that cash within the RigCo Group is no more than US$50 million below the applicable RigCo Group Minimum Liquidity requirement on such days) and will be tested by way of a compliance certificate provided to the lenders on a quarterly basis in respect of quarterly dates to be agreed.

7

***DSCR and Net Leverage***

- Debt Service Cover Ratio: Adjusted EBITDA to Debt Service (measured quarterly on a trailing 12 month basis).

- Net Leverage: Net Funded Debt to Adjusted EBITDA (measured quarterly on the basis of Net Funded Debt on the measurement date and on a trailing 12 months basis for Adjusted EBITDA).

- *DSCR/Net Leverage Testing*: DSCR and Net Leverage will not be tested until the financial quarter ending on 31 March 2021.

- *Margin Increase Trigger*: DSCR and Net Leverage will be tested on the last day of each financial quarter beginning with the financial quarter ending on 31 March 2021 and until (and including) the financial quarter ending on 31 December 2021 only for the purpose of determining whether a Margin Increase Trigger (as defined below) has occurred. If, on any such testing date:

(x) DSCR is less than 0.8x; or

(y) Net Leverage is greater than the level set at the same implied headroom as DSCR of 0.8x,

(the events described in either (x) or (y) (or both occurring on the same test date) being a "Margin Increase Trigger"), the "Applicable Margin" under each Secured Facility Agreement shall be increased by 25 basis points with effect from the testing date of such quarter in which a Margin Increase Trigger occurred.

The additional Applicable Margin will be PIK (and, for the avoidance of doubt, shall be excluded from any DSCR calculation).

Within 5 Business Days after the occurrence of a Margin Increase Trigger, IHCo shall be required to contribute cash to RigCo in an amount equal to the lesser of:

- an amount that reduces cash held by IHCo, excluding any IHCo Excluded Cash (as defined in the Cash Pooling Term Sheet), to zero; and

- an amount that, when added to Adjusted EBITDA, is sufficient to eliminate the Margin Increase Trigger,

8

it being understood that (i) cash may be contributed into IHCo and IHCo Excluded Cash may (but shall not be required to) be used for this purpose and (ii) IHCo shall be under no obligation to downstream cash to RigCo greater than the lesser of (x) the cash it holds excluding any IHCo Excluded Cash (as defined in the Cash Pooling Term Sheet) and (y) the cash required to 'cure' the Margin Increase Trigger. If the Margin Increase Trigger is 'cured' as a result of the contribution to RigCo the margin increase described above shall not apply. For the avoidance of doubt, if sufficient cash to cure the Margin Increase Trigger is not contributed to RigCo then, unless IHCo had sufficient cash to cure the Margin Increase Trigger, the only consequence shall be the imposition of the additional margin described above.

In circumstances where the Margin Increase Trigger has occurred the senior banks will have consultation rights with Seadrill Limited, IHCo and RigCo (to be agreed). For the avoidance of doubt, the occurrence of a Margin Increase Trigger during these first four testing periods will not be a default or an event of default.

- *Covenant Reinstatement*: Commencing with the financial quarter ending on 31 March 2022 and each financial quarter thereafter through the final maturity of the Secured Credit Facilities, DSCR and Net Leverage covenants will be reinstated and RigCo will have to comply, as of the last day of each such financial quarter, with DSCR being not less than 1.0x and Net Leverage being no greater than the level set at the same implied headroom as DSCR of 1.0x.

*Equity Cure*: Breach of the DSCR or Net Leverage subject to equity cure rights (in addition to those specified above) on the following terms:

- equity or subordinated debt injection via IHCo cash or cash available to Seadrill Limited and its subsidiaries (other than the RigCo Group) subject to agreed intercreditor restrictions or via the proceeds of a SDRL Equity Issue or SDRL Debt Issue (each as defined in Annex 4 (Group Wide Restrictive Covenants));

- cure amounts will be paid into the excess sales proceeds escrow account (but without the requirement for Group liquidity to be less than US$750 million before such amounts may be applied to meet upcoming amortisations) and will be applied in payment (i) firstly, of outstanding amounts under the Amortisation Conversion Election; and (ii) secondly, of upcoming amortisations under the Secured Facility Agreements on a pro-rata basis;

- 5 Business Days grace period for exercise of cure if funded from equity or subordinated debt injection via IHCo cash or cash available to Seadrill Limited and its subsidiaries (other than the RigCo Group);

- 30 Business Days grace period for exercise of cure if funded from the proceeds of a SDRL Equity Issue or SDRL Debt Issue which has not yet occurred as of the date of breach of the DSCR or Net Leverage; and

9

- ability to exercise 4 times during the period starting with the financial quarter ending on 31 March 2022 through the last final maturity date under the Secured Credit Facilities, provided that (A) in the event of an overcure in respect of a testing period, equity cure may not be exercised in respect of the immediately following testing period and (B) where there is no overcure in respect of a testing period, equity cure may be exercised on consecutive testing periods, provided that:.

- equity cure rights may not be exercised on consecutive testing periods more than twice during the life of the Secured Credit Facilities; and

- there shall be no more than two equity cures in any given calendar year.

Financial covenant definitions set out in Annex 5 (Financial Covenant Definitions).

The provisions described in this "Financial Covenants" section (including the cure mechanics and the amount of the margin increase) will be a common term provision applicable to all Secured Facility Agreements and may be amended or waived with the consent of the Supra Majority Lenders.

| 2. | **Cash Sweep** | Semi-annual cash sweep (with the first cash sweep in respect of the semi-annual period ending 30 June 2021) until the last final maturity date under the Secured Facility Agreements (each, a "**Cash Sweep Calculation Date**") on which RigCo cash (cash calculation to be agreed but to exclude excess sale proceeds, any portion of cash held by AOD and its subsidiaries which is reserved or available for distribution to AOD's minority shareholder in accordance with the cash pooling arrangements described in the Cash Pooling Term Sheet and other restricted amounts and cash which is committed to be applied within a specified period in accordance with the agreed covenant package, and to be calculated only after all principal and interest payments due to be made on such date (if any) have been made) exceeds US$1.25 billion (the amount by which RigCo cash exceeds US$1.25 billion on such Cash Sweep Calculation Date being the "**Cash Sweep Amount**"). |

The Cash Sweep Amount shall be paid as follows:

- an amount equal to 75% of such Cash Sweep Amount shall be applied within 5 Business Days of such Cash Sweep Calculation Date in prepayment of amounts outstanding under the Secured Facility Agreements; and

10

- an amount equal to 25% of such Cash Sweep Amount shall be upstreamed within 5 Business Days of such Cash Sweep Calculation Date through the RigCo Restricted Payments Membrane (as described in the Cash Pooling Term Sheet) from RigCo to IHCo provided that cash at IHCo (excluding any IHCo Excluded Cash (as defined in the Cash Pooling Term Sheet)) does not exceed US$250 million at the time of or immediately following the making of such payment (it being understood that a percentage less than 25% may be upstreamed to ensure compliance with this condition. Any amount of the 25% of the Cash Sweep Amount which is not capable of being upstreamed as a result of this condition shall remain at RigCo.

The Cash Sweep Amounts applied in prepayment of the amounts outstanding under the Secured Facility Agreements shall be applied:

- firstly, if the Amortisation Conversion Election has been exercised, in prepayment of the secured tranches created as a result of the exercise of the Amortisation Conversion Election (on a pro rata basis across all Secured Facility Agreements) to the extent required to repay such secured tranches in full; and

- secondly, in repayment of PIK interest (if any) accrued under the Secured Facility Agreements (on a pro rata basis across all Secured Facility Agreements); and

- thirdly, in prepayment of the Secured Credit Facilities (on a pro rata basis across all Secured Facility Agreements, and applied in inverse chronological order against future amortisation payments).

| 3. | Minimum Market Value Covenant | Minimum market value covenant and associated mandatory prepayment event to be temporarily waived until extended maturity dates. |
| | | The Group will continue to provide market valuations of rigs on a semi-annual basis for informational purposes only. |
| 4. | Voluntary Prepayment | Voluntary prepayment to be permitted: |

- in accordance with the refinancing parameters set out in the Intercreditor Term Sheet set out in Annex 6 to Exhibit A of the RSA (the "**Intercreditor Term Sheet**");

- as a condition to the use of certain baskets as detailed in Annex 4 (Group Wide Restrictive Covenants);

- as a condition to the making of IHCo Top-up Payments (as that term is defined in the Cash Pooling Term Sheet) in accordance with the procedure set out in the Cash Pooling Term Sheet; and

- from the excess sale proceeds escrow account(s) in accordance with the conditions set out in the Cash Pooling Term Sheet.

For the avoidance of doubt, there shall be no restriction on voluntary prepayment of the secured tranches created as a result of the exercise of the Amortisation Conversion Election.

| 5. | **Insulation** | Cross-default, insolvency related events of default, material adverse change and similar events of default, and the representations and covenants and definition of Material Subsidiary in each Secured Facility Agreement to be amended so that they exclude: |
|----|----------------|---|

(i) the following entities:

    (a) any non-100% owned Subsidiaries or investments of Seadrill Ltd from time to time (other than NADL, Sevan and AOD and their Subsidiaries from time to time); and

    (b) each Non-Consolidated Entity,

    and each Subsidiary of each of them; and

(ii) any default or similar event or any consequences of the same under any Financial Indebtedness of (a) any non-100% owned Subsidiaries or investments of Seadrill Ltd from time to time (other than under the NADL Facility Agreement, the Sevan Facility Agreement, the AOD Facility Agreement or any other Financial Indebtedness of NADL, Sevan, AOD or any of their Subsidiaries from time to time) or (b) any Non-Consolidated Entity or any Subsidiary of any of them in each case in respect of which Seadrill Ltd or any other member of the Group has any liability (whether actual or contingent),

provided that none of the above shall apply to exclude any Obligor or Security Provider under the Secured Facility Agreements.

Any acceleration of the New Secured Notes shall give rise to an event of default under the Secured Facility Agreements.

| 6. | **Seadrill Ltd Deficiency Claims** | Guarantees and similar financial support arrangements provided by Seadrill Ltd for the Secured Facility Agreements will continue. Seadrill Ltd's obligations as borrower under any Secured Facility Agreement will be novated to another Obligor under that Secured Facility Agreement which is a member of the RigCo Group and Seadrill Ltd will provide a guarantee. |
|----|----------------|---|

**D. CONDITIONS TO AMENDMENTS AND EXTENSION**

| 1. | **Refinancing Conditions** | The amendments and the extensions set out in Parts B and C above to be subject to satisfaction of the conditions to the Restructuring Effective Date (as defined in the RSA) other than the effectiveness of the Credit Facility Amendments (as defined in the RSA) on or prior to the Outside Date (as defined in the RSA). |
|----|----------------|---|

2.  **Initial Conditions Precedent to Amendments**

The amendments to each Secured Facility Agreement set out in this Term Sheet will be subject to the following conditions precedent delivered in form and substance satisfactory to the Agents under the Secured Facility Agreements and (other than the legal opinions, KYC under paragraph (b) of "Other Documents and Evidence" below and any conditions precedent under paragraph (j) of "Other Documents and Evidence" below) the Required Commitment Parties (as defined in the RSA) (certified, notarised and/or apostilled as required) and in the case of the Required Commitment Parties acting reasonably and in accordance with section 5.9 of the Investment Agreement (as defined in the RSA):

**Corporate Authorisations**

In respect of each relevant Obligor or Security Provider:

(a) Company Certificate (or similar);

(b) Articles of Association, Certificate of Incorporation and By-laws (or equivalent);

(c) Updated Good Standing Certificate / Certificate of Continuing Registration / Extract Issued by the Board of Trade / Deed of Foundation (or similar);

(d) Resolutions passed at a board meeting of the relevant Obligor or Security Provider evidencing:

    (i) the approval of the terms of the relevant amendment, transaction and other finance documents; and

    (ii) the authorisation of its appropriate officer or officers or other representatives to execute the relevant amendment, transaction and other finance documents and any other documents necessary for the transactions contemplated by the amendment, transaction and other finance documents, on its behalf;

(e) Certified true copies of valid proof of identity in respect of the persons signing on behalf of the relevant Obligor or Security Provider;

(f) If applicable, a copy of resolutions signed by the holders of the issued shares in the relevant Obligor or Security Provider (other than Seadrill Ltd.), approving the terms of the relevant amendment, transaction and other finance documents;

(g) If applicable, a copy of any relevant power of attorney granted by any relevant Obligor or Security Provider; and

13

(h)  Officer's certificate, including, but not limited to, certification of the relevant corporate documents,  up-to-date company registry extracts, specimen signatures of each person signing on behalf of the relevant Obligor or Security Provider and confirmations on solvency.

**Finance Documents**

(a) The relevant amendment and restatement agreements countersigned by each of the Obligors and, where relevant, Security Providers;

(b) Global intercreditor agreement in respect of all Secured Facility Agreements substantially in accordance with the Intercreditor Term Sheet and countersigned by each party to it;

(c) The relevant fee letter(s);

(d) New Security: First ranking and second ranking security documents necessary to give effect to the new security arrangements outlined below and in the Intercreditor Term Sheet;

(e) Existing Security: Copies of all required amendments to the Senior Secured Lenders' existing security and guarantee documentation (to be provided in accordance with the relevant local counsel advice and input). If required, any release documents in respect of the existing security; and

(f) Signed copies of other relevant finance documents, Ship Finance documents, New Secured Notes purchase agreement, etc. (to be further specified in due course).

**Legal opinions**

(a) Executed legal opinion from Norwegian or English law counsel to the Senior Secured Lenders (depending on whether the relevant Secured Facility Agreement is governed by Norwegian law or English law) relating to Norwegian/English law matters in respect of the relevant amendment and restatement agreements and related finance documents;

(b) Executed legal opinion from counsel to the Senior Secured Lenders in each jurisdiction of governing law of any other security document or finance document; and

(c) Executed legal opinion from counsel to the Senior Secured Lenders in each jurisdiction in which Obligors and Security Providers under the relevant Secured Facility Agreement are incorporated in respect of the relevant Obligor's or Security Provider's capacity to enter into the relevant amendment, transaction and finance documents.

**Other Documents and Evidence**

(a) Fees: Evidence that all fees and expenses due under or in connection with the transaction and finance documents have been paid or will be paid;

(b) KYC: Copies of all the documentation and other evidence or information required by the Senior Secured Lenders and delivered by the relevant Obligor or Security Provider in respect of whom such information is sought;

(c) A copy of the most recent audited accounts of the Company, relevant Obligor and relevant Security Provider;

(d) A copy of the Base Case Model as at the signing of the RSA together with any updates thereto (if any);

(e) A copy of the Group structure chart;

(f) A copy of the Structure Memorandum (as defined in Annex 4 (Group Wide Restrictive Covenants)), accompanied by executed reliance letters;

(g) A copy of the most recent offshore drilling market study prepared by Fearnley Offshore for Seadrill Limited, provided on a non-reliance basis;

(h) Consents and Filings: Copies of all required corporate, regulatory (including competition clearances), shareholder and other approvals required to be obtained as a condition of completion of the transaction (but excluding any shareholder approvals of Seadrill Ltd.) and notified to the Company by the Senior Secured Lenders;

(i) Evidence of contributions to RigCo from new capital on the Refinancing Closing Date as required by the cash pooling arrangements described in the Cash Pooling Term Sheet; and

(j) A copy of any other Authorisation or other document, opinion or assurance which the Senior Secured Lenders notify the Company is necessary in connection with the entry into and performance of the transactions contemplated by any transaction / finance document or for the validity and enforceability of any transaction / finance document.

15

3.  **Request 1 Provisions**   The Company undertakings and provisions of Request 1 (including, but not limited to, the provisions relating to equal treatment of lenders) will continue in effect until the Refinancing Closing Date, save for:

(a) any amendments necessary to implement the restructuring of the Non-Consolidated Entities, including those described in section B5 and in the RSA;

(b) any amendments necessary to implement any other arrangement described in this Term Sheet or in the RSA (including the annexes to Exhibit A of the RSA and the other Exhibits of the RSA) and which is to become effective before the Refinancing Closing Date;

(c) any payments made in respect of any Newbuild Contract (as defined under Request 1) up to US$200m in aggregate; and

(d) as may otherwise be agreed with the Required Lenders under each Secured Facility Agreement.

**E. ECONOMICS**

1.  **Consent Fees**   50bps calculated on the funded amounts under the relevant Secured Facility Agreement on the Refinancing Closing Date but subject to credit for, in the case of any Secured Facility Agreement extended as part of Request 1, 50% of the Request 1 extension fees paid in respect of such Secured Facility Agreement.

The consent fees will be payable to the Agent under the relevant Secured Facility Agreement (for the account of each Senior Secured Lender and ECA under that Secured Facility Agreement) within five Business Days after the Refinancing Closing Date, subject to receipt by the Company of an invoice for the relevant fees (such invoice to include such information as is reasonably required by the Company) prior to the Refinancing Closing Date. Where Senior Secured Lenders are backed by ECA or commercial lender guarantees, the relevant consent fees will be shared among such Senior Secured Lenders, ECAs and commercial lenders in such manner as they may agree among themselves.

2.  **Margin**   The "Applicable Margin" under each Secured Facility Agreement shall apply but shall be increased by 100 bps as compared to the post R1 applicable cash margin level, from the Refinancing Closing Date for the remaining term of the relevant Secured Facility Agreement. No return to margin grid.

Where Senior Secured Lenders are backed by ECA or commercial lender guarantees, the ECAs, the covered lenders and the relevant commercial lenders in respect of each such Secured Credit Facility shall agree the allocation of margin as between themselves.

16

**F. COVENANTS**

| | | |
|---|---|---|
| 1. | **Group Wide Restrictive Covenants** | Restrictive covenants in respect of the RigCo Group, the NSNCo Group and on a Group-wide basis as set out in Annex 4 (Group Wide Restrictive Covenants) to be included in each Secured Facility Agreement. These will replace the restrictive covenants agreed as part of Request 1 and the existing equivalent covenants in the Secured Facility Agreements to the extent that those existing equivalent covenants currently apply on a Group-wide basis. Subject to the Intercreditor Term Sheet, amendments and waivers to, and consents under, these covenants to be subject to Supra Majority Lenders consent. |
| | | Disenfranchisement of shareholders and their affiliates that purchase debt to be introduced into the Secured Facility Agreements. |
| 2. | **Rig Disposals and Disposals of Rig Owners** | No Obligor shall enter into a transaction to sell or otherwise dispose of any rig or rig-owner without the prior written consent of the Required Lenders under the relevant Secured Facility Agreement (whose first lien collateral is proposed to be sold or otherwise disposed of), except where the debt allocated to the relevant rig is prepaid in full at par. |

Where the aggregate consideration received for the disposal is not less than 90% of the aggregate amount required to be prepaid under the relevant Secured Facility Agreement, the Group will be permitted to top up the difference from cashflow (including, without limitation, the proceeds of any equity raise by Seadrill Ltd, the proceeds of any permitted debt instruments or loan facilities and the proceeds of any other permitted disposal which are not restricted and are permitted to be transferred to the RigCo Group, in each case after the Refinancing Closing Date) provided that:

- at the time of the disposal, there is no continuing event of default; and

- cash in an amount at least equal to the then applicable RigCo Minimum Liquidity Requirement plus US$250 million remains within the RigCo Group (and calculated on the same basis as for compliance with the RigCo Minimum Liquidity Requirement) at the time of and immediately following the making of the relevant payment on a pro forma basis and the Parent provides evidence of this to the Agents under the Secured Facility Agreements.

Each Secured Facility Agreement to be amended to permit resignation of any rig-owner sold in accordance with the terms above and to permit any release of security required as a result of a disposal in accordance with the terms above. More generally, all lender consent provisions in each Secured Facility Agreement to be amended to make clear that replacement and/or release of Obligors and Guarantors and release of security will require all lender consent only when done otherwise than in accordance with the provisions of the relevant Secured Facility Agreement.

| 3. | **Rig refinancings** | A refinancing of the debt allocated to a particular rig or rigs shall be permitted where such debt allocated to the relevant rigs is prepaid in full at par as part of that refinancing. |
|---|---|---|

Where the aggregate refinancing proceeds are not less than 90% of the aggregate amount required to be prepaid under the relevant Secured Facility Agreement, the Group will be permitted to top up the difference from cashflow (including, without limitation, the proceeds of any equity raise by Seadrill Ltd, the proceeds of any permitted debt instruments or loan facilities and the proceeds of any other permitted disposal which are not restricted and are permitted to be transferred to the RigCo Group, in each case after the Refinancing Closing Date) provided that:

- at the time of the refinancing, there is no continuing event of default; and

- cash in an amount at least equal to the then applicable RigCo Minimum Liquidity Requirement plus US$250 million remains within the RigCo Group (and calculated on the same basis as for compliance with the RigCo Minimum Liquidity Requirement) at the time of and immediately following the making of the relevant payment on a pro forma basis and the Parent provides evidence of this to the Agents under the Secured Facility Agreements.

Each Secured Facility Agreement to be amended to permit resignation of any rig-owner and any other Obligors and Guarantors and release of all security relating to the refinanced in accordance with the terms above.

| 4. | **Amendments to Drilling Contracts** | As part of the regularising changes across all Secured Facility Agreements, covenants, representations, mandatory prepayment provisions, conditions precedent and events of default to be amended to bring them into line with the majority of the Secured Facility Agreements such that none of the Secured Facility Agreements shall put any constraint on, or impose any prepayment requirement, drawstop or other adverse consequence in relation to, any amendment, variation, termination or supplement to any drilling contract agreed by any member of the Group, including but not limited to any amendment to the duration of such contract or the day rates chargeable under such contract. |
|---|---|---|
| 5. | **Restricted Payments** | Refer to the Cash Pooling Term Sheet for the RigCo Restricted Payments Membrane. |

**G. OTHER PROVISIONS**

| 1. | **Implementation of IHCo – RigCo - NSNCo Structure** | All amendments/consents/confirmations required to implement the IHCo – RigCo - NSNCo structure substantially as contemplated by the proposed IHCo - RigCo – NSNCo structure to be given, including: |
|---|---|---|

(a) confirmation and agreement that implementation of the IHCo–RigCo-NSNCo structure, including the transfer of all or substantially all of the assets of the Company to a new holding company and/or any wholly owned subsidiaries of such holding company (and any subsequent liquidation of the Company) does not amount to a 'reorganisation', 'corporate restructuring' or 'transaction with an Affiliate' in breach of the provisions of any Secured Facility Agreement;

(b) consent under each Secured Facility Agreement and related security documents to the transfer by the Company and/or its Subsidiaries of the shares which it holds in other entities (including its Subsidiaries) to a new holding company, IHCo, RigCo, or NSNCo (as applicable), such transfer to be made, to the extent possible, subject to existing security over such shares; and

(c) consent to implementation through any of the Implementation Mechanisms (as defined in the RSA).

Certain amendments to the Secured Facility Agreements and Request 1 waiver approval letters giving flexibility to achieve the IHCo – RigCo - NSNCo structure may need to be effective before the Refinancing Closing Date.

| 2. | **Guarantees** | Secured Facility Agreements to retain existing guarantees from Seadrill Ltd, rig-owners and intra-group charterers (in each case, where applicable). |
|----|----------------|----|
|    |                | In addition, Secured Facility Agreements to receive a first ranking guarantee from RigCo (shared with a second ranking guarantee in favour of New Secured Noteholders (detailed in the New Secured Notes Term Sheet) and third ranking guarantees in favour of SFL Hercules Ltd., SFL Deepwater Ltd. and SFL Linus Ltd. as set out in Annex 7 to Exhibit A of the RSA and the Intercreditor Term Sheet). |
| 3. | **Security for Senior Secured Lenders** | The Senior Secured Lenders will be secured by: |
|    |                | • the existing security which has been granted in favour of the Senior Secured Lenders under the respective Secured Facility Agreements to secure the Senior Debt over assets held by members of the Group including, without limitation, security over rigs and vessels and related assets, earnings accounts, shares and receivables, which security will remain in place on its current terms without modification, subject to any adjustments required to reflect the change of ownership of shares in connection with the existing share security granted by Seadrill Ltd pursuant to the IHCo – RigCo – NSNCo hive down (the "**Existing Security**"); |
|    |                | • security to be granted in favour of the Senior Secured Lenders under the respective Secured Facility Agreements over any intercompany liability owed to RigCo by a subsidiary of RigCo whose shares are subject to the Existing Security, on a first ranking basis (together with the Existing Security, the "**First Ranking Asset Level Security**"); |

19

- security to be granted over upstream intercompany loans made by RigCo to IHCo, on a first priority basis;

- security to be granted over excess sales proceeds escrow account, the bank account into which IHCo funds contributions and the RigCo periodic cash sweep accounts established by RigCo, on a first priority basis;

- security to be granted over the shares and any other equity interests in RigCo (including any equity interest arising from an equity contribution made by IHCo to RigCo), on a first priority basis;

- security to be granted over any intercompany loans advanced by IHCo to RigCo, on a first priority basis; and

- security to be granted over the shares in any Guaranteed Newbuild (as defined in Annex 4 (Group Wide Restrictive Covenants)) entity or a holding company of that entity, on a first ranking basis but limited in recourse to the amount of Group cash (pre-Refinancing Closing Date) or RigCo cash (post-Refinancing Closing Date) used pursuant to the relevant basket in Annex 4 (Group Wide Restrictive Covenants) in respect of those Guaranteed Newbuilds. Such share security to be released and retaken at a level high enough in the ownership structure so as not prejudice the financing in respect of the relevant Guaranteed Newbuild at the time of such financing.

| 4. | **Implementation of New Security** | All amendments/consents/confirmations required to grant security for the Secured Facility Agreements as contemplated above and by the Intercreditor Term Sheet, and for the New Secured Notes as contemplated in the New Secured Notes Term Sheet and by the Intercreditor Term Sheet, to be given. |
| 5. | **Extension of Letters of Credit/Bank Guarantees** | The Group-wide covenants set out in Annex 4 (Group Wide Restrictive Covenants) will permit facilities for letters of credit and other forms of payment assurance within permitted exceptions and baskets, whether by way of extensions of existing facilities or entering into new facilities. |
| 6. | **Intercompany Loan Balances** | Subject to Seadrill Ltd confirming the tax, accounting and legal implications of this as a due diligence matter, intercompany loan balances to be adjusted and rationalised on a Group wide basis with effect from the Refinancing Closing Date as set out in the Cash Pooling Term Sheet. |
| 7. | **Subordination of Intercompany Loans** | Subordination of intercompany loans addressed in the Intercreditor Term Sheet and loans subordinated pursuant to such terms shall be permitted under the Secured Facility Agreements. |
| 8. | **Subsidiary definition** | Definition of Subsidiary to be amended in accordance with Annex 3 (Common Terms and Definitions and Regularising Amendments for Secured Facility Agreements). |

| 9. | **Documentation** | Definitive documentation to be agreed but amendments to the Secured Facility Agreements to be implemented by way of amendment and restatement agreements. |
|---|---|---|
| 10. | **Change of Control** | Change of control provisions in each of the Secured Facility Agreements to be amended such that it is a change of control if John Fredriksen or any of his investment vehicles (including Hemen Holding Limited) owns less than the Applicable Percentage of the voting shares in Seadrill Ltd. and ceases to have the director appointment rights set out at Exhibit B (Board Governance Term Sheet) of the Investment Agreement for this percentage of voting shares, provided that, in the event of John Fredriksen's death or permanent disability, these provisions will fall away six months after such event. |

"**Applicable Percentage**" means:

(a) until the date falling 12 months after the Restructuring Effective Date, 20%;

(b) between the date falling 12 months after the Restructuring Effective Date and the date falling 24 months after the Restructuring Effective Date, 10%; and

(c) from the date falling 24 months after the Restructuring Effective Date, 5%.

In addition to the above, it will be a change of control if a third party (i.e. a person who is not Hemen or a John Fredriksen investment vehicle) acquires (i) 50.1% of the voting shares in Seadrill Ltd. or (ii) the ability to appoint a majority of the board of directors of Seadrill Ltd.

| 11. | **Insurance Covenants** | Requisite insurance thresholds to be reset as provided for in Annex 3 (Common Terms and Definitions and Regularising Amendments for Secured Facility Agreements). Appropriate provisions for captive insurance as currently included in certain Secured Facility Agreements to be included for all Secured Facility Agreements as set out in Annex 3 (Common Terms and Definitions and Regularising Amendments for Secured Facility Agreements). |
|---|---|---|
| 12. | **Repetition of representations and warranties** | Certain representations to be carved out of repeating representations as set out in Annex 3 (Common Terms and Definitions and Regularising Amendments for Secured Facility Agreements). |
| 13. | **Financial Reporting** | Financial reporting requirements to be amended across Secured Facility Agreements such that a requirement for RigCo consolidated financial statements is included, all dates and time periods for delivery of consolidated financial statements are the same and any requirement for *solus* financial statements for any individual obligor other than Seadrill Ltd and RigCo is deleted. |

| 14. | **Secured Facility Agreements to be Regularised** | Certain representations, covenants, events of default and related definitions are to be regularised across all Secured Facility Agreements. |
| | | The principles of certain amendments to be made to specific Secured Facility Agreements or generally across all Secured Facility Agreements to achieve this are set out in Annex 3 (Common Terms and Definitions and Regularising Amendments for Secured Facility Agreements). |
| 15. | **ECA related matters** | Break Cost provisions for fixed interest/CIRR loans shall continue to apply as set out in the existing Secured Facility Agreements subject to technical or administrative changes (if any) required to reflect the amendments to the Secured Facility Agreements to be made pursuant to this term sheet. |
| | | Loans with "fixed margin periods" expiring prior to the extended Final Maturity Date contemplated in this term sheet are to continue on the currently applicable margins until such extended Final Maturity Date and will not be subject to any renegotiation of interest rates until such extended Final Maturity Date. This is without prejudice to any increase in the Applicable Margin specified in paragraph E.2 (Margin) of this term sheet. Any prepayment requirements related to renegotiation of the fixed margins or expiry of the fixed margin periods to be deleted or permanently waived. |
| | | Sharing of economics under any Amortisation Conversion Election tranche shall, for amounts relating to an ECA backed portion of a facility, be agreed between the relevant ECA and ECA backed lenders. Any Amortisation Conversion Election tranche shall be subject to a 550bps cash margin over LIBOR as set out in paragraph B.3 (Amortisation Conversion Election). |
| | | The following shall be a precondition for ECA consent under the US$300,000,000 senior secured credit facility agreement originally dated 16 July 2013 between, amongst others, Seadrill Ltd as borrower and DNB Bank ASA as agent, in addition to other Conditions Precedent: |
| | | • Extension of the commercial lenders' guarantee under the facility until the Final Maturity Date and otherwise on the existing terms, subject only to any sharing of the increase in the Applicable Margin specified in paragraph E.2 (Margin) of this term sheet to be agreed between the relevant lenders and the commercial lenders |
| | | Additional logical, administrative and technical amendments on ECA-related matters, to the extent required by the relevant ECAs, to be agreed. |

22

**ANNEX 1**
**DEFINITIONS**

| | |
|---|---|
| **2020 Bonds** | The US$500,000,000 6 ⅛% Senior Notes due 2020 issued by Seadrill Ltd. |
| **AOD** | Asia Offshore Drilling Limited. |
| **AOD Facility Agreement** | The US$360,000,000 senior secured credit facility agreement originally dated 9 April 2013 between, amongst others, Asia Offshore Rig 1 Limited, Asia Offshore Rig 2 Limited and Asia Offshore Rig 3 Limited as borrowers and ABN AMRO Bank N.V. as agent. |
| **Company or Seadrill Ltd.** | Seadrill Ltd., any successor of Seadrill Ltd. or any entity in each case to which all or substantially all of Seadrill Ltd.'s material assets are directly or indirectly transferred and which becomes the holding company for IHCo and its Subsidiaries including the NSNCo Group and the RigCo Group (whereafter Seadrill Limited shall no longer constitute the Company). |
| **Existing Bonds** | The Existing Seadrill USD Bonds, the Existing NADL USD Bonds, the Seadrill NOK/SEK Bond Issues and the NADL NOK Bond Issue. |
| **Existing NADL USD Bonds** | As defined in Annex 1 to Exhibit A of the RSA. |
| **Existing Seadrill USD Bonds** | As defined in Annex 1 to Exhibit A of the RSA. |
| **Existing USD Bonds** | The Existing Seadrill USD Bonds and the Existing NADL USD Bonds. |
| **Group** | Seadrill Ltd and its Subsidiaries (as defined in Annex 3 (Common Terms and Definitions and Regularising Amendments for Secured Facility Agreements)). |
| **IHCo** | The new intermediate holding company to be put in place as a direct wholly-owned subsidiary of Seadrill Ltd. |
| **NADL** | North Atlantic Drilling Ltd. |
| **NADL Facility Agreement** | The US$2,000,000,000 senior secured credit facility agreement originally dated 15 April 2011 between, amongst others, NADL as borrower and DNB Bank ASA as agent. |
| **NADL NOK Bond Issue** | As defined in Annex 1 to Exhibit A of the RSA. |
| **New Secured Notes** | The new secured notes substantially on the terms set out in Annex 4 to Exhibit A of the RSA. |

23

| | |
|---|---|
| **NOK/SEK Bonds** | The NADL NOK Bond Issue and the Seadrill NOK/SEK Bond Issues. |
| **Non-Consolidated Entity** | (a) Seadrill Partners LLC; |
| | (b) Archer Limited; |
| | (c) SeaMex Ltd.; |
| | (d) Seabras Sapura Participacoes Limitida; |
| | (e) Seabras Sapura Holding GmbH; |
| | (f) Camburi Drilling BV; |
| | (g) Itaunas Drilling BV; and |
| | (h) Sahy Drilling BV, |
| | and each of their respective Subsidiaries from time to time. |
| **NSNCo** | The new holding company to be in place as a direct and wholly-owned special purpose subsidiary of IHCo |
| **NSNCo Group** | NSNCo and its Subsidiaries (as defined in Annex 3 (Common Terms and Definitions and Regularising Amendments for Secured Facility Agreements)). |
| **Refinancing Condition** | Each of the conditions described as such in the "Refinancing Conditions" section of this Term Sheet. |
| **Refinancing Closing Date** | The earliest date on which all the Refinancing Conditions have been satisfied. |
| **Request 1** | The amendments made pursuant to the waiver and extension approval letters relating to the Secured Facility Agreements dated 28 April 2016 and as amended and/or supplemented. |
| **Required Lenders** | Has the meaning given to the term "Required Majority", "Required Lenders" or "Majority Lenders", as the case may be, in each Secured Facility Agreement. |
| **RigCo** | The new intermediate holding company to be put in place as a direct wholly-owned subsidiary of IHCo. |
| **RigCo Group** | RigCo and its Subsidiaries (as defined in Annex 3 (Common Terms and Definitions and Regularising Amendments for Secured Facility Agreements)). |
| **SDLP** | Seadrill Partners LLC. |
| **Seadrill NOK/ SEK Bond Issues** | As defined in Annex 1 to Exhibit A of the RSA. |

24

**Secured Facility Agreements**

(a) The US$1,350,000,000 senior secured credit facility agreement originally dated 26 August 2014 between, amongst others, Seadrill Ltd as borrower and DNB Bank ASA as agent;

(b) the US$450,000,000 senior secured credit facility agreement originally dated 13 December 2013 between, amongst others, Seadrill Eminence Ltd as borrower and Danske Bank A/S as agent;

(c) the AOD Facility Agreement;

(d) the US$400,000,000 senior secured credit facility agreement originally dated 8 December 2011 between, amongst others, Seadrill Ltd as borrower and Nordea Bank Norge ASA as agent;

(e) the US$950,000,000 senior secured credit facility agreement originally dated 26 January 2015 between, amongst others, Seadrill Ltd as borrower and Nordea Bank AB, London Branch as agent;

(f) the US$300,000,000 senior secured credit facility agreement originally dated 16 July 2013 between, amongst others, Seadrill Ltd as borrower and DNB Bank ASA as agent;

(g) the US$1,500,000,000 senior secured credit facility agreement originally dated 30 July 2014 between, amongst others, Seadrill Neptune Hungary Kft, Seadrill Saturn Ltd and Seadrill Jupiter Ltd as borrowers and Nordea Bank Finland Plc, London Branch as agent;

(h) the US$450,000,000 senior secured credit facility agreement dated 26 August 2015 between, amongst others, Seadrill Ltd as borrower and Nordea Bank AB, London Branch as agent;

(i) the NADL Facility Agreement;

(j) the Sevan Facility Agreement;

(k) the US$440,000,000 senior secured credit facility agreement originally dated 4 December 2012 between, amongst others, Seadrill Ltd. as borrower and Citibank Europe plc, UK Branch as agent; and

(l) the US$483,333,333.34 senior secured credit facility agreement between, amongst others, Seadrill Tellus Ltd. as borrower and ING Bank N.V. as agent, pursuant to an amendment and restatement agreement dated 16 August 2017,

"**Secured Facility Agreement**" means any one of them and "**Secured Credit Facility**" or "**Secured Credit Facilities**" means the facilities made available thereunder.

**Sevan**

Sevan Drilling Limited.

| | |
|---|---|
| **Senior Debt** | Has the meaning given to such term in the Intercreditor Term Sheet. |
| **Senior Secured Lender** | A lender under any one of the Secured Credit Facilities. |
| **Sevan Facility Agreement** | The US$1,750,000,000 senior secured credit facility agreement originally dated 30 September 2013 between, amongst others, various Subsidiaries of Sevan as borrowers and ING Bank N.V. as agent. |
| **Ship Finance Agreements** | The West Hercules Ship Finance Agreement, the West Taurus Ship Finance Agreement and the West Linus Ship Finance Agreement, each as defined in Annex 7 to Exhibit A of the RSA. |
| **Supra Majority Lenders** | A two third majority of the lenders under the Secured Facility Agreements with reference to total outstanding commitments across the Secured Facility Agreements. |

**ANNEX 2**
**AMORTISATION**

**PART I**

27

**Assumes Post-31-Aug-2017 Chapter 11 Filing Date and 31-Mar-2018 Emergence Date**

All payment dates post-Emergence Date harmonised to be annually 31 March, 30 June, 30 September and 31 December

| Facility | New Maturity | Outst. Amount at Emergence Date ($) | Annual Debt Service Payment Dates | Amortisation paid from Emergence Date to 31-Dec-2018 (included) ($) | Amortisation paid from 1-Jan-2019 to 31-Dec-2019 (included) ($) | Amortisation paid from 1-Jan-2020 to 31-Dec-2020 (included) ($) | Amortisation paid from 1-Jan-2021 to 31-Dec-2021 (included) ($) | Amortisation paid from 1-Jan-2022 to 31-Dec-2022 (included) ($) | Amortisation paid from 1-Jan-2023 to 31-Dec-2023 (included) ($) | Amortisation paid from 1-Jan-2024 to 31-Dec-2024 (included) ($) | Balloons at Maturity ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SDRL $450 MM Eminence Facility Total | 19-Mar-22 | 264,705,800.0 | 4 | — | — | 24,154,514.3 | 28,407,453.7 | — | — | — | 212,143,832.0 |
| SDRL $400 MM Facility Total | 24-Jul-22 | 135,107,913.7 | 4 | — | — | 16,569,713.1 | 19,487,179.5 | 9,743,589.7 | — | — | 89,307,431.4 |
| SDRL $400 MM Facility—Term Loan | 24-Jul-22 | — | 4 | — | — | — | — | — | — | — | — |
| SDRL $400 MM Facility—RCF | 24-Jul-22 | 135,107,913.7 | 4 | — | — | 16,569,713.1 | 19,487,179.5 | 9,743,589.7 | — | — | 89,307,431.4 |
| NADL $2,000 MM Facility Total | 27-Oct-22 | 908,333,333.0 | 4 | — | — | 79,875,530.7 | 93,939,393.9 | 70,454,545.5 | — | — | 664,063,862.9 |
| NADL $2,000 MM Facility—Term Loan | 27-Oct-22 | — | 4 | — | — | — | — | — | — | — | — |
| NADL $2,000 MM Facility—RCF | 27-Oct-22 | 908,333,333.0 | 4 | — | — | 79,875,530.7 | 93,939,393.9 | 70,454,545.5 | — | — | 664,063,862.9 |
| SDRL $440 MM Facility—Telstot(1) | 30-Apr-23 | 64,058,823.9 | 4 | — | — | 6,207,230.0 | 7,300,150.9 | 7,300,150.9 | 1,825,037.7 | — | 41,426,254.4 |
| SDRL $1,450 MM West Tellus Facility Total | 15-Jul-23 | 322,222,229.0 | 4 | — | — | 12,981,897.6 | 27,110,042.8 | 27,110,042.8 | 13,555,021.4 | — | 241,465,224.3 |
| West Tellus Facility—GIEK(2) | 15-Jul-23 | 127,777,770.6 | 4 | — | — | 5,147,993.5 | 10,750,533.4 | 10,750,533.4 | 5,375,266.7 | — | 95,753,443.6 |
| West Tellus Facility—Kexim(2) | 15-Jul-23 | 74,666,671.8 | 4 | — | — | 3,008,219.2 | 6,282,051.6 | 6,282,051.6 | 3,141,025.8 | — | 55,953,323.6 |
| West Tellus Facility—K-sure(2) | 15-Jul-23 | 74,666,671.8 | 4 | — | — | 3,008,219.2 | 6,282,051.6 | 6,282,051.6 | 3,141,025.8 | — | 55,953,323.6 |
| West Tellus Facility—Commercial | 15-Jul-23 | 45,111,114.9 | 4 | — | — | 1,817,465.8 | 3,795,406.2 | 3,795,406.2 | 1,897,703.1 | — | 33,805,133.5 |
| AOD $360 MM Facility Total | 25-Jul-23 | 210,000,000.0 | 4 | — | — | 18,319,839.5 | 21,545,454.5 | 21,545,454.5 | 10,772,727.3 | — | 137,816,524.2 |
| SDRL $300 MM Facility Total | 29-Oct-23 | 144,000,000.0 | 4 | — | — | 5,977,968.8 | 14,086,956.5 | 14,086,956.5 | 10,565,217.4 | — | 99,282,900.8 |
| Eksportkredit GIEK Facility—West Tucana Sub Tranche | 29-Oct-23 | 18,000,000.0 | 4 | — | — | 747,246.1 | 1,760,869.6 | 1,760,869.6 | 1,320,652.2 | — | 12,410,362.6 |
| Eksportkredit Commercial Facility—West Tucana Sub Tranche | 29-Oct-23 | 27,000,000.0 | 4 | — | — | 1,120,869.1 | 2,641,304.3 | 2,641,304.3 | 1,980,978.3 | — | 18,615,543.9 |
| DNB Liv GIEK Facility—West Tucana Sub Tranche | 29-Oct-23 | 27,000,000.0 | 4 | — | — | 1,120,869.1 | 2,641,304.3 | 2,641,304.3 | 1,980,978.3 | — | 18,615,543.9 |
| Eksportkredit GIEK Facility—West Castor Sub Tranche | 29-Oct-23 | 18,000,000.0 | 4 | — | — | 747,246.1 | 1,760,869.6 | 1,760,869.6 | 1,320,652.2 | — | 12,410,362.6 |
| Eksportkredit Commercial Facility—West Castor Sub Tranche | 29-Oct-23 | 27,000,000.0 | 4 | — | — | 1,120,869.1 | 2,641,304.3 | 2,641,304.3 | 1,980,978.3 | — | 18,615,543.9 |
| DNB Liv GIEK Facility—West Castor Sub Tranche | 29-Oct-23 | 27,000,000.0 | 4 | — | — | 1,120,869.1 | 2,641,304.3 | 2,641,304.3 | 1,980,978.3 | — | 18,615,543.9 |
| Sevan $1,750 MM Facility Total | 26-Nov-23 | 875,000,000.0 | 4 | — | — | 69,871,484.7 | 82,173,913.2 | 82,173,913.2 | 61,630,434.9 | — | 579,150,254.1 |
| Sevan $1,750 MM Facility—Tranche A1 | 26-Nov-23 | 118,749,999.9 | 4 | — | — | 9,581,142.7 | 11,268,115.9 | 11,268,115.9 | 8,451,087.0 | — | 78,181,538.3 |
| Sevan $1,750 MM Facility—Tranche A2 | 26-Nov-23 | 756,250,000.1 | 4 | — | — | 60,290,342.0 | 70,905,797.2 | 70,905,797.2 | 53,179,347.9 | — | 500,968,715.7 |
| SDRL $1,350 MM Facility Total | 31-Jul-24 | 945,000,000.0 | 4 | — | — | 37,419,097.9 | 83,700,000.0 | 83,700,000.0 | 83,700,000.0 | 41,850,000.0 | 614,630,902.1 |
| SDRL $1,500 MM Facility Total | 20-Jul-24 | 1,124,999,999.9 | 4 | — | — | 40,218,164.7 | 84,051,724.1 | 84,051,724.1 | 84,051,724.1 | 42,025,862.1 | 790,600,800.7 |
| SDRL $1,500 MM Facility—West Jupiter Commercial Tranche | 20-Jul-24 | 75,000,000.0 | 4 | — | — | 2,681,211.0 | 5,603,448.3 | 5,603,448.3 | 5,603,448.3 | 2,801,724.1 | 52,706,720.1 |
| SDRL $1,500 MM Facility—West Jupiter GIEK Facility(2) | 20-Jul-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 3,735,632.2 | 70,275,626.7 |
| SDRL $1,500 MM Facility—West Jupiter Kexim Facility(2) | 20-Jul-24 | 55,000,000.0 | 4 | — | — | 1,966,221.4 | 4,109,195.4 | 4,109,195.4 | 4,109,195.4 | 2,054,597.7 | 38,651,594.7 |
| SDRL $1,500 MM Facility—West Jupiter Kexim Guarantee Facility(2) | 20-Jul-24 | 45,000,000.0 | 4 | — | — | 1,608,726.6 | 3,362,069.0 | 3,362,069.0 | 3,362,069.0 | 1,681,034.5 | 31,624,032.0 |
| SDRL $1,500 MM Facility—West Jupiter K-Sure Facility(2) | 20-Jul-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 3,735,632.2 | 70,275,626.7 |
| SDRL $1,500 MM Facility—West Neptune Commercial Tranche | 20-Jul-24 | 75,000,000.0 | 4 | — | — | 2,681,211.0 | 5,603,448.3 | 5,603,448.3 | 5,603,448.3 | 2,801,724.1 | 52,706,720.1 |
| SDRL $1,500 MM Facility—West Neptune GIEK Facility(2) | 20-Jul-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 3,735,632.2 | 70,275,626.7 |
| SDRL $1,500 MM Facility—West Neptune Kexim Facility(2) | 20-Jul-24 | 55,000,000.0 | 4 | — | — | 1,966,221.4 | 4,109,195.4 | 4,109,195.4 | 4,109,195.4 | 2,054,597.7 | 38,651,594.7 |
| SDRL $1,500 MM Facility—West Neptune Kexim Guarantee Facility(2) | 20-Jul-24 | 45,000,000.0 | 4 | — | — | 1,608,726.6 | 3,362,069.0 | 3,362,069.0 | 3,362,069.0 | 1,681,034.5 | 31,624,032.0 |
| SDRL $1,500 MM Facility—West Neptune K-Sure Facility(2) | 20-Jul-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 3,735,632.2 | 70,275,626.7 |
| SDRL $1,500 MM Facility—West Saturn Commercial Tranche | 20-Jul-24 | 75,000,000.0 | 4 | — | — | 2,681,211.0 | 5,603,448.3 | 5,603,448.3 | 5,603,448.3 | 2,801,724.1 | 52,706,720.1 |
| SDRL $1,500 MM Facility—West Saturn GIEK Facility(2) | 20-Jul-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 3,735,632.2 | 70,275,626.7 |
| SDRL $1,500 MM Facility—West Saturn Kexim Facility(2) | 20-Jul-24 | 55,000,000.0 | 4 | — | — | 1,966,221.4 | 4,109,195.4 | 4,109,195.4 | 4,109,195.4 | 2,054,597.7 | 38,651,594.7 |
| SDRL $1,500 MM Facility—West Saturn Kexim Guarantee Facility(2) | 20-Jul-24 | 45,000,000.0 | 4 | — | — | 1,608,726.6 | 3,362,069.0 | 3,362,069.0 | 3,362,069.0 | 1,681,034.5 | 31,624,032.0 |
| SDRL $1,500 MM Facility—West Saturn K-Sure Facility(2) | 20-Jul-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 3,735,632.2 | 70,275,626.7 |
| SDRL $950 MM Facility Total | 30-Aug-24 | 566,056,341.4 | 4 | — | — | 38,326,720.7 | 45,074,992.1 | 45,074,992.1 | 45,074,992.1 | 22,537,496.1 | 369,967,148.3 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SDRL $950 MM Facility—Carina ECA Tranche(2) | 30-Aug-24 | 150,416,666.4 | 4 | — | — | 9,355,568.9 | 11,002,824.9 | 11,002,824.9 | 11,002,824.9 | 5,501,412.4 | 102,551,210.3 |
| SDRL $950 MM Facility—Carina Term Loan | 30-Aug-24 | 47,500,000.0 | 4 | — | — | 2,954,390.2 | 3,474,576.3 | 3,474,576.3 | 3,474,576.3 | 1,737,288.1 | 32,384,592.9 |
| SDRL $950 MM Facility—Carina RCF | 30-Aug-24 | 130,639,675.0 | 4 | — | — | 7,927,303.2 | 9,323,081.2 | 9,323,081.2 | 9,323,081.2 | 4,661,540.6 | 90,081,587.8 |
| SDRL $950 MM Facility—Eclipse Term Loan | 30-Aug-24 | 112,500,000.0 | 4 | — | — | 18,089,458.4 | 21,274,509.8 | 21,274,509.8 | 21,274,509.8 | 10,637,254.9 | 19,949,757.3 |
| SDRL $950 MM Facility—Eclipse RCF | 30-Aug-24 | 125,000,000.0 | 4 | — | — | — | — | — | — | — | 125,000,000.0 |
| SDRL $450 MM Facility Total (3) | 30-Sep-24 | 102,532,294.4 | 4 | — | — | 8,523,322.0 | 14,583,333.3 | 14,583,333.3 | 14,583,333.3 | 7,291,666.7 | 42,967,305.7 |
| SDRL $450 MM Facility—Term Loan (3) | 30-Sep-24 | 102,532,294.4 | 4 | — | — | 8,523,322.0 | 14,583,333.3 | 14,583,333.3 | 14,583,333.3 | 7,291,666.7 | 42,967,305.7 |
| **Total Credit Facilities** | | **5,662,016,735.1** | | **—** | **—** | **358,445,484.1** | **521,460,594.6** | **459,824,702.7** | **325,758,488.3** | **113,705,024.8** | **3,882,822,440.7** |

(1)   Instalments paid semi annually pre-filing and quarterly post-emergence

(2)   The ECA facility is 12 years but it matures after 5 years if the commercial facility is not refinanced on acceptable terms

(3)   Includes $26.6m modelled of debt balance reduction related the sale of West M ischief expected pre-emergence

**1   SDRL $450 MM Eminence Facility Total**

**New Maturity** 19-Mar-22

| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance |
|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 264,705,800.0 |
| 1 | 31-Mar-18 | 2018 | | | 264,705,800.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 264,705,800.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 264,705,800.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 264,705,800.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 264,705,800.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 264,705,800.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 264,705,800.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 264,705,800.0 |
| 9 | 31-Mar-20 | 2020 | 6,043,546.5 | — | 258,662,253.5 |
| 10 | 30-Jun-20 | 2020 | 6,043,546.5 | — | 252,618,707.0 |
| 11 | 30-Sep-20 | 2020 | 6,043,546.5 | — | 246,575,160.5 |
| 12 | 31-Dec-20 | 2020 | 6,043,546.5 | — | 240,531,613.9 |
| 13 | 31-Mar-21 | 2021 | 7,101,863.4 | — | 233,429,750.5 |
| 14 | 30-Jun-21 | 2021 | 7,101,863.4 | — | 226,327,887.1 |
| 15 | 30-Sep-21 | 2021 | 7,101,863.4 | — | 219,226,023.7 |
| 16 | 31-Dec-21 | 2021 | 7,101,863.4 | — | 212,124,160.3 |
| 17 | 19-Mar-22 | 2022 | — | 212,124,160.3 | — |

**1   SDRL $450 MM Eminence Facility Total**

**New Maturity** 19-Mar-22

| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance |
|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 264,705,800.0 |
| 1 | 31-Mar-18 | 2018 | | | 264,705,800.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 264,705,800.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 264,705,800.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 264,705,800.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 264,705,800.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 264,705,800.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 264,705,800.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 264,705,800.0 |
| 9 | 31-Mar-20 | 2020 | 6,038,628.6 | — | 258,667,171.4 |
| 10 | 30-Jun-20 | 2020 | 6,038,628.6 | — | 252,628,542.8 |
| 11 | 30-Sep-20 | 2020 | 6,038,628.6 | — | 246,589,914.2 |
| 12 | 31-Dec-20 | 2020 | 6,038,628.6 | — | 240,551,285.7 |
| 13 | 31-Mar-21 | 2021 | 7,101,863.4 | — | 233,449,422.2 |
| 14 | 30-Jun-21 | 2021 | 7,101,863.4 | — | 226,347,558.8 |
| 15 | 30-Sep-21 | 2021 | 7,101,863.4 | — | 219,245,695.4 |
| 16 | 31-Dec-21 | 2021 | 7,101,863.4 | — | 212,143,832.0 |
| 17 | 19-Mar-22 | 2022 | — | 212,143,832.0 | — |

**2    SDRL $400 MM Facility—Term Loan**

**New Maturity** 24-Jul-22

| # Repayments | Date | Year | Term Loan | | | RCF | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | | | | 135,107,913.7 | | | 135,107,913.7 |
| 1 | 31-Mar-18 | 2018 | | | | | — | 135,107,913.7 | | — | 135,107,913.7 |
| 2 | 30-Jun-18 | 2018 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 3 | 30-Sep-18 | 2018 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 4 | 31-Dec-18 | 2018 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 5 | 31-Mar-19 | 2019 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 6 | 30-Jun-19 | 2019 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 7 | 30-Sep-19 | 2019 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 8 | 31-Dec-19 | 2019 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 9 | 31-Mar-20 | 2020 | — | — | — | 4,142,428.3 | — | 130,965,485.4 | 4,142,428.3 | — | 130,965,485.4 |
| 10 | 30-Jun-20 | 2020 | — | — | — | 4,142,428.3 | — | 126,823,057.1 | 4,142,428.3 | — | 126,823,057.1 |
| 11 | 30-Sep-20 | 2020 | — | — | — | 4,142,428.3 | — | 122,680,628.9 | 4,142,428.3 | — | 122,680,628.9 |
| 12 | 31-Dec-20 | 2020 | — | — | — | 4,142,428.3 | — | 118,538,200.6 | 4,142,428.3 | — | 118,538,200.6 |
| 13 | 31-Mar-21 | 2021 | — | — | — | 4,871,794.9 | — | 113,666,405.7 | 4,871,794.9 | — | 113,666,405.7 |
| 14 | 30-Jun-21 | 2021 | — | — | — | 4,871,794.9 | — | 108,794,610.8 | 4,871,794.9 | — | 108,794,610.8 |
| 15 | 30-Sep-21 | 2021 | — | — | — | 4,871,794.9 | — | 103,922,816.0 | 4,871,794.9 | — | 103,922,816.0 |
| 16 | 31-Dec-21 | 2021 | — | — | — | 4,871,794.9 | — | 99,051,021.1 | 4,871,794.9 | — | 99,051,021.1 |
| 17 | 31-Mar-22 | 2022 | — | — | — | 4,871,794.9 | — | 94,179,226.2 | 4,871,794.9 | — | 94,179,226.2 |
| 18 | 30-Jun-22 | 2022 | — | — | — | 4,871,794.9 | — | 89,307,431.4 | 4,871,794.9 | — | 89,307,431.4 |
| 19 | 24-Jul-22 | 2022 | — | — | — | — | 89,307,431.4 | — | — | 89,307,431.4 | — |

31

**3   NADL $2,000 MM Facility Total**

New Maturity 27-Oct-22

| # Repayments | Date | Year | Term Loan | | | RCF | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | — | | | 908,333,333.0 | | | 908,333,333.0 |
| 1 | 31-Mar-18 | 2018 | — | — | — | — | — | 908,333,333.0 | — | — | 908,333,333.0 |
| 2 | 30-Jun-18 | 2018 | — | — | — | — | — | 908,333,333.0 | — | — | 908,333,333.0 |
| 3 | 30-Sep-18 | 2018 | — | — | — | — | — | 908,333,333.0 | — | — | 908,333,333.0 |
| 4 | 31-Dec-18 | 2018 | — | — | — | — | — | 908,333,333.0 | — | — | 908,333,333.0 |
| 5 | 31-Mar-19 | 2019 | — | — | — | — | — | 908,333,333.0 | — | — | 908,333,333.0 |
| 6 | 30-Jun-19 | 2019 | — | — | — | — | — | 908,333,333.0 | — | — | 908,333,333.0 |
| 7 | 30-Sep-19 | 2019 | — | — | — | — | — | 908,333,333.0 | — | — | 908,333,333.0 |
| 8 | 31-Dec-19 | 2019 | — | — | — | — | — | 908,333,333.0 | — | — | 908,333,333.0 |
| 9 | 31-Mar-20 | 2020 | — | — | — | 19,968,882.7 | — | 888,364,450.3 | 19,968,882.7 | — | 888,364,450.3 |
| 10 | 30-Jun-20 | 2020 | — | — | — | 19,968,882.7 | — | 868,395,567.6 | 19,968,882.7 | — | 868,395,567.6 |
| 11 | 30-Sep-20 | 2020 | — | — | — | 19,968,882.7 | — | 848,426,684.9 | 19,968,882.7 | — | 848,426,684.9 |
| 12 | 31-Dec-20 | 2020 | — | — | — | 19,968,882.7 | — | 828,457,802.3 | 19,968,882.7 | — | 828,457,802.3 |
| 13 | 31-Mar-21 | 2021 | — | — | — | 23,484,848.5 | — | 804,972,953.8 | 23,484,848.5 | — | 804,972,953.8 |
| 14 | 30-Jun-21 | 2021 | — | — | — | 23,484,848.5 | — | 781,488,105.3 | 23,484,848.5 | — | 781,488,105.3 |
| 15 | 30-Sep-21 | 2021 | — | — | — | 23,484,848.5 | — | 758,003,256.8 | 23,484,848.5 | — | 758,003,256.8 |
| 16 | 31-Dec-21 | 2021 | — | — | — | 23,484,848.5 | — | 734,518,408.3 | 23,484,848.5 | — | 734,518,408.3 |
| 17 | 31-Mar-22 | 2022 | — | — | — | 23,484,848.5 | — | 711,033,559.8 | 23,484,848.5 | — | 711,033,559.8 |
| 18 | 30-Jun-22 | 2022 | — | — | — | 23,484,848.5 | — | 687,548,711.4 | 23,484,848.5 | — | 687,548,711.4 |
| 19 | 30-Sep-22 | 2022 | — | — | — | 23,484,848.5 | — | 664,063,862.9 | 23,484,848.5 | — | 664,063,862.9 |
| 20 | 27-Oct-22 | 2022 | — | — | — | — | 664,063,862.9 | — | — | 664,063,862.9 | — |

32

**4    SDRL $440 MM Facility—Telesto(1)**

**New Maturity** 30-Apr-23

| # Repayments | Date | Year | Telesto | | Balance |
|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | |
| 0 | 12-Sep-17 | 2017 | | | 64,058,823.9 |
| 1 | 31-Mar-18 | 2018 | | | 64,058,823.9 |
| 2 | 30-Jun-18 | 2018 | — | — | 64,058,823.9 |
| 3 | 30-Sep-18 | 2018 | — | — | 64,058,823.9 |
| 4 | 31-Dec-18 | 2018 | — | — | 64,058,823.9 |
| 5 | 31-Mar-19 | 2019 | — | — | 64,058,823.9 |
| 6 | 30-Jun-19 | 2019 | — | — | 64,058,823.9 |
| 7 | 30-Sep-19 | 2019 | — | — | 64,058,823.9 |
| 8 | 31-Dec-19 | 2019 | — | — | 64,058,823.9 |
| 9 | 31-Mar-20 | 2020 | 1,551,807.50 | — | 62,507,016.4 |
| 10 | 30-Jun-20 | 2020 | 1,551,807.50 | — | 60,955,208.9 |
| 11 | 30-Sep-20 | 2020 | 1,551,807.50 | — | 59,403,401.4 |
| 12 | 31-Dec-20 | 2020 | 1,551,807.50 | — | 57,851,593.9 |
| 13 | 31-Mar-21 | 2021 | 1,825,037.72 | — | 56,026,556.2 |
| 14 | 30-Jun-21 | 2021 | 1,825,037.72 | — | 54,201,518.5 |
| 15 | 30-Sep-21 | 2021 | 1,825,037.72 | — | 52,376,480.7 |
| 16 | 31-Dec-21 | 2021 | 1,825,037.72 | — | 50,551,443.0 |
| 17 | 31-Mar-22 | 2022 | 1,825,037.72 | — | 48,726,405.3 |
| 18 | 30-Jun-22 | 2022 | 1,825,037.72 | — | 46,901,367.6 |
| 19 | 30-Sep-22 | 2022 | 1,825,037.72 | — | 45,076,329.9 |
| 20 | 31-Dec-22 | 2022 | 1,825,037.72 | — | 43,251,292.2 |
| 21 | 31-Mar-23 | 2023 | 1,825,037.72 | — | 41,426,254.4 |
| 22 | 30-Apr-23 | 2023 | — | 41,426,254.4 | — |

33

**5**  **SDRL $1,450 MM West Tellus Facility Total**

New Maturity 15-Jul-23

| | | | West Tellus | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | GIEK Lender Facility | | | Kexim Facilty | | | K-Sure Facility | | |
| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 127,777,770.6 | | | 74,666,671.8 | | | 74,666,671.8 |
| 1 | 31-Mar-18 | 2018 | | | 127,777,770.6 | | | 74,666,671.8 | | | 74,666,671.8 |
| 2 | 30-Jun-18 | 2018 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 3 | 30-Sep-18 | 2018 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 4 | 31-Dec-18 | 2018 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 5 | 31-Mar-19 | 2019 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 6 | 30-Jun-19 | 2019 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 7 | 30-Sep-19 | 2019 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 8 | 31-Dec-19 | 2019 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 9 | 31-Mar-20 | 2020 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 10 | 30-Jun-20 | 2020 | 577,469.2 | — | 127,200,301.4 | 337,442.9 | — | 74,329,228.9 | 337,442.9 | — | 74,329,228.9 |
| 11 | 30-Sep-20 | 2020 | 2,285,262.1 | — | 124,915,039.3 | 1,335,388.1 | — | 72,993,840.7 | 1,335,388.1 | — | 72,993,840.7 |
| 12 | 31-Dec-20 | 2020 | 2,285,262.1 | — | 122,629,777.1 | 1,335,388.1 | — | 71,658,452.6 | 1,335,388.1 | — | 71,658,452.6 |
| 13 | 31-Mar-21 | 2021 | 2,687,633.4 | — | 119,942,143.8 | 1,570,512.9 | — | 70,087,939.7 | 1,570,512.9 | — | 70,087,939.7 |
| 14 | 30-Jun-21 | 2021 | 2,687,633.4 | — | 117,254,510.4 | 1,570,512.9 | — | 68,517,426.8 | 1,570,512.9 | — | 68,517,426.8 |
| 15 | 30-Sep-21 | 2021 | 2,687,633.4 | — | 114,566,877.1 | 1,570,512.9 | — | 66,946,913.9 | 1,570,512.9 | — | 66,946,913.9 |
| 16 | 31-Dec-21 | 2021 | 2,687,633.4 | — | 111,879,243.7 | 1,570,512.9 | — | 65,376,401.0 | 1,570,512.9 | — | 65,376,401.0 |
| 17 | 31-Mar-22 | 2022 | 2,687,633.4 | — | 109,191,610.4 | 1,570,512.9 | — | 63,805,888.1 | 1,570,512.9 | — | 63,805,888.1 |
| 18 | 30-Jun-22 | 2022 | 2,687,633.4 | — | 106,503,977.0 | 1,570,512.9 | — | 62,235,375.2 | 1,570,512.9 | — | 62,235,375.2 |
| 19 | 30-Sep-22 | 2022 | 2,687,633.4 | — | 103,816,343.7 | 1,570,512.9 | — | 60,664,862.3 | 1,570,512.9 | — | 60,664,862.3 |
| 20 | 31-Dec-22 | 2022 | 2,687,633.4 | — | 101,128,710.3 | 1,570,512.9 | — | 59,094,349.4 | 1,570,512.9 | — | 59,094,349.4 |
| 21 | 31-Mar-23 | 2023 | 2,687,633.4 | — | 98,441,077.0 | 1,570,512.9 | — | 57,523,836.5 | 1,570,512.9 | — | 57,523,836.5 |
| 22 | 30-Jun-23 | 2023 | 2,687,633.4 | — | 95,753,443.6 | 1,570,512.9 | — | 55,953,323.6 | 1,570,512.9 | — | 55,953,323.6 |
| 23 | 15-Jul-23 | 2023 | — | 95,753,443.6 | — | — | 55,953,323.6 | — | — | 55,953,323.6 | — |

34

5    SDRL $1,450 MM West Tellus Facility Total

| | | | West Tellus Commercial Facility | | | Total For West Tellus Total | | |
|---|---|---|---|---|---|---|---|---|
| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 45,111,114.9 | | | 322,222,229.0 |
| 1 | 31-Mar-18 | 2018 | | | 45,111,114.9 | | | 322,222,229.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 10 | 30-Jun-20 | 2020 | 203,871.8 | — | 44,907,243.1 | 1,456,226.81 | — | 320,766,002.2 |
| 11 | 30-Sep-20 | 2020 | 806,797.0 | — | 44,100,446.1 | 5,762,835.40 | — | 315,003,166.8 |
| 12 | 31-Dec-20 | 2020 | 806,797.0 | — | 43,293,649.1 | 5,762,835.40 | — | 309,240,331.4 |
| 13 | 31-Mar-21 | 2021 | 948,851.6 | — | 42,344,797.5 | 6,777,510.71 | — | 302,462,820.7 |
| 14 | 30-Jun-21 | 2021 | 948,851.6 | — | 41,395,946.0 | 6,777,510.71 | — | 295,685,310.0 |
| 15 | 30-Sep-21 | 2021 | 948,851.6 | — | 40,447,094.4 | 6,777,510.71 | — | 288,907,799.3 |
| 16 | 31-Dec-21 | 2021 | 948,851.6 | — | 39,498,242.8 | 6,777,510.71 | — | 282,130,288.5 |
| 17 | 31-Mar-22 | 2022 | 948,851.6 | — | 38,549,391.3 | 6,777,510.71 | — | 275,352,777.8 |
| 18 | 30-Jun-22 | 2022 | 948,851.6 | — | 37,600,539.7 | 6,777,510.71 | — | 268,575,267.1 |
| 19 | 30-Sep-22 | 2022 | 948,851.6 | — | 36,651,688.2 | 6,777,510.71 | — | 261,797,756.4 |
| 20 | 31-Dec-22 | 2022 | 948,851.6 | — | 35,702,836.6 | 6,777,510.71 | — | 255,020,245.7 |
| 21 | 31-Mar-23 | 2023 | 948,851.6 | — | 34,753,985.1 | 6,777,510.71 | — | 248,242,735.0 |
| 22 | 30-Jun-23 | 2023 | 948,851.6 | — | 33,805,133.5 | 6,777,510.71 | — | 241,465,224.3 |
| 23 | 15-Jul-23 | 2023 | — | 33,805,133.5 | — | — | 241,465,224.3 | — |

35

**6   AOD $360 MM Facility Total**

New Maturity 25-Jul-23

| # Repayments | Date | Year | AOD I | | | AOD II | | | AOD III | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 69,000,000.0 | | | 69,000,000.0 | | | 72,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 69,000,000.0 | | | 69,000,000.0 | | | 72,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 9 | 31-Mar-20 | 2020 | 1,504,844.0 | — | 67,495,156.0 | 1,504,844.0 | — | 67,495,156.0 | 1,570,272.0 | — | 70,429,728.0 |
| 10 | 30-Jun-20 | 2020 | 1,504,844.0 | — | 65,990,312.1 | 1,504,844.0 | — | 65,990,312.1 | 1,570,272.0 | — | 68,859,456.1 |
| 11 | 30-Sep-20 | 2020 | 1,504,844.0 | — | 64,485,468.1 | 1,504,844.0 | — | 64,485,468.1 | 1,570,272.0 | — | 67,289,184.1 |
| 12 | 31-Dec-20 | 2020 | 1,504,844.0 | — | 62,980,624.2 | 1,504,844.0 | — | 62,980,624.2 | 1,570,272.0 | — | 65,718,912.2 |
| 13 | 31-Mar-21 | 2021 | 1,769,805.2 | — | 61,210,819.0 | 1,769,805.2 | — | 61,210,819.0 | 1,846,753.2 | — | 63,872,158.9 |
| 14 | 30-Jun-21 | 2021 | 1,769,805.2 | — | 59,441,013.8 | 1,769,805.2 | — | 59,441,013.8 | 1,846,753.2 | — | 62,025,405.7 |
| 15 | 30-Sep-21 | 2021 | 1,769,805.2 | — | 57,671,208.6 | 1,769,805.2 | — | 57,671,208.6 | 1,846,753.2 | — | 60,178,652.4 |
| 16 | 31-Dec-21 | 2021 | 1,769,805.2 | — | 55,901,403.4 | 1,769,805.2 | — | 55,901,403.4 | 1,846,753.2 | — | 58,331,899.2 |
| 17 | 31-Mar-22 | 2022 | 1,769,805.2 | — | 54,131,598.2 | 1,769,805.2 | — | 54,131,598.2 | 1,846,753.2 | — | 56,485,145.9 |
| 18 | 30-Jun-22 | 2022 | 1,769,805.2 | — | 52,361,793.0 | 1,769,805.2 | — | 52,361,793.0 | 1,846,753.2 | — | 54,638,392.7 |
| 19 | 30-Sep-22 | 2022 | 1,769,805.2 | — | 50,591,987.8 | 1,769,805.2 | — | 50,591,987.8 | 1,846,753.2 | — | 52,791,639.5 |
| 20 | 31-Dec-22 | 2022 | 1,769,805.2 | — | 48,822,182.6 | 1,769,805.2 | — | 48,822,182.6 | 1,846,753.2 | — | 50,944,886.2 |
| 21 | 31-Mar-23 | 2023 | 1,769,805.2 | — | 47,052,377.4 | 1,769,805.2 | — | 47,052,377.4 | 1,846,753.2 | — | 49,098,133.0 |
| 22 | 30-Jun-23 | 2023 | 1,769,805.2 | — | 45,282,572.2 | 1,769,805.2 | — | 45,282,572.2 | 1,846,753.2 | — | 47,251,379.7 |
| 23 | 25-Jul-23 | 2023 | — | 45,282,572.2 | — | — | 45,282,572.2 | — | — | 47,251,379.7 | — |

**6    AOD $360 MM Facility Total**

| # Repayments | Date | Year | Total | | |
| --- | --- | --- | --- | --- | --- |
| | | | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 210,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 210,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 210,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 210,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 210,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 210,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 210,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 210,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 210,000,000.0 |
| 9 | 31-Mar-20 | 2020 | 4,579,959.87 | — | 205,420,040.1 |
| 10 | 30-Jun-20 | 2020 | 4,579,959.87 | — | 200,840,080.3 |
| 11 | 30-Sep-20 | 2020 | 4,579,959.87 | — | 196,260,120.4 |
| 12 | 31-Dec-20 | 2020 | 4,579,959.87 | — | 191,680,160.5 |
| 13 | 31-Mar-21 | 2021 | 5,386,363.64 | — | 186,293,796.9 |
| 14 | 30-Jun-21 | 2021 | 5,386,363.64 | — | 180,907,433.3 |
| 15 | 30-Sep-21 | 2021 | 5,386,363.64 | — | 175,521,069.6 |
| 16 | 31-Dec-21 | 2021 | 5,386,363.64 | — | 170,134,706.0 |
| 17 | 31-Mar-22 | 2022 | 5,386,363.64 | — | 164,748,342.3 |
| 18 | 30-Jun-22 | 2022 | 5,386,363.64 | — | 159,361,978.7 |
| 19 | 30-Sep-22 | 2022 | 5,386,363.64 | — | 153,975,615.1 |
| 20 | 31-Dec-22 | 2022 | 5,386,363.64 | — | 148,589,251.4 |
| 21 | 31-Mar-23 | 2023 | 5,386,363.64 | — | 143,202,887.8 |
| 22 | 30-Jun-23 | 2023 | 5,386,363.64 | — | 137,816,524.2 |
| 23 | 25-Jul-23 | 2023 | — | 137,816,524.2 | — |

**7**   **SDRL $300 MM Facility Total**

**New Maturity** 29-Oct-23

| # Repayments | Date | Year | Eksportkredit GIEK Facility - West Tucana Sub Tranche | | | Eksportkredit Commercial Facility - West Tucana Sub Tranche | | | DNB Liv GIEK Facility - West Tucana Sub Tranche | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 18,000,000.0 | | | 27,000,000.0 | | | 27,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 18,000,000.0 | | | 27,000,000.0 | | | 27,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 10 | 30-Jun-20 | 2020 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 11 | 30-Sep-20 | 2020 | 372,934.6 | — | 17,627,065.4 | 559,401.9 | — | 26,440,598.1 | 559,401.9 | — | 26,440,598.1 |
| 12 | 31-Dec-20 | 2020 | 374,311.5 | — | 17,252,753.9 | 561,467.3 | — | 25,879,130.9 | 561,467.3 | — | 25,879,130.9 |
| 13 | 31-Mar-21 | 2021 | 440,217.4 | — | 16,812,536.5 | 660,326.1 | — | 25,218,804.8 | 660,326.1 | — | 25,218,804.8 |
| 14 | 30-Jun-21 | 2021 | 440,217.4 | — | 16,372,319.1 | 660,326.1 | — | 24,558,478.7 | 660,326.1 | — | 24,558,478.7 |
| 15 | 30-Sep-21 | 2021 | 440,217.4 | — | 15,932,101.7 | 660,326.1 | — | 23,898,152.6 | 660,326.1 | — | 23,898,152.6 |
| 16 | 31-Dec-21 | 2021 | 440,217.4 | — | 15,491,884.3 | 660,326.1 | — | 23,237,826.5 | 660,326.1 | — | 23,237,826.5 |
| 17 | 31-Mar-22 | 2022 | 440,217.4 | — | 15,051,666.9 | 660,326.1 | — | 22,577,500.4 | 660,326.1 | — | 22,577,500.4 |
| 18 | 30-Jun-22 | 2022 | 440,217.4 | — | 14,611,449.6 | 660,326.1 | — | 21,917,174.3 | 660,326.1 | — | 21,917,174.3 |
| 19 | 30-Sep-22 | 2022 | 440,217.4 | — | 14,171,232.2 | 660,326.1 | — | 21,256,848.2 | 660,326.1 | — | 21,256,848.2 |
| 20 | 31-Dec-22 | 2022 | 440,217.4 | — | 13,731,014.8 | 660,326.1 | — | 20,596,522.2 | 660,326.1 | — | 20,596,522.2 |
| 21 | 31-Mar-23 | 2023 | 440,217.4 | — | 13,290,797.4 | 660,326.1 | — | 19,936,196.1 | 660,326.1 | — | 19,936,196.1 |
| 22 | 30-Jun-23 | 2023 | 440,217.4 | — | 12,850,580.0 | 660,326.1 | — | 19,275,870.0 | 660,326.1 | — | 19,275,870.0 |
| 23 | 30-Sep-23 | 2023 | 440,217.4 | — | 12,410,362.6 | 660,326.1 | — | 18,615,543.9 | 660,326.1 | — | 18,615,543.9 |
| 24 | 29-Oct-23 | 2023 | — | 12,410,362.6 | — | — | 18,615,543.9 | — | — | 18,615,543.9 | — |

**7    SDRL $300 MM Facility Total**

| # Repayments | Date | Year | Eksportkredit GIEK Facility - West Castor Sub Tranche | | | Eksportkredit Commercial Facility - West Castor Sub Tranche | | | DNB Liv GIEK Facility - West Castor Sub Tranche | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 18,000,000.0 | | | 27,000,000.0 | | | 27,000,000.0 | | | 144,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 18,000,000.0 | | | 27,000,000.0 | | | 27,000,000.0 | | | 144,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 10 | 30-Jun-20 | 2020 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 11 | 30-Sep-20 | 2020 | 372,934.6 | — | 17,627,065.4 | 559,401.9 | — | 26,440,598.1 | 559,401.9 | — | 26,440,598.1 | 2,983,476.59 | — | 141,016,523.4 |
| 12 | 31-Dec-20 | 2020 | 374,311.5 | — | 17,252,753.9 | 561,467.3 | — | 25,879,130.9 | 561,467.3 | — | 25,879,130.9 | 2,994,492.20 | — | 138,022,031.2 |
| 13 | 31-Mar-21 | 2021 | 440,217.4 | — | 16,812,536.5 | 660,326.1 | — | 25,218,804.8 | 660,326.1 | — | 25,218,804.8 | 3,521,739.13 | — | 134,500,292.1 |
| 14 | 30-Jun-21 | 2021 | 440,217.4 | — | 16,372,319.1 | 660,326.1 | — | 24,558,478.7 | 660,326.1 | — | 24,558,478.7 | 3,521,739.13 | — | 130,978,553.0 |
| 15 | 30-Sep-21 | 2021 | 440,217.4 | — | 15,932,101.7 | 660,326.1 | — | 23,898,152.6 | 660,326.1 | — | 23,898,152.6 | 3,521,739.13 | — | 127,456,813.8 |
| 16 | 31-Dec-21 | 2021 | 440,217.4 | — | 15,491,884.3 | 660,326.1 | — | 23,237,826.5 | 660,326.1 | — | 23,237,826.5 | 3,521,739.13 | — | 123,935,074.7 |
| 17 | 31-Mar-22 | 2022 | 440,217.4 | — | 15,051,666.9 | 660,326.1 | — | 22,577,500.4 | 660,326.1 | — | 22,577,500.4 | 3,521,739.13 | — | 120,413,335.6 |
| 18 | 30-Jun-22 | 2022 | 440,217.4 | — | 14,611,449.6 | 660,326.1 | — | 21,917,174.3 | 660,326.1 | — | 21,917,174.3 | 3,521,739.13 | — | 116,891,596.4 |
| 19 | 30-Sep-22 | 2022 | 440,217.4 | — | 14,171,232.2 | 660,326.1 | — | 21,256,848.2 | 660,326.1 | — | 21,256,848.2 | 3,521,739.13 | — | 113,369,857.3 |
| 20 | 31-Dec-22 | 2022 | 440,217.4 | — | 13,731,014.8 | 660,326.1 | — | 20,596,522.2 | 660,326.1 | — | 20,596,522.2 | 3,521,739.13 | — | 109,848,118.2 |
| 21 | 31-Mar-23 | 2023 | 440,217.4 | — | 13,290,797.4 | 660,326.1 | — | 19,936,196.1 | 660,326.1 | — | 19,936,196.1 | 3,521,739.13 | — | 106,326,379.0 |
| 22 | 30-Jun-23 | 2023 | 440,217.4 | — | 12,850,580.0 | 660,326.1 | — | 19,275,870.0 | 660,326.1 | — | 19,275,870.0 | 3,521,739.13 | — | 102,804,639.9 |
| 23 | 30-Sep-23 | 2023 | 440,217.4 | — | 12,410,362.6 | 660,326.1 | — | 18,615,543.9 | 660,326.1 | — | 18,615,543.9 | 3,521,739.13 | — | 99,282,900.8 |
| 24 | 29-Oct-23 | 2023 | — | 12,410,362.6 | — | — | 18,615,543.9 | — | — | 18,615,543.9 | — | — | 99,282,900.8 | — |

39

**8    Sevan $1,750 MM Facility Total**

**New Maturity** 26-Nov-23

| # Repayments | Date | Year | Tranche A1 | | | Tranche A2 (Commercial) | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 118,749,999.9 | | | 756,250,000.1 | | | 875,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 118,749,999.9 | | | 756,250,000.1 | | | 875,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 9 | 31-Mar-20 | 2020 | 2,395,285.68 | — | 116,354,714.2 | 15,072,585.49 | — | 741,177,414.6 | 17,467,871.2 | — | 857,532,128.8 |
| 10 | 30-Jun-20 | 2020 | 2,395,285.68 | — | 113,959,428.5 | 15,072,585.49 | — | 726,104,829.1 | 17,467,871.2 | — | 840,064,257.6 |
| 11 | 30-Sep-20 | 2020 | 2,395,285.68 | — | 111,564,142.9 | 15,072,585.49 | — | 711,032,243.6 | 17,467,871.2 | — | 822,596,386.4 |
| 12 | 31-Dec-20 | 2020 | 2,395,285.68 | — | 109,168,857.2 | 15,072,585.49 | — | 695,959,658.1 | 17,467,871.2 | — | 805,128,515.2 |
| 13 | 31-Mar-21 | 2021 | 2,817,028.99 | — | 106,351,828.2 | 17,726,449.30 | — | 678,233,208.8 | 20,543,478.3 | — | 784,585,037.0 |
| 14 | 30-Jun-21 | 2021 | 2,817,028.99 | — | 103,534,799.2 | 17,726,449.30 | — | 660,506,759.5 | 20,543,478.3 | — | 764,041,558.7 |
| 15 | 30-Sep-21 | 2021 | 2,817,028.99 | — | 100,717,770.2 | 17,726,449.30 | — | 642,780,310.2 | 20,543,478.3 | — | 743,498,080.4 |
| 16 | 31-Dec-21 | 2021 | 2,817,028.99 | — | 97,900,741.2 | 17,726,449.30 | — | 625,053,860.9 | 20,543,478.3 | — | 722,954,602.1 |
| 17 | 31-Mar-22 | 2022 | 2,817,028.99 | — | 95,083,712.2 | 17,726,449.30 | — | 607,327,411.6 | 20,543,478.3 | — | 702,411,123.8 |
| 18 | 30-Jun-22 | 2022 | 2,817,028.99 | — | 92,266,683.3 | 17,726,449.30 | — | 589,600,962.3 | 20,543,478.3 | — | 681,867,645.5 |
| 19 | 30-Sep-22 | 2022 | 2,817,028.99 | — | 89,449,654.3 | 17,726,449.30 | — | 571,874,512.9 | 20,543,478.3 | — | 661,324,167.2 |
| 20 | 31-Dec-22 | 2022 | 2,817,028.99 | — | 86,632,625.3 | 17,726,449.30 | — | 554,148,063.6 | 20,543,478.3 | — | 640,780,688.9 |
| 21 | 31-Mar-23 | 2023 | 2,817,028.99 | — | 83,815,596.3 | 17,726,449.30 | — | 536,421,614.3 | 20,543,478.3 | — | 620,237,210.6 |
| 22 | 30-Jun-23 | 2023 | 2,817,028.99 | — | 80,998,567.3 | 17,726,449.30 | — | 518,695,165.0 | 20,543,478.3 | — | 599,693,732.4 |
| 23 | 30-Sep-23 | 2023 | 2,817,028.99 | — | 78,181,538.3 | 17,726,449.30 | — | 500,968,715.7 | 20,543,478.3 | — | 579,150,254.1 |
| 24 | 26-Nov-23 | 2023 | — | 78,181,538.3 | — | — | 500,968,715.7 | — | — | 579,150,254.1 | — |

40

**9**   **SDRL $1,350 MM Facility Total**

**New Maturity** 31-Jul-24

| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance |
|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 945,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 945,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 945,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 945,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 945,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 945,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 945,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 945,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 945,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 945,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 1,834,548.94 | — | 943,165,451.1 |
| 11 | 30-Sep-20 | 2020 | 17,792,274.47 | — | 925,373,176.6 |
| 12 | 31-Dec-20 | 2020 | 17,792,274.47 | — | 907,580,902.1 |
| 13 | 31-Mar-21 | 2021 | 20,925,000.00 | — | 886,655,902.1 |
| 14 | 30-Jun-21 | 2021 | 20,925,000.00 | — | 865,730,902.1 |
| 15 | 30-Sep-21 | 2021 | 20,925,000.00 | — | 844,805,902.1 |
| 16 | 31-Dec-21 | 2021 | 20,925,000.00 | — | 823,880,902.1 |
| 17 | 31-Mar-22 | 2022 | 20,925,000.00 | — | 802,955,902.1 |
| 18 | 30-Jun-22 | 2022 | 20,925,000.00 | — | 782,030,902.1 |
| 19 | 30-Sep-22 | 2022 | 20,925,000.00 | — | 761,105,902.1 |
| 20 | 31-Dec-22 | 2022 | 20,925,000.00 | — | 740,180,902.1 |
| 21 | 31-Mar-23 | 2023 | 20,925,000.00 | — | 719,255,902.1 |
| 22 | 30-Jun-23 | 2023 | 20,925,000.00 | — | 698,330,902.1 |
| 23 | 30-Sep-23 | 2023 | 20,925,000.00 | — | 677,405,902.1 |
| 24 | 31-Dec-23 | 2023 | 20,925,000.00 | — | 656,480,902.1 |
| 25 | 31-Mar-24 | 2024 | 20,925,000.00 | — | 635,555,902.1 |
| 26 | 30-Jun-24 | 2024 | 20,925,000.00 | — | 614,630,902.1 |
| 27 | 31-Jul-24 | 2024 | — | 614,630,902.1 | — |

41

**10    SDRL $1,500 MM Facility Total**

**New Maturity** 20-Jul-24

| | | | West Jupiter Tranche | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Commercial Facility | | | GIEK | | | Kexim Facility | | |
| # Repayments | Repayment Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | | Balance |
| 0 | 12-Sep-17 | 2017 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 3 | 30-Sep-18 | 2018 | | — | 75,000,000.0 | | — | 100,000,000.0 | | — | 55,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 5 | 31-Mar-19 | 2019 | | — | 75,000,000.0 | | — | 100,000,000.0 | | — | 55,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 7 | 30-Sep-19 | 2019 | | — | 75,000,000.0 | | — | 100,000,000.0 | | — | 55,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 298,938.8 | — | 74,701,061.2 | 398,585.1 | — | 99,601,414.9 | 219,221.8 | — | 54,780,778.2 |
| 11 | 30-Sep-20 | 2020 | 1,191,136.1 | — | 73,509,925.1 | 1,588,181.4 | — | 98,013,233.4 | 873,499.8 | — | 53,907,278.4 |
| 12 | 31-Dec-20 | 2020 | 1,191,136.1 | — | 72,318,789.1 | 1,588,181.4 | — | 96,425,052.0 | 873,499.8 | — | 53,033,778.6 |
| 13 | 31-Mar-21 | 2021 | 1,400,862.1 | — | 70,917,927.0 | 1,867,816.1 | — | 94,557,235.9 | 1,027,298.9 | — | 52,006,479.7 |
| 14 | 30-Jun-21 | 2021 | 1,400,862.1 | — | 69,517,064.9 | 1,867,816.1 | — | 92,689,419.8 | 1,027,298.9 | — | 50,979,180.9 |
| 15 | 30-Sep-21 | 2021 | 1,400,862.1 | — | 68,116,202.9 | 1,867,816.1 | — | 90,821,603.7 | 1,027,298.9 | — | 49,951,882.0 |
| 16 | 31-Dec-21 | 2021 | 1,400,862.1 | — | 66,715,340.8 | 1,867,816.1 | — | 88,953,787.6 | 1,027,298.9 | — | 48,924,583.2 |
| 17 | 31-Mar-22 | 2022 | 1,400,862.1 | — | 65,314,478.7 | 1,867,816.1 | — | 87,085,971.5 | 1,027,298.9 | — | 47,897,284.3 |
| 18 | 30-Jun-22 | 2022 | 1,400,862.1 | — | 63,913,616.6 | 1,867,816.1 | — | 85,218,155.4 | 1,027,298.9 | — | 46,869,985.5 |
| 19 | 30-Sep-22 | 2022 | 1,400,862.1 | — | 62,512,754.6 | 1,867,816.1 | — | 83,350,339.4 | 1,027,298.9 | — | 45,842,686.6 |
| 20 | 31-Dec-22 | 2022 | 1,400,862.1 | — | 61,111,892.5 | 1,867,816.1 | — | 81,482,523.3 | 1,027,298.9 | — | 44,815,387.8 |
| 21 | 31-Mar-23 | 2023 | 1,400,862.1 | — | 59,711,030.4 | 1,867,816.1 | — | 79,614,707.2 | 1,027,298.9 | — | 43,788,088.9 |
| 22 | 30-Jun-23 | 2023 | 1,400,862.1 | — | 58,310,168.4 | 1,867,816.1 | — | 77,746,891.1 | 1,027,298.9 | — | 42,760,790.1 |
| 23 | 30-Sep-23 | 2023 | 1,400,862.1 | — | 56,909,306.3 | 1,867,816.1 | — | 75,879,075.0 | 1,027,298.9 | — | 41,733,491.2 |
| 24 | 31-Dec-23 | 2023 | 1,400,862.1 | — | 55,508,444.2 | 1,867,816.1 | — | 74,011,258.9 | 1,027,298.9 | — | 40,706,192.4 |
| 25 | 31-Mar-24 | 2024 | 1,400,862.1 | — | 54,107,582.2 | 1,867,816.1 | — | 72,143,442.8 | 1,027,298.9 | — | 39,678,893.5 |
| 26 | 30-Jun-24 | 2024 | 1,400,862.1 | — | 52,706,720.1 | 1,867,816.1 | — | 70,275,626.7 | 1,027,298.9 | — | 38,651,594.7 |
| 27 | 20-Jul-24 | 2024 | — | 52,706,720.1 | — | — | 70,275,626.7 | — | — | 38,651,594.7 | — |

**10    SDRL $1,500 MM Facility Total**

| | | | West Jupiter Tranche | | | | Total For West Jupiter Tranche | |
| | | | Kexim Guarantee Facility | | K-Sure Facility | | Total | |
| # Repayments | Repayment Date | Year | Installment Amount | Balance | Installment Amount | Balance | Installment Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | 45,000,000.0 | | 100,000,000.0 | | 375,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | 45,000,000.0 | | 100,000,000.0 | | 375,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 179,363.3 | 44,820,636.7 | 398,585.1 | 99,601,414.9 | 1,494,694.1 | 373,505,305.8 |
| 11 | 30-Sep-20 | 2020 | 714,681.6 | 44,105,955.1 | 1,588,181.4 | 98,013,233.4 | 5,955,680.4 | 367,549,625.4 |
| 12 | 31-Dec-20 | 2020 | 714,681.6 | 43,391,273.4 | 1,588,181.4 | 96,425,052.0 | 5,955,680.4 | 361,593,945.1 |
| 13 | 31-Mar-21 | 2021 | 840,517.2 | 42,550,756.2 | 1,867,816.1 | 94,557,235.9 | 7,004,310.3 | 354,589,634.7 |
| 14 | 30-Jun-21 | 2021 | 840,517.2 | 41,710,238.9 | 1,867,816.1 | 92,689,419.8 | 7,004,310.3 | 347,585,324.4 |
| 15 | 30-Sep-21 | 2021 | 840,517.2 | 40,869,721.7 | 1,867,816.1 | 90,821,603.7 | 7,004,310.3 | 340,581,014.0 |
| 16 | 31-Dec-21 | 2021 | 840,517.2 | 40,029,204.4 | 1,867,816.1 | 88,953,787.6 | 7,004,310.3 | 333,576,703.7 |
| 17 | 31-Mar-22 | 2022 | 840,517.2 | 39,188,687.2 | 1,867,816.1 | 87,085,971.5 | 7,004,310.3 | 326,572,393.3 |
| 18 | 30-Jun-22 | 2022 | 840,517.2 | 38,348,170.0 | 1,867,816.1 | 85,218,155.4 | 7,004,310.3 | 319,568,083.0 |
| 19 | 30-Sep-22 | 2022 | 840,517.2 | 37,507,652.7 | 1,867,816.1 | 83,350,339.4 | 7,004,310.3 | 312,563,772.6 |
| 20 | 31-Dec-22 | 2022 | 840,517.2 | 36,667,135.5 | 1,867,816.1 | 81,482,523.3 | 7,004,310.3 | 305,559,462.3 |
| 21 | 31-Mar-23 | 2023 | 840,517.2 | 35,826,618.2 | 1,867,816.1 | 79,614,707.2 | 7,004,310.3 | 298,555,152.0 |
| 22 | 30-Jun-23 | 2023 | 840,517.2 | 34,986,101.0 | 1,867,816.1 | 77,746,891.1 | 7,004,310.3 | 291,550,841.6 |
| 23 | 30-Sep-23 | 2023 | 840,517.2 | 34,145,583.8 | 1,867,816.1 | 75,879,075.0 | 7,004,310.3 | 284,546,531.3 |
| 24 | 31-Dec-23 | 2023 | 840,517.2 | 33,305,066.5 | 1,867,816.1 | 74,011,258.9 | 7,004,310.3 | 277,542,220.9 |
| 25 | 31-Mar-24 | 2024 | 840,517.2 | 32,464,549.3 | 1,867,816.1 | 72,143,442.8 | 7,004,310.3 | 270,537,910.6 |
| 26 | 30-Jun-24 | 2024 | 840,517.2 | 31,624,032.0 | 1,867,816.1 | 70,275,626.7 | 7,004,310.3 | 263,533,600.2 |
| 27 | 20-Jul-24 | 2024 | — | 31,624,032.0 | — | 70,275,626.7 | — | 263,533,600.2 | — |

**10   SDRL $1,500 MM Facility Total**

| | | | West Neptune Tranche | | | | | | | | |
| | | | Commercial Facility | | | GIEK | | | Kexim Facility | | |
| # Repayments | Repayment Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 298,938.8 | — | 74,701,061.2 | 398,585.1 | — | 99,601,414.9 | 219,221.8 | — | 54,780,778.2 |
| 11 | 30-Sep-20 | 2020 | 1,191,136.1 | — | 73,509,925.1 | 1,588,181.4 | — | 98,013,233.4 | 873,499.8 | — | 53,907,278.4 |
| 12 | 31-Dec-20 | 2020 | 1,191,136.1 | — | 72,318,789.1 | 1,588,181.4 | — | 96,425,052.0 | 873,499.8 | — | 53,033,778.6 |
| 13 | 31-Mar-21 | 2021 | 1,400,862.1 | — | 70,917,927.0 | 1,867,816.1 | — | 94,557,235.9 | 1,027,298.9 | — | 52,006,479.7 |
| 14 | 30-Jun-21 | 2021 | 1,400,862.1 | — | 69,517,064.9 | 1,867,816.1 | — | 92,689,419.8 | 1,027,298.9 | — | 50,979,180.9 |
| 15 | 30-Sep-21 | 2021 | 1,400,862.1 | — | 68,116,202.9 | 1,867,816.1 | — | 90,821,603.7 | 1,027,298.9 | — | 49,951,882.0 |
| 16 | 31-Dec-21 | 2021 | 1,400,862.1 | — | 66,715,340.8 | 1,867,816.1 | — | 88,953,787.6 | 1,027,298.9 | — | 48,924,583.2 |
| 17 | 31-Mar-22 | 2022 | 1,400,862.1 | — | 65,314,478.7 | 1,867,816.1 | — | 87,085,971.5 | 1,027,298.9 | — | 47,897,284.3 |
| 18 | 30-Jun-22 | 2022 | 1,400,862.1 | — | 63,913,616.6 | 1,867,816.1 | — | 85,218,155.4 | 1,027,298.9 | — | 46,869,985.5 |
| 19 | 30-Sep-22 | 2022 | 1,400,862.1 | — | 62,512,754.6 | 1,867,816.1 | — | 83,350,339.4 | 1,027,298.9 | — | 45,842,686.6 |
| 20 | 31-Dec-22 | 2022 | 1,400,862.1 | — | 61,111,892.5 | 1,867,816.1 | — | 81,482,523.3 | 1,027,298.9 | — | 44,815,387.8 |
| 21 | 31-Mar-23 | 2023 | 1,400,862.1 | — | 59,711,030.4 | 1,867,816.1 | — | 79,614,707.2 | 1,027,298.9 | — | 43,788,088.9 |
| 22 | 30-Jun-23 | 2023 | 1,400,862.1 | — | 58,310,168.4 | 1,867,816.1 | — | 77,746,891.1 | 1,027,298.9 | — | 42,760,790.1 |
| 23 | 30-Sep-23 | 2023 | 1,400,862.1 | — | 56,909,306.3 | 1,867,816.1 | — | 75,879,075.0 | 1,027,298.9 | — | 41,733,491.2 |
| 24 | 31-Dec-23 | 2023 | 1,400,862.1 | — | 55,508,444.2 | 1,867,816.1 | — | 74,011,258.9 | 1,027,298.9 | — | 40,706,192.4 |
| 25 | 31-Mar-24 | 2024 | 1,400,862.1 | — | 54,107,582.2 | 1,867,816.1 | — | 72,143,442.8 | 1,027,298.9 | — | 39,678,893.5 |
| 26 | 30-Jun-24 | 2024 | 1,400,862.1 | — | 52,706,720.1 | 1,867,816.1 | — | 70,275,626.7 | 1,027,298.9 | — | 38,651,594.7 |
| 27 | 20-Jul-24 | 2024 | — | 52,706,720.1 | — | — | 70,275,626.7 | — | — | 38,651,594.7 | — |

**10   SDRL $1,500 MM Facility Total**

| | | | West Neptune Tranche | | | | Total For West Neptune Tranche | |
| | | | Kexim Guarantee Facility | | K-Sure Facility | | Total | |
| # Repayments | Repayment Date | Year | Installment Amount | Balance | Installment Amount | Balance | Installment Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | 45,000,000.0 | | 100,000,000.0 | | 374,999,999.9500 |
| 1 | 31-Mar-18 | 2018 | | 45,000,000.0 | | 100,000,000.0 | | 375,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 179,363.3 | 44,820,636.7 | 398,585.1 | 99,601,414.9 | 1,494,694.1 | 373,505,305.8 |
| 11 | 30-Sep-20 | 2020 | 714,681.6 | 44,105,955.1 | 1,588,181.4 | 98,013,233.4 | 5,955,680.4 | 367,549,625.4 |
| 12 | 31-Dec-20 | 2020 | 714,681.6 | 43,391,273.4 | 1,588,181.4 | 96,425,052.0 | 5,955,680.4 | 361,593,945.1 |
| 13 | 31-Mar-21 | 2021 | 840,517.2 | 42,550,756.2 | 1,867,816.1 | 94,557,235.9 | 7,004,310.3 | 354,589,634.7 |
| 14 | 30-Jun-21 | 2021 | 840,517.2 | 41,710,238.9 | 1,867,816.1 | 92,689,419.8 | 7,004,310.3 | 347,585,324.4 |
| 15 | 30-Sep-21 | 2021 | 840,517.2 | 40,869,721.7 | 1,867,816.1 | 90,821,603.7 | 7,004,310.3 | 340,581,014.0 |
| 16 | 31-Dec-21 | 2021 | 840,517.2 | 40,029,204.4 | 1,867,816.1 | 88,953,787.6 | 7,004,310.3 | 333,576,703.7 |
| 17 | 31-Mar-22 | 2022 | 840,517.2 | 39,188,687.2 | 1,867,816.1 | 87,085,971.5 | 7,004,310.3 | 326,572,393.3 |
| 18 | 30-Jun-22 | 2022 | 840,517.2 | 38,348,170.0 | 1,867,816.1 | 85,218,155.4 | 7,004,310.3 | 319,568,083.0 |
| 19 | 30-Sep-22 | 2022 | 840,517.2 | 37,507,652.7 | 1,867,816.1 | 83,350,339.4 | 7,004,310.3 | 312,563,772.6 |
| 20 | 31-Dec-22 | 2022 | 840,517.2 | 36,667,135.5 | 1,867,816.1 | 81,482,523.3 | 7,004,310.3 | 305,559,462.3 |
| 21 | 31-Mar-23 | 2023 | 840,517.2 | 35,826,618.2 | 1,867,816.1 | 79,614,707.2 | 7,004,310.3 | 298,555,152.0 |
| 22 | 30-Jun-23 | 2023 | 840,517.2 | 34,986,101.0 | 1,867,816.1 | 77,746,891.1 | 7,004,310.3 | 291,550,841.6 |
| 23 | 30-Sep-23 | 2023 | 840,517.2 | 34,145,583.8 | 1,867,816.1 | 75,879,075.0 | 7,004,310.3 | 284,546,531.3 |
| 24 | 31-Dec-23 | 2023 | 840,517.2 | 33,305,066.5 | 1,867,816.1 | 74,011,258.9 | 7,004,310.3 | 277,542,220.9 |
| 25 | 31-Mar-24 | 2024 | 840,517.2 | 32,464,549.3 | 1,867,816.1 | 72,143,442.8 | 7,004,310.3 | 270,537,910.6 |
| 26 | 30-Jun-24 | 2024 | 840,517.2 | 31,624,032.0 | 1,867,816.1 | 70,275,626.7 | 7,004,310.3 | 263,533,600.2 |
| 27 | 20-Jul-24 | 2024 | 31,624,032.0 | — | 70,275,626.7 | — | 263,533,600.2 | — |

**10    SDRL $1,500 MM Facility Total**

| | | | West Saturn Tranche | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Commercial Facility | | | GIEK | | | Kexim Facility | | |
| # Repayments | Repayment Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 75,000,000.2 | | | 100,000,000.0 | | | 55,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 298,938.8 | — | 74,701,061.2 | 398,585.1 | — | 99,601,414.9 | 219,221.8 | — | 54,780,778.2 |
| 11 | 30-Sep-20 | 2020 | 1,191,136.1 | — | 73,509,925.1 | 1,588,181.4 | — | 98,013,233.4 | 873,499.8 | — | 53,907,278.4 |
| 12 | 31-Dec-20 | 2020 | 1,191,136.1 | — | 72,318,789.1 | 1,588,181.4 | — | 96,425,052.0 | 873,499.8 | — | 53,033,778.6 |
| 13 | 31-Mar-21 | 2021 | 1,400,862.1 | — | 70,917,927.0 | 1,867,816.1 | — | 94,557,235.9 | 1,027,298.9 | — | 52,006,479.7 |
| 14 | 30-Jun-21 | 2021 | 1,400,862.1 | — | 69,517,064.9 | 1,867,816.1 | — | 92,689,419.8 | 1,027,298.9 | — | 50,979,180.9 |
| 15 | 30-Sep-21 | 2021 | 1,400,862.1 | — | 68,116,202.9 | 1,867,816.1 | — | 90,821,603.7 | 1,027,298.9 | — | 49,951,882.0 |
| 16 | 31-Dec-21 | 2021 | 1,400,862.1 | — | 66,715,340.8 | 1,867,816.1 | — | 88,953,787.6 | 1,027,298.9 | — | 48,924,583.2 |
| 17 | 31-Mar-22 | 2022 | 1,400,862.1 | — | 65,314,478.7 | 1,867,816.1 | — | 87,085,971.5 | 1,027,298.9 | — | 47,897,284.3 |
| 18 | 30-Jun-22 | 2022 | 1,400,862.1 | — | 63,913,616.6 | 1,867,816.1 | — | 85,218,155.4 | 1,027,298.9 | — | 46,869,985.5 |
| 19 | 30-Sep-22 | 2022 | 1,400,862.1 | — | 62,512,754.6 | 1,867,816.1 | — | 83,350,339.4 | 1,027,298.9 | — | 45,842,686.6 |
| 20 | 31-Dec-22 | 2022 | 1,400,862.1 | — | 61,111,892.5 | 1,867,816.1 | — | 81,482,523.3 | 1,027,298.9 | — | 44,815,387.8 |
| 21 | 31-Mar-23 | 2023 | 1,400,862.1 | — | 59,711,030.4 | 1,867,816.1 | — | 79,614,707.2 | 1,027,298.9 | — | 43,788,088.9 |
| 22 | 30-Jun-23 | 2023 | 1,400,862.1 | — | 58,310,168.4 | 1,867,816.1 | — | 77,746,891.1 | 1,027,298.9 | — | 42,760,790.1 |
| 23 | 30-Sep-23 | 2023 | 1,400,862.1 | — | 56,909,306.3 | 1,867,816.1 | — | 75,879,075.0 | 1,027,298.9 | — | 41,733,491.2 |
| 24 | 31-Dec-23 | 2023 | 1,400,862.1 | — | 55,508,444.2 | 1,867,816.1 | — | 74,011,258.9 | 1,027,298.9 | — | 40,706,192.4 |
| 25 | 31-Mar-24 | 2024 | 1,400,862.1 | — | 54,107,582.2 | 1,867,816.1 | — | 72,143,442.8 | 1,027,298.9 | — | 39,678,893.5 |
| 26 | 30-Jun-24 | 2024 | 1,400,862.1 | — | 52,706,720.1 | 1,867,816.1 | — | 70,275,626.7 | 1,027,298.9 | — | 38,651,594.7 |
| 27 | 20-Jul-24 | 2024 | — | 52,706,720.1 | — | — | 70,275,626.7 | — | — | 38,651,594.7 | — |

**10    SDRL $1,500 MM Facility Total**

| | | | West Saturn Tranche | | | | | | Total For West Saturn Tranche | |
| | | | Kexim Guarantee Facility | | K-Sure Facility | | | | Total | |
| # Repayments | Repayment Date | Year | Installment Amount | Balance | Installment Amount | Balance | | | Installment Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | 45,000,000.0 | | 100,000,000.0 | | | | 375,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | 45,000,000.0 | | 100,000,000.0 | | | | 375,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 179,363.3 | 44,820,636.7 | 398,585.1 | 99,601,414.9 | | | 1,494,694.1 | 373,505,305.8 |
| 11 | 30-Sep-20 | 2020 | 714,681.6 | 44,105,955.1 | 1,588,181.4 | 98,013,233.4 | | | 5,955,680.4 | 367,549,625.4 |
| 12 | 31-Dec-20 | 2020 | 714,681.6 | 43,391,273.4 | 1,588,181.4 | 96,425,052.0 | | | 5,955,680.4 | 361,593,945.1 |
| 13 | 31-Mar-21 | 2021 | 840,517.2 | 42,550,756.2 | 1,867,816.1 | 94,557,235.9 | | | 7,004,310.3 | 354,589,634.7 |
| 14 | 30-Jun-21 | 2021 | 840,517.2 | 41,710,238.9 | 1,867,816.1 | 92,689,419.8 | | | 7,004,310.3 | 347,585,324.4 |
| 15 | 30-Sep-21 | 2021 | 840,517.2 | 40,869,721.7 | 1,867,816.1 | 90,821,603.7 | | | 7,004,310.3 | 340,581,014.0 |
| 16 | 31-Dec-21 | 2021 | 840,517.2 | 40,029,204.4 | 1,867,816.1 | 88,953,787.6 | | | 7,004,310.3 | 333,576,703.7 |
| 17 | 31-Mar-22 | 2022 | 840,517.2 | 39,188,687.2 | 1,867,816.1 | 87,085,971.5 | | | 7,004,310.3 | 326,572,393.3 |
| 18 | 30-Jun-22 | 2022 | 840,517.2 | 38,348,170.0 | 1,867,816.1 | 85,218,155.4 | | | 7,004,310.3 | 319,568,083.0 |
| 19 | 30-Sep-22 | 2022 | 840,517.2 | 37,507,652.7 | 1,867,816.1 | 83,350,339.4 | | | 7,004,310.3 | 312,563,772.6 |
| 20 | 31-Dec-22 | 2022 | 840,517.2 | 36,667,135.5 | 1,867,816.1 | 81,482,523.3 | | | 7,004,310.3 | 305,559,462.3 |
| 21 | 31-Mar-23 | 2023 | 840,517.2 | 35,826,618.2 | 1,867,816.1 | 79,614,707.2 | | | 7,004,310.3 | 298,555,152.0 |
| 22 | 30-Jun-23 | 2023 | 840,517.2 | 34,986,101.0 | 1,867,816.1 | 77,746,891.1 | | | 7,004,310.3 | 291,550,841.6 |
| 23 | 30-Sep-23 | 2023 | 840,517.2 | 34,145,583.8 | 1,867,816.1 | 75,879,075.0 | | | 7,004,310.3 | 284,546,531.3 |
| 24 | 31-Dec-23 | 2023 | 840,517.2 | 33,305,066.5 | 1,867,816.1 | 74,011,258.9 | | | 7,004,310.3 | 277,542,220.9 |
| 25 | 31-Mar-24 | 2024 | 840,517.2 | 32,464,549.3 | 1,867,816.1 | 72,143,442.8 | | | 7,004,310.3 | 270,537,910.6 |
| 26 | 30-Jun-24 | 2024 | 840,517.2 | 31,624,032.0 | 1,867,816.1 | 70,275,626.7 | | | 7,004,310.3 | 263,533,600.2 |
| 27 | 20-Jul-24 | 2024 | — | 31,624,032.0 | — | 70,275,626.7 | — | | 263,533,600.2 | — |

**11    SDRL $950 MM Facility Total**

**New Maturity** 30-Aug-24

| # Repayments | Date | Year | Carina ECA Facility | | | Carina Term Loan | | | Carina RCF | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 150,416,666.4 | | | 47,500,000.0 | | | 130,639,675.0 |
| 1 | 31-Mar-18 | 2018 | | | 150,416,666.4 | | | 47,500,000.0 | | | 130,639,675.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 9 | 31-Mar-20 | 2020 | 2,338,892.24 | — | 148,077,774.1 | 738,597.55 | — | 46,761,402.5 | 1,981,825.79 | — | 128,657,849.2 |
| 10 | 30-Jun-20 | 2020 | 2,338,892.24 | — | 145,738,881.9 | 738,597.55 | — | 46,022,804.9 | 1,981,825.79 | — | 126,676,023.4 |
| 11 | 30-Sep-20 | 2020 | 2,338,892.24 | — | 143,399,989.7 | 738,597.55 | — | 45,284,207.4 | 1,981,825.79 | — | 124,694,197.6 |
| 12 | 31-Dec-20 | 2020 | 2,338,892.24 | — | 141,061,097.4 | 738,597.55 | — | 44,545,609.8 | 1,981,825.79 | — | 122,712,371.8 |
| 13 | 31-Mar-21 | 2021 | 2,750,706.22 | — | 138,310,391.2 | 868,644.07 | — | 43,676,965.7 | 2,330,770.29 | — | 120,381,601.5 |
| 14 | 30-Jun-21 | 2021 | 2,750,706.22 | — | 135,559,685.0 | 868,644.07 | — | 42,808,321.7 | 2,330,770.29 | — | 118,050,831.3 |
| 15 | 30-Sep-21 | 2021 | 2,750,706.22 | — | 132,808,978.8 | 868,644.07 | — | 41,939,677.6 | 2,330,770.29 | — | 115,720,061.0 |
| 16 | 31-Dec-21 | 2021 | 2,750,706.22 | — | 130,058,272.5 | 868,644.07 | — | 41,071,033.5 | 2,330,770.29 | — | 113,389,290.7 |
| 17 | 31-Mar-22 | 2022 | 2,750,706.22 | — | 127,307,566.3 | 868,644.07 | — | 40,202,389.5 | 2,330,770.29 | — | 111,058,520.4 |
| 18 | 30-Jun-22 | 2022 | 2,750,706.22 | — | 124,556,860.1 | 868,644.07 | — | 39,333,745.4 | 2,330,770.29 | — | 108,727,750.1 |
| 19 | 30-Sep-22 | 2022 | 2,750,706.22 | — | 121,806,153.9 | 868,644.07 | — | 38,465,101.3 | 2,330,770.29 | — | 106,396,979.8 |
| 20 | 31-Dec-22 | 2022 | 2,750,706.22 | — | 119,055,447.7 | 868,644.07 | — | 37,596,457.3 | 2,330,770.29 | — | 104,066,209.5 |
| 21 | 31-Mar-23 | 2023 | 2,750,706.22 | — | 116,304,741.4 | 868,644.07 | — | 36,727,813.2 | 2,330,770.29 | — | 101,735,439.2 |
| 22 | 30-Jun-23 | 2023 | 2,750,706.22 | — | 113,554,035.2 | 868,644.07 | — | 35,859,169.1 | 2,330,770.29 | — | 99,404,669.0 |
| 23 | 30-Sep-23 | 2023 | 2,750,706.22 | — | 110,803,329.0 | 868,644.07 | — | 34,990,525.1 | 2,330,770.29 | — | 97,073,898.7 |
| 24 | 31-Dec-23 | 2023 | 2,750,706.22 | — | 108,052,622.8 | 868,644.07 | — | 34,121,881.0 | 2,330,770.29 | — | 94,743,128.4 |
| 25 | 31-Mar-24 | 2024 | 2,750,706.22 | — | 105,301,916.6 | 868,644.07 | — | 33,253,236.9 | 2,330,770.29 | — | 92,412,358.1 |
| 26 | 30-Jun-24 | 2024 | 2,750,706.22 | — | 102,551,210.3 | 868,644.07 | — | 32,384,592.9 | 2,330,770.29 | — | 90,081,587.8 |
| 27 | 30-Aug-24 | 2024 | — | 102,551,210.3 | — | — | 32,384,592.9 | — | — | 90,081,587.8 | — |

48

**11    SDRL $950 MM Facility Total**

| # Repayments | Date | Year | Eclipse Term Loan | | | Eclipse RCF | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 112,500,000.0 | | | 125,000,000.0 | | | 566,056,341.4 |
| 1 | 31-Mar-18 | 2018 | | | 112,500,000.0 | | | 125,000,000.0 | | | 566,056,341.4 |
| 2 | 30-Jun-18 | 2018 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 3 | 30-Sep-18 | 2018 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 4 | 31-Dec-18 | 2018 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 5 | 31-Mar-19 | 2019 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 6 | 30-Jun-19 | 2019 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 7 | 30-Sep-19 | 2019 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 8 | 31-Dec-19 | 2019 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 9 | 31-Mar-20 | 2020 | 4,522,364.61 | — | 107,977,635.4 | — | — | 125,000,000.0 | — | — | 556,474,661.2 |
| 10 | 30-Jun-20 | 2020 | 4,522,364.61 | — | 103,455,270.8 | — | — | 125,000,000.0 | 9,581,680.2 | — | 546,892,981.0 |
| 11 | 30-Sep-20 | 2020 | 4,522,364.61 | — | 98,932,906.2 | — | — | 125,000,000.0 | 9,581,680.2 | — | 537,311,300.8 |
| 12 | 31-Dec-20 | 2020 | 4,522,364.61 | — | 94,410,541.6 | — | — | 125,000,000.0 | 9,581,680.2 | — | 527,729,620.6 |
| 13 | 31-Mar-21 | 2021 | 5,318,627.45 | — | 89,091,914.1 | — | — | 125,000,000.0 | 11,268,748.0 | — | 516,460,872.6 |
| 14 | 30-Jun-21 | 2021 | 5,318,627.45 | — | 83,773,286.7 | — | — | 125,000,000.0 | 11,268,748.0 | — | 505,192,124.6 |
| 15 | 30-Sep-21 | 2021 | 5,318,627.45 | — | 78,454,659.2 | — | — | 125,000,000.0 | 11,268,748.0 | — | 493,923,376.6 |
| 16 | 31-Dec-21 | 2021 | 5,318,627.45 | — | 73,136,031.8 | — | — | 125,000,000.0 | 11,268,748.0 | — | 482,654,628.5 |
| 17 | 31-Mar-22 | 2022 | 5,318,627.45 | — | 67,817,404.3 | — | — | 125,000,000.0 | 11,268,748.0 | — | 471,385,880.5 |
| 18 | 30-Jun-22 | 2022 | 5,318,627.45 | — | 62,498,776.9 | — | — | 125,000,000.0 | 11,268,748.0 | — | 460,117,132.5 |
| 19 | 30-Sep-22 | 2022 | 5,318,627.45 | — | 57,180,149.4 | — | — | 125,000,000.0 | 11,268,748.0 | — | 448,848,384.4 |
| 20 | 31-Dec-22 | 2022 | 5,318,627.45 | — | 51,861,522.0 | — | — | 125,000,000.0 | 11,268,748.0 | — | 437,579,636.4 |
| 21 | 31-Mar-23 | 2023 | 5,318,627.45 | — | 46,542,894.5 | — | — | 125,000,000.0 | 11,268,748.0 | — | 426,310,888.4 |
| 22 | 30-Jun-23 | 2023 | 5,318,627.45 | — | 41,224,267.1 | — | — | 125,000,000.0 | 11,268,748.0 | — | 415,042,140.4 |
| 23 | 30-Sep-23 | 2023 | 5,318,627.45 | — | 35,905,639.6 | — | — | 125,000,000.0 | 11,268,748.0 | — | 403,773,392.3 |
| 24 | 31-Dec-23 | 2023 | 5,318,627.45 | — | 30,587,012.2 | — | — | 125,000,000.0 | 11,268,748.0 | — | 392,504,644.3 |
| 25 | 31-Mar-24 | 2024 | 5,318,627.45 | — | 25,268,384.7 | — | — | 125,000,000.0 | 11,268,748.0 | — | 381,235,896.3 |
| 26 | 30-Jun-24 | 2024 | 5,318,627.45 | — | 19,949,757.3 | — | — | 125,000,000.0 | 11,268,748.0 | — | 369,967,148.3 |
| 27 | 30-Aug-24 | 2024 | — | 19,949,757.3 | — | — | 125,000,000.0 | — | — | 369,967,148.3 | — |

49

**12**   **SDRL $450 MM Facility Total**

**New Maturity** 30-Sep-24

| # Repayments | Date | Year | Term Loan | | Balance |
|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | |
| 0 | 12-Sep-17 | 2017 | | | 102,532,294.4 |
| 1 | 31-Mar-18 | 2018 | | | 102,532,294.4 |
| 2 | 30-Jun-18 | 2018 | — | — | 102,532,294.4 |
| 3 | 30-Sep-18 | 2018 | — | — | 102,532,294.4 |
| 4 | 31-Dec-18 | 2018 | — | — | 102,532,294.4 |
| 5 | 31-Mar-19 | 2019 | — | — | 102,532,294.4 |
| 6 | 30-Jun-19 | 2019 | — | — | 102,532,294.4 |
| 7 | 30-Sep-19 | 2019 | — | — | 102,532,294.4 |
| 8 | 31-Dec-19 | 2019 | — | — | 102,532,294.4 |
| 9 | 31-Mar-20 | 2020 | — | — | 102,532,294.4 |
| 10 | 30-Jun-20 | 2020 | 2,323,306.03 | — | 100,208,988.3 |
| 11 | 30-Sep-20 | 2020 | 3,100,008.00 | — | 97,108,980.3 |
| 12 | 31-Dec-20 | 2020 | 3,100,008.00 | — | 94,008,972.3 |
| 13 | 31-Mar-21 | 2021 | 3,645,833.33 | — | 90,363,139.0 |
| 14 | 30-Jun-21 | 2021 | 3,645,833.33 | — | 86,717,305.7 |
| 15 | 30-Sep-21 | 2021 | 3,645,833.33 | — | 83,071,472.3 |
| 16 | 31-Dec-21 | 2021 | 3,645,833.33 | — | 79,425,639.0 |
| 17 | 31-Mar-22 | 2022 | 3,645,833.33 | — | 75,779,805.7 |
| 18 | 30-Jun-22 | 2022 | 3,645,833.33 | — | 72,133,972.3 |
| 19 | 30-Sep-22 | 2022 | 3,645,833.33 | — | 68,488,139.0 |
| 20 | 31-Dec-22 | 2022 | 3,645,833.33 | — | 64,842,305.7 |
| 21 | 31-Mar-23 | 2023 | 3,645,833.33 | — | 61,196,472.3 |
| 22 | 30-Jun-23 | 2023 | 3,645,833.33 | — | 57,550,639.0 |
| 23 | 30-Sep-23 | 2023 | 3,645,833.33 | — | 53,904,805.7 |
| 24 | 31-Dec-23 | 2023 | 3,645,833.33 | — | 50,258,972.3 |
| 25 | 31-Mar-24 | 2024 | 3,645,833.33 | — | 46,613,139.0 |
| 26 | 30-Jun-24 | 2024 | 3,645,833.33 | — | 42,967,305.7 |
| 27 | 30-Sep-24 | 2024 | — | 42,967,305.7 | — |

50

**PART II**

51

PART II

**Assumes Post-31-Aug-2017 Chapter 11 Filing Date and 31-Mar-2018 Emergence Date**

All payment dates post-Emergence Date harmonised to be annually 31 March, 30 June, 30 September and 31 December

| Facility | New Maturity | Outst. Amount at Emergence Date ($) | Annual Debt Service Payment Dates | Amortisation paid from Emergence Date to 31-Dec-2018 (included) ($) | Amortisation paid from 1-Jan-2019 to 31-Dec-2019 (included) ($) | Amortisation paid from 1-Jan-2020 to 31-Dec-2020 (included) ($) | Amortisation paid from 1-Jan-2021 to 31-Dec-2021 (included) ($) | Amortisation paid from 1-Jan-2022 to 31-Dec-2022 (included) ($) | Amortisation paid from 1-Jan-2023 to 31-Dec-2023 (included) ($) | Amortisation paid from 1-Jan-2024 to 31-Dec-2024 (included) ($) | Balloons at Maturity ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SDRL $450 MM Eminence Facility Total | 19-Jun-22 | 264,705,800.0 | 4 | — | — | 24,154,514.3 | 28,407,453.7 | 7,101,863.4 | — | — | 205,041,968.6 |
| SDRL $400 MM Facility Total | 24-Oct-22 | 135,107,913.7 | 4 | — | — | 16,569,713.1 | 19,487,179.5 | 14,615,384.6 | — | — | 84,435,636.5 |
| SDRL $400 MM Facility—Term Loan | 24-Oct-22 | — | 4 | — | — | — | — | — | — | — | — |
| SDRL $400 MM Facility—RCF | 24-Oct-22 | 135,107,913.7 | 4 | — | — | 16,569,713.1 | 19,487,179.5 | 14,615,384.6 | — | — | 84,435,636.5 |
| NADL $2,000 MM Facility Total | 27-Jan-23 | 908,333,333.0 | 4 | — | — | 79,875,530.7 | 93,939,393.9 | 93,939,393.9 | — | — | 640,579,014.4 |
| NADL $2,000 MM Facility—Term Loan | 27-Jan-23 | — | 4 | — | — | — | — | — | — | — | — |
| NADL $2,000 MM Facility—RCF | 27-Jan-23 | 908,333,333.0 | 4 | — | — | 79,875,530.7 | 93,939,393.9 | 93,939,393.9 | — | — | 640,579,014.4 |
| SDRL $440 MM Facility—Teleste(1) | 30-Jul-23 | 64,058,823.9 | 4 | — | — | 6,207,230.0 | 7,300,150.9 | 7,300,150.9 | 3,650,075.4 | — | 39,601,216.7 |
| SDRL $1,450 MM West Tellus Facility Total | 15-Oct-23 | 322,222,229.0 | 4 | — | — | 12,981,897.6 | 27,110,042.8 | 27,110,042.8 | 20,332,532.1 | — | 234,687,713.6 |
| West Tellus Facility—GIEK(2) | 15-Oct-23 | 127,777,770.6 | 4 | — | — | 5,147,993.5 | 10,750,533.4 | 10,750,533.4 | 8,062,900.1 | — | 93,065,810.3 |
| West Tellus Facility—Kexim(2) | 15-Oct-23 | 74,666,671.8 | 4 | — | — | 3,008,219.2 | 6,282,051.6 | 6,282,051.6 | 4,711,538.7 | — | 54,382,810.7 |
| West Tellus Facility—K-sure(2) | 15-Oct-23 | 74,666,671.8 | 4 | — | — | 3,008,219.2 | 6,282,051.6 | 6,282,051.6 | 4,711,538.7 | — | 54,382,810.7 |
| West Tellus Facility—Commercial | 15-Oct-23 | 45,111,114.9 | 4 | — | — | 1,817,465.8 | 3,795,406.2 | 3,795,406.2 | 2,846,554.7 | — | 32,856,281.9 |
| AOD $360 MM Facility Total | 25-Oct-23 | 210,000,000.0 | 4 | — | — | 18,319,839.5 | 21,545,454.5 | 21,545,454.5 | 16,159,090.9 | — | 132,430,160.5 |
| SDRL $300 MM Facility Total | 29-Jan-24 | 144,000,000.0 | 4 | — | — | 5,977,968.8 | 14,086,956.5 | 14,086,956.5 | 14,086,956.5 | — | 95,761,161.6 |
| Eksportkredit GIEK Facility—West Tucana Sub Tranche | 29-Jan-24 | 18,000,000.0 | 4 | — | — | 747,246.1 | 1,760,869.6 | 1,760,869.6 | 1,760,869.6 | — | 11,970,145.2 |
| Eksportkredit Commercial Facility—West Tucana Sub Tranche | 29-Jan-24 | 27,000,000.0 | 4 | — | — | 1,120,869.1 | 2,641,304.3 | 2,641,304.3 | 2,641,304.3 | — | 17,955,217.8 |
| DNB Liv GIEK Facility—West Tucana Sub Tranche | 29-Jan-24 | 27,000,000.0 | 4 | — | — | 1,120,869.1 | 2,641,304.3 | 2,641,304.3 | 2,641,304.3 | — | 17,955,217.8 |
| Eksportkredit GIEK Facility—West Castor Sub Tranche | 29-Jan-24 | 18,000,000.0 | 4 | — | — | 747,246.1 | 1,760,869.6 | 1,760,869.6 | 1,760,869.6 | — | 11,970,145.2 |
| Eksportkredit Commercial Facility—West Castor Sub Tranche | 29-Jan-24 | 27,000,000.0 | 4 | — | — | 1,120,869.1 | 2,641,304.3 | 2,641,304.3 | 2,641,304.3 | — | 17,955,217.8 |
| DNB Liv GIEK Facility—West Castor Sub Tranche | 29-Jan-24 | 27,000,000.0 | 4 | — | — | 1,120,869.1 | 2,641,304.3 | 2,641,304.3 | 2,641,304.3 | — | 17,955,217.8 |
| Sevan $1,750 MM Facility Total | 26-Feb-24 | 875,000,000.0 | 4 | — | — | 69,871,484.7 | 82,173,913.2 | 82,173,913.2 | 82,173,913.2 | — | 558,606,775.8 |
| Sevan $1,750 MM Facility—Tranche A1 | 26-Feb-24 | 118,749,999.9 | 4 | — | — | 9,581,142.7 | 11,268,115.9 | 11,268,115.9 | 11,268,115.9 | — | 75,364,509.3 |
| Sevan $1,750 MM Facility—Tranche A2 | 26-Feb-24 | 756,250,000.1 | 4 | — | — | 60,290,342.0 | 70,905,797.2 | 70,905,797.2 | 70,905,797.2 | — | 483,242,266.4 |
| SDRL $1,350 MM Facility Total | 31-Oct-24 | 945,000,000.0 | 4 | — | — | 37,419,097.9 | 83,700,000.0 | 83,700,000.0 | 83,700,000.0 | 62,775,000.0 | 593,705,902.1 |
| SDRL $1,500 MM Facility Total | 20-Oct-24 | 1,124,999,999.9 | 4 | — | — | 40,218,164.7 | 84,051,724.1 | 84,051,724.1 | 84,051,724.1 | 63,038,793.1 | 769,587,869.7 |
| SDRL $1,500 MM Facility—West Jupiter Commercial Tranche | 20-Oct-24 | 75,000,000.0 | 4 | — | — | 2,681,211.0 | 5,603,448.3 | 5,603,448.3 | 5,603,448.3 | 4,202,586.2 | 51,305,858.0 |
| SDRL $1,500 MM Facility—West Jupiter GIEK Facility(2) | 20-Oct-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 5,603,448.3 | 68,407,810.6 |
| SDRL $1,500 MM Facility—West Jupiter Kexim Facility(2) | 20-Oct-24 | 55,000,000.0 | 4 | — | — | 1,966,221.4 | 4,109,195.4 | 4,109,195.4 | 4,109,195.4 | 3,081,896.6 | 37,624,295.8 |
| SDRL $1,500 MM Facility—West Jupiter Kexim Guarantee Facility(2) | 20-Oct-24 | 45,000,000.0 | 4 | — | — | 1,608,726.6 | 3,362,069.0 | 3,362,069.0 | 3,362,069.0 | 2,521,551.7 | 30,783,514.8 |
| SDRL $1,500 MM Facility—West Jupiter K-Sure Facility(2) | 20-Oct-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 5,603,448.3 | 68,407,810.6 |
| SDRL $1,500 MM Facility—West Neptune Commercial Tranche | 20-Oct-24 | 75,000,000.0 | 4 | — | — | 2,681,211.0 | 5,603,448.3 | 5,603,448.3 | 5,603,448.3 | 4,202,586.2 | 51,305,858.0 |
| SDRL $1,500 MM Facility—West Neptune GIEK Facility(2) | 20-Oct-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 5,603,448.3 | 68,407,810.6 |
| SDRL $1,500 MM Facility—West Neptune Kexim Facility(2) | 20-Oct-24 | 55,000,000.0 | 4 | — | — | 1,966,221.4 | 4,109,195.4 | 4,109,195.4 | 4,109,195.4 | 3,081,896.6 | 37,624,295.8 |
| SDRL $1,500 MM Facility—West Neptune Kexim Guarantee Facility(2) | 20-Oct-24 | 45,000,000.0 | 4 | — | — | 1,608,726.6 | 3,362,069.0 | 3,362,069.0 | 3,362,069.0 | 2,521,551.7 | 30,783,514.8 |
| SDRL $1,500 MM Facility—West Neptune K-Sure Facility(2) | 20-Oct-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 5,603,448.3 | 68,407,810.6 |
| SDRL $1,500 MM Facility—West Saturn Commercial Tranche | 20-Oct-24 | 75,000,000.0 | 4 | — | — | 2,681,211.0 | 5,603,448.3 | 5,603,448.3 | 5,603,448.3 | 4,202,586.2 | 51,305,858.0 |
| SDRL $1,500 MM Facility—West Saturn GIEK Facility(2) | 20-Oct-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 5,603,448.3 | 68,407,810.6 |
| SDRL $1,500 MM Facility—West Saturn Kexim Facility(2) | 20-Oct-24 | 55,000,000.0 | 4 | — | — | 1,966,221.4 | 4,109,195.4 | 4,109,195.4 | 4,109,195.4 | 3,081,896.6 | 37,624,295.8 |
| SDRL $1,500 MM Facility—West Saturn Kexim Guarantee Facility(2) | 20-Oct-24 | 45,000,000.0 | 4 | — | — | 1,608,726.6 | 3,362,069.0 | 3,362,069.0 | 3,362,069.0 | 2,521,551.7 | 30,783,514.8 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SDRL $1,500 MM Facility—West Saturn K-Sure Facility(2) | 20-Oct-24 | 100,000,000.0 | 4 | — | — | 3,574,948.0 | 7,471,264.4 | 7,471,264.4 | 7,471,264.4 | 5,603,448.3 | 68,407,810.6 |
| SDRL $950 MM Facility Total | 30-Nov-24 | 566,056,341.4 | 4 | — | — | 38,326,720.7 | 45,074,992.1 | 45,074,992.1 | 45,074,992.1 | 33,806,244.1 | 358,698,400.2 |
| SDRL $950 MM Facility—Carina ECA Tranche(2) | 30-Nov-24 | 150,416,666.4 | 4 | — | — | 9,355,568.9 | 11,002,824.9 | 11,002,824.9 | 11,002,824.9 | 8,252,118.7 | 99,800,504.1 |
| SDRL $950 MM Facility—Carina Term Loan | 30-Nov-24 | 47,500,000.0 | 4 | — | — | 2,954,390.2 | 3,474,576.3 | 3,474,576.3 | 3,474,576.3 | 2,605,932.2 | 31,515,948.8 |
| SDRL $950 MM Facility—Carina RCF | 30-Nov-24 | 130,639,675.0 | 4 | — | — | 7,927,303.2 | 9,323,081.2 | 9,323,081.2 | 9,323,081.2 | 6,992,310.9 | 87,750,817.5 |
| SDRL $950 MM Facility—Eclipse Term Loan | 30-Nov-24 | 112,500,000.0 | 4 | — | — | 18,089,458.4 | 21,274,509.8 | 21,274,509.8 | 21,274,509.8 | 15,955,882.4 | 14,631,129.8 |
| SDRL $950 MM Facility—Eclipse RCF | 30-Nov-24 | 125,000,000.0 | 4 | — | — | — | — | — | — | — | 125,000,000.0 |
| SDRL $950 MM Facility Total (3) | 31-Dec-24 | 102,532,294.4 | 4 | — | — | 8,523,322.0 | 14,583,333.3 | 14,583,333.3 | 14,583,333.3 | 10,937,500.0 | 39,321,472.3 |
| SDRL $450 MM Facility—Term Loan (3) | 31-Dec-24 | 102,532,294.4 | 4 | — | — | 8,523,322.0 | 14,583,333.3 | 14,583,333.3 | 14,583,333.3 | 10,937,500.0 | 39,321,472.3 |
| **Total Credit Facilities** | | **5,662,016,735.1** | | **—** | **—** | **358,445,484.1** | **521,460,594.6** | **495,283,209.5** | **363,812,617.7** | **170,557,537.2** | **3,752,457,292.0** |

(1) Instalments paid semi annually pre-filing and quarterly post-emergence

(2) The ECA facility is 12 years but it matures after 5 years if the commercial facility is not refinanced on acceptable terms

(3) Includes $ 26.6m modelled of debt balance reduction related the sale of West M ischief expected pre-emergence

**1    SDRL $450 MM Eminence Facility Total**

**New Maturity** 19-Jun-22

| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance |
|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 264,705,800.0 |
| 1 | 31-Mar-18 | 2018 | | | 264,705,800.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 264,705,800.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 264,705,800.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 264,705,800.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 264,705,800.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 264,705,800.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 264,705,800.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 264,705,800.0 |
| 9 | 31-Mar-20 | 2020 | 6,038,628.6 | — | 258,667,171.4 |
| 10 | 30-Jun-20 | 2020 | 6,038,628.6 | — | 252,628,542.8 |
| 11 | 30-Sep-20 | 2020 | 6,038,628.6 | — | 246,589,914.2 |
| 12 | 31-Dec-20 | 2020 | 6,038,628.6 | — | 240,551,285.7 |
| 13 | 31-Mar-21 | 2021 | 7,101,863.4 | — | 233,449,422.2 |
| 14 | 30-Jun-21 | 2021 | 7,101,863.4 | — | 226,347,558.8 |
| 15 | 30-Sep-21 | 2021 | 7,101,863.4 | — | 219,245,695.4 |
| 16 | 31-Dec-21 | 2021 | 7,101,863.4 | — | 212,143,832.0 |
| 17 | 31-Mar-22 | 2022 | 7,101,863.4 | — | 205,041,968.6 |
| 18 | 19-Jun-22 | 2022 | — | 205,041,968.6 | — |

53

**2    SDRL $400 MM Facility—Term Loan**

**New Maturity** 24-Oct-22

| | | | Term Loan | | | RCF | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | — | | | 135,107,913.7 | | | 135,107,913.7 |
| 1 | 31-Mar-18 | 2018 | | | — | | | 135,107,913.7 | | | 135,107,913.7 |
| 2 | 30-Jun-18 | 2018 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 3 | 30-Sep-18 | 2018 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 4 | 31-Dec-18 | 2018 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 5 | 31-Mar-19 | 2019 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 6 | 30-Jun-19 | 2019 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 7 | 30-Sep-19 | 2019 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 8 | 31-Dec-19 | 2019 | — | — | — | — | — | 135,107,913.7 | — | — | 135,107,913.7 |
| 9 | 31-Mar-20 | 2020 | — | — | — | 4,142,428.3 | — | 130,965,485.4 | 4,142,428.3 | — | 130,965,485.4 |
| 10 | 30-Jun-20 | 2020 | — | — | — | 4,142,428.3 | — | 126,823,057.1 | 4,142,428.3 | — | 126,823,057.1 |
| 11 | 30-Sep-20 | 2020 | — | — | — | 4,142,428.3 | — | 122,680,628.9 | 4,142,428.3 | — | 122,680,628.9 |
| 12 | 31-Dec-20 | 2020 | — | — | — | 4,142,428.3 | — | 118,538,200.6 | 4,142,428.3 | — | 118,538,200.6 |
| 13 | 31-Mar-21 | 2021 | — | — | — | 4,871,794.9 | — | 113,666,405.7 | 4,871,794.9 | — | 113,666,405.7 |
| 14 | 30-Jun-21 | 2021 | — | — | — | 4,871,794.9 | — | 108,794,610.8 | 4,871,794.9 | — | 108,794,610.8 |
| 15 | 30-Sep-21 | 2021 | — | — | — | 4,871,794.9 | — | 103,922,816.0 | 4,871,794.9 | — | 103,922,816.0 |
| 16 | 31-Dec-21 | 2021 | — | — | — | 4,871,794.9 | — | 99,051,021.1 | 4,871,794.9 | — | 99,051,021.1 |
| 17 | 31-Mar-22 | 2022 | — | — | — | 4,871,794.9 | — | 94,179,226.2 | 4,871,794.9 | — | 94,179,226.2 |
| 18 | 30-Jun-22 | 2022 | — | — | — | 4,871,794.9 | — | 89,307,431.4 | 4,871,794.9 | — | 89,307,431.4 |
| 19 | 30-Sep-22 | 2022 | — | — | — | 4,871,794.9 | — | 84,435,636.5 | 4,871,794.9 | — | 84,435,636.5 |
| 20 | 24-Oct-22 | 2022 | — | — | — | — | 84,435,636.5 | — | — | 84,435,636.5 | — |

**3    NADL $2,000 MM Facility Total**

**New Maturity** 27-Jan-23

| # Repayments | Date | Year | Term Loan | | | RCF | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | — | — | — | | | 908,333,333.0 | | | 908,333,333.0 |
| 1 | 31-Mar-18 | 2018 | — | — | — | | — | 908,333,333.0 | | — | 908,333,333.0 |
| 2 | 30-Jun-18 | 2018 | — | — | — | — | | 908,333,333.0 | — | | 908,333,333.0 |
| 3 | 30-Sep-18 | 2018 | — | — | — | | — | 908,333,333.0 | | — | 908,333,333.0 |
| 4 | 31-Dec-18 | 2018 | — | — | — | | — | 908,333,333.0 | | — | 908,333,333.0 |
| 5 | 31-Mar-19 | 2019 | — | — | — | | — | 908,333,333.0 | | — | 908,333,333.0 |
| 6 | 30-Jun-19 | 2019 | — | — | — | | — | 908,333,333.0 | | — | 908,333,333.0 |
| 7 | 30-Sep-19 | 2019 | — | — | — | — | | 908,333,333.0 | — | | 908,333,333.0 |
| 8 | 31-Dec-19 | 2019 | — | — | — | | — | 908,333,333.0 | — | | 908,333,333.0 |
| 9 | 31-Mar-20 | 2020 | — | — | — | 19,968,882.7 | — | 888,364,450.3 | 19,968,882.7 | — | 888,364,450.3 |
| 10 | 30-Jun-20 | 2020 | — | — | — | 19,968,882.7 | — | 868,395,567.6 | 19,968,882.7 | — | 868,395,567.6 |
| 11 | 30-Sep-20 | 2020 | — | — | — | 19,968,882.7 | — | 848,426,684.9 | 19,968,882.7 | — | 848,426,684.9 |
| 12 | 31-Dec-20 | 2020 | — | — | — | 19,968,882.7 | — | 828,457,802.3 | 19,968,882.7 | — | 828,457,802.3 |
| 13 | 31-Mar-21 | 2021 | — | — | — | 23,484,848.5 | — | 804,972,953.8 | 23,484,848.5 | — | 804,972,953.8 |
| 14 | 30-Jun-21 | 2021 | — | — | — | 23,484,848.5 | — | 781,488,105.3 | 23,484,848.5 | — | 781,488,105.3 |
| 15 | 30-Sep-21 | 2021 | — | — | — | 23,484,848.5 | — | 758,003,256.8 | 23,484,848.5 | — | 758,003,256.8 |
| 16 | 31-Dec-21 | 2021 | — | — | — | 23,484,848.5 | — | 734,518,408.3 | 23,484,848.5 | — | 734,518,408.3 |
| 17 | 31-Mar-22 | 2022 | — | — | — | 23,484,848.5 | — | 711,033,559.8 | 23,484,848.5 | — | 711,033,559.8 |
| 18 | 30-Jun-22 | 2022 | — | — | — | 23,484,848.5 | — | 687,548,711.4 | 23,484,848.5 | — | 687,548,711.4 |
| 19 | 30-Sep-22 | 2022 | — | — | — | 23,484,848.5 | — | 664,063,862.9 | 23,484,848.5 | — | 664,063,862.9 |
| 20 | 31-Dec-22 | 2022 | — | — | — | 23,484,848.5 | — | 640,579,014.4 | 23,484,848.5 | — | 640,579,014.4 |
| 21 | 27-Jan-23 | 2023 | — | — | — | — | 640,579,014.4 | — | — | 640,579,014.4 | — |

**4**      **SDRL $440 MM Facility—Telesto**

**New Maturity** 30-Jul-23

| | | | Telesto | | |
|---|---|---|---|---|---|
| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 64,058,823.9 |
| 1 | 31-Mar-18 | 2018 | | | 64,058,823.9 |
| 2 | 30-Jun-18 | 2018 | — | — | 64,058,823.9 |
| 3 | 30-Sep-18 | 2018 | — | — | 64,058,823.9 |
| 4 | 31-Dec-18 | 2018 | — | — | 64,058,823.9 |
| 5 | 31-Mar-19 | 2019 | — | — | 64,058,823.9 |
| 6 | 30-Jun-19 | 2019 | — | — | 64,058,823.9 |
| 7 | 30-Sep-19 | 2019 | — | — | 64,058,823.9 |
| 8 | 31-Dec-19 | 2019 | — | — | 64,058,823.9 |
| 9 | 31-Mar-20 | 2020 | 1,551,807.50 | — | 62,507,016.4 |
| 10 | 30-Jun-20 | 2020 | 1,551,807.50 | — | 60,955,208.9 |
| 11 | 30-Sep-20 | 2020 | 1,551,807.50 | — | 59,403,401.4 |
| 12 | 31-Dec-20 | 2020 | 1,551,807.50 | — | 57,851,593.9 |
| 13 | 31-Mar-21 | 2021 | 1,825,037.72 | — | 56,026,556.2 |
| 14 | 30-Jun-21 | 2021 | 1,825,037.72 | — | 54,201,518.5 |
| 15 | 30-Sep-21 | 2021 | 1,825,037.72 | — | 52,376,480.7 |
| 16 | 31-Dec-21 | 2021 | 1,825,037.72 | — | 50,551,443.0 |
| 17 | 31-Mar-22 | 2022 | 1,825,037.72 | — | 48,726,405.3 |
| 18 | 30-Jun-22 | 2022 | 1,825,037.72 | — | 46,901,367.6 |
| 19 | 30-Sep-22 | 2022 | 1,825,037.72 | — | 45,076,329.9 |
| 20 | 31-Dec-22 | 2022 | 1,825,037.72 | — | 43,251,292.2 |
| 21 | 31-Mar-23 | 2023 | 1,825,037.72 | — | 41,426,254.4 |
| 22 | 30-Jun-23 | 2023 | 1,825,037.72 | — | 39,601,216.7 |
| 23 | 30-Jul-23 | 2023 | — | 39,601,216.7 | — |

56

**5    SDRL $1,450 MM West Tellus Facility Total**

**New Maturity** 15-Oct-23

| | | | West Tellus | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | GIEK Lender Facility | | | Kexim Facilty | | | K-Sure Facility | | |
| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 127,777,770.6 | | | 74,666,671.8 | | | 74,666,671.8 |
| 1 | 31-Mar-18 | 2018 | | | 127,777,770.6 | | | 74,666,671.8 | | | 74,666,671.8 |
| 2 | 30-Jun-18 | 2018 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 3 | 30-Sep-18 | 2018 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 4 | 31-Dec-18 | 2018 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 5 | 31-Mar-19 | 2019 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 6 | 30-Jun-19 | 2019 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 7 | 30-Sep-19 | 2019 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 8 | 31-Dec-19 | 2019 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 9 | 31-Mar-20 | 2020 | — | — | 127,777,770.6 | — | — | 74,666,671.8 | — | — | 74,666,671.8 |
| 10 | 30-Jun-20 | 2020 | 577,469.2 | — | 127,200,301.4 | 337,442.9 | — | 74,329,228.9 | 337,442.9 | — | 74,329,228.9 |
| 11 | 30-Sep-20 | 2020 | 2,285,262.1 | — | 124,915,039.3 | 1,335,388.1 | — | 72,993,840.7 | 1,335,388.1 | — | 72,993,840.7 |
| 12 | 31-Dec-20 | 2020 | 2,285,262.1 | — | 122,629,777.1 | 1,335,388.1 | — | 71,658,452.6 | 1,335,388.1 | — | 71,658,452.6 |
| 13 | 31-Mar-21 | 2021 | 2,687,633.4 | — | 119,942,143.8 | 1,570,512.9 | — | 70,087,939.7 | 1,570,512.9 | — | 70,087,939.7 |
| 14 | 30-Jun-21 | 2021 | 2,687,633.4 | — | 117,254,510.4 | 1,570,512.9 | — | 68,517,426.8 | 1,570,512.9 | — | 68,517,426.8 |
| 15 | 30-Sep-21 | 2021 | 2,687,633.4 | — | 114,566,877.1 | 1,570,512.9 | — | 66,946,913.9 | 1,570,512.9 | — | 66,946,913.9 |
| 16 | 31-Dec-21 | 2021 | 2,687,633.4 | — | 111,879,243.7 | 1,570,512.9 | — | 65,376,401.0 | 1,570,512.9 | — | 65,376,401.0 |
| 17 | 31-Mar-22 | 2022 | 2,687,633.4 | — | 109,191,610.4 | 1,570,512.9 | — | 63,805,888.1 | 1,570,512.9 | — | 63,805,888.1 |
| 18 | 30-Jun-22 | 2022 | 2,687,633.4 | — | 106,503,977.0 | 1,570,512.9 | — | 62,235,375.2 | 1,570,512.9 | — | 62,235,375.2 |
| 19 | 30-Sep-22 | 2022 | 2,687,633.4 | — | 103,816,343.7 | 1,570,512.9 | — | 60,664,862.3 | 1,570,512.9 | — | 60,664,862.3 |
| 20 | 31-Dec-22 | 2022 | 2,687,633.4 | — | 101,128,710.3 | 1,570,512.9 | — | 59,094,349.4 | 1,570,512.9 | — | 59,094,349.4 |
| 21 | 31-Mar-23 | 2023 | 2,687,633.4 | — | 98,441,077.0 | 1,570,512.9 | — | 57,523,836.5 | 1,570,512.9 | — | 57,523,836.5 |
| 22 | 30-Jun-23 | 2023 | 2,687,633.4 | — | 95,753,443.6 | 1,570,512.9 | — | 55,953,323.6 | 1,570,512.9 | — | 55,953,323.6 |
| 23 | 30-Sep-23 | 2023 | 2,687,633.4 | — | 93,065,810.3 | 1,570,512.9 | — | 54,382,810.7 | 1,570,512.9 | — | 54,382,810.7 |
| 24 | 15-Oct-23 | 2023 | — | 93,065,810.3 | — | — | 54,382,810.7 | — | — | 54,382,810.7 | — |

57

**5**    **SDRL $1,450 MM West Tellus Facility Total**

| # Repayments | Date | Year | West Tellus Commercial Facility | | | Total For West Tellus Total | | |
|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 45,111,114.9 | | | 322,222,229.0 |
| 1 | 31-Mar-18 | 2018 | | | 45,111,114.9 | | | 322,222,229.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 3 | 30-Sep-18 | 2018 | | — | 45,111,114.9 | | — | 322,222,229.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 5 | 31-Mar-19 | 2019 | | — | 45,111,114.9 | | — | 322,222,229.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 7 | 30-Sep-19 | 2019 | | — | 45,111,114.9 | | — | 322,222,229.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 45,111,114.9 | — | — | 322,222,229.0 |
| 9 | 31-Mar-20 | 2020 | | — | 45,111,114.9 | | — | 322,222,229.0 |
| 10 | 30-Jun-20 | 2020 | 203,871.8 | — | 44,907,243.1 | 1,456,226.81 | — | 320,766,002.2 |
| 11 | 30-Sep-20 | 2020 | 806,797.0 | — | 44,100,446.1 | 5,762,835.40 | — | 315,003,166.8 |
| 12 | 31-Dec-20 | 2020 | 806,797.0 | — | 43,293,649.1 | 5,762,835.40 | — | 309,240,331.4 |
| 13 | 31-Mar-21 | 2021 | 948,851.6 | — | 42,344,797.5 | 6,777,510.71 | — | 302,462,820.7 |
| 14 | 30-Jun-21 | 2021 | 948,851.6 | — | 41,395,946.0 | 6,777,510.71 | — | 295,685,310.0 |
| 15 | 30-Sep-21 | 2021 | 948,851.6 | — | 40,447,094.4 | 6,777,510.71 | — | 288,907,799.3 |
| 16 | 31-Dec-21 | 2021 | 948,851.6 | — | 39,498,242.8 | 6,777,510.71 | — | 282,130,288.5 |
| 17 | 31-Mar-22 | 2022 | 948,851.6 | — | 38,549,391.3 | 6,777,510.71 | — | 275,352,777.8 |
| 18 | 30-Jun-22 | 2022 | 948,851.6 | — | 37,600,539.7 | 6,777,510.71 | — | 268,575,267.1 |
| 19 | 30-Sep-22 | 2022 | 948,851.6 | — | 36,651,688.2 | 6,777,510.71 | — | 261,797,756.4 |
| 20 | 31-Dec-22 | 2022 | 948,851.6 | — | 35,702,836.6 | 6,777,510.71 | — | 255,020,245.7 |
| 21 | 31-Mar-23 | 2023 | 948,851.6 | — | 34,753,985.1 | 6,777,510.71 | — | 248,242,735.0 |
| 22 | 30-Jun-23 | 2023 | 948,851.6 | — | 33,805,133.5 | 6,777,510.71 | — | 241,465,224.3 |
| 23 | 30-Sep-23 | 2023 | 948,851.6 | — | 32,856,281.9 | 6,777,510.71 | — | 234,687,713.6 |
| 24 | 15-Oct-23 | 2023 | — | 32,856,281.9 | — | — | 234,687,713.6 | — |

**6    AOD $360 MM Facility Total**

**New Maturity** 25-Oct-23

| # Repayments | Date | Year | AOD I | | | AOD II | | | AOD III | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 69,000,000.0 | | | 69,000,000.0 | | | 72,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 69,000,000.0 | | | 69,000,000.0 | | | 72,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 69,000,000.0 | — | — | 69,000,000.0 | — | — | 72,000,000.0 |
| 9 | 31-Mar-20 | 2020 | 1,504,844.0 | — | 67,495,156.0 | 1,504,844.0 | — | 67,495,156.0 | 1,570,272.0 | — | 70,429,728.0 |
| 10 | 30-Jun-20 | 2020 | 1,504,844.0 | — | 65,990,312.1 | 1,504,844.0 | — | 65,990,312.1 | 1,570,272.0 | — | 68,859,456.1 |
| 11 | 30-Sep-20 | 2020 | 1,504,844.0 | — | 64,485,468.1 | 1,504,844.0 | — | 64,485,468.1 | 1,570,272.0 | — | 67,289,184.1 |
| 12 | 31-Dec-20 | 2020 | 1,504,844.0 | — | 62,980,624.2 | 1,504,844.0 | — | 62,980,624.2 | 1,570,272.0 | — | 65,718,912.2 |
| 13 | 31-Mar-21 | 2021 | 1,769,805.2 | — | 61,210,819.0 | 1,769,805.2 | — | 61,210,819.0 | 1,846,753.2 | — | 63,872,158.9 |
| 14 | 30-Jun-21 | 2021 | 1,769,805.2 | — | 59,441,013.8 | 1,769,805.2 | — | 59,441,013.8 | 1,846,753.2 | — | 62,025,405.7 |
| 15 | 30-Sep-21 | 2021 | 1,769,805.2 | — | 57,671,208.6 | 1,769,805.2 | — | 57,671,208.6 | 1,846,753.2 | — | 60,178,652.4 |
| 16 | 31-Dec-21 | 2021 | 1,769,805.2 | — | 55,901,403.4 | 1,769,805.2 | — | 55,901,403.4 | 1,846,753.2 | — | 58,331,899.2 |
| 17 | 31-Mar-22 | 2022 | 1,769,805.2 | — | 54,131,598.2 | 1,769,805.2 | — | 54,131,598.2 | 1,846,753.2 | — | 56,485,145.9 |
| 18 | 30-Jun-22 | 2022 | 1,769,805.2 | — | 52,361,793.0 | 1,769,805.2 | — | 52,361,793.0 | 1,846,753.2 | — | 54,638,392.7 |
| 19 | 30-Sep-22 | 2022 | 1,769,805.2 | — | 50,591,987.8 | 1,769,805.2 | — | 50,591,987.8 | 1,846,753.2 | — | 52,791,639.5 |
| 20 | 31-Dec-22 | 2022 | 1,769,805.2 | — | 48,822,182.6 | 1,769,805.2 | — | 48,822,182.6 | 1,846,753.2 | — | 50,944,886.2 |
| 21 | 31-Mar-23 | 2023 | 1,769,805.2 | — | 47,052,377.4 | 1,769,805.2 | — | 47,052,377.4 | 1,846,753.2 | — | 49,098,133.0 |
| 22 | 30-Jun-23 | 2023 | 1,769,805.2 | — | 45,282,572.2 | 1,769,805.2 | — | 45,282,572.2 | 1,846,753.2 | — | 47,251,379.7 |
| 23 | 30-Sep-23 | 2023 | 1,769,805.2 | — | 43,512,767.0 | 1,769,805.2 | — | 43,512,767.0 | 1,846,753.2 | — | 45,404,626.5 |
| 24 | 25-Oct-23 | 2023 | — | 43,512,767.0 | — | — | 43,512,767.0 | — | — | 45,404,626.5 | — |

**6      AOD $360 MM Facility Total**

| # Repayments | Date | Year | Total | | |
| --- | --- | --- | --- | --- | --- |
| | | | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 210,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 210,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 210,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 210,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 210,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 210,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 210,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 210,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 210,000,000.0 |
| 9 | 31-Mar-20 | 2020 | 4,579,959.87 | — | 205,420,040.1 |
| 10 | 30-Jun-20 | 2020 | 4,579,959.87 | — | 200,840,080.3 |
| 11 | 30-Sep-20 | 2020 | 4,579,959.87 | — | 196,260,120.4 |
| 12 | 31-Dec-20 | 2020 | 4,579,959.87 | — | 191,680,160.5 |
| 13 | 31-Mar-21 | 2021 | 5,386,363.64 | — | 186,293,796.9 |
| 14 | 30-Jun-21 | 2021 | 5,386,363.64 | — | 180,907,433.3 |
| 15 | 30-Sep-21 | 2021 | 5,386,363.64 | — | 175,521,069.6 |
| 16 | 31-Dec-21 | 2021 | 5,386,363.64 | — | 170,134,706.0 |
| 17 | 31-Mar-22 | 2022 | 5,386,363.64 | — | 164,748,342.3 |
| 18 | 30-Jun-22 | 2022 | 5,386,363.64 | — | 159,361,978.7 |
| 19 | 30-Sep-22 | 2022 | 5,386,363.64 | — | 153,975,615.1 |
| 20 | 31-Dec-22 | 2022 | 5,386,363.64 | — | 148,589,251.4 |
| 21 | 31-Mar-23 | 2023 | 5,386,363.64 | — | 143,202,887.8 |
| 22 | 30-Jun-23 | 2023 | 5,386,363.64 | — | 137,816,524.2 |
| 23 | 30-Sep-23 | 2023 | 5,386,363.64 | — | 132,430,160.5 |
| 24 | 25-Oct-23 | 2023 | — | 132,430,160.5 | — |

**7**   **SDRL $300 MM Facility Total**

**New Maturity** 29-Jan-24

| # Repayments | Date | Year | Eksportkredit GIEK Facility - West Tucana Sub Tranche | | | Eksportkredit Commercial Facility - West Tucana Sub Tranche | | | DNB Liv GIEK Facility - West Tucana Sub Tranche | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 18,000,000.0 | | | 27,000,000.0 | | | 27,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 18,000,000.0 | | | 27,000,000.0 | | | 27,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 10 | 30-Jun-20 | 2020 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 |
| 11 | 30-Sep-20 | 2020 | 372,934.6 | — | 17,627,065.4 | 559,401.9 | — | 26,440,598.1 | 559,401.9 | — | 26,440,598.1 |
| 12 | 31-Dec-20 | 2020 | 374,311.5 | — | 17,252,753.9 | 561,467.3 | — | 25,879,130.9 | 561,467.3 | — | 25,879,130.9 |
| 13 | 31-Mar-21 | 2021 | 440,217.4 | — | 16,812,536.5 | 660,326.1 | — | 25,218,804.8 | 660,326.1 | — | 25,218,804.8 |
| 14 | 30-Jun-21 | 2021 | 440,217.4 | — | 16,372,319.1 | 660,326.1 | — | 24,558,478.7 | 660,326.1 | — | 24,558,478.7 |
| 15 | 30-Sep-21 | 2021 | 440,217.4 | — | 15,932,101.7 | 660,326.1 | — | 23,898,152.6 | 660,326.1 | — | 23,898,152.6 |
| 16 | 31-Dec-21 | 2021 | 440,217.4 | — | 15,491,884.3 | 660,326.1 | — | 23,237,826.5 | 660,326.1 | — | 23,237,826.5 |
| 17 | 31-Mar-22 | 2022 | 440,217.4 | — | 15,051,666.9 | 660,326.1 | — | 22,577,500.4 | 660,326.1 | — | 22,577,500.4 |
| 18 | 30-Jun-22 | 2022 | 440,217.4 | — | 14,611,449.6 | 660,326.1 | — | 21,917,174.3 | 660,326.1 | — | 21,917,174.3 |
| 19 | 30-Sep-22 | 2022 | 440,217.4 | — | 14,171,232.2 | 660,326.1 | — | 21,256,848.2 | 660,326.1 | — | 21,256,848.2 |
| 20 | 31-Dec-22 | 2022 | 440,217.4 | — | 13,731,014.8 | 660,326.1 | — | 20,596,522.2 | 660,326.1 | — | 20,596,522.2 |
| 21 | 31-Mar-23 | 2023 | 440,217.4 | — | 13,290,797.4 | 660,326.1 | — | 19,936,196.1 | 660,326.1 | — | 19,936,196.1 |
| 22 | 30-Jun-23 | 2023 | 440,217.4 | — | 12,850,580.0 | 660,326.1 | — | 19,275,870.0 | 660,326.1 | — | 19,275,870.0 |
| 23 | 30-Sep-23 | 2023 | 440,217.4 | — | 12,410,362.6 | 660,326.1 | — | 18,615,543.9 | 660,326.1 | — | 18,615,543.9 |
| 24 | 31-Dec-23 | 2023 | 440,217.4 | — | 11,970,145.2 | 660,326.1 | — | 17,955,217.8 | 660,326.1 | — | 17,955,217.8 |
| 25 | 29-Jan-24 | 2024 | — | 11,970,145.2 | — | — | 17,955,217.8 | — | — | 17,955,217.8 | — |

61

**7    SDRL $300 MM Facility Total**

| # Repayments | Date | Year | Eksportkredit GIEK Facility - West Castor Sub Tranche | | | Eksportkredit Commercial Facility - West Castor Sub Tranche | | | DNB Liv GIEK Facility - West Castor Sub Tranche | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 18,000,000.0 | | | 27,000,000.0 | | | 27,000,000.0 | | | 144,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 18,000,000.0 | | | 27,000,000.0 | | | 27,000,000.0 | | | 144,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 10 | 30-Jun-20 | 2020 | — | — | 18,000,000.0 | — | — | 27,000,000.0 | — | — | 27,000,000.0 | — | — | 144,000,000.0 |
| 11 | 30-Sep-20 | 2020 | 372,934.6 | — | 17,627,065.4 | 559,401.9 | — | 26,440,598.1 | 559,401.9 | — | 26,440,598.1 | 2,983,476.59 | — | 141,016,523.4 |
| 12 | 31-Dec-20 | 2020 | 374,311.5 | — | 17,252,753.9 | 561,467.3 | — | 25,879,130.9 | 561,467.3 | — | 25,879,130.9 | 2,994,492.20 | — | 138,022,031.2 |
| 13 | 31-Mar-21 | 2021 | 440,217.4 | — | 16,812,536.5 | 660,326.1 | — | 25,218,804.8 | 660,326.1 | — | 25,218,804.8 | 3,521,739.13 | — | 134,500,292.1 |
| 14 | 30-Jun-21 | 2021 | 440,217.4 | — | 16,372,319.1 | 660,326.1 | — | 24,558,478.7 | 660,326.1 | — | 24,558,478.7 | 3,521,739.13 | — | 130,978,553.0 |
| 15 | 30-Sep-21 | 2021 | 440,217.4 | — | 15,932,101.7 | 660,326.1 | — | 23,898,152.6 | 660,326.1 | — | 23,898,152.6 | 3,521,739.13 | — | 127,456,813.8 |
| 16 | 31-Dec-21 | 2021 | 440,217.4 | — | 15,491,884.3 | 660,326.1 | — | 23,237,826.5 | 660,326.1 | — | 23,237,826.5 | 3,521,739.13 | — | 123,935,074.7 |
| 17 | 31-Mar-22 | 2022 | 440,217.4 | — | 15,051,666.9 | 660,326.1 | — | 22,577,500.4 | 660,326.1 | — | 22,577,500.4 | 3,521,739.13 | — | 120,413,335.6 |
| 18 | 30-Jun-22 | 2022 | 440,217.4 | — | 14,611,449.6 | 660,326.1 | — | 21,917,174.3 | 660,326.1 | — | 21,917,174.3 | 3,521,739.13 | — | 116,891,596.4 |
| 19 | 30-Sep-22 | 2022 | 440,217.4 | — | 14,171,232.2 | 660,326.1 | — | 21,256,848.2 | 660,326.1 | — | 21,256,848.2 | 3,521,739.13 | — | 113,369,857.3 |
| 20 | 31-Dec-22 | 2022 | 440,217.4 | — | 13,731,014.8 | 660,326.1 | — | 20,596,522.2 | 660,326.1 | — | 20,596,522.2 | 3,521,739.13 | — | 109,848,118.2 |
| 21 | 31-Mar-23 | 2023 | 440,217.4 | — | 13,290,797.4 | 660,326.1 | — | 19,936,196.1 | 660,326.1 | — | 19,936,196.1 | 3,521,739.13 | — | 106,326,379.0 |
| 22 | 30-Jun-23 | 2023 | 440,217.4 | — | 12,850,580.0 | 660,326.1 | — | 19,275,870.0 | 660,326.1 | — | 19,275,870.0 | 3,521,739.13 | — | 102,804,639.9 |
| 23 | 30-Sep-23 | 2023 | 440,217.4 | — | 12,410,362.6 | 660,326.1 | — | 18,615,543.9 | 660,326.1 | — | 18,615,543.9 | 3,521,739.13 | — | 99,282,900.8 |
| 24 | 31-Dec-23 | 2023 | 440,217.4 | — | 11,970,145.2 | 660,326.1 | — | 17,955,217.8 | 660,326.1 | — | 17,955,217.8 | 3,521,739.13 | — | 95,761,161.6 |
| 25 | 29-Jan-24 | 2024 | — | 11,970,145.2 | — | — | 17,955,217.8 | — | — | 17,955,217.8 | — | 95,761,161.6 | — |

**8    Sevan $1,750 MM Facility Total**

**New Maturity** 26-Feb-24

| # Repayments | Date | Year | Tranche A1 | | | Tranche A2 (Commercial) | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 118,749,999.9 | | | 756,250,000.1 | | | 875,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 118,749,999.9 | | | 756,250,000.1 | | | 875,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 5 | 31-Mar-19 | 2019 | | — | 118,749,999.9 | | — | 756,250,000.1 | | — | 875,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 118,749,999.9 | — | — | 756,250,000.1 | — | — | 875,000,000.0 |
| 9 | 31-Mar-20 | 2020 | 2,395,285.68 | — | 116,354,714.2 | 15,072,585.49 | — | 741,177,414.6 | 17,467,871.2 | — | 857,532,128.8 |
| 10 | 30-Jun-20 | 2020 | 2,395,285.68 | — | 113,959,428.5 | 15,072,585.49 | — | 726,104,829.1 | 17,467,871.2 | — | 840,064,257.6 |
| 11 | 30-Sep-20 | 2020 | 2,395,285.68 | — | 111,564,142.9 | 15,072,585.49 | — | 711,032,243.6 | 17,467,871.2 | — | 822,596,386.4 |
| 12 | 31-Dec-20 | 2020 | 2,395,285.68 | — | 109,168,857.2 | 15,072,585.49 | — | 695,959,658.1 | 17,467,871.2 | — | 805,128,515.2 |
| 13 | 31-Mar-21 | 2021 | 2,817,028.99 | — | 106,351,828.2 | 17,726,449.30 | — | 678,233,208.8 | 20,543,478.3 | — | 784,585,037.0 |
| 14 | 30-Jun-21 | 2021 | 2,817,028.99 | — | 103,534,799.2 | 17,726,449.30 | — | 660,506,759.5 | 20,543,478.3 | — | 764,041,558.7 |
| 15 | 30-Sep-21 | 2021 | 2,817,028.99 | — | 100,717,770.2 | 17,726,449.30 | — | 642,780,310.2 | 20,543,478.3 | — | 743,498,080.4 |
| 16 | 31-Dec-21 | 2021 | 2,817,028.99 | — | 97,900,741.2 | 17,726,449.30 | — | 625,053,860.9 | 20,543,478.3 | — | 722,954,602.1 |
| 17 | 31-Mar-22 | 2022 | 2,817,028.99 | — | 95,083,712.2 | 17,726,449.30 | — | 607,327,411.6 | 20,543,478.3 | — | 702,411,123.8 |
| 18 | 30-Jun-22 | 2022 | 2,817,028.99 | — | 92,266,683.3 | 17,726,449.30 | — | 589,600,962.3 | 20,543,478.3 | — | 681,867,645.5 |
| 19 | 30-Sep-22 | 2022 | 2,817,028.99 | — | 89,449,654.3 | 17,726,449.30 | — | 571,874,512.9 | 20,543,478.3 | — | 661,324,167.2 |
| 20 | 31-Dec-22 | 2022 | 2,817,028.99 | — | 86,632,625.3 | 17,726,449.30 | — | 554,148,063.6 | 20,543,478.3 | — | 640,780,688.9 |
| 21 | 31-Mar-23 | 2023 | 2,817,028.99 | — | 83,815,596.3 | 17,726,449.30 | — | 536,421,614.3 | 20,543,478.3 | — | 620,237,210.6 |
| 22 | 30-Jun-23 | 2023 | 2,817,028.99 | — | 80,998,567.3 | 17,726,449.30 | — | 518,695,165.0 | 20,543,478.3 | — | 599,693,732.4 |
| 23 | 30-Sep-23 | 2023 | 2,817,028.99 | — | 78,181,538.3 | 17,726,449.30 | — | 500,968,715.7 | 20,543,478.3 | — | 579,150,254.1 |
| 24 | 31-Dec-23 | 2023 | 2,817,028.99 | — | 75,364,509.3 | 17,726,449.30 | — | 483,242,266.4 | 20,543,478.3 | — | 558,606,775.8 |
| 25 | 26-Feb-24 | 2024 | — | 75,364,509.3 | — | — | 483,242,266.4 | — | — | 558,606,775.8 | — |

63

**9**    **SDRL $1,350 MM Facility Total**

New Maturity 31-Oct-24

| # Repayments | Date | Year | Installment Amount | Balloon Amount | Balance |
|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 945,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 945,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 945,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 945,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 945,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 945,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 945,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 945,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 945,000,000.0 |
| 9 | 31-Mar-20 | 2020 | | | 945,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 1,834,548.94 | — | 943,165,451.1 |
| 11 | 30-Sep-20 | 2020 | 17,792,274.47 | — | 925,373,176.6 |
| 12 | 31-Dec-20 | 2020 | 17,792,274.47 | — | 907,580,902.1 |
| 13 | 31-Mar-21 | 2021 | 20,925,000.00 | — | 886,655,902.1 |
| 14 | 30-Jun-21 | 2021 | 20,925,000.00 | — | 865,730,902.1 |
| 15 | 30-Sep-21 | 2021 | 20,925,000.00 | — | 844,805,902.1 |
| 16 | 31-Dec-21 | 2021 | 20,925,000.00 | — | 823,880,902.1 |
| 17 | 31-Mar-22 | 2022 | 20,925,000.00 | — | 802,955,902.1 |
| 18 | 30-Jun-22 | 2022 | 20,925,000.00 | — | 782,030,902.1 |
| 19 | 30-Sep-22 | 2022 | 20,925,000.00 | — | 761,105,902.1 |
| 20 | 31-Dec-22 | 2022 | 20,925,000.00 | — | 740,180,902.1 |
| 21 | 31-Mar-23 | 2023 | 20,925,000.00 | — | 719,255,902.1 |
| 22 | 30-Jun-23 | 2023 | 20,925,000.00 | — | 698,330,902.1 |
| 23 | 30-Sep-23 | 2023 | 20,925,000.00 | — | 677,405,902.1 |
| 24 | 31-Dec-23 | 2023 | 20,925,000.00 | — | 656,480,902.1 |
| 25 | 31-Mar-24 | 2024 | 20,925,000.00 | — | 635,555,902.1 |
| 26 | 30-Jun-24 | 2024 | 20,925,000.00 | — | 614,630,902.1 |
| 27 | 30-Sep-24 | 2024 | 20,925,000.00 | — | 593,705,902.1 |
| 28 | 31-Oct-24 | 2024 | — | 593,705,902.1 | — |

10      **SDRL $1,500 MM Facility Total**

**New Maturity** 20-Oct-24

| | | | West Jupiter Tranche | | | | | | | |
| | | | Commercial Facility | | | GIEK | | | Kexim Facility | | |
| # Repayments | Repayment Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 75,000,000.0 | | | 100,000,000.0 | | 55,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 75,000,000.0 | | | 100,000,000.0 | | 55,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 298,938.8 | — | 74,701,061.2 | 398,585.1 | — | 99,601,414.9 | 219,221.8 | — | 54,780,778.2 |
| 11 | 30-Sep-20 | 2020 | 1,191,136.1 | — | 73,509,925.1 | 1,588,181.4 | — | 98,013,233.4 | 873,499.8 | — | 53,907,278.4 |
| 12 | 31-Dec-20 | 2020 | 1,191,136.1 | — | 72,318,789.1 | 1,588,181.4 | — | 96,425,052.0 | 873,499.8 | — | 53,033,778.6 |
| 13 | 31-Mar-21 | 2021 | 1,400,862.1 | — | 70,917,927.0 | 1,867,816.1 | — | 94,557,235.9 | 1,027,298.9 | — | 52,006,479.7 |
| 14 | 30-Jun-21 | 2021 | 1,400,862.1 | — | 69,517,064.9 | 1,867,816.1 | — | 92,689,419.8 | 1,027,298.9 | — | 50,979,180.9 |
| 15 | 30-Sep-21 | 2021 | 1,400,862.1 | — | 68,116,202.9 | 1,867,816.1 | — | 90,821,603.7 | 1,027,298.9 | — | 49,951,882.0 |
| 16 | 31-Dec-21 | 2021 | 1,400,862.1 | — | 66,715,340.8 | 1,867,816.1 | — | 88,953,787.6 | 1,027,298.9 | — | 48,924,583.2 |
| 17 | 31-Mar-22 | 2022 | 1,400,862.1 | — | 65,314,478.7 | 1,867,816.1 | — | 87,085,971.5 | 1,027,298.9 | — | 47,897,284.3 |
| 18 | 30-Jun-22 | 2022 | 1,400,862.1 | — | 63,913,616.6 | 1,867,816.1 | — | 85,218,155.4 | 1,027,298.9 | — | 46,869,985.5 |
| 19 | 30-Sep-22 | 2022 | 1,400,862.1 | — | 62,512,754.6 | 1,867,816.1 | — | 83,350,339.4 | 1,027,298.9 | — | 45,842,686.6 |
| 20 | 31-Dec-22 | 2022 | 1,400,862.1 | — | 61,111,892.5 | 1,867,816.1 | — | 81,482,523.3 | 1,027,298.9 | — | 44,815,387.8 |
| 21 | 31-Mar-23 | 2023 | 1,400,862.1 | — | 59,711,030.4 | 1,867,816.1 | — | 79,614,707.2 | 1,027,298.9 | — | 43,788,088.9 |
| 22 | 30-Jun-23 | 2023 | 1,400,862.1 | — | 58,310,168.4 | 1,867,816.1 | — | 77,746,891.1 | 1,027,298.9 | — | 42,760,790.1 |
| 23 | 30-Sep-23 | 2023 | 1,400,862.1 | — | 56,909,306.3 | 1,867,816.1 | — | 75,879,075.0 | 1,027,298.9 | — | 41,733,491.2 |
| 24 | 31-Dec-23 | 2023 | 1,400,862.1 | — | 55,508,444.2 | 1,867,816.1 | — | 74,011,258.9 | 1,027,298.9 | — | 40,706,192.4 |
| 25 | 31-Mar-24 | 2024 | 1,400,862.1 | — | 54,107,582.2 | 1,867,816.1 | — | 72,143,442.8 | 1,027,298.9 | — | 39,678,893.5 |
| 26 | 30-Jun-24 | 2024 | 1,400,862.1 | — | 52,706,720.1 | 1,867,816.1 | — | 70,275,626.7 | 1,027,298.9 | — | 38,651,594.7 |
| 27 | 30-Sep-24 | 2024 | 1,400,862.1 | — | 51,305,858.0 | 1,867,816.1 | — | 68,407,810.6 | 1,027,298.9 | — | 37,624,295.8 |
| 28 | 20-Oct-24 | 2024 | — | 51,305,858.0 | — | — | 68,407,810.6 | — | — | 37,624,295.8 | — |

**10    SDRL $1,500 MM Facility Total**

| # Repayments | Repayment Date | Year | West Jupiter Tranche | | | | Total For West Jupiter Tranche | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Kexim Guarantee Facility | | K-Sure Facility | | Total | |
| | | | Installment Amount | Balance | Installment Amount | Balance | Installment Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | 45,000,000.0 | | 100,000,000.0 | | 375,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | 45,000,000.0 | | 100,000,000.0 | | 375,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | 45,000,000.0 | — | 100,000,000.0 | — | 375,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 179,363.3 | 44,820,636.7 | 398,585.1 | 99,601,414.9 | 1,494,694.1 | 373,505,305.8 |
| 11 | 30-Sep-20 | 2020 | 714,681.6 | 44,105,955.1 | 1,588,181.4 | 98,013,233.4 | 5,955,680.4 | 367,549,625.4 |
| 12 | 31-Dec-20 | 2020 | 714,681.6 | 43,391,273.4 | 1,588,181.4 | 96,425,052.0 | 5,955,680.4 | 361,593,945.1 |
| 13 | 31-Mar-21 | 2021 | 840,517.2 | 42,550,756.2 | 1,867,816.1 | 94,557,235.9 | 7,004,310.3 | 354,589,634.7 |
| 14 | 30-Jun-21 | 2021 | 840,517.2 | 41,710,238.9 | 1,867,816.1 | 92,689,419.8 | 7,004,310.3 | 347,585,324.4 |
| 15 | 30-Sep-21 | 2021 | 840,517.2 | 40,869,721.7 | 1,867,816.1 | 90,821,603.7 | 7,004,310.3 | 340,581,014.0 |
| 16 | 31-Dec-21 | 2021 | 840,517.2 | 40,029,204.4 | 1,867,816.1 | 88,953,787.6 | 7,004,310.3 | 333,576,703.7 |
| 17 | 31-Mar-22 | 2022 | 840,517.2 | 39,188,687.2 | 1,867,816.1 | 87,085,971.5 | 7,004,310.3 | 326,572,393.3 |
| 18 | 30-Jun-22 | 2022 | 840,517.2 | 38,348,170.0 | 1,867,816.1 | 85,218,155.4 | 7,004,310.3 | 319,568,083.0 |
| 19 | 30-Sep-22 | 2022 | 840,517.2 | 37,507,652.7 | 1,867,816.1 | 83,350,339.4 | 7,004,310.3 | 312,563,772.6 |
| 20 | 31-Dec-22 | 2022 | 840,517.2 | 36,667,135.5 | 1,867,816.1 | 81,482,523.3 | 7,004,310.3 | 305,559,462.3 |
| 21 | 31-Mar-23 | 2023 | 840,517.2 | 35,826,618.2 | 1,867,816.1 | 79,614,707.2 | 7,004,310.3 | 298,555,152.0 |
| 22 | 30-Jun-23 | 2023 | 840,517.2 | 34,986,101.0 | 1,867,816.1 | 77,746,891.1 | 7,004,310.3 | 291,550,841.6 |
| 23 | 30-Sep-23 | 2023 | 840,517.2 | 34,145,583.8 | 1,867,816.1 | 75,879,075.0 | 7,004,310.3 | 284,546,531.3 |
| 24 | 31-Dec-23 | 2023 | 840,517.2 | 33,305,066.5 | 1,867,816.1 | 74,011,258.9 | 7,004,310.3 | 277,542,220.9 |
| 25 | 31-Mar-24 | 2024 | 840,517.2 | 32,464,549.3 | 1,867,816.1 | 72,143,442.8 | 7,004,310.3 | 270,537,910.6 |
| 26 | 30-Jun-24 | 2024 | 840,517.2 | 31,624,032.0 | 1,867,816.1 | 70,275,626.7 | 7,004,310.3 | 263,533,600.2 |
| 27 | 30-Sep-24 | 2024 | 840,517.2 | 30,783,514.8 | 1,867,816.1 | 68,407,810.6 | 7,004,310.3 | 256,529,289.9 |
| 28 | 20-Oct-24 | 2024 | 30,783,514.8 | — | 68,407,810.6 | — | 256,529,289.9 | — |

**10   SDRL $1,500 MM Facility Total**

| | | | West Neptune Tranche | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Commercial Facility | | | GIEK | | | Kexim Facility | | |
| # Repayments | Repayment Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 298,938.8 | — | 74,701,061.2 | 398,585.1 | — | 99,601,414.9 | 219,221.8 | — | 54,780,778.2 |
| 11 | 30-Sep-20 | 2020 | 1,191,136.1 | — | 73,509,925.1 | 1,588,181.4 | — | 98,013,233.4 | 873,499.8 | — | 53,907,278.4 |
| 12 | 31-Dec-20 | 2020 | 1,191,136.1 | — | 72,318,789.1 | 1,588,181.4 | — | 96,425,052.0 | 873,499.8 | — | 53,033,778.6 |
| 13 | 31-Mar-21 | 2021 | 1,400,862.1 | — | 70,917,927.0 | 1,867,816.1 | — | 94,557,235.9 | 1,027,298.9 | — | 52,006,479.7 |
| 14 | 30-Jun-21 | 2021 | 1,400,862.1 | — | 69,517,064.9 | 1,867,816.1 | — | 92,689,419.8 | 1,027,298.9 | — | 50,979,180.9 |
| 15 | 30-Sep-21 | 2021 | 1,400,862.1 | — | 68,116,202.9 | 1,867,816.1 | — | 90,821,603.7 | 1,027,298.9 | — | 49,951,882.0 |
| 16 | 31-Dec-21 | 2021 | 1,400,862.1 | — | 66,715,340.8 | 1,867,816.1 | — | 88,953,787.6 | 1,027,298.9 | — | 48,924,583.2 |
| 17 | 31-Mar-22 | 2022 | 1,400,862.1 | — | 65,314,478.7 | 1,867,816.1 | — | 87,085,971.5 | 1,027,298.9 | — | 47,897,284.3 |
| 18 | 30-Jun-22 | 2022 | 1,400,862.1 | — | 63,913,616.6 | 1,867,816.1 | — | 85,218,155.4 | 1,027,298.9 | — | 46,869,985.5 |
| 19 | 30-Sep-22 | 2022 | 1,400,862.1 | — | 62,512,754.6 | 1,867,816.1 | — | 83,350,339.4 | 1,027,298.9 | — | 45,842,686.6 |
| 20 | 31-Dec-22 | 2022 | 1,400,862.1 | — | 61,111,892.5 | 1,867,816.1 | — | 81,482,523.3 | 1,027,298.9 | — | 44,815,387.8 |
| 21 | 31-Mar-23 | 2023 | 1,400,862.1 | — | 59,711,030.4 | 1,867,816.1 | — | 79,614,707.2 | 1,027,298.9 | — | 43,788,088.9 |
| 22 | 30-Jun-23 | 2023 | 1,400,862.1 | — | 58,310,168.4 | 1,867,816.1 | — | 77,746,891.1 | 1,027,298.9 | — | 42,760,790.1 |
| 23 | 30-Sep-23 | 2023 | 1,400,862.1 | — | 56,909,306.3 | 1,867,816.1 | — | 75,879,075.0 | 1,027,298.9 | — | 41,733,491.2 |
| 24 | 31-Dec-23 | 2023 | 1,400,862.1 | — | 55,508,444.2 | 1,867,816.1 | — | 74,011,258.9 | 1,027,298.9 | — | 40,706,192.4 |
| 25 | 31-Mar-24 | 2024 | 1,400,862.1 | — | 54,107,582.2 | 1,867,816.1 | — | 72,143,442.8 | 1,027,298.9 | — | 39,678,893.5 |
| 26 | 30-Jun-24 | 2024 | 1,400,862.1 | — | 52,706,720.1 | 1,867,816.1 | — | 70,275,626.7 | 1,027,298.9 | — | 38,651,594.7 |
| 27 | 30-Sep-24 | 2024 | 1,400,862.1 | — | 51,305,858.0 | 1,867,816.1 | — | 68,407,810.6 | 1,027,298.9 | — | 37,624,295.8 |
| 28 | 20-Oct-24 | 2024 | — | 51,305,858.0 | — | — | 68,407,810.6 | — | — | 37,624,295.8 | — |

67

**10    SDRL $1,500 MM Facility Total**

| | | | West Neptune Tranche | | | | | | Total For West Neptune Tranche | |
| | | | Kexim Guarantee Facility | | K-Sure Facility | | | | Total | |
| # Repayments | Repayment Date | Year | Installment Amount | Balance | Installment Amount | Balance | | | Installment Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | 45,000,000.0 | | 100,000,000.0 | | | | 374,999,999.9500 |
| 1 | 31-Mar-18 | 2018 | | 45,000,000.0 | | 100,000,000.0 | | | | 375,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | 45,000,000.0 | — | 100,000,000.0 | | | — | 375,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 179,363.3 | 44,820,636.7 | 398,585.1 | 99,601,414.9 | | | 1,494,694.1 | 373,505,305.8 |
| 11 | 30-Sep-20 | 2020 | 714,681.6 | 44,105,955.1 | 1,588,181.4 | 98,013,233.4 | | | 5,955,680.4 | 367,549,625.4 |
| 12 | 31-Dec-20 | 2020 | 714,681.6 | 43,391,273.4 | 1,588,181.4 | 96,425,052.0 | | | 5,955,680.4 | 361,593,945.1 |
| 13 | 31-Mar-21 | 2021 | 840,517.2 | 42,550,756.2 | 1,867,816.1 | 94,557,235.9 | | | 7,004,310.3 | 354,589,634.7 |
| 14 | 30-Jun-21 | 2021 | 840,517.2 | 41,710,238.9 | 1,867,816.1 | 92,689,419.8 | | | 7,004,310.3 | 347,585,324.4 |
| 15 | 30-Sep-21 | 2021 | 840,517.2 | 40,869,721.7 | 1,867,816.1 | 90,821,603.7 | | | 7,004,310.3 | 340,581,014.0 |
| 16 | 31-Dec-21 | 2021 | 840,517.2 | 40,029,204.4 | 1,867,816.1 | 88,953,787.6 | | | 7,004,310.3 | 333,576,703.7 |
| 17 | 31-Mar-22 | 2022 | 840,517.2 | 39,188,687.2 | 1,867,816.1 | 87,085,971.5 | | | 7,004,310.3 | 326,572,393.3 |
| 18 | 30-Jun-22 | 2022 | 840,517.2 | 38,348,170.0 | 1,867,816.1 | 85,218,155.4 | | | 7,004,310.3 | 319,568,083.0 |
| 19 | 30-Sep-22 | 2022 | 840,517.2 | 37,507,652.7 | 1,867,816.1 | 83,350,339.4 | | | 7,004,310.3 | 312,563,772.6 |
| 20 | 31-Dec-22 | 2022 | 840,517.2 | 36,667,135.5 | 1,867,816.1 | 81,482,523.3 | | | 7,004,310.3 | 305,559,462.3 |
| 21 | 31-Mar-23 | 2023 | 840,517.2 | 35,826,618.2 | 1,867,816.1 | 79,614,707.2 | | | 7,004,310.3 | 298,555,152.0 |
| 22 | 30-Jun-23 | 2023 | 840,517.2 | 34,986,101.0 | 1,867,816.1 | 77,746,891.1 | | | 7,004,310.3 | 291,550,841.6 |
| 23 | 30-Sep-23 | 2023 | 840,517.2 | 34,145,583.8 | 1,867,816.1 | 75,879,075.0 | | | 7,004,310.3 | 284,546,531.3 |
| 24 | 31-Dec-23 | 2023 | 840,517.2 | 33,305,066.5 | 1,867,816.1 | 74,011,258.9 | | | 7,004,310.3 | 277,542,220.9 |
| 25 | 31-Mar-24 | 2024 | 840,517.2 | 32,464,549.3 | 1,867,816.1 | 72,143,442.8 | | | 7,004,310.3 | 270,537,910.6 |
| 26 | 30-Jun-24 | 2024 | 840,517.2 | 31,624,032.0 | 1,867,816.1 | 70,275,626.7 | | | 7,004,310.3 | 263,533,600.2 |
| 27 | 30-Sep-24 | 2024 | 840,517.2 | 30,783,514.8 | 1,867,816.1 | 68,407,810.6 | | | 7,004,310.3 | 256,529,289.9 |
| 28 | 20-Oct-24 | 2024 | — | 30,783,514.8 | — | 68,407,810.6 | — | | 256,529,289.9 | — |

68

**10   SDRL $1,500 MM Facility Total**

| | | | West Saturn Tranche | | | | | | | | |
| | | | Commercial Facility | | | GIEK | | | Kexim Facility | | |
| # Repayments | Repayment Date | Year | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | | 75,000,000.0 | | | 100,000,000.0 | | | 55,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 9 | 31-Mar-20 | 2020 | — | — | 75,000,000.0 | — | — | 100,000,000.0 | — | — | 55,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 298,938.8 | — | 74,701,061.2 | 398,585.1 | — | 99,601,414.9 | 219,221.8 | — | 54,780,778.2 |
| 11 | 30-Sep-20 | 2020 | 1,191,136.1 | — | 73,509,925.1 | 1,588,181.4 | — | 98,013,233.4 | 873,499.8 | — | 53,907,278.4 |
| 12 | 31-Dec-20 | 2020 | 1,191,136.1 | — | 72,318,789.1 | 1,588,181.4 | — | 96,425,052.0 | 873,499.8 | — | 53,033,778.6 |
| 13 | 31-Mar-21 | 2021 | 1,400,862.1 | — | 70,917,927.0 | 1,867,816.1 | — | 94,557,235.9 | 1,027,298.9 | — | 52,006,479.7 |
| 14 | 30-Jun-21 | 2021 | 1,400,862.1 | — | 69,517,064.9 | 1,867,816.1 | — | 92,689,419.8 | 1,027,298.9 | — | 50,979,180.9 |
| 15 | 30-Sep-21 | 2021 | 1,400,862.1 | — | 68,116,202.9 | 1,867,816.1 | — | 90,821,603.7 | 1,027,298.9 | — | 49,951,882.0 |
| 16 | 31-Dec-21 | 2021 | 1,400,862.1 | — | 66,715,340.8 | 1,867,816.1 | — | 88,953,787.6 | 1,027,298.9 | — | 48,924,583.2 |
| 17 | 31-Mar-22 | 2022 | 1,400,862.1 | — | 65,314,478.7 | 1,867,816.1 | — | 87,085,971.5 | 1,027,298.9 | — | 47,897,284.3 |
| 18 | 30-Jun-22 | 2022 | 1,400,862.1 | — | 63,913,616.6 | 1,867,816.1 | — | 85,218,155.4 | 1,027,298.9 | — | 46,869,985.5 |
| 19 | 30-Sep-22 | 2022 | 1,400,862.1 | — | 62,512,754.6 | 1,867,816.1 | — | 83,350,339.4 | 1,027,298.9 | — | 45,842,686.6 |
| 20 | 31-Dec-22 | 2022 | 1,400,862.1 | — | 61,111,892.5 | 1,867,816.1 | — | 81,482,523.3 | 1,027,298.9 | — | 44,815,387.8 |
| 21 | 31-Mar-23 | 2023 | 1,400,862.1 | — | 59,711,030.4 | 1,867,816.1 | — | 79,614,707.2 | 1,027,298.9 | — | 43,788,088.9 |
| 22 | 30-Jun-23 | 2023 | 1,400,862.1 | — | 58,310,168.4 | 1,867,816.1 | — | 77,746,891.1 | 1,027,298.9 | — | 42,760,790.1 |
| 23 | 30-Sep-23 | 2023 | 1,400,862.1 | — | 56,909,306.3 | 1,867,816.1 | — | 75,879,075.0 | 1,027,298.9 | — | 41,733,491.2 |
| 24 | 31-Dec-23 | 2023 | 1,400,862.1 | — | 55,508,444.2 | 1,867,816.1 | — | 74,011,258.9 | 1,027,298.9 | — | 40,706,192.4 |
| 25 | 31-Mar-24 | 2024 | 1,400,862.1 | — | 54,107,582.2 | 1,867,816.1 | — | 72,143,442.8 | 1,027,298.9 | — | 39,678,893.5 |
| 26 | 30-Jun-24 | 2024 | 1,400,862.1 | — | 52,706,720.1 | 1,867,816.1 | — | 70,275,626.7 | 1,027,298.9 | — | 38,651,594.7 |
| 27 | 30-Sep-24 | 2024 | 1,400,862.1 | — | 51,305,858.0 | 1,867,816.1 | — | 68,407,810.6 | 1,027,298.9 | — | 37,624,295.8 |
| 28 | 20-Oct-24 | 2024 | — | 51,305,858.0 | — | — | 68,407,810.6 | — | — | 37,624,295.8 | — |

**10    SDRL $1,500 MM Facility Total**

| | | | West Saturn Tranche | | | | | | Total For West Saturn Tranche | | |
| | | | Kexim Guarantee Facility | | K-Sure Facility | | | | Total | | |
| # Repayments | Repayment Date | Year | Installment Amount | Balance | Installment Amount | | Balance | | Installment Amount | | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | 45,000,000.0 | | | 100,000,000.0 | | | | 375,000,000.0 |
| 1 | 31-Mar-18 | 2018 | | 45,000,000.0 | | | 100,000,000.0 | | | | 375,000,000.0 |
| 2 | 30-Jun-18 | 2018 | — | 45,000,000.0 | — | | — | | — | | 375,000,000.0 |
| 3 | 30-Sep-18 | 2018 | | 45,000,000.0 | | | 100,000,000.0 | | | | 375,000,000.0 |
| 4 | 31-Dec-18 | 2018 | — | 45,000,000.0 | — | | — | | — | | 375,000,000.0 |
| 5 | 31-Mar-19 | 2019 | | 45,000,000.0 | | | 100,000,000.0 | | | | 375,000,000.0 |
| 6 | 30-Jun-19 | 2019 | — | 45,000,000.0 | — | | — | | — | | 375,000,000.0 |
| 7 | 30-Sep-19 | 2019 | | 45,000,000.0 | | | 100,000,000.0 | | | | 375,000,000.0 |
| 8 | 31-Dec-19 | 2019 | — | 45,000,000.0 | — | | — | | — | | 375,000,000.0 |
| 9 | 31-Mar-20 | 2020 | | 45,000,000.0 | | | 100,000,000.0 | | | | 375,000,000.0 |
| 10 | 30-Jun-20 | 2020 | 179,363.3 | 44,820,636.7 | 398,585.1 | | 99,601,414.9 | | 1,494,694.1 | | 373,505,305.8 |
| 11 | 30-Sep-20 | 2020 | 714,681.6 | 44,105,955.1 | 1,588,181.4 | | 98,013,233.4 | | 5,955,680.4 | | 367,549,625.4 |
| 12 | 31-Dec-20 | 2020 | 714,681.6 | 43,391,273.4 | 1,588,181.4 | | 96,425,052.0 | | 5,955,680.4 | | 361,593,945.1 |
| 13 | 31-Mar-21 | 2021 | 840,517.2 | 42,550,756.2 | 1,867,816.1 | | 94,557,235.9 | | 7,004,310.3 | | 354,589,634.7 |
| 14 | 30-Jun-21 | 2021 | 840,517.2 | 41,710,238.9 | 1,867,816.1 | | 92,689,419.8 | | 7,004,310.3 | | 347,585,324.4 |
| 15 | 30-Sep-21 | 2021 | 840,517.2 | 40,869,721.7 | 1,867,816.1 | | 90,821,603.7 | | 7,004,310.3 | | 340,581,014.0 |
| 16 | 31-Dec-21 | 2021 | 840,517.2 | 40,029,204.4 | 1,867,816.1 | | 88,953,787.6 | | 7,004,310.3 | | 333,576,703.7 |
| 17 | 31-Mar-22 | 2022 | 840,517.2 | 39,188,687.2 | 1,867,816.1 | | 87,085,971.5 | | 7,004,310.3 | | 326,572,393.3 |
| 18 | 30-Jun-22 | 2022 | 840,517.2 | 38,348,170.0 | 1,867,816.1 | | 85,218,155.4 | | 7,004,310.3 | | 319,568,083.0 |
| 19 | 30-Sep-22 | 2022 | 840,517.2 | 37,507,652.7 | 1,867,816.1 | | 83,350,339.4 | | 7,004,310.3 | | 312,563,772.6 |
| 20 | 31-Dec-22 | 2022 | 840,517.2 | 36,667,135.5 | 1,867,816.1 | | 81,482,523.3 | | 7,004,310.3 | | 305,559,462.3 |
| 21 | 31-Mar-23 | 2023 | 840,517.2 | 35,826,618.2 | 1,867,816.1 | | 79,614,707.2 | | 7,004,310.3 | | 298,555,152.0 |
| 22 | 30-Jun-23 | 2023 | 840,517.2 | 34,986,101.0 | 1,867,816.1 | | 77,746,891.1 | | 7,004,310.3 | | 291,550,841.6 |
| 23 | 30-Sep-23 | 2023 | 840,517.2 | 34,145,583.8 | 1,867,816.1 | | 75,879,075.0 | | 7,004,310.3 | | 284,546,531.3 |
| 24 | 31-Dec-23 | 2023 | 840,517.2 | 33,305,066.5 | 1,867,816.1 | | 74,011,258.9 | | 7,004,310.3 | | 277,542,220.9 |
| 25 | 31-Mar-24 | 2024 | 840,517.2 | 32,464,549.3 | 1,867,816.1 | | 72,143,442.8 | | 7,004,310.3 | | 270,537,910.6 |
| 26 | 30-Jun-24 | 2024 | 840,517.2 | 31,624,032.0 | 1,867,816.1 | | 70,275,626.7 | | 7,004,310.3 | | 263,533,600.2 |
| 27 | 30-Sep-24 | 2024 | 840,517.2 | 30,783,514.8 | 1,867,816.1 | | 68,407,810.6 | | 7,004,310.3 | | 256,529,289.9 |
| 28 | 20-Oct-24 | 2024 | — | 30,783,514.8 | — | | 68,407,810.6 | | — | | 256,529,289.9 |

70

**11**   **SDRL $950 MM Facility Total**

**New Maturity** 30-Nov-24

| # Repayments | Date | Year | Carina ECA Facility | | | Carina Term Loan | | | Carina RCF | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 150,416,666.4 | | | 47,500,000.0 | | | 130,639,675.0 |
| 1 | 31-Mar-18 | 2018 | | | 150,416,666.4 | | | 47,500,000.0 | | | 130,639,675.0 |
| 2 | 30-Jun-18 | 2018 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 3 | 30-Sep-18 | 2018 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 4 | 31-Dec-18 | 2018 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 5 | 31-Mar-19 | 2019 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 6 | 30-Jun-19 | 2019 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 7 | 30-Sep-19 | 2019 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 8 | 31-Dec-19 | 2019 | — | — | 150,416,666.4 | — | — | 47,500,000.0 | — | — | 130,639,675.0 |
| 9 | 31-Mar-20 | 2020 | 2,338,892.24 | — | 148,077,774.1 | 738,597.55 | — | 46,761,402.5 | 1,981,825.79 | — | 128,657,849.2 |
| 10 | 30-Jun-20 | 2020 | 2,338,892.24 | — | 145,738,881.9 | 738,597.55 | — | 46,022,804.9 | 1,981,825.79 | — | 126,676,023.4 |
| 11 | 30-Sep-20 | 2020 | 2,338,892.24 | — | 143,399,989.7 | 738,597.55 | — | 45,284,207.4 | 1,981,825.79 | — | 124,694,197.6 |
| 12 | 31-Dec-20 | 2020 | 2,338,892.24 | — | 141,061,097.4 | 738,597.55 | — | 44,545,609.8 | 1,981,825.79 | — | 122,712,371.8 |
| 13 | 31-Mar-21 | 2021 | 2,750,706.22 | — | 138,310,391.2 | 868,644.07 | — | 43,676,965.7 | 2,330,770.29 | — | 120,381,601.5 |
| 14 | 30-Jun-21 | 2021 | 2,750,706.22 | — | 135,559,685.0 | 868,644.07 | — | 42,808,321.7 | 2,330,770.29 | — | 118,050,831.3 |
| 15 | 30-Sep-21 | 2021 | 2,750,706.22 | — | 132,808,978.8 | 868,644.07 | — | 41,939,677.6 | 2,330,770.29 | — | 115,720,061.0 |
| 16 | 31-Dec-21 | 2021 | 2,750,706.22 | — | 130,058,272.5 | 868,644.07 | — | 41,071,033.5 | 2,330,770.29 | — | 113,389,290.7 |
| 17 | 31-Mar-22 | 2022 | 2,750,706.22 | — | 127,307,566.3 | 868,644.07 | — | 40,202,389.5 | 2,330,770.29 | — | 111,058,520.4 |
| 18 | 30-Jun-22 | 2022 | 2,750,706.22 | — | 124,556,860.1 | 868,644.07 | — | 39,333,745.4 | 2,330,770.29 | — | 108,727,750.1 |
| 19 | 30-Sep-22 | 2022 | 2,750,706.22 | — | 121,806,153.9 | 868,644.07 | — | 38,465,101.3 | 2,330,770.29 | — | 106,396,979.8 |
| 20 | 31-Dec-22 | 2022 | 2,750,706.22 | — | 119,055,447.7 | 868,644.07 | — | 37,596,457.3 | 2,330,770.29 | — | 104,066,209.5 |
| 21 | 31-Mar-23 | 2023 | 2,750,706.22 | — | 116,304,741.4 | 868,644.07 | — | 36,727,813.2 | 2,330,770.29 | — | 101,735,439.2 |
| 22 | 30-Jun-23 | 2023 | 2,750,706.22 | — | 113,554,035.2 | 868,644.07 | — | 35,859,169.1 | 2,330,770.29 | — | 99,404,669.0 |
| 23 | 30-Sep-23 | 2023 | 2,750,706.22 | — | 110,803,329.0 | 868,644.07 | — | 34,990,525.1 | 2,330,770.29 | — | 97,073,898.7 |
| 24 | 31-Dec-23 | 2023 | 2,750,706.22 | — | 108,052,622.8 | 868,644.07 | — | 34,121,881.0 | 2,330,770.29 | — | 94,743,128.4 |
| 25 | 31-Mar-24 | 2024 | 2,750,706.22 | — | 105,301,916.6 | 868,644.07 | — | 33,253,236.9 | 2,330,770.29 | — | 92,412,358.1 |
| 26 | 30-Jun-24 | 2024 | 2,750,706.22 | — | 102,551,210.3 | 868,644.07 | — | 32,384,592.9 | 2,330,770.29 | — | 90,081,587.8 |
| 27 | 30-Sep-24 | 2024 | 2,750,706.22 | — | 99,800,504.1 | 868,644.07 | — | 31,515,948.8 | 2,330,770.29 | — | 87,750,817.5 |
| 28 | 30-Nov-24 | 2024 | — | 99,800,504.1 | — | — | 31,515,948.8 | — | — | 87,750,817.5 | — |

**11    SDRL $950 MM Facility Total**

| # Repayments | Date | Year | Eclipse Term Loan | | | Eclipse RCF | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance | Installment Amount | Balloon Amount | Balance |
| 0 | 12-Sep-17 | 2017 | | | 112,500,000.0 | | | 125,000,000.0 | | | 566,056,341.4 |
| 1 | 31-Mar-18 | 2018 | | | 112,500,000.0 | | | 125,000,000.0 | | | 566,056,341.4 |
| 2 | 30-Jun-18 | 2018 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 3 | 30-Sep-18 | 2018 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 4 | 31-Dec-18 | 2018 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 5 | 31-Mar-19 | 2019 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 6 | 30-Jun-19 | 2019 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 7 | 30-Sep-19 | 2019 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 8 | 31-Dec-19 | 2019 | — | — | 112,500,000.0 | — | — | 125,000,000.0 | — | — | 566,056,341.4 |
| 9 | 31-Mar-20 | 2020 | 4,522,364.61 | — | 107,977,635.4 | — | — | 125,000,000.0 | 9,581,680.2 | — | 556,474,661.2 |
| 10 | 30-Jun-20 | 2020 | 4,522,364.61 | — | 103,455,270.8 | — | — | 125,000,000.0 | 9,581,680.2 | — | 546,892,981.0 |
| 11 | 30-Sep-20 | 2020 | 4,522,364.61 | — | 98,932,906.2 | — | — | 125,000,000.0 | 9,581,680.2 | — | 537,311,300.8 |
| 12 | 31-Dec-20 | 2020 | 4,522,364.61 | — | 94,410,541.6 | — | — | 125,000,000.0 | 9,581,680.2 | — | 527,729,620.6 |
| 13 | 31-Mar-21 | 2021 | 5,318,627.45 | — | 89,091,914.1 | — | — | 125,000,000.0 | 11,268,748.0 | — | 516,460,872.6 |
| 14 | 30-Jun-21 | 2021 | 5,318,627.45 | — | 83,773,286.7 | — | — | 125,000,000.0 | 11,268,748.0 | — | 505,192,124.6 |
| 15 | 30-Sep-21 | 2021 | 5,318,627.45 | — | 78,454,659.2 | — | — | 125,000,000.0 | 11,268,748.0 | — | 493,923,376.6 |
| 16 | 31-Dec-21 | 2021 | 5,318,627.45 | — | 73,136,031.8 | — | — | 125,000,000.0 | 11,268,748.0 | — | 482,654,628.5 |
| 17 | 31-Mar-22 | 2022 | 5,318,627.45 | — | 67,817,404.3 | — | — | 125,000,000.0 | 11,268,748.0 | — | 471,385,880.5 |
| 18 | 30-Jun-22 | 2022 | 5,318,627.45 | — | 62,498,776.9 | — | — | 125,000,000.0 | 11,268,748.0 | — | 460,117,132.5 |
| 19 | 30-Sep-22 | 2022 | 5,318,627.45 | — | 57,180,149.4 | — | — | 125,000,000.0 | 11,268,748.0 | — | 448,848,384.4 |
| 20 | 31-Dec-22 | 2022 | 5,318,627.45 | — | 51,861,522.0 | — | — | 125,000,000.0 | 11,268,748.0 | — | 437,579,636.4 |
| 21 | 31-Mar-23 | 2023 | 5,318,627.45 | — | 46,542,894.5 | — | — | 125,000,000.0 | 11,268,748.0 | — | 426,310,888.4 |
| 22 | 30-Jun-23 | 2023 | 5,318,627.45 | — | 41,224,267.1 | — | — | 125,000,000.0 | 11,268,748.0 | — | 415,042,140.4 |
| 23 | 30-Sep-23 | 2023 | 5,318,627.45 | — | 35,905,639.6 | — | — | 125,000,000.0 | 11,268,748.0 | — | 403,773,392.3 |
| 24 | 31-Dec-23 | 2023 | 5,318,627.45 | — | 30,587,012.2 | — | — | 125,000,000.0 | 11,268,748.0 | — | 392,504,644.3 |
| 25 | 31-Mar-24 | 2024 | 5,318,627.45 | — | 25,268,384.7 | — | — | 125,000,000.0 | 11,268,748.0 | — | 381,235,896.3 |
| 26 | 30-Jun-24 | 2024 | 5,318,627.45 | — | 19,949,757.3 | — | — | 125,000,000.0 | 11,268,748.0 | — | 369,967,148.3 |
| 27 | 30-Sep-24 | 2024 | 5,318,627.45 | — | 14,631,129.8 | — | — | 125,000,000.0 | 11,268,748.0 | — | 358,698,400.2 |
| 28 | 30-Nov-24 | 2024 | — | 14,631,129.8 | — | — | 125,000,000.0 | — | 358,698,400.2 | | |

**12    SDRL $450 MM Facility Total**

**New Maturity** 31-Dec-24

| # Repayments | Date | Year | Term Loan | | Balance |
| | | | Installment Amount | Balloon Amount | |
|---|---|---|---|---|---|
| 0 | 12-Sep-17 | 2017 | | | 102,532,294.4 |
| 1 | 31-Mar-18 | 2018 | | | 102,532,294.4 |
| 2 | 30-Jun-18 | 2018 | — | — | 102,532,294.4 |
| 3 | 30-Sep-18 | 2018 | — | — | 102,532,294.4 |
| 4 | 31-Dec-18 | 2018 | — | — | 102,532,294.4 |
| 5 | 31-Mar-19 | 2019 | — | — | 102,532,294.4 |
| 6 | 30-Jun-19 | 2019 | — | — | 102,532,294.4 |
| 7 | 30-Sep-19 | 2019 | — | — | 102,532,294.4 |
| 8 | 31-Dec-19 | 2019 | — | — | 102,532,294.4 |
| 9 | 31-Mar-20 | 2020 | — | — | 102,532,294.4 |
| 10 | 30-Sep-20 | 2020 | 2,323,306.03 | — | 100,208,988.3 |
| 11 | 30-Sep-20 | 2020 | 3,100,008.00 | — | 97,108,980.3 |
| 12 | 31-Dec-20 | 2020 | 3,100,008.00 | — | 94,008,972.3 |
| 13 | 31-Mar-21 | 2021 | 3,645,833.33 | — | 90,363,139.0 |
| 14 | 30-Jun-21 | 2021 | 3,645,833.33 | — | 86,717,305.7 |
| 15 | 30-Sep-21 | 2021 | 3,645,833.33 | — | 83,071,472.3 |
| 16 | 31-Dec-21 | 2021 | 3,645,833.33 | — | 79,425,639.0 |
| 17 | 31-Mar-22 | 2022 | 3,645,833.33 | — | 75,779,805.7 |
| 18 | 30-Jun-22 | 2022 | 3,645,833.33 | — | 72,133,972.3 |
| 19 | 30-Sep-22 | 2022 | 3,645,833.33 | — | 68,488,139.0 |
| 20 | 31-Dec-22 | 2022 | 3,645,833.33 | — | 64,842,305.7 |
| 21 | 31-Mar-23 | 2023 | 3,645,833.33 | — | 61,196,472.3 |
| 22 | 30-Jun-23 | 2023 | 3,645,833.33 | — | 57,550,639.0 |
| 23 | 30-Sep-23 | 2023 | 3,645,833.33 | — | 53,904,805.7 |
| 24 | 31-Dec-23 | 2023 | 3,645,833.33 | — | 50,258,972.3 |
| 25 | 31-Mar-24 | 2024 | 3,645,833.33 | — | 46,613,139.0 |
| 26 | 30-Jun-24 | 2024 | 3,645,833.33 | — | 42,967,305.7 |
| 27 | 30-Sep-24 | 2024 | 3,645,833.33 | — | 39,321,472.3 |

**ANNEX 3**
**COMMON TERMS AND DEFINITIONS AND REGULARISING AMENDMENTS**
**FOR SECURED FACILITY AGREEMENTS**

74

**ANNEX 3**
**COMMON TERMS AND DEFINITIONS AND REGULARISING AMENDMENTS FOR SECURED**
**FACILITY AGREEMENTS**

This Annex sets out the key principles for amendments to be made to specific Secured Facility Agreements or generally across all Secured Facility Agreements as of the Refinancing Closing Date in order to conform and/or regularise provisions or otherwise amend certain representations, covenants, events of default and related definitions. These changes are to reflect the proposed cross-collateralisation structure and accordingly limit the scope of matters which relate to a single rig, entity or Secured Facility Agreement giving rise to cross-default into other Secured Facility Agreements. As part of this, it will also be necessary to correct certain existing drafting errors across the Secured Facility Agreements.

Covenants or parts of covenants which apply across the Group will be replaced with the agreed group-wide covenants in Annex 4 to the extent they are inconsistent or relate to the same matters. Covenants which relate only to rig owning entities and intra-group charterers will not be replaced but may be regularised in the manner described in this Annex (for example, the negative pledge and the "restrictions on indebtedness" covenant).

This Annex 3 does not address those provisions and definitions which will be adjusted by virtue of the terms of the Secured Credit Facilities Term Sheet to which this Annex is attached or the intercreditor principles and cash pooling arrangements set out in Exhibit B to the RSA.

As a general rule, amendments will be made in order to conform and/or regularise provisions across the Secured Facility Agreements. This will involve, amongst other things, appropriate exclusions, carve-outs and qualifications being included in certain representations, covenants, events of default and related definitions. In addition, amendments will be made in order to ensure that transactions (such as disposals) permitted by the group-wide covenants (and not otherwise restricted by the covenants which relate only to rig owners and intra-group charterers) are not inadvertently restricted by other representations, covenants or events of default.

The provisions which will be amended as part of these regularising changes include, but are not limited to, the following:

1. Certain facilities contain provisions relating to satisfactory drilling contracts or cancellation or termination of drilling contracts. These will be deleted. In particular, covenants, representations, mandatory prepayment provisions, conditions precedent and events of default will be amended to bring them into line with the majority of the Secured Facility Agreements such that none of the Secured Facility Agreements shall put any express constraint on, or expressly impose any prepayment requirement, drawstop or other adverse consequence in relation to, any amendment, variation, termination or supplement to any drilling contract, including but not limited to any amendment to the duration of such contract or the day rates chargeable under such contract.

2. Applicable accounting principles will be frozen as at the Refinancing Closing Date solely in connection with the calculation of financial covenants except for:

   • the definition of "Finance Lease" which will be frozen as set out below; and

- in relation to non-financial covenants, the amended and restated Secured Facility Agreements will provide that the Lenders agree to discuss in good faith any future amendment to the relevant covenants based on a change in Accounting Principles, provided that the Parent provides a report to the Agents (for distribution to all Lenders) describing the change in Accounting Principles, explaining the impact that this change in Accounting Principles could have if no amendment is made, and providing sufficient information for the Lenders to make an accurate comparison between the situation where the requested amendment is made versus the situation where the amendment is not made, in each case based on the Group's actual or projected financial position at the relevant time.

3.  "Solvency" representation to be made a non-repeating representation.

4.  The level of detail regarding restrictions on ownership and control of companies within the RigCo Group will be regularised across all the Secured Facility Agreements. As a rule there should be no prohibitions on a restructuring or reorganisation where Subsidiaries are moved within the RigCo Group and no requirement to maintain any particular direct holdings, in each case except as restricted under the group-wide covenants. In particular, rig owners and intra-group charterers will be able to be less than 100% owned by a member of the RigCo Group where required to meet local content requirements or applicable regulations as long as the relevant entity remains a Subsidiary of RigCo and as long as (i) the investor is not an entity to which it would be contrary to applicable law, regulation or internal policy requirements of particular lenders to lend to, (ii) the lenders have been provided with all applicable KYC requirements in relation to that investor and (iii) the facility agents receive all relevant accession documentation (including applicable documentation in respect of guarantees and security either from the relevant rig owner or intra-group charterer or over the shares in such entity, corporate authorisations, applicable consents, legal opinions and other information reasonably required, in each case in form and substance satisfactory to the relevant facility agents).

5.  New provision to be included in each Secured Facility Agreement requiring information on changes to Drilling Units, drilling contracts, rig owners and intra-group charterers to be provided to the Agent and references to Drilling Units, drilling contracts, rig owners and intra-group charterers in the various provisions of the Secured Facility Agreements to be as these are updated from time to time.

6.  Alignment of Interest Periods between different Secured Facility Agreements (to facilitate treasury management of interest rate hedging) to be addressed in the Amendment and Restatement Agreements.

7.  All instances of subjectivity (such as references to opinion of the Agent) to be deleted and Material Adverse Effect test conformed such that any qualification by reference to Material Adverse Effect will be as follows: "has, or is reasonably likely to have, a Material Adverse Effect".

8.  New "Changes to Guarantors" provision to be included in each Secured Facility Agreement to permit accession and release of guarantors, intra-group charterers and rig owners (and associated creation or release of security) without requiring lender consent where the entity is being disposed of in accordance with the terms of the Finance Documents or where it is necessary in order to enable the Drilling Unit to be employed or deployed (including in order to enable the Drilling Unit to be employed or deployed in a particular jurisdiction or under a specific contract) and the Parent provides the Agent with the details of such change, provided that where the change in Guarantor is in order to enable the Drilling Unit to be employed or deployed any associated release of security will be subject to the exiting Guarantor not being of material value. For the avoidance of doubt, the accession of new guarantors will be subject to (i) the lenders being provided with all

<div align="center">2</div>

applicable KYC requirements in relation to that entity and (ii) the facility agents receiving all relevant accession documentation (including applicable documentation in respect of guarantees and security either from the relevant rig owner or intra-group charterer or over the shares in such entity, corporate authorisations, applicable consents, legal opinions and other information reasonably required, in each case in form and substance satisfactory to the relevant facility agents).

9. Material Subsidiary to be limited to Subsidiaries of RigCo which own a drilling unit which is the subject of a Secured Facility Agreement and all Events of Default relating to Material Subsidiaries to be qualified by Material Adverse Effect.

10. Representations in relation to financial information to be given in respect of the most recently delivered of (i) the Original Financial statements or (ii) the financial information most recently delivered to the Agent.

11. Representations and covenants relating to taxes to be limited to material Taxes.

12. "No misleading information" representation to be amended to apply only to material factual information as at the date of the relevant documents or the date at which the information is expressed to be given (and subject to anything disclosed in writing to the Agent) and not forecasts, projections, forward-looking statements, etc. Any representation relating to the omission of information which if disclosed could reasonably be expected to affect the decision of a Finance Party to enter into a Finance Document will only apply in respect of Finance Documents entered into on or around the Amendment Date and will not be a repeating representation.

13. "No winding-up" representation to exclude solvent reorganisations.

14. Representations referring to Drilling Units being operationally seaworthy or fit for service or similar to include provisions that (i) any laid-up or stacked rig is capable of maintaining operational capabilities upon being re-entered in a Classification Society upon removal from lay up or stacking and (ii) any lay up or stacking is carried out in accordance with prudent industry standards.

15. "Stock Exchange Listing" covenant to be amended to reflect implementation envisaged under the RSA.

16. Covenants requiring subordination of additional debt to be deleted and addressed in Intercreditor Agreement or in separate subordination undertaking(s).

17. "Investment Restrictions" covenant which restricts investments and acquisitions unless there would be pro forma compliance with financial covenants to be deleted.

18. "Insurance" covenant thresholds to be subject to a waiver that will apply until the final maturity date under each of the Secured Facilities Agreements such that, for so long as 120% of the Total Commitments is higher than the Market Value of the relevant Drilling Units, if (i) the RigCo has used all reasonable efforts to secure insurance for an amount of greater than or equal to 120% of the Total Commitments and (ii) the Group's insurance broker or advisor has confirmed that insurance in respect of 120% of the Total Commitments is not available in the market, RigCo shall seek as high an aggregate insured value as the Group's insurance broker or advisor confirms is available in the market subject to a hard floor of the higher of (i) the aggregate Market Value of the relevant Drilling Units and (ii) 100% of the Total Commitments. The aggregate insurance value shall be updated on a semi-annual basis by reference to the regular rig valuations provided under the Secured Facilities Agreements.

19. Appropriate provisions for captive insurance as currently included in certain Secured Facility Agreements to be included for all Secured Facility Agreements.

20. "Alteration to the Drilling Units" covenant in all Secured Facility Agreements to be amended to match the covenant in the USD450,000,000 senior secured credit facility agreement originally dated 26 August 2015 with Nordea Bank AB, London Branch as agent.

21. Covenants relating to compliance with laws, regulations (statutory or otherwise), constitutional documents, etc to be subject to a Material Adverse Effect qualification.

22. "Loss of Property" Event of Default to only apply to Obligors and Material Subsidiaries.

23. FATCA position to be amended in all Secured Facility Agreements to follow the LMA investment grade template facility agreement FATCA wording (formerly contained in Rider 3 of the May 2013 FATCA Riders published by the LMA).

24. Amendments (if any, and on terms to be agreed) to clarify and address, to the extent necessary, the interaction between the ongoing capital equipment and spare parts arrangements operated by any member of the Group including, but not limited to, those operated by Seadrill Global Services Limited and the provisions of the Secured Facility Agreements and related documents.

25. The following non-exhaustive list of examples of regularising changes to be made across all Secured Facility Agreements (to the extent applicable). The USD1,350,000,000 senior secured credit facility agreement originally dated 26 August 2014 with DNB Bank ASA as agent has been taken as a base:

| Provision/ Defined term | Amended language |
| --- | --- |
| 1. **"Rig Related Financial Indebtedness"** | Note: This definition will apply only in respect of any Financial Indebtedness covenant relating specifically to rig owners and intra-group charterers exclusively. Financial Indebtedness for the purposes of the group-wide covenants and other provisions will be as defined in Annex 4. |
| | Without double counting, indebtedness for or in respect of any of the following (unless otherwise specified below, whether or not the same are required to be classified and accounted for as a liability on the face of the Group's consolidated balance sheet in accordance with Accounting Principles): |
| | (a) moneys borrowed and debit balances at banks or other financial institutions; |
| | (b) any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent); |
| | (c) any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument; |

4

(d) the amount of any liability in respect of Finance Leases;

(e) receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis under the Accounting Principles);

(f) any derivative transaction (and, when calculating the value of that transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that transaction, that amount) shall be taken into account);

(g) any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of an underlying liability of any entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition;

(h) any amount raised by the issue of redeemable shares which are redeemable (other than at the option of the issuer) before the Final Maturity Date or are otherwise classified as borrowings under the Accounting Principles;

(i) any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 30 180 days after the date of supply receipt of the invoice in respect of such supply;

(j) any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the Accounting Principles; and

(k) the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (j) above,

but shall not include any borrowings or other such liabilities owed by a member of the Group to another member of the Group as permitted pursuant to the terms of this Agreement the Finance Documents.

5

| | | |
|---|---|---|
| 2. | **"Finance Lease"** | means a lease ~~or~~, charterparty <u>or hire purchase contract</u> which ~~(i)~~ would be classified as a finance lease in accordance with ~~the Accounting Principles of an Obligor or (ii) is required to be classified and accounted for as a liability or asset on the face of the Group's consolidated balance sheet in accordance with Accounting Principles~~ <u>GAAP as applicable to the financial statements of the Parent for the financial year ending 31 December 2016.</u> |
| 3. | **"Material Adverse Effect"** | A material adverse effect on: |

(a) the financial condition, assets, business or operation of ~~any Obligor or~~ the <u>Obligors taken as a whole, the</u> Group <u>taken</u> as a whole <u>or the RigCo Group taken as a whole</u>;

(b) the ability of any of the Obligors or<u>,</u> the Group <u>taken</u> as a whole <u>or the RigCo Group taken as a whole</u> to perform any of their material obligations under the Finance Documents; or

(c) the validity or enforceability of, or the effectiveness or ranking of any security granted or purporting to be granted pursuant to any of the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

| | | |
|---|---|---|
| 4. | **"Security Period"** | The period commencing on the date of this Agreement and ending the date on which the Agent notifies the Borrower and the other Finance Parties that: |

(a) all amounts which have become due for payment by the Borrower or any other party under the Finance Documents have been paid;

(b) no amount is owing or has accrued (without yet having become due for payment) under any of the Finance Documents;

(c) the Borrower has no future or contingent liability under any provision of this Agreement and the other Finance Documents; <u>and</u>

~~(d) the Agent and the Required Majority do not consider that there is a significant risk that any payment or transaction under a Finance Document would be set aside, or would have to be reversed or adjusted, in any present or possible future proceeding relating to a Finance Document or any asset covered (or previously covered) by a Security Interest created by a Finance Document; and~~

(d) there are no Commitments in force.

5.  **"Subsidiary"**

An entity from time to time of which a person:

(a) has direct or indirect control; or

(b) owns directly or indirectly more than fifty per cent (50%) (votes and/or capital),

provided that, for the avoidance of doubt, none of Seadrill Partners LLC, Seadrill Operating LP, Seadrill Capricorn Holdings LLC or any of their respective Subsidiaries shall be a Subsidiary of any member of the Group unless any control or ownership of more than fifty per cent (50%) of votes and/or capital is direct or through another Subsidiary or Subsidiaries.

and for For the purpose of paragraph (a), an entity shall be treated as being controlled by a person if that person is able to direct its affairs and/or control the majority composition of its board of directors or equivalent body.

6.  **Representations**

Clause 20.11 (No proceedings pending or threatened)

No litigation, judgment, order, injunction, restraint, arbitration or administrative proceedings (private or public) of or before any court, arbitral body or agency, which if adversely determined, might would reasonably be expected to have a Material Adverse Effect, have been started or are pending or (to the best of its knowledge and belief) have been threatened against it.

7.  **Information undertakings**

Clause 21.4 (Information – miscellaneous)

The Obligors shall notify the Agent and/or supply to the Agent (in sufficient copies for all the Lenders, if the Agent so requests):

(a) promptly upon becoming aware of them, the details of: any claim, action, suit, proceeding or investigation with respect to Sanctions against it, any of its direct or indirect owners, Subsidiaries, any of their joint ventures or any of their respective directors, officers, employees, agents or representatives;

(i) any breach of material contracts (including rig building contracts and charter contracts) or any material litigation, judgment, order, injunction, restraint, arbitration or administrative proceedings which is current, threatened, alleged or pending against any of the Obligors or any member of the Group; and

(ii) any changes to the senior management of (A) the Parent or (B) any member of the Group where the change of senior management concerned is of material significance to the Group as a whole;

7

(b) all documents dispatched by the Parent (and by each of the Obligors, to the extent requested by the Agent) to its shareholders <u>generally</u>, or to or from its creditors generally at the same time as they are dispatched;

(c) immediately upon becoming aware of them, breaches of contracts, the details of any litigation, judgment, order, injunction, restraint, arbitration or administrative proceedings which are current, threatened, alleged or pending against any of the Obligors and which ~~(in the opinion of the Agent or the Required Majority)~~ would, if adversely determined, be reasonably expected to have a Material Adverse Effect;

(d) immediately such further information regarding the business, properties, conditions, assets and operations (financial or otherwise) of the Obligors and ~~its~~ <u>their</u> Subsidiaries as any Finance Party (through the Agent) may reasonably request;

(e) all filings with or reports forwarded to any Exchange; and

(f) such updates of forecasts as the Agent may reasonably request.

| | | |
|---|---|---|
| 8. | **General undertakings** | Clause 21.7 (Information of new contracts) |

(a) The Parent shall provide the Agent with information on any new employment contract in respect of a Drilling Unit <u>within</u> five (5) days ~~prior to~~ <u>after</u> entering into any such contract.

(b) The Parent shall procure that a Contract Memo for any new employment contract in respect of a Drilling Unit is sent to the Agent within ~~ten~~ <u>thirty</u>. (~~1~~30) Business Days of the entering into of such contract.

| | | |
|---|---|---|
| 9. | **General undertakings** | Clause 23.23 (Investment Restrictions) |

~~(a) Subject to Clause 23.15(a) (ii) and (iii) (Dividends Parent) and subject to (b) below, neither the Parent nor its Subsidiaries (other than the Drilling Unit Owner) shall make any investments and acquisitions unless:~~

~~(i) after giving effect to any such investment, the Parent and its Subsidiaries are in pro forma ("pro forma" meaning that the calculation of the financial covenants shall take into account any effect of the investment or acquisition made) compliance (evidenced by adjusted financial calculations taking into account any effect of the investment or acquisition made) with the Financial Covenants set out in Clause 22 (Financial Covenants) of this Agreement; and~~

8

~~(ii) no Default is continuing or would result from the proposed investment and acquisition.~~

The Drilling Unit Owners shall not make any further investments or acquisitions, except for any capital expenditure or investments related to ordinary upgrade or maintenance work of their respective Drilling <u>Units or otherwise in the ordinary course of business or in accordance with Clause 24.4 (Alteration to the Drilling Units)</u>.

**10. Events of Default**

Clause 25.4 (Misrepresentations)

Any representation, warranty or statement made or deemed to be made by any of the Obligors in the Finance Documents or any other document delivered by or on behalf of the Obligors under or in connection with any of the Finance Documents is or proves to have been incorrect or misleading in any material respect when made or deemed to be made<u>, provided that no Event of Default will occur under this Clause 25.4 if the event or circumstance giving rise to the representation, warranty or statement being incorrect or misleading is capable of remedy and is remedied within thirty (30) calendar days of the earlier of the Agent giving notice to the Borrower or the Borrower becoming aware of the failure to comply.</u>

9

**ANNEX 4**
**GROUP WIDE RESTRICTIVE COVENANTS**

75

**ANNEX 4**

**Group Wide Restrictive Covenants**

This Annex sets out the terms for the new Group-wide restrictive covenants that will apply from the Refinancing Closing Date.

The covenants set out in this Annex will replace the existing equivalent covenants in the Secured Facilities Agreements to the extent that those existing equivalent covenants currently apply on a Group-wide basis. The existing restrictive covenants in the Secured Facilities Agreements which apply only to the rig owning entities and charterers which are party to those Secured Facilities Agreements are not considered in this Annex and are proposed to remain in place subject to being updated and importantly, where applicable, made consistent in line with the separate regularising amendments proposed in the term sheets for the recapitalisation plan.

This Annex does not deal with the covenants that will be needed to reflect the operation of the cash pooling arrangements but it does set out how the cash pooling arrangements will impact the Group-wide restrictive covenants. References to the cash pooling arrangements in this Annex are to the arrangements contemplated in the Cash Pooling Term Sheet.

The Group-wide restrictive covenants are structured as follows:

- There is a holding company covenant which applies to IHCo and which restricts IHCo to holding company activities and certain other limited activities.

- Generally, the Group-wide covenants apply to restrict activities by any member of the Group subject to exceptions for:

    - Activities which can be undertaken by any member of the Seadrill Limited Group, the NSNCo Group and the RigCo Group

    - Activities which can be undertaken only by a member of the Seadrill Limited Group

    - Activities which can be undertaken only by a member of the NSNCo Group

    - Activities which can be undertaken only by a member of the RigCo Group

    in each case consistent with the structural limitations that have been agreed in the term sheets for the recapitalisation plan.

It should be noted that these Group-wide covenants have been drafted for the Secured Facilities Agreements and accordingly there will be covenants in the New Secured Notes indenture which directly or indirectly restrict the activities permitted under these Group-wide covenants.

It is anticipated that the Group-wide restrictive covenants set out in this Annex will be incorporated into the Secured Facilities Agreements and will apply from the Refinancing Closing Date. Importantly amendments or waivers of these covenants will be a matter for a majority representing over two thirds of the lenders under the Secured Facilities Agreements with reference to total outstanding commitments across the Secured Facilities Agreements (the "**Supra Majority Lenders**").

2

<u>**General definitions**</u>

"**Additional Notes Issue**" means any issue of New Secured Notes after the Refinancing Closing Date up to a maximum principal amount of New Secured Notes in issue at any time of USD1,000,000,000 (excluding any upsizing of the New Secured Notes representing the payment in kind or capitalisation of interest payments).

"**Acquisition Basket Funding**" means all funding of acquisitions or Rig Investments (as the case may be) under paragraph (D) of the definition of Permitted RigCo Group Acquisition, paragraph (C)(iv) of the definition of Permitted Parent Acquisition, paragraph (B)(x) of the definition of Permitted RigCo Group Rig Investment and paragraph (D) of the definition of Permitted Parent Rig Investment, and all equity contributions made for any Joint Ventures pursuant to paragraph (F) of the definition of Permitted Joint Venture Investment.

"**Construction Cost**" means, in respect of any drilling vessel, rig or other drilling unit, the full cost paid by members of the Group for the construction of such drilling vessel, rig or other drilling unit.

"**First Leverage Threshold Date**" means the first date on which Net Leverage for the RigCo Group when tested on any Quarter Date is less than 4x for two consecutive quarterly testing dates.[1]

"**Group**" means the Parent and its Subsidiaries from time to time.

"**IHCo – RigCo Structure**" means the structure of the Group to be implemented on or about the Refinancing Closing Date with the interposition of IHCo as a wholly owned subsidiary of the Parent and each of RigCo and NSSCo as wholly owned subsidiaries of IHCo, as more particularly described in the Structure Memorandum.

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity.

"**Net Consideration**" means the consideration paid in connection with an acquisition which consideration is not funded by Financial Indebtedness provided by persons who are not members of the Group (other than a SDRL Debt Issue).

"**Newbuild and Acquisitions Basket**" means:

(i)     for the period from and including 1 January 2020, an aggregate amount from time to time equal to USD100,000,000 (or its equivalent in any other currency) less the amount of any liability (whether actual or contingent) assumed by any member of the RigCo Group as a result of the relevant Rig Investment or acquisition (other than in respect of a Newbuild) but only to the extent (as determined by the board of directors of the Parent (acting reasonably)) not reflected in the purchase price, adequately insured or indemnified by the seller(s);

---

[1]     There will be an ability to test Net Leverage on any Quarter Date for the purposes of determining whether the First Leverage Threshold Date and/or the Second Leverage Threshold Date has occurred.

(ii) for the period from and including 1 July 2021, an aggregate amount from time to time equal to USD200,000,000 (inclusive of the USD100,000,000 referred to in paragraph (i) above) (or its equivalent in any other currency) less the amount of any liability (whether actual or contingent) assumed by any member of the RigCo Group as a result of the relevant Rig Investment or acquisition (other than in respect of a Newbuild) but only to the extent (as determined by the board of directors of the Parent (acting reasonably)) not reflected in the purchase price, adequately insured or indemnified by the seller(s); or

(iii) if the Second Leverage Threshold Date has occurred, an aggregate amount from time to time equal to USD600,000,000 (inclusive of the USD100,000,000 referred to in paragraph (i) above and the USD200,000,000 referred to in paragraph (ii) above (without double counting)) (or its equivalent in any other currency), less the amount of any liability (whether actual or contingent) assumed by any member of the RigCo Group as a result of the relevant Rig Investment or acquisition (other than in respect of a Newbuild) but only to the extent (as determined by the board of directors of the Parent (acting reasonably)) not reflected in the purchase price, adequately insured or indemnified by the seller(s), provided that RigCo Group liquidity (based on the calculations that apply to the RigCo Minimum Liquidity Requirement) is at least equal to the then applicable RigCo Minimum Liquidity Requirement (as defined in the Cash Pooling Term Sheet) plus USD250,000,000 at the time of and immediately following the making of the relevant payment on a pro forma basis

and provided that, in the case of paragraphs (ii) and (iii) above, the following conditions are satisfied:

(a) the Amortisation Conversion Election has not been exercised or if it has been exercised, the secured tranches created as a result of its exercise have been prepaid in full;

(b) for every dollar which exceeds USD100,000,000, three dollars is or has been applied:

 (A) firstly, in repayment of PIK interest (if any) accrued under the Secured Facilities Agreements (on a pro rata basis across all Secured Facilities Agreements); and

 (B) secondly, in prepayment of the Secured Facilities Agreements (on a pro rata basis across all Secured Facilities Agreements, and applied against future amortisation payments in inverse chronological order),

 provided that any repayment or prepayment made pursuant to the cash sweep as described in section C2 of the Secured Facilities term sheet or as a condition to any IHCo Top-up Payments (regardless of the order in which such prepayments were applied against future payments) shall count towards this.

"**Newbuild Basket Funding**" means all Permitted Newbuild Contract Payments pursuant to the basket in paragraph (c) of the definition of Permitted Newbuild Contract Payments, all Newbuild Delivery Equity Contributions and all Newbuild JV Equity Contributions.

"**NSNCo Group**" means NSNCo and its Subsidiaries from time to time.[2]

"**NSN Security**" means any Security Interest securing the New Secured Notes and permitted under the terms of the Intercreditor Agreement including any Security Interest securing the New Secured Notes created after the Refinancing Closing Date in accordance with the terms of the Intercreditor Agreement.

"**Parent**" means Seadrill Limited, any successor of Seadrill Limited or any entity, in each case, to which all or substantially all of Seadrill Limited's material assets are directly or indirectly transferred and which becomes the holding company for IHCo and its Subsidiaries including the NSNCo Group and the RigCo Group (whereafter Seadrill Limited shall no longer constitute the Parent).

"**Refinancing**" means the refinancing to be implemented on or about the Refinancing Closing Date.

"**RigCo Group**" means RigCo and its Subsidiaries from time to time.

"**SDRL Debt Issue**" means:

(i)      any Additional Notes Issue; and

(ii)     any issue of any bond, note or other debt security and any loan made by a person that is not a member of the Group under any syndicated or bilateral facility, in each case where the obligors are only members of the Seadrill Limited Group and/or the NSNCo Group and which do not benefit from guarantees or Security Interests from IHCo or any member of the RigCo Group.

"**SDRL Equity Issue**" means any issue by the Parent after the Refinancing Closing Date of any share or stock (whether or not ordinary or preference), warrant or other equity or quasi equity instrument or equity linked instrument to any person which is not a member of the Group.

"**Seadrill Limited Group**" means the Parent and its Subsidiaries from time to time other than IHCo and its Subsidiaries.

"**Second Leverage Threshold Date**" means the first date on which Net Leverage for the RigCo Group when tested on any Quarter Date is less than 4x for four consecutive quarterly testing dates.

"**Special Purpose Company**" means a member of the Group which is not an obligor or security provider under any Secured Facilities Agreement, none of whose Financial Indebtedness retains the benefit of any guarantee, indemnity or other commitment from IHCo or any member of the RigCo Group (other than (a) another Special Purpose Company and (b) where the Special Purpose Company is itself a member of the RigCo Group, RigCo) in each case to assure the repayment of, or indemnify against loss in respect of non-payment of, that Financial Indebtedness.

---

[2]      Note: Subject to agreed hive down paper.

"**Structure Memorandum**" means the memorandum describing the structure of the Group before and after implementation of the IHCo – RigCo Structure and the key steps envisaged to implement the same, capable of being relied upon by the finance parties under the Secured Facilities Agreements.

**1. Existing Newbuilds**

*Payments under Newbuild Contracts*

The Parent shall not (and shall ensure that no other member of the Group shall) make any direct or indirect payment to any person who is not a member of the Group under any Newbuild Contract, other than a Permitted Newbuild Contract Payment, a payment arising pursuant to a Permitted Newbuild Investment or a payment consented to by the Supra Majority Lenders.

*Taking delivery of Newbuilds*

The Parent shall not (and shall ensure that no other member of the Group shall) take delivery of a Newbuild except pursuant to a Permitted Newbuild Investment.

*Definitions*

"**Guaranteed Newbuild**" means a drilling vessel, rig or other drilling unit which is the subject of a Guaranteed Newbuild Contract.

"**Guaranteed Newbuild Contract**" means each of the following contracts (as amended from time to time):

(i)      Construction Contract between Seadrill Libra Ltd and Daewoo Shipbuilding & Marine Engineering Co., Ltd in relation to West Libra;

(ii)     Construction Contract between Seadrill Aquila Ltd and Daewoo Shipbuilding & Marine Engineering Co., Ltd in relation to West Aquila;

(iii)    Construction Contract between Seadrill Dorado Ltd and Samsung Heavy Industries Co., in relation to West Dorado; and

(iv)     Construction Contract between Seadrill Draco Ltd and Samsung Heavy Industries Co., in relation to West Draco.

"**Newbuild**" means a drilling vessel, rig or other drilling unit which is the subject of a Newbuild Contract, including any Guaranteed Newbuild.

"**Newbuild Contract**" means all of the newbuild contracts of the Group existing on the Refinancing Closing Date (as amended from time to time), including the Guaranteed Newbuild Contracts.

"**Permitted Newbuild Contract Payment**" means any payment:

(A)     in respect of stacking costs of a Newbuild;

(B)     required to defer payment of an instalment otherwise due under a Newbuild Contract;

7

(C)   made pursuant to or in settlement of any legally binding contractual term of a Newbuild Contract; and

(D)   of costs and expenses in respect of any Newbuild Contract which relates to the entering into of a Joint Venture agreement between the relevant member of the Group and the relevant shipyard (or associated person thereof) which is a Permitted Joint Venture Investment under paragraph (C) of the definition thereof and which is not, for the avoidance of doubt, the payment of any additional or final instalments with respect to such Newbuild Contract,

provided that:

(a)   in respect of Guaranteed Newbuilds and Guaranteed Newbuild Contracts, the aggregate amount of:

    (i)   the payments described in paragraphs (A) to (D) above not funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal; and

    (ii)   the amount of equity contributions made to the relevant Special Purpose Company after the Refinancing Closing Date and funded in cash by members of the Group in connection with the delivery of any Guaranteed Newbuilds falling under paragraph (B)(vi)(x) of the definition of Permitted Newbuild Investment (the "**Guaranteed Newbuild Delivery Equity Contributions**") or the entering into of a Permitted Joint Venture Investment by any member of the Group falling under paragraph (C)(i) of the definition of Permitted Joint Venture Investment (the "**Guaranteed Newbuild JV Equity Contributions**") in each case other than those funded by the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal,

shall not exceed USD200,000,0003 (or its equivalent in any other currency);

(b)   to the extent not made pursuant to paragraph (a) above, prior to 1 January 2020, the aggregate amount of the payments described in paragraphs (A) to (D) above not funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal shall not exceed USD25,000,000 (or its equivalent in any other currency); or

(c)   to the extent not made pursuant to paragraph (a) above, from 1 January 2020, the aggregate amount of:

---

**3**   Basket to be reduced to the extent of amounts spent on such payments prior to the Refinancing Closing Date. Intercreditor Agreement to provide for the lenders under the Secured Facilities Agreements to be granted a first ranking pledge of the equity over the newbuild entity or a holding company of that newbuild entity limited in recourse to the amount of Group cash (pre-Refinancing Closing Date) or RigCo Group cash (post-Refinancing Closing Date) used pursuant to this basket. Second ranking pledge to be granted in favour of the New Secured Noteholders up to the amount of the secured obligations under the senior lenders' security and first priority otherwise. Pledges to be released and retaken at a level high enough in the ownership structure so as to not prejudice any financing in respect of the newbuild at the time of such financing.

(i)    the payments described in paragraphs (A) to (D) above not funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal or pursuant to paragraph (a) above;

(ii)    the amount of equity contributions made to the relevant Special Purpose Company after the Refinancing Closing Date and funded in cash by members of the Group in connection with the delivery of any Newbuilds falling under paragraph (B)(vi)(z) of the definition of Permitted Newbuild Investment (the "**Newbuild Delivery Equity Contributions**") or the entering into of a Permitted Joint Venture Investment by any member of the Group falling under paragraph (C)(iii) of the definition of Permitted Joint Venture Investment (the "**Newbuild JV Equity Contributions**") in each case other than those funded by the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal; and

(iii)    Acquisitions Basket Funding, other than amounts funded by the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal,

shall not exceed the then applicable Newbuild and Acquisitions Basket.

The Secured Facilities Agreements will envisage a series of accounts and ledgers so that the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal can be ascertained at any time.

"**Permitted Newbuild Investment**" means a member of the Seadrill Limited Group or a member of the RigCo Group acquiring, financing and/or operating a Newbuild where:

(A)    the Supra Majority Lenders have consented to the same; or

(B)    each of the following conditions are satisfied:

(i)    each member of the Group which shall acquire, own, finance and/or charter that Newbuild is a Special Purpose Company and that Newbuild will be managed by Seadrill Management Ltd;

(ii)    the relevant Special Purpose Company first offers the lenders under the Secured Facilities Agreements the option to provide any required debt financing for the Newbuild on specified terms and, to the extent that the lenders under the Secured Facilities Agreements do not wish to provide the whole or any part of the debt financing on those terms, the relevant Special Purpose Company shall then be permitted to seek debt financing from other sources on substantially similar terms (and provided that, if there is a material change to such terms, the lenders under the Secured Facilities Agreements must be reoffered the option to provide the debt financing on such amended terms before the debt financing from other sources is entered into), provided in all cases that the amount of the Financial Indebtedness being provided does not exceed an amount equal to 80 per cent. of the lower of the purchase price, Construction Cost or market value (as determined by the board of directors of the Parent (acting reasonably)) of the relevant drilling unit, rig or vessel ("**Permitted Newbuild Financing**");

9

(iii)    recourse in respect of such Permitted Newbuild Financing is limited to the relevant Special Purpose Company and any other Special Purpose Companies to be involved in the ownership, financing, chartering and/or operation of that Newbuild and their shares or other ownership interests and their respective assets and if applicable either a full or limited guarantee in respect of that Financial Indebtedness from the Parent and, where the relevant Special Purpose Company is a member of the RigCo Group, RigCo, provided that any entity serving as intragroup charterer for a Newbuild financed under such Permitted Newbuild Financing may provide a guarantee and security over earnings and other receivables and bank accounts relating solely to such Newbuild;

(iv)    where the relevant Special Purpose Company is a member of the RigCo Group, the Group's latest available financial projections demonstrate that the RigCo Group will be in pro forma ("pro forma" meaning that the calculation of the financial covenants shall take into account any effect of the investment) compliance with the financial covenants under the Secured Facilities Agreements as and when they are to apply in the next 12 months and the Parent provides evidence of this to the Agents under the Secured Facilities Agreements;

(v)    where debt finance for the Newbuild is being incurred, a drilling contract has been agreed with respect to the Newbuild which is satisfactory to the board of directors of the Parent (acting reasonably) and the lenders providing the debt finance for the same; and

(vi)    any equity contribution provided by members of the Group to the Special Purpose Company in connection with that Newbuild after the Refinancing Closing Date which is not funded from the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal:

(x)    in respect of Guaranteed Newbuilds, when aggregated with (i) all other Guaranteed Newbuild Delivery Equity Contributions, (ii) all Permitted Newbuild Contract Payments pursuant to the basket in paragraph (a) of the definition of Permitted Newbuild Contract Payments and (iii) all Guaranteed Newbuild JV Equity Contributions, in each case without double counting and not funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal, shall not exceed USD200,000,000[4] (or its equivalent in any other currency);

(y)    to the extent not funded pursuant to paragraph (x) above, shall not be permitted prior to 1 January 2020; and

---

[4]    Basket to be reduced to the extent of amounts spent on such payments prior to the Refinancing Closing Date.

(z)     to the extent not funded pursuant to paragraph (x) above, from 1 January 2020, when aggregated with (i) all other Newbuild Delivery Equity Contributions, (ii) all Permitted Newbuild Contract Payments pursuant to the basket in paragraph (c) of the definition of Permitted Newbuild Contract Payments, (iii) all Newbuild JV Equity Contributions and (iv) all Acquisitions Basket Funding, in each case not funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal, shall not exceed the then applicable Newbuild and Acquisitions Basket.

11

**2. Financial Indebtedness**

The Parent shall not (and shall ensure that no other member of the Group shall) on or after the Refinancing Closing Date incur or allow to remain outstanding any Financial Indebtedness other than:

(A)    in the case of any member of the Seadrill Limited Group, any Permitted Group Financial Indebtedness or any Permitted Parent Financial Indebtedness;

(B)    in the case of any member of the NSNCo Group, any Permitted Group Financial Indebtedness or any Permitted NSNCo Financial Indebtedness;

(C)    in the case of any member of the RigCo Group, any Permitted Group Financial Indebtedness or any Permitted RigCo Group Financial Indebtedness; and

(D)    in the case of IHCo, to the extent permitted by the IHCo holding company undertaking and including, without limitation, Financial Indebtedness owed by IHCo to RigCo, NSNCo or a member of the Seadrill Limited Group.

*Definitions*

"**Financial Indebtedness**" means, without double counting, indebtedness for or in respect of any of the following (unless otherwise specified below, whether or not the same are required to be classified and accounted for as a liability on the face of the Group's consolidated balance sheet in accordance with Accounting Principles):

(A)    moneys borrowed and debit balances at banks or other financial institutions;

(B)    any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(C)    any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(D)    the amount of any liability in respect of Finance Leases;

(E)    receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis under the Accounting Principles);

(F)    any derivative transaction (and, when calculating the value of that transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that transaction, that amount) shall be taken into account);

(G)    any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of an underlying liability of any entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition;

(H)    any amount raised by the issue of redeemable shares which are redeemable (other than at the option of the issuer) before the final maturity date of any Secured Facilities Agreement or are otherwise classified as borrowings under the Accounting Principles;

(I)    any amount of any liability under an advance or deferred purchase agreement if one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question;

(J)    any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) otherwise classified as borrowings under the Accounting Principles; and

(K)    the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (A) to (J) above.

"**Permitted Group Financial Indebtedness**" means Financial Indebtedness which:

(A)    arises pursuant to the New Secured Notes and any Additional Notes Issue, together with any further upsizing of the New Secured Notes representing the payment in kind or capitalisation of interest payments, in each case to the extent permitted under the Intercreditor Agreement;

(B)    is outstanding under the Secured Facilities Agreements (as at the Refinancing Closing Date) including any increase in such Financial Indebtedness to the extent permitted under the Intercreditor Agreement;

(C)    is existing on the Refinancing Closing Date or arises pursuant to any legally binding commitment or arrangement existing or any facility available on the Refinancing Closing Date, including for the avoidance of doubt as a result of any exercise of the Amortisation Conversion Election;

(D)    is a refinancing of the whole or any part of the Financial Indebtedness referred to in paragraphs (A), (B), (C), (E), (F), (I), (J), (K), (L), (M) or (N) or is a refinancing of Financial Indebtedness refinancing that Financial Indebtedness, in each case where such refinancing is a Permitted Refinancing;

(E)    is an amount of any liability (i) under an advance or deferred purchase agreement if the agreement is in respect of the supply of assets or services, or (ii) arising under any commercial agreement or arrangement by virtue of the extension, deferral, reduction or other variation of payment terms, in each case in the ordinary course of business;

(F)    in respect of any person that becomes a member of the Group after the Refinancing Closing Date, is outstanding at the time such person becomes a member of the Group, provided that:

    (i)    such Financial Indebtedness was not incurred in contemplation of such person becoming a member of the Group;

(ii) such Financial Indebtedness is not assumed or supported by any member of the Group other than (a) a Special Purpose Company, (b) the Parent, (c) any other member of the Seadrill Limited Group which is not an Obligor, (d) any member of the NSNCo Group or (e) RigCo where such person becomes a member of the RigCo Group; and

(iii) the amount of such Financial Indebtedness is not increased except where such increase would otherwise constitute Permitted Financial Indebtedness;

(G) arises from the endorsement of negotiable instruments in the ordinary course of trading;

(H) arises under any derivative or hedging transaction which is entered into for hedging purposes and is not of a speculative nature;

(I) arises pursuant to any Permitted Sale and Leaseback;

(J) is incurred by a Special Purpose Company in connection with any Permitted Newbuild Investment, provided that the amount of such Financial Indebtedness does not exceed an amount equal to 80 per cent. of the lower of the purchase price, Construction Cost or market value (as determined by the board of directors of the Parent (acting reasonably)) of the Newbuild on the date of acquisition, and provided further that:

(i) the relevant Special Purpose Company first offers the lenders under the Secured Facilities Agreements the option to provide such Financial Indebtedness on specified terms and, to the extent that the lenders under the Secured Facilities Agreements do not wish to provide the whole or any part of the debt financing on those terms, the relevant Special Purpose Company shall then be permitted to seek debt financing from other sources on substantially similar terms (and provided that, if there is a material change to such terms, the lenders under the Secured Facilities Agreements must be reoffered the option to provide the debt financing on such amended terms before the debt financing from other sources is entered into); and

(ii) where the relevant Special Purpose Company is a member of the RigCo Group, the Group's latest available financial projections demonstrate that the RigCo Group will be in pro forma ("pro forma" meaning that the calculation of the financial covenants shall take into account any effect of the transaction) compliance with the RigCo financial covenants under the Secured Facilities Agreements as and when they are to apply in the next 12 months and the Parent provides evidence of this to the Agents under the Secured Facilities Agreements,

provided that any entity serving as intragroup charterer for a Newbuild may provide a guarantee and security over earnings and other receivables and bank accounts relating solely to such Newbuild;

(K) is or arises under or pursuant to any Permitted Financial Support;

14

(L)     is or arises under or pursuant to any Permitted Joint Venture Investment, provided that the Group's latest available financial projections demonstrate that the RigCo Group will be in pro forma ("pro forma" meaning that the calculation of the financial covenants shall take into account any effect of the transaction) compliance with the RigCo financial covenants under the Secured Facilities Agreements as and when they are to apply in the next 12 months taking into account the Permitted Joint Venture Investment and the Parent provides evidence of this to the Agents under the Secured Facilities Agreements;

(M)     arises pursuant to any SDRL Debt Issue;

(N)     is or arises pursuant to a refinancing of any debt amount under any Secured Facilities Agreement in respect of any Drilling Unit (under and as such term or equivalent term is defined in any Secured Facilities Agreement) provided that the allocated debt amount applicable to the relevant Drilling Unit under the relevant Secured Facilities Agreement (if applicable) is prepaid in full and the following conditions are satisfied:[5]

     (i)     the relevant Drilling Unit Owner (under and as such term or equivalent term is defined in the relevant Secured Facilities Agreement) first offers the lenders under the Secured Facilities Agreements the option to provide the refinancing debt on specified terms and, to the extent that the lenders under the Secured Facilities Agreements do not wish to provide the whole or any part of the refinancing debt on those terms, the relevant Drilling Unit Owner shall then be permitted to procure refinancing debt from other sources on substantially similar terms (and provided that, if there is a material change to such terms, the lenders under the Secured Facilities Agreements must be reoffered the option to provide the refinancing debt on such amended terms before the refinancing debt from other sources is entered into), provided in all cases that the amount of the Financial Indebtedness being provided does not exceed an amount equal to 80 per cent. of the lower of the purchase price, Construction Cost or market value (as determined by the board of directors of the Parent (acting reasonably)) of the relevant Drilling Unit (as such term or equivalent term is defined in the relevant Secured Facilities Agreement) (a "**Permitted Rig Refinancing**");

     (ii)     recourse in respect of such Permitted Rig Refinancing is limited to the relevant Drilling Unit Owners and Obligors (in each case under and as such term or equivalent term is defined in the relevant Secured Facilities Agreement, prior to their release from such Secured Facilities Agreement) in respect of such Drilling Unit and any other members of the RigCo Group to be involved in the ownership, financing, chartering and/or operation of that Drilling Unit, and their shares or other ownership interests and their respective assets, and if applicable either a full or limited guarantee in respect of that Financial Indebtedness from the Parent and/or RigCo;

     (iii)     the Group's latest available financial projections demonstrate that the RigCo Group will be in pro forma ("pro forma" meaning that the calculation of the financial covenants shall take into account any effect of the investment) compliance with the financial covenants under the Secured Facilities Agreements as and when they are to apply in the next 12 months and the Parent provides evidence of this to the Agents under the Secured Facilities Agreements; and

---

[5]     The individual Secured Facilities Agreements will permit refinancing of debt allocated to specific rigs without consent provided that the allocated debt amount in respect of the relevant rig under the relevant Secured Facilities Agreement is prepaid in full and the aggregate refinancing proceeds are not less than 90% of the aggregate amount required to be prepaid. There will be a mechanism to ensure automatic release of the relevant rig owners, other obligors and security in the case of such a refinancing.

(iv)    a drilling contract has been agreed with respect to the Drilling Unit which is satisfactory to the board of directors of the Parent (acting reasonably) and the lenders providing the debt finance for the same;

(O)    arises pursuant to the ongoing capital equipment and spare parts arrangements operated by any member of the Group including, but not limited to, those operated by Seadrill Global Services Limited;

(P)    is owed by IHCo to RigCo, NSNCo or a member of the Seadrill Limited Group;

(Q)    is owed by a Special Purpose Company to a member of the Seadrill Limited Group in relation to the acquisition of a Newbuild;

(R)    is owed by a member of the Group to Seadrill Management Ltd, Seadrill Global Services Limited or Seadrill Insurance Ltd in relation to services provided by those companies in the ordinary course of business;**6**

(S)    any counter-indemnity obligation in respect of any letter of credit, bank guarantee or similar in respect of obligations or liabilities which constitute Financial Indebtedness provided that the outstanding liability under such counter-indemnities does not exceed in aggregate USD100,000,000 (or its equivalent in other currencies) at any time prior to 1 January 2020 and USD200,000,000 (or its equivalent in other currencies) at any time from 1 January 2020;

(T)    is pursuant to a facility or facilities entered into in order to manage the business or operations of the Group in particular jurisdictions (each a "Local Facility") and incurred by a member of the Group other than RigCo incorporated, formed or operating in such jurisdiction where the outstanding amount of which does not exceed in aggregate USD30,000,000 (or its equivalent in any other currency) at any time;

(U)    is or arises under a guarantee from any member of the Group in respect of any member of the Group's obligations under any derivative or hedging transaction which transaction constitutes Permitted Financial Indebtedness;

(V)    is consented to by the Supra Majority Lenders; or

(W)    is not permitted by the preceding paragraphs, is not Permitted Parent Financial Indebtedness, Permitted NSNCo Financial Indebtedness or Permitted RigCo Group Financial Indebtedness where the outstanding amount of which does not exceed in aggregate USD50,000,000 (or its equivalent in any other currency) at any time.

---

**6**    Other exceptions to be listed to enable service companies to continue to be able to operate and provide services to the Group and to conform to the exceptions contemplated in the Cash Pooling Term Sheet.

"**Permitted NSNCo Financial Indebtedness**" means Financial Indebtedness which:

(A)    is owed by one member of the NSNCo Group to another member of the NSNCo Group or to IHCo (provided that such Financial Indebtedness is in compliance with the Intercreditor Agreement);

(B)    is incurred by a member of the NSNCo Group where recourse in respect of such Financial Indebtedness is limited to members of the NSNCo Group and their shares or other ownership interests and their respective assets;

(C)    is a refinancing of the whole or any part of the Financial Indebtedness referred to in paragraphs (A) and (B), or is a refinancing of Financial Indebtedness refinancing that Financial Indebtedness, and in each case which is a Permitted Refinancing;

(D)    is or arises under a guarantee from any member of the NSNCo Group for or in respect of any Permitted Financial Indebtedness; or

(E)    arises from any netting, setting off, multi-account overdraft, group cash pool or group cash management arrangements relating only to members of the NSNCo Group.

"**Permitted Parent Financial Indebtedness**" means Financial Indebtedness which:

(A)    is owed by one member of the Seadrill Limited Group to another member of the Seadrill Limited Group or to IHCo (provided that such Financial Indebtedness is in compliance with the Intercreditor Agreement);

(B)    is or arises under any obligation in respect of Financial Indebtedness of one or more members of the Seadrill Limited Group which is assumed by or transferred or novated to another member of the Seadrill Limited Group;

(C)    is incurred in connection with any Permitted Parent Rig Investment, provided that:

(i)    the amount of such Financial Indebtedness does not exceed an amount equal to 80 per cent. of the lower of the purchase price, Construction Cost or market value (as determined by the board of directors of the Parent (acting reasonably)) of the drilling unit, rig, vessel, company, shares, business or undertaking (as applicable) on the date of acquisition; and

(ii)    the relevant member of the Seadrill Limited Group first offers the lenders under the Secured Facilities Agreements the option to provide such Financial Indebtedness on specified terms and, to the extent that the lenders under the Secured Facilities Agreements do not wish to provide the whole or any part of the debt financing on those terms, the relevant member of the Seadrill Limited Group shall then be permitted to seek debt financing from other sources on substantially similar terms (and provided that, if there is a material change to such terms, the lenders under the Secured Facilities Agreements must be reoffered the option to provide the debt financing on such amended terms before the debt financing from other sources is entered into);

17

(D)    is a refinancing of the whole or any part of the Financial Indebtedness referred to in paragraphs (A) to (C), or is a refinancing of Financial Indebtedness refinancing that Financial Indebtedness, and in each case which is a Permitted Refinancing;

(E)    is or arises under a guarantee from the Parent for or in respect of any Permitted Financial Indebtedness; or

(F)    arises from any netting, setting off, multi-account overdraft, group cash pool or group cash management arrangements relating only to members of the Seadrill Limited Group.

"**Permitted Refinancing**" means a refinancing of the whole or any part of the relevant Financial Indebtedness where the requirements of the Intercreditor Agreement relating to the refinancing of that Financial Indebtedness (where applicable) are complied with.

"**Permitted RigCo Group Financial Indebtedness**" means Financial Indebtedness which:

(A)    is owed by one member of the RigCo Group to another member of the RigCo Group or owed by RigCo to IHCo (provided that such Financial Indebtedness is in compliance with the Intercreditor Agreement);

(B)    is or arises under any obligation in respect of Financial Indebtedness of one or more members of the RigCo Group which is assumed by or transferred or novated to another member of the RigCo Group;

(C)    is incurred by a Special Purpose Company in connection with any Permitted RigCo Group Rig Investment, provided that:

    (i)    the amount of such Financial Indebtedness does not exceed an amount equal to 80 per cent. of the lower of the purchase price, Construction Cost or market value (as determined by the board of directors of the Parent (acting reasonably)) of the drilling unit, rig, vessel, company, shares, business or undertaking (as applicable) on the date of acquisition;

    (ii)    the relevant Special Purpose Company first offers the lenders under the Secured Facilities Agreements the option to provide such Financial Indebtedness on specified terms and, to the extent that the lenders under the Secured Facilities Agreements do not wish to provide the whole or any part of the debt financing on those terms, the relevant Special Purpose Company shall then be permitted to seek debt financing from other sources on substantially similar terms (and provided that, if there is a material change to such terms, the lenders under the Secured Facilities Agreements must be reoffered the option to provide the debt financing on such amended terms before the debt financing from other sources is entered into); and

    (iii)    the Group's latest available financial projections demonstrate that the RigCo Group will be in pro forma ("pro forma" meaning that the calculation of the financial covenants shall take into account any effect of the transaction) compliance with the RigCo financial covenants under the Secured Facilities Agreements as and when they are to apply in the next 12 months and the Parent provides evidence of this to the Agents under the Secured Facilities Agreements,

provided that any entity serving as intragroup charterer for such drilling unit, rig or vessel may provide a guarantee and security over earnings and other receivables and bank accounts relating solely to such drilling unit, rig or vessel;

(D)    is or arises under a guarantee from RigCo for or in respect of any Permitted Financial Indebtedness in connection with any Permitted Newbuild Investment, Permitted RigCo Group Rig Investment or Permitted RigCo Group Acquisition or where all of the obligors in respect of such Permitted Financial Indebtedness are members of the RigCo Group;

(E)    is or arises as a result of a member of the RigCo Group replacing another member of the RigCo Group as a rig owner or intra-group charterer in respect of a particular drilling unit, rig or vessel under the relevant Secured Facilities Agreement;

(F)    is or arises as a result of a member of the RigCo Group becoming an intra-group charterer in respect of a particular drilling unit, rig or vessel and acceding to the Secured Facilities Agreement under which that particular drilling unit, rig or vessel is financed as a guarantor;**7**

(G)    is a refinancing of the whole or any part of the Financial Indebtedness referred to in paragraphs (A) to (C) above, or is a refinancing of Financial Indebtedness refinancing that Financial Indebtedness and in each case which is a Permitted Refinancing; or

(H)    arises from any netting, setting off, multi-account overdraft, group cash pool or group cash management arrangements relating only to members of the RigCo Group.

"**Permitted Sale and Leaseback**" means any sale and leaseback, Finance Lease or similar transaction (a "**Sale and Leaseback Transaction**") which involves:

(A)    any Sale and Leaseback Transaction undertaken by any member of the NSNCo Group and which does not involve any member of the Group (other than the NSNCo Group);

(B)    one or more drilling units, rigs or vessels being sold to one or more entities which then lease back the drilling units, rigs or vessels to a member of the Group or a Permitted Joint Venture Investment in which a member of the Group participates and which meets the following conditions:

        (i)    the proceeds received by the drilling unit, rig or vessel owner before the Sale and Leaseback Transaction is implemented are sufficient to mandatorily prepay the allocated debt amount applicable to that drilling unit, rig or vessel under the relevant Secured Facilities Agreement in full and are so applied, in each case if applicable;

---

7    The Secured Facilities Agreements will be amended to include a mechanism for the release/accession of new entities in the circumstances described in this paragraph (F) and in paragraph (E) above, and the associated release and granting of security.

(ii)     any obligation on any member of the Group arising on maturity of that Sale and Leaseback Transaction to buy back the drilling unit, rig or vessel subject to it falls after the maturity date of the Secured Facilities Agreement under which that drilling unit, rig or vessel (if any) was previously financed;

(iii)    there is no Event of Default continuing at the time the Sale and Leaseback Transaction is entered into; and

(iv)    the Group's latest available financial projections demonstrate that the RigCo Group will be in pro forma ("pro forma" meaning that the calculation of the financial covenants shall take into account any effect of the transaction) compliance with the financial covenants under the Secured Facilities Agreements as and when they are to apply in the next 12 months and the Parent provides evidence of this to the Agents under the Secured Facilities Agreements; or

(C)    any capital equipment, parts or other assets being sold to one or more entities which then lease back the capital equipment, parts or other assets (as applicable) to a member of the Group or a Permitted Joint Venture Investment in which a member of the Group participates and which meets the following conditions:

(i)     there is no Event of Default continuing at the time the Sale and Leaseback Transaction is entered into; and

(ii)    the Group's latest available financial projections demonstrate that the RigCo Group will be in pro forma ("pro forma" meaning that the calculation of the financial covenants shall take into account any effect of the transaction) compliance with the financial covenants under the Secured Facilities Agreements as and when they are to apply in the next 12 months and the Parent provides evidence of this to the Agents under the Secured Facilities Agreements.

Drilling units, rigs and vessels which are subject to Permitted Sale and Leasebacks will no longer participate in the cross collateralisation at RigCo as they will be owned by the relevant lessor.

Financial Indebtedness permitted by these restrictions (taking into account which entity is incurring the Financial Indebtedness) will be "**Permitted Financial Indebtedness**".

**3. Financial Support**

The Parent shall not (and shall ensure that no other member of the Group shall) on or after the Refinancing Closing Date incur any obligation constituting Financial Support to or for the benefit of:

(A)   any of the Non-Consolidated Entities; or

(B)   any other person in whom the Parent has a direct or indirect ownership interest (in votes and/or shares) and who is not a member of the Group (together with the Non-Consolidated Entities, the "Relevant Entities"),

in each case save for Permitted Financial Support.

For these purposes, "**incur**" means issue, assume, guarantee or otherwise become liable for and the replacement, refinancing, amendment or extension of existing Financial Support the aggregate amount of which does not exceed the amount of the existing Financial Support so replaced, refinanced, amended or extended (and whether or not the replacement, refinanced, amended or extended Financial Support is the same type of instrument or obligation as the existing Financial Support) shall not be considered an incurrence.

*Definitions*

"**Financial Support**" means loans, guarantees, hedging, credits, indemnities, equity injections or equity contributions, or other similar form of credit or financial support.

"**Non-Consolidated Entities**" means, for so long as they are not members of the Group:

(A)   Seadrill Partners LLC;

(B)   Archer Limited;

(C)   Seamex Ltd;

(D)   Seabras Sapura Participacoes Limitada;

(E)   Seabras Sapura Holding GmbH;

(F)   Camburi Drilling BV;

(G)   Itaunas Drilling BV; and

(H)   Sahy Drilling BV,

and each of their respective Subsidiaries from time to time.

21

"**Permitted Financial Support**" means:

(A) any Financial Support that any member of the Group is contractually or otherwise legally obliged to provide as at the Refinancing Closing Date[8] and any refinancing or extension of the same provided that there is no change to the provider of such Financial Support and the principal amount thereof is not increased and in relation to any refinancing or extension of the same the Parent uses its reasonable endeavours to keep the amount of the same to a minimum taking into account the interests of the Group and its creditors as well as its investment in the entity which is receiving the benefit of that Financial Support;

(B) any Financial Support which is provided, procured, created or permitted to subsist in the ordinary course of trading of any member of the Group;

(C) any Financial Support granted or arising pursuant to any Permitted Joint Venture Investment, including for the avoidance of doubt any Permitted Joint Venture Investment entered into in connection with a Newbuild;

(D) any Financial Support which constitutes a Permitted Acquisition, a Permitted Disposal, a Permitted Sale and Leaseback, a Permitted Newbuild Investment or a Permitted Rig Investment;

(E) any Financial Support arising pursuant to the provision of any administrative, accounting, management or operational services in the ordinary course of business of any member of the Group;

(F) any Financial Support arising pursuant to the ongoing capital equipment and spare parts arrangements operated by any member of the Group including, but not limited to, those operated by Seadrill Global Services Limited;

(G) any Financial Support provided by any member of the NSNCo Group to any Relevant Entity in which it has a direct or indirect equity or other ownership interest;

(H) any Financial Support funded by the proceeds of a SDRL Equity Issue, SDRL Debt Issue, Permitted NSNCo Disposal, Permitted Parent Disposal or cash held by NSNCo and/or its Subsidiaries;

(I) any Financial Support consented to by the Supra Majority Lenders; or

(J) any Financial Support not permitted by the preceding paragraphs:

    (i) which the Parent considers (acting reasonably) is in the best interests of the Group;

---

[8] Note: This is based on the obligations which currently exist. Any new Financial Support obligations entered into between the date of this Annex and the Refinancing Closing Date will need to be agreed if they are to be caught by this paragraph (A). For the avoidance of doubt, this will not restrict Financial Support provided prior to the Refinancing Closing Date pursuant to existing obligations, including but not limited to JV funding obligations.

(ii)     to the extent there are no available Net Realisation Proceeds after application to any mandatory offer as required by the New Secured Notes to fund such Financial Support;

(iii)    where to the extent outstanding amounts funded pursuant to this paragraph (J) by way of Junior Obligations Permitted Payments and not repaid to RigCo exceed USD25,000,000, such excess amounts are provided by way of loans from RigCo to IHCo (and contributed or loaned by IHCo to NSNCo) in accordance with the cash pooling arrangements and repaid from Net Realisation Proceeds or amounts released from the NSN Escrow Amount in accordance with the terms of the Intercreditor Agreement **9** (but for the avoidance of doubt this shall not restrict the form of Financial Support to the Relevant Entity); and**10**

(iv)     the cumulative outstanding amount of which (excluding any outstanding amounts funded pursuant to this paragraph (J) by way of Junior Obligations Permitted Payments which have subsequently been repaid to RigCo from Net Realisation Proceeds or amounts released from the NSN Escrow Amount in accordance with the terms of the Intercreditor Agreement) does not exceed:

(x)      USD75,000,000 (or its equivalent in any other currency) in aggregate for the Group at any time; or

(y)      USD100,000,000, provided that for every dollar which exceeds USD75,000,000, one dollar has been released to IHCo from NSNCo or from assets held by NSNCo or a member of the NSNCo Group or subject to NSN Security, including the proceeds of any disposal of, or cashflows from, assets held by a member of the NSNCo Group or assets subject to NSN Security,**11**

provided that, prior to any such Financial Support being provided, the Parent shall procure that each relevant member of the NSNCo Group uses its reasonable endeavours to take steps available to it to avoid the need for such Financial Support taking into account the interests of the Group and its creditors as well as the investment in the Relevant Entity which is receiving the benefit of that Financial Support.

---

**9**     Intercreditor Agreement to provide that any RigCo cash used for basket over USD25m to be repaid to the extent of (i) available Net Realisation Proceeds under the New Secured Notes after application to any mandatory offer as required by the New Secured Notes and (ii) amounts released from the NSN Escrow Amount in accordance with the New Secured Notes but not yet released to IHCo.

**10**    It is anticipated that such financial support will be funded by way of loan to IHCo from RigCo. IHCo will then on-loan or otherwise contribute the amounts to NSNCo.

**11**    Use of IHCo cash first, before RigCo cash can be used, is covered in the Junior Obligations Permitted Payments in the Cash Pooling Term Sheet.

23

**4. Negative Pledge**

The Parent shall not (and shall ensure that no other member of the Group shall) on or after the Refinancing Closing Date create or permit to subsist any Security Interest over any of its assets other than:

(A)     in the case of any member of the Seadrill Limited Group, any Permitted Parent Security or any Permitted Group Security;

(B)     in the case of any member of the NSNCo Group, any Permitted NSNCo Security or any Permitted Group Security;

(C)     in the case of any member of the RigCo Group, any Permitted RigCo Group Security or any Permitted Group Security; and

(D)     in the case of IHCo, the Security Interests specified in the Intercreditor Agreement.

The Parent shall procure that no member of the RigCo Group shall permit to subsist cash collateral or collateral over Cash Equivalents provided by members of the RigCo Group in an aggregate amount in excess of USD125,000,000 (or its equivalent in other currencies) at any time under, in respect of or in connection with any counter-indemnity obligation in respect of any letter of credit, bank guarantee or similar provided on behalf of any member of the Group, other than up to USD85,000,000 (or its equivalent in other currencies) in connection with any unpaid Tax where the liability to pay such Tax is being contested in good faith.

*Definitions*

"**Permitted Group Security**" means:

(A)     any Security Interest existing on the Refinancing Closing Date or any Security Interest legally required to be created under arrangements existing on the Refinancing Closing Date;

(B)     any rights of set-off arising in respect of any member of the Group in the ordinary course of its business and not securing Financial Indebtedness;

(C)     any lien arising by operation of law and in the ordinary course of business and not as a result of any default or omission by any member of the Group;

(D)     any Security Interest arising in connection with any unpaid Tax where the liability to pay such Tax is being contested in good faith by appropriate proceedings;

(E)     any Security Interest arising under any court order or injunction or for costs arising in connection with any litigation or court proceedings being contested by any member of the Group in good faith;

24

(F)    any payment or close out netting or set-off arrangement pursuant to any derivative or hedging transaction entered into by any member of the Group constituting Permitted Financial Indebtedness;

(G)    any cash collateral provided under, in respect of or in connection with any counter-indemnity obligation in respect of any letter of credit, bank guarantee or similar provided on behalf of any member of the Group in respect of obligations other than for the repayment of Financial Indebtedness;

(H)    any cash collateral provided under, in respect of or in connection with any counter-indemnity obligation in respect of any letter of credit, bank guarantee or similar not falling within paragraph (G) above and funded with:

     (i)    the proceeds of any SDRL Equity Issue and/or SDRL Debt Issue;

     (ii)    the cash available within the Seadrill Limited Group;

     (iii)    the proceeds of a Permitted Parent Disposal;

     (iv)    cash held by NSNCo and/or its Subsidiaries; and/or

     (v)    the proceeds of a Permitted NSNCo Disposal.

(I)    any cash collateral provided under, in respect of or in connection with any counter-indemnity obligation in respect of any letter of credit, bank guarantee or similar not falling within paragraphs (G) or (H) above in an aggregate amount not to exceed USD100,000,000 (or its equivalent in other currencies) at any time prior to 1 January 2020 and USD200,000,000 (or its equivalent in other currencies) at any time from 1 January 2020;

(J)    any Security Interest arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to any member of the Group in the ordinary course of business;

(K)    any Security Interest instituted by or arising under any lease, charter or hire purchase arrangement entered into in the ordinary course of business;

(L)    any "Permitted Encumbrance" (or equivalent term as applicable) permitted to subsist or arise under any Secured Facilities Agreement;

(M)    deposits or grants of any other Security Interest to secure the performance of any bid, commercial contracts, leases, intellectual property rights, insurance contracts, surety bonds, performance bonds, import duties or tax liabilities or like obligations or to secure any public, statutory or regulatory obligations, in each case incurred in the ordinary course of business;

(N)    any Security Interest securing Financial Indebtedness of any member of the Group incurred to finance the acquisition of fixed or capital assets provided that:

(i)  such Security Interest shall be created substantially simultaneously with the acquisition of such fixed or capital assets;

(ii)  such Security Interest does not at any time encumber any assets other than the assets the acquisition of which was financed by such Financial Indebtedness; and

(iii)  the amount of Financial Indebtedness secured thereby is not increased (other than pursuant to the instrument under which such encumbrance was created or to the extent that such increase in Financial Indebtedness would constitute Permitted Financial Indebtedness);

(O)  any Security Interest securing Financial Indebtedness existing on any property or assets at the time of its acquisition by a member of the Group or existing on property or assets of any person that becomes a member of the Group after the date hereof at the time such person becomes a member of the Group, provided that:

(i)  the Financial Indebtedness was not created in contemplation of such acquisition;

(ii)  in the case of a Security Interest existing on any property or assets acquired by a member of the Group, the Financial Indebtedness secured thereby is assumed by the relevant acquiring member of the Group and no other person or, in the case of a Security Interest on property or assets of a person who becomes a member of the Group, is not assumed or supported by any other member of the Group (other than the Parent);

(iii)  no such Security Interest is extended to cover any additional property or assets except to the extent that such extension would constitute Permitted Security; and

(iv)  the amount of Financial Indebtedness secured thereby is not increased (other than pursuant to the instrument under which such Security Interest was created or to the extent that such increase in Financial Indebtedness would constitute Permitted Financial Indebtedness);

(P)  any Security Interest on the property of any member of the Group in favour of the landlord of such property securing licences, subleases or leases (including rental deposits);

(Q)  any attachment or judgment Security Interest or Security Interest otherwise arising as a result of legal proceedings and assessments by authorities not constituting an Event of Default;

(R)  any Security Interest securing any refinancing constituting Permitted Financial Indebtedness;

(S)  any Security Interest securing Financial Indebtedness under the Secured Facilities Agreements;

(T)  any NSN Security;

26

(U)     any Security Interest created over any shares or other ownership interests in, or debts or other obligations of, a Special Purpose Company to secure Financial Indebtedness of that Special Purpose Company and/or any other Special Purpose Company with rights or liabilities in relation to the same drilling unit(s), rig(s) or vessel(s);

(V)     any Security Interest over any of the property or assets of a Special Purpose Company;

(W)     any Security Interest securing Financial Indebtedness incurred in connection with a Permitted Newbuild Investment;

(X)     any Security Interest arising in connection with a Permitted Sale and Leaseback;

(Y)     any Security Interest incurred in the ordinary course of business arising from the drydocking or maintenance of drilling unit(s), rig(s) or vessel(s), the furnishing of supplies and bunkers to drilling unit(s), rig(s) or vessel(s), repairs and improvements to drilling unit(s), rig(s) or vessel(s), crews' wages, maritime liens and liens for salvage;

(Z)     any Security Interest securing Local Facilities the outstanding principal amount of which does not exceed in aggregate USD30,000,000 (or its equivalent in any other currency); or

(AA)    any Security Interest consented to by the Supra Majority Lenders.

"**Permitted NSNCo Security**" means:

(A)     any netting or set-off arrangement entered into by any member of the NSNCo Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances of members of the NSNCo Group (including as part of any multi-account overdraft, group cash pool or group cash management arrangements); and

(B)     any Security Interest over the shares or other ownership interests in, or the property and assets of, any member of the NSNCo Group.

"**Permitted Parent Security**" means:

(A)     any Security Interest on any property or assets of a member of the Seadrill Limited Group granted in favour of another member of the Seadrill Limited Group;

(B)     any netting or set-off arrangement entered into by any member of the Seadrill Limited Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances of members of the Seadrill Limited Group (including as part of any multi-account overdraft, group cash pool or group cash management arrangements);

(C)     any Security Interest securing Financial Indebtedness incurred to finance any Permitted Parent Rig Investment, or any derivative or hedging transaction which is entered into for hedging purposes in respect of such Financial Indebtedness, where such Security Interest does not at any time encumber any assets other than shares or other

27

ownership interests in, or the property and assets of, members of the Seadrill Limited Group which are not Obligors and where such Security Interest is not otherwise prohibited under the terms of the Secured Facilities Agreements, including the assets the acquisition of which was financed by such Financial Indebtedness; or

(D)   any Security Interest on any property or assets of a member of the Seadrill Limited Group in addition to that permitted under the previous paragraphs, and which is not Permitted Group Security, securing Financial Indebtedness the outstanding principal amount of which (when aggregated with (i) the outstanding principal amount of any other Financial Indebtedness which has the benefit of any Security Interest given by any member of the Seadrill Limited Group (other than any permitted under paragraphs (A) to (C) above or which is a Permitted Group Security) and (ii) the outstanding principal amount of any Financial Indebtedness which has the benefit of any Security Interest given by any member of the RigCo Group (other than any permitted under paragraphs (A) to (D) of the definition of "Permitted RigCo Group Security" or which is Permitted Group Security) does not exceed in aggregate USD50,000,000 (or its equivalent in any other currency).

"**Permitted RigCo Group Security**" means:

(A)   any Security Interest on any property or assets of a member of the RigCo Group granted in favour of another member of the RigCo Group;

(B)   any netting or set-off arrangement entered into by any member of the RigCo Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances of members of the RigCo Group (including as part of any multi-account overdraft, group cash pool or group cash management arrangements);

(C)   any Security Interest securing Financial Indebtedness incurred to finance any Permitted RigCo Group Rig Investment or Permitted RigCo Group Acquisition, or any derivative or hedging transaction which is entered into for hedging purposes in respect of such Financial Indebtedness, where such Security Interest does not at any time encumber any assets other than shares or other ownership interests in, or the property and assets of, the relevant Special Purpose Companies and/or the assets the acquisition of which was financed by such Financial Indebtedness;

(D)   any guarantee and/or security over earnings and other receivables and bank accounts granted by a company acting solely as intragroup charterer and relating solely to a rig, drilling unit or other vessel, granted to secure the financing of that rig, drilling unit or vessel; or

(E)   any Security Interest on any property or assets of a member of the RigCo Group in addition to that permitted under the previous paragraphs, and which is not Permitted Group Security, securing indebtedness the outstanding principal amount of which (when aggregated with (i) the outstanding principal amount of any other Financial Indebtedness which has the benefit of any Security Interest given by any member of the RigCo Group (other than any permitted under paragraphs (A) to (D) above or which is Permitted Group Security) and (ii) the outstanding principal amount of any Financial

28

Indebtedness which has the benefit of any Security Interest given by any member of the Seadrill Limited Group (other than any permitted under paragraphs (A) to (C) of the definition of "Permitted Parent Security" or which is Permitted Group Security) does not exceed in aggregate USD50,000,000 (or its equivalent in any other currency).

"**Security Interest**" means any mortgage, charge (whether fixed or floating), pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having similar effect.

A Security Interest permitted by these restrictions will be "**Permitted Security**".

**5. Disposals**

The Parent shall not (and shall ensure that no other member of the Group shall) on or after the Refinancing Closing Date enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose (a "**Disposal**") of any asset other than:

(A)    in the case of any member of the Seadrill Limited Group, any Permitted Parent Disposal or any Permitted Group Disposal;

(B)    in the case of any member of the NSNCo Group, any Permitted NSNCo Disposal or any Permitted Group Disposal;

(C)    in the case of any member of the RigCo Group, any Permitted RigCo Group Disposal or any Permitted Group Disposal; and

(D)    in the case of IHCo, to the extent permitted by the IHCo holding company undertaking.

*Definitions*

"**Permitted Group Disposal**" means any Disposal:

(A)    of trading stock made by any member of the Group in the ordinary course of business of the disposing entity;

(B)    to give effect to the IHCo—RigCo Structure;

(C)    of assets in exchange for other assets (other than drilling units, rigs, vessels or shares) comparable or superior as to type, value and quality;

(D)    of obsolete or redundant vehicles, plant and equipment for cash;

(E)    of Cash Equivalent Investments for cash or in exchange for other Cash Equivalent Investments;

(F)    of any capital equipment or spare parts relating to, or to be used in connection with, any drilling unit, rig or vessel (but not any drilling unit, rig or vessel itself) either (i) in exchange for other capital equipment or spare parts required by the member of the Group making the disposal or (ii) pursuant to the ongoing capital equipment and spare parts arrangements operated by any member of the Group including, but not limited to, those operated by Seadrill Global Services Limited;

(G)    which is the application of cash not otherwise prohibited by the terms of the Secured Facilities Agreements;

(H)    which is the granting of any licence of intellectual property or lease or licence in each case in the ordinary course of business or otherwise where the board of directors of the Parent (acting reasonably) considers this to be in the best interests of the Group;

(I)     in connection with a Permitted Sale and Leaseback;

(J)     of assets pursuant to the creation of any Security Interest not otherwise prohibited under the terms of the Secured Facilities Agreements;

(K)     which is the granting of any lease, drilling contract, charter, bareboat charter or operating lease or any licence, in each case entered into in the ordinary course of business;

(L)     pursuant to a Permitted Joint Venture Investment in which a member of the Group participates in circumstances not otherwise prohibited by the terms of the Secured Facilities Agreements;

(M)     resulting from the unwinding of a Permitted Joint Venture Investment entered into or acquired pursuant to paragraph (B)(i) of the definition of Permitted Joint Venture Investment;[12]

(N)     of any interest held by a member of the Group in a Permitted Joint Venture Investment or any Non-Consolidated Entity on arm's length terms for what the board of directors of the Parent (acting reasonably) considers to be fair value;

(O)     of any Drilling Unit, the shares in any Obligor or Drilling Unit Owner (in each case under and as such term or equivalent term is defined in any Secured Facilities Agreement) or any asset subject to a Security Interest created under or in connection with a Secured Facilities Agreement, in the case of any Drilling Unit or Drilling Unit Owner provided that the allocated debt amount applicable to the relevant Drilling Unit under the relevant Secured Facilities Agreement (if applicable) is prepaid in full[13];

(P)     of any Rig Investment on arm's length terms for what the board of directors of the Parent (acting reasonably) considers to be fair value, provided that where any financing in respect of such Rig Investment benefits from a guarantee from RigCo, either such guarantee is released or the proceeds received for such disposal are sufficient to prepay the relevant financing in full (and are so applied); or

(Q)     consented to by the Supra Majority Lenders.

"**Permitted NSNCo Disposal**" means any Disposal of any asset by a member of the NSNCo Group or which is the subject of NSN Security.

---

[12]     The intention of this paragraph is to address, by way of example, the unwinding of joint venture arrangements originally entered into for local content rules purposes where those rules no longer have to be complied with either because of a change in law or because the rig is moved out of the relevant jurisdiction.

[13]     The individual Secured Facilities Agreements will permit disposals of rigs and rig owners and related charterers without consent provided that the allocated debt amount in respect of the relevant rig under the relevant Secured Facilities Agreement is prepaid in full and the aggregate consideration received on the sale of any rig is not less than 90% of the aggregate amount required to be prepaid. There will be a mechanism to ensure automatic release of security in the case of such a disposal.

"**Permitted Parent Disposal**" means any Disposal of any asset by a member of the Seadrill Limited Group:

(A)     to another member of the Seadrill Limited Group or to IHCo or to any member of the NSNCo Group or the RigCo Group; or

(B)     not falling within paragraph (A) above and not being a Permitted Group Disposal or a Disposal of shares in IHCo provided that the Disposal is made on arm's length terms for what the board of directors of the Parent (acting reasonably) considers to be fair value.

"**Permitted RigCo Group Disposal**" means any Disposal of any asset by a member of the RigCo Group:

(A)     to another member of the RigCo Group; or

(B)     not falling within paragraph (A) above and not being a Drilling Unit, the shares of any Obligor or any Drilling Unit Owner (in each case under and as such term or equivalent term is defined in any Secured Facilities Agreement) or any asset subject to a Security Interest created under or in connection with a Secured Facilities Agreement or a Permitted Group Disposal provided that:

      (i)     the Disposal is made on arm's length terms for what the board of directors of RigCo (acting reasonably) considers to be fair value; and

      (ii)    the net consideration receivable (when aggregated with the net consideration receivable for any other such Disposal) does not exceed in any financial year of the Parent:

            (a)     at any time before the First Leverage Threshold Date, an amount equal to USD10,000,000 (or its equivalent in any other currency); and

            (b)     at any time after the First Leverage Threshold Date, an amount equal to USD50,000,000 (or its equivalent in any other currency).

A Disposal permitted by these restrictions (taking into account which entity is making the Disposal) will be a "**Permitted Disposal**".

**6. Company Acquisitions**

The Parent shall not (and shall ensure that no other member of the Group shall) on or after the Refinancing Closing Date acquire a company or any shares (or similar equity investments) or a business or undertaking (or, in each case, any interest in any of them) not constituting a Rig Investment or the acquisition of a Newbuild (a "**Company Acquisition**"), save for:

(A)     in the case of any member of the Seadrill Limited Group, any Permitted Parent Acquisition or any Permitted Group Acquisition;

(B)     in the case of any member of the NSNCo Group, any Permitted NSNCo Acquisition or any Permitted Group Acquisition;

(C)     in the case of any member of the RigCo Group, any Permitted RigCo Group Acquisition or any Permitted Group Acquisition; and

(D)     in the case of IHCo, to the extent permitted by the IHCo holding company undertaking.

*Definitions*

"**Permitted Group Acquisition**" means:

(A)     any incorporation of a company with limited liability which on incorporation becomes a member of the Group or the acquisition of a shelf company having no material assets or liabilities at the time of acquisition;

(B)     any acquisition to give effect to the IHCo – RigCo Structure;

(C)     any acquisition which arises pursuant to any legally binding obligation, commitment or arrangement of any member of the Group existing on the Refinancing Closing Date;

(D)     any acquisition of securities from any director, officer or other employee of any member of the Group in connection with the termination of that person's employment or repurchase of any options granted in the course of that person's employment;

(E)     any acquisition pursuant to the operation of any management incentive scheme of the Group or any part thereof from time to time in operation;

(F)     any acquisition which arises pursuant to the provision of Permitted Financial Support;

(G)     any acquisition of an interest in a Joint Venture or acquisition by a Joint Venture vehicle, in each case as part of implementing any Permitted Joint Venture Investment;

33

(H)     any acquisition resulting from the unwinding of a Permitted Joint Venture Investment which is not a Non-Consolidated Entity;[14]

(I)     any acquisition consented to by the Supra Majority Lenders;

(J)     prior to 1 January 2020, any single acquisition not forming part of a wider series of acquisitions where the consideration paid by members of the Group (or where it does form part of a wider series of acquisitions where the total consideration paid by members of the Group) for that acquisition and any related acquisition of which that acquisition is part does not exceed USD5,000,000 (or its equivalent in any other currency), and when aggregated with the consideration paid by members of the Group for any other acquisitions under this paragraph (J) does not exceed USD20,000,000 (or its equivalent in any other currency); or

(K)     any other acquisition to the extent the Net Consideration payable by any member of the Group is settled by a SDRL Equity Issue or funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal and where any other funding of the Net Consideration for that acquisition (if any) falls within one of the other paragraphs of this definition.

"**Permitted Joint Venture Investment**" means:

(A)     any Joint Venture existing on the Refinancing Closing Date to which a member of the Group is a party;

(B)     any Joint Venture to be entered into or Joint Venture stake to be acquired by a member of the Group (other than a member of the NSNCo Group except in respect of a Non-Consolidated Entity or Joint Venture existing on the Refinancing Closing Date) where the purpose of entering into the Joint Venture or acquiring the Joint Venture stake is (a) to enable the Group to access additional markets or increase its presence in a particular market, (b) to enable the Group to secure drilling contracts from a counterparty who is only willing or permitted by law to grant those drilling contracts pursuant to or as part of implementing a Joint Venture with the Group, or (c) otherwise a purpose that the board of directors of the Parent (acting reasonably) considers to be in the best interests of the Group and where the Parent provides details to the Agents under the Secured Facilities Agreements explaining the business rationale for the same and in each case, either:

      (i)     entering into or acquiring or increasing a stake in such Joint Venture is required by law in order to enable the Group to operate/charter a drilling unit, rig or vessel in a particular jurisdiction, provided that the Joint Venture is at all times a Subsidiary of the Parent and, where the Joint Venture involves a member of the Group whose shares are secured in favour of the lenders under a Secured Facilities Agreement, the consent of the requisite lenders under that Secured Facilities Agreement has been obtained;[15] or

---

[14]    The intention of this paragraph is to address, by way of example, the unwinding of joint venture arrangements originally entered into for local content rules purposes where those rules no longer have to be complied with either because of a change in law or because the rig is moved out of the relevant jurisdiction.

[15]    The intention of this paragraph is to permit the operation of rigs in jurisdictions where local content rules mean that by law a certain percentage of the rig owner must be owned by a local partner. The details of such arrangements would need to be considered on an individual Secured Facilities Agreement basis, including the impact on any existing security arrangements, but this should not be restricted by the Group-wide covenants as it is important for the Group to be able to deploy rigs in various jurisdictions.

(ii)     the following conditions are satisfied:

(a)     the interest of the Group in the Joint Venture is proportionate with the value of assets or capital contributed to such Joint Venture by the relevant member(s) of the Group (and for these purposes, any deferred consideration payable by the relevant Joint Venture or any third party investor in the relevant Joint Venture may be taken into account as part of the interest in the Joint Venture when determining whether such interest is proportionate);

(b)     any equity contributions made by any member of the Group to the Joint Venture in cash are funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal;

(c)     there is no Event of Default continuing at the time the Joint Venture is entered into; and

(d)     where any rigs or drilling units of the Group are being transferred to such Joint Venture, the portion of the amounts outstanding in respect of those rigs or drilling units under the relevant Secured Facilities Agreement(s) is prepaid if and to the extent required in accordance with the terms of that/those Secured Facilities Agreement(s);

(C)     any Joint Venture entered into by a member of the Group (other than a member of the NSNCo Group) in connection with any Newbuild Contract in order to avoid the Group having to take delivery of the relevant Newbuild pursuant to a legally binding contractual term of the Newbuild Contract, provided that any equity contribution made by any member of the Group after the Refinancing Closing Date and funded in cash in connection with such Joint Venture which is not funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal:

(i)     in respect of Guaranteed Newbuilds and Guaranteed Newbuild Contracts, when aggregated with (a) all other Guaranteed Newbuild JV Equity Contributions, (b) all Guaranteed Newbuild Delivery Equity Contributions and (c) all Permitted Newbuild Contract Payments pursuant to the basket in paragraph (a) of the definition of Permitted Newbuild Contract Payments, in each case to the extent not funded with the proceeds of a SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal, shall not exceed USD200,000,000 [16] (or its equivalent in any other currency);

---

[16]     Basket to be reduced to the extent of amounts spent on such payments prior to the Refinancing Closing Date.

(ii)     to the extent not funded pursuant to paragraph (i) above, shall not be permitted prior to 1 January 2020; and

(iii)     to the extent not funded pursuant to paragraph (i) above, from 1 January 2020, when aggregated with (a) all other Newbuild JV Equity Contributions, (b) all Newbuild Delivery Equity Contributions, (c) all Permitted Newbuild Contract Payments pursuant to the basket in paragraph (c) of the definition of Permitted Newbuild Contract Payments and (d) all Acquisitions Basket Funding, in each case to the extent not funded with the proceeds of a SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal, shall not exceed the then applicable Newbuild and Acquisitions Basket;

(D)     any Joint Venture to the extent the equity contributions made by any member of the Group are funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal;

(E)     any other Joint Venture entered into by a member of the Seadrill Limited Group either:

       (a)     not falling within paragraphs (A) to (D) above where the equity contribution made by members of the Seadrill Limited Group for that Joint Venture; or

       (b)     only partly falling within one of paragraphs (A) to (D) above where any equity contribution made by members of the Seadrill Limited Group for that Joint Venture which is not funded as contemplated by the relevant paragraph(s) of this definition,

     is funded with:

       (x)     cash held by any members of the Seadrill Limited Group (being the proceeds of any SDRL Equity Issues or SDRL Debt Issues and cashflows from assets held by or acquisitions and investments made by any member of the Seadrill Limited Group) other than restricted cash (including cash transferred from IHCo to Seadrill Limited) which is subject to the USD25,000,000 cap under the cash pooling arrangements[17]; and/or

       (y)     the proceeds of a Permitted Parent Disposal or a Permitted NSNCo Disposal;

(F)     any other Joint Venture entered into by a member of the RigCo Group either:

       (a)     not falling within paragraphs (A) to (D) above where the equity contribution made by members of the RigCo Group for that Joint Venture, or

---

[17]     Restricted amounts transferred from IHCo to Seadrill Limited and which are subject to the USD25m cap will be paid into a separate bank account for identification purposes.

(b)   only partly falling within one of paragraphs (A) to (D) above where any equity contribution made by members of the RigCo Group for that Joint Venture which is not funded as contemplated by the relevant paragraph(s) of this definition,

when aggregated with:

(1)   all Newbuild Basket Funding;

(2)   the Net Consideration paid by any member of the Seadrill Limited Group in respect of any Permitted Parent Acquisition (to the extent funded pursuant to paragraph (C)(iv) of the definition thereof)

(3)   the Net Consideration paid by any member of the Seadrill Limited Group in respect of any Permitted Parent Rig Investment (to the extent funded pursuant to paragraph (D) of the definition thereof);

(4)   the equity contribution made for any other Joint Ventures falling under this paragraph (F);

(5)   the Net Consideration paid for any Permitted RigCo Group Acquisition falling under paragraph (D) of the definition of "Permitted RigCo Group Acquisition"; and

(6)   the Net Consideration paid for any Permitted RigCo Group Rig Investment falling under paragraph (B)(x) of the definition of "Permitted RigCo Group Rig Investment",

does not at any time exceed an amount equal to the then applicable Newbuild and Acquisitions Basket; or

(G)   any other Joint Venture entered into by a member of the NSNCo Group either:

(a)   not falling within paragraphs (A) to (D) above where the equity contribution made by a member of the NSNCo Group for that Joint Venture, or

(b)   only partly falling within one of paragraphs (A) to (D) above where any equity contribution made by a member of the NSNCo Group for that Joint Venture which is not funded as contemplated by the relevant paragraph(s) of this definition,

is funded with:

(x)   cash held by NSNCo and/or its Subsidiaries; and/or

(y)   the proceeds of a Permitted NSNCo Disposal.

"**Permitted NSNCo Acquisition**" means:

(A)   any acquisition by a member of the NSNCo Group from, or of shares or similar equity investments issued by, another member of the NSNCo Group; or

(B)    any acquisition by a member of the NSNCo Group to the extent the Net Consideration payable is funded with:

    (i)    cash held by NSNCo and/or its Subsidiaries; and/or

    (ii)    the proceeds of a Permitted NSNCo Disposal.

"**Permitted Parent Acquisition**" means:

(A)    any acquisition from, or of shares or similar equity investments issued by, another member of the Seadrill Limited Group;

(B)    any acquisition by the Parent of shares or similar equity instruments issued by IHCo; or

(C)    any acquisition to the extent the Net Consideration payable by any member of the Seadrill Limited Group is settled by a SDRL Equity Issue or funded with:

    (i)    cash held by any members of the Seadrill Limited Group (being the proceeds of any SDRL Equity Issues or SDRL Debt Issues and cashflows from assets held by or acquisitions and investments made by any member of the Seadrill Limited Group) other than restricted cash (including cash transferred from IHCo to Seadrill Limited) which is subject to the USD25,000,000 cap under the cash pooling arrangements[18];

    (ii)    the proceeds of any SDRL Equity Issue or SDRL Debt Issue;

    (iii)    the proceeds of a Permitted Parent Disposal or a Permitted NSNCo Disposal; and/or

    (iv)    any available amount in respect of the then applicable Newbuild and Acquisitions Basket.

"**Permitted RigCo Group Acquisition**" means:

(A)    any acquisition from, or of shares or similar equity investments issued by, another member of the RigCo Group;

(B)    any acquisition funded with the proceeds of a Permitted RigCo Group Disposal in circumstances where the proceeds of such Permitted RigCo Group Disposal are not required to be applied in prepayment of any of the Secured Facilities Agreements or any other Financial Indebtedness of the Group or paid into any Excess Sales Proceeds Escrow Account;

(C)    any acquisition to the extent the Net Consideration payable by any member of the RigCo Group is settled by a SDRL Equity Issue or funded with the proceeds of any SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal and where any other funding of the Net Consideration for that acquisition (if any) falls within one of the other paragraphs of this definition; or

---

[18]    Restricted amounts transferred from IHCo to Seadrill Limited and which are subject to the USD25m cap will be paid into a separate bank account for identification purposes.

(D)    any acquisition, other than a Permitted Group Acquisition, either:

    (a)    not falling within paragraphs (A) to (C) above where the Net Consideration paid by members of the RigCo Group, or

    (b)    only partly falling within one of paragraphs (A) to (C) above where the Net Consideration paid by members of the RigCo Group for that acquisition which is not funded as contemplated by the relevant paragraph(s) of this definition,

    when aggregated with:

    (1)    all Newbuild Basket Funding;

    (2)    the Net Consideration paid by any member of the Seadrill Limited Group in respect of any Permitted Parent Acquisition (to the extent funded pursuant to paragraph (C)(iv) of the definition thereof);

    (3)    the Net Consideration paid by any member of the Seadrill Limited Group in respect of any Permitted Parent Rig Investment (to the extent funded pursuant to paragraph (D) of the definition thereof);

    (4)    the Net Consideration paid for any other acquisitions falling under this paragraph (D);

    (5)    the Net Consideration paid for any Permitted RigCo Group Rig Investment falling under paragraph (B)(x) of the definition of "Permitted RigCo Group Rig Investment"; and

    (6)    the aggregate equity contributions made for any Joint Ventures falling within paragraph (F) of the definition of "Permitted Joint Venture Investment",

    does not at any time exceed the then applicable Newbuild and Acquisitions Basket.

An acquisition permitted by these restrictions (taking into account which entity is making the acquisition) will be a "**Permitted Acquisition**".

**7. Rig Investments**

The Parent shall not (and shall ensure that no other member of the Group shall) on or after the Refinancing Closing Date:

(A)     acquire a drilling unit, rig or vessel;

(B)     acquire any company, business or undertaking or any shares in a company in each case which owns one or more drilling units, rigs or vessels; or

(C)     enter into or make payments in respect of a newbuild contract entered into after the Refinancing Closing Date in respect of a drilling unit, rig or vessel,

in each case where such drilling units, rigs or vessels are not Newbuilds (each a "**Rig Investment**"), save for any Permitted Rig Investment or any Rig Investment consented to by the Supra Majority Lenders.

*Definitions*

"**Permitted JV Rig Investment**" means any Rig Investment:

(A)     pursuant to any acquisition of an interest in a Joint Venture or acquisition by a Joint Venture vehicle, in each case as part of implementing any Permitted Joint Venture Investment; or

(B)     resulting from the unwinding of a Permitted Joint Venture Investment which is not a Non-Consolidated Entity.[19]

"**Permitted Parent Rig Investment**" means any Rig Investment by a member of the Seadrill Limited Group provided that the Net Consideration payable by any member of the Seadrill Limited Group is settled by a SDRL Equity Issue or funded with:

(A)     cash held by any members of the Seadrill Limited Group (being the proceeds of any SDRL Equity Issues or SDRL Debt Issues and cashflows from assets held by or acquisitions and investments made by any member of the Seadrill Limited Group) other than restricted cash (including cash transferred from IHCo to Seadrill Limited) which is subject to the USD25,000,000 cap under the cash pooling arrangements[20];

(B)     the proceeds of any SDRL Equity Issue or SDRL Debt Issue;

(C)     the proceeds of a Permitted Parent Disposal or a Permitted NSNCo Disposal; and/or

---

[19]     The intention of this paragraph is to address, by way of example, the unwinding of joint venture arrangements originally entered into for local content rules purposes where those rules no longer have to be complied with either because of a change in law or because the rig is moved out of the relevant jurisdiction.

[20]     Restricted amounts transferred from IHCo to Seadrill Limited and which are subject to the USD25m cap will be paid into a separate bank account for identification purposes.

(D)    any available amount in respect of the then applicable Newbuild and Acquisitions Basket.

"**Permitted RigCo Group Rig Investment**" means any Rig Investment by a member of the RigCo Group provided that each of the conditions set out in sub-paragraphs (i) to (v) of paragraph (B) of the definition of "Permitted Newbuild Investment" are met *mutatis mutandis* with respect to such Rig Investment (provided that, in the case of sub-paragraph (iii) of paragraph (B) of the definition of "Permitted Newbuild Investment", a full or limited guarantee from RigCo in respect of the relevant Financial Indebtedness shall also be permitted) and the Rig Investment is:

(A)    on arm's length terms at what the board of directors of the Parent (acting reasonably) considers to be fair value; and

(B)    one of the following conditions is satisfied:

    (x)    any Net Consideration paid by members of the RigCo Group for that acquisition which is not settled by a SDRL Equity Issue or funded with the proceeds of a SDRL Equity Issue, SDRL Debt Issue, Permitted Parent Disposal or Permitted NSNCo Disposal or in accordance with paragraph (y) below, when aggregated with:

        (i)    any Newbuild Basket Funding;

        (ii)    the Net Consideration paid by any member of the Seadrill Limited Group in respect of any Permitted Parent Acquisition (to the extent funded pursuant to paragraph (C)(iv) of the definition thereof)

        (iii)    the Net Consideration paid by any member of the Seadrill Limited Group in respect of any Permitted Parent Rig Investment (to the extent funded pursuant to paragraph (D) of the definition thereof);

        (iv)    the Net Consideration paid for any other acquisitions falling under this paragraph (B)(x);

        (v)    the Net Consideration paid for any Permitted RigCo Group Acquisition falling under paragraph (D) of the definition of "Permitted RigCo Group Acquisition"; and

        (vi)    the aggregate equity contributions made for any Joint Ventures falling within paragraph (F) of the definition of "Permitted Joint Venture Investment",

    does not at any time exceed the then applicable Newbuild and Acquisitions Basket; or

41

(y)      the Rig Investment is by a Special Purpose Company which is a member of the RigCo Group from another member of the RigCo Group.[21]

A Rig Investment permitted by these restrictions (taking into account which entity is making the acquisition) will be a "**Permitted Rig Investment**".

[21]      We envisage that it would be possible to refinance rigs into new facilities by a new RigCo Group company either acquiring the rigs or the rig-owning entities, funding the acquisition with new debt and using the proceeds to pay down the existing allocated debt amount.

**8. Change of business**

The Parent shall ensure that, from the Refinancing Closing Date, no substantial change is made to the general nature of the business of the Group taken as a whole from that carried on on the Refinancing Closing Date.

**9. Transactions with Affiliates**

Except for (i) transactions and payments expressly permitted under the cash pooling arrangements (including those contemplated by the Specified Permitted Payments as defined in the Cash Pooling Term Sheet) or entered into in the ordinary course of business of the Group, (ii) any transactions and payments made in the ordinary course of business pursuant to day-to-day operating requirements of the Group (including, without limitation, sharing management, accounting and legal functions and expenses), (iii) transactions arising pursuant to the ongoing capital equipment and spare parts arrangements operated by any member of the Group including, but not limited to, those operated by Seadrill Global Services Limited and (iv) intercompany loans or other Financial Indebtedness owed by one member of the Group to another member of the Group otherwise in compliance with the Finance Documents, the Parent shall procure that, from the Refinancing Closing Date:

(A)     all transactions entered into by a member of the RigCo Group with IHCo, a member of the Seadrill Limited Group or a member of the NSNCo Group; and

(B)     all transactions entered into by a member of the Seadrill Limited Group with IHCo, a member of the RigCo Group or a member of the NSNCo Group,

are made on arm's length terms (as determined by the board of directors of the relevant entity (acting reasonably) or a member of senior management of the Parent).

**10. IHCo holding company undertaking**22

IHCo shall not trade, carry on any business, own any assets or incur any liabilities except for:

(A)   the business or trade of a holding company and all activities incidental thereto;

(B)   as required to give effect to the IHCo—RigCo Structure;

(C)   the ownership of shares in RigCo and NSNCo;

(D)   the entering into, the exercise of rights and the performance of obligations under, loans and other intercompany obligations owed to, or by, any member of the NSNCo Group, RigCo or any member of the Seadrill Limited Group in each case in accordance with the terms of the Transaction Documents, and any liabilities arising under such loans and intercompany obligations;

(E)   the provision of administrative services (excluding treasury services) to RigCo and NSNCo of a type customarily provided by a holding company to its Subsidiaries;

(F)   operating, exercising its rights and performing its obligations in respect of the IHCo Cash Pool, including but not limited to the making of contributions to NSNCo and RigCo, the application of cash, the transfer of funds and the granting of loans to another member of the Group in each case in accordance with the terms of the Transaction Documents;

(G)   exercising its rights and performing its obligations under the Transaction Documents and any liabilities under the Transaction Documents;

(H)   professional fees and administration costs in the ordinary course of business as a holding company;

(I)   the acquisition and surrender of tax losses; and

(J)   as consented to in writing by the Supra Majority Lenders.

---

22    Covenant to be further developed in the long form documentation in order to permit activities contemplated in the term sheets.

45

**11. Dividends**

The Parent shall not:

(A)    make any dividend payments or other distributions in respect of its share capital to its shareholders;

(B)    enter into new total return swaps (for the avoidance of doubt, excluding roll-over or unwinding, in whole or in part, of existing total return swaps (which roll-over or unwinding will include the purchase of shares and corresponding reduction of any such existing total return swap)) or enter into similar transactions with similar effect; or

(C)    buy back or redeem any shares in its capital,

(each an "**Equity Transaction**") in each case, other than:

(x)    to the extent any of the same occurs solely as part of the operation in the ordinary course of business of any executive or employee benefit scheme or plan;

(y)    in respect of (A) above, where funded from the cash held by any members of the Seadrill Limited Group (being the proceeds of any SDRL Equity Issues and SDRL Debt Issues and cashflows from assets held by or disposed of by, or acquisitions and investments made by, any member of the Seadrill Limited Group) other than restricted cash (including cash transferred from IHCo to Seadrill Limited) which is subject to the USD25,000,000 cap under the cash pooling arrangements, provided that the aggregate amount of all dividends or distributions funded pursuant to this paragraph (y) shall not exceed an amount equal to 100 per cent. of the proceeds of all SDRL Equity Issues; or

(z)    in respect of (A) above, from 1 July 2021, provided that:

    (1)    there is no Event of Default continuing at the time;

    (2)    the Amortisation Conversion Election has not been exercised or if it has been exercised, the secured tranches created as a result of its exercise have been prepaid in full;

    (3)    aggregate proceeds of USD200,000,000 have been raised from SDRL Equity Issues after the Refinancing Closing Date;

    (4)    Gross Leverage for the RigCo Group has been less than 2.5x for the four consecutive quarters prior to the date of such payment or distribution and the Parent provides evidence of this to the Agents under the Secured Facilities Agreements;

    (5)    amortisation under the Secured Facilities Agreements has been repaid or prepaid from 1 January 2017 in an aggregate amount equal to the equivalent of USD510,000,000 per annum calculated from 1 January 2017 up to the date of the Equity Transaction; and

(6)   for every dollar applied to an Equity Transaction pursuant to this paragraph (z), three dollars is applied:

    (i)   firstly, in repayment of PIK interest (if any) accrued under the Secured Facilities Agreements (on a pro rata basis across all Secured Facilities Agreements); and

    (ii)   secondly, in prepayment of the Secured Facilities Agreements (on a pro rata basis across all Secured Facilities Agreements, and applied against future amortisation payments in inverse chronological order).

47

**ANNEX 5**
**FINANCIAL COVENANT DEFINITIONS**

| | |
|---|---|
| **"Additional Indebtedness"** | Interest-bearing Financial Indebtedness incurred by members of the RigCo Group pursuant to: |

(a) paragraphs (J), (L) or (N) of the definition of Permitted Group Financial Indebtedness;

(b) paragraph (C) of the definition of Permitted RigCo Group Financial Indebtedness; and

(c) paragraphs (B) or (C) of the definition of Permitted Sale and Leaseback,

(each as defined in Annex 4 (Group Wide Restrictive Covenants)) or any refinancing of the same.

| | |
|---|---|
| **"Adjusted EBITDA"** | In relation to a Relevant Period, EBITDA for that Relevant Period adjusted by: |

(a) including the operating profit (calculated on the same basis as EBITDA) of a member of the RigCo Group (or attributable to a business or assets) acquired during the Relevant Period, for that Relevant Period prior to its becoming a member of the RigCo Group or (as the case may be) prior to the acquisition of the business or assets, provided that:

(i) in the event that a member of the RigCo Group acquires rigs or rig owning entities with a firm charter contract in place and historical operating profit information (calculated on the same basis as EBITDA) is available for the rigs' or relevant entities' previous ownership but not in respect of the whole of the Relevant Period, such operating profit shall be annualised to represent operating profit (calculated on the same basis as EBITDA) for the Relevant Period and included within EBITDA, provided that such firm charter contract remained in place for the remainder of the Relevant Period; and

(ii) in the event that a member of the RigCo Group acquires rigs or rig owning companies without historical operating profit information (calculated on the same basis as EBITDA) available, RigCo may calculate the future projected operating profit (calculated on the same basis as EBITDA) for the next 12 months subject to any such new rig having (i) a firm charter contract in place at the time of delivery of the rig with a duration of minimum 12 months and (ii) a firm charter contract in place at the time of such operating profit calculation, and such future projected operating profit (calculated on the same basis as EBITDA) shall be included within EBITDA for the Relevant Period, provided RigCo provides the Agent with a detailed calculation of the future projected operating profit;

76

(b) including all contributions made by IHCo to RigCo (including Equity Cure Contributions) after the Refinancing Closing Date; and

(c) excluding the operating profit (calculated on the same basis as EBITDA) of a member of the RigCo Group (or attributable to a business or assets) disposed of during the Relevant Period, for that part of the Relevant Period prior to such disposal.

**"Cash"**  (a) cash in hand legally and beneficially owned by a member of the RigCo Group;

(b) cash deposits legally and beneficially owned by a member of the RigCo Group and which are held in the Excess Sale Proceeds Escrow Accounts, the bank account(s) into which IHCo funds cash pursuant to the Contribution Agreement, the RigCo periodic cash sweep accounts or any of the RigCo Group cash pooling accounts; and

(c) all other cash deposits legally and beneficially owned by a member of the RigCo Group and which are held in any other bank accounts and all cash collateral posted by a member of the RigCo Group (whether held in a bank account of a member of the RigCo Group or in the account of the relevant bank or other financial institution in favour of which such cash collateral was posted) which in each case are:

(i) free from any Security Interest (for the avoidance of doubt, for this purpose rights of set-off and similar rights in favour of any account bank on such account bank's usual terms of business shall not constitute a Security Interest), other than (A) pursuant to the Security Documents relating to any of the Secured Bank Facilities and as therein defined and (B) any Permitted Security provided that, in respect of cash collateral and collateral over Cash Equivalents secured in favour of persons other than the Senior Secured Lenders and/or any agent or representative for them (**"Pledged Cash and Cash Equivalents"**), only up to US$100,000,000 (or its equivalent in other currencies) of such Pledged Cash and Cash Equivalents shall be included;

(ii) otherwise (and excluding any arrangements relating to (A) Security Interests pursuant to the Security Documents relating to any of the Secured Bank Facilities and as therein defined and/or (B) any Permitted Security) at the free and unrestricted disposal of the relevant member of the RigCo Group by which it is owned; and

(iii) otherwise, in the case of cash deposits legally and beneficially owned by a member of the RigCo Group other than RigCo, and excluding any arrangements relating to (A) Security Interests pursuant to the Security Documents relating to any of the Secured Bank Facilities and as therein defined and/or (B) any Permitted Security, capable or would, upon the occurrence of an Event of Default under the Secured Facility Agreements, become capable of being paid without restriction to RigCo within five (5) Business Days of request or demand therefor either by way of a dividend, by way of loan or by way of a repayment of principal (or the payment of interest thereon) in respect of an intercompany loan from RigCo to that member of the RigCo Group.

**"Cash Equivalent"**      At any time:

(a) any investment in marketable debt obligations issued or guaranteed by (i) a government or (ii) an instrumentality or agency of a government and in respect of (i) and (ii) having a credit rating of either A-1 or higher by Standard & Poor's Rating Group Services or the equivalent with any other principal credit rating agency in the United States of America or Europe, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(b) commercial paper (debt obligations) not convertible or exchangeable to any other security;

(i) for which a recognised trading market exists;

(ii) issued by an issuer incorporated in the United States of America, the United Kingdom or Norway;

(iii) which matures within one year after the relevant date of calculation; and

(iv) which has a credit rating of at least A-1 or higher by Standard & Poor's Rating Group Services or the equivalent with any other principal credit rating agency in the United States of America or Europe;

(c) any investment in money market funds which (i) have a credit rating of either A-1 or higher by Standard & Poor's Rating Group Services or the equivalent with any other principal credit rating agency in the United States of America or Europe, (ii) which invest substantially all their assets in securities of the types described in paragraphs (a) to (b) above and (iii) can be turned into cash on not more than 5 days' notice; or

78

(d) any other debt security approved by the Supra Majority Lenders,

in each case, to which any member of the RigCo Group is alone (or together with other members of the RigCo Group) beneficially entitled at that time and which is not issued or guaranteed by any member of the RigCo Group or subject to any Security Interest other than any Permitted Security, provided that, in respect of Pledged Cash and Cash Equivalents, only up to US$100,000,000 (or its equivalent in other currencies) of such Pledged Cash and Cash Equivalents shall be included.

**"Debt Service"**   In respect of any Relevant Period, the aggregate (without double counting) of all amounts of interest and scheduled principal payments payable by members of the RigCo Group falling due under the Secured Facility Agreements and in respect of any Additional Indebtedness during that Relevant Period, including any scheduled principal payments which have been converted into Amortisation Conversion Election tranches (as though such scheduled principal payments had not been converted), but for the avoidance of doubt excluding (i) any amounts payable on the final maturity date under any of the Secured Facility Agreements or on the final maturity date in respect of any Additional Indebtedness; (ii) any interest payments falling due in respect of any Amortisation Conversion Election tranches; (iii) any mandatory or voluntary prepayment or any related prepayment fees or charges (including Break Costs) under the Secured Facility Agreements or in respect of any Additional Indebtedness; and (iv) amounts payable by members of the RigCo Group under fees, increased costs, tax and indemnities provisions under the Secured Facility Agreements, the Finance Documents and the Transaction Documents (including the RSA and the Investment Agreement) or in respect of any Additional Indebtedness.

**"Debt Service Cover Ratio"**   The ratio of Adjusted EBITDA to Debt Service in respect of any Relevant Period.

**"EBITDA"**   In respect of any Relevant Period, the consolidated operating profit of the RigCo Group before taxation (including the results from discontinued operations):

(a) before deducting any interest, commission, fees, discounts, prepayment fees, premiums or charges and other finance payments whether paid, payable or capitalised by any member of the RigCo Group (calculated on a consolidated basis) in respect of that Relevant Period;

(b) not including any accrued interest owing to any member of the RigCo Group;

(c) after adding back any amount attributable to the amortisation, depreciation or impairment of assets of members of the RigCo Group (and taking no account of the reversal of any previous impairment charge made in that Relevant Period);

(d) before taking into account any Exceptional Items;

(e) before taking into account any Pension Items;

(f) before taking into account any gains and/or losses arising from a disposal of any asset to any person that is not a member of the RigCo Group or an upward or downward revaluation of any other asset;

(g) before deducting any fees, costs and expenses, stamp, registration and other Taxes incurred by or any member of the RigCo Group in connection with any Permitted Acquisition or Permitted Rig Investment;

(h) before taking into account any unrealised gains or losses on any derivative instrument (other than any derivative instrument which is accounted for on a hedge accounting basis);

(i) adding back any costs or losses recovered through a claim under any insurance, warranty or indemnity;

(j) adding back any business interruption or loss recovered through insurance proceeds; and

(k) adding back any non-cash charges relating to any employee equity plan or management incentive plan,

in each case, to the extent added, deducted or taken into account, as the case may be, for the purposes of determining operating profits of the RigCo Group before taxation.

| "Exceptional Items" | Any material items of an unusual or non-recurring nature which represent a gain or loss or cost arising on or in relation to: |

(a) the restructuring of any member of the RigCo Group (including the restructuring of the Group occurring on the Refinancing Closing Date or in connection with the Recapitalisation Plan) or other restructuring charge;

(b) revaluations, write downs or impairment of non-current assets; or

80

|  |  |
|---|---|
|  | (c) any fees, cash, stamp duty, registration fees or taxes related to any equity offering, investments, disposals, acquisitions, incurrence of Financial Indebtedness or other activities permitted under the terms of the Finance Documents. |
| **"Financial Quarter"** | The period commencing on the day after one Quarter Date and ending on the next Quarter Date. |
| **"Minimum Liquidity"** | As at any date, the aggregate amount of Cash and Cash Equivalents (but where an Event of Default has occurred and is continuing, excluding any Cash in the Excess Sale Proceeds Escrow Accounts). |
| **"Net Funded Debt"** | At any time, the aggregate of all outstanding principal amounts under the Secured Facility Agreements and in respect of any Additional Indebtedness (including, for the avoidance of doubt, any amounts outstanding under any Amortisation Conversion Election tranches) less the aggregate amount of Cash and Cash Equivalents at that time. |
| **"Net Leverage"** | In respect of any Relevant Period, the ratio of Net Funded Debt on the last day of that Relevant Period to Adjusted EBITDA in respect of that Relevant Period. |
| **"Pension Items"** | Any income or charge attributable to a post-employment benefit scheme other than the current service costs attributable to the scheme. |
| **"Quarter Date"** | Each of 31 March, 30 June, 30 September and 31 December. |
| **"Relevant Period"** | Each period of twelve months ending on or about the last day of each Financial Quarter. |

81

**ANNEX 4 to EXHIBIT A**

**New Secured Notes Term Sheet**

**SEADRILL LIMITED**

**RECAPITALISATION PLAN PROPOSAL**

**NEW SECURED NOTES TERM SHEET**

**SUMMARY TERMS FOR NEW SECURED NOTES**

**The New Secured Notes are envisaged to take the form of New York law governed high yield bonds. The New Secured Notes will initially be issued on a private placement basis with the timing of the offering memorandum and other requirements for listing, placement, resales and marketing as set out in the Investment Agreement (as defined in the restructuring support and lock-up agreement (the "RSA") to which this term sheet is attached).**

**Further details of the terms of the Secured Facilities Agreements (as defined below), the intercreditor principles and the cash pooling arrangements are set out in the term sheets annexed at Exhibit A of the RSA.**

**Reference to "Seadrill Limited" or the "Company" in this term sheet are to Seadrill Limited, any successor of Seadrill Limited or any entity to which all or substantially all of Seadrill Limited's material assets are directly or indirectly transferred and which becomes the holding company for IHCo and its subsidiaries.**

**A.    PARTIES**

| | | |
|---|---|---|
| 1. | **Issuer** | NSNCo, a newly formed, direct and wholly-owned special purpose subsidiary of IHCo, which will be a newly formed, direct and wholly-owned subsidiary of Seadrill Limited and 100% direct owner of RigCo (both IHCo and NSNCo to be incorporated in Bermuda). |
| | | New secured notes to be issued substantially on the terms set out in these Summary Terms (the "**New Secured Notes**"). |
| 2. | **Guarantees in favour of the New Secured Notes** | (a) a guarantee from Seadrill Limited (on a pari passu basis with the Bank Finance Parties and all other unsecured creditors of Seadrill Limited); |
| | | (b) a first ranking guarantee from IHCo; |
| | | (c) a first ranking guarantee from all other subsidiaries of Seadrill Limited outside of the RigCo group (being RigCo and its subsidiaries) (other than Seadrill Limited and IHCo, which are addressed in (a) and (b) above) subject to exceptions for immaterial subsidiaries and rig-owning subsidiaries to be agreed; and |
| | | (d) a second ranking guarantee from RigCo (shared with (i) a first ranking guarantee in favour of the lenders, agents and other finance parties (the "**Bank Finance Parties**") under the existing secured facilities agreements to which Seadrill Limited and certain of its subsidiaries are a party (the "**Secured Facilities Agreements**") and (ii) third ranking guarantees in favour of the Ship Finance Parties as defined in and as set out in the Intercreditor Term Sheet). |

| 3. | **Investors** | The Debt Commitment Parties and other Rights Offering Participants (as defined in, and as contemplated under, the Investment Agreement) including, without limitation, (i) Hemen Investments Limited or its affiliates ("**Hemen**"), (ii) Centerbridge Credit Partners L.P or its affiliates ("**Centerbridge**"), (iii) funds managed by or affiliated with Aristeia Capital LLC, GLG Partners Inc., Saba Capital Management, LP and Whitebox Advisors LLC (such funds being the **"Select Commitment Parties"**) and (iv) ARCM Master Fund III Ltd ("**ARCM**") and Fintech Investments Ltd ("**Fintech**") and ARCM and Fintech, together with Hemen, Centerbridge and the Select Commitment Parties being the "**Investors**"), on the terms set out in the Investment Agreement. |
|---|---|---|
| | | Hemen and Centerbridge will fully underwrite US$462,442,000 of the New Secured Notes issuance on the terms set out in the Investment Agreement. |
| | | ARCM will underwrite US$15 million of the New Secured Notes issuance on the terms set out in the Investment Agreement. |
| | | Fintech will underwrite US$25 million of the New Secured Notes issuance on the terms set out in the Investment Agreement. |
| | | The Select Commitment Parties will fully underwrite US$357,558,000 of the New Secured Notes issuance on the terms set out in the Investment Agreement. |
| 4. | **Commitment Term** | As set out in the Investment Agreement. |
| 5. | **Group** | The Seadrill group. |
| 6. | **NSNCo Group** | NSNCo and its restricted subsidiaries. |
| **B.** | **NEW SECURED NOTES** | |
| 1. | **Status** | Senior secured obligations of the Issuer which will rank *pari passu* without any preference or priority among themselves. |

| 2. | **Notes** | Senior secured notes to be issued in US dollars. |
|---|---|---|
| 3. | **Initial Principal Amount** | US$860,000,000. |

The principal amount of the New Secured Notes can be increased to up to US$1,000,000,000 without requiring any consent from the lenders under the Secured Credit Facilities provided that (i) the equity element of the new money investment does not fall below US$200 million and any additional New Secured Notes proceeds arising from such further New Secured Notes flow down into RigCo and its subsidiaries (net of any required additional escrow amount to be provided on the same basis as set under NSNCo Cash below).

| 4. | **Listing** | Application will be made for the New Secured Notes to be listed on the Lux Euro MTF, Irish Stock Exchange or another exchange to be agreed by the Required Commitment Parties (as defined in the RSA) acting reasonably. The New Secured Notes will be initially issued on a private placement basis. An Offering Memorandum containing information customary for 144A issuances of high yield securities in the US will be prepared by the Company on the Refinancing Closing Date (as defined below) or as soon as practicable after the date of issuance of the New Secured Notes but in any event within a timeframe consistent with the requirements of the Investment Agreement. |
|---|---|---|
| 5. | **Public rating** | The Issuer shall procure a public instrument rating of the New Secured Notes within a period of time to be agreed between the Company and the Required Commitment Parties (in each case acting reasonably) after the date on which all the refinancing conditions have been satisfied (the "**Refinancing Closing Date**"). |

4

| 6. | **Purpose** | On the Refinancing Closing Date, the proceeds from the issue of the New Secured Notes will be used (a) to provide a contribution of US$523.9 million to RigCo on the Refinancing Closing Date as described in the Cash Pooling Term Sheet at Annex 5 to Exhibit A of the RSA (the "**Cash Pooling Term Sheet**") and support compliance with the continuing RigCo Minimum Liquidity Requirement as described in the Credit Facilities Term Sheet at Annex 3 to Exhibit A of the RSA (the "**Credit Facilities Term Sheet**") in respect of the cash pooling arrangements as set out in the Cash Pooling Term Sheet, (b) to fund the NSN Escrow Amount as described in section E6 below and in the Cash Pooling Term Sheet, (c) to provide a contribution of US$100 million to IHCo on the Refinancing Closing Date as described in the Cash Pooling Term Sheet, and (d) to pay the 1% closing fee. |
|---|---|---|
| 7. | **Final Maturity Date** | Seventh anniversary of the Refinancing Closing Date or such later date such that the last occurring maturity date in respect of the Secured Facilities Agreements falls not less than 6 months prior to the maturity of the New Secured Notes. |
| **C.** | **ECONOMICS** | |
| 1. | **Price of Notes** | Par subject to a 1% closing fee (see section C5) |
| 2. | **Amortisation** | Bullet repayment on Final Maturity Date. |
| 3. | **Interest** | The New Secured Notes will bear interest at a fixed rate of 12 per cent per annum consisting of (i) 4 per cent per annum payable in cash and (ii) 8 per cent per annum interest paid with additional New Secured Notes ("**PIK Interest**"). |
| | | Subject to the following paragraph, the Issuer will have an option to pay PIK Interest in cash on any interest payment date upon 2 Business Days' notice to the trustee and, if no such notice is received the PIK Interest shall be presumed to be payable in kind. |
| | | The Issuer may only pay PIK Interest in cash on an interest payment date out of (i) the proceeds of the issuance of equity, warrant, quasi equity or equity like instruments which are contractually or structurally subordinated to the New Secured Notes; (ii) the proceeds of any issue of any bond, note or other debt security or any loan under any syndicated or bilateral facility where the obligors are Seadrill Limited and/or its subsidiaries (excluding IHCo and its subsidiaries) |

5

and in each case which is structurally subordinated (for the avoidance of doubt, without guarantees or security from IHCo, NSNCo, RigCo and/or any of their respective subsidiaries); (iii) any cash available to Seadrill Limited and/or its subsidiaries (excluding IHCo and its subsidiaries) from the proceeds of any SDRL Equity Issue or SDRL Debt Issue (each as defined in in Annex 4 (Group Wide Restrictive Covenants) of the Credit Facilities Term Sheet) or cashflows from assets held by or acquisitions and investments made by Seadrill Limited and its subsidiaries (other than IHCo and its subsidiaries) (but excluding the restricted cash which is subject to the US$25 million cap under the Cash Pooling Term Sheet); or (iv) Net Realisation Proceeds (as defined below).

Interest will accrue from the earlier of (x) the Refinancing Closing Date and (y) the date falling 240 days after the Petition Date (as defined in the Investment Agreement) and will be payable semi-annually in arrears from the Refinancing Closing Date to the Final Maturity Date, provided that any interest which accrues prior to the Refinancing Closing Date shall be payable on the Refinancing Closing Date.

| | | |
|---|---|---|
| 5. | **Fees and Cost Cover** | 1% closing fee calculated on the amount of the New Secured Notes issued on the Refinancing Closing Date as adjusted in accordance with the Investment Agreement and payable at closing. All other fees and costs shall be as set forth in the Investment Agreement. |
| 6. | **Equity of Seadrill Limited** | Following and accounting for the full equitization of all existing high-yield bonds and other unsecured claims at Seadrill Limited, approximately 57.5% of the pre-dilution common equity in Seadrill Limited. Such equity to be immediately detachable from the New Secured Notes from the Refinancing Closing Date. |
| **D.** | **REDEMPTION** | |
| 1. | **Voluntary Redemption** | Voluntary prepayment or purchase of the New Secured Notes will be permitted at a minimum where: |

1. such prepayment or purchase is prior to the third anniversary of the Refinancing Closing Date and is funded with the proceeds of issuances of equity (which shall include equity-like instruments which are contractually or structurally subordinated to the New Secured Notes) or structurally subordinated

6

unsecured debt (for the avoidance of doubt, without guarantees from IHCo, NSNCo, RigCo and/or any of their respective subsidiaries) undertaken by Seadrill Limited after the Refinancing Closing Date and contributed by Seadrill Limited through IHCo to the Issuer and applied by the Issuer within 120 days after the relevant equity issuance to prepay or purchase up to 50% of the aggregate principal amount of the New Secured Notes originally issued, at a redemption price equal to 106% of the principal amount of the New Secured Notes prepaid or purchased, plus accrued and unpaid interest to (but excluding) the redemption date, provided that at least 50% of the aggregate principal amount of the New Secured Notes originally issued remains outstanding immediately after such prepayment or purchase;

2. such prepayment or purchase is funded with the Net Realisation Proceeds, within 60 days following the expiry of the mandatory offer described in section D2 below, in an amount not to exceed 50% of the Net Realisation Proceeds at a redemption price equal to:

- 106% of the principal amount of the New Secured Notes prepaid or purchased, if such prepayment or purchase is prior to the fourth anniversary of the Refinancing Closing Date; or

- 103% of the principal amount of the New Secured Notes prepaid or purchased, if such prepayment or purchase is on or after the fourth anniversary of the Refinancing Closing Date and prior to the fifth anniversary of the Refinancing Closing Date; or

- 100% of the principal amount of the New Secured Notes prepaid or purchased, if such prepayment or purchase is on or after the fifth anniversary of the Refinancing Closing Date.

in each case, plus accrued and unpaid interest to (but excluding) the redemption date;

"**Net Realisation Proceeds**" for the purposes of the term sheet means:

(i) any cash income, dividends, distributions, collections (other than (A) earn-outs from Seadrill Operating LP, Seadrill Capricorn Holdings LLC, Seadrill Gulf Operations Vela LLC, Seadrill Vela Hungary Kft. and Seadrill Polaris Ltd, (B) dividends in an aggregate amount of no greater than US$60,000,000 per calendar year from Seadrill Partners LLC ("**SDLP**") and other SDLP group facility obligors or holding companies of such SDLP group facility obligors and (C) amounts paid by Seadrill Vencedor Ltd pursuant to the loan agreement dated 28 September 2012 between Seadrill Limited (as lender) and Seadrill Vencedor Ltd (as borrower) (as amended, extended and/or restated from time to time, including by a letter agreement dated 28 August 2014 between the parties to the loan agreement and by a letter agreement dated 14 April 2015 between the parties to the loan agreement), in each case which shall be paid to IHCo), from an asset which is subject to the First Ranking New Secured Notes Security (defined below) or which is owned by an entity whose shares are subject to the same (and for the avoidance of doubt this shall include those assets assigned pursuant to section E5) or from an asset where the required consents and/or waivers for taking such First Ranking New Secured Notes Security were not obtained as contemplated in section E (provided that, in respect of any subsidiary of Seadrill Limited party to a newbuild contract or which has acquired or taken delivery of the relevant newbuild, will only include cash, dividends or distributions which are paid up to the entity at which the relevant First Ranking New Secured Notes Security is taken and will not include any cash pledged to the lenders under the financing of such newbuild) but excluding cash paid by Seadrill Limited or NSNCo to IHCo in accordance with the Cash Pooling Term Sheet made by way of repayment of intercompany loans owed by those entities to IHCo; or

(ii) the cash realisations of a disposal of an asset (A) which is subject to the First Ranking New Secured Notes Security, (B) which is owned by an entity whose shares are subject to the same (and for the avoidance of doubt this shall include those assets assigned pursuant to section E5), or (C) where the required consents and/or waivers for taking such First Ranking New Secured Notes Security were not obtained as contemplated in section E, (including non-ordinary course proceeds from the realisation of assets of Seadrill Partners LLC, Seadrill Gulf Operations Vela LLC, Seadrill Vela Hungary Kft., Seadrill Polaris Ltd or other SDLP facility obligors or holding companies), or cash proceeds in the event of loss of such assets.

8

For the avoidance of doubt, any non-cash income, dividends, distributions, collections or other realisations of an asset which is subject to the First Ranking New Secured Notes Security or which is owned by an entity whose shares are subject to the same shall become part of the First Ranking New Secured Notes Security; and

3. subject to the Intercreditor Agreement: (i) if such prepayment or purchase is prior to the third anniversary of the Refinancing Closing Date, at a redemption price of 100% of the principal amount of the New Secured Notes prepaid or purchased, plus customary T+50-based make-whole premium, plus accrued and unpaid interest to (but excluding) the redemption date, (ii) if such prepayment or purchase is on or after the third anniversary of the Refinancing Closing Date and prior to the fourth anniversary of the Refinancing Closing Date, at a redemption price of 106% of the principal amount of the New Secured Notes prepaid or purchased, plus accrued and unpaid interest to (but excluding) the redemption date, (iii) if such prepayment or purchase is on or after the fourth anniversary of the Refinancing Closing Date and prior to the fifth anniversary of the Refinancing Closing Date, at a redemption price of 103% of the principal amount of the New Secured Notes prepaid or purchased, plus accrued and unpaid interest to (but excluding) the redemption date and (iv) if such prepayment or purchase is on or after the fifth anniversary of the Refinancing Closing Date, at a redemption price of 100% of the principal amount of the New Secured Notes prepaid or purchased, plus accrued and unpaid interest to (but excluding) the repurchase date.

2.   **Redemption out of Asset Realisation Proceeds; Reinvestment**   In the event that Seadrill Limited or any of its affiliates obtains Net Realisation Proceeds which, together with any cash amounts in the mandatory offer holding account, exceed a threshold to be agreed, then the Issuer shall make an offer equal to such Net Realisation Proceeds and such cash account balance within 10 days of receipt of such Net Realisation Proceeds, to repurchase New Secured Notes at 103% of the principal amount of the New Secured Notes prepaid or purchased, plus accrued and unpaid interest to (but excluding) the repurchase date, with the offer period to be open for a period not less than 30 days or more than 60 days.

9

With respect to any such Net Realisation Proceeds as to which no New Secured Notes were tendered in such offer, the Issuer may (i) prepay the New Secured Notes voluntarily under the second bullet of Voluntary Redemption section above (in an amount not to exceed 50% of the total Net Realisation Proceeds before the mandatory offer); (ii) reinvest up to 100% of such proceeds (in accordance with reinvestment rights to be agreed); (iii) make payments or other contributions or investments by way of financial support to non-consolidated entities; (iv) repay RigCo cash in accordance with the Intercreditor Agreement to the extent over US$25m of RigCo cash has been used pursuant to the basket in paragraph (J) of the definition of Permitted Financial Support in Annex 4 (Group Wide Restrictive Covenants) of the Credit Facilities Term Sheet; and/or (v) apply any such proceeds to pay PIK Interest in cash as described in section C3 above.

Net Realisation Proceeds shall be kept, until applied as contemplated above, in the mandatory offer holding account at NSNCo over which the holders of the New Secured Notes (the "**New Secured Noteholders**") shall have a sole first ranking security interest.

If any proceeds in respect of which reinvestment rights become available, are not reinvested within 360 days of such reinvestment right becoming available, then they will be transferred from the mandatory offer holding account at NSNCo to an IHCo Bank Account.

All asset realisations must be for fair market value and at least 75% of the consideration must be cash or cash equivalents, subject to customary exceptions. Fair market value for the asset realisation to be confirmed in a board resolution of Seadrill Limited and NSNCo with third party appraisal of fair value if over a threshold value to be agreed, subject to customary exceptions.

Subject to the requirements set out in the immediately preceding paragraph, the realisation of non-core assets shall be made in accordance with any plan agreed by the Board.

10

| | | |
|---|---|---|
| 3. | **Redemption on Change in Tax Law** | In the event that a change in tax law or regulation or the interpretation thereof results in the Issuer being required to pay a tax gross up in respect of an affected New Secured Note and the Issuer cannot avoid any such payment obligation by taking reasonable measures available to it, the affected New Secured Notes will be redeemable by the Issuer at an amount equal to par plus accrued and unpaid interest to (but excluding) the redemption date. |
| 4. | **Change of Control Protection** | Upon the occurrence of a Change of Control, New Secured Noteholders will have the right to require the Issuer to repurchase all of the New Secured Notes at 101% of the principal amount of the New Secured Notes repurchased, plus accrued and unpaid interest to (but excluding) the repurchase date. Definition of "Change of Control" shall match the definition in the harmonized Secured Facilities Agreement, subject to satisfactory review by the New Secured Noteholders. |
| E. | **SECURITY** | |
| 1. | **General** | As described in more detail below, first ranking security to be granted in favour of the New Secured Noteholders or their representatives over all unencumbered assets (subject to a materiality threshold of US$5 million except in respect of equity interests or intra-group receivables which shall not be subject to such threshold) as at the date of issuance of the New Secured Notes (including equity interests of subsidiaries) of Seadrill Limited, IHCo, NSNCo, each NSN HoldCo (as defined below) and their respective subsidiaries other than those specifically carved out (including RigCo and its subsidiaries) and subject to exceptions to be agreed. |
| | | The hive down, assignment and any security granted in favour of the New Secured Notes or their representatives as set out in this Section E shall constitute the "**NSN Collateral**". |
| | | To the extent that consents and/or waivers to any hive down, assignment or security contemplated in this section E cannot be obtained on satisfactory terms by the Company using all reasonable endeavours, the alternative structure, security and/or assignment for that entity or asset as set out in this section E shall be implemented. For the avoidance of doubt, if any alternative structure results in an entity or asset not being hived down, any cash income (including ordinary course dividends and disposal proceeds) therefrom received by the Group after the Refinancing Closing Date shall be promptly transferred to NSNCo and shall constitute Net Realisation Proceeds. |

11

Unless otherwise permitted in accordance with the New Secured Notes indenture, the NSNCo Group shall not transfer, assign or dispose of, or grant security over, the NSN Collateral, it being understood however that the Board will identify assets (including NSN Collateral) which are to be subject to an asset disposal plan agreed by the Board and the New Secured Notes indenture will not restrict any disposals of assets (including NSN Collateral) which assets in any event shall be disposed of in accordance with section D2.

2.   **Hive Down**

Each unencumbered entity and asset including, but not limited to, those specified in sections E3 and E4 below (other than (i) any entity or asset which will be hived down to RigCo, (ii) cash and (iii) any subsidiary of Seadrill Limited party to a newbuild contract (including North Atlantic Rigel Limited and any equity stake in the West Rigel rig or related joint venture) to be hived down to the NSNCo Group as contemplated in the hive down steps paper prepared by Ernst & Young LLP (the "**EY Paper**") or in sections E3, E4 and E5 below.

For the avoidance of doubt, the hive down and change in shareholding structure of Seabras Sapura Participacoes SA and Sapura Navegacao Maritima S.A may result in defaults being triggered under (i) the US$543 million secured facilities agreement originally dated 31 December 2013 (as amended from time to time) between, amongst others, Sapura Diamante GmbH and Sapura Topazio GmbH as borrowers and ING Bank N.V. as Agent (the "**PLSV I Facility**") and (ii) the US$780 million secured facilities agreement originally dated 10 April 2015 (as amended from time to time) between, amongst others, Sapura Onix GmbH, Sapura Jade GmbH and Sapura Rubi GmbH as borrowers and ING Bank N.V. as Agent (the "**PLSV II Facility**"), if the required consents and/or waivers cannot be obtained (which the Company will use all reasonable endeavours to obtain as part of the discussions relating to discharge of the Seadrill Limited guarantees in respect of the PLSV I Facility and PLSV II Facility). If any defaults or events of default are continuing under the PLSV I Facility or the PLSV II Facility or would result from the hive down or change in shareholding structure contemplated in the EY Paper, at Hemen and Centerbridge's election either (i) Seabras Servicos de Petroleo SA, Seabras Sapura Participacoes SA and Sapura Navegacao Maritima S.A shall be hived down as contemplated in the EY Paper notwithstanding such defaults or events of default or (ii) Seabras Servicos de Petroleo SA, Seabras Sapura Participacoes SA and Sapura Navegacao

12

Maritima S.A. shall not be hived down to the NSNCo Group and any cash income (including ordinary course dividends and disposal proceeds) therefrom received by the Group after the Refinancing Closing Date shall be promptly transferred to NSNCo and shall constitute Net Realisation Proceeds.

Certain entities will be transferred to separate and newly formed individual holding companies which are direct and wholly-owned subsidiaries of NSNCo (each an "**NSN HoldCo**") as contemplated in the EY Paper.

Each NSN HoldCo to be incorporated in a jurisdiction satisfactory to the New Secured Noteholders and agreed with the Company.

For the avoidance of doubt, where practicable and consistent with legal constraints, each of the following entities shall be transferred to sit directly below its own respective NSN HoldCo (with security taken over each NSN HoldCo but not directly over the equity in the following entities):

    1. Seadrill Capricorn Holdings LLC;

    2. Seadrill Operating LP; and/or

    3. Seadrill Partners LLC.

| | | |
|---|---|---|
| 3. | **First Ranking Security over Shares** | First ranking share charge to be granted in favour of the New Secured Noteholders or their representatives over shares or other equity interests held by members of the Group in: |

1. IHCo (including any equity interest arising from an equity contribution made by Seadrill Limited to IHCo and over any intercompany loans advanced by Seadrill Limited to IHCo);

2. NSNCo (including any equity interest arising from an equity contribution made by Seadrill Limited or IHCo to NSNCo and over any intercompany loans advanced by Seadrill Limited or IHCo to NSNCo);

3. any subsidiary of Seadrill Limited party to a newbuild contract other than the newbuild contracts which are guaranteed by Seadrill Limited (noting that certain shareholdings are indirectly held by Seadrill Limited) provided that such share charges will be released and retaken at a level high enough in the ownership structure so as to not prejudice any financing in respect of the newbuild at the time of such financing;

13

4. each NSN HoldCo;

5. Archer Limited and for the avoidance of doubt the Company shall procure a release of the share charge granted in favour of Danske Bank under an amended and restated group cash management agreement, dated 6 March 2013, between Seadrill Limited and Danske Bank;

6. SeaMex Ltd., provided that the Company shall use all reasonable endeavours to obtain the required consent(s) and/or waiver(s) to grant such security, and if such consents and/or waivers cannot be obtained on satisfactory terms, a first ranking share charge shall be granted over the shares or other equity interests in the NSN HoldCo under which the Group's stake in SeaMex Ltd. shall be directly transferred as part of the hive down contemplated in section E2 but not over the equity in SeaMex Ltd.;

7. the entity referred to as Seadrill Jack Up NewCo in the EY Paper;

8. such entity(ies) (as applicable) which directly hold(s) the equity stakes in Seabras Sapura Holding GmbH and Seabras Servicos de Petroleo SA as set out in the EY Paper (subject to any changes to the hive down structure as contemplated in section E2);

9. Seabras Sapura Holding GmbH;

10. Seabras Servicos de Petroleo SA;

11. Seabras Sapura Participacoes Ltda (which stake, for the avoidance of doubt, will remain directly held by Seabras Servicos de Petroleo SA);

12. Seadrill Member LLC;

13. the equity stake in any joint venture (the "**JV Equity Stake**") entered into with Jurong Shipyard Pte. Ltd. or any related entity of Jurong Shipyard Pte. Ltd. in relation to the West Rigel rig and the Group entity which holds the JV Equity Stake, provided that the Company shall use all reasonable endeavours to obtain the required consent(s) and/or waiver(s) to transfer the JV Equity Stake to a newly incorporated holding company

14

(which shall be a direct held wholly owned subsidiary of Seadrill Limited) and to grant such security, and if such consents and/or waivers cannot be obtained on satisfactory terms either (a) the JV Equity Stake shall be transferred to another entity or newly incorporated holding company (in each case which shall on the Refinancing Closing Date be a directly held wholly owned subsidiary of Seadrill Limited) pursuant to the terms of the joint venture agreement and a first ranking share pledge shall be granted over the shares or equity interests in such holding company; or if that is not possible or the required consents and/or waivers cannot be obtained on satisfactory terms (b) the JV Equity Stake shall not be transferred and security shall not be granted over it but the available cashflows and cash proceeds received by the Group after the Refinancing Closing Date in relation to such JV Equity Stake shall be promptly transferred to NSNCo and shall constitute Net Realisation Proceeds; and

14. to the extent that all or any part of the outstanding principal amount owing under the Archer Subordinated Loans (as defined in section E4 below) are converted into shares in Archer Limited pursuant to the terms of (i) a subordinated loan agreement originally dated 24 October 2014 as amended and/or restated from time to time and (ii) a subordinated loan agreement originally dated 27 May 2016 as amended and/or restated from time to time, such shares in Archer Limited.

Seadrill Global Services Ltd. and Seadrill Management Limited shall be moved to sit directly below RigCo. For the avoidance of doubt, Seadrill Global Services Limited and Seadrill Management Ltd shall not be subject to any new security arrangements and shall continue to operate on the basis on which they currently operate.

| | | |
|---|---|---|
| 4. | **First Ranking Security over Intercompany, Related Party, Other Receivables, and over Assets** | First ranking security to be granted in favour of the New Secured Noteholders or their representatives over: |

• the intercompany loans referred to in section E3; above;

• intercompany loans advanced by NSNCo to IHCo with the New Secured Noteholders having a first priority and sole claim;

15

• certain other unencumbered intercompany loan claims, related party debt claims and other receivables (subject to exceptions to be agreed in the case of third party receivables), including but not limited to those set out in this section E4 (but for the avoidance of doubt does not include (i) intercompany loan claims owed by RigCo to IHCo and upstream intercompany loans made by RigCo to IHCo (which are to be secured in favour of the Bank Finance Parties on a first ranking basis and in respect of which the New Secured Noteholders will be granted a second ranking charge as detailed below), and (ii) the SapuraKencana Receivable and the SeaMex Seller's Credit (each as defined further below) (other than as contemplated in section E5); provided that, where any required consents and/or waivers from third parties to assign or transfer such receivables or grant security over them cannot be obtained on satisfactory terms, the relevant receivables shall not be assigned or transferred and security shall not be granted but the cash proceeds of such receivables received by the Group after the Refinancing Closing Date shall constitute Net Realisation Proceeds;

• any intercompany loan claims owed by Seadrill Partners LLC to each of Seadrill Limited, IHCo and/or NSNCo;

• subordinated loans (the aggregate outstanding principal amount of which was US$44,975,800 as at 30 June 2017), owed to the Company by Archer Limited pursuant to (i) a subordinated loan agreement originally dated 24 October 2014 as amended and/or restated from time to time and (ii) a subordinated loan agreement originally dated 27 May 2016 as amended and/or restated from time to time (and in each case subject to (a) an intercreditor agreement dated 26 April 2017 between, amongst others, Archer Limited, Seadrill Limited and Danske Bank A/S and (b) a subordination agreement dated 1 June 2017 between, amongst others, Archer Limited, Seadrill Limited and BNP Paribas) (the "Archer Subordinated Loans"), provided that the Company shall use all reasonable endeavours to obtain the required consent(s) and/or waiver(s) in order to (x) grant such security and assign the rights under the Archer Subordinated Loans to an NSN HoldCo (and a first ranking share pledge shall be granted over the shares or equity interests in such NSN HoldCo); or if the required consents and/or waivers to grant such security over the Archer Subordinated Loans cannot be obtained on satisfactory terms, (y) assign the rights under the Archer Subordinated Loans to an NSN HoldCo (and a first ranking share pledge shall be granted over the shares or equity interests in such NSN HoldCo but security shall

16

not be granted over the loans themselves). If the required consents and/or waivers to assign the rights under the Archer Subordinated Loans cannot be obtained on satisfactory terms, the loans shall not be transferred and security shall not be granted but the cash proceeds of such receivables received by the Group after the Refinancing Closing Date shall constitute Net Realisation Proceeds;

• loans (the aggregate outstanding principal amount of which was approximately US$28,300,000 as at 30 June 2017) owed by Seabras Sapura Participacoes SA to Seadrill Limited pursuant to (i) the US$10.8 million loan agreement dated 2 May 2014 (as amended, supplemented and novated from time to time) between Seadrill Limited (as lender) and Seabras Sapura Participacoes SA (as borrower) (and originally between Seadrill Limited (as lender) and Sapura Navegacao Maritima S.A. (as borrower)); (ii) the US$17.5 million loan agreement dated 19 January 2015 (as amended, supplemented and novated from time to time) between Seadrill Limited (as lender) and Seabras Sapura Participacoes SA (as borrower) (and originally between Seadrill Limited (as lender) and Sapura Navegacao Maritima S.A. (as borrower)); and (iii) a deed of novation and debt assumption dated 30 December 2015 between Sapura Navegacao Maritima S.A., Seabras Sapura Participacoes SA and Seadrill Limited;

• receivables (the aggregate outstanding principal amount of which was approximately US$3,308,720.92 as at 30 June 2017) owed by Seabras Sapura Participacoes S.A. to Seadrill Limited pursuant to a deed of novation, debt acknowledgment and debt assumption dated 30 December 2015 between Sapura Navegacao Maritima S.A., Seabras Sapura Participacoes S.A. and Seadrill Limited as amended by an extension letter dated 6 June 2017 between Sapura Navegacao Maritima S.A., Seabras Sapura Participacoes S.A. and Seadrill Limited;

• loans (the aggregate outstanding principal amount of which was approximately US$14,457,696 as at 30 June 2017) owed by Sapura Topazio GmbH and Sapura Diamante GmbH to Seadrill Limited and Seadrill UK Limited pursuant to (i) a subordinated loan agreement dated 27 May 2014 between Sapura Topazio GmbH (as borrower) and Seadrill Limited (as lender) and (ii) a subordinated loan agreement dated 27 May 2014 between Sapura Diamante GmbH (as borrower) and

17

Seadrill Limited (as lender), provided that the Company shall use all reasonable endeavours to obtain (as part of the discussions relating to discharge of the Seadrill Limited guarantee in respect of the PLSV I Facility) the consents and/or waivers required under the PLSV I Facility and related subordination deed to assign the receivables to the NSNCo Group and grant such security, and if such consents and/or waivers cannot be obtained on satisfactory terms, the receivables shall not be transferred and security shall not be granted but the cash proceeds of such receivables received by the Group after the Refinancing Closing Date shall constitute Net Realisation Proceeds;

• loans (the current aggregate outstanding principal amount of which was approximately US$45,286,582 as at 30 June 2017) owed by Sapura Rubi GmbH, Sapura Jade GmbH and Sapura Onix GmbH to Seadrill Limited and Seadrill UK Limited pursuant to (i) a subordinated loan agreement dated 14 April 2015 between Sapura Rubi GmbH (as borrower) and Seadrill Limited (as lender); (ii) a subordinated loan agreement dated 14 April 2015 between Sapura Jade GmbH (as borrower) and Seadrill Limited (as lender); and (iii) a subordinated loan agreement dated 14 April 2015 between Sapura Onix GmbH (as borrower) and Seadrill Limited (as lender), provided that the Company shall use all reasonable endeavours to obtain (as part of the discussions relating to discharge of the Seadrill Limited guarantee in respect of the PLSV II Facility) the consents and/or waivers required under the PLSV II Facility and related subordination deed to assign the receivables to the NSNCo Group and grant such security, and if such consents and/or waivers cannot be obtained on satisfactory terms, the receivables shall not be hived down and security shall not be granted but the cash proceeds of such receivables received by the Group after the Refinancing Closing Date shall constitute Net Realisation Proceeds;

• loans (the current aggregate outstanding principal amount of which was approximately US$45,000,000 as at 30 June 2017) owing to Sea Dragon De Mexico S. De R.L. De C.V by Seadrill Holdings Mexico S.A. De C.V. pursuant to an intercompany loan agreement dated 3 November 2016 but with effect from 1 May 2015) (the "**Sea Dragon Loan**"), provided that the Company shall use all reasonable endeavours to obtain the required consent(s) and/or waiver(s) in order to (x) grant such

18

security and assign the rights under the Sea Dragon Loan to an NSN HoldCo (and, in addition to the security over the Sea Dragon Loan, a first ranking share pledge shall be granted over the shares or equity interests in such NSN HoldCo); or if the required consents and/or waivers to grant such security over the Sea Dragon Loan cannot be obtained on satisfactory terms, (y) assign the rights under the Sea Dragon Loan to an NSN HoldCo (and a first ranking share pledge shall be granted over the shares or equity interests in such NSN HoldCo but security shall not be granted over the loan itself). If the required consents and/or waivers to assign the rights under the Sea Dragon Loan cannot be obtained on satisfactory terms, the loan shall not be transferred and security shall not be granted but the cash proceeds of such receivables received by the Group after the Refinancing Closing Date shall constitute Net Realisation Proceeds;

- intercompany loans or other receivables owed by North Atlantic Rigel Limited to another member of the Group in connection with the West Rigel rig; and

- all other unencumbered assets (including equity interests of subsidiaries and Net Realisation Proceeds or assets purchased with Net Realisation Proceeds) held by NSNCo and its subsidiaries, to the extent practicable and permissible, and in accordance with legal constraints. Security over such assets purchased with Net Realisation Proceeds will be granted only where permitted under any financing with respect to such assets, it being understood that holdco level security should, where structurally possible, be provided (with satisfactory anti-layering protections for the NSNs) where any finance in respect of such asset limits security over the assets and/or owner of the assets (as applicable).

Any amounts received by the Group (i) after the date of the Investment Agreement up to the date falling 240 days after the Petition Date, other than scheduled interest payments contemplated under the applicable agreement or arrangement as at the date of the Investment Agreement; and (ii) after the date falling 240 days after the Petition Date but prior to the Refinancing Closing Date, from a third party in respect of any of the receivables for which a balance is described in this section E4 or the SeaMex Seller's Credit in section E5 below, shall be held in a segregated and unencumbered account or accounts of member(s) of the

Group. On the Refinancing Closing Date, such amounts shall be transferred to bank accounts of NSNCo and such accounts shall be secured in favour of the New Secured Noteholders or their representative. Amounts held in such accounts shall be released on the earlier of (i) the original maturity of the relevant loan or receivable (as at the date of the Investment Agreement) to which such amount relates and (ii) three months after the Refinancing Closing Date into the mandatory offer holding account at NSNCo and shall constitute Net Realisation Proceeds. The security over each such account shall be released when all amounts in the applicable account have been transferred into the mandatory offer holding account.

5.   **Assignment**

The following intercompany loan claims, related party debt claims and other receivables shall be assigned (but security will not be granted over the same) to their own separate and individual NSN HoldCos and a first ranking share pledge shall be granted in favour of the New Secured Noteholders or their representatives over such NSN HoldCos:

- the deferred consideration owed by SapuraKencana Drilling Pte. Ltd to Seadrill Limited pursuant to a sale and purchase agreement dated 12 February 2013 (as amended) (the "**SapuraKencana Receivable**"). In the event that the outstanding balance of the SapuraKencana Receivable at any time prior to the Refinancing Closing Date is less than US$55 million (the "**SK Projected Refinancing Closing Balance**"), the Company will hold the difference in a segregated and unencumbered account of the Company such that the aggregate amount of (i) such amounts so segregated and (ii) the remaining outstanding balance of the SapuraKencana Receivable is in an amount of not less than the SK Projected Refinancing Closing Balance. On the Refinancing Closing Date, all such segregated amounts shall be transferred to a bank account of NSNCo and such account shall be secured in favour of the New Secured Noteholders or their representative. The amounts held in such account shall be released (and the security over such account shall be released) on 3 August 2018 if such date occurs after the Refinancing Closing Date or otherwise three months after the Refinancing Closing Date, into the mandatory offer holding account at NSNCo and shall constitute Net Realisation Proceeds. No transfers shall be made out of this account prior to such release date; and

20

• loans (the aggregate outstanding principal amount of which was US$250,000,000 as at 30 June 2017) owing to the Company by SeaMex Ltd. pursuant to a US$230 million a term loan facility and a US$20 million term loan facility in connection with a seller's credit agreement dated 26 November 2014 (the "**SeaMex Seller's Credit**"), provided that the Company shall use its reasonable endeavours to obtain the consent(s) and/or waiver(s) required to assign the SeaMex Seller's Credit to such NSN HoldCo, and if such consents and/or waivers cannot be obtained on satisfactory terms, the SeaMex Seller's Credit shall not be assigned and security shall not be granted but the cash proceeds of such receivables received by the Group after the Refinancing Closing Date shall constitute Net Realisation Proceeds.

6.  **NSNCo Cash**

Sole first ranking charge to be granted in favour of the New Secured Noteholders or their representatives over all deposit and security accounts (including accounts into which the Net Realisation Proceeds and proceeds of the New Secured Notes are deposited) and all cash balances, held by NSNCo (the "**NSN Cash Security**" together with the first ranking security described in sections E3 and E4 above, the "**First Ranking New Secured Notes Security**").

With respect to the NSN Cash Security:

• NSNCo will receive all of the Net Realisation Proceeds into a mandatory offer holding account maintained by it pending redemption/repayment or re-investment in accordance with section D2 above,

• US$227.5 million of the initial proceeds of the New Secured Notes (the "**NSN Escrow Amount**") initially to be held in an escrow account on terms satisfactory to the New Secured Noteholders. The initial NSN Escrow Amount shall be reduced:

  • on each anniversary of the Refinancing Closing Date, by a proportion equal to the principal amount of New Secured Notes redeemed or otherwise retired during the preceding 12 month period over the accrued New Secured Notes balance had no such redemptions taken place during the preceding 12 month period; and

21

• from the date falling two years after the Refinancing Closing Date, pursuant to a performance based reduction mechanism as follows:

    • for the first year ended 31 December where LTM consolidated EBITDA is greater than US$1.3 billion, the lesser of (x) 30% of the original NSN Escrow Amount (i.e. US$227.5m) and (y) the then current balance of the NSN Escrow Amount, will be released and the NSN Escrow Amount reduced accordingly; and

    • for each subsequent year ended 31 December where LTM consolidated EBITDA is greater than US$1.5 billion, the lesser of (x) 35% of the original NSN Escrow Amount (i.e. US$227.5m) and (y) the then current balance of the NSN Escrow Amount, will be released and the NSN Escrow Amount reduced accordingly.

Such released amounts shall be applied to repay RigCo cash in accordance with the Intercreditor Agreement to the extent over US$25 million of RigCo cash has been used pursuant to the basket in paragraph (J) of the definition of Permitted Financial Support in Annex 4 (Group Wide Restrictive Covenants) of the Credit Facilities Term Sheet and otherwise will be subject to a reinvestment right on the same terms as the reinvestment rights to be agreed for Net Realisation Proceeds before payment to IHCo.

| | | |
|---|---|---|
| 7. | **Second Ranking Security** | Second ranking charge to be granted in favour of the New Secured Noteholders or their representative (with first ranking charge to be granted in favour of the Bank Finance Parties) over: |

(a) the shares and any other equity interests in RigCo (including any equity interest arising from an equity contribution made by IHCo to RigCo);

(b) the intercompany loan claims owed by RigCo to IHCo (including intercompany loans granted by IHCo pursuant to the Contribution Agreement set out in the Cash Pooling Term Sheet);

(c) upstream intercompany loans owed to RigCo by IHCo;

(d) the excess sales proceeds escrow accounts and the periodic cash sweep account established by RigCo and, in the case of the excess sale proceeds escrow accounts, other members of the RigCo group; and

(e) the RigCo bank account(s) into which IHCo funds cash pursuant to the Contribution Agreement (as described in the Cash Pooling Term Sheet).

Second ranking charge to be granted over any subsidiary of Seadrill Limited party to a guaranteed newbuild contract, with first ranking charge to be granted in favour of the Bank Finance Parties limited in recourse to the amount of Group cash (pre-Refinancing Closing Date) or RigCo cash (post- Refinancing Closing Date) used in respect of such guaranteed newbuild. Share charges to be released and retaken at a level high enough in the ownership structure so as to not prejudice any financing in respect of the newbuild at the time of such financing.

| 8. | **IHCo Cash/Pari Passu Charge** | US$100 million of the New Secured Notes proceeds shall be transferred on the Refinancing Closing Date to one or more specified bank accounts satisfactory to the New Secured Noteholders at IHCo ("**IHCo Bank Accounts**"). In respect of any IHCo Bank Accounts, the New Secured Noteholders and the Bank Finance Parties will have a pari passu claim (vis a vis each other) and, in any event, such claim will be senior to any other claims at IHCo. The New Secured Noteholders claim to the IHCo Bank Accounts will be for the aggregate outstanding amount of the New Secured Notes (including principal, interest and other amounts) (being the full US$750 million of the New Secured Notes and any additional amounts in respect of the accrual of PIK interest and unpaid cash interest, subject to reductions for retirement or redemption of any New Secured Notes from time to time) and the Bank Finance Parties' claim to the IHCo Bank Accounts will be limited to the difference between the RigCo Minimum Liquidity Requirement (as described in the Cash Pooling Term Sheet) and the consolidated cash balance of the RigCo group at the time of enforcement. The security will be in the form of a pledge over the IHCo Bank Accounts in the jurisdiction where the IHCo Bank Accounts are set up. For the avoidance of doubt, such security will not restrict the application of cash in the IHCo Bank Accounts in accordance with the cash pooling arrangements as described in the Cash Pooling Term Sheet and agreed covenants. |
|---|---|---|

For the avoidance of doubt, the Bank Finance Parties will have no claim or security interest in the Net Realisation Proceeds.

23

| 9. | **Intercreditor** | Save as described in the paragraph below, a global intercreditor agreement (the "**Intercreditor Agreement**") will govern the ranking and claims (including guarantee claims) of (i) the Bank Finance Parties in respect of each Secured Facilities Agreement and the related finance documents, (ii) the New Secured Noteholders, (iii) the Ship Finance Parties, and (iv) the members of the Group which provide intercompany loans to the obligors under the Secured Facilities Agreements and where such loans are required by the terms of the relevant Secured Facilities Agreement and the Intercreditor Agreement to be subordinated. Intercreditor Agreement to be subject to Intercreditor Principles on substantially the terms summarised in the Intercreditor Term Sheet. |
|---|---|---|
| | | First Ranking New Secured Notes Security and intercompany debt obligations between IHCo and the NSNCo Group to be regulated by a separate security trust and subordination deed. |
| 10. | **Ranking** | Proceeds of enforcement of the First Ranking New Secured Notes Security to be applied: |

      1. first, to discharge any sums owing to the New Secured Noteholders' security agent;

      2. second, to discharge related enforcement costs and expenses;

      3. third, to discharge the New Secured Notes, and

      4. fourth, to Seadrill Limited, IHCo, NSNCo or their respective subsidiaries as the relevant provider of the First Ranking New Secured Notes Security.

| F. | **COVENANTS** | |
|---|---|---|
| 1. | **Covenants** | Customary covenants to be agreed, but to include without limitation: |

(a) no financial covenants

(b) no voluntary repayment of the Secured Facilities Agreements (other than as set out in the Credit Facilities Term and the Intercreditor Term Sheet)

(c) anti-layering

24

(d) payment of the New Secured Notes

(e) maintenance of office or agency

(f) reports and other information

(g) corporate existence

(h) payment of taxes

(i) further assurances

(j) compliance certificate; notice of default

(k) payments for consent

(l) waiver of stay, extension or usury laws

(m) change of control

(n) incurrence of indebtedness and issuance of disqualified stock and preferred stock

(o) limitations on restricted payments

(p) limitations on liens

(q) limitations on asset sales; events of loss

(r) limitations on transactions with affiliates (to be replicated from Secured Facilities Agreements)

(s) dividend and other payment restrictions affecting subsidiaries

(t) subsidiary guarantees

(u) reports to holders

(v) limitations on designation of restricted and unrestricted subsidiaries

(w) payment of additional amounts

(x) limitation on business activities of Seadrill Limited, IHCo and NSNCo

(y) mergers, consolidations etc.

25

(z) successor substituted

(aa) intercreditor arrangements

(bb) after-acquired collateral

(cc) insurance

(dd) maintenance of the required NSN Escrow Amount

2.  **Financial Information**

Financial information requirements to include:

(a) audited annual consolidated accounts of the Group, to be provided within 120 days after the end of each financial year, except that the first group audited financials, if the restructuring is implemented via Chapter 11, will be due within a period to be agreed due to fresh start accounting;

(b) unaudited consolidated accounts of the Group for each financial quarter, to be provided within 70 days after the end of each financial quarter, except that the first unaudited quarterly accounts, if restructuring is implemented via Chapter 11, will be due within a period to be agreed due to fresh start accounting; and

(c) unaudited unconsolidated accounts for IHCo, NSNCo and RigCo (quarterly and annually).

3.  **Covenant Suspension**

Upon achievement of certain milestones and/or satisfaction of certain conditions to be agreed, certain of the covenants to be agreed under the heading "Covenants" will not apply until such time as those conditions are no longer satisfied (the "**Suspension Period**").

For the avoidance of doubt, no action taken during the Suspension Period will cause a default or event of default under the New Secured Notes after the end of a Suspension Period if such action was permitted under the terms of the New Secured Notes when taken during the relevant Suspension Period (i.e. debt incurred during the Suspension Period for which no basket is available will be deemed to be permitted existing debt after the end of such Suspension Period during which it was incurred).

**G.**      **EVENTS OF DEFAULT**

1.      **Events of Default**

Events of default under the New Secured Notes shall be customary and satisfactory to the New Secured Noteholders and the Company, which shall include but not be limited to:

(a) (i) non-payment of principal under the New Secured Notes and (ii) non-payment of interest or other amounts due under the New Secured Notes, which in the case of clause (a)(ii) shall be subject to grace periods to be agreed;

(b) insolvency and insolvency proceedings in respect of the Issuer or any guarantor (or group of guarantors) that is a significant subsidiary;

(c) breach of covenants, subject to grace periods to be agreed;

(d) cross acceleration to (i) Secured Facilities Agreements and/or, (ii) subject to a US$50,000,000 *de minimis* threshold, other indebtedness;

(e) final and non-appealable judgment against the Issuer or any Guarantor, subject to a US$50,000,000 *de minimis* threshold; and

(f) failure to maintain a perfected security interest (subject to exceptions and materiality to be agreed).

The applicable make-whole or prepayment premium that would be applicable to a voluntary redemption of the New Secured Notes at the time of any acceleration of the New Secured Notes as the result of an Event of Default will be payable upon such acceleration of the New Secured Notes.

**H.**      **DOCUMENTATION**

1.      **Commitment/ Subscription**

The obligations of New Secured Noteholders to subscribe for the New Secured Notes will be contained in an investment agreement.

27

| | | |
|---|---|---|
| 2. | **Note Documentation** | Documentation by which the New Secured Notes will be constituted to include: |
| | | (a) indenture; |
| | | (b) notes; |
| | | (c) all first ranking and second ranking security documents necessary to give effect to the security arrangements outlined above; and |
| | | (d) the Intercreditor Agreement. |
| 3. | **Offering Memorandum** | Seadrill shall prepare a customary Rule 144A Offering Memorandum to be in place as soon as practicable following the date of issuance of the New Secured Notes and by no later than that contemplated in the Investment Agreement. |
| **I.** | **OTHER** | |
| 1. | **Governance** | As set out in the Board Governance Term Sheet at Exhibit B of the Investment Agreement. |
| | | Management incentive plan for management to be created on terms to be agreed. |
| 2. | **Withholding Tax** | Tax gross-up in relation to any applicable Bermudan withholding tax only. |
| 3. | **Amendments and Waivers** | Subject to the Intercreditor Term Sheet, amendments of the New Secured Notes Finance Documents will be subject to the consent of the majority of the New Secured Noteholders by value. However, the consent of at least 90% of the New Secured Noteholders by value will be required for certain economic and other customary entrenched amendments. For the avoidance of doubt, when calculating the amount of New Secured Notes outstanding and the amount of New Secured Notes that have consented to any amendment, waiver or supplement or in giving any direction to the trustee or security agent, New Secured Notes held by the Investors shall be included in such calculation. |

28

| 4. | **Securities Act Exemption; Transferability** | The New Secured Notes rights offering commitment will be made only to "eligible holders" (i.e., a "qualified institutional buyer," an institutional "accredited investor" or a non-"U.S. person") pursuant to an exemption from registration under the Securities Act. The New Secured Notes will be transferable under an effective registration statement or pursuant to an exemption from the registration requirements of the Securities Act (i.e. Rule 144A), in each case in accordance with the Investment Agreement. |
| 5. | **Governing Law and Jurisdiction** | The investment agreement and indenture in respect of the New Secured Notes shall be subject to New York law/courts. |

**ANNEX 5 to EXHIBIT A**

**Cash Pooling Term Sheet**

**PROJECT EAGLE**

**Cash Pooling Terms**

**Background**

- This term sheet sets out the key terms of the cash pooling arrangements to be put in place as part of the proposed restructuring in relation to Seadrill Limited ("**Seadrill Limited**" or the "**Company**").

- It is agreed that Seadrill Global Services Limited and Seadrill Management Limited will be hived down to RigCo. For the avoidance of doubt, Seadrill Global Services Limited and Seadrill Management Ltd shall not be subject to any new security arrangements and shall continue to operate on the basis on which they currently operate.

- It is further assumed for the purposes of this term sheet that:

  - the security and guarantees that benefit the New Secured Notes shall be as set forth in the New Secured Notes and Intercreditor term sheets annexed at Exhibit A of the restructuring support and lock-up agreement (the "**RSA**") to which this term sheet is also attached; and

  - no member of the "**NSNCo group**" (to be defined as NSNCo and its subsidiaries) may have any liability to any other Group (as defined in the Secured Facilities term sheet annexed at Exhibit A of the RSA) entity outside of the NSNCo group other than IHCo, and then only to the extent such liabilities are subject to acceptable subordination agreements in favour of the New Secured Noteholders and pledged in favour of the New Secured Noteholders, subject to exceptions to be agreed (provided that any such agreed specific exceptions will be subject to release on enforcement).

- It is also assumed for the purposes of this term sheet that the intercompany loan arrangements of the Group will be adjusted and rationalised on a group-wide basis with effect from the Refinancing Closing Date (as that defined in the Secured Facilities term sheet) such that (subject to exceptions to be agreed, including as permitted under the agreed covenant package set out in Annex 4 (Group Wide Restrictive Covenants) of the Secured Facilities term sheet):

  - no subsidiary of RigCo whose shares are subject to existing security for the lenders under any Secured Facilities Agreement has any intercompany loan liability to any group or related entity other than RigCo;

  - security will be granted in favour of the lenders under any Secured Facilities Agreement over any intercompany loan liability owed to RigCo by a subsidiary of RigCo whose shares are subject to existing security for those same lenders;

  - no other subsidiary of RigCo has any intercompany loan liability to any group or related entity other than RigCo or another subsidiary of RigCo; and

  - RigCo has no intercompany loan liabilities except to its own subsidiaries and IHCo,

and for these purposes intercompany loan liabilities do not include trade payables or amounts due in respect of services provided by a member of the Group which are paid in cash or otherwise settled within a specified period.

- References to cash in this term sheet include cash equivalents where appropriate.

**Summary of Cash Pooling Arrangements**

*RigCo Group cash pool*

- The cash pooling arrangements currently operating at the Seadrill Limited level will be moved down to the RigCo level or a new cash pool will be established at the RigCo level. The NADL cash pool will either continue to operate at the NADL level on the same basis as it operates today or will be terminated.

- On the closing date of the recapitalisation, cash will be moved within the Seadrill group so that all Available Closing Cash (as defined below) is held by RigCo and its subsidiaries (including NADL, Sevan and AOD and their respective subsidiaries) (the "**RigCo Group**") and, to the extent held by RigCo, it shall be held in the RigCo contribution account.

- Out of the proceeds of (a) the New Secured Notes (which shall be subject to a 1% closing fee funded from the initial proceeds of the New Secured Notes) and (b) the new equity placement ((a) and (b) together, the "**New Capital Contributions**"):

    - US$200 million (being 100% of the proceeds of the new equity placement or any other new capital contribution in lieu of the new equity placement) less an amount up to US$25 million (that will remain at Seadrill Limited to fund liquidity requirements at such level) will be contributed to RigCo;

    - US$227.5 million of the proceeds of the New Secured Notes (such amount as reduced from time to time as contemplated below, the "**NSN Escrow Amount**") will be held in a restricted cash account at NSNCo;

    - US$100 million of the proceeds of the New Secured Notes will be contributed to IHCo; and

    - US$523.9 million of the proceeds of the New Secured Notes will be contributed to RigCo.

- At closing, IHCo will therefore hold approximately US$100 million.

- Available Closing Cash for these purposes will be the Consolidated Cash Balance of the Company and its subsidiaries at closing less:

    - transaction costs including financing fees and payments to implement the recapitalisation;

    - the gross proceeds of the New Capital Contributions;

2

- restricted cash for the purposes of Seadrill Limited's consolidated financial statements being essentially cash over which security has been granted to other parties or which has been ring fenced for the benefit of other parties such as for example cash collateral for letters of credit or other existing financing arrangements but for the avoidance of doubt this will not include cash in the earnings accounts over which security has been granted in favour of the lenders under the Secured Facilities Agreements; and

- cash relating to certain loans and other receivables which form part of the NSN Collateral (as defined in section E1 of the New Secured Notes term sheet) received prior to the Refinancing Closing Date and which are required under the New Secured Notes term sheet to be held in segregated and unencumbered accounts of the Company and/or other members of the Group (as applicable) and to be subsequently transferred on the Refinancing Closing Date to bank accounts of NSNCo (which accounts will be secured in favour of the New Secured Noteholders).

- The Consolidated Cash Balance will include all cash held by Seadrill Limited and its subsidiaries including NADL, Sevan, AOD and their respective subsidiaries at closing, including cash held in accounts charged in favour of the lenders under the Secured Facilities Agreements.

- There will be no adjustment to the terms applicable to the existing security for the lenders under the respective Secured Facilities Agreements in respect of such earnings accounts.

- Subject to the RigCo periodic cash sweep mechanic described below, moneys held by the RigCo Group (other than moneys held in the excess sales proceeds escrow account(s)) will be free to be moved around the RigCo Group (in the case of moneys held in earnings accounts and the bank account(s) into which IHCo funds cash pursuant to the Contribution Agreement (defined below), for so long as no event of default is continuing under the relevant Secured Facilities Agreements). There will be a periodic cash sweep (subject to exceptions to be agreed, including but not limited to exceptions (i) for legal restrictions such as exchange or capital controls or legal requirements to which the directors of the relevant subsidiary are subject and (ii) where tax and/or other costs on the payment or transfer of funds to RigCo would be material for that subsidiary) of cash balances held by subsidiaries of RigCo into periodic cash sweep accounts to be opened and maintained by RigCo, provided that, for so long as there is a minority shareholder of AOD, any sweep of cash held by AOD and its subsidiaries will operate as follows:

  - Up to 30 June 2021, any cash held by AOD and its subsidiaries over the higher of US$20 million and the amount of cash required by AOD and its subsidiaries to (i) meet its debt service obligations for the next six months, (ii) repay any loans made by RigCo to AOD or AOD's subsidiaries and (iii) meet ongoing financial and operating costs and liabilities, may at the election of the board of directors of AOD be paid pro rata to RigCo and AOD's minority shareholder (in each case pro rata to its equity stake in AOD) by way of intercompany loans on terms to be agreed (but provided that the interest rate on such loans shall not be lower than the interest rate payable on the AOD Facility Agreement and AOD shall be entitled to request repayment of such loans on demand to the extent that it requires funds to meet its financial and operational costs and liabilities, and provided further that where AOD requests repayment of such loans, AOD shall request repayment of such loans by each of RigCo and AOD's minority shareholder, in each case pro rata to its equity stake in AOD).

3

- On the last day of each semi-annual period, starting with the semi-annual period ending 30 June 2021, any cash held by AOD and its subsidiaries over the amount of cash required by AOD and its subsidiaries to (i) meet its debt service obligations for the next six months, (ii) fund any cash sweep as described in section C2 of the Secured Facilities term sheet in relation to the AOD Facility Agreement in respect of that semi-annual period, (iii) repay any loans made by RigCo to AOD or AOD's subsidiaries and (iv) meet ongoing financial and operating costs and liabilities, shall be paid pro rata to RigCo and AOD's minority shareholder (in each case pro rata to its equity stake in AOD) by way of intercompany loans on terms to be agreed (but provided that the interest rate on such loans shall not be lower than the interest rate payable on the AOD Facility Agreement and AOD shall be entitled to request repayment of such loans on demand to the extent that it requires funds to meet its financial and operational costs and liabilities, and provided further that where AOD requests repayment of such loans, AOD shall request repayment of such loans by each of RigCo and AOD's minority shareholder, in each case pro rata to its equity stake in AOD).

  During this period, provided that the cash required to meet the items described in paragraphs (i) to (iv) above has been retained by AOD and its subsidiaries and AOD and its subsidiaries additionally have (and will continue to have after any such dividend is paid) at least a free cash float in an amount to be agreed that is generated from its own funds, the board of directors of AOD may, if they consider it appropriate, elect to pay dividends to the shareholders of AOD instead of making these upstream loans, such dividends to be paid on a pro rata basis according to the shareholders' shareholdings.

The RigCo periodic cash sweep accounts will be subject to security as further detailed in the Intercreditor term sheet.

- There will be a minimum liquidity requirement of US$650 million for the remainder of the year 2017, US$525 million for the year 2018 and US$400 million thereafter within the RigCo Group for the benefit of the lenders under the Secured Facilities Agreements (the "**RigCo Minimum Liquidity Requirement**"). The RigCo Minimum Liquidity Requirement must be satisfied at all times (subject to a cure period of not more than 5 Business Days between quarterly testing dates for intra period variations in the event that cash within the RigCo Group is no more than US$50 million below the applicable RigCo Minimum Liquidity Requirement on such days) and will be tested by way of a compliance certificate provided to the lenders on a quarterly basis.

  All cash collateral posted by members of the RigCo Group (whether or not held by such member of the RigCo Group) and all cash within the RigCo Group including cash in hand and cash in bank accounts, as well as cash held in earnings accounts and the bank account(s) into which IHCo funds cash pursuant to the Contribution Agreement and the RigCo periodic cash sweep accounts, which are charged in favour of the lenders under the Secured Facilities and cash held in cash pooling accounts will count towards this requirement, provided that in respect of cash collateral pledged in favour of third party creditors, only up to US$100 million

4

of such pledged cash will be taken into account. For the avoidance of doubt, the cash in the excess sales proceeds escrow account(s) described below will be taken into account when calculating compliance with the RigCo Minimum Liquidity Requirement only where no event of default is continuing under the Secured Facilities Agreements. Any Amortisation Conversion Election (as that term is defined in the Secured Facilities term sheet) will not result in any manufactured adjustment to the RigCo Minimum Liquidity Requirement (i.e. deferred amortisation will not be deducted, and no amount corresponding to deferred amortisation will be added, when calculating the RigCo Minimum Liquidity covenant).

- There will be restrictions on moneys being paid out of the RigCo Group to IHCo or its affiliates (other than members of the RigCo Group) (the "**RigCo Restricted Payments Membrane**"). In particular:

  (a)   certain payments will be permitted to be made through the RigCo Restricted Payments Membrane at any time so long as no payment or insolvency event of default, no event of default arising out of a breach of the RigCo Minimum Liquidity Requirement and no event of default arising out of non-compliance by IHCo of its obligations to make payments or contributions to RigCo pursuant to the Contribution Agreement (save for a failure by IHCo to pay or contribute an amount if caused by an administrative or technical error and such payment or contribution is made within 3 Business Days of its due date) is continuing under the Secured Facilities Agreements or, in any such case, would result therefrom and such payments are to be promptly applied to meet the purpose for which they are being made (the "**Junior Obligations Permitted Payments**"). These Junior Obligations Permitted Payments will include payments from RigCo Group cash to fund:

    (i)    payments of principal, interest or other amounts due in respect of unsecured debt (if any) issued by Seadrill Limited;

    (ii)   payments of principal, interest or other amounts due in respect of the New Secured Notes or any instrument refinancing the New Secured Notes to the extent there is insufficient cash at IHCo available to make such payments;

    (iii)  payments under hedging arrangements existing on the Refinancing Closing Date and, to the extent permitted to exist by the agreed covenant package set out in Annex 4 of the Secured Facilities term sheet, non-speculative hedging arrangements entered into in the future;

    (iv)   payments by way of financial support to non-consolidated entities (including payments made in respect of guarantees of non-consolidated entities permitted to exist by the agreed covenant package set out in Annex 4 of the Secured Facilities term sheet) existing on the Refinancing Closing Date to the extent there is insufficient cash at IHCo available to make such payments;

    (v)    payments in respect of newbuilds which are permitted to be made by the agreed covenant package set out in Annex 4 of the Secured Facilities term sheet to the extent there is insufficient cash at IHCo available to make such payments; and

5

(vi)    payments in respect of acquisitions and rig investments which are permitted to be made by the agreed covenant package set out in Annex 4 of the Secured Facilities term sheet to the extent there is insufficient cash at IHCo available to make such payments.

(b)    certain payments which are not Junior Obligations Permitted Payments will be permitted to be made through the RigCo Restricted Payments Membrane at any time irrespective of whether any event of default has occurred or is continuing under the Secured Facilities Agreements and such payments are to be promptly applied to meet the purpose for which they are being made (the "**Structural Permitted Payments**", and together with the Junior Obligations Permitted Payments, the "**Specified Permitted Payments**"). Structural Permitted Payments will include payments from freely available RigCo Group cash to fund:

(i)    payments made on arm's length terms for services or goods provided;

(ii)    payments made to meet corporate, administration, tax, employment, pensions, IT, listing and property costs and expenses and other payments arising in the ordinary course of business of Seadrill Limited and its subsidiaries (other than RigCo and its subsidiaries) (the "**SDRL/IHCo/NSNCo Group**");

(iii)    payments in respect of insurance arrangements of Seadrill Limited and its subsidiaries;

(iv)    payments made to meet regulatory or legal obligations or requirements of Seadrill Limited and its subsidiaries;

(v)    payments made to meet payment obligations of members of the SDRL/IHCo/NSNCo Group either existing on the Refinancing Closing Date or arising under committed arrangements existing on the Refinancing Closing Date (but in each case not including Junior Obligations Permitted Payments);

(vi)    payments which are permitted to be made or in respect of transactions which are permitted (including in order to fund equity contributions and including Equity Transactions (as defined in Annex 4 of the Secured Facilities term sheet)) by the agreed covenant package set out in Annex 4 of the Secured Facilities term sheet (but in each case not including payments which represent Junior Obligations Permitted Payments);

(vii)    payments made by Seadrill Global Services Limited consistent with the ordinary course of its business in operating its capital equipment pool and consistent with the basis on which it is currently operated;

(viii)     payments made by Seadrill Management Limited consistent with the basis on which it is currently operated including payments in relation to directors' service payments, employee salaries and pensions payments;

(ix)     payments made by Seadrill Insurance Limited consistent with the basis on which it is currently operated;

(x)     payments due under guarantees granted by Seadrill Limited, provided that Seadrill Limited shall use its reasonable endeavours to (A) procure that the principal meets the primary obligations in respect of which the guarantee has been called to the extent possible, with funds available to the principal and (B) legally reduce, postpone or avoid such payment unless it considers (acting reasonably) that to do so would not be in the interests of the Group or its financial creditors (because, for example, but without limitation, the same risks resulting in additional amounts being claimed from members of the Group) provided that, for the avoidance of doubt, nothing in this proviso shall delay or prohibit Seadrill Limited from making any payment due under a guarantee which it is satisfied has become legally due and payable under the terms of the relevant documentation; and

(xi)     Net Realisation Proceeds (as defined in section D1 of the New Secured Notes term sheet) which arise within the RigCo Group and are required to be paid to NSNCo in accordance with the New Secured Notes term sheet;

(c)     other payments which are not Specified Permitted Payments or payments in respect of the cash sweep described in paragraph (d) immediately below (the "**IHCo Top-up Payments**") will only be permitted to be made through the RigCo Restricted Payments Membrane to upstream RigCo Group cash from RigCo to IHCo and its affiliates (other than members of the RigCo Group) so long as:

(i)     no such payment is made prior to 1 January 2020;

(ii)     there is no continuing event of default under the Secured Facilities Agreements at the time of and immediately following the making of the payment;

(iii)     cash at IHCo does not exceed US$250 million excluding any Specified Permitted Payments, the proceeds of any SDRL Equity Issue and the proceeds of any SDRL Debt Issue (in each case provided that such amounts are to be promptly applied to meet the purpose for which such payments are being made) (the "**IHCo Excluded Cash**") (the US$250 million excluding the IHCo Excluded Cash being the "**IHCo Cash Cap**") at the time of and immediately following the making of the payment;

(iv)     cash held by Seadrill Limited and its subsidiaries (other than IHCo and its subsidiaries) (the "**SDRL Group**") does not exceed the SDRL Group Cash Cap (as defined below) at the time of and immediately following the making of the payment;

<div align="center">7</div>

(v) cash in an amount at least equal to the then RigCo Minimum Liquidity Requirement plus US$250 million (including, where no event of default is continuing, cash in the excess sales proceeds escrow account(s) described below) remains within the RigCo Group at the time of and immediately following the making of the payment;

(vi) the Amortisation Conversion Election has not been exercised or if it has been exercised, the secured tranches created as a result of its exercise have been prepaid in full by the date of payment; and

(vii) for every dollar that is upstreamed from RigCo to IHCo, three dollars is concurrently applied:

(A) firstly, in repayment of PIK interest (if any) accrued under the Secured Facilities Agreements (on a pro rata basis across all Secured Facilities Agreements); and

(B) secondly, in prepayment of the Secured Facilities (on a pro rata basis across all Secured Facilities Agreements, and applied against future amortisation payments in inverse chronological order); and

(d) payments will be permitted to IHCo pursuant to the cash sweep described in section C2 of the Secured Facilities term sheet.

For the avoidance of doubt, the RigCo Restricted Payments Membrane will not restrict the payment of dividends from AOD to its minority shareholder as described above and below.

- There will be no requirement that any IHCo Top-up Payments or payments to IHCo pursuant to the cash sweep described in section C2 of the Secured Facilities term sheet are made for any specific purpose or directly or contemporaneously towards any purpose and no look forward liquidity test in relation to the RigCo Group as a condition to any of the Specified Permitted Payments, IHCo Top-up Payments or payments to IHCo pursuant to the cash sweep.

- Where moneys are advanced by RigCo to IHCo they will be advanced by way of:

    - repayment of intercompany loans made by IHCo to RigCo; or

    - by way of upstream intercompany loans on a subordinated basis to the claims of the New Secured Noteholders on the agreed intercreditor terms. Security will be granted over any such upstream intercompany loans with all lenders under the Secured Facilities having a first priority claim and the New Secured Noteholders having a second priority claim subject to agreed intercreditor terms.

- For the avoidance of doubt, RigCo will not make dividends to IHCo or otherwise return funds to equity.

8

*NSNCo Cash*

- There will be a minimum liquidity requirement at NSNCo (the "**NSNCo Liquidity Requirement**") funded by means of the initial NSN Escrow Amount. The initial NSN Escrow Amount shall be reduced from time to time:

  - in an amount based on the amount of New Secured Notes redeemed or otherwise retired; and

  - pursuant to a performance based reduction mechanism,

  in each case in accordance with section E6 of the New Secured Notes term sheet, with such released amounts being subject to a reinvestment right before payment to IHCo.

- NSNCo will also receive into a mandatory offer holding account maintained by it (pending redemption/repayment of the New Secured Notes, application to pay PIK interest in cash, re-investment or payment to IHCo in accordance with sections C3 and D2 of the New Secured Notes term sheet), the Net Realisation Proceeds.

*IHCo cash pool*

- A second cash pool will be established with IHCo at its head.

- In addition to the increase in IHCo cash through permitted payments from RigCo and from amounts released from the NSN Escrow Amount and not reinvested (in accordance with section E6 of the New Secured Notes term sheet), IHCo will also receive the following from the NSNCo group:

  - (i) earn-outs from Seadrill Operating LP, Seadrill Capricorn Holdings LLC, Seadrill Gulf Operations Vela LLC, Seadrill Vela Hungary Kft. and Seadrill Polaris Ltd; (ii) dividends in an aggregate amount of no greater than US$60,000,000 per calendar year from Seadrill Partners LLC ("**SDLP**") and other SDLP group facility obligors or holding companies of such SDLP group facility obligors; and (iii) amounts paid by Seadrill Vencedor Ltd pursuant to the loan agreement dated 28 September 2012 between Seadrill Limited (as lender) and Seadrill Vencedor Ltd (as borrower) (as amended, extended and/or restated from time to time, including by a letter agreement dated 28 August 2014 between the parties to the loan agreement and by a letter agreement dated 14 April 2015 between the parties to the loan agreement); and

  - any Net Realisation Proceeds which have not been used to redeem/repay New Secured Notes, to pay PIK interest in cash, to fund financial support to non-consolidated entities, to repay RigCo cash used to fund financial support or which have not been reinvested, in each case accordance with section D2 of the New Secured Notes term sheet,

  in each case, as soon as reasonably practicable after such amounts become available for distribution from NSNCo to IHCo.

9

- There will be no minimum liquidity requirement at IHCo, but IHCo may only hold maximum cash equal to the IHCo Cash Cap. The IHCo Cash Cap will not restrict (i) cash being passed through IHCo in order to be used or applied in accordance with the cash pooling arrangements set out in this term sheet and agreed covenants and (ii) Net Realisation Proceeds being passed through IHCo to be paid to NSNCo, and in each case such cash will be excluded for the purposes of calculating whether IHCo cash exceeds the IHCo Cash Cap.

- Where, on a New Secured Note cash interest payment date, cash at IHCo exceeds the IHCo Cash Cap (after payment of such cash interest), such excess cash will be promptly contributed to RigCo. For the avoidance of doubt, this will allow IHCo to fund RigCo above the RigCo Minimum Liquidity Requirement, notwithstanding the requirements of the Contribution Agreement described below.

- IHCo and RigCo will enter into a contribution agreement (the "**Contribution Agreement**") whereby IHCo will contractually commit (subject only to the conditions set out below) to make available on a quarterly basis to RigCo such funds as are required in order to maintain the RigCo Minimum Liquidity Requirement applicable at that time within the RigCo Group (for the avoidance of doubt, automatically and without the need for RigCo to make a payment demand) for so long as IHCo has funds available.

- In the event that:

  (i)   there is an event of default under any Secured Facilities Agreement which continues unremedied or (other than with respect to a payment or insolvency event of default which would be resolved by the continued contribution of moneys from IHCo to RigCo in accordance with the Contribution Agreement and taking into account funds available to IHCo for such contribution) unwaived for a period of more than 60 days; or

  (ii)  any Secured Facilities Agreement is accelerated or any related security is enforced (and this will include any lender exercising rights of set-off or similar against any member of the Group),

  in either case where the underlying event of default under the relevant Secured Facilities Agreement is not:

  - an event of default arising in circumstances where the avoidance of the occurrence of such event of default is in the control of the SDRL/IHCo/NSNCo Group (provided that, for the avoidance of doubt, this does not require IHCo to breach (or procure that its subsidiaries breach) the NSNCo Liquidity Requirement or the New Secured Notes indenture as in effect on the Refinancing Closing Date), or

  - a cross-default arising as a result of an event of default under any credit facilities to which a member of the Seadrill Group (other than the RigCo Group) is the primary obligor (other than an event of default under the Secured Facilities Agreements) where the circumstances giving rise to such event of default do not otherwise constitute an event of default under the Secured Facilities Agreements,

  then the maximum amount required to be provided by IHCo pursuant to the Contribution

Agreement will be equal to the lesser of:

(a)     cash held by IHCo at that time; and

(b)     the RigCo Minimum Liquidity Requirement applicable at that time,

minus, in the case of paragraph (b) above, any cash at that time in the RigCo Group (including cash in the earnings accounts, the RigCo periodic cash sweep accounts, and the bank account(s) into which IHCo funds cash pursuant to the Contribution Agreement or similar (irrespective of whether an event of default has occurred or is continuing)).

No further amounts over and above this maximum will then be required to be provided by IHCo pursuant to the Contribution Agreement unless (i) the relevant event of default under the Secured Facilities Agreements is remedied or (other than with respect to a payment or insolvency event of default which would be resolved by the continued contribution of moneys from IHCo to RigCo in accordance with the Contribution Agreement and taking into account funds available to IHCo for such contribution) waived or (ii) the acceleration or enforcement action under the Secured Facilities Agreements is rescinded to the satisfaction of IHCo in its absolute discretion.

For the avoidance of doubt:

(i)     the suspension of the obligation for IHCo to make contributions to RigCo pursuant to the Contribution Agreement shall apply solely to the obligations under that document and shall not in any way restrict the ability of IHCo to otherwise make payments to RigCo to the extent such payments are otherwise permitted by the New Secured Notes, nor shall any such suspension in and of itself constitute, or be deemed to constitute, grounds for the directors of IHCo to conclude that they may or should cease to make payments to RigCo;

(ii)    the filing or other initiation of insolvency or other similar proceedings whether voluntary or involuntary including, but not limited to, US Chapter 11 proceedings and the taking of any step or action in connection with the same, shall not be deemed to be an event the avoidance of the occurrence of which is in the control of the SDRL/IHCo/NSNCo Group for these purposes;

(iii)   the maximum amount to be provided by IHCo pursuant to the Contribution Agreement in the circumstances set out herein will be calculated prior to the exercise of any set-off or similar rights by the lenders under the Secured Facilities Agreements exercisable as a result of the underlying event of default; and

(iv)    under no circumstances will IHCo be required to make contributions to RigCo, if, as the result of such contribution, the NSN Escrow Amount will fall below the NSNCo Liquidity Requirement or there would be any reduction in the mandatory offer holding account not otherwise permitted under the terms of the New Secured Notes.

11

- Except as contemplated in this term sheet and/or the Contribution Agreement, the [Intercreditor Agreement] [New Secured Notes indenture] will restrict the ability of the SDRL/IHCo/NSNCo Group to fund the RigCo Group in excess of an amount to be agreed, provided, however, that with respect to the first US$250m of Amortisation Conversion Elections (as defined in the Secured Facilities term sheet) there will be a mechanism whereby in the event of an Amortisation Conversion Election, IHCo will be required to contribute additional cash to RigCo equal to the lesser of:

  - such amount that equates to a proportion of 40 cents for every dollar of Amortisation Conversion Election; and

  - the residual cash balance at IHCo excluding any IHCo Excluded Cash.

    For the avoidance of doubt, the Company shall be able to exercise an Amortisation Conversion Election notwithstanding the cash balance at IHCo being zero.

- Changes to the Contribution Agreement will not be permitted without the consent of the Supra Majority Lenders and the majority of the New Secured Noteholders by value (subject to agreed exceptions), and non-compliance with the Contribution Agreement shall constitute an event of default under the Secured Facilities Agreements unless in the case of a non-payment or failure to contribute, a party's failure to pay or contribute an amount is caused by an administrative or technical error and such payment or contribution is made within 3 Business Days of its due date.

- Moneys held by the SDRL/IHCo/NSNCo Group will otherwise be free to be moved around the SDRL/IHCo/NSNCo Group or advanced to RigCo, provided that movement of cash amounts between IHCo and the NSNCo Group (and vice versa) must be consistent with this term sheet (and the NSN Escrow Amount shall at all times remain at NSNCo) and provided further that cash held by the SDRL Group will not be permitted to exceed US$25 million[1] at any time excluding any cashflows from assets held by or acquisitions and investments made by the SDRL Group and also excluding:

  - the proceeds of any SDRL Equity Issue (as defined in Annex 4 (Group Wide Restrictive Covenants) of the Secured Facilities term sheet);

  - the proceeds of any SDRL Debt Issue (as defined in Annex 4 (Group Wide Restrictive Covenants) of the Secured Facilities term sheet); and

  - any IHCo Excluded Cash,

  in each case held by or which has been upstreamed to the SDRL Group (cumulatively, the "**SDRL Group Cash Cap**").

- There will be no restricted payments restrictions between (i) IHCo and (ii) the SDRL Group other than the restricted payments covenant in the New Secured Notes indenture (to be agreed) in addition to the SDRL Group Cash Cap. Payments made to counterparties of Seadrill Limited and its subsidiaries will be permitted unless restricted by the agreed covenant package set out in Annex 4 of the Secured Facilities term sheet.

---

[1]   There will be a separate bank account in which the initial US$25m and future amounts from IHCo (excluding IHCo Excluded Cash) up to the US$25m cap will be held, and from which relevant permitted payments will be paid. Scope of payments permitted from this account to be agreed.

- The SDRL Group will be entitled to hold and apply the following proceeds subject only to the agreed covenant package set out in Annex 4 of the Secured Facilities term sheet:

    - the proceeds of any SDRL Equity Issue;

    - the proceeds of any SDRL Debt Issue;

    - any Specified Permitted Payments; and

    - any cashflows from assets held by or acquisitions and investments made by the SDRL Group.

- Where moneys are advanced by IHCo to RigCo they will be advanced either by way of equity contribution or in the form of loans subordinated to the claims of all lenders under the Secured Facilities Agreements and the New Secured Noteholders on the agreed intercreditor terms but there shall be no restriction on the repayment of such loans where the tests for payments out of the RigCo Group specified above are met.

- There will be restrictions on the SDRL/IHCo/NSNCo Group paying dividends or otherwise returning funds to shareholders of Seadrill Limited and restrictions on the SDRL/IHCo/NSNCo Group paying moneys by way of financial support to non-consolidated entities, in each case subject to exceptions as set out in the agreed covenant package at Annex 4 (Group Wide Restrictive Covenants) of the Secured Facilities term sheet.

*Excess Sales Proceeds Escrow Accounts*

- An excess sales proceeds escrow account will be established at RigCo. Further excess sales proceeds escrow accounts may also be established in members of the RigCo Group that are not wholly owned subsidiaries of RigCo or where there are legal restrictions on upstreaming moneys to RigCo.

- Security will be granted over the excess sales proceeds escrow account(s) with all lenders under the Secured Facilities Agreements having a first priority claim and the New Secured Noteholders having a second priority claim subject to the agreed intercreditor terms.

- Where any disposal proceeds remain after application pursuant to the mandatory prepayment requirements of a Secured Facilities Agreement (in the case of a non-distressed disposal) or after application pursuant to a Secured Facilities Agreement of recoveries following an enforcement sale (in the case of a distressed disposal) and after the payment of costs and expenses (including taxation) of the disposal ("**Excess Sales Proceeds**"), then such Excess Sales Proceeds will be paid into the relevant excess sales proceeds escrow account(s) at RigCo, provided that, for so long as there is a minority shareholder of AOD, any Excess Sale Proceeds relating to the AOD Facility Agreement will be applied as follows:

    (a)     first, to repay any loans made by RigCo to AOD or AOD's subsidiaries, and such amounts shall be paid into the relevant excess sales proceeds escrow account(s) at RigCo;

13

    (b)    RigCo's pro rata portion (pro rata to its equity stake in AOD) of any remaining amounts after application in accordance with paragraph (a) above will be paid into the relevant excess sales proceeds escrow account(s) at RigCo; and

    (c)    AOD's minority shareholder's pro rata portion (pro rata to its equity stake in AOD) of any remaining amounts after application in accordance with paragraph (a) above will be available to be distributed to AOD's minority shareholder.

•   For so long as no event of default is continuing under a Secured Facilities Agreement, amounts standing to the credit of the excess sale proceeds escrow account(s):

    •   may be applied (at RigCo's election) in prepayment of the secured tranches created as a result of the exercise of the Amortisation Conversion Election (on a pro rata basis across all Secured Facilities Agreements); and

    •   if the Amortisation Conversion Election has not been exercised or if the secured tranches created as a result of the Amortisation Conversion Election have been prepaid in full, may be applied (at RigCo's election):

        (i)    towards scheduled principal amortisations and interest payments under the Secured Facilities Agreements (on a pro rata basis across all Secured Facilities and applied to upcoming payments) but only if and to the extent that RigCo Group liquidity (based on the same calculations as apply to the RigCo Minimum Liquidity Requirement) is below US$750 million. The provision of a 12 month cash forecast will be a condition precedent to such application of amounts standing to the credit of the excess sale proceeds escrow account(s), with the option of a call with management. For the avoidance of doubt, the provision of cash forecasts and holding of calls with management shall not give rise to any consent or approval rights for the lenders under the Secured Facilities Agreement or be capable of triggering any defaults; and/or

        (ii)    (subject to the consent of the Supra Majority Lenders) towards the acquisition of new rigs within the RigCo Group,

  but in any event amounts standing to the credit of the excess sale proceeds escrow account(s) shall not be used for:

    •   capital and other reinvestment in the rigs of members of the RigCo Group which are secured under the Secured Facilities Agreements; or

    •   working capital requirements of members of the RigCo Group (not including payments to members of the SDRL/IHCo/NSNCo Group).

•   If an event of default is continuing under a Secured Facilities Agreement, amounts may not be withdrawn from the excess sale proceeds escrow account(s) without the consent of the common security agent (acting on the instructions of the Supra Majority Lenders) and only then to meet deficiency amounts under the Secured Facilities Agreements, in each case until the amounts owing under the Secured Facilities Agreements have been repaid in full.

**ANNEX 6 to EXHIBIT A**

**Intercreditor Term Sheet**

**PROJECT EAGLE**

**SECURED DEBT INTERCREDITOR PRINCIPLES**

This paper sets out the key terms of the intercreditor arrangements to be put in place as part of the proposed restructuring in relation to Seadrill Limited ("**Seadrill Limited**" or the "**Company**"). References are made to the Credit Facilities Term Sheet, New Secured Notes Term Sheet and the Cash Pooling Term Sheet, which are annexed at Exhibit A of the restructuring support and lock-up agreement to which this term sheet is also attached.

It is proposed that a single global intercreditor agreement (the "**Intercreditor Agreement**") will be entered into in respect of the New Secured Notes and all of the Secured Facilities Agreements on the terms set out in these Intercreditor Principles.

The Intercreditor Agreement will govern the ranking and claims of (i) the finance parties (the "**Bank Finance Parties**") under the Secured Facilities Agreements and related finance documents to which they relate (the "**Bank Finance Documents**"), (ii) the holders of the New Secured Notes (the "**New Secured Noteholders**") and related finance documents to which they relate (the "**New Secured Notes Finance Documents**" and, together with the Bank Finance Documents, including, without limitation, the guarantee ranking scheme therein, the "**Secured Debt Documents**"), (iii) certain members of the Group (as defined in the Credit Facilities Term Sheet) which provide intercompany loans (the "**Intercompany Lenders**") to RigCo or other Obligors where such loans are required by the terms of the relevant Secured Facilities Agreement to be subordinated and (iv) SFL Hercules Ltd., SFL Deepwater Ltd. and SFL Linus Ltd. (the "**Ship Finance Parties**") in relation to the guarantees proposed to be granted by RigCo in respect of the arrangements relating to the Ship Finance Agreements (as defined in the Credit Facilities Term Sheet). The Intercreditor Agreement will also govern payment waterfalls, security enforcement and release, options to purchase and the appointment of a common security agent in respect of the RigCo Security on the terms set out below.

For the avoidance of doubt, the Intercreditor Agreement will not govern the existing security or guarantee arrangements under the Bank Finance Documents or otherwise restrict the Banks Finance Parties' rights under such security and guarantee arrangements.

The Intercreditor Agreement will be entered into between (i) the Bank Finance Parties, (ii) Seadrill Limited, (iii) IHCo, (iv) RigCo, (v) NSNCo, (vi) the Obligors, (vii) the Intercompany Lenders, (viii) the New Secured Noteholders and (ix) the Ship Finance Parties or, in each case, their representative.

Seadrill Global Services Limited and Seadrill Management Limited will be hived down to RigCo. For the avoidance of doubt, Seadrill Global Services Limited and Seadrill Management Limited shall not be subject to any new security arrangements and shall continue to operate on the basis on which they currently operate.

| | |
|---|---|
| **Documentation** | The CoCom's advisers will be responsible for the drafting of the Intercreditor Agreement. |
| **Secured Facilities** | The facility/ies made available under the Secured Facilities Agreements. |
| **Required Lenders** | Has the meaning given to the term "Required Majority", "Required Lenders" or "Majority Lenders" as the case may be, in each Secured Facilities Agreement. |

| | |
|---|---|
| **Supra Majority Lenders** | Two third majority of the lenders under the Secured Facilities Agreements with reference to total outstanding commitments and loans (without duplication) across the Secured Facilities Agreements. |
| **Senior Debt** | Liabilities under the Bank Finance Documents and any permitted refinancing thereof designated by Seadrill Limited as "Senior Debt" pursuant to the Intercreditor Agreement. For the avoidance of doubt, any reference to "liabilities" in these Intercreditor Principles shall include any liability in respect of a guarantee. |
| **New Secured Notes** | The New Secured Notes to be issued by NSNCo on the terms set out in the New Secured Notes Term Sheet. |
| **Intra Group Debt** | Liabilities of the relevant Obligors under intercompany loans made by Intercompany Lenders to RigCo or other Obligors where such loans are required by the terms of the relevant Secured Facilities Agreement and the Intercreditor Agreement to be subordinated. |
| **Obligors** | The borrowers, guarantors and security providers under the Bank Finance Documents (other than Seadrill Limited). |
| **Creditors** | The Bank Finance Parties, the New Secured Noteholders and the Intercompany Lenders. |
| **NSNCo Structure** | Assets subject to First Ranking New Secured Notes Security (as defined in the New Secured Notes Term Sheet) to be transferred prior to closing so that they are owned by NSNCo and/or its subsidiaries (the "**NSNCo Group**") where practicable and consistent with legal constraints and as further described in the New Secured Notes Term Sheet, but excluding any subsidiary of Seadrill Limited party to a newbuild contract. Alternative structures to be devised for assets where such transfer is not possible and/ or are subject to security restrictions. |
| | No member of the NSNCo Group may have any liabilities to any other Group entity outside of the NSNCo Group other than IHCo, and then only to the extent such liabilities are subject to acceptable subordination arrangements in favour of the New Secured Noteholders and pledged in favour of the New Secured Noteholders (subject to exceptions to be agreed, provided that any such agreed specific exception will be subject to release on enforcement). |
| | First Ranking New Secured Notes Security and intercompany debt obligations between IHCo and the NSNCo Group to be regulated by a separate security trust and subordination deed. |
| **Security for Bank Finance Parties** | As described in the Credit Facilities Term Sheet. |

| | |
|---|---|
| **Security for New Secured Noteholders** | As described in the New Secured Notes Term Sheet. |
| **IHCo Bank Accounts** | All New Secured Notes proceeds not applied on the Refinancing Closing Date to (a) provide a contribution of US$523.9 million to RigCo on the Refinancing Closing Date and support compliance with the continuing RigCo Minimum Liquidity Requirement in respect of the cash pooling arrangements; and/or (b) to fund the NSN Escrow Amount (as defined in the New Secured Notes Term Sheet), will be held (subject to application in accordance with the Cash Pooling Term Sheet, the covenants contained in the New Secured Notes and the covenants contained in the Secured Facilities Agreements) in one or more specified accounts satisfactory to the New Secured Noteholders at IHCo ("**IHCo Bank Accounts**"). In respect of any IHCo Bank Accounts, the New Secured Noteholders and the Bank Finance Parties will have a pari passu claim (vis a vis each other) and, in any event, such claim will be senior to any other claims at IHCo. The New Secured Noteholders claim to the IHCo Bank Accounts will be for the aggregate outstanding amount of the New Secured Notes (including principal, interest and other amounts) (being the full US$860 million of the New Secured Notes and any additional amounts in respect of the accrual of PIK interest and unpaid cash interest, subject to reductions for retirement or redemption of any New Secured Notes from time to time) and the Bank Finance Parties' claim to the IHCo Bank Accounts will be limited to the difference between the RigCo Minimum Liquidity Requirement (as described in the Cash Pooling Term Sheet) and the consolidated cash balance of the RigCo Group (as defined in the Cash Pooling Term Sheet) at the time of enforcement. The security will be in the form of a pledge over the IHCo Bank Accounts in the jurisdiction where the IHCo Bank Accounts are set up. For the avoidance of doubt, the Bank Finance Parties will have no direct claim or security interest in the Net Realisation Proceeds. |
| **Ranking of Payment Claims** | Liabilities owed by each Obligor (other than RigCo) to the Creditors shall rank in the following order:<br><br>• first, the Secured Facilities Agreement to which that Obligor is party or a guarantor or security provider in relation thereto; and<br><br>• second, the Intra Group Debt.<br><br>Liabilities owed by RigCo to the Creditors and the Ship Finance Parties shall rank in the following order:<br><br>• first, the Senior Debt;<br><br>• second, the New Secured Notes;<br><br>• third, the Ship Finance Parties; and<br><br>• fourth, the Intra Group Debt.<br><br>Any payment received by a Creditor or the Ship Finance Parties other than in accordance with the terms of the Intercreditor Agreement will be subject to customary turnover provisions. |

| | |
|---|---|
| **Ranking of Security** | The First Ranking Asset Level Security (as defined in the Credit Facilities Term Sheet) will secure the Senior Debt under the relevant Secured Facilities Agreement on a first priority basis. |
| | The following security (the "**RigCo Security**") will secure all the Senior Debt under the Secured Facilities Agreements on a first priority basis and the New Secured Notes on a second priority basis: |
| | • security over upstream intercompany loans made by RigCo to IHCo; |
| | • security over excess sales proceeds escrow account and RigCo periodic cash sweep account established by RigCo and, in the case of the excess sales proceeds escrow accounts, other members of the RigCo Group; |
| | • security over the shares and any other equity interests in RigCo (including any equity interest arising from an equity contribution made by IHCo to RigCo) and over any intercompany loans advanced by IHCo to RigCo; |
| | • security to be granted over the RigCo bank account(s) into which IHCo funds cash pursuant to the Contribution Agreement (as described in the Cash Pooling Term Sheet). |
| | The First Ranking New Secured Notes Security will secure the New Secured Noteholders only. The Intercreditor Agreement will not restrict or limit the rights or claims of the New Secured Noteholders in relation to such security. |
| | The ranking of claims against the IHCo Bank Accounts (as defined in the New Secured Notes Term Sheet) shall be as set forth above in the New Secured Notes Term Sheet. |
| **Security Holders** | The First Ranking Asset Level Security will be held by the existing security agents for the relevant Bank Finance Parties (each an "**Existing Security Agent**" and together the "**Existing Security Agents**") in accordance with the terms of the relevant Bank Finance Documents. |
| | The RigCo Security will be held by a common security agent for the Bank Finance Parties and the New Secured Noteholders (the "**Common Security Agent**") appointed under the terms of the Intercreditor Agreement. |
| | The First Ranking New Secured Notes Security will be held by a security agent (that at all times must be an independent professional security agent with appropriate expertise to act as a security agent) for the New Secured Noteholders only (the "**Noteholders' Security Agent**") appointed under the terms of the Intercreditor Agreement. There will be a right to replace the Noteholders' Security Agent subject to certain conditions, provided that any replacement security agent must at all times be an independent professional security agent with appropriate expertise to act as a security agent. |

| **Ranking of RigCo guarantees** | The Secured Facilities will receive a first ranking guarantee from RigCo as described in the Credit Facilities Term Sheet. |
|---|---|

The New Secured Notes will receive a second ranking guarantee from RigCo as described in the New Secured Notes Term Sheet.

Each of the Ship Finance Parties will receive a third ranking guarantee from RigCo as set out in Annex 7 to Exhibit A of the restructuring support agreement to which this term sheet is also attached. Such third ranking guarantees shall rank pari passu as between themselves but shall be subordinated as to payment and priority to the first ranking guarantee granted in favour of the Secured Facilities and the second ranking guarantee granted in favour of the New Secured Notes and shall be subject to customary subordination and turnover provisions. The terms of this subordination will provide that RigCo shall be permitted to make payments in respect of any valid claims of a Ship Finance Party under such third ranking guarantee provided that no default or event of default (howsoever defined) has occurred and is continuing under any Secured Facility Agreement or the New Secured Notes.

**Subordination of Intra Group Debt**

**Facility Intra Group Debt**

The following provisions shall apply to Facility Intra Group Debt (as defined below):

- no payment shall be made by any Facility Obligor (as defined below) if the facilities available under the relevant Secured Facilities Agreement or the New Secured Notes are being accelerated or the related security is being enforced or any insolvency event affects an Obligor party to that Facility Intra Group Debt;

- no right of set off exercised by any Facility Intercompany Lender (as defined below), in each case, in respect of any Facility Intra Group Debt if the facilities available under the relevant Secured Facilities Agreement or the New Secured Notes are being accelerated or the related security is being enforced or any insolvency event affects an Obligor party to that Facility Intra Group Debt; and

- no guarantee or security shall be granted to any Facility Intercompany Lender or permitted to subsist in favour of any Facility Intercompany Lender in respect of the Facility Intra Group Debt,

without, in each case, obtaining the consent of the Required Lenders under the relevant individual Secured Facilities Agreement.

**Upstream RigCo Debt**

The following provisions shall apply to Upstream RigCo Debt (as defined below):

- no payment shall be made by RigCo and no right of set off exercised by any lender to RigCo who is a member of the RigCo Group, in each case, in respect of any Upstream RigCo Debt if the RigCo Security is being enforced or an insolvency event affects RigCo; and

- no guarantee or security shall be granted to any lender to RigCo who is a member of the RigCo Group or permitted to subsist in favour of any lender to RigCo who is a member of the RigCo Group in respect of the Upstream RigCo Debt,

without, in each case, obtaining the consent of the Required Lenders under the relevant individual Secured Facilities Agreement.

For the avoidance of doubt:

- intercompany loans advanced by IHCo to RigCo;

- upstream intercompany loans made by RigCo to IHCo; and

- intercompany liabilities owed to RigCo by a subsidiary of RigCo whose shares are subject to First Ranking Asset Level Security,

shall not be subject to any of the aforementioned restrictions.

Subordination and restrictions on intra group liabilities of Obligors under the Bank Finance Documents will be governed under the relevant Bank Finance Documents.

For the purposes of this section:

"**Facility Intra Group Debt**" means the liabilities owed by an Obligor to a member of the RigCo Group who is also an Obligor where such borrower (the "**Facility Obligor**") and such lender (the "**Facility Intercompany Lender**") are both parties to the same individual Secured Facilities Agreement.

"**Upstream RigCo Debt**" means the liabilities owed by RigCo to a member of the RigCo Group.

**Enforcement Mechanics**

**First Ranking Asset Level Security**

The Bank Finance Parties in respect of each Secured Facilities Agreement may enforce the relevant First Ranking Asset Level Security through the relevant Existing Security Agent in accordance with the terms of the relevant Bank Finance Documents subject to ongoing regular notification to the Common Security Agent and the Noteholders' Security Agent and keeping them updated at regular intervals on the progress of the enforcement action.

**RigCo Security**

The Common Security Agent (acting on the instructions of the Supra Majority Lenders) will control enforcement of the RigCo Security. For the avoidance of doubt while the Senior Debt is outstanding, there shall be no independent enforcement of the RigCo Security by the Common Security Agent on behalf of the New Secured Noteholders without the prior written consent of the Supra Majority Lenders. However, the Bank Finance Parties shall notify New Secured Noteholders prior to taking any enforcement action (including insolvency proceedings) in relation to the RigCo Security and will keep New Secured Noteholders informed in a timely manner of all material processes and developments in respect of any impending or actual enforcement action.

**First Ranking New Secured Notes Security**

The Noteholders' Security Agent (acting on the instructions of New Secured Noteholders holding a simple majority of outstanding New Secured Notes) will control enforcement of the First Ranking New Secured Notes Security. The Noteholders' Security Agent shall notify the Bank Finance Parties and keep them updated at regular intervals on the progress of the enforcement action.

In all cases, the security documents relating to the RigCo Security and the First Ranking New Secured Notes Security will become enforceable only upon acceleration (as opposed to upon the occurrence of an Event of Default under, and as such term is defined in, the Bank Finance Documents or the New Secured Notes).

| | |
|---|---|
| **Qualified Person** | Any independent, internationally recognised (i) professional services firm which is regularly engaged in providing valuations of assets of the type which are subject to the First Ranking Asset Level Security, the RigCo Security or the First Ranking New Secured Notes Security (as applicable) or, where applicable, advising on competitive sales processes in relation to assets of that type; (ii) investment bank or (iii) international accountancy firm, in each case not being the firm appointed as the relevant Obligor's administrator or other relevant officer. |
| **No Permitted Payments Regime / Limitation on Voluntary Prepayment or Purchase of New Secured Notes** | There will be no payment blockage or stop notice provisions restricting or controlling payments on the Secured Facilities or the New Secured Notes following an event of default or otherwise.

There will be restrictions on the right to voluntarily prepay or purchase the New Secured Notes prior to the discharge in full of the Senior Debt; provided, however, that voluntary prepayment or purchase of the New Secured Notes will be permitted with proceeds from the following: |

- any issue by Seadrill Limited after the Refinancing Closing Date of any share or stock (whether or not ordinary or preference), warrant or other equity or quasi equity instrument (including subordinated debt) to any person who is not a member of the Group;

- the proceeds of any issue of any bond, note or other debt security or any loan made by a person that is not a member of the Group under any syndicated or bilateral facility where the obligors are only Seadrill Limited and/or its subsidiaries (excluding IHCo and the RigCo Group) and/or any member of the First Ranking NSNCo Group and which do not benefit from guarantees or security from IHCo or any member of the RigCo Group;

- issuances or incurrence of permitted refinancing debt after the Refinancing Closing Date, including any refinancing of the New Secured Notes, where:

  - the relevant creditors (or trustee or agent acting on their behalf) have acceded to the Intercreditor Agreement;

  - the final maturity of the refinancing debt is at least 6 months after the last occurring maturity date in respect of the Secured Facilities Agreements; and

- the amount of the refinancing debt (net of any fees, costs and expenses associated with raising such refinancing debt) is not greater than the aggregate of the New Secured Notes being refinanced plus a percentage to be agreed; and

- sales or disposals of any or all assets other than those subject to First Ranking Asset Level Security.

The terms and conditions for any voluntary prepayment or purchase of the New Secured Notes shall be governed by the New Secured Notes Finance Documents.

| | |
|---|---|
| **Voluntary pre-payments under Secured Facilities Agreements** | Voluntary prepayments of the Secured Facilities to be permitted: |

- in accordance with the refinancing parameters set out in these Intercreditor Principles;

- where applicable as a condition to the use of certain baskets as detailed in Annex 4 (Group Wide Restrictive Covenants) of the Credit Facilities Term Sheet;

- as a condition to the making of IHCo Top-up Payments (as that term is defined in the Cash Pooling Term Sheet) in accordance with the procedure set out in the Cash Pooling Term Sheet; and

- from the excess sale proceeds escrow account(s) in accordance with the conditions set out in the Cash Pooling Term Sheet.

For the avoidance of doubt, there shall be no restriction on voluntary prepayment of the secured tranches created as a result of the exercise of the Amortisation Conversion Election.

| | |
|---|---|
| **Release of Security on Distressed Disposals / Fair Value Safeguards** | *First Ranking Asset Level Security* |

Subject to customary affiliate transaction covenant restrictions, there shall be no obligation on the Existing Security Agents and/or Bank Finance Parties or any member of the Group to achieve fair value in any specified way in respect of the First Ranking Asset Level Security, whether for cash or non-cash consideration.

*RigCo Security*

Authority will be granted by the New Secured Noteholders for the Common Security Agent to immediately (and without any further consent, sanction, authority or further confirmation from any New Secured Noteholder or any of their other representatives) release their second priority claim with respect to the RigCo Security and their second ranking guarantee from RigCo (but not to release any of their other claims including any claims against Seadrill Limited or IHCo and claims against the proceeds of any such enforcement or disposal, subject to the priorities set forth herein) following an enforcement and disposal of assets subject to the RigCo Security that complies with the fair value safeguards set out below.

The following fair value safeguards will be provided for the benefit of the holders of the New Secured Notes in respect of any enforcement of the RigCo Security:

- any disposal of any of the assets subject to the RigCo Security will be made under supervision of a court with jurisdiction determining value or pursuant to a public auction or a competitive bid process (in the case of a public auction or competitive bid process, including a good faith marketing period of at least 3 months), in each case with a view to obtaining the best price reasonably obtainable taking into account all relevant circumstances and with a view to facilitating a sale at the best price reasonably obtainable, provided, however, that the Common Security Agent shall have no obligation to postpone, beyond the mandatory good faith marketing period of at least 3 months, a sale being made on a reasonably timely basis solely on the basis that the price obtainable may improve in the future; or

- if a disposal under court supervision or pursuant to a public auction or competitive bid process (in the case of a public auction or competitive bid process, including a good faith marketing period of at least 3 months) has been unsuccessful, the Common Security Agent acting on the instructions of the Supra Majority Lenders may provide the New Secured Noteholders with a fairness opinion from a Qualified Person that the proceeds receivable in connection with a subsequent enforcement and disposal are fair from a financial point of view taking account of all of the relevant circumstances and confirming that in the opinion of the Qualified Person the procedures followed in connection with the enforcement and disposal in order to obtain the best price reasonably obtainable in all the circumstances were reasonable and appropriate in the circumstances (and the New Secured Noteholders shall be entitled to have reliance on any such fairness opinion provided that the Qualified Person may limit its liability in accordance with its normal terms of business), and

in each case:

- the proceeds of enforcement will be received entirely in cash, save in the case of any bid from the holders of the New Secured Notes where only that portion of the consideration payable equal to the amount of the first priority claims outstanding need be in cash;

- the relevant Creditors shall simultaneously effect the unconditional release (or unconditional transfer to the purchaser of the relevant assets) of all borrowing liabilities, guarantee liabilities and other liabilities owing to such Creditors under the relevant Secured Facilities Agreements; and

- New Secured Noteholder will be entitled to participate in any public auction or competitive bid process on the same basis as other participants in any such process.

Authority will also be granted by the Ship Finance Parties for the Common Security Agent to immediately (and without any further consent, sanction, authority or further confirmation from any Ship Finance Party) release their third ranking guarantees from RigCo following an enforcement and disposal of RigCo pursuant to the security granted in favour of the Secured Facilities Agreements or the New Secured Notes.

Consistent with the above, the enforcement mechanics in respect of the first priority security over RigCo shares will also include customary provisions allowing for a release of any third ranking guarantees / intra-group receivables in order to facilitate a sale of RigCo (on the instructions of the Supra Majority Lenders) on a debt-free basis without any further consent, sanction, authority or further confirmation from any Bank Finance Party or any of their other representatives.

In connection with any enforcement of the RigCo Security, there will be no release of the First Ranking New Secured Notes Security or the New Secured Noteholders' other security, guarantees or other claims.

Similarly, the enforcement mechanics in respect of the second priority security over RigCo shares will also include customary provisions allowing for a release of any third ranking guarantees granted by RigCo in favour of the Ship Finance Parties and intra-group liabilities in order to facilitate a sale of RigCo by the New Secured Noteholders on a debt-free basis without any further consent, sanction, authority or further confirmation from any Ship Finance Party.

*First Ranking New Secured Notes Security*

The First Ranking New Secured Notes Security may be enforced by the Noteholders' Security Agent in such manner as the requisite percentage of New Secured Noteholders set forth in the applicable agreements governing the New Secured Notes shall direct. Subject to customary affiliate transaction covenant restrictions, there shall be no obligation on the Noteholders' Security Agent and/or the New Secured Noteholders to the other Bank Finance Parties or any member of the Group to achieve fair value in any specified way in respect of the First Ranking New Secured Notes Security, whether for cash or non-cash consideration.

For the avoidance of doubt, in connection with any enforcement of the First Ranking New Secured Notes Security, there will be no release of the Bank Finance Parties' security, guarantee or other claims.

| | |
|---|---|
| **Conditions for Release of Security on Non-Distressed Disposals** | Authority will be granted from the New Secured Noteholders for the Common Security Agent to immediately (and without any further consent, sanction, authority or further confirmation from any New Secured Noteholder or any of their other representatives) release and transfer their second priority claim with respect to the RigCo Security and their second ranking guarantee from RigCo (but not to release any of their other claims including any claims against Seadrill Limited or IHCo and claims against the proceeds of any such disposal, subject to the priorities set forth herein) following a disposal of RigCo which is permitted under the Bank Finance Documents and the New Secured Notes and does not constitute an enforcement of security. |

Authority will also be granted by the Ship Finance Parties for the Common Security Agent to immediately (and without any further consent, sanction, authority or further confirmation from any Ship Finance Party) release their third ranking guarantees from RigCo following a disposal of RigCo which is permitted under the Bank Finance Documents and the New Secured Notes and does not constitute an enforcement of security.

**Restrictions on Amendments / Waivers of Bank Finance Documents**

Generally the Bank Finance Parties shall be entitled to amend the Bank Finance Documents as they see fit with the agreement of Seadrill Limited and RigCo.

However, the following limitations shall apply (subject to receiving the prior consent in writing of New Secured Noteholders holding a simple majority of outstanding New Secured Notes):

• restriction on the amount of additional Senior Debt which may be made available subject to the Senior Headroom (as defined below), save as a result of a deferral of any scheduled payment date for a period no longer than 6 months;

• restriction on any addition or increases in margin, interest, fees, commission (or any changes to the basis on which the same accrue, are calculated or are payable), save as a result of a deferral of any scheduled payment date for a period no longer than 6 months, which would (when taken together) increase the total annual cash cost of the Senior Debt by more than 10 per cent. per annum or the total annual PIK cost of the Senior Debt by more than 10 per cent. per annum; and

• deferral or adjustment of any scheduled or mandatory repayment date by a period more than 6 months where the amount of principal whose repayment dates are deferred would exceed in aggregate the Senior Headroom, unless the deferred repayment date falls after the maturity of the New Secured Notes.

**Application of Proceeds of Enforcement**

**First Ranking New Secured Notes Security**

Proceeds of enforcement of the First Ranking New Secured Notes Security to be applied:

• first, to discharge any sums owing to the Noteholders' Security Agent;

• second, to discharge related enforcement costs and expenses;

• third, to discharge the New Secured Notes; and

• fourth, to Seadrill Limited, IHCo, NSNCo or any other entity as the relevant provider of the First Ranking New Secured Notes Security.

**RigCo Security**

Proceeds of enforcement of the RigCo Security to be applied:

- first, to discharge any sums owing to the Common Security Agent;

- second, to discharge related enforcement costs and expenses;

- third, to discharge the Senior Debt pro rata;

- fourth, to discharge the New Secured Notes; and

- fifth, to RigCo or IHCo as the relevant provider of the RigCo Security.

**First Ranking Asset Level Security**

For the avoidance of doubt, the Intercreditor Agreement will not govern the application of proceeds of enforcement of the First Ranking Asset Level Security, which will be applied in accordance with the relevant existing Bank Finance Documents save that any surplus proceeds remaining after the repayment of the relevant Senior Debt shall be paid to the excess sales proceeds escrow account established by RigCo.

| | |
|---|---|
| **Senior Headroom** | The written consent of the simple majority by principal amount of the beneficial holders of the New Secured Notes will be required prior to an increase in the Senior Debt by more than 10 per cent. of the total outstanding commitments across the Secured Facilities Agreements as at the Refinancing Closing Date provided that the impact of any Amortisation Conversion Election will be excluded from the calculation of any increase in the Senior Debt. |
| **Refinancing of Senior Debt** | A framework will be included in the Intercreditor Agreement which, subject to certain parameters (see below), will allow the Senior Debt to be refinanced in whole or in part (including any portion of the Senior Debt relating to a specific rig or drilling unit) by new facilities, bonds or other debt instruments which become Senior Debt under the Intercreditor Agreement without the need for the consent of any Creditor. It is not anticipated that any amendments to the Intercreditor Agreement would be required to allow the accession of refinancing creditors. To the extent this is necessary however, all parties to the Intercreditor Agreement will negotiate, acting reasonably, in agreeing to any amendments necessary to implement the permitted refinancing of the Senior Debt. |
| | The Intercreditor Agreement will not restrict the refinancing of Senior Debt where the resulting financing does not constitute Senior Debt. |
| **Permitted Refinancing Parameters** | Any debt refinancing the Senior Debt (and which is intended to represent Senior Debt under the Intercreditor Agreement following such refinancing) will be required to comply with the following parameters: |

- the relevant creditors (or trustee or agent acting on their behalf) have acceded to the Intercreditor Agreement;

- the final maturity of the refinancing debt is equal to or later than the final maturity of the Senior Debt which it is refinancing (as may be amended in accordance with these Intercreditor Principles);

- the weighted average life to maturity of the refinancing debt is at least equal to (and no shorter than) the weighted average life to maturity of the Senior Debt being refinanced;

• the amount of the refinancing debt (net of any fees, costs and expenses associated with raising such refinancing debt) is not greater than the aggregate of the Senior Debt being refinanced and the then available Senior Headroom; and

• no financial reporting requirements, representations, warranties, covenants, undertakings or events of default (howsoever described) which are more onerous than the Senior Debt which is being refinanced, unless the same or better terms are offered to the other Bank Finance Parties.

| | |
|---|---|
| **Amendments to New Secured Notes** | Other than as detailed below, the New Secured Noteholders may amend the terms of the New Secured Notes in accordance with their terms at any time. |
| | Prior to the discharge of the Senior Debt, the New Secured Noteholders may not amend the terms of the New Secured Notes without the prior consent of the Supra Majority Lenders if the amendment relates to an amendment increasing the cash pay element of the New Secured Notes, increasing the quantum of notes by more than a percentage to be agreed (excluding for such purposes any increase as a result of PIK interest) or shortening the maturity of the New Secured Notes to less than 6 months after the last occurring maturity date in respect of the Secured Facilities Agreements. |
| **Restrictions on Security** | Bank Finance Parties are permitted to receive additional first ranking security over new assets held by any subsidiary of RigCo as required by the terms of a Secured Facilities Agreement. |
| | Bank Finance Parties are permitted to receive additional first ranking security over new assets held by RigCo as required by the terms of the Bank Finance Documents, provided that the New Secured Noteholders are granted equivalent second ranking security on terms equivalent to the RigCo Security, provided however that the New Secured Noteholders shall not receive such second ranking security where such additional or replacement security is granted over shares in or receivables owed by a subsidiary of RigCo only for individual facilities (i.e. not serving as cross collateral for the Secured Facilities Agreements as a whole). |
| | Save as described above, New Secured Noteholders are not permitted to receive any additional security over new assets held by RigCo or any other subsidiary of RigCo without the consent of the Supra Majority Lenders. |
| **Options to Purchase** | There will be no options to purchase. |
| **Repayment of RigCo cash used for Financial Support** | Any Net Realisation Proceeds (as defined in the New Secured Notes Term Sheet) available after application to any mandatory offer as required by the New Secured Notes and any amounts released from the NSN Escrow Amount in accordance with the New Secured Notes but not yet released to IHCo to be used to repay RigCo cash to the extent over US$25 million of RigCo cash has been used pursuant to the basket in paragraph (J) of the definition of Permitted Financial Support in Annex 4 (Group Wide Restrictive Covenants) of the Credit Facilities Term Sheet. |

| | |
|---|---|
| **Voting on Exercise of Acceleration Rights under Senior Facilities Agreements** | Exercise of acceleration rights with respect to any Event of Default under a Senior Facilities Agreement to be decided on a facility-by-facility basis by the Required Lenders under each individual Secured Facilities Agreement. |
| **Subordination Agreement under Bankruptcy Code** | The Intercreditor Agreement will constitute a "subordination agreement" for purposes of Section 510(a) of the Title 11 of the U.S. Code (i.e. the Bankruptcy Code) and shall be enforceable in any insolvency proceeding in accordance with its terms. |
| **Bankruptcy Financing Matters** | The New Secured Noteholders in their capacities as holders (and beneficiaries) of RigCo Security (collectively, in such capacity, the "**Junior Lien Creditors**") shall not object to any use of cash collateral or post-petition financing (including debtor-in-possession financing) consented to or proposed by the relevant Bank Finance Parties in their capacities as holders (and beneficiaries) of RigCo Security (collectively, in such capacity, the "**Senior Lien Creditors**") in respect of any applicable relevant Secured Facilities Agreement; provided that the Junior Lien Creditors may request adequate protection as provided herein. |
| **Bankruptcy Asset Sales** | Subject to the notification detailed above, the Junior Lien Creditors shall not object to any disposition of RigCo Security that is (i) permitted under the applicable Secured Facilities Agreements, (ii) consented to by the applicable Senior Lien Creditors, and (iii) in connection with a sale under Section 363 of the Bankruptcy Code (it being understood that Junior Lien Creditors will not be deemed to have waived any right to bid in connection with such disposition). |
| **Adequate Protection** | Junior Lien Creditors will not object to adequate protection (including post-petition interest at the default rate) requested by the Senior Lien Creditors with respect to the RigCo Security.<br><br>In addition, Junior Lien Creditors may not request adequate protection with respect to the RigCo Security, except that the Junior Lien Creditors may request adequate protection with respect to the RigCo Security in the form of replacement security if the Senior Lien Creditors are granted replacement security senior to any replacement security granted to Junior Lien Creditors and superpriority or other administrative expense claim status if the Senior Lien Creditors are granted superpriority or other administrative expense claim status senior to any such claim granted to the Junior Lien Creditors. For the avoidance of doubt, the New Secured Noteholders may seek adequate protection with respect to the First Ranking New Secured Notes Security. |
| **Automatic Stay** | The Junior Lien Creditors shall not request relief from the automatic stay with respect to the RigCo Security except and to the extent the applicable Senior Lien Creditors request and obtain relief from the automatic stay with respect to the RigCo Security. |
| **Plan of Reorganization** | Junior Lien Creditors will not propose or vote for any plan or reorganization that is inconsistent with the Intercreditor Agreement. |

| | |
|---|---|
| **Other U.S. Bankruptcy Matters** | To be consistent with U.S. market intercreditor terms after incorporating the features and terms set forth in these Intercreditor Principles, and including, without limitation (i) waiver of any claims under Sections 506(c), 552 and 1111(b) of the Bankruptcy Code and (ii) provisions for the accrual of post-petition interest under Section 506(b) of the Bankruptcy Code. The terms set forth in these Intercreditor Principles with respect to Bankruptcy Matters shall only apply to the Junior Lien Creditors in their capacity as secured creditors. |
| **Deemed consent provisions** | There will be no provisions deeming that the New Secured Noteholders have given the same consent, waiver or amendment given by the Bank Finance Parties save for matters of a minor, technical or administrative nature which do not adversely affect the interests of the New Secured Noteholders or change the commercial terms contained in the New Secured Notes. However, the Intercreditor Agreement will contain a deemed consent provision in relation to the Intercompany Lenders. |
| **Override** | The Intercreditor Agreement will override anything to the contrary in any of the Secured Debt Documents, strictly on the understanding that, for the avoidance of doubt, the Intercreditor Agreement will not govern enforcement, release and/or the application of proceeds of enforcement of the First Ranking Asset Security or the First Ranking New Secured Notes Security (other than the notification of enforcement protections in respect of the First Ranking Asset Level Security and the First Ranking New Secured Notes Security and the treatment of any surplus proceeds in the excess sale proceeds escrow account(s) established by RigCo and/or other members of the RigCo Group (over which the Bank Finance Parties have a first priority claim and the New Secured Noteholders have a second priority claim) arising from the enforcement of such security as detailed above), which will be applied in accordance with the relevant existing Bank Finance Documents and the New Secured Notes Finance Documents (as applicable). |
| **Equalisation** | Recoveries between the Bank Finance Parties in respect of the RigCo Security to be shared pro rata across all of the Secured Facilities Agreements and to be equalised following distribution of proceeds of enforcement with respect to the RigCo Security by the Common Security Agent to the Bank Finance Parties. |
| **Governing Law and Jurisdiction** | State of New York, with waiver of jury trial, exclusive New York jurisdiction and forum selection. |

**ANNEX 7 to EXHIBIT A**

**SFL Term Sheet**

**SEADRILL LIMITED**

**RECAPITALISATION PLAN PROPOSAL**

**SHIP FINANCE AGREEMENTS**

**SUMMARY PROPOSED TERMS**

**OVERVIEW OF PROPOSED CAPITAL STRUCTURE FOLLOWING IMPLEMENTATION OF RECAPITALISATION PLAN**



Note: Full summary of guarantees and security set out in the relevant term sheets.

2

**KEY COMMERCIAL TERMS FOR SHIP FINANCE AGREEMENTS AND STRUCTURE**

This document (together with its annexes, the "**Term Sheet**") sets out the terms and conditions for the amendment of the West Hercules Ship Finance Agreement, the West Taurus Ship Finance Agreement and the West Linus Ship Finance Agreement (the "**Rig Owners' Agreements**") under the recapitalisation plan for Seadrill Limited and its subsidiaries (the "**Group**") (the "**Recapitalisation Plan**") pursuant to the restructuring support agreement (the "**RSA**") to which this Term Sheet is attached.

References to "Seadrill Limited" in this term sheet are to Seadrill Limited, any successor of Seadrill Limited or any entity to which all or substantially all of Seadrill Limited's material assets are directly or indirectly transferred and which becomes the holding company for IHCo and its subsidiaries.

A.  **DESCRIPTION OF SHIP FINANCE ARRANGEMENTS**

| | | |
|---|---|---|
| 1. | **West Hercules Ship Finance Arrangements** | Head-charter agreement originally dated 7 October 2008 (as amended, restated and/or novated from time to time) made between SFL Hercules Ltd as owner, Seadrill Offshore AS as charterer and Seadrill Limited as charter guarantor (the "**West Hercules Ship Finance Agreement**"). |
| | | No sub-charter agreement currently in place. Rig currently stacked in Norway. |
| 2. | **West Taurus Ship Finance Arrangements** | Head-charter agreement originally dated 7 October 2008 (as amended, restated and/or novated from time to time) made between SFL Deepwater Ltd. as owner, Seadrill Deepwater Charterer Ltd. as charterer and Seadrill Limited as charter guarantor (the "**West Taurus Ship Finance Agreement**"). |
| | | No sub-charter agreement currently in place. Rig currently stacked in Spain. |
| 3. | **West Linus Ship Finance Arrangements** | Head-charter agreement originally dated 30 June 2013 (as amended, restated and/or novated from time to time) made between SFL Linus Ltd (together with SFL Hercules Ltd and SFL Deepwater Ltd, the "**Rig Owners**" and each a "**Rig Owner**") as owner, North Atlantic Linus Charterer Ltd as charterer and Seadrill Limited as charter guarantor (the "**West Linus Head-Charter**"). |
| | | Sub-charter agreement originally dated 30 June 2013 (as amended, restated and/or novated from time to time) made between North Atlantic Linus Charterer Ltd as owner, North Atlantic Norway Limited as charterer and Seadrill Limited as charter guarantor (together with the West Linus Head-Charter, the "**West Linus Ship Finance Agreement**"). |
| | | The customer contract is between North Atlantic Norway Limited as contractor and ConocoPhillips as customer. |

3

**B.    STRUCTURE**

| 1. | **IHCo** | A new intermediate holding company, IHCo, to be put in place as a direct wholly-owned subsidiary of Seadrill Limited. |
| | | Please refer to the structure diagram on page 2 for further detail. |
| 2. | **NSNCo** | A second new intermediate holding company, NSNCo, to be put in place as a direct wholly-owned subsidiary of IHCo. |
| | | Seadrill Limited's interests in Seadrill Partners LLC, Seadrill Capricorn Holdings LLC and Seadrill Operating LP to be moved down to sit below new individual holding companies put in place as direct wholly-owned subsidiaries of NSNCo. Other assets to be moved under NSNCo as set out in the term sheet in respect of the new secured notes (the "**New Secured Notes**") set out in Annex 4 to Exhibit A of the RSA. |
| | | Please refer to the structure diagram on page 2 for further detail. |
| 3. | **RigCo** | A new intermediate holding company, RigCo, is to be put in place as a direct wholly-owned subsidiary of IHCo. |
| | | Rig-owners and intra-group charterers to be moved down to sit below RigCo, together with the Group's interests in North Atlantic Drilling Ltd., Sevan Drilling Limited and Asia Offshore Drilling Limited. |
| | | Seadrill Global Services Limited (owner of the Seadrill shared capital equipment pool) and Seadrill Management Ltd to be moved down to sit below RigCo.For the avoidance of doubt, Seadrill Global Services Limited and Seadrill Management Ltd shall not be subject to any new security arrangements and shall continue to operate on the basis on which they currently operate. |
| | | Please refer to the structure diagram on page 2 for further detail. |
| 4. | **Consequences of IHCo—RigCo—NSNCo Structure for Rig Owners' Agreements** | **West Hercules:** Seadrill Offshore AS to be hived down to directly below RigCo. |
| | | **West Taurus:** Seadrill Deepwater Charterer Ltd. to be hived down to directly below RigCo. |
| | | **West Linus:** North Atlantic Linus Charterer Ltd. and North Atlantic Norway Ltd. to remain directly owned by North Atlantic Drilling Ltd., which itself will be hived down to directly below RigCo. |

4

**C.   CHARTER HIRE AMENDMENTS**

| | |
|---|---|
| 1.   **Charter Hire Amendments** | The charter hire accruing under the existing Rig Owners' Agreements (before the amendments described in this Term Sheet) will continue to be payable by the members of the Seadrill group that are charterers under, and pursuant to, the Rig Owners' Agreements until the Refinancing Closing Date. |
| | The Rig Owners' Agreements to be amended from the Refinancing Closing Date (as defined in the Secured Facilities Term Sheet (as defined in Annex 1 hereto)) by deferring charter payments between the Refinancing Closing Date and 31 December 2022 (the "**Deferral Period**"), as set out in Schedule 1 hereto. |
| | The Adjusted Charter Hire Rate set out in Schedule 1 hereto has been calculated based on an assumed Refinancing Closing Date of 31 December 2017. In the event that the Refinancing Closing Date does not occur until some time in 2018, the Adjusted Charter Hire Rate set out in Schedule 1 hereto will be revised so that the average charter hire amount for 2018 is equivalent to the position set out in Schedule 1 hereto. |
| | The charter payment adjustment provisions in the Rig Owners' Agreements, which relate to actual LIBOR from time to time as compared to the base LIBOR assumed in calculating the charter payments, shall be retained without amendment. |
| | At the end of each respective charter period (as extended as set out in paragraph C.2 below with respect to West Hercules and West Taurus), the relevant purchase obligation or put option price, as applicable, shall be amended as set out in Schedule 1 hereto. |
| | For the avoidance of doubt, the Adjusted Charter Hire Rate set out in Schedule 1 hereto shall not be subject to any further revisions in the event that any rig financed under the Rig Owners' Agreements becomes contracted to any customer (or any existing customer contract is amended or extended). Any revenue generated by such rigs shall be for the sole account of the Group and shall not be shared with the Rig Owners. |
| 2.   **Purchase Obligation Dates** | Purchase obligation dates for West Hercules and West Taurus to be extended as follows in order to fall outside the revised maturity profile of the Group's secured bank facility agreements (the "**Secured Facilities Agreements**"): |
| | West Hercules purchase obligation: extended from 6 November 2023 to 6 December 2024. |
| | West Taurus purchase obligation: extended from 14 November 2023 to 14 December 2024. |
| | West Linus put option exercisable by SFL Linus Ltd to remain unchanged at 25 May 2029. |

| 3. | **Call Options** | The effective date of each call option in respect of each rig will not be amended. However, the strike price will be adjusted by adding deferred amounts and subtracting repaid amounts as set out in Schedule 1 hereto until such call option date on a dollar for dollar basis. |

**D.   GUARANTEES**

| 1. | **Seadrill Limited Guarantees** | The head-charter and sub-charter guarantees granted by Seadrill Limited under each of the head-charter agreements and the West Linus sub-charter agreement will be retained. |
| 2. | **RigCo Guarantee** | Each of the head-charter agreements to benefit from a third ranking guarantee from RigCo (ranking *pari passu* as between themselves but subordinated to a first ranking guarantee in favour of the lenders and other finance parties under the Secured Facilities Agreements and a second ranking guarantee in favour of the holders of the New Secured Notes), as set out in Annex 6 to Exhibit A to the RSA. Each of SFL Hercules Ltd., SFL Deepwater Ltd. and SFL Linus Ltd. shall be party to an Intercreditor Agreement on the terms set out in Annex 6 to Exhibit A to the RSA. |

**E.   ECONOMICS**

| 1. | **Consent Fees** | 50bps calculated on the carrying value of the finance lease liability on the relevant head-charterer's unconsolidated balance sheet (prior to consolidating eliminations for any of the Rig Owners) as of the Refinancing Closing Date.[1] |
| | | The consent fees will be payable to the relevant Rig Owners within five Business Days after the Refinancing Closing Date, subject to receipt by Seadrill Limited of an invoice for the relevant fees (such invoice to include such information as is reasonably required by Seadrill Limited). |

---

[1]   If Refinancing Closing Date is 31 December 2017, the total lease liability is expected to be approximately $1.094 billion.

**F.    REPRESENTATIONS, COVENANTS AND TERMINATION EVENTS / EVENTS OF DEFAULT**

| | | |
|---|---|---|
| 1. | **Financial Covenants** | Except as set out in the final paragraph of this section F.1, Seadrill Limited financial covenants (and related definitions) in each of the head-charter agreements to be amended and/or suspended (as appropriate) to mirror the amendments to be made to the equivalent financial covenants in the Secured Facilities Agreements, as summarised in Annex 1. |
| | | Except as set out in the final paragraph of this section F.1, each Rig Owner to procure that the Seadrill Limited financial covenants (and related definitions) in the relevant Rig Owner's facility agreement are amended and/or suspended (as appropriate) to mirror the equivalent financial covenants in the Secured Facilities Agreements, as summarised in Annex 1. |
| | | If required by a requisite majority of the lenders under a Rig Owner's facility agreement, the margin increase trigger and related uplift in margin as described in the Secured Facilities Term Sheet shall be incorporated in the Seadrill Limited financial covenants in such Rig Owner's facility agreement as amended to reflect the arrangements described in this Term Sheet. To the extent that any such margin uplift becomes payable under any Rig Owner's facility agreement pursuant to these provisions, the relevant Rig Owner shall be entitled to pass the cost of such margin uplift on to the member of the Seadrill group that, under the relevant Rig Owner's Agreement, is the charterer of the rig ultimately financed by that Rig Owner's facility agreement. |
| 2. | **Change of Control** | Change of control provisions in each of the head-charter agreements to be amended to mirror the amendments to be made to the equivalent provisions in the Secured Facilities Term Sheet. |
| | | Each Rig Owner to procure that the change of control provisions in the relevant Rig Owner's facility agreement are amended to mirror the amendments to be made to the equivalent provisions in the Secured Facilities Agreements. |
| 3. | **Representations, Non-Financial Covenants and Termination Events / Events of Default** | Representations (including repetition thereof), non-financial covenants and termination events in each head-charter agreement to be aligned, where applicable, with equivalent provisions in the Secured Facilities Agreements including, but not limited to, insurance covenants, anti-corruption/sanctions covenants and financial information covenants (please refer to the Secured Facilities Term Sheet (including Annex 3 and Annex 4 thereto) for further details). Where the Secured Facilities Agreements do not include equivalent provisions, the provisions of the relevant head-charter agreement will need to be reviewed in detail to determine any required amendments, for example deletion of any provisions relating to third party charter party agreements remaining in full force and effect. |

7

Each Rig Owner to procure that the representations, non-financial covenants and events of default in the relevant Rig Owner's facility agreement are aligned, where applicable, with equivalent provisions in the Secured Facilities Agreements. Where the Secured Facilities Agreements do not include equivalent provisions, the provisions of the relevant Rig Owner's facility agreement will need to be reviewed in detail to determine any required amendments.

**G. OTHER**

1. **Implementation of IHCo—RigCo—NSNCo Structure**

All amendments/consents/confirmations required to implement the IHCo—RigCo—NSNCo structure to be given under each head-charter agreement and the West Linus sub-charter agreement, and to be sought under the related Rig Owners' facility agreements, including (to the extent applicable):

(a) confirmation and agreement that implementation of the IHCo—RigCo—NSNCo structure, including the transfer of all or substantially all of the assets of Seadrill Limited to a new holding company and/or any wholly owned subsidiaries of such holding company (and any subsequent liquidation of Seadrill Limited following such asset transfer) does not amount to a 'reorganisation', 'corporate restructuring' or 'transaction with an affiliate' in breach of the provisions of any head-charter agreement, the West Linus sub-charter agreement or any Rig Owner's facility agreement;

(b) consent under each head-charter agreement, the West Linus sub-charter agreement and each Rig Owner's facility agreement and related security documents to the transfer by Seadrill Limited and/or its subsidiaries of the shares which it holds in other entities (including its subsidiaries) to a new holding company, IHCo, RigCo, or NSNCo (as applicable); and

(c) consent to implementation through any of the Implementation Mechanisms (as defined in the RSA).

Certain amendments to each head-charter agreement, the West Linus sub-charter agreement and each Rig Owner's facility agreement giving flexibility to achieve the IHCo—RigCo—NSNCo structure may need to be effective before the Refinancing Closing Date.

2. **Documentation**

Amendments to be implemented by way of an amendment and restatement agreement for each head-charter agreement, the West Linus sub-charter agreement and each Rig Owner's facility agreement, subject to customary conditions precedent.

8

**SCHEDULE 1**

**CHARTER HIRE AMENDMENTS**

**West Hercules**

| Beginning Month (inclusive) | Ending Month (exclusive) | Previous Charter Hire Rate | (Deferred) / Repaid Amounts | Adjusted Charter Hire Rate | Deferral / (Repay) % |
|---|---|---|---|---|---|
| Jan-18 | Nov-18 | $170,000 | ($ 49,300) | $120,700 | 29.0% |
| Nov-18 | Nov-20 | $142,500 | ($ 41,325) | $101,175 | 29.0% |
| Nov-20 | Jan-23 | | ($ 39,150) | $ 95,850 | 29.0% |
| Jan-23 | Nov-23 | $135,000 | $ 49,300 | $184,300 | (36.5%) |
| Nov-23 | Dec-24 | | $ 41,325 | $176,325 | (30.6%) |

| Date | Previous Purchase Obligation ($ in millions) | Adjusted Purchase Obligation ($ in millions) |
|---|---|---|
| December 6, 2024 | $135.0 (Nov 23) | $    138.0 |

| Date | Previous Call Option ($ in millions) | Adjusted Call Option ($ in millions) |
|---|---|---|
| November 6, 2018 | $   297.0 | $    312.3 |
| November 6, 2020 | $   236.0 | $    281.5 |

9

**West Taurus**

| Beginning Month (inclusive) | Ending Month (exclusive) | Previous Charter Hire Rate | (Deferred) / Repaid Amounts | Adjusted Charter Hire Rate | Deferral / (Repay) % |
|---|---|---|---|---|---|
| Jan-18 | Feb-19 | $157,500 | ($ 45,675) | $ 111,825 | 29.0% |
| Feb-19 | Feb-21 | $142,500 | ($ 41,325) | $101,175 | 29.0% |
| Feb-21 | Jan-23 | | ($ 39,150) | $ 95,850 | 29.0% |
| Jan-23 | Feb-24 | $135,000 | $ 45,675 | $180,675 | (33.8%) |
| Feb-24 | Dec-24 | | $ 41,325 | $176,325 | (30.6%) |

| Date | Previous Purchase Obligation ($ in millions) | Adjusted Purchase Obligation ($ in millions) |
|---|---|---|
| December 14, 2024 | $149.0 (Nov 23) | $ 154.0 |

| Date | Previous Call Option ($ in millions) | Adjusted Call Option ($ in millions) |
|---|---|---|
| February 14, 2019 | $ 302.0 | $ 320.7 |
| February 14, 2021 | $ 241.0 | $ 289.9 |

10

**West Linus**

| Beginning Month (inclusive) | Ending Month (exclusive) | Previous Charter Hire Rate | (Deferred) / Repaid Amounts | Adjusted Charter Hire Rate | Deferral / (Repay) % |
|---|---|---|---|---|---|
| Jan-18 | May-19 | $222,000 | ($ 64,380) | $157,620 | 29.0% |
| May-19 | May-22 | $140,000 | ($ 40,600) | $ 99,400 | 29.0% |
| May-22 | Jan-23 | $125,000 | ($ 36,250) | $ 88,750 | 29.0% |
| Jan-23 | May-24 | | $ 64,380 | $189,380 | (51.5%) |
| May-24 | May-27 | | $ 40,600 | $135,600 | (42.7%) |
| May-27 | Jan-28 | $ 95,000 | $ 36,250 | $131,250 | (38.2%) |
| Jan-28 | May-29 | | $ 0 | $ 95,000 | 0.0% |

| Date | | | | Previous Put Option ($ in millions) | Adjusted Put Option ($ in millions) |
|---|---|---|---|---|---|
| May 25, 2029 | | | | $ 100.0 | $ 86.0 |

| Date | | | | Previous Call Option ($ in millions) | Adjusted Call Option ($ in millions) |
|---|---|---|---|---|---|
| May 25, 2019 | | | | $ 370.0 | $ 402.9 |
| May 25, 2022 | | | | $ 295.0 | $ 372.3 |
| May 25, 2024 | | | | $ 245.0 | $ 297.4 |
| May 25, 2026 | | | | $ 220.0 | $ 228.0 |
| May 25, 2029 | | | | $ 170.0 | $ 170.0 |

11

**ANNEX 1**

**FINANCIAL COVENANTS**

Except as set out in the final paragraph of section F.1, financial covenants in the Rig Owners' Agreements to be aligned with the Secured Facilities Agreements, as set out in Annex 3 to Exhibit A to the RSA (the "**Secured Facilities Term Sheet**").

12

**ANNEX 8 to EXHIBIT A**

Seabras Term Sheet

**SEABRAS TERM SHEET**
**KEY COMMERCIAL TERMS FOR INSULATION OF SEABRAS SAPURA**

**THIS TERM SHEET SETS FORTH POTENTIAL KEY COMMERCIAL TERMS FOR THE INSULATION OR OTHER TREATMENT OF SEABRAS WITH RESPECT TO THE IMPLEMENTATION MECHANISMS AND RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT.**

**THIS TERM SHEET IS PROVIDED IN CONNECTION WITH COMPROMISE NEGOTIATIONS AND IS SUBJECT TO RULE 408 OF THE UNITED STATES FEDERAL RULES OF EVIDENCE AND SIMILAR RULES OR STATUTES. NOTHING IN THIS TERM SHEET CONSTITUTES AN ADMISSION OR WAIVER WITH RESPECT TO ANY RIGHTS OR CLAIMS.**

| A. | **SUMMARY** | |
|---|---|---|
| 1. | **PLSV Guarantees** | Seadrill Limited ("**Seadrill**") and Sapura Energy Berhad ("**SK**") have guaranteed (via separate sponsor guarantee and undertaking documents (the "**PLSV Guarantees**")) approximately $1.09 billion of Seabras funded debt obligations on a 50-50 basis for the benefit of the lenders (the "**PLSV Lenders**") under two facilities (the "**PLSV Facilities**"). The Facility Agent under the PLSV Facilities is ING Bank, N.V. and the Security Agent is ABN AMRO Bank NV, Singapore Branch. |
| | | Funding under the PLSV Facilities is split as follows: |
| | | • PLSV I facility: $397 million; and |
| | | • PLSV II facility: $689 million. |
| | | The PLSV Facilities are secured by the following pipe-laying service vessels: |
| | | • the PLSV I Facility is secured by the Sapura Diamante and Sapura Topazio vessels. |
| | | • the PLSV II Facility is secured by the Sapura Onix, Sapura Jade, and Sapura Rubi vessels. |
| | | The PLSV Guarantees become callable pursuant to their terms only during a "Guaranteed Period" as defined therein. |
| 2. | **PLSV Lenders** | The PLSV Lenders (a list is attached as an Appendix to this termsheet) overlap with the Seadrill lenders. More specifically, the PLSV I Facility has approximately 82-percent lender overlap with Seadrill and the PLSV II Facility has approximately 72-percent overlap. |
| 3. | **Atradius Insurance Policies** | In connection with the parties' entry into the PLSV Facilities, Atradius Dutch State Business NV issued an insurance policy in respect of each PLSV Facility in favour of the PLSV agent. |

1

| 4. | **Potential Treatment of PLSV Guarantees and Seabras** | The Parties agree that the insulation or other treatment of the PLSV Guarantees and Seabras shall be consistent with any one of the following sections: |

• Section B. Discharge of the Seadrill PLSV Guarantees in Chapter 11; or

• Section C. Consensual Release of the Seadrill PLSV Guarantees.

Notwithstanding the foregoing sentence, Seadrill will act in good faith to negotiate a consensual release of the PLSV Guarantees acceptable to each of Seabras, Seadrill, SK, the PLSV Lenders and the Parties.

**B.    DISCHARGE OF THE SEADRILL PLSV GUARANTEES IN CHAPTER 11**

| 1. | **Summary** | In the event Seadrill is unable to obtain a consensual release of the PLSV Guarantees which Seadrill has provided (together with any related Sponsor undertakings, the "**Seadrill PLSV Guarantees**"), such Seadrill PLSV Guarantees will be discharged, and any claims thereunder will be subject to compromise, in chapter 11. |
| 2. | **Treatment of Claims on Account of Seadrill PLSV Guarantees** | Claims (if any) under the Seadrill PLSV Guarantees will be treated as contingent general unsecured claims. |

Allowance or disallowance of any claims on account of the Seadrill PLSV Guarantees will be subject to all applicable provisions of the Plan, the Bankruptcy Code and the United States Federal Rules of Bankruptcy Procedure.

Allowed claims (if any) on account of the Seadrill PLSV Guarantees will receive the treatment established by the Plan for general unsecured claims.

**C.    CONSENSUAL RELEASE OF THE SEADRILL PLSV GUARANTEES**

| 1. | **Summary** | Seadrill would seek, with the agreement of the relevant Obligors under the PLSV Facilities and in conjunction with them, to negotiate a consensual release of the Seadrill PLSV Guarantees (and in all likelihood also the PLSV Guarantees provided by SK) on terms acceptable to each of the PLSV Lenders and the relevant Obligors under the financing. |

The aim of any consensual agreement would be the structural separation of Seadrill from Seabras, with the effect not only that the Seadrill PLSV Guarantees are discharged but that Seadrill is no longer referenced in or relevant to the PLSV Facilities as a Sponsor entity. It is also likely that, in order to retain parity of treatment for the shareholders of Seabras, similar structural separation would be sought for SK.

| 2. | **Terms of Potential Release of Seadrill PLSV Guarantees** | The Obligors under the PLSV Facilities, including Seadrill, would seek to release the Seadrill PLSV Guarantees, provided the required lenders under each of the PLSV Facilities consent to this. The Obligors would propose (and seek to agree) terms for such release as they determine appropriate (each in their respective sole discretion and with Seadrill's consultation with the Parties to the Agreement) in the circumstances. Any consideration provided to the lenders for such release will be paid solely out of the assets from the Seabras group. |

2

3.  **Documentation**   The consensual release of the Seadrill PLSV Guarantees (and potentially the PLSV Guarantees issued by SK) will be effectuated through the following documentation:

- Release of Seadrill PLSV Guarantees (and potentially PLSV Guarantees issued by SK);

- Release of Seadrill (and potentially SK) from the PLSV Sponsor Undertakings;

- Amendments to the PLSV Facilities credit documents to: (i) permit and provide for the mechanics for the releases of the PLSV Guarantees and PLSV Sponsor Undertakings (including any amendments to reflect consideration granted in connection therewith); (ii) remove references to Seadrill (and potentially SK); (iii) remove any potential default or mandatory prepayment events related to Seadrill (and potentially SK); and (iv) as the parties to the PLSV Facilities credit documents otherwise deem necessary or appropriate;

- Amendments to any Seabras joint venture agreement(s) as Seadrill and SK determine necessary or appropriate to implement the consensual release of any of the PLSV Guarantees or other transactions contemplated in connection therewith; and

- Amendments to further documentation if determined by Seadrill and the parties to such further documentation determine necessary or appropriate.

E.  **OTHER**

1.  **Other Terms**   Other terms (if any) regarding the insulation or other treatment of the PLSV Guarantees and Seabras will be acceptable to Seadrill and Seabras.

3

*Appendix*

*PLSV Lenders*

| PLSV I | Common to Seadrill | Exposure |
|---|---|---|
| Standard Chartered | Yes | 15% |
| ABN Amro Bank N.V | Yes | 14% |
| The Bank of Toyko-Mitsubishi UFJ Ltd | Yes | 15% |
| ING Bank N.V | Yes | 15% |
| Kfw IPEX - Bank GmbH | Yes | 14% |
| Sumitomo Mitsui Banking Corporation | Yes | 15% |
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank | No | 12% |
| | | 100% |
| Total Seadrill Overlap by Exposure | | 82% |

| PLSV II | Common to Seadrill | Exposure |
|---|---|---|
| Standard Chartered | Yes | 14% |
| ABN Amro Bank N.V | Yes | 15% |
| ING Bank N.V | Yes | 15% |
| Kfw IPEX - Bank GmbH | Yes | 14% |
| Sumitomo Mitsui Banking Corporation | Yes | 14% |
| Rabo Bank | No | 14% |
| DZ Bank AG Deutsche Zentral-Genossenschaftsbank | No | 14% |
| | | 100% |
| Total Seadrill Overlap by Exposure | | 72% |

4

**EXHIBIT B**

**Investment Agreement**

**EXHIBIT C**

**Marketing Procedures**

**Marketing Procedures for Alternative Restructuring Proposals**[1]

1. As part of the Company Parties' efforts to solicit Alternative Restructuring Proposals, and subject to and in accordance with the terms of the Investment Agreement, the Company Parties intend to conduct a customary marketing process seeking Alternative Restructuring Proposals from financial and strategic parties (the "**Marketing Process**"). The Marketing Process shall be conducted on the terms as described herein and consistent with the terms of the Restructuring Support and Lock-Up Agreement and Section 5.15 of the Investment Agreement.

2. **Parties and Diligence.**

   a. The Company Parties and their advisors will identify potential interested parties, including parties solicited in pre-petition marketing efforts, and develop an outreach strategy (the "Potential Interested Parties").

   b. The Company Parties and/or their advisors will distribute a process letter, along with publicly available information to the Potential Interested Parties, which will describe, among other things, the operations and assets of the Company Parties, the anticipated Chapter 11 Cases, the investments contemplated by the Investment Agreement, and other Restructuring Transactions.

3. **Phases of Marketing Process**. The Company Parties will conduct the Marketing Process as a two-step process, consisting of Phase I and Phase II, as described below.

   **a.** **Phase I.** As part of Phase I, Potential Interested Parties ("Phase I Parties") will receive access to publicly available information regarding the Restructuring Transactions, financial projections, as well as further public information as the Company Parties deem appropriate.

      i. The Company Parties may provide different levels of information to different Phase I Parties in its sole discretion, including due to competitive sensitivities.

      ii. Phase I Parties will then be requested to submit a preliminary, written, non-binding offer ("**Indicative Offer**") for an Alternative Restructuring Proposal by a date to be determined, anticipated to be no later than 30 days after the Petition Date.

      iii. Following completion of Phase I, the Company Parties, in consultation with their advisors, will evaluate the Indicative Offers.

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Restructuring Support and Lock-Up Agreement to which these procedures are attached.

b.   **Phase II**. In the Company Parties' sole discretion, qualifying Phase I Parties may be selected to participate in Phase II ("<u>Phase II Parties</u>").

    i.   Phase II Parties will be requested to sign a non-disclosure agreement ("<u>**NDA**</u>") to receive confidential information and other information that is not publicly available.

    ii.   Phase II will provide Phase II Parties the opportunity to complete additional due diligence and access to certain confidential information to facilitate preparation of final offers.

    iii.   As part of Phase II, Phase II Parties will receive access to confidential information regarding the Restructuring Transactions, financial projections, an independent industry report, access to a virtual dataroom consisting of due diligence materials, and a meeting with management, as well as further information as the Company Parties deem appropriate.

    iv.   The Company Parties, in their sole discretion, may encourage multiple Phase II Parties to combine, collaborate, or otherwise work together to develop an Alternative Restructuring Proposal.

    v.   The Company Parties will request that Phase II Parties provide a final offer for any Alternative Restructuring Proposals by a date certain (a "<u>**Final Offer**</u>"), but in all instances prior to the entry of the Confirmation Order as consistent with Section 5.15 of the Investment Agreement. Each Phase II Party which submits a Final Offer shall also provide with such Final Offer additional evidence (in the form of financial disclosure or credit-quality support information) which demonstrates such Phase II Party's ability to fund and close the proposed transaction.

4.   **Conclusion of Marketing Process.** Upon conclusion of Phase II of the Marketing Process, which shall occur no later than 90 days after the Petition Date, the Company Parties will evaluate any Alternative Restructuring Proposals and proceed in the manner set forth in Section 5.15 of the Investment Agreement. The Company Parties shall comply in all respects with Section 5.15 and the other provisions of the Investment Agreement.

5.   **Modifications.** The Company Parties may modify the procedures set forth in this <u>**Exhibit C**</u> from time to time in their sole discretion after consultation with counsel to the Required Consenting Lenders (which consultation shall not, for the avoidance of doubt, require disclosure of the terms of any Alternative Restructuring Proposals or the identity of the Entities submitting them); *provided* such modifications shall not be inconsistent with nor impact or modify the obligations of the Company Parties and the rights of the Commitment Parties under the Restructuring Support and Lock-Up Agreement and Investment Agreement.

6.   **Weekly Updates.** The Company Parties shall perform weekly update calls as described in Section 5.16 of the Investment Agreement and Section 6.01(k) of the Restructuring Support and Lock-Up Agreement.

7.   **Disputes.** Any dispute regarding the procedures set forth in this <u>**Exhibit C**</u>, the Marketing Process, or any matter arising therefrom shall be resolved by the Bankruptcy Court.

**EXHIBIT D**

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support and Lock-Up Agreement, dated as of (the "**Agreement**"),2 by and among Seadrill Limited ("**Seadrill**") and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a ["Consenting Stakeholder"] and a ["Consenting Lender"] ["Consenting Noteholder"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

*Aggregate Amounts Beneficially Owned or Managed on Account of:*

| Credit Agreement Claims (principal amount) | |
|---|---|
| - $1.35B Credit Facility | US$ |
| - $450M Credit Facility (Eminence) | US$ |
| - $360M Credit Facility | US$ |
| - $400M Credit Facility | US$ |
| - $950M Credit Facility | US$ |
| - $300M Credit Facility | US$ |
| - $1.5B Credit Facility | US$ |
| - $450M Credit Facility (Nordea) | US$ |
| - $2B Credit Facility | US$ |
| - $1.75B Credit Facility | US$ |

---

2        Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| | |
|---|---|
| - $440M Credit Facility (Telesto) | US$ |
| - $483M Credit Facility (Tellus) | US$ |
| SFL Claims (principal amount) | US$ |
| Unsecured Note Claims (principal amount) | |
| - Seadrill 2017 Notes | US$ |
| - Seadrill 2020 Notes | US$ |
| - NADL 2019 Notes | US$ |
| - Seadrill NOK Notes | NOK |
| - Seadrill SEK Notes | SEK |
| - NADL NOK Notes | NOK |
| Commitment under the Investment Agreement | US$ |
| Equity Interests in Seadrill | |
| Equity Interests in NADL | |
| Equity Interests in any other Company Party other than Seadrill and NADL (please specify) | |

**EXHIBIT E**

**Form of Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support and Lock-Up Agreement, dated as of (the "**Agreement**"),1 by and among Seadrill Limited ("**Seadrill**") and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a ["Consenting Stakeholder" and a ["Consenting Lender"] ["Consenting Noteholder"] ["Commitment Party"] [an "Agent"] [a "Trustee"] [a Company Party] under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Credit Agreement Claims (principal amount) | |
| - $1.35B Credit Facility | US$ |
| - $450M Credit Facility (Eminence) | US$ |
| - $360M Credit Facility | US$ |
| - $400M Credit Facility | US$ |
| - $950M Credit Facility | US$ |
| - $300M Credit Facility | US$ |
| - $1.5B Credit Facility | US$ |
| - $450M Credit Facility (Nordea) | US$ |
| - $2B Credit Facility | US$ |
| - $1.75B Credit Facility | US$ |
| - $440M Credit Facility (Telesto) | US$ |

_____

1    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| | |
|---|---|
| - $483M Credit Facility (Tellus) | US$ |
| SFL Claims (principal amount) | US$ |
| Unsecured Note Claims (principal amount) | |
| - Seadrill 2017 Notes | US$ |
| - Seadrill 2020 Notes | US$ |
| - NADL 2019 Notes | US$ |
| - Seadrill NOK Notes | NOK |
| - Seadrill SEK Notes | SEK |
| - NADL NOK Notes | NOK |
| Commitment under the Investment Agreement | US$ |
| Equity Interests in Seadrill | |
| Equity Interests in NADL | |
| Equity Interests in any other Company Party other than Seadrill and NADL (please specify) | |

**Schedule 1**

**Filing Entities**

1. Eastern Drilling AS
2. North Atlantic Alpha Ltd.
3. North Atlantic Crew AS
4. North Atlantic Crewing Ltd.
5. North Atlantic Drilling Ltd.
6. North Atlantic Drilling UK Ltd.
7. North Atlantic Elara Ltd.
8. North Atlantic Epsilon Ltd.
9. North Atlantic Linus Charterer Ltd.
10. North Atlantic Management AS
11. North Atlantic Navigator Ltd.
12. North Atlantic Norway Ltd.
13. North Atlantic Phoenix Ltd.
14. North Atlantic Support Services Ltd.
15. North Atlantic Venture Ltd.
16. Scorpion Drilling Ltd.
17. Scorpion Intrepid Ltd.
18. Scorpion Servicos Offshore Ltda.
19. Scorpion Vigilant Ltd.
20. Sea Dragon De Mexico S. De R.L. De C.V
21. Seadrill Abu Dhabi Operations Limited
22. Seadrill Americas, Inc.
23. Seadrill Angola Ltda.
24. Seadrill Aquila Ltd.
25. Seadrill Ariel Ltd.
26. Seadrill Brunei Ltd.
27. Seadrill Callisto Ltd.
28. Seadrill Capital Spares Pool AS
29. Seadrill Carina Ltd.
30. Seadrill Castor Ltd.
31. Seadrill Castor Pte Ltd.
32. Seadrill Cressida Ltd.
33. Seadrill Deepwater Charterer Ltd.
34. Seadrill Deepwater Crewing Ltd.
35. Seadrill Deepwater Units Pte Ltd.
36. Seadrill Dorado Ltd.
37. Seadrill Draco Ltd.
38. Seadrill Eclipse Ltd.
39. Seadrill Eminence Ltd.
40. Seadrill Far East Ltd.
41. Seadrill Freedom Ltd.

| | |
|---|---|
| 42. | Seadrill GCC Operations Ltd. |
| 43. | Seadrill Gemini Ltd. |
| 44. | Seadrill Global Services Ltd. |
| 45. | Seadrill Gulf Operations Neptune LLC |
| 46. | Seadrill Indonesia Ltd. |
| 47. | Seadrill International Resourcing DMCC |
| 48. | Seadrill Jack Up Holding Ltd. |
| 49. | Seadrill Jack Up I BV |
| 50. | Seadrill Jack Up II BV |
| 51. | Seadrill Jupiter Ltd. |
| 52. | Seadrill Labuan Ltd. |
| 53. | Seadrill Libra Ltd. |
| 54. | Seadrill Limited |
| 55. | Seadrill Management (S) Pte Ltd. |
| 56. | Seadrill Management AME Ltd. |
| 57. | Seadrill Management Ltd. |
| 58. | Seadrill Neptune Hungary Kft. |
| 59. | Seadrill Newfoundland Operations Limited |
| 60. | Seadrill Nigeria Operations Ltd. |
| 61. | Seadrill Offshore AS |
| 62. | Seadrill Offshore Malaysia Sdn. Bhd |
| 63. | Seadrill Offshore Nigeria Ltd. |
| 64. | Seadrill Operations de Mexico, S. de R.L. De C.V |
| 65. | Seadrill Orion Ltd. |
| 66. | Seadrill Pegasus Pte. Ltd. |
| 67. | Seadrill Prospero Ltd. |
| 68. | Seadrill Saturn Ltd. |
| 69. | Seadrill Servicos de Petroleo Ltda. |
| 70. | Seadrill Telesto Ltd. |
| 71. | Seadrill Tellus Ltd. |
| 72. | Seadrill Tucana Ltd. |
| 73. | Seadrill UK Ltd. |
| 74. | Sevan Brasil Ltd. |
| 75. | Sevan Driller Ltd. |
| 76. | Sevan Drilling Limited (UK) |
| 77. | Sevan Drilling Ltd. (Bermuda) |
| 78. | Sevan Drilling North America LLC |
| 79. | Sevan Drilling Pte Ltd. |
| 80. | Sevan Drilling Rig II AS |
| 81. | Sevan Drilling Rig II Pte Ltd. |
| 82. | Sevan Drilling Rig V AS |
| 83. | Sevan Drilling Rig V Pte Ltd. |
| 84. | Sevan Drilling Rig VI AS |
| 85. | Sevan Louisiana Hungary Kft. |
| 86. | Sevan Marine Servicos de Perfuracao Ltda |

**Schedule 2**

**First Day Pleadings**

1. **Cash Collateral**
2. **Cash Management**
3. **Wages**
4. **Utilities**
5. **Taxes**
6. **Foreign Vendors / Lienholders**
7. **Customer Contracts**
8. **Insurance**
9. **Worldwide Enforcement of Automatic Stay**
10. **Joint Administration**
11. **Schedules and SOFAs Extension**

**Schedule 3**

**Lender Terms**

Any amendment or waiver that has the effect of changing or which relates to (in each case relative to what was set out in the Credit Facility Term Sheet, the Cash Pooling Term Sheet and the Intercreditor Term Sheet as at the Agreement Effective Date):

(a) the definition of "Supra Majority Lenders" or the definition of "Required Lenders", "Majority Lenders" or "Required Majority" (as the case may be) under each Credit Agreement;

(b) an extension of the date of any payment of any amount under any Credit Agreement Finance Document;

(c) a reduction in the margin payable under any Credit Agreement (provided that such consent will only be required by all affected lenders under any Credit Agreement which contains the margin that is to be reduced) or a reduction in the amount of any payment of principal, interest, fees or commission payable under any Credit Agreement Finance Document;

(d) an increase in or extension of any lender's commitment under any Credit Agreement;

(e) a term of any Credit Agreement Finance Document which expressly requires the consent of all of the lenders under the related Credit Agreement;

(f) a proposed substitution or replacement of any of the obligors under any Credit Agreement;

(g) the release of any obligor under any Credit Agreement Finance Document, the release of any of the guarantees provided by the guarantors under any Credit Agreement, or the release of any guarantee obligations or any security interest under "Security Document" (or equivalent definition) as defined in each Credit Agreement;

(h) any terms relating to sanctions, anti-corruption, money laundering, and any form of compliance with law or regulation under the Credit Finance Documents;

(i) any terms relating to payment of dividends other distributions; and/or

(j) this Schedule 3 or any provision of this Agreement relating to amendments or waivers concerning Lender Terms (including, without limitation, the definition of "Lender Terms" in this Agreement.

**Exhibit 10.3**

**EXECUTION VERSION**

INVESTMENT AGREEMENT

AMONG

SEADRILL LIMITED,

THE OTHER COMPANY PARTIES

AND

THE COMMITMENT PARTIES PARTY HERETO

Dated as of September 12, 2017

TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

Section 1.1   Definitions                                                          2
Section 1.2   Construction                                                        22
Section 1.3   Investment Agreement Effective Date                                 23

ARTICLE II

ISSUE AND PURCHASE OF NEW SECURED NOTES AND EQUITY SECURITIES

Section 2.1   New Money Commitments; Equity Grants                                23
Section 2.2   Applicable Law                                                      24
Section 2.3   Default                                                             25
Section 2.4   Escrow Account; Funding                                             26
Section 2.5   Closing                                                             28
Section 2.6   Designation and Assignment Rights                                   30

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 3.1    Organization and Qualification                                     32
Section 3.2    Corporate Power and Authority                                      32
Section 3.3    Execution and Delivery; Enforceability                             33
Section 3.4    Reorganisation; New Seadrill                                       34
Section 3.5    Authorized and Issued Equity Interests                             34
Section 3.6    No Conflict                                                        35
Section 3.7    Consents and Approvals                                             35
Section 3.8    Financial Statements                                              36
Section 3.9    Financial Projections                                             36
Section 3.10   Registration Statement; Offering Memorandum                       36
Section 3.11   Company SEC Documents and Disclosure Statement                     37
Section 3.12   Absence of Certain Changes                                         37
Section 3.13   No Violation; Compliance with Laws                                 37
Section 3.14   Legal Proceedings                                                 37
Section 3.15   Labor Relations                                                   37
Section 3.16   Intellectual Property                                             38
Section 3.17   Title to Real and Personal Property                               38
Section 3.18   Licenses and Permits                                              39

Section 3.19   Environmental                                                                                           39
Section 3.20   Tax Returns                                                                                              40
Section 3.21   Material Contracts                                                                                       41
Section 3.22   No Unlawful Payments                                                                                     41
Section 3.23   Compliance with Money Laundering Laws                                                                    42
Section 3.24   Compliance with Sanctions Laws                                                                           42
Section 3.25   No Broker's Fees                                                                                         42
Section 3.26   Insurance                                                                                                42
Section 3.27   Investment Company Act                                                                                   43
Section 3.28   No General Solicitation                                                                                  43
Section 3.29   Rule 144A Eligibility                                                                                    43
Section 3.30   Securities Registration Exemption                                                                        43
Section 3.31   Similar Offerings                                                                                        43
Section 3.32   No Undisclosed Relationship                                                                              43
Section 3.33   No Undisclosed Liabilities                                                                               44
Section 3.34   No Registration Rights                                                                                   44
Section 3.35   Alternative Restructuring Proposals                                                                      44
Section 3.36   Execution of the RSA                                                                                     44
Section 3.37   EY Paper                                                                                                 44

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES

Section 4.1    Organization                                                                                             44
Section 4.2    Organizational Power and Authority                                                                       44
Section 4.3    Execution and Delivery                                                                                   44
Section 4.4    No Conflict                                                                                              45
Section 4.5    Consents and Approvals                                                                                   45
Section 4.6    No Registration                                                                                          45
Section 4.7    Purchasing Intent                                                                                        46
Section 4.8    Sophistication; Investigation                                                                            46
Section 4.9    No Broker's Fees                                                                                         46
Section 4.10   Sufficient Funds                                                                                         46

ARTICLE V

ADDITIONAL COVENANTS

Section 5.1    Conduct of Business                                                                                      46
Section 5.2    Other Covenants and Agreement Regarding Disclosure and Effectuation and Implementation of the Restructuring Transactions   47
Section 5.3    New Secured Notes DTC Eligibility                                                                        48
Section 5.4    Use of Proceeds                                                                                          49
Section 5.5    Cooperation Regarding Security                                                                           49
Section 5.6    New Board of Managers                                                                                    49

Section 5.7   Access to Information; Confidentiality                                             49
Section 5.8   Resale Cooperation                                                                52
Section 5.9   Commercially Reasonable Efforts                                                   53
Section 5.10  Registration Rights                                                               54
Section 5.11  Equity Securities DTC Eligibility                                                 54
Section 5.12  Share Legend                                                                      54
Section 5.13  Antitrust Approval                                                                55
Section 5.14  New Seadrill and New Structure                                                    56
Section 5.15  Go Shop                                                                           56
Section 5.16  Business Update Conference Calls                                                  57
Section 5.17  Financial Information                                                             57
Section 5.18  Further Assurances                                                                58
Section 5.19  Organizational Documents                                                          58
Section 5.20  Rule 144A Information                                                             58
Section 5.21  Tax Treatment                                                                     58

ARTICLE VI

CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 6.1   Conditions to the Obligations of the Commitment Parties                           59
Section 6.2   Waiver of Conditions to Obligations of Commitment Parties                         61
Section 6.3   Conditions to the Obligations of the Company                                      61
Section 6.4   Conditions to the Obligations of All Parties                                      62
Section 6.5   Waiver of Conditions to Obligations of All Parties                                62
Section 7.1   Indemnification                                                                   62
Section 7.2   Indemnification Procedures                                                        63
Section 7.3   Settlement of Indemnified Claims                                                  64
Section 7.4   Contribution                                                                      64
Section 7.5   Survival and Exclusive Remedy                                                     65

ARTICLE VIII

TERMINATION

Section 8.1   Consensual Termination                                                            65
Section 8.2   Termination by Commitment Parties                                                 65
Section 8.3   Termination by the Company                                                        67
Section 8.4   Return of Deposit                                                                 68
Section 8.5   Effect of Termination                                                             69

ARTICLE IX

FEES AND EXPENSES

Section 9.1   New Secured Notes related Fees                                                    69

3

| | | |
|---|---|---|
| Section 9.2 | Equity Purchaser Fees | 70 |
| Section 9.3 | Structuring Fees | 70 |
| Section 9.4 | Expense Reimbursement; Incremental Expenses | 71 |
| Section 9.5 | Further Agreements | 72 |

ARTICLE X

GENERAL PROVISIONS

| | | |
|---|---|---|
| Section 10.1 | Notices | 73 |
| Section 10.2 | Assignment; Third Party Beneficiaries | 75 |
| Section 10.3 | Prior Negotiations; Entire Agreement | 76 |
| Section 10.4 | Governing Law; Venue | 76 |
| Section 10.5 | Waiver of Jury Trial | 77 |
| Section 10.6 | Counterparts | 77 |
| Section 10.7 | Waivers and Amendments; Rights Cumulative; Consent | 77 |
| Section 10.8 | Headings | 77 |
| Section 10.9 | Specific Performance | 77 |
| Section 10.10 | No Survival | 77 |
| Section 10.11 | Damages | 78 |
| Section 10.12 | No Reliance | 78 |
| Section 10.13 | Publicity | 78 |
| Section 10.14 | Settlement Discussions | 78 |
| Section 10.15 | No Recourse | 79 |
| Section 10.16 | Enforceability of Agreement | 79 |
| Section 10.17 | Relationship Among Parties | 79 |

SCHEDULES

| | |
|---|---|
| Schedule 1 | Commitment Schedule |
| Schedule 2 | Form of Joinder Agreement |
| Schedule 3 | Registration Rights Agreement Term Sheet |
| Schedule 4 | Material Documents |
| Schedule 5 | Notice Information |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Rights Offering Procedures |
| Exhibit B | Board Governance Term Sheet |

-iv-

INVESTMENT AGREEMENT

THIS INVESTMENT AGREEMENT (including all exhibits, schedules, and annexes hereto, as may be amended, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of September 12, 2017, is made by and among Seadrill Limited, a company incorporated under the laws of Bermuda with registration number 36832, as the debtor in possession and reorganized debtor, as applicable, and the ultimate controlling parent of each of the other Debtors (as defined below) (the "**Company**"); (ii) each of the other Company Parties (as defined below) and (iii) each Commitment Party (as defined below). The Company, each other Company Party, each Commitment Party and each Person that has executed a Joinder Agreement substantially in the form of Schedule 2 (each, a "**Joinder Agreement**") is referred to herein individually as a "**Party**" and collectively as the "**Parties**." Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings given to them in Section 1.1 hereof or, if not defined therein, shall have the meanings given to them in the Restructuring Support and Lock-Up Agreement (as defined below).

RECITALS

WHEREAS, the Company and the other Debtors intend to file voluntary petitions for relief (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") in the Bankruptcy Court on or before 12 September 2017 (such actual date of filing, the "**Petition Date**");

WHEREAS, simultaneously with the execution and delivery of this Agreement, the Company Parties, the Consenting Lenders, the Consenting Noteholders, the Commitment Parties, SFL, the Consenting Stakeholders, the Agents/Trustees, and solely with respect to Sections 4.06, 4.07, 13 and 14 therein, the Seadrill ECAs, entered into a Restructuring Support and Lock-Up Agreement, dated as of September 12, 2017 (including the terms and conditions set forth in the Restructuring Term Sheet attached as Exhibit 1 to Exhibit B to the Restructuring Support and Lock-Up Agreement (the "**Restructuring Term Sheet**") and including all exhibits, schedules, and annexes thereto, as may be amended, supplemented or otherwise modified from time to time, the "**Restructuring Support and Lock-Up Agreement**");

WHEREAS, the Company will conduct certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure pursuant to a plan of reorganization to be filed in connection with the Chapter 11 Cases, reflecting the Restructuring Support and Lock-Up Agreement (as amended, supplemented or otherwise modified from time to time consistent with the terms of the Restructuring Support and Lock-Up Agreement and this Agreement);

WHEREAS, in accordance with the Plan, Restructuring Support and Lock-Up Agreement and this Agreement, the Company (or New Seadrill) will form NSNCo ("**NSNCo**"), which will be an exempted company limited by shares to be incorporated in Bermuda and a direct and wholly-owned subsidiary of IHCo ("**IHCo**") (which will be an exempted company limited by shares to be incorporated in Bermuda and a newly formed indirect subsidiary of the Company (or New Seadrill));

WHEREAS, subject to entry of the Confirmation Order and the other terms and conditions specified in this Agreement (including the Rights Offerings), and also subject to and simultaneously with the consummation of the Plan, New Seadrill will:

(a) through NSNCo, issue and sell $860,000,000 of new senior secured notes on the terms set forth in the New Secured Notes Term Sheet and the Indenture (the "**New Secured Notes**") to the Debt Commitment Parties (including any respective Ultimate Purchasers) and under certain circumstances set forth in the Plan, to certain other eligible holders of General Unsecured Claims pursuant to the Debt Rights Offering; and

(b) issue and sell $200,000,000 of Equity Securities to the Equity Commitment Parties (including any respective Ultimate Purchaser) and under certain circumstances set forth in the Plan, to certain other eligible holders of General Unsecured Claims pursuant to the Creditor Equity Rights Offering; and

WHEREAS, each purchaser of the New Secured Notes shall receive, in addition to the New Secured Notes, its *pro rata* share (calculated by dividing the aggregate principal amount of New Secured Notes purchased by such purchaser and the total aggregate principal amount of New Secured Notes purchased by all purchasers) of an amount of Equity Securities equal to 57.5% of the total outstanding Equity Securities as of the Closing on a pre-dilution basis, after giving effect to the transactions described herein (the "**Granted Equity Securities**").

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, the Company, each other Company Party and each of the Commitment Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1 Definitions. Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified below or in the Plan, as applicable:

"**Acquired Debt Securities**" has the meaning set forth in Section 2.1(b).

"**Acquired Equity Securities**" has the meaning set forth in Section 2.1(a).

"**Acquired Equity Securities Per Share Purchase Price**" means the price per share of New Seadrill at Closing.

-2-

"**Additional Commitment Parties**" means the funds and/or accounts that are managed, advised or sub-advised by each of Fintech Advisory Inc. and Asia Research & Capital Management Limited.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code. "**Affiliated**" has a correlative meaning.

"**Affiliated Fund**" means any investment fund the primary investment advisor or manager to which is a Commitment Party or an Affiliate thereof.

"**Agents/Trustees**" means each applicable "Agent" and "Trustee" as such terms are defined in the Restructuring Support and Lock-Up Agreement.

"**Aggregate Debt Commitment Amount**" means $860,000,000 in aggregate principal amount of New Secured Notes.

"**Aggregate Equity Commitment Amount**" means $200,000,000 in aggregate Equity Securities valued at the Acquired Equity Securities Per Share Purchase Price.

"**Agreement**" has the meaning set forth in the Preamble.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, or discussion with respect to a new money investment, restructuring, reorganization, merger, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Ancillary Proceedings**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity, whether domestic or foreign, having jurisdiction pursuant to the Antitrust Laws, and "**Antitrust Authority**" means any of them.

"**Antitrust Laws**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law, whether domestic or foreign, governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"**Applicable Consent**" has the meaning set forth in Section 3.7.

"**Applicable Taxing Authorities**" means any Governmental Entity having the authority and jurisdiction to tax the Company or any other Debtor.

"**Automatic Shelf Registration Statement**" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act.

"**Available Debt Securities**" means the Acquired Debt Securities that any Debt Commitment Party fails to purchase as a result of a Debt Commitment Party Default by such Debt Commitment Party.

"**Available Equity Securities**" means the Acquired Equity Securities that any Equity Commitment Party fails to purchase as a result of an Equity Commitment Party Default by such Equity Commitment Party.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"**Bankruptcy Court**" has the meaning ascribed to it in the Restructuring Support and Lock-Up Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

"**Board Governance Term Sheet**" means the term sheet attached to this Agreement as Exhibit B, as may be modified in a manner that is reasonably acceptable to the Required Commitment Parties and the Company.

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Cash Collateral Orders**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Centerbridge**" means Centerbridge Credit Partners, L.P. and its Affiliates that are signatories hereto.

"**Centerbridge Debt Rights Offering Reduction Percentage**" means an amount equal to (a) the HCB Debt Rights Offering Backstop Percentage multiplied by (b) fifty percent (50%).

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Charter Contracts**" means all of the charter contracts to which any of the Company Parties is party.

"**Closing**" has the meaning set forth in Section 2.5(a).

-4-

"**Closing Date**" has the meaning set forth in Section 2.5(a).

"**Closing Fee**" has the meaning set forth in Section 9.1(b).

"**CoCom**" has the meaning ascribed to it in the Restructuring Support and Lock-Up Agreement.

"**Collateral Agent**" means the collateral agent for the New Secured Notes as set forth in the Indenture.

"**Commitment Fee**" has the meaning set forth in Section 9.1(a).

"**Commitment Party**" means each Debt Commitment Party and Equity Commitment Party.

"**Commitment Party Agreements**" means this Agreement, the Registration Rights Agreement, the Escrow Agreement, and all other documents and agreements contemplated by this Agreement to which a Commitment Party is or will be a party.

"**Commitment Party Approved Person**" means any Person selected by the Company to participate in a Cover Transaction who, prior to the Cover Transaction, has been approved, in writing, by the Original Commitment Parties; provided that (a) any request by the Company for such approval may not be unreasonably withheld, conditioned or delayed and (b) in no event shall any Original Commitment Party have any approval rights if such Person is also a Defaulting Party.

"**Commitment Schedule**" means Schedule 1 to this Agreement, as may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement.

"**Company**" has the meaning set forth in the Preamble.

"**Company Agent**" means Prime Clerk LLC or another agent appointed by the Company and reasonably satisfactory to the Required Commitment Parties.

"**Company Disqualified Institutions**" has the meaning set forth in Section 2.6(a).

"**Company Parties**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Company SEC Documents**" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company and its Subsidiaries.

"**Confirmation Order**" means an Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving this Agreement.

-5-

"**Confirmation Order Milestone**" has the meaning set forth in <u>Section 6.1(a)(iv)</u>.

"**Confirmation Order Milestone Date**" has the meaning set forth in <u>Section 6.1(a)(iv)</u>.

"**Consenting Lender**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Consenting Noteholder**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Control**" or "**Controlled**" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or agency or otherwise.

"**Cover Transaction**" has the meaning set forth in <u>Section 2.3(b)</u>.

"**Cover Transaction Period**" has the meaning set forth in <u>Section 2.3(b)</u>.

"**Credit Agreement**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Credit Facility Documents**" means (A) new and/or amended Credit Agreements effectuating the treatment set forth in the Credit Facility Term Sheet; and (B) new and/or amended guarantees and security documents in accordance with the Credit Facility Term Sheet.

"**Credit Facility Term Sheet**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Creditor Equity Rights Offering**" means the offering of Equity Subscription Rights to certain eligible holders of General Unsecured Claims under certain circumstances set forth in the Restructuring Term Sheet and the Plan for $25,000,000 in aggregate Equity Securities valued at the Acquired Equity Securities Per Share Purchase Price in connection with the Restructuring Transactions substantially on the terms reflected in the Restructuring Support and Lock-Up Agreement, this Agreement, the Plan and the Rights Offering Procedures.

"**Creditor Equity Rights Offering Securities**" means the Equity Securities that may be purchased upon the exercise of rights offered pursuant to and in accordance with the Rights Offering Procedures in the Creditor Equity Rights Offering.

"**Creditor Equity Subscription Amount**" means the aggregate purchase price of Creditor Equity Rights Offering Securities purchased pursuant to and in accordance with the Rights Offering Procedures in the Creditor Equity Rights Offering.

"**Debt Commitment**" means, as to each Debt Commitment Party, the obligation to purchase New Secured Notes in an amount equal to its Debt Commitment Funding Amount.

"**Debt Commitment Funding Amount**" means for each Debt Commitment Party, an amount equal to the Aggregate Debt Commitment Amount multiplied by such Debt Commitment Party's Debt Commitment Percentage; as such product may be increased pursuant to Section 2.3(e); provided, however that the Debt Commitment Funding Amount of the Original Commitment Parties and the Select Commitment Parties shall be reduced by an amount equal to such Person's Debt Rights Offering Reduction Amount, or as otherwise mutually agreed among the Company, the Original Commitment Parties and the Select Commitment Parties.

"**Debt Commitment Party**" means each Person listed on Schedule 1 as a "Debt Commitment Party" and includes any Ultimate Purchaser of such Debt Commitment Party's Debt Commitment pursuant to Section 2.6(a).

"**Debt Commitment Party Default**" means the failure by any Debt Commitment Party to fulfill its obligations under Section 2.1(b), to the extent such failure occurs after all conditions set forth in Article VI that must be met prior to Closing have been met or waived and the Company has confirmed in writing that it is ready to perform all actions it is required to perform at the Closing.

"**Debt Commitment Party Replacement**" has the meaning set forth in Section 2.3(b).

"**Debt Commitment Party Replacement Period**" has the meaning set forth in Section 2.3(b).

"**Debt Commitment Percentage**" means, with respect to a Debt Commitment Party, the percentage initially set forth opposite the name of such Debt Commitment Party under the heading "Debt Commitment Percentage" in Schedule 1 attached hereto as such Schedule 1 may be updated by written notice from the Required Commitment Parties to the Company pursuant to Section 2.6(a) hereof.

"**Debt Deposit Amount**" means for each Debt Commitment Party, an amount equal to ten percent (10%) of such Debt Commitment Party's Debt Commitment Percentage multiplied by the Aggregate Debt Commitment Amount.

"**Debt Replacing Commitment Parties**" has the meaning set forth in Section 2.3(b).

"**Debt Rights Offering**" means the offering of Debt Subscription Rights to certain eligible holders of General Unsecured Claims under certain circumstances set forth in the Restructuring Term Sheet and the Plan for $85,000,000 in aggregate principal amount of Debt Rights Offering Securities in connection with the Restructuring Transactions substantially on the terms reflected in the Restructuring Support and  Lock-Up Agreement, this Agreement, the Plan and the Rights Offering Procedures.

"**Debt Rights Offering Reduction Amount**" means (a) for Hemen, an amount equal to (i) the Debt Subscription Amount multiplied by (ii) the Hemen Debt Rights Offering Reduction Percentage, (b) for Centerbridge, an amount equal to (i) the Debt Subscription Amount multiplied by (ii) the Centerbridge Debt Rights Offering Reduction Percentage and (c) for each Select Commitment Party, an amount equal to (i) the Debt Subscription Amount multiplied by (ii) such Select Commitment Party's SCP Debt Rights Offering Reduction Percentage.

"**Debt Rights Offering Securities**" means the New Secured Notes that may be purchased upon the exercise of rights offered pursuant to and in accordance with the Rights Offering Procedures in the Debt Rights Offering.

"**Debt Subscription Amount**" means the aggregate principal amount of Debt Rights Offering Securities purchased pursuant to and in accordance with the Rights Offering Procedures in the Debt Rights Offering.

"**Debt Subscription Rights**" means the subscription rights to purchase Debt Rights Offering Securities.

"**Debtors**" means the "Filing Entities" as defined in the Restructuring Support and Lock-Up Agreement.

"**Defaulting Party**" means (a) in respect of a Debt Commitment Party Default that is continuing, the applicable defaulting Debt Commitment Party and (b) in respect of an Equity Commitment Party Default that is continuing, the applicable defaulting Equity Commitment Party.

"**Definitive Documents**" means (a) the Definitive Documents (as defined in the Restructuring Support and Lock-Up Agreement), (b) the Restructuring Support and Lock-Up Agreement, (c) the Registration Rights Agreement, (d) the organizational documents of New Seadrill, IHCo, NSNCo, other members of the NSNCo Group and RigCo, (e) the New Secured Notes, (f) the Rights Offering Documents, (h) any employment agreement of any member of the Company's executive management (comprising those employees in relation to whom disclosure is made in the Company's annual report on Form 20-F), as such list may change from time to time between the date hereof and the Closing, (g) the EIP if the EIP has been adopted by the managers or other governing body of New Seadrill as of the Closing Date, and (h) any other agreements or supplements referred to in the foregoing.

"**Deposit Credit Amount**" has the meaning set forth in Section 2.4(b)(iii).

"**Depositary**" has the meaning set forth in the Indenture.

"**Disclosed**" means disclosed in a manner that is reasonably apparent on the face of a document which is disclosed or disclosed fairly and accurately and with sufficient particularity to enable the Commitment Parties to reasonably assess the matter, fact or circumstance disclosed and "**Disclosure**" shall be construed accordingly.

"**Disclosure Schedule**" means the disclosure schedule (together with all attachments and appendices thereto) delivered by the Company Parties to the Commitment Parties on the date hereof, as may be supplemented or amended in writing delivered by the Company Parties to the Commitment Parties from time to time after the date hereof and until the Effective Date for events occurring or first known after the date hereof.

"**Disclosure Statement**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Disclosure Statement Order**" means an Order, in form and substance reasonably acceptable to the Company and the Required Commitment Parties, approving, among other things, (a) the Disclosure Statement, (b) the solicitation procedures with respect to the Plan, and (c) the Rights Offering Procedures.

"**DTC**" means The Depository Trust Company.

"**DTC Agreement**" means a letter of representations, dated on or before the Closing Date, between NSNCo and the Depositary.

"**Effective Date**" means the effective date of the Plan.

"**EIP**" has the meaning set forth in Section 3.4(a).

"**Environmental Laws**" means all applicable laws (including common law), rules, regulations, codes, ordinances, orders in council, Orders, treaties, conventions, protocols, directives or legally binding agreements promulgated or entered into by or with any Governmental Entity, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release of, or exposure to, any Hazardous Material, or to health and safety (solely to the extent related to the environment or Hazardous Materials).

"**Equity Commitment**" means, as to each Equity Commitment Party, the obligation to purchase Equity Securities in an amount equal to its Equity Commitment Funding Amount.

"**Equity Commitment Funding Amount**" means, as to each Equity Commitment Party, an amount equal to (a) the Aggregate Equity Commitment Amount multiplied by (b) such Equity Commitment Party's Equity Commitment Percentage; as such product may be increased pursuant to Section 2.3(d); provided, however, that the Equity Commitment Funding Amount of Hemen shall be reduced by an amount equal to the Creditor Equity Subscription Amount.

"**Equity Commitment Party**" means each Person listed on Schedule 1 as an "Equity Commitment Party" and includes any Ultimate Purchaser of such Equity Commitment Party's Equity Commitment pursuant to Section 2.6(a).

"**Equity Commitment Party Default**" means the failure by any Equity Commitment Party to fulfill its obligations under Section 2.1(a), to the extent such failure occurs after all conditions set forth in Article VI that must be met prior to Closing have been met or waived and the Company has confirmed in writing that it is ready to perform all actions it is required to perform at the Closing.

"**Equity Commitment Party Replacement**" has the meaning set forth in Section 2.3(a).

"**Equity Commitment Party Replacement Period**" has the meaning set forth in Section 2.3(a).

"**Equity Commitment Percentage**" means, with respect to an Equity Commitment Party, the percentage initially set forth opposite the name of such Equity Commitment Party under the heading "Equity Commitment Percentage" in Schedule 1 attached hereto as such Schedule 1 may be updated by written notice from the Required Commitment Parties to the Company pursuant to Section 2.6(a) hereof.

"**Equity Deposit Amount**" means for each Equity Commitment Party, an amount equal to ten percent (10%) of such Equity Commitment Party's Equity Commitment Percentage multiplied by the Aggregate Equity Commitment Amount.

"**Equity Fee Nominal Amount**" has the meaning set forth in Section 2.5(e).

"**Equity Pro Rata Share**" means an amount equal to the total Equity Commitment of an Equity Commitment Party that has not triggered an Equity Commitment Party Default divided by the total Equity Commitment of all Equity Commitment Parties that have not triggered an Equity Commitment Party Default.

"**Equity Purchaser Cash Fee**" has the meaning set forth in Section 9.2(a).

"**Equity Replacing Commitment Parties**" has the meaning set forth in Section 2.3(a).

"**Equity Securities**" means all common shares in New Seadrill or the Company (as applicable).

"**Equity Subscription Rights**" means the subscription rights to purchase Creditor Equity Rights Offering Securities in the Creditor Equity Rights Offering.

"**Escrow Account Funding Date**" has the meaning set forth in Section 2.4(c).

"**Escrow Account**" means an escrow account established under the Escrow Agreement.

"**Escrow Agent**" means Citibank National Association.

"**Escrow Agreement**" means the escrow agreement between the Commitment Parties, the Company and Escrow Agent, dated as of September 11, 2017.

"**Escrow Property**" has the meaning set forth in the Escrow Agreement.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change, which, for the avoidance of doubt, may include (a) a change in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism (including cyber terrorism) or military actions, or any escalation or material worsening of any such actions or declarations of national emergencies), (b) a change in the general global, national or regional financial or economic conditions, economies, securities (including any suspension or material limitation in trading of securities on the Oslo Stock Exchange or the New York Stock Exchange), commodities (including the price of oil) or capital or financial markets (including a material disruption of commercial banking activities or settlement systems or change in exchange controls), including, in each case, any material worsening thereof, (c) any force majeure events, "acts of God" or environmental disasters, and (d) termination or cancellation of Contracts, including one or more Charter Contracts, to which a Company Party is party, in the case of (a) to (c), affecting the industries, regions or markets in which the Company or any of the Debtors operates.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Expenses**" means all properly incurred reasonable and documented out-of-pocket fees, costs and expenses incurred by each of the Commitment Parties, their Affiliates and each of their attorneys, accountants, advisors, financial advisors, consultants and other professionals in connection with their due diligence, approval, documentation, and purchase of the New Secured Notes, the Equity Securities and the related Restructuring Transactions, whether incurred before or after the date hereof, including without limitation (a) the preparation, negotiation and implementation of this Agreement or the Restructuring Support and Lock-Up Agreement (including any amendment or modification hereto) and any related documents and (b) the preparation, negotiation and implementation of any agreement contemplated by the Restructuring Transactions. Expenses shall include, without limitation, reasonable and properly incurred (i) attorneys' fees and legal expenses (provided that legal fees shall be limited to the reasonable fees and disbursements of one set of counsel for each Original Commitment Party, the Select Commitment Parties and the Additional Commitment Parties (based in both New York and London) and, in addition, (A) one local counsel for each Original Commitment Party, the Select Commitment Parties and the Additional Commitment Parties in each appropriate jurisdiction, (B) to the extent required by the subject matter, one specialist counsel for each Original Commitment Party, the Select Commitment Parties and the Additional Commitment Parties for each area of law in each appropriate jurisdiction), (ii) fees and expenses of one financial advisor of the Select Commitment Parties (which, for the avoidance of doubt, shall be Moelis & Company, whose fees and expenses shall be payable in accordance with its engagement letter with the Company) and fees and expenses of one financial advisor of the Original Commitment Parties (which, for the avoidance of doubt, shall be Goldman Sachs, whose fees and expenses shall be payable in accordance with its engagement letter with the

-11-

Company) and (iii) expenses related to the successful enforcement of any of the rights and remedies of the Commitment Parties under this Agreement or the Restructuring Support and Lock-Up Agreement (except to the extent such expenses arise from a breach of this Agreement by one or more of the Commitment Parties), in each case, regardless of whether the New Secured Notes or Equity Securities are issued.

"**EY Paper**" means the tax and hive down and steps paper dated September 5, 2017, as prepared by Ernst & Young LLP and as amended, supplemented or otherwise modified from time to time.

"**Filing Party**" has the meaning set forth in Section 5.13(b).

"**Final Order**" means an Order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified or amended, that is not stayed, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the Order could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such Order or has otherwise been dismissed with prejudice.

"**First Day Pleadings**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Full Transfer**" has the meaning set forth in Section 2.6(a).

"**Funding Notice**" has the meaning set forth in Section 2.4(b).

"**Funding Notice Date**" has the meaning set forth in Section 2.4(b).

"**GAAP**" means United States generally accepted accounting principles.

"**General Unsecured Claims**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Governmental Entity**" means any instrumentality, subdivision, court, administrative agency, commission, official or other governmental authority of the United States or any other country or any state, municipality, locality, tribe or other government or political subdivision thereof, or any quasi-governmental or private body exercising any administrative, executive, judicial, legislative, police, regulatory, taxing, importing or other governmental or quasi-governmental body, including, for the avoidance of doubt, the Bankruptcy Court.

"**Granted Equity Securities**" has the meaning set forth in the Recitals.

"**Group**" means, prior to the Closing Date, the Company and its Subsidiaries, and after the Closing Date, New Seadrill or the Company (as applicable) and its Subsidiaries.

"**Hazardous Materials**" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents that are regulated due to their hazardous, toxic, dangerous or deleterious properties or characteristics, including explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation or which can give rise to liability under any Environmental Law.

"**HCB Debt Rights Offering Backstop Percentage**" means an amount equal to 22.442 divided by 85.

"**Hemen**" means Hemen Investments Limited.

"**Hemen Debt Rights Offering Reduction Percentage**" means an amount equal to (a) the HCB Debt Rights Offering Backstop Percentage multiplied by (b) fifty percent (50%).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

"**IHCo**" has the meaning set forth in the Recitals.

"**Implementation Mechanisms**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Incremental Expenses**" has the meaning set forth in Section 9.4(d).

"**Indemnified Claim**" has the meaning set forth in Section 7.2.

"**Indemnified Persons**" has the meaning set forth in Section 7.1.

"**Indemnifying Party**" has the meaning set forth in Section 7.1.

"**Indenture**" means an indenture for the New Secured Notes in accordance with the New Secured Notes Term Sheet.

"**Intellectual Property Rights**" has the meaning set forth in Section 3.16.

"**Investment Agreement Effective Date**" has the meaning set forth in Section 1.3.

"**Joinder Agreement**" has the meaning set forth in the Preamble.

"**Joint Filing Party**" has the meaning set forth in Section 5.13(c).

"**Knowledge of the Company**" means the actual knowledge, after reasonable inquiry of their direct reports, of the chief executive officer, chief financial officer, chief operating officer, general counsel, and the board of directors of the Company. As used herein, "actual knowledge" means information that is personally known by the listed individual(s).

-13-

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

"**Legal Proceedings**" has the meaning set forth in Section 3.14.

"**Legend**" has the meaning set forth in Section 5.12.

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"**Losses**" has the meaning set forth in Section 7.1.

"**Material Adverse Effect**" means one or more Events or a series of Events that taken alone or together:

(a) has a material adverse effect on the Company Parties, taken as a whole, that prevents the Company Parties from implementing the Restructuring Transactions; or

(b) has a material adverse effect on, or is reasonably likely to have a material adverse effect on, the business, assets, properties, results of operation or financial condition of the Company Parties taken as a whole, at any time during the period starting on the date hereof and ending 18 months immediately following the Outside Date,

other than the following Events, which are:

(a) a breach of any financing arrangement (i) which has been waived under the Restructuring Support and Lock-Up Agreement or any other document in each case with the consent of the Required Commitment Parties or (ii) provided that the Company or any other Debtor is taking reasonable steps to remedy the breach, in respect of which any applicable grace period or cure period is unexpired (including by reason of any extension);

(b) (i) the failure to meet any projections or estimated revenues or profits or (ii) the occurrence of exceeding any estimated costs or expenses (but in the case of each of (i) and (ii), not the underlying facts giving rise to such variance unless such facts are otherwise excluded pursuant to a separate clause contained in this definition);

(c) any enforcement action which has been stayed, suspended, or dismissed;

(d) any litigation or similar action against any Company Party which arises from or relates to the Restructuring Transactions with respect to the Company Parties' capital structure and is being defended by a Company Party in good faith;

(e) the commencement or pendency of any Scheme of Arrangement, any Chapter 11 Case or any Ancillary Proceedings, if any, or any other aspect of the Implementation Mechanisms in accordance with the Restructuring Support and Lock-Up Agreement;

-14-

(f) the execution, announcement or performance of this Agreement or other Definitive Documents or the transactions contemplated hereby or thereby (including any act or omission of the Company or any other Debtor expressly required or prohibited, as applicable, by this Agreement or consented to or required by the Required Commitment Parties in writing or any other act or omission of any Commitment Party);

(g) the departure of officers or directors of the Company or any other Debtor not in contravention of the terms and conditions of this Agreement (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition);

(h) any matters known or expressly Disclosed in (i) the Disclosure Statement as delivered on the date hereof or subsequently as such matters may be expressly agreed by the Required Commitment Parties; or (ii) Company Disclosure Schedules as delivered on the date hereof;

(i) any material changes after the date hereof in applicable Law or GAAP or enforcement thereof; or

(j) the occurrence of a Debt Commitment Party Default.

"**Material Contracts**" means all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which any Debtor is a party.

"**Money Laundering Laws**" has the meaning set forth in Section 3.23.

"**New Seadrill**" means a new Bermuda holding company established by the Debtors for the purpose of carrying out certain transactions under the Plan with respect to the Company.

"**New Seadrill Bye-laws**" means the bye-laws of New Seadrill, which shall become effective as of the Effective Date, and which shall be consistent with the terms set forth in the Plan, and otherwise be in a form and substance reasonably satisfactory to the Required Commitment Parties and the Company.

"**New Seadrill Memorandum of Association**" means the memorandum of association of New Seadrill as in effect on the Effective Date, which shall be consistent with the terms set forth in the Plan, and otherwise be in a form and substance reasonably satisfactory to the Required Commitment Parties and the Company.

"**New Seadrill Organizational Documents**" means, collectively, the New Seadrill  Bye-laws and New Seadrill Memorandum of Association.

-15-

"**New Secured Notes**" has the meaning set forth in the Recitals.

"**New Secured Notes Term Sheet**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Non-Applicable Consent**" has the meaning set forth in Section 3.7.

"**Non-Consolidated Entities**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**NSN Collateral**" has the meaning set forth in the New Secured Notes Term Sheet.

"**NSN Percentage**" means, for each NSN Purchaser, an amount equal to (a) the aggregate principal amount of New Secured Notes purchased by such NSN Purchaser on the Closing Date divided by (b) the Aggregate Debt Commitment Amount.

"**NSN Purchasers**" means the Debt Commitment Parties and the Rights Offering Participants that purchase New Secured Notes on the Closing Date.

"**NSNCo**" has the meaning set forth in the Recitals.

"**NSNCo Group**" means NSNCo and its Subsidiaries.

"**NSNCo Organizational Documents**" means the memorandum of association and bye-laws of NSNCo, each of which shall be in a form and substance reasonably satisfactory to the Required Commitment Parties.

"**OC Expense Reimbursement**" has the meaning set forth in Section 9.4(a).

"**Offering Memorandum**" means a customary private offering memorandum with respect to resales of New Secured Notes pursuant to Rule 144A and Regulation S containing all customary information of the type and form that are customarily included in private placements of high-yield debt securities pursuant to Rule 144A (including information required by Regulation S-K and Regulation S-X under the Securities Act, but excluding, for the avoidance of doubt, any information of the type required by Rule 3-09, Rule 3-10 (other than a customary summary of such information for a Rule 144A offering) or Rule 3-16 of Regulation S-X or separate consolidating financial statements in respect of the Subsidiaries, any compensation discussion and analysis required by Item 402 of Regulations S-K or information regarding executive compensation and other exceptions customary for a Rule 144A offering) and otherwise substantially consistent with (other than disclosures relating to the New Secured Notes) the Resale Registration Statement.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Original Commitment Parties**" means Hemen and Centerbridge.

-16-

"**Outside Date**" has the meaning set forth in Section 6.1(a)(v).

"**Party**" has the meaning set forth in the Preamble.

"**Permitted Liens**" means (a) Liens for Taxes that (i) are not yet delinquent, (ii) the nonpayment of which in the aggregate would not reasonably be expected to have a Material Adverse Effect or (iii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) landlord's, operator's, vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens for labor, materials or supplies or other like Liens arising by operation of law in the ordinary course of business or incidental thereto, including any liens arising from the financing of the Company Parties' assets for amounts that are not more than sixty (60) days delinquent and that do not materially detract from the value of, or materially impair the use of, any of the Real Property or personal property of any of the Debtors, or, if for amounts that do materially detract from the value of, or materially impair the use of, any of the Real Property or personal property of any of the Debtors, if such Lien is being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; provided that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property; (d) easements, covenants, conditions, minor encroachments, restrictions on transfer and other similar matters affecting title to any Real Property (including any title retention agreement) and other title defects and encumbrances that do not or would not materially impair the ownership, use or occupancy of such Real Property or the operation of the Debtors' business; (e) Liens granted under any Contracts, in each case, to the extent the same are ordinary and customary in the offshore oil field services business and do not or would not materially impair the ownership, use or occupancy of any Real Property or the operation of the Debtors' business and which are for claims not more than sixty (60) days delinquent or, if such claim does materially impair such ownership, use, occupancy or operation and are for obligations that are more than sixty (60) days delinquent, are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (f) from and after the occurrence of the Effective Date, Liens granted in connection with the Credit Facility Documents; (g) mortgages on a lessor's interest in a lease or sublease; (h) Liens that, pursuant to the Plan and the Confirmation Order will be discharged and released on the Effective Date; and (i) Liens granted in favor of the holders of the New Secured Notes under the Indenture and any related security, collateral, pledge or similar agreements related thereto.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity or other entity or organization.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Plan**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement and includes all exhibits, supplements, appendices, and schedules thereto.

-17-

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time), which at all times shall be consistent with the terms of the Restructuring Support and Lock-Up Agreement and this Agreement and otherwise be in a form and substance reasonably satisfactory to the Required Commitment Parties.

"**Pre-Closing Period**" has the meaning set forth in Section 5.1(a).

"**Pro Rata Share**" means an amount equal to the total Debt Commitment of a Debt Commitment Party that has not triggered a Debt Commitment Party Default divided by the total Debt Commitment of all Debt Commitment Parties that have not triggered a Debt Commitment Party Default.

"**Prospectus**" means the prospectus included in a Registration Statement (including a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A promulgated under the Securities Act), all amendments and supplements to the Prospectus, including post-effective amendments, all material incorporated by reference or deemed to be incorporated by reference in such Prospectus and any Issuer Free Writing Prospectus (as defined in Rule 433 promulgated under the Securities Act).

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any of the Debtors, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Registration Rights Agreement**" has the meaning set forth in Section 5.10.

"**Registration Statement**" means a registration statement of the Company or New Seadrill filed with or to be filed with the SEC under the Securities Act and other applicable law, including an Automatic Shelf Registration Statement, and including any Prospectus, amendments and supplements to each such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"**Registration Statement Effectiveness**" has the meaning set forth in Section 5.2(c).

"**Registration Statement Filing Date**" has the meaning set forth in Section 5.2(b).

"**Related Parties**" means in relation to a Person, its Affiliates and each of their respective current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, dispersing or migrating. "**Released**" has a correlative meaning.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Required Commitment Parties**" means Commitment Parties holding at least 50.1% in principal amount of the commitments to purchase the New Secured Notes held by all such Commitment Parties at such time; provided that at all times, each of the Original Commitment Parties shall be part of the "Required Commitment Parties"; provided, further, that each Select Commitment Party and each Additional Commitment Party shall be part of the "Required Commitment Parties" with respect to (i) material modifications to this Agreement, the Restructuring Support and Lock-Up Agreement and the exhibits to each such document and the terms of any other Definitive Documents to the extent such modifications are adverse to such Select Commitment Party or Additional Commitment Party and (ii) any economic modifications to this Agreement, the Restructuring Support and Lock-Up Agreement and the exhibits to each such document and the terms of any other Definitive Documents to the extent such economic modifications are adverse to such Select Commitment Party or Additional Commitment Party, without regard to materiality; provided, however, that notwithstanding the foregoing, in no event will any Commitment Party be a Required Commitment Party at any point in time that such Person is also a Defaulting Party.

"**Required Consenting Lenders**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Resale Registration Statement**" means a Registration Statement for the purpose of resales of Acquired Equity Securities, Granted Equity Securities and the issued Creditor Equity Rights Offering Securities (if any) by the holders thereof.

"**Restructuring Support and Lock-Up Agreement**" has the meaning set forth in the Recitals.

"**Restructuring Term Sheet**" has the meaning set forth in the Recitals.

"**Restructuring Transactions**" means, collectively, the transactions contemplated by the Restructuring Support and Lock-Up Agreement, this Agreement and the Plan.

"**RigCo**" means, the new intermediate holding company to be put in place as a direct wholly owned subsidiary of IHCo.

"**Rights Offering Documents**" means the Rights Offering Procedures and the applicable Subscription Agreement, Beneficial Holder, Subscription Form, Master Subscription Form and Eligible Holder Cover Letter, which shall be in a form and substance reasonably satisfactory to the Required Commitment Parties with respect to each of the Rights Offerings and as such terms are defined in the applicable Rights Offerings Procedures.

-19-

"**Rights Offerings**" means (i) the Debt Rights Offering and (ii) the Creditor Equity Rights Offering.

"**Rights Offering Expiration Time**" means the time and the date on which the rights offering subscription forms must be duly delivered to the Company Agent in accordance with the Rights Offering Procedures.

"**Rights Offering Participants**" means those participants in the applicable Rights Offering as determined in accordance with the Restructuring Support and Lock-Up Agreement.

"**Rights Offering Procedures**" means the procedures with respect to the applicable Rights Offering that are approved by the Bankruptcy Court pursuant to the Disclosure Statement Order, which procedures shall be in form and substance substantially as set forth on Exhibit A hereto, as may be modified in a manner that is reasonably acceptable to the Required Commitment Parties and the Company.

"**RSA Effective Date**" means the "Agreement Effective Date" as defined in the Restructuring Support and Lock-Up Agreement.

"**Scheme of Arrangement**" means has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**SCP Debt Commitment Percentage**" means an amount equal to the sum of the Debt Commitment Percentage for the Select Commitment Parties.

"**SCP Debt Rights Offering Backstop Percentage**" means an amount equal to 62.558 divided by 85.

"**SCP Debt Rights Offering Reduction Percentage**" means for each Select Commitment Party, an amount equal to (a) the SCP Debt Rights Offering Backstop Percentage multiplied by (b) (i) such Select Commitment Party's Debt Commitment Percentage divided by (ii) the SCP Debt Commitment Percentage.

"**SCP Expense Reimbursement**" has the meaning set forth in Section 9.4(b).

"**Seadrill ECA**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Documents**" means the agreements and documents pursuant to which any person creates or grants any security interests, mortgages, encumbrances or Liens as security for the obligations of NSNCo under the New Secured Notes.

"**Select Commitment Parties**" means the funds and/or accounts that are managed, advised or sub-advised by each of Aristeia Capital L.L.C., GLG Partners LP, Saba Capital Management LP and Whitebox Advisors, LLC or each such Person's Affiliate(s) that are signatories hereto.

-20-

"**SFL**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Specified Permitted Transfer**" has the meaning set forth in <u>Section 5.8</u>.

"**Structuring Fee**" has the meaning set forth in <u>Section 9.3</u>.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body, or (c) has the power to direct the business and policies.

"**Tax Returns**" has the meaning set forth in <u>Section 3.20(a)</u>.

"**Taxes**" means all taxes, assessments, duties, levies or other similar mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.

"**Term Sheets**" has the meaning set forth in the Restructuring Support and Lock-Up Agreement.

"**Ticking Fee**" has the meaning set forth in <u>Section 9.2(b)</u>.

"**Ticking Fee Event**" has the meaning set forth in <u>Section 9.2(b)</u>.

"**Ticking Fee Event Date**" has the meaning set forth in <u>Section 9.2(b)</u>.

"**Transaction Agreements**" have the meaning set forth in <u>Section 3.2(a)</u>.

"**Transfer**" means to sell, resell, reallocate, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest in a subscription right, New Secured Note or Equity Security). "**Transfer**" used as a noun has a correlative meaning.

"**Ultimate Purchaser**" has the meaning set forth in <u>Section 2.6(a)</u>.

"**<u>Unlegended Securities</u>**" has the meaning set forth in <u>Section 5.11</u>.

"**<u>Virtual Data Room</u>**" means the data room comprising the actual copies of documents and other information relating to the Company Parties and which the Company made available to the Commitment Parties on-line and enclosed in a CD attached to this Agreement.

"**<u>willful or intentional breach</u>**" has the meaning set forth in <u>Section 8.5</u>.

Section 1.2 Construction . In this Agreement, unless the context otherwise requires:

(a) references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b) references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(c) words expressed in the singular number shall include the plural and *vice versa*; words expressed in the masculine shall include the feminine and neuter gender and *vice versa*;

(d) the words "hereof," "herein," "hereto" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(e) the term "this Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(f) "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g) references to "day" or "days" are to calendar days;

(h) references to "the date hereof" means the date of this Agreement;

(i) unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time;

(j) references to "dollars" or "$" refer to currency of the United States of America, unless otherwise expressly provided; and

(k) for the avoidance of doubt, nothing herein is intended to, and nothing herein shall, affect or modify the rights and obligations, if any, of the Company, the other Company Parties and the Commitment Parties under the Restructuring Support and Lock-Up Agreement. Further, each of the Commitment Parties' obligations to fund the Debt Commitment and/or Equity Commitment (as applicable) shall be subject solely to the terms and conditions in this Agreement.

-22-

Section 1.3 Investment Agreement Effective Date . This Agreement shall become effective and binding on each of the Parties upon the occurrence of (a) the RSA Effective Date and (b) payment of the Commitment Fee, the Equity Purchaser Cash Fee and the Expense Reimbursement (the "**Investment Agreement Effective Date**").

<div align="center">

**ARTICLE II**

**ISSUE AND PURCHASE OF NEW SECURED NOTES AND EQUITY SECURITIES**

</div>

Section 2.1 New Money Commitments; Equity Grants.

(a) Equity Commitment. On the basis of the representations and warranties herein contained and subject to the terms and conditions herein set forth including any applicable upward adjustment pursuant to Section 2.3, (i) each Equity Commitment Party commits, severally and not jointly, to (x) purchase, at the Closing, an aggregate amount of Equity Securities at the Acquired Equity Securities Per Share Purchase Price in an amount equal to such Equity Commitment Party's Equity Commitment Funding Amount and (y) pay to New Seadrill, at the Closing, an amount in cash equal to such Equity Commitment Party's Equity Commitment Funding Amount; and (ii) the Company shall ensure that New Seadrill shall, and New Seadrill shall, issue and sell to each Equity Commitment Party, an aggregate amount of Equity Securities valued at the Acquired Equity Securities Per Share Purchase Price equal to such Equity Commitment Party's Equity Commitment Funding Amount. The Equity Securities that the Equity Commitment Parties commit to purchase pursuant to this Section 2.1(a) are referred to as the "**Acquired Equity Securities**". It is understood among the Commitment Parties that any acceptable increases or decreases in the Equity Commitment Percentages of the Equity Commitment Parties shall be shared pro rata among the Equity Commitment Parties; provided that in all circumstances, any such changes to the Equity Commitment Percentage of an Equity Commitment Party shall require the prior written consent of each Equity Commitment Party and the Company Parties.

(b) Debt Commitments. On the basis of the representations and warranties herein contained and subject to the terms and conditions herein set forth including any applicable upward adjustment pursuant to Section 2.3, (i) each Debt Commitment Party commits, severally and not jointly, to (x) purchase, at the Closing, an aggregate principal amount of New Secured Notes in an amount equal to such Debt Commitment Party's Debt Commitment Funding Amount and (y) pay to NSNCo, at the Closing, an amount in cash equal to such Debt Commitment Party's Debt Commitment Funding Amount; and (ii) the Company shall ensure that NSNCo shall, and NSNCo shall, issue and sell to each Debt Commitment Party, an aggregate principal amount of New Secured Notes equal to such Debt Commitment Party's Debt Commitment Funding Amount. The New Secured Notes that the Debt Commitment Parties commit to purchase pursuant to this Section 2.1(b) are referred to as the "**Acquired Debt Securities**". It is understood among the Commitment Parties that any acceptable increases or decreases in the Debt Commitment Percentages or Debt Rights Offering Reduction Percentages of the Debt Commitment Parties shall

<div align="center">-23-</div>

be shared pro rata among the Debt Commitment Parties; provided that in all circumstances, any such changes to the Commitment Percentage or Debt Rights Offering Reduction Percentage of a Debt Commitment Party shall require the prior written consent of each Debt Commitment Party and the Company.

(c) Debt Rights Offering. On and subject to the terms and conditions hereof and the Restructuring Support and Lock-Up Agreement, the Company shall procure that NSNCo shall, and NSNCo shall, conduct the Debt Rights Offering pursuant to and in accordance with the Rights Offering Procedures and the Disclosure Statement Order. Each Commitment Party shall not exercise any Debt Subscription Rights offered to such Commitment Party in the Debt Rights Offering on account of General Unsecured Claims held by such Commitment Party on the RSA Agreement Effective Date; provided that this provision shall not apply to Debt Subscription Rights offered to a Commitment Party on account of General Unsecured Claims acquired after the RSA Effective Date.

(d) Equity Rights Offerings. On and subject to the terms and conditions hereof and the Restructuring Support and Lock-Up Agreement, the Company shall procure that New Seadrill shall, and New Seadrill shall, conduct the Creditor Equity Rights Offering pursuant to and in accordance with the Rights Offering Procedures and the Disclosure Statement Order. Each Commitment Party shall not exercise any Equity Subscription Rights offered to such Commitment Party in the Creditor Equity Rights Offering on account of General Unsecured Claims held by such Commitment Party on the RSA Effective Date; provided that this provision shall not apply to Equity Subscription Rights offered to a Commitment Party on account of General Unsecured Claims acquired after the RSA Agreement Effective Date.

(e) Equity Grants. In consideration of the Debt Commitments and the purchase of New Secured Notes on the Closing Date by the Debt Commitment Parties and Rights Offering Participants in the Debt Rights Offering, the Company shall cause New Seadrill to issue the Granted Equity Securities to the purchasers of the New Secured Notes pursuant to the terms and conditions hereunder and the Debt Rights Offering, after giving effect to the transactions described herein, pro rata based on the amount of New Secured Notes purchased by each Debt Commitment Party and each Rights Offering Participant in the Debt Rights Offering. For this purpose, the Company shall procure that a part of the Aggregate Debt Commitment Amount equal to the nominal amount of the Granted Equity Securities (the "**Granted Equity Nominal Amount**") is applied to pay up those shares and the aggregate price of the New Secured Notes shall be correspondingly reduced. The Company will procure that New Seadrill contributes an amount equal to the Granted Equity Nominal Amount to NSNCo.

(f) Rounding of Shares. The number of Equity Securities issued pursuant to the terms and conditions hereof shall be rounded among the applicable holders solely to avoid fractional shares as the Company shall determine in consultation with the Required Commitment Parties.

Section 2.2 Applicable Law. The New Secured Notes and the Equity Securities will be issued to the Commitment Parties in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act and the Disclosure Statement shall include statements to such effect.

Section 2.3 Default.

(a) Upon the occurrence of an Equity Commitment Party Default, each Equity Commitment Party (other than any Defaulting Party) and its Affiliates shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Equity Commitment Parties of such Equity Commitment Party Default, which notice shall be given promptly following the occurrence of such Equity Commitment Party Default and to all Equity Commitment Parties concurrently (such five (5) Business Day period, the "**Equity Commitment Party Replacement Period**"), to make arrangements for one or more of the Equity Commitment Parties (other than any Defaulting Party) or their Affiliates, as applicable, to purchase all or any portion of the Available Equity Securities (any such purchase, an "**Equity Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon by all of the Equity Commitment Parties (other than any Defaulting Party), or their Affiliates, as applicable, who have elected to purchase all or any portion of the Available Equity Securities (the "**Equity Replacing Commitment Parties**"), or, if no such agreement is reached, based upon such Equity Replacing Commitment Parties Equity Pro Rata Share of the aggregate number of Available Equity Securities.

(b) Upon the occurrence of a Debt Commitment Party Default, each Debt Commitment Party (other than any Defaulting Party) and its Affiliates shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Debt Commitment Parties of such Debt Commitment Party Default, which notice shall be given promptly following the occurrence of such Debt Commitment Party Default and to all Debt Commitment Parties concurrently (such five (5) Business Day period, the "**Debt Commitment Party Replacement Period**"), to make arrangements for one or more of the Debt Commitment Parties (other than any Defaulting Party) or their Affiliates, as applicable, to purchase all or any portion of the Available Debt Securities (any such purchase, a "**Debt Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon by all of the Debt Commitment Parties (other than any Defaulting Party), or their Affiliates, as applicable, electing to purchase all or any portion of the Available Debt Securities, or, if no such agreement is reached, based upon such Debt Commitment Parties (other than any Defaulting Party) or their Affiliates (such Debt Commitment Parties or their Affiliates, as applicable, the "**Debt Replacing Commitment Parties**") Pro Rata Share of the aggregate number of Available Debt Securities.

(c) As to any remaining Available Equity Securities that are not purchased pursuant to Section 2.3(a) or any Available Debt Securities that are not purchased pursuant to Section 2.3(b), the Company may, after giving prior written notice to the Commitment Parties, elect to utilize the Cover Transaction Period to consummate a Cover Transaction. As used herein, "**Cover Transaction**" means a circumstance in which the Company arranges for the sale of all or any portion of the Available Equity Securities or the Available Debt Securities, as applicable, to any Commitment Party Approved Person, on the terms and subject to the conditions set forth in this Agreement, during the Cover Transaction Period, and "**Cover Transaction Period**" means the period ending on the later of (i) twelve months after the Petition

-25-

Date and (ii) the 30th day after, as applicable, (x) the expiration of the five (5) Business Day period specified in Section 2.3(a) with respect to the Available Equity Securities or Section 2.3(b) with respect to the Available Debt Securities or (y) the date upon which all conditions set forth in Article VI that must be met prior to the Closing have been met or waived.

(d) Any Available Equity Securities purchased by an Equity Replacing Commitment Party (and any commitment and applicable aggregate purchase price associated therewith) shall be included, among other things, in the determination of the Equity Commitment Funding Amount of such Equity Replacing Commitment Party for purposes of Section 2.1(a) and Section 2.5(e). If an Equity Commitment Party Default occurs, the Outside Date shall be delayed for such Equity Commitment Party Default only to the extent necessary to allow for if applicable, the Equity Commitment Party Replacement to be completed within the Equity Commitment Party Replacement Period or for a Cover Transaction to be completed.

(e) Any Available Debt Securities purchased by a Debt Replacing Commitment Party (and any commitment and applicable aggregate purchase price associated therewith) shall be included, among other things, in the determination of (i) the Debt Commitment Funding Amount of such Debt Replacing Commitment Party for purposes of Section 2.1(b) and Section 2.5(c) and (ii) the Debt Commitment of such Debt Replacing Commitment Party for purposes of the definition of "Required Commitment Parties." If a Debt Commitment Party Default occurs, the Outside Date shall be delayed for such Debt Commitment Party Default only to the extent necessary to allow for if applicable, the Debt Commitment Party Replacement to be completed within the Debt Commitment Party Replacement Period or for a Cover Transaction to be completed.

(f) Nothing in this Agreement shall be deemed to require an Equity Commitment Party or a Debt Commitment Party to purchase more than its respective Equity Commitment Percentage of the Aggregate Equity Commitment Amount or Debt Commitment Percentage of the Aggregate Debt Commitment Amount.

(g) For the avoidance of doubt, no provision of this Agreement shall relieve any Defaulting Party from liability hereunder, or limit the availability of the remedies set forth in Section 10.9, in connection with any such Defaulting Party's Debt Commitment Party Default or Equity Commitment Party Default.

Section 2.4 Escrow Account; Funding .

(a) Initial Deposit. As of the Investment Agreement Effective Date, (i) each Debt Commitment Party shall pay either (x) by wire transfer in immediately available funds that are U.S. dollars or (y) by deliver of an irrevocable letter of credit or similar credit support agreement that is in a form and from a creditworthy financial institution that is reasonably acceptable to the Company, in each case to the Escrow Agent in an amount equal to its Debt Deposit Amount to be held by the Escrow Agent in an Escrow Account and (ii) each Equity Commitment Party shall pay by wire transfer in immediately available funds to Escrow Agent an amount equal to its Equity Deposit Amount to be held by the Escrow Agent in an Escrow Account. If a Commitment Party makes a Transfer pursuant to Section 2.6(a), then (x) the Ultimate Purchaser of such Commitment Party's Transferred Debt Commitment or Equity

-26-

Commitment, as applicable, shall pay by wire transfer in immediately available funds that are U.S. dollars to the Escrow Agent for deposit into an Escrow Account an amount equal to ten percent (10%) of the Debt Commitment and/or Equity Commitment Transferred to such Ultimate Purchaser by the Commitment Party and (y) pursuant to the terms of the Escrow Agreement, the Escrow Agent shall distribute to the transferring Commitment Party on a date no earlier than the date the Ultimate Purchaser makes a corresponding deposit pursuant to subclause (x), a portion of the Escrow Property equal to ten percent (10%) of the portion of the Debt Commitment and/or Equity Commitment, as applicable, Transferred to the Ultimate Purchaser plus any interest earned on such amount under the Escrow Agreement while deposited in such Escrow Account.

(b) Funding Notice. No later than the seventh (7th) Business Day following the Rights Offering Expiration Time, the Company Agent shall, on behalf of the Company, deliver to each Commitment Party a written notice (the "**Funding Notice**," and the date of such delivery, the "**Funding Notice Date**") setting forth:

(i) as to each Debt Commitment Party, the Debt Commitment Funding Amount after giving effect to the aggregate principal amount of New Secured Notes to be purchased pursuant to the Debt Rights Offering;

(ii) as to each Equity Commitment Party, the Equity Commitment Funding Amount, after giving effect to the aggregate Equity Securities to be purchased pursuant to the Creditor Equity Rights Offering; and

(iii) as to each Commitment Party, the amount previously deposited into an Escrow Account by such Commitment Party together with any interest thereon earned or to be earned prior to the Escrow Account Funding Date (the "**Deposit Credit Amount**").

The Company shall ensure that (x) the Company Agent shall provide all relevant written backup, information and documentation relating to the information contained in the applicable Funding Notice simultaneously with delivery of the Funding Notice and (y) shall provide all further relevant written backup, information and documentation relating to the information contained in the applicable Funding Notice as any relevant Commitment Party may reasonably request; and

(c) Escrow Account Funding. Pursuant to the terms of the Escrow Agreement, on the date agreed with the Required Commitment Parties (the "**Escrow Account Funding Date**"), each Commitment Party shall deliver and pay an amount equal to its Debt Commitment Funding Amount, if any, plus its Equity Commitment Funding Amount, if any, less its applicable Deposit Credit Amount by wire transfer of immediately available funds in U.S. dollars into its Escrow Account in satisfaction of such Commitment Party's Debt Commitment purchase obligation and/or Equity Commitment purchase obligation, as applicable; provided that in no event shall the Escrow Account Funding Date be less than ten (10) Business Days after the Funding Notice Date or more than five (5) Business Days prior to the Effective Date. Payment to a Commitment Party's Escrow Account in accordance with this Section 2.4 shall be a complete discharge to the relevant funding Person who shall not be concerned with the distribution of such monies so paid.

-27-

Section 2.5 Closing.

(a) Subject to Article VI, unless otherwise mutually agreed in writing between the Company and the Required Commitment Parties, the consummation of the commitments set forth in Section 2.1 and the issue and purchase of the Acquired Equity Securities, the Acquired Debt Securities, the Granted Equity Securities, the Debt Rights Offering Securities (if any are to be issued and purchased) and the Creditor Equity Rights Offering Securities (if any are to be issued and purchased) pursuant to Section 2.1 (collectively, the "**Closing**") shall take place at the offices of Kirkland & Ellis LLP, 601 Lexington Ave, New York, New York 10022, at 10:00 a.m., New York City time, on the Effective Date; provided, however, if all of the conditions set forth in Article VI have not been satisfied or waived in accordance with this Agreement as of Effective Date (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), the Closing shall occur on the date that is five (5) Business Days after the date on which all such conditions have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**."

(b) At the Closing, the Escrow Agent shall release and distribute the funds held in the Escrow Accounts to the Company or the Company's designee and such amounts shall be released and utilized in accordance with the Plan and the Escrow Agreement.

(c) At the Closing, the Company shall procure that NSNCo shall and NSNCo shall issue and deliver the Acquired Debt Securities to each Debt Commitment Party (including any Ultimate Purchaser in accordance with Section 2.6(a)) in an amount determined pursuant to Section 2.1(b) to such account or accounts as the relevant Debt Commitment Party may designate.

The New Secured Notes to be purchased hereunder and pursuant to the Debt Rights Offering on the Closing Date from NSNCo will be represented by one or more definitive global notes in book-entry form which will be deposited by or on behalf of the NSNCo with DTC or its designated custodian. At the Closing, the Company shall procure that NSNCo shall and NSNCo shall deliver the New Secured Notes to the purchasers thereof by causing DTC to credit the New Secured Notes to the account of the Trustee, against payment by the Persons to whom delivery is made, of the purchase price therefor, as specified herein and in the Rights Offering Procedures. The certificates for the New Secured Notes purchased as provided herein and in the Rights Offering Procedures shall be in such denominations and registered in the name of Cede & Co., as nominee of the Depositary, pursuant to the DTC Agreement, and shall be made available for inspection at the Closing location on the Business Day preceding the Closing Date. Notwithstanding anything to the contrary in this Agreement, all New Secured Notes will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company on behalf of NSNCo.

(e) At the Closing, the Company shall procure that New Seadrill will issue the Acquired Equity Securities, the Granted Equity Securities, the issued Creditor Equity Rights Offering Securities and the Equity Securities in satisfaction of the Structuring Fee, as applicable, to (i) each Equity Commitment Party (including any Ultimate Purchaser in accordance with Section 2.6(a)) in an amount determined pursuant to Section 2.1(a), (ii) to the NSN Purchasers;

-28-

(iii) the Rights Offering Participants in the Creditor Equity Rights Offering as provided in <u>Section 2.1(d)</u>; and (iv) Hemen and the Select Commitment Parties in satisfaction of the Structuring Fees, or in each case, to such account or accounts as the relevant Person may designate. The Equity Securities issued in satisfaction of the Structuring Fee shall be paid up as to their nominal amount (the "**<u>Equity Fee Nominal Amount</u>**") by applying a part of the Aggregate Debt Commitment Amount payable by Hemen or such member of the Select Commitment Parties, as applicable, and reducing the aggregate price of the New Secured Notes correspondingly. The Company will procure that New Seadrill contributes an amount equal to the Equity Fee Nominal Amount to NSNCo.

(f) The following transactions shall occur immediately prior to or simultaneously with the Closing:

(i) the New Seadrill Organizational Documents and the organizational documents of its Subsidiaries shall be duly approved and adopted and shall be in full force and effect;

(ii) the written resignations, in an agreed form, of the then-current directors and/or secretaries of New Seadrill, if any, resigning from such positions shall be delivered to the Company, with such resignations to take effect from Closing, except to the extent such director or secretary is requested to continue their service to New Seadrill by holders of Equity Securities in accordance with such holders' rights as set forth in the Board Governance Term Sheet;

(iii) the appointment of any new directors and/or secretaries of New Seadrill (other than any continuing directors and/or secretaries) shall be made in accordance with the Board Governance Term Sheet;

(iv) if applicable and requested by the Required Commitment Parties, a written termination, in a form that is reasonably satisfactory to the Required Commitment Parties, of the then-appointed auditor of New Seadrill shall be delivered to such auditor, with such resignation to take effect as of the Closing;

(v) if applicable and requested by the Required Commitment Parties, the appointment of auditors of New Seadrill as requested by and on terms to be agreed with the Commitment Parties shall be made by New Seadrill;

(vi) share certificates, if any, in respect of the issued Equity Securities shall be delivered by New Seadrill to the NSN Purchasers and the Equity Commitment Parties and Rights Offering Participants in the Creditor Equity Rights Offering that purchase Equity Securities;

(vii) the statutory registers and minute books (properly written up to the time immediately prior to Closing), the common seal (if any), the certificate of incorporation and (if applicable) any certificate of incorporation on change of name and (if applicable) the authentication code for access to the companies regulator of New Seadrill's location of incorporation (if applicable) shall be made available at the registered office of New Seadrill;

(viii) all existing instructions and authorities to bankers will be revoked and will be replaced with alternative instructions, mandates and authorities in the agreed form with the Commitment Parties;

(ix) the Closing Fee shall be paid by the Company; and

(x) the Company Parties shall pay to the Commitment Parties all Incremental Expenses.

Notwithstanding anything to the contrary in this Agreement, all Equity Securities and New Secured Notes shall be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company on behalf of New Seadrill or NSNCo, as applicable.

(g) If the Closing conditions contained in <u>Section 6.1</u> are not satisfied and all Closing conditions contained in <u>Section 6.3</u> have been satisfied or waived in accordance with <u>Section 6.4</u> and <u>Section 6.5</u> or if this Agreement is otherwise terminated pursuant to <u>Article VIII</u>, then the Escrow Agent shall distribute all amounts held by the Escrow Agent in accordance with <u>Section 8.4</u> of this Agreement and the Escrow Agreement.

Section 2.6 Designation and Assignment Rights.

(a) The Commitment Parties shall not be entitled to Transfer all or any portion of their Debt Commitments or Equity Commitments, as applicable, except as expressly provided in this <u>Section 2.6(a)</u>. Notwithstanding anything to the contrary in the immediately preceding sentence or otherwise in this Agreement, each Commitment Party shall have the right to Transfer all or any portion of its Debt Commitment or Equity Commitment, as applicable, to (i) an Affiliate or Affiliated Fund of the transferring Commitment Party (other than a portfolio company of the Commitment Party, its Affiliates or Affiliated Funds), (ii) one or more special purpose vehicles that are wholly owned by one or more of such Commitment Parties, its Affiliates and its Affiliated Funds, created for the purpose of holding such obligations or holding debt or equity of New Seadrill, the Company or its Subsidiaries and (iii) with respect to Debt Commitments only, to third-party investors (other than to institutions identified by name and designated in writing by the Company prior to the date of this Agreement ("**Company Disqualified Institutions**")) identified by such Commitment Party (with the written consent of the other Debt Commitment Parties); <u>provided</u> that in the case of (i), (ii) and (iii), prior to such Transfer, the transferring Commitment Party shall provide the Company with reasonably sufficient evidence of such transferee's (x) creditworthiness in relation to the obligation being transferred and (y) capability of consummating the transactions contemplated hereby in a timely fashion; <u>provided</u>, <u>further</u>, that such transferee shall not be related to or Affiliated with any portfolio company of such Commitment Party or any of its Affiliates or Affiliated Funds (other than solely by virtue of its affiliation with such Commitment Party) and the equity of such transferee shall not be directly or indirectly transferable other than to such Persons described in clauses (i), (ii) or (iii) of this <u>Section 2.6(a)</u>, and in such manner as such Commitment Party's obligation is transferable pursuant to this <u>Section 2.6(a)</u> (each of the Persons referred to in clauses (i), (ii) and (iii), an "**Ultimate Purchaser**"). In each case of a Commitment Party's Transfer of all or any portion of its Debt Commitment or Equity Commitment, as applicable, pursuant to this <u>Section 2.6(a)</u>, (1) the Ultimate Purchaser shall have provided a written

-30-

agreement to the Company under which it (w) confirms the accuracy of the representations and warranties set forth in Article IV as applied to such Ultimate Purchaser, (x) agrees to purchase such portion of such Commitment Party's Debt Commitment or the Equity Commitment, as applicable, (y) agrees to be fully bound by, and subject to, this Agreement as a Debt Commitment Party or Equity Commitment Party, as applicable, by executing a Joinder Agreement and (z) executes a joinder agreement for the Escrow Agreement in the form of the joinder agreement attached thereto, and (2) the transferring Commitment Party and the Ultimate Purchaser shall have duly executed and delivered to the Company and Kirkland & Ellis LLP (at the addresses set forth in Section 10.1) written notice of such Transfer; provided, however, that unless the Company has consented (in its sole discretion) that such Transfer will relieve the transferring Commitment Party of its obligations hereunder (a "**Full Transfer**"), no such Transfer shall relieve the transferring Commitment Party from any of its obligations hereunder. For the avoidance of doubt, unless the Company consents to a Full Transfer, if such Ultimate Purchaser becomes a Defaulting Party, no provision of this Agreement shall relieve any Defaulting Party or the Commitment Party that transferred all or any portion of its Debt Commitments or Equity Commitments, as applicable, to such Defaulting Party, from liability hereunder, or limit the availability of the remedies set forth in Section 10.9. If the Company has consented to a Full Transfer (in its sole discretion), then after such Full Transfer, the transferring Commitment Party shall no longer be obligated to fund that portion of the Commitment Party's Debt Commitment Funding Amount and/or Equity Commitment Funding Amount so transferred and if such Ultimate Purchaser becomes a Defaulting Party, the Commitment Party that transferred all or any portion of its Debt Commitment or Equity Commitment, as applicable, to such Defaulting Party shall not be liable for any obligations of such Defaulting Party. Other than as set forth in this Section 2.6(a), no Commitment Party shall be permitted to Transfer all or any portion of its Debt Commitment or Equity Commitment, as applicable, without the prior written consent of the Company, which, as applied to Transfers other than a Full Transfer, shall not be unreasonably withheld, conditioned or delayed.

(b) Each Commitment Party, severally and not jointly, agrees that it will not Transfer, at any time prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, any of its rights and obligations under this Agreement to any Person other than in accordance with Section 2.6(a). After the Closing Date, nothing in this Agreement shall limit or restrict in any way the ability of any Commitment Party (or any permitted transferee thereof) to Transfer any of the New Secured Notes or Equity Securities or any interest therein; provided that any such Transfer shall be in compliance with any applicable provisions in the Restructuring Support and Lock-Up Agreement and otherwise made pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable securities Laws.

<div align="center">

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

</div>

Except as disclosed in the Company Parties' Disclosure Schedule, the Virtual Data Room, the Company SEC Documents filed with the SEC on or after March 31, 2014, and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system prior

<div align="center">-31-</div>

to the date hereof (excluding any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive, cautionary or forward looking in nature), the Company, on behalf of itself, each of the other Debtors and NSNCo and New Seadrill (in each case, once formed and as applicable), jointly and severally, hereby represents and warrants to the Commitment Parties as of the date hereof, or once formed and subject to the terms of the Joinder Agreement, as applicable, and as of the Closing Date (except for such representation and warranties that are made as of a specific date, which are made only as of such date), as follows:

Section 3.1 Organization and Qualification. The Company, NSNCo, New Seadrill, each of the Debtors and each other material Subsidiary of the Company (a) is or will be, as applicable, a duly organized and validly existing company, corporation, limited liability company or limited partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization, (b) has or will have, as applicable, the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) except where the failure to have such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, is or will be, as applicable, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications.

Section 3.2 Corporate Power and Authority.

(a) The Company has, and each of NSNCo and New Seadrill will have as applicable, (i) the requisite corporate power and authority (A) to enter into, execute and deliver this Agreement and (B) subject to entry of the Confirmation Order, to perform each of its other obligations hereunder (including payment of the Commitment Fee, the Equity Purchaser Cash Fee and each Commitment Party's Expenses) and the Restructuring Support and Lock-Up Agreement (except for such obligations that are specified in each such agreement as becoming effective immediately upon the execution by the Company Parties, which in each case the requisite power and authority shall not be subject to entry of the Confirmation Order) and (ii) at the time such actions are taken, will have the requisite corporate power and authority, subject to entry of the Confirmation Order, to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver all agreements to which it will be a party as contemplated by the this Agreement and the Plan and to perform its obligations under each of the Definitive Documents (other than this Agreement). The Company has taken, and each of New Seadrill and NSNCo will have taken at the time of execution and delivery of any agreement contemplated by this Agreement, the Definitive Documents and the Plan to which it is a party, all necessary corporate action required for the due authorization, execution, delivery and performance by them of this Agreement, including the issuance and offering of the Debt Subscription Rights, Equity Subscription Rights, New Secured Notes and the Equity Securities and all other agreements to which they are or will be party as contemplated by this Agreement and the Definitive Documents and the Plan (such agreements, collectively, the "**<u>Transaction Agreements</u>**").

(b) Subject to entry of the Confirmation Order, each of the other Debtors has the requisite corporate power and authority to enter into, execute and deliver each Transaction Agreement to which such other Debtor is a party and to perform its obligations thereunder.

Subject to entry of the Confirmation Order, the execution and delivery of this Agreement and each of the other Definitive Documents and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of each other Debtor party thereto, and no other proceedings on the part of any other Debtor party thereto are or will be necessary to authorize this Agreement or any of the other Definitive Documents or to consummate the transactions contemplated hereby or thereby.

Section 3.3 Execution and Delivery; Enforceability.

(a) This Agreement has been and, upon the execution and delivery of each other Transaction Agreement and the Indenture, each other Transaction Agreement and the Indenture will be, duly and validly executed and delivered by the Company, NSNCo, New Seadrill or the Debtors, as applicable. Upon entry of the Confirmation Order and assuming due and valid execution and delivery of this Agreement and the other Definitive Documents by the Commitment Parties and, to the extent applicable, any other parties hereof and thereof, each of the obligations of the Company, NSNCo, New Seadrill and, to the extent applicable, the other Debtors hereunder and thereunder will constitute the valid and legally binding obligations of the Company, NSNCo, New Seadrill and, to the extent applicable, the other Debtors, enforceable against the Company, NSNCo, New Seadrill and, to the extent applicable, the other Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.

(b) The Plan will be duly and validly filed with the Bankruptcy Court by the Debtors in accordance with the Restructuring Support and Lock-Up Agreement and, upon entry of the Confirmation Order and consummation of the Plan, will constitute the valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms.

(c) Subject to the requirements of applicable local Laws, each Security Document, when executed and delivered in connection with the issuance of the New Secured Notes, will be effective to create in favor of the Collateral Agent under the Indenture for the benefit of itself, the trustee under the Indenture and the holders of the New Secured Notes, a legal, valid and enforceable security interest in the NSN Collateral described in the New Secured Notes Term Sheet except as enforceability may be limited by applicable bankruptcy, fraudulent conveyance, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing. Upon completion of the delivery, filing and other actions specified in the relevant Security Documents, the Collateral Agent under the Indenture shall have a fully perfected security interest in the NSN Collateral on the terms set forth in the New Secured Notes Term Sheet (to the extent a security interest in the NSN Collateral can be perfected through taking of such actions), as security for the obligations under the Indenture.

(d) The New Secured Notes will, on the Closing Date, (A) be in the form contemplated by the Indenture governing such New Secured Notes, (B) have been duly authorized for issuance and sale pursuant to this Agreement and the Indenture governing such New Secured Notes and (C) have been duly executed by the Company and NSNCo and, when authenticated in the manner provided for in the Indenture governing such New Secured Notes

-33-

and delivered against payment of the purchase price therefor, will constitute valid and binding obligations of the Company and NSNCo. The guarantees executed by the guarantors to the New Secured Notes (the "**Guarantees**," and the guarantors, the "**Guarantors**") on the Closing Date when issued will be in the respective forms contemplated by the Indenture governing such Guarantee and have been duly authorized for issuance pursuant to the Indenture governing such Guarantee; the Guarantees, at the Closing Date, have been duly executed by each of the Guarantors and, when the applicable New Secured Notes have been authenticated in the manner provided for in the Indenture governing such Guarantee and issued and delivered against payment of the purchase price therefor, such Guarantee will constitute a valid and binding agreement of the applicable Guarantor, enforceable against such Guarantor in accordance with its terms.

Section 3.4 Reorganisation; New Seadrill.

(a) On the Closing Date, (i) the Equity Securities will consist of all of the issued and outstanding common shares as set forth in the articles of association of New Seadrill filed as part of a supplement to the Plan, (ii) no Equity Securities will be held by New Seadrill in its treasury, (iii) the Equity Securities will be available for issuance in accordance with the Plan and/or upon exercise of options and other rights to purchase or acquire membership interests granted in connection with New Seadrill's employee incentive plan ("**EIP**") if the EIP has been adopted by the managers or other governing body of New Seadrill as of the Closing Date, and any other employment arrangement approved by the managers or other governing body of New Seadrill, and (iv) no warrants to purchase Equity Securities will be issued and outstanding.

(b) As of the Closing Date, all issued and outstanding Equity Securities shall have been duly authorized and validly issued and shall be fully paid and non-assessable, and such Equity Securities shall be available for issuance to each Commitment Party by all necessary company action and, when issued in accordance with the terms of this Agreement and the other applicable Definitive Documents, shall be validly issued and shall be fully paid and non-assessable and free and clear of any Lien or charge of any kind, or an agreement, arrangement or obligation to create any Lien or Taxes and (except as set forth in the Registration Rights Agreement, the corporate governance documents and under Bermuda law) the issuance of such Equity Securities will not be subject under any other agreement to the preemptive or other similar rights of any security holder of the Company.

(c) Except as set forth in this Section 3.4 or in the Definitive Documents, as of the Closing Date, no membership interest or other equity securities or voting interest in New Seadrill will have been issued, available for issuance or outstanding.

Section 3.5 Authorized and Issued Equity Interests . Except as set forth in the Restructuring Support and Lock-Up Agreement, the Plan and this Agreement, as of the Closing Date, none of the Company, New Seadrill or any of their material Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates any of the Company, New Seadrill or any such Subsidiary to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any units or shares of capital stock

-34-

of, or other equity or voting interests in, any of the Company, New Seadrill or any such Subsidiary or any security convertible or exercisable for or exchangeable into any units or shares of capital stock of, or other equity or voting interests in, any of the Company, New Seadrill or any such Subsidiary, (ii) obligates any of the Company, New Seadrill or any such Subsidiary to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any units or shares of capital stock of, or other equity interests in, any of the Company, New Seadrill or any such Subsidiary or (iv) relates to the voting of any shares, units or other equity interests in any of the Company, New Seadrill or any such Subsidiary. On the Effective Date, New Seadrill shall only issue capital stock or other equity interests as expressly and specifically authorized pursuant to the Plan and this Agreement.

Section 3.6 No Conflict. Assuming the consents described in clauses (a) through (e) of <u>Section 3.7</u> are obtained, the execution and delivery by the Company, New Seadrill or any of their Subsidiaries and any other Debtor, as applicable, of this Agreement, the Plan and the other Definitive Documents, the compliance by the Company, New Seadrill or any of their Subsidiaries and, if applicable, any other Debtor with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which the Company, New Seadrill or any of their Subsidiaries or any other Debtor will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of the Company, New Seadrill or any of their Subsidiaries or any Debtor will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of any of the Company's, New Seadrill's, any of their material Subsidiaries' or other Debtors' organizational documents (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases and/or Ancillary Proceedings, as applicable, or the Company's, New Seadrill's or any of their Subsidiaries or any other Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases and/or Ancillary Proceedings, as applicable), or (c) result in any violation of any Law or Order applicable to the Company, New Seadrill or any of their Subsidiaries or any Debtors or any of their properties, except in each of the cases described in clauses (a) or (c) for any conflict, breach, modification, violation, default, acceleration or Lien which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.7 Consents and Approvals. No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over any of the Company, New Seadrill or any of their material Subsidiaries or any other Debtors or any of their properties (each, an "**Applicable Consent**") is required for the execution and delivery by the Company, New Seadrill or any such Subsidiary or other Debtor of this Agreement, the Plan and the other Definitive Documents, the compliance by the Company, New Seadrill or any such Subsidiary or other Debtor, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the Confirmation Order, (b) entry of the Disclosure Statement Order, (c) entry by the Bankruptcy Court or any other court of competent jurisdiction (including any such court that may properly

-35-

preside over the Ancillary Proceedings, if any), of Orders as may be necessary in the Chapter 11 Cases and/or Ancillary Proceedings, from time-to-time, (d) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, (e) such consents, approvals, authorizations, registrations or qualifications as may be required under applicable federal, foreign and/or state securities or "Blue Sky" Laws in connection with the issuance of the Debt Subscription Rights, Equity Subscription Rights, the issuance of the Debt Rights Offering Securities pursuant to the exercise of the Debt Subscription Rights and the issuance of the Creditor Equity Rights Offering Securities pursuant to the exercise of the Equity Subscription Rights, (f) the listing of the Equity Securities on the New York Stock Exchange or the Oslo Stock Exchange, and (g) any Applicable Consents that have already been made or obtained or, if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (each, a "**Non-Applicable Consent**"). Notwithstanding any of the foregoing, no Non-Applicable Consent is required for the execution and delivery of this Agreement by the Company, New Seadrill or any of their material Subsidiaries or any other Debtors.

Section 3.8 Financial Statements. The financial statements and the related notes thereto of the Company and its consolidated Subsidiaries included or incorporated by reference in the documents filed by the Company with the SEC under the Exchange Act since January 1, 2015 and prior to the date of this Agreement (the "**Exchange Act Documents**") complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto as of the dates indicated and the results of their operations and their cash flows for the periods specified. Such financial statements have been prepared in conformity with GAAP applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Exchange Act Documents).

Section 3.9 Financial Projections. All material projections provided by the Company to the Commitment Parties in writing prior to the date hereof in connection with the transaction contemplated by this Agreement were, and as of the Closing Date, any updated projections shall have been, prepared in good faith and based upon assumptions considered reasonable by the Company at the time made in light of past business operations (it being understood and acknowledged by the Commitment Parties that projections are subject to uncertainties and contingencies and that actual results may differ in a material respect from such projections).

Section 3.10 Registration Statement; Offering Memorandum. (i) When declared effective by the SEC and after giving effect to any amendments or supplements thereto, the Registration Statement will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading, and the prospectus contained therein will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading and (ii) the final Offering Memorandum, as of the date set forth on its cover page and after giving effect to any amendments or supplements thereto pursuant to section 5.2(f) of this Agreement, will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

-36-

Section 3.11 *Company SEC Documents and Disclosure Statement.* Since December 31, 2016, the Company and its Subsidiaries have filed all required Company SEC Documents with the SEC. As of the date hereof, no Company or Subsidiary SEC Document that has been filed prior to the date this representation has been made, after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, in each case filed prior to the date this representation is made, contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Disclosure Statement as approved by the Bankruptcy Court will contain "adequate information," as such term in defined in section 1125 of the Bankruptcy Code, and will otherwise comply in all material respects with section 1125 of the Bankruptcy Code.

Section 3.12 *Absence of Certain Changes.* Since December 31, 2016, no Event has occurred or exists that constitutes, individually or in the aggregate, a Material Adverse Effect.

Section 3.13 *No Violation; Compliance with Laws.* (a) The Company is not in violation of its memorandum of association or bye-laws, and (b) New Seadrill, NSNCo and no other Debtor is in violation of its respective memorandum of association or bye-laws, certificate of formation or limited liability company operating agreement or similar organizational document in any material respect. None of the Company, New Seadrill, NSNCo or the other Debtors is or has been at any time since January 1, 2015 in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.14 *Legal Proceedings.* Other than the Chapter 11 Cases and/or Ancillary Proceedings, as applicable, and any adversary proceedings, contested matters, or similar proceedings in connection therewith, there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened to which any of the Company, New Seadrill or any of their Subsidiaries or any other Debtors is a party or may become a party or to which any property of any of such Persons is the subject, in each case that in any manner draws into question the validity or enforceability of this Agreement, the Plan or the other Definitive Documents or that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.15 *Labor Relations.* Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no strikes or other labor disputes pending or threatened against any of the Company, New Seadrill or any of their Subsidiaries or any other Debtors. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the consummation of the transactions contemplated by the Definitive Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which any of the Company, New Seadrill or any of their Subsidiaries or any other Debtors (or any predecessor) is a party or by which any of such Persons (or any predecessor) is bound.

Section 3.16 Intellectual Property. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of the Company, New Seadrill, any of their Subsidiaries and any other Debtors owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, domain names, and any and all applications or registrations for any of the foregoing (collectively, "**Intellectual Property Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, (b) to the Knowledge of the Company, none of the Company, New Seadrill or any of their Subsidiaries or any other Debtors, nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by or contemplated to be employed, sold or offered by such Person, is interfering with, infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any Person, and (c) no claim or litigation regarding any of the foregoing is pending or, to the Knowledge of the Company, threatened.

Section 3.17 Title to Real and Personal Property.

(a) Real Property. Each of the Company, New Seadrill or any of their Subsidiaries and any other Debtors has good and defensible title to its respective Real Properties, in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, and except where the failure (or failures) to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the Knowledge of the Company, all such properties and assets are free and clear of Liens, except for Permitted Liens and except for such Liens as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) Leased Real Property. Each of the Company, New Seadrill or any of their Subsidiaries and other Debtors is in compliance with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases or Ancillary Proceedings, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of such Persons has received written notice of any good faith claim asserting that such leases are not in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each of the Debtors enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to materially interfere with its ability to conduct its business as currently conducted or have, individually or in the aggregate, a Material Adverse Effect.

(c) Personal Property. Except to the extent such failure would not reasonably be expected to be materially adverse to the Company Parties, each of the Company, New Seadrill and each of their material Subsidiaries and the other Debtors have good title to, free and clear of any and all Liens, or a valid leasehold interest in, all personal properties, machinery, equipment

-38-

and other tangible assets of the business necessary for the conduct of the business as presently conducted and such properties, (x) are in the possession or control of the applicable Company, New Seadrill or any of their Subsidiaries and other Debtors, as appropriate; and (y) are in good and operable condition and repair, reasonable wear and tear excepted.

(d) Intellectual Property. Each of the Company, New Seadrill or any of their Subsidiaries and other Debtors owns or possesses the right to use all Intellectual Property Rights and all licenses and rights with respect to any of the foregoing used in the conduct of their businesses, without any conflict (of which any of the Company, New Seadrill or any of their Subsidiaries and other Debtors has been notified in writing) with the rights of others, and free from any burdensome restrictions on the present conduct of the Company, New Seadrill or any of their Subsidiaries and other Debtors, as the case may be, except where such conflicts and restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.18 Licenses and Permits. The Company, New Seadrill or any of their Subsidiaries and other Debtors possess all licenses, certificates, permits and other authorizations issued by, have made all declarations and filings with and have maintained all financial assurances required by, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of the business, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Company, New Seadrill or any of their Subsidiaries and other Debtors (i) has received notice of any revocation or modification of any such license, certificate, permit or authorization or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.19 Environmental. Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) no written notice, claim, demand, request for information, Order, complaint or penalty has been received by the Company, New Seadrill or any of their Subsidiaries or other Debtors, and there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened which allege a violation of or liability under any Environmental Law, in each case relating to the Company, New Seadrill or any of their Subsidiaries or other Debtors, (b) each of the Company, New Seadrill or any of their Subsidiaries and other Debtors has received (including timely application for renewal of the same) and maintains in full force and effect all environmental permits, licenses, certificates and other approvals, and maintains all financial assurances, in each case to the extent necessary for its operations to comply with all applicable Environmental Laws and is, and since January 1, 2015 has been, in compliance with the terms of such permits, licenses, certificates and other approvals and with all applicable Environmental Laws, (c) no Hazardous Material is located at, on or under any property currently or formerly owned, operated or leased by the Company, New Seadrill or any of their Subsidiaries or other Debtors that would reasonably be expected to give rise to any cost, liability or obligation of any of the Company, New Seadrill or any of their Subsidiaries or other Debtors under any Environmental Laws other than future costs, liabilities and obligations that are asset retirement obligations to be incurred in the ordinary course of business and that are specified in the Exchange Act Documents, (d) no Hazardous Material has

-39-

been Released, generated, treated, stored or handled by (or on behalf of) the Company, New Seadrill or any of their Subsidiaries or other Debtors, and no Hazardous Material has been transported to or Released at any location, in each case, in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company, New Seadrill or any of their Subsidiaries or other Debtors under any Environmental Laws other than future costs, liabilities and obligations incurred in the ordinary course of business, and (e) there are no agreements in which any of the Debtors has expressly assumed or undertaken responsibility for any known or reasonably likely liability or obligation of any other Person arising under or relating to Environmental Laws that remains unresolved, which has not been made available to the Commitment Parties prior to the date hereof. Notwithstanding the generality of any other representations and warranties in this Agreement, the representations and warranties in this Section 3.20 constitute the sole and exclusive representations and warranties in this Agreement with respect to any environmental, health or safety matters arising under Environmental Laws.

Section 3.20 Tax Returns. Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a) Each of the Company, New Seadrill or any of their Subsidiaries and other Debtors has timely filed or caused to be filed (taking into account any applicable extension of time within which to file) all tax returns, statements, forms and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("**Tax Returns**") required to have been filed by it. Each such Tax Return is true and correct in all respects;

(b) Except to the extent the non-payment thereof is permitted by the Bankruptcy Code, each of the Company, New Seadrill or any of their Subsidiaries and other Debtors has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in Section 3.20(a).

(c) Except to the extent the non-payment thereof is permitted by the Bankruptcy Code, all Taxes (other than Taxes referred to in Section 3.20(b) with respect to periods or portions of periods ending on or before the date hereof have been paid, other than Taxes (i) which are not delinquent or (ii) which are being contested in good faith pursuant to appropriate proceeding, in each case, for which adequate provision or reserve has been made;

(d) As of the date hereof, with respect to the Company, New Seadrill or any of their Subsidiaries and other Debtors, other than in connection with the Chapter 11 Cases and/or Ancillary Proceedings, as applicable, and other than Taxes that are being contested in good faith for which adequate provision or reserve has been made, (i) no claims of deficiency have been asserted in writing with respect to any Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given, other than extensions or waivers provided in the ordinary course of business, and (iii) no Tax Returns are being examined by, and no written notification of intention to examine has been received from, the Applicable Taxing Authorities;

(e) All Taxes that the Company, New Seadrill or any of their Subsidiaries and other Debtors (taken as a whole) were (or was) required by Law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable;

(f) There are no Liens with respect to Taxes upon any of the assets or properties of the Company, New Seadrill or any of their Subsidiaries and other Debtors (taken as a whole), other than Liens for Taxes that (i) are not due and payable (or for which payment has been suspended as a result of the Chapter 11 Cases) or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto;

(g) The Company, New Seadrill or any of their Subsidiaries and other Debtors have no liability for any amount of Taxes of any other person or entity, either by operation of law, by contract or as a transferee or successor. The Company, New Seadrill or any of their Subsidiaries and other Debtors are not a party to any Tax allocation or Tax sharing agreement with any third party (other than an agreement entered into the principal purpose of which is not the sharing, assumption or indemnification of Tax, including, without limitation, leases, licenses and sale or acquisition agreements); and

(h) None of the Company, New Seadrill or any of their Subsidiaries or other Debtors has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under any law with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its current or past Subsidiaries are or were the only members).

Section 3.21 Material Contracts. Other than as a result of rejection by the Debtors in the Chapter 11 Cases or Ancillary Proceedings, as applicable, the automatic stay under the Bankruptcy Code, injunctions in the Plan, or like, provisions applicable in connection with the Ancillary Proceedings, or any direct consequence thereof, all Material Contracts are valid, binding and enforceable by and against the Debtor party thereto and, to the Knowledge of the Company, each other party thereto (except where the failure to be valid, binding or enforceable does not constitute a Material Adverse Effect), and no written notice to terminate, in whole or part, any Material Contract has been delivered to any of the Debtors (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect). Other than as a result of the filing or continuance of the Chapter 11 Cases or Ancillary Proceedings, as applicable, or any direct consequence thereof, none of the Company, New Seadrill or any of their Subsidiaries and other Debtors nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.22 No Unlawful Payments. The Company, New Seadrill or any of their Subsidiaries and other Debtors nor, to the Knowledge of the Company, any of their respective directors, officers or employees has in any material respect: (a) used any funds of any of the Company, New Seadrill or any of their Subsidiaries and other Debtors for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 3.23 Compliance with Money Laundering Laws. The operations of the Company, New Seadrill or any of their Subsidiaries and other Debtors are and have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company, New Seadrill or any of their Subsidiaries and other Debtors operate (and the rules and regulations promulgated thereunder) and any related or similar Laws (collectively, the "**Money Laundering Laws**") and no material Legal Proceedings by or before any Governmental Entity or any arbitrator involving any of the Company, New Seadrill or any of their Subsidiaries and other Debtors with respect to Money Laundering Laws are pending or, to the Knowledge of the Company, threatened.

Section 3.24 Compliance with Sanctions Laws. None of the Company, New Seadrill or any of their Subsidiaries and other Debtors nor, to the Knowledge of the Company, any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act is currently the subject of any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. The Company, New Seadrill, and any other Debtors will not directly or indirectly use the proceeds of the New Secured Notes and the Equity Securities issuance, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person, for the purpose of financing the activities of any person, or in any country or territory, that, at the time of such financing, is the subject of U.S. sanctions, or in any other manner that will result in a violation by any Party to this Agreement of U.S. sanctions.

Section 3.25 No Broker's Fees. Except as provided in this Agreement, none of the Company, New Seadrill or any of their Subsidiaries and other Debtors is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offerings or the sale of the New Secured Notes or Equity Securities.

Section 3.26 Insurance. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) the Company, New Seadrill or any of their Subsidiaries and other Debtors have insured their material properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses and have made available to the Commitment Parties a schedule of such insurance policies in force; (ii) all premiums due and payable in respect of material insurance policies maintained by the Company, New Seadrill or any of their Subsidiaries and other Debtors have been paid; (iii) the Company reasonably believes that the insurance maintained by or on behalf of the Company, New Seadrill or any of their Subsidiaries and other Debtors is adequate in all material respects; and (iv) as of the date hereof, to the Knowledge of the Company, none of the Company, New Seadrill or any of their Subsidiaries or other Debtors has received notice from any insurer or agent of such insurer with respect to any material insurance policies of such Persons of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

-42-

Section 3.27 Investment Company Act. None of the Company, New Seadrill or any of their respective Subsidiaries that are a party to the Credit Facility Documents or that are the issuer or guarantors of the New Secured Notes, after the consummation of the Restructuring Transactions, will be, an "investment company" or a company "controlled" by an "investment company" required to register under the Investment Company Act of 1940, as amended.

Section 3.28 No General Solicitation. None of the Company nor any of its respective Subsidiaries or any other person acting on behalf of any of them has engaged, in connection with the offering of the New Secured Notes (and Guarantees) and the Equity Securities, in any form of general solicitation or general advertising within the meaning of Rule 502(c) under the Securities Act. Assuming the accuracy of the representations and warranties of the Commitment Parties in Article 4 hereof and their compliance with their agreements set forth herein, it is not necessary in connection with the offer, sale and delivery of the New Secured Notes or the Equity Securities to the Commitment Parties in the manner contemplated by this Agreement to register any of the New Secured Notes or the Equity Securities under the Securities Act.

Section 3.29 Rule 144A Eligibility. At the Closing Date, the New Secured Notes (and Guarantees) will be eligible for resale pursuant to Rule 144A and will not be of the same class as securities listed on a national securities exchange registered under Section 6 of the Exchange Act, or quoted in a U.S. automated interdealer quotation system.

Section 3.30 Securities Registration Exemption. The issuance of the New Secured Notes and the Equity Securities in the manner contemplated by the Disclosure Statement shall be exempt from registration pursuant to Section 4(a)(2) under the Securities Act in the United States, Regulation S and/or Regulation D thereunder or another exemption from the Securities Act. With respect to those New Secured Notes and the Equity Securities sold in reliance upon Regulation S under the Securities Act, (i) none of the Company, New Seadrill, the Guarantors or any of their respective affiliates or any person acting on its or their behalf has engaged or will engage in any directed selling efforts within the meaning of Regulation S under the Securities Act and (ii) each of the Company, New Seadrill, the Guarantors and any of their respective affiliates and any person acting on its or their behalf has complied and will comply with the offering restrictions set forth in Regulation S under the Securities Act.

Section 3.31 Similar Offerings. None of the Company, New Seadrill, the Guarantors or any of their respective affiliates, as such term is defined in Rule 501(b) under the Securities Act, has, directly or indirectly, solicited any offer to buy, sold or offered to sell or otherwise negotiated in respect of, in the United States or to any United States citizen or resident, any security which is or would be integrated with the sale of the New Secured Notes (and Guarantees) and Equity Securities in a manner that would require the offered New Secured Notes (and Guarantees) and Equity Securities to be registered under the Act.

Section 3.32 No Undisclosed Relationship. No relationship, direct or indirect, exists between or among the Company, on the one hand, and the directors, officers and 10% shareholders of the Company, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that are not so described in such filings, except for the transactions contemplated by this Agreement.

-43-

Section 3.33 No Undisclosed Liabilities. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there have been no liabilities incurred since December 31, 2016 for which any Debtor has any liabilities, whether individual or in the aggregate, whether absolute, accrued, contingent or otherwise, of a type required to be disclosed on a balance sheet prepared in accordance with GAAP other than in the ordinary course of business or as set forth in the Company's Exchange Act Documents.

Section 3.34 No Registration Rights. Except as will be expressly provided in the Registration Rights Agreement, no person shall have the right to require the Company, New Seadrill or any of their Subsidiaries to register any of its respective capital stock for sale under the Securities Act.

Section 3.35 Alternative Restructuring Proposals. As of the date hereof, the Debtors are not party to any binding commitment to pursue, implement or effectuate any Alternative Restructuring Proposal.

Section 3.36 Execution of the RSA. Solely with respect to any Company Party that is formed following the date hereof, such Company Party has, concurrently with its execution of the Joinder Agreement, executed a joinder agreement to the Restructuring Support and Lock-Up Agreement.

Section 3.37 EY Paper. As of the Closing Date, the EY Paper is in a form consistent with the Term Sheets and does not give rise to a new Tax liability which has a Material Adverse Effect on the Company Parties.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES

Each Commitment Party, severally and not jointly, represents and warrants to the Company and other Company Parties as to itself only as of the date of this Agreement and the Closing Date as set forth below.

Section 4.1 Organization. Such Commitment Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

Section 4.2 Organizational Power and Authority. Such Commitment Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each of the other Commitment Party Agreements, to perform its obligations hereunder and thereunder, and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Commitment Party Agreements.

Section 4.3 Execution and Delivery. This Agreement and each other Commitment Party Agreement (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Commitment Party and (b) assuming due and valid

-44-

execution and delivery hereof and thereof by the Company and the other Debtors, as applicable, will constitute valid and legally binding obligations of such Commitment Party, enforceable against such Commitment Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 4.4 No Conflict. Assuming that the consents referred to in clauses (a) and (b) of <u>Section 4.5</u> are obtained, the execution and delivery by such Commitment Party of this Agreement and each other Commitment Party Agreement to which such Commitment Party is a party, the compliance by such Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any Lien under any Contract to which such Commitment Party is a party or is bound or to which any of the property or assets of such Commitment Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Commitment Party and (c) will not result in any material violation of any Law or Order applicable to such Commitment Party or any of its properties, except in each of the cases described in clauses (a), (b) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement.

Section 4.5 Consents and Approvals. No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Commitment Party or any of its properties is required for the execution and delivery by such Commitment Party of this Agreement and each other Commitment Party Agreement to which such Commitment Party is a party, the compliance by such Commitment Party with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except (a) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement and each other Commitment Party Agreement to which such Commitment Party is a party and (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement.

Section 4.6 No Registration. Such Commitment Party understands as applicable that (a) none of the Acquired Debt Securities and the Acquired Equity Securities have been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed herein or otherwise made pursuant hereto and (b) the foregoing securities cannot be sold unless subsequently registered under the Securities Act or in compliance with an exemption from registration available under the Securities Act and under the securities laws of any applicable jurisdiction.

Section 4.7 Purchasing Intent. Such Commitment Party is acquiring the Acquired Debt Securities or Acquired Equity Securities, as applicable, for its own account or accounts or funds over which it holds voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws in the United States or any applicable jurisdiction, and such Commitment Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with applicable securities Laws in the United States or any applicable jurisdiction.

Section 4.8 Sophistication; Investigation. Such Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Acquired Debt Securities or Acquired Equity Securities, as applicable. Such Commitment Party is (a) an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act, (b) a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act, (c) a non-U.S. person under Regulation S under the Securities Act and/or (d) the foreign equivalent of (a) or (b) above. Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time). Except for the representations and warranties expressly set forth in this Agreement or any other Transaction Agreement, such Commitment Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of any of the Debtors.

Section 4.9 No Broker's Fees. Except as set forth in Article IX, such Commitment Party is not a party to any Contract with any Person that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offerings or the sale of the Acquired Debt Securities or the Equity Securities.

Section 4.10 Sufficient Funds. Such Commitment Party has sufficient available cash and the financial capacity to perform all of its obligations under this Agreement, including as applicable to the Debt Commitment Parties, the ability to fund such Debt Commitment Party's Debt Commitment, and, as applicable to the Equity Commitment Parties, the ability to fund such Equity Commitment Party's Equity Commitment.

<div align="center">

**ARTICLE V**

**ADDITIONAL COVENANTS**

</div>

Section 5.1 Conduct of Business.

(a) Except as expressly set forth in this Agreement, the Restructuring Support and Lock-Up Agreement, the Plan or with the prior written consent of the Required Commitment Parties, during the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms (the "**Pre-Closing Period**"), (a) the Company shall, and shall cause each of New Seadrill, NSNCo, its Subsidiaries and the other Debtors to, carry on its business in the ordinary course and use its commercially reasonable efforts to: (i) preserve intact its business, (ii) preserve its material relationships with

<div align="center">-46-</div>

customers, suppliers, licensors, licensees, distributors and others having material business dealings with any of the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors in connection with their business, (iii) file Company SEC Documents within the time periods required under the Exchange Act, in the case of (i), (ii) and (iii) above, in accordance with ordinary course practices, and (iv) to comply with and give effect to this Agreement, the Restructuring Support and Lock-Up Agreement and the Plan and the transactions contemplated thereby and (b) each of the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors shall not enter into any transaction that is material to their business, including: (v) sell, convey, transfer, dispose of, charge, pledge or otherwise encumber the NSN Collateral, (w) make any equity investment (including by way of merger, consolidation or acquisition) in any other Person, (x) except in the ordinary course of business, amend, renew, terminate, execute, cancel, waive, fail to renew, release or relinquish in any respect, any Material Contract or enter into any new contract that would have been a Material Contract, if it had existed on the date hereof, including any new or existing Charter Contract or new-build contract with any shipyards whether or not such contract satisfied the definition of a Material Contract, (y) make, change or revoke any material election related to Taxes inconsistent in material respects with past practice (other than as contemplated by the Restructuring Transactions) or prepare any Tax Return in a manner that is inconsistent in material respects with past practice with respect to the treatment of items on such Tax Return, in each case, to the extent such action could reasonably be expected to have a disproportionately negative Tax consequence in the period following the Closing; *provided, however*, that this Section 5.1(a)(b)(y) shall be inapplicable with respect to any Subsidiary of the Company that the Company (or an entity controlled by the Company) does not control or manage with respect to Tax matters; *provided further, however*, that notwithstanding anything else in this Agreement to the contrary, the Company and its applicable Subsidiaries shall be permitted to elect to participate in the "amnesty" program with respect to Brazilian tax issues disclosed in Schedule 1 Part C of the Company Parties' Disclosure Schedules or otherwise settle such Brazilian tax issues in a manner consistent with the information referenced in Section 1.1 of Schedule 1 Part C of the Company Parties' Disclosure Schedules or (z) knowingly take any action that would invalidate or cause the cancellation of any current material insurance coverage (without replacement thereof) or fail to maintain current material insurance coverage or suitable renewals thereof providing coverage substantially the same as any expiring policy; other than (A) transactions after prior notice to the Commitment Parties to implement tax planning which transactions are not reasonably expected to materially adversely affect any Commitment Party and (B) transactions expressly contemplated by the Definitive Documents. Except as otherwise provided in this Agreement, nothing in this Agreement shall give the Commitment Parties, directly or indirectly, any right to control or direct the operations of the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors. Prior to the Closing Date, the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of their respective businesses.

(b) Notwithstanding Section 5.9(a), the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors are not in any event prevented from, and in no event shall need consent from the Commitment Parties to (in each case, as reasonably determined by an executive officer of the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors): (i) take any action to prevent, address or mitigate the effects of any environmental release or hazard, any occupational health, safety and welfare hazard, or any emergency; (ii) take

-47-

or refrain from taking any action on any matter as may be required to give effect to any provision of this Agreement or otherwise provided for in this Agreement or to comply with applicable Laws; (iii) take any action to prevent or mitigate injury or damage to any Person or property or otherwise take any commercially reasonable action in response to a business emergency or other unforeseen operational matters; or (iv) take or refrain from taking any action in accordance with prudent practices for an offshore oilfield services business or a company operating under the Bankruptcy Code.

Section 5.2 Other Covenants and Agreement Regarding Disclosure and Effectuation and Implementation of the Restructuring Transactions. Without prejudice to the generality of the foregoing, the Company (on behalf of itself and the Company's Subsidiaries, including New Seadrill and NSNCo, when formed and as applicable) agrees:

(a) as soon as reasonably practicable following the date of this Agreement (i) to file the Plan and the Disclosure Statement with the Bankruptcy Court, each in form and substance reasonably satisfactory to the Company and the Required Commitment Parties; (ii) to seek the entry of the Disclosure Statement Order by the Bankruptcy Court, in form and substance reasonably acceptable to the Company and the Required Commitment Parties; (iii) to seek the entry of the Confirmation Order by the Bankruptcy Court, in form and substance reasonably acceptable to the Company and the Required Commitment Parties and (iv) to otherwise seek to satisfy the milestones set forth herein. The Company will provide draft copies of the Definitive Documents, including the Plan and the Disclosure Statement to the Commitment Parties, to the extent required under the Restructuring Support and Lock-Up Agreement or this Agreement.

(b) to use commercially reasonable efforts to have the Resale Registration Statement covering the sale, resale or other distribution of the Equity Securities issued to the Commitment Parties pursuant to the terms and conditions hereunder and in connection with the Rights Offerings filed with the SEC in accordance with the Registration Rights Agreement within five (5) Business Days following the entry of the Confirmation Order (the "**Registration Statement Filing Date**").

(c) to use commercially reasonable efforts to have the Resale Registration Statement covering the sale, resale or other distribution of the Equity Securities described in  Section 5.2(b) declared effective by the SEC in accordance with the Registration Rights Agreement (the "**Registration Statement Effectiveness**") and to effectuate the transactions set forth in the Registration Rights Agreement as soon as reasonably practicable following the Registration Statement Filing Date.

(d) as soon as reasonably practicable following the entry of the Confirmation Order and prior to the Effective Date to submit listing applications to the Oslo Stock Exchange and the New York Stock Exchange for the listing thereon of the Equity Securities and to use commercially reasonable efforts (i) to cause the Equity Securities to be listed on the Oslo Stock Exchange, and (ii) to cause the Equity Securities to be listed on the New York Stock Exchange and registered under the Exchange Act concurrently with the Registration Statement Effectiveness.

-48-

(e) as soon as reasonably practicable following the entry of the Disclosure Statement and prior to the Effective Date to effectuate the Rights Offerings in accordance with the Plan and the Rights Offering Procedures.

(f) to (i) deliver the final version of the Offering Memorandum as soon as practicable and on a date that is no later than the effective date of the Resale Registration Statement and (ii) within 15 Business Days of written notice from the Required Commitment Parties, to deliver an updated Offering Memorandum so that the financial statements and other information therein does not become stale under the rules and regulations of the Securities Act and the Exchange Act; provided, however, that the Required Commitment Parties may only request (and have the right to receive) an updated Offering Memorandum three (3) times.

(g) to notify the Commitment Parties within one (1) Business Day of any terminations of the Restructuring Support and Lock-Up Agreement by any Consenting Lender.

(h) as soon as reasonably practicable following the entry of the Confirmation Order, take all actions necessary to deliver the NSN Collateral to the Collateral Agent on the terms set forth in the New Secured Notes Term Sheet on the Closing Date.

Section 5.3 New Secured Notes DTC Eligibility. The Company will ensure, and cause NSNCo to ensure, that upon issuance thereof and while outstanding, the New Secured Notes shall be eligible for clearance and settlement through the facilities of DTC, and be evidenced by one or more global notes to be issued in the name of Cede & Co., as nominee for DTC, pursuant to the DTC Agreement and do all other things necessary and appropriate to give effect to the foregoing provisions.

Section 5.4 Use of Proceeds. All funds paid by the Commitment Parties in connection with the issuance of the New Secured Notes and the Equity Securities, without any deductions for fees or expenses, shall be used by the Company, New Seadrill and their Subsidiaries as set forth in the Restructuring Support and Lock-Up Agreement, the Plan and the Disclosure Statement.

Section 5.5 Cooperation Regarding Security. The Company, New Seadrill and their Subsidiaries shall cooperate with the Commitment Parties in creating, perfecting and evidencing all security interests, mortgages, encumbrances and Liens on the NSN Collateral securing the New Secured Notes pursuant to the Security Documents.

Section 5.6 New Board of Managers. On the Effective Date, the composition of the board of managers (or directors, if applicable) of the Company and/or New Seadrill shall be as set forth in the Board Governance Term Sheet and subject to the applicable consultation rights as set forth therein.

Section 5.7 Access to Information; Confidentiality.

(a) Subject to applicable Law and Section 5.7(b), upon reasonable notice during the Pre-Closing Period, the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors shall afford the Commitment Parties and their Representatives upon request reasonable access, during normal business hours and without unreasonable disruption or interference with the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors

-49-

business or operations, to their employees, properties, books, Contracts and records and, during the Pre-Closing Period, the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors shall furnish promptly to such parties all reasonable information concerning the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors' business, properties and personnel as may reasonably be requested by any such party, <u>provided</u> that the foregoing shall not require the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company, would cause any of the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors to violate any of their respective obligations with respect to confidentiality to a third party if the Company used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (ii) to disclose any legally privileged information of any of the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors or (iii) to violate any applicable Laws or Orders. All requests for information and access made in accordance with this <u>Section 5.7</u> shall be directed to an executive officer of the Company or such Person as may be designated by the Company's executive officers.

(b) From and after the date hereof until the date that is one (1) year after the expiration of the Pre-Closing Period, each Commitment Party shall, and shall cause its Representatives to, (i) keep confidential and not provide or disclose to any Person any documents or information received or otherwise obtained by such Commitment Party or its Representatives pursuant to <u>Section 5.1</u> and <u>Section 5.7(a)</u> or in connection with a request for approval pursuant to <u>Section 5.1</u> (except that provision or disclosure may be made to any Affiliate or Representative of such Commitment Party who needs to know such information for purposes of this Agreement or the other Definitive Documents or transactions contemplated hereby or thereby and who agrees to observe the terms of this <u>Section 5.7(b)</u> (and such Commitment Party will remain liable for any breach of such terms by any such Affiliate or Representative)), and (ii) not use such documents or information for any purpose other than in connection with this Agreement or the other Definitive Documents, the transactions contemplated hereby or thereby or in connection with their stake in the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors. Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (A) is now or subsequently becomes generally available to the public through no violation of this <u>Section 5.7(b)</u>, (B) becomes available to a Commitment Party or its Representatives on a non-confidential basis from a source other than any of the Debtors or any of their respective Representatives, (C) becomes available to a Commitment Party or its Representatives through document production or discovery in connection with the Chapter 11 Cases and/or Ancillary Proceedings or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Cases and/or Ancillary Proceedings or other such process, or (D) such Commitment Party or any Representative thereof is required to disclose by any court or governmental, banking, taxation or other regulatory authority or similar body, or by the rules of any relevant stock exchange or pursuant to a request by any such body with which a person in a position similar to that of a Commitment Party would be reasonably expected to comply, or pursuant to any applicable law or regulation; <u>provided</u> that such Commitment Party or such Representative shall provide the Company with prompt written notice of such compulsion and cooperate with the Company to obtain a protective Order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Company's sole cost and expense; <u>provided</u>, <u>further</u>, that, in the event that such

-50-

protective Order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its commercially reasonable efforts (at the Company's sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or documents. The provisions of this Section 5.7(b) shall not apply to any Commitment Party that, as of the date hereof, is party to a confidentiality or non-disclosure agreement with the Debtors, for so long as such agreement remains in full force and effect and which shall continue to govern the confidentiality obligations in respect of the parties thereto.

(c) Notwithstanding the foregoing and anything to the contrary in this Agreement, after the Closing Date (i) the Company (on behalf of itself, New Seadrill, NSNCo, their Subsidiaries and the other Debtors) agrees that all the information provided by or on behalf of each of the Company, New Seadrill, NSNCo, their Subsidiaries, the other Debtors and their affiliates to the Commitment Parties regarding the Company, New Seadrill, NSNCo, their Subsidiaries and the other Debtors and their affiliates and the Restructuring Transactions contemplated by this Agreement may be disseminated by or on behalf of the Commitment Parties to prospective purchasers of the New Secured Notes and other persons, who have agreed to be bound by customary confidentiality and standstill agreements and (ii) the Company (on behalf of itself, New Seadrill, NSNCo, their Subsidiaries and the other Debtors) agrees that the Commitment Parties may disclose information relating to the New Secured Notes to industry publications or for its marketing materials, with such information to consist of deal terms and other information customarily found in such publications or marketing materials and that the Commitment Parties may otherwise use the corporate name and logo of the Company or its affiliates in "tombstones" or other advertisements, marketing materials or public statements.

(d) Prior to the Closing, the Company shall provide the Commitment Parties:

(i) the *pro forma* capital and ownership structure and the shareholder arrangements of the Company Parties after giving effect to the Restructuring Transactions, including, without limitation, their charter and by-laws and each agreement or instrument relating thereto;

(ii) the issuer, amount, ranking, tenor and other terms and conditions of, as well as the holders of, (A) all equity and other debt financings comprising part of the Restructuring Transactions, including the issuance of the Equity Securities and (B) all material intercompany indebtedness and all material indebtedness and other material liabilities of the Company Parties to third parties that are to remain outstanding following the Closing Date;

(iii) evidence of lien searches on the NSN Collateral reasonably requested by the Required Commitment Parties and conducted no more than 15 days before the Closing; provided, that for the avoidance of doubt, the lien searches need not say the NSN Collateral is free from Liens and the NSN Collateral shall be consistent with the terms set forth in the New Secured Notes Term Sheet;

-51-

(iv) a list of the amount, types and terms and conditions of all material insurance maintained by the Company Parties, and endorsements naming the Collateral Agent, on behalf of the holders of the New Secured Notes, as an additional insured or loss payee, as the case may be, under all material insurance policies to be maintained with respect to the properties of the Company Parties forming part of the NSN Collateral;

(v) copies of the interim unaudited balance sheet, income statement and statement of cash flow for the Company and its consolidated Subsidiaries for each month ending between the date hereof and the Closing; provided that no such financial statements will be due for the month during which Closing occurs or the preceding month to the extent Closing occurs within 30 Business Days of the beginning of the month;

(vi) information sufficient for the Commitment Parties to perform customary "know your customer," anti-corruption, anti-money laundering, anti-trust and tax inquiries.

(e) At the Closing, the Company shall provide the projected quarterly balance sheets, income statements and statements of cash flows of the Company for the period through the end of remainder of the fiscal year in which Closing occurs and annually thereafter for the period through the maturity of the New Secured Notes, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to the Commitment Parties, and an opening *pro forma* balance sheet for the Company Parties.

Section 5.8 Resale Cooperation. In connection with any Transfer of all or any portion of the Debt Commitments of any Debt Commitment Party in accordance with Section 2.6(a) or any Transfer by any Debt Commitment Party of New Secured Notes within one year following the Closing Date (each of the foregoing, a "**Specified Permitted Transfer**"), if requested by any Debt Commitment Party, upon reasonable advance notice, the Company agrees to use its commercially reasonable efforts to, and to cause its Subsidiaries (including NSNCo) to, assist such Debt Commitment Party in completing a Specified Permitted Transfer, which assistance shall include, but not be limited to, the following for each Specified Permitted Transfer: (i) a single diligence session via conference call with representatives of the Company and prospective purchasers of New Secured Notes at a time to be mutually reasonably agreed, which shall include question and answer session based upon customary and reasonable diligence questions submitted by such prospective purchasers a reasonable period of time in advance of such session; (ii) a single management presentation via conference call at a time to be mutually reasonably agreed with a reasonable opportunity for prospective purchasers of the New Secured Notes to ask customary and reasonable follow-up questions on such call; (iii) providing reasonable and customary assistance in completion of the prospective purchasers' due diligence review; and (iv) subject to Section 5.2(f), delivering to the Debt Commitment Party an Offering Memorandum sufficient to assist the Debt Commitment Party with any Transfer of New Secured Notes, and in case of (i), (ii) or (iii), pursuant to the terms of a customary nondisclosure agreement on terms reasonably satisfactory to the Company in the event any material nonpublic information is required to be provided by the Company.

Section 5.9 Commercially Reasonable Efforts.

(a) Without in any way limiting any other respective obligation of the Company or any Commitment Party in this Agreement, each Party shall use (and the Company shall cause New Seadrill, NSNCo, their Subsidiaries and the other Debtors to use) commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement, including, as applicable, using commercially reasonable efforts in:

(i) timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii) defending any Legal Proceedings in any way challenging (A) this Agreement, the Restructuring Support and Lock-Up Agreement, the Registration Rights Agreement or any other Transaction Agreement, or (B) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii) working together in good faith to finalize the New Seadrill Organizational Documents, Definitive Documents not already finalized as of the Investment Agreement Effective Date and all other documents relating thereto in a form consistent with the Term Sheets and for timely inclusion in the Plan Supplement and filing with the Bankruptcy Court, as applicable.

Notwithstanding the foregoing, nothing in this Section 5.9(a) shall require any Commitment Party to incur any expenses or liabilities, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in any material expenses or liabilities to any Commitment Party; provided, however, that nothing herein shall serve to limit, alter or modify any Commitment Party's express obligations under the terms of this Agreement.

(b) Subject to Laws or applicable rules relating to the exchange of information, and in accordance with the Restructuring Support and Lock-Up Agreement, the Commitment Parties and the Company shall have the right to the extent reasonably practicable to review in advance, and to the extent reasonably practicable each will consult with the other on, all of the material information relating to Commitment Parties or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; provided, however, that the Parties are not required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court. In exercising the foregoing rights, the Parties shall act as reasonably and as promptly as practicable.

(c) Without limitation to Section 5.1 or Section 5.7, the Company shall (i) provide counsel for the Commitment Parties a reasonable opportunity to review draft copies of all First Day Pleadings prior to filing with the Bankruptcy Court and, (ii) to the extent reasonably practicable, provide a reasonable opportunity to counsel for the Commitment Parties to review draft copies of other documents that the Debtors intend to file with the Bankruptcy Court that materially affect the Commitment Parties or that are contemplated by the Restructuring Support and Lock-Up Agreement, or relate to this Agreement or the Plan.

(d) Nothing contained in this <u>Section 5.9</u> shall limit the ability of any Commitment Party to consult with the Company, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the Restructuring Support and Lock-Up Agreement.

Section 5.10 Registration Rights. The Commitment Parties are entitled to registration rights pursuant to a registration rights agreement relating to the Equity Securities to be entered into as of the date of the entry of the Confirmation Order, as outlined in the term sheet set forth in <u>Schedule 3</u> (the "**Registration Rights Agreement**"). The form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan Supplement.

Section 5.11 Equity Securities DTC Eligibility. Unless otherwise requested by the Required Commitment Parties, NSNCo and New Seadrill shall use commercially reasonable efforts to promptly make, when applicable from time to time after the Closing, all Unlegended Securities eligible for deposit with DTC. "**Unlegended Securities**" means any Equity Securities acquired by the Commitment Parties and their respective Affiliates (including any Ultimate Purchaser in respect thereof) pursuant to this Agreement and the Plan, including all Equity Securities issued to the Equity Commitment Parties and Rights Offering Participants, as applicable, that do not require, or are no longer subject to, the Legend.

Section 5.12 Share Legend. Each certificate evidencing an Equity Security, and each certificate issued in exchange for or upon the Transfer of any such security, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such securities are uncertificated, such shares shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by New Seadrill or agent and the term "Legend" shall include such restrictive notation. New Seadrill shall remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such shares (or the share register or other appropriate New Seadrill records, in the case of uncertified shares), upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such shares may be sold under Rule 144 of the Securities Act. New Seadrill may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

Section 5.13 Antitrust Approval.

(a) Each Party agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Agreement, the Plan and the other Definitive Documents, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (and, if required by any Antitrust Authority, any drafts thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable (and with respect to any filings required pursuant to the HSR Act, no later than fifteen (15) Business Days following entry of the Disclosure Statement Order) and (ii) promptly furnishing any documents or information reasonably requested by any Antitrust Authority. Notwithstanding the foregoing, no Commitment Party shall be under any obligation to effect any disposals, sales or transfers of any of its other businesses or assets or to incur any material financial or other liabilities, other than as expressly agreed hereunder in order to comply with its obligations hereunder.

(b) The Company and each Commitment Party subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Agreement, the Plan or the other Definitive Documents (each such Commitment Party, a "**Filing Party**") agree to notify each other in writing of such obligations as soon as possible and to reasonably cooperate with each other as to the appropriate time of filing such notification and its content. The Company and each Filing Party shall, to the extent permitted by applicable Law: (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally or in writing of) any material communications from or with an Antitrust Authority; (ii) not participate in any substantive meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all material correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) provide copies of all draft filings and submissions in advance and give each other Filing Party and the Company, as applicable, a reasonable opportunity to comment on the same, such comments to be taken into account where reasonable, except that sharing of copies of filings made under the HSR Act shall not be required; (v) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (vi) not withdraw its filing, if any, under the HSR Act or other applicable Antitrust Laws without the prior written consent of the Required Commitment Parties and the Company.

(c) Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing Party**") any transaction contemplated by this Agreement, the Plan or the other Definitive Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any substantive communications from or with an Antitrust Authority.

(d) The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable Antitrust Laws or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest possible date after the date of filing, including providing information, proposing, negotiating, committing to and/or effecting, by consent decree, hold separate orders, or otherwise, the sale, divesture or disposition of, or holding separate (through the establishment of a trust or otherwise) of any assets, properties or businesses as are required to be divested in order to avoid the entry of, or to effect the dissolution of, any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of materially delaying or preventing the consummation of the transaction contemplated hereby or that would otherwise make the consummation of such transaction unlawful. The communications contemplated by this Section 5.13 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards. The obligations in this Section 5.13 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Plan or the other Definitive Documents.

Section 5.14 New Seadrill and New Structure.

(a) The Company shall form New Seadrill, shall transfer all of the Company's assets to New Seadrill and shall liquidate the Company through Bermuda dissolution proceedings, in each case in a manner that is reasonably satisfactory to the Required Commitment Parties.

(b) The Company shall form IHCo, NSNCo and other wholly owned entities required to be formed pursuant to the Plan, the Plan Supplement and the Restructuring Support and Lock-Up Agreement and shall give effect to the corporate restructuring transactions contemplated in the Plan, the Plan Supplement and the Restructuring Support and Lock-Up Agreement in a manner that is reasonably satisfactory to the Required Commitment Parties.

(c) Each of New Seadrill, IHCo, NSNCo and other wholly owned entities required to be formed pursuant to Section 5.14 shall, immediately upon formation, execute a joinder to this Agreement pursuant to an agreement in substantially the form attached as Schedule 2 hereto and a joinder to the Plan and the Restructuring Support and Lock-Up Agreement.

Section 5.15 Go Shop.

(a) Notwithstanding anything to the contrary in this Agreement, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives:

(i) from the date of this Agreement until the entry of the Confirmation Order (but, for the avoidance of doubt, not thereafter):

-56-

(A) shall not solicit, initiate, encourage, or induce Alternative Restructuring Proposals except as provided in this Agreement and the Restructuring Support and Lock-Up Agreement; and

(B) shall have the rights to (1) consider, respond to, and facilitate Alternative Restructuring Proposals; (2) provide access to non-public information concerning any Company Party to any Person or enter into confidentiality agreements or nondisclosure agreements with any Person; (3) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals, including those received pursuant to clause (b) of this Section 5.15; (4) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (5) enter into or continue discussions or negotiations with holders of Claims against or equity interests in a Company Party regarding the Restructuring Transactions or Alternative Restructuring Proposals; and

(ii) from the date of this Agreement until 90 days after the Petition Date, shall have the rights to solicit, initiate, encourage, or induce Alternative Restructuring Proposals from any Person.

(b) Before the Company Parties determine in the exercise of their fiduciary duties to enter into, or to seek authorization from the Bankruptcy Court to enter into, a commitment with respect to any Alternative Restructuring Proposal, they shall negotiate with the Commitment Parties in good faith (to the extent that the Commitment Parties so desire) with respect to any changes proposed by the Commitment Parties to the terms of the Restructuring Transaction. As soon as reasonably practicable after entry into any Alternative Restructuring Proposal, the Company Parties will publicly disclose such Alternative Restructuring Proposal by filing the material documentation thereof with the Bankruptcy Court or otherwise.

Section 5.16 Business Update Conference Calls. During the Pre-Closing Period, the Company shall participate in weekly (or as may be agreed to between the Company and the Commitment Parties) calls with the Commitment Parties and their financial advisors regarding (i) the Company's business, including current industry conditions, Company operations and business projections; and (ii) the status and progress of the implementation of the Restructuring Transactions, including the Chapter 11 Cases, the Company's efforts with respect to any Alternative Restructuring Proposals (which may, in the Company Parties' discretion, be on a no-name basis without any requirement to disclose the terms thereof) and the Company's efforts with respect to confirmation of the Plan.

Section 5.17 Financial Information. During the Pre-Closing Period, the Company shall deliver to the counsel and financial advisors to the Commitment Parties, and to each Commitment Party that so requests (i) a copy of each update to the Company's business plan as soon as reasonably practicable after it becomes available, together with a reconciliation to the prior business plan; (ii) promptly, but in any event no later than the thirtieth (30th) day of each calendar month, a financial report for the Company and each of the Non-Consolidated Entities as of the last day of the preceding calendar month, in form and detail reasonably acceptable to the Commitment Parties, (iii) within three (3) business days after the receipt

-57-

thereof, any information relating to the amendment, renewal, termination, execution, cancellation, waiver, failure to renew, release or relinquishment of the Company's rights under any new or existing Charter Contract or new-build contract with any shipyards and (iv) such other reports and information as the Commitment Parties may reasonably request.

Section 5.18 Further Assurances. Without in any way limiting any other obligation of the Company, New Seadrill or any of their Subsidiaries and any other Debtors in this Agreement, the Company, New Seadrill or any of their Subsidiaries and any other Debtors shall use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, and as any Commitment Party may reasonably request, in order to consummate and make effective the transactions contemplated by this Agreement. The Company, New Seadrill or any of their Subsidiaries and any other Debtors furthermore agree that they shall perform any and all of its covenants, agreements obligations under this Agreement and not take any actions that would be inconsistent with such obligations.

Section 5.19 Organizational Documents. Subject to compliance with local Law requirements, which the Company and New Seadrill shall comply with, the Plan will provide that on the Effective Date, the NSNCo Organizational Documents and the New Seadrill Organizational Documents will be duly authorized, approved, adopted and in full force and effect. Forms of the NSNCo Organizational Documents and the New Seadrill Organizational Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement.

Section 5.20 Rule 144A Information. For so long as any of the New Secured Notes or the Equity Securities remain outstanding, the Company and New Seadrill will make available, upon request, to any holder of the New Secured Notes or Equity Securities, as applicable and any prospective purchasers thereof the information specified in Rule 144A(d)(4) under the Securities Act, unless the Company furnishes such information to the SEC pursuant to Section 13 or 15(d) of the Exchange Act.

Section 5.21 Tax Treatment. Unless the Company, New Seadrill, NSNCo, and the Debt Commitment Parties mutually agree that a different treatment is required under applicable law, for all applicable U.S. federal, state and local tax purposes, the Company, New Seadrill, NSNCo and the Debt Commitment Parties agree that, during the 90 day period following the Closing Date, New Seadrill and NSNCo, in consultation with the Required Commitment Parties, will determine the issue price of the New Secured Notes in accordance with Treas. Reg. §1.1273-2, and without limiting the foregoing, such parties agree to treat the New Secured Notes and the Granted Equity Securities as an "investment unit" within the meaning of Treas. Reg. §1.1273-2(h) and to allocate the issue price of such investment unit between the New Secured Notes and the Granted Equity Securities in accordance with such regulations for all applicable U.S. federal, state and local tax purposes.

**ARTICLE VI**

**CONDITIONS TO THE OBLIGATIONS OF THE PARTIES**

Section 6.1 Conditions to the Obligations of the Commitment Parties. The obligations of each Commitment Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with Section 6.2) the satisfaction of the following conditions on the dates specified herein or if not so specified prior to or at the Closing:

(a) Milestones. The Company complies with, satisfies, or achieves the following deadlines:

(i) On or prior to 12 September 2017, the Petition Date shall have occurred;

(ii) On or prior to a date that is forty-five (45) days from the Petition Date, the Company Parties shall have filed the Disclosure Statement and Plan;

(iii) On or prior to a date that is one hundred fifty (150) days from the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order;

(iv) On or prior to a date that is two hundred seventy (270) days from the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order ("**Confirmation Order Milestone**" and the scheduled date of such Confirmation Order Milestone, the "**Confirmation Order Milestone Date**"); and

(v) On or prior to a date that is sixty (60) days from entry of the Confirmation Order, and in any event within three hundred thirty (330) days from the Petition Date, the Effective Date shall have occurred (the "**Outside Date**");

Each of the Orders above, and the Plan, as approved, shall be in a form and substance reasonably acceptable to the Required Commitment Parties.

(b) Representations and Warranties. The representations and warranties contained in this Agreement shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on both (i) the date hereof and (ii) as of the Closing Date without considering any supplements or amendments to the Disclosure Schedule after the date hereof (after giving effect to the Plan) with the same effect as if made on and as of the Closing Date (after giving effect to the Plan) (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date) except, in each of (i) and (ii), where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect.

(c) Covenants. The Company Parties shall have performed and complied in all material respects, with all of their respective covenants and agreements contained in the following agreements, which contemplate, by their terms, performance or compliance prior to or at the Closing and all of the conditions to Closing set forth therein shall have been met or waived in accordance with their terms:

(i) this Agreement;

(ii) the Restructuring Support and Lock-Up Agreement;

(iii) the Rights Offering Documents, if applicable;

-59-

(iv) the Plan; and

(v) the Plan Supplement.

(d) <u>Funding Notice</u>. The Commitment Parties shall have received the Funding Notice.

(e) <u>Approval of the Commitment Parties</u> Each of the Definitive Documents shall contain terms and conditions consistent with this Agreement and the Restructuring Support and Lock-Up Agreement after giving effect to any amendments or supplements thereto and otherwise be in form and substance, including with respect to any security arrangements, reasonably acceptable to the Required Commitment Parties. Each of the documents set forth on <u>Schedule 4</u> shall be in full force and effect and shall not have been terminated.

(f) <u>Registration Rights Agreement</u>. The Registration Rights Agreement shall have been executed and delivered by the Company, shall otherwise have become effective with respect to the Commitment Parties and the other parties thereto, and shall be in full force and effect.

(g) <u>Reorganized Company Organizational Documents</u>. The New Seadrill Organizational Documents and the organizational documents of its Subsidiaries shall have been duly approved and adopted and shall be in full force and effect.

(h) <u>Material Adverse Effect</u>. Since the date of this Agreement, there shall not have occurred nor shall there exist any Event that constitutes, individually or in the aggregate, a Material Adverse Effect.

(i) <u>Potential Action</u>. Since the date of this Agreement, there shall not have occurred any action, suit, investigation or proceeding pending or, to the Knowledge of the Company, threatened in writing in any court or before any arbitrator or governmental authority, in each case, that could reasonably be expected to have a Material Adverse Effect.

(j) <u>No Default</u>. No default or event of default shall have occurred under any other indebtedness of the Company Parties, concurrently with or after giving effect to the issuance and sale of the New Secured Notes.

(k) <u>Restructuring Transactions</u>. The Restructuring Transactions shall be:

(i) consistent in all material respects with the Restructuring Support and Lock-Up Agreement and this Agreement; and

(ii) consummated substantially concurrently with the purchase of the New Secured Notes in accordance with Restructuring Support and Lock-Up Agreement and this Agreement.

(l) <u>Plan and Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order, which together with the Plan, shall be in form and substance reasonably satisfactory to the Required Commitment Parties, shall not be stayed, and shall not have been reversed, modified, or otherwise qualify as materially adverse to the Commitment Parties, and the conditions to the occurrence of the Effective Date of the Plan (other than the Closing of this Agreement) shall have been satisfied or waived in accordance with the terms thereof.

(m) <u>No Alternative Restructuring Proposal</u>. The Company shall not be a party to an agreement to consummate an Alternative Restructuring Proposal.

(n) <u>Fees and Expenses</u>. The Incremental Expenses and the Closing Fee shall have been so paid or reimbursed in accordance with this Agreement; it being understood and agreed that the Closing Fee may be payable by deducting such amount from the Debt Commitment Funding Amount.

(o) <u>Closing Certificate</u>. The Commitment Parties shall have received on and as of the Closing a certificate of the chief executive officer or chief financial officer of the Company, in their capacity as such and not in their individual capacity, confirming that the conditions set forth in <u>Section 6.1(b)</u> and <u>Section 6.1(c)</u> have been satisfied.

(p) <u>Registration Statement; Offering Memorandum; Listing</u>. The Company shall have filed a Resale Registration Statement covering the resale of Equity Securities with the SEC in a form reasonably satisfactory to the Commitment Parties. The Company shall have delivered to the Commitment Parties a draft of the Offering Memorandum. The Company shall have applied for listing of the Equity Securities on (i) the Oslo Stock Exchange and (ii) the New York Stock Exchange.

Section 6.2 Waiver of Conditions to Obligations of Commitment Parties. All or any of the conditions set forth in <u>Section 6.1</u> may only be waived in whole or in part with respect to all Commitment Parties by a written instrument executed by the Required Commitment Parties in their sole discretion and if so waived, all Commitment Parties shall be bound by such waiver.

Section 6.3 Conditions to the Obligations of the Company. The obligations of the Company to consummate the transactions contemplated hereby with the Commitment Parties are subject to (unless waived by the Company) the satisfaction of each of the following conditions:

(a) Representations and Warranties.

(i) The representations and warranties of the Commitment Parties contained in this Agreement that are qualified by "materiality" or "material adverse effect" or words or similar import shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all respects only as of the specified date).

(ii) The representations and warranties of the Commitment Parties contained in this Agreement that are not qualified by "materiality" or "material adverse effect" or words or similar import shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(b) Covenants. The Commitment Parties shall have performed and complied, in all material respects, with all of their covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement.

Section 6.4 Conditions to the Obligations of All Parties. The obligations of each of the Parties to consummate the transactions contemplated hereby are subject to the satisfaction of each of the following conditions (unless waived by all Parties in accordance with Section 6.5):

(a) Governmental Approvals. All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under Antitrust Laws or otherwise required by any Governmental Entity in connection with the transactions contemplated by this Agreement shall have been obtained or filed, unless the absence of such authorizations, approvals, consents, clearances or filings under Antitrust Laws or otherwise would not be material and adverse to the Company Parties' or the Commitment Parties' ability to consummate the Restructuring Transaction.

(b) No Legal Impediment to Issuance. No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the transactions contemplated by this Agreement or the Plan.

Section 6.5 Waiver of Conditions to Obligations of All Parties. All or any of the conditions set forth in Section 6.4 may only be waived in whole or in part by a written instrument executed by the Company and, with respect to all Commitment Parties, the Required Commitment Parties in their sole discretion and if so waived, all Parties shall be bound by such waiver.

<div align="center">

**ARTICLE VII**

**INDEMNIFICATION**

</div>

Section 7.1 Indemnification. Upon entry of the Confirmation Order, to the fullest extent permitted by applicable Law, the Company and its Affiliates (excluding the Commitment Parties) (the "**Indemnifying Party**") agrees to indemnify, defend, and hold harmless each of the Commitment Parties and its Affiliates (excluding, for the avoidance of doubt, the Company and its Subsidiaries), and each of their Representatives (each, an "**Indemnified Person**") from and against (i) any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities and costs, expenses, and disbursements, (ii) any and all actions, suits, proceedings and investigations in respect thereof, and (iii) any and all legal costs or other costs, expenses or disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise (including, without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any such action, proceeding or investigation (whether or not in connection with litigation in which any of the

Indemnified Persons is a party) and including, without limitation, any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements, resulting from any act or omission of any of the Indemnified Persons), in each of subsections (i), (ii) and (iii) above only if arising out of a claim asserted by a third party and in each of subsections (i) and (iii), only to the extent such costs and expenses are reasonable, documented, out-of-pocket, third party costs (collectively (i)-(iii), the "**Losses**") directly caused by, relating to, based upon, arising out of or in connection with, a third party claim related to the issuance of the New Secured Notes or the Equity Securities, the Rights Offerings, the Restructuring Transactions or this Agreement, or a third party claim related to any untrue statement or alleged untrue statement of a material fact contained in, or material omissions or alleged omissions in, information furnished by the Indemnifying Party or any of its Subsidiaries or Affiliates, or any other person acting at the Company Parties' direction in connection with the issuance of the New Secured Notes or the Equity Securities or the resale of such securities in accordance with this Agreement; provided, that, such indemnity agreement shall not apply to any portion of any such loss, claim, damage, obligation, penalty, judgment, award, liability, cost, expense or disbursement of an Indemnified Person to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from (x) the gross negligence or wilful misconduct of such Indemnified Person or (y) the material breach of this Agreement or the Restructuring Support and Lock-Up Agreement by such Indemnified Person (or, if such Indemnified Person is not a Commitment Party or is not a party to the Restructuring Support and Lock-Up Agreement, by its Affiliate or Representative, as applicable). These indemnification provisions shall be in addition to any liability which the Indemnifying Party may have to the Indemnified Persons.

Section 7.2 Indemnification Procedures. Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding for which such Indemnified Person is indemnified pursuant to Section 7.1 (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Article VII. In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to

such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person. Notwithstanding anything herein to the contrary, the Company Parties shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Debtors.

Section 7.3 Settlement of Indemnified Claims. In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Article VII, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed). If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Article VII. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 7.4 Contribution. In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these indemnification provisions is made but is found by a judgment of a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Indemnifying Party, on the one hand, and the Indemnified Persons, on the other hand, shall contribute to the losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements to which

-64-

the Indemnified Persons may be subject in accordance with the relative benefits received by the Indemnifying Party, on the one hand, and the Indemnified Persons, on the other hand, and also the relative fault of the Indemnifying Party, on the one hand, and the Indemnified Persons collectively and in the aggregate, on the other hand, in connection with the statements, acts or omissions which resulted in such losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements and the relevant equitable considerations shall also be considered. No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any other person who is not also found liable for such fraudulent misrepresentation. Notwithstanding the foregoing, none of the Indemnified Persons shall be obligated to contribute any amount hereunder that exceeds the amount of fees previously received by such Indemnified Person pursuant to this Agreement.

Section 7.5 Survival and Exclusive Remedy. Neither expiration nor termination of the Commitment Parties' commitments under this Agreement or funding or repayment of the New Secured Notes or Equity Securities shall affect these indemnification provisions which shall remain operative and continue in full force and effect. With respect to the matters set forth in Section 7.1, the remedies set forth in this Article VII shall be the sole and exclusive remedy with respect to those matters set forth in Section 7.1 and each of the Commitment Parties, on behalf of itself and its Affiliates, hereby waives to the fullest extent permitted under applicable Law and all rights, claims and causes of action it or any of its respective Affiliates may have against the Indemnifying Parties with respect to the subject matter therein, regardless.

<div align="center">

**ARTICLE VIII**

**TERMINATION**

</div>

Section 8.1 Consensual Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Company Parties and the Required Commitment Parties.

Section 8.2 Termination by Commitment Parties. This Agreement may be terminated by the Required Commitment Parties upon prior written notice to the Debtors in accordance with Section 10.1 upon the occurrence and continuance of the events listed in subclause (i) or the occurrence of the events listed in subclause (m) of this Section 8.2, and this Agreement may be terminated by each of the Commitment Parties in respect of its commitment hereunder upon prior written notice to the Debtors in accordance with Section 10.1 upon the occurrence and continuance of any of the following events listed (excluding those events listed in subclause (i)) in each case, other than as contemplated by the Restructuring Transactions, provided prior written notice shall not be required for termination pursuant to clause (a):

(a) the Closing Date has not occurred by 11:59 p.m., New York City time on the Outside Date; provided, that the Outside Date may be waived or extended with the prior written consent of each Commitment Party; provided, further, that no Commitment Party shall have the right to terminate this Agreement pursuant to this Section 8.2 if such Commitment Party is then in willful or intentional material breach of this Agreement;

(b) the Bankruptcy Court enters an order denying confirmation of the Plan;

(c) upon termination of the Restructuring Support and Lock-Up Agreement according to its terms (other than as a result of a breach by any Commitment Party) as to the Required Commitment Parties, the Required Consenting Lenders, the Company Parties, or pursuant to Section 13.03 of the Restructuring Support and Lock-Up Agreement with respect to any Commitment Party, or all parties thereto;

(d) any of the milestone dates provided in Section 6.1(a) (as they may be extended or modified according to the terms of this Agreement) have not been met, provided that in the case of the Confirmation Order Milestone, the Company shall notify the Commitment Parties and the Consenting Lenders in writing at least 10 Business Days prior to the Confirmation Order Milestone Date if it considers, acting reasonably, that the Confirmation Order Milestone Date will not be met. Upon receipt of the Company's notice, the Required Commitment Parties shall in good faith and acting reasonably, negotiate with the Company (in consultation with the Consenting Lenders) in respect of any extension or modification of the applicable Confirmation Order Milestone Date; provided that any such extension or modification is made pursuant to the mutual agreement of the Company and Commitment Parties, each at their sole discretion;

(e) any Company Party (i) enters into any binding (subject to Bankruptcy Court approval) commitment or agreement to consummate any Alternative Restructuring Proposal or (ii) publicly announces that such Company Party will support any Alternative Restructuring Proposal;

(f) if at any time before entry of the Confirmation Order, holders of at least 66.67% of Credit Agreement Claims under each individual Credit Agreement are no longer party to the Restructuring Support and Lock-Up Agreement (and the Company shall keep the Commitment Parties informed of any terminations of the Restructuring Support and Lock-Up Agreement by any Consenting Lender);

(g) the filing by the Company of any motion or other request for relief without the written consent of counsels to the Commitment Parties (not to be unreasonably withheld, conditioned or delayed), seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(h) the entry of an order by the Bankruptcy Court, without the written consent of counsels to the Commitment Parties (not to be unreasonably withheld, conditions or delayed) (a) dismissing any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) appointing a trustee pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (d) making a finding of fraud, dishonesty, or misconduct by any officer or director of the Company;

-66-

(i) (w) the Company or the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or the other Debtors in this Agreement and any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 6.1(b) or Section 6.1(c) not to be satisfied, (x) the Commitment Parties shall have delivered written notice of such breach or inaccuracy to the Company, (y) such breach or inaccuracy is not cured by the Company or the other Debtors by the tenth (10th) Business Day after the Required Commitment Parties transmit a written notice in accordance with Section 10.1 hereof detailing any such issuance, and (z) as a result of such failure to cure, any condition set forth in Section 6.1(b) or Section 6.1(c) is not capable of being satisfied; provided, that no Commitment Party shall have the right to terminate this Agreement pursuant to this Section 8.2(i) if any Commitment Party is then in willful or intentional material breach of this Agreement;

(j) the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any Final Order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for seven (7) Business Days after the Required Commitment Parties transmit a written notice in accordance with Section 10.1 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Commitment Party that requested such issuance in contravention of any obligation set out in this Agreement;

(k) the Company (i) materially and adversely to the Commitment Parties amends or modifies, or files a pleading seeking authority to materially and adversely to the Commitment Parties amend or modify, the Definitive Documents in a manner that is inconsistent with this Agreement without the consent of the Required Commitment Parties, provided that if such amendment, modification or filing disproportionately impacts a Commitment Party in a material and adverse way relative to the other Commitment Parties and such Commitment Party is not a Required Commitment Party, such Commitment Party's consent shall be required and (ii) such amendment or modification remains in effect for, or such pleading is not withdrawn within, fifteen (15) Business Days after the Required Commitment Parties transmit a written notice in accordance with Section 10.1 hereof detailing any such occurrence;

(l) the Confirmation Order is reversed, stayed, modified, or amended without the acquiescence or written consent (not to be unreasonably withheld, conditioned or delayed) of the Required Commitment Parties (and such action has not been reversed or vacated within thirty (30) Business Days after the Required Commitment Parties transmit a written notice in accordance with Section 10.1 hereof detailing any such occurrence) in a manner that prohibits the consummation of the Restructuring Transactions and that cannot be remedied by the Debtors; or

(m) any Consenting Stakeholder (other than the terminating Commitment Party, if it is the defaulting Consenting Stakeholder) commits any material breach of Section 4.01(b)(ii) of the Restructuring Support and Lock-Up Agreement.

Section 8.3 Termination by the Company. This Agreement may be terminated by each of the Company Parties upon prior written notice to each Commitment Party in accordance with Section 10.1 upon the occurrence and continuance of any of the following events, subject to the rights of the Company to fully and conditionally waive, in writing, on a prospective or retroactive basis the occurrence of such Event:

-67-

(a) any Law or Final Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Restructuring Transactions, the other Definitive Documents or the Registration Rights Agreement in a way that cannot be remedied by the Commitment Parties subject to the reasonable satisfaction of the Company;

(b) subject to the right of the Debt Commitment Parties to arrange a Debt Commitment Party Replacement in accordance with <u>Section 2.3(a)</u> (which will be deemed to cure any breach by the replaced Debt Commitment Party pursuant to this subsection (b)), (i) any Commitment Party shall have breached any representation, warranty, covenant or other agreement made by such Commitment Party in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in <u>Section 6.3(a)</u> or <u>Section 6.3(b)</u> not to be satisfied, (ii) the Company shall have delivered written notice in accordance with <u>Section 10.1</u> hereof of such breach or inaccuracy to such Commitment Party, (iii) such breach or inaccuracy is not cured by such Commitment Party by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in <u>Section 6.3(a)</u> or <u>Section 6.3(b)</u> is not capable of being satisfied; <u>provided</u>, that the Company shall not have the right to terminate this Agreement pursuant to this <u>Section 8.3(b)</u> if it is then in willful or intentional breach of this Agreement;

(c) the Confirmation Order is reversed, stayed, modified, or amended without the acquiescence or written consent (not to be unreasonably withheld, conditioned or delayed) of the Company (and such action has not been reversed or vacated within thirty (30) Business Days) in a manner that prohibits the consummation of the Restructuring Transactions and that cannot be remedied by the Commitment Parties;

(d) the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with this Agreement or any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(e) upon termination of the Restructuring Support and Lock-Up Agreement (other than as a result of a breach by any Company Party), as to the Required Commitment Parties, the Required Consenting Lenders, the Company Parties or all parties thereto; or

(f) the Closing Date has not occurred by the Outside Date (as the same may be extended pursuant <u>Section 2.3(e)</u>); <u>provided</u>, that the Company shall not have the right to terminate this Agreement pursuant to this <u>Section 8.3(f)</u> if it is then in breach of this Agreement;

Section 8.4 Return of Deposit.

(a) If this Agreement is terminated (i) pursuant to a provision in this Article VIII other than <u>Section 8.3(b)</u>, then pursuant to the Escrow Agreement, the Escrow Agent shall distribute to each Commitment Party the amount in such Commitment Party's Escrow

Account (which, for the avoidance of doubt, includes any interest earned on under the Escrow Agreement on any amounts deposited therein) and return and cancel any letters of credit held in an Escrow Account or (ii) pursuant to Section 8.3(b), then pursuant to the Escrow Agreement, the Escrow Agent shall distribute to (x) the Company the amount in the Escrow Account (which, for the avoidance of doubt, includes any interest earned on under the Escrow Agreement on any amounts deposited therein and any letter of credit deposited therein) of any Commitment Party whose breach of this Agreement provided the Company with a termination right pursuant to Section 8.3(b) and (y) each of the other Commitment Parties, if any, the amount in such Commitment Party's Escrow Account (which, for the avoidance of doubt, includes any interest earned on under the Escrow Agreement on any amounts deposited therein) and return and cancel any letters of credit held in such other Commitment Party's Escrow Account.

(b) For the avoidance of doubt, nothing in this Section 8.4 shall impair, restrict or replace the rights of the Company set forth in Section 10.9.

Section 8.5 Effect of Termination. Upon termination of this Agreement pursuant to this Article VII, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; provided, that (i) the provisions set forth in Article X, shall survive the termination of this Agreement in accordance with their terms and (ii) nothing in this Section 8.4 shall relieve any Party from liability for its gross negligence or willful or intentional breach of this Agreement. For purposes of this Agreement, "willful or intentional breach" means a breach of this Agreement that is a consequence of an act or omission undertaken by the breaching Party if such breaching Party knew or should have known that such act or omission would, or would reasonably be expected to, cause a breach of this Agreement.

## ARTICLE IX

### FEES AND EXPENSES

Section 9.1 New Secured Notes related Fees.

(a) Commitment Fee. As consideration for the Debt Commitment and the other agreements of the Debt Commitment Parties in this Agreement, and as a condition to the occurrence of the Investment Agreement Effective Date, the Company shall pay, or shall cause to be paid, to each Debt Commitment Party, for its own account, such Debt Commitment Party's Debt Commitment Percentage of a nonrefundable and non-avoidable commitment fee of 5.0% of the Aggregate Debt Commitment Amount (the "**Commitment Fee**"), which shall be paid to the Debt Commitment Parties or their designees on the Investment Agreement Effective Date and shall be earned by the Debt Commitment Parties upon receipt. For the avoidance of doubt, payment of the Commitment Fee is a condition to the Investment Agreement Effective Date, but is not an obligation of the Company as of the date of this Agreement.

(b) Closing Fee. As consideration for the NSN Purchasers' purchase of the New Secured Notes on the Closing Date and as a condition to the occurrence of the Closing, the Company shall pay or cause to be paid to each NSN Purchaser for its own account such NSN Purchaser's NSN Percentage of 1.0% of the Aggregate Debt Commitment Amount ("**Closing Fee**"), which shall be paid to the NSN Purchasers or their designees upon Closing and shall be earned by the NSN Purchasers upon receipt. For the avoidance of doubt, payment of the Closing Fee is a condition to the Closing, but is not an obligation of the Company as of the date of this Agreement.

Section 9.2 Equity Purchaser Fees.

(a) As consideration for the commitment to purchase the Acquired Equity Securities in accordance with this Agreement, and as a condition to the occurrence of the Investment Agreement Effective Date, the Company shall deliver, or shall have caused the delivery, to each Equity Commitment Party (or its designee), for its own account, such Equity Commitment Party's Equity Commitment Percentage of a nonrefundable and non-avoidable fee of 5.0% of the Aggregate Equity Commitment Amount (the "**Equity Purchaser Cash Fee**") which fee shall be earned by the Equity Commitment Parties upon receipt. For the avoidance of doubt, payment of the Equity Purchaser Cash Fee is a condition to the Investment Agreement Effective Date, but is not an obligation of the Company as of the date of this Agreement.

(b) The Company agrees that if the Equity Securities are not available for trade on the Oslo Stock Exchange within 90 days of the Confirmation Order being entered ("**Ticking Fee Event Date**" and the Equity Securities not being so available, the "**Ticking Fee Event**"), then on the first day of the month following the Ticking Fee Event Date, and the first day of each month thereafter until such Ticking Fee Event has been cured, the Company shall pay to the Equity Commitment Parties an aggregate amount in cash, equal to $100,000, allocated among the Equity Commitment Parties pro rata based on the number of Equity Securities purchased by such Equity Commitment Parties at the Closing ("**Ticking Fee**"). The Ticking Fee shall accrue on a daily basis, beginning on the Ticking Fee Event Date and each day following the Ticking Fee Event Date on which the Ticking Fee Event is continuing; provided, however, that notwithstanding anything herein to the contrary, in no event shall the Company be liable for the Ticking Fee on the Ticking Fee Event Date or for any period of time thereafter if the Ticking Fee Event is continuing for reasons beyond the reasonable control of the Company. If the Ticking Fee payment is due on a day that is not a Business Day, such payment shall be paid on the next succeeding Business Day. If the Ticking Fee payment is due on a day that is not a Business Day, such payment shall be paid on the next succeeding Business Day. If the Company fails to pay any amounts due pursuant to this Section 9.2(b) in full within seven (7) Business Days after the date they are payable, the Company shall pay interest thereon at a rate of six percent (6.0%) per annum (or such lesser maximum amount that is permitted to be paid by applicable law) to each of the Equity Commitment Parties based on the amount so due to such Equity Commitment Party, as applicable, accruing daily from the date such partial amounts are due until such amounts, plus all such interest thereon, are paid in full. Notwithstanding the foregoing, the aggregate amount of such amounts payable by the Company under this Section 9.2(b) shall not exceed $3,000,000.

Section 9.3 Structuring Fees. Further, as consideration for the commitment to purchase their portion of the Acquired Equity Securities in accordance with this Agreement and the other agreements of, and services by, Hemen and the Select Commitment Parties in respect of the the Restructuring Transactions, and as a condition to the occurrence of the Closing, the Company shall, and shall procure that New Seadrill shall issue to Hemen and the Select Commitment Parties at Closing Equity Securities as follows (collectively, the "**Structuring Fees**"):

(a) to Hemen (or its designee) 5.0% of New Seadrill's Equity Securities on a post-dilution basis, excluding, for the avoidance of doubt, any dilution resulting from the EIP which shall be given effect after all other Equity Securities have been issued at the Closing; and

(b) to each of the Select Commitment Parties (or its designee), its pro rata share (relative to each member's Equity Commitment Percentage) of 0.5% of New Seadrill's Equity Securities on a pre-dilution basis.

For the avoidance of doubt, payment of the Structuring Fee is a condition to the Closing, but is not an obligation of the Company as of the date of this Agreement.

Section 9.4 Expense Reimbursement; Incremental Expenses.

(a) As a condition to the occurrence of the Investment Agreement Effective Date, the Company shall, or shall have caused, the delivery of a cash payment in an amount to be agreed between the Company, the Original Commitment Parties, and the CoCom (the "**OC Expense Reimbursement**") for the benefit of the Original Commitment Party, which shall be applied, (a) first, to Expenses including monthly fees and expenses of (i) Goldman Sachs, as financial advisor to the Original Commitment Parties and (ii) counsels to each Original Commitment Party, in each case incurred as of the Investment Agreement Effective Date, (b) second, to a prepayment retainer, earned by counsels to each Original Commitment Party upon receipt, for estimated Expenses through the Closing Date and (c), to a prepayment retainer earned by each Original Commitment Party for the monthly fees and expense of Goldman Sachs through to the Closing Date. For the avoidance of doubt, payment of the Expense Reimbursement is a condition to the Investment Agreement Effective Date, but is not an obligation of the Company as of the date of this Agreement.

(b) As a condition to the occurrence of the Investment Agreement Effective Date, the Company shall, or shall have caused, the delivery of a cash payment in an amount to be agreed between the Company, the Select Commitment Parties, and the CoCom (the "**SCP Expense Reimbursement**") for the benefit of the Select Commitment Parties, which shall be applied, (a) first, to Expenses including monthly fees and expenses of (i) Moelis & Company, as financial advisor to the Select Commitment Parties and (ii) Akin Gump Strauss Hauer & Feld LLP as counsel to the Select Commitment Parties, in each case incurred as of the Investment Agreement Effective Date, (b) second, to a prepayment retainer, earned by counsel to the Select Commitment Parties upon receipt, for estimated Expenses through the Closing Date and (c), to a prepayment retainer earned by the Select Commitment Parties for the monthly fees and expense of Moelis & Company through and until the Closing Date. For the avoidance of doubt, payment of the Expense Reimbursement is a condition to the Investment Agreement Effective Date, but is not an obligation of the Company as of the date of this Agreement.

(c) As a condition to the occurrence of the Investment Agreement Effective Date, the Company shall, or shall have caused, the delivery of a cash payment in an amount to be agreed between the Company, the Additional Commitment Parties, and the CoCom for the

-71-

benefit of the Additional Commitment Parties, which shall be applied, (a) first, to counsel to the Additional Commitment Parties incurred as of the Investment Agreement Effective Date and (b) second, to a prepayment retainer, earned by counsel to the Additional Commitment Parties upon receipt, for estimated Expenses through the Closing Date. For the avoidance of doubt, payment of the Expense Reimbursement is a condition to the Investment Agreement Effective Date, but is not an obligation of the Company as of the date of this Agreement.

(d) At Closing, the Company Parties shall pay to each Commitment Party and, as applicable, to each Commitment Party's attorneys, accountants, advisors, financial advisors, consultants and other professionals, all Expenses, including all monthly fees and expenses of Goldman Sachs and Moelis & Company, in each case incurred from the Investment Agreement Effective Date to the Closing Date that exceed the Expense Reimbursement ("**Incremental Expenses**"). To the extent Expenses incurred through the Closing Date are less than the retainers paid pursuant to this Section 9.4, the applicable Commitment Parties shall refund such excess amounts of such retainers to the Company Parties at Closing.

Section 9.5 Further Agreements.

(a) Each of the fees and expenses set out herein shall be fully earned, nonrefundable and non-avoidable and shall be paid in full in cash by the Company, free and clear of any withholding or deduction for any U.S. or Bermuda Taxes, on the date of payment set forth in this Agreement, unless required by applicable law. If any applicable law requires the deduction or withholding of any U.S. or Bermuda Tax from any such payment for any reason other than the failure of the recipient of any such payment to provide applicable documentation (that such recipient is legally entitled to provide) that would make such deduction or withholding inapplicable, then the Company shall make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Entity in accordance with applicable law and the sum payable by Company shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made. The Company acknowledges and agrees that, as of the date hereof, it does not anticipate or have actual knowledge of any withholding or deduction for any Taxes other than U.S. or Bermuda with respect to the fees and expenses set forth in this Agreement. If the Company concludes that withholding or deduction may be necessary for Taxes other than U.S. or Bermuda, the Company shall promptly notify the Commitment Party with respect to which withholding or deduction may be required, and the Company shall use its best efforts and cooperate with such Commitment Party to minimize or eliminate any such withholding or deduction; *provided, that*, in the event such withholding or deduction is ultimately determined to be required, the Company shall be entitled to make such deduction or withholding, shall promptly pay over any such withheld or deducted amount to the applicable Governmental Entity, and the amounts so withheld or deducted shall be treated as paid pursuant to this Agreement. The Company agrees that all such fees and expenses are provided at fair value in exchange for the commitments provided by the recipients (or their representatives) to the Company. The provisions for the payment of the fees and expenses are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.

-72-

**ARTICLE X**

**GENERAL PROVISIONS**

      Section 10.1 Notices. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)    If to a Company Party (including the Company):

      Seadrill Limited
      Par-la-Ville Place
      14 Par-la-Ville Road
      Hamilton HM 08, Bermuda
      Attention: Georgina Sousa

with    a copy for information only (which shall not constitute notice) to:

      Seadrill Management Ltd.
      (Corporate Headquarters)
      2nd Floor
      Building 11
      Chiswick Business Park
      566 Chiswick High Road
      London W4 5YS
      United Kingdom
      Attention: Chris Edwards
      Email: Chris.Edwards@seadrill.com

and:

      Kirkland & Ellis LLP
      600 Travis Street
      Houston, Texas 77002
      Attention: Doug Bacon, P.C.
            Brian Schartz
      E-mail: doug.bacon @kirkland.com
            bschartz@kirkland.com

and:

>Kirkland & Ellis LLP
>300 North LaSalle
>Chicago, IL 60654
>Attention: Anup Sathy, P.C.
>          Ross M. Kwasteniet, P.C.
>E-mail: anup.sathy@kirkland.com
>          ross.kwasteniet@kirklandcom

(b)    If to an Original Commitment Party:

To such Original Commitment Party at the addresses or e-mail addresses set forth below the Original Commitment Party's signature page in its signature page to this Agreement.

with a copy (which shall not constitute notice) to:

>Cadwalader, Wickersham & Taft LLP
>Dashwood House, 69 Old Broad Street, London
>EC2M 1QS
>Attention: Gregory Petrick
>          Yushan Ng
>E-mail addresses: Gregory.Petrick@cwt.com; Yushan.Ng@cwt.com; projecteagle@cwt.com

and:

>Fried, Frank, Harris, Shriver & Jacobson LLP
>One New York Plaza
>New York, New York 10004
>Attn: Brad E. Scheler
>Jennifer L. Rodburg
>Email: Brad.Scheler@friedfrank.com; Jennifer.Rodburg@friedfrank.com

(c)    If to a Select Commitment Party:

To such Select Commitment Party at the addresses or e-mail addresses set forth in <u>Schedule 5</u> to this Agreement.

with a copy (which shall not constitute notice) to:

>Akin Gump Strauss Hauer & Feld LLP
>One Bryant Park, Bank of America Tower
>New York, New York 10036
>Facsimile: (212) 872-1002
>Attention: Ira S. Dizengoff

Philip C. Dublin
Allison P. Miller
Email: idizengoff@akingump.com
pdublin@akingump.com
amiller@akingump.com

(d)    If to an Additional Commitment Party:

To such Additional Commitment Party at the addresses or e-mail addresses set forth in Schedule 5 to this Agreement.

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 373-0524
Attention: Andrew Rosenberg
Elizabeth McColm
Catherine Goodall
Email: arosenberg@paulweiss.com
emccolm@paulweiss.com
cgoodall@paulweiss.com

If a notice is delivered personally delivered, sent via electronic facsimile or electronic mail, then the notice shall be deemed received on the day such notice was sent if such notice was sent before 5:00 p.m. New York City time on a Business Day, and otherwise, shall be deemed received on the next Business Day. If the notice is sent by registered or certified mail (return receipt requested), the notice shall be deemed delivered on the third Business Day after such notice was sent. If the notice is delivered by express overnight courier (with confirmation), the notice shall be deemed delivered on the next Business Day after such notice was sent. Notwithstanding the foregoing, if notice is actually received before the deemed received date, then such notice shall be considered received on the date of actual receipt (or the next Business Day if the day of actual receipt is not a Business Day or it is otherwise past 5:00 p.m. New York City time on the day of receipt).

Section 10.2 Assignment; Third Party Beneficiaries. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Company and the Required Commitment Parties, other than an assignment by a Commitment Party expressly permitted by Section 2.3 or Section 2.6 and any purported assignment in violation of this Section 10.2 shall be void *ab initio*. This Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties (including their permitted transferees and assignees) and the Indemnified Persons.

Section 10.3 Prior Negotiations; Entire Agreement.

(a) This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties and the Restructuring Support and Lock-Up Agreement (including the Restructuring Term Sheet) will each continue in full force and effect.

(b) Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.7.

Section 10.4 Governing Law; Venue. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR OTHER PROCEEDING IN THE BANKRUPTCY COURT AND IRREVOCABLY AND UNCONDITIONALLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN THE BANKRUPTCY COURT THAT ANY SUCH SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN THE BANKRUPTCY COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

-76-

Section 10.5 Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6 Counterparts. This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.7 Waivers and Amendments; Rights Cumulative; Consent. This Agreement may be amended, restated, modified or changed only by a written instrument signed by the Company and the Required Commitment Parties; provided, that any Commitment Party's prior written consent shall be required for any amendment that would have a materially adverse and disproportionate effect on such Commitment Party and each Commitment Party's prior written consent shall be required for any revisions to the Commitment Schedule. Notwithstanding the foregoing, the Debt Commitment Schedule shall be revised as necessary without requiring a written instrument signed by the Company and the Required Commitment Parties to reflect changes in the composition of the Debt Commitment Parties and Debt Commitment Percentage as a result of Transfers permitted in accordance with the terms and conditions of this Agreement. The terms and conditions of this Agreement (other than the conditions set forth in Section 6.1, Section 6.3 and Section 6.4, the waiver of which shall be governed solely by Article VI) may be waived (A) by the Debtors only by a written instrument executed by the Company and (B) by the Required Commitment Parties only by a written instrument executed by the Required Commitment Parties. No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.

Section 10.8 Headings. The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.9 Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Any Company Party may enforce the Company's rights and remedies under this Agreement under this Section 10.9. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

Section 10.10 No Survival. All representations and warranties in this Agreement shall not survive the Closing Date.

-77-

Section 10.11 Damages. Each Defaulting Party shall be liable for any and all losses, claims, damages, liabilities and costs and expenses to the extent such losses were reasonably foreseeable as a result of such Party's actions that cause it to be a Defaulting Party including special, indirect or consequential damages and damages for lost profits; provided that for the avoidance of doubt, such liability shall be several and not joint with any other Defaulting Parties.

Section 10.12 No Reliance. No Commitment Party or any of its Related Parties shall have any duties or obligations to the other Commitment Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein. Without limiting the generality of the foregoing, (a) no Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Commitment Parties, (b) no Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Commitment Party, (c) no Commitment Party or any of its Related Parties shall have any duty to the other Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Commitment Parties any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Commitment Party or any of its Affiliates in any capacity, (d) no Commitment Party may rely, and each Commitment Party confirms that it has not relied, on any due diligence investigation that any other Commitment Party or any Person acting on behalf of such other Commitment Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, and (e) each Commitment Party acknowledges that no other Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Debt Commitment Percentage of its Debt Commitment.

Section 10.13 Publicity. At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company and the Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement, it being understood that nothing in this Section 10.13 shall prohibit any Party from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Chapter 11 Cases or filings with any other court of competent jurisdiction in the Ancillary Proceedings, as applicable.

Section 10.14 Settlement Discussions. This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to section 408 of the U.S. Federal Rules of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases or other court of competent jurisdiction in the Ancillary Proceedings, as applicable (other than a Legal Proceeding to approve or enforce the terms of this Agreement).

Section 10.15 No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' or other respective Related Parties in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 10.15 shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments. For the avoidance of doubt, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties or their respective successors and permitted assigns, as applicable.

Section 10.16 Enforceability of Agreement. Each of the Parties to the extent enforceable, waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required. If any Company Party asserts that the automatic stay prevents the exercise of any termination rights by any Commitment Parties, then this Agreement shall terminate automatically without any further action or notice by any Party.

Section 10.17 Relationship Among Parties. None of the Commitment Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Company Party, or any of the Company Party's respective creditors, equityholders or other stakeholders. It is understood and agreed that any Commitment Party may trade in any debt or equity securities of any Company Party without the consent of any Company Party or any other Commitment Party, subject to applicable securities laws and Section 2.6 of this Agreement. No prior history, pattern or practice of sharing confidences among or between any of the Commitment Parties and/or any Company Party shall in any way affect or negate this understanding and agreement.

[Signature Page Follows]

-79-

IN WITNESS WHEREOF, the undersigned Parties have duly executed this Agreement as of the date first above written.

**Company Parties' Signature Page to**
**the Investment Agreement**

**SEADRILL LIMITED**
EASTERN DRILLING AS
SCORPION COURAGEOUS LTD.
SCORPION DEEPWATER LTD.
SCORPION DRILLING LTD.
SCORPION FREEDOM LTD.
SCORPION INTERNATIONAL LTD.
SCORPION INTREPID LTD.
SCORPION OFFSHORE, INC.
SCORPION USA EXPATS INC.
SCORPION VIGILANT LTD.
SDS DRILLING LTD.
SEA DRAGON DE MEXICO S. DE R.L. DE C.V
SEABRAS RIG HOLDCO LTD.
SEADRILL ABU DHABI OPERATIONS LIMITED
SEADRILL AMA OPERATIONS LTD.
SEADRILL AMERICAS, INC.
SEADRILL AQUILA LTD.
SEADRILL ARIEL LTD.
SEADRILL AURIGA LTD.
SEADRILL BRUNEI LTD.
SEADRILL CALLISTO LTD.
SEADRILL CAPITAL SPARES POOL AS
SEADRILL CAPRICORN LTD.
SEADRILL CARINA LTD.
SEADRILL CASTOR PTE LTD.
SEADRILL COMMON HOLDINGS LTD.
SEADRILL CRESSIDA LTD.
SEADRILL DEEPWATER CHARTERER LTD.
SEADRILL DEEPWATER CONTRACTING LTD.
SEADRILL DEEPWATER CREWING LTD.
SEADRILL DEEPWATER HOLDINGS LTD.
SEADRILL DIONE LTD.
SEADRILL DORADO LTD.
SEADRILL DRACO LTD.
SEADRILL ECLIPSE LTD.
SEADRILL EGYPT OPERATIONS LTD.
SEADRILL EMINENCE LTD.
SEADRILL EQUATORIAL GUINEA LTD.
SEADRILL FREEDOM LTD.
SEADRILL GCC OPERATIONS LTD.
SEADRILL GEMINI LTD.
SEADRILL GLOBAL SERVICES LTD.

*[Signature page to Investment Agreement]*

SEADRILL GULF OPERATIONS NEPTUNE LLC
SEADRILL HYPERION LTD.
SEADRILL INDONESIA LTD.
SEADRILL INSURANCE LTD.
SEADRILL INTERNATIONAL RESOURCING DMCC
SEADRILL INVEST I LTD.
SEADRILL IVORY COAST OPERATIONS LTD.
SEADRILL JACK UP HOLDING LTD.
SEADRILL JACK-UPS CONTRACTING LTD.
SEADRILL JANUS LTD.
SEADRILL JUPITER LTD.
SEADRILL JV GHANA LTD.
SEADRILL LABUAN LTD.
SEADRILL LIBRA LTD.
SEADRILL LIMITED
SEADRILL MANAGEMENT AME LTD.
SEADRILL MANAGEMENT AS
SEADRILL MANAGEMENT LTD.
SEADRILL MANAGEMENT SERVICES LTD.
SEADRILL MIMAS LTD.
SEADRILL MIRA LTD.
SEADRILL NEPTUNE LTD.
SEADRILL NEWFOUNDLAND OPERATIONS LIMITED
SEADRILL NIGERIA DEEPWATER CONTRACTING LTD.
SEADRILL OBERON LTD.
SEADRILL OFFSHORE AS
SEADRILL OFFSHORE MALAYSIA SDN. BHD
SEADRILL OPERATIONS DE MEXICO, S. DE R.L. DE C.V
SEADRILL ORION LTD.
SEADRILL PAYROLL LTD.
SEADRILL PROSPERO LTD.
SEADRILL PROTEUS LTD.
SEADRILL RHEA LTD.
SEADRILL SATURN LTD.
SEADRILL TELESTO LTD.
SEADRILL TELLUS LTD.
SEADRILL TETHYS LTD.
SEADRILL TITAN LTD.
SEADRILL TITANIA SARL
SEADRILL TUCANA LTD.
SEADRILL UK LTD.
SEADRILL UMBRIEL LTD.

**Company Parties' Signature Page to
the Investment Agreement**

SEADRILL VELA LIMITED
SEADRILL VIETNAM LTD.


By:   /s/ Georgina E. Sousa
Name:   Georgina E. Sousa
Title:   Authorized Signatory

**Company Parties' Signature Page to
the Investment Agreement**

GOLDEN DREAM SHIPPING COMPANY LIMITED
SEADRILL AUSTRALIA PTE LTD.
SEADRILL CASTOR LTD.
SEADRILL DEEPWATER UNITS PTE LTD.
SEADRILL FAR EAST LTD.
SEADRILL HOLDINGS SINGAPORE PTE LTD
SEADRILL JANUS LIMITED
SEADRILL MANAGEMENT (S) PTE LTD.
SEADRILL OFFSHORE SINGAPORE PTE LTD.
SEADRILL PEGASUS PTE. LTD.
SEADRILL LARISSA LIMITED
SEADRILL (DALIAN) CONSULTING LTD.


By:      /s/ Lee Geok Hiang
Name:   Lee Geok Hiang
Title:    Authorized Director

**Company Parties' Signature Page to**
**the Investment Agreement**

**NORTH ATLANTIC DRILLING LTD.**
NORTH ATLANTIC ALPHA LTD.
NORTH ATLANTIC CREW AS
NORTH ATLANTIC CREWING LTD.
NORTH ATLANTIC DRILLING LTD.
NORTH ATLANTIC DRILLING UK LTD.
NORTH ATLANTIC ELARA LTD.
NORTH ATLANTIC EPSILON LTD.
NORTH ATLANTIC HELENE LTD.
NORTH ATLANTIC KARI LTD.
NORTH ATLANTIC LINUS CHARTERER LTD.
NORTH ATLANTIC MANAGEMENT AS
NORTH ATLANTIC NAVIGATOR LTD.
NORTH ATLANTIC NORWAY LTD.
NORTH ATLANTIC PHOENIX LTD.
NORTH ATLANTIC RIGEL LTD.
NORTH ATLANTIC SUPPORT SERVICES LTD.
NORTH ATLANTIC VENTURE LTD.


By:      /s/ Georgina E. Sousa
Name:   Georgina E. Sousa
Title:    Authorized Signatory

**Company Parties' Signature Page to**
**the Investment Agreement**

NORTH ATLANTIC MANAGEMENT LLC

By:     /s/ Alf Løudal
Name:   Alf Ragnar Løvdal
Title:   Director

**Company Parties' Signature Page to
the Investment Agreement**

SCORPION DEEPWATER BV
SCORPION NEDERLANDSE BV


By:      /s/ Jon Olav Østhus
Name:   Jon Olav Østhus
Title:    Director

**Company Parties' Signature Page to**
**the Investment Agreement**

SCORPION SERVICOS OFFSHORE LTDA.

By: Scorpion International Ltd.
Its: Shareholder

By:     /s/ Jon Olav Østhus
Name:  Jon Olav Østhus
Title:   Authorized Director

**Company Parties' Signature Page to**
**the Investment Agreement**

SEABRAS HOLDINGS GMBH

By:     /s/ Jon Olav Østhus
Name:   Jon Olav Østhus
Title:   Authorized Signatory

**Company Parties' Signature Page to**
**the Investment Agreement**

SEABRAS RIG HOLDING GMBH

By:      /s/ Jon Olav Østhus
Name:   Jon Olav Østhus
Title:    Authorized Signatory

**Company Parties' Signature Page to**
**the Investment Agreement**

SEABRAS SERVICOS DE PETROLEO SA

By: Seadrill UK Ltd.
Its: Shareholder

       By: /s/ David Sneddon
       Name: David Sneddon
       Title: Authorized Director

By: Seadrill Common Holdings Ltd.
Its: Shareholder

By: /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

**Company Parties' Signature Page to**
**the Investment Agreement**

SEADRILL ANGOLA LTDA.

By: /s/ Roger Åserød
Name: Roger Åserød
Title: Director

By: /s/ Alok Jha
Name: Alok Jha
Title: Director

By: /s/ Renato Moure 6/9/17
Name: Renato Moure
Title: Director

**Company Parties' Signature Page to
the Investment Agreement**

SEADRILL JACK UP I BV
SEADRILL SAUDI I BV
SEADRILL SAUDI II BV


By:      /s/ Jon Olav Østhus
Name:   Jon Olav Østhus
Title:    Director


By:      /s/ Ieva Zigmantaite
Name:   Ieva Zigmantaite
Title:    Director

**Company Parties' Signature Page to
the Investment Agreement**

SEADRILL JACK UP II BV

By:  /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Director

By:  /s/ Johannes Maria Anonius
Name: Johannes Maria Anonius 5.9.2017
Title: Director

**Company Parties' Signature Page to
the Investment Agreement**

SEADRILL MIRA HUNGARY KFT.
SEADRILL NEPTUNE HUNGARY KFT.


By:  /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Director

**Company Parties' Signature Page to**
**the Investment Agreement**

SEADRILL NIGERIA OPERATIONS LTD.

By:     /s/ Thompson Tatua
Name:    Thompson Tatua
Title:    Director


By:     /s/ Grant Creed
Name:    Grant Creed
Title:    Director

**Company Parties' Signature Page to
the Investment Agreement**

SEADRILL OFFSHORE NIGERIA LTD.

By: Seadrill UK Ltd.
Its: Shareholder

      By:  /s/ David Sneddon
      Name: David Sneddon
      Title: Authorized Director

By: Seadrill Limited
Its: Shareholder

      By:  /s/ Georgina E. Sousa
      Name: Georgina E. Sousa
      Title: Authorized Signatory

**Company Parties' Signature Page to
the Investment Agreement**

SEADRILL SERVICOS DE PETROLEO LTDA.

By: Eastern Drilling AS
Its: Shareholder

By: _____/s/ Jon Olav Østhus_____
Name: Jon Olav Østhus
Title: Authorized Director

By: Seadrill Offshore AS
Its: Shareholder

By: _____/s/ Jon Olav Østhus_____
Name: Jon Olav Østhus
Title: Authorized Director

**Company Parties' Signature Page to**
**the Investment Agreement**

SEVAN INVESTIMENTOS DO BRASIL LTDA

By: Sevan Drilling Limited
Its: Shareholder

By: _____/s/ Georgina E. Sousa_____
Name: Georgina E. Sousa
Title: Authorized Signatory

By: Sevan Drilling Rig IX Pte.
Its: Shareholder

By: Sevan Drilling Limited
Its: Shareholder

By: _____/s/ Georgina E. Sousa_____
Name: Georgina E. Sousa
Title: Authorized Signatory

**Company Parties' Signature Page to
the Investment Agreement**

SUBSEA DRILLING (IV) LIMITED

By:  /s/ Livar Voll
_____
Name: Livar Voll
Title: Authorized Director

**Company Parties' Signature Page to**
**the Investment Agreement**

SUBSEA DRILLING (III) LIMITED

By:  /s/ Jon Olav Østhus
Name: Jon Olav Østhus
Title: Authorized Director

**Company Parties' Signature Page to
the Investment Agreement**

**SEVAN DRILLING LIMITED**
SEVAN BRASIL LTD.
SEVAN DEVELOPER LTD.
SEVAN DRILLER LTD.
SEVAN DRILLING ASA
SEVAN DRILLING LIMITED (UK)
SEVAN DRILLING LTD. (BERMUDA)
SEVAN DRILLING MANAGEMENT AS
SEVAN DRILLING NORTH AMERICA LLC
SEVAN DRILLING RIG II AS
SEVAN DRILLING RIG V AS
SEVAN DRILLING RIG VI AS


By:     /s/ Georgina E. Sousa
Name:   Georgina E. Sousa
Title:     Authorized Signatory

**Company Parties' Signature Page to**
**the Investment Agreement**

SEVAN DRILLING PTE LTD.
SEVAN DRILLING RIG II PTE LTD.
SEVAN DRILLING RIG IX PTE LTD.
SEVAN DRILLING RIG V PTE LTD.
SEVAN DRILLING RIG VI PTE. LTD.


By:  /s/ Lee Geok Hiang
Name: Lee Geok Hiang
Title: Authorized Director

**Company Parties' Signature Page to**
**the Investment Agreement**

SEVAN MARINE SERVICOS DE PERFURACAO LTDA

By: Sevan Drilling Rig IX Pte.
Its: Shareholder

    By: Sevan Drilling Limited
    Its: Shareholder

        By:    /s/ Georgina E. Sousa
        Name:  Georgina E. Sousa
        Title:   Authorized Signatory


By: Sevan Investimentos do Brasil Ltda
Its: Shareholder

    By: Sevan Drilling Limited
    Its: Shareholder

        By:    /s/ Georgina E. Sousa
        Name:  Georgina E. Sousa
        Title:   Authorized Signatory


By: Sevan Drilling Rig IX Pte.
Its: Shareholder

    By: Sevan Drilling Limited
    Its: Shareholder

        By:    /s/ Georgina E. Sousa
        Name:  Georgina E. Sousa
        Title:   Authorized Signatory

**Company Parties' Signature Page to
the Investment Agreement**

SEVAN LOUISIANA HUNGARY KFT.

By:  /s/ Scott Mcreaken

Name: Scott Mcreaken
Title: Director

**Company Parties' Signature Page to
the Investment Agreement**

SOAS SERVICOS DE PETROLEO LTDA.

By: Eastern Drilling AS
Its: Shareholder


By: _____/s/ Jon Olav Østhus_____
Name: Jon Olav Østhus
Title : Authorized Director

By: Seadrill Offshore AS
Its: Shareholder


By: _____/s/ Jon Olav Østhus_____
Name: Jon Olav Østhus
Title: Authorized Director

[COMMITMENT PARTIES]

By:
     Name:
     Title:

[*Signature page to Investment Agreement*]

SCHEDULE 1

Debt Commitment Schedule

Equity Commitment Schedule

Sch. 1-1

SCHEDULE 2

Form of Joinder Agreement

JOINDER AGREEMENT

This joinder agreement (the "**Joinder Agreement**") to the Investment Agreement dated September [•], 2017 (as amended, supplemented or otherwise modified from time to time, the "**Investment Agreement**"), between the Company (as defined in the Investment Agreement), the other Company Parties (as defined in the Investment Agreement) and the Commitment Parties (as defined in the Investment Agreement) is executed and delivered by (the "**Joining Party**") as of , 201 (the "**Joinder Date**").

Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Investment Agreement.

Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the Investment Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof), as a Commitment Party for all purposes under the Investment Agreement.

Representations and Warranties. The Joining Party hereby severally and not jointly makes the representations and warranties given by the Commitment Parties set forth in Section 4 of the Investment Agreement to the Company Parties as of the date of this Joinder Agreement.

Governing Law. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

[Signature pages follow]

Sch. 2-1

SCHEDULE 3

Registration Rights Agreement Term Sheet

**SEADRILL LIMITED**

**Registration Rights Term Sheet1**

*This indicative summary of terms and conditions (this "__Registration Rights Term Sheet__") is for discussion purposes only. This Registration Rights Term Sheet does not constitute an agreement or an offer to enter into an agreement to purchase equity securities or the rights associated with such equity securities described herein or otherwise. Such an agreement will arise only under definitive documentation (the "__Registration Rights Agreement__") duly executed by the parties in accordance with its terms and is further subject to, among other things, the final order of the Bankruptcy Court confirming the Plan and the effectiveness of the Plan. This Registration Rights Term Sheet does not attempt to describe all of the terms, conditions and requirements that would pertain to the purchase of equity securities or the rights associated with such equity securities described herein, but rather is intended to outline certain basic items around which the equity investment will be structured. This Registration Rights Term Sheet is not intended to limit the scope of discussion or negotiation of any and all matters whether or not set forth herein. All dollar amounts, where not otherwise specified, are in United States dollars.*

| | |
|---|---|
| **Issuer:** | Seadrill Limited, a Bermuda company, or New Seadrill Limited, a Bermuda company (such entity, the "__Issuer__") |
| **Investor Parties to Registration Rights Agreement:** | Hemen Investments Limited, a Cyprus holding company ("__Hemen__") |
| | Centerbridge Credit Partners L.P. (along with certain of its affiliates, "__Centerbridge__") |
| | Certain funds and/or accounts that are managed, advised or sub-advised by each of Aristeia Capital L.L.C., GLG Partners LP, Saba Capital Management LP and Whitebox Advisors, LLC or such Person's affiliate(s), in each case, that are signatories to the Investment Agreement (collectively, the "__Select Commitment Parties__"). |

**Registration Rights**

| | |
|---|---|
| **Exemption from SEC Registration:** | The Equity Securities issued and sold pursuant to the Investment Agreement will be issued and sold in reliance upon an exemption from registration under Section 4(a)(2) of the Securities Act of 1933, as amended (the "__Securities Act__"), or another exemption thereunder, and will therefore be "restricted securities" within the meaning of Rule 144 under the Securities Act. |
| **Registrable Securities:** | "__Registrable Securities__" means each of the following: (a) any Equity Securities issued to the Commitment Parties as contemplated by the Investment Agreement (including any Equity Securities owned by any of the Commitment Parties as a result of, or issuable upon, the conversion, exchange or exercise of options, warrants and other |

---

1   Capitalized terms used but not defined in this Registration Rights Term Sheet have the meanings given to such terms in the Investment Agreement.

securities convertible into, or exchangeable or exercisable for (at any time or upon the occurrence of any event or contingency and without regard to any vesting or other conditions to which such securities may be subject) such Equity Securities; (b) any other Equity Securities acquired or owned by any of the Commitment Parties prior to the effectiveness of the Resale Registration Statement, or acquired or owned by any of the Commitment Parties after the effectiveness of the Resale Registration Statement if such Commitment Party is an Affiliate of the Issuer and (c) any Equity Securities issued or issuable to any of the Commitment Parties with respect to the Registrable Securities by way of stock or unit dividend or stock or unit split or in connection with a combination of shares or units, recapitalization, merger, consolidation or other reorganization or otherwise and any Equity Securities, as the case may be, issuable upon conversion, exercise or exchange thereof; provided that any such Registrable Securities shall cease to be Registrable Securities when (i) a Registration Statement covering such Registrable Securities has been declared effective under the Securities Act by the SEC and such Registrable Securities have been disposed of pursuant to such effective Registration Statement, (ii) such Registrable Securities are sold in a private transaction in which the transferor's rights under the Registration Rights Agreement are not assigned to the transferee of such securities, (iii) the date on which such Registrable Securities have been disposed of pursuant to Rule 144 or (iv) the date on which such Registrable Securities cease to be outstanding.

| | |
|---|---|
| **Restrictions on Transfer:** | Absent registration under the Securities Act, sales of Registrable Securities may be made pursuant to one or more exemptions under the Securities Act, including Rule 144A, Regulation S and Rule 144 under the Securities Act (subject to holding periods and limitations on sales by affiliates) and, if applicable, in accordance with applicable non-U.S. securities laws. |
| | The Issuer shall at all times use commercially reasonable efforts to make available information necessary to comply with Rule 144 and Rule 144A under the Securities Act with respect to resales of Registrable Securities to the extent required to enable holders of Registrable Securities to sell without registration within the limitations of the exemptions provided by Rule 144 and Rule 144A. |
| **Registration Rights2:** | The Issuer shall use commercially reasonable efforts to file an initial registration statement on Form F-13 with the SEC within five (5) Business Days following the date of the entry of the confirmation order (the "**Confirmation Order**") of the Bankruptcy Court confirming the Plan (the "**Registration Statement Filing Date**"), which will cover the sale, resale or other distribution on a continuous basis pursuant to Rule 415 under the Securities Act of the Registrable Securities (the "**Resale Registration Statement**"). |

---

2    Note: Similar detail to be agreed in respect of Oslo listing following discussions with Norwegian counsel to the company to the extent applicable.

3    Note: Form of registration statement to be confirmed.

The Issuer shall use commercially reasonable efforts to have the Resale Registration Statement declared effective by the SEC (the "**Registration Statement Effectiveness**") and to effectuate the transactions set forth herein as soon as reasonably practicable following the Registration Statement Filing Date.

It is understood that in the event the Issuer becomes a WKSI or is otherwise eligible to use Form F-3, it shall use commercially reasonable efforts to convert the Resale Registration Statement on Form F-1 into a Resale Registration Statement on Form F-3 as soon as reasonably practicable. If the Issuer thereafter becomes ineligible to use Form F-3, it shall use commercially reasonable efforts to file and obtain an effective Resale Registration Statement on Form F-1 as soon as reasonably practicable.

The Issuer shall inform all the shareholders named in the Resale Registration Statement of its effectiveness on the same Business Day as effectiveness is obtained and shall file a final prospectus under Rule 424 with the SEC to the extent required. The Issuer shall maintain the effectiveness of the Resale Registration Statement until the date on which all of the Registrable Securities covered by the Resale Registration Statement have been sold.

The plan of distribution of the Resale Registration Statement shall provide for customary means of disposition of the Registrable Securities covered by the Resale Registration Statement.

**Underwritten shelf takedown, demand and piggy back registration rights:**

(a) Hemen, (b) Centerbridge and (c) the Select Commitment Parties (each, a "**Qualified Holder**") may request to sell all or a portion of its Registrable Securities in an underwritten offering (including block trades) that is registered pursuant to the Resale Registration Statement ("**Underwritten Shelf Takedown**"), subject to the priority allocations as set forth below; *provided*, however, that no Qualified Holder shall be entitled to make a demand for any Underwritten Shelf Takedown unless such Qualified Holder holds at least 5% of the outstanding Equity Securities, calculated at the time of such demand, but shall be entitled to piggyback registration rights as set forth herein.

In connection with one or more Underwritten Shelf Takedowns relating to the first $200 million[4] of Registrable Securities, any cutback in connection with such offering shall be allocated as follows: (i) Hemen shall be entitled to 54% of the Registrable Securities in such Underwritten Shelf Takedown, (ii) Centerbridge shall be entitled to 6% of the Registrable Securities in such Underwritten Shelf Takedown and (iii) the Select Commitment

---

[4]    Note: This should correspond to the amount that is actually purchased ($200m less whatever is taken up in the $25m equity rights offering).

Parties shall be entitled to 40% of the Registrable Securities in such Underwritten Shelf Takedown (such securities, the "**Priority Shares**"). Thereafter (i.e., following the sale of the first $200 million[5] of Registrable Securities), any cutback in connection with an Underwritten Shelf Takedown shall be allocated on a *pro rata* basis based off the Registrable Securities attributable to the aggregate New Secured Notes purchased by each Commitment Party at Closing. The holders of a majority of the Registrable Securities requested to be included in an Underwritten Shelf Takedown shall have the right to select the investment banker(s) and manager(s) to administer the offering, subject to the Issuer's approval which shall not be unreasonably withheld, conditioned or delayed, and determine the sale price.

In addition to the above registration rights for Underwritten Shelf Takedowns, (i) each Qualified Holder that holds at least 5% of the outstanding Equity Securities, calculated at the time of such demand, shall receive unlimited demand resale registration rights (if there is no effective Resale Registration Statement and the terms of the Registration Rights Agreement would otherwise require that the Resale Registration Statement be effective) and (ii) each Qualified Holder shall receive unlimited piggyback registration rights. The demand and piggyback registration rights shall be transferable (A) in connection with any private sale transaction of Registrable Securities of $25 million or more and (B) in connection with any transfer of Registrable Securities to an affiliate.

Notwithstanding the foregoing, the Issuer will not be required to effect (x) more than four (4) Underwritten Shelf Takedowns (together with any demand registrations) in any 12-month period; (y) an Underwritten Shelf Takedown or demand registration within sixty (60) days (or such longer period specified in any applicable lock-up agreement entered into with underwriters) after the consummation of a previous Underwritten Shelf Takedown or demand registration or (z) any Underwritten Shelf Takedown or demand registration if the aggregate proceeds expected to be received from the sale of the Registrable Securities requested to be sold in such Underwritten Shelf Takedown or demand registration, in the good faith judgment of the managing underwriter(s) therefor (or the Issuer if such demand registration is not underwritten), is less than $50 million.

Subject to the cutback provisions set forth above, for any piggyback registration that is an underwritten offering initiated by the Issuer for a primary offering, if the managing underwriter(s) advise the Issuer in writing that in their opinion the number of Registrable Securities requested to be included exceeds the number of securities which can be sold without adversely affecting the marketability, proposed offering price, timing or method of distribution of the offering, the

---

5    Note: This should correspond to the amount that is actually purchased ($200m less whatever is taken up in the $25m equity rights offering).

4

Issuer shall include in such registration the maximum amount of securities that would not have such adverse effect: (i) first, the securities offered by the Issuer; (ii) second, the Priority Securities; (iii) third, up to the full amount of the Registrable Securities requested to be included, reduced *pro rata* among the respective holders thereof on the basis of the amount of Registrable Securities owned by each such holder; and (iv) fourth, any other securities to be included pursuant to a registration request from such other holders in such proportions as the Issuer and those holders may agree.

The Issuer shall have the right to select the managing underwriter(s) for any offering initiated by the Issuer under which the Qualified Holders have piggyback rights, reasonably acceptable to the holders of a majority of Registrable Securities, if any, to be included in such offering, which approval shall not be unreasonably withheld or delayed.

In any underwritten offering, the Issuer shall use commercially reasonable efforts to enter into customary underwriting agreements with the managing underwriter(s) including, without limitation, supporting, and paying the fees for, the Issuer's independent certified public accountant to provide comfort letters to the underwriters and agreeing to all other customary provisions in similar underwritten offerings.

**Listing:**

The Issuer shall, as soon as reasonably practicable following the Confirmation Order and prior to the Effective Date, submit listing applications to the Oslo Stock Exchange and the New York Stock Exchange (or an alternate "national securities exchange" (within the meaning of the Exchange Act), as reasonably determined by the Issuer's board in consultation with the Commitment Parties) for the listing thereon of the Equity Securities.

The Issuer shall use commercially reasonable efforts to (i) cause the Equity Securities to be listed on the Oslo Stock Exchange and (ii) cause the Equity Securities to be listed on the New York Stock Exchange (or an alternate "national securities exchange" (within the meaning of the Exchange Act), as reasonably determined by the Issuer's board in consultation with the Commitment Parties) and registered under the Exchange Act concurrently with the Registration Statement Effectiveness.

**Fees and Expenses of Registration and Listing:**

To be borne by the Issuer (other than underwriting fees, discounts, selling commissions and stock transfer taxes of a selling shareholder).

The Issuer will pay reasonable and documented fees and expenses within 30 calendar days of receipt of the applicable invoice of one single special counsel to represent all of the participating Qualified Holders ("**Investors' Counsel**") selected: (i) in the case of an Underwritten Shelf Takedown, by the holders of a majority of the Registrable Securities requesting such Underwritten Shelf Takedown; and (ii) in the case of a Piggyback Registration, the holders of a majority of the Registrable Securities included in such Piggyback Registration.

| | |
|---|---|
| **Lock-Up:** | In connection with the first (and, for the avoidance of doubt, *only* the first) public/underwritten offering (regardless of whether such offering is a primary or secondary offering and including an Underwritten Shelf Takedown), each Qualified Holder agrees that it shall not, during the 60 days after the pricing (the "**Lock-Up Period**"), directly or indirectly, offer, pledge, assign, encumber, announce the intention to sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, or otherwise transfer or dispose of any of their Acquired Equity Securities, Granted Equity Securities or Equity Securities issued to such Qualified Holder in connection with the Structuring Fee to any Person; *provided, however,* that the Lock-Up Period shall not apply to the following: (i) the Equity Securities issued to a Commitment Party in exchange for such party's Unsecured Notes under the Plan (i.e., the 1145 exempt Equity Securities); (ii) resales of a maximum of 15% of the applicable Commitment Party's Equity Securities as of the Closing Date pursuant to the Resale Registration Statement; (iii) a tender offer for the Equity Securities approved by the Board of Directors of the Issuer; (iv) sales to the Issuer pursuant to an authorized share repurchase program in accordance with Rule 10b5-1 under the Exchange Act; (v) Registrable Securities included in the Underwritten Shelf Takedown; (vi) transfers of Equity Securities between affiliate entities of a Commitment Party; or (vii) sales of Equity Securities pursuant to such registered offering. For the avoidance of doubt, (a) the Lock-Up Period shall not apply to any Equity Securities sold under one or more exemptions from registration under the Securities Act, but shall apply to sales on the Oslo Stock Exchange and (b) before the commencement of, and after the termination or expiration of, the Lockup Period, there shall be no restrictions on the ability of any Qualified Holder to resell its Registrable Securities through the Resale Registration Statement in non-underwritten offerings.

The Lock-Up Period may be extended for up to an additional 30 days (for an aggregate of 90 days), at the reasonable request of the managing underwriters/ lead book-runner/ manager. |
| **Review and Comment:** | In connection with an Underwritten Shelf Takedown or Piggyback Registration, at least 5 Business Days before filing a registration statement (other than the initial registration statement, in which case such period shall be at least 15 Business Days), prospectus, prospectus supplement or an amendment to the foregoing with the SEC, the Issuer shall furnish Investors' Counsel with such documents, and such documents are subject to the reasonable review, comment and approval of such counsel before filing. |
| **Holder Information:** | Holders seeking registration of Registrable Securities will be required to timely provide customary information to allow the Issuer to list such holders as selling securityholders in a registration statement or prospectus. |

| | |
|---|---|
| **Indemnification:** | Customary cross-indemnification and contribution provisions by the Issuer, on the one hand, and the Commitment Parties, on the other hand. |
| **Other Covenants:** | Such other covenants and agreements as are customary for registration rights agreements that the Issuer and the Commitment Parties shall mutually agree. |
| **Removal of Legends:** | Substantially consistent with Section 5.12 of the Investment Agreement as applied to the Registrable Securities. |
| **Successors and Assigns:** | The Issuer may assign its rights and obligations under the Registration Rights Agreement with the consent of the Commitment Parties holding a majority of the Registrable Securities on the Closing Date in connection with a sale or acquisition of the Issuer in which the successor or acquiring person agrees in writing to assume all of the Issuer's rights and obligations under the Registration Rights Agreement.<br><br>Each Commitment Party may assign its rights under the Registration Rights Agreement to any affiliate of such Commitment Party without the Issuer's consent; *provided* that such transferee shall be required to become a party to the Registration Rights Agreement. |
| **Amendments:** | Amendments or modifications to the Registration Rights Agreement, and any waivers under the Registration Rights Agreement, shall require the consent of: (i) Hemen and Centerbridge and (ii) Select Commitment Parties holding 2/3rds of the Registrable Securities held by all Select Commitment Parties. |
| **Governing Law:** | New York. |

SCHEDULE 4

Material Documents

1.  Definitive Documents (as defined in the Restructuring Support and Lock-Up Agreement)

2.  Registration Rights Agreement

3.  New Secured Notes

Sch. 4-1

SCHEDULE 5

Notice Information

<u>Select Commitment Parties</u>

Sch. 5-1

**EXHIBIT A**

Form of Rights Offering Procedures

# SEADRILL LIMITED

# DEBT RIGHTS OFFERING PROCEDURES

The New Seadrill Common Stock and the NSNCo New Secured Notes (collectively, the "<u>Debt Rights Offering Securities</u>") are distributed and issued (the "<u>Debt Rights Offering</u>") without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), in reliance upon the exemption from registration provided by Section 4(a)(2) thereof, Regulation D and/or Regulation S.

None of the Subscription Rights (defined below) or Debt Rights Offering Securities issuable upon exercise of such rights distributed pursuant to these Debt Rights Offering Procedures have been or, at the time of original issuance, will be registered under the Securities Act, or the securities laws of any state.

No Subscription Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the Debt Rights Offering Securities, the Applicable Claims (defined below) and any related claims) (each of the above, a "<u>Transfer</u>"); provided, however, that holding securities attesting ownership of Subscription Rights in an account with a broker-dealer where the broker-dealer holds a security interest or other encumbrance over property in the account generally, which security interest or other encumbrance is released upon transfer of such securities, shall not constitute a "Transfer" for purposes hereof.

No Debt Rights Offering Securities may be sold or transferred except pursuant to an exemption from registration under the Securities Act or the securities laws of any state.

These Debt Rights Offering Procedures are being distributed and communicated only to Eligible Holders (defined below). The Debt Rights Offering Securities are available only to, and any invitation, offer or agreement to purchase will be entered into only with Eligible Holders. Any person who is not a Eligible Holder should not act or rely on this document or any of its contents.

The distribution or communication of these Debt Rights Offering Procedures and the issue of the Debt Rights Offering Securities in certain jurisdictions may be restricted by law. No action has been taken or will be taken to permit the distribution or communication of these Debt Rights Offering Procedures in any jurisdiction where any action for that purpose may be required. Accordingly, these Debt Rights Offering Procedures may not be distributed or communicated, and the Debt Rights Offering Securities may not be subscribed, purchased or issued, in any jurisdiction except in

circumstances where such distribution, communication, subscription, purchase or issue would comply with all applicable laws and regulations without the need for the issuer to take any action or obtain any consent, approval or authorization therefor except for any notice filings required under U.S. federal and applicable state securities laws.

Each Rights Offering Security issued upon exercise of a Subscription Right, and each certificate issued in exchange for or upon the transfer, sale or assignment of any such Debt Rights Offering Securities, shall be stamped or otherwise imprinted with a legend in substantially the following form:

["[THIS NOTE HAS/THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE] NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, ACCORDINGLY, NEITHER THE [NOTE/SHARES] NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF WITHIN THE UNITED STATES WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER ON ITS OWN BEHALF AND BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED [NOTE/SHARES] (1) REPRESENTS THAT (A) IT IS AN "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501 UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THE [NOTE/SHARES] IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THE [NOTE/SHARES] OR ANY BENEFICIAL INTEREST THEREIN EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) FOR SO LONG AS THE [NOTE/SHARES] ARE ELIGIBLE FOR RESALE PURSUANT TO 144A UNDER THE SECURITIES ACT, INSIDE THE UNITED STATES TO A PERSON IT REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (D) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REASONABLY REQUESTS), OR (E) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM [THIS NOTE IS/THESE SHARES ARE] TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING AS DEFINED BY REGULATION S UNDER THE SECURITIES ACT."]

ii

**[In the case of Debt Rights Offering Securities sold pursuant to Regulation S, each certificate shall additionally be stamped or otherwise imprinted with a legend in substantially the following form:**

**THESE SECURITIES WERE ISSUED IN AN OFFSHORE TRANSACTION TO PERSONS WHO ARE NOT, OR NOT FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS PURSUANT TO REGULATION S UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). ACCORDINGLY, NONE OF THE SECURITIES TO WHICH THIS CERTIFICATE RELATES HAVE BEEN REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, UNLESS SO REGISTERED, THESE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING AS DEFINED BY REGULATION S UNDER THE 1933 ACT.**

**[Additional Jurisdiction Legends to Come if Applicable]**

**In any member state of the European Economic Area (the "EEA") that has implemented the EU Prospectus Directive (each, a "Relevant Member State"), these Debt Rights Offering Procedures are only addressed to and only directed at qualified investors in that Relevant Member State within the meaning of the EU Prospectus Directive. These Debt Rights Offering Procedures have been prepared on the basis that all offers of Debt Rights Offering Securities within the EEA will be made pursuant to an exemption under the EU Prospectus Directive from the requirement to produce a prospectus for offer of securities. Accordingly, any person making or intending to make any subscription of Debt Rights Offering Securities within any EEA member state should only do so in circumstances in which no obligation arises to publish a prospectus or a supplement to a prospectus under the EU Prospectus Directive for such offer. Neither Seadrill Limited, NSNCo nor any person acting on their behalf has authorized, nor do they authorize, the making of any offer of Debt Rights Offering Securities through any financial intermediary, other than as may be contemplated herein. The expression "EU Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in each Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.**

**The Debt Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

Pursuant to the Plan, if Class B3, D3 or F3, constituting the General Unsecured Claims against Seadrill, NADL, and Sevan, vote as a class to accept the Plan, the Subscription Agent will transmit to Holders of claims of each class that voted to accept the Plan (the "Applicable Claims") as of the Record Date a certification form (an "Eligibility Certificate") to determine if such Holder is an Eligible Holder (defined below) permitted to participate in the Debt Rights Offering.

An "Eligible Holders" is a Holder of an Applicable Claim as of the Record Date that is:

(1)   an "Accredited Investor" (as defined by Rule 501 of Regulation D promulgated under the Securities Act) and, if that person is in a Member State of the EEA that has implemented the EU Prospectus Directive, is a "qualified investor" in that Relevant Member State within the meaning of the EU Prospectus Directive; or

(2)   is a "Qualified Investor" (defined below) that is not a "U.S. Person" (as defined by Rule 902 of Regulation S promulgated under the Securities Act).

The term "Qualified Investor" means:

(1)   a non-U.S. Person in a Member State of the EEA, that is a "qualified investor" in that Relevant Member State within the meaning of the EU Prospectus Directive; or

(2)   a non-U.S. Person not in a Member State of the EEA, that is lawfully entitled subscribe and purchase the Debt Rights Offering Securities under all applicable securities laws and regulations (whether pursuant to an applicable exemption or otherwise), without the need for any registration, the filing or publication of any prospectus or other action by the issuer.

Each Eligible Holder, seeking to participate in the Debt Rights Offering is required to return the applicable Eligibility Certificate to the Subscription Agent so as to be actually received by the Subscription Agent by the Eligibility Certificate Deadline ([•], 2017 at 5:00 p.m. New York City time) and is required to certify therein to the ownership of an Applicable Claim and status as an Eligible Holder.

Only those Holders of Applicable Claims that certify that they are Eligible Holders will have the opportunity to participate in the Debt Rights Offering. Holders of Applicable Claims that do not return the applicable Eligibility Certificate will be deemed to relinquish and waive any right to participate in the Debt Rights Offering.

Pursuant to the Plan (and in accordance with and subject to the terms and conditions of these Debt Rights Offering Procedures, the Subscription Form and the Subscription Agreement), if Class B3, D3 or F3, constituting the General Unsecured Claims against Seadrill, NADL, and Sevan, vote as a class to accept the Plan, each Eligible Holder of an Applicable Claim will receive subscription rights to subscribe for its pro rata share of Debt Rights Offering Securities (the "Subscription Rights"), provided that the Debt Commitment Parties have agreed not to receive Subscription Rights on account of their Applicable Claims against Seadrill, NADL, and Sevan held as of the Agreement Effective Date (as defined in the Restructuring Support and

1

Lock-Up Agreement). Holders of claims in a class enumerated above that does not vote as a class to approve the Plan will not receive Subscription Rights in respect of claims in such class. For the avoidance of doubt, Debt Commitment Parties shall receive Subscription Rights for Applicable Claims acquired by such Debt Commitment Parties after the Agreement Effective Date (as defined in the Restructuring Support and Lock-Up Agreement).

Eligible Holders (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|------|---------------|-------|
| Record Date | [•], 2017 | The date and time fixed for the determination of the holders entitled to participate in the Debt Rights Offering. |
| Subscription Commencement Date | [•], 2017 | Commencement of the Debt Rights Offering. |
| Subscription Expiration Deadline | 5:00 p.m. New York City time on [•], 2017 | The deadline for Eligible Holders of Applicable Claims to subscribe for Debt Rights Offering Securities. The Eligible Holder's Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement must be received by the Subscription Agent by the Subscription Expiration Deadline. |
| | | Eligible Holders who hold Applicable Claims through a broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee (as applicable, the "Nominee") must provide their Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to allow sufficient time to allow such Nominee to process and deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline. |
| | | Eligible Holders of Applicable Claims who are not Debt Commitment Parties (as defined in the Investment Agreement) must deliver the aggregate Purchase Payment by the Subscription Expiration Deadline. |
| | | Eligible Holders who are Debt Commitment Parties must deliver the aggregate Purchase Price within the third Business Day following receipt of a Funding Notice (as defined below) in accordance with the terms of the Investment Agreement. |

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below) or Investment Agreement (as defined in the Plan) as applicable.**

2

To Eligible Holders and Nominees of Eligible Holders:

On September [•], 2017, the Debtors filed their Chapter 11 Plan of Reorganization with the United States Bankruptcy Court for the [•] (as such plan of reorganization may be amended or modified from time to time in accordance with its terms, the "Plan"), and the disclosure statement with respect to the Plan (as such disclosure statement may be amended from time to time in accordance with its terms, the "Disclosure Statement"). Pursuant to the Plan, each Holder of an Applicable Claim as of the Record Date that is an Eligible Holder and that has timely and validly completed and returned an Eligibility Certificate has the right to participate in the Debt Rights Offering in accordance with the terms and conditions of the Subscription Agreement and these Debt Rights Offering Procedures.

Only Eligible Holders that provide an Eligibility Certificate and complete the Eligibility Questionnaire included as part of the Subscription Form may participate in the Debt Rights Offering.

Pursuant to the Plan, if Class B3, D3 or F3, constituting the General Unsecured Claims against Seadrill, NADL, and Sevan, vote as a class to accept the Plan, each Eligible Holder of an Applicable Claim (other than a Debt Commitment Party on account of their Applicable Claims against Seadrill, NADL, and Sevan held as of the Agreement Effective Date) will receive Subscription Rights to subscribe for its pro rata share of Debt Rights Offering Securities, provided that it timely and properly executes and delivers its applicable Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the Subscription Agent or its Nominee, as applicable, in advance of the Subscription Expiration Deadline. Each Nominee will receive a Master Subscription Form which it shall use to summarize the Subscription Rights exercised by each Eligible Holder of Applicable Claims that timely returns the applicable properly filled out Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to such Nominee. Please note that all Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement must be returned to the applicable Nominee in sufficient time to allow such Nominee to process and deliver the Master Subscription Form and copies of all Subscription Forms (and the accompanying Subscription Agreements and IRS Forms) prior to the Subscription Expiration Deadline.

No Eligible Holder shall be entitled to participate in the Debt Rights Offering unless the aggregate Purchase Price (as defined below) for the Debt Rights Offering Securities it subscribes for is received by the Subscription Agent (i) in the case of an Eligible Holder of an Applicable Claim that is not a Debt Commitment Party by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Holder of an Applicable Claim that is a Debt Commitment Party, on the third Business Day following receipt of a written notice (a "Funding Notice") delivered by [•] to the Debt Commitment Parties in accordance with Section 2.4 of the Investment Agreement (the "Backstop Funding Deadline"). No interest is payable on any advanced funding of the Purchase Price except in the case of Commitment Parties, in which case interest will be calculated and paid under the terms of the Escrow

4

Agreement. If the Debt Rights Offering is terminated for any reason, your Purchase Price will be returned to you promptly. Debt Commitment Parties may deposit their Purchase Price in the Escrow Account (as defined below). No interest will be paid on any returned Purchase Price. Any Eligible Holder of an Applicable Claim submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to allow the Nominee to forward such payment to the Subscription Agent by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable.

**In order to participate in the Debt Rights Offering, you must complete all the steps outlined below by the Subscription Expiration Deadline, or the Backstop Funding Deadline, as applicable. If you fail to do so, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Debt Rights Offering.**

### 1. Rights Offering

If Class B3, D3 or F3, constituting the General Unsecured Claims against Seadrill, NADL, and Sevan, vote as a class to accept the Plan, each Eligible Holder of an Applicable Claim (other than a Debt Commitment Party on account of their Applicable Claims against Seadrill, NADL, and Sevan held as of the Agreement Effective Date) will have the right, but not the obligation, to participate in the Debt Rights Offering. Only Holders of an Applicable Claim as of the Record Date that validly and timely completed the Eligibility Certificate and the Eligibility Questionnaire included as part of the Subscription Form and that are Eligible Holders may participate in the Debt Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Debt Rights Offering Procedures, the Subscription Form and the Subscription Agreement, each Eligible Holder is entitled to subscribe for $1,000 Principal Amount of New Secured Notes per $[•] amount of Applicable Claim at a purchase price of $[•], plus accrued interest if any (the "<u>Purchase Price</u>"). Each Eligible Holder who subscribes for New Secured Notes will also receive [•] shares of Common Stock per $1,000 aggregate principal amount of New Secured Notes purchased.

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT AND THE INVESTMENT AGREEMENT IN THE CASE OF ANY DEBT COMMITMENT PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

### 2. Subscription Period

The Debt Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline. Each Eligible Holder intending to purchase Debt Rights Offering Securities in the Debt Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Subscription Form and Subscription Agreement by the Subscription Expiration Deadline.

5

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

The Debtors may extend the Subscription Expiration Deadline with the consent of the Required Commitment Parties (as defined in the Investment Agreement), such consent not to be unreasonably withheld, or as required by law.

**3.  Delivery of Subscription Agreement**

Subject to the terms and conditions of the Subscription Agreement, each Eligible Holder may exercise all or any portion of such Eligible Holder's Subscription Rights. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send these Debt Rights Offering Procedures, Subscription Form and Subscription Agreement to each Eligible Holder or its Nominee, as applicable, together with appropriate instructions for the proper completion, due execution and timely delivery of the executed Subscription Form and Subscription Agreement and the payment of the applicable Purchase Price for its Debt Rights Offering Securities.

**4.  Exercise of Subscription Rights**

(a) In order to validly exercise its Subscription Rights, each Eligible Holder that is not a Debt Commitment Party must:

i.   return a duly executed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the Subscription Agent or its Nominee, as applicable, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and and

ii.  at the same time it returns its Subscription Agreement and Subscription Form to the Subscription Agent or its Nominee, as applicable, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the Subscription Form.

(b) In order to validly exercise its Subscription Rights, each Eligible Holder that is a Debt Commitment Party must:

i.   return a duly executed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the Subscription Agent or its Nominee, as applicable, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and and

ii.  no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the Debt Securities Escrow Account established by the Subscription Agent pursuant to the Escrow Agreement by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the Subscription Form.

**ALL DEBT COMMITMENT PARTIES MUST PAY THEIR APPLICABLE PURCHASE PRICE DIRECTLY TO THE DEBT SECURITIES ESCROW ACCOUNT AND SHOULD NOT PAY THEIR NOMINEES, IF ANY.**

For those Eligible Holders that hold Applicable Claims through a Nominee (e.g. bank, broker, custodian, etc.), you must duly complete, execute and return your Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement in accordance with the instructions herein **to your Nominee** in sufficient time to allow your Nominee to process your instructions and deliver to the Subscription Agent the Master Subscription Form, your completed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement and, solely with respect to the Eligible Holders that are not Debt Commitment Parties, payment of the applicable Purchase Price, payable for the Debt Rights Offering Securities elected to be purchased by such Eligible Holder, by the Subscription Expiration Deadline.

Any Eligible Holder that <u>does not</u> hold an Applicable Claims through a Nominee must deliver their completed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement and, solely with respect to the Eligible Holders that are not Debt Commitment Parties, payment of the applicable Purchase Price payable for the Debt Rights Offering Securities elected to be purchased by such Eligible Holder directly to the Subscription Agent on or before the Subscription Expiration Deadline. In all cases, Eligible Holders that are Debt Commitment Parties must deliver their payment of the applicable Purchase Price payable for the Debt Rights Offering Securities elected to be purchased by such Eligible Holder directly to the Subscription Agent no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent from any Eligible Holder do not correspond to the Purchase Price payable for the Debt Rights Offering Securities elected to be purchased by such Eligible Holder, the number of the Debt Rights Offering Securities deemed to be purchased by such Eligible Holder will be the lesser of (i) the amount of the Debt Rights Offering Securities elected to be purchased by such Eligible Holder and (ii) an amount of the Debt Rights Offering Securities determined by dividing the amount of the funds received by the Purchase Price.

The cash paid to the Subscription Agent in accordance with these Debt Rights Offering Procedures will be deposited and held by the Subscription Agent in a segregated escrow account designed in escrow agreements mutually satisfactory to each of the Debt Commitment Parties and the Debtors until administered in connection with the settlement of the Debt Rights Offering on the Effective Date. The Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates.

**5.    Transfer Restriction; Revocation**

The Subscription Rights may not be Transferred after the Record Date. Any attempted Transfer of Subscription Rights by an Eligible Holder will be cancelled, and neither such Eligible Holder nor the purported transferee will receive any Debt Rights Offering Securities otherwise purchasable on account of such Transferred Subscription Rights. Any Applicable Claim (or interest therein) Transferred after the Record Date will not be traded with the Subscription Rights attached.

Once an Eligible Holder has properly exercised its Subscription Rights, subject to the terms and conditions of the applicable Subscription Agreement and the Investment Agreement (in the case of any Debt Commitment Party) such exercise will be irrevocable.

**6.    Return of Payment**

If the Debt Rights Offering is not consummated, any cash paid to the Subscription Agent will be returned, without interest except in the case of a Debt Commitment Party, to the applicable Eligible Holder as soon as reasonably practicable, but in any event within five Business Days, after the date on which the Debt Rights Offering is terminated.

**7.    Settlement of the Rights Offering and Distribution of the Debt Rights Offering Securities**

The Debtors intend that the Debt Rights Offering Securities will be issued to the Eligible Holders, and/or to any Affiliates (as defined in the Subscription Agreement) that the Eligible Holders so designate in the Subscription Form, in book-entry form, and that DTC, or its nominee, will be the holder of record of such Debt Rights Offering Securities. To the extent DTC is unwilling or unable to make the Debt Rights Offering Securities eligible on the DTC system, the Debt Rights Offering Securities will be issued directly to the Eligible Holder or its designee and such Eligible Holder or its designee will be the holder of record.

**8.    Minimum Denominations; No Fractional Shares**

All allocations (including each Eligible Holder's Debt Rights Offering Securities) will be calculated and rounded down to the nearest whole share or minimum denominations of $1,000 and integral multiples of $1,000 in excess thereof, as applicable.

**9.    Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors in consultation with the Required Commitment Parties and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors may waive any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, or reject, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith.

*Before exercising any Subscription Rights, Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

**10.   Backstop Commitment**

Pursuant to the terms and conditions of the Investment Agreement, the Debt Commitment Parties have agreed to purchase any Debt Rights Offering Securities not subscribed for by the other Eligible Holders.

**11.   Modification of Procedures**

With the prior written consent of the Required Commitment Parties, such consent not to be unreasonably withheld, the Debtors reserve the right to modify or adopt additional procedures consistent with these Debt Rights Offering Procedures to effectuate the Debt Rights Offering and to issue the Debt Rights Offering Securities, provided, however, that the Debtors shall provide prompt written notice to each Eligible Holder of any modification to these Debt Rights Offering Procedures made after the Subscription Commencement Date that has a material negative effect on such Eligible Holder. In so doing, and subject to the consent of the Required Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate and implement the Debt Rights Offering and the issuance of the Debt Rights Offering Securities. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Holder party thereto.

The Debtors shall undertake reasonable procedures to confirm that each participant in the Rights Offering is in fact an Eligible Holder, including but not limited to, requiring such participant to validly and timely complete an Eligibility Certificate, requiring additional certifications by such participant to that effect and other diligence measures as the Debtors deem reasonably necessary.

**12.   Inquiries And Transmittal of Documents; Subscription Agent**

The Rights Offering Instructions for Eligible Holders of Applicable Claims attached hereto should be carefully read and strictly followed by the Eligible Holders of Applicable Claims.

Questions relating to the Debt Rights Offering should be directed to the Subscription Agent at the following phone number: [•].

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Subscription Rights and not the Debtors, the Subscription Agent, or Commitment Parties.

**SEADRILL LIMITED**

**DEBT RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE HOLDERS**

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.  **Insert** the principal amount of the Applicable Claims that you held as of the Record Date in Item 1 of your Subscription Form (if your Nominee holds your Applicable Claims on your behalf and you do not know such amount, please contact your Nominee immediately).

2.  **Confirm** whether you are a Debt Commitment Party pursuant to the representation in Item 3 of your Subscription Form. (This section is only for Debt Commitment Parties, each of whom is aware of their status as a Debt Commitment Party).

3.  **Complete** the calculation in Item 2a of your Subscription Form, which calculates the maximum amount of Debt Rights Offering Securities available for you to purchase. Such amount must be rounded down to the nearest whole share or $1,000 increment as applicable.

4.  **Complete** the calculation in Item 2b of your Subscription Form to indicate the amount of Debt Rights Offering Securities that you elect to purchase and calculate the Purchase Price for the Debt Rights Offering Securities that you elect to purchase.

5.  **Read and complete** the certification in Item 2c of your Subscription Form certifying that you are an Eligible Holder.

6.  **Read, complete and sign** the certification in Item 5 of your Subscription Form.

7.  **Read and countersign** the Subscription Agreement with respect to Applicable Claims. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

8.  **Read, complete and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

9.  **Return** your signed Subscription Agreement and Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the Subscription Agent prior to the Subscription Expiration Deadline or to your Nominee in sufficient time to allow your Nominee to process your instructions and prepare and deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline. A registered holder of Applicable Claims hold on behalf of beneficial owners should follow the delivery instructions as provided in the Master Subscription Form.

10. **Arrange for full payment** of the aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 2b of your Subscription Form. For Eligible Holders that are not Debt Commitment Parties that hold Applicable Claims via a Nominee, please instruct your Nominee to coordinate payment of the Purchase Price and transmit and deliver such payment to the Subscription Agent by the Subscription Expiration Deadline. A registered holder of Applicable Claims that is not a Debt Commitment Party should follow the payment instructions as provided in the Master Subscription Form. A registered holder of Applicable Claims that is a Debt Commitment Party should follow the payment instructions in the Funding Notice.

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [•], 2017.**

**Please note that the Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and the Subscription Agreement must be received by your Nominee (e.g. broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or other nominee) in sufficient time to allow such Nominee to process and deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline, along with the appropriate funding (with respect to Eligible Holders that are not Debt Commitment Parties) or the subscription represented by your Subscription Form will not be counted and you will be deemed forever to have relinquished and waived your right to participate in the Debt Rights Offering. Registered holders of Applicable Claims that are not Debt Commitment Parties should follow the delivery and payment instructions provided in the Master Subscription Form. Registered holders of Applicable Claims that are Debt Commitment Parties should follow the payment instructions in the Funding Notice.**

**Eligible Holders that are Debt Commitment Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Backstop Funding Deadline.**

**EXHIBIT A**

Form of Rights Offering Procedures

**SEADRILL LIMITED**

**CREDITOR EQUITY RIGHTS OFFERING PROCEDURES**

The New Seadrill Common Stock (collectively, the "<u>Creditor Equity Rights Offering Securities</u>") are distributed and issued (the "<u>Creditor Equity Rights Offering</u>") without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), in reliance upon the exemption from registration provided by Section 4(a)(2) thereof, Regulation D and/or Regulation S.

None of the Subscription Rights (defined below) or Creditor Equity Rights Offering Securities issuable upon exercise of such rights distributed pursuant to these Creditor Equity Rights Offering Procedures have been or, at the time of original issuance, will be registered under the Securities Act, or the securities laws of any state.

No Subscription Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the Creditor Equity Rights Offering Securities, the Applicable Claims (defined below) and any related claims) (each of the above, a "<u>Transfer</u>") ; provided, however, that holding securities attesting ownership of Subscription Rights in an account with a broker-dealer where the broker-dealer holds a security interest or other encumbrance over property in the account generally, which security interest or other encumbrance is released upon transfer of such securities, shall not constitute a "Transfer" for purposes hereof.

No Creditor Equity Rights Offering Securities may be sold or transferred except pursuant to an exemption from registration under the Securities Act or the securities laws of any state.

These Creditor Equity Rights Offering Procedures are being distributed and communicated only to Eligible Holders (defined below). The Creditor Equity Rights Offering Securities are available only to, and any invitation, offer or agreement to purchase will be entered into only with Eligible Holders. Any person who is not a Eligible Holder should not act or rely on this document or any of its contents.

The distribution or communication of these Creditor Equity Rights Offering Procedures and the issue of the Creditor Equity Rights Offering Securities in certain jurisdictions may be restricted by law. No action has been taken or will be taken to permit the distribution or communication of these Creditor Equity Rights Offering Procedures in any jurisdiction where any action for that purpose may be required. Accordingly, these Creditor Equity Rights Offering Procedures may not be distributed or communicated, and the Creditor Equity Rights Offering Securities may not be

subscribed, purchased or issued, in any jurisdiction except in circumstances where such distribution, communication, subscription, purchase or issue would comply with all applicable laws and regulations without the need for the issuer to take any action or obtain any consent, approval or authorization therefor except for any notice filings required under U.S. federal and applicable state securities laws.

Each Rights Offering Security issued upon exercise of a Subscription Right, and each certificate issued in exchange for or upon the transfer, sale or assignment of any such Creditor Equity Rights Offering Securities, shall be stamped or otherwise imprinted with a legend in substantially the following form:

["THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, ACCORDINGLY, NEITHER THE SHARES NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF WITHIN THE UNITED STATES WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER ON ITS OWN BEHALF AND BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SHARES (1) REPRESENTS THAT (A) IT IS AN "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501 UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THE SHARES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THE SHARES EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) FOR SO LONG AS THE SHARES ARE ELIGIBLE FOR RESALE PURSUANT TO 144A UNDER THE SECURITIES ACT, INSIDE THE UNITED STATES TO A PERSON IT REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (D) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REASONABLY REQUESTS), OR (E) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THESE SHARES ARE TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING AS DEFINED BY REGULATION S UNDER THE SECURITIES ACT."]

ii

[In the case of Creditor Equity Rights Offering Securities sold pursuant to Regulation S, each certificate shall additionally be stamped or otherwise imprinted with a legend in substantially the following form:

"THESE SECURITIES WERE ISSUED IN AN OFFSHORE TRANSACTION TO PERSONS WHO ARE NOT, OR NOT FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS PURSUANT TO REGULATION S UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). ACCORDINGLY, NONE OF THE SECURITIES TO WHICH THIS CERTIFICATE RELATES HAVE BEEN REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, UNLESS SO REGISTERED, THESE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING AS DEFINED BY REGULATION S UNDER THE 1933 ACT."]

[Additional Jurisdiction Legends to Come if Applicable]

In any member state of the European Economic Area (the "EEA") that has implemented the EU Prospectus Directive (each, a "Relevant Member State"), these Creditor Equity Rights Offering Procedures are only addressed to and only directed at qualified investors in that Relevant Member State within the meaning of the EU Prospectus Directive. These Creditor Equity Rights Offering Procedures have been prepared on the basis that all offers of Creditor Equity Rights Offering Securities within the EEA will be made pursuant to an exemption under the EU Prospectus Directive from the requirement to produce a prospectus for offer of securities. Accordingly, any person making or intending to make any subscription of Creditor Equity Rights Offering Securities within any EEA member state should only do so in circumstances in which no obligation arises to publish a prospectus or a supplement to a prospectus under the EU Prospectus Directive for such offer. Neither Seadrill Limited nor any person acting on their behalf has authorized, nor do they authorize, the making of any offer of Creditor Equity Rights Offering Securities through any financial intermediary, other than as may be contemplated herein. The expression "EU Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in each Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

iii

**The Creditor Equity Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

Pursuant to the Plan, if Class B3, D3 or F3, constituting the General Unsecured Claims against Seadrill, NADL, and Sevan, vote as a class to accept the Plan, the Subscription Agent will transmit to Holders of claims of each class that voted to accept the Plan (the "Applicable Claims") as of the Record Date a certification form (an "Eligibility Certificate") to determine if such Holder is an Eligible Holder (defined below) permitted to participate in the Creditor Equity Rights Offering.

An "Eligible Holders" is a Holder of an Applicable Claim as of the Record Date that is:

(1)   an "Accredited Investor" (as defined by Rule 501 of Regulation D promulgated under the Securities Act) and, if that person is in a Member State of the EEA that has implemented the EU Prospectus Directive, is a "qualified investor" in that Relevant Member State within the meaning of the EU Prospectus Directive; or

(2)   is a "Qualified Investor" (defined below) that is not a "U.S. Person" (as defined by Rule 902 of Regulation S promulgated under the Securities Act).

The term "Qualified Investor" means:

(1)   a non-U.S. Person in a Member State of the EEA, that is a "qualified investor" in that Relevant Member State within the meaning of the EU Prospectus Directive; or

(2)   a non-U.S. Person not in a Member State of the EEA, that is lawfully entitled subscribe and purchase the Creditor Equity Rights Offering Securities under all applicable securities laws and regulations (whether pursuant to an applicable exemption or otherwise), without the need for any registration, the filing or publication of any prospectus or other action by the issuer.

Each Eligible Holder, seeking to participate in the Creditor Equity Rights Offering is required to return the applicable Eligibility Certificate to the Subscription Agent so as to be actually received by the Subscription Agent by the Eligibility Certificate Deadline ([•], 2017 at 5:00 p.m. New York City time) and is required to certify therein to the ownership of an Applicable Claim and status as an Eligible Holder.

Only those Holders of Applicable Claims that certify that they are Eligible Holders will have the opportunity to participate in the Creditor Equity Rights Offering. Holders of Applicable Claims that do not return the applicable Eligibility Certificate will be deemed to relinquish and waive any right to participate in the Creditor Equity Rights Offering.

Pursuant to the Plan (and in accordance with and subject to the terms and conditions of these Creditor Rights Offering Procedures, the Subscription Form and the Subscription Agreement), if Class B3, D3 or F3, constituting the General Unsecured Claims against Seadrill, NADL, and Sevan, vote as a class to accept the Plan, each Eligible Holder of an Applicable Claim will receive subscription rights to subscribe for its pro rata share of Creditor Equity Rights Offering Securities (the "Subscription Rights"), provided that the Debt Commitment Parties have agreed not to receive Subscription Rights on account of their Applicable Claims against Seadrill, NADL, and Sevan held as of the Agreement Effective Date (as defined in the Restructuring

1

Support and Lock-Up Agreement). Holders of claims in a class enumerated above that does not vote as a class to approve the Plan will not receive Subscription Rights in respect of claims in such class. For the avoidance of doubt, Debt Commitment Parties shall receive Subscription Rights for Applicable Claims acquired by such Debt Commitment Parties after the Agreement Effective Date (as defined in the Restructuring Support and Lock-Up Agreement).

Eligible Holders (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Record Date | [•], 2017 | The date and time fixed for the determination of the holders entitled to participate in the Creditor Equity Rights Offering. |
| Subscription Commencement Date | [•], 2017 | Commencement of the Creditor Equity Rights Offering. |
| Subscription Expiration Deadline | 5:00 p.m. New York City time on [•], 2017 | The deadline for Eligible Holders of Applicable Claims to subscribe for Creditor Equity Rights Offering Securities. The Eligible Holder's Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement must be received by the Subscription Agent by the Subscription Expiration Deadline.

Eligible Holders who hold Applicable Claims through a broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee (as applicable, the "Nominee") must provide their Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to allow sufficient time to allow such Nominee to process and deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline. |

2

Eligible Holders of Applicable Claims who are not Debt Commitment Parties (as defined in the Investment Agreement) must deliver the aggregate Purchase Payment by the Subscription Expiration Deadline.

Eligible Holders who are Debt Commitment Parties must deliver the aggregate Purchase Price within the third Business Day following receipt of a Funding Notice (as defined below) in accordance with the terms of the Investment Agreement.

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below) or Investment Agreement (as defined in the Plan) as applicable.**

3

To Eligible Holders and Nominees of Eligible Holders:

On [•], 2017, the Debtors filed their Chapter 11 Plan of Reorganization with the United States Bankruptcy Court for the [•] (as such plan of reorganization may be amended or modified from time to time in accordance with its terms, the "Plan"), and the disclosure statement with respect to the Plan (as such disclosure statement may be amended from time to time in accordance with its terms, the "Disclosure Statement"). Pursuant to the Plan, each Holder of an Applicable Claim as of the Record Date that is an Eligible Holder and that has timely and validly completed and returned Eligibility Certificate has the right to participate in the Creditor Equity Rights Offering in accordance with the terms and conditions of the Subscription Agreement and these Creditor Equity Rights Offering Procedures.

Only Eligible Holders that provide an Eligibility Certificate and complete the Eligibility Questionnaire included as part of the Subscription Form may participate in the Creditor Equity Rights Offering.

Pursuant to the Plan, if Class B3, D3 or F3, constituting the General Unsecured Claims against Seadrill, NADL, and Sevan, vote as a class to accept the Plan, each Eligible Holder of an Applicable Claim (other than a Debt Commitment Party on account of their Applicable Claims against Seadrill, NADL, and Sevan held as of the Agreement Effective Date) will receive Subscription Rights to subscribe for its pro rata share of Creditor Equity Rights Offering Securities, provided that it timely and properly executes and delivers its applicable Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the Subscription Agent or its Nominee, as applicable, in advance of the Subscription Expiration Deadline. Each Nominee will receive a Master Subscription Form which it shall use to summarize the Subscription Rights exercised by each Eligible Holder of Applicable Claims that timely returns the applicable properly filled out Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to such Nominee. Please note that all Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement must be returned to the applicable Nominee in sufficient time to allow such Nominee to process and deliver the Master Subscription Form and copies of all Subscription Forms (and the accompanying Subscription Agreements and IRS Forms) prior to the Subscription Expiration Deadline.

No Eligible Holder shall be entitled to participate in the Creditor Equity Rights Offering unless the aggregate Purchase Price (as defined below) for the Creditor Equity Rights Offering Securities it subscribes for is received by the Subscription Agent (i) in the case of an Eligible Holder of an Applicable Claim that is not a Debt Commitment Party by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Holder of an Applicable Claim that is a Debt Commitment Party, on the third Business Day following receipt of a written notice (a "Funding Notice") delivered by [•] to the Debt Commitment Parties in accordance with Section 2.4 of the Investment Agreement (the "Backstop Funding Deadline"). No interest is payable on any advanced funding of the Purchase Price except in the case of the Commitment Parties, in which case interest will be calculated and paid under the terms of the Escrow

Agreement. If the Creditor Equity Rights Offering is terminated for any reason, your Purchase Price will be returned to you promptly. Debt Commitment Parties may deposit their Purchase Price in the Escrow Account (as defined below). No interest will be paid on any returned Purchase Price. Any Eligible Holder of an Applicable Claim submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to allow the Nominee to forward such payment to the Subscription Agent by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable.

**In order to participate in the Creditor Equity Rights Offering, you must complete all the steps outlined below by the Subscription Expiration Deadline, or the Backstop Funding Deadline, as applicable. If you fail to do so, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Creditor Equity Rights Offering.**

### 1. Rights Offering

If Class B3, D3 or F3, constituting the General Unsecured Claims against Seadrill, NADL, and Sevan, vote as a class to accept the Plan, each Eligible Holder of an Applicable Claim (other than a Debt Commitment Party on account of their Applicable Claims against Seadrill, NADL, and Sevan held as of the Agreement Effective Date) will have the right, but not the obligation, to participate in the Creditor Equity Rights Offering. Only Holders of an Applicable Claim as of the Record Date that validly and timely completed the Eligibility Certificate and the Eligibility Questionnaire included as part of the Subscription Form and that are Eligible Holders may participate in the Creditor Equity Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Creditor Equity Rights Offering Procedures, the Subscription Form and the Subscription Agreement, each Eligible Holder is entitled to subscribe for [•] share of Common Stock per $[•] amount of Applicable Claim at a purchase price of $[•] per share (the "Purchase Price").

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT AND THE INVESTMENT AGREEMENT IN THE CASE OF ANY DEBT COMMITMENT PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

### 2. Subscription Period

The Creditor Equity Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline. Each Eligible Holder intending to purchase Creditor Equity Rights Offering Securities in the Creditor Equity Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Subscription Form and Subscription Agreement by the Subscription Expiration Deadline.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored.

The Debtors may extend the Subscription Expiration Deadline with the consent of the Required Commitment Parties (as defined in the Investment Agreement), such consent not to be unreasonably withheld, or as required by law.

**3.    Delivery of Subscription Agreement**

Subject to the terms and conditions of the Subscription Agreement, each Eligible Holder may exercise all or any portion of such Eligible Holder's Subscription Rights. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send these Creditor Equity Rights Offering Procedures, Subscription Form and Subscription Agreement to each Eligible Holder or its Nominee, as applicable, together with appropriate instructions for the proper completion, due execution and timely delivery of the executed Subscription Form and Subscription Agreement and the payment of the applicable Purchase Price for its Creditor Equity Rights Offering Securities.

**4.    Exercise of Subscription Rights**

(a) In order to validly exercise its Subscription Rights, each Eligible Holder that is not a Debt Commitment Party must:

i.    return a duly executed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the Subscription Agent or its Nominee, as applicable, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.   at the same time it returns its Subscription Agreement and Subscription Form to the Subscription Agent or its Nominee, as applicable, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the Subscription Form.

(b) In order to validly exercise its Subscription Rights, each Eligible Holder that is a Debt Commitment Party must:

i.    return a duly executed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the Subscription Agent or its Nominee, as applicable, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.   no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the Creditor Equity Securities Escrow Account established by the Subscription Agent pursuant to the Escrow Agreement by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the Subscription Form.

**ALL DEBT COMMITMENT PARTIES MUST PAY THEIR APPLICABLE PURCHASE PRICE DIRECTLY TO THE CREDITOR EQUITY SECURITIES ESCROW ACCOUNT AND SHOULD NOT PAY THEIR NOMINEES, IF ANY.**

For those Eligible Holders that hold Applicable Claims through a Nominee (e.g. bank, broker, custodian, etc.), you must duly complete, execute and return your Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement in accordance with the instructions herein **to your Nominee** in sufficient time to allow your Nominee to process your instructions and deliver to the Subscription Agent the Master Subscription Form, your completed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement and, solely with respect to the Eligible Holders that are not Debt Commitment Parties, payment of the applicable Purchase Price, payable for the Creditor Equity Rights Offering Securities elected to be purchased by such Eligible Holder, by the Subscription Expiration Deadline.

Any Eligible Holder that <u>does not</u> hold an Applicable Claims through a Nominee must deliver their completed Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement and, solely with respect to the Eligible Holders that are not Debt Commitment Parties, payment of the applicable Purchase Price payable for the Creditor Equity Rights Offering Securities elected to be purchased by such Eligible Holder directly to the Subscription Agent on or before the Subscription Expiration Deadline. In all cases, Eligible Holders that are Debt Commitment Parties must deliver their payment of the applicable Purchase Price payable for the Creditor Equity Rights Offering Securities elected to be purchased by such Eligible Holder directly to the Subscription Agent no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent from any Eligible Holder do not correspond to the Purchase Price payable for the Creditor Equity Rights Offering Securities elected to be purchased by such Eligible Holder, the number of the Creditor Equity Rights Offering Securities deemed to be purchased by such Eligible Holder will be the lesser of (i) the amount of the Creditor Equity Rights Offering Securities elected to be purchased by such Eligible Holder and (ii) an amount of the Creditor Equity Rights Offering Securities determined by dividing the amount of the funds received by the Purchase Price.

The cash paid to the Subscription Agent in accordance with these Creditor Equity Rights Offering Procedures will be deposited and held by the Subscription Agent in a segregated escrow account designed in escrow agreements mutually satisfactory to each of the Debt Commitment Parties and the Debtors until administered in connection with the settlement of the Creditor Equity Rights Offering on the Effective Date. The Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates.

**5.     Transfer Restriction; Revocation**

The Subscription Rights may not be Transferred after the Record Date. Any attempted Transfer of Subscription Rights by an Eligible Holder will be cancelled, and neither such Eligible Holder nor the purported transferee will receive any Creditor Equity Rights Offering Securities otherwise purchasable on account of such Transferred Subscription Rights. Any Applicable Claim (or interest therein) Transferred after the Record Date will not be traded with the Subscription Rights attached.

Once an Eligible Holder has properly exercised its Subscription Rights, subject to the terms and conditions of the applicable Subscription Agreement and the Investment Agreement (in the case of any Debt Commitment Party) such exercise will be irrevocable.

**6.     Return of Payment**

If the Creditor Equity Rights Offering is not consummated, any cash paid to the Subscription Agent will be returned, without interest except in the case of a Debt Commitment Party, to the applicable Eligible Holder as soon as reasonably practicable, but in any event within five Business Days, after the date on which the Creditor Equity Rights Offering is terminated.

**7.     Settlement of the Rights Offering and Distribution of the Creditor Equity Rights Offering Securities**

The Debtors intend that the Creditor Equity Rights Offering Securities will be issued to the Eligible Holders, and/or to any Affiliates (as defined in the Subscription Agreement) that the Eligible Holders so designate in the Subscription Form, in book-entry form, and that DTC, or its nominee, will be the holder of record of such Creditor Equity Rights Offering Securities. To the extent DTC is unwilling or unable to make the Creditor Equity Rights Offering Securities eligible on the DTC system, the Creditor Equity Rights Offering Securities will be issued directly to the Eligible Holder or its designee and such Eligible Holder or its designee will be the holder of record.

**8.     Minimum Denominations; No Fractional Shares**

All allocations (including each Eligible Holder's Creditor Equity Rights Offering Securities) will be calculated and rounded down to the nearest whole share.

**9.     Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors may waive any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, or reject, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith.

*Before exercising any Subscription Rights, Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

### 10.  Backstop Commitment

Pursuant to the terms and conditions of the Investment Agreement, Hemen Investments Limited has agreed to purchase any Creditor Equity Rights Offering Securities not subscribed for by the other Eligible Holders.

### 11.  Modification of Procedures

With the prior written consent of the Required Commitment Parties, such consent not to be unreasonably withheld, the Debtors reserve the right to modify or adopt additional procedures consistent with these Creditor Equity Rights Offering Procedures to effectuate the Creditor Equity Rights Offering and to issue the Creditor Equity Rights Offering Securities, provided, however, that the Debtors shall provide prompt written notice to each Eligible Holder of any modification to these Creditor Equity Rights Offering Procedures made after the Subscription Commencement Date that has a material negative effect on such Eligible Holder. In so doing, and subject to the consent of the Required Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate and implement the Creditor Equity Rights Offering and the issuance of the Creditor Equity Rights Offering Securities. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Holder party thereto.

The Debtors shall undertake reasonable procedures to confirm that each participant in the Rights Offering is in fact an Eligible Holder, including but not limited to, requiring such participant to validly and timely complete an Eligibility Certificate, requiring additional certifications by such participant to that effect and other diligence measures as the Debtors deem reasonably necessary.

### 12.  Inquiries And Transmittal of Documents; Subscription Agent

The Rights Offering Instructions for Eligible Holders of Applicable Claims attached hereto should be carefully read and strictly followed by the Eligible Holders of Applicable Claims.

Questions relating to the Creditor Equity Rights Offering should be directed to the Subscription Agent at the following phone number: [•].

The risk of non-delivery of all documents and payments to the Subscription Agent and any Nominee is on the Eligible Holder electing to exercise its Subscription Rights and not the Debtors, the Subscription Agent, or Commitment Parties.

**SEADRILL LIMITED**

**CREDITOR EQUITY RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE HOLDERS**

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.  **Insert** the principal amount of the Applicable Claims that you held as of the Record Date in Item 1 of your Subscription Form (if your Nominee holds your Applicable Claims on your behalf and you do not know such amount, please contact your Nominee immediately).

2.  **Confirm** whether you are a Debt Commitment Party pursuant to the representation in Item 3 of your Subscription Form. (This section is only for Debt Commitment Parties, each of whom is aware of their status as a Debt Commitment Party).

3.  **Complete** the calculation in Item 2a of your Subscription Form, which calculates the maximum amount of Creditor Equity Rights Offering Securities available for you to purchase. Such amount must be rounded down to the nearest whole share.

4.  **Complete** the calculation in Item 2b of your Subscription Form to indicate the amount of Creditor Equity Rights Offering Securities that you elect to purchase and calculate the Purchase Price for the Creditor Equity Rights Offering Securities that you elect to purchase.

5.  **Read and complete** the certification in Item 2c of your Subscription Form certifying that you are an Eligible Holder.

6.  **Read, complete and sign** the certification in Item 5 of your Subscription Form.

7.  **Read and countersign** the Subscription Agreement with respect to Applicable Claims. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

8.  **Read, complete and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

9.  **Return** your signed Subscription Agreement and Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to the Subscription Agent prior to the Subscription Expiration Deadline or to your Nominee in sufficient time to allow your Nominee to process your

instructions and prepare and deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline. A registered holder of Applicable Claims hold on behalf of beneficial owners should follow the delivery instructions as provided in the Master Subscription Form.

10. **Arrange for full payment** of the aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 2b of your Subscription Form. For Eligible Holders that are not Debt Commitment Parties that hold Applicable Claims via a Nominee, please instruct your Nominee to coordinate payment of the Purchase Price and transmit and deliver such payment to the Subscription Agent by the Subscription Expiration Deadline. A registered holder of Applicable Claims that is not a Debt Commitment Party should follow the payment instructions as provided in the Master Subscription Form. A registered holder of Applicable Claims that is a Debt Commitment Party should follow the payment instructions in the Funding Notice.

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [•], 2017.**

**Please note that the Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and the Subscription Agreement must be received by your Nominee (e.g. broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or other nominee) in sufficient time to allow such Nominee to process and deliver the Master Subscription Form to the Subscription Agent by the Subscription Expiration Deadline, along with the appropriate funding (with respect to Eligible Holders that are not Debt Commitment Parties) or the subscription represented by your Subscription Form will not be counted and you will be deemed forever to have relinquished and waived your right to participate in the Creditor Equity Rights Offering. Registered holders of Applicable Claims that are not Debt Commitment Parties should follow the delivery and payment instructions provided in the Master Subscription Form. Registered holders of Applicable Claims that are Debt Commitment Parties should follow the payment instructions in the Funding Notice.**

**Eligible Holders that are Debt Commitment Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Backstop Funding Deadline.**

**EXHIBIT B**

Board Governance Term Sheet

**SEADRILL LIMITED**

**Governance Term Sheet[1]**

*This indicative summary of terms and conditions (this "**Governance Term Sheet**") is for discussion purposes only. This Governance Term Sheet does not constitute an agreement or an offer to enter into an agreement to purchase equity securities or the rights associated with such equity securities described herein or otherwise. Such an agreement will arise only under definitive documentation duly executed by the parties in accordance with its terms and is further subject to, among other things, the final order of the Bankruptcy Court confirming the Plan and the effectiveness of the Plan. This Governance Term Sheet does not attempt to describe all of the terms, conditions and requirements that would pertain to the purchase of equity securities or the rights associated with such equity securities described herein, but rather is intended to outline certain basic items around which the equity investment will be structured. The governance rights and arrangements under this Governance Term Sheet will, to the extent required, be amended to ensure that shares of New Seadrill (as defined below) can be listed on the Oslo Bors or any other stock exchange contemplated by the Plan or as agreed between relevant stakeholders. This Governance Term Sheet is not intended to limit the scope of discussion or negotiation of any and all matters whether or not set forth herein and reflects the requirements of the Investors (as defined below) on governance and not the views of the Board of Seadrill Limited.*

| | |
|---|---|
| **Issuer:** | Seadrill Limited, a Bermuda company, or New Seadrill Limited, a Bermuda company (such entity, "**New Seadrill**") |
| **Investors:** | Hemen Investments Limited, a Cyprus holding company ("**Hemen**") |
| | Centerbridge Credit Partners L.P., and certain of its affiliates ("**Centerbridge**") |
| | Certain funds and/or accounts that are managed, advised or sub-advised by each of Aristeia Capital L.L.C., GLG Partners LP, Saba Capital Management LP and Whitebox Advisors, LLC or such Person's Affiliate(s), in each case, that are signatories to the Investment Agreement (the "**Select Commitment Parties**") |
| | Each of Hemen, Centerbridge and each Select Commitment Party is an "**Investor**" and together they are the "**Investors**") |

<div align="center"><b>Corporate Governance Matters</b></div>

| | |
|---|---|
| **Board Representation:** | The board of directors of New Seadrill (the "**Board**") will be the main decision making body of New Seadrill and may delegate specific powers to Board committees and/or management from time to time. The Board will be set at nine (9) directors. For so long as Hemen owns at least [5]% of the issued and outstanding Equity Securities, New Seadrill will not increase or decrease the size of the Board without the prior written consent of Hemen. |
| | For so long as Hemen maintains ownership of at least [10]% of the issued and outstanding Equity Securities of New Seadrill, Hemen will have the right to: |
| | • designate for election to the Board/appoint three (3) directors (the "**Hemen Designees**"), including the Chairman with a casting vote; and |

---

1   Capitalized terms used but not defined in this Governance Term Sheet have the meanings given to such terms in the Investment Agreement.

- designate for election to the Board/appoint two (2) independent directors, each of whom shall not be related parties of Hemen or otherwise connected with Hemen and shall qualify as an "independent director" under applicable provisions of the Exchange Act and under applicable NYSE and Oslo Exchange rules and regulations (the "**Independent Nominees**"); *provided* that the other directors on the Board shall be provided with a reasonable opportunity to meet with and consult with such prospective Independent Nominees and Hemen prior to their nomination.

For so long as Hemen maintains ownership of at least [5]% but less than [10]% of the issued and outstanding Equity Securities of New Seadrill, Hemen will have the right to:

- designate for election to the Board/appoint two (2) Hemen Designees, including the Chairman with a casting vote; and

- designate for election to the Board/appoint two (2) Independent Nominees; *provided* that the other directors on the Board shall be provided with a reasonable opportunity to meet with and consult with such prospective Independent Nominees and Hemen prior to their nomination.

- The majority of the Hemen Designees and the Independent Nominees (taken together) including the Chairman shall be persons who are not resident in the United Kingdom.

- Meetings of the Board shall be held outside Norway and the United Kingdom.

- Where board meetings or committee meetings are held by electronic means, the majority of the members participating (including the Chairman) shall be physically located outside the United Kingdom. The Board will use all reasonable endeavours to ensure that no such meeting is deemed to be held in Norway.

- The quorum for meetings of the Board shall be a majority in number of directors who are neither resident nor present in the United Kingdom, provided that at least three independent directors shall be present. If quorum is not formed, the meeting shall be adjourned for [72 hours, provided that in an emergency the meeting shall be adjourned for 24 hours], and at the adjourned meeting quorum will be formed by the directors present.

- Written resolutions of the Board or any committee of the Board shall only be permitted if all the directors or committee members (as applicable) are outside the United Kingdom when the resolution is signed. The use of written resolutions shall be kept to a minimum, as far as is practically possible.

For so long as the Hemen Designees are entitled to serve on the Board, at least one of the Hemen Designees shall be entitled to serve on, and the Board shall appoint such Hemen Designee to, such committee or committees of the Board as

shall be determined by Hemen, subject to applicable independence requirements of the NYSE and the Exchange Act and/or the Oslo Exchange rules, provided that the Board shall not create any new committees and/or increase the size of any committees of the Board currently in existence without the prior written consent of Hemen, not to be unreasonably withheld or delayed.

For so long as Centerbridge retains at least 50% of its original investment in the Equity Securities of New Seadrill, Centerbridge shall have the right to designate for election to the Board/appoint as of the Effective Date and at the first election of directors to the Board following the one year anniversary of the Effective Date one (1) independent director (the "**Centerbridge Designee**").

The Select Commitment Parties, in their capacity as shareholders of New Seadrill, will have the right to designate for election to the Board/appoint as of the Effective Date one (1) independent director.

Hemen, Centerbridge and the Select Commitment Parties on mutual agreement (with each party's agreement not to be unreasonably withheld) will have the right to designate for election to the Board/appoint as of the Effective Date two (2) independent directors.

The ability to designate and/or appoint Board members shall include the ability to remove such Board members. The initial shareholders will provide New Seadrill with a customary indemnity on terms to be agreed in relation to any claims that may arise against New Seadrill as a result of initial shareholders exercising such a removal right.

From and after the first election of directors to the Board following the one year anniversary of the Effective Date, all members of the Board, excluding the Hemen Designees, the Independent Nominees and, for the first election of directors to the Board following the one year anniversary of the Effective Date only, the Centerbridge Designee, shall be elected by shareholders as provided in the New Seadrill bye-laws.

The board representation rights set out in this Governance Term Sheet will be reflected in New Seadrill's bye-laws. There will be no shareholders agreement.

| | |
|---|---|
| **Veto/Approval Right:** | For so long as Hemen owns at least [5]% of the issued and outstanding Equity Securities of New Seadrill, New Seadrill will not, without the prior written consent of Hemen, amend New Seadrill's organizational documents in a manner that would modify or impact Hemen's right to appoint the Hemen Designees, or the voting power of the Hemen Designees, under New Seadrill's organizational documents.<br><br>The veto/approval right set out in this Governance Term Sheet will be reflected in New Seadrill's bye-laws. There will be no shareholders agreement. |
| **IHCo/RigCo/NSNCo:** | New Seadrill to determine board composition of each of IHCo/RigCo/NSNCo to ensure alignment of interests of the relevant boards. NSNCo board composition to include customary SPV issuer arrangements. |

| | |
|---|---|
| **Access to Management and Information Rights:** | Subject to the final paragraph below, New Seadrill shall provide each Investor, at the Investor's election, with the same disclosure as is provided to the holders of the New Secured Notes, including quarterly financial statements (at the same time as such statements are provided to the holders of the New Secured Notes) and audited annual financial statements (at the same time as such statements are provided to the holders of the New Secured Notes), in each case, prepared in accordance with GAAP as in effect from time to time, which statements shall include the consolidated balance sheets of New Seadrill, its subsidiaries and any New Seadrill joint ventures (that are consolidated) and the related consolidated statements of income, shareholders' equity and cash flows and a reasonably detailed Management's Discussion and Analysis of the Financial Condition and Results of Operations (with a level of detail in line with Seadrill Limited's existing 20-F practices) that is for the applicable period in which financial statements are being provided. |
| | Subject to the final paragraph below, New Seadrill shall permit each individual Investor holding at least [10]% of the Equity Securities of New Seadrill and its respective representatives reasonable access to visit and inspect any of the properties of New Seadrill or any of its subsidiaries, including its and their books of account and other records, and to discuss its and their affairs, finances and accounts with its and their officers, all upon reasonable notice and at such reasonable times and as often as such Investor may reasonably request. Any investigation pursuant to this provision shall be conducted during normal business hours and in such manner so as not to interfere unreasonably with the conduct of New Seadrill and its subsidiaries. |
| | Subject to the final paragraph below, New Seadrill shall provide to each individual Investor (or in the case of Hemen, the Hemen Designee to pass onto Hemen) holding at least [10]% of the Equity Securities of New Seadrill, at the Investor's election, all written information that is provided to the Board at substantially the same time at which such information is first delivered or otherwise made available to the Board. This right is also subject to ensuring that New Seadrill is satisfied that the relevant Investor is subject to appropriate confidentiality arrangements, restricted from dealing and without cleansing rights against New Seadrill. Nothing herein shall require New Seadrill or any of its subsidiaries to disclose any information to the extent prohibited by applicable law. |
| | Nothing in this section "Access to Management and Information Rights" shall oblige Seadrill, New Seadrill or any of their subsidiaries, or any of the directors, officers, employees or agents of any of them to provide or disclose any material non-public price sensitive information or information which is otherwise confidential to any member of the group. |
| **Bye-laws and Organizational Documents to Control** | The issues of corporate governance reflected in this term sheet shall be implemented consistently with the provisions of the bye-laws and other organizational documents of New Seadrill, including those provisions relating to tax residence considerations vis-à-vis the U.K., Norway, and any other applicable jurisdiction; *provided, that* the parties acknowledge and agree that such bye-laws and other organizational documents shall reflect similar protocols that are in the currently-existing bye-laws and organizational documents of Seadrill Ltd., to be supplemented consistently with advice received by Seadrill's professionals in consultation with each of the Investors' respective professionals, *provided, further,* that in the event any provision of this term sheet cannot be implemented consistently therewith, the provisions of the bye-laws and other organizational documents shall control. |

**Exhibit 99.1**

**SDRL – Seadrill Announces Comprehensive Restructuring Plan to Be Implemented with Prearranged Chapter 11 Cases**

**Hamilton, Bermuda, September 12, 2017 -** Seadrill Limited ("Seadrill" or the "Company") has entered into a restructuring agreement with more than 97 percent of its secured bank lenders, approximately 40 percent of its bondholders and a consortium of investors led by its largest shareholder, Hemen Holding Ltd.

The agreement delivers $1.06 billion of new capital comprised of $860 million of secured notes and $200 million of equity. The Company's secured lending banks have agreed to defer maturities of all secured credit facilities, totaling $5.7 billion, by approximately five years with no amortization payments until 2020 and significant covenant relief. Additionally, assuming unsecured creditors support the plan, the Company's $2.3 billion of unsecured bonds and other unsecured claims will be converted into approximately 15% of the post-restructured equity with participation rights in both the new secured notes and equity, and holders of Seadrill common stock will receive approximately 2% of the post-restructured equity. The agreed plan comprehensively addresses Seadrill's liabilities, including funded debt and other obligations. For additional information please refer to the Company's Form 6K filed along with this announcement.

The agreed restructuring plan was developed over the course of more than a year of detailed discussions, and the plan will ensure that Seadrill can continue to operate its large, modern fleet of drilling units. By extending and re-profiling the secured bank debt, reducing leverage and delivering a significant amount of new capital, this agreement provides Seadrill with a five-year runway. Post-restructuring, Seadrill will have a strong cash position and good liquidity to take advantage when the market recovers.

To implement the restructuring agreement, Seadrill has today filed prearranged chapter 11 cases in the Southern District of Texas together with the agreed restructuring plan. As part of the chapter 11 cases, the Company filed "first day" motions that, when granted, will enable day-to-day operations to continue as usual. Specifically, the Company requested authority to pay its key trade creditors and employee wages and benefits without change or interruption. Additionally, the Company expects it will pay all suppliers and vendors in full under normal terms for goods and services provided during the chapter 11 cases. At the point of filing, Seadrill has over $1 billion in cash and does not require debtor-in-possession financing. The restructuring agreement contemplates a balance sheet restructuring that is not intended to affect the Company's operations.

As part of the restructuring process, Seadrill has successfully ring-fenced its non-consolidated affiliates from the Company's restructuring, including Seadrill Partners LLC, SeaMex Ltd., Archer Limited and their respective subsidiaries. These non-consolidated affiliates did not file chapter 11 cases, and we expect their business operations to continue uninterrupted.

**Commenting today, Anton Dibowitz, CEO and President of Seadrill Management Ltd., said:**

*"The restructuring agreement we signed today is a comprehensive plan that raises over $1 billion of new capital, is underpinned by Hemen Holding Ltd., our largest shareholder, and is overwhelmingly supported by our banks and approximately 40 percent of our bondholders. This is a testament to our position in the sector, having a large, modern fleet, a top-quality customer base and a proven operating track record. With our improved capital structure, we will be in a strong position to capitalise when the market recovers.*

*The continued focus and dedication of all our employees throughout this process has been exceptional. It is due to our people's commitment to deliver safe, efficient operations day in, day out that we have succeeded in reaching this restructuring agreement."*

The Company has engaged Kirkland & Ellis LLP as legal counsel, Houlihan Lokey, Inc. as financial advisor, and Alvarez & Marsal as restructuring advisor. Slaughter and May has been engaged as corporate counsel, and Morgan Stanley served as co-financial advisor during the negotiation of the restructuring agreement. Advokatfirmaet Thommessen AS is serving as Norwegian counsel. Conyers Dill & Pearman is serving as Bermuda counsel.

Court filings and other information related to the restructuring proceedings are available at a website administered by the Company's claims agent, Prime Clerk, at https://cases.primeclerk.com/seadrill or via the information call center at 844-858-8891 (US toll free) or the following international numbers:

Brazil Toll Free: 0-800-591-8054
Mexico Toll Free: 01-800-681-5354
Nigeria Toll Free: 070-80601847
Norway Toll Free: 800-25-030
Saudi Arabia Toll Free: 800-850-0029
Singapore Toll Free: 800-492-2272
Thailand Toll Free: 1-800-011-156
UAE Toll Free: 8000-3570-4559
UK Toll Free: 0-800-069-8580

Copies of the documents governing the restructuring agreement are contained in a Report of Foreign Issuer on Form 6-K to be filed with the Securities and Exchange Commission on September 13, 2017. The Company has also posted FAQs on its website at www.seadrill.com/restructuring.

This press release is not intended to be, and should not in any way be construed as, a solicitation of votes of bondholders or other investors regarding the chapter 11 plan.

CONTACT:

Prime Clerk

US Toll Free: 844-858-8891

Brazil Toll Free: 0-800-591-8054
Mexico Toll Free: 01-800-681-5354
Nigeria Toll Free: 070-80601847
Norway Toll Free: 800-25-030
Saudi Arabia Toll Free: 800-850-0029
Singapore Toll Free: 800-492-2272
Thailand Toll Free: 1-800-011-156
UAE Toll Free: 8000-3570-4559
UK Toll Free: 0-800-069-8580

Email: seadrillinfo@primeclerk.com

FORWARD LOOKING STATEMENTS

This news release includes forward looking statements. Such statements are generally not historical in nature, and specifically include statements about the Company's plans, strategies, business prospects, changes and trends in its business, the markets in which it operates and its restructuring efforts. These statements are made based upon management's current plans, expectations, assumptions and beliefs concerning future events impacting the Company and therefore involve a number of risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed or implied in the forward-looking statements, which speak only as of the date of this news release. Consequently, no forward-looking statement can be guaranteed. When considering these forward-looking statements, you should keep in mind the risks described from time to time in the Company's filings with the Securities and Exchange Commission, including its Annual Report on Form 20-F (File No. 001-34667). The Company undertakes no obligation to update any forward looking statements to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for the Company to predict all of these factors. Further, the Company cannot assess the impact of each such factor on its business or the extent to which any factor, or combination of factors, may cause actual results to be materially different from those contained in any forward looking statement.

This information is subject of the disclosure requirements pursuant to section 5-12 of the Norwegian Securities Trading Act.