**KEPPEL OPP'N EXH.  44**

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  ------------------------------x

4  EIG ENERGY FUND XIV, L.P.,

   EIG ENERGY FUND XIV-A, L.P.,

5  et al.

6          Plaintiffs,

7          vs.

8  KEPPEL OFFSHORE & MARINE LTD.,

9          Defendant.

10

   18 Civ. 1047 (PGG)

11

   ------------------------------x

12

13

14          C O N F I D E N T I A L

15

16    VIDEOTAPED DEPOSITION OF JEFFREY CHOW

17          Thursday, June 24, 2021

18            Conducted Remotely

19

20

21

22

23  REPORTED BY:

24  Christina Diaz, CRC, CRR, RMR, CSR, CLR

25  Job Number:  4626891

                    J. Chow - Confidential

1

2       Q.    I would like you to look at page

3   19 if you would.

4       A.    Yes.

5       Q.    And this document is executed by

6   someone named Nicholas Choo Kwan Hui.  I am

7   not sure if I'm pronouncing that correctly

8   from Keppel Offshore Marine on December 22,

9   2017.

10           Do you know what his position was

11  at Keppel Offshore Marine?

12      A.    Specifically at that time, I am

13  not certain but he should be assistant

14  general manager of legal.

15      Q.    Did he report to you when you

16  were at Keppel Offshore Marine?

17      A.    He did and then he left for two,

18  2 1/2 years and I asked him to come back.

19      Q.    When did he come back?

20      A.    I am not really sure of the

21  specific time but definitely before this

22  document.

23      Q.    All right.  Do you see that --

24  look at page A-1 of this document at the

25  top it says Attachment A, Statement of

```
                                              Page 50
 1              J. Chow - Confidential
 2   Facts.
 3              MS. SKAISTIS:  Which page?
 4              MR. GOLDMAN:  A-1.  The top says
 5       Attachment A, Statement of Facts.
 6       A.    I am there.
 7   BY MR. GOLDMAN:
 8       Q.    It states there, "The following
 9   Statement of Facts is incorporated by
10   reference as part of the deferred
11   prosecution agreement between the DOJ and
12   the US Attorneys Office and Keppel Offshore
13   Marine Limited."
14              Do you see that?
15       A.    Yes.
16       Q.    And then if you look at A-10?
17              MR. MEISTER:  A-10.
18              MR. GOLDMAN:  Yes.  Paragraph 50.
19   BY MR. GOLDMAN:
20       Q.    Are you there, sir?
21       A.    Okay.
22       Q.    And paragraph number 50 above it
23   there is a heading that says the P-53 and
24   P-58 projects and in paragraph 51 it talks
25   about bribes that Keppel Offshore Marine
```

```
                                            Page 51
 1              J. Chow - Confidential
 2   paid regarding these projects.
 3              Were you aware, let's say in 2010
 4   and before that Keppel Offshore Marine had
 5   paid bribes relating to the P-53 and P-58
 6   projects?
 7              MR. MEISTER:  Wait a second.  The
 8         question was muffled.  I don't think we
 9         heard the year that you referenced in
10         your question.  Maybe you could restate
11         the question.
12   BY MR. GOLDMAN:
13         Q.    Mr. Chow, were you aware in the
14   2010 time period that Keppel Offshore
15   Marine had paid bribes relating to the P-53
16   and P-58 projects with Petrobras?
17         A.    I was aware that we had those
18   projects and that Zwi was our agent but the
19   details of those two projects, I am not
20   that familiar with.
21         Q.    Did you draft consulting
22   agreements on those projects with
23   Mr. Skornicki?
24         A.    Offhand I drafted most of the
25   projects' commission agreements but these
```

