**KEPPEL OPP'N EXH.  45**

CONFIDENTIAL

Page 1

1

2 UNITED STATES DISTRICT COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 18-cv-01047 (PGG)

5 - - - - - - - - - - - - - - - - - - - -x

6 EIG ENERGY FUND XIV, L.P.,

EIG ENERGY FUND XIV-A, L.P.,

7 EIG ENERGY FUND XIV-B, L.P.,

EIG ENERGY FUND XIV (CAYMAN), L.P.,

8 EIG ENERGY FUND XV, L.P.,

EIG ENERGY FUND XV-A, L.P.

9 EIG ENERGY FUND XV-B, L.P.

EIG ENERGY FUND XV (CAYMAN), L.P.

10                    Plaintiffs,

          -against-

11 KEPPEL OFFSHORE & MARINE LTD.,

                    Defendant.

12 - - - - - - - - - - - - - - - - - - - -x

13                Virtual Zoom Deposition

14

                  July 20, 2021

15                  10:00 a.m.

16    CONFIDENTIAL VIRTUAL VIDEO DEPOSITION

17 of KEVIN CORRIGAN, in the above-entitled

18 action, held at the above time and place,

19 taken before Jeremy Richman, a Shorthand

20 Reporter and Notary Public of the State of

21 New York, pursuant to the Federal Rules of

22 Civil Procedure, and stipulations between

23 Counsel.

24

25              *       *       *

Page 33

1                    CONFIDENTIAL - CORRIGAN

2     interesting to me, and I would like to

3     move forward in gathering additional

4     information and seeing if this is

5     something --

6          Q.     There was an echo there,

7     maybe you can just repeat yourself.

8          A.     Oh, sorry.  Posting memo is

9     --

10              MS. LAW:  I think he just

11         means the last line, the last line

12         you said, would like to move

13         forward in gathering additional

14         information and seeing if this is,

15         something, and then the word

16         dropped off.

17         A.     Something that we want to

18     pursue.

19              MS. LAW:  Thank you.

20         Q.     And is a posting memo, does

21     that represent a decision point in the

22     process?

23         A.     No, I would say it's a very

24     initial impression of one individual,

25     in this case the writer of the posting

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    memo, who is advocating to, or who has
 3    sufficient interest in a transaction to
 4    present it to management and say, Hey,
 5    this is something we should look at
 6    more deeply.
 7         Q.    So we -- during this process
 8    we have a posting memo, and then we
 9    have a recommendation.  Those are two
10    separate points in time, correct?
11         A.    Correct.
12         Q.    Other than creating the
13    posting memo and creating the
14    recommendation document, is the due
15    diligence process documented in any
16    other way?
17         A.    We had periodic, I want to
18    say weekly, but it may have been every
19    other week, meetings with our chief
20    investment officer where all the
21    transactions we were working on as a
22    group were discussed, and people would
23    say, you know, We got the model and we
24    like it, or we don't like it, or we've
25    done it.  It's a very iterative process
```

CONFIDENTIAL

Page 35

1                CONFIDENTIAL - CORRIGAN

2    where certainly our chief investment

3    officer would sort of follow the

4    progress of transactions.

5         Q.    In terms of documents created

6    related to the due diligence process,

7    is it just the posting memo and the

8    investment recommendation, or are there

9    other documents or work product that

10   are created to show what happened

11   during the due diligence process?

12        A.    Well, there was a shared

13   drive at EIG where a lot of the due

14   diligence documents that we were

15   working on were posted, so that people

16   could have access to it, and then of

17   course there were periodic memos in the

18   interim, if you, you know, you ran into

19   something that you wanted some guidance

20   on, you would probably write a memo to

21   the chief investment officer and/or the

22   CEO.

23        Q.    And then the investment

24   recommendation document essentially

25   summarizes that entire process and

Page 36

1                  CONFIDENTIAL - CORRIGAN

2      presents it to the investment

3      committee?

4            A.    Yes.  By the time we are

5      writing an investment recommendation,

6      the tires have been thoroughly kicked,

7      and we're ready to propose an

8      investment.

9            Q.    So the investment

10     recommendation sort of brings together

11     the entire due diligence process for

12     the investment committee?

13           A.    Yes.

14                 MS. LAW:  Objection to form.

15         You can answer.

16           Q.    So what was the investment

17     decision-making body for EIG Energy

18     Fund XIV?

19                 MS. LAW:  Objection to form.

20                 MR. BARBUR:  I can rephrase,

21         if it will help.

22                 MS. LAW:  I don't know what

23         you mean by "investment

24         decision-making body."

25           Q.    Who, what person or group of

CONFIDENTIAL

Page 37

```
 1            CONFIDENTIAL - CORRIGAN
 2    persons made the decision with respect
 3    to EIG Energy Fund XIV investing at
 4    Sete?
 5            MS. LAW:  And, Peter, you're
 6        talking about the entire decade at
 7        TCW and then when it spun off to
 8        EIG --
 9            MR. BARBUR:  I'm just
10        focusing on EIG Energy Fund XIV and
11        its investment in Sete, so I think
12        that's all the EIG time period.
13            MS. LAW:  I wasn't sure you
14        were connecting it to Sete, so
15        that's fine.
16        A.    Each fund, I mean, there was
17    an investment committee comprised of
18    several people that made decisions on
19    behalf of all the funds.
20        Q.    And was it the same
21    investment committee for all of the
22    funds and all of the investments that
23    EIG made?
24        A.    Yeah, it was the same
25    committee for the decisions of
```

CONFIDENTIAL

Page 38

1              CONFIDENTIAL - CORRIGAN

2      investments in funds like Fund XIV and

3      XV, EIG had other initiatives that I'm

4      not privy to how that worked, like an

5      instrument called Gateway and things

6      like that.  I never got involved with

7      those.

8                   So the committee I worked

9      with was the same committee, whether it

10     was Fund XIV, XV, XVI, and the

11     allocation among funds was a decision

12     that I really didn't get involved in.

13     But that was something our management

14     decided, We'll put X in this fund and Y

15     in that fund.

16          Q.     And just again, I think you

17     covered this in the prior deposition,

18     but so we're clear here, the investment

19     committee made the decision for Fund

20     XIV to invest in Sete in June 2011,

21     correct?

22          A.     That sounds right, yes.  Now,

23     you know, what they do is approve an

24     investment?

25          Q.     Okay.  And the approval for

Page 55

1              CONFIDENTIAL - CORRIGAN

2      of the Brazilian economy.

3              Q.     You were dealing directly

4      with representatives of Petrobras and

5      Sete relating to EIG's investments in

6      Sete, correct?

7              A.     Correct.

8              Q.     Did you ever ask any of them,

9      directly or indirectly, to give you

10     assurances that bribes were not being

11     paid?

12             A.     Well, we had a lot of written

13     materials that suggested that they were

14     being run professionally and within the

15     law, and we took those assurances as

16     sufficient for the purpose of moving

17     ahead with the investment.

18             Q.     Just to go back to my

19     question, did you ever ask anyone at

20     Petrobras or Sete, as part of the due

21     diligence process, whether they were

22     paying bribes?

23             A.     No, I did not.

24             Q.     Did you ask for any

25     assurances that they were not paying

CONFIDENTIAL

Page 56

1              CONFIDENTIAL - CORRIGAN

2     bribes?

3          A.    No.

4          Q.    Did you speak to anyone in

5     connection with the due diligence

6     process and ask questions relating to

7     the possibility of corruption?

8          A.    No.

9          Q.    So beyond the CompliNet

10    searches and just generally thinking

11    that Petrobras was on the up-and-up,

12    what else did EIG do with respect to

13    corruption due diligence?

14              MS. LAW:   Objection to form.

15       You can answer.

16          A.    As I mentioned a second ago,

17    we had the info memo and various other

18    documents that indicated that they were

19    following the law.  Sete itself had a

20    person on staff who was a compliance

21    person, they practice -- they had best

22    practices on corruption and code of

23    conduct and all that, so to me it

24    looked like it was all being done very

25    professionally.

CONFIDENTIAL

1           CONFIDENTIAL - CORRIGAN
2       Q.    You were the lead member of
3   EIG's team in connection with the Sete
4   investment, correct?
5       A.    Yes, I would say so.
6       Q.    Did you speak to any members
7   of the Sete deal team to prepare for
8   your testimony, other members of the
9   Sete deal team?
10           MS. LAW:   Within EIG?
11      Q.    Within EIG.
12      A.    Oh, no.
13      Q.    When did you first learn
14  about the Sete investment opportunity?
15      A.    I think it was September of
16  2010.   I was visiting Brazil with Clay
17  Taylor from our Houston office.
18      Q.    And how did you learn about
19  the possibility of the Sete investment
20  at that time?
21      A.    I had made an appointment at
22  Banco Santander with a guy I used to
23  work with at Norchem, which is the
24  chemical operation that I referred to
25  earlier, when I lived there from '92 to

```
 1              CONFIDENTIAL - CORRIGAN
 2      '94.  His name is Luis Cantidio,
 3      C-A-N-T-I-D-I-O.  And I didn't have any
 4      particular agenda except to say hello,
 5      we're interested in doing business in
 6      Brazil, and what does he got, and does
 7      he have any ideas, etcetera.  And he
 8      says, It turns out I'm looking at this
 9      opportunity called Sete Brasil.  And
10      across the Chinese wall over there, is,
11      our bank is also the financial advisor
12      to Petrobras, and if you would like,
13      I'll introduce you to the guy who is
14      leading that effort, and his name was
15      Luiz Reis, R-E-I-S, and that's the
16      first time I learned about Sete Brasil.
17          Q.    What was the next step in the
18      process that ultimately led to the
19      investment in Sete Brasil?
20          A.    Well, I believe it was after
21      that I spoke to a friend of mine at
22      Société Générale, and he said, I have a
23      presentation on Sete, and he sent it to
24      me.  And I know that's among the
25      documents you have.  And so that was
```

CONFIDENTIAL

Page 59

