**KEPPEL OPP'N EXH.  46**

Page 1

1              CONFIDENTIAL - SIMON R. HAYDEN
2           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
3

     EIG ENERGY FUND XIV,       :
4    L.P., EIG ENERGY FUND      :  No. 18-cv-01047-PGG
     XIV-A, L.P.,EIG ENERGY     :
5    FUND XIV-B, L.P., EIG      :
     ENERGY FUND XIV            :
6    (CAYMAN), L.P., EIG        :
     ENERGY FUND XV, L.P.,      :
7    EIG ENERGY FUND XV-A,      :
     6 L.P., EIG ENERGY         :
8    FUND XV-B, L.P., and       :
     EIG ENERGY FUND            :
9    XV(CAYMAN), L.P.,          :
               Plaintiffs,      :
10                              :
               vs.              :
11                              :
     KEPPEL OFFSHORE &          :
12   MARINE LTD.,               :
               Defendant.       :
13   ----------------------     :
14
15           VIDEOTAPE DEPOSITION VIA ZOOM OF:
16                  SIMON R. HAYDEN
17              THURSDAY, MAY 27, 2021
18
19
20
21
22
23
24   REPORTED BY:
     SILVIA P. WAGE, CCR, CRR, RPR
25   JOB NO. 4590550

```
                                            Page 51
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2      that the due diligence that was conducted was not
 3      adequate?
 4                 MS. PAK:  Objection to form.
 5                 MR. KUMAGAI:  What's the objection
 6      Claudia?
 7                 MS. PAK:  I don't know what you mean
 8      by "adequate."
 9           Q.  Mr. Hayden, do you know what I mean
10      by "adequate"?
11           A.  Well, do you want to clarify?  I
12      don't -- I don't really know.
13           Q.  Well, have you ever expressed
14      concerns about the level of due diligence that
15      EIG performed on an investment?
16           A.  On an investment we made or --
17      because my -- you know, part of my job is to make
18      sure diligence is done properly.  So, if I see a
19      problem, you know, on any deal, I will improve
20      the -- so it's, you know, I mean -- you know,
21      weekly, monthly I'm improving diligence for the
22      deals I work on.  So it would be a fairly common
23      thing for me to see areas in investments that
24      needed to be diligenced.
25           Q.  Can you give some examples of
```

```
                                            Page 52
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2     concerns you have raised about the level of due
 3     diligence that had been done on a particular
 4     investment analysis?
 5          A.   I wouldn't say I "raised" concerns.
 6     I mean, I'm just speaking to my teams today.  We
 7     should look at this or, you know, have we thought
 8     about this event and do we need to dive into
 9     that.
10              So, I mean, you know, recently,
11     we've, you know, just a general mark on the
12     moment, you know, we've asked market consultants
13     -- this is a renewables deal.  It's completely
14     separate.  But, you know, there are market risks
15     around electricity prices that I had a view on,
16     you know, this is the major risk in this country,
17     we should ask the consultant to look at that.  I
18     wasn't really raising a concern.  I was just
19     telling the team what they should be doing.
20          Q.   And in that example you just gave,
21     you were asking the team to look harder at the
22     risks of fluctuations in electricity prices?
23          A.   Yes.
24              MS. PAK:  Objection to form.
25          A.   Yes.  And they would have appointed
```

```
                                           Page 53
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2      -- we are working with a market advisor.  So they
 3      told the market advisor to look into it, you
 4      know.
 5              Q.  And so we talked earlier about
 6      changes in oil prices or the market and the risks
 7      those potential changes would pose to an
 8      investment.
 9              Why was that a risk that you wanted
10      to look at further in this case?
11              MS. PAK:  Objection to form.
12              A.  The oil price -- are we talking about
13      the oil price risk in relation to the Sete
14      investment?
15              Q.  Yes, yes.
16              A.  Well, I think, what I was trying to
17      say before was -- well, I don't recall what we
18      did.  So that's the first thing.
19              But from my recollection of the
20      transaction and the fact we had long-term fixed
21      price, charter agreements from Petrobas, my
22      recollection is the investment was protected from
23      all price risk and it may not have been an issue
24      we looked at in detail.  I just can't recall
25      exactly what we did.
```

```
 1           CONFIDENTIAL - SIMON R. HAYDEN
 2           Q.  Do you recall whether changes in oil
 3    prices actually did have an effect on EIG's
 4    investments in Sete?
 5           A.  I don't recall if they did.
 6           Q.  Do you recall ever doing --
 7    conducting an analysis of the impact that
 8    fluctuations in oil prices would have on EIG's
 9    investments in Sete?
10           A.  I don't recall any analysis to that
11    effect.
12           Q.  Do you recall ever discussing the
13    impact that fluctuations in oil prices could have
14    on EIG's investments in Sete with anyone else at
15    EIG?
16           A.  No, I don't recall that.
17           Q.  So how many people back in 2010,
18    2011, how many people would EIG, typically, staff
19    on the due diligence work for a potential
20    investment?
21           A.  The core Deal Team would normally be
22    three or four people and then there would be
23    other people involved from EIG, you know, could
24    be several other people involved.
25           Q.  And can you describe the roles of --
```

