**KEPPEL OPP'N EXH.  51**

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   --------------------------------x

4   EIG ENERGY FUND XIV, L.P.,

5   EIG ENERGY FUND XIV-A, L.P.,

6   EIG ENERGY FUND XIV-B, L.P.,

7   EIG ENERGY FUND XIV (CAYMAN), L.P.,

8   EIG ENERGY FUND XV, L.P.,

9   EIG ENERGY FUND XV-A, L.P.,

10  EIG ENERGY FUND XV-B, L.P., AND

11  EIG ENERGY FUND XV (CAYMAN), L.P.,

12           Plaintiffs,

13     Vs.      Case No. 18-cv-01047 (PGG)

14  KEPPEL OFFSHORE & MARINE LTD.,

15           Defendant.

16  --------------------------------x

17              "CONFIDENTIAL"

18          VIDEOTAPE DEPOSITION OF

19               KURT TALBOT

20         VIA ZOOM VIDEOCONFERENCE

21             June 17, 2021

22               10:00 a.m.

23  Reported by:

24  Maureen Ratto, RPR, CCR

25  Job No. 4628202

Page 55

1            KURT TALBOT CONFIDENTIAL
2    deal. That was the only other transaction
3    I had personally done in Brazil, and it
4    was partially in Brazil.
5            Q.    And when you said a few
6    moments ago that Brazil seemed to be
7    coming on, a major country coming on the
8    world stage, what do you mean by that?
9            A.    It had growing GDP, it was
10   hosting the Olympics, it was hosting the
11   World Cup, had this major new discovery.
12   So, you know, as you look for global
13   markets it seemed like a pretty good
14   place to look. Lots was going on there.
15           Q.    Do you recall any analyses or
16   discussions about the political culture
17   in Brazil?
18           A.    I know there was discussion --
19                 MS. PAK:  Object to form.
20           Q.    Sorry.  Mr. Talbot, do you
21   mind repeating your answer?
22                 MS. PAK:  Maybe you can
23        clarify what time period you're
24        referring to, David?
25                 MR. KUMAGAI:  Sure.

Page 56

1              KURT TALBOT CONFIDENTIAL
2          Q.     Mr. Talbot, do you recall any
3    analyses or discussions about the
4    political culture in Brazil prior to
5    EIG's investments in Brazil?
6          A.     I recall discussions. I don't
7    recall specific -- the specifics of those
8    discussions.
9          Q.     What, if anything, do you
10   recall about those discussions?
11         A.     I really don't.  You know,
12   Kevin Corrigan spent high school in
13   Brazil, he's fluent in Portuguese, he
14   lived in Sao Paolo for -- you know, that
15   was kind of where he considered home and
16   had moved down to Rio. I'm not sure if he
17   was in Rio or not yet then but -- you
18   know, so discussed a lot about Brazil
19   with Kevin, who's lived there and fluent
20   and was pretty plugged in.
21         Q.     Do you recall the subject of
22   any of those discussions with
23   Mr. Corrigan?
24         A.     I don't.
25         Q.     But I understand -- is what

```
                                            Page 57
 1            KURT TALBOT CONFIDENTIAL
 2   you're saying he was the source of
 3   information about Brazil at EIG; is that
 4   fair?
 5            MS. PAK:  Objection to form.
 6        A.    Yeah. No, he was not the
 7   source, necessarily.  But, you know, he
 8   certainly read the local papers and, you
 9   know, he knew -- you know, he knew who
10   people were and the reputations of
11   countries -- companies and that thing, so
12   for sure.
13        Q.    Aside from Mr. Corrigan, was
14   there anyone else at EIG who you or
15   people went to for information about
16   Brazil?
17        A.    You know, prior to Investment
18   Committee they were required to do the
19   background checks and I forget what the
20   name of the systems we used, but that was
21   also routine.
22        Q.    Can you speak Portuguese at
23   all?
24        A.    No.
25        Q.    And during the time of the
```

