**KEPPEL OPP'N EXH.  55**

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Case No. 18-cv-01047 (PGG)
 5   - - - - - - - - - - - - - - - - - - -x
 6   EIG ENERGY FUND XIV, L.P.,
     EIG ENERGY FUND XIV-A, L.P.,
 7   EIG ENERGY FUND XIV-B, L.P.,
     EIG ENERGY FUND XIV (CAYMAN), L.P.,
 8   EIG ENERGY FUND XV, L.P.,
     EIG ENERGY FUND XV-A, L.P.
 9   EIG ENERGY FUND XV-B, L.P.
     EIG ENERGY FUND XV (CAYMAN), L.P.
10                     Plaintiffs,
             -against-
11   KEPPEL OFFSHORE & MARINE LTD.,
                       Defendant.
12   - - - - - - - - - - - - - - - - - - -x
13                 Virtual Zoom Deposition
14
                   June 11, 2021
15                 10:00 a.m.
16      CONFIDENTIAL VIRTUAL VIDEO DEPOSITION
17   of RANDALL WADE, in the above-entitled
18   action, held at the above time and place,
19   taken before Jeremy Richman, a Shorthand
20   Reporter and Notary Public of the State of
21   New York, pursuant to the Federal Rules of
22   Civil Procedure, and stipulations between
23   Counsel.
24
25              *     *     *
```

Page 25

```
 1              CONFIDENTIAL - WADE
 2    participant as well.
 3         Q.    And what was EGDI's role?
 4         A.    EGDI was a single investor; a
 5    single investor, separate account, or
 6    single investor fund that had an
 7    overlapping strategy to Fund XIV and
 8    Fund XV.
 9              I don't recall if there was
10    an investor.  I know there -- I don't
11    remember if they actually invested.
12    They were considered -- they considered
13    it.
14         Q.    And who was the single
15    investor in EGDI?
16         A.    CIC, China Investment Corp.
17         Q.    And just to be clear, you
18    cannot recall whether CIC invested
19    directly in Sete; is that right?
20         A.    Correct.  They had an
21    overlapping investment strategy with
22    Funds XIV and XV, but I don't recall
23    specifically if they invested in Sete
24    or not.
25         Q.    What does it mean to have an
```

1          CONFIDENTIAL - WADE

2    overlapping strategy with Funds XIV and

3    XV?

4          A.    An investment strategy that

5    would have been similar to those of

6    Funds XIV and XV.  And so some

7    opportunities that would fit for Fund

8    XIV and XV would also fit for EGDI.

9          Q.    And do you recall when you

10   first heard about the Sete investment

11   opportunity?

12         A.    Not specifically.

13         Q.    Were you involved in EIG's

14   initial discussions around whether or

15   not to invest in Sete?

16         A.    I would have been aware of

17   discussions as they became serious,

18   about to be brought to the investment

19   committee, but I was not an active

20   member of the investment team.

21         Q.    And what do you recall, if

22   anything, about those discussions

23   around the Sete investment opportunity?

24         A.    Could you ask that maybe more

25   specifically.

```
 1              CONFIDENTIAL - WADE
 2        Q.    Do you recall any of the
 3   discussions about Sete?
 4        A.    I don't recall any specific
 5   discussions.
 6        Q.    Do you recall who first told
 7   you about the Sete investment
 8   opportunity?
 9        A.    I don't.
10        Q.    Do you recall approximately
11   when you first learned about the
12   opportunity to invest in Sete?
13        A.    I don't.
14        Q.    Can you speak Portuguese?
15        A.    I cannot.
16        Q.    Can you read Portuguese?
17        A.    I cannot.
18        Q.    Can you read Portuguese at
19   all, understand anything about
20   Portuguese?
21        A.    I've learned to say hello in
22   Portuguese.  That is the extent of my
23   language skills.
24        Q.    Did you review any documents
25   in connection with the assessment of
```

CONFIDENTIAL - WADE

1
2     the Sete investment opportunity?
3          A.    Can you clarify; do you mean
4     internal investment approval documents
5     versus project level documents, legal
6     contracts related to the investment?
7          Q.    Well, what documents, if any,
8     did you review in connection with EIG's
9     assessment of Sete?
10         A.    I only would have reviewed
11    our internal analysis, so our
12    investment committee recommendation,
13    you know, that brought to the
14    investment committee.
15              I did not review any of the
16    source diligence materials or legal
17    documents related to the investment.
18         Q.    And is that typical of your
19    role as someone on the investment
20    committee, but not on the deal team?
21         A.    That is typical.
22         Q.    Do you recall the content of
23    any documents that you reviewed in
24    connection with Sete?
25         A.    Not specific contents.

Page 29

1                CONFIDENTIAL - WADE
2          Q.    Did you review any contracts
3    with any shipbuilders in connection
4    with Sete?
5          A.    I did not.
6          Q.    Did you review any contracts
7    in connection with any -- strike that.
8                Did you review any contracts
9    with any shipyards in connection with
10   Sete?
11         A.    I did not.
12         Q.    Did you review any of the
13   offering or marketing documents in
14   connection with Sete?
15         A.    I did not.
16         Q.    Did you attend the investment
17   committee meetings for Fund XIV when
18   that fund approved its investment in
19   Sete?
20         A.    I don't recall specifically,
21   but I likely did attend, but I don't
22   recall the meeting specifically.
23         Q.    Just to be clear, you do not
24   recall one way or the other if you did
25   attend or not?

