**KEPPEL OPP'N EXH.  57**



Deposition of:
# Kevin Corrigan

*October 16, 2020*

In the Matter of:

# EIG v. Petrobras

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Page 15

1    office in Tysons Corner, Virginia.  You know,

2    Washington D.C., basically.  And in mid-2006 that

3    office was closed down.  It was part of TCW.  I

4    should -- are you aware that, you know, EIG was an

5    offshoot of TCW that occurred in 2010?

6          So I say EIG for the 10 years, but it was

7    really TCW and then EIG.

8       Q.  So let's clear that up.  So TCW is the Trust

9    Company of the West?

10      A.  Correct.  Yes, based in Los Angeles.

11      Q.  So you were first employed by TCW in February

12   of 2005?

13      A.  That's correct.  And EIG was the -- were the

14   initials for the Energy and Infrastructure Group

15   within TCW.

16      Q.  And that group was spun off into a separate

17   company or series of companies in 2010?

18      A.  Approximately 2010, yeah.

19      Q.  Okay.  Did that change your employment in any

20   way?

21      A.  Really, for me, it was completely seamless.

22   I was doing the same thing.  I was working with the

Confidential                                          EIG_KEP_00257422

Page 16

1   same people, and we just left Los Angeles and went

2   back to Washington, D.C.

3       Q.  So was there a time where you were located in

4   Los Angeles?

5       A.  Yes.  I started to say that.  So the first --

6   so when I was hired until the middle of 2006, we were

7   in Tysons Corner.  Then we -- TCW asked us to close

8   that office, and we all went out to Los Angeles.

9   There were about four or five of us in that office,

10  and we all moved to Los Angeles.  And I lived there

11  for four years until we went back to Washington, D.C.

12  with EIG.

13          There was a transition period where EIG and

14  TCW were still sort of co-existing, and I think -- my

15  recollection is that they were completely independent

16  as of January of 2011.

17      Q.  2011, you said?

18      A.  Yeah.

19      Q.  Okay.  And so when did you move back to

20  Washington, D.C.?

21      A.  Around July of 2010.

22      Q.  Okay.  So you were in Washington, D.C. from

Confidential

EIG_KEP_00257423

Page 17

1    July of 2010 through when?

2         A.   June of 2012, when I went to Brazil.

3         Q.   Okay.  And so where did you live in Brazil?

4         A.   Rio.

5         Q.   And how long were you there?

6         A.   Two years.  From 2012 to mid-2014.  I retired

7    from Rio.

8         Q.   And why did you go to Rio de Janeiro -- why

9    did you relocate to Rio de Janeiro in 2012?

10        A.   Well, EIG was expanding at the time, and we

11   wanted to have a presence in Brazil.  We were

12   committed to that market, and so I opened an office

13   for EIG in Rio.

14        Q.   Okay.  How many people were in that office

15   besides you, if any?

16        A.   Let's see.  The first hire was sort of a side

17   kick for me named Marcel Abe, and then we had an

18   administrative assistant, and that was it.  Of course

19   we served as a place for people to hang their hats

20   when they came on visits.  We had a fair number of

21   visitors coming and going from EIG.

22        Q.   Go ahead, please.

Confidential                                                    EIG_KEP_00257424

Page 18

1          A.   I'm sorry.   That office was shared with

2     Lakeshore Partners, the financial advisors.

3          Q.   So was it one office that both companies were

4     in?

5          A.   Well, originally, we actually shared offices

6     in Sete Brasil's headquarters in Humaita.   And we,

7     "we," meaning Lakeshore and us, got our own office in

8     Ipanema for several months.   I don't remember how

9     many.   And then we moved to more permanent

10    headquarters in Botafogo.

11              And that's correct.   We each paid sort of

12    50-50, and, you know, we had our own communication

13    systems and what not, but we shared space essentially.

14         Q.   Okay.   So just -- I don't need to know the

15    exact dates, but I'm just trying to get my head around

16    this.   So starting in June 2012, you relocated to

17    Rio de Janeiro, and EIG shared office space with Sate

18    Brasil and Lakeshore or just Sete Brasil?

19         A.   No, and Lakeshore.

20         Q.   Okay.   And when you say, "shared office

21    space," it wasn't like you each had full run of the

22    building.   You all were in a shared space.   You might

Confidential                                                      EIG_KEP_00257425

Page 19

1    have had individual personal offices, but there wasn't

2    a separation between the companies in terms of

3    physical barriers?

4         A.   I believe there was a wall --

5              MS. LAW:  Kevin, could you please just give

6    me a chance to put objections in.

7              THE WITNESS:  Oh.  Sorry.

8              MS. LAW:  There was an objection to form on

9    that.

10   BY MR. WOLINSKY:

11        Q.   Go ahead.

12        A.   There was a barrier of sorts that separated

13   Sete from these outsiders, if you will.

14        Q.   And was that barrier a wall --

15   floor-to-ceiling wall?

16        A.   Yes, that's my recollection.

17        Q.   Okay.  But you and Lakeshore shared office

18   space without such a barrier?

19        A.   Correct.

20        Q.   And the principal at Lakeshore was a

21   gentleman named Luiz Reis; is that right?

