**KEPPEL OPP'N EXH. 58**



Deposition of:
# Simon Hayden

*October 29, 2020*

In the Matter of:

# EIG v. Petrobras

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Confidential   EIG_KEP_00258738

```
                                                   Page 148
 1   BY MR. WOLINSKY:
 2       Q.   Sorry, I don't want to cut you off.  Did
 3   you have more to say?
 4       A.   No, no.  That's --
 5       Q.   Okay.  As of September 2013, were you
 6   involved in evaluating or assessing EIG's
 7   investment in Sete Brasil?
 8       A.   Yes.  I was still involved.  Yeah.
 9       Q.   Okay.  What was your role at that time in
10   evaluating or assessing EIG's investment in Sete
11   Brasil?
12       A.   I was part of a, I think, a three-person
13   team.  Probably at that stage it was Kevin
14   Corrigan, myself, and Hoshrav Patel.  So I was,
15   you know, involved in reviewing the work that
16   Hoshrav was doing and working with Kevin whenever
17   he needed help on matters related to the project.
18       Q.   Was Mr. Lowder no longer involved in the
19   Sete deal team as of September 2013?
20       A.   I don't think so.
21       Q.   Okay.  Do you know why he was no longer
22   involved?
```

Confidential

EIG_KEP_00258886

1    A.   No.  I don't know why he -- we went
2  through -- I mean, I can't remember the exact
3  dates, but sort of Hoshrav came in at some point.
4  I don't remember why Kevin left and Hoshrav came
5  in.
6    Q.   In September 2013, what would have been
7  the procedures or processes that EIG's Sete deal
8  team would have been using to continue its
9  assessment or evaluation of the investment?
10         MS. LAW:  Objection to form.
11         You can answer.
12         THE WITNESS:  Well, from recollection,
13  Kevin Corrigan I think was in country at that
14  point.  And so he was very much the day-to-day
15  lead on the transaction.  So we would, in London,
16  get downloads from Kevin periodically, and
17  particularly in advance of the quarterly review.
18  If necessary, we'd update the model, the
19  evaluation model with material changes.  And I
20  would sort of be reviewing the outputs and any
21  changes to assumptions in the model.
22

```
                                                   Page 150
 1   BY MR. WOLINSKY:
 2        Q.   When you say reviewing the outputs, you
 3   mean outputs of the model?
 4        A.   Yeah.  And the assumptions --
 5        Q.   Okay.  And the model you're referring
 6   to --
 7             MS. LAW:  I'm not quite sure he finished
 8   his answer.
 9             MR. WOLINSKY:  Yeah, I'm so sorry.  I'm
10   so sorry.
11   BY MR. WOLINSKY:
12        Q.   I didn't intend to cut you off.
13        A.   Yeah.  Reviewing the assumption changes
14   and the outputs.
15        Q.   Okay.  Was the model that you're
16   referring to an internal EIG model?
17        A.   I don't recall the details.  I mean, I
18   think we -- we were getting models from Lakeshore.
19   And then I imagine we were -- we could have been
20   changing assumptions or asking Lakeshore to do it
21   for us.  And then -- I'm sure there was extra
22   analysis that we were running in the model, but I
```

Confidential

EIG_KEP_00258888

1  don't recall really the sort of -- the heritage,
2  let's call it, of the model.
3       Q.  All right.  Do you -- is there a document
4  or a spreadsheet or something like that that was
5  used to do the modeling?
6            MS. LAW:  Objection to form.
7            THE WITNESS:  Well, the -- I don't
8  recall.  I think the model -- the announcements
9  were done in the financial model.  That is
10 obviously the spreadsheet -- or a spreadsheet.  So
11 it was all in -- yeah, I assume.
12 BY MR. WOLINSKY:
13      Q.  Okay.  Let me ask -- actually, going back
14 to Exhibit 15 for one minute -- tell me when you
15 have that open.
16      A.  I'm opening it.
17      Q.  I'm looking at page 2.
18           It indicates that you gave a presentation
19 to the investor meeting on Sete Brasil, correct?
20      A.  That's right.
21           MS. LAW:  Objection to form.
22           You can answer.

Page 152

```
 1            THE WITNESS:  I did.  Yeah.
 2   BY MR. WOLINSKY:
 3        Q.   Okay.  Do you remember giving that
 4   presentation?
 5        A.   Vaguely.  I don't have clear
 6   recollections, really, no.
 7        Q.   Did you have notes that you used to make
 8   that presentation?
 9        A.   I think I did have notes.  Yes.
10        Q.   Okay.  Would you have created PowerPoint
11   slides that you would have used to make the
12   presentation?
13        A.   There was a PowerPoint presentation that
14   I would have worked on with the team that was up
15   on the screen behind me as I was presenting.
16        Q.   Okay.  And what were you -- what was the
17   purpose of making the presentation?  What type of
18   information were you providing to the investor
19   conference about Sete Brasil?
20        A.   The purpose of the presentation was to
21   inform our investors that had invested in Fund XV
22   and XIV how we had invested their money, so giving
```

1  them an overview of Sete Brasil and then
2  explaining why we thought it was an attractive
3  investment.
4      Q.  Okay.  Was the presentation ten minutes?
5          MS. LAW:  Objection to form.
6          THE WITNESS:  I don't recall.
7  Approximately.
8  BY MR. WOLINSKY:
9      Q.  Okay.  If you look at Exhibit 15 it says,
10 actual presentation time, ten.
11         So I was asking -- that's why I'm asking,
12 do you recall whether it was a ten-minute
13 presentation?
14     A.  I don't recall.  I mean, I'm reading the
15 same thing as you.  It seems like it was, from
16 what I'm reading in the exhibit, but I can't
17 recall how long it was.
18         MR. WOLINSKY:  Okay.  Let me find my next
19 exhibit.
20         Okay.  So this is an Excel file.  So I'm
21 getting this message that says it's not actually
22 going to be -- I can introduce it and you'll be

