**KEPPEL OPP'N EXH.  69**



# Sete Brasil Participações

## Private Placement

## Confidential *Information Memorandum*

September 2011



**Exhibit
DEF 62**
Wade

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

i

setebrasil

## *Disclaimer*

This material was prepared by Sete Brasil Participações S.A. ("Sete Brasil" or "Company"), with the support from Lakeshore Financial Partners Participações Ltda. ("Lakeshore") and Souza, Cescon, Barrieu Flesh & Advogados ("SCBF"), jointly (the "Advisors").

Lakeshore was retained as the Company's exclusive financial advisor in the Private Placement process with the objective of raising equity for Sete Brasil ("Transaction") and is authorized to disclose this material for potential investors. This material contains summary information with no intention of being complete. We make no statement, explicit or implicit, and do not warrant the adequacy or completeness of such information.

This presentation contains certain forward-looking statements that reflect the current views and/or expectations of the Company and its management regarding future performance or events related to the operation. These projections are subject to risks, uncertainties and future events. Prospective investors are cautioned that several important factors could cause actual results to differ in a relevant way of such plans, objectives, expectations, estimates and intentions expressed in this presentation. In no event shall Company and the Advisors, their respective subsidiaries and affiliates, their respective directors, officers, agents or employees be liable to third parties (including investors) for any investment decisions that will be taken based on the information and statements in this present presentation, or for any damages resulting therefrom.

This presentation does not constitute an offer, invitation or solicitation of an offer to subscribe for or purchase any securities. Moreover, neither this presentation nor its contents are the basis of any contract or commitment of any kind.

The information and statistical data on the relevant market for the operation were obtained in the reports of independent consultants, government agencies and consumer publications. The Company and the Advisors believe in the credibility of these sources of information.

This presentation and its contents are proprietary information of Company and may not be reproduced or circulated, in part or in whole, without the prior written consent of the Company. The terms and conditions contained herein are preliminary and are subject to additions, amendments and corrections.

CONFIDENTIAL

EIG_KEP_00000002

setebrasil

## Contact Information

| Sete Brasil | Phone & E-mail |
|---|---|
| João Carlos Ferraz | +55 21 2528 0080 |
| *CEO* | joao.ferraz@setebr.com |
| Vinicius Dias | +55 21 2528 0080 |
| *Finance and IR Manager* | vinicius.dias@setebr.com |
| Leonardo Eder | +55 21 2528 0080 |
| *Senior Analyst* | leonardo.eder@setebr.com |

| Lakeshore | Phone & E-mail |
|---|---|
| Luiz Reis | +55 11 8151 6309 |
| *Partner* | luiz.reis@lakeshorepartners.com.br |
| Ivan Hong | +55 11 7344 9314 |
| *Partner* | van.hong@lakeshorepartners.com.br |
| Fabio Kono | +55 11 7330 6940 |
| *Partner* | fabio.kono@lakeshorepartners.com.br |

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG_KEP_00000003

setebrasil

## *Table of Contents*

**1    Executive Summary**          **7**

1.1     Sete Brasil Investment Opportunity     7
1.2     Introduction to Pre-Salt     8
1.3     Petrobras' Business Plan and the Pre-Salt     9
1.4     Pre-Salt Drilling Program     9
1.5     ANP Local Content Regulation     10
1.6     Deepwater Drilling Rigs Market     11
1.7     Sete Brasil Overview     12
1.8     Investment Thesis     13
1.9     Sete Brasil's Current Structure     16
1.10    Attractiveness for Interested Parties     17

**2    Sector Overview**          **19**

2.1     World Consumption of Energy     19
2.2     Fuel Production     20
2.3     Deepwater E&P Trends and Offshore Activity in Brazil     21
2.4     Supply and Demand for Deepwater Platforms     23
2.5     Demand by Region and Redeployment Opportunities     25
2.6     Charter Daily Rates Projections     26
2.7     Market Prices and Technological Risks     26
2.8     Evolution of Types of Drilling Rigs     28

**3    Sete Brasil**          **30**

3.1     Introduction     30
3.2     Brief History     30
3.3     Corporate Structure     31
3.4     Growth Strategy in Deepwater Rigs     32
3.5     Growth Strategy in E&P Assets     32
3.5.1   Petrobras' Non-Compete     32
3.6     Subordinated Debt Facility     32
3.7     Shipyards     32
3.8     Revenues and Expenses     33
3.9     Rig Operators     34
3.10    Portfolio Financing     36
3.11    Credit Enhancements Features     37

**4    Petrobras' International Bid For 21 Rigs**          **39**

4.1     Bidding Model     39
4.2     Sete Brasil's Participation     39

**5    Tax Structure**          **40**

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

| | | |
|---|---|---|
| 5.1 | General Structure | 40 |
| 5.2 | Location of Entities | 40 |
| 5.3 | Brazil-Austria Double Taxation Treaty | 41 |
| 5.4 | Brazil-Netherland Tax Treaty | 41 |
| 5.5 | REPETRO Program | 41 |

**6    The Shipbuilding Construction Guarantee Fund    43**

| | | |
|---|---|---|
| 6.1 | Brief History | 43 |
| 6.2 | FGCN Overview | 43 |
| 6.2.1 | Execution of FGCN Guarantees | 46 |

**7    Key Contracts    48**

| | | |
|---|---|---|
| 7.1 | Key Contractual Relations | 48 |
| 7.2 | EPC Contract | 48 |
| 7.3 | Charter Contract | 50 |
| 7.4 | Services Agreement (Operation & Maintenance) | 52 |
| 7.5 | Construction Management Agreement | 55 |

**8    Corporate Governance    56**

| | | |
|---|---|---|
| 8.1 | Sete Brasil Participações S.A. | 56 |
| 8.2 | FIP Sondas | 56 |
| 8.3 | FIP Sondas Investment Committee | 58 |
| 8.4 | Maximum Equity Participation | 58 |
| 8.5 | Sete International | 58 |
| 8.6 | SPVs | 59 |
| 8.7 | Petrobras Interest | 59 |
| 8.8 | Management and Organizational Structure | 60 |
| 8.9 | Management Bios | 60 |
| 8.10 | Board of Directors | 61 |
| 8.11 | Summary of Current Shareholders | 62 |
| 8.12 | IPO Plans | 63 |
| 8.12.1 | Undisbursed Committed Capital | 64 |
| 8.12.2 | Secondary Offering | 64 |

**9    Key Assumptions and Results    65**

| | | |
|---|---|---|
| 9.1 | Introduction | 65 |
| 9.2 | Capital Expenditures | 65 |
| 9.3 | Construction Schedule | 65 |
| 9.4 | Key Dates & Charter Terms | 67 |
| 9.5 | Daily Rates | 67 |
| 9.6 | Uptime | 68 |
| 9.7 | Mobilization Fee | 68 |
| 9.8 | G&A Expenses | 68 |
| 9.9 | FIP Sondas Expenses | 68 |
| 9.10 | Capital Structure and Financing | 68 |
| 9.11 | Financing Terms | 69 |



LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

v

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

| | 9.12 | Sources and Uses | 70 |
| | 9.13 | Charter Contract Renewal | 71 |
| | 9.14 | Senior Debt Refinancing | 72 |
| | 9.15 | Terminal Value | 72 |
| | 9.16 | Tax Assumptions | 73 |
| | 9.17 | ICMS Reimbursement | 73 |
| | 9.18 | Main Macroeconomic Assumptions | 74 |
| **10** | **Capital Structure and Financing Plan** | | **75** |
| | 10.1 | Key Financing Considerations | 75 |
| | 10.2 | Financing Plan | 75 |
| | 10.2.1 | BNDES | 76 |
| | 10.2.2 | ECAs | 78 |
| | 10.2.3 | Commercial Banks – Syndication | 78 |
| | 10.3 | Main Covenants and Obligations | 79 |
| | 10.4 | Guarantees Package | 79 |
| **11** | **Risks and Mitigating Factors** | | **81** |
| | 11.1 | Design and Engineering Risks | 81 |
| | 11.2 | Risk of Cost Overrun | 82 |
| | 11.3 | Risk of Delay | 82 |
| | 11.4 | Performance Risk | 83 |
| | 11.5 | Charter Agreement Renewal Risk | 84 |
| | 11.6 | Termination of the Brazil-Austria Tax Treaty Risk | 84 |
| | 11.7 | Environmental and Social Risk | 84 |
| | 11.8 | Total or Partial Loss During Operation Risk | 85 |
| **12** | **Insurance Package** | | **86** |
| | 12.1 | Third-Party Liability Insurance | 86 |
| | 12.2 | Hull & Machinery | 86 |
| **13** | **The Brazilian Shipbuilding Industry** | | **87** |
| | 13.1 | Brief History | 87 |
| | 13.2 | Current Scenario | 87 |
| | 13.3 | Description of Selected Existing Shipyards | 89 |
| | 13.4 | Description of Selected Greenfield Shipyards | 90 |
| | 13.5 | PROMINP Program | 91 |
| | 13.6 | PROGREDIR Program | 91 |



LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

VI

setebrasil

# 1   EXECUTIVE SUMMARY

## 1.1   Sete Brasil Investment Opportunity

Sete Brasil Participações S.A. ("Sete Brasil" or "Company") is a recently incorporated Company with the purpose of holdin interest in companies or special purpose vehicles for constructing, operating, purchasing, selling or chartering high spec drilling rigs and other Exploration and Production ("E&P") assets, such as, FPSOs[1], oil tankers and supply vessels. Sete Brasil's objective is to lease these assets for companies that are concessionaires and/or assignees of exploration blocks in the Brazilian Pre-Salt area.

The Brazilian Pre-Salt is considered one of the most important oil and gas discoveries in the last 30 years. The potential reserves position Brazil as one of the major players in the oil & gas industry globally. In the last five years, more than 50% of the global discoveries (17.3 billion bbl) were made in deepwater and 62% of these discoveries are located in Brazil.

Sete Brasil begins operations amongst the leaders in the ultra-deepwater sector[2] (by number of charter contracts) and the only player with a strategic alliance with Petrobras. Currently, Sete Brasil has seven long term charter contracts with Petrobras, representing a contractual backlog of over R$ 20 billion (US$ 12 billion).

The first stage's total investment is estimated at US$ 5.7 billion. The seven drillships are identical and will be built by Estaleiro Atlântico Sul ("EAS"), the largest shipyard in Latin American. The drillships are expected to be delivered and start operating in 2015-2019 period.

Sete Brasil recently finalized a very successful first round private placement, raising R$ 1.8 billion in capital commitments. The capital is sufficient to fund the first stage's equity.

Additionally, Sete Brasil is currently participating in an international bid, promoted by Petrobras, for up to 21 ultra-deepwater rigs, also to be built in Brazilian shipyards under long term charter contracts and may seek to raise new equity through a second private placement round.

The investment in Sete Brasil is a unique Pre-Salt opportunity, aligning attractive returns, strong creditworthiness of counterparties in a sector with enormous potential. Moreover, it is an opportunity to participate, in partnership with Petrobras, in the early stages of development of the Brazilian Pre-Salt.

---

[1] Floating Production, Storage and Offloading Platform.

[2] Drilling rigs with drilling capacity of over 7,500 ft.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG_KEP_00000007

setebrasil

## 1.2   Introduction to Pre-Salt

*Pre-Salt is considered one of the most relevant discoveries of the global oil industry in the last 30 years*

The Brazilian Pre-Salt oilfield is considered one of the most relevant discoveries in the global oil industry in the last 30 years. The highly promising reserves are considered the new frontier of development in the world oil industry. The development of the Pre-Salt reserves will establish a new technological paradigm for deepwater[3] hydrocarbon exploration.

The total Pre-Salt area is 149,000 km2 and only ~39% (45,615 km²) was already auctioned through ANP bidding rounds. As of 1Q'2011, 21 Pre-Salt wells were drilled[4].

Merely as a comparison, Bacia de Campos, currently the largest Brazilian oilfield and responsible today for almost 85% of all oil domestic production, has an area of approximately 28.600 km2 and over 630 drilled (and completed) wells.

*Exhibit 1: Brazilian Pre-Salt map*



*Petrobras is the exclusive operator of the blocks granted by the Government in the Pre-Salt area*

Petrobras is the concessionaire (in partnership) and exclusive operator of the blocks granted by the Government in the Pre-Salt area. The exploration of such blocks will demand a significant increase in the capacity for exploratory wells perforation and deepwater production, which opens a window of opportunity without precedent for the development of the sector's infrastructure.

The strategic importance of the development of Pre-Salt oilfields for Petrobras lies not only in the maintenance of the company's high reserve reposition indicators, but also

---

[3] Water depth capacity >10,000 feet.
[4] Source: Petrobras.

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
                          ADVOGADOS

8

setebrasil

as a means to guarantee the company's long term positioning among the world's largest oil producers.

### 1.3   Petrobras' Business Plan and the Pre-Salt

*Petrobras has a US$224.7bn capex program, of which US$53.4bn for the Pre-Salt*

Petrobras' 2011-2015 Business Plan contemplates an investment program of US$ 224.7 billion, out of which, 57% or US$ 127.5 billion are directed at E&P. Pre-Salt exploration and development capex is estimated at US$ 53.4 billion (up 63% from the 2010-2014 Business Plan).

The company's long-term business plan is based on a rapid development of the Oil & Gas ("O&G") wells of the Pre-Salt reserves. Consequently, Petrobras has to successfully implement an aggressive drilling program. Petrobras' management expects to drill more than 1,000 offshore wells (40% exploratory and 60% production).[5]

Petrobras forecasts an increase in the participation of the Pre-salt in the domestic production from 2% in 2011 to ~40% in 2020.

### 1.4   Pre-Salt Drilling Program

*There aren't enough drilling rigs available with the necessary specifications*

The reserve characteristics, wells' depth (over 7,000 meters) and sea's depth (up to 3,000 meters) demand the use of special, state-of-the-art technology drilling rigs. Currently, there aren't enough drilling rigs in the market, with the required specifications, to cover Petrobras' drilling program. Therefore, the Pre-Salt E&P will demand a substantial volume of new equipment.

*Table 1: Drilling Units in Use by Exploration and Production*

|  | Leasing | Petrobras | Total |
|---|---|---|---|
| Onshore | 22 | 12 | 34 |
| Offshore | 44 | 8 | 53 |
|    Jack-up | 1 | 4 | 5 |
|    500 to 1,000 meters | 11 | 2 | 13 |
|    1,001 to 2,000 meters | 19 | 2 | 21 |
|    2,001 to 3,000 meters | 13 | 0 | 13 |

*Source: Petrobras - Form 20-F as of 2010.*

As the exclusive operator of the blocks already conceived, Petrobras will need to charter 40 drilling rigs (drillship or semi-submersible platforms) for the blocks already granted (~39% of the total Pre-Salt area). To meet this initial demand, in 2008 Petrobras conduced a bid to charter the initial set of 12 rigs to be built in foreign shipyards with expected delivery between 2011 and 2012.

---

[5] Source: Petrobras' 2011-2015 Business Plan.

 LAKESHORE   Souza, Cescon, Barrieu & Flesch
ADVOGADOS

9

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

*Table 2: Drilling Rigs Contracted Through International Bidding in 2008*

| Drilling Rig | Operator | Shipyard | Expected Delivery |
|---|---|---|---|
| Amaralina Sta | QGOG | Samsung - South Korea | 2012 |
| Laguna Star | QGOG | Samsung - South Korea | 2012 |
| ODN 1 | OOG | DSME – South Korea | 2011 |
| ODN 2 | OOG | DSME - South Korea | 2011 |
| Norbe VIII | OOG | DSME - South Korea | 2011 |
| Norbe IX | OOG | DSME - South Korea | 2011 |
| TBN I | Schahin | Samsung - South Korea | 2011 |
| TBN II | Schahin | Samsung - South Korea | 2011 |
| Alpha Star | Queiroz Galvão | Keppel Fels - Singapore | 2012 |
| Carolina | Petroserv | DSME - South Korea | 2011 |
| Etesco VIII | Etesco | Samsung - South Korea | 2011 |
| Sevan Brasil | Sevan | Cosco/Qidong - China | 2012 |

Source: E&P - Petrobras.

*28 out of the 40 for the first phase of Pre-Salt drilling program will be built in Brazil*

For the remaining 28 drilling rigs, the Brazilian Government, grantor of blocks, established local minimum content reuquirements and, as a result, they will have to be built in Brazilian shipyards and count on the participation of suppliers of equipment and services based in Brazil. This scenario creates the necessary conditions for the economic development of the naval industry supply chain, enabling specialization, technology transfer and global competitiveness in this sector.

### 1.5    ANP Local Content Regulation

The Brazilian National Petroleum Agency (*ANP or Agência Nacional do Petróleo, Gas Natural e Biocombustíveis*) has promoted the local O&G equipment and services industry since the first bidding round auction for exploration blocks.

*Exhibit 2: Local Content Evolution – ANP Bidding Rounds*



CONFIDENTIAL                                                                                          EIG_KEP_00000010

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

Source: ANP (September 2011).
Note: 8th ANP bidding round auction results are still under discussion.

The concession contracts with the Brazilian Government include minimum local content rules. In the first four auction rounds there was no pre-established minimum local content, however, the proponents had to commit to a minimum percentage (that was used as criteria to determine the winner). Starting in the fifth round, ANP demanded minimum local content for exploration and development.

The average minimum local content in the exploration phase since the fifth bidding round is 77% and 84% in the development phase.

The Brazilian Government's key objectives in local content requirements are:

◆    Increase the local O&G equipment and services industry;

◆    Incentivize the development of local technology; and

◆    Increase direct and indirect employment in the O&G sector.

ANP's local content stimulus has already driven several suppliers in the O&G space to set up facilities in Brazil, such ash, Wellstream and Prysmian (flexible pipes), Weatherford (pumping units), Cameron (valves) Rolls Royce (turbine generators).

In the last four years, two FPSOs were fully built in Brazil. And the backlog of equipment under contruction includes an additional six platforms, eight FPSO hulls (65% local content) and seven ultra-deepwater drilling rigs.

### 1.6    Deepwater Drilling Rigs Market[6]

*Petrobras is clearly the most prominent player in the deepwater and ultra-deepwater segments*

Outlook: Favorable oil prices and increasing investments in E&P favor trend towards more challenging and complex resources, such as the Pre-Salt.

Supply: The supply side of the deepwater rig market is fragmented, with nearly 40 companies involved in managing the fleet. The top five contractors, namely Transocean, Diamond, Noble, Ensco and Seadrill, between them account for only a little more than half the global fleet.

Demand: Latin America, where Brazil represents the bulk of the demand, is expected to present the highest growth rate in demand for deepwater rigs.

Petrobras: Petrobras is by far the most important operator by any measure (Regarding the contracting parties in this market, the oil operators). Petrobras charters (or owns) over a quarter of all deepwater drilling rigs (33 drilling rigs) under contract. Regarding ultra-deepwater drilling rigs[7], Petrobras has 11 contracted drilling rigs, twice as much as the second player.

---

[6] Source: ODS-Petrodata, August 2011.

[7] Drilling rigs with drilling capacity of over 7,500 ft.



LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

11

setebrasil

Local Content: ANP minimum local content rule (and penalties) in the O&G industry creates entry barriers for rigs built in offshore shipyards, making Sete's local new builds more competitive.

Day Rates: Shortages and surpluses are not expected to be very great and therefore the fluctuations in day rates will be relatively limited, on average close to US$500thd/day (2010 values).

Technology: The oil industry is fairly conservative and the offshore drilling sector is no exception. The risk of technical obsolescence for at least the first 25 years of the rigs' lives is regarded as negligible.

Redeployment: Opportunities for the Sete's rigs are also available in other regions, namely Gulf of Mexico, West Africa, Indian Ocean, Australasia and Southeast Asia.

### 1.7   Sete Brasil Overview

*Sete Brasil already has seven charter contracts with Petrobras for ultra-deepwater drilling rigs*

Sete Brasil is a start-up company incorporated to hold interest in other Brazilian or foreign companies, with the purpose of constructing, operating, purchasing, selling, renting or chartering specialized drilling rigs and other assets for exploration and production of oil and gas, for companies that are concessionaires and/or assignees of exploration blocks.

In the first development phase, Sete Brasil chartered seven ultra-deepwater drilling rigs to Petrobras ("First System"). The total investment foreseen for the First System is of approximately US$ 5.7 billion. These state-of-the-art, 6th generation assets will be built in Brazil and operate in the Brazilian Pre-Salt area. The first drilling rig is expected to start operation in 4Q'2015, while the last in 4Q'2019. EAS is responsible for building the first seven rigs under a turnkey, lump-sum, date-certain EPC contract.

*The Company's business plan targets chartering 28 rigs to Petrobras*

The growth strategy of Sete Brasil involves chartering 28 drilling rigs to Petrobras (sole operator of the Brazilian Pre-Salt) through the construction (or purchase), operation and charter of rigs for use in deepwater, with technical specifications similar to those for the First System.

In June 2011, Petrobras invited domestic and international players for the bidding process of 21 new drilling rigs to be built in Brazil. Sete Brasil intends to bid in the full set of 21 Rigs. Regardless of participation in an official bidding process, Sete Brasil may also voluntarily submit offers to charter new Rigs to Petrobras.

