KEPPEL OPP'N EXH.  88

Bracuhy Drilling B.V.

Bracuhy Drilling B.V.- 003/2012-FELS

DRU #3

**Execution Version**

# ENGINEERING, PROCUREMENT AND

# CONSTRUCTION CONTRACT

Dated as of August 2nd, 2012

**By and between**

## BRACUHY DRILLING B.V.

**and**

## FERNVALE PTE. LTD.

**Drilling Rig Unit**

95-4952876

Confidential

KEPPEL00610372

Bracuhy Drilling B.V.

Bracuhy Drilling B.V.- 003/2012-FELS
DRU #3

## TABLE OF CONTENTS

ARTICLE 1   DEFINITIONS AND INTERPRETATION.................................................. 10
    1.1.   Definitions................................................................................... 10
    1.2.   Section and Exhibit References................................................. 18
    1.3.   Interpretation. ........................................................................... 18
ARTICLE 2   RELATIONSHIPS AND ACKNOWLEDGEMENTS.................................. 20
    2.1.   Subject Matter of this Agreement............................................. 20
    2.2.   Status of Contractor. ................................................................ 20
    2.3.   Acknowledgement of Contractor. ............................................. 20
ARTICLE 3   OBLIGATIONS OF CONTRACTOR.......................................... 20
    3.1.   Scope of Work – General Scope. .............................................. 20
    3.2.   Specific Obligations.................................................................. 21
    3.3.   Contractor's Obligations Regarding the Performance of the Works.................. 22
    3.4.   Spare Parts................................................................................ 24
    3.5.   Standard of Performance........................................................... 24
    3.6.   Contractor's Tools and Equipment............................................ 25
    3.7.   Employment of Personnel......................................................... 25
    3.8.   Key Personnel........................................................................... 29
    3.9.   Operation Personnel and Assisted Operation............................ 29
    3.10.   Emergencies. ............................................................................ 30
    3.11.   Approvals, Certificates, Permits and Licenses. ........................ 30
    3.12.   Books, Records and Audits. ...................................................... 30
    3.13.   Tax Accounting. ....................................................................... 30
    3.14.   Temporary Facilities................................................................. 31
    3.15.   No Liens.................................................................................... 31
    3.16.   Quality Assurance..................................................................... 31
    3.17.   Plan & Reports. ........................................................................ 32
    3.18.   Payment.................................................................................... 34
    3.19.   Progress Meetings..................................................................... 34
    3.20.   Site Security. ............................................................................ 34
    3.21.   Access to Documents................................................................ 37
    3.22.   Environmental Compliance....................................................... 37



Confidential

KEPPEL00610373

Bracuhy Drilling B.V.

Bracuhy Drilling B.V.- 003/2012-FELS
DRU #3

| 3.23. | Transportation | 38 |
| 3.24. | Export of DRU | 38 |
| ARTICLE 4 | LOCAL CONTENT REQUIREMENTS | 38 |
| 4.1. | Local Operations in Brazil | 38 |
| 4.2. | Brazilian Local Content | 39 |
| 4.3. | Brazilian Local Content Report | 39 |
| 4.4. | Liquidated Damages | 40 |
| ARTICLE 5 | OBLIGATIONS OF OWNER | 40 |
| 5.1. | Payment | 40 |
| 5.2. | Permits | 40 |
| 5.3. | Temporary Asset Transfers | 41 |
| 5.4. | Good Industry Practices | 41 |
| ARTICLE 6 | REPRESENTATIONS OF THE PARTIES | 41 |
| 6.1. | Representations and Warranties of Owner | 41 |
| 6.2. | Representations and Warranties of Contractor | 42 |
| ARTICLE 7 | TAXES | 43 |
| 7.1. | General provision | 43 |
| 7.2. | Modification of the Tax Burden | 44 |
| 7.3. | Indemnification | 45 |
| ARTICLE 8 | MILESTONES PAYMENTS | 45 |
| 8.1. | Milestones Payments | 45 |
| 8.2. | Milestone Payment Event | 45 |
| 8.3. | Milestone Payment Documents | 46 |
| ARTICLE 9 | CONTRACT PRICE | 46 |
| 9.1. | Contract Price | 46 |
| 9.2. | Price | 46 |
| 9.3. | Payment Limit | 47 |
| 9.4. | Incentive Amount | 47 |
| ARTICLE 10 | PAYMENTS TO CONTRACTOR | 48 |
| 10.1. | Payments | 48 |
| 10.2. | Invoicing | 48 |
| 10.3. | Invoicing Documents | 48 |
| 10.4. | Representation | 49 |

Confidential
KEPPEL00610374

| 10.5. | Review and Approval. | 49 |
|---|---|---|
| 10.6. | Payments. | 50 |
| 10.7. | Payments Not Acceptance of Work | 51 |
| 10.8. | Payments Withheld and Deducted | 51 |
| 10.9. | Interest on Late Payments. | 52 |
| 10.10. | Payments During Default. | 52 |
| 10.11. | Offset. | 52 |
| 10.12. | Payment Error. | 52 |
| 10.13. | Adjustments. | 52 |
| 10.14. | Final Completion. | 57 |
| ARTICLE 11 | COMMENCEMENT OF WORK: PROJECT SCHEDULE | 57 |
| 11.1. | Commencement of Work. | 57 |
| 11.2. | [Not applicable]. | 57 |
| 11.3. | Project Schedule. | 57 |
| 11.4. | Project Schedule Baseline. | 58 |
| ARTICLE 12 | CHANGE ORDERS | 59 |
| 12.1. | Change. | 59 |
| 12.2. | Imputed Change. | 60 |
| 12.3. | Changes Caused by Owner Delays. | 60 |
| 12.4. | Procedures for Negotiation of Change Orders. | 61 |
| 12.5. | Unsuccessful Negotiation of Change Orders. | 61 |
| 12.6. | Rules. | 61 |
| 12.7. | Owner's Written Consent | 62 |
| ARTICLE 13 | TITLE AND RISK OF LOSS | 62 |
| 13.1. | Title. | 62 |
| 13.2. | Contractor Waiver. | 62 |
| 13.3. | Risk of Loss. | 63 |
| ARTICLE 14 | INSURANCE | 63 |
| 14.1. | Provision of Insurance. | 63 |
| 14.2. | Lenders as Additional Insureds. | 63 |
| 14.3. | Subrogation Waivers. | 63 |
| 14.4. | New Technology. | 63 |
| 14.5. | No Cancellation. | 63 |



- 4 -

95-40522876

Confidential

KEPPEL00610375

Bracuhy Drilling B.V.

Bracuhy Drilling B.V.- 003/2012-FELS
DRU #3

| 14.6. | Obligations Not Relieved. | 63 |
| 14.7. | Failure to Provide Required Insurance. | 64 |
| ARTICLE 15 | DOCUMENTATION | 64 |
| 15.1. | Delivery of Record As-Built Drawings. | 64 |
| 15.2. | Purchasing and Subcontractor Supplied Information. | 64 |
| 15.3. | Construction Drawings and Manuals. | 64 |
| 15.4. | Other Information. | 64 |
| ARTICLE 16 | COMPLETION | 64 |
| 16.1. | Mechanical Completion. | 64 |
| 16.2. | Substantial Completion. | 65 |
| 16.3. | Owner Acceptance of Substantial Completion. | 65 |
| 16.4. | Substantial Completion Punch-list. | 65 |
| 16.5. | Handover. | 66 |
| 16.6. | Handover Certificate. | 66 |
| 16.7. | Performance Acceptance. | 66 |
| 16.8. | Final Completion. | 66 |
| 16.9. | Long-Term Obligations. | 66 |
| ARTICLE 17 | INSPECTION AND WARRANTY | 67 |
| 17.1. | Scope of Warranty. | 67 |
| 17.2. | Owner Right to Inspect. | 68 |
| 17.3. | Warranty of Defects and Services. | 69 |
| 17.4. | Warranty Exclusions. | 70 |
| ARTICLE 18 | ASSIGNMENT AND GUARANTEE | 70 |
| 18.1. | Assignment. | 70 |
| 18.2. | Encumbrances. | 70 |
| 18.3. | Contractor not to be Released. | 71 |
| 18.4. | Assignment by Owner. | 71 |
| 18.5. | Right of Termination. | 71 |
| ARTICLE 19 | SUBCONTRACTING | 71 |
| 19.1. | Subcontractors. | 71 |
| 19.2. | Subcontractors Qualification. | 71 |
| 19.3. | Proposed Subcontractors. | 72 |
| 19.4. | Subcontracts. | 72 |



