mainly in Exhibit VI and Section 11.4. The Project Schedule shall include a precedence diagram, showing the critical path of the Project, indicating the execution time for all activities of the Works detailed in the Works Breakdown Schedule - WBS, and the logical interrelationship of such activities, (project precedence diagram with critical path), complying with the dates indicated in Exhibit VI and Section 11.4. The Project Schedule will be the baseline of the Project and, once expressly approved by Owner, will be revised only as required under Sections 12.1, 12.2, 12.3, 12.4, 12.5 and 21.3.

(b)   Final Completion. Final Completion shall occur no later than the date (such date, the "Required Final Completion Date") falling two thousand three hundred forty-three (2,343) Days from the date of issuance of the Notice to Proceed. The Required Final Completion Date shall be adjusted only as provided in this Agreement

(c)   Acceleration. If at any time the progress of the Works is delayed by more than sixty (60) Days from the Project Schedule due to Contractor's fault, Owner shall notify Contractor thereof, then Contractor shall within thirty (30) Days present an acceleration plan to Owner, for its approval, specifically identifying the steps to be taken and the resources to be committed to accelerate the progress of the Works in order to bring the Works back into compliance with the Project Schedule ("Acceleration Plan").   All additional costs related to the implementation of any such Acceleration Plan shall be borne by Contractor.

(d)   Failure to comply with the Acceleration Plan. In case the Contractor fails to perform the Works in accordance with the Acceleration Plan and there is a resulting additional delay of thirty (30) Days, the Contractor shall be in Default under this Agreement, pursuant to Section 21.1.

11.4.   Project Schedule Baseline.   The Works shall be performed in accordance with the milestones and other interim deadlines described below, which shall be included in the Project Schedule to be submitted by Contractor in accordance with Section 11.3(a):

11.4.1 Plans, procedures and documentation.   Complete issuance of plans, procedures and documentation shall occur no later than the dates indicated on Exhibit VI.

11.4.2 Purchase Orders.   Complete the issuance of purchase orders for critical Equipment and materials, which shall be clearly identified as such by Contractor in its procurement management plan, no later than ninety (90) Days from the issuance of the Notice to Proceed.

11.4.3 Start fabrication.   Commence fabrication of the first DRU no later than eight hundred eighty-three (883) Days from the issuance of the Notice to Proceed.

11.4.4 <u>Start of the DRU Erection</u>.   Commence erection of the first DRU no later than <u>one thousand one hundred twenty-six (1,126)</u> Days from the issuance of the Notice to Proceed.

11.4.5 <u>Handover</u>.  The Handover of the DRU shall occur on the date no later than <u>one thousand nine hundred seventy-eight (1,978)</u> Days from the issuance of the Notice to Proceed (such date, the "<u>Handover Date</u>").

11.4.6 <u>Final Completion</u>.   Final Completion shall occur no later than the Required Final Completion Date.

11.4.7 [Not applicable].

11.4.8 <u>Contractor's technical assistance</u>.  Contractor shall provide offshore technical assistance to the Owner during a period of twelve (12) months after the actual date of Handover for the DRU.

## ARTICLE 12 CHANGE ORDERS

12.1.   <u>Change</u>.   Owner shall have the right to make, from time to time, any change, modification, addition/reduction or deletion to, in or from the Scope of Work, and/or to adjust the Project Schedule for performance thereof (a "<u>Change</u>").

12.1.1  As soon as possible, and in any event no later than fourteen (14) Days after Owner's request for a Change, extendable upon mutual agreement, Contractor shall prepare and furnish to Owner a written statement specifying the consequences of such Change on the Contract Price and on the Project Schedule, setting out in full details an estimate of the resulting cost or savings from such Change in the DRU, and proposed modification, as the case may be, in the schedule or in the estimated value of this Agreement.  The above-mentioned written statement shall contemplate any requisite adjustment to the time for completion, any proposed modifications to this Agreement and/or any effect that such Change would imply to the DRU, the Works and/or on any other provisions of this Agreement.  The Change shall be mutually agreed to by the Parties and set out in a Change Order in accordance with the following:

Confidential                                                                                                     KEPPEL00610430

12.1.1.1The adjustment to the Contract Price for any Change shall be calculated by Contractor based on cost plus fee (overhead, profit, insurance) in accordance with the Statement of Price Formation, as per Appendix 7 of Exhibit XXVIII, as presented in Contractor's original bid proposal. In case of new equipment, not referred to in the Statement of Price Formation, Contractor shall present three price quotations for Owner's analysis and decision. Each Change Order shall present a complete breakdown showing in detail quantities, unit prices and taxes, taking into consideration any savings or costs not incurred by Contractor due to such Change, and shall be based on a lump sum fixed price.

12.1.1.2The Project Schedule will only be adjusted in any Change Order to the extent that Contractor can demonstrate that the Change has affected the Project Schedule. If it is possible to maintain the Project Schedule by accelerating the performance of the Works, then Contractor shall propose such acceleration as an option for Owner, and give Owner the cost impact of performing the Works on an accelerated basis as opposed to the cost impact without acceleration. Contractor shall use its best efforts to minimize the impact of any Change on the Project Schedule.

12.1.2  If Owner and Contractor reach agreement on all matters identified in the written statement furnished by Contractor under the terms of Section 12.1.1 above, then Owner shall approve a Change Order giving effect thereto. Such Change Order shall contain full particulars of the modifications, any adjustments of the Contract Price and/or the Project Schedule and all other modifications to this Agreement, and shall be signed by Owner and by Contractor. The Change identified in such Change Order shall thereupon be deemed to form part of the Works and to be an amendment to this Agreement, and shall be subject to all of Contractor's obligations under this Agreement. Upon receipt of a Change Order, Contractor shall be obligated to perform the Works as changed by Owner without deficiency or delay. Any Change shall only be executed after approval of the Change Order by Owner.

12.1.3  Owner will have fourteen (14) Days to approve a Change Order submitted to it by Contractor. If Owner does not so approve within such fourteen (14) Day period, Owner shall be deemed to have rejected such Change Order, and the Change Order shall not be implemented.

12.2.  Imputed Change. If Contractor reasonably believes that any action, directive, order, or other communication of or from Owner constitutes a Change but is not formally identified as such, Contractor shall so inform Owner in writing as soon as possible and not later than fifteen (15) Days after receipt of such action, directive, order or other communication, and prior to performing the corresponding tasks. After such notice, within fifteen (15) Days or other period of time to be agreed between the Parties, Contractor shall provide Owner with a detailed estimate of cost and other consequences of the alleged Change, in accordance with the requirements of Sections 12.1.1.1 and 12.1.1.2.

12.3.  Changes Caused by Owner Delays. As soon as possible, and in any event no later than ten (10) Days after the occurrence of the applicable event, Contractor shall give notice to Owner

Confidential

KEPPEL00610431

of any Owner Delay which may impact on the Contract Price or the Project Schedule.  Such notice shall specify the estimated effect on the Contract Price and/or Project Schedule and include the other details required pursuant to Section 12.1.1.1 and Section 12.1.1.2.  In the event that it is impossible to estimate the impact on the Contract Price or the Project Schedule at the time such notice is delivered, Contractor shall provide Owner with periodic supplemental notices during the period over which the event continues.  Such supplemental notices shall keep Owner informed of any change, development, progress or other relevant information concerning the event of which Contractor is aware.

