**KEPPEL OPP'N EXH. 152**



COURT'S
EXHIBIT NO. 1
IDENTIFICATION/EVIDENCE
DKT.# 17cr697
DATE: 12/22/17

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

**CASE NO.   17-CR-697 (KAM)**

**UNITED STATES OF AMERICA**

**v.**

**KEPPEL OFFSHORE & MARINE LTD.,**

    **Defendant.**

_____ /

## DEFERRED PROSECUTION AGREEMENT

The defendant Keppel Offshore & Marine Ltd. (the "Company"), pursuant to authority

granted by the Company's Board of Directors, and the United States Department of Justice,

Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office

for the Eastern District of New York (the "Office"), enter into this deferred prosecution

agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.  The Company acknowledges and agrees that the Fraud Section and the Office will

file the attached one-count criminal Information (the "Information") in the United States District

Court for the Eastern District of New York charging the Company with one count of conspiracy

to commit an offense against the United States, in violation of Title 18, United States Code,

Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of

1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-2 and 78dd-3.  In so

doing, the Company: (a) knowingly waives its right to indictment on this charge, as well as all

rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title

1

18, United States Code, Section 3161 and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York. The Fraud Section and the Office agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate.  Should the Fraud Section or the Office pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Facts in any proceeding by the Fraud Section or the Office, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term").  The Company agrees, however, that, in the event the Fraud Section and the Office determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and the Office, in their sole discretion, for up to a total additional time period of one year, without prejudice to the

2

Fraud Section's and the Office's right to proceed as provided in Paragraphs 14-18 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early. If the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

## **Relevant Considerations**

4.      The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.      the Company did not receive voluntary disclosure credit because, although it notified the Fraud Section about publicly-reported allegations in Brazil prior to the Fraud Section and the Office contacting the Company, the Fraud Section and the Office were already aware of the allegations;

b.      the Company received full credit for its substantial cooperation with the Fraud Section and the Office's investigation, including conducting a thorough internal investigation, meeting the Fraud Section's and the Office's requests promptly, proactively identifying issues and facts that would likely be of interest to the Fraud Section and the Office, making regular factual presentations to the Fraud Section and the Office, agreeing to make foreign-based employees available for interviews in the United States, producing documents to the Fraud Section and the Office from foreign countries in ways that did not implicate foreign data privacy

3

laws, and collecting, analyzing, and organizing voluminous evidence and information for the Fraud Section and the Office;

c.    the Company provided to the Fraud Section and the Office all relevant facts known to it, including information about the individuals involved in the misconduct, which assisted the Fraud Section's and the Office's prosecution of individuals in this case;

d.    the Company engaged in extensive remedial measures, including: taking disciplinary action against 17 former or current employees in relation to the misconduct described in the Statement of Facts; causing seven employees who participated in the misconduct described in the Statement of Facts to separate from the Company; issuing demotions and/or written warnings to seven employees who failed to detect the misconduct and/or failed to take appropriate steps to mitigate corruption and compliance risks; imposing approximately $8.9 million in financial sanctions on 12 former or current employees as part of the disciplinary process; and conducting individualized anti-corruption and compliance training for six employees;

e.    the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including by implementing heightened controls and additional procedures and policies relating to third parties; instituting a compliance governance framework, including a formal compliance function; developing a comprehensive anti-corruption training program; conducting ongoing reviews of its compliance program with the assistance of outside advisors, and ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

f.    based on the Company's remediation and the state of its compliance program, and the Company's agreement to report to the Fraud Section and the Office as set forth

4

in Attachment D to this Agreement (Corporate Compliance Reporting), the Fraud Section and the Office determined that an independent compliance monitor was unnecessary;

g.  the Company is entering into resolutions with authorities in Singapore and Brazil relating to the same conduct described in the Statement of Facts, which the Fraud Section and the Office are crediting in connection with the penalty in this Agreement;

h.  the nature and seriousness of the offense conduct, including a long-running scheme, the amount of bribe payments made to Brazilian government officials, and the involvement of high-level KOM executives;

i.  the Company has no prior criminal history;

j.  the Company has agreed to continue to cooperate with the Fraud Section and the Office in any ongoing investigation of the conduct of the Company, its subsidiaries and affiliates, and its officers, directors, employees, agents, business partners, and consultants relating to violations of the FCPA; and

k.  accordingly, after considering (a) through (j) above, the Company received full cooperation and remediation credit of 25 percent off the bottom of the applicable United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") fine range.

## **Future Cooperation and Disclosure Requirements**

5.  The Company shall, subject to applicable law and regulations, cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct relating to corrupt payments under investigation by the Fraud Section and the Office at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term specified in Paragraph 3 above. At the request of the Fraud

5

Section and the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct relating to corrupt payments under investigation by the Fraud Section and the Office at any time during the Term. The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following, subject to local law and regulations, including relevant data privacy and national security laws and regulations:

      a.     The Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or attorney work product doctrine with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section and the Office may inquire of the Company.

      b.     Upon request of the Fraud Section and the Office, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 5(a) above on behalf of the

6

Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

      c.     The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

      d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

6.     In addition to the obligations in Paragraph 5 above, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section and the Office.

