UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EIG ENERGY FUND XIV, L.P., EIG
ENERGY FUND XIV-A, L.P., EIG
ENERGY FUND XIV-B, L.P., EIG
ENERGY FUND XIV (CAYMAN), L.P.,
EIG ENERGY FUND XV, L.P., EIG
ENERGY FUND XV-A, L.P., EIG
ENERGY FUND XV-B, L.P., and EIG
ENERGY FUND XV (CAYMAN), L.P.

                  Plaintiffs,

      - against -

KEPPEL OFFSHORE & MARINE LTD.,

                Defendant.

**MEMORANDUM
OPINION & ORDER**

18 Civ. 1047 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      In this action, Plaintiffs are energy investment funds managed by EIG

Management Company, LLC (collectively, "EIG"). EIG alleges that it was defrauded by non-

parties Petróleo Brasileiro S.A. ("Petrobras") – the Brazilian state oil company – and Sete Brasil

Participações, S.A. ("Sete") – a company that Petrobras controlled – and that Defendant Keppel

Offshore & Marine Ltd. ("Keppel") aided and abetted the fraud.

      Petrobras established Sete to raise money to drill for oil in an enormous oil field

discovered off the coast of Brazil. Keppel – a manufacturer and operator of offshore drilling

equipment – was awarded contracts by Sete to build "drillships" for the offshore drilling project.

      EIG invested approximately $220 million in Sete. When EIG invested in Sete, it

did not know that Petrobras, Sete, and Keppel were engaged in a years-long bribery scheme in

Brazil. Brazilian law enforcement eventually exposed the bribery scheme, following an

investigation known as "Operação Lava Jato" or "Operation Carwash." EIG contends that

Petrobras and Sete defrauded EIG by failing to disclose the bribery scheme, that Keppel aided and abetted their fraud, and that the revelation of the bribery scheme caused EIG to lose the entirety of its $220 million investment.

EIG and Keppel have cross-moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on EIG's sole remaining cause of action, which is for aiding and abetting fraud under New York law.  For the reasons stated below, Keppel's motion will be granted, and EIG's motion will be denied.

## BACKGROUND[1]

Plaintiffs are energy investment funds managed by EIG Management Company, LLC.  (Am. Cmplt. (Dkt. No. 17) ¶¶ 6, 15-22)  The funds are subsidiary entities of EIG Global Energy Partners, LLC, a "global alternative asset manager investing in the energy sector, based in Washington, D.C."  (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶ 1 (quotation omitted))

"Keppel is a company based in Singapore that specializes in offshore rig design,

---

[1]  The Court's factual statement is drawn from the parties' Local Rule 56.1 statements and accompanying exhibits, as well as matters of public record.  To the extent that this Court cites facts drawn from a movant's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where the opposing party disagrees with the movant's characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the opposing party's characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

The parties' evidentiary submissions in this case are extensive.  (See, e.g., Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) (82 pages and 490 numbered paragraphs))  The Court's factual statement focusses on the facts that are material to Keppel's motion.  In resolving Keppel's motion, this Court has drawn all factual inferences in favor of EIG.

construction and shipbuilding."  (Id. ¶ 2)

Jurisdiction over Plaintiffs' state law aiding and abetting fraud claim is premised on supplemental jurisdiction under 28 U.S.C. § 1367.  (Am. Cmplt. (Dkt. No. 17) ¶ 28)

## I.      FACTS

### A.      Petrobras and the Formation of Sete

"Petrobras is an oil company controlled by the Brazilian government."  (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶ 6)

Following the discovery of the "pre-salt reserves" – a massive oil field off the coast of Brazil – Petrobras established Sete as a partnership among "Petrobras, private investors, and public pension funds to build ultra-deepwater drillships and charter them under long term contract to Petrobras."  Sete was incorporated in 2010.  (Id. ¶¶ 7-10 (quotations omitted))  "There is no evidence that Keppel was involved in the decision or process by Petrobras to create Sete." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 143-2) ¶ 12)

"Petrobras installed former Petrobras employees as Sete's most senior executives, including João Ferraz as Sete's CEO" and Pedro José Barusco Filho ("Barusco") as Sete's chief operating officer.  (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶ 11 (quotation omitted); Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 6-7)

### B.      Keppel's Contracts with Sete

"On December 16, 2011, Sete and Keppel executed an [Engineering, Procurement, and Construction] Contract."  In the contract, Keppel agreed "to build one drillship for Sete via [Keppel] subsidiaries[] Fernvale and Urca Drilling B.V."  (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶ 119)  The contract price for the first drillship was $809,288,000.00.  (Def. R. 56.1 Stmt., Ex. 43 (Dec. 16, 2011 Keppel Contract) (Dkt. No. 155-68) § 9.1)

"On April 12, 2012, Keppel announced that it had entered [into] a letter of intent with Sete to build an additional five drillships. . . . , [and] [o]n August 2, 2012, [Engineering, Procurement, and Construction] Contracts for five drillships were executed between Keppel and Sete [through their subsidiaries]." (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶¶ 136-37)  The total contract price for the five drillships was approximately $4.12 billion.  (Def. R. 56.1 Stmt., Ex. 63 (Apr. 12, 2012 Keppel Press Release) (Dkt. No. 155-103) at 2)[2]

EIG was not a party to any of Keppel's contracts with Sete.  (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶¶ 121, 138)

**C.    EIG's Investment in Sete**

**1.    EIG's Initial Contacts Concerning an Investment in Sete**

EIG Senior Vice President Kevin Corrigan was "the lead member of EIG's team in connection with the Sete investment." (Id. ¶ 15)  Corrigan learned about the opportunity to invest in Sete in September 2010, from personnel at Banco Santander and Société Générale.  "On September 30, 2010, . . . Corrigan sent [then-Petrobras employee and future Sete CEO] Ferraz . . . an email introducing himself and requesting a meeting during his [upcoming] trip to Rio de Janeiro, Brazil."  On October 19, 2010, Corrigan met with Ferraz in Brazil in order "'to learn more about [Fundo de Investimento em Participações Sondas ('Sondas'), the Brazilian investment fund through which EIG and other equity investors made their investments in Sete,] and see if EIG could participate.'" (Id. ¶¶ 20-24 (quoting Def. R. 56.1 Stmt., Ex. 16 (Corrigan Dep.) (Dkt. No. 155-18) at 80:10-81:15))

---

[2] Except for deposition transcripts, the page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  Deposition page numbers refer to the pagination assigned by the court reporter.

"There is no evidence [that] anyone at Keppel was involved in or aware of any of [these September and October 2010] discussions [between Corrigan and Ferraz]."  (Id. ¶ 25)

EIG then conducted several months of due diligence concerning a potential investment in Sete.  EIG reviewed financial models, held regular meetings regarding the potential investment, and ran searches on a compliance database for corruption or money laundering allegations relating to individuals and entities connected with Sete.  Keppel disputes the adequacy of EIG's due diligence, although it does not raise this issue in support of its own motion for summary judgment.  (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 357-70; Def. R. 56.1 Cntrstmt. (Dkt. No. 144-2) ¶¶ 357-70)

### 2. EIG's Internal Investment Recommendations and Committee Approvals

In a June 3, 2011 email, Corrigan informed Luiz Reis, a representative of Sete's financial advisor Lakeshore Capital that "the decision to invest in Sete Brasil has been made internally. . . . [W]e are committed to this investment for all the reasons we've enunciated during our [recent] trip [to Brazil], and we very much look forward to closing this as soon as possible."  (Def. R. 56.1 Stmt., Ex. 60 (June 3, 2011 Corrigan email) (Dkt. No. 155-99) at 2; see Pltf. R. 56.1 Stmt., Ex. 20 (July 2011 EIG Contact List re Sete Investment) (Dkt. No. 151-22) at 3 (describing Reis as affiliated with "Lakeshore Capital (Financial Advisor)"))

Corrigan and his team prepared "[t]he final Investment Recommendation for [EIG Energy] Fund XIV, dated June 27, 2011, . . . a 42-page document summarizing the diligence work and analysis on the Sete investment."  (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶ 375; Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶ 71)  The June 2011 Investment Recommendation "propose[d] that Energy Fund XIV . . . purchase[] up to . . . 250 million Brazilian Reais (approximately $160 million) of common equity in Sondas . . . , a newly created investment vehicle established in

Brazil that, along with [Petrobras], will own Sete." (Pltf. R. 56.1 Stmt., Ex. 17 (June 2011 Investment Recommendation) (Dkt. No. 151-19) at 4)

As discussed above, Keppel's first drillship contract with Sete was executed in December 2011, about sixth months after the internal June 2011 Investment Recommendation at EIG. The June 2011 Investment Recommendation notes, however, that Keppel's Brazilian subsidiary BrasFELS is a "[p]otential . . . [Engineering, Procurement, and Construction] Contractor[]," and contains five bullet points regarding BrasFELS:

- Sponsors: Keppel Fels (Singap[o]re)

- Location: Angra dos Reis, Rio de Janeiro

- Technical Partner: Keppel Fels (Singap[o]re)

- Commentary: recently delivered the P-56 platform for Petrobras and is currently building TL WP P-61 platform

- Website: http://www.kfelsbrasil.com.br/mkt/release/r_2.htm

(Id. at 43)

On June 27, 2011, Corrigan and other EIG employees presented the June 2011 Investment Recommendation to EIG's investment committee, which includes "the seniormost people in the firm," including EIG CEO Blair Thomas. The investment committee approved the recommendation that day. (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶¶ 72, 75; Pltf. R. 56.1 Stmt. (Dkt No. 143-1) ¶ 381, and Ex. 135 (Thomas Dep.) (Dkt. No. 151-141) at 116:8)

At deposition, CEO Thomas agreed that "at the time of the June 2011 investment committee meeting . . . [he] didn't know whether Keppel would ever get a contract from Sete." (Def. R. 56.1 Stmt., Ex. 15 (Thomas Dep.) (Dkt. No. 155-17) at 96:17-25)

"A revised Investment Recommendation dated September 16, 2011" – which "was nearly identical to the June 2011 Investment Recommendation" – was subsequently

"prepared for consideration [by the investment committee as a possible] investment [for] [EIG Energy] Fund XV." (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶ 380)  The September 2011 Investment Recommendation contains the same five bullet points regarding Keppel and its BrasFELS subsidiary that are set forth in the June 2011 Investment Recommendation. (Pltf. R. 56.1 Stmt., Ex. 33 (Sept. 2011 Investment Recommendation) (Dkt. No. 151-35) at 43)

"On September 16, 2011, EIG's Investment Committee approved an investment of up to . . . 250,000,000 [Brazilian Reais, or approximately $160 million] of common equity in . . . Sondas through Fund XV," as recommended. (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶ 383 (quotation omitted))

### 3.   EIG's Investment Agreements

In a June 29, 2011 email to other EIG employees, Corrigan states: "This week we are signing a binding agreement to make the investment [in Sete]." (Def. R. 56.1 Stmt., Ex. 26 (June 29, 2011 Corrigan email) (Dkt. No. 155-30) at 2)

On June 30, 2011, EIG executed an Investment Agreement with Sete and Sete's investment advisor Lakeshore for an investment of up to 250 million Brazilian Reais.  On September 8, 2011, the parties executed a First Amendment and Restatement Agreement, increasing the maximum investment amount to 500 million Brazilian Reais. (Pltf. R. 56.1 Stmt., Ex. 19 (June 2011 Investment Agreement) (Dkt. No. 151-21), and Ex. 31 (September 2011 First Amendment and Restatement Agreement) (Dkt. No. 151-33))  The parties dispute whether the Investment Agreement and the First Amendment and Restatement Agreement obligated EIG to invest in Sete.  EIG contends that they did not, because of conditions precedent in the contracts. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 143-2) ¶¶ 82, 96, 113)

"On July 31, 2012, EIG entered into an Investment Commitment . . . whereby it committed 'to subscribe and pay for the quotas issued by [Sondas]' up to the limit of EIG's

committed capital of . . 509,459,990 [Brazilian Reais]."  (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶

412 (quoting Pltf. R. 56.1 Stmt., Ex. 62 (July 2012 Investment Commitment) (Dkt. No. 151-68)

§ 1.1))[3]  The Investment Commitment Agreement requires EIG to meet capital calls, and there is

no dispute as to its binding nature.  (Pltf. R. 56.1 Stmt., Ex. 62 (July 2012 Investment

Commitment Agreement) (Dkt. No. 151-68) § 2.1)[4]

---

[3]  The Court understands the term "quota," as used in the Investment Commitment Agreement, to
mean "share."

[4]  EIG also executed an Amended Quotaholders' Agreement and a Second Amendment to the
Investment Agreement on the same day that it executed the Investment Commitment Agreement.
(Pltf. R. 56.1 Stmt., Ex. 63 (July 2012 Amended Quotaholders' Agreement) (Dkt. No. 151-69),
and Ex. 61 (July 2012 Second Amendment to the Investment Agreement) (Dkt. No. 151-67))

4.    **EIG's Payments to Sete**

Pursuant to the Investment Commitment, EIG – via two subsidiaries – made the
following payments to Sete:

| Date | Amount |
|---|---|
| August 3, 2012 | $50,049,309.66 |
| August 9, 2012 | $25,020,988.03 |
| May 7, 2013 | $2,391,661.00 |
| October 1, 2013 | $214,717.89 |
| April 11, 2014 | $14,132,504.22 |
| May 7, 2014 | $22,022,539.74 |
| June 4, 2014 | $10,856,257.42 |
| August 12, 2014 | $8,058,966.67 |
| August 25, 2014 | $12,354,944.76 |
| October 15, 2014 | $9,488,769.34 |
| November 10, 2014 | $8,863,942.29 |
| December 8, 2014 | $15,088,880.88 |
| January 6, 2015 | $42,567,695.54 |
| **Total:** | **$221,111,177.44** |

(Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 419-32)

D.    **Petrobras and Keppel's Bribery Scheme**

It is a matter of public record – and undisputed here (Def. R. 56.1 Cntrstmt. (Dkt. No. 144-2) ¶¶ 9-10) – that Petrobras and Keppel engaged in a years-long bribery scheme in Brazil relating to the procurement of energy contracts, and that this scheme encompassed Keppel's contracts with Sete.  Keppel, Petrobras, and individuals involved in the scheme have admitted to this criminal conduct.  See United States v. Keppel Offshore & Marine Ltd., Deferred Prosecution Agreement (the "DPA" or "Keppel DPA"), 17 Cr. 697 (E.D.N.Y. Dec. 19, 2017), available at https://www.justice.gov/d9/press-releases/attachments/2017/12/22/kom_dpa_0.pdf.; Petrobras Non-Prosecution Agreement (the "NPA" or "Petrobras NPA") (E.D. Va. Sept. 26, 2018), available at https://www.justice.gov/opa/pr/petr-leo-brasileiro-sa-petrobras-agrees-pay-more-850-million-fcpa-violations; United States v. Jeffery Chow, Plea Tr. (17 Cr. 466, Dkt. No. 14) (E.D.N.Y. Aug. 29, 2017); United States v. Zwi Skorniki, Plea Tr. (19 Cr. 277, Dkt. No. 26) (E.D.N.Y. June 25, 2019).

In the DPA, Keppel "admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents"; admits that it conspired to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 (the "FCPA"), as charged in a criminal information; and agrees to pay a penalty of $105,554,245.  Keppel DPA ¶¶ 1-2, 7.  Attached to the DPA is a statement of facts, which Keppel admits is "true and accurate."  Id. ¶ 2.  According to the statement of facts,

> [f]or a number of years, executives and employees of Petrobras with responsibility over the bidding of certain large projects, including [Petrobras employee and Sete Chief Operating Officer Barusco] and [Petrobras employee Renato Duque], and politicians and political parties in Brazil, including the Workers' Party, administered a scheme to secure corrupt payments equal to a percentage of a contract's value from the companies awarded those projects.  In or

around 2011, this scheme was extended to projects awarded by Sete Brasil, which commissioned a large fleet of rigs for Petrobras'[] end use.

In or about and between 2001 and 2014, [Keppel], together with others, including executives of [Keppel subsidiary] KOM USA, knowingly and willfully conspired to pay, and paid, bribes in connection with thirteen projects in Brazil tendered by Petrobras and Sete Brasil.

These bribes amounted to approximately $55 million paid corruptly for the benefit of foreign officials, including [Barusco] and [Duque], and the Workers' Party to secure improper advantages and to influence those foreign officials and the Workers' Party to obtain and retain business in Brazil. [Keppel] and its related entities, including KOM USA, earned profits totaling approximately $351.8 million from business in Brazil obtained through the bribery scheme.

In or about and between 2001 and 2011, [Keppel] and KOM USA executives created and executed agreements on behalf of [Keppel] with consulting companies controlled by [Keppel's] Consultant [Zwi Skorniki] that were intended to facilitate bribe payments to obtain business from Petrobras and Sete Brasil and to conceal their purpose.

In or about and between 2004 and 2014, under the guise of these consulting agreements, [Keppel] effectuated bribes by making payments to bank accounts in the United States and elsewhere in the names of shell companies controlled by [Skorniki]. [Skorniki] then transferred money from those bank accounts in the United States to bank accounts outside the United States controlled by or for the benefit of [Barusco], [Duque], [a Workers'] Party Official, and the Workers' Party to further the bribery scheme.