Page 52

```
 1            J. Chow - Confidential
 2   two I believe may have been executed by
 3   Keppel shipyard not Keppel sales.
 4            Keppel Offshore Marine was
 5   divided into three separate business
 6   groups.  One was Keppel sales which did the
 7   offshore marine structures like oil rigs,
 8   drilling semis, jack-ups.  Keppel shipyard
 9   did more of the marine repair, conversion
10   and these two -- when you take a tanker and
11   you convert it to a floating production
12   unit.
13            Unfortunately, the forms were
14   fairly general, straightforward.  As I
15   mentioned earlier, there was no real
16   negotiation other than putting the figure
17   for what the commission amount would be and
18   to what entity would be the agent that
19   Mr. Skornicki represented.
20            So offhand, I couldn't tell you
21   for certain whether I participated in
22   drafting those but they would have used the
23   similar format.
24       Q.   I am just going to put this all
25   together in one question.
```

```
                                         Page 53
 1              J. Chow - Confidential
 2              Starting on paragraph 23, there
 3   is a reference to the P-48 --
 4              MR. MEISTER:  Hold on a second.
 5              MS. SKAISTIS:  We have got to get
 6       there.
 7              MR. MEISTER:  Paragraph 43?
 8   BY MR. GOLDMAN:
 9       Q.    Paragraph 23 there is a reference
10   to the P-48 project.
11              Do you see that, sir?
12       A.    Yes.
13       Q.    Then above paragraph 31 there is
14   a reference to the P-51 and P-52 projects.
15              Do you see that?
16       A.    Paragraph 31, yes.
17       Q.    And then there is -- above
18   paragraph 42 there is a reference to the
19   P-56 project.
20              Do you see that?
21       A.    Yes.
22       Q.    Paragraph 56, the P-61 project.
23              Do you see that?
24       A.    Yes.
25       Q.    All right.
```

1          J. Chow - Confidential

2              Now, were you aware that Keppel

3     Offshore Marine was paying bribes and

4     kickbacks through Mr. Skornicki for these

5     projects with Petrobras?

6          A.    I do now.  At the specific time,

7     I may not have been working on those in

8     particular but ultimately I would be aware

9     of it.

10          Q.    When you put it all together in

11     2008 that Keppel Offshore Marine had been

12     paying bribes and kickbacks for projects

13     with Petrobras, were these projects that

14     you had concluded that bribes and kickbacks

15     had been paid upon?

16          A.    Yes.  Because they were involving

17     Brazil and that was part of the way I came

18     to my conclusion is this was Brazil and how

19     it seemed Brazil operated.  So anything

20     that was in relation to Petrobras projects,

21     I would have assumed that there was some

22     commission involved.

23          Q.    All right.  Sir, if you turn to

24     page A-14, paragraph 70.