```
 1              CONFIDENTIAL - CORRIGAN
 2      the first, that's what would have
 3      prompted me to write a memo about this
 4      opportunity, whether we should look at
 5      it, etcetera.
 6              And then later we got access
 7      to the data room and, you know, then we
 8      really jumped in.
 9          Q.    Why did EIG want to pursue
10      this opportunity to invest in Sete?
11          A.    Well, it was the hottest deal
12      in the market in 2010.  Everybody
13      wanted to be in it, and I thought, as I
14      said earlier, we were dealing with the
15      A team, the largest corporation in
16      South America, the largest pension
17      funds, as co-investors.  Very large
18      construction groups involved in the
19      shipbuilding.  Petrobras is the
20      off-taker, Petrobras is the appointor
21      of senior management, BNDES support, I
22      mean, you couldn't get a better list of
23      entities in Brazil to work with on a
24      transaction, even though it had a lot
25      of inherent risk.
```

CONFIDENTIAL

Page 60

```
 1              CONFIDENTIAL - CORRIGAN
 2         Q.     What was the first step in
 3    EIG's due diligence process with
 4    respect to investing in Sete?
 5         A.     Well, I always took the
 6    approach that you want to understand
 7    the story, does the story hold
 8    together.  And if the story holds
 9    together, and you think you can
10    mitigate the risk that you identified
11    to the point where you're not taking
12    undue risk, then you move forward.  And
13    the next step is to look at the model
14    to ascertain what your projected
15    returns might be.  But the story has to
16    hold together.  That's really step
17    number one.
18         Q.     And what did you do to make
19    sure that the story held together?
20         A.     Well, we sort of skirted it,
21    but it's again, you know, it was an
22    objective of the -- a national
23    objective of the government, to
24    revitalize the Brazilian shipbuilding
25    industry.  A desire on them to, you
```

Page 61

```
 1            CONFIDENTIAL - CORRIGAN
 2    know, increase local content and
 3    improve employment.  That was the
 4    big-picture goal.  And then you had
 5    Petrobras, which was buying a lot of
 6    these ships overseas, and they had a
 7    need for many of them, agreeing to
 8    pursue them locally, and that led to
 9    the creation of Sete Brasil as an
10    offshore -- off-balance-sheet financing
11    vehicle, because Petrobras didn't want
12    to put all this debt directly on their
13    balance sheet, so that part made sense.
14            And then as I said, you know,
15    they invited the largest pension funds,
16    investment bank, foreign bank,
17    commercial bank, all of them were
18    investors.  You had mitigants built
19    into cost overruns and delays to the
20    treasury from, you know, through the
21    naval -- guaranteed naval fund.  And
22    then I looked at the shipyards and who
23    they were, and some had a track record,
24    others were green field.
25            In the end, you know, there
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2     we got comfortable with that because,
 3     as I indicated earlier, the sponsors
 4     and their technical joint venture
 5     partners were household names, so to
 6     speak.
 7          Q.    Let's post to Exhibit Share
 8     what was previously marked as Exhibits
 9     38 and 39, which relate to the
10     investment recommendation.  If you
11     could pull those up, Mr. Corrigan, that
12     would be great.
13              MS. LAW:  Kevin, I'll let you
14         know when I see them, they're not
15         in yet.
16              THE WITNESS:  Okay.
17              (Exhibit 38, previously
18         marked, was shown to the witness,
19         Bates stamped EIG_KEP_00077787.)
20              MS. LAW:  Peter, he only has
21         the ability to look at one document
22         at a time.
23              THE WITNESS:  I should look
24         at 38 first?
25          Q.    Open 38 first.  We won't
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    spend  much  time  on  this  one.   So do you
 3    have 38 in front of you, Mr. Corrigan?
 4          A.    Yes, sir, I do.
 5          Q.    Do you recognize this
 6    document?
 7          A.    Yes, it's a, you know,
 8    calling an investment committee meeting
 9    by Blair's secretary, Iris.
10          Q.    And this is the investment
11    committee meeting on June 27, 2011,
12    when the decision to invest -- to have
13    Fund XIV invest in Sete was made; is
14    that correct?
15          A.    I believe it is.  Is there an
16    agenda?
17          Q.    No, but there are materials
18    attached, and if you go back to Exhibit
19    Share and pull up Exhibit 39.
20          A.    Okay, it had the investment
21    rec?
22          Q.    Yes.
23          A.    Okay, so yeah, I'll do that.
24    39.  I always have to refresh, don't I?
25                MS. LAW:  Yes, and it should
```

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2       be there.  And again, it's in

3       numerical order.

4          A.    Thirty-nine, right?

5          Q.    Yes.

6                (Exhibit 39, previously

7       marked, was shown to the witness,

8       EIG_KEP_00077790.)

9          A.    Okay, investment rec.

10         Q.    And do you recognize this

11   document we marked as Exhibit 39?

12         A.    Yes, I do.

13         Q.    And describe what it is?

14         A.    It's an investment

15   recommendation to invest 250 million

16   reals in Sete Brasil.

17         Q.    And this is the kind of

18   investment recommendation you talked

19   about earlier, correct?

20         A.    Correct.

21         Q.    And this is the one for the

22   investment by Fund XIV in the Sete

23   project, correct?

24         A.    That's right.

25         Q.    And this, then, sort of is

CONFIDENTIAL

Page 70

1              CONFIDENTIAL - CORRIGAN
2      the culmination of the due diligence
3      process and a recommendation to make
4      the investment, correct?
5              A.    Yes.
6              Q.    And this was presented to the
7      investment committee on June 27, 2011?
8              A.    It appears that way, yes.
9              Q.    And at that meeting, the
10     investment committee approved the
11     investment, correct?
12             A.    Correct.
13             Q.    How did you decide which
14     details relating to this possible
15     investment to put in this investment
16     recommendation?
17             A.    I'm not sure I understand the
18     question.
19             Q.    Well, you had learned a lot
20     about the Sete investment up to this
21     point in time, correct?
22             A.    Yes.
23             Q.    And you had to make some
24     decisions about what to put in here and
25     what not to put in here, correct?

CONFIDENTIAL

Page 71

```
 1              CONFIDENTIAL - CORRIGAN
 2         A.    Yes.
 3         Q.    So just describe, generally,
 4    the process of deciding what to put in
 5    here and what not to put in here.
 6         A.    Well, it's a fairly long
 7    document to begin with, but the idea is
 8    to present the transaction as
 9    completely as possible with the terms
10    and conditions under which you're going
11    to invest, with the risks and mitigants
12    that you've identified for the
13    investment, and then there's, you know,
14    the projected returns and stress tests
15    on the returns.  I would say those are
16    the main themes that you want to
17    present to your investment committee.
18         Q.    And is this the most
19    comprehensive document that summarizes
20    the due diligence process relating to
21    this investment?
22              MS. LAW:  Objection to form.
23         A.    This is the only document
24    that exists that was used to approve
25    the transaction inside EIG.
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2        Q.    And if I want --
 3        A.    I'm not sure what you mean by
 4   "most comprehensive."
 5        Q.    If I wanted to understand
 6   everything that happened during the due
 7   diligence process, is there any better
 8   document to look at than this one?
 9             MS. LAW:  Objection to form.
10        A.    Well, again, there were --
11   this was an iterative process where, as
12   I mentioned earlier, we had periodic
13   discussions with Kurt about the
14   progress of the deal.  So there --
15   again, I don't remember specifically,
16   but there would have been issues that
17   came up, and we would have discussed
18   them and dealt with them.  Whether all
19   of that appeared in the final
20   investment recommendation, I don't
21   know.
22        Q.    The members of the investment
23   committee, did they get information
24   related to this potential investment
25   other than what's in this investment
```

CONFIDENTIAL

Page 73

1          CONFIDENTIAL - CORRIGAN
2    recommendation?
3          A.    Well, the independent
4    directors, no, they get it and they
5    read it, and then they attend the
6    meeting.  Obviously, Kurt Talbot and
7    Blair Thomas, who were on the
8    committee, were quite familiar with the
9    transaction by the time they got this
10   document.
11         Q.    How many members are there of
12   the investment committee?
13         A.    I believe there were five at
14   the time, so it was Randy, Blair and
15   Kurt, and then the two independent
16   directors from TCW.
17         Q.    Turn to page 12 of the IR,
18   which has, begins in production number
19   2482.  Do you have that page in front
20   of you?
21         A.    Yes, sir.
22         Q.    It refers to EPC contractors.
23   Do you see that?
24         A.    Mm-hmm.
25         Q.    You need to say yes or no.

Page 74

1          CONFIDENTIAL - CORRIGAN
2        A.    Yes, sorry.
3        Q.    Could you describe what EPC
4    contractor means in this document?
5        A.    Well, EPC stands for
6    engineering, procurement and -- anyway,
7    it means in this case the six shipyards
8    that were building the, either
9    semi-submersibles or ultra deepwater
10   drill ships.
11       Q.    At this time, did you know
12   exactly which shipbuilders would
13   ultimately end up building which ships?
14       A.    In June of 2011, we had a
15   list of the shipyards that had been
16   identified, yes.  And I think EAS had
17   already been granted their --
18       Q.    You had EAS that you knew was
19   going to be building one of the ships,
20   right?
21       A.    Right.
22       Q.    And there was a list of other
23   potential shipyards, but none of them
24   had actually had any contracts with
25   Sete, correct?

CONFIDENTIAL

Page 75