Page 55

1            CONFIDENTIAL - SIMON R. HAYDEN
2       the typical roles of the three or four core
3       people on a Deal Team?
4            A.   Well, we tend to have, you know, deal
5       leader, the senior person.  I should say Kevin
6       Corrigan on this one, you know, at the time of
7       making the investment, and then a vice president
8       would be, you know, looking after the analysis,
9       due diligence and then, you know, a junior person
10      would be in charge of the model.
11            Sometimes, the junior person would
12      also be doing the diligence as well.  I mean,
13      that's quite often the case, that they were doing
14      the model and the diligence.
15            Q.   And so, after the due diligence
16      process is completed, what is the next step in
17      the investment process at EIG?
18            MS. PAK:  Objection to form.
19            A.   After due diligence is completed, we
20      would go to -- we made -- there may be sort of
21      legal documentation sort of work stream as well,
22      which is going on.  But when diligence is
23      completed or nearly complete and documentation
24      is, you know, well advanced, we would go to
25      Investment Committee to get approval to move

```
 1            CONFIDENTIAL - SIMON R. HAYDEN
 2       forward with the transaction.  There may be
 3       remaining diligence left to do.  There may be a
 4       bunch of other documents.  But that would be the
 5       next major step in the process.
 6            Q.  When you say, there may be remaining
 7       diligence left to do before going to an
 8       Investment Committee, what do you mean by that?
 9            MS. PAK:  Objection to form.
10            A.  Well, I mean, to an extent, the
11       diligence is never over until you've funded the
12       investment, right, and then you move to the
13       monitoring phase.  So you could get Investment
14       Committee approval to move forward with the
15       transaction, you know, good period before you
16       fund or even sign the documents.  So we're still
17       working on diligence in those -- we may have
18       completed the bulk of it by the time we go to
19       Investment Committee, but we're still working on
20       diligence.
21            But it's not, you know, the
22       completion of diligence is an ongoing thing.  We
23       keep doing diligence and then that evolves into
24       monitoring at some point once the investment's
25       funded.
```

1        CONFIDENTIAL - SIMON R. HAYDEN

2        Q.   And after the Investment Committee

3   approves an investment, what is the next step,

4   typically, at EIG?

5        A.   Well, that's a green light to proceed

6   to, you know, complete any remaining diligence,

7   if there is any, and then to agree documentation.

8   And if there are material changes in that period,

9   you would go back to Investment Committee.  But

10  if there are no material changes to what was

11  expected Investment Committee, then that would be

12  sufficient to, you know, to sign the deal.

13       Q.   And if there were -- was additional

14  work to be done after gaining Investment

15  Committee approval, how would the Deal Team

16  communicate that to the Investment Committee?