Page 58

1          KURT TALBOT CONFIDENTIAL
2    discussions around Sete Brasil could you
3    ever speak or read Portuguese at all?
4          A.    No.
5          Q.    Apart from Mr. Corrigan do you
6    recall if anyone else at EIG during that
7    time could speak or read Portuguese?
8          A.    I don't know of the specific
9    employment times, but it was probably
10   later when we had additional Portuguese
11   speakers, probably 2014 or '15 would be
12   my -- would be a better time guess, not
13   in 2011.
14         Q.    Are there any additional steps
15   or requirements that -- strike that.
16               How did the process differ, if
17   at all, when EIG was investing in
18   countries that were non-English speaking
19   countries?
20               MS. PAK:  Objection to form.
21         A.    I mean, it didn't in --
22   candidly in most every place in the world
23   business is conducted in English, and
24   certainly energy.  So as a practical
25   matter, most of it was conducted in

Page 59

KURT TALBOT CONFIDENTIAL

1
2   English.  But to the extent documents
3   needed to be -- you know, we'd always get
4   local counsel that spoke the local
5   language. But other than that, maybe the
6   choice of counsel or additional counsel,
7   you'd have your regular counsel plus your
8   local counsel, local laws and language,
9   there was really no difference, you know.
10       Q.    Did you review any specific
11  documents in connection with EIG's
12  analysis of the Sete investment
13  opportunity?
14            MS. PAK:  Objection to form.
15       A.    I certainly reviewed the
16  investment rec and in 2011 I probably
17  would have reviewed drafts and commented,
18  you know, more for style and, you know,
19  editing type things and then those --
20  that would be the analysis, you know,
21  drafts and what ends up in the final
22  version of it, yes, I would have assumed
23  I saw those.
24       Q.    Just to be clear, by "those",
25  you mean drafts of the investment

```
 1            KURT TALBOT CONFIDENTIAL
 2   recommendations?
 3        A.    Yes, underlying models,
 4   economic models.
 5        Q.    Do you recall whether you
 6   personally had access to the -- to any
 7   data room that was set up for Sete?
 8        A.    I may have had access but I do
 9   not believe I ever accessed the data room
10   for Sete.
11        Q.    Did you review any offering
12   documents or marketing materials in
13   connection with EIG's analysis of the
14   Sete investment opportunity?
15        A.    I don't recall specifically
16   doing so, but more likely than not I
17   would have.
18        Q.    And what makes you say that
19   it's more likely than not that you would
20   have?
21        A.    It's a deal we proceeded with
22   and so early elevation and stuff always
23   to see what do we have behind this,
24   what's -- what do we have. So likely, I
25   would ask for, you know, more
```

Page 104

1           KURT TALBOT CONFIDENTIAL
2    know, you couldn't always do that but...
3        Q.    And what did you mean by
4    "uncertain exit"?
5        A.    Unlike a loan that has a
6    maturity date or any security that has a
7    maturity date, there is no maturity date
8    and it's kind of uncertain how this
9    equity would be realized.  Just what
10   common equity is, right, private common
11   equity is.
12       Q.    What do you mean by that?
13       A.    Private common equity has no
14   ready exchange, so it can't easily be
15   converted to cash.
16       Q.    And in this case of Sete, what
17   assurances did EIG have that the
18   investment would be converted to cash at
19   some point?
20       A.    It was a belief on the
21   fundamentals of the deepwater
22   development, you know, massive reserves
23   controlled by Petrobras.  The State was
24   backing, you know, creating State
25   champions to localize as much as

Page 105

1           KURT TALBOT CONFIDENTIAL
2    possible, that's what Sete was,
3    ultimately the biggest company in South
4    America going to take all the product you
5    can deliver, they're going to take on
6    term contracts.  And those were in
7    dollars, I believe, I'm pretty sure. So
8    that was pretty compelling.
9         Q.    Was there a guarantee that EIG
10   would be able to cash out at some point?
11        A.    I never saw the final
12   documents. I don't recall that being an
13   option.  So I can't really -- I don't
14   know the answer to that.
15        Q.    And can you describe the
16   sentiment that you are -- strike that.
17             Can you describe the point
18   that you're trying to make in this email
19   to Mr. Thomas in February 1st, 2014?
20             MS. PAK:  Objection to form.
21        A.    The point is portfolio
22   construction and just looking at
23   balancing yield in the fund.  You know,
24   how does this investment fit into the
25   entire portfolio?  That's what this is

Page 106

1              KURT TALBOT CONFIDENTIAL

2    about.