```
 1              CONFIDENTIAL - WADE
 2        Q.    Do you recall watching any
 3   video related to Sete at any annual
 4   investors conference?
 5        A.    I recall that we had a video
 6   of Sete.  We often had videos of our
 7   portfolio companies, but I don't
 8   remember the content of the video.
 9        Q.    Have you ever been to Brazil?
10        A.    I have.
11        Q.    And when have you been to
12   Brazil?
13        A.    I don't recall specifically.
14        Q.    Do you recall approximately
15   how many times you visited Brazil?
16        A.    I believe I've been twice.  I
17   take that back.  Three times.  There
18   was one very early on.
19        Q.    Okay.  And ballpark, do you
20   know approximately when those visits
21   took place?
22        A.    My first visit would have
23   been in the late 1990s, in connection
24   with an investment we were making.  I
25   visited once in connection with -- with
```

```
                                    Page 40

 1              CONFIDENTIAL - WADE
 2   Sete, as the principle consideration.
 3   And I've attended once since then,
 4   with -- in relation to another
 5   portfolio company.
 6        Q.    And what was the other
 7   portfolio company that you referenced?
 8        A.    It's a company currently
 9   called Prumo.
10        Q.    And do you recall
11   approximately when the visit in
12   connection with Sete occurred?
13        A.    I don't remember which year
14   it was.  It was after the investment
15   had been made.  And -- and, you know, I
16   went down to meet with our team and
17   had, you know, some Sete-related
18   meetings.
19        Q.    Who did you meet with during
20   those -- that visit to Brazil in
21   connection with Sete?
22        A.    Our team would have been led
23   by Kevin Corrigan.  I don't remember at
24   the time who the other associates in
25   our office were.  I met with Lake Shore
```

Page 41

```
 1              CONFIDENTIAL - WADE
 2     Advisors, Luiz Reis, and some of his
 3     colleagues, and I had a brief
 4     introduction with Feroz, but I don't
 5     recall his first name.
 6          Q.    And what was the purpose of
 7     that visit to Brazil?
 8          A.    As a meaningful portfolio
 9     company, it seemed like a good idea
10     just to go down and, you know, hear
11     things more directly.  And I spend -- I
12     visit all of our offices on a periodic
13     basis, and that would have been the
14     reason for being in Brazil.
15          Q.    Was the purpose of the trip
16     related to EIG's due diligence of Sete
17     in any way?
18          A.    No.  This was -- it would
19     have been post our investment.
20          Q.    And after EIG makes an
21     investment, it does not continue to
22     conduct due diligence; is that what you
23     mean?
24          A.    I consider due diligence a
25     preinvestment -- I define due diligence
```

Page 42

                    CONFIDENTIAL - WADE

 1

 2    as preinvestment.

 3         Q.    Do you recall any -- strike

 4    that.

 5               Do you recall the substance

 6    of any discussions with Feroz?

 7         A.    I don't.

 8         Q.    Aside from Lake Shore and

 9    Feroz, do you recall any other

10    individuals who you met during that

11    trip to Brazil?

12         A.    Other than Kevin Corrigan, I

13    do not.

14         Q.    Apart from Kevin Corrigan,

15    was there anyone else from EIG with you

16    on that visit to Brazil?

17         A.    We may have had part of the

18    local team there, but I generally

19    travel alone, and so there was nobody

20    accompanying me from outside of Brazil.

21         Q.    I'm going to try to introduce

22    a document.

23               MR. GOLDMAN:  Hey, Dave,

24         maybe now is the time to take a --

25         before you do that -- just a