22        A.   Reis, yes.

Confidential                                           EIG_KEP_00257426

Page 78

1    you because I'm taking a trip to Rio de Janeiro on

2    October 18 and 19, along with a colleague, and would

3    like to know if scheduling a meeting for our

4    presentation is possible, in addition to understand a

5    little better if there are any opportunities for us to

6    work in concert in major investments in which

7    Petrobras is engaging."  So let me just start with

8    this.

9          Mr. Ferraz was not expecting this request

10   from you; correct?

11          MS. LAW:  Objection.

12          MR. WOLINSKY:  Let me rephrase that,

13   actually.

14      Q.  You reached out to Mr. Ferraz on your own

15   accord.  Isn't that right?

16      A.  Correct.

17      Q.  Okay.  And at that point in time, you had no

18   existing relationship with Mr. Ferraz; correct?

19      A.  Correct.

20      Q.  Okay.  In fact, you never met him or

21   communicated with him as of September 30, 2010 when

22   you sent this E-mail?

Confidential                                                    EIG_KEP_00257485

Page 79

1       A.  That's correct.

2       Q.  And your request to him does not mention Sete

3   Brasil; correct?

4       A.  Correct.

5       Q.  It doesn't mention Project Sondas either.

6       A.  No.

7       Q.  In fact, it asks for time for you to make a

8   presentation to him; correct?

9       A.  Yes.

10      Q.  Okay.  And Mr. Ferraz writes back and says,

11  "I am available for a brief conversation on the 19th

12  afternoon."  Do you see that?

13      A.  Uh-huh.

14      Q.  And you write back to that on the first page,

15  and you say, "Thank you much for your reply; this will

16  work for us.  Surely, we will not take more than

17  thirty minutes of your time for our presentation";

18  correct?

19      A.  Correct.

20      Q.  Did you, in fact, make a presentation to

21  Mr. Ferraz on October 19, 2010?

22      A.  I'm sure I did.  We typically would bring a

Confidential

EIG_KEP_00257486

Page 80

1    little marketing pamphlet, if you will, and show

2    people.

3        Q.  Okay.  Was there anybody -- who was at the

4    meeting you had with Mr. Ferraz, to the extent you

5    remember?

6        A.  Yeah, I'm having -- well, because earlier, I

7    said that I thought it was just me, but I'm talking

8    about here me and a colleague.  But I thought I went

9    by myself to visit Ferraz.

10       Q.  So it was you, potentially an EIG colleague,

11   and Mr. Ferraz in the meeting?

12       A.  Yes.

13       Q.  Was there anybody else there that you

14   remember?

15       A.  No.

16       Q.  Okay.  Did Mr. Ferraz make any sort of

17   presentation to you at that meeting?

18       A.  No.

19       Q.  Did he present a slide show?

20       A.  No.

21       Q.  Did he give you any documents?

22       A.  I don't believe so, no.

Confidential

EIG_KEP_00257487

1          Q.  Is it fair to describe this meeting as a kind

2     of meet and greet or getting to know you type meeting?

3          A.  Yes.  It was definitely an introductory

4     meeting between EIG and Petrobras.

5          Q.  Okay.  And it wasn't focused on any

6     particular transaction; correct?

7          A.  No.  But we -- I'm sure we talked about

8     Project Sondas.

9          Q.  Okay.  Do you recall talking about anything

10    else -- actually, let me ask you this:  Do you

11    specifically remember talking about Project Sondas?

12         A.  Well, I don't remember the details of the

13    meeting, but I was going there to meet him and to

14    learn more about Sondas and see if EIG could

15    participate.

16         Q.  Okay.  Was that the -- were there any other

17    projects or opportunities discussed at that meeting,

18    to your knowledge?

19         A.  I don't believe so.

20         Q.  Okay.

21         A.  Although, I'm sure I would have made a

22    general request that if there's anything we can do for

Confidential                                                   EIG_KEP_00257488

Page 82

1      Petrobras, we would be happy to look at it.

2           Q.  Okay.  And at that point, did EIG already

3      have an investment with the Bolivia Brazil pipeline?

4           A.  I don't think so.  I think that came later.

5           Q.  Okay.

6           A.  I'm sorry I don't remember the time.

7           Q.  That's okay.  It's a decade ago.  If you

8      remembered every detail, it would be remarkable.

9               So -- and you said you discussed Project

10     Sondas with Mr. Ferraz.  Did you discuss specifically

11     Sete Brasil?

12          A.  Well, Sete Brasil was the vehicle through

13     which Sondas was going to be developed.  So yeah, they

14     kind of go hand-in-hand.

15          Q.  Okay.  And you expressed interest to

16     Mr. Ferraz in becoming an investor in Sete Brasil?

17          A.  I'm sure I would have.

18          Q.  And at that point in time, your understanding

19     was that there was a desire -- there wasn't a desire

20     to have international investors in Sete Brasil, I

21     believe is what you said before?

22              MS. LAW:  Objection.  Form.

Confidential                                          EIG_KEP_00257489

1           THE WITNESS:  Yeah.  That did not come from

2      Ferraz, but I was in contact with their financial

3      advisors who were telling me that.