Confidential

EIG_KEP_00258891

Page 302

```
 1        A.   I don't recall.
 2        Q.   Did you do anything in response to this
 3   e-mail when you received it?
 4        A.   I don't recall.
 5        Q.   At this point in time, you'd been
 6   involved with the Sete Brasil investment for about
 7   ten days, right?
 8             MS. LAW:  Objection to form.
 9             THE WITNESS:  Yeah.  We had this
10   discussion before.  About ten days.  I'm not sure.
11             MR. WOLINSKY:  Okay.  Let's take a
12   three-minute break.  I think I'm probably done.
13             MS. LAW:  Okay.  If the Kramer Levin team
14   could go into the breakout room once we're off
15   video.
16             Does the videographer need to take us
17   off?
18             VIDEO TECHNICIAN:  Please stand by.  I'm
19   here.
20             The time is 3:40 p.m.  We're going off
21   the record.
22             (A recess was taken.)
```

Page 303

```
 1          VIDEO TECHNICIAN:  The time is 3:45 p.m.
 2   We're back on the record.
 3          Please proceed, Counsel.
 4   BY MR. WOLINSKY:
 5      Q.  Mr. Hayden, just a few last questions.
 6          The first is, as part of your involvement
 7   in the Sete Brasil investment by EIG, did you
 8   interact at all with Ronnie Hawkins?
 9      A.  I would have done towards the end of my
10   involvement.
11      Q.  Okay.  And what was his role, if any, in
12   the Sete Brasil investment?
13      A.  Well, towards the end of my involvement,
14   he joined as the head of international.  And so
15   Brazil fell under his sort of domain, internal
16   domain.  And so the Sete investment was -- I
17   suppose he became sort of the most senior person
18   overseeing that investment.
19      Q.  Okay.  And so did you ever have any
20   direct communications with him about the
21   investment?
22      A.  I don't recall.
```

Confidential

EIG_KEP_00259041

1    Q.  Okay.  Did you ever meet Pedro Barusco?
2    A.  I don't recall.  I only know him through
3 conversations that -- or maybe it was the
4 complaint I read -- of who he is.  I met people
5 from Sete and have met board members, and I may
6 have met him.  But I don't recall meeting him.
7    Q.  How about Eduardo Musa?
8    A.  I don't know who that is.
9    Q.  Okay.  Have you ever communicated with
10 any government official or politician in Brazil?
11    A.  I mean, the BNDES guys.  You know,
12 government officials, that's all I can think of.
13    Q.  Have you ever communicated with anyone
14 who worked for or on behalf of the Workers Party
15 in Brazil?
16    A.  Not to my knowledge, no.
17    Q.  Okay.  Have you ever communicated with
18 anybody who worked for any of the shipyards who
19 built -- who was contracted to build a ship for
20 Sete, a drillship for Sete.
21    A.  I attended a site visit of the BrasFELS
22 shipyard when we were showing ADIC.  That kind

Confidential                                          EIG_KEP_00259042

1  of -- it's a diligence trip they made to Brazil.
2  So I visited a shipyard, the BrasFELS yard. I
3  think that's the only -- I'm trying to think if
4  there were other investments. I don't recall
5  involvement with shipyards apart from the
6  BrasFELS.
7         Q.  Okay.  Do you remember who you spoke to
8  there?
9         A.  I don't recall.
10        Q.  And when did you first become aware of
11 Operation Car Wash?
12        A.  I don't know.  2015.  I'm not sure when I
13 first learned.
14        Q.  Okay.  And what is your understanding of
15 the issues that are covered by Operation Car Wash?
16            MS. LAW:  Objection to form.
17            You can answer.
18 BY MR. WOLINSKY:
19        Q.  Do you have an understanding of what
20 issues are covered by Operation Car Wash?
21            MS. LAW:  Objection to form.
22            THE WITNESS:  I mean, issues -- I mean,

1  it was a corruption scandal where Petrobras
2  employees and Sete employees were taking bribes, I
3  think, from -- from shipyards for themselves and
4  for the political party in Brazil.
5  BY MR. WOLINSKY:
6         Q.  Do you know anything else about that?
7         A.  No.  That's my basic understanding.
8         Q.  Okay.
9             MR. WOLINSKY:  Okay.  I don't have
10 anything else at this time.
11            MS. LAW:  I have no questions for this
12 witness.
13            MR. WOLINSKY:  Great.  All right.  Take
14 care, everybody.
15            VIDEO TECHNICIAN:  Please stand by.
16            The time is 3:49 p.m., and this concludes
17 today's testimony given by Mr. Simon Hayden.
18 We're now off the record.
19            (Whereupon, at 3:49 p.m., the
20            confidential remote videotaped deposition
21            of SIMON HAYDEN was concluded.)
22

```
 1                 C E R T I F I C A T E
 2            I do hereby certify that the aforesaid
 3   testimony was taken before me, pursuant to
 4   notice, at the time and place indicated; that
 5   said deponent was by me duly sworn to tell the
 6   truth, the whole truth, and nothing but the
 7   truth; that the testimony of said witness was
 8   taken by me in stenotypy and thereafter reduced
 9   to typewriting under my direction; that said
10   statement is a true record of the proceedings;
11   that I am neither counsel for, related to, nor
12   employed by any of the parties to the action in
13   which this statement was taken; and, further,
14   that I am not a relative or employee of any
15   counsel or attorney employed by the parties
16   hereto, nor financially or otherwise interested
17   in the outcome of this action.
18
19
20
21
22                     CHRISTINA S. HOTSKO, RPR, CRR
```