Additionally, Sete Brasil may also expand its business into other related activities, such as:

- Offshore drilling operation (and not merely its ownership);
- Charter and operation of oil platforms and FPSOs; and
- Charter and operation of other vessels used in exploration and production by the oil industry.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

12

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

The Sete Brasil project was conceived by Petrobras and the resulting financial structure is off-balance sheet to Petrobras under IFRS guidelines. Sete Brasil and Petrobras have a non-compete agreement for a period of two years, whereby Petrobras agrees not to participate, directly or indirectly, in a similar structure with the purpose of building and chartering Rigs, up to a maximum of 28 rigs, provided that Sete Brasil is able to provide Petrobras the charter of new rigs under commercial terms similar to the proposals for the First System.

By amply promoting the economic development of the naval construction and drilling rigs operation national industry, including all its production chain, the Sete Brasil has strong support from the Brazilian Federal Government, including financial support, through the creation of a guarantor fund destined to mitigate the risk of construction of drilling rigs in the country (*Shipbilding Guarantee Fund*, or "FGCN").

*Strong shareholders base*

Finally, Sete Brasil has one of the strongest shareholders base in Brazil. Currently Petrobras own 9.75% (directly and through FIP Sondas) of Sete Brasil and holds a 15% stake in the SPVs. FIP Sondas currently convenes the largest Brazilian Pension Funds (Previ, FUNCEF, Petros and Valia) and the main Brazilian commercial and investment banks (Bradesco, BTG Pactual and Santander).

### 1.8 Investment Thesis

*Partnership with Petrobras – leader in deepwater exploration and sole operator of Pre-Salt*

Petrobras is the fourth largest energy company in the world[8], by oil production, and the second largest company in the sector by market value. In terms of deepwater oil production, Petrobras is the absolute leader, with a market share of approximately 23%.

Petrobras has 61 drilling rigs today (46 semi-submersible and 15 drillships) in operation or contracted, 11 of which for ultra-deepwater, 5 of which operating in the Pre-Salt[9].

Petrobras' participation is not limited to chartering the rigs. Petrobras also participates in the following manner:

- Manager and inspector of the construction works,
- Shareholder of the Sete Brasil, with a minimum share of 5% and maximum share of 10% of its equity; and
- Operator of two out of the seven drilling rigs comprised in the first system to be allocated to the Project, both of them with a 20-year chartering contract.

---

[8] Source: PFC Energy (January 2010).
[9] Source: ODS-Petrodata, May 2010.

 LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

EIG_KEP_00000013

CONFIDENTIAL INFORMATION MEMORANDUM                    setebrasil

*Long term contracts with high expectance of cash flow*

Sete Brasil's 10-year (five contracts) and 20-year (two contracts) contracts are well above the average of one to three years usually practiced in the industry. For comparison basis, Seadrill's current average charter term is 3.1 years[10] and Diamond Offshore is 2.0 years[11]. Sete Brasil's average charter term is 12.9 years and the first charter renewal occurs only in 2027. The charter contract terms of the 21 rigs in the new bid are 10-year and 15-year.

Sete Brasil' contractual backlog is equivalent to R$ 20 billion (US$ 12 billion).

In all cases, the payment of chartering contracts is directly connected to the operator's performance, measured by the availability of drilling rigs (uptime), which is independent from exploration success results, production level or oil prices. In the event that uptime is superior to 94%, chartering contracts foresee payments of proportional and increasing bonuses, which may reach up to 10% of the daily charter rate.

*Exhibit 3: Sete Brasil - Contracted Period of the Rigs*



Source: Sete Brasil.

*Company with the largest number of UDW Rig Charter Agreements in Brazil*

Sete Brasil starts amongst the largest Brazilian players (larger by number of contracts than QGOG and Schahin) in the deepwater segment. It is a top 10 player if compared to global peers and has the potential to become the second largest behind only Transocean.

---

[10] Source: Seadrill's Fleet Status Report – 2Q'2011. Average for semisubs and drillships.
11 Source: Diamond Offshore's Rig Status Report – As of August 2011. Excludes jack-ups rigs.

 SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

14

setebrasil

*Exhibit 4: Deepwater Fleet Management (number of contracts)*



Source: ODS-Petro data, Petrobras and Sete Brasil.

(1) Sete Brasil has the potential to become one of the largest deepwater players globally with a successful result in Petrobras' international bid

*Industry with enormous growth potential*

As illustrated in Petrobras' 2011-2015 Business Plan the projected demand of new vessels and equipment is significant.

The Company's growth plan also includes other E&P related assets, such as FPSOs and tankers. Sete Brasil is well positioned to capture bottom line accretive opportunities.

*Table 3: Petrobras' Critical Resources Delivery Plan*

| Equipment | Dec'2010 | By 2013 | By 2015 | By 2020 |
|---|---|---|---|---|
| Rigs (2,000m+) | 15 | 39 | 37 | 65 |
| Supply and Special Vessels | 287 | 423 | 479 | 568 |
| Production Platform and FPSOs | 44 | 54 | 61 | 94 |

Source: Petrobras – 2011-2015 Business Plan.

Note: Accumulated values.

*The Pre-salt is the largest UDW market worldwide*

In the last five years, more than 50% of the global discoveries (17.3 billion bbl) were made in deepwater and 62% of these discoveries are located in Brazil[12].

---

[12] Source: Petrobras. 2005-2010 period.

 SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

15

setebrasil

*Exhibit 5: Global Oil and Gas Reserves (billion boe)*



Source: BP Statistical Review of World Energy (2010) and Wall Street Research.

| | |
|---|---|
| *State-of-the-art drilling rigs with high market value after 20 years* | According to ODS-Petrodata projections[13], demand for ultra-deepwater drilling rigs is expected to remain strong in the future. ODS-Petrodata estimates that in 2025-2030 period, drilling rigs similar to those to be built in Brazil are expected to reach a market value between US$ 425 million (low case) and US$ 800 million (high case), an average of US$ 612 million[14]. Additionally, the risk of technological obsolescence during the first 25 years the rigs' lives is regarded as negligible. The average age of the global feet is currently 22 years (and 30 years for midwater fleet)[15]. |
| *Experienced Management* | The CEO, Mr. João Carlos Ferraz, was chosen among the directors of the Company and was appointed as such by Petrobras and selected by the shareholders. The COO, Mr. Pedro Barusco, were appointed by Petrobras and approved by the shareholders. |
| | They accumulate over 63 years in the O&G sector and are former senior executives at Petrobras. Mr. Ferraz was a General Manager at the Finance Department and was responsible, among other initiatives, for the feasibility of the Sete Brasil project. Mr. Barusco was an Executive Manager at the Engineering Department, where he was responsible for the construction of several oil production platforms, refineries, oil and gas pipelines and LNG terminals. |

### 1.9    Sete Brasil's Current Structure

Sete Brasil is a holding company located in Brazil. Sete Brasil has a wholly-owned subsidiary named Sete International GmbH ("Sete International"), located in Vienna, Austria. Sete International, in turn, has as its sole purpose to hold ownership in special purpose companies located in the Netherlands, each SPV owning one rig.

---

[13] ODS-Petrodata is an international consulting company, specialized in the production of consolidated reports aimed at the offshore oil industry. The estimates related to this Note comprise data known up to August 2011.
[14] Source: ODS-Petrodata. 2011 values.
[15] Source: ODS-Petrodata.

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

16

*Exhibit 6: Ownership Structure*



Source: Sete Brasil.

The SPVs have two types of shares (Class A and Class B), with equal voting and economic rights, but with differences in the nature and qualification of their owners. For the first seven rigs, the Class A shareholder is Sete International with an 85% stake in of each one of the SPVs. The Class B shareholder will have a 15% stake and shall be a company specialized and responsible exclusively for the operation of each rig, through a Services Agreement.

FIP Sondas is the investment vehicle created for the current and new shareholders.

### 1.10   Attractiveness for Interested Parties

Investors
- Decrease in the nominal interest rates in Brazil in the last few years motivates local institutional investors to seek alternative investments
- For international investors looking at the Brazilian infrastructure sector, Sete Brasil is an opportunity to invest in a project with US$ cash flow and asset value
- Sete Brasil is not a project, but a long-term "going-concern" investment company
- Explore "new frontiers" in partnership with Petrobras
- Opportunity to participate in projects with attractive return potential
- Significant long term upside opportunities

Operators
- Establishment and growth of the oil services industry in Brazil
- Potential increase in its market share, with smaller investments
- Higher *all-in* IRRs in relation to similar projects
- Interest for the activity / business already demonstrated (business risks have already been accepted by market players)

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG_KEP_00000017

CONFIDENTIAL INFORMATION MEMORANDUM                    setebrasil

       ◆    Limitation in the capacity to develop a large number of projects simultaneously (especially national operators)
       ◆    Unique opportunity to participate in multiple projects
       ◆    Facilitate the entry of national operators with good experience and accountability

*Federal Government*

       ◆    Unique opportunity to establish a new, modern and competitive structuring industry in Brazil, without the need to perform direct investments
       ◆    Directly and actively assist the development of the Brazilian Pre-Salt, modernizing and preparing the whole Brazilian production chain to serve the country's naval industry, enabling it to successfully take orders for decades ahead, without the need of any subsidy or government resources
       ◆    Creation of new direct and indirect employment, especially at the shipyards
       ◆    Create investment and reinvestment opportunities in the country as a way to apply the resources to be generated from the Pre-Salt, decreasing risks of the *Dutch disease* (gap between great export surpluses and structuring internal economic growth)

*Petrobras*

       ◆    Have at its disposal, through long term contracts, the required drilling rigs for the implementation of the Pre-Salt drilling program, in accordance with the required technical specifications, complying with the Brazilian content index demanded by the Brazilian Government and with competitive prices daily rates
       ◆    Preserve the active participation in the deepwater drilling operation with the traditional operators
       ◆    Avoid Sete Brasil's assets and liabilities to be consolidated in the Petrobras' balance sheet

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
              ADVOGADOS

CONFIDENTIAL                    EIG_KEP_00000018

## 2   SECTOR OVERVIEW

### 2.1   World Consumption of Energy

According to the International Energy Outlook 2009 ("IEO2009") projections, world energy consumption is expected to grow about 44% in the 2006-2030 period.

This increase should be driven mainly by countries outside of the "Organization for Economic Cooperation and Development" ("OECD"). Emerging markets and non-OECD countries should generate growth of 73% in the 2006-2030 period, against 15% in the same period of OECD member countries.

*Exhibit 7: World Energy Consumption*



Source: IEO2009.

CONFIDENTIAL                                                      EIG_KEP_00000019

setebrasil

## 2.2   Fuel Production

In response to the increase in energy demand, IEO2009 projections indicate an increase in production of every type of fuel, with a highlight to fossil fuels (oil, natural gas and coal derived products) that shall continue to provide the majority of energy consumed in the world. Within this group, liquid fuels present a more relevant participation.

*Exhibit 8: Main Sources of Energy*



*Source: IEO 2009.*

The increment of 22 million boe per day in the production of liquid fuels in the period of 2006 to 2030 should come from OPEC member countries (with a total production estimated in 44 million boe per day in 2030), as well as non-OPEC member countries (with a production of 63 million boe per day).

In the period under analysis, non-OPEC members should contribute the highest increase in traditional (and non-traditional) liquid fuels production, such as Brazil.

*Exhibit 9: Conventional Liquid Fuels Production – Non-OPEP Countries*



*Source: IEO2009.*

 LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

20

**EIG_KEP_00000020**

CONFIDENTIAL INFORMATION MEMORANDUM                    setebrasil

It is worth noting that the increases in production are based on volumes produced in 2008. Therefore, the effective growth in liquid fuels production must take into consideration the natural decline rate in the production of existing fields.

In this scenario, production in existing fields is estimated to fall until 2030 to a third of the volume produced in 2008, creating a critical demand for new discoveries capable of covering a potential production deficit of about 60 million boe in 2030.

*Exhibit 10: Liquid Fuels Production by sources in 2030*



*Source: IEO2009.*

## 2.3    Deepwater E&P Trends and Offshore Activity in Brazil

Within this context, the exploration and development of hydrocarbon reserves, especially in non-OPEP countries, located in the sedimentary basins of the oceanic coasts of Brazil, the Gulf of Mexico and Africa (known as the "Golden Triangle"), become important.

Recently, special attention has been given to the exploration of potential reserves in the basins located in deepwater and ultra-deepwater. Few companies have the necessary know-how, Petrobras is clearly an exception.

Petrobras has been pioneer in the development of offshore activities in deepwater and was responsible for the discovery and development of the majority of hydrocarbon reserves in the Brazilian coast. Such discoveries have allowed that, through time, Brazil went from oil importer to oil exporter.

CONFIDENTIAL                                                            EIG_KEP_00000021

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

*Exhibit 11: Discovery per year – Offshore Brazil*



*Source: ODSP Discoveries database.*

The reduction in the number of discoveries of new reserves is mainly due to Petrobras' successful effort to place the already identified oilfields into production. However, the main discoveries in the last years have been in deepwater or ultra-deepwater.

*Exhibit 12: Discoveries per year – Brazil, Offshore*



*Source: ODSP Discoveries database.*

A good example of offshore discoveries in Brazil is the gigantic oilfield Tupi, the development of which is expected to last over a decade. Petrobras planned a long test starting in 2009 and, after that, the operator estimates six to ten completed phases, with a minimum of ten wells each, in order to fully take advantage of the Pre-Salt formation. The recoverable reserves are estimated between five and eight billion oil barrels. In terms of comparison, the largest oilfield in the North Sea had one billion recoverable barrels and Thunderhorse, the largest oilfield in the North-American portion of the Gulf of Mexico, also had with one billion barrels.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

22

EIG_KEP_00000022

setebrasil

### 2.4   Supply and Demand for Deepwater Platforms

In 1990 the deepwater drilling rigs segment represented only a small portion of the world fleet (only 20 rigs). During the 90s new deepwater drilling rigs were constructed and existing equipment were upgraded. In 2002, deepwater drilling rigs amounted to more than 80. Starting in 2007, a new wave of 6th generation drilling rigs emerged from shipyards. Currently, there are more than 160 drilling rigs in operation and 70 in construction (or in order), excluding the 21 rigs from Petrobras under a tender process.

Despite the rapid demand growth, utilization has been high during the last decade, and in the last five years always above 90%.

The supply side of the deepwater market is reasonably fragmented, with a total of 32 companies involved in the ownership and management of the fleet. Transocean holds approximately 20% of the market, and the 5 top owners (Transocean, Diamond, Noble, Pride and Seadrill) hold just a little over half of such fleet.

In addition, other operators returned to the market (Vantage, Pacific, Rowan Companies and Aker Drilling[16]), and new companies entered the market for the first time (Sete Brasil and PetroSaudi).

*Exhibit 13: Deepwater Fleet (including equipment under construction)*



*Source: ODS-Petrodata.*

Regarding the operators (oil and gas companies), Petrobras is by far the most important. The company currently responds for 40 of the 141 contracted drilling rigs (including the ones under construction). In the ultra-deepwater drilling rigs market, Petrobras is even more dominant, with 17 contracted rigs, more than double the the second ranked player (BP and Total, with 7 each).

---

[16] Recently acquired by Transocean.

 Souza, Cescon, Barrieu & Flesch
ADVOCADOS

23

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

*Exhibit 14: World Fleet of Deepwater Drilling Rigs – By Operator*



*Source: ODS-Petrodata.*

*Exhibit 15: World Fleet of Ultra-deepwater Drilling Rigs – By Operator*



*Source: ODS-Petrodata.*

The chart below illustrated the estimated long term supply and demand for deepwater rigs under three oil price scenarios (high, mid and low case). It is worth noting that, according to ODS-Petrodata projections, the number of deepwater drilling rigs almost doubles in the next 15 years. Additionally, ODS-Petrodata projects mid-case demand and supply curves are close to each other, reflecting an environment where new orders to shipyards are based on existing charter contracts (rig building takes place when needed and few assets are built for speculation purposes).

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

24

CONFIDENTIAL INFORMATION MEMORANDUM

*Exhibit 16: Deepwater Platforms Market Balance*



*Source: ODS-Petrodata, August 2011.*

**2.5    Demand by Region and Redeployment Opportunities**

Latin America, where Brazil represents the bulk of the demand, is expected to present the highest growth rate – driven by Petrobras and the Pre-Salt development.

Sete Brasil's drilling rigs (First System) are 6th generation design equipment, therefore they are appropriate for the vast majority of deepwater and ultra-deepwater exploration areas. In a remote scenario where Petrobras does not renew all the charter contracts, many redeployment opportunities exist, such as the Golden Triangle, or the Gulf of Mexico, Brazil and West Africa, as well as other areas under development (Indian Ocean, Australasia and Southeast Asia).

The following chart shows the demand by region for deepwater rigs.

*Exhibit 17: Deepwater Rig Demand by Region (mid case)*



*Source: ODS-Petrodata, August 2011.*

CONFIDENTIAL

EIG_KEP_00000025

### 2.6    Charter Daily Rates Projections

The following exhibit presents the projected daily rates until 2025 for deepwater rigs. As may be observed, price cycles capture periods where supply and demand will not be exactly balanced. However, such unbalances are expected to be minor and the volatility of daily rates to be limited.

*Exhibit 18: Historical and Projected Daily Rates for Deepwater Rigs*



*Source: ODS-Petrodata, August 2011.*

The underlying future oil prices used for the daily rates projections are based on NYMEX futures oil prices, as illustrated below.

*Exhibit 19: Oil Prices (2010 values)*



*Source: ODS-Petrodata and NYMEX.*

### 2.7    Market Prices and Technological Risks

The oil industry is typically conservative and the deepwater exploration industry is no exception. The main equipment (jack-ups, drillships and semi-submersibles) has

setebrasil

been developed in the 50s and 60s. Additionally, the drilling rigs have been demonstrating impressive longevity, with many drilling rigs operating for longer than 30 years with excellent availability levels.

The average age of the global fleet is superior to 22 years (and 30 years for the midwater fleet).

According to ODS-Petrodata, "The risk of technical obsolescence for at least the first 25 years of the rigs' lives is therefore regarded as negligible, although some upgrading and/or replacement of the drilling equipment will almost certainly be needed during this time…".

*Exhibit 20: Average Age of Offshore Rig Types (years)*



*Source: ODS-Petrodata, August 2011.*

The exhibit below presents future market value projections by ODS-Petrodata. In 2030, Sete Brasil's fleet (First System) will be only 13 years of age, probably less than half their economical useful lives, therefore presenting a significant secondary market value.

*Exhibit 21: Future Values Estimate of Deepwater Rigs*

| Rig Values - USD Million (2011 dollars) | | |
| --- | --- | --- |
| | Semisubmersibles | Drillships |
| 2015 | USD 550 to USD 650 | USD 550 to USD 650 |
| 2020 | USD 525 to USD 700 | USD 525 to USD 725 |
| 2025 | USD 475 to USD 750 | USD 475 to USD 775 |
| 2030 | USD 425 to USD 775 | USD 425 to USD 800 |

*Source: ODS-Petrodata, August 2011.*

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

27

EIG_KEP_00000027

setebrasil

## 2.8   Evolution of Types of Drilling Rigs

The exhibit below presents the evolution of the types of drilling rigs, from conventional onshore drilling rigs to latest generation semi-submersibles and drillships.

*Exhibit 22: Evolution of Types of Drilling Rigs*



*Source: Petrobras.*

*Table 4: Summary of the Project Phases*

| Type | Brief Description |
| --- | --- |
| Fixed Platforms | These were the first units used. They have been the preferred type for oilfield located in water depth of up to 300 meters. Normally, the fixed platforms are built of modular steel structures, installed in the operation location and fixed by stakes thrust into the bottom of the sea. Fixed platforms are projected to comprise all the perforation equipment, storage of materials, staff lodging, as well as all installations necessary for the production of wells. |
| Jack-up | They are constituted, basically, of a ferry equipped with a support structure, or legs that, when activated mechanically or hydraulically, move down until they reach the bottom of the sea. Then, the platform elevates above the water level, to a safe height beyond the reach of waves. Such platforms are movable, and are transported by tugboats or by their own propulsion. They are used in the perforation of exploratory wells within the continental platform, in water lamina between 5 and 130 meters. |
| Semi-Submersible Platforms | They are composed of a one or more decks structure, supported by columns in submerged floats. A floating unit suffers movement due to the action of waves, currents and winds, possibly damaging the equipment to be lowered into the well. It is necessary therefore that it stays positioned on the surface of the sea, within a circle with a tolerance radius dictated by the subsurface equipment, such operation to be performed in water lamina. Two types of system are responsible for the positioning of the floating unit: the anchorage system and the dynamic positioning system.

The anchorage system is constituted by 8 to 12 anchors and cables and/or chains that act as springs producing efforts capable of restoring the position of the floating unit when it is altered by the action of waves, currents or winds.