95-40522876

Confidential

KEPPEL00610376

Bracuhy Drilling B.V.                                        Bracuhy Drilling B.V.- 003/2012-FELS
DRU #3

ARTICLE 20      GUARANTEE OF TIMELY COMPLETION............................................. 74
    20.1.   Guarantee of Timely Completion. .................................................. 74
    20.2.   Liquidated Damages for Delay. ..................................................... 74
    20.3.   Liquidated Damages Are Not a Penalty. ......................................... 74
    20.4.   Sole Remedy for Delay. ................................................................ 75
    20.5.   No Challenge. ............................................................................... 75
    20.6.   Performance Security. ................................................................... 75
    20.7.   Corporate Guaranty from FELS OFFSHORE PTE. LTD. ............... 76
ARTICLE 21      DEFAULT, TERMINATION AND SUSPENSION .................................. 77
    21.1.   Default by Contractor. ................................................................. 77
    21.2.   Termination for Convenience by Owner. ........................................ 78
    21.3.   Suspension of Works by Owner. .................................................... 79
    21.4.   Termination by Contractor. ........................................................... 79
    21.5.   Suspension of Work by Contractor. ............................................... 80
ARTICLE 22      INDEMNITIES; LIMITATIONS OF LIABILITY ................................ 80
    22.1.   Contractor's Indemnification Obligation. ...................................... 80
    22.2.   Owner's Indemnification Obligation. ............................................ 80
    22.3.   Patent Indemnification. ................................................................ 80
    22.4.   Notice. ......................................................................................... 81
    22.5.   Survival and Duration. ................................................................. 82
    22.6.   Limitation of Liability. ................................................................. 82
    22.7.   Consequential Damages. .............................................................. 83
ARTICLE 23      FORCE MAJEURE .......................................................................... 83
    23.1.   No Liability. ................................................................................ 83
    23.2.   Prevention and Reduction. ........................................................... 84
    23.3.   Mutual Consultation. .................................................................... 84
    23.4.   Definition. ................................................................................... 84
    23.5.   Termination for Force Majeure. .................................................... 84
ARTICLE 24      DISPUTE RESOLUTION.................................................................. 85
    24.1.   Amicable Resolution. ................................................................... 85
    24.2.   Disputes of Technical Nature. ...................................................... 85
    24.3.   Binding Arbitration. ..................................................................... 86
ARTICLE 25      MISCELLANEOUS PROVISIONS ..................................................... 88



Confidential                                                              KEPPEL00610377

Bracuhy Drilling B.V.

Bracuhy Drilling B.V.- 003/2012-FELS
DRU #3

25.1.   Entire Agreement.................................................................. 88

25.2.   Opportunity to Review........................................................... 88

25.3.   Amendments......................................................................... 88

25.4.   Captions............................................................................... 89

25.5.   Notice................................................................................... 89

25.6.   Severability.......................................................................... 90

25.7.   No Waiver............................................................................ 90

25.8.   Governing Law..................................................................... 90

25.9.   Successors and Assigns........................................................ 90

25.10.  Exhibits............................................................................... 90

25.11.  Limitations on Third Party Beneficiaries; No Joint Venture. ..... 90

25.12.  Further Assurances.............................................................. 90

25.13.  Restrictions on Public Announcements................................. 90

25.14.  Confidentiality..................................................................... 91

25.15.  Survival............................................................................... 92

25.16.  Negotiation.......................................................................... 92

25.17.  DRU as Sister Vessel........................................................... 92

ARTICLE 26      ADDITIONAL CONSIDERATIONS ........................... 93

26.1.   Duty to Perform.................................................................. 93

26.2.   Right to Negotiate................................................................ 93



Bracuhy Drilling B.V.

Bracuhy Drilling B.V.- 003/2012-FELS
DRU #3

## LIST OF EXHIBITS

| | |
|---|---|
| EXHIBIT I | SCOPE OF WORK |
| EXHIBIT II | GENERAL TECHNICAL DESCRIPTION |
| EXHIBIT III | DIRECTIVES FOR ENGINEERING SERVICES |
| EXHIBIT IV | DIRECTIVES FOR CONSTRUCTION AND ASSEMBLY |
| EXHIBIT V | DIRECTIVES FOR PROCUREMENT |
| EXHIBIT VI | DIRECTIVES FOR PLANNING AND CONTROL |
| EXHIBIT VII | DIRECTIVES FOR QUALITY ASSURANCE SYSTEM |
| EXHIBIT VIII | DIRECTIVES FOR COMMISSIONING |
| EXHIBIT IX | DIRECTIVES FOR HEALTH, SAFETY AND ENVIRONMENT |
| EXHIBIT X | GENERAL FUNCTIONAL DESCRIPTION |
| EXHIBIT XI | FACILITIES FOR OWNER'S REPRESENTATIVES |
| EXHIBIT XII | LIST OF SUBCONTRACTORS |
| EXHIBIT XIII | CONTRACTOR CONSENTS AND PERMITS |
| EXHIBIT XIV | OWNER CONSENTS AND PERMITS |
| EXHIBIT XV | BRAZILIAN LOCAL CONTENT REQUIREMENTS |
| EXHIBIT XVI | PRICE SCHEDULE |
| EXHIBIT XVII | MILESTONES PAYMENTS |
| EXHIBIT XVIII | PROJECT SCHEDULE |
| EXHIBIT XIX | FORM OF CHANGE ORDER |
| EXHIBIT XX | INSURANCE REQUIREMENTS |
| EXHIBIT XXI | FORM OF HANDOVER CERTIFICATE |
| EXHIBIT XXII | FORM OF FINAL LIEN WAIVER |
| EXHIBIT XXIII | PERFORMANCE SECURITY |

SPAULO-1-37049-v3

95-40522876

Confidential

KEPPEL00610379

Bracuhy Drilling B.V.

Bracuhy Drilling B.V.- 003/2012-FELS
DRU #3

EXHIBIT XXIV      FORM OF SUBSTANTIAL COMPLETION CERTIFICATE

EXHIBIT XXV      FORM OF FINAL COMPLETION CERTIFICATE

EXHIBIT XXVI      FORM OF PERFORMANCE ACCEPTANCE CERTIFICATE

EXHIBIT XXVII      INTERNATIONAL INVITATION NR. 0966646118

EXHIBIT XXVIII      CONTRACTOR DOCUMENTATION

EXHIBIT XXIX      FORM OF DECLARATION

EXHIBIT XXX      CORPORATE GUARANTY – FELS OFFSHORE PTE. LTD.



Confidential

KEPPEL00610380

## ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT

THIS ENGINEERING, PROCUREMENT AND CONSTRUCTION CONTRACT (this "Agreement"), is made and entered into as of August 2ᵗʰ, 2012, by and between BRACUHY DRILLING B.V., a limited liability company organized and existing under the laws of The Netherlands, having its main office at De Entree 99 -197, 1101HE Amsterdam, The Netherlands ("Owner"), and FERNVALE PTE. LTD., a private company limited by shares (Company Registration No.201132918E) organized and existing under the laws of the Republic of Singapore, having its main office at 50 Gul Road Singapore 629351 (the "Contractor" and together with Owner, the "Parties," and each a "Party"); and SETE INTERNATIONAL GMBH, a corporation organized and existing under the laws of Austria, with head offices at Schwarzenbergstraße 1-3/14a, 1010 Vienna, registered under number FN 348664 t ("Sete International"), executes this Agreement as intervening consenting party and agrees with the payment terms and conditions set forth herein (and for this exclusive purpose the dispute resolution provisions in Article 24 shall apply to Sete International as if it is a Party).