12.4.   Procedures for Negotiation of Change Orders.  If either Party believes it is entitled to an adjustment in the Contract Price and/or the Project Schedule as a result of a Change or an Owner Delay, then Owner and Contractor shall use reasonable efforts to negotiate the terms of the Change Order, and if requested by either Party in writing, the Parties shall meet to determine whether a Change Order is appropriate or the extent of the adjustment.

12.5.   Unsuccessful Negotiation of Change Orders.  If the Parties are unable to agree on the terms of a Change Order, then Owner may elect in writing to have the Change performed on a time and materials basis in accordance with Section 12.5.1 and Section 12.5.2 with the consequences on the Project Schedule and Contract Price to be determined prior to Substantial Completion.  In such case, the Parties shall enter into a Change Order, which states that any modification in the Contract Price and/or Project Schedule will be determined after completion of the Works as changed.  If the Parties cannot agree on the amount of any adjustment after application of the procedures contained in this Article 12, then the issue shall be resolved under the procedures set forth in Article 24.   Pending resolution of the dispute, Contractor shall perform the Works as directed by Owner on a time and material basis as set out in the Statement of Price Formation.  Failure to so perform the Works shall constitute a Default.

12.5.1  If a Change Order is performed on a time and materials basis pursuant to Section 12.5, then the Contract Price shall be adjusted by an amount equal to the increase or decrease in Contractor's cost of performing the Works that was affected by the Change or Owner Delay, as provided in Section 12.5.2, on an open book basis.  Contractor shall use its best efforts to minimize such costs, and shall provide Owner with options whenever possible for reducing costs.  Contractor shall maintain proper and detailed documentation of all such costs and shall provide such documentation and other information reasonably requested by Owner to substantiate any adjustment.   Documentation shall include invoices and timesheets, which specifically identify that such amounts relate to changed Works or Owner Delay.  To the extent that Contractor has not properly documented such costs, such costs shall not be recoverable from Owner hereunder.

12.5.2  For any adjustments to the Project Schedule or the Contract Price, the requirements of the Sections 12.1.1.1 and 12.1.1.2 shall be considered.

12.6.   Rules.  If Contractor reasonably believes that a change in the rules set by a relevant coastal or flag authority or in the applicable codes and standards specifically related to the technical rules applicable to the construction of the DRU has occurred after the Proposal Submission Date, Contractor shall provide Owner with a detailed estimated cost and other

Confidential                                                                                    KEPPEL00610432

consequences of the alleged change, prior to performing the corresponding tasks. Upon mutual agreement between the Parties the change shall be set out in a Change Order accordingly.

12.7. Owner's Written Consent. Notwithstanding any provisions to the contrary in this Agreement, no variations to the Works, drawings, schedules, prices, delivery or any other data and information provided by Owner will be allowed without the prior written consent of Owner, unless in case of emergency that puts at risk the safety of the DRU and persons. In such cases Contractor shall submit a report with all necessary evidence to Owner according to Section 3.17 and the Parties will discuss the pertinent matters in good faith. If the Parties cannot agree on the variation or the existence of the "emergency" giving arise to any such variation, the Contractor shall be obligated to comply with original obligations, and Owner shall not bear any costs in connection therewith.

## ARTICLE 13 TITLE AND RISK OF LOSS

13.1.  Title.

(a)  Clear Title. Contractor warrants and guarantees that Owner's legal title to, and ownership of, the Works and the DRU shall at all times be free and clear of any and all Liens, claims, security interests or other encumbrances, whenever the title thereto passes to Owner, except as expressed otherwise under Section 3.15(c).

(b)  Title to Works. Title to the Works in respect of the DRU shall pass to Owner upon the earlier of (i) payment by Owner; or (ii) incorporation into such DRU, amounting to delivery of such DRU in sheltered waters in accordance with this Agreement. For the purposes of this item (b), Contractor shall, upon each payment made hereunder, issue a declaration, in the form attached hereto as Exhibit XXIX, evidencing the transfer to Owner of the title and ownership of the Works performed and any and all Equipment and/or materials related thereto.

(c)  Title to Drawings. Contractor retains all rights with respect to the specifications, plans and working drawings, technical descriptions, calculations, test results and other data information concerning the design and construction of the DRU and hereby grants to, or agrees to procure on behalf of, Owner an irrevocable, non-exclusive, royalty-free and perpetual license to use such specifications, plans and working drawings, technical descriptions, calculations, test results and other data information for operating and maintaining the DRU, and for training engineers and operators for that purpose.

13.2.  Contractor Waiver. Contractor hereby irrevocably waives all rights of any kind and nature, in law or equity, to claim at any place and before any jurisdiction, any Lien or retention rights to any parts of the Works or to the DRU based on whatever reasons or allegations. Contractor shall also require from its Subcontractors, suppliers, agents or any other persons to equally waive any such rights in their respective agreements and contracts.

Confidential                                                                                    KEPPEL00610433

13.3.   Risk of Loss.  Contractor hereby agrees that Contractor shall bear all risks of any losses and damages caused by Contractor and/or Contractor Group relating to the performance of the Works until Handover of the DRU to Owner whereupon Owner shall assume and bear all risks of loss of or damage to the DRU.  In order to assist Contractor in mitigating such risks, Owner has agreed to procure insurance under a Builder's Risk Insurance policy as set forth in Exhibit XX. Without limiting the generality of Section 25.2, Contractor acknowledges that it has investigated to its satisfaction all of the terms and conditions of the proposed Builder's Risk Insurance policy as set forth in Exhibit XX and hereby waives any right to make any claim hereunder that the coverage provided under such Builder's Risk Insurance policy is inadequate to insure against such risks or that Owner has failed to disclose or provide adequate disclosure regarding the terms and conditions of such insurance coverage; provided that the insurance coverage provided by Owner in respect of such risks is equivalent or substantially similar in all material respects to the Builder's Risk Insurance policy described in Exhibit XX.

## ARTICLE 14 INSURANCE

14.1.   Provision of Insurance.  Contractor and Owner shall provide, at a minimum, the insurance specified in Exhibit XX on terms and conditions therein stated (which, in the case of Contractor, shall include Owner as the loss payee under the insurance policy, where applicable).

14.2.   Lenders as Additional Insureds.  The insurance provided by the Parties pursuant to Section 14.1 shall list any and all Lenders as additional insureds, where applicable.

14.3.   Subrogation Waivers.  The Parties shall provide, whenever applicable, subrogation waivers from the insurers contracted pursuant to Section 14.1 in form and substance reasonably acceptable to the other Party.

14.4.   New Technology.  Notwithstanding Contractor's representation in Section 17.1 that it will not install unproven or prototype equipment, if the insurance provider characterizes certain technologies installed and which comprise the Works as being new technologies, and such insurance provider restricts, denies, limits, or is unwilling to provide insurance coverage in connection with such new technology, then the Party that is requiring the related new technologies shall secure such additional coverage and pay any additional or increased insurance premiums that may be charged by an insurance provider as a result of the use of new technology.

14.5.   No Cancellation.  All policies providing coverage hereunder shall contain a provision that no cancellation or material change to any policy shall become effective except upon thirty (30) Days advanced written notice thereof to the other Party, where applicable.