## Payment of Monetary Penalty

7.     The Fraud Section, the Office and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

7

a.   The 2016 USSG are applicable to this matter.

b.   Offense Level. Based upon USSG § 2C1.1, the total offense level is 42, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 12 |
| (b)(1) | Multiple Bribes | +2 |
| (b)(2) | Value of benefit received more than $250,000,000 | +28 |
| **TOTAL** | | 42 |

c.   Base Fine. Based upon USSG § 8C2.4(a)(2), the base fine is $351,847,483.

d.   Culpability Score. Based upon USSG § 8C2.5, the culpability score is 8, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | The organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 8 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $351,847,483 |
| Multipliers | 1.6 (min)/3.2 (max) |
| Fine Range | $562,955,972.80 – $1,125,911,945.60 |

The Fraud Section, the Office and the Company agree, based on the application of the

Sentencing Guidelines, that the appropriate total criminal penalty is $422,216,980 ("Total

Criminal Penalty"). This reflects a 25 percent discount off the bottom of the applicable

Sentencing Guidelines fine range. The Fraud Section, the Office and the Company further agree

that the Company will pay a monetary penalty to the United States Treasury in the amount of

$105,554,245, of which $4,725,000 will be paid as a criminal fine on behalf of the Company's

United States subsidiary Keppel Offshore & Marine USA, Inc. ("KOM USA"), in connection

with KOM USA's guilty plea and plea agreement. The payments will be made within 10

business days of the entry of the judgment of KOM USA's sentence by the Court. The Fraud

Section, the Office and the Company further agree that the Fraud Section and the Office will

credit the amount the Company pays to Brazilian authorities, up to a maximum of $211,108,490,

and to Singaporean authorities, up to a maximum of $105,554,245. The Company's payment

obligations to the United States will be complete upon the Company's payment of $105,554,245,

equal to a total of 25 percent of the Total Criminal Penalty, so long as the Company pays the

remaining amount of the Total Criminal Penalty to authorities in Brazil and Singapore pursuant

to their respective agreements. Should any amount of such payment to the authorities in Brazil

or Singapore not be made by the end of the Term, or be returned to the Company or any

affiliated entity for any reason, the remaining balance of the Total Criminal Penalty will be paid

to the United States Treasury. The Fraud Section, the Office and the Company agree that this

penalty is appropriate given the facts and circumstances of this case, including the Relevant

Considerations outlined in Paragraph 4 above. The Total Criminal Penalty is final and shall not

be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the

Fraud Section and the Office that $422,216,980 is the maximum penalty that may be imposed in

any future prosecution, and the Fraud Section and the Office are not precluded from arguing in

any future prosecution that the Court should impose a higher fine, although the Fraud Section

9

and the Office agree that under those circumstances, they will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty, including in Brazil or Singapore. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Total Criminal Penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts, except in the event a foreign enforcement authority were to provide credit for additional penalties, fines, or forfeiture above the Total Criminal Penalty imposed on the Company by or paid to a different foreign enforcement authority or regulator (or its designee) other than the Ministério Público Federal in Brazil and the Attorney General's Chambers in Singapore.

## Conditional Release from Liability

8.      Subject to Paragraphs 14-18 below, the Fraud Section and the Office agree, except as provided in this Agreement, that they will not bring any criminal or civil case against the Company or any of its direct or indirect subsidiaries or joint ventures, other than the charges specified in the Information and Plea Agreement between the Fraud Section and the Office and KOM USA filed on December 22, 2017, relating to any of the conduct described in the Statement of Facts or the Information filed pursuant to this Agreement. The Fraud Section and the Office, however, may use any information related to the conduct described in the Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any

10

crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.     This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

## Corporate Compliance Program

9.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.

10.    In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively

11

detect and deter violations of the FCPA and other applicable anti-corruption laws. The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C.

**Corporate Compliance Reporting**

11.    The Company agrees that it will report to the Fraud Section and the Office annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

**Deferred Prosecution**

12.    In consideration of the undertakings agreed to by the Company herein, the Fraud Section and the Office agree that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company that is not set forth in the Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

13.    The Fraud Section and the Office further agree that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section and the Office will not continue the criminal prosecution against the Company described in Paragraph 1 above and, at the conclusion of the Term, this Agreement shall expire. Within six months of the Agreement's expiration, the Fraud Section and the Office shall seek dismissal with prejudice of the Information filed against the Company described in Paragraph 1 above, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts.

12

## Breach of the Agreement

14.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 above; (d) fails to implement a compliance program as set forth in Paragraphs 9 and 10 above and Attachment C; or (e) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term is complete, the Company and its subsidiaries shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1 above, which may be pursued by the Fraud Section and the Office in the United States District Court for the Eastern District of New York or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Fraud Section and the Office's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this

13

Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

15. In the event the Fraud Section and the Office determine that the Company has breached this Agreement, the Fraud Section and the Office agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Company.

16. In the event that the Fraud Section and the Office determine that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Fraud Section and the Office or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such

14

statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision as to whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

17.     The Company acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

18.     Thirty days prior to the end of the period of deferred prosecution specified in this Agreement, the Company, by the Chief Executive Officer and the Chief Financial Officer, will certify to the Fraud Section and the Office that the Company has met its disclosure obligations pursuant to Paragraph 6 above. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

### Sale, Merger, or Other Change in Corporate Form of Company

19.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates

15

involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section's and the Office's ability to declare a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Fraud Section and the Office at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form. If the Fraud Section and the Office notify the Company prior to such transaction (or series of transactions) that they have determined that the transaction(s) has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Fraud Section and the Office, the Company agrees that such transaction or transactions will not be consummated. In addition, if at any time during the Term the Fraud Section and the Office determine in their sole discretion that the Company has engaged in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, they may deem it a breach of this Agreement pursuant to Paragraphs 14-18 above. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

16

## Public Statements by Company

20. The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 14 through 18 above. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and the Office. If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Fraud Section and the Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts, provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

21. The Company agrees that if it, its parent company, or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with

17

this Agreement, the Company shall first consult with the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section, the Office and the Company; and (b) whether the Fraud Section and the Office have any objection to the release.