Keppel DPA, Statement of Facts ¶¶ 18-22. (See Pltf. R. 56.1 Stmt., Ex. 114 (Keppel's

Interrogatory Resps.) (Dkt. No. 151-120) at Resp. 1.a (decoding pseudonyms used in the DPA))

  As to "[t]he Sete Brasil Projects,"

[b]etween in or about 2011 and 2012, Sete Brasil contracted with five companies to commission the construction of a fleet of ultra-deepwater rigs for which Petrobras would be the end user. The construction contracts were split among the companies, with a [Keppel] subsidiary successfully bidding for contracts for construction of six semi-submersible units.

Participating companies, including [Keppel], negotiated bribes with [Barusco] (who was employed by Sete Brasil at the time the agreements were finalized) equal to 0.9 to one percent of the value of their respective contracts. Two thirds of the payments were designated to the Workers' Party and one third was to be divided equally between the relevant Petrobras and Sete Brasil executives. That

split was agreed [to] and administered by [Barusco], [Duque], and [a Workers']
Party Official.

During the negotiation period, [Keppel] executives, including [Keppel CEO Tong
Chong Heong], [KOM USA President Chow Yew Yuen], and an executive of a
[Keppel] subsidiary in Brazil, authorized [Skorniki] during several telephone calls
to pay one percent of the contract value as bribes in response to the demand of
[Barusco]. Accordingly, [Skorniki] paid approximately $14.4 million in bribes to
[Barusco], [Duque], and the Workers' Party.

On or about September 19, 2011, [Keppel General Counsel Jeffery Chow] sent a
chat to his secretary asking her to type a message to [Chow Yew Yuen]
explaining, "will need to prepare Commission Agreement with [Skorniki's]
company for the 1.5 percent. Is this okay, as he will have to show that this is all
he is getting?"

On or about September 19, 2011, [Jeffery Chow] sent an email to his secretary,
stating:

> Put this in a plain paper and pass to [Tong Chong Heong/Chow Yew
> Yuen], then delete email: "Further to our [telephone call], made the
> suggestion to have one of us go to explain the situation. However, the
> problem is that we will not be brought to all involved to explain. As such,
> need to execute the standard Commission Agreement with [Skorniki's]
> company, with the 1.5%, as a copy of this will be showed up the line to
> convey that this is all. Nothing more. We've signed before for other jobs
> and have seen other agreements with [Skorniki's] company for even larger
> amounts. Would prefer not to, but the Comm[ission] Agreement may be
> the only thing that will satisfy people. Other than reverting to original
> plan, wherein proof would not be required then. At a loss as to
> alternatives."

On or about March 30, 2012, [Skorniki] emailed [Jeffery Chow], copying [Keppel
FELS Brasil executive Tommy Sam], stating that he was "having pressure from
my partners about my contract. . . ."

On or about April 12, 2012, [Tommy Sam] emailed [Jeffery Chow] informing
him that "[Skorniki] was asked by his 'friends' to call [Tong Chong Heong]
tonight about the contract. Fyi."

On or about July 18, 2012, [Jeffery Chow] sent an email to [Chow Yew Yuen] in
which he mentioned dividing payments to [Skorniki] into two agreements. [Chow
Yew Yuen] responded the following day, "What do you mean by 2 agreements?,"
to which [Jeffery Chow] responded, "one for 0.5% and one for 1.5% for different
parties, totaling the 2%."

Additionally, in or about September 2013 to November 2014, at the instruction of
a Workers' Party official, [Skorniki] made nine payments of $500,000 to a bank

account in Switzerland to settle payments owed to the Workers' Party as bribes.
FN

  FN It is not clear that all nine bribe payments related to the Sete Brasil projects.  At
least some of the payments may have been outstanding bribes owed on earlier
[Keppel] projects.

Keppel DPA, Statement of Facts ¶¶ 70-78 (alterations omitted).[5]

         The Keppel DPA does not mention EIG or any other investor in Sete, and does

not refer to investment fraud committed by Petrobras or Sete.  The statement of facts attached to

Petrobras' NPA likewise does not mention EIG or any other investor in Sete.  Indeed, the only

investment transaction referenced in the NPA is a 2010 public offering of Petrobras stock on the

New York Stock Exchange – an offering that is not at issue in the instant case.  See Petrobras

NPA, Statement of Facts ¶ 48.

         **E.**      **Petrobras and Sete Statements**

                  **1.**      **Petrobras and Sete Statements that Were Reviewed by EIG**

         EIG states that it relied on the following Petrobras/Sete documents in deciding to

invest:

-   a 2010 slide deck entitled "The Drilling Rigs Project:  Petrobras' Strategy for its
    successful implementation" (obtained by Corrigan from a Société Générale employee
    on September 27, 2010) (Pltf. R. 56.1 Stmt., Ex. 2 (Dkt. No. 151-3));

-   an October 2010 slide deck entitled "Sete Brasil:  Pre-Salt Oil Rigs Project" (obtained
    by Corrigan on October 25, 2010 from a Santander employee) (Pltf. R. 56.1 Stmt.,
    Ex. 3 (Dkt. No. 151-5));

---

[5] See also United States v. Jeffery Chow, Plea Tr. (17 Cr. 466, Dkt. No. 14) at 26-27 (E.D.N.Y.
Aug. 29, 2017) (allocution as to drafting sham consulting contracts for use in bribing Petrobras
officials and Brazilian politicians); United States v. Zwi Skorniki, Plea Tr. (19 Cr. 277, Dkt. No.
26) at 28-29 (E.D.N.Y. June 25, 2019) ("In order to keep the bribes a secret, employees at []
companies [including Keppel] sen[t] money to my consulting companies I controlled.  They did
this under agreement that made it look like my companies were being paid only for help in
negotiation with potential customers.  In reality, part of the payments were to be used to pay
bribes.").

- a January 2010 document entitled "Confidential Information Memorandum: Pre-Salt Drilling Rigs Project" (Pltf. R. 56.1 Stmt., Ex. 1 (Dkt. No. 151-2));

- a January 2011 slide deck prepared by "Caixa" using information supplied by Petrobras and entitled "Investment Memorandum: FIP Sondas" (Pltf. R. 56.1 Stmt., Ex. 6 (Dkt. No. 151-8));

- an August 2011 slide deck prepared by Sete's financial advisor Lakeshore and entitled "Sete Brasil Participações S/A Management Presentation" (Pltf. R. 56.1 Stmt., Ex. 30 (Dkt. No. 151-32)); and

- a September 2011 document prepared by Lakeshore and entitled "Sete Brasil Participações: Private Placement Confidential Information Memorandum" (Pltf. R. 56.1 Stmt., Ex. 32 (Dkt. No. 151-34)).

Although these documents address certain key risks and business considerations associated with Sete, it is undisputed that they do not disclose the bribery scheme. (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 305, 312, 328, 335, 345, 351; Def. R. 56.1 Cntrstmt. (Dkt. No. 144-2) ¶¶ 305, 312, 328, 335, 345, 351)

### 2.   Petrobras and Sete Statements that Were Reviewed by Keppel

Keppel received "financial and operational documents concerning Sete," mostly in connection with Keppel's consideration of a potential investment in Sete in late 2011. (See generally Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 115-37; Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶¶ 147-58) Two of the documents that Keppel received had been reviewed by EIG in connection with EIG's investment decision:

On September 27, 2011, a member of Keppel's board of directors provided Keppel executives with a copy of the slide deck entitled "Drilling Rigs Project: Petrobras' Strategy for its successful implementation," the same slide deck that EIG had received a year earlier. (Pltf. R. 56.1 Stmt., Ex. 37 (Dkt. No. 151-39))

On October 30, 2011, Keppel executive Tommy Sam received a November 2011 version of the Lakeshore slide deck entitled "Sete Brasil Participações S/A Management Presentation" (Pltf. R. 56.1 Stmt., Ex. 39 (Dkt. No. 151-42)) This slide deck was

"substantially identical" to the August 2011 version reviewed by EIG.  (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶ 136)[6]

The Court assumes, for purposes of resolving Keppel's motion for summary judgment, that Keppel employees read these two documents, and observed that they did not disclose bribery.