25              MR. MEISTER:  One second.

```
                                      Page 61

 1           J. Chow - Confidential

 2       10:56.

 3             (Recess)

 4             THE VIDEOGRAPHER:  We are now

 5       going back on.  The time is 11:14.

 6             MR. GOLDMAN:  All right.

 7       Mr. Chow.  I am going to mark another

 8       exhibit.

 9             (Plaintiffs' Exhibit 4, e-mail

10       string beginning with e-mail dated

11       7/15/11 bearing Production Nos. KEPPEL

12       269513 through 515, was marked for

13       identification)

14             MR. MEISTER:  You need to give us

15       a second.

16             MR. GOLDMAN:  Okay.  How about I

17       introduce it anyway and get it up.

18             MR. MEISTER:  Are we on

19       Exhibit 4?

20             MR. GOLDMAN:  That's correct.

21             MR. MEISTER:  Okay.  We have it

22       up.

23             MR. GOLDMAN:  All right.  I am

24       going to mark another one actually.

25       Hold that in abeyance.
```

```
                                        Page 62
 1              J. Chow - Confidential
 2              (Plaintiffs' Exhibit 5, e-mail
 3         string beginning with e-mail dated
 4         5/12/10 bearing Production Nos. KEPPEL
 5         541358 through 59, was marked for
 6         identification)
 7    BY MR. GOLDMAN:
 8         Q.    All right.  I marked as Exhibit 5
 9    is series of e-mails.  It's got Bates stamp
10    KEPPEL 541358 through 59.  The top e-mail
11    is dated March 12, 2010.
12              All right, Mr. Chow, if you would
13    look at the bottom there, do you see there
14    is an e-mail from someone named Tommy Sam
15    to Mr. Tong and Mr. Chow, Mr. Sang, and the
16    subject is "DRU's bid."
17              Do you see that?
18         A.    Wait one second.
19         Q.    We are on Exhibit 5.  The one I
20    marked 4, please set that aside for now.  I
21    am going to come back for now.
22              MR. MEISTER:  You are Plaintiffs'
23         Exhibit 5?
24              MR. GOLDMAN:  Yes.
25              MR. MEISTER:  I see.  The bottom
```

```
                                          Page 63
 1            J. Chow - Confidential
 2       of the first page, okay.  We are
 3       looking at an e-mail, the Bates numbers
 4       ending 358, the bottom e-mail.
 5            MR. GOLDMAN:  That's correct.
 6  BY MR. GOLDMAN:
 7       Q.    Do you see that, Mr. Chow?
 8       A.    Yes.
 9       Q.    So, first of all, who is Tommy
10  Sam?
11       A.    One of my colleagues at the
12  group.
13       Q.    Was he employed by Keppel
14  Offshore Marine or was he with BrasFELS?
15       A.    He had various positions over
16  time.  He was in Brazil for a while.  He
17  was in the US for a while.  He was in
18  Singapore for a while.
19       Q.    What about CH Tong, what was his
20  position as of December 4, 2010?
21       A.    It shows he was CEO of Keppel
22  Offshore Marine.
23       Q.    And what about YY Chow, what was
24  his position as of December 4, 2010?
25       A.    From the e-mail, he was president
```

```
                                        Page 64
 1              J. Chow - Confidential
 2    of Keppel Offshore Marine USA in Houston.
 3         Q.    And Mr. Sang was the CFO of
 4    Keppel Offshore Marine, I take it?
 5         A.    Mr. Sit.  The surname is first
 6    for a lot of them.
 7         Q.    I am sorry.  Mr. Sit?
 8         A.    Yes.
 9         Q.    And what about KC Kwok, what was
10    his position?
11         A.    At the time, I couldn't be
12    certain unless I see where his e-mails are
13    going.  He was in Singapore, the project
14    manager and then he went to Brazil and took
15    over as president of Keppel Brazil for a
16    while.
17         Q.    If you look at the next page, it
18    has the Bates stamp 541359.  It talks about
19    at the top there, new company will be set
20    off by Petrobras called Sete Enterprise
21    with 10 percent owned by Petrobras and 90
22    percent to be owned by some funds to
23    conduct direct negotiation with the other
24    bidders and it goes on.
25              Do you see that discussion?
```

Page 65

```
 1                J. Chow - Confidential
 2        A.      Yes.
 3        Q.      And it states, "Barusco will
 4   retire soon to become the president of this
 5   new company, Sete Enterprise."
 6                Do you see that?
 7        A.      Yes.
 8        Q.      At this point Keppel Offshore
 9   Marine thought it was going to construct
10   four semi-submersible units for Sete, is
11   that right?
12        A.      I don't remember.  Just reading
13   what Mr. Sam wrote, that he highlighted.
14        Q.      And it says, "The thing is that
15   we should be getting four semis out of this
16   exercise for US 700 million dollars each."
17                Was that the cost to construct
18   these units for Sete?
19        A.      He doesn't make that as a price.
20   The cost of the price is usually much
21   different.
22        Q.      Do you know what that refers to,
23   the 700 million each?  This is on your
24   e-mail of December 4, 2010 which is the
25   middle there on the first page of this
```

```
                                           Page 66
 1              J. Chow - Confidential
 2   document.
 3       A.    Yes.   That's the indicative price
 4   from the e-mail, it's the indicative price
 5   per semi.
 6       Q.    What's an indicative price?
 7       A.    The 700 million.
 8       Q.    What does that mean, an
 9   indicative price?
10       A.    That's not the final price
11   because you would have to negotiate the
12   final specific technical specifications and
13   then adjust your pricing according to the
14   final specification.
15       Q.    So this -- at the top there you
16   sent an e-mail to Mr. Koh dated May 12,
17   2010, the subject is "DRU's Bid -
18   Confidential."
19              I take it that you would have
20   been assuming at this point that Keppel
21   Offshore Marine would be paying bribes to
22   the extent it got construction or EPC
23   contracts relating to the semi-submersibles
24   in Brazil, right?
25       A.    I am sorry?
```

Page 105

1           J. Chow - Confidential

2    based on receipt by Keppel FELS Brasil?"