```
 1              CONFIDENTIAL - CORRIGAN
 2        A.     In June of 2011, yeah, I
 3    don't remember exactly when the other
 4    contracts were given, but I think it
 5    was after that.  You're right.  But we
 6    had studied the six shipyards to get
 7    comfortable with their ability to
 8    produce future contracts granted to
 9    them.
10        Q.     And EAS, as we discussed
11    previously, that's a company that one
12    of the owners of is Camargo Corrêa that
13    was involved in the corruption scandal,
14    right?
15              MS. LAW:  Objection to form.
16        Q.     I'm sorry, I didn't hear your
17    answer, Mr. Corrigan.
18        A.     Yes, correct.
19        Q.     And with respect to EAS, if
20    we look at page 15 of the -- 15 and 16
21    of the investment recommendation, this
22    just discusses certain risks, including
23    shipyard bankruptcy.  Do you see that?
24        A.     Yes.
25        Q.     And the only shipyard that's
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    discussed under shipyard bankruptcy is
 3    EAS, correct?
 4         A.    Yes.
 5         Q.    And that's because EAS was
 6    the only shipyard that actually had an
 7    agreement to build ships for Sete,
 8    correct?
 9         A.    At that point, yes.
10         Q.    And then if we turn to,
11    there's an appendix to this document.
12    It's the second to the last page,
13    appendix 6, page 41 of the document.
14         A.    Okay.  Yes.
15         Q.    And this is the suggestion
16    about other potential shipyard
17    contractors, correct?
18         A.    Correct.
19         Q.    We have Jurong, Brasfels and
20    three others, correct?
21         A.    Mm-hmm.
22         Q.    Please answer yes or no.
23               MS. LAW:  Objection to form.
24         A.    Yes, I'm sorry, yes.
25    Paraguaçu is misspelled, I just
```

CONFIDENTIAL

Page 77

                  CONFIDENTIAL - CORRIGAN

1

2    realized it, anyway.

3         Q.    And where did this investment

4    recommendation come from with respect

5    to these shipyards?

6         A.    It was in the data room, we

7    had -- it was identified in various

8    info memos that we reviewed.

9         Q.    And in fact, you simply

10   copied these bullet points from a

11   bank -- Banco Santander presentation,

12   correct?

13        A.    Right, I do remember saying,

14   just use that info.  It provided a

15   summary of who these folks were.

16        Q.    With respect to Brasfels,

17   which is the Keppel entity, this is the

18   sum total of information that was

19   presented to the investment committee

20   regarding Brasfels, correct?

21        A.    That's correct.

22        Q.    And this information came

23   from Banco Santander?

24        A.    Right, as Petrobras's

25   financial advisor.

CONFIDENTIAL

1            CONFIDENTIAL - CORRIGAN

2        Q.     And did you do any

3    independent due diligence beyond

4    Santander to verify that what was said

5    about Brasfels here was correct?

6        A.     We went on websites and

7    talked to people.  We, of course,

8    visited both EAS and Brasfels.  So no,

9    we did do additional due diligence

10   along with all the other factors we

11   were looking at.  We were trying to get

12   comfortable that they would be able to

13   build these ships.

14       Q.     Prior to the time that this

15   investment recommendation was created,

16   you had not visited Brasfels, correct?

17       A.     Prior to June of 2011?

18       Q.     Correct.

19       A.     I believe that was

20   afterwards, yes.  I think we had

21   visited EAS at that point.

22       Q.     I think you said in your

23   Petrobras deposition, it was post EAS

24   and Jurong, correct?

25       A.     I don't remember visiting

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2      Jurong.

3          Q.    Let's just focus on EAS.

4      What do you recall about your visit to

5      the EAS shipyard as part of your due

6      diligence process?

7          A.    Well, I remember Barusco

8      accompanied us, and it was Kevin Lauder

9      and myself, and we flew up to Recife

10     and spent the day, you know, meeting

11     with various officials of the company,

12     who gave us a presentation and showed

13     us how the ships were going to be

14     built.  So it was just kind of a

15     get-to-know-you type of visit, and we

16     were impressed.  They looked like they

17     knew what they were doing, and that was

18     it.

19         Q.    Just so the record is clear,

20     who is Barusco?

21         A.    He was the COO of Sete,

22     although at that point he might have

23     still been an employee of Petrobras.  I

24     don't remember the exact --

25         Q.    He was originally with

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    looks like a final.  We looked at
 3    drafts earlier on, I remember.
 4         Q.    Okay.  But you got this
 5    before the date of the investment
 6    committee meeting, right?
 7         A.    Right.
 8         Q.    If you turn to page 41 of
 9    this document.
10              MS. LAW:  You're referring to
11         the page numbers at the bottom of
12         the document.
13              MR. BARBUR:  Correct.
14         A.    38, 39, here we go, 41, okay,
15    I'm here.
16         Q.    And you see that there are
17    representations and warranties by the
18    contractor --
19         A.    Mm-hmm, yes.
20         Q.    -- in 6.2?
21         A.    Yes.
22         Q.    Did EIG consider these
23    representations and warranties here to
24    be material to its investment decision?
25              MS. LAW:  Objection to form.
```

CONFIDENTIAL

Page 91

```
 1            CONFIDENTIAL - CORRIGAN
 2       You can answer.
 3       A.    Yes, this is an important
 4   part of the contract.
 5       Q.    And one of the
 6   representations and warranties is the
 7   contractor is not in violation of any
 8   applicable law.  Do you see that?
 9       A.    Yes.
10       Q.    And other than simply reading
11   this on this page, did you do anything
12   to verify whether that representation
13   and warranty was correct?
14       A.    No, we took it at face value.
15       Q.    And we talked earlier about
16   the CompliNet searches you ran as part
17   of the due diligence process.  Do you
18   recall that?
19       A.    Yes, sir.
20       Q.    And you said you ran some
21   CompliNet searches related to Keppel,
22   correct?
23            MS. LAW:  Objection,
24       mischaracterizes his prior
25       testimony.
```

Page 92

1                CONFIDENTIAL - CORRIGAN

2          A.     I don't recall that I said

3     that, no.

4          Q.     Okay.  Do you recall whether

5     you ran any CompliNet searches related

6     to any Keppel entities --

7          A.     I don't recall that, no.

8          Q.     You don't recall that one way

9     or the other?

10         A.     Correct.

11         Q.     So what, if anything, do you

12    recall about the June 27, 2011,

13    investment committee meeting?  Do you

14    recall the discussion that occurred?

15         A.     I remember that I made a

16    presentation, probably 10 minutes or

17    so, highlighting the transaction.

18    There would have been some discussion

19    and questions, and then it was

20    approved.

21         Q.     Approximately how long was

22    the discussion relating to this Sete

23    investment?

24         A.     I don't recall.

25         Q.     Just ballpark it.  Five

Page 93

1           CONFIDENTIAL - CORRIGAN
2     minutes, an hour and a half?  I'm just
3     trying to get a sense.
4           A.    Well, again, the key -- two
5     of the key decision-makers were already
6     quite familiar with the transaction, so
7     it would have been Alvin and David
8     asking questions.  I would say probably
9     10 minutes.
10          Q.    Do you recall any questions
11    that were asked during that meeting?
12          A.    I don't.
13          Q.    Do you recall if any
14    questions were asked relating to
15    bribery or corruption?
16          A.    No, I mean, again, I don't
17    remember the questions, but I don't
18    believe there were any on that subject.
19          Q.    Did you discuss during that
20    meeting any of the visits to the
21    shipyards you had had?
22          A.    I don't recall, but I would
23    have mentioned that we had visited EAS;
24    you know, that we knew the others were
25    building their good capabilities.

CONFIDENTIAL

Page 94

1          CONFIDENTIAL - CORRIGAN

2          Q.    I think in your prior answer

3     you said David was at the meeting.  Did

4     you mean Jeffrey Anderson?

5          A.    Jeff, yeah, sorry.

6               MR. BARBUR:  Let's mark

7          another document, Dave, tab 11.

8               MS. LAW:  Kevin, I'll tell

9          you when it's up.

10              (Exhibit 86, marked for

11         identification, Bates stamped

12         EIG_KEP_00077755.)

13              MS. LAW:  It should be there

14         now as Exhibit 86.

15              THE WITNESS:  Thank you, I

16         got it.

17         A.    Okay, I'm there, Peter.

18         Q.    This is an email you prepared

19    on or about June 29th of 2011, correct?

20         A.    Yes.

21         Q.    What was the purpose of this

22    email?