17            MS. PAK:  Objection to form.

18       A.   That would normally be done verbally.

19  You know, we would have been speaking to each

20  other outside of Investment Committee meetings.

21  And so it would have been understood if there was

22  remaining diligence expected and then, you know,

23  there is a delegation of some responsibility to

24  the Deal Team and the Deal Team leader to

25  highlight any, you know, new findings, any

1        CONFIDENTIAL - SIMON R. HAYDEN
2    changes that results in the remaining diligence
3    to the Investment Committee.
4            Q.  And during your time at EIG, has EIG
5    ever not funded an investment after receiving
6    approval from the Investment Committee?
7            A.  I don't know.
8            Q.  Are you aware of any instance in
9    which EIG did not fund an investment that had
10   been approved by the Investment Committee?
11           A.  We -- we haven't -- I mean, there are
12   several investments where we haven't provided the
13   full funding.  You know, things have changed on
14   the investment and we've not funded the amount
15   approved at Investment Committee.
16           Q.  The question is, have you -- are you
17   aware of any instance in which EIG did not fund
18   an investment that had been approved by the
19   Investment Committee?
20           A.  So I'm aware of an instance where we
21   didn't fully fund -- is your question fund at
22   all?
23           Q.  Yes.
24           A.  I'm not -- I can't recall approved
25   investments where we didn't fund at all.  There

Page 68

1              CONFIDENTIAL - SIMON R. HAYDEN

2          A.   I recall being in the meeting, yes.

3          Q.   Do you recall when the investment

4     recommendation was made for Sete to the

5     Investment Committee for Fund XIV?

6          A.   Do I remember a date or do I recall

7     the event?

8          Q.   Do you recall when that happened?

9          A.   I think that was in June 2011.

10          Q.   And you testified earlier that you

11    made that -- you presented the investment

12    recommendation to the Investment Committee for

13    EIG Fund XIV in June 2011; is that right?

14          A.   I presented parts of it.  I probably

15    wasn't the only presenter.

16          Q.   And who presented the other parts of

17    the investment recommendation?

18          A.   Kevin Corrigan would have presented

19    some of it.

20          Q.   Anyone else?

21          A.   I don't recall if anyone else

22    presented.

23          Q.   And prior to that presentation to the

24    Investment Committee for Fund XIV, did you do any

25    due diligence of shipyards involved in Sete?