3              Blair and I -- you know, Blair

4    and I were partners and we had, you know,

5    lively discussions every day about

6    everything. So, you know, but we

7    communicate, there was never any

8    misunderstandings. We did well.

9              So this is basically an

10   argument.  We'd made an investment that

11   is currently not performing, we really

12   don't need additional exposure to it, you

13   know, I don't really see how it helps our

14   portfolio doing that. That's what this --

15   that's what this memo says.

16        Q.    And you were describing

17   earlier the significance of Petrobras'

18   involvement.

19             Do you recall what guarantees,

20   if any, there were that Petrobras would

21   not walkaway from the project?

22        A.    I don't recall Petrobras

23   giving any such guarantees. I don't know

24   if they did or didn't.

25        Q.    Is it fair to describe Sete as

```
 1              KURT TALBOT CONFIDENTIAL
 2   a securitization vehicle of Petrobras?
 3              MS. PAK:  Objection to form.
 4        A.    I think functionally I would
 5   think of it as something akin to that.
 6   You know, legally I don't know exactly
 7   what all those terms would mean from a
 8   legal standpoint.
 9              So but functionally they were
10   -- they needed to build drillships and
11   they came up with a credit enhanced way
12   of doing it because, otherwise, it would
13   have been tough to do.
14        Q.    Was it common, was that type
15   of structure common, in your experience?
16              MS. PAK:  Objection to form.
17        A.    People do all kind of
18   structures so -- and within a broad -- a
19   broad definition.  I didn't see it -- it
20   seemed to be similar to other type
21   transaction I'd seen.
22        Q.    Are you familiar with CDOs or
23   collateralized debt obligation?
24        A.    In a broad sense I am.
25        Q.    Can you describe your
```

1          KURT TALBOT CONFIDENTIAL

2    understanding of CDOs?

3          A.    You take a series of

4    securities, typically bonds or mortgages,

5    you can package them, bundle them up

6    together and reslice the cash flows and

7    create different risk levels of security

8    and the lower the risk, the lower the

9    yield.

10         Q.    And would you describe the

11   Sete structure as comparable in any way

12   to the way CDOs are structured?

13         A.    I don't remember the Sete

14   structure in any kind of detail to make

15   that comparison.

16         Q.    Going back to the currency

17   issue, was EIG -- strike that.

18               You testified earlier that EIG

19   was not bringing in cash yet from its

20   Sete investments as of the date of that

21   email in February 2014; is that a fair

22   summary?

23         A.    Yes.

24         Q.    So why would the declining or

25   changes in the exchange rate impact EIG's

1               C E R T I F I C A T E

2               I, MAUREEN M. RATTO, a

3    Registered Professional Reporter, do

4    hereby certify that prior to the

5    commencement of the examination, KURT

6    TALBOT was sworn by me to testify the

7    truth, the whole truth and nothing but

8    the truth.

9               I DO FURTHER CERTIFY that the

10   foregoing is a true and accurate

11   transcript of the proceedings as taken

12   stenographically by and before me at

13   the time, place and on the date

14   hereinbefore set forth.

15              I DO FURTHER CERTIFY that I am

16   neither a relative nor employee nor

17   attorney nor counsel of any of the

18   parties to this action, and that I am

19   neither a relative nor employee of such

20   attorney or counsel, and that I am not

21   financially interested in this action.

22

23

24   _____

              MAUREEN M. RATTO, RPR

25            License No. 817125