```
                                              Page 43
 1             CONFIDENTIAL - WADE
 2        five-minute break.  Even though we
 3        haven't had a full hour testimony,
 4        we have been going for over an
 5        hour.
 6             MR. KUMAGAI:  Do you mind if
 7        we just do this document and then
 8        go on the break, it won't take
 9        long?
10             MR. GOLDMAN:  That's fine.
11             MR. KUMAGAI:  Thanks.
12             (Exhibit 48, marked for
13        identification, Bates stamped
14        EIG_KEP_00075612.)
15      Q.    I would like to introduce as
16   Defendant's Exhibit 48, document Bates
17   stamped EIG_KEP_00075612.
18             It appears to be an e-mail
19   from Randall Wade to Kevin Corrigan and
20   Angel Dunn dated October 25, 2011.
21             Mr. Wade, do you see
22   Exhibit 48?
23      A.    I am refreshing.  Yes.  I put
24   on my glasses, so I can see it.
25      Q.    Do you recognize this as an
```

                    CONFIDENTIAL - WADE

1
2    e-mail you sent around October 25,
3    2011?
4         A.    I don't recall or recognize
5    the e-mail, but yes, this is an e-mail
6    from me.
7         Q.    And if you scroll down to the
8    bottom of the chain, there appears to
9    be an agenda or what looks like a visit
10   to Brazil involving you and Kevin
11   Corrigan.
12              Do you see that?
13        A.    I do.
14        Q.    Is this the visit to Brazil
15   that you referenced earlier in
16   connection with Sete?
17        A.    I believe so.
18        Q.    So it would appear the visit
19   occurred around October 2011; is that
20   right?
21        A.    It appears so.
22        Q.    And was this the only trip
23   you made to Brazil in connection with
24   Sete?
25        A.    Yes.   The only one I recall.

```
 1              CONFIDENTIAL - WADE
 2    sending a letter out to all of our
 3    investors that is intended to address
 4    your questions."
 5              Do you see that?
 6        A.    I do.
 7        Q.    Do you know whether Fund XV
 8    sent out a letter to its investors
 9    related to questions -- oh, go ahead.
10        A.    Fund XV wouldn't have sent
11    out a letter.  We would have sent out a
12    letter to all of our fund investors
13    related to the fund.
14        Q.    Do you recall the content of
15    the letter that was sent in December of
16    2014?
17        A.    I don't recall the content of
18    the letter specifically.
19        Q.    And how often would EIG send
20    letters to investors in its funds?
21        A.    Not a -- there's not a
22    determined period to those kinds of
23    communications.  This letter did, for
24    context, oil prices collapsed in late
25    November 2014, and so that would
```

Page 75

```
 1              CONFIDENTIAL - WADE
 2    have -- that's what would have
 3    necessitated that.  But, you know, that
 4    -- that's a difficult-to-predict
 5    occurrence.
 6         Q.    And so, typically, EIG would
 7    send out letters when there was some
 8    sort of notable event; is that fair?
 9         A.    Correct.  We would send
10    something in addition to our normal
11    reporting, when there was an event that
12    we felt warranted it.
13         Q.    And the event in this case of
14    Defendant Exhibit 53 was the collapse
15    of oil prices; is that right?
16         A.    That's correct.
17         Q.    Do you recall what impact, if
18    any, the collapse of oil prices around
19    this time period had on EIG's
20    investments in Sete?
21         A.    I don't recall any impact on
22    Sete.
23         Q.    Do you recall whether the
24    collapse in oil prices affected EIG's
25    evaluation of its Sete investments?
```

```
 1              CONFIDENTIAL - WADE
 2        A.    I don't recall the -- an
 3   impact specifically on Sete.  The
 4   collapse in oil prices certainly had an
 5   impact on much of our portfolio, but I
 6   don't recall Sete specifically.
 7        Q.    Sitting here today, do you
 8   understand what impact, if any, the
 9   collapse in oil prices around this time
10   of November 2014 had on Sete?
11        A.    I don't believe there was
12   any.
13        Q.    And can you explain how that
14   would be the case?
15        A.    Our investment in Sete wasn't
16   tied to commodity prices.  Our
17   investment in Sete was supported by
18   contractual -- a contractual revenue
19   stream that was unrelated to commodity
20   prices.  And so if the contract had
21   performed, we wouldn't have had any --
22   the lower oil prices would not have had
23   any impact on our investment.
24        Q.    And so is it your
25   understanding that EIG's investments in
```

Page 77