4      BY MR. WOLINSKY:

5           Q.  Okay.  So you were trying to make the case to

6      Ferraz for the inclusion of a U.S. based investment

7      firm or fund in the Sete Brasil project?

8           MS. LAW:  Objection to form.

9           You can answer.

10          THE WITNESS:  Well, I was trying to make the

11     case that EIG would be interested in supporting

12     Petrobras in this undertaking.

13     BY MR. WOLINSKY:

14          Q.  By making an investment in Sete Brasil?

15          A.  Yes.

16          Q.  Okay.  At that point in time, did you have a

17     specific amount that you believed EIG was interested

18     in investing?

19          A.  No.  I'm sure that was premature at that

20     point.

21          Q.  At that point in time, did you have any

22     authorization to invest in Sete Brasil?

Confidential          EIG_KEP_00257490

Page 84

1          A.   Oh, no.   Absolutely not.

2          Q.   At that point in time, did you have enough

3     information about the project in order to make a

4     decision about investing?

5          A.   No.

6          Q.   Okay.   If you look back at Exhibit 3, which

7     is the Complaint.

8          A.   Okay.   What page?

9          Q.   It's Page 16.

10          A.   Paragraph 16 or Page 16?

11          Q.   Page 16.   We just talked about Paragraph 45 a

12     moment ago --

13          A.   Right.

14          Q.   -- which was the October 2010 meeting.   I

15     want to go back to that for a second.

16          A.   I'm on it.

17          Q.   Okay.   So this says, "in October of 2010,

18     employees of EIG met with Ferraz."   Do you see that?

19          A.   Uh-huh.

20          Q.   Is that the meeting that we were just talking

21     about?

22          A.   Yes.   Exactly.

Confidential                                        EIG_KEP_00257491

Page 85

1         Q.  To your knowledge, is it referring to any

2    other meetings with Ferraz?

3              MS. LAW:  Objection.

4              THE WITNESS:  Not -- I don't believe so, no.

5    BY MR. WOLINSKY:

6         Q.  Okay.  And do you remember what colleague was

7    with you at the October 2010 meeting?

8         A.  If it was anybody, it would have been Clay

9    Taylor.

10        Q.  Okay.  And then the next paragraph says,

11   "During March 2011, EIG representatives again met in

12   Brazil with Ferraz, who at the time was a Petrobras

13   employee."  Do you see that?

14        A.  Uh-huh.

15        Q.  Okay.  So did you have any --

16             MR. WOLINSKY:  Let me show you another

17   document.  Hold on.  Too many screens.

18             (Pause in proceedings.)

19             MR. WOLINSKY:  I'm going to show you what

20   I've marked as Exhibit 9.  Let me know when it pops up

21   on your screen.

22             (Deposition Exhibit 9 was marked for

Confidential                                        EIG_KEP_00257492

Page 93

1      A.  Yes.

2      Q.  Do you have any knowledge of whether or not

3   Mr. Ferraz was aware of any unlawful conduct ongoing

4   at Petrobras as of the time you met with him in March

5   2011.

6      A.  I would have no way of knowing that, Robert.

7      Q.  Okay.  And -- okay.  If you look at

8   Paragraph 47 of the Complaint, it says, "On or about

9   September 14, 2011, Lakeshore Financial Partners

10  Participacoes Limitada - acting, upon information and

11  belief, as an agent of and/or financial adviser to

12  Sete and/or Petrobras - transmitted to EIG, again at

13  its law offices in Washington, D.C., yet another

14  confidential information memorandum promoting

15  investment in Sete, dated September 2011 (the

16  'Lakeshore Memorandum')."  Do you see that?

17     A.  Yes.

18     Q.  Okay.  I guess first of all, previously you

19  had said that you weren't aware of Lakeshore ever

20  acting on behalf of Petrobras; correct?

21         MS. LAW:  Objection.

22         You can answer.

Confidential

EIG_KEP_00257500

Page 94

1           THE WITNESS:  That's correct.  I believe that

2      Lakeshore became a client of Sete, the subsidiary of

3      Petrobras.

4      BY MR. WOLINSKY:

5           Q.  Okay.  It's your understanding that Sete is a

6      subsidiary of Petrobras?

7           A.  Yeah.  It has a minority shareholding.

8           Q.  And that's your understanding of what makes a

9      company a subsidiary of another company?

10          A.  It can be.  It doesn't mean it has to be

11     controlling shareholdings, even though it controlled

12     it effectively.

13          Q.  Okay.  So was Sete a subsidiary of EIG?

14          A.  Sete was a -- we had a minority participation

15     in Sete.  We had funds.  So there's not a corporate

16     entity that would have a subsidiary.

17          Q.  Well, so didn't Petrobras -- you understand

18     that Petrobras' relationship to Sete was as a

19     shareholder and a business -- an arm's length -- let

20     me start over.