In the dynamic positioning system, there is no physical connection between the platform and the bottom of the sea, except for the perforation equipment. Acoustic sensors determine the drift, and computer-activated propellers in the cask restore the position of the platform. |

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG_KEP_00000028



| Type | Brief Description |
|------|------------------|
| | Semi-submersible platforms may or may not have their own propulsion. However they present great mobility and are the preferred platforms for perforation of exploratory wells. |
| Drillship | A drillship is a ship projected for the perforation of undersea wells. Its perforation tower is located at the center of the ship, where an opening in the hull allows the passage of the perforation column. The positioning system of the drillship, composed by acoustic sensors, propellers and computers, annuls the effects of wind, waves and currents that tend to shift the ship from its position. |

*Source: Petrobras and Sete Brasil.*

CONFIDENTIAL

EIG_KEP_00000029

setebrasil

# 3   SETE BRASIL

## 3.1   Introduction

Sete Brasil is a corporation incorporated to hold interest as a shareholder, partner, or quota holder, in companies or special purpose vehicles ("SPVs") with the purpose of constructing, operating, purchasing, selling or chartering specialized drilling rigs and other assets for exploration and production of oil and gas, such as, FPSOs, oil tankers and supply and special vessels.

Sete Brasil's objective is to lease these assets for companies that are concessionaires and/or assignees of exploration blocks for the Brazilian Pre-Salt area.

Currently, Sete Brasil has seven Charter Contracts with Petrobras for ultra-deepwater drillships. The first stage's total investment is estimated at US$ 5.7 billion. The drillships will be built by Estaleiro Atlântico Sul, the largest shipyard in Latin American, and are expected to be delivered in 2015-2019 period.

Additionally, Sete Brasil is currently participating in an international bid, promoted by Petrobras, for up to 21 ultra-deepwater rigs, also to be built in Brazilian shipyards under long term Charter Contracts.

## 3.2   Brief History

The Company was incorporated in December 2010. Petrobras' objective was to create an off-balance sheet vehicle to support the Pre-Salt drilling program and contract lease rates at market prices, despite the local content requirements.

In parallel, Petrobras conducted a bidding process for the construction of drilling rigs in Brazil based on the lowest construction cost. A key contractual obligation for the shipyards was a minimum local content (ranging from 55% to 65%), which meant the rigs had to build in Brazilian shipyards. The technical and commercial proposals of shipyards were delivered to Petrobras in May 2010 and in November 2010, EAS was announced the winner with the lowest proposal for the construction of a lot of seven drilling rigs: US$ 4,650 billion for seven drilling rigs or US$ 664.2 million per drilling rig[17].

In August 2010, FIP Sondas was constituted and in December 2010 became a shareholder of the Company along with Petrobras. The first private placement round was finalized in May 2011 and R$ 1.8 billion was raised with local pension funds and commercial and investment banks.

---

[17] Petrobras negotiated the price down to US$662 million per rig.


LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

30

setebrasil

The Engineering, Procurement and Construction Contract ("EPC Contract") was signed with Sete International and the SPVs on June 15, 2011. The Charter and Service Agreements were signed in the same date.

Sete Brasil is headquartered in Rio de Janeiro (Rua Humaitá, 275, 13º floor, Humaitá, Rio de Janeiro, RJ).

### 3.3    Corporate Structure

Sete Brasil Participações S/A is a holding company located in Brazil. Sete Brasil has a wholly-owned subsidiary named Sete International, located Austria.

Sete International, in turn, has as its sole purpose to hold ownership in special purpose companies located in the Netherlands, each SPV owning one rig.

*Exhibit 23: Ownership Structure*



*Source: Sete Brasil.*

The SPVs have two types of shares (Class A and Class B), with equal voting and economic rights, but with differences in the nature and qualification of their owners. For the first seven rigs, the Class A shareholder is Sete International with an 85% stake in of each SPVs. The Class B shareholders have a 15% stake and shall be a company specialized and responsible exclusively for the operation of each rig, through a Services Agreement.

Initially, Petrobras through Petrobras Netherlands B.V. ("PNBV"), is the only Class B shareholder for all SPVs. However, according to criteria and conditions described in the Shareholders Agreements of the SPVs, such ownership interest may be transferred to other companies specialized in drilling operations, which shall have the same rights and obligations as Petrobras, directly or indirectly, as Class B shareholder of the SPV.

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

setebrasil

### 3.4 Growth Strategy in Deepwater Rigs

*Sete Brasil plan to continue growing in the deepwater rig sector and plans to reach up to 28 charter contracts in the short term*

The growth strategy of Sete Brasil involves the construction, operation and charter of rigs for use in deepwater, with technical specifications similar to those for the first system, or the purchase of similar assets already built or under construction.

Sete Brasil's initial growth phase is focused on Petrobras' international bid for an additional 21 rigs. The Company intends to bid on all 21 Charter Agreements. The Company's management is authorized by the shareholders to participate in the auction.

However, regardless of participating in an official bidding process, Sete Brasil may voluntarily submit offers to charter new rigs to Petrobras.

### 3.5 Growth Strategy in E&P Assets

*The Company also plans to expand into new businesses in the medium term*

In a second stage, Sete Brasil will also look to expand its business activities with a focus on:

- Rig operation (and not merely its ownership);
- Charter and operation of oil platforms and FPSOs; and
- Charter and operation of other vessels used in exploration and production by the oil industry.

In order to enter into new lines of business, 65% shareholder approval is required.

#### 3.5.1 Petrobras' Non-Compete

*2-year non-compete agreement with Petrobras*

For a period of two years Petrobras agrees not to participate, directly or indirectly in a financial structure similar to Sete Brasil with the purpose of building and chartering rigs provided that Sete Brasil is able to provide Petrobras the charter of new rigs under commercial terms similar to the proposals for the First System.

The non-compete arrangement ends if Sete Brasil decides not to offer the new rigs to Petrobras, or even if, unreasonably, it wishes to submit different terms than those used for the First System.

The commitment described above shall cease to exist if during the period of two years, Sete Brasil signs 28 Charter Agreements.

### 3.6 Subordinated Debt Facility

In order to take advantage of the tax advantages of the Double Tax Treaty Brazil-Austria, Sete Brasil is analyzing a subordinated debt facility (respecting the senior ranking of the BNDES, ECAs and Commercial Banks facilities).

### 3.7 Shipyards

EAS shall be the shipyard for the First System. EAS is located in the Industrial Port Complex of Suape, State of Pernambuco.

LAKESHORE   Souza, Cescon, Barrieu & Flesch
ADVOGADOS

CONFIDENTIAL

setebrasil

The shipyards for the additional 21 rigs have not been determined. A description of the shipbuilding industry and the potential shipyards can be found in chapter 13.

### 3.8   Revenues and Expenses

*Revenues*   The SPVs have one source of revenue, the Charter Contract. The revenues shall service the debt (senior and subordinated), cover operational and administrative expenses and remunerate shareholders with a dividends flow.

The table below illustrates the revenue build-up for one SPV.

*Table 5: Annual Revenue Build-up*

|  | Assumption | Commentary |
|---|---|---|
| (a) Daily Rate | US$ 331,000 | Charter Agreeement (Article 5) |
| (b) Number of Days | 365 | One year |
| (c) Uptime | 95.0% | Assumption for first year of operation |
| (d) Performance Bonus | 2.5% | Charter Agreeement (Apendix 2a) |
| (e) Annual Charter Revenue | US$117mm | (a)*(b) *(c)*(d) |
| (f) Mobilization Fee | US$30mm | One-time payment in first month of operaration |
| **(g) Total Revenue** | **US$147mm** | 2010 values |

*Source: Sete Brasil and Lakeshore.*

The charter daily rate also includes US$35,000/day to pay insurance policies expenses and spare parts.

Sete Brasil's seven long term charter contracts represent a contractual backlog of in excess of R$ 20 billion (US$ 12 billion).

*Table 6: Contract Backlog (2011 values)*

| SPV | R$ billions | US$ billions |
|---|---|---|
| SPV #1 | R$ 4,51 | $2,70 |
| SPV #2 | 4,51 | 2,70 |
| SPV #3 | 2,29 | 1,38 |
| SPV #4 | 2,29 | 1,38 |
| SPV #5 | 2,29 | 1,38 |
| SPV #6 | 2,29 | 1,38 |
| SPV #7 | 2,29 | 1,38 |
| **Total** | R$ 20,49 | $12,29 |

*Source: Charter Agreements (Clause 5.1).*

*O&M Expenses*   The operator will receive a service daily rate (through a Service Contract with Petrobras, directly connected to the Charter Contract of the same drilling rig) and assume the operation of the drilling rig as its main responsibility. The operators are



setebrasil

responsible for the maintenance (spare parts) and insurance, however, as mentioned above, this portion of the service daily rate is paid directly to the SPVs under the Charter Agreement, thus the payment of maintenance expenses will be performed directly by the SPVs.

### 3.9    Rig Operators

*Sete Brasil's strategy involves partnerships with world-class operators*

As mentioned previously, Sete Brasil starts-up as an owner of E&P assets and not as an operator of deepwater rigs or other assets.

While the Class A shareholder (Sete International) will be the same for the entire system, each SPV shall have only one Class B shareholder.

For the First System, Petrobras is, initially, the only Class B shareholder for all SPVs. Petrobras shall remain as Class B shareholder, and operator, in two SPVs (rigs 1 and 2 – with 20-year Charter and Service Contracts).

Later, for the remaining five SPVs, specialized operators will be selected by Petrobras from a Short List. Petrobras will sell the Class B shares together with the assignment of the Services Agreement. Provided that the operator (buyer of Class B shares) is included in the list of pre-selected companies previously approved, the sale shall not need any approval by the other shareholders.

The table below presents a brief overview of the operators included in the Short List and the potential partners for Sete Brasil in the bid for 21 rigs:

*Table 7: Operators Overview (Short List)*

|  | Overview | Rig Fleet | Financial Highlights |
| --- | --- | --- | --- |
| Atwood Oceanics | Atwood Oceanics is engaged in the international offshore drilling and completion of exploratory and developmental oil and gas wells. Its operations include nine offshore mobile drilling units located in five regions: Southeast Asia, Africa, Australia, South America and the Mediterranean Sea | Total: 15 Deepwater: 3 | 2010 Revenues: US$651bn Market Cap: US$2.6bn |
| Odebrecht Oil & Gas | Offshore drilling arm of the Odebrecht Group. OOG offers services to the oil and gas industry, ranging from the design of project engineering and management to the operation of drilling, production and support units. | Total: 7 Deepwater: 7 | N.A. |
| Brasdril (Diamond) | Diamond Offshore is a global offshore oil and gas drilling contractor. The company provides offshore drilling services to a customer base that includes independent oil and gas companies and government-owned oil companies. It offers a range of services worldwide in various markets, including the deepwater, harsh environment, conventional semisubmersible and jack-up markets | Total: 46 Deepwater: 8 | 2010 Revenues: US$3.3bn Market Cap: US$8.5bn |
| Dolphin Drilling | Dolphin Drilling is Norwegian company and one of the oldest independent drilling offshore in the area. Dolphin Drilling's fleet include one ultra-deepwater DP drillship, one deepwater moored semi, three conventional water depth semis and one accommodation semi. Part of the Fred Olsen Energy Group | Total: 5 Deepwater: 2 | N.A. |
| Ensco International | Ensco is a global offshore contract drilling company. Operates in Asia Pacific, Europe and Africa and North and South | Total: 74 Deepwater: 21 | 2010 Revenues: US$1.7bn |

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

34

setebrasil

| | Overview | Rig Fleet | Financial Highlights |
|---|---|---|---|
| | America. The company is engaged in the drilling of offshore oil and gas wells by providing its drilling rigs and crews under contracts with major international, government-owned and independent oil and gas companies | | Market Cap: US$10.8bn |
| Etesco | Founded in 1956, participates in projects in the oil and gas sector. Operates, in conjunction with Petrobras, 2 production and storage units. Currently, Etesco operates 2 drillships | Total: 3 Deepwater: 1 | N.A. |
| Maersk Drilling | Maersk is part of the conglomerate AP Moller-Maersk group with experience of almost 50 years. Currently it operates in the North Sea, Algeria, Angola, Gulf of Mexico, Turkmenistan, Morocco, Brazil, Colombia and Suriname with 3500 employees. The fleet consists of semi-submersible deepwater drilling barges and jack up platforms | Total: 29 Deepwater: 3 | N.A. |
| Noble | Noble is the oldest company operating in the sector, with experience of more than 90 years. It operates in all major offshore fields in the world including the Middle East, India, Gulf of Mexico, North Sea, Africa, and Asia Pacific. In Brazil currently has six rigs in operation | Total: 79 Deepwater: 20 | 2010 Revenues: US$3.0bn Market Cap: US$8.1bn |
| Ocean Rig | Ocean Rig owns and operates two for ultra-deepwater rigs and in 2011 took delivery of two the new drillships (Corcovado and Olympia). The company has two further drillships under construction at Samsung with scheduled delivery in 2011 | Total: 6 Deepwater: 6 | N.A. |
| Odfjell Drilling | Odfjell Drilling has more than 35 years of international experience in operational management of semi-submersibles, modular units and jack up. Has 3,000 employees. It operates mainly in the North Sea, United Kingdom and Norway | Total: 7 Deepwater: 2 | N.A. |
| Pacific Drilling | Pacific Drilling has five deepwater rigs under construction at Samsung, with delivery forecast for 2011. Of these, three will be operated by the company and the other two will be operated in a joint venture. Recently closed a 3-year charter with Petrobras for the ultra-deepwater drillship the Pacific Mistral | Total: 6 Deepwater: 6 | N.A. |
| Petroserv | The main activity of the Petroserv Group consists in owning, chartering and operating offshore units. Currently Petroserv owns 6 units, all chartered to Petrobras. The company was founded in 1972 | Total: 6 Deepwater: 3 | N.A. |
| Queiroz Galvão Oil and Gas | QGOG was established in 1980, and is part of the Queiroz Galvão Group. Began operations as a provider of onshore drilling services, and expanded its activities into offshore in 1994. QGOG's fleet includes 2 FPSOs and 8 rigs. The company also has 9 onshore operating rigs | Total: 8 Deepwater: 5 | N.A. |
| Saipem | Saipem SpA is an Italy-based company active as contractor in the oil and gas industry in remote areas and deepwater. The Company is organized into two business units: engineering & construction and drilling. Saipem is a subsidiary of the Italian group ENI | Total: 17 Deepwater: 5 | 2010 Revenues: US$16.1bn Market Cap: US$18.6bn |
| Seadrill | SeaDrill Limited is a Bermuda-based company active in the oil and gas industry. The Company operates a fleet of 60 units comprising drillships, jack-up rigs, semi-submersible rigs and tender rigs for operations in shallow to ultra-deepwater areas. The Company's customers are national, international and independent oil companies | Total: 60 Deepwater: 20 | 2010 Revenues: US$2.1bn Market Cap: US$14.0bn |

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH   ADVOGADOS

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

| | Overview | Rig Fleet | Financial Highlights |
|---|---|---|---|
| Sevan | Sevan Marine ASA is a Norway-based company engaged in floating production of oil and gas. The Company is also active within deepwater drilling based on its cylindrical hull design. It is also engaged in the development of other applications, including floating Liquefied Natural Gas production and power plants with carbon dioxide capture. Was founded in 2001 and employs approximately 400 employees | Total: 2 Deepwater: 2 | 2010 Revenues: US$256mm |
| Transocean | Largest offshore driller globally. International provider of offshore contract drilling services for oil and gas wells. Recently acquired Aker Drilling (Norway) for US$1.4bn | Total: 139 Deepwater: 27 | 2010 Revenues: US$9.6bn Market Cap: US$16.7bn |
| Vantage Drilling | Vantage is drilling company focused on operating a fleet of drilling units. The company's primary business is to contract drilling units, related equipment and work crews primarily on a day rate basis to drill oil and natural gas wells for its customers. It also provides construction supervision services for drilling units owned by others | Total: 9 Deepwater: 5 | 2010 Revenues: US$278mm Market Cap: US$392mm |
| Grupo R. | Group R. is a company specialized in providing services to the oil and gas industry. Leader in the Mexican drilling segment, where it is based. Founded in 1956, its operations are divided in offshore construction, engineering, onshore and offshore drilling and transportation | Total: 2 Deepwater: 2 | N.A. |

Source: Companies' websites and financial statements, Bloomberg and Sete Brasil.

Note: Market cap as of September 6, 2011.

For the 21-rig tender process, Sete Brasil has to present a bid offer indicating beforehand the operators for each rig. The Company is currently negotiating with domestic and international operators the terms and conditions of these partnerships.

### 3.10  Portfolio Financing

The Portfolio Finance concept was successfully implemented in several projects in Brazil. The structure grants an additional comfort for lenders and is based on risk dilution:

◆   Dilution of operating risk: The source of revenues of all SPVs will be the Charter Contract and operating costs will be covered by the Services Contract. Despite the contractual simplicity, there is the risk low uptime performance and consequently reducing its capacity to its obligations. The Portfolio Finance consolidates the dividend flows from all SPVs in Sete International, in such a way that the SPVs with high uptime performance can support the underperforming SPVs. Also, the Project's financial structure implies two additional mitigating factors: (i) the Performance Fund, destined to create a reserve for immediate coverage of any qualified expense that cannot be met due to low operating performance; (ii) Contingency Reserve Account, established under the form of a "pool" common to all SPVs and centralized at Sete International, with the purpose of mitigating cost overrun.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

◆   <u>Dilution of Charter Renewal Risk:</u> The envisaged financing package contemplates a facility with an amortization tenor longer than the 10-year Charter Contracts. This condition incorporates an additional risk related to the renewal of the Charter Contracts or the refinancing of maturing debt. The Portfolio Finance mechanism helps mitigate this risk, by using the excess cash from SPVs with existing Charter Contracts. Additionally, a Charter Renewal Reserve Account will be created (with US$ 117 million for the First System) and the resources shall be used for the payment of debt service (exclusively under the hypothesis of non-renewal of the Charter Contract).

### 3.11  Credit Enhancements Features

The proposed structure, in addition to the comfort of the portfolio finance, presents three important mechanisms destined to enhance the credit conditions of the Project:

*FGCN (The Shipbuiliding Construction Guarantee Fun)*

◆   <u>Objective:</u> Mitigate risk of delay in commercial operating date ("CoD")

◆   <u>Constitution:</u> Guarantee fund of a private nature, already constituted and partially capitalized

◆   <u>Use:</u> The FGCN will offer two types of coverage on a First-Loss base: (i) Credit Risk Guarantee (in favor of financers) to be contracted, compulsorily, by the party that orders the vessel (SPE); and (ii) Performance Risk Guarantee (in favor of the construction contractor) to be contracted optionally by the shipyard (alternatively to equivalent insurance available in the market)

   ◆   <u>Amount:</u> Total net equity of R$ 5 billion, of which R$ 4 billion exclusively for the construction of drilling rigs in Brazilian shipyards

Once initiated the operational phase, each SPV shall be responsible to constitute, through the payments of extraordinary dividends to Sete International, three type of reserves accounts: the Performance Fund; the Charter Renewal Fund and the Contingency Reserve Account. These accounts will be managed by a trustee and shall be pledged to senior lenders.

*Performance Fund*

◆   <u>Objective:</u> Mitigate the performance risk of the operators and consequently, lower uptime and lower revenue generation. In the event that one SPV presents low availability to the point that cannot service senior debt (or other qualified obligations), the SPVs may withdraw on the fund

◆   <u>Constitution:</u> It will be constituted during the first year of operation of each drilling rig by means of payment of extraordinary dividends to Sete International, employing for such all the initial revenues available, including those referring to mobilization, commission and pre-operation fees, thus creating a special fund to be managed by an account manager agent, and with a maximum limit estimated during the execution of his mandate. When the ideal amount is reached, the contributions shall cease. In the event that the fund is used and have its balance reduced below the defined minimum, contributions from the SPVs will resume through the generation of free cash flow, prior to the distribution of dividends to Sete International

◆   <u>Use:</u> The fund resources shall be used to pay the debt service and other qualified obligations of SPVs, in the eventual lack of resources due to problems

setebrasil

in the operation of the drilling rigs and consequently shortage of cash. The resources not used may be reverted to free cash to Sete International, and may be reverted to its controlling company (Sete Brasil) under the form of dividend distribution. In the event of a sustained unsatisfactory performance by the Operator, there may take place the dilution of the Operator in the equity of the SPV under difficulty (as Class B shareholder). In the event of constant operation problems and low performance, and consequent dilution in its interest in the SPE, the Operator shall be substituted

♦ <u>Amount:</u> Indicatively US$ 56 million for the First System (~US$ 8 million per SPV)

**Charter Renewal Fund**

♦ <u>Objective:</u> Mitigate the risk of payment of the senior debt (or refinancing) following the end of the first term of Charter contracts of drilling rigs not operated by Petrobras (10-year contracts).