### RECITALS

**WHEREAS**, Owner desires to engage Contractor to supply one (1) DRILLING RIG UNIT, semi-submersible type, designing, engineering, procuring, supplying, constructing, commissioning, and completing such DRU, in accordance with the requirements and technical specification set out in the Invitation applicable to a semi-submersible rigs, as further described herein;

**WHEREAS**, Owner desires that Contractor provide the foregoing engineering, procurement, and construction services on a lump sum price basis; and

**WHEREAS**, Contractor is a wholly-owned subsidiary of FELS Offshore Pte Ltd and an affiliate of Keppel FELS Brasil S.A. and has expertise and experience in carrying out works similar to the Works as defined herein and its other obligations under the Agreement, in accordance with the schedule set forth in this Agreement and in a suitable and efficient manner;

**NOW THEREFORE**, in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

### ARTICLE 1  DEFINITIONS AND INTERPRETATION

1.1.  Definitions.  In addition to other defined terms used throughout this Agreement, the following terms shall have the meanings specified below in this Article 1.

"Affiliate" shall mean (i) any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a Party, or (ii) any Person that, directly or indirectly, is the beneficial owner of 50% (fifty percent) or more of any class of equity securities of, or other ownership interests in, a Party or of which a Party is directly or indirectly the owner of 50% (fifty percent) or more of any class of equity securities or other ownership interests.

"Agreement" or "EPC Contract" shall mean this Engineering, Procurement and Construction Contract, including all Exhibits attached hereto, and including all Bid Documents, and all of their respective amendments from time to time by the Parties.

Confidential

KEPPEL00610381

"ANP" shall mean the Brazilian National Agency for Petroleum, Natural Gas and Biofuels (*Agência Nacional do Petróleo, Gas Natural e Biocombustíveis*).

"Applicable Codes and Standards" shall mean the codes, standards or requirements, effective on the Proposal Submission Date, set forth herein or in any Applicable Law, as amended from time to time, which codes and standards include, but are not limited to, those listed in the Exhibits hereto and shall govern Contractor's performance of the Work. In the event of an inconsistency or conflict between any of the Applicable Codes and Standards, the highest performance standard shall govern Contractor's performance under this Agreement.

"Applicable Law" shall mean any treaty, law, statute, code, ordinance, decree, injunction, judgment, order, license, permit, Consent (as defined herein), rule or regulation (including those relating to taxes), policies having the force of law, collective labor agreement, promulgated, entered into, or endorsed by any Governmental Authority having jurisdiction over the matter in question, of any Governmental Authority, including any requirements and rules of a relevant flag authority and the Environmental Laws and the permits, approvals and licenses described in Section 3.2(j) and Section 5.2 herein, which relates to the performance of the Works or the interpretation or application of this Agreement, as such laws, statutes, codes, ordinances, decrees, injunctions, judgments, orders, licenses, permits, Consents, rules and regulations may be amended, modified or supplemented from time to time. The conduct adjustment commitment (*Termo de Ajustamento de Conduta*, "TAC"), issued, amended, modified or supplemented from time to time, shall also be considered Applicable Law.

"Bid Circulars" shall mean those documents specified in the schedules attached hereto as Exhibit XXVII, Appendix 2.

"Bid Documents" shall mean those documents specified in the schedules attached hereto as Exhibit XXVII, Appendix 1.

"BNDES" shall mean the Brazilian Bank for Social and Economic Development (*Banco Nacional de Desenvolvimento Econômico e Social*).

"Brazilian Reais" shall mean the lawful currency of the Federative Republic of Brazil.

"Brazilian Local Content" shall have the meaning set forth in Section 4.2.

"Business Day" shall mean every day other than a Saturday, Sunday or a day that is an official holiday in the City of Rio de Janeiro, Brazil, in Amsterdam, Netherlands, Singapore or in New York City, United States of America.

"CEI" shall have the meaning set forth in Section 3.7.4.2.

"Centre" shall have the meaning set forth in Section 24.2(b).

"Change" shall have the meaning set forth in Section 12.1.



Confidential                                                              KEPPEL00610382

"Change Order" shall mean a written, signed order from Owner to Contractor in accordance with Article 12 hereof and in the form set forth in Exhibit XIX, which authorizes an addition to, deletion from, or revision of, the Scope of Work of this Agreement and/or an adjustment to the Project Schedule.

"Classification Society" shall mean the classification society indicated in Exhibit I.

"Confidential Information" means any proprietary information, technical data, trade secrets or know-how, data, reports or records, or other information marked as confidential by the disclosing Party, including without limitation research, product ideas, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, hardware configuration information, marketing, finances or other business information disclosed by a Party to the other Party directly or indirectly either orally, in writing or by drawings or inspection of parts or equipment. Confidential Information does not include information which (x) is known to the non-disclosing Party at the time of disclosure by the disclosing Party as evidenced by written records of the non-disclosing Party, (y) has become publicly known and made generally available through no wrongful act or inaction of the non-disclosing Party, or (z) has been rightfully received by the non-disclosing Party from a third party who is authorized to make such disclosure.

"Consent" shall mean any approval, consent, authorization or other requirement that is required from any Governmental Authority under Applicable Law with respect to the prosecution of the Works or of the activities related thereto.

"Contractor" shall have the meaning set forth in the preamble hereto.

"Contractor Group" shall mean Contractor, its Affiliates, successors, permitted assigns, officers, directors, employees and agents (including Subcontractors).

"Contractor Project Manager" shall mean that Person designated by Contractor in a written notice to Owner who shall have complete authority to act on behalf of Contractor on all matters pertaining to this Agreement or to the performance of the Works, including giving instructions, and making changes previously approved by Owner in the Works.

"Contract Price" shall mean the amount to be paid by Owner to Contractor for the performance of the Works, as calculated and adjusted only in accordance with the terms of this Agreement.

"Day" or "day" shall mean a calendar day.

"Decision" shall have the meaning set forth in Section 24.2(c).

"Default" shall have the meaning set forth in Section 21.1(a).

"Defect" shall mean any design, plan, specification, engineering, Equipment, material, tool, supply, test, procedure, component, part or assembly which does not materially conform to the Scope of Work or the Applicable Codes and Standards, including any improper or inferior

95-40522876

Confidential                                                                              KEPPEL00610383

workmanship that is inconsistent with the Scope of Work or Good Industry Practices, and "Defective" shall have a correlative meaning.

"Defective Work" shall mean any Works that are Defective as determined pursuant to the terms of this Agreement.

"Delay Damages" shall have the meaning set forth in Section 20.2.3.

"Demonstration Tests" shall have the meaning set forth in Exhibit VIII.

"Dispute" shall have the meaning set forth in Section 24.1(a).

"Dissatisfaction Notice" shall have the meaning set forth in Section 24.2(d).

"DRU" shall mean a fully operational, complete drilling rig unit, as more specifically described in Exhibit II and Exhibit X, including Equipment incorporated or to be incorporated therein (irrespective of when such Equipment has been or is to be incorporated), to be designed, engineered, procured, supplied, constructed, commissioned and completed pursuant to this Agreement.

"Environmental Law" shall mean any Applicable Law relating in any way to the environment, preservation or reclamation of natural resources, to the management, Release or the threatened Release of any Hazardous Materials, or to the health and safety matters attending to the personnel working at the Site, to the extent applicable to the Works and/or the Site, as amended, from time to time.

"Equipment" shall mean all equipment, materials, supplies, apparatus, machinery, parts, tools (including special tools), components, instruments, appliances, spare parts and appurtenances thereto (including those set forth and described as part of the Scope of Work in Exhibit I) that are required for the full and timely completion of the Works.

"Euro" shall mean the single currency unit of any member state of the European Communities that adopts or has adopted the euro as its lawful currency in accordance with legislation of the European Community relating to economic and monetary union.

"Expert" shall have the meaning set forth in Section 24.2(b).

"FGTS" shall have the meaning set forth in Section 3.7.4.1.