14.6.   Obligations Not Relieved.  Notwithstanding anything to the contrary, the occurrence of any of the following events shall not relieve a Party from any of its obligations under this Agreement: (i) failure by a Party to secure the required insurance coverage hereunder; (ii) failure by a Party to fully comply with any of the insurance requirements of this Agreement; (iii) failure by a Party to secure such endorsements on the policies as may be necessary to carry out this Agreement; (iv) the insolvency, bankruptcy or failure of any insurance company providing

Confidential                                                                    KEPPEL00610434

insurance to a Party; or (v) failure of any insurance company to pay any claim accruing under its policy.

14.7.   Failure to Provide Required Insurance.   In the event that coverage for any loss or damage is denied by the underwriter or underwriters due to, in whole or in part, the breach of the insurance policy terms and conditions by a Party, or for any other reason attributable to a Party, or in case the Party required to procure and/or maintain the insurance fails to do so, then the defaulting Party shall defend, indemnify and hold the other Party harmless against all losses which would otherwise have been covered by said insurance.   In the event Contractor fails to maintain the required insurance, Owner may obtain the required insurance, and may demand reimbursement of such premiums and related expenses, together with interest in accordance with Section 10.9.   Owner also reserves the right to set off any such amounts (including interest) in accordance with Section 10.8 hereof.   In the event that Contractor fails to keep the required insurance coverage in effect while performing the Works, such failure shall constitute a breach of this Agreement and Owner also shall have the right, in addition to any other rights it may have under this Agreement, to terminate this Agreement immediately without any further cost to Owner.

## ARTICLE 15 DOCUMENTATION

15.1.   Delivery of Record As-Built Drawings.   Contractor shall deliver to Owner its "As-Built" Drawings in accordance with Exhibit III, promptly after Substantial Completion.

15.2.   Purchasing and Subcontractor Supplied Information.   As more fully set forth in Exhibit III and Exhibit V, Contractor shall deliver to Owner copies of all purchase documents, vendor operating and maintenance information manuals, material and fabrication certifications as applicable, installation instructions, and specific guarantee and warranty information documentation prior to Substantial Completion.

15.3.   Construction Drawings and Manuals.   Contractor shall provide Owner with construction and erection drawings specified in Exhibit III and Exhibit IV.

15.4.   Other Information.   Contractor shall provide all other information and documentation as may be reasonably requested by Owner.

## ARTICLE 16 COMPLETION

16.1.   Mechanical Completion.   Contractor shall give Owner not less than twenty (20) Days prior written notice of its intention to commence any pre-commissioning activities required for Mechanical Completion.   Prior to Mechanical Completion, all systems shall undergo all pre-commissioning checks and tests required to ensure that such systems were correctly installed and are capable of being operated safely and reliably within the specifications contained in this Agreement and in Exhibit VIII and according to Good Industry Practices and without damage to such DRU or any other property and without injury to any person, and documentation shall be provided to Owner which establishes and verifies that all such pre-commissioning activities have been performed.   Upon achievement of Mechanical Completion of the DRU, Contractor shall

Confidential                                                                                                    KEPPEL00610435

notify Owner. Contractor shall comply with all procedures and requirements for the achievement of Mechanical Completion set forth herein and in Exhibit VIII.

16.2. Substantial Completion. Contractor shall comply with all requirements for Substantial Completion set forth herein and in Exhibit VIII. To the extent not specified in Exhibit VIII, the Parties shall mutually agree upon procedures for the performance of the Performance Tests, Reliability Tests, and Demonstration Tests. Contractor shall provide labor, equipment, supplies, and all other items necessary for the performance of the Performance Tests, Reliability Tests, and Demonstration Tests. Contractor shall be responsible for analyzing the data obtained during the Performance Tests, Reliability Tests and Demonstration Tests, and for ensuring that such data reflects the performance standards required hereunder. A complete copy of all raw performance data, and a detailed listing of all testing instrumentation utilized, shall be provided to Owner at the completion of the tests. Upon Substantial Completion of the DRU, Contractor shall certify to Owner that all of the requirements for Substantial Completion for such DRU have occurred in the form specified in Exhibit XXIV (the "Substantial Completion Certificate") and shall provide a performance test report and analysis to Owner. At a minimum, the test report shall include (i) the raw performance data; (ii) a description of the instrumentation utilized for the performance testing; (iii) the procedures utilized during the performance testing, together with all correction curves and formulas; (iv) a full explanation of all corrections and calculations required to correct the test data to site conditions; and (v) any other supporting information used to demonstrate that each system tested has met the performance standards required under the terms of this Agreement. The Substantial Completion Certificate shall be accompanied by all other supporting documentation as may be required to establish that the requirements for Substantial Completion have been met.

16.3. Owner Acceptance of Substantial Completion. Owner shall notify Contractor whether it accepts or rejects the Substantial Completion Certificate for the DRU no later than sixty (60) Days following receipt of the Substantial Completion Certificate. Prior to the end of the sixty (60) Day review period, the Parties may agree in writing to extend the previously mentioned period as may be necessary according to the circumstances. If Owner does not accept or reject the Substantial Completion Certificate within the term established or agreed by the Parties in this Section 16.3, Contractor may deem for all purposes that the Substantial Completion Certificate has been accepted. If Owner does not agree that Substantial Completion has occurred, then Owner shall state the basis for its rejection in reasonable detail in a written notice provided promptly to Contractor. The Parties shall thereupon promptly and in good faith confer and undertake all reasonable efforts to resolve any issues preventing the acceptance by Owner of the Substantial Completion Certificate. In the event such issues are not resolved within twenty (20) Days of the delivery by Owner of its notice, or in the period of days agreed by the Parties to enable any correction in order to achieve Substantial Completion, Owner and Contractor shall resolve the dispute in accordance with the dispute resolution procedures provided for under Article 24.

16.4. Substantial Completion Punch-list. Prior to the issuance of the Substantial Completion Certificate for the DRU, Owner and Contractor shall inspect the whole DRU, to identify the pending items to be included in the Substantial Completion Punch-list. As a result of such

Confidential

KEPPEL00610436

inspection, Contractor shall prepare the Substantial Completion Punch-list.  Contractor shall promptly provide the Substantial Completion Punch-list to Owner for the DRU, together with an estimation of the time and cost necessary to complete or correct each Substantial Completion Punch-list item.  Owner shall review the Substantial Completion Punch-list to ensure that it includes only items of a minor nature.  Contractor shall immediately initiate measures to complete or correct, as appropriate, any item Owner requires to be completed to ensure the proper operation of the DRU or protection of the Equipment or personnel safety.  The failure to include any items on the Substantial Completion Punch-list shall not alter the responsibility of Contractor to complete all Works in accordance with the terms and provisions of this Agreement. All Works on the Substantial Completion Punch-list shall be completed no later than ninety (90) Days following the effective date of Substantial Completion, or other period of time previously agreed between the Parties.  If Contractor fails to complete such Works during such period of time, Owner will have the right, but not the obligation, to complete such Substantial Completion Punch-list items at the expense of Contractor.