22.     The Fraud Section and the Office agree, if requested to do so, to bring to the attention of law enforcement, regulatory and debarment authorities, as well as those of MDBs the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Fraud Section and the Office are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such authorities.

## **Limitations on Binding Effect of Agreement**

23.     This Agreement is binding on the Company, the Fraud Section and the Office but specifically does not bind any other component of the United States Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section and the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

## **Notice**

24.     Any notice to the Fraud Section and the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Daniel S. Kahn, Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Washington, D.C. 20005; as well as

18

Jacquelyn Kasulis, Chief, Business and Securities Fraud Section, United States Attorney's Office

for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, NY 11201. Any notice

to the Company under this Agreement shall be given by personal delivery, overnight delivery by

a recognized delivery service, or registered or certified mail, addressed to Sean Hecker,

Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022. Notice shall be effective

upon actual receipt by the Fraud Section and the Office or the Company.

## Complete Agreement

25.     This Agreement, including its attachments, sets forth all the terms of the

agreement between the Company, the Fraud Section and the Office. No amendments,

modifications or additions to this Agreement shall be valid unless they are in writing and signed

by the Fraud Section and the Office, the attorneys for the Company and a duly authorized

representative of the Company.

**AGREED:**

**FOR KEPPEL OFFSHORE & MARINE LTD.:**

Date:  22/12/17                              By:  _____

                                                  Nicholas Choo Kwang Hui
                                                  KEPPEL OFFSHORE & MARINE LTD.

Date:  12/22/2017                            By:  _____

                                                  Sean Hecker
                                                  David A. O'Neil
                                                  DEBEVOISE & PLIMPTON LLP

19

**FOR THE DEPARTMENT OF JUSTICE:**

> SANDRA MOSER
> Acting Chief, Fraud Section
> Criminal Division
> United States Department of Justice

Date: 12/22/17                    BY: _____

> Derek J. Ettinger
> David M. Fuhr
> Trial Attorneys

**FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK:**

> BRIDGET M. ROHDE
> Acting United States Attorney
> Eastern District of New York

Date: 12/22/17                    BY: _____

> Patrick T. Hein
> Assistant United States Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel

for Keppel Offshore & Marine Ltd. (the "Company"). I understand the terms of this Agreement

and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this

Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights

of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the

consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the

Company. I have advised and caused outside counsel for the Company to advise the Board of

Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines'

provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this

Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person

authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement.

I am also satisfied with outside counsel's representation in this matter. I certify that I am the

Assistant General Manager (Legal & Compliance) for the Company and that I have been duly

authorized by the Company to execute this Agreement on behalf of the Company.

Date:  18/12/17

Keppel Offshore & Marine Ltd.

By:  _____

Nicholas Choo Kwang Hui
Assistant General Manager (Legal & Compliance)

## CERTIFICATE OF COUNSEL

I am counsel for Keppel Offshore & Marine Ltd. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Assistant General Manager (Legal & Compliance) of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: __12/19/2017__

By: _____

Sean Hecker
Debevoise & Plimpton LLP
Counsel for Keppel Offshore & Marine Ltd.

### ATTACHMENT A

### STATEMENT OF FACTS

1.      The following Statement of Facts is incorporated by reference as part of the

Deferred Prosecution Agreement (the "Agreement") between the United States Department of

Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's

Office for the Eastern District of New York (the "Office") (collectively, the "United States"),

and the defendant Keppel Offshore & Marine Ltd.  Certain of the facts herein are based on

information obtained from third parties by the Fraud Section and the Office through their

investigation and described to Keppel Offshore & Marine Ltd.  Keppel Offshore & Marine Ltd.

hereby agrees and stipulates that the following facts and conclusions of law are true and accurate.

Keppel Offshore & Marine Ltd. admits, accepts, and acknowledges that it is responsible for the

acts of its officers, directors, employees, and agents as set forth below.

### Relevant Entities and Individuals

2.      The defendant Keppel Offshore & Marine Ltd. ("KOM" or the "Company"), a

Singapore-based corporation, operated shipyards in Asia, the Americas, and Europe.  KOM's

business consisted primarily of building mobile offshore drilling rigs and handling repairs,

conversions, and upgrades of shipping vessels.

3.      Keppel Offshore & Marine USA, Inc. ("KOM USA") was a wholly-owned

subsidiary of KOM based in Houston, Texas and incorporated in Delaware, and whose

executives supervised operations in, among other locations, Brazil.  KOM USA was a "domestic

concern," as that term is defined in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United

States Code, Section 78dd-2(h)(1).

4.      Petróleo Brasileiro S.A. ("Petrobras") was a Brazilian state-controlled oil

company headquartered in Rio de Janeiro, Brazil, that operated to refine, produce and distribute

oil, oil products, gas, biofuels and energy. The Brazilian government directly owned more than 50 percent of Petrobras's common shares with voting rights. Petrobras was controlled by Brazil and performed government functions, and thus was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3.

5.      Sete Brasil Participacoes S.A. ("Sete Brasil") was a privately held corporation headquartered in Rio de Janeiro, Brazil, that specialized in portfolio management of assets related to the offshore oil and gas sector.