### 3.   Keppel's Knowledge of Petrobras and Sete Statements Made to EIG

None of the documents listed above mention EIG.  "There is [likewise] no evidence [that] anyone at Keppel received . . . [or] knew about" (1) the "Confidential Information Memorandum:  Pre-Salt Drilling Rigs Project" document; (2) the "Sete Brasil Participações:  Private Placement Confidential Information Memorandum" document; or (3) the "Investment Memorandum:  FIP Sondas" document,[7] or was aware that these documents had been shared with EIG.   (Def. R. 56.1 Cntrstmt. (Dkt. No. 144-2) ¶¶ 520-22, 526-28; Pltf. R. 56.1 Reply Stmt. (Dkt. No. 143-3) ¶¶ 520-22, 526-28) [8]

As to the "Sete Brasil Participações S/A Management Presentation" document – which Keppel received – it is undisputed that there is no evidence that Keppel knew what "other entities, if any, received [it]."  (Def. R. 56.1 Cntrstmt. (Dkt. No. 144-2) ¶¶ 538-39; Pltf. R. 56.1 Reply Stmt. (Dkt. No. 143-3) ¶¶ 538-39)

---

[6] On January 14, 2011, Skorniki provided Keppel executive Yew Yuen Chow with a January 12, 2011 Petrobras slide deck entitled "Drilling Rigs in Brazil Project:  Presentation to Drilling Operators," which likewise does not disclose the risk of bribery.  (Pltf. R. 56.1 Stmt., Ex. 8 (Dkt. No. 151-10))  EIG does not allege that it received this document.

[7] Although Keppel does not explicitly address its knowledge of the "Investment Memorandum: FIP Sondas" document, there is no evidence in the record that Keppel received it or knew of its existence.

[8] It is also undisputed that there is no evidence that Keppel was aware of various allegedly misleading emails Petrobras/Sete personnel had sent to EIG.  (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶¶ 55-67; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 143-2) ¶¶ 55-67)

As to the slide deck entitled "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" – which Keppel also received – Keppel contends that "[t]here is no evidence anyone at Keppel knew [it had been] shared with EIG." (Def. R. 56.1 Cntrstmt. (Dkt. No. 144-2) ¶ 516)  EIG disputes this assertion, contending that Keppel knew the document had been shared with EIG because of the following disclaimer in the slide deck:



(Def. R. 56.1 Cntrstmt., Ex. 137 (Dkt. No. 156-161) at 6)

According to EIG, because the above disclaimer is made to "U.S. investors," and EIG was a "U.S. investor" in Sete, Keppel would have known that EIG received this document. (Pltf. R. 56.1 Reply Stmt. (Dkt. No. 143-3) ¶ 516)

F.   **Visits by EIG and its Agents to Keppel's Shipyard**

Corrigan and other EIG personnel visited the shipyard of Keppel's Brazilian subsidiary BrasFELS – where it built drillships – in August 2011, March 2012, and June 2013.

Corrigan arranged the August 2011 and March 2012 shipyard visits through Sete. The visits were intended to assist EIG clients that were contemplating making an investment in Sete with conducting due diligence. (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶¶ 83-85, 123, 125-28) The parties dispute whether these visits were also part of EIG's own due diligence, given that the

visits took place after EIG had executed the Investment Agreement with Sete in June 2011 (as amended in September 2011), but before EIG executed the Investment Commitment with Sete in July 2012.  (Id. ¶¶ 96, 128; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 143-2) ¶¶ 96, 128)  Corrigan attended the June 2013 tour along with representatives of other Sete investors in order to observe the construction progress.  (Def. R. 56.1 Stmt. (Dkt. No. 144-1) ¶¶ 173-74)

Barrington Media, a video company EIG had hired, visited the BrasFELS shipyard in August 2011 to film a video for EIG's annual investors' meeting.  (Id. ¶¶ 98-100, 110)[9]

It is undisputed that (1) none of the visitors to the shipyard asked Keppel representatives about bribery and/or corruption; and (2) none of the Keppel representatives disclosed the bribery scheme.  (Id. ¶¶ 93, 108, 130, 175; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 143-2) ¶¶ 93, 108, 130, 175)  EIG does not contend that Keppel representatives made any affirmative misrepresentations during the visits.

**G.     Evidence that Keppel Knew that EIG Was an Investor in Sete**

EIG has proffered contemporaneous evidence that Keppel was aware that EIG was an investor in Sete, including (1) emails Keppel employees received in connection with EIG's August 2011 shipyard visit that refer to EIG as an "investor," and (2) a press clipping that Keppel employees received on February 13, 2012 stating that "EIG Global Energy Partners is . . . an investor in [Sete]."  (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 96, 98-99, 104, 158 (quotation omitted))

---

[9]  The video (Dkt. No. 157) is about five minutes long, and shows Sete CEO Ferraz touting Sete's prospects and stating that Sete is "very happy to have EIG among [its] shareholders."  The video contains scenes of offshore drilling and footage of the BrasFELS shipyard and a busy office.  The video does not mention Keppel or BrasFELS, and their names and logos are not visible in the shipyard footage.

**H.     Keppel's Statements**

EIG contends that Keppel made statements that contain misrepresentations or omissions regarding the bribery scheme.  In this regard, EIG cites Keppel's (1) compliance representations in Engineering, Procurement, and Construction Contracts; (2) "anticorruption letters," which were provided by Sete to a Brazilian bank; and (3) public denials of wrongdoing. (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 144-57, 238-42, 268-89)

**1.     Engineering, Procurement, and Construction Contracts**

Keppel's Engineering, Procurement, and Construction Contracts obligate Keppel to act "in compliance with . . . Applicable Laws and . . . consistent with Good Industry Practices."  In these contracts, Keppel warrants that "[i]t is not in violation of any Applicable Law . . . [that] would materially and adversely affect its performance of any obligations under this Agreement."  (Pltf. R. 56.1 Stmt., Ex. 44 (Dec. 2011 Keppel Contract) (Dkt. Nos. 151-47, 151-48) §§ 2.1, 6.2(b); Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶ 239)

A draft Engineering, Procurement, and Construction Contract was among the documents that EIG reviewed in making its investment decision.  (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 336, 338-40)  EIG does not contend that Keppel prepared or knew about this draft contract, however, and it appears that Petrobras and/or Sete created the draft as a template to be used by any company that was awarded a contract to build drillships.  The draft contract contains compliance language that is substantially the same as the language quoted above.  (Pltf. R. 56.1 Stmt., Ex. 116 (Draft Engineering, Procurement, and Construction Contract) (Dkt. No. 151-122) §§ 2.1, 6.2(b))

**2.     Anticorruption Letters**

In order to obtain a major loan from the Banco Nacional de Desenvolvimento Econômico e Social ("Banco Nacional"), Sete asked Keppel to prepare "anticorruption letters"

and provide them to Sete subsidiaries.  Sete would then submit the anticorruption letters to Banco Nacional.  Keppel General Counsel Jeffery Chow approved drafts of the anticorruption letters in December 2014, and they were finalized and executed on January 16, 2015.  (Pltf. R. 56.1 Stmt., Exs. 83, 85 (Draft and Executed Anticorruption Letters and Accompanying Emails) (Dkt. Nos. 151-89 and -91))

In these letters, Keppel states, inter alia, that neither Keppel nor its "directors, officers, employees, or, to the best of [Keppel's] knowledge after due enquiry, agents and no other person acting on behalf of [Keppel], made or received any corrupt payments to obtain or retain business or improperly secure a business advantage, which would or might constitute bribery within [the meaning of the FCPA or other anti-bribery or anti-money-laundering laws]."  (Dkt. No. 151-91 at 4)

### 3. Public Denials of Wrongdoing

On February 5, 2015, news reports appeared concerning the involvement of Petrobras and Keppel in a bribery scheme.  (Pltf. R. 56.1 Stmt., Ex. 89 (Feb. 5-6, 2015 Keppel Email Thread) (Dkt. No. 151-95))  Keppel subsequently issued press releases and a letter to its customers in which it denied involvement.  (Pltf. R. 56.1 Stmt., Ex. 93 (Feb. 9, 2015 Keppel Press Release) (Dkt. No. 151-99) at 2 ("We refute allegations made in media reports on [Keppel's] involvement in the scandal surrounding Petrobras.  We would like to emphasise that Keppel Group has a Code of Conduct [that] prohibits, among other[] [things], bribery and corruption."), Ex. 92 (Feb. 9, 2015 Keppel Customer Letter) (Dkt. No. 151-98) at 4 ("Please rest assured that Keppel . . . finds these allegations [of bribery] to be false and without merit."), and Ex. 101 (Aug. 3, 2016 Keppel Press Release) (Dkt. No. 151-107) at 2 ("Keppel strongly denies the allegations reportedly made that Keppel executives authorized Mr. Skornicki to pay bribes on its behalf."))

EIG does not contend that it read or relied on Keppel's signed Engineering, Procurement, and Construction Contracts, Keppel's anti-corruption letters, or Keppel's public denials of wrongdoing.