3    And then you respond on December 15th in

4    the e-mail above that to Mr. Choo cc'ing

5    Miss Marsuki, "Fernvale."

6           What is Fernvale?

7        A.    If I remember properly, it was

8    the special purpose company that was going

9    to execute on one or more of the Sete

10   projects.

11       Q.    And that was a special purpose

12   company that was formed and owned by Keppel

13   Offshore Marine?

14       A.    Yes.

15       Q.    And then Mr. Choo writes, "Dear

16   Jeff.  Please find attached draft for

17   Eagle.  Kindly note the highlighted

18   clauses.  Not sure if you want them in or

19   amended."

20           Do you see that?

21       A.    Yes.

22       Q.    And then if you turn back on this

23   document to the Bates stamp KEPPEL 435122.

24           Are you there?

25       A.    Yes, I see it.

```
 1              J. Chow - Confidential
 2       Q.    And it appears to be a draft of a
 3  marketing consulting and services agreement
 4  between Fernvale and Eagle do Brasil.
 5              Do you see that?
 6       A.    Yes.
 7       Q.    And Eagle do Brasil was
 8  Mr. Skornicki's company, right?
 9       A.    Yes.
10       Q.    Then if you look at page KEPPEL
11  435132, section 9.0, Business Ethics, do
12  you see that, sir?
13       A.    Yes.  I have it now.
14       Q.    And this section -- and you can
15  tell me if I am wrong, this draft provides
16  that Mr. Skornicki is going to comply with
17  anticorruption laws and not pay bribes and
18  kickbacks to, among others, including
19  Petrobras, right?
20       A.    Correct.
21       Q.    Why was this in this agreement?
22       A.    We would update our format from
23  time to time and inclusion of these
24  provisions was recommended to me by some
25  friends or business acquaintances.  So we
```

```
 1              J. Chow - Confidential
 2    incorporated different things from time to
 3    time, and for this one, it's a clause that
 4    other companies have used and in particular
 5    Zwi had signed with another company having
 6    similar provisions.
 7         Q.    But you knew, sir, that he was
 8    not going to be able to comply with what
 9    was set forth in section 9.0, right?
10         A.    Well, it was up to him to agree
11    or not agree to it and up to him to comply
12    or not comply.
13         Q.    I got that, sir.  But you knew
14    that Mr. Skornicki was not going to be able
15    to comply with anticorruption laws because
16    he was going to be paying bribes to
17    Petrobras, right?
18         A.    I had come to the conclusion that
19    he was.
20         Q.    And wasn't the purpose of this
21    section, one of the purposes was to conceal
22    the fact that he would be paying bribes?
23         A.    Not to conceal it, no.  It was
24    more for protection internally.
25         Q.    Well, sir, I mean, one of the
```

1        J. Chow - Confidential

2   reasons why you executed these types of

3   agreements with Mr. Skornicki in these

4   projects with Petrobras was to conceal the

5   true nature and purpose of the bribe

6   payments, right, sir?

7        A.    The intention wasn't to conceal

8   any bribe payments.  The intention was to

9   capture in writing the agreement between

10  the company and Mr. Skornicki, that he

11  would be paid a certain commission fee for

12  his assistance under certain contracts.

13       Q.    Okay.  Sir, well, let's go back

14  to Exhibit 2 then.  These are the charges

15  to which you plead guilty.

16            Are you there, sir?

17       A.    Yes.  Sorry.

18            MS. SKAISTIS:  We are just

19       pulling up Exhibit 2.

20  BY MR. GOLDMAN:

21       Q.    Paragraph 13, are you there?

22       A.    Now I am.

23       Q.    And you agreed earlier at this

24  deposition that the statements in paragraph

25  13 were true, right, sir?