23         A.    Well, Phil Abejar was our

24    operational guy who was concerned with

25    the booking entity and the timing of

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2      disbursements and things of that
 3      nature, so let me just look at, he sent
 4      something to me, right, yeah, he was,
 5      we had set up a Luxembourg funding
 6      vehicle from a tax efficiency
 7      standpoint.  That was the kind of stuff
 8      Phil did, I didn't really have any
 9      involvement in that.  So he was asking
10      me about the timing and, you know, this
11      was post investment committee, and we
12      had signed a commitment with the FIP at
13      that point, or we were about to.
14           Q.    We'll get to that in just a
15      minute.  You in the very first line,
16      and then again in the first line of the
17      second paragraph, refer to a binding
18      commitment and a binding agreement.  Do
19      you see that?
20           A.    Yes.
21           Q.    And that was your
22      understanding, that you would enter
23      into a binding agreement to invest?
24                MS. LAW:  Objection, calls
25           for a legal conclusion.  You can
```

answer.

A. Well, we signed a commitment if certain conditions were met, one of which, an important one I remember, was an allocation, which at that point we did not have.

Q. When you wrote binding commitment and binding agreement, did you mean that?

MS. LAW: Objection.

A. Again, it's binding if the conditions are met.

Q. And the conditions are what, exactly, in your mind?

A. Well, the one was having an allocation for Petrobras. I don't recall the other ones, but there would have been certain CPs.

Q. Were any of those conditions not met?

A. Well, eventually we funded, so I presume they were all met by, you know, a year later or so.

Q. So you had a binding

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    commitment subject to conditions that
 3    were met; is that correct?
 4              MS. LAW:  Objection to form,
 5        mischaracterizes testimony.
 6         A.    These are, yeah, Peter, this
 7    is a legal discussion that I'm not
 8    qualified to opine.
 9         Q.    I understand that you're not
10    a lawyer, but you did write an email
11    that says, binding commitment and
12    binding agreement.
13              Do you see that?
14         A.    Yes.
15         Q.    And you meant what you said?
16         A.    This was an internal
17    communication to Phil to let him know
18    where things stood, and that he still
19    had a lot of time before he needed to
20    fund any disbursements.
21         Q.    You're not --
22         A.    That was the purpose of this
23    email.  It's not a legal document to an
24    outside party.
25         Q.    Trust me, I'm not asking you
```

```
 1              CONFIDENTIAL - CORRIGAN
 2    for a legal opinion.  You're not a
 3    lawyer, I'm not asking you for a legal
 4    opinion.  But when you wrote, binding
 5    commitment and binding agreement, did
 6    you mean what you said?
 7              MS. LAW:  Objection, form.
 8         A.    I have to go back and look at
 9    what we had signed.  I'm sure we had
10    signed something with Kaisha, and I
11    probably was using terms that they were
12    using.  I don't remember.  That's why I
13    used that word.  But clearly, we had an
14    expectation of investing, but I don't
15    feel we were committed at this point.
16         Q.    And you were not committed
17    because you thought there were certain
18    conditions, is that your testimony?
19         A.    Yes.
20         Q.    And those conditions related
21    to allocations and other things, and
22    they were met, those conditions?
23         A.    Eventually, yes.
24         Q.    Let's mark another exhibit,
25    tab 12.
```

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN

2          A.    That's correct, yes.

3          Q.    And in fact, this document is

4    almost identical to the investment

5    recommendation made for Fund XIV,

6    correct?

7          A.    I would think so, although I

8    would have to read them both.  But I

9    agree, there would have been

10   significant changes between June and

11   September.

12         Q.    Would additional due

13   diligence have been done between June

14   and September?

15         A.    Well I think, no, not per se.

16   We were still there monitoring what was

17   going on and the progress of the

18   contracts with Petrobras for the

19   additional drill ships, and all I can

20   say is if we had gotten a whiff of

21   anything untoward during that time, we

22   clearly would have pulled the deal.

23   But I don't remember that we made more

24   trips specifically for this purpose.

25         Q.    What we've marked as

CONFIDENTIAL

Page 109

1              CONFIDENTIAL - CORRIGAN
2      Exhibit 75, this was sent to the
3      investment committee, correct?
4           A.   It would have been the same
5      procedure as the previous one, yes.
6           Q.   Ultimately, this investment
7      was approved in September of 2011,
8      correct?
9           A.   Correct.
10          Q.   And if you look at page 41 of
11     this document, it's the second to the
12     last page, it refers again to potential
13     system to EPC contractors, do you see
14     that?
15          A.   Yes, hold on.  Yes, I see,
16     I'm here.
17          Q.   And this is identical to the
18     same page in the prior investment
19     recommendation for Fund XIV, correct?
20          A.   Appendix 5 seems to be a
21     little more fleshed out.  Appendix 6,
22     yes, that's the same.
23          Q.   And this is the part that
24     deals with Brasfels, which is the
25     Keppel entity, correct?

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2        A.    Correct.

3        Q.    What this says about Brasfels

4   is exactly what was said about Brasfels

5   in the investment recommendation for

6   Fund XIV, correct?

7        A.    It looks like it, yes.

8        Q.    Had any additional due

9   diligence been done relating to

10  Brasfels or Keppel between June and

11  September?

12       A.    I don't believe so, no.  We

13  were comfortable with them because they

14  were, you know, they were an operating

15  entity, they had a track record in

16  Brazil.  The others did not.

17       Q.    And then you would have

18  presented this investment

19  recommendation to the investment

20  committee at a meeting in September of

21  2011, correct?

22       A.    Yes.

23       Q.    And was the presentation

24  essentially the same as the

25  presentation for the Fund XIV

CONFIDENTIAL

Page 111

                CONFIDENTIAL - CORRIGAN

1
2   investment?

3        A.    I'm guessing this would have
4   been a quick approval.

5        Q.    Do you recall anyone asking
6   questions at that meeting?

7        A.    I don't recall, no.

8        Q.    Do you recall that, the
9   subject of bribery or corruption risk,
10  coming up at that September meeting?

11       A.    No, it never came up
12  internally, or we wouldn't have gotten
13  to this point in the transaction.

14       Q.    Were any of EIG's visits to
15  any of the shipyards discussed at the
16  meeting?

17       A.    I don't recall.

18       Q.    Was any Keppel entity
19  discussed at the September 11th
20  investment committee meeting?

21       A.    I don't recall.

22       Q.    Let's mark another exhibit.
23  It's tab 19.

24              (Exhibit 89, marked for
25        identification, Bates stamped

CONFIDENTIAL

```
 1           CONFIDENTIAL - CORRIGAN
 2       EIG_KEP_00048626.)
 3              THE WITNESS:  It's not there
 4       yet.
 5              MS. LAW:  I'll tell you when
 6       it's there, Kevin.  I'll always
 7       tell you when it's there, you don't
 8       have to worry about it.  Should be
 9       there, listed as Exhibit 89.
10        Q.    Take your time to read as
11   much as you want of this document.  I'm
12   just going to have a few very
13   high-level questions.
14              MS. LAW:  Kevin, why don't
15       you familiarize yourself generally
16       with the document, and let Peter
17       ask his questions, and if you need
18       to look more to answer the
19       questions, you can.
20              THE WITNESS:  This looks very
21       similar to the one signed in June.
22       Changes the amount to 500 million.
23              MS. LAW:  Kevin, why don't
24       you wait and see what questions
25       Peter has.  Just let him know when
```

CONFIDENTIAL

Page 113

1              CONFIDENTIAL - CORRIGAN

2        you're ready for them.

3        Q.    I was basically going to ask

4   the questions of what you were just

5   saying.  This is the agreement for the

6   second round of investments in Sete

7   that brought the total investment up to

8   500 million reals; is that right?

9        A.    Yes, that's what it looks

10   like.

11        Q.    And again, this is, you

12   signed this, as well as Mr. Thomas, on

13   behalf of EIG?

14        A.    Correct.

15        Q.    Do you remember any

16   negotiations going on with Sete between

17   June and September?

18             MS. LAW:  Objection to form.

19        A.    Yeah, my general recollection

20   of the dynamics concerning our

21   participation were that it took a long

22   time for there to be definition or

23   concurrence that we were welcome to

24   join the club.  And I don't remember

25   if, between June and September of '11,

Page 128

1           CONFIDENTIAL - CORRIGAN

2       confirmation you got from Sete that

3       Keppel had actually been awarded one of

4       these contracts, right?

5           A.    It appears to be, yes.

6           Q.    As part of the due diligence

7       process, do you believe -- excuse me,

8       let me restate that.

9               Does EIG consider that Keppel

10      concealed any information from EIG as

11      part of EIG's due diligence process?

12              MS. LAW:  I'm sorry, Peter,

13          could you restate it?  I can't tell

14          if the first clause is part of the

15          --

16              MR. BARBUR:  Sure.

17          Q.    Is it EIG's position that

18      Keppel concealed any information from

19      EIG as part of EIG's due diligence

20      process?

21          A.    I don't know how to answer

22      that, because in retrospect, they did.

23      At the time I thought they did not.

24          Q.    In what way did EIG, even in

25      retrospect, conceal something as part

Page 129

1          CONFIDENTIAL - CORRIGAN

2    of the due diligence process?

3          A.    Well, because we now know

4    that Keppel, among others, was part of

5    the Lava Jato bribery scheme.

6          Q.    Did you have any connections

7    with Keppel during the due diligence

8    process?

9          A.    Just the visits that we

10   talked about before.

11         Q.    The visits were after the

12   first investment decision was made,

13   right?

14         A.    That's correct.

15         Q.    So they were not part of the

16   due diligence process to make the

17   investment, were they?

18             MS. LAW:   Objection to form.

19      You can answer.

20         A.    Right, we had visited EAS,

21   and we had looked at the other

22   shipyards, and as I had said earlier,

23   for us, Keppel was the star because it

24   had a long history of operating in

25   Brazil.

CONFIDENTIAL

1        CONFIDENTIAL - CORRIGAN

2        Q.    Well, did you have any

3    conversations with anyone at Keppel

4    where you would have thought they

5    should have disclosed the bribes, and

6    they failed to do so?

7        A.    Not prior to the investment

8    recommendation, no.

9        Q.    At some point you made some

10   visits to the Keppel -- the Brasfels

11   shipyard in Brazil, correct?

12       A.    Yes.

13       Q.    And the first one of those

14   visits was in August of 2011, as you

15   testified in your Petrobras deposition,

16   right?

17       A.    I'm going to refer to the

18   binder, since we had agreed earlier

19   that I could do that.