1          CONFIDENTIAL - SIMON R. HAYDEN
2          A.   I think there was a mention of them
3     or in the investment recommendation, but that was
4     an area more that, I think, Kevin Lowder, Kevin
5     Corrigan were more familiar with.
6          Q.   But my question was, did you do any
7     due diligence of the shipyards involved in Sete
8     prior to the June 2011 meeting where Fund XIV
9     Investment Committee approved the Sete
10    investment?
11         A.   I don't recall.
12         Q.   And you testified in the DC action
13    that the Fund XV Investment Committee approved
14    its investment in Sete in September 2011; is that
15    right?
16         A.   I think that's right, yes.
17         Q.   And prior to September of 2011, did
18    you do any due diligence of any of the shipyards
19    involved in Sete?
20         A.   I don't recall.
21         Q.   And so, when you joined the Sete Deal
22    Team in mid June of 2011, did you have any
23    concerns about the due diligence that had been
24    done up to that date?
25         A.   I had no concerns, no.  There were

```
 1            CONFIDENTIAL - SIMON R. HAYDEN
 2     things that needed to be completed, but I wasn't
 3     concerned by anything.
 4            Q.  And what do you recall needed to be
 5     completed when you joined the Sete team in June
 6     of 2011?
 7            A.  I think the financial analysis was
 8     still being completed.  You know, personally I
 9     wanted to read some of the key documents, so that
10     still needed to be done.
11            Q.  Is that all that you recall still
12     needing to be done when you joined the Sete Deal
13     Team in June 2011?
14            A.  Yeah, that's all I recall.  There may
15     have been other things, but I don't remember.
16            Q.  And at the time you worked on the
17     Sete transaction, could you speak or read
18     Portuguese?
19            A.  No, no.  It's a bit like Spanish.  I
20     can understand parts of it, but I wouldn't try to
21     read a full document in Portuguese.
22            Q.  So the documents that you reviewed as
23     parts of the due diligence process for Sete were
24     in English; is that right?
25            A.  I think they --
```

```
 1           CONFIDENTIAL - SIMON R. HAYDEN
 2             MS. PAK:  Objection to form.
 3          A.  The charter agreement was a dual
 4     English but along side the Brazilian.  The EPC
 5     contract was -- must have been in English to read
 6     it.  I think it was just in English rather than
 7     in both languages.
 8          Q.  And those contracts that you
 9     reviewed, were they executed contracts or draft
10     agreements?
11          A.  I don't recall if they were signed or
12     not.
13          Q.  Do you recall who the counterparties
14     were for those agreements that you reviewed?
15          A.  No, there was just examples.  Sete
16     was one of them.  But I don't recall the exact
17     counterparties.
18          Q.  At the time you joined the Sete Deal
19     Team in June 2011, who else was on the Deal Team
20     at EIG?
21          A.  Kevin Lowder and Kevin Corrigan.
22          Q.  Is that everyone?
23          A.  To my recollection, yes.
24          Q.  At the June 2011 Investment Committee
25     meeting where Fund XIV approved the investment in
```

```
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2      Sete, do you recall Alvin Albay asking any
 3      questions?
 4              A.  I don't recall.
 5              Q.  And did Jeffrey Anderson ask any
 6      questions at that same meeting?
 7              A.  I don't recall either.
 8              Q.  Did Blaire Thomas ask any questions
 9      at that same meeting?
10              A.  I don't recall.  I mean, between them
11      they would have asked some questions, you know,
12      in the normal course of any Investment Committee.
13      But I don't remember the exact questions or a
14      memory of what they asked.
15              Q.  And aside from the June 2011 and
16      September 2011 decisions to invest in Sete, did
17      EIG make any other decisions to invest in Sete?
18              MS. PAK:  Objection to form.
19              A.  There were I suppose an original loan
20      -- part of the investment subsequently came up
21      and then, yeah, I think there would have been
22      reviews of funding requests, as we were asked to
23      fund.
24              Q.  Were you involved in the review --
25      any reviews of funding requests related to Sete?
```

Page 82

```
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2      Ivan on the way.
 3              Q.  And how long did it take you to drive
 4      to the Brasfels Shipyard?
 5              A.  I think it was a few hours.  It was a
 6      long ride.  I don't remember exactly now.
 7              Q.  What did you do when you arrived at
 8      the Brasfels Shipyard?
 9              A.  We -- do you mean immediately when we
10      arrived, or what did we do when we got there,
11      sorry?  Are you asking for my general
12      recollection of what we did while we were at
13      Brasfels Shipyard?
14              Q.  Well, what -- once you arrived at the
15      shipyard, did you meet any employees of the
16      shipyard?
17              A.  Yes, we were shown around the
18      shipyard by Keppel employees.  We also had a
19      meeting with them in a meeting room at the
20      shipyard.
21              Q.  And who showed you around the
22      shipyard?
23              A.  I don't recall the name of the
24      person.  There were, at least, two Keppel people
25      showing us around.  There were reasonable
```

Page 83

1              CONFIDENTIAL - SIMON R. HAYDEN
2      sizeable group.  So we were accompanied.  We are
3      accompanied to these sites.  So we were
4      accompanied throughout the trip by, at least, a
5      couple of Keppel employees and -- you know, but I
6      don't remember their names.
7              Q.  And how did you know that they were
8      "Keppel employees"?
9              A.  They were wearing the sort of Keppel
10     sort of boiler suits and the hat, the hardhat.
11             Q.  And what did you see at the Brasfels
12     Shipyard?
13             A.  They showed us the whole shipyard.
14     So we started off in the welding area where the
15     equipment is sort of -- you know, like, building
16     these ships is like a jigsaw puzzle.  So you
17     start by welding the, you know, the metal parts
18     into the right shape and it sort of goes down
19     towards the shore and gets bigger as more parts
20     get welded together.  So we saw all of that in
21     the transition area.  They were at work at the
22     time.
23                  And then we saw the, obviously, you
24     know, near the dock where the boats are actually,
25     you know, final construction takes place and, you