```
                              CONFIDENTIAL - WADE
 1
 2     Sete were incapable of being impacted
 3     by changes in oil prices?
 4               MR. GOLDMAN:  Object to form.
 5        You may answer.
 6        A.    Incapable is -- any impact
 7     would have been indirect and most
 8     likely would have been if oil prices
 9     changed the credit profile of Petrobras
10     to such a sustained degree that they
11     could no longer live up to the terms of
12     their contract, then that could have
13     had an impact on our investment, but I
14     don't believe that's what occurred
15     here.
16        Q.    And can you explain what you
17     mean by changed the credit profile of
18     Petrobras?
19        A.    If Petrobras reached a point
20     of insolvency, and so they could no
21     longer pay under the terms of the
22     contract.
23               MR. KUMAGAI:  Dan, did we
24        lose you?
25               MR. GOLDMAN:  No, I just
```

```
 1              CONFIDENTIAL - WADE
 2       turned the camera off for one
 3       second.  I heard everything that
 4       you -- all the testimony.
 5              MR. KUMAGAI:  Just making
 6       sure you were still around.
 7              MR. GOLDMAN:  Still here.
 8        Q.    Do you recall any analyses
 9    that EIG did of the credit profile of
10    Petrobras?
11        A.    I don't recall.
12              MR. KUMAGAI:  I would like to
13       introduce as Defendant Exhibit 54,
14       document Bates stamped
15       EIG_KEP_00139825.
16              (Exhibit 54, marked for
17       identification, Bates stamped
18       EIG_KEP_00139825.)
19        Q.    And Defendant Exhibit 54
20    appears to be an e-mail from Randall
21    Wade to Blair Thomas dated February 18,
22    2015.
23              Can you see Defendant
24    Exhibit 54, Mr. Wade?
25        A.    I can.
```

Page 79

1              CONFIDENTIAL - WADE

2        Q.     Do you recall this exchange

3    with Mr. Thomas?

4        A.     I do not.

5        Q.     Do you recall any exchanges

6    with any investors in the funds related

7    to Operation Car Wash?

8        A.     Not specifically.

9        Q.     And when you say not

10   specifically, do you recall general

11   conversations?

12       A.     I'm sure I had conversations

13   related to Car Wash with investors, but

14   I don't remember the specific nature of

15   those.

16       Q.     And in the bottom of the

17   e-mail you referred to an NHC script.

18              Do you see that?

19       A.     I do.

20       Q.     Can you tell me what NHC

21   stands for?

22       A.     New Holland Capital.

23       Q.     Do you recall whether EIG's

24   funds continued to fund Sete after

25   allegations were disclosed -- strike

Page 80

1              CONFIDENTIAL - WADE

2      that.

3              Do you recall whether EIG

4      continued to fund Sete after Operation

5      Car Wash was disclosed?

6          A.    I don't recall any of the

7      specifics on the mechanics around Sete.

8          Q.    Did anyone at EIG get

9      disciplined in any way as a result of

10     Sete?

11         A.    No.

12         Q.    Have any of the funds'

13     investors accused EIG of any wrongdoing

14     with respect to Sete?

15         A.    None.

16         Q.    Sorry, what did you say?

17         A.    I said none.

18         Q.    What was the role of the

19     Investment Product Review Committee?

20         A.    The Investment Product Review

21     Committee was a committee at Trust

22     Company of the West, TCW, that was a

23     committee to review and approve the

24     launching of a new fund.

25              So TCW had many portfolio

Page 116

1

2                    CERTIFICATION

3

4

5      I, JEREMY RICHMAN, a Notary Public for

6   and within the State of New York, do

7   hereby certify:

8      That the witness whose testimony as

9   herein set forth, was duly sworn by me;

10   and that the within transcript is a true

11   record of the testimony given by said

12   witness.

13      I further certify that I am not

14   related to any of the parties to this

15   action by blood or marriage, and that I am

16   in no way interested in the outcome of

17   this matter.

18      IN WITNESS WHEREOF, I have hereunto

19   set my hand this 17th day of June, 2021.

20

21   _____

22   JEREMY RICHMAN

23                *      *      *

24

25