21          You understand that Petrobras' relationship

22     with Sete was that Petrobras was a shareholder of

Confidential                                          EIG_KEP_00257501

Page 95

1      Sete; correct?

2          A.   That's one of many roles Petrobras played

3      with Sete.  It was entirely conceived, established,

4      run by Petrobras from Day 1.  They appointed senior

5      management.  They were provided the contracts that

6      allowed the company to exist.  So I don't see how we

7      could try and make the point that this is not

8      Petrobras.

9          Q.   Well, you understand that companies observe

10     corporate formalities and have separate legal

11     existence; correct?

12              MS. LAW:  Objection to form.

13              THE WITNESS:  Yes, I understand that.

14     BY MR. WOLINSKY:

15         Q.   Okay.  Is what you just said EIG's position

16     or your own personal views?

17         A.   What I was trying to summarize is the reason

18     we wanted to go into the transaction and that we did

19     go into the transaction were for those reasons, that

20     this had -- this was a AAA credit with the top notch

21     company in Brazil, the largest private investment

22     bank, the largest foreign bank, the most prestigious

Confidential                                                          EIG_KEP_00257502

Page 96

1    pension funds.  This was a club we wanted to enter,

2    but Petrobras ran this show.

3         Q.  When you say, "this is a club we wanted to

4    enter," what "club" are you referring to?

5         A.  That if you're going to do business in

6    Brazil, you could not have a better group of

7    counterparts than the ones that existed in Sete

8    Brasil.

9         Q.  Okay.  Are you familiar, on behalf of EIG, of

10   the ownership structure of Sete Brasil?

11        A.  I mean I knew those numbers off the top of my

12   head a while back.  I remember we owned 6.3 percent.

13        Q.  Okay.

14        A.  I remember BTG Pactual was the largest

15   shareholder.  Petrobras, I think, had 10 percent,

16   et cetera.

17        Q.  So Petrobras was not even the largest

18   shareholder in Sete Brasil; correct?

19        A.  Yes.  Robert, we've already established that,

20   but there's a lot more to it than that.

21        Q.  Okay.  And --

22        A.  If you want to beat down on 10 percent and

Confidential                                    EIG_KEP_00257503

Page 97

1    say they didn't control it, that's your view, and I

2    respect that, but this transaction --

3             MS. LAW:  Let him ask his questions, and you

4    just answer his questions.

5             THE WITNESS:  All right.

6    BY MR. WOLINSKY:

7        Q.  Okay.  And Sete -- and Petrobras actually

8    engaged in a bidding process to award contracts for

9    rigs; correct?

10       A.  That's correct.

11       Q.  And Sete had to bid for the rig contracts

12   from Petrobras just like any other third party would;

13   right?

14            MS. LAW:  Objection.

15            THE WITNESS:  That's right.

16   BY MR. WOLINSKY:

17       Q.  And then Petrobras and Sete negotiated

18   contracts using separate legal teams; right?

19            MS. LAW:  Objection to form.

20            THE WITNESS:  Well, I know who Sete's lawyers

21   were.  I don't recall the other side.

22   BY MR. WOLINSKY:

Confidential                                                EIG_KEP_00257504

Page 98

1          Q.   And when you dealt with Lakeshore, Lakeshore

2     was speaking -- or working on behalf of Sete Brasil.

3     Isn't that right?

4          A.   That's how we viewed them, yes.

5          Q.   Okay.  And are you aware of any agency

6     relationship between Lakeshore and Petrobras?

7               MS. LAW:  Objection to form.

8               Robert, when you say, "agency" --

9               THE WITNESS:  I'm not sure what agency

10    relationship --

11    BY MR. WOLINSKY:

12         Q.   Okay.  So you look at Paragraph 47 in the

13    Complaint, where it says, "On or about September 14,

14    2011, Lakeshore Financial Partners - acting, upon

15    information and belief, as an agent of and/or

16    financial adviser to Sete and/or Petrobras."

17              Do you see that?

18         A.   Uh-huh.

19         Q.   So what I'm asking is when Lakeshore

20    financial partners sent you a document on

21    September 14, 2011, what is your basis for saying they

22    were an agent of Petrobras?

Confidential                                          EIG_KEP_00257505

Page 99

1        A.   Well, that's the discussion we were just

2    having.  You're trying to make a point that Sete

3    wasn't a subsidiary of Petrobras because it only owned

4    10 percent, and we're saying to us, they were

5    together.

6             MS. LAW:  Objection to form.

7    BY MR. WOLINSKY:

8        Q.   Okay.  And so is there any other basis for

9    believing that Lakeshore was an agent of Petrobras

10   besides what you've told me?

11       A.   No.

12       Q.   Okay.  Does EIG believe that Lakeshore was a

13   financial advisor to Petrobras?

14       A.   Not at that time.  They had been earlier when

15   they all worked for Banco Santander.  It's the same

16   people.

17       Q.   You're talking about people.  I'm talking

18   about companies here.  I want to know -- your

19   Paragraph 47 says, "Lakeshore Financial Partners

20   Participacoes" -- I'm sure I'm saying that poorly --

21   "Limitada," and that's the entity I'm asking about.

22            That's the one you refer to, EIG refers to in

Confidential

EIG_KEP_00257506

Page 100

1     its Complaint.  Are you -- is EIG aware of any time

2     when Lakeshore was financial advisor to Petrobras?