♦ <u>Constitution:</u> It will be dimensioned to cover three months of the debt service of all drilling rigs with 10-year Charter contracts and capitalized through dividend payments between the 8th and 10th year of operation of each SPV (including the drilling rigs with 20-year Charter Contracts), thus creating a special fund managed by a trustee

♦ <u>Use:</u> The reserve account may be used exclusively under the hypothesis of non-renewal of the 10-year Charter Contracts and the resources shall use solely for the payment of debt service and operational costs of SPVs, until the total utilization of the Renewal Fund's balance

♦ <u>Amount:</u> Indicatively US$ 117 million for the First System (~US$ 17 million per SPV)

**Contingency Reserve Account**

♦ <u>Objective:</u> Mitigate the risk of cost overrun funding during the pre-operational phase of each SPV

♦ <u>Constitution:</u> The reserve account will be funded from the resources of the Mobilization Fee each SPV receives in the first month of operation. Similar to the other credit reserve accounts, it will be established under the form of a "pool" common to all SPVs and centralized in Sete International. The resources will be transferred from the SPVs to Sete International through extraordinary dividend payments. The fund shall be limited to the maximum committed amount, with no obligation to replace, partially or fully, the resources used

♦ <u>Use:</u> Exclusively to cover extraordinary capex and pre-operational expenses incurred by SPVs during construction of each drilling rig.. The resources deposited in the Reserve Account for Eventualities and not used may only be withdrawn and used by Sete International after the renewal of the last drilling rig of the First System.

♦ <u>Amount:</u> Indicatively US$ 154 million for the First System (~US$ 22 million per SPV)

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

EIG_KEP_00000038

setebrasil

# 4   PETROBRAS' INTERNATIONAL BID FOR 21 RIGS

*Petrobras launched a bid to charter 21 ultra-deepwater rigs*

On June 6th, 2011, Petrobras invited domestic and international players for a bid process to charter up to 21 new drilling rigs to be built in Brazil. The bid offers are due on October 3, 2011.

## 4.1   Bidding Model

Petrobras is interested in chartering up to 21 drilling rigs (at Petrobras sole discretion). The winner(s) of the bidding process will be based on the lowest offer for daily rates (charter agreement and service agreement).

*Sete Brasil can bid for 21 rigs*

Petrobras invited both offshore drilling operators and rig investors. Rig Investors, such as Sete Brasil, may bid for all 21 drilling rigs, as long as in partnership with operators, complying with the limitation of drilling rigs per operator (5 units each).

All bidders may present proposals for 10 or 15 years charter agreements. The 10-year contracts may be renewed for additional 10 years and the 15-year contracts may be renewed for additional 5 years.

The bidding process encompass two different types of rigs (i) type A, for drillships; and (ii) type B, for semisubs. Complying with the maximum of 21 drilling rigs, Petrobras may charter type A, type B or a mix of both types.

The rig's technical specifications will be materially as the rigs in the First System already chartered to Petrobras (state-of-the-art ultra-deepwater, dynamically-positioned rigs).

Similar to Sete Brasil's first set of seven rigs, the drilling rigs must be built in Brazilian shipyards. There is an increasing minimum local content level, varying from 55% to 65%. The delivery period is 48 months for the first unit and 96 months for the last unit.

## 4.2   Sete Brasil's Participation

As mentioned previously, Sete Brasil can bid for the full set of 21 rigs. Currently, the Company is in ongoing negotiations with potential shipyards and operators. The capex per rig and the construction disbursement schedule are the key variables in determining the bid offer. Thus, the number of drilling rigs to be built by each shipyard is key factor to bargain better prices. Finally, shipyard selection must also take into consideration the operators preferences.

Differently from the previous bidding round, Sete Brasil must partner with operators (and shipyards) to participate in the bid.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

39

EIG_KEP_00000039

# 5 TAX STRUCTURE

## 5.1 General Structure

*Objectives*

The main goals of Sete Brasil's fiscal structure are the following:

- Maximize fiscal efficiency, reducing, in accordance to laws and regulations in force and applicable to each jurisdictions, unnecessary tax payments;

- Reduce exchange rate risk in cross border and/or multi-currency transactions;

- Avoid the establishment of the SPVs in jurisdictions considered as "tax haven";

- Avoid the taxation of dividends from the SPVs to Sete International as the cash flow communication vehicle in the Portfolio Financing structure;

- Efficient use of tax sparing credits in the SPVs (located in the Netherlands) to reduce or eliminate income tax payments;

- Allow high leverage with and efficient use of a subordinated debt structure (from sponsors or third-party); and

- Avoid taxation on profits and dividends from the SPVs (generators of income) to Sete Brasil, and ultimately the shareholders.

## 5.2 Location of Entities

As a result of objectives described above, Sete Brasil's vehicles are located according to the following assumptions:

*Sete Brasil – Local Holding*

Sete Brasil, given the profile of the initial shareholders and limitation of local Pension Funds to invest in foreign entities, was established in Brazil[18].

*Sete International – Foreign Holding*

Sete International, given its purpose to mitigate risks by means of cash flows solidarity (Portfolio Financing), was incorporated abroad to avoid cross-border risk. For tax reasons, the company was incorporated in Austria, country that holds a double taxation treaty with Brazil and, being part of the European Union, avoids withholding tax on the SPVs' dividend distribution (and interest on intercompany loans).

*SPVs*

The SPVs must be foreign entities in order to take advantage of the REPETRO program's benefits. On the other hand, such SPVs could not be located in jurisdictions deemed "tax haven" for Brazilian legislation purposes. After an extensive analysis of alternatives, Sete Brasil constituted each SPV in the Netherlands, as the country's legislation allows the use of the North-American dollar as functional currency, as well as the use of tax sparing credits.

---

[18] Investments offshore typically demand previous consent granted by the *Secretaria de Previdência Complementar* and, eventually, the *Conselho Monetário Nacional*.



SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

EIG_KEP_00000040

setebrasil

**Operators**    On its turn, each unit's operator must be a local entity (Brazilian), contracted by Petrobras by means of a Service Contract (drilling rig operation), and bound to the Charter Contract. The payments regarding such contract shall be in local currency (*Reais*) while payments regarding the Charter Contract may be in North-American dollars (possibly 80%) as well as *Reais* (possibly 20%), fully or partially[19].

### 5.3    Brazil-Austria Double Taxation Treaty

Pursuant to Brazilian legislation in force, Brazilian companies that hold investments in controlled or associated companies abroad are obligated to tax such companies' profit at the end of each fiscal year, independently of the availability of such profits in Brazil[20].

However, according to the double taxation treaty entered into by Brazil and Austria[21], profits incurred by the Sete International shall not be taxed in Brazil, be such profits attributed to Sete International[22] (are taxed only in Austria), be such profits effectively distributed in the form of dividends (dividends received by a Brazilian company from its subsidiary in Austria are exempt, provided that the interest of the Brazilian company in the Austrian company is greater than 25%).

Consequently, only the dividends from Sete International to Sete Brasil are taxed at 15% (withholding tax).

### 5.4    Brazil-Netherland Tax Treaty

The key characteristic of the Brazil-Netherlands Tax Treaty is the Tax Sparing Credits[23]("TSC"). The TSC are available when:

- The lease payments are paid by a resident of Brazil to the SPVs, who qualify as a resident of the Netherlands
- The lease payments qualify as a royalty under the Treaty
- The SPVs are considered the beneficial owners of the lease payments

The TSC grant a corporate tax credit equivalent to 20.0% of the charter revenue. Thus, despite the 25.5% corporate tax rate, the effective tax paid by SPVs is projected to be zero.

### 5.5    REPETRO Program

Generally, all commercial transactions are subject to taxation by Brazilian authorities and, for imports specifically, there is the incidence of the following taxes: Import Tax, IPI, PIS and COFINS and ICMS.

---

[19] Such possibility has been allowed by Law 12.024, as of August 27, 2009, which is under regulation process by the Executive.
[20] Article 74 of the Provisory Measure No. 2.158-35/01 – "MP 2.158-35/01".
[21] Decree No. 78.107/76.
[22] By force of art. 74 of MP 2.158-35/01 (notional dividends or profits).
[23] Article 21, paragraphs 3 and 4 of the Tax Treaty.

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

41

EIG_KEP_00000041

The impact of the application of such taxes would be material to any financial structure that does not benefit from the *Regime Aduaneiro Especial de Exportação e Importação* for export goods destined to the exploration and production of oil and natural gas ("REPETRO"), implemented in 1999[24]. Consequently, it is essential that the financial structure allowed the SPVs to fully benefit from REPETRO, which exempts commercial transactions of all federal taxes and, depending on the situation and specific consultation, of ICMS also.

Under the REPETRO regime:

* Goods may be imported as raw materials, without retention or tax payments as long as they are used in the production of assets later eligible for exporting;

* The sale of certain eligible assets by a Brazilian producer to a foreign entity may be considered as an export operation, even if such assets do not physically leave Brazil; and

* The import of certain eligible assets may be considered as a temporary admission of such assets in Brazil and, therefore, are exempted from federal taxation applied to imports.

Sete Brasil's structure allows the SPVs and Petrobras to fully benefit from the REPETRO:

* Each SPVs, a foreign entity, will own a rig;

* All resources demanded by the SPVs to execute and conclude the construction of the platforms will be supplied offshore to the SPV;

* All foreign content shall be imported by EPC contractors / Shipyards under a drawback regime;

* Local content incorporated to foreign content shall be subject to formal export; and

* The drilling rigs imported by Petrobras, in the last instance, will be under the temporary admission regime.

---

[24] The REPETRO is currently regulated by Decree No. 6.759, as of February 05, 2009 and by norms issued by the *Secretaria da Receita Federal*.



CONFIDENTIAL                                                                    EIG_KEP_00000042

setebrasil

# 6   THE SHIPBUILDING CONSTRUCTION GUARANTEE FUND

## 6.1   Brief History

*Oil & Gas sector has driven demand of the shipbuilding industry*

The Brazilian shipbuilding industry has undergone a period of strong growth in the last 10 years, mainly driven by Oil & Gas sector, notably new FPSOs orders, by Petrobras, and new oil tankers, by Transpetro[25].

Despite the recent development of this industry in Brazil, the construction of drilling rigs to serve Pre-Salt demands still presents challenges given the lack of experience of local shipyards in the construction of new builds and the need for competitiveness if compared to more established and specialized shipyards, notably Korean, Singaporean and Chinese shipyards. Thus, due to the pioneering nature of deepwater rigs in Brazil and the reference to more competitive offshore shipyards, the construction of 6th generation drilling rigs in Brazilian shipyards is associated to larger risks of (i) delay, (ii) cost overruns, (iii) availability of quailified labor force, in comparison to other foreign shipyards.

*The FGCN was constituted by the Brazilian Government to reduce the risks associated with of building deepwater rigs in Brazil*

Therefore, in order to promote local construction of deepwater rigs and reduce risks associated to contracting drilling rigs with 55%-65% local content, the Brazilian Government issued the Provisory Measure 429, converted into Law 11.786/08, authorizing the creation of the Shipbuilding Construction Guarantee Fund (*Fundo Garantidor da Construção Naval* or "FGCN").

## 6.2   FGCN Overview

*The main objective of the FGCN is to guarantee credit risk of financing operations*

The main objective of the FGCN is to guarantee the risk of construction/completion (deriving from a Brazilian shipyards' performance) for lenders involved with financing the SPVs (and indirectly the sponsors, such as Sete Brasil).

FGCN is a private fund initially capitalized by the Brazilian Treasury in the amount of up to R$ 5 billion, of which 80% of resources (or R$ 4 billion) are to be applied exclusively to guarantee credit and performance risk related to the construction or Pre-Salt drilling rigs in a Brazilian shipyard. *Caixa Econômica Federal* is the administrator, manager and custodian of the FGCN.

The Brazilian Government, initially, is the exclusive quota holder of the FGCN, however, other quota holders may be incorporated later, voluntarily or compulsorily, in the later case, the contractors and the beneficiaries of the guarantees provided by FGCN (the SPVs and/or the shipyards). The payment of quotas by the Union may be performed in local currency, government bonds, shares listed in stock exchanges and other securities negotiated in organized over-the-counter markets. The FGCN shall

---

[25] Transpetro is a subsidiary of Petrobras.

setebrasil

respond for its obligations with the assets up to its total net worth, there is no additional guarantee or endorsement from the Federal Government.

The payment of quotas by the remaining quota holders may be performed only in local currency. In addition, quota holders shall not be liable to the fund's obligations, only to quotas' underwriting.

The guarantees to be provided by FGCN are restricted to vessels built in the Brazilian shipyards, and shall be valid during the construction period, until its acceptance by Petrobras and Sete Brasil.

FGCN offers:

♦ Credit Risk Guarantee: related to the financing (senior and subordinated) granted to SPVs for the construction of the respective drilling rig. Each SPV shall sign a Guarantee Contract (*Contrato de Prestação de Garantia* or "CPG") with FGCN, contemplating the provision of credit risk guarantee related to the construction of drilling rigs in Brazilian shipyard. The beneficiaries of the CPG shall be all the SPVs' debt holders; and

♦ Performance Risk Guarantee: regarding risks inherent to the construction of drilling rigs by the shipyards. In this case, the guarantee takers are the shipyards.

The credit risk guarantee shall be due in the event of contractual default by the SPV or early maturity of the financing contract, due to non-delivery and/or non-acceptance of the financed vessel, on the date foreseen in the construction contract, considered by the lenders to determine the initial term of the financing amortization.

The performance risk guarantee, on the other hand, shall be exercized in events under the responsibility of the shipyard, with the possibility of loss resulting from noncompliance with an obligation set forth in the construction contract and/or inadequacy in the construction's quality.

The guarantees granted by FGCN shall be structured under the form of a completion guarantee (and not a refund guarantee), and applicable to all lenders, including the subordinated facility (if that is the case). Amongst the events covered by FGCN, the following are included:

♦ Bankruptcy of the shipyard;

♦ Delays in the physical schedules of works (for any motive non-imputable to the contractor);

♦ Economic-financial difficulty of the shipyard resulting in failure to pay its obligations (taxes, suppliers, employees, etc.), which imply in a delay to deliver the drilling rigs;

♦ Technical difficulty (technological capacity, manufacturing processes employed, stable flow of inputs delivery, etc.), which imply in a delay to deliver the drilling rigs; and

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG_KEP_00000044

- Operational problems of any nature that come to impede or negatively impact the acceptance of units by the contractor in the unit delivery phase.

FGCN, in its turn, at the concession of a credit risk and/or performance risk guarantee, shall receive counter-guarantees from the guaranteed SPE, exclusively through the assignment of rights over the guarantees offered by the contracted shipyard, and by the shipyards to which the construction of the respective drilling rig has been allocated, as follows:

- Lien of the totality of shares issued by the constructor shipyard;
- Mortgage of the vessel;
- Corporate Guarantee from the sponsors of the shipyard;
- Signing of the lease contracts of the industrial facilities where the vessel will be built, as well as machinery and equipment necessary for its construction; and
- Guarantee insurance with minimum coverage of 3% of credit granted.

In the event that the lien of the totality of shares issued by the shipyard has already been provided as guarantee, the lien commitment of the totality of shares issued by the Brazilian shipyard may be accepted.

When providing guarantee, FGCN shall receive a pecuniary commission due: (i) by the Brazilian shipyard, regarding the performance risk guarantee; and (ii) by the SPE, regarding the credit risk guarantee. In the event of an extension in the guarantee's term, a complementary Pecuniary Commission will be charged relative to the added term. The premium to be charged by FGCN referring such commission will vary according to the risk analysis to be performed by the fund administrator, for each situation, as a result of perceived risks connected to the provision of guarantees.

The Brazilian shipyard shall be bound to acquire quotas of the FGCN, in two situations, each in the amount equivalent to 0.25% of the guaranteed amount: (i) in the contracting of Performance Risk Guarantee by the shipyard itself, and (ii) in the contracting of Credit Risk Guarantee, even when such contracting has been conducted by the SPE. The quotas shall be acquired in a single upfront installment.

In addition to the payment of pecuniary commission to be charged by the administrator of FGCN at the concession of credit guarantees in Brazilian shipyard operations, the SPV shall also be bound to acquire FGCN quotas, in an amount equivalent to one percent (1%) of the guaranteed value, as of the contracting of the above-mentioned guarantees, to be acquired in a single advance installment, and to remain unavailable for a (minimum) period of five years.

When granting guarantees, FGCN must observe the following limitations:

- The performance guarantee shall not be superior in value to 10% of the cost value of each drilling rig's construction;

CONFIDENTIAL                                      EIG_KEP_00000045

- ♦ The credit risk guarantee may not be superior in value to 50% of the due balance of each financing operation (provided that such limit may be increased depending on the risk of each transaction, if thus determined by the Quota Holders Meeting);

- ♦ In the financing operations guaranteed by FGCN, the amount financed by the financial agents may correspond up to ninety percent (90%) of the total value of the project; and

- ♦ The limit of FGCN insurance is limited to 25% of its net worth for each SPV (or each guaranteed entity).

Regarding each SPV guaranteed by FGCN, such SPV may enter into, when applicable, an agreement with the lenders involved with the financing, which disciplines the form and proceeding for the exclusion of the guarantees.

### 6.2.1 Execution of FGCN Guarantees

In the event that the execution of a credit guarantee is necessary, FGCN is responsible for the due debt service payments. However, it's the insurance coverage is limited to 50% of the outstanding debt balance.

In the event of early maturity of the financing contract object of the credit risk guarantee, FGCN shall pay the due balance at the date of the early maturity, deriving from the amounts disbursed by financers, up to the limit of the contracted guarantee.

The guarantees common to FGCN and lenders shall be executed by FGCN, and the resulting amounts of such execution shall be applied first to pay the remaining due balance of the financing.

The acquittance of each financing installment by FGCN shall imply a proportional exoneration of the guarantee.

The credit risk guarantee contracts shall provide, in the event of the early maturity of the financing contract, the possibility of cash payment or payment by means of the replacement of the payment flow foreseen in the financing contract, at the discretion of FGCN.

For the credit guarantee payment, the lenders shall activate FGCN, within a maximum of ninety (90) days from the event that caused the activation of the guarantee, by means of formal communication with Receipt Notice, stating the reasons for the solicitation.

The lenders shall opt to receive the payment under one of the following forms:

- ♦ Assets composing the segregated property connected to the guarantee by means of transfer of ownership at the guarantee payment date.

- ♦ Local currency, by means of deposit in current account held by the financer.

In the event that no segregated property has been put aside in connection to the guarantee, the lenders may also opt to receive as payment the assets that constitute

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
                        ADVOGADOS

setebrasil

FGCN's equity, by means of the transfer of ownership at the guarantee payment date, with the consent of FGCN.

FGCN shall communicate, by means of correspondence with receipt notice, the requisition of the guarantee payment to the SPV and the financer, as the case may be, and to the Brazilian shipyard, establishing a period for its manifestation and regularization.

FGCN shall conduct diligences, within 30 business days from the receipt of the formal communication sent by the financer soliciting the payment of the guarantee, with the purpose of verifying the financer's solicitation, pursuant to clauses foreseen in the financing contract or the construction contract, depending on the case.

FGCN shall comply with the guarantee within 10 business days, from the end date of the mentioned diligence.

CONFIDENTIAL

EIG_KEP_00000047

CONFIDENTIAL INFORMATION MEMORANDUM                                    setebrasil

# 7   KEY CONTRACTS

### 7.1   Key Contractual Relations

The exhibit below illustrates the key contractual relations of the first set of seven drillships:

*Exhibit 24: Key Contractual Relations*



*Source: Sete Brasil and Lakeshore.*

### 7.2   EPC Contract

The construction EPC Contracts were signed on June 15, 2011 between each SPV and EAS Shipyard. The key terms are summarized below:

*Key terms of the EPC Contract*

- ◆   Contract Type: Lump-sum turn-key basis, with a fixed price (plus indexation) and defined delivery dates

- ◆   Key Dates: For the First System, the construction deadlines for the Construction Contract with the EAS are as follows (starting from the signing of the EPC Contract):

    - ◆   Rig 1: 1,440 days (May 2015)
    - ◆   Rig 2: 1,740 days (March 2016)
    - ◆   Rig 3: 1,980 days (November 2016)
    - ◆   Rig 4: 2,220 days (June 2017)
    - ◆   Rig 5: 2,460 days (March 2018)
    - ◆   Rig 6: 2,700 days (November 2018)
    - ◆   Rig 7: 2,940 days (July 2019)

- ◆   General Characteristics: The EPC Contract signed with EAS includes design, engineering, supply, construction, commissioning, start-up, testing and completion of the units, along with any other specifications contained in the contract. EAS shall execute the works (i) in accordance with the scope of works

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

setebrasil

and the terms and conditions of the EPC Contract, (ii) in accordance to and under consent of the applicable law, (iii) in accordance with good industrial practices and, (iv) within the deadline stipulated in the contract for each unit. The duties of the EPC Companies are to: (i) purchase, supply, transport, handle, storage and properly preserve equipment, including those received from the SPV; (ii) be responsible for design and engineering in accordance with the contractual specifications; (iii) provide for the construction, manage the construction, including providing all the administration and supervision of labor, workplace, equipment, tools, field materials, storage and necessary facilities for manufacturing each Unit; (iv) comply with the applicable laws and facilitate the export of each Unit, which shall be physically delivered to the SPV in sheltered waters in Guanabara Bay; (v) negotiate guarantees, insurances, delivery schedules, performance requirements with all subcontractors; (vi) ensure that the works are in accordance with the construction schedule; (vii) conduct and manage the performance tests; (viii) obtain the required licenses, permits and authorizations for the execution of works; (ix) obtain any certificates required by the applicable law for conducting performance, demonstration and operation tests; (x) provide the information and documents required by the SPV, which are necessary for the inspection of works; (xi) provide the SPV with training regarding operation and maintenance of equipment supplied by the EPC Company; (xii) supersede any subcontractors which are not executing the works in accordance with the terms of the EPC contract; (xiii) deal with customs matters and be responsible for all tasks related to imported equipment; (xiv) upon request of the SPE, cooperate and respond to questions from any creditors regarding the works and other activities to be developed in the scope of the contract; (xv) meet the funding requirements of BNDES, in the Brazilian case, where the local content is funded by this institution; (xvi) be responsible for all payments and tax withholding related to the works; and (xvii) pay the subcontractors within the deadlines set forth in the subcontracts. According to the local content rules, EAS shall execute the construction, assembly, pre-operation, start-up and assisted operation related to the works in Brazil, including the hull construction, as well as steel related works, up to its integration with the drilling plant. EAS must meet the Brazilian local content requirements, which are calculated in compliance with the methods and criteria of the Brazilian Petroleum Agency (*Agência Nacional de Petróleo* or ANP). For the first two drilling rigs to be built, at least 55% of human resources and total weight of structural parts, panels and block manufacturing and assembly, all the subsequent works for the completion of the hull beside the pier, the integration of the drilling plan and other activities, must be conducted in Brazil. The remaining rigs shall have their nationalization rates progressively increasing until they reach 65% for the two last units from the initial package of seven rigs. Should EAS demonstrate that it wouldn't be feasible to execute the steel works or manufacturing of supplying parts/components in Brazil due to technological issues, such parts may be imported as long as they comply with the following percentages: 60% of the generation, propulsion and dynamic positioning systems, 50% of the drilling package, and 65% global.