"Final Completion" shall mean the full and complete performance of all Works in accordance with the terms of this Agreement, including without limitation: (i) the successful achievement of Mechanical Completion and Substantial Completion of the DRU; (ii) the completion of all Substantial Completion Punch-list items with respect to the DRU; (iii) the Handover Certificate in respect of the DRU has been accepted by Owner; (iv) all DRU systems are fully functional and operable; (v) receipt by Owner of a final Lien waiver in accordance with Exhibit XXII; (vi) the transfer from Contractor to Owner of all final documentation, records, as-built drawings and test reports required by this Agreement; (vii) the removal of all of Contractor's and



Confidential                                                                                    KEPPEL00610384

Subcontractor's personnel, supplies, waste, materials, rubbish, and temporary facilities from Owner's property; and (viii) the receipt by Owner of any and all classification certificates from the relevant Classification Society.

"Final Completion Certificate" shall mean the certificate described in Section 16.8.

"Force Majeure" shall have the meaning set forth in Section 23.4.

"GFIP" shall have the meaning set forth in Section 3.7.4.1.

"Good Industry Practices" shall mean the highest internationally accepted professional practices, methods, techniques and standards observed by the petroleum construction and production industries in countries such as the United States and the United Kingdom for operations in areas such as the Gulf of Mexico, or the offshore waters of Brazil for the design, engineering, construction, commissioning, testing, and operation of major drilling rig units, that, in the exercise of good judgment by skilled and experienced construction contractors would have been expected to accomplish the desired result in a manner consistent with Applicable Laws, Applicable Codes and Standards, safety, reliability, environmental protection, local conditions, economy and efficiency.

"Governmental Authority" shall mean any national, regional or other government of any state, province, county, municipality, or other political subdivision thereof, any governmental body, agency, authority, division, department, board or commission, or any instrumentality, officer or official of any of the foregoing, including any court, tribunal or committee, and having administrative and regulatory power over a Party, the Site or any portion of the Works.

"GPS" shall have the meaning set forth in Section 3.7.4.2.

"Handover" shall have the meaning set forth in Section 16.5.

"Handover Certificate" shall mean the document issued by Contractor and accepted by Owner pursuant to Section 16.6.

"Handover Date" shall have the meaning set forth in Section 11.4.5.

"Hazardous Materials" shall mean any hazardous, toxic, or polluting substance, material, waste or contaminant as defined or regulated pursuant to Environmental Laws, or Applicable Laws, in general, including, but not limited to asbestos or asbestos containing material, and polychlorinated biphenyls.

"ICC Rules" shall have the meaning set forth in Section 24.3(a).

"Incentive Amount" shall have the meaning set forth in Section 9.4.

"Invoice" shall mean a request for a payment issued by Contractor in accordance with Section 10.2.

Confidential                                                                        KEPPEL00610385

"INSS" shall have the meaning set forth in Section 3.7.4.1.

"International Invitation No.0966646118" or "Invitation" shall have the meaning set forth in the Exhibit XXVII.

"Lender" shall mean any entity or entities providing temporary or permanent financing for the DRU and any agent or trustee of such parties.

"Letter of Intent" shall mean the letter agreement between Sete Brasil Participações S.A., Keppel FELS Brasil S.A. and Estaleiro BrasFELS Ltda dated 22 March 2012.

"Lien" shall mean any encumbrance of any kind, mortgage, lien, pledge, charge, security interest, deed of trust, claim, or any charge on property for payment of some debt, obligation or duty.

"Major Subcontract" shall mean any agreement between Contractor and a Subcontractor as defined herein, having an aggregate value in excess of US$ 30,000,000 (thirty million United States Dollars) for performance of any part of the Works.

"Major Subcontractor" shall mean the Subcontractors listed in Exhibit XII and, in addition, any approved Subcontractor with whom Contractor enters, or intends to enter, into a Major Subcontract.

"Milestones Payments" shall have the meaning set forth in Section 8.1.

"Milestones Payment Documents" shall have the meaning set forth in Section 8.3.

"Milestone Payment Event" shall have the meaning set forth in Section 8.2.

"Milestones Payment Schedule" shall have the meaning set forth in Exhibit XVII, Appendix 1.

"Mechanical Completion" shall mean, with respect to any DRU, the completion of the procurement, fabrication, installation, and pre-commissioning of all systems of such DRU, except for those items which do not affect the operation, safety, and mechanical and electrical integrity of such DRU, and including all operating, protection, fire, safety, and other related systems required prior to start-up.

"Monthly Progress Report" shall have the meaning set forth in Section 3.17(d).

"Monthly Report" shall mean the report to be provided in accordance with Exhibit VI, Appendix 1.

"Notice to Proceed" shall have the meaning set forth in Section 11.1.

"Operational Tests" shall have the meaning set forth in Exhibit VIII.

"Owner" shall have the meaning specified in the preamble hereto.

Confidential                                                              KEPPEL00610386

"Owner Delay" shall mean events of interference in the progress of the Works, delay or failure of performance caused by Owner, the Owner Project Manager, or their respective employees or agents and/or their subcontractors and suppliers that affects the critical path of the Project Schedule.

"Owner Group" shall mean Owner, its Affiliates, related parties, successors, assigns, officers, directors, employees, agents and any other Person legally authorized to act in name of Owner.

"Owner Policies" shall mean the safety rules and regulations of Owner set forth in Exhibit IX.

"Owner Project Manager" shall mean the Person indicated by Owner in a written notice to Contractor, from time to time, to act on behalf of Owner in all matters relating to the Works.

"Party" or "Parties" shall mean Owner and/or Contractor and their permitted successors and assigns.

"Performance Security" shall have the meaning ascribed to it in Section 20.6 hereunder.

"Performance Tests" shall mean, with respect to the DRU, those tests performed to ensure that such DRU meets the performance and operational criteria set forth in Exhibit I, which tests shall be set forth in Exhibit VIII.

"Person" shall mean any natural or legal person or entity.

"Project Schedule" shall have the meaning set forth in Section 11.3(a).

"Proposal Submission Date" shall be July 09, 2011.

"Quality Assurance System" shall mean the quality assurance system developed by Contractor in accordance with Exhibit VII.

"Record As-Built Drawings" shall mean, with respect to the DRU, record drawings (but not field mark-ups) of such DRU showing current and accurate "as-built" conditions.

"Release" shall mean any release, spill, emission, leaking, pumping, injection, pouring, emptying, deposit, disposal, discharge, dispersal, dumping, escaping, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Reliability Tests" shall mean, with respect to any DRU, those tests performed to ensure that such DRU can be reliably and safely operated as guaranteed, which tests shall be as set forth in Exhibit VIII.

"REPETRO Regime" shall mean the special custom regime granted on the temporary import of goods intended for the exploration or production of oil or gas, regulated by Articles 458 to 462 of Decree No. 6,759 of February 5, 2009 and by RFB Normative Instruction 844/2008, as amended from time to time.

Confidential

KEPPEL00610387

"Request" shall have the meaning set forth in Section 24.3(d).

"Required Final Completion Date" shall have the meaning set forth in Section 11.3(b).

"Scope of Work" shall mean the description of the Works to be performed by Contractor as set forth herein and as detailed in Exhibit I, which may include mandatory designs and specifications, and which may be adjusted pursuant to this Agreement.

"SELIC" shall mean the rate assessed by the Brazilian Special Liquidation and Custody System (*Sistema Especial de Liquidação e Custódia*) – SELIC, published by the Central Bank of Brazil, obtained by calculating the adjusted weight average rate of one-day financing operations, backed by public federal bonds and traded in such system.

"SISCOMEX" shall mean the Brazilian electronic foreign trade information system (*Sistema Integrado de Comércio Exterior*), jointly operated by the Brazilian Central Bank, the Brazilian Federal Tax Revenue Agency and the Brazilian Foreign Trade Agency.

"Site" shall mean the parcel(s) of real property on which the Works are performed by Contractor or its Subcontractors.

"Subcontract" shall mean any agreement between Contractor and a Subcontractor for the performance of any portion of the Works.