16.5.   Handover.  The transfer of physical care and custody of a DRU ("Handover") shall only occur once the following events are completed: (i) Substantial Completion of such DRU has been achieved; (ii) all Tests and Sea Trials, necessary to safely transport and operate the DRU at the drilling location, have been performed in accordance with Exhibit VIII; (iii) Contractor has delivered to Owner the Handover Certificate and its terms have been reviewed and accepted by Owner; (iv) Contractor has taken all necessary steps, according to this Agreement, customs requirements and Applicable Law, for the export of such DRU; and (v) such DRU is safely and properly transferred to Owner at sheltered waters in the city of Angra dos Reis-RJ in Brazil.

16.6.   Handover Certificate.  The Handover conditions agreed between Owner and Contractor shall be fully described in the Handover Certificate as per Exhibit XXI.

16.7.   Performance Acceptance.  Performance acceptance shall occur only after all TTAS-2s have been issued and approved by Owner and all Substantial Completion Punch-list Items have been completed.

16.8.   Final Completion.  The Works shall be finally complete when all requirements for Final Completion have been satisfied and Contractor has delivered a certificate in the form specified in Exhibit XXV, and Owner has accepted such Final Completion Certificate, attesting that Final Completion of the Works has occurred.  Acceptance by Owner of such Final Completion Certificate shall determine the expiration of this Agreement.

16.9.   Long-Term Obligations.  Final acceptance and payment shall not in any way release Contractor or any surety of Contractor from any unperformed obligations under this Agreement, including warranties, obligations, or any other liabilities for which insurance is required, or any other responsibility of Contractor, including the payment of any and all fines and penalties assessed as a result of Contractor's failure to comply with Applicable Law.  It is expressly understood and agreed to by the Parties that nothing in this Article 16 shall in any way modify or alter Contractor's obligations under Article 17 and Article 20 hereof.

Confidential                                                                        KEPPEL00610437

## ARTICLE 17 INSPECTION AND WARRANTY

17.1.   Scope of Warranty.

(a)   General Standards.   Contractor shall ensure that all Works performed hereunder, all Equipment supplied hereunder, and the DRU shall comply with all requirements set forth in this Agreement.   Without limiting the preceding sentence, Contractor warrants (i) that the Equipment and all other items furnished hereunder are new and unused, of internationally acceptable standards according to Good Industry Practices, and free from encumbrance, Liens or other security interest, and that only proven technology, in commercial operation at the time of execution of this Agreement, with conditions substantially similar to those contained herein, shall be used; (ii) that the Works and the Equipment shall be free from Defects in materials and/or workmanship, including but not limited to, any latent defects that may not be readily evident and shall conform in all respects with the Scope of Work; and (iii) that the Works shall conform to Good Industry Practices and all Applicable Codes and Standards and Applicable Law.

(b)   Equipment Quality.   Contractor shall furnish evidence reasonably satisfactory to Owner as to the kind, quality, and quantity of all Equipment.   Contractor shall not use any Equipment other than as specified in this Agreement except with prior written approval by Owner specifically waiving the pertinent requirements of this Agreement.   If Contractor wishes to modify the requirements for any Equipment contained herein, then it shall make written application to Owner for Owner's approval, in Owner's sole discretion, prior to performing any such Works.   Such application shall (i) identify the requirements being modified, (ii) certify that the quality of the proposed substitute is equal to or better than that currently specified, and (iii) certify that the substitute is suited to the same use and capable of performing the same function as that specified.   If the preceding requirements are not followed, then any substitution shall constitute a Default by Contractor.   All Equipment and material shall be new and manufactured, built, applied, installed, connected, operated (during start-up and testing), cleaned and conditioned in accordance with the instructions and warranties of the applicable vendor, manufacturer, fabricator or processor.   Contractor shall obtain (or cause to be obtained) manufacturers' warranties for all Equipment, to be held by Owner in Owner's name or assigned to Owner pursuant to Section 17.3(b).

(c)   Environmental Compliance.   From the date of execution of this Agreement until the Handover, Contractor is fully responsible for ensuring that the Works are performed in an environmentally sound manner, in compliance with all provisions of this Agreement regarding the environment and is in compliance with all Environmental Laws.   In the event of any non-compliance by Contractor or any member of Contractor Group with Environmental Law, or the occurrence of any environmental condition (including any Release) caused by any member of Contractor Group, Contractor shall notify Owner thereof as soon as reasonably possible after having knowledge thereof, and in no event later than one (1) day

Confidential                                                                      KEPPEL00610438

after such occurrence.  Contractor shall, at its sole cost and expense, be responsible for all fines and penalties associated with such non-compliance, and remediate the Release of any substance or other event in violation of this Section 17.1(c) and shall repair any damage caused thereby.  Contractor's obligations under this Section 17.1(c) shall not be subject to any limitation of liability contained in this Agreement, except for the provisions of Section 22.6.2, and shall survive termination of this Agreement.

(d)　　Local Content Compliance.  Contractor is fully responsible for ensuring that Brazilian Local Content requirements are met in accordance with the terms of this Agreement.

17.2.　Owner Right to Inspect.

(a)　　General Rights.  All Works shall be subject to inspection by Owner at all times to determine whether the Works conform to the requirements of this Agreement, for which purpose Owner, its officials or authorized representatives shall at all times have unrestricted right of access to all locations where the Works are in progress, whether on the Site or any other places, including Subcontractors' premises where any Works or parts thereof are being manufactured, stored or prepared for delivery to Contractor.  Contractor shall furnish Owner with access to all locations where Works are in progress, including locations not on the Site.  If, in the judgment of Owner, any Works are Defective, then Contractor shall, at its own expense, promptly repair or replace the Defective Works.  Subject to Contractor's right to pursue a dispute under Article 24, the decision of Owner shall be conclusive as to whether the Works are conforming or Defective, and Contractor shall comply with the instructions of Owner in all such matters while pursuing any such dispute.  If it is later determined that the Works were not Defective, then Owner shall reimburse Contractor for all costs incurred in connection with such repair or replacement and a Change Order shall be issued for such amount and shall address any impact the repair or replacement may have had on the Project Schedule.  If Contractor fails, after a reasonable period of time not to exceed seven (7) Days, to repair or replace any Defective Works, or to commence to repair or replace any Defective Works, then Owner may repair, replace or have the Defective Works repaired or replaced and the expenses thereof shall be reimbursed by Contractor, and Contractor shall not be entitled to any extension of the Project Schedule.

(b)　　No Obligation to Inspect.  Owner's right to conduct inspections under Section 17.2(a) shall not obligate Owner to do so.  Neither the exercise of Owner of any such right, nor any failure on the part of Owner to discover or reject Defective Works, shall be construed to imply an acceptance of such Defective Works or a waiver of such Defect.

(c)　　Cost of Disassembling.  The cost of disassembling or dismantling finished Works for the purposes of Owner's control, and of reassembling such portions (together

Confidential　　　KEPPEL00610439

with any delay associated therewith) shall be borne by Owner if such Works are found to conform with the requirements of this Agreement, and by Contractor if such Works are found to be Defective.