6.      The Workers' Party of Brazil ("Workers' Party") was a political party in Brazil that formed part of the federal government of Brazil in or about and between 2003 and 2016. The Workers' Party was a "political party" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(a)(2) and 78dd-3(a)(2).

7.      Consultant, a citizen of Brazil whose identity is known to the United States and KOM, was an agent of KOM in or about and between 2000 and 2016 who facilitated bribe payments from KOM to public officials of Brazil and the Workers' Party.

8.      KOM Executive 1, a citizen of Singapore whose identity is known to the United States and KOM, was a senior executive of KOM in or about and between 2002 and 2014.

9.      KOM Executive 2, a citizen of Singapore whose identity is known to the United States and KOM, was a senior executive of a wholly-owned, Singapore-based subsidiary of KOM in or about and between 1989 and 2009 and a senior executive of KOM in or about and between 2013 and 2017.

10.     KOM Executive 3, a citizen of Singapore and legal permanent resident of the United States in or about and between 2002 and 2013, whose identity is known to the United States and KOM, was a senior executive of KOM USA in or about and between 2002 and 2011

A-2

and a senior executive of KOM in or about and between 2011 and 2017. Thus, in or about and between 2002 and 2011, KOM Executive 3 was an "employee" and "agent" of a domestic concern, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2.

11.     KOM Executive 4, a citizen of Singapore whose identity is known to the United States and KOM, was an executive at KOM in or about and between 2002 and 2017. He was an executive at KOM USA in or about and between 2011 and 2017. Thus, in or about and between 2011 and 2017, KOM Executive 4 was an "employee" and "agent" of a domestic concern, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2.

12.     KOM Executive 5, a legal permanent resident of the United States since 2015, whose identity is known to the United States and KOM, held executive positions at multiple KOM subsidiaries in Brazil in or about and between 2003 and 2017. He also held an executive position at KOM and at KOM USA in or about and between 2012 and 2017. Thus, in or about and between 2012 and 2017, KOM Executive 5 was an "employee" and "agent" of a domestic concern, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2.

13.     KOM Executive 6, a United States citizen whose identity is known to the United States and KOM, held various senior positions in the legal department of KOM in or about and between 1990 and 2017. KOM Executive 6 was a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-(h)(1).

14.     KOM Sub Executive, a citizen of Singapore whose identity is known to the United States and KOM, was a senior executive of a wholly-owned, Brazil-based subsidiary of KOM in or about and between 2000 and 2007.

15.     Brazilian Official 1, a citizen of Brazil whose identity is known to the United States and KOM, was an employee of Petrobras in or about and between 2003 and April 2011. During that time, Brazilian Official 1 was a "foreign official," as that term is defined in the

FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A). Brazilian Official 1 had responsibility for, among other things, the bidding process organized by a division of Petrobras. In or about and between April 2011 and August 2013, Brazilian Official 1 was an employee of Sete Brasil with responsibility for overseeing operations, during which time Brazilian Official 1 was not a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

16.     Brazilian Official 2, a citizen of Brazil whose identity is known to the United States and KOM, was an employee of Petrobras with responsibility over the bidding process of certain projects in or about and between 2003 and April 2012. During that time, Brazilian Official 2 was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

17.     Party Official, a citizen of Brazil whose identity is known to the United States and KOM, was a senior official in the Workers' Party. Party Official was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

**Overview of the Bribery Scheme**

18.     For a number of years, executives and employees of Petrobras with responsibility over the bidding of certain large projects, including Brazilian Official 1 and Brazilian Official 2, and politicians and political parties in Brazil, including the Workers' Party, administered a scheme to secure corrupt payments equal to a percentage of a contract's value from the companies awarded those projects. In or around 2011, this scheme was extended to projects awarded by Sete Brasil, which commissioned a large fleet of rigs for Petrobras's end use.

19.    In or about and between 2001 and 2014, KOM, together with others, including executives of KOM USA, knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil.

20.    These bribes amounted to approximately $55 million paid corruptly for the benefit of foreign officials, including Brazilian Official 1 and Brazilian Official 2, and the Workers' Party to secure improper advantages and to influence those foreign officials and the Workers' Party to obtain and retain business in Brazil. KOM and its related entities, including KOM USA, earned profits totaling approximately $351.8 million from business in Brazil obtained through the bribery scheme.

21.    In or about and between 2001 and 2011, KOM and KOM USA executives created and executed agreements on behalf of KOM with consulting companies controlled by Consultant that were intended to facilitate bribe payment to obtain business from Petrobras and Sete Brasil and to conceal their purpose.

22.    In or about and between 2004 and 2014, under the guise of these consulting agreements, KOM effectuated bribes by making payments to bank accounts in the United States and elsewhere in the names of shell companies controlled by Consultant. Consultant then transferred money from those bank accounts in the United States to bank accounts outside the United States controlled by or for the benefit of Brazilian Official 1, Brazilian Official 2, Party Official, and the Workers' Party to further the bribery scheme.

## Details of the Bribery Conspiracy

### The P-48 Project

23.    In or about 2001, KOM, through a joint venture, won a subcontract to convert a floating platform for Petrobras ("P-48").

24.     In or about and between June 2001 and April 2002, pursuant to instructions and authorization from KOM Executive 2 and KOM Sub Executive, KOM made $300,000 in bribe payments to government officials in Brazil's capital in connection with the P-48 contract.