I.       **Public Disclosure of the Bribery Scheme**

On February 5, 2015, stories appeared in the Brazilian press concerning Sete Chief Operating Officer Barusco's testimony before Brazilian prosecutors.  Pursuant to a plea deal, Barusco disclosed widespread bribery at Sete, included bribes paid by Keppel via "consultant" Zwi Skorniki.  (Pltf. R. 56.1 Stmt., Ex. 89 (Feb. 5-6, 2015 Keppel Email Thread) (Dkt. No. 151-95))  Banco Nacional suspended long-term financing for Sete that had been scheduled to close the next day, February 6, 2015.  (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶ 279) The financing never occurred, and Sete went into bankruptcy in 2016.  (Id. ¶¶ 485-86)

"On November 1, 2019, the FIP Sondas investment committee approved the sale of all Sete shares for the symbolic total value of R$ 1.00 (one real)."  (Id. ¶ 489 (quotation omitted))  It thus appears that EIG's $221 million investment in Sete is worthless.

II.      **PROCEDURAL HISTORY**

In 2016, EIG brought claims for fraud, aiding and abetting fraud, and conspiracy to defraud against Keppel, Petrobras, and other defendants in the United States District Court for the District of Columbia.  See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A., 246 F. Supp. 3d 52, 61 (D.D.C. 2017), aff'd, 894 F.3d 339 (D.C. Cir. 2018).  On March 30, 2017, the district court granted Keppel's motion to dismiss for lack of personal jurisdiction.  Id. at 91.

On February 6, 2018, Plaintiffs filed the Complaint in the instant action. (Dkt. No. 1)  The Amended Complaint – filed on April 30, 2018 – asserts claims for RICO conspiracy and aiding and abetting fraud.  (Dkt. No. 17)

On May 11, 2020, this Court granted in part and denied in part Keppel's motion

to dismiss the Amended Complaint (Dkt. No. 35).  See EIG Energy Fund XIV, L.P. v. Keppel

Offshore & Marine Ltd. ("EIG I"), No. 18 CIV. 1047 (PGG), 2020 WL 2319127 (S.D.N.Y. May

11, 2020).  This Court held that EIG's (1) claims were not barred by res judicata as a result of the

dismissal in the D.C. action; (2) RICO conspiracy claim failed, because "the alleged conduct

[fell] within the PSLRA's bar on predicate acts involving securities fraud," id. at *7-9; and (3)

claim for aiding and abetting fraud survived.  Id. at *10-11.

On May 26, 2020, Keppel moved for reconsideration, arguing that this Court

should not have retained supplemental jurisdiction over EIG's state law aiding and abetting

claim.  (Dkt. No. 48)  This Court denied Keppel's motion on June 26, 2020.  (Dkt. No. 54,

available at 2020 WL 3488037)

The parties subsequently filed cross-motions for summary judgment on the

Amended Complaint's aiding and abetting fraud claim.  (Dkt. Nos. 97, 104)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Motion for Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no

genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes

where the evidence is such that a reasonable jury could decide in the non-movant's favor."

Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480

F.3d 140, 145 (2d Cir. 2007)).  "When no rational jury could find in favor of the nonmoving

party because the evidence to support its case is so slight, there is no genuine issue of material

fact and a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd.

P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108,

1114 (2d Cir. 1988)).  "'[T]hat opposing parties assert competing versions of the same event is

not in itself sufficient to preclude summary judgment,' in that contradictory testimony only

establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'"  Yi Fu Chen v.

Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29,

2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y.

2009)).

   In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'[a] party may not rely on

mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d

159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex,

Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  Moreover, "'[t]he principles governing admissibility of

evidence do not change on a motion for summary judgment[,]' and district courts need only

consider admissible evidence in ruling on a motion for summary judgment."  I.M. v. United

States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55,

66 (2d Cir. 1997)).

   "Where the nonmoving party will bear the burden of proof at trial, the moving

party may establish the propriety of summary judgment by 'point[ing] to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim.'  Once the moving party has

done so, the burden shifts to 'the nonmoving party [to] come forward with admissible evidence sufficient to raise a genuine issue of fact for trial' on each essential element of their claims." Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F. Supp. 3d 473, 481 (S.D.N.Y. 2018) (quoting Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008) (alterations in Silvercreek)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

B.    **Aiding and Abetting Fraud**

"To establish liability under New York law for aiding and abetting fraud, [a plaintiff] must prove: '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 252 (S.D.N.Y.2005) (quoting Filler v. Hanvit Bank, No. 01 Civ. 9510(MGC), 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003)); Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006) (same). "'A claim for aiding and abetting fraud must be proven by clear and convincing evidence.'" de Abreu v. Bank of Am. Corp., 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011) (quoting Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 488 (S.D.N.Y. 2001)).

II.    **KEPPEL'S MOTION FOR SUMMARY JUDGMENT**

In arguing that it is entitled to summary judgment, Keppel does not "dispute[] that [it] paid bribes in connection with obtaining shipbuilding contracts from Sete," and does not "challeng[e] EIG's underlying fraud claim against Petrobras." Keppel instead argues that there

23

is no evidence that (1) it was aware that Petrobras and Sete were defrauding EIG; or (2) it substantially assisted any fraud perpetrated on EIG.  (Def. Br. (Dkt. No. 149-1) at 8, 11)

A.    **Actual Knowledge**

Keppel contends that "there is no evidence Keppel knew Petrobras (or Sete) made any of the alleged misrepresentations to EIG," and that "the collective evidence EIG has identified amounts to, at best, constructive knowledge of the alleged fraud – not actual knowledge."  (Id. at 21)

EIG counters that "Keppel erroneously conflates constructive knowledge, which is what defendants could or should have known, with circumstantial evidence that, collectively, establishes actual knowledge. . . . Here, the evidence establishes not only that Keppel 'could or should have known' that Sete investors were misled about the existence of the bribery scheme, but that Keppel actually knew Sete and Petrobras were not disclosing the bribery scheme to EIG and other Sete investors."  (Pltf. Opp. (Dkt. No. 147) at 21 (emphasis in original))

1.    **Applicable Law**

"A showing of actual knowledge of the alleged fraud is required to support a claim for aiding and abetting fraud; constructive knowledge – the possession of information that would cause a person exercising reasonable care and diligence to become aware of the fraud – is insufficient."  de Abreu, 812 F. Supp. 2d at 322 (emphasis in original).  "'The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one.'"  Id. at 323 (quoting Chemtex, LLC v. St. Anthony Enters., 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007)).

In Krys v. Pigott, 749 F.3d 117 (2d Cir. 2014), the Second Circuit distinguished "constructive knowledge" from circumstantial allegations of actual knowledge at the pleading stage:

To be "distinguished" from actual knowledge is "constructive knowledge," which is "[k]nowledge that one using reasonable care or diligence <u>should</u> have, and therefore that is attributed by law to a given person." Black's Law Dictionary 950 (9th ed. 2009) (emphasis added). However, under New York law, a complaint adequately alleges the knowledge element of an aiding and abetting claim when it pleads "not . . . constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding circumstances." <u>Oster v. Kirschner</u>, 77 A.D.3d 51, 56 (1st Dep't 2010). A failure to allege sufficient facts to support the inference that the alleged aider and abettor had actual knowledge of the fraudulent scheme warrants dismissal of the aiding and abetting claim at the pleading stage. <u>See, e.g.</u>, <u>Lerner</u>, 459 F.3d at 292-93; <u>National Westminster Bank USA v. Weksel</u>, 124 A.D.2d 144, 149 (1st Dep't), <u>leave</u> to appeal <u>denied</u>, 70 N.Y.2d 604 (1987).

<u>Krys</u>, 749 F.3d at 127 (citations altered).

The parties have not cited – and this Court has not found – a Second Circuit case that addresses in detail the difference between evidence (as opposed to allegations) of constructive knowledge and evidence of actual knowledge in the context of an aiding and abetting fraud claim. The Second Circuit has addressed the distinction in the context of other causes of action, however. In <u>Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc. ("Nomura")</u>, 873 F.3d 85 (2d Cir. 2017), for example, the court elaborated on the distinction between evidence of constructive knowledge and circumstantial evidence of actual knowledge in a securities fraud dispute.

The plaintiffs in <u>Nomura</u> were

two government-sponsored enterprises, the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie)" and Federal National Mortgage Association ("Fannie Mae" or "Fannie") . . . [that] purchased a subset of [residential mortgage-backed securities ("RMBS")] . . . from a host of private banks. Defendants-appellants Nomura and RBS sold the [plaintiffs] seven of these certificates . . . using prospectus supplements (the "ProSupps"). Each ProSupp described the creditworthiness of the loans supporting the Securitization, including an affirmation that the loans "were originated generally in accordance with the underwriting criteria."

. . . .

25

> [At trial,] [t]he [C]ourt found that Defendants violated Sections 12(a)(2) and 15 of the Securities Act . . . and analogous provisions of the Virginia and D.C. Blue Sky laws . . . by falsely stating in the ProSupps that, <u>inter alia</u>, the loans supporting the Securitizations were originated generally in accordance with the pertinent underwriting guidelines.