Page 109

```
 1              J. Chow - Confidential
 2      A.      Correct.
 3      Q.      And according to paragraph 13,
 4   "To facilitate the payment of those bribes
 5   and conceal the true nature and purpose of
 6   the payments, in accordance with
 7   established practices and Rig Construction
 8   Company, the defendant, Jeffrey Chow, and
 9   other employees at Rig Construction Company
10   created and executed false agreements on
11   behalf of Rig Construction Company with
12   consulting companies controlled in whole or
13   in part by Rig Construction Company Agent."
14              Do you see that?
15      A.      Yes.
16      Q.      And that was true, right?
17      A.      Yes.  Yes.
18      Q.      And you see the last sentence
19   says, "Certain of these agreements also
20   falsely represented that Rig Construction
21   Company Agent was abiding by antibribery
22   law and was not making improper payments."
23              Do you see that?
24      A.      Yes.
25      Q.      And that was also true, right,
```

Page 110

```
 1            J. Chow - Confidential
 2  sir?
 3       A.    Yes.
 4            MR. GOLDMAN:  I am going to mark
 5       another exhibit.
 6            (Plaintiffs' Exhibit 16, e-mail
 7       string beginning with e-mail dated
 8       12/17/11 bearing Production Nos. KEPPEL
 9       453940 through 41, was marked for
10       identification)
11  BY MR. GOLDMAN:
12       Q.    All right.  I have marked
13  Plaintiffs' Exhibit 16.
14            Do you see it, Mr. Chow?
15       A.    Yes.  Now I do.
16       Q.    This is a multi-page document
17  with -- I will tell you what the Bates
18  stamp is -- multi-page document with the
19  Bates stamp KEPPEL 453940 through 41.
20            And do you see that the bottom of
21  the page there is an e-mail from Mr. Chong
22  to a number of people and you are cc'd on
23  that e-mail dated December 17, 2011?
24       A.    Yes.
25       Q.    It says, "Dear All, FYI the
```

```
 1           J. Chow - Confidential
 2    other companies you can use.  Can you send
 3    names of these companies."
 4              Were you looking for other
 5    companies in which Keppel could enter into
 6    consulting agreements with Mr. Skornicki?
 7         A.   No.  The purpose was to ask Zwi
 8    what company he is going to use to sign the
 9    consulting agreement.
10              MR. GOLDMAN:  All right.  We will
11         mark another exhibit.
12              (Plaintiffs' Exhibit 20, e-mail
13         string beginning with e-mail dated
14         9/4/12 bearing Production Nos. KEPPEL
15         46490 through 46494, was marked for
16         identification)
17    BY MR. GOLDMAN:
18         Q.   Do you have Plaintiffs' Exhibit
19    20?
20         A.   Now I do.
21         Q.   It's a multi-page document,
22    e-mail thread, Bates stamp KEPPEL 46490
23    through 46494.  I want you to start at the
24    bottom of the third page.  There is an
25    e-mail from you to Mr. Skornicki dated
```

```
 1              J. Chow - Confidential
 2   April 9, 2012 cc'ing Tommy Sam.
 3            Do you see that?
 4       A.    Yes.
 5       Q.    It says, "Need you to advise on
 6   company for outside agreement between that
 7   company and Fernvale.  I have suggested and
 8   agreement is reached to have one portion
 9   via normal channels to Eagle in Brazil,
10   with balance to be with Fernvale outside."
11            Why were you making this
12   suggestion?
13            MR. MEISTER:  Can you point me to
14       where you are in that document again.
15       Sorry about that.
16            MR. GOLDMAN:  I will ask the
17       question again.
18   BY MR. GOLDMAN:
19       Q.    Look at the page with KEPPEL
20   46493.  You wrote to Mr. Skornicki, "Need
21   you to advise a company for outside
22   agreement between that company and
23   Fernvale.  I have suggested and agreement
24   is reached to have one portion via normal
25   channels to Eagle in Brazil with balance to
```