20       Q.    Absolutely, help yourself.

21       A.    And that has on tab, towards

22   the end, it has correspondence about

23   that visit, I believe.  Okay, I think

24   it's tab 21, talks about your trip in

25   August of 2011.

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2         Q.      Correct.   And this was a trip
 3    in conjunction with an entity called
 4    CIC, correct?
 5         A.      That is correct.
 6         Q.      What is CIC?
 7         A.      China Investment Corporation.
 8    It's a customer of EIG's.
 9         Q.      You mean, when you say
10    customer --
11         A.      I'm sorry, yeah, I -- an
12    investor in EIG funds.
13         Q.      And this tour in August of
14    2011 occurred after EIG had already
15    made its decision, initial decision to
16    invest in Sete, correct?
17         A.      Correct.
18         Q.      And this tour concerned CIC's
19    potential investment in Sete rather
20    than EIG's, correct?
21              MS. LAW:   Objection, you can
22         answer.
23         A.      Yeah, we set it up to help
24    CIC in their due diligence, but I
25    wouldn't say that we were -- you know,
```

```
 1          CONFIDENTIAL - CORRIGAN
 2    we would do nothing in our own case.
 3    It was the first time we'd been to
 4    Keppel, so we would have been
 5    interested to see what was going on in
 6    connection with our own investment.
 7          Q.    Would you have set up this
 8    trip, but for CIC?
 9               MS. LAW:  Objection to form,
10       you can answer.
11          A.    I don't know how to answer
12    that.  Probably not at this time, but
13    we would have eventually wanted to
14    visit.  Keppel had the benefit of being
15    the closest physically to Rio, and it
16    was easier to get to the other ones
17    where you had to get on a plane.
18          Q.    And what was the purpose of
19    visiting the yard?  Setting aside the
20    role of CIC, for either CIC or EIG,
21    what was the purpose?
22          A.    Well, CIC was, you know,
23    beginning to kick the tires, as we had
24    the previous year, and they just wanted
25    to see one of the shipyards to see
```

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN
2     what -- to gain impressions on their
3     ability to fulfill contracts.
4          Q.    Is it fair to say the focus
5     was the technical ability of the
6     shipyard to construct the drill ships?
7                MS. LAW:  Objection to form.
8        You can answer.
9          A.    Yeah, I think that would --
10    well, again, I don't know exactly what
11    Yangyang and Dr. Xu wanted to
12    accomplish on that trip, but I think
13    what you've said is a reasonable
14    assumption.
15         Q.    There were discussions with
16    representatives of Brasfels on this
17    trip; is that correct?
18         A.    Yes, they, I recall they
19    greeted us, they gave a presentation
20    and then we walked around the shipyard,
21    which is quite large.
22         Q.    And the presentation focused
23    on their ability to construct the drill
24    ships, correct?
25         A.    I don't remember the exact

Page 134

1              CONFIDENTIAL - CORRIGAN
2      nature of the presentation, but it
3      would have been an overview of their
4      operations, and I'm sure it was touting
5      their skills, etcetera.
6           Q.     When we talk about skills,
7      it's really their shipbuilding capacity
8      was the focus, right?
9           A.     Yes, that's correct.
10          Q.     What was EIG's relationship
11     with CIC?
12          A.     I would prefer that you ask
13     Blair that question, if you don't mind,
14     because I just know they were an
15     important investor in EIG.
16          Q.     Setting -- did you understand
17     that EIG had a preexisting relationship
18     with CIC prior to this yard tour?
19          A.     Just as an aside, in a fund
20     management company such as EIG, you
21     have the folks that deal with
22     investors, and then folks like me that
23     deal with the deployment of those
24     funds.  And the two don't really mix or
25     interact that much.

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2         Q.    Okay.
 3         A.    Does that clarify anything,
 4    or --
 5         Q.    Well, sort of.  I mean, did
 6    you deal with CIC prior to this yard
 7    tour?
 8         A.    No.
 9         Q.    And was this set, this yard
10    tour, set up at the request of EIG or
11    CIC or Sete?
12         A.    No, I would have set up the
13    agenda in consultation with Yangyang,
14    and I would have asked Sete to arrange
15    it.  I didn't think I could call
16    Brasfels directly and get a visit, but
17    I knew that Sete would be able to
18    arrange a visit.
19         Q.    So you initiated this yard
20    tour?
21         A.    Correct.
22         Q.    Do you recall any specific
23    discussions with representatives of
24    Brasfels at this tour?
25         A.    I don't, besides the general
```

CONFIDENTIAL

1                CONFIDENTIAL - CORRIGAN

2    overview I gave you a minute ago.

3         Q.    Do you think that any

4    inaccurate or misleading information

5    was provided by Brasfels during this

6    tour?

7              MS. LAW:  Objection, you can

8         answer.

9         A.    Again, it's what I said

10   earlier.  No, at that time I thought

11   everything they said was truthful and,

12   you know, they didn't bring up the

13   corruption scheme that already existed.

14        Q.    Did you or did anyone else on

15   this tour raise questions relating to

16   bribery or corruption?

17        A.    No.

18        Q.    Do you recall that CIC

19   invited someone from Morgan Stanley to

20   this yard tour?

21        A.    My recollection, I think his

22   name was Kevin, poor guy, and he was

23   sort of an intern.  I don't think he

24   was wearing a Morgan Stanley hat, so he

25   was seconded or doing an internship of

CONFIDENTIAL

```
1              CONFIDENTIAL - CORRIGAN
2      sorts at CIC.  So I viewed him as a CIC
3      person, not a Morgan Stanley person.
4           Q.    Do you recall saying that you
5      were offended that he came on the yard
6      tour?
7           A.    No.
8           Q.    Why don't we mark another
9      document, it's tab 16.
10               MS. LAW:  I'll tell you when
11          it's there.  It should be there as
12          Defendant's Exhibit 91.
13               (Exhibit 91, marked for
14          identification, Bates stamped
15          EIG_KEP_00049094.)
16          A.    Hmm, yeah, I don't remember
17      this exchange.
18          Q.    You did write to Blair, I
19      just found out this guy is from Morgan
20      Stanley.  I think they should have
21      asked if it was okay, and I'm a bit
22      offended.
23               Do you see that?
24          A.    Yes.
25          Q.    As you sit here today, do you
```

CONFIDENTIAL

1           CONFIDENTIAL - CORRIGAN

2    recall why you were offended?

3          A.    I don't know, since I didn't

4    remember this thought that I had.

5    Kevin Lee, there's his name.

6          Q.    So when you were asked about

7    this yard tour in your Petrobras

8    deposition, you said you were not

9    100 percent sure which shipyard was

10   visited.

11              Do you recall that?

12         A.    I'm sorry, you're saying on

13   the CIC trip, I couldn't remember?

14         Q.    Correct.  When you were asked

15   about it, you said you were not

16   100 percent sure it was Brasfels, as

17   opposed to some other shipyard.

18              Do you recall that?

19         A.    I don't recall saying that,

20   sorry.

21         Q.    Are you -- sitting here

22   today, are you a hundred percent sure

23   it was Brasfels?

24         A.    Yes.

25         Q.    And why do you say that?

CONFIDENTIAL

1           CONFIDENTIAL - CORRIGAN
2               MS. LAW:  Objection to form.
3       A.    Several, five or six.
4       Q.    Five or six Brasfels people
5    participated in this yard tour?
6       A.    No, well, in the
7    presentation, I remember we went into a
8    conference room, and then we met
9    several people.  They gave a
10   presentation, and then I think the walk
11   itself was with just one individual.
12      Q.    And when you walked around,
13   what were you looking at?
14      A.    Where they store the steel,
15   where the dry dock is, these huge
16   cranes.  There was a semi-submersible
17   sitting in the water.  I mean, it's a
18   big operation.
19      Q.    And this yard tour occurred
20   before Brasfels actually had a contract
21   to build one of the rigs for Sete,
22   right?
23      A.    Yes, because we established
24   that was at the end of the year, and
25   this is August.

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2          Q.     And you were not actually

3      looking at the construction of one of

4      the rigs for Sete?

5          A.     Correct.

6          Q.     And do you recall whether the

7      presentations were in English or in

8      Portuguese?

9          A.     I'm pretty sure they were in

10     English.

11         Q.     You recall a presentation,

12     was that like a slide deck

13     presentation?

14         A.     Yes.

15         Q.     Were any videos shown?

16         A.     I don't recall.

17         Q.     Do you have to wear safety

18     equipment, like a hardhat?

19         A.     When we were walking around,

20     absolutely, yes.  And I think we put on

21     safety vests, you know, the kind that

22     you can see.

23         Q.     And do you recall asking any

24     questions of anyone at Brasfels about

25     corruption or bribery issues?

CONFIDENTIAL

Page 143

1              CONFIDENTIAL - CORRIGAN

2         A.     No.

3         Q.     Did the subject of corruption

4    or bribery come up in any way?

5         A.     I don't recall that it did,

6    no.

7         Q.     And again, the focus was on

8    the shipbuilding capacity of Brasfels?

9         A.     Yes.

10             MS. LAW:  Objection to form.

11        You can answer.  I think the answer

12        was yes.

13        A.     Yes, sorry.

14        Q.     Do you believe that any of

15   the information that was provided by

16   Brasfels during the yard tour was

17   inaccurate or misleading?

18             MS. LAW:  Objection, asked

19        and answered multiple times.

20        A.     Yeah, it's the same answer

21   that at the moment, at that time, no,

22   but in retrospect, yes.

23        Q.     Did EIG rely on anything it

24   learned in connection with this yard

25   tour as part of its decision to invest

CONFIDENTIAL

Page 144

                CONFIDENTIAL - CORRIGAN

1

2    in Sete?

3              MS. LAW:  Objection to form,

4        you can answer.

5         A.    Well, at that time we had

6    already made one approval, and I

7    wouldn't say -- this would have been a

8    negative event, if something had come

9    to light that was negative, we wouldn't

10   have proceeded with the second

11   investment rec.  At that point our due

12   diligence we felt was pretty complete.