1              CONFIDENTIAL - SIMON R. HAYDEN

2      know, the cranes, the different docks.  And then

3      they also showed us inside -- at the very back of

4      the shipyard first away from the shore was the

5      building where the sort of, you know, the admin

6      building, that's where we had the meeting with

7      them.

8              Q.  And what happened at the meeting that

9      you referenced?

10             A.  They introduced the shipyard and gave

11     us an overview of Keppel and the shipyard.  The

12     purpose of the visit was to get -- Sete was

13     really telling its investors to give them comfort

14     that these ships could be built in Brazil.  And

15     so the Keppel yard was selected as the best one

16     -- yeah, at least, one of the best, if not the

17     best yard in Brazil to show us around.  So it was

18     kind of a presentation of the, I think, abilities

19     of this shipyard to produce these complex

20     vessels.

21             Q.  And so was the presentation focused

22     on the ship building capacity of the shipyard?

23             A.  Yeah, to the best of my recollection,

24     it was going through the capacity of the

25     shipyard.

```
                                              Page 85
 1           CONFIDENTIAL - SIMON R. HAYDEN
 2           Q.   Was the presentation or tour in
 3     English or Portuguese?
 4           A.   It was presented in English.
 5           Q.   And who gave the presentation at the
 6     Brasfels Shipyard?
 7           A.   I don't recall the name of the
 8     person.
 9           Q.   Was it a man or a woman?
10           A.   A man.
11           Q.   And how old, approximately, was he?
12                MS. PAK:   Objection to form.
13           A.   I would say middle-aged.  I don't
14     remember.
15           Q.   Did you speak with any employees of
16     the shipyard?
17           A.   Yeah, I think it was -- it was a
18     free-flowing conversation for the hour or more
19     that we were going around.  We were sort of
20     question and answer session where we were asking
21     questions around the shipyard and they were
22     responding to us.
23                So it was quite a lot of interaction,
24     you know, over the shipyard and what we're
25     looking at and they're explaining to us, you
```

```
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2      know, exactly how it all worked and the process
 3      of that, the shipyard.
 4              Q.  And did you personally ask any
 5      questions of anyone at the shipyard?
 6              A.  Well, I would have -- I think I was
 7      quite fascinated by it.  I was quite involved,
 8      but I don't remember the exact questions.
 9              Q.  Did you see any ships being built for
10      Sete at the Brasfels Shipyard?
11              A.  I don't recall for whom the ships
12      were being built.
13              Q.  What did the ships look like?
14              MS. PAK:  Objection to form.
15              A.  I mean, they were -- they were just
16      pieces of metal at that point in time.  They
17      weren't -- I don't recall the sort of, you know,
18      big ships sitting in the dock ready to sail off.
19      They were literally welding the initial pieces of
20      things together and it was sort of moving along.
21      So I don't recall seeing it sort of, you know, a
22      big completed boat and -- well, actually, now you
23      saying that, I do actually remember there was a
24      boat there, which had sort of technical -- needed
25      an upgrade.  But, anyway, you know, I don't -- I
```