3          A.  No.

4              MR. WOLINSKY:  Okay.  Let me get another

5     document for you.

6              (A discussion was held off the record.)

7              (Deposition Exhibit 10 was marked for

8              identification.)

9     BY MR. WOLINSKY:

10         Q.  Okay.  This is an E-mail exchange.  Take your

11    time to look at it.  It's from -- the bottom E-mail is

12    from August 16, 2011.  Do you see that E-mail?

13         A.  Yes.

14         Q.  That's an E-mail written by someone from CIC,

15    China Investment Company --

16         A.  Corporation, yes.

17         Q.  Corporation.  Sorry.  You accompanied them on

18    a trip to Brazil in August of 2011; correct?

19         A.  Correct.

20         Q.  Okay.  What was the purpose of that trip?

21         A.  Well, among the -- in addition to considering

22    us to come in as an investor, the financial advisers

Confidential                                          EIG_KEP_00257507

Page 101

1    and Sete discussed the possibility of maybe having

2    more than one, and could EIG help them with this.  And

3    so not me, but I think Blair reached out to CIC,

4    because they were one of our important clients, you

5    know, on the funding side in China, and they obviously

6    expressed enough interest to at least explore it so

7    that they -- we arranged this trip for them, which I

8    then accompanied these two individuals on.  And it was

9    for the sole purpose of gauging their interest in

10   investing in Sete Brasil.

11        Q.  So you as EIG were facilitating an

12   introduction to CIC to Sete and Lakeshore; is that

13   right?

14        A.  Correct.

15        Q.  And you accompanied them on a trip in August

16   of 2011 to do due diligence, I guess?

17            MS. LAW:  Objection to form.

18            THE WITNESS:  To do their preliminary due

19   diligence, yes.

20   BY MR. WOLINSKY:

21        Q.  Do you remember who you met with during that

22   trip?

Confidential

EIG_KEP_00257508

Page 102

1          A.  Well, we certainly met with Ferraz.  We

2     met -- we visited one of the shipyards.  I want to say

3     it was Keppel Fels, but I'm not 100 percent sure.  We

4     met with one of the other investors, and I think we

5     met with a couple of the other pension fund investors

6     in Sete because they wanted to ask, you know, "What

7     attracts you to this transaction.  So we would listen

8     to what they had to say.

9          Q.  So looking at the E-mails here, they don't

10    identify anyone from Petrobras on them.  Is that

11    because -- well, is that correct?  No Petrobras

12    people -- I don't see any.  Do you?

13         A.  I'm not sure I understand the question,

14    Robert.  This is sort of like internal communications

15    between EIG and CIC and Lakeshore to set up some

16    meetings in Brazil.  Isn't that what this is?

17         Q.  I guess so.  You tell me what it is.

18         A.  That's how I'm reading it.

19         Q.  Okay.  So communications -- so it does

20    include Sete.  So if you look at the bottom E-mail

21    that Mr. Yangyang sent --

22         A.  That's a woman.

Confidential

Page 103

1           Q.  Miss.  Thank you.

2                -- sent she, sent it to Mr. Ferraz at Sete,

3      to Luiz Reis, to Ivan Hong, both at Lakeshore, and

4      then to a number of China investment folks, and then

5      to you and Mr. Thomas; correct?

6           A.  Right.

7           Q.  So that was the core group that was

8      discussing CIC's involvement in the investment in

9      Sete; right?

10               MS. LAW:  Objection.  Form.

11               THE WITNESS:  Right.

12     BY MR. WOLINSKY:

13          Q.  During your meetings -- during your visit to

14     Brazil in August of 2011 with CIC, did you meet with

15     anyone from Petrobras?

16          A.  I don't remember.  We probably would have

17     tried to set up an appointment with somebody at

18     Petrobras, but I don't remember.

19          Q.  Okay.  And I guess it's fair also to say you

20     don't -- if you don't remember whether you did, you

21     don't remember meeting with any specific Petrobras

22     employee during that meeting; correct?

Confidential                                              EIG_KEP_00257510

Page 154

1          A.  Yes.

2          Q.  Okay.  Why were you sending this information

3     to the China Investment Corporation?

4          A.  Well, it goes back to the earlier discussion

5     we had on how Sete was thinking of asking for

6     additional overseas investors, and we were continuing

7     the dialogue that we already started with CIC.

8          Q.  Okay.  And, you know, at least the investment

9     recommendation and some of the Brazilian counsel notes

10    are, you know, internal documents.  Why was EIG

11    willing to share those internal documents with CIC?

12          MS. LAW:  Objection to form.

13    BY MR. WOLINSKY:

14          Q.  To the extent you know, why was EIG willing

15    to share these documents with CIC?

16          MS. LAW:  Same objection.

17          THE WITNESS:  I don't know.  You'd have to

18    ask my superiors at EIG at the time.

19    BY MR. WOLINSKY:

20          Q.  So you sent these documents to CIC at someone

21    else's direction?

22          A.  Yes.  I can say that CIC at that point was --

Confidential                                          EIG_KEP_00257561

Page 155

1    I don't know if it had already happened.  They were

2    investing in EIG.  They were an extremely important

3    client, and we had approached them about an interest

4    in basically co-investing with us.  So we would have

5    been very open with our information with that.