EIG_KEP_00000049

setebrasil

- ◆ <u>Indexation:</u> The EPC Contract carries an indexation formula of both local and foreign content to reflect inflation of the cost base.

- ◆ <u>Delay Penalties:</u> The EPC Contract also foresees the payments of penalties by the shipyard to the SPV in case of delays, limited to 10% of the total contract value. Once this total amount is reached, the SPV shall have the right to terminate the EPC Contract. In case of delay, the funds from penalties from the Construction Contract shall be used for the payment of penalties from the Charter Contract. The receivables (rights emerging from the EPC Contract) from EPC contracts shall be pledged to the senior lenders (standard market practice).

- ◆ <u>Local Content:</u> The EPC Contract sets forth liquidated damages for non-compliance with the local content requirements. Such penalties vary in accordance with local content requirements for the drillship and will be limited to the greater of (i) the aggregate liquidated damages assessed for non-compliance with the Global Brazilian Local Content requirements; (ii) and the sum of the aggregate liquidated damages for non-compliance with the Brazilian Local Content requirements related to the Drilling Package and to the Generation, Propulsion, and Dynamically Positioning Systems.

- ◆ <u>Warranty:</u> EAS shall grant a guarantee, in the amount of US$ 50 million, half of which shall be released upon issuance of the handover certificate, and the other half upon issuance of the performance acceptance certificate. The shipyard shall give a warranty of defects and services, for a period of 12 months from the handover of the rig.

### 7.3   Charter Contract

The Charter Contract with Petrobras foresees the payment of a daily rate based on the availability the drilling rig (uptime) and is not in any way linked to production or success of the drilling program. The key terms are summarized below:

*Charter Contracts terms*

- ◆ <u>Parties:</u> Petrobras, PNBV and SPVs.

- ◆ <u>Execution Date:</u> June 15, 2011 (First System).

- ◆ <u>Offtaker:</u> Petrobras.

- ◆ <u>Term:</u> 10 years or 20 years (being the latter exclusively for drilling rigs operated by Petrobras) for the First System. For the remaining 21 rigs under bidding process by Petrobras, 10 and 15 year charter terms are available. Sete Brasil intends to maintain the same average term (~13 years) of the First System. The term of the contract starts from the date Petrobras formally accepts the rigs.

- ◆ <u>Daily Rate:</u> US$331,000/day[26] for the First System. For the remaning 21 rigs the charter daily rates have not been set.

---

[26] Appendix 3 of the Charter Agreement.


LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG_KEP_00000050

setebrasil

- Order of Charter Contracts: The 20-year contracts are the first two rigs to start operations (4Q'15 and 3Q'16, respectively). The order of the contracts for the remaining 21 rigs under bidding process by Petrobras has not yet been determined by Sete Brasil's management.

- Currency: The charter rate may be paid partially in US$ and partially in R$. The breakdown shall be defined immediately before the beginning of operation of each drilling rig and shall reflect the SPV's capital structure. The envisaged breakdown is 80% in US$ terms and 20% in R$ terms.

- Frequency of payments: Monthly.

- Indexation During Construction: The daily rate shall be readjusted according to the final value of the EPC Contract[27]. Upon delivery of each drilling rig, exclusively as a result of the EPC Contract price readjustment formula, the original daily rate value of the Charter Contract shall be readjusted, upwards or downwards, to incorporate the additional investment related to the indexation of the EPC Contract (in a 1:1 ratio), to maintain the same profitability expected for the base case. Such readjustment does not apply to the Services Contract.

- Indexation During Operation: Counting from the start of the Charter Contract term, the daily rate (adjusted to the final value of the drilling rig) is readjusted yearly, both the R$ denominated portion and in US$ denominated. (i) The R$ portion shall be 100% indexed to the *Índice Nacional de Preços ao Consumidor Amplo* ("IPCA"); and (ii) the US$ portion shall be readjusted by 20% of the US Consumer Price Index ("CPI").

- Payment: Offshore for the US$ portion and onshore (SPVs' non-resident account in Brazil) for the R$ portion[28].

- Mobilization: Upon delivery and acceptance of each drilling rig, Petrobras will make a payment in a single installment equivalent to US$ 30 million[29]. The fee will be used to fund the Contingency Reserve Account (US$ 22 million) and the Performance Fund (US$ 8 million).

- Early Delivery: Petrobras shall start payment of the daily rate starting from the beginning of its entry into operation, even in the case the rigs are delivered before the contractual dates.

- Delay: The Charter Contract foresees a penalty for delay in case the delivery date is not met (limited to 10% of the contract value)[30]. Any penalties the SPV is held accountable for shall be discounted from the charter payments, and the subsequent payments that the SPV is entitled. The discounts shall be limited to 30% of the corresponding monthly payment, until the penalty is paid in full. The EPC Contract also foresees the payment of a penalty by the shipyard to the SPV in the event that the payment deadline defined in the contract is not met

---

[27] Article 6.2 of the Charter Agreement.

[28] Pending regulation by the SRF.

[29] Article 5.1.1 of the Charter Agreement.

[30] Article 9.1.1 of the Charter Agreement.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

(limited to 10% of the total amount stipulated in the contract). In case of delay, the funds from penalties from the EPC Contract shall be used for the payment of penalties from the Charter Contract.

- ◆ Termination of the Charter Contract: Petrobras has the option to terminate the Charter Contract if the there is a delay of more than 2 years from the contractual delivery date (and 3 years for the additional 21 rigs).

*Performance Bonus*      ◆ Availability Bonus: The Charter Contract provides a performance bonus with the objective of encouraging operator to obtain a high level of uptime. The bonus is calculated based on the monthly uptime. The table below illustrates the bonus ranges associated to the rig availability.

*Table 8: Availability Bonus*

| Availability | Applicable Bonus |
|---|---|
| Under 94% | 0.0% |
| 95% | 2.5% |
| 96% | 5.0% |
| 97% | 7.5% |
| 98% | 10.0% |
| 99% | 10.0% |
| 100% | 10.0% |

*Source: Charter Contract, Appendix 2.a.*

*Renewal of Contract*      ◆ Renewal: The Charter Contract of the First System may be renewed for a term equal to the original term upon agreement between Petrobras and the SPV. In order to preserve their right of first refusal on the renewal, the SPV and / or Petrobras must, within 12 months before the termination of the term, notify the other party, informing its intention of renewing the contract and the conditions according to which it should be done. As mentioned previously, for the remaining 21 rigs under bidding process by Petrobras, 10 and 15 year charter terms are available. For the 10 year contract, a 10-year renewal period is available and for the 15-year contracts, the contract maybe renewed for an additional 5 years.

### 7.4   Services Agreement (Operation & Maintenance)

As explained earlier, the Charter Contract is linked to a Services Agreement. The key terms are summarized below:

*Key Assumptions*      ◆ Parties: Petrobras, PNBV and SPVs.

- ◆ Execution Date: June 15, 2011 (First System).

- ◆ Operators: Petrobras for 2 units. Operators for the remaining 5 unit will be defined after the Class B shares sale process. In the case of the additional 21 rigs, Sete Brasil has to partner with operators to present the bid.

CONFIDENTIAL                                                      EIG_KEP_00000052

setebrasil

- <u>Term</u>: 10 years or 20 years (in this case, exclusively for Petrobras Rigs)

- <u>Currency:</u> the rate shall be set in US$ and converted to R$ at the exchange rate of the base date of the contract, and kept in R$ until the termination of the Services Contract.

- <u>Service Fee:</u> US$ 127,000/day or (R$ 211,836/day)[31].

- <u>Currency:</u> R$.

- <u>Frequency of payments:</u> Monthly.

- <u>Index:</u> National Consumer Price Index ("INPC"), published by the Brazilian Institute of Geography and Statistics ("IBGE").

- <u>Payment:</u> Onshore in R$. Petrobras shall pay directly to the Operator (or a subsidiary constituted by the Operator) in Brazil.

- <u>Other costs:</u> Other operating costs, namely insurance expenses and replacement parts (totaling US$ 35,000/day) were added to the charter daily rate, and will therefore be paid by each SPV.

- <u>General Characteristics:</u> The Services Contract shall always be performed simultaneously with the Charter Contract. The contractor undertakes to: (i) keep, throughout the entire term of the contract, all qualification conditions undertaken in the tender; (ii) respect and comply with the administrative rules in force at Petrobras; (iii) facilitate the action of the Authority, providing information or providing access to documentation and ongoing services and promptly meet remarks and demands presented by them; (iv) repair, at their own expense and within the deadlines specified, each and every service deemed unacceptable; Be responsible for any damages or losses caused to Petrobras or to third parties, as a result of the execution of the services foreseen in the Services Contract. (v) Obtain licenses pertaining to its activity; (vi) Be responsible for the operation, supervision, technical and administrative supervision and the necessary manpower; (vii) The composition of the manpower onboard (effective) will have a minimum percentage of skilled national workforce ranging between 66% (1 year contract) and 85% (from the 6th year of contract); (viii) Perform tests on the Unit's equipment within 72 hours of the liberation to navigate to the first location; (ix) Perform the services in accordance with the international labor safety standards; (x) Maintain complete confidentiality on all information and data provided by Petrobras; (xi) Plan and conduct operations intended to prevent and fight outbreaks of oil, gas, fires and other accidents; (xii) Take responsibility and bear the burden for the withdrawal of any equipment or material dropped on the seabed, through their own fault; (xiii) Regulate the entry and stay of the unit in the country, as well as materials and equipment, providing, at its expense, releases, inspections, logs and temporary hiring's; and (xiv) Hiring insurance that is relevant for the activity as well as consecutive renewals during the term of the contract. Petrobras undertakes

---

[31] Services Agreement Appendix 3.



CONFIDENTIAL

EIG_KEP_00000053

setebrasil

to: (i) Make the payments to the contractor for every effectively provided, measured and billed service; (ii) Provide the operations and locations schedule in due advance; (iii) Perform measures on the services being executed and issue the measurement report; (iv) Provide personnel, materials, and equipment transportation to the Unit; (v) Provide, at its expense, all the fuel and water necessary for the execution of the works contemplated by the contract; (vi) Maintain control over the drilling and completion fluid; and (vii) Provide, at its expense and responsibility, the ancillary services related to: Directional drilling, cementing, testing, training, electrical logging, coiled tubing operations, operations with nitrogen, electric cable operations, wire operations, when resulting from Petrobras' schedule. Petrobras may terminate the Services Contract in the following situations: (i) failing to comply or irregularly complying with contractual terms, specifications, operations or deadlines; (ii) slowness in performance leading Petrobras to assume the impossibility of completing the services on schedule; (iii) undue delay in the initiation of services; (iv) suspension of services without just cause and prior notice; (v) transferring or subcontracting all or part of its object without the prior written consent of Petrobras, as well as the association, merger, spin-off or incorporation of the contractor without prior notice to Petrobras; (vi) failing to comply with regular determinations indicated during inspection; (vii) if, after the extra-judicial recovery plan is approved or the judicial recovery is deferred, the contractor does not provide enough security to ensure compliance with contractual obligations, at the discretion of Petrobras; (viii) suspension of services by determination of competent authority, motivated by the contractor; (ix) failure to submit proof of due performance with labor obligations; (x) delay in commencement of the contract of over 365 days; (xi) termination of the Charter Contract, regardless of cause; and (xii) suspension of operations for more than 60 days, for reasons imputable to the contractor, except for downtime for fortuitous event or force majeure. The contractor may terminate the contract in the following situations: (i) suspension of its execution by order of Petrobras, for a period exceeding 120 days; (ii) delay of more than 90 days of payments due; (iii) Petrobras does not release the location for execution of services; and (iv) termination of the Charter Contract, regardless of cause. As in the Charter Contract, in the Services Agreement the contractor is prohibited from assigning or pledging, in any capacity, in whole or in part, the claims of any nature from or arising out of this contract, except with prior authorization by Petrobras.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

setebrasil

### 7.5    Construction Management Agreement

For the First System, each SPV (through Sete International) has retained Petrobras to supervise the construction process in the role of Owners' Engineer. The Construction Management Agreement ("CMA") aims to provide the SPVs with specialized technical services in the areas of supervision, assistance in contract management, technical advice to the works and technical reporting. Petrobras undertakes to provide services to ensure and facilitate the proper management and supervision of the construction, launch, completion, testing, commissioning, purchase and delivery in respect of the drillships, all in accordance with the EPC Contract.

This activity optimizes costs, quality control and deadlines management.

*Characteristics*
- Parties: Petrobras and SPVs.

- Execution Date: June 15, 2011 (First System).

- Term: The agreement terminates upon the acceptance, by SPV, of the Final Completion Certificate under the terms of the EPC Contract.

- Value: US$ 8.0 million per unit (plus reimbursement of expenses capped at US$ 0.35 million).

- Currency: US$.

- Frequency of payments: monthly (according to the physical construction of each rig.

The key responsibilities of Petrobras as the construction supervisor are:

- Cooperate with the SPVs with respect to the EPC Contract

- On a quarterly basis provide a construction-in-progress report (covering all aspects construction and equipment, including any problems or delay or anticipated delay of which Petrobras is aware)

- Develop and monitor physical and financial planning of the works

- Monitor and supervise the execution of the works with quality control

- Review and release monthly measurements verifying compliance with the schedule, preventing the advanced disbursement of incomplete services

- Monitor the execution of the works to minimize potential claims by the shipyards and keep the SPVs informed regarding incidents that give rise to claims

For the remaining 21 rigs under bidding process by Petrobras, Sete Brasil has to be associated with operators to present a bid. Therefore, the operators may be the Owners' Engineer for the other 21 rigs instead of Petrobras.

CONFIDENTIAL

EIG_KEP_00000055

setebrasil

## 8   CORPORATE GOVERNANCE

### 8.1   Sete Brasil Participações S.A.

*Sete Brasil shall follow the corporate governance standards of the Novo Mercado segment*

The Company, established in Brazil, was set-up to follow corporate governance standards based on Bovespa's *Novo Mercado* segment:

- The Company shall exclusively issue ordinary shares, all shareholders have voting rights;

- In the event of sale of a controlling share, the buyer shall extend the purchase offer to all the remaining shareholders, assuring the same treatment applied to the seller controller (tag along);

- The company's Board of Directors must be composed by, at least, five members, with a unified mandate of, at the most, two years, with the presence of an independent counselor (after IPO only); and

- The company shall have not beneficiary parties.

*Shareholders Agreement*

As previously mentioned, with the exception of Petrobras, all investors in Sete Brasil shall invest through FIP Sondas. Initially, Petrobras directly holds 5.00% of Sete Brasil shares and 4.75% though FIP Sondas, totaling 9.75%.

Therefore, Sete Brasil's Shareholders Agreement disciplines matters such as types of deliberations by shareholders and matters subject to a qualified quorum, appointment of officers and directors, etc.

The Shareholders Agreement also disciplines, among others, the following matters:

- Shareholders deliberations and matter subject to a qualified quorum;

- Pre-emptive right and tag along;

- Appointment of officers and directors; and

- Right to demand the initial public offering of the company's capital.

*Business Plan*

A Business Plan shall be part of the Sete Brasil's By-Laws and shall define its main strategies, as well as its corporate and tax structure, its financing plan, the capital structure, its plans for the constitution of assets (connected to the construction of drilling rigs), among others. Any other changes unforeseen in the Business Plan shall be subject to approval by the Board of Directors, according to rules to be established in the corporate documents of Sete Brasil.

### 8.2   FIP Sondas

FIP Sondas is the primary vehicle for equity fundraising. FIP (*Fundo de Investimento em Participações*) structures are the preferred vehicles of pension funds and foreign investors for Private Equity investments in Brazil. The FIP allows, simply and directly,

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

56

CONFIDENTIAL

setebrasil

Brazilian pension funds and other financial investors to commit resources to the Sete Brasil. The choice of the FIP as investment vehicle is due to:

- Deferment of incurred gains
- Typical investment vehicle for Pension Funds
- Tax exemption for non-resident foreign investors
- Simplification of the Sete Brasil's corporate structure

By investing in the FIP Sondas, investors shall enter into a Quota Holders Agreement that, among other matters, handles the following:

- Deliberation by the quota holders on matter subject to a qualified quorum
- Deliberation by the quota holders to regulate the exercise the voting right of FIP in Sete Brasil
- Pre-emption rights and tag along in the transfer of quotas
- Replacement of the Manager/Administrator and Custodian
- Appointment of members of the Investment Committee

The main characteristics are:

- Manager and Administrator: Caixa Econômica Federal ("CEF")
- Custodian: Banco Bradesco S.A. ("Bradesco")
- Legal Advisor: Tauil & Chequer Advogados, associated to Mayer Brown LLP
- Auditor: PriceWaterhouseCoopers
- Terms: Up to 20 years counting from the first payment of quotas, in the occurrence of an IPO, whichever comes first
- Investment Period: Up to 10 years
- Disinvestment Period: Up to ten years
- Administration Rate: 0.20% p.a. of the FIP's net worth
- Performance Fee: Not applicable
- Custody Rate: 0.0185% p.a of the FIP's net worth (or 0.0095% if the new worth is greater than R$ 1.5 billion)

Payment of Dividends of FIP: The product resulting from the distribution of dividends or interest on new equity by Sete Brasil to which the FIP shareholder is entitled to, while the FIP exists, shall be fully used to amortize the quotas issued by the FIP, save when the Administrator, justifiably, deems necessary to retain a portion of the whole of resources obtained by the disinvestment to perform payments of the fund's liabilities, observed the maximum limit of half percent (0.5%) of the fund's net equity.

Permitted Investments: The FIP cash balance not invested in Company's shares, shall be maintained in one of the following assets, up to the limit of ten percent (10%) of the Net Equity: (i) local currency; (ii) treasury bonds; (iii) committed operations

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

EIG_KEP_00000057

based on the bonds mentioned in item (ii) above, contracted with top financial institutions; (iv) quotas of an investment fund or quotas of an investment fund of funds, with daily liquidity, and investment policy that allows for the allocation of resources exclusively in the assets identified in items (i) and (ii) above, as well as an investment policy that allows derivative operations, provided protection for positions held on demand, up to their limit; and (v) fixed income securities issued by top financial institutions.

### 8.3    FIP Sondas Investment Committee

The FIP Sondas has an investment committee. The investment committee deliberates on key strategic issues, such as, investment decisions, Board of Directors changes, M&A, asset sale, IPO, etc. Other characteristics are:

- Composed of seven members from the FIP Sondas investors (each shareholder indicated a member)

- The administrator of the FIP Sondas' (CEF) also participates in the investment committee, however is not be entitled to vote

- Votes are proportional to the number of quotas held by each investor

- Minimum quorum of 85%

### 8.4    Maximum Equity Participation

According to the FIP Sondas By-Laws[32], no quota holder may individually or jointly with other quota holders of the same economic group hold more than 30% of the FIP Sondas's quotas.

### 8.5    Sete International

Sete International is subsidiary of Sete Brasil and, was established to concentrate financial flows (dividends and intercompany loans) from the SPVs, an essential element in the proposed portfolio financing structure.

Sete International was constituted in July 13, 2010, initially as a subsidiary of PNBV and in May 6, 2011, Sete International was acquired by Sete Brasil.

Since Sete International is 100% owed by Sete Brasil, all corporate governance of Sete International is controlled by Sete Brasil.