"Subcontractor" shall mean any Person (other than Contractor) with whom Contractor has entered into any Subcontract, purchase order or other agreement for such Person to perform any part of the Works, or to provide any materials, Equipment or supplies, including any Person at any tier with whom any Subcontractor has further subcontracted any part of the Works.

"Substantial Completion" shall mean, with respect to the DRU, that the following have occurred for such DRU: (i) Mechanical Completion has been achieved; (ii) Performance Tests, Reliability Tests and Demonstration Tests have been successfully completed, (iii) the Works have been completed (including familiarization, manuals and the delivery of all documentation required for operation) except for Works on the Substantial Completion Punch-list; (iv) Contractor has delivered to Owner the Substantial Completion Certificate and Owner has reviewed and approved such certificate pursuant to Section 16.3; (v) such DRU is available for full commercial operation and is capable of being safely and reliably operated in accordance with the specifications contained in this Agreement and without damage to such DRU or any other property and without injury to any Person; (vi) all TTAS-1 have been signed by Owner, according to Exhibit VIII; and (vii) any other requirement set forth under Exhibit VIII has been duly complied with.

"Substantial Completion Certificate" shall have the meaning set forth in Section 16.2.

"Substantial Completion Punch-list" shall mean, with respect to the DRU, a list of minor items required to complete the Works for such DRU which remain to be completed or corrected by Contractor after Substantial Completion but which shall not interrupt, disrupt or interfere with

Confidential
KEPPEL00610388

the safe and reliable operation of such DRU or any other completed DRU as contemplated by this Agreement, as more fully described in Section 16.4 of this Agreement.

"Technical Dispute" shall have the meaning set forth in Section 24.2(a).

"Tribunal" shall have the meaning set forth in Section 24.3(e).

"TTAS-1" shall mean the document issued by Contractor and signed by Contractor and Owner upon successful accomplishment of a Performance Acceptance Test phase 1 (TAP-1) that formalizes the transfer of the custody (with Assisted Operation by Contractor) and care of that specific system/subsystem equipment, parts and components from Contractor to Owner.  No outstanding items type A, as defined in Exhibit VIII, shall remain for the issuance of TTAS-1.

"TTAS-2" shall mean the document issued by Contractor and signed by Contractor and Owner upon successful accomplishment of a Performance Acceptance Test phase 2 (TAP- 2) that formalizes the transfer of the custody and care of that specific system/subsystem equipment, parts and components of a DRU from Contractor to Owner.

"United States Dollars" shall mean the lawful currency of the United States of America.

"Warranty Period" shall have the meaning set forth in Section 17.3(a).

"Works" shall mean all work, goods and services to be provided, and all acts or actions required or necessary for the design, engineering, supply, procurement, construction, commissioning, and completion guaranteeing the performance and warranty of the DRU described in Exhibit I, complete in every detail, whether at the Site or elsewhere, until Final Completion and satisfaction of Contractor's warranties, all in accordance with Good Industry Practices and the Applicable Codes and Standards, and all other works and services necessary to provide Owner with one (1) fully operating DRU satisfying the conditions of this Agreement.

"Work Authorization Initial Date" shall mean the initial date of the Works according to Article 11 and as more fully described in Exhibit I.

1.2.    Section and Exhibit References.   Any reference to a particular Article, Section, subsection, paragraph, subparagraph, Exhibit, schedule, if any, shall be a reference to such Article, Section, subsection, paragraph, subparagraph, Exhibit, or schedule in and to this Agreement.

1.3.    Interpretation.

    (a)    Terms in the singular shall include the plural and vice versa.

    (b)    Any reference to any agreement, document or drawing defined or referred to in this Agreement shall include each amendment, modification and supplement thereto and waiver thereof as may become effective from time to time in accordance with the terms thereof, except where otherwise indicated.

Confidential                                                                          KEPPEL00610389

(c)     Any term defined by reference to any other agreement or document shall have such meaning whether or not such agreement or document remains in effect.

(d)     The words "include" and "including" shall be construed to include the phrase "not limited to". The terms "hereof" or "thereof", "herein" or "therein", "hereunder" or "thereunder," and comparable terms refer to the entire Agreement with respect to which such terms are used and not to any particular Article, Section or other subdivision thereof.

(e)     A reference to any Governmental Authority includes any Governmental Authority succeeding to such agency's or authority's functions and capabilities. Any reference to a Person shall include that Person's successors and permitted assigns or to any Person succeeding to that Person's functions.

(f)     If any provision of this Agreement contemplates that the Parties shall negotiate or agree to any matter after the date that this Agreement is effective, such provision shall be construed to include an obligation of the Parties to negotiate or reach an agreement in good faith within the spirit and intent of this Agreement.

(g)     Except as otherwise expressly indicated herein, any reference in this Agreement to any Applicable Law shall be considered as including a reference to any amendment or supplement then in force, as well as a reference to all norms or regulations then in force and enacted in connection with the relevant Applicable Law and whose validity derives there from.

(h)     All schedules, Exhibits or attachments to this Agreement shall be read in conjunction with the body of the Agreement, and such schedules, Exhibits or attachments shall be interpreted so as to give effect to the intent of the Parties as evidenced by their terms when taken as a whole; provided however, that in the event of an express and irreconcilable conflict between the terms of any schedules, Exhibits or attachments and the provisions of the body of this Agreement, the provisions of the body of this Agreement shall control. Contractor acknowledges that it has reviewed this Agreement and all of the Exhibits to this Agreement and to the best of its knowledge, there are no conflicts between this Agreement and the Exhibits or among the Exhibits.

(i)     The irreconcilable conflict between or among provisions of Sections of this Agreement and the Exhibits and/or attachments shall be controlled as follows:

(A)     In all cases the Sections of this Agreement shall prevail upon any Exhibit or attachment of this Agreement.

(B)     In all cases the terms and provisions of Exhibit I (Scope of Work) shall prevail upon any other Exhibit and/or attachment of this Agreement.

95-40522876

Confidential                                                                                     KEPPEL00610390

(C)     The Bid Circulars shall have priority over the terms and provisions of Bid Documents to the extent specifically modified.

Notwithstanding the above, the provisions of this Agreement, including all Exhibits, shall be wherever possible construed as complementary rather than conflicting.

## ARTICLE 2  RELATIONSHIPS AND ACKNOWLEDGEMENTS

2.1.    Subject Matter of this Agreement.  The subject matter of this Agreement is the design, engineering, supply, construction, commissioning, start-up, testing, completion and procurement of the DRU, together with all other services and supplies required under this Agreement. Contractor shall perform and prosecute the Works (i) in accordance with the Scope of Work and terms and conditions of this Agreement, (ii) in compliance with all Consents and Applicable Laws, and (iii) consistent with Good Industry Practices.

2.2.    Status of Contractor.  The relationship between Contractor and Owner shall be that of an independent contractor and nothing contained herein shall be construed as constituting any relationship between the Parties other than that at arms-length of owner and independent contractor.  Any provisions of this Agreement which may appear to give Owner or the Owner Project Manager the right to direct or control Contractor as to details of performing the Works, or to exercise any measure of control over the Works, shall be deemed to mean that Contractor shall follow the desires of Owner or the Owner Project Manager in the results of the Works only, and not in the means by which the Works are to be accomplished.  Nothing herein shall be interpreted to create a master-servant or principal-agent relationship between Contractor or any of its Subcontractors and Owner.  Nevertheless, Contractor shall strictly comply with all provisions, terms and conditions of this Agreement, and the fact that Contractor is an independent contractor does not relieve it from its responsibility to fully, completely, timely and safely perform the Works in strict compliance with this Agreement and be responsible for all Subcontractors' performance and supply.

2.3.    Acknowledgement of Contractor.  Contractor hereby acknowledges and agrees that the percentage of Brazilian Local Content, established in Section 4.2, may be financed by BNDES, and that in such event Contractor will be required to comply with the requirements of BNDES. Contractor further acknowledges and agrees that it may have to execute, as an intervening party, a BNDES financing agreement, to be entered into between Owner and BNDES.  If BNDES's requirements represent any additional requirements (other than established in this Agreement), Parties shall negotiate a Change Order.