17.3.   Warranty of Defects and Services.

(a)   Warranty Period.   Contractor shall promptly correct, repair or replace, and properly install, at no cost to Owner, any Defective Works, and any part of the DRU or other property which is damaged or affected by Defective Works, if the Defect appears, is discovered or occurs during the 12 (twelve) month-period (the "Warranty Period") commencing on the actual date of Handover of such DRU. Any labor, services, Equipment and materials furnished by Contractor to correct any Defect shall be guaranteed for an additional 12 (twelve) month warranty period starting as of the date that the correction, repair or replacement work is completed; however, in no event shall the Warranty Period extend past 18 (eighteen) months from the actual date of Handover of the DRU.

(b)   Additional Warranties.   Without limiting Contractor's obligations hereunder to warrant the Works, Contractor shall assign to Owner all rights under any warranties it may receive or be entitled to from Subcontractors and suppliers. Contractor shall execute such additional documents as Owner may require evidencing that assignment to Owner.

(c)   Remedy.   Owner shall provide notice to Contractor of the discovery of any Defective Works as soon as reasonably practicable after such discovery. Contractor shall correct, repair or rep lace such Defective Works, and any other portions of the Project damaged or affected by such Defective Works, immediately and on an expedited basis, at no cost to Owner. Owner shall provide Contractor with access to the DRU sufficient to perform its warranty obligations under this Agreement, so long as such access does not unreasonably interfere with operation of the DRU and subject to any reasonable security or safety requirements of Owner. Any change to parts or Equipment that would alter the requirements of this Agreement may be made only with prior written approval of Owner in accordance with the terms of Section 17.1(b) hereof.

(d)   Repair by Owner.   Should Contractor, after notification of a breach of a warranty under Section 17.3(c), fail to commence remedial action within a reasonable period of time not to exceed seven (7) Days, or delay in continuing or completing such remedial action, Owner may, upon written notice to Contractor, correct or have such Defect(s) corrected in accordance with the provisions of this Agreement. In such case Contractor shall be liable for all costs, charges and expenses incurred by Owner in connection therewith, upon receipt of an invoice from Owner and provided that (i) such costs, charges and expenses shall be calculated on a time and material basis and (ii) the Statement of Price Formation presented in Contractor's original proposal shall be used as a reference; provided always that the Contractor's total and cumulative liabilities hereunder shall be

Confidential

KEPPEL00610440

subject to the limitation of liabilities under Article 22, as well as the exclusions therefrom, and further provided always that Owner shall give the Contractor free and unfettered access to the Works.

17.4.   Warranty Exclusions.  Notwithstanding the foregoing, Contractor shall not in any event be responsible or liable for:

(i)     Repairing / dismantling / reassembling of objects / parts / equipment other than Contractor's own work as guaranteed herein;

(ii)    Costs of heavy lift operations offshore or organizing the same;

(iii)   The costs of routine maintenance of the DRU;

(iv)    The costs of repairing damage to the DRU or of correcting any such defects which result from or are due to:

　　　　a.      Normal fair wear and tear;

　　　　b.      Incorrect operation of or failure to maintain the DRU by Owner; or

　　　　c.      Actual operating conditions being different from those specified in this Agreement (including in Exhibit II and Exhibit X) or any Change Orders;

(v)     Any materials or equipment supplied by Owner; and

(vi)    Any costs in addition to Contractor's guarantee pursuant to Section 17.3.

17.4.1 In addition to the above, if the remedial work requires Contractor to complete work offshore and/or such work requires work below the waterline and/or is required to be completed in dry dock, Owner shall make all necessary arrangements at its own cost to facilitate and ensure Contractor has the necessary access required in order to complete the remedial work.  In no event shall Contractor be responsible for any delay or time taken or lost for events arising out of this paragraph and Section 17.3(c).

## ARTICLE 18 ASSIGNMENT AND GUARANTEE

18.1.   Assignment.  This Agreement shall not be assigned or transferred by Contractor in whole or in part without Owner's prior written consent, which Owner may grant or withhold at its sole discretion.  Notwithstanding the provisions of any assignment, Contractor shall together with any assignee remain jointly and severally liable to Owner for the due performance of all Contractor's obligations under this Agreement.

18.2.   Encumbrances.  Contractor may not establish or authorize the establishment of any security interest or encumbrance over its rights in this Agreement (including any credits arising hereunder), nor agree with legal acts to the same effect, in any form, fully or partially, unless upon prior written authorization by Owner.

Confidential                                                                                            KEPPEL00610441

18.3.   Contractor not to be Released.  The assignment or establishment of guarantees permitted above does not release Contractor from any of its contractual obligations hereunder.  Should Owner agree and authorize a partial subcontracting of the Contractor's obligations, the Contractor will remain responsible to Owner for any actions or omissions by any Subcontractor.

18.4.   Assignment by Owner.  At its sole discretion and without any previous consent from Contractor, Owner may pledge or assign its rights and obligations in and to this Agreement in whole or in part to any entity that is an Affiliate of the Owner, or to any Lender upon written and prior notice to Contractor.  If the Owner wishes to assign its rights and obligations under this Agreement to an entity that is not an Affiliate of Owner or who is not a Lender, the same shall be subject to the prior written consent of the Contractor, which shall not be unreasonably withheld or delayed.  Contractor also agrees and undertakes, if so requested by Owner, Lender or creditor, to execute a specific agreement or agreements with Owner, Lender or creditor, under terms deemed satisfactory to Contractor and Owner or such Lender or creditor, including an amendment and/or replication of this Agreement to reflect such whole or partial assignment.  Such specific agreement may also provide for Contractor's obligation to furnish financial and accounting information, as well as any other information of any nature relating to this Agreement and the performance of the Works.  Such assignment shall not impose on Contractor any additional obligation (including tax burden) or adversely affect any right or remedy available to Contractor hereunder.

18.5.   Right of Termination.  When duly assigned in accordance with the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the assignee; any assignment not in accordance with the provisions of Article 18 shall be void and without force or effect.  Any attempt of Contractor to assign this Agreement in violation of this Article 18 shall grant Owner the right, but not the obligation, to terminate this Agreement at its sole option pursuant to Section 21.1(a).

## ARTICLE 19 SUBCONTRACTING

19.1.   Subcontractors.  Owner acknowledges and agrees that Contractor intends to have portions of the Works executed by Subcontractors pursuant to written Subcontracts between Contractor and certain Subcontractors previously approved by Owner.  Subject to Section 7.2, any tax burden arising in relation to any Subcontracts and/or Major Subcontracts shall be borne exclusively by Contractor.

19.2.   Subcontractors Qualification.  All Subcontractors shall be reputable, qualified firms with an established record of successful performance in their respective trades performing identical or substantially similar work.  All contracts with Subcontractors shall be consistent with the terms or provisions of this Agreement including in the case of Major Subcontracts as heretofore defined, that they contain provisions in the form and substance of Section 22.1 and Article 14.  No Subcontractor is intended to be or shall be deemed to be a third party beneficiary of this Agreement.  Contractor shall be fully responsible to Owner for the acts and omissions of Subcontractors and of persons directly or indirectly employed by them, as it is for the acts or omissions of persons directly employed by Contractor.  The work of any Subcontractor shall be subject to inspection by Owner to the same extent as the Works of Contractor.  All

Confidential                                                                      KEPPEL00610442

Subcontractors and personnel of Subcontractors are to be instructed in the terms and requirements of Owner's approved safety and environmental protection regulations, including the Owner Policies, and are expected to comply with such regulations. In the event Subcontractor's personnel does not adhere to such regulations, then they shall be removed by Contractor. In no event shall Contractor be entitled to any adjustment of the Contract Price or Project Schedule as a result of any increase in cost due to compliance with such regulations or due to the removal of personnel.