25.     On or about June 7, 2001, KOM Executive 2 sent an email to the financial controller of a KOM subsidiary, copying KOM Sub Executive, stating:

> [T]here is a commitment to pay US$300k for some governmental guy(s) to help us put pressure for the [P-48 project] to be carried out in Brazil. [KOM Sub Executive] and myself have discussed this and decided to keep to the commitment. Pls make arrangement for the first US$50k to be paid accordingly . . . ."[1]

26.     On or about August 3, 2001, KOM Executive 2 sent an email to the financial controller, copying KOM Sub Executive, stating, "[KOM's joint venture partner on the P-48 project] cannot get [the follow-up payments] deferred, as the 'friends' are saying that it was definitely with their help that the conversion landed up in Brazil [...]. Pls made payment for US$100k asap . . . ."

27.     On or about October 18, 2001, KOM Executive 2 sent an email to the financial controller, in which he stated: "[t]ime has come for making another 2 payment [ ] for friends . . . similar to previous 3 payments. Pls proceed to make payment for US$100k . . . . After this we will have only one payment of US$50k left."

28.     On or about April 4, 2002, KOM's joint venture partner on the P-48 project sent KOM Executive 2 an email stating, "[o]ur friend in Brasilia called me again requesting the last installment of US$50K. This situation leaves us in a very delicate position. What do you suggest me to answer? Please settle this pending subject as quickly as possible; it is much more cheaper than you can imagine."

---

[1] Unless bracketed, all quotations appear as in the original document, without corrections or indications of misspellings or typographical errors.

29.     On or about April 4, 2002, KOM Executive 2 sent an email to the KOM financial controller stating, "Pls see note from [joint venture partner on the P-48 project]. Pls check if we still outstand this payment to 'friends.'"

30.     Also on or about April 4, 2002, the financial controller responded affirmatively to the email referenced in Paragraph 29, after which KOM Executive 2 instructed him to make the remaining payment of $50,000.

### The P-51 and P-52 Projects

31.     In or about 2003, Consultant told KOM Sub Executive and a different joint venture partner of KOM about a way to pay bribes to Petrobras officials to win two Petrobras projects ("P-51" and "P-52") with the help of a third-party agent.

32.     In or about 2003, in connection with the P-51 and P-52 projects, Consultant received authorization from KOM Executive 1, KOM Sub Executive, and the joint venture partner to pay bribes equal to a percentage of the contracts' value, which amounted to approximately $13.3 million. Consultant paid the bribes through an intermediary to Brazilian Official 1, who kept some of the money for himself and shared the rest with Brazilian Official 2 and the Workers' Party.

33.     On or about September 10, 2003, an employee of a KOM subsidiary sent an email to KOM Executive 2 and KOM Sub Executive, copying KOM Executive 1, with the subject line "P52 – Consortium Mgt Meeting," stating, "[s]o far [Brazilian Official 2] has delivered through [Consultant]. Guess we have to trust in our relationship and go with it."

34.     On or about October 3, 2003, KOM Executive 6 sent an email to an executive of KOM and KOM Executive 1, copying KOM Sub Executive, about negotiations for the P-52 project, stating:

> [KOM Sub Executive], [the joint venture partner] and Consultant will be
> meeting with [Brazilian Official 2] and [Brazilian Official 1] this evening
> at 6:00 p.m. The purpose of the meeting is for [Brazilian Official 2] to
> openly emphasize the need for significant movement from [the joint
> venture] on the price (all a show for [Brazilian Official 1's] benefit).

35.    That same day, on or about October 3, 2003, Consultant sent an email to KOM

Sub Executive with the subject line, "Big Brother meeting," stating, "[a]fter your meeting with

the above people, I call him to understand how was his feeling: Very good, was his comment."

36.    On or about October 31, 2003, KOM Sub Executive sent an email to KOM

Executive 2, copying KOM Executive 1, KOM Executive 6, and other KOM employees, stating

that he had informed KOM's joint venture partner on the P-52 and P-51 projects that a KOM

subsidiary had an interest in obtaining the P-51 contract and that "Big brother is with us on P-

51."

37.    In or about December 2003, Petrobras awarded the P-52 project to the relevant

KOM joint venture.

38.    On or about February 12, 2004, Consultant sent an email to KOM Sub Executive

and a KOM joint venture employee, advising them that Brazilian Official 2 told him how KOM

would need to alter its bid in order for Brazilian Official 2 to ensure that KOM won the contract

for the P-51 project. Consultant stated that KOM should, in part:

> Drop our today price in US$ 2 Million . . . with help again to compensate
> during the term of the contract.
>
> Reduce our delivery time in 2 months . . . and looking in my face, he
> promised me the two months will be give us back before the first year of
> the contract (we need to believe in him). This agreement will be straight
> with him, jointly with Brazilian Official 1 [and] [another Brazilian
> official], but we cannot ask them officially, please believe him and me.

39.    In the same email referenced in Paragraph 38, Consultant explained, "[i]f we go

in the above line and provide them with above conditions, he will be able to convince [others], to

A-8

stop all negotiations and award the contract to us." Consultant warned, however, that KOM needed to act fast because Brazilian Official 2 was "expecting very soon some one from Brasilia will request him to reopen the negotiations with [a competitor], and he will not be able work on our favor and against the power from Brasilia."

40.     On or about April 1, 2004, Consultant sent an email to KOM Executive 5, copying KOM Sub Executive, urging that the consulting agreement needed to be signed and commissions be paid because "our friends already lost patience, special after knowing, two payments was made and nothing to them or to us."