<u>Id.</u> at 96-97 (footnote omitted).

On appeal, defendants argued that they were not liable for fraud, because Freddie and Fannie "were or should have been aware that the ProSupps' underwriting guidelines statements were false." <u>Id.</u> at 115. Defendants challenged the district court's finding that plaintiffs' "expertise in the general mortgage loan market did not provide adequate knowledge of the specific untruths in the ProSupps." <u>Id.</u> at 116. In rejecting defendants' argument, the Second Circuit explained that – as with the aiding and abetting fraud standard at issue in the instant case – the

> [a]bsence-of-[k]nowledge [e]lement [of Section 12 of the Securities Act] . . . require[d] plaintiffs to prove only that they in fact lacked knowledge of the falsity. . . . Actual knowledge may be proven or disproven by direct evidence, circumstantial evidence, or a combination of the two. Publicly available information may provide relevant circumstantial evidence of actual knowledge. However, Section 12's amenability to circumstantial evidence of actual knowledge should not be viewed as creating a constructive knowledge standard.

<u>Id.</u> at 122 (citation omitted).

The Second Circuit went on to reject defendants' argument "that [plaintiffs] could have reasonably inferred that the ProSupps contained false statements from their . . . experience with the mortgage loan originators" (<u>id.</u> at 123):

> At most, [Freddie and Fannie] were aware that many [of the RMBS] were supported by loans that were not originated in accordance with the underwriting guidelines. There is no evidence that [Freddie or Fannie] knew whether the specific [securities] at issue were within or without the class of infected [securities]. Without that crucial piece of information, [our case law] precludes a reasonable jury from holding that [Freddie and Fannie] actually knew of the specific misstatements in the ProSupps.

<u>Id.</u> at 124.

In support of its holding, the Nomura court cites Viacom International, Inc. v. YouTube, Inc., 676 F.3d 19 (2d Cir. 2012), a copyright case in which the court found that "evidence . . . that YouTube knew, based on internal surveys of its website, that between 75% and 80% of its content contained copyright material" did not demonstrate that "YouTube had actual and specific knowledge of the copyrighted material Viacom accused it of hosting." Id. (discussing Viacom, 676 F.3d at 32-34).

The Restatement of Torts' discussion of the actual knowledge standard for aider and abettor liability is consistent with the Second Circuit's teaching in Nomura and Viacom that "red flag" documents showing the defendant's awareness of a probability of fraud do not amount to actual knowledge:

> Swindler establishes a fraudulent investment firm.  Customer, unaware of the fraud, wires money to Swindler in hopes of making a profit.  Swindler disappears with Customer's money.  Customer sues Bank for aiding and abetting Swindler's misconduct.  Customer offers evidence that Bank had documents revealing that Swindler's enterprise was fraudulent, and that Bank nevertheless processed customer's wire transfer.  Customer's claim fails because Bank's possession of revealing documents [is] not "knowledge."

Restatement (Third) of Torts:  Liability for Economic Harm § 28, illus. 5 (2020).[10]

Courts in this District applying New York law, as well as New York state courts, apply the actual knowledge standard at summary judgment.  See de Abreu, 812 F. Supp. 2d at 326 (knowledge of money laundering did not amount to actual knowledge of Ponzi scheme); Silvercreek, 346 F. Supp. 3d at 488-89 (bank employees' testimony that "the Enron people were paying themselves a lot of money," and that the bank employees felt like they "need[ed] to go take a shower and go to confession" after executing transactions for Enron, raised an issue of fact

---

[10]  New York courts have followed the Restatement of Torts as to the elements of aider and abettor liability in the fraud context.  See, e.g., Small v. Lorillard Tobacco Co., 94 N.Y.2d 43, 57 (1999).

as to actual knowledge of Enron's accounting fraud regarding related-party transactions);

Chemtex, 490 F. Supp. 2d at 547 (defendant lender entered into factoring agreements with

defendant predecessor company and then with defendant successor company; lender's

knowledge that (1) $231,000 in [successor company's] accounts receivable bore an invoice date

prior to the execution of [its] Factoring Agreement; (2) [predecessor company] and [successor

company] sold similar inventory to some of the same customers; and (3) [successor company]

could not have generated "almost $2.4 million in sales without any material purchase of

inventory" amounted to – at most – constructive knowledge of fraudulent conveyance by

predecessor company to successor company); Glob. Mins. & Metals Corp. v. Holme, 35 A.D.3d

93, 102 (1st Dep't 2006) (defendant shareholder of closely held corporation breached

shareholder agreement by investing in rival company; shareholder's wife's request for a dividend

from rival company was not evidence of actual knowledge of the breach, because "[t]he fact that

[she] knew [her husband] was a shareholder and officer of [his company] does not show that she

knew his dealings with [the rival company] violated any agreements").

### 2.   Analysis

Drawing all reasonable inferences in favor of EIG, the evidence in the record

indicates that Keppel knew that (1) EIG was an investor in Sete; (2) Petrobras and Sete were

perpetrating a bribery scheme; and (3) some Petrobras/Sete investor materials – which Keppel

received as a potential investor in Sete – did not disclose the bribery scheme.

There is no evidence that Keppel knew that any particular statement made by

Petrobras or Sete was communicated to EIG, however.  This is for the most part undisputed.

(See Def. R. 56.1 Cntrstmt. (Dkt. No. 144-2) ¶¶ 520-22, 526-28, 538-39; Pltf. R. 56.1 Reply

Stmt. (Dkt. No. 143-3) ¶¶ 520-22, 526-28, 538-39)  With respect to the slide deck entitled "The

Drilling Rigs Project:  Petrobras' Strategy for its successful implementation," EIG contends that

a generic disclaimer to "U.S. investors" about the use of certain oil and gas resource terminology creates a fact issue as to whether Keppel knew that EIG – a U.S. investor – saw this slide deck. (Pltf. R. 56.1 Reply Stmt. (Dkt. No. 143-3) ¶ 516)  But the disclaimer is boilerplate and does not refer to EIG.  (Def. R. 56.1 Cntrstmt., Ex. 137 (Dkt. No. 156-161) at 6)

As with Keppel's knowledge of specific communications made by Petrobras or Sete to EIG, there is no evidence that Keppel was aware of a general strategy by Petrobras or Sete to conceal bribery and corruption-related risks from EIG.  There is no evidence, for example, that Petrobras or Sete instructed or cautioned Keppel not to disclose the bribery scheme to EIG on the shipyard tours, which Petrobras and Sete knew about and helped to arrange. Acknowledging that EIG does not have to "prove Keppel's knowledge of each specific misrepresentation alleged by EIG" (Pltf. Opp. (Dkt. No. 147) at 22), EIG does have to proffer evidence that creates a material issue of fact as to whether Keppel had actual knowledge that Petrobras and Sete were perpetrating a fraud on EIG.

While EIG argues that Keppel could have inferred that Petrobras and Sete were defrauding EIG merely from (1) EIG's status as an investor in Sete, and (2) the existence of Petrobras and Sete investor materials reflecting material omissions (Pltf. Opp. (Dkt. No. 147) at 23-27), as explained above, "red flag" documents and probable awareness amount to constructive knowledge, not actual knowledge.

And while EIG argues that (1) Keppel understood Petrobras and Sete were soliciting investors, including EIG, and (2) Keppel had motive and opportunity – i.e., scienter – with respect to the fraud on EIG (id. at 29-32), this argument is not persuasive.

Assuming <u>arguendo</u> that Keppel knew that Petrobras and Sete were raising money from investors such as EIG, that does not amount to actual knowledge of what Petrobras and Sete were telling or not telling EIG in soliciting EIG's investment.

To the extent EIG argues that it can raise a material issue of fact by demonstrating scienter in lieu of actual knowledge, that is incorrect. The actual knowledge requirement is black letter law. <u>Krys</u>, 749 F.3d at 127; <u>de Abreu</u>, 812 F. Supp. 2d at 322-23 (citing cases); Restatement (Third) of Torts: Liability for Economic Harm § 28. And the cases EIG cites in support of this argument (<u>see</u> Pltf. Opp. (Dkt. No. 147) at 22, 30-31) are either not on point or not persuasive.