Page 121

```
                          J. Chow - Confidential
 1          J. Chow - Confidential
 2   be with Fernvale outside."
 3               First of all, what do you mean by
 4   that suggestion?
 5        A.    It's the normal process that I
 6   have been familiar dealing with Zwi in the
 7   past.  He breaks it down into two portions,
 8   local currency portion and a US dollar
 9   portion outside.
10        Q.    When you say outside, what do you
11   mean by that?
12        A.    Outside of Brazil.
13        Q.    And then the next e-mail above
14   that is from Mr. Sam to Jerald Lee Quan Ti.
15               Who is that?
16        A.    I believe he was the CFO in
17   Brazil at the time.
18        Q.    Okay.  And you were cc'd and
19   Mr. Sam says, "Jerald, Zwi is requesting
20   that part in Brazil be paid in Reals from
21   Fernvale's nonresident account in Brazil.
22   If so, do we have to withhold taxes?
23   Kindly check."
24               Was that a concern that you would
25   have to withhold taxes?
```

```
                                        Page 122
 1              J. Chow - Confidential
 2         A.    It wasn't a concern that I had.
 3    I didn't know about the tax issues.
 4         Q.    And then you wrote above that on
 5    April 9th, "So the contract would be
 6    between Fernvale and Eagle for both Reals
 7    and US dollar portions?  I was hoping to
 8    lay off .5 percent to BrasFELS, and rest
 9    Fernvale (so that Eagle helped BrasFELS get
10    it job, while XYZ company help Fernvale get
11    job)."
12              What did you mean by that?
13         A.    Fernvale shouldn't be bearing the
14    full brunt of the 2 percent and that the
15    company that was enjoying the benefit of
16    the contract should be bearing some of it,
17    that being BrasFELS.
18              So the normal procedure before in
19    dealing with these, it was always split up
20    into two portions, a local currency portion
21    and a portion outside with the special
22    project company.
23         Q.    And why was it split up in two
24    portions in that manner?
25         A.    In the past, Zwi had requested it
```

```
 1              J. Chow - Confidential
 2   to be split up that US dollars outside, he
 3   asked to Eagle do Brasil.
 4        Q.    Why had you requested it?
 5        A.    Why did he request it?
 6        Q.    You are saying that Mr. Skornicki
 7   requested that a portion be paid in Reals
 8   and a portion be paid in dollars?
 9        A.    That was my understanding, yes.
10        Q.    Then Mr. Sam writes back to you,
11   "Zwi is setting up a newco for USD.  He is
12   requesting to be paid by Fernvale to save
13   taxes.  If we agree on this, he must sign
14   an exclusion with BF."
15              Do you know what that refers to,
16   an exclusion with BF?
17        A.    There was at one time an overall
18   agency agreement between Keppel sales
19   Brazil and BrasFELS with Eagle do Brasil.
20              So if you were going to pay him
21   his commission for the Reals portion, the
22   other vehicle, you should exclude it from
23   the general agreement that it normally
24   would have fallen under.  So you are not
25   obligated to pay twice that amount.
```

Page 158

```
 1              J. Chow - Confidential
 2   contract we saw earlier today dated
 3   December 16, 2011?
 4        A.    I couldn't say for sure.  It just
 5   doesn't reference a specific project since
 6   they were all between Fernvale and Deepsea
 7   Oil.
 8              (Plaintiffs' Exhibit 28, e-mail
 9         string beginning with e-mail dated
10         9/1/15 bearing Production Nos. KEPPEL
11         634953 through 955, was marked for
12         identification)
13   BY MR. GOLDMAN:
14        Q.    All right I have marked
15   Plaintiffs' Exhibit 28.  Let me know when
16   you have it.
17        A.    I have it.
18        Q.    All right.  So if you look --
19   this is an e-mail chain in January of 2015
20   Bates stamped KEPPEL 634953 through 955 and
21   there is an e-mail there, the second one
22   down from the top from Yan Nain Myint to
23   you -- to Mr. Sam, to Zwi, and you are cc'd
24   on it.  It's dated January 2015.  The
25   subject is "URKA and Frade Anticorruption
```

1              J. Chow - Confidential

2      Letters."

3              Do you recall that in this time

4      period that the Brazilian National

5      Development Bank and other lenders were

6      requiring Sete, Petrobras, and Shipbuilders

7      to give anticorruption letters?

8          A.    I wasn't aware because normally

9      once the contract is signed, it goes to

10     operation people and there is a different

11     group that handles that.  I wasn't aware of

12     the details of that.