13        Q.    And you didn't add any

14   information concerning Brasfels to the

15   September investment recommendation as

16   a result of this yard tour, correct?

17        A.    That appears to be correct,

18   yes.

19        Q.    Are you aware of a video that

20   was made by Barrington Media?

21        A.    Yes, I recall it.

22        Q.    Describe generally what you

23   recall about that video.

24        A.    Well, Barrington worked with

25   TCW and EIG to prepare presentations

CONFIDENTIAL

Page 145

1              CONFIDENTIAL - CORRIGAN
2      for our annual meeting, and they were
3      asked to provide an overview of Sete,
4      which had been approved at that point,
5      and was shown in our October 2011
6      investor conference, and so they went
7      down to Brazil.  I arranged for them to
8      meet with Sete, and they wanted to
9      visit one of the shipyards and we,
10     again, through Sete, arranged for them
11     to visit Keppel, or Brasfels.
12          Q.    What was your understanding
13     of what they wanted to take video of?
14          A.    I think just an overview of
15     the shipyard, and where they would be
16     building these semi-submersibles.
17          Q.    And for what purpose did EIG
18     want to have Barrington Media take such
19     video?
20          A.    Well, as I tried to say a
21     second ago, we would always pick four
22     or five investments that had been
23     approved the previous year, and
24     highlight them at our annual investor
25     conference.  And each of these videos

Page 152

1              CONFIDENTIAL - CORRIGAN
2        Q.     This is an email chain
3    relating to the Barrington video.  Take
4    a second to familiarize yourself with
5    it, and I'll ask you a few questions.
6        A.     Okay.
7        Q.     Is this, in fact, an email
8    chain between you and Barbara Olsen of
9    Barrington concerning their video?
10       A.     Yes.
11       Q.     And on the second page of
12   this there's an email from Ms. Olsen to
13   someone at Sete Brasil, copying you.
14              Do you see that?
15       A.     Yes, Fernanda.
16       Q.     And who is Fernanda?
17       A.     Ferraz's secretary.
18       Q.     And in this email Ms. Olsen
19   says, The purpose of the videotape is
20   to highlight and present the importance
21   of your company to their investor
22   audience.
23              Do you see that?
24       A.     Yes.
25       Q.     And by, your company, she

Page 153

1                CONFIDENTIAL - CORRIGAN

2       means Sete, correct?

3            A.    Correct.

4                 MS. LAW:   Objection to form.

5            Q.    And that was your

6       understanding of the purpose of the

7       videotape?

8            A.    Yes.

9            Q.    And she goes on to say, At

10      EAS, because they're still talking

11      about filming at EAS, I would like to

12      videotape general shipbuilding

13      activity.

14                 Do you see that?

15           A.    Yes.

16           Q.    And was that your

17      understanding of what they wanted to

18      videotape, that is, general

19      shipbuilding activity?

20           A.    Yeah, I mean, this is the

21      only interaction I had on this subject,

22      so it's a pretty broad statement, but

23      that's what they wanted to do.

24                 MR. BARBUR:   Let's mark

25         another exhibit.  It's tab 18,

CONFIDENTIAL

Page 154

```
 1              CONFIDENTIAL - CORRIGAN
 2        Dave.
 3                MS. LAW:  Kevin, it should be
 4        there as Defendant's 94.
 5          Q.    Do you have Exhibit 94 in
 6     front of you, Mr. Corrigan?
 7          A.    It just opened, yes.
 8          Q.    Take a minute to familiarize
 9     yourself and I'll ask a couple
10     questions.
11                (Exhibit 94, marked for
12        identification, Bates stamped
13        EIG_KEP_00048996.)
14          A.    Okay.
15          Q.    And again, what we've marked
16     as Exhibit 94, this is another email
17     chain involving you and Ms. Olsen
18     relating to the Barrington video,
19     correct?
20          A.    Correct.
21          Q.    And by this point in time, it
22     had obviously been determined to shoot
23     at Brasfels rather than EAS, correct?
24          A.    Yes.
25          Q.    And in particular, for
```

CONFIDENTIAL

Page 155

```
 1              CONFIDENTIAL - CORRIGAN
 2    August 24th, the entry says, Drive to
 3    Brasfels' shipyard, videotape general
 4    shipyard activity.
 5              Do you see that?
 6         A.    Yes.
 7         Q.    And that's consistent with
 8    what you understood Barrington Video
 9    would be doing at Brasfels, correct?
10         A.    Yes.
11         Q.    Did you have -- let me back
12    up.  Were you the primary person at EIG
13    who was tagged with logistics for this
14    video shoot?
15         A.    I think I just served to
16    introduce her to Sete, and then I
17    don't, I really wasn't involved after
18    that in the specifics, you know, the
19    exact dates and when she was meeting
20    with whom.  She pretty much, I think,
21    corresponded directly with Sete on
22    that, keeping me in the loop.  So I --
23    once we introduced her to the right
24    people, she pretty much set it up.
25         Q.    And so you and EIG didn't
```

CONFIDENTIAL

1         CONFIDENTIAL - CORRIGAN
2    have any direct contact with Brasfels
3    relating to this video shoot; it was
4    done through Barrington and Sete,
5    correct?
6         A.    That would be correct, yes.
7         Q.    Do you know whether
8    Barrington Media interviewed any
9    employees of Keppel or Brasfels for the
10   video?
11        A.    I don't know that.
12        Q.    Did you have any
13   understanding that the people from
14   Barrington on this video shoot would be
15   asking questions of Brasfels?
16        A.    I'm not sure I understand the
17   question, Peter.
18        Q.    Well, Barrington Media was
19   going to go to the shipyard to take
20   some video, correct?
21        A.    Yes.
22        Q.    Was it your understanding
23   they were going to be meeting with
24   people at Brasfels and asking them
25   questions about anything?

1              CONFIDENTIAL - CORRIGAN
2          A.    I don't really know what they
3     intended to do, but they were not an
4     extension of our due diligence, if
5     that's what you're asking.
6          Q.    So this was independent of
7     due diligence?
8          A.    Correct.
9          Q.    Do you know whether there was
10    any discussion of corruption or bribery
11    during the filming by Barrington at the
12    Brasfels shipyard?
13         A.    I'm sorry, I wasn't there,
14    and I don't know what was discussed.
15         Q.    Do you have any reason to
16    believe that any false or misleading
17    information was provided to Barrington
18    Media during this video shoot?
19         A.    I don't know.
20         Q.    What did EIG ultimately do
21    with the video that Barrington
22    produced?
23         A.    They made a little
24    five-minute or so presentation that was
25    shown at our annual meeting that year.

CONFIDENTIAL

1                CONFIDENTIAL - CORRIGAN

2          Q.     Do you remember, like,

3     approximately how much of that video

4     was devoted to the shipyard?

5          A.     A relatively small portion,

6     10 to 15 percent, maybe.

7          Q.     And this would have been just

8     background shots of ships being built

9     at Brasfels?

10         A.     Yeah, no interviews at

11    Brasfels.

12         Q.     Was the -- never mind, I'll

13    move on.

14                This was then shown at an

15    investors' conference in

16    September 2011, correct?

17         A.     Yes, I thought it was in

18    October, but it must have been in

19    September that year.

20         Q.     Okay.  You were present?

21         A.     Yes.

22         Q.     Do you recall how long the

23    conference lasted?

24         A.     It was an all-day affair.

25         Q.     And the video all together

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2       was about five minutes of that?

3            A.    Approximately, around that.

4            Q.    Do you recall any discussion

5       relating to the video of the shipyards

6       at the investors' conference?

7            A.    No.

8            Q.    Do you recall any discussion

9       of corruption or bribery risk in Brazil

10      at the investors' conference?

11           A.    No, I don't recall.

12           Q.    Do you remember any

13      discussions about the identities of the

14      shipyards at the investors' conference?

15           A.    I don't remember, but I

16      believe Simon gave a presentation about

17      Sete at that conference.  In other

18      words, the video wouldn't have been

19      shown in isolation.  It would have

20      accompanied a presentation by an

21      investment officer of the transaction.

22           Q.    Is it fair to say that the

23      discussion at the investors' conference

24      relating to the Sete project focused on

25      Sete, as opposed to the individual

CONFIDENTIAL

Page 160

1                   CONFIDENTIAL - CORRIGAN

2     shipyards?

3          A.     Yes.

4          Q.     Do you recall that there was

5     another visit to the Brasfels shipyard

6     in March of 2012?

7          A.     Yes, I'm going to refer again

8     to my binder on that.  Yeah, that's the

9     second one, with another investor.

10         Q.     And what do you recall about

11    the purpose of this yard tour?

12         A.     My recollection is that it

13    was a mirror of the CIC's visit a few

14    months earlier, except now with ADICO,

15    the sovereign wealth fund of Abu Dhabi,

16    as opposed to a Chinese entity.

17         Q.     So the purpose of this was to

18    present to ADICO the possibility of

19    investing in Sete?

20         A.     That is correct.  A-D-I-C-O.

21    It's Abu Dhabi Investment Company, I

22    believe it stands for.

23         Q.     Did EIG have a preexisting

24    relationship with ADICO?