Page 87

1              CONFIDENTIAL - SIMON R. HAYDEN
2      don't recall the details of the -- what vessels
3      they were or who they were for.
4              Q.  And how long, approximately, did your
5      visit to the Brasfels Shipyard last?
6              A.  I would say two to three hours.
7              Q.  And did you watch any videos or slide
8      shows during your visit to the Brasfels Shipyard?
9              A.  I recall a slide show and then the
10     presentation, there being a slide show, yes.  I
11     don't remember if there was a video, all the
12     contents of the slide show.
13             Q.  What was included -- what do you
14     remember about the slide show?
15             A.  Well, I think, it was just a poor --
16     you know, the presentation of the shipyard
17     capacity, you know, the capacity of the shipyard
18     to produce (UNINTELLIGIBLE) ships and
19     recollection of, you know, being the mention of
20     the Keppel and their ability, you know, the sort
21     of it's a Keppel yard and, you know, sort of
22     broad corporate picture supporting the yard.
23             Q.  Is there anything else that you
24     recall about the presentation?
25             A.  No.

```
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2         Q.  Alright.  I'd like to introduce as
 3    Defendant Exhibit 16, a document Bates stamped
 4    KEPPEL0001989 [sic].
 5              (Deposition Exhibit Defendant's 16,
 6    slide deck DSS38E Semi-Submersible KEPPEL00012989
 7    to KEPPEL00013002, was marked for
 8    identification.)
 9         Q.  Mr. Hayden, let me know when you see
10    the document.
11              MS. PAK:  David, is this a standalone
12    document, or is it part of a family?
13              MR. KUMAGAI:  There is a family.  But
14    I'm just going to ask questions about the
15    attachment.
16              MS. PAK:  Okay.  So can you introduce
17    the family to provide context to the witness as
18    to the entire document?
19              MR. KUMAGAI:  Well, I'll ask him
20    questions.  And if he needs context, I can
21    introduce the family.
22              MS. PAK:  Okay.  Well, we object to
23    the fact that the parent, to the extent there is
24    one, is missing from this exhibit.
25              MR. KUMAGAI:  Okay.
```

```
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2      involved in corruption schemes like this.
 3           Q.  Prior to this EIG didn't think that
 4      blue chip companies could be engaged in
 5      corruption?
 6                MS. PAK:  Objection to form.
 7           A.  I can't speak for EIG.  But my -- my
 8      view at the time I suppose and now, it could
 9      always happen, but you just don't expect it from
10      -- you don't expect it in life in general but,
11      particularly, from, you know, large companies
12      that have solid reputations and, you know, very
13      established energy players.  It's ship builders,
14      you know, it's not something that I expected to
15      happen.  I suppose you learn from experience is
16      what I'm saying.
17           Q.  And what would you do differently
18      about the due diligence work that you did on the
19      Sete transaction in light of your experience on
20      Sete?
21                MS. PAK:  Objection to form.
22           A.  I don't know what we would have done.
23      I mean, we did our compliance checks.  I mean, it
24      was, obviously, hidden and nobody knew about it.
25      So I don't think amount of diligence back then
```

```
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2      would have uncovered it.  It, obviously, took,
 3      you know, years to come out.  So, you know, we do
 4      our diligence still on, you know, compliance
 5      corruption.  And, I mean, I don't -- I'm not sure
 6      we'd do differently, maybe dig harder with the
 7      experience of having been through a corruption
 8      scandal and not be quite so trusting.  But it's
 9      kind of -- you know, it's a soft personal thing.
10              But, in terms of policies, I think,
11      we do pretty much the same as we did and I'm just
12      not sure any amount of diligence would have
13      uncovered what was going on in 2011.
14          Q.  If EIG had uncovered allegations of
15      bribery against entities involved in Sete before
16      deciding to invest in Sete, would you have
17      recommended that EIG invest in Sete?
18              MS. PAK:  Objection to form.
19          A.  Well, if -- yeah, if it was, you
20      know, bribery scheme like that, we never would
21      have invested had we known of the Lava-Jato
22      corruption.  I mean, no investor would have
23      invested like that.  That's obvious.
24          Q.  What would you expect EIG to do in
25      response to learning of allegations against
```