6         Q.  Okay.  And who would have directed you to

7    send this to them?

8         A.  I don't remember getting permission, but --

9              MS. LAW:  Objection to form.

10             THE WITNESS:  I'm sorry.

11             MS. LAW:  I just wanted to make sure the

12   objection was noted on the record.

13             THE WITNESS:  Robert, I don't know the answer

14   to that.

15             MR. WOLINSKY:  Okay.  Fair enough.

16             Okay.  Let me get the next document up.

17             (Deposition Exhibit 21 was marked for

18             identification.)

19             MR. WOLINSKY:  Exhibit 21.

20        Q.  This is the "Energy FUND XIV Investment

21   Recommendation" for 250 million reais of common

22   equity.  It's dated June 27, 2011.

Confidential                                    EIG_KEP_00257562

Page 156

1           Have you seen this document before?

2      A.   Yes.  I had a big part in preparing it.

3      Q.   Would you say that you were the lead person

4   in preparing it?

5      A.   Yes.  I was viewed as the lead within EIG.

6      Q.   Okay.  Can you tell me what the purpose of

7   this document is?

8      A.   The purpose of the document is to bring

9   together the months of due diligence we've done and

10  the thousands of pages of documents we've sifted

11  through and models we've analyzed and try to summarize

12  it into a presentable document that is sent to our

13  investment committee, and they then read it and vote

14  to approve this -- the investment.

15     Q.   So is it fair to think that you read and

16  approved of every word in this before it was

17  finalized?

18     A.   Yes.

19     Q.   And is there a template or a specific set of

20  requirements for investment recommendation to an EIG

21  fund?

22     A.   Yes.  I mean there's some ability to tailor

Confidential

Page 157

1    to specific circumstances, but there are certain

2    information that needs to be included.

3        Q.   Okay.  If you look at Page 15, it starts

4    "Risks and Mitigants."  Do you see that?

5        A.   On 15, yes.  "Risks and Mitigants."

6        Q.   It goes on to 18, 19, 20.

7        A.   Right.

8        Q.   Okay.  Did you draft that?

9            MS. LAW:  Objection to form.

10           MR. WOLINSKY:  What's the objection?

11           MS. LAW:  I don't know, are you talking about

12   the section?  Are you talking about the pages that you

13   just responded to?

14           MR. WOLINSKY:  Yes.  They're the same thing.

15   Risks and mitigants go from Page 15 to 20 with a

16   section and those pages, and I want to know whether

17   this witness drafted those pages, which was a

18   collective section.

19           THE WITNESS:  I believe I did, but I can't

20   tell you I remember writing all of these, but that

21   would have normally been my job.

22   BY MR. WOLINSKY:

Confidential

EIG_KEP_00257564

Page 158

1          Q.  Would you have relied on inputs from anyone

2     else to draft this section?

3               MS. LAW:  Objection to form.

4               THE WITNESS:  Well, only the information

5     memoranda given to us by Santander and Caixa Economica

6     Federal, which had their own discussions on risks and

7     mitigants.

8     BY MR. WOLINSKY:

9          Q.  So would you do your own independent analysis

10    of risks?

11              MS. LAW:  Objection to form.

12              THE WITNESS:  Yes.  We had done that as well,

13    but I'm saying the source of those documents were

14    those info memos.

15              MS. LAW:  Objection.

16    BY MR. WOLINSKY:

17         Q.  And would you also have relied on advice of

18    your own counsel in considering the risks and

19    mitigants?

20              MS. LAW:  Objection to form, and I instruct

21    the witness to the extent he is talking about

22    discussions with counsel, he can say "yes" or "no"

Confidential                                           EIG_KEP_00257565

Page 213

1    investment in Queiroz Galvao, one of their ships.

2         Q.   Okay.  So it was an investment in the Queiroz

3    Galvao ship?

4         A.   Well, Queiroz Galvao, yes, asset, the oil and

5    gas-related asset.

6         Q.   And of course, you're aware that Camargo and

7    Queiroz Galvao and the EAS shipyard were all accused

8    in various ways of misconduct in Operation Lava Jato;

9    correct?

10        A.   Yes.

11        Q.   Do you still view Queiroz Galvao as a highly

12   reputable partner?

13        A.   Of course not.  I don't view any of these

14   counterparties as reputable anymore.

15        Q.   And when you did your investment in Atlantic

16   Star, what due diligence did EIG do on Queiroz Galvao

17   at that time?

18             MS. LAW:  Objection to form.

19             THE WITNESS:  I don't know.

20   BY MR. WOLINSKY:

21        Q.   Do you know if they did any due diligence on

22   Queiroz Galvao?

Confidential                                              EIG_KEP_00257620

Page 214

1        A.   I don't know.   I mean our normal procedure is

2    to do due diligence and prepare investment

3    recommendations.   So there would have been due

4    diligence.   I did not prepare it.

5        Q.   Okay.   Does EIG consider the arrest of 10

6    employees, including 4 executives for an alleged

7    kickback scheme involving millions of dollars, to be a

8    serious issue?