Sete International is managed by two officers appointed by Sete Brasil. All voting rights of Sete International in the SPVs depend on a voting instruction from Sete Brasil. Therefore, Sete International shall require an instruction from Sete Brasil to decide on SPVs matters.

---

[32] Article 32 of the FIP Sondas By-Laws.



setebrasil

### 8.6   SPVs

Sete International owns 85% of the SPVs of the First System[33] and the remaining 15% is owned by the Class B Shareholders.

There Shareholders Agreement between Class A and Class B shareholders establishes:

- The appointment of officers that manage the SPVs being one the CEO (appointed by Sete International) and other the COO (appointed by the Class B Shareholder)

- The list of matters subject to shareholders' approval, including the ones subject to majority and unanimous approval

- The lock-up and transferability of shares provisions

- The compensation provisions for underperformance of the Class B Shareholder

### 8.7   Petrobras Interest

*Petrobras Interest as Class A and Class B shareholder*

Petrobras shall hold up to a 10% stake of the Sete Brasil. Additionally, during the construction phase, only Petrobras (directly or through one of its vehicles) shall also hold a Class B interest. Despite being a minority shareholder in the SPVs, Petrobras, as qualified shareholder and experienced in the construction and operation of drilling rigs business, shall contribute with the company by providing services of inspection of construction activities and drilling rigs assembly. However, such condition shall not provide Petrobras with any preference or ascendance versus the remaining shareholders of each SPE, in Sete International or Sete Brasil, where all decisions shall prevail strictly by means of a majority of votes among shareholders and pursuant to the Shareholders Agreement and the By-Laws.

*Sale of Class B shares*

At the incorporation of the SPVs, PNBV was only Class B shareholder of all SPVs. However, as previously mentioned, during the construction phase, Petrobras shall sell its Class B shares in five of the seven SPVs of the First System to offshore drillers, identified and selected among pre-qualified companies included in a Short List. As long as Petrobras sells its equity stake to a company in the Short List, no further approvals from Class A shareholders is necessary.

The Strategic Investor selection process may take place at any time, from the signing of the Charter and Services Contract, to the final acceptance of the rig by Petrobras. The actual step-in of the new strategic shareholder will occur after the acceptance tests of the rig by Petrobras. PNBV, after selecting the new strategic shareholder, shall sign a bidding Share Purchase Agreement ("SPA") with certain conditions precedent to be fulfilled by the selected strategic shareholder before the transfer of the Class B shares. Upon the transfer of the Class B shares, the new operator will

---

[33] For the additiiotional 21 rigs, the operators (Class B shareholders) may have 15%-25% stake in each SPV.

setebrasil

also acquire the rights and obligations in every contractual instrument executed by PNBV related to the project, including the Services Agreement.

In the new bidding round, Sete Brasil will select and parter-up with operators to present the bid offer.

## 8.8   Management and Organizational Structure

Sete Brasil is a company with professional management, comprised by officers selected, approved and hired by the Company's Board of Directors, in addition to an administrative structure of its own, Sete Brasil may outsource activities not directly related to its main strategic activities.

Top management will be composed by three officers: a CEO, a CFO and a COO.

*Exhibit 25: Organizational Structure*



Source: Sete Brasil.

The CEO (Mr. João Carlos Ferraz), was chosen among the directors of the Company and was appointed as such by Petrobras and selected by the shareholders in a list of three indications. The COO (Mr. Pedro Barusco) was appointed by Petrobras and approved by the shareholders.

## 8.9   Management Bios

*João Carlos Ferraz –*
*Chief Executive Office*

- Joined Petrobras in 1980 and has over 30 years of experience in the oil industry
- Mr. Ferraz worked in several areas of the value chain such as upstream, downstream and distribution, including offshore platforms
- In 2000, joined Petrobras Finance Department and was initially responsible for Project Finance structures, where he has developed and implemented 10+ transactions, raising over US$ 10 billion
- In 2006, Mr. Ferraz was appointed as Petrobras Head of Treasury, where he was responsible for cash management strategies and financial operations of

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

60

setebrasil

the Petrobras Holding, besides monitoring the treasury departments of Petrobras' subsidiaries on and offshore.

- In 2007, he developed a wide program aiming to centralize all financial and cash management transactions of the Petrobras Group, including cash pooling
- In 2009, Mr. Ferraz became the Head of the Financing Department of Special Projects of Petrobras, where he was responsible, among other initiatives, for the feasibility of the Sete Brasil project
- Mr Ferraz holds a Bachelor Degree in Mechanical Engineering from UFRJ – Universidade Federal do Rio de Janeiro
- In the last years, Mr. Ferraz wrote the book "International Business Transactions with Brazil", about the advantages of Project Finance structures, especially for companies with footprint in emerging countries

| | |
|---|---|
| *Pedro Barusco – Chief Operating Officer* | • Joined Petrobras in 1979, where he developed his professional career<br>• Mr. Barusco worked for 15 years in the Centro de Pesquisas da Petrobras (CENPES), in the development of technologies for deep water oil production, as naval engineering and oceanography manager of CENPES<br>• In 1995, he became the production facilities manager of the Exploration & Production Department of Petrobras<br>• In 2003, Mr. Barusco was appointed as executive manager of Engineering of Petrobras, where he was responsible for the construction of several oil production platforms, refineries, oil and gas pipelines, oil, gas and LNG terminals and the new Research Centre of Petrobras. He also led the capacity increase and fuel quality improvement program in all Petrobras refineries.<br>• Mr. Barusco has worked in the Pre-Salt Sondas Project of Petrobras since its inception<br>• Mr. Barusco holds a Bachelor Degree in Naval Engineering from University of São Paulo and a Masters Degree in Oceanic Engineering from COPPE -UFRJ |

The Chief Financial Officer is currently being selected by the Company's shareholders. The FIP Sondas quota holders shall produce a triple list for the indication of the CFO. The Board will select one of the names (or reject all candidates, in such case, a new list will be prepared for the Board's appreciation).

### 8.10   Board of Directors

The Board of Directors of Sete Brasil shall consist of at least 11 and at most 13 voting members (and an equal number of alternates), one of them necessarily the CEO of the Company.

Currently, there are 11 members (11 alternates) appointed as follows:

- 9 members (and their alternates) appointed by FIP Sondas quota-holders

- 1 member (and its alternate) appointed by Petrobras, in its capacity of shareholder of the Company; and

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG_KEP_00000061

CONFIDENTIAL INFORMATION MEMORANDUM                    setebrasil

◆     1 member shall be the CEO of the Company.

Regarding the members of the Board of Directors to be appointed by FIP Sondas, one member shall be appointed by the manager of FIP Sondas or by the manager of FI-FGTS, in case it becomes a quota holder of FIP Sondas.

*Table 9: Board of Directors*

| # | Board Member | Substitute | Indication |
|---|---|---|---|
| 1 | Newton Carneiro da Cunha[34] | Marcelo Almeida de Souza | Petros |
| 2 | Fernando Jorge Buso Gomes[35] | Norberto Pinto Barbedo | Bradesco |
| 3 | João Carlos Ferraz | Pedro José Barusco Filho | Sete Brasil |
| 4 | Luiz Carlos Cantidio Junior | Marcelo Hudik | Banco Santander |
| 5 | Lucas Caulliraux Martinelli | Oderval Duarte Filho | BTG Pactual |
| 6 | Armando Ramos Tripodi | Ricardo Berretta Pavie | Petros |
| 7 | Vitor Hugo dos Santos Pinto | Raquel Cristina Tedesco | FIP Sondas |
| 8 | Carlos Alberto Caser | Demósthenes Marques | FUNCEF |
| 9 | Carlos Augusto Borges | Roberto Yoshio Miura | FUNCEF |
| 10 | Eberaldo de Almeida Neto | José Luiz Roque | Petrobras |
| 11 | Jorge Wilson Luiz Alves | Ivan Farías de Castro | PREVI |

Source: Sete Brasil.

### 8.11  Summary of Current Shareholders

*Petros Pension Fund*



◆     Pension Fund of Petrobras' employees

◆     Founded in 1970, Petros is the 2nd largest Pension fund in Brazil in terms of Assets Under Management ("AUM") and currently has ~145,000 members

◆     AUM (Dec'2010) of R$ 55 billion (US$ 35 billion)

*FUNCEF Pension Fund*



◆     FUNCEF is Caixa Economica Federal's employees' pension fund

◆     3rd largest Pension Fund in Brazil and currently has ~100,000 members

◆     AUM (Dec 2010) of R$ 44 billion (US$ 28 billion)

*Previ Pension Fund*



◆     Previ is Banco do Brasil's current and former employees' Pension Fund

◆     Previ was founded in 1904 and is the largest pension fund in Latin America and currently has ~185,000 members

◆     AUM of R$ 152 billion (US$ 97 billion)

◆     Previ is a key investor in the Brazilian infrastructure sector

---

[34] President
[35] Vice-President


LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

62

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

*Banco Bradesco*



- Bradesco is one of Brazil's largest private banks in total assets, and offers a wide range of banking and financial products to individuals, small/mid-sized companies and major corporations
- Total Assets (Dec'10): R$ 637 billion (US$ 406 billion)
- Net Income (2010): R$ 10 billion (~US$ 6 billion)
- Market Capitalization: R$ 100 billion (~R$ 65 billion)
- Invested in Sete Brasil through a new investment fund denominated Strong

*Banco Santander Brasil*



- Santander branch in Brazil is the 4th largest bank in the country and the largest controlled by an foreign group
- Total Assets: R$ 396 billion (US$ 252 billion)
- Net Income: R$ 3.8 billion (US$ 2.5 billion)
- Market Capitalizion (Brazilian unit): R$ 55 billion (~R$ 35 billion)

*BTG Pactual*



- BTG Pactual is one of the leading investment banks, asset and wealth managers in Brazil
- In 2010, investors from Asia, Middle East, Europe and America made a US$ 1.8 billion capital injection
- Total Assets (Dec'10): R$ 74 billion (US$ 47 billion)
- Net Income (2010): R$ 810 million (US$ 516 million)

*Valia Pension Fund*



- Valia is the Vale's employees' Pension Fund
- Valia was founded in 1973 and is one of the largest Pension Funds in Brazil. Currently has ~86,000 members
- AUM (Dec 2010) of R$ 13.6 billion (US$ 8.7 billion)

### 8.12 IPO Plans

*The IPO of Sete Brasil is contemplated in the Strategic Guidelines Plan*

The IPO of Sete Brasil is contemplated in the Strategic Guidelines Plan (*Plano de Diretrizes Estratégicas*).

In case Sete Brasil considers that there is a market opportunity and interest from investors, Sete Brasil may conduct a public offer of its shares in the market, through an IPO. The IPO shall consist of a primary offering. The IPO may include a secondary tranche, if there is interest from shareholders of Sete Brasil and if deemed appropriate, considering the market conditions.

At the moment the Executive Board of Sete Brasil submits a report with the terms and conditions of the IPO for the shareholders, unless shareholders representing 85% of

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

63

setebrasil

the total capital disagree with the IPO plans, the shareholders shall take all steps necessary, sign all documents and perform all corporate acts necessary for performance of the IPO.

During the IPO process, FIP Sondas may be extinguished and the quota-holders may instead become direct shareholders of Sete Brasil.

### 8.12.1  Undisbursed Committed Capital

The Strategic Guidelines Plan also determines that in the case of an IPO the committed capital (from each shareholder) not yet disbursed maybe be requested by the management of the Company.

However, if during the IPO process, the Company's management indicates that there is a possibility of cancellation of part of the committed capital not yet disbursed, management shall communicate this position to its shareholders and they may choose individually to: (i) cancel, in whole or in part, its respective remaining committed capital, or (ii) anticipate the contribution, in whole or in part, of its respective remaining committed capital.

### 8.12.2  Secondary Offering

After the 5th year from the date of the first equity contribution to Sete Brasil, the quota-holders of FIP Sondas and/or shareholders of Sete Brasil or group of shareholders and/or quota-holders that hold, directly and/or indirectly, at least 10% of the total capital of Sete Brasil shall be entitled on any date after the 5th year from the first equity contribution, to further a secondary public offering, for sale, in whole or in part, of their shares ("Secondary Offering").

In this case, Sete Brasil, its shareholders, FIP Sondas, its quota-holders and management shall take all steps necessary to perform the Secondary Offering.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

setebrasil

# 9   KEY ASSUMPTIONS AND RESULTS

### 9.1   Introduction

In order to appraise Sete Brasil's potential internal rate of return, a financial model was developed by Sete Brasil in conjunction with Lakeshore, representing all the key assumptions applicable to the project. The financial model is built on a quarterly basis and according to the functional currency of each jurisdiction (Sete Brasil-R$, Sete International-EUR and SPVs-US$). The projections contemplate the construction period and 20 years of operation for each SPV. The model forecasts the 28 SPVs (individually), Sete International and Sete Brasil.

### 9.2   Capital Expenditures

The total capital expenditures ("capex") budget comprises investments in:

* EPC Contract with the Shipyards;
* Indexation of the EPC Contract;
* Start-up equipment;
* Construction Management Agreement;
* Insurance during construction; and
* Financial Costs (fees and interest during construction).

The capex budget was prepared based on the actual EPC Contract with EAS Shipyard for the First System and on Sete Brasil's best view of EPC prices for the additional 21 rigs (based on non-binding proposals from the shipyards).

*Exhibit 26: Projected Capex*

| Sources | First System (7 rigs) | New System (21 rigs) | Total (28 rigs) |
|---|---|---|---|
| Construction Cost | $4.637.000 | $16.859.000 | $21.496.000 |
| EPC Contract Indexation | 768.296 | 1.440.762 | 2.209.058 |
| Start-up Equipment | 105.000 | 630.000 | 735.000 |
| FGCN | 26.469 | 75.852 | 102.321 |
| Construction Supervision | 58.450 | 504.000 | 562.450 |
| Insurance | 79.358 | 283.946 | 363.304 |
| Financial Costs | 43.595 | 95.735 | 139.330 |
| **Total** | **$5.718.168** | **$19.889.296** | **$25.607.463** |

*Source: Sete Brasil and Lakeshore.*

### 9.3   Construction Schedule

The investment schedule contemplates the entire construction period, approximately 10 years. All 28 rigs are expected to be operating in 2020.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

65

EIG_KEP_00000065

setebrasil

The disbursement schedule assumes that Sete Brasil is awarded the full set of 21 rigs in Petrobras' bidding process and that the EPC contracts are signed in January 2012. The tables below illustrate the projected investment schedule of the 28 drilling rigs as a percentage of total capex and in US$ terms.

*Table 10: Investment Schedule (% of Total)*

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Shipyard 1 - EAS (7 Rigs) | 13,5% | 15,1% | 18,1% | 16,1% | 15,7% | 12,1% | 5,7% | 2,7% | 1,1% |
| Shipyard 2 (6 Rigs) | 0,0% | 16,4% | 17,0% | 22,5% | 19,1% | 16,9% | 4,7% | 2,6% | 1,0% |
| Shipyard 3 (6 Rigs) | 0,0% | 16,0% | 14,9% | 15,7% | 16,8% | 17,3% | 10,6% | 5,5% | 2,4% |
| Shipyard 4 (6 Rigs) | 0,0% | 16,2% | 17,5% | 17,9% | 10,8% | 17,3% | 12,9% | 5,1% | 1,4% |
| Shipyard 4 (3 Rigs) | 0,0% | 17,2% | 22,9% | 28,4% | 24,1% | 0,0% | 4,7% | 2,7% | 0,0% |
| Consolidated | 2,9% | 16,1% | 17,5% | 19,2% | 16,5% | 14,2% | 8,1% | 3,9% | 1,3% |

*Source: Sete Brasil.*

*Table 11: Investment Schedule (US$ millions)*

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Shipyard 1 - EAS (7 Rigs) | $720,6 | $805,9 | $961,0 | $858,1 | $834,8 | $641,8 | $301,4 | $144,7 | $55,9 |
| Shipyard 2 (6 Rigs) | 0,0 | 928,2 | 965,3 | 1.274,2 | 1.081,2 | 956,0 | 265,9 | 148,4 | 55,4 |
| Shipyard 3 (6 Rigs) | 0,0 | 917,6 | 854,8 | 900,0 | 967,8 | 994,1 | 607,9 | 314,2 | 135,0 |
| Shipyard 4 (6 Rigs) | 0,0 | 929,0 | 1.001,0 | 1.023,9 | 616,5 | 994,1 | 740,6 | 292,9 | 79,6 |
| Shipyard 4 (3 Rigs) | 0,0 | 481,5 | 640,9 | 797,2 | 674,9 | 0,0 | 132,7 | 76,7 | 0,0 |
| Consolidated | $720,6 | $4.062,2 | $4.423,0 | $4.853,4 | $4.175,2 | $3.586,0 | $2.048,5 | $976,8 | $325,8 |

*Source: Sete Brasil.*

*Exhibit 27: Annual Capex Disbursement (US$ millions)*



*Source: Sete Brasil.*

 SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

EIG_KEP_00000066

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

### 9.4    Key Dates & Charter Terms

*Table 12: Commercial Operation Date of Each Rig*

|  | Rig #1 | Rig #2 | Rig #3 | Rig #4 | Rig #5 | Rig #6 | Rig #7 |
|---|---|---|---|---|---|---|---|
| Shipyard 1 - EAS (7 Rigs) | 4Q'15 | 3Q'16 | 2Q'17 | 4Q'17 | 3Q'18 | 2Q'19 | 4Q'19 |
| Shipyard 2 (6 Rigs) | 2Q'16 | 2Q'17 | 4Q'17 | 3Q'18 | 2Q'19 | 4Q'19 | N.A. |
| Shipyard 3 (6 Rigs) | 2Q'16 | 2Q'17 | 3Q'18 | 2Q'19 | 4Q'19 | 3Q'20 | N.A. |
| Shipyard 4 (6 Rigs) | 2Q'16 | 2Q'17 | 4Q'17 | 2Q'19 | 4Q'19 | 3Q'20 | N.A. |
| Shipyard 4 (3 Rigs) | 2Q'16 | 4Q'17 | 3Q'18 | N.A. | N.A. | N.A. | N.A. |

Source: Sete Brasil.
Note: Assumes 3-month of commissioning and acceptance testing after delivery from shipyards.

*Table 13: Charter Terms*

|  | Rig #1 | Rig #2 | Rig #3 | Rig #4 | Rig #5 | Rig #6 | Rig #7 |
|---|---|---|---|---|---|---|---|
| Shipyard 1 - EAS (7 Rigs) | 20 years | 20 years | 10 years | 10 years | 10 years | 10 years | 10 years |
| Shipyard 2 (6 Rigs) | 15 years | 15 years | 15 years | 15 years | 15 years | 15 years | N.A. |
| Shipyard 3 (6 Rigs) | 15 years | 15 years | 15 years | 15 years | 15 years | 15 years | N.A. |
| Shipyard 4 (6 Rigs) | 15 years | 15 years | 15 years | 15 years | 15 years | 15 years | N.A. |
| Shipyard 4 (3 Rigs) | 15 years | 15 years | 15 years | N.A. | N.A. | N.A. | N.A. |

Source: Sete Brasil.
Note: Contractual charter terms, does not consider renewal.

### 9.5    Daily Rates

The total daily rates are composed of two components: (i) the Charter Daily Rates, paid by Petrobras to the SPV; and (ii) Service Daily Rates, paid by Petrobras to the operator.

- Charter Daily Rate: US$ 331,000/day; and
- Service Daily Rate: US$ 127,000/day or (R$ 211,836/day)

Each SPV shall have as their sole source of revenue the bare boat Charter rate paid by Petrobras on a monthly basis, according to the availability of each drilling rig (Up Time).

*Insurance and Maintenance Costs*

The charter daily rate shall also cover US$ 13,000 per day of insurance expenses and US$ 22,000 per day of spare parts and dock due expenses to be paid by the SPE[36].

*Service Rates*

The operational assumptions shall be ruled by a Service Contract signed with the operator company. The financial model accounts for a service rate of USD 115,000

---

[36] Source: Petrobras, referrring to real data practiced by the company and other rigs operators consulted. Such value may be altered by Petrobras.

 LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

67

EIG_KEP_00000067

setebrasil

per day[37], full revenue to go to the rig operator to cover all operation costs, charges and profit margin. As in other similar contracts, the costs for which Petrobras is responsible (such as fuel, water supply and support ships, etc.) are not included in these values.

### 9.6   Uptime

The base case of the financial model assumes that the drilling rigs shall present an average availability of 95.0% in the first year and 97.0% for the remainder of the projected period. A 95.0% uptime entitles the SPV do receive a performance bonus of 2.5% of the charter daily rate and an uptime of 97.0% entitles the SPV to receive a performance bonus of 7.5%.

Such assumptions are based on data from ODS-Petrodata[38] and Petrobras' experience as operator and lessor.

### 9.7   Mobilization Fee

Each drilling rig shall receive a single payment of US$ 30 million in the first month of operations following the acceptance of the rig by Petrobras.

This resource (which typically funds the mobilization costs of the vessel from an offshore shipyard to Brazil) will be used to fund the Contingency Reserve Account (US$ 22 million) and the Performance Reserve Account (US$ 8 million).