## ARTICLE 3  OBLIGATIONS OF CONTRACTOR

3.1.    Scope of Work – General Scope.  Contractor has determined to its satisfaction that the requirements of the Scope of Work are consistent with Good Industry Practices and its obligations under Section 2.1 above, and are capable of supporting the timely completion of the DRU and fulfillment of Contractor's obligations hereunder.  It is understood and agreed that the Works shall include any incidental work that can reasonably be inferred as required and necessary to complete the DRU in accordance with Good Industry Practices, Applicable Laws,

Confidential
KEPPEL00610391

Bracuhy Drilling B.V.                                    Bracuhy Drilling B.V.- 003/2012-FELS

Applicable Codes and Standards and all other terms and provisions of this Agreement, excluding only those items which Owner has specifically agreed to provide under the terms of this Agreement. The Works are more specifically described in Exhibit I hereto.

3.1.1   The Exhibit XXVIII- Contractor Documentation, APPENDIX 04- Specification Clarification and APPENDIX 03- GTD Clarification shall be applicable in the interpretation and/or determination of the extent of the Scope of Work. In the event of any conflict, inconsistency or contradiction, APPENDIX 03- GTD Clarification shall prevail in the interpretation of Exhibit II – General Technical Description.

3.2.   Specific Obligations.  Without limiting the generality of Section 3.1 or the requirements of any other provision of this Agreement, as part of the Works Contractor shall:

(a)   Procure, supply, transport, handle, insure and properly store and preserve the Equipment (other than Equipment supplied by Owner), and receive, store, and preserve the Equipment supplied by Owner;

(b)   Be responsible for the engineering design in accordance with the specifications provided in this Agreement;

(c)   Provide construction, construction management, including furnishing all management, labor, all Site supervision and craft labor, Equipment, tools, field supplies, warehousing and facilities necessary for such fabrication, all necessary power (electrical or otherwise), and all inspection (excluding inspections performed by Owner hereunder) and quality control services required to ensure that the Works are performed in accordance herewith;

(d)   Take into consideration and comply with all Applicable Laws in order to make feasible the exportation of the DRU, which shall be physically delivered to Owner at sheltered waters in the city of Angra dos Reis-RJ, not cleared for import.

(e)   Negotiate all guarantees, warranties, delivery schedules, insurance requirements and performance requirements with all Subcontractors so that all Subcontracts are consistent with this Agreement;

(f)   Perform shop and other inspections of the work of Subcontractors to ensure that such work meets all of the requirements of this Agreement;

(g)   Contract the Classification Society and provide the DRU classification, as indicated in this Agreement, especially in Exhibits I and III;

(h)   Ensure that the Works are performed in accordance with the Project Schedule;

(i)   Conduct and manage all pre-commissioning, start-up operations, commissioning and performance testing;

95-40522876

Confidential                                                                    KEPPEL00610392

(j)     Obtain all Consents listed in Exhibit XIII, and any other Consents, permits, approvals or licenses required for performance of the Works for which Owner has not assumed responsibility under Exhibit XIV;

(k)     Obtain any and all certificates, permits, and authorizations, including, without limitation, completion certificates, and operating permits as required by Applicable Laws to conduct the Performance Tests, Demonstration Tests, or Operational Tests;

(l)     Provide information, assistance and documentation to Owner as reasonably requested in connection with the permits and consents to be obtained by Owner hereunder as listed on Exhibit XIV;

(m)    Provide familiarization with the DRU equipment for Owner's operating and maintenance personnel during the course of the construction period;

(n)     Replace any Subcontractor(s) that fails to perform its Subcontract obligations;

(o)     Handle all customs issues and be responsible for all duties related to imported Equipment;

(p)     At the request of Owner, cooperate with and respond to inquiries from any Lender relating to the Works and any other activities being undertaken under the Agreement;

(q)     Comply with the BNDES financing requirements, in the event that the Brazilian Local Content is financed by the BNDES;

(r)     Be responsible for and pay any and all withholding taxes related to the Works; and

(s)     Pay Subcontractors in a timely fashion.

3.3.    Contractor's Obligations Regarding the Performance of the Works. Without limiting the generality of Section 3.1 or the requirements of any other provision of this Agreement, as part of the Works Contractor shall further:

3.3.1   Perform the Works in due time and in compliance with the provisions of this Agreement, the Project Schedule, the detailed work schedule, the Environmental Laws and in strict compliance with any other Applicable Law.

3.3.2   Perform the pre-commissioning and commissioning of the DRU, as well as render assistance to Owner's operations personnel during the technical assistance period, as set forth in Exhibits I and VIII.

3.3.3   Supply to Owner all documents and information necessary for the inspection of the Works (including the exercise by Owner of its powers as contemplated in Section 17.2),

Confidential                                                                        KEPPEL00610393

granting access to the Site where any portion of the Works is being carried out, as well as to promptly complying with Owner's remarks and contractual requirements regarding the Works.

3.3.4   Prior to the Handover of the DRU, remake or repair, at its own expense and within a schedule mutually agreed between Owner and Contractor, any irregularities or Defects in any portion of the Works that may have been rejected by Owner or that have been carried out without due regard to the terms of this Agreement. After Handover of the DRU the provisions of the Warranty Period shall apply.

3.3.5   For the whole period of the Agreement in its dealings with Owner in regard to the performance of the Works, Contractor shall be represented by a qualified professional, duly certified and in good standing at the relevant professional organization. The name of such professional accompanied by the relevant curriculum vitae shall be submitted to Owner for prior approval (the "Contractor Project Manager"). Any substitution, provisional or permanent, of Contractor Project Manager, shall be submitted to Owner for Owner's prior approval.

3.3.6   Correct any errors, discrepancies or omissions in any documents prepared by Contractor in accordance with this Agreement.

3.3.7   Prepare and maintain, at the Site, a Work Report ("RDO") for each phase of the Works, as described in Exhibit I, prepared in accordance with a format provided by Owner, containing records on the service orders, remarks on irregularities found and other events concerning the performance of this Agreement. The RDO shall be issued and delivered to Owner on a daily basis, or other period agreed between the Parties, in two counterparts (the first one to Owner and the second to Contractor), duly executed by Contractor Project Manager and by Owner.

3.3.8   Obtain all Consents listed in Exhibit XIII, and any other permits, approvals or licenses required for performance of the Works for which Owner has not assumed responsibility under Exhibit XIV. Notwithstanding the generality of the foregoing, Contractor shall, in a manner to enable the performance of the Works to comply with the Project Schedule, obtain and maintain all Consents required for the performance of the Works, including all licenses for river crossings, road, railway and transmission line crossings, as well as licenses for disposal and storage of materials and/or all other special services required for the construction or assembly of the Works.

3.3.8.1 Maintain the validity and compliance with all Consents or environmental licenses issued by the respective Governmental Authority and comply with any term of commitment and behavior adjustment" (*Termo de Ajustamento de Conduta*, "TAC") during the entire execution of this Agreement, referring to the Site where the Works shall be performed, and provide copies thereof to the Lenders, whenever requested.

Confidential

KEPPEL00610394

3.3.9   Carry out the quality control of the Works in accordance with the provisions of the Quality Assurance System to be implemented and maintained by Contractor at its expense, as described in Exhibit VII

3.3.10  Submit for Owner's review, on the dates indicated in Exhibit VI, the documents concerning the Quality Assurance System.

3.3.11  Supply all materials, tools, Equipment and appliances necessary for the quality assurance activities, which shall include any such materials, tools, Equipment and appliances used in qualification tests of its own staff and the qualification of its employees and procedures.