19.3.   Proposed Subcontractors. In the event that Contractor is considering the selection of a Subcontractor for a Major Subcontract, Contractor shall notify Owner of its proposed Major Subcontractor as soon as possible during the selection process and furnish Owner all information reasonably requested by Owner with respect to Contractor's selection criteria (including copies of bid packages furnished to prospective Major Subcontractors and the qualifications of the proposed Major Subcontractors), or in no event less than thirty (30) Days prior to the execution of a Major Subcontract, whichever is earlier. Contractor shall not enter into any Major Subcontract with a proposed Major Subcontractor rejected by Owner in accordance with the preceding sentence. Owner shall undertake in good faith to review the information provided by Contractor pursuant to this Section 19.3 expeditiously and shall notify Contractor of its decision to accept or reject a proposed Major Subcontractor as soon as practicable after such decision is made.

19.3.1   The Subcontractors shall comply with and perform for the benefit of Owner all requirements and obligations of Contractor to Owner under this Agreement, as such requirements and obligations are applicable to the performance of the work under the Major Subcontract, including but not limited to an indemnity in substance the same as that included in Section 22.1 and the insurance requirements specified in Article 14.

19.4.   Subcontracts.

19.4.1   Major Subcontracts. Notwithstanding the provisions under Section 19.3, Contractor shall furnish Owner with a copy of all Major Subcontracts within ten (10) Days after execution thereof. With respect to the Major Subcontract for the Major Subcontractor listed in item 1.2 of the Exhibit XII Contractor shall furnish Owner with a copy duly executed by such Major Subcontractor within twenty-five (25) Days after the date of this Agreement. Without prejudice to other applicable provisions of this Agreement, each Major Subcontract will contain the following provisions:

    (a)   It is the responsibility of Contractor to fully disclose this Agreement and the contents thereof, except for commercial terms, to any Subcontractor. Contractor shall undertake all necessary action to prevent Owner from becoming liable directly to any claims by Subcontractors and shall defend, indemnify and hold each member of Owner Group free and harmless from and against any claims, losses and/or liabilities (including the cost and expenses related to any administrative, judicial, and arbitration procedures before any court or in any level of jurisdiction that may be filed against any member of Owner Group and related attorneys' fees) suffered or incurred by any member of Owner Group as a

Confidential

KEPPEL00610443

result of any such claim by any Subcontractor. Without limiting the generality of the foregoing, Contractor shall require that all Subcontractors release and waive any and all rights against Owner and the Lenders for recovery of payment of any moneys.

(b)     No Subcontract, supply contract, purchase order or other agreement entered into by Contractor for the purposes of performing the Works shall bind or purport to bind Owner.  Contractor shall ensure that each such Subcontract, supply contract, purchase order or other agreement contains a provision permitting assignment thereof to Owner, in the event this Agreement is terminated by Owner pursuant to Section 21.1 or upon Contractor's written consent.  Subject to the following sentence, Contractor hereby assigns to Owner (and Owner's assigns) all of its interest in any Subcontracts, purchase orders and warranties (or any portion thereof relating to the DRU if any such Subcontracts, purchase orders and warranties relate to other projects or Contractor) now existing or hereafter entered into or received by Contractor for performance of any part of the Works, which assignment will be effective upon acceptance by Owner in writing only as to those Subcontracts, purchase orders and warranties which Owner designates in such writing.  Owner agrees not to exercise any right to assignment of any Subcontract, purchase order or warranty unless and until (i) any obligation by any Subcontractor thereunder extends beyond the expiration of this Agreement, including the last day of the Warranty Period, (ii) Owner terminates this Agreement in accordance with its terms or (iii) Contractor has failed to perform any of its obligations under this Agreement and Owner takes no action that would release or otherwise compromise any right or claim of Contractor against any Subcontractor under the applicable Subcontract or purchase order.

(c)     All Subcontracts, supply contracts, purchase orders or other agreements shall provide for the right of unilateral termination by Contractor of all or a portion of such Subcontract, supply contract, purchase order or other agreement without any penalties to Contractor or to Owner.  If so requested by Owner, following any termination of this Agreement for convenience, or by reason of Default by Contractor, Contractor shall terminate any such agreements, Subcontracts, supply contract, purchase order or other agreement.  Each Subcontract, supply contract, purchase order and other agreement shall also provide that, in the event of termination, title to Equipment or partially completed Works for which Owner has paid (whether directly or indirectly) shall pass to Owner and Contractor, at the direction of Owner, will instruct the Subcontractor with respect to the disposition of such Equipment or Works.

19.4.2  Nothing contained herein or in any such Subcontract, supply contract, purchase order or other agreement shall (i) create or constitute any contractual relationship between Owner and any Subcontractor, (ii) create any obligation on the part of Owner to a Subcontractor or (iii) obligate Owner to pay any amount to any Subcontractor.

Confidential                                                                                     KEPPEL00610444

## ARTICLE 20 GUARANTEE OF TIMELY COMPLETION

20.1.    Guarantee of Timely Completion.  Contractor acknowledges that time is of the essence in the performance of this Agreement, and agrees that it shall diligently pursue the Works, assigning to it a priority that will comply with the Project Schedule prepared according to the Project Schedule Baseline specified in Section 11.4, and cause (i) the DRU to satisfy and to achieve Handover on or before the relevant Handover Date and (ii) Final Completion to occur on or before the Required Final Completion Date.

20.2.    Liquidated Damages for Delay.  The events indicated in the Project Schedule Baseline, Section 11.4, shall be achieved by Contractor in sufficient time to permit Substantial Completion and Handover of the DRU on or prior to the relevant Handover Date.

20.2.1  If Handover of the DRU has not occurred on or before the applicable Handover Date, then Contractor shall pay to Owner, as liquidated damages for such delay, the amount corresponding to the percentage of the Contract Price of such DRU as per Schedule A of Exhibit XVI, indicated below, for each full week of delay, until Handover occurs:

| 1st to 16th week | 0.05% of the Contract Price of the relevant DRU as per Schedule A |
| 17th week onwards | 0.1% of the Contract Price of the relevant DRU as per Schedule A |

20.2.2  If Contractor fails to comply with any of its obligations under this Agreement, in a timely manner, Contractor shall pay to Owner an amount corresponding to 0.001% (one thousandth of one percent) of the Contract Price of the DRU per day of delay for complying with the related obligation, after elapsed the time period set by the notification of irregularity issued by Owner.

20.2.3  The maximum total amount of liquidated damages payable under Section 20.2 ("Delay Damages") in respect of the DRU shall be equal to ten percent (10%) of the Contract Price of such DRU. Once this total amount is reached, Owner shall have the right, at its option, to terminate this Agreement in accordance with Article 21.

20.2.4  Liquidated damages payable pursuant to this Section 20.2 shall be paid by Contractor in arrears on the final Business Day of each month during which such liquidated damages are incurred.  Owner will have the right to offset any liability of Contractor under this Article 20 against any amount due or to become due from Owner to Contractor under this Agreement.