41.     In or about June 2004, Petrobras awarded the P-51 project to the KOM joint venture.

**The P-56 Project**

42.     In or about 2007, Consultant learned from Brazilian Official 1 that KOM and its joint venture partner on the P-56 project would need to pay bribes in an amount equal to 1 percent of the contract value to obtain the P-56 project, of which half would go to Brazilian Official 1's group and the other half to the Workers' Party in the form of corrupt political donations.

43.     In or about 2007, during a meeting with KOM Sub Executive and an executive at KOM's joint venture partner on the P-56 project, Consultant received authorization to pay bribes equal to a percentage of the P-56 contract value to Brazilian Official 1 and the Workers' Party to obtain the P-56 project, which resulted in approximately $14.2 million in bribes.

44.     On or about September 19, 2007, KOM Sub Executive sent an email to and copying multiple KOM executives, including KOM Executive 1, KOM Executive 2, KOM Executive 5, KOM Executive 6, and an executive of a KOM subsidiary in Singapore, stating:

> Petrobras . . . found a loop-hole in the Brazilian Law that they could invite
> [the KOM joint venture] for direct negotiation if it were to be a "clone" of
> an existing unit. . . . [T]he Project Manager . . . met [the joint venture
> partner] and me on 20 March on her action plan to launch direct
> negotiation with [the KOM joint venture] for the P-56, as a "clone" of
> P-51. She told us that her budget was US$950m.

45.     In or about October 2007, Petrobras awarded the P-56 project to the KOM joint

venture.

46.     On or about May 11, 2010, a KOM employee sent an email to an employee in the

financial and accounting office of the KOM joint venture, stating, "remember there was a

donation to [the Workers' Party] as part of election in 2008 of R$1,942k and R$483k[.] I was

told that these are reimbursable from [the joint venture]-do [yo]u know the exact arrangement?"

47.     On or about May 12, 2010, the joint venture finance employee responded to the

email referenced in Paragraph 46, copying others, including KOM Executive 5, stating: "1,942

KBRL have already been reimbursed by [the joint venture] . . . . Do not know about the 483

KBRL."

48.     Also on or about May 12, 2010, the same joint venture finance employee replied

to the emails referenced in Paragraphs 46 and 47, stating, "[s]eems that equivalent amount of

250,000 USD have been paid to [KOM entity] to cover this 483 KBRL."

49.     Also on or about May 12, 2010, KOM Executive 5 responded to the emails

referenced in Paragraphs 46 through 48 above, stating, "[l]et's not communica[te] such

confidential thing over email."

## The P-53 and P-58 Projects

50.     In or about 2005 and in or about 2009, a KOM subsidiary was awarded portions

of two floating platform hull conversion projects from Petrobras ("P-53" and "P-58").

51.     In or about 2005 and in or about 2009, executives of KOM and a KOM subsidiary in Singapore, including KOM Executive 1, authorized Consultant to pay bribes equal to a percentage of the P-53 contract value and the P-58 contract value to Brazilian Official 1 and the Workers' Party, which amounted to approximately $4.4 million in bribes.

52.     On or about August 11, 2005, Consultant sent an email to an executive of a KOM subsidiary in Singapore asking that he not disclose that the KOM subsidiary was paying above the regular commission to Consultant "because this portion just [KOM Sub Executive], you, [another executive of a KOM subsidiary in Singapore] and I knows, and also, is to protect ours friends (you known what I mean) . . . We need be very careful on this issue."

53.     In connection with a discussion about whether Consultant would represent KOM on the P-58 project, Consultant wrote to an executive of a KOM subsidiary in Singapore on or about April 26, 2009 that "[y]ou known my commitments and with whom. Please advise asap your decision, because if you decide to go with [the other consultant], I need to advise my partners to cancel the commitments."

54.     On or about October 27, 2010, Consultant sent an email to an executive of a KOM subsidiary in Singapore with the subject line "Contracts," stating, "Any news about [m]y commission contract and when do you expect to pay me?  I need to answer to my partners!!!"

55.     KOM ultimately utilized Consultant's services and secured both the P-53 and P-58 conversion projects.

### P-61 Project

56.     Starting in or about 2007, KOM and KOM USA, as part of a joint venture with an engineering company, began work to obtain a large platform construction contract from Petrobras (the "P-61 project").

A-11

57.     On or about March 3, 2007, a KOM employee sent an email to KOM Executive 2,

copying KOM Executive 1, KOM Executive 3 and others, stating that a joint venture manager

had expressed concerns that Consultant would be retained for the P-61 project because under the

joint venture partner's corporate governance rules it "cannot pay [Consultant] to pay government

officials – Petrobras ???"

58.     On or about March 28, 2007, KOM Executive 2 sent an email to KOM Executive

4 and KOM Executive 6, copying KOM Executive 3, with the subject line "Vetting process for

[Consultant] – Brazil," in which he stated:

> I spoke to [Consultant]....he does not want to be tied in with any agency
> for US company  (can understand why),  He suggests way forward is that
> he is working on behalf of [a KOM subsidiary in Brazil] for these projects
> and any fees be built into [the KOM subsidiary's] price to the joint venture
> on the subcontract fabrication. In this way, in every meeting [the KOM
> subsidiary] is also present, so he can be present.