For example, <u>Wight v. BankAmerica Corp.</u>, 219 F.3d 79, 91-92 (2d Cir. 2000) addresses a motion to dismiss rather than a summary judgment motion, and holds that allegations of motive and opportunity can suffice at the pleading stage "for the simple reason that 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" <u>Id.</u> (quoting <u>Connecticut Nat. Bank v. Fluor Corp.</u>, 808 F.2d 957, 962 (2d Cir. 1987)). And to the extent that <u>Primavera Familienstifung v. Askin</u>, 130 F. Supp. 2d 450 (S.D.N.Y. 2001) suggests that evidence of "a motive for participating in a fraudulent scheme and a clear opportunity to do so" suffices in lieu of evidence of actual knowledge at summary judgment, that court erroneously relies on <u>Dreieck Finanz AG v. Sun</u>, No. 89 Civ. 4347, 1990 WL 11537, at *12 (S.D.N.Y. Feb. 9, 1990), a motion to dismiss opinion that analyzes the Rule 9(b) pleading standard. <u>Askin</u>, 130 F. Supp. 2d at 507. In any event, the language in <u>Askin</u> that EIG relies on is <u>dicta</u>, because there was ample evidence of the aider and abettor's actual knowledge in that case. <u>See id.</u> at 508 (employee of aider-and-abettor brokerage firm stating, "we are defrauding investors").

In sum, no reasonable jury could find that Keppel had actual knowledge of Petrobras and Sete's fraud on EIG. Accordingly, Keppel is entitled to summary judgment on EIG's aiding and abetting claim.

**B.** **Substantial Assistance**

Keppel also argues that "[d]iscovery has revealed no evidence to support EIG's central claim that 'Keppel did its part in knowingly concealing the illicit bribery and kickback scheme from EIG in order to induce EIG and plaintiffs to invest in Sete.' EIG's lack of evidence to prove this essential element is another independent basis to grant summary judgment in Keppel's favor." (Def. Br. (Dkt. No. 149-1) at 43-44 (quoting Am. Cmplt. (Dkt. No. 17) ¶ 70))

**1.** **Applicable Law**

"'Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'" 2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp., 816 F. Supp. 2d 222, 237 (S.D.N.Y. 2011) (quoting Lerner, 459 F.3d at 295), aff'd, 503 F. App'x 51 (2d Cir. 2012). "'However, . . . mere inaction . . . constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'" Id. (quoting Lerner, 459 F.3d at 295); accord Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur, 892 F.2d 199, 207 (2d Cir. 1989). "Whether the assistance is substantial or not is measured, in turn, by whether 'the action of the aider and abettor proximately caused the harm on which the primary liability is predicated.'" Winnick, 406 F. Supp. 2d at 256 (quoting In re WorldCom, Inc. Sec. Litig., 382 F. Supp. 2d 549, 560 (S.D.N.Y. 2005)). "Aider and abettor liability will not attach where the injury was not a direct or reasonably foreseeable result of the defendant's conduct." Filler, 2003 WL 22110773, at *2. "'Awareness and approval, standing alone, do not constitute substantial assistance.'" Fid.

Funding of California, Inc. v. Reinhold, 79 F. Supp. 2d 110, 122 (E.D.N.Y. 1997) (quoting

Armstrong v. McAlpin, 699 F.2d 79, 92 (2d Cir.1983)).

"Knowledge of wrongdoing and substantial assistance of it are separate elements

of liability for aiding and abetting a tort. . . . [H]owever, the plaintiff's evidence on one of those

two elements sometimes may color the interpretation of the other.  To be sure, substantial

assistance must be shown in all cases; if it was not provided, no amount of knowledge on the

defendant's part can compensate.  But a clear understanding of wrongdoing can make a small act

of assistance more blameworthy than it would seem if the defendant's knowledge were less

certain or precise."  Restatement (Third) of Torts: Liability for Economic Harm § 28, cmt. d.

Accordingly, "[t]here must . . . be a 'nexus between the primary fraud, the alleged aider and

abettor's knowledge of the fraud, and what the alleged aider and abettor did with the intention of

advancing the fraud's commission.'"  Krys, 749 F.3d at 127 (alterations omitted) (quoting

Franco v. English, 210 A.D.2d 630, 633 (3d Dep't 1994), abrogated on other grounds by

Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 561 (2009)).  See De Sole v.

Knoedler Gallery, LLC, 139 F. Supp. 3d 618, 659 (S.D.N.Y. 2015) ("Plaintiffs [have not]

demonstrated that [defendant art gallery owner] and [defendant art gallery employee] knowingly

and intentionally provided substantial assistance to those allegedly defrauding [art gallery's]

customers through the sale of [forged] [p]aintings"; granting owner's and employee's motions

for summary judgment on aiding and abetting fraud claim).

## 2.    **Analysis**

In connection with the substantial assistance issue, the Court has considered, inter

alia, (1) whether Keppel drafted or assisted in drafting fraudulent misstatements that were made

to EIG; (2) whether the bribery scheme and investment fraud were so highly interdependent that

Keppel's participation in the bribery scheme amounted to substantial assistance in the fraud on

EIG; and (3) the particular acts of alleged substantial assistance by Keppel that EIG cites.  As discussed below, the Court concludes that EIG has not proffered evidence that creates a material issue of fact as to whether Keppel substantially assisted Petrobras and Sete in defrauding EIG.

a.     <u>**Alleged Fraudulent Misstatements**</u>

While there is no evidence that Keppel drafted or assisted in drafting Petrobras' or Sete's alleged misstatements to EIG, Plaintiffs cite three categories of statements made by Keppel that allegedly contain misrepresentations or omissions about the bribery scheme:  (1) Keppel's compliance statements in its Engineering, Procurement, and Construction Contracts; (2) Keppel's "anticorruption letters"; and (3) Keppel's public denials of wrongdoing.  (Pltf. R. 56.1 Stmt. (Dkt. No. 143-1) ¶¶ 144-57, 238-42, 268-89)  None of these statements constitutes or effected a fraud on EIG.

As to the Engineering, Procurement, and Construction Contracts, the drafts that EIG reviewed were prepared by Petrobras and/or Sete – not Keppel – and they do not mention Keppel.  That Keppel signed subsequent versions of the drafts EIG reviewed does not retroactively render these draft contracts statements made by Keppel.  As to the signed versions of the contracts, there is no evidence that EIG ever reviewed or relied on them.

Keppel's January 16, 2015 "anticorruption letters" are likewise irrelevant, because (1) they postdate EIG's last investment in Sete, which was made on January 6, 2015, and (2) there is no evidence that EIG saw or relied on these letters.  As to Keppel's February 2015 public denials of wrongdoing, these public statements were made long after EIG had made its last investment in Sete.  See Washington State Inv. Bd. v. Odebrecht S.A., No. 17 CIV. 8118 (PGG), 2023 WL 5016787, at *15 (S.D.N.Y. Aug. 4, 2023) (holding that public denials of wrongdoing by Brazilian company involved in bribery scheme – which postdated plaintiff's

33

investment, and on which plaintiff did not rely – were irrelevant to plaintiff's investment fraud claim).

In sum, there is no evidence that Keppel drafted or disseminated fraudulent misstatements on which EIG relied.

**b.      Whether Liability May be Predicated on the Alleged Interdependent Nature of the Fraud and Bribery Schemes**

In denying Keppel's motion to dismiss EIG's aiding and abetting fraud claim in EIG I, this Court noted that the Amended Complaint alleged a """"highly interdependent scheme in which both [the principal and the aider and abettor] benefited."""" EIG I, 2020 WL 2319127, at *10 (quoting Nathel v. Siegal, 592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008) (in turn quoting ABF Capital Mgmt. v. Askin Capital Mgmt., 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997)) (brackets in EIG I). The Court went on to conclude that the Amended Complaint sufficiently alleged substantial assistance. Id. In opposing Keppel's motion for summary judgment, EIG renews its "highly interdependent scheme" argument, citing once again to ABF and Nathel. (Pltf. Opp. (Dkt. No. 147) at 12-16)

EIG I, ABF, and Nathel were all decided at the pleading stage. In ABF, a group of hedge funds allegedly represented to investors that they would invest only in low-risk mortgage-backed securities. The hedge funds instead invested their clients' money in exceptionally high-risk securities. When the hedge funds collapsed, litigation ensued. The defendants in ABF included brokers who – with full knowledge that the hedge funds were being marketed as conservative investment opportunities – created the high-risk securities and sold them to the hedge funds. ABF, 957 F. Supp. at 1315-16. The brokers were not alleged to have drafted the prospectuses and other documents that the hedge funds provided to investors,

however.  In denying defendants' motion to dismiss, the ABF court relied on the interdependent

nature of the brokers and hedge funds' illegal conduct:

> It is true that where the primary fraud claim is predicated on misrepresentations in or omissions from documents, the substantial assistance of an unrelated third party must generally relate to the preparation or dissemination of the false statements themselves. However, Plaintiffs here allege a highly interdependent scheme in which both parties benefitted from [the hedge funds'] fraudulent activity.  In such circumstances, allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient.

Id. at 1228 (citations omitted).

In Nathel, the principal defendant created oil and gas investment partnerships, for

which he solicited investments.  The defendant aiders and abettors were managing partners.