13         Q.    So this e-mail goes on and says,

14     "Dear All, I just received this from Sete

15     which they said is approved by BNDES.  From

16     quick look, it is much simpler than

17     previous versions.  I have highlighted that

18     English law has to be changed back to New

19     York law to be in line with EPC contract.

20     Please review and give feedback ASAP."

21             First of all, who was Yan Nain --

22     I don't know how to pronounce it -- is it

23     Myint?

24         A.    Yes.  He was the project director

25     appointed for the Sete jobs.

```
 1              J. Chow - Confidential
 2        Q.     So he was the project director at
 3   Keppel?
 4        A.     Yes.
 5        Q.     And you wrote back to Mr. Sam,
 6   "Can you contact Yan and tell him to keep
 7   this off e-mails, as we don't want to be
 8   seen to colluding with others (as we have
 9   been doing it already since the draft
10   submitted - Fernando used our arguments and
11   drafts, to the most extent)?"
12              Why were you telling Mr. Yan to
13   keep this off e-mail?
14        A.     It just doesn't look good to
15   client if we are sharing our approach or
16   requests from them with other shipyards
17   that are contracting with them.  So I told
18   him to stop it.
19        Q.     So who is Fernando?
20        A.     Fernando at that time should have
21   been the guy in charge at the Enseada Yard
22   for AutoBrik.
23        Q.     And the Enseada Yard was one of
24   the shipbuilders for the Sete project?
25        A.     Correct.
```

```
                                        Page 161

 1              J. Chow - Confidential

 2                 (Plaintiffs' Exhibit 29, e-mail

 3         dated 10/1/15 bearing Production Nos.

 4         KEPPEL 485414, was marked for

 5         identification)

 6   BY MR. GOLDMAN:

 7        Q.     I have introduced Plaintiffs'

 8   Exhibit 29.  Let me know when you have it.

 9        A.     I have it.

10        Q.     It's a single page, KEPPEL

11   485414, and I am interested in the e-mail

12   that you wrote on January 9, 2015 where you

13   said, "Fernando confirmed that they signed

14   letter to BNDES, dealing directly with

15   them.  He said the others have also signed.

16   Engevix signed as they will sign anything,

17   nothing to lose."

18                And in the third paragraph down

19   you said, "Confirmed AMA signed which would

20   free up bridging loan funds next week."

21                AMA, does that refer to an asset

22   management agreement?

23        A.     I don't remember what it stood

24   for.

25        Q.     And it says, "Carneiro
```

Page 162

```
 1              J. Chow - Confidential
 2   optimistic, things better but taking time."
 3              Is Carneiro the CEO of Sete?
 4      A.    I don't think so.  It was just
 5   Ferraz or Barusco that I remember.
 6      Q.    Well, do you remember having a
 7   discussion with somebody at Sete about how
 8   the Sete business was doing in around this
 9   time period?
10      A.    No.
11      Q.    And it says, "Fernando will send
12   language of their letter signed, but for
13   obvious reasons cannot send copy of letter.
14   Will forward once received.  Will keep in
15   touch via phone as things develop.  If
16   Tommy could advise those in Brazil, as
17   things too dicey to be sending too much
18   through internet.  Regards Jeff."
19              What do you mean, "things are too
20   dicey to be sending through internet"?
21      A.    It appears that Sete is asking
22   for stuff and it must be outside of the
23   contract requirements because if it were
24   within the contract requirements, then
25   there is no issue.  But if they are asking
```

Page 189

1

2                   C E R T I F I C A T E

3    STATE OF NEW YORK )

4                      ) ss.:

5    COUNTY OF NEW YORK)

6          I, Christina Diaz, a Certified

7    Realtime Captioner, Registered Merit

8    Reporter and Certified Realtime Reporter and

9    Notary Public within and for the State of

10   New York, do hereby certify:

11         That JEFFREY CHOW, the witness whose

12   deposition is hereinbefore set forth, was

13   duly remotely sworn by me and that such

14   deposition is a true record of the testimony

15   given by such witness on June 24, 2021.

16         I further certify that I am not

17   related to any of the parties to this action

18   by blood or marriage and that I am in no way

19   interested in the outcome of this matter.

20   Dated:  June 25, 2021

21

22

           CHRISTINA DIAZ

23         NCRA Certified Realtime Captioner

           NCRA Certified Realtime Reporter

24         NCRA Registered Merit Reporter

           NYS Certified Shorthand Reporter

25