25         A.     I go back to my response how

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN
2    I answered you on CIC.  It was an
3    investor of ours, and beyond that I
4    don't know.  But clearly it was an
5    important investor.
6          Q.    Do you know whether ADICO was
7    an investor in either Fund XIV or Fund
8    XV?
9          A.    I don't recall.
10         Q.    But this tour was focused on
11   a potential separate investment by
12   ADICO in Sete; is that correct?
13              MS. LAW:  Objection to form.
14      You can answer.
15         A.    That -- yeah, that was an
16   evolution.  It didn't start out that
17   way.  It eventually became that, and at
18   this point in time I'm not sure whether
19   it's to co-invest with us, to come in
20   with us, or to do their own thing.
21         Q.    Did ADICO ultimately invest
22   in Sete separate from EIG?
23         A.    We understand that it came in
24   through BTG Bactual.
25         Q.    What was the last word you

CONFIDENTIAL

Page 162

```
 1              CONFIDENTIAL - CORRIGAN
 2    said?
 3         A.    B-A-C-T-U-A-L.
 4         Q.    And what is that?
 5         A.    That's the investment bank
 6    that had the single largest investment
 7    in Sete, and a lot of that was, I don't
 8    know how much, but they had, you know,
 9    co-investors behind them, ADICO being
10    one of them.
11         Q.    Who was present for this
12    March 28th Brasfels yard tour from EIG,
13    if anyone?
14         A.    My recollection is it was
15    Simon Hayden from our London office,
16    myself, an analyst from London named
17    Hoshrav Patel, and then Jeppe from
18    ADICO.  He might have had somebody with
19    him, I can't remember.
20              MR. BARBUR:  Let's mark a
21         document, tab 23, David.
22              MS. LAW:  It should be in
23         your folder as Exhibit 95.
24              THE WITNESS:  Got it.
25         Q.    Do you recognize this email,
```

CONFIDENTIAL

Page 163

```
 1            CONFIDENTIAL - CORRIGAN
 2   Mr. Corrigan?
 3            (Exhibit 95, marked for
 4       identification, Bates stamped
 5       EIG_KEP_00121469.)
 6       A.    Okay.
 7       Q.    I'm sorry, the question was,
 8   do you recognize this?
 9       A.    Yes.
10       Q.    And do you recall this email
11   exchange in 2012?
12       A.    Vaguely.
13       Q.    You sent the email to someone
14   named Jeppe Starup, correct?
15       A.    Yes, that's the same
16   individual that had come -- or I don't
17   know if this is before or after, but
18   he's the one that visited Brasfels with
19   us.
20       Q.    And these are ADICO?
21       A.    He is the investment officer
22   that was looking at the transaction
23   from ADICO, yes.
24       Q.    And you were sending him an
25   article that, in fact, related about
```

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    finding a way for ADICO to come into
 3    Sete, right?
 4              MS. LAW:  Objection to form,
 5       you can answer.
 6         A.    Right, so this is in
 7    connection with the interest that he
 8    had shown in possibly investing in
 9    Sete.
10         Q.    Is it fair to say that you
11    were trying to help ADICO get the
12    opportunity to invest in Sete?
13         A.    Yes, as we did with CIC.
14         Q.    And so, just give me the list
15    of all of the participants on the yard,
16    too.  You mentioned yourself and
17    Mr. Hayden.  Who else was on?
18         A.    I think Hoshrav.  He might
19    have not been allowed in, because he
20    didn't have his ID with him, so I don't
21    remember exactly if he attended or not,
22    but he came to Brazil at that time with
23    Simon.
24         Q.    Hoshrav, I'm sorry, he's with
25    EIG?
```

CONFIDENTIAL

Page 165

1          CONFIDENTIAL - CORRIGAN

2          A.    He was an analyst in our

3     London office, yeah, he worked with

4     Simon Hayden.

5          Q.    And how many representatives

6     of ADICO were on this --

7          A.    As I said earlier, for sure

8     Jeppe, and I can't remember if he had

9     someone with him or not.  I think he

10    was by himself, but I wouldn't swear to

11    it.

12         Q.    Anyone else on the yard tour

13    beyond the people at Brasfels?

14         A.    I don't remember if somebody

15    from Lakeshore came with us.  Ivan Hong

16    might have been with us, but again, I

17    don't recall.

18         Q.    And Ivan Hong is with a Sete

19    entity called Lakeshore?

20         A.    No, Lakeshore is the

21    financial advisor that, let's say,

22    replaced Santander.  But, you know,

23    it's the same people.  They had been

24    employees of Santander, then they

25    formed their own advisory company and

Page 166

1          CONFIDENTIAL - CORRIGAN

2      became Sete's advisors.

3          Q.    Was anyone from Sete or

4      Petrobras on the yard tour?

5          A.    I don't believe so, no.

6          Q.    Do you recall meeting with

7      employees of the shipyard?

8          A.    My recollection is that it

9      was very similar to what we had done

10     with CIC, where they made a

11     presentation, and then we had a walk

12     around the shipyard, and I think we had

13     lunch in their staff dining hall.

14         Q.    And again, the focus of the

15     yard tour was the shipbuilding capacity

16     of Brasfels?

17              MS. LAW:  Objection to form.

18         A.    Yes.

19         Q.    Do you remember any specific

20     questions that were asked of Brasfels

21     on this tour?

22         A.    I don't.

23         Q.    You had a general tour of the

24     shipyard and looked at ships being

25     constructed; is that correct?

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2         A.    Well, semi-submersibles.  I

3    don't recall that there was one being

4    built, but they had one, I think,

5    floating nearby, and they had a dry

6    dock.  They were doing maintenance and

7    stuff like that.

8         Q.    Did the subject of corruption

9    or bribery come up at any time during

10   this yard tour?

11        A.    Not that I recall.

12        Q.    Do you recall -- did you or

13   anyone else from EIG ask any questions

14   relating to corruption or bribery?

15        A.    No, I don't recall, I believe

16   not.

17        Q.    Do you have any reason to

18   believe that Brasfels provided any

19   false or misleading information during

20   this tour?

21            MS. LAW:   Objection to form,

22      you can answer.

23        A.    Yeah, this is a similar

24   question.  The way I answered it is at

25   the time, no, we thought it was all on

CONFIDENTIAL

1              CONFIDENTIAL - CORRIGAN

2     the up-and-up, and nobody told us that

3     there was an underlying issue that we

4     should have known about.

5          Q.    The focus of the yard tours,

6     we discussed, was the shipbuilding

7     capacity of Brasfels, right?

8               MS. LAW:  Objection.

9          A.    Semi-submersibles that

10    Petrobras was contracting them for.

11         Q.    And was any misleading

12    information provided relating to that?

13              MS. LAW:  Objection, asked

14       and answered.

15         Q.    You can answer.  The question

16    is, was any misleading information

17    provided concerning the shipbuilding

18    capacity of Brasfels?

19         A.    No, not concerning

20    shipbuilding capacity.  Concerning the

21    overall transaction in retrospect, yes,

22    as we said before.

23         Q.    Did EIG rely on anything it

24    learned during this yard tour for any

25    purpose?

CONFIDENTIAL

Page 169

1              CONFIDENTIAL - CORRIGAN
2                  MS. LAW:  Objection to form.
3          You can answer.
4          A.    At this point we had approved
5      the transaction, so I wouldn't say we
6      added anything, but we didn't subtract
7      anything, either.
8          Q.    And there was another yard
9      tour at Brasfels in June of 2013,
10     correct?
11         A.    Yes.
12         Q.    And what is your recollection
13     about the purpose of that yard tour?
14         A.    That came up at a board
15     meeting, and I don't remember now if
16     one of the shareholders said, Hey, it
17     would be great to see the progress of
18     the shipyards, or if it was Ferraz's
19     idea, but anyway, the idea was floated
20     that it would be interesting for the
21     board to visit one of the shipyards,
22     and that was arranged at Brasfels.
23         Q.    And you're talking about the
24     board of Sete here?
25         A.    That's correct, yeah.

CONFIDENTIAL

                    CONFIDENTIAL - CORRIGAN

1

2          Q.     And so there was a board

3     meeting at Sete, and the idea of a yard

4     tour came up?

5          A.     That's correct.

6          Q.     Were you at the board

7     meeting?

8          A.     Yes.

9          Q.     You were a member of the

10     board of Sete?

11          A.     I was, yes.

12          Q.     For how long?

13          A.     Yeah, I should clarify.  The

14     board, the director assigned to the

15     board was Blair, but in Brazil it's

16     common that all directors have a

17     suplante, or a -- what would that be,

18     like a secondary, and that allows at

19     least one individual from each

20     organization to attend board meetings,

21     since Blair was living in Washington

22     and I was in Rio.

23          Q.     You were sort of Mr. Thomas'

24     proxy for these board meetings?

25                MS. LAW:  Objection to form.

                     CONFIDENTIAL - CORRIGAN
1
2        You can answer.
3        A.    I don't think "proxy" is the
4    right word.  When I was there, I was
5    the director for EIG.
6        Q.    Okay.  Do you recall, at any
7    Sete board meetings that you attended,
8    the subject matter of corruption or
9    bribery coming up?
10       A.    Never.
11       Q.    Do you remember ever asking
12   any questions about corruption or
13   bribery at any Sete board meetings?
14       A.    I did not.
15       Q.    Did you have personal
16   friendship type relationships with
17   anyone at Sete?
18       A.    I considered Ferraz my
19   friend.
20       Q.    And did you socialize with
21   him, have dinners and that sort of
22   thing?
23       A.    Yes, occasionally.  My wife
24   and I had dinner with him and his wife
25   once.  Kevin Lauder and I went to