Page 139

```
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2      people or entities involved in Sete that they
 3      were accepting bribes?
 4              MS. PAK:  Objection to form.
 5          A.  We -- we would -- you know, cause,
 6      you know, the exact context of what we -- the
 7      situation you're talking about, but we would
 8      investigate and, you know, look into that.
 9      Sometimes there are baseless allegations,
10      sometimes they're real allegation.  And so we
11      would have dug into it and tried to get to the
12      bottom as to whether those allegations were real
13      or not.
14          Q.  And what do you mean, we would have
15      dug into it to get to the bottom of it?  What
16      would that have involved?
17              MS. PAK:  Objection to form.
18          A.  Well, reviewing what's sort of
19      publically known.  We would have spoken to people
20      in -- you know, we have a local office.  So
21      spoken to people to see what we could find out
22      about the nature of the allegations by talking to
23      the companies that we had access to and ask them
24      directly what is the -- what's the charge here
25      and, you know, give us more information and
```

```
 1              CONFIDENTIAL - SIMON R. HAYDEN
 2     explain it to us.  I mean, there are different
 3     ways of getting to the bottom of these
 4     allegations.
 5              Q.  But if EIG did discover those kinds
 6     of bribery or corruption allegations against an
 7     entity involved in Sete, your expectation would
 8     be that EIG investigate those allegations
 9     including by talking to the entities directly; is
10     that your testimony?
11              MS. PAK:  Objection to form.
12              A.  I would expect, you know, we would do
13     that.  I wasn't involved in Sete when all this
14     broke.  But that's -- yeah, I mean, we may take
15     legal advice as to what you should do in terms
16     of, you know, speaking.  I think different
17     geographies is different.  But -- so as long as
18     there's legal advice permitting it, those are the
19     things I would do anyway.
20              Q.  In terms of the bear minimum
21     expectation after learning about these types --
22     allegations of corruption or bribery against
23     someone at Sete, what would you have expected EIG
24     to do?
25              A.  Is that not the same question?
```

```
 1                CONFIDENTIAL - SIMON R. HAYDEN
 2       Sorry, after learning of the allegations, what
 3       would we have done?
 4                    You know, that you -- make sure that
 5       the allegations are real, just to check that
 6       they're not sort of frivolous.  That's what we
 7       just talked about.
 8                    And then are you saying if you
 9       decided that they weren't frivolous or something
10       real here, what would you do?
11            Q.  Well, how would you be satisfied that
12       they were "frivolous"?
13                    MS. PAK:  Objection to form.
14            A.  That's -- that's an odd question.
15       It's a judgment call based on the information you
16       have.
17            Q.  If they had been charged, criminally
18       charged, would you consider that to be serious
19       enough to investigate?
20                    MS. PAK:  Who is "they," David?
21            Q.  Did people involved in a transaction
22       that you were investing had been criminally
23       charged, would that require you to investigate?
24                    MS. PAK:  Objection to form.
25            A.  So you're talking about people
```

Page 162

1          CONFIDENTIAL - SIMON R. HAYDEN

2      C E R T I F I C A T E   O F   R E P O R T E R

3          I, SILVIA P. WAGE, a Certified Shorthand

4      Reporter, Certified Realtime Reporter and Registered

5      Reporter, herby certify that the witness in the

6      foregoing deposition was by me duly sworn to tell

7      the truth, the whole truth, and nothing but the

8      truth in the within-entitled cause; that said

9      deposition was taken down in shorthand by me, a

10     disinterested person, at the time and place therein

11     stated, and that the testimony of the said witness

12     was thereafter reduced to typewriting, by

13     computer, under my direction and supervision;

14     that before completion of the deposition, review

15     of the transcript [X] was [ ] was not requested.

16     If requested, any changes made by the deponent

17     (and provided to the reporter) during the period

18     allowed are appended hereto.

19         I further certify that I am not of counsel

20     or attorney for either or any of the parties to

21     the said deposition, nor in any way interested in

22     the event of this cause, and that I am not

23     related to any of the parties thereto.

24

                                       May 28, 2021

25     License No. 30X100182700