9            MS. LAW:   Objection to form.

10            THE WITNESS:   Yes.

11   BY MR. WOLINSKY:

12       Q.   Okay.   If you look at No. 2, it says,

13   "Demosthenes Marques is [an investment director] at

14   FUNCEF, one of the largest Brazilian pension funds."

15   Do you see where I am?

16       A.   Yep.

17       Q.   "FUNCEF will be one of several investors,

18   including large Brazilian banks and [other

19   institutions], alongside EIG in the Sete transaction.

20   Complinet noted that in 2006, a congressional inquiry

21   asked prosecutors to bring charges against directors

22   from 10 pension funds, including Mr. Marques.   The

Confidential                                              EIG_KEP_00257621

Page 215

1    directors were accused of funneling funds to

2    politicians through private banks.  Complinet did not

3    provide further information regarding the allegations.

4    Independent searches indicated that Mr. Marques has

5    continued serve as a director for several companies

6    from 2006 to the present."  Do you see that?

7        A.  Yes.

8        Q.  Did you do any further diligence with respect

9    to the allegation that Mr. Marques funneled funds to

10   politicians?

11           MS. LAW:  Objection to form.

12           THE WITNESS:  No.

13   BY MR. WOLINSKY:

14       Q.  You are aware that one of the alleged

15   conducts that is involved in Lava Jato is funneling

16   funds to politicians; correct?

17       A.  Yes.

18       Q.  Okay.  So is it fair to say that both of

19   these two items in Mr. Songsanand's E-mail involved

20   conduct that is the same or similar to the conduct

21   involved in Operation Lava Jato?

22           MS. LAW:  Objection to form.

Confidential

Page 216

1              THE WITNESS:  Yes.

2    BY MR. WOLINSKY:

3         Q.   Let's go up to your response on June 23, 2011

4    at 8:10 a.m.  You write back to Mr. Songsanand, and

5    copying Carl Vogel, and you say, "Thanks, Patrick."

6              Do you see that?

7         A.   Yep.

8         Q.   You say, "I think it would be useful to have

9    some guidelines on how broad the checks we run should

10   be."  At that point in time, June 23, 2011, did you

11   have any guidelines at all on how broad the checks you

12   should run should be?

13        A.   No.  I think it was up to the individual

14   investment officer to pick who should be checked,

15   which normally would be, of course, your direct party,

16   Sete in this case.  And here, because the project

17   involved the construction of ships, we would have

18   looked at the underlying shipbuilders.

19        Q.   EAS was being awarded shipbuilding contracts

20   in excess of $4 billion; correct?

21        A.   Correct.

22        Q.   Then you said, "I gave you about thirty names

Confidential                                        EIG_KEP_00257623

Page 217

1      covering just about every entity in the transaction -

2      is that what we're after?"  Is that not something that

3      you knew the answer to yourself as part of your job

4      responsibilities at EIG?

5           A.   Yeah, I didn't, or I wouldn't have been

6      asking it.

7           Q.   Okay.  So whose job responsibility is it to

8      know the answer to that?

9           A.   Well, this is an interactive process with our

10     compliance officer, and she was brought into the

11     picture.  I don't remember the outcome of that

12     discussion, but there would have been a discussion

13     with Carla and we deemed that this, while significant,

14     did not reach the threshold of pulling out of the

15     transaction.  You know, in retrospect, I made the

16     wrong call.

17          Q.   So let me just see here.  The sticker is in

18     the way.  And Patrick Songsanand writes back and says,

19     "This is from Randy previously."  Who is "Randy"?

20          A.   The COO, Randy Wade.

21          Q.   Okay.  Does EIG have a written policy about

22     which parties to check as part of a client's due

Confidential                                          EIG_KEP_00257624

Page 218

1    diligence?

2         A.   I think, as I said earlier, it would be up to

3    me to determine who the proper counterparties are in a

4    transaction you're considering, and then put those

5    folks on a list.  I think it's just a broad

6    categorization saying, you know, who you're going to

7    be working with.  And so for each transaction it would

8    be different because, in this case, you had shipyards,

9    the company itself, and other investors.  So those are

10   the people we checked out.

11        Q.   So in the second top E-mail, Ms. Vogel

12   responds on June 23.  Do you see that?

13        A.   Yes.

14        Q.   And she says, "I reviewed the articles with

15   Patrick last night, and I agree that based on the

16   information in these articles (which are several years

17   old), the fact that no subsequent findings were

18   identified in our searches and the role these subjects

19   have in our investment, the information is of 'low

20   risk'"?

21        A.   Right.

22        Q.   And then she goes on and says, "While we've

Confidential

EIG_KEP_00257625

Page 224

1    confirm we have been getting automatic updates from

2    Complinet on the Sete search since June 2011.  If not,

3    we may need to redo the search given the time lapse.

4    I'll let you know shortly."  Do you see that?

5         A.  Yes.

6         Q.  Okay.  Do you know who Terria is?

7         A.  Oh, this was her assistant.  I remember that.

8         Q.  I see.  Okay.  Is there a reason why

9    Mr. Songsanand was not included on these E-mails that

10   you know of?