### 9.8   G&A Expenses

The G&A expenses are accounted for at the Sete Brasil level. The estimated annual G&A expense is approximately R$ 26.6 million per year (2010 values).

The G&A expenses are adjusted annualy by IPCA inflation.

### 9.9   FIP Sondas Expenses

The financial model also takes into account the FIP Sondas management and custody fees, respectively 0.20% and 0.0185% p.a of the FIP's net worth.

The FIP Sondas expenses are considered to end in the 2Q'16, considering Sete Brasil goes public in the next five years.

For modeling purposes, the FIP Sondas fees are accounted for at the Sete Brasil level, thus the resulting IRR are net of management and custody fees.

### 9.10   Capital Structure and Financing

In the preliminary financial planning, the model contemplates a senior debt/equity ratio of 80/20.

---

[37] Source: Petrobras, referring to real data practiced by the company and other rigs operators consulted. Such value may be altered by Petrobras.
[38] Source: *Ultra-Deepwater Rigs for Brazil, A report for Banco Santander related to Petrobras' Pre-salt Oil Rigs Project*, May 2010.

 LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

setebrasil

However, until the financial closing and disbursement of thesenior financing (expected for 3Q'12),

Out of the funds of financial investors (Class A equity), a portion may be obtained by a financing granted by the shareholders themselves, or by third parties, nonetheless subordinated to the senior debt (the "Subordinated Debt"). Based on the eligible costs and the project's capacity to serve its debt, the project's capital structure has been estimated in the following manner:

*Table 14: Debt Facilities*

| Tranche | Description | % of Financed Total |
|---|---|---|
| BNDES | Financing of local goods and services | 45,0% |
| ECAs | Financing of imported goods and services | 20,0% |
| Commercial Banks | Financing remaining items not covered by BNDES and ECAs | 15,0% |

*Source: Sete Brasil and Lakeshore.*

### 9.11  Financing Terms

The financing terms foreseen in the Pre-Salt Drilling Rigs Project's financial model are in line with the conditions previously discussed with BNDES, GEIK and Commercial Banks. However, such conditions have been formally stated and therefore the conditions presented below are preliminary, and subject to change.

*Table 15: Financing Terms and Conditions[39]*

| Item | BNDES | ECAs | Commercial Banks |
|---|---|---|---|
| Total Term (years) | Construction + 15 | Construction + 12 | Construction + 10 |
| Index | Libor | Libor or CIRR[40] | Libor |
| Spread | 2.75% | 3.00% | 3.00% |
| Repayment Style | Mortgage Style | Linear | Customized |
| Repayment Schedule | Quarterly | Quarterly | Quarterly |
| Months of Reserve Account | 3 | 3 | 3 |
| Capitalize IDC? | Yes | Yes | Yes |

*Source: Sete Brasil, BNDES, OECD, GIEK and Lakeshore.*

---

[39] Indicative terms and conditions.
[40] Commercial Interest Reference Rates – set by OECD monthly, currently at 3.28% p.a.

 SOUZA, CESCON, BARRIEU & FLESCH ADVOGADOS

CONFIDENTIAL

EIG_KEP_00000069

setebrasil

### 9.12  Sources and Uses

*First System*  Based on the projected capital expenditure and the proposed capital structure, the sources and uses statement foreseen for the First System is detailed below. Note that for the First System the EPC Contracts with EAS were already signed (US$ 662 million per Rig, 2010 values).

*Table 16: Sources and Uses (First System)*

| Sources | US$ 000 | Uses | US$ 000 |
|---|---|---|---|
| **Debt** | **$4.574.534** | EPC Contract | $4.637.000 |
| BNDES | 2.573.175 | EPC Contract Indexation | 768.296 |
| ECAs | 1.143.634 | Startup Equipment | 105.000 |
| Commercial Banks | 857.725 | FGCN | 26.469 |
| **Mezzanine Facility** | **$325.936** | Work inspection | 58.450 |
| Total Sub-Debt | 325.936 | Insurance | 79.358 |
| **Equity** | **$817.698** | Financial Costs | 43.595 |
| Class A Equity | 695.043 | | |
| Class B Equity | 122.655 | | |
| **Total** | **$5.718.168** | | **$5.718.168** |

Source: Sete Brasil and Lakeshore.
Note: excludes pre-operational G&A and FIP Sondas expenses.

*Additional 21 Rigs*  For the additional 21 rigs, Sete Brasil is in negotiation with several shipyards in order to present a competitive bid for Petrobras. The following table is based on the assumption that the investment per rig is ~US$ 803 million per rig.

*Table 17: Sources and Uses (21 rigs)*

| Sources | US$000 | Uses | US$ 000 |
|---|---|---|---|
| **Debt** | **$15.911.437** | Construction Cost | $16.859.000 |
| BNDES | 8.950.183 | EPC Contract Indexation | 1.440.762 |
| ECAs | 3.977.859 | Startup Equipment | 630.000 |
| Commercial Banks | 2.983.394 | FGCN | 75.852 |
| **Mezzanine Facility** | **$1.133.690** | Work inspection | 504.000 |
| Total Sub-Debt | 1.133.690 | Insurance | 283.946 |
| **Equity** | **$2.844.169** | Financial Costs | 95.735 |
| Class A Equity | 2.261.068 | | |
| Class B Equity | 583.101 | | |
| **Total** | **$19.889.296** | | **$19.889.296** |

Source: Sete Brasil and Lakeshore.



CONFIDENTIAL

EIG_KEP_00000070

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

*Consolidated 28 Rigs*   The table below consolidates the sources and uses tables of the First System and the additional 21 rigs.

*Table 18: Consolidated Sources and Uses (28 rigs)*

| Sources | US$ mm | Uses | US$ mm |
|---|---|---|---|
| **Debt** | **$20.485.971** | Construction Cost | $21.496.000 |
| BNDES | 11.523.358 | Construction Indexation | 2.209.058 |
| ECAs | 5.121.493 | Startup Equipment | 735.000 |
| Commercial Banks | 3.841.119 | FGCN | 102.321 |
| **Mezzanine Facility** | **$1.459.625** | Work inspection | 562.450 |
| Total Sub-Debt | 1.459.625 | Insurance | 363.304 |
| **Equity** | **$3.661.867** | Financial Costs | 139.330 |
| Class A Equity | 2.956.111 | | |
| Class B Equity | 705.756 | | |
| **Total** | **$25.607.463** | | **$25.607.463** |

*Source: Sete Brasil and Lakeshore.*

### 9.13   Charter Contract Renewal

The financial model projects 20 years of operating life for each SPV. Therefore, the 20-year contracts are not renewed, the 10-year contracts are renewed for an additional period of 10 years and the 15-year contracts are renewed for an additional period of 5 years.

The model assumes the Charter Contracts are renewed at ~US$500thd/day, the median prices projected by ODS-Petrodata, as demonstrated in the chart below.

*Exhibit 28: Historical and Projected Daily Rates for Deepwater Rigs*



*Source: ODS-Petrodata.*

 SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

71

CONFIDENTIAL

EIG_KEP_00000071

setebrasil

### 9.14   Senior Debt Refinancing

The financial model also contemplates the refinancing of the original senior financing package with Project Bonds in the international capital markets. The objective is to reduce the Company's weighted average cost of capital. The key refinancing assumptions are:

- Issuance Date: operating year 10 (First System) and operating year 2 (21 rigs)
- Term: 10 years door-to-door
- Coupon: 6.50% p.a.
- Amortization: fully amortizing (First System) and 30% ballon at maturity (21 rigs)

The assumptions for refinancing terms are based on two recent bond offerings by Brazilian offshore drillers for ultra-deepwater and midwater assets with long-term charter agreeements with Petrobras (illustrated in the table below).

*Table 19: Project Bonds - Benckmark*

| | Norbe 8 & 9 | Alpha & Alaskan Star |
|---|---|---|
| Sponsor | Odebrecht O&G | Queiroz Galvão O&G |
| Offering Type | 144A/ Reg A Senior Secured Notes | 144A/ Reg A Senior Secured Notes |
| Issuance Size | US$ 1,500 million | US$ 700 million |
| Use of Proceeds | Refinancing of existing bank facilities | Refinancing of existing bank facilities (~US$400mm) and general corporate purposes |
| Assets | 2 ultra-deepwater rigs (DSME, 2011) | Alaskan Star (1976, Mitsubishi) and Atlantic Star (1976, CFEM) |
| Maturity | July 2021 | July 2018 |
| Average Life | 8 years | 4 years |
| Coupon | 6.350% p.a. | 5.375% p.a. |
| Rating | Baa3 (Moody's) / BBB- (Fitch) | Baa3 (Moody's) / BBB- (Fitch) |
| Amortization | Amortizing with 30% balloon at maturity | Fully amortizing |
| Collateral | Secured by first priority liens on substantially all of the Issuer's and the SPVs' tangible assets and Plegde of all Project Accounts | Secured by first priority liens on substantially all of the Issuer's and the SPVs' tangible assets and Plegde of all Project Accounts |

*Source: Offering Prospectus, Sete Brasil and Lakeshore.*

### 9.15   Terminal Value

After 20 years of operations, these assets are expected to carry a significant market value. The current average age of the global feets is 22 years. Additionally, as described earlier the technological risk for the next 25 years is remote.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

EIG_KEP_00000072

setebrasil

According to ODS-Petrodata's projections, the future value of similar assets in 2030 ranges from US$ 425 million to US$ 800 million, an average of US$ 662.5 million (2011 dollars).

Therefore, the financial model considers as terminal value, US$ 662.5 million (indexed to CPI) at the end of year 20 of each SPV.

*Exhibit 29: Future Values Estimate of Deepwater Rigs*

| Rig Values - USD Million (2011 dollars) | | |
|---|---|---|
| | Semisubmersibles | Drillships |
| 2015 | USD 550 to USD 650 | USD 550 to USD 650 |
| 2020 | USD 525 to USD 700 | USD 525 to USD 725 |
| 2025 | USD 475 to USD 750 | USD 475 to USD 775 |
| 2030 | USD 425 to USD 775 | USD 425 to USD 800 |

*Source: ODS-Petrodata.*

### 9.16   Tax Assumptions

The following table illustrates all taxes contemplated in the financial model.

*Table 20: Tax Summary*

| Tax | Rate | Comment |
|---|---|---|
| **Sete Brasil** | | |
| IOF/Credit | 1.88% | At the grant of a loan |
| IOF/Exchange rate | 0.38% | Applied on the exit and entry of funds (capital or debt) |
| **Sete Brasil** | | |
| Withholding Tax (dividends) | 15.0% | According to Brazil-Austria Tax Treaty |
| Withholding Tax (interest) | 0.0% | Not applicable |
| Capital Duty | 1.0% | On the capitalization of Sete International by Sete Brasil |
| Stamp Duty | 0.8% | On the value of the loan contract (subordinated debt) of Sete Brasil to Sete International |
| **SPVs** | | |
| Income Tax | 25.5% | 20% tax credit on charter revenue |
| Withholding Tax – Dividends | 0.0% | No withholding in the Euro zone |

*Source: Sete Brasil.*

### 9.17   ICMS Reimbursement

The financial model also considers the payment of the Imposto sobre Circulação de Mercadorias e Serviços ("ICMS"), which is a State tax and its exemption in not contemplated in the REPETRO Program. The ICMS tax is equivalent to ~R$ 50

EIG_KEP_00000073

setebrasil

million and is paid upon delivery of the rig. This amount is fully refunded by Petrobras under the Services Contract.[41]

### 9.18   Main Macroeconomic Assumptions

The main macroeconomic assumptions[42] are presented below.

*Table 21: Macroeconomic Assumptions*

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| INCC[43] | 7,9% | 9,3% | 5,5% | 6,0% | 5,4% | 5,4% | 4,8% |
| IPCA[44] | 6,1% | 6,0% | 5,5% | 4,5% | 4,5% | 4,5% | 4,0% |
| Average CDI [45] | 13,0% | 13,0% | 12,0% | 10,0% | 9,7% | 9,7% | 13,0% |
| R$/US$ | 1,55 | 1,55 | 1,60 | 1,62 | 1,65 | 1,68 | 1,70 |
| R$/EURO | 1,92 | 1,89 | 1,95 | 1,98 | 2,01 | 2,05 | 2,08 |
| Libor (6 months) | 2,0% | 2,0% | 2,0% | 2,0% | 2,5% | 2,5% | 2,5% |
| US CPI | 1,0% | 1,7% | 3,0% | 3,0% | 3,0% | 2,5% | 2,5% |

*Source: Santander Economics Department, as of August 2011.*

---

[41] Appendix 3 (Additional Operation Rate) of the Services Agreement.

[42] The macroeconomic assumptions are subject to updates.

[43] INCC is the Brazilian National Construction Inflation Index.

[44] IPCA is the Brazilian Consumer Price Inflation Index.

[45] CDI is the Brazilian local interbank interest rate.



LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOCADOS

CONFIDENTIAL

EIG_KEP_00000074

setebrasil

# 10 CAPITAL STRUCTURE AND FINANCING PLAN

### 10.1 Key Financing Considerations

*Maximizing Financing Terms*

The term of financing facilities represents one of the most important variables in the setting of a competitive daily rate and in consequently in the sponsors' IRR. A key challenge is negotiate a financing package with an average repayment term superior to the charter term of 10 years (and 12.8 years on average). For such, the structure must contain mechanisms for risk mitigation and provide comfort for lenders. The envisaged structure offers the following mitigates:

- ◆ Charter Renewal Fund to be constituted at the Sete International level, capitalized by dividends from the SPVs;
- ◆ A portfolio finance structure enabling SPVs' cash flows to complement each other through Sete International;
- ◆ Two SPVs with 20-year Charter Contracts;
- ◆ State-of-the-art assets with redeployment opportunities in other regions besides the Brazilian Pre-Salt;
- ◆ Petrobras, the most representative player offtaker of deepwater asset as Sete Brasil's shareholder; and
- ◆ Residual value of assets.

*Limit the number of financing sources*

Given the complexity and amounts of financing involved, the funding strategy is focused on financing sources with large underwriting potential. The credit approval activity of each source of financing is extensive (due diligence, contracts, negotiations, etc.) and considerably costly. Based on such strategy, Sete Brasil's objective is to focus on few financing sources, with a special focus on BNDES financing.

*IPO*

Despite the fact that the financing plan does not foresee resources from the capital markets, it is Sete Brasil's intention to contemplate a flexible structure that takes into account the equity capital markets, creating mechanisms for additional fundraising demanded by Sete Brasil and liquidity mechanisms for shareholders within the contractual structure.

### 10.2 Financing Plan

The main sources of financing for the Project are:

*Bridge Loan*

- ◆ Use of resources: first disbursements and downpayments
- ◆ Participation: ~US$ 800mm (possibly US$ 1 billion depending on market appetite)
- ◆ Currency: US$
- ◆ Borrower: SPVs or Sete International
- ◆ Comment: Revolver-type loan

*BNDES*

- ◆ Use of Resources: local equipment and services
- ◆ Participation: 40% to 50%

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

**EIG_KEP_00000075**

setebrasil

|  | |
|--|--|
| | ◆ Currency: US$ |
| | ◆ Borrower: SPVs |
| | ◆ Comment: project's main source of financing |
| *ECAs* | ◆ Use of Resources: imported goods and services |
| | ◆ Participation: 20% |
| | ◆ Currency: US$ |
| | ◆ Borrower: SPVs |
| | ◆ Comment: the probable ECA is GIEK with funding from banks |
| *Commercial Banks* | ◆ Use of Resources: non-eligible costs of BNDES and ECAs |
| | ◆ Participation: 10% to 20% |
| | ◆ Currency: US$ |
| | ◆ Comment: flexibility in disbursement and amortization |
| *Equity* | ◆ Use of Resources: financing of goods and services non-eligible to others sources of financing |
| | ◆ Participation: 20% |
| | ◆ Comment: in order to take advantage of the Brazil-Austria Double Taxation Treaty (tax withholding not applicable to the payment of interest between Brazil and Austria) |

### 10.2.1  BNDES

BNDES is the largest source of long-term financing in Brazil and has already formally manifested its commitment to participate in the Project's financing through an issued letter with the express authorization of its Board.

The amount of financing from BNDES is limited to the amount of local content of the Project (55% to 65%).

Given that the loan takers, the SPVs, will be located in the Netherlands and, as a result of the REPETRO features, the only BNDES product available for this project is the BNDES EXIM, under which the resources may be disbursed directly to local suppliers in BRL and accounted for in the SPEs' debt in US$, converted at the date of disbursement.

The following financing terms and conditions for the First System have been approved by the BNDES' Board:

- Form of Support: Direct funding from BNDES

- Financial Cost: LIBOR + 2.25% per year, for a total term of 18 years, 3 of each grace period and 15 of which amortization

- Amortization System: mortgage style

- Risk Remuneration: defined by the credit policy of BNDES, according to the risk rating of the Project; and

LAKESHORE        SOUZA, CESCON, BARRIEU & FLESCH
                 ADVOGADOS

76

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

- Participation Level: 100% of the national machinery and equipment and 80% of additional financeable items.

The approval granted by the BNDES' Board, however, is conditioned to the compliance with requisites described below, as well as with others that may be included during the analysis of the financing operation:

- That the EPC Contract is entered into by an EPC contractor the credit quality of which is acceptable to BNDES;

- That the daily rate is at least sufficient for: (i) covering the costs of operation and maintenance of drilling rigs; (ii) the senior debt coverage ratio is equal or superior to 1.2x; (iii) the total debt coverage ratio is equal to or superior to 1.00x; (iv) the constitution of funds and reserve accounts to be assigned in guarantee; and (v) the flow of receivables of Sete International (such as dividends, internet and principal of subordinated debt) is sufficient to cover 120% of any cash deficiency of the SPEs, specially the SPEs' debt service that fail to have its contract renewed after the 10th year of operation

- That during the pre-operational phase the following guarantees are provided, among others that may be negotiated in the analysis of the operation phase, considering, yet, that the rules applied to guarantees constituted abroad shall be determined at the discretion of BNDES: (i) fiduciary assignment of credit rights of the EPC Contract; (ii) pledge or fiduciary assignment of credit rights of the Sete International accounts; (iii) pledge or fiduciary assignment of the credit rights of the SPEs' accounts; (iv) pledge of the SPEs' shares; (v) performance guarantee insurance; (vi) reserve account for eventualities; (vii) credit guarantee from FGCN in the amount of 50% of financing

- That during the operational phase the following guarantees are provided among others that may be negotiated during the analysis of the operation phase, considering, yet, that the rules applied to guarantees constituted abroad shall be determined at the discretion of BNDES: (i) pledge or fiduciary assignment of Sete International receivables, (ii) pledge or fiduciary assignment of SPVs receivables; (iii) pledge of SPVs shares; (iv) reserve account of, at least, 3 months of debt service; (vii) renewal fund in the minimum amount of US$ 150 million; (viii) performance fund of a minimum amount of US$ 70 million; and (ix) mortgage or fiduciary ownership of rigs.

- Availability of FGCN resources to grant credit guarantee for the package of drilling rigs to be contracted; Net equity of shareholder of 20% of the investment, composed by 10% of net equity and 10% of subordinated debt, noting that, in the event that the portion of own resources increases, the same may occur by the increase in the participation of the subordinated debt in the Project's sources;

- That Petrobras holds, at least, 10% of the Sete Brasil equity, save the possibility of reduction of such participation up to the minimum of 5% in case the company goes public;



setebrasil

- ▪ That Petrobras PNBV remains as Class B shareholder of each SPV holding a 10-year Charter contract until, at least, 12 months prior to the delivery of the respective drilling rig;

- ▪ That the obligation is maintained of PNBV remaining as Class B shareholder of each SPV holding a 20-year Charter contract until, at least, the end of the senior debt amortization term; and

- ▪ That the commitment is established for shareholders to commit own resources in the SPEs, by means of a capital assignment of subordinated debt to senior creditors, in case there is the need to complement resources in order to finish the construction of the rigs, provided that such cost increase derives from a project alteration requirement issued by the SPV (Change Order) and/or the price adjustment index pertaining to the EPC Contract.

### 10.2.2 ECAs

*USEximbank - United States*

Independent agency of the North-American government created in 1934 to facilitate the financing of export of north-American goods and services. Eximbank promotes North-American exports by the offer of insurance and credit guarantees to buyers and suppliers.

It currently holds an attractive price due to the recent improvement in the OECD Brazil risk. It typically demands an entry of at least 15%.

*GIEK - Norway*

GIEK's goal is to promote Norwegian exports through guarantees representing the Norwegian government. Since 1994 GIEK is organized as a public institution within the Ministry of Commerce.

GIEK's support to businesses connected to Norwegian exports has been object of a growing focus in light of the international financial crisis.

Additionally, considering that the supply of goods and services for the construction of maritime drilling rigs niche has a large presence in Norway today, GIEK's support to the Project may mean a considerable participation of such institution in the structure's financing package.

### 10.2.3 Commercial Banks – Syndication

Traditionally the main source of financing of drilling rigs built outside of Brazil are Commercial Banks syndicates, given that BNDES does not finance foreign equipment and service.