3.3.12  Implement and maintain, at its own expenses, during the entire term of this Agreement, a Quality Assurance System as per Exhibit VII, as well as:

(a)   Carry out all required qualifications of specialized workers and the assembly and welding procedures pursuant to the guidelines prescribed by the applicable norms and issue the relevant certificates required by the Quality Assurance System, bearing all the qualifications costs (including traveling, materials and equipment expenses used in the centralized qualification of workers and procedures);

(b)   Carry out all additional experiments and tests that Owner may deem necessary to evidence the compliance with the quality levels required for the Works, in accordance with the Quality Assurance System. If such additional experiments and tests do not demonstrate the non-compliance with the quality levels required for the Works, in accordance with the Quality Assurance System, Owner shall reimburse such costs and allow reasonable extension of time to Contractor.

3.3.13  Subject to the provisions of Article 7, pay and bear all taxes and expenses, including import duties, payable as a consequence of the performance of the Works in accordance with the terms of this Agreement to all local, state or federal governmental authorities, as the case may be, both in Brazil and abroad.

3.3.14  Provide the insurances set forth in Article 14 and bear all expenses related to any insurance contracted in accordance with Article 14.

3.4.   Spare Parts. Contractor shall provide to Owner a list of factory recommended operating spare parts for the DRU for a two (2) year period of operations, with sufficient lead time (no later than eighteen (18) months before the Substantial Completion data) to permit the review and procurement of long lead-time items by Owner so that they may be delivered to the Site at or before the date of Substantial Completion. Contractor shall receive, store, and preserve such spare parts.

3.5.   Standard of Performance. Contractor shall perform the Works in a good and workmanlike manner, in accordance with the terms and conditions of this Agreement, and shall cause all Subcontractors of any tier to perform all elements of the Works to be performed by

Confidential                                                                KEPPEL00610395

them, in compliance with all Applicable Laws and in accordance with Good Industry Practices. Notwithstanding the generality of the foregoing, in all activities related to the performance of the Works, Contractor shall refrain from using the work of minors and shall ensure that the same requirement is adopted in the agreements executed with its Subcontractors and suppliers.

3.6.    Contractor's Tools and Equipment.  Contractor shall furnish all tools and Equipment necessary and appropriate for the timely and safe completion of the Works in strict compliance with this Agreement.  Contractor shall be responsible for damage to or destruction or loss of, from any cause whatsoever (other than the acts of Owner), all construction tools and Equipment owned, rented or leased by Contractor for use in accomplishing the Works, and shall not be entitled to reimbursement therefor under this Agreement.

3.6.1   Contractor shall ensure that all Equipment for the DRU, including Equipment supplied by Owner, is stored, protected and preserved in accordance with the manufacturer's written instructions and so as to maintain intact all warranties related thereto.

3.7.    Employment of Personnel.  Contractor shall not, nor shall permit its Subcontractors to, employ, in connection with its performance under this Agreement any unfit person or anyone not skilled in the work assigned to such person.  Contractor agrees to promptly remove (or to require any Subcontractor to remove) from the Site in connection with the Works any employee who does not meet the foregoing requirements or if contracted, any person who obstructs or causes difficulties to his supervision action, or whose presence at the Site, under justified reason, is deemed inconvenient, without costs for Owner.  In addition, Contractor agrees that within twenty four (24) hours after receipt of written notice from Owner, it will promptly remove from the Works any employee or agent of Contractor or of Contractor's Subcontractors, who is interrupting, interfering or impeding the timely and proper completion of the Works.  Owner shall have no liability and Contractor agrees to defend, indemnify and hold each member of Owner Group free and harmless from and against any claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against a member of Owner Group and related attorneys' fees) suffered or incurred by any member of Owner Group resulting from Contractor's or any Subcontractor's termination of the employment of any such employee who fails to meet the foregoing requirements following a request by Owner to have such employee removed from the Works.

3.7.1   Contractor shall, with respect to its employees and its Subcontractors' employees:

3.7.1.1 Be solely responsible for the supervision, technical and administrative guidance and labor required for the performance of the Works.

3.7.1.2 Refrain from using, in all activities related to the performance of this Agreement, forced labor and work of minors, and cause the above-mentioned requirement to be included in each Subcontract.

Confidential                                                                              KEPPEL00610396

3.7.1.3  Whenever required by Owner, Contractor undertakes to issue a written statement representing that it has complied or is complying with the requirement contained in Section 3.7.1.2.

3.7.1.4  Submit for approval by Owner the curriculum vitae of the key personnel that will carry out the Works from time to time as well as inform, in writing, any proposed changes in such key personnel

3.7.1.5  Submit for approval by Owner, before the commencement of the Works, a forecast for mobilization and demobilization of its key personnel, including those in charge of supervision and inspection, based on the Project Schedule.

3.7.1.6  Submit for approval by Owner, the documents indicated in Exhibit VI, on the dates therein established.

3.7.1.7  Entrust the Works to reputable professionals qualified to carry out the Works in accordance with Good Industry Practices.  Owner may request evidence of any such professional's technical qualification.

3.7.2   Contractor shall cause its employees and its Subcontractors' employees, as well as their respective contractors, when working at any Owner facility, to use identification badges furnished by Owner, which must be returned to Owner after termination of the Agreement or upon termination of the employee or contractor from the activities related to this Agreement.

3.7.3   Contractor shall comply, in a timely manner, with all labor and social security regulations related to tax obligations, submitting, whenever requested by Owner, the documentation evidencing such compliance with regard to its employees and Subcontractors, as applicable.

3.7.3.1  Pay and bear all charges and expenses deriving from lodging, boarding, transportation, medical assistance and emergency medical assistance to its employees.

3.7.4   For all the Works carried out in Brazil, Contractor shall provide, or cause to be provided to Owner, together with the Monthly Report and in accordance with the Applicable law:

3.7.4.1  A certified copy of the relevant social security collection form (*Guia de Recolhimento do Fundo de Garantia por Tempo de Serviço e Informações à Previdência Social*) ("GFIP") of the employee severance fund (*Fundo de Garantia por Tempo de Serviço*) ("FGTS") and information to the social security administration (*Instituto Nacional do Seguro Social*)("INSS") for the month immediately preceding the month to which such Monthly Report refers, duly completed and paid, together with the relevant proof of receipt.

3.7.4.2  A certified copy of the social security collection form (*Guia da Previdência Social*) ("GPS") for the month immediately preceding the month to which such Monthly

- 26 -

95-40522876

Confidential

KEPPEL00610397

Report refers, containing the amount indicated in the report of the relevant GFIP, duly completed and paid, and containing the enrollment of the work (*Cadastro Específico do INSS*) ("**CEI**").

3.7.4.3 A statement, issued on a yearly basis, executed by Contractor Project Manager and its accountant, certifying the regularity of Contractor's bookkeeping.

3.7.4.4 No later than thirty (30) Business Days after the period prescribed by Brazilian law for the authentication of the ledger (*Livro Diário*) at the commercial board, a certified copy of the balance sheet extracted from the ledger and certified at the commercial board, reflecting the previous fiscal year.

3.7.4.5 Subject to the provisions of Exhibit XIII, annually, during the period of validity of this Agreement, a certified copy of the following documents, duly filed at with the relevant authorities: (i) environmental risk prevention program (*Programa de Prevenção de Riscos Ambientais*), (ii) working conditions technical report (*Laudo Técnico de Condições Ambientais de Trabalho*), (iii) construction industry working conditions and environment program (*Programa de Condições e Meio Ambiente do Trabalho na Indústria de Construção*) and (iv) medical control and occupational health program (*Programa de Controle Médico e da Saúde Ocupacional*).

3.7.4.6 No later than thirty (30) Business Days after the date of execution of this Agreement, the enrollment of the Works at the CEI to the extent applicable.

3.7.4.7 In case of suspension of the Works, a copy of the GFIP containing a code reflecting the cause of the suspension, with the relevant proof of delivery within the maximum term of five (5) Business Days after the date of delivery of the relevant GFIP to the competent Governmental Authority.

3.7.4.8 For the last Monthly Report, in addition to the documents indicated in the previous items of this Section 3.7.4, the documents referring to the last Milestone Payment must also be delivered, no later than three (3) Business Days prior to the due date of the collection document, as well as the evidence of termination of the Works at the CEI and the relevant government debt clearance certificate (*Certidão Negativa de Débitos*).