20.3.    Liquidated Damages Are Not a Penalty. The Parties acknowledge and agree that because of the unique nature of the DRU, the unavailability of substitute facilities, and the effects of delay, it would be impracticable or extremely difficult to determine the actual damages resulting from Contractor's failure to achieve the Handover of the DRU.  It is understood and agreed by the Parties that (i) Owner shall be damaged by failure of Contractor to meet such obligations, and

SPAULO-1-37049-v3                                  - 74 -                                       95-40522876

Confidential                                                                                  KEPPEL00610445

such damages can and will include any losses incurred by Owner or any of its subsidiaries or Affiliates or Partners as end user of the DRU which may result from lost oil production, (ii) it would be impracticable or extremely difficult to fix the actual damages resulting there from, (iii) any sums that would be payable under this Article 20 are in the nature of liquidated damages, and are not a penalty or consequential damages, and (iv) such payment represents a reasonable and appropriate estimate of fair compensation for the losses that may reasonably be anticipated from such failure.

20.4.   Sole Remedy for Delay.   Except as provided in Article 21, payment of the Delay Damages shall be Owner's sole and exclusive remedy for Contractor's failure to achieve the Handover of the DRU on or before the applicable Handover Date. Contractor agrees, however, that Delay Damages are intended only to cover damages suffered by Owner as a result of delay. Delay Damages also are not deemed to cover the cost of completion of the Works or other damages and Owner shall also be entitled to rely on its other remedies under this Agreement for all Defaults, further to those allowed in law or equity, should Owner opt to terminate the Agreement in accordance with Section 21.1. Notwithstanding anything to the contrary, this Agreement and all of its terms with the exception of those provisions identified in Section 25.15, shall expire automatically on the date indicated in Section 11.4.6. Owner, at its sole option, may agree to extend the date set forth in this Section 20.4.

20.5.   No Challenge.   Each of the Parties agrees not to challenge the enforceability of the liquidated damages provisions contained herein. If the enforceability of the amount of liquidated damages under this Agreement is successfully challenged by Contractor, or by a third party acting in its place and stead, as being a penalty or unreasonable in amount, Contractor shall instead be liable to Owner for all direct and consequential damages, costs and losses incurred by Owner in connection with such breach, together with all costs incurred by Owner in proving or enforcing the same, without regard to any limitations whatsoever set forth in this Agreement, including waiver of consequential damages.

20.6.   Performance Security.   In addition to any other performance securities provided herein, prior to the down payment, Contractor shall furnish to Owner a Performance Security in an amount equal to US$ 50,000,000.00, representing 6.07% of the Original Contract Price of USD 823,448,000.00 as stated in the Exhibit XVI (the "Original Contract Price") for the full and faithful performance of its obligations under this Agreement in the form set forth in Exhibit XXIII. This Performance Security is unconditional and irrevocable and Contractor shall maintain the Performance Security (or a replacement Performance Security, in the form set forth in Exhibit XXIII) in full force and effect at all times from the date hereof until the date of the issuance by the Owner of the Final Completion Certificate, as defined in Section 16.8. Contractor shall replace any current Performance Security with another Performance Security no later than thirty (30) days prior to the expiry of the current Performance Security; provided that if Contractor fails to replace such Performance Security no later than thirty (30) days prior to expiry, (i) Owner shall be entitled to draw the full value of the Performance Security and maintain such proceeds in an account in Owner's name for application for any purposes for which Owner would be entitled to draw the Performance Security provided that (1) should the Contractor subsequently provide a replacement Performance Security as required under this

Confidential                                                                                   KEPPEL00610446

Section, the Owner shall promptly return to the Contractor all amounts remaining in such account and (2) any amount in excess of US$25,000,000.00 in the account shall be duly paid to the Contractor upon Handover and any balance remaining in the account after the Final Completion Certificate shall be duly paid to the Contractor, and the Owner shall notify the Contractor of any amount that is withdrawn from such account and the purposes for which Owner would be entitled to draw the Performance Security, and (ii) if Owner does not so draw upon the Performance Security, Contractor shall be deemed to be in Default pursuant to Section 21.1(a)(x). Any Performance Security provided by Contractor hereunder must have a term of not less than two (2) years; provided that, any Performance Security with a term exceeding the date of Final Completion shall terminate on such date of Final Completion. For purposes of maintaining the Performance Security, the amount of any replacement Performance Security up to Handover, shall be based on the lower of US$50,000,000.00 and the undrawn amount of the Performance Security that it is replacing. And the amount of any replacement Performance Security after Handover shall be based on the lower of US$25,000,000.00 and the undrawn amount of the Performance Security that is replacing. Upon receipt of the replacement Performance Security, Owner undertakes not to draw on the existing Performance Security to be replaced and forthwith return the latter to the Contractor.

20.6.1 At any time during the term of this Agreement, if the financial institution that has issued the Performance Security has a long-term debt credit rating lower than BBB- by Standard and Poor's (or its equivalent), Owner shall have the right to request in writing that Contractor (and upon such request Contractor shall) procure another Performance Security to replace the existing Performance Security, within 20 (twenty) Business Days after the request made by Owner, or request local confirmation of the existing Performance Security with the expenses of such being borne by Contractor, it being agreed that the new financial institution shall meet the rating criteria set forth herein. For the avoidance of doubt, the new Performance Security to be issued pursuant to this Section shall take into consideration any amount drawn by Owner under the original Performance Security.

20.6.2 Should the Contract Price be subject to any increase due to Change Orders in accordance with the terms of this Agreement, after the date on which the Performance Security mentioned in Section 20.6 was issued, and such increase is individually, or in aggregate equal to or greater than (i) 8.6 % (with respect to the first Change Order) or (ii) 10% (with respect to the following Change Orders) of the Original Contract Price then the amount of the Performance Security shall be increased accordingly so that the amount of the Performance Security shall be equivalent to 6,27% of the Original Contract Price adjusted in accordance with the Change Orders. Contractor shall provide an increase Performance Security no later than 20 (twenty) Business Days from Owner's written request.

20.7.  Corporate Guaranty from FELS OFFSHORE PTE. LTD.  Contractor shall furnish to Owner on the date hereof, and maintain in full force and effect throughout the term of this Agreement, a corporate guaranty issued by FELS OFFSHORE PTE. LTD. in order to secure the

Confidential

KEPPEL00610447

full performance of Contractor's obligations under this Agreement, in form and substance as set forth in Exhibit XXX.