59.     On or about April 6, 2007, KOM Executive 2 sent an email to KOM Executive 1,

KOM Executive 4, KOM Executive 6, and another KOM employee, explaining that if the joint

venture partner and the joint venture are "so hand tied to the US Code of Business Conduct, it

would not be possible to involve [Consultant] which in reality diminishes our chances in the

project.  How we go?"

60.     In or about 2008, the KOM joint venture was invited to bid on the P-61 project

along with at least two other companies.

61.     In or about 2008, the KOM joint venture submitted the first technical proposal to

Petrobras for the P-61 project.

62.     In or about 2008, after the invitation to bid, Consultant met with Brazilian Official

1, who told him that KOM would need to pay a percentage of the contract value in bribes to

Brazilian Official 1 and the Workers' Party to win the contract.

63. On or about November 25, 2008, Consultant sent an email to KOM Executive 2, KOM Executive 3, KOM Executive 4, KOM Executive 5 and KOM Executive 6, copying KOM Executive 1, seeking confirmation, "based on our telecom, some days ago," that for his work on the P-61 project Consultant would be paid his regular commission, referred to as "rates actually used in the existing contract," plus an additional two percent comprised of 0.5 percent for "the party," 0.5 percent for "Group A" and one percent for "Group B." "The party" referred to the Workers' Party, "Group A" referred to Brazilian Official 1 and affiliated persons, and "Group B" referred to Consultant himself.

64. On or about November 25, 2008, KOM Executive 4 wrote to KOM Executive 2, KOM Executive 3, KOM Executive 5, and KOM Executive 6 in regards to Consultant's email referenced in Paragraph 63: "The problem is that when broken down the parts look reasonable, but the whole is something else ... how to deal with this? We have to get this past our partner somehow, else it will remain a matter of we stand alone (too risky) or no bid???"

65. On or about November 29, 2008, KOM Executive 4 responded to the emails referenced in Paragraphs 63 and 64, including to KOM Executive 2, KOM Executive 3, KOM Executive 5, and KOM Executive 6, stating:

> [I]f the fees are not reasonably close to what is expected by the various interested parties, there is little incentive for anyone to push our offer. So what is 'expected'?? If we are not willing or able to offer similar to previous projects, we need to make a very unambiguous statement to those parties.

66. After discussions about limiting the scope of Consultant's services on the P-61 project in light of FCPA and bribery concerns expressed by the joint venture partner, on or about November 30, 2008, KOM Executive 5 emailed KOM Executive 2, KOM Executive 3, KOM Executive 4, and KOM Executive 6, stating that "[Consultant] also mentioned that [the joint venture] was originally not invited for this project until much lobbying with his friends help.

A-13

And the fees were told to us sometime ago. If they perceive us as not honoring our commitment, it may be bad for future business."

67.     In or about 2009, Consultant received authorization from KOM Executive 3 and an executive at a KOM subsidiary in Brazil to pay bribes equal to a percentage of the P-61 contract value to Brazilian Official 1 and the Workers' Party, which amounted to approximately $8.8 million. Brazilian Official 1 shared some of the bribe money with Brazilian Official 2.

68.     On or about November 1, 2009, a KOM subsidiary entered into a Marketing and Sales Representation Agreement with Consultant (the "November 2009 contract") in connection with the contemplated P-61 project, in which KOM USA was a shareholder of one of the sub-contracting joint venture entities. While knowing that Consultant would pay bribes on behalf of KOM from commissions paid to him under the November 2009 contract, KOM Executive 2 signed and KOM Executive 3 witnessed the agreement in Houston, Texas.

69.     In or about 2010, Petrobras awarded the P-61 contract to the KOM joint venture.

### The Sete Brasil Projects

70.     Between in or about 2011 and 2012, Sete Brasil contracted with five companies to commission the construction of a fleet of ultra-deepwater rigs for which Petrobras would be the end user. The construction contracts were split among the companies, with a KOM subsidiary successfully bidding for contracts for construction of six semi-submersible units.

71.     Participating companies, including KOM, negotiated bribes with Brazilian Official 1 (who was employed by Sete Brasil at the time the agreements were finalized) equal to 0.9 to one percent of the value of their respective contracts. Two thirds of the payments were designated to the Workers' Party and one third was to be divided equally between the relevant Petrobras and Sete Brasil executives. That split was agreed and administered by Brazilian Official 1, Brazilian Official 2, and Party Official.

A-14

72.     During the negotiation period, KOM executives, including KOM Executive 1,

KOM Executive 3, and an executive of a KOM subsidiary in Brazil, authorized Consultant

during several telephone calls to pay one percent of the contract value as bribes in response to

the demand of Brazilian Official 1. Accordingly, Consultant paid approximately $14.4 million in

bribes to Brazilian Official 1, Brazilian Official 2, and the Workers' Party.

73.     On or about September 19, 2011, KOM Executive 6 sent a chat to his secretary

asking her to type a message to KOM Executive 3 explaining, "[w]ill need to prepare

Commission Agreement with [Consultant's company] for the 1.5 [percent]. Is this okay, as he

will have to show that this is all he is getting?"

74.     On or about September 19, 2011, KOM Executive 6 sent an email to his secretary,

stating:

> Put this in a plain paper and pass to [KOM Executive 1 / KOM Executive
> 3], then delete email: Further to our t/c, made the suggestion to have one
> of us go to explain the situation. However, the problem is that we will not
> be brought to all involved to explain. As such, need to execute the
> standard Commission Agreement with [Consultant's company], with the
> 1.5%, as a copy of this will be showed up the line to convey that this is all.
> Nothing more. We've signed before for other jobs and have seen other
> agreements with [Consultant's company] for even larger amounts. Would
> prefer not to, but the Comm. Agreement, may be the only thing that will
> satisfy people. Other than reverting to original plan, wherein proof would
> not be required then. At a loss as to alternatives.