Plaintiffs alleged that the aiders and abettors

> worked with [the principal defendant] to make the partnerships appear legitimate, by holding themselves out as oil and gas experts qualified to serve as Managing Partners.  In fact, [the aider and abettor defendants] were not oil experts who would participate in oil and gas site selection, they were respectively, the CEO of a children's day camp and a practicing attorney.

Nathel, 592 F. Supp. 2d at 459.  In denying a motion to dismiss, the court held that by "signing

the partnership agreements" – which the alleged aiders and abettors knew would be "used to

deceive investors into believing that the partnerships were directed by competent and

experienced managing partners" – the aiders and abettors had provided substantial assistance.

Id. at 469-70.

ABF and Nathel have been cited almost exclusively in decisions addressing

motions to dismiss.  The ABF litigation did proceed to summary judgment, however, resulting in

the decision cited above as Askin, 130 F. Supp. 450.  The evidence at summary judgment was

consistent with the allegations against the brokers in the complaint.  In denying the brokers'

motion for summary judgment, the court held that "a reasonable jury could find that [the brokers] were involved in . . . a symbiotic fraudulent scheme." Id. at 512.

The Court concludes that ABF, Nathel, and Askin have no application here. In those cases, the aiders and abettors played key roles in "symbiotic" fraud schemes. For example, in ABF/Askin, the brokers created the high-risk securities and sold them to the hedge funds, knowing that they would be marketed to unsuspecting investors as conservative investments. And in Nathel, the managing partners – who had no experience in the gas and oil industry – posed as gas and oil industry experts in order to assist the principal fraudster in making the partnerships appear as legitimate, worthy investments. The aiders and abettors in these cases thus substantially assisted in the formation of businesses that were entirely fraudulent from the outset, and could not escape liability based on the mere fact that they had not drafted the investment materials.

Here, by contrast, Petrobras, Sete, and Keppel were not engaged in a sham business scheme. They were involved in a real project to build offshore oil drilling equipment that would be used to extract oil from a massive oil field that had been discovered off the coast of Brazil. Petrobras, Sete, and Keppel engaged in a bribery scheme, which Petrobras and Sete did not disclose to Sete investors, thereby committing investment fraud. But Keppel's participation in the bribery scheme, although criminal, was not inherently fraudulent vis-à-vis EIG, and the fraud perpetrated on EIG was not the natural or inevitable culmination of Keppel's criminal conduct. Keppel's bribery to procure contracts was thus attenuated from Petrobras and Sete's investment fraud on EIG, which Keppel did not know about and did not intend.

While Petrobras, Sete, and Keppel all benefited from the bribery scheme, the investment fraud that Petrobras and Sete perpetrated on EIG was not dependent on the bribery

scheme, or on Keppel's payment of bribes.  The instant case therefore does not involve the sort of "symbiotic fraudulent scheme" at issue in ABF, Askin, and Nathel.  There is thus no reason to broaden the exception – set out in ABF, Askin, and Nathel – to the usual rule that aiding and abetting an investment fraud requires assistance in the making of the fraudulent misstatements themselves.

EIG argues, however, that "the bribery scheme involving Sete was, from its very inception, wholly dependent on Sete and Petrobras'[] ability to fraudulently procure financing from third-party investors, whose monies would be used to fund the construction contracts, a portion of which Keppel would 'kick back' as bribes."  (Pltf. Opp. (Dkt. No. 147) at 13)  But this argument merely demonstrates how attenuated Keppel's bribes are from the investment fraud committed by Sete and Petrobras.  There is no evidence that investor money – much less EIG's investment in particular – was necessary to finance the bribes Petrobras paid to public officials or the bribes Keppel paid to Sete.

The Court concludes that the alleged "highly interdependent nature" of the investment fraud and bribery schemes does not excuse EIG from satisfying the usual rule that aiding and abetting fraud requires proof of involvement in the making of the fraudulent misstatements.

### c.      Evidence of Particular Actions by Keppel

EIG contends that Keppel substantially assisted the investment fraud through the shipyard tours and various acts of concealment.  (Pltf. Opp. (Dkt. No. 147) at 36-51)

### i.      Shipyard Tours

There is evidence that the August 2011 and March 2012 shipyard tours were part of EIG's due diligence in connection with its Sete investment.  As discussed above, it is undisputed that Keppel did not disclose the bribery scheme to EIG or its agents during the

shipyard tours.  It is likewise undisputed, however, that EIG and its agents did not ask about bribery or corruption during the shipyard tours, and that Keppel did not make any affirmative misrepresentations.

EIG's complaint about Keppel's actions during the shipyard tours is thus a complaint of non-disclosure.  But there is no evidence that Keppel owed EIG a fiduciary duty that would have required Keppel to disclose the criminal conduct to EIG.  See Turtur, 892 F.2d at 207 (stating that the "general rule" is that "'inaction can create aider and abettor liability only where there is a conscious or reckless violation of an independent duty to act'") (quoting IIT v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980), abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010)).[11]

The Court concludes that the shipyard tours do not constitute substantial assistance for purposes of EIG's aiding and abetting fraud claim.

### ii.   Acts of Concealment

EIG contends that Keppel (1) "facilitated and concealed the bribery through fraudulent consulting agreements, as it admitted in the DPA"; (2) made "false representations in [engineering, procurement, and construction] contracts [that] concealed the scheme"; and (3) "continued to lie about its criminal conduct [in "anticorruption letters" and public denials of

---

[11]  EIG cites Kingstone v. Oceanography Dev. Corp., No. 75 CIV. 2213, 1978 WL 1077 (S.D.N.Y. Apr. 11, 1978), to argue that "Keppel's concealment of the bribery scheme during these visits substantially assisted Sete because they helped Sete solicit investments from unsuspecting investors like EIG, allowing the fraud to continue." (Pltf. Opp. (Dkt. No. 147) at 45)  In Kingstone, the aider-and-abettor defendant provided "passive assistance in not mentioning the facts about the [fraud]" during a meeting between the primary fraudster and the fraud victim.  The victim had requested that the alleged aider-and-abettor defendant attend the meeting because of his reputation.  During the meeting, both the principal defendant and the aider-and-abettor defendant provided false assurances to the victim about a defaulted loan.  1978 WL 1077, at *2, *5.  There are no comparable facts here.

wrongdoing] as the scheme unraveled." (Pltf. Opp. (Dkt. No. 147) at 36-40, 47-51 (capitalization altered))

In support of its substantial assistance argument, EIG cites Keppel's admission in paragraph 21 of the DPA that "agreements on behalf of [Keppel] with consulting companies controlled by [Keppel's] Consultant [Zwi Skorniki] . . . were intended to facilitate bribe payment[s] to obtain business from Petrobras and Sete Brasil and to conceal their purpose." (Pltf. Opp. (Dkt. No. 147) at 37) EIG argues that "[t]his Court should not allow Keppel" to "side step [the admissions it made in] the DPA." (Id. at 36) But the DPA does not mention investors in Sete, and it cannot be inferred from the DPA that Keppel drafted the sham consulting contracts with Skorniki in order to conceal the bribery scheme from Sete investors.

In any event, the sham consulting agreements with Skorniki, and the "laundering [of] bribe payments through shell companies," do not constitute substantial assistance, because there is no evidence that Keppel (1) knew that Petrobras and Sete were perpetrating a fraud on EIG, or (2) knew or intended that its collusion with Skorniki would conceal the bribery scheme from EIG and other Sete investors and thereby further the investment fraud being committed by Petrobras and Sete. The record simply does not present the necessary nexus between Keppel's actions and the primary investment fraud.

As to the Engineering, Procurement, and Construction Contracts; the "anticorruption letters"; and the public denials of wrongdoing, these are irrelevant for reasons explained above. In any event, they also are not substantially linked to Petrobras and Sete's fraud on EIG. There is no evidence that Keppel intended its statements to conceal the bribery scheme from EIG.

In sum, no reasonable juror could find that Keppel's alleged acts of concealment substantially assisted the investment fraud perpetrated by Petrobras and Sete.

*      *      *      *

Because Keppel has demonstrated that there is no material issue of fact as to its actual knowledge of or substantial assistance in the investment fraud perpetrated by Petrobras and Sete on EIG, Keppel's motion for summary judgment (Dkt. No. 104) will be granted. For these same reasons, EIG's motion for summary judgment (Dkt. No. 97) will be denied.

## CONCLUSION

For the reasons stated above, Keppel's motion for summary judgment (Dkt. No. 104) is granted, and EIG's motion for summary judgment (Dkt. No. 97) is denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 97, 104), enter judgment for Defendant, and close this case.

Dated: New York, New York
       March 20, 2024

SO ORDERED.

Paul R. Gardephe

Paul G. Gardephe
United States District Judge