```
 1            CONFIDENTIAL - CORRIGAN
 2    watch, what was it, the 2014 Superbowl.
 3    He was a big New England Raiders fan.
 4        Q.    And --
 5        A.    Patriots, jeez, sorry.
 6        Q.    No, go ahead.
 7        A.    Sorry, New England Patriots.
 8        Q.    During any of your
 9    discussions with Mr. Ferraz, did the
10    subject of bribery or corruption ever
11    come up?
12        A.    Never.
13        Q.    Did you ever ask Mr. Ferraz
14    whether Sete was involved in any
15    bribery?
16        A.    I did not.
17        Q.    Do you recall who the
18    shareholders were that requested this
19    2013 yard tour?
20        A.    I don't, because as I said
21    earlier, I wasn't -- I'm not sure if
22    the genesis was one of the directors or
23    Ferraz.  But anyway, the idea was
24    broached, and it was enthusiastically
25    received, I remember that.
```

CONFIDENTIAL

1            CONFIDENTIAL - CORRIGAN

2        Q.    And do you remember who the

3    attendees were for this yard tour?

4        A.    I can't, I couldn't.  But I

5    think pretty much every investor had

6    somebody there, including myself.

7        Q.    So approximately how many

8    people would that be?

9        A.    I think the board had 13

10   people and, you know, I guess there was

11   probably 20 of us showed up, roughly.

12       Q.    And to sort of cut to the

13   chase, did this yard tour proceed,

14   essentially, as the other ones had?

15       A.    Yes, very similar.

16       Q.    There was a presentation, and

17   then there was a walk-around tour of

18   the yard?

19       A.    That's correct, that's my

20   recollection.

21       Q.    And do you recall anything

22   specific that was discussed, either

23   during the presentation or the

24   walk-around tour?

25       A.    I do not.

CONFIDENTIAL

1        CONFIDENTIAL - CORRIGAN

2        Q.    Did you at that point in time

3    see any work that was actually being

4    done in connection with the Sete

5    projects?

6        A.    I think they showed us some

7    of the raw materials that were going to

8    be utilized in the construction.  I

9    remember big piles of steel and things

10   of that nature, but not the actual --

11   nothing floating in the water, if you

12   will.

13       Q.    And again, the focus of the

14   yard tour was the shipbuilding capacity

15   of Brasfels, right?

16           MS. LAW:  Objection to form,

17      you can answer.

18       A.    Yes, I would say as a board

19   of directors, we want to be sure that

20   our money was being well spent at

21   Brasfels.

22       Q.    And you wanted to make sure

23   that Brasfels had the ability to

24   deliver the ships on time and on

25   budget, right?

CONFIDENTIAL

Page 175

1               CONFIDENTIAL - CORRIGAN

2          A.     That is correct.

3          Q.     Was the subject of corruption

4    or bribery ever discussed on this yard

5    tour?

6          A.     No.

7          Q.     Did you or anyone else from

8    EIG or any of the other investors ask

9    any questions of Brasfels relating to

10   corruption or bribery?

11         A.     I did not, and I don't recall

12   hearing anybody else bring up that

13   subject.

14         Q.     And did EIG rely on anything

15   that it learned on this yard tour for

16   any purpose?

17              MS. LAW:  Objection to form.

18       You can answer.

19         A.     Well, it provided, you know,

20   this was now several months after our

21   previous visit, and I remember feeling

22   good about the progress at Brasfels,

23   that they were a professional company

24   that was doing a good job.

25         Q.     And has your view on that

Page 176

1           CONFIDENTIAL - CORRIGAN

2    ever changed?

3           A.    No.

4           Q.    So moving beyond the three

5    yard tours that we have discussed, did

6    you or did anyone else from EIG have

7    any direct contact with anyone at

8    Keppel?

9           A.    I don't believe so, no.  And

10   we're talking about Brasfels, the

11   Brazilian entity, right?

12          Q.    Correct, well --

13          A.    I don't know, we had offices

14   in Australia and Hong Kong.  I don't

15   know if they ever met Keppel in

16   Singapore.

17          Q.    And you were the lead person

18   for the Sete investments for EIG,

19   right?

20          A.    That's correct, but Brasfels

21   -- Keppel's a very large company.

22          Q.    And you're not aware of any

23   contact by anyone at EIG with anyone at

24   Keppel relating to the Sete project

25   beyond --

CONFIDENTIAL

1            CONFIDENTIAL - CORRIGAN

2        A.    No, that I'm pretty confident

3   did not happen.

4        Q.    Do you know who Zwi Skornicki

5   is?

6        A.    Well, I didn't until Kerri

7   told me yesterday.

8        Q.    So you had never heard the

9   name Zwi Skornicki come up prior to

10   yesterday?

11        A.    That's correct.

12        Q.    I know this is after you

13   retired from EIG, but at some point

14   Operation Car Wash was widely

15   publicized in Brazil, right?

16        A.    That's correct.

17        Q.    Were you aware of that when

18   it happened?

19        A.    I mean, from press reports,

20   yeah, I think I found out about it the

21   way most people did.  I wasn't aware of

22   any buildup, if there was one.

23        Q.    And what did you understand

24   was revealed, generally, through

25   Operation Car Wash?

CONFIDENTIAL

Page 193

1              CONFIDENTIAL - CORRIGAN

2         A.    Yeah, as I said earlier, I

3    don't remember writing this, but I'm

4    reading it right now.

5         Q.    Okay.  If you look on the

6    second column, under Exhibit 2, it

7    says, Key Brazilian corporations also

8    experienced weakness.

9              Do you see that?

10        A.    Yes.

11        Q.    And then it focuses in

12   particular on Petrobras, correct?

13        A.    Yes.

14        Q.    And it says that Petrobras

15   has seen its share price fall by

16   85 percent, correct?

17        A.    Correct.

18        Q.    And then there's a graph

19   showing Petrobras stock price below

20   that.

21              Do you see that?

22        A.    Yes.

23        Q.    And from looking at that, you

24   can see that from the time that EIG

25   made its original investment decision

CONFIDENTIAL

Page 194

```
 1              CONFIDENTIAL - CORRIGAN
 2     in Sete in June of 2011 through April
 3     of 2014, the Petrobras stock price had
 4     declined by more than 50 percent,
 5     correct?
 6          A.    It appears to be about that,
 7     yes.
 8          Q.    And did this raise concerns
 9     at EIG about Sete's ability to fulfill
10     its obligations?
11          A.    About Petrobras' ability to
12     fulfill its obligations to Sete?
13          Q.    And Sete's ability to fulfill
14     its obligations as well.
15          A.    No, I wouldn't say this alone
16     would have caused that.
17          Q.    As of the time you wrote your
18     email that we marked as Exhibit 96, you
19     definitely had some concerns about
20     EIG's ability to continues its
21     operations, correct?
22              MS. LAW:  Objection, you said
23        EIG's ability.
24              MR. BARBUR:  I'm sorry, I
25        apologize.
```

CONFIDENTIAL

1          CONFIDENTIAL - CORRIGAN

2               MS. LAW:  He's going to

3        rephrase it, Kevin.

4          Q.    I asked a bad question.  I

5     used the wrong name.  At the time you

6     wrote the email, defense Exhibit 96,

7     you had concerns about Sete's ability

8     to continue its operations, correct?

9               MS. LAW:  Objection to form,

10         mischaracterizes the testimony.

11         A.    Is this the one we were just

12     looking at where I reported on the

13     board meeting of June?

14         Q.    Correct.

15         A.    Yes.  Clearly I did, at that

16     point.

17         Q.    Did there ever come a time

18     when EIG considered trying to withdraw

19     its commitment to invest in Sete?

20         A.    Not during my tenure there,

21     no.

22               MR. BARBUR:  Let's mark

23        another exhibit, tab 26, Dave.

24         A.    I can close this?

25         Q.    You can close this, yes, both

CONFIDENTIAL

```
 1              CONFIDENTIAL - CORRIGAN
 2    of us.
 3                 MS. LAW:  I'll tell you when
 4           the next one is up.  It should be
 5           up as Defendant's Exhibit 97.
 6                 THE WITNESS:  Got it.
 7                 (Exhibit 97, marked for
 8           identification, Bates stamped
 9           EIG_KEP_00117759.)
10           Q.    Okay, make sure I got it.  We
11    marked as Exhibit 97, this is an email
12    chain between you and Blair Thomas,
13    correct?
14           A.    Yes.
15           Q.    And it begins with your email
16    to Blair dated June 1, 2012.
17                 Do you see that?
18           A.    Yes, June 1, 2012, sorry,
19    right.
20           Q.    And then it begins with,
21    Yesterday when we corresponded, I was
22    in New York.
23                 Do you see that?
24           A.    Yes.
25           Q.    Do you remember what you were
```

CONFIDENTIAL

Page 197

1              CONFIDENTIAL - CORRIGAN
2    corresponding with Mr. Thomas about
3    when you were in New York on the day
4    before?
5              MS. LAW:  If you need to take
6         a minute to look at the email.
7         Q.    Absolutely, take your time.
8         A.    Yeah, again, I don't have a
9    clear recollection of this
10   correspondence, but there was also
11   going on around this time a question of
12   our allocation, and there was some
13   tense moments concerning that, where we
14   weren't sure what was going on, if
15   other investors didn't want us in.  And
16   then at one point I remember Luiz, the
17   financial advisor, coming to me and
18   saying, Well, Petrobras has approved
19   you guys.  So I think this is written
20   in the context of, when does this
21   expire, not that we're having second
22   thoughts about the investment.
23        Q.    But the concern was that Sete
24   might not give you your full allotment?
25        A.    Yes, for several months, that

CONFIDENTIAL

Page 211

1

2                           CERTIFICATION

3

4

5      I, JEREMY RICHMAN, a Notary Public for

6  and within the State of New York, do

7  hereby certify:

8      That the witness whose testimony as

9  herein set forth, was duly sworn by me;

10  and that the within transcript is a true

11  record of the testimony given by said

12  witness.

13      I further certify that I am not

14  related to any of the parties to this

15  action by blood or marriage, and that I am

16  in no way interested in the outcome of

17  this matter.

18      IN WITNESS WHEREOF, I have hereunto

19  set my hand this 21st day of July, 2021.

20

21

22    JEREMY RICHMAN

23                 *        *        *

24

25