11        A.  He might have left the company by then.  I'm

12   not sure.

13        Q.  Okay.  Had you seen any update on the

14   Complinet searches since the June E-mail exchange that

15   we looked at as Exhibit 28?

16        A.  No.

17        Q.  Okay.  Would you expect to receive such

18   updates if they were being run?

19            MS. LAW:  Objection to form.

20            You can answer.

21            THE WITNESS:  Yes.

22   BY MR. WOLINSKY:

Confidential                                                    EIG_KEP_00257631

Page 225

1          Q.   Okay.   I don't see an answer here to

2     Ms. Vogel checking to see whether they had been run.

3     Do you know whether they were?

4          A.   I don't know, Robert.

5               MR. WOLINSKY:   Okay.   Let me go -- let me

6     give you your next exhibit.

7               (Deposition Exhibit 30 was marked for

8               identification.)

9               MS. LAW:   Kevin, we've been going for about

10    an hour.   Do you want to keep going for another 15

11    minutes or so?

12              THE WITNESS:   Yeah.   That's good.

13    BY MR. WOLINSKY:

14         Q.   Okay.   No. 30 is coming.   Okay.   So this is

15    an E-mail chain picking up in January 2012.   If you

16    look at -- if you look at the third page, you write to

17    Mr. Songsanand and say, "Could you please respond on

18    the Complinet question since you ran those checks?

19              "Thanks, Kevin."   Do you see that?

20         A.   Uh-huh.

21         Q.   And Songsanand -- Mr. Songsanand writes back

22    the next day and said, "I haven't redone them but I

Confidential                                          EIG_KEP_00257632

Page 226

1     understand you need new Complinet runs since the

2     previous ones are dated."

3            And you wrote back and said, "I have no idea

4     what's needed; didn't think we needed to do this

5     twice!  Please speak with Carla, ok?"

6            Do you see that?

7     A.   Right.

8     Q.   So at that point in time, it looks like since

9     June 2011, no updates or current monitoring had been

10    done by EIG on compliance issues as it related to Sete

11    Brasil as of January 2012; correct?

12           MS. LAW:  Objection to form.

13           THE WITNESS:  Well, remember, this is in the

14    context of a new system that Carla was implementing.

15    You know, this pre-investment checklist, which is --

16    another way to look at it is like a conditions

17    precedent checklist.  It was just being more organized

18    in checking all the boxes before you disburse funds.

19    So the reason I would have said that is because we

20    weren't sure what was expected on the Complinet front.

21           But to answer your question I don't remember

22    running another Complinet between June and whatever

Confidential                                    EIG_KEP_00257633

Page 227

1    this date is, January.

2    BY MR. WOLINSKY:

3        Q.   And Mr. Songsanand specifically tells you he

4    did not; correct?

5        A.   Correct.

6        Q.   And you tell him that you don't know whether

7    one is required.  Isn't that right?

8        A.   Right.

9        Q.   And then he did run one and says, "a few new

10   items."  Can you discuss with me.  Do you see that?

11   "Are you available to discuss?"  Top of page -- I

12   can't tell what page it is.

13       A.   Hold on.

14       Q.   3, maybe.

15       A.   Okay.  Yeah, I see that.

16       Q.   Okay.  You write back on Friday, January 13,

17   2012 and say, "Funding is on Wednesday?  What sort of

18   issues did you find?"  And that's referring of funding

19   of the loan of Sete; correct?

20       A.   The bridge loan, yes.

21       Q.   Okay.  And that was $100 million?

22       A.   Yes.  That's my recollection.

Confidential

EIG_KEP_00257634

Page 228

```
 1        Q.   Okay.  And he identifies a couple of
 2    additional issues.  Let me make it bigger so I can
 3    read it.  That Queiroz Galvao was being extorted by
 4    drug lords.  That their reps visited Libya to meet
 5    with the Transitional National Council, and then he
 6    listed several people, including Joao Carlos Ferraz is
 7    on the Economic Commission for Latin America.
 8             Do you see that?
 9        A.   Okay.  Yes, I saw that.
10        Q.   Okay.  And then Mr. Songsanand sends an
11    E-mail to Ms. Vogel at the top of Page 2, saying,
12    "Carla,
13             "I discussed the items below with Kevin over
14    the phone."  Do you see that?
15        A.   Yes.
16        Q.   "Queiroz Galvao is no longer integral to the
17    Sete transaction, so we don't believe the Complinet
18    runs for QG need to be included."
19             And then "Regarding the 3 individuals, the
20    first two are false.  The match for Ferraz is probably
21    correct.  The commission he is on appears to be a UH
22    body; therefore we believe is low risk."
```

Confidential                                    EIG_KEP_00257635

Page 316

1                  C E R T I F I C A T E

2         I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15   _____

     Nancy J. Martin, RMR, CSR

16

17   Dated:  October 16, 2020

18

19   (The foregoing certification of this transcript does

20   not apply to any reproduction of the same by any

21   means, unless under the direct control and/or

22   supervision of the certifying shorthand reporter.)

Confidential                                        EIG_KEP_00257723