A syndicated operation of Commercial Banks' financing, therefore, shall complete the financing package and may be initiated speedily and gradually. One of the key advantages of this modality it is flexibility for customization in response to the Project's needs – much greater than BNDES, ECAs (USExim, GIEK) – even in regard to the type of debt amortization and variable schedule for funds disbursement, eliminating negative carry losses. Another important advantage is the knowledge of the sector on the part of the banks.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

setebrasil

### 10.3   Main Covenants and Obligations

Based on recent transactions in the sector and preliminary discussions with BNDES and commercial banks, the main obligations and covenants foreseen for the senior debt facilities are:

- Restriction on additional indebtedness;
- Negative-pledge;
- Change of Control;
- Waterfall of priorities and cash flow payments;
- Senior Debt Coverage Ratio of 1.20x for dividend payments and 1.1x for default;
- Debt Service Reserve Account ("DSRA") equivalent to 3 months of debt service (interest and principal);
- Charter Agreement Renewal Fund of US$ 17 million per rig;
- Performance Fund of US$ 8 million per rig; and
- Contingency Reserve Account of US$ 22 million per rig for extraordinary capex not foreseen in the business plan.

### 10.4   Guarantees Package

The insurance package that senior creditors will probably require shall include the following guarantees:

*Pre-Completion Guarantees*

- Pledge/Fiduciary Assignment of the Construction Contract
- Pledge/Fiduciary Lien of the Charter Contract
- Pledge/Fiduciary Lien of the shares/quotas of the specific SPEs
- Assignment of the insurance package
- Pledge/Fiduciary Lien of the Liquidated Damages of the Construction Contract

*Post-Completion Guarantees*

- Pledge/Fiduciary Lien of the do Charter Contract
- Pledge/Fiduciary Lien of the Service Contract (O&M)
- Pledge/Fiduciary Lien of the shares/quotas of the specific SPEs
- Mortgage of the SPVs' assets
- Assignment of the insurance package
- Pledge/Fiduciary Lien of the Project Accounts (DSRA, Performance Fund, Charter Renewal Fund and Contingency Reserve Account)

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

setebrasil

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOCADOS

CONFIDENTIAL

EIG_KEP_00000080

setebrasil

# 11 RISKS AND MITIGATING FACTORS

## 11.1 Design and Engineering Risks

*Risk Description*     Risk related to error in project design and/or engineering.

*Consequence*     Errors and failures can result in failure to pass Petrobras' acceptance test or result in operational levels below specifications.

*Mitigating Factors*
- Use of an existing design, or an evolution of an existing design, with a proven success track record (field proof). Sete Brasil's drilling units are 6th generation deepwater rigs

- The design of the units were previously specified by Petrobras

- Strict technical selection of experienced shipyards or shipyards associated with another a technical partner with proven reputation in the construction of similar vessels

    - EAS Shipyard will be responsible for the construction of the First System. EAS is the largest shipyards in the Americas and has Samsung Heavy Industries as a sponsor (currently 10%) and as a technical partner. Samsung is the leading shipbuilder worldwide

- Reduction of areas of interference between the design of the vessel and the shipyard

- Monitoring of the construction process by an Independent Engineer appointed by lenders and other interested parties

- Supervision of the construction process by Petrobras for the First System, through a Construction Management Agreement, consequently reducing the risk of non-acceptance of units by Petrobras

- Supervision of the construction process by the operators for the additional 21 rigs

- Approximately 40% total content is imported (mostly equipment). This equipment currently used in similar rigs under construction or already built in international shipyards. That is, with respect to such equipment and the final performance of the rigs, the construction site has little effect on the outcome, provided that the installation, assembly and integration of such systems are monitored and supervised by the manufacturers of the main equipment, which is expected in this case

- The portfolio structure and the strategy of contracting several rigs from the same shipyard should allow local shipyards to build up expertise and experience during the construction of the first rigs, reducing the global risk the construction process

- Sete Brasil's management team includes a construction management staff to supervise the construction process

◆ Lastly, the guarantees provided by the FCGN, to be contracted by the SPEs, produce an important mitigating effect to the construction risk

### 11.2  Risk of Cost Overrun

*Risk*  Risk of an increase in the projected total investment and risk of change orders by Petrobras

*Consequence*  A cost overrun can impact sponsor's IRR. Additionally, additional funding (equity and third-party resources) may be required.

*Mitigating Factors*  ◆ Use of an existing design, or an evolution of an existing design, with a proven success track record (field proof). Sete Brasil's drilling units are 6th generation deepwater rigs

◆ The design of the units were specified previously by Petrobras

◆ The EPC contracts are turnkey with fixed-price and date-certain. No additional payment is expected (besides the indexation of the EPC Contract)

◆ Change orders required by Petrobras can only occur with the consent of Sete Brasil. Change orders can only approved by the Board of Directors

◆ A Contingency Reserve Account of US$ 22 million per rig (total of US$ 154 million) will be constituted in the form of a "pool" shared by all SPVs and centralized at Sete International. The main objective is mitigate the risk of insufficient cash in the SPVs for coverage of obligations arising from extraordinary costs during pre-operational phase

◆ Constant supervision of the construction process. Petrobras and the operators will follow the construction processes of all the drilling rigs, thus proactively identifying problems and deviations, which can provide additional comfort to investors and lenders

◆ The indexation of the EPC Contract is reflected in the Charter Agreement, in such a way that the daily rate captures the final cost of the unit without the loss of sponsor's IRR

◆ As mentioned above, approximately 40% the total capex is sourced internationally from experienced suppliers and the same used by the other offshore shipyards

◆ Hiring of insurances of BAR insurance (Builders All Risk)

◆ The proposed financial structure allows the SPVs and Petrobras to benefit fully from REPETRO, thus Sete Brasil is less impacted an increase in taxes

### 11.3  Risk of Delay

*Risk*  Risk of delay is characterized by a delivery of equipment after the date that was contractually agreed.

*Consequence*



LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

EIG_KEP_00000082

setebrasil

The delay in delivering the rigs causes a delay in the revenue of the Charter Contract and therefore affects the ability to serve senior debt. A delay of more than 24 months will give Petrobras the right to cancel the Charter Contract.

*Mitigating Factors*
- Turnkey date-certain EPC contracts
- EPC contracts include Delay Liquidated Damages ("LDs") clause of up to 10% of the contract's value
- Hire of FGCN insurance to cover any delays in the original schedule. The FGCN insurance can be used to service the debt in case of delay in commercial operation
- Use of an existing design, or an evolution of an existing design, with a proven success track record (field proof). Sete Brasil's drilling units are 6th generation deepwater rigs
- Strict technical selection of experienced shipyards or shipyards associated with another a technical partner with proven reputation in the construction of similar vessels
- Constant supervision of the construction process. Petrobras and the operators will follow the construction processes of all the drilling rigs, thus proactively identifying problems and deviations, which can provide additional comfort to investors and lenders
- Adequate construction period (four years for the delivery of the first rig) due to the inexperience of local shipyards in the construction of similar equipment (with respect to the first units)
- Gain in experience and productivity by the shipyards with the first drilling rigs

### 11.4  Performance Risk

*Risk*
Risk of poor performance by the operators.

*Consequence*
Reduction of charter revenues, which may cause the project to fail to generate enough resources to honor all of its commitments and, performance standards required by Petrobras.

*Mitigating Factors*
- Hiring of operators with proven experience in the operation of deep and ultra-deepwater rigs
- Possibility of replacing operator in case of poor performance
- DSRA equivalent to three-months
- Performance Reserve Account (totaling US$56mm for the First System) will be constituted in the form of a "pool" shared by all SPVs and centralized at Sete International. The main objective is to fund the debt service in case of a low uptime performance
- Porftfolio Financing structure, where performing SPVs can supper underperforming SPVs

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

setebrasil

- ◆ Careful evaluation of the project with emphasis on the project's capacity to produce robust debt coverage ratios (above 1.20x)

- ◆ Additionally, the operators will be the Class B investor and therefore has the added incentive to achieve high levels of uptime, as it will benefit as a shareholder and from the uptime bonus in the Service Contract

### 11.5   Charter Agreement Renewal Risk

*Risk*        Since the envisaged financing plan contemplates an amortization period longer than the 10-year charter contract there is the risk that, at the termination of the original charter contract term, the SPVs have not generated enough cash to fully repay its debt obligation.

*Mitigating Factors*    ◆ The renewal of the Charter Agreement with Petrobras does not require a tender process, only direct negotiation

- ◆ Residual value of assets and the existence of a secondary market for this type of equipment

- ◆ In case the rig is not chartered to Petrobras, redeployment opportunities are available (possibility of using the equipment almost anywhere in the world)

- ◆ Establishment of the Charter Renewal Fund, with the sole purpose of providing additional mitigation to risk of renewal and servicing the debt during a period outside of an Charter Contract (approximately US$ 117 million)

### 11.6   Termination of the Brazil-Austria Tax Treaty Risk

*Risk*        Risk related to the termination of the Brazil-Austria Double Taxation Treaty.

*Mitigating Factors*    ◆ The Treaty was established in 1976[46] with the goal of avoiding double taxation on income and capital

- ◆ The treaty has no expiration date

- ◆ There is no recent history of objection to the treaty

### 11.7   Environmental and Social Risk

*Risk*        The risks related to not meeting environmental and social requirements and lead to accidents in the operation of the drilling rigs.

*Mitigating Factors*    ◆ The assets are drilling units and not production and storage platforms, therefore it is less exposed to environmental hazards

- ◆ State-of-the-art deepwater rigs and its design meet the current environmental and safety standards of this type of equipment. Additionally, the rigs use an existing design, with a proven track record of success and performance

---

[46] Decree No. 78.107/1976.



LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOCADOS

84



- During the operation of the rigs, Petrobras has supervisory personnel on board of each vessel. To this end, Petrobras also requires all its contractors to use standard procedures developed by the company and ongoing training of all employees and third parties

- The operation must follow the rules and policies of IBAMA, CONAMA and MARPOL

- The Charter Contract determines that in the event of oil spills or other wastes in the sea, the SPVs ) will respond, to the limit of US$ 1 million per event

- Lastly, financers (ECAs and Commercial Banks) will require compliance of the Project with all environmental and social obligations to which it is subject under the law and the prevailing social and environmental standards set by the Equator Principles

**11.8   Total or Partial Loss During Operation Risk**

*Risk*         The risks related to accidents resulting in total or partial damage to the rig.

*Mitigating Factors*   • This risk is mitigate by the insurance package, which include Hull and Machinery (equivalent to the market value of the asset) and Third-Party Liability (P&I)

85

CONFIDENTIAL                                                              EIG_KEP_00000085

## 12 INSURANCE PACKAGE

The insurance package and coverage amounts will be defined on a later stage with the advice of an insurance consultant. We present below the typical insurance for deepwater drilling operations.

The insurance of the operational phase shall be negotiated by Sete International and Petrobras, aiming to explore the benefits of negotiating an insurance package for a fleet (portfolio) not a single asset, generating gains of scale. The insurance policies, however, shall be contracted at the SPVs level.

Note that the insurance policies will be assigned to the senior lenders.

### 12.1 Third-Party Liability Insurance

*Description*  The third-party insurance will be demanded both in the construction and operation phases.

*Insured*
- SPE and/or Shipyard
- Financers (or *collateral agent*)

*Coverage*
- Legal liability of any insured referring to (a) death, injury, illness of any person (excluding employees), and (b) loss or damage of any property (excluding the project)
- Coverage amount has not been determined yet

### 12.2 Hull & Machinery

*Description*  The Hull & Machinery is an asset insurance. It starts approximately 12 months prior to the commercial operation and is to be annually renewed during the financing term. The Charter Contract (Article 21.2) determines that the SPVs shall maintain insurance coverage on the unit, and its property during the term of the agreement.

*Insured*
- EPC contractors and/or shipyard
- Financers (or *collateral agent*)

*Coverage*
- Financing amount (including derivative contracts) or the estimated market value of the insured equipment (drilling rig), including on-board equipment
- The coverage includes hurricanes, theft, fire, collision, submerging, etc.

LAKESHORE    SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

# 13 THE BRAZILIAN SHIPBUILDING INDUSTRY

## 13.1  Brief History

*The Brazilian shipbuilding industry reached its peak in the 1970*

The Brazilian shipbuilding industry dates back to 1846 when the first shipyard was installed in Niteroi, Rio de Janeiro. However, it was not until the 1950s that the industry was developed and at the time the sector was driven due to initiatives of President Juscelino Kubitschek. The industry reached its peak in the 1970s, when Brazil was the second most active country after Japan.

After this phase, the sector experienced a progressive decline until the end of the 1990s and only a few shipyards remained active and operating below capacity.

Activity in the sector started to pick up in the end of the 1990s with a movement from Petrobras to increase offshore E&P. The initial demand was for supply vessels and oil production platforms. In 2001, Petrobras launched the PROMEF[47] Program, designated for the modernization of the supply vessels fleet with a requirement for Brazilian flag ships, which further stimulated the sector. The Federal Government also imposed minimum local content requirements. Thus assembly and final production of platforms and vessels started to be conducted in Brazil.

*After almost 2 decades of low activity, demand from Petrobras changed the scale of the local industry and attracted foreign shipyard*

The demand from Petrobras also attracted foreign investor and Keppel Fels acquired a shipyard in Angra dos Reis in 2000. Samsung Heavy Industry made a partnership with Camargo Correa and Queiroz Galvão for the construction of the EAS shipyard.

Later in 2006, Transpetro (a subsidiary of Petrobras) selected, through an international bidding process, shipyards for an order of 26 new oil tankers, changing the scale of the naval industry in Brazil.

The shipbuilding industry is also contemplated in the Federal Government's PAC Program (Accelerated Growth Program). Additionally, the Brazilian Government is also providing support to the sector with a special financing program, called *Fundo da Marinha Mercante*, which provides up to 20-year financing, 90% leverage at competitive interest rates to finance greenfield and brownfield shipyard projects.

## 13.2  Current Scenario

According to SINAVAL (Brazilian Nacional Association of Shipyards) as of 2Q'2011, the direct formal employment of the shipbuilding industry is ~56,000 workers (and ~283,000 direct and indirect) and SINAVAL expects an additional 15,000 direct jobs to be created in the next 3 years. The current backlog is 276 projects (including repair and new builds). SINAVAL expects important orders to take place in the 2H'2011, including 14 oil tankers, 21 ultra-deepwater rigs and 30 supply vessels.

---

[47] Programa de Modernização e Expansão da Frota da Transpetro.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

EIG_KEP_00000087

setebrasil

The Brazilian oil and gas industry demand has driven the development of 13 greenfield shipyards.

The *Fundo da Marinha Mercante* has approved priority projects for the financing of ~R$ 10 billion, including the financing for 6 shipyards and 218 naval projects.

Pernambuco, Rio de Janeiro and Rio Grande do Sul states are responsible for ~90% of the TPB under construction.

*Exhibit 30: Map of Brazilian Shipyards*



Source: SINAVAL, August 2011.

LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOCADOS

CONFIDENTIAL

EIG_KEP_00000088

setebrasil

*Table 22: Select Brazilian Shipyards Comparison*

|  | EAS | Brasfels | Rio Grande | Jurong | Paraguaçu | OSX |
|---|---|---|---|---|---|---|
| Existing/Greenfield | Existing | Existing | Existing | Greenfield | Greenfield | Greenfield |
| Location | Suape | Angra | Rio Grande | Aracruz | Paraguaçu | Açu |
|  | (ES) | (RJ) | (RS) | (ES) | (BA) | (RJ) |
| Area (thd km2) | 780 | 1,000 | 450 | N.A. | N.A. | 3,000 |
| Steel Processing Capacity (thd tons/year) | 160 | 50 | N.A. | N.A. | N.A. | 180 |
| Technical Partner | Samsung Heavy Industrie | Keppel Fels | Cosco | SembCorp Marine | N.A. | Hyundai |

*Source: Sete Brasil and Verax Cosultoria.*

### 13.3   Description of Selected Existing Shipyards

**Estaleiro Atlântico Sul**

- Sponsors: Camargo Correa, Queiroz Galvão, Samsung Heavy Industries, PJMR
- Location: Suape, Pernambuco (~40km from the city of Recife)
- Technical Partner: Samsung Heavy Industries
- Commentary: largest ship ward in Latin America. Was founded in 2005 with a total capex of ~R$ 1.8 billion. Has 1 dry-dock (400m long) and a steel processing capacity of 160tons/year. Capacity to produce Tankers, Bulk Carriers, Container Ships, Cargo Ships, Chemical Carrier, Drilling Ships, Semi-submersible, FPSOs, TLPs and SPARs. Can produce all kind of cargo ship of up to 500,000 tons of deadweight DWT).
- Backlog: seven ultra-deepwater rigs for Sete Brasil, Transpetro tankers (10 Suezmax and 5 Aframax), P-55 hull for Petrobras
- Total Area: 780.000 m² (hangar 110.000 m²)
- Website: http://www.estaleiroatlanticosul.com.br

**Estaleiro Rio Grande**

- Sponsors: Engevix and FUNCEF
- Location: Rio Grande, Rio Grande do Sul
- Technical Partner: N.A.
- Commentary: has the largest dry-dock in Brazil. Was built by Wtorre in a partnership with Petrobras, who has the dy-dock occupation rights for a period of 10 years. Engevix and FUNCEF acquired the shipyard in June 2010 for US$ 228 million. The shipyards total investment in ~R$ 500mm
- Backlog: won the bid from Petrobras to build 8 FPSO hulls
- Total Area: 450.000 m² (hangar 20.000 m²)
- Website: N.A.

**Brasfels**

- Sponsors: wholly-owned subsidiary of Keppel Fels (Singapore)



LAKESHORE   SOUZA, CESCON, BARRIEU & FLESCH
ADVOGADOS

CONFIDENTIAL

setebrasil

- Location: Angra dos Reis, Rio de Janeiro
- Technical Partner: Keppel Fels - global leader in offshore rigs and ship conversion and repair
- Commentary: Has 1 dry-dock and 3 slipways and currently has a steel processing capacity of 60tons/year.
- Backlog: recently delivered the P-56 platform for Petrobras and is currently building TLWP P-61 platform and module integration of P-57 also for Petrobras
- Total Area: 1,000,000 m² (hangar 135.000 m²)
- Website: http://www.kfelsbrasil.com.br

### 13.4   Description of Selected Greenfield Shipyards

**Paraguaçu Shipyard**

- Sponsors: Odebrecht, OAS and UTC
- Location: São Roque do Paraguaçu, Bahia
- Technical Partner: N.A.
- Commentary: greenfield shipyard, already has preliminary and installation environmental licenses, estimated R$2bn investment
- Website: N.A.

**Jurong Shipyard**

- Sponsors: SembCorp Marine (Singapore)
- Location: Aracruz, Espírito Santo
- Technical Partner: Jurong (Singapore)
- Commentary: greenfield shipyard, already has preliminary and installation environmental licenses. Jurong will focus on platforms for the Pre-salt.
- Website: http://www.sembcorpmarine.com.sg/index.php?page=Estaleiro

**OSX Shipyard**

- Sponsor: EBX (Eike Batista)
- Location: São João da Barra, Rio de Janeiro
- Technical Partner: Hyundai Heavy Industries (Korea)
- Commentary: publicly listed company, has plans to build 48 units for OGX in the next 10 years
- Website: http://www.osx.com.br/cgi/cgilua.exe/sys/start.htm?tpl=home

LAKESHORE   Souza, Cescon, Barrieu & Flesch
ADVOGADOS

CONFIDENTIAL INFORMATION MEMORANDUM

setebrasil

### 13.5  PROMINP Program

The PROMINP (*Programa de Mobilização da Indústria Nacional de Petróleo e Gás Natural*) program was established in 2003 by the Brazilian Federal Government with the objective of supporting the local naval industry in order to reach global competitiveness levels. The program is focused on qualified job creation for the O&G industry.

The program was launched in parallel with the increase in local content regulation by ANP. Petrobras and BNDES are the key providers of resources and technical support for the PROMINP.

The program offers up to 175 training programs for the O&G sector. The courses are free and PROMINP also offers assistance for unemployed students (monthly salary).

Up to 2010, PROMINP had trained 78,000 people in 15 different states and has plans to capacitate another 212,000 workers by 2014. The PROMINP also offers a job website where over 1,500 companies can access the resumes from workers trained by PROMINP.

### 13.6  PROGREDIR Program

PROGREDIR is a special financing program developed by Petrobras together with a group of commercial banks (namely, Banco do Brasil, Bradesco, Itau, Caixa, HSBC and Santander) for the supply chain of the O&G sector. The objective of the program is to increase the access of suppliers to financing from commercial banks based on non-performed contracts with Petrobras.

The key objectives are:

- Create a unique and standardized environment between banks and companies, whether buyers or suppliers;
- Allow access, of up to date and accurate information on contracts (supply and financing) and performance of each contract;
- Retain historical information and performance in order to improve the basis for analysis and lending based on non-performing contracts; and
- Promote competition among participating banks.

The PROGREDIR portal is already operating[48].

---

[48] http://www.progredir.petronect.com.br/irj/portal/anonymous/financas.



CONFIDENTIAL

EIG_KEP_00000091