In case of subcontracting services in Brazil, according to Article 19, in addition to the documents indicated above, Contractor shall also provide the following documents related to the Subcontracts:

(a)    Copies of Subcontractors' invoices and/or receipts, related to the services provided by the Subcontractors, showing clearly the connection of such services with the Works and the amount related to INSS taxes withheld by Contractor, according to Applicable Law.

Confidential

KEPPEL00610398

(b)     Copies of collection documents, related to the amount withheld by Contractor according to paragraph (a) above, showing the evidence of payment of such amount to the INSS according to Brazilian law.

A certified copy of the relevant GFIP of the FGTS and information submitted to the INSS for the month immediately preceding the month to which the Monthly Report refers, issued by the Subcontractor, duly completed and paid, together with the relevant proof of receipt.

3.7.5   Contractor shall undertake any and all civil, labor, social security, tax and FGTS obligations deriving from the performance of the Works, together with any costs and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Owner Group. Contractor also undertakes to assume, either in or out of court, any and all the liabilities related to any occasional claims that may arise, including by requesting the exclusion of any member of Owner Group from such procedures, at the request of Owner, and by offering all guarantees or bonds required to release any member of Owner Group, and also bearing all costs and expenses incurred from such procedures.

3.7.5.1 If a claim referred to in Section 3.7.5 is made against Owner, Owner shall immediately give notice to Contractor and Contractor shall be entitled to contest any such claim in good faith by appropriate judicial or administrative procedures; provided that Contractor shall not settle any claims or proceedings referred to in Section 3.7.5 without the prior written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed (and with respect to any such claim or proceeding that has been submitted to a labor dispute court, Owner shall respond no later than twenty-four (24) hours following its receipt of notice from Contractor with respect to any proposed settlement). If Owner is found liable for any claim listed in Section 3.7.5, and the court, arbitration panel or any other competent Governmental Authority determines such claim resulted solely from Contractor's acts or omissions, Contractor shall pay to Owner, as the case may be, the Owner's liability amount in the decision rendered by the court, arbitration panel or any other competent Governmental Authority that Contractor's action or omission led to the filing of such claim. This indemnity is subject to the limitation of liabilities under Article 22 as well as the exclusions therefrom.

3.7.6   Contractor shall arrange for the technical responsibility annotation (*Anotação de Responsabilidade Técnica*) concerning this Agreement to be obtained at the appropriate engineering, architecture and agronomy regional council (*Conselho Regional de Engenharia, Arquitetura e Agronomia*), forwarding a copy thereof to Owner before the commencement of the Works, as well as demonstrate its compliance with any other such requirements before Owner whenever any amendments are introduced in the Agreement or in any of the cases provided for in the resolutions of the engineering, architecture and agronomy federal council (*Conselho Federal de Engenharia Arquitetura e Agronomia*).

3.7.7   Contractor shall deliver to Owner: (i) a letter by the nuclear energy national commission (*Comissão Nacional de Energia Nuclear*), approving the physical control system and the

Confidential                                                                                      KEPPEL00610399

contingency plan adopted by Contractor, (ii) industrial safety prescriptions adopted by it in accordance with Applicable Law, (iii) instructions furnished to its employees, agents, representatives and Subcontractors regarding the risks and precautions to be observed, and (iv) affidavits reflecting the verification and assessment of monitoring and measurement equipment, all in accordance with Brazilian law (including nuclear energy national commission norms), in any event prior to the performance of any portion of the Works involving any industrial X-ray and/or gamma-ray service.

3.7.7.1 Contractor shall have a X-Ray and/or gamma-ray Protection Superintendent, whose name and resume shall be submitted to Owner together with the names and resumes of its agents and representatives at the time of the submission of the documents listed in Section 3.7.7. Such X-ray and/or gamma-ray Protection Superintendent shall be responsible for ensuring, especially in emergency cases, the safety of all persons who, given the place and conditions of the activity performed by them, may be exposed to the radiation emitted in connection thereof.

3.7.8   Contractor shall arrange and maintain in effect all the documentation related to any expatriate employees that take part in the performance of any portion of the Works, including the necessary work visas, according to Applicable Law.

3.7.9   Contractor's Additional Obligations.

3.7.9.1 Furnish monthly, or whenever requested by Owner in accordance with the terms and conditions of this Agreement, reports in writing, on the development of the several stages of the Works, as well as of the requirements for suitability and adequacy thereof and preparation of data and statistical information, in accordance with the Owner's requirements.

3.7.9.2 [Not Applicable]

3.7.9.3 Correct, immediately and at its own expense, any and all portion of the Works, Equipment or engineering documents that are not in accordance with this Agreement and/or remake the part of the Works that has been rejected by Owner as not having been carried out in accordance with the requirements contained in this Agreement for engineering documents, specifications, rules and applicable standards or with the Applicable Codes and Standards, including repairs in welding and the relevant X-ray and/or gamma-ray inspection.

3.8.   Key Personnel.   Contractor's organizational chart shall be provided to Owner within thirty (30) days from the effective date of the Notice to Proceed and shall be implemented for the Works. Contractor shall promptly advise Owner of any reassignment of its personnel assigned to perform the Works.

3.9.   Operation Personnel and Assisted Operation.   Contractor shall provide familiarization with the DRU equipment for Owner's operating and maintenance personnel during the course of

Confidential

KEPPEL00610400

construction period. The familiarization shall be performed in accordance with a familiarization plan to be agreed between the Parties prior to the anticipated date of Mechanical Completion.

3.10.  Emergencies.  In the event of any emergency endangering life or property during the performance of Works, Contractor shall take such action as may be reasonable and necessary to prevent, avoid or mitigate injury, damage, or loss and shall, as soon as possible, report any such incidents, including Contractor's response thereto, to Owner.  If Contractor has not taken reasonable precautions for the safety of the public or the protection of the Works, and such failure creates an emergency requiring immediate action, then Owner, with or without notice to Contractor may, but shall be under no obligation to, provide reasonable protection as required to control such emergency.  The taking of any such action by Owner, or Owner's failure to take any action, shall not limit Contractor's liability.   Contractor shall reimburse Owner for the performance of any such Works or the furnishing of any such Equipment in connection with any emergency in an amount equal to the reasonable costs incurred by Owner in such performance of Works or furnishing of Equipment.  The taking by Contractor or Owner of any actions pursuant to this Section 3.10 to prevent, avoid or mitigate injury, damage, or loss as a result of an emergency shall in no way alter or excuse any of Contractor's obligations under this Agreement.

3.11.  Approvals, Certificates, Permits and Licenses.  Other than those permits and consents listed in Exhibit XIV, which shall be responsibility of Owner, Contractor shall obtain and maintain all Consents, approvals, certificates, permits and licenses required to perform the Works, including the Consents listed on Exhibit XIII. Contractor shall provide Owner with copies of such permits and Consents as soon as they are obtained.  Contractor shall provide information, assistance and documentation to Owner as reasonably requested in connection with the permits and Consents to be obtained by Owner hereunder as listed on Exhibit XIV.

3.12.  Books, Records and Audits.

(a)     Contractor shall keep such full and detailed books, construction logs, records, daily reports, accounts, payroll records and other pertinent documents as may be necessary for proper financial management under this Agreement and as required under Applicable Law.  Contractor shall maintain all such books and records in accordance with applicable generally accepted accounting principles, or otherwise in the ordinary course of business, and shall retain all such books and records for a minimum period of ten (10) years following issuance of the Notice to Proceed, or such greater period of time as may be required under Applicable Law.

(b)     Upon request by Owner, Contractor shall provide Owner or its agents or representatives with any appropriate information, documents or reports that may be necessary to determine Contractor's compliance with Brazilian Local Content requirements hereunder.

3.13.  Tax Accounting.   Within a reasonable period of time following Owner's request, Contractor shall provide Owner with any information regarding the quantities, descriptions and costs of any Equipment installed in or incorporated into the DRU as Owner may deem reasonably necessary in connection with its tax planning or the preparation of its tax returns.

Confidential                                                                    KEPPEL00610401