## ARTICLE 21 DEFAULT, TERMINATION AND SUSPENSION

21.1.    Default by Contractor.

    (a)    Termination by Owner for Default.    Contractor shall be in default of this Agreement in the event that any of the following events (each a "Default") occurs and is continuing: (i) Contractor fails to perform the Works in accordance with Section 11.3(c) and/or Section 11.3(d); (ii) Contractor fails to pay its Subcontractors or to pay its debts as they become due in accordance with the relevant contract, Subcontract or Subcontractor's undisputed invoice; (iii) Contractor becomes insolvent or has a receiver appointed, in which case the cure period described below shall not apply; (iv) Contractor violates the anti-assignment provisions of Section 18.4 or makes a general assignment for the benefit of its creditors, in which case the cure period described below shall not apply; (v) Contractor exceeds the maximum Delay Damages allowed in accordance with Section 20.2.3; (vi) Contractor modifies the ownership or composition of its Affiliate relationship with the Major Subcontractor listed in item 1.2 of Exhibit XII hereto without the prior written consent of Owner; (vii) Contractor abandons the Works (except due to a termination of the Works permitted by this Agreement); (viii) Contractor refuses or fails to provide sufficient skilled workers, adequate supervision or payment of materials of the proper quality; (ix) Contractor causes, by action or omission, the stoppage or delay or interference with the Works, or (x) Contractor fails to comply with any essential provision of this Agreement upon notice by Owner in accordance with Section 25.5 specifying the nature and origin of the alleged Default; and provided, however, Contractor shall not have taken adequate steps to cure such condition within seven (7) Days counted from the notice by Owner, or if the Default is impossible to be corrected within such seven (7) Days, and Contractor has commenced such corrective action within seven (7) Days and cures such condition within fourteen (14) Days, Owner, at its option, without prejudice to the other rights it may have under this Agreement, and without further notice to any Party, may:

    (i)    Take such steps as are necessary to overcome the condition, in which case Contractor shall be fully liable to Owner and shall pay for the cost thereof;

    (ii)    Terminate this Agreement or Contractor's performance of all or any part of the Works, seeking any legal remedies as it may be entitled to under this Agreement; or

    (iii)    Seek interlocutory, equitable or injunctive relief requiring performance of Contractor's obligations, it being agreed by Contractor that such relief may be necessary to avoid irreparable harm to Owner.

Confidential                                                                    KEPPEL00610448

Under no circumstances shall Owner be responsible for any payments to Contractor hereunder during a Default by Contractor. Notwithstanding any of the foregoing, Owner shall not have any affirmative obligation to terminate this Agreement, in the event of a Default.

(b)     Additional Rights of Owner Upon Termination.   In the event that Owner terminates this Agreement in whole or in part by reason of Contractor's Default, Owner may, at its sole option, (i) enter onto the Site and take possession, at its sole discretion, for the purpose of completing the Works of all of the Equipment, materials, tools, supplies, documents, and information of Contractor in order to allow the safe removal and transportation of the DRU to another site to complete the Works, (ii) assume any or all of the Subcontracts, at its sole discretion, and (iii) either itself or through others, complete the Works in the most cost-efficient means reasonably practicable. To the extent Owner exercises any of its additional rights upon termination, Contractor shall cooperate fully with, and provide all reasonable assistance to Owner. Contractor shall not be entitled to receive any further payment from Owner until the Works have been fully completed and accepted by Owner, and any Disputes in connection with such completion are resolved. Owner's rights under this Section 21.1(b) are in addition to any other rights provided for under this Agreement. Owner agrees to act reasonably and use its best efforts to mitigate any costs it might incur in connection with any termination for default by Contractor. Any risk of loss of the DRU upon the occurrence of the events mentioned in this Section shall pass on to the Owner.

21.2.   Termination for Convenience by Owner.   Owner shall have the right to terminate for convenience this Agreement or Contractor's performance of all or any part of the Works by providing Contractor with a written notice of termination, to be effective thirty (30) Days after the receipt by Contractor of such notice. Upon termination for convenience, Contractor shall (i) as soon as practicable discontinue the Works on the date and to the extent specified in such notice, (ii) place no further orders for Subcontracts, Equipment, or services except as may be necessary for completion of such portion of the Works currently being undertaken so as to avoid the impact of any remobilization, (iii) promptly make every reasonable effort to procure cancellation or transfer/assignment of the Subcontracts and rental agreements to Owner, or to any of its appointees, upon terms satisfactory to Owner to the extent they relate to the performance of the Works then discontinued and to the extent requested by Owner, (iv) cooperate with Owner for the efficient transition of the Works, and (v) thereafter execute only that portion of the Works as may be necessary to preserve and protect Works already in progress and to protect Equipment at the Site or in transit thereto, and to comply with any Applicable Law. Contractor shall be paid the value of the Works performed prior to termination plus its reasonable demobilization and dismantling costs and reasonable direct and associated close-out costs, but in no event shall Contractor be entitled to receive any amount for overhead or anticipatory profit. However, Contractor shall be entitled to receive a percentage of the remaining amount of the Contract Price that shall be: (i) 3% if termination occurs during the first 22 months from the Work Authorization Initial Date; (ii) 6% if termination occurs between the 23rd and the 44th month following the Work Authorization Initial Date; and (iii) 9% if

Confidential                                                                            KEPPEL00610449

termination occurs between the 45th and the 65th month following the Work Authorization Initial Date. For the avoidance of doubt, the Contractor shall return to the Owner, within sixty (60) Days from the receipt of the aforementioned notice any and all difference between the amounts already paid as part of the Contract Price by the Owner under this Agreement and the amounts due in connection with this Section.

21.3.   Suspension of Works by Owner.  Owner may, for any reason, at any time and from time to time, by written notice to Contractor, suspend the carrying out of the Works or any part thereof, whereupon Contractor shall suspend the carrying out of the Works or any part thereof for such time or times and in such manner as Owner may require. During any such suspension, Contractor shall properly protect and secure the Works in such manner as Owner may reasonably require. Unless otherwise instructed by Owner, Contractor shall during any such suspension maintain its staff and labor on or near the Site and otherwise ready to proceed with the Works upon receipt of Owner's further instructions. Owner and Contractor shall negotiate a Change Order to address the impact of such suspension on the Contract Price and on the Project Schedule. The Contract Price shall be adjusted for the reasonable costs (including actual overhead and reasonable profit) of such suspension, including demobilization and remobilization costs, if required, along with appropriate supporting documentation to evidence such costs, and the Project Schedule shall be equitably adjusted to reflect such suspension.

21.4.   Termination by Contractor.  Contractor may terminate this Agreement or suspend the execution of the Works in the following circumstances:

21.4.1  Any undisputed amount due and payable to Contractor by Owner is not paid within sixty (60) Business Days after Contractor's notice of non-payment to Owner; provided that Contractor has achieved the corresponding portion of the Works set forth in the Project Schedule.

21.4.2  Owner, by written notice to Contractor, suspends the Works pursuant to Section 21.3 for more than 180 (one hundred and eighty) consecutive days.

If this Agreement is terminated by Contractor pursuant to the terms of this Section 21.4, Owner shall pay to Contractor, within sixty (60) Business Days after the date of the termination notice, the reasonable value of the Works performed prior to termination plus any reasonable mobilization costs plus reasonable direct close-out costs. In no event shall Contractor be entitled to receive any amount for overhead or anticipatory profit following such termination, but Contractor shall be entitled to receive a percentage of the remaining amount of the Contract Price that shall be: (i) 3% if termination occurs during the first 22 months from the Work Authorization Initial Date; (ii) 6% if termination occurs between the 23rd and the 44th month following the Work Authorization Initial Date; and (iii) 9% if termination occurs between the 45th and the 65th month following the Work Authorization Initial Date. However, if there is a dispute with respect to the amount owed, Owner shall pay all undisputed amounts on or before the due date hereof and the Parties may submit the dispute for resolution as set forth in Article 24.

Confidential                                                                                      KEPPEL00610450