75.     On or about March 30, 2012, Consultant emailed KOM Executive 6, copying

KOM Executive 5, stating that he was "having pressure from my partners about my contract . . ."

76.     On or about April 12, 2012, KOM Executive 5 emailed KOM Executive 6

informing him that "[Consultant] was asked by his 'friends' to call KOM Executive 1 tonight

about the contract. Fyi[.]"

77.     On or about July 18, 2012, KOM Executive 6 sent an email to KOM Executive 3

in which he mentioned dividing payments to Consultant into two agreements. KOM Executive 3

responded the following day, "What do [you] mean by 2 agreements?," to which KOM

Executive 6 responded, "[o]ne for 0.5% and one for 1.5% for different parties, totaling the 2%."

78. Additionally, in or about September 2013 to November 2014, at the instruction of

a Workers' Party official, Consultant made nine payments of $500,000 to a bank account in

Switzerland to settle payments owed to the Workers' Party as bribes.[2]

---

[2] It is not clear that all nine bribe payments related to the Sete Brasil projects. At least some of the payments may have been outstanding bribes owed on earlier KOM projects described above.

# ATTACHMENT  B

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Keppel Offshore & Marine Ltd. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Eastern District of New York (the "Office") regarding issues arising in relation to certain improper payments to foreign officials to assist in obtaining business for the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section and the Office; and

WHEREAS, the Company's outside counsel, Sean Hecker and David A. O'Neil, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office;

Therefore, the Board of Directors has RESOLVED that:

1. The Company (a) acknowledges the filing of the one-count Information charging the Company with a violation of 18 U.S.C. §371; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section and the Office (the "Agreement"); and (c) agrees to accept a total criminal penalty against the Company totaling $422,216,980, of which $105,554,245 will be paid to the

United States Treasury, and to pay such penalty with respect to the conduct described in the Information in the manner described in the Agreement;

2. The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver, for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts, of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3. Nicholas Choo Kwang Hui, the Company's Assistant General Manager (Legal & Compliance), is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as Nicholas Choo Kwang Hui, may approve;

2

4. Nicholas Choo Kwang Hui, the Company's Assistant General Manager (Legal & Compliance), is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5. All of the actions of Nicholas Choo Kwang Hui, the Company's Assistant General Manager (Legal & Compliance), which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: 19 DECEMBER 2017

By:
Chris Ong Leng Yeow
Chief Executive Officer
Keppel Offshore & Marine Ltd.

3

ATTACHMENT C

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, Keppel Offshore & Marine Ltd., on behalf of itself and its subsidiaries (the "Company"), agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

*Policies and Procedures*

C-1

2.    The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws,"), which policy shall be memorialized in a written compliance code.

3.    The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

    a.    gifts;

    b.    hospitality, entertainment, and expenses;

    c.    customer travel;

    d.    political contributions;

    e.    charitable donations and sponsorships;

    f.    facilitation payments; and

C-2

g.     solicitation and extortion.

4.     The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that:

a.     transactions are executed in accordance with management's general or specific authorization;

b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

c.     access to assets is permitted only in accordance with management's general or specific authorization; and

d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

C-3

6. The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7. The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8. The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.    The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

*Enforcement and Discipline*

12.    The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.    The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees.

C-5

Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.     informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.     seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of

C-6

the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

    a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

    b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption

C-7

code, policies, and procedures, taking into account relevant developments in the field and

evolving international and industry standards.

ATTACHMENT D

**REPORTING REQUIREMENTS**

Keppel Offshore & Marine Ltd., on behalf of itself and its subsidiaries (the "Company"),
agrees that it will report to the Fraud Section and the Office periodically, at no less than twelve-
month intervals during a three-year term, regarding remediation and implementation of the
compliance program and internal controls, policies, and procedures described in Attachment C.
During this three-year period, the Company shall: (1) conduct an initial review and submit an
initial report, and (2) conduct and prepare at least two (2) follow-up reviews and reports, as
described below:

        a.    By no later than one year from the date this Agreement is executed, the
Company shall submit to the Fraud Section and the Office a written report setting forth a
complete description of its remediation efforts to date, its proposals reasonably designed to
improve the Company's internal controls, policies, and procedures for ensuring compliance with
the FCPA and other applicable anti-corruption laws, and the proposed scope of the subsequent
reviews. The report shall be transmitted to Deputy Chief - FCPA Unit, Fraud Section, Criminal
Division, U.S. Department of Justice, 1400 New York Avenue, NW, Bond Building, Eleventh
Floor, Washington, DC 20530 and Chief, Business and Securities Fraud Section, United States
Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, NY
11201. The Company may extend the time period for issuance of the report with prior written
approval of the Fraud Section and the Office.

        b.    The Company shall undertake at least two follow-up reviews and reports,
incorporating the Fraud Section and the Offices' views on the Company's prior reviews and
reports, to further monitor and assess whether the Company's policies and procedures are

reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws.

      c.     The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Fraud Section and the Office. The second follow-up review and report shall be completed and delivered to the Fraud Section and the Office no later than thirty days before the end of the Term.

      d.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section and the Offices' discharge of their duties and responsibilities or is otherwise required by law.

      e.     The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section and the Office.